**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*,[1] | Case Nos. 26-16388 (CMG) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ASSAF RAVID, CHIEF RESTRUCTURING OFFICER OF THE SIMAD DEBTORS, IN SUPPORT OF THE SIMAD DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN INTERIM ORDER (I) AUTHORIZING THE SIMAD DEBTORS' IMMEDIATE USE OF CASH COLLATERAL AND EXISTING BANK ACCOUNTS FOR PURPOSES OF SATISFYING PREPETITION GROSS SALARIES, PAYROLL TAXES, AND OTHER CRITICAL EXPENSES, (II) AUTHORIZING THE SIMAD DEBTORS TO SATISFY AND DIRECT PAYROLL BANKS TO HONOR CERTAIN PREPETITION GROSS SALARIES AND PAYROLL TAXES OF THEIR EMPLOYEES, (III) AUTHORIZING THE SIMAD DEBTORS' CONTINUED USE OF THEIR CASH MANAGEMENT**

---

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of SIMAD Debtor SIMAD Holding Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

**SYSTEM, HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, AND CONTINUE ADDITIONAL TRANSACTIONS, AND (IV) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Assaf Ravid, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.     I presently serve as Chief Restructuring Officer (the "CRO") for the SIMAD Debtors pursuant to an engagement letter dated as of June 2, 2026. I previously served as the Chief Restructuring Officer / CEO at All Year Holdings Ltd from March 2021 to April 2023, overseeing the restructuring of a $2 billion-dollar real estate portfolio in New York City. I have also served as the Chief Restructuring Officer of the William Vale Hotel between 2022 and June 2024. In addition, I serve as the plan administrator for both estates. I hold various roles representing foreign publicly traded bond holders for distressed US and BVI Real estate companies. Prior to these roles, I was the Managing Director at CGI | Real Estate Investment Strategies until 2020. Earlier in my career, I worked as an associate at R.D.Ravid & Co. and as an associate at Danziger, Klagsbald & Co. from 2003 to 2004. I completed my LLB degree in Law from Tel Aviv University, where I studied from 2000 to 2003.

2.     I submit this declaration (the "Declaration") in support of the *SIMAD Debtors' Emergency Motion for Entry of An Interim Order (I) Authorizing the SIMAD Debtors' Immediate Use of Cash Collateral and Existing Bank Accounts For Purposes of Satisfying Prepetition Gross Salaries, Payroll Taxes, and Other Critical Expenses, (II) Authorizing the Debtors to Satisfy and Direct Payroll Banks to Honor Certain Prepetition Gross Salaries and Payroll Taxes of their Employees, (III) Authorizing the SIMAD Debtors' Continued Use of Their Cash Management System, Honor Certain Prepetition Obligations Related Thereto, and Continue Additional*

2

*Transactions, and (IV) Granting Related Relief* (the "Motion"),[2] seeking entry of an emergency interim order (a) authorizing the SIMAD Debtors' emergency use of cash, including cash collateral, and their existing bank accounts for purposes of satisfying prepetition gross salaries, payroll taxes and other emergent expenses, and granting adequate protection as necessary; (b) authorizing the SIMAD Debtors to direct their banks to honor certain prepetition gross salaries, payroll taxes and other related expenses of their employees; and (c) authorizing, but not directing, the SIMAD Debtors to (i) continue using their cash management system, (ii) honor certain prepetition obligations related thereto, and (iii) continue additional transactions and funding consistent with the SIMAD Debtors' historical practices funded through a centralized account under the control of the SIMAD CRO; and (d) granting related relief, all as more fully set forth in the Motion.  Based upon information available to date, a list of the SIMAD Debtors' bank accounts that the SIMAD Debtors are requesting continued access to was prepared and attached as **Exhibit B** to the Motion, and, upon information and belief, those bank accounts are used to fund all of the camp related expenses.

3.        Since I was engaged by the SIMAD Debtors on June 2, 2026, I have been working diligently with the SIMAD Debtors' management and other professionals to understand, analyze, and take efforts to control the SIMAD Debtors' businesses and operations.   In connection with these efforts, I have developed relevant experience and expertise regarding the SIMAD Debtors, their operations, day-to-day business affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases.  I have also actively worked with the necessary individuals at the SIMAD Debtors' respective campsites, including the camp directors, in preparation for the camp season due to begin in the upcoming weeks.  Some of the information in

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

the Motion, and set forth in this Declaration, was obtained by publicly available information concerning the SIMAD Debtors.

