**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

**SIMAD DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE BIDDING PROCEDURES, (II) APPROVING THE STALKING HORSE BID PROTECTIONS, (III) SCHEDULING BID DEADLINES AND AUCTION(S), (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (VI) GRANTING RELATED RELIEF**

---

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.  The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

TO THE HONORABLE CHIEF JUDGE CHRISTINE M. GRAVELLE,
CHIEF JUDGE, UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "SIMAD Debtors") state as follows in support of this motion (the "Motion"):[2]

**Preliminary Statement**

1.      Time is truly of the essence in these chapter 11 cases.  As described more fully in the First Day Declaration, the SIMAD Debtors own and operate summer camps that generally operate from June through August.  With the summer season in full swing—and many campers showing up this week—the unique circumstances of these chapter 11 cases justify the expedited timeline contemplated by this Motion and the Bidding Procedures.  Simply stated, the ability to drive a value-maximizing transaction for the summer camps requires certainty concerning which party (or parties) will operate the summer camps going forward.  Moreover, the SIMAD Debtors need a transaction partner or partners in order to obtain commitments from parents and campers for the 2027 season.  Only an expedited sale process—with bids due in mid-July and a hearing to approve a sale transaction or transactions in early August—can provide the required level of assurance.  In light of the foregoing, the SIMAD Debtors believe that a drawn-out and protracted sale process would be value-destructive for the SIMAD Debtors, their estates, campers, and all other stakeholders.

2.      Accordingly, by this Motion, the SIMAD Debtors propose an expeditious and flexible bidding and sale process to offer all, substantially all, or any portion of their assets related

---

[2]   A detailed description of the SIMAD Debtors and their business, including the facts and circumstances giving rise to the SIMAD Debtors' chapter 11 cases, is set forth in the *Declaration of Assaf Ravid, Chief Restructuring Officer of the SIMAD Debtors, in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 62] (the "First Day Declaration").  Capitalized terms used but not defined in this Motion have the meaning ascribed to them in the First Day Declaration or in the Bidding Procedures, as applicable.

to the summer camp business (the "Assets")[3] for sale to the highest or otherwise best bidder or

bidders in any number of combinations and quantities (each, a "Sale" or a "Sale Transaction").

3.      In June 2026, the SIMAD Debtors engaged their proposed investment banker, SSG

Capital Advisors ("SSG"), in part, to launch a competitive marketing process (the "Marketing

Process") to solicit third parties (the "Potential Purchasers") that might be interested in pursuing a

Sale Transaction.   To date, SSG has received significant interest from numerous Potential

Purchasers that have expressed a desire to participate in a competitive process for the SIMAD

Debtors' Assets.   The potential Sale Transaction(s) shall be free and clear of all liens, claims,

rights, interests, pledges, obligations, restrictions, limitations, charges, encumbrances, and other

interests (collectively, the "Encumbrances") with such Encumbrances attaching to the proceeds in

the same order, validity, and extent as existed prior to the closing.

4.      Furthermore, while the SIMAD Debtors have not yet selected (and may not elect

to select) a stalking horse to serve as a committed buyer of the applicable Assets, the Bidding

Procedures provide the SIMAD Debtors with flexibility to select one or more Stalking Horse

Bidders and grant Stalking Horse Bid Protections after notice and an opportunity to object.   The

SIMAD Debtors believe that approval of the Bidding Procedures will maximize the time available

to potential purchasers to review diligence and develop and submit bids within the proposed

timeline.

5.      To that end, the SIMAD Debtors also seek to establish a schedule (the

"Schedule") that provides sufficient time for robust marketing efforts while balancing the SIMAD

Debtors' desire to minimize administrative expenses and business disruption.   The Bidding

---

[3]   For the avoidance of doubt, the SIMAD Debtors' assets associated with its real property located at 365 Canal
Street, New Orleans, LA 70130 are not subject to this Motion.

Procedures proposed herein provide further opportunities to market all, substantially all, or any portion of the SIMAD Debtors' assets in one or more sale packages (each, a "Sale Package"),[4] receive and evaluate any Bids, and, if necessary, hold one or more Auction(s) to determine the highest or otherwise best bids. The Schedule proposed herein is tailored to accommodate the SIMAD Debtors' liquidity constraints and their desire to consummate a value-maximizing Sale Transaction(s) as expeditiously as possible under the circumstances.

6. In addition, to ensure an orderly transfer of Assets following a Sale Transaction(s) in accordance with section 365 of the Bankruptcy Code, the SIMAD Debtors also seek approval of assumption and assignment procedures by which the SIMAD Debtors and counterparties to the Executory Contracts or Unexpired Leases transferred in connection with any Sale Transaction(s) can (a) reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code and (b) object to the assumption and assignment of the Executory Contracts and/or related cure payments (the "Assumption and Assignment Procedures") as set forth in detail in the order substantially in the form attached hereto as **Exhibit A** (the "Order" or "Bidding Procedures Order").

7. The Bidding Procedures and the relief requested in this Motion are in the best interests of the SIMAD Debtors' estates and their stakeholders and will expedite resolution of these chapter 11 cases, reduce the expenses associated with administering these cases, and allow the SIMAD Debtors to maximize the value of their assets for the benefit of all stakeholders. The SIMAD Debtors, therefore, request that the Court approve the Bidding Procedures as set forth herein.

---

[4] For the avoidance of doubt, the SIMAD Debtors may sell camps in a single transaction, several transactions or on an individual basis. Through this process, the SIMAD Debtors will be able to identify the value-maximizing transaction for each camp.

**Relief Requested**

8.      The SIMAD Debtors seek entry of the Order, substantially in the form attached hereto as **Exhibit A**, (i) authorizing and approving the Bidding Procedures, attached as Exhibit 1 to the Order, by which the SIMAD Debtors will solicit and, if value-maximizing, select the highest or otherwise best offer(s) for the Sale(s) of substantially all, or any portion of the SIMAD Debtors' Assets (each successful bidder for the Sale of some or all of the SIMAD Debtors' Assets, a "Successful Bidder"), (ii) approving the Stalking Horse Bid Protections provided for in the Bidding Procedures, (iii) establishing certain dates and deadlines related thereto and scheduling an Auction or Auctions, (iv) approving the form and manner of notice thereof, (v) establishing notice requirements and procedures for the assumption and assignment of Executory Contracts and Unexpired Leases in connection with any proposed Sale(s), and (vi) granting such other and further relief as may be just and proper.

9.      Additionally, if applicable, the SIMAD Debtors will seek entry of one or more orders (each, a "Sale Order") (a) authorizing and approving each Sale Transaction with the Successful Bidder on the terms substantially set forth in the Successful Bid; (b) authorizing and approving the sale of the SIMAD Debtors' Assets free and clear of any and all Encumbrances to the extent set forth in an asset purchase agreement with any Successful Bidder; (c) authorizing the assumption and assignment of Executory Contracts and Unexpired Leases as set forth in an asset purchase agreement with any Successful Bidder; and (d) granting any related relief.

**Jurisdiction and Venue**

10.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.).  The SIMAD Debtors confirm their consent to the Court

entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.    The statutory and legal predicates for the relief requested herein are sections 105(a) and 521 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 1007(c) and 9006(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-5 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

### Background

13.    On June 4, and June 5, 2026 (collectively, the "Petition Date"), each of the SIMAD Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered under Case No. 26-16388 (CMG) pursuant to Bankruptcy Rule 1015(b) [Docket No. 15].  The SIMAD Debtors are operating their business and managing their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

14.    Information regarding the SIMAD Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of the chapter 11 cases can be found in the First Day Declaration, which is incorporated herein by reference.

**Proposed Sale Process and Selection of Stalking Horse Bidder(s)**

**I.      The Bidding Procedures**.

15.      The Bidding Procedures describe, among other things, the procedures for interested

parties to access due diligence, the manner in which bidders and Bids become "qualified," the

conduct of any Auction(s), the selection and approval of a Successful Bidder or Bidders and back-

up bidders, and the deadlines with respect to the foregoing.

16.      The deadlines set forth in the Bidding Procedures were calculated to balance the

need to provide adequate notice to parties in interest and Potential Purchasers with the need to run

an expeditious and efficient Sale process.  The Bidding Procedures are designed to generate the

highest or otherwise best available recoveries to the SIMAD Debtors' stakeholders by encouraging

prospective bidders to submit competitive, value-maximizing Bids.  The SIMAD Debtors believe

that the Bidding Procedures and the Schedule set forth therein are in the best interests of the

SIMAD Debtors' estates, will establish whether and to what extent any additional market for the

Sale Package exists, and provide Potential Purchasers with sufficient opportunity to participate.

Because the Bidding Procedures are attached as Exhibit 1 to the Order, they are not restated in

their entirety herein.    Generally speaking, however, the Bidding Procedures establish the

following, among other things:[5]

      a.      **Public Announcement of Auction(s)**. Within two (2) days after entry of the Order, the SIMAD Debtors shall cause (i) a notice of an Auction(s) substantially in the form attached to the Order as Exhibit 2 (the "Auction Notice"), the Order, and the Bidding Procedures, to be served on the parties that received notice of this Motion; (ii the Auction Notice(s) to be posted on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD and (iii) the Auction

---

[5]    This summary is provided in accordance with Local Rule 6004-2(b) and for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Bidding Procedures, the latter governs in all respects.

Notice(s), with any modifications necessary for ease of publication, to be published on one occasion in *The New York Times* (National Edition) and/or another national publication reasonably acceptable to the SIMAD Debtors.

b.    **Potential Purchaser Requirements.** To participate in the bidding process, a Potential Purchaser must deliver or have previously delivered to the SIMAD Debtors and their advisors the following preliminary documentation:

i.    An executed confidentiality agreement (a "Confidentiality Agreement") in a form and substance acceptable to the SIMAD Debtors;

ii.    identification of the Potential Purchaser and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale Transaction(s);

iii.    a statement of which Sale Package(s) the Potential Purchaser intends to acquire;

iv.    sufficient information that the Potential Purchaser has or can reasonably obtain the financial capacity to close the contemplated Sale(s), the adequacy of which must be acceptable to the SIMAD Debtors; and

v.    a statement detailing whether the Potential Purchaser is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

The SIMAD Debtors, in consultation with their advisors and the Consultation Parties,[6] will determine and notify each Potential Purchaser whether such Potential Purchaser has submitted adequate documents so that such Potential Purchaser may proceed to conduct due diligence and submit a bid (such Potential Purchaser that complies with the foregoing conditions, an "Acceptable Bidder"). For the avoidance of doubt, an Acceptable Bidder shall not be eligible to participate in the Auction(s) unless such Acceptable

---

[6]    The Consultation Parties shall mean the following: (i) counsel to any official committees appointed in these chapter 11 cases, (ii) counsel to Bank of New Hampshire, (iii) counsel to Mishmeret Trust Company, Ltd. in its capacity as Trustee for the Debentures (Series A) (the "Bond Trustee"), and (iv) counsel to Mishmeret Trust Company, Ltd. in its capacity as DIP agent (the "DIP Agent").

Bidder meets the requirements set forth in clause (c) below and therefore constitutes a Qualified Bidder.  For the avoidance of doubt, in the event that any secured creditor authorized to submit a credit bid pursuant to any applicable underlying security or credit agreement and related credit documentation including any intercreditor agreement or any agent or designee of such secured creditor, each such secured creditor, or such secured creditor's agent or designee, if applicable, shall be an Acceptable Bidder (notwithstanding whether such party complies with the aforementioned potential bidder requirements), subject to any applicable challenge rights relating to the validity of such underlying security or credit agreement and related credit documentation, on the basis that the alleged secured creditor is not entitled to credit bid their alleged interests.

c.      **Qualified Bid Requirements.** To be eligible to participate in the Auction(s), an Acceptable Bidder must deliver to the SIMAD Debtors and their advisors an irrevocable offer to purchase the applicable Sale Package(s) in the form of a document signed by the Acceptable Bidder (each, a "Bid" and if such Bid meets the requirements in this clause (c), a "Qualified Bid"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline (as defined below) (such Acceptable Bidder that complies with the forthcoming conditions, a "Qualified Bidder"):[7]

   i.      **Purchased Sale Package(s) and Assumed Liabilities.** Each Bid must clearly state the following: (a) which Sale Package(s) and which Assets or equity the Acceptable Bidder seeks to purchase; (b) if applicable, the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c) any executory contracts (the "Executory Contracts") and unexpired leases (the "Unexpired Leases") to be received by assignment;

   ii.     **Good Faith Deposit.** Each Bid must be accompanied by a cash deposit in the amount equal to ten (10) percent of the aggregate Purchase Price of the Bid, to be held in an escrow account to be identified and established by the SIMAD Debtors (the "Good Faith Deposit").  To the extent that a Bid is modified at or prior to the Auction(s), the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals ten (10) percent of the increased aggregate Purchase Price promptly and in no event later than one (1) business day following the conclusion of the Auction(s);

---

[7]    The Stalking Horse Bidder(s) shall automatically be deemed a Qualified Bidder.

9

iii.   **Purchase Price.** Each Bid must: (a) clearly set forth the purchase price to be paid for the applicable Sale Package(s) (the "Purchase Price"); (b) identify separately the cash and noncash components of the Purchase Price; (c) indicate the allocation of the Purchase Price among the applicable Sale Package Assets (including liabilities and obligations to be assumed in connection with any Sale Transaction(s)); provided that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation; and (d) describe its proposed post-emergence debt obligations and liquidity position for the post-reorganization company, if the Bid contemplates to effectuate the sale through a plan of reorganization.  The Purchase Price should be a single point value in U.S. dollars on a cash-free, debt-free basis.  Any Bid for substantially all of the applicable Sale Package Assets must also include a statement as to whether the Bid is conditioned on purchasing all of the business or whether the Bid should be viewed as a separate Bid for one or more Sale Package(s);

iv.   **Tax Structure; Structure**. Each Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if the SIMAD Debtors will incur any incremental tax liabilities under the Bid.  Each Bid must also identify the structure proposed for undertaking any Sale Transaction(s), including the specific Sale Package(s) of the SIMAD Debtors Assets being acquired and liabilities being assumed, the proposed steps to accomplish the Sale(s), and any financial, legal, or tax considerations upon which the Bid's proposed structure relies;

v.   **Sources of Financing**. To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate any Sale Transaction(s) set forth in its Bid with cash on hand, the Bid must include evidence of committed financing, documented to the SIMAD Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction(s) and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and

10

shall have covenants and conditions acceptable to the SIMAD Debtors;

vi. **Same or Better Terms; Bid Documents**. Each Bid must include duly executed and non-contingent transaction documents necessary to effectuate any Sale Transaction(s) contemplated in the Bid (the "Bid Documents") and must be submitted by the deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline"). The Bid Documents shall include, at a minimum: (a) a purchase agreement, the form of which will be provided to Acceptable Bidders no later than July 1, including the exhibits and schedules related thereto and any related material documents integral to such Bid pursuant to which the Acceptable Bidder proposes to effectuate any Sale Transaction(s), along with copies that are marked to reflect any amendments and modifications from the purchase agreement provided, which amendments and modifications may not be materially more burdensome than or otherwise inconsistent with the Bidding Procedures, (b) a schedule of contracts and leases to be rejected to the extent applicable to the Bid, (c) any other material documents integral to such Bid, and (d) a statement from the Acceptable Bidder that (i) it is prepared to enter into any Sale Transaction(s), subject to any necessary regulatory approvals, as specified by the Acceptable Bidder in such Bid Documents and (ii) the Bid will be irrevocable (whether or not such Bid is selected as the Successful Bid or next highest or otherwise best bid) (the "Back-Up Bid") until the confirmation of a plan;

vii. **No Qualified Bidder Bid Protections**. Unless such Bid is selected as a Stalking Horse Bid, such Bid must include a statement that the Bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the applicable Sale Package;

viii. **No Fees**. Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the bidding process and any Sale Transaction, and by submitting its Bid(s) is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code, any breakup fee,

11

termination fee, or similar type of payment or reimbursement; provided that the SIMAD Debtors are authorized to provide the Stalking Horse Bid Protections (defined below) to one or more Stalking Horse Bidders in accordance with the Bidding Procedures;

ix.   **Employee Obligations**. Each Bid must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the SIMAD Debtors' current management team, camp leadership team and, to the extent known, other employees, and a description of any contemplated incentive plan, to the extent applicable;

x.   **Adequate Assurance of Future Performance and Information.** Each Bid must (i) identify the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned in connection with the proposed Sale Transaction(s), (ii) provide for the Cure Payments (as defined in the Order) related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate, in the SIMAD Debtors' business judgment, that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, (iv) be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the reasonable satisfaction of the SIMAD Debtors, that such Acceptable Bidder (a) has the financial wherewithal and ability to consummate the proposed Sale Transaction(s) (the "Closing(s)"), and (b) can provide adequate assurance of future performance in connection with the proposed Sale Transaction(s), and (v) identify a contact person that parties may contact to obtain additional Adequate Assurance Information;

xi.   **Contingencies; No Financing or Diligence Outs.** Each Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of such Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline;

