**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>                 Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

**DECLARATION OF J. SCOTT VICTOR IN SUPPORT OF THE SIMAD
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE
BIDDING PROCEDURES, (II) APPROVING THE STALKING HORSE
BID PROTECTIONS, (III) SCHEDULING BID DEADLINES AND
AUCTION(S), (IV) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE
ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
LEASES, AND (VI) GRANTING RELATED RELIEF**

---

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.  The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

I, J. Scott Victor, declare as follows under penalty of perjury:

1.      I am the Founding Partner and Managing Director at SSG Advisors, LLC ("SSG") the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "SIMAD Debtors").  SSG is an independent boutique investment banking firm which has its principal office at 300 Barr Harbor Drive, Suite 420, West Conshohocken, PA 19428. SSG has expertise assisting middle-market companies and their stakeholders in completing special situation transactions and provides its clients with comprehensive investment banking services in the areas of mergers and acquisitions, private placements, financial restructurings, valuations, litigation and strategic advisory.  SSG has served as an investment banker to debtors and creditors in a variety of industries, and has provided its advisory services in connection with more than 500 transactions.    SSG and its professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

2.      I submit this declaration (this "Declaration") in support of the *SIMAD Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* (the "Motion"),[2] filed contemporaneously herewith which, as noted in the Motion, seeks entry of an order:  (i) authorizing and approving the Bidding Procedures, attached as Exhibit 1 to the Order,

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion, the Bidding Procedures (as defined herein), the Order (as defined in the Motion), or the *Declaration of Assaf Ravid, Chief Restructuring Officer of the SIMAD Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 62], which is incorporated herein by reference.  The material terms of the Bidding Procedures are set forth in greater detail in the Motion.

2

by which the SIMAD Debtors will solicit and, if value-maximizing, select the highest or otherwise best offer(s) for the Sale(s) of substantially all, or any portion of the SIMAD Debtors' Assets, (ii) approving the Bid Protections provided for in the Bidding Procedures, (iii) establishing the Schedule, (iv) approving the form and manner of notice thereof, (v) establishing notice requirements and procedures for the assumption and assignment of Executory Contracts and Unexpired Leases in connection with any proposed Sale(s), and (vi) granting such other and further relief as may be just and proper.

3.      Although SSG is expected to be compensated for its work as the SIMAD Debtors' proposed investment banker in these chapter 11 cases, I am not being compensated separately for this Declaration or testimony.  Except as otherwise indicated herein, all statements set forth in this Declaration are based upon: (a) my personal knowledge of the SIMAD Debtors' operations, finances, and sale efforts; (b) my review of relevant documents; (c) information provided to me by the SIMAD Debtors, the SIMAD Debtors' employees and/or the SIMAD Debtors' other advisors; (d) information provided to me by the employees of SSG working directly with me under my supervision, direction, or control; or (e) my experience as a restructuring professional.  If called upon to testify, I could and would testify to the statements set forth herein on that basis.  I am over the age of 18 years and am authorized to submit this Declaration.

### Professional Background and Qualifications

4.      SSG has extensive experience negotiating and managing restructuring transactions (both outside of court and in chapter 11) and negotiating, structuring, and marketing debtor-in-possession financings. In my current role, I am responsible for tracking and staying current on market trends for special situations capital markets, including distressed entity transactions and debtor-in-possession financings.

5.      I have over 40 years of restructuring experience and have closed over 300 transactions. I have served as an investment banker in more than 200 chapter 11 cases since 2001.

6.      I am also familiar with the SIMAD Debtors' business operations and the marketing process initiated by the SIMAD Debtors upon the commencement of these chapter 11 cases.

**The Retention of SSG**

7.      As more fully described in the First Day Declaration, the SIMAD Debtors own and operate thirty (30) summer camps around the country that are held indirectly by SIMAD Holdings Ltd., a BVI company. The SIMAD Debtors purchase, manage and operate summer camps for children and teenagers (aged 7 to 16).  The SIMAD Debtors' summer camps operate from June through August and are located predominantly throughout the eastern United States region, including in New Jersey, New York, Maine, Pennsylvania, among other states, in which approximately 20,500 children enroll each year.