4.      I am over the age of eighteen (18) years, and if called upon to testify, I would testify competently to the facts and opinions set forth in this Declaration.  All statements in this Declaration are based upon: (a) my personal knowledge, belief, or opinion; (b) information learned from my review of the SIMAD Debtors' records maintained in the ordinary course of their business; (c) information supplied to me and/or verified by the SIMAD Debtors' employees or advisors working directly with me or under my supervision, direction, or control; and/or (d) my knowledge, skill, education, experience, and/or training concerning financial restructurings.  Due to the circumstances of my recent engagement, I have limited visibility into the SIMAD Debtors' financial dealings and their overall operations.  As part of my engagement, I will continue to investigate these issues, and others, over the coming weeks and months ahead.

5.      On June 4, and June 5, 2026 (collectively, the "Petition Date"), each of the SIMAD Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The SIMAD Debtors have simultaneously filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The SIMAD Debtors are operating their business and managing their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

6.      The SIMAD Debtors are all subsidiaries of SIMAD Holdings Ltd., a BVI Holding Company which raised bonds with a par value of NIS 620,000,000 on the Tel Aviv Stock Exchange

in December 2025.  Since 2006, the SIMAD Debtors have largely operated as summer camps.[2] The SIMAD Debtors employ thousands of employees over their various properties, including directors, counselors, educational staff, medical staff, kitchen staff, and maintenance teams.  The SIMAD Debtors recruit high-quality staff who have ample experience in fields of training, pedagogy, safety, management and the like.  In addition to employing regionally located camp staff, the SIMAD Debtors also hire international staff members for the summers who reside in the United States on a work visa.

7.    Within the summer camp framework of the SIMAD Debtors' business operations, the SIMAD Debtors purchase, manage and operate summer camps for children and teenagers (aged 7 to 16).  As of the Petition Date, the SIMAD Debtors operate 30 summer camps which are primarily active during the summer months (June through August).[3]  Eight of these camps are day camps and the remaining are sleepaway camps.  The SIMAD Debtors' summer camps are located predominantly throughout the eastern United States region, including in New Jersey, New York, Maine, Pennsylvania, among others, in which approximately 20,500 children enroll each year.  As much as 5% of the campers are from outside of the United States.

8.    The SIMAD Debtors' camps capture a large and diversified audience through the various types of camp-options offered, such as camps focused on sports, academics, arts, technology, and religion.  Each camp has its own unique character and internal culture.  The camps are separately branded and operate independently, including through their own management team, individualized staff, distinct accounting departments, and dedicated operational infrastructure.  An

---

[2]    Certain affiliates of the SIMAD Debtors own and operate multifamily properties, offices, hotels, and retail space. Those affiliates also filed emergency chapter 11 petitions and will seek to be separately administered from the SIMAD Debtors' chapter 11 cases.

[3]    One of those camps, Willow Lake Day Camp, is not a chapter 11 debtor.

average summer camp operates on dozens to hundreds of acres of land which include residential facilities (i.e., cabins or rooms), a central dining hall, sports facilities (basketball, soccer, and tennis courts, swimming pools), arts and crafts areas, theatre, natural spaces, hiking trails, and a clinic. The camp's daily activities are typically structured by pre-planned, full day agendas and include wake-up calls, breakfast, morning activities, lunch breaks, afternoon activities, dinner, and evening social activities. The camps operate full residential programs under the supervision of a professional staff, with each group of campers assigned to a dedicated counselor. All in all, the camps provide a comprehensive package where each camper is covered for their accommodation, meals, classes, activities, basic medical services, and sometimes organized transportation from central pick-up points. These are services that the SIMAD Debtors arrange for well in advance of the summer to make sure the appropriate vendors and accommodations are ready for the season.

9. The camps' main source of income is derived from payments of the registration fees made by parents for their children's participation in the summer camps. Deposits for any given summer are due the year prior. The SIMAD Debtors' expenses for one summer season alone cost tens of millions. Registration and payments are made in advance of the summer season. Another portion of income, albeit less material, is generated through the sale of food and clothing on the campgrounds, as well as from the SIMAD Debtors leasing the space during the year to private events or groups and educational institutions.