12

xii.   **Identity & Corporate Authority**. Each Bid must (i) fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the proposed Purchaser is an entity formed for the purpose of consummating the Sale(s)), and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered, by power of attorney or otherwise, to complete the Sale Transaction(s) on the terms contemplated by the parties, and (ii) include contact information for the specific person(s) and counsel whom the SIMAD Debtors' advisors should contact regarding such Bid. Each Bid must also fully disclose any business relationships, affiliations, or agreements with the SIMAD Debtors, any other known, potential, prospective bidder or Qualified Bidder, or any officer, director, or equity security holder of the SIMAD Debtors;

xiii.  **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the applicable Sale Package(s) in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

xiv.   **Authorization**. Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the contemplated Sale Transaction(s);

xv.    **Joint Bids**. The SIMAD Debtors will be authorized to approve joint Bids in their reasonable business judgment on a case-by-case basis, so long as a joint bid meets the Qualified Bid requirements and the applicable bidders otherwise comply with the Bidding Procedures;

13

xvi. **Acknowledgement of Compliance with Bidding Procedures, Bidding Order, Bankruptcy Code, and Non-Bankruptcy Law**. Each Acceptable Bidder in connection with each Bid submitted must acknowledge its compliance in all respects with the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code and any applicable non-bankruptcy law;

xvii. **No Collusion**. Each Acceptable Bidder must, in writing, (a) acknowledge that it has not engaged in any collusion with respect to any Bids or any Sale Transaction(s), specifying that it did not agree with any other Acceptable Bidders or Potential Purchaser to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction(s), or any Sale Transaction(s). For the avoidance of doubt, this requirement does not restrict Potential Purchaser(s) from working with other Potential Purchaser(s) with the SIMAD Debtors' prior written consent (email shall suffice);

xviii. **Good Faith Offer**. Each Bid must constitute a good faith, bona fide offer to consummate any proposed Sale Transaction(s);

xix. **Back-Up Bid**. Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder if the Acceptable Bidder's Bid is the next highest or otherwise best bid after the Successful Bid for the applicable portion of the applicable Sale Package(s);

xx. **Regulatory and Third-Party Approvals and Covenants**. Each Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction(s), if any, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the applicable purchase agreement and/or confirmation of the SIMAD Debtors' chapter 11 plan (the "Plan"), those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible). Each Bid must include the forms necessary for submission of regulatory approval of any Sale Transaction(s), as applicable;

14

xxi. **Expected Closing Date**. Each Bid must state the Acceptable Bidder's expected Closing date;

xxii. **Time Frame for Closing**. A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the SIMAD Debtors;

xxiii. **Adherence to Bidding Procedures**. By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of the Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction(s) after conclusion of the Auction(s);

xxiv. **Consent to Jurisdiction**. Each Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the SIMAD Debtors' qualification of: (i) Bid(s), (ii) Auction(s), (iii) Sale(s), (iv) Sale Transaction(s) and the construction and (v) enforcement of the Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bid(s), the Bid Documents, and any and all other agreements entered into in connection with any Sale Transaction(s), and the Closing(s), as applicable;

xxv. **Allocation Condition**. If a Bid has an allocation of value across Sale Package(s), or otherwise across multiple segments of the SIMAD Debtors' businesses, a statement indicating such allocation of value across such Sale Package(s) or segments; and

xxvi. **Conditions to Closing**. Each Bid must identify with particularity each and every condition to closing, including the Executory Contracts and Unexpired Leases for which assumption and assignment is required.

d. **Stalking Horse Bid Protections**. Pursuant to the Bidding Procedures Order, the SIMAD Debtors may select, in consultation with the Consultation Parties, one or more Qualified Bidders (each, a "Stalking Horse Bid") to act as a stalking horse bidder(s) (the "Stalking Horse Bidder(s)") in connection with the Auction(s) and in connection with any stalking horse agreement with the Stalking Horse Bidder(s) (the "Stalking Horse Agreement(s)"), provide a break-up fee (the "Break Up Fee") not to exceed three percent (3%)

15

of the Purchase Price and agree to reimburse the reasonable and documented out-of-pocket fees and expenses of such Stalking Horse Bidder(s) (the "Expense Reimbursement" and, together with the Break Up Fee, the "Stalking Horse Bid Protections") not to exceed one percent (1%) of the Purchase Price; *provided, however*, that the SIMAD Debtors shall not agree to, incur, or pay any Stalking Horse Bid Protections from the proceeds of any Sale Transaction without the prior written consent of (i) Bank of New Hampshire with respect to its collateral,  (ii) the DIP Agent with respect to its collateral, or (iii) the Bond Trustee with respect to its collateral.  To the extent the SIMAD Debtors designate more than one Stalking Horse Bidder pursuant to the Bidding Procedures, no two Stalking Horse Bidders will be designated with respect to any of the same Sale Package(s). The SIMAD Debtors shall not pay Stalking Horse Bid Protections to any Stalking Horse Bidder(s) on account of the portion of the Purchase Price of such Bid that is a credit bid, assumption of liabilities, or other non-cash (or cash equivalent) consideration, nor provide any Stalking Horse Bid Protections to an insider or affiliate of the SIMAD Debtors;

d.      To the extent the SIMAD Debtors, consistent with the Bidding Procedures, offer Stalking Horse Bid Protections to any additional Stalking Horse Bidder(s), the SIMAD Debtors shall disclose such Stalking Horse Bid Protections in a corresponding notice designating such Stalking Horse Bidder(s) (each, a "Stalking Horse Notice") and serve the Stalking Horse Notice on the Stalking Horse Bidder, the U.S. Trustee for the District of New Jersey (the "U.S. Trustee"), and the Consultation Parties.  The Stalking Horse Notice shall include: (a) the identity of the Stalking Horse Bidder; (b) the amount of the Stalking Horse Bid; (c) the proposed Stalking Horse Bid Protections to be provided to the Stalking Horse Bidder; (d) the terms of the Stalking Horse Agreement; and (e) the applicable Sale Package(s) to which the Stalking Horse Bid relates.  Any objection to (i) the Stalking Horse Bid Protections set forth in the Stalking Horse Notice or (ii) the designation of the Stalking Horse Bidder (a "Stalking Horse Objection"), shall be filed no later than one (1) business day after the filing of the Stalking Horse Notice at 4:00 p.m. (prevailing Eastern Time).  If a timely Stalking Horse Objection is filed, the SIMAD Debtors are authorized to seek an expedited hearing with respect to the Stalking Horse Objection as soon as reasonably possible, subject to the Court's availability.  Absent any timely Stalking Horse Objections, the Stalking Horse Bid Protections set forth in the Stalking Horse Notice(s) and the designation of the Stalking Horse Agreement(s) are approved.  Absent any timely Stalking Horse Objection, the Court may approve the Stalking Horse Bid Protections set forth in the Stalking Horse Notice and the

16

designation of the Stalking Horse Bidder(s) without further hearing. Upon approval of the designation of a Stalking Horse Bidder(s), the SIMAD Debtors are authorized, but not directed, to incur and pay the Stalking Horse Bid Protections to each Stalking Horse Bidder; *provided*, *however*, that, except with the consent of the Bank of New Hampshire or the Bond Trustee, the Stalking Horse Bid Protections shall be paid solely from the gross proceeds of any Sale Transaction with a Successful Bidder other than the Stalking Horse Bidder(s);

e.   **Modification of the Bid Procedures**. The SIMAD Debtors reserve the right to modify the Bidding Procedures, in consultation with the Consultation Parties, in good faith to further the goal of attaining the highest or otherwise best offer, or impose, at or prior to the Auction(s), additional terms and conditions on any Sale Transaction(s).  The SIMAD Debtors shall provide notice of any such modification to any Qualified Bidder, including any Stalking Horse Bidder(s); *provided* that the SIMAD Debtors may not (i) modify the consultation or consent rights of Bank of New Hampshire, the DIP Agent or the Bond Trustee as a Consultation Party or (ii) subject to the challenge rights of parties in interest, abridge or limit the rights of Bank of New Hampshire, the DIP Agent or the Bond Trustee to credit bid; and

f.   **Private Sale Procedures.** The Debtors may, in their business judgment, in consultation with the Consultation Parties, after the applicable Bid Deadline, select a Successful Bidder for any of the Assets (each, a "Private Sale") without holding an Auction for such Assets, including any specific camp property pursuant to the procedures described herein (the "Private Sale Procedures").

   i.   To the extent the SIMAD Debtors determine a Private Sale is in the SIMAD Debtors' estates best interests with respect to any Asset, the SIMAD Debtors shall file a notice (each, a "Private Sale Notice") with the Court identifying: (i) the Assets being sold; (ii) the SIMAD Debtor that directly owns the Assets; (iii) the proposed Purchaser of the Assets; (iv) the holders of any Encumbrances or asserted Encumbrances on the Assets known to the SIMAD Debtors; (v) the proposed Purchase Price; (vi) the material economic terms and conditions of the proposed Sale Transaction; (vii) any commission, fees, or similar expenses to be paid in connection with such Proposed Transaction; and (viii) a copy of the proposed Sale Order approving the proposed Private Sale.  The SIMAD Debtors shall serve the Private Sale Notice on the U.S. Trustee, any statutory committee appointed in these chapter 11 cases, any Secured Creditor

17

with respect to the Assets subject to the Private Sale (including, for the avoidance of doubt, Bank of New Hampshire and the Bond Trustee), and any party reasonably known to allege it is a Secured Creditor with respect to the Assets subject to the Private Sale Notice;

ii. The Private Sale Notice shall establish an objection deadline (the "Private Sale Objection Deadline") seven (7) calendar days after the filing of the Private Sale Notice for parties in interest to objection (each, a "Private Sale Objection") to the proposed Private Sale. To the extent no Private Sale Objections are filed prior to the Private Sale Objection Deadline, the SIMAD Debtors may file a Certificate of No Objection and submit the applicable proposed Sale Order to the Court for approval; and

iii. Notwithstanding anything to the contrary herein, no Private Sale Notice for the Sale of any Assets that constitute collateral securing the obligations owed to Bank of New Hampshire, the Bond Trustee, or the DIP Agent shall be filed without the prior written consent (not to be unreasonably withheld) of such parties if the proposed Purchase Price for such Assets, net of all costs and expenses of the sale (including any commissions, fees, or similar expenses), would be insufficient to indefeasibly pay in full in cash all outstanding obligations owed to such party that are secured by such Assets.

17. Importantly, the Bidding Procedures recognize the SIMAD Debtors' fiduciary obligations to maximize value, and, as such, do not impair the SIMAD Debtors' ability to consider all Qualified Bid proposals, and preserve the SIMAD Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates. Moreover, the SIMAD Debtors will provide information about the ongoing Sale process, to ensure that the SIMAD Debtors' stakeholders are apprised of the status and determinations related to any Sale Transaction.

## II. The Proposed Schedule

18. The SIMAD Debtors are seeking approval of the Bidding Procedures and the following proposed Schedule for the Marketing Process to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids. Moreover, the SIMAD Debtors, in their

18

sound business judgment, reserve the right to alter the timing of the Schedule as necessary under the circumstances, or to conduct multiple Sale Transaction(s) across one or more than one Auction in order to maximize the value of the estates, in each case in accordance with the Bidding Procedures.  The SIMAD Debtors respectfully request that the Court approve the Schedule.

| Action | Description | Deadline |
|---|---|---|
| **Stalking Horse Deadline** | The deadline by which the SIMAD Debtors may selecting a Stalking Horse Bidder and enter into a Stalking Horse Agreement (the "Stalking Horse Deadline"). For the avoidance of doubt, nothing contained in the Bid Procedures shall prevent the SIMAD Debtors from selecting a Stalking Horse Bidder prior to the Stalking Horse Deadline. | No later than July 9, 2026, at 4:00 p.m. prevailing Eastern Time |
| **Bid Deadline** | The deadline by which any Acceptable Bidders must submit all binding Bids to be evaluated as Qualified Bids to participate in the Auction(s), if any. | July 17, 2026, at 4:00 p.m. prevailing Eastern Time |
| **Deadline to File Assumption Notices** | The deadline by which the SIMAD Debtors must file and serve the Assumption Notice on the Contract or Lease Counterparties. | No later than July 21, 2026 |
| **Auction(s)** | The Auction(s), if needed, will be virtually via Zoom, or such other location as determined by the SIMAD Debtors. | July 28, 2026, at 10:00 a.m. prevailing Eastern Time |
| **Notice(s) of Successful Bidder** | As soon as reasonably practicable after the conclusion of the Auction(s) (or, if no Auction is held, the Bid Deadline), the SIMAD Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder(s) (as defined in the Bidding Procedures) (each, a "Notice of Successful Bidder"), identifying the applicable Successful Bidder(s), the applicable Sale Package, and key terms of the agreement. | As soon as reasonably practicable after the conclusion of the Auction(s) (or, if no Auction is held, the Bid Deadline) |

| Action | Description | Deadline |
|---|---|---|
| **Sale Objection Deadline[8]** | The deadline by which objections to the entry of an order by the Court approving any Sale Transaction(s) or objections to the ability of the Successful Bidder(s) to provide adequate assurance of future performance with respect to any Executory Contract or Unexpired Lease (the "Sale Objection Deadline") must be filed with the Court and served so as to be actually received by the appropriate notice parties. | July 31, 2026, at 4:00 p.m. prevailing Eastern Time |
| **Sale Objection Reply Deadline** | Deadline for the SIMAD Debtors and any other parties supporting the Sale Transaction(s) to respond to any objections to such Sale Transaction(s). | August 3, 2026, at 4:00 p.m. prevailing Eastern Time |
| **Sale Hearing** | Date for a hearing at which the Court will consider approving any Sale Transaction(s) to the Potential Purchaser(s). | August 4, 2026, at 10:00 a.m. prevailing Eastern Time or such other date as may be scheduled by the Court |

19. The timeline contemplated in the foregoing Schedule is essential for the SIMAD Debtors' swift emergence from chapter 11 and preserving the value of the SIMAD Debtors' estates. The proposed Schedule is designed to assure all stakeholders, including campers and camp families, that SIMAD Debtors' summer camps will be operating long into the future. Accordingly, the SIMAD Debtors believe the relief requested herein is in the best interest of the SIMAD Debtors' estates, will provide interested parties with sufficient opportunity to participate, and, therefore, should be approved.

**III.   Form and Manner of Auction Notice(s).**

20. The Auction(s), if needed, will be held on July 28, 2026, at 10:00 a.m. prevailing Eastern Time (or such other date as selected by the SIMAD Debtors) virtually via Zoom, or such other location as determined by the SIMAD Debtors.

---

[8]   To the extent that the Auction concludes less than two (2) days prior to the Sale Objection Deadline, the SIMAD Debtors shall file a notice on the docket advising the parties of a new Sale Objection Deadline.

21.     Within two (2) days after entry of the Order, or as soon as reasonably practicable thereafter, the SIMAD Debtors will cause the Auction Notice(s) to be served upon all parties that received notice of this Motion. In addition, as soon as reasonably practicable after entry of the Order, the SIMAD Debtors will post the Auction Notice(s) on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD and publish the Auction Notice(s), with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition) and/or another national publication reasonably acceptable to the SIMAD Debtors to provide notice to any other potential interested parties.  The SIMAD Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given. In addition, the SIMAD Debtors shall send written notice of the date, time, and place of the Auction(s) to the Qualified Bidders and the U.S. Trustee no later than two (2) business days before such Auction(s), and will post notice of the date, time, and place of the Auction(s) no later than two (2) business days before such Auction(s) on the website of the SIMAD Debtors' claims and noticing agent, at https://restructuring.ra.kroll.com/SIMAD.

22.     The Auction Notice(s) are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale Transaction(s), including the date, time, and place of the Auction(s) (if any), the Bidding Procedures, and the dates and deadlines related thereto. Accordingly, the SIMAD Debtors request that the form and manner of the Auction Notice(s) be approved and no other or further notice of the Auction(s) be required.