8.      Prior to the Petition Date, it became apparent that the SIMAD Debtors would not be able to satisfy their funded debt obligations without a chapter 11 filing and required an emergent filing to avoid potentially catastrophic impacts on the SIMAD Debtors' summer camp season. Given these circumstances, the SIMAD Debtors, in consultation with their advisors, determined that the best path to preserving and maximizing value was to pursue the sale of all, substantially all, or any portion of the SIMAD Debtors' summer camps.  Shortly following the chapter 11 filings, the SIMAD Debtors' immediate focus turned to consummating Sale Transaction(s) for the camp Assets which are subject to the Motion.  As part of this process, the SIMAD Debtors engaged SSG as their investment banker on June 15, 2026 to initiate a sale and marketing process for the SIMAD Debtors' summer camp Assets.  Since its engagement, SSG has worked closely with the SIMAD Debtors and their advisors to: (a) review and analyze the SIMAD Debtors' businesses and

financial projections, and (b) market the SIMAD Debtors' Assets (as defined in the Motion), including developing marketing materials and identifying and engaging with Potential Purchasers. Additionally, SSG has worked with the SIMAD Debtors' management and other professionals, and has become familiar with the SIMAD Debtors' capital structure, financial condition, liquidity needs, and business operations.

### The Marketing Process

9.      Shortly after the commencement of these chapter 11 cases, the SIMAD Debtors, with the assistance of SSG, launched a marketing process to engage parties that may be interested in pursuing a Sale Transaction(s) for the SIMAD Debtors' summer camp assets.  Since the SIMAD Debtors commenced the marketing process, SSG has had contact with approximately seventy (70) Potential Purchasers and, as of the filing of the Motion, thirty-five (35)  parties have executed nondisclosure agreements and were provided with access to the SIMAD Debtors' virtual data room containing a confidential information presentation and additional financial, operational, and legal diligence materials.

10.      With the foundation for a successful marketing process in place and proposals indicative of a competitive auction in hand, the SIMAD Debtors plan to utilize chapter 11 to "market test" the interest they have received to attempt to consummate Sale Transaction(s) for the highest or otherwise best possible bid(s) in an effort to maximize the value of their camp Assets for all stakeholders.  Accordingly, the marketing process will continue during these cases so that the SIMAD Debtors can determine if and which of their Potential Purchaser(s) should be signed up as a Stalking Horse Bidder(s), participate in an auction (the "Auction(s)"), if necessary, or be subject to a private sale of such Assets.  Ultimately, the SIMAD Debtors' goal is to obtain the highest or otherwise best possible bids to maximize value for the SIMAD Debtors' estates and

provide camp families assurance that the 2027 camp season will not be impacted by these chapter 11 cases.

### The Bidding Procedures

11.     As noted in the Motion, the Bidding Procedures set forth, among other things, the procedures for interested parties to access due diligence, the manner in which Potential Purchasers and Bids become "qualified," the manner and timing of any Auction(s), the selection and approval of Successful Bidder(s) and Back-Up Bidder(s), and the deadlines with respect to the foregoing.

12.     The Schedule is calculated to balance the need to provide adequate notice to Potential Purchasers with the need to run an expeditious and efficient sale process.  In addition, the Bidding Procedures are designed to generate the highest or otherwise best available recoveries for the SIMAD Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids.  I believe that the Bidding Procedures and the Schedule will appropriately market the Assets and provide interested parties with sufficient opportunity to participate. Importantly, I understand that the Bidding Procedures recognize the SIMAD Debtors' fiduciary obligations to seek to maximize value, and, as such, do not impair the SIMAD Debtors' ability to consider all Qualified Bid(s), and preserve the SIMAD Debtors' right to modify the Bidding Procedures in accordance with their terms as necessary or appropriate to seek to maximize value for the SIMAD Debtors' estates.  Furthermore, I believe that the SIMAD Debtors' ability to pivot to a Private Sale of any of their Assets, pursuant to the terms of the Private Sale Procedures, will ensure the SIMAD Debtors can maximize the value of the Assets while reducing the administrative costs associated with an Auction.