10. Each camp maintains and operates its own bank account for operating expenses. Effective as of the Petition Date, the SIMAD Debtors' controlling shareholders, David Shabsels and Michael Shabsels, ceded control over the SIMAD Debtors' bank accounts to the SIMAD CRO. The CRO is in the process of assessing the finances maintained in each of the bank accounts and familiarizing himself with the SIMAD Debtors' operational expenses.

11.     Further, the Debtor SIMAD Holdings Ltd. ("SIMAD") also holds certain certificates of indebtedness (nonconvertible) which are being offered to the public in Israel and are registered for trading on the Tel Aviv Stock Exchange, then, for as long as securities of the Company namely debentures that are publicly held (the "Debentures (Series A)").  The Debentures (Series A) with a par value of NIS 620,000,000 (or approximately $211,600,000) bear a fixed annual interest rate of 7% and are not linked (principal and interest) to any index.  In order to secure the SIMAD Debtors' obligations towards certain Israeli Bondholders with respect to the Debentures (Series A), SIMAD pledged certain collateral in favor of the Bondholders and the Trustees for the Bondholders.[4]  The principal payments of the Debentures (Series A) were to be made annually on November 30 each year from 2026 through 2030.  The interest of the Debentures (Series A) was to be paid semi-annually on May 31 and November 30 from 2026 through 2030. The SIMAD Debtors defaulted in making the first interest payment of the Debentures (Series A) due on May 31, 2026.

12.     These chapter 11 cases were precipitated by the potential catastrophic impact on the SIMAD Debtors' ability to operate resulting from the substantial purported duplicate debt obligations to which the SIMAD Debtors were made a party.  Among other things, as of May 31, 2026, the SIMAD Debtors were in default on payments owed to Israeli Bondholders in connection with obligations due under certain Debentures (Series A).  Further, in the days leading up to the filings, the SIMAD Debtors' and their affiliates' estates were at risk of that certain merchant cash advance and short-term funders and lenders (the "MCA Lenders") alleged to be owed in excess of $100,000,000 may exercise remedies upon default that may have left the SIMAD Debtors without

---

[4]   The Trustees have asserted a lien on all of the SIMAD Debtors' assets, including cash.  The SIMAD Debtors are continuing to review the liens and security interests held by the Trustees for the Bondholders, and all rights of the parties are reserved.

access to cash and accounts receivable.[5]  In efforts to mitigate that risk within the weeks leading up to opening day for the various summer camps, the SIMAD Debtors appointed me as CRO to help guide the process through the chapter 11 proceedings.

13.     As discussed in greater detail in the Motion, the immediate relief requested by the SIMAD Debtors for the emergency use of their cash, including their cash collateral, and their existing bank accounts, is crucial to avoid interruption of the SIMAD Debtors' operations caused by lack of funds.  Imminently, the SIMAD Debtors require the relief requested in the Motion given that children are scheduled to start at the summer camps in a matter of weeks; families have already paid for their children to attend the SIMAD Debtors' camps for this summer; and the SIMAD Debtors have taken substantial steps towards preparing the necessary accompanying services and accommodations for the 2026 camp season, including having arranged for transportation services, meal preparation, special enrichment activities, and have hired and fully trained their seasonal staff (including the international staff members who are in the United States on visas and must comply with strict legal obligations regarding their employment, housing and overall safety).  Unless the SIMAD Debtors are authorized to use their cash, including cash collateral, and existing bank accounts, the SIMAD Debtors will be unable at this critical juncture to satisfy prepetition gross salaries, payroll taxes and other emergent and related expenses, which are critical to getting the camps open and continue the SIMAD Debtors' business operations.  In particular, the camp staff's support for the SIMAD Debtors' reorganization efforts is critical and cannot be jeopardized.

14.     As a result of the foregoing, I believe that the relief sought therein is necessary and in the best interests of the SIMAD Debtors' estates, as it will allow the SIMAD Debtors to limit

---

[5]     Based on information available, the SIMAD Debtors do not believe that the MCA Lenders have a perfected interest in the cash in the SIMAD Debtors' bank accounts through deposit account control agreements.

operational disruption at the outset of these chapter 11 cases.  The SIMAD Debtors' request for immediate relief in the Motion has been narrowly tailored to relief necessary to avoid immediate and irreparable harm to the Debtors' estates.

Pursuant to 28 U.S.C. § 1748, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief based upon information available to me as of the date of this Declaration.

Dated: June 7, 2026

/s/ Assaf Ravid
Assaf Ravid