### Basis for Relief

**I.      The Relief Sought in the Order Is in the Best Interests of the SIMAD Debtors'
Estates and Should Be Approved.**

23.     "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John

21

J. Jerome & Robert D. Drain, *Bankruptcy Court is Newest Arena for M&A Action*, N.Y.L.J., June 3, 1991; *see In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Adams Res. Expl. Corp.*, 2017 WL 5493616, at \*12 (Bankr. D. Del. May 24, 2017) ("The relief requested in the Sale Motion is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors.").  In furtherance of that goal, bidding procedures and bid protections, such as those proposed here, may be used in court-supervised sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers," and maximize value. Jerome & Drain (1991) at 8, col. 4; *see In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (recognizing that bid protections "encourage a prospective bidder to do the due diligence that is the prerequisite to any bid by assuring the prospective bidder that it will receive compensation for that undertaking if it is unsuccessful"); *In re Dura Automotive Sys., Inc.*, 2007 WL 7728109, at \*90 (Bankr. D. Del. Aug. 15, 2007) (recognizing that bidding procedures "intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and bid protections "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Metaldyne Corp.,* 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[b]idder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be

shopped around for a higher offer"). In overseeing a sale subject to an auction process, the bankruptcy court must weigh: on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate. *In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992). Because the bankruptcy court must perform this balancing act, "a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it." *Id.* at 169–70; *see Dura Automotive*, 2007 WL 7728109 at *90 ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.").

24. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"). Where there is a court-approved auction process, the assets are presumed to sell for a full and fair price because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a

"sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

25.  Approval of bidding procedures shortly after the first-day hearing is appropriate where the SIMAD Debtors have demonstrated that such approval will maximize estate value, and courts in this District have approved bidding procedures on such a timeline several times. *See, e.g.*, *In re FreshRealm, Inc.,* No. 26-14656 (MEH) (Bankr. D.N.J. May 21, 2026); *In re Eddie Bauer LLC*, No. 26-11422 (SLM) (Bankr. D.N.J. Feb. 10, 2026)*; In re Invitae Corporation*, No. 24-11362 (MBK) (Bankr. D.N.J. Feb. 16, 2024); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 18, 2023); *In re Cyxtera Tech., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 29, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. April 25, 2023).

26.  Here, the SIMAD Debtors submit that the Bidding Procedures are a valid exercise of their business judgment, fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this circuit and in the best interest of their estates. Courts have consistently held that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *Schipper*, 933 F.2d at 515 (internal citations and quotations omitted) ("Under Section 363, the debtor in possession can sell property of the estate

. . . if he has an 'articulated business justification' . . . ."); *see Integrated Res.*, 147 B.R. at 656 (applying business judgment rule to bidding procedures and incentives and noting that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence").

27.   The proposed Bidding Procedures will promote active bidding from seriously interested parties and will maximize the value of the Sale Package(s) for the benefit of the SIMAD Debtors' estates.  The proposed Bidding Procedures will allow the SIMAD Debtors to conduct the Auction(s) in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who can demonstrate their ability to consummate the transaction.  In particular, the Bidding Procedures contemplate an open and public marketing process with minimum barriers to entry and provide Potential Purchasers with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

28.   The SIMAD Debtors respectfully submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings in bankruptcy proceedings and are consistent with the controlling legal standard in the Third Circuit.  Accordingly, the SIMAD Debtors request that the Court approve the Bidding Procedures as a valid exercise of the SIMAD Debtors' business judgment.

## II.   The Stalking Horse Bid Protections Have a Sound Business Purpose, Are Necessary and Appropriate, and Should Be Approved.

29.   In the event the SIMAD Debtors seek to appoint one or more Stalking Horse Bidder(s), the SIMAD Debtors seek authority to offer customary bid protections, including the Break Up Fee and Expense Reimbursement.  The use of a stalking horse in a public auction process for a sale in chapter 11 is a customary practice, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a

25

framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254 at *1 (E.D. Wis. July 7, 2011).

30.     Generally, bidding protections, such as break-up fees, are a normal and, in many cases, necessary component of significant sales under the Bankruptcy Code. *See Integrated Res.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value.") (emphasis added).  As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *O'Brien*, 181 F.3d 527.  The SIMAD Debtors believe that the allowance of the Stalking Horse Bid Protections is in the best interests of the SIMAD Debtors' estates and their creditors, as the Stalking Horse Bidder(s), if designated, will establish a floor for further bidding that may increase the consideration given in exchange for the Sale Package(s) for the benefit of the SIMAD Debtors' estates.

31.     In the Third Circuit, bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 (citing *O'Brien*, 181 F.3d at 535); *Reliant Energy*, 594 F.3d at 206 (holding that the general standard used for all administrative expenses applies to break-up fees).

26

Thus, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).

32.     The SIMAD Debtors propose to pay the Stalking Horse Bid Protections only in the event they determine, after good faith, arm's-length negotiations, that designating one or more Stalking Horse Bid(s) as stalking horse bids would be necessary and beneficial for their estates. Courts in this district have routinely approved break-up fees and/or expense reimbursements offered to stalking horse bidders. *See, e.g.*, *In re FreshRealm, Inc.,* No. 26-14656 (MEH) (Bankr. D.N.J. May 21, 2026) [Docker No. 160] (approving bidding procedures and stalking horse bidding protections, including expense reimbursement and break-up fees); *In re Eddie Bauer LLC,* No. 26-11422 (SLM) (Bankr. D.N.J. Feb. 10, 2026) [Docket No. 65] (same); *In re Careismatic Brands, LLC*, No. 24-10561, (VFP) (Bankr. D.N.J. Feb. 29, 2024) [Docket No. 339] (same); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Feb. 16, 2024) [Docket No. 57] (same); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 18, 2023) [Docket No. 129] (same); *In re Cyxtera Tech., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 29, 2023) [Docket No. 180] (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. April 25, 2023) [Docket No. 92] (same).

33.     Without the Stalking Horse Bid Protections, a potential bidder may elect not to participate in the process to the detriment of the SIMAD Debtors' estates.  The Bidding Procedures do not require the payment of the Stalking Horse Bid Protections.  Rather, the SIMAD Debtors have the option of paying or otherwise incurring such obligations in the event that offering such Stalking Horse Bid Protections is necessary to foster a competitive bidding process that will maximize the value of the SIMAD Debtors' estates.  In that instance, the value created

27

for the SIMAD Debtors' estates will likely greatly outweigh the cost of any Stalking Horse Bid Protections.  In any case, granting the SIMAD Debtors authority to offer the Stalking Horse Bid Protections sends a strong signal to the market that the SIMAD Debtors are serious about running a competitive Sale process to generate the best result for the SIMAD Debtors and their estates. Furthermore, to the extent any party objects to the Stalking Horse Bid Protections, such party's ability to object is preserved, since there will be an objection deadline following the filing of the Stalking Horse Notice and an opportunity for a hearing.

34.     The Break Up Fee will not exceed three percent (3%) of any proposed Purchase Price and Expense Reimbursement will not exceed one percent (1%) of any Purchase Price.  This is an amount that is well within market for transactions of this type, and which has been routinely approved by courts in this district.  *See, e.g.*, *In re FreshRealm, Inc.,* No. 26-14656 (MEH) (Bankr. D.N.J. May 21, 2026) [Docker No. 160] (approving stalking horse bid protections, including a break-up fee not to exceed three percent of the proposed purchase price and reasonable and documented expense reimbursements); *In re Eddie Bauer LLC,* No. 26-11422 (SLM) (Bankr. D.N.J. Feb. 10, 2026) [Docket No. 65] (approving stalking horse bid protections, including a break-up fee not to exceed three percent of the proposed purchase price and reasonable and documented expense reimbursements); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) [Docket No. 339] (approving stalking horse bid protections, including a break-up fee not to exceed three percent of the proposed purchase price and reasonable and documented expense reimbursements); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Feb. 16, 2024) [Docket No. 57] (approving stalking horse bid protections, including a break-up fee and expense reimbursement, not to exceed three percent of the proposed purchase price in the aggregate); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 18,

2023) [Docket No. 129] (approving stalking horse bid protections, including a break-up fee and expense reimbursement, not to exceed three percent or three and a half percent, as applicable, of the proposed purchase price in the aggregate); *In re Cyxtera Tech., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 29, 2023) [Docket No. 180] (approving stalking horse bid protections, including a break-up fee not to exceed three percent of the proposed purchase price and reasonable and documented expense reimbursements); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. April 25, 2023) [Docket No. 92] (approving stalking horse bid protections, including a break-up fee and expense reimbursement, not to exceed three percent of the proposed purchase price in the aggregate).

35.     Accordingly, for the reasons set forth above, the SIMAD Debtors respectfully request that the Court grant the SIMAD Debtors the authority to incur and pay the Stalking Horse Bid Protections to the extent the Stalking Horse Bid Protections are necessary to preserve the value of the SIMAD Debtors' estates.

**III.     The Form and Manner of Notice Should Be Approved.**

36.     Pursuant to Bankruptcy Rule 2002(a), the SIMAD Debtors are required to provide creditors with twenty-one days' notice of the Auction(s). Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction(s) and the deadline for filing any objections to such a Sale.

37.     Within two (2) days after entry of the Order, or as soon as reasonably practicable thereafter, the SIMAD Debtors will cause the Auction Notice(s) to be served upon the parties that receive notice of this Motion. In addition, as soon as reasonably practicable after entry of the Order, the SIMAD Debtors will post the Auction Notice(s) on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD and publish the Auction Notice(s), with any modifications necessary for ease of publication, on one occasion in *The New*

*York Times* (National Edition) and/or another national publication reasonably acceptable to the SIMAD Debtors.

38.     The SIMAD Debtors submit that the service and publication of the Auction Notice(s) constitutes good and adequate notice of the Auction(s) and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.  Accordingly, no further notice is necessary and the SIMAD Debtors request that this Court approve the form and manner of the notice of the Auction Notice(s).

## IV.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.

39.     As set forth in detail in Section III of the Order, any Sale Transaction will contemplate the assumption and assignment of Executory Contracts and Unexpired Leases (the "Assumed Contracts") to the Successful Bidder.  In connection with this process, the SIMAD Debtors believe it is necessary to establish assumption and assignment procedures by which: (a) the SIMAD Debtors and counterparties to the Executory Contracts or Unexpired Leases (each a "Contract or Lease Counterparty" and collectively, the "Contract or Lease Counterparties") can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such Contract or Lease Counterparties can object to the assumption and assignment of the contracts and/or related cure payments (the "Assumption and Assignment Procedures").  The SIMAD Debtors also request that any Contract or Lease Counterparty that fails to object to the proposed assumption and assignment of any Executory Contract or Unexpired Lease be deemed to consent to the assumption and assignment of the applicable Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure payments identified in the Assumption Notice (as defined in the Order).  *See, e.g., In re Boy Scouts of Am.*, 642 B.R. 504, 569 (Bankr. D. Del.

30

2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2)."); *In re Christ Hosp.*, 2014 WL 4613316, at *14 (D.N.J. Sept. 12, 2014) (same); *In re Congoleum Corp.*, 2007 WL 1428477, at *1 (Bankr. D.N.J. May 11, 2007) (same); *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

40.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Grp. of Inst'l Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to section 365 of the Bankruptcy Code, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); *In re S.A. Holding Co., LLC*, 357 B.R. 51, 56 (Bankr. D.N.J. 2006) (applying the business judgment test in determining whether to approve a contract rejection); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) ("Although the [Bankruptcy Code] does not provide the standard to be applied in determining the propriety of the [debtor's] decision [to assume or reject a contract], most Circuits, including the Third Circuit have adopted the business judgment test.").

31

41. Upon finding that a debtor has exercised its reasonable business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the proposed assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (i) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (ii) compensate parties for pecuniary losses arising therefrom, and (iii) provide adequate assurance of future performance thereunder. *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988). This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Id.* (quoting *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)).

42. Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with any Sale Transaction(s) as a sound exercise of the SIMAD Debtors' business judgment because the Assumed Contracts are necessary to operate the applicable Sale Package(s), integral to any Sale Transaction(s), and, as such, are essential to inducing the best offer for the applicable Sale Package(s). Moreover, the SIMAD Debtors submit that the statutory requirements of section 365(b) will be promptly satisfied because (i) each Bid must provide for the payment of all Cure Payments, (ii) the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over Cure Payments or other defaults, (iii) the SIMAD Debtors will evaluate the financial wherewithal of Potential Purchasers to ensure they can demonstrate adequate assurance of future performance, and (iv) the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to

32

evaluate and, if necessary, challenge proposed Cure Payments or the ability of the Successful Bidder to provide adequate assurance of future performance.

43.    The SIMAD Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to the Contract or Lease Counterparties and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the SIMAD Debtors request the Court approve the Assumption and Assignment Procedures set forth in the Order.

**V.    The Sale Transaction(s) and The SIMAD Debtors' Entry into One or More Asset Purchase Agreement(s) Should be Approved as an Exercise of Sound Business Judgment.**

44.    Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to enter into a transaction outside the ordinary course of its business so long as there is a "sound business purpose" that justifies such action. *See* 11 U.S.C. § 363(b)(1); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("[U]nder normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification.") (citation omitted); *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task"); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that judicial approval under section 363 of the Bankruptcy Code requires a showing that there is a good business reason).

45.    The business judgment rule shields a debtor's decisions from judicial second-guessing. Once a debtor articulates a valid business justification, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citations omitted); *In*

33

*re Filene's Basement, LLC*, 2014 WL 1713416, at \*12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

46. Generally, courts in the Third Circuit have applied four factors in determining whether a sale of a debtor's assets should be approved: (a) whether a sound business purpose exists for the sale; (b) whether the proposed sale price is fair; (c) whether the debtor has provided adequate and reasonable notice; and (d) whether the buyer acted in good faith. *See In re Summit Glob. Logistics, Inc.*, 2008 WL 819934, at \*9 (Bankr. D.N.J. Mar. 26, 2008) (citing *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008)); *see also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149–50 (3d Cir. 1986) (noting that the element of "good faith" is of particular importance in the Third Circuit); *In re Delaware & Hudson Ry.*, 124 B.R. 169, 176 (D. Del. 1991) ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

### 1. A Sound Business Purpose Exists for the Sale Transaction(s).

47. The Sale Transaction(s) are supported by a sound business purpose—maximizing the value of the SIMAD Debtors' estates. As previously discussed, it is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am.*

*Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, 2001 WL 1820326, *4 (Bankr. D. Del. Apr. 2, 2001) ("[I]t is worth noting that a [section] 363(b) sale transaction does not require an auction procedure. The auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction."). Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the SIMAD Debtors' business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practically available alternative. *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820326 at *4 (while a "section 363(b) sale transaction does not require an auction procedure, [t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

48.     As noted above, prior to the Bid Deadline, SSG will continue to market the Assets and solicit offers consistent with the Bidding Procedures, including, for example by identifying and contacting potential purchasers, continuing to provide Acceptable Bidders with data room access and requested information, and otherwise assisting the SIMAD Debtors with all efforts to increase transaction value. This will ensure that the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction(s) are held because no Auction is necessary the purchase price will, conclusively, be deemed fair value. The SIMAD Debtors will submit additional evidence at the Sale Hearing if necessary to support the foregoing conclusions. All of these considerations, together, support the conclusion that any Sale Transaction(s) entered into pursuant to the Bidding Procedures will represent the most value-maximizing path forward for the SIMAD Debtors in these chapter 11 cases.

35

49.    As such, the SIMAD Debtors' determination to sell the Assets through the competitive process outlined in the Bidding Procedures and subsequently to enter into any purchase agreement(s)) with the Successful Bidder(s) is a valid and sound exercise of the SIMAD Debtors' business judgment.  Therefore, the SIMAD Debtors request that the Court make a finding that the proposed sale of the Assets is a sound exercise of the SIMAD Debtors' business judgment and is rightly authorized.

50.    With respect to any Private Sale(s), Bankruptcy Rule 6004(f) authorizes a debtor to sell estate property outside of the ordinary course of business by private sale or public auction.  A court-approved auction process is not required under the Bankruptcy Code, Bankruptcy Rules, or Local Rules.  *See, e.g., In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49–50 (Bankr. S.D.N.Y. 2016) ("[T]here is no rule that . . . asset sales are . . . conditioned on such a requirement [a formal auction], which does not appear in the Bankruptcy Code or Bankruptcy Rules.  Additionally, courts have held that a debtor has broad discretion to determine the manner in which its assets are sold.  *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through private sale).