13.     The SIMAD Debtors are seeking approval of the Schedule to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that

ensures the SIMAD Debtors are able to consummate any Sale Transaction(s) expeditiously and avoid disruptions to the SIMAD Debtors' operations.  In addition, the Schedule is designed to ensure that the summer camps can obtain commitments from parents and campers for the 2027 season.

14.     Additionally, as noted in the Motion, I understand that the SIMAD Debtors also seek approval of certain Stalking Horse Bid Protections.  Specifically, the SIMAD Debtors seek approval of a break-up fee not to exceed three percent (3%) of any Purchase Price and the reimbursement of reasonable and documented fees and out-of-pocket expenses not to exceed one percent (1%) of any Purchase Price in the event the SIMAD Debtors decide in their business judgment to offer Stalking Horse Bid Protections to a Stalking Horse Bidder in connection with a Stalking Horse Agreement

### The Proposed Bidding Procedures, Stalking Horse Bid Protections, and Schedule are Reasonable

15.     Based on my experience, I believe that the proposed Bidding Procedures have been designed with the intent to maximize the value received for the Assets by facilitating an open and competitive bidding process in which Potential Purchasers are encouraged to participate and submit competing Bid(s) within the specified timeframe.

16.     Additionally, given the anticipated duration and scope of the SIMAD Debtors' contemplated Schedule (taking into account both the marketing process, the SIMAD Debtors' seasonal operations, and the anticipated commitments for the summer 2027 camp season), it is my view, based on my experience, that the proposed Bidding Procedures, including, without limitation, the marketing process timeline, are reasonable under the circumstances of these chapter 11 cases, as described herein and in the Motion.

17.     With respect to the Schedule, in my opinion, the Schedule provides appropriate time for the SIMAD Debtors to run their comprehensive marketing process, receive and evaluate bids, and, if necessary, hold any Auction(s) for the Assets.  Under the circumstances of these cases, I believe that, based on my experience, this timeline, although expedited, provides the SIMAD Debtors with an appropriate amount of time to conduct the marketing process, solicit and identify competitive, value-maximizing bids and provides camp families assurance that the 2027 camp season will not be impacted by these chapter 11 cases.  Additionally, as set forth in the proposed Bidding Procedures, the SIMAD Debtors will have an opportunity to consider all potential competing offers and select the Successful Bid(s) that they deem to be the highest or otherwise best offers at any Auction(s).  Finally, to the extent the SIMAD Debtors determine that a Private Sale will maximize value with respect to any Assets, the SIMAD Debtors may still pursue such Private Sale.

18.     To the extent the SIMAD Debtors seek to appoint any Stalking Horse Bidder(s), the Stalking Horse Bid Protections identified in the Motion are, in my view and based on my experience, customary and reasonable and are in line with bid protections that stalking horse bidders typically require in similar situations based on fee comparisons reviewed by myself and the SSG team.  In the event the SIMAD Debtors seek to appoint a Stalking Horse Bidder, such appointment will be sought on notice to parties in interest in these chapter 11 cases.  I believe that the allowance of the Stalking Horse Bid Protections is in the best interest of the SIMAD Debtors' estates and their creditors, as a Stalking Horse Bidder, if designated, would establish a floor for bidding that may ultimately increase the consideration received by the SIMAD Debtors in exchange for the Assets.  I believe the ability to appoint a Stalking Horse Bidder and provide such

8

bidder with Stalking Horse Bid Protections provides the SIMAD Debtors the necessary flexibility to pursue a value maximizing transaction.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: June 24, 2026

*/s/ J. Scott Victor*

Name: J. Scott Victor
Title: Founding Partner and Managing Director
SSG Advisors, LLC

9