51.    The SIMAD Debtors believe, based on the initial interest received with respect to the SIMAD Debtors' Assets, certain of the camp properties may be of strategic interest to a limited number of parties.  Accordingly, the SIMAD Debtors believe that holding an Auction(s) in connection with certain Assets may not result in additional value to the SIMAD Debtors' estates.  Any proposed Private Sale will only be pursued in consultation with the Consultation Parties and all parties in interest will receive the Private Sale Notice and sufficient notice of any Private Sale.  Accordingly, the SIMAD Debtors submit that a Private Sale may be in the best interests of the

36

SIMAD Debtors' estates, avoid unnecessary administrative costs to the estates, and does not prejudice any party in interest.

### 2. Adequate and Reasonable Notice of the Auction and Sale Transactions Will Be Provided.

52.    The Auction Notice(s): (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale Transaction(s) or the Assumed Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale Transaction(s). Significantly, the form and manner of the Auction Notice(s) will have been approved by this Court pursuant to the Order after notice and a hearing before the Auction Notice(s) is served on parties in interest.  Furthermore, any Private Sale Notice(s) will be served in a manner that provides parties with sufficient information regarding a proposed Private Sale and sufficient time to lodge an objection, if desired.

### 3. The Sale Transaction(s) Have Been Proposed in Good Faith Without Collusion, and the Successful Bidder(s) Are a "Good-Faith Purchaser."

53.    The SIMAD Debtors request that the Court find the Successful Bidder(s) are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of Assets. Section 363(m) of the Bankruptcy Code provides, in pertinent part, that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal

11 U.S.C. § 363(m).

54.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." *See id.* While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. *See*, *e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same) *abrogated on other grounds*, *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993).

55.     The SIMAD Debtors submit that the Successful Bidder(s) will be "good faith purchaser(s)" within the meaning of section 363(m) of the Bankruptcy Code, and that the Stalking Horse Agreement(s), if any, and any marked versions thereof, will be good-faith, arm's-length agreement(s) entitled to the protections of section 363(m) of the Bankruptcy Code.[9]

---

[9]   The SIMAD Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder(s). Pursuant to the Bidding Procedures, any Successful Bidder(s) will have had to present a proposal in accordance with the Bidding Procedures. In addition, the SIMAD Debtors will not choose as the Successful Bidder(s) or Back-Up Bidder(s) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

56.     *First*, as set forth in more detail above, the consideration to be received by the SIMAD Debtors from any Successful Bidder(s) will be substantial, fair, and reasonable. *Second*, any sale agreement with any Successful Bidder(s) will be the culmination of a competitive auction process in which all parties are likely to be represented by counsel and all negotiations will be conducted on an arm's length, good-faith basis or, with respect to any Private Sale, made in consultation with the Consultation Parties *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders," or similar conduct that would cause or permit the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code. *Abbotts Dairies of Pennsylvania*, 788 F.2d at 147 (citing *Rock Indus. Mach. Corp.*, 572 F.2d at 1198). With respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Finally, any Bids that the SIMAD Debtors ultimately determine to be Successful Bids will have been evaluated and approved by the SIMAD Debtors in consultation with their advisors and the Consultation Parties. Accordingly, the SIMAD Debtors believe that the Successful Bidder(s), if any, and any purchase agreement associated with such Successful Bid(s) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### 4.     The Sale Transaction(s) Should be Approved "Free and Clear" under Section 363(f) of the Bankruptcy Code.

57.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a *bona fide* dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

39

58. Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the SIMAD Debtors' sale of the Assets free and clear of all Encumbrances, except with respect to any interests that may be assumed liabilities under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 354 (E.D. Pa. 1988) (holding that a sale "free and clear" may be approved provided the requirements of at least one subsection are met).

59. The SIMAD Debtors submit that, to the extent that any interest in the Assets will not be an assumed liability, any such interest in the Assets satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such interest will be adequately protected by either being paid in full at the Closing, or by having it attach to the net proceeds of such Sale Transaction(s), subject to any claims and defenses the SIMAD Debtors may possess with respect thereto. The SIMAD Debtors accordingly request authority to convey the Assets to the Successful Bidder(s) arising from the Auction(s), if any, free and clear of all Encumbrances, with any such encumbrances to attach to the proceeds of the applicable Sale Transaction(s) in the same order, validity and extent as existed prior to the Closing.

### Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

60. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed for 14 days after the order is entered." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease ... is stayed for 14 days after the order is entered." The SIMAD Debtors request that any Sale Order be effective immediately upon its entry by providing that the 14 day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

61.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14 day stay period, the leading treatise on bankruptcy suggests that the 14 day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

62.     To maximize the value received for the Sale Package(s), the SIMAD Debtors seek to close any Sale Transaction(s) as soon as possible.   Accordingly, the SIMAD Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

### Disclosures Under Local Rule 6004-1

63.     Local Rule 6004-1 requires, among other things, that a debtor include the "material terms of the proposed sale" in a sale motion.  As set forth above, the SIMAD Debtors and their professionals have commenced an aggressive marketing of the SIMAD Debtors' Assets. Nevertheless, the SIMAD Debtors do not, as yet, have a signed agreement.  Moreover, because the SIMAD Debtors continue to negotiate with parties in interest, they cannot, as yet, identify, with any reasonable specificity, the terms of the Sale Transaction(s).  Accordingly, the SIMAD Debtors are unable, at this time, to make the disclosures required under Local Rule 6004-1.  In the event the SIMAD Debtors secure one or more Stalking Horse Bidder(s), the SIMAD Debtors will file the Stalking Horse Agreement(s), commitment agreement(s), and make the requisite disclosures.

**Reservation of Rights**

64. Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the SIMAD Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the SIMAD Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is a secured claim, an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission by the SIMAD Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the SIMAD Debtors' estates; (g) a waiver or limitation of the SIMAD Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the SIMAD Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the SIMAD Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed

as an admission as to the validity of any particular claim or a waiver of the SIMAD Debtors' rights to subsequently dispute such claim.

## No Prior Request

65.    No prior request for the relief sought in this Motion has been made to this Court or any other court.

## Notice

66.    The SIMAD Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to the Bond Trustee; (c) counsel to the DIP Agent; (d) counsel to Bank of New Hampshire; (e) the Debtors' fifty (50) largest unsecured creditors (on a consolidated basis); (f) any known secured creditors; (g) the United States Attorney's Office for the District of New Jersey; (h) the Internal Revenue Service; (i) the attorney general in the states where the SIMAD Debtors conduct business operations; (j) any party that has expressed interest in the Assets; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The SIMAD Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, the SIMAD Debtors request that the Court enter the Order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: June 24, 2026

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
               wusatine@coleschotz.com
               dbass@coleschotz.com
               fyudkin@coleschotz.com
               dharris@coleschotz.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

44

**Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

### ORDER (I) APPROVING THE BIDDING PROCEDURES, (II) APPROVING THE STALKING HORSE BID PROTECTIONS, (III) SCHEDULING BID DEADLINES AND AUCTION(S), (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (VI) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered two (2) through seventeen (17), is

**ORDERED**.

---

[1]   A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.  The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

(Page | 2)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

Upon the *Motion For Entry of an Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "SIMAD Debtors"), for entry of an order (this "Order") (a) authorizing and approving the proposed marketing, auction, and bidding procedures attached hereto as **Exhibit 1** to the Order (the "Bidding Procedures"), by which the SIMAD Debtors will solicit and, if value-maximizing, select the highest or otherwise best offer(s) for the purchase of some, all, or substantially all of the Sale Package(s), (b) approving the Stalking Horse Bid Protections, if any, (c) establishing the Schedule, (d) approving the manner of notice of the Auction(s), as may be necessary, (e) approving procedures for the assumption and assignment of certain Executory Contracts and Unexpired Leases in connection with any Sale Transaction(s), if any, and (f) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); and this Court having found that venue of this proceeding

---

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

(Page | 3)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that the SIMAD Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing, establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor

**IT IS HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. The SIMAD Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of the SIMAD Debtors' estates, including with respect to the proposed procedures for providing Stalking Horse Bid Protections as determined by the SIMAD Debtors in a sound exercise of their business judgment in accordance with the Bidding Procedures.

3. The SIMAD Debtors' proposed notice of the Motion and the Hearing was (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and (iii) adequate and sufficient under the circumstances of these

(Page | 4)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

chapter 11 cases, and no other or further notice is required.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to all interested persons and entities.

4.        All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

I.        **Important Dates and Deadlines.**

5.        **Bid Deadline**. **July 17, 2026, at 4:00 p.m. prevailing Eastern Time**, is the deadline by which all Bids must be **actually received** by the parties specified in the Bidding Procedures.

6.        **Stalking Horse Bidder(s) and Bid Protections**. The SIMAD Debtors, upon entry of this Order, shall be authorized, but are not obligated or directed, in an exercise of their reasonable business judgment, to designate one or more Stalking Horse Bidder(s) with respect to the applicable Sale Package(s) and enter into such stalking horse agreements (the "Stalking Horse Agreement(s)"), and subject to paragraphs 7 and 8 of this Order, to provide such Stalking Horse Bidder(s) with Stalking Horse Bid Protections.

7.        In the event that the SIMAD Debtors enter into a Stalking Horse Agreement(s) with one or more Stalking Horse Bidder(s), on or before **July 9, 2026 at 4:00 p.m., prevailing Eastern Time**, the SIMAD Debtors shall file with the Court and serve a copy of the Stalking Horse Notice(s) on the Stalking Horse Bidder(s), the U.S. Trustee, counsel to the DIP Agent, counsel to the Bond Trustee, and counsel to Bank of New Hampshire.  For the avoidance of doubt, nothing contained in

(Page | 5)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

this Order shall prevent the SIMAD Debtors from selecting Stalking Horse Bidder(s) and entering into Stalking Horse Agreement(s) prior to the Stalking Horse Deadline. Any Stalking Horse Notice(s) shall seek approval of the designation of such Stalking Horse Agreement(s) and the Stalking Horse Bid Protections which shall include: (a) the identity of the Stalking Horse Bidder(s); (b) the amount of the Stalking Horse Bid(s); (c) the proposed Stalking Horse Bid Protections to be provided to the Stalking Horse Bidder(s); (d) the terms of the Stalking Horse Agreement(s); and (e) the applicable Sale Package(s) to which the Stalking Horse Bid(s) relates.  Any objection to (i) the Stalking Horse Bid Protections set forth in a Stalking Horse Notice(s) or (ii) the designation of the Stalking Horse Agreement(s) (a "Stalking Horse Objection"), shall be filed no later than one (1) business day after the filing of the applicable Stalking Horse Notice at 4:00 p.m., (prevailing Eastern Time).  If a timely Stalking Horse Objection is filed, the SIMAD Debtors are authorized to seek an expedited hearing with respect to the Stalking Horse Objection as soon as reasonably possible, subject to the Court's availability.  Absent any timely Stalking Horse Objections, the Stalking Horse Bid Protections set forth in the Stalking Horse Notice(s) and the designation of the Stalking Horse Agreement(s) are approved.

8.        Upon approval of the designation of one or more Stalking Horse Agreement(s), the SIMAD Debtors are authorized, but not directed, to incur and pay the Stalking Horse Bid Protections to each such Stalking Horse Bidder(s) subject to the terms of the applicable Stalking Horse Agreement(s) and this Order; *provided* that the SIMAD Debtors shall not pay Stalking Horse Bid Protections to any Stalking Horse Bidder(s) on account of the portion of the Purchase Price of such Bid that is a credit bid, assumption of liabilities, or other non-cash (or cash

(Page | 6)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

equivalent) consideration, nor provide any Stalking Horse Bid Protections to an insider or affiliate of the SIMAD Debtors; *provided*, further, that, except with the consent of the Bank of New Hampshire or the Bond Trustee, the Stalking Horse Bid Protections shall be paid solely from the gross proceeds of any Sale Transaction with a Successful Bidder other than the Stalking Horse Bidder(s).

9.      **Auction(s)**. The date and time of the Auction(s), if needed, is **July 28, 2026, at 10:00 a.m. prevailing Eastern Time**, which time may be extended by the SIMAD Debtors upon written notice to the Court. The Auction(s) will be held virtually, via Zoom or such other location designated by the SIMAD Debtors.  Only the SIMAD Debtors, the Consultation Parties, the Qualified Bidders, the U.S. Trustee, and any other parties as the SIMAD Debtors may determine in their reasonable discretion, in each case, along with the representatives and advisors, shall be entitled to participate in the Auction(s), and only Qualified Bidders will be entitled to make Overbids (as defined in the Bidding Procedures) at the Auction(s); *provided*, *however*, that any party in interest will be permitted to attend the Auction(s).  The SIMAD Debtors shall send written notice of the date, time, and place of the Auction(s) to the Qualified Bidders, the Consultation Parties, and the U.S. Trustee no later than two (2) business days before such Auction(s), and will post notice of the date, time, and place of the Auction(s) no later than two (2) business days before such Auction(s) on the website of the SIMAD Debtors' claims and noticing agent, Kroll Restructuring Administration (the "Claims and Noticing Agent"), at https://restructuring.ra.kroll.com/SIMAD.

(Page | 7)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

10.     **Notice(s) of Successful Bidder**. As soon as reasonably practicable after the conclusion of the Auction(s), the SIMAD Debtors shall file the Notice(s) of Successful Bidder(s).

11.     **Sale Objection Deadline**.[3] Objections to any Sale Transaction(s), Sale Order and the Notice(s) of Successful Bidder(s) ("Sale Objection Deadline"), if any, must be made on or before **July 31, 2026, at 4:00 p.m., prevailing Eastern Time**.  For the avoidance of doubt, this does not include objections made in connection with any Assumption Notice or Supplemental Assumption Notice (each defined below) and any such objection must be made in accordance with the Assumption and Assignment Procedures.

12.     **Failure to Object**. If any party fails to timely file with the Court and serve an objection by the Sale Objection Deadline or otherwise abide by the procedures set forth in the Bidding Procedures regarding an objection to any Sale Transaction(s), such party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the Motion or to the consummation and performance of any Sale Transaction(s), including the transfer of the applicable Sale Package(s) to the Successful Bidder(s), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" for the purposes of section 363(f) of the Bankruptcy Code.

13.     **Sale Hearing**. **August 4, 2026 at 10:00 a.m., prevailing Eastern Time**, or as soon thereafter as the SIMAD Debtors may be heard, is the date and time for the hearing for the Court to

---

[3]   To the extent that the Auction concludes less than two (2) days prior to the Sale Objection Deadline, the SIMAD Debtors shall file a notice on the docket advising the parties of a new Sale Objection Deadline.

(Page | 8)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

consider the Successful Bid(s), if needed (the "Sale Hearing"). The Sale Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required. Upon entry of this Order, the SIMAD Debtors are authorized to perform any obligations of the SIMAD Debtors set forth in the Stalking Horse Agreement(s) or other applicable purchase agreement that are intended to be performed prior to the Sale Hearing or entry of the applicable Sale Order.

## II.      Auction(s), Bidding Procedures, Auction Notice(s), and Related Relief.

14.      The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Sale Transaction(s). Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order. The SIMAD Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.  Subject to the terms of the Bidding Procedures, the SIMAD Debtors, in consultation with the Consultation Parties, may modify the Bidding Procedures as necessary or appropriate to maximize value for their estates except as expressly prohibited by this Order; *provided* that the SIMAD Debtors may not (i) modify the consultation or consent rights of Bank of New Hampshire, the Bond Trustee, or the DIP Agent, or (ii) subject to the challenge rights of other parties in interest, abridge or limit the rights of Bank of New Hampshire, the DIP Agent or the Bond Trustee to credit bid.

(Page | 9)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

15.    Pursuant to the Bidding Procedures, the SIMAD Debtors, in their business judgment after consultation with the Consultation Parties, may (a) determine which Qualified Bid is the highest or otherwise best offer, (b) reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the SIMAD Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of any Sale Transaction(s), or (iii) contrary to the best interests of the SIMAD Debtors, their estates, their creditors, and other stakeholders, and (c) impose such other terms and conditions upon Potential Purchasers as the SIMAD Debtors determine to be in the best interests of the SIMAD Debtors' estates in these chapter 11 cases.

16.    If the SIMAD Debtors determine not to conduct the Auction(s), then the SIMAD Debtors shall file a notice with the Court of such determination within one (1) business day of the making of such determination by the SIMAD Debtors.

17.    Any deposit(s) (including any Good Faith Deposit) provided by a Stalking Horse Bidder or other Bidder shall be held in escrow by the SIMAD Debtors or their agent and shall not become property of the SIMAD Debtors' bankruptcy estates unless and until released from escrow to the SIMAD Debtors pursuant to the terms of the applicable purchase agreement, escrow agreement, the Bidding Procedures, or order of this Court, as applicable.

18.    The Auction Notice(s), substantially in the form attached hereto as **Exhibit 2**, are hereby approved. Within two (2) days after entry of the Order,  the SIMAD Debtors will cause the Auction Notice(s) (i) to be served upon the parties that received notice of the Motion., (ii) to be

(Page | 10)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

posted on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD and (iii) to be published, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition) and/or another national publication reasonably acceptable to the SIMAD Debtors to provide notice to any other potential interested parties.

19.      Pursuant to Local Rule 6004-2: (a) each bidder participating at the Auction(s) shall be required to confirm that it has not engaged in any bad faith or collusion with respect to the bidding or any Sale Transaction(s), as set forth in the Bidding Procedures; (b) the Auction(s) shall be conducted openly and all parties in interest will be permitted to attend; and (c) the bidding at the Auction(s) will be documented, recorded, or videotaped.

## III.      **Assumption and Assignment Procedures.**

20.      The procedures set forth below regarding the Assumed Contracts proposed to be assumed by the SIMAD Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Successful Bidder(s), if any, pursuant to section 365(f) of the Bankruptcy Code in connection with any Sale Transaction(s) are hereby approved to the extent set forth herein.

21.      These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the SIMAD Debtors' Executory Contracts and Unexpired Leases to be assumed and assigned in connection with any Sale Transaction(s), if any, subject to the payment of any amount necessary to satisfy all defaults and actual pecuniary loss to the Contract or Lease Counterparty resulting from such defaults, including, but not limited to, all claims, demands,

(Page | 11)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

charges, rights to refunds and monetary and non-monetary obligations that the relevant counterparty can assert under an Executory Contract or Unexpired Lease, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to a Contract (the foregoing amounts as stated in the Assumption Notice, the "Cure Payments"):

(a)  **Notice of Assumption**. As soon as reasonably practicable but in no event later than **July 21, 2026**, the SIMAD Debtors shall file on the docket and serve a notice of contracts assumed and assigned to any Successful Bidders(s) (the "Assumption Notice"), in substantially the form attached hereto as **Exhibit 3**, via first-class mail on the Contract or Lease Counterparties. The Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the Executory Contract or Unexpired Lease, (ii) the identity of the Contract or Lease Counterparty, (iii) the SIMAD Debtors' good faith estimates of the Cure Payments, if any, required in connection with the Executory Contract or Unexpired Lease, and (iv) the Sale Objection Deadline; *provided*, however, that service of an Assumption Notice does not constitute an admission that any Executory Contract and/or Unexpired Lease listed thereon is an executory contract or unexpired lease or that such stated Cure Payment constitutes a claim against the SIMAD Debtors or a right against any Successful Bidder(s), all rights with respect thereto being expressly reserved. Further, the inclusion of a contract on the Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.

(b)  **Cure Payments**. The payment of the applicable Cure Payments by the SIMAD Debtors and/or the Successful Bidder(s), as applicable, shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Executory Contract or Unexpired Lease by the SIMAD Debtors and the assignment of such Executory Contract or Unexpired Lease to the Successful Bidder(s), constitute adequate assurance of future performance thereof.

(Page | 12)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

(c)     **Supplemental Assumption Notice**. To the extent the SIMAD Debtors, at any time after the Auction(s) (or, if no Auction is held, the Bid Deadline) (i) identify additional Executory Contracts or Unexpired Leases that may be assumed by and assigned to the Successful Bidder(s), (ii) remove any Executory Contracts or Unexpired Leases from the Assumption Notice, and/or (iii) modify the previously stated Cure Payment associated with any Executory Contract or Unexpired Lease, the SIMAD Debtors will promptly file with this Court and serve by first-class mail a supplemental notice of contract or lease assumption (a "Supplemental Assumption Notice") on each of the Contract or Lease Counterparties affected by the Supplemental Assumption Notice. Each Supplemental Assumption Notice will include the same information with respect to listed Executory Contracts or Unexpired Leases as was included in the Assumption Notice. Except as otherwise provided in any purchase agreement, the SIMAD Debtors (in consultation with the Successful Bidder(s)) may designate additional Executory Contracts and Unexpired Leases to be assumed and assigned up to two (2) business days prior to the Closing and may remove Executory Contracts or Unexpired Leases from the list of Executory Contracts and Unexpired Leases up to two (2) business days prior to Closing.

(d)     **Objections**. Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payment, state the correct Cure Payment alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the SIMAD Debtors, (b) counsel to the Successful Bidder(s), and (c) any other party that has filed a notice of appearance in these chapter 11 cases, so as to be **actually received no later than 4:00 p.m., prevailing Eastern Time, on the date that is ten (10) calendar days after service of the Assumption Notice and in no event later than 4:00 p.m., prevailing Eastern Time on July 31, 2026 or the deadline set forth in any Supplemental Assumption Notice, as applicable**. The SIMAD Debtors may modify the Sale Objection Deadline, including the deadline to object to a proposed Cure Payment, and the deadline set forth in a Supplemental Assumption Notice by filing a notice of such modification on the Court's docket.

(Page | 13)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

(e)     **Dispute Resolution**. In the event that the SIMAD Debtors and a Contract or Lease Counterparty cannot resolve an objection to a Cure Payment, the Executory Contract or Unexpired Lease at issue may be assumed by the SIMAD Debtors and assigned to the Successful Bidder; *provided* that the SIMAD Debtors shall segregate the Cure Payment that the Contract or Lease Counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties. If an objection to the proposed assumption and assignment of an Executory Contract or Unexpired Release or related Cure Payment proposed in connection with any Sale Transaction(s) remains unresolved as of the Sale Hearing, the SIMAD Debtors shall seek a hearing before this Court to determine the Cure Payments, if any, and approve the assumption of the applicable Executory Contract or Unexpired Lease.

(f)     **Contract or Lease Assumption**. No Executory Contract or Unexpired Lease shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of (i) the date the Court has entered an order assuming and assigning such Executory Contract or Unexpired Lease or (ii) the date any Sale Transaction(s) closed.

22.     Any party failing to timely file an objection to the Cure Payments or the proposed assumption and assignment of an Executory Contract or Unexpired Lease listed on the Assumption Notice or a Supplemental Assumption Notice is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Executory Contract or Unexpired Lease, (c) the related relief requested in the Motion, and (d) the applicable Sale Transaction(s). Such party shall be forever barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Executory Contract or Unexpired Lease, adequate assurance of future performance, the relief requested in the Motion, whether or not applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder(s) for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any

(Page | 14)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

additional cure or other amounts against the SIMAD Debtors and the Successful Bidder(s) with respect to such party's Executory Contract or Unexpired Lease.

23.     The SIMAD Debtors shall, concurrently with the Assumption Notice, provide evidence to each Executory Contract or Unexpired Lease Counterparty that the proposed assignee has the ability to comply with the requirements of adequate assurance of future performance; *provided* that any such evidence that constitutes nonpublic information shall be provided on a confidential basis.  All Bidders are deemed to consent to the transmission of such evidence of adequate assurance of future performance on a confidential basis to counsel for the applicable Executory Contract or Unexpired Lease Counterparty via email with such information to be used only for the purpose of assessing the applicable Bidder.

24.     The inclusion of an Executory Contract or Unexpired Lease in the Assumption Notice or a Supplemental Assumption Notice will not obligate any SIMAD Debtor to assume any Executory Contract or Unexpired Lease listed thereon or a Successful Bidder to accept assignment of such assumed Executory Contract or Unexpired Lease. Only those Executory Contracts and Unexpired Leases that are included on a schedule of assumed and assigned contracts attached to the executed definitive asset purchase agreement with a Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the applicable Successful Bidder. No Executory Contract or Unexpired Lease in the Assumption Notice or a Supplemental Assumption Notice shall be assumed other than

(Page | 15)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

in connection with (and concurrently with the effectiveness of) the assignment of such Executory Contract or Unexpired Lease to the applicable Successful Bidder.

## IV.   **Miscellaneous.**

25.      Nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies or defenses that any party (including the SIMAD Debtors and any Stalking Horse Bidder(s), if applicable, or any other Potential Purchaser) has or may have under applicable bankruptcy and non-bankruptcy law, under any indemnity agreements, or related agreements or any letters of credit relating thereto, or any rights, remedies, or defenses of the SIMAD Debtors with respect thereto, including seeking Bankruptcy Court relief with regard to the Auction(s), the Bidding Procedures, any Sale Transaction(s), and any related items (including, if necessary, to seek an extension of the Bid Deadline).

26.      The SIMAD Debtors may modify any of the dates and deadlines set forth herein without further order of the Court in consultation with the Consultation Parties; *provided* that the SIMAD Debtors will serve notice (email from the SIMAD Debtor's proposed counsel, Cole Schotz P.C., to suffice) to any Qualified Bidder(s), Stalking Horse Bidder(s), and the U.S. Trustee, as applicable and appropriate, informing them of such modification.  The SIMAD Debtors are further authorized, but not directed, to conduct multiple Sale Transaction(s) and/or Auction(s) (as necessary) in substantial conformity with the Schedule and Bidding Procedures established through this Order.

(Page | 16)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

27.     The failure to include or reference a particular provision of the Bidding Procedures specifically in this Order shall not diminish or impair the effectiveness or enforceability of such a provision.

28.     In the event of any inconsistencies between this Order, the Motion and/or the Bidding Procedures, this Order shall govern in all respects.

29.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the SIMAD Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the SIMAD Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is a secured claim, an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Order or the Motion or any order granting the relief requested by the Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission by the SIMAD Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the SIMAD Debtors' estates; (g) a waiver or limitation of the SIMAD Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) a concession by the SIMAD Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are

(Page | 17)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief |

valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; or (i) a waiver of the obligation of any party in interest to file a proof of claim. Any payment made pursuant to this Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the SIMAD Debtors' rights to subsequently dispute such claim.

30.     The SIMAD Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

31.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be effective and enforceable immediately upon entry hereof.

32.     Notice of the Motion as provided herein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

33.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 1

## Bidding Procedures

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*,[1] | Case No. 26-16388 (CMG) |
| Debtors. | (Jointly Administered) |

**BIDDING PROCEDURES FOR THE SUBMISSION, RECEIPT,**
**AND ANALYSIS OF BIDS INCONNECTION WITH THE**
**SALE OF THE SIMAD DEBTORS' SALE PACKAGES**

On June 4, 2026 and June 5, 2026, the above-captioned debtors and debtors in possession (collectively, the "SIMAD Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Court").

---

[1]   A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.  The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

On [●], 2026, the Court entered an order (the "Bidding Procedures Order"), approving, among other things, these bidding procedures (the "Bidding Procedures").[2] These Bidding Procedures set forth the process by which the SIMAD Debtors are authorized to solicit bids and conduct an auction or multiple auctions (each, an "Auction").

Copies of the Bidding Procedures Order or any other documents in the SIMAD Debtors' chapter 11 cases are available upon request to the SIMAD Debtors' Claims and Noticing Agent, by visiting the website of the Claims and Noticing Agent at https://restructuring.ra.kroll.com/SIMAD.

### I.      Sale Package(s) to be Auctioned.

The SIMAD Debtors are seeking to sell all, substantially all, or a portion of the assets (collectively, the "Assets")[3] relating their portfolio of summer camps in one or more sale transactions. **For the avoidance of doubt, the SIMAD Debtors may sell camps in a single transaction, several transactions or on an individual basis.**

### II.     Public Announcement of Auction(s).

Within two (2) business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the SIMAD Debtors shall (i) cause a notice of an Auction(s) substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Auction Notice(s)"), the Order, and the Bidding Procedures, to be served on the parties that received notice of the Motion, (ii) post the Auction Notice(s) on the website of the SIMAD Debtors' Claims and Noticing agent at https://restructuring.ra.kroll.com/SIMAD, and (iii) submit for publication the Auction Notice(s), with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition) and/or another national publication reasonably acceptable to the SIMAD Debtors.

### III.    Potential Purchaser Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the applicable Sale Package (a "Potential Purchaser") must deliver or have previously delivered to the SIMAD Debtors and their advisors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

  a.   an executed confidentiality agreement (a "Confidentiality Agreement") in a form and substance acceptable to the SIMAD Debtors;

---

[2]   Capitalized terms used but not defined herein shall have the meanings given to them in the Bidding Procedures Order.

[3]   For the avoidance of doubt, the SIMAD Debtors' assets associated with its real property located at 365 Canal Street, New Orleans, LA 70130 are not subject to these Bidding Procedures.

b.    identification of the Potential Purchaser and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale Transaction;

c.    a statement of what Sale Package(s) the Potential Purchaser intends to acquire;

d.    sufficient information that the Potential Purchaser has or can reasonably obtain the financial capacity to close the contemplated Sale Transaction(s), the adequacy of which must be acceptable to the SIMAD Debtors; and

e.    a statement detailing whether the Potential Purchaser is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

The SIMAD Debtors, in consultation with their advisors and the Consultation Parties,[4] will determine and notify each Potential Purchaser whether such Potential Purchaser has submitted adequate documents so that such Potential Purchaser may proceed to conduct due diligence and submit a bid (such Potential Purchaser that complies with the foregoing conditions, an "Acceptable Bidder"). For the avoidance of doubt, an Acceptable Bidder shall not be eligible to participate in the Auction(s) unless such Acceptable Bidder meets the requirements set forth in section IV below. For the avoidance of doubt, in the event that any secured creditor authorized to submit a credit bid pursuant to any order of the Bankruptcy Court, applicable underlying security or credit agreement and related credit documentation including any intercreditor agreement or any agent or designee of such secured creditor, elects to submit a credit bid for any Sale Package(s), each such secured creditor, or such secured creditor's agent or designee, if applicable, shall be an Acceptable Bidder and shall not be required to comply with the aforementioned potential bidder requirements of this Section III, subject to any applicable challenge rights relating to the validity of such underlying security or credit agreement and related credit documentation, on the basis that the alleged secured creditor is not entitled to credit bid their alleged interests. To the extent a secured creditor submits a credit bid, it shall not be one of the Consultation Parties with respect to the assets for which it submits a credit bid.

## IV.    Qualified Bid Requirements.

To be eligible to participate in the Auction(s), an Acceptable Bidder must deliver to the SIMAD Debtors and their advisors an irrevocable offer to purchase the applicable Sale Package(s) in the form of a document signed by the Acceptable Bidder (each, a "Bid," and if such Bid meets the requirements of this section, a "Qualified Bid"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline (as defined below) (such Acceptable Bidder that complies with the forthcoming conditions, a "Qualified Bidder"):

---

[4]    The Consultation Parties shall mean the following: (i) counsel to any official committees appointed in these chapter 11 cases, (ii) counsel to Bank of New Hampshire, (iii) counsel to Mishmeret Trust Company, Ltd. in its capacity as Trustee for the Debentures (Series A) (the "Bond Trustee"), and (iv) counsel to Mishmeret Trust Company, Ltd. in its capacity as DIP agent (the "DIP Agent").

i.  **Purchased Sale Package(s) and Assumed Liabilities.** Each Bid must clearly state the following: (a) which Sale Package(s) and which Assets or equity the Acceptable Bidder seeks to purchase; (b) if applicable, the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c) any executory contracts (the "Executory Contracts") and unexpired leases (the "Unexpired Leases") to be received by assignment;

ii.  **Good Faith Deposit.** Each Bid must be accompanied by a cash deposit in the amount equal to ten (10) percent of the aggregate Purchase Price of the Bid, to be held in an escrow account to be identified and established by the SIMAD Debtors (the "Good Faith Deposit").  To the extent that a Bid is modified at or prior to the Auction(s), the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals ten (10) percent of the increased aggregate Purchase Price promptly and in no event later than one (1) business day following the conclusion of the Auction(s);

iii.  **Purchase Price.** Each Bid must: (a) clearly set forth the purchase price to be paid for the applicable Sale Package(s) (the "Purchase Price"); (b) identify separately the cash and noncash components of the Purchase Price; (c) indicate the allocation of the Purchase Price among the applicable Sale Package Assets (including liabilities and obligations to be assumed in connection with any Sale Transaction(s)); provided that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation; and (d) describe its proposed post-emergence debt obligations and liquidity position for the post-reorganization company, if the Bid contemplates to effectuate the sale through a plan of reorganization.  The Purchase Price should be a single point value in U.S. dollars on a cash-free, debt-free basis.  Any Bid for substantially all of the applicable Sale Package Assets must also include a statement as to whether the Bid is conditioned on purchasing all of the business or whether the Bid should be viewed as a separate Bid for one or more Sale Package(s);

iv.  **Tax Structure; Structure**. Each Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if the SIMAD Debtors will incur any incremental tax liabilities under the Bid.  Each Bid must also identify the structure proposed for undertaking any Sale Transaction(s), including the specific Sale Package(s) of the SIMAD Debtors Assets being acquired and liabilities being assumed, the proposed steps to accomplish the Sale(s), and any financial, legal, or tax considerations upon which the Bid's proposed structure relies;

v.  **Sources of Financing**. To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate any Sale Transaction(s) set forth in its Bid with cash on hand, the Bid must include evidence of committed financing, documented to the SIMAD Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Acceptable Bidder has received sufficient funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction(s) and other obligations under its Bid. Such

funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the SIMAD Debtors;

vi.   **Same or Better Terms; Bid Documents**. Each Bid must include duly executed and non-contingent transaction documents necessary to effectuate any Sale Transaction(s) contemplated in the Bid (the "Bid Documents") and must be submitted by the deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline").  The Bid Documents shall include, at a minimum: (a) a purchase agreement, the form of which will be provided to Acceptable Bidders no later than July 1, including the exhibits and schedules related thereto and any related material documents integral to such Bid pursuant to which the Acceptable Bidder proposes to effectuate any Sale Transaction(s), along with copies that are marked to reflect any amendments and modifications from the purchase agreement provided, which amendments and modifications may not be materially more burdensome than or otherwise inconsistent with the Bidding Procedures, (b) a schedule of contracts and leases to be rejected to the extent applicable to the Bid, (c) any other material documents integral to such Bid, and (d) a statement from the Acceptable Bidder that (i) it is prepared to enter into any Sale Transaction(s), subject to any necessary regulatory approvals, as specified by the Acceptable Bidder in such Bid Documents and (ii) the Bid will be irrevocable (whether or not such Bid is selected as the Successful Bid or next highest or otherwise best bid) (the "Back-Up Bid") until the confirmation of a plan;

vii.   **No Qualified Bidder Bid Protections**. Unless such Bid is selected as a Stalking Horse Bid, such Bid must include a statement that the Bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the applicable Sale Package;

viii.   **No Fees**. Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the bidding process and any Sale Transaction, and by submitting its Bid(s) is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code, any breakup fee, termination fee, or similar type of payment or reimbursement; provided that the SIMAD Debtors are authorized to provide the Stalking Horse Bid Protections (defined below) to one or more Stalking Horse Bidders in accordance with the Bidding Procedures;

ix.   **Employee Obligations**. Each Bid must include a description of the Acceptable Bidder's intentions with respect to the relevant members of the SIMAD Debtors' current management team, camp leadership team and, to the extent known, other employees, and a description of any contemplated incentive plan, to the extent applicable;

x. **Adequate Assurance of Future Performance and Information.** Each Bid must (i) identify the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned in connection with the proposed Sale Transaction(s), (ii) provide for the Cure Payments (as defined in the Order) related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate, in the SIMAD Debtors' business judgment, that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, (iv) be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the reasonable satisfaction of the SIMAD Debtors, that such Acceptable Bidder (a) has the financial wherewithal and ability to consummate the proposed Sale Transaction(s) (the "Closing(s)"), and (b) can provide adequate assurance of future performance in connection with the proposed Sale Transaction(s), and (v) identify a contact person that parties may contact to obtain additional Adequate Assurance Information;

xi. **Contingencies; No Financing or Diligence Outs.** Each Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of such Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline;

xii. **Identity & Corporate Authority**. Each Bid must (i) fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the proposed Purchaser is an entity formed for the purpose of consummating the Sale(s)), and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered, by power of attorney or otherwise, to complete the Sale Transaction(s) on the terms contemplated by the parties, and (ii) include contact information for the specific person(s) and counsel whom the SIMAD Debtors' advisors should contact regarding such Bid. Each Bid must also fully disclose any business relationships, affiliations, or agreements with the SIMAD Debtors, any other known, potential, prospective bidder or Qualified Bidder, or any officer, director, or equity security holder of the SIMAD Debtors;

xiii. **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the applicable Sale Package(s) in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement;

xiv. **Authorization**. Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the contemplated Sale Transaction(s);

xv. **Joint Bids**. The SIMAD Debtors will be authorized to approve joint Bids in their reasonable business judgment in consultation with the Consultation Parties on a case-by-case basis, so long as a joint bid meets the Qualified Bid requirements and the applicable bidders otherwise comply with the Bidding Procedures;

xvi. **Acknowledgement of Compliance with Bidding Procedures, Bidding Order, Bankruptcy Code, and Non-Bankruptcy Law**. Each Acceptable Bidder in connection with each Bid submitted must acknowledge its compliance in all respects with the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code and any applicable non-bankruptcy law;

xvii. **No Collusion**. Each Acceptable Bidder must, in writing, (a) acknowledge that it has not engaged in any collusion with respect to any Bids or any Sale Transaction(s), specifying that it did not agree with any other Acceptable Bidders or Potential Purchaser to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction(s), or any Sale Transaction(s).  For the avoidance of doubt, this requirement does not restrict Potential Purchaser(s) from working with other Potential Purchaser(s) with the SIMAD Debtors' prior written consent (email shall suffice);

xviii. **Good Faith Offer**. Each Bid must constitute a good faith, bona fide offer to consummate any proposed Sale Transaction(s);

xix. **Back-Up Bid**. Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder if the Acceptable Bidder's Bid is the next highest or otherwise best bid after the Successful Bid for the applicable portion of the applicable Sale Package(s);

xx. **Regulatory and Third-Party Approvals and Covenants**. Each Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction(s), if any, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the applicable purchase agreement and/or confirmation of the SIMAD Debtors' chapter 11 plan (the "Plan"), those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible). Each Bid must include the forms necessary for submission of regulatory approval of any Sale Transaction(s), as applicable;

xxi. **Expected Closing Date**. Each Bid must state the Acceptable Bidder's expected Closing date;

xxii. **Time Frame for Closing**. A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the SIMAD Debtors in consultation with the Consultation Parties;

xxiii. **Adherence to Bidding Procedures**. By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of the Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction(s) after conclusion of the Auction(s);

xxiv. **Consent to Jurisdiction**. Each Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the SIMAD Debtors' qualification of: (i) Bid(s), (ii) Auction(s), (iii) Sale(s), (iv) Sale Transaction(s) and the construction and (v) enforcement of the Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bid(s), the Bid Documents, and any and all other agreements entered into in connection with any Sale Transaction(s), and the Closing(s), as applicable;

xxv. **Allocation Condition**. If a Bid has an allocation of value across Sale Package(s), or otherwise across multiple segments of the SIMAD Debtors' businesses, a statement indicating such allocation of value across such Sale Package(s) or segments; and

xxvi. **Conditions to Closing**. Each Bid must identify with particularity each and every condition to closing, including the Executory Contracts and Unexpired Leases for which assumption and assignment is required;

Only Bids fulfilling all of the preceding requirements contained in this section, or as otherwise determined in the SIMAD Debtors' reasonable business judgment, in consultation with the Consultation Parties, may be deemed to be a Qualified Bid and only those parties submitting Qualified Bids may, in the SIMAD Debtors' reasonable business judgment, be deemed to be Qualified Bidders; *provided that*, notwithstanding anything to the contrary herein, in the event that any secured creditor authorized to submit a credit bid pursuant to any applicable order of the Bankruptcy Court, underlying security or credit agreement and related credit documentation including any intercreditor agreement or any agent or designee of such secured creditor, elects to submit a credit bid for any Sale Package(s), such secured creditor, or such secured creditor's agent or designee, if applicable, shall be a Qualified Bidder and such Bid shall be a Qualified Bid *provided, however*, (i) that such secured creditor shall not be required to submit a Good Faith Deposit, (ii) such Bid shall not be required to serve as a Backup Bid subject to this Section IV, and (iii) such secured creditor shall not be a Consultation Party with respect to the Assets for which it submits a credit bid; *provided* that such secured creditors, or such secured creditor's agent or

designee, if applicable, must comply with the requirements listed in sections (iv), (vi), (viii), (ix), (xi), (xiv), (xvi), (xviii), (xxi), (xxii), (xxiii), (xxiv), (xxv), (xxvi) of this Section IV.

Neither the SIMAD Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the applicable Sale Package(s) and any liabilities and obligations to be assumed in connection with any Sale Transaction(s), including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of any Sale Transaction(s) with governmental laws, the truth, accuracy, or completeness of any documents related to the applicable Sale Package(s) or any other information provided by or on behalf of the SIMAD Debtors to a bidder, or any other matter or thing regarding the applicable Sale Package(s). All bidders must acknowledge and agree that upon closing, the SIMAD Debtors shall sell and transfer to the Successful Bidder(s), and the Successful Bidder(s) shall purchase and accept, the applicable Sale Package(s), as applicable, except to the extent expressly provided in the Court's Sale Order. Neither the SIMAD Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the applicable Sale Package(s) and any liabilities and obligations to be assumed in connection with any Sale Transaction(s), or otherwise relating thereto that the SIMAD Debtors, any advisor, or agent representing or purporting to represent the SIMAD Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the SIMAD Debtors only) specifically set forth in the Court's Sale Order.

There shall be no communications between or among Potential Purchasers and/or Acceptable Bidders unless the SIMAD Debtors' advisors have authorized such communication in writing (email to suffice). The SIMAD Debtors reserve the right, in their business judgment, to disqualify any Potential Purchasers or Acceptable Bidders that have communications between or amongst themselves without the prior authorization of the SIMAD Debtors' advisors. For the avoidance of doubt, the joining of Bids between Potential Purchasers or Acceptable Bidders may be permitted by the SIMAD Debtors in their business judgment in consultation with the Consultation Parties.

No later than two (2) days prior to the Auction(s), the SIMAD Debtors, in consultation with the Consultation Parties, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction(s). Any Bid that is not deemed a Qualified Bid shall not be considered by the SIMAD Debtors; provided that if the SIMAD Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the SIMAD Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the commencement of the Auction(s).

**V.   Right to Credit Bid.**

Notwithstanding anything set forth herein or in these Bidding Procedures, any Qualified Bidder who has a valid and perfected lien on any portion of the applicable Sale Package(s) of the SIMAD Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its claim only

with respect to the collateral by which such Secured Creditor is secured; *provided*, further, that Secured Creditors shall not be permitted to credit bid at or after the Auction(s), unless the Secured Creditor notifies the SIMAD Debtors (email between counsel being sufficient) that they intend to credit bid at least three (3) calendar days before the commencement of the Auction(s) and relinquishes all of its rights as a Consultation Party with respect to the evaluation and qualification of competing Bids for the Assets included in their Bid or with respect to seeking and/or obtaining information about other Bids, unless and until such party unequivocally revokes its Bid and waives its right to continue in the bidding process, but shall remain a Consultation Party for other purposes set forth in these Bidding Procedures.

Any credit bid made by a Secured Creditor will be deemed to be a cash Bid solely for purposes of the SIMAD Debtors' evaluation of Bids (including the SIMAD Debtors' evaluation of Qualified Bids and subsequent Bids).  Any Secured Creditor shall be deemed to be an Acceptable Bidder, shall be deemed to have submitted a Qualified Bid, and may participate in any Auction(s) with respect to any assets constituting collateral of such Secured Creditor; *provided* that the credit bid must be submitted no later than three days prior to the Auction.  For the avoidance of doubt, in the event that any secured creditor authorized to submit a credit bid pursuant to any applicable underlying security or credit agreement and related credit documentation including any intercreditor agreement or any agent or designee of such secured creditor, subject to any applicable challenge rights relating to the validity of such underlying security or credit agreement and related credit documentation, elects to submit a credit bid for any Sale Package(s), each such secured creditor, or such secured creditor's agent or designee, if applicable, shall be an Acceptable Bidder (notwithstanding whether such party complies with the aforementioned potential bidder requirements).  Any credit submitted by a secured creditor shall be subject to any applicable challenge rights relating to the validity of such underlying security or credit agreement and related credit documentation, on the basis that the alleged secured creditor is not entitled to credit bid their alleged interests.  For the avoidance of doubt, (i) the DIP Agent shall be deemed a Qualified Bidder with respect to the DIP Agent's collateral; (ii) the Bond Trustee shall be deemed a Qualified Bidder with respect to the Bond Trustee's collateral; and (iii) the Bank of New Hampshire shall be deemed a Qualified Bidder with respect to Bank of New Hampshire's collateral.

## VI.   <u>Obtaining Due Diligence Access</u>.

Only Acceptable Bidders shall be eligible to receive due diligence information, access to the SIMAD Debtors' electronic data room, and additional non-public information regarding the SIMAD Debtors; provided that such access may be terminated by the SIMAD Debtors in their reasonable discretion, including if: (i) an Acceptable Bidder does not become a Qualified Bidder; (ii) the SIMAD Debtors determine any bidder is no longer an Acceptable Bidder; or (iii) these Bidding Procedures are terminated. **No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement**. Beginning on the date the SIMAD Debtors determine that a party is an Acceptable Bidder, or as soon as reasonably practicable thereafter, the SIMAD Debtors will provide such Acceptable Bidder with access to an electronic data room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request.

Acceptable Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the SIMAD Debtors or a potential transaction with any

customer, supplier, or other contractual counterparty of the SIMAD Debtors without the prior written consent of the SIMAD Debtors (email to suffice).  The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the SIMAD Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the SIMAD Debtors shall not furnish any confidential information relating to the SIMAD Debtors or a potential transaction to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement; *provided,* however, that the Consultation Parties shall have access to the data room and all due diligence materials.

The SIMAD Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided that* the SIMAD Debtors may decline to provide such information to Acceptable Bidders who, in the SIMAD Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate a Sale Transaction. For any Potential Purchaser who is a competitor or customer of the SIMAD Debtors or is affiliated with any competitors or customers of the SIMAD Debtors, or otherwise presents a bona fide competitive or strategic concern, the SIMAD Debtors reserve the right to withhold or modify any diligence materials that the SIMAD Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such Potential Purchaser.

### A.      Communications with Acceptable Bidders (including Qualified Bidders).

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Acceptable Bidders (including any Qualified Bidders) shall be through SSG Capital Advisors, LLC. The SIMAD Debtors reserve the right, in their reasonable business judgment to disqualify any Acceptable Bidders that have communications between and amongst themselves without the prior written consent of the SIMAD Debtors (email to suffice).

The SIMAD Debtors have designated Alexander D. Lamm at SSG (alamm@ssgca.com) to coordinate all reasonable requests for additional information and due diligence access.

### B.      Due Diligence from Acceptable Bidders (including Qualified Bidders).

Each Acceptable Bidder (including any Qualified Bidder) and their respective advisors shall comply with all reasonable requests for additional information and due diligence access requested by the SIMAD Debtors or their advisors, regarding the ability of such Acceptable Bidder (including any Qualified Bidder) to consummate its contemplated Sale Transaction(s).  Failure by an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder(s), if any) to comply with such reasonable requests for additional information and due diligence access may be a basis for the SIMAD Debtors, to determine that such Acceptable Bidder is no longer an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder(s), if any) or that a bid made by such bidder is not a Qualified Bid.

**VII.   Bid Deadline**.

Binding Bids must be submitted in writing to the following parties (the "Notice Parties") so as to be **actually received** no later than **4:00 p.m. (prevailing Eastern Time) on July 17, 2026** (the "Bid Deadline"):

(i)     proposed counsel to the SIMAD Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn. Michael D. Sirota, Esq. (msirota@coleschotz.com), Warren A. Usatine, Esq. (wusatine@coleschotz.com), David M. Bass, Esq. (dbass@coleschotz.com), Felice R. Yudkin, Esq. (fyudkin@coleschotz.com), and Daniel J. Harris, Esq. (dharris@coleschotz.com); and

(ii)    the SIMAD Debtors' proposed investment banker, SSG Capital Advisors, LLC, Attn: J. Scott Victor (jsvictor@ssgca.com), Teresa C. Kohl (tkohl@ssgca.com), Craig D. Warznak (cwarznak@ssgca.com), Alexander D. Lamm (alamm@ssgca.com) and Dylan E. Rush (drush@ssgca.com); and

(iii)   counsel to any statutorily appointed committees in these chapter 11 cases.

The SIMAD Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment for all or certain Acceptable Bidders, in consultation with the Consultation Parties.

**VIII.   Evaluation of Qualified Bids.**

The SIMAD Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the SIMAD Debtors' business judgment, in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids for the Sale Package or portion(s) thereof, as applicable (the "Starting Bid"). The SIMAD Debtors shall promptly (and in no event later than twenty-four (24) hours after receipt by the SIMAD Debtors) provide to the U.S. Trustee and the Consultation Parties copies of all Bids received by the SIMAD Debtors; *provided* that the U.S. Trustee and the Consultation Parties must treat such Bids and any related information as confidential and shall not publicly disclose such information without the written consent of the SIMAD Debtors and the applicable bidder. The SIMAD Debtors shall keep the Consultation Parties reasonably informed of all interested parties that become Acceptable Bidders and the status of their due diligence.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the SIMAD Debtors may consider the following factors, in consultation with the Consultation Parties, in addition to any other factors that the SIMAD Debtors deem appropriate: (a) the amount and nature of the total consideration, which includes but is not limited to, assumed liabilities (administrative liabilities, Cure Payments); (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the SIMAD Debtors' estates from the Sale Transaction(s) contemplated by the Bid Documents; (d) the SIMAD Debtors' regulatory requirements; (e) the tax consequences of such Qualified Bid; (f) whether the Qualified Bid contemplates a Sale Transaction

that would be consummated through a plan or a sale pursuant to section 363 of the Bankruptcy Code; (g) the certainty of a Qualified Bid leading to a confirmed plan; and (h) any other consideration that may impact the SIMAD Debtors' stakeholders. Prior to commencing the Auction(s), the SIMAD Debtors shall notify the Stalking Horse Bidder(s), if any, and all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction(s) with respect to the applicable Sale Package(s). At such time, the SIMAD Debtors shall also distribute copies of the Starting Bid to the Stalking Horse Bidder(s), if any, and each Qualified Bidder.

## IX.    **Stalking Horse Bid(s)**

Pursuant to the Order, the SIMAD Debtors may, in consultation with the Consultation Parties, select one or more Qualified Bidders (each, a "Stalking Horse Bid") to act as a stalking horse bidder(s) (the "Stalking Horse Bidder(s)") in connection with the Auction(s) and in connection with any stalking horse agreement with the Stalking Horse Bidder(s) (the "Stalking Horse Agreement(s)"), provide a break-up fee (the "Break Up Fee") not to exceed three percent (3%) of the Purchase Price and agree to reimburse the reasonable and documented out-of-pocket fees and expenses of such Stalking Horse Bidder(s) (the "Expense Reimbursement" and, together with the Break Up Fee, the "Stalking Horse Bid Protections") not to exceed one percent (1%) of the Purchase Price; *provided, however*, that the SIMAD Debtors shall not agree to, incur, or pay any Stalking Horse Bid Protections from the proceeds of any Sale Transaction without the prior written consent of (i) Bank of New Hampshire with respect to its collateral, (ii) the DIP Agent with respect to its collateral, or (iii) the Bond Trustee with respect to its collateral.  To the extent the SIMAD Debtors designate more than one Stalking Horse Bidder pursuant to the Bidding Procedures, no two Stalking Horse Bidders will be designated with respect to any of the same Sale Package(s).  The SIMAD Debtors shall not pay Stalking Horse Bid Protections to any Stalking Horse Bidder(s) on account of the portion of the Purchase Price of such Bid that is a credit bid, assumption of liabilities, or other non-cash (or cash equivalent) consideration, nor provide any Stalking Horse Bid Protections to an insider or affiliate of the SIMAD Debtors.

To the extent the SIMAD Debtors, consistent with the Bidding Procedures, offer Stalking Horse Bid Protections to any additional Stalking Horse Bidder(s), the SIMAD Debtors shall disclose such Stalking Horse Bid Protections in a corresponding notice designating such Stalking Horse Bidder(s) (each, a "Stalking Horse Notice") and serve the Stalking Horse Notice on the Stalking Horse Bidder, the U.S. Trustee, and the Consultation Parties.  The Stalking Horse Notice shall include: (a) the identity of the Stalking Horse Bidder; (b) the amount of the Stalking Horse Bid; (c) the proposed Stalking Horse Bid Protections to be provided to the Stalking Horse Bidder; (d) the terms of the Stalking Horse Agreement; and (e) the applicable Sale Package(s) to which the Stalking Horse Bid relates.  Any objection to (i) the Stalking Horse Bid Protections set forth in the Stalking Horse Notice or (ii) the designation of the Stalking Horse Bidder (a "Stalking Horse Objection"), shall be filed no later than one (1) business day after the filing of the Stalking Horse Notice at 4:00 p.m. (prevailing Eastern Time).  If a timely Stalking Horse Objection is filed, the SIMAD Debtors are authorized to seek an expedited hearing with respect to the Stalking Horse Objection as soon as reasonably possible, subject to the Court's availability.  Absent any timely Stalking Horse Objections, the Stalking Horse Bid Protections set forth in the Stalking Horse Notice(s) and the designation of the Stalking Horse Agreement(s) are approved. Absent any timely Stalking Horse Objection, the Court may approve the Stalking Horse Bid Protections set forth in the Stalking Horse Notice and the designation of the Stalking Horse Bidder(s) without further hearing.

Upon approval of the designation of a Stalking Horse Bidder(s), the SIMAD Debtors are authorized, but not directed, to incur and pay the Stalking Horse Bid Protections to each Stalking Horse Bidder; *provided*, *however*, that, except with the consent of the Bank of New Hampshire or the Bond Trustee, the Stalking Horse Bid Protections shall be paid solely from the gross proceeds of any Sale Transaction with a Successful Bidder other than the Stalking Horse Bidder(s).

**X.      No Qualified Bids; No Auction(s).**

If the SIMAD Debtors do not receive a Qualified Bid or combination of Qualified Bids by the Bid Deadline (or by such date reflecting an extension of the Bid Deadline by the SIMAD Debtors for all or some Acceptable Bidders), the SIMAD Debtors reserve the right to cancel the Auction(s). In the event the only Qualified Bid or combination of Qualified Bids with respect to the applicable Sale Package(s) received by the Bid Deadline is a credit bid, then the Auction(s) will not occur, and the Stalking Horse Bid or the Qualified Bid will be deemed to be the Successful Bid(s) for the Assets to which the Stalking Horse Bid or Qualified Bid relates. The SIMAD Debtors shall, as soon as reasonably practicable after the Bid Deadline, file notice of any cancellation of the Auction(s) with the Court.

**XI.     Modification of the Bid Procedures**.

The SIMAD Debtors reserve the right to modify the Bidding Procedures, in consultation with the Consultation Parties, in good faith to further the goal of attaining the highest or otherwise best offer, or impose, at or prior to the Auction(s), additional terms and conditions on any Sale Transaction(s).  The SIMAD Debtors shall provide notice of any such modification to any Qualified Bidder, including any Stalking Horse Bidder(s); *provided* that the SIMAD Debtors may not (i) modify the consultation or consent rights of Bank of New Hampshire, the DIP Agent or the Bond Trustee as a Consultation Party or (ii) subject to the challenge rights of parties in interest, abridge or limit the rights of Bank of New Hampshire, the DIP Agent or the Bond Trustee to credit bid.

**XII.    Private Sale Procedures**

The Debtors may, in their business judgment, in consultation with the Consultation Parties, after the applicable Bid Deadline, select a Successful Bidder for any of the Assets (each, a "Private Sale") without holding an Auction for such Assets, including any specific camp property pursuant to the procedures described herein (the "Private Sale Procedures").

> i.    To the extent the SIMAD Debtors determine a Private Sale is in the SIMAD Debtors' estates best interests with respect to any Asset, the SIMAD Debtors shall file a notice (each, a "Private Sale Notice") with the Court identifying: (i) the Assets being sold; (ii) the SIMAD Debtor that directly owns the Assets; (iii) the proposed Purchaser of the Assets; (iv) the holders of any Encumbrances or asserted Encumbrances on the Assets known to the SIMAD Debtors; (v) the proposed Purchase Price; (vi) the material economic terms and conditions of the proposed Sale Transaction; (vii) any commission, fees, or similar expenses to be paid in connection with such Proposed Transaction; and (viii) a copy of the proposed Sale Order approving the proposed Private Sale.  The SIMAD Debtors shall serve the

Private Sale Notice on the U.S. Trustee, any statutory committee appointed in these chapter 11 cases, any Secured Creditor with respect to the Assets subject to the Private Sale, and any party reasonably known to allege it is a Secured Creditor with respect to the Assets subject to the Private Sale Notice;

ii. The Private Sale Notice shall establish an objection deadline (the "Private Sale Objection Deadline") seven (7) calendar days after the filing of the Private Sale Notice for parties in interest to objection (each, a "Private Sale Objection") to the proposed Private Sale.  To the extent no Private Sale Objections are filed prior to the Private Sale Objection Deadline, the SIMAD Debtors may file a Certificate of No Objection and submit the applicable proposed Sale Order to the Court for approval; and

iii. Notwithstanding anything to the contrary herein, no Private Sale Notice for the Sale of any Assets that constitute collateral securing the obligations owed to Bank of New Hampshire, the Bond Trustee, or the DIP Agent shall be filed without the prior written consent (not to be unreasonably withheld) of such parties if the proposed Purchase Price for such Assets, net of all costs and expenses of the sale (including any commissions, fees, or similar expenses), would be insufficient to indefeasibly pay in full in cash all outstanding obligations owed to such party that are secured by such Assets.

## XIII.  Auction(s).

Other than as expressly set forth herein, if the SIMAD Debtors receive more than one Qualified Bid for the applicable Sale Package(s)) by the Bid Deadline, the SIMAD Debtors shall conduct the Auction(s) to determine the Successful Bidder(s) in their reasonable business judgment with respect to the applicable Sale Package(s). If one or more Qualified Bids (other than the Bid submitted by the Stalking Horse Bidder(s), if any) are received by the Bid Deadline with respect to the applicable Sale Package, then the SIMAD Debtors shall conduct the Auction(s) with respect to the applicable Sale Package in accordance with the Auction Procedures (as defined below).

If the SIMAD Debtors determine that they have received no Qualified Bids other than any Stalking Horse Bid(s) or they have received only a single Qualified Bid, then the Auction(s) will not occur, and the Stalking Horse Bid(s) or the Qualified Bid will be deemed to be the Successful Bid(s) for the Sale Package(s) to which such Stalking Horse Bid(s) relate. The SIMAD Debtors shall file a notice with the Court within one (1) business day of making such a determination.

The Auction(s), if necessary, shall commence on **July 28, 2026 at 10:00 a.m. (prevailing Eastern Time)**, or such later time or other place as the SIMAD Debtors may determine. The Auction(s) shall be held virtually, via Zoom or such other location designated by the SIMAD Debtors.

The Auction(s) will be conducted in accordance with the following procedures (the "Auction Procedures"):

a. except as otherwise provided herein, only Qualified Bidders shall be entitled to bid at the Auction(s);

b. only the SIMAD Debtors, Qualified Bidders, Consultation Parties, and the U.S. Trustee, and such parties' representatives and advisors may attend the Auction(s); *provided* that Qualified Bidders may appear through a duly authorized representative (other than their counsel) bearing a valid and enforceable power of attorney or other written proof evidencing their ability to bind the applicable Qualified Bidder, which document(s) shall be delivered to the SIMAD Debtors and their advisors prior to the commencement of the Auction(s);

c. the SIMAD Debtors, with the assistance of their advisors, shall direct and preside over any Auction(s);

d. at the commencement of the Auction(s), the SIMAD Debtors may announce modified or additional procedures for conducting the Auction(s) and related rules governing the Auction(s), including time periods available to all Qualified Bidders to submit successive bid(s), or otherwise modify the Bidding Procedures, in each case in consultation with the Consultation Parties;

e. the Qualified Bidders, including any Stalking Horse Bidder(s), if any, must appear in person or through duly-authorized representatives at the Auction(s);

f. bidding shall begin with the Starting Bid(s);

g. subsequent bids (each, an "Overbid") must comply with the following terms: at the Auction(s), the SIMAD Debtors shall announce the minimum increment by which any Overbid must increase in cash, cash equivalents, or other such consideration that the SIMAD Debtors may, in their reasonable business judgment, deem equivalent (including the right of a secured creditor to credit bid any remaining amount of its secured claims) over the previous bid *plus*, in the event that the SIMAD Debtors have entered into a Stalking Horse Agreement to which the Overbid relates, the aggregate amount of Stalking Horse Bid Protections (including, for the avoidance of doubt, any Break Up Fees and/or Expense Reimbursements) under such Stalking Horse Agreement and/or Expense Reimbursement under such Stalking Horse Agreement (a "Minimum Overbid"). The SIMAD Debtors may, in their reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction(s). For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at the Auction(s) must contain a Purchase Price in cash, cash equivalents, or such other consideration that the SIMAD Debtors may, in their reasonable business judgment, deem equivalent (including the right of a secured creditor to credit bid any remaining amount of its secured claims) that exceeds the then existing highest Bid by at least the amount of the Minimum Overbid;

h. each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction(s), as determined by the SIMAD Debtors; *provided*, that, unless the SIMAD Debtors determine otherwise, a failure to respond and submit successive bid(s) at the Auction(s) will result in disqualification;

i.      during the course of the Auction(s), the SIMAD Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous bids and inform each Qualified Bidder which Overbid(s) reflect, in the SIMAD Debtors' view, the highest or otherwise best bid(s) with respect to the applicable Sale Package(s);

j.      to remain eligible to participate in the Auction(s), in each round of bidding, each Qualified Bidder must submit an Overbid with respect to such round of bidding and to the extent a Qualified Bidder fails to submit an Overbid with respect to such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction(s);

k.      the Auction(s) will be transcribed to ensure an accurate recording of the bidding at the Auction(s);

l.      each Qualified Bidder will be required to confirm on the record that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Sale Transaction(s). For the avoidance of doubt, this requirement does not restrict Qualified Bidder(s) from working with other Qualified Bidder(s) with the SIMAD Debtors' prior written consent (email to suffice);

m.      each Qualified Bidder will be required to confirm that its bid is a good faith, *bona fide* offer and it intends to consummate any Sale Transaction(s) if selected as the Successful Bid in accordance with these Bidding Procedures (as may be modified in accordance herewith at the Auction(s));

n.      subject to each Debtor's fiduciary obligations, including as set forth herein, the Court and the SIMAD Debtors will not consider bids made after the Auction(s) has been closed;

o.      the SIMAD Debtors, in their reasonable business judgment, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the SIMAD Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of any Sale Transaction(s), or (iii) contrary to the best interests of the SIMAD Debtors, their estates, their creditors, and other stakeholders;

p.      the SIMAD Debtors have the right to request any additional information that will allow the SIMAD Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the SIMAD Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction(s);

q.      the SIMAD Debtors reserve the right, in their business judgment, to adjourn the Auction(s) one or more times to, among other things, (a) facilitate discussions between the SIMAD Debtors and Qualified Bidders, (b) allow Qualified Bidders the opportunity to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to

provide the SIMAD Debtors with such additional evidence as the SIMAD Debtors, in their business judgment, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount;

r.      notwithstanding anything herein to the contrary, the SIMAD Debtors may at any time choose to adjourn the Auction(s) by announcement at the Auction(s). The SIMAD Debtors shall promptly file notice of such adjournment with the Court; and

s.      the SIMAD Debtors reserve the right to further amend, waive, or otherwise modify the Auction Procedures at any time; *provided* that the SIMAD Debtors may not (i) modify the consultation or consent rights of the Consultation Parties, or (ii) subject to the challenge rights of parties in interest, abridge or limit the rights of Bank of New Hampshire, the DIP Agent or the Bond Trustee to credit bid with respect to each party's respective collateral.

For the avoidance of doubt, nothing in the Bidding Procedures, including the Auction Procedures, will prevent the SIMAD Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the SIMAD Debtors, in consultation with counsel).

Any auction rules adopted by the SIMAD Debtors will not modify any of the terms of any Stalking Horse Agreement(s) or the rights of the Stalking Horse Bidder(s), if any, without the consent of the Stalking Horse Bidder(s), if any.

Except as otherwise determined by the SIMAD Debtors, only (i) the SIMAD Debtors, (ii) the Office of the United States Trustee, (iii) any other Qualified Bidders, (iii) the Consultation Parties, and (iv) the respective representatives and professionals of the foregoing parties shall be entitled to participate in the Auction(s), however, any party in interest will be permitted to attend the Auction(s).

The SIMAD Debtors shall send written notice of the date, time, and place of the Auction(s) to the Qualified Bidders the U.S. Trustee, and the Consultation Parties no later than two (2) business days before such Auction(s), and will post notice of the date, time, and place of the Auction(s) no later than two (2) business days before such Auction(s) on the website of the SIMAD Debtors' claims and noticing agent, at https://restructuring.ra.kroll.com/SIMAD.

## XIV.     Acceptance of the Successful Bid(s).

The Auction(s) shall continue until (i) there is only one Qualified Bid or a combination of Qualified Bids that the SIMAD Debtors determine, in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail, in consultation with the Consultation Parties, is the highest or otherwise best bid to purchase the applicable Sale Package(s), as applicable (each, a "Successful Bid"), and (ii) the SIMAD Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the SIMAD Debtors, at which point, the Auction(s) will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the SIMAD Debtors may, in consultation with the Consultation Parties, consider the following factors in addition to any other factors that the SIMAD Debtors deem appropriate: (a) the amount and nature of the total consideration, which includes but is not limited to, assumed liabilities (administrative liabilities, Cure Payments); (b) the likelihood of the Qualified Bidder's ability to close the Sale Transaction(s) and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the SIMAD Debtors' estates from the transaction contemplated by the Bid Documents; (d) the SIMAD Debtors' regulatory requirements; (e) the tax consequences of such Qualified Bid; (f) whether the Qualified Bid contemplates a Sale Transaction that would be consummated through a plan or a sale pursuant to section 363 of the Bankruptcy Code; (g) the certainty of a Qualified Bid leading to a confirmed plan; and (h) any other consideration that may impact the SIMAD Debtors' stakeholders.

Any Qualified Bidder that submits a Successful Bid will be deemed a "<u>Successful Bidder</u>" with respect to the applicable Sale Package contemplated for purchase pursuant to such Successful Bid. The SIMAD Debtors shall file notice of the Successful Bid and the Successful Bidder with the Court as soon as reasonably practicable after conclusion of the Auction(s). Following conclusion of any Auction(s) and selection of a Successful Bidder, the SIMAD Debtors shall present the results of any Auction(s) at a hearing and shall seek (a) certain findings from the Court regarding the Auction(s), including, among other things, that (i) the Auction(s) was conducted, and the Successful Bidder(s) was selected, in accordance with these Bidding Procedures, (ii) the Auction(s) was fair in substance and procedure, and (iii) Closing of the Successful Bid(s) will provide the highest or otherwise best value for the applicable Sale Package(s), and is in the best interests of the SIMAD Debtors' estates, and (b) Court approval to enter into a binding purchase agreement with the Successful Bidder(s) on the terms of the Successful Bid(s); provided that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that the SIMAD Debtors determined in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law. Within one (1) business day of the conclusion of any Auction(s), each Successful Bidder(s) (including both the Stalking Horse Bidder(s), if any, and Back-Up Bidder, if applicable, but excluding any Secured Creditor exercising its right to credit bid) shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate Purchase Price such that the Successful Bidder's total cash deposit is equal to ten (10) percent of the aggregate Purchase Price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the SIMAD Debtors. Each Successful Bidder and the SIMAD Debtors shall, as soon as possible, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## XV.   <u>Designation of Back-Up Bidder.</u>

The Back-Up Bid to purchase any applicable Sale Package(s) (the "<u>Back-Up Bidder</u>") will be determined by the SIMAD Debtors at the conclusion of the Auction(s), and will be announced at that time to all the Qualified Bidders participating in the Auction(s). The SIMAD Debtors' selection of a Back-Up Bid shall be deemed final and the SIMAD Debtors shall not accept any further bids or offers to submit a bid after such selection; provided that, notwithstanding anything

to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that the SIMAD Debtors determined in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law. The SIMAD Debtors will be authorized, but not required, to consummate any Sale Transaction(s) with the Back-Up Bidder without further order of the Court, so long as such Back-Up Bid shall have been approved in connection with the Court's approval of the Successful Bid, or subject to Court approval if not.

If for any reason a Successful Bidder fails to consummate the Sale Transaction(s) within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid, and the Back-Up Bidder shall be deemed a Successful Bidder and shall be required to consummate any Sale Transaction(s) with the SIMAD Debtors as soon as is reasonably practicable without further order of the Court, upon 24 hours advance notice filed with the Court. To the extent any objections are raised and remain unresolved, the Court may schedule a hearing on an expedited basis to adjudicate such objection.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) ninety (90) days following the hearing to consider the applicable order approving the Sale Transaction(s) (the "Sale Order"), (ii) confirmation of a plan, and (iii) the release of such Back-Up Bid by the SIMAD Debtors in writing (the "Back-Up Termination Date"). The SIMAD Debtors shall return the Back-Up Bidder's deposit owed within five (5) business days of the Back-Up Termination Date.

## XVI.    Approval of the Sale Transaction(s).

A hearing to consider approval of each Sale Transaction(s) (the "Sale Hearing"), is currently scheduled to take place on **August 4, 2026, at 10:00 a.m.**, prevailing Eastern Time, before the Honorable Christine M. Gravelle, or conducted consistent with the procedures established pursuant to the Court's standing orders.

At the Sale Hearing, certain findings will be sought from the Court regarding the Auction(s), including, among other things, that: (i) the Auction(s) occurred, and the Successful Bidder(s) were selected, in accordance with the Bidding Procedures; (ii) the Auction(s) were fair in substance and procedure; (iii) the Successful Bid(s) were Qualified Bid(s) as defined in the Bidding Procedures; and (iv) consummation of any Sale Transaction(s) as contemplated by the Successful Bid(s) in the Auction(s) will provide the highest or otherwise best offer for the applicable Sale Package and are in the best interests of the SIMAD Debtors and their estates. **The Sale Hearing may be continued to a later date by the SIMAD Debtors by sending notice to creditors or other parties in interest prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder(s), if any).**

Objections to the Sale Transaction(s) and the Sale Order must: (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local

Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to be <u>actually received</u> by the SIMAD Debtors by **July 31, 2026[5], at 4:00 p.m., prevailing Eastern Time**.

## XVII.  <u>Return of Good Faith Deposit.</u>

The Good Faith Deposit(s) of the Successful Bidder(s), if any, will, upon consummation of the Successful Bid(s), become property of the SIMAD Debtors' estates and be credited to the portion of such Successful Bidder's or Successful Bidders' applicable Purchase Price.

If the Successful Bidder(s) (or Back-Up Bidder or Back-Up Bidders, if applicable), if any, fails to consummate the Successful Bid(s) (or Back-Up Bid or Back-Up Bids, if applicable), then the Good Faith Deposit(s) of such Successful Bidder(s) (or Back-Up Bidder or Back-Up Bidders, if applicable) will be irrevocably forfeited to the SIMAD Debtors and may be retained by the SIMAD Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the SIMAD Debtors.

The Good Faith Deposits of any unsuccessful Qualified Bidders (except for any Back-Up Bidder or Back-Up Bidders and any Stalking Horse Bidder(s)) will be returned within five (5) business days after consummation of the applicable Sale Transaction(s) or upon the permanent withdrawal of the applicable proposed Sale Transaction(s).

The Good Faith Deposit(s) of any Back-Up Bidder(s), if any, will be returned to such Back-Up Bidder or Back-Up Bidders no later than five (5) business days of the Back-Up Termination Date.

The return of any Good Faith Deposits of any Stalking Horse Bidder(s) will be subject to the terms of such Stalking Horse Bidders' Plan or purchase agreement, as applicable.  All such deposits shall be held in escrow and at no time shall be deemed property of the SIMAD Debtors' estates absent further order of the Court.

## XVIII. <u>Reservation of Rights.</u>

The SIMAD Debtors, in consultation with the Consultation Parties, reserve their rights to modify these Bidding Procedures in good faith, to further the goal of attaining the highest or otherwise best offer, or impose, at or prior to the Auction(s) (if held), additional terms and conditions on the Sale(s) in any manner that will best promote the goals of the bidding process including, without limitation: (i) extending the deadlines set forth in the Bidding Procedures; (ii) adjourning the Auction(s); (iii) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction(s) (if held); (iv) canceling the Auction(s); (v) rejecting any or all Bid(s) or Qualified Bid(s); and (vi) adjusting the applicable Minimum Overbid. The SIMAD Debtors shall provide notice of any such modification to any Qualified Bidder, including any Stalking Horse Bidder(s); *provided* that the SIMAD Debtors may

---

[5]  To the extent that the Auction concludes less than two (2) days prior to the Sale Objection Deadline, the SIMAD Debtors shall file a notice on the docket advising the parties of a new Sale Objection Deadline.

not (i) modify the consultation or consent rights of Bank of New Hampshire, the DIP Agent or the Bond Trustee as a Consultation Party, or (ii) subject to the challenge rights of parties in interest, abridge or limit the rights of Bank of New Hampshire to credit bid. Notwithstanding anything to the contrary herein, the SIMAD Debtors may elect to consummate the Sale Transaction(s) under section 363(f) of the Bankruptcy Code as opposed to pursuant to the Plan with the Successful Bidder(s). All parties expressly reserve all of their rights (and do not waive any such rights) to seek Court relief with regard to the Auction(s), the Bidding Procedures, any Sale Transaction(s), and any related items (including, if necessary, to seek an extension of the Bid Deadline).

### XIX.    **Consent to Jurisdiction.**

All Qualified Bidders at the Auction(s) will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction(s), the Sale(s), the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction(s), as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction(s), any Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the Sale(s) or Sale Transaction(s) if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

### XX.    **Fiduciary Out.**

Notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a SIMAD Debtor or its board of directors, board of managers, or similar governing body of a SIMAD Debtor, or special committee of any board of any SIMAD Debtor, to take any action or to refrain from taking any action related to any Sale Transaction(s) or with respect to these Bidding Procedures, to the extent such SIMAD Debtor, board of directors, board of managers, or such similar governing body determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

**<u>Exhibit 2</u>**

**Form of Auction Notice**

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*,[1] | Case No. 26-16388 (CMG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF SALE BY AUCTION AND SALE HEARING**

PLEASE TAKE NOTICE that on [●], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief*

---

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[Docket No. [●]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "SIMAD Debtors").

**PLEASE TAKE FURTHER NOTICE** that the SIMAD Debtors are soliciting offers for the purchase of all, substantially all, or any portion of the SIMAD Debtors' assets free and clear of all liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, encumbrances, and other interests (collectively, the "Encumbrances") consistent with the bidding procedures (the "Bidding Procedures") approved by the Court pursuant to the Bidding Procedures Order. **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures is **July 17, 2026, at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that if the SIMAD Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the SIMAD Debtors will conduct an auction or multiple auctions (each, an "Auction," and collectively, the "Auctions") of the applicable Sale Package(s) **on July 28, 2026, at 10:00 a.m. (prevailing Eastern Time)** virtually, via Zoom or such other location as determined by the SIMAD Debtors.

**PLEASE TAKE FURTHER NOTICE** that only the SIMAD Debtors, the Qualified Bidders, the U.S. Trustee, and any other parties as the SIMAD Debtors may determine in their reasonable discretion, in each case, along with the representatives and advisors, shall be entitled to participate in the Auction(s), and only Qualified Bidders will be entitled to make Overbids (as defined in the Bidding Procedures) at the Auction(s); *provided*, *however*, that any party in interest and their respective counsel will be permitted to attend the Auction(s). **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bidding Procedures Order.** Copies of the Bidding Procedures, the Bidding Procedures Order, and any other related documents are available upon request to the SIMAD Debtors' Claims and Noticing Agent, by visiting the SIMAD Debtors' restructuring website at https://restructuring.ra.kroll.com/SIMAD.

**PLEASE TAKE FURTHER NOTICE** that the SIMAD Debtors will seek approval of any Sale Transaction(s) at a hearing scheduled to commence **on or before August 4, 2026 at 10:00 a.m., prevailing Eastern Time** (the "Sale Hearing") before the Honorable Christine M. Gravelle, or conducted consistent with the procedures established pursuant to the Court's standing orders.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order, objections to consummation or approval of any Sale Transaction(s) and any objections to proposed cure payments or the assumption and assignment of Executory Contracts or Unexpired Leases, must (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual bases for the objection

---

[2]   Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** **on or before July 31, 2026³, 4:00 p.m., prevailing Eastern Time,** by the following parties:

(i)          proposed counsel to the SIMAD Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn. Michael D. Sirota, Esq. (msirota@coleschotz.com), Warren A. Usatine, Esq. (wusatine@coleschotz.com), David M. Bass, Esq. (dbass@coleschotz.com), Felice R. Yudkin, Esq. (fyudkin@coleschotz.com), and Daniel J. Harris, Esq. (dharris@coleschotz.com); and

(ii)          counsel to any statutorily appointed committee.

### CONSEQUENCE OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE OR A SALE TRANSACTION, AS APPLICABLE, ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE APPLICABLE SIMAD DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT OR THE PLAN, AS APPLICABLE.**

[*Remainder of Page Intentionally Left Blank*]

---

³    To the extent that the Auction concludes less than two (2) days prior to the Sale Objection Deadline, the SIMAD Debtors shall file a notice on the docket advising the parties of a new Sale Objection Deadline.

Dated: June [__], 2026

/s/
**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          dbass@coleschotz.com
          fyudkin@coleschotz.com
          dharris@coleschotz.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

**Exhibit 3**

**Form of Assumption Notice**

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*,[1] | Case No. 26-16388 (CMG) |
| Debtors. | (Jointly Administered) |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY**
**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

---

[1]   A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.  The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
> OR ONE OF YOUR AFFILIATES ARE A COUNTERPARTY TO AN
> EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
> OF THE SIMAD DEBTORS AS SET FORTH ON **EXHIBIT A** ATTACHED HERETO.

**PLEASE TAKE NOTICE** that on [●], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving the Bidding Procedures (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order")[2] in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "SIMAD Debtors").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid(s), the SIMAD Debtors **may** assume and assign to the Successful Bidder(s) the Executory Contracts and Unexpired Leases listed on **Exhibit A** to which you are a counterparty, upon approval of any Sale Transaction(s). The SIMAD Debtors have conducted a review of their books and records and have determined that the Cure Payments for unpaid monetary obligations under such Executory Contract or Unexpired Lease is as set forth on **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Payments, object to a proposed assignment to the Successful Bidder of any Executory Contract or Unexpired Lease, or dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Payments, state the correct Cure Payments alleged to be owed under the applicable Contract or Lease Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **actually received no later than July 31, 2026, at 4:00 p.m. (prevailing Eastern Time)** (**the "Sale Objection Deadline"**) on the following parties:

(i)      proposed counsel to the SIMAD Debtors, Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn. Michael D. Sirota, Esq. (msirota@coleschotz.com), Warren A. Usatine, Esq. (wusatine@coleschotz.com), David M. Bass, Esq. (dbass@coleschotz.com), Felice R. Yudkin, Esq. (fyudkin@coleschotz.com), and Daniel J. Harris, Esq. (dharris@coleschotz.com);

(ii)     and counsel to any statutorily appointed committee.

---

[2]  Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Payments, the proposed assignment and assumption of any Executory Contract or Unexpired Lease, or adequate assurance of the Successful Bidder's ability to perform is filed by the Sale Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Payments as determined by the SIMAD Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Payments are due under the Executory Contract or Unexpired Lease, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of any Sale Transaction(s).

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Executory Contract or Unexpired Lease or related Cure Payments in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Executory Contract or Unexpired Lease on the Assumption Notice or any Supplemental Assumption Notice does not require or guarantee that such Executory Contract or Unexpired Lease will be assumed by the SIMAD Debtors at any time or assumed and assigned, and all rights of the SIMAD Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved. Moreover, the SIMAD Debtors explicitly reserve the right, in their reasonable discretion, to seek to reject or assume each Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the SIMAD Debtors and/or the Successful Bidder, as applicable, to designate any Executory Contract or Unexpired Lease as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that nothing herein (i) alters in any way the prepetition nature of the Executory Contracts or Unexpired Leases or the validity, priority, or amount of any claims of a Contract or Lease Counterparty against the SIMAD Debtors that may arise under such Executory Contract or Unexpired Lease, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Executory Contract or Unexpired Lease against the SIMAD Debtors that may arise under such Executory Contract or Unexpired Leas

Dated: June [●], 2026

/*s*/

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            dbass@coleschotz.com
            fyudkin@coleschotz.com
            dharris@coleschotz.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

**Exhibit A**

**Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases**

[*to be filed with Assumption Notice*]