## **EXHIBIT A**

# SIMAD Holdings Ltd.
## סימד הולדינגס לימיטד

## חברה המאוגדת לפי דיני איי הבתולה הבריטיים

### ("החברה")

## תשקיף להשלמה
### של

620,000,000 ש"ח ערך נקוב אגרות חוב (סדרה א') לא המירות, בנות 1 ש"ח ע.נ., רשומות על שם, הנושאות ריבית שנתית קבועה בשיעור של 7% ואינן צמודות (קרן וריבית) לבסיס הצמדה כלשהו (**"אגרות החוב (סדרה א')"** או **"אגרות החוב"** או **"ניירות הערך המוצעים"**).

אגרות החוב (סדרה א') מוצעות למשקיעים מוסדיים בדרך של הצעה לא אחידה, כאמור בתקנות ניירות ערך (אופן הצעת ניירות ערך לציבור), התשס"ז-2007 (**"תקנות אופן ההצעה"**), באמצעות 620,000 יחידות בנות 1,000 ש"ח ערך נקוב אגרות החוב (סדרה א') כל אחת, כאשר הרכב כל יחידה ומחירה הינם כדלקמן:

| | |
|---|---|
| 1,000 ש"ח ערך נקוב אגרות חוב (סדרה א') | 985 ש"ח |
| **סה"כ מחיר ליחידה** | **985 ש"ח** |

עובר לפרסום התשקיף ולאחר פרסומו, מתנהל הליך קבלת הזמנות (Building Book) ממשקיעים מוסדיים באמצעות החתם המתמחר. החברה טרם נענתה להזמנות ממשקיעים מוסדיים כאמור. הקצאת אגרות החוב (סדרה א') בין המשקיעים המוסדיים תיקבע לפי שיקול דעתה של החברה, לאחר היוועצות בחתם המתמחר.

על אף האמור לעיל, רשאית החברה למכור במסגרת מכרז שיפורסם על-ידיה עד 30% מאגרות החוב (סדרה א') המוצעות על-פי תשקיף זה, למי שאינו משקיע מוסדי, ובלבד שהמכירה למי שאינו משקיע מוסדי תיעשה בהצעה אחידה, באותו המחיר וכן בתוקצינה היחידות למשקיעים המוסדיים ובאותו היום, והכמות שתוקצה לכל משקיע שאינו משקיע מוסדי, תהיה לפי חלקה היחסי של הזמנתו מתוך סך כל ההזמנות של מי שאינו משקיע מוסדי, כאשר כל משקיע יוכל להגיש הזמנה אחת בלבד. היה והחברה תבקש לפרסם מכרז כאמור (**"המכרז"**) יובאו פרטיו במסגרת ההודעה המשלימה (כהגדרתה להלן).

לאחר פרסומו של תשקיף זה, תפרסם החברה הודעה משלימה אשר במסגרתה יושלמו הפרטים החסרים בתשקיף זה ו/או יעודכנו הפרטים הניתנים לעדכון בתשקיף זה, בהתאם לסעיף 16(א1)(2) לחוק ניירות ערך, התשכ"ח-1968 (**"חוק ניירות ערך"**) ולתקנות ניירות ערך (הודעה משלימה וטיוטת תשקיף), התשס"ז-2007 (**"תקנות הודעה משלימה"**) לרבות, אך לא רק,שינויים, ככל שיהיו, בכמות ובתנאי ניירות הערך המוצעים, אשר לא יעלו על השיעורים המותרים בתקנות הודעה משלימה, המוצעים לפי תשקיף זה (**"הודעה משלימה"**). עם פרסומה, תהפוך ההודעה המשלימה לחלק בלתי נפרד מתשקיף זה. לפרטים נוספים אודות ההודעה המשלימה, ראה סעיף 2.7 לתשקיף. ככל שתבוצע גם הצעה אחידה לציבור, כאמור לעיל, תפרסם החברה במסגרת ההודעה המשלימה את מועד פתיחת רשימת החתימות במכרז לציבור ואת מועד סגירת רשימת החתימות במכרז לציבור (ככל שיהיה). כמו כן, ככל שבהודעה המשלימה ישונו פרטים בשיעורים העולים על השיעורים הקבועים בתקנות 1א(א) עד 1א(3) לתקנות הודעה משלימה, תתחיל התקופה להגשת הזמנות לרכישת ניירות הערך המוצעים על-פי תשקיף זה לא לפני חלוף שני (2) ימי מסחר ממועד פרסום ההודעה המשלימה. התקופה להגשת הזמנות תסתיים, בהצעה אחידה לפי תקנה 11(א)(1) לתקנות אופן ההצעה לציבור, לא יאוחר מ-75 ימים מיום פרסום התשקיף להשלמה או מ-45 ימים מתחילת התקופה להגשת הזמנות, לפי המוקדם, ובכל מקרה לא לפני תום שבע (7) שעות ומתוכן חמש (5) שעות מסחר לפחות ממועד פרסום ההודעה המשלימה.

**הצעת ניירות הערך המוצעים הינה הצעה ראשונה לציבור של ניירות הערך של החברה (IPO).** לתיאור ניירות הערך המוצעים, פרטי ההצעה ואופן הצעת ניירות הערך המוצעים – ראה פרק 2 לתשקיף.

לפרטים בדבר אפשרות לפדיון מוקדם של אגרות החוב (סדרה א'), ראה סעיף 7 לשטר הנאמנות בגין אגרות החוב (סדרה א') המובא בנספח ב' לפרק 2 לתשקיף (**"שטר הנאמנות"**). לפרטים בדבר עילות לפירעון מיידי של אגרות החוב, ראה סעיף 8 לשטר הנאמנות.

אגרות החוב (סדרה א') מדורגות בדירוג (P)A3.il על-ידי מידרוג בע"מ. ראה נספח א' בפרק 2 לתשקיף.

אגרות החוב (סדרה א') מבוטחות בשעבודים כמפורט בסעיף 6 לשטר הנאמנות.

לפרטים אודות מגבלות שנטלה על עצמה החברה בקשר עם חלוקת דיבידנדים, ראה סעיף 5.5 לשטר הנאמנות וסעיף 7.4 לתשקיף.

הרישום למסחר בבורסה לניירות ערך בתל אביב בע"מ (**"הבורסה"**) של אגרות החוב המוצעות על-פי תשקיף זה, מותנה בקיום פיזור מזערי של החזקות ציבור באגרות החוב (מהסדרה הרלוונטית) כמפורט בסעיף 2.3.1.1 לתשקיף, בקיום שווי החזקות ציבור מינימאלי באגרות החוב (מהסדרה הרלוונטית) כמפורט בסעיף 2.3.1.2 לתשקיף וכן בקבלת אישור מיותציה המשפטיים של החברה בארה"ב כי הזכויות המועברות (כהגדרתן בסעיף 7.1.6 לתשקיף) הועברו לחברה (**"אישור היועצים המשפטיים בארה"ב"**) ופרסום דוח מיידי (אשר יהווה חלק בלתי נפרד מתשקיף זה) אודות קבלת אישור היועצים המשפטיים בארה"ב, שייחתם בידי החברה, כלל הדירקטורים המכהנים בחברה (נכון למועד הדוח המיידי) ובידי אינפין קפיטל בע"מ בע"מ המשמשת כחתם מתמחר בהנפקה. אם יתברר כי לא התקיימו כל דרישות הבורסה כאמור ו/או לא התקבל אישור היועצים המשפטיים בארה"ב תוך 14 ימי עסקים ממועד קבלת הכספים בידי רכז ההנפקה, אזי תתבטל הנפקת ניירות הערך המוצעים, הם לא יירשמו למסחר בבורסה, הכספים שהתקבלו בידי רכז ההנפקה יושבו למזמינים וניירות הערך המוצעים לא יוקצו למזמינים והחברה תודיע על כך בדיווח מיידי. לעניין זה יובהר, כי הזכויות המועברות תועברנה לידי החברה בסמוך לאחר ההנפקה מכוח תשקיף זה וההודעה המשלימה ולפני הרישום למסחר של אגרות חוב.

לפרטים אודות ייעוד תמורת ההנפקה ראה פרק 6 לתשקיף. בהקשר זה יצוין, כי מאחר שבעלי השליטה בחברה העמידו ערבויות ביחס להתחייבויות החברה כלפי גורמים מממנים, פרעון הלוואות שנטלה החברה מגורמים מממנים כולל באופן אינהרנטי שחרור של בעלי השליטה מערבויות כאמור.

| |
|---|
| להערכת הנהלת החברה, גורמי הסיכון בעלי השפעה גדולה על עסקי החברה, נכון למועד התשקיף הינם: סיכוני מט"ח. גורמי סיכון אלו וגורמי סיכון אחרים בעלי השפעה על עסקי החברה, ומידת הערכת הנהלת החברה את השפעתם על עסקי החברה, ראה סעיף 7.18 לתשקיף. |

נכון ליום 30 ביוני 2025 שיעור הריבית הממוצע בגין הלוואות שנטלה החברה (כמפורט בסעיף המפורטות בסעיף 7.14 לתשקיף) עמד על כ-6.3%.

נכון למועד התשקיף, לבעלי השליטה בחברה ישנה פעילות עסקית נוספת אשר, בחלקה, הינה בתחומי פעילות דומים של החברה. לפרטים אודות הסכם תיחום פעילות בין בעלי השליטה לבין החברה ראה סעיף 7.1.4.2 לתשקיף.

לפרטים אודות התחייבות בעלי השליטה, כאמור לעיל, להעביר לחברה את כל הזכויות המועברות (כמפורט בסעיף 7.1.6 לתשקיף), כנגד הקצאת מניות של החברה ותשלום מזומן בסך של 50 מיליון דולר (אשר ישולם מתוך תמורת הנפקת אגרות החוב (סדרה א') של החברה), בכפוף להתקיימות דרישות הסף לרישום אגרות החוב המוצעות על-פי תשקיף זה וההודעה המשלימה למסחר בבורסה, ועובר למועד רישומן של אגרות החוב למסחר כאמור, ראה סעיף 7.16 לתשקיף. העברת הזכויות המועברות לחברה תתבצע על בסיס "As Is" והחברה לא תהא זכאית לכל שיפוי מהיישויות המעבירות בקשר עם הזכויות המועברות (כהגדרת מונחים אלו בסעיף 7.1.6 לתשקיף).

החברה התאגדה ביום 28 במאי 2025, באיי הבתולה הבריטיים (the British Virgin Islands), כחברה פרטית מוגבלת במניות, בהתאם להוראות ה- BVI Business Companies Act, 2004. כל עוד יוחזקו בידי הציבור ניירות הערך של החברה המוצעים על-פי תשקיף זה, יחולו על החברה הוראות חוק ניירות ערך והתקנות שהותקנו מכוחו, החלות על חברות שהתאגדו מחוץ לישראל ואשר רשומות למסחר בבורסה בישראל. בהתאם, כל עוד מוחזקים ניירות הערך של החברה על-ידי הציבור, החברה תדווח בהתאם להוראות הדיווח המתאימות על-פי חוק ניירות ערך ותקנותיו. בנוסף, יחולו על החברה הוראות סעיף 39א(א) לחוק ניירות ערך וכפועל יוצא מכך יחולו עליה הוראות שונות של חוק החברות, התשנ"ט-1999 ("חוק החברות"), החלות על חברות שהתאגדו מחוץ לישראל והמציעות אגרות חוב לציבור בישראל, לרבות הוראות הנוגעות למינוי דירקטורים חיצוניים, מבקר פנים וועדת ביקורת, כמפורט בתוספת הרביעית לחוק ניירות ערך. הוראות כאמור בנוסף להוראות מסמכי ההתאגדות של החברה ודיני איי הבתולה הבריטיים.

תקנון החברה כולל את כלל ההוראות המוחלות על החברה מכח סעיף 39א(א) לחוק ניירות ערך לרבות הוראות סעיף 350 לחוק החברות וכן סעיף המחיל את סמכות השיפוט בישראל. בהקשר זה, קיבלה החברה חוות דעת מעורכי דינה באיי הבתולה הבריטיים לפיה הוראות סעיף 350 לחוק החברות חלות עליה, וכי ההתייחסות בתקנון לסמכות השיפוט בישראל אינם סותרים את חוקי איי הבתולה הבריטיים. חוות הדעת כאמור מצורפת לפרק 11 לתשקיף.

מובהר, כי שטר הנאמנות ונספחיו, לרבות אגרות החוב, כפופים להוראות הדין הישראלי (ראה סעיף 14 לתנאים הרשומים מעבר לדף שבשטר הנאמנות). שטר הנאמנות קובע כי בית המשפט היחידי שיהיה מוסמך לדון בעניינים הקשורים לחברה ואשר נוגעים לשטר הנאמנות על נספחיו, לרבות אגרות החוב, יהיה בית המשפט המוסמך בתל-אביב-יפו.

לפרטים אודות התחייבויות בלתי חוזרת של החברה, בעלי השליטה של החברה, ונושאי המשרה המכהנים בחברה (בהווה ובעתיד) (ושיכהנו בה בעתיד), בין היתר, שלא להתנגד לבקשת הנאמן ו/או מחזיקי אגרות החוב אשר תוגש לבית משפט בישראל להחלת הדין הישראלי לעניין פשרה והסדר וחדלות פירעון, ככל שתוגש, שלא לפנות ביוזמתם לבית משפט מחוץ לישראל בכדי לקבל הגנה המונעת או מגבילה את הליך הנקנט על-ידי הנאמן ו/או מחזיקי אגרות החוב שלא להתנגד אם בית משפט בישראל יבקש להחיל את הדין הישראלי לעניין פשרה והסדר וחדלות פרעון, וכן שלא להעלות טענה כנגד סמכותו המקומית של בית המשפט בישראל בקשר עם הליכים שיוגשו על-ידי הנאמן ו/או מחזיקי אגרות החוב של החברה, ראה סעיף 33 לשטר הנאמנות. למען הסר ספק יובהר ויוגדש כי התחייבות בעלי השליטה ונושאי המשרה בחברה תכלולנה באופן מפורש גם התחייבות בלתי חוזרת שלא להניע ביוזמתם הליך של חדלות פירעון לפי דין זר ובמקום שיפוט שאינו ישראל.

לעניין דיני חדלות פירעון, תתכן תחולה של הדינים האמורים בשלוש טריטוריות, ישראל, איי הבתולה הבריטים וארה"ב. עם זאת, לאור האמור לעיל ובכפוף לקיום ההתחייבויות החברה, בעלי השליטה ונושאי המשרה, אזי הליך של חדלות פירעון, שלא על-פי הדין הישראלי ו/או בתי משפט לא ישראליים, יכול לנבוע רק מתביעה של נושה זר.

לעניין זה יצוין כי ככל שייפתח הליך של חדלות פירעון, שלא על-פי הדין הישראלי ו/או בית משפט זר, הנובע מתביעה של נושה זר, החברה תעשה כמיטב יכולתה ותטען ל"פורום לא נאות" והכל בכפוף לכל דין.

בהתאם לחוות דעת של משרד עורכי דין Maples & Calder מאיי הבתולה הבריטיים[1] (מדינת התאגדותה של החברה), אשר הוגשה לבורסה : דיני איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה אינם מגבילים או מונעים את הצעתם של ניירות הערך המוצעים בתשקיף זה לציבור בישראל, את רישומם למסחר של ניירות הערך המוצעים על-פי תשקיף זה בבורסה ו/או את המסחר בהם בבורסה, וניירות הערך המוצעים על-פי תשקיף זה יוכלו להיסחר בחופשיות בבורסה ולהיסלק במסלקת הבורסה ללא מגבלות כלשהן תחת דיני איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה.

לפרטים נוספים ראו גם בחוות הדעת של משרד עורכי דין Maples & Calder בעניין זה ותרגומה לעברית המובאים בפרק 11 לתשקיף.

על תשקיף זה ועל הצעת ניירות הערך על-פיו ורכישתם וכל הנובע ו/או הקשור לתשקיף זה, בהצעת ניירות הערך המוצעים בתשקיף זה, יחולו דיני מדינת ישראל. סמכות השיפוט בכל עניין הקשור לתשקיף זה ולהצעת ניירות הערך המוצעים מוקנית לבתי המשפט המוסמכים בישראל. רוכשי ניירות הערך המוצעים על-פי תשקיף זה, בהסכמתם לרכוש את ניירות הערך האמורים, מקבלים על עצמם סמכות שיפוט בלעדית זו וברירת דין זו.

לפרטים אודות השלכות המיסוי הקשורות בהשקעה בניירות הערך המוצעים על-פי תשקיף זה, בין היתר, בשל תחולת דיני המס של איי הבתולה הבריטיים, דיני המס בארה"ב וכן דיני המס בישראל ראו בסעיף 2.9 לתשקיף.

החברה (בהתימתה על התשקיף) ובעלי השליטה בה התחייבו, כי כל עוד קיימת יתרה של אגרות חוב (סדרה א') במחזור ובכפוף לחוקי המס הקיימים, החברה תבחר שלא להיחשב כתאגיד הממוסה כחברה (corporation) לצרכי מס אמריקאי. ראה גם סעיף 7.15 לתשקיף.

נכון למועד פרסום התשקיף, החברה מינתה יושב ראש דירקטוריון שהינו תושב ישראל, לצד דירקטורים נוספים שהינם תושבי ישראל, כך שמרבית חברי דירקטוריון החברה הינם תושבי ישראל. בהתאם, למועד פרסום התשקיף לא מתקיים בחברה האמור בהגדרת של "חברה נטולת זיקה לישראל", כמשמעותה ב-"הוראות רשות ניירות ערך למנהלי הקרנות בדבר גילוי בשם הקרן אודות חשיפה אפשרית לאג"ח שאינו מדורג בדירוג השקעה, לאג"ח של חברות נטולות זיקה לישראל ולתאגיד בנקאי אצלו מוחזקים מזומנים ופיקדונות של הקרן (נוסח חדש – 2021)".

נכון למועד התשקיף, בעלי השליטה ונושאי המשרה בחברה מאוגדים או הינם תושבי ו/או אזרחי ארה"ב, יותר מ-50% מנכסי החברה ממוקמים בארה"ב ועסקיה של החברה מנוהלים בעיקר בארה"ב. לפיכך, החברה הינה "domestic issuer" כהגדרת המונח בסעיף 902 ל- Regulation S שהותקנה מכוח United States Securities Act of 1933, כפי שתוקן ("Regulation S" ו-"Securities Act"), בהתאמה).

ההצעה לציבור מכוח תשקיף זה, ככל שתיעשה, תעשה בישראל בלבד לתושבי ישראל, בהתאם לפטור מדרישות הרישום של ניירות ערך אמריקאיים תחת Regulation S אשר הותקן תחת ה-Securities Act, כהצעה על-פי Category 1.

כל רוכש של ניירות הערך שמוצעים על-פי תשקיף זה, ייחשב כמי שהצהיר כלפי החברה והמפיצים מצג, כי הוא תושב ישראל אשר שהה מחוץ לארה"ב בעת שהדרכשה לרכישת היחידות המוצעות הוגשה, כי הוא אינו רוכש את ניירות הערך המוצעים עבור U.S. Person וכי הוא אינו רוכש את ניירות הערך המוצעים תוך כוונה לבצע "הפצה" (distribution) בארה"ב (כהגדרת מונח זה ב-Securities Act). מפיצים עימם תתקשר החברה, ככל שתתקשר, להפצת ניירות הערך שיוצעו מכוח תשקיף זה, חברות קשורות שלהם וכל מי שפועל מטעמם, יצהירו, כי יציעו את ניירות הערך האמורים לתושבי ישראל בלבד ולא למי שהוא U.S. Person וכי לא ביצעו ולא יבצעו בארה"ב כל פעולה או פרסום בקשר עם קידום מכירתם של ניירות הערך האמורים.

סעיף 904 ל-Regulation S קובע, כי ניירות ערך שמוצעים על-פי תשקיף זה ניתנים למכירה חוזרת בבורסה על-ידי כל אדם (למעט על-ידי החברה, מפיץ, או גופים הקשורים למי מהם או כל אדם הפועל בשם האנשים האמורים (למעט נושא משרה או דירקטור שהינו צד קשור לחברה או למפיץ רק בשל היותו דירקטור או נושא משרה כאמור), כל עוד : (א) אין הצעה נעשית ל-U.S. Person (כהגדרתו ב-Regulation S); (ב) אין למוכר או למי שפועל מטעמו ידיעה, כי הרכישה תואמה מראש עבור קונה בארצות הברית ; ו-(ג) אין מאמצי מכירה מכוונים (כהגדרתה ב-Regulation S) בארה"ב על-ידי המוכר, גוף קשור, או כל אדם הפועל בשמם. במקרה של מכירה חוזרת על-ידי נושא משרה או דירקטור בחברה או במפיץ, שהוא גוף קשור לחברה או למפיץ רק בשל היותו דירקטור או נושא משרה כאמור, כפופים בנוסף למגבלה הבאה : לא יהיו זכאים לעמלות מכירה, עמלות או תגמול אחר, מלבד עמלת הברוקרים השגרתית והנהוגה המתקבלת על-ידי אדם המבצע עסקה כאמור כסוכן.

אף אדם אינו מוסמך לנקוט בכל פעולה בארה"ב בקשר עם הצעתם או מכירתם של ניירות הערך שמוצעים על-פי תשקיף זה.

תשקיף זה לא הוגש, ולא יוגש, לרשות ניירות ערך בארה"ב, וניירות הערך אשר מוצעים על-פי תשקיף זה לא נרשמו תחת ה-Securities Act בארה"ב.

יש לקבל החלטה לרכוש את ניירות הערך המוצעים על-פי תשקיף זה, אך ורק בהסתמך על המידע הנכלל בתשקיף זה. החברה לא התירה ולא תתיר לכל אדם או גוף אחר כלשהו למסור מידע שונה מזה המפורט בתשקיף זה.

תשקיף זה לא יהווה הצעה של ניירות ערך בכל מדינה אחרת, למעט מדינת ישראל.

החברה המציאה לבורסה חוות דעת של משרד עורכי דין אמריקאי, לפיה, כפוף להנחות, להסתייגויות ולמגבלות הקבועות בחוות הדעת, לא נדרש רישומן של אגרות החוב תחת ה-Securities Act לצורך מכירת או מסירת אגרות החוב המוצעים באופן המפורט בתשקיף זה, לצורך רישום שלהן למסחר בבורסה ולצורך מסחר בהן במסגרתה.

---

[1] יודגש, כי חוות הדעת האמורה לא תיחשב כחוות דעת עורך דין לעניין סעיף 17(ב)(3) לחוק ניירות ערך.

סך כל ההוצאות הכרוכות בהנפקת ניירות הערך המוצעים על-פי תשקיף זה יפורטו במסגרת ההודעה המשלימה.

**הנאמן לאגרות החוב (סדרה א')** : משמרת – חברה לשירותי נאמנות בע"מ.[2]

**חיתום** : בהתאם לתקנה 11(א)(1) לתקנות אופן ההצעה, הצעת ניירות הערך המוצעים כאמור תובטח בחלקה (25%) בחיתום. בכוונת החברה להתקשר עם אינפין קפיטל בע"מ ("**החתם המתמחר**") בהסכם חיתום כאמור. החתם המתמחר יחתום על ההודעה המשלימה, אשר מכוחה יוצעו ניירות הערך המוצעים ויראו בחתימתו כאמור כחתימה על התשקיף. פרטי הסכם החיתום יובאו במסגרת הודעה המשלימה.

בדוחותיה הכספיים של החברה ליום 31 בדצמבר 2024 וליום 30 ביוני 2025, הפנו רואי החשבון המבקרים של החברה את תשומת הלב, מבלי לסייג את חוות דעתם, לאמור בביאור 1א לדוחות הכספיים פרופורמה בדבר שינוי המבנה בחברה במסגרתו יועברו זכויות בתאגידים כנגד הנפקת מניות של החברה ותמורת תשלום מזומן בסך של 50 מיליון דולר אשר יקטין את הון החברה בסכום זה.

# ותשקיף מדף

על-פי תשקיף זה, המהווה גם תשקיף מדף, תוכל החברה להנפיק סוגים שונים של ניירות ערך : אגרות חוב שאינן ניתנות להמרה, כתבי אופציה הניתנים למימוש לאגרות חוב שאינן ניתנות להמרה, ניירות ערך מסחריים, וכל נייר ערך אחר שאינו ניתן להמרה למניות ואשר ניתן להנפיקו על פי דין במסגרת תשקיף מדף.

הצעת ניירות הערך על-פי תשקיף מדף זה תיעשה על-פי סעיף 23 א(ו) לחוק ניירות הערך, על-ידי דוחות הצעת מדף, אשר בתוכם תכלול החברה את כל הפרטים הנדרשים עבור כל אחת מההצעות, לרבות הרכב היחידות המוצעות ושאר תנאי ניירות הערך המוצעים ואופן ההנפקה על-פי הדין החל (לרבות תקנון הבורסה וההנחיות על פיו), לפי העניין, בעת ההצעה.

על-פי תקנון והנחיות הבורסה, הצעת ניירות ערך על-פי דוחות הצעת מדף שיפורסמו מכוח תשקיף זה תהיה מותנית בקבלת חוות דעת עורך דין של החברה מאיי הבתולה הבריטיים שתוגש לבורסה קודם למועד פרסומו של דוח הצעת המדף על-ידי החברה, לפיה ובכפוף לה: דיני איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה אינם מגבילים או מונעים את הצעתם של ניירות הערך שיוצעו על-פי דוח הצעת המדף לציבור בישראל, את רישומם למסחר בבורסה ו/או את המסחר בהם בבורסה, והם יוכלו להיסחר בחופשיות בבורסה ולהיסלק במסלקת הבורסה ללא מגבלות כלשהן תחת איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה.

הצעת ניירות ערך על-פי דוחות הצעת מדף שיפורסמו מכוח תשקיף זה, ככל שתיעשה, תיעשה בישראל בלבד, ולא תיעשה בארה"ב ו/או לאדם הנמצא בארה"ב ו/או ל-U.S. Person כהגדרתם ב-Regulation S שהותקנה מכוח ה-Securities Act. על-פי תקנון והנחיות הבורסה, הצעת ניירות ערך על-פי דוחות הצעת מדף שיפורסמו מכוח תשקיף זה תהיה מותנית בעמידת החברה בפטור מדרישות הרישום על-פי Regulation S ביחס לניירות הערך שיוצעו על-ידי החברה כאמור, וזאת על-פי חוות דעת עורך דין אמריקאית של החברה שתוגש לבורסה קודם למועד פרסומו של דוח הצעת המדף על-ידי החברה, לפיה אין מניעה לחברה לפי הדין האמריקאי להציע לצבור בישראל את ניירות הערך שיוצעו בדוח הצעת המדף, לרשום אותם למסחר בבורסה ולקיים בהם מסחר.

כל רוכש של ניירות הערך שיוצעו על-פי דוח הצעת מדף שיפורסם מכוח תשקיף זה ייחשב כמי שהצהיר כי הוא תושב ישראל, כי אינו U.S. Person, כי הוא אינו רוכש את ניירות הערך שיוצעו על-פי דוח הצעת מדף כאמור עבור U.S. Person ו/או אדם הנמצא בארה"ב, כי לא היה בארה"ב בעת שהגיש בקשה לרכוש את ניירות הערך אמורים וכי אינו רוכש את ניירות הערך האמורים תוך כוונה לבצע "distribution" (כהגדרת מונח זה ב-Securities Act) בארה"ב. מפיצים עימם תתקשר החברה, ככל שתתקשר, להפצת ניירות הערך שיוצעו על-פי דוח הצעת מדף שיפורסם מכוח תשקיף זה, חברות קשורות שלהם וכל מי שפועל מטעמם, יצהירו כי יציעו את ניירות הערך האמורים לתושבי ישראל בלבד ולא למי שהוא U.S. Person וכי לא ביצעו ולא יבצעו בארה"ב כל פעולה או פרסום בקשר עם קידום מכירתם של ניירות הערך האמורים.

על תשקיף זה, על דוחות הצעת מדף שיפורסמו מכוחו ועל הצעת ניירות הערך ורכישתם על-פיהם וכל הנובע ו/או הקשור בתשקיף זה ובדוחות הצעת המדף שיפורסמו מכוחו, יחולו דיני מדינת ישראל. סמכות השיפוט בכל עניני הקשור לתשקיף זה, לדוחות הצעת מדף שיפורסמו מכוחו והצעת ניירות ערך ורכישת ניירות ערך על-פיהם מוקנית לבתי המשפט המוסמכים בישראל. רוכשי ניירות הערך שיוצעו על-פי דוחות הצעת מדף שיפורסמו מכוח תשקיף זה, בהסכמתם לרכוש את ניירות הערך האמורים, מקבלים על עצמם סמכות שיפוט בלעדית זו וברירת דין זו.

**תשקיף זה ודוחות הצעת מדף שיפורסמו מכוחו אינם מיועדים לפרסום, הפצה ו/או חלוקה בארה"ב ו/או ל-U.S. Person כהגדרתם ב-Regulation S, ואף אדם אינו מוסמך לפעול למכירת ניירות הערך שיוצעו על-פי דוחות הצעת מדף כאמור בארה"ב. תשקיף מדף זה לא הוגש לרשות ניירות ערך בארה"ב ודוחות הצעת המדף שיפורסמו מכוחו לא יוגשו לרשות ניירות ערך בארה"ב. ניירות הערך שיוצעו על-פי דוחות הצעת מדף שיפורסמו מכוח תשקיף זה לא יירשמו תחת ה-Securities Act בארה"ב.**

**תאריך התשקיף : 28 בנובמבר 2025**

---

[2] כפי שנמסר לחברה מהנאמן : ביום 17.11.2025 הוגשה כנגד הנאמן בקשה לאישור תביעה ייצוגית בקשר עם תפקידו כנאמן למחזיקי אגרות החוב (סדרה ג') של חברת אוטומקס מוטורס בע"מ על-ידי מחזיק באגרות החוב האמורות. המבקש טוען, בתמצית, כי הנאמן הפר את חובותיו החקוקות והחוזיות ופעל ברשלנות. לטענת המבקש הנאמן לא הפעיל את סמכויותיו לפיקוח ובדיקה כדי לגלות את תרמית החברה הנטענת על-ידי, ולפי המבקש מחדל הנאמן הנטען גרם נזק משמעותי. הנאמן דוחה את הטענות וסבור כי פעל כנדרש בשטר הנאמנות ומילא את חובות הנאמנות שלו על פי דין, וכי התביעה מתבססת על עובדות שגויות.

# תוכן העניינים

**עמוד**

| | | |
|---|---|---|
| | **מבוא** | **1.** |
| 1-1 | כללי | 1.1 |
| 1-1 | היתרים ואישורים להצעה ראשונה של ניירות הערך על-פי תשקיף זה | 1.2 |
| 1-2 | היתרים ואישורים הנוגעים לתשקיף המדף | 1.3 |
| 1-4 | הון החברה | 1.4 |
| 1-4 | נתונים כספיים בדולר ארה"ב | 1.5 |
| | | |
| | **פרטי ההצעה** | **2.** |
| 2-1 | ניירות הערך המוצעים לציבור | 2.1 |
| 2-2 | אופן הצעת ניירות הערך לציבור | 2.2 |
| 2-2 | רישום למסחר בבורסה | 2.3 |
| 2-2 | הצעה לציבור | 2.4 |
| 2-4 | החשבון המיוחד | 2.5 |
| 2-4 | הקצאת ניירות ערך, מכתבי הקצאה ותעודות ניירות ערך | 2.6 |
| 2-5 | הודעה משלימה | 2.7 |
| 2-6 | הימנעות מעשיית הסדרים | 2.8 |
| 2-6 | מיסוי | 2.9 |
| 2-15 | תנאי אגרות החוב | 2.10 |
| 2-16 | שטר הנאמנות הגין אגרות החוב (סדרה א') | 2.11 |
| 2-16 | חתם מתמחר, ריכוז והפצה | 2.12 |
| 2-17 | הצעת ניירות ערך על-פי תשקיף המדף | 2.13 |
| 2-18 | דוח דירוג ומכתב הסכמה | **נספח א'** |
| | שטר הנאמנות בגין אגרות החוב (סדרה א') ונספחיו | **נספח ב'** |
| | שטר הנאמנות בגין אגרות החוב (סדרה ב') ונספחיו | **נספח ג'** |
| | טבלאות ריכוז מידע רלוונטי בשטר הנאמנות | **נספח ד'** |
| | | |
| | **הון המניות של החברה** | **3.** |
| 3-1 | פרטים על הון המניות של החברה לתאריך התשקיף | 3.1 |
| 3-1 | התפתחות ההון הרשום והמונפק של החברה ממועד ייסודה | 3.2 |
| 3-1 | החזקות בעלי עניין בניירות הערך של החברה | 3.3 |
| | | |
| | **זכויות ההצבעה הנלוות למניות החברה** | **4.** |
| 4-1 | סעיפים 20 ו-22 לחוק החברות | 4.1 |
| 4-1 | סעיף 59 לחוק החברות | 4.2 |
| 4-1 | סעיף 61(א) לחוק החברות | 4.3 |
| 4-1 | סעיף 81 לחוק החברות | 4.4 |
| 4-1 | סעיף 222 לחוק החברות | 4.5 |
| 4-1 | סעיף 301 לחוק החברות | 4.6 |
| 4-1 | זכויות ההצבעה הנלוות למניות החברה | 4.7 |
| | | |
| | **השוואת דינים** | **5.** |
| 5-1 | תחולת דיני ניירות ערך וחוק החברות בישראל ודיני איי הבתולה הבריטיים | 5.1 |
| 5-3 | אכיפת פסקי חוץ | 5.2 |
| 5-4 | הדין החל על שטר הנאמנות | 5.3 |
| 5-5 | השוואה בין מספר סוגיות בדיני חברות – הוראות הדין החל באיי הבתולה הבריטיים לעומת הוראות הדין הישראלי | 5.4 |
| 5-15 | חוות דעת של יועצה המשפטיים של החברה באיי הבתולה הבריטיים לעניין השוואת הדינים | 5.5 |
| | | |
| | **יעוד התמורה** | **6.** |
| 6-1 | תמורת ההנפקה | 6.1 |
| 6-1 | יעוד תמורת ההנפקה | 6.2 |
| 6-2 | סכום מינימאלי | 6.3 |
| 6-2 | חיתום | 6.4 |

- 2 -

**עמוד**

| | | |
|---|---|---|
| | **תיאור עסקי החברה** | **7.** |
| | ראה תוכן עניינים נפרד בפרק | |
| | | |
| | **דירקטוריון החברה** | **8.** |
| 8-1 | דירקטוריון החברה | 8.1 |
| 8-3 | נושאי משרה בכירה | 8.2 |
| 8-3 | הוראות תקנון החברה המתייחסות למינוי, כהונה ומילוי מקום של דירקטורים | 8.3 |
| 8-9 | מושאי חתימה עצמאיים | 8.4 |
| 8-9 | פרטים נוספים | 8.5 |
| | | |
| | **בעלי עניין ונושאי משרה בכירה בחברה** | **9.** |
| 9-1 | תגמולים לבעלי עניין ולנושאי משרה בכירים בחברה | 9.1 |
| 9-1 | עסקאות עם בעל השליטה | 9.2 |
| 9-4 | החזקות בעלי עניין ונושאי משרה | 9.3 |
| | | |
| | **דוחות כספיים** | **10.** |
| 10-1 | הדוחות הכספיים של החברה | 10.1 |
| | | |
| 10-1 | מכתב הסכמה של רואי החשבון המבקרים של החברה ושל החברות המועברות | 10.2 |
| | | |
| | **פרטים נוספים** | **11.** |
| 11-1 | חוות דעת עורך דין | 11.1 |
| 11-2 | התחייבות לשיפוי | 11.2 |
| 11-2 | הוצאות ועמלות | 11.3 |
| 11-2 | דמי עמילות בקשר לניירות ערך אחרים | 11.4 |
| 11-3 | הקצאת ניירות ערך שלא בתמורה מלאה במזומנים | 11.5 |
| 11-3 | עיון במסמכים | 11.6 |
| 11-3 | חוות דעת יועציה המשפטיים של החברה באיי הבתולה הבריטיים | 11.7 |
| | | |
| | **חתימות** | **12.** |
| 12-1 | החברה | 12.1 |
| 12-1 | הדירקטורים | 12.2 |

# SIMAD Holdings Ltd.

## חברה המאוגדת לפי דיני איי הבתולה הבריטיים

### (בתשקיף זה: "החברה")

# פרק 1 - מבוא

1.1 **כללי**

החברה התאגדה ביום 28 במאי 2025 באיי הבתולה הבריטיים, כחברה פרטית מוגבלת במניות, בהתאם להוראות ה-BVI Business Companies Act, 2004.

כל עוד יוחזקו בידי הציבור ניירות הערך של החברה המוצעים על-פי תשקיף זה, יחולו על החברה הוראות חוק ניירות ערך, התשכ"ח-1968 ("**חוק ניירות ערך**") והתקנות שהותקנו מכוחו החלות על חברות שהתאגדו מחוץ לישראל ואשר ניירות הערך שלהן רשומים למסחר בבורסה לניירות ערך בע"מ ("**הבורסה**") בישראל. בהתאם, החברה תדווח בהתאם להוראות הדיווח המתאימות על-פי חוק ניירות ערך ותקנותיו.

כמו-כן, על החברה יחולו הוראות סעיף 39א(א) לחוק ניירות ערך, וכפועל יוצא מכך - יחולו עליה הוראות שונות של חוק החברות, התשנ"ט-1999 החלות על חברה שהתאגדה מחוץ לישראל והמציעה תעודות התחייבות שלה לציבור בישראל, ובכלל זה הוראות לעניין מינוי דירקטורים חיצוניים, מבקר פנים וועדת ביקורת, הכול בהתאם למפורט בתוספת הרביעית לחוק ניירות ערך. הוראות אלו יחולו בנוסף להוראות מסמכי ההתאגדות של החברה ודיני איי הבתולה הבריטיים.

**לפרטים אודות הדין החל על שטר הנאמנות וניירות הערך שיונפקו על-פי תשקיף להשלמה זה, הדין החל על החברה לעניין דיני חדלות פירעון ודיני חלוקה, ולהתחייבויות החברה, בעלי השליטה בה ונושאי משרה בה לרבות בקשר עם הנושאים האמורים והוראות הדין החלות על החברה, ראה סעיף 5.1 לתשקיף.**

1.2 **היתרים ואישורים להצעה ראשונה של ניירות ערך על-פי תשקיף להשלמה זה**

החברה קיבלה את כל ההיתרים, האישורים והרישיונות הדרושים על-פי כל דין להצעת ניירות הערך על-פי תשקיף זה, להנפקתם ולפרסום התשקיף.

**אין בהיתר של רשות ניירות ערך לפרסם את התשקיף משום אימות הפרטים המובאים בו או אישור מהימנותם או שלמותם, ואין בו משום הבעת דעה על טיבם של ניירות הערך המוצעים על-פי התשקיף.**

הבורסה נתנה לחברה את אישורה העקרוני לתשקיף להשלמה זה ("**אישור הבורסה לתשקיף להשלמה**"), לפיו תנאי אגרות החוב (סדרה א') הכלולות בתשקיף זה ("**אגרות החוב**"), עומדים בתנאים הקבועים בתקנון הבורסה ובהנחיות לפיו.

מתן אישור הבורסה לתשקיף להשלמה כאמור, אינו מהווה אישור לרישום למסחר של אגרות החוב, ורישומן למסחר בבורסה יהיה כפוף לקבלת אישור הבורסה לרישום למסחר כאמור על-פי הודעה משלימה, אשר תפורסם על-ידי החברה בהתאם להוראות חוק ניירות ערך ותקנות ניירות ערך (הודעה משלימה וטיוטת תשקיף), התשס"ז-2007 ("**ההודעה המשלימה**" ו-"**תקנות הודעה משלימה**", בהתאמה).

הרישום למסחר של ניירות הערך הכלולים בתשקיף וההודעה המשלימה, מותנה בקיום פיזור מזערי של החזקות הציבור בסדרת אגרות החוב כמפורט בסעיף 2.3.1.1 לתשקיף, בקיום שווי החזקות ציבור מינימאלי בסדרת אגרות החוב כמפורט בסעיף 2.3.1.2 לתשקיף, וכן בקבלת אישור היועצים המשפטיים של החברה בארה"ב כי הזכויות המועברות הועברו לחברה ("**אישור היועצים המשפטיים בארה"ב**") ובפרסום דיווח מיידי (אשר יהווה חלק בלתי נפרד מתשקיף זה) אודות העברת הזכויות המועברות לחברה וקבלת אישור היועצים המשפטיים בארה"ב, שייחתם בידי החברה, כלל הדירקטורים המכהנים בחברה (נכון למועד הדיווח המיידי) ובידי אינפין קפיטל בע"מ המשמש כחתם מתמחר בהנפקה, תוך 14 ימי עסקים ממועד קבלת הכספים בידי רכז ההנפקה (ראו סעיף 2.3.2 לתשקיף).

**אין לראות באישור האמור של הבורסה לתשקיף להשלמה אישור לפרטים המובאים בתשקיף או למהימנותם או לשלמותם, ואין בו משום הבעת דעה כלשהי על החברה או על טיבם של ניירות הערך המוצעים בתשקיף להשלמה או על המחיר בו הם מוצעים או שיוצעו בהודעה המשלימה.**

**כמו-כן, אין לראות באישור הבורסה משום התחייבות למתן אישור לרישום בה למסחר של אגרות החוב על-פי הודעה משלימה.**

**על אישור בקשה לרישום למסחר על-פי הודעה משלימה כאמור יחולו הוראות תקנון הבורסה וההנחיות על-פיו כפי שיהיו בתוקף בעת הגשת הבקשה לרישום למסחר כאמור, לרבות בקשר עם קיום פיזור מזערי באגרות החוב וקיום דרישות שווי אחזקות ציבור מינימאלי באגרות החוב, כאמור לעיל.**

אישור הבורסה לרישום בה למסחר של אגרות החוב על-פי הודעה משלימה, יינתן לחברה (ככל שיינתן) טרם פרסומה של ההודעה המשלימה ביחס להנפקה מכוח תשקיף זה.

כל המפיצים בהנפקה יתחייבו שכל הצעה או מכירת ניירות ערך שתבוצע על-ידיהם או על-ידי מי מטעמם תבוצע בישראל בלבד וכי לא יוצעו או ימכרו ניירות ערך לאדם כלשהו בארה״ב או לכל אדם הנמנה על קבוצה המזוהה כאזרחי ארה״ב, מחוץ לארה״ב.

1.3    **היתרים ואישורים הנוגעים לתשקיף המדף**

החברה קיבלה את כל ההיתרים, האישורים והרישיונות הדרושים על-פי כל דין לפרסום תשקיף המדף.

**אין בהיתר של רשות ניירות ערך לפרסם את התשקיף משום אימות הפרטים המובאים בו או אישור מהימנותם או שלמותם, ואין בו משום הבעת דעה על טיבם של ניירות הערך המוצעים על-פי תשקיף המדף.**

הצעת ניירות ערך לציבור על-פי תשקיף המדף כאמור בסעיף 23א(ו) לחוק ניירות ערך תיעשה על-פי דוח הצעת מדף אשר יוגש בהתאם לחוק ניירות ערך ותקנות ניירות ערך (הצעת מדף של ניירות ערך), התשס״ו-2005 (״**תקנות הצעת מדף**״) ואשר בו יושלמו הפרטים המיוחדים לאותה הצעה (״**דוח הצעת המדף**״ או ״**דוח ההצעה**״). קודם לביצוע הצעה של נייר ערך כלשהו על-פי דוחות הצעת מדף שיפורסמו מכוח תשקיף מדף זה, תעביר החברה לבורסה חוות דעת בעניינים כאמור להלן, מאת עורכי דין מאיי הבתולה הבריטיים ומארה״ב.

במסגרת דוח ההצעה יתחייבו כל המפיצים באותה הנפקה, שכל הצעה או מכירת ניירות ערך שתבוצע על-ידיהם או על-ידי מי מטעמם תבוצע בישראל בלבד וכי לא יוצעו או ימכרו ניירות ערך לאדם כלשהו בארה״ב או לכל אדם הנמנה על קבוצה המזוהה כאזרחי ארה״ב, מחוץ לארה״ב.

הבורסה נתנה אישור עקרוני המתייחס לרישום למסחר של אגרות חוב, כתבי אופציה הניתנים למימוש לאגרות חוב וניירות ערך מסחריים (״**ניירות הערך**״) אשר יוצעו על-פי תשקיף מדף זה באמצעות דוחות הצעת מדף (״**האישור העקרוני**״).

**אין לראות באישור העקרוני של הבורסה אישור לפרטים המובאים בתשקיף המדף או למהימנותם או לשלמותם, ואין בו משום הבעת דעה על החברה או על טיבם של ניירות הערך אשר יוצעו בתשקיף המדף באמצעות דוחות הצעת מדף או על המחיר בו הם יוצעו בדוחות הצעת המדף.**

מתן האישור העקרוני כאמור אינו מהווה אישור לרישום ניירות הערך למסחר והרישום למסחר של ניירות הערך אשר יוצעו על-פי תשקיף מדף זה באמצעות דוחות הצעת מדף יהיה כפוף לקבלת אישור לבקשה לרישום ניירות ערך למסחר על-פי דוח הצעת מדף אשר יוגש בהתאם לחוק ניירות ערך ותקנות הצעת מדף.

אין במתן האישור העקרוני משום התחייבות למתן אישור לרישום ניירות הערך למסחר על-פי דוח הצעת מדף. על אישור בקשה לרישום ניירות ערך למסחר על-פי דוח הצעת מדף יחולו הוראות תקנון הבורסה וההנחיות על-פי כפי שיהיו בתוקף בעת הגשת הבקשה לרישום על-פי דוח הצעת המדף.

בהתאם לחוות דעת של משרד עורכי דין Maples & Calder מאיי הבתולה הבריטיים (מדינת התאגדותה של החברה)[1] אשר הוגשה לבורסה: דיני איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה אינם מגבילים או מונעים את הצעתם של ניירות הערך המוצעים בתשקיף זה לציבור בישראל, את רישומם למסחר ו/או את המסחר בהם בבורסה, וניירות הערך המוצעים על-פי תשקיף זה יוכלו להיסחר בחופשיות בבורסה ולהיסלק במסלקת הבורסה ללא מגבלות כלשהן תחת דיני איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה.

---

[1]    יודגש כי מכתב זה אינו בגדר חוות דעת של עורך דין לעניין סעיף 17(ב)(3) לחוק ניירות ערך.

לפרטים נוספים ראו גם חוות הדעת של משרד עורכי דין Maples & Calder בעניין זה ותרגומה לעברית המצורפת לתשקיף זה בפרק 11 לתשקיף. קודם לביצוע הצעה של נייר ערך כלשהו על-פי דוחות הצעת מדף שיפורסמו מכוח תשקיף מדף זה, תעביר החברה לבורסה חוות דעת בעניינים כאמור להלן, מאת עורכי דין מאיי הבתולה הבריטיים.

החברה הינה "מנפיק חוץ" כמשמעו בתקנות ניירות ערך (דוחות כספיים שנתיים), התשע"ע-2010 (**"תקנות דוחות כספיים"**), ולפיכך חלות עליה הוראות תקנה 5 לתקנות דוחות כספיים, לרבות לעניין הקלות במתכונת הדיווח של החברה.

החברה הינה "domestic issuer" כהגדרת המונח בסעיף 902 ל-Regulation S שהותקנה מכוח United States Securities Act of 1933, כפי שתוקן (**"Regulation S"** ו-**"Securities Act"**, בהתאמה).

**ההצעה לציבור מכוח תשקיף זה, ככל שתעשה, תעשה בישראל בלבד לתושבי ישראל ולא תעשה בארה"ב ו/או ל-U.S. Person כהגדרתם תחת Regulation S, בהתאם לפטור מדרישות הרישום של ניירות ערך אמריקאיים תחת Regulation S אשר הותקן תחת ה-Securities Act, כהצעה על-פי Category 1.**

**כל רוכש של ניירות הערך שמוצעים על-פי תשקיף זה ייחשב כמי שהצהיר כלפי החברה והמפיצים כי הוא תושב ישראל אשר לא שהה בארה"ב בעת שהבקשה לרכישת ניירות הערך המוצעים הוגשה, כי אינו U.S. Person (כמוגדר ב-Regulation S), כי אינו רוכש את ניירות הערך המוצעים עבור U.S. Person, או עבור אדם השוהה בארה"ב וכי הוא אינו רוכש את ניירות הערך המוצעים תוך כוונה לבצע "הפצה" (distribution) בארה"ב. כמו כן, כל המפיצים (כהגדרתם בתשקיף זה ובהודעה המשלימה) התחייבו, שכל הצעת ניירות ערך שתבוצע על-ידיהם או על-ידי מי מטעמם, תבוצע בישראל בלבד לתושבי ישראל בלבד, בהתאם לדרישות הדין בישראל ולנהלים ולסדים הנהוגים בה, ולא בארה"ב או ל-U.S. Person. כן התחייבו המפיצים כי לא יבצעו מאמצי מכירה מכוונים (כהגדרתם ב-Regulation S) בארה"ב, ביחס להצעת ניירות הערך, וכי ההצעה אינה חלק מתוכנית להתחמק מדרישות הרישום תחת ה-Securities Act.**

על תשקיף זה ועל הצעת ניירות הערך על-פיו ורכישתם וכל הנובע וכל הקשור בתשקיף זה, בהצעת ניירות הערך על-פיו וברכישתם, יחולו דיני מדינת ישראל. סמכות השיפוט בכל עניין הקשור לתשקיף זה ולהצעת ניירות הערך על-פיו מוקנית לבתי המשפט המוסמכים בישראל. רוכשי ניירות הערך שמוצעים על-פי תשקיף זה, בהסכמתם לרכוש את ניירות הערך האמורים, מקבלים על עצמם סמכות שיפוט בלעדית זו ובלירת דין זו.

סעיף 904 ל-Regulation S קובע, כי ניירות הערך המוצעים על-פי תשקיף זה ניתנים למכירה חוזרת בבורסה על-ידי כל אדם (למעט על-ידי החברה, מפיץ, או גופים הקשורים למי מהם או כל אדם הפועל בשם האנשים האמורים), כל עוד: (א) אין ההצעה נעשית לאדם בארצות הברית, (ב) אין למוכר או למי שפועל מטעמו ידיעה כי הרכישה אורגנה עבור "U.S. Person" (כמוגדר ב-Regulation S) ו-(ג) אין "מאמצי מכירה מכוונים" (כהגדרתה ב-Regulation S) בארה"ב על-ידי המוכר, גוף קשור, או כל אדם הפועל בשמם. במקרה של מכירה חוזרת על-ידי נושא משרה או דירקטור בחברה או במפיץ, שהוא חברה כלולה של החברה או המפיץ אך ורק מכוח החזקה בתפקיד זה, לא ניתן לשלם זכויות ממכירה, שכר או גמול אחר בקשר עם הצעה או מכירה כאמור, מלבד עמלת הברוקרים השגרתית והנהוגה על-ידי אדם המבצע עסקה כאמור כסוכן, בקשר עם ההצעה או המכירה של ניירות הערך האמורים לעיל.

**אף אדם אינו מוסמך לנקוט בכל פעולה בארה"ב בקשר עם הצעתם או מכירתם של ניירות הערך שמוצעים על-פי תשקיף זה.**

תשקיף זה והמידע המובא להלן לא נועד לשם הפצה בארה"ב. תשקיף זה אינו מהווה הצעה למכירה או שידול להצעה למכירה של ניירות ערך בארה"ב או בכל סמכות שיפוט אחרת, היכן שהאמור אינו כדין. ניירות הערך המוצעים על-פי תשקיף זה, לא נרשמו ולא יירשמו תחת ה-Securities Act או דיני ניירות הערך של מדינה ממדינות ארה"ב ואין להציעם או למכרם בתוך גבולות ארה"ב ללא רישום או פטור מתאים מרישום, או במסגרת עסקה שאינה עומדת בדרישות הרישום של ה-Securities Act. תשקיף זה לא הועבר, או נסקר או אושר בידי רשות ניירות ערך האמריקאית (U.S. Securities and Exchange Commission) ולא תבוצע כל הצעה לציבור של ניירות ערך בארה"ב. ניתן להציע או למכור ניירות ערך באמצעות תשקיף זה, בישראל בלבד בעסקה מחוץ למדינה בהתאם ל-Regulation S תחת ה-Securities Act ואין להציע ניירות ערך כאמור בתוך ארה"ב או ל-U.S. Person.

יש לקבל החלטה לרכוש את ניירות הערך המוצעים על-פי תשקיף זה, אך ורק בהסתמך על המידע הנכלל בתשקיף זה. החברה לא התירה ולא תתיר לכל אדם או גוף אחר כלשהו למסור מידע שונה מזה המפורט בתשקיף זה.

תשקיף זה אינו מהווה ולא יהווה הצעה של ניירות ערך בכל ארץ או מדינה אחרת למעט מדינת ישראל.

החברה המציאה לבורסה חוות דעת של משרד עורכי דין אמריקאי, לפיה, בהתבסס על ההנחות, ההסתייגויות והמגבלות בחוות הדעת, ההצעה על-פי ההודעה המשלימה המפורסמת מכוח תשקיף זה פטורה מדרישות הרישום על-פי Category 1 של Regulation S וכן כי בהתאם ל-Regulation S, ניירות ערך שמוצעים על-פי תשקיף זה יהיו ניתנים למכירה חוזרת בבורסה על-ידי כל אדם (למעט כמפורט לעיל). הצעת ניירות ערך על-פי דוחות הצעת מדף שיפורסמו מכוח תשקיף מדף זה תהיה מותנית בעמידת החברה בפטור מדרישות הרישום על-פי Regulation S ביחס לניירות הערך שיוצעו על-ידי החברה כאמור, וזאת על-פי חוות דעת עורך דין אמריקאי של החברה שתוגש לבורסה קודם למועד פרסומו של דוח הצעת המדף על-ידי החברה, לפיה אין מניעה לחברה לפי הדין האמריקאי להציע לציבור בישראל את ניירות הערך שיוצעו בדוח הצעת המדף, לרשום אותם למסחר בבורסה ולקיים בהם מסחר.

1.4 **הון החברה**

1.4.1 הון מניות רשום, מונפק ונפרע של החברה למועד התשקיף

| סוג המניות[2] | הון רשום | הון מונפק ונפרע |
|---|---|---|
| מניות רגילות בנות ללא נקוב | 50,000 | 1,000 |

1.4.2 ההון בדוחות הכספיים המאוחדים פרופורמה ליום 30 ביוני 2025 (באלפי דולר)

| | |
|---|---|
| הון מניות נפרע וקרנות הון | 276,980 |
| יתרת הפסד | (151,781) |
| **סה"כ הון המיוחס לבעלי מניות החברה האם** | **125,199** |
| הון המיוחס לבעלי זכויות שאינן מקנות שליטה | 25,203 |
| **סה"כ הון** | **150,402** |

לפרטים נוספים ראה הדוחות הכספיים המאוחדים פרופורמה של החברה, ליום 31 בדצמבר 2024 וליום 30 ביוני 2025 המובאים בפרק 10 לתשקיף.

1.5 כל הנתונים הכספיים בתשקיף הינם בדולר ארה"ב ("**דולר**"), אלא אם כן נאמר במפורש אחרת.

---

[2] אינן רשומות למסחר בבורסה.

# פרק 2 - פרטי ההצעה

הצעת ניירות הערך על-ידי החברה כמתואר בתשקיף זה, תתבצע על-פי תשקיף זה ועל-פי הודעה משלימה. לאחר פרסומו של תשקיף זה, תפרסם החברה הודעה משלימה אשר במסגרתה יושלמו הפרטים החסרים בתשקיף זה ו/או יעודכנו הפרטים הניתנים לעדכון בתשקיף זה, בהתאם לסעיף 16(א1)(2) לחוק ניירות ערך, התשכ"ח-1968 ("חוק ניירות ערך") ולתקנות ניירות ערך (הודעה משלימה וטיוטת תשקיף), התשס"ז-2007 ("תקנות הודעה משלימה"), לרבות שינויים, ככל שיהיו, בכמות ו/או בתנאי ניירות הערך המוצעים ("ההודעה המשלימה"). ההודעה המשלימה תפורסם, וככל שתבוצע גם הצעה אחידה לציבור, המכרז לציבור יערך, לא יאוחר מ-75 ימים מיום פרסום התשקיף או מ-45 ימים מתחילת התקופה להגשת בקשות, לפי המוקדם. ככל שההודעה המשלימה תפורסם ו/או המכרז לציבור יערך במועדים מאוחרים למועד האמור לעיל, תידרש החברה להגיש בקשה לתיקון תשקיף טרם ביצוע ההצעה לפי תשקיף זה. עם פרסומה, תהפוך ההודעה המשלימה לחלק בלתי נפרד מתשקיף זה.

**ניירות** הערך המוצעים יוצעו בדרך של הצעה לא אחידה, כאמור בתקנה 11 לתקנות ניירות ערך (אופן הצעת ניירות ערך לציבור), התשס"ז-2007 ("**תקנות אופן ההצעה**") למשקיעים מוסדיים, כהגדרת מונח זה בתקנות אופן ההצעה ("**משקיעים מוסדיים**"). ההצעה של ניירות הערך על-פי תשקיף זה וההודעה המשלימה תובטח בחלקה בחיתום, כאשר אינפין קפיטל בע"מ מיועד לשמש כחתם המתמחר ("**החתם**" או "**החתם המתמחר**"). עם זאת, בהתאם להוראות תקנות אופן ההצעה, החברה תהיה רשאית למכור עד 30% מן ההנפקה למי שאינו משקיע מוסדי, ובלבד שהמכירה כאמור תיעשה בהצעה אחידה, באותו מחיר בו יוקצו ניירות הערך המוצעים למשקיעים המוסדיים ובאותו יום, ובכפוף לתנאים הקבועים בתקנות אופן ההצעה. לפרטים נוספים ראה סעיף 2.4 לתשקיף.

| | | |
|---|---|---|
| 2.1 | | **ניירות הערך המוצעים לציבור** |
| | 2.1.1 | **אגרות החוב (סדרה א')** |

2.1.1.1   620,000,000 ש"ח ע.נ. אגרות חוב (סדרה א') ("**אגרות החוב (סדרה א')**" או "**אגרות החוב**" או "**ניירות הערך המוצעים**"), נושאות ריבית שנתית קבועה בשיעור של 7% ("**שיעור הריבית השנתית**").[1] אגרות החוב (סדרה א') אינן צמודות (קרן וריבית) למדד או לבסיס הצמדה כלשהו.

2.1.1.2   קרן אגרות החוב (סדרה א') תעמוד לפירעון בחמישה (5) תשלומים ביום 30 בנובמבר של כל אחת מהשנים 2026 עד 2030 (כולל), באופן בו ארבעת התשלומים הראשונים יהיו בשיעור של 2.5% מקרן אגרות החוב (סדרה א') והתשלום האחרון יהיה בשיעור של 90% מקרן אגרות החוב (סדרה א').

2.1.1.3   הריבית בגין אגרות החוב (סדרה א') תשולם בתשלומים חצי שנתיים בימים 31 במאי ו-30 בנובמבר של כל אחת מהשנים 2026 עד 2030 (כולל). שיעור הריבית שתשולם בעד תקופת ריבית מסוימת (למעט התשלום בגין תקופת הריבית הראשונה (כמפורט להלן), יחושב כשיעור הריבית השנתית חלק שניים.

2.1.1.4   תשלום הריבית הראשון על חשבון אגרות החוב (סדרה א') ישולם ביום 31 במאי 2026, עבור התקופה המתחילה ביום המסחר הראשון שלאחר מועד הדיווח על תוצאות ההנפקה (כאמור בסעיף 2.4.6 לתשקיף) והמסתיימת ביום האחרון שלפני מועד תשלום הריבית (דהיינו, ביום 30 במאי 2026) ("**תקופת הריבית הראשונה**"). הריבית עבור תקופת הריבית הראשונה תחושב לפי מספר הימים בתקופה זו ועל בסיס של 365 ימים בשנה. החברה תפרסם במסגרת הדיווח על תוצאות ההנפקה, את שיעור הריבית בגין תקופת הריבית הראשונה ואת שעור הריבית החצי שנתית.

2.1.1.5   תשלומי הריבית שלאחר מכן יהיו בגובה הריבית השנתית חלקי שניים (מספר תשלומי הריבית בשנה) וישולמו בעד התקופה שתתחילתה במועד תשלום הריבית הסמוך האחרון וסיומה ביום האחרון שלפני מועד התשלום הסמוך אחרי תחילתה.

---

[1]   כפוף להתאמות כמפורט בסעיפים 5.2 ו-5.3 לשטר הנאמנות בגין אגרות החוב (סדרה א') ו/או לזכאות לריבית פיגורים (כהגדרתה בסעיף 3.4 לתנאים שמעבר לדף אשר בתוספת הראשונה לשטר הנאמנות בגין אגרות החוב (סדרה א')).

2.1.1.6 תשלום הריבית האחרון ישולם ביום 30 בנובמבר 2030 ביחד עם התשלום האחרון על חשבון קרן אגרות החוב (סדרה א'), וזאת כנגד מסירת תעודות אגרות החוב (סדרה א') לידי החברה.

2.1.1.7 לפרטים נוספים אודות תנאי אגרות החוב (סדרה א'), ראה סעיף 2.10 לתשקיף ושטר הנאמנות בגין אגרות החוב (סדרה א') (**"שטר הנאמנות"**).

## 2.2 אופן הצעת ניירות הערך לציבור

אגרות החוב (סדרה א') מוצעות למשקיעים מוסדיים בדרך של הצעה לא אחידה, כאמור בתקנות אופן ההצעה.

אגרות החוב (סדרה א') המוצעות תישאנה ריבית שנתית בשיעור של 7%, והן מוצעות באמצעות 620,000 יחידות (**"יחידות אגרות החוב (סדרה א')"** או **"היחידות"**), כאשר הרכב כל יחידה ומחירה הינם כדלקמן:

| | |
|---|---|
| 1,000 ש"ח ערך נקוב אגרות חוב (סדרה א') במחיר של | 985 ש"ח |
| **סה"כ מחיר ליחדת אגרות חוב (סדרה א')** | **985 ש"ח** |

## 2.3 רישום למסחר בבורסה

2.3.1 הבורסה נתנה את אישורה העקרוני לתשקיף להשלמה זה, לפיו תנאי אגרות החוב (סדרה א') המוצעות מכוח תשקיף להשלמה זה עומדים בתנאים הקבועים בתקנון הבורסה ובהנחיות על-פיו.

2.3.2 לפני פרסום ההודעה המשלימה, תפנה החברה לבורסה בבקשה לרשום בה למסחר את אגרות החוב (סדרה א') המוצעות מכוח תשקיף להשלמה זה וההודעה המשלימה. בכפוף לקבלת אישור הבורסה לרישום למסחר כאמור לעיל, תפנה החברה בבקשה לרשום בה את ניירות הערך למסחר תוך שלושה (3) ימי עסקים לאחר מועד התקיימות התנאי המפורט בסעיף 2.3.4 לתשקיף.

2.3.3 אישור הבורסה כאמור כפוף לעמידה בדרישות הבורסה ביחס לאגרות החוב (סדרה א') כמפורט בסעיף זה להלן.

2.3.3.1 הפיזור המזערי של אחזקות הציבור הינו 35 מחזיקים לפחות, כשכל אחד מחזיק בשווי החזקות מזערי של 200,000 ש"ח לפחות (**"שווי החזקה מזערי למחזיק"**). כשלעניין זה "מחזיק" ייחשב - מחזיק אחד שישווי החזקותיו עולה על שווי ההחזקה המזערי למחזיק כאמור או מחזיק ביחד עם אחרים שישווי החזקותיהם במשותף עולה על שווי ההחזקה המזערי למחזיק כאמור.

2.3.3.2 שווי אחזקות הציבור באגרות החוב, לאחר הרישום למסחר, לא יפחת מ-36 מיליון ש"ח.

מאחר ושווי החזקות הציבור באגרות החוב (סדרה א') הינו 200 מיליון ש"ח לפחות, החברה אינה נדרשת לעמוד בדרישות הון עצמי מינימאלי.

2.3.4 בנוסף, הרישום למסחר של אגרות החוב מותנה גם בהעברת הזכויות המועברות (כהגדרתן בסעיף 7.1.6 לתשקיף) לחברה ובפרסום דוח מיידי של החברה אודות העברת הזכויות המועברות לחברה וקבלת אישור היועצים המשפטיים של החברה בארה"ב (כהגדרתו בסעיף 1.2 לתשקיף), כי הזכויות המועברות הועברו לחברה.

2.3.5 אם יתברר כי לא התקיימו איזה מדרישות הבורסה המפורטות בסעיף 2.3.3 לתשקיף ו/או לא התקבל אישור היועצים המשפטיים בארה"ב ו/או לא פורסם הדוח המיידי כאמור בסעיף 2.3.4 לתשקיף בתוך 14 ימי עסקים ממועד קבלת הכספים בידי רכז ההנפקה, אזי תתבטל הנפקת אגרות החוב (סדרה א'), הן לא תירשמנה למסחר בבורסה, הכספים שהתקבלו בידי רכז ההנפקה יושבו למזמינים, ניירות הערך לא יוקצו למזמינים והחברה תודיע על כך בדוח מיידי. לעניין זה יובהר, כי הזכויות המועברות תועברנה לידי החברה בסמוך לאחר ההנפקה מכוח תשקיף זה.

2.4 **אופן ההצעה לציבור**

2.4.1 <u>כללי</u>

ניירות הערך המוצעים יוצעו במסגרת הצעה לא אחידה, כאמור בפרק ג' לתקנות אופן ההצעה, ב-620,000 יחידות, כאשר כל יחידה מכילה מספר שווה של אגרות חוב (סדרה א') מוצעות.

ניירות הערך המוצעים מוצעים על-ידי החברה בדרך של הצעה לא אחידה באופן המפורט בתקנה 11(א)(1) לתקנות אופן ההצעה. לפיכך, בהתאם לקבוע בתקנה כאמור, ההצעה על-פי תשקיף זה תובטח בחלקה (לפחות 25% מכמות ניירות הערך המוצעים) בחיתום והניצעים בהצעה יהיו משקיעים מוסדיים (כהגדרת מונח זה בתקנות אופן ההצעה). עם זאת, החברה תהא רשאית למכור עד 30% מן ההנפקה למי שאינו משקיע מוסדי, ובלבד שהמכירה למי שאינו משקיע מוסדי תיעשה באופן של הצעה אחידה, באותו מחיר שיוקצו בו ניירות הערך לניצעים בהצעה הלא אחידה ובאותו יום, והכמות שתוקצה לכל משקיע שאינו משקיע מוסדי, תהיה לפי חלקה היחסי של הזמנתו מתוך סך כל ההזמנות של מי שאינו משקיע מוסדי, כאשר כל משקיע יוכל להגיש הזמנה אחת בלבד.

2.4.2 <u>התקופה להגשת בקשות</u>

התקופות להגשת בקשות על-פי תשקיף זה, תפורטנה במסגרת ההודעה המשלימה (**"התקופה להגשת בקשות"**).

2.4.3 <u>התחייבויות מוקדמות</u>

2.4.3.1 בכוונת החברה לנהל הליך קבלת הזמנות (Book Building) ממשקיעים מוסדיים באמצעות החתם המתמחר. החברה טרם נענתה להזמנות ממשקיעים מוסדיים כאמור. הקצאת יחידות אגרות החוב (סדרה א') בין המשקיעים המוסדיים תיקבע לפי שיקול דעתה של החברה, לאחר היוועצות בחתם המתמחר.

2.4.3.2 כל הזמנות המשקיעים המוסדיים בהצעה הלא אחידה תוגשנה לחתם המתמחר ולחברה על גבי טפסי הזמנה בנוסח שיישלח אליהם על-ידי החתם המתמחר ותנקובנה במחיר ליחידה שיפורסם בהודעה המשלימה ובמספר היחידות המבוקש לרכישה. ניתן יהיה להגיש בקשות לרכישת יחידות שלמות בלבד. בקשה שתוגש לגבי חלק כלשהו של יחידה, יראו אותה כבקשה המוגשת לגבי מספר היחידות השלמות הנקוב בה בלבד, וחלק היחידה הכלול בבקשה יראו אותו כאילו לא נכלל בה מלכתחילה. לפיכך, בקשה שמספר היחידות הנקוב בה פחות מיחידה אחת, לא תתקבל.

2.4.3.3 בקשות המשקיעים המוסדיים לרכישת יחידות כאמור תהיינה בלתי חוזרות. כל בקשה תחשב כהתחייבות בלתי חוזרת מצד המבקש לקבל את ניירות הערך שיוקצו לו כתוצאה מהיענות מלאה או חלקית לבקשתו ולשלם באמצעות רכז ההנפקה ששמו יפורט בהודעה המשלימה (**"רכז ההנפקה"**) את המחיר המלא על פי תנאי התשקיף וההודעה המשלימה של ניירות הערך המוצעים שיוקצו לו עקב היענות על פי תנאי התשקיף וההודעה המשלימה, לבקשתו.

2.4.3.4 יודגש, כי החתם המתמחר התחייב שכל הצעת ניירות ערך שתתבצע על-ידיו או על-ידי מי מטעמו תבוצע בישראל בלבד ולא ל-US Person, כהגדרת המונח בסעיף 1.3 לתשקיף.

2.4.4 <u>הקצאת היחידות למשקיעים המוסדיים</u>

2.4.4.1 לאחר תום התקופה להגשת בקשות, היחידות המוצעות תוקצינה למזמינים בהצעה לא אחידה לפי שיקול דעתה של החברה, לאחר היוועצות בחתם המתמחר. במסגרת ההקצאה לא תעלה הכמות שתוקצה לכלל המשקיעים המוסדיים המנויים בקבוצתו של חתם להצעה (בין שנמכרו לו על-ידי החתם המנוי בקבוצתו ובין שנמכרו לו על-ידי חתם או מפיץ אחר) או בקבוצת מפיץ, או שהשקעותיהם מנוהלות על-ידי קבוצתו, על 5% מכמות היחידות שנמכרה בהצעה. היה שווי הנכסים המנוהלים עבור הציבור על-ידי כלל

המשקיעים המוסדיים בקבוצת החתם כאמור, גבוה מ-10 מיליארד ש״ח, לא תעלה הכמות שתוקצה להם, על 10% מכמות היחידות המוצעות.

2.4.4.2    **״קבוצת חתם״** או **״קבוצת מפיץ״**, לפי העניין, משמעה כהגדרת המונח בתקנות אופן ההצעה.

2.4.4.3    כל היחידות תימכרנה למשקיעים המסווגים במחיר אחיד ליחידה, ללא כל הנחה או הטבה מעבר לעמלות הפצה למפיצים כפי שתפורסמנה בהודעה המשלימה.

2.4.5    <u>הזמנת והקצאת יחידות שיוקצו במסגרת הצעה אחידה לכלל הציבור, ככל שתהא</u>

2.4.5.1    כאמור לעיל, הניצעים בהצעה זו אחידה זו לא יהיו משקיעים מוסדיים (כהגדרת מונח זה בתקנות אופן ההצעה), אך החברה תהא רשאית למכור עד 30% מן ההנפקה למי שאינו משקיע מוסדי, ובלבד שהמכירה למי שאינו משקיע מוסדי תיעשה באופן של הצעה אחידה, כאשר כל מזמין יוכל להגיש הזמנה אחת בלבד, במחיר האחיד ובמהלך התקופה להגשת בקשות שתפורסם בהודעה המשלימה.

2.4.5.2    הכמות שתוקצה לכל משקיע, תהא לפי חלקה היחסי של הזמנתו מתוך סך ההזמנות בחלק ההנפקה הפתוח לכל, כאשר ההקצאה למי שאינו משקיע מוסדי תבוצע בסמוך לאחר סגירת רשימת החתימות במכרז לציבור (ככל שיהיה). ככל שיתקיים מכרז לציבור, החברה תפרסם במסגרת ההודעה המשלימה את מועד פתיחת וסגירת רשימת החתימות.

2.4.5.3    אם בהקצאת ניירות הערך על-פי ההיענות במכרז לציבור כאמור לעיל, ייוצרו שברי יחידות, הן יעוגלו ככל הניתן ליחידה השלמה הקרובה ביותר. עודפים של יחידות שייוותרו כתוצאה מהעיגול כאמור, יירכשו על-ידי רכז ההנפקה אשר עמו תתקשר החברה עד למועד פרסום ההודעה המשלימה, במחיר ליחידה שנקבע.

2.4.6    <u>הודעה על תוצאות ההנפקה</u>

ביום המסחר הראשון שלאחר תום התקופה להגשת בקשות, תודיע החברה בדוח מיידי לרשות ניירות ערך ולבורסה את תוצאות ההנפקה (**״הדיווח על תוצאות ההנפקה״**).

2.5    <u>**החשבון המיוחד**</u>

2.5.1    סמוך לפני תחילת התקופה להגשת בקשות יפתח רכז ההנפקה בתאגיד בנקאי חשבון נאמנות מיוחד נושא פירות ע״ש החברה (**״החשבון המיוחד״**). חשבון זה ינוהל באופן בלעדי על-ידי רכז ההנפקה בשם החברה ועבורה ובהתאם להוראות חוק ניירות ערך. כל הכספים שיתקבלו בגין הבקשות לרכישת היחידות הכלולות בבקשות שנענו, יועברו לחשבון המיוחד.

יצוין כי תמורת ההנפקה למשקיעים שאינם משקיעים מוסדיים, אשר יכול שתבוצע על-ידי החברה בדרך של הצעה אחידה (כמפורט בסעיף 2.4.5 לתשקיף), תופקד אף היא בחשבון המיוחד.

2.5.2    ביום המסחר הראשון שלאחר תום התקופה להגשת בקשות עד השעה 00:12 בצהריים, יחייב רכז ההנפקה את חשבונות המשקיעים המוסדיים שבקשותיהם לרכישת יחידות אגרות החוב (סדרה א׳) נענו באופן מלא או חלקי, כאמור בסעיף 2.4.4 לתשקיף. הכספים האמורים יושקעו בפיקדונות נזילים שקליים לא צמודים ונושאי ריבית על בסיס יומי.

2.5.3    בכפוף להוראות סעיף 2.3 לתשקיף, רכז ההנפקה יעביר לחברה, לא יאוחר מהשעה 00:12 ביום המסחר השני שלאחר תום התקופה להגשת בקשות, את יתרת הכספים שייוותרו בחשבון המיוחד בצירוף הפירות אשר נצברו בגינם לחשבון הנאמנות (כהגדרתו בשטר הנאמנות) וזאת כנגד העברת אגרות החוב לחברה לרישומים וזיכוי חבר הבורסה על-פי הוראות רכז ההנפקה.

2.5.4    החברה רואה בהפקדת תמורת ההנפקה אצל רכז ההנפקה, כקבלת התמורה בידיה.

2.6 **הקצאת ניירות ערך, מכתבי הקצאה ותעודות ניירות ערך**

2.6.1 במועד ההקצאה ובתנאי שהתקיימו התנאים להעברת הכספים שהופקדו בחשבון המיוחד על-ידי רכז ההנפקה לחברה כאמור בסעיף 2.5.3 לתשקיף וכנגד העברת הכספים כאמור, תקצה החברה למבקשים, באמצעות החברה לרישומים של הבורסה לניירות ערך בתל-אביב בע"מ ("**החברה לרישומים**") את ניירות הערך הכלולים ביחידות שהבקשות לרכישתן נענו (במסגרת ההצעה הלא אחידה ובמסגרת ההצעה האחידה, ככל שתהא רלוונטית), במלואן או בחלקן, ואשר תמורתן שולמה במלואה, על-ידי משלוח תעודות בגין אגרות החוב (סדרה א') לחברה לרישומים.

2.6.2 תעודות אגרות החוב תהיינה ניתנות לפיצול או להעברה או לוויתור לטובת אחרים בכפוף למילוי כתב העברה או פיצול או ויתור, לפי העניין ומסירתו בצירוף התעודות, לחברה, ובכפוף לתשלום על-ידי המבקש של כל מס או היטל או הוצאה הכרוכים בכך.

2.6.3 החברה רשאית לבטל את ההצעה על-פי תשקיף זה וההודעה המשלימה בכל עת לפני קבלת כספי ההנפקה מבלי שתהיה לניצעים כל טענה בקשר לכך. במקרה של ביטול ההנפקה כאמור, ניירות הערך המוצעים לא יונפקו, לא יירשמו למסחר בבורסה ולא ייגבה כסף מהמזמינים בקשר לאותן יחידות שהוזמנו על-ידיהם.

2.7 **הודעה משלימה**

2.7.1 לאחר פרסומו של תשקיף זה, תפרסם החברה הודעה משלימה אשר במסגרתה יושלמו הפרטים החסרים בתשקיף זה ו/או יעודכנו הפרטים הניתנים לעדכון בתשקיף זה (הכל, ככל שרלוונטי), בהתאם וכפוף להוראות סעיף 16(א1)(2) לחוק ניירות ערך ולתקנות הודעה משלימה, לרבות שינויים (ככל שיהיו) בכמות ובתנאי אגרות החוב המוצעות וכן פרטים נוספים, ובכללם :

[א] התקופה להגשת בקשות ומועד המכרז לציבור (ככל שיתקיים) ;

[ב] אישור הבורסה לרישום למסחר בה של אגרות החוב ;

[ג] פרטי רכז ההנפקה ;

[ד] שינוי בכמות אגרות החוב ו/או במחיר היחידה ו/או בשיעור הריבית השנתית של אגרות החוב המוצעות על-פי תשקיף זה בשיעור שלא יעלה על 20% מהכמות ו/או משיעור הריבית השנתית המצוין בסעיף 2.1.1.1 לתשקיף, ובכפוף לכך שמכפלת כמות היחידות המוצעות במחיר לא תשונה מ-30% מהמכפלה האמורה הנגזרת מהמחיר והכמות שצוינו בתשקיף וכן בכפוף להוראות תקנות הודעה משלימה. הכמות, המחיר ושיעור הריבית השנתית העדכניים כאמור יפורטו בהודעה המשלימה ;

[ה] שינוי בכמות ו/או במחיר היחידה ו/או בשיעור הריבית השנתית של אגרות החוב המוצעות על-פי תשקיף זה בשיעור העולה על השיעור הנקוב בס"ק [ד] לעיל, ובלבד שלא ישונה אף אחד מבין המחיר או הכמות של ניירות הערך המוצעים ביותר מ-50% מן הכמות ומן המחיר שצוינו בתשקיף זה, לפי העניין, ומכפלת המחיר בכמות לא תשונה ביותר מ-50% מן המכפלה האמורה הנגזרת מן הכמות והמחיר שצוינו בסעיף 2.1 לתשקיף ;

[ו] במקרה של הצעה אחידה לציבור, סך ההתחייבויות המוקדמות שניתנו לחברה על-ידי משקיעים מסווגים בקשר עם אגרות החוב (סדרה א') המוצעות מכוח התשקיף וההודעה המשלימה, לרבות שמותיהם, וכן שיעורי הריבית וכמות יחידות אגרות החוב (סדרה א') אשר ביחס אליהם התחייב כל אחד מהמשקיעים המסווגים כאמור ;

[ז] פירוט ההוצאות בשל הצעת אגרות החוב והנפקתן, לרבות עמלות עבור התחייבות מוקדמת, ריכוז והפצה ;

[ח] כל פרט אשר תיקונו מתחייב מהשינוי בתנאי אגרות החוב המוצעות כאמור לעיל, ככל שיהא ;

[ט]      כמות היחידות המוצעות שתימכרנה למי שאינו משקיע מוסדי, ככל שתהא כמות כאמור;[2]

[י]      עיקרי הסכם החיתום עם החתם המתמחר.

2.7.2      פורסמה הודעה משלימה, התקופה להגשת הזמנות תחל לא לפני מועד פרסום ההודעה המשלימה, וכן לא לפני תום חמישה (5) ימי עסקים ממועד פרסום התשקיף. כמו כן, ככל שבהודעה המשלימה ישונו פרטים בשיעורים העולים על השיעורים הקבועים בס״ק ד׳ לעיל, תחל התקופה להגשת הזמנות לרכישת ניירות הערך המוצעים על-פי תשקיף זה, לא פני חלוף שני (2) ימי מסחר ממועד פרסום ההודעה המשלימה. התקופה להגשת הזמנות תסתיים, בהצעה אחידה ובהצעה לא אחידה, לפי תקנה 11(א)(1) לתקנות ההצעה, לא יאוחר מ-75 ימים מיום פרסום התשקיף להשלמה או מ-45 ימים ממועד פרסום ההודעה המשלימה, לפי המוקדם, ובהצעה אחידה כאמור, במסגרת המכרז הציבורי, ככל שתיערך על-פי תשקיף זה, תסתיים לא לפני תום שבע (7) שעות ומתוך חמש (5) שעות מסחר לפחות ממועד פרסום ההודעה המשלימה.

2.7.3      עם פרסומה, תהפוך ההודעה המשלימה לחלק בלתי נפרד מהתשקיף ותצורף לכל עותק מהתשקיף אשר תפיץ החברה לאחר פרסום ההודעה המשלימה.

2.7.4      אישור הבורסה לרישום למסחר בה של ניירות הערך המוצעים על-פי תשקיף זה להשלמה, יינתן טרם פרסום ההודעה המשלימה.

2.8      **הימנעות מעשיית הסדרים**

2.8.1      החברה, הדירקטורים והחתם המתמחר מתחייבים בחתימתם על תשקיף זה ו/או ההודעה המשלימה (לפי העניין)[3] להימנע מלעשות הסדרים שאינם כתובים בתשקיף בקשר עם הצעת הערך, הפצתם ופיזורם בציבור ומתחייבים להימנע מלהעניק זכות לרוכשי ניירות ערך על-פי התשקיף למכור את ניירות הערך שרכשו מעבר למפורט בתשקיף ובהודעה המשלימה.

2.8.2      החברה, הדירקטורים והחתם המתמחר מתחייבים בחתימתם על תשקיף זה ו/או ההודעה המשלימה (לפי העניין) להודיע לרשות ניירות ערך על כל הסדר הידוע להם עם צד שלישי הסותר את ההתחייבות כאמור בסעיף 2.8.1 לתשקיף.

2.8.3      החברה, הדירקטורים, והחתם המתמחר מתחייבים בחתימתם על תשקיף זה ו/או ההודעה המשלימה (לפי העניין) להימנע מלהתקשר בקשר לניירות הערך המוצעים על-פי התשקיף עם צד שלישי כלשהו שלפי מיטב ידיעתם ובדיקתם ערך הסדרים בניגוד לאמור בסעיף 2.8.1 לתשקיף.

2.8.4      החברה, הדירקטורים והחתם המתמחר לא יקבלו הזמנות לניירות ערך מהנפקה זו ממפיץ, שלא התחייב בכתב לנהוג בהתאם להוראות פסקה זו.

2.9      **מיסוי**

**התיאור הנ״ל הינו כללי בלבד ואינו מהווה תחליף לייעוץ אינדיבידואלי על-ידי מומחים, בשים לב לנסיבות המיוחדות לכל משקיע. מומלץ לכל המבקש לרכוש מניירות ערך המוצעים, לפנות לייעוץ מקצועי על מנת להבהיר את תוצאות המס אשר יחולו עליו בשים לב לנסיבותיו הייחודיות של המשקיע ושל נייר הערך המוצע.**

2.9.1      <u>מיסוי על-פי דיני איי הבתולה הבריטיים</u>

התיאור האמור מטה של דיני המס באיי הבתולה הבריטיים מבוסס על הדין הקיים במועד התשקיף. נכון למועד תשקיף זה, למדינת ישראל אין הסכם או אמנה עם איי הבתולה הבריטיים בדבר מניעת מיסי כפל ומניעת התחמקות ממיסים.

<u>שיקולי מס החלים על מחזיקי אגרות החוב באיי הבתולה הבריטיים</u>

לעניין רווח הון שינבע ממכירת אגרות החוב, הן יחידים והן חברות תושבות ישראל והן תושבים זרים וחברות זרות לרבות כאלו שהינן תושבי איי הבתולה, פטורים ממס באיי הבתולה הבריטיים בגין הון

---

[2]      עד 30% מסך היחידות המוצעות בהנפקה זו.

[3]      יובהר כי בניגוד לחברה ולדירקטורים, שיחתמו גם על התשקיף וגם על ההודעה המשלימה, החתם המתמחר יחתום רק על ההודעה המשלימה ואולם עם חתימתו זו יראו בחתימתו כאמור כחתימתו על התשקיף.

שינבע להם ממכירת אגרות החוב, אשר תונפקנה על-ידי החברה במסגרת תשקיף זה, ומרווח הון האמור, ככל שיהיה, אין חובת ניכוי מס במקור באיי הבתולה הבריטיים.

לעניין הריבית שתנבע מאגרות החוב, וכן לעניין מיסוי בגין ניכיון אגרות החוב, הן יחידים והן חברות תושבי ישראל והן תושבים זרים וחברות זרות לרבות כאלו שהינן תושבי איי הבתולה, פטורים ממס באיי הבתולה הבריטיים בגין ריבית על אגרות החוב אשר תונפקנה על-ידי החברה במסגרת תשקיף זה, או בגין דמי ניכיון על אגרות החוב, לפי העניין, וריבית אשר תשולם על-ידי החברה, אינה חייבת בניכוי מס במקור באיי הבתולה הבריטים והמחזיקים יהיו פטורים מניכוי במקור גם בגין דמי הניכיון על אגרות החוב.

לעניין הסדרים מיוחדים שיידרשו מהמחזיקים בקשר עם תשלום הריבית על אגרות החוב, ראה האמור מטה.

מובהר, כי ככל שתקום בעתיד חובה לניכוי מס במקור, תודיע החברה על כך למחזיקי אגרות חוב בדיווח מיידי, בסמוך לפני מועד ביצוע התשלום, וחובת הניכוי במקור תהיה של החברה ומחזיקי אגרות החוב החובה יהיו כפופים לחובה לפעול בהתאם לאמור להלן.

נכון למועד התשקיף לא חלה חובת ניכוי מס במקור ליחידים וחברות תושבי ישראל וכן לתושבים זרים ו/או לחברות זרות, לרבות תושבי איי הבתולה הבריטיים, בגין רווח הון שינבע להם ממכירת אגרות החוב ו/או בגין הריבית שתשולם להם בגין אגרות החוב ו/או בגין דמי הניכיון על אגרות החוב הללו.

### 2.9.2 דיני המס בארה״ב

### 2.9.2.1 מיסוי פדראלי בארה״ב

סעיף זה מסכם חלק מהשלכות המס המהותיות הנוגעות למס הכנסה פדראלי ומס עיזבון פדראלי בארה״ב ביחס לרכישה, החזקה, מכירה או כל דיספוזיציה אחרת של אגרות החוב.

**אלה אם מצוין אחרת, סעיף זה רלוונטי אך ורק ל״מחזיק ישראל״ (כהגדרת המונח להלן) אשר מחזיק בניירות הערך כנכס הוני לצורכי מס אמריקאי (באופן כללי, נכס המוחזק למטרות השקעה).**

תיאור זה מבוסס על הוראות U.S. Internal Revenue Code of 1986, כפי שתוקן (**"הקוד"**), ההיסטוריה החקיקתית של הקוד, תקנות קיימות והתקנות המוצעות של משרד האוצר האמריקאי, פירושים משפטיים והנחיות מנהליות שפורסמו על-ידי שלטונות מס ההכנסה בארה״ב (**"IRS"**), אשר עשויות, בנסיבות מצומצמות, לחול למפרע, כמפורט בתקנות, אשר כפופות לשינויים ולפרשנויות שונים,. תיאור זה אינו מתייחס לכל ההיבטים של המיסוי הפדראלי של ההכנסות בארה״ב אשר עשוי לחול על משקיעים לאור נסיבותיהם המיוחדות או על משקיעים אשר כפופים לטיפול מיוחד במסגרת חוקי מס הכנסה פדראלי בארה״ב. בנוסף לכך, תיאור זה מתבסס על הוראות האמנה בין ממשלת ארה״ב וממשלת ישראל ביחס למיסוי הכנסות שנחתמה ביום 20 בנובמבר 1975, ותוקנה באמצעות פרוטוקולים שנחתמו ביום 30 במאי 1980 וביום 26 בינואר 1993 (**"האמנה"**).

לעניין זה, בעל אגרות חוב ייחשב "מחזיק ישראלי" אם הינו תושב ישראל למטרות האמנה, אשר מכוח האמנה זכאי להטבות בקשר עם הכנסותיו ורווחיו מאגרות החוב, ואשר נחשב כבעלים המוטב של איגרות החוב. בלבד שהמחזיק כאמור אינו לצרכי מס הכנסה הפדרלי : (א) יחיד שהוא אזרח או תושב ארה״ב, (ב) יחיד שהוא אזרח או תושב לשעבר של ארה״ב הכפוף לכללים המיוחדים בהתאם לסעיף 877 או 877A של הקוד, (ג) תאגיד, שותפות או ישות אחרת שנוצרה או התאגדה לפי חוקי ארה״ב, חוקי כל אחת מהמדינות בתוך ארה״ב או לפי חוקי חלוקות המשנה הפוליטיות האחרות בתוך ארה״ב, או של מחוז קולומביה (ד) נאמנות אם (1) לבית משפט בתוך ארה״ב יש סמכות להפעיל פיקוח ראשי על האדמיניסטרציה שלה ו-US Person אחד או יותר, הינם בעלי סמכות לשלוט בכל ההחלטות המהותיות של הנאמנות, או (2) הנאמנות הייתה קיימת ביום 20

באוגוסט 1996, והיא בחרה בהתאם לתקנות האוצר (Treasury Regulations) הרלוונטיות להיחשב כנאמנות מקומית (domestic trust) ובחירתה זו הינה בתוקף, (ה) עיזבון, אשר ההכנסה ממנו כפופה למס הכנסה בארה״ב, יהא מקורה אשר יהא או (ו) ישות אחרת המסווגת כשותפות.

**סיכום זה הינו כללי באופיו ואינו דן בכל השלכות מס ההכנסה הפדראלי האמריקאי העשויות להיות רלוונטיות למחזיקים ישראלים לאור נסיבותיהם המיוחדות או לסוגים מסוימים של משקיעים הכפופים לטיפול מס מיוחד במסגרת מס ההכנסה הפדראלי האמריקאי, כגון מוסדות ממשלתיים, בנקים או מוסדות פיננסיים, חברות ביטוח, ישויות שאינן אמריקאיות אשר יכול ותסווגנה כשותפויות או נאמנויות לצורכי מס הכנסה פדראלי אמריקאי, תאגידים נשלטים זרים, חברות השקעה זרות פאסיביות, סוחרים בניירות ערך או במטבעות, משקיעים הפטורים ממס, עובדים המקבלים את ניירות הערך כחלק משכרם או במהלך העסקתם, ומחזיקים ישראלים המחזיקים (במישרין או בעקיפין) ב-10% לפחות מכוח ההצבעה במשלם.**

**מומלץ למחזיקים ישראלים להתייעץ עם יועצי המס שלהם לגבי השלכות דיני מס ההכנסה הישראלי, האמריקאי המדינתי והמקומי, כמו גם לעניין מיסים בגין רכוש אישי, זיכיון, מקומי, מדינתי ופדראלי, בארה״ב והשלכות מס אחרות, כולל תחולת הוראות האמנה, המתייחסות לרכישה, בעלות ומכירה של ניירות הערך.**

מאחר שהחברה, אשר התאגדה באיי הבתולה הבריטיים, בחרה, באמצעות טופס המס IRS 8832, להיחשב כשותפות לצרכי מס הכנסה פדרלי בארה״ב, דיני המס בארה״ב מתייחסים אל אגרות החוב כאל כאלו שהונפקו על-ידי ישות שקופה (pass-through). לפיכך, החברה ככלל לא תחוב בתשלום מס הכנסה פדרלי ברמת התאגיד, וחובת המס הפדרלי ככלל יחולו על בעלי החברה.

2.9.2.2    <u>מיסוי של מחזיקים ישראלים</u>

חוקי מס ההכנסה הפדראלי בארה״ב החלים על מחזיקים ישראליים של אגרות החוב הינם מורכבים וסעיף זה ינסה לספק סיכום תמציתי בלבד של כללים אלו. מומלץ למשקיעים פוטנציאלים להתייעץ עם יועצי מס על מנת לקבוע את היקף ההשפעה של חוקי המס המקומי, המדינתי והפדראלי בארה״ב ומחוץ לארה״ב (כולל ישראל), כמו גם אמנות מס הכנסה רלוונטיות, בנוגע להשקעה באיגרות החוב, כולל דרישות דיווח בגינם.

2.9.2.3    <u>הכנסות מריבית</u>

ככלל, הכנסה מריבית (לרבות ניכיון הנפקה מקורי (״**OID**״) המתקבלת על-ידי מחזיק ישראלי בקשר עם אגרות החוב, נחשבת להכנסה ממקור זר לצורכי מס הכנסה פדרלי אמריקאי , למעט אם הכנסה כאמור קשורה באופן אפקטיבי למסחר או לעסק בארה״ב של המחזיק הישראלי או אם לחברה יש הכנסות שמקורן בארה״ב. כפועל יוצא, ניכוי מס במקור בארה״ב לא יחול, אלא אם הריבית נחשבת להכנסה שמקורה בארה״ב.

אם מקורה של הריבית בארה״ב, אזי עשויה לקום חובת ניכוי מס במקור בשיעור של 30%. מחזיקים ישראליים עשויים להיות זכאים לשיעור ניכוי מס במקור מופחת במסגרת האמנה, בכפוף להמצאת האישורים הנדרשים, לרבות המצאת טפסי W-8BEN IRS, -W 8-BEN-E IRS או W-8IMT.

מחזיקים ישראליים עשויים לעמוד בתנאי ״Portfolio Interest Exemption״ מכוח הדין האמריקאי, אך פטור יחול רק בהתקיים כל התנאים הבאים :

1.  המחזיק הישראלי אינו מחזיק, במישרין או בעקיפין, לפחות 10% מזכויות ההצבעה בחברה ;

2.  המחזיק הישראלי אינו ״חברה נשלטת זרה״ לצורכי מס הכנסה פדרלי בארה״ב אשר נחשבת כקשורה למי שנחשב בעלים של החברה לצורכי מס הכנסה פדרלי בארה״ב ;

3. המחזיק הישראלי אינו בנק שנחשב לקבלת הריבית על העמדת אשראי שנעשתה בהתאם להסכם הלוואה שנתחם במהלך העסקים הרגיל;

4. הומצאו טפסי W-8 לידי סוכן הניכוי.

למעט אם נקבע אחרת באמנה, ריבית הקשורה באופן אפקטיבי למסחר או עסק של המחזיק הישראלי חבה במס הכנסה פדרלי אמריקאי. במקרה כאמור, מחזיק הישראלי המסווג כתאגיד לצרכי מס הכנסה פדרלי אמריקאי עלול, להיות כפוף בנוסף למס "רווחי סניף" אמריקאי בשיעור מס מופחת במסגרת האמנה, וכן עלול לחוב במס הכנסה אמריקאי מדינתי ו/או מקומי.

### 2.9.2.4 <u>מכירה, החלפה, רכישה מחדש, פדיון או מכירה אחרת של אגרות חוב</u>

מחזיק ישראלי לא יהיה כפוף למס הכנסה פדראלי בארה"ב בגין כל רווח ממכירה, החלפה, רכישה מחדש, פדיון או העברה אחרת של אגרות חוב (סדרה א) (למעט, כל סכום בגין ריבית שנצברה וטרם שולמה, אשר נחשבת לכל דבר ועניין כריבית), אלא אם כן: (1) רווח כאמור מיוחס למוסד קבע של המחזיק הישראלי בארה"ב; או (2) אם המחזיק ישראלי הינו יחיד, מחזיק ישראלי כאמור נכח בארה"ב בהיקף כולל של 183 ימים או יותר בשנת המס בה התקיימה ההעברה וכן התקיימו תנאים מסויימים נוספים.

### 2.9.2.5 <u>מס עיזבון פדראלי</u>

אם הריבית על אגרות החוב עומדות בתנאי ה-Portfolio Interest Exemption המתוארים לעיל, והריבית אינה נחשבת לריבית שמקורה בארה"ב, אזי אגרות החוב המוחזקות על-ידי יחיד ישראלי בזמן מותו לא ייכללו בעיזבונו של אותו יחיד למטרות מס עיזבון פדראלי בארה"ב.

### 2.9.2.6 <u>ניכוי מס במקור לצורך גיבוי (backup withholding tax) וחובות דיווח</u>

החברה נדרשת לבצע "ניכוי במקור כגיבוי" על בסיס ברוטו על כל תשלומי ריבית שישולמו בגין אגרות החוב אם דרישות מסוימות אינן מתקיימות. תחת הדין הקיים שיעור ניכוי מס במקור כגיבוי הינו כיום 24%. ניכוי מס במקור כגיבוי אינו חל על תשלומים בגין אגרות החוב למחזיק ישראלי אם ההצהרות הרלוונטיות המתוארות להלן (תחת הכותרת של – השלמת טופס מס הכנסה W-8BEN או מס הכנסה טופס, W-8BEN-E, או טופס W-8IMY על-ידי מחזיקי אגרות החוב) נמסרו כדין על-ידי המחזיק הישראלי, ובתנאי שלמשלם אין ידיעה בפועל או סיבה לדעת שהמחזיק הישראלי הינו תושב ארה"ב. ניכוי המס במקור כגיבוי (במידה וקיים) בגין כל מחזיק ישראלי ידווח ל-IRS. סכומים אשר נוכו במקור במסגרת חוקי ניכוי מס במקור כגיבוי אינם מס נוסף ועשויים להיות מוחזרים או מקוזזים כנגד חבות מס ההכנסה הפדראלית של המחזיק הישראלי, אם בכלל, ובלבד כי המידע מדווח ל-IRS במועד. אי המצאת טפסי W-8 תקפים עשויה להקים חובות דיווח ל-IRS.

### 2.9.2.7 <u>מילוי טופס W-8BEN IRS או W-8BEN-E IRS, W-8IMY IRS על-ידי מחזיקי אגרות החוב</u>

מחזיקי אגרות החוב אשר תונפקנה על-פי תשקיף זה וכן מחזיקים אשר ירכשו את אגרות החוב האמורות בשלב יותר מאוחר, ידרשו, כתנאי לרכישת אגרות החוב, למלא טופס W-8BEN IRS או טופס W-8BEN-E IRS (במקרה של ישות) או טופס W-8IMY (לרבות כל הנספחים הרלוונטיים), או טופס W-8ECI IRS.

**למען הסר ספק יובהר בזאת, כי מחזיק אגרות חוב אשר לא יעביר טופס W-8BEN IRS או W-8BEN-E IRS, W-8IMY (לרבות כל הנספחים הרלוונטיים) או W-8ECI, ממולא כנדרש, יהיה כפוף לניכוי מס במקור על כל תשלומי הריבית וזאת בשיעור של 30% כמתואר לעיל.**

**אם בעתיד תקום לחברה חובת ניכוי מס במקור, תודיע על כך החברה בדיווח מיידי סמוך למועד התשלום, והחובה לניכוי המס תחול על החברה.**

2.9.2.8 <u>דרישת תפעוליות נוספות</u>

מדי שנה ולא יאוחר מיום ה-15 בדצמבר של כל שנה קלנדארית החברה תעביר למסלקת הבורסה טיוטת טופס IRS1042 בצירוף התפלגות התשלומים השונים אותם זכאים לקבל מחזיקי אגרות החוב (שהונפקו על-פי תשקיף זה) מהחברה, באמצעות החברה לרישומים והמסלקה, על-פי תנאי אגרות החוב ותנאי שטר הנאמנות לרבות תשלומי ריבית, ערוך כדין. מדי שנה החברה תעביר למסלקת הבורסה את טפסי IRS1042 הסופיים, ערוכים כדין עבור שנה קלנדארית שהסתיימה, וזאת בהתאם ללוח הזמנים כמפורט בחוקי העזר.

2.9.2.9 <u>החוק לאכיפת מיסים בחשבונות זרים</u>

בהתאם לסעיפים 1471 — 1474 לקוד, אשר נחקקו במסגרת חקיקה המוכרת בשם "החוק לאכיפת מיסים בחשבונות זרים" ("FATCA"), מס מנוכה במקור ברוטו בשיעור של 30% עשוי להיות מוטל תשלומי ריבית ממקור בארצות הברית (לרבות על אגרות החוב), על מוסדות פיננסיים זרים בין אם כבעלים מוטב או כגוף ביניים (Intermediaries), במידה שאישורים או דרישות מסוימות לא מולאו. בכפוף להוראות מסוימות, ניכוי מס במקור על-פי ה-FATCA לרוב אינו חל על רווחים ברוטו ממכירה, החלפה, רכישה מחדש, פדיון או דיספוזיציה בדרך אחרת של חבות שמייצרת ריבית שמקורה בארה"ב (כגון אגרות החוב), אך היבטים מסוימים של כללים אלו כפופים לפרשנות ולהוראות הרגולטוריות.

במקרה של תשלומים המתבצעים למוסד פיננסי זר, כהגדרת המונח ב-FACTA, בכפוף למספר חריגים יוטל ניכוי מס במקור על-פי ה-FATCA , אלא אם מוסד כאמור (1) אוסף ומעביר ל- IRS או לרשויות המס הרלוונטיות, מידע מסוים לגבי חשבונות בארה"ב של מוסד כאמור מכוח הסכם עם ה- IRS או חוק זר אחר רלוונטי אשר נחקק בקשר עם ההסכם הבין ממשלתי בין ישראל וארצות הברית; וכן (2) עומד בחובות דיווח וניכוי במקור מתשלומים מסוימים לבעלי חשבונות ספציפיים של מוסד כאמור ולאנשים מסוימים אחרים. במקרה של תשלומים המתבצעים לישות זרה שאינה מוסד פיננסי זר (כהגדרתו), בכפוף למספר חריגים, ניכוי המס במקור על-פי ה- FATCA יחול על-פי רוב אלא אם ישות זרה כאמור מסרה לסוכן הניכוי: (1) אישור על כך שאין לה "בעלים מהותיים אמריקאים", כהגדרת המונח ב-FATCA ובתקנות שתוקנו לפיו; או (2) מידע ספציפי בנוגע לבעלים מהותיים אמריקאים שיש לה.

מחזיק ישראלי, או גוף ביניים שאינו אמריקאי (Non-U.S. intermediary) בשרשרת הבעלות, אשר לא עמד בדרישה לאישורים או בדרישות אחרות המוטלות על-פי ה-FATCAאו על-פי ההסכם הבין-ממשלתי בין ישראל וארצות הברית, יגיע בדרך כלל לניכוי במקור בשיעור של 30%. לא ישולמו סכומים נוספים על חשבון חובת ניכוי במקור המוטלת לגבי תשלומים בגין אגרות החוב כתוצאה מאי עמידתו של מחזיק אגרת חוב שאינו אמריקאי, או כל גוף ביניים שאינו אמריקאי באמצעותו מחזיק כאמור, במישרין או בעקיפין, מחזיק באגרות החוב, בדרישות ה- FATCA.

2.9.3 <u>מיסוי הכנסות על-פי דיני מדינת ישראל</u>

**כמקובל בהחלטות השקעה, על המשקיע לשקול את השלכות המס הקשורות בהשקעה בניירות ערך הכלולים בתשקיף. האמור בתשקיף אינו מתיימר להוות פרשנות מוסכמת ו/או מלאה של הוראות החוק או תיאור ממצה של הוראות המס הנוגעות לניירות הערך הכלולים בו, ואינו בא במקום יעוץ משפטי ומקצועי בנדון, שאותו יש לקבל בהתאם לנתוניו המיוחדים של כל משקיע.**

**יובהר, שהאמור להלן מתייחס לאופן מיסויים של משקיעים ישראלים בלבד. לפיכך, מוצע לתושב חוץ המעוניין לרכוש את ניירות הערך המוצעים לפנות לקבלת ייעוץ מקצועי טרם ביצוע הרכישה.**

**ההוראות הכלולות בתשקיף ביחס למיסוי ניירות הערך אינן מתיימרות להיות פרשנות מוסמכת של הוראות החוק והן אינו מחליפים ייעוץ מקצועי, שבודק את נסיבותיו המיוחדות של כל משקיע.**

<u>היבטי מס חברות בישראל</u>

בהתאם להוראות סעיף 1 לפקודת מס הכנסה (נוסח חדש), התשכ״א-1961 (״**הפקודה**״). חברה תיחשב כתושבת ישראל לצרכי מס אם התאגדה בישראל או שהשליטה והניהול בה מופעלים מישראל. המונח שליטה וניהול אינו מוגדר בפקודה. החברה התאגדה מחוץ לישראל ולמיטב ידיעת החברה, רישום ניירות הערך המוצעים של החברה למסחר בבורסה בישראל, כשלעצמו, אינו מקיים שליטה וניהול בישראל, ועל כן למיטב ידיעת החברה היא אינה נחשבת כתושבת ישראל לצרכי מס הכנסה.

חבר בני אדם תושב חוץ חייב במס בישראל רק על הכנסה ממקורות ישראלים. החברה אינה צופה כי יהיו לה הכנסות ממקורות ישראלים.

<u>היבטי מס החלים על מחזיקי אגרות חוב</u>

יובהר, שהאמור להלן מתייחס לאופן מיסויים של משקיעים ישראלים בלבד. לפיכך, מוצע לתושב חוץ המעוניין לרכוש את ניירות הערך המוצעים לפנות לקבלת ייעוץ מקצועי טרם ביצוע הרכישה.

על-פי הדין הנוכחי הקיים כיום, להלן מתואר בתמצית עיקרי הסדרי המס בישראל החלים על ניירות הערך המוצעים על-פי תשקיף זה:

2.9.3.1   <u>מיסוי רווחי הון מממוש ניירות ערך סחירים</u>

א.   <u>רווח הון מממכירת ניירות ערך בידי תושבי ישראל</u>

בהתאם לסעיף 91 לפקודה רווח הון, בידי יחיד, במכירת אגרת חוב, שאינה צמודה למדד[4] (או שאינה נקובה במטבע חוץ או שערכה אינו צמוד למטבע חוץ), יחויב במס בשיעור שלא יעלה על 15%, ויראו את כל רווח ההון כרווח הון ריאלי. לגבי מכירת ניירות ערך על-ידי יחיד שהינו ״בעל מניות מהותי״ בחברה-קרי, המחזיק, במישרין או בעקיפין, לבדו או יחד עם אחר[5] ב-10% לפחות באחד או יותר מסוג כלשהו של אמצעי השליטה בחברה במועד מכירת ניירות הערך או במועד כלשהו ב-12 החודשים שקדמו למכירה כאמור, שיעור המס לגבי רווח הון בידיו יהיה בשיעור שלא יעלה על 20% (״**בעל מניה מהותי**״).

כמו כן, לגבי יחיד שתבע הוצאות ריבית ריאלית והפרשי הצמדה בשל ניירות הערך, יחויב רווח ההון ממכירת ניירות הערך במס בשיעור של שלושים אחוזים (30%), עד קביעת הוראות ותנאים לניכוי הוצאות ריבית ריאלית לפי סעיפים 101א(9) או 101א(ב) לפקודה. שיעור המס המופחת כאמור לא יחול לגבי יחיד שההכנסה בידיו ממכירת ניירות הערך היא בגדר הכנסה מ״עסק״, בהתאם להוראות סעיף 2(1) לפקודה. במקרה זה יחויב היחיד בשיעור מס שולי בהתאם להוראות סעיף 121 לפקודה.

חבר בני אדם תושב ישראל יהיה חייב במס על רווח הון ריאלי ממכירת ניירות ערך בשיעור הקבוע בסעיף 126(א) לפקודה, (23% במועד ההנפקה).

קרן נאמנות פטורה וכן קופות גמל וגופים הפטורים ממס לפי סעיף 9(2) לפקודה, פטורים ממס בגין רווחי הון ממכירת ניירות ערך כאמור בהתקיים התנאים הקבועים באותו סעיף ובכפוף להמצאת האישורים המתאימים על-ידם. על הכנסותיה של קרן נאמנות חייבת ממכירת ניירות ערך יחול שיעור המס החל על הכנסתו של יחיד שההכנסה אינה מהווה בידיו הכנסה מ״עסק״ או מ״משלח יד״, אלא אם כן נקבע מפורשות אחרת בדין. לא נקבע להכנסה שיעור מס מיוחד, תחויב ההכנסה במס בשיעור המרבי הקבוע בסעיף 121 לפקודה.

ככלל, תושב חוץ חייב במס רווח הון בישראל רק על רווח הון שנצמח או הופק בישראל. במקרה בו חייב תושב החוץ במס רווח הון בישראל, על-פי הוראות הפקודה תושב חוץ פטור ממס על רווחי הון במכירת ניירות ערך הנסחרים בבורסה, אם רווח

---

4   כהגדרת מונח זה בסעיף 91 לפקודה.

5   כהגדרת מונח זה בסעיף 88 לפקודה.

ההון אינו במפעל הקבע שלו בישראל⁶. במקרה שפטור כאמור אינו חל, יחולו הוראות אמנת המס (אם קיימת) בין ישראל למדינת התושבות של תושב החוץ.

הפסדים בשנת המס, שמקורם במכירת ניירות הערך המוצעים בשנת המס ושאילו היו רווחי הון היו חייבים במס בידי מקבלם, יקוזזו כנגד רווחי הון ושבח מקרקעין לרבות רווח ממכירת נייר ערך, נסחר או שאינו נסחר, ישראלי או זר, וכן, כנגד ריבית ששולמה בגין אותו נייר ערך או ריבית ודיבידנד ששולמו בגין ניירות ערך אחרים (בתנאי ששיעור המס החל על ריבית או דיבידנד כאמור לא עלה על שיעור מס החברות לגבי חברה ולא עלה על שיעור המס הקבוע בסעיפים 125ב(1) ו125ג(ב) לפקודה לגבי יחיד (שיעור מס של 25%)), באותה שנת מס. קיזוז ההפסדים יבוצע בדרך של קיזוז הפסד ההון כנגד רווחי הון או הכנסות מריבית או מדיבידנד כאמור.

בהתאם לתקנות מס הכנסה (ניכוי מתמורה, מתשלום או מרווח הון במכירת נייר ערך, במכירת יחידה בקרן נאמנות או בעיסקה עתידית), התשס"ג-2002 ("תקנות ניכוי רווח הון"), בעת חישוב רווח ההון לצורך ניכוי המס במקור ממכירת ניירות ערך נסחרים, יחידות של קרנות נאמנות ועסקאות עתידיות ("ניירות סחירים"), יקזז החייב בניכוי במקור את הפסד ההון שנוצר ממכירת ניירות סחירים שהיו בניהולו ובכפוף לכך שהרווח נוצר באותה שנת מס שבה נוצר הפסד, בין טרם יצירת ההפסד ובין לאחר המועד האמור.

לעניין ניכוי המס במקור מרווח ההון הריאלי במכירת ניירות הערך המוצעים, בהתאם לתקנות ניכוי רווח הון, חייב (כהגדרת מונח זה בתקנות האמורות) המשלם למוכר תמורה במכירת ניירות הערך, ינכה מס בשיעור של חמישה עשר אחוזים (15%) מרווח ההון הריאלי בגין נייר ערך שאינו צמוד למדד כאשר המוכר הינו יחיד, ובשיעור מס חברות (23% במועד ההנפקה), מרווח ההון הריאלי כאשר המוכר הינו חבר בני אדם. זאת, כפוף לאישורי פטור (או שיעור מופחת) מניכוי מס במקור וכפוף לקיזוז הפסדים שרשאי המנכה במקור לבצע. כמו כן, לא ינוכה מס במקור לקופות גמל, קרנות נאמנות וגופים נוספים הפטורים מניכוי מס במקור לפי הדין. אם במועד המכירה לא נוכה מלוא המס במקור מרווח ההון הריאלי, יחולו הוראות סעיף 91(ד) לפקודה וההוראות מכוחו בדבר דיווח ותשלום מקדמה על-ידי המוכר בגין מכירה כאמור.

ככל שניירות הערך המוצעים על פי תשקיף זה יימחקו ממסחר בבורסה, שיעור הניכוי במקור שינוכה בעת מכירתם (היינו, לאחר המחיקה) יהיה שלושים אחוזים (30%) מהתמורה, כל עוד לא הומצא אישור מפקיד השומה המורה על שיעור ניכוי מס במקור אחר של ניכוי מס במקור (לרבות פטור מניכוי מס במקור).

הוראות תקנות ניכוי רווח הון לא יחולו על חייב שהוא מוסד כספי המשלם למוכר שהנו תושב חוץ תמורה או תשלום אחר בשל רווח הון פטור, אם הגיש תושב החוץ למוסד הכספי בתוך 14 ימים מיום פתיחת החשבון ואחת לשלוש שנים, אם היה בישראל, הוא או בא כוחו, הצהרה בטופס 2402 על היותו תושב חוץ ועל זכאותו לפטור.

ככלל, תושב חוץ (יחיד וחברה) פטור ממס על רווחי הון במכירת ניירות ערך הנסחרים בבורסה, אם רווח ההון אינו במפעל הקבע שלו בישראל. האמור לעיל לא יחול לגבי חברה תושבת חוץ המוחזקת בידי תושבי ישראל, בהתאם לקבוע בסעיף 68א לפקודה. במקרה שפטור כאמור אינו חל, יחולו הוראות אמנת המס (אם קיימת) בין ישראל למדינת התושבות של תושב החוץ. כמו-כן, לא ינוכה מס במקור על-ידי תאגיד בנקאי

---

6    האמור לעיל לא יחול לגבי חברה תושבת חוץ המוחזקת בידי תושבי ישראל, בהתאם לקבוע בסעיף 68א לפקודה.

או חבר בורסה לתושב חוץ בהתקיים תנאים מסוימים.

<u>שיעור המס שיחול על הכנסות ריבית מאגרות חוב</u>   2.9.3.2

בהתאם לסעיף 125ג(ג) לפקודה יחיד יהא חייב במס על הכנסה מריבית (לרבות דמי ניכיון) מאגרת חוב שאינה צמודה למדד בשיעור של 15%.

בהתאם לסעיף 125(ד) לפקודה, שיעור המס המופחת כאמור לעיל לא יחול בהתקיים, בין היתר, אחד מהתנאים הבאים : (1) הריבית היא הכנסה מ"עסק" או "משלח יד" לפי סעיף 2(1) לפקודה או שהיא רשומה בספרי חשבונותיו של היחיד או חייבת ברישום כאמור ; (2) היחיד תבע ניכוי של הוצאות ריבית והפרשי הצמדה בשל אגרות החוב ; (3) היחיד הוא בעל מניות מהותי - כהגדרתו בסעיף 88 לפקודה – בחברה המשלמת את הריבית ; במקרים אלו יחול מס שולי בהתאם להוראות סעיף 121 לפקודה כמפורט לעיל.

שיעור המס החל על הכנסות הריבית או דמי הניכיון של חבר בני אדם תושב ישראל שאיננו חבר בני אדם שהוראות סעיף 9(2) לפקודה חלות בקביעת הכנסתו, למעט לעניין סעיף 3(ח) לפקודה לגבי ריבית שנצברה, הינו שיעור מס החברות (23% בשנת 2024).

ככלל, תושב חוץ אינו חייב במס בישראל כאשר מקום מושב משלם הריבית אינו בישראל. ככל שמשלם הריבית הנו תושב ישראל, תושב חוץ פטור ממס על הכנסה מריבית, מדמי ניכיון או מהפרשי הצמדה בשל אגרת חוב הנסחרת בבורסה בישראל, שהנפיק חבר בני אדם תושב ישראל, ובלבד שההכנסה אינה במפעל קבע של תושב החוץ בישראל. ככל שלא יחול הפטור כאמור לעיל, שיעור המס שיחול על הכנסות ריבית בידי תושבי חוץ (יחיד וחבר בני-אדם) שמקורן בניירות הערך, עשוי להיות כפוף להוראותיהן של אמנות למניעת כפל מס שנכרתו בין מדינת ישראל לבין מדינת מושבו של תושב החוץ.

קרן נאמנות פטורה וכן קופות גמל וגופים הפטורים ממס לפי סעיף 9(2) לפקודה, פטורים ממס בגין הכנסת ריבית או דמי ניכיון כאמור, כפוף להוראות סעיף 3(ח) לפקודה בדבר ריבית או דמי ניכיון שנצברו בתקופת החזקתו של אחר, ובכפוף להמצאת האישורים המתאימים על-ידם. על הכנסותיה של קרן נאמנות חייבת מריבית או מדמי ניכיון יחול שיעור המס החל על הכנסתו של יחיד שההכנסה אינה מהווה בידיו הכנסה מ"עסק" או ממשלח יד, אלא אם נקבע אחרת.

בהתאם לתקנות מס הכנסה (ניכוי מריבית, מדיבידנד ומרווחים מסוימים), התשס"ו-2005 ("**תקנות הניכוי**"), שיעור המס שיש לנכות במקור על ריבית (כהגדרתה בתקנות הניכוי)[7] המשולמת על אגרות חוב נסחרות בבורסה, לגבי יחיד שאינו בעל מניות מהותי בחברה המשלמת את הריבית במקרה בו אגרות החוב אינן צמודות למדד המחירים לצרכן או למטבע חוץ, הינו 15%. לגבי יחיד שהינו בעל מניות מהותי בחברה המשלמת את הריבית או עובד בחברה המשלמת את הריבית או נותן לה שירותים או מוכר לה מוצרים, שיעור המס יהיה בהתאם לשיעור המס השולי המרבי לפי סעיף 121 לפקודה כמפורט לעיל. לגבי חבר בני אדם (תושב ישראל ותושב חוץ) ינוכה מס בשיעור מס החברות הקבוע בסעיף 126(א) לפקודה.

שיעור המס שינוכה במקור לגבי תושב חוץ, ככל שהינו חייב במס כאמור לעיל, כפוף להוראות האמנות למניעת כפל מס עליהן חתומה מדינת ישראל.

החברה[8] תנכה במקור מתשלומי הריבית שישולמו על-ידיה למחזיקי אגרות החוב את תשלומי המס אותם היא חייבת לנכות במקור, למעט לגבי גופים הפטורים מניכוי מס במקור כאמור בהתאם לדין.

בתקנה 4 לתקנות מס הכנסה (חישוב רווח הון במכירת נייר ערך הנסחר בבורסה, מלווה מדינה או יחידה בקרן נאמנות), התשס"ג-2002, נקבע כי בפדיון של אגרת חוב הנסחרת

---

7   ריבית - ריבית, הפרשי הצמדה שאינם פטורים על-פי כל דין, לרבות הפרשי הצמדה חלקיים, כהגדרתם בסעיף 9(13) לפקודה ודמי ניכיון.

8   במישרין או באמצעות חברי הבורסה, לפי הוראות רשות המיסים מיום 27 בדצמבר 2010 והוראות רשות המסים כפי שיהיו מעת לעת.

בבורסה שבו משולמים גם דמי ניכיון, יראו כתמורת הפדיון את התמורה בתוספת דמי הניכיון, אם התקיימו כל אלה: (1) רווח ההון במכירת איגרת החוב אינו פטור ממס; (2) במועד הפדיון נוצר הפסד הון; ו-(3) הפדיון אינו בידי בעל שליטה או בידי מי שהחזיק באיגרת החוב מיום שהוקצתה או הוצאה, והכל עד גובה הפסד ההון. דמי הניכיון שרואים אותם כתמורה לפי הוראות אלה, לא ייחשבו כהכנסה לפי סעיף 2(4) לפקודה.

### 2.9.3.3    מס יסף על הכנסות גבוהות

בהתאם לסעיף 121ב לפקודה, יחיד שהכנסתו החייבת עולה בשנת המס (2024) על סך של 721,560 ש״ח (סכום שמתואם מידי שנה), יהא חייב במס על חלק מהכנסתו החייבת העולה על הסכום האמור, בשיעור נוסף של 3%. הוראות סעיף זה חלות בין היתר, על רווחי הון מניירות ערך, למעט על מרכיב רווח ההון האינפלציוני, ועל הכנסות מדיבידנדים וריביות.

בהתאם לחוק ההתייעלות הכלכלית (תיקוני חקיקה להשגת יעדי התקציב לשנת התקציב 2025) (הקפאת עדכוני מס ומס יסף), התשפ״ה-2024, בשנים 2025-2027, סכום ההכנסה החייבת הנ״ל יוקפא, כך שבשנות-המס הנ״ל לא יתואם סכום זה לפי שיעור עליית המדד. בנוסף נקבע בחוק הנ״ל, כי יושת מס נוסף בשיעור של 2% נוספים (מעבר ל-3% הקיימים) על ״הכנסה חייבת ממקורות הוניים״ הכוללת, בין היתר, רווח הון, ריבית ודיבידנד.

### 2.9.3.4    הנפקת אגרות חוב נוספות במסגרת הרחבת סדרה

מאחר ואגרות החוב (סדרה א׳) מוצעות במחיר הנמוך מערכן הנקוב, הן צפויות להיות מונפקות בניכיון. החברה תודיע במסגרת ההודעה המשלימה ו/או במסגרת הדיווח על תוצאות ההנפקה את שיעור הניכיון של אגרות החוב.

במקרה בו תנפיק החברה בעתיד אגרות חוב נוספות מסדרה א׳, במסגרת הרחבת סדרה, בשיעור ניכיון השונה משיעור הניכיון של הסדרה (לרבות העדר ניכיון, ככל שרלוונטי) תפנה החברה, לפני הרחבת הסדרה, לרשות המסים על-מנת לקבל את אישורה כי לעניין ניכוי המס במקור על דמי הניכיון בגין אגרות החוב (סדרה א׳), ייקבע לאגרות החוב שיעור ניכיון אחיד לפי נוסחה המשקללת את שיעורי הניכיון השונים באותה סדרה, ככל שיהיו (״**שיעור הניכיון המשוקלל**״). במקרה של קבלת אישור כאמור, החברה תחשב לפני הרחבת הסדרה את שיעור הניכיון המשוקלל בגין כל אגרות החוב בהתאם לאותו אישור ולפני הרחבת הסדרה תגיש החברה דוח מיידי (ככל הניתן בדיווח בדבר תוצאות ההנפקה) בו תודיע את שיעור הניכיון המשוקלל לכל הסדרה וינוכה מס במועדי הפדיון של אגרות החוב לפי שיעור הניכיון המשוקלל כאמור ובהתאם להוראות הדין. במקרה כאמור יחולו כל יתר הוראות הדין הנוגעות למיסוי דמי ניכיון. באם לא יתקבל אישור כאמור מרשות המסים, תגיש החברה דיווח מיידי לפני הרחבת הסדרה בו תודיע על אי קבלת אישור כאמור ועל כך שששיעור הניכיון האחיד יהיה על שיעור הניכיון הגבוה ביותר שנוצר בגין הסדרה ויחולו כל יתר הוראות הדין הנוגעות למיסוי דמי ניכיון. חברי הבורסה ינכו מס במקור בעת פדיון הסדרה, בהתאם לשיעור שידווח כאמור.

לפיכך, ייתכנו מקרים בהם ינוכה מס במקור בגין דמי ניכיון בשיעור הגבוה מדמי הניכיון שנקבעו למי שהחזיק באגרות החוב מהסדרה טרם הגדלת הסדרה (״**דמי הניכיון העודפים**״), וזאת בין אם התקבל אישור מרשות המסים לקביעת שיעור ניכיון אחיד לאותה סדרה ובין אם לאו. נישום שהחזיק את אגרות החוב מהסדרה האמורה לפני הרחבת הסדרה ועד לפירעון אגרות החוב המוחזקות על-ידי, יהיה זכאי להגיש דוח לרשות המסים ולקבל החזר מס בגובה המס שנוכה מדמי הניכיון העודפים, ככל שהינו זכאי להחזר כאמור על-פי דין.

חברי הבורסה ינכו במקור מתשלומי הריבית שישולמו על-ידם למחזיקי אגרות החוב את תשלומי המס אותם חובה לנכות במקור, למעט לגבי גופים הפטורים מניכוי מס במקור כאמור בהתאם לדין. במועדי פירעון קרן אגרות החוב חברי הבורסה ינכו מס במקור בגין דמי הניכיון, אם יהיו.

נכון למועד התשקיף, החברה פתחה בהליך לפתיחת תיק ניכויים במס הכנסה בישראל.

**התיאור הכללי לעיל אינו מהווה תחליף לייעוץ אינדיבידואלי על-ידי מומחים, בשים לב לנסיבות הייחודיות לכל משקיע. מומלץ לכל המבקש לרכוש ניירות ערך על-פי תשקיף זה, לפנות לייעוץ מקצועי על-מנת להבהיר את תוצאות המס אשר יחולו עליו בשים לב לנסיבותיו הייחודיות.**

**כמקובל בעת קבלת החלטות על השקעות כספים, יש לשקול את השלכות המס הקשורות בהשקעה בניירות הערך המוצעים על-פי תשקיף זה. מובהר כי האמור לעיל משקף את הוראות הדין המתוארות בו כפי שהינן למועד התשקיף, והוראות אמנות מס רלוונטיות, ואלה עשויות להשתנות ולהוביל לתוצאות שונות. בנוסף יש להדגיש, כי האמור לעיל אינו מתיימר להוות פרשנות מוסמכת של הוראות החוק הנזכרות בתשקיף; לפיכך, התיאור הכללי לעיל אינו מהווה תחליף לייעוץ אינדיבידואלי על-ידי מומחים, בשים לב לנסיבות הייחודיות לכל משקיע. מומלץ לכל המבקש לרכוש ניירות ערך על-פי תשקיף זה, לפנות לייעוץ מקצועי על-מנת להבהיר את תוצאות המס אשר יחולו עליו בשים לב לנסיבותיו הייחודיות.**

2.10    <u>**תנאי אגרות החוב**</u>

2.10.1   בכל מקרה שמועד תשלום תשלום חל ביום שאינו יום עסקים, יידחה מועד התשלום ליום העסקים הראשון הבא אחריו, ללא תוספת תשלום, והיום הקובע לצורך קביעת הזכאות לפדיון או לריבית לא ישתנה בשל כך.

2.10.2   התשלום לזכאים ייעשה בשיקים או בהעברה בנקאית לזכות חשבון הבנק של האנשים אשר שמותיהם יהיו רשומים במרשם מחזיקי אגרות החוב ואשר יצוין בפרטים שימסרו בכתב לחברה מבעוד מועד, בהתאם לאמור בסעיף 2.7.4 לתשקיף. אם החברה לא תוכל לשלם סכום כלשהו לזכאים לכך, מסיבה שאינה תלויה בה, יחולו הוראות סעיף 14 לשטר הנאמנות.

2.10.3   מחזיק אגרות החוב יודיע לחברה את פרטי חשבון הבנק לזיכוי בתשלומים לאותו מחזיק על-פי אגרות החוב, או על שינוי בפרטי החשבון האמור או בכתובתו, לפי העניין, בהודעה בכתב שישלח בדואר רשום לחברה. החברה תהא חייבת לפעול על-פי הודעתו של המחזיק בדבר שינוי כאמור לאחר חלוף חמישה-עשר (15) ימי עסקים מיום שהודעתו של המחזיק הגיעה לחברה.

2.10.4   לא מסר מחזיק אגרות החוב הזכאי לתשלום כאמור בעוד מועד לחברה פרטים בדבר חשבון הבנק שלו, ייעשה כל תשלום על חשבון הקרן והריבית בשיק שיישלח בדואר רשום לכתובתו האחרונה הרשומה במרשם מחזיקי אגרות החוב. משלוח שיק לזכאי בדואר רשום כאמור ייחשב לכל דבר ועניין כתשלום הסכום הנקוב בו בתאריך שיגורו בדואר, ובלבד שנפרע עם הצגתו כהלכה לגביה.

2.10.5   אגרות החוב (סדרה א׳) תעמודנה כולן בדרגת בטחון שווה פרי פסו, בינן לבין עצמן בקשר עם התחייבויות החברה על-פי אגרות החוב, ובלי זכות בכורה או עדיפות של האחת על פני האחרת.

2.10.6   מכל תשלום בגין אגרות החוב (סדרה א׳) ינוכה כל תשלום חובה ככל הנדרש על-פי דין (ראה סעיף 2.9 לתשקיף וסעיף 3.8 לתנאים שמעבר לדף בשטר הנאמנות).

2.10.7   <u>הרחבה של סדרות קיימות והנפקה והקצאה של אגרות חוב וניירות ערך נוספים</u>

2.10.7.1   החברה תהיה רשאית להנפיק אגרות חוב (סדרה א׳) נוספות בהתאם לתנאים הקבועים בסעיף 4.1 לשטר הנאמנות ובכפוף לקבלת אישור הבורסה לרישומן למסחר של אגרות החוב הנוספות כאמור.

2.10.7.2   החברה תהיה רשאית להנפיק בכל עת סדרות נוספות של אגרות חוב ו/או ניירות ערך אחרים, מכל מין וסוג שהוא, ללא צורך בקבלת אישור מהנאמן ו/או מהמחזיקים הקיימים באותה עת, כאמור בסעיף 4.2 לשטר הנאמנות.

2.10.8   <u>התחייבויות</u>

החברה קיבלה על עצמה התחייבויות בהן עליה לעמוד עד לפירעון מלוא הסכומים להם זכאים מחזיקי אגרות החוב - לפרטים ראה סעיפים 5 ו-18 לשטר הנאמנות.

2.10.9   <u>פירעון מיידי</u>

אגרות החוב (סדרה א׳) ניתנות להעמדה לפירעון מיידי בקרות איזה מהמקרים המתוארים בסעיף 8 לשטר הנאמנות.

2.10.10   <u>פדיון מוקדם (כפוי או ביוזמת החברה)</u>

אגרות החוב (סדרה א׳) עשויות להיות מעומדות לפדיון מוקדם, כפוי או לפי החלטת החברה, כמתואר בסעיפים 7.1 ו-7.2 לשטר הנאמנות.

2.10.11   <u>ריבית פיגורים</u>

לפרטים אודות ריבית הפיגורים החלה על אגרות החוב, ראה סעיף 3.4 לתנאים שמעבר לדף בשטר הנאמנות.

2.10.12   <u>דירוג אגרות החוב</u>

אגרות החוב (סדרה א׳) מדורגות על-ידי מידרוג בע״מ (״**מידרוג**״) בדירוג A3.il(P) באופק יציב בהיקף של עד 480 מיליון ש״ח ערך נקוב.

לדוח הדירוג ומכתב ההסכמה של מידרוג, ראה **נספח א׳** לפרק זה לתשקיף.

עובר לפרסום ההודעה המשלימה, בכוונת החברה לפנות אל מידרוג בבקשה להגדלת כמות אגרות החוב (סדרה א׳) שנקבעה על-ידה במסגרת דוח הדירוג כאמור.

לגילוי מרוכז של מנגנוני ההגנה בשטר הנאמנות ראה **נספח ג׳** לפרק זה לתשקיף.

2.11   **שטר הנאמנות בגין אגרות החוב (סדרה א׳)**

החברה התקשרה עם משמרת- חברה לשירותי נאמנות בע״מ (״**הנאמן**״), בשטר נאמנות המסדיר את תנאיהן של אגרות החוב (סדרה א׳).

פרטים בקשר לנאמן, הינם כדלקמן : מרחוב מנחם בגין 48-46 תל-אביב, טלפון : 6374344-03, פקס : 6374344-03 (״**הנאמן**״). איש הקשר מטעם הנאמן הינו רו״ח רמי סבטי, דואר אלקטרוני : [ramis@mtrust.co.il](ramis@mtrust.co.il).[9] הנאמן הינו חברה הרשומה בישראל, העוסקת בנאמנויות, והוא עונה על דרישות הכשירות הקבועות בחוק ניירות ערך והתקנות שהותקנו על-פיו, לנאמן לאגרות חוב.

הנאמן הצהיר בשטר הנאמנות כי מתקיימים בו כל תנאי הכשירות הדרושים לנאמן לתעודות ההתחייבות על-פי חוק ניירות ערך וכל דין אחר וכי הוא הסכים לחתום על שטר הנאמנות ולפעול כנאמן של מחזיקי אגרות החוב.

אין בחתימת הנאמן על שטר הנאמנות הבעת דעה מצדו בדבר טיבם של ניירות הערך המוצעים או כדאיות ההשקעה בהם.

2.12   **חתם מתמחר, ריכוז והפצה**

2.12.1   הצעת ניירות הערך על -פי תשקיף זה תתבצע בדרך של הצעה לא אחידה על -פי תקנה 11(א)(1) לתקנות אופן ההצעה, וככזו תובטח ההצעה הלא אחידה בחיתום של לפחות 25% מההצעה.

2.12.2   בהתאם, בכוונת החברה להתקשר בהסכם חיתום עם החתם המתמחר (כהגדרתו לעיל). עיקרי הסכם החיתום, לרבות שם החתם המתמחר והחתמים האחרים (ככל שיהיו), שיעור השתתפותם בהבטחת ההצעה, ההתחייבויות המוקדמות שניתנו, לרבות עמלות ההפצה בגין ההתחייבויות כאמור, וקיומה של התחייבות לשיפוי החתמים, ככל שישנה, יובאו במסגרת ההודעה המשלימה.

2.12.3   החתם המתמחר יחתום על ההודעה המשלימה, אשר מכוחה יוצעו ניירות הערך המוצעים ויראו בחתימתו כאמור כחתימה על התשקיף וחתימה כאמור מהווה תנאי לפרסום ההודעה המשלימה.

---

[9]   כפי שנמסר לחברה מהנאמן : ביום 17.11.2025 הוגשה כנגד הנאמן בקשה לאישור תביעה ייצוגית בקשר עם תפקידו כנאמן למחזיקי אגרות החוב (סדרה ג׳) של חברת אוטומקס מוטורס בע״מ על-ידי מחזיק באגרות החוב האמורות. המבקש טוען, בתמצית, כי הנאמן הפר את חובותיו החקוקות והחוזיות ופעל ברשלנות. לטענת המבקש הנאמן לא הפעיל את סמכויותיו לפיקוח ובדיקה כדי לגלות את תרמית החברה הנטענת על-ידיו, ולפי המבקש מחדל הנאמן הנטען גרם נזק משמעותי. הנאמן דוחה את הטענות וסבור כי פעל כנדרש בשטר הנאמנות ומילא את חובות הנאמנות שלו על פי דין, וכי התביעה מתבססת על עובדות שגויות.

2.12.4 יובהר כי נכון למועד פרסום התשקיף, ההתחייבות החיתומית טרם נכנסה לתוקף, וכי ההתחייבות החיתומית תיכנס לתוקפה רק עם חתימת הסכם החיתום ופרסם ההודעה המשלימה.

2.12.5 כמו כן, בכפוף להוראות כל דין, בגין הצעת ניירות ערך על-פי תשקיף זה, תהיה החברה רשאית להתקשר עם רכז הנפקה בהסכם ריכוז ולשלם עמלת ריכוז למי שישמש כרכז הנפקה; וכן עם מפיצים ולשלם עמלות הפצה למי שישמש כמפיץ.

במסגרת ההודעה המשלימה יינתן גילוי (ככל שרלוונטי) בדבר זהותם של המפיצים ושל רכז ההנפקה, עמלות ההפצה וריכוז שהם אמורים לקבל וכן פרוט בדבר הקשר בין מפיצים למשקיעים מסווגים ובין המפיצים לחברה ו/או לבעלי העניין בה, ככל שקיים.

**2.13** **הצעת ניירות ערך על-פי תשקיף המדף**

מכח תשקיף זה, המהווה גם תשקיף מדף, תוכל החברה להציע ניירות ערך (אגרות חוב שאינן ניתנות להמרה, כתבי אופציה הניתנים למימוש לאגרות חוב וניירות ערך מסחריים, וביחד להלן בס״ק זה: **"ניירות הערך"**), בהתאם להוראות סעיף 23א לחוק ניירות ערך, באמצעות דוחות הצעת מדף בהם יושלמו כל הפרטים הנדרשים לפי פרק ג׳ לתקנות ניירות ערך (פרטי התשקיף וטיוטת תשקיף - מבנה וצורה), התשכ״ט-1969, ביחס לאותה הצעה, לרבות פרטי ותנאי ניירות הערך והרכב היחידות המוצעות, בהתאם להוראות כל דין, ובכלל זה בהתאם לתקנון והנחיות הבורסה ולעמדות סגל רשות ניירות ערך כפי שיהיו באותה העת, ובהתאם לסוג ניירות הערך שיוצעו על-פי דוח הצעת המדף כאמור.

## נספח א׳ לפרק 2 – דוח דירוג ומכתב הסכמה



האורבעה 21 | מגדל פלטינום
תל אביב 6473921
טל. 03-6844700 | פקס. 03-6855002
www.midroog.co.il

26.11.2025

לכבוד:

<u>סימד הולדינגס לימיטד</u>

**הנדון: <u>צירוף דוח דירוג לתשקיף של החברה</u>**

בהמשך לפנייתכם הננו לאשר לכם לצרף את דוח הדירוג שבוצע לסימד הולדינגס לימיטד (להלן: "החברה") מיום 19.11.2025 (להלן: "דוח הדירוג") ובלבד שיצורף במלואו ללא השמטות ו/או שינויים ואתם רשאים לצרפו לרבות בדרך של הפניה לתשקיף של החברה להנפקת אגרות חוב (סדרה א') של החברה אשר צפוי להתפרסם בחודש נובמבר 2025.

בנוסף, בהתאם להוראות תקנות ניירות ערך (חתימה ודיווח אלקטרוני), התשס"ג-2003, אנו מאשרים בזאת לגורם המוסמך לכך מטעם החברה המנפיקה לדווח באופן אלקטרוני לרשות לניירות ערך על אישור צירוף זה ועל דוח הדירוג.

הנכם נדרשים לאשר למידרוג בכתב, טרם פרסום התשקיף דלעיל כי נוסחו של התשקיף שהתפרסם זהה לנוסח שנמסר למידרוג במסגרת תהליך הדירוג.

הסכמתנו לצירוף דוח הדירוג הינה בתוקף למשך 60 יום ממועד מכתבנו זה ואין לכלול ו/או לצרפו לאחר מועד זה ללא קבלת אישורנו מראש ובכתב.

בכבוד רב,

סיגל יששכר, סמנכ"ל
ראש תחום נדל"ן



האכבעה 21 | מגדל פלטינום
תל אביב 6473921
טל. 03-6844700 | פקס. 03-6855002
www.midroog.co.il

# SIMAD Holdings Ltd.

## דירוג ראשוני ı נובמבר 2025

**אנשי קשר:**

**שניר אברהם**
אנליסט, מעריך דירוג ראשי
snir.a@midroog.co.il

**גיל רז**
ראש צוות, מעריך דירוג משני
gil.r@midroog.co.il

**סיגל יששכר, סמנכ״ל**
ראשת תחום נדל״ן
i.sigal@midroog.co.il

# SIMAD Holdings Ltd.

| | | |
|---|---|---|
| **דירוג מנפיק (מותנה)** | **(P) Baa1.il** | **אופק דירוג: יציב** |
| **דירוג סדרה מובטחת (מותנה)** | **(P) A3.il** | **אופק דירוג: יציב** |

מידרוג קובעת דירוג דירוג מותנה Baa1.il (P)[1] לחברת SIMAD Holdings Ltd. (להלן: "SIMAD" או "החברה") וכן קובעת דירוג מותנה A3.il (P) לאגרות חוב (סדרה א') מובטחות בשעבודים בסך של עד 480 מיליון ₪ ערך נקוב שמתכננת החברה להנפיק. תמורת הנפקת אגרות החוב (סדרה א') מיועדת לפירעון מוקדם של הלוואות שהועמדו לחברה על ידי תאגידים בנקאיים בסך כ-70 מיליון דולר בגין 13 מחנות קיץ שישועבדו לטובת מחזיקי אגרות החוב (סדרה א') ולחלוקת דיבידנד לבעלי המניות בחברה בסך 50 מיליון דולר. יתרת תמורת ההנפקה תשמש את החברה בעיקר לשם רכישת נכסים מניבים ו/או מחנות קיץ. אגרות החוב (סדרה א') עומדות לפירעון ב-5 תשלומים שנתיים לא שווים, מהם 4 תשלומים בין השנים 2026 עד 2029 (כולל) בשיעור 2.5% מגובה הקרן ותשלום חמישי ב-30 בנובמבר 2030 בגובה 90% מגובה הקרן. עם התקיימות התנאים להלן יוסר סימול הדירוג כמותנה: 1) מילוי התנאים והמצגים המפורטים בטיוטת תשקיף ההנפקה מ-16.11.2025 המתייחסים למבנה ההנפקה הכולל ובין היתר העברת מלוא הזכויות והכנסות לידי החברה וכן 2) רישום השעבודים לטובת אגרות חוב סדרה א'.

## אודות החברה

החברה התאגדה ביום 28 במאי 2025, בהתאם להוראות חוק ה-BVI Business Companies Act, 2024, באיי הבתולה הבריטיים, כחברה פרטית המוגבלת במניות. החברה הוקמה, בין היתר, לצורך גיוס חוב באמצעות הנפקת אגרות חוב ורישומן למסחר בבורסה לניירות ערך בת"א. ממועד התאגדותה ועד למועד התשקיף לא הייתה לחברה פעילות כלשהי. החברה פועלת בתחום מחנות הקיץ בארה"ב באמצעות רכישה, ניהול והפעלה של מחנות קיץ לילדים ובני נוער בארה"ב הממוקמים בשטחי נדל"ן שבבעלותה. לחברה 30 מחנות קיץ הממוקמים ברובם בצפון-מזרח ארה"ב אליהם נרשמים כ-20,500 ילדים מדי שנה.

בעלי המניות וזכויות ההצבעה בחברה הינם האחים מר דיוויד שאבסלס ומר מייקל שאבסלס (להלן: "בעלי המניות") המשמשים כמנהלי קבוצת SIMAD. בעלי המניות התחייבו כי קודם לרישום למסחר בבורסה של אגרות החוב סדרה א', הם יעבירו לחברה את זכויותיהם בתאגידים המחזיקים בשרשור בזכויות ב-30 נכסי מחנות הקיץ בארה"ב, כנגד הנפקת מניות של החברה.

קבוצת SIMAD מתמקדת ברכישה וניהול של נכסים מניבים תזרימיים. ממועד הקמתה, רכשה הקבוצה מעל ל-80 נכסי נדל"ן בארה"ב בתחומי מגורים, מסחר, משרדים, ומלונאות, והחל משנת 2006 החלה לפעול בתחום מחנאות קיץ בארה"ב. החברה התקשרה בהסכם ניהול עם חברת ניהול בשליטת בעלי המניות, שתספק לחברה את מכלול השירותים הנדרשים לניהול מחנות הקיץ ונכסים נוספים שתרכוש החברה בעתיד, בתמורה לדמי ניהול שייקבעו מראש בהסכם ניהול. מטה קבוצת SIMAD מונה כ-15 אנשי צוות בתחום מחנות הקיץ ופועל בשיתוף פעולה עם מנהלי הנכסים והדירקטורים במחנות. מר דיוויד שאבסלס אחראי על ניהול מחנות הקיץ ומר מייקל שאבסלס אחראי על המימון והרכישות. הקבוצה מעסיקה למעלה מ-7,500 עובדים, מתוכם כ-300 עובדים קבועים והיתר עונתיים.

בנוסף לפעילות העיקרית בתחום מחנות הקיץ, החברה עשויה להרחיב את פעילותה לתחום הנכסים המניבים באמצעות רכישת נכסים מניבים לכך היא מיועדת חלק מתמורת הנפקת האג"ח. בעלי המניות התחייבו כי כל הזדמנויות להשקעה בנכסים חדשים בתחום מחנות קיץ בארה"ב שיוצגו לבעלי המניות יוצעו לראשונה לחברה למעט הזדמנויות הקשורות להשקעות קיימות שיווותרו בידי בעלי המניות ולא יועברו לחברה או השקעות מחוץ לתחום הפעילות של החברה. השקעות שיוצעו לחברה על ידי בעלי המניות ייבחנו בדירקטוריון החברה בהתאם למנגנון שנקבע מראש.

---

[1] - (P) - מידרוג מציבה דירוגים מותנים כאשר כניסת הדירוג לתוקפו כפופה להתקיימות נסיבות המפורטות בדו"ח הדירוג, בין היתר, כאשר כניסת הדירוג לתוקף כפופה להשלמות שונות. להגדרת "דירוג מותנה" ראה קישור למסמך סולמות הדירוג של מידרוג בפרק דוחות קשורים.

<div dir="rtl">

מידרוג

## שיקולים עיקריים לדירוג

- ***ענף מחנות הקיץ בארה"ב נהנה מביקוש יציב מצד פלחי אוכלוסיה אמידים יחסית, אך מתמודד עם עלויות תפעול גבוהות ומאופיין בצמיחה מתונה.*** ענף מחנות הקיץ בארה"ב מהווה מסורת תרבותית ותיקה, עם מאות אלפי משתתפים מדי שנה וקהילות בוגרים תומכות. מחנות הקיץ של הקבוצה פונים לילדים ובני נוער ממשפחות אמידות. הענף מאופיין בעונתיות גבוהה בהיותו נשען בעיקר על שלושה חודשי הקיץ יוני עד אוגוסט. עם זאת, הרשמות מוקדמות על בסיס מקדמות כספיות מהוות גורם ממתן סיכון המאפשר תחזית טובה להיקף המשתתפים בעונת הפעילות הצפויה ולהיקף ההכנסות ותזרימי המזומנים. אתגר משמעותי בענף הוא האמרת עלויות השכר של עובדים בענפי השירותים בארה"ב לאורך השנים האחרונות וצורך בכוח אדם מיומן, שמוביל לעלויות שכר גבוהות, לצד תחרות מצד מחנות אחרים. הענף חשוף לאירועי אקלים בהיותו מאופיין בפעילות חוץ בעיקר, וכן חשוף לסיכוני מוניטין בהיותו פונה לילדים ונוער. היקף ההכנסות בכלל הענף בארה"ב נאמד בכ-4.7 מיליארד דולר בשנת 2024, כאשר ההכנסות גדלות בקצב שנתי מתון מאוד. הביקוש רגיש להכנסה הפנויה ולאמון הצרכנים, אך משקי בית עם הכנסה גבוהה מספקים יציבות יחסית. לאחר ירידה בתקופת הקורונה, הענף מתאושש בהדרגה, אם כי הרווחיות הכוללת טרם חזרה לרמות לפני המגפה.[2]

- ***פורטפוליו מחנות קיץ רחב ומגוון המנוהל באופן עצמאי ומציג תפוסה יציבה ורווחיות נאה.*** החברה מחזיקה ב-30 מחנות קיץ, מתוכם 29 בשווי של כ-429 מ' דולר מאוחדים בספריה[3], ובשטח כולל של כ-5,650 אייקר, בעיקר בצפון-מזרח ארה"ב. מרבית המחנות מנוהלים על ידי קבוצת SIMAD, כאשר כל מחנה פועל כיחידה עצמאית עם צוות ייעודי ומיתוג נפרד. מאז הקמתה הרחיבה הקבוצה בהדרגה את פורטפוליו המחנות, כולל רכישת 4 מחנות ב-2022. מרבית המחנות מוחזקים ומנוהלים על ידי הקבוצה לאורך שנים. פורטפוליו החברה כולל 22 מחנות לינה ו-8 מחנות יום, הפועלים בעיקר בארבע מדינות: ניו יורק, פנסילבניה, ניו ג'רזי ומיין, עם כ-20,500 משתתפים מדי שנה, חלקם הגדול משתתפים חוזרים ממשפחות במעמד סוציו-אקונומי בינוני-גבוה. תרומת המחנות להכנסות החברה ולשווי נכסיה מבוזרת יחסית: המחנה הגדול תורם כ-16% משווי הנכסים וכ-12% מההכנסות, ושלושת המחנות הגדולים מהווים יחד כ-32% מהנכסים וכ-26% מההכנסות. הכנסות החברה מהפעלת מחנות הקיץ הסתכמו בכ-160 מ' דולר בשנת 2024, גידול של 1.9% לעומת 2023. מידרוג הביאה בחשבון הכנסות של 170-165 מ' דולר בשנים 2026-2025. הפעילות ייצרה רווח תפעולי (EBIT) של כ-21 מ' דולר ב-2024, בדומה לשנת 2023, עם שיעור רווח תפעולי ממוצע ויציב של 13% בשנים 2024-2022, בולט ביחס לדירוג. EBITDA בשנת 2024 הסתכם בכ-36 מ' דולר בהשוואה לכ-35 מ' דולר בשנת 2023, ולהערכת מידרוג צפוי לגדול במידה מתונה בהתבסס על הנכסים הקיימים בלבד.

- ***רכישת נכסים מניבים במימון חוב תוביל להאטת יחסי הכיסוי ועלייה במינוף.*** החוב הפיננסי ברוטו של החברה, שכולו מובטח בנכסי מחנות הקיץ, עמד על כ-179 מ' דולר ל-30.06.2025, ובמגמת ירידה בשנתיים האחרונות עקב פירעון הלוואות בנקאיות מתוך התזרים מפעילות. החברה מתכננת הנפקת אג"ח בהיקף של עד 148 מ' דולר, שתשמש לפירעון מלוא ההלוואות הבכירות המשועבדות ב-13 נכסי מחנות הקיץ בהיקף של כ-70 מ' דולר ולחלוקת דיבידנד לבעלי המניות בחברה בהיקף של 50 מ' דולר. החוב הפיננסי של החברה צפוי לגדול לצורך רכישת נכסים חדשים באמצעות גיוס האג"ח ונטילת חוב ייעודי. בשנת 2026 רכישת נכסים מניבים צפויה להגדיל את ה-EBITDA (מאוחד) לטווח של 47-45 מ' דולר. יחס חוב פיננסי נטו ל-EBITDA צפוי לעמוד בטווח של 4.0-3.5 בשנת 2025 לעומת 5.1 בשנת 2024 ואילו בשנת 2026 הוא צפוי להאט לטווח של 5.5-6.0 שנים. החברה רושמת את נכסי מחנות הקיץ בספריה על בסיס הערכה מחדש (שווי הוגן) ובין שנת 2022 עד יוני 2025 רשמה רווח מהערכה מחדש שטרם למימוש לגידול בהון, עם יחס הון עצמי למאזן של 44% ל- 31.12.2024 (חוב נטו לקאפ נטו 47.6%). בשל העונתיות בפעילות, החברה רושמת הפסד נקי במחצית הראשונה של השנה והיחס ל-30.06.2025 עמד על 33%. יחס הון עצמי למאזן צפוי להישחק בעקבות רכישת נכסים חדשים והגדלת המאזן.

---

[2] נתונים כמותיים אודות הענף נלקחו מתוך IBISWorld.
[3] הנתונים בדוח זה מתייחסים לנכסי החברה במאוחד (29 נכסים) אלא אם נרשם אחרת.

</div>

- ***עודף התמורה מגיוס האג"ח והתזרים השוטף ממחנות הקיץ צפויים לתרום לנזילות החברה ולשמש להשקעות חדשות.*** ליום 30.06.2025 לחברה גירעון בהון החוזר בסך כ-101 מ' דולר הנובע ממקדמות שקיבלה בגין הרשמות מוקדמות למחנות הקיץ שיתרתן כ-142 מ' דולר וכן מחלויות שוטפות של הלוואות לז"א בסך כ-9.7 מ' דולר. חלק מהמקדמות הועמד לבעלי המניות במסגרת חו"ז שוטף והן צפויות להיפרע ולשמש לפעילות השוטפת במהלך הרבעון השלישי, בהתאם לעונתיות הפעילות.

- ***החברה צפויה להגדיל את יתרות הנזילות במהלך שנת 2026.*** תחזית מקורות ושימושים לשנת 2026 כוללת יתרת מזומן פתיחה 31.12.2025 של כ-30 מ' דולר, עודף נטו מגיוס אג"ח בסך כ-28 מ' דולר (לאחר פרעון מוקדם של חוב מובטח וחלוקת דיבידנד לבעלי המניות בחברה) וכן תזרים מזומנים מפעילות שוטפת לאחר תשלום ריבית והשקעות שוטפות הנאמד בסך כ-19 מ' דולר לשנה לפני שינויים בהון החוזר. עודף מקורות זה צפוי לשמש את החברה בטווח הקצר-בינוני לאמורטיזציה של הלוואות ואג"ח ולהשקעות חדשות. בהתחשב גם בלוח הסילוקין המתוכנן לאגרות החוב (סדרה א'), החברה צפויה להציג נזילות טובה יחסית לחלויות החוב גם בשנת 2026.

- ***חלוקת דיבידנד מיוחד מעיבה על המדיניות הפיננסית, שדורשת בחינה לאורך הזמן.*** ניהול הנזילות של החברה צפוי להישען בעיקר על מקדמות מלקוחות והחברה אינה מחזיקה במסגרת אשראי. בהתאם למידע שהתקבל מהחברה, היא צפויה לשמור על יתרות נזילות בהיקף שלא יפחת מתשלומי האג"ח השנתיים. החברה צפויה לחלק דיבידנד מיוחד בהיקף 50 מ' דולר מכספי גיוס האג"ח ובהתאם לטיוטות התשקיף לא תחלק דיבידנד נוסף, עד לצבירת רווחים בסך 50 מ' דולר. לחברה חשיפה מטבעית בשל גיוס אג"ח שקלי כאשר פעילותה דולרית.

**תרחיש הבסיס** של מידרוג מניח גיוס אג"ח ופירעון חוב בכיר מתמורת האג"ח בהתאם למתווה הגיוס שתואר לעיל; פירעון חו"ז של בעלי המניות לחברה; חלוקת דיבידנד לבעלי המניות בחברה בסך 50 מ' דולר; רכישת נכסים בהיקף השקעת הון עצמי של כ-30 מ' דולר במהלך 2026-2027 בהתאם לאסטרטגיית הצמיחה של החברה ועלייה בהיקף EBITDA בשל כך לצד עלייה בהוצאות המימון; שמירה על יתרות נזילות הולמות ביחס לצורכי שירות החוב של החברה. מידרוג לא הניחה חלוקת דיבידנדים נוספת לבעלי המניות בהיקף מהותי.

### שיקולים נוספים לדירוג

במסגרת שיקולים נוספים לדירוג, מידרוג הביאה לשלילה טרק רקורד קצר יחסית (2024-2022) לגבי השינויים בשווי הרכוש הקבוע של החברה על בסיס הערכה מחדש, בהתחשב בהיותם של מחנות הקיץ סקטור נכסים ייחודי יחסית.

### שיקולים מבניים לדירוג

להבטחת הקיום המלא והמדויק של כל התחייבויות החברה על פי אגרות החוב (סדרה א') ושטר הנאמנות ופירעונם של כלל הסכומים המובטחים, מתחייבת החברה לרשום לטובת מחזיקי אגרות החוב (סדרה א') שעבודים על 13 מחנות קיץ בהם מחזיקה החברה בשרשור בבעלות מלאה, כדלקמן: Achim ‏(BAHS) Chen-A-Wanda, Club Getaway, Country Roads, Eagles Landing, ECHO ‏(SHAB), Green Lane ‏(Malka) Greenville Land, Lavi, Meadowbrook, Mogenavco, Mohawk, Rolling Hills. השעבודים לטובת מחזיקי האג"ח יכללו בין היתר משכנתא ראשונה על הנכסים המשועבדים ושעבוד ראשון בדרגה ללא הגבלה בסכום על זכויות ההשתתפות שמחזיקה חברת ההחזקות שבבעלותה המלאה של החברה בתאגידי הנכסים המשועבדים לרבות הזכויות הנלוות הנובעות מהן. לפרטים מלאים אודות מבנה השעבודים ותנאיהם אנו מפנים לטיוטות תשקיף מיום 16 בנובמבר 2025 שפרסמה החברה. מידרוג בחנה מתן הטבה דירוגית לאגרות החוב המגובות בבטוחות (סדרה א') בהתאם למתודולוגיה "שיקולים מבניים בדירוג מכשירי חוב בתחום המימון התאגידי"[4]. בחינת הסדרה המובטחת כללה הערכה של איכות הבטוחה ושל שיעור ההשבה של הבטוחה ביחס לחוב המובטח, ובהתחשב בדירוג המנפיק. מידרוג מעריכה את מאפייני הבטוחה לטובת אגרות החוב (סדרה א') באיכות "גבוהה" לאור תזרים שוטף מהנכסים, מיקומם ושוויים. יחד עם זאת, מידרוג מעריכה את מידת סחירות הבטוחה כבינונית בהשוואה לנכסי נדל"ן

---

[4] הדוח המתודולוגי מופיע באתר מידרוג: www.midroog.co.il

<div dir="rtl">

| מידרוג |
|---|

מניבים, מה שמחליש את איכותה במידה מסוימת. מידרוג בחנה את שיעור ההשבה מהנכסים תחת תרחישי רגישות ביחס לשווי ההוגן של נכסי הנדל״ן המשועבדים ליום 30.06.2025 הנע עד כדי 50% משווים. להערכת מידרוג, תחת תרחישי הרגישות, יחס ההשבה למחזיקי אגרות החוב (סדרה א׳) עולה בסבירות על 70%. בהתאם לכך מידרוג העניקה לאגרות החוב (סדרה א׳) הטבה דירוגית בגובה נוטש אחד מעל דירוג המנפיק.

### אופק הדירוג

אופק הדירוג היציב מבטא את הערכת מידרוג כי הכנסות החברה ורווחיה יציגו יציבות וכי החברה לא תגדיל את רמת המינוף מעבר לתרחיש הבסיס של מידרוג.

**גורמים אשר יכולים להוביל להעלאת הדירוג:**

- עלייה משמעותית בהיקף ההכנסות וברווח התפעולי לצד גידול בתזרים המזומנים מפעילות שוטפת
- שיפור מתמשך ביחסי הכיסוי של החברה

**גורמים אשר יכולים להוביל להורדת הדירוג:**

- שחיקה מתמשכת בפעילות החברה שמתבטאת בירידה בהכנסות או שחיקה ברווחיות
- הרעה ביחסי הכיסוי וביחס חוב פיננסי נטו ל-EBITDA בהשוואה לתרחיש הבסיס של מידרוג

**SIMAD Holdings Ltd. · נתונים פיננסים עיקריים פרופורמה, במיליוני דולר ארה"ב**

|  | LTM 30.06.2025 | 31.12.2024 | 31.12.2023 | 31.12.2022 |
|---|---|---|---|---|
| סך מאזן | 497.5 | 457.8 | 433.8 | 409.9 |
| חוב פיננסי ברוטו | 179.3 | 185.6 | 193.4 | 184.8 |
| הון עצמי/סך מאזן | 33.6% | 43.8% | 39.8% | 34.4% |
| הכנסות* | 161.0 | 159.3 | 156.4 | 132.6 |
| EBIT* | 21.2 | 20.5 | 21.3 | 16.6 |
| EBIT % | 13.2% | 12.8% | 13.6% | 12.5% |
| EBITDA | 37.2 | 35.6 | 35.0 | 28.3 |
| רווח (הפסד) נקי* | 11.7 | 10.5 | 11.5 | 13.1 |
| חוב פיננסי נטו/EBITDA | 4.4 | 5.1 | 5.3 | 5.9 |

* נתונים תוצאתיים בטבלה לעיל מוצגים על בסיס LTM. בשל עונתיות הפעילות בענף מחנות הקיץ, שעיקר הפעילות בו נעשית בחודשים יוני-אוגוסט, בתקופה ינואר-יוני 2025 רשמה החברה הכנסות של 11.5 מ׳ דולר (כ- 9.9 מ׳ דולר בתקופה המקבילה אשתקד), הפסד תפעולי של 27.3 מ׳ דולר (כ-27.9 מ׳ דולר בתקופה המקבילה אשתקד) והפסד נקי של כ-32 מ׳ דולר (כ-33 מ׳ דולר בתקופה המקבילה אשתקד).

### פירוט השיקולים העיקריים לדירוג

**ענף מחנות הקיץ מתאפיין ביציבות מבנית ובביקוש עקבי, לצד אתגרי תפעול ועלויות כוח אדם עולות; תחזית ההכנסות לשנים הקרובות מצביעה על קצב צמיחה מתון בענף**

ארה״ב מדורגת Aa1 באופק יציב על ידי Moody's ומאופיינת בכוח כלכלי יוצא דופן המתבטא בגיוון, תחרותיות, רמת הכנסה גבוהה לנפש וכן, חשיפה נמוכה לסיכוני נזילות בשל תפקידיו המרכזיים של הדולר האמריקאי ושוק האג״ח של ארה״ב במערכת הפיננסית העולמית. על פי Moody's האתגר של ארה״ב הוא ירידה צפויה בנגישות לחוב של הבנק הפדרלי. בהתאם לתחזיות של Moody's התוצר צפוי לגדול במהלך 2025 בשיעור של 4.4% לעומת 2024. לאחר שהגיעה לשיא של כ-9.1% ביוני 2022, שיעור האינפלציה החל לרדת בהדרגה בעיקר על רקע ירידה במחירי חומרי הגלם והתמתנות השיבושים בשרשראות האספקה. שיעור האינפלציה ל-12 החודשים שהסתיימו בספטמבר 2025 עמד על כ-3.0%, בעוד התחזית לשנת 2025 כולה מצביעות על אינפלציה שנתית ממוצעת בטווח 3.0%-3.2%. מאז ספטמבר 2024 חלה ירידה מצטברת בריבית הפד מ-5.5% ל-4.5%, שנשמרה עד ספטמבר 2025, אז בוצעה

</div>

ירידה נוספת ל-4.25%. באוקטובר 2025 נרשמה ירידה נוספת לרמה הנוכחית של 4.0%, עם אפשרות להורדה נוספת עד לסוף השנה. שוק התעסוקה האמריקאי אמנם מאופיין בשיעור אבטלה נמוך יחסית, אולם הגידול במספר המועסקים חלש מאוד מאז תחילת השנה. שיעור האבטלה בשנת 2024 עמד על 4%, עלייה קלה מ-3.6% ב-2022-2023. בהתאם לתחזיות Moody's שיעור האבטלה צפוי לעלות במעט לרמות של 4.3%-4.5% בשנים 2025-2026.

ענף מחנות הקיץ בארצות הברית נשען על מסורת רבת-שנים של משפחות השולחות את ילדיהן למחנות מדור לדור. הענף מאופיין בהיקף פעילות רחב, עם מאות אלפי משתתפים מדי שנה וקהילות בוגרים פעילות השומרות על קשר עם המחנות לאורך זמן, דבר המחזק את נאמנות הלקוחות ואת מיצובם של המחנות. לצד המחנות הכלליים, פועלים מגוון רחב של מחנות ייעודיים, המותאמים לקהילות דתיות ותרבותיות שונות וכן לתחומי עניין ייחודיים ־ ובהם ספורט, אומנויות, מדעים, טכנולוגיה, ועוד. גיוון זה מאפשר לחברות הפועלות בו להציע סל שירותים רחב ומותאם לקהלי יעד שונים ותורם לפיזור הסיכונים וליציבות הענף. מחנה קיץ טיפוסי משתרע על שטח של מאות עד עשרות דונמים וכולל מתקני מגורים, חדר אוכל מרכזי, מתקני ספורט ופעילות, אזורי אומנות ויצירה, תיאטרון, מרחבי טבע ומרפאה. המחנות פועלים במתכונת של מגורים מלאים תחת פיקוח צוות מקצועי הכולל מנהל, מדריכים, אנשי חינוך, צוות רפואי ומערך תחזוקה, כאשר ההרשמה והתשלום מתבצעים מראש ומכסים לינה, ארוחות, חוגים ופעילויות. אתגר מרכזי בענף הוא מחסור מתמשך בכוח אדם מיומן, במיוחד בתפקידי הדרכה, מטבח ובריאות, מה שמביא לעלויות שכר גבוהות ולהכבדה על ההוצאות התפעוליות. תעסוקה עונתית מסייעת בחלק מהמקרים לצמצום העלויות, אך שימור עובדים איכותיים נותר אתגר מתמשך.

להערכת מידרוג, מגמת הביקוש לשירותי המחנות צפויה להישאר יציבה לפחות בטווח הבינוני, אם כי לאורך זמן קיימת פגיעות מסוימת לאיום מצד תחליפים או שינויי העדפות הצרכנים. הענף מאופיין בחסמי כניסה גבוהים, הנובעים מעלויות רכישה ובנייה גבוהות, השקעה בתשתיות משמעותיות ודרישות הון עצמי ראשוני משמעותי, לצד דרישות רגולטוריות ותכנוניות מקומיות. נוסף לכך, הצלחת המחנה תלויה בבניית מוניטין ארוך שנים, וכן בגיוס והכשרת עובדים ומנהלים בעלי ניסיון ייחודי בתחום. על פי נתוני IBISWorld, בשנת 2024 תרם ענף מחנות הקיץ כ-70 מיליארד דולר לכלכלת ארצות הברית, הן מהפעילות הישירה של המחנות והן באופן עקיף. הענף העסיק למעלה מ-986 אלף עובדים ברחבי ארה"ב, ומהווה גורם משמעותי בשוק העבודה העונתי ובכלכלת השירותים הקהילתית. בין השנים 2020-2023 נרשם גידול עקבי בהיקף הפעילות של הענף ־ מהכנסות של כ-2.46 מיליארד דולר בשנת 2020 לכ-3.56 מיליארד דולר בשנת 2023. בשנת 2024 הסתכמו הכנסות הענף בכ-4.7 מיליארד דולר, וצפי ההכנסות לשנים הקרובות מצביע על קצב צמיחה מתון, בשיעור שנתי ממוצע (CAGR) של 0.6%. הביקוש למחנות הקיץ מושפע בעיקר משינויים בהכנסה הפנויה של משקי הבית ומרמות אמון הצרכנים. בהיותו שירות שאינו חיוני, הענף רגיש להאטה כלכלית ולשינויים במגמות ההוצאה על פנאי. עם זאת, אוכלוסיות בעלות הכנסה גבוהה - במיוחד משקי בית עם הכנסה שנתית העולה על 100 אלף דולר - מהווה שוק יעד מרכזי ויציב יחסית, המסוגל לשמר את רמת הביקוש גם בתקופות של תנודתיות כלכלית. בהתאם, גידול במספר משקי הבית ברמת הכנסה זו צפוי לתמוך בהמשך הצמיחה בענף. בעקבות מגפת הקורונה חווה הענף ירידה חדה בפעילות, עקב ביטולי תוכניות והגבלות תנועה, כאשר ההתאוששות בפועל החלה רק בשנת 2022. מאז נרשמה התאוששות הדרגתית במספר המשתתפים וברווחיות, אם כי הרווחיות הכוללת טרם שבה לרמות שלפני המגפה, בין היתר עקב עלייה בעלויות התפעול והשכר.

**פורטפוליו מחנות קיץ ותיק מאוד בניהול עצמאי עם היקף משתתפים יציב ורווחיות גבוהה יחסית**

על בסיס פרופורמה המשקפת את השלמת הנפקת אגרות החוב והעברת הנכסים לחברה, מחזיקה החברה ב-30 נכסי מחנות קיץ, מתוכם 29 מחנות מאוחדים ומוצגים כרכוש קבוע בספריה בשווי הוגן של כ-429 מ' דולר ובשטח כולל של כ-5,650 אייקר. מחנות הקיץ ממוקמים ברובם בצפון-מזרח ארה"ב. המחנות נהנים ממיקורד תפעולי ממושך תחת ניהול קבוצת SIMAD, כאשר מרבית מצויים בבעלות ובניהול הקבוצה לתקופה שבין 10 ל-20 שנים. לחברה ולצוות הניהול ניסיון מוכח בתחום מחנות הקיץ, כאשר החברה פועלת בענף עשרות שנים והרחיבה בהדרגה את מצבת המחנות שבבעלותה. בשנת 2022 רכשה החברה 4 מחנות נוספים. החברה מציינת כי קיימת פעילות מינימלית של עסקאות מכירה של מחנות באזור פעילותה.

הפורטפוליו כולל 22 מחנות לינה ו-8 מחנות יום, חלקם בעלי ותק של עשרות שנים, הפרוסים ברובם בארבע מדינות: ניו יורק (9 מחנות), פנסילבניה (6 מחנות), ניו ג'רזי (5 מחנות) ומיין (5 מחנות). מחנות היום, המיועדים לגילאי 3־12, ממוקמים בדרך כלל בקרבת שכונות מגורים ושטחם הממוצע כ-30 אייקר, בעוד שמחנות הלינה, המיועדים לגילאי 12־18 כוללים שטחים גדולים יותר, בממוצע כ-250 אייקר, ולעיתים קרובות סמוכים למקורות מים טבעיים כמו אגמים. החברה מפעילה בעצמה את מרבית מחנות הקיץ, כאשר תפעול כל מחנה נעשה כיחידה עצמאית והוא מנוהל בידי צוות ייעודי עבור אותו מחנה. כל אחד מהמחנות פועל תחת מיתוג עצמאי ונפרד. המשתתפים נהנים ממגוון מתקנים ופעילויות העשרה וספורט. מרבית המשתתפים הם חוזרים או בני משפחות של משתתפים קודמים. על פי החברה, רוב המשתתפים הם מהקהילה היהודית ממשפחות במעמד סוציו-אקונומי בינוני-גבוה. בשנת 2022 פעלו 27 מחנות, ומספרם עלה ל-30 בשנים 2023־2024. במקביל, מספר המשתתפים גדל מכ-19 א' בשנת 2022 לכ-21 א' בשנים 2023־2024. על פי נתוני החברה, המחיר הממוצע למשתתף עלה מכ-6,000 דולר בשנת 2022 לכ-6,900 דולר בשנת 2023, ולכ-7,200 דולר בשנת 2024. העלייה בשנת 2023 נובעת בעיקר מהתאמות מחיר שבוצעו על ידי החברה לאור התייקרות התשומות. פעילות המחנות עונתית, ומתרכזת בעיקר בין יוני לאוגוסט; ביתר השנה מתקיימת פעילות מוגבלת בלבד, כגון השכרת השטח לאירועים. הליך ההרשמה המוקדמת, המתרחש בין יולי לינואר שלפני העונה, כולל 70%־80% מכלל המשתתפים הצפויים, ותורם ליציבות תזרימית ולתכנון מוקדם של ההכנסות מהפעילות העונתית, ובכך מספק לחברה ודאות עסקית ופיננסית בשלב מוקדם של השנה.

הכנסות החברה מהפעלת מחנות הקיץ הסתכמו בכ-159 מ' דולר בשנת 2024 (ל-29 הנכסים המאוחדים), עלייה של 1.9% לעומת כ-156 מ' דולר בשנת 2023. מידרוג מניחה הכנסות מהמחנות בשנים 2025־2026 בטווח של 170־165 מ' דולר לשנה. פעילות המחנות ייצרה רווח תפעולי (EBIT) של כ-21 מ' דולר בשנת 2024, כאשר שיעור הרווח התפעולי ממחנות הקיץ עמד בממוצע על כ-13% בשנים 2024־2022 - רמה יציבה ובולטת ביחס לדירוג - ומידרוג מניחה כי הרווחיות תיוותר דומה בשנים 2025-2026. יש לציין כי הפחת השנתי בספרי החברה (כ-15 מ' דולר בשנת 2024) נובע בחלקו מעלייה בשווי רכוש קבוע דרך קרן הערכה מחדש בהון העצמי והינו גבוה מהיקף ההשקעות השוטפות במחנות (כ-10 מ' דולר בשנת 2024).

**עלייה במינוף הפיננסי וגידול צפוי בהוצאות המימון בעקבות רכישת נכסים, לצד שיפור בתזרים השוטף**

בשנת 2024 רשמה החברה EBITDA (מאוחד) בסך כ-35 מ' דולר, בדומה לשנת 2023. הוצאות המימון בכל אחת מהשנים השתיים הסתכמו בכ-12 מ' דולר והשקעות שוטפות במחנות הקיץ נאמדות בכ-10 מ' דולר לשנה הכוללות גם הוצאות לשיפור ושדרוג המחנות. התזרים השוטף ממחנות הקיץ לאחר הוצאות מימון והשקעות שוטפות וקבלת דיבידנד שוטף מחברה כלולה, במונחים שנתיים, נאמד לפיכך בטווח 15-13 מ' דולר לשנה באותן שנים. EBITDA לשנת 2025 צפוי לעמוד על כ-37 מ' דולר. בשנת 2026 מידרוג צופה גידול ב-EBITDA לטווח של 47-45 מ' דולר, שינבע ברובו מרכישת נכסים חדשים, כתלות בהיקף ומועד הרכישות החדשות. יש לציין כי עיקר תזרים המזומנים מעונת פעילות בשנה קלנדרית מתקבל החל ברבעון הרביעי של השנה הקלנדרית הקודמת ועד למחצית שנת הפעילות, בדרך של מקדמות על הרשמות מוקדמות. ברבעון השלישי המקדמות יורדות ומשמשות להוצאות השוטפות והתזרים הופך גרעוני לאותו הרבעון.

החוב הפיננסי ברוטו של החברה עמד על 179 מ' דולר ליום 30.06.2025, לעומת כ-186 מ' דולר בסוף שנת 2024 וכ-193 מ' דולר בסוף 2023, ומצביע על מגמת ירידה הדרגתית ברמת המינוף לאחר עלייה שנבעה מרכישת מחנות בשנת 2022. הירידה משקפת בעיקר פירעון חלויות של הלוואות בנקאיות מתוך התזרים השוטף. החברה מתכננת להרחיב את פעילותה למגזר הנדל"ן המניב באמצעות רכישת נכסים במטרה להגדיל את בסיס הנכסים ולהוסיף הכנסות מעבר למגזר מחנות הקיץ. בתרחיש הבסיס הניחה מידרוג רכישת נכסים בשווי כ-85 מ' דולר, מכך השקעת הון עצמי של כ-30 מ' דולר והיתר הלוואות בכירות מובטחות בנכסים שיירכשו. השקעות ההון העצמי ימומנו בשילוב של עודף המזומנים מתמורת גיוס האג"ח ותזרים שוטף שהחברה מייצרת מפעילותה. לפיכך, צפוי גידול בחוב הפיננסי ובהוצאות המימון, שצפויות להסתכם בכ-19 מ' דולר לשנה בהתאם לתרחיש הבסיס של מידרוג, בהשוואה לכ-12 מ' דולר לשנה בשנים 2024-2025. יחס כיסוי הריבית EBIT להוצאות מימון עמד בפועל בטווח של 1.7־1.8 בשנים 2023־2024, ועל פי תרחיש הבסיס של מידרוג היחס צפוי להיוותר דומה בשנת 2025 ולרדת לכ-1.5 בשנת 2026, זאת נוכח הגידול הצפוי בהוצאות

המימון. יחס חוב נטו ל-EBITDA עמד על 5.3 בשנת 2023 וירד במתינות לכ-5.1 בשנת 2024 ובשנת 2025 צפויה ירידה נוספת ביחס לרמה של כ-4.0, כאשר שיפור היחס נובע מאמורטיזציה שוטפת של החוב הפיננסי מתוך התזרים שמייצרת החברה ממחנות הקיץ גם לאחר השקעות הוניות שוטפות ומבלי שהחברה ביצעה השקעות חדשות באותן שנים. בשנת 2026 צפוי היחס לעלות לטווח 5.5- 6.0, עקב גידול מתוכנן בהיקף החוב נטו למימון רכישת הנכסים החדשים והשקעות הוניות.

בהתאם לטיוטת התשקיף, החברה התחייבה שלא לחלק דיבידנד העולה על 75% מהרווח הנקי המתואם (לרבות תוספת פחת והפחתות) ובניכוי סכום הדיבידנד המיוחד שיחולק לבעלי המניות בחברה בסך 50 מ' דולר מתוך תמורת הנפקת אג"ח סדרה א'. מידרוג העריכה כי החברה אינה צפויה לחלק דיבידנדים בשנים 2026-2025. יחס הון עצמי למאזן הציג מגמת התחזקות בשנים האחרונות, מ-34.4% בסוף שנת 2022 ל-39.8% בסוף שנת 2023 ול-43.8% בסוף שנת 2024 (עם חוב נטו לקאפ נטו של 47.6% לאותו מועד), במידה רבה הודות לרווח אחר בגין הערכה מחדש של רכוש קבוע, המשקף את שערוך שווי המחנות. כמו כן רשמה החברה רווח מצטבר מפעילות שוטפת. על פי תרחיש הבסיס של מידרוג, בשנת 2025 צפוי שיפור מתון ביחס זה, ואילו בשנת 2026 צפויה ירידה לרמה של 30%-31% (חוב נטו לקאפ נטו של 61%-62%), בשל הדיבידנד המיוחד וגידול בהיקף הנכסים המתוכנן.

**נזילות חזקה וגמישות פיננסית התומכות בעמידת החברה בהתחייבויותיה הפיננסיות**

להלן הערכת מידרוג לתחזית המקורות והשימושים עבור החברה לתקופה ינואר ˗ דצמבר 2026:

- אומדן מזומן פתיחה בסך כ-30 מ' דולר.

- תמורה מגיוס אג"ח סדרה א', בהתאם להיקף הגיוס בפועל, נטו לאחר פירעון מלוא ההלוואות המשועבדות ב-13 נכסי מחנות הקיץ, ובניכוי דיבידנד מיוחד לבעלי המניות בחברה, בסך כ-28 מ' דולר.

- תזרים מזומנים ממחנות הקיץ ומנכסים שיירכשו בסך כ-19 מ' דולר (לפני שינויים בהון חוזר ולאחר השקעות שוטפות בנכסים) בהתאם לתרחיש הבסיס של מידרוג.

- אמורטיזציה של ההלוואות מובטחות בנכסים ואג"ח בסך כ-13 מ' דולר.

- השקעת הון עצמי ברכישת נכסים מניבים בסך כ-30 מ' דולר.

לפי ההנחות לעיל, ובהתחשב בקבלת מקדמות בגין שנת הפעילות העוקבת, החברה צפויה להגדיל את יתרות הנזילות במהלך 2026.

## שיקולי סביבה, חברה וממשל תאגידי (ESG)

שיקולי ESG נושאים השפעה שלילית על הדירוג, כאשר להערכת מידרוג החשיפה של החברה לסיכוני ממשל תאגידי הינה בינונית. החברה הינה חלק מקבוצת SIMAD שפועלת כחברה פרטית ונשלטת בידי שני אנשי מפתח. שירותי הניהול של החברה יסופקו בידי חברת ניהול בבעלות בעלי המניות. המדיניות הפיננסית כחברה מדווחת אינה מוכחת עדיין ודורשת בחינה לאורך זמן. סיכונים אלו ממותנים מצד קיומו של הסכם ניהול וכן לאור המבנה התאגידי הצפוי בחברה לאחר הפיכתה למדווחת, אשר יכלול את האורגנים הנדרשים על פי חוק. להערכת מידרוג, לחברה סיכונים תפעוליים הנובעים מחשיפה לאירועי אקלים ובטיחות. מרבית המחנות מצויים באזורים מיוערים ובסמוך למקורות מים, כאשר תנאי אקלים קיצוניים עלולים להשפיע לרעה על פעילות המחנות, על תקינות התשתיות ועל רווחיותם. קהל היעד הינו ילדים ובני נוער המשתתפים בפעילויות חוץ, ספורט, מים וספורט אתגרי, ועל כן נדרשת הקפדה יתרה על נהלי בטיחות ופיקוח הדוק של הצוותים. בכל אחד מהמחנות פועלת מרפאה ייעודית המעניקה מענה רפואי ראשוני למשתתפים. החברה מציינת כי היא פועלת לבטח את פעילותה ואת פעילות החברות הבנות שלה בכיסויים המתאימים לה. בהתאם, מתקשרת החברה עם גורמים מבטחים בפוליסות מטריה קבוצתית בסכום כיסוי של כ-30 מ' דולר. במקרה של קרות אירוע ביטוחי, עשויה להיות לחברה חשיפה פיננסית בסכום המהווה את ההפרש בין סכום הכיסוי הביטוחי לבין היקף הכספי של התביעה או הנזק לנכס. החברה מעריכה כי היא אינה מבוטחת בחסר.

<div dir="rtl">

## מידרוג

### מטריצת הדירוג

| קטגוריה | פרמטרים | מדידה [1], [2] | ניקוד | מדידה [2] | ניקוד |
|---|---|---|---|---|---|
| | | **ליום 31.12.2024** | | **תחזית מידרוג** | |
| ענף הפעילות | סיכון ענפי | --- | Baa.il | --- | Baa.il |
| פרופיל עסקי | היקף הכנסות, מ' ש"ח | 582 | Baa.il | 525-575 | Baa.il |
| | מעמד עסקי | --- | Baa.il | --- | Baa.il |
| רווחיות | שיעור רווח תפעולי | 12.8% | Aaa.il | 13.0% | Aaa.il |
| פרופיל פיננסי | הון עצמי / מאזן | 43.8% | Aa.il | 31%-30% | A.il |
| | חוב פיננסי / EBITDA | 5.1 | Baa.il | 5.0-6.0 | Baa.il |
| | רווח תפעולי / הוצאות מימון | 1.7 | Baa.il | 1.4-1.6 | Baa.il |
| | מדיניות פיננסית | --- | Baa.il | --- | Baa.il |
| **דירוג נגזר** | | | **Baa1.il** | | |
| **דירוג בפועל** | | | **Baa1.il** | | |

[1] המדדים המוצגים בטבלה הינם לאחר התאמות מידרוג, ולא בהכרח זהים לאלה המוצגים על ידי החברה. תחזית מידרוג כוללת את הערכות מידרוג ביחס למנפיק בהתאם לתרחיש הבסיס של מידרוג, ולא את הערכות המנפיק.

[2] החברה מדווחת בדולר, הסכומים בטבלה הומרו לש"ח לפי שער דולר-שקל של כ-3.65 ליום 31.12.2024 ו-3.23 בממוצע בתקופת התחזית.

### דוחות קשורים

דירוג תאגידים לא פיננסים - דוח מתודולוגי, דצמבר 2022

התאמות לדוחות כספיים והצגת מדדים פיננסיים מרכזיים בדירוג תאגידים, דצמבר 2024

שיקולים מבניים בדירוג מכשירי חוב בתחום המימון התאגידי - דוח מתודולוגי, ספטמבר 2019

קווים מנחים לבחינת סיכונים סביבתיים, חברתיים וממשל תאגידי בדירוגי אשראי - דוח מתודולוגי - פברואר 2022

טבלת זיקות והחזקות

סולמות והגדרות הדירוג של מידרוג

הדוחות מפורסמים באתר מידרוג www.midroog.co.il

### מידע כללי

| | |
|---|---|
| **תאריך דוח הדירוג:** | 19.11.2025 |
| **שם יוזם הדירוג:** | SIMAD Holdings LLC |
| **שם הגורם ששילם עבור הדירוג:** | SIMAD Holdings LLC |

### מידע מן המנפיק

מידרוג מסתמכת בדירוגיה בין השאר על מידע שהתקבל מגורמים מוסמכים אצל המנפיק.

</div>

| | מידרוג |
|---|---|

## סולם דירוג מקומי לזמן ארוך

| Aaa.il | מנפיקים או הנפקות המדורגים Aaa.il מציגים, על פי שיפוטה של מידרוג, כושר החזר אשראי הגבוה ביותר יחסית למנפיקים מקומיים אחרים. |
|---|---|
| Aa.il | מנפיקים או הנפקות המדורגים Aa.il מציגים, על פי שיפוטה של מידרוג, כושר החזר אשראי גבוה מאד יחסית למנפיקים מקומיים אחרים. |
| A.il | מנפיקים או הנפקות המדורגים A.il מציגים, על פי שיפוטה של מידרוג, כושר החזר אשראי גבוה יחסית למנפיקים מקומיים אחרים. |
| Baa.il | מנפיקים או הנפקות המדורגים Baa.il מציגים, על פי שיפוטה של מידרוג, כושר החזר אשראי בינוני יחסית למנפיקים מקומיים אחרים והם עלולים להיות בעלי מאפיינים ספקולטיביים מסוימים. |
| Ba.il | מנפיקים או הנפקות המדורגים Ba.il מציגים, על פי שיפוטה של מידרוג, כושר החזר אשראי חלש יחסית למנפיקים מקומיים אחרים והם בעלי מאפיינים ספקולטיביים. |
| B.il | מנפיקים או הנפקות המדורגים B.il מציגים, על פי שיפוטה של מידרוג, כושר החזר אשראי חלש מאוד יחסית למנפיקים מקומיים אחרים והם בעלי מאפיינים ספקולטיביים משמעותיים. |
| Caa.il | מנפיקים או הנפקות המדורגים Caa.il מציגים, על פי שיפוטה של מידרוג, כושר החזר אשראי חלש ביותר יחסית למנפיקים מקומיים אחרים והם בעלי מאפיינים ספקולטיביים משמעותיים ביותר. |
| Ca.il | מנפיקים או הנפקות המדורגים Ca.il מציגים, על פי שיפוטה של מידרוג, כושר החזר אשראי חלש באופן קיצוני והם קרובים מאוד למצב של כשל פירעון עם סיכויים כלשהם להחזר קרן וריבית. |
| C.il | מנפיקים או הנפקות המדורגים C.il מציגים, על פי שיפוטה של מידרוג, כושר החזר אשראי החלש ביותר ובדרך כלל הם במצב של כשל פירעון עם סיכויים קלושים להחזר קרן וריבית. |

הערה: מידרוג משתמשת במשתנים מספריים 1,2,3 בכל אחת מקטגוריות הדירוג מ- Aa.il ועד Caa.il המשתנה '1' מציין שאגרת החוב מצויה בקצה העליון של קטגורית הדירוג שאליה היא משתייכת, המצוינת באותיות. המשתנה '2' מציין שהיא נמצאת באמצע קטגורית הדירוג ואילו המשתנה '3' מציין שאגרת החוב נמצאת בחלק התחתון של קטגורית הדירוג שלה, המצוינת באותיות.

## מידרוג

**© כל הזכויות שמורות לחב׳ מידרוג בע״מ (להלן: ״מידרוג״).**

דירוגים שהונפקו על ידי מידרוג משקפים חוות דעת סובייקטיבית של מידרוג ביחס לכושר החזר האשראי היחסי העתידי של גופים, התחייבויות, חובות ו/או מכשירים פיננסיים דמויי חוב, נכון למועד פרסומם או אספקתם, וכל עוד מידרוג לא שינתה את הדירוג או הפסיקה אותו, וכל החומרים, המוצרים, השירותים והמידע שמידרוג מפרסמת או מספקת (להלן: ״חומרי מידרוג״), עשויים לכלול חוות דעת סובייקטיבית כאמור לעיל.

דירוג מגדירה כושר החזר אשראי כיכולת המנפיק לעמוד בהתחייבויות החוזיות וההפסד במקרה של כשל פירעון או אירוע פגימה.

דירוגי מידרוג אינם מתייחסים לכל גורם אחר, כגון אך לא רק לסיכוני נזילות, שווי שוק, שינויים בשערי ריבית, תנודתיות מחירים או כל גורם אחר שאינו כושר החזר אשראי.

אין לראות בדירוגים של מידרוג, בהערכות שאינן בדבר סיכוני אשראי (להלן: ״הערכות מידרוג״) או בכל חוות דעת הכלולה בחומרי מידרוג, עובדות או נתונים היסטוריים. חומרי מידרוג עשויים לכלול גם הערכות כמותיות בנוגע לכושר החזר אשראי, המבוססות על מודלים, וכן חוות דעת והערות בנוגע להערכות אלו. דירוגי האשראי של מידרוג, הערכות מידרוג, חוות דעת של מידרוג וחומרי מידרוג אחרים, אינם מהווים יעוץ השקעות או יעוץ פיננסי, ואינם בגדר המלצה לרכוש ניירות ערך כלשהם, למכור אותם או להחזיק בהם.

דירוגי האשראי של מידרוג, הערכות מידרוג, חוות הדעת של מידרוג וחומרי מידרוג אחרים, אינם בגדר חוות דעת לגבי ההתאמה של השקעה כלשהי לצרכיו של משקיע מסוים.

מידרוג מנפיקה דירוגי אשראי, הערכות וחוות דעת או אחרות ומפרסמת או מספקת את חומרי מידרוג מתוך הנחה וציפייה כי כל משקיע ינקוט זהירות ראויה ויבצע הערכות משלו בדבר הכדאיות של רכישה, מכירה או החזקת כל נייר ערך. מידרוג ממליצה לכל משקיע פרטי להיוועץ בייעוץ מקצועי לגבי כדאיות ההשקעה, לגבי הדין החל, ולגבי כל עניין מקצועי אחר, בטרם יחליט יחליט החלטה כלשהי לגבי השקעות.

דירוגי מידרוג, הערכות מידרוג וכל חוות דעת או חומרי מידרוג אחרים, אינם מיועדים לשימוש על ידי משקיעים פרטיים. משקיעים פרטיים מוזהרים בזאת שלא לבסס החלטות השקעה על חומרי מידרוג. משקיע פרטי שיבסס החלטות בענייני השקעות על חומרי מידרוג, ינהג בכך בצורה פזיזה וחסרת אחריות. מידרוג ממליצה לכל משקיע פרטי להיוועץ בייעוץ פיננסי או ביעוץ מקצועי אחר בטרם יקבל החלטה כלשהי לגבי השקעות.

כל המידע הכלול במסמך זה הוא מידע המוגן על פי דין, כולל, בין היתר, מכוח דיני זכויות יוצרים וקניין רוחני. אין להעתיק את כל המידע או חלק כשלהו ממנו או לסרוק אותו, לשכתב אותו, להפיצו, להעבירו, לשכפל אותו, להציגו, לתרגמו או לשמור אותו לשימוש נוסף למטרה כלשהי, בכל דרך שהיא, ללא אישורה של מידרוג בכתב ומראש.

לצורך חוות הדעת שמידרוג מפיקה, מידרוג משתמשת בסולמות דירוג, בהתאם להגדרות המפורטות בכל סולם. הסימול שנבחר על מנת לשקף את דעתה של מידרוג לגבי כושר החזר האשראי, משקף אך ורק הערכה יחסית של אותו סיכון. הדירוגים של מידרוג אינם חוות דעת לגבי כושר החזר האשראי של המנפיק או ההנפקה באופן יחסי לזה של מנפיקים או הנפקות אחרים בישראל.

דירוגי האשראי, ההערכות וחוות הדעת של מידרוג וחומרי מידרוג אינם מיועדים לשימוש כ״בנצ׳מרק״, במשמעותו של מונח זה בהקשר הרגולטורי, ואין להשתמש בהם בכל דרך אשר עלולה להוביל לכך שהם ייחשבו ״בנצ׳מרק״.

**מידרוג אינה מעניקה שום אחריות, מפורשת או משתמעת, ביחס לרמת הדיוק של כל דירוג, הערכה או חוות דעת אחרת או מידע שנמסרו או נוצרו על ידי מידרוג בכל דרך ואופן שהוא, או ביחס להיותם נכונים למועד מסוים, או ביחס לשלמותם, לסחירותם או להתאמתם למטרה כלשהי.**

כל המידע הכלול בדירוגים של מידרוג, בהערכות של מידרוג, בחוות הדעת של מידרוג ובחומרי מידרוג (להלן: ״המידע״), נמסר למידרוג על ידי מקורות מידע הנחשבים בעיניה אמינים ומדויקים. יחד עם זאת, והיות שתמיד תיתכן טעות אנוש או תקלה טכנית, וכן בשל גורמים אחרים, כל המידע הנכלל במסמך הזה מסופק כפי שהוא (as is) בלי שום אחריות משום סוג שהוא.

מידרוג אינה אחראית לנכונותו של המידע. מידרוג נוקטת אמצעים סבירים כדי שהמידע שהיא משתמשת בו לצורך הדירוג יהיה באיכות מספקת וכי יגיע ממקורות הנחשבים בעיניה לאמינים, לרבות מידע שהתקבל מצדדים שלישיים בלתי תלויים, ככל שהדבר רלבנטי. יחד עם זאת, מידרוג אינה גוף המבצע ביקורת ולכן אינה יכולה לאמת או לתקף את המידע שהתקבל בכל מקרה ומקרה בסולם מהלך תהליך הדירוג או במהלך הכנת חומרי מידרוג.

התוכן של חומרי מידרוג איננו חלק מן המתודולוגיה של מידרוג, למעט אותם חלקים בתוכן אשר לגביהם מצוין במפורש כי הם מהווים חלק מן המתודולוגיה.

בכפוף לאמור בכל דין, מידרוג, הדירקטורים שלה, נושאי המשרה שלה, עובדיה, שלוחיה, נציגיה, כל גורם שהעניק למידרוג רישיון, וכן ספקיה (להלן: ״אנשי מידרוג״), לא יישאו באחריות כלפי כל אדם או גוף בגין כל נזק או הפסד עקיף, מיוחד, תוצאתי או נלווה, אשר ינבע מן המידע שבמסמך זה או משימוש במידע כאמור או מאי יכולת להשתמש במידע כאמור, וזאת אף אם נאמר למידרוג או למי מאנשי מידרוג, כי נזק או הפסד כאמור עלולים להתרחש. מבלי לגרוע מכלליות האמור לעיל, מידרוג לא תישא באחריות: (א) לאובדן רווחים בהווה או בעתיד; (ב) לאובדן או לנזק הנובעים ממכשיר פיננסי שלא עמד במוקד דירוג אשראי ספציפי של מידרוג.

בכפוף לאמור בכל דין, מידרוג ואנשי מידרוג לא יישאו באחריות כלפי כל אדם או גוף בגין כל נזק או הפסד ישירים הנובעים מן המידע הכלול במסמך זה, או משימוש בו או מאי היכולת להשתמש בו, כולל, בין היתר, בגין נזק או הפסד שנובעים מרשלנות מצדם (למעט מרמה, פעולה בזדון או כל פעולה אחרת שהדין אינו מתיר לפטור מאחריות בגינה), או מאירוע בלתי צפוי, בין אם אותו אירוע הוא בשליטתם של מידרוג או אנשי מידרוג, ובין אם לאו.

מידרוג אימצה מדיניות ונהלים לעניין עצמאות הדירוג ותהליכי הדירוג.

כל דירוג, הערכה או חוות דעת שהונפקו על ידי מידרוג עשויים להשתנות כתוצאה משינויים במידע שעליו התבססו ו/או כתוצאה מקבלת מידע חדש ו/או מכל סיבה אחרת. כשרלבנטי, עדכונים ו/או שינויים בדירוגים מופיעים באתר האינטרנט של מידרוג שכתובתו [www.midroog.co.il](http://www.midroog.co.il).

# נספח ב' לפרק 2 - שטר הנאמנות בגין אגרות החוב (סדרה א')

# <u>שטר נאמנות בגין אגרות חוב (סדרה א')</u>

**שנערך ונחתם ביום 27 בחודש נובמבר 2025**

**בין SIMAD Holdings Ltd. לבין משמרת- חברה לשירותי נאמנות בע"מ**

- 2 -

# שטר נאמנות

### שנערך ונחתם ביום 27 בנובמבר 2025

**ב י ן :**

**SIMAD Holdings Ltd.**
חברה המאוגדת לפי דיני איי הבתולה הבריטיים ואשר משרדיה וכתובתה הינם כדלקמן :

| | |
|---|---|
| C/o Maples Corporate Services (BVI) Limited<br>PO Box 173<br>Kingston Chambers<br>Road Town, Tortola<br>British Virgin Islands | המשרד הרשום של החברה באיי הבתולה : |
| רחוב יגאל אלון 98, תל-אביב<br>אצל משרד עורכי דין גולדפרב גרוס זליגמן ושות׳<br>טלפון : 03-6089999<br>פקס : 03-6089909 | כתובת החברה בישראל להמצאת כתבי בי-דין : |

(״החברה״ או ״התאגיד״)

**מצד אחד ;**

**ל ב י ן :**

**משמרת- חברה לשירותי נאמנות בע״מ**
מדרך מנחם בגין 48-46, תל אביב
טלפון : 03-6374352
פקס : 03-6374344
(״הנאמן״)

**מצד שני ;**

## תוכן עניינים

| עמוד | נושא | סעיף |
|---|---|---|
| 2 | **שטר הנאמנות** | |
| 4 | מבוא ; פרשנות והגדרות | 1 |
| 7 | הנפקת אגרות החוב ; תנאי הנפקה ; דרגה שווה | 2 |
| 8 | רכישת אגרות חוב על-ידי החברה ו/או מחזיק קשור | 3 |
| 9 | הרחבת סדרת אגרות החוב (סדרה א׳) והנפקה והקצאה של אגרות חוב וניירות ערך נוספים | 4 |
| 11 | התחייבויות החברה | 5 |
| 21 | הבטחת אגרות החוב | 6 |
| 38 | פדיון מוקדם | 7 |
| 41 | זכות להעמדה לפירעון מיידי | 8 |
| 46 | תביעות והליכים בידי הנאמן | 9 |
| 47 | נאמנות על התקבולים | 10 |
| 47 | סמכות לדרוש מימון | 11 |
| 48 | סמכות לעכב חלוקת כספים | 12 |
| 48 | הודעה על חלוקה | 13 |
| 49 | הימנעות מתשלום מסיבה שאינה תלויה בחברה | 14 |
| 49 | קבלה מאת מחזיקי אגרות החוב ומאת הנאמן | 15 |
| 49 | הצגת אגרת חוב לנאמן ; רישום בקשר עם תשלום חלקי | 16 |
| 50 | השקעות כספים | 17 |
| 50 | התחייבויות החברה כלפי הנאמן | 18 |
| 53 | התחייבויות נוספות | 19 |
| 54 | באי כוח | 20 |
| 54 | הסכמים אחרים | 21 |
| 54 | דוחות על ענייני הנאמנות | 22 |
| 55 | שכר וכיסוי הוצאות הנאמן | 23 |
| 56 | סמכויות מיוחדות | 24 |
| 57 | סמכות הנאמן להעסיק שלוחים | 25 |
| 57 | שיפוי לנאמן | 26 |
| 60 | הודעות | 27 |
| 60 | ויתור, פשרה ושינויים בשטר הנאמנות | 28 |
| 61 | מרשם המחזיקים באגרות החוב | 29 |
| 61 | שחרור | 30 |
| 62 | מינוי ופקיעת כהונתו של הנאמן, תפקידיו וסמכויותיו | 31 |
| 63 | אסיפות של מחזיקי אגרות החוב | 32 |
| 63 | תחולת הדין וסמכות שיפוט ; התחייבויות החברה, בעלי השליטה ונושאי המשרה בחברה | 33 |
| 65 | כללי | 34 |
| 65 | אחריות הנאמן | 35 |
| 65 | מענים | 36 |
| 65 | הסמכה למגנ״א | 37 |
| 67 | **נספח א׳ – נכסי הנדל״ן המשועבדים** | |
| 68 | **נספח ב׳ – אופן חישוב אמות מידה פיננסיות** | |
| 69 | **תוספת ראשונה – תעודת אגרות חוב (סדרה א׳)** | |
| 70 | **התנאים הרשומים מעבר לדף** | |
| 70 | כללי | 1 |
| 70 | אגרות החוב (סדרה א׳) | 2 |
| 70 | תשלומי הקרן והריבית של אגרות החוב (סדרה א׳) | 3 |
| 71 | הימנעות מתשלום מסיבה שאינה תלויה בחברה | 4 |
| 71 | מרשם מחזיקי אגרות החוב | 5 |
| 71 | פיצול תעודות אגרות החוב | 6 |
| 72 | העברת אגרות החוב | 7 |
| 72 | החלפת תעודת אגרות החוב | 8 |
| 72 | פדיון מוקדם | 9 |
| 72 | ויתור, פשרה ושינויים בשטר הנאמנות | 10 |
| 72 | אסיפות מחזיקי אגרות החוב | 11 |
| 72 | פירעון מיידי | 12 |
| 72 | הודעות | 13 |
| 72 | הדין החל וסמכות שיפוט | 14 |
| 73 | **תוספת שנייה – אסיפות מחזיקי אגרות החוב (סדרה א׳)** | |
| 78 | **תוספת שלישית – נציגות דחופה למחזיקי אגרות החוב** | |

- 4 -

**הואיל:** ובכוונת החברה לפרסם תשקיף להשלמה (אשר הינו גם תשקיף מדף), על-פיו היא תציע לראשונה אגרות חוב (סדרה א') שלה, אשר בכפוף לתנאים המפורטים בו תירשמנה למסחר בבורסה לניירות ערך בתל-אביב בע"מ;

**והואיל:** ובחודש נובמבר 2025, הודיעה חברת הדירוג (כהגדרתה להלן) על מתן דירוג A3.il (**"דירוג הבסיס"**) לסדרת אגרות חוב חדשה של החברה נשוא שטר זה;

**והואיל:** ונכון למועד חתימת שטר זה החברה עומדת בכל התנאים של חברת הדירוג לצורך דירוגה של סדרת אגרות החוב (סדרה א') בדירוג המפורט לעיל;

**והואיל:** והחברה פנתה בבקשה אל הנאמן שישמש כנאמן למחזיקי אגרות החוב (סדרה א'), והנאמן הסכים לכך, הכל בכפוף ובהתאם לתנאי שטר נאמנות זה;

**והואיל:** והנאמן הינו חברה פרטית, מוגבלת במניות, שנתאגדה בישראל לפי חוק החברות, התשנ"ט-1999 (**"חוק החברות"**), ואשר מטרתה העיקרית הינה עיסוק בנאמנות;

**והואיל:** והנאמן הצהיר כי אין כל מניעה על-פי חוק ניירות ערך, התשכ"ח-1968 (**"חוק ניירות ערך"**), או כל דין אחר, להתקשרותו עם החברה על-פי שטר נאמנות זה, לרבות ביחס לניגודי עניינים המונעים את התקשרותו עם החברה כאמור, כי הוא עונה על הדרישות ותנאי הכשירות הקבועים בחוק ניירות ערך לשמש נאמן להנפקת אגרות החוב נשוא שטר זה, וכן כי אין לו כל עניין בחברה ולחברה אין כל עניין אישי בנאמן;

**והואיל:** והחברה מצהירה כי אין מניעה על-פי כל דין להתקשרותה עם הנאמן על-פי שטר נאמנות זה;

**והואיל:** ואין כל מניעה לפי כל דין ו/או כל הסכם להנפקת אגרות החוב (סדרה א') על-ידי החברה בהתאם להוראות שטר זה וכי נתקבלו כל האישורים להנפקת אגרות החוב (סדרה א') בהתאם להוראות שטר זה לפי כל דין ו/או כל הסכם, והכל למעט קבלת אישור הבורסה (כהגדרתה להלן) אשר טרם נתקבל נכון למועד חתימת שטר נאמנות זה ויתקבל עד פרסום דוח הצעת המדף;

<p align="center">**לפיכך הוסכם, הוצהר והותנה בין הצדדים כדלקמן**:</p>

1. **מבוא; פרשנות והגדרות**

1.1 המבוא לשטר נאמנות זה והנספחים הרצופים לו מהווים חלק מהותי ובלתי נפרד הימנו.

1.2 חלוקת שטר נאמנות זה לסעיפים וכן מתן כותרות לסעיפים, נעשו מטעמי נוחות וכמראי מקום בלבד, ואין להשתמש בהם לשם פרשנות.

1.3 בכל מקום בשטר זה בו נאמר "בכפוף לכל דין" (או ביטוי הדומה לכך), הכוונה היא בכפוף לכל דין שאינו ניתן להתניה.

1.4 כל האמור בשטר זה בלשון רבים אף יחיד במשמע וכן להפך, כל האמור במין זכר אף מין נקבה במשמע וכן להפך, וכל האמור באדם אף תאגיד במשמע, והכל כשאין בשטר זה הוראה אחרת מפורשת.

1.5 שטר נאמנות זה ייכנס לתוקפו במועד ההקצאה בפועל של אגרות החוב על-ידי החברה. מוסכם, כי במקרה של ביטול הנפקת אגרות החוב מכל סיבה שהיא, יהא שטר נאמנות זה בטל מעיקרו מבלי שלמי מהצדדים לשטר זה תהא טענה כלשהי כנגד האחר.

1.6 בשטר נאמנות זה ובאגרות החוב תהיה לביטויים הבאים המשמעות שלצידם, אלא אם נקבע מפורשות אחרת:

1.6.1 **"אירוע הפרה"** - המועד בו : (א) קמה עילה להעמדת אגרות החוב לפירעון מיידי ו/או למימוש בטוחות על פי הוראות שטר הנאמנות; או (ב) אגרות החוב הועמדו לפירעון מיידי, לפי המוקדם.

1.6.2 **"שטר זה"** או **"שטר הנאמנות"** או **"שטר נאמנות זה"** – שטר נאמנות זה לרבות הנספחים המצורפים אליו והמהווים חלק בלתי נפרד הימנו, בנוסחם כפי שיהיה מעת לעת;

1.6.3 **"התשקיף"** – תשקיף להשלמה ותשקיף המדף של החברה הנושא תאריך 28 בנובמבר 2025;

- 5 -

1.6.4. **"אגרות החוב"** או **"אגרות החוב (סדרה א')"** — אגרות חוב (סדרה א') של החברה, רשומות על שם, שתנאיהן יהיו בהתאם לתעודת אגרת החוב ולתשקיף החברה, אשר תונפקנה מעת לעת על-ידי החברה לפי שיקול דעתה הבלעדי, הכל בהתאם וכפוף להוראות כל דין ושטר זה;

1.6.5. **"הנאמן"** — משמרת חברה לשירותי נאמנות בע"מ או כל מי שיכהן מדי פעם בפעם כנאמן של מחזיקי אגרות החוב לפי שטר זה;

1.6.6. **"מרשם המחזיקים באגרות החוב"** או **"המרשם"** — מרשם המחזיקים באגרות החוב כאמור בסעיף 29 לשטר זה;

1.6.7. **"מחזיק/ים"** או **"מחזיק/י אגרות החוב"** או **"בעל/י אגרות החוב"** — כמשמעות המונחים "מחזיק" ו-"מחזיק בתעודות התחייבות", בסעיף 35א לחוק ניירות ערך;

1.6.8. **"תעודת אגרת החוב"** — תעודת אגרת חוב (סדרה א') אשר נוסחה מופיע בתוספת הראשונה לשטר זה;

1.6.9. **"יום עסקים"** או **"יום עסקים בנקאי"** — כל יום בו פתוחים רוב הבנקים בישראל לביצוע עסקאות;

1.6.10. **"יום מסחר"** — כל יום בו מתבצעות עסקאות בבורסה;

1.6.11. **"החברה לרישומים"** — החברה לרישומים של הבורסה לניירות ערך בתל-אביב בע"מ, או כל חברה לרישומים אחרת עימה תתקשר החברה, לפי שיקול דעתה הבלעדי ובכפוף לכל דין, ובלבד שכל ניירות הערך של החברה יהיו רשומים על שם אותה חברה לרישומים;

1.6.12. **"קרן"** — סך הערך הנקוב של אגרות החוב (סדרה א');

1.6.13. **"הבורסה"** — הבורסה לניירות ערך בתל-אביב בע"מ;

1.6.14. **"הוראות הבורסה"** — הוראות תקנון הבורסה, ההנחיות מכוחו וחוקי העזר של מסלקת הבורסה (לפי העניין), בנוסחן כפי שיהיה מעת לעת;

1.6.15. **"מסלקת הבורסה"** — מסלקת הבורסה לניירות ערך בתל אביב בע"מ;

1.6.16. **"אסיפה נדחית"** או **"אסיפת מחזיקים נדחית"** — אסיפת מחזיקים אשר נדחתה למועד אחר מזה אשר נקבע לפתיחת האסיפה כאמור בסעיף 3 לתוספת השנייה לשטר זה;

1.6.17. **"החלטה מיוחדת"** — החלטה שנתקבלה באסיפה כללית של מחזיקי אגרות החוב, בה נכחו, בעצמם או על-ידי באי כוחם, מחזיקי אגרות חוב המחזיקים בחמישים אחוזים (50%) לפחות מיתרת הערך הנקוב של אגרות החוב שבמחזור, או באסיפה נדחית שנכחו בה, בעצמם או על-ידי באי כוחם, מחזיקי אגרות החוב המחזיקים, בעצמם או על-ידי באי-כוחם, בעשרים אחוזים (20%) לפחות מיתרת הערך הנקוב כאמור, ואשר נתקבלה (בין באסיפה המקורית ובין באסיפה הנדחית), ברוב של לפחות שני שלישים (2/3) מכלל הקולות של המשתתפים בהצבעה, למעט הנמנעים;

1.6.18. **"החלטה רגילה"** — החלטה שנתקבלה באסיפת מחזיקי אגרות החוב, שהתכנסה לפי סעיף 35יב13 ו-35יב14(א) לחוק ניירות ערך, ואשר נתקבלה (בין באסיפה המקורית ובין באסיפה הנדחית) ברוב של לפחות חמישים אחוזים (50%) מכלל הקולות של המשתתפים בהצבעה, למעט הנמנעים. מובהר כי בכל מקום בשטר זה בו לא נאמר במפורש אחרת ובכפוף להוראות החוק שאינן ניתנות להתניה, החלטת אסיפת מחזיקי אגרות החוב תתקבל כהחלטה רגילה;

1.6.19. **"נציגות חופה"** — כמפורט בתוספת השלישית לשטר זה;

1.6.20. **"דירוג"** — דירוג שנעשה על-ידי חברת הדירוג;

- 6 -

1.6.21. בשטר נאמנות זה ובאגרות החוב תהיה לדירוג אגרות החוב המשמעות המפורטת בטבלה להלן :

| **"-ilAA"** | ilAA- בדירוג מעלות או Aa3.il בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |
| **"+ilA"** | ilA+ בדירוג מעלות או A1 בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |
| **"ilA"** | ilA בדירוג מעלות או A2 בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |
| **"-ilA"** | ilA- בדירוג מעלות או A3 בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |
| **"+ilBBB"** | ilBBB+ בדירוג מעלות או Baa1 בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |
| **"ilBBB"** | ilBBB בדירוג מעלות או Baa2 בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |
| **"-ilBBB"** | ilBBB- בדירוג מעלות או Baa3 בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |
| **"+ilBB"** | ilBB+ בדירוג מעלות או Ba1 בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |
| **"ilBB"** | ilBB בדירוג מעלות או Ba2 בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |
| **"-ilBB"** | ilBB- בדירוג מעלות או Ba3 בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על-ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה א'). |

1.6.22. **"דולר"** – דולר ארה"ב.

1.6.23. **"חברת הדירוג"** – מידרוג בע"מ או חברת דירוג אחרת, כהגדרת המונח "חברת דירוג" בחוק להסדרת פעילות חברות דירוג האשראי, התשע"ד-2014;

1.6.24. **"חשבון הנאמנות"** חשבון אשר יפתח הנאמן על שמו בנאמנות עבור מחזיקי אגרות החוב (סדרה א'), באחד מחמשת הבנקים הגדולים בישראל בו תופקד, בין היתר, כרית ההוצאות וכספים אשר יופקדו בחשבון זה, על תתי חשבונותיו, בהתאם להוראות שטר נאמנות זה ואשר כל זכויות החברה בחשבון ובמופקד בו (ככל שיהיו) מעת לעת, ישועבדו לטובת הנאמן בשעבוד יחיד, ראשון בדרגה וקבוע ללא הגבלה בסכום על כל הכספים שיופקדו בו מעת לעת על תתי חשבונותיו, לרבות הפירות בגינם, כפי שיהיו בו מעת לעת וכן כל הכספים אשר צפויים להיות מופקדים בו. הבנק בו יפתח חשבון הנאמנות יאשר לנאמן בכתב כי הוא מוותר על כל זכות קיזוז עיכוב או עיכבון של הבנק בגין כל חוב או התחייבות של החברה כלפי הבנק למעט התחייבויות של החברה בגין הפעילות בחשבון הנאמנות עצמו. זכויות החתימה בחשבון הנאמנות יהיו של הנאמן בלבד. כל עלויות פתיחת ניהול וסגירת החשבון הנאמנות יחולו על החברה. הנאמן ישקיע את הכספים בחשבון הנאמנות בהתאם להוראות סעיף 17 לשטר הנאמנות;

1.6.25. **"תאגיד מדווח"** – כהגדרתו בחוק ניירות ערך;

1.6.26. **"בעלי השליטה"** – דיוויד שאבסלס (David Shabsels) ומייקל שאבסלס ( Michael Shabsels);

1.6.27. **"תקנות הדוחות"** – תקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970, כפי שיהיו מעת לעת;

1.6.28. **"דוחות כספיים"** – דוחות כספיים מאוחדים, שנתיים או רבעוניים, מבוקרים או סקורים, שעל החברה לפרסם בהתאם לחוק ניירות ערך.

1.6.29. **"הערך ההתחייבותי של אגרות החוב"** או **"הערך המותאם של אגרות החוב"** – במועד בדיקה מסוים, יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה א') בתוספת הריבית הצבורה.

1.6.30. **"הון עצמי"** – ההון העצמי הנומינאלי המאוחד של החברה (כולל זכויות מיעוט), בהתאם לדוחות הכספיים.

1.6.31. **"חוב פיננסי נטו מתואם"** – חוב נושא ריבית לזמן קצר ולזמן ארוך מבנקים ומוסדות פיננסיים וכן מכל גורם אחר שמעמיד חוב בתוספת חוב כלפי מחזיקי אגרות חוב שהונפקו,

- 7 -

בניכוי מזומן ושווי מזומן מזומן, שאינו מוגבל (או מוגבל לטובת אגרות החוב), וכן בניכוי השקעות לזמן קצר, ניירות ערך סחירים המסווגים בדוחות הכספיים כנכסים שוטפים ופקדונות (לרבות נכסים כאמור המוגבלים בשימוש למעט הגבלה לטובת הבטחת ערבות שניתנה לטובת צד שלישי) והכל על בסיס הדוחות הכספיים המאוחדים של החברה.

יובהר, כי למטרת חישוב יחס החוב הפיננסי נטו מתואם ל-EBITDA מתואם, בחישוב החוב הפיננסי נטו מתאם, יתווסף חלק החברה בחוב פיננסי נטו של חברות המטופלות בשיטת השווי המאזני.

1.6.32. כמו כן, יובהר, כי למטרת חישוב יחס החוב הפיננסי נטו מתואם ל-EBITDA מתואם, בעת רכישה ו/או העברה ו/או סיום ההקמה במהלך ארבעת הרבעונים עובר למועד החישוב, ינוטרלו השפעות הרכישה ו/או סיום ההקמה מהרכישה ו/או ההעברה ו/או מתקופת סיום ההקמה (החוב הבכיר וההון העצמי שהושקעו בנכס). **"CAP נטו"** – חוב פיננסי נטו מתואם בתוספת סך ההון העצמי המאוחד של החברה (כולל זכויות מיעוט) לפי הדוחות הכספיים המאוחדים האחרונים, סקורים או מבוקרים, שפורסמו.

1.6.33. **"EBITDA מתואם"**– לגבי מועד חישוב מסוים, רווח תפעולי בתוספת הכנסות מימון (ככל שאינן נכללות ברווח התפעולי) ובתוספת פחת והפחתות בנטרול רווחי / הפסדי שערוך, בנטרול חלק החברה ברווחי/הפסדי חברות המטופלות בשיטת השווי המאזני (ככל שנלקחו בחשבון ברווח התפעולי), בתוספת חלק החברה ב-EBITDA המתואם של חברות המטופלות לפי שיטת השווי המאזני, המחושב לפי ארבעת הרבעונים שהסתיימו במועד החישוב, בנטרול השפעת שער חליפין ובתוספת רווח מנכסים שמומשו.

יובהר כי למטרות חישוב יחס החוב הפיננסי נטו מתואם מתואם ל-EBITDA מתואם, תנוטרל ההשפעה של נכסים חדשים שירכשו ו/או יועברו ו/או יוקמו בארבעת הרבעונים עובר למועד החישוב, זאת עד לתום תקופה של ארבעה רבעונים מממועד הרכישה ו/או ההעברה ו/או סיום ההקמה, לפי העניין.

1.6.34. **"יחס ההלוואה לבטוחה בתאגיד המשועבד"** – כמפורט בסעיף 6.4 לשטר זה.

1.6.35. **"תשואת החוב של הנכסים המשועבדים"** – סך ה-EBITDA המתואם של נכסי הנדל"ן המשועבדים חלקי הערך ההתחייבותי של אגרות החוב בניכוי כספים המופקדים בחשבון המשועבד ו/או בחשבון הנאמנות ו/או מזומנים ושווי מזומנים בתאגיד המשועבד;

1.6.36. **"חברת ההחזקות"** – SIMAD Equities LLC, אשר הינה חברה בת בבעלותה המלאה (במישרין) של החברה;

1.6.37. **"התאגיד המשועבד"** – Intermediate Simad 1 LLC, אשר הינה חברה בת בבעלותה המלאה (במישרין) של חברת ההחזקות;

1.6.38. **"חברות הנכס"** ו-**"חברות התפעול"** – חברות הנכס וחברות התפעול הרלוונטיות אשר זכויות ההשתתפות (membership rights) בהן יועברו לתאגיד המשועבד אשר יחזיק בהן במישרין. לפרטים נוספים ראה סעיף 6.2 **ונספח א'** לשטר זה.

1.7. בכל מקום בו הוראות הבורסה חלות או יחולו על פעולה כלשהי על-פי שטר נאמנות זה, תהא להן עדיפות על האמור בשטר נאמנות זה, ומועדי הפעולה כאמור ייקבעו בהתאם להוראות הבורסה.

1.8. בכל מקרה של סתירה בין שטר הנאמנות למסמכים הנלווים לו, יגברו הוראות שטר הנאמנות. בכל מקרה של סתירה בין שטר הנאמנות להוראות המתוארות בתשקיף, יגברו הוראות שטר הנאמנות.

2. **הנפקת אגרות החוב; תנאי הנפקה; דרגה שווה**

2.1. כפוף להיענות להצעת אגרות החוב (סדרה א'), תנפיק החברה אגרות חוב (סדרה א'), רשומות על שם, אשר תעמודנה לפירעון בחמישה (5) תשלומים שנתיים לא שווים אשר ישולמו ביום 30 בנובמבר של כל אחת מהשנים 2026 עד 2030 (כולל). ארבעת התשלומים הראשונים יהוו, כל אחד, 2.5% מגובה הקרן והתשלום החמישי והאחרון יהווה 90% מגובה הקרן. אגרות החוב (סדרה א')

- 8 -

לא תהיינה צמודות (קרן וריבית) לבסיס הצמדה כלשהו. קרן אגרות החוב (סדרה א') תישא ריבית שנתית קבועה בשיעור אשר יקבע בהודעה המשלימה (אך בכפוף להתאמות בשיעור הריבית, ככל שיבוצעו, כתוצאה מאופן אי עמידת החברה באמות מידה פיננסיות ו/או כתוצאה משינוי בדירוג אגרות החוב (סדרה א'), הכל כמפורט בסעיפים 5.2 ו-5.3 לשטר זה). הריבית על היתרה הבלתי מסולקת של קרן אגרות החוב (סדרה א') תשולם בתשלומים חצי שנתיים בימים 31 במאי ו-30 בנובמבר של כל אחת מהשנים 2026 עד 2030 (כולל).

לפרטים נוספים אודות תנאי אגרות החוב (סדרה א'), לרבות אופן ביצוע התשלומים על חשבון קרן וריבית אגרות החוב, אופן קביעת שיעור הריבית בגין תקופת הריבית הראשונה, ריבית פיגורים והמועד הקובע לביצוע התשלומים על חשבון קרן וריבית אגרות החוב, ראה סעיפים 2 ו-3 לתנאים הרשומים מעבר לדף.

2.2    כפוף לעמידה בתנאי הסף הקבועים בהוראות הבורסה, אגרות החוב (סדרה א') אשר תונפקנה לראשונה על-פי התשקיף, תירשמנה למסחר בבורסה ומבלי לפגוע בהוראות שטר נאמנות זה החברה תפעל בצורה מיטבית כי אגרות החוב ייסחרו בבורסה עד פירעונם הסופי (כולל).

2.3    החברה שומרת לעצמה את הזכות לבצע פדיון מוקדם לאגרות החוב בהתקיים התנאים המפורטים בסעיף 7.2 לשטר זה.

2.4    אגרות החוב (סדרה א') תעמודנה כולן בדרגת שוויון בטחון פרי-פסו, בינן לבין עצמן בקשר עם התחייבויות החברה על-פי אגרות החוב, ובלי זכות בכורה או עדיפות של האחת על פני האחרת.

2.5    על-פי הנחיות הבורסה, אי הצמדתה של קרן אגרות החוב למדד כלשהו, לא תשונה במהלך כל תקופת אגרות החוב.

2.6    הוראות שטר נאמנות זה יחולו על אגרות החוב שיונפקו כאמור על-פי שטר זה ואשר יוחזקו מעת לעת, על כל רוכש אגרות חוב, לרבות על-ידי הציבור, אלא אם כן נאמר מפורשות אחרת.

3.    **רכישת אגרות חוב על-ידי החברה ו/או מחזיק קשור**

3.1    החברה שומרת לעצמה, בכפוף לכל דין, את הזכות לרכוש (לפי שיקול דעתה הבלעדי) את אגרות החוב (סדרה א') בכל עת ומעת לעת, בלי לפגוע בחובת הפירעון של אגרות החוב (סדרה א') שבמחזור. במקרה של רכישה כאמור, החברה תודיע על כך לנאמן בכתב, מבלי לגרוע מחובת הדיווח המיידי החלה עליה, וכן תגיש דו"ח מיידי על הרכישה של אגרות חוב, שבוצעה על-ידה כאמור. במקרה שאגרות החוב (סדרה א') תירכשנה על-ידי החברה, החברה תפנה בבקשה למסלקת הבורסה למשיכת התעודות שנרכשו כאמור.

במקרה של רכישה על-ידי החברה כאמור לעיל יפקעו אגרות החוב (סדרה א') הנרכשות באופן אוטומטי, תתבטלנה ותמחקנה מהמסחר והחברה לא תהיה רשאית להנפיקן מחדש, אלא אם ייקבע אחרת מפורשות לפי הוראות הדין כפי שיהיו באותה עת. היה ולפי הוראות הדין באותה עת אגרות החוב (סדרה א') לא תתבטלנה ולא תימחקנה מהמסחר בבורסה, החברה תהא רשאית למכור את אגרות החוב (סדרה א') הנרכשות, כולן או חלקן, לפי שיקול דעתה הבלעדי, בהתאם להוראות הדין כפי שיהיו באותה עת, מבלי לקבל את הסכמת הנאמן ו/או המחזיקים של אגרות החוב (סדרה א') ובלבד שמכירה כאמור תבוצע בכפוף להתקיימות כל התנאים המפורטים בסעיף 4.1 לשטר זה ביחס להנפקה נוספת של אגרות חוב (סדרה א'), בשינויים המחויבים. במקרה של מכירת אגרות החוב (סדרה א') על-ידי החברה כאמור, תודיע החברה לנאמן מראש על כוונתה לבצע מכירה כאמור ותצרף להודעתה אישור חתום על-ידי נושא המשרה הבכיר בתחום הכספים בחברה (אליו יצורף תחשיב רלוונטי) בדבר התקיימותם של כל התנאים האמורים לשביעות רצון הנאמן. אין באמור לעיל בכדי לפגוע בזכות החברה לפדות בפדיון מוקדם את אגרות החוב (סדרה א') כאמור בסעיף 7.2 לשטר זה.

3.2    בעלי השליטה בחברה (במישרין או בעקיפין) ו/או בני משפחתם (בן זוג וכן אח, הורה, הורה הורה, צאצא או צאצא של בן הזוג, או בן זוגו של כל אחד מאלה) ו/או חברה בת של החברה ו/או חברה קשורה של החברה ו/או חברה כלולה של החברה ו/או תאגיד בשליטתם של כל אחד מהם (במישרין או בעקיפין) (למעט החברה עצמה יחול האמור לגביה בסעיף 3.1 לשטר זה) ("**מחזיק קשור**"), יהיו רשאים לרכוש ו/או למכור מעת לעת בבורסה ו/או מחוצה לה (לרבות במקרה של הנפקה על-ידי

- 9 -

החברה), אגרות חוב (סדרה א') על-פי שיקול דעתם (בכפוף לכל דין). במקרה של רכישה ו/או מכירה כאמור על-ידי חברה בת של החברה ו/או תאגיד בשליטתה, תמסור החברה על כך דיווח מיידי. אגרות החוב (סדרה א') אשר תוחזקנה כאמור על-ידי מחזיק קשור תיחשבנה כנכס של המחזיק הקשור, ואם הן רשומות למסחר, הן לא תימחקנה מהמסחר בבורסה, וכן תהיינה ניתנות להעברה כיתר אגרות החוב (סדרה א'), בכפוף להוראות שטר הנאמנות ואגרת החוב. יובהר כי לעניין יתרת הערך הנקוב של סדרת אגרות החוב לשם חישוב המניין החוקי כאמור בתוספת השנייה לשטר הנאמנות, לא ייללחו בחשבון אגרות החוב המוחזקות על ידי מחזיק קשור, ובנוסף אגרות החוב כאמור לא תקנה למחזיק קשור זכויות הצבעה.

3.3   לעניין עריכת אסיפת מחזיקי אגרות החוב, המניין החוקי באסיפה ומניין המצביעים באסיפה יחולו הוראות התוספת השנייה לשטר הנאמנות.

3.4   מחזיק קשור ידווח לחברה, ככל שהינו מחויב על-פי דין לעשות כן, על רכישת אגרות חוב (סדרה א') והחברה תמסור לנאמן, על-פי דרישתו, את רשימת המחזיקים הקשורים ואת הכמויות המוחזקות על-ידם בתאריך שיבקש הנאמן וזאת על-פי הדיווחים שהתקבלו כאמור ממחזיקים קשורים ואשר דווחו במערכת המגנ"א על-ידי החברה. מובהר, כי דיווח במערכת המגנ"א יהווה דיווח לנאמן לצרכי סעיף זה.

3.5   אין באמור בסעיף זה לעיל, כשלעצמו, כדי לחייב את החברה או מחזיק קשור או את מחזיקי אגרות החוב (סדרה א') לקנות את אגרות החוב ו/או למכור את אגרות החוב שבידיהם.

4.   **הרחבת סדרת אגרות החוב (סדרה א') והנפקה והקצאה של אגרות חוב וניירות ערך נוספים**

4.1   הרחבת סדרת אגרות החוב (סדרה א')

בכפוף לקבלת אישור הבורסה לרישום למסחר, החברה תהיה רשאית להנפיק, מפעם לפעם, על-פי שיקול דעתה הבלעדי, ללא צורך בקבלת אישור מהנאמן ו/או מהמחזיקים הקיימים באותה עת לרבות למחזיק קשור (כהגדרתו בסעיף 3.2 לשטר זה), בהתאם להוראות כל דין, אגרות חוב (סדרה א') נוספות ("**אגרות החוב הנוספות**") (בין בהצעה פרטית, בין במסגרת תשקיף ו/או תיקון תשקיף, בין על-פי דוח הצעת מדף ובין בכל דרך אחרת), שתנאיהן יהיו זהים לתנאי אגרות החוב שהונפקו מסדרה א' לראשונה, בכל מחיר ובכל אופן כפי שתימצא לנכון.

החברה תפנה לבורסה בבקשה לרשום למסחר את אגרות החוב (סדרה א') הנוספות כאמור, אם וככל שיוצעו.

על אף האמור לעיל, הנפקה נוספת של אגרות חוב (סדרה א') תבוצע בכפוף לכך שיתקיימו כל התנאים המפורטים להלן : (א) הנפקה של אגרות החוב הנוספות כאמור לא תפגע בדירוג אגרות החוב (סדרה א'), כפי שיהיה הדירוג באותו מועד (קרי, הדירוג ערב הרחבת הסדרה). היה ואגרות החוב (סדרה א') תדורגנה על-ידי יותר מחברת דירוג אחת, אז לצרכי סעיף זה ייקבע הדירוג ערב הרחבת הסדרה בהתאם לדירוג הגבוה מבין כלל הדירוגים שנקבעו לאגרות החוב כאמור ; (ב) בהתאם לדוחותיה הכספיים האחרונים שפורסמו טרם מועד הנפקת אגרות החוב הנוספות, במועד הנפקת אגרות החוב הנוספות החברה עומדת בכל התניות הפיננסיות המפורטות בסעיף 5.7 לשטר זה ותמשיך לעמוד בהן לאחר ביצוע ההרחבה כאמור וזאת מבלי לקחת בחשבון את תקופות הריפוי וההמתנה בקשר עם התניות הפיננסיות ; (ג) במועד הנפקת אגרות החוב הנוספות לא מתקיימת עילה להעמדת אגרות החוב לפירעון מיידי ואין חשש לקיומה של עילה כאמור כתוצאה מהנפקת אגרות החוב הנוספות, וזאת מבלי לקחת בחשבון את תקופות הריפוי וההמתנה בקשר עם עילות פירעון מיידי, כלל שרלוונטי ; (ד) החברה עומדת בכל התחייבויותיה המהותיות כלפי מחזיקי אגרות החוב בהתאם להוראות שטר הנאמנות ; ו-(ה) יחס ההלוואה לבטוחה בתאגיד המשועבד אינו עולה על 65%.

בכל מקרה, היקף אגרות החוב (סדרה א') במחזור לא יעלה על 750 מיליון ש"ח ע.נ..

החברה תמסור לנאמן טרם קיום המכרז למשקיעים מסווגים (ככל שיתקיים) או המכרז לציבור, לפי המוקדם, אישור בכתב בחתימת נושא המשרה הבכיר בתחום הכספים בחברה, בנוסח לשביעות רצון הנאמן, בדבר : (1) התקיימותם של כל התנאים האמורים (למעט התנאי המסומן בס"ק (א) לעיל, לגביו

- 10 -

תמציא החברה את אישורה של חברת הדירוג כמפורט להלן) ; (2) כי הנפקת אגרות החוב הנוספות לא תפגע ביכולת הפירעון של החברה את אגרות החוב (סדרה א').

בכל מקרה של הנפקת אגרות החוב הנוספות, הרחבת הסדרה תיעשה בכפוף לקבלת אישור מראש מחברת הדירוג שהגדלת הסדרה כאמור לא תפגע בדירוג אגרות החוב (סדרה א') כפי שיהיה באותה עת (קרי, הדירוג ערב הרחבת הסדרה). אישור חברת הדירוג יפורסם טרם הרחבת הסדרה וכן יצורף לאישור החברה לנאמן כאמור בסעיף זה לעיל. החברה תודיע לנאמן בכתב וכן תפרסם דוח מיידי או תכלול את הגילוי שלהלן בדוח הצעת המדף, עוד קודם לביצוע הנפקת אגרות החוב הנוספות, אם הנפקת אגרות החוב הנוספות עומדת (או לא עומדת, לפי העניין) בתנאים האמורים לעיל וכן כי דירקטוריון החברה בחן את השפעת הרחבת הסדרה כאמור על יכולתה של החברה לעמוד במלוא התחייבויותיה למחזיקי אגרות החוב (סדרה א') קודם לביצוע ההנפקה כאמור.

אין בזכות זאת של החברה, כדי לפטור את הנאמן מלבחון את ההנפקה כאמור, ככל שחובה כזו מוטלת על הנאמן על-פי דין, ואין בה כדי לגרוע מזכויותיו של הנאמן ושל מחזיקי אגרות החוב לפי שטר זה, לרבות מזכותם להעמיד לפירעון מיידי את אגרות החוב, כאמור בסעיף 8 לשטר זה.

ככל שידרש בהתאם להנחיות עורך הדין האמריקאי, יתוקנו במקרה של הרחבת הסדרה השעבודים על-פי שטר זה באופן שיבטיח גם את הסדרה המוגדלת ותמורת ההנפקה לא תועבר לחברה עד תיקון מסמכי השעבוד הרלוונטיים לשביעות רצון הנאמן. לפרטים ראה גם סעיף 6.3.5 לשטר זה.

כפוף להוראות שטר הנאמנות, הנאמן יכהן כנאמן עבור אגרות החוב (סדרה א'), כפי שתתהיינה מעת לעת במחזור, וזאת גם במקרה של הרחבת סדרה, והסכמת הנאמן לכהונתו כנאמן לסדרה המורחבת לא תידרש. אגרות החוב (סדרה א') שתתהיינה במחזור ערב הרחבת הסדרה ואגרות חוב (סדרה א') נוספות, אשר תונפקנה (אם בכלל) כאמור בסעיף זה לעיל, תהוונה (ממועד הנפקתן) סדרה אחת לכל דבר ועניין, ושטר הנאמנות יחול גם לגבי כל אגרות החוב (סדרה א') הנוספות כאמור שתונפקנה על-ידי החברה. אגרות החוב הנוספות לא תקנינה זכות לתשלום קרן ו/או ריבית בגין אגרות החוב (סדרה א') שהמועד הקובע לתשלומו חל קודם למועד הנפקתן. במקרה של הרחבת סדרה כאמור, תחולנה השלכות המס, לרבות בקשר עם חישוב שיעור הניכיון, ככל שיידרש, כמפורט בדוח ההצעה ובהתאם להוראות כל דין כפי שיהיו במועד ההנפקה של אגרות החוב הנוספות.

### 4.2   <u>הנפקה והקצאה של אגרות חוב וניירות ערך נוספים</u>

מבלי לגרוע מכלליות האמור לעיל, החברה שומרת לעצמה את הזכות, בכפוף להוראות כל דין, להנפיק בכל עת ומעת לעת (בין בהצעה פרטית, בין במסגרת תשקיף, בין על-פי דוח הצעת מדף ובין בכל דרך אחרת) ומבלי להידרש להסכמת מחזיקי אגרות החוב (סדרה א') ו/או להסכמת הנאמן, לפי העניין, ולרבות למחזיק קשור (כהגדרתו בסעיף 3.2 לשטר זה), סדרות נוספות של אגרות חוב ו/או ניירות ערך נוספים, כפי שהחברה תמצא לנכון וזאת מבלי לפגוע בחובת הפירעון המוטלת על החברה מכוח שטר זה. כמו כן, ככל שהחברה תנפיק סדרת אגרות חוב נוספת או ניירות ערך אחרים שהינם חוב וסדרה נוספת זו או ניירות ערך שהינם חוב אלו, לפי העניין, לא תהיה מגובה בבטחונות (וכל עוד אינה מגובה בבטחונות), זכויות הסדרה הנוספת או ניירות הערך שהינם חוב, לפי העניין, בפירוק לא תהיינה עדיפות על זו של אגרות החוב (סדרה א'). מובהר, כי ככל שהחברה תנפיק סדרת אגרות חוב נוספת או ניירות ערך אחרים שהינם חוב וסדרה נוספת זו או ניירות ערך שהינם חוב, לפי העניין, תהיה מגובה בבטחונות, זכויות הסדרה הנוספת בפירוק תהיינה עדיפות על זו של אגרות החוב (סדרה א') רק ביחס לאותם בטחונות.

על אף האמור, החברה מתחייבת כי כל עוד אגרות החוב (סדרה א') לא נפרעו במלואן, היא לא תנפיק בעצמה אגרות חוב מחוץ לישראל ולא תיטול בעצמה חוב אחר, מחוץ לישראל. על אף האמור לעיל, החברה תהיה רשאית ליטול מסגרות אשראי מבנקים בישראל ו/או בארה"ב בלבד לצורך גידור מטבע וזאת כנגד שעבודי Non-recourse בלבד, כמפורט בסעיף 5.11 לשטר זה, וכן להעמיד ערבויות והתחייבויות מקובלות אחרות כבעלת חברות נכס בארה"ב.

- 11 -

מבלי לגרוע מהאמור לעיל אין בזכויות האמורות של החברה, כדי למעט מזכות הנאמן מלבחון את השלכות ההנפקה כאמור, ואין בה כדי לגרוע מזכויות הנאמן ו/או מחזיקי אגרות החוב לפי שטר זה, לרבות מזכותם להעמיד לפירעון מיידי את אגרות החוב (סדרה א') , כאמור בסעיף 8 לשטר זה.

בכפוף להוראות כל דין, החברה תודיע לנאמן, אודות הנפקת אגרות החוב וניירות הערך הנוספים כאמור עובר לביצוע ההנפקה ותעביר אליו כל דיווח שתוציא בקשר לעניין זה על פי כל דין.

על אף האמור, בסעיף 4.2 זה לעיל, הנפקת סדרה נוספת או ניירות ערך אחרים שהינם חוב (**"ההנפקה האחרת"**) תהא כפופה לקבלת אישור הבורסה ולהתקיימות כל התנאים המפורטים להלן : (א) ההנפקה האחרת כאמור לא תפגע בדירוג אגרות החוב (סדרה א') כפי שיהיה דירוגן באותו מועד (קרי, הדירוג ערב ההנפקה האחרת). אישור חברת הדירוג לכך שההנפקה האחרת לא תפגע בדירוג איגרות החוב (סדרה א') יפורסם על-ידי החברה טרם ביצוע ההנפקה האחרת ; (ב) במועד ההנפקה האחרת, בהתאם לדוחותיה הכספיים האחרונים שפורסמו טרם מועד ההנפקה האחרת, ולאחר ביצוע ההנפקה האחרת, החברה תעמוד בכל התניות הפיננסיות המפורטות בסעיף 5.7 לשטר זה וזאת מבלי לקחת בחשבון את תקופות הריפוי וההמתנה ; (ג) לא מתקיימת עילה להעמדה לפירעון מיידי כמפורט בסעיף 8.1 לשטר זה וזאת מבלי לקחת בחשבון את תקופות הריפוי וההמתנה (ככל שרלוונטי). החברה תמסור לנאמן אישור בכתב בחתימת נושא המשרה הבכיר בתחום הכספים בחברה, בצירוף תחשיב ביחס לתנאי הקבוע בסעיף 4.2 זה לעיל, בדבר התקיימותם של כל התנאים האמורים טרם ביצוע מכרז לקבלת התחייבות מוקדמת ממשקיעים מסווגים (ככל שיתקיים מכרז כאמור בהתאם לשיקול דעתה הבלעדי של החברה) ובכל מקרה טרם ביצוע ההנפקה האחרת והכל לשביעות רצון הנאמן.

5. **התחייבויות החברה**

5.1 <u>התחייבות לביצוע תשלומים ולמלא אחר תנאים</u>

החברה מתחייבת בזה לשלם, במועדים הקבועים לכך, את כל סכומי הקרן והריבית (כל תוספת ריבית שהיא בהתאם להוראות שטר זה וכן ריבית פיגורים, ככל שתחול) אשר ישתלמו על-פי תנאי אגרות החוב (סדרה א') . החברה אינה יכולה להתנות בכל דרך שהיא על התחייבויותיה כאמור לעיל בסעיף זה. במקרה של סתירה בין האמור לעיל בסעיף זה לכל התחייבות נוגדת של החברה על פי שטר זה, יגבר האמור בסעיף זה.

כן מתחייבת החברה למלא אחר כל יתר התנאים וההתחייבויות המוטלים עליה על-פי תנאי אגרות החוב (סדרה א') ועל-פי שטר זה. בכל מקרה שבו מועד תשלום על חשבון סכום קרן ו/או ריבית יחול ביום שאינו יום עסקים, יידחה מועד התשלום ליום העסקים הראשון הבא אחריו, ללא כל תוספת תשלום והיום הקובע לצורך קביעת הזכאות לפדיון או ריבית לא ישתנה בשל כך.

5.2 <u>התאמת שיעור הריבית בגין שינוי בדירוג אגרות החוב (סדרה א')</u>

לעניין סעיף זה :

יובהר, כי היה ואגרות החוב (סדרה א') תהיינה מדורגות על-ידי יותר מחברת דירוג אחת, בחינת הדירוג לצורך התאמת שיעור הריבית לשינוי בדירוג (אם וככל שיהא שינוי כאמור) תיעשה, בכל עת, על-פי הדירוג הנמוך מביניהם.

שיעור הריבית שתישאנה אגרות החוב (סדרה א') , יותאם בגין שינוי בדירוג של אגרות החוב (סדרה א') , כמפורט להלן בסעיף זה :

> **יובהר, כי אם וככל שתידרש התאמה של ריבית בהתאם למנגנון המתואר בסעיף זה לעיל ולהלן וכן על-פי המנגנון המתואר בסעיף 5.3 לשטר זה, אזי בכל מקרה (למעט במקרה שקמה זכאות לריבית פיגורים בהתאם לסעיף 3.4 לתנאים הרשומים מעבר לדף, שתתווסף בכל מקרה בו החברה תידרש לשלמה ללא תלות בשיעור הריבית אותו נושאות אגרות החוב באותו המועד) השיעור המצטבר המקסימאלי של הריבית הנוספת, לא יעלה על 2% מעל שיעור הריבית השנתית של אגרות החוב (סדרה א') ("מגבלת עליית הריבית המקסימלית").**

- 12 -

לעניין זה :

**"שיעור הריבית הנוסף"** - שיעור של 0.25% לשנה בגין כל ירידה של דרגה אחת (Notch) מתחת לדירוג הבסיס, והכל עד לתוספת מקסימלית של 1.5% לריבית השנתית לכל היותר (בסעיף 5.2 זה : **"מגבלת שיעור הריבית הנוסף"**).

א. ככל שדירוג אגרות החוב (סדרה א') על-ידי חברת הדירוג (במקרה של החלפת חברת דירוג, תעביר החברה לידי הנאמן השוואה בין סולם הדירוג של חברת הדירוג המוחלפת לבין סולם הדירוג של חברת הדירוג החדשה) יעודכן במהלך תקופת ריבית כלשהי, כך שהדירוג שייקבע לאגרות החוב (סדרה א') יהיה נמוך בדרגה אחת (Notch) או יותר (בסעיף 5.2 זה : **"הדירוג המופחת"**) מדירוג הבסיס, יעלה שיעור הריבית השנתית שתישא יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה א'), בשיעור הריבית הנוסף, בכפוף למגבלת שיעור הריבית הנוסף, וזאת בגין התקופה שתתחיל ממועד פרסום הדירוג החדש על-ידי חברת הדירוג ועד לפירעון מלא של יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה א'), וזאת בכפוף לשינוי בשיעור הריבית בהתאם להוראות סעיף 5.3 לשטר זה. הועלה שיעור הריבית קודם לכן בגין חריגה מאמות מידה פיננסיות כאמור בסעיף 5.3 לשטר זה, אזי עליית שיעור הריבית בגין ירידת דירוג כאמור תוגבל בהתאם למגבלת עליית הריבית המקסימלית.

ב. לא יאוחר מתום יום עסקים אחד מקבלת הודעת חברת הדירוג בדבר הורדת דירוג אגרות החוב (סדרה א') לדירוג המופחת, תפרסם החברה דוח מיידי, בו תציין החברה : (א) את דבר הורדת הדירוג, את הדירוג המופחת, את דוח הדירוג ואת מועד תחילת דירוג אגרות החוב (סדרה א') בדירוג המופחת (בסעיף 5.2 זה : **"מועד הורדת הדירוג"**) ; (ב) עמידתה או אי עמידתה באמות המידה הפיננסיות המפורטות בסעיף 5.3 לשטר זה, בהתאם לנתוני הדוח הכספי המאוחד האחרון (סקור או מבוקר, לפי העניין) של החברה שפורסם לפני מועד הדוח המיידי האמור וכן האם חל שינוי בריבית בגין עמידתה או אי עמידתה באמות המידה הפיננסיות כאמור ; (ג) את שיעור הריבית המדויקת שתישא יתרת קרן אגרות החוב (סדרה א') לתקופה שמתחילת תקופת הריבית הנוכחית ועד למועד הורדת הדירוג (שיעור הריבית יחושב לפי 365 ימים בשנה) (בסעיף 5.2 זה : **"ריבית המקור"** ו-**"תקופת ריבית המקור"**, בהתאמה) ; (ד) את שיעור הריבית שתישא יתרת קרן אגרות החוב (סדרה א') החל ממועד הורדת הדירוג ועד מועד תשלום הריבית הקרוב בפועל, דהיינו : ריבית המקור בתוספת שיעור הריבית הנוסף לשנה (שיעור הריבית יחושב לפי 365 ימים בשנה) (בסעיף 5.2 זה : **"הריבית המעודכנת"**), וזאת בכפוף למגבלת עליית הריבית המקסימלית ולמגבלת שיעור הריבית הנוסף ; (ה) את שיעור הריבית המשוקללת שתשלם החברה למחזיקי אגרות החוב (סדרה א') במועד תשלום הריבית הקרוב, הנובעת מן האמור בס"ק (ג) ו-(ד) לעיל ; (ו) את שיעור הריבית השנתית המשתקפת משיעור הריבית המשוקללת ; ו-(ז) את שיעור הריבית השנתית ואת שיעור הריבית החצי שנתית (הריבית החצי שנתית תחושב כריבית השנתית חלקי שניים) לתקופות הבאות.

ג. היה ומועד תחילת דירוג אגרות החוב (סדרה א') בדירוג המופחת יחול במהלך הימים שתחילתם ארבעה (4) ימים לפני המועד הקובע לתשלום ריבית כלשהו וסיומם במועד תשלום הריבית הקרוב למועד הקובע האמור (בסעיף 5.2 זה : **"תקופת הדחייה"**), תשלם החברה למחזיקי אגרות החוב (סדרה א'), במועד תשלום הריבית הקרוב, את ריבית המקור בלבד, כאשר, שיעור הריבית הנובע מתוספת הריבית בשיעור השווה לשיעור הריבית הנוסף לשנה במשך תקופת הדחייה (מחושב על-פי 365 ימים בשנה), ישולם במועד תשלום הריבית הבא, והכל בכפוף למגבלת עליית הריבית המקסימלית ולמגבלת שיעור הריבית הנוסף. החברה תודיע בדוח מיידי את שיעור הריבית המדויק לתשלום במועד תשלום הריבית הבא.

ד. במקרה של עדכון הדירוג של אגרות החוב (סדרה א') על-ידי חברת הדירוג, באופן שישפיע על שיעור הריבית שתישאנה אגרות החוב (סדרה א') כאמור בס"ק (א) לעיל או (ה) להלן, תודיע החברה על כך לנאמן בכתב תוך יום עסקים אחד ממועד פרסום הדוח המיידי כאמור.

ה. יובהר, כי במקרה שלאחר הורדת הדירוג באופן שהשפיע על שיעור הריבית שתישאנה אגרות החוב (סדרה א') כאמור בס"ק (א) לעיל, תעדכן חברת הדירוג את הדירוג לאגרות החוב (סדרה

- 13 -

א') כלפי מעלה, יופחת שיעור הריבית השנתית שתישא הקרן הבלתי מסולקת של אגרות החוב (סדרה א'), במועד התשלום הרלוונטי של הריבית, בשיעור הריבית הנוסף או בחלקו, בהתאם למדרגות שנקבעו כאמור בס"ק (א) לעיל, וזאת בגין התקופה בה אגרות החוב (סדרה א') דורגו בדירוג הגבוה בלבד, כך ששיעור הריבית שתישא היתרה הבלתי מסולקת של קרן אגרות החוב (סדרה א'), ככל שדירוג אגרות החוב יעמוד על דירוג הבסיס, יהיה שיעור הריבית שנקבע בהודעה המשלימה, ללא כל תוספת בגין הורדת דירוג קודמת כאמור בסעיף 5.2 זה (אך בכפוף להוראות סעיף 5.3 לשטר זה). מובהר, כי בכל מקרה, לא יפחת שיעור הריבית השנתית שתישאנה אגרות החוב משיעור הריבית שנקבע בהודעה המשלימה. במקרה כאמור תפעל החברה בהתאם לאמור בס"ק (ב) עד (ד) לעיל, בשינויים המחויבים הנובעים מהדירוג הגבוה במקום הדירוג המופחת. יודגש כי ככל שדירוג אגרות החוב יעלה על דירוג הבסיס לא תהא בכך כל השפעה על הריבית אותה נושאות אגרות החוב באותה העת.

ו.    ככל שאגרות החוב (סדרה א') תפסקנה להיות מדורגות מסיבה התלויה בחברה (כך לדוגמה, אך לא רק, בשל אי קיום התחייבויות של החברה כלפי חברת הדירוג, לרבות בשל אי מתן תשלומים ו/או דיווחים להם התחייבה החברה כלפי חברת הדירוג) לתקופה העולה על עשרים ואחד (21) ימים, לפני פירעונן הסופי, תיחשב הפסקת הדירוג כהורדת דירוג מתחת לדירוג הבסיס באופן ששיעור הריבית הנוסף יסתכם ב-1.5% (גם אם הועלה שיעור הריבית בהתאם לס"ק (א) לעיל עובר לאותו מועד) ו/או אם שיעור הריבית הועלה קודם לכן בגין חריגה מאמות המידה הפיננסיות כאמור בסעיף 5.3 לשטר זה (אך בכפוף למגבלת עליית הריבית המקסימלית), והוראות ס"ק (ב) עד (ה) לעיל יחולו בהתאם, וזאת מבלי לגרוע מהאמור בס"ק 8.1.26 לשטר זה. תוספת הריבית תשולם מהמועד בו הופסק הדירוג על-ידי החברה. למען הסר ספק יובהר, כי היה ואגרות החוב (סדרה א') יפסיקו להיות מדורגות, לפני פירעונן הסופי, מסיבה שאינה תלויה בחברה, הדבר לא ישפיע על שיעור הריבית כאמור בס"ק (א) לעיל והוראות סעיף 5.2 זה לא יחולו.

ז.    במקרה בו תוחלף חברת הדירוג או שאגרות החוב (סדרה א') תפסקנה להיות מדורגות על-ידי חברת דירוג, תפרסם החברה דוח מיידי, בתוך יום מסחר אחד ממועד השינוי ובו תודיע החברה על נסיבות החלפת חברת הדירוג או הפסקת הדירוג, לפי העניין.

ח.    למען הסר ספק, מובהר כי: (1) שינוי אופק הדירוג של אגרות החוב (סדרה א') ו/או הורדת הדירוג או העלאת הדירוג בגין אגרות החוב (סדרה א'), המבוצעת במסגרת עדכון דירוג לכל החברות בכלל ו/או לכל החברות בישראל העוסקות בתחום הפעילות של החברה בפרט, כתוצאה משינוי המתודולוגיה של חברת הדירוג בלבד, לא יגרור שינוי בשיעור הריבית שתישאנה אגרות החוב (סדרה א') כאמור בסעיף זה לעיל; (2) ככל שאגרות החוב (סדרה א') תהיינה מדורגות במועד כלשהו על-ידי יותר מחברת דירוג אחת וכל עוד הן תהיינה מדורגות על-ידי יותר מחברת דירוג אחת כאמור, ס"ק (ו) לעיל לא יחול, אלא במקרה שבו כל חברות הדירוג גם יחד יפסיקו לדרג את אגרות החוב (סדרה א') ובחינת הדירוג לצורך התאמת שיעור הריבית לשינוי בדירוג (אם וככל שיהא שינוי כאמור) תיעשה, בכל עת, על-פי הדירוג הנמוך ביניהם.

ט.    ככל שלפני מועד הורדת הדירוג חלה עלייה בשיעור הריבית בגין חריגה מאחת או יותר מאמות המידה הפיננסיות על-פי המנגנון המפורט בסעיף 5.3 לשטר זה, השינוי שיחול בשיעור הריבית בגין מנגנון ההתאמה המפורט בסעיף 5.2 זה לעיל יוגבל על-פי מגבלת עליית הריבית המקסימלית.

5.3    <u>התאמת שיעור הריבית כתוצאה מאי עמידת החברה באמות מידה פיננסיות</u>

5.3.1    שיעור הריבית שתישאנה אגרות החוב (סדרה א') יותאם אם החברה תחרוג מאיזו מאמות המידה הפיננסיות המפורטות להלן:

א.    ההון העצמי לא יפחת מ-120 מיליון דולר (סכום זה לא יוצמד לבסיס הצמדה כלשהו);

- 14 -

ב.   יחס החוב הפיננסי נטו מתואם ל-CAP נטו לא יעלה על 70%;

ג.   יחס החוב הפיננסי נטו מתואם ל-EBITDA מתואם לא יעלה על 15;

ד.   יחס ההלוואה לבטוחה בתאגיד המשועבד לא יעלה על 72.5%;

ה.   תשואת החוב של הנכסים המשועבדים לא תפחת מ-8.5%.

בסעיפים 5.3.1(א) עד (ה) לעיל ולהלן תקרא כל אחת מאמות המידה הפיננסיות דלעיל: **"אמת מידה פיננסית"** וביחד **"אמות המידה הפיננסיות"**.

לעניין סעיף 5.3 זה:

> יובהר כי אם וככל שתידרש התאמה של ריבית בהתאם למנגנון המתואר בסעיף זה לעיל ולהלן וכן על-פי המנגנון המתואר בסעיף 5.2 לשטר זה, אזי בכל מקרה (למעט במקרה שקמה זכאות לריבית פיגורים בהתאם לסעיף 3.4 לתנאים הרשומים מעבר לדף) השיעור המצטבר המקסימאלי של הריבית הנוספת, לא יעלה על מגבלת עליית הריבית המקסימלית (כהגדרת מונח זה בסעיף 5.2 לשטר).

לעניין זה:

**"שיעור הריבית הנוסף"** – שיעור של 0.5% בגין חריגה מכל אחת מאמות המידה הפיננסיות (ולגבי חריגה מאמת המידה הפיננסית הקבועה בס"ק ד – 0.75%) עד לתוספת מקסימלית של 1.5% לריבית השנתית לכל היותר. מובהר, כי העלאת שיעור הריבית תיעשה רק פעם אחת בגין חריגה מאמת מידה פיננסית, ככל שתהא חריגה כאמור, ושיעור הריבית לא יועלה פעם נוספת במקרה שהחריגה באותה אמת מידה פיננסית תימשך.

**"מועד החריגה"** - מועד פרסום הדוחות הכספיים אשר מצביעים על החריגה. יובהר, כי במסגרת בחינת אמות המידה הפיננסיות לפי סעיף 5.3 זה לעיל ינוטרלו השפעות שווי הוגן של עסקאות גידור מטבע מהם תהיה קשורה החברה במועד הבדיקה הרלוונטי בפרט והשפעות שער חליפין בכלל.

5.3.2.   ככל שתחרוג החברה מאמת מידה פיננסית על-פי דוחותיה הכספיים המאוחדים של החברה הסקורים או המבוקרים (בסעיף 5.3 זה: **"החריגה"**), יעלה שיעור הריבית השנתית שתישא יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה א'), בשיעור הריבית הנוסף בגין החריגה, מעל שיעור הריבית, אותו נושאות אגרות החוב (סדרה א') כפי שיהיה באותה עת, טרם השינוי, וזאת בגין התקופה שתתחיל ממועד החריגה ועד לפירעון מלא של יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה א') או עד למועד פרסום דוחות כספיים של החברה לפיהם החברה עומדת באמת המידה הפיננסית, לפי המוקדם, והכל בכפוף למגבלת שיעור הריבית הנוסף.

5.3.3.   היה ותתקיים חריגה כאמור, לא יאוחר מתום יום עסקים אחד מפרסום דוחותיה הכספיים של החברה, מבוקרים או סקורים (לפי העניין) תפרסם החברה דוח מיידי, בו תציין החברה: (א) את אי העמידה בהתחייבות האמורה, תוך פירוט אמות המידה הפיננסיות במועד הדוח הכספי; (ב) את הדירוג העדכני של אגרות החוב (סדרה א') על-פי דוח הדירוג האחרון שפורסם לפני מועד הדוח המיידי; (ג) את שיעור הריבית המדויקת שתישא קרן אגרות החוב (סדרה א') לתקופה שמתחילת תקופת הריבית הנוכחית ועד למועד החריגה (שיעור הריבית יחושב לפי 365 ימים בשנה) (בסעיף 5.3 זה: **"ריבית המקור"** ו-**"תקופת ריבית המקור"**, בהתאמה); (ד) את שיעור הריבית שתישא יתרת קרן אגרות החוב (סדרה א') החל ממועד החריגה ועד מועד תשלום הריבית הקרוב בפועל, דהיינו: ריבית המקור בתוספת שיעור הריבית הנוסף לשנה (שיעור הריבית יחושב לפי 365 ימים בשנה) (בסעיף 5.3 זה: **"הריבית המעודכנת"**), וזאת בכפוף למגבלת שיעור הריבית הנוסף; (ה) את שיעור הריבית המשוקללת שתשלם החברה למחזיקי אגרות החוב (סדרה א') במועד תשלום הריבית הקרוב, הנובעת מן האמור בס"ק (ב) ו-(ג) לעיל; (ו) את שיעור הריבית השנתית המשתקפת משיעור הריבית המשוקללת; ו-(ז) את שיעור הריבית

- 15 -

השנתית ואת שיעור הריבית החצי שנתית (הריבית החצי שנתית תחושב כריבית השנתית חלקי שניים) לתקופות הבאות.

5.3.4. היה ומועד החריגה יחול במהלך הימים שתחילתם ארבעה (4) ימים לפני המועד הקובע לתשלום ריבית כלשהו וסיומם במועד תשלום הריבית הקרוב למועד הקובע האמור (בסעיף 5.3 זה: **"תקופת הדחייה"**), תשלם החברה למחזיקי אגרות החוב (סדרה א'), במועד תשלום הריבית הקרוב, את ריבית המקור בלבד, כאשר שיעור הריבית הנובע מתוספת הריבית בשיעור השווה לשיעור הריבית הנוסף לשנה במשך תקופת הדחייה (מחושב על בסיס 365 ימים בשנה), ישולם במועד תשלום הריבית הבא, והכל בכפוף למגבלת שיעור הריבית הנוסף. החברה תודיע בדוח מיידי את שיעור הריבית המדויק לתשלום במועד תשלום הריבית הבא.

5.3.5. במקרה של חריגה מאמת מידה פיננסית, באופן שישפיע על שיעור הריבית שתישאנה אגרות החוב (סדרה א'), תודיע החברה על כך לנאמן בכתב תוך יום עסקים אחד ממועד פרסום הדוחות הכספיים כאמור.

5.3.6. מובהר, למען הסר ספק, כי במקרה שלאחר החריגה, תפרסם החברה את דוחותיה הכספיים, מבוקרים או סקורים (לפי העניין), ועל-פיהם תעמוד החברה באמת המידה הפיננסית האמורה, אזי תבוטל עליית הריבית השנתית בגין החריגה מאמת המידה הפיננסית האמורה באופן ששיעור הריבית השנתית שיישאו אגרות החוב יקטן בשיעור של 0.5%, וזאת בגין התקופה בה החברה עמדה באמת המידה הפיננסית, אשר תחילתה במועד פרסום הדוחות הכספיים אשר מצביעים על עמידה באמת המידה הפיננסית, וזאת מבלי לגרוע מהוראות סעיף 5.3 זה במקרה של חריגה נוספת מאותה אמת מידה פיננסית בעתיד. במקרה כאמור תפעל החברה בהתאם לאמור בסעיפים 5.3.3 עד 5.3.5 לעיל, בשינויים המחויבים, לפי העניין, הנובעים מעמידת החברה באותה אמת מידה פיננסית. מובהר, כי בכל מקרה, לא יפחת שיעור הריבית השנתית שתישאנה אגרות החוב משיעור הריבית שיקבע בהודעה המשלימה.

5.3.7. הבדיקה בדבר עמידת החברה בכל אחת מאמות המידה הפיננסיות תתבצע ביום פרסום הדוחות הכספיים על-ידי החברה וכל עוד אגרות חוב (סדרה א') קיימות במחזור, ביחס לדוחות הכספיים הרבעוניים/השנתיים שהיה על החברה לפרסם עד לאותו מועד.

החברה תפרט במסגרת דוח הדירקטוריון הרבעוני או השנתי, לפי העניין, את עמידתה או אי עמידתה בכל אחת מאמות המידה הפיננסיות.

למען הסר ספק יובהר, כי בכפוף לאמור לעיל ולמגבלת שיעור הריבית הנוסף, תשלומי הריבית הנוספת כתוצאה מהורדת דירוג כאמור בסעיף 5.2 לשטר זה ו/או כתוצאה מאי עמידת החברה באמות המידה הפיננסיות כאמור בסעיף 5.3 זה לעיל, הינם מצטברים.

במקרה ותחול ירידה בדירוג וכן תחרוג החברה מאמת מידה פיננסית, אחת או יותר, יהיו זכאים מחזיקי אגרות החוב (סדרה א') לעלייה בשיעור הריבית בהתאם לאמור לעיל ובלבד ששיעור הריבית הנוסף לא יעלה על מגבלת עליית הריבית המקסימלית.

5.4. <u>דירוג אגרות החוב</u>

החברה מתחייבת לפעול לכך, כי ככל שהדבר בשליטתה, אגרות החוב (סדרה א') תהיינה מדורגות על-ידי חברת הדירוג במשך כל תקופת אגרות החוב (סדרה א') ולצורך כך החברה מתחייבת, בין היתר, לשלם לחברת הדירוג את התשלומים אותם התחייבה לשלם לחברת הדירוג ולמסור לחברת הדירוג את הדיווחים והמידע הנדרשים על-ידה במסגרת ההתקשרות בין החברה לבין חברת הדירוג. לעניין זה, בין היתר, יראו את אי ביצוע של התשלומים שהתחייבה החברה לשלם לחברת הדירוג ואת אי מסירת הדיווחים הנדרשים על-ידי חברת הדירוג במסגרת ההתקשרות בין החברה לחברת הדירוג, כסיבות ונסיבות שהינן בשליטת החברה.

- 16 -

החברה איננה מתחייבת שלא להחליף את חברת הדירוג או שלא לסיים התקשרות עמה במשך
תקופת אגרות החוב (סדרה א'). במקרה בו החברה תחליף את חברת הדירוג או תפסיק את עבודתה
של חברת הדירוג, גם במקרה בו אגרות החוב מדורגות על-ידי למעלה מחברת דירוג אחת, מתחייבת
החברה כי תפרסם בדיווח מיידי ותודיע על כך לנאמן ולמחזיקי אגרות החוב ותציין בהודעה את
הסיבות לכך, וכל זאת לא יאוחר מיום מסחר אחד ממועד ההחלפה כאמור ו/או ממועד ההחלטה
על הפסקת עבודתה של חברת הדירוג, לפי המוקדם. מובהר, כי אין באמור לעיל כדי לגרוע מזכותה
של החברה להחליף בכל עת חברת דירוג או להפסיק את עבודתה של חברת הדירוג (במקרה בו אינה
חברת דירוג יחידה), לפי שיקול דעתה הבלעדי ומכל סיבה שתמצא לנכון.

במקרה של הפסקת דירוג עקב סיבות ו/או נסיבות שהינן בשליטת החברה יחולו הוראות סעיף
8.1.26 לשטר זה.

כן מובהר כי הפסקת דירוג עקב סיבות ו/או נסיבות שאינן בשליטת החברה לא תחשב כהפרה של
החברה ולא תקנה למחזיקי אגרות החוב, כשלעצמה, עילה להעמדת אגרות החוב לפירעון מיידי
וזאת מבלי לגרוע מעילות אחרות אם וככל שיהיו. אין באמור כדי לגרוע מזכותם של מחזיקי אגרות
החוב לתוספת ריבית במקרה של הפסקת דירוג מסיבה התלויה בחברה כאמור בסעיף 5.2(ו) לשטר
זה.

5.5. <u>מגבלות על ביצוע חלוקה</u>

החברה מתחייבת, כי עד לסילוק המלא, הסופי והמדויק של החוב על פי תנאי אגרות החוב היא לא
תבצע חלוקה כלשהי (כמשמעה בחוק החברות), ובכלל זה לא תכריז, תשלם או תחלק כל דיבידנד
וכן לא תבצע פעולות דומות לפי הדין החל על החברה אשר תוצאתן הפחתת הון בחברה (**"חלוקה"**),
אלא אם מתקיימים כל התנאים המפורטים להלן בסעיף 5.5 זה:[1]

(1) סכום החלוקה לא יעלה על 75% מהרווח הנקי בדוחות הכספיים בגין התקופה שתחל מיום 1
ביולי 2025 (בסעיף זה : **"המועד הקובע"**) בתוספת פחת והפחתות, ובנטרול הפסדי/רווחי שערוך
נטו (שטרם מומשו) הנובעים משינוי בשווויים ההוגן של נכסי החברה ביחס לשווים ההוגן ליום
30 ביוני 2025 או למועד בו נרכשו הנכסים, לפי המאוחר מביניהם (**"רווחי/הפסדי שערוך"**)
ובנטרול רווחי/הפסדי שערי חליפין. מסכום זה יופחתו 50 מיליון דולר (סכום אשר משולם
לבעלי השליטה כנגד העברת הזכויות המועברות לחברה, כמתואר בסעיף 7.1.6 לתשקיף)
(**"הרווחים הניתנים לחלוקה"**). מובהר כי הרווחים הניתנים לחלוקה אשר לא בוצעה על
בסיס חלוקה ברבעון מסוים יצטברו לרבעונים הבאים ;

(2) ההון העצמי, בטרם החלוקה ולאחריה, בניכוי הדיבידנד שיחולק, לא יפחת מ-180 מיליון דולר
(סכום זה לא יוצמד לבסיס הצמדה כלשהו) ;

(3) יחס החוב הפיננסי נטו מתואם ל-CAP נטו, בטרם החלוקה ולאחריה, לא יעלה על 68% ;

(4) יחס החוב הפיננסי נטו מתואם ל-EBITDA מתואם, בטרם החלוקה ולאחריה לא יעלה על 12 ;

(5) יחס ההלוואה לבטוחה בתאגיד המשועבד, בטרם החלוקה ולאחריה, לא יעלה על 72.5% ;

(6) תשואת החוב של הנכסים המשועבדים, בטרם החלוקה ולאחריה, לא תפחת מ-9% ;

(7) במועד החלטת הדירקטוריון על החלוקה ועל-פי הדוחות הכספיים, לא מתקיימים בחברה
"סימני אזהרה" כהגדרתם בתקנה 10(ב)(14) לתקנות הדוחות ;

(8) במועד החלטת הדירקטוריון על החלוקה או כתוצאה ממנה לא מתקיימת איזה מעילות
ההעמדה לפירעון מיידי הקבועות בסעיף 8.1 לשטר זה (מבלי להתחשב בתקופות ריפוי
והמתנה) ;

---

[1] יצוין, כי המגבלות כאמור לא יחולו על חלוקה בסך של 50 מיליון דולר, כפי שאושרה על-ידי דירקטוריון החברה עובר למועד פרסום
התשקיף. לפרטים ראה סעיף 7.4.2 לתשקיף.

- 17 -

(9)  החברה עומדת בכל התחייבויותיה המהותיות למחזיקי אגרות החוב בהתאם להוראות שטר זה.

יובהר, כי במסגרת בחינת המגבלות האמורות בסעיפים (4) ו-(5) לעיל ינוטרלו השפעות שווי הוגן של עסקאות גידור מטבע בהם תהיה קשורה החברה במועד הבדיקה הרלוונטי בכל ושינויי שער חליפין בפרט.

החברה תעביר לידי הנאמן בתוך שני (2) ימי עסקים לאחר אישור החלוקה על-ידי דירקטוריון החברה וטרם ביצוע החלוקה, אישור בכתב מאת נושא המשרה הבכיר בחברה בתחום הכספים בדבר עמידת החברה בכל מגבלות החלוקה המפורטות לעיל, לרבות פירוט החישוב הרלוונטי, והכל בנוסח לשביעות רצון הנאמן. הנאמן יהיה רשאי להסתמך על אישור החברה ולא יידרש לבצע בדיקות נוספות מטעמו. החברה תפרט במסגרת דוחות הדירקטוריון הרבעוניים והשנתיים את סך הרווחים הניתנים לחלוקה (כהגדרתם לעיל) נכון לאותו מועד. בנוסף לאמור, החברה תדווח על הכוונה לבצע חלוקה בדיווח מיידי לפחות 14 ימים לפני ביצוע החלוקה בפועל ותציין, בין היתר, את עמידתה במגבלות שטר הנאמנות לשם ביצוע החלוקה כמפורט בסעיף זה לעיל.

יצוין, כי נכון למועד החתימה על שטר זה לא חלה על החברה כל מגבלה שהיא ביחס לחלוקה או רכישה עצמית של מניותיה, למעט כמפורט בסעיף 5.5 זה לעיל.

5.6.    מינוי נציג לחברה בישראל

5.6.1.  עד למועד הסילוק המלא בפועל, הסופי והמדויק של אגרות החוב (סדרה א') על-פי תנאי שטר נאמנות זה כלפי מחזיקי אגרות החוב, החברה מתחייבת כי יהיה לה נציג מטעמה בישראל, אליו ניתן יהיה להמציא בכל הקשור לשטר זה כתבי בי-דין לחברה ו/או לנושאי המשרה בה ו/או לבעלי השליטה בה חלף המצאתם בכתובת החברה בחו"ל המפורטת במבוא לשטר זה. יצוין, כי ההמצאה לנציג כאמור תחשב כהמצאה לחברות הנכס וכן לתאגיד המשועבד, לחברות התפעול ולחברת ההחזקות.

5.6.2.  נכון למועד חתימת השטר, הנציג בישראל הינו משרד עו"ד גולדפרב גרוס זליגמן ושות' (אשר כתובתו הינה כמפורט במבוא לשטר זה) ("נציג החברה הישראלי").

5.6.3.  המצאה לנציג החברה בישראל תיחשב כהמצאה תקפה ומחייבת בקשר לכל תביעה ו/או דרישה של הנאמן ו/או המחזיקים באגרות החוב (סדרה א') על-פי שטר נאמנות זה (לרבות מסמכי השעבודים).

5.6.4.  החברה תהיה רשאית להחליף את זהות נציג החברה בישראל מעת לעת ובלבד שבעת החלפתו, החברה תדווח את פרטי נציג החברה החדש בדוח מיידי וכן תעביר על כך הודעה לנאמן מיידית ובכתב. הדוח המיידי וההודעה לנאמן כאמור יכללו גם את המועד בו נכנס מינויו של הנציג החדש לתוקף.

יובהר כי עד מועד כניסת מינויו לתוקף של נציג החברה בישראל החדש, לרבות במקרה של התפטרותו של נציג החברה בישראל, כתובתו של נציג החברה בישראל שכיהן טרם ההחלפה תחייב את החברה ו/או נושאי המשרה בה ו/או בעלי השליטה בה לכל דבר ועניין.

5.6.5.  החברה מתחייבת טרם הנפקת אגרות החוב לקבל את הסכמת המנויים בסעיף 5.6.1 לשטר זה להוראות סעיף 5.6 זה. עוד יודגש כי החברה מתחייבת שבעת מינויו של נושא משרה בחברה ("**נושא המשרה החדש**") וכן במועד בו תחלף השליטה בחברה ("**בעל השליטה החדש**") אזי נושא המשרה החדש וכן בעל השליטה החדש יתחייבו להוראות סעיף 5.6 זה.

5.7.    התחייבויות פיננסיות

עד לאחר הסילוק המלא, הסופי והמדויק של החוב על-פי תנאי אגרות החוב (סדרה א'), ומילוי כל יתר התחייבויות החברה כלפי מחזיקי אגרות החוב (סדרה א') על-פי שטר נאמנות זה ותנאי אגרות החוב (סדרה א'), תעמוד החברה בכל עת בכל ההתניות הפיננסיות המפורטות להלן (לכל המונחים תהיינה המשמעות שניתנה להם כאמור להלן, ובהעדר ציון מפורש, כמשמעותם בכללי חשבונאות מקובלים):

- 18 -

5.7.1.     ההון העצמי לא יפחת מ-100 מיליון דולר (סכום זה לא יוצמד לבסיס הצמדה כלשהו) (**"התניית ההון העצמי"**);

5.7.2.     יחס החוב הפיננסי נטו מותאם ל-CAP נטו לא יעלה על 75% (**"התניית יחס חוב ל-CAP"**);

5.7.3.     יחס החוב הפיננסי נטו מותאם ל-EBITDA מותאם לא יעלה על 17.

כל אחת מההתניות הפיננסיות בסעיף 5.7 זה לעיל – **"התניה פיננסית"** וביחד – **"ההתניות הפיננסיות"**.

הבדיקה בדבר עמידת החברה בכל אחת מהתניות הפיננסיות בסעיף זה לעיל, תתבצע ביום פרסום הדוחות הכספיים על-ידי החברה וכל עוד אגרות חוב (סדרה א') קיימות במחזור (**"מועד הבדיקה"**). במסגרת בחינת עמידת החברה בכל אחת מהתניות הפיננסיות כאמור ינוטרלו ההשפעות הנובעות משינויים בשערי חליפין וכן ההשפעות שווי הוגן של עסקאות גידור מטבע בהם תהיה קשורה החברה במועד הבדיקה הרלוונטי.

החברה תפרט במסגרת דוח הדירקטוריון לתקופה הרלוונטית, את עמידתה או אי עמידתה בכל אחת מההתניות הפיננסיות כאמור בצירוף הנתונים המספריים.

במקרה של אי עמידה באיזו מבין ההתניות הפיננסיות ברבעון כלשהו, החברה תדווח בכתב על כך לנאמן וכן תדווח בדיווח מיידי במגנ"א אודות נתון זה ואת משמעות הנתון בהתאם לסעיף זה, וזאת לא יאוחר מתום יום עסקים אחד לאחר פרסום הדוחות הכספיים (רבעוני או שנתי, לפי העניין). לעניין סעיף זה, דיווח במגנ"א לא ייחשב כדיווח לנאמן.

אי עמידה באיזו מבין ההתניות הפיננסיות במשך שני (2) רבעונים רצופים, תהווה עילה להעמדה לפירעון מיידי של כל היתרה הבלתי מסולקת של אגרות החוב (סדרה א'), כמפורט בסעיפים 8.1.14, 8.1.15 ו-8.1.16 לשטר זה.

5.8.     <ins>כרית הוצאות</ins>

מבלי לגרוע מהוראות סעיף 26 לשטר הנאמנות, מתוך תמורת ההנפקה נטו יופקד סך השווה ל-400 אלפי דולר, ובמקרה בו היקף אגרות החוב יעלה על 650 מיליון ש"ח ערך נקוב, סך השווה ל-500 אלפי דולר (קרי, תוספת של 100 אלפי דולר) (על-פי השער היציג של הדולר בגין יום לפני מועד הדיווח על תוצאות ההנפקה לראשונה של אגרות החוב), לחשבון הנאמנות, אשר ישמש לצורך תשלום ההוצאות השוטפות והוצאות הניהול של הנאמן במקרה בו יועמדו אגרות החוב (סדרה א') לפירעון מיידי ו/או במקרה בו החברה הפרה את הוראות שטר הנאמנות (**"כרית ההוצאות"**).

מובהר כי ההוצאות ישולמו על ידי החברה ואילו כרית ההוצאות תשמש להבטחת תשלומים אלו והנאמן יהיה רשאי לעשות בה שימוש למטרות לעיל על פי שיקול דעתו. כרית ההוצאות תופקד במזומן.

ככל שהנאמן יעשה שימוש בכרית ההוצאות בהתאם לאמור לעיל, תשלים החברה את כרית ההוצאות כך שתהיה שווה ל-400 אלפי דולר או 500 אלפי דולר, לפי העניין, וזאת בתוך 14 ימים מהיום בו מסר הנאמן דרישה בכתב לחברה להשלמת כרית ההוצאות (**"הודעת השלמת כרית הוצאות"**).

סכום כרית ההוצאות יוחזק עד למועד הפירעון הסופי והמלא של אגרות החוב (סדרה א'), למעט אם החברה עשתה שימוש בכרית ההוצאות במסגרת פדיון סופי של אגרות החוב. לאחר פירעון מלוא אגרות החוב (סדרה א') תועבר יתרת כרית ההוצאות (בצירוף כל הפירות שנצברו בגינה), לחברה בהתאם לפרטים שיימסרו על ידה מראש ובכתב לנאמן.

במקרה בו סכום כרית ההוצאות לא יספיק לכיסוי הוצאות הנאמן בקשר עם העמדה לפירעון מיידי של אגרות החוב (סדרה א') ו/או הפרת הוראות שטר הנאמנות על-ידי החברה כאמור, יפעל הנאמן בהתאם לאמור בסעיף 26 לשטר זה.

- 19 -

5.9. **פעילות החברה**

5.9.1. כל עוד אגרות החוב (סדרה א׳) של החברה טרם נפרעו במלואן, מתחייבת החברה לכך ש-
90% מנכסיה נטו, יהיו נכסי נדל״ן להשקעה (לרבות רכוש קבוע) בארה״ב. כמו כן, היקף
פרויקטי הייזום של החברה במאוחד (לרבות חלקה של החברה בחברות (כלולות ובחברות
בשליטה משותפת) לא יעלה על 20% מסך המאזן המאוחד של החברה (כהגדרתו להלן)
(**"מגבלת תחום פעילות עיקרי"**).

**"היקף פרויקטי הייזום של החברה"** בסעיף זה משמעו – עלות ההשקעה (במובחן משווי
הוגן) של החברה בפרויקטים שהבנייה שלהם החלה נכון למועד הדוחות הכספיים
הרלוונטיים.

**"המאזן המאוחד"** בסעיף זה משמעו – סך המאזן המאוחד של החברה בתוספת חלק
החברה בחברות כלולות וחברות בשליטה משותפת.

**"נכסים נטו"** בסעיף זה משמעם – נכסי החברה, על-פי שוויים בדוחות הכספיים, בנטרול
מזומן והשקעות זמן קצר.

5.9.2. כל עוד אגרות החוב (סדרה א׳) של החברה טרם נפרעו במלואן, מתחייבת החברה כי ככלל
החברה תפעל אך ורק בארצות הברית ונכסי הנדל״ן המוחזקים על-ידי החברה, באמצעות
תאגידים המוחזקים על-ידה, יהיו בארצות הברית (**"מגבלת אזור פעילות עיקרי"**).

5.9.3. כל עוד אגרות החוב (סדרה א׳) של החברה טרם נפרעו במלואן, מתחייבת החברה שלא
לרכוש נכס בודד שעלותו גבוהה מ-20% מסך המאזן של החברה בהתאם לדוחות הכספיים
המאוחדים האחרונים של החברה שפורסמו (מבוקרים או סקורים, לפי המקרה) (**"מגבלת
נכס בודד"**).

לעניין זה, "נכס בודד" – כולל מספר מבנים הנמצאים באותה עיר, נרכשו באותו חודש
קלנדרי, מאותו מוכר (במישרין ו/או בעקיפין) והמרחק בין כל אחד מהמבנים אינו עולה
על 1 ק״מ.

בחינת עמידת החברה בהתחייבויות כאמור תיעשה במועד פרסום הדוחות הרבעוניים / השנתיים של
החברה (סקורים או מבוקרים, לפי העניין) על בסיס הדוחות הכספיים המאוחדים של החברה לתקופה
הרלוונטית. החברה תדווח בדוח הדירקטוריון לתקופה הרלוונטית את עמידתה או אי עמידתה
בהתחייבויות כאמור. אי עמידה באחת ממגבלת תחום פעילות עיקרי, אזור פעילות עיקרי, נכס בודד
במשך יותר מרבעון אחד, תהווה עילה להעמדה לפירעון מיידי של כל היתרה הבלתי מסולקת של אגרות
החוב (סדרה א׳), כמפורט בסעיף 8.1.17 לשטר זה.

5.10. **עסקאות חריגות עם בעלי השליטה**

החברה מתחייבת כי עסקאות חריגות של החברה (כהגדרתן בחוק החברות), עם בעל השליטה
בחברה, או עסקאות חריגות של החברה עם אדם אחר שלבעל השליטה יש בהן עניין אישי, או
התקשרויות של החברה עם בעל השליטה או עם קרובו (כהגדרת המונח בחוק החברות), במישרין
או בעקיפין לרבות באמצעות חברה בשליטתו וכן אם הוא גם נושא משרה בה – באשר לתנאי כהונתו
והעסקתו, ואם הוא עובד החברה ואינו נושא משרה בה – באשר להעסקתו בחברה (**"העסקאות
המיוחדות"**), תהיינה מותנות, בנוסף לאישורים לפי הוראות סעיף 275 לחוק החברות, בהסכמת
מחזיקי אגרות החוב (סדרה א׳), מראש, בהחלטה רגילה.

לעניין סעיף 5.10 זה, **"החברה"** – לרבות תאגידים מוחזקים של החברה.

לעניין סעיף 5.10 זה יובהר, למען הסר ספק, כי העסקאות המפורטות להלן לא תיחשבנה "עסקאות
מיוחדות" ולפיכך לא יידרש אישור המחזיקים כאמור בסעיף 5.10 זה לעיל (**"עסקאות פטורות"**):

א. שחרור בעלי שליטה ו/או בעלי עניין מערבויות שנתנו לטובת צדדים שלישיים בקשר עם נכסים
שבבעלות החברה, במישרין או בעקיפין.

- 20 -

ב.    העברת נכסים לחברה בעלי שווי נקי (שווי הוגן של הנכס בניכוי ההתחייבויות הפיננסיות בגינו) חיובי על-ידי בעלי השליטה או קרובו, במישרין או בעקיפין לרבות באמצעות חברה בשליטתו, כנגד הקצאת מניות בלבד (ללא תמורה כספית במזומן) ;

ג.    רכישת חלקם של שותפים ו/או משקיעים (שהינם צדדים שלישיים) בתאגידים מוחזקים של החברה (לרבות בתאגידים כלולים ותאגידים בשליטה משותפת) המחזיקות (במישרין או בעקיפין) בנכסי נדל"ן, על בסיס הערכת שווי בלתי תלויה שתאריכה אינו עולה על שלושה (3) חודשים ;

ד.    אישור או חידוש העסקאות המפורטות בפרק 9 לתשקיף אשר אושרו עובר למועד פרסום התשקיף, בתנאי כי החידוש ייעשה בתנאים מסחריים זהים לאלו המתוארים בתשקיף ;

ה.    העמדת ערבויות על ידי בעלי השליטה (במישרין ו/או בעקיפין) לטובת גופים מממנים עבור החברה ו/או לתאגידים בשליטת החברה ללא כל עלות לחברה ;

ו.    עסקאות לא חריגות, וכן עסקאות חריגות שאושרו בהתאם לתקנות החברות (הקלות בעסקאות עם בעלי ענין), תשׄ"ס-2000 ;

ז.    התקשרות בפוליסות לביטוח נכסי החברה והתאגידים המוחזקים כנגד הסיכונים המקובלים, במסגרת פוליסות המכסות את פורטפוליו הנכסים של החברה ביחד עם נכסיהם של בעלי השליטה ככל שיהיו (כאשר סכומי הפרמיה מוקצים על ידי חברת הביטוח לנכסים השונים כאשר מובהר בזאת כי החברה לא תשא בתשלום בגין נכסיו של בעל השליטה וכן בגין חלקו ככל שמחזיק בהחזקה משותפת עם החברה בנכסים כלשהם) ;

ח.    הענקת כתב שיפוי לבעלי השליטה ו/או קרובם כמפורט בפרק 9 לתשקיף וכן כתב שיפוי חדש כפי שיעודכן, ככל שיעודכן, בהתאם לחוק החברות והתקנות על פי כפי שיהיו מעת לעת, וכן התקשרות בפוליסות ביטוח נושאי משרה ודירקטורים כמקובל בחברות מסוג זה. תנאי כתבי השיפוי לבעלי השליטה ו/או קרובם וכן תנאי פוליסת ביטוח נושאי משרה ודירקטורים יהיו זהים לתנאי כתבי השיפוי ופוליסת ביטוח נושאי משרה ודירקטורים של שאר נושאי המשרה בחברה ;

החברה תאשר במסגרת דוח הדירקטוריון המצורף לדוחות הכספיים, לפי העניין, כי לא בוצעו עסקאות מיוחדות כאמור בסעיף 5.10 זה מבלי שניתנה הסכמת מחזיקי אגרות החוב (סדרה א').

5.11.    החברה מתחייבת כי לא תיטול בעצמה אשראי ממוסדות פיננסיים שאינם ישראלים ולא תעניק שעבודים למוסדות פיננסיים שאינם ישראלים, למעט בגין מסגרות אשראי אשר שיועמדו אך ורק על-ידי מוסדות פיננסיים בארה"ב (וזאת כנגד שעבודים ספציפיים להבטחת אותן מסגרות אשראי ולאותם מוסדות פיננסיים לא תהא כל יכולת חזרה לחברה בקשר עם אותם חובות של החברה למעט השעבודים הספציפיים שהחברה העמידה לאותם מוסדות פיננסיים כאמור) וזאת לצורך ביצוע עסקאות הגנה על שער החליפין של השקל מול הדולר ביחס לאגרות חוב אותן תנפיק החברה. מובהר כי אין באמור לעיל כדי לגרוע מיכולת החברה להנפיק אגרות חוב בישראל, לרבות אגרות חוב שתהיינה מגובות בבטוחות ו/או להעמיד ערבויות.

5.12.    <u>עמידה בהתחייבויות החברה במקרה של שינוי בתקינה חשבונאית</u>

מובהר, כי לצרכי שטר זה, לרבות בקשר עם עמידת החברה בהתחייבויות המפורטות בסעיפי המשנה של סעיף 5 לשטר זה, במקרה של שינוי בתקינה החשבונאית החלה על החברה, לרבות במקרה בו החברה אמצה תקינה חשבונאית שונה, לעומת זאת החלה עליה במועד התקשרותה בשטר נאמנות זה והמשפיע על תוצאות חישוב איזו מאמות המידה הפיננסיות בשטר זה לרבות איזו מהתניות הפיננסיות, הרי שאמות המידה הפיננסיות וכן התניות הפיננסיות ייבדקו לפי התקינה החשבונאית על החברה במועד התקשרותה בשטר נאמנות זה, והחברה תערוך על בסיס רבעוני מאזן פרופורמה במתכונת מקוצרת, הכולל באורים מהותיים ורלוונטיים בלבד, מסוקרים או מבוקרים (לפי העניין) בהתאם לתקינה החשבונאית שלפיה נערכו דוחותיה הכספיים של החברה במועד ההנפקה של אגרות החוב ("<b>מאזן הפרופורמה</b>"), ותפרסם אותו יחד עם דוחותיה הכספיים של החברה, על בסיס רבעוני. במקרה כאמור, תיבחנה תחולת הוראות שטר זה על-פי מאזן הפרופורמה.

- 21 -

5.13. <ins>התחייבויות החברה, בעלי השליטה ונושאי המשרה בחברה</ins>

בנוסף להתחייבויות החברה, בעלי השליטה ונושאי המשרה בחברה כאמור בסעיף 33 לשטר זה, החברה, בעלי השליטה ונושאי המשרה בחברה, בהווה ובעתיד, מתחייבים באופן בלתי חוזר ויתחייבו באופן בלתי חוזר (לפי העניין):

5.13.1. שלא להעלות טענות כנגד זכות מחזיקי אגרות החוב (סדרה א') להגיש תביעה נגזרת.

5.13.2. שהחברה והתאגידים המוחזקים על-ידה לא יבחרו להיחשב כחברות (corporations) אלא ימשיכו להיחשב ישות שקופה עבור בעליה או כשותפות, לפי העניין (Pass Through Entity) לצרכי מס הכנסה פדרלי בארה"ב.

5.13.3. לפעול בהתאם להתחייבותם לתיחום פעילות החברה המפורטת בתשקיף.

5.14. <ins>סך נזילות מינימאלי</ins>

החברה מתחייבת כי אמצעיה הנזילים בתום כל רבעון לא יפחתו מסך השווה לתשלום הריבית שעליה לשלם למחזיקי אגרות החוב (סדרה א') בתקופה שתחילתה בתום הרבעון וסופה בתום 6 חודשים מתום הרבעון (**"סך הנזילות המינימאלי"**).

לעניין סעיף זה: **"אמצעים נזילים"** – מזומנים המופקדים בחשבונות החברה ו/או בחשבון המשועבד ו/או בחשבון הנאמנות ושאין מגבלה להעברתם לחברה, שווי מזומנים והשקעות לזמן קצר (לרבות פיקדונות וניירות ערך סחירים) בהתאם לדוחותיה הכספיים המאוחדים, המבוקרים או הסקורים, לפי העניין, של החברה שאין מגבלה להעברתם לחברה. למען הסר ספק, מזומנים ושווי מזומנים המשועבדים לטובת הבטחת עסקאות גידור מטבע ייחשבו אמצעים נזילים.

החברה תפרט במסגרת דוח הדירקטוריון לתקופה הרלוונטית, את עמידתה או אי עמידתה בהתחייבותה המפורטת בסעיף 5.14 זה.

6. **הבטחת אגרות החוב**

6.1. אגרות החוב (סדרה א') מובטחות בבטוחות, כמפורט בסעיף 6.2 לשטר זה. לפרטים אודות התחייבות החברה בדבר אי יצירת שעבוד שוטף כללי ו/או ספציפי, ראה סעיף 6.6 לשטר זה. מבלי לגרוע מהאמור, ראה פרטים בדבר כרית ההוצאות בסעיף 5.8 לשטר זה.

למען הסר ספק מובהר, כי על הנאמן לא חלה חובה לבחון, ובפועל הנאמן לא בחן, את הצורך בהעמדת בטחונות להבטחת התשלומים למחזיקי אגרות החוב (סדרה א'). הנאמן לא נתבקש לערוך, והנאמן בפועל לא ערך בדיקת נאותות (Due Diligence) כלכלית, חשבונאית או משפטית באשר למצב עסקי החברה או חברות הבת שלה. בהתקשרותו בשטר נאמנות זה ובהסכמת הנאמן לשמש כנאמן למחזיקי אגרות החוב (סדרה א'), הנאמן אינו מחווה דעתו, באופן מפורש או משתמע, באשר ליכולתה של החברה לעמוד בהתחייבויותיה כלפי מחזיקי אגרות החוב (סדרה א'). אין באמור כדי לגרוע מחובות הנאמן על-פי כל דין ו/או שטר הנאמנות לרבות אין בה כדי לגרוע מחובתו של הנאמן (ככל שחובה כזו חלה על הנאמן על-פי כל דין) לבחון השפעתם של שינויים בחברה מתאריך התשקיף ואילך ככל שיש בהם כדי להשפיע לרעה על יכולתה של החברה לעמוד בהתחייבויותיה למחזיקי אגרות החוב (סדרה א').

6.2. <ins>הנכסים המשועבדים</ins>

להבטחת מלוא התחייבויות החברה כלפי מחזיקי אגרות החוב (סדרה א'), בקשר עם אגרות החוב (סדרה א') לפי שטר נאמנות זה, ולרבות אגרות חוב (סדרה א') שתונפקנה מעת לעת במסגרת הרחבת סדרה, לרבות פירעון מלא ובמועד של אגרות החוב (סדרה א') (לרבות קרן, ריבית וריבית פיגורים ככל שתחול), ולהבטחת הקיום המלא והמדויק של כל יתר תנאי אגרות החוב, לרבות כיסוי כל עלויות מימוש השעבודים שנוצרו לטובת מחזיקי אגרות החוב בשטר זה לרבות העלויות המשפטיות של המימוש האמור (**"הסכומים המובטחים"**), החברה תיצור ותרשום ו/או תגרום שייווצרו ויירשמו לטובת הנאמן ומחזיקי אגרות החוב, שעבודים כמפורט להלן:

מובהר, כי עם ההנפקה הראשונה של אגרות החוב (סדרה א'), החברה אינה מתחייבת, כי ישועבדו כל הנכסים המפורטים בסעיף 6.2.1 לשטר זה, אלא כי הנכסים שישועבדו מתוך הנכסים האמורים,

- 22 -

יבחרו לפי סדר הצגתם, באופן בו יחס ההלוואה לבטוחה בתאגיד המשועבד במועד השלמת הנפקת
אגרות החוב (סדרה א') לראשונה לא יעלה על 65%. יובהר, כי החברה לא תהיה רשאית לשעבד
חלק מזכויותיה בנכס כלשהו לצורך עמידה בהוראות יחס ההלוואה לבטוחה בתאגיד המשועבד
אלא את מלוא הזכויות באותו נכס בלבד. באופן זה החברה תגרום לכך שיירשמו לטובת הנאמן
ומחזיקי אגרות החוב שעבודים כמפורט להלן :

6.2.1. משכנתא ראשונה, על מלוא הזכויות (100%) של חברות הנכס בנכסים המפורטים ב**נספח א'**
לשטר זה (**"המשכנתאות"** ו-**"נכסי הנדל"ן המשועבדים"**, לפי העניין), בהתאם להוראות חוות
דעת עורך דין כמפורט בסעיף 6.2.3 לשטר זה. החברה וחברות הנכס מצהירות, כי נכון למועד
החתימה על שטר נאמנות זה, רשומות על נכסי הנדל"ן המשועבד, משכנתאות בדרגה ראשונה
לטובת גורמים ממנים. לשם יצירת המשכנתאות על-פי סעיף זה, יוסרו המשכנתאות הרשומות
על נכסי הנדל"ן המשועבדים והן תוחלפנה על פי הוראות שטר נאמנות זה למשכנתאות לטובת
הנאמן להבטחת התחייבויות החברה כלפי מחזיקי אגרות החוב (סדרה א').

במסגרת מסמכי המשכנתאות כאמור יומחו על דרך השעבוד, בהמחאה בלתי חוזרת לטובת
הנאמן למחזיקי אגרות החוב (סדרה א') כל הזכויות לקבלת כספים שיגיעו בגין או מכוח
נכסי הנדל"ן המשועבדים, זכויות קדימה או זכויות אחרות ו/או כל זכות לקבלת תזרים
ו/או זכות לקבלת כל תקבולי הביטוח, ככל שיתקבלו ו/או כל הסכם אחר, אם קיים, מקנים
ויקנו מפעם לפעם בגין הזכויות בנכסי הנדל"ן המשועבדים ולרבות המטלטלין, ההסכמים,
החוזים, פוליסות ביטוח, זכויות פיצוי ושיפוי, הרשיונות, חשבונות חייבים, פקדונות,
חשבונות, קניין רוחני, נכסים בלתי מוחשיים וזכויות משפטיות, הכל בקשר עם נכסי
הנדל"ן המשועבדים.

יובהר כי כל עוד השעבודים בקשר לנכסי הנדל"ן המשועבדים הינם בתוקף בהתאם להוראות
שטר זה, כלל התזרים של חברות הנכס ו/או חברות התפעול יועבר אך ורק ישירות לתאגיד
המשועבד.

ביום המסחר הראשון שלאחר תום התקופה להגשת בקשות (כאמור בתשקיף ובהודעה
המשלימה) תודיע החברה בדוח מיידי את תוצאות ההנפקה ובכלל זאת תודיע אילו נכסים מתוך
הנכסים המפורטים בסעיף 6.2.1 זה לעיל ישועבדו לטובת הנאמן עבור מחזיקי אגרות החוב
(סדרה א').

למעט המשכנתאות, בחתימתה על שולי שטר זה מתחייבת כל אחת מהחברה, חברת ההחזקות,
התאגיד המשועבד, חברות הנכס וחברות התפעול שלא לשעבד את רכושה וזכויותיה של מי
מחברות הנכס, הקיימות והעתידיות ולגרום לכך שתאגידים בבעלותן לא ישעבדו את רכושם
וזכויותיהם, כולן או מקצתן, בשעבוד שוטף כללי ו/או בשעבודים ספציפיים (לרבות שעבוד שוטף
על נכס/ים ספציפי/יים), ללא קבלת הסכמה מראש של אסיפת מחזיקי אגרות החוב (סדרה א')
לכך בהחלטה מיוחדת. החברה תכלול גילוי כאמור בדבר אי יצירת שעבודים על-ידי חברות
הנכס במסגרת דוח הדירקטוריון אשר יצורף לדוח התקופתי ו/או הרבעוני של החברה.

מובהר, כי כל עוד לא אירע אירוע הפרה, בכפוף למשכנתאות וכן להתחייבויות בשטר זה, זכויות
החברה בנכסים המשועבדים ו/או בחברות הנכס מכוח דין, הסכם או תקנון לא תיפגענה ותהיינה
בידיה באופן מלא ובלעדי.

לעניין זה מובהר כי סכום ההלוואה ב-Note יתעדכן על בסיס חצי שנתי בהתאם ליתרת הערך
הנקוב של אגרות החוב במועד פרסום הדוחות הכספיים של החברה ליום 31 בדצמבר וליום 30
ביוני ועל בסיס שער החליפין למועד הבדיקה. במקרה של עדכון כאמור, תוגדל המשכנתא כך
שתבטיח את התוספת ל-Note והכל בהתאם לייעוץ משפטי שיקבל הנאמן מאת עורכי הדין
האמריקאים של הנאמן.

ככל שבתום תקופת הבדיקה כאמור ערך ה-Note (סכום ההלוואה) יהיה גבוה מיתרת הערך הנקוב
של אגרות החוב על בסיס שער החליפין למועד הבדיקה, באפשרות החברה לא לעדכן את סכום

- 23 -

ההלוואה ב-Note. ככל שהחברה עדכנה את סכום ההלוואה ב-Note, החברה תציין את סכום ה-Note בכל דוח דירקטוריון, רבעוני או שנתי.

כמו כן, החברה תבצע בדיקה של שער החליפין נכון למועד פרסום הדוחות הכספיים ליום 31 במרס וליום 30 בספטמבר, של כל שנה, וככל שיימצא כי הפרש שער החליפין נכון למי ממועדי הבדיקה האמורים ביחס לבדיקה במועד הבדיקה הקודם יהא מעל ל-10% וכן כי הסכום המובטח נכון למועד פרסום הדוחות הכספיים ליום 31 במרס או 30 בספטמבר, לפי העניין, נמוך מיתרת הערך הנקוב של אגרות החוב כפי שהיא באותו מועד, יתבצע עדכון כאמור לעיל גם בתאריך זה וההוראות לעיל יחולו בשינויים המחויבים.

מובהר כי הליך מימוש המשכנתאות, ככל שיבוצע, יבוצע בהתאם לדין האמריקאי ובהתאם לייעוץ שיקבל הנאמן בסמוך למועד המימוש.

6.2.2. חברת ההחזקות תשעבד, לטובת הנאמן עבור מחזיקי אגרות החוב (סדרה א'), בשעבוד ראשון בדרגה, ללא הגבלה בסכום, את אחזקותיה בזכויות ההשתתפות (membership rights) שלה בתאגיד המשועבד, הקיימות והעתידיות, לרבות הזכויות הנלוות (כהגדרתן להלן) (**"זכויות ההשתתפות המשועבדות"** ו-**"שעבוד הזכויות"**, בהתאמה), בהתאם להוראות חוות דעת עורך דין כמפורט בסעיף 6.3 לשטר זה.

כל עוד אגרות החוב (סדרה א') לא נפרעו במלואן, חברת ההחזקות תמשיך להיות חברה בת בבעלות מלאה (במישרין ו/או בעקיפין) ובשליטה של החברה וכן התאגיד המשועבד ימשיך להיות בבעלות מלאה של חברת ההחזקות.

**"הזכויות הנלוות"** - משמען כל הזכויות הנובעות ו/או הקשורות ו/או שינבעו מזכויות ההשתתפות המשועבדות, לרבות אך מבלי לפגוע מכלליות האמור לעיל : כל זכות לקבלת נכסים, כספים וכן זכויות מכל מין וסוג שיגיעו מפעם לפעם ובכלל זאת, זכויות קדימה, זכויות לקבלת ניירות ערך אחרים בגינן מכל סוג שהוא, זכויות לשיפוי ו/או לפיצוי, וכן כל דיבידנדים, בכסף או בעין ותשלומי קרן ו/או ריבית שיוענקו ו/או יעמדו לתשלום בגינן וזכות לקבלת כל תמורה שתתקבל בגינן ; וכל הזכויות לקבלת הכספים ו/או זכויות לקבלת נכסים שיגיעו בגין, זכויות קדימה או זכויות אחרות, לרבות תקבולים מהסכמי השכירות בקשר עם הנכסים.

מובהר כי הליך מימוש שעבוד הזכויות, ככל שיבוצע, יבוצע בהתאם לדין האמריקאי ובהתאם לייעוץ שיקבל הנאמן בסמוך למועד המימוש.

החברה וחברת ההחזקות מתחייבות כי חברת ההחזקות תעביר לתאגיד המשועבד את מלוא זכויותיה בחברות הנכס ובחברות התפעול שהינן מחזיקות ו/או מפעילות את נכסי הנדל"ן המשועבדים שתשעבד החברה לטובת מחזיקי אגרות החוב. לאחר העברת הזכויות כאמור, יצורפו חברות הנכס וחברות התפעול את חתימותיהן לשטר זה. מובהר, כי הנאמן לא ישחרר את תמורת ההנפקה (כמתואר בסעיף 6.3.3 לשטר זה) מבלי שיקבל את חתימות כלל חברות הנכס וחברות התפעול הרלוונטיות.

6.2.3. כל אחת מחברות הנכס וכל אחת מחברות התפעול תרשומנה שעבוד שוטף קבוע, באמצעות הגשת הצהרת UCC-1 למשרד מזכיר המדינה הרלוונטי, במדינה בה הוקמה חברת נכס או חברת התפעול הרלוונטית. כל הצהרה כאמור תציין במפורש : (1) חברת הנכס או חברת התפעול הרלוונטית כחייבת והנאמן כצד מובטח ; וכן (2) את הבטוחה כ-"כל נכסי החייב" (All assets of Debtor), אשר מעצם הגדרתה כאמור תעניק לנאמן זכות בטוחה ראשונה על כל נכסי החייב כאמור (לרבות, בין היתר, על כל חשבונות הבנק של חברת הנכס וחברת התפעול). לפיכך, במקרה של הפרת תנאי המשכנתא, לנאמן תהיה הזכות, בין היתר, לקבל שליטה על כל אחד מנכסי חברות הנכס ו/או חברות התפעול, לרבות, בין היתר, על כל חשבונות הבנק שלהן.

6.2.4. החברה וחברת ההחזקות תהינה אחראית לכך והתאגיד המשועבד מתחייב כי יחתום וימסור הסכם שליטה (DACA) אשר ייחתם על-ידיו ועל-ידי תאגיד בנקאי בארה"ב, בו

- 24 -

ימצא חשבון התאגיד המשועבד ("**הסכם השליטה**"), אשר יהיה החשבון היחידי על שמו של התאגיד המשועבד, אשר יקנה לנאמן עבור מחזיקי אגרות החוב (סדרה א'), שעבוד ראשון בדרגה על מלוא זכויותיו של התאגיד המשועבד בחשבון הבנק ("**החשבון המשועבד**"), לרבות בכספים, בפקדונות ובניירות הערך המופקדים ו/או שיופקדו מעת לעת בחשבון המשועבד וכל תמורה שתתקבל בגינם, על פירותיהם, בהתאם להוראות הבאות, כאשר התאגיד הבנקאי בו מתנהל החשבון המשועבד אישר את הסכמתו להוראות הסכם השליטה האמור ולרבות:

א.    השעבוד יווצר על-פי דין זר החל על התאגיד המשועבד בהתאם להוראות עורך דין אמריקאי מטעם הנאמן.

ב.    זכויות החתימה בחשבון המשועבד תהיינה של התאגיד המשועבד בלבד כאשר החברה תהיה אחראית לאפשר לנאמן זכויות צפייה בחשבון המשועבד. במקרה בו יחס ההלוואה לבטוחה בתאגיד המשועבד יעלה על 75% או במועד בו תשואת החוב של הנכסים המשועבדים תפחת מ-10% או במועד בו יועמדו אגרות החוב (סדרה א') לפירעון מיידי או במועד בו אירע אירוע הפרה, לפי המוקדם, לנאמן תהיה זכות למסור הודעה לתאגיד הבנקאי אצלו מתנהל החשבון המשועבד והחל ממועד ההודעה האמורה זכויות החתימה בחשבון המשועבד תהיינה של הנאמן בלבד. לאור האמור, מובהר כי עד למועד בו יחס ההלוואה לבטוחה בתאגיד המשועבד לא עלה על 75% או למועד בו תשואת החוב של הנכסים המשועבדים תפחת מ-10% או למועד בו אגרות החוב לא הועמדו לפירעון מיידי או למועד בו אירע אירוע הפרה, לפי המוקדם. החשבון ינוהל על-ידי התאגיד המשועבד באופן בלעדי ולנאמן לא תהיה יכולת אפקטיבית לבקר פעולות בחשבון בזמן אמת אלא בדיעבד בלבד. החברה, חברת ההחזקות והתאגיד המשועבד יעשו את מירב המאמצים על מנת לגרום לכך שלנאמן יהיו זכויות צפייה בחשבון המשועבד. ככל שלנאמן לא יהיו זכויות צפייה בחשבון המשועבד, החברה תמציא לנאמן, בתחילת כל חודש, תדפיס תנועות בחשבון המשועבד. החברה תפרט במסגרת דוח הדירקטוריון לתקופה הרלוונטית, את יחס ההלוואה לבטוחה בתאגיד המשועבד.

ג.    החברה תמציא לנאמן אישור מאת התאגיד הבנקאי בו ייפתח החשבון המשועבד לפיו התאגיד הבנקאי יהיה נחות לאגרות החוב בקשר עם זכויות שעבוד, קיזוז, עכבון ככל שאלו קיימים לו. מבלי לגרוע מכלליות האמור, התאגיד המשועבד לא יפתח חשבונות נוספים (בין באותו תאגיד בנקאי ובין בתאגיד בנקאי או מוסד פיננסי אחר) והחשבון המשועבד יהיה חשבון הבנק היחיד של התאגיד המשועבד. למען הסר ספק, כחלק מהמסמכים הנדרשים לפי סעיף 6.3.1 לשטר זה, התאגיד המשועבד יצהיר במסגרת הסכם החשבון המשועבד כי החשבון המשועבד יישאר החשבון היחיד של התאגיד המשועבד.

ד.    כל עוד יחס ההלוואה לבטוחה בתאגיד המשועבד לא עולה על 75% ו/או למועד בו תשואת החוב של הנכסים המשועבדים תפחת מ-10% ו/או לא הועמדו אגרות החוב לפירעון מיידי ו/או לא אירע ארוע הפרה, לפי המוקדם, לא יחולו מגבלות על השימוש בכספים המופקדים בחשבון המשועבד, לרבות ביצוע חלוקות על-ידי התאגיד המשועבד. כמו כן, מדיניות ניהול הכספים בחשבון המשועבד וביצוע תיקבע על-פי שיקול דעתו הבלעדי של התאגיד המשועבד ו/או בהתאם להוראות סעיף 17 לשטר זה.

ה.    החל מהמועד וכל עוד יחס ההלוואה לבטוחה בתאגיד המשועבד עולה על 75% או המועד בו תשואת החוב של הנכסים המשועבדים תפחת מ-10% או מתקיים אירוע הפרה או אגרות החוב הועמדו לפירעון מיידי, לפי המוקדם, כל הכספים בחשבון המשועבד ו/או שיגיעו לתאגיד המשועבד מכל מקור שהוא, יישארו בחשבון המשועבד וייעשה בהם שימוש אך ורק לשם (א) לצורך פיתוח והפעלת נכסי הנדל"ן המשועבדים; ו/או (ב) לצורך ביצוע תשלומים שוטפים למחזיקי אגרות החוב בהתאם ללוח הסילוקין

- 25 -

של אגרות החוב ו/או לשם ביצוע פדיון מוקדם מלא או חלקי של אגרות החוב; ו/או (ג) רכישת אגרות חוב (סדרה א') במסגרת המסחר בבורסה ו/או הצעת רכש, וזאת עד לפירעון מלא וסופי של אגרות החוב (סדרה א'), על בסיס אישור של החברה, החתום על-ידי נושא המשרה הבכיר בחברה בתחום הכספים אליו יצורפו אסמכתאות ותחשיב מתאים בנוסח לשביעות רצון הנאמן.

יובהר, כי במקרה בו אגרות החוב (סדרה א') יי, רכשו על-ידי התאגיד המשועבד באמצעות כספים מהחשבון המשועבד וכל עוד אגרות החוב (סדרה א') האמורות מוחזקות בידי התאגיד המשועבד, אזי אגרות החוב האמורות יוחזקו בחשבון המשועבד, כל התמורות בגינן יופקדו בחשבון המשועבד וככל שיחס ההלוואה לבטוחה בתאגיד המשועבד יעלה על 75% ו/או ככל שתשואת החוב של הנכסים המשועבדים תפחת מ-10% או ו/או יועמדו אגרות החוב לפירעון מיידי ו/או אירע אירוע הפרה, לפי המוקדם, לא ייעשה בתמורות שימוש עד לפירעון מלא של אגרות החוב (סדרה א'), אלא אם כן הנאמן יקבע אחרת לפי שיקול דעתו המוחלט. ככל שאגרות החוב כאמור שיירכשו על-ידי התאגיד המשועבד ימכרו לצד שלישי, תמורת המכירה תופקד ישירות בחשבון המשועבד.

ו.    כל הפעילות של התאגיד המשועבד תבוצע באמצעות החשבון המשועבד בלבד ולמעט החשבון המשועבד התאגיד המשועבד לא יפתח חשבונות נוספים אצל בנקים או כל תאגיד או ישות המאפשרת ניהול חשבון בו ניתן להפקיד כספים. על אף האמור, התאגיד המשועבד יהיה רשאי לפתוח חשבונות נוספים באותו תאגיד בנקאי בו הוא מחזיק את החשבון המשועבד אם יישם כלפי אותם חשבונות את מלוא ההוראות הנוגעות לחשבון המשועבד (לרבות, אך לא רק, שעבוד החשבון, חתימת הסכם השליטה והקניית זכויית חתימה לנאמן במקרה של אירוע כמפורט בסעיף 6.2.3.ב לשטר זה).

6.2.5.    החברה וחברת ההחזקות תהינה אחראית לכך והתאגיד המשועבד מתחייב כי יחתום וימסור הסכם שליטה (DACA) על חשבונות הבנק (הקיימים או שיפתחו לשם כך) של חברות התפעול המפעילות נכסי נדל"ן משועבדים אשר בהתאם לדוחותיה הכספיים של החברה ליום 31 בדצמבר 2025 יציגו NOI בסך העולה על 5,000 אלפי דולר (TTM), וזאת עד ליום 31 ביולי 2026. הוראות סעיף 6.2.4 (לרבות השימוש בהגדרה "החשבון המשועבד") יחולו על האמור בסעיף זה בשינויים המחויבים. החברה תפרסם דוח מיידי בדבר השלמת ההתקשרות בהסכמי השליטה כאמור.

מובהר, כי כל עוד לא אירע אירוע הפרה או יחס ההלוואה לבטוחה בתאגיד המשועבד לא עלה על 75% או תשואת החוב של הנכסים המשועבדים תפחת מ-10% או אם אגרות החוב לא הועמדו לפירעון מיידי, לפי המוקדם, בכפוף לתנאי המשכנתא והשעבוד ולמסמכי ההלוואה אחרים שנחתמו בקשר לכך, ולהתחייבויות בשטר זה, יתרת זכויות החברה בנכסים המשועבדים ו/או בחברות הנכס מכוח דין, הסכם או תקנון לא תיפגענה ותהיינה בידיה באופן מלא ובלעדי.

כן מובהר, כי התנהלותן של חברות הנכס ו/או חברות התפעול תתבצע בחשבונות בבעלות חברות הנכס ו/או חברות התפעול אשר לא ישועבדו לטובת הנאמן ולא תהיינה לו זכויות חתימה בהם.

כל השעבודים שייווצרו לטובת הנאמן עבור מחזיקי אגרות החוב כאמור בסעיף 6.2 זה לעיל יכונו בשטר זה: **"השעבודים"**; נכסי הנדל"ן המשועבדים, זכויות ההשתתפות המשועבדות והחשבון המשועבד יכונו בשטר זה: **"הנכסים המשועבדים"**.

6.3.    יצירת השעבודים

6.3.1.    אופן יצירת ורישום השעבודים

יצירתם של השעבודים תעשה בהתאם למזכר או חוות דעת עורך דין או עורכי דין המתמצא/ים בדין הרלוונטי בארה"ב, החל על הנכסים המשועבדים הרלוונטיים (**"עורך הדין האמריקאי"**), כמפורט בס"ק (א) להלן, ועל-פי המסמכים הבאים, שעם המצאת כולם לנאמן, בנוסח לשביעות רצונו של הנאמן, יראו את השעבודים כ-"נרשמו" ו/או "נוצרו", לפי העניין.

- 26 -

**יצוין, כאמור לעיל, כי למועד החתימה על שטר זה, רשומות על נכסי הנדל"ן המשועבדים משכנתאות לטובת גורמים ממומנים. בהתאם להנחית עורך הדין האמריקאי, תפעל החברה לרישום מחדש או הסבה של השעבודים לטובת הנאמן בהתאם להוראות שטר הנאמנות להלן.**

א. מזכר המופנה לנאמן עם העתק לחברה מאת עורך דין אמריקאי[2] בדבר אופן יצירת השעבודים, ובו יפורט מהם המסמכים הנדרשים, אשר יצורפו למזכר, וכן מהן ההחלטות הנדרשות לצורך יצירת השעבודים ורישומם על-פי הדין החל על השעבודים, לפי העניין. המזכר יפרט גם את דרכי ואופני מימוש השעבודים על-פי הדין הרלוונטי. במזכר תיכלל רשימת אישורים או מסמכים אשר יש לקבל מדי שנה, אם וככל שהדבר נדרש, כדי לוודא את תוקפם של השעבודים על-פי הדין מכוחו נוצרו. מובהר, כי מזכר זה לא ייצור יחסי לקוח בין הנאמן לעורך הדין האמריקאי.

ב. חוות דעת מעורך הדין האמריקאי, המופנית לנאמן, לפיה חברת ההחזקות, התאגיד המשועבד, וכל חברות הנכס קיבלו את כל ההחלטות הנדרשות לצורך יצירת השעבודים, וכי המוסמכים לחתום בשמן חתמו על כל המסמכים הנדרשים לצורך יצירת השעבודים ורישומם.

ג. חוות דעת מאת עורך הדין האמריקאי המופנית לנאמן, לפיה: (1) השעבודים תקפים, בני אכיפה ומימוש ; (2) אישור כי יצירת ורישום השעבודים על-ידי סוכן הסגירה ( closing agent) כאמור תואם את הדרישות הנקובות במזכר עורך הדין האמריקאי כאמור בס"ק (א) לעיל ; (3) תנאי השעבודים תואמים את הוראות שטר זה ובפרט הוראות ס"ק (א) לעיל ביחס לתיאור הנכסים המשועבדים, לסכומים המובטחים בשעבודים וכן כוללים הוראות מתאימות על מנת לאפשר לחברה לעמוד בהתחייבויותיה למסור מידע ביחס לנכסים המשועבדים .לעניין חוות דעת זו, רשאי עורך הדין האמריקאי להסתמך על אישור מאת סוכן הסגירה כאמור בס"ק (ה) להלן.

ד. תצהיר נושא משרה בכירה בחברה, בחברות ההחזקות והתאגיד המשועבד וכן בחברות הנכס וחברות התפעול, לפי העניין (Officer Certificate), המאשר כי התקבלו ההחלטות הנדרשות לשם יצירת ורישום השעבודים ובדבר העדר התחייבויות סותרות ו/או נוגדות של החברה, חברת ההחזקות, חברות הנכס וחברות התפעול בקשר עם יצירת השעבודים וכן כי נכסי הנדל"ן המשועבדים הינם בבעלותן ובקניינן הבלעדי של חברות הנכס, לפי העניין ; וכן כי דיני ארה"ב הינם הדינים החלים על השעבודים, וכי מתן השעבודים אינו נוגד או עומד בסתירה לכל התחייבות או חובה אחרת של אותו התאגיד. האישור יכלול תחשיב כי נכון למועד הנפקת אגרות החוב יחס החוב ההלוואה לבטוחה אינו עולה על 75% ויצורף תחשיב מתאים בקובץ אקסל פעיל.

ה. זהות החותם והיותו נושא משרה בכירה בחברה ו/או בחברות ההחזקות ו/או בחברות הנכס ו/או בחברות התפעול, לפי העניין, תאומת ותאושר על-ידי עורך דין אמריקאי.

ו. בתוך 90 ימים ממועד הסגירה - אישור 'סוכן הסגירה' (closing agent), כי השעבודים נרשמו בהתאם לאמור בחוות הדעת של עורך הדין האמריקאי כמפורט בס"ק ג' לעיל.

ז. הסכם השליטה חתום על-ידי הצדדים לו.

ח. העתק המסמכים הנדרשים לצורך ביצוע ורישום השעבודים, אשר יצורפו למזכר של עורך הדין האמריקאי, כאמור בסעיף א' לעיל, בנוסח לשביעות רצון הנאמן.

ט. אישור מאת המבטח של כל אחד מנכסי הנדל"ן המשועבדים כי הנאמן התווסף כמוטב לפוליסות הביטוח (פוליסת רכש ופוליסת חבות) של הנכס המשועבד.

---

[2] מזכר כאמור יערך על-ידי עורך דין אמריקאי מטעם החברה וטרם המצאתו לנאמן, יועבר לעיונו, בדיקתו והתייחסותו של עורך דין אמריקאי מטעם הנאמן שמונה על-ידו שיאשרו לשביעות רצונו.

- 27 -

י.    פוליסת/ות ביטוח Title Insurance מסוג Lender Policy, לטובת הנאמן.

יא.   אישור מאת המבטח של נכסי הנדל"ן המשועבדים כי הנאמן התוסף כמוטב לפוליסות הביטוח (פוליסת רכוש ופוליסת חבות) של כל אחד מנכסי הנדל"ן המשועבדים.

יב.   החברה, חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול מתחייבות לחתום על כל מסמך שיידרש לשם יצירתם רישומם, אכיפתם ומימושם של השעבודים, לפי העניין.

מסמכי השעבוד מכוחם ירשמו השעבודים לטובת הנאמן, יהיו בנוסח לשביעות רצון הנאמן ולנאמן תהא הסמכות להסכים לכל שינוי בנוסח מסמכי השעבוד, באותם התנאים בהם רשאי הנאמן להסכים לשינויים בשטר הנאמנות לגופו, כמפורט בסעיף 28 לשטר זה, בשינויים המחויבים. מובהר, כי אישורי עורך הדין האמריקאי (לרבות חוות הדעת והמזכר) עשויים לכלול הנחות עובדתיות והסתייגויות מקובלות וכן יהיה רשאי עורך הדין האמריקאי להסתמך על הצהרות החברה ו/או חברות ההחזקה ו/או חברות הנכס ו/או אדם אחר בקשר להנחות העובדתיות (ללא בדיקה עצמאית) ככל שהדבר מקובל בדין הרלוונטי לשם ביצוע בדיקה כאמור במדינה בה מבוצע השעבוד.

מובהר בזאת, כי במועד הפירעון הסופי של אגרות החוב (סדרה א') ובכפוף לפירעון המלא, או סילוק היתרה הבלתי מסולקת של אגרות החוב (סדרה א') בכל דרך שהיא (לרבות בדרך של רכישה עצמית ו/או פדיון מוקדם) ולתשלום כל שכר טרחת הנאמן והוצאותיו לרבות של שלוחיו, יפקעו השעבודים וייחשבו כבטלים מאליהם ללא צורך בנקיטת פעולה נוספת והנאמן יחתום על כל מסמך שיידרש לצורך ביטול השעבודים ככל שיהיה צורך בכך או הסבתם לגורם אחר לפי הנחיות החברה, בהתאם לתנאים הקבועים בשעבוד ובכפוף לייעוץ משפטי שיקבל הנאמן מאת עורך הדין האמריקאי של הנאמן באותו מועד.

החברה מתחייבת לחתום על כל מסמך שיידרש לשם יצירתם ומימושם (ככל שיידרש) של השעבודים.

6.3.2.    מחיקת המשכנתאות הרשומות על נכסי חברות הנכס ויצירת משכנתאות חדשות

6.3.2.1.    החברה, חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול מצהירות, כי נכון למועד החתימה על שטר נאמנות זה, רשומות על נכסי הנדל"ן המשועבדים משכנתאות לטובת גורמים ממממנים וכן שעבודים נוספים על מי מחברות התפעול וחברות הנכס ובכלל ("**השעבודים הקיימים**").

6.3.2.2.    לצורך שחרור השעבודים הקיימים ורישום משכנתאות חדשות לטובת הנאמן לאגרות החוב (סדרה א') כאמור על נכסי הנדל"ן המשועבדים כולם או חלקם במלואם להבטחת התחייבויות החברה כלפי מחזיקי אגרות החוב, עשויה החברה לפרוע מתוך תמורת ההנפקה את יתרת החוב (כולו או חלקו) כלפי הגורמים הממממנים.

לשם כך, יעביר הנאמן על-פי הוראה כאמור לעיל מתוך תמורת ההנפקה אשר תוחזק בידו בנאמנות, סכומים בהתאם למכתבי כוונות (Payoff Letters) ("**מכתבי הכוונות**") מטעם הגורמים הממממנים אשר יועברו אל הנאמן (או בהתאם לדרישת 'סוכן הסגירה' שיקבל את מכתבי הכוונות) ובהם יפורטו סכומי הפירעון הנדרשים להעברה לגורמים הממממנים לשם הסרת השעבודים הקיימים, ואת פרטי חשבון הבנק של 'סוכן הסגירה' (כמפורט להלן) אליו יש להעביר את סכומי הפירעון והכל בכפוף למפורט בסעיפים 6.3.2.3 ו-6.3.2.4 לשטר זה. מכתבי הכוונות יציינו, כי כנגד העברת הסכומים האמורים, אשר יהוו סילוק סופי של מלוא ההלוואות הקיימות כלפי הגורמים הממממנים, ישחררו הגורמים הממממנים את השעבודים הקיימים לטובתם על אותם הנכסים ויסירו כל רישום בגין שעבודים אלו.

- 28 -

מבלי לגרוע מהאמור לעיל, עשויה החברה לפרוע את השעבודים הקיימים ממקורותיה ולא מתוך תמורת הנפקת אגרות החוב (סדרה א').

6.3.2.3. ככל שהפירעון של מלוא ההלוואות הקיימות לגורמים הממנים יבוצע מתוך תמורת הנפקת אגרות החוב (סדרה א'), הנאמן יעביר ל'סוכן הסגירה' מתוך כספי תמורת ההנפקה את הסכומים הנדרשים, בהתאם למכתבי הכוונות, כנגד הסרת כל השעבודים הקיימים אותם בחרה החברה לשעבד לטובת הנאמן ורישום השעבודים המפורטים בסעיף 6.2 לשטר זה לטובת הנאמן עבור מחזיקי אגרות החוב.

**על-פי יעוץ משפטי שקיבלה החברה, הליך הסרת השעבודים הקיימים ורישום משכנתאות חדשות מבוצע על-ידי 'סוכן סגירה' (Closing agent) שאינו מייצג את מי מהצדדים. במסגרת הליך הסגירה, מועברים על-ידי כל הצדדים כל מסמכי העסקה המאושרים והחתומים וכן, ככל שייידרש, כל הכספים הנדרשים להעברה. לפיכך (בכפוף לאמור בסעיף 6.3.2.4 לשטר זה) הנאמן, ככל שייידרש, יעביר את הכספים הנדרשים לסוכן הסגירה לאחר שיאשר לו סוכן הסגירה כי הכספים יוחזקו על ידו בנאמנות עבור הנאמן בהתאם להוראות סעיף 6.3.2.5 לשטר זה.**

6.3.2.4. הנאמן יעביר את הסכומים הנדרשים לשם הסרת השעבודים הקיימים ל'סוכן הסגירה', בהתאם למכתבי הכוונות, לאחר שייחתם הסכם נאמנות (Escrow Agreement) בין הנאמן לסוכן הסגירה אשר יכלול הסדרים ופעולות שעניינם:

א. העברת תמורת ההנפקה לשם תשלום הסכומים הרלוונטיים לצורך הסרת השעבודים הקיימים.

ב. הבטחת יצירת ורישום המשכנתאות והשעבודים להבטחת אגרות החוב (סדרה א').

ג. התחייבות סוכן הסגירה להנפקת פוליסת ביטוח משכנתא כמפורט בסעיף 6.3.2.5 לשטר זה.

ד. ייירשמו השעבודים לטובת הנאמן לשם הבטחת אגרות החוב (סדרה א'), כמפורט בסעיף 6.2 לשטר זה.

ה. סוכן הסגירה ינפיק פוליסת ביטוח משכנתא כמפורט בסעיף 6.3.2.5 לשטר זה.

במסגרת הסכם הנאמנות יצהיר ויתחייב 'סוכן הסגירה' כדלקמן:

א. הוא יאשר לנאמן מיד לאחר שיהיו מצויים בידיו כל המסמכים הנדרשים לשם: (1) ביצוע פירעון השעבודים הקיימים; (2) יצירת המשכנתאות והשעבודים ביחס לסכום השווה למלוא תמורת ההנפקה.

ב. העתקים מהמסמכים לעיל ישלחו לנאמן בתוך 7 ימים ממועד הסגירה.

ג. סוכן הסגירה לא יעביר סכום כלשהו ללא קבלת הוראת הנאמן בכתב.

ד. ככל שלא תתקבל הוראת הנאמן עד למועד שיורה סוכן הסגירה, יושבו הכספים שהופקדו על-ידי הנאמן לחשבון ממנו הופקדו.

ה. עם העברת הכספים לטובת מחזיקי אגרות החוב (סדרה א') של החברה, תונפק פוליסת ביטוח משכנתא (Title Insurance) כמפורט בסעיף 6.3.2.5 לשטר זה ותימסר לנאמן. תעודת ביטוח המשכנתא בגין פוליסת ביטוח המשכנתא כמפורט לעיל בסכום של מלוא תמורת ההנפקה תומצא לנאמן עם הפקתה (אשר יהא לאחר רישום השעבודים והמשכנתאות במרשמים הרלוונטיים אשר צפוי לחול מספר שבועות לאחר מועד הסגירה, אך אין בכך כדי לפגוע בכך כי הפוליסה וההתחייבות המבטח הינן בתוקף).

- 29 -

ו.    עם העברת הכספים הוא יגיש לרישום את כל המסמכים לביצוע האמור לעיל ויוודא את רישומם כדין.

6.3.2.5.    במועד הסגירה, סוכן הסגירה ימציא לנאמן מסמך ובו עיקרי פוליסת ביטוח המשכנתא (pro forma title commitments) על שם הנאמן בגובה סכום מלוא תמורת הנפקת אגרות החוב ("**פוליסת ביטוח המשכנתא**"), בד בבד עם שחרור הכספים על-ידי הנאמן כמפורט לעיל. לאחר מועד הסגירה ידאג סוכן הסגירה לרישום המשכנתאות והשעבודים והמצאת נוסח מלא של פוליסת ביטוח המשכנתא לנאמן, כאשר לעניין זה מובהר, כי ביטוח המשכנתא יהיה בתוקף ממועד שחרור הכספים על-ידי הנאמן (ללא קשר ליצירת ורישום השעבודים). פוליסת ביטוח המשכנתא תבטח את מלוא הסכום המובטח על-ידי הלוואת המשכנתא הרלוונטית, שהינה מלוא תמורת ההנפקה, בגין כל פגם שיתגלה בבעלות חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול בנכסים המשועבדים ו/או במשכנתאות ו/בשטרי החוב ו/או בשעבודים לטובת הנאמן ולרבות במקרים בהם יינקטו הליכי חדלות פירעון נגד החברה ו/או חברת ההחזקות ו/או ההתאגיד המשועבד ו/או חברות הנכס ו/או חברות התפעול, בכפוף לחריגים סטנדרטיים הקשורים לחדלות פירעון בפוליסת ביטוח המשכנתא כפי שנקבע במסמכי הפוליסה, וכן מבטחת את התוקף, יכולת האכיפה והמימוש (enforceability) והעדיפות כנגד צדדים שלישיים של השעבודים והמשכנתאות בקשר עם הנכסים המשועבדים לטובת הנאמן. מובהר, כי סכום הכיסוי של הפוליסה יהיה נקוב בדולר ארה"ב ולא יהיה צמוד לשינויים בשערי החליפין או לבסיס הצמדה אחר.

6.3.3.    <u>העברת תמורת ההנפקה לחברה</u>

6.3.3.1.    עם קבלת אישור רכז ההנפקה (כהגדרתו בתשקיף) על קבלת תמורת ההנפקה אצל רכז ההנפקה, תועבר על-ידי רכז ההנפקה, תמורת ההנפקה ברוטו על פירותיה (אך בניכוי עמלת התחייבות מוקדמת למשקיעים מוסדיים), לחשבון הנאמנות, וזאת עד להעברת תמורת ההנפקה ל'סוכן הסגירה' כמפורט בשטר זה. מובהר לעניין זה, כי בפועל, סכום השווה לסכום הוצאות ההנפקה בהתאם לתחשיב שיועבר על-ידי החברה לנאמן, עשוי להיוותר בחשבון הנאמנות ו/או בידי רכז ההנפקה בנאמנות עבור הנאמן ומחזיקי אגרות החוב והוא ישולם על-ידי החברה על חשבון הוצאות ההנפקה רק במועד הסרת השעבודים הקיימים ורישום השעבודים לטובת הנאמן עבור מחזיקי אגרות החוב .

**מעבר לאמור בסעיף 6.5 לשטר זה, החברה וכן חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול מתחייבות, כי עד להשלמת יצירת ורישום השעבודים לטובת הנאמן עבור מחזיקי אגרות החוב, לשביעות רצון הנאמן, והעברת כל המסמכים המפורטים בסעיפים 6.2.3 ו-6.3.1 לשטר זה, לפי העניין, לנאמן לשביעות רצונו, החברה וכן חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול לא יתקשרו בהסכמים ו/או יטלו התחייבויות מכל מין וסוג שהוא אשר יש בהן כדי ליצור לחברת ההחזקות ו/או לתאגיד המשועבד ו/או לחברות הנכס ו/או לחברות התפעול נושים נוספים מלבד מחזיקי אגרות החוב (סדרה א').**

לצורך רישום אגרות החוב למסחר בלבד, החברה רואה בקבלת תמורת ההנפקה אצל רכז ההנפקה, כקבלת התמורה בחברה, ולאור זאת תבקש את רישום אגרות החוב (סדרה א') למסחר בבורסה.

6.3.3.2.    אך ורק לאחר שבידי סוכן הסגירה יימצאו כל המסמכים המפורטים בסעיף 6.2.3 ו-6.3.1 לשטר זה, ביחס לשעבודים, ולאחר שיימחקו מלוא השעבודים הקיימים וייווצרו השעבודים לטובת הנאמן עבור מחזיקי אגרות החוב (סדרה א') לשביעות רצון הנאמן בהתאם להוראות שטר זה, תועבר יתרת תמורת ההנפקה (בניכוי כריית ההוצאות) לחברה על-פי דרישת החברה בכתב, בה יפורטו גם פרטי החשבון להעברה

- 30 -

(לרבות מתן הוראה לרכז ההנפקה לבצע את התשלומים בגין הוצאות ההנפקה מתוך סכומים שהוחזקו בידיו בנאמנות).

6.3.3.3. הנאמן יסתמך על חוות דעת ואישורי עורכי הדין שלו או של החברה בארה״ב כמפורט בסעיף 6.3.1 לשטר זה (**"אישורי עורכי הדין בארה"ב"**) ולא יידרש לבדוק את תוקפם ו/או אמינותם.

6.3.3.4. מוסכם, כי כל עוד לא התקיימו התנאים לשחרור תמורת ההנפקה לחברה לא תהיה החברה זכאית לסכום כלשהו מתוך תמורת ההנפקה לגביו לא התקיים התנאי לשחרורו.

6.3.3.5. החברה מתחייבת כי כל התנאים המפורטים בסעיפים 6.3.1, 6.3.2 ו-6.3.3 לשטר זה יתקיימו בתוך תקופה של מאה ועשרים (120) ימים ממועד הנפקת אגרות החוב (סדרה א׳). אסיפת מחזיקי אגרות החוב רשאית לאשר להאריך את התקופה האמורה בהחלטה מיוחדת (תקופת 120 הימים האמורה בצירוף כל ארכה שתאושר כאמור, ככל שתאושר, תכונה להלן : **"תקופת הביניים"**).

ככל שלא יתקיימו כל התנאים המפורטים בסעיפים 6.3.1, 6.3.2 ו-6.3.3 לשטר זה כאמור עד תום תקופת הביניים, תפעל החברה לביצוע פדיון מוקדם מלא ומחיקתן ממסחר של אגרות החוב לא לפני תום תקופת הביניים (**"הפדיון המוקדם הכפוי"**). יום עסקים אחד לאחר תום תקופת הביניים החברה תפרסם דוח מיידי עם העתק לנאמן ובו תודיע אודות ביצוע הפדיון המוקדם הכפוי ומועדו. מועד הפדיון המוקדם הכפוי יהא לא פחות משבעה-עשר (17) ימים ולא יותר מארבעים וחמישה (45) ימים לאחר דיווח החברה אודות הפדיון המוקדם הכפוי למחזיקי אגרות החוב. בדוח המיידי כאמור תפרסם החברה את סכום הקרן שייפרע בפדיון המוקדם הכפוי וכן את הריבית שנצברה ואת שעור הריבית בגין סכום הקרן עד למועד הפדיון המוקדם הכפוי.

במקרה זה הערך ההתחייבותי של אגרות החוב, דהיינו קרן אגרות החוב (סדרה א׳) בצירוף ריבית שנתית על-פי שיעור של הריבית בגין אגרות החוב (סדרה א׳) שנצברה מיום המסחר הראשון שלאחר מועד הדיווח על תוצאות ההנפקה ועד למועד הפדיון המוקדם הכפוי בפועל, ישולמו למחזיקי אגרות החוב (סדרה א׳) בניכוי מס כדין. לצורך ביצוע פדיון מוקדם כפוי לפי סעיף 6.3.3.5 זה ייעשה, בין היתר, שימוש בכספים שנותרו בחשבון הנאמנות אשר יועברו על-ידי הנאמן ישירות מחשבון הנאמנות לחברה לרישומים בניכוי עלויות פתיחת חשבון הנאמנות, ניהולו וסגירתו, בניכוי עמלות נוספות לצדדים שלישיים ככל שיהיו, והחברה תשלים כל סכום שיידרש לצורך ביצוע פדיון מוקדם כאמור.

למען הסר ספק ככל שהשעבודים כאמור בשטר זה טרם נרשמו במועד ביצוע הפדיון המוקדם הכפוי במלואו, לא תחול עוד חובה על החברה לירשום את השעבודים לטובת מחזיקי אגרות החוב (סדרה א׳), ושטר נאמנות זה יפקע ויהא חסר כל תוקף.

6.3.3.6. מבלי לגרוע מהאמור לעיל, מובהר כי כל עוד לא התקיימו התנאים להעברת תמורת ההנפקה לחברה, תהיה תמורת ההנפקה אשר תוחזק בחשבון הנאמנות, מיועדת להבטחת מלוא התחייבויות החברה בקשר עם אגרות החוב (סדרה א׳) בהתאם לשטר הנאמנות, והחברה לא תהיה זכאית לקבל לידיה את תמורת ההנפקה אלא בכפוף להתקיימות כל התנאים המפורטים בסעיפים 6.3.1, 6.3.2 ו-6.3.3 לשטר זה.

6.3.3.7. על אף האמור בסעיף זה לעיל, מובהר כי חתימה על הסכם השליטה כמתואר בסעיף 6.2.1.3 לשטר זה ושעבוד החשבון המשועבד, אינו מהווה תנאי לשחרור תמורת ההנפקה והחברה תפעל לחתימה על הסכם השליטה כאמור לאחר השלמת הנפקת אגרות החוב (סדרה א׳) לראשונה. עד לחתימה על הסכם השליטה כאמור והשלמת יצירת השיעבוד על החשבון המשועבד, יוחזק בחשבון

- 31 -

הנאמנות פקדון בסך של השווה ל-15 מיליון דולר מתוך תמורת ההנפקה ("**פיקדון ה-DACA**"). עם התקשרות התאגיד המשועבד בהסכם השליטה כאמור והשלמת יצירת השיעבוד על החשבון המשועבד, יראו בשעבוד על החשבון המשועבד כחלק מהשעבודים המתוארים בשטר זה לכל דבר ועניין והנאמן ישחרר את פקדון ה-DACA לחברה בהתאם להוראותיה.

6.3.4.   <u>מכירת נכסים משועבדים ו/או מימון מחדש</u>

החברה תהא רשאית למכור לצדדים שלישיים ו/או לבצע מימון מחדש של נכסי הנדל"ן המשועבדים (כפי שיהיו מעת לעת), כולם או מקצתם, כאשר יודגש כי נכס משועבד יימכר או יבוצע מימון מחדש לנכס, במלואו בלבד, ללא קבלת אישור הנאמן ו/או אסיפת מחזיקי אגרות החוב לכך, ובלבד שתפעל כדלקמן :

6.3.4.1.   התמורה נטו בגין מכירת נכס הנדל"ן המשועבד ו/או המימון מחדש שלו, היינו בניכוי (שיבוצע לפני העברה לנאמן) המס והוצאות ישירות החלות על החברה בגין מכירת הנכס המשועבד או המימון מחדש שלו ("**תמורת המכירה נטו**"), תופקד ישירות בחשבון הנאמנות, באופן שלאחר הפקדת תמורת המכירה כאמור, יחס ההלוואה לבטוחה בתאגיד המשועבד לא יעלה על 65% במועד הבדיקה, שהינו המועד בו תועבר לחשבון הנאמנות במלואה תמורת המכירה נטו. החברה מתחייבת לדאוג לכך כי הסכם המכר ו/או הסכם המימון מחדש יכלול הוראה בלתי חוזרת לפיה תמורת המכירה נטו, תופקד ישירות בחשבון הנאמנות וכי היא תאכוף ביצוע הוראה זו. מובהר בזאת, כי החברה תודיע בדוח המיידי אודות מכירת הנכס ו/או מימון מחדש שלו, אשר יפורסם לפחות שלושים (30) ימים קודם למועד מכירת הנכס, האם כספי תמורת המכירה נטו יופקדו בחשבון הנאמנות עד למועד הפירעון הסופי של אגרות החוב או עד לביצוע פדיון מוקדם של אגרות החוב כמפורט בסעיף 6.3.4.3 לשטר זה.

קודם להעברת תמורת המכירה נטו לחשבון הנאמנות, החברה תמציא לנאמן תחשיב חתום על-ידי נושא משרה בכיר בתחום הכספים בחברה בקשר עם תמורת המכירה נטו, יחס ההלוואה לבטוחה בתאגיד המשועבד לאחר המכירה ו/או המימון מחדש, יתרת הערך המתואם של אגרות החוב וכן אסמכתאות (לרבות העתק נאמן למקור של הסכם המכר ו/או המימון מחדש) וכל אישור או מסמך אחר שידרוש הנאמן לשביעות רצונו.

מוסכם, כי ככל שהמכירה תבוצע באמצעות סוכן סגירה, יראו בהפקדת הכספים אצל סוכן הסגירה וקבלת התחייבות של סוכן הסגירה להפקיד את הכספים בחשבון הנאמנות כהפקדה ישירה בחשבון הנאמנות.

6.3.4.2.   בכפוף לעמידת החברה בתנאי ובהתחייבות כאמור בסעיף 6.3.4.1 לשטר זה, לאחר ביצוע מכירה ו/או מימון מחדש כאמור, ולאחר קבלת כל האמור בסעיף 6.3.4.2 לשטר זה לשביעות רצון הנאמן, הנאמן ימסור לחברה מכתב המאשר, כי עם קבלת האישור על הפקדת תמורת המכירה נטו בחשבון הנאמנות, הוא ישתף פעולה עם החברה להסרת השעבוד מן הנכס המשועבד העומד למכירה ו/או למימון מחדש בהתאם לחוות דעת שתתקבל מעורך הדין האמריקאי.

6.3.4.3.   מובהר, כי החברה תהא רשאית בכל עת, לפי שיקול דעתה הבלעדי, לעשות שימוש בכספים שיופקדו בחשבון הנאמנות, לרבות פירותיהם, אשר יתקבלו ממכירה ו/או מימון מחדש של נכס משועבד, לצורך פרעון קרן ו/או ריבית אגרות חוב (סדרה א'), לרבות בדרך של פדיון מוקדם (מלא או חלקי, לפי שיקול דעת החברה).

בנוסף מעבר לאמור לעיל בסעיף זה, החברה תהיה רשאית למשוך את הכספים הנובעים אך ורק ממכירת הנכס המשועבד ו/או ממימון מחדש כאמור שהופקדו

- 32 -

בחשבון הנאמנות, ובלבד שלאחר תשלום הקרן ו/או הריבית או משיכת הכספים כאמור, יחס ההלוואה לבטוחה בתאגיד המשועבד לא יעלה על 65%.

במקרה של ביצוע פדיון מוקדם, יחולו הוראות סעיף 7.2 לשטר זה, בשינויים המחוייבים.

6.3.5. **הוראות להרחבת סדרה**

6.3.5.1. החברה תהיה רשאית להרחיב את סדרת אגרות החוב על-פי סעיף 4.1 לשטר זה.

6.3.5.2. לצורך עמידה בהוראות יחס ההלוואה לבטוחה בתאגיד המשועבד לאחר הרחבת הסדרה, תהא החברה רשאית, ככל שנדרש וזאת ללא צורך בקבלת אישור הנאמן ו/או מהמחזיקים באגרות החוב (סדרה א') הקיימים באותה עת, ליצור משכנתא בדרגה ראשונה וכן את כל השעבודים הנוספים בסעיף 6.2 לשטר הנאמנות, לטובת הנאמן עבור מחזיקי אגרות החוב אך ורק על אילו מהנכסים המשועבדים, המפורטים בסעיף 6.2.1 לשטר זה, שטרם נוצרו שעבודים בגינם.

6.3.5.3. תמורת ההנפקה שתתקבל בידי רכז ההנפקה, תועבר על-ידי רכז ההנפקה, על פירותיה לחשבון הנאמנות וזאת עד ליצירת השעבודים הנוספים בהתאם לחוות דעת עורך הדין האמריקאי, בשינויים המחוייבים והכל לשביעות רצון הנאמן.

6.3.6. **שחרור של נכסים משועבדים**

החברה תהא רשאית, בכל מועד, בהתאם לשיקול דעתה הבלעדי, לדרוש מהנאמן להסיר במלואו שעבוד מנכס משועבד כלשהו, לרבות שחרור של בטוחות פיננסיות על פירותיהן (אם וככל שתשועבדנה), באופן שהנכס ממנו הוסר השעבוד לא יכלל בנכסי הנדל"ן המשועבדים מאותו מועד, ו/או לשנות את רישום השעבוד כך שיחול רק על חלק מנכסי הנדל"ן המשועבדים, לפי שיקול דעתה, מבלי שתידרש לשם כך לאישור הנאמן ו/או מחזיקי אגרות החוב (סדרה א') (לרבות אישורים ביחס לזהות הנכסים שיוותרו משועבדים והנכסים שישוחררו כאמור), והנאמן מתחייב בזאת לפעול בהתאם לדרישת החברה כאמור ולחתום על כל מסמך ו/או אישור שיהיו נחוצים או מועילים להסרת השעבודים במלואם.

הסרת השעבודים כאמור תתאפשר בלבד שהחברה תוכיח לנאמן, באמצעות תחשיב המאושר על-ידי נושא המשרה הבכיר בתחום הכספים בחברה, כי לאחר גריעת הנכס/ים המשועבד/ים, יחס ההלוואה לבטוחה בתאגיד המשועבד אינו עולה על 55%, וכן בכפוף לאישור החברה כי במועד בקשת שחרור הנכסים משעבוד החברה עומדת בכל התחייבויותיה כלפי מחזיקי אגרות החוב בהתאם לשטר הנאמנות וכן כי לא קמה עילה להעמדת אגרות החוב לפירעון מיידי ו/או למימוש בטוחות, והכל בנוסח לשביעות רצון הנאמן.

מובהר, כי לאחר הסרת נכס הנדל"ן המשועבד מנכסי הנדל"ן המשועבדים, לא יהיו הם כפופים בדרך כלשהי להוראות שטר זה (לרבות חברת הנכס המחזיקה בו וחברת התפעול המפעילה אותו).

6.4. **יחס ההלוואה לבטוחה**

יחס ההלוואה לבטוחה בתאגיד המשועבד יחושב בהתאם לנוסחא הבאה:

$$\textbf{יחס ההלוואה לבטוחה בתאגיד המשועבד} \ = \ \frac{A - B - D}{C - D}$$

כאשר:

A = הערך ההתחייבותי של אגרות החוב (סדרה א'), קרי קרן בתוספת ריבית שנצברה, נכון למועד הבדיקה.

B = יתרת המזומנים בחשבון הנאמנות, נכון למועד הבדיקה.

- 33 -

C =  השווי ההוגן של כלל נכסי הנדל״ן המשועבדים בהתאם לדוחותיה הכספיים האחרונים של החברה.

D =  מזומנים בחשבון המשועבד.

6.5.    <u>הצהרות והתחייבויות בקשר עם הנכסים המשועבדים</u>

כל אחת מהחברה, חברת ההחזקות, התאגיד המשועבד חברות התפעול וחברות הנכס מצהירות ומתחייבות, לפי העניין, כדלקמן:

6.5.1.1    כל אחד מנכסי הנדל״ן המשועבדים הינו בבעלותה המלאה, הישירה והבלעדית של חברת הנכס הרלוונטית, והכל כמפורט ב**נספח א׳** לשטר זה.

6.5.1.2    כל אחת מחברות התפעול זכאית, באופן בלעדי, למלוא ההכנסות הנובעות מנכסי הנדל״ן המשועבדים ומחויבת בכל ההוצאות בקשר עם מנכסי הנדל״ן המשועבדים, והכל כמפורט ב**נספח א׳** לשטר זה.

6.5.1.3    לעשות שימוש בכוח הנובע מהחזקותיהם על מנת שחברת ההחזקות, התאגיד המשועבד וחברות הנכס וחברות התפעול יחתמו על כל מסמך שיידרש בהתאם לשטר הנאמנות.

6.5.1.4    הסכמי התפעול של חברת ההחזקות, התאגיד המשועבד, חברות התפעול וחברות הנכס או מסמכי ההתאגדות שלהן או כל הסכם אחר שהן צד לו אינם סותרים את הוראות שטר זה וכן לא יסתרו בעתיד כל הוראה מהוראות שטר הנאמנות.

6.5.1.5    לעשות שימוש בכוח הנובע מהחזקותיה על מנת שחברת ההחזקות, התאגיד המשועבד, חברות התפעול וחברות הנכס לא ישנו את הסכמי התפעול שלהן או כל הסכם אחר בו הן קשורות או יתקשרו, באופן שתחולנה מגבלות כלשהן על הזכויות בנכסים המשועבדים, עבירותן או מימושן ו/או שעבוד הזכויות מכוחן ו/או מימוש השעבודים.

6.5.1.6    כל אחת מחברת ההחזקות, התאגיד המשועבד, חברות התפעול וחברות הנכס לא תשנה את הסכמי התפעול שלה או כל הסכם אחר בו היא מתקשרת, באופן שתחולנה מגבלות כלשהן על איזו מהזכויות בנכסים המשועבדים, עבירותן או מימושן ו/או המחאת הזכויות מכוחן ו/או תוקף ו/או יכולת אכיפה ומימוש השעבודים עליהן הנוצרים על פי שטר הנאמנות.

6.5.1.7    בכפוף להוראות שטר הנאמנות, להימנע מביצוע כל דיספוזיציה בחברת ההחזקות ו/או בתאגיד המשועבד ו/או בחברות הנכס ו/או בחברות התפעול ו/או בנכסים המשועבדים, לרבות להימנע מהקצאת זכויות נוספות של חברות הנכס ו/או של התאגיד המשועבד ו/או חברות התפעול לכל אדם או גוף (כולל החברה) ובכלל זאת לא להקנות לכל אדם או גוף (כולל החברה) זכות כלשהי כלפי הנכסים המשועבדים וזאת כל עוד לא נפרעו כל הסכומים המובטחים ולא מולאו כל התחייבויות החברה בגינם, ללא קבלת אישור חתום על-ידי הנאמן מראש לאחר שהתקבלה החלטת אסיפת מחזיקי אגרות החוב בנושא בהחלטה מיוחדת. מובהר, כי החברה לא תשעבד את החזקותיה בחברות הנכס וכן לא תשעבד את הנכסים המשועבדים לטובת נושה אחר כל עוד לא נפרעו הסכומים המובטחים ולא מולאו כל התחייבויות החברה בגינם. החברה תכלול אישור בדבר עמידה בהוראות סעיף זה באישור השנתי שתמציא לנאמן בהתאם להוראות סעיף 18.17 לשטר זה.

יובהר, כי העברת הזכויות בחברות הנכס ובחברות התפעול לתאגיד המשועבד, כמפורט בסעיף 6.2.2 לשטר זה, לא תהווה דיספוזיציה לצורכי סעיף זה.

6.5.1.8    מבלי לגרוע מהאמור בסעיף 6.5.1.7 לשטר זה, החברה וחברת ההחזקות מתחייבות כי ככל שיוקצו זכויות נוספות בתאגיד המשועבד, הן יהיו אחראיות לכך שזכויות אלו ישועבדו לטובת הנאמן עבור מחזיקי אגרות החוב בהתאם להוראות שטר זה (לרבות לעניין המסמכים שיידרשו בקשר עם שעבוד כאמור).

- 34 -

6.5.1.9. פעילותה היחידה של חברת ההחזקות היא החזקה במישרין בזכויות ההשתתפות המשועבדות של התאגיד המשועבד ואין לה נכסים כלשהם למעט זכויות ההשתתפות המשועבדות. חברת ההחזקות מתחייבת שלא לשנות את האמור לכל אורך חיי אגרות החוב.

6.5.1.10. פעילותו היחידה של התאגיד המשועבד הינה החזקה במישרין בזכויות השתתפות בחברות הנכס ואין לו נכסים כלשהם למעט זכויות ההשתתפות המשועבדות בחברות הנכס. התאגיד המשועבד מתחייב שלא לשנות את האמור לכל אורך חיי אגרות החוב.

6.5.1.11. פעילותה היחידה של כל אחת מחברות הנכס היא החזקה במישרין בנכס הנדל"ן המשועבד שבבעלותה המלאה ואין לכל אחת מחברות הנכס נכסים נוספים כלשהם למעט נכס הנדל"ן המשועבד. חברות הנכס מתחייבות שלא לשנות את האמור לכל אורך חיי אגרות החוב.

6.5.1.12. פעילותה היחידה של כל אחת מחברות התפעול הינה הפעלה של נכס הנדל"ן המשועבד בו היא פועלת. חברות התפעול מתחייבות שלא לשנות את האמור לכל אורך חיי אגרות החוב.

6.5.1.13. בכפוף להוראות שטר הנאמנות, לא לנקוט בהליכים כלשהם בגין איזה מהשעבודים ואיזה מהנכסים המשועבדים שיש בהם פגיעה ביכולתו של הנאמן לאכוף ו/או לממש את השעבודים ו/או בתוקפו של איזו מהשעבודים.

6.5.1.14. לא למשכן ולא לשעבד, בין במישרין ובין בעקיפין, בין במעשה ובין במחדל, את הנכסים המשועבדים או כל חלק מהם לטובת צד שלישי כלשהו באיזה אופן שהוא וכן לא להעניק כל זכות שהיא בתאגיד המשועבד או באיזו מחברות הנכס או באיזו מחברות התפעול לרבות בנכסיהן.

6.5.1.15. בכפוף להוראות שטר הנאמנות, כל עוד הנכסים המשועבדים הינם משועבדים, לא למכור, לא להעביר ולא להמחות ו/או להקנות לגורם כלשהו באיזה אופן שהוא את הנכסים המשועבדים, או כל חלק מהם ו/או כל זכות בהם, בין במישרין ובין בעקיפין, בין במעשה ובין במחדל.

6.5.1.16. לעשות ולהורות לחברת ההחזקות, לתאגיד המשועבד, לחברות הנכס ולחברות התפעול, על חשבונה של החברה או על חשבונן, לפי העניין, כל שיהיה דרוש בנסיבות העניין, על מנת שכוחם של השעבודים שירשמו לטובת הנאמן יהיה תקף כלפי צדדים שלישיים, לרבות נושים אחרים - קיימים או עתידיים - של החברה ושל חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול ויגבר על זכויותיהם בכל הנוגע לשעבודים.

6.5.1.17. חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול רשאיות לשעבד את הנכסים המשועבדים, לפי האמור בשטר זה לטובת מחזיקי אגרות החוב (סדרה א'), ולא נדרשת הסכמה כלשהי לצורך הסבת ורישום המשכנתאות.

6.5.1.18. במועד ההתקשרות בשטר זה ובמועד יצירת ורישום השעבודים אין כל מניעה על-פי כל דין, הסכם או התחייבות, לרבות מסמכי ההתאגדות של החברה, חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול, לחתימה על שטר הנאמנות, ואין כל הגבלה או תנאי על רישום השעבודים ועל התחייבויות החברה, חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול בו, וכי התקשרותה וחתימת החברה התאגיד המשועבד, חברת ההחזקות, חברות התפעול וחברות הנכס על שטר זה אינו מהווה הפרה של התחייבות כלשהי שמי מהן נטלה על עצמה, וכי המוסדות המוסמכים של כל אחד מהתאגידים הרלוונטיים קיבלו החלטה כדין בדבר יצירת ורישום השעבודים וחתימתם על שטר זה וכי לא נדרשת הסכמה לרישום השעבודים מכל גורם שהוא. החברה מתחייבת בזאת להודיע לנאמן בכתב מיידית במקרה בו יחול שינוי באמור בס"ק זה.

6.5.1.19. למעט ביחס לשעבודים הקיימים שכאמור יוסרו ובמקומם ירשמו השעובדים לטובת הנאמן עבור מחזיקי אגרות החוב, זכויות התאגיד המשועבד, חברת ההחזקות, חברות הנכס וחברות התפעול בנכסים המשועבדים נקיות וחופשיות מכל חוב, עיקול, עכבון, שעבוד או זכות צד ג' כלשהי, ואין כל הגבלה או תנאי החלים על-פי דין או הסכם על העברת הבעלות בהם או על שעבודם ו/או מימושם ו/או העברת הבעלות בהם בעת מימוש.

6.5.1.20. במועד החתימה על שטר זה ובמועד יצירת ורישום השעבודים, החברה ו/או חברת ההחזקות ו/או התאגיד המשועבד ו/או חברות הנכס ו/או חברות התפעול אינם מצויים בהליכי פירוק ו/או כינוס נכסים (זמני או קבוע) ו/או הקפאת הליכים (או כל הליך דומה בהתאם לדין החל על החברה ו/או על חברת ההחזקות ו/או על התאגיד המשועבד ו/או על חברות הנכס ו/או על חברות התפעול) ו/או איום בהגשת בקשה או בנקיטת הליכים כאמור, והחברה ו/או חברת ההחזקות ו/או התאגיד המשועבד ו/או חברות הנכס ו/או חברות התפעול לא קיבלו החלטת פירוק או החלטה דומה על פי הדין החל עליהן.

6.5.1.21. החברה ו/או חברת ההחזקות ו/או התאגיד המשועבד ו/או חברות הנכס ו/או חברות התפעול לא קיבלו הודעה כלשהי על תביעות כלשהן ביחס לזכויות מי מהן בנכסים המשועבדים במועד החתימה על שטר זה ובמועד יצירת ורישום השעבודים. החברה ו/או חברות ההחזקה ו/או התאגיד המשועבד ו/או חברות הנכס ו/או חברות התפעול מתחייבות בזאת להודיע לנאמן בכתב במקרה בו יחול שינוי באמור בס"ק זה מיד כשייוודע למי מהן הדבר ולטפל בתביעות אלו באופן מיידי.

6.5.1.22. במועד החתימה על שטר זה במועד יצירת ורישום השעבודים, לא ידוע לחברה ו/או לחברת ההחזקות ו/או לתאגיד המשועבד ו/או לחברות הנכס ו/או לחברות התפעול על כל הליך פלילי או מינהלי המתנהל על-ידי רשות שלטונית או מנהלית נגד מי מהן.

6.5.1.23. לא ידוע לחברה ו/או לחברת ההחזקות ו/או לתאגיד המשועבד ו/או לחברות הנכס ו/או לחברות התפעול על כל פגם בזכויות בנכסים המשועבדים, וכי אם יתגלה פגם כאמור הן תפעלנה לתיקון הפגם בהקדם האפשרי מיד כשייוודע להן על פגם כאמור ועם גילוי הפגם האמור ידווחו לנאמן על כך בכתב באופן מיידי ובתוך כמה זמן צפויות לתקן הפגם.

6.5.1.24. מיד לאחר שיוודע על כך לחברה ו/או לחברת ההחזקות ו/או לתאגיד המשועבד ו/או לחברות הנכס ו/או לחברות התפעול, החברה תודיע לנאמן בכתב על כל מקרה של הטלת עיקול, שעבוד (כולל lien), נקיטת פעולת הוצאה לפועל או הגשת בקשה למינוי כונס נכסים או בקשה למינוי ו/או מינוי כל בעל תפקיד אחר על כל אחד מהנכסים המשועבדים ו/או על חלקם (או כל הליך דומה בהתאם לדין החל על החברה ו/או על חברת ההחזקות ו/או על התאגיד המשועבד ו/או על חברות הנכס ו/או על חברות התפעול). כמו-כן, לאחר שנודע על כך לחברה ו/או לחברת ההחזקות ו/או לתאגיד המשועבד ו/או לחברות הנכס ו/או לחברות התפעול, הן תודענה מיד על דבר קיומו של שעבוד לטובת הנאמן לרשות שעיקלה או נקטה פעולת הוצאה לפועל או שנתבקשה למנות כונס נכסים או כל בעל תפקיד אחר כאמור (או כל הליך דומה בהתאם לדין החל על החברה ו/או על חברת ההחזקות ו/או על התאגיד המשועבד ו/או על חברות הנכס ו/או על חברות התפעול) ו/או לצד שלישי שיזם או ביקש את אלה או את חלק מאלה, וכן תנקוטנה מיד על חשבונה של החברה בכל האמצעים הסבירים הדרושים לשם ביטול העיקול, פעולת ההוצאה לפועל או מינוי כונס הנכסים או המנהל המיוחד, לפי המקרה.

6.5.1.25. כל עוד תיוותרנה אגרות חוב (סדרה א') במחזור, החברה, חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול מתחייבות לבטח את נכסי הנדל"ן המשועבדים כמקובל בהלוואות בכירות במדינות בהם מצויים נכסי הנדל"ן המשועבדים. החברה מתחייבת להודיע לנאמן בכתב מיד בכל מקרה בו נודע לה על כל שינוי לרעה בהיקף הכיסוי הביטוחי בגין מי מנכסי הנדל"ן המשועבדים, או כי פקעה פוליסת הביטוח בגינם או במקרה בו הודיע לה, לחברת ההחזקות, לתאגיד המשועבד, לחברות הנכס או לחברות

- 36 -

התפעול, המבטח על פקיעת הפוליסה בגינם או על ביטולה. החברה תכלול גילוי כאמור בדבר תקפותו של הביטוח במסגרת דוח הדירקטוריון שיצורף לדוח התקופתי או הרבעוני (לפי העניין) של החברה.

6.5.1.26. במועד החתימה על שטר זה ו/או במועד יצירת ורישום השעבודים, לא נתקבלו אצל החברה ו/או חברת ההחזקות ו/או התאגיד המשועבד ו/או חברות הנכס ו/או חברות התפעול דרישה בכתב ו/או תביעה ו/או צו כלשהם של רשות מוסמכת לטפל במפגעים סביבתיים שמקורם באיזה מנכסי הנדל"ן המשועבדים.

6.5.1.27. כל עוד תיוותרנה אגרות החוב (סדרה א') במחזור, אחת לשנה בסמוך למועד פרסום הדוחות הכספיים השנתיים של החברה, החברה תמציא לנאמן אישור או חוות דעת, לפי העניין, מאת עורך הדין האמריקאי, בנוסח לשביעות רצון הנאמן, כי השעבודים על הנכסים המשועבדים, לרבות המשכנתאות בגין נכסי הנדל"ן המשועבדים, הינם תקפים וברי אכיפה.

6.5.1.28. החברה, חברת ההחזקות, התאגיד המשועבד, חברות הנכס וחברות התפעול מתחייבות להחזיק ולשמור את הנכסים המשועבדים במצב טוב ותקין, ומבלי לגרוע מכלליות האמור, לשלם במועד את כל המיסים והאגרות המוטלים ושיוטלו כדין על הנכסים המשועבדים, על-ידי הממשלה ו/או הרשות המקומית הרלוונטית, וזאת מבלי לגרוע מזכותן לנקוט בכל הליך אל מול הרשויות בקשר לדרישות כאמור. למועד חתימת שטר נאמנות זה ולמועד יצירת ורישום השעבודים זה מצהירות החברה וחברות הנכס כי לא קיים כל פיגור בתשלומי מיסים או האגרות כנגד איזה מהנכסים המשועבדים או חברות הנכס או חברת ההחזקות או חברות התפעול או התאגיד המשועבד.

6.5.1.29. למועד חתימת שטר זה ובמועד יצירת ורישום השעבודים, לא קיימים תשלומי מיסים או אגרות כנגד הנכסים המשועבדים או חברות הנכס או חברות התפעול, אשר מועד פירעונם חלף והם טרם שולמו.

6.5.1.30. חברות הנכס וחברות התפעול לא יהיו רשאיות להגיש בקשה לפשיטת רגל, בקשת פירוק מרצון או הליכים דומים אחרים אלא בהתאם להליך bankruptcy remote על-פיו תידרש הסכמת מנהל חיצוני או דירקטור שתפקידו היחיד הינו מתן אישור הסכמה להליך כאמור. מובהר כי מינוי מנהלים כאמור יתבצע על-ידי הנאמן וייידרש רק קודם לקבלת החלטה כאמור.

6.5.1.31. כל עוד תיוותרנה אגרות החוב (סדרה א') במחזור, יחולו ההוראות הבאות ביחס לחברת ההחזקות, התאגיד המשועבד, חברות התפעול וחברות הנכס:

א.    לא ישעבדו איזה מנכסיהן בשעבוד מכל סוג שהוא ובכל דרגה שהיא ולא יעמידו אותם כערובה בכל דרך שהיא, ללא קבלת הסכמה מראש של אסיפת מחזיקי אגרות החוב (סדרה א') בהחלטה מיוחדת.

ב.    לא תיטולנה חובות וכן התחייבויות פיננסיות נוספות כלשהן, לרבות העמדת ערבויות לצדדים שלישיים.

ג.    לא יקצו זכויות נוספות ללא קבלת אישור חתום על-ידי הנאמן מראש לאחר קבלת אישור אסיפת מחזיקי אגרות החוב בהחלטה מיוחדת.

ד.    החברה תמשיך להחזיק בזכויות השליטה ומהותן של היישויות המחזיקות (במישרין ובעקיפין) בחברות הנכס וחברות התפעול, כפי שהן במועד בו חברת הנכס שעבדה את נכס הנדל"ן הרלוונטי.

ה.    ימשיכו לשלם דמי ניהול מכח הסכם הניהול כמתואר בפרק 9 לתשקיף ולמעט הסכם הניהול האמור חברות הנכס לא יהיו צד לעסקאות עם בעל השליטה בחברה.

ו.    לא יקבלו החלטה על פירוק מרצון או החלטה דומה על-פי הדין החל עליהן.

- 37 -

ז.   חברת ההחזקות לא תקים תאגידים בינה לבין התאגיד המשועבד; התאגיד המשועבד לא יקים תאגידים בינו לבין חברות הנכס ו/או חברות התפעול; חברות הנכס או חברות התפעול לא יקימו תאגידים נוספים תחתיהם.

6.5.1.32.   החברה תבצע הערכות שווי לנכסי הנדל"ן המשועבדים לפחות אחת לשנה. פרסום הערכת שווי או מכתב עדכון להערכת שווי על-ידי החברה, במערכת במגנ"א, יהווה המצאה לנאמן.

6.5.2.   הוראות בקשר עם ה- Note

6.5.2.1.   החברה, חברת ההחזקות התאגיד המשועבד וחברות הנכס (לפי העניין) יהיו לווים במשותף, כאשר לחברה תהיה זכות לחייב את חברות הנכס, חברות ההחזקות והתאגיד המשועבד, בכל החלטה הקשורה בשטר החוב, לרבות פדיון מוקדם.

6.5.2.2.   החברה, חברת ההחזקות התאגיד המשועבד וחברות הנכס, לא יהיו רשאים לנקוט בכל פעולה שהיא לשם הקטנה ו/או שינוי של תנאי שטר החוב, בכל צורה שהיא ו/או לממש זכויות המוקנות לחברה בשטר החוב, למעט באופן של פירעון מלוא החוב על פי תנאיו (ומבלי לגרוע מאחריות החברה לביצוע הפירעונות למחזיקי אגרות החוב).

6.5.2.3.   החברה, חברת ההחזקות התאגיד המשועבד וחברות הנכס לא יהיו רשאים לנקוט בפעולה כלשהי על פי שטר החוב ו/או פעולה שהם רשאים לנקוט בה על פי דין (בישראל ו/או בארה"ב) ביחס לשטר החוב ו/או פעולות אחרות ביחס לחוב המובטח בשטר החוב, אלא אם פעולה כזו מותרת בשטר הנאמנות ובהתאם ובכפוף לתנאים של שטר הנאמנות.

6.5.2.4.   כל פירעון על חשבון החזר ה-Note ייחשב כשולם אם בוצע לחשבון הנאמנות, או לחשבון החברה לרישומים ישירות לצורך תשלום על חשבון קרן ו/או ריבית אגרות החוב (סדרה א') ו/או לצורך ביצוע פדיון מוקדם של אגרות החוב (סדרה א').

6.6.   התחייבות לא ליצור שעבודים

6.6.1.   החברה מתחייבת שלא לשעבד, לרבות לטובת גורם מממן את כלל רכושה (המוחזק על-ידה במישרין בלבד) בשעבוד שוטף כללי (או שעבוד דומה לכך בהתאם לדין החל על החברה), ללא קבלת הסכמה מראש של אסיפת מחזיקי אגרות החוב (סדרה א') לכך בהחלטה מיוחדת (לפירוט הליכי אסיפות מחזיקי אגרות החוב ראו סעיף 32 ובתוספת השנייה לשטר זה).

על אף האמור לעיל, החברה תהא רשאית ליצור שעבוד שוטף כללי על נכסיה וזכויותיה, הקיימים והעתידיים, כולם או מקצתם, לטובת גורם מממן בישראל עימו קשורה החברה בעסקאות הגנה על שער החליפין של השקל מול הדולר בקשר עם אגרות חוב שהנפיקה (או תנפיק) החברה אשר יעמיד מימון לחברה עצמה (ובכלל זה מחזיקי אגרות חוב מסדרות אחרות) ללא צורך בקבלת הסכמה של אסיפת מחזיקי אגרות החוב (סדרה א'), וזאת בכפוף לכך שבד בבד עם יצירת שעבוד שוטף כללי כאמור תיצור החברה שעבוד מאותו סוג ובדרגה שווה לטובת מחזיקי אגרות החוב (סדרה א'), פרי-פסו על-פי יחס החובות נכון לאותו מועד, אשר יהיה בתוקף כל עוד אגרות החוב (סדרה א') לא נפרעו במלואן. החברה מבהירה, כי למועד חתימת שטר זה לא יצרה החברה שעבוד שוטף כללי כאמור ולא התחייבה ליצור שעבוד שוטף כללי כאמור.

במקרה של יצירת שעבוד שוטף כאמור, יווצר השעבוד על פי הנחיות עורך הדין של הנאמן בטריטוריה הרלוונטית וכן תומצא לנאמן חוות דעת משפטית של עורך הדין של הנאמן בקשר לאופן רישום השעבוד, תוקפו, דרגת נשייתו, חוקיותו והיותו בר מימוש ואכיפה על-פי הדין החל הרלוונטי, וכן הצהרה של החברה כי אין כל מגבלה או תנאי בהסכם להבטחת החוב ו/או ההתחייבות ו/או הסכם השעבוד מול הצד השלישי האמור למימוש השעבוד על-ידי הנאמן וכן כי לא נדרשת הסכמת הצד השלישי ו/או מי מטעמו לשם מימוש השעבוד על-ידי הנאמן ו/או מחזיקי איגרות החוב (סדרה א') בנוסח שהיא לשביעות רצון הנאמן על-פי שיקול דעתו הסביר. החברה תישא במלוא העלויות הכרוכות ביצרת שעבוד כאמור לרבות שכר טרחת הנאמן ושכר טרחת עוה"ד של הנאמן.

- 38 -

6.6.2. בנוסף, החברה מתחייבת כי היא לא תשעבד את רכושה (המוחזק על-ידה במישרין בלבד), כולו או מקצתו, בשעבודים ספציפיים (לרבות שעבוד שוטף על נכס/ים ספציפי/ים), ללא קבלת הסכמה מראש של אסיפת מחזיקי אגרות החוב (סדרה א') לכך בהחלטה מיוחדת, אלא בכפוף לכך שהשעבוד ניתן לגורם ממוְן בישראל בלבד לצורך ביצוע עסקאות הגנה על שער החליפין של השקל מול הדולר ביחס לאגרות חוב אותן הנפיקה (או תנפיק) החברה (לרבות אגרות החוב (סדרה א') שיונפקו מכוח שטר זה). לעניין זה יובהר, כי החברה תהיה רשאית לתת ערבויות שאינן מגובות בשעבוד, וזאת מבלי להידרש לאישורה של אסיפת מחזיקי אגרות החוב (סדרה א'). החברה תפרט במסגרת דוח הדירקטוריון לכל רבעון, את עמידתה או אי עמידתה בהתחייבותה על-פי סעיפים 6.2.1 ו-6.2.2 זה לשטר זה ובו יפורט, בין היתר, כל שעבוד שיצרה בהתאם להתחייבותה זו (לרבות מטרת השעבוד שנוצר בהתאם לאמור לעיל).

כל אימת שהחברה תיצור לטובת מחזיקי אגרות החוב (סדרה א') שעבוד כאמור בסעיף 6.2.1 לשטר זה, תמציא החברה לנאמן את כל המסמכים הנדרשים לצורך יצירת ורישום השעבוד בכל המרשמים הרלוונטיים (כולל תעודות ו/או דוחות מאותו מרשם לאחר רישום השעבוד) לרבות אישור חתום על-ידי נושא המשרה הבכיר בתחום הכספים, בו יתואר השעבוד שבכוונת החברה ליצור ובו יאושר כי השעבוד הינו שעבוד מותר, כמפורט בסעיף זה, ולרבות חוות דעת מאת עורך הדין המתמצא בדין הרלוונטי החל על החברה, אשר יהיו בנוסח לשביעות רצונו של הנאמן וכן כל מסמך סביר אחר שידרוש הנאמן מעת לעת, שמקובל לדרוש בנסיבות העניין להבטחת תוקפו של השעבוד ויכולת אכיפתו ומימושו.

למען הסר ספק יובהר, כי בכפוף לאמור בסעיף 6.6.3 לשטר זה, חברות מוחזקות אחרות של החברה רשאיות לשעבד את רכושן, כולו או מקצתו, בכל שעבוד (לרבות שעבוד שוטף) ובכל דרך שהיא, ללא קבלת הסכמת אסיפת מחזיקי אגרות החוב (סדרה א') לכך ומבלי שתידרש העמדת בטוחה כלשהי למחזיקי אגרות החוב (סדרה א') במקביל ליצירת שעבוד כאמור על-ידן.

6.6.3. החברה מתחייבת שלא לשעבד בכל שעבוד שהוא (שאינו קיים במועד חתימת השטר), את החזקותיה בחברות המוחזקות על-ידה במישרין. מובהר, כי האמור בסעיף זה לא יחול בקשר עם שעבוד ההחזקות הישירות בחברות נכס (חברות המחזיקות במישרין בנכסי הנדל"ן של החברה) על-ידי חברות האם של חברות הנכס, וזאת לטובת מחזיקי אגרות החוב של החברה בקשר עם אגרות חוב מסדרה חדשה ו/או בקשר למימון שיועמד לחברות האם של חברות הנכס ו/או בקשר למימון שיועמד לחברות הנכס, הכל בכפף להוראות שטר זה.

6.7. החברה תמציא לנאמן לא יאוחר מ- 30 ימים לאחר חתימת שטר זה, חוות דעת מאת עו"ד המתמחה בדיני איי הבתולה הבריטיים החלים על החברה, על-פיה באיי הבתולה הבריטיים לא ניתן לרשום התחייבות לאי יצירת שעבודים כמפורט בסעיף 6.6 לשטר זה במרשם כלשהו המתנהל על-פי דיני איי הבתולה הבריטיים.

החברה תמציא לנאמן, מידי יום 30 ביוני ו-31 בדצמבר של כל שנה, אישור מאת נושא המשרה הבכיר בתחום הכספים בחברה, לפיו החברה לא רשמה במרשמיה ו/או במרשם אחר המתנהל על-פי הדין הרלוונטי שעבוד שוטף או ספציפי כלשהו לטובת מאן דהוא בניגוד לסעיף 6.6 לשטר זה.

החברה תמציא לנאמן, מידי יום 31 בדצמבר של כל שנה, אישור מאת עו"ד המתמחה בדין הרלוונטי החל על החברה לפיו החברה לא רשמה במרשמיה ו/או במרשם אחר המתנהל על-פי הדין הרלוונטי ולא יצרה שעבוד שוטף ו/או ספציפי כלשהו לטובת מאן דהוא בניגוד להתחייבותה בסעיף 6.6 לשטר זה. לאישור עוה"ד תצורף אסמכתא מהמרשם המתנהל לעניין זה על-פי הדין החל על החברה. אישור עו"ד המתמחה בדין הרלוונטי יתייחס לחברה בלבד ולא לחברות המוחזקות על-ידה.

החברה תכלול בדוח הדירקטוריון לכל רבעון, התייחסות בדבר עמידתה או אי עמידתה בהתחייבות האמורה בסעיף 6.6 לשטר זה. למעט בקשר עם הנכסים המשועבדים ובכפוף להוראות שטר זה, החברה תהיה רשאית למכור, להחכיר, להמחות, למסור או להעביר בכל דרך שהיא את רכושה, כולו או חלקו, בכל דרך שהיא, לטובת מי שתמצא לנכון, ללא צורך בהסכמה כלשהי של הנאמן ו/או מחזיקי אגרות החוב (סדרה א'), לפי העניין. למעט בקשר עם הנכסים המשועבדים, החברה אינה מחויבת להודיע לנאמן על העברה או מכירה של

- 39 -

נכס כלשהו מנכסיה אלא אם מדובר במכירה או העברה של ״נכס מהותי של החברה״ כהגדרתו בסעיף 8.1 לשטר זה, וכן אינה מחויבת להודיע לנאמן על יצירת כל שעבוד על נכסיה, למעט כאמור בסעיף 6.6 לשטר זה.

**7. פדיון מוקדם**

**7.1 פדיון מוקדם ביוזמת הבורסה**

במקרה בו יוחלט על-ידי הבורסה על מחיקה מהרישום למסחר בה של אגרות החוב (סדרה א׳) שבמחזור מפני ששווי סדרת אגרות החוב פחת מהסכום שנקבע בהוראות הבורסה בדבר מחיקה מהמסחר של אגרות חוב, תבצע החברה פדיון מוקדם של אגרות החוב (סדרה א׳) כדלקמן:

7.1.1. תוך ארבעים וחמישה (45) ימים מתאריך החלטת דירקטוריון הבורסה בדבר המחיקה מרישום למסחר כאמור, תודיע החברה על מועד פדיון מוקדם שבו רשאי המחזיק באגרות החוב לפדותן.

7.1.2. מועד הפדיון המוקדם יחול לא לפני עבור שבעה-עשר (17) ימים מתאריך פרסום ההודעה ולא מאוחר מארבעים וחמישה (45) ימים מהתאריך הנ״ל, אך לא בתקופה שבין המועד הקבוע לתשלום ריבית לבין מועד תשלומה בפועל.

7.1.3. במועד הפדיון המוקדם תפדה החברה את אגרות החוב שהמחזיקים בהן ביקשו לפדותן. תמורת הפדיון לא תפחת מסכום הערך המתואם של אגרות החוב (דהיינו, יתרת קרן אגרות החוב (סדרה א׳) שבמחזור בתוספת הפרשי ריבית שנצברו עד ליום התשלום בפועל וטרם שולמו נכון לאותו מועד, כקבוע בתנאי אגרות החוב), ותהיה בסכום הגבוה מבין הסכומים המפורטים בסעיף 7.2.7 לשטר זה.

7.1.4. קביעת מועד פדיון מוקדם כאמור לעיל אין בה כדי לפגוע בזכויות הפדיון הקבועות באגרות החוב של מי ממחזיקי אגרות החוב שלא יפדו אותן במועד הפדיון המוקדם כאמור לעיל, אך אגרות החוב תמחקנה מהמסחר בבורסה ויחולו עליהן, בין היתר, השלכות המס הנובעות מכך.

7.1.5. פדיון מוקדם של אגרות החוב כאמור לעיל לא יקנה למי שהחזיק באגרות החוב שייפדו כאמור את הזכות לתשלום על חשבון ריבית בגין התקופה שלאחר מועד הפדיון.

ההודעה על מועד הפדיון המוקדם תפורסם בדו״ח מיידי שישלח לרשות ולבורסה, בהודעה כאמור יפורט גם סכום תמורת הפדיון המוקדם.

**7.2 פדיון מוקדם ביוזמת החברה**

החברה תהא רשאית, בכל עת, אך לא לפני חלוף לפחות שישים (60) ימים ממועד רישומן למסחר בבורסה של אגרות החוב (סדרה א׳), לפי שיקול דעתה הבלעדי, להעמיד את אגרות החוב (סדרה א׳) לפדיון מוקדם, מלא או חלקי, ובמקרה כאמור יחולו ההוראות הבאות, והכל בכפוף להנחיות רשות ניירות ערך ולהוראות הבורסה, כפי שיהיו במועד הרלוונטי:

7.2.1. תדירות הפדיונות המוקדמים לא תעלה על פדיון אחד לרבעון. נקבע פדיון מוקדם ברבעון שקבוע בו גם מועד לתשלום ריבית, או מועד לתשלום פדיון חלקי או מועד לתשלום פדיון סופי, יבוצע הפדיון המוקדם במועד שנקבע לתשלום כאמור. למרות האמור לעיל, ניתן לבצע פדיון סופי ברבעון גם אם בוצע בו תשלום ריבית או פדיון חלקי. לעניין זה ״רבעון״ משמעו כל אחת מהתקופות הבאות: ינואר – מרץ, אפריל – יוני, יולי – ספטמבר, אוקטובר – דצמבר.

7.2.2. ההיקף המזערי של כל פדיון מוקדם, לא יפחת מ-1 מיליון ש״ח. למרות האמור לעיל, החברה תהא רשאית לבצע פדיון מוקדם בהיקף הנמוך מ-1 מיליון ש״ח ובלבד שתדירות הפדיונות לא תעלה על פדיון אחד לשנה. כל סכום שייפרע בפירעון מוקדם על-ידי החברה, ייפרע ביחס לכלל מחזיקי אגרות החוב, פרו-רטה, לפי הערך הנקוב של אגרות החוב המוחזקות.

- 40 -

7.2.3. החברה תמסור לנאמן תוך חמישה (5) ימי עסקים ממועד קבלת החלטה של דירקטוריון החברה בעניין ביצוע פדיון מוקדם כאמור לעיל, אישור חתום על ידי נושא המשרה הבכיר בתחום הכספים בחברה, בצירוף תחשיב, בדבר הסכום שישולם בפדיון המוקדם למחזיקי אגרות החוב (סדרה א') בנוסח לשביעות רצון הנאמן. כמו-כן, עם קבלת החלטה של דירקטוריון החברה בעניין ביצוע פדיון מוקדם כאמור לעיל, תפרסם החברה דוח מיידי עם העתק לנאמן, על ביצוע פדיון מוקדם למחזיקי אגרות החוב (סדרה א') אשר יכלול, בין היתר, את הסכום שישולם בפדיון מוקדם למחזיקי אגרות החוב (סדרה א'). הדיווח המיידי יפורסם לא פחות משבעה-עשר (17) ימים ולא יותר מארבעים וחמישה (45) ימים לפני ביצוע פדיון מוקדם.

7.2.4. מועד הפדיון המוקדם לא יחול בתקופה שבין המועד הקובע לתשלום ריבית בגין אגרות החוב לבין מועד תשלום הריבית בפועל. בדוח המיידי כאמור תפרסם החברה את סכום הקרן שייפרע בפדיון מוקדם ואת הריבית שנצברה בגין סכום הקרן האמור עד למועד הפדיון המוקדם, בהתאם לאמור להלן.

7.2.5. במקרה של פדיון מוקדם חלקי, החברה תשלם למחזיקי אגרות החוב במועד הפדיון המוקדם החלקי את הריבית שנצברה רק עבור החלק הנפדה בפדיון חלקי ולא על כל היתרה הבלתי מסולקת. לא ייעשה פדיון מוקדם לחלק מסדרת אגרות החוב אם סכום הפדיון האחרון יפחת מ-3.2 מיליון ש"ח. במועד פדיון מוקדם חלקי, ככל שיהיה, החברה תודיע בדוח מיידי על : (1) שיעור הפדיון החלקי במונחי היתרה הבלתי מסולקת; (2) שיעור הפדיון החלקי במונחי הסדרה המקורית; (3) שיעור הריבית בפדיון החלקי על החלק הנפדה; (4) עדכון שיעורי הפדיונות החלקיים שנותרו, במונחי הסדרה המקורית; (5) המועד הקובע לזכאות לקבלת הפדיון המוקדם של קרן אגרות החוב שיהיה שנים-עשר (12) ימים לפני המועד שנקבע לפדיון המוקדם ; והכל לפי העניין.

7.2.6. פדיון מוקדם חלקי יבוצע פרי פסו לכל אחד ממחזיקי אגרות החוב.

7.2.7. הסכום שישולם למחזיקי אגרות החוב (סדרה א') במקרה של פדיון מוקדם, יהיה הסכום הגבוה מבין הבאים : (1) שווי שוק של יתרת אגרות החוב (סדרה א') העומדות לפדיון מוקדם, אשר ייקבע על-פי מחיר הנעילה הממוצע של אגרות החוב בשלושים (30) ימי המסחר שקדמו למועד קבלת החלטת הדירקטוריון בדבר ביצוע הפדיון המוקדם אולם במקרה בו חל מועד הפדיון המוקדם במועד בו מבוצע תשלום ריבית, ינוכה משווי השוק האמור של אגרות החוב סכום בגובה הריבית בלבד המשולמת באותו המועד ; (2) הערך ההתחייבותי של אגרות החוב העומדות לפדיון מוקדם שבמחזור, דהיינו קרן בתוספת ריבית צבורה עד למועד הפידיון המוקדם בפועל ; (3) יתרת תזרים המזומנים של אגרות החוב העומדות לפדיון מוקדם (קרן בתוספת הריבית אותן נושאות אגרות החוב במועד הפדיון המוקדם) כשהיא מהוונת לפי תשואת האג"ח הממשלתי (כהגדרתה להלן) בתוספת 1.5% לשנה. היוון אגרות החוב העומדות לפדיון מוקדם יחושב החל ממועד הפדיון המוקדם ועד למועד הפירעון האחרון שנקבע ביחס לאגרות החוב (סדרה א') העומדות לפדיון מוקדם.

לעניין זה **"תשואת האג"ח הממשלתי"** משמעה, ממוצע משוקלל של תשואה לפדיון (ברוטו), בתקופה של שבעה (7) ימי עסקים, המסתיימת שני (2) ימי עסקים לפני מועד ההודעה על הפדיון המוקדם, של שתי (2) סדרות אגרות חוב ממשלתי שאינן צמודות למדד, בעלות ריבית בשיעור קבוע, ושמשך חייהן הממוצע הוא הקרוב ביותר למשך החיים הממוצע של אגרות החוב (סדרה א') במועד הרלוונטי, היינו סדרה אחת בעלת המח"מ הקרוב הגבוה ממח"מ אגרות החוב (סדרה א') במועד הרלוונטי, וסדרה אחת בעלת המח"מ הנמוך למח"מ אגרות החוב (סדרה א') במועד הרלוונטי ואשר, שקלולן ישקף את מח"מ אגרות החוב במועד הרלוונטי.

לדוגמא : אם מח"מ של אג"ח ממשלתי א' הוא 4 שנים, המח"מ של אג"ח ממשלתי ב' הוא 2 שנים ומח"מ יתרת ההלוואה הוא 3.5 שנים, תחושב התשואה כדלקמן :

$$4x + 2(1-x) = 3.5$$

- 41 -

X = משקל התשואה של אג"ח ממשלתי א'.

1 – X = משקל התשואה של אג"ח ממשלתי ב'.

על פי החישוב, התשואה השנתית של אג"ח ממשלתי א' תשוקלל בשיעור של שבעים וחמישה אחוזים (75%) מתשואת האג"ח הממשלתי והתשואה השנתית של אג"ח ממשלתי ב' תשוקלל בשיעור של עשרים וחמישה אחוזים (25%) מתשואת האג"ח הממשלתי.

במקרה של תשלום ריבית נוספת על-פי ס"ק (1) או ס"ק (3) לעיל עקב הפדיון המוקדם תשולם הריבית הנוספת על הערך הנקוב שנפדה בפדיון מוקדם בלבד.

8.   **זכות להעמדה לפירעון מיידי**

8.1   בקרות אחד או יותר מן המקרים המנויים בסעיף זה להלן יחולו ההוראות שבסעיף 8.2 לשטר, לפי העניין:

8.1.1   אם החברה לא תפרע במועד סכום כלשהו שיגיע ממנה בקשר לאגרות החוב או לפי שטר הנאמנות או לא תעמוד באיזו מיתר התחייבויותיה המהותיות כלפי המחזיקים.

8.1.2   אם החברה תגיש בקשה לצו הקפאת הליכים כהגדרתו בחוק חדלות פירעון ושיקום כלכלי, התשע"ח-2018 ("**חוק חדלות פירעון**") או אם יינתן צו דומה בהתאם להוראות חוק חדלות פירעון כנגד החברה או אם החברה תגיש בקשה לפשרה או להסדר עם נושי החברה לפי סעיף 350 לחוק החברות, או בהתאם לחוק חדלות פירעון או אם ניתן צו כאמור או אם החברה הגישה בקשה לצו פתיחת הליכים, כהגדרת מונח זה בחוק חדלות פירעון (למעט למטרת מיזוג עם חברה אחרת כאמור בסעיף 8.1.22 לשטר ו/או שינוי במבנה החברה לרבות פיצול, שאינם אסורים לפי תנאי שטר זה, ולמעט עשיית הסדרים בין החברה ובעלי מניותיה, שאין בהם כדי להשפיע על יכולת הפירעון של אגרות החוב (סדרה א'), אשר אינם אסורים לפי תנאי שטר זה) או אם יינתן צו כאמור כנגד החברה, או אם החברה תציע לנושיה בדרך אחרת פשרה או הסדר כאמור, על רקע העדר יכולתה של החברה לעמוד בהתחייבויותיה במועדן. יובהר, כי לעניין ס"ק זה, הליכים וכן פעולות, כדוגמת ההסדר, ביחס לחברה יהיו הליכים וכן פעולות בהתאם לדין הישראלי או הליכים דומים, בהתאם לדין זר.

8.1.3   אם תוגש בקשה לפי סעיף 350 לחוק החברות או חוק חדלות פירעון (או הליך דומה בהתאם לדין החל) כנגד החברה ושלא בהסכמתה, אשר לא נדחתה או בוטלה בתוך ארבעים וחמישה (45) ימים ממועד הגשתה.

יובהר, כי לעניין ס"ק זה, הליכים וכן פעולות, כדוגמת ההסדר, ביחס לחברה יהיו הליכים וכן פעולות בהתאם לדין הישראלי או הליכים דומים, בהתאם לדין זר.

8.1.4   אם החברה תקבל החלטת פירוק (למעט פירוק כתוצאה ממיזוג עם חברה אחרת כאמור בסעיף 8.1.22 לשטר) או אם יינתן ביחס לחברה צו פירוק קבוע וסופי על-ידי בית משפט או צו בעל משמעות דומה בהתאם להוראות חוק חדלות פירעון או ימונה לה מפרק קבוע או התקבלה החלטה דומה או מונה בעל תפקיד דומה על ידי החברה או כלפיה על פי חוק חדלות פירעון או על פי דין אחר או ימונה נאמן כהגדרת מונח זה בחוק חדלות פירעון. יובהר, כי לעניין ס"ק זה, הליכי הפירוק ביחס לחברה או הליכים דומים להם יהיו הליכים בהתאם לדין הישראלי או הליכים מקבילים, בהתאם לדין זר, הדומים, להליך הישראלי.

8.1.5   אם יינתן צו פירוק זמני או צו בעל משמעות דומה בהתאם להוראות חוק חדלות פירעון או צו דומה על פי הדין הרלוונטי או ימונה מפרק זמני או בעל תפקיד דומה בהתאם להוראות חוק חדלות פירעון או בעל תפקיד דומה על-פי הדין הרלוונטי או נאמן זמני, כהגדרת מונח זה בחוק חדלות פירעון, או כל בעל תפקיד דומה שימונה על פי הדין הרלוונטי או תתקבל כל החלטה שיפוטית בעלת אופי דומה על-ידי בית המשפט, וצו או החלטה כאמור לא נדחו או בוטלו בתוך ארבעים וחמישה (45) ימים ממועד מתן הצו או קבלת ההחלטה, לפי העניין. על אף האמור, לא תינתן לחברה תקופת ריפוי כלשהי ביחס לבקשות שהוגשו או צווים או

- 42 -

ניתנו, לפי העניין, על-ידי החברה או בהסכמתה. יובהר, כי לעניין ס״ק זה, הליכי הפירוק ביחס לחברה או הליכים דומים להם יהיו הליכים בהתאם לדין הישראלי או הליכים מקבילים, בהתאם לדין זר הרלוונטי לחברה, הדומים, להליך הישראלי.

8.1.6. אם הוגשה בקשה לכינוס נכסים או למינוי כונס נכסים (זמני או קבוע) או כל בעל תפקיד דומה שימונה על פי הדין לחברה או על נכס מהותי של החברה (כהגדרתו להלן), או אם יינתן צו למינוי כונס נכסים זמני או כל בעל תפקיד דומה שימונה על פי הדין או מונה נאמן זמני, כהגדרת מונח זה בחוק חדלות פירעון - אשר לא נדחו או בוטלו בתוך ארבעים וחמישה (45) ימים ממועד הגשתם או נתינתם, לפי העניין; או - אם ניתן צו למינוי כונס נכסים קבוע לחברה או ניתן צו למינוי נאמן (כהגדרת מונח זה בחוק חדלות פרעון) או על נכס מהותי של החברה (כהגדרתו להלן) או צו דומה על פי הדין החל על החברה. על אף האמור, לא תינתן לחברה תקופת ריפוי כלשהי ביחס לצו מינוי כונס נכסים קבוע או נאמן או ביחס לבקשות או צווים שהוגשו או ניתנו, לפי העניין, על-ידי החברה או בהסכמתה. יובהר, כי לעניין ס״ק זה, הליכי הכינוס ביחס לחברה או הליכים דומים להם יהיו הליכים בהתאם לדין הישראלי או הליכים מקבילים, בהתאם לדין זר הרלוונטי לחברה, הדומים, להליך הישראלי.

8.1.7. אם יוטל עיקול או יבוצעו פעולות הוצאה לפועל בקשר עם נכס מהותי של החברה (כהגדרתו להלן), והעיקול לא הוסר, או הפעולה לא בוטלה, לפי העניין, תוך ארבעים וחמישה (45) ימים ממועד הטלתם או ביצועם, לפי העניין. על אף האמור, לא תינתן לחברה תקופת ריפוי כלשהי ביחס לבקשות או צווים שהוגשו או ניתנו, לפי העניין, על-ידי החברה או בהסכמתה. יובהר, כי לעניין ס״ק זה, הליכי העיקול או הליכי הוצאה לפועל ביחס לחברה או הליכים דומים להם יהיו הליכים בהתאם לדין הישראלי או הליכים מקבילים, בהתאם לדין זר, הדומים, להליך הישראלי.

8.1.8. אם יממשו בעלי שעבודים את השעבודים שיש להם על נכס מהותי של החברה (כהגדרתו להלן).

8.1.9. אם קיים חשש ממשי שהחברה לא תעמוד, או שהחברה לא עמדה, בהתחייבויותיה המהותיות כלפי מחזיקי אגרות החוב (סדרה א׳). מובהר, כי בין ההתחייבויות המהותיות של החברה נכללים, בין היתר, סכומי התשלום למחזיקים ומועדיהם.

8.1.10. אם החברה הפסיקה או הודיעה על כוונתה להפסיק את תשלומיה, או חדלה או הודיעה על כוונתה לחדול מניהול עסקיה, כפי שאלו יהיו מעת לעת.

8.1.11. אם חלה הרעה מהותית בעסקי החברה לעומת מצבה במועד ההנפקה לראשונה של אגרות החוב (סדרה א׳) וקיים חשש ממשי שהחברה לא תוכל לפרוע את אגרות החוב (סדרה א׳) במועדן.

8.1.12. אם הועברה השליטה בחברה, במישרין או בעקיפין, ולא התקבלה להעברת השליטה כאמור הסכמת מחזיקי אגרות החוב (סדרה א׳) בהחלטה מיוחדת, טרם העברת השליטה.

לעניין ס״ק זה "**שליטה**" – כהגדרתה בחוק ניירות ערך, לא כולל החזקה ביחד עם אחרים שאינם בני משפחה (כהגדרת המונח בחוק ניירות ערך). למען הסר ספק יובהר לעניין זה כי ירושה על פי דין אינה מהווה העברת שליטה.

8.1.13. אם יועמדו לפירעון מיידי: (1) סדרת אגרות חוב אחרת שהנפיקה החברה אשר רשומה למסחר בבורסה; או (2) חוב או מס׳ חובות במצטבר של החברה או של תאגיד מאוחד אשר הערך ההתחייבותי שלה הינו 35 מיליון דולר לפחות או אשר היקפו עולה על 10% מסך הנכסים של החברה, על-פי הדוחות הכספיים המאוחדים האחרונים של החברה שפורסמו (מבוקרים או סקורים, לפי המקרה), לפי הנמוך מביניהם; או (3) חוב או מס׳ חובות במצטבר של תאגיד כלול שמכפלת שיעור ההחזקה של החברה (בשרשור סופי) בתאגיד הכלול בערך ההתחייבותי של החוב מהווה 35 מיליון דולר לפחות לפי הדוחות הכספיים האמורים (חובות כאמור בס״ק (2) ו-(3) לעיל, להלן בסעיף זה: "**החוב האחר**"); או (4) חוב או מס׳ חובות במצטבר של החברה או של תאגיד מאוחד או של תאגיד כלול, כולל הלוואות

- 43 -

ללא יכולת חזרה לחברה (Non-Recourse), אשר הערך ההתחייבותי שלו עולה על 30% מסך הנכסים על-פי הדוחות הכספיים המאוחדים האחרונים של החברה שפורסמו (מבוקרים או סקורים, לפי המקרה). לעניין סעיפים קטנים (2) ו-(3) לעיל, הלוואה ללא יכולת חזרה לחברה (Non-Recourse) לא תיחשב לעניין זה כחוב אחר כאמור לעיל. לעניין זה יצוין, כי בקשר עם חוב אחר אשר חבות החברה בגינו הינה בעקבות מתן ערבות לפירעון אותו חוב, העילה שבסעיף 8.1.13 זה תקום במועד שהחברה נדרשה לפרוע בפועל סכום הגבוה או שווה לחוב האחר האמור. ככל שיתקיימו התנאים האמורים דלעיל אזי תחול העילה האמורה וזאת החל מאותו מועד שבו נדרשה החברה לפרוע את החוב האמור (ולמען הסר ספק לאחר שחלפו תקופות הריפוי שחלות ביחס לחובות הרלוונטיים) ולא ממועד העמדת אותו חוב לפירעון מיידי, ככל שמועדים אלו אינם חופפים.

8.1.14. אם החברה לא תעמוד בהתניית ההון העצמי (כהגדרתה בסעיף 5.7.1 לשטר זה) במשך התקופה המפורטת בסעיף 5.7 לשטר זה.

8.1.15. אם החברה לא תעמוד בהתניית יחס חוב ל-CAP (כהגדרתה בסעיף 5.7.2 לשטר זה) במשך התקופה המפורטת בסעיף 5.7 לשטר זה.

8.1.16. אם החברה לא תעמוד בתניית יחס חוב נטו ל-EBITDA (כהגדרתה בסעיף 5.7.3) במשך התקופה המפורטת בסעיף 5.7 לשטר זה.

8.1.17. אם החברה תפר את התחייבותה לעמוד במגבלות תחום פעילות עיקרי ו/או אזור פעילות עיקרי ו/או נכס בודד (כהגדרתן בסעיף 5.9 לשטר זה), והדבר לא תוקן עד למועד פרסום הדוחות הכספיים המאוחדים (רבעוניים או שנתיים) העוקבים לדוחות הכספיים המאוחדים של החברה לפיהם החברה אינה עומדת במגבלה האמורה.

8.1.18. אם החברה תפר איזו מהתחייבויותיה, כמפורט בסעיף 5.10 לשטר זה.

8.1.19. אם החברה ביצעה חלוקה בניגוד להוראות סעיף 5.5 לשטר זה.

8.1.20. ככל שדירוג אגרות החוב (סדרה א') על-ידי חברת הדירוג יופחת לדירוג הנמוך מדירוג -BBB. במקרה של החלפת חברת דירוג, תעביר החברה לידי הנאמן השוואה בין סולם הדירוג של חברת הדירוג המוחלפת לבין סולם הדירוג של חברת הדירוג החדשה.

לעניין סעיף זה להלן יודגש, כי היה ובזמן כלשהו אגרות החוב (סדרה א') תהיינה מדורגות על-ידי יותר מחברת דירוג אחת, בחינת הדירוג לעניין העילה לפירעון מיידי שלעיל תיעשה, כל עת, על-פי הדירוג הנמוך מביניהם.

8.1.21. אם החברה תמכור לאחר/ים את כל נכסיה או את עיקר נכסיה, ולא התקבלה למכירה כאמור הסכמת מחזיקי אגרות החוב (סדרה א') מראש בהחלטה מיוחדת. לעניין סעיף זה, "**מכירה לאחר**" משמעה מכירה לכל צד שלישי (לרבות בעלי השליטה בחברה ו/או תאגידים בשליטתם), למעט מכירה לתאגידים בבעלות מלאה של החברה;

לעניין סעיף זה - "**עיקר נכסי החברה**" משמעם נכס או צירוף של מספר נכסים אשר שוויו או שווים המצרפי (לפי העניין) בדוחות הכספיים המאוחדים האחרונים שפורסמו טרם קרות האירוע הרלוונטי עולה על חמישים אחוזים (50%) מהיקף נכסיה במאזן המאוחד על-פי הדוחות הכספיים כאמור.

8.1.22. בוצע מיזוג ללא קבלת אישור מוקדם של מחזיקי אגרות החוב (סדרה א') בהחלטה מיוחדת, אלא אם כן היישות הקולטת נטלה על עצמה את מלוא התחייבויותיה של החברה כלפי מחזיקי אגרות החוב ובנוסף הצהירה החברה או היישות הקולטת (לפי העניין) כלפי מחזיקי אגרות החוב (סדרה א'), לרבות באמצעות הנאמן, לפחות עשרה (10) ימי עסקים לפני מועד המיזוג, כי לא קיים חשש סביר שעקב המיזוג לא יהיה ביכולתה של היישות הקולטת לקיים את ההתחייבויות כלפי מחזיקי אגרות החוב (סדרה א'). אין בסעיף זה כדי לגרוע מיתר העילות להעמדה לפירעון מיידי המוקנות למחזיקי אגרות החוב בהתאם לסעיף 8.1 זה לעיל ולהלן וכי החל מתקופה של שלושים (30) ימים לפני מועד המיזוג המתוכנן, יחולו כל העילות

- 44 -

המנויות בסעיף 8.1 זה לעיל ולהלן גם ביחס ליישות הקולטת כאילו היתה החברה. ביחס לאמור בסעיפים בהם האמור נגזר מהדוחות הכספיים של החברה, תבוצע הבדיקה ביחס לדוחות הכספיים של היישות הקולטת כפי שיהיו לאחר המיזוג.

8.1.23. אם המסחר באגרות החוב (סדרה א') בבורסה הושעה על-ידי הבורסה, למעט השעייה בעילה של היווצרות אי בהירות כאמור בחלק הרביעי לתקנון הבורסה, וחלפו שישים (60) ימים ממועד ההשעייה במהלכם ההשעייה לא בוטלה.

8.1.24. אם החברה תחוסל או תימחק מכל סיבה שהיא.

8.1.25. אם החברה הפרה את תנאי אגרות החוב (סדרה א') או שטר הנאמנות הפרה יסודית, ובכלל זה אם יתברר כי מצג ממצגי החברה באגרות החוב או בשטר הנאמנות אינו נכון או אינו מלא, והנאמן נתן הודעה לחברה בכתב לתקן את ההפרה והחברה לא תיקנה את ההפרה כאמור בתוך ארבעה-עשר (14) ימים ממתן ההודעה.

8.1.26. אם אגרות החוב (סדרה א') תפסקנה להיות מדורגות לתקופה העולה על שישים (60) ימים עקב סיבות או נסיבות שהינן בשליטת החברה. לעניין זה יראו, בין היתר, את אי ביצוע התשלומים שהתחייבה החברה לשלם לחברת הדירוג ואת אי מסירת הדיווחים והמידע הנדרשים על-ידי חברת הדירוג במסגרת ההתקשרות בין החברה לחברת הדירוג, כסיבות ונסיבות שהינן בשליטת החברה.

8.1.27. במקרה שהחברה תבצע הרחבת סדרה לאגרות החוב (סדרה א') או תנפיק סדרות נוספות של אגרות חוב או ניירות ערך אחרים, בניגוד להוראות שטר הנאמנות.

8.1.28. אם החברה תחדל להיות תאגיד מדווח.

8.1.29. אם החברה לא פרסמה דוח כספי שהיא חייבת בפרסומו לפי כל דין, בתוך שלושים (30) ימים מהמועד האחרון שבו היא חייבת בפרסומו בהתאם להוראות הדין החלים עליה או בתום ארכה שניתנה לחברה על ידי רשות מוסמכת על פי דין, המאוחר מביניהם.

8.1.30. אם אגרות החוב (סדרה א') נמחקו מהמסחר בבורסה.

8.1.31. אם אגרות החוב (סדרה א') לא נפרעו במועדן או לא קוימה התחייבות מהותית אחרת שניתנה לטובת המחזיקים.

8.1.32. אם החברה תפר את איזו מהתחייבויותיה כאמור בסעיף 6 לשטר זה, ובפרט את הוראות סעיף 6.2.5 לשטר זה.

8.1.33. אם תרשם הערת "עסק חי" בדוחות הכספיים של החברה למשך תקופה של שני (2) רבעונים רצופים.

8.1.34. אם החברה תפר את התחייבותה שלא להנפיק אגרות חוב מחוץ לישראל ושלא ליטול בעצמה חוב אחר מחוץ לישראל, כמפורט בסעיף 4.2 לשטר זה או אם הופרו איזו מההתחייבויות המפורטות בסעיף 5.11 לשטר זה.

8.1.35. אם החברה, נושאי המשרה בחברה ו/או בעלי השליטה בה יפרו את התחייבויותיהם כמפורט בסעיף 33 לשטר.

8.1.36. בקרות כל אירוע אחר המהווה פגיעה מהותית ו/או עלול לגרום לפגיעה מהותית בזכויות מחזיקי אגרות החוב.

8.1.37. אם החברה ו/או בעלי השליטה בה יפרו את התחייבויותיהם כמפורט בסעיף 5.13 לשטר.

8.1.38. אם החברה תפר איזו מהתחייבויותיה בקשר לכריית ההוצאות כמפורט בסעיף 5.8 לשטר.

8.1.39. אם החברה תפר איזו מהתחייבויותיה בקשר למינוי נציג לחברה בישראל (כהגדרתו בסעיף 5.6.1 לשטר) כמפורט בסעיף 5.6.1 לשטר.

- 45 -

8.1.40. אם חברת ההחזקות, התאגיד המשועבד, חברות הנכס או חברות התפעול הפרו הפרה יסודית את הוראות סעיף 6 לשטר זה ו/או את מסמכי השעבוד, ובכלל זה אם יתברר כי מצג מהותי ממצגי חברת ההחזקות, התאגיד המשועבד, חברות הנכס או חברות התפעול, לפי העניין, בסעיף 6 לשטר זה או במסמכי השעבוד אינו נכון או אינו מלא ומי מחברת ההחזקות או התאגיד המשועבד או חברות הנכס או חברות התפעול, לפי העניין, לא תיקן/נה את ההפרה כאמור תוך 30 ימים ממועד ההפרה או ממועד שנודע לו/לה על ההפרה, לפי העניין.

8.1.41. אם יחול אחד או יותר מהאירועים המתוארים בסעיפים 8.1.2 – 8.1.8, 8.1.10 ו-8.1.24 לעיל ביחס לחברת ההחזקות ו/או התאגיד המשועבד ו/או חברות הנכס ו/או חברות התפעול.

בסעיף זה :

"**נכס מהותי של החברה**" משמעו : נכס (בודד), אשר על-פי הדוחות הכספיים המאוחדים האחרונים של החברה שפורסמו לפני אותו מועד, שיעורו עולה על עשרים (20%) מהיקף הנכסים במאזן המאוחד של החברה על-פי אותם דוחות כספיים ; אומספר נכסים במצטבר, אשר על-פי הדוחות הכספיים המאוחדים האחרונים של החברה שפורסמו לפני אותו מועד, שיעורם עולה על שלושים אחוזים (30%) מהיקף הנכסים במאזן המאוחד של החברה על-פי אותם דוחות כספיים.

8.2. <u>בקרות איזה מהאירועים המפורטים בסעיף 8.1 לשטר, יחולו ההוראות הבאות, לפי העניין</u> :

8.2.1. הנאמן יהיה חייב לזמן אסיפת מחזיקי אגרות החוב (סדרה א') אשר מועד כינוסה יהיה בחלוף עשרים ואחד (21) ימים ממועד זימונה (או מועד קצר יותר בהתאם להוראות סעיף 8.2.6 לשטר), ואשר על סדר יומה תהיה החלטה בדבר העמדה לפירעון מיידי של כל היתרה הבלתי מסולקת של אגרות החוב (סדרה א') ו/או מימוש בטוחות ככל שניתנו, בשל קרות איזה מהאירועים המפורטים בסעיף 8.1 לשטר זה, לפי העניין. פעולת הנאמן תתבצע במקרים כאמור ללא שיהוי ובמועד הראשון האפשרי.

8.2.2. בהודעת הזימון יצוין, כי היה והחברה תגרום לביטולו ו/או להפסקתו של האירוע הרלוונטי המפורט בסעיף 8.1 לשטר שבגינו זומנה האסיפה, עד למועד כינוס האסיפה, אזי יבוטל זימון אסיפת מחזיקי אגרות החוב כאמור לעיל.

8.2.3. מובהר, כי אין באמור בכדי למנוע מן הנאמן מלזמן את אסיפת מחזיקי אגרות החוב במועד מוקדם יותר אם ראה בכך צורך לשם הגנה על זכויות מחזיקי אגרות החוב.

8.2.4. החלטת מחזיקים להעמיד את אגרות החוב (סדרה א') לפירעון מיידי תתקבל באסיפת מחזיקים שנכחו בה מחזיקים בחמישים אחוזים (50%) לפחות מיתרת הערך הנקוב של אגרות החוב (סדרה א'), ברוב של המחזיקים ביתרת הערך הנקוב של אגרות החוב המיוצג בהצבעה או ברוב כאמור באסיפת מחזיקים נדחית שנכחו בה מחזיקים בעשרים אחוזים (20%) לפחות מהיתרה כאמור.

8.2.5. במקרה בו עד למועד כינוס האסיפה לא בוטל או הוסר איזה מהאירועים המפורטים בסעיף 8.1 לשטר זה, לפי העניין, והחלטה באסיפת מחזיקי אגרות החוב (סדרה א') כאמור התקבלה באופן הנדרש כמפורט בסעיף 8.2.4 לשטר זה, הנאמן יהיה חייב, במועד האפשרי הראשון, להעמיד לפירעון מיידי את כל היתרה הבלתי מסולקת של אגרות החוב (סדרה א') ו/או לממש בטוחות ככל שניתנו, ובלבד שנתן לחברה התראה בכתב של חמישה-עשר (15) ימים על כוונתו לעשות כן והאירוע שבגינו התקבלה ההחלטה לא בוטל או הוסר בתוך תקופה זו.

8.2.6. הנאמן רשאי, בהתאם לשיקול דעתו, לקצר את מניין עשרים ואחד (21) הימים האמורים בסעיף 8.2.1 לשטר ו/או את חמישה-עשר (15) ימי ההתראה האמורים (בסעיף 8.2.5 לשטר זה) ו/או לא למסור התראה כלל, במקרה בו יהיה הנאמן בדעה, כי קיים חשש כי המתנת תקופה זו או מסירת ההתראה, לפי העניין, תפגע באפשרות להעמיד את אגרות החוב לפירעון מיידי או תפגע בזכויות המחזיקים.

- 46 -

8.2.7. העתק מהודעת זימון האסיפה כאמור ישלח על ידי הנאמן לחברה לשם פרסום והזימון לאסיפה יהווה התראה מראש ובכתב לחברה על כוונתו לפעול להעמדה לפירעון מיידי של אגרות החוב כאמור.

8.2.8. נקבעה באיזה מסעיפי המשנה בסעיף 8.1 לשטר זה, תקופה סבירה שבה רשאית החברה לבצע פעולה או לקבל החלטה שכתוצאה ממנה נשמטת העילה להעמדה לפירעון מיידי, רשאים הנאמן או המחזיקים להעמיד את אגרות החוב לפירעון מיידי כאמור בסעיף 8 זה, רק אם חלפה התקופה שנקבעה כאמור והעילה לא נשמטה; ואולם הנאמן רשאי לקצר את התקופה האמורה אם סבר שיש בה כדי לפגוע באופן מהותי בזכויות המחזיקים.

8.2.9. למען הסר ספק יובהר, כי אין באמור בסעיף 8.2 זה לעיל כדי לגרוע מסמכותו של הנאמן להעמיד לפירעון מיידי את אגרות החוב (סדרה א') על-פי שיקול דעתו ובכפוף לכל דין.

8.2.10. החברה תודיע למחזיקי איגרות החוב ולנאמן על קרות אירוע המהווה עילה לפירעון מיידי לאחר שנודע לה בפועל הדבר. ההודעה למחזיקי אגרות החוב כאמור תפורסם במערכת המגנ"א ובלבד שהחברה הינה תאגיד מדווח באותה עת, הכל מבלי לגרוע מהוראות סעיף 27 להלן.

8.2.11. למען הסר ספק מובהר, כי הפירעון המיידי ייעשה לפי יתרת ערכן הנקוב של אגרות החוב (סדרה א'), אשר טרם נפרעו, כולל הפרשי ריבית (וריבית פיגורים, ככל שתחול) שהצטברו על הקרן, כאשר הריבית תחושב לתקופה המתחילה לאחר היום האחרון שבגינו שולמה ריבית ועד למועד הפירעון המיידי בפועל (חישוב הריבית עבור חלק משנה ייעשה על בסיס 365 ימים בשנה).

8.2.12. למען הסר ספק מובהר, כי אין בזכות ההעמדה לפירעון מיידי כאמור לעיל ו/או בהעמדה לפירעון מיידי כדי לגרוע או לפגוע בכל סעד אחר או נוסף העומד למחזיקי אגרות החוב (סדרה א') או לנאמן על-פי תנאי אגרות החוב (סדרה א') והוראות שטר זה או על-פי דין (לרבות בזכות הנאמן להעמיד את אגרות החוב לפירעון מיידי בהתאם לסעיף 35ט1 לחוק גם ללא אסיפה), ואי העמדת החוב לפירעון מיידי בקרות איזה מהמקרים המפורטים בסעיף 8.1 לשטר, לא תהווה ויתור כלשהו על זכויותיהם של מחזיקי אגרות החוב או של הנאמן כאמור.

8.2.13. בקרות איזה מהאירועים המפורטים בסעיף 8.1 לשטר זה, מתחייבת החברה כי החל מאותו מועד (וכל עוד מתקיים אירוע ההפרה כאמור) היא לא תשלם לבעלי השליטה את התמורה לה הם זכאים בקשר עם הסכם הניהול בו קשורה עימו במישרין החברה (היינו, הסכם הניהול שתנאיו העיקריים מתוארים בתקנה 22 בחלק ד' לדוח התקופתי).

## 9. תביעות והליכים בידי הנאמן

9.1. בנוסף על כל הוראה אחרת בשטר זה וכזכות וסמכות עצמאית, הנאמן יהיה רשאי, בכל עת, לפי שיקול דעתו, ויהיה חייב לעשות כן על-ידי החלטה רגילה (למעט לעניין פירוק, לגביה תידרש החלטה מיוחדת) שנתקבלה באסיפת מחזיקי אגרות החוב וללא מתן הודעה, לנקוט בכל אותם הליכים, לרבות הליכים משפטיים ובקשות לקבלת הוראות, כפי שימצא לנכון ובכפוף לכל דין, לשם מימוש ו/או הגנה על זכויות מחזיקי אגרות החוב (סדרה א') וכן לשם אכיפת הביצוע על החברה של התחייבות אחרת של החברה על-פי שטר הנאמנות. אין באמור לעיל כדי לפגוע ו/או לגרוע מזכותו של הנאמן לפתוח בהליכים משפטיים ו/או אחרים גם אם אגרות החוב (סדרה א') לא הועמדו לפירעון מיידי והכל להגנת מחזיקי אגרות החוב (סדרה א') ו/או לצורך מתן כל צו באשר לענייני הנאמנות ובכפוף להוראות כל דין. על אף האמור בסעיף זה מובהר, כי זכות להעמדה לפירעון מיידי תקום רק בהתאם להוראות סעיף 8 לשטר זה ולא מכח סעיף זה.

9.2. הנאמן רשאי בטרם ינקוט בהליכים כאמור לעיל, לכנס אסיפת מחזיקי אגרות חוב, בהחלטה רגילה, בכדי שיוחלט על ידי המחזיקים באילו הליכים לנקוט למימוש זכויותיהם על פי שטר זה. כן יהיה הנאמן רשאי לשוב ולכנס אסיפות מחזיקי אגרות החוב, בהחלטה רגילה, לצורך קבלת הוראות בכל

- 47 -

הנוגע לניהול ההליכים כאמור ובלבד שכינוס האסיפה ייעשה במועד הראשון האפשרי על-פי הוראות
התוספת השנייה לשטר הנאמנות ולא יהיה בדחיית ההליכים כדי לסכן את זכויות המחזיקים.

9.3    בכפוף להוראות שטר הנאמנות, רשאי הנאמן אך לא חייב, לכנס בכל עת אסיפה כללית של מחזיקי אגרות
החוב (סדרה א'), בהחלטה רגילה, על מנת לדון ו/או לקבל את הוראותיה בכל עניין הנוגע לשטר הנאמנות.

9.4    כל אימת שהנאמן יהיה חייב לפי תנאי שטר הנאמנות לעשות פעולה כלשהי, לרבות פתיחת הליכים או
הגשת תביעות לפי דרישת מחזיקי אגרות החוב (סדרה א') כאמור בסעיף זה, יהיה הנאמן רשאי, על-פי
שיקול דעתו הבלעדי, לעכב ביצוע של כל פעולה כאמור עד שיקבל הוראות מאסיפה כללית של מחזיקי
אגרות החוב (סדרה א'), בהחלטה רגילה ו/או הוראות מבית המשפט כיצד לפעול ובלבד שכינוס האסיפה
או הפניה לבית המשפט ייעשו במועד הראשון האפשרי. למען הסר ספק יובהר, כי הנאמן לא יהיה רשאי
לעכב נקיטת פעולות או הליכים כאמור במקרה בו השיהוי עשוי לפגוע בזכויות מחזיקי אגרות החוב
(סדרה א').

9.5    הנאמן יהיה רשאי, בכפוף לכל החלטה של כל מחזיקי אגרות החוב (סדרה א') בהחלטה מיוחדת, לוותר
באותם תנאים שיראה לנכון על קיומן של אותן התחייבויות, כולן או מקצתן, של החברה.

10.    **נאמנות על התקבולים**

כל התקבולים שיתקבלו על-ידי הנאמן, למעט שכר טרחתו, הוצאותיו ופירעון כל חוב כלפיו, בכל דרך שהיא,
לרבות, אך לא רק, כתוצאה מהעמדת אגרות החוב לפירעון מיידי ו/או כתוצאה מהליכים שינקוט, אם ינקוט,
כנגד החברה, יוחזקו על-ידי בנאמנות וישמשו בידו למטרות ולפי סדר הקדימויות בנשיה הבא : **תחילה** - לסילוק
ההוצאות, התשלומים, ההיטלים וההתחייבויות שהוצאו על-ידי הנאמן, הוטל עליו, או נגרמו אגב או כתוצאה
מפעולות ביצוע הנאמנות או באופן אחר בקשר עם תנאי שטר הנאמנות, לרבות שכרו (ובתנאי כי הנאמן לא יקבל
את שכרו הן מהחברה והן ממחזיקי אגרות החוב) ; **שנית** - לתשלום כל סכום אחר על-פי ההתחייבות לשיפוי
(כהגדרת מונח זה בסעיף 26.4 לשטר זה) ; **ושלישית** - לתשלום למחזיקי אגרות החוב (סדרה א') אשר נשאו
בתשלומים לפי סעיף 26.4.2 לשטר זה.

יתרת התקבולים כאמור תשמש, אלא אם הוחלט אחרת בהחלטה מיוחדת למטרות ולפי סדר העדיפות
הבא : (א) **ראשית** - לתשלום למחזיקי אגרות החוב של ריבית הפיגורים בגין פיגורים בתשלום הריבית פרי-פסו ובאופן
יחסי לסכום הריבית שבפיגור המגיע לכל אחד מהם, ללא העדפה או זכות קדימה לגבי איזה מהם ; (ב) **שנית** -
לתשלום למחזיקי אגרות החוב של ריבית הפיגורים בגין פיגורי הקרן המגיעים להם לפי תנאי אגרות החוב, פרי-
פסו ובאופן יחסי לסכום הקרן שבפיגור המגיע לכל אחד מהם, ללא העדפה או זכות קדימה לגבי איזה מהם ; (ג)
**שלישית** - לתשלום למחזיקי אגרות החוב של סכומי הריבית המגיעים להם על-פי אגרות החוב המוחזקות על-
ידם, פרי-פסו, שמועד תשלומם טרם חל ובאופן יחסי לסכומים המגיעים להם, בלי כל העדפה בקשר לקדימות
בזמן של הוצאת אגרות החוב על-ידי החברה או באופן אחר ; (ד) **רביעית** - לתשלום למחזיקי אגרות החוב של
סכומי הקרן המגיעים להם על-פי אגרות החוב המוחזקות על-ידם, פרי-פסו, שמועד תשלומם טרם חל ובאופן
יחסי לסכומים המגיעים להם, בלי כל העדפה בקשר לקדימות בזמן של הוצאת אגרות החוב על-ידי החברה או
באופן אחר ; ו-(ה) **חמישית** - את העודף, במידה שיהיה כזה, ישלם הנאמן לחברה או לחליפיה.

מהתשלומים למחזיקי אגרות החוב (סדרה א') ינוכה מס במקור, ככל שיש חובה לנכותו על-פי כל דין.

מחזיקי אגרות החוב (סדרה א') יוכלו לשנות את סדר העדיפויות שלעיל בהחלטה מיוחדת, וזאת ביחס לחלופות
(א) ו-(ב) לעיל בלבד. האמור כפוף לכך שיתקבל אישור מתאים מרשות המסים.

יובהר, כי ככל והיה על החברה לשאת באיזה מההוצאות אולם היא לא עשתה כן, יפעל הנאמן לקבלת הסכומים
כאמור מהחברה, ובמקרה ויצליח לקבלם, יוחזקו אותם סכומים על-ידו בנאמנות וישמשו בידו למטרות ולפי סדר
העדיפות המפורט בסעיף זה לעיל.

11.    **סמכות לדרוש מימון**

11.1    הנאמן יהיה רשאי להורות לחברה להעביר לידיו, לחשבון הנאמן עבור מחזיקי אגרות החוב (סדרה א'),
חלק מתשלום הריבית בלבד אותו על החברה לשלם למחזיקים (בסעיף זה : "**התשלום הרלוונטי**") וזאת
לשם מימון ההליכים ו/או ההוצאות ו/או שכר הנאמן על-פי שטר זה ("**סכום המימון**") ובלבד שהחברה
לא נשאה בסכום המימון ו/או הפקידה בידי הנאמן מראש את סכום המימון. החברה תעביר את סכום

- 48 -

המימון לידי הנאמן לא יאוחר ממועד ביצוע התשלום הרלוונטי. החברה אינה רשאית לסרב לפעול על-פי הודעת הנאמן ויראו את החברה כמי שמילאה אחר התחייבותה כלפי המחזיקים האמורים אם העבירה את מלוא סכום המימון לזכות החשבון שפרטיו פורטו בהודעת הנאמן.

סכום המימון שיהא רשאי הנאמן להורות לחברה להעביר לידיו כאמור בסעיף זה לעיל ככל שלא התקבלה קודם לכן החלטת מחזיקים בעניין (לרבות החלטה בקשר עם נקיטת ההליכים ו/או ביצוע הפעולות בגינם נדרש סכום המימון) יוגבל לסך של 500 אלפי ש"ח (בצירוף מע"מ).

אין באמור כדי לשחרר את החברה מחובתה לשאת בתשלומי סכום המימון, ככל שיהיו, מקום בו היא חייבת לשאת בהם על-פי שטר זה או על-פי דין. אין באמור בכדי לגרוע מחובתו של הנאמן לפעול באופן סביר להשגת הסכומים אשר שימשו למימון כאמור והמגיעים למחזיקים מן החברה.

11.2.    במקרה כאמור לעיל יחולו ההוראות הבאות, אלא אם החברה תעביר לנאמן, לפני המועד הקובע כאמור לעיל, סכום השווה לסכום המימון וזאת שלא מתוך התשלום המסוים כאמור לעיל:

11.3.    החברה תעביר לנאמן את סכום המימון במועד שנקבע בשטר זה לתשלום הריבית כאמור לעיל.

11.4.    סכום התשלום המסוים של הריבית כאמור לעיל יקטן ויעמוד על סכום בניכוי סכום המימון. סכום המימון ינוכה רק מתשלומי ריבית ולא מתשלומי קרן.

11.5.    עד לא יאוחר מארבעה ימי מסחר לפני המועד הקובע לביצוע התשלום הרלוונטי ממנו יופחת סכום המימון יפורסם דוח מיידי בו יפורטו סכום המימון, מטרתו סכומי הריבית ושיעורי הריבית העדכניים שישולמו למחזיקים במסגרת התשלום הרלוונטי.

11.6.    כמו-כן, תציין החברה בדיווח המיידי כאמור, כי סכום המימון שיועבר לנאמן ייחשב לכל דבר ועניין כתשלום למחזיקי אגרות החוב.

11.7.    על אף האמור לעיל, ככל שיקבע בהחלטה שיפוטית חלוטה לאחר העברת סכום המימון כאמור בסעיף זה לעיל, כי החברה לא היתה חייבת במימון הנדרש לעניינים שנקבעו בהחלטת האסיפה כאמור, תהיה החברה זכאית לסעד של אי החלה של הוראות סעיף 11.5 לעיל או כל סעד אחר כפי שיקבע בהחלטה השיפוטית.

11.8.    אין באמור כדי לשחרר את החברה מחובתה לשאת בתשלומי ההוצאות והשכר כאמור מקום בו היא חייבת לשאת בהם על-פי שטר זה ו/או על-פי דין ועל הנאמן לפעול לגביית הסכומים האמורים מהחברה. אין באמור בסעיף זה לעיל, כדי לפטור את הנאמן מנקיטת פעולה דחופה הדרושה לשם מניעת פגיעה מהותית לרעה בזכויות מחזיקי אגרות החוב.

12.    **<u>סמכות לעכב חלוקת כספים</u>**

על אף האמור בסעיף 10 לשטר זה, היה והסכום הכספי אשר יתקבל כתוצאה מנקיטת ההליכים האמורים לעיל ואשר יעמוד בזמן כלשהו לחלוקה, כאמור באותו סעיף, יהיה פחות מסך של 1 מיליון ש"ח (**"הסכום המינימאלי"**), לא יהיה הנאמן חייב לחלקו והוא יהיה רשאי להשקיע את הסכום האמור, כולו או מקצתו, בהשקעות המותרות לפי סעיף 17 לשטר זה, והוא יהיה רשאי להחליף השקעות אלה מזמן לזמן בהשקעות מותרות אחרות כאמור בסעיף 17 לשטר זה.

לכשתגענה השקעות אלה, על רווחיהן, יחד עם כספים נוספים שיגיעו לידי הנאמן לצורך תשלום למחזיקי אגרות החוב, לסכום המינימאלי, ישלמם הנאמן למחזיקים בהתאם למטרות ולסדר הקדימויות כאמור בסעיף 10 לשטר. במקרה בו עד למועד המוקדם מבין: מועד תשלום הריבית ו/או הקרן הקרוב; או זמן סביר לאחר קבלת הסכום הכספי האמור, לא יהיה בידי הנאמן סכום מינימאלי, יהיה הנאמן רשאי לחלק למחזיקי אגרות החוב את הכספים שבידו.

על אף האמור בסעיף 12 זה לעיל, רשאים מחזיקי אגרות החוב (סדרה א'), לפי החלטה רגילה שתתקבל על-ידם, להורות לנאמן לשלם להם את הכספים שנתקבלו על-ידי הנאמן והעומדים לחלוקה כאמור בסעיף 10 לשטר, אף אם סכומם עומד על פחות מהסכום המינימאלי וזאת בכפוף להוראות הבורסה. על אף האמור, תשלום שכר הנאמן והוצאות הנאמן ישולמו מתוך הכספים האמורים מיד עם הגיע מועדם (ולעניין ההוצאות שכבר שולמו על-ידי

- 49 -

הנאמן, יוחזר לנאמן סכום מיד עם הגיע הכספים לידי הנאמן) אף אם הסכומים שהגיעו לידי הנאמן הינם נמוכים מהסכום המינימאלי.

מובהר כי האמור בסעיף זה אינו גורע מחובת החברה לבצע את התשלום למחזיקי אגרות החוב והנאמן ידרוש את מלוא הסכום הנדרש לתשלום.

13. **הודעה על חלוקה**

הנאמן יודיע למחזיקי אגרות החוב (סדרה א') על היום והמקום שבו יבוצע תשלום כלשהו מבין התשלומים הנזכרים בסעיפים 10 ו-12 לשטר זה, וזאת בהודעה מוקדמת בת ארבעה-עשר (14) ימים, אשר תימסר באופן הקבוע בסעיף 27 לשטר.

לאחר היום הקבוע בהודעה, יהיו מחזיקי אגרות החוב (סדרה א') זכאים לריבית לפי השיעור הקבוע באגרת החוב, אך ורק על יתרת סכום הקרן (אם תהיה כזו) לאחר ניכוי הסכום ששולם.

הכספים שיחולקו כאמור בסעיף 13 זה לעיל יחשבו כתשלום על חשבון הפירעון.

14. **הימנעות מתשלום מסיבה שאינה תלויה בחברה**

14.1. סכום כלשהו המגיע למחזיק אגרת חוב (סדרה א') ואשר לא שולם בפועל במועד הקבוע לתשלומו, מסיבה שאינה תלויה בחברה, בעוד שהחברה היתה מוכנה ויכולה לשלמו, במלואו ובמועדו יחדל לשאת ריבית מהמועד שנקבע לתשלומו והמחזיק באגרת החוב (סדרה א') יהיה זכאי אך ורק לאותם סכומים שהיה זכאי להם במועד שנקבע לפירעון אותו תשלום על חשבון הקרן או הריבית.

14.2. החברה תפקיד בידי הנאמן, בתוך ארבעה-עשר (14) ימים מהמועד שנקבע לתשלום, את סכום התשלום שלא שולם במועדו, כאמור בסעיף 14.1 לשטר, ותודיע למחזיקי אגרות החוב (סדרה א'), בכתב, על-פי הכתובות המצויות ברשותה (ככל שמצויות ברשותה), על הפקדה כאמור, והפקדה כאמור תיחשב כסילוק אותו תשלום למחזיק ובמקרה של סילוק כל המגיע בגין אגרות החוב, גם כפדיון אגרת החוב (סדרה א') על-ידי החברה.

14.3. כל סכום שיוחזק על-ידי הנאמן בנאמנות עבור המחזיקים יופקד על-ידי הנאמן בבנק ויושקע על-ידו, בשמו או בפקודתו, לפי שיקול דעתו, בהשקעות המותרות לו על-פי הוראות סעיף 17 לשטר זה. עשה כן הנאמן, לא יהיה חייב לזכאים בגין אותם סכומים אלא את התמורה שתתקבל ממימוש ההשקעות בניכוי ההוצאות הקשורות בהשקעה האמורה, לרבות בגין ניהול חשבון הנאמנות, העמלות, בניכוי תשלומי החובה החלים על חשבון הנאמנות ובניכוי שכר טרחתו. מתוך הכספים כאמור יעביר הנאמן סכומים למחזיקי אגרות החוב הזכאים להם וישולמו כנגד אותן הוכחות שידרשו על-ידו לשביעות רצונו המלאה.

14.4. הנאמן יחזיק בכספים האמורים לעיל וישקיעם, על-פי הוראות סעיף 17 לשטר זה, עד לתום שנה אחת מהמועד הסופי לפירעון אגרות החוב (סדרה א'), אז יחזיר הנאמן את הסכומים שיצטברו בידו (כולל פירותיהם) בניכוי הוצאותיו ובניכוי שכר טרחתו והוצאות אחרות אשר הוצאו בהתאם להוראות שטר זה (כגון שכר נותני שירותים וכדומה), לחברה, והחברה תחזיק בסכומים אלו בנאמנות עבור מחזיקי אגרות החוב (סדרה א') הזכאים לאותם סכומים לתקופה של עד תום שבע (7) שנים ממועד הפירעון הסופי של אגרות החוב (סדרה א'), ובכל הנוגע לסכומים שיועברו אליה על-ידי הנאמן כאמור לעיל יחולו עליה הוראות סעיף 14.3 לשטר בשינויים המחוייבים. כספים שלא יידרשו מאת החברה על-ידי מחזיק אגרות חוב (סדרה א') בתום שבע (7) שנים ממועד הפירעון הסופי של אגרות החוב (סדרה א'), יעברו לבעלות החברה, והיא תהא רשאית להשתמש בכספים הנותרים לכל מטרה שהיא. לאחר החזרת הסכומים לחברה לא יהיה הנאמן חייב למחזיקי אגרות החוב (סדרה א') תשלום כלשהו בגין הסכומים שהוחזקו על-ידו כאמור.

14.5. החברה תאשר בכתב לנאמן את החזרת הסכומים כאמור בסעיף 14.4 לשטר זה ואת דבר קבלתם בנאמנות עבור מחזיקי אגרות החוב (סדרה א') כאמור ותשפה את הנאמן בגין כל תביעה ו/או הוצאה ו/או נזק מכל סוג שהוא שייגרם לו עקב ובגין העברת הכספים כאמור, אלא אם כן פעל הנאמן ברשלנות (למעט רשלנות הפטורה על-פי חוק, כפי שיהיה מעת לעת), בחוסר תום לב או בזדון.

- 50 -

15. **קבלה מאת מחזיקי אגרות החוב ומאת הנאמן**

15.1 קבלה חתומה מאת מחזיק אגרת החוב (סדרה א') או אסמכתא של חבר הבורסה המעביר על ביצוע ההעברה או ביצוע ההעברה באמצעות מסלקת הבורסה, בגין סכומי הקרן והריבית ששולמו לו על-ידי הנאמן בגין אגרת החוב תשחרר את הנאמן בשחרור מוחלט בכל הקשור לעצם ביצוע התשלום של הסכומים הנקובים בקבלה.

15.2 קבלה מאת הנאמן בדבר הפקדת סכומי הקרן והריבית אצלו לזכות מחזיקי אגרת החוב (סדרה א') כאמור לעיל תיחשב כקבלה מאת מחזיק אגרת החוב (סדרה א') לצורך האמור בסעיף 15.1 לשטר ביחס לשחרור החברה בכל הקשור לביצוע התשלום של הסכומים הנקובים בקבלה.

15.3 כספים שחולקו כאמור בסעיפים 10 ו-12 לשטר ייחשבו כתשלום על חשבון הפירעון של אגרות החוב (סדרה א').

16. **הצגת אגרת חוב לנאמן; רישום בקשר עם תשלום חלקי**

16.1 הנאמן יהיה רשאי לדרוש ממחזיק אגרת חוב (סדרה א') להציג בפני הנאמן, בזמן תשלום ריבית כלשהי או תשלום חלקי של קרן וריבית, את תעודת אגרות החוב (סדרה א') שבגינן משולמים התשלומים, ומחזיק אגרת החוב (סדרה א') יהיה חייב להציג את תעודת אגרות החוב כאמור ובלבד שלא יהיה בכך כדי לחייב את מחזיקי אגרות החוב (סדרה א') בכל תשלום ו/או הוצאה ו/או להטיל על מחזיקי אגרות החוב (סדרה א') אחריות ו/או חבות כלשהי.

16.2 הנאמן יהיה רשאי לרשום על תעודת אגרות החוב (סדרה א') הערה בנוגע לסכומים ששולמו כאמור לעיל ותאריך תשלומם.

16.3 הנאמן יהיה רשאי בכל מקרה מיוחד, לפי שיקול דעתו, לוותר על הצגת תעודת אגרות החוב (סדרה א') לאחר שניתן לו על-ידי מחזיק אגרת החוב (סדרה א') כתב שיפוי ו/או ערובה מספקת להנחת דעתו בגין נזקים העלולים להיגרם מחמת אי רישום ההערה כאמור, הכל כפי שימצא לנכון.

16.4 למרות האמור לעיל יהיה הנאמן רשאי, על-פי שיקול דעתו, לקיים רישומים באופן אחר, לגבי תשלומים חלקיים כאמור.

17. **השקעות כספים**

כל הכספים אשר רשאי הנאמן להשקיעם לפי שטר הנאמנות, יושקעו על-ידו באחד מחמשת הבנקים הגדולים בישראל, אשר דירוגו לא יפחת מדירוג AA ובמקרה שלא קיים בנק ישראלי עם דירוג כאמור, באחד משלושת הבנקים הגדולים ביותר בישראל, בשמו או בפקודתו, ובלבד שישקיע בפיקדונות בנקאיים בשקלים לתקופה של עד 30 יום ו/או באגרות חוב של ממשלת ישראל.

עשה כן הנאמן, לא יהיה חייב לזכאים בגין אותם סכומים אלא את התמורה שתתקבל ממימוש ההשקעות בניכוי שכר טרחתו והוצאותיו, העמלות וההוצאות הקשורות בהשקעה האמורה ובניהול חשבונות הנאמנות ותשלומי החובה החלים על חשבון הנאמנות, וביתרת הכספים כאמור יפעל הנאמן על-פי הוראות סעיפים 12 ו/או 14 לשטר, לפי העניין.

18. **התחייבויות החברה כלפי הנאמן**

החברה מתחייבת בזאת כלפי הנאמן, כל זמן שאגרות החוב (סדרה א') טרם נפרעו במלואן, כדלקמן:

18.1 להתמיד ולנהל את עסקי החברה והתאגידים בשליטתה בצורה סדירה, נאותה ויעילה.

18.2 לנהל פנקסי חשבונות סדירים בהתאם לעקרונות חשבונאיים מקובלים, ולשמור את הפנקסים, לרבות המסמכים המשמשים להם כאסמכתאות (לרבות שטרי משכון, משכנתא, חשבונות וקבלות), במשרדיה, ולאפשר לנאמן ו/או לכל נציג מורשה של הנאמן לעיין, במועד שיתואם מראש עם החברה ושלא יעלה על חמישה ימי עסקים, בכל פנקס כאמור ו/או מסמך כאמור שהנאמן יבקש לעיין בו. לעניין זה, נציג מורשה של הנאמן פירושו מי שהנאמן ימנה למטרת עיון כאמור, וזאת בהודעה בכתב של הנאמן שתימסר לחברה לפני העיון כאמור, וזאת בכפוף להתחייבות לסודיות בכפוף להוראות סעיף 31.11 לשטר זה. עד כמה

- 51 -

שניתן, בשים לב למהות ונסיבות העניין, תפעל החברה לאפשר את זכות העיון כאמור בסעיף זה לעיל, בישראל לרבות העברת חומרים בכל אמצעי מדיה שהוא.

18.3. להודיע לנאמן בכתב בהקדם האפשרי, ולא יאוחר מיום עסקים אחד לאחר שנודע לה, על כל מקרה בו הוטל עיקול ו/או בוצעה פעולת הוצאה לפועל על נכס מהותי של החברה(כהגדרת מונח זה בסעיף 8.1 לשטר זה), וכן בכל מקרה בו מונה לנכס מהותי של החברה כהגדרתו בסעיף 8.1 לשטר זה כונס נכסים, מנהל מיוחד ו/או מפרק זמני או קבוע ו/או נאמן שמונה במסגרת בקשה להקפאת הליכים לפי סעיף 350 לחוק החברות כנגד החברה ו/או כל בעל תפקיד אחר, לרבות על פי חוק חדלות פירעון ו/או כל בעל תפקיד אחר בעל מאפיינים דומים על פי הדין הרלוונטי החל על החברה, וכן לנקוט על חשבונו בהקדם האפשרי בכל האמצעים הסבירים הנדרשים לשם הסרת עיקול כזה או ביטול כינוס הנכסים, הפירוק או הניהול, לפי העניין. האמור בסעיף זה יחול גם על חברות הנכס במקרה בו איזה מהאירועים האמורים בסעיף זה לעיל התרחשו בקשר עם איזה מהנכסים המשועבדים.

18.4. להודיע לנאמן בכתב, מייד עם היוודע הדבר לחברה ולא יאוחר מיום מסחר אחד, על: (1) קרות אחד או יותר מן המקרים המנויים בסעיף 8.1 לשטר זה על סעיפיו הקטנים; ו-(2) חשש ממשי של החברה לקרות אחד או יותר מן המקרים המנויים בסעיף 8.1 לשטר זה. האמור ביחס להודעה האמורה יבוצע על-ידי החברה מבלי להביא בחשבון את תקופות הריפוי וההמתנה המנויות בסעיף 8.1 לשטר, ככל שקיימות.

18.5. למסור לנאמן הודעה בכתב חתומה בידי נושא המשרה הבכיר בתחום הכספים בחברה, על ביצוע כל תשלום לבעלי אגרות החוב לרבות פירוט אופן חישוב התשלום, ועל יתרת הסכומים אותם חייבת החברה באותו מועד לבעלי אגרות החוב, וזאת תוך שבעה (7) ימי עסקים לאחר ביצוע התשלום כאמור. מובהר, כי פרסום דוח כאמור במגנ"א, ייחשב גם כמסירה לנאמן לצורך סעיף זה.

18.6. למסור לנאמן מיד עם פרסומו, כל דוח שהיא חייבת בהגשתו לרשות ניירות ערך. אלא אם נאמר במפורש אחרת בשטר זה, דיווח מיידי במערכת המגנ"א של רשות ניירות ערך וכל דיווח או מידע אשר יפורסם (במלואו) על-ידי החברה במערכת המגנ"א, ייחשב כאילו נמסר לנאמן. על אף האמור לעיל, לבקשת הנאמן תמסור החברה לנאמן עותק מודפס של הדיווח או המידע כאמור.

18.7. לאפשר לנאמן ו/או למי שימנה הנאמן בכתב למטרה זו, להיכנס בתיאום מראש למשרדיה של החברה ולכל מקום שבו יימצאו נכסיה של החברה, בכל זמן סביר וזאת לא יאוחר משבעה (7) ימי עסקים ממועד הבקשה של הנאמן, לשם בדיקת נכסיה, על-פי שיקול דעתו של הנאמן, לשם הגנה על מחזיקי אגרות החוב.

18.8. למסור לנאמן העתקים מהודעות ומהזמנות שתיתן החברה, כאמור בסעיף 27 לשטר זה.

18.9. לגרום לכך כי נושא משרה הבכיר בתחום הכספים בחברה ייתן, בתוך שבעה (7) ימי עסקים ממועד בקשתו של הנאמן, לנאמן ו/או לאנשים שיורה, כל הסבר, מסמך, חישוב או מידע בנוגע לחברה, עסקיה ו/או נכסיה שיהיו דרושים באופן סביר, על-פי שיקול דעתו של הנאמן, לשם בדיקות שנעשות על-ידי הנאמן לצורך הגנה על מחזיקי אגרות החוב.

18.10. כל עוד החברה הינה חברת אגרות חוב שהינה חברה פרטית (כהגדרת המונחים בחוק החברות) - להמציא לנאמן פרוטוקולים חתומים של אסיפות בעלי המניות לא יאוחר מ-5 ימי עסקים ממועד חתימתם ובכלל זה מתחייבת החברה למסור לנאמן העתק מכל מסמך ו/או מידע שהחברה העבירה למחזיקי אגרות החוב, ככל שהעבירה ולמסור העתקים מהודעות ומהזמנות שינתנו למחזיקי אגרות החוב, ככל שינתנו. ככל שבמהלך חיי אגרות החוב תהפוך החברה לחברה ציבורית (כהגדרת המונח בחוק החברות) - לזמן את הנאמן להיות נוכח באופן טלפוני באסיפות הכלליות (בין אם באסיפות כלליות שנתיות ובין אם באסיפות כלליות מיוחדות של בעלי המניות בחברה) של בעלי המניות של החברה (ללא זכויות השתתפות או הצבעה). פרסום זימון לאסיפה כללית של בעלי המניות של החברה במערכת המגנ"א, ייחשב כזימון הנאמן לצרכי סעיף זה.

18.11. כפוף להוראות סעיף 18.6 לשטר זה, כל זמן שאגרות החוב (סדרה א') טרם נפרעו במלואן, לתת לנאמן את הדוחות והדיווחים כמפורט להלן:

- 52 -

18.11.1. דוחות כספיים שנתיים מבוקרים של החברה, ודוחות כספיים רבעוניים סקורים של החברה, לא יאוחר מהמועדים הקבועים לכך לפי חוק ניירות ערך גם במקרה בו החברה תפסיק להיות תאגיד מדווח.

18.11.2. אם וככל שהחברה תהא חברה ציבורית (כהגדרת המונח בחוק החברות) - העתק מכל מסמך שהחברה מעבירה לכלל בעלי מניותיה או למחזיקים באגרות החוב ופרטי כל מידע שהחברה מעבירה להם בדרך אחרת, לרבות כל דוח המוגש על-פי דין לרשות ניירות ערך לשם פרסומו לציבור (דיווחים מיידיים), מייד עם פרסומו. כל עוד החברה הינה חברת אגרות חוב שהינה חברה פרטית – להמציא לנאמן העתק מכל מסמך שהחברה מעבירה למחזיקים באגרות החוב ופרטי כל מידע שהחברה מעבירה להם בדרך אחרת, לרבות כל דוח המוגש על-פי דין לרשות ניירות ערך לשם פרסומו לציבור (דיווחים מיידיים), מייד עם פרסומו.

18.11.3. למסור לנאמן, לפי דרישתו הראשונה בכתב, לא יאוחר מ-5 ימי עסקים ממועד בקשתו של הנאמן, אישור בכתב חתום על-ידי רואה החשבון המבקר של החברה, כי כל התשלומים למחזיקי אגרות החוב שולמו במועדם, ואת יתרת הערך הנקוב של אגרות החוב שבמחזור.

18.11.4. חדלה החברה מהיות תאגיד מדווח, תמסור החברה לנאמן, בנוסף לאמור בסעיפים 18.3 עד 18.10 לשטר, דיווחים שנתיים, רבעוניים ומיידיים כמפורט להלן, כאשר כל אחד מהם חתום על ידי נושא המשרה הבכיר בתחום הכספים ומנכ"ל החברה :

א. דיווח שנתי הכולל את המידע המפורט בנספח 5.2.4.8 לפרק 4 בחלק 2 (ניהול נכסי השקעה והעמדת אשראי) בשער 5 (עקרונות לניהול עסקים) בחוזר המאוחד[3] או כפי שיעודכן מעת לעת, לא יאוחר משישים (60) ימים מהמועד בו הייתה נדרשת החברה לפרסם את דוחותיה השנתיים אילו היייתה תאגיד מדווח;

ב. דיווח רבעוני הכולל את המידע המפורט בנספח 5.2.4.9 לפרק 4 בחלק 2 (ניהול נכסי השקעה והעמדת אשראי) בשער 5 (עקרונות לניהול עסקים) בחוזר המאוחד או כפי שיעודכן מעת לעת, לא יאוחר משלושים (30) ימים מהמועד בו הייתה נדרשת החברה לפרסם את דוחותיה הרבעוניים אילו הייתה תאגיד מדווח;

ג. דיווח מיידי אם אירע אחד מן האירועים המפורטים בנספח 5.2.4.10 לפרק 4 בחלק 2 (ניהול נכסי השקעה והעמדת אשראי) בשער 5 (עקרונות לניהול עסקים) בחוזר המאוחד או כפי שיעודכן מעת לעת. הדיווח יימסר במועד בו הייתה נדרשת החברה לדווח על קרות האירוע עפ"י תקנה 30(ב) לתקנות הדוחות או בכל תקנה אשר תחליף תקנה זו.

ד. במקרה של מסירת דיווח בהתאם לאמור, תמסור החברה הודעה לבורסה לשם פרסומה במערכת המאי"ה על-פיה החברה העבירה לנאמן הודעה בהתאם לסעיף זה וכי מחזיק באגרות החוב רשאי לקבל העתק ממנה כנגד הצגת אישור בעלות. ככל שלא ניתן יהיה לפרסם הודעות באופן האמור, תפתח החברה אתר אינטרנט (לרבות באמצעות הנאמן) בו יתפרסמו הודעות למחזיקי אגרות החוב כאמור, והחברה תודיע על כתובתו של האתר בדיווח מיידי שידווח טרם הפסקת חובות הדיווח של החברה.

18.12. למסור לנאמן לא יאוחר משבעה (7) ימי עסקים ממועד בקשתו של הנאמן, על-פי דרישתו הסבירה, תצהיר ו/או ההצהרות ו/או מסמכים ו/או פרטים ו/או מידע נוסף, בנוגע לחברה ולחברות הבנות שלה (לרבות הסברים, מסמכים וחישובים בנוגע לחברה, ולחברות הבנות שלה, עסקיהם או נכסיהם ומידע אשר לפי שיקול דעתו הסביר של הנאמן נדרש לשם הגנה על זכויות מחזיקי אגרות החוב) ואף להורות לרואה

---

[3] .http://ozar.mof.gov.il/hon/2001/law/Codex.asp

- 53 -

החשבון שלה וליועציה המשפטיים לעשות כן, וזאת ככל שלדעתו הסבירה של הנאמן המידע דרוש לנאמן לשם יישום והפעלת הסמכויות, הכוחות וההרשאות של הנאמן ו/או באי כוחו על-פי שטר הנאמנות, לרבות מידע אשר עשוי להיות חיוני ונדרש לשם הגנה על זכויות מחזיקי אגרות החוב ובלבד שהנאמן פועל בתום לב, וזאת בכפוף להתחייבות לסודיות כאמור בסעיף 31.11 לשטר זה.

18.13. למסור לנאמן את כל הדוחות או ההודעות כמפורט בסעיף 35י לחוק ניירות ערך.

18.14. לא יאוחר מעשרה (10) ימי עסקים לאחר פרסום הדוחות הכספיים השנתיים או הרבעוניים של החברה, לפי העניין, תמציא החברה לנאמן, אישור בכתב מאת החברה בצירוף בקובץ אקסל פעיל, חתום על-ידי דירקטור, מנכ"ל או נושא המשרה הבכיר בתחום הכספים בחברה, בדבר עמידת החברה בהתניות הפיננסיות המפורטות בסעיף 5.7 לשטר והכל בנוסח לשביעות רצון הנאמן.

18.15. לגרום לכך כי נושא משרה הבכיר בתחום הכספים בחברה ייתן, תוך 5 ימי עסקים, לנאמן ו/או לאנשים שיורה, כל הסבר, מסמך, חישוב או מידע בנוגע לחברה, עסקיה ו/או נכסיה שיהיו דרושים באופן סביר, על-פי שיקול דעתו של הנאמן, לשם מילוי תפקידיו ולצורך הגנה על מחזיקי אגרות החוב.

18.16. להחזיק ולשמור את נכסיה במצב טוב ותקין ולשלם בקביעות ובדייקנות את כל תשלומי החובה החלים, במידה שחלים, על נכסיה.

18.17. מידי 10 באפריל של כל שנה, עבור השנה הקלנדרית הקודמת, וכל עוד שטר זה בתוקף, תעביר החברה לנאמן, אישור מאת החברה, חתום על-ידי דירקטור, מנכ"ל או נושא המשרה הבכיר בתחום הכספים בחברה, בדבר ביצוע של כל תשלומי הריבית ו/או תשלומים על חשבון הקרן, בקשר עם אגרות חוב (סדרה א׳), שמועד תשלומם הגיע לפני תאריך האישור, ומועד התשלום, וכן את יתרת הערך הנקוב של אגרות החוב (סדרה א׳) שעדיין במחזור נכון למועד האישור; וכן מדי 31 במרס של כל שנה וכל עוד שטר זה בתוקף, אישור מאת דירקטור בחברה ומאת מנהלה הכללי, כי בתקופה שמתאריך השטר ו/או מתאריך האישור הקודם שנמסר לנאמן, המאוחר מביניהם, ועד למועד מתן האישור, לא קיימת מצד החברה הפרה של שטר זה, לרבות הפרה של תנאי אגרות החוב, אלא אם כן צוין בו במפורש אחרת.

18.18. להודיע בכתב לנאמן על כל שינוי בשמה או בכתובתה לא יאוחר מ-2 ימי עסקים מהשינוי.

18.19. הנאמן רשאי להורות לחברה לדווח לאלתר במערכת המגנ"א, בשם הנאמן, כל דיווח בנוסח כפי שיועבר בכתב על-ידי הנאמן לחברה, והחברה תהיה חייבת לדווח לאלתר ובכל מקרה לא יאוחר מיום מסחר אחד לאחר קבלתו את הדיווח כאמור.

18.20. החברה תודיע לנאמן בכתב על אי עמידה בקובננט זר כלשהו בהקדם האפשרי ולא יאוחר מיום עסקים מיום תחילת אי העמידה בקובננט הזר או בתוך יום עסקים מהמועד בו ניתנה לה הודעה על-ידי תאגיד מוחזק בדבר אי עמידה בקובננט זר כלשהו, לפי העניין, וכן את ההשלכות הצפויות של אי עמידה זו בהתאם להסכמים עם אותו גורם. מובהר, כי ככל שהחברה לא תעמוד או תאגיד מוחזק כלשהו לא יעמוד בקובננט זר כלשהו וויינתן למי מהם ארכה לשם עמידה בקובננט הזר, לא יגרע הדבר מחובת החברה להודיע לנאמן על אי העמידה בקובננט הזר כאמור.

על אף האמור בסעיף 27 לשטר, תעביר החברה לנאמן הודעה בכתב על אי העמידה בקובננט זר בנוסף לכל דיווח מיידי שתפרסם החברה בעניין, ככל שיפורסם.

לעניין סעיף זה –

**"קובננט זר"** – תניה פיננסית מהותית של החברה או כל תאגיד מוחזק של החברה במסגרת הסכם עם מוסד פיננסי או עם גורם אחר אשר העמיד לחברה או לתאגיד המוחזק אשראי המהווה לפחות 7.5% מסך ההלוואות של החברה לפי דוחות כספיים מאוחדים.

**"תניה פיננסית מהותית"** – תניה פיננסית אשר אי עמידה בה מקימה עילה לפירעון מיידי של החוב הרלוונטי.

- 54 -

19. **התחייבויות נוספות**

19.1. ככל שאיגרות החוב תעמודנה לפירעון מיידי, כמוגדר בסעיף 8 לשטר, תבצע החברה מזמן לזמן ובכל עת שתדרש לכך על-ידי הנאמן, את כל הפעולות הסבירות כדי לאפשר את הפעלת כל הסמכויות הנתונות בידי הנאמן ובמיוחד תעשה החברה את הפעולות הבאות, וזאת לא יאוחר משבעה (7) ימי עסקים ממועד בקשת הנאמן :

19.1.1. לפרוע למחזיקי איגרות החוב ולנאמן את כל הסכומים המגיעים להם לפי תנאי שטר הנאמנות, בין אם מועד החיוב בגינן חל או לא ('האצה' 'Acceleration').

19.1.2. תצהיר את ההצהרות ו/או תחתום על כל המסמכים ו/או תבצע ו/או תגרום לביצוע כל הפעולות הנחוצות או הדרושות בהתאם לחוק לשם מתן תוקף להפעלת הסמכויות, הכוחות וההרשאות של הנאמן ו/או באי כוחו על-פי שטר זה.

19.1.3. תיתן את כל ההודעות, הפקודות וההוראות, שהנאמן יראה אותן למועילות וידרשן לשם יישום הוראות שטר הנאמנות.

19.2. למטרות סעיף זה - הודעה בכתב חתומה על-ידי הנאמן המאשרת כי פעולה הנדרשת על-ידו, במסגרת סמכויותיו, היא פעולה סבירה, תהווה ראיה לכאורה לכך.

20. **באי כוח**

20.1. החברה ממנה בזאת, באופן בלתי חוזר, את הנאמן בתור בא כוחה, להוציא לפועל ולבצע בשמה ובמקומה את כל הפעולות שתהיה חייבת לבצע לפי התנאים הכלולים בשטר זה, ולפעול בשמה בהתייחס לפעולות שהחברה חייבת לעשותן על-פי שטר זה ולא ביצעה אותן או לבצע חלק מהסמכויות הנתונות לה, ולמנות כל אדם אחר כפי שהנאמן ימצא לנכון לביצוע תפקידיו על-פי שטר זה וזאת, בכפוף לכך שהחברה לא ביצעה את הפעולות שהיא חייבת לבצע לפי תנאי שטר זה תוך ארבעה-עשר (14) ימים על-פי קביעת הנאמן ממועד דרישת הנאמן ובלבד שפעל באופן סביר.

20.2. אין במינוי לפי סעיף 20.1 לשטר זה כדי לחייב את הנאמן לעשות כל פעולה ואין בכך כדי לגרוע ממחויבויות החברה בהתאם לשטר הנאמנות, והחברה פוטרת בזאת את הנאמן ושלוחיו מראש במקרה שלא יעשו כל פעולה שהיא, והחברה מוותרת מראש על כל טענה כלפי הנאמן ושלוחיו בגין כל נזק שנגרם או עלול להיגרם לחברה במישרין או בעקיפין, בגין זה, על סמך כל פעולה שלא נעשתה על-ידי הנאמן ושלוחיו כאמור לעיל, והכל למעט במקרה של פעולה או מחדל שנעשו בחוסר תום לב או רשלנות (למעט רשלנות הפטורה על-פי חוק, כפי שיהיה מעת לעת).

21. **הסכמים אחרים**

21.1. בכפוף להוראות החוק ולמגבלות המוטלות על הנאמן בחוק, לא יהיה במילוי תפקידו של הנאמן, לפי שטר זה, או בעצם מעמדו כנאמן, כדי למנוע אותו מלהתקשר עם החברה בחוזים שונים או מלבצע עמה עסקאות במהלך הרגיל של עסקיו.

21.2. נכון למועד חתימת שטר זה הנאמן מצהיר כי הינו מבוטח בביטוח אחריות מקצועית בסך של 10 מיליון דולר לתקופה ("**סכום הכיסוי**"). ככל שלפני הפירעון המלא של איגרות החוב (סדרה א') יופחת סכום הכיסוי מסך של 8 מיליון דולר מסיבה כלשהי, אזי הנאמן יעדכן את החברה לא יאוחר משבעה (7) ימי עסקים מהיום בו נודע על ההפחתה האמורה מהמבטח על מנת לפרסם דיווח מיידי בנושא.

הוראות סעיף זה יחולו עד למועד כניסתן לתוקף של תקנות לחוק ניירות ערך אשר יסדירו את חובת הכיסוי הביטוחי של הנאמן. לאחר כניסתן לתוקף של תקנות כאמור תחול חובה על הנאמן לעדכן את החברה אך ורק במקרה בו הנאמן לא יעמוד בדרישות התקנות.

- 55 -

22. **דוחות על ענייני הנאמנות**

22.1. הנאמן יהיה חייב להגיש דוח לגבי פעולות שביצע בהתאם להוראות סעיף 35ח1 לחוק ניירות ערך.

22.2. הנאמן יערוך עד ליום 30 ביוני לכל שנה, עבור השנה הקלנדרית הקודמת, דוח שנתי על ענייני הנאמנות (בסעיף 22 זה: **"הדוח השנתי"**). הדוח השנתי יכלול דיווח על אירועים חריגים בקשר עם הנאמנות שאירעו במהלך השנה שחלפה.

22.3. הנאמן יפרסם (בעצמו או באמצעות החברה לבקשת הנאמן) את הדוח השנתי במערכת המגנ"א.

22.4. נודע לנאמן על הפרה מהותית של שטר זה ו/או של תנאי אגרות החוב (סדרה א') מצד החברה, מכח פרסומים פומביים של החברה או מכח הודעת החברה לנאמן לפי סעיף 18.4 לשטר זה, יודיע למחזיקי אגרות החוב (סדרה א') תוך זמן סביר על ההפרה ועל הצעדים שננקט למניעתה או לאכיפת קיום התחייבויות החברה על החברה, לפי העניין. חובה זו לא תחול אם מדובר באירוע שפורסם על-ידי החברה על-פי הדין. חובה זאת של הנאמן כפופה לידיעתו בפועל אודות ההפרה כאמור.

22.5. הנאמן יעדכן את החברה על כל דוח שיוגש לפי סעיף 22 זה אלא אם כן יהא בכך כדי לפגוע בזכויות מחזיקי אגרות החוב.

22.6. אין באמור בסעיף זה לגרוע מכל חובת דיווח אחרת או נוספת של הנאמן על-פי כל דין. הנאמן חייב להגיש דוח לגבי פעילות שביצע לפי הוראות פרק ה' 1 לחוק לפי דרישה סבירה של מחזיקים בעשרה אחוזים (10%) לפחות מיתרת הערך הנקוב של אגרות החוב בתוך זמן סביר ממועד הדרישה, והכל בכפוף לחובת הסודיות שחב הנאמן כלפי החברה כאמור בסעיף 35י(ד) לחוק.

22.7. לפי דרישה של המחזיקים בלמעלה מחמישה אחוזים (5%) מיתרת הערך הנקוב של אגרות החוב, הנאמן יעביר למחזיקים נתונים ופרטים אודות הוצאותיו בקשר עם הנאמנות.

23. **שכר וכיסוי הוצאות הנאמן**

החברה תשלם שכר לנאמן עבור שירותיו כנאמן לאגרות החוב בהתאם לשטר הנאמנות, כמפורט להלן:

23.1. ביחס לסדרת אגרות החוב (סדרה א'), שכר הטרחה יחושב כדלקמן:

23.2. תשלום בסך של 28,000 ש"ח בגין כל שנת נאמנות, החל משנת הנאמנות הראשונה ואילך (קרי, החל מתום 12 חודשים ממועד ההנפקה) או לכל חלק ממנה, בה יהיו במחזור אגרות חוב (קרן, ריבית והצמדה).

23.3. השכר השנתי, האמור בסעיף 23.2 לעיל, ישולם לנאמן בתחילת כל שנת נאמנות בגין שנת הנאמנות הבאה או כל חלק ממנה, כאשר מועד התשלום של שכר הנאמן בגין השנה הראשונה יהיה בתוך 30 יום ממועד ביצוע ההנפקה בפועל של אגרות החוב.

23.4. באם החברה תבצע הרחבת אגרות החוב (סדרה א'), יהיה השכר השנתי שווה לשכר השנתי הנקוב לעיל כשהוא מוכפל בתוצאת החלוקה של סך אגרות החוב (סדרה א') שהונפקו עד לאותו מועד (ללא הבאה בחשבון של פדיונות) המחולק בסך אגרות החוב (סדרה א') שהונפקו במסגרת ההנפקה הראשונה של אגרות החוב (סדרה א'). במקרה שהחברה תפרע אגרות חוב (סדרה א'), יקטן שכר טרחת הנאמן באופן יחסי בהתאם אך בכל מקרה לא יפחת שכר הטרחה משכר שנקבע במסגרת ההנפקה הראשונה של אגרות החוב (סדרה א').

23.5. מבלי לפגוע בהוראות סעיף 23 זה להלן, התשלומים הקבועים בשטר הנאמנות, ישולמו לנאמן בגין התקופה שעד תום תקופת הנאמנות ביחס לכל אחת מסדרת אגרות החוב שתונפקנה על-פי תנאי שטר הנאמנות, גם אם מונה לחברה מפרק ו/או כונס נכסים ו/או מנהל ו/או באם הנאמנות על-פי שטר הנאמנות תנוהל בהשגחת בית משפט.

23.6. בגין השתתפות באסיפות בעלי מניות שנערכות בישראל, ישולם לנאמן סך של 750 ש"ח לאסיפה.

23.7. מבלי לגרוע מכלליות האמור בסעיפים 23.1-23.6 לעיל, יהיה הנאמן זכאי לתשלום שכר טרחה בסך של 600 ש"ח, בעבור כל שעת עבודה שיידרש לה בגין (הכל בכפוף להוראות שטר הנאמנות):

- 56 -

23.7.1   פעולות הנובעות מהפרה או חשש להפרה של השטר על ידי החברה;

23.7.2   פעולות בקשר להעמדת סדרה כלשהי של אגרות החוב שהונפקה על פי התשקיף לפירעון מיידי ו/או פעולות בקשר עם החלטת אסיפת מחזיקי אגרות חוב של סדרה כאמור להעמיד את אגרות החוב לפירעון מיידי;

23.7.3   פעולות בקשר לשעבודים שיינתנו, כמפורט בסעיף 6 לשטר זה, ככל שיינתנו;

23.7.4   פעולות מיוחדות שיידרש או שיהא צריך לבצע, לצורך מילוי תפקידיו על פי שטר זה בקשר עם זכויות מחזיקי אגרות החוב מסדרה כלשהיא לרבות כינוסן של אסיפות מחזיקי אגרות חוב כאמור בשטר זה;

23.7.5   עבודות מיוחדות (לרבות, אך לא רק, עבודה הנדרשת בשל שינוי במבנה החברה או עבודה בשל דרישת החברה) או בגין הצורך בביצוע פעולות נוספות לשם מילוי תפקידיו כנאמן סביר, בשל שינוי עתידי בחוקים ו/או תקנות ו/או הוראות מחייבות אחרות שיחולו בקשר לפעולות הנאמן ואחריותו לפי שטר נאמנות זה;

23.7.6   פעולות בקשר לרישום או ביטול רישום של בטוחות במרשם המתנהל כדין (לרבות בחו"ל), כמו כן, בדיקה, פיקוח בקרה, אכיפה וכיוצ"ב של התחייבויות (כגון: הגבלות על חופש הפעולה של החברה, שעבוד נכסים ועוד), שנטלה או שתיטול החברה או שינטלו על-ידי מי מטעמה או עבורה, בקשר להבטחת התחייבויות אחרות של החברה או מי מטעמה (כגון: ביצוע תשלומים לפי תנאי אגרות החוב) כלפי מחזיקי אגרות החוב, לרבות באשר למהות תנאי בטוחות והתחייבויות כאמור והתקיימותם.

23.8   ככל שיהיה צורך ברישום שעבודים, שכר טרחה נוסף ייקבע בהתאם להיקף העבודה שיידרש.

23.9   מובהר בזאת, כי היה ובשל שינוי עתידי בחוקים ו/או בתקנות ו/או בהוראות מחייבות אחרות החלים על פעולת הנאמן יושתו על הנאמן הוצאות נוספות, שידרשו ממנו לשם מילוי תפקידו כנאמן סביר, תשלם החברה לנאמן את שכרו והוצאותיו (בהצמדה חיובית למדד המחירים לצרכן, ממועד ההוצאה).

23.10   בכפוף להוראות שטר הנאמנות, הנאמן יהיה זכאי להחזר הוצאות (בהצמדה חיובית למדד המחירים לצרכן ממועד ההנפקה) שיוציא במסגרת מילוי תפקידו ו/או מכח הסמכויות המוענקות לו על פי שטר הנאמנות לרבות (אך לא רק) מודעות בעיתונים וחוות דעת מומחה ובלבד שבגין הוצאות חוות דעת מומחה, ייתן הנאמן הודעה לחברה מראש על כוונתו לקבל חוות דעת מומחה.

23.11   החברה תישא בכל תשלום ו/או הוצאה הכרוכה באגרות החוב, מהנפקתם ועד לפירעונם הסופי. הוצאות אלו כוללות בין השאר שכר טרחת נותני שירותים כגון עו"ד, חתמים, נאמנים, יועצים כלכליים וכו' ככל שנשכרו, מיסים ואגרות שאינם מוטלים על מחזיק אגרות חוב מכח הדין.

23.12   במידה ופקעה כהונת הנאמן, כאמור בסעיף 31 בשטר הנאמנות, לא יהיה הנאמן זכאי לתשלום שכר טרחתו החל ממועד התחלת כהונתו של הנאמן החליף.

23.13   האמור בסעיפים אחרים בשטר זה בדבר כיסוי הוצאות ועלויות בקשר לפעולות הנאמן בא להוסיף על האמור בסעיף 23 זה.

23.14   כל הסכומים שישולמו לנאמן הינם בתוספת מע"מ כדין וצמודים חיובית למדד המחירים לצרכן הידוע במועד חתימת שטר זה.

24.   **סמכויות מיוחדות**

24.1   הנאמן יהיה רשאי להפקיד את כל השטרות והמסמכים המעידים, המייצגים ו/או הקובעים את זכותו בקשר עם הנאמנות נשוא שטר זה לרבות בקשר עם כל נכס הנמצא באותו זמן בידו, בכספת ו/או במקום אחר שיבחר, אצל כל בנקאי ו/או כל חברה בנקאית ו/או אצל עורך דין.

24.2   הנאמן רשאי במסגרת ביצוע ענייני הנאמנות לפי שטר זה להזמין את חוות דעתו או את עצמו של כל עורך דין, רואה חשבון, שמאי, מעריך, מודד, מתווך או מומחה אחר (**"היועצים"**), ולפעול בהתאם למסקנותיה,

- 57 -

והנאמן לא יהיה אחראי בעד כל הפסד או נזק שייגרם כתוצאה מכל פעולה או מחדל שנעשו על-ידו על סמך עצה או חוות דעת כאמור, אלא אם כן נקבע בפסק דין חלוט כי הנאמן פעל ברשלנות (למעט רשלנות הפטורה על-פי חוק) ו/או בחוסר תום לב ו/או בזדון. הנאמן יעמיד העתק מחוות הדעת או מהעצה כאמור לעיון מחזיקי אגרות החוב והחברה, לפי דרישתם (בכפוף להוכחת בעלותו של המבקש באגרות החוב). החברה תישא במלוא ההוצאות הסבירות בגין העסקת היועצים שימונו כאמור ובלבד, ככל שהדבר אפשרי בנסיבות אותו עניין וככל שלא יהיה בכך כדי לפגוע בזכויות המחזיקים, שהנאמן ייתן לחברה הודעה מראש על כוונתו לקבל חוות דעת מומחה או עצה כאמור וככל שהדבר ניתן לפי נסיבות העניין, יפעל לאחר קבלת מספר הצעות מחיר.

24.3. כל עצה ו/או חוות דעת כאמור יכולה להינתן, להישלח או להתקבל על-ידי מכתב, פקסימיליה, דואר אלקטרוני ו/או כל אמצעי אלקטרוני אחר להעברות מידע, והנאמן לא יהיה אחראי בגין פעולות שעשה על סמך עצה ו/או חוות דעת או ידיעה שהועברו באחד האופנים המוזכרים לעיל על אף שנפלו בה שגיאות ו/או שלא היו אותנטיות, אלא אם ניתן היה לגלות שגיאות אלה בבדיקה סבירה ובלבד שלא פעל ברשלנות (למעט רשלנות הפטורה על-פי חוק, כפי שיהיה מעת לעת) ו/או בחוסר תום-לב. מובהר, כי המסמכים יהיו ניתנים להעברה, מחד, והנאמן רשאי להסתמך עליהם, מאידך, רק במקום בו הינם מתקבלים באופן נהיר, וכאשר לא מתעורר כל קושי בקריאתם.

24.4. בכפוף לכל דין, הנאמן לא יהיה חייב להודיע לצד כלשהו על חתימת שטר הנאמנות ואינו רשאי להתערב באיזו צורה שהיא בהנהלת עסקי החברה או ענייניה, אלא על-פי הסמכויות אשר הוקנו לנאמן בשטר זה או בהתאם להוראות כל דין. אין באמור בסעיף זה כדי להגביל את הנאמן בפעולות שעליו לבצע בהתאם לשטר הנאמנות.

24.5. בכפוף לכל דין, הנאמן ישתמש בנאמנות בכוחות, בהרשאות ובסמכויות שהוקנו לו לפי שטר הנאמנות, לפי שיקול דעתו המוחלט ובכפוף ליתר הוראות שטר זה. פעל כך הנאמן, הוא לא ישא באחריות לכל נזק ו/או הפסד ו/או הוצאה אשר ייגרמו לחברה ו/או למחזיקי אגרות החוב ו/או אשר בהם יהיה עליהם לשאת עקב כל פעולה ו/או מחדל שייעשו על-ידי הנאמן, לרבות כתוצאה מטעויות בשיקול דעת, אלא אם כן נקבע בפסק דין חלוט כי הנאמן פעל ברשלנות (למעט רשלנות הפטורה על-פי חוק כפי שיהיה מעת לעת) או בחוסר תום לב או בזדון או בניגוד להוראות שטר זה והכל בכפוף ובהתאם להוראות הדין.

25. **סמכות הנאמן להעסיק שלוחים**

הנאמן יהיה רשאי, במסגרת ניהול עסקי הנאמנות, למנות שלוח/ים שיפעל/ו במקומו, בין עורך דין ובין אדם אחר, כדי לעשות או להשתתף בעשיית פעולות מיוחדות שיש לעשותן בקשר לנאמנות ולשלם שכר סביר לכל שלוח כאמור, ומבלי לגרוע מכלליות האמור לעיל נקיטה בהליכים משפטיים. כן יהיה הנאמן רשאי לסלק על חשבון החברה את שכרו הסביר של כל שלוח כזה לרבות בדרך של קיזוז מסכומים שהגיעו לידיו והחברה תחזיר לנאמן מייד עם דרישתו הראשונה כל הוצאה כאמור, והכל בתנאי שהנאמן נתן לחברה הודעה מראש בדבר מינוי שלוחים כאמור וזאת ככל שהדבר יהיה אפשרי בנסיבות העניין וככל שלא יהיה בכך כדי לפגוע בזכויות המחזיקים.

מובהר, כי אין במינוי שלוח כאמור כדי לגרוע מאחריות הנאמן בגין פעולותיו ופעולות שלוחיו.

26. **שיפוי לנאמן**

26.1. החברה ומחזיקי אגרות החוב (במועד הקובע הרלוונטי כאמור בסעיף 26.6 לשטר, כל אחד בגין התחייבותו כאמור בסעיף 26.4 לשטר) מתחייבים בזאת לשפות את הנאמן וכל נושאי משרה בו, עובדיו, שלוח או מומחה שימונה מטעמו (**"הזכאים לשיפוי"**):

26.1.1. בגין כל נזק ו/או הפסד ו/או חיוב כספי על-פי פסק דין (שלא ניתן לגביו עיכוב ביצוע) או על-פי פשרה שנסתיימה (וככל שהפשרה נוגעת לחברה ניתנה הסכמת החברה לפשרה), אשר עילתו קשורה לפעולות שביצעו הזכאים לשיפוי או שעליהם לבצע מכוח הוראות שטר זה ו/או על-פי חוק ו/או הוראה של רשות מוסמכת ו/או כל דין ו/או לפי דרישת מחזיקי אגרות החוב (סדרה א') ו/או לפי דרישת החברה; וכן

26.1.2. בגין שכר הזכאים לשיפוי והוצאות שהוציאו ו/או שעומדים להוציא מכוח הוראות שטר זה ו/או על-פי חוק ו/או הוראה של רשות מוסמכת ו/או כל דין ו/או לפי דרישת מחזיקי אגרות

- 58 -

החוב (סדרה א') ו/או לפי דרישת החברה ו/או בקשר לשימוש בסמכויות והרשאות הנתונות מתוקף שטר זה וכן בקשר לכל מיני הליכים משפטיים, חוות דעת עורכי דין ומומחים אחרים, משא ומתן, דין ודברים, הוצאות, תביעות ודרישות בנוגע לכל עניין ו/או דבר שנעשו ו/או לא נעשו באופן כלשהו ביחס לנדון.

והכל בתנאי כי :

26.1.2.1    הזכאים לשיפוי לא ידרשו שיפוי מראש בעניין שאינו סובל דיחוי (מבלי לפגוע בזכותם לשיפוי בדיעבד, אם וככל שתקום להם זכות כאמור) ;

26.1.2.2    לא נקבע בהחלטה שיפוטית חלוטה כי הזכאים לשיפוי פעלו שלא בתום לב והפעולה נעשתה שלא במסגרת מילוי תפקידם, שלא בהתאם להוראות הדין ו/או שלא על-פי שטר נאמנות זה ;

26.1.2.3    לא נקבע בהחלטה שיפוטית חלוטה כי הזכאים לשיפוי התרשלו ברשלנות שאינה פטורה על פי חוק כפי שיהיה מעת לעת ;

26.1.2.4    לא נקבע בהחלטה שיפוטית חלוטה כי הזכאים לשיפוי פעלו בזדון, ברשלנות נפשעת או בהתנהלות בלתי הולמת בכוונה ;

התחייבויות השיפוי על-פי סעיף 26.1 זה תקרא "**התחייבות השיפוי**".

גם במקרה בו ייטען כנגד הזכאים לשיפוי, כי אינם זכאים לשיפוי מכל טעם שהוא, יהיו הזכאים לשיפוי זכאים מיד עם דרישתם הראשונה, לתשלום הסכום המגיע להם בגין 'התחייבות השיפוי'. במקרה בו יקבע בהחלטה שיפוטית חלוטה כי לא קמה לזכאים לשיפוי זכות לשיפוי, ישיבו הזכאים לשיפוי את סכומי התחייבות השיפוי ששולמו להם.

26.2.    מבלי לפגוע בזכויות לפיצוי הניתנות לנאמן לפי החוק ובכפוף לאמור בשטר זה ו/או במחויבויות החברה על-פי שטר זה, יהיו הזכאים לשיפוי זכאים לקבל שיפוי מתוך הכספים שיתקבלו על-ידי הנאמן מהליכים שננקט, בנוגע להתחייבויות שקיבלו על עצמם, בנוגע להוצאות סבירות שהוציאו אגב ביצוע הנאמנות או בקשר לפעולות כאלה, שלפי דעתם היו דרושות לביצוע הנ"ל ו/או בקשר לשימוש בסמכויות והרשאות הנתונות מתוקף שטר זה וכן בקשר לכל מיני הליכים משפטיים, חוות דעת עורכי דין ומומחים אחרים, משא ומתן, דין ודברים, תביעות ודרישות בנוגע לכל עניין ו/או דבר שנעשו ו/או לא נעשו באופן כלשהו ביחס לנדון, והנאמן יוכל לעכב את הכספים הנמצאים ברשותו ולשלם מתוכם את הסכומים הנחוצים לשם תשלום השיפוי האמור. כל הסכומים האמורים יעמדו בעדיפות על זכויות מחזיקי אגרות החוב (סדרה א') ובכפוף להוראות כל דין ובלבד שהנאמן נהג בתום לב ובהתאם לחובות המוטלות עליו על-פי כל דין ועל-פי שטר זה. לעניין סעיף זה, פעולה של הנאמן שאושרה על-ידי החברה ו/או מחזיקי אגרות החוב, תיחשב כפעולה שהיתה דרושה באופן סביר.

26.3.    מבלי לגרוע מתוקף 'התחייבות השיפוי' שבסעיף 26.1 לשטר, כל אימת שהנאמן יהיה חייב לפי תנאי שטר הנאמנות ו/או על-פי חוק ו/או הוראה של רשות מוסמכת ו/או כל דין ו/או לפי דרישת מחזיקי אגרות החוב (סדרה א') ו/או לפי דרישת החברה, לעשות פעולה כלשהי, לרבות, אך לא רק, פתיחת הליכים או הגשת תביעות לפי דרישת בעלי אגרות החוב (סדרה א'), כאמור בשטר זה, יהיה הנאמן רשאי להימנע מלנקוט כל פעולה כאמור, עד שיקבל לשביעות רצונו פיקדון כספי לכיסוי 'התחייבות השיפוי' ("**כרית המימון**") בסכום הנדרש, בעדיפות ראשונה מהחברה, ובמקרה בו החברה לא תפקיד את מלוא כרית המימון במועד בו נדרשה לעשות זאת על-ידי הנאמן ובתנאי שהנאמן נקט בצעדים סבירים בנסיבות העניין על מנת לגבות את כספי כיסוי התחייבות השיפוי מהחברה יפנה הנאמן למחזיקי אגרות החוב (סדרה א') שהחזיקו באגרות החוב (סדרה א') במועד הקובע (כאמור בסעיף 26.6 לשטר), בבקשה כי יפקידו בידו את סכום כרית המימון, כל אחד את חלקו היחסי (כהגדרת מונח זה בסעיף 26.5 לשטר). במקרה בו מחזיקי אגרות החוב (סדרה א') לא יפקידו בפועל את מלוא סכום כרית המימון הנדרשת, לא תחול על הנאמן חובה לנקוט בפעולה או בהליכים הרלוונטיים ; אין באמור כדי לפטור את הנאמן מנקיטת פעולה דחופה הדרושה לשם מניעת פגיעה מהותית לרעה בזכויות מחזיקי אגרות החוב (סדרה א'). אין בתשלום על-ידי המחזיקים לפי סעיף זה כדי לשחרר את החברה מחבותה לשאת בתשלום האמור.

- 59 -

הנאמן מוסמך לקבוע את סכום כרית המימון ויהיה רשאי לחזור ולפעול ליצירת כרית נוספת כאמור, מעת לעת, בסכום שייקבע על-ידו.

כרית המימון תופקד בחשבון בנק שייפתח על-ידי הנאמן ועל שמו בלבד ("**חשבון כרית המימון**") אשר ישמש לצורך ההתחייבות השיפוי. הנאמן על פי שיקול דעתו הבלעדי יהיה רשאי לעשות שימוש בכספים המופקדים בכרית המימון לשם ביצוע פעולות או שימוש בהליכים הרלוונטיים.

סכום כרית המימון יוחזק בחשבון כרית המימון עד למועד הפירעון הסופי והמלא של אגרות החוב (סדרה א') ועד לתשלום מלא לנאמן ו/או שלוחיו בגין שכרם, הוצאותיהם, נזקים והפסדים שנגרמו להם כתוצאה מפעולותיהם על פי שטר הנאמנות.

לאחר פרעון מלוא סכומים אלו לנאמן ושלוחיו תועבר יתרת כרית המימון לגורם שהפקידה. היו אלו מספר גורמים שהפקידו את כספי כרית המימון, תחולק יתרת כרית המימון פארי פאסו ביניהם.

במקרה בו סכום כרית ההוצאות לא יספיק לכיסוי הוצאות הנאמן בקשר עם העמדה לפירעון מיידי של אגרות החוב (סדרה א') ו/או הפרת הוראות שטר הנאמנות על-ידי החברה כאמור, יפעל הנאמן בהתאם לאמור בסעיף 26 להלן.

26.4.    התחייבות השיפוי :

26.4.1.    תחול על החברה בכל מקרה של : (1) פעולות שבוצעו על-פי שיקול דעת הנאמן ו/או על-פי כל דין ו/או נדרשו להתבצע לפי תנאי שטר הנאמנות או לשם הגנה על זכויות מחזיקי אגרות החוב (לרבות בשל דרישת מחזיק הדרושה לשם הגנה כאמור) ; וכן (2) פעולות שבוצעו ו/או נדרשו להתבצע לפי דרישת החברה.

26.4.2.    תחול על המחזיקים שהחזיקו במועד הקובע (כאמור בסעיף 26.6 לשטר זה) בכל מקרה של : (1) פעולות שבוצעו ו/או נדרשו להתבצע לפי דרישת מחזיקי אגרות החוב (ולמעט פעולות כאמור שננקטו לפי דרישת מחזיקים לשם הגנה על זכויות מחזיקי אגרות החוב) ; וכן (2) אי תשלום על-ידי החברה של סכום התחייבות השיפוי החלה עליה על-פי סעיף 26.4.1 לשטר זה (בכפוף להוראות סעיף 26.7 לשטר זה). יובהר, כי אין בתשלום בהתאם לס"ק (2) לעיל כדי לגרוע מחובת החברה לשאת בהתחייבות השיפוי בהתאם להוראות סעיף 26.4.1 לשטר זה.

26.5.    בכל מקרה בו החברה לא תשלם את מלוא הסכומים הדרושים לכיסוי התחייבות השיפוי ו/או לא תפקיד את מלוא סכום כרית המימון, לפי העניין ; ו/או נקראו המחזיקים להפקיד את סכום כרית המימון בהתאם להוראות סעיף 26.3 לשטר זה, הכספים ייגבו באופן הבא :

26.5.1.    ראשית - הסכום ימומן מתוך כספי הריבית וככל שלא יספיקו כספי הריבית, מכספי הקרן שעל החברה לשלם למחזיקי אגרות החוב (סדרה א') לאחר תאריך הפעולה הנדרשת, ויחולו הוראות סעיף 11 לשטר זה ; מובהר כי במקרה בו נעשה שימוש בסכומים אלה על ידי הנאמן משום שהחברה לא שילמה את מלוא הסכומים הדרושים לכיסוי 'ההתחייבות לשיפוי' ו/או לא הפקידה את מלוא סכום 'כרית המימון', לא יראו בסכומים אלה כאילו נפרעו על ידי החברה על חשבון אגרות החוב לטובת מחזיקי איגרות החוב ;

26.5.2.    שנית - ככל שלדעת הנאמן לא יהיה בסכומים המופקדים בכרית המימון כדי לכסות את התחייבות השיפוי, יפקידו המחזיקים שהחזיקו במועד הקובע (כאמור בסעיף 26.6 לשטר זה) בהתאם לחלקם היחסי (כהגדרת מונח זה להלן) בידי הנאמן את הסכום החסר.

"**חלקו היחסי**" משמעו : החלק היחסי של אגרות החוב (סדרה א') אותם החזיק המחזיק במועד הקובע הרלוונטי כאמור בסעיף 26.6 לשטר זה מסך הערך הנקוב של הסדרה שבמחזור באותו מועד. מובהר, כי חישוב החלק היחסי ייוותר קבוע אף אם לאחר אותו מועד יחול שינוי בערך הנקוב של אגרות החוב שבידי המחזיק.

- 60 -

יובהר, כי מחזיקי אגרות החוב אשר יישאו באחריות לכיסוי הוצאות כאמור בסעיף זה לעיל יוכלו לשאת בהוצאות כאמור בסעיף זה לעיל מעבר לחלקם היחסי ובמקרה זה יחול על השבת הסכומים סדר העדיפות בהתאם לאמור בסעיף 10 לשטר.

26.6. המועד הקובע לקביעת חבותו של מחזיק בהתחייבות השיפוי ו/או בתשלום כרית המימון הינו כדלקמן :

26.6.1. בכל מקרה בו התחייבות השיפוי ו/או תשלום כרית המימון נדרשים בשל החלטה או פעולה דחופה הדרושות לשם מניעת פגיעה מהותית לרעה בזכויות מחזיקי אגרות החוב (סדרה א׳) וזאת ללא החלטה מוקדמת של אסיפת מחזיקי אגרות החוב (סדרה א׳) - יהיה המועד הקובע לחבות, תום יום המסחר של יום נקיטת הפעולה או של קבלת ההחלטה, ואם אותו יום אינו יום מסחר, יום המסחר הקודם לו.

26.6.2. בכל מקרה בו התחייבות השיפוי ו/או תשלום כרית המימון נדרשים על-פי החלטת אסיפת מחזיקי אגרות חוב (סדרה א׳), יהיה המועד הקובע לחבות המועד הקובע להשתתפות באסיפה (כפי שמועד זה נקבע בהודעת הזימון לאסיפה) ותחול גם על מחזיק אשר לא נכח או השתתף באסיפה.

26.7. אין בתשלום על-ידי המחזיקים במקום החברה של סכום כלשהו המוטל על החברה על-פי סעיף 26 זה, כדי לשחרר את החברה מחבותה לשאת בתשלום האמור והנאמן יפעל בהתאם להוראות שטר זה והסמכויות המוקנות לו מכוחו להשבת כספים כאמור, למחזיקים.

26.8. לעניין קדימות ההחזר למחזיקים אשר נשאו בתשלומים לפי סעיף זה מתוך תקבולים בידי הנאמן, ראה סעיף 10 לשטר.

27. **הודעות**

27.1. כל הודעה מטעם החברה ו/או הנאמן למחזיקי אגרות החוב תינתן על-ידי דיווח במערכת המגנ״א של רשות ניירות ערך.

27.2. הנאמן רשאי להורות לחברה והחברה תהיה חייבת לדווח לאלתר במערכת המגנ״א בשם הנאמן כל דיווח למחזיקי איגרות החוב בנוסחו כפי שיועבר בכתב על ידי הנאמן לחברה.

27.3. במקרה בו תחדל החברה לדווח בהתאם לפרק ו׳ לחוק, כל הודעה מטעם החברה ו/או הנאמן למחזיקי אגרות החוב תינתן על-ידי משלוח הודעה בדואר רשום לכל מחזיק רשום של אגרות חוב לפי כתובתו האחרונה הרשומה במרשם מחזיקי אגרות החוב (במקרה של מחזיקים במשותף – למחזיק המשותף אשר שמו מופיע ראשון במרשם). כל הודעה שתשלח כאמור תחשב כאילו נמסרה לידי מחזיקי אגרות החוב כעבור 14 ימי עסקים מיום מסירתה בדואר רשום ובמקבל תועבר הודעה בדואר אלקטרוני לנאמן. החברה תדאג גם לפרסום מודעה בשני עיתונים יומיים בעלי תפוצה רחבה, היוצאים לאור בשפה העברית. לחלופין, תפתח החברה אתר אינטרנט (לרבות באמצעות הנאמן) בו יתפרסמו הודעות למחזיקי אגרות החוב כאמור, והחברה תודיע על כתובתו של האתר בדיווח מיידי שידווח טרם הפסקת חובות הדיווח של החברה.

27.4. העתקים מהודעות ומהזמנות שינתנו ע״י החברה למחזיקי איגרות החוב ישלחו על ידיה גם לנאמן. יובהר, כי ההודעות וההזמנות כאמור אינם כוללים דיווחים שוטפים של החברה לציבור.

27.5. כל הודעה או דרישה מטעם הנאמן לחברה או מטעם החברה לנאמן תוכל להינתן על-ידי מכתב שיישלח בדואר רשום לפי הכתובת המפורטת בשטר הנאמנות, או לפי כתובת אחרת עליה יודיע צד אחד למשנהו בכתב (לרבות כתובת דואר אלקטרוני), או באמצעות שיגורה בפקסימיליה או על-ידי שליח וכל הודעה או דרישה כאמור תיחשב כאילו נתקבלה על-ידי הצד השני : (1) במקרה של שיגור בדואר רשום- כעבור שלושה (3) ימי עסקים מיום מסירתה בדואר ; (2) במקרה של שיגורה בפקסימיליה (בתוספת וידוא טלפוני בדבר קבלתה)- כעבור יום עסקים אחד מיום שיגורה ; (3) במקרה של שליחתה על-ידי שליח- במסירתה על-ידי השליח לנמען או בהצעתה לנמען לקבלה, לפי העניין ; ו-(4) במקרה של שליחתה באמצעות דואר אלקטרוני- עם קבלת אישור כי ההודעה נקראה (על פי המוקדם מביניהם).

- 61 -

28.   **ויתור, פשרה ושינויים בשטר הנאמנות**

כפוף להוראות כל דין, למעט ביחס : (1) למועדים ותשלומים על-פי תנאי אגרות החוב ; (2) מנגנוני התאמה בשיעור הריבית ובכלל זה שיעור הריבית הנוסף כתוצאה מאי עמידה באמות מידה פיננסיות ו/או משינויי דירוג ; (3) לתנאי הפירעון של אגרות החוב ועילות העמדה לפירעון מיידי של אגרות החוב ; (4) להקטנת שיעור הריבית הנקובה באגרות החוב ; (5) לויתור בעניין ביצוע תשלומים ודיווחים שעל החברה ליתן לנאמן ; (6) להוראות הנוגעות להרחבת סדרה ; (7) לאמות המידה הפיננסיות ולהתניות הפיננסיות ; (8) למגבלות על חלוקה ; (9) מגבלה על תחום פעילות ; (10) מינוי נציג ; (11) כרית הוצאות ; (12) הוראות סעיף 6 לשטר הנאמנות ; (13) הוראות בדבר עסקאות עם בעלי שליטה ; ו-(14) מגבלות על פעילות החברה כמפורט בסעיף 5.9 לשטר ; יהיה הנאמן רשאי מזמן לזמן ובכל עת כאשר אין בדבר, לדעתו, משום פגיעה בזכויות מחזיקי אגרות החוב (סדרה א׳), לוותר על כל הפרה או אי-מילוי של כל תנאי מתנאי אגרות החוב או אי מילוי של כל תנאי מתנאי שטר הנאמנות על-ידי החברה.

בכפוף להוראות כל דין, ובאישור מוקדם של מחזיקי אגרות החוב בהחלטה מיוחדת, יהיה הנאמן רשאי, בין לפני ובין אחרי שקרן אגרות החוב (סדרה א׳) תעמוד לפירעון, להתפשר עם החברה בקשר לכל זכות או תביעה של מחזיקי אגרות החוב (סדרה א׳), לוותר על כל זכות או תביעה של מחזיקי אגרות החוב (סדרה א׳) או מי מהם כלפי החברה על-פי שטר הנאמנות ואגרות החוב (סדרה א׳) ולהסכים עם החברה לכל הסדר של זכויותיהם, כולל לוותר על כל זכות או תביעה של מחזיקי אגרות החוב (סדרה א׳) או מי מהם כלפי החברה על-פי שטר זה.

התפשר הנאמן עם החברה, ויתר על כל זכות או תביעה של מחזיקי אגרות החוב (סדרה א׳) או הסכים עם החברה לכל הסדר של זכויות מחזיקי אגרות החוב (סדרה א׳) לאחר שקיבל אישור מוקדם של אסיפת מחזיקי אגרות החוב (סדרה א׳) כאמור לעיל, יהיה הנאמן פטור מאחריות בגין פעולה זו, כפי שאושרה על-ידי האסיפה הכללית, ובלבד שהנאמן לא הפר חובת אמון ולא פעל בחוסר תום לב או בזדון ביישום החלטת האסיפה הכללית.

מבלי לגרוע מהאמור לעיל, בכפוף להוראות כל דין יהיו החברה והנאמן רשאים, בין לפני ובין אחרי שקרן אגרות החוב תעמוד לפירעון, לשנות את שטר הנאמנות על נספחיו (לרבות שינוי בתנאי אגרות החוב (סדרה א׳)) אם נתקיים אחד מאלה :

28.1.   הנאמן שוכנע, כי השינוי אינו פוגע במחזיקים באגרות החוב (למעט ביחס לרשימת הנושאים המסומנים בס״ק (1) עד (14) ברישא של סעיף 28 לעיל, אשר הנאמן לא רשאי להסכים לשינויים ו/או ויתורים בהם או לגביהם), ובלבד שהודיע על כך בכתב למחזיקי אגרות החוב (סדרה א׳).

28.2.   השינוי אושר על-ידי מחזיקי אגרות החוב (סדרה א׳) בהחלטה מיוחדת.

מבלי לגרוע מהאמור לעיל, תנאי אגרות החוב יהיו ניתנים לשינוי גם במסגרת הסדר או פשרה, אשר אושר על-ידי בית המשפט, לפי חוק חדלות פירעון או במסגרת הליכי פירוק לפי הפרק השמיני לחוק החברות או במסגרת הליכי חדלות פירעון על פי כל דין אחר ככל שננקט (וזאת מבלי לגרוע מהתחייבויות בעלי השליטה, נושאי המשרה והחברה, כמפורט בסעיף 33 לשטר זה).

החברה תמסור למחזיקי אגרות החוב הודעה באמצעות דיווח במערכת המגנ״א על כל שינוי כאמור לעיל, ככל הניתן לאחר ביצועו.

בכל מקרה של שימוש בזכות הנאמן על-פי סעיף זה, יהיה הנאמן רשאי לדרוש ממחזיקי אגרות החוב (סדרה א׳) למסור לו או לחברה את תעודות אגרות החוב, לשם רישום הערה בהן בדבר כל פשרה, ויתור, שינוי או תיקון כאמור ולפי דרישת הנאמן תרשום החברה הערה כאמור. בכל מקרה של שימוש בזכות הנאמן על-פי סעיף זה, יודיע על כך הנאמן למחזיקי אגרות החוב (סדרה א׳) תוך זמן סביר, בכתב.

29.   **מרשם המחזיקים באגרות החוב**

29.1.   החברה תחזיק ותנהל במשרדה הרשום מרשם של מחזיקים באגרות החוב (סדרה א׳) בהתאם לחוק ניירות ערך, שיהיה פתוח לעיונו של כל אדם.

29.2.   במרשם יירשמו :

29.2.1.   מספר אגרות החוב, שהונפקו לציבור, בציון הסדרה, הערך הנקוב ומועד הפירעון ;

29.2.2.   מספר אגרות החוב המוחזקות בידי כלל המחזיקים באגרות החוב ;

- 62 -

29.2.3.   שמו, מספר זהותו ומענו של כל מי שמחזיק באגרות החוב;

29.2.4.   תאריך ההנפקה של אגרות החוב הרשומות או מועד העברתן למחזיק, לפי העניין;

29.3.   במרשם תרשם כל העברת בעלות באיגרות החוב. כל אדם, לרבות הנאמן וכל מחזיקי אגרות חוב, יהיה רשאי לעיין במרשם בכל זמן סביר.

29.4.   החברה לא תהיה חייבת לרשום במרשם מחזיקי אגרות החוב (סדרה א') שום הודעה בדבר נאמנות מפורשת, מכללא או משוערת, או משכון או שעבוד מכל מין שהוא או כל זכות שביושר, תביעה או קיזוז או זכות אחרת כלשהי, בקשר לאגרות החוב (סדרה א'). החברה תכיר אך ורק בבעלותו של האדם שבשמו נרשמו אגרות החוב, אך בכפוף לכך שיורשיו החוקיים של האדם שבשמו נרשמו אגרות החוב, מנהלי עזבונו או מבצעי צוואתו, וכל אדם שיהיה זכאי לאגרות חוב עקב פשיטת רגל של כל מחזיק רשום (ואם הוא תאגיד – עקב פירוקו), יהיו רשאים להירשם כמחזיקים לאחר מתן הוכחות שלדעת מנהלי החברה תספקנה כדי להוכיח את זכותם להירשם כמחזיקים של אגרות החוב הרלוונטיות.

30.   **שחרור**

לכשיוכח לשביעות רצונו של הנאמן כי כל אגרות החוב (סדרה א') נפרעו, נפדו או לכשתפקיד החברה בנאמנות בידי הנאמן סכומי כסף אשר יספיקו לפדיון מלא וסופי של אגרות החוב בהתאם להוראות שטר זה (כולל ריבית פיגורים, ככל שתחול), וכן לכשיוכח לשביעות רצונו של הנאמן כי מלוא שכרו וכל ההוצאות שהוצאו על-ידו ו/או על-ידי שלוחיו בקשר עם פעולותיו על-פי שטר הנאמנות ועל-פי הוראותיו, שולמו במלואן, אזי יהיה הנאמן חייב, לפי דרישה ראשונה של החברה, לפעול בכספים שהופקדו אצלו בגין אגרות חוב (סדרה א') שלא נדרש פדיונן על-פי התנאים הקבועים בשטר זה.

31.   **מינוי ופקיעת כהונתו של הנאמן, תפקידיו וסמכויותיו**

31.1.   החברה ממנה בזאת את הנאמן כנאמן עבור מחזיקי אגרות החוב (סדרה א') בלבד מכח הוראות סעיף 35ב לחוק ניירות ערך.

31.2.   תקופת מינויו של הנאמן תהיה עד מועד כינוסה של אסיפת מחזיקים בהתאם להוראות סעיף 35ב(א1) לחוק ניירות ערך.

31.3.   ממועד כניסתו לתוקף של שטר נאמנות זה תפקידי הנאמן יהיו על-פי כל דין ושטר זה.

31.4.   הנאמן יפעל בהתאם להוראות כל דין ובכלל זה חוק ניירות ערך והנחיות רשות ניירות ערך.

31.5.   הנאמן ייצג את המחזיקים באגרות החוב (סדרה א') בכל עניין הנובע מהתחייבויות החברה כלפיהם, והוא יהיה רשאי לשם כך לפעול למימוש הזכויות הנתונות למחזיקים לפי חוק ניירות ערך או לפי שטר הנאמנות.

31.6.   הנאמן רשאי לנקוט בכל הליך לשם הגנה על זכויות המחזיקים בהתאם לכל דין וכמפורט בשטר נאמנות זה.

31.7.   הנאמן רשאי למנות שלוחים כמפורט בסעיף 25 לשטר.

31.8.   פעולותיו של הנאמן הן בנות תוקף על אף פגם שנתגלה במינויו או בכשירותו.

31.9.   אין בחתימת הנאמן על שטר נאמנות זה משום הבעת דעה מצדו בדבר טיבם של ניירות הערך המוצעים או כדאיות ההשקעה בהם.

31.10.   בכפוף להוראות כל דין, הנאמן אינו מחויב לפעול באופן שאינו מפורט במפורש בשטר נאמנות זה, כדי שמידע כלשהו, לרבות על החברה ו/או בקשר ליכולתה של החברה לעמוד בהתחייבויותיה למחזיקי אגרות החוב יגיע לידיעתו ואין זה מתפקידו.

31.11.   בכפוף להוראות כל דין ולאמור בשטר נאמנות זה, הנאמן מתחייב בחתימתו על שטר זה, לשמור בסודיות כל מידע שניתן לו מהחברה ושיקבל על-פי כל דין, כפי שיהיה מעת לעת, לא יגלה אותו לאחר ולא יעשה בו כל שימוש, אלא אם כן גילויו או השימוש בו נדרש לשם מילוי תפקידו לפי חוק ניירות ערך, לפי שטר הנאמנות, או לפי צו של בית משפט או לשם הגנה על זכויות מחזיקי אגרות החוב, ובלבד שגילוי מידע

- 63 -

כאמור יצומצם למידה וההיקף המינימאליים הנדרשים כדי לעמוד בדרישות הדין וכי הנאמן יתאם עם החברה מראש, ככל שניתן ומותר ולא יהיה בכך כדי לפגוע בזכויות מחזיקי אגרות החוב, את תוכן ועיתוי הגילוי, באופן שיותיר בידי החברה שהות סבירה לפנות לערכאות במידת הצורך למניעת גילוי המידע כאמור. חובת הסודיות כאמור תחול גם על כל שלוח של הנאמן (לרבות כל יועץ, בא כוח וכדומה). מובהר, כי העברת מידע למחזיקי אגרות החוב לצורך קבלת החלטה הנוגעת לזכויותיהם על-פי אגרת החוב או לצורך מתן דיווח על מצב החברה, אינה מהווה הפרה של התחייבותו של הנאמן לסודיות כאמור.

31.12 הנאמן רשאי להסתמך במסגרת נאמנותו על כל מסמך בכתב, לרבות כתב הוראות, הודעה, בקשה, הסכמה או אישור, הנחזה להיות חתום או מוצא על-ידי אדם או גוף כלשהו, אשר הנאמן מאמין בתום לב כי נחתם או הוצא על-ידו.

31.13 <u>סיום כהונה</u>

31.13.1 על סיום כהונת הנאמן יחולו הוראות חוק ניירות ערך.

31.13.2 הנאמן יהיה רשאי להתפטר מתפקידו בכל מועד שירצה לאחר מתן הודעה בכתב לחברה, אשר בה יפורטו סיבות ההתפטרות. להתפטרות הנאמן אין תוקף אלא אם כן ניתן לה אישור בית המשפט, ומן היום שנקבע לכך באישור בית המשפט כאמור.

31.13.3 למרות האמור לעיל, המחזיקים בחמישה אחוזים מיתרת הערך הנקוב של אגרות חוב רשאים לכנס אסיפת מחזיקים והאסיפה רשאית להחליט על העברת הנאמן מכהונתו ובלבד שנכחו בה מחזיקי אגרות חוב המחזיקים בעצמם, או על-ידי באי כוחם, בחמישים אחוזים (50%) לפחות מיתרת הערך הנקוב של אגרות החוב שבמחזור ולעניין אסיפת מחזיקים נדחית – ובלבד שנכחו בה מחזיקים בעשרה אחוזים (10%) לפחות מהיתרה כאמור, וכן שההחלטה נתקבלה ברוב של שבעים וחמישה אחוזים (75%) לפחות מיתרת הערך הנקוב של אגרות החוב המיוצג בהצבעה, או ברוב כאמור באסיפה נדחית, שנכחו בה מחזיקי אגרות חוב המחזיקים בעצמם או על-ידי באי כוחם, בעשרה אחוזים (10%) לפחות מן היתרה האמורה.

31.13.4 פקעה כהונתו של נאמן, ימונה נאמן חדש במקומו באסיפת מחזיקים.

31.13.5 בכפוף להוראות כל דין, הנאמן שכהונתו פקעה ימשיך לכהן בתפקידו עד למינוי נאמן אחר תחתיו. הנאמן יעביר לידי הנאמן החדש את כל המסמכים והסכומים שהצטברו אצלו בקשר עם הנאמנות נשוא שטר זה, ויחתום על כל מסמך שיידרש לשם כך. לכל נאמן חדש יהיו אותם כוחות, חובות וסמכויות, והוא יוכל לפעול לכל דבר ועניין, כאילו התמנה כנאמן מלכתחילה.

31.14 לכל נאמן חדש יהיו אותם הכוחות, הסמכויות וההרשאות האחרות כשל הנאמן שכהונתו פקעה, והוא יוכל לפעול, לכל דבר ועניין כאילו התמנה כנאמן מלכתחילה. מובהר כי התחייבות הנאמן לבצע פעולות על פי שטר הנאמנות ולפי אגרת החוב לא יפקעו עד לסיום העברת כספי הנאמנות, נכסיה וזכויותיה, ככל שיהיו, לידי הנאמן החדש. הנאמן מתחייב לפעול בשיתוף פעולה עם החברה והנאמן החליף לצורך העברה כאמור. מובהר כי אין בסיום כהונתו של הנאמן כדי לגרוע מזכויות, תביעות או טענות שיהיו לחברה ו/או למחזיקי אגרות החוב כלפי הנאמן, ככל שיהיו, שעילתן קודמת למועד סיום כהונתו כנאמן, ואין בכך כדי לשחרר את הנאמן מחבות כלשהי על פי כל דין.

31.15 החברה תפרסם דוח מיידי בכל מקרה של התפטרות הנאמן ו/או מינוי נאמן אחר.

32. <u>**אסיפות של מחזיקי אגרות החוב**</u>

אסיפות מחזיקי אגרות החוב (סדרה א') יתנהלו כאמור בתוספת השנייה לשטר זה.

הנאמן יכנס אסיפת מחזיקים בהתאם לסעיף 35יב(א1) לחוק כפי שיהיה מעת לעת. הוראה זו תעמוד בתוקפה כל עוד קיימת דרישה בחוק לכינוס אסיפה כאמור שלא ניתן להתנות עליה

33. <u>**תחולת הדין וסמכות שיפוט; התחייבויות החברה, בעלי השליטה ונושאי המשרה בחברה**</u>

הדין החל על שטר נאמנות זה, לרבות על נספחיו, הינו הדין הישראלי בלבד. בכל עניין שלא נזכר בשטר זה וכן בכל מקרה של סתירה בין הוראות הדין לבין שטר זה, יפעלו הצדדים בהתאם להוראות הדין הישראלי. בנוסף, בכל

- 64 -

מקרה של סתירה בין ההוראות המתוארות בדוח הצעת המדף בקשר לשטר זה ו/או אגרות החוב יגברו הוראות שטר זה. יובהר, כי מימוש השעבודים הניתנים במסגרת שטר זה, ייעשה (ככל שייעשה) בהתאם לדין החל עליהם.

סמכות השיפוט הייחודית והבלעדית בכל הקשור לשטר זה על נספחיו ובאגרת החוב המצורפת כנספח לו תהיה נתונה לבתי המשפט המוסמכים בתל אביב-יפו.

החברה, בעלי השליטה בחברה (בהווה ובעתיד) ונושאי המשרה בחברה (המכהנים ושיכהנו בעתיד) התחייבו ויתחייבו, לפי העניין: כי לא יתנגדו לבקשת הנאמן ו/או מחזיקי אגרות החוב (סדרה א') אשר תוגש בבית משפט בישראל, בהליך שהוגש נגד החברה, להחלת הדין הישראלי לעניין פשרה, הסדר וחדלות פירעון בקשר לחברה (ולרבות פירוק), ככל שתוגש; לא יפנו ביוזמתם לבית משפט מחוץ לישראל בכדי לקבל הגנה מפני הליך הננקט על-ידי הנאמן ו/או מחזיקי אגרות החוב של החברה; לא יתנגדו אם בית משפט בישראל יבקש להחיל את הדין הישראלי לעניין פשרה או הסדר וחדלות פירעון בקשר לחברה (ולרבות פירוק); ולא יעלו טענות כנגד סמכותו המקומית של בית המשפט בישראל בקשר עם הליכים כנגד החברה שיוגשו על-ידי הנאמן ו/או מחזיקי אגרות החוב (סדרה א') של החברה כנגד החברה, לרבות תובענה ייצוגית ותביעה נגזרת. כמו-כן, החברה לא תחתום על הסכמים עם גורמים כלשהם, לרבות עם עובדי החברה, אלא אם נקבע בהם כי הליכים בקשר עם פשרה, הסדר וחדלות פרעון (לרבות פירוק) כנגד החברה יפתחו רק בבית משפט ישראלי ובהתאם לדין בישראל.

לאור האמור לעיל ובכפוף לקיום התחייבויות החברה, בעלי השליטה ונושאי המשרה (בהווה ובעתיד, לפי העניין), אזי הליך של חדלות פרעון, שלא על-פי הדין הישראלי ו/או בבתי משפט לא ישראליים, יכול לנבוע רק מתביעה של נושה זר. לעניין זה יצוין כי ככל שייפתח הליך של חדלות פירעון, שלא על פי הדין הישראלי ו/או בבית משפט זר, הנובע מתביעה של נושה זר, החברה תעשה כמיטב יכולתה ותטען ל"פורום לא נאות" והכל בכפוף לכל דין.

למען הסר ספק, יובהר, כי התחייבויות בעלי השליטה ונושאי המשרה (בהווה ובעתיד) כאמור, תכלולנה באופן מפורש גם התחייבות בלתי חוזרת שלא להניע ביוזמתם הליך של חדלות פירעון לפי דין זר ו/או בבית משפט זר.

לאור האמור לעיל ובכפוף לקיום התחייבויות החברה, בעלי השליטה ונושאי המשרה (בהווה ובעתיד) כאמור, אזי, להבנת החברה, הליך של חדלות פירעון של החברה, שלא על פי הדין הישראלי ו/או בבתי משפט לא ישראליים, יכול לנבוע רק מתביעה של נושה שאינו אחד מהגורמים הנ"ל (החברה, בעלי השליטה ונושאי המשרה כאמור).

בנוסף, החברה, בעלי השליטה ונושאי המשרה בחברה (שאינם תושבי ישראל) (בהווה ובעתיד), מתחייבים ויתחייבו (לפי העניין) באופן בלתי חוזר בכתב, שלא להעלות טענות כנגד סמכותה של רשות ניירות ערך ו/או ועדת האכיפה המינהלית בישראל בקשר לעיצומים כספיים ו/או אמצעי אכיפה מינהליים שיוטלו עליהם על-ידי רשות ניירות ערך ו/או ועדת האכיפה המינהלית בישראל, וזאת על-פי פרק ח'3 ו/או פרק ח'4 לחוק ניירות ערך, וכן הינם מתחייבים ויתחייבו באופן בלתי חוזר בכתב לקיים את החלטותיה של רשות ניירות ערך ו/או ועדת האכיפה המינהלית בישראל, ובכלל זה, מבלי לגרוע מכלליות האמור, לשלם את העיצומים הכספיים ו/או תשלומים לנפגעי הפרה אשר יוטלו עליהם (אם יוטלו) ולנקוט פעולות לתיקון ההפרה ומניעת הישנותה.

בנוסף לאמור לעיל, מתחייבת החברה להמציא לנאמן בסמוך למועד חתימת שטר הנאמנות ולא יאוחר מ-2 ימי עסקים, התחייבויות בלתי חוזרות בכתב של החברה, של בעלי השליטה במועד חתימת שטר הנאמנות (וכן בסמוך אך לא יאוחר מ-2 ימי עסקים לאחר שינוי שליטה בחברה, לפי העניין) ושל כל נושאי המשרה המכהנים בחברה במועד חתימת שטר הנאמנות (וכן בסמוך אך לא יאוחר מ-2 ימי עסקים לאחר מינויים של נושאי משרה נוספים לחברה, לפי העניין) בתוקף תפקידם כנושאי משרה בחברה: (1) שלא להתנגד לבקשת הנאמן ו/או מחזיקי אגרות החוב (סדרה א') אשר תוגש לבית משפט בישראל בהליך שיוגש נגד החברה, להחלת הדין הישראלי לעניין פשרה או הסדר וחדלות פירעון (לרבות פירוק) בקשר עם החברה, ככל שתוגש; (2) שלא להתנגד אם בית משפט בישראל יבקש להחיל את הדין הישראלי לעניין פשרה או הסדר וחדלות פירעון (לרבות פירוק) בקשר עם החברה; (3) שלא להעלות טענות כנגד סמכותו המקומית של בית המשפט בישראל כנגד החברה, לרבות תובענה ייצוגית ותביעה נגזרת; (4) שלא לפנות ביוזמתם לבית משפט מחוץ לישראל בכדי לקבל הגנה מפני הליך הננקט על-ידי הנאמן ו/או מחזיקי אגרות החוב של החברה ושלא להניע ביוזמתם הליך של חדלות פרעון כנגד החברה לפי דין זר ובמקום שיפוט שאינו ישראל; (5) שלא להעלות טענות כנגד סמכותה של רשות ניירות ערך ו/או ועדת האכיפה המינהלית בישראל בקשר לעיצומים כספיים ו/או אמצעי אכיפה מינהליים שיוטלו עליהם על-ידי רשות ניירות ערך ו/או ועדת האכיפה המינהלית בישראל, וזאת על-פי פרק ח'3 ו/או פרק ח'4 לחוק ניירות ערך, וכן הינם מתחייבים ויתחייבו באופן בלתי חוזר

- 65 -

בכתב לקיים את החלטותיה של רשות ניירות ערך ו/או ועדת האכיפה המינהלית בישראל, ובכלל זה, מבלי לגרוע מכלליות האמור, לשלם את העיצומים הכספיים ו/או תשלומים לנפגעי הפרה אשר יוטלו עליהם (אם יוטלו) ולנקוט פעולות לתיקון ההפרה ומניעת הישנותה. התחייבויותיהם האמורות של החברה, נושאי המשרה ובעלי השליטה בחברה יכונו בהמשך כ-"התחייבויות החברה, נושאי המשרה ובעלי השליטה".

התחייבויות החברה, נושאי המשרה ובעלי השליטה כאמור לעיל, יפורסמו בדוח מיידי בסמוך לאחר פרסום הדוח בדבר תוצאות הנפקת אגרות החוב (סדרה א') או לפי העניין וכן יצורפו במסגרת הדוח המיידי בדבר מינוי נושא המשרה, או בדבר שינוי השליטה בחברה, לפי העניין, אשר תפרסם החברה בהתאם להוראות הדין בישראל, כחלק מהדיווחים טרום ההנפקה ובעת מינויו של כל נושא משרה חדש ו/או כניסתו של בעל שליטה חדש, והכול במהלך חיי אגרות החוב (סדרה א').

דיני איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה אינם מגבילים או מונעים את רישומם למסחר של ניירות הערך המוצעים על-פי תשקיף זה, ואלו יוכלו להיסחר בחופשיות בבורסה ללא מגבלות כלשהן תחת דיני איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה.

בנוסף לאמור לעיל, יצוין כי החברה, בעלי השליטה ונושאי המשרה בחברה, בהווה ובעתיד, מתחייבים באופן בלתי חוזר ויתחייבו באופן בלתי חוזר (לפי העניין) שלא להעלות טענות נגד תחולתו, תקפותו או אופן יישומו של סעיף 39א לחוק ניירות ערך.

החברה מסכימה כי אישורים והודעות חתומות על ידה שתמציא החברה או מי מטעמה לנאמן בקשר עם אגרות החוב ואשר יישלחו לנאמן כמסמכים סרוקים בדואר אלקטרוני, יהיה הנאמן רשאי להציגם כמקור.

מבלי לגרוע מהאמור בסעיף זה לעיל, יובהר כי נכסי החברה ממוקמים בארה"ב ולפיכך הליכי מימוש הנכסים ודיני חדלות הפירעון של החברות המחזיקות בנכסי החברה המאוגדות בארצות הברית יתבצעו בהתאם לדיני ארה"ב.

### 34. **כללי**

מבלי לגרוע מהוראותיו האחרות של שטר זה ושל אגרות החוב (סדרה א'), הרי כל ויתור, ארכה, הנחה, שתיקה, הימנעות מפעולה (כל אחד מהם: **"ויתור"**) מצד הנאמן לגבי אי קיומה או קיומה החלקי או הבלתי נכון של התחייבות כלשהי מהתחייבות לנאמן על-פי שטר זה ואגרת החוב (סדרה א'), לא ייחשבו כויתור מצד הנאמן על זכות כלשהי אלא כהסכמה מוגבלת להזדמנות המיוחדת בה ניתנה. מבלי לגרוע מההוראות האחרות של שטר זה ואגרת החוב (סדרה א'), הרי כל שינוי בהתחייבויות לנאמן, לרבות ויתור, מחייב קבלת הסכמת הנאמן מראש ובכתב. כל הסכמה אחרת, בין בעל פה ובין על דרך של ויתור והימנעות מפעולה או בכל דרך אחרת שאינה בכתב, לא תיחשב כהסכמה כלשהי. זכויות הנאמן לפי הסכם זה הינן עצמאיות ובלתי תלויות זו בזו ובאות בנוסף לכל זכות שקיימת ו/או שתהיה לנאמן על-פי דין ו/או הסכם (לרבות שטר זה ואגרת החוב (סדרה א')).

### 35. **אחריות הנאמן**

35.1. על אף האמור בכל דין ובשטר הנאמנות, ככל שהנאמן פעל לשם מילוי תפקידו בתום לב ובתוך זמן סביר וכן בירר את העובדות שנאמן סביר היה מברר בנסיבות העניין, לא יהא הנאמן אחראי כלפי מחזיק באגרות החוב לנזק שנגרם לו כתוצאה מכך שהנאמן הפעיל את שיקול דעתו לפי הוראות סעיפים 35ח(ד1) או 35ט1 לחוק ניירות ערך, אלא אם כן יוכיח התובע כי הנאמן פעל ברשלנות חמורה, בזדון ו/או בחוסר תום לב. מובהר, כי ככל שתתעורר סתירה בין הוראת סעיף זה להוראה אחרת בשטר הנאמנות, תגבר הוראת סעיף זה.

35.2. בכפוף לכל דין, הנאמן, ישתמש בנאמנות, בכוחות, בהרשאות ובסמכויות שהוקנו לו לפי שטר זה, לפי שיקול דעתו המוחלט ולא יהיה אחראי לכל נזק שנגרם עקב טעות בשיקול הדעת כנ"ל, שנעשתה בתום-לב, אלא אם כן נקבע בפסק דין חלוט כי הנאמן פעל ברשלנות (למעט רשלנות הפטורה על-פי חוק כפי שיהיה מעת לעת) או בחוסר תום-לב או בזדון או בניגוד לשטר זה.

35.3. פעל הנאמן בתום לב ובלא התרשלות בהתאם להוראות סעיפים 35ח(ד2) או 35ח(ד3) לחוק ניירות ערך, לא יהיה הנאמן אחראי בשל ביצוע הפעולה כאמור.

- 66 -

36. **מעניים**

כתובות הצדדים יהיו כמפורט במבוא לשטר זה, או כל מען אחר אשר תינתן לגביו הודעה מתאימה בכתב לצד שכנגד.

37. **הסמכה למגנ"א**

בהתאם להוראות תקנות ניירות ערך (חתימה ודיווח אלקטרוני), התשס"ג-2003, הנאמן מאשר בזאת לגורם המוסמך לכך מטעם החברה, לדווח באופן אלקטרוני את שטר נאמנות זה.

- 67 -

**ולראיה באו הצדדים על החתום:**

| | |
|---|---|
| **SIMAD Holdings Ltd.** | **משמרת- חברה לשירותי נאמנות בע"מ** |

**SIMAD Equities LLC**

**Intermediate Simad 1 LLC**

- 68 -

# SIMAD Holdings Ltd.
### נספח א'
### נכסי הנדל"ן המשועבדים

| קבוצת נכסים | מס' סידורי | שם המחנה | חברת הנכס | שיעור החזקת החברה בחברת הנכס⁴ | חברת התפעול | שיעור החזקת החברה בחברת התפעול |
|---|---|---|---|---|---|---|
| קבוצה A | C1 | Achim | Achim Landco LLC | 100% | Achim Operatingco LLC | 100% |
| | C5 | Chen-A-Wanda | BAHS Holdings LLC | ⁵99% | BAHS Operating Inc. | ⁵100% |
| | C6 | Club Getaway | Club Getaway Landco, LLC | 80% | Club Getaway Operatingco, LLC | 80% |
| | C7 | Country Roads | Country Roads Landco LLC | 99% | Country Roads Operatingco LLC | 99% |
| | C8 | Eagles Landing | Mill Road Landco LLC | 100% | Eagle's Landing Day Camp LLC | 100% |
| | C9 | Echo | SHAB Holdings LLC | 100% | Shab Operating Inc | 100% |
| | C10 | Green Lane | Green Lane Landco, LLC | 51% | Green Lane Operatingco, LLC | 51% |
| | C11 | Malka | Greenvilleland LLC | 100% | Malka Operatingco LLC | 100% |
| | C15 | Lavi | Lavland LLC, | 99% | Lavco LLC | 99% |
| | C17 | Meadowbrook | Meadowbrook Landco LLC | 99% | Meadowbrook Operatingco LLC | 99% |
| | C20 | Mogenavco | Mogenavland LLC | 100% | Mogenavco LLC | 100% |
| | C21 | Mohawk | Mohawkland LLC | 100% | Mohawkcampco LLC / Mohawk Country Day School, Inc. | 100% / 100% |
| | C25 | Rolling Hills | Rolling Hills Landco LLC | 99% | Rolling Hills Operatingco LLC | 99% |
| קבוצה B | C2 | Banner | Banner Landco LLC | 90% | Banner Operatingco LLC | 90% |
| קבוצה C | C13 | Island Lake | Island Lake Landco LLC | 99% | Island Lake Campco LLC | 99% |
| קבוצה D | C16 | Lokanda | RDM Camps, LLC | 75% | - | - |
| קבוצה E | C12 | IAFA | Iafalandco, LLC, | 99% | IAFAOPERATINGCO, LLC | 99% |
| | C18 | Med-O-Lark | Washington Lake, LLC | 99% | Camp Med-O-Lark, Inc | 100% |
| | C22 | New England Golf & Tennis (Belgrade) | Belgrade Lakes Summer Camps, LLC | 99% | - | - |
| | C23 | North Star (Poland) | Poland Landco LLC | 99% | Poland Campco LLC | 99% |
| | C28 | Waukeela | Waukeela Landco LLC | 99% | Waukeela Operatingco LLC | 99% |
| | C29 | Wekeela | Wekeeland, LLC | 99% | Mainewekeelaco LLC | 99% |
| | C31 | Windsor Mountain | WM Land LLC | 51% | WM Camp, LLC | 51% |
| קבוצה F | C19 | Mesorah | Mesorahland LLC | 75% | Mesorahco LLC | 75% |
| | C24 | Pine Forest | Pine Forest Landco LLC | ⁶99% | Pine Forest Campco LLC | ⁶99% |

---

[4] כמפורט בסעיף 6 לשטר הנאמנות, החזקותיה החברה בחברות הנכס ובחברות התפעול הרלוונטיות יועברו לתאגיד המשועבד. המשכנתא שתירשם על נכסי הנדל"ן הרלוונטיים תירשם על כלל הנכס.

[5] בהתאם להסכמות חוזיות, שיעור ההחזקה בפועל הינו 51%.

[6] בהתאם להסכמות חוזיות, שיעור ההחזקה בפועל הינו 79%.

- 69 -

## SIMAD Holdings Ltd.
### נספח ב'
#### אופן חישוב אמות מידה פיננסיות

להלן דוגמה, לשם ההמחשה בלבד, בהתבסס על נתוני הדוחות הכספיים פרופורמה של החברה ליום 30 בספטמבר 2025 (ובהנחה של השלמת העברת הזכויות המועברות לחברה, לרבות תשלום רכיב המזומן בעדן (כמפורט בסעיף 7.1.6 לתשקיף)), המפרטת את עמידת החברה באמות המידה הפיננסיות העיקריות הקבועות בשטר הנאמנות :

| | אופן החישוב ותוצאותיו ליום 30 בספטמבר 2025 (נתונים כספיים באלפי דולר) | | סעיף 5.5 לשטר הנאמנות לעניין מגבלות על חלוקת דיבידנד (*) | סעיף 5.3 לשטר הנאמנות לעניין התאמת שיעור הריבית | סעיף 5.7 לשטר הנאמנות לעניין העמדה לפירעון מיידי | אמת המידה הפיננסיות | ס' |
|---|---|---|---|---|---|---|---|
| | | בהתאם לסעיף בשטר הנאמנות | | | | | |
| **169,367** | 169,367 | הון עצמי (כולל זכויות מיעוט) | לא יפחת מ-180 מיליון דולר | לא יפחת מ-120 מיליון דולר | לא יפחת מ-100 מיליון דולר | הון עצמי | 1 |
| **56.4%** | 219,103 | חוב פיננסי נטו מתואם | לא יעלה על 68% | לא יעלה על 70% | לא יעלה על 75% | יחס חוב פיננסי נטו מתואם ל- CAP נטו | 2 |
| | 388,471 | CAP נטו | | | | | |
| **5.04** | 219,103 | חוב פיננסי נטו מתואם | לא יעלה על 12 | לא יעלה על 15 | לא יעלה על 17 | יחס חוב פיננסי נטו מתואם ל- EBITDA מתואם | 3 |
| | 43,441 | EBITDA מתואם | | | | | |
| **62.4%** | 170,599 | הערך ההתחייבותי של אגרות החוב | לא יעלה על 72.5% | לא יעלה על 72.5% | - | יחס הלוואה לבטוחה בתאגיד המשועבד (**) | 4 |
| | 273,500 | שווי הנכסים המשועבדים | | | | | |
| **15.9%** | 170,599 | הערך ההתחייבותי של אגרות החוב | לא תפחת מ-9% | לא תפחת מ- 8.5% | - | תשואת חוב של הנכסים המשועבדים (**) | 5 |
| | 27,155 | EBITDA מתואם של הנכסים המשועבדים | | | | | |

(*)    למגבלות נוספות על ביצוע חלוקה, ראה סעיף 5.5 לשטר הנאמנות.

(**)    תחת הנחת הנפקת 564 מיליון ש"ח ערך נקוב אגרות חוב (סדרה א') ושיעבוד של הנכסים המפורטים בקבוצות A, B ו-C בנספח א' לשטר הנאמנות.

להלן פירוט אודות אופן חישוב ה-EBITDA המתואם בהתאם לשטר הנאמנות :

| לתקופה של תשעה חודשים שהסתיימה ביום 30 בספטמבר 2025 | לתקופה של שנה שהסתיימה ביום 31 בדצמבר 2024 | לתקופה של תשעה חודשים שהסתיימה ביום 30 בספטמבר 2024 | |
|---|---|---|---|
| | (באלפי דולר) | | |
| 42,608 | 22,047 | 39,528 | רווח תפעולי |
| 12,688 | 15,187 | 11,420 | בתוספת פחת והפחתות |
| (1,987) | (1,522) | (2,092) | חלק החברה ברווחי חברות המטופלות בשיטת השווי המאזני |
| 1,186 | 413 | 315 | הכנסות מימון |
| 2,359 | 2,008 | 2,438 | חלק EBITDA של חברות המטופלות בשיטת השווי המאזני החברה ב- |
| 53 | 15 | 5 | חלק החברה של חברות המטופלות בשיטת השווי המאזני בהכנסות מימון |
| 56,907 | 38,148 | 51,614 | **EBITDA מתואם לתקופה** |
| | 43,441 | | **EBITDA מתואם לתקופה של שנה אחרונה** |

- 70 -

# SIMAD Holdings Ltd.
**<u>תוספת ראשונה</u>**
**<u>תעודת אגרות חוב (סדרה א׳)</u>**

**<u>אגרות חוב רשומות על שם</u>**

מספר התעודה : _____

ערך נקוב של אגרת זו : _____ ש״ח.

המחזיק הרשום של אגרת חוב זו : _____

1. תעודה זו מעידה כי SIMAD Holdings Ltd. (**"החברה"**) תשלם למחזיקי אגרות החוב (סדרה א׳) תשלומי קרן וריבית במועדים, על-פי תנאי התשלום, למי שיהיה המחזיק כהגדרתו בתנאים שמעבר לדף) הרשום באגרת החוב במועד הקובע לאותו תשלום, והכל בכפיפות למפורט ובהתאם לכל יתר התנאים הקבועים בתנאים הרשומים מעבר לדף, בשטר הנאמנות בגין אגרות החוב (סדרה א׳) מיום 27 בנובמבר 2025 (על הנספחים המצורפים אליו), שנחתם בין החברה מצד אחד לבין הנאמן לאגרות החוב האמורות/ואו כל מי שיכהן מדי פעם כנאמן של מחזיקי אגרות החוב (סדרה א׳) לפי שטר הנאמנות (**"שטר הנאמנות"**), מצד שני.

2. אגרת חוב זו נושאת ריבית קבועה אשר תשולם במועדים, והכל כמפורט בתנאים הרשומים מעבר לדף.

3. אגרת חוב זו תיסחר בבורסה לניירות ערך בתל אביב בע״מ.

4. אגרת חוב זו מונפקת כחלק מסדרה א׳ של אגרות חוב בתנאים זהים לתנאי אגרת זו ובכפיפות לתנאים הרשומים מעבר לדף ובהתאם לשטר הנאמנות מובטחות בבטוחות כמפורט בסעיף 6 לשטר הנאמנות.

5. מובהר, כי הוראות שטר הנאמנות יהוו חלק בלתי נפרד מהוראות אגרת חוב זו ויחייבו את החברה ואת המחזיקים באגרות החוב הכלולות בסדרה הנ״ל. בכל מקרה של סתירה בין האמור בתעודה זו לבין האמור בשטר הנאמנות יגברו הוראות שטר הנאמנות.

6. תשלום הקרן והתשלום האחרון של הריבית ייעשו כנגד מסירת איגרת החוב לידי החברה במשרדה הרשום ביום התשלום, כאמור בתנאים הרשומים מעבר לדף או בכל מקום אחר עליו תודיע החברה. הודעת החברה תימסר לא יאוחר מחמישה ימי עסקים לפני מועד התשלום.

7. אגרות החוב (סדרה א׳) שבמחזור תעמודנה בדרגה שווה, בינן לבין עצמן (פרי-פסו) בקשר עם התחייבויות החברה על-פי אגרות החוב (סדרה א׳), בלי זכות בכורה או עדיפות של האחת על פני האחרת.

8. כל העברה של איגרות החוב כפופה למגבלות ההעברה המפורטות בסעיף 7 לתנאים הרשומים מעבר לדף של תעודת איגרת החוב.

**נחתם על-ידי החברה ביום** _____

_____

**SIMAD Holdings Ltd.**

- 71 -

# התנאים הרשומים מעבר לדף

**1. כללי**

1.1 לביטויים ולמונחים בחלק זה תהיה המשמעות המוקנית להם בסעיף 1 לשטר הנאמנות, אלא אם נקבע מפורשות אחרת.

1.2 תנאי אגרות החוב (התנאים הרשומים מעבר לדף) הינם חלק בלתי נפרד מהוראות שטר הנאמנות ויראו את הוראות שטר הנאמנות כאילו נכללו במפורש בתנאי אגרות חוב אלו. בכל מקרה של סתירה בין האמור באיגרת החוב לבין האמור בשטר הנאמנות יגברו הוראות שטר הנאמנות

**2. אגרות החוב (סדרה א')**

2.1 אגרות חוב (סדרה א'), רשומות על שם, אשר תעמודנה לפירעון (קרן) בחמישה (5) תשלומים שנתיים אשר ישולמו ביום 30 בנובמבר של כל אחת מהשנים 2026 עד 2030 (כולל). ארבעת התשלומים הראשונים יהיו, כל אחד, 2.5% מגובה הקרן והתשלום החמישי והאחרון יהווה 90% מגובה הקרן. אגרות החוב (סדרה א') לא תהיינה צמודות (קרן וריבית) לבסיס הצמדה כלשהו. קרן אגרות החוב (סדרה א') תישא ריבית שנתית קבועה בשיעור אשר יקבע בהודעה המשלימה (אך בכפוף להתאמות בשיעור הריבית, ככל שיבוצעו, כתוצאה מאופן אי עמידת החברה באמות מידה פיננסיות ו/או כתוצאה משינוי בדירוג אגרות החוב (סדרה א'), הכל כמפורט בסעיפים 5.2 ו-5.3 לשטר זה).

2.2 על-פי הנחיות הבורסה, אי הצמדתה של קרן אגרות החוב למדד כלשהו, לא ישונה במהלך כל תקופת אגרות החוב.

2.3 הריבית על היתרה הבלתי מסולקת של קרן אגרות החוב (סדרה א') תשולם בתשלומים חצי שנתיים בימים 31 במאי ו-30 בנובמבר של כל אחת מהשנים 2026 עד 2030 (כולל). תקופת הריבית הראשונה של אגרות החוב (סדרה א') תתחיל ביום המסחר הראשון שלאחר מועד הדיווח על תוצאות ההנפקה של אגרות החוב, ותסתיים יום לפני מועד התשלום הראשון של הריבית (קרי, יום 30 במאי 2026). הריבית עבור תקופת הריבית הראשונה תחושב לפי מספר הימים בתקופה זו על בסיס של 365 ימים בשנה.

תשלומי הריבית שלאחר תשלום הריבית הראשון יהיו בגובה הריבית השנתית חלקי שניים (מספר תשלומי הריבית בשנה) וישולמו בעד תקופה של שישה (6) חודשים, המתחילה ביום התשלום ומסתיימת ביום הקודם לתשלום הבא.

2.4 לפרטים אודות מנגנון התאמה בשיעור הריבית כתוצאה משינוי בדירוג אגרות החוב (סדרה א'), ראה סעיף 5.2 לשטר הנאמנות. לפרטים אודות מנגנון התאמה בשיעור הריבית כתוצאה משינוי בעמידת החברה בהתניות פיננסיות להן התחייבה, ראה סעיף 5.3 לשטר הנאמנות. לפרטים אודות זכאות החברה לביצוע פדיון מוקדם של אגרות החוב (סדרה א'), ראה סעיף 7 לשטר הנאמנות.

2.5 שיעור הריבית השנתית, שיעור הריבית החצי שנתית ושיעור הריבית בגין תקופת הריבית הראשונה של אגרות החוב (סדרה א'), יפורטו בדוח מיידי שתפרסם החברה בדבר תוצאות הנפקת אגרות החוב (סדרה א') לראשונה.

2.6 התשלום האחרון של הריבית על קרן אגרות החוב (סדרה א') ישולם ביחד עם התשלום האחרון על חשבון קרן אגרות החוב (סדרה א') וזאת כנגד מסירת תעודות אגרות החוב לידי החברה.

2.7 אם לאחר מועד הנפקתן לראשונה של אגרות החוב (סדרה א'), תורחב הסדרה על-ידי החברה, מחזיקי אגרות החוב (סדרה א') אשר תונפקנה במסגרת הרחבת הסדרה, לא יהיו זכאים לקבל תשלום על חשבון קרן ו/או ריבית בגין אגרות החוב (סדרה א') שהמועד הקובע לתשלומי יחול קודם למועד הנפקתן כאמור.

**3. תשלומי הקרן והריבית של אגרות החוב (סדרה א')**

3.1 התשלומים על חשבון קרן ו/או ריבית אגרות החוב (סדרה א') ישולמו לאנשים אשר שמותיהם יהיו רשומים במרשם (כהגדרתו בסעיף 1 לשטר הנאמנות) בימים 19 במאי ו-18 בנובמבר לגבי כל תקופה רלוונטית אשר קדמה למועד פירעונו של אותו תשלום (כל אחד מהמועדים כאמור : **"היום הקובע"**).

על אף האמור לעיל, התשלום האחרון על חשבון קרן וריבית אגרות החוב (סדרה א') ייעשה כנגד מסירת תעודות אגרות החוב לידי החברה ביום התשלום, במשרדה הרשום של החברה או בכל מקום אחר עליו תודיע החברה. הודעת החברה כאמור תפורסם לא יאוחר מחמישה (5) ימי עסקים לפני מועד התשלום האחרון.

3.2 מובהר, כי מי שלא יהיה רשום במרשם ביום הקובע, לא יהיה זכאי לתשלום ריבית בגין תקופת הריבית שהתחילה לפני אותו מועד.

3.3 בכל מקרה שבו מועד פירעון התשלום על חשבון קרן ו/או ריבית יחול ביום שאינו יום עסקים, יידחה מועד התשלום ליום העסקים הראשון הבא אחריו, ללא תוספת תשלום, והיום הקובע לצורך קביעת הזכאות לפדיון או לריבית לא ישתנה בשל כך.

3.4 כל תשלום על חשבון קרן ו/או ריבית, אשר ישולם באיחור העולה על שבעה (7) ימי עסקים מהמועד הקבוע לתשלומו על-פי תנאי אגרות החוב (סדרה א'), וזאת מסיבות התלויות בחברה, יישא ריבית פיגורים וזאת החל מהמועד הקבוע לתשלומו של התשלום שבפיגור ועד מועד תשלומו בפועל. לעניין זה, ריבית פיגורים פירושה ריבית שנתית בשיעור ריבית אגרות החוב (סדרה א') בתוספת 3.5% לשנה. במקרה כאמור, תודיע החברה בדיווח מיידי, לפחות שני (2) ימי עסקים לפני תשלום הקרן והריבית שלא שולמו כאמור, על שיעור ריבית הפיגורים המדויק שישולם ועל מועד התשלום החדש.

3.5 התשלום לזכאים ייעשה בשיקים או בהעברה בנקאית לזכות חשבון הבנק של האנשים אשר שמותיהם יהיו רשומים במרשם ואשר יצוין בפרטים שיימסרו בכתב לחברה בעוד מועד, בהתאם לאמור בסעיף 3.6 להלן. אם החברה לא תוכל לשלם סכום כלשהו לזכאים לכך, מסיבה שאינה תלויה בה, יחולו הוראות סעיף 14 לשטר הנאמנות.

3.6 מחזיק רשום באגרות החוב (סדרה א') יודיע לחברה את פרטי חשבון הבנק לזיכוי בתשלומים לאותו מחזיק על-פי אגרות החוב כאמור לעיל, או על שינוי בפרטי החשבון האמור או בכתובתו, לפי העניין, בהודעה בכתב שישלח בדואר רשום לחברה. החברה תהא חייבת לפעול על-פי הודעתו של מחזיק רשום בדבר שינוי כאמור לאחר חלוף חמישה-עשר (15) ימי עסקים מיום שהודעתו הגיעה לחברה.

3.7 לא מסר מחזיק אגרות החוב הזכאי לתשלום כאמור בעוד מועד לחברה פרטים בדבר חשבון הבנק שלו, ייעשה כל תשלום על חשבון הקרן ו/או הריבית בשיק שיישלח בדואר רשום לכתובתו האחרונה הרשומה במרשם. משלוח שיק לזכאי בדואר רשום כאמור ייחשב לכל דבר ועניין כתשלום הסכום הנקוב בו בתאריך שיגורו בדואר, ובלבד שנפרע עם הצגתו כהלכה לגבייה.

3.8 מכל תשלום בגין אגרות החוב (סדרה א') ינוכה כל תשלום חובה ככל הנדרש על-פי דין.

4. **הימנעות מתשלום מסיבה שאינה תלויה בחברה**

לפרטים בעניין הימנעות מתשלום מסיבה שאינה תלויה בחברה והפקדה בידי הנאמן ראה סעיף 14 לשטר הנאמנות.

5. **מרשם מחזיקי אגרות החוב**

לפרטים אודות מרשם מחזיקי אגרות החוב (סדרה א'), ראה סעיף 29 לשטר הנאמנות.

6. **פיצול תעודות אגרות החוב**

6.1 בגין אגרות החוב (סדרה א') הרשומות על שם מחזיק אחד תוצא לו תעודה אחת, או לפי בקשתו, תוצאנה לו מספר תעודות בכמות סבירה.

6.2 כל תעודת אגרות חוב ניתנת לפיצול לתעודות אגרות חוב אשר סך כל הערך הנקוב שלהן שווה לסכום הערך הנקוב של התעודה שפיצולה מבוקש, ובלבד שתעודות כאמור לא תוצאנה אלא בכמות סבירה. הפיצול ייעשה כנגד מסירת אותה תעודת אגרת חוב ביחד עם בקשה בכתב בחתימת המחזיק הרשום לחברה במשרדה הרשום לשם ביצוע הפיצול. כל ההוצאות הכרוכות בפיצול, לרבות מסים והיטלים, אם יהיו כאלה, יחולו על מבקש הפיצול.

7. **העברת אגרות החוב**

אגרות החוב ניתנות להעברה במלוא סכום הערך הנקוב, ואף לגבי חלקו, ובלבד שיהיה בשקלים חדשים שלמים. כל העברה של אגרות החוב המוחזקות על-ידי מחזיק הרשום במרשם המחזיקים באגרות החוב, תיעשה על-פי כתב העברה בנוסח מקובל, חתום כיאות על-ידי המחזיק הרשום או נציגיו החוקיים ועל-ידי מקבל ההעברה או נציגיו החוקיים, אשר יימסר לחברה במשרדה הרשום בצירוף תעודות אגרות החוב המועברות על-פיו וכל הוכחה אחרת שתידרש על-ידי החברה לשם הוכחת זכותו של המעביר להעברתן.

אם יחול מס או כל תשלום חובה אחר על כתב העברה של אגרות החוב, יימסרו לחברה הוכחות על תשלומם שתהיינה להנחת דעתה של החברה.

תקנון ההתאגדות של החברה החל על העברת מניות נפרעות במלואן ועל הסבתן יחול, בשינויים המחויבים, לפי העניין, על אופן העברת אגרות החוב ועל הסבתן כאמור.

במקרה של העברת חלק בלבד מסכום הערך הנקוב בתעודה של אגרת חוב, יש לפצל תחילה את התעודה, על-פי הוראות סעיף 6 לתוספת זו, למספר תעודות אגרות חוב כמתחייב מכך, באופן שסך כל הערך הנקוב בהן יהיה שווה לסכום הערך הנקוב של תעודת אגרת החוב האמורה.

לאחר קיום כל התנאים כאמור תירשם ההעברה במרשם, והחברה תהא רשאית לדרוש כי הערה בדבר ההעברה כאמור תירשם על תעודת אגרת החוב המועברת שתימסר למקבל ההעברה או כי תוצא לו במקומה תעודת אגרת חוב חדשה, ויחולו על הנעבר כל התנאים המפורטים בתעודת אגרת החוב המועברת, כך שבכל מקום בו נאמר "מחזיק" יראו כאילו נאמר "הנעבר", והוא ייחשב כ"מחזיק" לצורכי שטר הנאמנות.

כל ההוצאות והעמלות הכרוכות בהעברה יחולו על מבקש ההעברה.

8. **החלפת תעודת אגרת החוב**

במקרה שתעודת אגרת החוב תתבלה, תאבד או תושמד תהיה החברה רשאית להוציא במקומה תעודה חדשה, באותם תנאים. מסים והיטלים אחרים, וכן הוצאות אחרות הכרוכות בהוצאת התעודה החדשה, יחולו על מבקש התעודה האמורה (לרבות הוצאות בקשר להוכחת בעלותו באגרת החוב, ובקשר לשיפוי ו/או כיסוי ביטוחי שתבקש החברה, אם תבקש, בקשר לכך). במקרה של בלאי, תעודת אגרות החוב הבלויה תוחזר לחברה בד בבד וכנגד הוצאת התעודה החדשה.

9. **פדיון מוקדם**

לפרטים אודות פדיון מוקדם של אגרות החוב ביוזמת הבורסה ו/או החברה, ראה סעיף 7 לשטר הנאמנות.

10. **ויתור, פשרה ושינויים בשטר הנאמנות**

לפרטים אודות סמכות לבצע ויתורים, פשרות ו/או שינויים בתנאי שטר הנאמנות, ראה סעיף 28 לשטר הנאמנות.

11. **אסיפות מחזיקי אגרות החוב**

אסיפות מחזיקי אגרות החוב תתכנסנה ותתנהלנה בהתאם לאמור בתוספת השנייה לשטר הנאמנות.

12. **פירעון מיידי**

לעניין פירעון מיידי של אגרות החוב, ראה סעיף 8 לשטר הנאמנות.

13. **הודעות**

לעניין הודעות, ראה סעיף 27 לשטר הנאמנות.

14. **הדין החל וסמכות שיפוט**

לעניין הדין החל וסמכות שיפוט, ראה סעיף 33 לשטר הנאמנות.

- 74 -

# SIMAD Holdings Ltd.

## תוספת שנייה

### אסיפות מחזיקי אגרות החוב (סדרה א')

1. **זכאות לכינוס אסיפה**

1.1 הנאמן או החברה רשאים לזמן את מחזיקי אגרות החוב לאסיפה של מחזיקי אגרות החוב בכל עת. זימנה החברה אסיפה של מחזיקי אגרות החוב, עליה לשלוח מיד הודעה בכתב לנאמן על המקום, היום והשעה בה תתקיים האסיפה וכן על העניינים שיובאו לדיון בה, והנאמן או נציג מטעמו יהיו רשאים להשתתף באסיפה כאמור מבלי שתהיה להם זכות הצבעה.

1.2 הנאמן יהיה חייב לזמן אסיפה כאמור לפי בקשה של המחזיקים, אחד או יותר, בלפחות חמישה אחוזים (5%) מהערך הנקוב של היתרה הבלתי מסולקת של קרן אגרות החוב. במקרה שהמבקשים את זימון האסיפה הינם מחזיקי אגרות החוב, יהיה הנאמן רשאי לדרוש מהמבקשים שיפוי עבור ההוצאות הסבירות הכרוכות בכך.

1.3 יובהר, כי דרישת השיפוי על-ידי הנאמן, לא תפגע בזימון אסיפה אשר זומנה לצורך נקיטת פעולה שנועדה למנוע פגיעה בזכויות מחזיקי אגרות החוב ולא יהיה בדרישת שיפוי זו כדי לגרוע מחובת החברה לשאת בהוצאות הכרוכות בזימון האסיפה.

1.4 הנאמן יזמן אסיפת מחזיקים בתוך עשרים ואחד (21) ימים מיום שהוגשה לו הדרישה לכנסה, למועד שייקבע בהזמנה, ובלבד שמועד הכינוס לא יהיה מוקדם משבעה (7) ימים ולא מאוחר מעשרים ואחד (21) ימים ממועד הזימון; ואולם הנאמן רשאי להקדים את כינוס האסיפה, ליום אחד לפחות לאחר מועד הזימון, אם סבר כי הדבר דרוש לשם הגנה על זכויות המחזיקים; עשה כן הנאמן, ינמק הנאמן בדוח בדבר זימון האסיפה את הסיבות להקדמת מועד הכינוס.

1.5 לא זימן הנאמן אסיפת מחזיקים, לפי דרישת מחזיק, בתוך עשרים ואחד (21) ימים מיום שנדרש לזמנה, רשאי המחזיק לכנס את האסיפה, ובלבד שמועד הכינוס יהיה בתוך ארבעה-עשר (14) ימים, מתום התקופה לזימון האסיפה בידי הנאמן, והנאמן יישא בהוצאות שהוציא המחזיק בקשר עם כינוס האסיפה.

1.6 כל אסיפת מחזיקי אגרות החוב (סדרה א') תתקיים בישראל, במקום עליו יודיעו החברה ו/או הנאמן, והחברה תישא בעלויות של המקום, ובלבד שהינן עלויות סבירות. הנאמן רשאי לקבוע כי האסיפה תתקיים באמצעים אלקטרוניים.

2. **זימון לאסיפה וסדר היום באסיפה**

2.1 זימון לאסיפה מטעם הנאמן לשם התייעצות בלבד עם מחזיקי אגרות החוב יפורסם לפחות יום אחד לפני מועד כינוסה ("**אסיפת התייעצות**"). לאסיפת התייעצות לא יפורסם סדר יום ולא יתקבלו בה החלטות.

2.2 זימון לאסיפה, שאינה אסיפת התייעצות, יפורסם בהתאם להוראות חוק ניירות ערך כפי שיהיה מעת לעת, לפחות שבעה (7) ימים, אך לא יותר מעשרים ואחד (21) ימים, טרם כינוס האסיפה ("**זימון**").

2.3 הנאמן יקבע את סדר היום באסיפת מחזיקים. מחזיק באגרות החוב (סדרה א'), אחד או יותר, שלו חמישה אחוזים (5%) לפחות מיתרת הערך הנקוב של אגרות החוב (סדרה א'), רשאי לבקש מהנאמן לכלול נושא בסדר היום של אסיפת מחזיקים שתתכנס בעתיד, ובלבד שהנושא מתאים לדעת הנאמן להיות נדון באסיפה כאמור וכן שבקשה הוגשה לנאמן לפחות 7 ימי עסקים טרם כינוסה של האסיפה;

- 75 -

2.4 הנאמן יהיה רשאי לקצר את מועד ההתכנסות ליום אחד לפחות לאחר מועד הזימון אם ראה כי דחייה בכינוס האסיפה מהווה או עלולה להוות פגיעה בזכויות מחזיקי אגרות החוב. עשה כן, ינמק הנאמן בדוח בדבר זימון האסיפה את הסיבות להקדמת מועד הכינוס.

2.5 בזימון יפורטו, בין היתר:

2.5.1 מקום התכנסות האסיפה;

2.5.2 תאריך התכנסות האסיפה ושעת האסיפה;

2.5.3 פירוט הנושאים שעל סדר היום. לצד כל אחד מהנושאים האמורים יובא תיאורו ופירוט העובדות העיקריות הדרושות להבנת כל עניין הטעון הצבעה באסיפה, כמו כן יובא נוסח כל החלטה מוצעת ותיאור תמציתי של עיקריה;

2.5.4 הרוב הנדרש לקבלת החלטה בכל אחד מהנושאים שעל סדר היום;

2.5.5 המועד הקובע להשתתפות באסיפה אשר יחול לא פחות משלושה ימי מסחר ולא יותר מארבעה עשר ימים לפני כינוס האסיפה;

2.5.6 המניין החוקי לפתיחת האסיפה כמפורט בסעיף 3 לתוספת זו;

2.5.7 הסדרים לעניין הצבעה בכתב.

2.6 הנאמן רשאי לקבוע כי אסיפת מחזיקי אגרות חוב תתקיים באמצעים אלקטרוניים.

## 3. **המניין החוקי לפתיחת אסיפה ואסיפה נדחית**

3.1 אסיפת התייעצות תתקיים בכל מספר משתתפים שהוא.

3.2 אסיפת מחזיקי אגרות החוב תיפתח לאחר שיוכח כי קיים המניין החוקי הדרוש לקיום האסיפה.

3.3 כפוף למניין החוקי הנדרש באסיפה שכונסה לקבלת החלטה מיוחדת וכפוף להוראות חוק ניירות ערך, המניין החוקי לקיום אסיפת מחזיקים הוא נוכחות של לפחות שני (2) מחזיקים באגרות החוב שלהם עשרים וחמישה אחוזים (25%) לפחות מהיתרה הבלתי מסולקת של הערך הנקוב של אגרות החוב הנמצאות במחזור אותה עת, בתוך מחצית השעה מהמועד שנקבע לפתיחת האסיפה, אלא אם נקבעה דרישה אחרת בחוק.

3.4 לא נכח באסיפת מחזיקים, בתום מחצית השעה מהמועד שנקבע לתחילת האסיפה, מניין חוקי, תידחה האסיפה למועד אחר שלא יקדם משני (2) ימי עסקים לאחר המועד שנקבע לקיום האסיפה המקורית או מיום עסקים אחד, אם סבר הנאמן כי הדבר דרוש לשם הגנה על זכויות מחזיקי אגרות החוב; נדחתה האסיפה, ינמק הנאמן בדוח בדבר זימון האסיפה הנדחית את הסיבות לכך.

3.5 למעט בקשר עם אסיפה שכונסה לקבלת החלטה מיוחדת ובכפוף להוראות חוק ניירות ערך, או אסיפה אחרת שנקבע לגביה בשטר הנאמנות במפורש אחרת מהאמור להלן, היה ולא נכח באסיפת המחזיקים הנדחית מניין חוקי כעבור מחצית השעה לאחר המועד שנקבע לתחילתה, יהיה המניין החוקי כדלקמן:

3.5.1 אם כונסה האסיפה על-ידי הנאמן - בכל מספר משתתפים שהוא;

3.5.2 אם כונסה האסיפה עקב דרישת מחזיקים או על-ידי מחזיקים, כמפורט בסעיפים 1.2 ו- 1.5 לתוספת זו – יהיה המניין החוקי מחזיקים באגרות החוב, אחד או יותר, שלהם חמישה אחוזים (5%) לפחות מזכויות ההצבעה בסדרת אגרות החוב.

3.6 אגרות חוב המוחזקות על-ידי מחזיק קשור (כהגדרתו בסעיף 3.2 לשטר הנאמנות) לא יובאו בחשבון לצורך קביעת המניין החוקי.

## 4. **יושב הראש**

בכל אסיפת מחזיקים יכהן הנאמן או מי שהוא מינה כיושב ראש לאותה אסיפה.

- 76 -

5. **אסיפה נמשכת**

5.1 אסיפה שנפתחה תינעל על-פי הודעת הנאמן או הודעת ראש האסיפה ויכול שיהיו בה מושב אחד או יותר.

5.2 אסיפת מחזיקים שיש בה מניין חוקי, יושב ראש האסיפה ו/או הנאמן, רשאים להחליט על קיום מושב נוסף אשר יתקיים במועד אחר ובמקום שייקבע על-ידי הנאמן (**"אסיפה נמשכת"**);

5.3 הנאמן יהיה אחראי לפרסום הודעה בדבר המועד והמקום בהם תתכנס האסיפה הנמשכת ובלבד שהודעה כאמור תינתן שתיים-עשרה (12) שעות לפחות טרם כינוסה של האסיפה הנמשכת.

5.4 באסיפה נמשכת או נדחית ניתן לדון בנושא שהיה על סדר יומה של האסיפה המקורית ושלא נתקבלה לגביו החלטה וכן בנושאים נוספים. דיון בנושאים נוספים כאמור יהיה כפוף להודעה מוקדמת באמצעות המגנ"א.

5.5 מחזיק שלא נכח באסיפה המקורית יוכל להתייצב לאסיפה הנמשכת ולהצביע על הנושאים שעלו להצבעה (ושההצבעה עליהם טרם ננעלה) ושיועלו להצבעה, בכפוף לכך שיוכיח בפני מזמן האסיפה את בעלותו באגרות החוב נשוא האסיפה נכון למועד הקובע לאסיפה כפי שנקבע בהודעת הזימון של האסיפה.

6. **אסיפות מיוחדות**

באסיפה שעל סדר יומה החלטה בנושא שנקבע בשטר הנאמנות או באגרת החוב כי הוא כפוף להחלטה מיוחדת, המניין החוקי הינו נוכחות של מחזיקים באגרות החוב, בעצמם או על-ידי באי כוחם, שלהם חמישים אחוזים (50%) לפחות מיתרת הערך הנקוב של אגרות החוב שבמחזור, או באסיפה נדחית - נוכחות של מחזיקים באגרות החוב, בעצמם או על-ידי באי כוחם, שלהם עשרים אחוזים (20%) לפחות מיתרת הערך הנקוב של אגרות החוב שבמחזור. הרוב הנדרש לקבלת החלטה מיוחדת (בין באסיפה המקורית ובין באסיפה הנדחית) הינו רוב של שני שלישים (2/3) מיתרת הערך הנקוב של אגרות החוב המיוצג בהצבעה.

באסיפה מיוחדת שעל סדר יומה החלטת מחזיקים להעמיד את אגרות החוב (סדרה א') לפירעון מיידי, המניין החוקי והרוב הדרוש לקבלתה יהיו כמפורט בסעיף 8.2.4 לשטר.

7. **הודעות עמדה**

7.1 הנאמן או מחזיק אגרות החוב, אחד או יותר, שלו חמישה אחוזים (5%) לפחות מיתרת הערך הנקוב של אגרות החוב (סדרה א') רשאי לפנות בכתב למחזיקים באגרות החוב במכתב שיצורף לכתב ההצבעה על מנת לשכנעם לגבי אופן הצבעתם בנושא מהנושאים העולים לדיון באותה אסיפה (בתוספת זו – **"הודעת עמדה"**).

7.2 מחזיק אשר יבקש לעשות שימוש בזכות זו, יודיע על כך לנאמן בעת המושב בו הוחלט על העמדת אותו נושא להצבעה ויעביר לנאמן את הודעת העמדה עד שני ימי עסקים לפני המועד האחרון למשלוח כתבי הצבעה. מזמן אסיפת המחזיקים ימציא למחזיקים את נוסח הודעת העמדה בהקדם האפשרי ולא יאוחר מיום עסקים אחד לאחר שמחזיק המציא למזמן אסיפת המחזיקים.

7.3 באסיפה שזומנה עקב דרישת מחזיקי אגרות חוב או על-ידי מחזיקי אגרות החוב, כמפורט בסעיפים 1.2 ו-1.5 לתוספת זו, יהיה רשאי כל מחזיק, באמצעות הנאמן, לפרסם הודעת עמדה ביחס לנושאים שעל סדר יומה של האסיפה.

7.4 הנאמן והחברה יהיו רשאים, כל אחד בנפרד, לפרסם הודעת עמדה בתגובה על הודעת עמדה שנשלחה בהתאם לסעיפים 7.1 או 7.3 לתוספת זו או בתגובה לפניה אחרת למחזיקי אגרות החוב.

7.5 באסיפת התייעצות לא יפורסמו הודעות עמדה.

7.6 הודעת העמדה תיערך בשפה בהירה ותמציתית פשוטה ומובנת, היא תכלול לא יותר מ-500 מילים לכל נושא שעל סדר היום.

7.7 אם הודעת העמדה היא של מחזיק, היא תכלול את זהות המחזיק ואת שיעור החזקותיו באגרות החוב וכן בכל נייר ערך אחר של המנפיק, של בעל השליטה בו או חברה קשורה שלו. אם המחזיק

- 77 -

הוא תאגיד, יפורטו גם זהות בעל שליטה בו והחזקות נוספות של אותו בעל שליטה בניירות ערך של המנפיק, של בעל השליטה בו או חברה קשורה, למיטב ידיעתו של המחזיק.

7.8  מחזיק המגיש הודעת עמדה, הפועל בשיתוף פעולה עם אחרים לעניין ההצבעה באסיפת המחזיקים, דרך כלל או לגבי נושא מן הנושאים שעל סדר היום, יציין זאת בהודעת העמדה ויפרט את הסדרי שיתוף הפעולה וזהותם של המחזיקים הפועלים בשיתוף פעולה; אם למחזיק או לאדם אחר הפועל עמו בשיתוף פעולה עניין אחר בתוצאות ההצבעה באסיפת המחזיקים, יצויין טיבו של העניין האחר.

7.9  הודעת עמדה של מחזיק שלבקשתו זומנה אסיפת המחזיקים לפי סעיף 35יב1 לחוק, תכלול גם את העובדה כי אסיפת המחזיקים זומנה לדרישתו.

7.10  האחריות לתוכן הודעת העמדה תהא על מגיש הודעת העמדה בלבד.

8.  **הצבעות באסיפה**

8.1  ההצבעה באסיפת מחזיקי אגרות חוב תיערך ביחס לנושאים אשר פורטו בזימון בלבד או בהודעה בהתאם לאמור בסעיף 5.4 לעיל.

8.2  מחזיק יהיה רשאי להצביע בעצמו, באמצעות שלוח שימונה בהתאם לתוספת זו או באמצעות כתב הצבעה.

8.3  יו"ר האסיפה רשאי לקבוע כי הצבעות יהיו בדרך של כתבי הצבעה או בהצבעה במהלך האסיפה. במקרה בו קבע היו"ר כי ההצבעה תהיה בדרך של כתב הצבעה, ידאג הנאמן כי נוסח כתב ההצבעה יופץ למחזיקים, ויקבע את מועד נעילת ההצבעה שעד אליו על המחזיקים לשלוח לנאמן את כתב ההצבעה מלא וחתום כדין. מחזיק אשר לא ימלא את כתב ההצבעה במלואו ו/או אשר לא יוכיח את זכאותו להשתתף ולהצביע באסיפה על-פי הוראות התוספת השנייה, ייחשב כמי שלא מסר כתב הצבעה, ולפיכך בחר שלא להצביע על הנושא/ים שבכתב ההצבעה. כתב הצבעה מלא וחתום כדין שבו ציין מחזיק את אופן הצבעתו, אשר הגיע לנאמן עד למועד האחרון שנקבע לכך, ייחשב כנוכחות באסיפה לעניין קיום המניין החוקי באסיפה.

8.4  אלא אם נקבע במפורש אחרת בשטר זה, הרוב הדרוש לקבלת כל החלטה של האסיפה הכללית הוא רוב רגיל של מספר הקולות המיוצגים בהצבעה והמצביעים בעד או נגד. בנוסף רשאי הנאמן להחליט על-פי שיקול דעתו בהתאם לנסיבות האם אישור החלטה דורש רוב שאינו רגיל.

8.5  הנאמן ישתתף באסיפה ללא זכות הצבעה. החברה לא תיטול חלק באסיפה, אלא רק תציג באמצעות נציגיה סוגיות טרם הדיון או שנציגיה יטלו חלק ככל שיהיו שאלות של מחזיקים לחברה, ובלבד שתתבקש לעשות כן זמן סביר מראש.בעלי אגרות החוב זכאים להשתתף ולהצביע בכל אסיפה כללית בעצמם או באמצעות באי כוח. בכל הצבעה של מחזיקי אגרות חוב תתנהל ההצבעה לפי מניין קולות, כך שכל מחזיק אגרות חוב או בא-כוחו, יהיה זכאי לקול אחד בגין כל 1 ש"ח ערך נקוב מהקרן הכוללת הנקובה שטרם נפרעה של אגרות החוב שמכוחן הוא רשאי להצביע. במקרה של מחזיקים במשותף, יתקבל רק קולו של המבקש להצביע הרשום ראשון מביניהם במרשם, אם בעצמו ואם על-ידי שלוח.

8.6  בעל אגרות החוב או שלוחו רשאים להצביע בגין חלק מהקולות שלו בעד הצעת החלטה מסוימת, ובגין חלק אחר נגד, ובגין חלק אחר להימנע, הכל לפי ראות עיניו.

9.  **הכרזה על קבלת החלטה**

הכרזת יושב הראש שהחלטה באסיפת מחזיקים נתקבלה או נדחתה, בין פה אחד ובין ברוב פלוני, תהיה ראיה לכאורה לאמור בה.

לא תיפסל החלטה כלשהי שנתקבלה כדין באסיפה שזומנה כאמור, אם בשגגה לא ניתנה הודעה עליה למחזיקים בפחות מעשרה אחוזים (10%) מהערך הנקוב של היתרה הבלתי מסולקת של קרן אגרות החוב או שהודעה כאמור לא נתקבלה על ידי מחזיקים כאמור.

- 78 -

10. **כתב מינוי**

10.1   כתב מינוי הממנה מיופה כוח ו/או שלוח יהיה בכתב וייחתם על-ידי הממנה או על-ידי בא כוחו שיש לו הסמכה לעשות כן בכתב כהלכה. אם הממנה הוא תאגיד, ייעשה המינוי בכתב, חתום בחותמת התאגיד ובצירוף חתימתו של מורשה חתימה בתאגיד שיש לו הסמכות לעשות כן. כתב המינוי של שלוח ייערך בכל צורה מקובלת. שלוח אינו חייב להיות בעצמו מחזיק.

10.2   כתב מינוי וייפוי-הכח או התעודה האחרת שעל-פיה נחתם כתב המינוי, או העתק מאושר של יפוי כח כזה, יופקד במשרדו של הנאמן, עובר למועד האסיפה שלגביה ניתן יפוי-הכח, אלא אם נקבע אחרת בהודעה המזמנת את האסיפה. החברה תהא רשאית לקבל, לבקשתה, העתק מכתבי המינוי וייפוי הכוח כאמור.

10.3   הצבעה שנעשתה בהתאם לתנאים שבמסמך הממנה שלוח תהא תקפה אף אם קודם לכן נפטר המרשה או הוכרז פסול דין או בוטל כתב המינוי או הועברה אגרת החוב שלגביה ניתן הקול, אלא אם נתקבלה במשרדי הנאמן, לפני האסיפה, הודעה בכתב בדבר הפטירה, החלטת הפסלות, הביטול או ההעברה, לפי העניין.

10.4   כל תאגיד שהוא בעלים של אגרת חוב, רשאי, על-ידי הרשאה בכתב חתומה כדין, ליפות את כוחו של אדם שייראה בעיניו לפעול כנציגו בכל אסיפה של בעלי אגרות החוב, והאדם שהורשה לכך יהיה רשאי לפעול בשם התאגיד שהוא מייצג.

11. **פרוטוקול**

11.1   הנאמן יערוך פרוטוקולים של אסיפת המחזיקים, וישמור אותם במשרדו הרשום לתקופה של שבע (7) שנים ממועד האסיפה.

11.2   פרוטוקול שנחתם על-ידי יושב ראש האסיפה, ישמש ראיה לכאורה לעניינים הרשומים בו וכל עוד לא יוכח ההפך, כל החלטה שנתקבלה באסיפה שכזו תחשב כאילו נתקבלה כדין. הכרזת יושב ראש האסיפה בדבר קבלת החלטה או דחייתה והרישום בעניין זה במרשם הפרוטוקולים, ישמשו ראיה לכאורה על עובדה זו.

11.3   מרשם הפרוטוקולים של אסיפות המחזיקים יישמר במשרדו הרשום של הנאמן ויהיה פתוח לעיון מחזיקי אגרות החוב, והעתק ממנו יישלח לכל מחזיק באגרות החוב שביקש זאת.

11.4   הנאמן יהיה רשאי לעכב מסירה של כל פרוטוקול, לכל גורם שהוא, אם על-פי שיקול דעתו הבלעדי העברת הפרוטוקול, כולו או חלקו, עשויה לפגוע או להביא לפגיעה בזכויות מחזיקי אגרות החוב (סדרה א').

12. אדם או אנשים שיתמנו על-ידי הנאמן, מזכיר החברה וכל אדם או אנשים אחרים שיורשו לכך על-ידי הנאמן, יהיו רשאים להיות נוכחים באסיפות של מחזיקי אגרות החוב. במקרה בו על-פי שיקול דעתו הסביר של הנאמן יידרש לערוך בחלק מהאסיפה דיון ללא נוכחות נציגי החברה, אזי לא ישתתפו באותו חלק של הדיון נציגי החברה או מי מטעמה או מי מטעמו של מחזיק קשור.

13. כל האמור בתוספת זו כפוף להוראות שטר הנאמנות.

14. על תוספת זו יחולו תקנות ניירות ערך (הצבעה בכתב, הודעות עמדה והוכחת בעלות בתעודות התחייבות לצורך הצבעה באסיפת מחזיקים של תעודות התחייבות) התשע״ה-2015.

- 79 -

# SIMAD Holdings Ltd.

## תוספת שלישית

## נציגות דחופה למחזיקי אגרות החוב

ככל שתמונה נציגות דחופה של מחזיקי אגרות החוב (סדרה א') במקרה של אי עמידה באחת או יותר מהתניות הפיננסיות, החברה מתחייבת כי יחולו עליה, על מינויה ועל פעולותיה ההוראות הרלוונטיות מתוך נספח 5.2.4.4 לפרק 4 לחלק 2 בשער 5 לקודקס הרגולציה[7] כפי שיהא מעת לעת, או בכל חוזר אחר ו/או מסמך אחר אשר יחליף אותו, וכן מתחייבת החברה לפעול בשיתוף פעולה מלא עם הנציגות הדחופה והנאמן, ככל הנדרש לצורך ביצוע הבדיקות הנדרשות על ידם וגיבוש החלטת הנציגות הדחופה, ולהעביר לנציגות הדחופה את כל הנתונים והמסמכים שיידרשו לה לגבי החברה.

לנציגות הדחופה תהא הסמכות למתן ארכה חד פעמית לחברה בקשר למועדים לעמידה בהתניות הפיננסיות, וזאת לתקופה שעד למועד פרסום הדוחות הכספיים הקרובים לאחר מועד פרסום הדוחות הכספיים, מהם עלה לראשונה כי, החברה לא עמדה באיזו מהתניות הפיננסיות לתקופה של עד תשעים (90) ימים לפי המוקדם מביניהם. יובהר, כי פרק הזמן שעד למינויה של הנציגות הדחופה יובא בחשבון במסגרת האורכה האמורה לעיל, והוא לא יהווה עילה למתן ארכה נוספת כלשהי לחברה מעבר לאמור לעיל. עוד יובהר, כי פעילות הנציגות הדחופה ושיתוף הפעולה בין חבריה יוגבל לדיון באפשרות של מתן ארכה כאמור, וכי לא יועבר בין חברי הנציגות הדחופה כל מידע אחר שאינו נוגע למתן ארכה כאמור.

כן מתחייבת החברה לפעול בשיתוף פעולה מלא עם הנציגות הדחופה והנאמן, ככל הנדרש לצורך ביצוע הבדיקות הנדרשות על ידם וגיבוש החלטת הנציגות הדחופה, ולהעביר לנציגות הדחופה את כל הנתונים והמסמכים שיידרשו לה לגבי החברה כאשר המידע לא יכלול כל פרט מטעה ולא יהיה חסר.

אם לא מונתה נציגות דחופה לפי הוראות תוספת שלישית זו, או אם הנציגות הדחופה החליטה שלא לתת לחברה ארכה כאמור לעיל, הנאמן יהיה חייב לזמן אסיפת מחזיקי אגרות החוב בהתאם להוראות סעיף 8 לשטר זה.

החברה תישא בעלויות הנציגות הדחופה, ובכלל זה בעלויות העסקת יועצים ומומחים על-ידי הנציגות או מטעמה, בהתאם להוראות סעיף 26 לשטר הנאמנות.

הנציגות הדחופה תפעל ותחליט בעניינים המסורים לידה, על פי שיקול דעתה המוחלט ולא תהא אחראית, היא או מי מבין חבריה, נושאי המשרה בהם, עובדיהם או יועציהם, והחברה ומחזיקי אגרות החוב פוטרים אותם בזאת, ביחס לכל טענות, דרישות ותביעות כנגדם בגין כך שהשתמשו או נמנעו מלהשתמש בכוחות, בסמכויות או בשיקול הדעת שהוקנו להם על פי שטר נאמנות זה ובקשר אליו או מכל פעולה אחרת שביצעו אותה על פי, למעט אם פעלו כך בזדון ו/או בחוסר תום לב.

---

[7]   קודקס הרגולציה - עקרונות לניהול עסקים, שער 5, חלק 2 - הון מדידה וניהול סיכונים, פרק 4 - ניהול נכסי השקעה, שפורסם על-ידי הממונה על שוק ההון, ביטוח וחסכון במשרד האוצר, כפי שיהיה מעת לעת.

# נספח ג' לפרק 2 – טבלאות ריכוז מידע רלוונטי בשטר הנאמנות

טבלאות הגילוי שלהלן מהוות ריכוז תמציתי של המידע בשטר הנאמנות הנוגע למנגנוני הגנה הקיימים בו לטובת מחזיקי אגרות החוב (סדרה א'), וזאת בהתאם לעמדת סגל רשות ניירות ערך.[10] **למען הסר ספק יובהר, כי המידע שלהלן הינו תמציתי ונועד להציג באופן מרוכז וכללי מנגנוני הגנה כאמור, אך מידע זה אינו ממצה ואינו מחליף קריאה מלאה של שטר הנאמנות ויתר מסמכי ההנפקה, אשר הינו הנוסח המחייב בהקשר זה.**

תניות חוזיות ובטחונות בגין אגרות החוב

| | קיים (סעיף בשטר) / לא קיים | תיאור תמציתי | האם הפרה מהווה עילה לפירעון מיידי? |
|---|---|---|---|
| **תעודות ההתחייבות מובטחות בביטחונות או בשעבודים קבועים אחרים** | **קיים**. ראה סעיף 6.2 לשטר הנאמנות. | להבטחת מלוא התחייבויות החברה כלפי מחזיקי אגרות החוב (סדרה א'), החברה תיצור ותרשום ו/או תגרום שייווצרו וירשמו לטובת הנאמן ומחזיקי אגרות החוב השעבודים הבאים: (א) משכנתא ראשונה, על כל או חלק מהנכסים המפורטים בנספח א' לשטר הנאמנות; (ב) חברת ההחזקות תשעבד, לטובת הנאמן עבור מחזיקי אגרות החוב (סדרה א'), בשעבוד ראשון בדרגה, ללא הגבלה בסכום, את אחזקותיה בזכויות ההשתתפות (membership rights) שלה בתאגיד המשועבד, הקיימות והעתידיות, לרבות הזכויות הנלוות (כהגדרתן בשטר הנאמנות); (ג) כל אחת מחברות הנכס וכל אחת מחברות התפעול תרשומנה שעבוד שוטף קבוע על נכסיהן; (ד) החברה וחברת ההחזקות תהיינה אחראיות לכך והתאגיד המשועבד מתחייב כי יחתום ותמסור הסכם שליטה (DACA) אשר ייחתם על-ידי ועל-ידי תאגיד בנקאי בארה"ב, בו ימצא חשבון התאגיד המשועבד, אשר יהיה החשבון היחידי על שמו של התאגיד המשועבד, אשר יקנה לנאמן עבור מחזיקי אגרות החוב (סדרה א'), שעבוד ראשון בדרגה על מלוא זכויותיו של התאגיד המשועבד בחשבון הבנק, לרבות בכספים, בפיקדונות ובניירות הערך המופקדים ו/או שיופקדו מעת לעת בחשבון המשועבד וכל תמורה שתתקבל בגינם, על פירותיהם. כמו כן, החברה וחברת ההחזקות תהינה אחראית לכך והתאגיד המשועבד מתחייב כי יחתום וימסור הסכם שליטה (DACA) על חשבונות הבנק של חברות התפעול המפעילות נכסי נדל"ן משועבדים אשר בהתאם לדוחותיה הכספיים של החברה ליום 31 בדצמבר 2025 ייצגו NOI בסך העולה על 5,000 אלפי דולר (TTM), וזאת עד ליום 31 ביולי 2026. | כן. ראה סעיף 8.1.32 לשטר הנאמנות |
| **תעודות ההתחייבות מובטחות בשעבוד צף ו/או שוטף** | **לא קיים**. | - | - |
| **התחייבות לאי יצירת שעבודים (שעבוד שלילי)** | **קיים**. ראה סעיף 6.6 לשטר הנאמנות. | החברה התחייבה שלא לשעבד, לרבות לטובת גורם מממן את כלל רכושה (המוחזק על-ידה במישרין בלבד) בשעבוד שוטף כללי ולא לשעבד נכס המוחזק על-ידה (כולל מס' נכסים) בשעבוד ספציפי, ללא קבלת הסכמה מראש של אסיפת מחזיקי אגרות החוב לכך בהחלטה מיוחדת. | - |
| **התחייבות לעמידה באמות מידה פיננסיות** | **קיים**. ראה סעיף 5.7 לשטר הנאמנות. | ראה טבלה נפרדת להלן. | **כן**. ראה סעיפים 8.1.14, 8.1.15 ו-8.1.16 לשטר הנאמנות. |
| **התחייבות לדירוג אגרות החוב במועד ההנפקה; שמירה על דירוג במשך כל חיי תעודת ההתחייבות** | **קיים**. ראה סעיף 5.4 לשטר הנאמנות. | החברה התחייבה לפעול לכך, כי ככל שהדבר בשליטתה, אגרות החוב תהיינה מדורגות על-ידי חברת הדירוג במשך כל תקופת אגרות החוב. | **כן.** ראה בסעיף 8.1.26 לשטר הנאמנות. |
| **התחייבות לדירוג כפול לתעודות ההתחייבות** | **לא קיים**. | - | - |
| **התחייבות שלא להחליף את החברה המדרגת לאורך כל חיי תעודת ההתחייבות** | **לא קיים**. | במקרה בו החברה תחליף את חברת הדירוג או תפסיק את עבודתה של חברת הדירוג, גם במקרה בו אגרות החוב מדורגות על-ידי למעלה מחברת דירוג אחת, התחייבה החברה כי תפרסם בדיווח מיידי ותודיע על כך לנאמן ולמחזיקי אגרות החוב. לפרטים ראה סעיף 5.4 לשטר הנאמנות. | - |

[10] עמדת סגל משפטית (103-41) בנושא גילוי מרוכז של מנגנוני ההגנה בשטרי הנאמנות, מחודש אוגוסט 2020: https://www.isa.gov.il/%D7%92%D7%95%D7%A4%D7%99%D7%9D%20%D7%9E%D7%A4%D7%95%D7%A7%D7%97%D7%99%D7%9D/Corporations/Staf_Positions/SLB_Decision/Public_Offers/Documents/SHTARNEMANUT.pdf#search=%D7%A9%D7%98%D7%A8%20%D7%A0%D7%90%D7%9E%D7%A0%D7%95%D7%AA

| | קיים (סעיף בשטר) / לא קיים | תיאור תמציתי | האם הפרה מהווה עילה לפירעון מיידי? |
|---|---|---|---|
| **מגבלות על יצירת חוב פיננסי נוסף** | **קיים**. ראה סעיף 5.11 לשטר הנאמנות. | החברה התחייבה כי לא תיטול בעצמה באחראי ממוסדות פיננסיים שאינם ישראלים ולא תעניק שעבודים למוסדות פיננסיים שאינם ישראלים, למעט בגין מסגרות אשראי אשר יכול שיועמדו אך ורק על-ידי מוסדות פיננסיים בארה"ב (וזאת כנגד שעבודים ספציפיים להבטחת אותן מסגרות אשראי ולאותם מוסדות פיננסיים לא תהא כל יכולת חזרה לחברה בקשר עם אותם חובות של החברה למעט השעבודים הספציפיים שהחברה העמידה לאותם מוסדות פיננסיים כאמור) וזאת לצורך ביצוע עסקאות הגנה על שער החליפין של השקל מול הדולר ביחס לאגרות חוב אותן תנפיק החברה. יצוין, כי סעיף 4.1 לשטר הנאמנות כולל מגבלות מסוימות בנוגע להרחבת סדרת אגרות החוב, ואי עמידה בהן מהווה עילה לפירעון מיידי – ראה סעיף 8.1.25 לשטר הנאמנות. | **כן**. ראה סעיף 8.1.34 לשטר הנאמנות |
| **מגבלה על חלוקת דיבידנדים** | **קיים**. ראה סעיף 5.5 לשטר הנאמנות. | החברה התחייבה, כי עד לאחר הסילוק המלא, הסופי והמדויק של החוב על-פי תנאי אגרות החוב היא לא תבצע חלוקה כלשהי, ובכלל זה לא תכריז, תשלם או תחלק כל דיבידנד, אלא אם מתקיימים כל התנאים המפורטים בסעיף 5.5 לשטר הנאמנות. | **כן**. ראה סעיף 8.1.19 לשטר הנאמנות |
| **מגבלות על עסקאות עם בעלי השליטה בחברה** | **קיים**. ראה סעיף 5.10 לשטר הנאמנות. | החברה התחייבה כי עסקאות חריגות של החברה, עם בעל השליטה בחברה, או עסקאות חריגות של החברה עם אדם אחר שלבעל השליטה יש בהן עניין אישי, או התקשרויות של החברה עם בעל השליטה או עם קרובו, במישרין או בעקיפין לרבות באמצעות חברה בשליטתו וכן אם הוא גם נושא משרה בה – כאשר לתנאי כהונתו והעסקתו, ואם הוא עובד החברה ואינו נושא משרה בה – כאשר להעסקתו בחברה, תהיינה מותנות, בנוסף לאישורים לפי הוראות סעיף 275 לחוק החברות, בהסכמת מחזיקי אגרות החוב, מראש, בהחלטה רגילה, למעט ביחס לעסקאות פטורות. | **כן**. ראה סעיף 8.1.18 לשטר הנאמנות |
| **מגבלות על שינוי שליטה** | **קיים**. ראה סעיף 8.1.12 לשטר הנאמנות. | קיימת עילה לפירעון מיידי לפיה אם הועברה השליטה בחברה, במישרין או בעקיפין, ולא התקבלה להעברת השליטה כאמור הסכמת מחזיקי אגרות החוב בהחלטה מיוחדת, טרם העברת השליטה. | **כן**. ראה סעיף 8.1.12 לשטר הנאמנות. |
| **מנגנון להתאמת ריבית במקרים מסוימים** | **קיים**. ראה סעיפים 5.2 ו-5.3 לשטר הנאמנות. | שיעור הריבית שתישאנה אגרות החוב יותאם בגין שינוי בדירוג של אגרות החוב ו/או בגין אי עמידת החברה באמות המידה הפיננסיות. | - |

עילות לפירעון מיידי בגין אגרות החוב

| העילה | קיים בשטר (סעיף בשטר) / לא קיים | הערות/הסבר |
|---|---|---|
| **חלה הרעה מהותית בעסקי המנפיק/חברות מוחזקות, וקיים חשש שהמנפיק לא יוכל לפרוע את תעודות ההתחייבות במועדן.** | **קיים**. ראה סעיף 8.1.11 לשטר הנאמנות. | אם חלה הרעה מהותית בעסקי החברה לעומת מצבה במועד ההנפקה לראשונה של אגרות החוב וקיים חשש ממשי שהחברה לא תוכל לפרוע את אגרות החוב במועדן. |
| **הכללת הערת "עסק חי" בחוות הדעת / בדוח הסקירה של רואה החשבון המבקר, המצורפים לדו"חות הכספיים של החברה** | **קיים**. ראה סעיף 8.1.33 לשטר הנאמנות. | אם תירשם הערת "עסק חי" בדוחות הכספיים של החברה למשך תקופה של שני (2) רבעונים רצופים. |
| **תעודות ההתחייבות לא נפרעו במועדן.** | **לא קיים**. | - |
| **Cross Default / Cross Acceleration (הפרה צולבת, במקרה של אי תשלום חובות אחרים או העמדה לפירעון מיידי)** | **קיים**. ראה סעיף 8.1.13 לשטר הנאמנות. | אם יועמדו לפירעון מיידי: (1) סדרת אגרות חוב אחרת שהנפיקה החברה אשר רשומה למסחר בבורסה; או (2) חוב או מס' חובות במצטבר של החברה או של חברה מאוחדת אשר הערך ההתחייבותי שלו הינו 35 מיליון דולר לפחות או אשר היקפו עולה על 10% מסך הנכסים של החברה, על-פי הדוחות הכספיים המאוחדים האחרונים של החברה שפורסמו (מבוקרים או סקורים, לפי המקרה), לפי הנמוך מביניהם; או (3) חוב או מס' חובות במצטבר של חברה כלולה שמכפלת שיעור ההחזקה של החברה (בשרשור סופי) בחברה הכלולה בערך ההתחייבותי של החוב מהווה 35 מיליון דולר לפחות לפי הדוחות הכספיים האמורי |
| **ירידת דירוג האג"ח מתחת לדירוג מינימאלי שנקבע** | **קיים**. ראה סעיף 8.1.20 לשטר הנאמנות. | ככל שדירוג אגרות החוב על-ידי חברת הדירוג יופחת לדירוג הנמוך מדירוג -BBB. |

| הערות/הסבר | קיים בשטר (סעיף בשטר) / לא קיים | העילה |
|---|---|---|
| אם החברה הפסיקה או הודיעה על כוונתה להפסיק את תשלומיה, או חדלה או הודיעה על כוונתה לחדול לנהול עסקיה, כפי שאלו יהיו מעת לעת. | **קיים**. ראה סעיף 8.1.10 לשטר הנאמנות. | **המנפיק הפסיק או הודיע על הפסקת תשלומיו** |
| אם יממשו בעלי שעבודים את השעבודים שיש להם על נכס מהותי של החברה (כהגדרתו בשטר הנאמנות) | **קיים**. ראה סעיף 8.1.8 לשטר הנאמנות | **מימוש שיעבוד על נכס מהותי או מכירת נכס בסיסי** |
| אם החברה לא פרסמה דוח כספי שהיא חייבת בפרסומו לפי כל דין, בתוך שלושים (30) ימים מהמועד האחרון שבו היא חייבת בפרסומו בהתאם להוראות הדין החלים עליה או בתום ארכה שניתנה לחברה על-ידי רשות מוסמכת על פי דין, המאוחר מביניהם. | **קיים**. ראה סעיף 8.1.29 לשטר הנאמנות. | **אי פרסום דוחות כספיים במועד הרלוונטי** |
| אם החברה הפרה את תנאי אגרות החוב או שטר הנאמנות הפרה יסודית, ובכלל זה אם יתברר כי מצג ממציגי החברה באגרות החוב או בשטר הנאמנות אינו נכון או אינו מלא, והנאמן נתן הודעה לחברה בכתב לתקן את ההפרה והחברה לא תיקנה את ההפרה כאמור בתוך ארבעה-עשר (14) ימים ממתן ההודעה. | **קיים**. ראה סעיף 8.1.25 לשטר הנאמנות. | **הפרה יסודית של תנאי אג"ח** |
| אם החברה לא תפרע במועד סכום כלשהו שיגיע ממנה בקשר לאגרות החוב או לפי שטר הנאמנות או לא תעמוד באיזו מיתר התחייבויותיה המהותיות כלפי המחזיקים; אם קיים חשש ממשי שהחברה לא תעמוד, או שהחברה לא עמדה, בהתחייבויותיה המהותיות כלפי מחזיקי אגרות החוב. מובהר, כי בין ההתחייבויות המהותיות של החברה נכללים, בין היתר, סכומי התשלום למחזיקים ומועדיהם; בקרות כל אירוע אחר המהווה פגיעה מהותית ו/או עלול לגרום לפגיעה מהותית בזכויות מחזיקי אגרות החוב. | **קיים**. ראה סעיפים 8.1.1, 8.1.9 ו-8.1.31 לשטר הנאמנות. | **הפרת התחייבויות מהותיות או ביצוע פעולה העשויה לפגוע מהותית בזכויות המחזיקים** |
| בוצע מיזוג ללא קבלת אישור מוקדם של מחזיקי אגרות החוב בהחלטה מיוחדת, אלא אם כן היישות הקולטת נטלה על עצמה את מלוא התחייבויותיה של החברה כלפי מחזיקי אגרות החוב ובנוסף הצהירה החברה או היישות הקולטת (לפי העניין) כלפי מחזיקי אגרות החוב, לרבות באמצעות הנאמן, לפחות עשרה (10) ימי עסקים לפני מועד המיזוג, כי לא קיים חשש סביר שעקב המיזוג לא יהיה ביכולתה של היישות הקולטת לקיים את ההתחייבויות כלפי מחזיקי אגרות החוב וכן כתוצאה מהמיזוג לא יועברו לחברה שעבודים באופן שהחברה לא תעמוד בהוראות שטר הנאמנות לעניין התחייבויותיה לאי יצירת שעבודים כמפורט בסעיף 6.6 לשטר הנאמנות. | **קיים**. ראה סעיף 8.1.22 לשטר הנאמנות. | **הפרת התחייבות בנוגע לשינויים מבניים, מיזוגים ורכישות, ללא אישור מחזיקי האג"ח** |
| אם החברה תמכור לאחר/ים (כהגדרת המונח בשטר) את כל נכסיה או את עיקר נכסיה (כהגדרת המונח בשטר), ולא התקבלה למכירה כאמור הסכמת מחזיקי אגרות החוב מראש בהחלטה מיוחדת. | **קיים**. ראה סעיף 8.1.21 לשטר הנאמנות. | **מכירת רוב נכסי המנפיק** |
| אם החברה תקבל החלטת פירוק או אם יינתן ביחס לחברה צו פירוק קבוע וסופי על-ידי בית משפט או צו בעל משמעות דומה בהתאם להוראות חוק חדלות פירעון או ימונה לה מפרק קבוע או התקבלה החלטה דומה או מונה בעל תפקיד דומה על-ידי החברה או כלפיה על פי חוק חדלות פירעון או על פי דין אחר או ימונה נאמן (כהגדרת מונח זה בחוק חדלות פירעון; אם יינתן צו פירוק זמני או צו דומה על פי הדין הרלבנטי או ימונה מפרק זמני או בעל תפקיד דומה בהתאם להוראות חוק חדלות פירעון או צו בחוק חדלות פירעון, או כל בעל תפקיד דומה שימונה על פי הדין הרלבנטי או תתקבל כל החלטה שיפוטית בעלת אופי דומה על-ידי בית המשפט, וצו או החלטה כאמור לא נדחו או בוטלו בתוך ארבעים וחמישה (45) ימים ממועד מתן הצו או קבלת ההחלטה, לפי העניין. | **קיים**. ראה סעיפים 8.1.4 ו- 8.1.5 לשטר הנאמנות. | **מתן צו פירוק קבוע / מתן צו פירוק זמני שלא בוטל תוך תקופה X** |
| אם יוטל עיקול או יבוצעו פעולות הוצאה לפועל בקשר עם נכס מהותי של החברה (כהגדרת המונח בשטר), והעיקול לא הוסר, או הפעולה לא בוטלה, לפי העניין, תוך ארבעים וחמישה (45) ימים ממועד הטלתם או ביצועם, לפי העניין. | **קיים**. ראה סעיף 8.1.7 לשטר הנאמנות. | **הטלת עיקול על נכסי המנפיק או ביצוע פעולת הוצל"פ** |
| אם הוגשה בקשה לכינוס נכסים או למינוי כונס נכסים (זמני או קבוע) או כל בעל תפקיד דומה שימונה על פי הדין לחברה או על נכס מהותי של החברה (כהגדרת המונח בשטר), או אם יינתן צו למינוי כונס נכסים זמני או כל בעל תפקיד דומה שימונה על פי הדין או מונה נאמן זמני, כהגדרת מונח זה בחוק חדלות פירעון - אשר לא נדחו או בוטלו בתוך ארבעים וחמישה (45) ימים ממועד הגשתם או נתינתם, לפי העניין; או - אם ניתן צו למינוי כונס נכסים קבוע לחברה או על נכס מהותי של החברה (כהגדרת המונח בשטר) או צו דומה על פי הדין החל על החברה. | **קיים**. ראה סעיף 8.1.6 לשטר הנאמנות. | **מינוי כונס נכסים קבוע או זמני (ובלבד שהמינוי לא בוטל במועד סביר)** |
| ראה האמור לעיל בעילה 'המנפיק הפסיק או הודיע על הפסקת תשלומיו'. | **קיים**. ראה סעיף 8.1.10 לשטר הנאמנות. | **המנפיק הודיע על כוונתו לחדול מלהמשיך בעיסוקו ו/או לנהל את עסקיו** |

| העילה | קיים בשטר (סעיף בשטר) / לא קיים | הערות/הסבר |
|---|---|---|
| **החברה חדלה מלהיות תאגיד מדווח ע"פ חוק ני"ע** | **קיים**. ראה סעיף 8.1.28 לשטר הנאמנות. | אם החברה תחדל להיות תאגיד מדווח. |
| **מחיקה ממרשם החברות, למעט מיזוג** | **קיים**. ראה סעיף 8.1.24 לשטר הנאמנות. | אם החברה תחוסל או תימחק מכל סיבה שהיא. |
| **בקשה/מתן צו להקפאת הליכים** | **קיים**. ראה סעיף 8.1.2 לשטר הנאמנות. | אם החברה תגיש בקשה לצו הקפאת הליכים כהגדרתו בחוק חדלות פירעון או אם יינתן צו דומה בהתאם להוראות חוק חדלות פירעון כנגד החברה או אם החברה תגיש בקשה לפשרה או להסדר עם נושי החברה לפי סעיף 350 לחוק החברות או בהתאם לחוק חדלות פירעון או אם החברה הגישה בקשה לצו פתיחת הליכים, כהגדרת מונח זה בחוק חדלות פירעון או אם יינתן צו כאמור כנגד החברה, או אם החברה תציע לנושיה בדרך אחרת פשרה או הסדר כאמור, על רקע העדר יכולתה של החברה לעמוד בהתחייבויותיה במועדן או בוצע הליך דומה על ידי החברה או כלפיה על פי הדין הזר הרלוונטי לחברה. |
| **הוגשה בקשה לפי סעיף 350 לחוק החברות** | **קיים**. ראה סעיף 8.1.3 לשטר הנאמנות. | אם תוגש בקשה לפי סעיף 350 לחוק החברות או חוק חדלות פירעון (או הליך דומה בהתאם לדין החל) כנגד החברה ושלא בהסכמתה, אשר לא נדחתה או בוטלה בתוך ארבעים וחמישה (45) ימים ממועד הגשתה. |
| **הוגשה בקשה לצו לפתיחת הליכים לפי חוק חדלות פירעון ושיקום כלכלי, תשע"ח-2018 ("חוק חדלות פירעון")** | **קיים**. ראה סעיף 8.1.3 לשטר הנאמנות. | ראה האמור לעיל בעילה 'הוגשה בקשה לפי סעיף 350 לחוק החברות. |
| **הוגשה בקשה לאישור הסדר חוב שלא במסגרת צו לפתיחת הליכים לפי חוק חדלות פירעון** | **לא קיים**. | - |
| **הבורסה השעתה/מחקה את המסחר באג"ח** | **קיים**. ראה סעיפים 8.1.23 ו- 8.1.30 לשטר הנאמנות. | אם המסחר באגרות החוב בבורסה הושעה על-ידי הבורסה, למעט השעיה בעילה של היווצרות אי בהירות כאמור בחלק הרביעי לתקנון הבורסה, וחלפו שישים (60) ימים ממועד ההשעיה במהלכם ההשעיה לא בוטלה ; אם אגרות החוב נמחקו מהמסחר בבורסה. |
| **הפרת מגבלות על גיוס חוב נוסף, כולל הרחבת סדרה** | **קיים**. ראה סעיף 8.1.27 לשטר הנאמנות. | במקרה שהחברה תבצע הרחבת סדרה לאגרות החוב או תנפיק סדרות נוספות של אגרות חוב או ניירות ערך אחרים, בניגוד להוראות שטר הנאמנות. |
| **אי עמידה בהתחייבות למנגנון התאמה לשיעור הריבית, כתוצאה מאי הסרת שיעבוד צף** | **לא קיים**. | - |
| **נטילת חוב פיננסי או אשראי בניגוד להתחייבות לאי יצירת שעבוד שוטף** | **לא קיים**. | - |
| **הפרת התחייבות להפקיד כספי כרית הוצאות וכרית ריבית או הפקדת כספים בפיקדון להוצאות מיוחדות** | **קיים**. ראה סעיף 8.1.38 לשטר הנאמנות. | אם החברה תפר איזו מהתחייבויותיה בקשר לכרית ההוצאות כמפורט בסעיף 5.8 לשטר הנאמנות. |
| **מתן צו נאמן זמני או מינוי נאמן זמני** | **קיים**. ראה סעיף 8.1.5 לשטר הנאמנות. | ראה האמור לעיל בעילה 'מתן צו פירוק קבוע / מתן צו פירוק זמני שלא בוטל תוך תקופה X'. |
| **העברת שליטה** | **קיים**. ראה סעיף 8.1.12 לשטר הנאמנות. | אם הועברה השליטה בחברה, במישרין או בעקיפין, ולא התקבלה להעברת השליטה כאמור הסכמת מחזיקי אגרות החוב בהחלטה מיוחדת, טרם העברת השליטה. |
| **אי עמידה באמות מידה פיננסיות** | **קיים**. ראה סעיפים 8.1.14, 8.1.15 ו- 8.1.16 לשטר הנאמנות. | |
| **הפרת התחייבות בקשר עם עסקאות חריגות** | **קיים**. ראה סעיף 8.1.18 לשטר הנאמנות. | אם החברה תפר איזו מהתחייבויותיה כמפורט בסעיף 5.10 לשטר הנאמנות. |
| **חלוקה בניגוד להוראות מגבלת החלוקה** | **קיים**. ראה סעיף 8.1.19 לשטר הנאמנות. | אם החברה ביצעה חלוקה בניגוד להוראות סעיף 5.5 לשטר הנאמנות. |
| **הפסקת דירוג אגרות החוב** | **קיים**. ראה סעיף 8.1.26 לשטר הנאמנות. | אם אגרות החוב תפסקנה להיות מדורגות לתקופה העולה על שישים (60) ימים עקב סיבות או נסיבות שהינן בשליטת החברה. |

| הערות/הסבר | קיים בשטר (סעיף בשטר) / לא קיים | העילה |
|---|---|---|
| אם החברה תפר איזו מהתחייבויותיה שבסעיף 6 לשטר הנאמנות בעניין אי יצירת שעבודים שוטפים או ספציפיים. | **קיים**. ראה סעיף 8.1.32 לשטר הנאמנות. | **הפרת התחייבות לאי יצירת שעבודים (שעבוד שלילי)** |
| אם החברה תפר את התחייבותה שלא להנפיק אגרות חוב מחוץ לישראל ושלא ליטול בעצמה חוב אחר מחוץ לישראל, כמפורט בסעיף 4.2 לשטר הנאמנות או אם הופרו איזו מהתחייבויות המפורטות בסעיף 5.11 לשטר הנאמנות. | **קיים**. ראה סעיף 8.1.34 לשטר הנאמנות. | **הפרת התחייבות החברה שלא להנפיק אגרות חוב מחוץ לישראל ושלא ליטול בעצמה חוב אחר מחוץ לישראל** |
| אם החברה, נושאי המשרה בחברה ו/או בעל השליטה בה יפרו את התחייבויותיהם כמפורט בסעיף 33 לשטר הנאמנות; אם החברה ו/או בעלי השליטה בה יפרו את התחייבויותיהם כמפורט בסעיף 5.13 לשטר הנאמנות. | **קיים**. ראה סעיפים 8.1.35 ו- 8.1.37 לשטר הנאמנות. | **הפרת התחייבויות נושאי משרה בחברה ו/או בעל השליטה** |
| אם החברה תפר איזו מהתחייבויותיה בקשר למינוי נציג לחברה בישראל כמפורט בסעיף 5.6.1 לשטר הנאמנות. | **קיים**. ראה סעיף 8.1.39 לשטר הנאמנות. | **מינוי נציג חברה בישראל** |
| אם החברה תפר את התחייבותה לעמוד בהוראות סעיף 5.9 לשטר הנאמנות, והדבר לא תוקן עד למועד פרסום הדוחות הכספיים המאוחדים (רבעוניים או שנתיים) העוקבים לדוחות הכספיים המאוחדים של החברה לפיהם אינה עומדת במגבלה האמורה. | **קיים**. ראה סעיף 8.1.17 לשטר הנאמנות. | **מגבלת תחום/איזור פעילות עיקרי** |
| אם החברה תפר איזו מהתחייבויותיה שבסעיף 6 לשטר הנאמנות; אם חברת ההחזקות, התאגיד המשועבד, חברות הנכס או חברות התפעול הפרו הפרה יסודית את הוראות סעיף 6 לשטר הנאמנות ו/או את מסמכי השעבוד | **קיים**. ראה סעיפים 8.1.32 ו- 8.1.40 לשטר הנאמנות. | **השלמת יצירת השעבודים** |

דרישות עמידה באמות מידה פיננסיות בגין אגרות החוב

| פירוט אמות המידה | קיים בשטר/ לא קיים בשטר | אמות מידה פיננסיות |
|---|---|---|
| ההון העצמי לא יפחת מ-100 מיליון דולר | ראה סעיף 5.7.1 לשטר הנאמנות | הון עצמי מינימאלי |
| יחס החוב הפיננסי נטו מתואם ל-CAP נטו לא יעלה על 75% | ראה סעיף 5.7.2 לשטר הנאמנות | יחס חוב הפיננסי נטו מתואם ל-CAP נטו |
| יחס החוב הפיננסי נטו מתואם ל-EBITDA מתואם לא יעלה על 17 | ראה סעיף 5.7.3 לשטר הנאמנות | יחס חוב פיננסי נטו מתואם ל-EBITDA מתואם |

**לתיאור יתר תנאי אגרות החוב ראה הוראות שטר הנאמנות. בכל מקרה של סתירה בין ההוראות המתוארות בדוח הצעת המדף ו/או במסמכים הנלווים לשטר הנאמנות, לבין שטר הנאמנות, יגברו הוראות שטר הנאמנות, והכל בכפוף לתקנון הבורסה והנחיותיו. נכון למועד התשקיף לא קיימת סתירה בין ההוראות המתוארות בתשקיף ו/או במסמכים הנלווים לשטר הנאמנות להוראות שטר הנאמנות.**

# פרק 3 – הון המניות של החברה

**3.1** <u>פרטים על הון המניות של החברה למועד התשקיף</u>

| הון מונפק ונפרע | הון רשום | סוג המניה |
|---|---|---|
| 1,000 | 50,000 | מניות רגילות ללא ערך נקוב |

**3.2** <u>התפתחות ההון הרשום והמונפק של החברה ממועד ייסודה</u>

ביום 28 במאי 2025, מועד התאגדותה של החברה, הקצתה החברה 1,000 מניות רגילות ללא ערך נקוב (**"מניות רגילות"**).

מאז מועד היווסדה של החברה ועד למועד פרסום התשקיף לא חל שינוי בהון הרשום ובהון המונפק והנפרע של החברה.

**3.3** <u>החזקות בעלי עניין בניירות הערך של החברה</u>

**3.3.1** למועד פרסום התשקיף, מניות החברה מוחזקות בידי דיוויד שאבסלס ומייקל שאבסלס ( David Shabsels and Michael Shabsels) (**"בעלי השליטה"**).

**3.3.2** למועד פרסום התשקיף, ההחזקה במניות החברה הינה כדלקמן :

| שיעור ההחזקה בהון המונפק והנפרע של החברה | מספר מניות רגילות שיוחזקו על-ידי בעל המניות | שם בעל המניות |
|---|---|---|
| 50% | 500 | דיוויד שאבסלס |
| 50% | 500 | מייקל שאבסלס |

**3.3.3** <u>החזקות של בעלי עניין ונושאי משרה בכירה בחברה בניירות ערך של חברות בנות וקשורות</u>

כמתואר לעיל, נכון למועד פרסום התשקיף, מחזיקים בעלי השליטה ב-100% מהונה המונפק והנפרע של החברה.

# פרק 4 – זכויות ההצבעה הנלוות למניות החברה

**התיאור להלן מהווה תיאור תמציתי של הוראות תזכיר ותקנון ההתאגדות של החברה הנוגעות לזכויות ההצבעה הצמודות למניות החברה. ניתן יהיה לעיין בנוסח המלא של תזכיר ותקנון ההתאגדות של החברה באתר "מגנא" של רשות ניירות ערך, בכתובת: <u>www.magna.gov.il</u>. התיאור התמציתי שלהלן אינו מהווה תחליף לעיון בנוסח המלא של תזכיר ותקנון ההתאגדות של החברה.**

לפרטים אודות תחולת הוראות חוק ניירות ערך, התשכ"ח-1968 והתקנות שמכוחו, וכן הוראות שונות מחוק החברות, התשנ"ט-1999 ("**חוק החברות**"), על החברה, ראה סעיפים 1.1 ו-4.1 לתשקיף.

להלן פירוט הסדרים על-פי הוראות תקנה 26(ד) לתקנות ניירות ערך (פרטי התשקיף וטיוטת תשקיף – מבנה וצורה), תשכ"ט-1969, אשר נקבעו בתקנון החברה ואשר הינם שונים מהסדרי ברירת המחדל הרלוונטיים על-פי חוק החברות:

4.1 <u>סעיפים 20 ו-22 לחוק החברות</u> – בהתאם להוראות התקנון: (א) ניתן לשנות את תקנון החברה בהחלטת הדירקטוריון או בהחלטת בעלי המניות מעת לעת; (ב) על אף האמור לעיל, הדירקטוריון לא יוכל לשנות את הוראות התקנון: (1) כך שיגבילו את זכויותיהם או סמכותם של בעלי המניות לשנות את התקנון; (2) כך שישתנה הרוב הדרוש לקבלת החלטת בעלי המניות לשינוי התקנון; או (3) בנסיבות בהן בעלי המניות אינם רשאים לשנות את התקנון.

4.2 <u>סעיף 59 לחוק החברות</u> – בהתאם להוראות התקנון, הדירקטורים בחברה ימונו בהחלטת האסיפה הכללית או בהחלטת הדירקטוריון.

4.3 <u>סעיף 61(א) לחוק החברות</u> – התקנון אינו קובע כל חובה לעניין קיום אסיפה שנתית.

4.4 <u>סעיף 81 לחוק החברות</u> – בהתאם להוראות התקנון: (א) המניין החוקי לפתיחת האסיפה הכללית הינו נוכחות של בעל או בעלי מניות, בעצמם או באמצעות באי כוחם, המחזיקים חמישים אחוזים (50%) לפחות מזכויות ההצבעה הרלוונטיות; (ב) היה וכעבור מחצית השעה מהמועד הקבוע לפתיחת האסיפה הכללית לא יתהווה מניין חוקי, תבוטל האסיפה הכללית, או, על-פי שיקול דעת יושב הראש, תידחה האסיפה הכללית לאותו יום בשבוע שלאחר מכן באותה השעה ו/או המקום או ליום, שעה ו/או מקום אחרים על-פי החלטת יושב הראש. היה וכעבור מחצית השעה מהמועד הקבוע לתחילת האסיפה הנדחית לא יתהווה מניין חוקי, יהוו בעלי מניות הנוכחים מניין חוקי; (ג) הדירקטורים יהיו רשאים בכל זמן עובר למועד כינוס האסיפה הכללית, למנות כל אדם לשמש כיושב ראש האסיפה הכללית, או, אם הדירקטורים לא קיבלו החלטה כאמור, יושב ראש הדירקטוריון ישב בראש האסיפה הכללית. באין יושב ראש דירקטוריון כאמור או במקרה בו הוא אינו נוכח בתוך חמש-עשרה (15) דקות מהמועד שנקבע לתחילת האסיפה הכללית או אם סרב לשמש כיושב ראש האסיפה, הדירקטורים הנוכחים יבחרו באחד מביניהם לשמש כיושב ראש האסיפה. באין דירקטור המוכן לשמש כיושב ראש האסיפה או במקרה בו לא נוכח דירקטור בתוך חמש-עשרה (15) דקות מהמועד שנקבע לתחילת האסיפה, יבחרו בעלי המניות הנוכחים באחד מביניהם לשמש כיושב ראש האסיפה.

4.5 <u>סעיף 222 לחוק החברות</u> – בהתאם להוראות התקנון, דירקטור ימונה לתקופה כפי שתקבע בהחלטה למינותו, או בהעדר קביעה כאמור, ייראה כאילו מונה לתקופה בלתי מוגבלת.

4.6 <u>סעיף 301 לחוק החברות</u> – בהתאם להוראות התקנון, דירקטוריון החברה רשאי, בהחלטת דירקטוריון, לאשר ביצוע חלוקה בידי החברה בזמן, בסכום ולבעלי מניות כפי שימצא לנכון, וזאת לאחר שהשתכנע, על יסוד סביר, שמיד לאחר ביצוע חלוקה כאמור שווי סך נכסי החברה יהיה גבוה מסך התחייבויותיה וכי החברה תוכל לעמוד בפירעון חובותיה בהגיע מועד קיומם.

4.7 <u>זכויות ההצבעה הנלוות למניות החברה</u>

4.7.1 המניות יחולקו למספר סוגים וסדרות כפי שיחליט הדירקטוריון, מעת לעת, ועד שיחולקו כאמור, יהוו סוג אחד וסדרה אחת.

4.7.2 כל מניה של החברה מעניקה לבעל המניות:

4.7.2.1    את הזכות להצביע בכל החלטה של בעלי המניות ;

4.7.2.2    את הזכות לחלק שווה בכל דיבידנד שישולם על-ידי החברה ;

4.7.2.3    את הזכות לחלק שווה בחלוקת נכסים עודפים של החברה בפירוק.

4.7.3    ניתן להנפיק מניות וניירות ערך אחרים במועדים, לאנשים, בתמורה ובתנאים שהדירקטורים רשאים להחליט עליהם באמצעות החלטת דירקטוריון. תמורה כאמור עשויה להיות בכל צורה, בהתאם להחלטת הדירקטוריון, לרבות כסף, שטר חוב, או התחייבות כתובה אחרת להעברת כסף, רכוש, נכסי דלא ניידי, רכוש פרטי (לרבות מוניטין וידע), מתן שירותים או חוזה לשירותים עתידיים.

4.7.4    לא ניתן להנפיק מניות בעד תמורה שאיננה כסף, אלא אם הדירקטורים קיבלו החלטה המציינת :

4.7.4.1    את הסכום שייזקף להנפקת המניות ;

4.7.4.2    את הערך הכספי הנוכחי הסביר של תמורה לא כספית עבור ההנפקה ;

4.7.4.3    לדעתם הערך הכספי הנוכחי של התמורה הלא כספית עבור ההנפקה, אינו פחות מהסכום שייזקף להנפקת המניות.

**תיאור הוראות התקנון בנושאים המנויים בפרק 4 לעיל הינו תיאור תמציתי של הוראות התקנון בקשר עם אותם נושאים והוא אינו מהווה תחליף לעיון בנוסח המלא של תקנון החברה.**

# פרק 5 - השוואת דינים

**האמור להלן הינו תיאור כללי ותמציתי של סוגיות מהדין הישראלי, וסוגיות מהדינים החלים באיי הבתולה הבריטיים אשר אינו מתיימר להיות תיאור ממצה או פרשנות מוסמכת של הדין, ואינו מהווה תחליף לייעוץ מקצועי.**

**דיני איי הבתולה הבריטיים, החלים על החברה הינם The BVI Business Companies Act 2004 (להלן: "דין איי הבתולה הבריטיים").**

**ההתייחסות בפרק זה לדין איי הבתולה הבריטיים הינה בהתאם לחוות דעתו של משרד עוה"ד Maples & Calder, הכלולה בפרק זה להלן, במקור ובתרגום לעברית, אשר הסכים להכללת חוות דעתו ותרגומה בתשקיף. יצוין כי חוות הדעת מאיי הבתולה כוללת הוראות נוספות מתחום דיני החברות אשר אינם נכללים בפרק זה להלן, לאור החלטתה של חלק ב' לתוספת הרביעית, כהגדרתה להלן.**

**תקנון החברה כולל את כל ההוראות המוחלות על החברה מכח סעיף 39א(א) לחוק ניירות ערך, התשכ"ח-1968 ("חוק ניירות ערך") לרבות הוראות סעיף 350 לחוק החברות וכן סעיף המחיל את סמכות השיפוט בישראל. כמו כן, בהתאם לחוות הדעת מעורכי דינה של החברה באיי הבתולה הבריטיים המצורפת לפרק 11 לתשקיף, הוראות תקנון החברה אינן סותרות את דיני איי הבתולה הבריטיים.**

5.1    **תחולת דיני ניירות ערך וחוק החברות בישראל ודיני איי הבתולה הבריטיים**

החברה התאגדה ונרשמה מחוץ לישראל על-פי הדין החל באיי הבתולה הבריטיים, ולא התאגדה על-פי הוראות פקודת החברות [נוסח חדש], התשמ"ג-1983 (**"פקודת החברות"**) או הוראות חוק החברות.

הואיל ותעודות ההתחייבות (לא המירות) של החברה מוצעות לציבור בישראל על-פי תשקיף זה, ותירשמנה למסחר בבורסה, אזי כל עוד יוחזקו בידי הציבור ניירות הערך של החברה המוצעים על-פי תשקיף זה, יחולו על החברה הוראות חוק ניירות ערך והתקנות שהותקנו מכוחו והחלות על חברות שהתאגדו מחוץ לישראל ואשר ניירות הערך שלהן נסחרים בבורסה בישראל או רשומים בה למסחר. בהתאם, החברה תדווח בהתאם להוראות הדיווח המתאימות על-פי חוק ניירות ערך ותקנותיו.

בנוסף, יחולו על החברה הוראות סעיף 39א(א) לחוק ניירות ערך, וכפועל יוצא מכך יחולו עליה הוראות שונות של חוק החברות החלות על חברה שהתאגדה מחוץ לישראל והמציעה תעודות התחייבות שלה לציבור בישראל, ובכלל זה הוראות לעניין מינוי דירקטורים חיצוניים, מבקר פנים וועדת ביקורת, הכול בהתאם למפורט בתוספת הרביעית (חלק ב') לחוק ניירות ערך. הוראות אלו יחולו בנוסף להוראות מסמכי ההתאגדות של החברה[1] ודיני איי הבתולה הבריטיים. יצוין, כי רשות ניירות ערך רשאית לפטור חברה כאמור מהוראות ותקנות המפורטות בתוספת האמורה, כולן או חלקן, אם נוכחה כי הדין מחוץ לישראל החל על החברה מבטיח די הצורך את ענייניו של ציבור המשקיעים בישראל.

החברה (בחתימתה על תשקיף זה), בעלי השליטה ונושאי המשרה בחברה, בהווה ובעתיד, מתחייבים באופן בלתי חוזר ויתחייבו באופן בלתי חוזר (לפי העניין) שלא להעלות טענות נגד תחולתו, תקפותו או אופן יישומו של סעיף 39א כאמור.

**שטר הנאמנות ונספחיו לרבות אגרות החוב כפופים להוראות הדין הישראלי.[2] שטר הנאמנות קובע כי בית המשפט היחידי שיהיה מוסמך לדון בעניינים הקשורים לחברה אשר נוגעים בשטר הנאמנות על נספחיו ובאגרות החוב יהיה בית המשפט המוסמך בתל-אביב-יפו. בכל עניין שלא נזכר בשטר הנאמנות וכן בכל מקרה של סתירה בין הוראות הדין לבין שטר הנאמנות, יפעלו הצדדים בהתאם להוראות הדין הישראלי.**

---

[1]    תקנון החברה כולל סעיפים החלים על החברה מכוח סעיף 39א לחוק ניירות ערך. יובהר, כי למועד התשקיף, בתקנון החברה אין הוראה הסותרת דין קוגנטי באיי הבתולה הבריטיים.

[2]    לעניין זה ראו סעיף 14 לשטר הנאמנות בגין אגרות החוב (סדרה א') בין החברה לבין הנאמן למחזיקי אגרות החוב, המצורף כנספח ב' לפרק 2 לתשקיף (**"שטר הנאמנות"**).

החברה (בחתימתה על תשקיף זה), בעלי השליטה בחברה (בהווה ובעתיד) ונושאי המשרה בחברה (המכהנים ושיכהנו בעתיד) התחייבו ויתחייבו, לפי העניין: כי לא יתנגדו לבקשת הנאמן ו/או מחזיקי אגרות החוב אשר תוגש בבית משפט בישראל, בהליך שהוגש נגד החברה, להחלת הדין הישראלי לעניין פשרה, הסדר, חדלות פירעון בקשר לחברה (ולרבות פירוק מרצון), ככל שתוגש ; לא יפנו ביוזמתם לבית משפט מחוץ לישראל בכדי לקבל הגנה מפני הליך הננקט על-ידי הנאמן ו/או מחזיקי אגרות החוב של החברה ; לא יתנגדו אם בית משפט בישראל יבקש להחיל את הדין הישראלי לעניין פשרה, הסדר וחדלות פירעון בקשר לחברה (ולרבות פירוק) ; ולא יעלו טענות כנגד סמכותו המקומית של בית המשפט בישראל בקשר עם הליכים שיוגשו על-ידי הנאמן ו/או מחזיקי אגרות החוב של החברה, לרבות תובענה ייצוגית ותביעה נגזרת. כמו כן, החברה (בחתימתה על תשקיף זה) לא תחתום על הסכמים עם גורמים כלשהם, לרבות עם עובדי החברה, אלא אם נקבע בהם כי הליכים בקשר עם פשרה, הסדר וחדלות פירעון (לרבות פירוק) כנגד החברה יפתחו רק בבית משפט ישראלי ובהתאם לדין בישראל.

לאור האמור לעיל ובכפוף לקיום התחייבויות החברה, בעלי השליטה ונושאי המשרה (בהווה ובעתיד, לפי העניין), אזי הליך של חדלות פרעון, שלא על-פי הדין הישראלי ו/או בבתי משפט לא ישראליים, יכול לנבוע רק מתביעה של נושה זר. לעניין זה יצוין כי ככל שייפתח הליך של חדלות פירעון, שלא על-פי הדין הישראלי ו/או בבית משפט זר, הנובע מתביעה של נושה זר, החברה תעשה כמיטב יכולתה ותטען ל"פורום לא נאות" והכל בכפוף לכל דין.

למען הסר ספק, יובהר, כי התחייבויות בעלי השליטה ונושאי המשרה (בהווה ובעתיד) כאמור, תכלולנה באופן מפורש גם התחייבות בלתי חוזרת שלא להניע ביוזמתם הליך של חדלות פירעון לפי דין זר ו/או בבית משפט זר.

לאור האמור לעיל ובכפוף לקיום התחייבויות החברה, בעלי השליטה ונושאי המשרה[3] (בהווה ובעתיד) כאמור, אזי, להבנת החברה, הליך של חדלות פירעון של החברה, שלא על-פי הדין הישראלי ו/או בבתי משפט לא ישראליים, יכול לנבוע רק מתביעה של נושה שאינו אחד מהגורמים הנ"ל (החברה, בעלי השליטה ונושאי המשרה כאמור).

בנוסף, החברה (בחתימתה על תשקיף זה), בעלי השליטה ונושאי המשרה בחברה (בהווה ובעתיד), מתחייבים ויתחייבו (לפי העניין) באופן בלתי חוזר בכתב, שלא להעלות טענות כנגד סמכותה של רשות ניירות ערך ו/או ועדת האכיפה המנהלית בישראל בקשר לעיצומים כספיים ו/או אמצעי אכיפה מנהליים שיוטלו עליהם על-ידי רשות ניירות ערך ו/או ועדת האכיפה המנהלית בישראל, וזאת על-פי פרק ח'3 ו/או פרק ח'4 לחוק ניירות ערך, וכן הינם מתחייבים ויתחייבו באופן בלתי חוזר בכתב לקיים את החלטותיה של רשות ניירות ערך ו/או ועדת האכיפה המנהלית בישראל, ובכלל זה, מבלי לגרוע מכלליות האמור, לשלם את העיצומים הכספיים ו/או תשלומים לנפגעי הפרה אשר יוטלו עליהם (אם יוטלו) ולנקוט פעולות לתיקון ההפרה ומניעת הישנותה.

בנוסף לאמור לעיל, החברה (בחתימתה על תשקיף זה) מתחייבת להמציא לנאמן, בסמוך למועד חתימת שטר הנאמנות, התחייבויות בלתי חוזרות בכתב של החברה, של בעלי השליטה בחברה במועד חתימת שטר הנאמנות (וכן בסמוך לאחר שינוי שליטה בחברה, לפי העניין) ושל כל נושאי המשרה כאמור לעיל המכהנים בחברה במועד חתימת שטר הנאמנות (וכן בסמוך לאחר מינויים של נושאי משרה נוספים לחברה, לפי העניין) בתוקף תפקידם כנושאי משרה בחברה : (1) שלא להתנגד לבקשת הנאמן ו/או מחזיקי אגרות החוב אשר תוגש לבית משפט בישראל בהליך שיוגש כנגד החברה, להחלת הדין הישראלי לעניין פשרה או הסדר וחדלות פירעון (לרבות פירוק) בקשר עם חברה, ככל שתוגש, (2) שלא להתנגד אם בית משפט בישראל יבקש להחיל את הדין הישראלי לעניין פשרה או הסדר וחדלות פירעון (לרבות פירוק) בקשר עם החברה, (3) שלא להעלות טענות כנגד סמכותו המקומית של בית המשפט בישראל בקשר עם הליכים שיוגשו על-ידי הנאמן ו/או מחזיקי אגרות החוב של החברה כנגד החברה, לרבות תובענה ייצוגית ותביעה נגזרת, (4) שלא לפנות ביוזמתם לבית משפט מחוץ לישראל בכדי לקבל הגנה מפני הליך הננקט

---

[3]    שאינם תושבי ישראל.

על-ידי הנאמן ו/או מחזיקי אגרות החוב של החברה ושלא להניע ביוזמתם הליך של חדלות פירעון כנגד החברה לפי דין זר ובמקום שיפוט שאינו ישראל, (5) כי החל מתום שלושה (3) חודשים ממועד ההנפקה וכל עוד אגרות החוב הינן במחזור, יכהנו בחברה לפחות שני דירקטורים (ובכלל זה הדירקטורים החיצוניים), (6) שלא להעלות טענות כנגד סמכותה של רשות ניירות ערך ו/או ועדת האכיפה המנהלית בישראל בקשר לעיצומים כספיים ו/או אמצעי אכיפה מנהליים שיוטלו עליהם על-ידי רשות ניירות ערך ו/או ועדת האכיפה המנהלית בישראל, וזאת על-פי פרק ח'3 ו/או פרק ח'4 לחוק ניירות ערך, וכן הינם מתחייבים ויתחייבו באופן בלתי חוזר בכתב לקיים את החלטותיה של רשות ניירות ערך ו/או ועדת האכיפה המנהלית בישראל, ובכלל זה, מבלי לגרוע מכלליות האמור, לשלם את העיצומים הכספיים ו/או תשלומים לנפגעי הפרה אשר יוטלו עליהם (אם יוטלו) ולנקוט פעולות לתיקון ההפרה ומניעת הישנותה. התחייבויותיהם האמורות של החברה, נושאי המשרה ובעלי השליטה בחברה יכונו בהמשך כ-"**התחייבויות החברה, נושאי המשרה ובעלי השליטה**".

התחייבויות החברה, נושאי המשרה ובעלי השליטה כאמור לעיל יפורסמו בסמוך לאחר פרסום תוצאות המכרז בדבר הנפקת אגרות החוב (סדרה א') או, לפי העניין, במסגרת הדוח המיידי בדבר מינוי נושא המשרה, או בדבר שינוי השליטה בחברה, אשר תפרסם החברה בהתאם להוראות הדין בישראל, כחלק מהדיווחים טרם ההנפקה ובעת מינויו של כל נושא משרה חדש ו/או כניסתו של בעל שליטה חדש, והכול במהלך חיי אגרות החוב.

**דיני איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה אינם מגבילים או מונעים את רישומם למסחר של ניירות הערך המוצעים על-פי תשקיף זה, ואלו יוכלו להיסחר בחופשיות בבורסה ללא מגבלות כלשהן תחת דיני איי הבתולה הבריטיים ומסמכי ההתאגדות של החברה.**

### 5.2   אכיפת פסקי חוץ

#### הדין הישראלי

על-פי דיני מדינת ישראל, אכיפה בישראל של פסק דין זר נעשית בהתאם להוראות חוק אכיפת פסקי חוץ, התשי"ח-1958, הדין ובכלל זה החוק האמור קובע כי פסק חוץ לא יוכרז אכיף אם ניתן במדינה שלפי דיניה אין אוכפים פסקים של בתי המשפט בישראל. נכון למועד תשקיף זה, לא קיימת אמנה לפיה ניתן להכיר בפסקי חוץ של איי הבתולה הבריטיים בישראל, ולמיטב ידיעת החברה, אין פסקי דין בהם נדונה שאלת האכיפה בין שתי מערכות הדינים.

#### הדין באיי הבתולה הבריטיים

פסקי דין זרים אינם ניתנים לאכיפה באיי הבתולה הבריטיים, אך ניתן לאוכפם באמצעות תביעה של המשפט המקובל או במקרה של פסקי דין שניתנו בידי סמכויות שיפוט מסוימות – באמצעות רישום באיי הבתולה הבריטיים לפי הפקודה לאכיפה הדדית של פסקי דין זרים או החוק לאכיפה הדדית של פסקי דין. יצוין, כי לא כל פסק דין זר ניתן לאכיפה. חלקם עשויים לזכות בהכרה רק על-ידי בתי המשפט באיי הבתולה הבריטיים.[4]

החוק לאכיפה הדדית של פסקי דין, 1922, ופקודת אכיפת פסקי חוץ (אכיפה הדדית), 1964, אינם חלים בישראל או בארה"ב, ועל כן אכיפה באמצעות המשפט המקובל הינה רלוונטית.

על-פי המשפט המקובל, בתי המשפט באיי הבתולה הבריטיים יתייחסו לפסק דין כספי סופי וחלוט בנוגע לסכום מוגדר, שהתקבל כנגד החייב בבתי משפט בסמכויות שיפוט זרות, כאל עילת תביעה לחוב עצמו, כך שמשפט חוזר אינו הכרחי, ובלבד שבנוגע לפסקי דין זרים: (א) בית המשפט הזר שנתן את פסק הדין היה בעל סמכות שיפוט בעניין והחברה כפופה לסמכות שיפוט כאמור או שהייתה תושבת או ניהלה עסקים בתחומי סמכות שיפוט כאמור, וההזמנה לדין נמסרה לה כדין; (ב) פסק הדין שניתן על-ידי בית המשפט הזר לא היה קשור בעונשים, מיסים, קנסות, או התחייבויות דומות בדבר מיסוי או הכנסות של

---

4   לדוגמה, פסק דין אשר דוחה תביעה (אם כי צו להוצאות ניתן לאכיפה); פסק דין הצהרתי; והוראות בקשר עם פשיטת רגל של יחידים או פירוק חברות. בית המשפט באיי הבתולה הבריטיים רשאי גם להכיר בפסק דין זר כהגנה מפני פעולה או להכיר בו כמכונן העברה של נכסים.

החברה; (ג) בקבלת פסק הדין לא הייתה כל מרמה מצד האדם אשר לטובתו ניתן פסק הדין או מצד בית [5]
המשפט; (ד) הכרה או אכיפה של פסק הדין באיי הבתולה הבריטיים לא תעמוד בסתירה לתקנת ציבור;
וכן (ה) ההליכים לפיהם התקבל פסק הדין לא עמדו בסתירה לכללי הצדק הטבעי.

בהתאם לחוק החל באיי הבתולה הבריטיים, פסק דין או צו לתשלום סכום כסף, למעט צו לתשלום כסף
לבית משפט, ניתן לאכיפה באמצעות: (א) צו חיוב; (ב) צו עיקול אצל צד שלישי; (ג) זימון למשפט לצורך
שימוע וחקירת יכולת; (ד) צו עיקול ומכירה של נכסים; וכן (ה) מינוי כונס נכסים.

בית המשפט באיי הבתולה הבריטיים ממלא תפקיד תומך המקל על הליכי בוררות, והוא יכיר ויאכוף
פסקי בוררות זרים שניתנו באחת מהמדינות שהתקשרו באמנת ניו יורק בהתאם לתנאי האמנה. בנוסף,
בכפוף לחוק הבוררות, 2013 (1) החברה המאוגדת באיי הבתולה חתומה על אמנת ניו-יורק ו-(2) העילות
לסירוב לאכיפה החלות על פסק בוררות של אמנת ניו יורק יחול על אכיפת פסק בוררות שאינו של האמנה,
ובשני המקרים עילות אלו מעוגנות במלואן בחוק הבוררות עצמו.

### 5.3    הדין החל על שטר הנאמנות

כאמור בסעיף 14 לשטר הנאמנות, הדין שיחול על שטר הנאמנות הוא הדין הישראלי.

---

בתי המשפט באיי הבתולה הבריטיים לא יוכלו, בהכרח, לאכוף בכל זה עיצומים כספיים שהוטלו על-ידי רשות ניירות ערך [5]
בישראל או אמצעי אכיפה מנהליים שהוטלו על-ידי ועדת האכיפה המנהלית בישראל בהתאם להוראות פרקים ח'3 ו-ח'4 לחוק
ניירות ערך, לפי העניין.

- 5 -

**5.4** **השוואה בין מספר סוגיות בדיני חברות – הוראות הדין החל באיי הבתולה הבריטיים לעומת הוראות הדין הישראלי**

**5.4.1** היות שהחברה מציעה לציבור תעודות התחייבות יחולו עליה הוראות חלק ב׳ לתוספת הרביעית לחוק ניירות ערך, כדלקמן :

| נושא | סעיפים[6] מחוק החברות/תקנות החברות החלים על החברה | האם הסעיפים האמורים כלולים בתקנון?[7] | הסעיפים בתקנון החברה המתייחסים להוראות חלק ב' לתוספת הרביעית לחוק ניירות ערך | הדין באיי הבתולה הבריטיים[8] |
|---|---|---|---|---|
| **יו״ר הדירקטוריון והמנכ״ל** | סעיפים 94(א), 95, 119 ו-121(ג) לחוק החברות. | כן | 13.1, 23.8, 23.9, ו-23.10 | בכפוף לתזכיר ותקנון ההתאגדות של החברה והחוק, ביחס לעניינים הקשורים בגילוי אינטרסים, אין בחוק כל איסור המונע מאדם לפעול כיושב ראש ומנכ״ל של חברה בהתאם לדיני איי הבתולה. |
| **ועדת ביקורת** | סעיפים 114 עד 117 לחוק החברות. | כן | 24 | החוק אינו כולל כל דרישה מחברה למנות ועדת ביקורת. |
| **ועדת תגמול** | סעיפים 118א ו-118ב לחוק החברות. | כן | 26 | החוק אינו כולל כל דרישה מחברה למנות ועדת תגמול. |
| **ועדה לבחינת הדוחות הכספיים** | תקנות החברות (הוראות ותנאים לעניין הליך אישור הדוחות הכספיים), התש״ע-2010. | כן | 27 | אין חובה חוקית למנות ועדה לבחינת הדוחות הכספיים. |
| **מען רשום** | סעיף 123(א) לחוק החברות. | כן | 3 החברה תמנה נציג בישראל כמפורט בשטר הנאמנות | על-פי חוקי איי הבתולה הבריטיים, כל חברה רשומה באיי הבתולה הבריטיים חייבת בסוכן רישום הנוכח באיי הבתולה הבריטיים. אדם לא יהיה ולא יסכים להיות סוכן רישום של חברה המאוגדת באיי הבתולה הבריטיים, אלא אם האדם האמור מחזיק ברישיון על-פי חוק ניהול חברה משנת 1990 או חוק הבנקים וחברות נאמנות משנת 1990 של איי הבתולה הבריטיים, המסמיך אותו לספק שירותי סוכן רשום. |
| **מבקר פנימי** | סעיפים 146 עד 153 לחוק החברות. | כן | 32 | החוק אינו כולל דרישה מחברה למנות מבקר פנימי. |
| **התביעה הנגזרת** | סעיפים 194 עד 205א לחוק החברות. | לא | להתחייבות החברה, בעלי השליטה ונושאי המשרה, בהווה ובעתיד, שלא להתנגד להגשת תביעה נגזרת על-ידי מחזיקי אגרות החוב, ראה סעיף 5.1 לתשקיף | על-פי החוק החל באיי הבתולה הבריטיים, בעלי מניות יכולים לתבוע תביעות נגזרות, תביעות אישיות או תביעות ייצוגיות, בנסיבות מסוימות. יודגש כי החוק החל באיי הבתולה הבריטיים אינו מקנה זכויות כאמור לנושים. |

---

[6]   תקנון החברה כולל (כמפורט בתקנון החברה, בפרקים 4, ו-8 לתשקיף זה וכן בטבלה זו) סעיפים מחוק החברות החלים על החברה מכוח סעיף 39א לחוק ניירות ערך. תקנון החברה מנוסח ומאושר על-ידי עורך דין באיי הבתולה הבריטיים ( **"עורך דין ה-BVI"**) יודגש כי נמסר לחברה על-ידי עורך דין ה-BVI כי בתקנון אין הוראה הסותרת דין קוגנטי באיי הבתולה הבריטיים. מכוח סעיף סמכות השיפוט בישראל, הנכלל בתקנון החברה ( **"סעיף סמכות השיפוט"**) הכללת ההתחייבות התשקיפית לעניין תביעה נגזרת כמפורט בסעיף 5.1 לעיל - אינה סותרת דין קוגנטי באיי הבתולה הבריטיים. לפרטים חוות דעת יועצה המשפטיים של החברה באיי הבתולה הבריטיים המופיעה בסעיף 11.

[7]   בשינויים המחויבים, ובכלל זה באמצעות הכללת סעיף סמכות השיפוט (כהגדרתו בהערת שוליים 7 לעיל) בתקנון החברה ובצירוף ההתחייבויות התשקיפיות כמפורט בסעיף 5.1 לתשקיף.

[8]   ההוראות המפורטות בעמודה זו, הינן הוראות מכוח הוראות דיני איי הבתולה הבריטיים והמשפט המקובל בהיבטים מסוימים.

| נושא | סעיפים[6] מחוק החברות/תקנות החברות החלים על החברה | האם הסעיפים האמורים כלולים בתקנון?[7] | הסעיפים בתקנון החברה המתייחסים להוראות חלק ב' לתוספת הרביעית לחוק ניירות ערך | הדין באיי הבתולה הבריטיים[8] |
|---|---|---|---|---|
| **הגבלות על מינוי ופקיעת כהונה של דירקטור** | סעיפים 225 עד 232א ו-234 לחוק החברות. | כן | 14 | קיימות הגבלות על מינוי דירקטור (ובכלל זה יחיד מתחת לגיל 18, פסול דין, פושט רגל וכו') וכן נסיבות הקבועות בדין לסיום כהונתו ו/או פקיעת הכהונה. נושאי המשרה בחברה מתחייבים באופן בלתי חוזר, כי במקרה שבו מי מהדירקטורים המכהנים הודיע לחברה כי הורשע בפסק דין בעבירה כאמור בסעיף 226(א)(1) לחוק החברות או 226(א)(1) לחוק החברות, או שוועדת האכיפה המנהלית החליטה להטיל על אותו דירקטור אמצעי אכיפה האוסר עליו לכהן כדירקטור בחברה פרטית שהיא חברת אג"ח, אזי יפעלו בהתאם להוראות תקנון החברה לכינוס אסיפת בעלי מניות או ישיבת דירקטוריון (לפי העניין) דחופה, אשר על סדר יומה יהא קבלת החלטה לפטר את הדירקטור האמור לאלתר ("**ההחלטה**") וכי בעלי השליטה בחברה יצביעו בעד החלטה כאמור. |
| **הגבלות על מינוי ופקיעת כהונה של נושא משרה (שאינו דירקטור)** | סעיף 251א לחוק החברות. | כן | 22.1 | החוק אינו מחייב חברה למנות נושאי משרה, והדבר נתון לשיקול דעתה של החברה. החוק אינו כולל הוראות דין לעניין פסלות למינוי או הרחקה כנושא משרה של חברה (שאינו דירקטור) באיי הבתולה הבריטיים. |
| **דירקטורים חיצוניים** | סעיפים 239 עד 249א לחוק החברות. תקנות החברות (כללים בדבר גמול והוצאות לדירקטור חיצוני), התשס"ס-2000; תקנות החברות (עניינים שאינם מהווים זיקה), התשס"ז-2006; תקנות החברות (תנאים ומבחנים לדירקטור בעל מומחיות חשבונאית ופיננסית ולדירקטור בעל כשרות מקצועית), התשס"ו-2005. | כן | 16 | החוק אינו כולל כל דרישה שחברה תמנה דירקטורים חיצוניים או דירקטורים שאינם נושאי משרה לדירקטוריון חברה. החוק אינו מבחין בין דירקטורים בחברה לדירקטורים בלתי תלויים בחברה. |
| **דירקטור בלתי תלוי** | סעיפים 249ב ו-249ג לחוק החברות. | כן | 10 (הגדרה של דירקטור בלתי תלוי) | אין חובה חוקית למנות דירקטורים בלתי תלויים. |
| **חובת אמון וזהירות** | סעיפים 252 עד 256 לחוק החברות. | כן | 18 | החוק מטיל חובת האמונים על הדירקטורים של החברה, וכן מטיל חובה לנהוג ביושר ובתום לב, בהתאם לאופן שבו כל דירקטור מבין את טובתה המרבית של החברה. בנוסף לחובות האמון, לדירקטור חובות זהירות, שקדנות ומיומנות, אשר הוא חב כלפי החברה עצמה. הדין באיי הבתולה הבריטיים אינו מטיל חובות כאמור על נושאי משרה שאינם דירקטורים. |
| **מתן פטור, שיפוי וביטוח** | סעיפים 258 עד 264 לחוק החברות. | כן | 25 | החוק באיי הבתולה הבריטיים אינו מגביל את היקף השיפוי שניתן לקבוע לנושאי משרה ודירקטורים בתקנון ההתאגדות של חברה, למעט ככל שהוראה כאמור עשויה להיחשב על-ידי בית המשפט כהוראה הסותרת את תקנת הציבור הקבועה בחוק באיי הבתולה הבריטיים. לעניין ביטוח, החברה רשאית לרכוש ולהחזיק ביטוח ביחס לכל מי שמכהן או כיהן כדירקטור בה.[9] |

---

[9] כאמור בסעיף 7.1.7 לתשקיף, במסגרת הסכם העברת הזכויות, הישות המעבירה לא התחייבו לתת שיפוי כלשהו לחברה בכל הקשור לזכויות המועברות ואלו תועברנה "as is".

| הדין באיי הבתולה הבריטיים[8] | הסעיפים בתקנון החברה המתייחסים להוראות חלק ב׳ לתוספת הרביעית לחוק ניירות ערך | האם הסעיפים האמורים כלולים בתקנון?[7] | סעיפים[6] מחוק החברות/תקנות החברות החלים על החברה | נושא |
|---|---|---|---|---|
| בעלי המניות או, בכפוף לתזכיר ותקנון ההתאגדות של החברה, הדירקטורים בחברה רשאים לקבוע את תגמולי הדירקטורים בגין השירותים שיעמידו לחברה בכל מסגרת שהיא. אין חובה חוקית לקיים מדיניות תגמול לדירקטורים ו/או לנושאי משרה (שאינם דירקטורים). | 20 | כן | סעיפים 267א, 267ב, 270(2), 270(3), 272, ו-273 לחוק החברות. תקנות החברות (הקלות לעניין החובה לקבוע מדיניות תגמול), התשע״ג-2013 | **מדיניות תגמול לנושאי משרה ותנאי כהונה והעסקה של נושאי משרה** |
| דירקטורים אינם רשאים להעמיד את עצמם במצב של ניגוד עניינים בין חובתם כלפי החברה לבין האינטרסים האישיים שלהם.<br>בדרך כלל, תזכיר ותקנון התאגדות של חברה באיי הבתולה הבריטיים יאפשר לדירקטור בעל עניין בעסקה מסוימת להצביע לגביה, להיות נוכח בישיבות בהן נשקלת עסקה כאמור ולחתום על מסמכים מטעם החברה הקשורים בעסקה. | 20 | כן | סעיפים 270(1), 270(4א), 272(א) ו-275 עד 282 לחוק החברות. תקנות החברות (הקלות בעסקאות עם בעלי עניין), התש״ס-2000. | **עסקאות עם צדדים קשורים וניגוד עניינים** |

| חלוקת דיבידנדים | סעיפים 301 עד 311 לחוק החברות. תקנות החברות (אישור חלוקה), התשס״א-2001. תקנות החברות (סכומים אחרים הכלולים בהון עצמי שיראו אותם כעודפים), התשע״ב-2012. | | כן | 29 | |
|---|---|---|---|---|---|

(1) כפוף לתזכיר ותקנון ההתאגדות של החברה, הדירקטורים בחברה רשאים, בהחלטת דירקטוריון, לאשר חלוקה על-ידי החברה לבעלי המניות שלה במועד ובסכום כפי שהדירקטורים ימצאו לנכון, ובלבד ששוכנעו, מטעמים סבירים, כי מיד לאחר החלוקה, החברה תעמוד במבחן כושר פירעון הקבוע בדין איי הבתולה הבריטיים. חברה תעמוד במבחן כושר הפירעון אם: (א) שווי נכסי החברה עולה על התחייבויותיה; וכן- (ב) החברה מסוגלת לשלם את חובותיה בהגיע מועד פירעונם. יש לכלול בהחלטת הדירקטורים הצהרה על כך שלדעת הדירקטורים החברה תעמוד במבחן כושר הפירעון מיד לאחר החלוקה.

(2) בעלי סמכות במשפט האנגלי, אשר נחשבים על-ידי בית המשפט כמשכנעים ביותר, אך אינם מחייבים אותו[10], מספקים הנחיות לגבי המשמעות של ״יכולתה של חברה לשלם את חובותיה בהגיע מועד פירעונם״. מקרה אחד כאמור הינו BNY Corporate Trustee Services Ltd. v. Eurosail- UK Plc[11], בו נקבע כי השוואת נכסים קיימים עם התחייבויות קיימות ועתידיות (התחייבויות למעט תביעות תלויות ודחיות) היה המבחן שהוחל וכי נטל ההוכחה צריך להיות של הצד הטוען לחדלות פירעון מאזנית. המבחן כרוך בניתוח ההקשר הכולל והעובדות הרלוונטיות לחברה שעל הפרק. על-פי פרשת Re Cheyne Finance plc (בכינוס נכסים)[12], יש להתחשב בהתחייבויות שיגיע מועד פירעונן בעתיד. בפרשה האמורה נקבע כי אין להוכיח חדלות פירעון של תזרים מזומנים רק מהסתכלות על חובות שיש לפרוע בהווה, אלא ניתן לקחת בחשבון חובות עתידיים ידועים, המיועדים לפירעון בעתיד המיידי. לדעת בית המשפט, מהמילים ״בהגיע מועד פירעונם״ עולה אלמנט עתידי, כך שהן החובות הקיימים והן החובות שיעמדו לפירעון בעתיד המיידי עשויים להיות רלוונטיים בכדי לקבוע אם חברה יכולה לשלם את חובותיה. בנוסף, בפרשת (Re a Company (No 006794 of 1983[13] נקבע כי העובדה שחברה יכולה לשלם את חובותיה רק באמצעות כספים שלוותה, אינה אומרת בהכרח כי אין ביכולתה לשלם את חובותיה, על אף שבאופן עקבי לא הצליחה לשלם או התרשלה בתשלומם עד שחויבה לעשות כן, וכך במקרה המתאים, בית המשפט יכול לפסוק כי החברה אינה יכולה לשלם את חובותיה.

(3) חלוקה, בהתייחס לחלוקה על-ידי חברה מוגבלת במניות לבעל מניותיה, משמעה: (א) העברה ישירה או עקיפה של נכס, למעט מניות החברה, אל או לטובת בעל המניות; או (ב) נטילת חוב לטובת בעל מניות ביחס למניות המוחזקות על-ידו, ובין אם בדרך של רכישת נכס, רכישה, פדיון או השגת המניות באופן אחר, העברת חבויות או מסירתן בדרך אחרת, ולרבות דיבידנד.

(4) החברה תוכל לקבל חזרה חלוקה שבוצעה לבעל מניות במקרה בו שמיד לאחר החלוקה החברה לא עמדה במבחן כושר הפירעון, אלא אם: (א) בעל המניות קיבל את החלוקה בתום לב ומבלי לדעת על אי עמידתה של החברה במבחן כושר הפירעון; (ב) בעל המניות שינה את מצבו בהסתמך על תקפות החלוקה; וכן (ג) לא יהיה זה הוגן לדרוש פירעון מלא או בכלל. אם, לאחר שאושרה חלוקה ולפני שבוצעה, הדירקטורים אינם משוכנעים עוד, על בסיס סביר, כי מיד לאחר ביצוע החלוקה החברה תעמוד במבחן כושר הפירעון, כל חלוקה שבוצעה על-ידי החברה תיחשב כאילו לא אושרה.

(5) במקרה שחלוקה תיחשב כאילו לא אושרה, דירקטור אשר: (א) חדל להאמין, מטעמים סבירים, לאחר אישור החלוקה אך טרם ביצועה בפועל, שהחברה תעמוד במבחן כושר הפירעון מיד לאחר ביצוע החלוקה; וכן (ב) לא נקט באמצעים סבירים למנוע את ביצוע החלוקה בפועל, יהא אחראי באופן אישי כלפי החברה לפרוע עבורה את אותו חלק מהחלוקה שלא התקבל חזרה מבעלי מניות בחברה. במקרה שבמסגרת תובענה שהוגשה כנגד דירקטור או בעל מניות דלעיל בהתאם לסעיף הנ״ל, בית המשפט העליון באיי הבתולה הבריטיים שוכנע כי החברה תוכל, באמצעות חלוקה של סכום נמוך יותר, לעמוד במבחן כושר הפירעון, בית המשפט רשאי – (א) לאפשר לבעל המניות לשמור על סכום השווה לשווי כל חלוקה שניתן היה לבצע כהלכה; או – (ב) לשחרר את הדירקטור מאחריותו בגין, סכום השווה לשווי כל חלוקה שיכלה להתבצע כראוי.

- 9 - 5 -

| הדין באיי הבתולה הבריטיים[8] | הסעיפים בתקנון החברה המתייחסים להוראות חלק ב׳ לתוספת הרביעית לחוק ניירות ערך | האם הסעיפים האמורים כלולים בתקנון?[7] | סעיפים[6] מחוק החברות/תקנות החברות החלים על החברה | נושא |
|---|---|---|---|---|
| על-פי דיני החברות באיי הבתולה הבריטיים, קיימות הוראות חוקיות אשר מאפשרות הסדרים, הכרוכים בתוכנית הסדר שתאושר בהחלטה של דירקטוריון החברה, והגשת בקשה לבית המשפט לאישור מתכונת ההסדר המוצע. | 36 | כן | סעיף 350 לחוק החברות. תקנות החברות (בקשה לפשרה או להסדר), התשס״ב-2002. | **פשרה והסדר** |
| בתי המשפט באיי הבתולה הבריטיים לא יוכלו לאכוף פסק חוץ אשר ניתן על-ידי בית משפט זר בקשר עם קנסות, עיצומים, מיסים או מחויבויות פיסקליות או פירותיות אחרות, ובכלל זה לא יוכלו לאכוף עיצומים כספיים שהוטלו על-ידי רשות ניירות ערך בישראל או אמצעי אכיפה מנהליים שהוטלו על-ידי ועדת האכיפה המנהלית בישראל, בהתאם להוראות פרקים ח׳3 ו-ח׳4 לחוק ניירות ערך, לפי העניין.<br><br>עם זאת, כאמור לעיל, החברה ונושאי המשרה בחברה, שאינם תושבי ישראל, בהווה ובעתיד, מתחייבים באופן בלתי חוזר ויתחייבו באופן בלתי חוזר ובכתב, שלא להעלות טענות כנגד סמכותה של רשות ניירות ערך ו/או ועדת האכיפה המנהלית בישראל בקשר עם עיצומים כספיים ו/או אמצעי אכיפה מנהליים שיוטלו עליהם על-ידי רשות ניירות ערך ו/או ועדת האכיפה המנהלית בישראל, וזאת על-פי פרק ח׳3 ו/או פרק ח׳4 לחוק ניירות ערך וכן הינם מתחייבים באופן בלתי חוזר ויתחייבו באופן בלתי חוזר ובכתב לקיים את החלטות רשות ניירות ערך ו/או ועדת האכיפה המנהלית בישראל ובכלל זה, ומבלי לגרוע מכלליות האמור, לשלם את העיצומים הכספיים ו/או תשלומים לנפגעי עבירה אשר יוטלו עליהם (ככל שיוטלו) ולנקוט בפעולות לתיקון ההפרה ומניעת הישנותה. | להתחייבות החברה, בעלי השליטה ונושאי המשרה, בהווה ובעתיד, שלא להעלות טענות כנגד סמכות רשות ניירות ערך ו/או וועדת אכיפה מנהלית בישראל, ראה סעיף 5.1 לתשקיף | לא | סעיפים 363א(א) ו-(ב)(2) עד (12), 363ב ו-363ג. | **הטלת עיצום כספי** |

---

[10] המערכת המשפטית באיי הבתולה הבריטיים מבוססת, ברובה, על מערכת המשפט המקובל האנגלית, ומשום כך נהוג לייבא חוקים מהמשפט המקובל, אף על-פי שאלו אינם מחייבים בבתי המשפט באיי הבתול הבריטיים.

[11] 2007-3BL Plc [2013] UKSC 28

[12] [2007] EWHC 2402 (Ch)

[13] [1986] BCLC 261

<div dir="rtl">

5.4.2    <u>פירוק ודיון קדימה</u>

יצוין כי אף העובדה שחלק ד׳ לתוספת הרביעית אינו כולל הוראות בקשר עם פירוק ודין קדימה ולפיכך אינו מחיל הוראות אלה מהדין הישראלי על החברה כחברה זרה,[14] להלן תיאור קצר של הדין שחל באיי הבתולה הבריטיים בקשר עם פירוק ודין קדימה והתחייבויות החברה ונושאי המשרה בה לעניין חדלות פירעון :

| נושא | סעיפי הדין הישראלי הרלוונטיים | הדין באיי הבתולה הבריטיים[15] |
|---|---|---|
| **עילות לפירוק החברה** | סעיפים 257 ו-319 עד 347 לפקודת החברות וסעיף 362 לחוק החברות. | פירוק של חברה, עשוי להיות פירוק מרצון של חברה בעלת כושר פירעון או פירעון לפי חוק חדלות פירעון. בהתאם לחוק חדלות פירעון, חברה הינה חדלת פירעון אם היא אינה יכולה לציית לדרישות של תביעה סטטוטורית אשר לא נדחתה על-פי חוק חדלות פירעון, ההוצאה לפועל או תהליך אחר אשר הוצא בפסק דין, צו או הוראה של בית משפט לטובת נושה של החברה ותביעה כאמור מושבת ריקם, במלואה או בחלקה, ערך ההתחייבויות של החברה עולה על נכסיה או שהחברה אינה מסוגלת לשלם את חובותיה עם הגיע מועד פירעונם. |
| **דין קדימה** | סעיף 354 לפקודת החברות והוראות הדין הישראלי בעניין סדרי קדימויות בפירוק חברה. | בעת פירוק בחדלות פירעון של חברה, נכסי החברה ימומשו בהתאם לסדר העדיפויות שלהלן : (א) בעדיפות על פני כל יתר התביעות - תשלום העלויות וההוצאות שנגרמו כדין בפירוק בהתאם לסדר העדיפות שנקבע ; (ב) לאחר תשלום העלויות וההוצאות של הפירוק, תשלום התביעות העדיפות שאושרו על-ידי המפרק (שכר ומשכורות, סכומים למוצעה לביטוח לאומי באיי הבתולה הבריטיים, תגמולי ביטוח, מיסים ממשלתיים) – תביעות עדיפות מדורגות באופן שווה בינן לבין עצמן וכן, אם נכסי החברה אינם מספיקים לצורך תשלום התביעות במלואן, הן תשולמנה באופן יחסי ; (ג) לאחר תשלום התביעות העדיפות, תשלום כל יתר התביעות שאושרו על-ידי המפרק, לרבות תביעות של נושים בלתי מובטחים – תביעות הנושים הבלתי מובטחים של החברה תדורגנה באופן שווה בינן לבין עצמן, ואם נכסי החברה אינם מספיקים לצורך תשלום התביעות במלואן, נושים בלתי מובטחים כאמור יקבלו תשלום באופן יחסי ; (ד) לאחר תשלום כל התביעות שאושרו במלואן, תשלום הריביות המשולמות בהתאם לחוק חדלות הפירעון של איי הבתולה הבריטיים ; ולבסוף (ה) כל נכס עודף שיישאר לאחר תשלום העלויות, ההוצאות והתביעות שלעיל יחולק לבעלי המניות בהתאם לזכויותיהם ולעניין שלהם בחברה. החלק השמיני לחוק חדלות הפירעון קובע פעולות שונות שמפרק רשאי לבצע בכדי להפריש עסקאות שהביאו לצמצום הנכסים העומדים לרשות הנושים. |

----

14    בהמשך לאמור, יצוין כי לעניין דיני חדלות פירעון יחולו על החברה דיני איי הבתולה הבריטיים.

15    ההוראות המפורטות בעמודה זו, הינן הוראות מכוח הוראות דיני איי הבתולה הבריטיים והמשפט המקובל בהיבטים מסוימים.

</div>

<div dir="rtl">

5.4.3     <u>עילות לפירוק החברה</u>

[א]     הדין הישראלי

על-פי פקודת החברות, עילות הפירוק בידי בית המשפט הינן כמפורט להלן:
(1) החברה קיבלה החלטה מיוחדת שהיא תפורק בידי בית המשפט; (2) החברה לא
התחילה בעסקיה תוך שנה לאחר שהתאגדה, או הפסיקה את עסקיה למשך שנה;
(3) החברה הייתה לחדלת פירעון; (4) בית המשפט סבור שמן הצדק והיושר שהחברה
תפורק. כמו כן, לפי חוק החברות, בנסיבות מסוימות של אי תשלום עיצומים כספיים,
רשאי רשם החברות לבקשת פירוקה של חברה בידי בית המשפט. בנוסף, חברה יכולה גם
להתפרק מרצון בנסיבות שנקבעו בפקודת החברות.


[ב]     הדין באיי הבתולה הבריטיים

פירוק חברה באיי הבתולה הבריטיים, יהיה פירוק מרצון של חברה בעלת כושר פירעון או
לפי חוק חדלות פירעון. מקום בו חברה נמחקה[16] ממרשם החברות בהתאם לחוק לתקופה
רצופה של שבע (7) שנים, היא תפורק (כאשר המועד הקובע לפירוקה יהא היום האחרון
של אותה תקופה).

במקרה שפירוק הינו פירוק מרצון של חברה בעלת כושר פירעון, הוראות החוק מסדירות
את הפירוק. חברה רשאית להתפרק לפי חוק בפירוק מרצון רק אם אין לה התחייבויות
או אם ביכולתה לשלם את חובותיה בהגיע מועד פירעונם ושווי נכסיה עולה על
התחייבויותיה. בכפוף לתזכיר ותקנון ההתאגדות של חברה, מפרק רשאי להתמנות
בהחלטת דירקטוריון או בהחלטת בעלי מניות, אך אם הדירקטוריון החל בפירוק
בהחלטת דירקטוריון, בעלי המניות יאשרו את תוכנית הפירוק בהחלטת בעלי מניות,
למעט בנסיבות מוגבלות.

מפרק מתמנה לצורכי גביה ומימוש נכסי החברה וחלוקת ההכנסות מההליכים האמורים
לנושים.

The Insolvency Act 2003 (**"חוק חדלות פירעון"**) מסדיר פירוק בחדלות פירעון. בהתאם
לחוק חדלות פירעון, חברה הינה חדלת פירעון אם היא אינה יכולה לציית לדרישות של
תביעה סטטוטורית אשר לא נדחתה על-פי חוק חדלות פירעון, ההוצאה לפועל או תהליך
אחר אשר הוצא בפסק דין, צו או הוראה של בית משפט לטובת נושה של החברה ותביעה
כאמור מושבת ריקם, במלואה או בחלקה, ערך ההתחייבויות של החברה עולה על נכסיה
או שהחברה אינה מסוגלת לשלם את חובותיה עם הגיע מועד פירעונם. המפרק יהיה כונס
הנכסים הרשמי באיי הבתולה הבריטיים או כונס מורשה באיי הבתולה הבריטיים לפירוק
חברות. תושב יחיד מחוץ לאיי הבתולה הבריטיים יכול להתמנות כמפרק ביחד עם כונס
מורשה באיי הבתולה הבריטיים לפירוק חברות או כונס הנכסים הרשמי. בעלי המניות
בחברה רשאים למנות כונס מומחה בתחום חדלות הפירעון כמפרק לחברה או שבית
המשפט רשאי למנות כונס נכסים רשמי או מומחה כשיר בתחום. הבקשה לבית המשפט
יכולה להיעשות על-ידי אחד או יותר מהבאים: (א) החברה; (ב) נושה; (ג) בעל מניות; (ד)
המפקח על הסדר נושים ביחס לחברה, הוועדה לשירותים פיננסיים או התובע הכללי באיי
הבתולה הבריטיים.

---

[16] כאשר חברה נמחקת מהמרשם, החברה, הדירקטורים שלה, החברים בה וכל מפרק או כונס נכסים שלה, לא יהיו רשאים (א)
לפתוח בהליכים משפטיים, להתקשר בכל עסק או עסקה באשר הם בקשר עם נכסי החברה; (ב) להתגונן מפני כל הליך משפטי,
להעלות כל תביעה או טענה או זכות של החברה או בשמה; או (ג) לפעול בכל דרך שהיא בקשר עם ענייני החברה. חרף האמור
לעיל, כאשר חברה נמחקת מהמרשם, החברה, הדירקטורים שלה, החברים בה וכל מפרק או כונס נכסים שלה, יהיו רשאים (א)
להגיש בקשה להשבת החברה למרשם; (ב) להמשיך ולהתגונן בהליכים שנפתחו כנגד החברה עובר למועד המחיקה; וכן (ג) להמשיך
ולנהל הליכים משפטיים שנפתחו בשם החברה עובר למועד המחיקה. העובדה שחברה נמחקה מהמרשם אינה מונעת (א) מהחברה
לצבור חבויות; או (ב) מכל נושה להעלות טענה כנגד החברה ולפעול למימוש התביעה עד לקבלת פסק דין או הוצאה לפועל, וכן
אינה משפיעה על החבות של מי מחבריה, הדירקטורים שלה, נושאי המשרה בה או סוכניה.

</div>

בית המשפט רשאי למנות מפרק אם:

(א)    החברה חדלת פירעון;

(ב)    בית המשפט הינו בדעה כי מן הדין ומן הצדק למנות מפרק; או

(ג)    בית המשפט הינו בדעה כי קיים עניין ציבורי במינוי מפרק.

בקשה לפי ס״ק (א) לעיל מטעם בעל מניות תתבצע אך ורק באישור בית המשפט ואישור כאמור לא יינתן עד שבית המשפט ישתכנע כי מדובר לכאורה בחברה חדלת פירעון. בקשה לבית המשפט לפי ס״ק (ג) לעיל תיעשה אך ורק על-ידי הוועדה לשירותים פיננסיים או התובע הכללי שרשאים להגיש בקשה לפי ס״ק (ג) לעיל רק אם החברה נשוא הפנייה היא, או הייתה בזמן כלשהו, גוף מפוקח (למשל, גוף אשר מחזיק רישיון למתן שירותים פיננסיים) או שהיא מנהלת, או ניהלה בזמן כלשהו, עסק למתן שירותים פיננסיים ללא רישיון.

**יצוין כי החברה ונושאי המשרה בחברה לא יתנגדו לבקשת הנאמן ו/או מחזיקי אגרות החוב אשר תוגש בבית משפט בישראל להחלת הדין הישראלי לעניין פשרה והסדר וחדלות פירעון, ככל שתוגש וכן לא יתנגדו אם בית משפט בישראל יבקש להחיל את הדין הישראלי לעניין פשרה והסדר וחדלות פירעון.**

**למען הסר ספק יובהר ויודגש כי התחייבויות החברה ונושאי המשרה תכלולנה באופן מפורש גם התחייבות בלתי חוזרת שלא להגיע ביוזמתם הליך של חדלות פירעון לפי דין זר ובמקום שיפוט שאינו ישראל לרבות באיי הבתולה הבריטיים.**

**לאור האמור לעיל ובכפוף לקיום התחייבויות החברה ונושאי המשרה, יודגש ויובהר כי הליך של חדלות פירעון, שלא על-פי הדין הישראלי ובבתי משפט ישראליים, יכול לנבוע רק מתביעה של נושה זר. לעניין זה יצוין כי ככל שייפתח הליך של חדלות פירעון, שלא על-פי הדין הישראלי ובבית משפט זר, הנובע מתביעה של נושה זר, החברה תעשה כמיטב יכולתה ותטען ל״פורום לא נאות״ והכל בכפוף לכל דין.**

### 5.4.4    דין קדימה

[א]    הדין הישראלי

סדר העדיפויות בהחזר חובות בפירוק יהיה כמפורט להלן (בכפוף למועדים והתקרות הקבועות בחוק): (1) הוצאות הפירוק; (2) חובות מס בשעבוד סטטוטורי; (3) חובות מובטחים בשעבוד קבוע; (4) שכר עבודה לעובדי החברה והלוואה לצורך תשלום שכר עבודה; (5) סכומי מס הכנסה בגין שכר עבודה שנוכו במקור וטרם שולמו; (6) החובות המפורטים להלן, והם יהיו שווים זה לזה במעלה וישולמו במלואם (ואם אין בנכסים כדי תשלום מלא של כולם יופחתו התשלומים בשיעור שווה): (א) תשלומי חובה שהגיעו מאת החברה בתאריך הקובע (קרי, תאריך צו הפירוק או תאריך תחילת הפירוק) והיא נתחייבה בהם, או שזמן פרעונם הגיע תוך שנים עשר החדשים שקדמו לאותו תאריך (״תשלומי חובה״ - מסים עירוניים, מסים של מועצות מקומיות, תרומות שהן בבחינת מסים על-פי פקודת העדות הדתיות (ארגונן) ואגרות המשתלמות לרשם החברות על-פי פקודת החברות); (ב) מסים המשתלמים לאוצר המדינה שנישומו והוטלו על החברה עד 31 בדצמבר האחרון שלפני התאריך הקובע וסך כולם אינו עולה על השומה של שנה אחת ומסים אחרים המשתלמים לאוצר המדינה שהחברה נתחייבה בהם, או שזמן פרעונם הגיע, במשך שנים עשר החדשים שקדמו לאותו תאריך; (ג) דמי שכירות של שנה אחת, לכל היותר, שלפני התאריך הקובע, המגיעים למשכיר בעד בתים וקרקעות ששכרה החברה; (7) חובות המובטחים בשעבוד צף שהתגבש עם פירוק החברה; (8) חובות לנושים כלליים; (9) בעלי המניות בחברה.

בהתאם לפקודת החברות, כל פעולה בנכסי חברה, אשר אילו נעשתה בידי יחיד בפשיטת רגל היו רואים אותה כהעדפת מרמה, הרי שהיא תחשב כהעדפת מרמה של נושה בפירוק

החברה ולכן לא יהיה לה תוקף. פעולה או עסקה כלשהי תחשב כהעדפת מרמה אסורה, ועל כן בלתי תקפה, בהתקיים ארבעת התנאים הבאים במצטבר: (1) החברה מצויה בפירוק; (2) בזמן שנעשתה הפעולה או העסקה, החברה לא הייתה מסוגלת לפרוע את חובותיה בהגיע מועד פירעונם; (3) הפעולה או העסקה נעשו על-מנת להעדיף נושה אחד על-פני אחרים (או מתוך אילוץ או שידול שלא כדין); (4) הפעולה או העסקה נעשו בתקופה של שלושת החודשים שקדמו להגשת בקשת הפירוק.

[ב]    הדין באיי הבתולה הבריטיים

[1]    בעת פירוק בחדלות פירעון של חברה, נכסי החברה ימומשו בהתאם לסדר העדיפויות שלהלן: (א) בעדיפות על פני כל יתר התביעות - תשלום העלויות וההוצאות שנגרמו כדין בפירוק בהתאם לסדר העדיפות שנקבע; (ב) לאחר תשלום העלויות וההוצאות של הפירוק, תשלום התביעות העדיפות שאושרו על-ידי המפרק (שכר ומשכורות, סכומים למועצה לביטוח לאומי באיי הבתולה הבריטיים, תגמולי ביטוח, מיסים ממשלתיים) – תביעות עדיפות מדורגות באופן שווה בינן לבין עצמן וכן, אם נכסי החברה אינם מספיקים לצורך תשלום התביעות במלואן, הן תשולמנה באופן יחסי; (ג) לאחר תשלום התביעות העדיפות, תשלום כל יתר התביעות שאושרו על-ידי המפרק, לרבות תביעות של נושים בלתי מובטחים – תביעות הנושים הבלתי מובטחים של החברה תדורגנה באופן שווה בינן לבין עצמן, ואם נכסי החברה אינם מספיקים לצורך תשלום התביעות במלואן, נושים בלתי מובטחים כאמור יקבלו תשלום באופן יחסי; (ד) לאחר תשלום כל התביעות שאושרו במלואן, תשלום הריביות המשולמות בהתאם לחוק חדלות הפירעון של איי הבתולה הבריטיים; ולבסוף (ה) כל נכס עודף שיישאר לאחר תשלום העלויות, ההוצאות והתביעות שלעיל יחולק לבעלי המניות בהתאם לזכויותיהם ולעניין שלהם בחברה. החלק השמיני לחוק חדלות הפירעון קובע פעולות שונות שמפרק רשאי לבצע בכדי להפריש עסקאות שהביאו לצמצום הנכסים העומדים לרשות הנושים.

[2]    מינוי מפרק לנכסי החברה לא ישפיע על זכותו של נושה מובטח לתפוס בעלות ולממש או להתמודד בצורה אחרת עם נכסי החברה המהווים בטוחה לנושה כאמור. בהתאם, נושה מובטח רשאי לאכוף את הבטוחה שלו במישרין ומבלי להזדקק למפרק, תוך מתן עדיפות לסדר התשלומים המתואר בס"ק [1] לעיל. יחד עם זאת, ככל שנכסיה של חברה בפירוק הזמינים לתשלום תביעות נושים בלתי מובטחים אינם מספיקים לתשלום העלויות וההוצאות של הפירוק והנושים העדיפים, הרי שלעלויות, הוצאות ותביעות כאמור תינתן עדיפות על פני תביעות של בעלי שעבוד בגין נכסים הכפופים לשעבוד צף שנוצר על-ידי החברה ואשר תשולמנה בהתאם מתוך נכסים כאמור.

במקרה של חברה בחדלות פירעון, קיימים ארבעה סוגי עסקאות הניתנות לביטול, אשר נקבעו בחוק חדלות הפירעון:

(א)    **העדפה בלתי הוגנת** – בהתאם לסעיף 245 לחוק חדלות פירעון, עסקה בה התקשרה החברה, אם נכנסה לתוקף ב"תקופת המגבלות" (Hardening Period), כהגדרתה להלן, אם בעת ההתקשרות החברה הייתה חדלת פירעון, או אם העסקה הביאה את החברה לחדלות פירעון (**"עסקה בחדלות פירעון"**), ואשר כתוצאה ממנה הנושה מצוי בעמדה טובה יותר מהעמדה בה היה בלא העסקה, תיחשב כהעדפה בלתי הוגנת וכמבוטלת. עסקה אינה בגדר העדפה בלתי הוגנת אם התקיימה במהלך העסקים הרגיל. יצוין כי סעיף זה יחול גם אם התשלום או ההעברה בוצעו כנגד תמורה שוות ערך או בשווי חסר.

(ב)    **עסקאות בשווי בחסר** – בהתאם לסעיף 246 לחוק חדלות פירעון, הענקת מתנה או התקשרות בעסקה ללא תמורה, או אם שווי התמורה בגין העסקה, בכסף או בשווה כסף, נמוך באופן משמעותי מהשווי בכסף או בשווה כסף של התמורה שניתנה על-ידי החברה, תיחשב (אם מדובר בעסקה בחדלות פירעון שנכנסה לתוקף בתקופת המגבלות) כעסקה בשווי חסר. לא יראו חברה כאילו התקשרה בעסקה בשווי חסר אם התקשרה בה בתום לב ולצרכים עסקיים, ואם בעת ההתקשרות בעסקה, היו סיבות סבירות להאמין שהעסקה הינה לטובת החברה.

(ג)    **שעבודים צפים ברי ביטול** – בהתאם לסעיף 247 לחוק חדלות פירעון, שעבוד צף שנוצר על-ידי החברה ניתן לביטול אם מדובר בעסקה בחדלות פירעון שנוצרה בתוך תקופת המגבלות. שעבוד צף אינו ניתן לביטול אם הוא נועד להבטיח : (1) כסף שהועבר או שולם לחברה, או לפי שיקול דעתה, במקביל או לאחר יצירת השעבוד ; (2) סכום של התחייבות כלשהי של החברה שבוטלה או הופחתה במקביל או לאחר יצירת השעבוד ; (3) שווי נכסים שנמכרו או סופקו, או שירותים שניתנו לחברה במקביל או לאחר יצירת השעבוד ; ו-(4) הריבית, אם בכלל, ששולמה על חשבון הסכומים שנזכרים בס״ק (1) – (3) בהתאם להסכם לפיו כסף הועבר או שולם, ההתחייבות בוטלה או הופחתה, הנכסים נמכרו או סופקו, או השירותים סופקו.

(ד)    **עסקאות אשראי מופקעות** – בהתאם לסעיף 248 לחוק חדלות פירעון, עסקה בחדלות פירעון בה התקשרה חברה לשם קבלת אשראי לחברה או עסקה כאמור הכרוכה במתן אשראי לחברה, יכול שתיחשב כעסקת אשראי מופקעת אם, בהתחשב בסיכון שנוטל על עצמו האדם המספק את האשראי, תנאי העסקה הינם או היו כאלו המחייבים ביצוע תשלומים מופקעים בעליל בגין מתן האשראי, או אם העסקה סותרת באופן בוטה עקרונות מקובלים של מסחר הוגן, ועסקה כאמור מתבצעת בתוך תקופת המגבלות.

״תקופת המגבלות״ (״Hardening Period״) הידועה בחוק חדלות פירעון כ״תקופת הפגיעות״ (״Vulnerability period״) ביחד לעסקאות הניתנות לביטול המפורטות לעיל, הינה כדלקמן :

(1)    למטרות סעיפים 245, 246 ו-247 לחוק חדלות פירעון התקופה משתנה בתלות בשאלה האם האדם, או האנשים, עמם התקשרה החברה בעסקה, או אשר להם ניתנה ההעדפה, נחשבים ״אנשים קשורים״ לחברה כמשמעות המונח בחוק חדלות פירעון :

(א)    במקרה של ״אנשים קשורים״ ״תקופת המגבלות״ הינה התקופה המתחילה שנתיים קודם ל״מועד הקובע לחדלות הפירעון״ ומסתיימת עם מינוי המפרק לחברה ; ו-

(ב)    במקרה של אנשים אחרים, ״תקופת המגבלות״ הינה התקופה המתחילה שישה חודשים קודם ל״מועד הקובע לחדלות הפירעון״ ומסתיימת עם מינוי של מפרק לחברה ; ו-

(2)    למטרת סעיף 248 לחוק חדלות פירעון ״תקופת המגבלות״ הינה התקופה המתחילה חמש שנים קודם ל״מועד הקובע לחדלות הפירעון״ ומסתיימת עם מינוי המפרק לחברה מבלי להתחשב בשאלה האם האנשים עמם התקשרה החברה הינם ״אנשים קשורים״.

״המועד הקובע לחדלות פירעון״ למטרות אלה הינו המועד שבו הוגשה בקשה למינוי מפרק (אם הפרק מונה על-ידי בית המשפט) או המועד של מינוי המפרק (אם המפרק מונה על-ידי החברים).

[3]   העברת נכסים המתבצעת על-ידי אדם מתוך כוונה להונות נושים ניתנת לביטול במקרה שאדם נפגע בעטיה. אין כל דרישה כי בעת ההתקשרות בעסקה הרלוונטית צד אחד הינו חדל פירעון או הפך לחדל פירעון כתוצאה מהעסקה, ואין כל דרישה שהצד המעביר ייכנס לאחר מכן לפירוק. יחד עם זאת, לא ניתן לתקוף העברה כאמור אם בוצעה כנגד תמורה בעלת ערך ובתום לב עם אדם שלא היה מודע לכוונה להונות.

5.5   **חוות דעת של יועציה המשפטיים של החברה באיי הבתולה הבריטיים לעניין השוואת הדינים**

להלן מובאת חוות דעת של יועציה המשפטיים של החברה באיי הבתולה הבריטיים לעניין השוואת הדינים בין הדין הישראלי לבין דיני איי הבתולה הבריטיים:



Our ref: CMO/857353-000001/41869725v1

To the Addressees named in the Schedule

26 November 2025

Dear Sirs

**SIMAD Holdings Ltd.** (the "**Company**")

We have acted as counsel as to British Virgin Islands law to the Company in connection with the filing and publication of a supplementary prospectus and a supplementary notice under Israeli Securities laws and have been asked to render a legal opinion on certain matters and provisions of British Virgin Islands ("**BVI**") company law.

Having regard to such legal considerations as we deem relevant, we are of the opinion as follows:

### Summary of BVI company law

The Company is incorporated in the BVI under the BVI Business Companies Act (As Revised) (the "**Act**") and is subject to BVI law.  Set out below is a summary of certain provisions of BVI company law. The summary does not purport to contain all applicable qualifications and exceptions or to be a complete review of all matters of BVI company law and taxation, which may differ from equivalent provisions in jurisdictions with which interested parties may be more familiar.

### 1       Incorporation, Registered Office and Registered Agent

1.1     According to the provisions of the Act, a certificate of incorporation issued by the Registrar of Corporate Affairs is conclusive evidence that all the requirements of the Act as to incorporation have been complied with and that the Company is incorporated as from the date specified in the certificate of incorporation.

1.2     To maintain the Company in good standing with the Registrar of Corporate Affairs under the laws of the BVI, annual filing fees must be paid and returns made to the Registrar of Corporate Affairs within the time frame prescribed by law.

1.3     The Company shall, at all times, have a registered office in the BVI.

1.4     Every company registered in the BVI must have a registered agent present in the BVI. A person shall not act or agree to act as the registered agent of a company incorporated in the BVI unless, among other things, such person holds a licence under the Company Management Act (As

**Maples and Calder**
6th Floor  DUO  280 Bishopsgate  London  EC2M 4RB  England
Tel +44 20 7466 1600   Fax +44 20 7466 1700   **maples.com**

Registered in England and Wales No. 03369233. Registered office: 6th Floor  DUO  280 Bishopsgate  London EC2M 4RB  England

Revised) or the Banks and Trust Companies Act (As Revised), that authorises it to provide registered agent services.

## 2      Shares

2.1     Subject to the Act and to the company's memorandum or articles of association, shares in a company may be issued, and options to acquire shares in a company granted, at such times, to such persons, for such consideration and on such terms as the directors may determine.

2.2     A statement of the maximum number of shares that the company is authorised to issue or that the company is authorised to issue an unlimited number of shares, and the classes of shares that the company is authorised to issue, and – if the company is authorised to issue two or more classes of shares - the rights, privileges, restrictions and conditions attaching to each class of shares, must be included in the company's memorandum of association.

2.3     Shares may be issued for consideration which is in whole or in part in any form, including money, a promissory note, or other written obligation to contribute money or property, real property, personal property (including goodwill and know-how), services rendered or a contract for future services. The consideration for the issuance of a share with par value shall not be less than the par value of the share.

2.4     If shares are to be issued by a company for a consideration which is in whole or in part other than money, then the directors are required to pass a resolution stating: (a) the amount to be credited for the issue of the shares; and (b) that, in their opinion, the present cash value of the non-money consideration and money consideration, if any, for the issue is not less than the amount to be credited for the issue of the shares.

2.5     Subject to the company's memorandum or articles of association, a company may issue bonus shares, partly paid shares and nil paid shares. Subject to the company's memorandum or articles of association, a bonus share issued by the company is deemed to have been fully paid for on issue.

## 3      Transfer of Shares

3.1.    Under the Act the transfer of a registered share which is not listed on a recognised exchange is by a written instrument of transfer signed by the transferor and containing the name of the transferee. However, the instrument must also be signed by the transferee if registration would impose a liability on the transferee to the company. The instrument of transfer must be sent to the company for registration. Subject to the company's memorandum or articles of association the company shall on receipt of an instrument of transfer enter the name of the transferee of the share in the register of members unless the directors resolve to refuse or delay registration of the transfer for reasons that should be specified in a resolution of directors. The transfer of a registered share is effective when the name of the transferee is entered in the register of members. The entry of the name of a person in the company's register of members is prima facie evidence that legal title in the share vests in that person.

3.2     The procedure is different for the transfer of shares that are listed on a recognised exchange.  Such shares may be transferred without the need for a written instrument of transfer if the transfer is carried out in accordance with the laws, rules, procedures and other requirements applicable to shares listed on the recognised exchange and subject to the company's memorandum and articles of association.

2

**4       Financial Assistance to Purchase Shares of a Company**

The Act specifically provides that, subject to the memorandum and articles of association of the company, a company may give financial assistance to any person in connection with the acquisition of the company's own shares.

**5       Purchase of Shares and Warrants by a Company and its Subsidiaries**

5.1     The Act provides that a company may purchase, redeem or otherwise acquire its own shares, either in accordance with the procedures set out in the Act, or any other procedure as provided for in the company's memorandum and articles of association. The statutory provisions do not apply to a company to the extent that they are negated, modified or inconsistent with the provisions contained in a company's memorandum and articles of association. A company may acquire its own fully paid share or shares for no consideration by way of surrender of the share or shares to the company by the person holding the share or shares. Any such surrender of a share or shares shall be in writing and signed by the person holding the share or shares.

5.2     Under the statutory provisions, the directors may make an offer to purchase, redeem or otherwise acquire the shares in a company provided that the offer is either made: (a) to all members and would, if successful, leave the relative voting and distribution rights unaffected, and affords each member a reasonable opportunity to accept the offer; or (b) to one or more members and consented to in writing by all members, or otherwise permitted by the memorandum or articles of association.  Where the offer is to one or more members, the directors must have passed a resolution to the effect that in their opinion the purchase, redemption or other acquisition would (y) benefit the remaining members, and (z) that the proposed offer is fair and reasonable to the company and the remaining members.  A member may apply to the BVI High Court for an order restraining the proposed purchase, redemption or other acquisition on the grounds that (i) the purchase, redemption or other acquisition is not in the best interests of the remaining members; or (ii) the terms of the offer and the consideration offered for the shares are not fair and reasonable to the company or the remaining members.

5.3     Subject to the memorandum and articles of association of the company and the Act, a company may only acquire its own shares if the directors, by resolution of directors are satisfied, on reasonable grounds, that a company will, immediately after the distribution, satisfy the solvency test i.e. that the value of the company's assets exceeds its liabilities and the company is able to pay its debts as they fall due.

5.4     A share in the company can be redeemed otherwise than at the option of the company if such share is redeemable at the option of the member and the member gives proper notice to the company of his intention to redeem the share.

5.5     Under BVI law a company may hold shares that have been purchased, redeemed or otherwise acquired as treasury shares if the memorandum or articles of association of the company do not prohibit it from holding treasury shares; the directors resolve that shares to be purchased, redeemed or otherwise acquired shall be held as treasury shares; and the number of shares purchased, redeemed or otherwise acquired, when aggregated with shares of the same class already held by the company as treasury shares, does not exceed 50% of the shares of that class previously issued by the company, excluding shares that have been cancelled. All the rights and obligations attaching to a treasury share are suspended and cannot be exercised by or against the company while it holds a share as a treasury share.

5.6     A company is not prohibited from purchasing and may purchase its own warrants subject to and in accordance with the terms and conditions of the relevant warrant instrument or certificate. There is no requirement under BVI law that a company's memorandum or articles of association contain a specific provision enabling such purchases and the directors of a company may rely upon the general power contained in its memorandum of association.

CMO/857353-000001/41869725v1

## 6        Dividends and Distributions

6.1      Subject to the memorandum and articles of association of the company, the directors of a company may, by resolution of directors, authorise a distribution by the company to members at such time and of such an amount, as the directors think fit if they are satisfied, on reasonable grounds, that the company will, immediately after the distribution, satisfy the solvency test.  A company satisfies the solvency test if (a) the value of the company's assets exceeds its liabilities, and (b) the company is able to pay its debts as they fall due.  The resolution of the directors must contain a statement that, in the opinion of the directors, the company will, immediately after the distribution, satisfy the solvency test.

6.2      Authorities from English case law, which are treated as highly persuasive by the BVI High Court but are not binding on it, provide guidance on the meaning of a company being "able to pay its debts as they fall due".  Once such case is *BNY Corporate Trustee Services Ltd. v Eurosail-UK Plc*[1] which held that a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) was the applicable test and that the burden of proof must be on the party which asserted balance-sheet insolvency.  The test would involve an analysis of the overall context and facts applicable to the company in question.  As per the case of *Re Cheyne Finance plc (in receivership)*[2], consideration should be given to debts falling due in the future.  In that case it was held that cash flow insolvency should not be ascertained purely by looking at debts presently due, but that it is possible to take into account known future debts falling due in the immediate future.  The court considered that the words "as they fall due" suggested an element of futurity such that both debts presently due and those falling due in the immediate future are likely to be relevant to determining whether a company is able to pay its debts.  In addition, *Re a Company (No 006794 of 1983)*[3] held that the fact that the company can only pay its debts using borrowed money does not necessarily mean that it is unable to pay its debts, although if it has persistently failed or neglected to pay them until forced to do so then, in an appropriate case, the court can find that it is unable to pay its debts.

6.3      Distribution, in relation to a distribution by a company limited by shares to a member, means (a) the direct or indirect transfer of an asset, other than the company's own shares, to or for the benefit of the member, or (b) the incurring of a debt to or for the benefit of a member, in relation to shares held by a member, and whether by means of the purchase of an asset, the purchase, redemption or other acquisition of shares, a transfer of indebtedness or otherwise, and includes a dividend.

6.4      A distribution made to a member at a time when the company did not, immediately after the distribution, satisfy the solvency test may be recovered by the company from the member unless: (a) the member received it in good faith and without knowledge of the company's failure to satisfy the solvency test; (b) the member has altered its position in reliance on the validity of the distribution; and (c) it would be unfair to require repayment in full or at all.  If, after a distribution is authorised and before it is made, the directors cease to be satisfied on reasonable grounds that a company will, immediately after the distribution is made, satisfy the solvency test, any distribution made by the company is deemed not to have been authorised.  If  a distribution is deemed not to have been authorised a director who (a) ceased, after authorisation but before the making of the distribution, to be satisfied on reasonable grounds for  believing  that  the company would satisfy the solvency test immediately after distribution is made; and (b) failed to take reasonable steps to prevent the distribution being made, is personally liable to the company to repay to the company so much of the distribution as is not recovered from members.

---

[1] *2007-3BL Plc* [2013] UKSC 28

[2] [2007] EWHC 2402 (Ch)

[3] [1986] BCLC 261

4

6.5     If, in an action brought against a director or member under the aforementioned paragraph, the BVI High Court is satisfied that the company could, by making a distribution of a lesser account, have satisfied the solvency test, the Court may (a) permit the member to retain; or (b) relieve the director from liability in respect of, an amount equal to the value of any distribution that could properly have been made.

## 7       Rights of Members and Protection of Minorities

7.1     Under the provisions of the Act the memorandum and articles of association of a company are binding as between the company and its members and between the members.  In general, members are bound by the decision of the majority or special majorities as set out in the articles of association or in the Act.  As for voting, the usual rule is that with respect to normal commercial matters members may act from self-interest when exercising the right to vote attached to their shares[4].

7.2     If the majority members have infringed a minority member's rights, the minority may seek to enforce its rights either by derivative action or by personal action.  A derivative action concerns the infringement of the company's rights where the wrongdoers are in control of the company and are preventing it from taking action, whereas a personal action concerns the infringement of a right that is personal to the particular member concerned.

7.3     The Act provides for a series of remedies available to members.  Where a company incorporated under the Act conducts some activity which breaches the Act or the company's memorandum and articles of association, the BVI High Court can issue a restraining or compliance order.  Members can now also bring derivative, personal and Representative Actions[5] under certain circumstances.

7.4     The traditional English basis for members' remedies have also been incorporated into the Act: where a member of a company considers that the affairs of the company have been, are being or are likely to be conducted in a manner likely to be oppressive, unfairly discriminating or unfairly prejudicial to him, he may apply to the BVI High Court for an order on such conduct.

7.5     Any member of a company may apply to the BVI High Court for the appointment of a liquidator for the company and the Court may appoint a liquidator for the company if it is of the opinion that it is just and equitable to do so.

7.6     The Act provides that any member of a company is entitled to payment of the fair value of his shares upon dissenting from any of the following:

(a)     a merger;

(b)     a consolidation;

(c)     any sale, transfer, lease, exchange or other disposition of more than 50 per cent in value of the assets or business of the company if not made in the usual or regular course of the business carried on by the company but not including (i) a disposition pursuant

---

[4] There is a line of authorities that suggests that in certain circumstances, notably the exercise of a power to amend constitutional documents or alter voting rights, a majority member must act in good faith for the benefit of the Company as a whole (the burden of proof being upon the person who challenges the amendment) and failure to do so can lead to the amendment being invalidated: see *Citco Banking Corp. NV v Pusser's Ltd* [2007] UKPC 13; *Shuttleworth v. Cox Bros & Co (Maidenhead) Ltd and Ors* [1927] 2 KB 9 (CA); and most recently the English Court of Appeal case of *Arbuthnott v Bonnyman* [2015] ALL ER (D) 218 which illustrates the current approach of the Courts.

[5] Under the Act, a Representative Action is described as follows "Where a member of a company brings proceedings against the company and other members have the same or substantially the same interest in relation to the proceedings, the Court may appoint that member to represent all or some of the members having the same interest and may, for that purpose, make such order as it thinks fit including an order (a) as to the control and conduct of the proceedings; (b) as to the costs of the proceedings; and (c) directing the distribution of any amount ordered to be paid by the defendant in the proceedings among the members represented".  As such this action is only available to members and not any other party such as creditors.

5

to an order of the court having jurisdiction in the matter; (ii) a disposition for money on terms requiring all or substantially all net proceeds to be distributed to the members in accordance with their respective interest within one year after the date of disposition; or (iii) a transfer pursuant to the power of the directors to transfer assets for the protection thereof;

(d)     a redemption of 10 per cent, or fewer, of the issued shares of the company required by the holders of 90 percent, or more, of the shares of the company pursuant to the terms of the Act; and

(e)     an arrangement, if permitted by the BVI High Court.

7.7     Generally any other claims against a company by its members must be based on the general laws of contract or tort applicable in the BVI or their individual rights as members as established by the company's memorandum and articles of association.

7.8     The Act provides that if a company or a director of a company engages in, proposes to engage in or has engaged in, conduct that contravenes the Act or the memorandum or articles of association of the company, the BVI High Court may, on the application of a member or a director of the company, make an order directing the company or director to comply with, or restraining the company or director from engaging in conduct that contravenes the Act or the memorandum or articles of association.

## 8     Management

8.1     The Act provides that the business and affairs of a company shall be managed by, or under the direction or supervision of, the directors of the company.  The directors of a company have all the powers necessary for managing, and for directing and supervising, the business and affairs of the company.

8.2     The Act provides that, subject to the memorandum or articles of association of a company, any sale, transfer, lease, exchange or other disposition, other than a mortgage, charge or other encumbrance or the enforcement thereof, of more than 50 per cent in value of the assets of the company, if not made in the usual or regular course of the business carried on by the company, must be approved by a resolution of members.  The Act contains no other specific restrictions on the power of directors to dispose of assets of a company.

8.3     Fiduciary duties of directors have been enshrined in the Act, giving statutory standing to the duties to act honestly and in good faith, in what the relevant director believes to be the best interests of a company.  The Act also permits a director of a subsidiary company to exercise his duty by acting in the best interests of a holding company, even though it may not be in the best interests of the company of which he is a director (if so authorised by the memorandum or articles of association and – where the company is not a wholly-owned subsidiary – with the prior agreement of the members).

8.4     The Act reflects the English common law duties of due care, diligence and skill and imposes on directors the duty to act for a proper purpose and not in a manner which contravenes either the Act or the company's memorandum or articles of association.

8.5     See paragraph 11 below in relation to conflicts of interest.

## 9     External Directors

There is no requirement under the Act for a company to appoint external directors/non-executive directors to the board of a company.  The Act does not distinguish between a company's directors and independent directors.

6

**10      Chairman of the Board Serving as CEO**

Subject to the company's memorandum and articles of association and the Act in respect of matters related to disclosure of interests, there is no prohibition in the Act which prevents an individual acting as Chairman and CEO of a BVI company.

**11      Transactions with Related Parties and Conflicts of Interest**

11.1    Directors must not place themselves in a position in which there is a conflict between their duty to the company and their personal interests.  This means that, strictly speaking, a director should not participate in a decision in circumstances where he has a potential conflict.  That is, he should declare his interest and abstain.  The Act provides that a director "*shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the company, disclose the interest to the board of the company*".  The failure of a director to so disclose an interest does not affect the validity of a transaction entered into by the director or the company, provided that the director's interest was disclosed to the board prior to the company's entry into the transaction or was not required to be disclosed (for example where the transaction is between the company and the director himself or is otherwise in the ordinary course of business and on usual terms and conditions).  Typically a BVI company's memorandum and articles of association will allow a director interested in a particular transaction to vote on it, attend meetings at which it is considered, and sign documents on behalf of the company which relate to the transaction.

11.2    Under BVI law, a transaction entered into by the company in respect of which a director is interested will not be voidable by the company where the members have approved or ratified the transaction in knowledge of the material facts of the interest of the director in the transaction, or if the company received fair value for the transaction.

11.3    Broadly speaking, the duties that a director owes to a company may be divided into two categories. The first category encompasses fiduciary duties, that is, the duties of loyalty, honesty and good faith. The second category encompasses duties of skill and care. Each is considered in turn below.

11.4    A director's fiduciary duties can be summarised as follows:

(a)      Bona Fides: The directors must act bona fide in what they consider is in the best interests of the company (or, if permitted as above, that company's parent company).

(b)      Proper Purpose: The directors must exercise the powers that are vested in them for the purpose for which they were conferred and not for a collateral purpose.

(c)      Unfettered Discretion: Since the powers of the directors are to be exercised by them in trust for the company, they should not improperly fetter the exercise of future discretion.

(d)      Conflict of Duty and Interest: see paragraph 11.1 above.

11.5    In addition to their fiduciary duties a director has the duties of care, diligence and skill which are owed to the company itself and not, for example, to individual members (subject to the limited exceptions as to enforcement on behalf of the company).

**12      Alternate Directors**

12.1    Subject to the memorandum and articles of association of a company, a director of the company may appoint as an alternate any other director or any other person who is not disqualified for appointment as a director under the Act to (a) exercise the appointing director's powers, and (b) carry out the appointing director's responsibilities, in relation to the taking of decisions by the directors in the absence of the appointing director.

7

12.2 The appointing director may, at any time, terminate the alternate's appointment. The appointment of an alternate director and its termination shall be in writing and written notice of the appointment and termination shall be given by the appointing director to the company (a) within such period as may be specified in the memorandum or articles of association; or (b) if no period is specified in the memorandum or articles of association, as soon as reasonably practicable.

12.3 The termination of the appointment of an alternate director does not take effect until written notice of the termination has been given to the company.

12.4 An alternate director has no power to appoint an alternate, whether of the appointing director or of the alternate director; and does not act as an agent of or for the appointing director.

12.5 An alternate director has the same rights as the appointing director in relation to any directors' meeting and any written resolution circulated for written consent. Any exercise by the alternate director of the appointing director's powers in relation to the taking of decisions by the directors, is as effective as if the powers were exercised by the appointing director. An alternate director is liable for his own acts and omissions as an alternate director and Division 3 of Part VI of the Act applies to a person appointed as an alternate director, when acting as such.

## 13 Audit Committee

13.1 There is no requirement under the Act for a company to appoint an audit committee.

## 14 Remuneration Committee

There is no requirement under the Act for a company to appoint a remuneration committee.

## 15 Limitation on Appointment and Termination of Position as Company Directors and Officers

15.1 A person shall not be appointed as director or alternate director of a company, or nominated as a reserve director[6], unless, he has consented in writing to be a director or alternate director or to be nominated as a reserve director.

15.2 The Act states that the following are disqualified for appointment as the director of a company:

(a) an individual who is under eighteen years of age;

(b) a person who is a disqualified person within the meaning of section 260(4) of the Insolvency Act (As Revised) (the "**Insolvency Act**");

(c) a person who is a restricted person within the meaning of section 409 of the Insolvency Act;

(d) an undischarged bankrupt; and

(e) a person who, in respect of a particular company, is disqualified by the memorandum or articles from being a director of the company.

15.3 A director of a company shall resign forthwith if he is, or becomes, disqualified to act as director pursuant to the above.

---

[6] Where a company has only one member who is an individual and that member is also the sole director of the company, notwithstanding anything contained in the memorandum or articles, that sole member/director may, by instrument in writing, nominate a person who is not disqualified from being a director of the company under the Act as a reserve director of the company to act in the place of the sole director in the event of his death.

8

15.4   There is no requirement under the Act for a company to appoint officers. It is at the discretion of a BVI company whether they wish to appoint officers of the company. The Act does not contain provisions for disqualification for appointment or removal as officer of a BVI company.

## 16   Remuneration Policy

16.1   Members or, subject to the memorandum and articles of association of a company, the directors of the company may fix the emoluments of directors in respect of services to be rendered in any capacity to the company.

16.2   There is no requirement under the Act for a company to maintain a remuneration policy for directors and/or officers.

## 17   Indemnification

BVI law does not limit the extent to which a company's articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the BVI High Court to be contrary to public policy (e.g. for purporting to provide indemnification against the consequences of committing a crime). An indemnity will be void and of no effect and will not apply to a person unless the person acted honestly and in good faith and in what he believed to be in the best interests of the company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

## 18   Insurance

Under the Act, the company may purchase and maintain insurance in relation to any person who is or was a director of the company, or who at the request of the company is or was serving as a director of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the company has or would have had the power to indemnify the person against liability.  For the avoidance of doubt the company may purchase and maintain insurance in relation to any employee or officer of the company against any liability asserted against the employee or officer and incurred by the employee or officer in that capacity, whether or not the company has or would have had the power to indemnify the person against liability.

## 19   Internal and External Auditor

There is no requirement under the Act for a company to appoint an internal auditor.  There is also no requirement under the Act for a company to appoint an external auditor unless the company is a public mutual fund or is carrying out certain activities within the BVI which require the company to be licensed and have an auditor e.g. insurance company.  It is at the discretion of the directors of a BVI company whether they should call for the company's accounts to be audited.

## 20   Accounting Requirements and Financial Records

20.1.   The Act also requires every company:

(a)   to keep at the office of its registered agent or at such other place or places as the directors may determine, the records and underlying documentation[7] of the company;

---

[7] "Records and underlying documentation" includes accounts and records (such as invoices, contracts and similar documentation) in relation to (i) all sums of money received and expended by the company and the matters in respect of which the receipt and expenditure takes place; (ii) all sales and purchases of goods by the company; and (iii) the assets and liabilities of the company.

9

(b)    to retain the records and underlying documentation for a period of at least five years from the date:

(i)    of completion of the transaction to which the records and underlying documentation relate; or

(ii)    the company terminates the business relationship[8] to which the records and underlying documentation relate;

(c)    to provide its registered agent without delay any records and  underlying documentation in respect of the company that the registered agent requests where the registered agent has been required to do so by the BVI Financial Services Commission or any other competent authority in the BVI acting pursuant to the exercise of a power under an enactment;

(d)    to ensure that the records and underlying documentation of the company shall be in such form as:

(i)    are sufficient to show and explain the company's transactions; and

(ii)    will, at any time, enable the financial position of the company to be determined with reasonable accuracy;

(e)    where the records and underlying documentation are kept at a place or places other than at the office of the company's registered agent, to provide the registered agent with:

(i)    a written record of the physical address of the place at which the records and underlying documentation are kept; and

(ii)    a written record of the name of the person who maintains and controls the company's records and underlying documentation;

(f)    where the place or places at which the records and underlying documentation of the company, or the name of the person who maintains and controls the company's records and underlying documentation, change, to provide to its registered agent within 14 days of the change:

(i)    the physical address of the new location of the records and underlying documentation; and

(ii)    the name of the new person who maintains and controls the company's records and underlying documentation.

20.2    A company[9] must, in respect of each year, file an annual return with its registered agent.  The annual return shall be filed within 9 months after the end of the year[10] to which the annual return relates and contain such information and be in such form as the Financial Services Commission may prescribe.  Where a company fails to file its annual return as required under the Act, the

---

[8] "Business relationship" means a continuing arrangement between a company and one or more persons with whom the company engages in business, whether on a one-off, regular or habitual basis.

[9] The requirement to prepare and file an annual return does not apply to (i) a listed company, (ii) a company that is regulated under a financial services legislation and provides financial statements to the Financial Services Commission in accordance with the requirements of that financial services legislation; and (c) a company that files its annual tax return to the Inland Revenue Department accompanied by the company's financial statements.

[10] "Year" refers to a calendar year or, if a company's fiscal or financial year is not a calendar year, the company's fiscal or financial year.

10

registered agent shall, not later than 30 days after the annual return was due, notify the British Virgin Islands Registrar of Corporate Affairs in writing.

## 21      Inspection of Corporate Records

21.1    Members of the general public, on payment of a nominal fee, can inspect the public records of a company available at the office of the BVI Registrar of Corporate Affairs ("**Registrar of Corporate Affairs**") which will include the company's Certificate of Incorporation, its memorandum and articles of association (with any amendments) , a list of the names of the current directors and records of licence fees paid to date, and those records will also disclose any articles of dissolution or, articles of merger filed by the company and a register of charges if the company or a chargee has elected to file such a register.

21.2    A member of a company is entitled, on giving written notice to the company, to inspect (a) the memorandum and articles of association; (b) the register of members; (c) the register of directors; and (d) the minutes of meetings and resolutions of members and of those classes of members of which he is a member; and to make copies of or take extracts from the documents and records.  Subject to the memorandum and articles of association, the directors may, if they are satisfied that it would be contrary to the company's interests to allow a member to inspect any document, or part of a document, specified in (b), (c) and (d) above, refuse to permit the member to inspect the document or limit the inspection of the document, including limiting the making of copies or the taking of extracts from the records.

21.3    Where a company fails or refuses to permit a member to inspect a document or permits a member to inspect a document subject to limitations, that member may apply to the BVI High Court for an order that he should be permitted to inspect the document or to inspect the document without limitation.

21.4    A company is required to keep at the office of its registered agent: the memorandum and articles of association of the company; the register of members or a copy of the register of members; the register of directors or a copy of the register of directors; and copies of all notices and other documents filed by the company in the previous ten years.

21.5    Where a company keeps a copy of the register of members or the register of directors at the office of its registered agent, it is required to notify any changes to such registers to the registered agent, in writing, within 15 days of any change; and to provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.  In the event that the place at which the original register of members or the original register of directors is changed, the company is required to provide the registered agent with the physical address of the new location of the records within fourteen days of the change of location.

21.6    A company is also required to keep at the office of its registered agent or at such other place or places, within or outside the BVI, as the directors determine the minutes of meetings and resolutions of members and of classes of members, the minutes of meetings and resolutions of directors and committees of directors and underlying documentation.  Such records must be kept for a period of at least five years, commencing on the date of completion of the transaction to which the records and underlying documentation relate, or the termination of the business relationship to which they relate. If such records are kept at a place other than at the office of the company's registered agent, the company is required to provide the registered agent with a written record of the physical address of the place or places at which the records are kept and to notify the registered agent, within 14 days, of the physical address of any new location where such records may be kept.

21.7    Where a company has created a charge over any of its property, the company must keep a register of charges and enter particulars of the charge in such register. The register of charges or a copy thereof must be kept at the registered office of the company or at the office of its

11

registered agent. Where a change occurs in the relevant charges or in the details of the charges required to be recorded in the company's register of charges the company must, within 14 days of the change occurring, transmit details of the change to its registered agent.

## 22      The Right to Compromise or Settle

There are statutory provisions which facilitate both plans of arrangement and schemes of arrangement.

*Plan of Arrangement*

22.1    In relation to a plan of arrangement, "arrangement" includes:

(a)      an amendment to the memorandum or articles of association;

(b)      a reorganisation or reconstruction of a company;

(c)      a merger or consolidation of one or more companies that are companies registered under the Act with one or more other companies, if the surviving company or the consolidated company is a company incorporated under the Act;

(d)      a separation of two or more businesses carried on by a company;

(e)      any sale, transfer, exchange or other disposition of any part of the assets or business of a company to any person in exchange for shares, debt obligations or other securities of that other person, or money or other assets, or a combination thereof;

(f)      any sale, transfer, exchange or other disposition of shares, debt obligations or other securities in a company held by the holders thereof for shares, debt obligations or other securities in the company or money or other property, or a combination thereof;

(g)      a dissolution of a company; and

(h)      any combination of any of the things specified in paragraphs (a) to (g).

22.2    A plan of arrangement must be approved by a resolution of directors of the company and application made to the BVI High Court for approval of the proposed arrangement.

22.3    In the event that the BVI High Court makes an order approving a plan of arrangement, the directors of the company, if they are still desirous of executing the plan, shall confirm the plan of arrangement as approved by the Court whether or not the Court has directed any amendments to be made thereto.

22.4    The directors of the company, upon confirming the plan of arrangement shall (a) give notice to the persons to whom the order of the BVI High Court requires notice to be given; and (b) submit the plan of arrangement to those person for such approval, if any, as the Court requires.

22.5    After the plan of arrangement has been approved by those persons by whom the order of the BVI High Court may require approval, articles of arrangement shall be executed by the company and shall contain (a) the plan of arrangement, (b) the order of the Court approving the plan of arrangement; and (c) the manner in which the plan of arrangement was approved, if approval was required by the order of the BVI High Court. The articles of arrangement shall be filed with the Registrar of Corporate Affairs who shall register them. Upon registration of the articles of arrangement, the Registrar of Corporate Affairs shall issue a certificate in the approved form certifying that the articles of arrangement have been registered.

CMO/857353-000001/41869725v1

22.6    An arrangement is effective on the date the articles of arrangement are registered by the Registrar of Corporate Affairs or such date subsequent thereto, not exceeding thirty days, as is stated in the articles of arrangement.

22.7    A voluntary liquidator of the company may approve a plan of arrangement if a company is in liquidation, in which case the voluntary liquidator will carry out the functions of the director listed above and will be subject to such other modifications as are appropriate.

*Scheme of Arrangement*

22.8    Where a compromise or arrangement (which includes a reorganisation of the company's share capital by the consolidation of shares of different classes or by the division of shares into shares of different classes, or by both of those methods) is proposed between a company and its creditors, or any class of them, or between the company and its members, or any class of them, the BVI High Court may, on the application of (a) the company, (b) a creditor of the company, (c) a member, (d) the administrator, (e) the liquidator, order a meeting of the creditors or class of creditors, or of the members or class of members, as the case may be, to be summoned in such manner as the Court directs.

22.9    If a majority in number representing 75% in value of the creditors or class of creditors or members or class of members, as the case may be, present and voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement, if sanctioned by the BVI High Court, is binding on all the creditors or class of creditors, or the members or class of members, as the case may be, and also on the company or, in the case of a company in voluntary liquidation or in liquidation under the Insolvency Act, on the liquidator and on every person liable to contribute to the assets of the company in the event of its liquidation.

22.10   An order of the BVI High Court made as above shall have no effect until a copy of the order has been filed with the Registrar of Corporate Affairs.

## 23    Compulsory Acquisition

Subject to the memorandum or articles of association of a company, members of the company holding 90 per cent of the votes of the outstanding shares entitled to vote may give a written instruction to a company directing the company to redeem the shares held by the remaining members.  Upon receipt of the written instruction, the company is required to redeem the shares specified in the written instruction irrespective of whether or not the shares are by their terms redeemable and give written notice to each member whose shares are to be redeemed stating the redemption price and the manner in which the redemption is to be effected.  In such circumstances minority members can dissent from the acquisition and are entitled to receive payment of the "fair value" of their shares which is assessed on the basis of a statutory appraisal process.

## 24    Enforcement of Foreign Judgments

24.1    No foreign judgment has any direct operation in the BVI, but it may be enforced by action at common law or in the case of judgments from certain jurisdictions by registration under the Foreign Judgments Reciprocal Enforcement Ordinance or the Reciprocal Enforcement of Judgments Act in the BVI.  It should be noted that not every foreign judgment is capable of enforcement.  Some may lend themselves only to recognition by the BVI courts[11]. The Reciprocal Enforcement of Judgments Act (As Revised) and the Foreign Judgments

---

[11] For example, a judgment dismissing a claim (although an adverse costs order may be enforced); a declaratory judgment; and orders relating to the bankruptcy of individuals or the liquidation of companies. The British Virgin Islands court may also recognise a foreign judgment as a defence to an action or recognise it as constituting an assignment of property.

13

(Reciprocal Enforcement) Ordinance (As Revised) does not extend to Israel or the United States of America and thus enforcement by common law is applicable. Under common law, any final and conclusive money judgment for a definite sum obtained against the debtor in the courts of a foreign jurisdiction is treated by the BVI courts as a cause of action for debt itself so that no retrial of the issues is necessary provided that in respect of the foreign judgment:

(a)     the foreign court issuing the judgment had jurisdiction in the matter and the company either submitted to such jurisdiction or was resident or carrying on business within such jurisdiction and was duly served with process;

(b)     the judgment given by the foreign court was not in respect of penalties, taxes, fines or similar fiscal or revenue obligations of the company;

(c)     in obtaining judgment there was no fraud on the part of the person in whose favour judgment was given or on the part of the foreign court;

(d)     recognition or enforcement of the judgment in the BVI would not be contrary to public policy; and

(e)     the proceedings pursuant to which judgment was obtained were not contrary to natural justice.

24.2    Under BVI law a judgement or order for payment of a sum of money other than an order for payment of money into a court may be enforced by (a) a charging order; (b) a garnishee order; (c) a judgement summons; (d) an order for seizure of sale of goods; and (e) the appointment of a receiver.

24.3    A party to a judicial proceeding in a foreign court outside the BVI who has in its favour a non-money judgment, such as a declaratory judgment or an injunction, may, in certain circumstances, be able to enforce that judgment in the courts of the BVI. This would involve that party bringing fresh proceedings in the BVI in which the equitable doctrine of estoppel could be relied upon to obtain summary judgment from the BVI court on the basis that it would be an abuse of process for the claim to be re-litigated. In order to avail itself of the equitable doctrine of estoppel, certain requirements must be met including: (a) the non-money foreign judgment must be based on a cause of action recognised under the law of the BVI; (b) the foreign judicial proceeding must have identical parties and identical issues; (c) the foreign judgment must be rendered by a court with judicial authority; (d) the judgment must be final and conclusive; and (e) the judgment debtor must either have been present in the foreign country at the time the foreign proceedings were commenced, or have submitted to the jurisdiction of the foreign court by voluntarily appearing in the foreign proceedings, or prior to the commencement of those proceedings, agreed to submit to the jurisdiction of the foreign court in respect of the subject matter of the proceedings.

24.4    The BVI court plays a supportive role to facilitate arbitration procedures and will recognise and enforce foreign arbitral awards made in any of the contracting states to the New York Convention under the terms of the Convention.  In addition, pursuant to the Arbitration Act (As Revised) (a) the BVI became a signatory to the New York Convention and (b) the grounds for refusal of enforcement that apply to a New York Convention award also apply to the enforcement of a non-Convention award, and in both cases those grounds are fully incorporated into the Arbitration Act (As Revised) itself.

24.5    The articles of association of a company may provide for any dispute involving the company or the company and its members or the members of the company among themselves, to be settled through arbitration and for such arbitration to be conducted in the BVI pursuant to or in accordance with the Arbitration Act (As Revised) or any subsidiary legislation made thereunder.

14

## 25      Liquidation

25.1    The liquidation of a BVI company may be a voluntary solvent liquidation or a liquidation under the Insolvency Act.  Where a company has been struck off[12] the Register of Companies under the Act, the company is dissolved on the date the Registrar of Corporate Affairs publishes a notice of the striking off in the *British Virgin Islands Gazette*.

*Voluntary Liquidation*

25.2    If the liquidation is a solvent liquidation, the provisions of the Act governs the liquidation.  A company may only be liquidated under the Act as a solvent liquidation if it has no liabilities or it is able to pay its debts as they fall due and the value of its assets exceeds its liabilities. Subject to the memorandum and articles of association of a company, a liquidator may be appointed by a resolution of directors or resolution of members but if the directors have commenced liquidation by a resolution of directors the members must approve the liquidation plan by a resolution of members save in limited circumstances.

25.3    A sole liquidator appointed after 1 January 2023 must be resident in the BVI. An individual resident outside the BVI may be appointed to act as liquidator jointly with a BVI resident liquidator.

25.4    A liquidator is appointed for the purpose of collecting in and realising the assets of a company and distributing proceeds to creditors.

*Liquidation under the Insolvency Act*

25.5    The Insolvency Act governs an insolvent liquidation.  Pursuant to the Insolvency Act, a company is insolvent if (a) it fails to comply with the requirements of a statutory demand that has not be set aside pursuant to the Insolvency Act, execution or other process issued on a judgement, decree or order of court in favour of a creditor of the company is returned wholly or partly unsatisfied or either the value of the company's liabilities exceeds its assets or the company is unable to pay its debts as they fall due. The liquidator must be either the Official Receiver in BVI or a BVI licensed insolvency practitioner. An individual resident outside the BVI may be appointed to act as liquidator jointly with a BVI licensed insolvency practitioner or the Official Receiver. The members of the company may appoint an insolvency practitioner as liquidator of the company or the court may appoint an Official Receiver or an eligible insolvency practitioner. The application to the court can be made by one or more of the following: (a) the company (b) a creditor (c) a member (d), the supervisor of a creditors' arrangement in respect of the company, the Financial Services Commission and the Attorney General in the BVI.

25.6    The court may appoint a liquidator if:

(a)      the company is insolvent;

(b)      the court is of the opinion that it is just and equitable that a liquidator should be appointed; or

(c)      the court is of the opinion that it is in the public interest for a liquidator to be appointed.

---

[12] Where a company has been struck off the Register and dissolved, the company and the directors, members and any liquidator or receiver thereof, may not (a) commence legal proceedings, carry on any business or in any way deal with the assets of the company; (b) defend any legal proceedings, make any claim or claim any right for, or in the name of, the company; or (c) act in any way with respect to the affairs of the comgany. Notwithstanding the foregoing, where a company has been struck off the register and dissolved, the company, or a director, member, liquidator or receiver thereof, may (a) make application for restoration of the company to the Register; (b) continue to defend proceedings that were commenced against the company prior to the date of the striking-off; and (c) continue to carry on legal proceedings that were instituted on behalf of the company prior to the date of striking-off.  The fact that a company is struck off the Register and dissolved does not prevent (a) the company from incurring liabilities, or (b) any creditor from making a claim against the company and pursuing the claim through to judgement or execution, and does not affect the liability of any of its members, directors, officers or agents.

CMO/857353-000001/41869725v1

25.7   An application under (a) above by a member may only be made with leave of the court, which shall not be granted unless the court is satisfied that there is prima facie case that the company is insolvent. An application under (c) above may only be made by the Financial Services Commission or the Attorney General and they may only make an application under (c) above if the company concerned is, or at any time has been, a regulated person (i.e. a person that holds a prescribed financial services licence) or the company is carrying on, or at any time has carried on, unlicensed financial services business.

*Order of Preferential Payments upon Liquidation*

25.8   Upon the insolvent liquidation of a company, the assets of a company shall be applied in accordance with the following priorities: (a) in paying, in priority to all other claims, the costs and expenses properly incurred in the liquidation in accordance with the prescribed priority; (b) after payment of the costs and expenses of the liquidation, in paying the preferential claims admitted by the liquidator (wages and salary, amounts to the BVI Social Security Board, pension contributions, government taxes) - preferential claims rank equally between themselves and, if the assets of the company are insufficient to meet the claims in full, they shall be paid rateably; (c) after the payment of preferential claims, in paying all other claims admitted by the liquidator, including those of non-secured creditors - the claims of non-secured creditors of the Company shall rank equally among themselves and if the assets of the company are insufficient to meet the claims in full, such non-secured creditors shall be paid rateably; (d) after paying all admitted claims, paying any interest payable under the BVI Insolvency Act; and finally (e) any surplus assets remaining after payment of the costs, expenses and claims above shall be distributed to the members in accordance with their rights and interests in the Company. Part VIII of the Insolvency Act provides for various applications which may be made by a liquidator to set aside transactions which have unfairly diminished the assets which are available to creditors.

25.9   The appointment of a liquidator over the assets of a company does not affect the right of a secured creditor to take possession of and realise or otherwise deal with assets of the company over which that creditor has a security interest.  Accordingly, a secured creditor may enforce its security directly without recourse to the liquidator, in priority to the order of payments described in paragraph 25.8.  However, so far as the assets of a company in liquidation available for payment of the claims of unsecured creditors are insufficient to pay the costs and expenses of the liquidation and the preferential creditors, those costs, expenses and claims have priority over the claims of chargees in respect of assets that are subject to a floating charge created by a company and shall be paid accordingly out of those assets.

*Voidable Transactions*

25.10   In the event of the insolvency of a company, there are four types of voidable transaction provided for in the Insolvency Act:

(a)   Unfair Preferences: Under section 245 of the Insolvency Act a transaction entered into by a company, if it is entered into within the hardening period at a time when the company is insolvent, or it causes the company to become insolvent (an "**insolvency transaction**"), and which has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position it would have been in if the transaction had not been entered into, will be deemed an unfair preference. A transaction is not an unfair preference if the transaction took place in the ordinary course of business. It should be noted that this provision applies regardless of whether the payment or transfer is made for value or at an undervalue.

(b)   Undervalue Transactions: Under section 246 of the Insolvency Act the making of a gift or the entering into of a transaction on terms that the company is to receive no consideration, or where the value of the consideration for the transaction, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company will (if it is an insolvency transaction entered

16

CMO/857353-000001/41869725v1

into within the hardening period) be deemed an undervalue transaction.  A company does not enter into a transaction at an undervalue if it is entered into in good faith and for the purposes of its business and, at the time the transaction was entered into, there were reasonable grounds for believing the transaction would benefit the company.

(c)  Voidable Floating Charges: Under section 247 of the Insolvency Act a floating charge created by a company is voidable if it is an insolvency transaction created within the hardening period.  A floating charge is not voidable to the extent that it secures: (i) money advanced or paid to the company, or at its direction, at the same time as, or after, the creation of the charge; (ii) the amount of any liability of the company discharged or reduced at the same time as, or after, the creation of the charge; (iii) the value of assets sold or supplied, or services supplied, to the company at the same time as, or after, the creation of the charge; and (iv) the interest, if any, payable on the amount referred to in (i) to (iii) pursuant to any agreement under which the money was advanced or paid, the liability was discharged or reduced, the assets were sold or supplied or the services were supplied.

(d)  Extortionate Credit Transactions: Under section 248 of the Insolvency Act an insolvency transaction entered into by a company for, or involving the provision of, credit to the company, may be regarded as an extortionate credit transaction if, having regard to the risk accepted by the person providing the credit, the terms of the transaction are or were such to require grossly exorbitant payments to be made in respect of the provision of the credit, or the transaction otherwise grossly contravenes ordinary principles of fair trading and such transaction takes place within the hardening period.

25.11  The "hardening period" (known in the Insolvency Act as the "vulnerability period") in respect of each voidable transaction provision set out above is as follows:

(a)  for the purposes of sections 245, 246 and 247 of the Insolvency Act the period differs depending on whether the person(s) that the transaction is entered into with, or the preference is given to, are "connected persons" of the company within the meaning of the Insolvency Act:

(i)  in the case of "connected persons" the "hardening period" is the period beginning two years prior to the "onset of insolvency" and ending on the appointment of a liquidator of the company; and

(ii)  in the case of any other person, the "hardening period" is the period beginning six months prior to the "onset of insolvency" and ending on the appointment of a liquidator of the company; and

(b)  for the purposes of section 248 of the Insolvency Act the "hardening period" is the period beginning five years prior to the "onset of insolvency" and ending on the appointment of a liquidator of the company regardless of whether the person(s) that the transaction is entered into with is a connected person.

25.12  The onset of insolvency for these purposes is the date on which an application for the appointment of a liquidator was filed (if the liquidator was appointed by the court) or the date of the appointment of the liquidator (where the liquidator was appointed by the members).

25.13  A conveyance made by a person with intent to defraud creditors is voidable at the instance of the person thereby prejudiced.  There is no requirement that the relevant transaction was entered into at a time when one party was insolvent or became insolvent as a result of the transaction, and there is no requirement that the transferring party subsequently went into liquidation.  However, no conveyance entered into for valuable consideration and in good faith to a person who did not have notice of the intention to defraud may be impugned.

17

**26     Jurisdiction**

Subject to the memorandum or articles of association of a company, a company can enter into documents governed by Israeli law and can submit to the jurisdiction of the Courts of Israel contained in such documents and the submission is legal, valid and binding on the company assuming that it has been made in good faith and would be regarded as a valid and binding submission which will be upheld by the Courts of Israel.

We hereby consent to the inclusion of this opinion letter and its translation to Hebrew (which we have not reviewed) in the Company's supplementary prospectus (or draft supplementary prospectus) to be published no later than November 2025 and (if applicable) its filing with the Israeli Securities Authority.

This opinion letter is given only as to, and based on, circumstances and matters of fact existing and known to us on the date of this opinion letter. This opinion letter only relates to the laws of the British Virgin Islands which are in force on the date of this opinion letter.

This opinion letter is in English and we have not approved, and we shall have no liability in respect of, any translation of this opinion letter.

This opinion letter may be relied upon by the addressee only. It may not be relied upon by any other person except with our prior written consent.

We hereby authorise the authorised electronic signatory of the Company to file this opinion electronically (if applicable) with the Israeli Securities Authority.

Yours faithfully

Maples and Calder

Maples and Calder

18

**First Schedule**

**List of Addressees**

SIMAD Holdings Ltd.
PO Box 173
Road Town
Tortola
British Virgin Islands

The Tel Aviv Stock Exchange Ltd
2 Ahuzat Bayit St., Tel Aviv
Israel

Goldfarb Gross Seligman & Co., Law Offices
Electra Tower
98 Yigal Alon Street
Tel Aviv 6789141
Israel

**GOLDFARB
GROSS
SELIGMAN**

Established 1930

27 בנובמבר 2025

לכבוד :

SIMAD Holdings Ltd.

ג.א.נ.,

**הנדון : תרגום מהשפה האנגלית של חוות הדעת של Maples & Calder מיום 26 בנובמבר 2025 המצורפת
לתשקיף להשלמה ותשקיף מדף (ולטיוטת התשקיף) של החברה**

לבקשתכם, הריני לאשר בזאת כי אני שולטת בשפה העברית ובשפה האנגלית וכי לדעתי התרגום המצ"ב מאנגלית
לעברית של חוות הדעת שבנדון, הינו נכון.

למען הסר ספק יובהר כי במקרה של סתירה בין נוסח חוות הדעת בשפה אנגלית לבין התרגום בשפה העברית של
חוות הדעת האמורה, יגבר הנוסח בשפה האנגלית.

אני מסכימה כי מכתבי זה ייכלל בתשקיף של החברה.

בכבוד רב,

דניאלה רפולו, עו"ד

לנמענים הנקובים בתוספת

26 בנובמבר 2025

אדונים נכבדים,

## SIMAD Holdings Ltd. ("החברה")

התבקשנו לפעול כיועצים המשפטיים של "החברה" בכל הקשור לדיני איי הבתולה הבריטיים לעניין הגשה ופרסום תשקיף להשלמה והודעה משלימה בכפוף לדיני ניירות הערך בישראל ונתבקשנו לתת חוות דעת משפטית באשר למספר נושאים והוראות בדיני החברות של איי הבתולה הבריטיים.

לאחר עיון בהיבטים המשפטיים אשר נראו לנו רלבנטיים, הרינו בדעה כי :

### סיכום דיני החברות של איי הבתולה הבריטיים

החברה רשומה באיי הבתולה הבריטיים בהתאם ל-Companies Act, BVI Business (כפי שתוקן) ("החוק") וכפופה לדינים החלים באיי הבתולה. להלן סיכום של הוראות דיני החברות העיקריות החלות באיי הבתולה הבריטיים. הסיכום אינו מתיימר לכלול את כל ההנחות והחריגים או להוות בחינה מלאה של כל העניינים הנכללים בחוק החברות של איי הבתולה הבריטיים והמיסוי, אשר עשויים להיות שונים מההוראות בנושאים דומים בתחומי שיפוט אחרים אשר צדדים מעוניינים עשויים להכיר.

1. **התאגדות, משרד רשום וסוכן רשום**

1.1 בהתאם להוראות החוק, תעודת התאגדות אשר מוצאת על ידי הרשם לעניייני חברות הינה ראיה חלוטה כי כל דרישות החוק באשר להתאגדות מולאו וכי החברה נתאגדה מהמועד הנקוב בתעודת ההתאגדות.

1.2 כדי שהחברה תישאר קיימת ברשם לעניייני חברות בהתאם לחוקי איי הבתולה הבריטיים, עליה לשלם דמי רישום שנתיים לרשם לעניייני חברות ולהגיש דוח הכנסות שנתי, במסגרת הזמן הקבועה בחוק.

1.3 לחברה יהיה, בכל עת, משרד רשום באיי הבתולה הבריטיים.

1.4 לכל חברה הרשומה באיי הבתולה הבריטיים חייב להיות סוכן רשום באיי הבתולה הבריטיים. אדם לא יפעל ולא יסכים לפעול כסוכן רשום של חברה המאוגדת באיי הבתולה הבריטיים אלא אם, בין היתר, אדם זה מחזיק ברישיון לפי חוק ניהול החברה (כפי שתוקן) או חוק הבנקים וחברות הנאמנות (כפי שתוקן), המאשר לו לספק שירותי סוכן רשום.

2. **מניות**

2.1 כפוף להוראות החוק ולתזכיר ההתאגדות ותקנון ההתאגדות של החברה, ניתן להקצות מניות ואופציות לרכישת מניות, במועדים, לאנשים ובתמורות ובתנאים כפי שיקבע על ידי הדירקטורים.

2.2 בתזכיר ההתאגדות של החברה חייבת להיכלל הצהרה בדבר מספר מרבי של מניות שהחברה רשאית להנפיק או הצהרה כי החברה רשאית להנפיק מספר בלתי מוגבל של מניות, וסוגי המניות שהחברה רשאית להנפיק, ובמקרה שהחברה רשאית להנפיק מניות משני סוגים או יותר, הצהרה בדבר הזכויות, ההגבלות והתנאים הצמודים לכל אחד מסוגי המניות.

2.3 ניתן להקצות מניות כנגד כל תמורה שהינה מלאה או חלקית בכל צורה שהיא, לרבות כסף, שטר חוב או התחייבות אחרת בכתב לתשלום כסף או נכס, נכסי דלא ניידי, רכוש אישי)לרבות מוניטין וידע), כנגד שירותים שניתנו או כנגד חוזה למתן שירותים עתידיים. בכל מקרה, התמורה עבור הנפקת מניה בעלת ערך נקוב לא תהיה פחותה מערכה הנקוב של המניה.

2

2.4 לא יוקצו מניות בתמורה שהינה מלאה או חלקית שאינה כספית, אלא אם התקבלה החלטת דירקטוריון הקובעת את הבאים : (א) הסכום אותו יש לזקוף לזכות החברה כנגד הקצאת המניות ; ו-(ב) לדעת הדירקטוריון השווי הכספי הנוכחי של התמורה הלא כספית בגין ההקצאה אינו פחות מהסכום אשר אותו יש לזקוף כנגד הקצאת המניות.

2.5 בכפוף לתזכיר החברה או לתקנון החברה רשאית להנפיק מניות הטבה, מניות בתשלום חלקי ומניות בתשלום אפס. בכפוף לתזכיר החברה או לתקנון החברה, רואים במניית הטבה שהונפקה על ידי החברה כאילו שולמה במלואה בהנפקה.

### 3. העברת מניות

3.1 תחת החוק העברת מניה רשומה שאינה רשומה בבורסה מוכרת מתבצעת באמצעות מסמך העברה בכתב החתום על ידי המעביר ומכיל את שם הנעבר. עם זאת, המסמך יהיה חתום גם על ידי הנעבר אם הרישום עשוי להטיל עליו חבות כלשהי כלפי החברה. מסמך ההעברה יישלח לחברה לשם רישום. בכפוף לתזכיר ההתאגדות ותקנון החברה, עם קבלת שטר ההעברה, תרשום החברה את שם הנעבר למרשם בעלי המניות אלא אם הדירקטוריון יחליט לסרב לרשום את ההעברה או לדחותה מסיבות שיפורטו בהחלטת הדירקטוריון. העברת מניה רשומה תהיה בתוקף כאשר שמו של הנעבר הוכנס למרשם בעלי המניות. רישום שם האדם במרשם בעלי המניות של החברה הינה ראיה לכאורה לכך שהבעלות החוקית במניה הוענקה לאדם האמור.

3.2 ההליך שונה עבור העברת מניות הרשומות בבורסה מוכרת. מניות כאמור ניתן להעביר ללא צורך במסמך העברה כתוב אם ההעברה מתבצעת בהתאם לחוקים, לכללים, לנהלים ולדרישות אחרות החלות על המניות הרשומות למסחר בבורסה המוכרת ובכפוף לתקנון ההתאגדות של החברה.

### 4. סיוע כספי לרכישת מניות של החברה

החוק מאפשר באופן מפורש כי, בכפוף לתזכיר ההתאגדות ותקנון החברה, חברה רשאית לסייע כספית לכל אדם בקשר עם רכישת מניות החברה עצמה.

### 5. רכישת מניות ואופציות על ידי החברה וחברות בנות של החברה

5.1 החוק מאפשר לחברה לרכוש, לפדות או בכל דרך אחרת לרכוש את מניותיה שלה, אם לפי ההליכים המפורטים בחוק, ואם לפי הליכים אחרים ככל שפורטו בתזכיר ההתאגדות ובתקנון החברה. הוראות החוק לא יחולו על החברה ככל שהם נשללו, שונו או שאינן עולות בקנה אחד עם ההוראות הנכללות בתזכיר ההתאגדות ובתקנון החברה. חברה רשאית לרכוש המניות הנפרעות שלה או מניות ללא תמורה בדרך של העברת המניה או מניות בחברה מצד אדם המחזיק במניה או במניות. כל העברה כאמור של מניה או מניות תערך בכתב ותיחתם על ידי האדם המחזיק מניה או מניות.

5.2 לפי הוראות הדין, הדירקטורים רשאים להציע הצעה לרכוש, לפדות או לקנות בדרך אחרת את מניות החברה, ובלבד שההצעה מוצעת כדלקמן : (א) לכל בעלי המניות, ואם תצליח, לא תשפיע על יחס זכויות ההצבעה והזכויות לקבלת דיבידנדים מן החברה, וכן תקנה לכל בעל מניות הזדמנות סבירה לקבל את ההצעה ; או (ב) תהיה לאחד או יותר מבעלי המניות של החברה ותקבל הסכמה בכתב של כל בעלי המניות, או כפי שתזכיר ההתאגדות או תקנון החברה מתירים באופן אחר. במקרה בו הצעה היא לאחד או יותר מבעלי המניות, הדירקטורים חייבים להעביר החלטה אשר בהתאם אליה, על-פי דעתם, הרכישה, או הפדיון (א) יביאו תועלת לבעלי המניות הנותרים, ו- (ב) ההצעה הנשקלת היא הצעה סבירה והוגנת כלפי החברה וכלפי בעלי המניות הנותרים. בעל מניות רשאי לפנות בבקשה לבית המשפט העליון באיי הבתולה הבריטיים על מנת לקבל צו המגביל את הרכישה או הפדיון המתוכננות, מן הטעם ש : (א) הרכישה, או הפדיון אינן עולות בקנה אחד עם טובתם של בעלי המניות הנותרים ; או (ב) תנאי ההצעה והתמורה המוצעת עבור המניות אינם

הוגנים וסבירים כלפי החברה או כלפי בעלי המניות הנותרים.

5.3 כפוף להוראות התקנון ותזכיר החברה והחוק, חברה רשאית לרכוש את מניותיה, וזאת רק אם נחה דעתם של הדירקטורים, על יסוד טעמים סבירים, שמיד לאחר ביצוע החלוקה, החברה תעמוד במבחן כושר פירעון, קרי, שווי נכסי החברה עולה על התחייבויותיה והחברה מסוגלת לפרוע את חובותיה בהגיע מועד פירעונם.

5.4 במידה והמניות הן מניות בנות פדיון על פי אופציה של בעל המניות, ובעל המניות מסר הודעה הולמת לחברה על כוונתו לפדות את המניות, ניתן לפדות את המניות שלא על פי אופציה של החברה.

5.5 לפי דיני איי הבתולה הבריטיים, חברה רשאית להחזיק במניות שנרכשו, נפדו או נקנו באופן אחר, כמניות רדומות, אם תזכיר ההתאגדות או תקנון החברה אינם אוסרים על החברה להחזיק מניות רדומות; הדירקטורים החליטו שמניות אשר נפדו, נרכשו או נקנו באופן אחר תוחזקנה כמניות רדומות; ומספר המניות אשר נפדו, נרכשו או נקנו באופן אחר, כולל מניות רדומות מאותו סוג אשר קיימות בחברה, במצטבר, אינו עולה על 50% ממניות סוג זה שהונפקו קודם לכן על ידי החברה, לא כולל מניות שבוטלו. כל הזכויות והחובות הצמודות למניה רדומה יושעו ולא ניתן לממשן, על ידי החברה או כנגדה, בשעה שהחברה מחזיקה בה כמניה רדומה.

5.6 חברה אינה מנועה מלרכוש, ורשאית לרכוש את האופציות של עצמה, בכפוף ובהתאם לתנאים ולהוראות של כתב האופציה או התעודה הרלבנטיים. דיני איי הבתולה הבריטיים אינם מחייבים את החברה לכלול בתזכיר או תקנון ההתאגדות שלה הוראות ספציפיות אשר מאפשרות לחברה לבצע רכישות כאלה, והדירקטורים של החברה רשאים להסתמך על הסמכות הכללית שבתזכיר ההתאגדות שלה.

## 6. דיבידנדים וחלוקות

6.1 בכפוף לתזכיר ההתאגדות ותקנון החברה, הדירקטורים של החברה רשאים לאשר בהחלטתם חלוקה לבעלי המניות של החברה בזמנים, ובסכום, כפי שהדירקטורים ימצאו לנכון, אם נחה דעתם, על יסוד טעמים סבירים, שמיד לאחר ביצוע החלוקה, החברה תעמוד במבחן כושר פירעון.

חברה עומדת במבחן כושר הפירעון אם : (א) שווי נכסי החברה עולה על התחייבויותיה ; ו - (ב) החברה מסוגלת לפרוע את חובותיה במועד פירעונם. החלטת הדירקטורים חייבת לכלול הצהרה לפיה לדעת הדירקטורים החברה תעמוד במבחן כושר הפירעון מיד לאחר החלוקה.

6.2 בני סמכא במשפט האנגלי, אשר מקובלים על ידי בית המשפט העליון באיי הבתולה הבריטיים, אך אינם מחייבים אותו, מספקים הנחיות לגבי המשמעות של ״יכולתה של חברה לשלם את חובותיה בהגיע מועד פירעונם״. מקרה אחד כאמור הינו v Ltd. Services Trustee Corporate BNY .Plc UK -Eurosail[1], בו נקבע כי השוואת נכסים קיימים עם התחייבויות קיימות ועתידיות (התחייבויות למעט תביעות תלויות ודחיות) היה המבחן שהוחל וכי נטל ההוכחה צריך להיות של הצד הטוען לחדלות פירעון מאזנית. המבחן כרוך בניתוח ההקשר הכולל והעובדות הרלבנטיות לחברה שעל הפרק. על-פי פרשת plc Finance Cheyne Re (בכינוס נכסים)[2], יש להתחשב בהתחייבויות שיגיע מועד פירעון בעתיד. בפרשה האמורה נקבע כי אין להוכיח חדלות פירעון של תזרים מזומנים רק מהתחשבות בחובות שיש לפרוע בהווה, אלא ניתן לקחת בחשבון חובות עתידיים ידועים, המיועדים לפירעון בעתיד המיידי. לדעת בית המשפט, מהמילים ״בהגיע מועד פירעונם״ עולה אלמנט עתידי, כך שהן החובות הקיימים והן החובות שיעמדו לפירעון בעתיד המיידי עשויים להיות רלבנטיים בכדי לקבוע אם חברה יכולה לשלם את חובותיה. בנוסף, בפרשת

---

.2007-3BL Plc (2013) UKSC 28 [1]

.[2007] EWHC 2402 (Ch) [2]

(1983 of 006794 No) Re a Company[3] נקבע כי העובדה שחברה יכולה לשלם את חובותיה רק באמצעות כספים שלוותה, אין משמעותה בהכרח כי אין ביכולתה לשלם את חובותיה, אולם, אם באופן עקבי לא הצליחה לשלם או התרשלה בתשלומם עד שחויבה לעשות כן, במקרה המתאים, יוכל בית המשפט לפסוק כי החברה אינה יכולה לשלם את חובותיה.

6.3 חלוקה, בהתייחס לחלוקה על ידי חברה מוגבלת במניות לבעל מניותיה, משמעה : (א) העברה ישירה או עקיפה של נכס, למעט מניות החברה, אל בעל המניות או לטובתו ; או (ב) נטילת חוב עבור בעל מניות או לטובתו, ביחס למניות המוחזקות בידי אותו בעל מניות, ובין אם בדרך של רכישת נכס, רכישה, פדיון או השגת המניות באופן אחר, העברת חבויות או מסירתן בדרך אחרת, ולרבות דיבידנד.

6.4 חלוקה שבוצעה לבעל מניות בזמן שהחברה לא עמדה, מיד לאחר החלוקה האמורה, במבחן כושר הפירעון, יכול ותוחזר לחברה על ידי בעל המניות, אלא אם : (א) בעל המניות קיבל את החלוקה בתום לב וללא כל ידיעה על כך שהחברה אינה עומדת במבחן כושר הפירעון ; (ב) בעל המניות שינה את מצבו תוך הסתמכות על תוקפה של החלוקה ; ו- (ג) דרישת החזר התשלום תהא בלתי הוגנת.

אם, לאחר שחלוקה אושרה ולפני שבוצעה בפועל, הדירקטורים חדלים להיות משוכנעים, מסיבות סבירות, שהחברה תעמוד, מיד לאחר ביצוע החלוקה, במבחן כושר הפירעון, כל חלוקה שתתבצע על ידי החברה תיחשב כאילו לא אושרה.

אם חלוקה כלשהי נחשבת כאילו לא אושרה כאמור, דירקטור אשר - (א) חדל, לאחר האישור אולם לפני ביצוע החלוקה בפועל, להיות משוכנע, מסיבות סבירות, שהחברה תעמוד במבחן כושר הפירעון מיד לאחר ביצוע החלוקה ; ו-(ב) לא נקט בצעדים סבירים למנוע את ביצוע החלוקה בפועל - יהא אחראי באופן אישי כלפי החברה לשלם לה את החלק מתוך החלוקה שלא יוחזר על ידי בעלי המניות.

6.5 אם, בתביעה שמוגשת נגד דירקטור או בעל מניות על פי הפסקה דלעיל, בית המשפט הגבוה של איי הבתולה הבריטיים משוכנע שהחברה יכולה הייתה, על ידי ביצוע חלוקה בסכום נמוך יותר, לעמוד במבחן כושר הפירעון, אזי בית המשפט רשאי - (א) להתיר לבעלי המניות לשמור על סכום החלוקה ; או - (ב) לפטור את הדירקטור מאחריות בנוגע לסכום השווה לחלוקה שניתן היה לבצע באופן נאות.

## 7. זכויות של בעלי מניות והגנה על מיעוט

7.1 בכפוף להוראות החוק, מהווים תזכיר ותקנון החברה חוזה מחייב בין החברה ובעלי מניותיה ובינם לבין עצמם. עקרונית, בעלי המניות מחויבים להחלטות הרוב ולהחלטות רוב מיוחד שנקבעו בסעיפי התקנון, או החוק. באשר להצבעה, הכלל המקובל הוא, כי בקשר לעניינים מסחריים רגילים, יוכלו בעלי המניות לפעול מתוך אינטרס עצמי, כאשר הדבר יבוא לידי ביטוי במימוש זכות ההצבעה הצמודה למניותיהם[4].

7.2 במקרה בו בעלי מניות הרוב מפרים את זכויות בעלי מניות המיעוט, רשאים בעלי מניות המיעוט לזכות בסעד על ידי הגשת תביעה נגזרת או באמצעות הגשת תביעה אישית. התביעה הנגזרת נוגעת להפרת זכויות החברה כשהאחראים על הפרת זכויותיה הם בעלי השליטה בחברה אשר מונעים הגשת תביעה כאמור, בעוד תביעה אישית נוגעת להפרת זכות אישית של בעל מניות ספציפי.

7.3 החוק כולל סדרה של תרופות הניתנות לבעלי המניות. כאשר חברה שנתאגדה לפי החוק פועלת

---

[3]    .[1986] BCLC 261

[4]    מספר קטן של בני סמכא מציע כי, בנסיבות חריגות, בעיקר בעת שינויים בזכויות הצבעה, על רוב בעלי המניות לפעול בתום לב לטובת כלל החברה (נטל ההוכחה חל על מי שמתנגד לתיקון) ואם לא יעשו כן יהיה בכך כדי לבטל את תוקפו של התיקון : ראה .NV .Citco Banking Corp נ Pusser's Ltd [2007] UKPC 13 Shuttleworth v. Cox .(Cox Bros & Co (Maidenhead) Ltd Or [1927] 2 KB 9 (CA) נ Shuttleworth וכן Bros & Co (Maidenhead) Ltd and Ors [1927] 2 KB 9 (CA) ; וכן תיק שנדון לאחרונה בבית המשפט הבריטי לערעורים בעניין Arbuthnott v Bonnyman [2015] ALL ER (D) 218 שמדגים את הגישה הנוכחית של בתי המשפט.

באופן המפר את הוראות החוק או את הוראות תזכיר ההתאגדות ו/או תקנון החברה, בית המשפט העליון באיי הבתולה הבריטיים רשאי להוציא צו מניעה או צו אכיפה. גם בעלי מניות יכולים לתבוע תביעות נגזרות, תביעות אישיות או תביעות ייצוגיות[5], בנסיבות מסוימות.

7.4 הבסיס האנגלי המסורתי לתרופות לבעלי מניות נכלל גם הוא כחלק מהחוק, כאשר בעל מניות בחברה סובר כי ענייניה של החברה, נוהלו, מנוהלים או שיש סבירות שינוהלו באופן מדכא, מפלה בצורה לא הוגנת, או עם נטייה בלתי הוגנת לדעה קדומה כלפי אותו בעל מניות, הוא רשאי לפנות לבית המשפט העליון באיי הבתולה הבריטיים כדי לבקש צו בעניין זה.

7.5 כל בעל מניות רשאי לפנות לבית המשפט העליון באיי הבתולה הבריטיים ולבקש מינוי מפרק לחברה ובית המשפט רשאי למנות מפרק לחברה אם הוא בדעה שהדבר מוצדק והוגן.

7.6 החוק קובע כי לכל בעל מניות זכות לקבל את תשלום שוויין ההוגן של מניותיו בקרות אחד מן המקרים המפורטים להלן :

  (א) מיזוג ;

  (ב) קונסולידציה ;

  (ג) כל מכירה, העברה, החכרה, החלפה או דיספוזיציה אחרת של -50% או יותר בערך של הנכסים או העסקים של החברה, אם לא נעשים במהלך העסקים הרגיל של החברה, למעט : (1) דיספוזיציה בעקבות צו בית משפט מוסמך ; (2) דיספוזיציה בתמורה לכסף בתנאים הדורשים כי כל או חלק מהותי מהרווחים נטו יחולקו לבעלי המניות של החברה בהתאם לחלקם היחסי בחברה בתוך שנה אחת ממועד הדיספוזיציה ; (3) העברה עקב הפעלת סמכותם של הדירקטורים להעביר נכסים בכדי להגן עליהם ;

  (ד) פדיון 10% או פחות מההון המונפק של החברה בהתאם להחלטת בעלי מניות המחזיקים ב-90% מהון החברה או יותר, בהתאם להוראות החוק ; וכן

  (ה) הסדר, אם הותר על ידי בית המשפט העליון באיי הבתולה הבריטיים ;

7.7 באופן כללי, יתר התביעות כנגד החברה על ידי בעלי המניות שלה צריכים להיות מבוססים על חקיקת החוזים והנזיקין הכללית החלה באיי הבתולה הבריטיים או על זכויות בעלי המניות כפי שנקבעו בתזכיר ההתאגדות ובתקנון החברה.

7.8 החוק קובע כי אם חברה או דירקטור בחברה מעורבים במעשים הנוגדים את החוק, את תקנון החברה או את תזכיר ההתאגדות של החברה, הינם המציעים להיות מעורבים במעשים מסוג אלה או שהיו מעורבים במעשים כאמור, רשאי בית המשפט העליון באיי הבתולה הבריטיים, לבקשת בעל מניות חברה או לבקשת דירקטור, ליתן צו המורה לחברה או לדירקטור לעמוד בחוק ובמסמכים המתוארים דלעיל, או צו המורה לחברה או לדירקטור להימנע מלהיות מעורבים במעשים מסוג אלה הנוגדים את החוק, תקנון החברה או את תזכיר ההתאגדות של החברה.

## 8. ניהול

8.1 החוק קובע, כי עסקיה של חברה ינוהלו על-ידי הדירקטורים של החברה או תחת פיקוחם. לדירקטורים של החברה מלוא הסמכות הדרושה לצורך ניהול, הכוונה ופיקוח על עסקי החברה.

8.2 החוק קובע, כי בכפוף לתזכיר ולתקנון החברה, כל מכירה, העברה, השכרה, החלפה, או דיספוזיציה

---

[5] בהתאם לחוק, תביעה ייצוגית מוגדרת כדלקמן : "כאשר בעל מניות בחברה, פותח בהליכים משפטיים כנגד החברה ולבעל מניות אחר יש אינטרס זהה או בעיקרו זהה לזה של בעל המניות בקשר עם הליכים המשפטיים, במקרה כזה יכול בית המשפט למנות את אותו בעל המניות שהגיש את תביעה כמייצג את בעלי המניות (כולם או חלקם) שיש להם את אותו אינטרס בתביעה. למטרה זו, יכול בית המשפט, להוציא צווים, לפי ראות עיניו, ובכלל זה, צווים בקשר עם : א. השליטה בהליך ואופן ניהולו ב. הוצאות ההליך. ג. אופן חלוקת הסכומים, שבית המשפט יפסוק כי ישולמו על ידי הנתבע, בין אותם בעלי המניות המיוצגים בהליך". תביעה כזו אפשרית רק לבעלי מניות ולא לכל צד אחר לרבות נושים.

אחרת, למעט משכנתא, שעבוד או נטל אחר, או אכיפתם, בשווי העולה על 50% מנכסי החברה, אם לא נעשו במהלך העסקים הרגיל של החברה, חייבים לקבל אישור אסיפת בעלי המניות של החברה. החוק אינו קובע הגבלות מסוימות אחרות על כוחם של הדירקטורים לערוך דיספוזיציה של נכסי החברה.

8.3 החוק מטיל חובת נאמנות על הדירקטורים של החברה, וכן מטיל חובה לנהוג ביושר ובתום לב, בהתאם לאופן שבו כל דירקטור מבין את טובתה המרבית של החברה. החוק אף מתיר לדירקטור של חברת בת לפעול לטובתה המרבית של החברה, גם אם פעולה זו אינה לטובתה של חברת הבת שבה הוא מכהן כדירקטור (אם הוא רשאי לנהוג כן על פי הוראות תזכיר ותקנון ההתאגדות, וכאשר החברה אינה חברת בת בבעלות מלאה של החברה - בהסכמה מוקדמת של בעלי המניות בחברת הבת).

8.4 החוק משקף את חובות המשפט המקובל האנגלי לגבי חובת זהירות, נאותות ומיומנות ומטיל על הדירקטורים חובה לפעול למטרה ראויה ולא בדרך שהינה מנוגדת לחוק, לתזכיר ההתאגדות או לתקנון החברה.

8.5 ראה סעיף 11 להלן בנוגע לניגוד עניינים.

## 9.   דירקטורים חיצוניים

החוק אינו קובע חובת מינוי של דירקטורים חיצוניים או דירקטורים שאינם נושאי משרה בחברה לדירקטוריון החברה. החוק אינו מבדיל בין דירקטורים של החברה לבין דירקטורים עצמאיים.

## 10.   יו״ר הדירקטוריון משמש כמנכ״ל

בכפוף לתזכיר ותקנון ההתאגדות של החברה והחוק, ביחס לעניינים הקשורים בגילוי עניין אישי, אין בחוק כל איסור המונע מאדם לפעול כיושב ראש ומנכ״ל של חברה באיי הבתולה.

## 11.   עסקאות עם בעלי עניין וניגוד עניינים

11.1 דירקטורים אינם רשאים להעמיד את עצמם במצב של ניגוד עניינים בין חובתם כלפי החברה לבין האינטרסים האישיים שלהם. משמעות הדבר כי, במובן הצר, דירקטור אינו צריך להשתתף בקבלת החלטה בנסיבות בהן הוא מצוי בניגוד עניינים פוטנציאלי. כלומר, עליו להצהיר על העניין שיש לו, ולהימנע מליטול חלק באותה החלטה. החוק קובע כי דירקטור, ״מיד לאחר שנודע לו על העובדה שיש לו עניין בעסקה בה החברה התקשרה או עתידה להתקשר, ימסור גילוי לדירקטוריון החברה על העניין שיש לו״. אי מתן גילוי של דירקטור על עניין כאמור, לא ישפיע על תוקף העסקה בה התקשרו הדירקטור או החברה, ובלבד שהגילוי בדבר העניין האישי של הדירקטור נמסר לדירקטוריון טרם התקשרות החברה בעסקה או שלא נדרש היה ליתן גילוי לגביו (לדוגמא, כשהעסקה היא בין החברה לבין הדירקטור עצמו או שהיא במהלך העסקים הרגיל ובתנאים רגילים). לרוב, תזכיר ותקנון התאגדות של חברה באיי הבתולה הבריטיים יאפשר לדירקטור בעל עניין בעסקה מסוימת להצביע לגביה, להיות נוכח בישיבות בהן נשקלת עסקה כאמור ולחתום על מסמכים מטעם החברה הקשורים בעסקה.

11.2 בהתאם לחוק באיי הבתולה הבריטיים, עסקה בה התקשרה החברה ואשר יש לדירקטור עניין אישי בה לא ניתנת לביטול על ידי החברה, אם בעלי המניות אישרו או אשררו את העסקה כשהם מודעים לעובדות המהותיות בקשר לעניין האישי של הדירקטור בעסקה, או אם החברה קיבלה שווי הוגן עבור העסקה.

11.3 באופן כללי, ניתן לחלק חובות דירקטור כלפי חברה לשתי קטגוריות. הקטגוריה הראשונה כוללת את חובות האמון, דהיינו, חובות של נאמנות, יושר ותום לב. הקטגוריה השנייה כוללת חובות של

מיומנות וזהירות. כל קטגוריה תידון בתורה להלן.

11.4 ניתן לתמצת את חובות האמון של דירקטור כדלקמן:

11.4.1 תום לב: על הדירקטורים חלה חובה לפעול בתום לב ובהתאם לאופן שבו הם מבינים את טובתה המרבית של החברה (או, אם הדבר מותר כאמור לעיל, החברה האם של אותה חברה).

11.4.2 תכלית ראויה: על הדירקטורים חלה חובה לממש את הסמכויות שהוענקו להם למטרה לשמה הן הוענקו ולא למטרה נלווית.

11.4.3 אי הגבלת שיקול הדעת: מאחר שסמכויות הדירקטורים תמומשנה על ידם בנאמנות עבור החברה, הם אינם צריכים לכבול את עצמם באופן לא ראוי לשיקול דעת עתידי.

11.4.4 ניגוד חובות וניגוד עניינים: ראה פסקה 11.1 לעיל.

11.5 בנוסף לחובות האמון, מוטלות על דירקטור גם חובות זהירות, נאותות ומיומנות אותן הוא חב לחברה עצמה ולא, כדוגמא, לבעלי מניות מסוימים (בכפוף למספר מצומצם של חריגים באשר לאכיפה מטעם החברה).

## 12. דירקטורים חליפיים

12.1 בכפוף לתקנון ולתזכיר ההתאגדות של החברה, דירקטור רשאי למנות כחליף כל דירקטור אחר או כל אדם אחר שאינו פסול להתמנות כדירקטור בהתאם לחוק כדי: (א) לממש את סמכויותיו של הדירקטור הממנה ו-(ב) להיות אחראי בשם הדירקטור הממנה עבור קבלת החלטות בהיעדר הדירקטור הממנה.

12.2 הדירקטור הממנה רשאי, בכל עת, לבטל את מינויו של הדירקטור החליף. מינוי הדירקטור החליף וביטול המינוי יעשו בכתב, והודעה בכתב על המינוי או על ביטולו יוגשו ע"י הדירקטור הממנה לחברה: (א) בתוך תקופת הזמן המפורטת בתקנון החברה או בתזכיר ההתאגדות של החברה; או - (ב) אם תקופת הזמן איננה מוגדרת בתקנון החברה או בתזכיר ההתאגדות של החברה, בתוך פרק הזמן הקצר ביותר האפשרי.

12.3 ביטול מינויו של דירקטור חליף ייכנס לתוקף רק לאחר שהודעה בכתב על ביטול המינוי נמסרה לחברה.

12.4 לדירקטור חליף אין הסמכות למנות לעצמו חליף, בין אם לדירקטור הממנה ובין אם לדירקטור החליף; וכן הוא אינו פועל כנציג של או עבור הדירקטור הממנה.

12.5 לדירקטור חליף יש את אותן הזכויות שיש לדירקטור הממנה ביחס לכל ישיבת דירקטוריון וביחס לכל החלטה בכתב המופצת בין הדירקטורים לקבלת הסכמה בכתב. כל שימוש של הדירקטור החליף בסמכות הדירקטור הממנה ביחס לקבלת החלטות על ידי הדירקטוריון, הינה ברת תוקף באותה המידה כאילו נעשה שימוש בסמכות של הדירקטור הממנה. דירקטור חליף הוא האחראי למעשיו שלו ולמחדלים שלו כדירקטור חליף; ותת חלק 3 בחלק VI לחוק מתייחס לאדם הממונה לדירקטור חליף, כאשר הוא פועל בתפקיד כאמור.

## 13. ועדת ביקורת

13.1 אין חובה תחת החוק למינוי ועדת ביקורת.

## 14. ועדת תגמול

אין חובה תחת החוק למינוי ועדת תגמול.

8

**15. מגבלות על מינוי דירקטורים ונושאי משרה בחברה והפסקת כהונתם**

15.1 אדם לא יתמנה כדירקטור או כדירקטור חליף, או כדירקטור חלופי[6] אלא אם כן הוא הסכים בכתב להתמנות כדירקטור, כדירקטור חליף או כדירקטור חלופי.

15.2 החוק קובע שהתנאים הבאים פוסלים אדם מלהתמנות לכהונת דירקטור בחברה:

(א) אדם שלא מלאו לו 18 שנים;

(ב) אדם שהוא פסול דין כהגדרתו של מונח זה בסעיף 260(4) ל-The Insolvency Act (כפי שתוקן) ("**חוק חדלות הפירעון**");

(ג) אדם שהוא מוגבל כהגדרתו של מונח זה של סעיף 409 לחוק חדלות הפירעון;

(ד) פושט רגל שלא הופטר; וכן

(ה) אדם שהוא, ביחס לחברה מסוימת, פסול על ידי תקנון החברה או על ידי תזכיר ההתאגדות שלה מלשמש כדירקטור באותה חברה.

15.3 דירקטור בחברה יתפטר לאלתר אם הוא פסול מלשמש כדירקטור, או אם הוא הופך להיות פסול מלשמש כדירקטור בהתאם לאמור דלעיל.

15.4 החוק אינו מחייב חברה למנות נושאי משרה, וזה נתון לשיקול דעתה של החברה. החוק אינו מפרט תנאים לפסילת כהונה של העברה של נושאי משרה מחברה באיי הבתולה הבריטיים.

**16. מדיניות תגמול**

16.1 בעלי המניות, או בכפוף להוראות תזכיר ההתאגדות ותקנון החברה, דירקטוריון החברה רשאי לקבוע את הגמול לדירקטורים בגין שירותים שיעמידו לחברה בכל תפקיד שהוא.

16.2 אין חובה חוקית לקיים מדיניות תגמול לדירקטורים ו/או לנושאי משרה.

**17. שיפוי**

דיני איי הבתולה הבריטיים אינם מגבילים את היקף השיפוי שאפשר לקבוע לדירקטורים ונושאי משרה בתקנון ההתאגדות של חברה, בכפוף לפסילת הוראת שיפוי על ידי בית משפט העליון באיי הבתולה הבריטיים עקב היותה מנוגדת לתקנת הציבור (לדוגמה, הוראה המתיימרת לשפות נושא משרה על תוצאות ביצוע עבירה פלילית). שיפוי יהיה בטל ומבוטל וללא כל נפקות כלפי אדם, אלא אם אדם זה פעל ביושר ובתום לב, ולפי אמונתו, לטובתה המרבית של החברה, ובמקרה של הליכים פליליים, בתנאי שלא הייתה לאותו אדם סיבה סבירה להניח שהתנהגותו אינה חוקית.

**18. ביטוח**

בכפוף להוראות החוק, החברה רשאית לרכוש ולהחזיק ביטוח בקשר עם כל מי שמכהן או כיהן כדירקטור בה, או מי שלבקשתה מכהן או כיהן כדירקטור בה, או מי שפעל או יפעל למען גוף מאוגד או שותפות, יזמה משותפת, נאמנות או יוזמה אחרת, בתפקיד אחר, כנגד כל אחריות שנטענת כלפיו והושתה עליו בגין אותה פעולה, בין אם לחברה ישנה או הייתה הסמכות לפצותו, בין אם לאו. למען הסר ספק, החברה רשאית לרכוש ולהחזיק ביטוח בקשר עם כל עובד או נושא משרה בחברה, כנגד כל חבות שתיטען כנגד העובד או נושא המשרה בגינה הוא חשוף, וזאת בין אם לחברה סמכות לשפות את אותו אדם כנגד אחריות ובין אם לאו.

---

[6] במקרה בו לחברה בעל מניות אחד בלבד אשר הינו יחיד, ואותו בעל מניות הינו גם הדירקטור היחיד בחברה, על אף כל האמור בתזכיר או בתקנון החברה, אותו בעל מניות/דירקטור רשאי, באמצעות החלטה בכתב, למנות אדם, אשר אינו פסול על-פי החוק לכהן כדירקטור בחברה, כדירקטור חלופי של החברה אשר יפעל חלף הדירקטור היחיד במקרה של פטירתו.

9

**19. מבקר פנים ורואה חשבון מבקר**

לא קיימת חובה החלה על חברה תחת החוק באיי הבתולה הבריטיים למנות מבקר פנים.

כמו כן לא קיימת חובה החלה על חברה בהתאם לחוק למנות רואה חשבון מבקר, אלא אם החברה הינה קרן נאמנות ציבורית או שהינה עוסקת בפעילויות מסוימות בתוך איי הבתולה הבריטיים אשר מחייבות את החברה להיות בעלת רישיון ולמנות רואה חשבון מבקר, דוגמת חברת ביטוח. הדירקטורים של החברה רשאים לקבוע בהתאם לשיקול דעתם האם דוחותיה הכספיים של החברה יבוקרו.

**20. דרישות חשבונאיות ורישומים כספיים**

20.1   החוק באיי הבתולה הבריטיים קובע כי :

א.   על חברה להחזיק, במשרד של הסוכן הרשום שלה או במיקום אחר, כפי שיקבע על-ידי הדירקטורים, את הרשומות והמסמכים[7] של החברה.

ב.   להחזיק ברשומות ובמסמכים לתקופה שלא תפחת מחמש (5) שנים ממועד : (א) של השלמת העסקה אליה מתייחסים אותם רשומות ומסמכים, או (ב) החברה סיימה את יחסיה העסקיים[8] אליהם מתייחסים אותם רשומות ומסמכים.,

ג.   להמציא לסוכן הרשום, ללא עיכוב, כל רשומה וכל מסמך בקשר עם החברה אותם ביקש הסוכן הרשום, זאת כאשר הסוכן הרשום נדרש לבקשם על-ידי ועדת השירותים הפיננסיים של איי הבתולה הבריטיים, או על-ידי רשות מוסמכת אחרת הפועלת מכוח סמכות שהוענקה לה

ד.   לוודא כי הרשומות והמסמכים של החברה יהיו : (א) מספקים בכדי להציג ולהסביר את עסקאות החברה ; (ב) ואשר מעת לעת יאפשרו לקבוע את מצבה הכספי של החברה בדיוק סביר.

ה.   כאשר הרשומות או המסמכים נשמרים במקום או במקומות שאינם משרדו של הסוכן הרשום של החברה, להמציא לסוכן הרשום : (א) תיעוד בכתב של הכתובת הפיסית שבה שמורים הרשומות והמסמכים ; וכן (ב) תיעוד בכתב של האדם אשר מחזיק על הרשומות והמסמכים של החברה.

ו.   כאשר המקום או מקומות שבו נמצא הרישום והתיעוד הבסיסי של החברה, או כאשר השם של האדם המחזיק ברשומות החברה, משתנה, החברה תמסור לסוכן הרשום שלה, בתוך 14 ימים מיום השינוי, את : (א) הכתובת הפיסית של המיקום החדש של הרשומות והמסמכים ; או (ב) השם של האדם החדש המחזיק ברשומות ובמסמכים של החברה.

20.2   חברה[9] חייבת, בכל שנה, להגיש דוח הכנסות שנתי באמצעות הסוכן הרשום שלה. דוח ההכנסות השנתי יוגש בתוך 9 חודשים מתום השנה[10] אליה מתייחס דוח ההכנסות כאמור, ויהיה בנוסח שנקבע על ידי ועדת השירותים הפיננסיים. באם החברה לא תגיש את דוח ההכנסות השנתי במועד כנדרש מכוח החוק באיי הבתולה הבריטיים, אזי הסוכן הרשום ימסור על כך הודעה לרשם החברות

---

[7]   רשומות ומסמכים כוללים חשבונות ורשומות (כגון חשבוניות, חוזים ומסמכים דומים) בקשר עם : (1) כל סכום אותו החברה קיבלה או הוציאה והעניין בגינו בוצעה אותה הכנסה/הוצאה ; (2) כל מכירה ורכישה של טובין על-ידי החברה ; ו-(3) הנכסים וההתחייבויות של החברה.

[8]   "יחסים עסקיים" – הינם יחסים מתמשכים בין החברה ואדם אחד או יותר עימם החברה מתקשרת בעסקים בין אם באופן חד פעמי ובין על בסיס קבוע.

[9]   הדרישה להכנה ולהגשת דוח החזרים שנתי לא חלה על (א) חברה נסחרת ; (ב) חברה שמפוקחת מכוח חקיקת השירותים הפיננסיים ואשר ממציאה דוחות כספיים לוועדת השירותים הפיננסיים בהתאם לחוקי השירותים הפיננסיים ; וכן (ג) חברה שמגישה את החזרי המס השנתיים שלה למחלקת ההכנסה הישבתית (Inland Revenue Department) באמצעות הדוחות הכספיים של החברה.

[10]   המונח "שנה" מתייחס לשנה קלנדרית, ובאם שנת הכספים של חברה אינה שנה קלנדרית, אזי לשנת הכספים של החברה.

10

באיי הבתולה הבריטיים, לא יאוחר משלושים ימים מהמועד בו היה על הדוח להיות מוגש.

**21. עיון במסמכי החברה**

21.1 חברים מקרב הציבור רשאים, כנגד תשלום עמלה נומינלית, לעיין במרשמים הציבוריים של החברה הפתוחים לעיון הציבור ברשם לעניייני חברות של איי הבתולה הבריטיים (**"רשם החברות"**) אשר יכללו את תעודת ההתאגדות של החברה, תזכיר ההתאגדות ותקנון החברה (לרבות שינויים), רשימה של כל הדירקטורים המכהנים וכן רישום של אגרות ששולמו לאותו מועד וכן רשומות אלו יכללו גם הודעות בדבר פירוק, מיזוג או רישום שהוגשו על-ידי החברה שעובדים אם החברה בחרה לדווח על רישום כאמור.

21.2 בעל מניות בחברה, רשאי לאחר מתן הודעה בכתב לחברה, לעיין במסמכים הבאים: (1) תזכיר ותקנון; (2) מרשם בעלי מניות; (3) מרשם הדירקטורים; ו - (4) פרוטוקול אסיפות בעלי מניות והחלטותיהם, וכן בפרוטוקולים ובהחלטות של אסיפות של אסיפות מסוג שהוא נמנה עליהם. וכן ליצור העתקים או להכין תמציות מהמסמכים והרישומים. בכפוף לתזכיר ולתקנון, הדירקטורים רשאים, אם השתכנעו שהדבר מנוגד לאינטרסים של החברה להתיר לבעל מניות לעיין בכל אחד מהמסמכים המפורטים בס"ק 2, 3 ו-4 לעיל, לסרב לעיון או להגביל את העיון במסמך, לרבות הגבלת הזכות להעתיק או להכין תמציות מרישומים.

21.3 במקרה שהחברה אינה מאפשרת או מסרבת להתיר לבעל מניות לעיין במסמך כאמור או מתירה לו לעיין במסמך כאמור כפוף הגבלות, רשאי אותו בעל המניות לעתור לבית המשפט העליון באיי הבתולה הבריטיים לצו שיתיר לו לעיין במסמך או לעיין בו ללא הגבלות.

21.4 החברה מחויבת להחזיק במשרדו של הסוכן הרשום את: תזכיר ההתאגדות ותקנון החברה; מרשם בעלי המניות או העתק ממנו; מרשם הדירקטורים או העתק ממנו; העתק של כל ההודעות והמסמכים האחרים שהוגשו על ידי החברה בעשר השנים האחרונות.

21.5 כאשר החברה מחזיקה בהעתקים של מרשם בעלי המניות, מרשם הדירקטורים אצל הסוכן הרשום, עליה להודיע לסוכן הרשום על כל שינוי במרשמים האמורים, בכתב, בתוך 15 יום משינוי כאמור; וכן לספק לסוכן הרשום בכתב פרטים על המען או המענים שבו או בהם המרשם המקורי של בעלי המניות או מרשם הדירקטורים נשמר. כאשר המקום שבו נשמר מרשם בעלי המניות המקורי או מרשם הדירקטורים המקורי משתנה, על החברה לספק לסוכן הרשום פרטים על המען החדש למרשמים בתוך 14 יום משינוי מען כאמור.

21.6 החברה גם נדרשת לשמור במשרדי הסוכן הרשום או בכל מקום או מקומות אחרים, בתוך או מחוץ לאיי הבתולה הבריטיים, כפי שיקבעו הדירקטורים, פרוטוקולים והחלטות של אסיפות של בעלי המניות, פרוטוקולים והחלטות של ישיבות הדירקטוריון ופרוטוקולים והחלטות של ועדות הדירקטוריון. יש לשמור רשומות כאמור לתקופה של חמש שנים לפחות, החל ממועד השלמת העסקה אליה מתייחסים הרישומים והמסמכים, או ממועד סיום הקשרים העסקיים אליהם הם מתייחסים. אם המסמכים האמורים אינם נשמרים במשרדי הסוכן הרשום, החברה נדרשת לספק לסוכן הרשום פרטים בכתב על המקום או המקומות שבו או בהם נשמרים המסמכים האמורים ולידע את הסוכן הרשום בתוך 14 יום, בדבר המען של כל מקום חדש שבו נשמרים המסמכים האמורים.

21.7 כאשר החברה יוצרת שעבוד על כל אחד מנכסיה, על החברה להחזיק במרשם של שעבודים ולכלול פרטים בדבר שעבודים במרשם כאמור. מרשם השעבודים או העתק ממנו יישמרו במשרדה הרשום של החברה או במשרד של הסוכן הרשום שלה. ככל שייערך שינוי בשעבוד או בפרטים שיש לכלול במרשם השעבודים, על החברה להעביר, בתוך 14 ימים ממועד השינוי, את פרטי השינוי אל הסוכן הרשום.

**22. סמכות לפשרה או הסדר**

קיימות מספר הוראות חוק המאפשרות הן תוכניות להסדר והן מתכונות להסדר.

*תכנית להסדר*

22.1 בקשר לתוכנית להסדר, "הסדר" יכלול:

א.    תיקון לתקנון החברה ;

ב.    ארגון מחדש של החברה ;

ג.    מיזוג או איחוד של חברה אחת או יותר אשר הינן חברות שהתאגדו תחת החוק עם חברה אחת או יותר, אם החברה השורדת או המאוחדת תהיה חברה המאוגדת תחת החוק ;

ד.    הפרדת שני עסקים או יותר מהחברה ;

ה.    כל מכירה, העברה, החלפה או שינוי אחר בכל חלק מנכסי החברה או עסקיה עם כל אדם בתמורה למניות, חוב או ני"ע אחרים של אותו אדם, או כספים, או נכסים אחרים או שילוב של האמורים לעיל ;

ו.    כל מכירה, העברה, החלפה או כל שינוי אחר בהחזקה במניות, חוב או ני"ע אחרים בחברה המוחזקת על-ידי המחזיקים באותן מניות, חוב או ני"ע אחרים בחברה, או כספים, או נכסים אחרים או שילוב של האמורים לעיל ;

ז.    פירוק החברה ; ו-

ח.    כל שילוב של האמור בסעיפים א-ז לעיל.

22.2 תכנית להסדר תאושר בהחלטה של חברי הדירקטוריון של החברה ובאמצעות בקשה לבית המשפט העליון באיי הבתולה הבריטיים לקבלת אישור להסדר המוצע.

22.3 במקרה שבית המשפט העליון באיי הבתולה הבריטיים יוציא צו המאשר תכנית להסדר, הדירקטורים בחברה, ככל שהם עדיין מעוניינים בביצוע התוכנית, יאשרו את התוכנית להסדר כפי שאושרה על ידי בית המשפט, בין אם בית המשפט הורה לבצע בה תיקונים ובין אם לאו.

22.4 עם אישור התוכנית להסדר, הדירקטורים בחברה : (א) ימסרו הודעה לאנשים אשר צו בית המשפט העליון באיי הבתולה הבריטיים מורה למסור להם הודעה ; וכן (ב) יגישו את התוכנית להסדר לאותם אנשים לצורך קבלת אישורם, אם בכלל, לפי דרישת בית המשפט.

22.5 לאחר אישור התוכנית להסדר על ידי אותם אנשים מהם דורש צו בית המשפט העליון באיי הבתולה הבריטיים אישור, מסמכי ההסדר ייחתמו על ידי החברה ויכללו (א) את התוכנית להסדר ; (ב) את צו בית המשפט המאשר את התוכנית להסדר ; וכן (ג) את האופן בו אושרה התוכנית להסדר, ככל שנדרש אישור בצו של בית המשפט העליון באיי הבתולה הבריטיים. מסמכי ההסדר יוגשו לרשם החברות המקומי אשר ירשום אותם. במעמד רישום מסמכי ההסדר, רשם החברות המקומי ינפיק תעודה בנוסח מאושר, המעידה כי מסמכי ההסדר נרשמו.

22.6 ההסדר יכנס לתוקף במועד בו מסמכי ההסדר נרשמו על ידי רשם החברות המקומי או במועד מאוחר יותר שלא יעלה על שלושים יום, כאמור במסמכי ההסדר.

22.7 מפרק מרצון של החברה רשאי לאשר תכנית להסדר במקרה שחברה מצויה בפירוק, ובמקרה כזה המפרק מרצון יבצע את תפקידי הדירקטור המפורטים לעיל ויהיה כפוף להתאמות נוספות כפי שימצא לנכון.

*מתכונת להסדר*

22.8 במקום שפשרה או הסדר (הכוללת רה ארגון של הון המניות של החברה על ידי איחוד מניות מסוגים שונים או על ידי חלוקת המניות למניות מסוגים שונים, או על ידי שתי שיטות אלה) מוצעת בין חברה לבין נושיה, או כל סוג מהם, או בין החברה לבין בעלי מניותיה, או כל סוג מהם, בית המשפט העליון באיי הבתולה הבריטיים רשאי, לבקשת (א) החברה; (ב) נושה של החברה; (ג) בעל מניות; (ד) האדמיניסטרטור; (ה) המפרק, להורות על כינוס אספת נושים או אספת סוג של הנושים, או אספת בעלי מניות או אספת סוג בעלי המניות, לפי העניין, כפי שיורה בית המשפט.

22.9 אם רוב מספרי המייצג 75% משווי הנושים או סוג של נושים או בעלי מניות או סוג בעלי מניות, לפי העניין, נוכח ומצביע באספה בעצמו או באמצעות ייפוי כוח, ומסכים לפשרה או להסדר, הפשרה או ההסדר, ככל שאושרו על ידי בית המשפט העליון באיי הבתולה הבריטיים, יחייבו את כל הנושים או סוג הנושים, או בעלי המניות או סוג בעלי המניות, לפי העניין, וכן יחייבו את החברה, או במקרה שהחברה מצויה בפירוק מרצון או בפירוק בהתאם לחוק חדלות הפירעון, יחייבו את המפרק ואת כל האנשים האחרים החייבים לתרום לנכסי החברה במקרה של פירוק.

22.10    צו בית המשפט העליון באיי הבתולה הבריטיים שהוצא כאמור לעיל לא יהיה בתוקף כל עוד לא הוגש העתק הצו לרשם החברות.

## 23. מכירה כפויה

בכפוף לתזכיר ותקנון ההתאגדות של החברה, בעלי מניות המחזיקים ב-90% מזכויות ההצבעה בחברה, רשאים להורות לחברה בכתב לפדות את המניות המוחזקות בידי בעלי המניות הנותרים. עם קבלת הוראה בכתב כאמור לעיל, חייבת החברה לפדות את המניות המפורטות בהוראה שבכתב, בין אם המניות הן מניות בנות פדיון לפי תנאיהן ובין אם לאו, ועליה להודיע בהודעה בכתב לכל בעל מניות שמניותיו עתידות להיפדות, ולפרט בהודעה כאמור את מחיר הפדיון ואופן ביצוע הפדיון. בנסיבות כאמור בעלי מניות מיעוט יכולים להתנגד לרכישה וזכותם לקבל תשלום בשווי הוגן למניותיהם כפי שיוערך על בסיס הליך הערכת שווי סטטוטורית.

## 24. אכיפת פסקי חוץ

24.1 פסקי דין זרים אינם ניתנים לאכיפה באיי הבתולה הבריטיים, אך ניתן לאוכפם באמצעות תביעה במסגרת המשפט המקובל או במקרה של פסקי דין שניתנו בידי סמכויות שיפוט מסוימות – באמצעות רישום באיי הבתולה הבריטיים לפי הפקודה לאכיפה הדדית של פסקי דין זרים או החוק לאכיפה הדדית של פסקי דין. יצוין כי לא כל פסק דין זר ניתן לאכיפה. חלקם עשויים לזכות בהכרה רק על ידי בתי המשפט באיי הבתולה הבריטיים[11]. החוק לאכיפה הדדית של פסקי דין (כפי שתוקן), ופקודת אכיפת פסקי חוץ (אכיפה הדדית) (כפי שתוקנה), אינם חלים בישראל או בארה"ב, ועל כן אכיפה באמצעות המשפט המקובל באיי הבתולה הבריטיים הינה רלבנטית. על פי המשפט המקובל, בתי המשפט באיי הבתולה הבריטיים יתייחסו לפסק דין כספי סופי וחלוט בנוגע לסכום מוגדר, שהתקבל כנגד החייב בבתי משפט בסמכויות שיפוט זרות, כאל עילת תביעה לחוב עצמו, כך שמשפט חוזר אינו הכרחי, ובלבד שבנוגע לפסקי דין זרים:

א.    בית המשפט הזר שנתן את פסק הדין היה בעל סמכות שיפוט בעניין והחברה כפופה לסמכות שיפוט כאמור או שהייתה תושבת או ניהלה עסקים בתחומי סמכות שיפוט כאמור, וההזמנה לדין נמסרה לה כדין;

---

[11] לדוגמה, פסק דין אשר דוחה תביעה (אם כי צו להוצאות ניתן לאכיפה); פסק דין הצהרתי; והוראות בקשר עם פשיטת רגל של יחידים או פירוק חברות. בית המשפט באיי הבתולה הבריטיים רשאי גם להכיר בפסק דין זר כהגנה מפני פעולה או להכיר בו כמנגנון העברה של נכסים.

ב.‏ פסק הדין שניתן על ידי בית המשפט הזר לא היה קשור בעונשים, מיסים, קנסות, או התחייבויות דומות בדבר מיסוי או הכנסות של החברה;

ג.‏ בקבלת פסק הדין לא הייתה כל מרמה מצד האדם אשר לטובתו ניתן פסק הדין או מצד בית המשפט הזר;

ד.‏ הכרה או אכיפה של פסק הדין באיי הבתולה הבריטיים לא תעמוד בסתירה לתקנת ציבור; וכן

ה.‏ ההליכים לפיהם התקבל פסק הדין לא עמדו בסתירה לכללי הצדק הטבעי.

24.2 בהתאם לחוק החל באיי הבתולה הבריטיים, פסק דין או צו לתשלום סכום כסף, למעט צו לתשלום כסף לבית משפט, ניתן לאכיפה באמצעות (א) צו חיוב; (ב) צו עיקול אצל צד שלישי; (ג) זימון למשפט; (ד) צו לתפיסה ומכירה של נכסים; וכן (ה) מינוי כונס נכסים.

24.3 צד להליך משפטי בבית משפט זר מחוץ לאיי הבתולה הבריטיים אשר נפסק לזכותו פסק דין שאינו מקנה סעד כספי, פסק דין הצהרתי כאמור או צו מניעה, עשוי, בנסיבות מסוימות, להיות מסוגל לאכוף את פסק הדין כאמור בבתי המשפט של איי הבתולה הבריטיים. הדבר עשוי להיות כרוך בכך שאותו צד כאמור יפתח בהליכים חדשים באיי הבתולה הבריטיים בהם ניתן להסתמך על דוקטרינת הגינות או על השתק כדי לקבל פסק דין בהליך מקוצר מבית משפט באיי הבתולה הבריטיים בטענה כי דיון מחדש בתביעה יהווה ניצול לרעה של ההליכים. על מנת לעשות שימוש בדוקטרינת ההגינות או בהשתק יש לעמוד במספר תנאים לרבות: (א) פסק הדין זר שאינו מקנה סעד כספי, חייב להתבסס על עילת תביעה המוכרת מכוח חוקי איי הבתולה הבריטיים; (ב) ההליך המשפטי הזר חייב להיות בקשר עם אותם הצדדים ולעסוק באותן הסוגיות; (ג) פסק הדין הזר צריך להינתן על ידי בית משפט בעל סמכות שיפוטית;(ד) פסק הדין חייב להיות סופי וחד משמעי; וכן (ה) החייב מכוח פסק הדין חייב היה או להיות נוכח במדינה הזרה במועד פתיחת ההליכים הזרים, או להיות כפוף לסמכות השיפוט של בית המשפט הזר באופן וולונטרי ולהופיע להליכים המשפטיים הזרים, או טרם תחילת ההליכים כאמור, להסכים להיות כפוף לבית המשפט הזר בקשר עם הסוגייה נשוא ההליכים.

24.4 בית המשפט באיי הבתולה הבריטיים ממלא תפקיד תומך המקל על הליכי בוררות, והוא יכיר ויאכוף פסקי בוררות זרים שניתנו באחת מהמדינות שהתקשרו באמנת ניו יורק בהתאם לתנאי האמנה. בנוסף, בכפוף לחוק הבוררות (כפי שתוקן), : (א) איי הבתולה הבריטיים הפכו למורשה חתימה של אמנת ניו יורק ו-(ב) העילות לסירוב לאכיפה החלות על פסק בוררות של אמנת ניו יורק חלות גם על אכיפת פסק בוררות שלא הוענק בכפוף לאמנה, ובשני המקרים עילות אלו מעוגנות במלואן בחוק הבוררות עצמו(כפי שתוקן).

24.5 תקנון החברה עשוי לקבוע בכל מקרה של מחלוקת לחברה או החברה ובעלי מניותיה או בין בעלי מניות החברה לבין עצמם, כי יש ליישבם באמצעות בוררות כזו להתנהל באיי הבתולה הבריטיים על פי או בהתאם לחוק הבוררות (כפי שתוקן), או כל חקיקת משנה מכוחו.

## 25. פירוק

25.1 פירוק חברה באיי הבתולה הבריטיים, יהיה פירוק מרצון של חברה בעלת כושר פירעון, או לפי חוק חדלות פירעון. מקום בו חברה נמחקה[12] ממרשם החברות בהתאם לחוק, והחברה תחשב לחברה

---

[12] מקום בו חברה נמחקה ממרשם החברות ופורקה, החברה והדירקטורים, בעלי המניות וכל מפרק או כונס נכסים של החברה, לא יהיו רשאים: (א) להתחיל הליכים משפטיים, להמשיך את עסקי החברה או לבצע עסקאות בנכסיה בכל צורה שהיא; (ב) להגן מפני הליכים משפטיים או דרישות בשם החברה או ביחס לזכויותיה; או (ג) לפעול בכל צורה שהיא ביחס לעסקי החברה. יחד עם זאת, מקום בו חברה נמחקה ממרשם החברות ופורקה, החברה, או דירקטור, בעל מניות, מפרק או כונס נכסים של החברה, רשאים: (א) להגיש בקשה לרשם החברות לשיקום החברה; (ב) להמשיך להגן מפני הליכים משפטיים אשר החל מועד מחיקת החברה ממרשם החברות; ו-(ב) להמשיך הליכים משפטיים אשר הוגשו בשם החברה לפני מועד המחיקה. מחיקת חברה ממרשם החברות ופירוקה אינה מונעת: (א) מהחברה מלחשוף את עצמה למחויבויות; או (ב) מכל נושה מלהעלות טענות

שהתפרקה במועד בו רשם החברות יפרסם הודעה על מחיקת החברה בעיתון הרשמי של איי הבתולה הבריטיים.).

*פירוק מרצון*

25.2 במקרה שפירוק הינו פירוק מרצון של חברה בעלת כושר פירעון, הוראות החוק מסדירות את הפירוק. חברה רשאית להתפרק בפירוק מרצון לפי חוק רק אם אין לה התחייבויות או אם ביכולתה לשלם את חובותיה בהגיע מועד פירעונם ושווי נכסיה עולה על התחייבויותיה. בכפוף לתזכיר ותקנון ההתאגדות של החברה, מפרק רשאי להתמנות בהחלטת דירקטוריון או בהחלטת בעלי מניות, אך אם הדירקטורים החלו בפירוק בהחלטת דירקטוריון, בעלי המניות יאשרו את תכנית הפירוק בהחלטת בעלי מניות, למעט בנסיבות מוגבלות.

25.3 מפרק יחיד שמונה לאחר 1 בינואר 2023, חייב להיות תושב איי הבתולה הבריטיים. יחיד המתגורר מחוץ לאיי הבתולה הבריטיים עשוי להיות ממונה כמפרק שותף יחד עם תושב איי הבתולה הבריטיים.

25.4 מפרק מתמנה לצורכי גביה ומימוש נכסי חברה וחלוקת הכנסות מההליכים האמורים לנושים.

*פירוק לפי חוק חדלות פירעון*

25.5 חוק חדלות פירעון מסדיר פירוק של חברה חסרת יכולת פירעון. בהתאם לחוק חדלות פירעון, חברה היא חסרת יכולת פירעון אם: היא אינה יכולה לציית לדרישות של תביעה סטטוטורית אשר לא נדחתה על פי חוק חדלות פירעון, ההוצאה לפועל או תהליך אחר אשר הוצא בפסק דין, צו או הוראה של בית משפט של איי הבתולה לטובת נושה של החברה ותביעה כאמור מושבת ריקם, במלואה או בחלקה, ערך ההתחייבויות של החברה עולה על נכסיה או שהחברה אינה מסוגלת לשלם את חובותיה עם הגיע מועד פירעונם. על המפרק להיות כונס הנכסים הרשמי באיי הבתולה או כונס מורשה באיי הבתולה לפירוק חברות. יחיד שאינו תושב איי הבתולה יכול להתמנות כמפרק ביחד עם כונס מורשה באיי הבתולה לפירוק חברות או כונס הנכסים הרשמי. בעלי המניות של החברה יכולים למנות כונס מומחה בתחום חדלות הפירעון כמפרק של החברה או שבית המשפט יכול למנות כונס רשמי או מומחה כשיר בתחום. הפנייה לבית המשפט יכולה להתבצע על ידי אחד או יותר מהבאים: (א) החברה, (ב) נושה, (ג) בעל מניות, (ד) המפקח על הסדר נושים לחברה, הוועדה לשירותים פיננסיים או התובע הכללי באיי הבתולה הבריטיים.

25.6 בית המשפט יכול למנות מפרק אם:

(א)    החברה היא חסרת כושר פירעון,

(ב)    בית המשפט סבור כי זה אך הוגן וצודק שימונה מפרק או

(ג)    בית המשפט סבור כי מינוי מפרק הינו לטובת הציבור.

25.7 פנייה לבית המשפט במסגרת ס"ק (א) לעיל על ידי בעל מניות תיעשה רק באישור בית המשפט ואישור כאמור לא יינתן אלא אם נחה דעתו של בית המשפט כי יש עילה לכאורה שהחברה חסרת כושר פירעון. פנייה לבית המשפט במסגרת ס"ק (ג) לעיל תיעשה רק על ידי הוועדה לשירותים פיננסיים או התובע הכללי, וביכולתם לפנות לבית המשפט במסגרת ס"ק (ג) לעיל רק אם החברה נשוא הפנייה היא, או הייתה בזמן כלשהו, גוף מפוקח (למשל, גוף אשר מחזיק רישיון למתן שירותים פיננסיים) או שהיא מנהלת, או ניהלה בזמן כלשהו, עסק למתן שירותים פיננסיים ללא רישיון.

---

כנגד החברה ולהמשיך בהן עד לקבלת פסק דין או הוצאה לפועל, ואינה פוגעת בהתחייבויותיהם של מי מבעלי המניות, הדירקטורים, נושאי המשרה או הסוכנים של החברה.

*צו לתשלומים עדיפים אגב פירוק*

25.8 בעת פירוק חברה חסרת כושר פירעון, נכסיה ישמשו לפירעון חובותיה בסדר הבא: (א) קודם לתשלום של כל יתר התביעות, תשלום כל ההוצאות והעלויות שהוצאו בקשר להליכי הפירוק בהתאם לסדר העדיפויות; (ב) לאחר תשלום כל הוצאות ועלויות הליכי הפירוק, תשלום חובות עדיפים שאושרו על ידי המפרק (כגון הוצאות שכר עובדים, תשלומי חובה, הפרשות פנסיוניות, מיסים ממשלתיים), החובות העדיפים מדורגים בדרגה שווה בינם לבין עצמם, ואם נכסי החברה אינם מספקים לצורך פירעון התשלומים העדיפים במלואם, הם ישולמו על בסיס פרו רטה; (ג) לאחר פירעון החובות העדיפים, תשלום יתרת התביעות שאושרו על ידי המפרק, כולל חובות לנושים לא מובטחים - חובות לנושים בלתי מובטחים של החברה מדורגים בדרגה שווה בינם לבין עצמם - ואם נכסי החברה אינם מספקים לצורך פירעון התביעות של הנושים הבלתי מובטחים במלואם, הן תשולמנה על בסיס פרו רטה; (ד) לאחר פירעון כל החובות שאושרו על ידי המפרק, תשלום בהתאם לדיני הפירוק של איי הבתולה הבריטיים; ולבסוף (ה) כל יתרת נכסי החברה לאחר תשלום ההוצאות, העלויות והתביעות המפורטות לעיל יחולקו בין בעלי המניות בחברה בהתאם לזכויותיהם בחברה.

החלק השמיני לחוק חדלות הפירעון של איי הבתולה, קובע מספר הוראות אשר מפרק החברה עשוי להשתמש בהם בכדי לבטל עסקות שהפחיתו באופן בלתי הוגן את נכסי החברה הניתנים לנושים.

25.9 מינוי מפרק לנכסי חברה לא ישפיע על זכותו של נושה מובטח לתפוס בעלות וממש או להתמודד בצורה אחרת עם נכסי החברה המהווים בטוחה לנושה כאמור. בהתאם, נושה מובטח רשאי לאכוף את הבטוחה שלו במישרין ומבלי להזדקק למפרק, תוך מתן עדיפות לסדר התשלומים המתואר בפסקה 25.8. יחד עם זאת, ככל שנכסיה של חברה בפירוק הזמינים לתשלום תביעות נושים בלתי מובטחים אינם מספקים לתשלום העלויות וההוצאות של הפירוק והנושים העדיפים, הרי שלעלויות, הוצאות ותביעות כאמור תינתן עדיפות על פני תביעות של בעלי שעבוד בגין נכסים הכפופים לשעבוד צף שנוצר על ידי החברה ואשר תשולמנה בהתאם מתוך נכסים כאמור.

*עסקאות הניתנות לביטול*

25.10    במקרה של חברה בחדלות פירעון, קיימים ארבעה סוגי עסקאות הניתנות לביטול, אשר נקבעו בחוק חדלות הפירעון:

(א) **העדפה בלתי הוגנת** – בהתאם לסעיף 245 לחוק חדלות פירעון, עסקה בה התקשרה החברה, אם נכנסה לתוקף ב"תקופת המגבלות" (Hardening Period), כהגדרתה להלן, אם בעת ההתקשרות החברה הייתה חדלת פירעון, או אם העסקה הביאה את החברה לחדלות פירעון ("**עסקה בחדלות פירעון**"), ואשר כתוצאה ממנה הנושה מצוי בעמדה טובה יותר מהעמדה בה היה בה ללא העסקה, תיחשב כהעדפה בלתי הוגנת וכמבוטלת. עסקה אינה בגדר העדפה בלתי הוגנת אם התקיימה במהלך העסקים הרגיל. יצוין כי סעיף זה יחול גם אם התשלום או ההעברה בוצעו כנגד תמורה שוות ערך או בשווי חסר.

(ב) **עסקאות בשווי חסר** – בהתאם לסעיף 246 לחוק חדלות פירעון, הענקת מתנה או התקשרות בעסקה ללא תמורה, או אם שווי התמורה בגין העסקה, בכסף או בשווה כסף, נמוך באופן משמעותי מהשווי בכסף או בשווה כסף של התמורה שניתנה על ידי החברה, תיחשב (אם מדובר בעסקה בחדלות פירעון שנכנסה לתוקף בתקופת המגבלות) כעסקה בשווי חסר. לא יראו את החברה כאילו התקשרה בעסקה בשווי חסר אם התקשרה בה בתום לב ולצרכים עסקיים, ואם בעת ההתקשרות בעסקה, היו סיבות סבירות להאמין שהעסקה הינה לטובת החברה.

(ג) **שעבודים צפים ברי ביטול** – בהתאם לסעיף 247 לחוק חדלות פירעון, שעבוד צף שנוצר על ידי החברה ניתן לביטול אם מדובר בעסקה בחדלות פירעון שנוצרה בתוך תקופת המגבלות. שעבוד צף אינו ניתן לביטול אם הוא נועד להבטיח: (1) כסף שהועבר או שולם לחברה, או לפי שיקול דעתה, במקביל או לאחר יצירת השעבוד; (2) סכום של התחייבות כלשהי של החברה שבוטלה או הופחתה במקביל או לאחר יצירת השעבוד; (3) שווי נכסים שנמכרו או סופקו, או שירותים שניתנו לחברה במקביל או לאחר יצירת השעבוד; ו-(4) הריבית, אם בכלל, ששולמה על חשבון הסכומים שנזכרים בס"ק (1) – (3) בהתאם להסכם לפיו כסף הועבר או שולם, ההתחייבות בוטלה או הופחתה, הנכסים נמכרו או סופקו, או השירותים סופקו.

(ד) **עסקאות אשראי מופקעות** – בהתאם לסעיף 248 לחוק חדלות פירעון, עסקה בחדלות פירעון בה התקשרה חברה לשם קבלת אשראי לחברה או עסקה כאמור הכרוכה במתן אשראי לחברה, יכול שתיחשב כעסקת אשראי מופקעת אם, בהתחשב בסיכון שנוטל על עצמו האדם המספק את האשראי, תנאי העסקה הינם או היו כאלו המחייבים ביצוע תשלומים מופקעים בעליל בגין מתן האשראי, או אם העסקה סותרת באופן בוטה עקרונות מקובלים של מסחר הוגן, ועסקה כאמור מתבצעת בתוך תקופת המגבלות.

25.11 "תקופת המגבלות" ("Hardening Period") הידועה בחוק חדלות פירעון כ"תקופת הפגיעות" ("Vulnerability period") בקשר עם עסקאות הניתנות לביטול המפורטות לעיל, הינה כדלקמן:

(1) למטרות סעיפים 245, 246 ו-247 לחוק חדלות פירעון התקופה משתנה בהתאם לשאלה האם האדם, או האנשים, עמם התקשרה החברה בעסקה, או אשר להם ניתנה ההעדפה, נחשבים "אנשים קשורים" לחברה כמשמעות המונח בחוק חדלות פירעון:

[1] במקרה של "אנשים קשורים" "תקופת המגבלות" הינה התקופה המתחילה שנתיים עובר ל"מועד הקובע לחדלות הפירעון" ומסתיימת עם מינוי המפרק לחברה; ו-

[2] במקרה של אנשים אחרים, "תקופת המגבלות" הינה התקופה המתחילה שישה חודשים עובר ל"מעד הקובע לחדלות הפירעון" ומסתיימת עם מינוי של מפרק לחברה; ו-

(2) למטרות סעיף 248 לחוק חדלות פירעון "תקופת המגבלות" הינה התקופה המתחילה חמש שנים עובר ל"מועד הקובע לחדלות פירעון" ומסתיימת עם מינוי המפרק לחברה מבלי להתחשב בשאלה האם האנשים עמם התקשרה החברה הינם "אנשים קשורים".

"המועד הקבוע לחדלות פירעון" למטרות אלה הינו המועד שבו הוגשה בקשה למינוי מפרק (אם הפרק מונה על ידי בית המשפט) או מועד מינוי המפרק (אם המפרק מונה על ידי בעלי המניות).

25.12 העברת נכסים המתבצעת על ידי אדם מתוך כוונה להונות נושים ניתנת לביטול במקרה שאדם נפגע בעטיה. אין כל דרישה כי בעת ההתקשרות בעסקה הרלבנטית צד אחד הינו חדל פירעון או הפך לחדל פירעון כתוצאה מהעסקה, ואין כל דרישה שהצד המעביר ייכנס לאחר מכן לפירוק או כינוס. יחד עם זאת, לא ניתן לתקוף העברה כאמור אם בוצעה כנגד תמורה בעלת ערך ובתום לב עם אדם שלא היה מודע לכוונה להונות.

## 26. סמכות שיפוט

בהתאם להוראות תקנון החברה, החברה רשאית להתקשר במסמכים אשר הדין הישראלי הוא הדין השולט בהם. כמו כן יכולה החברה לקבוע כי בתי המשפט בישראל יהיו המוסמכים לדון במסמכים האמורים וההתקשרות תהיה על פי דין, תקפה ותחייב את החברה בהנחה שהדר נעשה בתום לב, ותיחשב כתקפה ומחייבת על ידי בתי המשפט בישראל.

הרינו מסכימים להכללת חוות דעת זו ותרגומה לעברית (אותו לא בדקנו) בתשקיף להשלמה של החברה

(או כל טיוטה שלו) העתיד להתפרסם לא יאוחר מחודש נובמבר 2025 ולהגשתה לרשות ניירות ערך הישראלית (ככל שהדבר רלוונטי).

חוות דעת זו ניתנת, אך ורק בהתייחס ובהתבסס על הנסיבות והעובדות הקיימות והידועות לנו במועד חוות דעת זו. חוות דעת זו מתייחסת אך ורק לדיני איי הבתולה הבריטיים אשר הינם בתוקף במועד חוות דעת זו.

חוות דעת זו הינה באנגלית ולא אישרנו ולא תהא לנו אחריות כלשהי בקשר עם תרגום חוות דעת זו.

נמעני חוות דעת זו בלבד רשאים להסתמך על חוות דעת זו. כל אדם אחר אינו רשאי להסתמך על חוות דעת זו ללא הסכמתנו לכך מראש ובכתב.

אנו מסמיכים בזאת את מורשי החתימה האלקטרונית של החברה, להגיש חוות דעת זאת באמצעים אלקטרוניים (ככל שהדבר רלוונטי), לרשות ניירות ערך הישראלית.


בכבוד רב,

Maples and Calder

18

# תוספת ראשונה

# רשימה של נמענים

**SIMAD Holdings, Ltd.**

ת.ד. 173

רואד טאון

טורטולה

איי הבתולה הבריטיים


הבורסה לניירות ערך בתל אביב בע״מ

רחוב אחוזת בית 2, תל אביב

ישראל


גולדפרב גרוס זליגמן ושות׳,

מגדל אלקטרה,

רחוב יגאל אלון 98,

תל-אביב 6789141

ישראל


19

# פרק 6 – יעוד התמורה

6.1. **תמורת ההנפקה**

התמורה הצפויה מהנפקת ניירות הערך המוצעים וההוצאות המשוערות הכרוכות בהנפקת ניירות הערך המוצעים, יפורטו בהודעה המשלימה אשר תפרסם החברה בהתאם לסעיף 16(א1)(2) לחוק ניירות ערך התשכ"ח-1968 ותקנות ניירות ערך (הודעה משלימה וטיוטת התשקיף), התשס"ז-2007. למועד התשקיף, טרם סוכמו פרטי התקשרות והתמורה למפיצים.

יחד עם זאת, החברה מעריכה כי התמורה הצפויה (ברוטו) בהנחה שתירכש כל הכמות המונפקת לציבור של אגרות החוב (סדרה א') המוצעות לפי תשקיף זה וההודעה המשלימה וכן סך כל ההוצאות הצפויות הכרוכות בהכנה ובפרסום תשקיף זה וההודעה המשלימה הינן כמפורט להלן :

| | |
|---|---|
| התמורה המיידית הצפויה (ברוטו) | 610,700 אלפי ש"ח |
| בניכוי עמלות ייעוץ, ניהול, הפצה וריכוז | כ-15,000 אלפי ש"ח |
| בניכוי הוצאות אחרות | כ-200 אלפי ש"ח |
| **סך התמורה הצפויה (נטו)** | **כ-595,500 אלפי ש"ח** |

בהתאם, החברה מעריכה כי בהנחה שתירכש כל הכמות המונפקת לציבור של אגרות החוב (סדרה א'), סך הוצאות ההנפקה יהוו כ-2.5% מסך התמורה המיידית הצפויה (ברוטו) בגין אגרות החוב.

יודגש, כי האמור לעיל בדבר הוצאות ההנפקה הינו הערכה ראשונית של החברה בלבד על בסיס המידע הקיים לה במועד זה והערכותיה, והסכומים הנ"ל ועשויים להשתנות ויעודכנו במסגרת ההודעה המשלימה.

6.2. **יעוד תמורת ההנפקה**

בכוונת החברה לעשות שימוש בתמורת ההנפקה לשם מימון פעילותה העסקית השוטפת, לרבות רכישת נכסים ושיפוץ נכסי החברה הקיימים, ולשם חיזוק מבנה ההון של החברה ו/או תשמש תמורת ההנפקה את החברה על-פי החלטות דירקטוריון החברה כפי שיהיו מעת לעת.

מבלי לגרוע מהאמור, בכוונת החברה להשתמש בתמורת ההנפקה לשם (לפי סדר ההצגה וכתלות בהיקף ההנפקה בפועל) :

(**א**) – במקרה בו תנפיק החברה אגרות חוב בתמורה (ברוטו) לסכום של לפחות 148 מיליון דולר פירעון מוקדם של ההלוואה אשר הועמדה לה על-ידי Bank of America (אשר יתרה למועד התשקיף הינה כ-70 מיליון דולר (קרן)). לפרטים אודות ההלוואה כאמור ראה סעיף 7.14.4 לתשקיף ; (**ב**) תשלום לבעלי השליטה בחברה בסך של 50 מיליון דולר בתמורה לזכויות המעוברות (כמפורט בסעיף 7.1.6 לתשקיף) ;

במקרה בו תנפיק החברה אגרות חוב בתמורה (ברוטו) לסכום של לפחות 167 מיליון דולר – האמור בס"ק (א) ו-(ב) לעיל וכן (**ג**) פירעון מוקדם של ההלוואה אשר הועמדה בקשר עם הנכס Banner על-ידי גורם מממן (אשר יתרתה למועד התשקיף הינה בסך של כ-13 מיליון דולר (קרן)) ;

במקרה בו תנפיק החברה אגרות חוב בתמורה (ברוטו) לסכום של לפחות 172 מיליון דולר – האמור בס"ק (א), (ב) ו-(ג) לעיל וכן (**ד**) פירעון מוקדם של ההלוואות אשר הועמדו בקשר עם הנכס Island Lake על-ידי גורמים ממנים (אשר יתרתן למועד התשקיף הינה כ-5 מיליון אלפי דולר (קרן)) ;

במקרה בו תנפיק החברה אגרות חוב בתמורה (ברוטו) לסכום של לפחות 183 מיליון דולר – האמור בס"ק (א), (ב), (ג) ו-(ד) לעיל וכן (**ה**) פירעון מוקדם של ההלוואות אשר הועמדו בקשר עם הנכס Lokanda על-ידי גורמים ממנים (אשר יתרתן למועד התשקיף הינה כ-10.6 מיליון דולר (קרן)) ;

במקרה בו תנפיק החברה אגרות חוב בתמורה (ברוטו) לסכום של לפחות 225 מיליון דולר – האמור בס"ק (א), (ב), (ג), (ד) ו-(ה) לעיל פירעון מוקדם של ההלוואה אשר הועמדה לה על-ידי Bank of New Hampshire (אשר יתרה למועד התשקיף הינה כ-30 מיליון דולר (קרן)). לפרטים אודות ההלוואה כאמור ראה סעיף 7.14.4 לתשקיף ;

במקרה בו תנפיק החברה אגרות חוב בתמורה (ברוטו) לסכום של לפחות 253 מיליון דולר – האמור בס״ק (א), (ב), (ג), (ד) ו-(ה) לעיל וכן **(ו)** פירעון מוקדם של ההלוואות אשר הועמדו בקשר עם הנכסים Mesorah ו- Pine Forest, על-ידי גורם ממממן (אשר יתרן הכוללת למועד התשקיף הינה בסך של כ-39 מיליון דולר (קרן)).

יצוין ביחס למדרגות המפורטות בסעיף זה לעיל, כי ככל שתנפיק החברה אגרות חוב (סדרה א׳) בתמורה לסכום העולה על הנקוב במדרגה מסוימת אך בתמורה לסכום הנמוך מהמדרגה שלאחריה, וכן, ככל שתנפיק החברה אגרות חוב (סדרה א׳) בתמורה לסכום העולה על השימושים המפורטים במדרגות לעיל, החברה תעשה שימוש בהפרש לצורך פעילותה העסקית השוטפת, לרבות רכישת נכסי נדל״ן מניב חדשים (שאינם בתחום הפעילות הנוכחי של החברה) ושיפוץ נכסי החברה הקיימים ו/או על-פי החלטות דירקטוריון החברה כפי שיהיו מעת לעת.

החברה עשויה, מעת לעת, על-פי שיקול דעתה הבלעדי ובאישור דירקטוריון החברה, לשנות את ייעוד תמורת ההנפקה. במקרה האמור, החברה תפרסם דוח מיידי בדבר ההחלטה.

החברה עשויה לגדר, באופן מלא או חלקי, את החשיפה שלה לתנודות בשערי החליפין של הדולר ארה״ב, אל מול השׁ״ח, כתוצאה מכך שאגרות החוב נקובות בשׁ״ח, על-ידי רכישת SWAP ועשויה להשתמש בתמורת ההנפקה לשם רכישת הגנה כאמור.

עד לשימוש בתמורת ההנפקה כאמור, החברה תפקיד ותשקיע את תמורת ההנפקה בהשקעות ברמת סיכון נמוכה, כפי שתמצא למתאים, בין היתר, מבין האפשרויות הבאות: פיקדונות בנקאיים בבנקים שדירוגם (בדירוג ישראלי A ומעלה (או דירוג בינלאומי שווה) ו/או אגרות חוב ממשלתיות המונפקות על-ידי בנק ישראל או ממשלת ארה״ב, ו/או מק״מ המונפק על-ידי בנק ישראל ו/או ניירות ערך דומים המונפקים על-ידי ממשלת ארה״ב, כפי שייקבע על-ידי הנהלת החברה מעת לעת.

יובהר, כי נכון למועד פרסום התשקיף, אין בכוונת החברה לעשות שימוש בתמורת ההנפקה לצורך השקעה בנגזרי מטבע שלא למטרות הגנת מטבע.

בנוגע לתשקיף המדף, במידה ויוצעו ניירות ערך בעתיד על-פי תשקיף מדף זה ועל-פי דוחות הצעת מדף, תמורת ההנפקה שתתקבל תשמש למימון פעילותה העסקית והשקעותיה של החברה בתחום פעילותה כמפורט בפרק 7 לתשקיף, על-פי החלטות דירקטוריון החברה כפי שיתקבלו מעת לעת. היה וייקבע ייעוד ספציפי לתמורת ניירות הערך על-פי דוח הצעת מדף שתפרסם החברה, הוא יפורט בדוח הצעת המדף.

6.3    **סכום מינימאלי**

הנפקת אגרות החוב על-פי תשקיף זה אינה מותנית בגיוס סכום מינימאלי, למעט הדרישה המתוארת בסעיף 2.3.1.2 לתשקיף.

6.4    **חיתום**

הצעת ניירות הערך המוצעים על-פי תשקיף זה תובטח בחלקה בחיתום, בהתאם לתקנה 11(א)(1) לתקנות אופן ההצעה. בכוונת החברה להתקשר עם אינפין קפיטל בע״מ (**"החתם המתמחר"**) בהסכם חיתום כאמור. בכפוף להתקשרות החברה בהסכם חיתום, החתם המתמחר יחתום על ההודעה המשלימה, אשר מכוחה יוצעו ניירות הערך המוצעים ויראו בחתימתו כאמור כחתימה על התשקיף. במסגרת ההודעה המשלימה יושלמו ו/או יעודכנו הפרטים החסרים בתשקיף, לרבות אך לא רק, חיתום, הפצה, ריכוז וכו׳.

# פרק 7 - תיאור עסקי החברה

## תוכן עניינים

| | | |
|---|---|---|
| 7.1 | פעילויות החברה וההתפתחות הכללית של עסקיה | 7-2 |
| 7.2 | תחום הפעילות של החברה | 7-10 |
| 7.3 | השקעות בהון החברה ועסקאות במניותיה | 7-10 |
| 7.4 | חלוקת דיבידנדים | 7-10 |
| 7.5 | מידע כספי לגבי תחום הפעילות של החברה | 7-11 |
| 7.6 | סביבה כללית והשפעת גורמים חיצוניים | 7-11 |
| 7.7 | תחום פעילות מחנות קיץ | 7-15 |
| 7.8 | רכוש קבוע | 7-38 |
| 7.9 | הון אנושי | 7-38 |
| 7.10 | הסכמים מהותיים | 7-38 |
| 7.11 | מגבלות ופיקוח על פעילות החברה | 7-38 |
| 7.12 | ביטוח | 7-38 |
| 7.13 | מימון | 7-39 |
| 7.14 | מיסוי | 7-42 |
| 7.15 | הליכים משפטיים | 7-46 |
| 7.16 | יעדים ואסטרטגיה עסקית ; התפתחות צפויה במהלך השנה הקרובה | 7-46 |
| 7.17 | דיון בגורמי סיכון | 7-46 |
| 7.18 | חברות בנות וקשורות של החברה | 7-52 |
| 7.19 | הסברי דירקטוריון החברה למצב ענייני החברה לתקופות שהסתיימו ביום 31 בדצמבר 2024, ביום 30 ביוני 2025 וביום 30 בספטמבר 2025 | 7-54 |

למועד התשקיף[1] החברה עומדת בתנאים הקבועים בסעיף 1(א) לתוספת הראשונה לתקנות ניירות ערך (פרטי התשקיף וטיוטת תשקיף – מבנה וצורה, התשכ״ט-1969 (**"תקנות פרטי תשקיף"**), ומשכך, תיאור החברה ועסקיה, כפי שיפורטו להלן, הינם לתקופה שתחילתה ביום 1 בינואר 2023 וסיומה סמוך למועד פרסום התשקיף, אלא אם צוין מפורשות אחרת.

---

[1] בפרק זה, **"מועד התשקיף"** – קרי, יום 30 ביוני 2025 ; **"מועד פרסום התשקיף"** – קרי, מועד פרסום התשקיף או מועד אחר סמוך לו, לפי העניין.

**חלק א – תיאור ההתפתחות הכללית של עסקי החברה**

7.1 **פעילויות החברה והתפתחותה העסקית**

7.1.1 SIMAD Holdings Ltd (**"החברה"**) התאגדה ביום 28 במאי 2025, בהתאם להוראות חוק ה-BVI Business Companies Act, 2004, באיי הבתולה הבריטיים, כחברה פרטית המוגבלת במניות.

7.1.2 החברה הוקמה, בין היתר, לצורך גיוס חוב באמצעות הנפקת אגרות חוב ורישומן למסחר בבורסה לניירות ערך בתל אביב בע"מ (**"הבורסה"**). ממועד התאגדותה ועד למועד התשקיף, לא הייתה לחברה פעילות כלשהי.

7.1.3 החברה פועלת בתחום מחנות הקיץ בארה"ב, כאשר במסגרת זו פועלת החברה לרכישה, ניהול והפעלה של מחנות קיץ לילדים ובני נוער בארה"ב, אשר ממוקמים בשטחי נדל"ן שבבעלותה. למועד התשקיף, לחברה 30 מחנות קיץ, בין היתר במדינות: ניו יורק, ניו ג'רזי, מיין, פנסילבניה ועוד, אליהם נרשמים כ-20,500 ילדים מדי שנה.

7.1.4 קבוצת SIMAD

7.1.4.1 קבוצת SIMAD (**"הקבוצה"** או **"קבוצת SIMAD"**) הוקמה על-ידי Michael Shabsels ו-David Shabsels (**"בעלי השליטה"**), אשר הינם, משקיעים ותיקים ומנוסים בעולמות הנדל"ן, האירוח והפנאי.

פעילותה של הקבוצה מתמקדת ברכישה וניהול של נכסים מניבים תזרימיים. ממועד הקמתה, רכשה הקבוצה מעל ל-80 נכסי נדל"ן בארה"ב, במגוון רחב של תחומים, לרבות: מגורים, מסחר, משרדים, מלונאות ומחנאות קיץ.

החל משנת 2006 פועלת הקבוצה בתחום מחנות הקיץ לילדים בארה"ב ובמסגרת זו רכשה הקבוצה 30 מחנות.

צוות הניהול של הקבוצה הינו בעל ניסיון רב של 10-20 שנה בתחומי פעילותה של החברה והיא מעסיקה למעלה מ-7,500 עובדים בנכסיה השונים (מתוכם כ-300 עובדים קבועים והיתר עונתיים).

במסגרת פעילותה, רכשה הקבוצה נכסים שונים, לרבות נכסי מגורים (Multifamily), משרדים, מסחר וכן נכסים המיועדים לתפעול מחנות קיץ.

7.1.4.2 התחייבות לתיחום פעילות של בעלי השליטה

כל הזדמנויות להשקעה במחנות קיץ בארה"ב (**"נכס חדש"**), שיוצגו לבעלי השליטה, יוצעו ראשונה לחברה, למעט: (1) הזדמנויות הקשורות להשקעות קיימות של בעלי השליטה וחברות קשורות שלהם שאינן מועברות לחברה; (2) השקעות מכל סוג שהוא מחוץ לתחום הפעילות של החברה.

בעלי השליטה התחייבו כי אם יבקשו או יתכננו להשקיע בנכס חדש מסוג הנכסים הנכלל במסגרת פעילותה של החברה (ואשר אינו נכלל בחריגים המפורטים בסעיף זה לעיל), בעלי השליטה יעבירו לחברה מכתב הצעה לרכישת ו/או להשקעה בנכס החדש (**"ההצעה"**), יחד עם חומרים תומכים ומידע באופן סביר אשר יאפשר לדירקטוריון לקבל החלטת השקעה בקשר להצעה. ההצעה תועבר על-ידי דירקטוריון החברה, אשר יידרש לתת את החלטתו ביחס להצעה

בתוך חמישה (5) ימי עסקים ממועד קבלת מלוא המידע הנדרש על-ידי הדירקטוריון לצורך קבלת ההחלטה.

ההחלטה אם להסכים להצעה תתקבל אך ורק על-ידי הדירקטוריון, בתום לב, על בסיס מספר גורמים, לרבות אך לא רק: (1) האם לחברה הון מספיק כדי לבצע את ההשקעה המוצעת; (2) האם ההשקעה המוצעת מתאימה לחברה (תוך התחשבות במדיניות החברה, במטרותיה, בהנחיותיה, במגבלותיה, במדיניות הגיוון ובכל שיקול עסקי אחר, בין אם רגולטורי או משפטי); (3) ההשפעה הפוטנציאלית של ההשקעה המוצעת על הדוחות הכספיים של החברה; (4) ההשפעה הפוטנציאלית של ההשקעה המוצעת על יכולתה של החברה לעמוד באמות מידה פיננסיות של שטר הנאמנות; וכן (5) כל שיקול עסקי אחר, רגולטורי או משפטי. בכל מקרה שלא אישר הדירקטוריון את קבלת ההצעה, תובא ההחלטה בדבר דחיית ההצעה לאישור ועדת הביקורת, אשר החלטתה על דחיית ההצעה תהיה סופית. היה וועדת הביקורת לא תסכים לדחיית ההצעה, ההצעה תועבר בכתב לדיון נוסף של הדירקטוריון, אשר יהיה רשאי לאשר או לדחות את קבלת ההצעה. מובהר, כי הליך כאמור ייינקט רק במידה שבעלי השליטה יבקשו לבצע את ההשקעה המוצעת.

בכל מקרה של העדר העכונת מצד החברה להצעה בתוך חמישה (5) ימי עסקים ממועד קבלת מלוא המידע הנדרש על-ידי הדירקטוריון לצורך קבלת ההחלטה, תחשב ההצעה כאילו נדחתה, ובעלי השליטה (בין במישרין ובין בעקיפין) יהיו רשאים לקבל את ההצעה. בנוסף, גם במקרה בו על אף העכונת החברה להצעה, לא ישתכלל (מסיבות שאינן תלויות בבעלי השליטה) הסכם להשקעה בנכס החדש ו/או לרכישת הנכס החדש על-ידי החברה, יהיו רשאים בעלי השליטה (בין במישרין ובין בעקיפין) לבצע את ההשקעה ו/או הרכישה.

החברה תפרסם דיווח בדבר החלטות ועדת הביקורת ודירקטוריון החברה לאחר כל החלטה בעניין תחום הפעילות.

למען הסר ספק יובהר כי ההתחייבות האמורה הינה החל ממועד רישומן למסחר של ניירות הערך של החברה בבורסה ואילך בכל הקשור לנכסים חדשים, ואין לה תחולה ביחס לנכסים אחרים שהוחזקו בידי בעלי השליטה במועד ההנפקה כאמור (ואשר לא הועברו לבעלות החברה).

יצוין, כי למיטב ידיעת החברה, למועד התשקיף מחזיקים בעלי השליטה במחנות קיץ שלא באמצעות החברה וכן בפעילות נדל"ן מניב מניב נפרדת.

- 7 - 4 -

7.1.5    <u>תרשים המבנה הארגוני נכון למועד התשקיף</u>



(*)    בהתאם להסכמות חוזיות, שיעור ההחזקה בפועל הינו 51%.

(**)    בהתאם להסכמות חוזיות, שיעור ההחזקה בפועל הינו 79%.

(***)    בין חברת התפעול (Wiki Operatingco LLC) לבין חברת הנכס (שהינה חברה בשליטת בעלי השליטה בחברה) נחתם הסכם לפיו תחכור חברת התפעול את הנכס. לפרטים ראה סעיף 9.2.2 לתשקיף.

7.1.6    <u>העברת הזכויות לחברה כנגד הנפקת מניות</u>

החברה חתמה על הסכם עם בעלי השליטה וחברות בשליטתם, במסגרתו התחייבו בעלי השליטה להעביר לחברה את מלוא זכויות ההשתתפות בחברות הבנות המפורטות בסעיף זה להלן (**״הזכויות המועברות״** או **״החברות המועברות״**), בתמורה להנפקת מניות של החברה ולתשלום מזומן בסך של 50 מיליון דולר (אשר ישולם מתוך תמורת הנפקת אגרות החוב (סדרה א׳) של החברה).

העברת הזכויות המועברות לחברה תיעשה כפי שהן (As-Is) במועד השלמת העברת הזכויות המועברות (בסעיף זה: **״מועד הסגירה״**), והחברה לא תהא זכאית לכל שיפוי מבעלי השליטה בקשר לזכויות המועברות. יובהר כי לאחר השלמת ההעברה של הזכויות המועברות לחברה, לא יחולו על החברה מגבלות כלשהן בקשר עם ההעברה ו/או המכירה של היישות המעבירה ו/או של החברה, למעט הסכמת המלווים בקשר לכל מכירה ו/או העברה (ככל שרלוונטי).

> **פרק 7 זה להלן, אלא אם צוין אחרת, או משתמע אחרת מההקשר או מהתוכן, תיאור עסקי החברה נעשה בהנחה של השלמת העברת הזכויות המועברות לחברה (כולל ביחס לתקופות עבר רלוונטיות). בהתאם, המונח ״נכון למועד התשקיף״ יישא במשמעות בהנחת השלמת העברת הזכויות המועברות לחברה, על אף העובדה שהעברתן בפועל תתבצע במועד הסגירה.**
>
> **לפרטים לגבי אופן הכנת הדוחות הכספיים של החברה על בסיס פרופורמה, ראו ביאור 1 לדוחות הכספיים פרופורמה של החברה ליום 30 ביוני 2025 (״הדוחות הכספיים״).**

הטבלה הבאה מפרטת את הזכויות המועברות, כמו גם נתונים הנוגעים להסכמות הנחוצות להשלמת העברתן. מובהר, כי כל העברת זכויות תהיה מותנית בקבלת זכויות הוניות בחברה ובתשלום מזומן, כמתואר בסעיף זה ובסעיפים 3.3.1 ו-9.2.1 לתשקיף.

| האם נדרשות הסכמות לביצוע ההעברה | שיעור העברה כוללת | בעל הזכויות בישות המועברת | | היישות המועברת | שם המחנה | מס׳ סידורי |
|---|---|---|---|---|---|---|
| | | שיעור החזקה בישות המועברת | שם | | | |
| - | | 1% | Michael Shabsels | Achim Operatingco LLC | Achim | C1 |
| - | | 49% | Shabsels Gift LLC | | | |
| - | 100% | 50% | David Shabsels | | | |
| המלווה הבכיר (*) | | 1% | Michael Shabsels | Achim Landco LLC | | |
| המלווה הבכיר (*) | | 49% | Shabsels Gift LLC | | | |
| המלווה הבכיר (*) | | 50% | David Shabsels | | | |
| המלווה הבכיר (**) | | 90% | SIMAD Holdings LLC | Banner Landco LLC | Banner | C2 |
| - | 90% | 90% | SIMAD Holdings LLC | Banner Operatingco LLC | | |

- 7 - 6 -

| האם נדרשות הסכמות לביצוע ההעברה | שיעור העברה כוללת | בעל הזכויות בישות המועברת | | הישות המועברת | שם המחנה | מס׳ סידורי |
|---|---|---|---|---|---|---|
| | | שיעור החזקה בישות המועברת | שם | | | |
| - | 70% | 70% | SIMAD Holdings LLC | Bluestar Operatingco, LLC | Blue Star | C3 |
| - | | 70% | SIMAD Holdings LLC | Bluestar Landco, LLC | | |
| המלווה הבכיר (**) | 100% | 50% | Shabsels Gift Trust | Chateaugay Landco LLC | Chateaugay | C4 |
| המלווה הבכיר (**) | | 50% | Holdingcods LLC | | | |
| - | | 50% | Shabsels Gift Trust | Chateaugay Campco LLC | | |
| - | | 50% | Holdingcods LLC | | | |
| - | 99%² | 50% | Michael Shabsels | BAHS Operating Inc. | Chen-A-Wanda | C5 |
| - | | 50% | David Shabsels | | | |
| המלווה הבכיר (*) | | 99% | SIMAD Holdings LLC | BAHS Holdings LLC | | |
| - | 80% | 80% | SIMAD Holdings LLC | Club Getaway Operatingco, LLC | Club Getaway | C6 |
| המלווה הבכיר (*) | | 80% | SIMAD Holdings LLC | Club Getaway Landco, LLC | | |
| המלווה הבכיר (*) | 99% | 99% | SIMAD Holdings LLC | Country Roads Landco LLC | Country Roads | C7 |
| - | | 99% | SIMAD Holdings LLC | Country Roads Operatingco LLC | | |
| המלווה הבכיר (*) | 100% | 50% | Shabsels Management LLC | Mill Road Landco LLC | Eagles Landing | C8 |
| המלווה הבכיר (*) | | 50% | David Shabsels | | | |
| - | | 50% | Shabsels Management LLC | Eagle's Landing Day Camp LLC | | |
| - | | 50% | David Shabsels | | | |
| - | 100% | 50% | Michael Shabsels | Shab Operating Inc | Echo | C9 |
| - | | 50% | David Shabsels | | | |
| המלווה הבכיר (*) | | 1% | Michael Shabsels | Shab Holdings LLC | | |

---

2   בהתאם להסכמות חוזיות, שיעור ההחזקה בפועל הינו 51%.

- 7 -7 -

| האם נדרשות הסכמות לביצוע ההעברה | שיעור העברה כוללת | בעל הזכויות בישות המועברת | | הישות המועברת | שם המחנה | מס׳ סידורי |
|---|---|---|---|---|---|---|
| | | שיעור החזקה בישות המועברת | שם | | | |
| המלווה הבכיר (*) | | 50% | David Shabsels | | | |
| המלווה הבכיר (*) | | 49% | Shabsels Gift LLC | | | |
| המלווה הבכיר (*) | 51% | 25.5% | Michael Shabsels | Green Lane Landco, LLC | Green Lane | C10 |
| המלווה הבכיר (*) | | 25.5% | David Shabsels | | | |
| - | | 25.5% | Michael Shabsels | Green Lane Operatingco, LLC | | |
| - | | 25.5% | David Shabsels | | | |
| המלווה הבכיר (*) | 100% | 1% | Michael Shabsels | Greenvilleland LLC | Malka | C11 |
| המלווה הבכיר (*) | | 50% | David Shabsels | | | |
| המלווה הבכיר (*) | | 49% | Shabsels Gift LLC | | | |
| - | | 1% | Michael Shabsels | Malka Operatingco LLC | | |
| - | | 50% | David Shabsels | | | |
| - | | 49% | Shabsels Gift LLC | | | |
| המלווה הבכיר (**) | 99% | 99% | SIMAD Holdings LLC | IAFALANDCO, LLC | IAFA | C12 |
| - | | 99% | SIMAD Holdings LLC | IAFAOPERATINGCO, LLC | | |
| המלווה הבכיר (**) | 99% | 99% | SIMAD Holdings LLC | Island Lake Landco LLC | Island Lake | C13 |
| - | | 99% | SIMAD Holdings LLC | Island Lake Campco LLC | | |
| - | 62.5% | 62.5% | SIMAD Holdings LLC | Kiwi Operatingco LLC | Kiwi | C14 |
| - | 99% | 99% | SIMAD Holdings LLC | Lavco LLC | Lavi | C15 |
| המלווה הבכיר (*) | | 99% | SIMAD Holdings LLC | Lavland LLC | | |
| המלווה הבכיר (**) | 75% | 37.5% | Michael Shabsels | RDM Camps, LLC | Lokanda | C16 |
| המלווה הבכיר (**) | | 37.5% | David Shabsels | | | |

| האם נדרשות הסכמות לביצוע ההעברה | שיעור העברה כוללת | בעל הזכויות בישות המועברת | | הישות המועברת | שם המחנה | מס' סידורי |
|---|---|---|---|---|---|---|
| | | שיעור החזקה בישות המועברת | שם | | | |
| - | 99% | 99% | SIMAD Holdings LLC | Meadowbrook Operatingco LLC | Meadowbrook | C17 |
| המלווה הבכיר (*) | | 99% | SIMAD Holdings LLC | Meadowbrook Landco LLC | | |
| - | 99% | 50% | Shabsels Management LLC | Camp Med-O-Lark, Inc | Med-O-Lark | C18 |
| - | | 50% | David Shabsels | | | |
| המלווה הבכיר (**) | | 99% | SIMAD Holdings LLC | Washington Lake, LLC | | |
| - | 75% | 75% | SIMAD Holdings LLC | Mesorahco LLC | Mesorah | C19 |
| המלווה הבכיר (**) | | 75% | SIMAD Holdings LLC | Mesorahland LLC | | |
| - | 100% | 1% | Michael Shabsels | Mogenavco LLC | Mogenavco | C20 |
| - | | 50% | David Shabsels | | | |
| - | | 49% | Shabsels Gift LLC | | | |
| המלווה הבכיר (*) | | 1% | Michael Shabsels | Mogenavland LLC | | |
| המלווה הבכיר (*) | | 50% | David Shabsels | | | |
| המלווה הבכיר (*) | | 49% | Shabsels Gift LLC | | | |
| - | 100% | 1% | Michael Shabsels | Mohawkcampco LLC | Mohawk | C21 |
| - | | 50% | David Shabsels | | | |
| - | | 49% | Shabsels Gift LLC | | | |
| המלווה הבכיר (*) | | 1% | Michael Shabsels | Mohawkland LLC | | |
| המלווה הבכיר (*) | | 50% | David Shabsels | | | |
| המלווה הבכיר (*) | | 49% | Shabsels Gift LLC | | | |
| - | | 50% | Michael Shabsels | Mohawk Country Day School, Inc. | | |
| - | | 50% | David Shabsels | | | |
| המלווה הבכיר (**) | 99% | 99% | SIMAD Holdings LLC | Belgrade Lakes Summer Camps LLC | New England Golf & Tennis | C22 |

- 7 - 9 -

| האם נדרשות הסכמות לביצוע ההעברה | שיעור העברה כוללת | בעל הזכויות בישות המוערת | | הישות המועברת | שם המחנה | מס׳ סידורי |
|---|---|---|---|---|---|---|
| | | שיעור החזקה בישות המועברת | שם | | | |
| המלווה הבכיר (**) | 99% | 99% | SIMAD Holdings LLC | Poland Landco LLC | North Star | C23 |
| - | | 99% | SIMAD Holdings LLC | Poland Campco LLC | | |
| - | 99%[3] | 99% | SIMAD Holdings LLC | Pine Forest Campco LLC | Pine Forest | C24 |
| המלווה הבכיר (**) | | 99% | SIMAD Holdings LLC | Pine Forest Landco LLC | | |
| המלווה הבכיר (*) | 99% | 99% | SIMAD Holdings LLC | Rolling Hills Landco LLC | Rolling Hills | C25 |
| - | | 99% | SIMAD Holdings LLC | Rolling Hills Operatingco LLC | | |
| - | 51% | 25.5% | Michael Shabsels | Summit Camp, LLC | Summit | C27 |
| - | | 25.5% | David Shabsels | | | |
| - | 99% | 99% | SIMAD Holdings LLC | Waukeela Operatingco LLC | Waukeela | C28 |
| המלווה הבכיר (**) | | 99% | SIMAD Holdings LLC | Waukeela Landco LLC | | |
| המלווה הבכיר (**) | 99% | 99% | SIMAD Holdings LLC | Wekeeland LLC | Wekeela | C29 |
| - | | 99% | SIMAD Holdings LLC | Mainewekeelaco LLC | | |
| יתר בעלי המניות (**) | 50% | 25% | Michael Shabsels | Willow Lake Day Camps, LLC | Willow Lake | C30 |
| יתר בעלי המניות (**) | | | | | | |
| יתר בעלי המניות (**) | | 25% | David Shabsels | | | |
| יתר בעלי המניות (**) | | 25% | Shabsels Management LLC | Willow Lake Land Corporation | | |
| יתר בעלי המניות (**) | | | | | | |
| יתר בעלי המניות (**) | | 25% | David Shabsels | | | |
| - | 51% | 51% | SIMAD Holdings LLC | WM Camp, LLC | Windsor Mountain | C31 |

---

[3] בהתאם להסכמות חוזיות, שיעור ההחזקה בפועל הינו 79%.

| מס׳ סידורי | שם המחנה | הישות המועברת | בעל הזכויות בישות המועברת | | שיעור העברה כוללת | האם נדרשות הסכמות לביצוע ההעברה |
|---|---|---|---|---|---|---|
| | | | שם | שיעור החזקה בישות המועברת | | |
| | | WM Land, LLC | SIMAD Holdings LLC | 51% | | המלווה הבכיר (**) |

(*) מאחר שבכוונת החברה לפרוע את ההלוואה הקיימת מתוך תמורת ההנפקה, החברה לא פנתה לגורם הממן לצורך קבלת הסכמתו לביצוע העברת הזכויות.

(**) החברה קיבלה את ההסכמות הנדרשות לביצוע העברת הזכויות.

### 7.2    **תחום הפעילות של החברה**

נכון למועד התשקיף, החברה פועלת בתחום פעילות אחד המהווה פעילות בר דיווח בדוחותיה הכספיים – הפעלה של מחנות קיץ לילדים ובני נוער בארה״ב. לפרטים ראה סעיף 7.7 לתשקיף.

### 7.3    **השקעות בהון החברה ועסקאות במניותיה**

7.3.1    עם התאגדותה, הנפיקה החברה 1,000 מניות רגילות בנות ללא ערך נקוב, המוחזקות באופן שווה על-ידי בעלי השליטה, אשר היוו, באותו מועד, את כל הונה המונפק והנפרע של החברה. לפרטים נוספים אודות ההון של החברה, ראה פרק 3 לתשקיף.

7.3.2    לפרטים בדבר התחייבויות בעלי השליטה להעביר לחברה את הזכויות המועברות כנגד הנפקת מניות רגילות של החברה ותשלום במזומן, ראה סעיף 7.1.6 לתשקיף.

### 7.4    **חלוקת דיבידנדים**

7.4.1    מאז מועד התאגדותה, החברה לא חילקה דיבידנדים.

7.4.2    נכון ליום 30 ביוני 2025, לחברה אין יתרת רווחים הניתנים לחלוקה בהתאם להוראות סעיף 302 לחוק החברות, התשנ״ט-1999 (**"חוק החברות"**).

7.4.3    לפרטים בדבר ההגבלות שהחברה נטלה על עצמה בקשר עם חלוקת דיבידנדים, ראה סעיף 5.5 לשטר הנאמנות.

7.4.4    יצוין, כי לא קיימת מניעה לחלוקת דיבידנד מהחברות הבנות של החברה אל החברה.

7.4.5    למועד התשקיף, דירקטוריון החברה לא אימץ מדיניות חלוקת דיבידנד.

**חלק ב' – מידע נוסף**

7.5    **מידע כספי לגבי תחומי הפעילות של החברה**

למידע כספי ראה את האמור בדוחות הכספיים ואת דוח הדירקטוריון ליום 31 בדצמבר 2024 ו-30 ביוני 2025 (**"דוח הדירקטוריון"**).

7.6    **סביבה כללית והשפעת גורמים חיצוניים[4]**

להלן גורמים בסביבה המאקרו-כלכלית של החברה המשפיעים ו/או עלולים להשפיע באופן מהותי על פעילותה ו/או תוצאותיה של החברה.

לפרטים נוספים בדבר גורמים חיצוניים נוספים אשר משפיעים ו/או עלולים להשפיע באופן מהותי על פעילות ו/או תוצאות החברה, ראה סעיף 7.22 לתשקיף (גורמי סיכון).

7.6.1    ענף מחנות הקיץ

ענף מחנות הקיץ הוא אחד הענפים הוותיקים ביותר בארה"ב, ותחילתו במחצית השנייה של המאה ה-19 עם הקמתם של מספר מחנות אשר חלקם עדיין פעילים. במהלך המאה ה-20 חלה התפתחות בתחום זה עם הקמת אגודת המחנות האמריקאים (ה-**"ACA"** – American Camp Association) בשנת 1910 כמו גם אגודות של מחנות שונים. בין השנים 1948-1965 קבע ה-ACA סטנדרטים לפעילות מחנות קיץ וקיבל החלטות שונות המסדירות את אופן הפעילות בתחום זה, לרבות החלטות הנוגעות לאיסורי הפליה, ואף יזם שינויים לחוקי העזר על מנת לתת מענה לסוגיות של גזע ודת. בשנות האלפיים, פיתח ה-ACA תוכנית בקרת איכות שנועדה להדריך את הצוותים ולאפשר להם לבחון הזדמנויות לשיפור במהלך הפעלת המחנה. [5]

ה-ACA מפעיל תוכנית אקרדיטציה וולונטרית שנועדה לתת לבעלים של מחנות קיץ ולמפעילים כלים לעניין התפעול והניהול של המחנות, בפרט אלו הקשורים באיכות התוכניות, בבריאות ובביטחון של המשתתפים ושל הצוות. התוכנית קובעת הנחיות, מתווה מדיניות והנהלים, וכל מחנה אחראי על יישום מדיניות כאמור. התוכנית נועדה גם לסייע לציבור בבחירת מחנות קיץ שעומדים בסטנדרטים מקובלים בתעשייה ומוכרים על ידי הממשל.[6]

כחלק מהתרבות הרווחת בארה"ב, הורים רבים מחפשים מחנות קיץ עבור ילדיהם, שאינם רק מספקים פעילויות מהנות בתקופת הקיץ, אלא גם מאפשרים לילדיהם לפתח כישורים בתחומים שונים כגון ספורט, אומנות ותחומים אקדמיים. מחנות קיץ אקדמיים כוללים מגוון של נושאים, החל מ-STEM (מדעים, טכנולוגיה, הנדסה ומתמטיקה), אומנות, לימודי שפות, פעילויות חוץ ופיתוח מנהיגות. מחנות קיץ חינוכיים מתמקדים בלמידה מעשית, דבר שמגביר את שימור החומר הנלמד והופך את הלימוד לחווייתי ואפקטיבי.[7]

---

[4]    פרק 7 לתשקיף בכלל וסעיף 7.6 זה בפרט, כוללים מידע המבוסס על סקרים, מחקרים ואתרים שונים. למעט אם צוין אחרת במפורש, החברה לא ביקשה, ובכל מקרה לא קיבלה, את הסכמת הסוקרים, עורכי המחקרים או האתרים כאמור לעיל, להכללת המידע האמור בתשקיף, ומידע כאמור הינו מידע המפורסם לציבור, ולפי מיטב ידיעת החברה, נמצא בנחלת הכלל. החברה אינה אחראית לתוכן סקרים, מחקרים ואתרים כאמור.

[5]    כאן

[6]    כאן

[7]    כאן

<u>סקירה כלכלית כללית של הענף</u>

בשנת 2024 ענף מחנות הקיץ תרם כ-70 מיליארד דולר לכלכלת ארצות הברית, הן מהפעילות עצמה והן בדרך של קידום רכישות בין עסקים והן בדרך של הכנסות מעבודה, זאת לצד העסקה של למעלה מ-986 אלף עובדים ברחבי ארצות הברית.[8]

מספר מחנות הקיץ בארצות הברית בשנת 2024 עמד על כ-20,175 מחנות. יצוין, כי בנתון זה לא נכללו מחנות קיץ שפועלים במדינות שאינן מחייבות החזקה ברישיון, כמו גם מחנות קיץ שמופעלים על-ידי גופים ציבוריים.[9]

בבחינה סטטיסטית שנערכה על-ידי Summer Camp Hub (שותפה עסקית של ה-ACA וחברה באגודה) נמצא כי מחנות קיץ המחזיקים באקרדיטציה מטעם ה-ACA דיווחו על הכנסות בהיקף של כ-2.8 מיליארד דולר, מתוך כ-3.4 עד 4 מיליארד דולר של כלל ההכנסות מהענף.[10]

בין השנים 2020-2023 חל גידול עקבי בנתח השוק של מחנות הקיץ בארה"ב, מ-2.46 מיליארד דולר בשנת 2020 ל-3.56 מיליארד דולר בשנת 2023.[11]



Market Size of the Summer Camp sector in the United States, In USD Billion, 2020-2023



Source: IBISWorld

בשנת 2024 עמדו ההכנסות מהענף על כ-4.7 מיליארד דולר.[12]

| | 7.6.2 <u>השפעות על ענף מחנות הקיץ</u> |

ענף מחנות הקיץ עשוי להיות מושפע ממספר גורמים חיצוניים וכלכליים. בין הגורמים המרכזיים ניתן למנות תנאי מזג האוויר, רמת האינפלציה , רמת הפופולריות של מחנות הקיץ בקרב ילדים ובני נוער, אופי מחנות הקיץ (עם לינה וללא לינה), גיוס ושימור כוח אדם ועוד. כל אחד מהגורמים הללו עלול לפגוע ישירות בכמות המשתתפים, בהכנסות, ובכדאיות הכלכלית של הפעלת מחנות הקיץ.

| | 7.6.2.1 <u>השפעת מזג אוויר קיצוני</u> |

מחנות קיץ רבים מתבססים על פעילויות חוץ כמו מסלולי טיול, שחייה, מחנאות, וספורט אתגרי. תנאי מזג אוויר קיצוניים כגון גלי חום עזים, סופות קשות או גשמים עזים עלולים לגרום לביטול

---

[8] <u>כאן</u>
[9] <u>כאן</u>
[10] <u>כאן</u>
[11] ראה ה"ש 12.
[12] <u>כאן</u>

פעילויות מרכזיות, לפגיעה במתקני המחנה, ואפילו לסיכון ממשי לבריאות ובטיחות החניכים והמדריכים. יצוין, כי הגם שמצבים כאמור עלולים לפגוע בסדר יום המחנה ופעילויות המתוכננות במסגרתו, לרוב אין באמור כדי להביא לביטולו של מחנה והורי המשתתפים לא יהיו זכאים להחזר בגין ביטול פעילויות ספיציפיות.

### 7.6.2.2   אינפלציה ועליית יוקר המחיה

גורם נוסף שעלול להשפיע לרעה על ענף מחנות הקיץ הוא עליית יוקר המחיה ואינפלציה גבוהה. עליית מחירים כללית, ובפרט התייקרות של מזון, תחבורה ושכר המדריכים, עשויה להוביל לעלייה בעלות הפעלת המחנות, וכפועל יוצא לגידול בעלות ההשתתפות במחנות. עבור משפחות רבות, מחנה קיץ הוא הוצאה משמעותית, ואם המחירים הופכים לבלתי נגישים – מספר הנרשמים עלול לרדת. עדות לכך ניתן למצוא בסקירה הסטטיסטית של Rustic Pathways, לפיה 42% מההורים דיווחו כי עלות המחנה היא הגורם המרכזי בהחלטה האם לשלוח את ילדיהם למחנה קיץ ו-66% דיווחו כי זהו אחד משלושת הגורמים המרכזיים בקבלת ההחלטה כאמור.[13] יחד עם זאת, על אף העלייה במחירים כאמור, הביקוש להרשמה למחנות הקיץ של החברה הולך וגובר משנה לשנה. יתרה מזאת בשל אופי קהל היעד של המחנות, המורכב בעיקר ממשפחות אמידות, להערכת החברה, גידול בהוצאות תפעול המחנות יגולם לרוב במסגרת מחיר ההשתתפות, מבלי שהדבר יפגע ברווחיותם.

### 7.6.2.3   גיוס ושימור כוח אדם

אחד האתגרים המרכזיים שעומדים בפני מפעילי מחנות קיץ הוא גיוס ושימור של צוות מוסמך המועסק לרוב רק בתקופת הפעילות של המחנות, דבר שעשוי להביא חלק מהמחנות לפעול בתפוסה מופחתת.

### 7.6.3   מגפת הקורונה

בשנת 2020 התפרצה מגפת הקורונה (Covid-19) ברחבי העולם, אשר הביאה לנקיטת צעדים נרחבים למניעת התפשטות הנגיף, כגון סגירת גבולות, הגבלות על תנועה, מגבלות על התקהלויות, סגר ובידוד.

מגפת הקורונה השפיעה על מחנות החברה באופן משתנה. בעוד שמרבית המחנות המשיכו לפעול, הם עשו כן עם מספר מצומצם יותר של חניכים, ובמקרים מסוימים פעלו משך פרקי זמן קצרים יותר, זאת לשם עמידה בהנחיות הבריאות הממשלתיות ולהבטיח את בריאות החניכים והצוות. על אף האתגרים כאמור, ההשפעה על מצבה התזרימי של החברה לא הייתה מהותית, בין היתר לאור כך שחלק מהחניכים שלא יכלו להשתתף במחנות בחרו לעשות שימוש בדמי הרישום ששולמו עבור המחנה בקיץ שלאחר מכן.

---

13   כאן

- 7 - 14 -

כמו כן, במסגרת זו קיבלה החברה שתי הלוואות PPP (בהיקף לא מהותי של כמה מיליוני דולרים). ההלוואות כאמור נמחלו במלואן, והחברה עשתה בהן שימוש לתשלום משכורות לעובדים (הקבועים והעונתיים שלה) שהועסקו בתקופת המגפה.

## חלק ג – תיאור פעילות החברה

**7.7** **תחום פעילות מחנות קיץ**

**7.7.1** **מידע כללי על תחום הפעילות**

7.7.1.1 <u>כללי</u>

א. במסגרת תחום הפעילות, פועלת החברה לרכישה, ניהול והפעלה של מחנות קיץ לילדים ובני נוער בארה"ב.

החברה רוכשת מחנות בעלי מוניטין וקהל לקוחות קיים, ובכך נהנית מיתרון תחרותי משמעותי. למועד פרסום התשקיף מפעילה החברה באופן ישיר 30 מחנות הפועלים בעיקר בעונת הקיץ (חודשים יוני-אוגוסט), כאשר פעילות מחנות הקיץ נעשית על גבי מקרקעין בבעלות חברות הנכס אשר הינן ככלל בבעלות (מלאה או חלקית) של החברה.

החברה פועלת למיקסום ניצול ההכנסה הפוטנציאלית משטחי המחנה, ובהתאם, בחלק מהמחנות של החברה, בתקופות בהן הם אינם פעילים משכירה החברה את הנכסים לצורך אירועים, קונצרטים, נופשים משפחתיים וכו'. כמו כן, במספר מחנות פועלים במהלך השנה גני ילדים/ בתי ספר.

המחנות אותם מפעילה החברה מתחלקים לשני סגמנטים עיקריים : (א) מחנות הכוללים לינה ; ו-(ב) מחנות יום אליהם מגיעים המשתתפים בכל בוקר ושבים לביתם בסוף היום. למועד התשקיף, 8 ממחנות החברה הינם מחנות יום והשאר הינם מחנות לינה. מעבר לכך, החברה מפעילה סוגים שונים של מחנות, הפונים לאוכלוסיות ובעלי תחומי עניין שונים ומגוונים (כגון : מחנות ספורט, אומנויות, טכנולוגיה, מחנות דתיים ועוד), ובכך משיגה פיזור רחב של קהלי יעד. כל מחנה ממותג בנפרד ופועל באופן עצמאי, לרבות צוות ניהולי עצמאי, עובדים, הנהלת חשבונות ומערך תפעול ייעודי וכו'.

מקורות ההכנסה העיקריים של החברה בתחום הפעילות כוללים תשלומי לקוחות (הורים) בעבור השתתפות ילדיהם במחנות הקיץ. הכנסות נלוות מתקבלות משירותי הסעדה, הסעות, פעילויות העשרה מיוחדות, תשלומים נוספים בגין טיולים, מכונות ממכר אוטומטיות בשטחי המחנות ומרצ'נדייז, וכן מהשכרת שטחים במהלך השנה לאירועים פרטיים או קבוצות ולמוסדות (גני ילדים ובתי ספר) הפועלים בהם לאורך השנה. העלות הממוצעת למשתתף במחנה ממחנות הקיץ של החברה נעה בין 8 אלפי דולר ל-10 אלפי דולר, כאשר במחנות מסוימים העלות עשויה להיות באופן משמעותי נמוכה (כ-3 אלפי דולר) או גבוהה (כ-16 אלפי דולר) יותר, כתלות במשך תקופת השהיה במחנה ובסוג המחנה.

כל נכסי החברה עליהם ממוקמים מחנות הקיץ מופעלים על-ידי החברה, כאשר תפעול כל אחד ממחנות הקיץ של החברה נעשה כיחידה עצמאית

- 7 - 16 -

והוא מנוהל בידי צוות ייעודי עבור אותו מחנה, המורכב, בין היתר,
ממנהל המחנה, ממדריכים ומאנשי צוות נוספים.

ב.   להלן פרטים אודות מחנות הקיץ בניהולה של החברה לעונות הפעילות
2023 ו-2024 וליום 30 ביוני 2025 :

| | עונת 2023 | עונת 2024 | עונת 2025 (נכון ליום 30 ביוני 2025) |
|---|---|---|---|
| **מספר מחנות** | 30 | 30 | 30 |
| **מספר נרשמים/משתתפים (\*)** | 20,723 | 20,568 | 19,909 (\*\*) |
| **מחיר ממוצע למשתתף (בדולרים)** | 6,882 | 7,166 | 7,579 |

(\*)   יצוין, כי בבחינת מספר המשתתפים לא הובאו בחשבון המשתתפים במחנה Club Getaway של החברה,
שהינו מחנה המאפשר השתתפות לתקופות קצרות יותר.

(\*\*)   יצוין כי הרשמתם של חלק מהמשתתפים מתקבלת לאחר ה-30 ביוני 2025 וההרשמה נמשכת עד למספר
ימים טרם תחילת כל מחנה.

- 7 - 17 -

ג.   להלן פירוט אודות מחנות הקיץ אותם מפעילה החברה :

| מס' סידורי | שם המחנה | מיקום | שטח (באייקר) | שנת הרכישה | חלק החברה בהון חברת הנכס | שיטות הצגה בדוחות הכספיים | שווי בדוחות הכספיים ליום 30 ביוני 2025 | הכנסה לתקופה שהסתיימה ביום 31 בדצמבר 2024 (באלפי דולר) | EBITDA לתקופה שהסתיימה ביום 31 בדצמבר 2024 (באלפי דולר) | מקדמות שנתקבלו נכון ליום 30 ביוני 2025 (באלפי דולר) | יתרת קרן בספרים | ריבית נקובה ומועד פירעון סופי |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C1 | Achim | 365 Route 59, Suite 110, Airmont, NY | 98.03 | 2012 | 100% | מאוחד | 6,300 | 2,190 | 397 | 1,724 | 1,905 (*) | 6.42% (ריבית משתנה) 11/2032 |
| C2 | Banner | 1177 Riverwoods Rd Lake Forest, IL | 54.01 | 2013 | 90% | מאוחד | 30,300 | 10,503 | 3,396 | 6,302 | 13,125 | 6.93% (ריבית משתנה) 11/2027 |
| C3 | Blue Star | 179 Blue Star Way, Hendersonville, NC | 447.09 | 2012 | 70% | מאוחד | 17,500 | 8,027 | 1,699 | 5,820 | 3,401 | 3.95% (ריבית קבועה) 9/2026 |
| C4 | Chateauguay | 233 Gadway Rs Merril, NY | 243.20 | 2022 | 100% | מאוחד | 4,100 | 2,361 | 43 | 2,183 | 2,402 | 6.00% (ריבית קבועה) 6/2042 |
| | | | | | | | | | | | 1,045 | 4.50% (ריבית קבועה) 6/2032 |
| C5 | Chen-A-Wanda | 355 Camp Rd Thompson, PA | 180.68 | 2007 | 51% | מאוחד | 17,900 | 7,158 | 1,309 | 7,621 | 2,935 (*) | 6.42% (ריבית משתנה) 11/2032 |
| C6 | Club Gateway | 59 S Kent Rd Kent CT | 271.12 | 2012 | 80% | מאוחד | 19,300 | 7,008 | 2,171 | 2,127 | 4,193 (*) | 6.42% (ריבית משתנה) 11/2032 |
| C7 | Country Roads | 139 Pine Brook Rd, Manalapan Township, NJ | 25.68 | 2013 | 99% | מאוחד | 12,100 | 6,473 | 1,294 | 5,032 | 1,142 (*) | 6.42% (ריבית משתנה) 11/2032 |
| C8 | Eagles Landing | 74 Davidson Mill Road N. Brunswick Township, NJ | 12.79 | 2011 | 100% | מאוחד | 5,000 | 3,354 | 482 | 2,978 | 5,176 (*) | 6.42% (ריבית משתנה) 11/2032 |
| C9 | ECHO | 244 Kenilworth Rd, Ridgewood, NJ | 206.17 | 2007 | 100% | מאוחד | 12,500 | 5,004 | 1,037 | 4,813 | 2,888 (*) | 6.42% (ריבית משתנה) 11/2032 |
| C10 | Green Lane | 249 Camp Green Lane Rd Green Lane, PA | 106.40 | 2011 | 51% | מאוחד | 9,400 | 3,676 | 911 | 3,610 | 812 (*) | 6.42% (ריבית משתנה) 11/2032 |
| | | | | | | | | | | | 2,500 | 8.00% (ריבית קבועה) 1/2028 |
| C11 | Greenville Land (Malka) | 150 Ingalside Rd Greenville, NY | 131.52 | 2010 | 100% | מאוחד | 10,800 | 711 | (103) | 1,000 | 17,206 (*) | 6.42% (ריבית משתנה) 11/2032 |

| הלוואות בנכס (ליום 30 ביוני 2025) | | מקדמות שנתקבלו נכון ליום 30 ביוני 2025 (באלפי דולר) | EBITDA לתקופה שהסתיימה ביום 31 בדצמבר 2024 (באלפי דולר) | הכנסה לתקופה שהסתיימה ביום 31 בדצמבר 2024 (באלפי דולר) | שווי בדוחות הכספיים ליום 30 ביוני 2025 | שיטות הצגה בדוחות הכספיים | חלק החברה בהון חברת הנכס | שנת הרכישה | פרטים אודות המחנה | | | מס' סידורי |
| ריבית נקובה ומועד פירעון סופי | יתרת קרן בספרים | | | | | | | | שטח (באייקר) | מיקום | שם המחנה | |
| 3.50% (ריבית קבועה) 12/2041 | 2,203 (**) | 2,674 | 503 | 3,156 | 7,000 | מאוחד | 99% | 2011 | 206.70 | 1712 Main St., Freyburg, ME | IAFA | C12 |
| 4.25% (ריבית קבועה) 1/2037 | 743 | 6,038 | 1,247 | 5,751 | 15,600 | מאוחד | 99% | 2022 | 464.11 | Island Lake 50 Rd, Starrucca, PA | Island Lake | C13 |
| 9.50% (ריבית קבועה) 10/2028 | 991 | | | | | | | | | | | |
| 4.00% (ריבית קבועה) 1/2027 | 3,254 | | | | | | | | | | | |
| 6.44% (ריבית משתנה) 9/2033 | 585 | 4,079 | 1,213 | 4,434 | 13,100 | מאוחד | 62.5% | 2013 | 14.07 | 825 Union Valley Road, Carmel, NY | Kiwi | C14 |
| 6.13% (ריבית משתנה) 10/2037 | 172 | | | | | | | | | | | |
| 6.42% (ריבית משתנה) 11/2032 | 6,401 (*) | 4,537 | 146 | 4,613 | 7,700 | מאוחד | 99% | 2008 | 119.00 | 2656 Upper Woods Dr, Lakewood, PA | Lavi | C15 |
| 7.50% (ריבית קבועה) 12/2041 | 7,840 | 5,789 | 1,731 | 5,560 | 18,200 | מאוחד | 75% | 2008 | 219.46 | 432 Haring Rd, Glen Spey, NY | Lokanda | C16 |
| 9.50% (ריבית משתנה) 10/2028 | 2,780 | | | | | | | | | | | |
| 6.42% (ריבית משתנה) 11/2032 | 3,204 (*) | 7,280 | 709 | 6,202 | 9,100 | מאוחד | 99% | 2016 | 53.10 | 73 E Valley Brook Rd, Long Valley, NJ | Meadowbrook | C17 |
| 3.50% (ריבית קבועה) 12/2041 | 1,006 (**) | 2,014 | 148 | 2,203 | 3,000 | מאוחד | 100% | 2006 | 44.88 | 82 Medolark Road Washington, ME | Med-O-Lark | C18 |
| 0.00% (ריבית קבועה) 12/2026 | 220 | | | | | | | | | | | |
| 7.50% (ריבית משתנה) 8/2032 | 4,170 | 3,728 | (1,734) | 3,564 | 5,100 | מאוחד | 75% | 2008 | 315.73 | 325 North Pond Road, Guilford, NY | Mesorah | C19 |
| 9.50% (ריבית קבועה) 10/2028 | 991 | | | | | | | | | | | |
| 3.50% (ריבית קבועה) 12/2041 | 5,898 (**) | | | | | | | | | | | |
| 6.42% (ריבית משתנה) 11/2032 | 3,700 (*) | 6,824 | 1,981 | 7,095 | 24,100 | מאוחד | 100% | 2010 | 481.15 | | Mogenavco | C20 |

- 7 - 19 -

| הלוואות בנכס (ליום 30 ביוני 2025) ריבית נקובה ומועד פירעון סופי | יתרת קרן בספרים | מקדמות שנתקבלו נכון ליום 30 ביוני 2025 (באלפי דולר) | EBITDA לתקופה שהסתיימה ביום 31 בדצמבר 2024 (באלפי דולר) | הכנסה לתקופה שהסתיימה ביום 31 בדצמבר 2024 (באלפי דולר) | שווי בדוחות הכספיים ליום 30 ביוני 2025 | שיטות הצגה בדוחות הכספיים | חלק החברה בהון חברת הנכס | שנת הרכישה | שטח (באייקר) | מיקום | שם המחנה | מס' סידורי |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.50% (ריבית קבועה) 12/2041 | 6,944 (**) | | | | | | | | | 169 Laymon Rd, Swan Lake, NY | | |
| 6.42% (ריבית משתנה) 11/2032 | 11,019 (*) | 19,811 | 7,434 | 19,755 | 75,100 | מאוחד | 100% | 2009 | 37.39 | 200 Old Tarrytown Rd, White Plains, NY | Mohawak | C21 |
| 3.50% (ריבית קבועה) 12/2041 | 1,953 (**) | 292 | (234) | 615 | 2,900 | מאוחד | 99% | 2014 | 34.46 | 135 Maine St. suite 292 Brunswick, ME (winter address) 35 Golf Academy Drive Belgrade, ME (summer address) | New England Golf & Tennis (Belgrade) | C22 |
| 3.50% (ריבית קבועה) 12/2041 | 1,048 (**) | 1,729 | 549 | 2,518 | 6,000 | מאוחד | 99% | 2015 | 219.00 | 200 Verrill RoWad, Poland, ME | North Star (Poland) | C23 |
| 1.00% (ריבית קבועה) 7/2028 | 1,225 | | | | | | | | | | | |
| 6.00% (ריבית קבועה) 12/2042 | 19,308 | 11,707 | 3,826 | 14,205 | 37,300 | מאוחד | 80% | 2022 | 988.35 | 185 Pine Forest Rd, Greeley PA | Pine Forest | C24 |
| 1.50% (ריבית קבועה) 12/2027 | 3,860 | | | | | | | | | | | |
| 9.50% (ריבית קבועה) 10/2028 | 5,157 | | | | | | | | | | | |
| 6.42% (ריבית משתנה) 11/2032 | 8,753 (*) | 10,032 | 1,817 | 9,307 | 18,300 | מאוחד | 99% | 2022 | 22.18 | 14 Dittmar Dr. Freehold, NJ | Rolling Hills | C25 |
| 5.28% (ריבית קבועה) 9/2032 | 3,497 | 4,393 | 979 | 5,140 | 11,100 | מאוחד | 51% | 2009 | 93.60 | 168 Duck Harbor Rd, Honesdale, PA | Summit | C27 |
| 3.50% (ריבית קבועה) 12/2041 | 2,165 (**) | 1,003 | (11) | 1,177 | 2,400 | מאוחד | 99% | 2014 | 43.87 | 23 Brownfield Rd, Eaton Center, NH | Waukeela | C28 |
| 3.50% (ריבית קבועה) 12/2041 | 2,119 (**) | 3,881 | 1,233 | 4,014 | 12,900 | מאוחד | 99% | 2008 | 120.90 | 1750 Bear Pond Rd, Hartford, ME | Wekeela | C29 |
| 7.50% (ריבית קבועה) | 2,778 (***) | | | | | | | | | | | |

- 7 - 20 -

| | הלוואות בנכס (ליום 30 ביוני 2025) | | מקדמות שנתקבלו נכון ליום 30 ביוני 2025 (באלפי דולר) | EBITDA לתקופה שהסתיימה ביום 31 בדצמבר 2024 (באלפי דולר) | הכנסה לתקופה שהסתיימה ביום 31 בדצמבר 2024 (באלפי דולר) | שווי בדוחות הכספיים ליום 30 ביוני 2025 | שיטות הצגה בדוחות הכספיים | חלק החברה בהון חברת הנכס | שנת הרכישה | פרטים אודות המחנה | | | מס׳ סידורי |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ריבית נקובה ומועד פירעון סופי | יתרת קרן בספרים | | | | | | | | | שטח (באייקר) | מיקום | שם המחנה | |
| 11/2031 | | | | | | | | | | | | | |
| 6.10% (ריבית קבועה) 8/2035 | 1,800 | | 11,496 | 4,015 | 10,664 | 36,600 | כלולה | 50% | 2012 | 21.99 | 181-200, Lake Hopatcong, NJ | Willow Lake | C30 |
| 3.50% (ריבית קבועה) 12/2041 | 1,163 (**) | | | | | | | | | | | | |
| 7.50% (ריבית קבועה) 11/2031 | 2,778 (***) | | 3,402 | 1,482 | 3,581 | 14,600 | מאוחד | 51% | 2010 | 375.00 | 1 World Way, Windsor, NHs | WM Camp (Windsor Mt.) | C31 |
| - | - | | 153,919 | 39,681 | 170,019 | 465,300 | - | - | - | 5,651.63 | | סה״כ מאוחד בתוספת חברות כלולות | |

(*)    בגין מחנות הקיץ האמורים נלקחה הלוואה אחת בסך של כ-80 מיליון דולר אשר פוצלה בין המחנות לפי שיקול דעת החברה – למידע נוסף בנוגע להלוואה ראה סעיף 7.14 לתשקיף.

(**)    בגין מחנות הקיץ האמורים נלקחה הלוואה אחת בסך של כ-27 מיליון דולר אשר פוצלה בין המחנות לפי שיקול דעת החברה – למידע נוסף בנוגע להלוואה ראה סעיף 7.14 לתשקיף.

(***)    בגין מחנות הקיץ האמורים נלקחה הלוואה אחת בסך של כ-6 מיליון דולר אשר פוצלה בין המחנות לפי שיקול דעת החברה – למידע נוסף בנוגע להלוואה ראה סעיף 7.14 לתשקיף.

### 7.7.1.2    מיקומים גיאוגרפיים

נכון למועד התשקיף, החברה פועלת בארצות הברית בעיקר בצפון מזרח ארה"ב. להלן
פרטים אודות פיזורם הגיאוגרפי של מחנות החברה ליום 31 בדצמבר של השנים 2023
ו-2024 וליום 30 ביוני 2025 :

| | שיעור מתוך פורטפוליו החברה נכון ליום | | אזור |
|---|---|---|---|
| 31 בדצמבר 2023 | 31 בדצמבר 2024 | 30 ביוני 2025 | |
| 88.4% | 88.3% | 88.2% | צפון מזרח ארה"ב |
| 5% | 5.1% | 5.2% | האזור האטלנטי המרכזי של ארה"ב |
| 6.6% | 6.6% | 6.6% | מרכז ארה"ב |

יצוין, כי מאחר שמרבית מחנות הקיץ של החברה הינם מחנות לינה, כאשר לכל מחנה
היסטוריה, קהל יעד ומאפיינים ייחודיים משלו, למיקום הגיאוגרפי של המחנה ישנה
חשיבות משנית בהשפעה על אופי והיקף החניכים בו.

### 7.7.1.3    נתונים על נכסי החברה בהתאם להערכת השווי ליום 31 בדצמבר 2024 (לפי 100%) (*)

| שיעור היוון | NOI בפועל | NOI מייצג | השווי שנקבע (באלפי דולר) | שיטת הערכת השווי | שם המחנה | מספר סידורי |
|---|---|---|---|---|---|---|
| 10.50% | 397 | 662 | 6,300 | היוון תזרימי מזומנים | Achim | C1 |
| 10.50% | 3,396 | 3,180 | 30,300 | היוון תזרימי מזומנים | Banner | C2 |
| 10.00% | 1,699 | 1,752 | 17,500 | היוון תזרימי מזומנים | Blue Star | C3 |
| 9.50% | 43 | 388 | 4,100 | היוון תזרימי מזומנים | Chateauguay | C4 |
| 10.00% | 1,309 | 1,786 | 17,900 | היוון תזרימי מזומנים | Chen-A-Wanda (BAHS) | C5 |
| 10.50% | 2,171 | 2,025 | 19,300 | היוון תזרימי מזומנים | Club Gateway | C6 |
| 9.50% | 1,294 | 1,146 | 12,100 | היוון תזרימי מזומנים | Country Roads | C7 |
| 9.50% | 482 | 478 | 5,000 | היוון תזרימי מזומנים | Eagles Landing | C8 |
| 10.00% | 1,037 | 1,252 | 12,500 | היוון תזרימי מזומנים | ECHO (SHAB) | C9 |
| 10.00% | 911 | 937 | 9,400 | היוון תזרימי מזומנים | Green Lane | C10 |
| 10.50% | (103) | 1,134 | 10,800 | היוון תזרימי מזומנים | Greenville Land (Malka) | C11 |
| 9.50% | 503 | 664 | 7,000 | היוון תזרימי מזומנים | IAFA | C12 |
| 10.00% | 1,247 | 1,565 | 15,600 | היוון תזרימי מזומנים | Island Lake | C13 |
| 9.50% | 1,213 | 1,249 | 13,100 | היוון תזרימי מזומנים | Kiwi | C14 |
| 10.50% | 146 | 805 | 7,700 | היוון תזרימי מזומנים | Lavi | C15 |
| 10.00% | 1,731 | 1,824 | 18,200 | היוון תזרימי מזומנים | Lokanda | C16 |
| 9.50% | 709 | 869 | 9,100 | היוון תזרימי מזומנים | Meadowbrook | C17 |
| 9.50% | 148 | 288 | 3,000 | היוון תזרימי מזומנים | Med-O-Lark | C18 |
| 10.00% | (1,734) | 512 | 5,100 | היוון תזרימי מזומנים | Mesorah | C19 |
| 9.00% | 1,981 | 2,169 | 24,100 | היוון תזרימי מזומנים | Mogenavco | C20 |
| 11.00% | 7,434 | 8,259 | 75,100 | היוון תזרימי מזומנים | Mohawk | C21 |

| מספר סידורי | שם המחנה | שיטת הערכת השווי | השווי שנקבע (באלפי דולר) | NOI מייצג | NOI בפועל | שיעור היוון |
|---|---|---|---|---|---|---|
| C22 | New England Golf & Tennis (Belgrade) | היוון תזרימי מזומנים | 2,900 | 309 | (234) | 10.50% |
| C23 | North Star (Poland) | היוון תזרימי מזומנים | 6,000 | 569 | 549 | 9.50% |
| C24 | Pine Forest | היוון תזרימי מזומנים | 37,300 | 3,733 | 3,826 | 10.00% |
| C25 | Rolling Hills | היוון תזרימי מזומנים | 18,300 | 1,734 | 1,817 | 9.50% |
| C27 | Summit | היוון תזרימי מזומנים | 11,100 | 1,219 | 979 | 11.00% |
| C28 | Waukeela | היוון תזרימי מזומנים | 2,400 | 255 | (11) | 10.50% |
| C29 | Wekeela | היוון תזרימי מזומנים | 12,900 | 1,227 | 1,233 | 9.50% |
| C30 | Willow Lake | היוון תזרימי מזומנים | 36,600 | 4,031 | 4,015 | 11.00% |
| C31 | WM Camp (Windsor Mt.) | היוון תזרימי מזומנים | 14,600 | 1,530 | 1,482 | 10.50% |

(*)   מעריך השווי הינו Leitner, Berman. מעריך השווי הינו בלתי תלוי ולא נחתם הסכם שיפוי הינו לבין החברה.

## 7.7.1.4   נתונים תפעוליים אודות מחנות הקיץ של החברה (מאוחד) (ביחס לנכסים המאוחדים)

| | מחנות יומיים | | | | מחנות לינה | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | 2023 | 2024 | רבעון 2 2025 | 2022 | 2023 | 2024 | רבעון 2 2025 | תקופה |
| 140,300 | 147,000 | 153,900 | 153,900 | 234,770 | 254,735 | 274,800 | 274,800 | שווי הנכסים (באלפי דולר) |
| 1,492 | 2,058 | 1,687 | 1,040 | 8,336 | 9,250 | 8,269 | 5,652 | השקעות CAPEX שבוצעו (באלפי דולר) |
| 48,979 | 54,094 | 53,828 | 5,808 | 83,676 | 102,343 | 105,528 | 5,700 | הכנסות (באלפי דולר) |
| 7,391 | 7,357 | 7,057 | 8,383 | 11,420 | 13,366 | 13,511 | 11,526 | מספר משתתפים (*) (**) |
| 12,885 | 15,733 | 15,636 | (3,410) | 15,411 | 19,263 | 20,019 | (14,181) | EBITDA (באלפי דולר) |
| 7,523 | ל.ר. | ל.ר. | ל.ר. | 7,050 | ל.ר. | ל.ר. | ל.ר. | הכנסות ממחנות שנרכשו בתקופה (באלפי דולר) |
| 1,129 | ל.ר. | ל.ר. | ל.ר. | 1,041 | ל.ר. | ל.ר. | ל.ר. | EBITDA המיוחסת למחנות שנרכשו בתקופה (באלפי דולר) |
| 12,500 | ל.ר. | ל.ר. | ל.ר. | 29,670 | ל.ר. | ל.ר. | ל.ר. | שווי נכסים שנרכשו במהלך התקופה (באלפי דולר) |

(*)   יצוין, כי בבחינת מספר המשתתפים לא הובאו בחשבון המשתתפים במחנה Club Getaway של החברה, שהינו מחנה המאפשר השתתפות לתקופות קצרות יותר.

(**)   ביחס לנתוני המחצית הראשונה של שנת 2025, יצוין כי חלק מהמשתתפים מתקבלת לאחר ה-30 ביוני 2025 וההרשמה נמשכת עד למספר ימים טרם תחילת כל מחנה.

## להלן יובא פירוט בדבר נכסים אשר הציגו EBITDA שלילית או נמוכה מ-5% בשנים 2022-2024

| הסברי החברה ל- EBITDA ותוכניות החברה בקשר עם המחנה | EBITDA בשנת | | | שווי המחנה ליום 30 ביוני 2025 | שם המחנה | מס' סידורי |
|---|---|---|---|---|---|---|
| | 2022 | 2023 | 2024 | | | |
| המחנה נרכש על-ידי החברה בשנת 2022 והינו מצוי תחת ניהולו של מנהל חדש. אסטרטגיית הפעולה של המנהל במחנה התמקדה בתחילה בהגדלת ההכנסות, כאשר לאחרונה הוחלט לתת דגש על אופן ניהול ההוצאות במחנה ולקראת עונת 2025 הוכן תקציב מפורט עבור המחנה. | 525 | 35 | 43 | 4,100 | Chateaugay | C4 |
| המחנה הינו מחנה ותיק אשר פעל במשך שנים רבות כמחנה אורתודוקסי והתקשה להשיא רווחים. בשנת 2024 קיבלה החברה החלטה להפסיק את הפעלת המחנה ולהשכיר את הקרקע. להערכת החברה, שינוי זה צפוי להוביל בשנת 2025 ל-EBITDA חיובית בנכס. הסכם השכירות הינו למשך 5 עונות פעילות (עד חודש אוקטובר 2029) כאשר דמי השכירות שנקבעו הינם בסך של 1 מיליון דולר לכל עונה (בתוספת העלויות התפעוליות של המחנה בהן יישא השוכר). | (296) | 15 | (103) | 10,800 | Greenville Land (Malka) | C11 |
| המחנה פועל כמחנה אורתודוקסי והינו מתמודד עם אתגרים בהשאת הכנסות. חרף מאמצים לשיפור היקפי הרישום והתוכניות המוצעת, המחנה טרם הגיע לציבות פיננסית. החברה בוחנת את הצורך בביצוע התאמות תפעוליות נוספות על מנת להביא לצמיחה ויעילות של המחנה. | (120) | 521 | 146 | 7,700 | Lavi | C15 |

| | | | | | | |
|---|---|---|---|---|---|---|
| במטרה להביא לשיפור בביצועי המחנה, בשנת 2024 החליפה החברה את מנהל המחנה. השפעת השינויים בניהול המחנה על תוצאותיו עשויה לארוך תקופה מסוימת, כאשר להערכת החברה השיפור בתוצאות המחנה יבוא לידי ביטוי החל מעונת 2026. | 176 | 40 | 148 | 3,000 | Med-O-Lark | C18 |
| במטרה להביא לשיפור בביצועי המחנה, בשנת 2023 החליפה החברה את מנהל המחנה. אסטרטגיית הפעולה של המנהל במחנה התמקדה בתחילה בהגדלת ההכנסות, כאשר לאחרונה הוחלט לתת דגש על אופן ניהול ההוצאות במחנה ולקראת עונת 2025 הוכן תקציב מפורט עבור המחנה. השפעת השינויים בניהול המחנה על תוצאותיו עשויה לארוך תקופה מסוימת, כאשר להערכת החברה אף על פי שחלה התקדמות מסוימת בעונת 2025 במסגרתה חל קיטון בהפסד השנתי של המחנה, החברה בדעה כי יידרשו למחנה 1-2 עונות פעילות נוספות על מנת להגיע לאיזון ורווחיות. | 616 | (1,195) | (1,734) | 5,100 | Mesorah | C19 |
| במטרה להביא לשיפור בביצועי המחנה, ובפרט לשפר את התשתית הפיזית של המחנה ואת אסטרטגיית המכירות שלו, בשנת 2025 מינתה החברה מנהל-שותף נוסף במחנה. השפעת השינויים בניהול המחנה על תוצאותיו עשויה לארוך תקופה מסוימת, כאשר להערכת החברה אף על פי שצפויה לחול ירידה מסוימת בתוצאות המחנה בעונת 2025, החברה בדעה כי תוצאות אלו ישתפרו בעונת 2026 וכי יידרשו למחנה 1-2 עונות פעילות נוספות על מנת להגיע לרווחיות. | (133) | (112) | (234) | 2,900 | New England Golf & Tennis (Belgrade) | C22 |
| המחנה הינו מחנה לבנות בלבד. מצבו הטכני של המחנה טעון שדרוג אשר התעכב בשנים האחרונות מסיבה שונות. כמו כן למועד זה לא מונה מנהל משרה מלאה במחנה. להערכת החברה, מינוי מנהל כאמור וביצוע שדרוגים שונים במתקני המחנה יביאו לשיפור בתוצאות המחנה. | (86) | 22 | (11) | 2,400 | Waukeela | C28 |

**ההערכות החברה בדבר השפעתן של פעילות שביצעה ו/או שבכוונתה לבצע בקשר למחנות הקיץ שלה הינן מידע צופה פני עתיד, כהגדרתו בחוק ניירות ערך, התשכ״ח-1968 (״חוק ניירות ערך״). הערכות אלו מבוססות על מידע המצוי בידי החברה נכון למועד התשקיף ועל ניסיונה של הנהלת החברה בתחום הפעילות. הערכות כאמור, כולן או חלקן, עלולות שלא להתממש או להתממש באופן שונה מהמתואר, לרבות באופן מהותי, כתוצאה מגורמים שונים שחלקם אינם בשליטת החברה, לרבות הרעה בכלכלת ארה״ב, הפחתת ביקושים, שינויים רגולטורים בתחום הפעילות והתממשות כל או חלק מגורמי הסיכון המתוארים בסעיף 7.18 לתשקיף.**

7.7.1.5   <u>מבנה תחום הפעילות והשינויים החלים בו</u>

תחום מחנות הקיץ בארה״ב הינו תחום ותיק ומושרש עמוקות בתרבות האמריקאית, ומהווה חלק בלתי נפרד מהחוויה המשפחתית במדינה. מדובר במסורת רבת שנים, כאשר משפחות רבות שולחות את ילדיהן למחנות קיץ מדור לדור, ולעיתים אף באותם מחנות בהם הם עצמם השתתפו בילדותם. עבור רבים בארה״ב, ההשתתפות במחנה קיץ היא חוויה מעצבת, חינוכית וחברתית, ומהווה נדבך מרכזי בתהליך ההתבגרות. בהתאם, תחום מחנות הקיץ מהווה בארה״ב בענף פעילות רחב היקף, עם מאות אלפי משתתפים מדי שנה, ועם קהילות בוגרים נרחבות השומרות על קשר עם המחנה לאורך שנים.

תחום מחנות הקיץ בארה״ב מאופיין כיום במגוון רחב של מחנות הפונים לקהלים ייחודיים, קהילות תרבותיות, דתיות ואתניות שונות, וכן לבעלי תחומי עניין מגוונים. בהתאם, לצד מחנות קיץ כלליים, פועלים כיום מחנות ייעודיים המותאמים לקהילות יהודיות, קתוליות, ועוד, וכן מחנות המיועדים לבעלי תחומי עניין ייחודיים כגון ספורט מקצועי, מדעים, טכנולוגיה, אומנויות, מוזיקה, תיאטרון, מחנות למנהיגות, מחנות לבעלי צרכים מיוחדים ועוד. פיצול זה מאפשר להורים ולילדים לבחור חוויה המותאמת לערכים, לאורח החיים ולתחומי העניין שלהם, ומייצר פיזור רחב של קהלי יעד ומקטין את התלות במגזר אחד או בקהל יעד אחד. בנוסף, לכל מחנה אופי ייחודי, תרבות

פנימית וצוות ניהולי עצמאי. מגמה זו תורמת ליציבות הענף וליכולת להתמודד עם שינויים בביקושים או טרנדים משתנים, ומאפשרת לחברות הפועלות בתחום להציע סל מוצרים רחב ומותאם אישית.

מחנה קיץ ממוצע מופעל על שטח של עשרות עד מאות דונמים, הכולל מתקני מגורים (בקתות או חדרים), חדר אוכל מרכזי, מתקני ספורט (מגרשי כדורסל, כדורגל, טניס, בריכת שחייה), אזורי יצירה ואומנויות, תיאטרון, מרחבי טבע, מסלולי הליכה, ומרפאה. סדר היום במחנה מובנה וכולל השכמה, ארוחת בוקר, פעילות בוקר (לרוב חוגים או סדנאות בתחומי עניין שונים), הפסקת צהריים, פעילות אחר הצהריים (ספורט, שחייה, טיולים, יצירה), ארוחת ערב, ופעילות ערב חברתית (הופעות, מדורות, תחרויות ועוד). המחנה פועל במתכונת של מגורים מלאים תחת פיקוח צוות מקצועי, כאשר לכל קבוצת חניכים מוצמד מדריך קבוע. צוות המחנה כולל מנהל מחנה, מדריכים, אנשי חינוך, צוות רפואי, צוות מטבח ותחזוקה. ההרשמה והתשלום מתבצעים מראש, והמחנה מספק מעטפת מלאה הכוללת לינה, ארוחות, חוגים, פעילויות, שירותי רפואה בסיסיים, ולעיתים גם הסעות מאורגנות מנקודות איסוף מרכזיות. הדגש במחנה הוא על חוויה חינוכית, חברתית ובטוחה, תוך שילוב ערכים של עצמאות, עבודת צוות ופיתוח אישי.

<u>7.7.1.6     הקמה, רכישה ומכירה של נכסים בתחום הפעילות</u>

הקמה של מחנה קיץ הינה הליך המותאם לצורכי המחנה. כך לדוגמה מחנה לינה יתפרש על פני שטח רחב יותר ויכלול מספר רב יותר של מתקנים. יצוין כי למיטב ידיעת החברה בשנים האחרונות לא הוקמו מחנות חדשים באזור ניו-יורק ומחוץ לערים גדולות אחרות, בשל הקושי באיתור נכסים מתאימים להקמת מחנות כאמור.

על אף גודלו של שוק מחנות הקיץ בארה"ב, עסקאות הקנייה והמכירה שמתבצעות בו אינן רבות. זאת בין היתר לאור היותם של מחנות הקיץ כאלה המבוססים על מסורות ארוכות שנים. יחד עם זאת, להערכת החברה, מיעוט העסקאות בשוק הינו תולדה של היצע נמוך ולא של חוסר ביקוש, כאשר בשוק ישנם גורמים הפועלים בתחום הפעילות שהינם רוכשים פוטנציאליים למחנות קיץ, הן פעילים והן שאינם פעילים. להערכת החברה, זמן השיווק והמכירה של נכס בתחום פעילותה עומד על 6 עד 12 חודשים ולכל היותר עד 24 חודשים.[14] בהקשר זה יצוין, כי להערכת החברה במקרה של רכישה או מכירה של מחנה, לא קיים קושי מיוחד במציאת גורמים מתפעלים עבור המחנות. כך למשל, החברה מחליפה ו/או ממנה מעת לעת מנהלים במחנות אותם היא מפעילה, לעיתים בדרך של קידום עובדים קיימים ולעיתים בדרך של גיוס כוח אדם חדש.

אסטרטגיית החברה מתמקדת ברכישה של מחנות קיימים במצב פיזי טוב יחסית ובעלי אוכלוסיית משתתפים יציבה, כך שהינם רווחיים החל ממועד תחילת הפעלתם על-ידי החברה. בעת בחינת רכישה של נכס חדש, החברה בוחנת, בין היתר, את התפוסה הקיימת במחנה, את סוג האוכלוסייה הפונה אליו, את מצבו הפיזי של הנכס וכן את שיעור התשואה שהוא מייצר נכון למועד הרכישה. ככלל, החברה לרוב אינה מסתמכת בעת הרכישה על פוטנציאל השבחה עתידי של המחנה אלא פועלת לרכישת מחנות יציבים בעלי תשואה חיובית. יחד עם זאת, לאורך השנים חל שיפור בתוצאותיהם של חלק ניכר מהמחנות שרכשה החברה בהתאם לאסטרטגיה כאמור לעיל.

---

[14]     בהקשר זה, ראו האמור בעמוד 3 להערכת השווי לנכסי החברה המצורפת לתשקיף לפיה משך זמן השיווק והמכירה של נכס בתחום הפעילות עומד על 12 עד 24 חודשים.

להלן נתונים אודות נכסים שנרכשו על-ידי החברה בשנת 2022 :

| EBITDA | | | הכנסות | | | תמורת הרכישה | תאריך רכישה | שם המחנה | מס' סידורי |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | 2023 | 2024 | 2022 | 2023 | 2024 | | | | |
| (באלפי דולר) | | | | | | | | | |
| 525 | 35 | 43 | 2,098 | 2,124 | 2,361 | 3,820 | 24/6/2022 | Chateaugay | C4 |
| 189 | 1,005 | 1,247 | 3,922 | 5,019 | 5,751 | 4,250 | 18/01/2022 | Island Lake | C13 |
| 326 | 4,004 | 3,826 | 1,030 | 13,681 | 14,205 | 27,000 | 14/12/2022 | Pine Forest | C24 |
| 1,129 | 2,001 | 1,817 | 7,523 | 8,672 | 9,307 | 12,500 | 31/8/2022 | Rolling Hills | C25 |

7.7.1.7    גורמי הצלחה קריטיים בתחום הפעילות

להערכת החברה, גורמי ההצלחה הקריטיים בתחום הפעילות הינם:

- **מוניטין** – מוניטין המחנה ו/או הגורם המפעיל את המחנה הינם גורם הצלחה קריטי בתחום הפעילות, זאת במיוחד לאור כך שמשפחות רבות שולחות את ילדיהן לאותם מחנות קיץ לאורך מספר שנים ואף הורים השולחים את ילדיהם למחנות בהם השתתפו בעצמם.

- **איכות הצוות** – יכולתה של החברה לגייס צוות איכותי בעל ניסיון רב בתחום הפעילות (לרבות בתחומי ההדרכה, פדגוגיה, בטיחות, ניהול וכו') מהווה גורם הצלחה משמעותי בתחום הפעילות.

- **זמינות תשתיות** – מחנות קיץ נפרשים על פני שטחים רחבים אשר צריכים להיות מותאמים להפעלת מחנות, כאשר לאור מאפיין העונתיות שלהם, הינם צריכים להיות פנויים בחודשים הרלוונטיים.

7.7.1.8    חסמי כניסה ויציאה עיקריים בתחום הפעילות

להערכת החברה, חסמי הכניסה העיקריים בתחום הפעילות הינם :

- **הון עצמי** – כניסה באופן מוצלח לתחום הפעילות מחייבת הון עצמי ראשוני משמעותי לצורך רכישת/חכירת מקרקעין והשקעה בתשתיות פיזיות;

- **צורך ביצירת מוניטין ונאמנות לקוחות** – בניית מוניטין וקבלת הכרה בקרב קהל היעד הינה חסם כניסה מהותי אשר עשויות לקחת מספר שנים על מנת להתגבר עליו.

- **דרישה לידע וניסיון ניהולי ייחודי** – חברה המעוניינת לפעול בתחום מחנות הקיץ נדרשת לאנשי מקצוע בעלי ניסיון ייחודי בתחום ספציפי זה.

- **עונתיות** – לאור העונתיות המובהקת המאפיינת את תחום הפעילות, חברה הפועלת בתחום הפעילות נדרשת לתפעל מערך אופרטיבי משמעותי במהלך חלקי שנה בלבד, כך נדרשת חברה לגייס כמות גדולה של עובדים במשרה זמנית וכדו'.

להערכת החברה, תחום הפעילות אינו מאופיין בחסמי יציאה משמעותיים.

7.7.1.9    מגבלות, חקיקה, תקינה ואילוצים מיוחדים החלים על תחום הפעילות

מחנות יומיים ומחנות הכוללים לינה לרוב כפופים לכללים החלים על מחנות או על תחום הטיפול בילדים. עם זאת, מדינות רבות מפרידות בין השנים, וכוללות את

המחנות היומיים לצד מסגרות ותוכניות הטיפול בילדים, וקובעות כללים ספציפיים עבור המחנות הכוללים לינה. הפיקוח על המחנות מצוי במרבית המדינות תחת סמכות משרד הבריאות האמריקאי או גופים שונים כגון מחלקת הבריאות ושירותי כוח האדם האמריקאית. משרדי החינוך, מחלקות שירותי כוח האדם ומחלקות השירותים לילד ולמשפחה אחראים לעיתים על מתן רישיונות למחנות קיץ. יש לציין, כי סוגיית הרישוי תלויה במדינה הספציפית שבה מצוי המחנה, ובעוד מדינות שונות מעניקות רישיונות למחנות קיץ על בסיס המתקנים או מיקום המחנה, מדינות אחרות מחייבות ברישיון עבור התוכניות אותן מפעילים המחנות.

יחד עם זאת, מדינות רבות מעניקות פטור מחובת הרישוי, לרוב כאשר מדובר בארגונים דתיים, בארגונים ללא מטרות רווח, במוסדות חינוך, במחנות בעלי אקרדיטציה מטעם ה-ACA ועוד. כמו כן, מחנות רבים זכאים מפטור מחובת הרישוי מכיוון שאינם עומדים בסף הפעילות המינימלי.

המחנות אותם מפעילה החברה אינם נדרשים להחזיק ברישיון לצורך פעילותם, והם נדרשים לעבור ביקורות מטעם גופים שונים בתחומי הבריאות, התברואה, והבטיחות, ולעמוד בתנאים שנקבעו על-ידי גופים כאמור. כמו כן, במדינות שונות בארצות הברית, העסקת צוותים במחנות קיץ מחייבת עריכת בדיקות רקע (מרשם פלילי, מרשם עברייני מין) וכן עמידה בדרישות ספציפיות לתפקיד כגון הסמכה למתן עזרה ראשונה, הסמכה לביצוע החייאה, הכשרה במתן תרופות ועוד).

למיטב ידיעת החברה, למועד התשקיף, החברה אינה מצויה בהפרה של הוראות הנוגעות לייעוד הקרקעות (Zoning) עליהן ממוקמים מחנות החברה, במדינות בהן היא פועלת.

| | 7.7.2 | **מוצרים ושירותים** |

השירות המרכזי שמספקת החברה הוא הפעלת מחנות קיץ בני מספר שבועות בחודשים יוני-אוגוסט. במסגרת הפעילות מקבלים החניכים תנאים מלאים הכוללים לינה בבקתות ייעודיות, שלוש ארוחות ביום, תכניות חינוכיות מגוונות (לרבות סדנאות, ספורט, יצירה, מוזיקה, תיאטרון), פעילויות מים, טיולים בטבע, חוגים בהתאמה אישית, ושירותים רפואיים זמינים. צוות המחנות כולל מדריכים, אנשי חינוך, אנשי רפואה, מדריכי ספורט ואומנויות, מטבח, תחזוקה ועוד. בנוסף, החברה מציעה שירותים נלווים כגון הסעות מאורגנות, חנות פנימית, מכירת ציוד ומזכרות, תיעוד וצילום, ודיווחים שוטפים להורים. כמו כן, מחנות הלינה כוללים מגורים מלאים תחת פיקוח מקצועי והפעלות ואילו מחנות היום מספקים שירותי הסעות מביתם ולביתם של החניכים בכל בוקר וערב.

| | 7.7.3 | **פילוח הכנסות ורווחיות מוצרים ושירותים** |

כמפורט לעיל, עיקר הכנסות החברה בתחום הפעילות נובעות מדמי רישום שמשלמים המשתתפים במחנות הקיץ. בנוסף, לחברה הכנסות בהיקפים לא מהותיים ממכירת מזון ובגדים בשטחי המחנה וכן מהשכרה של השטח לאירועים ולמוסדות (כגון בתי ספר וגני ילדים הפועלים בחלק מנכסי החברה במהלך השנה).

יצוין, כי לאור פיזור המחנות הרחב של החברה, ההשפעה על תזרים המזומנים של החברה במקרה בו מסיבה מסוימת החברה לא תוכל להפעיל מחנה מסוים, אינה מהותית. בהקשר זה יצוין, כי הסבירות שהחברה לא תוכל להפעיל את אחד ממחנות הקיץ שלה הינה נמוכה ביותר, כאשר במקרה בו מתקיים אירוע חריג ובלתי צפוי בו אין ביכולת החברה לקיים את המחנה כסדרו, לחברה לרוב ישנן תוכניות מגירה להפעלת המחנה (כגון הקמת מבנים ארעיים חלופיים ואף העברת המחנה למקרקעין אחרים).

### 7.7.4 **לקוחות**

7.7.4.1 לקוחות החברה הם הורים לילדים ובני נוער, בגילאי 7 עד 16, אשר מבקשים להעניק לילדיהם חוויית קיץ חינוכית. רוב הלקוחות נמנים על המעמד הבינוני-גבוה, תושבי ערים גדולות ועיירות פרבריות בחוף המזרחי ובמערב התיכון של ארה"ב.

לקוחות החברה כוללים בעיקר משפחות מארה"ב, כאשר כ-1%-5% מלקוחות החברה הינן משפחות מחוץ לארה"ב, בהתאם למחנה ולעונה. כמו כן, שיעור ניכר מהמשתתפים במחנות הקיץ של החברה הינם מקרב יהודי ארה"ב, כאשר במחנות הלינה שמפעילה החברה ישנו רוב מובהק של משתתפים בני הקהילה היהודית (כ-60% עד 70%, וזאת מבלי להביא בחשבון מחנות שהינם מיועדים לבני הקהילה היהודית בלבד) ואילו במחנות היום שמפעילה החברה, שהינם בעלי אופי מגוון יותר, כמחצית מהמשתתפים הינם בני הקהילה היהודית.

ההרשמה למחנות החברה מתבצעת ברובה המכריע באופן מקוון, באמצעות אתרי האינטרנט של החברה או אתרים ייעודיים לכל מחנה. במסגרת הליך הרישום, הורה נדרש למלא טופס מקוון הכולל פרטי הילד, בחירת תאריכים ותכניות השתתפות, ולשלם מקדמה ראשונית (Deposit) אשר מבטיחה את שמירת המקום. לאחר הרישום הראשוני, נדרשים ההורים להמציא טפסים רפואיים נלווים, כולל אישורים מרופא, הצהרות בריאות, אישורי חיסונים, וטפסי הסכמה לטיפול רפואי במידת הצורך.

הגם שהחברה אינה מבצעת מעקב אחר היקף הלקוחות החוזרים שלה, להערכת החברה שיעור גבוה מהמשתתפים במחנות החברה הם לקוחות חוזרים, כאשר משפחות רבות שולחות את ילדיהן לאותו מחנה במשך מספר שנים ברציפות. מודל הלקוחות החוזרים, לצד פיזור גאוגרפי ותרבותי, תורם ליציבות ההכנסות ולמוניטין החברה בענף.

7.7.4.2 <u>אופן ההרשמה, תשלום ומדיניות ביטולים</u>

תהליך הרישום למחנות הקיץ של החברה מתחיל להתבצע לרוב כשנה מראש, עם סיום עונת הפעילות, וכולל התחייבות כספית מלאה מצד ההורים. לאור היקף הביקוש וההיצע המוגבל, הורים רבים מקפידים לרשום את ילדיהם חודשים מראש ולעיתים אף מייד בסיום עונת הפעילות הקודמת.

לוח התשלומים משתנה ממחנה למחנה ומשנה לשנה כאשר במועד ההרשמה משלמים המשתתפים מקדמה בסך של 750 דולר עד 1,500 דולר. תנאי התשלום מאפשרים לרוב תשלום של דמי ההשתתפות בחלוקה של עד שישה (6) תשלומים, כאשר המחנות פועלים ככלל לקבלת התשלומים מוקדם ככל הניתן. ברוב המקרים, עד סוף חודש פברואר של כל שנה (כשישה חודשים לפני מועד תחילת הפעילות בפועל) מתקבלים כ-40%-50% מדמי ההשתתפות של החניכים שנרשמו. בכל מקרה מלוא דמי ההשתתפות משולמים קודם לפתיחת המחנה.

מדיניות הביטול של החברה משתנה בהתאם למחנה, שכן לכל מחנה ישנם תנאים והגבלות משלו. עם זאת, חלק ניכר ממחנות החברה פועלים, ככלל, בהתאם לקווים המנחים הבאים:

- ביטול עד לחודש דצמבר-ינואר (כ-6 חודשים לפני תחילת עונת המחנות) יזכה בהחזר כספי מלא;

- ביטול מאוחר יותר (בהתאם למחנה ולשנה) יביא לגבייה של 25% מדמי הרישום ולאיבוד המקדמה ששולמה.

בפועל, מנהלי המחנות והנהלת החברה מפעילים לרוב שיקול דעת ביישום מדיניות הביטול (למשל, במקרה של פציעת חניך או טרגדיה משפחתית עשויים המנהלים לספק החזר כספי מלא או לאפשר לחניך לנצל את זכותו להשתתף במחנה בשנה הבאה).

באופן היסטורי, היקף הביטולים הכולל במחנות החברה עומד על שיעור לא מהותי של 1%-2%.

### 7.7.5    שיווק והפצה

שיווק פעילותה של החברה נעשה בראשונה מפה לאוזן. כמו כן, אסטרטגיית השיווק של החברה כוללת פעילות בערוצים דיגיטליים – לרבות ברשתות חברתיות וכן פרסום בקהילות רלוונטיות. בנוסף, מערך השיווק של החברה מבוסס על הפנייה מצד יועצים וסוכנים המפנים את הלקוחות לחברה.

### 7.7.6    תחרות

תחום מחנות הקיץ מתאפיין בריבוי שחקנים, מגוון מודלים עסקיים, ותחרות גבוהה באזורים מסוימים. החברה מתחרה הן מול מחנות פרטיים משפחתיים בעלי מוניטין ותיק, והן מול רשתות מסחריות גדולות או ארגונים ללא מטרת רווח.

כאמור לעיל, לאור מאפיין הקשר העמוק הנוצר תדיר בין החניכים ומשפחותיהם למחנה וכן קשרי החברות שנוצרים בין החניכים השונים, פעמים רבות חלק ניכר מהנרשמים הינם משתתפים חוזרים ו/או בני אותה משפחה. בהתאם, החברה שמה דגש על העמקת הקשר בין המחנות לבין החניכים ומשפחותיהם.

### 7.7.7    עונתיות

פעילות החברה מושפעת באופן מובהק מהעונתיות האופיינית לתחום. רוב פעילות המחנות מתבצעת ברבעון השלישי של השנה, כאשר התלמידים נמצאים בחופשה מבתי הספר. המחנות מותאמים ללוח החופשות השנתי, ולכן מחוץ לתקופה זו הפעילות הינה בעצימות נמוכה משמעותית. גם מבחינה כלכלית, המחנות מתנהלים במחזוריות שנתית: במהלך השנה ישנה היערכות הכוללת שיווק, גיוס מדריכים ותחזוקת מתקנים, אך מרבית ההכנסות מוכרות רק במהלך תקופת הקיץ הקצרה. יחד עם זאת, ההרשמה למחנות הקיץ של החברה פתוחה לאורך כל השנה ומתחילה לרוב כשנה מראש (פעמים רבות מיד עם סיום עונת הפעילות).

בהתאם לאמור, כ-90% מהכנסות החברה מוכרות במהלך הרבעון השלישי של השנה, כאשר הוצאות החברה מחולקות להוצאות עונתיות בקשר עם תפעול המחנות המהוות כ-85%-90% מסך ההוצאות השנתיות והינן מוצאות בעיקר ברבעון השלישי של השנה, והוצאות קבועות אשר משולמות גם במהלך השנה, הנובעות ממשכורות לעובדים קבועים, הוצאות שירות חוב שוטפים, מיסי נדל"ן, תחזוקה של המחנות, ביטוחים וכדו', המהוות כ-10%-15% מסך ההוצאות השנתיות.

להלן נתונים אודות כמות הנרשמים למחנות החברה וההכנסה הצפויה בגינם במהלך חודשי ההרשמה (מצטבר):

| | עונת שנת 2024 | | | עונת שנת 2025 | | | |
|---|---|---|---|---|---|---|---|
| הכנסה צפויה מדמי השתתפות (באלפי דולר) | שיעור מכלל הנרשמים (%) | כמות נרשמים לעונה הקרובה (באלפים) | הכנסה צפויה מדמי השתתפות (באלפי דולר) | השיעור מכלל הנרשמים (%) | כמות נרשמים לעונה הקרובה (באלפים) | | |
| 119,000 | 73% | 14.9 | 122,572 | 73% | 14.6 | | נובמבר |
| 124,000 | 78% | 15.8 | 127,588 | 78% | 15.6 | | דצמבר |
| 127,353 | 82% | 16.6 | 131,176 | 83% | 16.4 | | ינואר |
| 131,770 | 86% | 17.6 | 135,535 | 87% | 17.3 | | פברואר |
| 136,556 | 91% | 18.5 | 141,047 | 92% | 18.3 | | מרס |
| 139,611 | 94% | 19.2 | 143,876 | 95% | 19 | | אפריל |
| 143,404 | 97% | 19.8 | 148,335 | 98% | 19.5 | | מאי |
| 145,772 | 100% | 20.3 | 150,888 | 100% | 19.9 | | יוני |

**7.7.8** **חומרי גלם וספקים**

במסגרת תחום הפעילות החברה מתקשרת עם ספקים מגוונים לצורך הפעלת המחנות. בתחום ההסעדה, נעשה שימוש בספקים אזוריים גדולים המספקים מזון בכמויות מסחריות תוך עמידה בתקני בטיחות. בתחום הציוד, רוכשת החברה ציוד ספורט, מחנאות, אומנות ומחשוב מספקים מורשים. שירותי הסעה לחניכים ניתנים באמצעות חברות תחבורה אזוריות, בהתאם לרגולציה המקומית. כן פועלת החברה מול גורמים רפואיים – רופאים, אחיות ורוקחים – לצורך הקמה ותפעול של מרפאות באתרי המחנה.

**7.7.9** **נכסים מהותיים ומהותיים מאוד של החברה**[15]

להלן פרטים אודות נכסים מהותיים מאוד ומהותיים של החברה וכן נכסים שישועבדו ו/או עשויים להיות משועבדים לטובת מחזיקי אגרות החוב (סדרה א') של החברה:

**7.7.9.1** מחנה Mohawk (נכס מהותי מאוד)

א) הצגת הנכס

| | (הנתונים לפי 100%. חלק החברה בנכס – 100%) |
|---|---|
| Mohawk (C21) | שם הנכס |
| מחנה קיץ. במהלך השנה פועל בית ספר במקרקעין | תיאור כללי של הנכס |
| 200 Old Tarrytown Rd, White Plains, NY | מיקום הנכס |
| 100% | חלק החברה בנכס (משפטי/אפקטיבי) |
| במהלך השנה מושכר הנכס לטובת הפעלת בית ספר | האם מושכר במהלך השנה |
| 300-400 אלפי דולר לשנה במהלך חמש (5) השנים הקרובות | עלויות CAPEX צפויות |
| כן | האם הקרקע והמבנים בבעלות החברה? |
| 37.39 אייקר | שטח הקרקע |
| כן | האם מופעל על-ידי מנהל חיצוני |
| 2009 | שנת הרכישה |
| 20,000 | עלות הרכישה (באלפי דולר) |

ב) נתונים תפעוליים אודות הנכס

| 2022 | 2023 | 2024 | (הנתונים לפי 100%. חלק החברה בנכס – 100%) |
|---|---|---|---|
| 70,800 | 72,900 | 75,100 | שווי הוגן |
| 17,910 | 19,747 | 19,755 | הכנסות (באלפי דולר) |
| 2,700 | 2,602 | 2,337 | רווחי (הפסדי) שיערוך (באלפי דולר) |

---

[15] יצוין, כי הבחינה של נכסים מהותיים ונכסים מהותיים מאוד כאמור בסעיף זה הינה בהתאם להגדרות הקבועות בתיקון המוצע לתקנות ניירות ערך לעיגון "הנחיית גילוי בנוגע לפעילות נדל"ן להשקעה", וזאת על אף שהחברה אינה פועלת בתחום הנדל"ן להשקעה.

| | | | |
|---|---|---|---|
| 5,227 | 6,578 | 7,434 | EBITDA (באלפי דולר) |
| 7.4% | 9.0% | 9.9% | שיעור תשואה בפועל |
| 1,312 | 1,425 | 1,628 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 1,765 | 1,850 | 1,834 | כמות המשתתפים |
| | **זהות מעריך השווי** | | |
| | Leitner Berman | | שם מעריך השווי |
| לא | לא | לא | האם המעריך תלוי במזמין |
| כן | כן | כן | האם קיים הסכם שיפוי |
| | **פרטי הערכת השווי** | | |
| 31/12/2022 | 31/12/2023 | 31/12/2024 | תאריך התוקף |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 7,434 | 8,383 | 8,259 | EBITDA בשנה מיוצבת (באלפי דולר) |
| 3% | 3% | 3% | שיעור צמיחה שהונח ביחס להכנסות |
| 3% | 3% | 3% | שיעור צמיחה שהונח ביחס לעלויות |
| 1,312 | 1,425 | 1,628 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 10.50% | 11.50% | 11.00% | שיעור היוון (Discount Rate) |
| 10.50% | 11.50% | 11.00% | שיעור היוון (Cap Rate) |
| 10.50% | 11.50% | 11.00% | שיעור היוון (OCR) |
| (3,218) | (3,041) | (3,282) | עליה של 0.5% | השפעת השינוי בשיעורי |
| 3,540 | 3,309 | 3,557 | ירידה של 0.5% | היוון על שווי הנכס |

7.7.9.2    <u>מחנה Banner (נכס מהותי מאוד)</u>

א)   הצגת הנכס

| | |
|---|---|
| **(הנתונים לפי 100%. חלק החברה בנכס – 90%)** | |
| Banner (C2) | **שם הנכס** |
| מחנה קיץ הפועל כמחנה יום. | **תיאור כללי של הנכס** |
| 1177 Riverwoods Road, Lake Forest, IL | **מיקום הנכס** |
| 90% | **חלק החברה בנכס (משפטי/אפקטיבי)** |
| לא | **האם מושכר במהלך השנה** |
| 100-150 אלפי דולר לשנה במהלך חמש (5) השנים הקרובות | **עלויות CAPEX צפויות** |
| כן | **האם הקרקע והמבנים בבעלות החברה?** |
| 54.01 אייקר | **שטח הקרקע** |
| כן | **האם מופעל על-ידי מנהל חיצוני** |
| 2013 | **שנת הרכישה** |
| 10,750 | **עלות הרכישה (באלפי דולר)** |

ב)   נתונים תפעוליים אודות הנכס

| 2022 | 2023 | 2024 | |
|---|---|---|---|
| | | | **(הנתונים לפי 100%. חלק החברה בנכס – 90%)** |
| 28,500 | 29,400 | 30,300 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 912 | 850 | 1,113 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 9,414 | 10,469 | 10,503 | הכנסות (באלפי דולר) |
| 1,598 | 1,572 | 1,477 | כמות משתתפים |
| 3,519 | 3,604 | 3,396 | EBITDA (באלפי דולר) |
| 12.3% | 12.3% | 11.2% | שיעור תשואה בפועל |
| 954 | 1,097 | 1,174 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| | **פרטי מעריך השווי** | | |
| | Leitner Berman | | שם מעריך השווי |
| | לא | | האם המעריך תלוי במזמין |
| | כן | | האם קיים הסכם שיפוי |
| | **פרטי הערכת השווי** | | |
| 31/12/2022 | 31/12/2023 | 31/12/2024 | תאריך התוקף |
| | היוון תזרימי מזומנים | | מודל הערכת שווי |
| 2,850 | 3,234 | 3,180 | EBITDA מיוצב בהתאם להערכת השווי (באלפי דולר) |
| 11.62% | 0.15% | 0.00% | שיעור צמיחה שהונח ביחס להכנסות |
| 16.76% | 3.56% | 3.00% | שיעור צמיחה שהונח ביחס לעלויות |
| 954 | 1,097 | 1,174 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Discount Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Cap Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (OCR) |
| (1,357) | (1,278) | (1,377) | עליה של 0.5% | השפעת השינוי בשיעורי היוון על שווי הנכס |
| 1,500 | 1,400 | 1,515 | ירידה של 0.5% | |

7.7.9.3  מחנה Chen-A-Wanda (נכס מהותי מאוד)

א)  הצגת הנכס

| (הנתונים לפי 100%. חלק החברה בנכס – 51%) | |
|---|---|
| שם הנכס | Chen-A-Wanda (C5) |
| תיאור כללי של הנכס | מחנה קיץ הפועל כמחנה לינה. המחנה מציע פעילויות ספורטיביות ואומנותיות. |
| מיקום הנכס | 355 Camp Rd Thompson, PA |
| חלק החברה בנכס (משפטי/אפקטיבי) | 51% |
| האם מושכר במהלך השנה | לא |
| עלויות CAPEX צפויות | 150-200 אלפי דולר לשנה במהלך חמש (5) השנים הקרובות |
| האם הקרקע והמבנים בבעלות החברה? | כן |
| שטח הקרקע | 180.68 אייקר |
| האם מופעל על-ידי מנהל חיצוני | כן |
| שנת הרכישה | 2007 |
| עלות הרכישה (באלפי דולר) | 4,750 |

ב)  נתונים תפעוליים אודות הנכס

| 2022 | 2023 | 2024 | (הנתונים לפי 100%. חלק החברה בנכס –51%) |
|---|---|---|---|
| 16,900 | 17,400 | 17,900 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 1,056 | 957 | 676 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 5,404 | 6,102 | 7,158 | הכנסות (באלפי דולר) |
| 499 | 531 | 583 | כמות משתתפים |
| 513 | 833 | 1,309 | EBITDA (באלפי דולר) |
| 3.0% | 4.8% | 7.3% | שיעור תשואה בפועל |
| 1,423 | 1,517 | 1,628 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| **פרטי מעריך השווי** | | | |
| Leitner Berman | | | שם מעריך השווי |
| לא | | | האם המעריך תלוי במזמין |
| כן | | | האם קיים הסכם שיפוי |
| **פרטי הערכת השווי** | | | |
| 31/12/2022 | 31/12/2023 | 31/12/2024 | תאריך התוקף |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 1,786 | 1,786 | 1,786 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 12.93% | 17.43% | 5.00% | שיעור צמיחה שהונח ביחס להכנסות |
| 8.33% | 12.19% | 5.00% | שיעור צמיחה שהונח ביחס לעלויות |
| 1,423 | 1,517 | 1,628 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (Discount Rate) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (Cap Rate) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (OCR) |
| (845) | (791) | (852) | עליה של 0.5% | השפעת השינוי בשיעורי היוון על שווי הנכס |
| 939 | 870 | 942 | ירידה של 0.5% | |

7.7.9.4  מחנה Club Getaway (נכס מהותי מאוד)

א)  הצגת הנכס

| (הנתונים לפי 100%. חלק החברה בנכס – 80%) | |
|---|---|
| שם הנכס | Club Getaway (C6) |
| תיאור כללי של הנכס | מחנה קיץ המהווה אתר קמפ-דריזורט להרפתקאות לכל המשפחה (גם למבוגרים). המחנה מאפשר השתתפות לתקופות שונות. |
| מיקום הנכס | 59 S Kent Rd Kent CT |
| חלק החברה בנכס (משפטי/אפקטיבי) | 80% |
| האם מושכר במהלך השנה | פעיל במהלך רוב השנה |
| עלויות CAPEX צפויות | 150-200 אלפי דולר לשנה במהלך חמש (5) השנים הקרובות |
| האם הקרקע והמבנים בבעלות החברה? | כן |
| שטח הקרקע | 271.12 אייקר |
| האם מופעל על-ידי מנהל חיצוני | כן |
| שנת הרכישה | 2012 |
| עלות הרכישה (באלפי דולר) | 4,750 |

ב)  נתונים תפעוליים אודות הנכס

| 2022 | 2023 | 2024 | (הנתונים לפי 100%. חלק החברה בנכס –80%) |
|---|---|---|---|
| 18,200 | 18,700 | 19,300 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 474 | 566 | 642 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 6,127 | 6,588 | 7,008 | הכנסות (באלפי דולר) |
| ל.ר. | ל.ר. | ל.ר. | כמות משתתפים |
| 1,890 | 2,261 | 2,171 | EBITDA (באלפי דולר) |
| 10.4% | 12.1% | 11.2% | שיעור תשואה בפועל |
| ל.ר. | ל.ר. | ל.ר. | עלות השתתפות ממוצעת בשבוע (בדולר) |
| | | פרטי מעריך השווי | |
| | Leitner Berman | | שם מעריך השווי |
| | לא | | האם המעריך תלוי במזמין |
| | כן | | האם קיים הסכם שיפוי |
| | | פרטי הערכת השווי | |
| 31/12/2022 | 31/12/2023 | 31/12/2024 | תאריך התוקף |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 2,025 | 2,025 | 2,025 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 6.24% | 7.81% | 3.00% | שיעור צמיחה שהונח ביחס להכנסות |
| 2.22% | 11.75% | 3.00% | שיעור צמיחה שהונח ביחס לעלויות |
| ל.ר. | ל.ר. | ל.ר. | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Discount Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Cap Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (OCR) |
| (867) | (813) | (877) | השפעת השינוי בשיעורי היוון על שווי הנכס — עליה של 0.5% |
| 958 | 890 | 965 | ירידה של 0.5% |

7.7.9.5    מחנה Mogenavco (נכס מהותי מאוד)

א)  הצגת הנכס

| (הנתונים לפי 100%. חלק החברה בנכס – 100%) | |
|---|---|
| שם הנכס | Mogenavco (C20) |
| תיאור כללי של הנכס | מחנה קיץ הפועל כמחנה לינה. המחנה הינה מחנה לבנים יהודים אורתודוקסים, והוא כולל פעילויות למידה רוחנית לצד פעילות קיץ. |
| מיקום הנכס | 160 Laymon Road, Swan Lake, NY |
| חלק החברה בנכס (משפטי/אפקטיבי) | 100% |
| האם מושכר במהלך השנה | לא |
| עלויות CAPEX צפויות | 200-250 אלפי דולר לשנה במהלך חמש (5) השנים הקרובות |
| האם הקרקע והמבנים בבעלות החברה? | כן |
| שטח הקרקע | 481.15 אייקר |
| האם מופעל על-ידי מנהל חיצוני | כן |
| שנת הרכישה | 2010 |
| עלות הרכישה (באלפי דולר) | 7,000 |

ב)  נתונים תפעוליים אודות הנכס

| 2022 | 2023 | 2024 | (הנתונים לפי 100%. חלק החברה בנכס – 100%) |
|---|---|---|---|
| 22,700 | 23,400 | 24,100 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 1,003 | 902 | 1,338 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 6,343 | 6,751 | 7,095 | הכנסות (באלפי דולר) |
| 1,081 | 1,032 | 954 | כמות משתתפים |
| 1,560 | 1,786 | 1,981 | EBITDA (באלפי דולר) |
| 6.9% | 7.6% | 8.2% | שיעור תשואה בפועל |
| 915 | 1,015 | 1,094 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| | | פרטי מעריך השווי | |
| | Leitner Berman | | שם מעריך השווי |
| | לא | | האם המעריך תלוי במזמין |
| | כן | | האם קיים הסכם שיפוי |
| | | פרטי הערכת השווי | |
| 31/12/2022 | 31/12/2023 | 31/12/2024 | תאריך התוקף |
| היוון | היוון תזרימי | היוון תזרימי | מודל הערכת שווי |

| תזרימי מזומנים | מזומנים | מזומנים | |
|---|---|---|---|
| 1,930 | 2,223 | 2,169 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 6.43% | 4.99% | 5.00% | שיעור צמיחה שהונח ביחס להכנסות |
| 3.68% | 3.17% | 3.00% | שיעור צמיחה שהונח ביחס לעלויות |
| 915 | 1,015 | 1,094 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 8.50% | 9.50% | 9.00% | שיעור היוון (Discount Rate) |
| 8.50% | 9.50% | 9.00% | שיעור היוון (Cap Rate) |
| 8.50% | 9.50% | 9.00% | שיעור היוון (OCR) |
| (1,261) | (1,170) | (1,268) | השפעת השינוי בשיעורי היוון על שווי הנכס — עליה של 0.5% |
| 1,419 | 1,300 | 1,418 | ירידה של 0.5% |

7.7.9.6   מחנה Pine Forest (נכס מהותי מאוד)

א)   הצגת הנכס

| (הנתונים לפי 100%. חלק החברה בנכס – 80%) | |
|---|---|
| Pine Forest (C24) | שם הנכס |
| מחנה קיץ במתכונת של מחנה לינה. המחנה פעיל שנים רבות. | תיאור כללי של הנכס |
| 185  Pine Forest Rd, Greeley PA | מיקום הנכס |
| 80% | חלק החברה בנכס (משפטי/אפקטיבי) |
| לא | האם מושכר במהלך השנה |
| 250-300 אלפי דולר לשנה במהלך חמש (5) השנים הקרובות | עלויות CAPEX צפויות |
| כן | האם הקרקע והמבנים בבעלות החברה? |
| 241.44 אייקר | שטח הקרקע |
| כן | האם מופעל על-ידי מנהל חיצוני |
| 2022 | שנת הרכישה |
| 27,000 | עלות הרכישה (באלפי דולר) |

ב)   נתונים תפעוליים אודות הנכס

| 2022 | 2023 | 2024 | (הנתונים לפי 100%. חלק החברה בנכס – 80%) |
|---|---|---|---|
| 21,600 | 29,450 | 37,300 | שווי הוגן בסוף התקופה (באלפי דולר) |
| (3,602) | 6,496 | 6,941 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 1,030 | 13,681 | 14,205 | הכנסות (באלפי דולר) |
| 1,120 | 1,091 | 1,093 | כמות משתתפים |
| 326 | 4,004 | 3,826 | EBITDA (באלפי דולר) |
| 1.5% | 13.6% | 10.3% | שיעור תשואה בפועל |
| 1,843 | 1,890 | 2,163 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| | פרטי מעריך השווי | | |
| | Leitner Berman | | שם מעריך השווי |
| | לא | | האם המעריך תלוי במזמין |
| | כן | | האם קיים הסכם שיפוי |
| | פרטי הערכת השווי | | |
| 31/12/2022 | 31/12/2023 | 31/12/2024 | תאריך התוקף |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 2,160 | 3,239 | 3,733 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 10.65% | 3.83% | 3.00% | שיעור צמיחה שהונח ביחס להכנסות |
| 1.58% | 7.24% | 5.00% | שיעור צמיחה שהונח ביחס לעלויות |
| 1,843 | 1,890 | 2,163 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Discount Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Cap Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (OCR) |
| (1,029) | (1,280) | (1,695) | השפעת השינוי בשיעורי היוון על שווי הנכס — עליה של 0.5% |
| 1,137 | 1,402 | 1,865 | ירידה של 0.5% |

7.7.9.7   מחנה Rolling Hills (נכס מהותי מאוד)

א)   הצגת הנכס

| (הנתונים לפי 100%. חלק החברה בנכס – 99%) | |
|---|---|
| Rolling Hills (C25) | שם הנכס |
| מחנה קיץ הפועל כמחנה יום. המחנה כולל בריכות שחייה מחוממות, קיר טיפוס, מגרשי כדורסל ומגרשי ספורט נוספים, סטודיו לאמנות ויצירה ומתחמי בישול. | תיאור כללי של הנכס |
| 14 Dittmar Road, Freehold, NJ | מיקום הנכס |

| | |
|---|---|
| חלק החברה בנכס (משפטי/אפקטיבי) | 99% |
| האם מושכר במהלך השנה | לא |
| עלויות CAPEX צפויות | 150-200 אלפי דולר לשנה במהלך חמש (5) השנים הקרובות |
| האם הקרקע והמבנים בבעלות החברה? | כן |
| שטח הקרקע | 22.18 אייקר |
| האם מופעל על-ידי מנהל חיצוני | כן |
| שנת הרכישה | 2022 |
| עלות הרכישה (באלפי דולר) | 12,500 |

ב)   נתונים תפעוליים אודות הנכס

| 2022 | 2023 | 2024 | (הנתונים לפי 100%. חלק החברה בנכס – 99%) |
|---|---|---|---|
| 12,500 | 15,400 | 18,300 | שווי הוגן בסוף התקופה (באלפי דולר) |
| (911) | 2,934 | 3,154 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 7,523 | 8,672 | 9,307 | הכנסות (באלפי דולר) |
| 1,318 | 1,355 | 1,456 | כמות משתתפים |
| 1,129 | 2,001 | 1,817 | EBITDA (באלפי דולר) |
| 9.0% | 13.0% | 9.9% | שיעור תשואה בפועל |
| 822 | 891 | 928 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| | **פרטי מעריך השווי** | | |
| | Leitner Berman | | שם מעריך השווי |
| | לא | | האם המעריך תלוי במזמין |
| | כן | | האם קיים הסכם שיפוי |
| | **פרטי הערכת השווי** | | |
| 31/12/2022 | 31/12/2023 | 31/12/2024 | תאריך התוקף |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 1,187 | 1,617 | 1,734 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 15.14% | 7.31% | 3.00% | שיעור צמיחה שהונח ביחס להכנסות |
| 4.31% | 8.52% | 5.00% | שיעור צמיחה שהונח ביחס לעלויות |
| 822 | 891 | 928 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 10.00% | 10.50% | 9.50% | שיעור היוון (Discount Rate) |
| 10.00% | 10.50% | 9.50% | שיעור היוון (Cap Rate) |
| 10.00% | 10.50% | 9.50% | שיעור היוון (OCR) |
| (595) | (700) | (915) | עליה של 0.5% | השפעת השינוי בשיעורי היוון על שווי הנכס |
| 658 | 770 | 1,017 | ירידה של 0.5% | |

7.7.9.8   מחנה Blue Star (נכס מהותי)

| | | | (הנתונים לפי 100%. חלק החברה בנכס – 70%) |
|---|---|---|---|
| | 27/02/2012 | | מועד רכישה |
| | 8,800 | | עלות רכישה (באלפי דולר) |
| | 70% | | חלק החברה בנכס (משפטי/אפקטיבי) |
| | 179  Blue Star Way Hendersonville, NC | | מיקום הנכס |
| | 447.09 אייקר | | גודל הנכס |
| **2022** | **2023** | **2024** | **נתוני הנכס** |
| 16,500 | 17,000 | 17,500 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 133 | 213 | (53) | רווחי (הפסדי) שערוך (באלפי דולר) |
| 6,468 | 7,257 | 8,027 | הכנסות (באלפי דולר) |
| 1,010 | 1,062 | 1,105 | כמות משתתפים |
| 801 | 996 | 1,698 | EBITDA (באלפי דולר) |
| 1,500 | 1,500 | 1,642 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| **2022** | **2023** | **2024** | **פרטי הערכת השווי** |
| | Leitner Berman | | שם מעריך השווי |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 1,568 | 1,785 | 1,752 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 1,500 | 1,500 | 1,642 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (Discount Rate) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (Cap Rate) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (OCR) |

### 7.7.9.9   מחנה Achim

| 2022 | 2023 | 2024 | (הנתונים לפי 100%. חלק החברה בנכס –100%) |
|---|---|---|---|
| | | 21/08/2012 | מועד רכישה |
| | | 3,500 | עלות רכישה (באלפי דולר) |
| | | 100% | חלק החברה בנכס (משפטי/אפקטיבי) |
| | | Route 59, Suite 110, Airmont, 365 NY | מיקום הנכס |
| | | 98.03 אייקר | גודל הנכס |
| **2022** | **2023** | **2024** | **נתוני הנכס** |
| 5,900 | 6,100 | 6,300 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 126 | 451 | 404 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 1,883 | 2,009 | 2,190 | הכנסות (באלפי דולר) |
| 554 | 562 | 551 | כמות משתתפים |
| 619 | 107 | 397 | EBITDA (באלפי דולר) |
| 403 | 435 | 435 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| **2022** | **2023** | **2024** | **פרטי הערכת השווי** |
| | Leitner Berman | | שם מעריך השווי |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 662 | 662 | 662 | EBITDA מייצבת בהתאם להערכת השווי (באלפי דולר) |
| 403 | 435 | 435 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Discount Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Cap Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (OCR) |

### 7.7.9.10   מחנה Country Roads

| 2022 | 2023 | 2024 | (הנתונים לפי 100%. חלק החברה בנכס –99%) |
|---|---|---|---|
| | | 06/11/2013 | מועד רכישה |
| | | 4,500 | עלות רכישה (באלפי דולר) |
| | | 99% | חלק החברה בנכס (משפטי/אפקטיבי) |
| | | Pine Brook Rd, Manalapan 139 Township, NJ | מיקום הנכס |
| | | 25.68 אייקר | גודל הנכס |
| **2022** | **2023** | **2024** | **נתוני הנכס** |
| 11,400 | 11,700 | 12,100 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 502 | 461 | 599 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 5,819 | 6,630 | 6,473 | הכנסות (באלפי דולר) |
| 1,086 | 1,131 | 1,064 | כמות משתתפים |
| 971 | 1,288 | 1,294 | EBITDA (באלפי דולר) |
| 578 | 635 | 659 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| **2022** | **2023** | **2024** | **פרטי הערכת השווי** |
| | Leitner Berman | | שם מעריך השווי |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 1,146 | 1,146 | 1,146 | EBITDA מייצבת בהתאם להערכת השווי (באלפי דולר) |
| 578 | 635 | 659 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 9.00% | 10.00% | 9.50% | שיעור היוון (Discount Rate) |
| 9.00% | 10.00% | 9.50% | שיעור היוון (Cap Rate) |
| 9.00% | 10.00% | 9.50% | שיעור היוון (OCR) |

### 7.7.9.11   מחנה Eagles Landing

| 2022 | 2023 | 2024 | (הנתונים לפי 100%. חלק החברה בנכס –100%) |
|---|---|---|---|
| | | 30/12/2011 | מועד רכישה |
| | | 5,700 | עלות רכישה (באלפי דולר) |
| | | 100% | חלק החברה בנכס (משפטי/אפקטיבי) |
| | | 74 Davidson Mill Road N. Brunswick Township, NJ | מיקום הנכס |
| | | 12.79 אייקר | גודל הנכס |
| **2022** | **2023** | **2024** | **נתוני הנכס** |
| 4,800 | 4,900 | 5,000 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 51 | 68 | 229 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 3,365 | 3,683 | 3,354 | הכנסות (באלפי דולר) |
| 704 | 654 | 581 | כמות משתתפים |
| 714 | 908 | 482 | EBITDA (באלפי דולר) |
| 595 | 662 | 765 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| **2022** | **2023** | **2024** | **פרטי הערכת השווי** |

| Leitner Berman | | | שם מעריך השווי |
|---|---|---|---|
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 478 | 478 | 478 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| <u>595</u> | <u>662</u> | <u>765</u> | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 9.00% | 10.00% | 9.50% | שיעור היוון (Discount Rate) |
| 9.00% | 10.00% | 9.50% | שיעור היוון (Cap Rate) |
| 9.00% | 10.00% | 9.50% | שיעור היוון (OCR) |

### 7.7.9.12   מחנה <u>Green Lane</u>

| | | | (הנתונים לפי 100%. חלק החברה בנכס —51%) |
|---|---|---|---|
| | | 27/07/2011 | מועד רכישה |
| | | 3,200 | עלות רכישה (באלפי דולר) |
| | | 51% | חלק החברה בנכס (משפטי/אפקטיבי) |
| | | 249 Camp Green Lane Rd Green Lane, PA | מיקום הנכס |
| | | 106.40 אייקר | גודל הנכס |
| **2022** | **2023** | **2024** | **נתוני הנכס** |
| 8,800 | 9,100 | 9,400 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 435 | 382 | 439 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 2,754 | 3,514 | 3,676 | הכנסות (באלפי דולר) |
| 324 | 380 | 354 | כמות משתתפים |
| 336 | 897 | 911 | EBITDA (באלפי דולר) |
| 1,027 | 1,031 | 1,107 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| **2022** | **2023** | **2024** | **פרטי הערכת השווי** |
| | | Leitner Berman | שם מעריך השווי |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 937 | 937 | 937 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 1,027 | 1,031 | 1,107 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (Discount Rate) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (Cap Rate) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (OCR) |

### 7.7.9.13   מחנה <u>Lavi</u>

| | | | (הנתונים לפי 100%. חלק החברה בנכס —99%) |
|---|---|---|---|
| | | 28/02/2008 | מועד רכישה |
| | | 7,500 | עלות רכישה (באלפי דולר) |
| | | 99% | חלק החברה בנכס (משפטי/אפקטיבי) |
| | | 2656 Upper Woods Dr, Lakewood, PA | מיקום הנכס |
| | | 119.00 אייקר | גודל הנכס |
| **2022** | **2023** | **2024** | **נתוני הנכס** |
| 7,300 | 7,500 | 7,700 | שווי הוגן בסוף התקופה (באלפי דולר) |
| (536) | 53 | 273 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 4,079 | 4,741 | 4,613 | הכנסות (באלפי דולר) |
| 712 | 743 | 767 | כמות משתתפים |
| (120) | 521 | 146 | EBITDA (באלפי דולר) |
| 750 | 852 | 859 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| **2022** | **2023** | **2024** | **פרטי הערכת השווי** |
| | | Leitner Berman | שם מעריך השווי |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 805 | 805 | 805 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 750 | 852 | 859 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Discount Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Cap Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (OCR) |

### 7.7.9.14   מחנה <u>Malka</u>

| | | (הנתונים לפי 100%. חלק החברה בנכס —100%) |
|---|---|---|
| | 11/03/2010 | מועד רכישה |
| | 3,500 | עלות רכישה (באלפי דולר) |
| | 100% | חלק החברה בנכס (משפטי/אפקטיבי) |
| | 150 Ingalside Rd Greenville, NY | מיקום הנכס |
| | 131.52 אייקר | גודל הנכס |

- 7 - 37 -

| 2022 | 2023 | 2024 | נתוני הנכס |
|---|---|---|---|
| 10,200 | 10,500 | 10,800 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 304 | (171) | 312 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 2,482 | 2,587 | 710 | הכנסות (באלפי דולר) |
| 933 | 963 | ל.ר. | כמות משתתפים |
| (296) | 15 | (103) | EBITDA (באלפי דולר) |
| ל.ר. | ל.ר. | ל.ר. | עלות השתתפות ממוצעת בשבוע (בדולר) |
| 2022 | 2023 | 2024 | פרטי הערכת השווי |
| | Leitner Berman | | שם מעריך השווי |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 1,134 | 1,134 | 1,134 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| ל.ר. | ל.ר. | ל.ר. | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Discount Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (Cap Rate) |
| 10.00% | 11.00% | 10.50% | שיעור היוון (OCR) |

### 7.7.9.15   מחנה Meadowbrook

| | | | (הנתונים לפי 100%. חלק החברה בנכס —99%) |
|---|---|---|---|
| | 16/06/2016 | | מועד רכישה |
| | 8,350 | | עלות רכישה (באלפי דולר) |
| | 99% | | חלק החברה בנכס (משפטי/אפקטיבי) |
| | 73 E Valley Brook Rd, Long Valley, NJ | | מיקום הנכס |
| | 53.10 אייקר | | גודל הנכס |
| 2022 | 2023 | 2024 | נתוני הנכס |
| 8,500 | 8,800 | 9,100 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 209 | 342 | 391 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 6,323 | 6,412 | 6,202 | הכנסות (באלפי דולר) |
| 1,060 | 1,132 | 1,103 | כמות משתתפים |
| 1,223 | 435 | 709 | EBITDA (באלפי דולר) |
| 740 | 742 | 748 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| 2022 | 2023 | 2024 | פרטי הערכת השווי |
| | Leitner Berman | | שם מעריך השווי |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 869 | 869 | 869 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 740 | 742 | 748 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 9.00% | 10.00% | 9.50% | שיעור היוון (Discount Rate) |
| 9.00% | 10.00% | 9.50% | שיעור היוון (Cap Rate) |
| 9.00% | 10.00% | 9.50% | שיעור היוון (OCR) |

### 7.7.9.16   מחנה Echo

| | | | (הנתונים לפי 100%. חלק החברה בנכס —100%) |
|---|---|---|---|
| | 15/09/2007 | | מועד רכישה |
| | 5,600 | | עלות רכישה (באלפי דולר) |
| | 100% | | חלק החברה בנכס (משפטי/אפקטיבי) |
| | Kenilworth Rd, Ridgewood, NJ 244 | | מיקום הנכס |
| | 206.17 אייקר | | גודל הנכס |
| 2022 | 2023 | 2024 | נתוני הנכס |
| 11,700 | 12,100 | 12,500 | שווי הוגן בסוף התקופה (באלפי דולר) |
| 340 | 760 | 770 | רווחי (הפסדי) שערוך (באלפי דולר) |
| 5,239 | 5,180 | 5,004 | הכנסות (באלפי דולר) |
| 571 | 493 | 470 | כמות משתתפים |
| 1,534 | 1,141 | 1,037 | EBITDA (באלפי דולר) |
| 1,229 | 1,402 | 1,459 | עלות השתתפות ממוצעת בשבוע (בדולר) |
| 2022 | 2023 | 2024 | פרטי הערכת השווי |
| | Leitner Berman | | שם מעריך השווי |
| היוון תזרימי מזומנים | היוון תזרימי מזומנים | היוון תזרימי מזומנים | מודל הערכת שווי |
| 1,251 | 1,251 | 1,251 | EBITDA מיוצבת בהתאם להערכת השווי (באלפי דולר) |
| 1,229 | 1,402 | 1,459 | עלות השתתפות ממוצעת לשבוע (בדולר) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (Discount Rate) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (Cap Rate) |
| 9.50% | 10.50% | 10.00% | שיעור היוון (OCR) |

## חלק ד׳ – עניינים הקשורים לחברה באופן כללי

### 7.8    רכוש קבוע

לפרטים ראה ביאור 5 לדוחות הכספיים.

### 7.9    הון אנושי

7.9.1    נכון למועד התשקיף, לחברה עצמה אין מנגנון הנהלה בכירה נפרד לביצוע פעילותה. לאור האמור, התקשרה החברה בהסכם ניהול עם החברה בשליטת בעלי השליטה, לפיו תספק לחברה, בין היתר, שירותי אספקת צוות ניהולי (כולל שירותי נושאי משרה ודירקטורים לחברה). לפרטים בנוגע להסכם ניהול כאמור ראו סעיף 9.2.2 לתשקיף. מטה הקבוצה מונה כ-15 אנשי צוות בתחום מחנות הקיץ ופועל בשיתוף פעולה עם מנהלי הנכסים והדירקטורים במחנות.

7.9.2    פעילות המחנות של החברה מאופיינת בהעסקת עובדים עונתיים רבים. החברה מתקשרת מעת לעת, על-פי צריכה, עם עובדים עונתיים הנותנים בעיקר שירותים במחנות הקיץ של החברה. בשנת 2024, כ-300 מעובדי החברה היו עובדים קבועים והיתר עונתיים. מרבית העובדים הקבועים הינם אנשי תחזוקה האחראים על תפעול הנכסים, וכן אנשי שיווק ומכירה אחראים על רישום משתתפים, רכישת חומרים, בניית תוכניות פעילות, וכן גיוס עובדים עונתיים.

7.9.3    תפעול כל אחד ממחנות הקיץ של החברה נעשה כיחידה עצמאית והוא מנוהל בידי צוות ייעודי עבור אותו מחנה, המורכב, בין היתר, ממנהל המחנה, מדריכים ומאנשי צוות נוספים.

7.9.4    לצורך תמרוץ מנהלי המחנות, מעניקה החברה מעת לעת מענקים (בונוסים) למנהלי המחנות. במרבית המקרים, מנגנון התגמולים אינו קבוע והינו משתנה ממחנה אחד למשנהו, בהתאם לגורמים שונים, כגון היקפי מכירות ורווחיות ביחס לתקופות קודמות. קבלת החלטות בקשר עם מתן התגמולים הינה בהתאם לשיקול דעת הנהלת החברה.

### 7.10    הסכמים מהותיים

להלן יפורטו הסכמים מהותיים שאינם במהלך העסקים הרגיל, שהחברה ו/או חברות הבנות שלה או החברות הקשורות של החברה הן צד להם, נכון למועד פרסום התשקיף:

7.10.1    שטר הנאמנות ביחס לאגרות החוב (סדרה א׳) בין החברה לבין הנאמן לאגרות החוב. לפרטים ראה פרק 2 לתשקיף.

7.10.2    הסכם ניהול והסכם שירותים – ראה פרק 9 לתשקיף.

### 7.11    מגבלות ופיקוח על פעילות החברה

7.11.1    חוק חדלות פירעון

בחודש ספטמבר 2019 נכנס לתוקפו חוק חדלות פירעון ושיקום כלכלי, התשע״ח-2018 (״**חוק חדלות פירעון**״), הכולל בין היתר, הוראות אשר החליפו סעיפים מסוימים מחוק החברות בקשר עם פשרה או הסדר. לפיכך, למיטב ידיעת החברה, הוראות כאמור בקשר עם פשרה או הסדר (לרבות פרק ג׳ לחלק י׳ העוסק באישור הסדר חוב מהותי בחברת אגרות חוב), חלות על החברה החל ממועד כניסתו לתוקף של חוק חדלות פירעון.

### 7.12    ביטוח

החברה פועלת לבטח את פעילותה ואת פעילות החברות הבנות שלה בכיסויים המתאימים לה. בהתאם, מתקשרת החברה עם גורמים מבטחים (לרבות בדירוג $A$) בפוליסות מטריה קבוצתית בסכום כיסוי של כ-30 מיליון דולר.

7.13 **מימון**

7.13.1 כללי

פעילויות החברה והחברות המוחזקות על ידה ממומנות באמצעות הון, הון חוזר, השקעות מצד החברה (באמצעות חברות מוחזקות) ומצד השותפים בחברות הנכסים או בתאגידים המחזיקים אותן, כמו גם באמצעות קווי אשראי והלוואות משכנתא מבנקים וממוסדות כספיים אחרים (כולל ישויות בחסויות ממשלתיות).

ככלל, נהוג שחברות הנכסים (״**החברות מקבלות ההלוואות**״) מקבלות מימון מיועד עבור כל נכס או עבור מספר נכסים מתאגיד בנקאי או מתאגיד כספי אחר במבנה ההלוואה אשר תואם לשלב הפיתוח של הנכס הנרכש, כאשר ההלוואה היא לרוב ללא זכות חזרה לחברה, למעט חריגים אשר מאפשרים זכות חזרה לחברה מקבלת ההלוואה בנסיבות מסוימות (ביחס לכל סכום החוב או עד לתקרה קבועה מראש, לפי העניין, ובהתאם לתנאי הסכם המימון). ההלוואה אשר ניתנת לחברה מקבלת ההלוואה מובטחת, בין היתר, בשעבוד הנכס שבבעלות החברה ובתשואה הנובעת ממנו, לפי העניין, בנוסף לערבויות מסוגים שונים כמפורט בסעיף 7.14.2 לתשקיף.

במסגרת הסכמי המימון, מוטלות על החברה הגבלות רגילות ממועד קבלת ההלוואה, כולל (ובהתאם לנסיבות) הגבלות על: שימוש בנכס לצרכים אחרים מאשר נקבע מהסכם המימון ; ביצוע המחאות נוספות של זכויות במקרקעין ; נטילת מימון נוסף אשר מובטח על-ידי הנכס ; עיסוק בפעילויות שאינן הפעילויות אשר למטרתן הוקמה החברה מקבלת ההלוואה וניתן המימון ; שינוי שליטה בחברת הנכס ; וביצוע עבודות מסוימות בנכס, הכל מבלי לקבל אישור מנותן ההלוואה, וכדומה. אי ציות למגבלות אלו (ובנוסף, ביחס לנכסים אשר גם כפופים להסכמים רגולטורים, כהפרות של הסכמים כאמור), עלולה להוות, תחת מסמכי המימון של הנכס הרלוונטי, עילה לפירעון מיידי של יתרת החוב של חברת הנכס הרלוונטית כלפי הגוף הממַמֵן.

7.13.2 ערבויות

ככלל, כחלק מהסכמי המימון בהם התקשרו החברות מקבלות ההלוואות עם התאגידים נותני ההלוואות, חברת האם או אחת מחברות הבנות עשויים להידרש לתת ערבויות לצורך הבטחת התחייבויות מסוימות של החברות מקבלות ההלוואות כמפורט בתמציתיות להלן [16]:

א. ערבות כספית (ערבות תשלום) – ערבות זו מבטיחה תשלום החוב של החברה מקבלת ההלוואה לגוף הממַמֵן במקרה של הימנעות מתשלום מצד החברה מקבלת ההלוואה.

ב. ערבות Bad Acts – ככלל, תחת תנאי ערבות זו, הערב נוטל על עצמו אחריות בגין התחייבויות החברה מקבלת ההלוואה ביחס לכל הפסד, עלות או נזק אשר נגרמו לנותן ההלוואה כתוצאה, בין היתר, מהפעולות הבאות, ובמקרים מסוימים גם בגין מלוא החוב של החברה מקבלת ההלוואה כלפי הממַמֵן : (1) מצג שווא או תרמית מצד החברה מקבלת ההלוואה או הערב ; (2) שימוש פסול ו/או מעילה בכספי הפיקדון של המשתתפים ; (3) שימוש פסול ו/או מעילה בסכומים אשר נתקבלו מהביטוח ו/או אי תשלום פרמיות הביטוח ; (4) הרס פיסי מכוון של הנכס ; (5) רשלנות רבתי או מעשה פלילי בקשר עם הנכס המשועבד ; (6) אי תשלום מיסי מקרקעין ו/או הוצאות הקשורות לנכס המשועבד ; (7) העברה בלתי מורשית של זכויות בעלות בנכס ; (8) עיסוק בפעילות שאינה הפעילות המיועדת של החברה מקבלת ההלוואה ; או (9) הגשת בקשה או גרימה להגשת בקשה לפשיטת רגל של החברה מקבלת ההלוואה.

---

[16] ערבויות כאמור יכולות להיות לטובת הגוף הממַמֵן העיקרי של החברה מקבלת ההלוואה ו/או לטובת גוף אחר אשר נתן ערבות לטובת הגוף הממַמֵן בקשר עם המימון אשר ניתן לחברה מקבלת ההלוואה.

ג.   <u>ערבות סביבתית</u> – ערבות לתשלום תיקון של נזקים סביבתיים שיתגלו בנכס (כנדרש על מנת להחזיר לנכס את ערכו כפי שהיה אלמלא נזקים אלה). חלק מהערבויות הסביבתיות כאמור לעיל מכסות תיקונים נדרשים על מנת שהנכס יעמוד בדרישות ADA.

7.13.3   <u>להלן פרטים אודות יתרת הלוואות שהועמדו לחברה ליום 31 בדצמבר של השנים 2023 ו-2024, ליום 30 ביוני 2025 ולמועד פרסום התשקיף (במאוחד)</u> :

| 31.12.2023 | 31.12.2024 | 30.6.2025 | סמוך למועד פרסום התשקיף | |
|---|---|---|---|---|
| (באלפי דולר) | | | | |
| 193,374 | 185,601 | 179,342 | 176,923 | **סה"כ יתרת הלוואות**[17] |

---

[17]   יצוין, כי הסכומים המפורטים בטבלה כוללים מענקי/הלוואות קורונה שהחברה קיבלה מממשלת ארה"ב, אשר יתרתן למועד התשקיף הינה כ-3.3 מיליון דולר.

7.13.4 להלן נתונים אודות ההלוואות המהותיות של החברה:

| התאגיד הלווה | המלווה | מועד העמדת ההלוואה | סכום ההלוואה המקורי (אלפי דולר) | מועדי פירעון קרן וריבית | יתרת ההלוואה ליום 30 ביוני 2025 (אלפי דולר) | מועד פירעון סופי | שעבודים/ בטחונות | ריבית שנתית ליום 30 ביוני 2025 (%) | ערבויות | תניות פיננסיות מרכזיות | תנאים נוספים | שווי הנכסים המשועבדים ליום 30 ביוני 2025 (אלפי דולר) | האם ההלוואה הינה recourse לחברה |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BAHS Holdings LLC, Mohawkland LLC, Achim Landco LLC, Club Getaway Landco, LLC, Country Roads Landco LLC, Mill Road Landco LLC, Green Lane Landco, LLC, Lavland LLC, Greenvilleland LLC, Mogenavland LLC, SHAB Holdings LLC, Meadowbrook Landco LLC, Rolling Hills Landco LLC | Bank of America | 10/2022 | 80,000 | תשלום קרן וריבית חודשי | 69,667 | 11/2032 | שעבוד על מחנות הקיץ של החברות הלוות | TERM SOFR + 2% | בעלי השליטה בחברה וחברות בשליטתם והחברות התפעוליות של המחנות הלווים ערבים להחזר ההלוואה ללא מגבלת סכום | יחס כיסוי שירות חוב (DSCR) של 1.4 :1 (יחס ה-DSCR ליום 31 בדצמבר 2024 (מועד הבדיקה) עמד על 1.635 :1) | הפרה צולבת של מי מהלווים או הערבים או החברות הבנות שלהם חוב אחר בסכום העולה על 500 אלפי דולר | 227,600 | לא |
| Belgrade Lakes Summer Camps LLC, Iafalandco, LLC, Poland Landco LLC, Washington, Lake, LLC, Waukeela Landco LLC, Wekeeland, LLC, WM Land LLC | Bank of New Hampshire | 12/2021 | 27,000 | תשלום קרן וריבית חודשי | 24,560 | 12/2031 | שעבוד על מחנות הקיץ של החברות הלוות | 3.5% | בעלי השליטה בחברה וחברות בשליטתם והחברות התפעוליות של המחנות הלווים ערבים להחזר ההלוואה ללא מגבלת סכום | יחס כיסוי שירות חוב (DSCR) של 1. (יחס ה-DSCR ליום 31 בדצמבר 2024 (מועד הבדיקה) עמד על 2.2) | הפרה צולבת של מי מהלווים או הערבים חוב אחר בסכום העולה על 50 אלפי דולר | 48,800 | לא |
|  |  | 7/2023 | 6,000 | תשלום קרן וריבית חודשי | 5,558 | 11/2031 | שעבוד על מחנות הקיץ של החברות הלוות | 7.5% |  |  |  |  | לא |

7.13.5    להערכת החברה, בשנה הקרובה לא יידרשו לה מקורות נוספים על תמורת ההנפקה לצורך מילוי יעדי ההנפקה או לכיסוי תפעול עסקיה השוטפים.

7.14    **מיסוי**

7.14.1    <u>מיסוי מקרקעין</u>

החברה נדרשת לשלם מיסי נדל"ן על הנדל"ן שלה הממוקם בניו יורק, ניו ג'רזי ופנסילבניה. בניו ג'רזי, לכל נכס יש רק מס נדל"ן אחד לשלם לעירייה שבה הוא ממוקם. בניו יורק ובפנסילבניה, בעל הנכס בדרך כלל ישלם מסים נפרדים למדינה, למחוז ובפנסילבניה למועצות בתי הספר. הוא מחושב ומבוסס על שיטות הערכה שונות בכל מדינה ויישוב שבו נמצא נכס הנדל"ן.

7.14.2    <u>מיסוי החברה</u>

7.14.2.1    החברה התאגדה באיי הבתולה הבריטיים, ואינה כפופה למס הכנסה המקומי באיי הבתולה הבריטיים. על פי חוקי המס בארה"ב, החברה בחרה להיות מסווגת כשותפות בהתאם לטופס IRS 8832. בהתאם: (1) ככלל החברה אינה משלמת מס הכנסה פדרלי בארה"ב ברמת החברה. חבות המס עוברת לשותפי החברה (בסעיף זה: **"השותפים"**), האחראים לתשלום המס הפדרלי בארה"ב לפי חלקם היחסי; (2) יכולתה של ה-IRS האמריקאית לגבות מיסים פדרליים מוגבלת לזכויות השותפים. ה-IRS אינה יכולה לתפוס או להשתלט ישירות על החברה או על נכסיה, והאכיפה מתבצעת באמצעות שעבודים או עיקולים על זכויות השותפים בלבד, בהתאם לדיני המס הפדרליים בארה"ב; ו-(3) ה-IRS אינה יכולה לשנות באופן חד-צדדי את סיווגה של החברה או לכפות חלוקות מהחברה בניגוד למסמכי ההתאגדות שלה. כל שינוי בסיווג החברה ידרוש בחירות ודיווחים מתאימים לפי דיני המס בארה"ב ותקנות 'check-the-box'.

7.14.2.2    על פי חוקי המס בארה"ב, בנוסף לסיווגה של החברה כשותפות לצורכי מס פדרלי בארה"ב, חברות בע"מ המועברות לחברה וכן חברות בע"מ חדשות שנוצרו על-ידי החברה (**"LLCs Investee"**) מסווגות ככלל כגופים שקופים לצורכי מס פדרלי בארה"ב. כתוצאה מכך, חבויות המס הנוגעות לפעילות ה-Investee LLCs מועברות ככלל לשותפים, וה-Investee LLCs אינן נושאות במס הכנסה פדרלי ברמת הישות. במקרה שהחברה או ה-Investee LLCs תחדלנה מלהיות גוף "שקוף" לצורכי מס הכנסה פדרלי בארה"ב (לדוגמה עקב שינוי סיווג או בחירה אחרת), החברה עשויה להיות חייבת במס הכנסה פדרלי בארה"ב על הכנסותיה מאותו מועד ואילך.

כל המרה של ישות שקופה לחברה לפי כללי ה-check-the-box, נחשבת לרוב כהעברת נכסים רעיונית, שעשויה ליצור בסיס מס חדש לישות ולשותפים, אך כשלעצמה אינה יוצרת חבות מס פדרלי מיידית בארה"ב. השלכות המס על השותפים ועל כל בעלי מניות/זכויות חדשים צריכות להיבחן בהתאם לנסיבות הספציפיות במועד ההמרה.

בעל השליטה[18] והחברה הצהירו כי כל עוד קיימת יתרת אגרות חוב במחזור, ובכפוף לחוקי המס הקיימים, החברה וחברות Investee LLCs לא יבחרו להיחשב כ״תאגידים״ אלא ימשיכו להיחשב כשותפויות לצרכי מס בארה״ב (בסעיף זה: **״התחייבות לשמירה על סיווג כשותפות״**). מובהר כי התחייבות לשמירה על סיווג כשותפות הינה התחייבות אישית של בעלי השליטה, והפרתה על-ידי בעלי השליטה מהווה אף עילה לדרישה לפירעון מיידי של אגרות החוב.

לגבי Investee LLCs: כאמור לעיל, על פי דיני המס בארה״ב, המרה של שותפות (שהינה גוף שקוף) לתאגיד יוצרת לרוב אירוני מס רעיוני שעשויה ליצור בסיס מס חדש לישות ולשותפים, כאילו בעלי המניות בחברה העבירו לחברה את הנכסים וההתחייבויות בתמורה למניותיהם הקיימות בחברה (בסעיף זה: **״ההעברה הרעיונית״**). במקרה שבעלי השליטה מפרים את התחייבותם לשמור על סיווג כשותפות וגורם ל- Investee LLCs להפסיק להיות שקופים לצורכי מס , בסיס המס של הנכסים יהיה בסיס המס ההיסטורי של בעלי השליטה בנכסים (אשר עשוי להיות קרוב או שווה לאפס). במקרה כזה, החל ממועד אובדן הסיווג כשותפות ושקיפות המס, עם מכירת הנכסים, החברה עלולה להיות חשופה למס בגין מלוא ההפרש בין מחיר המכירה לבין בסיס המס, כפי שהוא קיים אצל בעלי השליטה, ושבגינו לא הוקצו מסים נדחים בדוחות הכספיים. בנוסף, החל מאובדן הסיווג כשותפות, החברה תהיה כפופה למס הכנסה בגין פעילותה השוטפת (הכנסות מהשכרת נכסים, הכנסות ממכירת נכסים וכדומה).

**מובהר כי אירוע זה יתרחש בדרך כלל רק במקרה בו בעלי השליטה מפרים את התחייבות לשמירה על סיווג כשותפות והחברה עצמה תשתף פעולה עם ההפרה האמורה.[19] בנוסף, אירוע זה יהווה עילה לקריאה לפירעון מיידי של אגרות החוב של החברה והפרת המצג לשמירה על סיווג כשותפות.**

העברת זכויות הוניות בחברה לצדדים שלישיים או למחזיקי אגרות החוב עשויה ליצור בסיס מס חדש למקבלים ולנכסי החברה, אך לא תשפיע באופן אוטומטי על סטטוס השקיפות של החברה, והטיפול המיסוי הפדרלי בארה״ב תלוי בכך שהחברה תישאר מסווגת כשותפות לצורכי מס פדרלי בארה״ב.

7.14.3    במקרה של העמדת אגרות החוב לפירעון מיידי המביא למינוי בעל תפקיד לחברה (בסעיף זה: **״בעל התפקיד״**), הפועל למכירת נכסיה (בסעיף זה: **״הליכי חדלות הפירעון״**), מעמדה של החברה כשותפות לצורכי מס פדרלי בארה״ב ממשיך לעבור לבעלים, תוך שמירה על הטיפול המיסוי למחזיקי אגרות חוב. לפיכך, לא צפוי שינוי בסטטוס המס של החברה מבחינת מחזיקי אגרות החוב.

**מובהר כי החברה הכינה מתווה כללי, כמפורט לעיל, של עקרונות המס הרלוונטיים של חוקי המס בארה״ב ביחס לעניינים הנדונים בסעיף זה; עם זאת, החברה אינה**

---

[18] בנוסף, בעל השליטה מצהיר כי אם תימכר השליטה בחברה, תנאי למכירה יהיה כי בעל השליטה החדש יחליף אותה ביחס למצג זה.

[19] זה המקרה שכן על מנת שה- Investee LLCs יפסיקו להיות שקופים לצורכי מס, על חברות LLC המושקעות עצמן לדווח לרשויות המס בארה״ב על ההחלטה להפסיק להיות שקופות כאמור.

**יכולה להעריך את ההיתכנות המדויקת של המצבים המתוארים בסעיף זה לעיל, או
את המשמעויות של מצבים אלה, לרבות היקף החשיפה, אם בכלל, לחברה, שכן
מצבים מסוג זה תלויים בנסיבות ובמשתנים רבים שלא ניתן לצפות באופן סביר כאשר
החברה היא עסק חי, לרבות עמידה בדרישות השונות של חוקי המס בארה"ב, סיכון
לשינוי חקיקה וכיו"ב. התיאור המפורט בסעיף זה לא יחליף את ייעוץ המס אותו
יבקשו מחזיקי אגרות החוב ו/או הנאמן ו/או המנהל המיוחד במקרה בו יידרשו אגרות
החוב של החברה לפירעון מיידי.**

7.14.4    <u>מיסוי מקרקעין (מס הדומה למס רכוש בישראל)</u> – למיטב ידיעת החברה, מיסי
המקרקעין מחושבים על ידי הרשות המקומית בה נמצאים נכסי הנדל"ן לאחר בחינת
גורמים שונים. גורמים אלה כוללים מכירות רלוונטיות בשוק באותה עת (אם בכלל),
הוצאות תפעוליות וניתוח דמי השכירות על מנת לבחון האם הן עלו, ירדו או נותרו ללא
שינוי, המצב הכלכלי הכללי בשוק ומספר גורמים נוספים. בנוסף, רשות המסים
המקומית לוקחת בחשבון את העלאות מסי הנדל"ן שהוזמנו על נכס בעבר, על מנת
להימנע מהטלת נטל מיותר על הנכס.

7.15    **הליכים משפטיים**

למועד התשקיף, החברה (והחברות הבנות שלה) אינה צד להליכים משפטיים מהותיים כלשהם.

7.16    **יעדים ואסטרטגיה עסקית; התפתחות צפויה במהלך השנה הקרובה**

למועד התשקיף, האסטרטגיה העסקית של החברה מתמקדת בשמירה על מעמדה כמובילה
בתחומה בשוק מחנות הקיץ. החברה פועלת לבסס ולתחזק מוניטין חיובי בקרב החניכים
ומשפחותיהם, בעיקר באמצעות שמירה על רמת שירות גבוהה והקפדה על סטנדרטים
תפעוליים, בטיחותיים וחינוכיים וכן חיזוק הקשר והזהות בין המחנה לחניכים. החברה רואה
במוניטין שלה ובקשר הנקרם בין המחנות לחניכים כנכס מרכזי שלה.

כחלק מהמאמצים להבטחת צמיחה ארוכת טווח, פועלת החברה להגדלת שיעורי התפוסה
במחנות שהיא מפעילה, בין אם על ידי שימור לקוחות חוזרים, גיוס משתתפים חדשים או
הרחבת הפעילות הגאוגרפית של מאמצי השיווק. לצורך כך, משקיעה החברה בפעילות שיווקית
ממוקדת, תוך התאמה לקהלי היעד הרלוונטיים ולמאפיינים הייחודיים של כל מחנה.

בנוסף, החברה בוחנת באופן שוטף הזדמנויות להרחבת פעילותה בטווח הבינוני והארוך, לרבות
רכישת מחנות חדשים, ניצול המקרקעין בתקופות שמחוץ לעונת המחנות או שיתופי פעולה
אסטרטגיים עם גופים חינוכיים ועסקיים. כמו כן, החברה עשויה להרחיב את פעילותה באופן
של רכישה ו/או השקעה בנכסי נדל"ן מניב (שאינם בתחום הפעילות הנוכחי של החברה).

7.17    **דיון בגורמי סיכון**

<u>סיכוני מקרו</u>

7.17.1    <u>סיכוני אינפלציה</u>

ארצות הברית חוותה גידול מהיר באינפלציה בתקופות האחרונות. לחץ אינפלציוני
מתמשך והשינויים הנלווים במדיניות המוניטרית או תגובות מדיניות אחרות עשויים
להשפיע לרעה על הסביבה המקרו-כלכלית וכפועל יוצא להשפיע על פעילות וביצועי
מחנות הקיץ של החברה. עליית מחירים כללית, ובפרט התייקרות של מזון, תחבורה
ושכר המדריכים, עשויה להוביל לעלייה בעלות הפעלת המחנות, וכפועל יוצא לגידול

בעלות ההשתתפות במחנות. עבור משפחות רבות, מחנה קיץ הוא הוצאה משמעותית, ואם המחירים הופכים לבלתי נגישים – מספר הנרשמים עלול לרדת.

אם השקעה אינה יכולה להגדיל את רווחיה בתקופות של אינפלציה גבוהה יותר, הרווחיות שלה עלולה להיות מושפעת לרעה.. האינפלציה משפיעה על הוצאות מחנות הקיץ, לרבות, בדרך של גידול בעלויות המס, בביטוח הנכס ובביטוח האחריות, בהוצאות שירותים ובעלויות נטילת אשראי. יתר על כן, גידול בשיעורי הריבית עלול להביא ליצירת עלויות מימון גבוהות יותר ולהפחית את תזרים המזומנים לאחר מס שמייצרת ההשקעה.

### 7.17.2    <u>סיכונים פיננסיים</u>

פעילות החברה חושפת אותה לסיכונים פיננסיים שונים, כגון סיכוני נזילות וסיכוני הון, כמפורט בביאור 12 לדוחות הכספיים.

### 7.17.3    <u>עליית מחירים משמעותית</u>

החברה חשופה לעליות מחירים של מרכיבי ההוצאה המרכזיים הכרוכים בהפעלת המחנות, לרבות עלויות שכר (ובפרט של עובדים עונתיים), מזון, ביטוח ותשתיות. עלויות כאלה עשויות לנבוע, בין היתר, מאינפלציה, שינויים בשוק העבודה, רגולציה חדשה או הפרעות בשרשראות האספקה. עלייה משמעותית בעלויות התפעול עלולה לחייב את החברה להעלות את מחירי ההשתתפות במחנות, דבר שעשוי להשפיע לרעה על יכולתם של חלק מהמשתתפים לשאת בעלות המחנה ולפגוע בביקוש. בנוסף, ככל שהחברה לא תוכל לגלגל את העלויות ללקוחות בשל מגבלות תחרותיות או אחרות, עלולה הרווחיות להיפגע.

<u>סיכונים ענפיים</u>

### 7.17.4    <u>עלות העסקת עובדים והתקשרות עם ספקים</u>

עלות העסקת עובדים במחנות הקיץ של החברה, כמו גם העלויות הקשורות בהתקשרות עם ספקי שירותים שונים (מזון, ציוד ספורט, מחנאות, אומנות ומחשוב, תחבורה שירותי ניקיון, אבטחה, צוותי רפואה, וכיוצא באלה) משפיעה על רווחיות החברה ולכן החברה מושפעת משינויים בעלויות מוצרים ושירותים, מעלות כוח אדם וממחסור בכוח אדם. כמו כן שימור כוח אדם איכותי ומוסמך לעבודה עם קבוצות הגיל השונות, הוא אחד האתגרים המרכזיים בענף מחנות הקיץ, ככל שהחברה לא תצליח להעסיק ו/או לשמר כוח אדם איכותי, הדבר עלול להוביל להפעלה של המחנות בתפוסה מופחתת.

### 7.17.5    <u>עונתיות</u>

ענף מחנות הקיץ מושפע מטבעו מעונתיות. עיקר ההכנסות של החברה מתקבלות ברבעון השלישי של השנה, שכן פעילות המחנות מותאמת ללוח החופשות של התלמידים. יחד עם זאת, ההיערכות להפעלת המחנות, והעלויות המגולמות בה (שיווק, גיוס והכשרת מדריכים, תחזוקת מתקנים) נפרשת על פני השנה כולה.

### 7.17.6    <u>עלויות והוצאות תפעול נכסים מניבים</u>

החזקת מקרקעין כרוכה בעלויות קבועות, אשר חובת התשלום חלה על בעל הנכס, לאורך כל תקופת הבעלות, בין אם הנכס מייצר הכנסה כלשהי ובין אם לאו. כך

למשל, בעל הנכס נושא בעלויות שירותי התשתית, לרבות מים וארנונה (עירונית וממלכתית), העלולות לעלות בשיעורים העולים על האינפלציה, וכתוצאה מכך עלולות להכביד על הוצאות החברה ולפגוע ברווחיות עסקיה. הוצאות אלה אינן בשליטת בעל הנכס ועשויות לחול ללא עלייה מקבילה בהכנסות ממחנות הקיץ. יש לציין כי לאור העובדה שמס המקרקעין (השוטף) המהווה חלק מהוצאות התפעול של נכס הנדל"ן נקבע על בסיס שווי הנכס, ועדכון סכום המס (כאשר ערך הנכס עלה) מתבצע על פני תקופה של מספר שנים, חשיפת החברה נשענת על כך שעלויות התפעול יעלו בהתאם, גם אם שווי הנכסים לא יעלה באותו יחס.

### 7.17.7   שינויים בתקנות ובדרישות הרגולטוריות

פעילות החברה כרוכה בעמידה בביקורות מצד גורמים מדינתיים שונים, בהם מחלקת הבריאות ושירותי כוח האדם האמריקאית, משרדי החינוך, מחלקות שירותי כוח האדם ומחלקות השירותים לילד ולמשפחה ועוד. נכון למועד זה מחנות הקיץ של החברה אינם נדרשים להחזיק ברישיון לשם הפעלת מחנות הקיץ. החמרה בביקורות הממשלתיות ו/או קביעת חובת רישוי למחנות הקיץ של החברה, עלולה להגדיל את העלויות התפעוליות של החברה, לפגוע ו/או לעכב את הפעלת מחנות הקיץ, וכתוצאה מכך לפגוע בתשואות של החברה.

### 7.17.8   חשיפה משפטית

מחנות קיץ, בדומה לבתי ספר ומסגרות אחרות לילדים, חבים בחובת זהירות כלפי הילדים שבטיפולם. משמעות הדבר היא כי מפעילי המחנות והצוות במחנה מחוייבים מבחינה משפטית לנקוט בכל הצעדים הסבירים על מנת להבטיח את ביטחון כל המשתתפים. החבות יכולה לבוא לידי ביטוי כרשלנות בפיקוח, למשל אם ילד נפגע במהלך שחייה או בפעילות ספורטיבית, המחנה עשוי להיתבע בעילת רשלנות. יחד עם זאת, מרבית המחנות דורשים מהורי הילדים לחתום על ויתורים במסגרת הליך הרישום, במסגרתם ההורים מוותרים על זכותם לתבוע את המחנה בגין פציעות מסוימות, אך אינם מקנים למחנה חסינות. הליכים משפטיים כאמור עלולים לפגוע בפעילות המחנה, לייצר מוניטין שלילי לחברה, ולפגוע בהכנסותיה.

### 7.17.9   ניהול מצבי חירום

מפעילי מחנות קיץ נדרשים להכין תוכנית חירום שמפרטת את הצעדים שיש לנקוט בכל מקרה חירום, החל ממתן עזרה ראשונה בסיסית וכלה בטיפול בפציעות חמורות יותר או במקרי חירום כגון ילד/ה שנעדרים, טביעה, שריפה, מצבי מזג אוויר קיצוניים, וצורך בפינוי. ככל שצוותי המחנה (מדריכים ומתנדבים כאחד) אינם מודעים לתוכנית ולנהלי החירום, הדבר עלול לייצר חשיפה למחנה ולחברה.

### 7.17.10   השפעת העידן הדיגיטלי

בעידן הרשתות החברתיות, בני הנוער מושפעים ממגמות שונות ומתחלפות, וככל שענף מחנות הקיץ לא יהווה עבורם גורם משיכה, הם עשויים להחליט שאין ברצונם להשתתף במחנות הקיץ, והדבר עלול להוביל לקיטון במספר המשתתפים במחנה, ולקיטון בהכנסות החברה. יחד עם זאת מחנות קיץ רבים, בהם מחנות הקיץ של החברה, מתאימים עצמם לסביבה המשתנה ומציעים חוויות מגוונות שנותנות מענה לתחומי עניין רבים. יתרה מזאת, הורים רבים מביעים רצון כי ילדיהם ישתתפו

במחנות קיץ לשם פיתוח כישורים חברתיים, לימוד וגם התנתקות מהמכשירים האלקטרוניים.

### 7.17.11   מכירת נכסים

על אף גודלו של שוק מחנות הקיץ בארה״ב, עסקאות הקנייה והמכירה שמתבצעות בו אינן רבות. זאת בין היתר לאור היותם של מחנות הקיץ כאלה המבוססים על מסורות ארוכות שנים. להערכת החברה, זמן השיווק והמכירה של נכס בתחום פעילותה עומד על 6 עד 12 חודשים ולכל היותר עד 24 חודשים. יחד עם זאת, במקרי קיצון החברה עלולה להיתקל בקושי למציאת רוכש לנכס מסוים ומכירת נכס, ככל שתבקש החברה למוכרו, עלולה לארוך זמן רב יותר.

<u>סיכונים ייחודיים לחברה</u>

### 7.17.12   תלות במנהלי מחנות

כל אחד מהמחנות של החברה פועל כיחידה ניהולית עצמאית, כאשר ניהולו של כל מחנה מופקד בידי צוות ניהולי ותיק ובעל ניסיון בהפעלת אותו המחנה. לצוותים אלה, ובפרט למנהלי המחנות, תפקיד מהותי בהובלת הפעילות התפעולית של המחנה, בהכשרת צוותים ובשמירה על סטנדרטים מקצועיים. יתרה מכך, הקשר שנוצר בין החניכים למחנה מבוסס פעמים רבות על הצוות הניהולי של המחנה אשר יוצר קשרים אישיים עם החניכים ומשפחותיהם ומבסס את המוניטין של המחנה.

בהתאם לאמור, להערכת החברה יש לה תלות מסוימת בחלק ממנהלי המחנות שלה, שכן עזיבתו של מנהל מחנה, בפרט בסמוך לעונת הפעילות, עלולה להביא לקשיים תפעוליים, לפגיעה באיכות השירות ובשביעות רצון המשתתפים וכן לפגיעה בקשר הקיים בין המחנה לחניכים. איתור והכשרה של מחליפים ראויים עשוי להוות אתגר, כאשר לאחר גיוס המחליף תידרש תקופת התאקלמות.

### 7.17.13   סיכוני מט״ח

פעילות החברה מתבצעת בארה״ב ובדולרים. מאחר וחלק מהחוב של החברה צפוי להתבצע בישראל, החברה עלולה להיות חשופה לשינויים בשער החליפין של הדולר מול השקל, ולכן שערוך השקל מול הדולר עלול להשפיע לרעה על תוצאותיה הכספיות של החברה. החברה בוחנת מעת לעת את יישום הגידור באמצעות נגזרים על מנת לצמצם חשיפה זו.

### 7.17.14   סיכוני ביטוח

החברה מבטחת את הנדל״ן שלה באמצעות פוליסות ביטוח רכוש וכו׳, ורוכשת פוליסות לביטוח הסיכונים המקובלים אליהם חשופה החברה. במקרה של קרות אירוע ביטוחי, עשויה להיות לחברה חשיפה פיננסית בסכום המהווה את ההפרש בין סכום הכיסוי הביטוחי לבין ההיקף הכספי של התביעה או הנזק לנכס. יודגש כי החברה מעריכה כי היא אינה מבוטחת בחסר.

### 7.17.15   דיני המס האמריקאים

החברה הינה חברה המאוגדת באיי הבתולה הבריטיים. החברה אינה חייבת במס באיי הבתולה הבריטיים. על-פי דיני המס של ארה״ב, החברה הינה חברה שקופה (pass through entity) דהיינו החברה אינה נישומה לצרכי מס וחבות המס הינה של

בעלי מניותיה. על-פי דיני המס של ארה״ב, התאגידים המוחזקים על-ידי החברה גם הם גופים שקופים לעניין דיני המס האמריקאים, דהיינו אין להם חבות במס בגין ההכנסה הנובעת מפעילותם אלא לבעלי מניותיהם. תוצאת האמור לעיל כי לחברה ולחברות המוחזקות שלה אין כל חבות במס. החברה ובעלי השליטה התחייבו כי כל עוד קיימת יתרה של אגרות חוב (סדרה א׳) במחזור ובכפוף לחוקי המס הקיימים, החברה והתאגידים המוחזקים על ידה לא יבחרו להיחשב כחברות (corporations) אלא ימשיכו להיחשב כשקופים לצרכי מס אמריקאי. משכך, שינוי בדיני המס האמריקאיים הקשורים למיסוי החברות המועברות עלול לשנות את מבנה המס של החברה. יצוין כי על-פי הדין האמריקאי, ככל שבמסגרת הליכי חדלות פירעון כאמור, יועברו יותר מ-50% (במישרין ו/או בעקיפין) מהחזקות בנכס נדל״ן בארה״ב, אזי קיימת חשיפה אפשרית לתשלום מס העברה (transfer tax) (המקביל למס הרכישה הנהוג בישראל) על-ידי המחזיקים.

7.17.16    <u>דיני חדלות פירעון ותביעה המוגשת על-ידי נושה זר</u>

החברה התאגדה ונרשמה מחוץ לישראל על-פי הדין החל באיי הבתולה הבריטיים. לפיכך ובהתאם להוראות סעיף 39א לחוק ניירות ערך, יחולו על החברה הוראות שונות של חוק החברות (ובכלל זה הוראות לעניין מינוי דירקטורים חיצוניים, מבקר פנים ועדת ביקורת) וכן החברה תחיל על עצמה הוראות בקשר עם פשרה או הסדר לפי חוק חדלות פירעון ושיקום כלכלי, התשע״ח-2018 (לרבות פרק ג׳ לחלק י׳ העוסק באישור הסדר חוב מהותי בחברת אגרות חוב) והוראות הללו תחולנה בנוסף להוראות מסמכי ההתאגדות של החברה ודיני איי הבתולה הבריטיים.

כמו כן, החברה, בעלת השליטה ונושאי המשרה נטלו על עצמם התחייבויות תשקיפיות בלתי חוזרות המפורטות בפרק 5 לתשקיף, שעניינן תחולת הדין הישראלי והתחייבויות שונות הקשורות בהליכי חדלות פירעון אשר עיקרן התחייבויות שלא להתנגד לבקשת הנאמן ו/או מחזיקי אגרות החוב אשר תוגש לבית משפט בישראל בהליך שיוגש כנגד החברה, להחלת הדין הישראלי לעניין פשרה או הסדר וחדלות פירעון בקשר עם החברה, ועוד התחייבויות רלבנטיות המנויות בפרק 5 כאמור.

על אף האמור לעיל, לעניין דיני חדלות פירעון, ייתכן תחולה של הדינים בכל אחת משלוש הטריטוריות, ישראל, איי הבתולה הבריטים וארה״ב (הן לעניין סמכות מקומית והן לעניין סמכות עניינית). עם זאת, לאור האמור לעיל ובכפוף לקיום התחייבויות החברה, בעלי השליטה ונושאי המשרה (בהווה ובעתיד, לפי העניין), אזי הליך של חדלות פירעון, שלא על-פי הדין הישראלי ו/או בבתי משפט לא ישראליים, יכול לנבוע רק מתביעה של נושה זר. לעניין זה יצוין כי ככל שייפתח הליך של חדלות פירעון כנגד החברה, שלא על-פי הדין הישראלי ו/או בבית משפט זר, הנובע מתביעה של נושה זר, התחייבה החברה כי תעשה כמיטב יכולתה ותטען ל״פורום לא נאות״ והכל בכפוף לכל דין.

כמו כן, לעניין נושה זר, יצוין כי החברה תתחייב במסגרת שטרי הנאמנות כי לא תיטול (במישרין) אשראי ממוסדות פיננסיים שאינם ישראלים ולא תעניק שעבודים למוסדות פיננסיים שאינם ישראלים, למעט בגין מסגרות אשראי אשר יכול שיועמדו על-ידי מוסדות פיננסיים בארה״ב לצורך ביצוע עסקאות הגנה על שער החליפין של השקל מול הדולר ביחס לאגרות חוב אותן תנפיק החברה וזאת באמצעות העמדת

שעבודים ספציפיים להבטחת אותן מסגרות אשראי. יובהר, כי החברה תהא רשאית להעמיד ערבויות בקשר פעילותה בחברות המוחזקות.

בעת ניהול הליכי חדלות פירעון בינלאומיים, בתי המשפט נדרשים לבחון איזה מבין ההליכים – ההליך הזר או ההליך הישראלי – הוא ההליך העיקרי ואיזה ההליך המשני. מכאן, הרי שככל שייקבע על-ידי בית משפט בישראל או על-ידי בית משפט זר, כי ההליך בישראל הוא הליך משני, המשמעות המשפטית מבחינת מחזיקי אגרות החוב תהא, עשויה להיות כי בית המשפט המוסמך יהיה בית משפט זר, וכי הם יצטרכו לנהל את הליכי חדלות הפירעון במדינה זרה. בהתאם, סמכויות בית המשפט בישראל יהיו מצומצמות והסעדים אותם יוכלו מחזיקי אגרות החוב לקבל מבית המשפט בישראל, עשויים להיות מצומצמים אף הם.

לאור כל האמור לעיל, החברה מעריכה כי מידת השפעת הסיכון על החברה הינה קטנה.

יצוין כי ככל שיפתחו הליכי חדלות פירעון בישראל אין כל ודאות כי בתי המשפט הזרים באיי הבתולה הבריטיים ו/או בארה"ב יאכפו את ההחלטות ופסקי הדין מכוח הליכי חדלות הפירעון בישראל כאמור. כמו-כן, ככל שיפתחו הליכים מקבילים של חדלות פירעון בנוסף לזה שבישראל, בטריטוריות הזרות, אזי אין כל ודאות כי בתי המשפט הזרים יכירו בהליך בישראל.

מבלי לגרוע מהאמור לעיל יובהר, כי נכסי החברה, ממוקמים בארה"ב ולפיכך הליכי מימוש הנכסים ודיני חדלות הפירעון של החברות המחזיקות בנכסי החברה המאוגדות בארצות הברית יתבצעו בהתאם לדיני ארה"ב.

גורמי הסיכון המפורטים לעיל מובאים להלן בטבלה המדרגת את רמת ההשפעה המשוערת של גורמי הסיכון על עסקי החברה, המסווגים לפי סוגי סיכונים:

| | השפעת גורמי הסיכון על החברה | | גורמי סיכון |
|---|---|---|---|
| השפעה קטנה | השפעה בינונית | השפעה גדולה | |
| | | | **סיכוני מקרו** |
| | X | | סיכוני אינפלציה |
| | X | | סיכונים פיננסיים |
| | X | | עליית מחירים משמעותית |
| | | | **סיכונים ענפיים** |
| X | | | עלות העסקת עובדים והתקשרות עם ספקים |
| X | | | עונתיות |
| | X | | עלויות והוצאות תפעול נכסים מניבים |
| X | | | שינויים בתקנות ובדרישות הרגולטוריות |
| | X | | חשיפה משפטית |
| | X | | ניהול מצבי חירום |
| X | | | השפעת העידן הדיגיטלי על הענף |
| X | | | מכירת נכסים |
| | | | **סיכונים ייחודיים לחברה** |
| | X | | תלות במנהלי מחנות |
| | | X | סיכוני מט"ח |
| X | | | סיכוני ביטוח |
| X | | | דיני המס האמריקאים |
| X | | | דיני חדלות פירעון ותביעה המוגשת על-ידי נושה זר |

### 7.18 חברות בנות וקשורות של החברה

7.18.1 להלן פרטים, למיטב ידיעת החברה והדירקטורים שלה, אודות מחזיקים אחרים המחזיקים למועד התשקיף, כעשרים וחמישה אחוזים (25%) או יותר מהון המניות המונפק או מכוח ההצבעה או מהסמכות למנות דירקטורים, בחברות בת ובחברות קשורות עיקריות (פעילות) של החברה:

| שיעור אחזקה על-ידי המחזיק האחר | שם המחזיק האחר | שם המחנה | מס׳ סידורי |
|---|---|---|---|
| 25% | Melissa Newman | Indian Acres/ Forest Acres | |
| 24.5% | Jacob Labovitz | WM Camp (Windsor Mt) | C31 |
| 24.5% | Kerry Labovitz | | |
| 24.5% | Jay Freedman | Green Lane | C10 |
| 24.5% | Adam Weiner | | |
| 49% | (*) Beton Holdings LLC | Summit | C27 |
| 25% | Ronen Gabbay | Lokanda | C16 |
| 25% | Joseph Stansky | Mesorah | C19 |
| 50% | (**) Willow Lake Day Camps, Inc | Willow Lake | C30 |

(*) למיטב ידיעת החברה, חברה פרטית בבעלותם של Glynis Conyer ו-Alan Smith.
(**) למיטב ידיעת החברה, חברה פרטית בבעלותם של Michael Shabsels (25%), David Shabsels (25%) (שהינם בעלי השליטה בחברה), Steven Weissman (19.24%), Wendy Saiff (5.8%), Abraham Weissman (8.32%), Eva Weissman (8.32%) ו-Jacob Weissman (8.32%).

7.18.2 להלן פרטים אודות רווחים (הפסדים) (לפני הפרשה למס ואחריה) של חברות בנות וחברות קשורות פעילות של החברה, בשנים 2023, 2024 וברבעון השני של שנת 2025 (באלפי דולר):

| שנת 2023 | | שנת 2024 | | רבעון שני של שנת 2025 | | שם המחנה | מס׳ סידורי |
|---|---|---|---|---|---|---|---|
| רווח (הפסד) כולל לתקופה | רווח (הפסד) לתקופה | רווח (הפסד) כולל לתקופה | רווח (הפסד) לתקופה | רווח (הפסד) כולל לתקופה | רווח (הפסד) לתקופה | | |
| 69 | (382) | 297 | (107) | (728) | (914) | Achim | C1 |
| 2,962 | 2,018 | 3,227 | 1,990 | 1,435 | 1,267 | Banner | C2 |
| 326 | 22 | 807 | 882 | (1,054) | (348) | Blue Star | C3 |
| (134) | (431) | (151) | (428) | (550) | (688) | Chateaugay | C4 |
| 767 | (190) | 930 | 254 | (1,526) | (1,582) | Chen-A-Wanda (BAHS) | C5 |
| 1,947 | 1,381 | 1,910 | 1,268 | (412) | (245) | Club Getaway | C6 |
| 1,423 | 962 | 1,242 | 643 | (466) | (646) | Country Roads | C7 |
| 385 | 317 | 120 | (109) | (920) | (969) | Eagles Landing | C8 |
| 1,183 | 423 | 1,071 | 301 | (1,023) | (1,244) | ECHO (SHAB) | C9 |
| 842 | 460 | 906 | 466 | (841) | (815) | Green Lane | C10 |
| (1,996) | (1,825) | (1,780) | (2,092) | (1,090) | (1,306) | Greenville Land (Malka) | C11 |
| 232 | (62) | 391 | 94 | (646) | (839) | IAFA | C12 |
| 5,673 | 656 | 6,227 | 555 | (1,153) | (1,302) | Island Lake | C13 |
| 1,309 | 650 | 1,373 | 470 | (1,151) | (1,338) | Kiwi | C14 |
| (324) | (377) | (510) | (783) | (1,159) | (1,074) | Lavi | C15 |
| 1,085 | 137 | 1,244 | 222 | (1,121) | (1,290) | Lokanda | C16 |
| 395 | 53 | 607 | 216 | (1,040) | (1,129) | Meadowbrook | C17 |
| 110 | (56) | 225 | 50 | (632) | (623) | Med-O-Lark | C18 |
| (2,378) | (2,334) | (3,260) | (2,873) | (1,120) | (1,180) | Mesorah | C19 |
| 781 | (122) | 959 | (379) | (2,982) | (2,483) | Mogenavco | C20 |
| 6,864 | 4,262 | 7,488 | 5,151 | (2,827) | (2,820) | Mohawk | C21 |
| (115) | (373) | (210) | (510) | (111) | (222) | New England Golf & Tennis (Belgrade) | C22 |
| 256 | 435 | 443 | 259 | (453) | (525) | North Star (Poland) | C23 |
| 9,780 | 1,661 | 9,816 | 1,139 | (2,944) | (3,104) | Pine Forest | C24 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3,987 | 1,023 | 3,982 | 797 | (1,706) | (1,874) | Rolling Hills | C25 |
| 888 | (10) | 1,059 | 118 | (814) | (1,111) | Summit | C27 |
| (9) | (160) | (19) | (196) | (306) | (352) | Waukeela | C28 |
| 1,302 | 830 | 1,201 | 616 | (1,087) | (1,290) | Wekeela | C29 |
| 3,787 | 2,441 | 3,709 | 3,042 | (2,938) | (2,603) | Willow Lake | C30 |
| 1,682 | 1,271 | 1,578 | 964 | (674) | (822) | WM Camp (Windsor Mt) | C31 |

7.18.3    להלן פרטים הכנסות שקיבלה החברה או שהיא זכאית לקבל מחברות בנות ומחברות קשורות פעילות שלה, בשנים 2023, 2024 וברבעון השני של שנת 2025 (באלפי דולר):

<u>לימים 31 בדצמבר 2023 ו-2024</u> :

| שנת 2023 | | | שנת 2024 | | | שם המחנה | מס' סידורי |
|---|---|---|---|---|---|---|---|
| דמי ניהול | חלוקות | הכנסות (הוצאות) ריבית | דמי ניהול | חלוקות | הכנסות (הוצאות) ריבית | | |
| - | - | - | - | - | - | Achim | C1 |
| - | 343 | - | - | 36 | - | Banner | C2 |
| - | 70 | - | - | 98 | - | Blue Star | C3 |
| - | - | - | - | 2 | - | Chateaugay | C4 |
| - | - | - | - | 229 | - | Chen-A-Wanda (BAHS) | C5 |
| - | 1,423 | - | - | 853 | - | Club Getaway | C6 |
| - | 819 | - | - | 632 | - | Country Roads | C7 |
| - | - | - | - | 17 | - | Eagles Landing | C8 |
| - | 403 | - | - | 433 | - | ECHO (SHAB) | C9 |
| - | 204 | - | - | 230 | - | Green Lane | C10 |
| - | - | - | - | 2 | - | Greenville Land (Malka) | C11 |
| - | 245 | - | - | 149 | - | IAFA | C12 |
| - | - | - | - | - | - | Island Lake | C13 |
| - | - | - | - | - | - | Kiwi | C14 |
| - | - | - | - | - | - | Lavi | C15 |
| - | 702 | - | - | 1,428 | - | Lokanda | C16 |
| - | 523 | - | - | - | - | Meadowbrook | C17 |
| - | 250 | - | - | - | - | Med-O-Lark | C18 |
| - | - | - | - | - | - | Mesorah | C19 |
| - | - | - | - | - | - | Mogenavco | C20 |
| - | - | - | - | - | - | Mohawk | C21 |
| - | - | - | - | - | - | New England Golf & Tennis (Belgrade) | C22 |
| - | 125 | - | - | 187 | - | North Star (Poland) | C23 |
| - | - | - | - | 582 | - | Pine Forest | C24 |
| - | 14 | - | - | 78 | - | Rolling Hills | C25 |
| - | - | - | - | - | - | Summit | C27 |
| - | - | - | - | - | - | Waukeela | C28 |
| - | - | - | - | 629 | - | Wekeela | C29 |
| - | 1,373 | - | - | 1,720 | - | Willow Lake | C30 |
| - | 645 | - | - | 632 | - | WM Camp (Windsor Mt) | C31 |

ליום 30 ביוני 2025 ועד סמוך למועד פרסום התשקיף :

| דמי ניהול | | חלוקות | | הכנסות (הוצאות) ריבית | | שם המחנה | מס׳ סידורי |
|---|---|---|---|---|---|---|---|
| התקופה שלאחר יום 30 ביוני 2025 ועד סמוך למועד פרסום התשקיף | רבעון 2 2025 | התקופה שלאחר יום 30 ביוני 2025 ועד סמוך למועד פרסום התשקיף | רבעון 2 2025 | התקופה שלאחר יום 30 ביוני 2025 ועד סמוך למועד פרסום התשקיף | רבעון 2 2025 | | |
| - | - | - | - | - | - | Achim | C1 |
| - | - | - | 354 | - | - | Banner | C2 |
| - | - | 7 | - | - | - | Blue Star | C3 |
| - | - | - | - | - | - | Chateaugay | C4 |
| - | - | - | 13 | - | - | Chen-A-Wanda (BAHS) | C5 |
| - | - | 129 | 46 | - | - | Club Getaway | C6 |
| - | - | 44 | 4 | - | - | Country Roads | C7 |
| - | - | - | - | - | - | Eagles Landing | C8 |
| - | - | 2 | 3 | - | - | ECHO (SHAB) | C9 |
| - | - | - | - | - | - | Green Lane | C10 |
| - | - | - | 2 | - | - | Greenville Land (Malka) | C11 |
| - | - | - | - | - | - | IAFA | C12 |
| - | - | - | - | - | - | Island Lake | C13 |
| - | - | - | - | - | - | Kiwi | C14 |
| - | - | - | - | - | - | Lavi | C15 |
| - | - | - | 452 | - | - | Lokanda | C16 |
| - | - | - | - | - | - | Meadowbrook | C17 |
| - | - | - | - | - | - | Med-O-Lark | C18 |
| - | - | - | - | - | - | Mesorah | C19 |
| - | - | - | 4 | - | - | Mogenavco | C20 |
| - | - | - | - | - | - | Mohawk | C21 |
| - | - | - | - | - | - | New England Golf & Tennis (Belgrade) | C22 |
| - | - | - | - | - | - | North Star (Poland) | C23 |
| - | - | - | - | - | - | Pine Forest | C24 |
| - | - | - | 83 | - | - | Rolling Hills | C25 |
| - | - | - | 153 | - | - | Summit | C27 |
| - | - | 2 | - | - | - | Waukeela | C28 |
| - | - | - | - | - | - | Wekeela | C29 |
| - | - | 564 | 872 | - | - | Willow Lake | C30 |
| - | - | 69 | 34 | - | - | WM Camp (Windsor Mt) | C31 |

7.19 **הסברי דירקטוריון החברה למצב ענייני החברה לתקופות שהסתיימו ביום 31 בדצמבר 2024, ביום 30 ביוני 2025 וביום 30 בספטמבר 2025**

# SIMAD Holdings Ltd

## ("החברה")

**דוח הדירקטוריון על מצב עסקי התאגיד לשנה שהסתיימה ביום 31 בדצמבר 2024 ולתקופת ששת החודשים שהסתיימה ביום 30 ביוני 2025 (6)**

1. **הסברי הדירקטוריון למצב עסקי החברה, תוצאות פעולותיה, הונה העצמי ותזרימי המזומנים שלה**

החברה התאגדה ביום 28 במאי 2025 באיי הבתולה הבריטיים כחברה פרטית מוגבלת במניות, בהתאם להוראות ה-BVI Business Companies Act, 2004. ממועד התאגדותה כאמור ועד למועד פרסום התשקיף, לחברה לא הייתה כל פעילות.

לפרטים אודות התחייבויותיהם של בעלי הזכויות בתאגידים המועברים (כהגדרתם בסעיף 7.1.6 לתשקיף) להעביר לחברה את הזכויות המועברות (כהגדרתן באותו סעיף), כפוף להתקיימות דרישות הסף המקדימות לרישום אגרות החוב של החברה המוצעות על-פי תשקיף זה וההודעה משלימה למסחר בבורסה, ראה באור 1 לדוחות הכספיים המאוחדים של החברה המובאים בפרק 10 לתשקיף.

בדוח דירקטוריון זה להלן, אלא אם צוין או משתמע אחרת מתוכן הדברים או הקשרם: תיאור עסקיה של החברה (לרבות נתונים כספיים) נערך על בסיס פרופורמה, תחת הנחת השלמת העברת הזכויות המועברות לחברה (לרבות בתקופות העבר הרלוונטיות). לפרטים אודות אופן עריכת הדוחות הכספיים של החברה על בסיס פרופורמה, ראה באור 1 לדוחות הכספיים המאוחדים של החברה המובאים בפרק 10 לתשקיף.

2. **המצב הכספי על-פי הדוחות מאוחדים על המצב הכספי של החברה (פרופורמה)**

2.1. ניתוח עיקרי השינויים שחלו במצבה הכספי של החברה:

| הסברי החברה לשינויים המהותיים | יתרה ליום 31 בדצמבר | | סעיף |
|---|---|---|---|
| | **2023** | **2024** | |
| | אלפי דולר | | |
| למידע בנוגע לשינויים ביתרות המזומנים ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 31 בדצמבר 2024. | 9,531 | 3,663 | מזומנים ושווי מזומנים |
| | 888 | 664 | חייבים ויתרות חובה |
| למידע נוסף ראה ביאור 12 דוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 31 בדצמבר 2024. | 4,506 | 7,639 | צדדים קשורים |
| | **14,926** | **11,966** | **סה"כ נכסים שוטפים** |
| מיוחס לנכס Willow Lake אשר החברה המחזיקה בו מטופלת לפי שיטת השווי המאזני. | 17,038 | 17,173 | השקעות המטופלות לפי שיטת השווי המאזני |
| עיקר הגידול בשנת 2024 מיוחס לשערוך נכסים לשווים ההוגן בהתאם להערכות שווי. למידע נוסף ראה באור 5 דוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 31 בדצמבר 2024. | 401,735 | 428,700 | רכוש קבוע |
| | **418,773** | **445,873** | **סה"כ נכסים לא שוטפים** |
| | **433,699** | **457,839** | **סה"כ נכסים** |
| מיוחס להתחייבויות בגין תשלומי קרן הלוואות לתקופה של שנה ממועד התקופה המוצגות. | 8,984 | 9,016 | הלוואות מתאגידים בנקאיים ומאחרים |
| | 3,472 | 4,134 | זכאים ויתרות זכות |
| מיוחס בעיקר למקדמות שהתקבלו מלקוחות עבור רישום למחנות קיץ בארה"ב. | 59,665 | 62,790 | מקדמות מלקוחות |
| | **72,121** | **75,940** | **סה"כ התחייבויות שוטפות** |
| עיקר הקיטון מיוחס לפירעון הלוואות. | 184,390 | 176,585 | הלוואות מתאגידים בנקאיים ומאחרים |
| מיוחס לפיצויים לשלם בגין עובדים. | 4,365 | 4,765 | זכאים ויתרות זכות |
| | **188,755** | **181,350** | **סה"כ התחייבויות לא שוטפות** |
| | **260,876** | **257,290** | **סה"כ התחייבויות** |
| עיקר השינוי נובע מרווח כולל בשנת 2024 בסך של כ-43 מיליון דולר. מנגד ישנו קיטון המיוחס לחלוקות. למידע נוסף ראה דוחות על השינויים בהון בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 31 בדצמבר 2024. | 172,823 | 200,549 | **סה"כ הון** |
| | **433,699** | **457,839** | **סה"כ התחייבויות והון** |

1

| הסברי החברה לשינויים המהותיים | יתרה ליום 31 בדצמבר | יתרה ליום 30 ביוני | | סעיף |
|---|---|---|---|---|
| | 2024 | 2024 | 2025 | |
| | | אלפי דולר | | |
| למידע בנוגע לשינויים ביתרות המזומנים ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 ביוני 2025. | 3,663 | 24,531 | 13,975 | מזומנים ושווי מזומנים |
| | 664 | 12,890 | 13,655 | חייבים ויתרות חובה |
| היתרה שוטפות מול צדדים קשורים לחברה. היתרה נפרעה במהלך הרבעון השלישי של שנת 2025. | 7,639 | 14,903 | 16,347 | צדדים קשורים |
| | **11,966** | **52,324** | **43,977** | **סה"כ נכסים שוטפים** |
| מיוחס לנכס Willow Lake אשר החברה המחזיקה בו מטופלת לפי שיטת השווי המאזני. | 17,173 | 15,160 | 14,832 | השקעות המטופלות לפי שיטת השווי המאזני |
| עיקר הגידול לעומת תקופה מקבילה אשתקד מיוחס לשערוך נכסים לשווים ההוגן בהתאם להערכות שווי. | 428,700 | 401,735 | 428,700 | רכוש קבוע |
| | **445,873** | **416,895** | **443,532** | **סה"כ נכסים לא שוטפים** |
| | **457,839** | **469,219** | **487,509** | **סה"כ נכסים** |
| מיוחס להתחייבויות בגין תשלומי קרן הלוואות לתקופה של שנה ממועד התקופות המוצגות. | 9,016 | 8,937 | 9,764 | הלוואות מתאגידים בנקאיים ומאחרים |
| עיקר הגידול בתקופת הדוח מיוחס להתחייבות בגין חלוקות למיעוט בסך של כ-7 מיליוני דולר. | 4,134 | 4,095 | 10,376 | זכאים ויתרות זכות |
| מקדמות שהתקבלו מלקוחות עבור רישום למחנות קיץ בארה"ב. | 62,790 | 137,219 | 142,424 | מקדמות מלקוחות |
| | **75,940** | **150,251** | **162,564** | **סה"כ התחייבויות שוטפות** |
| עיקר הקיטון לעומת תקופה מקבילה אשתקד מיוחס לפירעון הלוואות. | 176,585 | 181,214 | 169,578 | הלוואות מתאגידים בנקאיים ומאחרים |
| מיוחס לפיצויים לשלם בגין עובדים. | 4,765 | 4,565 | 4,965 | זכאים ויתרות זכות |
| | **181,350** | **185,779** | **174,543** | **סה"כ התחייבויות לא שוטפות** |
| | **257,290** | **336,030** | **337,107** | **סה"כ התחייבויות** |
| עיקר השינוי נובע מהפסד כולל בתקופת הדוח בסך של כ-30.6 מיליון דולר וחלוקות. למידע נוסף ראה דוחות על השינויים בהון בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 ביוני 2025. | 200,549 | 133,189 | 150,402 | **סה"כ הון** |
| | **457,839** | **469,219** | **487,509** | **סה"כ התחייבויות והון** |

2.2. ניתוח עיקרי תוצאות הפעילות על-פי הדוחות הכספיים המאוחדים :

| הסברי החברה ליתרות ולשינויים המהותיים | לשנה שהסתיימה ביום 31 בדצמבר | | | סעיף |
|---|---|---|---|---|
| | 2022 | 2023 | 2024 | |
| | | אלפי דולר | | |
| עיקר הגידול ביחס לשנת 2022 מיוחס לרכישת נכסים במהלך שנת 2022 ולשיפור בתוצאות התפעוליות של חלק מנכסי החברה. | 132,656 | 156,437 | 159,355 | הכנסות מהפעלת מחנות קיץ |
| עיקר עלות ההפעלה מיוחסת להוצאות בגין שכר ונלוות. למידע נוסף ראה ביאור 9 בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 31 בדצמבר 2024. הוצאות ההפעלה כוללות פחת בשנת 2025 בסך של כ-15.2 מיליוני דולר, בשנת 2024 בסך של כ-13.7 מיליוני דולר, ובשנת 2023 בסך של כ-11.7 מיליון דולר | (110,311) | (128,498) | (131,761) | עלות הפעלת מחנות קיץ |
| | **22,345** | **27,939** | **27,594** | **רווח גולמי** |
| | (2,307) | (2,695) | (2,820) | הוצאות הנהלה וכלליות |
| | (3,488) | (3,942) | (4,307) | הוצאות מכירה ושיווק |
| | 80 | 506 | 58 | הכנסות (הוצאות) אחרות, נטו |
| מיוחס לנכס Willow Lake אשר החברה המחזיקה בו מטופלת לפי שיטת השווי המאזני. | 603 | 1,220 | 1,522 | חלק החברה ברווחי חברות המטופלות בשיטת השווי המאזני, נטו |
| | **17,233** | **23,082** | **22,047** | **רווח תפעולי** |
| הוצאות מימון מיוחסות בעיקר להוצאות מימון בגין הלוואות מתאגידים בנקאיים ואחרים. | (7,159) | (11,767) | (11,960) | הוצאות מימון |
| | 3,020 | 198 | 413 | הכנסות מימון |
| | (4,139) | (11,569) | (11,547) | הוצאות מימון, נטו |
| | **13,094** | **11,459** | **10,500** | **רווח לתקופה** |
| בגין הערכה מחדש של רכוש קבוע (מחנות קיץ). | 5,531 | 29,724 | 32,529 | רווח כולל אחר |
| | **18,625** | **41,183** | **43,029** | **סך הכל רווח כולל** |

2

| סעיף | לתקופה של שישה חודשים שהסתיימה ביום 30 ביוני | | לתקופה של שלושה חודשים שהסתיימה ביום 30 ביוני | | לשנה שהסתיימה ביום 31 בדצמבר 2024 | הסברי החברה ליתרות ולשינויים המהותיים |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | | |
| | אלפי דולר | | | | | |
| הכנסות מהפעלת מחנות קיץ | 11,508 | 9,864 | 10,399 | 8,715 | 159,355 | הכנסות החברה מוכרות לאחר מתן שירותים ללקוחות המשתתפים במחנות הקיץ אשר מתקיימים במהלך החציון השני של השנה. לאור מדיניות ההכרה בהכנסה של החברה, וכן לאור העונתיות המאפיינת את פעילותה, החברה מכירה בהכנסה מהפעלת מחנות הקיץ של החברה רק לאחר סיום תקופת כל מחנה. בהתאם, ליום 30 ביוני 2025 החברה טרם הכירה בהכנסה בגין מקדמות ששולמו על-ידי לקוחות החברה, והן מסווגות כהתחייבויות תחת סעיף 'מקדמות מלקוחות'. |
| עלות הפעלת מחנות קיץ | (35,338) | (34,541) | (20,591) | (20,337) | (131,761) | עלויות ההפעלה במהלך הרבעונים נובעת מהיערכות למחנות הקיץ, הכוללת גיוס מדריכים, תחזוקת מתקנים והוצאות שוטפות אחרות. הוצאות ההפעלה כוללות הוצאות פחת במחצית הראשונה של שנת 2025 בסך של כ-8.5 מיליון דולר, במחצית הראשונה של שנת 2024 בסך של כ-7.6 מיליון דולר, ובשנת 2024 בסך של כ-15.1 מיליון דולר. |
| רווח (הפסד) גולמי | (23,830) | (24,677) | (10,192) | (11,622) | 27,594 | |
| הוצאות הנהלה וכלליות | (1,242) | (1,290) | (706) | (731) | (2,820) | |
| הוצאות מכירה ושיווק | (975) | (830) | (549) | (464) | (4,307) | |
| הכנסות (הוצאות) אחרות, נטו | 28 | (136) | 14 | 50 | 58 | |
| חלק החברה ברווחי (הפסדי) חברות המטופלות בשיטת השווי המאזני, נטו | (1,301) | (1,010) | (728) | (453) | 1,522 | מיוחס לנכס Willow Lake אשר החברה המחזיקה בו מטופלת לפי שיטת השווי המאזני. |
| רווח (הפסד) תפעולי | (27,320) | (27,943) | (12,161) | (13,220) | 22,047 | |
| הוצאות מימון | (5,632) | (5,715) | (2,840) | (2,884) | (11,960) | הוצאות מימון מיוחסות בעיקר להוצאות מימון בגין הלוואות מתאגידים בנקאיים ואחרים. |
| הכנסות מימון | 786 | 251 | 477 | 120 | 413 | |
| הוצאות מימון, נטו | (4,846) | (5,464) | (2,363) | (2,764) | (11,547) | |
| רווח (הפסד) לתקופה | (32,166) | (33,407) | (14,524) | (15,984) | 10,500 | |
| רווח כולל אחר | 1,597 | 1,229 | (241) | (184) | 32,529 | בגין הערכה מחדש של רכוש קבוע (מחנות קיץ). |
| סך הכל רווח (הפסד) כולל | (30,569) | (32,178) | (14,765) | (16,168) | 43,029 | |

2.3. <u>הון חוזר</u>:

הרכב ההון חוזר לתקופה של 12 חודשים ליום 31 בדצמבר 2024 :

| | הסכום שנכלל בדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (אלפי דולר) |
|---|---|
| רכוש שוטף | 11,966 |
| התחייבויות שוטפות | (75,940) |
| **עודף ההתחייבויות השוטפות על הרכוש השוטף** | **(63,974)** |

הרכב ההון חוזר לתקופה של 12 חודשים ליום 30 ביוני 2025 :

| | הסכום שנכלל בדוחות הכספיים המאוחדים פרופורמה ליום 30 ביוני 2025 (אלפי דולר) |
|---|---|
| רכוש שוטף | 43,977 |
| התחייבויות שוטפות | (162,564) |
| **עודף ההתחייבויות השוטפות על הרכוש השוטף** | **(118,587)** |

לימים 31 בדצמבר 2024 ו-30 ביוני 2025 לחברה גירעון בהון חוזר בסך של כ-64 מיליון דולר וכ-118.6 מיליון דולר, בהתאמה, לפי הדוחות הכספיים המאוחדים פרופורמה.

עיקר הגירעון לימים 31 בדצמבר 2024 ו-30 ביוני 2025 נובע בעיקר ממקדמות שהתקבלו מלקוחות בסך של כ-62.8 מיליון דולר וכ-142.4 מיליון דולר, בהתאמה, עבור רישום למחנות קיץ בארה"ב.

להערכת החברה יש ביכולתה לעמוד בפירעון התחייבויותיה בעתיד הנראה לעין, בין היתר, באמצעות תזרימי מזומנים חיוביים מפעילות שוטפת ופעולות אחרות ככל שידרשו, אשר יאפשרו לה לעמוד בהתחייבויותיה **השוטפות** ולממן את פעילותה. לאחר בחינה שערך, קבע דירקטוריון החברה כי לאור האמור לעיל לחברה יכולת לעמוד בפירעון התחייבויותיה ועל כן הגירעון בהון החוזר כאמור לעיל אינו מצביע על בעיית נזילות

בחברה, ומשכך לא מתקיים אחד או יותר מסימני האזהרה (כהגדרתם בתקנה 10(ב)(14) לתקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970).

2.4. <u>ניתוח נזילות ומקורות מימון של החברה</u>:

| סעיף | הסברי החברה לשינויים המהותיים | לשנה שהסתיימה ביום | | |
|---|---|---|---|---|
| | | 31.12.2022 | 31.12.2023 | 31.12.2024 |
| | | אלפי דולר | | |
| תזרימי מזומנים מפעילות שוטפת | למידע בנוגע לתזרימי מזומנים מפעילות שוטפת ראה דוחות על תזרימי מזומנים מאוחדים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 31 בדצמבר 2024. | 51,379 | 37,006 | 41,845 |
| תזרימי מזומנים מפעילות השקעה | עיקר תזרימי המזומנים ששימשו לפעילות השקעה בתקופות המוצגות מקורם בהשקעות ברכוש קבוע. למידע נוסף ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 31 בדצמבר 2024. | (58,936) | (11,308) | (9,957) |
| תזרימי מזומנים מפעילות מימון | עיקר תזרימי המזומנים מפעילות מימון בתקופות המוצגות מקורם בנטילת ופירעון של הלוואות, שינויים ביתרות מול צדדים קשורים, השקעות וחלוקות ותשלומי ריבית בגין הלוואות. למידע נוסף ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 31 בדצמבר 2024. | 9,308 | (33,270) | (37,756) |

| סעיף | הסברי החברה לשינויים המהותיים | לשנה שהסתיימה ביום 31 בדצמבר 2024 | לתקופה של שלושה חודשים שהסתיימה ביום 30 ביוני | | לתקופה של שישה חודשים שהסתיימה ביום 30 ביוני | |
|---|---|---|---|---|---|---|
| | | | 2024 | 2025 | 2024 | 2025 |
| | | | אלפי דולר | | | |
| תזרימי מזומנים מפעילות שוטפת | עיקר תזרימי המזומנים מפעילות שוטפת מיוחסים למקדמות שהתקבלו מלקוחות אשר מוכרות כהכנסה לאחר התקיימות מחנות הקיץ במהלך החציון השני של השנה. למידע בנוגע לתזרימי מזומנים מפעילות שוטפת ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 ביוני 2025. | 41,845 | 16,685 | 17,517 | 48,073 | 49,395 |
| תזרימי מזומנים מפעילות השקעה | תזרימי המזומנים ששימשו לפעילות השקעה בתקופות המוצגות מקורם בהשקעה ברכוש קבוע. למידע נוסף ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 ביוני 2025. | (9,957) | (4,077) | (4,466) | (6,532) | (6,692) |
| תזרימי מזומנים מפעילות מימון | עיקר תזרימי המזומנים מפעילות מימון בתקופות המוצגות מקורם בנטילת ופירעון של הלוואות, שינויים ביתרות מול צדדים קשורים, השקעות וחלוקות ותשלומי ריבית בגין הלוואות. למידע נוסף ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 ביוני 2025. | (37,756) | (11,888) | (13,623) | (26,541) | (32,391) |

2.5. EBITDA (Earnings Before Interest, Taxes, Depreciations, Amortizations):

ה-EBITDA (רווח לפני ריבית, מיסים, פחת והפחתות) הינו מדד המייצג את הרווח התפעולי של החברה בנטרול פחת והפחתות ובנטרול הכנסות או הוצאות שאינן תפעוליות ואינו מדד פיננסי מבוסס על כללי חשבונאות מקובלים. עם זאת, להערכת החברה, ה-EBITDA הינו אחד מן הפרמטרים החשובים ביותר, ועל כן מהווה נדבך פיננסי חשוב בהבנת תוצאותיה הכספיות (בנוסף וכפוף לתוצאות פעילותה כפי שאלו מוצגים בדוחותיה הכספיים).

יודגש כי מדד ה-EBITDA:

(א)   אינו מציג תזרימי מזומנים מפעילות שוטפת על-פי כללי חשבונאות מקובלים;

(ב)   אינו משקף מזומנים שבנמצא למימון כל תזרימי המזומנים של החברה, כולל יכולתה לבצע חלוקת כספים;

(ג)   אינו אמור להיחשב כתחליף לרווח הנקי לצורך הערכת תוצאות הפעילות של החברה;

(ד)   אינו נתון המבוקר ו/או סקור על-ידי רואי החשבון של החברה.

להלן נתוני ה-EBITDA של החברה:

4

| סעיף | לשנה שהסתיימה ביום | | | הסברי החברה לשינויים המהותיים |
|---|---|---|---|---|
| | 31.12.2022 | 31.12.2023 | 31.12.2024 | |
| | אלפי דולר | | | |
| EBITDA (מאוחד כולל חלק החברה בחברות כלולות) | 29,316 | 36,657 | 37,662 | עיקר הגידול מיוחס לרכישת נכסים במהלך שנת 2022 ולשיפור בתוצאות התפעוליות של חלק מנכסי החברה. |
| EBITDA (חלק החברה כולל חלק החברה בחברות כלולות) | 25,607 | 31,955 | 32,793 | |

| סעיף | לתקופה של שישה חודשים שהסתיימה ביום 30 ביוני | | לתקופה של שלושה חודשים שהסתיימה ביום 30 ביוני | | לשנה שהסתיימה ביום 31 בדצמבר 2024 | הסברי החברה לשינויים המהותיים |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | | |
| | אלפי דולר | | | | | |
| EBITDA (מאוחד כולל חלק החברה בחברות כלולות) | (18,654) | (19,960) | (7,808) | (9,320) | 37,662 | הכנסות החברה מוכרת לאחר מתן שירותים ללקוחות המשתתפים במחנות הקיץ אשר מתקיימים במהלך החציון השני של השנה. |
| EBITDA (חלק החברה כולל חלק החברה בחברות כלולות) | (16,428) | (17,288) | (7,045) | (8,206) | 32,793 | |

3.  **חשיפה לסיכוני שוק ודרכי ניהולם**

3.1  להערכת הנהלת החברה, פעילותה חשופה לסיכוני השוק העיקריים המפורטים בביאור 11 לדוחות הכספיים המאוחדים של החברה לשנת 2024.

כמו-כן, כתוצאה מהנפקת אגרות החוב על-פי תשקיף זה, ככל שתונפקנה, החברה תהא חשופה לשינויים בשער החליפין שקל/דולר. מדיניות החברה היא לגדר את החשיפה המטבעית באמצעות מכשירים פיננסיים מתאימים על מנת לצמצם את החשיפה כאמור.

3.2  _מדיניות החברה בניהול סיכוני השוק_

דירקטוריון החברה מפקח על מדיניות ניהול סיכוני השוק ומנחה את ההנהלה. כן, החברה מתאימה את מבנה המימון (או המימון מחדש) של נכסיה (לרבות תקופת ההלוואה, יצירת תחנות יציאה/פירעון מוקדם ללא קנס, הסכמה עם הבנק על תנאי ההלוואות וכדומה) לתכנית העסקית של כל נכס באופן המאפשר גמישות מרבית בהוצאתה לפועל של התכנית העסקית כאמור ומקסום שווי הנכס ורווחי החברה ממנו.

3.3  _אמצעי פיקוח ומימוש מדיניות_

הנהלת החברה עוקבת באופן שוטף אחר ההתפתחויות בשווקים הרלוונטיים של החברה ומדווחת לדירקטוריון החברה בדבר מידת החשיפה הקיימת. דירקטוריון החברה מפקח על מדיניות ניהול סיכוני השוק ומנחה את ההנהלה.

4.  **היבטי ממשל תאגידי**

4.1  _כללי_

לפרטים אודות תחולת הוראות ממשל תאגידי מסוימות מחוק החברות, התשנ״ט-1999 (**״חוק החברות״**) והתקנות על-פיו, על החברה, כחברה זרה אשר תעודות ההתחייבות שלה מוצעות לציבור בישראל, ראה סעיף 1.1 ופרק 5 לתשקיף. בסמוך לאחר השלמת הצעת אגרות החוב של החברה על-פי תשקיף זה וכל עוד ניירות ערך של החברה מוחזקים בידי הציבור בישראל, תפעל החברה לשם עמידה במלוא הוראות הממשל התאגידי המחייבות אותה כאמור, לרבות מינוי דירקטורים חיצוניים ודירקטור בלתי תלוי לחברה (ראה סעיף 5.1 לתשקיף) והקמת ועדת ביקורת וועדת תגמול.

4.2  _גילוי בדבר דירקטורים בלתי תלויים_

נכון למועד התשקיף, לא מכהנים בחברה דירקטורים בלתי תלויים, כהגדרת מונח זה בחוק החברות. תקנון החברה אינו כולל הוראה בדבר שיעור הדירקטורים הבלתי תלויים בחברה.

5

נכון למועד התשקיף, החברה טרם מינתה דירקטורים חיצוניים. לאחר ובכפוף להשלמת רישום אגרות החוב למסחר בבורסה על-פי תשקיף זה וההודעה המשלימה, החברה תפעל כמתחייב על-פי דין למינוי דירקטורים חיצוניים.

4.3. <u>מבקר פנימי</u>

למועד התשקיף לא מכהן בחברה מבקר פנים.

4.4. <u>מדיניות החברה בנושא תרומות</u>

לא נקבעה על-ידי הדירקטוריון מדיניות בנושא תרומות. לא קיימות התחייבויות למתן תרומות בתקופות עתידיות.

5. **פרטים בדבר רואה החשבון המבקר של החברה**

מאז הקמתה רואה החשבון המבקר של החברה הינו BDO זיו האפט. שכר טרחת רואה החשבון נקבע במשא ומתן בין הנהלת החברה לרואה החשבון המבקר, בהתאם להיקף העבודה, לאופי העבודה, ניסיון העבר ותנאי השוק.

החברה התאגדה ביום 28 במאי 2025 ובהתאם בשנים 2023 ו-2024 לא שילמה שכר בגין שירותי רואה החשבון המבקר.

6. **אירועים מהותיים שאירעו במהלך ולאחר תאריך הדיווח**

אין אירועים מהותיים שאירעו במהלך ולאחר תאריך הדיווח.

| | | |
|---|---|---|
| **Michael Shabsels**<br>**Chairman** | **David Shabsels**<br>**Director & CEO** | 18 בנובמבר 2025 |

# SIMAD Holdings Ltd

## ("החברה")

## דוח הדירקטוריון על מצב עסקי התאגיד לתקופת תשעה (9) ושלושה (3) שהסתיימה ביום 30 בספטמבר 2025

1. **הסברי הדירקטוריון למצב עסקי החברה, תוצאות פעולותיה, הונה העצמי ותזרימי המזומנים שלה**

החברה התאגדה ביום 28 במאי 2025 באיי הבתולה הבריטיים כחברה פרטית מוגבלת במניות, בהתאם להוראות ה-BVI Business Companies Act, 2004. ממועד התאגדותה כאמור ועד למועד פרסום התשקיף, לחברה לא הייתה כל פעילות.

לפרטים אודות התחייבויותיהם של בעלי הזכויות בתאגידים המועברים (כהגדרתם בסעיף 7.1.6 לתשקיף) להעביר לחברה את הזכויות המועברות (כהגדרתן באותו סעיף), כפוף להתקיימות דרישות הסף המקדימות לרישום אגרות החוב של החברה המוצעות על-פי תשקיף זה וההודעה משלימה למסחר בבורסה, ראה באור 1 לדוחות הכספיים המאוחדים של החברה המובאים בפרק 10 לתשקיף.

> בדוח דירקטוריון זה להלן, אלא אם צוין או משתמע אחרת מתוכן הדברים או הקשרם: תיאור עסקיה של החברה (לרבות נתונים כספיים) נערך על בסיס פרופורמה, תחת הנחת השלמת העברת הזכויות המועברות לחברה (לרבות בתקופות העבר הרלוונטית). לפרטים אודות אופן עריכת הדוחות הכספיים של החברה על בסיס פרופורמה, ראה באור 1 לדוחות הכספיים המאוחדים של החברה המובאים בפרק 10 לתשקיף.

2. **המצב הכספי על-פי הדוחות מאוחדים על המצב הכספי של החברה (פרופורמה)**

2.1. ניתוח עיקרי השינויים שחלו במצבה הכספי של החברה:

| הסברי החברה לשינויים המהותיים | יתרה ליום 31 בדצמבר | יתרה ליום 30 בספטמבר | | סעיף |
|---|---|---|---|---|
| | 2024 | 2024 | 2025 | |
| | | אלפי דולר | | |
| למידע בנוגע לשינויים ביתרות המזומנים ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 בספטמבר 2025. | 3,663 | 5,068 | 7,867 | מזומנים ושווי מזומנים |
| | 664 | 853 | 1,258 | חייבים ויתרות חובה |
| יתרות שוטפות מול צדדים קשורים לחברה. הקיטון מיוחס לפירעון במהלך הרבעון השלישי של שנת 2025. | 7,639 | 11,623 | 1,399 | צדדים קשורים |
| | **11,966** | **17,544** | **10,524** | **סה"כ נכסים שוטפים** |
| מיוחס לנכס Willow Lake אשר החברה המחזיקה בו מטופלת לפי שיטת השווי המאזני. | 17,173 | 17,691 | 17,590 | השקעות המטופלות לפי שיטת השווי המאזני |
| עיקר הגידול לעומת תקופה מקבילה אשתקד מיוחס לשערוך נכסים לשווים ההוגן בהתאם להערכות שווי. | 428,700 | 401,735 | 428,700 | רכוש קבוע |
| | **445,873** | **419,426** | **446,290** | **סה"כ נכסים לא שוטפים** |
| | **457,839** | **436,970** | **456,814** | **סה"כ נכסים** |
| מיוחס להתחייבויות בגין תשלומי קרן הלוואות לתקופה של שנה ממועד התקופות המוצגות. | 9,016 | 8,993 | 12,906 | הלוואות מתאגידים בנקאיים ומאחרים |
| עיקר הגידול בתקופת הדוח מיוחס להתחייבות בגין חלוקות למיעוט בסך של כ-7 מיליון דולר. | 4,134 | 8,545 | 13,583 | זכאים ויתרות זכות |
| מקדמות שהתקבלו מלקוחות עבור רישום למחנות קיץ בארה"ב. | 62,790 | 37,475 | 41,876 | מקדמות מלקוחות |
| | **75,940** | **55,013** | **68,365** | **סה"כ התחייבויות שוטפות** |
| עיקר הקיטון לעומת תקופה מקבילה אשתקד מיוחס לפירעון הלוואות. | 176,585 | 178,678 | 164,017 | הלוואות מתאגידים בנקאיים ומאחרים |
| מיוחס לפיצויים לשלם בגין עובדים. | 4,765 | 4,665 | 5,065 | זכאים ויתרות זכות |
| | **181,350** | **183,343** | **169,082** | **סה"כ התחייבויות לא שוטפות** |
| | **257,290** | **238,356** | **237,447** | **סה"כ התחייבויות** |
| עיקר השינוי נובע מרווח בתקופת הדוח כולל בתקופת הדוח בסך של כ-39.6 מיליון דולר. מנגד, ישנו קיטון בתקופת הדוח המיוחס לחלוקות לבעלים ולזכויות שאינן מקנות שליטה בסך של כ-20.7 מיליון דולר. למידע נוסף ראה דוחות על השינויים בהון בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 בספטמבר 2025. | 200,549 | 198,614 | 219,367 | **סה"כ הון** |
| | **457,839** | **436,970** | **456,814** | **סה"כ התחייבויות והון** |

2.2. <u>ניתוח עיקרי תוצאות הפעילות על-פי הדוחות הכספיים המאוחדים</u> :

| סעיף | לתקופה של תשעה חודשים שהסתיימה ביום 30 בספטמבר | | לתקופה של שלושה חודשים שהסתיימה ביום 30 בספטמבר | | לשנה שהסתיימה ביום 31 בדצמבר 2024 | הסברי החברה ליתרות ולשינויים המהותיים |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | | |
| | אלפי דולר | | | | | |
| הכנסות מהפעלת מחנות קיץ | 160,952 | 156,245 | 149,444 | 146,381 | 159,355 | עיקר הגידול מיוחס לשיפור בתוצאות התפעוליות של חלק מנכסי החברה. הכנסות החברה מוכרות לאחר מתן שירותים ללקוחות המשתתפים במחנות הקיץ אשר מתקיימים במהלך החציון השני של השנה. לאור מדיניות ההכרה בהכנסה של החברה, וכן לאור העונתיות המאפיינת את פעילותה, החברה מכירה בהכנסה מהפעלת מחנות הקיץ של החברה רק לאחר סיום תקופת כל מחנה.. |
| עלות הפעלת מחנות קיץ | (114,898) | (113,004) | (79,560) | (78,463) | (131,761) | עלויות ההפעלה במהלך הרבעונים נובעת מהיערכות למחנות הקיץ, הכוללת גיוס מדריכים, תחזוקת מתקנים והוצאות שוטפות אחרות. הוצאות ההפעלה כוללות הוצאות פחת בתקופה של תשעה חודשים של שנת 2025 בסך של כ-12.7 מיליון דולר, בתקופה של תשעה חודשים של שנת 2024 בסך של כ-11.4מיליון דולר, ובשנת 2024 בסך של כ-15.1 מיליון דולר. |
| **רווח גולמי** | 46,054 | 43,241 | 69,884 | 67,918 | 27,594 | |
| הוצאות הנהלה וכלליות | (2,103) | (2,343) | (861) | (1,053) | (2,820) | |
| הוצאות מכירה ושיווק | (3,383) | (3,338) | (2,408) | (2,508) | (4,307) | |
| הכנסות (הוצאות) אחרות, נטו | 53 | (124) | 25 | 12 | 58 | |
| חלק החברה ברווחי (הפסדי) חברות המטופלות בשיטת השווי המאזני, נטו | 1,987 | 2,092 | 3,288 | 3,102 | 1,522 | מיוחס לנכס Willow Lake אשר החברה המחזיקה בו מטופלת לפי שיטת השווי המאזני. |
| **רווח (הפסד) תפעולי** | 42,608 | 39,528 | 69,928 | 67,471 | 22,047 | |
| הוצאות מימון | (8,279) | (8,622) | (2,647) | (2,907) | (11,960) | הוצאות מימון מיוחסות בעיקר להוצאות מימון בגין הלוואות מתאגידים בנקאיים ואחרים. |
| הכנסות מימון | 1,186 | 315 | 400 | 64 | 413 | |
| הוצאות מימון, נטו | (7,093) | (8,307) | (2,247) | (2,843) | (11,547) | |
| **רווח (הפסד) לתקופה** | 35,515 | 31,221 | 67,681 | 64,628 | 10,500 | |
| רווח כולל אחר | 4,041 | 3,184 | 2,444 | 1,955 | 32,529 | בגין הערכה מחדש של רכוש קבוע (מחנות קיץ). |
| **סך הכל רווח (הפסד) כולל** | 39,556 | 34,405 | 70,125 | 66,583 | 43,029 | |

2.3. <u>הון חוזר</u> :

הרכב ההון חוזר לתקופה של 12 חודשים ליום 30 בספטמבר 2025 :

| | הסכום שנכלל בדוחות הכספיים המאוחדים פרופורמה ליום 30 בספטמבר 2025 (אלפי דולר) |
|---|---|
| רכוש שוטף | 10,524 |
| התחייבויות שוטפות | (68,365) |
| **עודף ההתחייבויות השוטפות על הרכוש השוטף** | (57,841) |

ליום 30 בספטמבר 2025 לחברה גירעון בהון חוזר בסך של כ-57.8 מיליון דולר, לפי הדוחות הכספיים המאוחדים פרופורמה.

עיקר הגירעון ליום 30 בספטמבר 2025 נובע בעיקר ממקדמות שהתקבלו מלקוחות בסך של כ-41.9 מיליון דולר עבור רישום למחנות קיץ בארה״ב.

להערכת החברה יש ביכולתה לעמוד בפירעון התחייבויותיה בעתיד הנראה לעין, בין היתר, באמצעות תזרימי מזומנים חיובים מפעילות שוטפת ופעולות אחרות ככל שידרשו, אשר יאפשרו לה לעמוד בהתחייבויותיה **השוטפות** ולממן את פעילותה. לאחר בחינה שערך, קבע דירקטוריון החברה כי לאור האמור לעיל לחברה יכולת לעמוד בפירעון התחייבויותיה ועל כן הגירעון בהון החוזר כאמור לעיל אינו מצביע על בעיית נזילות בחברה, ומשכך לא מתקיים אחד או יותר מסימני האזהרה (כהגדרתם בתקנה 10(ב)(14) לתקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש״יל-1970).

2

2.4. **ניתוח נזילות ומקורות מימון של החברה** :

| סעיף | לתקופה של תשעה חודשים שהסתיימה ביום 30 בספטמבר | | לתקופה של שלושה חודשים שהסתיימה ביום 30 בספטמבר | | לשנה שהסתיימה ביום 31 בדצמבר 2024 | הסברי החברה לשינויים המהותיים |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | | |
| | | | אלפי דולר | | | |
| תזרימי מזומנים מפעילות שוטפת | 35,986 | 33,444 | (13,409) | (14,629) | 41,845 | עיקר תזרימי המזומנים מפעילות שוטפת מיוחסים למקדמות שהתקבלו מלקוחות אשר מוכרות כהכנסה לאחר התקיימות מחוות הקיץ במהלך החציון השני של השנה. למידע בנוגע לתזרימי מזומנים מפעילות שוטפת ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 בספטמבר 2025. |
| תזרימי מזומנים מפעילות השקעה | (8,513) | (8,167) | (1,821) | (1,635) | (9,957) | תזרימי המזומנים ששימשו לפעילות השקעה בתקופות המוצגות מקורם בהשקעה ברכוש קבוע. למידע נוסף ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים פרופורמה של החברה ליום 30 בספטמבר 2025. |
| תזרימי מזומנים מפעילות מימון | (23,269) | (29,740) | 9,122 | (3,199) | (37,756) | עיקר תזרימי המזומנים מפעילות מימון בתקופות המוצגות מקורם בנטילה ופירעון של הלוואות, שינויים ביתרות מול צדדים קשורים, השקעות וחלוקות ותשלומי ריבית בגין הלוואות. למידע נוסף ראה דוחות על תזרימי מזומנים בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 בספטמבר 2025. |

2.5. EBITDA (Earnings Before Interest, Taxes, Depreciations, Amortizations) :

ה-EBITDA (רווח לפני ריבית, מיסים, פחת והפחתות) הינו מדד המייצג את הרווח התפעולי של החברה בנטרול פחת והפחתות ובנטרול הכנסות או הוצאות שאינן תפעוליות ואינו מדד פיננסי מבוסס על כללי חשבונאות מקובלים. עם זאת, להערכת החברה, ה-EBITDA הינו אחד מן הפרמטרים החשובים ביותר, ועל כן מהווה נדבך פיננסי חשוב בהבנת תוצאותיה הכספיות (בנוסף וכפוף לתוצאות פעילותה כפי שאלו מוצגים בדוחותיה הכספיים).

יודגש כי מדד ה-EBITDA :

(א)    אינו מציג תזרימי מזומנים מפעילות שוטפת על-פי כללי חשבונאות מקובלים ;

(ב)    אינו משקף מזומנים שבנמצא למימון כל תזרימי המזומנים של החברה, כולל יכולתה לבצע חלוקת כספים ;

(ג)    אינו אמור להיחשב כתחליף לרווח הנקי לצורך הערכת תוצאות הפעילות של החברה ;

(ד)    אינו נתון המבוקר ו/או סקור על-ידי רואי החשבון של החברה.

להלן נתוני ה-EBITDA של החברה :

| סעיף | לתקופה של תשעה חודשים שהסתיימה ביום 30 בספטמבר | | לתקופה של שלושה חודשים שהסתיימה ביום 30 בספטמבר | | לשנה שהסתיימה ביום 31 בדצמבר 2024 | הסברי החברה לשינויים המהותיים |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | | |
| | | | אלפי דולר | | | |
| EBITDA (מאוחד כולל חלק החברה בחברות כלולות) | 55,616 | 51,418 | 74,270 | 71,378 | 37,662 | עיקר הגידול מיוחס לשיפור בהוצאות התפעוליות של חלק מנכסי החברה. הכנסות החברה מוכרות לאחר מתן שירותים ללקוחות המשתתפים במחנות הקיץ אשר מתקיימים במהלך החציון השני של השנה. |
| EBITDA (חלק החברה כולל חלק החברה בחברות כלולות) | 48,577 | 44,636 | 65,005 | 61,924 | 32,793 | |

3.    **חשיפה לסיכוני שוק ודרכי ניהולם**

3.1    להערכת הנהלת החברה, פעילותה חשופה לסיכוני השוק העיקריים המפורטים בביאור 11 לדוחות הכספיים המאוחדים של החברה לשנת 2024.

כמו-כן, כתוצאה מהנפקת אגרות החוב על-פי תשקיף זה, ככל שתונפקנה, החברה תהא חשופה לשינויים בשער החליפין שקל/דולר. מדיניות החברה היא לגדר את החשיפה המטבעית באמצעות מכשירים פיננסיים מתאימים על מנת לצמצם את החשיפה כאמור.

3

3.2 <u>מדיניות החברה בניהול סיכוני השוק</u>

דירקטוריון החברה מפקח על מדיניות ניהול סיכוני השוק ומנחה את ההנהלה. כן, החברה מתאימה את מבנה המימון (או המימון מחדש) של נכסיה (לרבות תקופת ההלוואה, יצירת תחנות יציאה/פירעון מוקדם ללא קנס, הסכמה עם הבנק על תנאי ההלוואות וכדומה) לתכנית העסקית של כל נכס באופן המאפשר גמישות מרבית בהוצאתה לפועל של התכנית העסקית כאמור ומקסום שווי הנכס ורווחי החברה ממנו.

3.3 <u>אמצעי פיקוח ומימוש מדיניות</u>

הנהלת החברה עוקבת באופן שוטף אחר ההתפתחויות בשווקים הרלוונטיים של החברה ומדווחת לדירקטוריון החברה בדבר מידת החשיפה הקיימת. דירקטוריון החברה מפקח על מדיניות ניהול סיכוני השוק ומנחה את ההנהלה.

**4. <u>היבטי ממשל תאגידי</u>**

4.1 <u>כללי</u>

לפרטים אודות תחולת הוראות ממשל תאגידי מסוימות מחוק החברות, התשנ״ט-1999 (״**חוק החברות**״) והתקנות על-פיו, על החברה, כחברה זרה אשר תעודות ההתחייבות שלה מוצעות לציבור בישראל, ראה סעיף 1.1 ופרק 5 לתשקיף. בסמוך לאחר השלמת הצעת אגרות החוב של החברה על-פי תשקיף זה וכל עוד ניירות ערך של החברה מוחזקים בידי הציבור בישראל, תפעל החברה לשם עמידה במלוא הוראות הממשל התאגידי המחייבות אותה כאמור, לרבות מינוי דירקטורים חיצוניים ודירקטור בלתי תלוי לחברה (ראה סעיף 5.1 לתשקיף) והקמת ועדת ביקורת וועדת תגמול.

4.2 <u>גילוי בדבר דירקטורים בלתי תלויים</u>

נכון למועד התשקיף, לא מכהנים בחברה דירקטורים בלתי תלויים, כהגדרת מונח זה בחוק החברות. תקנון החברה אינו כולל הוראה בדבר שיעור הדירקטורים הבלתי תלויים בחברה.

נכון למועד התשקיף, החברה טרם מינתה דירקטורים חיצוניים. לאחר ובכפוף להשלמת רישום אגרות החוב למסחר בבורסה על-פי תשקיף זה וההודעה המשלימה, החברה תפעל כמתחייב על-פי דין למינוי דירקטורים חיצוניים.

4.3 <u>מבקר פנימי</u>

למועד התשקיף לא מכהן בחברה מבקר פנים.

4.4 <u>מדיניות החברה בנושא תרומות</u>

לא נקבעה על-ידי הדירקטוריון מדיניות בנושא תרומות. לא קיימות התחייבויות למתן תרומות בתקופות עתידיות.

**5. <u>אירועים מהותיים שאירעו במהלך ולאחר תאריך הדיווח</u>**

לא אירעו אירועים מהותיים לאחר תאריך הדוח.

| ———————— | ———————— | 18 בנובמבר 2025 |
| **Michael Shabsels** | **David Shabsels** | |
| **Chairman** | **Director & CEO** | |

4

# פרק 8 – דירקטוריון החברה

### 8.1    דירקטוריון החברה

להלן פרטים אודות הדירקטורים המכהנים בדירקטוריון החברה נכון למועד התשקיף [1]:

| שם | David Shabsels | Michael Shabsels | שחר נחמיאס | דורון תורג׳מן | לימור בלדב | בני גבאי |
|---|---|---|---|---|---|---|
| **מספר דרכון/ת.ז.** | 472749398 | A19922239 | 034442202 | 023568389 | 028511285 | 022051577 |
| **תאריך לידה** | 15 בספטמבר 1977 | 5 באפריל 1970 | 31 באוגוסט 1977 | 23 באפריל 1968 | 12 במרס 1971 | 30 בספטמבר 1965 |
| **מען להמצאת כתבי בי-דין** | 60 Carthage Road, Scarsdale, New York , 10583, United States of America | 444 East 58th Street #3C, New York , New York , 10022, United States of America | קיבוץ גדות, 1232500 | ענבר 9, מבשרת ציון | השיטה 17, כפר נטר | צאלון 12, ירקונה |
| **נתינות** | ארה״ב | ארה״ב | ישראל | ישראל | ישראל | ישראל |
| **תפקיד** | דירקטור ומנכ״ל | נשיא ודירקטור | יו״ר הדירקטוריון | דירקטור חיצוני | דירקטורית חיצונית | דירקטור בלתי תלוי |
| **תאריך תחילת כהונה** | 28 במאי 2025 | 28 במאי 2025 | 23 בנובמבר 2025 | 23 בנובמבר 2025 | 23 בנובמבר 2025 | 23 בנובמבר 2025 |
| **חברות בוועדות הדירקטוריון** | לא | לא | לא | ועדת ביקורת ; ועדה לבחינת הדוחות הכספיים ; ועדת תגמול | ועדה ביקורת ; ועדה לבחינת הדוחות הכספיים ; ועדת תגמול | ועדת ביקורת ; ועדה לבחינת הדוחות הכספיים ; ועדת תגמול |
| **האם הינו דירקטור בלתי תלוי או דירקטור חיצוני** | לא | לא | לא | כן | כן | כן |
| **בעל מומחיות חשבונאית ופיננסית או כשירות מקצועית או דח״צ מומחה** | לא | לא | לא | מומחיות חשבונאית ופיננסית | כשירות מקצועית | מומחיות חשבונאית ופיננסית |
| **האם הדירקטור הינו עובד של החברה, של חברה בת או של חברה קשורה שלה או של בעל עניין בה** | מנהל הקבוצה | מנהל הקבוצה | לא | לא | לא | לא |
| **השכלה** | תואר ראשון, אוניברסיטת אדלפי בניו יורק | תואר ראשון, אוניברסיטת ברנדייס במסצ׳וסטס | תואר ראשון במדעי המחשב, אוניברסיטת מסצ׳וסטס לואל | תואר ראשון בחשבונאות וכלכלה, האוניברסיטה העברית ; רואה חשבון מוסמך | תואר ראשון במשפטים, המכללה האקדמית נתניה ; תואר שני במנהל עסקים (התמחות במימון), המכללה האקדמית נתניה | תואר ראשון בחשבונאות וכלכלה, האוניברסיטה העברית ; רו״ח מוסמך |
| **עיסוק בחמש השנים האחרונות** | מנהל הקבוצה | מנהל הקבוצה | מנהל עסקי ב-גדות החזקות (2018- היום) | יועץ פיננסי ורואה חשבון עצמאי (2020- כיום) ; מנכ״ל אינטרנט גולד - קווי זהב בע״מ | עו״ד עצמאית ; דירקטורית בחברות שונות | מנהל כספים ב- Epilady 2000 LLC (2024 - היום) ; יועץ כלכלי |

---

[1]    נכון למועד פרסום התשקיף מרבית חברי דירקטוריון החברה הינם תושבי ישראל. בהתאם, למועד פרסום התשקיף לא מתקיים בחברה האמור בהגדרה של ״חברה נטולת זיקה לישראל״, כמשמעותה ב־ ״הוראות רשות ניירות ערך למנהלי הקרנות בדבר גילוי בשם הקרן אודות חשיפה אפשרית לאג״ח שאינו מדורג בדירוג השקעה, לאג״ח של חברות נטולות זיקה לישראל ולתאגיד בנקאי אצלו מוחזקים מזומנים ופיקדונות של הקרן (נוסח חדש – 2021)״.

| בני גבאי | לימור בלדב | דורון תורג׳מן | שחר נחמיאס | Michael Shabsels | David Shabsels | שם |
|---|---|---|---|---|---|---|
| לחברות | | (2011-2024) | | | | |
| - | דירקטורית חיצונית בחברות: קבוצת גבאי-בניה, יזום, ניהול ואחזקות נדל״ן בע״מ, מנרה ונצ׳רס אקס אל - שותפות מוגבלת, וואן טכנולוגיות תוכנה בע״מ והכשרת הישוב התחדשות עירונית בישראל בע״מ; דירקטורית בלתי תלויה בחברות: עמרם אברהם חברה לבנין בע״מ ו- MDG Real Estate Global Ltd | דירקטור חיצוני בחברות: אלון ריבוע כחול בע״מ, אפי קפיטל נדל״ן בע״מ, מ.ו. השקעות בע״מ, התעשייה האווירית לישראל בע״מ, Greystone senior debt BI Ltd, Encore Properties Ltd, GFI Real Estate Ltd, MDG Real Estate Global Ltd | הדרי הגליל, ג״ג, אבוקדו גל בע״מ, פלסגד מוצרים פלסטיים אגודה שיתופית חקלאית בע״מ, גדות החזקות אגודה שיתופית חקלאית בע״מ, תיירות גדות אגודה שיתופית חקלאית בע״מ, יזמות גדות, דוראל גדות אנרגיה מתחדשת בע״מ, נופר גדות (ניהול) בע״מ, בשן יזמות, קלע ניהול יזמות והשקעות בע״מ, בשן אמארא בע״מ, בשן אמארא ניהול השקעות שותפות מוגבלת | - | - | תאגידים בהם משמש כדירקטור |
| לא | לא | לא | לא | כן | כן | האם הדירקטור הינו בן משפחה של בעל עניין אחר בחברה |
| כן | לא | כן | לא | לא | לא | דירקטור שהחברה רואה אותו כבעל מומחיות חשבונאית ופיננסית לצורך עמידה במספר המזערי שקבע הדירקטוריון לפי סעיף 92(א)(12) לחוק החברות |

8.2   **נושאי משרה בכירה (שאינם דירקטורים)**

| שם | Randolph (Randy) Mittasch |
|---|---|
| **תאריך לידה** | 25 במאי 1962 |
| **התפקיד שהוא ממלא בחברה, בחברה-בת או בבעל ענין בחברה** | סמנכ"ל כספים |
| **השכלה** | רואה חשבון מוסמך ; תואר שני במנהל עסקים מאוניברסיטת אדלפי בניו יורק |
| **עיסוק בחמש השנים האחרונות** | תפקידים שונים בחברות הקבוצה |
| **אם הוא בן משפחה של נושא משרה בכירה אחר או של בעל ענין בחברה** | לא |

8.3   **הוראות תקנון החברה המתייחסות למינוי, כהונה ומילוי מקום של דירקטורים**

להלן תיאור כללי ותמציתי של ההוראות החלות על דירקטוריון החברה בהתאם להוראות הדין באיי הבתולה הבריטיים, תזכיר ההתאגדות של החברה ותקנון החברה. מובהר, כי תזכיר ההתאגדות ותקנון החברה כפופים להוראות דין איי הבתולה הבריטיים.

ההתייחסות בפרק זה לדין איי הבתולה הבריטיים הינה בהתאם לחוות הדעת של משרד עורכי דין המוסמך באיי הבתולה הבריטיים הכלול בפרק 11 לתשקיף, אשר הסכים להכללת חוות דעתו ותרגומה בתשקיף.

כאמור בסעיף 1.1 לתשקיף, כל עוד אגרות החוב (סדרה א') של החברה יהיו במחזור, על החברה יחולו הוראות סעיף 39א לחוק ניירות ערך, התשכ"ח-1968 ("**חוק ניירות ערך**"), וכפועל יוצא, הוראות שונות של חוק החברות, התשנ"ט-1999 ("**חוק החברות**"), ובכללן הוראות לגבי חובת מינוי דירקטורים חיצוניים[2] מינוי ועדת ביקורת[3] ומינוי ועדת תגמול,[4] יחולו על החברה, וזאת בנוסף להוראות מסמכי ההתאגדות של החברה ודיני איי הבתולה הבריטיים.[5]

החברה, בעלת השליטה ונושאי המשרה בחברה, מתחייבים באופן בלתי חוזר (לפי העניין) שלא להעלות טענות נגד תחולתו, תקפותו, או אופן יישומו של סעיף 39א לחוק ניירות ערך כאמור.

בנוסף, הואיל ועל-פי דיני איי הבתולה כהונתו של דירקטור מסתיימת קודם לתום התקופה שנקצבה לכהונה זו רק מכוח מותו (חו"ח), התפטרותו, החלטה של דירקטוריון החברה, אסיפת בעלי המניות או בית המשפט, אזי בעלי השליטה ויתר הדירקטורים המכהנים בדירקטוריון החברה מתחייבים באופן בלתי חוזר כי: (1) במקרה שבו מי מהדירקטורים החיצוניים הודיע לחברה כי חדל להתקיים בו תנאי הדרוש לפי חוק החברות לכהונתו כדירקטור חיצוני, אזי הם יפעלו בהתאם להוראות תקנון החברה לכינוס אסיפת בעלי מניות או ישיבת דירקטוריון (לפי העניין) דחופה, אשר על סדר יומה יהא קבלת החלטה לפטר את הדירקטור החיצוני האמור לאלתר, וכי הם יצביעו בעד ההחלטה כאמור; ו-(2) במקרה שבו מי מהדירקטורים המכהנים הודיע לחברה כי הורשע בפסק דין בעבירה כאמור בסעיף 226(א)(1) לחוק החברות או 226(א1) לחוק החברות, או שוועדת האכיפה המנהלית החליטה להטיל על אותו דירקטור אמצעי אכיפה האוסר עליו לכהן כדירקטור בחברה פרטית שהיא חברת אגרות חוב, אזי יפעלו בהתאם להוראות תקנון החברה לכינוס אסיפת בעלי מניות או ישיבת דירקטוריון (לפי העניין), אשר על סדר יומה יהא קבלת החלטה לפטר את הדירקטור האמור לאלתר, וכי הם יצביעו בעד ההחלטה כאמור.

החברה ובעלי השליטה מתחייבים באופן בלתי חוזר כי החל מתום שלושה (3) חודשים ממועד ההנפקה וכל

---

[2]   סעיפים 239 עד 249א לחוק החברות.

[3]   סעיפים 114 עד 117 לחוק החברות.

[4]   סעיפים 118א ו-118ב לחוק החברות.

[5]   מובהר, כי למועד התשקיף, בתקנון החברה אין הוראה הסותרת דין קוגנטי באיי הבתולה הבריטיים.

עוד אגרות חוב של החברה הינן במחזור, יכהנו בחברה לפחות שני דירקטורים (ובכלל זה הדירקטורים החיצוניים) שהינם תושבי ישראל.

**התיאור להלן מהווה תיאור עיקרי התקנות שבתזכיר ההתאגדות ובתקנון החברה והוא אינו ממצה או מהווה תחליף לעיון במסמכי ההתאגדות של החברה כאמור. ניתן יהא לעיין בתזכיר ההתאגדות ובתקנון החברה ובכל תיקון לתזכיר ולתקנון, ככל שיהיה, באופן אלקטרוני, באתר "מגנא" של רשות ניירות ערך, בכתובת: <u>www.magna.gov.il</u>.**

8.3.1    כפוף לאמור בתקנון החברה, עסקי וענייני החברה ינוהלו על-פי או תחת פיקוח הדירקטוריון. בחברה יכהנו בכל עת לפחות שני (2) דירקטורים חיצוניים. התקנון מוסיף ומציין שדירקטור לא חייב להחזיק במניות על מנת להיות כשיר למשרתו.

8.3.2    <u>מינוי דירקטורים, סיום כהונתם ודירקטורים חליפיים</u>

8.3.2.1    הדירקטור הראשון של החברה ימונה על-ידי הסוכן הרשום הראשון[6] של החברה. לאחר מכן ייבחרו ויפוטרו הדירקטורים באמצעות החלטה של בעלי המניות או החלטה של הדירקטוריון. דירקטור ימונה לתקופת הכהונה אשר צוינה בעת מינויו, ואם לא צוינה, ימונה לתקופה בלתי מוגבלת.

8.3.2.2    בכפוף לאמור בסעיף 8.2.2.1 לתשקיף, לא ימונה אדם כדירקטור בחברה אלא אם גילה את הפרטים הבאים לדירקטוריון החברה, וזאת בדרך של הצהרה בכתב (להלן: **"ההצהרה"**):

[א]    אם הורשע בפסק דין בעבירה כאמור בסעיף 8.2.2.3(א) לתשקיף וטרם חלפה התקופה שבה אסור לו לכהן כדירקטור על-פי סעיף 8.2.2.3(א) לתשקיף;

[ב]    אם הורשע בפסק דין בעבירה כאמור בסעיף 8.2.2.3(ב) לתשקיף וטרם חלפה התקופה שקבע בית המשפט על-פי אותו סעיף 8.2.2.3(ב) לתשקיף;

[ג]    אם וועדת האכיפה המנהלית הטילה אמצעי אכיפה האוסר עליו לכהן כדירקטור בכל חברה ציבורית או בכל חברה פרטית שהיא חברת אגרות חוב, וטרם חלפה התקופה שקבעה וועדת האכיפה המנהלית.

[ד]    אדם שהורשע בפסק דין באחת מהעבירות הבאות לא ימונה לכהונת דירקטור בחברה אלא אם עברו חמש שנים מיום מתן פסק הדין שבו הורשע:

(i)    בעבירות של: (1) שוחד; (2) גניבה מנכסי החברה על-ידי מנהל החברה; (3) השגת דבר מה במרמה; (4) זיוף; (5) שימוש במסמך מזויף; (6) שידול באמצעות מרמה; (7) רישום מזויף במסמכי חברה כלשהי; (8) עבירות של מנהלים או עובדים בחברה; (9) אי מסירת מידע ופרסום מטעה על-ידי נושא משרה בחברה; (10) מרמה והפרת אמונים בחברה; (11) הסתרה במרמה; (12) סחיטה תוך שימוש בכוח; (13) סחיטה באיומים; (14) שימוש במידע על-ידי איש פנים; (15) שימוש במידע פנים שמקורו באיש פנים; (16) הצעה ומכירת ניירות ערך לציבור בישראל שלא בהתאם לתשקיף או טיוטת תשקיף; (17) גרימה להכללת פרט מטעה בטיוטת תשקיף או בתשקיף; (18) גרימה להכללת פרט מטעה במידע המוצג באסיפת עובדים; (19) הוצאת חוות דעת, דוח או אישור הנכללים או שיש אליהם התייחסות לאחר מכן בתשקיף, דוח, הודעה או מפרט הצעת רכש, מתוך ידיעה שחוות הדעת, הדוח או האישור הכילו פרט מטעה; (20) גרימה להכללת פרט מטעה בדוח; הודעה; מסמך רישום או מפרט

---

[6]    על-פי חוקי איי הבתולה הבריטיים, כל חברה רשומה באיי הבתולה הבריטיים חייבת בסוכן רשום הנוכח באיי הבתולה הבריטיים. אדם לא יהיה ולא יסכים להיות סוכן רשום של חברה המאוגדת באיי הבתולה הבריטיים אלא אם האדם מחזיק ברישיון על-פי חוק ניהול חברה משנת 1990 או חוק הבנקים וחברות נאמנות משנת 1990 של איי הבתולה הבריטיים המסמיך אותו לספק שירותי סוכן רשום.

הצעת רכש המוגשים לרשות ניירות ערך או לבורסה; (21) לרבות פרט מטעה באחד מדוחותיה; פרסומיה או מידע אחר המפורסם על-ידה (22) הונאה בקשר לניירות ערך; או

(ii) הרשעה על-ידי בית משפט בכל מקום בעולם בעבירות של שוחד, מרמה, עבירות על-ידי מנהלי תאגיד או עבירות הכרוכות בניצול מידע פנים.

[ה] אדם שהורשע בפסק דין בעבירה שאינה מנויה בסעיף 8.2.2.3(א) לתשקיף לא ימונה כדירקטור בחברה, אם בית המשפט קבע שמכוח מהות, חומרת או נסיבות העבירה, האדם אינו רשאי או ראוי לכהן כדירקטור בחברה ציבורית או בחברה פרטית שהיא חברת אגרות חוב למשך התקופה שקבע בית המשפט אשר לא תעלה על חמש שנים מיום מתן פסק הדין.

[ו] הטילה ועדת האכיפה המנהלית על אדם אמצעי אכיפה האוסר עליו לכהן כדירקטור בחברה ציבורית או בחברה פרטית שהיא חברת אגרות חוב, לא ימונה אותו אדם כדירקטור בחברה בהתאם לאותה החלטה.

8.3.2.3 כל דירקטור יכהן במשרתו עד: (א) פסילתו לכהן כדירקטור תחת חוק החברות החל באיי הבתולה הבריטיים; (ב) מותו, או במקרה שאינו אדם, בהפסיקו להתקיים; (ג) בהתפטרותו; (ד) סיום תקופת כהונתו (ככל שקיימת) כמפורט בהחלטת מינויו או על-פי החלטת הדירקטוריון או בעלי המניות; (ה) תאריך הסרתו בפועל מכהונה על-ידי החלטה של הדירקטוריון או בעלי המניות; או (ו) ביחס לדירקטורים חיצוניים, כאמור בסעיף 8.2.3.9 לתשקיף, וביחס לדירקטורים בלתי תלויים אשר אינם דירקטורים חיצוניים, דירקטורים כאמור לא יכהנו כדירקטורים בחברה לתקופה העולה על תשע (9) שנים, ולעניין זה לא יראו בהפסקת כהונה שאינה עולה על שנתיים (2) כמפסיקה את רצף הכהונה.

8.3.2.4 לא יתמנה אדם כדירקטור של החברה אלא אם הסכים בכתב לשמש כדירקטור.

8.3.2.5 נודע לחברה כי דירקטור מונה בניגוד להוראות סעיפים 8.2.2.3-8.2.2.2 לתשקיף, או כי דירקטור הפר את הוראות סעיפים 8.2.2.3 או 8.2.2.8 לתשקיף, הדירקטוריון או בעלי המניות יסיימו את כהונתו של אותו דירקטור בישיבתם הראשונה שתתכנס לאחר שמידע כאמור נודע להם, אם מצאו כי נתקיימו התנאים האמורים, וממועד ההחלטה תפקע הכהונה. דרישות נוספות לפיטורי דירקטור חיצוני מפורטות בסעיפים 8.2.3.10-8.2.3.14 לתשקיף.

8.3.2.6 אם, לאחר מינויו כדירקטור בחברה, הורשע דירקטור בעבירה המפורטת בסעיפים 8.2.2.3(א) או 8.2.2.3(ב) לתשקיף, אותו דירקטור יודיע על כך לחברה מוקדם ככל האפשר באופן סביר וכהונתו של אותו דירקטור תיפסק בהחלטת דירקטוריון או בהחלטת בעלי המניות של החברה, ולא יהיה ניתן לשוב ולמנותו כדירקטור אלא אם כן חלפה התקופה שבה אסור לו לכהן כדירקטור, כמפורט בסעיף 8.2.2.3 לתשקיף.

8.3.2.7 אם, לאחר מינויו כדירקטור בחברה, החליטה ועדת האכיפה המנהלית להטיל אמצעי אכיפה על הדירקטור האוסר עליו להתמנות כדירקטור בכל חברה ציבורית, בכל חברה פרטית שהיא חברת אגרות חוב או בחברה, יודיע על כך אותו דירקטור לחברה מוקדם ככל האפשר באופן סביר וכהונתו תיפסק על-ידי הדירקטוריון או בעלי המניות של החברה, ולא יהיה ניתן לשוב ולמנותו כדירקטור בחברה, אלא אם חלפה תקופת האיסור שקבעה ועדת האכיפה המנהלית.

8.3.2.8 דירקטור רשאי להתפטר מתפקידו באמצעות מתן הודעה בכתב על התפטרותו לחברה וההתפטרות תיכנס לתוקפה ממועד קבלת ההודעה על-ידי החברה או ממועד מאוחר יותר כפי שיצוין בהודעה. בנוסף לדרישות המפורטות בסעיפים 8.2.2.3, 8.2.2.6, 8.2.2.7 ו-

8.2.2.8 לתשקיף, דירקטור יתפטר מתפקידו באופן מיידי אם הוא פסול או הופך להיות פסול מלכהן כדירקטור על-פי דיני איי הבתולה הבריטיים.

8.3.2.9 הדירקטוריון רשאי, בכל זמן, באמצעות קבלת החלטה, למנות כל אדם כדירקטור לשם מילוי משרה פנויה או בנוסף לדירקטורים הקיימים. תקופת כהונתו של דירקטור כאמור לא תהיה ארוכה יותר מאשר התקופה שנותרה לאדם שחדל להיות דירקטור להחזיק במשרה. משרת דירקטור בדירקטוריון החברה תתפנה במותו של דירקטור, או במקרה של דירקטור שהינו חבר בני-אדם – כאשר אותה ישות מפסיקה להתקיים, או בכל אופן אחר בו אותו אדם או ישות אינם מכהנים עוד בתפקידם כדירקטורים קודם למועד סיום תקופת כהונתם.

8.3.2.10 אדם אשר מתקיים בו אחד מהבאים, יהיה פסול מלכהן כדירקטור בחברה : (א) אדם אשר טרם מלאו לו 18 שנים ; (ב) אדם אשר הינו "disqualified person" או הינו " restricted person" כהגדרת מונחים אלו על-פי חוקי איי הבתולה הבריטיים ; (ג) פושט רגל.

8.3.2.11 התגמולים שיינתנו לדירקטורים בחברה בקשר עם השירותים הניתנים או שיינתנו על-ידם לחברה (בין אם בדרך של שכר, עמלה ו/או השתתפות ברווחים ובין אם בכל דרך אחרת), לרבות בגין שירותים שיינתנו על-ידם לחברות אשר החברה הינה בעלת עניין בהן, ייקבעו בהחלטה של הדירקטוריון או בהחלטה של בעלי המניות.

8.3.2.12 דירקטור אשר הפר את חובות הגילוי המפורטות בסעיפים 8.2.2.2, 8.2.2.7 או 8.2.2.8 לתשקיף, ייחשב כמי שהפר את חובת האמונים שלו כלפי החברה.

8.3.2.13 דירקטור רשאי, באמצעות מסמך בכתב שיופקד במשרדי החברה הרשומים, למנות חליף שהינו דירקטור או אדם שאינו פסול על-פי תנאי מינוי דירקטור והחליף יהיה זכאי : (א) לפעול לפי הסמכויות המוקנות לדירקטור הממנה ; ו-(ב) ליישם את תפקידיו של הדירקטור הממנה, בקשר לקבלת החלטות על-ידי הדירקטורים בעת היעדרו של הדירקטור הממנה.

8.3.3 <u>דירקטורים חיצוניים</u>

8.3.3.1 אם, במועד המינוי של דירקטור חיצוני, כל חברי הדירקטוריון בחברה שאינם בעלי השליטה בחברה או קרוביהם הם בני מין אחד, יהיה הדירקטור החיצוני הממונה בן המין השני.

8.3.3.2 הדירקטורים החיצוניים הראשונים ימונו לא יאוחר משלושה (3) חודשים מהמועד שבו הפכה החברה לחברת אגרות חוב.

8.3.3.3 דירקטור חיצוני ימונה על-פי החלטה של בעלי המניות או על-פי החלטה של הדירקטוריון רק לאחר המועד שבו המועמד כאמור המציא הצהרה בכתב לפיה הוא עומד בתנאים למינויו כדירקטור חיצוני וועדת הביקורת (או ביחס לדירקטורים החיצוניים הראשונים – הדירקטוריון) אישרה שהתקיימו כל התנאים הנקובים בסעיפים 8.2.3.4, 8.2.3.5 ו-8.2.3.6 לתשקיף.

8.3.3.4 רק יחיד שהוא תושב ישראל וכשיר להתמנות כדירקטור חיצוני ימונה כדירקטור חיצוני ויחיד זה יהיה בעל כשירות מקצועית או בעל מומחיות חשבונאית ופיננסית. לפחות אחד מהדירקטורים החיצוניים יהיה בעל מומחיות חשבונאית ופיננסית.

8.3.3.5 האנשים הבאים לא ימונו כדירקטורים חיצוניים בחברה :

[א] לא ימונה כדירקטור חיצוני יחיד אשר הינו קרובו של מי מבעלי השליטה בחברה ;

[ב] לא ימונה כדירקטור חיצוני יחיד שיש לו, לקרובו, לשותפו, למעבידו, למי שהוא כפוף במישרין או בעקיפין או לתאגיד שהוא בעל השליטה בו, במועד המינוי או

בשנתיים (2) שקדמו למועד המינוי, זיקה לחברה או למי מבעל השליטה בחברה או לקרובו, במועד המינוי, או לתאגיד אחר;[7,8]

[ג] לא ימונה כדירקטור חיצוני יחיד אם תפקידיו או עיסוקיו האחרים יוצרים או עלולים ליצור ניגוד עניינים עם תפקידו כדירקטור בחברה, או אם יש בהם לפגוע ביכולתו לפעול כדירקטור;

[ד] לא ימונה דירקטור בחברה פלונית כדירקטור חיצוני בחברה אחרת אם אותה שעה מכהן דירקטור בחברה האחרת כדירקטור חיצוני בחברה הפלונית;

[ה] לא ימונה יחיד כדירקטור חיצוני אם הוא עובד של רשות ניירות הערך או של הבורסה.

8.3.3.6 מבלי לגרוע מהוראות סעיף 8.2.3.5 לתשקיף, לא יתמנה יחיד כדירקטור חיצוני שיש לו, לקרובו, לשותפו, למעבידו, למי שהוא כפוף לו במישרין או בעקיפין או לתאגיד שהוא בעל השליטה בו, קשרים עסקיים או מקצועיים למי שאסורה זיקה אליו לפי הוראות סעיף 8.2.3.5 לתשקיף, גם אם הקשרים כאמור אינם דרך כלל, למעט קשרים זניחים, וכן יחיד שקיבל תמורה בניגוד להוראות סעיף 8.2.3.8 לתשקיף. קוימו קשרים או התקבלה תמורה כאמור בעת כהונת הדירקטור החיצוני, יראו בכך, לעניין סעיפים 8.2.3.11 עד 8.2.3.14 לתשקיף הפרת תנאי מן התנאים הדרושים למינויו או לכהונתו כדירקטור חיצוני.

8.3.3.7 בכל וועדה הרשאית להפעיל סמכות מסמכויות הדירקטוריון (ככל שדיני איי הבתולה הבריטיים או התקנון מתירים), יכהן לפחות דירקטור חיצוני אחד.

8.3.3.8 דירקטור חיצוני זכאי לגמול ולהחזר הוצאות בכפוף לכל דין. דירקטור חיצוני לא יקבל, נוסף על הגמול שלו הוא זכאי ולהחזר ההוצאות, כל תמורה אחרת, במישרין או בעקיפין, בשל כהונתו כדירקטור בחברה. לעניין סעיף זה, תמורה לא תכלול הענקת פטור, התחייבות לשיפוי, שיפוי או ביטוח.

8.3.3.9 תקופת כהונתו של דירקטור חיצוני תהיה שלוש שנים, ורשאית החברה, על אף הוראות סעיף 8.2.3.5 לתשקיף, למנותו לשתי תקופות נוספות, של שלוש שנים כל אחת.

8.3.3.10 למעט כאמור בסעיף 8.2.3.9 לתשקיף, דירקטור חיצוני לא יפוטר וכהונתו לא תפקע אלא בהתאם להוראות סעיפים 8.2.3.11 עד 8.2.3.14 לתשקיף.

8.3.3.11 דירקטור חיצוני שחדלו להתקיים בו התנאים הדרושים לכהונה כדירקטור חיצוני יודיע על כך לדירקטוריון החברה מיד וכהונתו תסתיים בהחלטת דירקטוריון או בהחלטת בעלי המניות של החברה.

8.3.3.12 נודע לדירקטוריון כי קיים חשש שדירקטור חיצוני חדל לקיים תנאי מהתנאים הדרושים למינויו כדירקטור חיצוני, או כי קיים חשש כי הדירקטור הפר את חובת האמונים לחברה, ידונו בכך הדירקטוריון או בעלי המניות בישיבה שתכונס לראשונה לאחר שנודע להם על כך.

8.3.3.13 נודע לדירקטוריון או לבעלי המניות, לאחר שנתנו לדירקטור החיצוני הזדמנות סבירה להציג את עמדתו, שהדירקטור החיצוני חדל לקיים תנאי מהתנאים הדרושים למינויו כדירקטור חיצוני, או כי הוא הפר את חובת האמונים שלו כלפי החברה, יזמן הדירקטוריון או יזמנו בעלי המניות אסיפה לשם סיום כהונתו של הדירקטור החיצוני.

8.3.3.14 בית המשפט רשאי, לבקשת דירקטור או בעל מניות, להורות על סיום כהונתו של דירקטור חיצוני אם מצא שהדירקטור החיצוני חדל לקיים תנאי מן התנאים הדרושים למינויו

---

[7] "זיקה" – קיום יחסי עבודה, קיום קשרים עסקיים או מקצועיים דרך כלל או שליטה, וכן כהונה כנושא משרה, למעט כהונה של דירקטור שמונה כדי לכהן כדירקטור חיצוני בחברה שעומדת להציע לראשונה מניות מניותיה לציבור.

[8] "תאגיד אחר" – תאגיד שבעל השליטה בו, במועד המינוי או בשנתיים שקדמו למועד המינוי, הוא החברה או בעלי השליטה בה.

כדירקטור חיצוני, או כי הפר את חובת האמונים לחברה. בנוסף, לבקשת החברה, דירקטור, בעל מניות או נושה, בית המשפט רשאי להורות על סיום כהונתו של דירקטור חיצוני אם מצא כי התקיים אחד מהבאים: (1) הדירקטור החיצוני אינו יכול עוד למלא את תפקידו; (2) במהלך כהונתו הורשע הדירקטור החיצוני בבית משפט מחוץ לישראל בעבירות כאמור בסעיף 8.2.2.3 לתשקיף.

| | |
|---|---|
| 8.3.3.15 | התפנתה משרתו של דירקטור חיצוני ולא מכהנים בחברה שני דירקטורים חיצוניים אחרים, ימלא הדירקטוריון את המשרה הפנויה על-פי החלטתו. |

8.3.3.16 החברה, בעלי השליטה בה ותאגיד בשליטתם לא יעניקו למי שכיהן כדירקטור חיצוני באותה חברה, לבן זוגו או לילדו טובת הנאה, במישרין או בעקיפין, ובכלל זה לא ימנו אותו, את בן זוגו או את ילדו, לכהונה כנושא משרה באותה חברה או בתאגיד בשליטת בעלי השליטה בה, לא יעסיקוהו כעובד ולא יקבלו ממנו שירותים מקצועיים בתמורה, בין במישרין ובין בעקיפין, לרבות באמצעות תאגיד בשליטתו, אלא אם כן חלפו שנתיים (2) מתום כהונתו כדירקטור חיצוני באותה חברה, ולעניין קרוב שאינו בן זוגו או ילדו – שנה (1) מתום כהונתו כדירקטור חיצוני.

### 8.3.4 <u>סמכויות הדירקטוריון</u>

כפוף להוראות התקנון, עסקי החברה ינוהלו על-פי או תחת פיקוח הדירקטוריון של החברה אשר יהא רשאי לשלם את כל ההוצאות שנגרמו לפני ובקשר עם התאגדות החברה ורשאי לממש את כל סמכויות החברה הנדרשות לצורך ניהול, הכוונה ופיקוח על עסקי ועניייני החברה, אשר לא הוקנו על-פי דיני איי הבתולה הבריטיים, התזכיר או התקנון לבעלי המניות בחברה.

### 8.3.5 <u>ועדות הדירקטוריון</u>

הדירקטורים רשאים להאציל אחת או יותר מסמכויות הדירקטוריון לוועדה, המורכבת מחבר או חברי דירקטוריון כפי שנראה להם הולם.

לדירקטוריון אין סמכות להאציל לוועדת דירקטוריון את הסמכויות הבאות:

| | |
|---|---|
| [א] | לתקן את התזכיר או התקנון; |
| [ב] | למנות ווועדות דירקטוריון; |
| [ג] | למנות דירקטורים; |
| [ד] | למנות סוכן; |
| [ה] | לאשר תוכנית מיזוג, איחוד או הסדר; או |
| [ו] | להוציא הכרזת כושר פירעון או לאשר תוכנית פירוק. |
| [ז] | לקבל החלטה לפי דיני איי הבתולה הבריטיים, שמייד לאחר הצעת חלוקה, החברה תעמוד במבחן יכולת הפירעון. |

### 8.3.6 <u>ועדת ביקורת</u>

| | |
|---|---|
| 8.3.6.1 | הדירקטוריון ימנה מבין חבריו וועדת ביקורת על-פי החלטתו. |
| 8.3.6.2 | מספר חבריה של ועדת הביקורת לא יפחת משלושה (3). חברי ווועדת הביקורת ייבחרו מבין חברי הדירקטוריון והוועדה תכלול בכל עת את כל הדירקטורים החיצוניים שמונו. רוב חברי ווועדת הביקורת יהיו דירקטורים חיצוניים או דירקטורים בלתי תלויים. |
| 8.3.6.3 | יושב ראש ווועדת הביקורת יהיה דירקטור חיצוני. |

### 8.3.7 <u>ועדת תגמול</u>

| | |
|---|---|
| 8.3.7.1 | הדירקטוריון ימנה מבין חבריו ווועדת תגמול על-פי החלטתו. |

8.3.7.2   מספר חבריה של וועדת התגמול לא יפחת משלושה (3). חברי וועדת התגמול ייבחרו מבין חברי הדירקטוריון והוועדה תכלול בכל עת את כל הדירקטורים החיצוניים שמונו. רוב חברי וועדת התגמול יהיה דירקטורים חיצוניים ושאר חבריה יהיו דירקטורים שתנאי כהונתם והעסקתם הם בהתאם להוראות שנקבעו לפי סעיף 8.2.3.8 לתשקיף.

8.3.7.3   יושב ראש ועדת התגמול יהיה דירקטור חיצוני.

8.3.8   שיפוי

בכפוף לדיני איי הבתולה הבריטיים, כל דירקטור ו/או נושא משרה של החברה (יובהר, שהאמור לא כולל מבקר של החברה), יחד עם כל דירקטור לשעבר ו/או נושא משרה לשעבר של החברה (בסעיף זה: "**משופה**") ישופה מתוך נכסי החברה כנגד כל אחריות, פעולות, הליכים, טענות, דרישות, עלויות, נזקים או הוצאות, כולל כל סוג של הוצאות משפטיות, שינבעו כתוצאה ממעשה או מחדל בהפעלת סמכויותיהם, מלבד אחריות (אם בכלל) אשר עשויה לנבוע מהונאה ממשית או מחדל בזדון. אף משופה לא יהיה אחראי כלפי החברה לגבי כל הפסד או נזק אשר נגרם לחברה (בין אם ישיר או לא ישיר) כתוצאה מהפעלת סמכויותיהם, אלא אם אחריותם נובעת מהונאה ממשית או מחדל בזדון של המשופה. שום אדם לא ייחשב כאילו ביצע הונאה ממשית או מחדל בזדון תחת תקנון החברה, אלא אם או עד שבית משפט בעל מוסמך קבע זאת.

החברה תיתן לכל משופה מקדמה לצרכים כגון שכר עורך דין סביר ועלויות אחרות והוצאות שייגרמו בקשר לכל פעולה, תביעה, הליך או חקירה בקשר למשופה אשר בגינם ניתן לבקש שיפוי. בקשר לכל מקדמה לכל סוג של הוצאות, המשופה יחתום על התחייבות לחברה שהוא ישיב לה את כל הסכומים אשר ניתנו לו, אם ייקבע בפסק דין סופי או כל פסיקה אחרת, שהמשופה לא היה זכאי לכל שיפוי מכוח סעיף זה בתקנון. אם ייקבע בפסק דין סופי או פסיקה אחרת שמשופה לא היה זכאי לכל שיפוי בקשר עם פסיקה, עלויות או הוצאות כלשהן, אז המשופה לא ישופה בקשר עם פסיקה, עלויות או הוצאות כאמור וכל מקדמה תושב לחברה (ללא ריבית) על-ידי המשופה.

הדירקטורים, בשם החברה, רשאים לרכוש ולהחזיק ביטוח בקשר לכל דירקטור ו/או נושא משרה בחברה, בגין כל חבות, לפי כל כלל או חוק, אשר עשויה להיות לו בקשר עם רשלנות, מחדל, הפרת חובות תפקידו או הפרת חובות אמון שבהן הוא אשם כלפי החברה.

בכפוף לאמור לעיל, החברה תשפה ותבטח את נושאי המשרה בה ביחס לתשלומים שעליהם לשלם כאמצעי אכיפה לנפגעי הפרה בהתאם להחלטת ועדת האכיפה המנהלית, או ביחס לתשלום הוצאות שנגרמו בקשר להליכי האכיפה המנהלית שננקטו בנוגע לאדם כאמור, לרבות הוצאות משפט סבירות – לרבות שכר טרחת עו״ד, ולרבות בדרך של שיפוי מראש.

8.4   **מורשי חתימה עצמאיים**

נכון למועד התשקיף, דיוויד שאבסלס ומייקל שאבסלס הינם מורשי חתימה עצמאיים בחברה.

8.5   **פרטים נוספים**

| | |
|---|---|
| עורכי הדין של ההנפקה: | **גולדפרב גרוס זליגמן ושות׳**<br>רחוב יגאל אלון 98, תל אביב |
| רואי החשבון של החברה: | זיו האפט (BDO), רואי חשבון - רחוב מנחם בגין 48, תל-אביב |
| המשרד הרשום של החברה באיי הבתולה: | C/o Maples Corporate Services (BVI) Limited<br>PO Box 173<br>Kingston Chambers<br>Road Town, Tortola<br>British Virgin Islands |
| כתובת החברה בישראל להמצאת כתבי בי-דין: | רחוב יגאל אלון 98, תל אביב<br>אצל משרד עורכי דין גולדפרב גרוס זליגמן ושות׳ |

# פרק 9 - בעלי עניין ונושאי משרה בכירה בחברה

### 9.1   תגמולים לבעלי עניין ולנושאי משרה בכירים בחברה

ממועד התאגדותה ועד מועד התשקיף, לא שולם כל תגמול לבעלי עניין בחברה ו/או לנושאי משרה בה בקשר עם כהונתם בחברה או בחברה בשליטתה.

### 9.2   עסקאות עם בעלי השליטה

למיטב ידיעת החברה, להלן פרטים ביחס לכל עסקה, אשר החברה ו/או תאגידים בשליטתה ו/או חברות קשורות שלה, התקשרו בה עם בעל השליטה בחברה או שלבעל השליטה בחברה עניין אישי בה, מיום 1 בינואר 2022 ועד בסמוך למועד התשקיף, או במועד מוקדם יותר אם היא עדיין בתוקף במועד התשקיף. עם כינונה של ועדת הביקורת, תקיים ועדת הביקורת את מחויבויותיה על-פי דין לרבות בחינת יישומן של עסקאות אשר אושרו עובר לפרסום תשקיף זה.

#### 9.2.1   <u>העברת זכויות לחברה כנגד הנפקת מניות</u>

החברה התקשרה בהסכם עם בעלי השליטה, דיוויד ומייקל שאבסלס (David and Michael Shabsels) וחברות בשליטתם, לפיו התחייבו בעלי השליטה והחברות כאמור, בכפוף לעמידה בתנאי הרישום של אגרות החוב של החברה המוצעות על-פי תשקיף זה ולפני הרישום למסחר שלהן בבורסה, להעביר לחברה את כלל הזכויות המועברות (כמפורט בסעיף 7.1.6 לתשקיף) בתמורה להנפקת מניות של החברה וכן לתשלום בסך של 50 מיליון דולר (אשר ישולם מתוך תמורת הנפקת אגרות החוב (סדרה א') של החברה).

העברת הזכויות המועברות לחברה תיעשה על בסיס "כפי שהוא" (as-is) ביום ההעברה.

לפרטים נוספים ראו סעיף 7.1.6 לתשקיף.

#### 9.2.2   <u>הסכם חכירה בקשר עם מחנה הקיץ Kiwi</u>

Kiwi Landco LLC, חברה בשליטת בעלי השליטה בחברה, שהינה בעלת הקרקע עליה ממוקם מחנה הקיץ Kiwi, התקשרה עם Wiki Operatingco LLC, שהינה חברת התפעול של המחנה, בהסכם לפיו תחכור חברת התפעול את הקרקע כאמור לצורך תפעול המחנה, בתמורה לסך של 1$ בשנה. תקופת החכירה הינה כ-25 שנים והיא תוארך באופן אוטומטי לתקופות נוספות אלא אם החברה תבחר שלא להאריך את תקופת החכירה כאמור.

#### 9.2.3   <u>הסכם ניהול החברה</u>

החברה הוקמה, בין היתר, לצורך הנפקת אגרות החוב של החברה המוצעות על-פי תשקיף זה בישראל, והזכויות המועברות יועברו עליה לפני רישום למסחר של אגרות החוב של החברה המוצעות על-פי תשקיף זה, כמפורט בסעיף 9.2.1 לתשקיף. לפיכך, נכון למועד התשקיף, לחברה עצמה אין מנגנון תפעול וניהול עצמאי בכל הקשור לפעילותה בתחום הפעילות,[1] המפורטת בתשקיף זה.

בכוונת החברה להתקשר, בסמוך למועד ההנפקה של אגרות החוב עם תאגיד בשליטת בעלי השליטה (בשרשור סופי) (**"חברת הניהול"**) בהסכם שירותים כולל (**"הסכם השירותים"**). במסגרת הסכם השירותים תעניק חברת הניהול לחברה שלל שירותי ניהול מטה, הכוללים בין היתר, כוח אדם פנימי, שירותי מנכ"לות, שירותי סמנכ"ל כספים, חשבות, ייעוץ השקעות, הנהלת חשבונות, שירותי משרד, תקשורת, שירותי טכנולוגיות מידע, פיקוח על ניהול הנכסים, מזכירות וכו' (**"שירותי הניהול"**). חברת הניהול תעניק לקבוצה או תגרום כי יוענקו לקבוצה, כוח אדם פנימי במידה מספקת ויועצים שהם צד

---

[1]   לפרטים אודות עובדים ונותני שירותים בחברות הבנות של החברה, ראה סעיף 7.9 לתשקיף.

ג', כפי שיידרשו לחברה מעת לעת, לרבות, בין היתר, עובדי מטה חברת הניהול. אנשים אלו יעניקו, בין היתר, שירותי מנכ"ל, שירותי סמנכ"ל כספים, הנהלת חשבונות, חשבות ושירותי משרד, תקשורת, מחשבים ומזכירות. שירותי הניהול ייגתנו על-ידי עובדים של חברת הניהול.[2] למועד התשקיף, חברות בשליטת בעלי השליטה מעניקות ו/או העניקו שירותים מסוימים לחברה, ובאמצעות הסכם השירותים, שירותים כאמור ימשיכו להינתן לקבוצה.

הסכם השירותים ייכנס לתוקף עם השלמת הסכם העברת הזכויות המועברות לחברה כמתואר בסעיף 7.1.6 לתשקיף, ויעמוד בתוקפו בכל תקופת חיי אגרות החוב של החברה. הסכם השירותים יפקע במועד שבו לא תיוותרנה אגרות חוב במחזור.

בתמורה לשירותי ניהול המטה והשירותים המקצועיים כמפורט לעיל, החברה תשלם לחברת הניהול 750 אלפי דולר בשנה.

9.2.4   מעת לעת במהלך העסקים שלהן, העמידה החברה הלוואות לבעלי השליטה (במישרין ו/או באמצעות חברות בשליטתם) ובעלי השליטה העמידו הלוואות לחברה. ליום 31 בדצמבר 2024 וליום 30 ביוני 2025, עמדה יתרת החובה של בעלי השליטה כלפי החברה על סך של כ-7,639 ו-16,347 אלפי דולר, בהתאמה. למועד פרסום התשקיף היתרה כאמור נפרעה.

9.2.5   <u>ערבויות בעלי השליטה</u>

בעלי השליטה העמידו, במישרין או בעקיפין, וכן הם עשויים להעמיד מעת לעת, ערבויות לטובת צדדים שלישיים, להבטחת התחייבויות החברה והחברות הבנות שלה על-פי הסכמים בהם הן מתקשרות, כמפורט בסעיף 7.13.2 לתשקיף. לא משולמת כל תמורה על-ידי החברה כנגד קבלת הערבויות המפורטות להלן.

9.2.6   <u>החזר הוצאות ביטוח</u>

חברה בשליטת בעלי השליטה בחברה נושאת בהוצאות הביטוח של החברה והחברות הבנות שלה, במסגרת פוליסת ביטוח כוללת. החברה מחזירה לתאגיד כאמור את הוצאות הביטוח ששולמו ללא מרווח.

9.2.7   <u>מיסוי</u>

לפרטים בדבר התחייבות החברה לבחור להיחשב כישות שקופה במקום כתאגיד (corporations) לצרכי מס בארה"ב, ראה סעיף 7.16 לתשקיף.

9.2.8   <u>התחייבות בעלות השליטה להחלת הדין הישראלי בעניינים שונים</u>

לפרטים אודות התחייבויות בעלות השליטה לטובת הנאמן ומחזיקי אגרות החוב – ראה פרק 5 לתשקיף.

9.2.9   <u>כתבי שיפוי לדירקטורים ונושאי משרה</u>

החברה הסכימה לתת לדירקטורים ולנושאי המשרה כתבי שיפוי כמקובל בשוק, על-פיהם התחייבה החברה בכפוף להוראות הדין, לשפות את נושאי המשרה בשל כל חבות או הוצאה, שתוטל עליהם או שתוציא עקב אחת או יותר מאלה : (א) פעולות ו/או נגזרת שלהן בתוקף היותם נושאי משרה ו/או מועסקים בחברה ו/או בחברות בנות ו/או קשורות של החברה, כפי שתהיינה מעת לעת ; ו-(ב) פעולות ו/או נגזרת שלהן בתוקף היותם נושאי

---

[2]   שירותי הניהול יינתנו על-ידי עובדים של חברת הניהול (כהגדרתה בפרק 7 לעיל) או השותף שלה, ממטה הקבוצה. עובדים ונושאי משרה בחברת הניהול אשר באמצעותם יועמדו השירותים לחברה לא יהיו מועסקים של החברה והתגמול שישולם להם בגין שירותיהם לא ישולם להם על-ידי החברה. יצוין כי חברת הניהול תוכל להחליט על שינוי בזהות נושאי המשרה, בכפוף לאישור דירקטוריון החברה.

משרה, עובד או שלוח של החברה בתאגיד אחר בו מחזיקה החברה בניירות ערך במישרין ו/או בעקיפין (**"תאגיד אחר"**).

ההתחייבות לשיפוי תחול בשל כל חבות או הוצאה, שהינה בת שיפוי על-פי דין ועל-פי תקנון החברה, כולל:

חבות כספית שתוטל על נושאי המשרה לטובת אדם אחר על-פי פסק דין, לרבות פסק דין שניתן בפשרה או פסק בורר שאושר בידי בית משפט, הקשורה במישרין או בעקיפין לאחד או יותר מהאירועים המפורטים בכתב השיפוי;

הוצאות התדיינות סבירות, לרבות שכר טרחת עורך דין, אשר הוצא עקב חקירה או הליך שהתנהל נגדו בידי רשות המוסמכת לנהל חקירה או הליך, ואשר הסתיים בלא הגשת כתב אישום נגד נושא המשרה ובלי שהוטלה עליו חבות כספית כחלופה להליך פלילי, או שהסתיים בלא הגשת כתב אישום נגד נושא המשרה אך בהטלת חבות כספית כחלופה להליך פלילי בעבירה שאינה דורשת הוכחת מחשבה פלילית או בקשר לעיצום כספי;

הוצאות התדיינות סבירות, לרבות שכר טרחת עורך דין, שהוציא או שחויב בהן נושא המשרה בידי בית משפט, בהליך שהוגש נגדו בידי החברה או תאגיד אחר, לפי המקרה, או בשם מי מהם או בידי אדם אחר, או באישום פלילי שממנו זוכה, או באישום פלילי שבו הורשע בעבירה שאינה דורשת הוכחת מחשבה פלילית.

הוצאות שהוצאו בקשר עם הליך שהתנהל בעניינו, לרבות הוצאות התדיינות סבירות, ובכלל זה שכר טרחת עורך דין. לעניין זה "הליך" – "הליך לפי פרק ח'3 לחוק ניירות ערך (הטלת עיצום כספי בידי רשות ניירות ערך), הליך לפי פרק ח'4 לחוק ניירות ערך (הטלת אמצעי אכיפה מנהליים בידי ועדת האכיפה המנהלית), הליך לפי פרק ט'1 לחוק ניירות ערך (הסדר להימנעות מנקיטת הליכים או הפסקת הליכים, המותנים בתנאים) והליך לפי סימן ד' (הטלת עיצום כספי בידי רשות ניירות ערך) לפרק הרביעי (סעדים, עיצום כספי ורישום חברה כחברה מפרה) בחלק התשיעי לחוק החברות.

תשלום לנפגע ההפרה כאמור בסעיף 52נד(א)(1)(א) לחוק ניירות ערך לפי פרק ח'4 לחוק ניירות ערך (הטלת אמצעי אכיפה מנהליים בידי ועדת האכיפה המנהלית).

חבות או הוצאה אחרת המותרת בשיפוי על-פי כל דין.

9.2.10    <u>מחויבות לרכישת פוליסת ביטוח של דירקטורים ונושאים משרה בחברה</u>

דירקטוריון החברה אישר/יאשר את מחויבותה של החברה ברכישת פוליסת ביטוח אחריות לדירקטורים ולנושאי משרה ("**פוליסת הביטוח**"). החל מתאריך זה, דירקטוריון החברה אישר/יאשר את הכנסתם של כל הדירקטורים ונושאי המשרה (כולל בעל השליטה בחברה ו/או קרוביהם) המכהנת ו/או שיכהנו מעת לעת, בחברה ו/או חברה בת ו/או חברה קשורה ו/או לבקשת החברה ו/או חברה בת ו/או חברה קשורה לחברה, בכל חברה אחרת כנושא משרה בה, כפי שיהיו בתוקף מעת לעת.

כמו כן, הוחלט כי החברה עשויה לרכוש פוליסות ביטוח לדירקטורים ונושאי משרה בחברה המשמשים ו/או תשמש מהעת לעת, בחברה ו/או חברה בת ו/או חברה קשורה ו/או לבקשת חברה ו/או חברה בת ו/או חברה קשורה, בחברה אחרת כנושא משרה, כפי שיהיה בתוקף מעת לעת, לתקופות ביטוח נוספות. פוליסה כאמור, אם תירכש, תהיה בתוקף לאחר פקיעת הפוליסה הקיימת או המדיניות הוארכה או חודש כאמור, לפי עניין. פוליסות הביטוח אשר עשויות להירכש, עשויות להיות בדרך של הרחבות או חידושים של המדיניות הקיימת ו/או על-ידי רכישת פוליסה אחרת.

9.3 **<u>החזקות בעלי עניין ונושאי משרה</u>**

להחזקות בעלי עניין ונושאי משרה במניות החברה למועד התשקיף – ראה סעיף 3.3 לתשקיף.

- 109 -

# פרק 10 - דוחות כספיים

10.1    בהתאם להוראות סעיף 56 לתקנות ניירות ערך (פרטי התשקיף וטיוטת תשקיף – מבנה וצורה), התשכ״ט-1969 (**"תקנות פרטי תשקיף"**), הדוחות הכספיים המפורטים להלן, מצורפים בפרק 10 זה:

10.1.1    הדוחות הכספיים המאוחדים פרופורמה של החברה ליום 31 בדצמבר 2024;

10.1.2    הדוחות הכספיים המאוחדים פרופורמה של החברה ליום 30 ביוני  2025;

10.1.3    דוחות כספיים סולו של החברה ליום 30 ביוני 2025;

10.1.4    הדוחות הכספיים המאוחדים פרופורמה של החברה ליום 30 בספטמבר 2025;

10.1.5    דוחות כספיים סולו של החברה ליום 30 בספטמבר 2025.

10.2    <u>**מכתב הסכמה של רואי החשבון המבקרים של החברה ושל החברות המועברות**</u>

מכתב הסכמה של רואי החשבון המבקרים של החברה בו הסכמתם כי נכללת הסכמתם חוות דעתם ודוחות הסקירה שלהם (לפי העניין) לכל אחד מהדוחות הכספיים המנויים בסעיף 10.1 לתשקיף, ייכללו בתשקיף זה, מובא בזאת בפרק זה להלן.

# דוח אירועים

**כמשמעו בתקנה 56א לתקנות ניירות ערך (פרטי התשקיף וטיוטת התשקיף - מבנה וצורה), התשכ"ט-1969, בדבר אירועים (כמשמעם בתקנה האמורה) מהותיים שאירעו בתקופה שלאחר מועד חתימת הדוחות הכספיים המאוחדים של החברה ליום 30 בספטמבר 2025 (קרי, ביום 18 בנובמבר 2025) ועד למועד פרסום התשקיף**

\*אין אירועים\*

| | | |
|---|---|---|
| **Randolph (Randy) Mittasch** | **Michael Shabsels** | **David Shabsels** |
| CFO | Director  and President | Director and CEO |

תאריך : 26 בנובמבר 2025

**BDO**

26 בנובמבר, 2025

לכבוד :

**הדירקטוריון של Simad Holdings Ltd.   ("החברה")**

**הנדון: מכתב הסכמה בקשר לתשקיף להשלמה ותשקיף מדף של החברה
(להלן: "התשקיף")**

הננו להודיעכם כי אנו מסכימים להכללה (לרבות בדרך של הפנייה) בתשקיף, של הדוחות שלנו המפורטים להלן :

1. דוח רואה החשבון  מיום 18 בנובמבר 2025 על הדוחות הכספיים המאוחדים פרופורמה של החברה לימים 31 בדצמבר 2024 ו-2023 ולכל אחת משלוש השנים בתקופה שהסתיימה ביום 31 בדצמבר 2024, בהתאם להוראות תקנות ניירות ערך (דוחות כספיים שנתיים), התשי"ע-2010 והנחות הפרופורמה המפורטים בדוחות הכספיים פרופורמה.

2. דוח רואה חשבון מיום 18 בנובמבר 2025 על המצב הכספי של החברה ליום 30 ביוני 2025 בהתאם להוראות תקנות ניירות ערך (דוחות כספיים שנתיים), התשי"ע-2010.

3. דוח סקירה של רואה החשבון מיום 18 בנובמבר 2025 על הדוח התמציתי המאוחד פרופורמה של החברה ליום 30 ביוני 2025 ולתקופות של שישה ושלושה חודשים שהסתיימו באותו תאריך, בהתאם לתקן חשבונאות בינלאומי IAS 34 "דיווח כספי לתקופות ביניים", בהתאם להוראות הגילוי לפי פרק ד' של תקנות ניירות ערך (דוחות תקופתיים ומיידיים, תשל"ל-1970 והנחות הפרופורמה המפורטים בדוחות הכספיים פרופורמה.

4. דוח רואה חשבון מיום 18 בנובמבר 2025 על המצב הכספי של החברה ליום 30 בספטמבר 2025 בהתאם להוראות תקנות ניירות ערך (דוחות כספיים שנתיים), התשי"ע-2010.

5. דוח סקירה של רואה החשבון מיום 18 בנובמבר 2025 על הדוח התמציתי המאוחד פרופורמה של החברה ליום 30 בספטמבר 2025 ולתקופות של תשעה ושלושה חודשים שהסתיימו באותו תאריך, בהתאם לתקן חשבונאות בינלאומי IAS 34 "דיווח כספי לתקופות ביניים", בהתאם להוראות הגילוי לפי פרק ד' של תקנות ניירות ערך (דוחות תקופתיים ומיידיים, תשל"ל-1970 והנחות הפרופורמה המפורטים בדוחות הכספיים פרופורמה.



זיו האפט
רואי חשבון

| אילת | מודיעין עילית | קרית שמונה | בני ברק | באר שבע | חיפה | ירושלים | תל אביב |
|---|---|---|---|---|---|---|---|
| 08-6339911 | 08-9744111 | 077-5054906 | 073-7145300 | 077-7784100 | 04-8680600 | 02-6546200 | 03-6386868 |

**משרד ראשי:** בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 **דוא"ל:** bdo@bdo.co.il בקרו באתר שלנו: www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

# SIMAD Holdings, Ltd

## דוחות כספיים מאוחדים פרופורמה ליום 31 בדצמבר 2024

# **SIMAD Holdings, Ltd**

### **דוחות כספיים מאוחדים פרופורמה ליום 31 בדצמבר 2024**

### **תוכן העניינים**

| ע מ ו ד | |
|---|---|
| 1-2 | דוח רואה החשבון המבקר |
| 3 | דוחות מאוחדים פרופורמה על המצב הכספי |
| 4 | דוחות מאוחדים פרופורמה על הרווח או הפסד ורווח כולל אחר |
| 5-6 | דוחות מאוחדים פרופורמה על השינויים בהון |
| 7 | דוחות מאוחדים פרופורמה על תזרימי המזומנים |
| 8-25 | ביאורים לדוחות הכספיים המאוחדים פרופורמה |



**דוח רואה החשבון המבקר לבעלי המניות של SIMAD Holdings, Ltd**

ביקרנו את הדוחות המאוחדים פרופורמה על המצב הכספי המצורפים של SIMAD Holdings, Ltd (להלן: "**החברה**") לימים 31 בדצמבר 2024 ו-2023 ואת הדוחות המאוחדים פרופורמה על הרווח או הפסד ורווח כולל אחר, השינויים בהון ותזרימי המזומנים לכל אחת משלוש השנים בתקופה שהסתיימה ביום 31 בדצמבר 2024. דוחות כספיים אלה הינם באחריות הדירקטוריון וההנהלה של החברה. אחריותנו היא לחוות דעה על דוחות כספיים אלה בהתבסס על ביקורתנו.

ערכנו את ביקורתנו בהתאם לתקני ביקורת מקובלים בישראל, לרבות תקנים שנקבעו בתקנות רואי חשבון (דרך פעולתו של רואה חשבון), התשל"ג-1973. על-פי תקנים אלה נדרש מאיתנו לתכנן את הביקורת ולבצעה במטרה להשיג מידה סבירה של ביטחון שאין בדוחות הכספיים הצגה מוטעית מהותית. ביקורת כוללת בדיקה מדגמית של ראיות התומכות בסכומים ובמידע שבדוחות הכספיים . ביקורת כוללת גם בחינה של כללי החשבונאות שיושמו ושל האומדנים המשמעותיים שנעשו על ידי הדירקטוריון וההנהלה של החברה וכן הערכת נאותות ההצגה בדוחות הכספיים בכללותה. אנו סבורים שביקורתנו מספקת בסיס נאות לחוות דעתנו.

לדעתנו, הדוחות הכספיים המאוחדים פרופורמה הנ"ל משקפים באופן נאות, מכל הבחינות המהותיות, את המצב הכספי של החברה והחברות המאוחדות שלה לימים 31 בדצמבר 2024 ו-2023 ואת תוצאות פעולותיהן, השינויים בהון ותזרימי המזומנים שלהן לכל אחת משלוש השנים בתקופה שהסתיימה ביום 31 בדצמבר 2024 בהתאם לתקני דיווח כספי בינלאומיים חשבונאיים (accounting standards IFRS), הוראות תקנות ניירות ערך (דוחות כספיים שנתיים), התש"ע-2010 והנחות הפרופורמה המפורטות בדוחות הכספיים פרופורמה.

פסקת הדגש ענין (הפנית תשומת לב)

מבלי לסייג את חוות דעתנו הנ"ל, אנו מפנים את תשומת הלב לאמור בבאור 1.א לדוחות הכספיים פרופורמה בדבר שינוי המבנה בחברה במסגרתו יועברו זכויות בתאגידים כנגד הנפקת מניות של החברה ותמורת מזומן בסך 50 מיליון דולר אשר תקטין את הון החברה בסכום זה.

**עניני מפתח בביקורת**

עניני מפתח בביקורת המפורטים להלן הם העניינים אשר תוקשרו, או שנדרש היה לתקשרם, לדירקטוריון החברה ואשר, לפי שיקול דעתנו המקצועי, היו משמעותיים ביותר בביקורת הדוחות הכספיים המאוחדים לתקופה השוטפת. עניינים אלה כוללים, בין היתר, כל ענין אשר: (1) מתייחס, או עשוי להתייחס, לסעיפים או לגילויים מהותיים בדוחות הכספיים וכן ( 2) שיקול דעתנו לגביו היה מאתגר, סובייקטיבי או מורכב במיוחד. לעניינים אלה ניתן מענה במסגרת ביקורתנו וגיבוש חוות דעתנו על הדוחות הכספיים המאוחדים בכללותם. התקשור של עניינים אלה להלן אינו משנה את חוות דעתנו על הדוחות הכספיים המאוחדים בכללותם ואין אנו נותנים באמצעותו חוות דעת נפרדת על עניינים אלה או על הסעיפים או הגילויים שאליהם הם מתייחסים

**הערכה מחדש של רכוש קבוע**

החברה עוסקת בהפעלה של מחנות קיץ, הממוקמים בשטחי נדל"ן שבבעלות החברה ומוצגים כרכוש קבוע. יתרת הרכוש הקבוע ליום 31 בדצמבר 2024 הינה 428,700 אלפי דולר. הערכה מחדש של הרכוש הקבוע לשנה שהסתיימה ביום 31 בדצמבר 2024 הסתכמה ל- 32,195 אלפי דולר.

כפי שמתואר בביאור 2.יב ו- 4 לדוחות הכספיים המאוחדים פרופורמה הרכוש הקבוע של החברה כולל מחנות קיץ ומוכר לראשונה לפי עלות. בתקופות שלאחר ההכרה לראשונה, מיישמת החברה את מודל הערכה מחדש. במועד ההערכה מחדש, הערך בספרים ברוטו הותאם באופן שהוא עקבי עם ההערכה מחדש של הנכס. הפחת שנצבר במועד ההערכה מחדש הותאם על מנת שיהיה שווה להפרש בין הערך בספרים ברוטו של הנכס לבין ערכו בספרים. עלייה בערך בספרים של נכס כתוצאה מהערכה מחדש מוכרת ברווח כולל אחר ונצברת בהון כקרן הערכה מחדש.

| אילת | מודיעין עילית | קרית שמונה | בני ברק | רחובות | באר שבע | חיפה | ירושלים | תל אביב |
|---|---|---|---|---|---|---|---|---|
| 08-6339911 | 08-9744111 | 077-8983322 | 073-7145300 | 03-6386788 | 077-7784100 | 04-8680600 | 02-6546200 | 03-6386868 |

**משרד ראשי:** בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 **דואל:** bdo@bdo.co.il בקרו באתר שלנו: www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms



**דוח רואה החשבון המבקר לבעלי המניות של SIMAD Holdings, Ltd (המשך)**

בהערכת השווי של הרכוש קבוע משתמשת החברה ב"שיטת הוון תזרימי המזומנים" אשר כוללת שימוש באומדנים של תזרימי מזומנים מייצגים מהנכס מהוון בשיעור היוון מתאים לתזרימי מזומנים אלה.

במדידת השווי ההוגן של הרכוש הקבוע נעשה שימוש, בין היתר, בהנחות באשר להכנסות מהפעלה ועלויות תפעול. ההנחות מביאות בחשבון, בין היתר, נתונים (היסטוריים, עדכניים ותחזיות) של הנכס המוערך וכן נתוני נכסים אחרים בעלי אופי ו/או מיקום הדומים לנכס המוערך. כמו כן הנחות באשר לשיעור היוון המתאים לכל נכס ונכס.

שינוי בהנחות המשמשות במדידת הרכשו הקבוע יכול לגרום לשינוי מהותי בשווי ההוגן של הרכוש הקבוע ולפיכך לשינוי מהותי בדוח על המצב הכספי של החברה ובתוצאות פעולותיה.

האומדנים נעשים על ידי מעריכי שווי בלתי תלויים בחברה בהתבסס על ניסיונם והיכרותם עם הנכס המוערך ונכסים דומים, בהתחשב בנתוני שוק רלוונטיים וכן בהסתמך על נתונים שמתקבלים מגורמים שונים בחברה.

תהליך זה של קביעת השווי ההוגן של הרכוש הקבוע נתון לאי וודאות משמעותית, להערכות סובייקטיביות ורגיש לשינויים בהנחות המשמשות ביישום השיטה. כמו כן, תהליך זה כרוך בהפעלת שיקול דעת משמעותי של ההנהלה.

כפועל יוצא מכל האמור לעיל, שיקול הדעת של המבקר בביקורת סעיף השווי ההוגן של הרכוש הקבוע היה מאתגר, סובייקטיבי ומורכב במיוחד. לאור זאת ולאור העובדה כי הרכוש הקבוע הינו סעיף מהותי בדוחות הכספיים של החברה, זיהינו את האומדנים והנחות ההנהלה המשמשים להערכת השווי ההוגן של הרכוש הקבוע כעניין מפתח בביקורת.

**נהלי הביקורת שבוצעו כמענה לעניין המפתח בביקורת**

(1)    השגנו הבנה לגבי התהליכים והנהלים הקיימים בחברה בהתייחס להערכות שווי של הרכוש הקבוע, ביקרנו את התכנון, היישום של בקרות מסוימות הקשורות לתהליכים אלה.

(2)    בחרנו מדגם של נכסים על בסיס פרמטרים כמותיים ואיכותיים ובצענו, בין היתר, את הנהלים הבאים:

-    קבלנו הערכות שווי ובדקנו שתוצאותיהן השתקפו באופן נאות בדוחות הכספיים של החברה לרבות הגילוי שניתן בדוחות הכספיים לסעיף הרכוש הקבוע

-    בדקנו כי מעריך השווי אובייקטיבי ובעל כישורים המתאימים לביצוע עבודה נשוא הערכות השווי ואתגרנו אותו לגבי הנתונים וההנחות ששימשו בבסיס הערכות השווי

-    בחנו את בסיסי הנתונים שהעבירה החברה למעריך השווי ושבהם נעשה שימוש לצורך אומדן תזרימי המזומנים והשווינו אותם לנתונים החברה ששימשו לצורך הכנת הדוחות הכספיים ולמסמכים מבססים אחרים.

-    בצענו בדיקות אנליטיות ובדיקות מבססות אחרות לבחינת סבירות הנתונים וההנחות בהערכת השווי ובכלל זה להכנסות ולהוצאות התפעול והשקעות נדרשות ומתוכננות לגבי הרכוש הקבוע.

-    נעזרנו במעריך שווי מטעמנו לבחינת סבירות הערכת השווי בכללותה ונאותות המתודולוגיה ונאותות האומדנים ששימשו את החברה, בדגש על שיעורי ההיוון הרלוונטיים לנכס בהתאם למאפייניו.

תל אביב, 18 בנובמבר, 2025

זיו האפט

רואי חשבון

- 2 -

אילת 08-6339911 | מודיעין עילית 08-9744111 | קרית שמונה 077-8983322 | בני ברק 073-7145300 | רחובות 03-6386788 | באר שבע 077-7784100 | חיפה 04-8680600 | ירושלים 02-6546200 | תל אביב 03-6386868

**משרד ראשי:** בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 **דואל:** bdo@bdo.co.il **בקרו באתר שלנו:** www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

**SIMAD Holdings, Ltd**

דוחות מאוחדים פרופורמה על המצב הכספי (באלפי דולר)

| 2023 | 2024 | ביאור | |
|---|---|---|---|
| | **31 בדצמבר** | | |
| | | | **נכסים** |
| | | | **נכסים שוטפים:** |
| 9,531 | 3,663 | | מזומנים ושווי מזומנים |
| 988 | 664 | | חייבים ויתרות חובה |
| 4,506 | 7,639 | 12 | צדדים קשורים |
| 14,926 | 11,966 | | סה"כ נכסים שוטפים |
| | | | |
| | | | **נכסים לא שוטפים:** |
| 17,038 | 17,173 | 3 | השקעות המטופלות לפי שיטת השווי המאזני |
| 401,735 | 428,700 | 4 | רכוש קבוע |
| 418,773 | 445,873 | | סה"כ נכסים לא שוטפים |
| | | | |
| 433,699 | 457,839 | | **סה"כ נכסים:** |
| | | | |
| | | | **התחייבויות והון** |
| | | | **התחייבויות שוטפות:** |
| 8,984 | 9,016 | 5 | הלוואות מתאגידים בנקאיים ומאחרים |
| 3,472 | 4,134 | 6 | זכאים ויתרות זכות |
| 59,665 | 62,790 | 7 | מקדמות מלקוחות |
| 72,121 | 75,940 | | סה"כ התחייבויות שוטפות |
| | | | |
| | | | **התחייבויות לא שוטפות:** |
| 184,390 | 176,585 | 5 | הלוואות מתאגידים בנקאיים ומאחרים |
| 4,365 | 4,765 | 6 | זכאים ויתרות זכות |
| 188,755 | 181,350 | | סה"כ התחייבויות לא שוטפות |
| | | | |
| 260,876 | 257,290 | | **סה"כ התחייבויות:** |
| | | | |
| | | 8 | **הון:** |
| | | | **הון המיוחס לבעלי מניות החברה האם:** |
| 246,835 | 275,558 | | הון מניות נפרע וקרנות הון |
| (107,371) | (111,501) | | יתרת הפסד |
| 139,464 | 164,057 | | סה"כ הון המיוחס לבעלי מניות החברה האם (ראה ביאור 1.א) |
| 33,359 | 36,492 | | **הון המיוחס לבעלי זכויות שאינן מקנות שליטה** |
| 172,823 | 200,549 | | סה"כ הון |
| | | | |
| 433,699 | 457,839 | | **סה"כ התחייבויות והון** |

18 בנובמבר, 2025 — תאריך אישור הדוחות הכספיים

| Randy Mittasch | David Shabsels | Michael Shabsels |
|---|---|---|
| CFO | CEO | Chairman |

- 3 -

**SIMAD Holdings Ltd**

**דוחות מאוחדים פרופורמה על הרווח או הפסד ורווח כולל אחר (באלפי דולר)**

| | לשנה שהסתיימה ביום | | ביאור | |
|---|---|---|---|---|
| **31.12.2022** | **31.12.2023** | **31.12.2024** | | |
| 132,656 | 156,437 | 159,355 | 9 א' | הכנסות מהפעלה |
| (110,311) | (128,498) | (131,761) | 9 ב' | עלות ההפעלה |
| 22,345 | 27,939 | 27,594 | | **רווח גולמי** |
| (2,307) | (2,695) | (2,820) | | הוצאות הנהלה וכלליות |
| (3,488) | (3,942) | (4,307) | | הוצאות מכירה ושיווק |
| 80 | 506 | 58 | | הכנסות (הוצאות) אחרות, נטו |
| 603 | 1,220 | 1,522 | 3 | חלק החברה ברווחי חברות המטופלות בשיטת השווי המאזני, נטו |
| 17,233 | 23,028 | 22,047 | | **רווח תפעולי** |
| (7,159) | (11,767) | (11,960) | 10 | הוצאות מימון |
| 3,020 | 198 | 413 | | הכנסות מימון |
| (4,139) | (11,569) | (11,547) | | סה"כ הוצאות מימון, נטו |
| 13,094 | 11,459 | 10,500 | | **רווח לשנה** |
| | | | | **רווח כולל אחר:** |
| | | | | פריטים שלא יסווגו מחדש לרווח או הפסד: |
| 4,781 | 29,052 | 32,195 | 4 | הערכה מחדש בגין שערוך רכוש קבוע |
| 750 | 672 | 334 | | חלק הקבוצה ברווח כולל אחר, נטו של חברות המטופלות לפי שיטת השווי המאזני |
| 5,531 | 29,724 | 32,529 | | סה"כ רווח כולל אחר |
| 18,625 | 41,183 | 43,029 | | סה"כ רווח כולל לשנה |
| | | | | רווח (הפסד) לתקופה המיוחס ל: |
| 11,471 | 9,871 | 8,806 | | בעלי מניות החברה האם |
| 1,623 | 1,588 | 1,694 | | זכויות שאינן מקנות שליטה |
| 13,094 | 11,459 | 10,500 | | |
| | | | | סה"כ רווח (הפסד) כולל המיוחס ל: |
| 15,844 | 35,803 | 37,448 | | בעלי מניות החברה האם |
| 2,781 | 5,380 | 5,581 | | זכויות שאינן מקנות שליטה |
| 18,625 | 41,183 | 43,029 | | |

- 4 -

<div dir="rtl">

**SIMAD Holdings, Ltd**

**דוחות מאוחדים פרופורמה על השינויים בהון (באלפי דולר)**

**לשנה שהסתיימה ביום 31.12.2024**

| | הון המניות הנפרע ופרמיה על מניות | קרן הערכה מחדש של רכוש קבוע | קרנות הון בגין עסקה עם בעל שליטה | יתרת הפסד | סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל |
|---|---|---|---|---|---|---|---|
| **יתרה ליום 1.1.2024** | 1,633 | 244,555 | 647 | (107,371) | 139,464 | 33,359 | 172,823 |
| רווח לשנה | - | - | - | 8,806 | 8,806 | 1,694 | 10,500 |
| רווח כולל אחר | - | 28,642 | - | - | 28,642 | 3,887 | 32,529 |
| סך-הכל רווח כולל לשנה | - | 28,642 | - | 8,806 | 37,448 | 5,581 | 43,029 |
| חלוקות לבעלים ולזכויות שאינן מקנות שליטה | - | - | - | (12,936) | (12,936) | (2,497) | (15,433) |
| השקעות בעלים וזכויות שאינן מקנות שליטה | 81 | - | - | - | 81 | 49 | 130 |
| **יתרה ליום 31.12.2024** | 1,714 | 273,197 | 647 | (111,501) | 164,057 | 36,492 | 200,549 |

**לשנה שהסתיימה ביום 31.12.2023**

| | הון המניות הנפרע ופרמיה על מניות | קרן הערכה מחדש של רכוש קבוע | קרנות הון בגין עסקה עם בעל שליטה | יתרת הפסד | סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל |
|---|---|---|---|---|---|---|---|
| **יתרה ליום 1.1.2023** | 604 | 218,623 | - | (110,103) | 109,124 | 31,719 | 140,843 |
| רווח לשנה | - | - | - | 9,871 | 9,871 | 1,588 | 11,459 |
| רווח כולל אחר | - | 25,932 | - | - | 25,932 | 3,792 | 29,724 |
| סך-הכל רווח כולל לשנה | - | 25,932 | - | 9,871 | 35,803 | 5,380 | 41,183 |
| רכישת זכויות שאינן מקנות שליטה | - | - | 647 | - | 647 | (1,647) | (1,000) |
| חלוקות לבעלים ולזכויות שאינן מקנות שליטה | - | - | - | (7,139) | (7,139) | (2,093) | (9,232) |
| השקעות בעלים וזכויות שאינן מקנות שליטה | 1,029 | - | - | - | 1,029 | - | 1,029 |
| **יתרה ליום 31.12.2023** | 1,633 | 244,555 | 647 | (107,371) | 139,464 | 33,359 | 172,823 |

</div>

**SIMAD Holdings, Ltd**

**דוחות מאוחדים פרופורמה על השינויים בהון (באלפי דולר)**

**לשנה שהסתיימה ביום 31.12.2022**

| | סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל | יתרת הפסד | קרנות הון בגין עסקה עם בעל שליטה | קרן הערכה מחדש של רכוש קבוע | הון המניות הנפרע ופרמיה על מניות |
|---|---|---|---|---|---|---|---|
| | | | הון המיוחס לבעלי מניות החברה האם | | | | |
| **יתרה ליום 1.1.2022** | **133,309** | 31,585 | 101,724 | (112,526) | - | 214,250 | - |
| רווח לשנה | 13,094 | 1,623 | 11,471 | 11,471 | - | - | - |
| רווח כולל אחר | 5,531 | 1,158 | 4,373 | - | - | 4,373 | - |
| סך-הכל רווח כולל לשנה | 18,625 | 2,781 | 15,844 | 11,471 | - | 4,373 | - |
| חלוקות לבעלים ולזכויות שאינן מקנות שליטה | (11,701) | (2,653) | (9,048) | (9,048) | - | - | - |
| השקעות בעלים וזכויות שאינן מקנות שליטה | 610 | 6 | 604 | - | - | - | 604 |
| **יתרה ליום 31.12.2022** | 140,843 | 31,719 | 109,124 | (110,103) | - | 218,623 | 604 |

**SIMAD Holdings Ltd**

**דוחות מאוחדים פרופורמה על תזרימי המזומנים (באלפי דולר)**

| לשנה שהסתיימה ביום | | | |
|---|---|---|---|
| 31.12.2022 | 31.12.2023 | 31.12.2024 | |
| | | | **תזרימי מזומנים מפעילות שוטפת:** |
| 13,094 | 11,459 | 10,500 | רווח לתקופה |
| | | | התאמות בגין: |
| (603) | (1,220) | (1,522) | חלק החברה ברווחי חברות המטופלות לפי שיטת השווי המאזני, נטו |
| 11,746 | 13,695 | 15,187 | פחת |
| 4,139 | 11,569 | 11,547 | הוצאות מימון ,נטו |
| | | | שינויים בנכסים ובהתחייבויות: |
| 18,630 | 64 | 3,125 | עלייה במקדמות מלקוחות |
| (420) | 366 | 225 | ירידה (עלייה) בחייבים ויתרות חובה |
| 3,246 | (300) | 1,063 | עלייה (ירידה) בזכאים ויתרות זכות |
| 49,832 | 35,633 | 40,125 | מזומנים מפעילות שוטפת |
| 1,547 | 1,373 | 1,720 | דיבידנד שהתקבל מחברות כלולות (ראה ביאור 3) |
| 51,379 | 37,006 | 41,845 | **מזומנים נטו מפעילות שוטפת** |
| | | | |
| | | | **תזרימי מזומנים מפעילות השקעה:** |
| (58,936) | (11,308) | (9,957) | רכישות והשקעות ברכוש קבוע |
| (58,936) | (11,308) | (9,957) | **מזומנים נטו מפעילות השקעה** |
| | | | |
| | | | **תזרימי מזומנים מפעילות מימון:** |
| 136,974 | 19,033 | 500 | קבלת הלוואות לזמן ארוך מתאגידים בנקאיים ומאחרים |
| (72,384) | (10,666) | (8,454) | פירעון הלוואות לזמן ארוך מתאגידים בנקאיים ומאחרים |
| 604 | 1,029 | 81 | השקעות בעלים |
| (9,048) | (7,139) | (12,936) | חלוקות לבעלים |
| 6 | - | 49 | השקעות זכויות שאינן מקנות שליטה |
| (2,653) | (2,093) | (2,497) | חלוקות לזכויות שאינן מקנות שליטה |
| (37,441) | (21,030) | (3,133) | צדדים קשורים, נטו |
| (6,750) | (11,404) | (11,366) | ריבית ששולמה |
| - | (1,000) | - | רכישת זכויות שאינן מקנות שליטה |
| 9,308 | (33,270) | (37,756) | **מזומנים נטו מפעילות מימון** |
| | | | |
| 1,751 | (7,572) | (5,868) | **עלייה (ירידה) במזומנים ושווי מזומנים** |
| | | | |
| 15,352 | 17,103 | 9,531 | **יתרת מזומנים ושווי מזומנים לתחילת השנה** |
| | | | |
| 17,103 | 9,531 | 3,663 | **יתרת מזומנים ושווי מזומנים לסוף השנה** |

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 1 - כללי:**

**א.    כללי:**

SIMAD Holdings Ltd (להלן: "החברה") התאגדה ביום 28 במאי 2025, כחברה פרטית המאוגדת לפי דיני איי הבתולה הבריטיים על פי BVI Business Companies Act, 2004, ללא נכסים, התחייבויות ופעילות כלשהם (למעט הון מניות). החברה הוקמה לצורך גיוס הון, באמצעות הנפקת אגרות חוב שאינן ניתנות להמרה למניות, בבורסה לניירות ערך בתל-אביב. בעלי השליטה בחברה הינם האחים מר Michael Shabsels ומר David Shabsels (להלן: "בעלי השליטה").

שינוי מבנה:

בעלי השליטה התחייבו, כי קודם לרישום למסחר בבורסה של אגרות החוב המוצעות לציבור, הם יעבירו לחברה את זכויותיהם בתאגידים, המחזיקים בשרשור בזכויות ב-30 נכסי נדל"ן בארה"ב (להלן – "הישויות המועברות"), כנגד הנפקת מניות של החברה ותמורת מזומן בסך של 50 מיליון דולר, אשר יקטין את הון החברה בסכום זה. תשלום המזומן כאמור יתבצע מתוך תמורת הנפקת אגרות החוב (סדרה א') של החברה (להלן: "העברה" או "רכישה"). קודם למועד ההעברה הוחזקו הישויות המועברות על ידי בעלי השליטה.

למועד הדוח הכספי, עיקר פעילות החברה והישויות המועברות הינה תפעול מחנות קיץ בארה"ב, הממוקמים בשטחי נדל"ן שבבעלות החברה.

הרכישה כאמור מותנית ותלויה בשלושה גורמים עיקריים:

1. השלמת הנפקת אגרות חוב.

2. אישורים של מספר מוסדות פיננסיים, המחזיקים בביטחונות על הנכסים המוחזקים על ידי הישויות המועברות.

3. בסדרה של הסכמים אשר טרם נחתמו, אשר במהותם הסכמים להעברת זכויות בעל השליטה בחברות הנכס לחברה.

ההסכמים והאישורים הנדרשים יתקבלו לפני מועד הרכישה.

מכיוון שהישויות המועברות נשלטות על ידי אותם בעלי השליטה בחברה לפני הרכישה ולאחריה, הרכישה אינה מטופלת בהתאם לתקן דיווח כספי בינלאומי IFRS3.

החברה טיפלה ברכישה בשיטת איחוד העניין (pooling of interests). כמו כן החברה ערכה דוחות כספיים מאוחדים פרופורמה על מנת לשקף בהם את הרכישה כאילו היא התרחשה בתחילת התקופה המוקדמת ביותר המוצגת בדוחות הכספיים (1 בינואר 2022). לפיכך, הדוחות הכספיים המאוחדים פרופורמה:

-    משקפים את המצב הכספי, את תוצאות הפעילות ואת תזרימי המזומנים של החברה ושל החברות המועברות, במאוחד.

-    נכסים והתחייבויות של הישויות המועברות הוכרו ליום 1 בינואר 2022 או למועד רכישתם, לפי המאוחר,  לפי ערכם בספרים של בעלי השליטה בחברה באותו מועד.

-

העברת הזכויות המועברות לחברה תהיה על בסיס "AS IS" במועד ההעברה, והחברה לא תהיה זכאית לכל שיפוי מהגופים המעבירים ביחס לזכויות המועברות. מובהר כי לאחר השלמת העברת הזכויות המועברות לחברה, לא יחולו על החברה מגבלות על מכירת הזכויות המועברות לחברה ו/או על מכירת הנכסים שבבעלותן, למעט קבלת אישורי המלווים ביחס לכל מכירה ו/או העברה.

- 8 -

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 1 - כללי (המשך):**

**ב.   הגדרות**

בדוחות כספיים אלה –

| | | |
|---|---|---|
| הקבוצה | - | החברה והחברות המוחזקות שלה. |
| חברות בנות | - | חברות אשר לחברה שליטה בהן (כהגדרתה ב-IFRS 10) ואשר דוחותיהן מאוחדים עם דוחות החברה. |
| צדדים קשורים | - | כהגדרתם ב-IAS 24. |
| חברות מוחזקות | - | חברות בנות. |
| בעלי עניין | - | כהגדרתם בתקנות ניירות ערך (דוחות כספיים שנתיים), התש"ע-2010. |
| דולר | - | דולר ארה"ב. |

**ג.   גירעון בהון חוזר**

ליום 31 בדצמבר 2024 לחברה גירעון בהון חוזר בסך של כ- 64 מיליון דולר.

עיקר הגירעון נובע ממקדמות שהתקבלו מלקוחות בסך של כ- 62.8 מיליון דולר עבור רישום למחנות קיץ בארה"ב.

להערכת החברה יש ביכולתה לעמוד בפירעון התחייבויותיה בעתיד הנראה לעין, בין היתר באמצעות תזרימי מזומנים חיובים מפעילות שוטפת ופעולות אחרות ככל וידרשו שיאפשרו לה לעמוד בהתחייבויותיה השוטפות ולממן את פעילותה.

- 9 -

<div dir="rtl">

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 2 - עיקרי המדיניות החשבונאית:**

**א.  ציות לתקני הדיווח הכספי הבינלאומיים:**

הדוחות הכספיים המאוחדים פרופורמה מצייתים להוראות תקני הדיווח הכספי הבינלאומיים החשבונאיים ( IFRS
accounting standards).

**ב.  עקרונות עריכת הדוחות הכספיים:**

הדוחות הכספיים השנתיים המאוחדים פרופורמה כוללים את הגילוי הנוסף הנדרש לפי תקנות ניירות ערך (דוחות כספיים
שנתיים), התש"ע-2010.

המחזור התפעולי של החברה הינו עד 12 חודשים.

המדיניות החשבונאית יושמה באופן עקבי בכל תקופות הדיווח המוצגות בדוחות הכספיים פרופורמה.

הדוחות הכספיים נערכו תוך יישום עיקרון העלות, למעט רכוש קבוע המשמש כמחנות קיץ אשר נמדדים לפי מודל הערכה
מחדש. מידע לגבי שיקולי דעת (מלבד אלה שכרוכים באומדנים המתוארים בביאור 2(ג) להלן) שהופעלו על ידי ההנהלה
בתהליך היישום של המדיניות החשבונאית ושיש להם השפעה משמעותית ביותר על הסכומים שהוכרו בדוחות הכספיים
מפורטים בביאור 4.

**ג.  הנחות מפתח בהסתייעות באומדנים מהותיים ושיקולי דעת משמעותיים:**

הכנת הדוחות הכספיים של החברה בהתאם ל-IFRS דורשת מהההנהלה לערוך אומדנים ולהניח הנחות המשפיעים על
הסכומים המוצגים בדוחות הכספיים. אומדנים אלו מצריכים לעתים שיקול דעת בסביבה של אי ודאות והינם בעלי השפעה
מהותית על הצגת הנתונים בדוחות הכספיים.

להלן תיאור של הנחות המפתח בהסתייעות באומדנים החשבונאיים המהותיים המשמשים בהכנת הדוחות הכספיים של
החברה, אשר בעת גיבושם נדרשה הנהלת החברה להניח הנחות באשר לנסיבות ולאירועים הכרוכים באי ודאות משמעותית.
בשיקול דעתה בקביעת האומדנים מתבססת הנהלת החברה על ניסיון העבר, עובדות שונות, גורמים חיצוניים והנחות סבירות
בהתאם לנסיבות המתאימות לכל אומדן. התוצאות בפועל עשויות להיות שונות מאומדני ההנהלה.

**רכוש קבוע** - לסוף תקופת הדיווח מעריכה החברה את שווים ההוגן של מחנות הקיץ המהווים רכוש קבוע על ידי שמאי.
הגישה המקובלת להערכת שווי הרכוש קבוע הינה "גישת היוון ההכנסות".  שיעור ההיוון הראוי נקבע בהתחשב בגורמי
הסיכון הספציפיים של הנכס המוערך. הנהלת החברה בוחנת את האומדנים בסוף כל תקופות דיווח. לפרטים נוספים בדבר
טכניקות ההערכה והאומדנים שבוצעו במדידת השווי ההוגן הרכוש הקבוע - ראה ביאור 4.

**אורך חיים שימושי של רכוש קבוע** - אורך חיים שימושי מבוסס על הערכות הנהלה לתקופה שבה הנכסים יפיקו הכנסות,
אשר נבחנות מדי סוף שנה לצורך בחינת נאותות אומדנים אלה. שינויים בהערכות אלו עשויים להוביל לשינויים מהותיים
בהוצאות הפחת הנזקפות לרווח או הפסד, (לרבות אלו הנכללות במסגרת תוצאות הפעולות בגין חברה כלולה) אשר נמדדות
בערך משוערך כתוצאה ממדידת הרכוש הקבוע בסכומים משוערכים.

</div>

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 2 - עיקרי המדיניות החשבונאית (המשך):**

**ד.   שווי הוגן:**

**1.   מדידת שווי הוגן:**

החברה מודדת שווי הוגן כמחיר שהיה מתקבל במכירת נכס או המחיר שהיה משולם להעברת התחייבות בעסקה רגילה בין משתתפים בשוק במועד המדידה.

כאשר מחיר לנכס זהה או להתחייבות זהה אינו ניתן לצפייה (כלומר, אין מחיר מצוטט בשוק פעיל), החברה מודדת שווי הוגן תוך שימוש בטכניקת הערכה אחרת שמתאימה לנסיבות ושקיים עבורן מספיק נתונים שניתנים להשגה כדי למדוד שווי הוגן, תוך שימוש מקסימלי בנתונים רלוונטיים שניתנים לצפייה ומזעור השימוש בנתונים שאינם ניתנים לצפייה.

החברה מודדת שווי הוגן תחת ההנחה שהעסקה למכירת הנכס או העברת ההתחייבות מתרחשת בשוק העיקרי של הנכס או של ההתחייבות שלחברה יש גישה אליו; או בהיעדר שוק עיקרי, בשוק הכדאי ביותר עבור הנכס או ההתחייבות שלחברה יש גישה אליו.

במדידת שווי הוגן של נכס לא פיננסי, החברה מביאה בחשבון את היכולת של משתתף בשוק להפיק הטבות כלכליות באמצעות הנכס בשימוש המיטבי שלו או על ידי מכירתו למשתתף אחר בשוק שישתמש בנכס בשימוש המיטבי שלו.

**2.   מידרג השווי ההוגן:**

לצורכי גילוי, החברה מסווגת מדידות שווי הוגן לאחת מהרמות במידרג השווי ההוגן המשקף את מקור הנתונים ששימשו למדידת השווי ההוגן:

רמה 1 - מחירים מצוטטים (לא מתואמים) בשווקים פעילים עבור נכסים זהים או התחייבויות זהות.

רמה 2 - נתונים שאינם מחירים מצוטטים הכלולים ברמה 1, אשר ניתנים לצפייה לגבי הנכס או ההתחייבות, במישרין או בעקיפין.

רמה 3 - נתונים שאינם ניתנים לצפייה עבור הנכס או ההתחייבות.

כאשר הנתונים ששימשו למדידת שווי הוגן מסווגים לרמות שונות במידרג השווי ההוגן, החברה מסווגת את מדידת השווי ההוגן בכללותה לרמה הנמוכה ביותר של הנתון שהוא משמעותי למדידה בכללותה. החברה מפעילה שיקול דעת בהערכת המשמעותיות של נתון מסוים למדידה בכללותה תוך הבאה בחשבון של גורמים ספציפיים לנכס או להתחייבות.

**ה.   דוחות כספיים מאוחדים:**

**1.   חברות בנות:**

כאשר החברה חשופה, או בעלת זכויות, לתשואות משתנות ממעורבותה בישות מושקעת ויש לה את היכולת להשפיע על תשואות אלה באמצעות כוח ההשפעה שלה, החברה שולטת באותה ישות אשר מסווגת כחברה בת. החברה מעריכה מחדש את שליטתה בחברה בת כאשר העובדות והנסיבות משתנות.

הדוחות הכספיים המאוחדים מציגים את הדוחות הכספיים של החברה והחברות הבנות שלה כדוחות כספיים של ישות כלכלית אחת החל מהמועד שבו מושגת שליטה ועד למועד שבו החברה מאבדת שליטה. לפיכך, יתרות הדדיות, הכנסות והוצאות, רווחים והפסדים אשר הוכרו בנכסים ותזרימי מזומנים, הנובעים מעסקאות תוך קבוצתיות בין הישויות של הקבוצה, בוטלו במלואם. הדוחות הכספיים של החברות הבנות הוכנו תוך שימוש במדיניות חשבונאית אחידה עם החברה לגבי עסקאות ואירועים דומים בנסיבות דומות.

- 11 -

**<u>SIMAD Holdings Ltd</u>**

**<u>ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)</u>**

**ביאור 2 - עיקרי המדיניות החשבונאית (המשך):**

ה.    **דוחות כספיים מאוחדים (המשך):**

2.  **זכויות שאינן מקנות שליטה:**

זכויות שאינן מקנות שליטה מייצגות את החלק בהון החברות הבנות שאינו ניתן לייחוס, במישרין או בעקיפין, לחברה.

ו.    **צירופי עסקים:**

כאשר הקבוצה משיגה לראשונה שליטה בעסק אחד או יותר (להלן: "הנרכש"), צירוף העסקים מטופל בהתאם לשיטת הרכישה.

ז.    **השקעות המטופלות לפי שיטת השווי המאזני**

השקעות הקבוצה בחברות כלולות ועסקאות משותפות מטופלות לפי שיטת השווי המאזני.

ח.    **מטבע הפעילות, מטבע ההצגה ומטבע חוץ:**

מטבע הפעילות של החברה ושל החברות הבנות שלה וכן מטבע ההצגה של הדוחות הכספיים הינו הדולר.

ט.    **שווי מזומנים:**

כשווי מזומנים נחשבות השקעות לזמן קצר ברמת נזילות גבוהה, אשר ניתנות להמרה בנקל לסכומים ידועים של מזומנים ואשר חשופות לסיכון בלתי משמעותי של שינויים בשווי, כאשר התקופה לפירעון הינה עד שלושה חודשים ממועד ההשקעה.

י.    **מזומנים מוגבלים לזמן קצר:**

פיקדונות בתאגידים פיננסיים לזמן קצר שתקופתם המקורית עולה על שלושה חודשים ממועד ההשקעה או שקיימת מגבלה לגבי השימוש בהם ושאינם עונים להגדרת שווי מזומנים. הפיקדונות מוצגים בהתאם לתנאי הפקדתם ומועד השימוש הצפוי בהם.

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 2 - עיקרי המדיניות החשבונאית (המשך):**

**יא.    מכשירים פיננסיים:**

**1.    נכסים פיננסיים:**

נכסים פיננסיים בתחילת התקן נמדדים במועד ההכרה לראשונה בשווי ההוגן ובתוספת עלויות עסקה שניתן לייחס במישרין לרכישה של הנכס הפיננסי, למעט במקרה של נכס פיננסי אשר נמדד בשווי הוגן דרך רווח או הפסד, לגביו עלויות עסקה נזקפות מיידית לרווח או הפסד. במועד זה נקבע סיווגם של הנכסים הפיננסיים לצורך מדידה בתקופות עוקבות.

לאחר ההכרה הראשונית, נכסים פיננסיים שהינם מכשירי חוב מסווגים ונמדדים בהתאם לסיווגם לאחת משלוש הקבוצות הבאות: נכסים פיננסיים בעלות מופחתת, נכסים פיננסיים בשווי הוגן דרך רווח או הפסד ונכסים פיננסיים בשווי הוגן דרך רווח כולל אחר.

נכסים פיננסיים שהינם מכשירי חוב מסווגים בדוחות הכספיים לקבוצה הרלבנטית בהתבסס על הקריטריונים להלן:

(א) המודל העסקי של החברה לניהול הנכסים הפיננסיים, וכן

(ב) מאפייני תזרים המזומנים החוזי של הנכס הפיננסי.

נכסים פיננסיים שהינם מכשירי חוב מסווגים לקבוצת נכסים פיננסיים בעלות מופחתת רק כאשר הם מוחזקים בהתאם למודל עסקי שמטרתו החזקה על מנת לגבות את תזרימי המזומנים החוזיים בלבד, וכן שהתנאים החוזיים שלהם מספקים זכאות במועדים מוגדרים לתזרימי מזומנים שהם תשלומי קרן וריבית בלבד. לצורך הבחינה האם תזרימי המזומנים כוללים קרן וריבית בלבד, 'קרן' הינה השווי ההוגן של הנכס הפיננסי במועד ההכרה לראשונה. 'ריבית' הינה תמורה עבור ערך הזמן של הכסף ועבור סיכון האשראי המיוחס לסכום הקרן שטרם נפרעה וגן במקרים מסוימים גם עבור סיכונים ועלויות בסיסיים אחרים של הלוואה(כגון סיכון נזילות) ומרווח המקובל בהסכמי הלוואה בסיסיים.

לקבוצה נכסים כאלה הנמדדים לראשונה בשווי הוגן בתוספת עלויות עסקה המיוחסות במישרין, למעט חייבים שנמדדים לראשונה במחיר העסקה שלהם. לאחר ההכרה לראשונה, נכסים אלה נמדדים בעלות מופחתת. אשראי לזמן קצר (כגון חייבים) מוצג לפי תנאיו, בדרך כלל בערכו הנומינלי. רווחים והפסדים מוכרים ברווח או הפסד בעת הגריעה או אם מוכרת בגינם ירידת ערך.

נכסים פיננסיים לא מסווגים מחדש בתקופות עוקבות אלא אם, ורק כאשר, החברה משנה את המודל העסקי שלה לניהול נכסי חוב פיננסיים, ובמקרה כאמור נכסי החוב הפיננסיים המושפעים מסווגים מחדש בתחילת תקופת הדיווח העוקבת לשינוי במודל העסקי.

**2.    התחייבויות פיננסיות:**

התחייבות פיננסית הוכרה כאשר החברה הפכה לצד להוראות החוזיות של המכשיר. כל ההתחייבויות הפיננסיות של החברה מסווגות לקבוצת ההתחייבויות הפיננסיות הנמדדות בעלות מופחתת. התחייבויות פיננסיות בקבוצה זו, כדוגמת הלוואות מבנקים ואגרות חוב, נמדדות לראשונה בשווי הוגן בניכוי עלויות עסקה שניתן לייחסן במישרין לעסקה. לאחר ההכרה לראשונה, התחייבויות אלו נמדדות על פי תנאיהן בעלותן המופחתת בהתאם לשיטת הריבית האפקטיבית, המביאה בחשבון גם את עלויות העסקה המיוחסות ישירות.

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 2 - עיקרי המדיניות החשבונאית (המשך):**

**יא.    מכשירים פיננסיים (המשך):**

**3.    ירידת ערך נכסים פיננסיים וביטולה:**

החברה בוחנת בכל מועד דיווח את ההפרשה להפסד בגין המכשירים הפיננסיים הנמדדים בעלות מופחתת. לחברה נכסים פיננסיים בעלי תקופות אשראי קצרות עד שנה, כגון חייבים אחרים, בגינם ההפרשה להפסד נמדדת בסכום השווה להפסדי אשראי חזויים לאורך כל חיי המכשיר, כלומר עד לסילוקו. הפסדי אשראי חזויים מהווים אומדן משוקלל-הסתברויות של הפסדי אשראי. הפסדי אשראי נמדדים לפי הערך הנוכחי של הפער בין תזרימי המזומנים שהחברה זכאית להם לפי החוזה לבין תזרימי המזומנים שהחברה צופה לקבל. הפסדי האשראי החזויים מהוונים לפי שיעור הריבית האפקטיבית של הנכס הפיננסי. ירידת הערך, במידה וקיימת, נזקפת לרווח או הפסד כנגד הפרשה המקוזזת מהנכס הפיננסי.

**יב.    רכוש קבוע:**

הרכוש הקבוע של החברה כולל מחנות קיץ ומוכר לראשונה לפי עלות, לרבות עלויות שניתן לייחסן במישרין לרכישת רכוש קבוע ולהבאתו למיקום ולמצב הדרושים לצורך פעולתו.

בתקופות שלאחר ההכרה לראשונה, מיישמת החברה את מודל הערכה מחדש החברה מפחיתה בנפרד כל חלק של רכוש קבוע עם עלות שהיא משמעותית ביחס לסך העלות של הפריט. במועד ההערכה מחדש, הערך בספרים הותאם באופן שהוא עקבי עם הערכה מחדש של הנכס. הפחת שנצבר במועד ההערכה מחדש הותאם על מנת שיהיה שווה להפרש בין הערך בספרים ברוטו של הנכס לבין ערכו בספרים הערכות מחדש של רכוש קבוע המשמש מחנות קיץ מבוצעות באופן סדיר מספיק, על מנת לוודא שהערך בספרים אינו שונה באופן מהותי מהערך שהיה נקבע לפי שווי הוגן בסוף תקופת הדיווח. עלייה בערך בספרים של נכס כתוצאה מהערכה מחדש מוכרת ברווח כולל אחר ונצברת בהון כקרן הערכה מחדש. עם זאת, העלייה מוכרת ברווח או הפסד עד לסכום שבו היא מבטלת ירידה בערך בספרים של אותו נכס כתוצאה מהערכה מחדש, שהוכרה קודם לכן ברווח או הפסד. ירידה בערך בספרים של נכס כתוצאה מהערכה מחדש מוכרת ברווח או הפסד. עם זאת, הירידה מוכרת ברווח כולל אחר עד לסכום שבו קיימת יתרת זכות כלשהי בקרן הערכה מחדש בגין אותו נכס בהון.. החברה מעבירה את קרן ההערכה מחדש ישירות לעודפים כאשר הרכוש הקבוע נגרע.

הוצאות הפחת לכל תקופה הוכרו ברווח או הפסד. להקצאת הסכום בר-הפחת של הרכוש קבוע באופן שיטתי על פני אורך החיים השימושיים שלו, החברה משתמשת בשיטת פחת (שיטת קו ישר) אשר משקפת את התבנית שבה החברה חזויה לצרוך את ההטבות הכלכליות העתידיות מהנכס (ראה ביאור 4).

החברה סוקרת את ערך השייר, את אורך החיים השימושיים ואת שיטת הפחת לפחות בכל סוף שנה. שינויים מטופלים כשינוי באומדן חשבונאי. החברה אינה מכירה בערך בספרים של פריט רכוש קבוע את עלויות התחזוקה השוטפות של הפריט. עלויות אלה מוכרות ברווח או בהפסד בעת התהוותן. החברה מכירה בעלות של החלפת חלקים של פריטי רכוש קבוע מסוימים כחלק מהערך בספרים של פריט רכוש קבוע, כאשר צפוי שתתקבלנה הטבות כלכליות עתידיות מאותו הפריט וכן הערך בספרים של הפריט המוחלף נגרע.

- 14 -

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 2 - עיקרי המדיניות החשבונאית (המשך):**

**יג.   הכרה בהכנסה:**

הכנסות החברה כוללות רק תזרים חיובי של הטבות כלכליות שמקבלת החברה ו/או זכאית לקבל בעבור עצמה.

הכנסה נמדדת לפי שווייה ההוגן של התמורה שהתקבלה או התמורה שהחברה זכאית לקבל.

הכנסה מהספקת שירותים המתייחסים לפעילות אירוח ופנאי מוכרת בהתאם לשלב ההשלמה של העסקה בסוף תקופת הדיווח. על פי שיטה זו, ההכנסה מוכרת בתקופות הדיווח שבה סופקו השירותים.

**יד.   מסים על הכנסה:**

בהתאם לחוקי המס החלים על חברה המאוגדת באיי הבתולה הבריטיים ועל חברות המאוגדות בארה"ב, החברות בקבוצה נחשבות ישויות שקופות לצורכי מס. לפיכך, לא הוכרו בדוחות הכספיים מסים על ההכנסה בגין מס הכנסה פדרלי ומס מדינה בארה"ב או בגין הטבות מס אחרות, מאחר וההכנסה חייבת במס או הפסדים לצורכי מס מדווחים בדוחות המס של בעלי המניות.

- 15 -

<div dir="rtl">

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 2 - עיקרי המדיניות החשבונאית (המשך):**

**טו.    יישום לראשונה של תקנים חדשים:**

**להלן מידע לגבי תיקונים לתקנים שהחברה יישמה לראשונה החל מיום 1 בינואר 2024.**

סיווג התחייבויות כשוטפות או כלא שוטפות והתחייבויות לא שוטפות עם אמות מידה פיננסיות - תיקונים לתקן חשבונאות בינלאומי 1 "הצגת דוחות כספיים" (להלן ביחד: "התיקונים ל-IAS 1")

להלן סקירה של עיקרי התיקונים ל- IAS 1:

- הזכות לדחות את סילוק ההתחייבות למשך לפחות 12 חודש לאחר תקופת הדיווח צריכה להיות ממשית וכן, חייבת להיות קיימת בסוף תקופת הדיווח. זכותה של החברה לדחות את סילוק ההתחייבות הנובעת מהסדר הלוואה, למשך לפחות 12 חודש לאחר תקופת הדיווח, עשויה להיות כפופה לכך שהחברה תעמוד באמות מידה פיננסיות. אמות מידה פיננסיות כאלה:

  - ישפיעו על השאלה האם זכות זו קיימת בסוף תקופת הדיווח, אם החברה נדרשת לעמוד באמות המידה הפיננסיות בתום תקופת הדיווח או לפניה, גם אם העמידה נבחנת לאחר תקופת הדיווח.

  - לא ישפיעו על השאלה האם זכות זו קיימת בסוף תקופת הדיווח, אם החברה נדרשת לעמוד באמות המידה הפיננסיות רק לאחר תקופת הדיווח.

- קריטריון הסיווג הנובע מקיומה של זכות לדחות סילוק למשך לפחות 12 חודש לאחר תקופת הדיווח אינו מושפע מכוונות ההנהלה או ציפיותיה למימוש הזכות או מהסילוק של ההתחייבות בפועל במהלך 12 חודש שלאחר תאריך הדיווח.

- "סילוק" לצורכי הסיווג של התחייבויות כשוטפות או לא שוטפות מתייחס להעברה לצד שכנגד שתוצאתה ביטול של ההתחייבות שכולל העברה של מזומן או של משאבים כלכליים אחרים כגון סחורות או שירותים, או של מכשירים הוניים, אלא אם מדובר בהתחייבות להעביר מכשירים הוניים הנובעת מאופציה להמרת חוב בהון, אשר מסווגת כמכשיר הוני ומוכרת בנפרד מהההתחייבות כרכיב הון של מכשיר פיננסי מורכב.

- נוספו הוראות גילוי המתייחסות לסילוק לאחר תקופת הדיווח של התחייבויות המסווגות כלא שוטפות, וכן למידע שיאפשר למשתמשים בדוחות הכספיים להבין את הסיכון שהתחייבויות - הנובעות מהסדרי הלוואות המסווגות כלא שוטפות, כאשר זכות החברה לדחות סילוק של התחייבויות אלה כפופה לעמידה באמות מידה פיננסיות במהלך 12 חודשים לאחר תקופת הדיווח - תהינה ניתנות לפירעון במהלך אותה תקופה.

  התיקונים ל-**IAS 1** יושמו למפרע, החל מתקופות שנתיות המתחילות ביום 1 בינואר 2024 או לאחר מכן.

</div>

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 2 - עיקרי המדיניות החשבונאית (המשך):**

**טז.** **תקנים חדשים בתקופה שלפני יישומם:**

תקן דיווח כספי בינלאומי 18, הצגה וגילוי בדוחות כספיים (להלן: "IFRS 18" או "התקן החדש")

IFRS 18 שפורסם באפריל 2024 נועד לשפר את יכולת ההשוואה והשקיפות של הדיווח על ביצועי החברות. התקן החדש מחליף את תקן חשבונאות בינלאומי 1, הצגת דוחות כספיים ואינו עוסק בנושאי הכרה ומדידה של פריטים בדוחות הכספיים.

להלן סקירה של עיקרי השינויים שיחולו בדוחות הכספיים עם יישום התקן החדש, ביחס להוראות ההצגה והגילוי החלות כיום:

- התקן החדש ישנה את מבנה הדוח על הרווח או הפסד ויכלול שלוש קטגוריות מוגדרות חדשות: הפעלה, השקעה ומימון וכן יוסיף שני סיכומי ביניים חדשים: רווח תפעולי ורווח לפני מימון ומסים על ההכנסה.

- התקן החדש כולל הנחיות למתן גילוי על מדדי ביצוע המוגדרים על-ידי ההנהלה ( Management-defined Performance Measures) (MPMs).

- התקן החדש מספק הנחיות לגבי קיבוץ ופיצול של המידע בדוחות הכספיים ביחס לשאלה האם מידע צריך להיכלל בדוחות הראשיים או בביאורים וגילויים לגבי פריטים שהוגדרו כ"אחרים".

- התקן החדש כולל תיקונים לתקנים אחרים, לרבות תיקונים מוגבלים לתקן חשבונאות בינלאומי 7, דוח על תזרימי מזומנים.

IFRS 18 ייושם למפרע החל מהתקופות השנתיות המתחילות ביום 1 בינואר 2027 או לאחר מכן תוך מתן גילוי ספציפי כפי שנקבע במסגרת הוראות המעבר של התקן החדש. יישום מוקדם של IFRS 18 אפשרי תוך מתן גילוי לכך.

החברה בוחנת את ההשפעה האפשרית של IFRS 18 על הדוחות הכספיים, אולם בשלב זה אין ביכולתה להעריך השפעה כאמור. השפעת התקן החדש, ככל שתהיה, תשפיע רק על ענייני הצגה וגילוי.

- 17 -

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 3 - השקעה בחברות מוחזקות:**

**א.   השקעות בחברות כלולות:**

**1.   מידע כללי בדבר חברות כלולות של החברה:**

| שיעור ההחזקה בהון חברת הפרוייקט (במישרין ו/או בעקיפין), ליום: % | | שם החברה המחזיקה הישירה בנכס (*) | שם הנכס |
|---|---|---|---|
| **31 בדצמבר** | | | |
| **2023** | **2024** | | |
| 50.0% | 50.0% | Willow Lake Day Camps, LLC Willow Lake Land Corporation | Willow Lake |

(*)   כל התאגידים המופיעים לעיל התאגדו בארה"ב, אשר הינה מקום פעילותם העסקית.

**2.   מידע על חברות כלולות מהותיות המטופלת תוך שימוש בשיטת השווי המאזני**

להלן מידע פיננסי מתומצת לגבי נתונים על המצב הכספי ותוצאות הפעולות של החברה המוחזקת הערוכים בהתאם ל-
IFRS ולמדיניות החשבונאית (מדידה לפי שיטת השווי המאזני) של החברה וללא התאמה בגין שיעור ההחזקה

Willow Lake Day Camps, LLC & Willow Lake Land Corporation (Willow Lake)

| **31 בדצמבר 2023** | **31 בדצמבר 2024** | |
|---|---|---|
| מבוקר | מבוקר | |
| 1,293 | 4,607 | נכסים שוטפים |
| 35,500 | 36,600 | רכוש קבוע |
| (2,715) | (5,101) | התחייבויות שוטפות |
| - | (1,759) | התחייבויות לא שוטפות |
| 34,078 | 34,347 | נכסים נטו |
| 17,038 | 17,173 | **ערך בספרים של ההשקעה בחברה הכלולה** |

| **לשנה שהסתיימה ביום 31 בדצמבר** | | | |
|---|---|---|---|
| **2022** | **2023** | **2024** | |
| מבוקר | מבוקר | מבוקר | |
| 8,080 | 9,222 | 10,664 | הכנסות |
| 1,206 | 2,441 | 3,042 | רווח לתקופה |
| 2,706 | 3,787 | 3,709 | סך רווח כולל לתקופה |
| 1,547 | 1,373 | 1,720 | **דיבידנדים שהתקבלו בקבוצה מהחברה הכלולה** |

- 18 -

**SIMAD Holdings Ltd**

ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)

ביאור 3 - השקעה בחברות מוחזקות (המשך):

ב.   השקעות בחברות מאוחדות:

מידע כללי בדבר חברות מאוחדות של החברה:

| שיעור ההחזקה בהון חברת הפרוייקט (במישרין ו/או בעקיפין), ליום: | | שם החברה המחזיקה הישירה בנכס (*) | שם הנכס |
|---|---|---|---|
| **%** | | | |
| **31 בדצמבר** | | | |
| **2023** | **2024** | | |
| 100.00% | 100.00% | Achim Operatingco LLC<br>Achim Landco LLC | Achim |
| 90.00% | 90.00% | Banner Landco LLC<br>Banner Operatingco LLC | Banner |
| 70.00% | 70.00% | Bluestar Operatingco, LLC<br>Bluestar Landco, LLC | Blue Star |
| 100.00% | 100.00% | Chateaugay Landco LLC<br>Chateaugay Campco LLC | Chateaugay |
| 51.00% | 51.00% | BAHS Operating Inc. (dba Camp Chen-a-Wanda)<br>BAHS Holdings LLC | Chen-A-Wanda (BAHS) |
| 80.00% | 80.00% | Club Getaway Operatingco, LLC<br>Club Getaway Landco, LLC | Club Getaway |
| 99.00% | 99.00% | Country Roads Landco LLC<br>Country Roads Operatingco LLC | Country Roads |
| 100.00% | 100.00% | Mill Road Landco LLC<br>Eagle's Landing Day Camp LLC | Eagles Landing |
| 100.00% | 100.00% | Shab Operating Inc.<br>Shab Holdings LLC | ECHO (SHAB) |
| 51.00% | 51.00% | Green Lane Landco, LLC<br>Green Lane Operatingco, LLC | Green Lane |
| 100.0% | 100.0% | Greenvilleland LLC<br>Malka Operatingco LLC | Greenville Land (Malka) |
| 99.0% | 99.0% | IAFALANDCO, LLC | IAFA |
| 99.0% | 99.0% | Island Lake Landco LLC<br>Island Lake Campco LLC | Island Lake |
| 62.5% | 62.5% | Kiwi Operatingco LLC<br>Kiwi Landco LLC | Kiwi |

<div dir="rtl">

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 3 - השקעה בחברות מוחזקות (המשך):**

ב.   **השקעות בחברות מאוחדות(המשך):**

**מידע כללי בדבר חברות מאוחדות של החברה (המשך):**

</div>

| שיעור ההחזקה בהון חברת הפרוייקט (במישרין ו/או בעקיפין), ליום: | | שם החברה המחזיקה הישירה בנכס (*) | שם הנכס |
|---|---|---|---|
| % | | | |
| 31 בדצמבר | | | |
| 2023 | 2024 | | |
| 99.0% | 99.0% | Lavco LLC<br>Lavland LLC | Lavi |
| 75.0% | 75.0% | RDM Camps, LLC | Lokanda |
| 99.0% | 99.0% | Meadowbrook Operatingco LLC<br>Meadowbrook Landco LLC | Meadowbrook |
| 100.0% | 100.0% | Camp Med-O-Lark, Inc.<br>Washington Lake, LLC | Med-O-Lark |
| 75.0% | 75.0% | Mesorahco LLC<br>Mesorahland LLC | Mesorah |
| 100.0% | 100.0% | Mogenavco LLC<br>Mogenavland LLC | Mogenavco |
| 100.0% | 100.0% | Mohawkcampco LLC<br>Mohawkland LLC<br>Mohawk Country Day School, Inc. | Mohawk |
| 99.0% | 99.0% | Belgrade Lakes Summer Camps LLC | New England Golf & Tennis (Belgrade) |
| 99.0% | 99.0% | Poland Landco LLC | North Star (Poland) |
| 80.0% | 80.0% | Pine Forest Campco LLC<br>Pine Forest Landco LLC | Pine Forest |
| 99.0% | 99.0% | Rolling Hills Landco LLC<br>Rolling Hills Operatingco LLC | Rolling Hills |
| 51.0% | 51.0% | Summit Camp, LLC | Summit |
| 99.0% | 99.0% | Waukeela Operatingco LLC<br>Waukeela Landco LLC | Waukeela |
| 99.0% | 99.0% | Wekeeland LLC<br>Mainewekeelaco LLC | Wekeela |
| 51.0% | 51.0% | WM Camp, LLC<br>WM Land, LLC | WM Camp (Windsor Mt) |

<div dir="rtl">

(*)   כל התאגידים המופיעים לעיל התאגדו בארה"ב, אשר הינה מקום פעילותם העסקית.

(**)   בתאגידים בהם שיעור האחזקה הוא 99%, יתרת הזכויות מוחזקת על ידי בעלת השליטה

</div>

<div dir="rtl">

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 4 - רכוש קבוע:**

**א.   הרכב:**

| סך הכל | ריהוט וציוד ואחרים | קרקע ומבנים של מחנות קיץ | |
|---|---|---|---|
| | | | **עלות** |
| 470,488 | 25,004 | 445,484 | יתרה ליום 1 בינואר, 2023 |
| 11,308 | 1,004 | 10,304 | תוספות במשך השנה |
| 42,516 | - | 42,516 | קרן הערכה מחדש |
| 524,312 | 26,008 | 498,304 | יתרה ליום 31 בדצמבר, 2023 |
| 9,957 | 573 | 9,384 | תוספות במשך השנה |
| 49,186 | - | 49,186 | קרן הערכה מחדש |
| 583,455 | 26,581 | 556,874 | יתרה ליום 31 בדצמבר, 2024 |
| | | | **פחת שנצבר** |
| (95,418) | (11,252) | (84,166) | יתרה ליום 1 בינואר, 2023 |
| (13,695) | (2,500) | (11,195) | תוספות במשך השנה |
| (13,464) | - | (13,464) | קרן הערכה מחדש |
| (122,577) | (13,752) | (108,825) | יתרה ליום 31 בדצמבר, 2023 |
| (15,187) | (2,601) | (12,586) | תוספות במשך השנה |
| (16,991) | - | (16,991) | קרן הערכה מחדש |
| (154,755) | (16,353) | (138,402) | יתרה ליום 31 בדצמבר, 2024 |
| 428,700 | 10,228 | 418,472 | עלות מופחתת ליום 31 בדצמבר, 2024 |
| 401,735 | 12,256 | 389,479 | עלות מופחתת ליום 31 בדצמבר, 2023 |

\* שווי הוגן של הנכסים המשועבדים ליום 31 בדצמבר 2024 הינו 428,700 אלפי דולר.
\*\* יתרת המבנים ברי הפחתה (מבנים) ליום 31 בדצמבר 2024 הינה כ- 265,016 אלפי דולר.

**ב.   פרטים נוספים:**

שיטת הפחת ששימשה את החברה להפחתת הרכוש הקבוע הינה שיטת הקו הישר. אורך חייו השימושיים של המבנים, והציוד של מחנות הקיץ, נקבעו בהתאם להערכות החברה.

**ג.   מודל הערכה מחדש:**

**1.   טכניקות הערכה ונתונים ששימשו במדידות שווי הוגן:**

השווי ההוגן של הרכוש הקבוע נמדד באמצעות מעריך שווי חיצוני בלתי תלוי, בעל כישורים מקצועיים רלוונטיים ובעל ניסיון במיקום ובסוג הנכסים הנמדדים.

מדידת השווי ההוגן של הרכוש הקבוע סווגה ברמה 3 ובוצעה בהתבסס על היוון תחזיות של תזרימי מזומנים מייצגים מהנכס בשיעור היוון מתאים לתזרימי מזומנים אלה.

נתונים משמעותיים שאינם ניתנים לצפייה ששימשו במדידת השווי ההוגן:

</div>

<div dir="rtl">

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 4 - רכוש קבוע (המשך):**

ב.   **מודל הערכה מחדש (המשך):**

1.   **טכניקות הערכה ונתונים ששימשו במדידות שווי הוגן (המשך):**

| טכניקת הערכת שווי | נתונים שאינם ניתנים לצפייה | 31.12.2024 | 31.12.2023 |
|---|---|---|---|
| היוון תזרימי מזומנים | שיעור היוון | 9.00%-11.00% | 9.50%-11.50% |

2.   **הערך בספרים שהיה מוכר בקבוצות הרכוש הקבוע אם הנכסים היו מוצגים לפי מודל העלות:**

| | 31.12.2023 | | | 31.12.2024 | | |
|---|---|---|---|---|---|---|
| | עלות מופחתת | פחת נצבר | עלות | עלות מופחתת | פחת נצבר | עלות |
| **סך-הכל** | 114,586 | (200,356) | 314,942 | 110,002 | (214,897) | 324,899 |

**ביאור 5 - הלוואות מתאגידים בנקאיים ואחרים:**

א.   **הרכב:**

| | | שיעור ריבית (*) | בסיס ריבית | מועד פירעון סופי (*) | 31.12.2024 | 31.12.2023 |
|---|---|---|---|---|---|---|
| ריבית קבועה | | 3.50% | | 2041 | 24,876 | 26,656 |
| ריבית קבועה | | 5.28%-9.50% | | 2028-2042 | 38,289 | 38,369 |
| ריבית קבועה | | 1.00%-4.50% | | 2026-2050 | 19,414 | 19,584 |
| ריבית קבועה | | 7.50% | | 2031 | 5,681 | 5,910 |
| ריבית משתנה | | 6.65% | SOFR+2.1% | 2032 | 71,333 | 75,333 |
| ריבית משתנה | | 7.13% | SOFR+2.6% | 2027 | 13,500 | 14,188 |
| ריבית משתנה | | 6.67%-7.50% | SOFR+2% WSJ Prime Rate | 2032-2041 | 13,119 | 13,798 |
| הלוואת אחרות | | | | | 646 | 974 |
| **סך הכל יתרת הלוואות** | | | | | **186,858** | **194,812** |
| עלויות גיוס נדחות | | | | | (1,257) | (1,438) |
| **סך הכל יתרת הלוואות, נטו** | | | | | **185,601** | **193,374** |
| התחייבויות שוטפות | | | | | 9,016 | 8,984 |
| התחייבויות לא שוטפות | | | | | 176,585 | 184,390 |

(*) ליום 31 בדצמבר 2024.

ב.   **פרטים נוספים:**

1.   <u>אמות מידה פיננסיות:</u>

חלק מהסכמי ההלוואה כוללים דרישה לאמות מידה פיננסיות בחברות הנכס, לדוגמה, בהתייחס ל- DSCR (יחס כיסוי חוב ו- LTV). למועד הדוח החברה עומדת בכל אמות המידה הפיננסיות שנקבעו.

2.   בעל השליטה, במישרין או בעקיפין, לרוב מעמיד ערבויות לטובת גופים מלווים, להבטחת התחייבויות חברות הקבוצה על-פי הסכמים בהם מתקשרות חברות הקבוצה.

3.   נכסי החברה משועבדים לטובת ההלוואות שנלקחו.

</div>

- 22 -

<div dir="rtl">

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 6 - זכאים ויתרות זכות:**

**הרכב:**

**התחייבויות שוטפות:**

| | ליום | |
|---|---|---|
| | 31.12.2024 | 31.12.2023 |
| ספקים | 2,274 | 2,506 |
| הוצאות לשלם ואחרים | 1,860 | 966 |
| | 4,134 | 3,472 |

**התחייבויות לא שוטפות:**

| | ליום | |
|---|---|---|
| | 31.12.2024 | 31.12.2023 |
| פיצויים לשלם בגין עובדים | 4,765 | 4,365 |
| | 4,765 | 4,365 |

**ביאור – 7 מקדמות מלקוחות**

מיוחס לתשלומים שהתקבלו מלקוחות עבור רישום למחנות הקיץ אשר מתקיימים בחודשי הקיץ.

**ביאור 8 – הון:**

כמתואר בביאור 1 לעיל, החברה התאגדה ביום 28 במאי 2025. למועד ההקמה, לחברה 1,000 מניות ללא ערך נקוב.

**ביאור 9 - הכנסות מהפעלה ועלות ההפעלה:**

**א.   הכנסות מהפעלה:**

| | לשנה שהסתיימה ביום | | |
|---|---|---|---|
| | 31.12.2024 | 31.12.2023 | 31.12.2022 |
| הפעלת מחנות קיץ | 155,721 | 152,712 | 128,563 |
| הפעלת בתי ספר ואחרות | 3,634 | 3,725 | 4,093 |
| | 159,355 | 156,437 | 132,656 |

**ב.   עלות ההפעלה:**

| | לשנה שהסתיימה ביום | | |
|---|---|---|---|
| | 31.12.2024 | 31.12.2023 | 31.12.2022 |
| פחת | 15,187 | 13,695 | 11,746 |
| שכר עבודה | 58,316 | 56,286 | 46,224 |
| תשתיות ואנרגיה | 2,824 | 2,835 | 2,552 |
| הוצאות אחזקה ותפעול | 47,341 | 47,539 | 41,760 |
| מיסי נכסים | 2,418 | 2,562 | 2,583 |
| ביטוחים | 3,027 | 2,743 | 2,799 |
| דמי ניהול נכסים | 785 | 926 | 528 |
| שירותים מקצועיים | 1,517 | 1,651 | 1,673 |
| אחרות | 346 | 261 | 446 |
| | 131,761 | 128,498 | 110,311 |

</div>

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 10 - הוצאות מימון:**

| | לשנה שהסתיימה ביום | |
| 31.12.2022 | 31.12.2023 | 31.12.2024 | |
|---|---|---|---|
| 7,002 | 11,602 | 11,779 | ריבית ועמלות לתאגידים בנקאיים ונותני אשראי אחרים |
| 157 | 165 | 181 | הפחתת ניכיון בגין הלוואות מתאגידים בנקאיים ואחרים |
| 7,159 | 11,767 | 11,960 | |

**ביאור 11 - מכשירים פיננסיים:**

**א.   מדיניות ניהול סיכונים:**

פעילויות החברה חושפות אותה לסיכונים פיננסיים שונים. תוכנית ניהול הסיכונים של החברה מתמקדת בפעולות לצמצום מינימלי של השפעות שליליות אפשריות על הביצועים הפיננסיים של החברה. ניהול הסיכונים מבוצע על ידי ההנהלה.

**ב.   סיכון אשראי:**

החברה אינה צופה סיכוני אשראי מהותיים בגין יתרות החייבים השונים לרבות מזומנים מוגבלים בשימוש.

**ג.   סיכון שיעור ריבית:**

החברה חשופה לשינויים בשיעור הריבית הפדראלית בארה"ב. עליה בשיעור הריבית האמורה עשויה לצמצם את יכולת החברה לממן מחדש את נכסיה דרך מחזור הלוואות קיימות בריבית גבוהה להלוואות חדשות בריבית נמוכה יותר.

**ד.   סיכון נזילות:**

סיכוני נזילות נובעים מניהול ההון החוזר של החברה וכן מהוצאות המימון והחזרי הקרן של מכשירי החוב של החברה. מדיניות החברה הינה להבטיח כי המזומן המוחזק יספיק תמיד לכיסוי ההתחייבויות במועד פירעון. על מנת להשיג מטרה זו החברה שואפת להחזיק יתרות מזומנים (או קווי אשראי מתאימים). על מנת לענות על דרישות המזומנים החזויות, בוחנת החברה תחזיות תזרימי מזומנים על בסיס חודשי, מידע בדבר יתרות המזומנים. בסוף תקופת הדיווח, תחזיות אלו מצביעות כי לחברה צפויות מקורות נזילים מספיקים לכיסוי כל מחויבויותיה תחת הנחות סבירות.

להלן ניתוח מועדי הפירעון החוזיים של ההתחייבויות פיננסיות בהתבסס, היכן שרלוונטי, על ערכים נקובים לסילוק שיעורי הריבית לסוף תקופת הדיווח:

| | | | | | | 31 בדצמבר 2024 | |
|---|---|---|---|---|---|---|---|
| סה"כ | מעל 5 שנים | מ- 4 עד 5 שנים | מ-3 עד 4 שנים | מ-2 עד 3 שנים | משנה עד שנתיים | עד שנה | |
| 8,899 | 4,765 | - | - | - | - | 4,134 | זכאים ויתרות זכות |
| 412,508 | 282,021 | 16,522 | 29,531 | 37,362 | 26,082 | 20,990 | הלוואות מבנקים ותאגידים פיננסיים |
| 421,407 | 286,786 | 16,522 | 29,531 | 37,362 | 26,082 | 25,124 | |

| | | | | | | 31 בדצמבר 2023 | |
|---|---|---|---|---|---|---|---|
| סה"כ | מעל 5 שנים | מ- 4 עד 5 שנים | מ-3 עד 4 שנים | מ-2 עד 3 שנים | משנה עד שנתיים | עד שנה | |
| 7,837 | 4,365 | - | - | - | - | 3,472 | זכאים ויתרות זכות |
| 515,593 | 382,736 | 22,104 | 40,776 | 28,929 | 20,848 | 20,200 | הלוואות מבנקים ותאגידים פיננסיים |
| 523,430 | 387,101 | 22,104 | 40,776 | 28,929 | 20,848 | 23,672 | |

- 24 -

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים פרופורמה ליום 31 בדצמבר 2024 (באלפי דולר)**

**ביאור 12 - בעלי עניין וצדדים קשורים:**

**א.    יתרות עם בעלי עניין וצדדים קשורים:**

| | ליום | |
|---|---|---|
| **31.12.2023** | **31.12.2024** | |
| 4,506 | 7,639 | צדדים קשורים - יתרות חובה (1) |

(1)    מעת לעת במהלך העסקים שלהן, העמידה החברה הלוואות לבעלי השליטה (במישרין ו/או באמצעות חברות בשליטתם) ובעלי השליטה העמידו הלוואות לחברה. היתרה נפרעה במהלך הרבעון השלישי של שנת 2025. בגין היתרות הוכרו הכנסות מימון כמפורט בסעיף ב' להלן.

**ב.    עסקאות עם בעלי עניין וצדדים קשורים:**

| | לשנה שהסתיימה | |
|---|---|---|
| | ביום 31 בדצמבר | |
| **2022** | **2023** | **2024** |
| 390 | 580 | 580 | דמי ניהול בחברות מאוחדות |
| 2,799 | 2,743 | 3,027 | ביטוחים (1) |
| - | 191 | 399 | הכנסות מימון |

(1)    תשלום לחברת האם בגין ביטוח גב אל גב.

**ג.    ערבויות:**

בעלי השליטה העמידו, במישרין או בעקיפין, ערבויות פיננסיות אישיות לא מוגבלות בסכום לטובת כל התחייבויות החברה מתאגידים בנקאיים ואחרים, להבטחת התחייבויות החברה והחברות הבנות שלה על-פי הסכמים בהם הן מתקשרות.

## SIMAD Holdings, Ltd

## דוחות כספיים תמציתיים מאוחדים פרופורמה ליום 30 ביוני 2025

### (בלתי מבוקר)

# **SIMAD Holdings, Ltd**

### **דוחות כספיים מאוחדים תמציתיים פרופורמה ליום 30 ביוני 2025**

### **תוכן העניינים**

**ע מ ו ד**

| | |
|---|---|
| דוח סקירה של רואה החשבון המבקר | 1 |
| דוחות מאוחדים תמציתיים פרופורמה על המצב הכספי | 2 |
| דוחות מאוחדים תמציתיים פרופורמה על הרווח או הפסד ורווח כולל אחר | 3 |
| דוחות מאוחדים תמציתיים פרופורמה על השינויים בהון | 4-6 |
| דוחות מאוחדים תמציתיים פרופורמה על תזרימי המזומנים | 7 |
| ביאורים לדוחות הכספיים המאוחדים תמציתיים פרופורמה | 8-10 |



**דוח סקירה של רואה החשבון המבקר לבעלי המניות של SIMAD Holdings, Ltd**

מבוא

סקרנו את המידע הכספי המצורף של SIMAD Holdings, Ltd (להלן – "החברה"), הכולל את הדוחות התמציתיים המאוחדים פרופורמה על המצב הכספי ליום 30 ביוני 2025 ואת הדוחות התמציתיים המאוחדים פרופורמה על רווח או הפסד ורווח כולל אחר, השינויים בהון ותזרימי המזומנים לתקופות של שישה ושלושה חודשים שהסתיימו באותו תאריך. הדירקטוריון וההנהלה אחראים לעריכה ולהצגה של מידע כספי  לתקופת ביניים זו בהתאם לתקן חשבונאות בינלאומי IAS 34 "דיווח כספי לתקופות ביניים", בכפוף להנחות הפרופורמה המפורטות במידע הכספי המאוחד פרופורמה וכן הם אחראים לעריכת מידע כספי לתקופת ביניים זו לפי פרק ד' של תקנות ניירות ערך (דוחות תקופתיים ומידיים), התש"ל-1970. אחריותנו היא להביע מסקנה על מידע כספי לתקופת ביניים זו בהתבסס על סקירתנו.

היקף הסקירה

ערכנו את סקירתנו בהתאם לתקן סקירה (ישראל) 2410 של לשכת רואי חשבון בישראל "סקירה של מידע כספי לתקופות ביניים הנערכת על ידי רואה החשבון המבקר של הישות". סקירה של מידע כספי לתקופות ביניים מורכבת מבירורים, בעיקר עם אנשים האחראים לעניינים הכספיים והחשבונאיים, ומיישום נהלי סקירה אנליטיים ואחרים. סקירה הינה מצומצמת בהיקפה במידה ניכרת מאשר ביקורת הנערכת בהתאם לתקני ביקורת מקובלים בישראל ולפיכך אינה מאפשרת לנו להשיג ביטחון שניוודע לכל העניינים המשמעותיים שהיו יכולים להיות מזוהים בביקורת. בהתאם לכך, אין אנו מחווים חוות דעת של ביקורת.

מסקנה

בהתבסס על סקירתנו, לא בא בא לתשומת לבנו דבר הגורם לנו לסבור שהמידע הכספי פרופורמה הנ"ל אינו ערוך, מכל הבחינות המהותיות, בהתאם לתקן חשבונאות בינלאומי IAS 34 ולהנחות הפרופורמה המפורטות במידע כספי המאוחדים פרופורמה. בנוסף לאמור בפסקה הקודמת, בהתבסס על סקירתנו, לא בא לתשומת לבנו דבר הגורם לנו לסבור שהמידע הכספי פרופורמה הנ"ל אינו ממלא, מכל הבחינות המהותיות, אחר הוראות הגילוי לפי פרק ד' של תקנות ניירות ערך (דוחות תקופתיים ומידיים), התש"ל-1970.

פסקת הדגש ענין (הפנית תשומת לב)

מבלי לסייג את מסקנתינו הנ"ל, אנו מפנים את תשומת הלב לאמור בבאור 1.א לדוחות הכספיים פרופורמה בדבר שינוי המבנה בחברה במסגרתו יועברו זכויות בתאגידים כנגד הנפקת מניות של החברה ותמורת מזומן בסך 50 מיליון דולר אשר תקטין את הון החברה בסכום זה.

תל אביב, 18 בנובמבר 2025

זיו האפט

רואי חשבון

- 1 -

| אילת | מודיעין עילית | קרית שמונה | בני ברק | רחובות | באר שבע | חיפה | ירושלים | תל אביב |
|---|---|---|---|---|---|---|---|---|
| 08-6339911 | 08-9744111 | 077-8983322 | 073-7145300 | 03-6386788 | 077-7784100 | 04-8680600 | 02-6546200 | 03-6386868 |

**משרד ראשי:** בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 **דואל:** bdo@bdo.co.il בקרו באתר שלנו: www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

**SIMAD Holdings, Ltd**

דוחות מאוחדים תמציתיים פרופורמה על המצב הכספי (באלפי דולר)

| 31 בדצמבר | 30 ביוני | | |
|---:|---:|---:|:---|
| **2024** | **2024** | **2025** | |
| | בלתי מבוקר | | |
| | | | **נכסים** |
| | | | **נכסים שוטפים:** |
| 3,663 | 24,531 | 13,975 | מזומנים ושווי מזומנים |
| 664 | 12,890 | 13,655 | חייבים ויתרות חובה |
| 7,639 | 14,903 | 16,347 | צדדים קשורים |
| 11,966 | 52,324 | 43,977 | סה"כ נכסים שוטפים |
| | | | |
| | | | **נכסים לא שוטפים:** |
| 17,173 | 15,160 | 14,832 | השקעות המטופלות לפי שיטת השווי המאזני |
| 428,700 | 401,735 | 428,700 | רכוש קבוע |
| 445,873 | 416,895 | 443,532 | סה"כ נכסים לא שוטפים |
| | | | |
| 457,839 | 469,219 | 487,509 | **סה"כ נכסים:** |
| | | | |
| | | | **התחייבויות והון** |
| | | | **התחייבויות שוטפות:** |
| 9,016 | 8,937 | 9,764 | הלוואות מתאגידים בנקאיים ומאחרים |
| 4,134 | 4,095 | 10,376 | זכאים ויתרות זכות |
| 62,790 | 137,219 | 142,424 | מקדמות מלקוחות |
| 75,940 | 150,251 | 162,564 | סה"כ התחייבויות שוטפות |
| | | | |
| | | | **התחייבויות לא שוטפות:** |
| 176,585 | 181,214 | 169,578 | הלוואות מתאגידים בנקאיים ומאחרים |
| 4,765 | 4,565 | 4,965 | זכאים ויתרות זכות |
| 181,350 | 185,779 | 174,543 | סה"כ התחייבויות לא שוטפות |
| | | | |
| 257,290 | 336,030 | 337,107 | **סה"כ התחייבויות:** |
| | | | |
| | | | **הון:** |
| | | | **הון המיוחס לבעלי מניות החברה האם:** |
| 275,558 | 247,868 | 276,980 | הון מניות נפרע וקרנות הון |
| (111,501) | (143,343) | (151,781) | יתרת הפסד |
| 164,057 | 104,525 | 125,199 | סה"כ הון המיוחס לבעלי מניות החברה האם (ראה ביאור א.1) |
| 36,492 | 28,664 | 25,203 | **הון המיוחס לבעלי זכויות שאינן מקנות שליטה** |
| 200,549 | 133,189 | 150,402 | סה"כ הון |
| | | | |
| 457,839 | 469,219 | 487,509 | **סה"כ התחייבויות והון** |

18 בנובמבר, 2025

תאריך אישור הדוחות הכספיים

| Randy Mittasch | David Shabsels | Michael Shabsels |
|:---:|:---:|:---:|
| CFO | CEO | Chairman |

**SIMAD Holdings Ltd**

<div dir="rtl">

**דוחות מאוחדים תמציתיים פרופורמה על הרווח או הפסד ורווח כולל אחר (באלפי דולר)**

| | לשנה שהסתיימה ביום 31.12.2024 | לתקופה של שלושה חודשים שהסתיימה ביום 30.06.2024 | 30.06.2025 | לתקופה של שישה חודשים שהסתיימה ביום 30.06.2024 | 30.06.2025 |
|---|---|---|---|---|---|
| | | | בלתי מבוקר | | |
| הכנסות מהפעלה | 159,355 | 8,715 | 10,399 | 9,864 | 11,508 |
| עלות ההפעלה | (131,761) | (20,337) | (20,591) | (34,541) | (35,338) |
| **רווח (הפסד) גולמי** | 27,594 | (11,622) | (10,192) | (24,677) | (23,830) |
| הוצאות הנהלה וכלליות | (2,820) | (731) | (706) | (1,290) | (1,242) |
| הוצאות מכירה ושיווק | (4,307) | (464) | (549) | (830) | (975) |
| הכנסות (הוצאות) אחרות, נטו | 58 | 50 | 14 | (136) | 28 |
| חלק החברה ברווחי (הפסדי) חברות המטופלות בשיטת השווי המאזני, נטו | 1,522 | (453) | (728) | (1,010) | (1,301) |
| **רווח (הפסד) תפעולי** | 22,047 | (13,220) | (12,161) | (27,943) | (27,320) |
| הוצאות מימון | (11,960) | (2,884) | (2,840) | (5,715) | (5,632) |
| הכנסות מימון | 413 | 120 | 477 | 251 | 786 |
| סה"כ הוצאות מימון, נטו | (11,547) | (2,764) | (2,363) | (5,464) | (4,846) |
| **רווח (הפסד) לתקופה** | 10,500 | (15,984) | (14,524) | (33,407) | (32,166) |
| **רווח (הפסד) כולל אחר:** | | | | | |
| פריטים שלא יסווגו מחדש לרווח או הפסד: | | | | | |
| הערכה מחדש בגין שערוך רכוש קבוע | 32,195 | (243) | (216) | 1,083 | 1,765 |
| חלק הקבוצה ברווח (הפסד) כולל אחר, נטו של חברות המטופלות לפי שיטת השווי המאזני | 334 | 59 | (25) | 146 | (168) |
| סה"כ רווח כולל אחר | 32,529 | (184) | (241) | 1,229 | 1,597 |
| סה"כ רווח (הפסד) כולל לתקופה | 43,029 | (16,168) | (14,765) | (32,178) | (30,569) |
| רווח (הפסד) לתקופה המיוחס ל: | | | | | |
| בעלי מניות החברה האם | 8,806 | (14,044) | (12,938) | (29,088) | (28,280) |
| זכויות שאינן מקנות שליטה | 1,694 | (1,940) | (1,586) | (4,319) | (3,886) |
| | 10,500 | (15,984) | (14,524) | (33,407) | (32,166) |
| סה"כ רווח (הפסד) כולל המיוחס ל: | | | | | |
| בעלי מניות החברה האם | 37,448 | (14,237) | (13,101) | (28,055) | (26,858) |
| זכויות שאינן מקנות שליטה | 5,581 | (1,931) | (1,664) | (4,123) | (3,711) |
| | 43,029 | (16,168) | (14,765) | (32,178) | (30,569) |

</div>

- 3 -

**SIMAD Holdings, Ltd**

**דוחות מאוחדים תמציתיים פרופורמה על השינויים בהון (באלפי דולר)**

**לתקופה של שישה חודשים שהסתיימה ביום 30 ביוני 2025 (בלתי מבוקר)**

| סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל | יתרת הפסד | קרנות הון בגין עסקה עם בעל שליטה | קרן הערכה מחדש של רכוש קבוע | הון המניות הנפרע ופרמיה על מניות | |
|---|---|---|---|---|---|---|---|
| | | הון המיוחס לבעלי מניות החברה האם | | | | | |
| 200,549 | 36,492 | 164,057 | (111,501) | 647 | 273,197 | 1,714 | **יתרה ליום 1.1.2025** |
| (32,166) | (3,886) | (28,280) | (28,280) | - | - | - | הפסד לתקופה |
| 1,597 | 175 | 1,422 | | - | 1,422 | - | רווח כולל אחר |
| (30,569) | (3,711) | (26,858) | (28,280) | - | 1,422 | - | סך-הכל רווח (הפסד) כולל לתקופה |
| (19,578) | (7,578) | (12,000) | (12,000) | - | - | - | חלוקות לבעלים ולזכויות שאינן מקנות שליטה |
| 150,402 | 25,203 | 125,199 | (151,781) | 647 | 274,619 | 1,714 | **יתרה ליום 30.06.2025** |

**לתקופה של שישה חודשים שהסתיימה ביום 30 ביוני 2024 (בלתי מבוקר)**

| סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל | יתרת הפסד | קרנות הון בגין עסקה עם בעל שליטה | קרן הערכה מחדש של רכוש קבוע | הון המניות הנפרע ופרמיה על מניות | |
|---|---|---|---|---|---|---|---|
| | | הון המיוחס לבעלי מניות החברה האם | | | | | |
| 172,823 | 33,359 | 139,464 | (107,371) | 647 | 244,555 | 1,633 | **יתרה ליום 1.1.2024** |
| (33,407) | (4,319) | (29,088) | (29,088) | - | - | - | הפסד לתקופה |
| 1,229 | 196 | 1,033 | - | - | 1,033 | - | רווח כולל אחר |
| (32,178) | (4,123) | (28,055) | (29,088) | - | 1,033 | - | סך-הכל רווח (הפסד) כולל לתקופה |
| (7,456) | (572) | (6,884) | (6,884) | - | - | - | חלוקות לבעלים ולזכויות שאינן מקנות שליטה |
| 133,189 | 28,664 | 104,525 | (143,343) | 647 | 245,588 | 1,633 | **יתרה ליום 30.06.2024** |

- 4 -

**SIMAD Holdings, Ltd**

**דוחות מאוחדים תמציתיים פרופורמה על השינויים בהון (באלפי דולר)**

**לתקופה של שלושה חודשים שהסתיימה ביום 30 ביוני 2025 (בלתי מבוקר)**

| | הון המניות הנפרע ופרמיה על מניות | קרן הערכה מחדש של רכוש קבוע | קרנות הון בגין עסקה עם בעל שליטה | יתרת הפסד | סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל |
|---|---|---|---|---|---|---|---|
| **יתרה ליום 1.04.2025** | 1,714 | 274,782 | 647 | (127,730) | 149,413 | 34,298 | 183,711 |
| הפסד לתקופה | - | - | - | (12,938) | (12,938) | (1,586) | (14,524) |
| הפסד כולל אחר | - | (163) | - | - | (163) | (78) | (241) |
| סך-הכל הפסד כולל לתקופה | - | (163) | - | (12,938) | (13,101) | (1,664) | (14,765) |
| חלוקות לבעלים ולזכויות שאינן מקנות שליטה | - | - | - | (11,113) | (11,113) | (7,431) | (18,544) |
| **יתרה ליום 30.06.2025** | 1,714 | 274,619 | 647 | (151,781) | 125,199 | 25,203 | 150,402 |

**לתקופה של שלושה חודשים שהסתיימה ביום 30 ביוני 2024 (בלתי מבוקר)**

| | הון המניות הנפרע ופרמיה על מניות | קרן הערכה מחדש של רכוש קבוע | קרנות הון בגין עסקה עם בעל שליטה | יתרת הפסד | סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל |
|---|---|---|---|---|---|---|---|
| **יתרה ליום 1.04.2024** | 1,633 | 245,781 | 647 | (128,498) | 119,563 | 30,784 | 150,347 |
| הפסד לתקופה | - | - | - | (14,044) | (14,044) | (1,940) | (15,984) |
| רווח (הפסד) כולל אחר | - | (193) | - | - | (193) | 9 | (184) |
| סך-הכל הפסד כולל לתקופה | - | (193) | - | (14,044) | (14,237) | (1,931) | (16,168) |
| חלוקות לבעלים ולזכויות שאינן מקנות שליטה | - | - | - | (801) | (801) | (189) | (990) |
| **יתרה ליום 30.06.2024** | 1,633 | 245,588 | 647 | (143,343) | 104,525 | 28,664 | 133,189 |

- 5 -

**SIMAD Holdings, Ltd**

**דוחות מאוחדים תמציתיים פרופורמה על השינויים בהון (באלפי דולר)**

**לשנה שהסתיימה ביום 31.12.2024**

| סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל | יתרת הפסד | קרנות הון בגין עסקה עם בעל שליטה | קרן הערכה מחדש של רכוש קבוע | הון המניות הנפרע ופרמיה על מניות | |
|---|---|---|---|---|---|---|---|
| | | הון המיוחס לבעלי מניות החברה האם | | | | | |
| 172,823 | 33,359 | 139,464 | (107,371) | 647 | 244,555 | 1,633 | **יתרה ליום 1.1.2024** |
| 10,500 | 1,694 | 8,806 | 8,806 | - | - | - | הפסד לשנה |
| 32,529 | 3,887 | 28,642 | - | - | 28,642 | - | רווח כולל אחר |
| 43,029 | 5,581 | 37,448 | 8,806 | - | 28,642 | - | סך-הכל רווח כולל לשנה |
| (15,433) | (2,497) | (12,936) | (12,936) | - | - | - | חלוקות לבעלים ולזכויות שאינן מקנות שליטה |
| 130 | 49 | 81 | - | - | - | 81 | השקעות בעלים וזכויות שאינן מקנות שליטה |
| 200,549 | 36,492 | 164,057 | (111,501) | 647 | 273,197 | 1,714 | **יתרה ליום 31.12.2024** |

- 6 -

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים תמציתיים ליום 30 ביוני 2025 (באלפי דולר)**

| | לתקופה של שישה חודשים שהסתיימה ביום 30.06.2025 | 30.06.2024 | לתקופה של שלושה חודשים שהסתיימה ביום 30.06.2025 | 30.06.2024 | לשנה שהסתיימה ביום 31.12.2024 |
|---|---|---|---|---|---|
| | בלתי מבוקר | | | | |
| **תזרימי מזומנים מפעילות שוטפת:** | | | | | |
| רווח (הפסד) לתקופה | (32,166) | (33,407) | (14,524) | (15,984) | 10,500 |
| התאמות בגין: | | | | | |
| חלק החברה בהפסדי (רווחי) חברות המטופלות לפי שיטת השווי המאזני, נטו | 1,301 | 1,010 | 728 | 453 | (1,522) |
| פחת | 8,456 | 7,615 | 4,250 | 3,834 | 15,187 |
| הוצאות מימון, נטו | 4,846 | 5,464 | 2,363 | 2,764 | 11,547 |
| שינויים בנכסים ובהתחייבויות: | | | | | |
| עלייה במקדמות מלקוחות | 79,635 | 77,554 | 33,258 | 32,743 | 3,125 |
| ירידה (עלייה) בחייבים ויתרות חובה | (12,991) | (12,001) | (9,883) | (9,510) | 225 |
| עלייה (ירידה) בזכאים ויתרות זכות | (558) | 823 | 874 | 1,869 | 1,063 |
| מזומנים מפעילות שוטפת | 48,523 | 47,058 | 17,066 | 16,169 | 40,125 |
| דיבידנד שהתקבל מחברות כלולות | 872 | 1,015 | 451 | 516 | 1,720 |
| **מזומנים נטו מפעילות שוטפת** | 49,395 | 48,073 | 17,517 | 16,685 | 41,845 |
| **תזרימי מזומנים מפעילות השקעה:** | | | | | |
| רכישות והשקעות ברכוש קבוע | (6,692) | (6,532) | (4,466) | (4,077) | (9,957) |
| **מזומנים נטו מפעילות השקעה** | (6,692) | (6,532) | (4,466) | (4,077) | (9,957) |
| **תזרימי מזומנים מפעילות מימון:** | | | | | |
| קבלת הלוואות לזמן ארוך מתאגידים בנקאיים ומאחרים | - | 500 | - | - | 500 |
| פירעון הלוואות לזמן ארוך מתאגידים בנקאיים ומאחרים | (6,368) | (3,812) | (4,158) | (1,753) | (8,454) |
| השקעות בעלים | - | - | - | - | 81 |
| חלוקות לבעלים | (12,000) | (6,884) | (11,113) | (801) | (12,936) |
| השקעות זכויות שאינן מקנות שליטה | - | - | - | - | 49 |
| חלוקות לזכויות שאינן מקנות שליטה | (578) | (572) | (431) | (189) | (2,497) |
| צדדים קשורים, נטו | (8,708) | (10,397) | 4,388 | (6,422) | (3,133) |
| ריבית ששולמה | (4,737) | (5,376) | (2,309) | (2,723) | (11,366) |
| **מזומנים נטו מפעילות מימון** | (32,391) | (26,541) | (13,623) | (11,888) | (37,756) |
| **עלייה (ירידה) במזומנים ושווי מזומנים** | 10,312 | 15,000 | (572) | 720 | (5,868) |
| **יתרת מזומנים ושווי מזומנים לתחילת תקופה** | 3,663 | 9,531 | 14,547 | 23,811 | 9,531 |
| **יתרת מזומנים ושווי מזומנים לסוף תקופה** | 13,975 | 24,531 | 13,975 | 24,531 | 3,663 |
| **נספח א' – פעילות מהותית שאינה במזומן** | | | | | |
| חלוקות לזכויות שאינן מקנות שליטה | 7,000 | - | 7,000 | - | - |

7

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים תמציתיים ליום 30 ביוני 2025 (באלפי דולר)**

**ביאור 1 - כללי:**

**א.    כללי:**

SIMAD Holdings Ltd (להלן: "החברה") התאגדה ביום 28 במאי 2025, כחברה פרטית המאוגדת לפי דיני איי הבתולה הבריטיים על פי BVI Business Companies Act, 2004, ללא נכסים, התחייבויות ופעילות כלשהם (למעט הון מניות). החברה הוקמה לצורך גיוס הון, באמצעות הנפקת אגרות חוב שאינן ניתנות להמרה למניות, בבורסה לניירות ערך בתל-אביב. בעלי השליטה בחברה הינם מר Michael Shabsels ומר David Shabsels (להלן: "בעלי השליטה").

שינוי מבנה:

בעלי השליטה בחברה התחייבו, כי קודם לרישום למסחר בבורסה של אגרות החוב המוצעות לציבור, הם יעבירו לחברה את זכויותיהם בתאגידים, המחזיקים בשרשור בזכויות ב-30 נכסי נדל"ן בארה"ב (להלן – "הישויות המועברות"), כנגד הנפקת מניות של החברה ותשלום מזומן בסך של 50 מיליון דולר, אשר יקטין את הון החברה בסכום זה. תשלום המזומן כאמור יתבצע מתוך תמורת הנפקת אגרות החוב (סדרה א') של החברה (להלן: "העברה" או "רכישה"). קודם למועד ההעברה הוחזקו הישויות המועברות על ידי בעלי השליטה.

למועד הדוח הכספי, עיקר פעילות החברה והישויות המועברות הינה תפעול מחנות קיץ בארה"ב, הממוקמים בשטחי נדל"ן שבבעלות החברה.

הרכישה כאמור מותנית ותלויה בשלושה גורמים עיקריים:

1. השלמת הנפקת אגרות חוב.
2. אישורים של מספר מוסדות פיננסיים, המחזיקים בביטחונות על הנכסים המוחזקים על ידי הישויות המועברות.
3. בסדרה של הסכמים אשר טרם נחתמו, אשר במהותם הסכמים להעברת זכויות בעל השליטה בחברות הנכס לחברה.

ההסכמים והאישורים הנדרשים יתקבלו לפני מועד הרכישה.

מכיוון שהישויות המועברות נשלטות על ידי אותם בעלי השליטה בחברה לפני הרכישה ולאחריה, הרכישה אינה מטופלת בהתאם לתקן דיווח כספי בינלאומי IFRS3.

החברה טיפלה ברכישה בשיטת איחוד העניין (pooling of interests). כמו כן החברה ערכה דוחות כספיים מאוחדים פרופורמה על מנת לשקף בהם את הרכישה כאילו היא התרחשה בתחילת התקופה המוקדמת ביותר המוצגת בדוחות הכספיים (1 בינואר 2022). לפיכך, הדוחות הכספיים המאוחדים פרופורמה:

- משקפים את המצב הכספי, את תוצאות הפעילות ואת תזרימי המזומנים של החברה ושל החברות המועברות, במאוחד.
- נכסים והתחייבויות של הישויות המועברות הוכרו ליום 1 בינואר 2022 או למועד רכישתם, לפי המאוחר, לפי ערכם בספרים של בעל השליטה הסופי בחברה באותו מועד.

העברת הזכויות המועברות לחברה תהיה על בסיס "AS IS" במועד ההעברה, והחברה לא תהיה זכאית לכל שיפוי מהגופים המעבירים ביחס לזכויות המועברות. מובהר כי לאחר השלמת העברת הזכויות המועברות לחברה, לא יחולו על החברה מגבלות על מכירת הזכויות המועברות לחברה ו/או על מכירת הנכסים שבבעלותן, למעט קבלת אישורי המלווים ביחס לכל מכירה ו/או העברה.

8

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים תמציתיים ליום 30 ביוני 2025 (באלפי דולר)**

**ביאור 1 – כללי (המשך):**

**ב.    גירעון בהון חוזר**

ליום 30 ביוני 2025 לחברה גירעון בהון חוזר בסך של כ- 118.6 מיליון דולר.

עיקר הגירעון נובע ממקדמות שהתקבלו מלקוחות בסך של כ- 142.4 מיליון דולר עבור רישום למחנות קיץ בארה"ב.

להערכת החברה יש ביכולתה לעמוד בפירעון התחייבויותיה בעתיד הנראה לעין, בין היתר באמצעות תזרימי מזומנים חיובים מפעילות שוטפת ופעולות אחרות ככל וידרשו שיאפשרו לה לעמוד בהתחייבויותיה השוטפות ולממן את פעילותה.

**ביאור 2 - עיקרי המדיניות החשבונאית:**

**עקרונות עריכת הדוחות הכספיים פרופורמה:**

הדוחות הכספיים התמציתיים פרופורמה ביניים מצייתים להוראות תקן חשבונאות בינלאומי 34 בדבר דיווח כספי לתקופות ביניים. כמו כן, הדוחות התמציתיים פרופורמה ביניים מקיימים את הוראות הגילוי לפי פרק ד' לתקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970.

הדוחות הכספיים התמציתיים פרופורמה ביניים נערכו לפי אותה מדיניות חשבונאית ושיטות החישוב שיושמו בדוחות הכספיים השנתיים של החברה ליום 31 בדצמבר 2024.

יש לעיין בדוחות הכספיים התמציתיים ביניים של החברה יחד עם הדוחות הכספיים השנתיים של החברה ליום 31 בדצמבר 2024 והביאורים המצורפים להם. לכן, לא הובאו במסגרת דוחות כספיים תמציתיים ביניים אלה ביאורים בדבר עדכונים לא משמעותיים יחסית למידע שכבר דווח בביאורים לדוחות הכספיים השנתיים האחרונים של החברה.

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים תמציתיים ליום 30 ביוני 2025 (באלפי דולר)**

**ביאור 3 - השקעה בחברות מוחזקות:**

**מידע על חברות כלולות מהותיות המטופלת תוך שימוש בשיטת השווי המאזני**

להלן מידע פיננסי מתומצת לגבי נתונים על המצב הכספי ותוצאות הפעולות של החברה המוחזקת הערוכים בהתאם ל-
IFRS ולמדיניות החשבונאית (מדידה לפי שיטת השווי המאזני) של החברה וללא התאמה בגין שיעור ההחזקה

Willow Lake Day Camps, LLC & Willow Lake Land Corporation (Willow Lake)

| 31 בדצמבר 2024 | 30 ביוני | | |
|---|---|---|---|
| | 2024 | 2025 | |
| מבוקר | לא מבוקר | | |
| 4,607 | 5,321 | 6,168 | נכסים שוטפים |
| 36,600 | 35,500 | 36,600 | רכוש קבוע |
| (5,101) | (10,502) | (11,344) | התחייבויות שוטפות |
| (1,759) | - | (1,759) | התחייבויות לא שוטפות |
| 34,347 | 30,319 | 29,665 | נכסים נטו |
| 17,173 | 15,160 | 14,832 | **ערך בספרים של ההשקעה בחברה הכלולה** |

| לשנה שהסתיימה ביום 31 בדצמבר 2024 | לתקופה של שלושה חודשים שהסתיימה ביום 30 ביוני | | לתקופה של שישה חודשים שהסתיימה ביום 30 ביוני | |
|---|---|---|---|---|
| | 2024 | 2025 | 2024 | 2025 |
| מבוקר | לא מבוקר | | | |
| 10,664 | - | - | - | - | הכנסות |
| 3,045 | (907) | (1,457) | (2,021) | (2,603) | רווח (הפסד) לתקופה |
| 3,709 | (788) | (1,506) | (1,729) | (2,938) | סך רווח (הפסד) כולל לתקופה |
| 1,720 | 516 | 451 | 1,015 | 872 | **דיבידנדים שהתקבלו בקבוצה מהחברה הכלולה** |

10

# **SIMAD Holdings, Ltd**

**דוחות כספיים ליום 30 ביוני 2025**

# SIMAD Holdings, Ltd

### דוחות כספיים ליום 30 ביוני 2025

### תוכן העניינים

| ע מ ו ד | |
|---|---|
| 1 | דוח רואה החשבון המבקר לבעלי המניות |
| 2 | דוח על המצב הכספי |
| 3-4 | ביאורים לדוח הכספי |

_____

_____

_____



**דוח רואה החשבון המבקר לבעלי המניות של SIMAD Holdings, Ltd**

ביקרנו את הדוח על המצב הכספי המצורף של SIMAD Holdings, Ltd (להלן: "**החברה**") ליום 30 ביוני 2025. דוח כספי זה הינו באחריות הדירקטוריון וההנהלה של החברה. אחריותנו היא לחוות דעה על דוח כספי זה בהתבסס על ביקורתנו..

ערכנו את ביקורתנו בהתאם לתקני ביקורת מקובלים בישראל, לרבות תקנים שנקבעו בתקנות רואי חשבון (דרך פעולתו של רואה חשבון), התשל"ג-1973. על-פי תקנים אלה נדרש מאיתנו לתכנן את הביקורת ולבצעה במטרה להשיג מידה סבירה של ביטחון שאין בדוח הכספי הצגה מוטעית מהותית. ביקורת כוללת בדיקה מדגמית של ראיות התומכות בסכומים ובמידע שבדוחות הכספיים. ביקורת כוללת גם בחינה של כללי החשבונאות שיושמו ושל האומדנים המשמעותיים שנעשו על ידי הדירקטוריון וההנהלה של החברה וכן הערכת נאותות ההצגה בדוח הכספי בכללותה. אנו סבורים שביקורתנו מספקת בסיס נאות לחוות דעתנו..

לדעתנו, בהתבסס על ביקורתנו, הדוח הכספי הנ"ל משקף באופן נאות, מכל הבחינות המהותיות, את המצב הכספי של החברה ליום 30 ביוני 2025 בהתאם לתקני דיווח כספי בינלאומיים חשבונאיים (accounting standards IFRS), הוראות תקנות ניירות ערך (דוחות כספיים שנתיים), התש"ע-2010

תל אביב, 18 בנובמבר, 2025

זיו האפט

רואי חשבון

| תל אביב | ירושלים | חיפה | באר שבע | בני ברק | קרית שמונה | פתח תקווה | מודיעין עילית | נצרת עילית | אילת |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 03-6386868 | 02-6546200 | 04-8680600 | 077-7784100 | 073-7145300 | 077-5054906 | 077-7784180 | 08-9744111 | 04-6555888 | 08-6339911 |

**משרד ראשי:** בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 **דוא"ל:** bdo@bdo.co.il **בקרו באתר שלנו:** www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

**SIMAD Holdings, Ltd**

דוחות על המצב הכספי (באלפי דולר)

---

30 ביוני
2025

נכסים:

(*)

(*)      **סה"כ נכסים**

הון עצמי:

(*)      סה"כ הון עצמי

(*)      **סה"כ הון עצמי והתחייבויות**

(*) פחות מ-1 אלפי דולר.

18 בנובמבר, 2025
תאריך אישור הדוחות הכספיים

| Randy Mittasch<br>CFO | David Shabsels<br>CEO | Michael Shabsels<br>Chairman | |
|---|---|---|---|

– 2 -

**SIMAD Holdings, Ltd**

<div dir="rtl">

ביאורים לדוח הכספי

**ביאור 1 - כללי**

SIMAD Holdings Ltd (להלן: "החברה") התאגדה ביום 28 במאי 2025, כחברה פרטית המאוגדת לפי דיני איי הבתולה הבריטיים על פי BVI Business Companies Act, 2004, ללא נכסים, התחייבויות ופעילות כלשהם (למעט הון מניות). החברה הוקמה לצורך גיוס הון, באמצעות הנפקת אגרות חוב שאינן ניתנות להמרה למניות, בבורסה לניירות ערך בתל-אביב. בעלי השליטה בחברה הינם מר Michael Shabsels ומר David Shabsels (להלן: "בעלי השליטה").

בעלי השליטה התחייבו, כי קודם לרישום למסחר בבורסה של אגרות החוב המוצעות לציבור, הם יעבירו לחברה את זכויותיהם בתאגידים, המחזיקים בשרשור בזכויות ב-30 נכסי נדל"ן בארה"ב (להלן – "הישויות המועברות"), כנגד הנפקת מניות של החברה ותשלום מזומן בסך של 50 מיליון דולר. תשלום המזומן כאמור יתבצע מתוך תמורת הנפקת אגרות החוב (סדרה א') של החברה (להלן: "העברה" או "רכישה"). קודם למועד ההעברה הוחזקו הישויות המועברות על ידי בעלי השליטה.

לאחר ההעברה עיקר פעילות החברה והישויות המועברות תהייה תפעול מחנות קיץ בארה"ב, הממוקמים בשטחי נדל"ן שבבעלות החברה.

דוח על הרווח הכולל, דוח על השינויים בהון ודוח על תזרימי המזומנים לא נכללו בדוח הכספי, מאחר ולמועד הדוחות הכספיים אין לחברה כל פעילות.

</div>

- 3 -

**SIMAD Holdings, Ltd**

ביאורים לדוח הכספי

---

**ביאור 2 - עיקרי המדיניות החשבונאית**

**2.1 עקרונות עריכת הדוחות הכספיים התמציתיים ביניים**

הדוח הכספי ערוך בהתאם לתקן חשבונאות בינלאומי 34, בדבר דיווח כספי לתקופות ביניים. כמו כן הדוח הכספי מקיים את הוראות הגילוי לפי פרק ד' לתקנות ניירות ערך (דוחות תקופתיים ומיידים), התש"ל -1970.

**2.2 שיטת איחוד העניין**

החברה מטפלת ברכישה בשיטת איחוד העניין (pooling of interests). כמו כן החברה ערכה דוחות כספיים מאוחדים פרופורמה ליום 31 בדצמבר 2024 וליום 30 ביוני 2025 על מנת לשקף בהם את הרכישה כאילו היא התרחשה בתחילת התקופה המוקדמת ביותר המוצגת בדוחות הכספיים (1 בינואר 2022). לפיכך, הדוחות הכספיים המאוחדים פרופורמה:

- משקפים את המצב הכספי, את תוצאות הפעילות ואת תזרימי המזומנים של החברה ושל החברות המועברות, במאוחד.

- נכסים והתחייבויות של הישויות המועברות הוכרו ליום 1 בינואר 2022 לפי ערכם בספרים של בעל השליטה הסופי בחברה באותו מועד.

- נכסים שנרכשו והתחייבויות שניטלו על ידי הישויות המועברות לאחר יום 1 בינואר 2022, משקפים את הנכסים וההתחייבויות ואת הפעילויות שלהם החל ממועד ההכרה בהם על ידי הישויות המועברות.

- יתרת ההון של הישויות המועברות ליום 1 בינואר 2022 סווגה בדוח פרופורמה על השינויים בהון. חלוקות שבוצעו לבעלי המניות קיבלו ביטוי בדוח פרופורמה על השינויים בהון בהנחה כי החלוקה הינה מתוך העודפים.

העברת הזכויות המועברות לחברה במועד הסגירה תהיה על בסיס "AS IS" במועד ההעברה, והחברה לא תהיה זכאית לכל שיפוי מהגופים המעבירים ביחס לזכויות המועברות. מובהר כי לאחר השלמת העברת הזכויות המועברות לחברה, לא יחולו על החברה מגבלות על מכירת הזכויות המועברות לחברה ו/או על מכירת הנכסים שבבעלותן, למעט קבלת אישורי המלווים ביחס לכל מכירה ו/או העברה.

למידע נוסף ראה ביאור 1 בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 ביוני 2025.

- 4 -

# SIMAD Holdings, Ltd

## דוחות כספיים תמציתיים מאוחדים פרופורמה ליום 30 בספטמבר 2025

### (בלתי מבוקר)

# **SIMAD Holdings, Ltd**

### **דוחות כספיים מאוחדים תמציתיים פרופורמה ליום 30 בספטמבר 2025**

### **תוכן העניינים**

| ע מ ו ד | |
|---|---|
| 1 | דוח סקירה של רואה החשבון המבקר |
| 2 | דוחות מאוחדים תמציתיים פרופורמה על המצב הכספי |
| 3 | דוחות מאוחדים תמציתיים פרופורמה על הרווח או הפסד ורווח כולל אחר |
| 4-6 | דוחות מאוחדים תמציתיים פרופורמה על השינויים בהון |
| 7 | דוחות מאוחדים תמציתיים פרופורמה על תזרימי המזומנים |
| 8-10 | ביאורים לדוחות הכספיים המאוחדים תמציתיים פרופורמה |

**LBDO**

**דוח סקירה של רואה החשבון המבקר לבעלי המניות של SIMAD Holdings, Ltd**

מבוא

סקרנו את המידע הכספי המצורף של SIMAD Holdings, Ltd (להלן – "החברה"), הכולל את הדוחות התמציתיים המאוחדים פרופורמה על המצב הכספי ליום 30 בספטמבר 2025 ואת הדוחות התמציתיים המאוחדים פרופורמה על רווח או הפסד ורווח כולל אחר, השינויים בהון ותזרימי המזומנים לתקופות של תשעה ושלושה חודשים שהסתיימו באותו תאריך. הדירקטוריון וההנהלה אחראים לעריכה ולהצגה של מידע כספי  לתקופת ביניים זו בהתאם לתקן חשבונאות בינלאומי IAS 34 "דיווח כספי לתקופות ביניים", בכפוף להנחות הפרופורמה המפורטות במידע הכספי המאוחד פרופורמה וכן הם אחראים לעריכת מידע כספי לתקופות ביניים זו לפי פרק ד' של תקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970. אחריותנו היא להביע מסקנה על מידע כספי לתקופת ביניים זו בהתבסס על סקירתנו.

היקף הסקירה

ערכנו את סקירתנו בהתאם לתקן סקירה (ישראל) 2410 של לשכת רואי חשבון בישראל "סקירה של מידע כספי לתקופות ביניים הנערכת על ידי רואה החשבון המבקר של הישות". סקירה של מידע כספי לתקופות ביניים מורכבת מבירורים, בעיקר עם אנשים האחראים לעניינים הכספיים והחשבונאיים, ומיישום נהלי סקירה אנליטיים ואחרים. סקירה הינה מצומצמת בהיקפה במידה ניכרת מאשר ביקורת הנערכת בהתאם לתקני ביקורת מקובלים בישראל ולפיכך אינה מאפשרת לנו להשיג ביטחון שניוודע לכל העניינים המשמעותיים שהיו יכולים להיות מזוהים בביקורת. בהתאם לכך, אין אנו מחווים חוות דעת של ביקורת.

מסקנה

בהתבסס על סקירתנו, לא בא בא לתשומת לבנו דבר הגורם לנו לסבור שהמידע הכספי פרופורמה הנ"ל אינו ערוך, מכל הבחינות המהותיות, בהתאם לתקן חשבונאות בינלאומי IAS 34 ולהנחות הפרופורמה המפורטות במידע כספי המאוחדים פרופורמה.

בנוסף לאמור בפסקה הקודמת, בהתבסס על סקירתנו, לא בא לתשומת לבנו דבר הגורם לנו לסבור שהמידע הכספי פרופורמה הנ"ל אינו ממלא, מכל הבחינות המהותיות, אחר הוראות הגילוי לפי פרק ד' של תקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970.

פסקת הדגש ענין (הפנית תשומת לב)

מבלי לסייג את מסקנתינו הנ"ל, אנו מפנים את תשומת הלב לאמור בבאור 1.א לדוחות הכספיים פרופורמה בדבר שינוי המבנה בחברה במסגרתו יועברו זכויות בתאגידים כנגד הנפקת מניות של החברה ותמורת מזומן בסך 50 מיליון דולר אשר תקטין את הון החברה בסכום זה.

תל אביב, 18 בנובמבר, 2025

זיו האפט

רואי חשבון

- 1 -

| אילת | מודיעין עילית | קרית שמונה | בני ברק | רחובות | באר שבע | חיפה | ירושלים | תל אביב |
|---|---|---|---|---|---|---|---|---|
| 08-6339911 | 08-9744111 | 077-8983322 | 073-7145300 | 03-6386788 | 077-7784100 | 04-8680600 | 02-6546200 | 03-6386868 |

**משרד ראשי:** בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 **דואל:** bdo@bdo.co.il **בקרו באתר שלנו:** www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

**SIMAD Holdings, Ltd**

דוחות מאוחדים תמציתיים פרופורמה על המצב הכספי (באלפי דולר)

| 31 בדצמבר | 30 בספטמבר | | |
|---|---|---|---|
| 2024 | 2024 | 2025 | |
| | בלתי מבוקר | | |
| | | | **נכסים** |
| | | | **נכסים שוטפים:** |
| 3,663 | 5,068 | 7,867 | מזומנים ושווי מזומנים |
| 664 | 853 | 1,258 | חייבים ויתרות חובה |
| 7,639 | 11,623 | 1,399 | צדדים קשורים |
| 11,966 | 17,544 | 10,524 | סה"כ נכסים שוטפים |
| | | | |
| | | | **נכסים לא שוטפים:** |
| 17,173 | 17,691 | 17,590 | השקעות המטופלות לפי שיטת השווי המאזני |
| 428,700 | 401,735 | 428,700 | רכוש קבוע |
| 445,873 | 419,426 | 446,290 | סה"כ נכסים לא שוטפים |
| | | | |
| 457,839 | 436,970 | 456,814 | **סה"כ נכסים:** |
| | | | |
| | | | **התחייבויות והון** |
| | | | **התחייבויות שוטפות:** |
| 9,016 | 8,993 | 12,906 | הלוואות מתאגידים בנקאיים ומאחרים |
| 4,134 | 8,545 | 13,583 | זכאים ויתרות זכות |
| 62,790 | 37,475 | 41,876 | מקדמות מלקוחות |
| 75,940 | 55,013 | 68,365 | סה"כ התחייבויות שוטפות |
| | | | |
| | | | **התחייבויות לא שוטפות:** |
| 176,585 | 178,678 | 164,017 | הלוואות מתאגידים בנקאיים ומאחרים |
| 4,765 | 4,665 | 5,065 | זכאים ויתרות זכות |
| 181,350 | 183,343 | 169,082 | סה"כ התחייבויות לא שוטפות |
| | | | |
| 257,290 | 238,356 | 237,447 | **סה"כ התחייבויות:** |
| | | | |
| | | | **הון:** |
| | | | **הון המיוחס לבעלי מניות החברה האם:** |
| 275,558 | 249,481 | 278,971 | הון מניות נפרע וקרנות הון |
| (111,501) | (88,251) | (93,404) | יתרת הפסד |
| 164,057 | 161,230 | 185,567 | סה"כ הון המיוחס לבעלי מניות החברה האם (ראה ביאור 1.א) |
| 36,492 | 37,384 | 33,800 | **הון המיוחס לבעלי זכויות שאינן מקנות שליטה** |
| 200,549 | 198,614 | 219,367 | סה"כ הון |
| | | | |
| 457,839 | 436,970 | 456,814 | **סה"כ התחייבויות והון** |

18 בנובמבר, 2025

| | | | תאריך אישור הדוחות הכספיים |
|---|---|---|---|
| Randy Mittasch | David Shabsels | Michael Shabsels | |
| CFO | CEO | Chairman | |

**SIMAD Holdings Ltd**

**דוחות מאוחדים תמציתיים פרופורמה על הרווח או הפסד ורווח כולל אחר (באלפי דולר)**

| לשנה שהסתיימה ביום | לתקופה של שלושה חודשים שהסתיימה ביום | | לתקופה של תשעה חודשים שהסתיימה ביום | | |
|---|---|---|---|---|---|
| **31.12.2024** | **30.09.2024** | **30.09.2025** | **30.09.2024** | **30.09.2025** | |
| | | בלתי מבוקר | | | |
| 159,355 | 146,381 | 149,444 | 156,245 | 160,952 | הכנסות מהפעלה |
| (131,761) | (78,463) | (79,560) | (113,004) | (114,898) | עלות ההפעלה |
| 27,594 | 67,918 | 69,884 | 43,241 | 46,054 | **רווח גולמי** |
| (2,820) | (1,053) | (861) | (2,343) | (2,103) | הוצאות הנהלה וכלליות |
| (4,307) | (2,508) | (2,408) | (3,338) | (3,383) | הוצאות מכירה ושיווק |
| 58 | 12 | 25 | (124) | 53 | הכנסות (הוצאות) אחרות, נטו |
| 1,522 | 3,102 | 3,288 | 2,092 | 1,987 | חלק החברה ברווחי (הפסדי) חברות המטופלות בשיטת השווי המאזני, נטו |
| 22,047 | 67,471 | 69,928 | 39,528 | 42,608 | **רווח תפעולי** |
| (11,960) | (2,907) | (2,647) | (8,622) | (8,279) | הוצאות מימון |
| 413 | 64 | 400 | 315 | 1,186 | הכנסות מימון |
| (11,547) | (2,843) | (2,247) | (8,307) | (7,093) | סה"כ הוצאות מימון, נטו |
| 10,500 | 64,628 | 67,681 | 31,221 | 35,515 | **רווח לתקופה** |
| | | | | | **רווח (הפסד) כולל אחר:** |
| | | | | | פריטים שלא יסווגו מחדש לרווח או הפסד: |
| 32,195 | 2,170 | 2,410 | 3,253 | 4,175 | הערכה מחדש בגין שערוך רכוש קבוע |
| 334 | (215) | 34 | (69) | (134) | חלק הקבוצה ברווח (הפסד) כולל אחר, נטו של חברות המטופלות לפי שיטת השווי המאזני |
| 32,529 | 1,955 | 2,444 | 3,184 | 4,041 | סה"כ רווח כולל אחר |
| 43,029 | 66,583 | 70,125 | 34,405 | 39,556 | סה"כ רווח כולל לתקופה |
| | | | | | רווח לתקופה המיוחס ל: |
| 8,806 | 56,024 | 59,040 | 26,936 | 30,760 | בעלי מניות החברה האם |
| 1,694 | 8,604 | 8,641 | 4,285 | 4,755 | זכויות שאינן מקנות שליטה |
| 10,500 | 64,628 | 67,681 | 31,221 | 35,515 | |
| | | | | | סה"כ רווח כולל המיוחס ל: |
| 37,448 | 57,607 | 61,031 | 29,552 | 34,173 | בעלי מניות החברה האם |
| 5,581 | 8,976 | 9,094 | 4,853 | 5,383 | זכויות שאינן מקנות שליטה |
| 43,029 | 66,583 | 70,125 | 34,405 | 39,556 | |

**SIMAD Holdings, Ltd**

**דוחות מאוחדים תמציתיים פרופורמה על השינויים בהון (באלפי דולר)**

**לתקופה של תשעה חודשים שהסתיימה ביום 30 בספטמבר 2025 (בלתי מבוקר)**

| סך-הכל | זכויות שאינן מקנות שליטה | הון המיוחס לבעלי מניות החברה האם | | | | | |
|---|---|---|---|---|---|---|---|
| | | סך-הכל | יתרת הפסד | קרנות הון בגין עסקה עם בעל שליטה | קרן הערכה מחדש של רכוש קבוע | הון המניות הנפרע ופרמיה על מניות | |
| 200,549 | 36,492 | 164,057 | (111,501) | 647 | 273,197 | 1,714 | **יתרה ליום 1.1.2025** |
| 35,515 | 4,755 | 30,760 | 30,760 | - | - | - | רווח לתקופה |
| 4,041 | 628 | 3,413 | - | - | 3,413 | - | רווח כולל אחר |
| 39,556 | 5,383 | 34,173 | 30,760 | - | 3,413 | - | סך-הכל רווח כולל לתקופה |
| (20,738) | (8,075) | (12,663) | (12,663) | - | - | - | חלוקות לבעלים ולזכויות שאינן מקנות שליטה |
| 219,367 | 33,800 | 185,567 | (93,404) | 647 | 276,610 | 1,714 | **יתרה ליום 30.09.2025** |

**לתקופה של תשעה חודשים שהסתיימה ביום 30 בספטמבר 2024 (בלתי מבוקר)**

| סך-הכל | זכויות שאינן מקנות שליטה | הון המיוחס לבעלי מניות החברה האם | | | | | |
|---|---|---|---|---|---|---|---|
| | | סך-הכל | יתרת הפסד | קרנות הון בגין עסקה עם בעל שליטה | קרן הערכה מחדש של רכוש קבוע | הון המניות הנפרע ופרמיה על מניות | |
| 172,823 | 33,359 | 139,464 | (107,371) | 647 | 244,555 | 1,633 | **יתרה ליום 1.1.2024** |
| 31,221 | 4,285 | 26,936 | 26,936 | - | - | - | רווח לתקופה |
| 3,184 | 568 | 2,616 | - | - | 2,616 | - | רווח כולל אחר |
| 34,405 | 4,853 | 29,552 | 26,936 | - | 2,616 | - | סך-הכל רווח כולל לתקופה |
| (8,644) | (828) | (7,816) | (7,816) | - | - | - | חלוקות לבעלים ולזכויות שאינן מקנות שליטה |
| 30 | - | 30 | - | - | - | 30 | השקעות בעלים |
| 198,614 | 37,384 | 161,230 | (88,251) | 647 | 247,171 | 1,663 | **יתרה ליום 30.09.2024** |

- 4 -

**SIMAD Holdings, Ltd**

דוחות מאוחדים תמציתיים פרופורמה על השינויים בהון (באלפי דולר)

**לתקופה של שלושה חודשים שהסתיימה ביום 30 בספטמבר 2025 (בלתי מבוקר)**

| סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל | יתרת הפסד | קרנות הון בגין עסקה עם בעל שליטה | קרן הערכה מחדש של רכוש קבוע | הון המניות הנפרע ופרמיה על מניות | |
|---|---|---|---|---|---|---|---|
| | | | | הון המיוחס לבעלי מניות החברה האם | | | |
| 150,402 | 25,203 | 125,199 | (151,781) | 647 | 274,619 | 1,714 | **יתרה ליום 1.07.2025** |
| 67,681 | 8,641 | 59,040 | 59,040 | - | - | - | רווח לתקופה |
| 2,444 | 453 | 1,991 | - | - | 1,991 | - | רווח כולל אחר |
| 70,125 | 9,094 | 61,031 | 59,040 | - | 1,991 | - | סך-הכל רווח כולל לתקופה |
| (1,160) | (497) | (663) | (663) | - | - | - | חלוקות לבעלים ולזכויות שאינן מקנות שליטה |
| 219,367 | 33,800 | 185,567 | (93,404) | 647 | 276,610 | 1,714 | **יתרה ליום 30.09.2025** |

**לתקופה של שלושה חודשים שהסתיימה ביום 30 בספטמבר 2024 (בלתי מבוקר)**

| סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל | יתרת הפסד | קרנות הון בגין עסקה עם בעל שליטה | קרן הערכה מחדש של רכוש קבוע | הון המניות הנפרע ופרמיה על מניות | |
|---|---|---|---|---|---|---|---|
| | | | | הון המיוחס לבעלי מניות החברה האם | | | |
| 133,189 | 28,664 | 104,525 | (143,343) | 647 | 245,588 | 1,633 | **יתרה ליום 1.07.2024** |
| 64,628 | 8,604 | 56,024 | 56,024 | - | - | - | רווח לתקופה |
| 1,955 | 372 | 1,583 | - | - | 1,583 | - | רווח כולל אחר |
| 66,583 | 8,976 | 57,607 | 56,024 | | 1,583 | - | סך-הכל רווח כולל לתקופה |
| (1,188) | (256) | (932) | (932) | - | - | - | חלוקות לבעלים ולזכויות שאינן מקנות שליטה |
| 30 | - | 30 | - | - | - | 30 | השקעות בעלים |
| 198,614 | 37,384 | 161,230 | (88,251) | 647 | 247,171 | 1,663 | **יתרה ליום 30.09.2024** |

**SIMAD Holdings, Ltd**

<div dir="rtl">

**דוחות מאוחדים תמציתיים פרופורמה על השינויים בהון (באלפי דולר)**

**לשנה שהסתיימה ביום 31.12.2024**

| | הון המניות הנפרע ופרמיה על מניות | קרן הערכה מחדש של רכוש קבוע | קרנות הון בגין עסקה עם בעל שליטה | יתרת הפסד | סך-הכל | זכויות שאינן מקנות שליטה | סך-הכל |
|---|---|---|---|---|---|---|---|
| | | | | | הון המיוחס לבעלי מניות החברה האם | | |
| **יתרה ליום 1.1.2024** | 1,633 | 244,555 | 647 | (107,371) | 139,464 | 33,359 | 172,823 |
| הפסד לשנה | - | - | - | 8,806 | 8,806 | 1,694 | 10,500 |
| רווח כולל אחר | - | 28,642 | - | - | 28,642 | 3,887 | 32,529 |
| סך-הכל רווח כולל לשנה | - | 28,642 | - | 8,806 | 37,448 | 5,581 | 43,029 |
| חלוקות לבעלים ולזכויות שאינן מקנות שליטה | - | - | - | (12,936) | (12,936) | (2,497) | (15,433) |
| השקעות בעלים וזכויות שאינן מקנות שליטה | 81 | - | - | - | 81 | 49 | 130 |
| **יתרה ליום 31.12.2024** | 1,714 | 273,197 | 647 | (111,501) | 164,057 | 36,492 | 200,549 |

</div>

- 6 -

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים תמציתיים ליום 30 בספטמבר 2025 (באלפי דולר)**

| לשנה שהסתיימה ביום 31.12.2024 | לתקופה של שלושה חודשים שהסתיימה ביום 30.09.2024 | 30.09.2025 | לתקופה של תשעה חודשים שהסתיימה ביום 30.09.2024 | 30.09.2025 | |
|---|---|---|---|---|---|
| | | בלתי מבוקר | | | |
| | | | | | **תזרימי מזומנים מפעילות שוטפת:** |
| 10,500 | 64,628 | 67,681 | 31,221 | 35,515 | רווח לתקופה |
| | | | | | התאמות בגין: |
| (1,522) | (3,102) | (3,288) | (2,092) | (1,987) | חלק החברה ברווחי חברות המטופלות לפי שיטת השווי המאזני, נטו |
| 15,187 | 3,805 | 4,231 | 11,420 | 12,687 | פחת |
| 11,547 | 2,843 | 2,247 | 8,307 | 7,093 | הוצאות מימון, נטו |
| | | | | | שינויים בנכסים ובהתחייבויות: |
| 3,125 | (99,744) | (100,549) | (22,190) | (20,914) | עלייה (ירידה) במקדמות מלקוחות |
| 225 | 12,037 | 12,397 | 36 | (594) | ירידה (עלייה) בחייבים ויתרות חובה |
| 1,063 | 4,549 | 3,308 | 5,372 | 2,750 | עלייה (ירידה) בזכאים ויתרות זכות |
| 40,125 | (14,984) | (13,973) | 32,074 | 34,550 | מזומנים מפעילות שוטפת |
| 1,720 | 355 | 564 | 1,370 | 1,436 | דיבידנד שהתקבל מחברות כלולות |
| 41,845 | (14,629) | (13,409) | 33,444 | 35,986 | **מזומנים נטו מפעילות שוטפת** |
| | | | | | **תזרימי מזומנים מפעילות השקעה:** |
| (9,957) | (1,635) | (1,821) | (8,167) | (8,513) | רכישות והשקעות ברכוש קבוע |
| (9,957) | (1,635) | (1,821) | (8,167) | (8,513) | **מזומנים נטו מפעילות השקעה** |
| | | | | | **תזרימי מזומנים מפעילות מימון:** |
| 500 | - | - | 500 | - | קבלת הלוואות לזמן ארוך מתאגידים בנקאיים ומאחרים |
| (8,454) | (2,520) | (2,481) | (6,332) | (8,849) | פירעון הלוואות לזמן ארוך מתאגידים בנקאיים ומאחרים |
| 81 | 30 | - | 30 | - | השקעות בעלים |
| (12,936) | (932) | (663) | (7,816) | (12,663) | חלוקות לבעלים |
| 49 | - | - | - | - | השקעות זכויות שאינן מקנות שליטה |
| (2,497) | (256) | (497) | (828) | (1,075) | חלוקות לזכויות שאינן מקנות שליטה |
| (3,133) | 3,280 | 14,948 | (7,117) | 6,240 | צדדים קשורים, נטו |
| (11,366) | (2,801) | (2,185) | (8,177) | (6,922) | ריבית ששולמה |
| (37,756) | (3,199) | 9,122 | (29,740) | (23,269) | **מזומנים נטו מפעילות מימון** |
| (5,868) | (19,463) | (6,108) | (4,463) | 4,204 | **עלייה (ירידה) במזומנים ושווי מזומנים** |
| 9,531 | 24,531 | 13,975 | 9,531 | 3,663 | **יתרת מזומנים ושווי מזומנים לתחילת לתקופה** |
| 3,663 | 5,068 | 7,867 | 5,068 | 7,867 | **יתרת מזומנים ושווי מזומנים לסוף לתקופה** |
| | | | | | **נספח א' – פעילות מהותית שאינה במזומן** |
| - | - | - | - | 7,000 | חלוקות לזכויות שאינן מקנות שליטה |

7

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים תמציתיים ליום 30 בספטמבר 2025 (באלפי דולר)**

**ביאור 1 - כללי:**

**א.    כללי:**

SIMAD Holdings Ltd (להלן: "החברה") התאגדה ביום 28 במאי 2025, כחברה פרטית המאוגדת לפי דיני איי הבתולה הבריטיים על פי BVI Business Companies Act, 2004, ללא נכסים, התחייבויות ופעילות כלשהם (למעט הון מניות). החברה הוקמה לצורך גיוס הון, באמצעות הנפקת אגרות חוב שאינן ניתנות להמרה למניות, בבורסה לניירות ערך בתל-אביב. בעלי השליטה בחברה הינם מר Michael Shabsels ומר David Shabsels (להלן: "בעלי השליטה").

שינוי מבנה:

בעלי השליטה התחייבו, כי קודם לרישום למסחר בבורסה של אגרות החוב המוצעות לציבור, הם יעבירו לחברה את זכויותיהם בתאגידים, המחזיקים בשרשור בזכויות ב-30 נכסי נדל"ן בארה"ב (להלן – "הישויות המועברות"), כנגד הנפקת מניות של החברה ותשלום מזומן בסך של 50 מיליון דולר, אשר יקטין את הון החברה בסכום זה. תשלום המזומן כאמור יתבצע מתוך תמורת הנפקת אגרות החוב (סדרה א') של החברה (להלן: "העברה" או "רכישה"). קודם למועד ההעברה הוחזקו הישויות המועברות על ידי בעלי השליטה.

למועד הדוח הכספי, עיקר פעילות החברה והישויות המועברות הינה תפעול מחנות קיץ בארה"ב, הממוקמים בשטחי נדל"ן שבבעלות החברה.

הרכישה כאמור מותנית ותלויה בשלושה גורמים עיקריים:

1. השלמת הנפקת אגרות חוב.

2. אישורים של מספר מוסדות פיננסיים, המחזיקים בביטחונות על הנכסים המוחזקים על ידי הישויות המועברות.

3. בסדרה של הסכמים אשר טרם נחתמו, אשר במהותם הסכמים להעברת זכויות בעלי השליטה בחברות הנכס לחברה.

ההסכמים והאישורים הנדרשים יתקבלו לפני מועד הרכישה.

מכיוון שהישויות המועברות נשלטות על ידי אותם בעלי השליטה בחברה לפני הרכישה ולאחריה, הרכישה אינה מטופלת בהתאם לתקן דיווח כספי בינלאומי IFRS3.

החברה טיפלה ברכישה בשיטת איחוד העניין (pooling of interests). כמו כן החברה ערכה דוחות כספיים מאוחדים פרופורמה על מנת לשקף בהם את הרכישה כאילו היא התרחשה בתחילת התקופה המוקדמת ביותר המוצגת בדוחות הכספיים (1 בינואר 2022). לפיכך, הדוחות הכספיים המאוחדים פרופורמה:

- משקפים את המצב הכספי, את תוצאות הפעילות ואת תזרימי המזומנים של החברה ושל החברות המועברות, במאוחד.

- נכסים והתחייבויות של הישויות המועברות הוכרו ליום 1 בינואר 2022 או למועד רכישתם, לפי המאוחר,  לפי ערכם בספרים של בעל השליטה הסופי בחברה באותו מועד.

-

העברת הזכויות המועברות לחברה תהיה על בסיס "AS IS" במועד ההעברה, והחברה לא תהיה זכאית לכל שיפוי מהגופים המעבירים ביחס לזכויות המועברות. מובהר כי לאחר השלמת העברת הזכויות המועברות לחברה, לא יחולו על החברה מגבלות על מכירת הזכויות המועברות לחברה ו/או על מכירת הנכסים שבבעלותן, למעט קבלת אישורי המלווים ביחס לכל מכירה ו/או העברה.

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים תמציתיים ליום 30 בספטמבר 2025 (באלפי דולר)**

**ביאור 1 – כללי (המשך):**

**ב.    גירעון בהון חוזר**

ליום 30 בספטמבר 2025 לחברה גירעון בהון חוזר בסך של כ- 57.8 מיליון דולר.

עיקר הגירעון נובע מממקדמות שהתקבלו מלקוחות בסך של כ- 41.9 מיליון דולר עבור רישום למחנות קיץ בארה"ב.

להערכת החברה יש ביכולתה לעמוד בפירעון התחייבויותיה בעתיד הנראה לעין, בין היתר באמצעות תזרימי מזומנים חיובים מפעילות שוטפת ופעולות אחרות ככל וידרשו שיאפשרו לה לעמוד בהתחייבויותיה השוטפות ולממן את פעילותה.

**ביאור 2 - עיקרי המדיניות החשבונאית:**

**עקרונות עריכת הדוחות הכספיים פרופורמה:**

הדוחות הכספיים התמציתיים פרופורמה ביניים מצייתים להוראות תקן חשבונאות בינלאומי 34 בדבר דיווח כספי לתקופות ביניים. כמו כן, הדוחות התמציתיים פרופורמה ביניים מקיימים את הוראות הגילוי לפי פרק ד' לתקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970.

הדוחות הכספיים התמציתיים פרופורמה ביניים נערכו לפי אותה מדיניות חשבונאית ושיטות החישוב שיושמו בדוחות הכספיים השנתיים של החברה ליום 31 בדצמבר 2024.

יש לעיין בדוחות הכספיים התמציתיים ביניים של החברה יחד עם הדוחות הכספיים השנתיים של החברה ליום 31 בדצמבר 2024 והביאורים המצורפים להם. לכן, לא הובאו במסגרת דוחות כספיים תמציתיים ביניים אלה ביאורים בדבר עדכונים לא משמעותיים יחסית למידע שכבר דווח בביאורים לדוחות הכספיים השנתיים האחרונים של החברה.

9

**SIMAD Holdings Ltd**

**ביאורים לדוחות הכספיים המאוחדים תמציתיים ליום 30 בספטמבר 2025 (באלפי דולר)**

**ביאור 3 - השקעה בחברות מוחזקות:**

**מידע על חברות כלולות מהותיות המטופלת תוך שימוש בשיטת השווי המאזני**

להלן מידע פיננסי מתומצת לגבי נתונים על המצב הכספי ותוצאות הפעולות של החברה המוחזקת הערוכים בהתאם ל-IFRS ולמדיניות החשבונאית (מדידה לפי שיטת השווי המאזני) של החברה וללא התאמה בגין שיעור ההחזקה

Willow Lake Day Camps, LLC & Willow Lake Land Corporation (Willow Lake)

| | 31 בדצמבר 2024 | 30 בספטמבר 2024 | 2025 | |
|---|---|---|---|---|
| | מבוקר | לא מבוקר | | |
| נכסים שוטפים | 4,607 | 2,664 | 1,653 | |
| רכוש קבוע | 36,600 | 35,500 | 36,600 | |
| התחייבויות שוטפות | (5,101) | (1,024) | (1,324) | |
| התחייבויות לא שוטפות | (1,759) | (1,757) | (1,748) | |
| נכסים נטו | 34,347 | 35,383 | 35,181 | |
| **ערך בספרים של ההשקעה בחברה הכלולה** | 17,173 | 17,691 | 17,590 | |

| | לשנה שהסתיימה ביום 31 בדצמבר 2024 | לתקופה של שלושה חודשים שהסתיימה ביום 30 בספטמבר | | לתקופה של תשעה חודשים שהסתיימה ביום 30 בספטמבר | |
|---|---|---|---|---|---|
| | | 2024 | 2025 | 2024 | 2025 |
| | מבוקר | לא מבוקר | | | |
| הכנסות | 10,664 | 10,679 | 11,568 | 10,679 | 11,568 |
| רווח (הפסד) לתקופה | 3,045 | 6,204 | 6,578 | 4,183 | 3,975 |
| סך רווח (הפסד) כולל לתקופה | 3,709 | 5,773 | 6,645 | 4,044 | 3,707 |
| **דיבידנדים שהתקבלו בקבוצה מהחברה הכלולה** | 1,720 | 355 | 564 | 1,370 | 1,436 |

10

# **SIMAD Holdings, Ltd**

**דוחות כספיים ליום 30 בספטמבר 2025**

# **SIMAD Holdings, Ltd**

**דוחות כספיים ליום 30 בספטמבר 2025**

**תוכן העניינים**

| **ע מ ו ד** | |
|---|---|
| 1 | דוח רואה החשבון המבקר לבעלי המניות |
| 2 | דוח על המצב הכספי |
| 3-4 | ביאורים לדוח הכספי |

_____

_____

\_\_\_\_\_



**דוח סקירה מיוחד של רואה החשבון המבקר לבעלי המניות של SIMAD Holdings, Ltd על מידע כספי ביניים נפרד לפי תקנה**
**38ד לתקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970**

*מ ב ו א*

סקרנו את המידע הכספי הביניים הנפרד המובא לפי תקנה 38ד לתקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970
של SIMAD Holdings, Ltd (להלן: **"החברה"**) ליום 30 בספטמבר 2025. הדירקטוריון וההנהלה אחראים לעריכה ולהצגה של
מידע כספי ביניים נפרד זה בהתאם לתקנה 38ד לתקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970. אחריותנו היא
להביע מסקנה על המידע הכספי הביניים הנפרד לתקופות ביניים אלה בהתבסס על סקירתנו.

*ה י ק ף  ה ס ק י ר ה*

ערכנו את סקירתנו בהתאם לתקן סקירה 2410 של לשכת רואי חשבון בישראל "סקירה של מידע כספי לתקופות ביניים הנערכת
על ידי רואה החשבון המבקר של היישות". סקירה של מידע כספי נפרד לתקופות ביניים מורכבת מבירורים, בעיקר עם אנשים
האחראים לעניינים הכספיים והחשבונאיים, ומיישום נהלי סקירה אנליטיים ואחרים. סקירה הינה מצומצמת בהיקפה במידה ניכרת
מאשר ביקורת הנערכת בהתאם לתקני ביקורת מקובלים בישראל ולפיכך אינה מאפשרת לנו להשיג ביטחון שניוודע לכל העניינים
המשמעותיים שהיו יכולים להיות מזוהים בביקורת. בהתאם לכך, אין אנו מחווים חוות דעת של ביקורת.

*מ ס ק נ ה*

בהתבסס על סקירתנו, לא בא לתשומת ליבנו דבר הגורם לנו לסבור שהמידע הכספי הביניים הנפרד הנ"ל אינו ערוך, מכל הבחינות
המהותיות, בהתאם להוראות תקנה 38ד לתקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970.

תל אביב, 18 בנובמבר, 2025

זיו האפט

רואי חשבון

| אילת | נצרת עילית | מודיעין עילית | פתח תקווה | קרית שמונה | בני ברק | באר שבע | חיפה | ירושלים | תל אביב |
|---|---|---|---|---|---|---|---|---|---|
| 08-6339911 | 04-6555888 | 08-9744111 | 077-7784180 | 077-5054906 | 073-7145300 | 077-7784100 | 04-8680600 | 02-6546200 | 03-6386868 |

**משרד ראשי:** בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 **דוא"ל:** bdo@bdo.co.il **בקרו באתר שלנו:** www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international
BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

**SIMAD Holdings, Ltd**

דוחות על המצב הכספי (באלפי דולר)

| 28 במאי 2025 (מועד הקמת החברה) | 30 בספטמבר 2025 | |
|---|---|---|
| | | **נכסים:** |
| (*) | (*) | |
| (*) | (*) | **סה"כ נכסים** |
| | | **הון עצמי:** |
| (*) | (*) | סה"כ הון עצמי |
| (*) | (*) | **סה"כ הון עצמי והתחייבויות** |

(*) פחות מ-1 אלפי דולר.

| | | | 18 בנובמבר, 2025 |
|---|---|---|---|
| Randy Mittasch CFO | David Shabsels CEO | Michael Shabsels Chairman | תאריך אישור הדוחות הכספיים |

– 2 -

**SIMAD Holdings, Ltd**

ביאורים לדוח הכספי

### ביאור 1 - כללי

SIMAD Holdings Ltd (להלן: "החברה") התאגדה ביום 28 במאי 2025, כחברה פרטית המאוגדת לפי דיני איי הבתולה הבריטיים על פי BVI Business Companies Act, 2004, ללא נכסים, התחייבויות ופעילות כלשהם (למעט הון מניות). החברה הוקמה לצורך גיוס הון, באמצעות הנפקת אגרות חוב שאינן ניתנות להמרה למניות, בבורסה לניירות ערך בתל-אביב. בעלי השליטה בחברה הינם מר Michael Shabsels ומר David Shabsels (להלן: "בעלי השליטה").

בעלי השליטה בחברה התחייבו, כי קודם לרישום למסחר בבורסה של אגרות החוב המוצעות לציבור, הם יעבירו לחברה את זכויותיהם בתאגידים, המחזיקים בשרשור בזכויות ב-30 נכסי נדל"ן בארה"ב (להלן – "הישויות המועברות"), כנגד הנפקת מניות של החברה ותשלום מזומן בסך של 50 מיליון דולר. תשלום המזומן כאמור יתבצע מתוך תמורת הנפקת אגרות החוב (סדרה א') של החברה (להלן: "העברה" או "רכישה"). קודם למועד ההעברה הוחזקו הישויות המועברות על ידי בעלי השליטה.

לאחר ההעברה עיקר פעילות החברה והישויות המועברות תהייה תפעול מחנות קיץ בארה"ב, הממוקמים בשטחי נדל"ן שבבעלות החברה.

דוח על הרווח הכולל, דוח על השינויים בהון ודוח על תזרימי המזומנים לא נכללו בדוח הכספי, מאחר ולמועד הדוחות הכספיים אין לחברה כל פעילות.

**SIMAD Holdings, Ltd**

<div dir="rtl">

**ביאורים לדוח הכספי**

---

**ביאור 2 - עיקרי המדיניות החשבונאית**

**2.1 עקרונות עריכת הדוחות הכספיים התמציתיים ביניים**

הדוח הכספי ערוך בהתאם לתקן חשבונאות בינלאומי 34, בדבר דיווח כספי לתקופות ביניים. כמו כן הדוח הכספי מקיים את הוראות הגילוי לפי פרק ד' לתקנות ניירות ערך (דוחות תקופתיים ומיידים), התש"ל -1970.

**2.2 שיטת איחוד העניין**

החברה מטפלת ברכישה בשיטת איחוד העניין (pooling of interests). כמו כן החברה ערכה דוחות כספיים מאוחדים פרופורמה ליום 31 בדצמבר 2024, ליום 30 ביוני 2025 וליום 30 בספטמבר 2025 על מנת לשקף בהם את הרכישה כאילו היא התרחשה בתחילת התקופה המוקדמת ביותר המוצגת בדוחות הכספיים (1 בינואר 2022). לפיכך, הדוחות הכספיים המאוחדים פרופורמה:

- משקפים את המצב הכספי, את תוצאות הפעילות ואת תזרימי המזומנים של החברה ושל החברות המועברות, במאוחד.
- נכסים והתחייבויות של הישויות המועברות הוכרו ליום 1 בינואר 2022 לפי ערכם בספרים של בעל השליטה הסופי בחברה באותו מועד.
- נכסים שנרכשו והתחייבויות שניטלו על ידי הישויות המועברות לאחר יום 1 בינואר 2022, משקפים את הנכסים וההתחייבויות ואת הפעילויות שלהם החל ממועד ההכרה בהם על ידי הישויות המועברות.
- יתרת ההון של הישויות המועברות ליום 1 בינואר 2023 סווגה בדוח פרופורמה על השינויים בהון. חלוקות שבוצעו לבעלי המניות קיבלו ביטוי בדוח פרופורמה על השינויים בהון בהנחה כי החלוקה הינה מתוך העודפים.

העברת הזכויות המועברות לחברה במועד הסגירה תהיה על בסיס "AS IS" במועד ההעברה, והחברה לא תהיה זכאית לכל שיפוי מהגופים המעבירים ביחס לזכויות המועברות. מובהר כי לאחר השלמת העברת הזכויות המועברות לחברה, לא יחולו על החברה מגבלות על מכירת הזכויות המועברות לחברה ו/או על מכירת הנכסים שבבעלותן, למעט קבלת אישורי המלווים ביחס לכל מכירה ו/או העברה.

למידע נוסף ראה ביאור 1 בדוחותיה הכספיים המאוחדים פרופורמה של החברה ליום 30 בספטמבר 2025.

</div>

# פרק 11 – פרטים נוספים

**11.1.** **חוות דעת עורך דין**

החברה קיבלה את חוות הדעת המשפטית הבאה:



לכבוד
<u>SIMAD Holdings Ltd.</u>

27 בנובמבר 2025

ג.א.נ.,

הנדון: **תשקיף להשלמה ותשקיף מדף מיום 28 בנובמבר 2025 ("התשקיף") של**
**SIMAD Holdings Ltd. ("החברה")**

לבקשתכם, הרינו לאשר בזה כי לדעתנו:

[א]    הזכויות הנלוות לניירות הערך המוצעים בתשקיף, תוארו נכונה בתשקיף.

[ב]    לחברה הסמכות להנפיק את ניירות הערך המוצעים בתשקיף, באופן המתואר בתשקיף.

[ג]    הדירקטורים של החברה מונו כדין, ושמותיהם נכללים בתשקיף.

אנו מסכימים מראש שחוות דעתנו זו תיכלל בתשקיף.

בכבוד רב,

הוד מימון , עו״ד        שוקי גוטליב, עו״ד        דניאלה רפולו, עו״ד

גולדפרב גרוס זליגמן ושות׳

www.goldfarb.com    מגדל אלקטרה, יגאל אלון 98, תל אביב 6789141|03-608-9999
info@goldfarb.com    המגדל העגול, מרכז עזריאלי 1, תל אביב 6701101 | 03-607-4444
Mittelstrasse 14, 8008 Zurich, Switzerland

- 2 -

**11.2**   **התחייבות לשיפוי**

החברה התחייבה כלפי משרד עו״ד גולדפרב גרוס זליגמן ושות׳ (״**גולדפרב גרוס זליגמן**״), כי אם גולדפרב גרוס זליגמן, מי משותפיו, מי מעובדיו ו/או מי מטעמו (בסעיף זה: ״**הנתבעים**״) ייתבע לשלם סכום כלשהו לצד שלישי, לרבות, אך מבלי לגרוע מכלליות האמור, לבעלי מניות של החברה, למחזיקי אגרות החוב של החברה ו/או לנאמן למחזיקים האמורים, או למי מהחתמים המתמחרים בתשקיף, בגין עילה העלולה לנבוע, במישרין או בעקיפין, מחוות הדעת המופיעה בסעיף 11.1 לתשקיף, אשר ניתנה על-ידי גולדפרב גרוס זליגמן לחברה (בסעיף זה: ״**חוות הדעת**״), וזאת כתוצאה מהסתמכות של גולדפרב גרוס זליגמן על נתונים ומסמכים שניתנו להם מהחברה או על-ידי יועציה החיצוניים, לרבות חוות דעת של יועציה המשפטיים של החברה בארצות הברית ואיי הבתולה הבריטיים (יחד: ״**מסמכי החברה**״), כי אז החברה תשפה את הנתבעים, בגין כל סכום שהנתבעים יחויבו לשלמו על-פי פסק דין של בית משפט או על-פי פשרה שהחברה הסכימה לה בכתב, וכן בגין הוצאות סבירות (בהתחשב בהיקף ההליך ובעורכי הדין, בעלי המקצוע והיועצים שימונו לטפל בעניין) שגולדפרב גרוס זליגמן יוציא או יידרש לשלם עבור ייצוג משפטי או אחר, התגוננות מפני הליכים משפטיים, משא ומתן וכיוצא באלו בקשר לכל תביעה, דרישה או הליכים אחרים שעילתם נובעת מהסתמכות גולדפרב גרוס זליגמן או מי מן הנתבעים האחרים על מסמכי החברה. גולדפרב גרוס זליגמן התחייב בשמו ובשם הנתבעים האחרים להודיע לחברה על כל תביעה שתוגש נגדם ועל כל הודעה בכתב בדבר כוונה להגיש תביעה כנגדם, בסמוך לאחר היוודע לגולדפרב גרוס זליגמן על כך. החברה תהא רשאית לדרוש מן הנתבעים בכתב, כי החברה תנהל בשמם כל הגנה ומשא ומתן נגד התביעה הנ״ל ובלבד שההגנה או המשא ומתן נגד התביעה הנ״ל ינוהלו על-ידי יועצים משפטיים בעלי רמה מקצועית מתאימה בהתחשב בהיקף ההליך, מהותו ובעלי המקצוע מטעם התובעים, ושיועצים משפטיים כאמור יאושרו על-ידי גולדפרב גרוס זליגמן וכן שגולדפרב גרוס זליגמן יהיה מעורב על-פי שיקול דעתו בניהול התביעה או המשא ומתן ושכל פשרה תהא טעונה אישור של גולדפרב גרוס זליגמן. אם החברה לא תממש את זכותה לניהול ההגנה או משא ומתן כאמור, או אם מימשה את זכותה אך לאחר מכן זנחה את ניהול ההגנה ו/או המשא ומתן או לא נקטה באמצעים הסבירים בנסיבות העניין לניהול ההגנה ו/או המשא ומתן, יהא גולדפרב גרוס זליגמן רשאי להתפשר עם התובעים על כל סכום שייראה לו לנכון והחברה תהיה חייבת לשפותו בגין מלוא סכום הפשרה ובגין כל ההוצאות הסבירות שהוצאו כאמור לעיל, ופשרה כאמור תחשב כפשרה שהחברה הסכימה לה בכתב. חובת השיפוי והפטור דלעיל לא יחולו במקרה של מרמה או מעשה בזדון או מחדל בזדון או פלילים, או רשלנות רבתי, מצד גולדפרב גרוס זליגמן.

**11.3**   **הוצאות ועמלות**

לפרטים אודות ההוצאות הכרוכות בהנפקה על-פי תשקיף זה ראה סעיף 6.1 לתשקיף.

למעט ההוצאות כאמור, למועד התשקיף החברה לא שילמה ולא התחייבה לשלם כל עמלה בקשר עם ניירות הערך המוצעים על-פי התשקיף.

**11.4**   **דמי עמילות בקשר לניירות ערך אחרים**

מאז ייסודה, החברה לא שילמה עמלות בקשר לחתימה או החתמה של ניירות ערך שהנפיקה.

- 3 -

**11.5** **הקצאת ניירות ערך שלא בתמורה מלאה במזומנים**

לפרטים אודות מניות החברה שיוקצו לבעלי השליטה, בכפוף להשלמת ההנפקה על-פי תשקיף זה וכנגד העברת הזכויות המועברות (כהגדרתן בסעיף 7.1.6 לתשקיף) לחברה, ראה בסעיפים 7.1.6 ו-7.1.7 לתשקיף.

**11.6** **עיון במסמכים**

העתקים מתשקיף זה ומכל דוח, חוות דעת, או אישור הכלולים או הנזכרים בו, עומדים לעיון כל דורש במשרדי גולדפרב גרוס זליגמן ושות׳, עורכי דין, רחוב יגאל אלון 98, מגדל אלקטרה, תל-אביב, בשעות העבודה הרגילות ובתיאום מראש. כמו-כן, ניתן לעיין בתשקיף זה באתר ההפצה של רשות ניירות ערך שכתובתו www.magna.isa.gov.il.

**11.7** **חוות דעת יועציה המשפטיים של החברה באיי הבתולה הבריטיים**

להלן מובאת חוות דעת של יועציה המשפטיים של החברה באיי הבתולה הבריטיים. חוות דעת זו אינה בגדר חוות דעת של עורך דין לעניין סעיף 17(ב)(3) לחוק ניירות ערך, התשכ״ח-1968.



Our ref: CMO/857353-000001/41816282v1

To the Addressees named in the First Schedule

26 November 2025

Dear Sirs

**SIMAD Holdings Ltd.**

**Public Offering in Israel**

We have acted as counsel as to British Virgin Islands law to SIMAD Holdings Ltd. (the "**Company**") and have been requested to render a legal opinion as to certain legal matters relating to the Company's registration, ownership, control and business.

We have been advised that our opinion has been requested in connection with (i) the filing by the Company of a  supplementary prospectus and a supplementary notice (the "**Prospectus**" and the "**Supplementary Notice**", respectively)  to be published in Israel according to the Israeli  Law; (ii) the Company's public offering of the Company's Debentures (Series A) (the "**Securities**") to be offered to persons in Israel (the "**Public Offering**"); and (iii) the listing and trading of the Securities on the Tel Aviv Stock Exchange Ltd. ("**TASE**").

## 1      Documents Reviewed

We have reviewed originals, copies, drafts or conformed copies of the following documents:

1.1     The public records of the Company on file and available for public inspection at the Registry of Corporate Affairs in the British Virgin Islands (the "**Registry of Corporate Affairs**") on 25 November 2025, including the Company's Certificate of Incorporation and its Memorandum and Articles of Association (the "**Memorandum and Articles**").

1.2     The records of proceedings available from a search of the electronic records maintained on the Judicial Enforcement Management System from 1 January 2000 and available for inspection on 25 November 2025 at the British Virgin Islands High Court Registry (the "**High Court Registry**").

1.3     The written resolutions of the board of directors of the Company dated 26 November 2025 (the "**Resolutions**").

1

**Maples and Calder**
6th Floor  DUO  280 Bishopsgate  London  EC2M 4RB  England
Tel +44 20 7466 1600   Fax +44 20 7466 1700   **maples.com**

Registered in England and Wales No. 03369233. Registered office: 6th Floor  DUO  280 Bishopsgate  London EC2M 4RB  England

1.4   A Certificate of Incumbency dated 25 November 2025, issued by Maples Corporate Services (BVI) Limited, the Company's registered agent, (a copy of which is attached as Annexure A) (the "**Registered Agent's Certificate**").

1.5   A certificate of good standing with respect to the Company issued by the Registrar of Corporate Affairs dated 25 November 2025 (the "**Certificate of Good Standing**").

## 2      Assumptions

In giving the following opinions, we have relied (without further verification) upon the completeness and accuracy of the Registered Agent's Certificate and the Certificate of Good Standing.  We have also relied upon the following assumptions, which we have not independently verified:

2.1   Copies of documents, conformed copies or drafts of documents provided to us are true and complete copies of, or in the final forms of, the originals, and translations of documents provided to us are complete and accurate.

2.2   The accuracy and completeness of all factual representations expressed in or implied by the documents we have examined.

2.3   All signatures, initials and seals are genuine.

2.4   That all public records of the Company which we have examined are accurate and that the information disclosed by the searches which we conducted against the Company at the Registry of Corporate Affairs and the High Court Registry is true and complete and that such information has not since then been altered and that such searches did not fail to disclose any information which had been delivered for registration but did not appear on the public records at the date of our searches.

2.5   The choice of Israeli law as the governing law of the Securities has been made in good faith and would be regarded as a valid and binding selection which will be upheld by the courts of Israel and any other relevant jurisdiction (other than the British Virgin Islands) as a matter of the Israeli law and all other relevant laws (other than the laws of the British Virgin Islands).

2.6   An application to a court of Israel of the type referred to in paragraph 3.16 below would constitute submission by the Company to the jurisdiction of a court of Israel as a matter of Israeli law.

2.7   There is nothing under any law (other than the laws of the British Virgin Islands) which would or might affect the opinions set out below.  Specifically, we have made no independent investigation of the laws of Israel.

## 3      Opinions

Based upon, and subject to, the foregoing assumptions and the qualifications set out below, and having regard to such legal considerations as we deem relevant, we are of the opinion that:

3.1   The Company is a company limited by shares incorporated with limited liability under the BVI Business Companies Act (As Revised) (the "**Act**"), is in good standing at the Registry of Corporate Affairs, is validly existing under the laws of the British Virgin Islands and possesses the capacity to sue and be sued in its own name.  The Company was incorporated under the laws of the British Virgin Islands on 28 May 2025.

3.2   Based solely on the Registered Agent's Certificate, the current directors of the Company are David Shabsels, Michael Shabsels, Shahar Nachmias, Doron Turgeman, Limor Beladev and Benjamin Gabbay.

3.3      David Shabsels, Michael Shabsels, Shahar Nachmias, Doron Turgeman, Limor Beladev and Benjamin Gabbay have each been duly appointed as a director of the Company.

3.4      Under the Act and the Memorandum and Articles the directors have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company.

3.5      Pursuant to the Resolutions, the Company has duly authorised publishing to the public the Prospectus and the Supplementary Notice to be filed with the Israel Securities Authority and TASE under applicable Israeli securities laws and has all requisite power and authority under the Amended and Restated Memorandum and Articles to issue the Securities offered within the framework of the Prospectus and the Supplementary Notice, in the manner and subject to the terms described therein.

3.6      The Memorandum and Articles do not violate, conflict with or result in a breach of any law, public rule or regulation applicable to the Company in the British Virgin Islands currently in force.

3.7      The Company has full power and authority to carry out any object not prohibited by the Act or any other law of the British Virgin Islands including the power and authority to issue the Securities described above.

3.8      No authorisations, consents, approvals, licences, validations or exemptions are required by law from any governmental authorities or agencies or other official bodies in the British Virgin Islands in connection with the ownership disposal of property or interests located outside the British Virgin Islands.

3.9      The Securities are not subject to any restrictions on transfer under British Virgin Islands law or the Memorandum and Articles, and following the completion of the Public Offering of the Securities in Israel (under applicable Israeli securities laws) and the listing of the Securities on the TASE, the Securities may be resold freely on TASE and cleared by the TASE Clearing House without the imposition of any holding period or other restriction under British Virgin Islands law or the Memorandum and Articles.

3.10     No authorisations, consents, approvals, licences, validations or exemptions are required by law (or the Memorandum and Articles) from any governmental authorities or agencies or other official bodies in the British Virgin Islands in connection with:

         (a)      the publication of the Prospectus and the Supplementary Notice;

         (b)      the consummation of the Public Offering of the Securities in Israel via the TASE in accordance with the Prospectus and the Supplementary Notice; or

         (c)      the listing and trading of the Securities on TASE.

3.11     With the exception of filing fees charged by the Registry of Corporate Affairs in respect of any optional filings made at the Registry of Corporate Affairs no taxes, fees or charges (including stamp duty) are payable (either by direct assessment or withholding) to the government or other taxing authority in the British Virgin Islands under the laws of the British Virgin Islands in respect of the Public Offering of the Securities.

3.12     Companies incorporated or registered under the Act are currently exempt from income and corporate tax including with respect to all dividends, interest, royalties, compensation and other amounts payable by the Company to persons who are resident or not resident in the British Virgin Islands. In addition, the British Virgin Islands currently does not levy capital gains tax on companies incorporated or registered under the Act, or on persons who are resident or not resident in the British Virgin Islands in relation to any share, debt obligations or other securities of the Company. No estate, inheritance, succession or gift tax, rate, duty, levy or other charges

are payable by persons who are resident or not resident in the British Virgin Islands with respect to any share, debt obligations or other securities of the Company.

3.13    Pursuant to the Company's Memorandum and Articles, the Company is authorised to issue a maximum of 50,000 shares of one class with no par value, of which 100 shares have been issued and are outstanding.

3.14    Based solely on our inspection of the Registered Agent's Certificate the shareholders of the Company as at the date hereof are Michael Shabsels holding 500 voting shares of no par value and David Shabsels holding 500 voting shares of no par value.

3.15    There is no express provision of British Virgin Islands legislation preventing or prohibiting the Company, its controlling shareholders and its officers (acting in that capacity) from giving undertakings in the Prospectus and the Supplementary Notice not to challenge or object to, on grounds of jurisdiction, the jurisdiction of a court in Israel in connection with a derivative claim under Israeli law filed against the Company in Israel regarding the Company's compliance with the terms of the Deed of Trust (as described in the Prospectus and in the Supplementary Notice) and the terms of the Bond (as described in the Prospectus and in the Supplementary Notice).

3.16    There is no express provision of British Virgin Islands legislation preventing or prohibiting the Company from applying to a court in Israel with respect to the approving of a settlement or arrangement under applicable Israeli law in order to amend the terms of the Securities. The submission by the Company to the jurisdiction of a court in Israel with respect to the approving of a settlement or arrangement under applicable Israeli law in order to amend the terms of the Securities is legal, valid and binding on the Company assuming that the same is true under Israeli law and under the laws, rules and procedures applying in the courts of the Israel.

## 4    Qualifications

The opinions expressed above are subject to the following qualifications:

4.1    To maintain the Company in good standing under the laws of the British Virgin Islands, annual filing fees must be paid to the Registry of Corporate Affairs.

4.2    The question of whether proceedings of the type referred to in paragraph 3.15 and 3.16 could be opposed on jurisdictional grounds is principally a question of Israeli law which we express no view on.

4.3    Under the Act, a company, a member or director of a company or any interested person may apply to the High Court for an order that an amendment to the memorandum or articles should have effect from a date no earlier than the date of the resolution to amend the memorandum or articles and the High Court may make such an order where it is satisfied it would be just to do so.

4.4    We express no opinion as to the meaning, validity or effect of any references to foreign (i.e. non-British Virgin Islands) statutes, rules, regulations, codes, judicial authority or any other promulgations and any references to them in the Memorandum and Articles.

4.5    This opinion is given only as to, and based on, circumstances and matters of fact existing and known to us on the date of this opinion letter. These opinions only relate to the laws of the British Virgin Islands which are in force on the date of this opinion letter.

We consent to the filing of this opinion (and its Hebrew translation, which we have not reviewed) with the Israel Securities Authority and TASE, as an exhibit to the Prospectus (or draft Prospectus) to be published no later than November 2025 and the filing thereof with the Israel Securities Authority.

CMO/857353-000001/41816282v1

This opinion is in English, and we have not approved, and we shall have no liability in respect of, any translation of this opinion.

This opinion letter is addressed to and for the benefit solely of the addressees and may not be relied upon by any other person for any purpose, nor may it be transmitted or disclosed (in whole or part) to any other person without our prior written consent.

We hereby authorise the authorised electronic signatory of the Company to electronically file this opinion to the Israel Securities Authority.

Yours faithfully

*Maples and Calder.*

Maples and Calder

CMO/857353-000001/41816282v1

**First Schedule**

**List of Addressees**

SIMAD Holdings Ltd.
PO Box 173
Road Town
Tortola
British Virgin Islands


The Tel Aviv Stock Exchange Ltd
2 Ahuzat Bayit St., Tel Aviv
Israel


Goldfarb Gross Seligman & Co., Law Offices
Electra Tower
98 Yigal Alon Street
Tel Aviv 6789141
Israel

**Annexure A**

**Registered Agent's Certificate**



## REGISTERED AGENT'S CERTIFICATE

In this certificate:

| | |
|---|---|
| **"Act"** | means the BVI Business Companies Act (As Revised). |
| **"BVI"** | means the British Virgin Islands. |
| **"Company"** | means **SIMAD Holdings Ltd.** |
| **"FSC"** | means the BVI Financial Services Commission. |
| **"Register"** | means the Register of Companies maintained by the Registrar. |
| **"Register of Charges"** | means the Company's register of charges maintained at the Registered Office pursuant to section 162 of the Act. |
| **"Registered Agent"** | means the Company's registered agent, being Maples Corporate Services (BVI) Limited. |
| **"Registered Office"** | means the Company's registered office as detailed below. |
| **"Registrar"** | means the Registrar of Corporate Affairs in the BVI. |

We, Maples Corporate Services (BVI) Limited of Kingston Chambers, PO Box 173, Road Town, Tortola, British Virgin Islands, being the Company's duly appointed Registered Agent hereby certify that as far as can be determined from the documents relating to the Company and retained for the Company at the Registered Office:

1      the Company was incorporated in the BVI on 28 May 2025 with company number 2177857;

2      the Registered Office is at Kingston Chambers, PO Box 173, Road Town, Tortola, British Virgin Islands;

3      the Company's name appears on the Register and the Company has paid all fees due and payable to the FSC;

4      the Company is duly incorporated, validly existing and in good standing under the laws of the British Virgin Islands;

5      the Company has not commenced liquidation under the Act or the Insolvency Act (As Revised) and no receiver has been appointed over the Company or any of its assets;

6      no legal, arbitration or other administrative proceedings have been threatened or commenced against the Company;

7    based solely on the register of directors and officers of the Company as maintained at the Registered Office, the Directors of the Company are as follows:

| Name | Appointment Date |
|---|---|
| Doron Turgeman | 23 November 2025 |
| Shahar Abraham Nachmias | 23 November 2025 |
| Michael Shabsels | 28 May 2025 |
| Limor Beladev | 23 November 2025 |
| David Shabsels | 28 May 2025 |
| Bejamin Gabay | 23 November 2025 |

8    based solely on the register of members of the Company as maintained at the Registered Office, the Shareholders of the Company are as follows:

| Name | Number of Shares Held |
|---|---|
| Michael Shabsels | 500 |
| David Shabsels | 500 |

9    the Company is not authorised to issue bearer shares;

10    no entries have been made on the Register of Charges.

All certifications are correct as at the 25th day of November 2025.

_____

For and on behalf of

Maples Corporate Services (BVI) Limited

Registered Agent

2

GOLDFARB
GROSS
SELIGMAN

26 בנובמבר 2025

לכבוד :

SIMAD Holdings Ltd.

ג.א.נ.,

הנדון : **תרגום מהשפה האנגלית של חוות הדעת של Maples & Calder מיום 27 בנובמבר 2025**

לבקשתכם, הריני לאשר בזאת כי אני שולטת בשפה העברית ובשפה האנגלית וכי לדעתי התרגום המצ״ב מאנגלית לעברית של חוות הדעת שבנדון, הינו נכון.

למען הסר ספק יובהר כי במקרה של סתירה בין נוסח חוות הדעת בשפה אנגלית לבין התרגום בשפה העברית של חוות הדעת האמורה, יגבר הנוסח בשפה האנגלית.

אני מסכמה כי מכתבי זה ייכלל בתשקיף של החברה.

בכבוד רב,

דניאלה רפולו, עו״ד

לנמענים הנקובים בתוספת הראשונה

26 בנובמבר 2025

אדונים נכבדים,

**SIMAD Holdings Ltd.**

**הצעה לציבור בישראל**

אנחנו פועלים כיועצים המשפטיים של SIMAD Holdings Ltd (**"החברה"**) בכל הקשור לדיני איי הבתולה הבריטיים ונתבקשנו להכין חוות דעת משפטית באשר למספר נושאים משפטיים הקשורים לרישומה של החברה, הבעלות עליה, השליטה בה ועסקיה.

נאמר לנו כי חוות דעת זו נתבקשה בקשר עם : (1) הגשה על-ידי החברה של תשקיף להשלמה והודעה משלימה (**"התשקיף"** ו-**"ההודעה המשלימה"**, בהתאמה) לפרסום בישראל בהתאם לדין הישראלי ; (2) הנפקה לציבור של אגרות החוב (סדרה א') של החברה (**"ניירות הערך"**) אשר יוצעו לאנשים בישראל (**"ההצעה לציבור"**) ; (3) רישומם למסחר של ניירות הערך בבורסה לניירות ערך בתל-אביב בע"מ (**"הבורסה"**).

1. מסמכים שנבחנו

בחנו את המסמכים המקוריים, ההעתקים, הטיוטות או העתקים המתאימים של המסמכים המפורטים להלן :

1.1. הרישומים הפומביים של החברה בתיק החברה הפתוח לעיון הציבור, במרשם החברות באיי הבתולה הבריטיים (**"רשם לענייני חברות"**) ביום 25 בנובמבר 2025, כוללים תעודת ההתאגדות של החברה ותקנון החברה (**" המזכר ותקנון ההתאגדות "**).

1.2. רישומי ההליכים בתיק הזמינים לחיפוש אלקטרוני כפי על בסיס מערכת ניהול האכיפה המנהלית מיום 1 בינואר 2000 הפתוחים לעיון ביום 25 בנובמבר, במרשם בית המשפט הגבוה באיי הבתולה הבריטיים (**"מרשם בית המשפט הגבוה"**).

1.3. ההחלטות בכתב של דירקטוריון החברה מיום 26 בנובמבר 2025 (**"ההחלטות"**).

1.4. תעודת כהונה בתפקיד מיום 25 בנובמבר 2025, אשר הוצאה על-ידי Maples Corporate Services (BVI) Limited הסוכן הרשום של החברה (העתק התעודה האמורה מצ"ב כנספח א') (**"תעודת הסוכן הרשום"**).

1.5. תעודת מעמד טוב (Certificate of Good Standing) ביחס לחברה אשר הונפקה על-ידי הרשם לענייני חברות ביום 25 בנובמבר 2025, (**"תעודת מעמד טוב"**).

2. הנחות

בהענייננו את חוות הדעת להלן, הסתמכנו (ללא אימות נוסף) על שלמות ודיוק תעודת הסוכן הרשום ותעודת המעמד הטוב. כמו כן הסתמכנו על ההנחות המפורטות להלן, אשר לא אומתו על ידינו עצמאית :

2.1. העתקי מסמכים, העתקים מתאימים או טיוטות של מסמכים שניתנו לנו הינם העתקים אמיתיים ומלאים או בגרסאות הסופיות של המקור, והתרגום של המסמכים שנשלח אלינו הינו שלם ומדויק.

2.2. הדיוק והשלמות של כל המצגים העובדתיים אשר ניתנו או שנבעו מן המסמכים שבחנו.

2.3. כל החתימות, ראשי התיבות והחותמות הינן אמיתיות.

2.4. כי כל המרשמים הציבוריים של החברה אשר נבחנו על ידינו הינם מדויקים, וכי המידע שנתגלה במהלך הבדיקות שערכנו כנגד החברה ברשם לענייני חברות ובמרשם בית המשפט הגבוה הינו נכון ומלא, וכי המידע כאמור לא שונה מאז אותו מועד וכי הבדיקות האמורות לא כשלו מלמצוא איזשהו מידע אשר הועבר לרישום במרשמים הציבוריים במועד הבדיקה שערכנו.

2.5. בחירת הדין הישראלי כדין החל על ניירות הערך נעשתה בתום לב ותיחשב לבחירה תקפה ומחייבת שתכובד על ידי בתי המשפט בישראל וכל סמכות שיפוטית רלוונטית אחרת (למעט איי הבתולה הבריטיים) כעניין הנוגע לדין הישראלי ולכל שאר החוקים הרלוונטיים (למעט החוקים של איי הבתולה הבריטיים).

2.6. בקשה לביהמ״ש ישראלי מהסוג הנזכר בס״ק 3.16 להלן תהווה הגשה של החברה לתחום השיפוט של בית משפט בישראל לעניין הדין הישראלי.

2.7. אין שום הוראה בשום דין (להוציא את דיני איי הבתולה הבריטיים) אשר עלול להשפיע על חוות הדעת האמורה להלן. בפרט, לא ערכנו שום חקירה עצמאית של הדין הישראלי.

3. <u>חוות דעת</u>

בהתבסס על וכפוף להנחות וההסתייגויות המפורטות לעיל ולהלן, ובהתייחס לאותם היבטים משפטיים אשר נראים לנו רלבנטיים, הרינו בדעה כי:

3.1. החברה הינה חברה מוגבלת במניות שהתאגדה עם אחריות מוגבלת תחת חוק החברות העסקיות באיי הבתולה הבריטיים, (כפי שתוקן) (״החוק״), הינה רשומה במעמד טוב ברשם לענייני חברות וקיימת בהתאם לדיני איי הבתולה, הינה בעלת כוחות לתבוע ולהיתבע בשמה. החברה התאגדה בהתאם לדיני איי הבתולה הבריטיים ביום 28 במאי 2025.

3.2. בהתבסס אך ורק על תעודת הסוכן הרשום, הדירקטורים המכהנים בחברה הינם: דיוויד שבסלס, מייקל שבסלס, שחר נחמיאס, דורון תורג׳ימן, לימור בלדב ובנימין גבאי.

3.3. דיוויד שבסלס, מייקל שבסלס, שחר נחמיאס, דורון תורג׳ימן, לימור בלדב ובנימין גבאי מונו כדין כדירקטורים בחברה.

3.4. בהתאם לחוק והתקנון, לדירקטורים של החברה יש את כל הכוחות הנדרשים לניהול ולפיקוח על עסקי וענייני החברה.

3.5. בהתאם להחלטות החברה, אישרה החברה את פרסום התשקיף וההודעה המשלימה אשר יוגשו לרשות לניירות ערך ולבורסה, בהתאם לחוק ניירות ערך הישראלי, וכי יש לה את הכוח והסמכות על-פי המזכר ותקנון ההתאגדות להנפיק את ניירות הערך המוצעים במסגרת התשקיף וההודעה המשלימה בדרך של הנפקה לציבור, ובכפוף לתנאים הקבועים בהם.

3.6. התקנון אינו מפר, סותר או גורם להפרה של חוק, תקנת הציבור או תקנה החלים על החברה באיי הבתולה הבריטיים אשר בתוקף במועד זה.

3.7. לחברה הסמכות המלאה להוציא לפועל כל פעולה שאינה אסורה על פי החוק או כל חוק אחר של איי הבתולה הבריטיים לרבות הסמכות והכוח להנפיק את ניירות הערך המתוארים לעיל.

3.8. לא נדרשים כל אישורים, הסכמות, רישיונות, אשרורים או פטורים, בהתאם לדיני איי הבתולה הבריטיים (או למזכר ולתקנון ההתאגדות), מאת כל רשות ממשלתית או סוכנות או גוף רשמי אחר באיי הבתולה הבריטיים בקשר עם: הבעלות או המכירה של נכסים או זכויות מחוץ לאיי הבתולה הבריטיים.

3.9. ניירות הערך אינם כפופים למגבלות עבירות בהתאם לדיני איי הבתולה או המזכר ותקנון ההתאגדות ועם השלמת ההצעה לציבור בישראל של ניירות הערך (בהתאם להוראות דיני ניירות ערך בישראל) ורישומם של ניירות הערך למסחר בבורסה, ניירות הערך יוכלו להימכר מחדש בצורה חופשית בבורסה ולהיסלק במסלקת הבורסה ללא תקופת חסימה או מגבלה אחרת לפי דיני איי הבתולה הבריטיים או המזכר ותקנון ההתאגדות.

3.10. לא נדרשים כל אישורים, הסכמות, רישיונות, אשרורים או פטורים, בהתאם לדיני איי הבתולה הבריטיים (או למזכר ולתקנון ההתאגדות), מאת כל רשות ממשלתית או סוכנות או גוף רשמי אחר באיי הבתולה הבריטיים בקשר עם: (1) פרסום התשקיף וההודעה המשלימה; (2) השלמת ההצעה לציבור בישראל של ניירות הערך בבורסה בהתאם לתשקיף ולהודעה המשלימה; או (3) רישום ניירות הערך למסחר בבורסה.

3.11. למעט תשלום של אגרות לרשם לענייני חברות בנוגע לכל הגשה שנחשבת להגשת רשות לרשם לענייני חברות, כל המיסים, באגרות או התשלומים (לרבות מס בולים) אינם חלים על החברה (במישרין או באמצעות ניכוי במקור) לממשלה או לרשות מס אחרת באיי הבתולה הבריטיים בהתאם לדיני איי הבתולה הבריטיים ביחס להצעה לציבור של ניירות הערך.

3.12. חברות שהתאגדו או נרשמו תחת דיני איי הבתולה הבריטיים, פטורות למועד זה מתחולת דיני מס הכנסה ומס חברות, לרבות, בכל הקשור לתשלום דיבידנדים, ריבית, תמלוגים, פיצויים וכל סכום אחר שישולם על ידי החברה לאנשים שהינם תושבי איי הבתולה הבריטיים ולאנשים שאינם תושבי איי הבתולה הבריטיים. בנוסף, איי הבתולה הבריטיים, למועד זה, אינם מטילים מס על רווחי הון שנבעו לחברות שהתאגדו או נרשמו בהתאם לחוק, או לתושבי איי הבתולה הבריטיים ומי שאינם תושבי איי הבתולה הבריטיים, ביחס למניות, אגרות חוב, או ניירות ערך אחרים של החברה. באיי הבתולה הבריטיים, אין מס מקרקעין, ירושה, עיזבון, מתנה או חובה מיסויית אחרת שחלה על מי שהינם תושבי איי הבתולה הבריטיים או אינם תושבי איי הבתולה הבריטיים ביחס למניות, אגרות חוב או ניירות ערך אחרים של החברה.

3.13. בהתאם לתזכיר ותקנון החברה המתוקנים, החברה מוסמכת להנפיק לא יותר מ-50,000 מניות רשומות, ללא ערך נקוב, מתוכן הוקצו וטרם נפרעו 100 מניות.

3.14. בהתבסס על בחינת תעודת הסוכן הרשום בלבד בעלי המניות של החברה ליום זה הם : דיוויד שבסלס המחזיק ב-500 מניות ללא ערך נקוב ומייקל שבסלס המחזיק ב-500 מניות ללא ערך נקוב.

3.15. אין הוראה מפורשת בדיני איי הבתולה הבריטיים המונעת או אוסרת על החברה, בעלי השליטה בה או נושאי משרה בה (המכהנים בתפקיד זה) מלתת התחייבויות במסגרת התשקיף וההודעה המשלימה שלא לערער או להתנגד, לעניין עילת סמכות השיפוט, על סמכות השיפוט של בית משפט בישראל בקשר עם תביעה נגזרת על פי הדין בישראל שהוגשה נגד החברה בישראל בדבר עמידת החברה בתנאי שטר הנאמנות (כמפורט בתשקיף ובהודעה המשלימה) בקשר עם ניירות הערך (כמפורט בתשקיף ובהודעה המשלימה).

3.16. אין הוראה מפורשת בדיני איי הבתולה הבריטיים המונעת או אוסרת על החברה, לפנות לבית משפט בישראל בקשר עם אישור פשרה או הסדר לפי הדין החל בישראל על מנת לתקן את תנאי ניירות הערך. בקשה של החברה שהוגשה בתחום השיפוט של בית משפט בישראל ביחס לאישור פשרה או הסדר לפי הדין הישראלי החל על מנת לתקן את תנאי ניירות הערך הינה חוקית, תקפה ומחייבת את החברה בהנחה שהדבר נכון גם לגבי הדינים, החוקים, הכללים והנהלים החלים בבתי המשפט של מדינת ישראל.

## 4. הסתייגויות

חוות הדעת שניתנו לעיל כפופות להסתייגויות המפורטות להלן :

4.1. כדי לשמור על המשך קיומה התקין של החברה אצל רשם החברות בהתאם לדיני איי הבתולה הבריטיים, יש לשלם דמי רישום שנתיים לרשם החברות ולהגיש דוח הכנסות שנתי, במסגרת הזמן הקבועה בחוק.

4.2. השאלה האם ניתן להתנגד להליכים מהסוג הנזכר בסעיפים 3.15 ו-3.16 עשויים על בסיס עילת סמכות השיפוט, הינה בעיקרה סוגייה הנוגעת לדין הישראלי אשר אנו לא חווים דעה בו.

4.3. בכפוף לחוק, החברה, חבר דירקטוריון או כל אדם מעוניין עשוי לפנות לבית המשפט העליון של איי הבתולה הבריטיים בבקשה לצו שיורה על תיקון המזכר ותקנון ההתאגדות אשר יהיה בתוקף ממועד שלא יקדם ממועד ההחלטה לתקן את התקנון והמזכר, ובית המשפט עשוי להיעתר לבקשה כאמור אם מצא כי הדבר צודק בנסיבות העניין.

4.4. איננו מביעים דעה לגבי משמעותם, תוקפם או השפעתם של חוקים זרים (כלומר, שאינם חוקי איי הבתולה הבריטיים), חוקים, כללים, תקנות, קודים, רשות שיפוטית או כל הודעה אחרת וכל התייחסות אליהם במסגרת המזכר ותקנון ההתאגדות.

4.5. חוות דעת זו ניתנת, אך ורק בהתייחס ובהתבסס על הנסיבות והעובדות הקיימות והידועות לנו במועד חוות דעת זו. חוות דעת זו מתייחסת אך ורק לדיני איי הבתולה הבריטיים אשר הינם בתוקף במועד חוות דעת זו.

הרינו מסכימים להגשת חוות דעת זו (ואת תרגומה לעברית, אשר לא סקרנו) לרשות ניירות ערך ולבורסה בקשר עם ההצעה לציבור של ניירות הערך כנספח לתשקיף (או לטיוטות התשקיף) אשר יפורסם לא יאוחר מחודש נובמבר 2025.

חוות דעת זו הינה באנגלית, ולא נתנו אישור ולא תהא לנו כל אחריות בקשר עם תרגומה.

חוות דעת זו ממוענת אך ורק לנמעניה וכל גורם אחר אינו רשאי להסתמך עליה לכל מטרה, ואין להעבירה או לגלותה

(בשלמותה או חלקים ממנה) לגורם אחר ללא הסכמתנו מראש ובכתב.

הרינו מאשרים בזאת למורשה החתימה האלקטרונית של החברה להגיש אלקטרונית את חוות דעת זו לרשות ניירות ערך הישראלית.

בכבוד רב,

Maples & Calder

**תוספת ראשונה**
**רשימה של מכותבים**


SIMAD Holdings Ltd.
ת.ד. 173
Road Town
Tortola
איי הבתולה הבריטיים

הבורסה לניירות ערך בתל אביב בע״מ
רחוב אחוזת בית 2, תל אביב
ישראל

גולדפרב גרוס זליגמן ושות׳,
מגדל אלקטרה
רחוב יגאל אלון 98,
תל-אביב 6789141
ישראל

נספח א׳ – תעודת סוכן רשום

Date: November 26, 2025

To: SIMAD Holdings Limited

Re: **Appraisal of 30 Camp Properties as part of SIMAD Holdings Limited - Consent to Publication**

At your request, we the undersigned, hereby give our consent to SIMAD Holdings Limited (the "**Company**") for inclusion (including by way of reference) of the appraisal, in its entirety only, of the 30 Camp Properties as part of SIMAD Holdings Limited that was carried out by our firm dated December 31, 2024 in the Company's Prospectus which is expected to be published in November 2025 (the "**Prospectues**").

I further give our consent to the inclusion of this letter in the Prospectus.

Respectfully submitted,

Joel Leitner



# SINGLE ASSET PORTFOLIO VALUATION REPORT

**30 Camp Properties as part of a Single Asset Portfolio**

**Leitner Berman File #2025-3163**

**Prepared For: Simad Holdings Limited**

**Date of Value: December 31, 2024**

www.leitnerberman.com

**Leitner | Berman**

401 Park Avenue South
Suite 910
New York, NY 10016
347-466-3264
www.leitnerberman.com

September 17, 2025

Re:    Leitner Berman File #2025-3163
       30 Camp Properties as part of a Single Asset Portfolio

Dear Simad Holdings Limited,

As requested, we have prepared a valuation report consisting of a single asset portfolio collaterized by thirty (30) camp properties (the "Portfolio").  This valuation provides a camp value which reflects the total value of the real estate, on-site facilities, site improvements, and infrastructure operations as a camp.

## Overview

Children's summer camps represent a fixed asset, in which users (campers) benefit from the real estate and related FF&E (summer camp).  A summer camp is unlike other fixed assets, like a factory, in which users use the building's machinery infrastructure to create a good.  Children's summer camps, particularly those with established operations and stable cash flows, represent a fundamentally irreplaceable asset class. Their unique combination of location, facilities, and infrastructure create property value not dissimilar to hotels and resorts, in which campers use the fixed asset to create an experience.

The camps that comprise the Portfolio are located in the following states:

- New York (9 camps)
- Pennsylvania (6)
- New Jersey (5)
- Maine (5)
- New Hampshire (2)
- Connecticut (1)
- North Carolina (1)
- Illinois (1)

The Portfolio consists of 22 overnight camps and 8 day camps.

The underlying collateral of the Portfolio is outlined in the following chart:

| # | File # | Camp Name | Camp Type | Address | City | State | Camp Value | Capitalization Rate | Net Operating Income |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **December 31, 2024** | | | |
| 1 | C2 | Banner Day Camp | Day Camp | 1225 Riverwoods Road | Lake Forest | IL | $30,300,000 | 10.50% | $3,180,374 |
| 2 | C7 | Country Roads Day Camp | Day Camp | 139 Pinebrook Road | Manalapan | NJ | $12,100,000 | 9.50% | $1,145,951 |
| 3 | C25 | Rolling Hills Country Day Camp | Day Camp | 14 Dittmar Road | Freehold | NJ | $18,300,000 | 9.50% | $1,733,907 |
| 4 | C11 | Malka | Overnight Camp | 150 Ingalside Road | Greenville | NY | $10,800,000 | 10.50% | $1,134,000 |
| 5 | C27 | Summit | Overnight Camp | 168 Duck Harbor Road | Honesdale | PA | $11,100,000 | 11.00% | $1,219,195 |
| 6 | C20 | SHMA Camps | Overnight Camp | 169 Laymon Road | Swan Lake | NY | $24,100,000 | 9.00% | $2,168,919 |
| 7 | C12 | Indian Acres / Forest Acres | Overnight Camp | 1712 Main Street | Freyburg | ME | $7,000,000 | 9.50% | $663,655 |
| 8 | C29 | Wekeela | Overnight Camp | 1750 Bear Pond Road | Hartford | ME | $12,900,000 | 9.50% | $1,227,278 |
| 9 | C3 | Blue Star | Overnight Camp | 179 Blue Star Way | Hendersonville | NC | $17,500,000 | 10.00% | $1,751,718 |
| 10 | C24 | Pine Forest/ Lake Owego/ Timber Tops | Overnight Camp | 185 Pine Forest Road/1687 US-6/1620 Route 6 | Greeley | PA | $37,300,000 | 10.00% | $3,732,549 |
| 11 | C21 | Mohawk | Day Camp | 200 Old Tarrytown Road | White Plains | NY | $75,100,000 | 11.00% | $8,258,799 |
| 12 | C30 | Willow Lake | Day Camp | 200 State Route 181 | Lake Hopatcong | NJ | $36,600,000 | 11.00% | $4,031,471 |
| 13 | C23 | North Star | Overnight Camp | 200 Verrill Road | Poland | ME | $6,000,000 | 9.50% | $569,194 |
| 14 | C9 | Echo | Overnight Camp | 210 Echo Road | Burlingham | NY | $12,500,000 | 10.00% | $1,251,781 |
| 15 | C28 | Waukeela | Overnight Camp | 23 Brownfield Road | Eaton Center | NH | $2,400,000 | 10.50% | $254,800 |
| 16 | C4 | Chateaguay | Overnight Camp | 233 Gadway Road | Merrill | NY | $4,100,000 | 9.50% | $388,498 |
| 17 | C10 | Green Lane | Overnight Camp | 249 Camp Green Lane Road | Green Lane | PA | $9,400,000 | 10.00% | $936,822 |
| 18 | C15 | Lavi | Overnight Camp | 2656 Upper Woods Road | Lakewood | PA | $7,700,000 | 10.50% | $805,350 |
| 19 | C19 | Mesorah | Overnight Camp | 325 North Pond Road | Guilford | NY | $5,100,000 | 10.00% | $511,875 |
| 20 | C22 | New England Golf | Overnight Camp | 35 Golf Academy Drive | Belgrade | ME | $2,900,000 | 10.50% | $308,700 |
| 21 | C5 | Chen-a-Wanda | Overnight Camp | 355 Camp Road | Thompson | PA | $17,900,000 | 10.00% | $1,785,729 |
| 22 | C16 | Lokanda | Overnight Camp | 432 Haring Road | Glen Spey | NY | $18,200,000 | 10.00% | $1,824,465 |
| 23 | C13 | Island Lake | Overnight Camp | 50 Island Lake Road | Starrucca | PA | $15,600,000 | 10.00% | $1,564,793 |
| 24 | C6 | Club Getaway | Overnight Camp | 59 South Kent Road | South Kent | CT | $19,300,000 | 10.50% | $2,025,256 |
| 25 | C1 | Camp Achim | Overnight Camp | 60 Pleasant Acres Road | Catskill | NY | $6,300,000 | 10.50% | $661,500 |
| 26 | C17 | Meadowbrook | Day Camp | 73 E. Valley Brook Road | Long Valley | NJ | $9,100,000 | 9.50% | $869,247 |
| 27 | C8 | Eagles Landing | Day Camp | 74 Davidson Mill Road North | Brunswick Township | NJ | $5,000,000 | 9.50% | $478,119 |
| 28 | C18 | Med-o-Lark | Overnight Camp | 82 Medolark Road | Washington | ME | $3,000,000 | 9.50% | $288,166 |
| 29 | C14 | Kiwi Country Day Camp | Day Camp | 825 Union Valley Road | Carmel | NY | $13,100,000 | 9.50% | $1,248,839 |
| 30 | C31 | Windsor Mountain | Overnight Camp | One World Way | Windsor | NH | $14,600,000 | 10.50% | $1,529,816 |
| | | | | | | **Total** | **$465,300,000** | | |

# Appraisal Methodology

For the Camp Value, we have utilized the Income Capitalization Approach. The Income Capitalization Approach is based on the theory of anticipation, which affirms that value may be defined as the present worth of all rights to future benefits.  In the Income Capitalization Approach, earning potential is forecast over a typical investor holding period, and appropriate deductions are made for expenses and vacancy and collection loss resulting in the net operating income.  Summer camps are typically owner-user properties.  However, income is generated in the form of dues collected from campers.  The subject's revenues and expenses were analyzed, with the resulting net operating income utilized in determining a market camp value.

While we acknowledge that summer camps carry inherent seasonality and operational risk, we mitigate this through a conservative financial approach

1. Treatment of management fees
2. Market operating expenses
3. Higher-than-market capitalization rates

**Treatment of Management Fees**

One important distinction between camp valuations and hotel valuations lies in how management fees are treated within the income approach to value.  In a hotel appraisal, it is standard industry practice to include a market-oriented management fee, typically ranging from 2.0% to 4.0% of gross revenue.  This fee reflects the cost of engaging an external, professional management company to operate the hotel, even if the hotel is owner-operated in practice.

For branded hotel properties (e.g., Marriott, Hilton, Sheraton), an additional franchise or brand fee may be included, often based on a percentage of gross revenue.  These fees cover brand affiliation, centralized

marketing, reservation systems, and operational oversight, and are treated as a necessary cost of doing business in the hotel industry.  These management and franchise fees are recognized as part of the normal operating expense structure.

In contrast, children's summer camps are typically owner-operated or managed by in-house leadership, often including founders, long-tenured directors, or non-profit boards.  It is not standard practice to include a market-based management fee in the same way it is for hotels, particularly for camps with stable, legacy operations.  Camps generally do not pay external management firms or brand/franchise fees, as they are standalone, independent operations with self-contained marketing, admissions, and staffing models.  Often, camp management fees are paid directly through a camp's payroll expense.  Below are six examples of fees from SIMAD's portfolio:

| Camp | Blue Star | Chen-A-Wanda | Country Roads | Green Lane | Lokanda | North Star |
|---|---|---|---|---|---|---|
| 2024 - Gross Income | $8,031,484 | $7,158,046 | $6,472,655 | $3,676,102 | $5,560,445 | $2,518,232 |
| 2024 - Manager Fees | $460,000 | $470,542 | $560,000 | $313,462 | $300,000 | $237,775 |
| % | 5.73% | 6.57% | 8.65% | 8.53% | 5.40% | 9.44% |

The market manager fees, as a percentage of gross income, generally range between 5.00% and 9.00%.  These fees cover ownership's accounting and back-office operation.

## Market Operating Projections

Valuations of the SIMAD portfolio camps are grounded in the stable operating history of each property and operating expenses that are consistent with market expectations for similar camp operations.

As outlined in our appraisal methodology, while individual expense categories (e.g., staffing, maintenance, utilities) can vary between operators based on location, program design, and operational philosophy, the total operating expense ratio is a more reliable and comparable metric.  Accordingly, our analysis focuses on overall operating expense ratios rather than line-item comparisons to ensure a consistent, apples-to-apples evaluation across properties.

Operating expense ratios for the subject camp properties generally fall between 60% and 80% of gross revenue.  Day camps typically fall on the lower end of the range, as they do not incur expenses related to overnight accommodations, food service, and 24-hour staffing.  Overnight camps generally exhibit higher expense ratios due to the increased infrastructure, staffing, and operational complexity required for full-time residential programs.

The operating expense ratios observed in the SIMAD portfolio are consistent with these market benchmarks and fall well within the expected range—inclusive of any management-related expenses.

## Higher-than-Market Capitalization Rates

While traditional real estate assets (e.g., apartments, industrial, office) typically trade at capitalization rates ranging from 6.00% to 9.00%, the valuation of children's summer camps requires a distinct risk adjustment due to their operational complexity and niche nature.

For the SIMAD portfolio, we concluded to a market capitalization rate range of 9.00% to 11.00%—reflecting the following risk considerations:

- *Operational Complexity*: Camps are not passive real estate investments; they are labor-intensive operations requiring specialized staff, infrastructure, and logistics.
- *Business-Driven Value*: As discussed, a portion of the value is derived from the operating business – not just the underlying real estate – necessitating a risk premium in the capitalization rate in order to neutralize the business value.
- *Niche Market Segment*: The camp industry is highly specialized, with few active buyers and limited comparable transactions, contributing to illiquidity and valuation opacity.

The higher capitalization rate is intended to capture these business and market risks, and is applied conservatively to support a defendable and market-consistent valuation.

In the development of our capitalization rate analysis, we applied a consistent set of market-oriented financing assumptions across all SIMAD portfolio camps. These assumptions are not reflective of the actual in-place debt or capital structure of the individual properties, but rather are intended to provide a uniform basis for valuation that aligns with common underwriting standards in U.S. real estate finance.
Specifically, we assumed:

- A loan-to-value (LTV) ratio of 65%, consistent with what is typically offered by lenders in U.S. real estate refinancings.
- A 25-year amortization period, which reflects standard repayment schedules in long-term real estate loan structures.
- A 10-year loan term, in line with prevailing market norms for commercial real estate financing.

By incorporating these standardized financing terms, we ensure that the capitalization rate conclusions are developed within a market-relevant lending context, supporting a credible and supportable valuation conclusion.

**<u>Conclusion</u>**

By applying market-based operating expenses and higher capitalization rates, we conclude that no business value or separate intangible assets or goodwill are included in our determination of market value.

The current highest and best use of each property within the Portfolio "as improved" is the present use as summer camps.  This conclusion is based, in part, on historical and current trends, the supply and demand conditions in each individual subject market area, and the historical performance of the subject.

Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformance with the in accordance with appropriate Federal regulatory authority guidelines specifically the appraisal requirements outlined in Title XI of the Federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) as revised and amended and the Interagency Appraisal and Evaluation Guidelines. In addition, the appraisal assignment is prepared in conformance with the 2024-2025 Uniform Standards of Professional Appraisal Practice (USPAP) promulgated by the Appraisal Standards Board of the Appraisal Foundation – effective January 1, 2024. In addition, this appraisal report has been prepared in compliance with IFRS-13 (International Financial Reporting Standings – fair value measurement).  We consent to inclusion of this valuation to be included within Simad Holdings Limited's company prospectus to be published in the Tel Aviv Stock Exchange in 2025.

After carefully considering all available information concerning the subject and all apparent factors affecting value, it is our opinion that the fair market value of the fee simple interest in the Portfolio, as of December 31, 2024 is:

| Appraisal Premise | Date of Value | Value Conclusion |
|---|---|---|
| Overall Camp Value | December 31, 2024 | $465,300,000 |

The opinions of value herein are qualified by certain assumptions, limiting conditions, and certification described in the following appraisal report.

If you have any questions or concerns regarding this assignment, please contact the undersigned via phone or email address listed below.

Very truly yours,

Joel Leitner, MAI
jleitner@leitnerberman.com
347-466-3264
Certified General Appraiser
State of New York (License #46-3011)
State of Pennsylvania (License #GA003488)
State of Connecticut (License #RCG.00011672)
State of New Jersey (License #RG01545)

Anthony Legotti, MAI
Certified General Appraiser
State of Illinois (License #553.002920)
State of North Carolina (License #A8898)
State of Maine (License #CG5108)

# MAP OF SUBJECT COLLATERAL





**\*Banner Day Camp, Lake Forest, IL**



**\*Blue Star, Hendersonville, NC**

# SUMMARY OF SALIENT FACTS

## GENERAL INFORMATION

| | |
|---|---|
| **Marketing Time:** | Between six months and one year. |
| **Exposure Time:** | Between six months and one year. |
| **Property Rights Appraised:** | Camp Value |
| **Intended User:** | The intended user of this report is Simad Holdings Limited |
| **Intended Use:** | The intended use of this appraisal is for use in Simad Holdings Limited's financial statements, including for bond issuance processes in the Tel Aviv Stock Exchange. |

## RECONCILED VALUES

| Appraisal Premise | Date of Value | Value Conclusion |
|---|---|---|
| Overall Camp Value | December 31, 2024 | $465,300,000 |

# TABLE OF CONTENTS

Introduction and Definitions ........................................................................................................... 1

   Identification of the Portfolio ..................................................................................................... 1

   Date of Valuation ...................................................................................................................... 1

   Client and Intended User of Report .......................................................................................... 1

   Intended Use of Report ............................................................................................................ 1

   Definition of Value ..................................................................................................................... 1

   Definition of Real Estate-Related Transaction ......................................................................... 2

   Definition of a Special Purpose Property .................................................................................. 2

   Estimate of Exposure Time ....................................................................................................... 2

   Estimate of Marketing Time ...................................................................................................... 2

   Extraordinary Assumptions ....................................................................................................... 3

   Hypothetical Conditions ............................................................................................................ 3

   Competency .............................................................................................................................. 3

Industry Commentary – Summer Camp Market ............................................................................ 4

   Overview ................................................................................................................................... 4

   Performance ............................................................................................................................. 6

   Products and Markets ............................................................................................................. 10

   Business Locations ................................................................................................................. 14

   External Drivers ...................................................................................................................... 15

   Financial Benchmarks ............................................................................................................ 17

Real Estate Taxes ....................................................................................................................... 22

General Appraisal Information – Overview ................................................................................... 23

   Highest and Best Use – "As Improved" .................................................................................. 23

   Valuation Methodology ........................................................................................................... 24

General Appraisal Information – Income Capitalization Approach ................................................ 25

   Comparable Operating Expenses ........................................................................................... 25

   Management Fees .................................................................................................................. 26

   Direct Capitalization ............................................................................................................... 27

   Higher Capitalization Rate Conclusion to Eliminate Business-Driven Value ......................... 31

Individual Property Information ..................................................................................................... 32

   C2 – Banner Day Camp .......................................................................................................... 32

   C7 – Country Roads Day Camp .............................................................................................. 36

   C25 – Rolling Hills Country Day Camp .................................................................................... 40

   C11 – Malka ............................................................................................................................ 44

C27 – Summit ................................................................................................................. 45

C20 – SHMA Camps ...................................................................................................... 49

C12 – Indian Acres / Forest Acres ................................................................................ 53

C29 – Wekeela ............................................................................................................... 57

C3 – Blue Star ............................................................................................................... 61

C24 – Pine Forest / Lake Owego / Timber Tops ........................................................... 65

C21 – Mohawk ............................................................................................................... 69

C30 – Willow Lake ......................................................................................................... 73

C23 – North Star ............................................................................................................ 78

C9 – Echo ...................................................................................................................... 82

C28 – Waukeela ............................................................................................................ 86

C4 – Chateaguay ........................................................................................................... 87

C10 – Green Lane .......................................................................................................... 88

C15 – Lavi ...................................................................................................................... 92

C19 – Mesorah .............................................................................................................. 93

C22 – New England Golf ............................................................................................... 94

C5 – Chen-a-Wanda ...................................................................................................... 95

C16 – Lokanda ............................................................................................................... 99

C13 – Island Lake ........................................................................................................ 103

C6 – Club Getaway ...................................................................................................... 107

C1 – Camp Achim ........................................................................................................ 111

C17 – Meadowbrook .................................................................................................... 112

C8 – Eagles Landing .................................................................................................... 116

C18 – Med-o-Lark ........................................................................................................ 117

C14 – Kiwi Country Day Camp .................................................................................... 118

C31 – Windsor Mountain ............................................................................................. 123

Portfolio Value Summary ............................................................................................. 128

Reconciliation of Values .............................................................................................. 129

Addenda ...................................................................................................................... 130

Representative Camp Photographs ............................................................................. 131

Limiting Conditions ...................................................................................................... 145

Certification ................................................................................................................. 147

Qualifications ............................................................................................................... 149

Appraiser's Licenses ................................................................................................... 152

# INTRODUCTION AND DEFINITIONS

## Identification of the Portfolio

The Portfolio is collaterized by thirty (30) camp properties.  The camps are located in the following states:

- New York (9 camps)
- Pennsylvania (6)
- New Jersey (5)
- Maine (5)
- New Hampshire (2)
- Connecticut (1)
- North Carolina (1)
- Illinois (1)

The Portfolio consists of 22 overnight camps and 8 day camps.

## Date of Valuation

The effective date of the appraisal is defined as the date at which the analyses and opinions of value in an appraisal applies. Our date of valuation is December 31, 2024.

## Client and Intended User of Report

The intended user of this report is Simad Holdings Limited

## Intended Use of Report

The intended use of this appraisal is for use in Simad Holdings Limited's financial statements, including for bond issuance processes in the Tel Aviv Stock Exchange.

## Definition of Value[1]

This appraisal provides an opinion of market value for the subject property as of the effective date of value. Market value, utilized herein, is defined as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consumption of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

---

[1] Source: Federal Register, Vol. 55, No. 161, Rules and Regulations 12 CFR, part 323, August 20, 1990. Uniform Standards of Professional Practice, Copyright 1990 by the Appraisal Foundation.



- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their own best interest;
- A reasonable time is allowed for exposure in the market;
- Payment is made in terms of cash in US dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

## Definition of Real Estate-Related Transaction[2]

A real estate-related transaction is any transaction involving:

- The sale, lease, purchase, investment in or exchange of real property, including interests in property, or the financing thereof; or
- The refinancing of real property or interests in real property; or
- The use of real property or interests in property as security for a loan or investment, including mortgage-backed securities.

## Definition of a Special Purpose Property

A special purpose property is a property that is appropriate for one use or a limited number of uses, e.gl, a clubhouse, a camp, a church property, a public museum, a public school, community facility; also, a building that cannot be converted to another use without a large capital improvement; e.g., a hospital, a theater, a brewery.  In some jurisdictions, courts have specifically defined this term.

Exposure time is defined as:

1) The time a property remains on the market.

2) The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market.

It is our opinion that a reasonable exposure time for the subject property at the value concluded for the Portfolio's underlying collateral would be approximately 18 to 24 months.  This conclusion is predicated on interviews with brokers and other real estate industry sources and on information pertaining to special purpose properties obtained in the verification process.

## Estimate of Marketing Time

---

[2] 12 U.S.C. 3350(5) (FIRREA section 1121(5)).

 Leitner | Berman

Marketing time is defined as:

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time.)

The subject property is a special purpose property for which there is a limited market, with a very limited number of potential buyers available at any particular time.  Due to the more limited pool of potential buyers for this specific asset class, this valuation assumes the marketing time for the underlying collateral to be between 18 and 24 months.

## Extraordinary Assumptions

According to The Dictionary of Real Estate Appraisal (6th Edition), an Extraordinary Assumption is "An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis."

**This appraisal does not employ any extraordinary assumptions.**

## Hypothetical Conditions

According to The Dictionary of Real Estate Appraisal (6th Edition), a Hypothetical Condition is "that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

**This appraisal does not employ any hypothetical conditions.**

## Competency

We have experience appraising similar properties and possess the knowledge and competency to produce a credible value opinion. Joel Leitner, MAI and Anthony Legotti, MAI have experience appraising similar properties and assignments, while possessing the knowledge and competency to produce credible value opinion. Joel Leitner, MAI and Anthony Legotti, MAI are actively engaged in appraisal work in the geographical area of the subject property, and Leitner Berman maintains a database of comparable properties for this area. Further, Joel Leitner, MAI and Anthony Legotti, MAI are versed in the analytical methods typically employed in appraising this property type. In summary, the appraisers collectively possess adequate knowledge of the property type, geographical location, and analytical methods necessary to comply with the competency requirements of USPAP for this appraisal assignment.

 Leitner | Berman

# INDUSTRY COMMENTARY – SUMMER CAMP MARKET

The market analysis section offers a detailed evaluation of supply and demand dynamics, reviews relevant transactions, and interprets insights from market participants. Using this information, along with an analysis of the subject property, the section draws conclusions about the property's competitive position within the market.

The following analysis reflects excerpts and information from the IBISWorld Industry Report: Summer Camps in the US as of August 2024:

## Definition

This industry includes establishments that operate overnight recreational camps for both children and adults. These camps often feature themed experiences and may include outdoor adventure retreats. Facilities typically offer accommodations such as cabins or fixed campsites, along with amenities like food services, recreational equipment, and organized group activities. The industry specifically excludes campgrounds and instructional day camps that do not provide overnight lodging.

## Overview



## Key Takeaways

**Performance**

- Staffing can be a challenge for some camps. It is often difficult to find qualified staff for an entire season, most notably in specialized staffing (nurses, cooks, waterski instructors, etc).
- Day camps offer similar activities at lower costs and will intensify competition. Traditional overnight camps need to focus on providing unique experiences and emphasizing their value proposition to maintain their customer base.



**External Environment**

- Summer camps must adhere to all common labor and employment laws but don't have many industry-specific regulations. The Fair Labor Standards Act and the Occupational Safety and Health Administration protect workers from exploitation and unsafe working conditions.

- Industry associations like the American Camp Association offer valuable support to their members. ACA-accredited camps benefit from savings on camp-related products, professional training and advocacy in public policy

## Key External Drivers

| Key External Drivers | Impact |
|---|---|
| Number of K-12 students | Positive |
| Total recreation expenditure | Positive |
| Participation in sports | Positive |
| Households earning more than $100,000 | Positive |

## Industry Structure

| Characteristic | Level | Trend |
|---|---|---|
| Concentration | Low | |
| Barriers To Entry | Moderate | Steady |
| Regulation and Policy | Low | Increasing |
| Life Cycle | Mature | |
| Revenue Volatility | High | |
| Assistance | Low | Steady |
| Competition | Moderate | Increasing |
| Innovation | Low | |

The summer camp industry has been adapting to emerging trends, with a notable shift towards mental health awareness and a post-pandemic surge in recreational spending. In recent years, camps have expanded their focus to include mental health support, integrating mindfulness practices and fitness programs to help campers build emotional resilience. Challenges persist, particularly in recruiting and retaining qualified staff, causing some camps to operate at reduced capacity. With demographic shifts and inflation impacting revenue, the industry's resilience and adaptability remain crucial for its sustained growth. Revenue has stagnated at $4.7 billion over the years to 2024, including a climb of 1.5% that year alone.

Demographics play an essential role in establishing the industry's primary markets. Children and adolescents from relatively affluent households are the primary customers of recreational and educational camps. Though the image of summer camp as a retreat to nature in a rustic setting still holds for most establishments, the industry has grown to encompass many new niche programs. Specialty camps centered on particular sports have grown in popularity as parents have exhibited increased demand to get

 Leitner | Berman

tangible results from their child's camping experience. As the number of households earning more than $100,000 annually increases, revenue will be positively affected.

Summer camps can expect a marginal growth in the number of children and adolescents that sign up for the next few summers, thanks to improving recreation expenditure and minor gains in sports participation. Competition from day camps persists, especially from programs offering a niche focus on a sport or educational avenue. In addition to being relatively less expensive, day camps are often closer to the home, which is attractive to reluctant or protective parents. Factors like expanding recreation expenditure and a preference among millennial parents for experiential opportunities for their children will drive demand. A shrinking population of school-aged children ultimately limits growth. Revenue is forecast to inch forward at a CAGR of 0.6% to $4.8 billion over the years to 2029.

# Performance

## Key Takeaways

- **Staffing shortages are a major headache for camps.** Staffing can be a challenge for some camps. It is often difficult to find qualified staff for an entire season, most notably in specialized staffing (nurses, cooks, waterski instructors, etc).

- **Day camps offer similar activities at lower costs and will intensify competition**. Traditional overnight camps need to focus on providing unique experiences and emphasizing their value proposition to maintain their customer base

## Performance Drivers

**Increased focus on mental health is shaping offerings**

- Summer camps help build self-esteem early on, improving emotional resilience and mental wellbeing. In response to rising concerns about child and adolescent mental health, camps increasingly focus on mental and physical well-being, incorporating mindfulness, meditation and fitness programs into their activities.

- Counselors and staff are now more frequently trained in mental health first aid, crisis intervention and trauma-informed care. Some camps partner with mental health professionals to offer on-site counseling services or develop programming specifically addressing mental health topics. This ensures that they can provide appropriate support to campers who may be struggling with anxiety, depression, or other mental health challenges.

- Some specialty camps take these benefits further, offering programs focused on specific issues. Grief camps are a notable example, providing support for young people who have lost loved ones through trained counselors and peer connections.

 Leitner | Berman

**Positive economic trends favor recreational spending**

- Consumers pay for recreational activities when they have the disposable income to do so. Per capita disposable income, and therefore total recreation expenditure, has increased over the past five years, which has supported attendance at summer camps.

- Postpandemic, pent-up demand for recreational activities contributed to greater spending. Summer camps were at a disadvantage, however, as registration for summer programs occurred the year before. Since parents would've had to sign their children up during the height of the pandemic, recovery in this industry didn't occur until 2022. • This growth in recreation expenditure fueled demand for summer camp registration. An uptick in households with an income over $100,000 ensured that kids who wanted to return to camp could.

- Despite inflation-driven price hikes, camp enrollment didn't wane, indicating price insensitivity among parents when it comes to financing their children's recreational activities. Sending kids to camp can be expensive, so families that do so can afford it. Camp administrators can raise prices without deterring parents' purchase intent, highlighting the industry's resilience to price changes.

**Demographic trends cause revenue to stagnate**

- The number of students in grades K-12 has contracted over the past five years, impacting the potential market for summer camps, which predominantly target children and adolescents.

- Overall participation in sports plays a significant role in determining the demand for specialized sports camps, as more niche camps offering athletic training open. Despite other available entertainment, like social media and video games, youth participation in sports has risen.

- Households with annual incomes exceeding $100,000 are a crucial demographic for summer camps, as their financial capacity allows them to afford camp expenses yearly, even amid economic challenges. Slight growth in the number of these families has helped prevent greater losses.

**Summer camps struggle with recruiting and retaining qualified staff**

- Staff recruitment poses a significant challenge for summer camps, with directors struggling to find qualified individuals. Camps struggle to find experienced staff or people with specialized skills to work as cooks, health supervisors and instructors for activities like watersports and horse-riding.

- As staffing has become difficult, camps rely more on connections through friends, family, university programs and alumnae. Asking staff to return the following summer has long been standard practice, but a shrinking pool of applicants has made it difficult to fill full-season positions and operate at full capacity.

- Staff reluctance to commit to the entire summer exacerbates the staffing issue. Many camps face the dilemma of turning away campers because of staff shortages, leading them to run shortened summer programs

 Leitner | Berman

## Industry Volatility

**Seasonal fluctuations affect revenue streams**

- Summer camps are highly seasonal, with most revenue generated during a few short months. This creates a narrow window to maximize income, making camps vulnerable to unexpected enrollment or operational cost changes.

- Weather-related disruptions can also lead to cancellations or lower attendance, exacerbating the financial risk for camps relying on a single season to cover their expenses.

**Economic instability inflates revenue volatility**

- Demand for summer camps is primarily determined by the level of consumer disposable income and consumer confidence in the economy. Summer camp registration is a discretionary purchase, making camps vulnerable to economic downturns.

- Unpredictable shifts in consumer confidence can make long-term preparation, as camps may face sudden drops in enrollment that aren't easily offset during the short summer season.

## Industry Outlook

**Recreation expenditure supports moderate growth**

- Households earning more than $100,000 and recreation expenditures are climbing, supporting revenue growth prospects for summer camps in the next few years.

- A moderate improvement in the economic landscape is expected to drive up demand for summer camps, particularly specialized or unique camps, thanks to their potentially higher costs.

- Camps focusing on skill development will do well, as parents want to know their kids are entertained, safe and learning, which will contribute positively to revenue.

- Millennial parents are showing a preference for providing experiential opportunities for their children over material possessions, making showcasing experiences an effective strategy in marketing camp programs moving forward.

**Summer camps need to find new methods of recruiting campers**

- With the potential for a shrinking population of school-aged children, the Simad group (as well as other camps) is staying in the forefront in innovation and delivering a quality camp experience for campers of many different backgrounds.
- Embracing social media advertising to target millennial parents on platforms like Facebook and Instagram is vital for growth. Leveraging user-generated content like customer reviews and photo contests can build trust and loyalty among this demographic while optimizing search engine results will enhance visibility and attract more campers.

 Leitner | Berman

**Competition rises thanks to more affordable alternatives**

- As digital distractions persist, parents are concerned about excessive screen time, especially in the summer. Signing their kids for summer programs can be a way for parents to redirect attention towards physical activities. Sports participation will experience a modest increase in the face of these digital distractions.

- Competition from day camps will intensify over the next few years. Day camps offer similar activities and services as overnight camps but pose a lower tuition barrier, expanding their potential market size to include lower-income individuals.

- Day camps often take place at local athletic facilities, like tennis clubs, golf courses or community pools that are closer to consumers' homes. They cost far less to run, often relying on volunteers and community support to operate. This is attractive for lower-income families reluctant to place their children in the hands of strangers for an extended period of time.

**Adult summer camps put a grown-up twist on childhood classics**

- Nostalgia marketing plays a crucial role in attracting adult campers, offering experiences reminiscent of childhood summers with vintage games and retro designs. Adult summer camps capitalize on nostalgia through canteens stocked with nostalgic snacks and communal cabins with bunk beds, creating an immersive and nostalgic atmosphere for campers to relive cherished memories in an adult-friendly setting.

- Adult summer camp programs cater to a wide range of interests, offering traditional camp activities like beach volleyball, crafting, cooking classes and watersports, as well as recreating classic camp traditions like color war and talent shows. Specialty camps like space camp or band camp geared for adults are also gaining more attention from adults with niche interests.

- Adult summer camps make efforts to create a more mature experience for their campers. One way is by providing better amenities for a price or including drink options for guests, like mimosas at breakfast and beer, wine and spirit tastings. Adult summer camps can range from having basic accommodations to being luxurious retreats with amenities like spa services and private rooms.

## Industry Summary

**Contribution to GDP**

- The pandemic deflated summer camps' contribution to GDP, yet they remain a steady economic contributor to the US economy, reflecting their resilience and ongoing demand.

**Market Saturation**

- Market saturation differs depending on location and type of camp. But since camps generally serve local markets, there is still demand for new camps.



**Innovation**

- Innovation in summer camps is constrained to offering new camps or activities. Camps can stand out by providing luxury experiences or niche activities.

**Consolidation**

- Larger summer camps often acquire smaller ones to expand their market share, leading to a more consolidated industry structure.

**Technology and Systems**

- Summer camps use technology primarily to develop a stronger online presence, aiming to reach and attract a broader customer base.

# Products and Markets

## Key Takeaways

- Sports camps are a hit with consumers, attracting a diverse range of young athletes. They offer specialized coaching and the chance to develop skills in a dedicated environment.

- Adolescents aged 10 to 12 are the primary market for summer camps. This demographic forms the largest segment in the industry, even though it encompasses a relatively narrow age range.



**Products & Services Segmentation**

Industry revenue in 2024 broken down by key product and service lines.

- Sports camps ($2.8bn) 60.2%
- Teambuilding camps ($900.5m) 19.1%
- Community service camps ($457.3m) 9.7%
- Farming, ranching and gardening camps ($268.7m) 5.7%
- Wilderness camps ($249.9m) 5.3%



**Sports camps are the most popular with consumers**

- Sports camps provide a focused environment for young athletes to develop their skills with the guidance of specialized coaches. As sports participation grows, the range of children interested in attending this type of camp expands.

- Sports camps can secure brand partnerships as a way to provide additional value to participants. Nike frequently partners with sports camps to provide campers with equipment, apparel and expertise. Nike also sponsors the Elite Hoops Basketball Camps, which are held in different locations across the US.

- Financial sponsorship from brands increases visibility for the brand and helps them connect with potential customers.

**Teambuilding camps enhance teamwork and collaboration**

- Teambuilding camps foster teamwork, communication and leadership skills through collaborative exercises and challenges.

- Businesses and organizations participate in team-building retreats to improve employee morale and productivity. Since these camps offer unique activities that promote trust, communication and problem-solving, they can be valuable assets for companies who want to strengthen their teams.

- Enrollment in team-building camps has grown, generating a lucrative revenue stream as they cater to groups looking to enhance their teamwork skills in a fun setting.

**Community service camps teach campers social responsibility**

- Community service camps provide a unique opportunity for participants to engage in meaningful volunteer work. Community service camps foster a sense of purpose and social awareness among campers by promoting a culture of giving back and making a positive impact.

- Through activities like assisting local shelters and engaging in environmental conservation projects, these camps offer socially conscious individuals a rewarding experience.

- Camp fees cover operational costs, but a portion is also allocated to support charitable causes. Contributing to philanthropic initiatives elevates a camp's reputation and attracts participants who value community involvement, while also strengthening partnerships with local organizations and sponsors.

**Farming, ranching and gardening camps teach campers about agriculture**

- Farming, ranching and gardening camps provide campers with first-hand experience in agricultural practices. These camps cater to individuals keen on sustainable living and agriculture, attracting youths and adults.

 Leitner | Berman

- These camps appeal to individuals interested in sustainable living and agriculture. Campers attend to learn all about farming, animal care and plant cultivation.
- With a focus on hands-on learning, campers gain practical knowledge in plant cultivation and animal husbandry

**Wilderness camps attract outdoor enthusiasts**

- Wilderness camps offer outdoor adventures and survival skills training in natural settings.

- Wilderness camps feature activities like hiking, swimming, camping and rock climbing, as well as survival skills and navigation training.

- As these trips can be more physically demanding, they are less popular with young groups. These camps appeal to outdoor enthusiasts looking to disconnect and challenge themselves in natural surroundings.

- Participants engage in various outdoor challenges and learn valuable skills for survival and navigation in the wilderness.

**Innovations**

Innovation is limited to what types of camps or activities at camp are offered.

- Some summer camps are enhancing their appeal by offering luxury experiences, catering to families seeking premium options. These camps diversify their activity options to meet niche interests, like coding, astronomy and specialized sports, to attract a broader range of campers.

- Advancements in online marketing strategies enable camps to reach a larger, more targeted audience, increasing enrollment and engagement. Incorporating technology, some camps now offer virtual or augmented reality experiences, providing unique, modern activities while preserving traditional camp values.

 Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Industry Commentary – Summer Camp Market

## Major Markets



**Day camps compete with summer camps over campers aged nine and younger**

- This market segment includes children aged nine and younger. Parents typically enroll their children in summer camps to find recreational activities for their children to engage in while on summer vacation from school.

- This demographic is more inclined to attend longstanding, more traditional summer camps than those that favor a niche activity or require specialized instruction.

- This segment remains the largest market, but it has contracted slightly as specialized instructional camps gain popularity and day camps provide parents with more affordable childcare.

**Demand from adolescents has increased**

This segment includes adolescents aged between 10 and 17.

- Specialized instructional camps and other niche activity camps are targeted toward teenagers and young adults. Most adolescents attend these camps to hone a talent, practice a sport or broaden their educational horizon.

- With the growing importance of extracurricular activities in university admissions and job applications, specialty camps have marketed themselves to these consumers as a way for campers to broaden their skill set.



**Adult camps have gained popularity**

- This segment includes consumers aged 18 and older.

- Though this segment has grown slightly as a share of revenue over the past few years, adults remain the smallest market segment for the industry. Adult summer camps have been gaining attention, but the revenue potential of regular summer camps is much higher.

- Similar to adolescents aged 10 to 17, adults are more likely to attend a specialty camp to practice a new skill, but in a social setting.

## Business Locations



**Large population drives demand from the Southeast**

- The Southeast boasts the highest percentage of the US population, providing a substantial customer base for summer camps.

- Local customers in this region prefer camps close to home, driving demand for nearby options.

- Thanks to favorable weather conditions, summer camps thrive in the Southeast, attracting adventurers and nature lovers.



**The West benefits from the natural environment**

- The West has an abundance of national parks. The availability of diverse environmental landscapes makes it a prime location for wilderness camps.

- The region is the second-most populated within the US, making it a strategic location for summer camps.

- Many consumers in the West region lead active lifestyles, fostering popularity for wilderness and outdoor activity-based summer camps.

**Urban hubs spur demand from the Mid-Atlantic**

- The presence of major urban hubs like New York City and Philadelphia in the Mid-Atlantic region creates a large customer base for summer camps.

- Access to extensive shoreline makes summer camps with water sports a popular choice in this region.

- Higher-than-average income levels in the Mid-Atlantic allow families to spend more on summer camps.

## External Drivers



The number of K-12 students, encompassing enrollees in public and private kindergartens and elementary and secondary schools, significantly impacts the summer camp industry. This demographic represents a crucial market for overnight camps. When the number of K-12 students rises, it represents an opportunity for the industry, benefiting growth and sustainability.



2025-3163 – Single Asset Portfolio – Simad Holdings LLC · Industry Commentary – Summer Camp Market



Recreation expenditure directly impacts the summer camp industry, fueling growth by increasing demand for camp programs. As families allocate more funds for leisure activities, camps see higher enrollment, enabling them to expand offerings and improve facilities. The cycle of investment and growth underscores recreation spending as a critical driver for the industry's sustained success.



The percentage of people participating in sports, including those who exercise or engage in recreational activities daily, influences the market potential for specialized sports camps. Participation in sports boosts the summer camp industry by driving registration for camps focusing on athletic training. Parents seek to nurture their children's sports skills, increasing enrollment in camps offering programs in popular activities like soccer, basketball and swimming.



2025-3163 – Single Asset Portfolio – Simad Holdings LLC    Industry Commentary – Summer Camp Market



Demographic and macroeconomic factors significantly impact the summer camp industry in the US. These households are a key demographic for camps offering high-quality instruction, luxurious amenities or exotic locations. With summer camp registration often being expensive, higher household incomes enable more families to sign up. If the number of households earning over $100,000 declines, it poses a potential threat to the industry.

# Financial Benchmarks

## Key Takeaways

- Purchase costs for summer camps are significant and were inflated in recent years, primarily because of the need for COVID-19-related supplies. This included utilities, maintenance, food, transportation and PPE, impacting overall operational expenses.

- High labor dependency at summer camps results in consistently elevated wage costs, further exacerbated by ongoing staffing challenges. Seasonal employment helps mitigate some wage expenses, but camps are facing difficulties attracting and retaining employees in the current labor market.





**Purchase costs are high for the industry**

- Summer camps encounter significant purchase costs to properly run their programs. These include utilities electricity, cooling and water, as well as equipment for camp activities including administrative equipment, telephone use and facility maintenance.

- Other purchase costs include food and transportation costs. Many summer camps provide their campers with rides to and from the campgrounds and excursions.

- Purchase costs have expanded over the last few years as the outbreak of COVID-19 created a need to invest in PPE equipment, sanitization supplies and health screening tools to avoid an outbreak.

**The pandemic pressured profit growth**

- Profit varies significantly between different companies depending on size, location, amenities and quality of service provided.

- Profit plateaued after a substantial drop postpandemic. As overnight camps all over the country had to close, camp organizers lost out on a season's revenue.

- Even as summer camp attendance recovered in 2021, profit has only inched forward and has yet to return to prepandemic levels.



**Necessary labor keeps wage costs high**

- Summer camps rely heavily on labor, so wage costs for camp organizers are high

- Many camp positions are seasonal, which allows camps to somewhat temper wage costs.

- Staffing has been an ongoing struggle, exacerbated since the pandemic, leading to a rise in wage costs as camps struggle to incentivize potential new employees to apply.

## Financial Ratios

### Industry Multiples

| Ratio | 2018 | 2019 | 2020 | 2021 | 2022 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|---|
| EBIT/Revenue | 11.8 | 13.0 | 14.8 | 13.8 | 11.3 | 13.3 | 12.9 | 17.1 |
| EBITDA/Revenue | 20.5 | 23.4 | 30.9 | 21.7 | 18.8 | 23.8 | 23.1 | 28.3 |
| Leverage Ratio | 10.0 | 4.3 | 3.2 | 4.6 | 5.3 | 4.4 | 5.5 | 5.9 |

### Industry Tax Structure

| Ratio | 2018 | 2019 | 2020 | 2021 | 2022 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|---|
| Taxes Paid/Revenue | 2.6 | 3.9 | 3.5 | 3.2 | 3.3 | 3.3 | 3.3 | 4.5 |

 Leitner | Berman

## Income Statement

| Ratio | 2018 | 2019 | 2020 | 2021 | 2022 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|---|
| Total Revenue | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Business receipts | 94.6 | 97.2 | 55.9 | 54.0 | 86.5 | 65.5 | 77.6 | 92.1 |
| Cost of goods | 56.4 | 55.4 | 47.2 | 34.6 | 34.6 | 38.8 | 45.6 | 53.3 |
| Gross Profit | 43.6 | 44.6 | 52.8 | 65.4 | 65.4 | 61.2 | 54.4 | 46.7 |
| Expenses | | | | | | | | |
| Salaries and wages | 18.5 | 18.9 | 21.9 | 9.9 | 9.9 | 13.9 | 15.8 | 14.7 |
| Advertising | 2.6 | 3.1 | 2.8 | 1.6 | 1.6 | 2.0 | 2.3 | 2.7 |
| Depreciation | 5.4 | 6.5 | 9.8 | 6.1 | 6.3 | 7.4 | 6.8 | 7.3 |
| Depletion | 1.8 | 2.3 | 5.0 | 0.1 | 0.0 | 1.7 | 1.8 | 2.5 |
| Amortization | 1.5 | 1.6 | 1.4 | 1.7 | 1.1 | 1.4 | 1.4 | 1.4 |
| Rent paid | 4.2 | 4.2 | 4.8 | 1.9 | 1.9 | 2.9 | 3.4 | 3.4 |
| Repairs | 0.4 | 0.5 | 0.9 | 1.1 | 0.7 | 0.9 | 0.7 | 0.8 |
| Bad debts | 0.7 | 0.5 | 0.1 | 0.2 | 0.3 | 0.2 | 0.4 | 0.4 |
| Employee benefit programs | 4.6 | 5.1 | 5.9 | 2.4 | 2.5 | 3.6 | 4.1 | 4.6 |
| Compensation of officers | 3.1 | 3.3 | 4.4 | 3.4 | 4.0 | 3.9 | 3.6 | 3.4 |
| Taxes paid | 2.6 | 3.9 | 3.5 | 3.2 | 3.3 | 3.3 | 3.3 | 4.5 |
| Interest Income | 0.9 | 1.0 | 0.9 | 0.5 | 0.5 | 0.7 | 0.8 | 0.9 |
| Other Income | | | | | | | | |
| Royalties | 0.4 | 1.0 | 2.4 | 1.2 | 1.1 | 1.6 | 1.2 | 1.5 |
| Rent Income | 3.7 | 4.4 | 8.4 | 3.9 | 3.1 | 5.1 | 4.7 | 4.9 |
| Net Income | 4.8 | 3.7 | 4.7 | 2.7 | 2.7 | 3.4 | 3.7 | 6.4 |


Leitner | Berman

Case 26-16388-CMG   Doc 271-1   Filed 06/25/26   Entered 06/25/26 21:35:47   Desc
Exhibit A   Page 376 of 515

2025-3163 – Single Asset Portfolio – Simad Holdings LLC · · · · · · · · · · · · · · · Industry Commentary – Summer Camp Market

## Coverage Ratios

| Ratio | 2018 | 2019 | 2020 | 2021 | 2022 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|---|
| Interest Coverage | 2.7 | 2.4 | 2.2 | 1.7 | 2.1 | 2.0 | 2.2 | 2.7 |
| Debt Service Coverage Ratio | 10.3 | 9.3 | 12.5 | 1.3 | 1.2 | 5.0 | 6.9 | 8.3 |

## Leverage Ratios

| Ratio | 2018 | 2019 | 2020 | 2021 | 2022 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|---|
| Fixed Assets/Net Worth | 4.0 | 8.4 | 10.5 | 5.7 | 5.2 | 7.1 | 6.7 | 7.8 |
| Debt/Net Worth | 3.8 | 7.5 | 10.7 | 6.8 | 6.5 | 8.0 | 7.0 | 7.1 |
| Tangible Net Worth | 0.3 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 | 0.2 | 0.2 |

## Operating Ratios

| Ratio | 2018 | 2019 | 2020 | 2021 | 2022 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|---|
| Return on Net Worth, % | 21.5 | 96.8 | 158.5 | 93.6 | 73.8 | 108.6 | 88.8 | 79.8 |
| Return on Assets, % | 5.7 | 13.0 | 14.8 | 13.8 | 11.3 | 13.3 | 11.7 | 11.3 |
| Sales/Total Assets | 0.5 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 0.9 | 0.7 |
| EBITDA/Revenue | 20.5 | 23.4 | 30.9 | 21.7 | 18.8 | 23.8 | 23.1 | 28.3 |
| EBIT/Revenue | 11.8 | 13.0 | 14.8 | 13.8 | 11.3 | 13.3 | 12.9 | 17.1 |

## Cash Flow & Debt Service Ratios (% of sales)

| Ratio | 2018 | 2019 | 2020 | 2021 | 2022 | 3-Year | 5-Year | 10-Year |
|---|---|---|---|---|---|---|---|---|
| Cash from Trading | 34.1 | 44.6 | 48.7 | 62.1 | 64.9 | 58.5 | 50.9 | 45.1 |
| Cash after Operations | 5.3 | 7.3 | 15.0 | 44.2 | 46.5 | 35.2 | 23.7 | 19.9 |
| Net Cash after Operations | 4.2 | 21.0 | 18.5 | 46.4 | 48.5 | 37.8 | 27.7 | 21.4 |
| Debt Service P&I Coverage | 0.1 | 0.9 | 0.8 | 2.4 | 3.0 | 2.1 | 1.4 | 0.9 |

## Conclusion

The summer camp industry plays a pivotal role in the U.S. economy, contributing billions in economic activity and providing employment opportunities across various regions. Its impact extends beyond economic metrics, fostering youth development and workforce skills essential for the nation's future. Continued support and investment in this sector are crucial for sustaining its growth and maximizing its benefits to communities nationwide.

 Leitner | Berman

# REAL ESTATE TAXES

Each camp property is individually assessed and taxed by its individual local county and municipality.  A variety of factors contribute to a property's assessed value, including location, site size, and on-site improvements.  Ultimately, real estate taxes are not considered a significant factor in the valuation of camp properties.

The individual tax liabilities have been incorporated into the net operating income and have been accounted for in the development of our net operating income for each underlying property.



# GENERAL APPRAISAL INFORMATION – OVERVIEW

The following information is consistent across the valuation of all 30 underlying camp properties that comprise the Portfolio.

## Highest and Best Use – "As Improved"

| | |
|---|---|
| **Legally Permissible:** | The subject improvement is a conforming (special) use and complies with bulk requirements.  Therefore, the subject as improved is legally permissible. |
| **Physically Possible:** | The subject improvements are physically possible as a result of their existence.  Continued use as a summer camp is physically possible.  The existing buildings are configured to support the current special purpose use as a summer camp.  The buildings' ability to support such a use would depend upon the specific requirements of a prospective user.  As a continuing camp operation for many years, the subject's camp use is physically possible. The land to building ratio is favorable for such use as well. |
| **Financially Feasible:** | The financial feasibility of the subject's existing use is addressed as follow:<br><br>The subject's current use as a seasonal camp facility is financially feasible due to the relatively limited number of such properties (i.e. in comparison to residential uses).  The subject property is considered to be a special purpose, limited use property for which neither a significant rental or sale market exists.  The subject site is considered to have more limited marketability as improved, and consequently the most immediate market would consist exclusively of experienced camp operators.  As a summer, the facilities generate a positive return to land based upon prevailing fees for such facilities. |
| **Maximally Productive Highest and Best Use:** | All legally permissible, physically possible, and financially feasible uses of the subject property, as improved, have been presented and examined.  As improved, the analyses indicate that based on the market value of the subject, it is our opinion that the highest and best use of the subject property, as improved, is its current use as a summer camp. |



## Valuation Methodology

Each individual camp is a special purpose, limited-use property for which a significant sales or rental market does not exist.  Although the market for special purpose properties such as camps is limited, the property is marketable to experienced camp operators and companies.  Accordingly, valuation of the subject property would not necessarily represent a value in use, or value to a specific intended user. In the analysis which follows, while we consider the subject to be a limited-market property without a significant sale or rental market, such properties do trade within the marketplace.  Therefore, we will value the market value of the subject property as a special purpose property.

Following is a discussion of our consideration of the various approaches to value.

### Limitations of the Cost Approach

To accurately assess the market value of the subject property via the cost approach, it is essential to analyze comparable land sales intended for recreational development. However, such transactions are infrequent in the region, largely due to a scarcity of large, well-situated parcels suited for this use. Properties that do become available are often acquired for residential development, which typically represents a higher and better use due to its greater profitability.

Each subject property's improvements were constructed over long periods. As a result, many of the structures exhibit physical depreciation, some of which is difficult to quantify given their age and varying conditions.  However, in the absence of a proven sale or rental market for summer camps, we have estimated the depreciated value of the building and site improvements.

### Limitation of the Sales Comparison Approach

In the Sales Comparison Approach, market value is estimated by comparing the subject property to sales of similar properties.  This Approach is based on the principle of substitution and contribution which states that a knowledgeable investor will pay no more for a property than would be paid for a comparable substitute property.

Our market research indicates that relatively few camp property sales have occurred in recent years. Of those that have, most involved ongoing operations, where the properties were acquired by entities intending to continue camp activities. Each underlying camp property is typically highly specialized and tailored to distinct programming and operational requirements. This level of specialization significantly limits the applicability of direct market comparisons.

Therefore, the Sales Comparison Approach has been excluded from this analysis.



# GENERAL APPRAISAL INFORMATION – INCOME CAPITALIZATION APPROACH

The Income Capitalization Approach is predicated on the assumption that there is a definite relationship between the amount of income that a property can produce and its value.  This Approach considers the ability of a property to produce income and recognizes that value is the present worth of future benefits resulting from ownership of the property.

For the Camp Value, we have utilized the Income Capitalization Approach. The Income Capitalization Approach is based on the theory of anticipation, which affirms that value may be defined as the present worth of all rights to future benefits.  In the Income Capitalization Approach, earning potential is forecast over a typical investor holding period, and appropriate deductions are made for expenses and vacancy and collection loss resulting in the net operating income.  Summer camps are typically owner-user properties.  However, income is generated in the form of dues collected from campers.  The subject's revenues and expenses were analyzed, with the resulting net operating income utilized in determining a market camp value.

## Comparable Operating Expenses

| Address | 1: Carroll County, New Hampshire | | 2: Orange County, Vermont | | 3: Rockland County, New York | | 4: Kennebec County, Maine | |
|---|---|---|---|---|---|---|---|---|
| Revenue | $ | | $ | | $ | | $ | |
| Total Revenue (PGI) | $7,721,147 | | $1,800,250 | | $7,432,910 | | $5,206,256 | |
| | | | | | | | | |
| Operating Expenses | $ | % of PGI | $ | % of PGI | $ | % of PGI | $ | % of PGI |
| Total Personnel and Personnel Related | $3,056,613 | 39.59% | $811,214 | 45.06% | $2,973,935 | 40.01% | $1,971,780 | 37.87% |
| Total Camper Programs | $710,600 | 9.20% | $93,250 | 5.18% | $431,015 | 5.80% | $472,071 | 9.07% |
| Total Food Service | $616,600 | 7.99% | $85,279 | 4.74% | $210,000 | 2.83% | $333,863 | 6.41% |
| Total Transportation | $101,800 | 1.32% | $24,000 | 1.33% | $924,000 | 12.43% | $343,291 | 6.59% |
| Total Maintenance | $398,476 | 5.16% | $59,500 | 3.31% | $299,800 | 4.03% | $317,737 | 6.10% |
| Total Utilities | $90,500 | 1.17% | $28,400 | 1.58% | $109,000 | 1.47% | $69,908 | 1.34% |
| Total Camper RecruitAdvirt/Promo | $178,100 | 2.31% | $42,005 | 2.33% | $269,730 | 3.63% | $94,312 | 1.81% |
| Total Other Camp Expenses | $473,660 | 6.13% | $12,750 | 0.71% | $36,400 | 0.49% | $335,577 | 6.45% |
| Total Insurance | $191,000 | 2.47% | $20,915 | 1.16% | $107,000 | 1.44% | $60,847 | 1.17% |
| Total Corporate and/or Other Exp | $0 | 0.00% | $92,010 | 5.11% | $535,975 | 7.21% | $0 | 0.00% |
| Total Operating Expenses | $5,817,349 | 75.34% | $1,269,323 | 70.51% | $5,896,855 | 79.33% | $3,999,386 | 76.82% |

| Address | 5: Rensselaer County, New York | | 6: Monmouth County, New Jersey | | 7; Middlesex County, New Jersey | | 8: Montgomery County, Pennsylvania | |
|---|---|---|---|---|---|---|---|---|
| Revenue | $ | | $ | | $ | | $ | |
| Total Revenue (PGI) | $3,941,370 | | $4,350,000 | | $3,314,151 | | $3,197,624 | |
| | | | | | | | | |
| Operating Expenses | $ | % of PGI | $ | % of PGI | $ | % of PGI | $ | % of PGI |
| Total Personnel and Personnel Related | $1,652,958 | 41.94% | $1,620,000 | 37.24% | $1,160,894 | 35.03% | $989,464 | 30.94% |
| Total Camper Programs | $215,327 | 5.46% | $360,500 | 8.29% | $109,117 | 3.29% | $144,123 | 4.51% |
| Total Food Service | $238,009 | 6.04% | $129,000 | 2.97% | $143,005 | 4.31% | $170,568 | 5.33% |
| Total Transportation | $145,514 | 3.69% | $303,500 | 6.98% | $34,790 | 1.05% | $551,091 | 17.23% |
| Total Maintenance | $240,834 | 6.11% | $93,000 | 2.14% | $141,388 | 4.27% | $50,513 | 1.58% |
| Total Utilities | $58,840 | 1.49% | $49,516 | 1.14% | $39,441 | 1.19% | $21,967 | 0.69% |
| Total Camper Recruit/Advirt/Promo | $156,441 | 3.97% | $42,000 | 0.97% | $69,380 | 2.09% | $81,545 | 2.55% |
| Total Other Camp Expenses | $273,210 | 6.93% | $0 | 0.00% | $0 | 0.00% | $0 | 0.00% |
| Total Insurance | $201,667 | 5.12% | $204,800 | 4.71% | $74,581 | 2.25% | $119,521 | 3.74% |
| Total Corporate and/or Other Exp. | $0 | 0.00% | $127,250 | 2.93% | $252,764 | 7.63% | $235,009 | 7.35% |
| Total Operating Expenses | $3,182,800 | 80.75% | $2,929,566 | 67.35% | $2,025,360 | 61.11% | $2,363,801 | 73.92% |


Leitner | Berman

Camp owners report operating expenses across various categories, which we have consolidated into broader groupings for analytical consistency. However, it is important to note that differences in expense categorization can exist between operators. For example, while some owners separately report a "repairs and maintenance" expense, the owner of the subject property includes this category within "grounds expenses." As such, our analysis focuses primarily on overall expense ratios rather than individual line items. It is also noted that no separate reserve for replacement is included, as such expenditures are incurred annually and classified under grounds expenses. Furthermore, capitalization rate data referenced herein is reported on a basis prior to the deduction of reserves for replacement.

Valuations of the SIMAD portfolio camps are grounded in the stable operating history of each property and operating expenses that are consistent with market expectations for similar camp operations.

As outlined in our appraisal methodology, while individual expense categories (e.g., staffing, maintenance, utilities) can vary between operators based on location, program design, and operational philosophy, the total operating expense ratio is a more reliable and comparable metric.  Accordingly, our analysis focuses on overall operating expense ratios rather than line-item comparisons to ensure a consistent, apples-to-apples evaluation across properties.

Operating expense ratios for the subject camp properties generally fall between 60% and 80% of gross revenue.  Day camps typically fall on the lower end of the range, as they do not incur expenses related to overnight accommodations, food service, and 24-hour staffing.  Overnight camps generally exhibit higher expense ratios due to the increased infrastructure, staffing, and operational complexity required for full-time residential programs.

Our appraisal approach is supported by data from eight (8) market operating expense comparables, all representing children's summer camp properties located throughout the United States.  These comparables were selected to represent a range of camp types and geographies and include both day and overnight programs.  They reflect independent camps that are similar in scale and scope to the SIMAD portfolio.

| Camp | Blue Star | Chen-A-Wanda | Country Roads | Green Lane | Lokanda | North Star |
|---|---|---|---|---|---|---|
| 2024 - Gross Income | $8,031,484 | $7,158,046 | $6,472,655 | $3,676,102 | $5,560,445 | $2,518,232 |
| 2024 - Manager Fees | $460,000 | $470,542 | $560,000 | $313,462 | $300,000 | $237,775 |
| % | 5.73% | 6.57% | 8.65% | 8.53% | 5.40% | 9.44% |

The operating expense ratios observed in the SIMAD portfolio are consistent with these market benchmarks and fall well within the expected range—inclusive of any management-related expenses.

## Management Fees

One important distinction between camp valuations and hotel valuations lies in how management fees are treated within the income approach to value.  In a hotel appraisal, it is standard industry practice to include a market-oriented management fee, typically ranging from 2.0% to 4.0% of gross revenue.  This fee reflects the cost of engaging an external, professional management company to operate the hotel, even if the hotel is owner-operated in practice.

For branded hotel properties (e.g., Marriott, Hilton, Sheraton), an additional franchise or brand fee may be included, often based on a percentage of gross revenue.  These fees cover brand affiliation, centralized



marketing, reservation systems, and operational oversight, and are treated as a necessary cost of doing business in the hotel industry.  These management and franchise fees are recognized as part of the normal operating expense structure.

In contrast, children's summer camps are typically owner-operated or managed by in-house leadership, often including founders, long-tenured directors, or non-profit boards.  It is not standard practice to include a market-based management fee in the same way it is for hotels, particularly for camps with stable, legacy operations.  Camps generally do not pay external management firms or brand/franchise fees, as they are standalone, independent operations with self-contained marketing, admissions, and staffing models.

Often, camp management fees are paid directly through a camp's payroll expense.  Below are six examples of fees from SIMAD's portfolio:

| Camp | Blue Star | Chen-A-Wanda | Country Roads | Green Lane | Lokanda | North Star |
|---|---|---|---|---|---|---|
| 2024 - Gross Income | $8,031,484 | $7,158,046 | $6,472,655 | $3,676,102 | $5,560,445 | $2,518,232 |
| 2024 - Manager Fees | $460,000 | $470,542 | $560,000 | $313,462 | $300,000 | $237,775 |
| % | 5.73% | 6.57% | 8.65% | 8.53% | 5.40% | 9.44% |

The market manager fees, as a percentage of gross income, generally range between 5.00% and 9.00%. These fees cover ownership's accounting and back-office operation.

## Direct Capitalization

Direct capitalization is a method used to convert a single year's estimated stabilized net operating income into an indication of value. Four general approaches are used in deriving an overall cap rate ("OAR").

- Comparable sale capitalization rates
- Investor surveys
- Guidance from market participants
- Mortgage-equity technique

On the following pages, all four approaches will be addressed.

### Comparable Sales

Typically, camp properties are transferred via word of mouth without broker involvement.  Bona fide camp sales are somewhat rare, as camp facilities/operations are handed down from generation to generation within the same family.  In some cases, camp operators who retire will not put the necessary maintenance into the facility and will oftentimes expense atypical items leading to a lower profit margin.

We believe that direct comparison to the subject is unreliable due to the limited number of sales which have occurred.  Each property, like the subject is a highly specialized facility and meets the needs of the next user in a unique way.  Often, with sales of camp properties, it is difficult to ascertain or delineate the value of the on-site facilities, infrastructure, and site improvements on a camp-to-camp basis.

As a proxy for camps, we have included some capitalization rates from specialty properties in the eastern US as follows:



| Cap Rate Sales | Address | Use | Building Size (SF) | Site Size (Acres) | Sale Date | Sale Price | Capitalization Rate |
|---|---|---|---|---|---|---|---|
| Cap Rate Sale 1 | 6590 S Cayuga Lake Road, Ovid, NY 14521 | Campground | 3,692 | 81.96 | 4/7/2025 | $1,700,000 | 11.00% |
| Cap Rate Sale 2 | 1932 Springbrook Square Drive, Naperville, IL 60564 | School | 11,453 | 1.39 | 3/1/2025 | $2,863,000 | 9.00% |
| Cap Rate Sale 3 | 203 Main Street, Lenox, MA 01240 | Bed/Breakfast | 11,383 | 3.90 | 2/24/2025 | $3,900,000 | 9.59% |
| Cap Rate Sale 4 | 25528 Fitzpatrick Avenue, Warsaw, MO 65355 | Campground and Winery | 3,750 | 31.00 | 2/3/2025 | $1,300,000 | 10.00% |
| Cap Rate Sale 5 | 57 Free Spirit Drive, Landisburg, PA 17040 | Campground | 1,000 | 65.99 | 1/13/2025 | $1,700,000 | 10.75% |
| Cap Rate Sale 6 | 1937 BristlePike, Morrisville, PA 19067 | Trailer Park | 1,000 | 2.00 | 1/7/2025 | $1,000,000 | 10.00% |
| Cap Rate Sale 7 | 8736 Double Cabin Road, VA 24343 | RV Resort | 29,272 | 98.00 | 11/14/2024 | $4,000,000 | 8.00% |
| Cap Rate Sale 8 | 7 Congress Street, Greenfield, MA 01301 | Bed/Breakfast | 14,414 | 0.53 | 2/14/2024 | $685,000 | 14.00% |
| Cap Rate Sale 9 | 16263 County Road 1, Fifty Lakes, MN 564448 | Campground | 14,716 | 35.00 | 9/28/2023 | $2,500,000 | 9.04% |
| Cap Rate Sale 10 | N5428 24th Avenue, Wild Rose, WI 54984 | School | 48,000 | 59.59 | 5/22/2023 | $3,400,000 | 10.28% |
| | | | | | | Min | 8.00% |
| | | | | | | Max | 14.00% |
| | | | | | | Average | 10.17% |

The above properties reflect similar specialty real estate types. While none of the sales are specifically of youth summer camps, they do provide an indication of the reasonable range of capitalization rates that would be anticipated for a specialty property such as a summer camp.

Although some of the sales occurred after our valuation date of December 31, 2024, it is assumed that these properties were either under contract or in the negotiation phase prior to that date. As such, they are considered relevant and reliable comparable sales for use in this analysis.

Based on the data reviewed, a reasonable capitalization rate for a youth summer camp property would range from 9.00% to 11.00%.

## Market Participants

We have surveyed a number of national consulting firms that specialize in the analysis of the camp properties, including Colliers, IBIS World, Cushman & Wakefield, and information provided by the American Camp Association.  Generally, the capitalization rate assumed for a camp's net income is about 10.00%.  However, discussions with these participants reveal that the concluded capitalization rate may vary (higher or lower) depending on a number of factors, including a camp's location, the value of the camp's underlying land, and the whether the camp is under/over performing compared to the market.

## Investor Surveys

The primary national source of going-in capitalization rates is provided by the PwC's investment surveys which summarize going-in capitalization rate for National Limited Service Midscale & Economy Lodging (as at least somewhat comparable to the subject as a youth camp). These rates are a representative sample of institutional investors.

| Survey | Type of Product | Overall Capitalization Rate |
|---|---|---|
| PwC 1Q 2025 | National Limited-Service Midscale & Economy Lodging | 7.50% to 12.00% |
| | | 9.50% average |


Leitner | Berman

## Mortgage-Equity Technique

The mortgage-equity technique (also known as the Akerson formula or the Ellwood method), considers the return of equity (including any potential appreciation/depreciation) in property value over the income projeciton period. This method also acocunts for the effects of financing through mortgage amortization and any additional equity benefits.

Direct capitalization measures a single, stabilized year's anticipate income in order to determine its value by a market capitlization rate. The mortgage-equity technique relies on risk, debt, and equity goal requirements. The below are considered in the development of a capitalization rate via the mortgage equity technique:

- Financing terms
- Holding period
- IRR
- Equity yield
- Change in value

**Financing -** Lending institutions typically lend at a 65% to 75% loan to value ratio. Interest rates, in a recent period, ranged from 5.00% to 7.00% with loan terms at five years with twenty- to twenty-five-year payout schedules.

**Holding Period** - Most investors/purchasers intend to hold a property for a period that typically ranges from 5 to 15 years.  We have selected a period of 10 years.

**Equity Yield** - This is a competitive rate of return reflecting the inherent risks, illiquidity, potential benefits and availability of tax shelter of property ownership relative to prospective rates of return for alternative investment opportunities.  Typical investors require a rate of return for investment quality property such as the subject which is greater than the safe or "riskless" rates offered for long-term treasury notes and bonds or high-grade corporate bonds.  The difference between an investor's required rate of return and the safe rate is basically the premium necessary to compensate the investor for the added risks of inflation, management, and lack of liquidity offered by a real estate investment. The following rates have been used as market indicators:

| Survey of Competitive Rates | |
| --- | --- |
| Federal Funds Rate | 4.33% |
| Prime Rate | 7.50% |
| 10-year Treasury Note (Nominal) | 4.48% |
| 20-year Treasury Note (Nominal) | 4.91% |
| 30-year Treasury Note (Nominal) | 4.85% |
| Corporate Bonds (10 yr Aaa) | 5.29% |
| Corporate Bonds (10 yr Baa) | 6.28% |
| Muni Bonds (10 year) | 3.49% |

Source: Federal Funds Rate, Prime Rate, T-Notes-Federal Reserve April 11, 2025
Source: Bonds - April 2025
Source: Muni Bond Bloomberg April 2025


Leitner | Berman

The Federal Funds Rate is a foundational rate determining the cost of funds by Federal Reserve banks to depository institutions. The Prime Rate is a base rate posted by large banks for loans to corporations. Long-term issues such as 10-year Treasury Notes are guaranteed by the federal government. Corporate Bonds and Utility Bonds are long-term securities protected by the creditworthiness of the issuer. Municipal Bonds are free of tax liabilities and, therefore, the return is typically less than investment opportunities which are taxable.

Another source of anticipatory yield rates is provided by the PwC investment surveys which summarize expected rates of return, including capitalization rates and income and expense growth rates, from a representative sample of institutional investors.  A specific summer camp is not compiled by the PwC survey.  Therefore, we have included a "Limited-Service Lodging Segment" survey which is somewhat similar to a resident sleep away camp:

| Survey | Type of Product | IRR |
|---|---|---|
| PWC | Limited Service Lodging | 8.50% to 14.00% |
| First Quarter 2025 | | 11.00% average |

These free and clear discount yield rates are reported for the First Quarter 2025 and reflect a range of 8.50% to 14.00% and predominant rates of approximately 11.00%.  The rates reflect acceptable expectations of yields desired by investors currently in the marketplace.

As the subject property's largest component is land suitable for development, we have also analyzed discount rates within the National Development Land Market as reported by the PwC investor surveys.  As of the Fourth Quarter 2024, discount rates for development sites ranged between 12.00% to 30.00%, with an average of 17.00%, including developer's profit, as indicated in the following table.

| Survey | Type of Product | IRR |
|---|---|---|
| PWC | National Land | 12.00% to 30.00% |
| Fourth Quarter 2024 | Development Market | 17.00% average |

The overall rates for land development are higher than for other investment grade real estate assets primarily due to two factors: the rates are inclusive of developer profit and are also reflective of additional risk associated with development projects over time.  While such rates are not fully relevant with regard to special purpose properties such as the subject represents, these rates may provide more insight with respect to the market for special purpose properties (with a large land component) such as summer camps.

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value, intangibles, or goodwill.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations.



2025-3163 – Single Asset Portfolio – Simad Holdings LLC       General Appraiser Information – Income Capitalization Approach

## Higher Capitalization Rate Conclusion to Eliminate Business-Driven Value

While traditional real estate assets (e.g., apartments, industrial, office) typically trade at capitalization rates ranging from 6.00% to 9.00%, the valuation of children's summer camps requires a distinct risk adjustment due to their operational complexity and niche nature.

For the SIMAD portfolio, we concluded to a market capitalization rate range of 9.00% to 11.00%—reflecting the following risk considerations:

- *Operational Complexity*: Camps are not passive real estate investments; they are labor-intensive operations requiring specialized staff, infrastructure, and logistics.
- *Business-Driven Value*: As discussed, a portion of the value is derived from the operating business – not just the underlying real estate – necessitating a risk premium in the capitalization rate in order to neutralize the business value.
- *Niche Market Segment*: The camp industry is highly specialized, with few active buyers and limited comparable transactions, contributing to illiquidity and valuation opacity.

The higher capitalization rate is intended to capture these business and market risks, and is applied conservatively to support a defendable and market-consistent valuation.

In the development of our capitalization rate analysis, we applied a consistent set of market-oriented financing assumptions across all SIMAD portfolio camps. These assumptions are not reflective of the actual in-place debt or capital structure of the individual properties, but rather are intended to provide a uniform basis for valuation that aligns with common underwriting standards in U.S. real estate finance.
Specifically, we assumed:

- A loan-to-value (LTV) ratio of 65%, consistent with what is typically offered by lenders in U.S. real estate refinancings.
- A 25-year amortization period, which reflects standard repayment schedules in long-term real estate loan structures.
- A 10-year loan term, in line with prevailing market norms for commercial real estate financing.

By incorporating these standardized financing terms, we ensure that the capitalization rate conclusions are developed within a market-relevant lending context, supporting a credible and supportable valuation conclusion.



# INDIVIDUAL PROPERTY INFORMATION

## C2 – Banner Day Camp

### Property Financials

| BANNER DAY CAMP OPERATING HISTORICALS | | | | | | |
|---|---|---|---|---|---|---|
| YEAR | 2021 | | 2022 | | 2023 | |
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $7,164,827 | 100.0% | $9,396,833 | 100.0% | $10,488,838 | 100.0% |
| TOTAL RENTAL INCOME | $7,164,827 | 100.0% | $9,396,833 | 100.0% | $10,488,838 | 100.0% |
| MISCELLANEOUS | | | | | | |
| Other Revenue | $0 | 0.0% | $0 | 0.0% | $0 | 0.0% |
| TOTAL MISCELLANEOUS | $0 | 0.0% | $0 | 0.0% | $0 | 0.0% |
| TOTAL GROSS INCOME | $7,164,827 | 100.0% | $9,396,833 | 100.0% | $10,488,838 | 100.0% |
| EXPENSE ITEMS | | | | | | |
| Payroll | ($2,278,051) | (31.8%) | ($2,831,571) | (30.1%) | ($3,528,822) | (33.6%) |
| Taxes and benefits | ($409,904) | (5.7%) | ($407,098) | (4.3%) | ($538,210) | (5.1%) |
| Total kitchen expense | ($407,120) | (5.7%) | ($480,657) | (5.1%) | ($516,343) | (4.9%) |
| Total program activities expense | ($310,962) | (4.3%) | ($370,237) | (3.9%) | ($440,045) | (4.2%) |
| Total grounds expense | ($140,339) | (2.0%) | ($163,890) | (1.7%) | ($175,382) | (1.7%) |
| Transportation expense | ($343,467) | (4.8%) | ($604,688) | (6.4%) | ($540,268) | (5.2%) |
| Total camper recruitment | ($23,173) | (0.3%) | ($33,586) | (0.4%) | ($29,844) | (0.3%) |
| Staffing expense | ($31,486) | (0.4%) | ($68,127) | (0.7%) | ($98,159) | (0.9%) |
| Advertising | ($55,176) | (0.8%) | ($76,791) | (0.8%) | ($83,334) | (0.8%) |
| Banking and credit card fees | ($194,101) | (2.7%) | ($243,474) | (2.6%) | ($268,515) | (2.6%) |
| Consulting | ($5,125) | (0.1%) | ($6,450) | (0.1%) | ($27,450) | (0.3%) |
| General Expense | ($4,823) | (0.1%) | ($19,825) | (0.2%) | ($23,856) | (0.2%) |
| Insurance | ($113,681) | (1.6%) | ($103,497) | (1.1%) | ($47,553) | (0.5%) |
| Management fee expense | ($15,000) | (0.2%) | ($15,000) | (0.2%) | ($20,000) | (0.2%) |
| Office expense | ($26,250) | (0.4%) | ($30,988) | (0.3%) | ($36,914) | (0.4%) |
| Postage and Printing | ($42,891) | (0.6%) | ($39,940) | (0.4%) | ($43,839) | (0.4%) |
| Professional fees | ($8,260) | (0.1%) | ($7,553) | (0.1%) | ($8,090) | (0.1%) |
| Real estate taxes | ($67,433) | (0.9%) | ($76,853) | (0.8%) | ($90,655) | (0.9%) |
| Rent - Office | $0 | - | ($153,288) | (1.6%) | $0 | - |
| Telephone & Internet | ($28,083) | (0.4%) | ($30,470) | (0.3%) | ($30,444) | (0.3%) |
| Travel & Auto Exp | ($85,661) | (1.2%) | ($68,082) | (0.7%) | ($101,335) | (1.0%) |
| Utilities | ($52,921) | (0.7%) | ($48,133) | (0.5%) | ($59,089) | (0.6%) |
| Camp Rent | ($132,291) | (1.8%) | $0 | - | ($157,840) | (1.5%) |
| TOTAL EXPENSES | ($4,776,197) | (66.7%) | ($5,880,198) | (62.6%) | ($6,865,986) | (65.5%) |
| NET OPERATING INCOME | $2,388,629 | 33.3% | $3,516,634 | 37.4% | $3,622,852 | 34.5% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



| STATEMENT OF INCOME AND EXPENSES | |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| | **Banner** |
| **INCOME:** | |
| Tuition - camp income (net) | $ 10,504,267 |
| Tuition - school income (net) | |
| Other revenue | |
| **Total income** | **$ 10,504,267** |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 3,550,327 |
| Taxes and benefits | 650,488 |
| Total kitchen expense | 531,077 |
| Total program activities expense | 506,330 |
| Total grounds expense | 210,926 |
| Transportation expense | 434,441 |
| Camper recruitment expense | 26,069 |
| Staffing expense | 143,218 |
| Other direct expense | |
| Total direct cost of operations | $ 6,052,875 |
| | |
| **Gross profit** | **$ 4,451,392** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 77,221 |
| Banking and credit card fees | 259,742 |
| Consulting | 28,200 |
| General expense | 19,684 |
| Insurance | 60,616 |
| Management Fee | 20,000 |
| Office | 35,643 |
| Postage and Printing | 37,956 |
| Professional fees | 17,196 |
| Real estate taxes | 92,438 |
| Camp Rent | 183,303 |
| Rent - Office | |
| Telephone & Internet | 40,132 |
| Travel & Auto Exp | 117,545 |
| Utilities | 68,024 |
| Total selling, general and administrative expense | $ 1,057,701 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 3,393,691** |

## Analysis of Income and Expenses

Covid severely impacted 2020 with some residual impact in 2021.  Thus, less reliance is placed on the historical income and expense from 2021.

To estimate the camp value of the subject we will first complete an abbreviated Income Capitalization Approach.  Due to the specific income and expense characteristics of a summer camp property, we will project income and expenses based on historical expenses tended for 2025.



After strong increases in the income between 2021 and 2023, the income was level for 2024.  Thus, we will project level income for 2025.  With the significant income increases between 2021 and 2023, expense also increases significantly over this period and while the income increase from 2023 to 2024 was negligible, the expense increased at close to 3%.  Therefore, we have projected expenses to increase at 3% for 2025.

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $7,164,827 | $9,396,833 | 31.15% | $10,488,838 | 11.62% | $10,504,267 | 0.15% | 11.85% | 0.00% | $10,504,267 |
| Total Expense | $4,776,197 | $5,880,198 | 23.11% | $6,865,986 | 16.76% | $7,110,576 | 3.56% | 13.23% | 3.00% | $7,323,893 |
| % of PGI | 66.7% | 62.6% | | 65.5% | | 67.7% | | | | 69.7% |
| Net Operating Income | $2,388,630 | $3,516,635 | | $3,622,852 | | $3,393,691 | | | | $3,180,374 |

The subject projected operating expense ratio of 69.7%.  Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range). The subject's projected expense ratio is reasonably in the comparable range.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations.  A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 400 basis points for asset management, and 200 basis points for risk.  This results in a 13.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 17.00%.

Based on the foregoing, it is our opinion that a 17.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

**Change in Value**

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.



| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 17.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 17.00% | | | = | 5.95% |
| **Weighted Rate** | | | | | | | **11.22%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.47% | = | 0.65% |
| **Adjusted Rate** | | | | | | | **10.56%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.47% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 10.56% |
| **(rounded to)** | | | | | | | **10.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 10.50%.  Therefore, our projected camp value for the subject property, as of December 31, 2024 is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $3,180,374 | | 10.50% | | $30,289,274 | $30,300,000 |



## C7 – Country Roads Day Camp

### Property Financials

### COUNTRY ROADS DAY CAMP OPERATING HISTORICALS

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| **INCOME ITEMS** | **TOTAL** | **% EGI** | **TOTAL** | **% EGI** | **TOTAL** | **% EGI** |
| Tuition Revenue | $5,190,132 | 100.0% | $5,815,194 | 99.9% | $6,629,600 | 100.0% |
| Other Revenue | $0 | 0.0% | $3,657 | 0.1% | $434 | 0.0% |
| **TOTAL GROSS INCOME** | $5,190,132 | 100.0% | $5,818,851 | 100.0% | $6,630,034 | 100.0% |
| **EXPENSE ITEMS** | | | | | | |
| Payroll | ($1,903,297) | (36.7%) | ($2,278,895) | (39.2%) | ($2,528,708) | (38.1%) |
| Taxes and Benefits | ($329,935) | (6.4%) | ($368,880) | (6.3%) | ($473,839) | (7.1%) |
| Total Kitchen Expense | ($131,756) | (2.5%) | ($182,866) | (3.1%) | ($198,950) | (3.0%) |
| Total Program Activities Expense | ($626,824) | (12.1%) | ($710,416) | (12.2%) | ($502,925) | (7.6%) |
| Camp Rents | $0 | - | ($16,837) | (0.3%) | $0 | - |
| Total Grounds Expense | ($179,688) | (3.5%) | ($195,512) | (3.4%) | ($190,668) | (2.9%) |
| Transportation Expense | ($295,503) | (5.7%) | ($396,658) | (6.8%) | ($402,004) | (6.1%) |
| Camper Recruitment Expense | ($9,562) | (0.2%) | ($28,178) | (0.5%) | ($10,724) | (0.2%) |
| Staffing Expense | ($40,431) | (0.8%) | ($11,221) | (0.2%) | ($70,519) | (1.1%) |
| Advertising | ($20,854) | (0.4%) | ($12,701) | (0.2%) | ($9,145) | (0.1%) |
| Bank and Credit Card Fees | ($167,001) | (3.2%) | ($234,523) | (4.0%) | ($121,245) | (1.8%) |
| Insurance | ($84,666) | (1.6%) | ($105,925) | (1.8%) | ($112,288) | (1.7%) |
| Management Fee | ($15,000) | (0.3%) | ($15,000) | (0.3%) | ($20,000) | (0.3%) |
| Office Expense | ($62,916) | (1.2%) | ($54,606) | (0.9%) | ($60,358) | (0.9%) |
| Postage and Printing | ($28,137) | (0.5%) | ($32,039) | (0.6%) | ($31,258) | (0.5%) |
| Professional Fees | ($7,046) | (0.1%) | ($37,380) | (0.6%) | ($17,356) | (0.3%) |
| Real Estate Taxes | ($52,143) | (1.0%) | ($46,903) | (0.8%) | ($45,465) | (0.7%) |
| Telephone & Internet | ($13,415) | (0.3%) | ($10,785) | (0.2%) | ($21,822) | (0.3%) |
| Travel and Auto Expense | ($11,365) | (0.2%) | ($100,171) | (1.7%) | ($5,664) | (0.1%) |
| Utilities | ($78,889) | (1.5%) | $0 | - | ($69,282) | (1.0%) |
| General Expense | ($10,365) | (0.2%) | ($9,612) | (0.2%) | ($20,864) | (0.3%) |
| **TOTAL EXPENSES** | ($4,068,793) | (78.4%) | ($4,849,108) | (83.3%) | ($4,913,083) | (74.1%) |
| **NET OPERATING INCOME** | **$1,121,339** | **21.6%** | **$969,743** | **16.7%** | **$1,716,951** | **25.9%** |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



2025-3163 – Single Asset Portfolio – Simad Holdings LLC                    Individual Property Information

| STATEMENT OF INCOME AND EXPENSES | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACCRUAL BASIS | | | | | | | |
| For the period January 1, 2024 to December 31, 2024 | | | | | | | |
| | | | | | | | **Country Roads** |
| **INCOME:** | | | | | | | |
| | Tuition - camp income (net) | | | | | | $  5,136,397 |
| | Tuition - school income (net) | | | | | | 1,336,258 |
| | Other revenue | | | | | | 22 |
| | | **Total income** | | | | | $  6,472,677 |
| | | | | | | | |
| | | | | | | | |
| | Grant Income | | | | | | |
| | | | | | | | |
| | | Total income | | | | | $  6,472,677 |
| | | | | | | | |
| **DIRECT COST OF OPERATIONS:** | | | | | | | |
| | Payroll | | | | | | $  2,701,647 |
| | Taxes and benefits | | | | | | 432,997 |
| | Total kitchen expense | | | | | | 170,464 |
| | Total program activities expense | | | | | | 345,762 |
| | Total grounds expense | | | | | | 41,066 |
| | Transportation expense | | | | | | 176,873 |
| | Camper recruitment expense | | | | | | 425,394 |
| | Staffing expense | | | | | | 7,663 |
| | Other direct expense | | | | | | 76,417 |
| | | Total direct cost of operations | | | | | $  4,378,284 |
| | | | | | | | |
| **Gross profit** | | | | | | | $  2,094,393 |
| | | | | | | | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | | | | | | | |
| | Advertising | | | | | | $  5,008 |
| | Banking and credit card fees | | | | | | 114,398 |
| | Consulting | | | | | | |
| | General expense | | | | | | 30,059 |
| | Insurance | | | | | | 115,281 |
| | Management Fee | | | | | | 20,015 |
| | Office | | | | | | 64,245 |
| | Postage and Printing | | | | | | 24,184 |
| | Professional fees | | | | | | 3,623 |
| | Real estate taxes | | | | | | 34,427 |
| | Camp Rent | | | | | | |
| | Rent - Office | | | | | | |
| | Telephone & Internet | | | | | | 24,166 |
| | Travel & Auto Exp | | | | | | 3,489 |
| | Utilities | | | | | | 97,117 |
| | | Total selling, general and administrative expense | | | | $  536,013 |
| | | | | | | | |
| **Net income before interest, depreciation & Corp. Tax** | | | | | | $  1,558,381 |

## Analysis of Income and Expenses

Covid severely impacted 2020 with some residual impact in 2021.  Thus, less reliance is placed on the historical income and expense from 2021.

In 2022 and 2023, the camp exhibited strong income growth, likely resulting from a continuing recovery from COVID.  However, in 2024, income slightly decreased.  Based on this trend, we will assume project 2025 income will remain level. Based on expense increases in 2024, we will assume a 3% increase in expenses for 2024.



**37**

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $5,190,132 | $5,815,194 | 12.04% | $6,629,600 | 14.00% | $6,472,677 | -2.37% | 7.35% | 0.00% | $6,472,677 |
| Total Expense | $4,068,793 | $4,849,108 | 19.18% | $4,913,083 | 1.32% | $4,914,297 | 0.02% | 5.81% | 3.00% | $5,061,726 |
| % of PGI | 78.4% | 83.4% | | 74.1% | | 75.9% | | | | 78.2% |
| Net Operating Income | $1,121,339 | $966,086 | | $1,716,517 | | $1,558,380 | | | | $1,410,951 |
| | | | | | | | | | * Less Incentive | $265,000 |
| | | | | | | | | | Adjusted NOI | $1,145,951 |

Ownership provides a bonus incentive to the current camp operator in addition to their base salary. In the event the operator were to depart, it is expected that a comparable bonus structure would be necessary to attract and retain a qualified replacement capable of maintaining the camp's high level of profitability. Accordingly, this bonus is considered an ongoing operational expense, consistent with historical financial performance where this cost has been regularly incurred and accounted for in reported income and expenses.

The subject projected operating expense ratio of 78.2%.  Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at the upper end of the range, noting that as a day camp, there may be potential streamline expenses creating additional value.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 200 basis points for risk.  This results in an 11.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 300 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 14.00%.

Based on the foregoing, it is our opinion that a 14.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

**Change in Value**

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

 Leitner | Berman

38

2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 14.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 14.00% | | | = | 4.90% |
| **Weighted Rate** | | | | | | | **10.17%** |
| | | | | | | | |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 5.17% | = | 0.76% |
| **Adjusted Rate** | | | | | | | **9.41%** |
| | | | | | | | |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 5.17% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 9.41% |
| **(rounded to)** | | | | | | | **9.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 9.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 10.00%.  Therefore, our projected camp value for the subject property, as of December 31, 2024 is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,145,951 | | 9.50% | | $12,062,643 | $12,100,000 |



2025-3163 – Single Asset Portfolio – Simad Holdings LLC                     Individual Property Information

## C25 – Rolling Hills Country Day Camp

### Property Financials

| YEAR | 2022 | | 2023 | |
|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $7,500,370 | 99.6% | $8,660,991 | 99.9% |
| Other Revenue | $32,349 | 0.4% | $12,238 | 0.1% |
| **TOTAL GROSS INCOME** | $7,532,719 | 100.0% | $8,673,229 | 100.0% |
| **EXPENSE ITEMS** | | | | |
| Payroll | ($2,832,044) | (37.6%) | ($3,275,271) | (37.8%) |
| Taxes and Benefits | ($295,531) | (3.9%) | ($507,368) | (5.8%) |
| Total Kitchen Expense | ($233,363) | (3.1%) | ($233,546) | (2.7%) |
| Total Program Activities Expense | ($599,904) | (8.0%) | ($623,450) | (7.2%) |
| Total Grounds Expense | ($335,406) | (4.5%) | ($258,265) | (3.0%) |
| Transportation Expense | ($714,242) | (9.5%) | ($790,124) | (9.1%) |
| Staffing Expense | ($141,959) | (1.9%) | ($153,064) | (1.8%) |
| Advertising | ($41,057) | (0.5%) | ($3,779) | (0.0%) |
| Bank and Credit Card Fees | ($76,527) | (1.0%) | ($75,523) | (0.9%) |
| Consulting | $0 | - | ($219,099) | (2.5%) |
| General Expense | ($30,486) | (0.4%) | ($43,684) | (0.5%) |
| Insurance | ($255,136) | (3.4%) | ($40,364) | (0.5%) |
| Management Fee | $0 | - | $0 | - |
| Office Expense | ($91,089) | (1.2%) | ($96,655) | (1.1%) |
| Postage and Printing | ($7,522) | (0.1%) | ($4,127) | (0.0%) |
| Professional Fees | ($212,672) | (2.8%) | ($41,271) | (0.5%) |
| Real Estate Taxes | ($55,908) | (0.7%) | ($89,447) | (1.0%) |
| Rent - Office | ($304,824) | (4.0%) | ($83,100) | (1.0%) |
| Telephone & Internet | ($36,822) | (0.5%) | ($30,913) | (0.4%) |
| Travel and Auto Expense | ($69,096) | (0.9%) | ($36,708) | (0.4%) |
| Utilities | ($65,103) | (0.9%) | ($66,673) | (0.8%) |
| **TOTAL EXPENSES** | ($6,398,692) | (84.9%) | ($6,672,431) | (76.9%) |
| **NET OPERATING INCOME** | $1,134,027 | 15.1% | $2,000,799 | 23.1% |

In addition, to the above 2022-2023, we have been supplied with year-end 2024 income and expenses as follows:



| STATEMENT OF INCOME AND EXPENSES | Rolling Hills |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| **INCOME:** | |
| Tuition - camp income (net) | $ 9,307,480 |
| Tuition - school income (net) | |
| Other revenue | |
| **Total income** | **$ 9,307,480** |
| Grant Income | |
| Total income | $ 9,307,480 |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 3,353,464 |
| Taxes and benefits | 551,970 |
| Total kitchen expense | 248,671 |
| Total program activities expense | 680,670 |
| Total grounds expense | |
| Transportation expense | 243,572 |
| Camper recruitment expense | 987,441 |
| Staffing expense | 165,933 |
| Other direct expense | |
| Total direct cost of operations | $ 6,231,721 |
| **Gross profit** | **$ 3,075,758** |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 5,346 |
| Banking and credit card fees | 166,946 |
| Consulting | |
| General expense | 43,336 |
| Insurance | 115,049 |
| Management Fee | 144,596 |
| Office | 111,931 |
| Postage and Printing | 3,425 |
| Professional fees | 20,256 |
| Real estate taxes | 93,512 |
| Camp Rent | |
| Rent - Office | 173,850 |
| Telephone & Internet | 29,288 |
| Travel & Auto Exp | 38,053 |
| Utilities | 63,450 |
| Total selling, general and administrative expense | $ 1,009,038 |
| **Net income before interest, depreciation & Corp. Tax** | **$ 2,066,721** |

## Analysis of Income and Expenses

In 2023 and 2024, the camp experienced strong income growth, likely attributable to continued recovery from the impacts of the COVID-19 pandemic. As of 2024, the camp is operating near full capacity, which limits the potential for further significant growth in enrollment-based revenue. Accordingly, for 2025, we are



projecting a more moderate income increase of 3%. Concurrently, in consideration of prevailing inflationary trends, operating expenses are projected to rise by 5% in 2025.

| | 2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|
| Gross Income | $7,532,719 | $8,673,229 | 15.14% | $9,307,480 | 7.31% | 11.78% | 3.00% | $9,586,704 |
| Total Expense | $6,396,692 | $6,672,431 | 4.31% | $7,240,759 | 8.52% | 6.60% | 5.00% | $7,602,797 |
| % of PGI | 84.9% | 76.9% | | 77.8% | | | | 79.3% |
| Net Operating Income | $1,136,027 | $2,000,798 | | $2,066,721 | | | | $1,983,907 |
| | | | | | | | * Less Incentive | $250,000 |
| | | | | | | | Adjusted NOI | $1,733,907 |

Ownership provides a bonus incentive to the current camp operator in addition to their base salary. In the event the operator were to depart, it is expected that a comparable bonus structure would be necessary to attract and retain a qualified replacement capable of maintaining the camp's high level of profitability. Accordingly, this bonus is considered an ongoing operational expense, consistent with historical financial performance where this cost has been regularly incurred and accounted for in reported income and expenses.

The subject projected operating expense ratio of 79.3%.  Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at the upper end of the range, noting that as a day camp, there may be potential streamline expenses creating additional value.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 200 basis points for risk.  This results in an 11.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 300 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 14.00%.

Based on the foregoing, it is our opinion that a 14.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

 Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 14.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 14.00% | | | | = | 4.90% |
| **Weighted Rate** | | | | | | | | **10.17%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 5.17% | | = | 0.76% |
| **Adjusted Rate** | | | | | | | | **9.41%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 5.17% | | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | | 9.41% |
| (rounded to) | | | | | | | | **9.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 9.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 10.00%. Therefore, our projected camp value for the subject property, as of December 31, 2024 is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,733,907 | | 9.50% | | $18,251,657 | $18,300,000 |



## C11 – Malka

### Historical Property Financials and Projected Income and Expenses

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $2,098,174 | $2,481,646 | 18.28% | $2,722,208 | 9.69% | $710,497 | -73.90% | -23.79% | Market | $5,670,000 |
| Total Expense | $2,038,404 | $2,783,291 | 36.54% | $2,575,235 | -7.48% | $814,251 | -68.38% | -23.58% | Market | $4,536,000 |
| % of PGI | 97.2% | 112.2% | | 94.6% | | 114.6% | | | | 80% |
| Net Operating Income | | -$301,645 | | $146,973 | | -$103,754 | | | | **$1,134,000** |

### Capitalization of Net Operating Income

| Market Projection | | 450 Campers @ $2,000 per week as an average | | | | $6,300,000 |
|---|---|---|---|---|---|---|
| | | 90% of Capacity | | | | $5,670,000 |
| | | 80% Expenses | | | | $4,536,000 |
| | | NOI | | | | $1,134,000 |
| | | Cap Rate | | | | 10.50% |
| | | Camp Value (Going Concern) | | | | $10,800,000 |



## C27 – Summit

### Property Financials

| SUMMIT CAMP OPERATING HISTORICALS | | | | | | |
|---|---|---|---|---|---|---|
| **YEAR** | **2021** | | **2022** | | **2023** | |
| **INCOME ITEMS** | **TOTAL** | **% EGI** | **TOTAL** | **% EGI** | **TOTAL** | **% EGI** |
| Tuition Revenue | $4,421,768 | 100.0% | $4,441,200 | 99.9% | $4,549,894 | 100.0% |
| Other Revenue | $0 | 0.0% | $5,563 | 0.1% | $1,981 | 0.0% |
| **TOTAL GROSS INCOME** | $4,421,768 | 100.0% | $4,446,764 | 100.0% | $4,551,875 | 100.0% |
| **EXPENSE ITEMS** | | | | | | |
| Payroll | ($947,142) | (21.4%) | ($1,232,015) | (27.7%) | ($1,266,897) | (27.8%) |
| Taxes and Benefits | ($140,094) | (3.2%) | ($157,785) | (3.5%) | ($137,734) | (3.0%) |
| Total Kitchen Expense | ($174,909) | (4.0%) | ($245,458) | (5.5%) | ($184,497) | (4.1%) |
| Total Program Activities Expense | ($358,392) | (8.1%) | ($661,500) | (14.9%) | ($717,691) | (15.8%) |
| Field Trip & Outside Entertainment | $0 | - | $0 | - | $0 | - |
| Total Grounds Expense | ($89,223) | (2.0%) | ($109,015) | (2.5%) | ($87,251) | (1.9%) |
| Transportation Expense | ($6,661) | (0.2%) | ($40,369) | (0.9%) | ($32,016) | (0.7%) |
| Camper Recruitment Expense | ($29,175) | (0.7%) | ($48,508) | (1.1%) | ($15,194) | (0.3%) |
| Staffing Expense | ($114,650) | (2.6%) | ($231,026) | (5.2%) | ($332,362) | (7.3%) |
| Other Expense | ($400) | (0.0%) | $0 | - | $0 | - |
| Advertising | ($6,806) | (0.2%) | ($44,350) | (1.0%) | ($29,809) | (0.7%) |
| Bank and Credit Card Fees | ($97,898) | (2.2%) | ($89,735) | (2.0%) | ($70,416) | (1.5%) |
| Consulting | ($5,000) | (0.1%) | ($1,560) | (0.0%) | ($9,800) | (0.2%) |
| Insurance | ($82,562) | (1.9%) | ($78,008) | (1.8%) | ($81,081) | (1.8%) |
| Management Fee | ($206,667) | (4.7%) | ($106,667) | (2.4%) | ($124,166) | (2.7%) |
| Office Expense | ($1,537) | (0.0%) | ($2,422) | (0.1%) | ($792) | (0.0%) |
| Postage and Printing | ($4,911) | (0.1%) | ($3,216) | (0.1%) | ($10,784) | (0.2%) |
| Professional Fees | ($3,828) | (0.1%) | ($18,310) | (0.4%) | ($35,676) | (0.8%) |
| Real Estate Taxes | ($29,201) | (0.7%) | ($47,194) | (1.1%) | $0 | - |
| Rent - Office | ($45,569) | (1.0%) | ($19,468) | (0.4%) | ($50,901) | (1.1%) |
| Telephone & Internet | ($15,541) | (0.4%) | ($17,972) | (0.4%) | ($15,754) | (0.3%) |
| Travel and Auto Expense | ($36,296) | (0.8%) | ($87,674) | (2.0%) | ($69,249) | (1.5%) |
| Utilities | ($41,875) | (0.9%) | ($65,937) | (1.5%) | ($64,648) | (1.4%) |
| General Expense | ($35,716) | (0.8%) | ($15,775) | (0.4%) | ($13,030) | (0.3%) |
| **TOTAL EXPENSES** | ($2,474,052) | (56.0%) | ($3,323,961) | (74.8%) | ($3,349,748) | (73.6%) |
| **NET OPERATING INCOME** | $1,947,716 | 44.0% | $1,122,802 | 25.2% | $1,202,126 | 26.4% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



2025-3163 – Single Asset Portfolio – Simad Holdings LLC                          Individual Property Information

| STATEMENT OF INCOME AND EXPENSES | |
| --- | --- |
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| | **Summit** |
| **INCOME:** | |
| Tuition - camp income (net) | $ 5,135,775 |
| Tuition - school income (net) | |
| Other revenue | 4,526 |
| **Total income** | **$ 5,140,301** |
| | |
| | |
| Grant Income | |
| | |
| Total income | $ 5,140,301 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 1,383,377 |
| Taxes and benefits | 103,119 |
| Total kitchen expense | 190,880 |
| Total program activities expense | 768,343 |
| Total grounds expense | 55,985 |
| Transportation expense | 27,907 |
| Camper recruitment expense | 109,974 |
| Staffing expense | 165,702 |
| Other direct expense | 4,168 |
| Total direct cost of operations | $ 2,809,456 |
| | |
| **Gross profit** | **$ 2,330,844** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 107,330 |
| Banking and credit card fees | 13,934 |
| Consulting | 52,823 |
| General expense | 23,280 |
| Insurance | 80,538 |
| Management Fee | 120,000 |
| Office | 664 |
| Postage and Printing | 11,463 |
| Professional fees | 27,813 |
| Real estate taxes | 43,000 |
| Camp Rent | |
| Rent - Office | 9,300 |
| Telephone & Internet | 15,094 |
| Travel & Auto Exp | 73,426 |
| Utilities | 70,167 |
| Total selling, general and administrative expense | $ 648,832 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 1,682,013** |

## Analysis of Income and Expenses

Over the past four years, the camp has experienced a consistent upward trend in gross income. However, operating expenses have fluctuated during this period, likely due to the specialized nature of the camp, which caters to individuals with special needs. In light of the steady increase in income, we have projected a 5% increase in gross income for 2025. Given the variability in historical expenses, we have applied a projected expense ratio of 70%, which closely aligns with the four-year average of 68%



| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $4,421,768 | $4,446,764 | 0.57% | $4,549,894 | 2.32% | $5,140,301 | 12.98% | 7.80% | 5.00% | $5,397,316 |
| Total Expense | $2,474,052 | $3,323,961 | 34.35% | $3,349,748 | 0.78% | $3,458,288 | 3.24% | 2.02% | | $3,778,121 |
| % of PGI | 56.0% | 74.8% | | 73.6% | | 67.3% | | | | 70% |
| Net Operating Income | $1,947,716 | $1,122,803 | | $1,200,146 | | $1,682,013 | | | | $1,619,195 |
| | | | | | | | | | * Less Incentive | $400,000 |
| | | | | | | | | | Adjusted NOI | $1,219,195 |

Ownership provides a bonus incentive to the current camp operator in addition to their base salary. In the event the operator were to depart, it is expected that a comparable bonus structure would be necessary to attract and retain a qualified replacement capable of maintaining the camp's high level of profitability. Accordingly, this bonus is considered an ongoing operational expense, consistent with historical financial performance where this cost has been regularly incurred and accounted for in reported income and expenses.

The subject projected operating expense ratio of 70%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at directly in the range of the comparable expenses indicating the camp is operating efficiently.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 200 basis points for risk.  This results in an 11.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment and we have also added 300 basis points due to the specialized use of this camp as a special needs camp which requires a higher oversight and caters to a limited population,  resulting in an equity yield rate of 18.00%

Based on the foregoing, it is our opinion that a 18.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.



2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                    Individual Property Information

## Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
| --- | --- |
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 18.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 18.00% | | | = | 6.30% |
| **Weighted Rate** | | | | | | | **11.57%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × 4.25% | | = | 0.62% |
| **Adjusted Rate** | | | | | | | **10.95%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.25% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 10.95% |
| (rounded to) | | | | | | | **11.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
| --- | --- | --- | --- | --- |
| Akerson Method | | | | 11.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 11.50%.  Therefore, our projected camp value for the subject property, as of December 31, 2024 is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
| --- | --- | --- | --- | --- | --- |
| $1,219,195 | | 11.00% | | $11,083,589 | $11,100,000 |



## C20 – SHMA Camps

### Property Financials

**CAMP MOGEN HELLER / SHMA CAMPS OPERATING HIST**

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $6,010,497 | 100.0% | $6,342,150 | 100.0% | $6,749,876 | 100.0% |
| Other Revenue | $885 | 0.0% | $600 | 0.0% | $626 | 0.0% |
| **TOTAL GROSS INCOME** | $6,011,382 | 100.0% | $6,342,750 | 100.0% | $6,750,502 | 100.0% |
| **EXPENSE ITEMS** | | | | | | |
| Payroll | ($1,432,439) | (23.8%) | ($1,809,920) | (28.5%) | ($1,856,066) | (27.5%) |
| Taxes and Benefits | ($233,988) | (3.9%) | ($388,437) | (6.1%) | ($379,000) | (5.6%) |
| Total Kitchen Expense | ($847,383) | (14.1%) | ($941,530) | (14.8%) | ($987,569) | (14.6%) |
| Total Program Activities Expense | ($578,523) | (9.6%) | ($597,367) | (9.4%) | ($587,885) | (8.7%) |
| Total Grounds Expense | ($222,322) | (3.7%) | ($215,807) | (3.4%) | ($281,590) | (4.2%) |
| Transportation Expense | ($100,539) | (1.7%) | ($103,451) | (1.6%) | ($108,043) | (1.6%) |
| Camper Recruitment Expense | ($13,325) | (0.2%) | ($19,471) | (0.3%) | ($28,847) | (0.4%) |
| Staffing Expense | ($598) | (0.0%) | ($7,013) | (0.1%) | ($14,043) | (0.2%) |
| Bank and Credit Card Fees | ($103) | (0.0%) | ($10,108) | (0.2%) | ($56,190) | (0.8%) |
| Insurance | ($199,116) | (3.3%) | ($201,053) | (3.2%) | ($196,362) | (2.9%) |
| Management Fee | ($15,000) | (0.2%) | ($15,000) | (0.2%) | ($20,000) | (0.3%) |
| Office Expense | ($16,175) | (0.3%) | ($24,464) | (0.4%) | ($13,603) | (0.2%) |
| Postage and Printing | $0 | - | $0 | - | $0 | - |
| Professional Fees | ($22,420) | (0.4%) | ($21,155) | (0.3%) | ($21,745) | (0.3%) |
| Real Estate Taxes | ($113,587) | (1.9%) | ($125,150) | (2.0%) | ($122,214) | (1.8%) |
| Telephone & Internet | ($47,274) | (0.8%) | ($33,482) | (0.5%) | ($41,007) | (0.6%) |
| Travel and Auto Expense | ($27,055) | (0.5%) | ($46,031) | (0.7%) | ($63,493) | (0.9%) |
| Utilities | ($158,684) | (2.6%) | ($198,533) | (3.1%) | ($175,376) | (2.6%) |
| General Expense | ($6,826) | (0.1%) | ($27,519) | (0.4%) | ($8,591) | (0.1%) |
| **TOTAL EXPENSES** | ($4,035,355) | (67.1%) | ($4,785,491) | (75.4%) | ($4,961,622) | (73.5%) |
| **NET OPERATING INCOME** | $1,976,027 | 32.9% | $1,557,259 | 24.6% | $1,788,880 | 26.5% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



| | SHMA |
|---|---|
| STATEMENT OF INCOME AND EXPENSES | |
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| **INCOME:** | |
| Tuition - camp income (net) | $ 7,087,154 |
| Tuition - school income (net) | |
| Other revenue | 7,491 |
| **Total income** | **$ 7,094,645** |
| | |
| Grant Income | |
| Total income | $ 7,094,645 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 1,983,056 |
| Taxes and benefits | 414,629 |
| Total kitchen expense | 959,474 |
| Total program activities expense | 671,609 |
| Total grounds expense | 113,165 |
| Transportation expense | 134,021 |
| Camper recruitment expense | 27,013 |
| Staffing expense | 11,434 |
| Other direct expense | |
| Total direct cost of operations | $ 4,314,401 |
| | |
| **Gross profit** | **$ 2,780,244** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | |
| Banking and credit card fees | 108,586 |
| Consulting | |
| General expense | 23,247 |
| Insurance | 208,228 |
| Management Fee | 20,000 |
| Office | 10,600 |
| Postage and Printing | 2,522 |
| Professional fees | 15,700 |
| Real estate taxes | 109,167 |
| Camp Rent | |
| Rent - Office | |
| Telephone & Internet | 58,286 |
| Travel & Auto Exp | 80,504 |
| Utilities | 167,782 |
| Total selling, general and administrative expense | $ 804,621 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 1,975,623** |

## Analysis of Income and Expenses

Over the past four years, the camp has experienced a consistent upward trend in gross income. Based on this trend, we will project 5% income growth for 2025. The average expense growth over the past four years skewed due to 2021 to 2022 (18.59%). Thus, based on 2023 and 2024 (where expenses increased approximately 2% per year), we will assume a 3% increase in expenses for 2025



| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $6,011,382 | $6,342,750 | 5.51% | $6,750,502 | 6.43% | $7,087,154 | 4.99% | 5.97% | 5.00% | $7,441,512 |
| Total Expense | $4,035,355 | $4,785,491 | 18.59% | $4,961,622 | 3.68% | $5,119,022 | 3.17% | 7.55% | 3.00% | $5,272,593 |
| % of PGI | 67.1% | 75.4% | | 73.5% | | 72.2% | | | | 70.9% |
| Net Operating Income | $1,976,027 | $1,557,259 | | $1,788,880 | | $1,968,132 | | | | $2,168,919 |

The subject projected operating expense ratio of 70.9%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at directly in the range of the comparable expenses indicating the camp is operating efficiently.

## Capitalization

### Discount Rate

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.   The summation approach was utilized to account for yield expectations associated with these investment considerations.  A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 200 basis points for risk.  This results in an 11.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 15.00%

Based on the foregoing, it is our opinion that a 15.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

### Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 15.00% |
| Holding Period | 10 |
| Appreciation Over Term | 15% |



| Development of Capitalization Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 15.00% | | | = | 5.25% |
| **Weighted Rate** | | | | | | | **10.52%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.93% | = | 0.72% |
| **Adjusted Rate** | | | | | | | **9.80%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 15.00% | × | 4.93% | | | = | **0.74%** |
| Overall Capitalization Rate | | | | | | | 9.06% |
| **(rounded to)** | | | | | | | **9.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 9.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the data reviewed, a reasonable capitalization rate for a youth summer camp property would range from 9.00% to 11.00%. The subject camp currently operates under a nonprofit or mission-driven model, with tuition at the lower end of the market. If the camp were to transition to a market-based tuition structure, the income potential would be significantly higher. Given this opportunity for income enhancement, we have concluded that a capitalization rate at the lower end of the range at 9.00% is appropriate. Accordingly, the projected camp value for the subject property, as of December 31, 2024  is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $2,168,919 | | 9.00% | | $24,099,100 | $24,100,000 |



## C12 – Indian Acres / Forest Acres

### Property Financials

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| **INCOME ITEMS** | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $2,217,787 | 97.2% | $2,536,292 | 99.7% | $2,736,147 | 96.1% |
| Other Revenue | $63,845 | 2.8% | $8,133 | 0.3% | $110,429 | 3.9% |
| **TOTAL RENTAL INCOME** | $2,281,632 | 100.0% | $2,544,425 | 100.0% | $2,846,576 | 100.0% |
| **EXPENSE ITEMS** | | | | | | |
| Payroll | ($732,264) | (32.1%) | ($804,691) | (31.6%) | ($912,116) | (32.0%) |
| Taxes and Benefits | ($123,976) | (5.4%) | ($121,472) | (4.8%) | ($134,157) | (4.7%) |
| Total Kitchen Expense | ($174,116) | (7.6%) | ($309,273) | (12.2%) | ($391,692) | (13.8%) |
| Total Program Activities Expense | ($230,155) | (10.1%) | ($233,746) | (9.2%) | ($291,047) | (10.2%) |
| Total Grounds Expense | ($133,686) | (5.9%) | ($134,392) | (5.3%) | ($142,762) | (5.0%) |
| Transportation Expense | ($57,073) | (2.5%) | ($125,578) | (4.9%) | ($104,678) | (3.7%) |
| Camper Recruitment Expense | ($21,211) | (0.9%) | ($32,806) | (1.3%) | ($16,985) | (0.6%) |
| Staffing Expense | ($37,384) | (1.6%) | ($142,166) | (5.6%) | ($107,673) | (3.8%) |
| Other Expense | ($6,437) | (0.3%) | $0 | - | $0 | - |
| Advertising | ($17,475) | (0.8%) | ($8,085) | (0.3%) | ($10,234) | (0.4%) |
| Bank and Credit Card Fees | ($51,116) | (2.2%) | ($58,989) | (2.3%) | ($51,360) | (1.8%) |
| Insurance | ($57,297) | (2.5%) | ($90,085) | (3.5%) | ($65,514) | (2.3%) |
| Management Fee | ($15,000) | (0.7%) | ($15,000) | (0.6%) | ($20,000) | (0.7%) |
| Office Expense | ($14,124) | (0.6%) | ($17,079) | (0.7%) | ($21,001) | (0.7%) |
| Postage and Printing | ($4,356) | (0.2%) | ($5,503) | (0.2%) | ($1,868) | (0.1%) |
| Professional Fees | ($3,500) | (0.2%) | ($8,224) | (0.3%) | ($5,550) | (0.2%) |
| Real Estate Taxes | ($60,721) | (2.7%) | ($50,937) | (2.0%) | ($54,575) | (1.9%) |
| Rent - Office | ($19,632) | (0.9%) | ($6,200) | (0.2%) | ($19,200) | (0.7%) |
| Telephone & Internet | ($25,716) | (1.1%) | ($26,045) | (1.0%) | ($20,091) | (0.7%) |
| Travel and Auto Expense | ($25,289) | (1.1%) | ($41,744) | (1.6%) | ($103,508) | (3.6%) |
| Utilities | ($66,676) | (2.9%) | ($53,443) | (2.1%) | ($61,773) | (2.2%) |
| General Expense | ($15,555) | (0.7%) | ($12,665) | (0.5%) | ($21,010) | (0.7%) |
| **TOTAL EXPENSES** | ($1,892,759) | (83.0%) | ($2,298,123) | (90.3%) | ($2,556,795) | (89.8%) |
| **NET OPERATING INCOME** | $388,873 | 17.0% | $246,302 | 9.7% | $289,781 | 10.2% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

| STATEMENT OF INCOME AND EXPENSES | IA/FA |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| | |
| **INCOME:** | |
| Tuition - camp income (net) | $ 3,155,957 |
| Tuition - school income (net) | |
| Other revenue | 4,986 |
| **Total income** | **$ 3,160,943** |
| | |
| | |
| Grant Income | |
| | |
| Total income | $ 3,160,943 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 959,526 |
| Taxes and benefits | 129,690 |
| Total kitchen expense | 370,102 |
| Total program activities expense | 247,424 |
| Total grounds expense | 132,135 |
| Transportation expense | 102,310 |
| Camper recruitment expense | 23,943 |
| Staffing expense | 127,974 |
| Other direct expense | |
| Total direct cost of operations | $ 2,093,104 |
| | |
| **Gross profit** | **$ 1,067,839** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 17,083 |
| Banking and credit card fees | 118,769 |
| Consulting | |
| General expense | 28,358 |
| Insurance | 73,850 |
| Management Fee | 20,000 |
| Office | 13,601 |
| Postage and Printing | 4,937 |
| Professional fees | 4,639 |
| Real estate taxes | 58,356 |
| Camp Rent | |
| Rent - Office | 21,665 |
| Telephone & Internet | 27,653 |
| Travel & Auto Exp | 86,665 |
| Utilities | 86,654 |
| Total selling, general and administrative expens | $ 562,231 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 505,608** |

## Analysis of Income and Expenses

Over the past three years, the subject camp has experienced strong income growth, driven primarily by the post-COVID-19 recovery and rising tuition rates within the regional market. As operations move toward stabilization in 2025, we project a 5% increase in income, consistent with recent trends in the sector. Operating expenses are expected to remain stable, resulting in an income-to-expense ratio of approximately 80%. While this ratio is currently at the higher end of the range observed for comparable


Leitner | Berman

**54**

camps, it reflects an improving trend and is anticipated to normalize as operational efficiencies continue to improve. Based on these assumptions, the projected income and expenses for the 2025 operating year are as follows:

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $2,281,632 | $2,544,425 | 11.52% | $2,846,147 | 11.86% | $3,160,943 | 11.06% | 12.85% | 5.00% | $3,318,990 |
| Total Expense | $1,892,873 | $2,298,123 | 21.41% | $2,556,795 | 11.26% | $2,655,335 | 3.85% | 5.18% | 0.00% | $2,655,335 |
| % of PGI | 83.0% | 90.3% | | 89.8% | | 84.0% | | | | 80.0% |
| Net Operating Income | $388,759 | $246,302 | | $289,352 | | $505,608 | | | | $663,655 |

The subject projected operating expense ratio of 80.0%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at the upper end of the range of the comparable expenses indicating the camp is may be some upside if operated more efficiently.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 100 basis points for risk.  This results in a 10.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 14.00%

Based on the foregoing, it is our opinion that a 14.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

**Change in Value**

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.


Leitner | Berman

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 14.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 14.00% | | | = | 4.90% |
| **Weighted Rate** | | | | | | | **10.17%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 5.17% | = | 0.76% |
| **Adjusted Rate** | | | | | | | **9.41%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 5.17% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 9.41% |
| **(rounded to)** | | | | | | | **9.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 9.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on our analysis, we have determined a market capitalization rate of 9.50% for the subject property. Capitalization rates for most camp properties typically range from 9.00% to 11.00%. Given that the subject property is a long-established location in a well-recognized summer camp market, we anticipate a higher degree of stability moving forward, justifying a capitalization rate at the lower end of the typical range. Therefore, a capitalization rate of 9.50% is considered reasonable. Accordingly, the camp value of the subject property, as of December 31, 2024 is estimated as follows:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $663,655 | | 9.50% | | $6,985,844 | $7,000,000 |



## C29 – Wekeela

### Property Financials

### CAMP WEKEELA OPERATING HISTORICALS

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $4,132,142 | 99.9% | $3,711,577 | 100.0% | $4,096,064 | 99.2% |
| Other Revenue | $5,031 | 0.1% | $207 | 0.0% | $32,468 | 0.8% |
| **TOTAL GROSS INCOME** | $4,137,173 | 100.0% | $3,711,784 | 100.0% | $4,128,533 | 100.0% |
| **EXPENSE ITEMS** | | | | | | |
| Payroll | ($904,064) | (21.9%) | ($860,994) | (23.2%) | ($940,332) | (22.8%) |
| Taxes and Benefits | ($140,350) | (3.4%) | ($131,073) | (3.5%) | ($130,781) | (3.2%) |
| Total Kitchen Expenses | ($169,240) | (4.1%) | ($344,676) | (9.3%) | ($376,376) | (9.1%) |
| Total Program Activities Expense | ($255,969) | (6.2%) | ($216,241) | (5.8%) | ($202,453) | (4.9%) |
| Total Grounds Expense | ($164,463) | (4.0%) | ($303,051) | (8.2%) | ($213,788) | (5.2%) |
| Transportation Expense | ($24,546) | (0.6%) | ($57,467) | (1.5%) | ($72,772) | (1.8%) |
| Camper Recruitment Expense | ($63,015) | (1.5%) | ($84,181) | (2.3%) | ($101,925) | (2.5%) |
| Staffing Expense | ($13,111) | (0.3%) | ($67,576) | (1.8%) | ($89,012) | (2.2%) |
| Other Expense | ($9,669) | (0.2%) | - | - | ($14,361) | (0.3%) |
| Advertising | ($39,061) | (0.9%) | ($34,122) | (0.9%) | ($72,742) | (1.8%) |
| Bank and Credit Card Fees | ($92,945) | (2.2%) | ($111,108) | (3.0%) | ($106,801) | (2.6%) |
| Consulting | ($22,257) | (0.5%) | ($38,500) | (1.0%) | ($28,040) | (0.7%) |
| Insurance | ($66,024) | (1.6%) | ($71,568) | (1.9%) | ($88,755) | (2.1%) |
| Management Fee | ($15,000) | (0.4%) | ($15,000) | (0.4%) | ($20,000) | (0.5%) |
| Office Expense | ($24,512) | (0.6%) | ($28,086) | (0.8%) | ($22,065) | (0.5%) |
| Postage and Printing | ($16,267) | (0.4%) | ($5,495) | (0.1%) | ($2,309) | (0.1%) |
| Professional Fees | ($4,767) | (0.1%) | ($2,575) | (0.1%) | ($23,249) | (0.6%) |
| Real Estate Taxes | ($37,512) | (0.9%) | ($69,847) | (1.9%) | ($71,525) | (1.7%) |
| Rent - Office | ($11,356) | (0.3%) | ($9,454) | (0.3%) | ($7,963) | (0.2%) |
| Telephone & Internet | ($26,950) | (0.7%) | ($37,284) | (1.0%) | ($24,011) | (0.6%) |
| Travel and Auto Expense | ($95,180) | (2.3%) | ($133,273) | (3.6%) | ($112,811) | (2.7%) |
| Utilities | ($61,448) | (1.5%) | ($77,284) | (2.1%) | ($80,798) | (2.0%) |
| General Expense | ($43,898) | (1.1%) | ($38,940) | (1.0%) | ($32,538) | (0.8%) |
| **TOTAL EXPENSES** | ($2,301,603) | (55.6%) | ($2,737,794) | (73.8%) | ($2,835,407) | (68.7%) |
| **NET OPERATING INCOME** | $1,835,570 | 44.4% | $973,990 | 26.2% | $1,293,126 | 31.3% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



| STATEMENT OF INCOME AND EXPENSES | |
| --- | --- |
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| | |
| | **Wekeela** |
| **INCOME:** | |
| Tuition - camp income (net) | $ 4,007,044 |
| Tuition - school income (net) | |
| Other revenue | 8,568 |
| **Total income** | **$ 4,015,612** |
| | |
| | |
| Grant Income | |
| | |
| Total income | $ 4,015,612 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 849,718 |
| Taxes and benefits | 142,427 |
| Total kitchen expense | 268,995 |
| Total program activities expense | 257,048 |
| Total grounds expense | 199,581 |
| Transportation expense | 92,715 |
| Camper recruitment expense | 57,937 |
| Staffing expense | 159,610 |
| Other direct expense | **10,965** |
| Total direct cost of operations | $ 2,038,995 |
| | |
| **Gross profit** | **$ 1,976,617** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 62,378 |
| Banking and credit card fees | 71,186 |
| Consulting | 42,000 |
| General expense | 18,880 |
| Insurance | 67,600 |
| Management Fee | 20,000 |
| Office | 31,780 |
| Postage and Printing | 8,606 |
| Professional fees | 4,592 |
| Real estate taxes | 71,249 |
| Camp Rent | |
| Rent - Office | 6,348 |
| Telephone & Internet | 42,575 |
| Travel & Auto Exp | 148,736 |
| Utilities | 48,410 |
| Total selling, general and administrative expens | $ 644,339 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 1,332,278** |

## Analysis of Income and Expenses

Over the past three years, the camp has seen strong income growth, largely due to the ongoing recovery from COVID-19 and increasing tuition rates in the local market. As the camp approaches more stabilized operations in 2025, we are assuming a 5% increase in income, in line with recent trends in tuition growth. Additionally, we expect expenses to remain level. This results in an income-to-expense ratio of 80%, which

 Leitner | Berman

is typical for competitive camps. Based on these assumptions, the projected income and expenses for 2025 are as follows:

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $4,132,142 | $3,711,577 | -10.18% | $4,096,064 | 10.36% | $4,015,612 | -1.96% | -0.94% | 0.00% | $4,015,612 |
| Total Expense | $2,296,572 | $2,737,587 | 19.20% | $2,802,938 | 2.39% | $2,683,334 | -4.27% | -0.66% | 0.00% | $2,683,334 |
| % of PGI | 55.6% | 73.8% | | 68.4% | | 66.8% | | | | 66.8% |
| Net Operating Income | $1,835,570 | $973,990 | | $1,293,126 | | $1,332,278 | | | | $1,332,278 |
| | | | | | | | | | * Less Incentive | $105,000 |
| | | | | | | | | | Adjusted NOI | $1,227,278 |

The subject projected operating expense ratio of 66.8%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at the upper end of the range of the comparable expenses indicating the camp is may be some upside if operated more efficiently.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.   The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 100 basis points for risk.  This results in a 10.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 14.00%

Based on the foregoing, it is our opinion that a 14.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

**Change in Value**

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 14.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | |
|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × 14.00% | | | = | 4.90% |
| **Weighted Rate** | | | | | | **10.17%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × 65.00% | × 5.17% | | = | 0.76% |
| **Adjusted Rate** | | | | | | **9.41%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × 5.17% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | 9.41% |
| **(rounded to)** | | | | | | **9.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 9.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on our analysis, we have determined a market capitalization rate of 9.50% for the subject property. Capitalization rates for most camp properties typically range from 9.00% to 11.00%. Given that the subject property is a long-established location in a well-recognized summer camp market, we anticipate a higher degree of stability moving forward, justifying a capitalization rate at the lower end of the typical range. Therefore, a capitalization rate of 9.50% is considered reasonable. Accordingly, the camp value of the subject property, as of December 31, 2024 is estimated as follows:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,227,278 | | 9.50% | | $12,918,716 | $12,900,000 |



## C3 – Blue Star

### Property Financials

### BLUE STAR CAMP OPERATING HISTORICALS

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $5,810,183 | 99.8% | $6,360,592 | 98.3% | $7,157,082 | 98.6% |
| Other Revenue | $9,051 | 0.2% | $107,117 | 1.7% | $100,040 | 1.4% |
| **TOTAL GROSS INCOME** | $5,819,234 | 100.0% | $6,467,709 | 100.0% | $7,257,122 | 100.0% |
| EXPENSE ITEMS | | | | | | |
| Payroll | ($1,399,314) | (24.0%) | ($1,703,095) | (26.3%) | ($1,765,162) | (24.3%) |
| Taxes and Benefits | ($241,550) | (4.2%) | ($220,282) | (3.4%) | ($215,361) | (3.0%) |
| Total Kitchen Expense | ($760,145) | (13.1%) | ($832,661) | (12.9%) | ($885,213) | (12.2%) |
| Total Program Activities Expense | ($456,142) | (7.8%) | ($635,180) | (9.8%) | ($569,110) | (7.8%) |
| Total Grounds Expense | ($527,823) | (9.1%) | ($564,868) | (8.7%) | ($698,065) | (9.6%) |
| Transportation Expense | ($162,007) | (2.8%) | ($210,635) | (3.3%) | ($493,861) | (6.8%) |
| Camper Recruitment Expense | ($357,569) | (6.1%) | ($526,546) | (8.1%) | ($561,425) | (7.7%) |
| Staffing Expense | ($31,153) | (0.5%) | ($90,426) | (1.4%) | ($103,501) | (1.4%) |
| Advertising | ($17,922) | (0.3%) | ($13,981) | (0.2%) | ($12,491) | (0.2%) |
| Bank and Credit Card Fees | ($169,024) | (2.9%) | ($224,313) | (3.5%) | ($256,614) | (3.5%) |
| Insurance | ($151,250) | (2.6%) | ($154,849) | (2.4%) | ($169,670) | (2.3%) |
| Management Fee | ($15,000) | (0.3%) | ($15,000) | (0.2%) | ($20,000) | (0.3%) |
| Office Expense | ($84,406) | (1.5%) | ($69,122) | (1.1%) | ($96,074) | (1.3%) |
| Postage and Printing | ($15,729) | (0.3%) | ($17,375) | (0.3%) | ($17,721) | (0.2%) |
| Professional Fees | ($5,961) | (0.1%) | ($10,588) | (0.2%) | ($10,309) | (0.1%) |
| Real Estate Taxes | ($76,200) | (1.3%) | ($76,501) | (1.2%) | ($66,122) | (0.9%) |
| Rent - Office | ($2,109) | (0.0%) | $0 | - | $0 | - |
| Telephone & Internet | ($61,285) | (1.1%) | ($85,982) | (1.3%) | ($79,255) | (1.1%) |
| Travel and Auto Expense | ($43,364) | (0.7%) | ($48,835) | (0.8%) | ($57,310) | (0.8%) |
| Utilities | ($106,027) | (1.8%) | ($108,254) | (1.7%) | ($117,519) | (1.6%) |
| General Expense | ($60,718) | (1.0%) | ($58,074) | (0.9%) | ($57,135) | (0.8%) |
| **TOTAL EXPENSES** | ($4,744,697) | (81.5%) | ($5,666,567) | (87.6%) | ($6,251,918) | (86.1%) |
| **NET OPERATING INCOME** | $1,074,537 | 18.5% | $801,142 | 12.4% | $1,005,204 | 13.9% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



| STATEMENT OF INCOME AND EXPENSES | Blue Star |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| **INCOME:** | |
| Tuition - camp income (net) | $   8,026,731 |
| Tuition - school income (net) | |
| Other revenue | 4,753 |
| **Total income** | **$   8,031,485** |
| | |
| Grant Income | |
| | |
| Total income | $   8,031,485 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $   2,157,369 |
| Taxes and benefits | 222,073 |
| Total kitchen expense | 727,542 |
| Total program activities expense | 521,315 |
| Total grounds expense | 516,371 |
| Transportation expense | 562,966 |
| Camper recruitment expense | 534,566 |
| Staffing expense | 107,058 |
| Other direct expense | |
| Total direct cost of operations | $   5,349,260 |
| | |
| **Gross profit** | **$   2,682,224** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $        14,390 |
| Banking and credit card fees | 255,101 |
| Consulting | |
| General expense | 67,699 |
| Insurance | 173,680 |
| Management Fee | 20,000 |
| Office | 82,960 |
| Postage and Printing | 20,411 |
| Professional fees | 18,363 |
| Real estate taxes | 66,105 |
| Camp Rent | |
| Rent - Office | |
| Telephone & Internet | 84,959 |
| Travel & Auto Exp | 46,454 |
| Utilities | 126,654 |
| Total selling, general and administrative expens | $      976,774 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$   1,705,450** |

## Analysis of Income and Expenses

Over the past three years, the camp has seen strong income growth, largely due to the ongoing recovery from COVID-19 and increasing tuition rates in the local market. As the camp approaches more stabilized operations in 2025, we are assuming a 3% increase in income and expenses, in line with recent trends in tuition growth. This results in an income-to-expense ratio of 75.4%, which is typical for competitive camps. Based on these assumptions, the projected income and expenses for 2025 are as follows:

 Leitner | Berman

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $5,819,234 | $6,467,709 | 11.14% | $7,257,122 | 12.21% | $8,026,731 | 10.60% | 12.64% | 3.00% | $8,267,533 |
| Total Expense | $4,744,697 | $5,666,567 | 19.43% | $6,251,918 | 10.33% | $6,326,034 | 1.19% | 3.88% | 3.00% | $6,515,815 |
| % of PGI | 81.5% | 87.6% | | 86.1% | | 78.8% | | | | 78.8% |
| Net Operating Income | $1,074,537 | $801,142 | | $1,005,204 | | $1,700,697 | | | | $1,751,718 |

The subject projected operating expense ratio of 78.8%. Optimal operational efficiency for youth camps generally results in expense ratios ranging from approximately 60% to 80% of total revenues. Day camps tend to fall on the lower end of this spectrum due to the absence of overnight accommodations and food service costs, while overnight camps, such as the subject property, typically incur higher operating expenses. In the referenced comparison table, Expense Comparables 7 and 8 represent day camps and accordingly exhibit lower expense ratios. In contrast, the subject camp's projected expense ratio lies at the upper end of the comparable range, suggesting that it is currently operating less efficiently. This indicates potential value enhancement opportunities through improved cost management or operational restructuring to bring expenses more in line with industry norms.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 250 basis points for risk.  This results in an 11.50% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 15.50%

Based on the foregoing, it is our opinion that a 14.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

**Change in Value**

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 15.50% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 15.50% | | | = | 5.43% |
| **Weighted Rate** | | | | | | | **10.69%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.81% | = | 0.70% |
| **Adjusted Rate** | | | | | | | **9.99%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.81% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 9.99% |
| **(rounded to)** | | | | | | | **10.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on our analysis, we have determined a market capitalization rate of 9.50% for the subject property. Capitalization rates for most camp properties typically range from 9.00% to 11.00%. Given that the subject property is a long-established location in a well-recognized summer camp market, we anticipate a higher degree of stability moving forward, justifying a capitalization rate at the lower end of the typical range. Therefore, a capitalization rate of 9.50% is considered reasonable. Accordingly, the camp value of the subject property, as of December 31, 2024 is estimated as follows:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,751,718 | | 10.00% | | $17,517,179 | $17,500,000 |



## C24 – Pine Forest / Lake Owego / Timber Tops

### Property Financials

| YEAR | 2022 | | 2023 | |
|---|---|---|---|---|
| **INCOME ITEMS** | **TOTAL** | **% EGI** | **TOTAL** | **% EGI** |
| Tuition Revenue | $12,349,909 | 99.9% | $13,680,879 | 100.0% |
| Other Revenue | $14,341 | 0.1% | $0 | 0.0% |
| **TOTAL GROSS INCOME** | $12,364,250 | 100.0% | $13,680,879 | 100.0% |
| **EXPENSE ITEMS** | | | | |
| Payroll | ($4,082,716) | (33.0%) | ($4,371,958) | (32.0%) |
| Taxes and Benefits | ($617,933) | (5.0%) | ($674,986) | (4.9%) |
| Total Kitchen Expense | ($946,619) | (7.7%) | ($954,055) | (7.0%) |
| Total Program Activities Expense | ($936,909) | (7.6%) | ($822,028) | (6.0%) |
| Total Grounds Expense | ($671,494) | (5.4%) | ($670,723) | (4.9%) |
| Transportation Expense | ($383,634) | (3.1%) | ($366,772) | (2.7%) |
| Camper Recruitment Expense | ($221,066) | (1.8%) | ($208,006) | (1.5%) |
| Staffing Expense | ($435,558) | (3.5%) | ($448,922) | (3.3%) |
| Advertising | ($180,617) | (1.5%) | ($104,314) | (0.8%) |
| Bank and Credit Card Fees | ($229,240) | (1.9%) | ($211,796) | (1.5%) |
| Insurance | ($151,178) | (1.2%) | ($104,472) | (0.8%) |
| Management Fee | $0 | - | ($20,000) | (0.1%) |
| Office Expense | ($67,514) | (0.5%) | ($66,776) | (0.5%) |
| Postage and Printing | ($23,259) | (0.2%) | ($27,867) | (0.2%) |
| Professional Fees | ($94,638) | (0.8%) | ($63,732) | (0.5%) |
| Real Estate Taxes | ($132,987) | (1.1%) | ($134,992) | (1.0%) |
| Telephone & Internet | ($116,996) | (0.9%) | ($125,363) | (0.9%) |
| Travel and Auto Expense | $0 | - | ($21,650) | (0.2%) |
| Utilities | ($177,861) | (1.4%) | ($229,526) | (1.7%) |
| General Expense | ($58,087) | (0.5%) | ($50,838) | (0.4%) |
| **TOTAL EXPENSES** | ($9,528,306) | (77.1%) | ($9,678,778) | (70.7%) |
| **NET OPERATING INCOME** | **$2,835,944** | **22.9%** | **$4,002,101** | **29.3%** |

In addition, to the above 2022-2023, we have been supplied with year-end 2024 income and expenses as follows:



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

| STATEMENT OF INCOME AND EXPENSES | |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| | **Pine Forest** |
| **INCOME:** | |
| Tuition - camp income (net) | $ 14,181,296 |
| Tuition - school income (net) | |
| Other revenue | 24,028 |
| **Total income** | **$ 14,205,324** |
| | |
| Grant Income | |
| | |
| Total income | $ 14,205,324 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 4,592,101 |
| Taxes and benefits | 692,492 |
| Total kitchen expense | 912,425 |
| Total program activities expense | 1,089,292 |
| Total grounds expense | 783,586 |
| Transportation expense | 405,116 |
| Camper recruitment expense | 245,891 |
| Staffing expense | 501,542 |
| Other direct expense | |
| Total direct cost of operations | $ 9,222,446 |
| | |
| **Gross profit** | **$ 4,982,878** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 93,620 |
| Banking and credit card fees | 212,272 |
| Consulting | |
| General expense | 51,232 |
| Insurance | 118,594 |
| Management Fee | 20,000 |
| Office | 83,217 |
| Postage and Printing | 49,392 |
| Professional fees | 33,826 |
| Real estate taxes | 140,740 |
| Camp Rent | |
| Rent - Office | |
| Telephone & Internet | 140,483 |
| Travel & Auto Exp | 24,001 |
| Utilities | 190,117 |
| Total selling, general and administrative expens | $ 1,157,492 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 3,825,386** |

## Analysis of Income and Expenses

The changes in income and expenses from 2022 to 2023 indicate a continued recovery from the impacts of COVID-19. The 2023 to 2024 figures reflect more typical year-over-year growth patterns. Based on this trend, we project a 3% increase in income and a 4% increase in expenses for the upcoming year.



Leitner | Berman

**66**

|  | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $5,819,234 | $6,467,709 | 11.14% | $7,257,122 | 12.21% | $8,026,731 | 10.60% | 12.64% | 3.00% | $8,267,533 |
| Total Expense | $4,744,697 | $5,666,567 | 19.43% | $6,251,918 | 10.33% | $6,326,034 | 1.19% | 3.88% | 3.00% | $6,515,815 |
| % of PGI | 81.5% | 87.6% |  | 86.1% |  | 78.8% |  |  |  | 78.8% |
| Net Operating Income | $1,074,537 | $801,142 |  | $1,005,204 |  | $1,700,697 |  |  |  | $1,751,718 |

The subject projected operating expense ratio of 74.5%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at directly in the range of the comparable expenses indicating the camp is operating efficiently.

## Capitalization

### Discount Rate

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 300 basis points for asset management, and 200 basis points for risk.  This results in a 12.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 16.00%

Based on the foregoing, it is our opinion that a 16.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

### Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 16.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

 Leitner | Berman

| Development of Capitalization Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 16.00% | | | | = | 5.60% |
| **Weighted Rate** | | | | | | | | **10.87%** |
| | | | | | | | | |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.69% | | = | 0.69% |
| **Adjusted Rate** | | | | | | | | **10.18%** |
| | | | | | | | | |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.69% | | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | | 10.18% |
| **(rounded to)** | | | | | | | | **10.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 10.00%. Therefore, our projected camp value for the subject property, as of December 31, 2024, is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $3,732,549 | | 10.00% | | $37,325,488 | $37,300,000 |



## C21 – Mohawk

### Property Financials

### CAMP MOHAWK OPERATING HISTORICALS

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue - Camp | $13,952,355 | 84.8% | $15,311,456 | 85.5% | $17,645,657 | 89.4% |
| Tuition Revenue - School | $2,483,061 | 15.1% | $2,588,546 | 14.5% | $2,068,100 | 10.5% |
| Other Revenue | $22,992 | 0.1% | $9,649 | 0.1% | $33,009 | 0.2% |
| TOTAL RENTAL INCOME | $16,458,408 | 100.0% | $17,909,651 | 100.0% | $19,746,766 | 100.0% |
| EXPENSE ITEMS | | | | | | |
| Payroll | ($4,572,379) | (27.8%) | ($5,139,934) | (28.7%) | ($5,370,081) | (27.2%) |
| Taxes and Benefits | ($823,628) | (5.0%) | ($876,574) | (4.9%) | ($908,724) | (4.6%) |
| Total Kitchen Expense | ($391,886) | (2.4%) | ($567,753) | (3.2%) | ($656,830) | (3.3%) |
| Total Program Activities Expense | ($280,874) | (1.7%) | ($379,129) | (2.1%) | ($370,115) | (1.9%) |
| Total Grounds Expense | ($435,468) | (2.6%) | ($523,110) | (2.9%) | ($512,707) | (2.6%) |
| Transportation Expense | ($1,583,045) | (9.6%) | ($1,943,102) | (10.8%) | ($1,968,604) | (10.0%) |
| Camper Recruitment Expense | ($21,051) | (0.1%) | ($16,110) | (0.1%) | ($6,611) | (0.0%) |
| Staffing Expense | ($190,091) | (1.2%) | ($436,098) | (2.4%) | ($396,668) | (2.0%) |
| Advertising | ($46,552) | (0.3%) | ($43,833) | (0.2%) | ($87,826) | (0.4%) |
| Bank and Credit Card Fees | ($153,538) | (0.9%) | ($103,958) | (0.6%) | ($119,184) | (0.6%) |
| Insurance | ($151,410) | (0.9%) | ($194,224) | (1.1%) | ($236,511) | (1.2%) |
| Management Fee | ($15,000) | (0.1%) | ($15,000) | (0.1%) | ($20,000) | (0.1%) |
| Office Expense | ($107,876) | (0.7%) | ($92,182) | (0.5%) | ($104,645) | (0.5%) |
| Postage and Printing | ($21,095) | (0.1%) | ($22,251) | (0.1%) | ($18,960) | (0.1%) |
| Professional Fees | ($13,550) | (0.1%) | ($16,553) | (0.1%) | ($14,196) | (0.1%) |
| Real Estate Taxes | ($387,666) | (2.4%) | ($312,652) | (1.7%) | ($397,437) | (2.0%) |
| Telephone & Internet | ($40,796) | (0.2%) | ($36,363) | (0.2%) | ($26,499) | (0.1%) |
| Travel and Auto Expense | ($90,978) | (0.6%) | ($104,233) | (0.6%) | ($93,743) | (0.5%) |
| Utilities | ($162,139) | (1.0%) | ($215,346) | (1.2%) | ($221,675) | (1.1%) |
| General Expense | ($59,130) | (0.4%) | ($22,088) | (0.1%) | ($37,107) | (0.2%) |
| TOTAL EXPENSES | ($9,548,153) | (58.0%) | ($11,060,490) | (61.8%) | ($11,568,122) | (58.6%) |
| NET OPERATING INCOME | $6,910,255 | 42.0% | $6,849,161 | 38.2% | $8,178,645 | 41.4% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



| STATEMENT OF INCOME AND EXPENSES | Mohawk |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| **INCOME:** | |
| Tuition - camp income (net) | $ 17,789,266 |
| Tuition - school income (net) | 1,960,517 |
| Other revenue | 5,696 |
| **Total income** | **$ 19,755,479** |
| | |
| Grant Income | |
| | |
| Total income | $ 19,755,479 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 5,195,239 |
| Taxes and benefits | 877,910 |
| Total kitchen expense | 585,869 |
| Total program activities expense | 407,385 |
| Total grounds expense | 489,116 |
| Transportation expense | 1,829,227 |
| Camper recruitment expense | 10,425 |
| Staffing expense | 370,250 |
| Other direct expense | |
| Total direct cost of operations | $ 9,765,419 |
| | |
| **Gross profit** | **$ 9,990,060** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 38,948 |
| Banking and credit card fees | 115,439 |
| Consulting | - |
| General expense | 54,556 |
| Insurance | 258,019 |
| Management Fee | 20,000 |
| Office | 120,144 |
| Postage and Printing | 22,637 |
| Professional fees | 11,602 |
| Real estate taxes | 394,979 |
| Camp Rent | - |
| Rent - Office | - |
| Telephone & Internet | 25,681 |
| Travel & Auto Exp | 86,155 |
| Utilities | 182,873 |
| Total selling, general and administrative expens | $ 1,331,032 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 8,659,028** |

## Analysis of Income and Expenses

Covid severely impacted 2020 with some residual impact in 2021.  Thus, less reliance is placed on the historical income and expense from 2021.

In 2022 and 2023, the camp experienced strong income growth, likely driven by the ongoing post-COVID recovery and a resurgence in demand for summer programming. However, income stabilized between 2023 and 2024, while expenses showed a moderate decline, indicating a return to more normalized operations.

 Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                    Individual Property Information

For 2025, based on current market conditions and industry trends, we project a typical annual increase of 3% in both income and expenses.

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $16,458,408 | $17,909,651 | 8.82% | $19,746,786 | 10.26% | $19,755,479 | 0.04% | 6.14% | 3.00% | $20,348,143 |
| Total Expense | $9,548,153 | $11,060,490 | 15.84% | $11,568,122 | 4.59% | $11,096,451 | -4.08% | 4.67% | 3.00% | $11,429,345 |
| % of PGI | 58.0% | 61.8% | | 58.6% | | 56.2% | | | | 56.2% |
| Net Operating Income | $6,910,255 | $6,849,161 | | $8,178,664 | | $8,659,028 | | | | $8,918,799 |
| | | | | | | | | | * Less Incentive | $660,000 |
| | | | | | | | | | Adjusted NOI | $8,258,799 |

The subject projected operating expense ratio of 56.2% (prior to incentive deduction).  Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at the upper end of the range, noting that as a day camp, there may be potential streamline expenses creating additional value.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations.  A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 300 basis points for asset management, and 500 basis points for risk.  This results in a 14.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 18.00%

Based on the foregoing, it is our opinion that an 18.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

**Change in Value**

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.



| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 18.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 18.00% | | | | = | 6.30% |
| **Weighted Rate** | | | | | | | | **11.57%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.25% | | = | 0.62% |
| **Adjusted Rate** | | | | | | | | **10.95%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.25% | | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | | 10.95% |
| (rounded to) | | | | | | | | **11.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 11.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

As noted, capitalization rates for camp properties generally range between 9% and 11%. While the subject property benefits from a strong and desirable location, its unusually low expense ratio suggests potential risk for rising operational costs in the future. To account for this risk, we have applied a capitalization rate of 11.00%, placing it at the higher end of the market range for similar properties. Based on this rate, our projected camp value for the subject property, as of December 31, 2024,  is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $8,258,799 | | 11.00% | | $75,079,989 | $75,100,000 |



## C30 – Willow Lake

### Property Financials

**WILLOW LAKE DAY CAMPS, LLC**
**STATEMENT OF INCOME AND EXPENSES**
**TAX BASIS**
**FOR THE YEAR ENDED DECEMBER 31, 2021**

| | | |
|---|---|---:|
| **INCOME** | | |
| Tuition | $ | 6,743,734 |
| Total income | | 6,743,734 |
| | | |
| **COST OF OPERATIONS** | | |
| Gross salaries and payroll taxes | | 2,963,238 |
| Transportation costs | | 548,704 |
| Selling expenses | | 29,452 |
| Operating expenses | | 1,165,477 |
| General and administrative expenses | | 751,949 |
| Total cost of operations | | 5,458,820 |
| Net income from operations | | 1,284,914 |
| **OTHER INCOME** | | |
| PPP Loan Forgiven | | 1,390,163 |
| ERC Income | | 49,421 |
| NJ grant income | | 20,000 |
| Total other income | | 1,459,584 |
| **NET INCOME** | $ | 2,744,498 |

 Leitner | Berman

**Willow Lake Day Camps, LLC**
**Statement of Income and Expenses**
**Income Tax Basis**
**Year Ended December 31, 2022**

| | |
|---|---:|
| **Tuition income** | $ 8,080,114 |
| **Cost of operations** | |
| Gross salaries and payroll taxes | 3,718,248 |
| Transportation costs | 592,395 |
| Selling expenses | 59,593 |
| Operating expenses | 1,335,680 |
| General and administrative expenses | 1,078,348 |
| **Total cost of operations** | 6,784,264 |
| **Net income from operations** | 1,295,850 |
| **Other income** | |
| ERC income | 2,076 |
| **Net income** | $ 1,297,926 |

**Willow Lake Day Camp, LLC**
**Statement of Revenues and Expenses**
**Income Tax Basis**
**Year Ended December 31, 2023**

| | |
|---|---:|
| **Revenue** | |
| Tuition | $ 9,222,099 |
| **Cost of operations** | |
| Salaries | 3,238,275 |
| Payroll taxes and employee benefits | 267,864 |
| Transportation costs | 624,131 |
| Selling expenses | 22,917 |
| Operating expenses | 1,477,431 |
| General and administrative expenses | 970,328 |
| **Total cost of operations** | 6,600,946 |
| **Net income** | $ 2,621,153 |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:

 Leitner | Berman

| STATEMENT OF INCOME AND EXPENSES<br>ACCRUAL BASIS<br>For the period January 1, 2024 to December 31, 2024 | Willow Lake |
|---|---|
| **INCOME:** | |
| Tuition – camp income (net) | $   10,663,552 |
| Tuition – school income (net) | |
| Other revenue | 28,619 |
| **Total income** | **$10,692,170** |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $   3,586,722 |
| Taxes and benefits | 232,275 |
| Total kitchen expense | 323,069 |
| Total program activities expense | 607,538 |
| Total grounds expense | 266,484 |
| Transportation expense | 667,388 |
| Camper recruitment expense | |
| Staffing expense | 159,961 |
| Other direct expense | |
| Total direct cost of operations | $   5,843,438 |
| | |
| **Gross profit** | **$ 4,848,732** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $      15,408 |
| Banking and credit card fees | 193,245 |
| Consulting | |
| General expense | 55,711 |
| Insurance | 200,868 |
| Management Fee | 20,000 |
| Office | 106,901 |
| Postage and Printing | 5,798 |
| Professional fees | 47,353 |
| Real estate taxes | 53,578 |
| Camp Rent | |
| Rent – Office | 13,380 |
| Telephone & Internet | 11,178 |
| Travel & Auto Exp | 40,837 |
| Utilities | 41,318 |
| Total selling, general and administrative expense | $      805,575 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 4,043,157** |

## Analysis of Income and Expenses

In 2023 and 2024, the camp experienced strong income growth, likely attributable to continued recovery from the impacts of the COVID-19 pandemic. As of 2024, the camp is operating near full capacity, which limits the potential for further significant growth in enrollment-based revenue. Accordingly, for 2025, we are projecting a more moderate income increase of 3%. Concurrently, in consideration of prevailing inflationary trends, operating expenses are projected to rise by 5% in 2025.

 Leitner | Berman

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2022/2023 | Annual Change 2022-2024 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $6,743,734 | $8,080,114 | 19.82% | $9,222,099 | 14.13% | $10,692,170 | 15.94% | 19.52% | 3.00% | $11,012,935 |
| Total Expense | $5,458,820 | $6,784,264 | 24.28% | $6,600,946 | -2.70% | $6,649,013 | 0.73% | 7.27% | 5.00% | $6,981,464 |
| % of PGI | 80.9% | 84.0% | | 71.6% | | 62.2% | | | | 63.4% |
| Net Operating Income | $1,284,914 | $1,295,850 | | $2,621,153 | | $4,043,157 | | | | $4,031,471 |

Ownership provides a bonus incentive to the current camp operator in addition to their base salary. In the event the operator were to depart, it is expected that a comparable bonus structure would be necessary to attract and retain a qualified replacement capable of maintaining the camp's high level of profitability. Accordingly, this bonus is considered an ongoing operational expense, consistent with historical financial performance where this cost has been regularly incurred and accounted for in reported income and expenses.

The subject projected operating expense ratio of 63.4%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps. In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range). The subject's projected expense ratio is at the upper end of the range, noting that as a day camp, there may be potential streamline expenses creating additional value.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties. In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value. In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment. The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds. The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 400 basis points for risk. This results in a 13.00% yield rate. This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 500 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 18.00%.

Based on the foregoing, it is our opinion that an 18.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.



## Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 18.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 18.00% | | | = | 6.30% |
| **Weighted Rate** | | | | | | | **11.57%** |
| | | | | | | | |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.25% | = | 0.62% |
| **Adjusted Rate** | | | | | | | **10.95%** |
| | | | | | | | |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.25% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 11.00% |
| **(rounded to)** | | | | | | | **11.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 11.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 11.00%. Therefore, our projected camp value for the subject property, as of December 31, 2024 is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $4,031,471 | | 11.00% | | $36,649,740 | $36,600,000 |



## C23 – North Star

### Property Financials

### CAMP NORTH STAR OPERATING HISTORICALS

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $2,045,786 | 100.0% | $2,285,995 | 100.0% | $2,646,435 | 100.0% |
| Other Revenue | $0 | 0.0% | $0 | 0.0% | $0 | 0.0% |
| **TOTAL GROSS INCOME** | $2,045,786 | 100.0% | $2,285,995 | 100.0% | $2,646,435 | 100.0% |
| **EXPENSE ITEMS** | | | | | | |
| Payroll | ($345,669) | (16.9%) | ($447,930) | (19.6%) | ($533,413) | (20.2%) |
| Taxes and Benefits | ($77,325) | (3.8%) | ($97,112) | (4.2%) | ($98,311) | (3.7%) |
| Total Kitchen Expense | ($145,838) | (7.1%) | ($195,486) | (8.6%) | ($217,089) | (8.2%) |
| Total Program Activities Expense | ($66,148) | (3.2%) | ($163,334) | (7.1%) | ($209,122) | (7.9%) |
| Total Grounds Expense | ($94,621) | (4.6%) | ($98,502) | (4.3%) | ($129,881) | (4.9%) |
| Transportation Expense | ($44,908) | (2.2%) | ($104,429) | (4.6%) | ($150,640) | (5.7%) |
| Camper Recruitment Expense | ($32,529) | (1.6%) | ($38,729) | (1.7%) | ($72,534) | (2.7%) |
| Staffing Expense | ($50,106) | (2.4%) | ($95,305) | (4.2%) | ($124,566) | (4.7%) |
| Advertising | ($18,751) | (0.9%) | ($21,818) | (1.0%) | ($26,707) | (1.0%) |
| Bank and Credit Card Fees | ($32,975) | (1.6%) | ($35,067) | (1.5%) | ($39,420) | (1.5%) |
| Consulting | ($4,500) | (0.2%) | ($625) | (0.0%) | $0 | - |
| Insurance | ($37,766) | (1.8%) | ($49,132) | (2.1%) | ($48,784) | (1.8%) |
| Management Fee | ($29,000) | (1.4%) | ($29,000) | (1.3%) | ($34,000) | (1.3%) |
| Office Expense | ($13,003) | (0.6%) | ($5,489) | (0.2%) | ($16,152) | (0.6%) |
| Postage and Printing | ($2,603) | (0.1%) | ($1,549) | (0.1%) | ($2,986) | (0.1%) |
| Professional Fees | ($4,900) | (0.2%) | ($3,000) | (0.1%) | ($8,400) | (0.3%) |
| Real Estate Taxes | ($46,937) | (2.3%) | ($46,309) | (2.0%) | ($48,343) | (1.8%) |
| Telephone & Internet | ($12,096) | (0.6%) | ($17,333) | (0.8%) | ($19,271) | (0.7%) |
| Travel and Auto Expense | ($44,501) | (2.2%) | ($69,076) | (3.0%) | ($47,538) | (1.8%) |
| Utilities | ($19,364) | (0.9%) | ($16,289) | (0.7%) | ($27,352) | (1.0%) |
| General Expense | ($17,024) | (0.8%) | ($17,764) | (0.8%) | ($21,464) | (0.8%) |
| **TOTAL EXPENSES** | ($1,140,566) | (55.8%) | ($1,553,277) | (67.9%) | ($1,875,973) | (70.9%) |
| **NET OPERATING INCOME** | $905,220 | 44.2% | $732,718 | 32.1% | $770,462 | 29.1% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:


Leitner | Berman

| STATEMENT OF INCOME AND EXPENSES | |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| | **North Star** |
| **INCOME:** | |
| Tuition - camp income (net) | $   2,518,232 |
| Tuition - school income (net) | |
| Other revenue | |
| **Total income** | **$   2,518,232** |
| | |
| | |
| Grant Income | |
| | |
| Total income | $   2,518,232 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $      582,954 |
| Taxes and benefits | 90,823 |
| Total kitchen expense | 197,402 |
| Total program activities expense | 220,894 |
| Total grounds expense | 128,219 |
| Transportation expense | 148,115 |
| Camper recruitment expense | 42,584 |
| Staffing expense | 131,192 |
| Other direct expense | |
| Total direct cost of operations | $   1,542,184 |
| | |
| **Gross profit** | **$      976,049** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $       28,257 |
| Banking and credit card fees | 60,240 |
| Consulting | |
| General expense | 14,425 |
| Insurance | 60,751 |
| Management Fee | 20,000 |
| Office | 7,787 |
| Postage and Printing | 2,172 |
| Professional fees | 2,800 |
| Real estate taxes | 56,623 |
| Camp Rent | |
| Rent - Office | |
| Telephone & Internet | 13,969 |
| Travel & Auto Exp | 56,748 |
| Utilities | 26,844 |
| Total selling, general and administrative expens | $      350,617 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$      625,432** |

## Analysis of Income and Expenses

Over the past three years, the camp has seen strong income growth, largely due to the ongoing recovery from COVID-19 and increasing tuition rates in the local market. As the camp approaches more stabilized operations in 2025, we are assuming a 3% increase in income and expenses, in line with recent trends in tuition growth. This results in an income-to-expense ratio of 75.2%, which is typical for competitive camps. Based on these assumptions, the projected income and expenses for 2025 are as follows:



| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $2,045,786 | $2,285,995 | 11.74% | $2,646,435 | 15.77% | $2,518,232 | -4.84% | 7.70% | 3.00% | $2,593,779 |
| Total Expense | $1,140,566 | $1,553,277 | 36.18% | $1,875,973 | 20.78% | $1,892,801 | 0.90% | 7.29% | 3.00% | $1,949,585 |
| % of PGI | 55.8% | 67.9% | | 70.9% | | 75.2% | | | | 75.2% |
| Net Operating Income | $905,220 | $732,718 | | $770,462 | | $625,431 | | | | $644,194 |
| | | | | | | | | | * Less Incentive | $80,000 |
| | | | | | | | | | Adjusted NOI | $564,194 |

Ownership provides a bonus incentive to the current camp operator in addition to their base salary. In the event the operator were to depart, it is expected that a comparable bonus structure would be necessary to attract and retain a qualified replacement capable of maintaining the camp's high level of profitability. Accordingly, this bonus is considered an ongoing operational expense, consistent with historical financial performance where this cost has been regularly incurred and accounted for in reported income and expenses.

The subject projected operating expense ratio of 75.2% (prior to incentive). Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at the upper end of the range of the comparable expenses indicating the camp may upside if operated more efficiently.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 100 basis points for risk.  This results in a 10.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 14.00%.

Based on the foregoing, it is our opinion that a 14.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.



## Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 14.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 14.00% | | | = | 4.90% |
| **Weighted Rate** | | | | | | | **10.17%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 5.17% | = | 0.76% |
| **Adjusted Rate** | | | | | | | **9.41%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 5.17% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 9.41% |
| **(rounded to)** | | | | | | | **9.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 9.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on our analysis, we have determined a market capitalization rate of 9.50% for the subject property. Capitalization rates for most camp properties typically range from 9.00% to 11.00%. Given that the subject property is a long-established location in a well-recognized summer camp market, we anticipate a higher degree of stability moving forward, justifying a capitalization rate at the lower end of the typical range. Therefore, a capitalization rate of 9.50% is considered reasonable. Accordingly, the camp value of the subject property, as of December 31, 2024 is estimated as follows:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $569,194 | | 9.50% | | $5,991,515 | $6,000,000 |



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## C9 – Echo

### Property Financials

### CAMP ECHO OPERATING HISTORICALS

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $5,258,199 | 100.0% | $5,238,628 | 100.0% | $5,171,405 | 99.8% |
| Other Revenue | $0 | 0.0% | $0 | 0.0% | $8,609 | 0.2% |
| TOTAL GROSS INCOME | $5,258,199 | 100.0% | $5,238,628 | 100.0% | $5,180,014 | 100.0% |
| EXPENSE ITEMS | | | | | | |
| Payroll | ($1,036,834) | (19.7%) | ($828,701) | (15.8%) | ($1,140,206) | (22.0%) |
| Taxes and Benefits | ($118,027) | (2.2%) | ($96,087) | (1.8%) | ($103,081) | (2.0%) |
| Total Kitchen Expense | ($331,097) | (6.3%) | ($375,165) | (7.2%) | ($414,241) | (8.0%) |
| Total Program Activities Expense | ($374,772) | (7.1%) | ($755,189) | (14.4%) | ($720,417) | (13.9%) |
| Total Grounds Expense | ($237,561) | (4.5%) | ($256,502) | (4.9%) | ($234,363) | (4.5%) |
| Transportation Expense | ($75,309) | (1.4%) | ($118,051) | (2.3%) | ($149,915) | (2.9%) |
| Camper Recruitment Expense | ($54,060) | (1.0%) | ($117,460) | (2.2%) | ($50,359) | (1.0%) |
| Staffing Expense | ($62,360) | (1.2%) | ($244,607) | (4.7%) | ($319,079) | (6.2%) |
| Advertising | ($9,650) | (0.2%) | ($17,579) | (0.3%) | ($2,508) | (0.0%) |
| Bank and Credit Card Fees | ($92,916) | (1.8%) | ($102,463) | (2.0%) | ($69,202) | (1.3%) |
| Consulting | $0 | - | ($6,686) | (0.1%) | $0 | - |
| Insurance | ($93,540) | (1.8%) | ($122,249) | (2.3%) | ($124,407) | (2.4%) |
| Management Fee | ($15,000) | (0.3%) | ($14,731) | (0.3%) | ($20,000) | (0.4%) |
| Office Expense | ($21,659) | (0.4%) | ($15,000) | (0.3%) | ($35,259) | (0.7%) |
| Postage and Printing | ($3,270) | (0.1%) | ($5,178) | (0.1%) | ($2,088) | (0.0%) |
| Professional Fees | ($13,095) | (0.2%) | ($10,670) | (0.2%) | ($9,550) | (0.2%) |
| Real Estate Taxes | ($116,112) | (2.2%) | ($122,447) | (2.3%) | ($128,662) | (2.5%) |
| Telephone & Internet | ($25,284) | (0.5%) | ($24,719) | (0.5%) | ($31,415) | (0.6%) |
| Travel and Auto Expense | ($70,411) | (1.3%) | ($99,762) | (1.9%) | ($115,847) | (2.2%) |
| Utilities | ($80,999) | (1.5%) | ($129,493) | (2.5%) | ($110,206) | (2.1%) |
| General Expense | ($12,903) | (0.2%) | ($12,802) | (0.2%) | ($8,684) | (0.2%) |
| TOTAL EXPENSES | ($2,844,859) | (54.1%) | ($3,481,057) | (66.4%) | ($3,789,490) | (73.2%) |
| NET OPERATING INCOME | $2,413,341 | 45.9% | $1,757,571 | 33.6% | $1,390,524 | 26.8% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



| STATEMENT OF INCOME AND EXPENSES | |
| :-- | --: |
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| | **Echo** |
| **INCOME:** | |
| Tuition - camp income (net) | $ 5,004,224 |
| Tuition - school income (net) | |
| Other revenue | 2,900 |
| **Total income** | **$ 5,007,124** |
| | |
| Grant Income | |
| | |
| Total income | $ 5,007,124 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 1,344,541 |
| Taxes and benefits | 103,439 |
| Total kitchen expense | 359,183 |
| Total program activities expense | 635,297 |
| Total grounds expense | |
| Transportation expense | 252,720 |
| Camper recruitment expense | 137,569 |
| Staffing expense | 54,907 |
| Other direct expense | 305,706 |
| Total direct cost of operations | $ 3,193,361 |
| | |
| **Gross profit** | **$ 1,813,763** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 1,117 |
| Banking and credit card fees | 153,165 |
| Consulting | |
| General expense | 59,717 |
| Insurance | 126,915 |
| Management Fee | 20,000 |
| Office | 13,697 |
| Postage and Printing | 4,142 |
| Professional fees | 4,583 |
| Real estate taxes | 133,709 |
| Camp Rent | |
| Rent - Office | |
| Telephone & Internet | 25,111 |
| Travel & Auto Exp | 115,862 |
| Utilities | 117,229 |
| Total selling, general and administrative expens | $ 775,245 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 1,038,518** |

## Analysis of Income and Expenses

Over the past 4 years, income has been generally level.  Therefore, we will utilize the 2024 income for 2025.  Expenses have significantly fluctuated over the past four years, noting the expense ratios for the past two years have been 73.3% and 78.3%.  Based on the past two year, we will assume an expense ratio of 75% for 2025:



|  | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $5,258,199 | $5,238,628 | -0.37% | $5,171,405 | -1.28% | $5,007,124 | -3.18% | -2.21% | $5,007,124 |
| Total Expense | $2,844,859 | $3,481,057 | 22.36% | $3,789,490 | 8.86% | $3,968,606 | 4.73% | 7.00% | $3,755,343 |
| % of PGI | 54.1% | 66.4% |  | 73.3% |  | 79.3% |  |  | 75.0% |
| Net Operating Income | $2,413,340 | $1,757,571 |  | $1,381,915 |  | $1,038,518 |  |  | $1,251,781 |

The subject projected operating expense ratio of 75.0% (prior to incentive). Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at the upper end of the range of the comparable expenses indicating the camp may upside if operated more efficiently.

## Capitalization

### Discount Rate

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 200 basis points for risk.  This results in an 11.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 15.00%.

Based on the foregoing, it is our opinion that a 15.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

### Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.



2025-3163 – Single Asset Portfolio – Simad Holdings LLC    Individual Property Information

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 15.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 15.00% | | | = | 5.25% |
| **Weighted Rate** | | | | | | | **10.52%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.93% | = | 0.72% |
| **Adjusted Rate** | | | | | | | **9.80%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.93% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 9.80% |
| **(rounded to)** | | | | | | | **10.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 10.00%. Therefore, our projected camp value for the subject property, as of December 31, 2024 is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,251,781 | | 10.00% | | $12,517,810 | $12,500,000 |



## C28 – Waukeela

## Historical Property Financials and Projected Income and Expenses

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $928,493 | $990,615 | 6.69% | $1,171,549 | 18.26% | $1,177,004 | 0.47% | 6.27% | Market Projection | $1,274,000 |
| Total Expense | $922,681 | $1,077,175 | 16.74% | $1,150,378 | 6.80% | $1,189,078 | 3.36% | 3.46% | Market Projection | $1,310,400 |
| % of PGI | | 108.7% | | 98.2% | | 101.0% | | | | 80% |
| Net Operating Income | | -$86,560 | | $21,171 | | -$12,074 | | | | $254,800 |

## Capitalization of Net Operating Income

| Market Projection | 130 Campers @ $2,000 per week as an average | | | $1,820,000 |
|---|---|---|---|---|
| | 70% of Capacity | | | $1,274,000 |
| | 80% Expenses | | | $1,019,200 |
| | NOI | | | $254,800 |
| | Cap Rate | | | 10.50% |
| | Camp Value (Going Concern) | | | $2,426,667 |



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## C4 – Chateaguay

### Historical Property Financials and Projected Income and Expenses

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | | $2,096,456 | | $2,122,634 | 1.25% | $2,361,143 | 11.24% | 4.21% | 10.0% | $2,656,285 |
| Total Expense | | $1,573,812 | | $2,092,506 | 32.96% | $2,267,787 | 8.38% | 14.70% | 0.0% | $2,267,787 |
| % of PGI | | 75.1% | | 98.6% | | 96.0% | | | | 85% |
| Net Operating Income | | $522,644 | | $30,128 | | $93,355 | | | | **$388,498** |

### Capitalization of Net Operating Income

| PGI | NOI | Expense Ratio | Cap Rate | Going Concern |
|---|---|---|---|---|
| $2,656,285 | $388,498 | 85% | **9.50%** | **$4,100,000** |

 Leitner | Berman

87

## C10 – Green Lane

### Property Financials

### CAMP GREEN LANE  OPERATING HISTORICALS

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| **INCOME ITEMS** | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $2,505,463 | 99.9% | $2,754,367 | 100.0% | $3,005,231 | 85.5% |
| Other Revenue | $2,730 | 0.1% | $0 | 0.0% | $508,773 | 14.5% |
| **TOTAL GROSS INCOME** | $2,508,193 | 100.0% | $2,754,367 | 100.0% | $3,514,004 | 100.0% |
| **EXPENSE ITEMS** | | | | | | |
| Payroll | ($624,663) | (24.9%) | ($798,271) | (29.0%) | ($796,979) | (22.7%) |
| Taxes and Benefits | ($87,037) | (3.5%) | ($81,381) | (3.0%) | ($85,214) | (2.4%) |
| Total Kitchen Expense | ($252,502) | (10.1%) | ($338,177) | (12.3%) | ($339,890) | (9.7%) |
| Total Program Activities Expense | ($183,409) | (7.3%) | ($288,292) | (10.5%) | ($304,508) | (8.7%) |
| Total Grounds Expense | ($108,418) | (4.3%) | ($121,849) | (4.4%) | ($169,450) | (4.8%) |
| Transportation Expense | ($13,997) | (0.6%) | ($49,600) | (1.8%) | ($78,422) | (2.2%) |
| Camper Recruitment Expense | ($47,586) | (1.9%) | ($63,790) | (2.3%) | ($49,857) | (1.4%) |
| Staffing Expense | ($123,550) | (4.9%) | ($153,822) | (5.6%) | ($205,447) | (5.8%) |
| Other Expense | $0 | - | ($25,489) | (0.9%) | ($54,548) | (1.6%) |
| Advertising | ($42,606) | (1.7%) | ($13,526) | (0.5%) | ($17,380) | (0.5%) |
| Bank and Credit Card Fees | ($8,154) | (0.3%) | ($14,170) | (0.5%) | ($13,111) | (0.4%) |
| Other Expense | $0 | - | ($25,489) | (0.9%) | ($54,548) | (1.6%) |
| Insurance | ($73,441) | (2.9%) | ($75,150) | (2.7%) | ($72,621) | (2.1%) |
| Management Fee | ($15,108) | (0.6%) | ($15,000) | (0.5%) | ($20,000) | (0.6%) |
| Office Expense | ($13,099) | (0.5%) | ($26,482) | (1.0%) | ($37,970) | (1.1%) |
| Postage and Printing | ($3,657) | (0.1%) | ($4,364) | (0.2%) | ($3,039) | (0.1%) |
| Professional Fees | ($5,740) | (0.2%) | ($45,910) | (1.7%) | ($24,630) | (0.7%) |
| Real Estate Taxes | ($43,800) | (1.7%) | ($45,058) | (1.6%) | ($47,000) | (1.3%) |
| Telephone & Internet | ($27,881) | (1.1%) | ($26,607) | (1.0%) | ($26,550) | (0.8%) |
| Travel and Auto Expense | ($75,947) | (3.0%) | ($123,122) | (4.5%) | ($162,004) | (4.6%) |
| Utilities | ($63,730) | (2.5%) | ($88,197) | (3.2%) | ($87,155) | (2.5%) |
| General Expense | ($16,939) | (0.7%) | ($20,764) | (0.8%) | ($22,474) | (0.6%) |
| **TOTAL EXPENSES** | ($1,831,263) | (73.0%) | ($2,444,511) | (88.8%) | ($2,672,796) | (76.1%) |
| **NET OPERATING INCOME** | $676,930 | 27.0% | $309,857 | 11.2% | $841,208 | 23.9% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



| | Green Lane |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| **INCOME:** | |
| Tuition - camp income (net) | $ 3,107,036 |
| Tuition - school income (net) | |
| Other revenue | 569,066 |
| **Total income** | **$ 3,676,102** |
| Grant Income | |
| Total income | $ 3,676,102 |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 896,678 |
| Taxes and benefits | 93,067 |
| Total kitchen expense | 323,414 |
| Total program activities expense | 297,956 |
| Total grounds expense | 243,729 |
| Transportation expense | 91,898 |
| Camper recruitment expense | 47,934 |
| Staffing expense | 167,875 |
| Other direct expense | 38,043 |
| Total direct cost of operations | $ 2,200,594 |
| **Gross profit** | **$ 1,475,509** |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 38,201 |
| Banking and credit card fees | 15,165 |
| Consulting | |
| General expense | 27,748 |
| Insurance | 92,864 |
| Management Fee | 20,000 |
| Office | 28,553 |
| Postage and Printing | 2,981 |
| Professional fees | 9,089 |
| Real estate taxes | 49,889 |
| Camp Rent | |
| Rent - Office | |
| Telephone & Internet | 28,923 |
| Travel & Auto Exp | 161,300 |
| Utilities | 90,825 |
| Total selling, general and administrative expens | $ 565,538 |
| **Net income before interest, depreciation & Corp. Tax** | **$ 909,971** |

## Analysis of Income and Expenses

Over the past three years, the camp has seen moderate income growth, largely due to the ongoing recovery from COVID-19 and increasing tuition rates in the local market. As the camp approaches more stabilized operations in 2025, we are assuming a 3% increase in income and expenses, in line with the increases from 2023 to 2024 and recent trends in industry tuition growth. This results in an income-to-expense ratio of about 70%, which is typical for well-run overnight youth camp. Based on these assumptions, the projected income and expenses for 2025 are as follows:

 Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                Individual Property Information

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $2,508,193 | $2,754,367 | 9.81% | $3,005,231 | 9.11% | $3,676,102 | 22.32% | 15.52% | 3.00% | $3,786,385 |
| Total Expense | $1,831,263 | $2,444,510 | 33.49% | $2,164,023 | -11.47% | $2,766,566 | 27.84% | 4.39% | 3.00% | $2,849,563 |
| % of PGI | 73.0% | 88.8% | | 72.0% | | 75.3% | | | | 75.3% |
| Net Operating Income | $676,930 | $309,857 | | $841,208 | | $909,536 | | | | $936,822 |

The subject projected operating expense ratio of 75.3%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at directly in the range of the comparable expenses indicating the camp is operating efficiently.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 250 basis points for risk.  This results in an 11.50% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment, resulting in an equity yield rate of 15.50%.

Based on the foregoing, it is our opinion that a 15.50% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

**Change in Value**

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 15.50% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

| Development of Capitalization Rate | | | | | | |
|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 15.50% | | = | 5.43% |
| **Weighted Rate** | | | | | | **10.69%** |
| | | | | | | |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × 4.81% | = | 0.70% |
| **Adjusted Rate** | | | | | | **9.99%** |
| | | | | | | |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.81% | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | 9.99% |
| **(rounded to)** | | | | | | **10.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 10.00%.  Therefore, our projected camp value for the subject property, as of December 31, 2024  is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $936,822 | | 10.00% | | $9,368,221 | $9,400,000 |



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## C15 – Lavi

### Historical Property Financials and Projected Income and Expenses

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $4,431,067 | $4,078,816 | -7.95% | $4,740,699 | 16.23% | $4,612,824 | -2.70% | 4.36% | Market Projection | $4,026,750 |
| Total Expense | $4,098,041 | $4,203,213 | 2.57% | $4,221,712 | 0.44% | $4,464,822 | 5.76% | 2.07% | Market Projection | $3,221,400 |
| % of PGI | | 103.0% | | 89.1% | | 96.8% | | | | 80% |
| Net Operating Income | | -$124,397 | | $518,987 | | $148,002 | | | | **$805,350** |

### Capitalization of Net Operating Income

| Market Projection | | 600 Campers @ $1,475 per week as an average | | | $6,195,000 |
|---|---|---|---|---|---|
| | | 65% of Capacity | | | $4,026,750 |
| | | 80% Expenses | | | $3,221,400 |
| | | NOI | | | $805,350 |
| | | Cap Rate | | | 10.50% |
| | | Camp Value (Going Concern) | | | $7,670,000 |



92

2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## C19 – Mesorah

### Historical Property Financials and Projected Income and Expenses

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $4,390,665 | $4,291,546 | -2.31% | $3,317,068 | -22.71% | $3,563,934 | 7.44% | -5.65% | See Market Below | $3,412,500 |
| Total Expense | $3,394,892 | $3,857,226 | 11.99% | $4,604,211 | 19.37% | $5,298,696 | 15.08% | 12.46% | See Market Below | $2,900,625 |
| % of PGI | 77.3% | 89.9% | | 138.8% | | 148.7% | | | | 80% |
| Net Operating Income | $995,773 | $434,320 | | -$1,287,143 | | -$1,734,763 | | | | **$511,875** |

### Capitalization of Net Operating Income

| Market Projection | | 500 Campers @ $1,500 per week as an average | | | | $5,250,000 |
|---|---|---|---|---|---|---|
| | | 65% of Capacity | | | | $3,412,500 |
| | | 85% Expenses | | | | $2,900,625 |
| | | NOI | | | | $511,875 |
| | | Cap Rate | | | | 10% |
| | | Camp Value (Going Concern) | | | | $5,118,750 |



## C22 – New England Golf

### Historical Property Financials and Projected Income and Expenses

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $587,339 | $750,841 | 27.84% | $777,110 | 3.50% | $614,502 | -20.92% | 1.54% | Market Projection | $1,543,500 |
| Total Expense | $805,158 | $884,292 | 9.83% | $890,021 | 0.65% | $849,036 | -4.60% | -1.33% | Market Projection | $1,234,800 |
| % of PGI | 137.1% | 117.8% | | 114.5% | | 138.2% | | | | 80.0% |
| Net Operating Income | -$217,819 | -$133,451 | | -$112,911 | | -$234,534 | | | | $308,700 |

### Capitalization of Net Operating Income

| Market Projection | 175 Campers @ $1,800 per week as an average | | | $2,205,000 |
|---|---|---|---|---|
| | 70% of Capacity | | | $1,543,500 |
| | 80% Expenses | | | $1,234,800 |
| | NOI | | | $308,700 |
| | Cap Rate | | | 10.50% |
| | Camp Value (Going Concern) | | | $2,940,000 |



## C5 – Chen-a-Wanda

### Property Financials

### CAMP CHEN-A-WANDA OPERATING HISTORICALS

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $5,199,868 | 99.9% | $5,397,729 | 99.9% | $6,095,813 | 99.9% |
| Other Revenue | $6,388 | 0.1% | $6,402 | 0.1% | $6,128 | 0.1% |
| TOTAL GROSS INCOME | $5,206,256 | 100.0% | $5,404,131 | 100.0% | $6,101,941 | 100.0% |
| EXPENSE ITEMS | | | | | | |
| Payroll | ($1,502,611) | (28.9%) | ($1,418,008) | (26.2%) | ($1,443,707) | (23.7%) |
| Taxes and Benefits | ($305,856) | (5.9%) | ($238,526) | (4.4%) | ($253,484) | (4.2%) |
| Total Kitchen Expense | ($333,863) | (6.4%) | ($343,479) | (6.4%) | ($427,527) | (7.0%) |
| Total Program Activities Expense | ($472,071) | (9.1%) | ($908,082) | (16.8%) | ($679,259) | (11.1%) |
| Total Grounds Expense | ($300,228) | (5.8%) | ($263,027) | (4.9%) | ($253,192) | (4.1%) |
| Transportation Expense | ($264,893) | (5.1%) | ($311,755) | (5.8%) | $0 | - |
| Camper Recruitment Expense | ($93,377) | (1.8%) | ($44,985) | (0.8%) | ($157,330) | (2.6%) |
| Staffing Expense | ($163,313) | (3.1%) | ($288,214) | (5.3%) | ($288,039) | (4.7%) |
| One-time Non-recurring Employee E | $0 | - | $0 | - | ($503,817) | (8.3%) |
| Advertising | ($935) | (0.0%) | ($5,759) | (0.1%) | ($1,095) | (0.0%) |
| Bank and Credit Card Fees | ($62,994) | (1.2%) | ($124,011) | (2.3%) | ($90,744) | (1.5%) |
| Insurance | ($60,847) | (1.2%) | ($103,238) | (1.9%) | ($121,424) | (2.0%) |
| Management Fee | ($90,481) | (1.7%) | ($48,790) | (0.9%) | ($53,790) | (0.9%) |
| Office Expense | ($26,472) | (0.5%) | ($90,701) | (1.7%) | ($93,376) | (1.5%) |
| Postage and Printing | ($31,810) | (0.6%) | ($2,489) | (0.0%) | ($21,782) | (0.4%) |
| Professional Fees | ($11,887) | (0.2%) | ($6,125) | (0.1%) | ($20,430) | (0.3%) |
| Real Estate Taxes | ($88,188) | (1.7%) | ($93,948) | (1.7%) | ($89,610) | (1.5%) |
| Telephone & Internet | ($23,745) | (0.5%) | ($22,128) | (0.4%) | ($28,766) | (0.5%) |
| Travel and Auto Expense | ($78,398) | (1.5%) | ($77,294) | (1.4%) | ($192,747) | (3.2%) |
| Utilities | ($69,908) | (1.3%) | ($96,910) | (1.8%) | ($137,771) | (2.3%) |
| General Expense | ($17,509) | (0.3%) | ($9,320) | (0.2%) | ($12,553) | (0.2%) |
| TOTAL EXPENSES | ($3,999,386) | (76.8%) | ($4,496,791) | (83.2%) | ($4,870,444) | (79.8%) |
| NET OPERATING INCOME | $1,206,870 | 23.2% | $907,340 | 16.8% | $1,231,497 | 20.2% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



2025-3163 – Single Asset Portfolio – Simad Holdings LLC                Individual Property Information

| STATEMENT OF INCOME AND EXPENSES | Chen-a-Wanda |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| **INCOME:** | |
| Tuition - camp income (net) | $  7,155,292 |
| Tuition - school income (net) | |
| Other revenue | 2,754 |
| **Total income** | **$  7,158,046** |
| | |
| | |
| Grant Income | |
| | |
| Total income | $  7,158,046 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $  1,699,015 |
| Taxes and benefits | 265,174 |
| Total kitchen expense | 497,293 |
| Total program activities expense | 788,530 |
| Total grounds expense | 325,620 |
| Transportation expense | 488,255 |
| Camper recruitment expense | 111,949 |
| Staffing expense | 359,175 |
| Other direct expense | |
| Total direct cost of operations | $  4,535,011 |
| | |
| **Gross profit** | **$  2,623,034** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $       4,394 |
| Banking and credit card fees | 187,654 |
| Consulting | |
| General expense | 54,446 |
| Insurance | 118,908 |
| Management Fee | 20,000 |
| Office | 62,257 |
| Postage and Printing | 14,153 |
| Professional fees | 13,758 |
| Real estate taxes | 67,428 |
| Camp Rent | |
| Rent - Office | |
| Telephone & Internet | 29,813 |
| Travel & Auto Exp | 199,142 |
| Utilities | 150,389 |
| Total selling, general and administrative expens | $     922,341 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$  1,700,693** |

## Analysis of Income and Expenses

Over the past four years, Camp Chen-A-Wanda has experienced a significant upward trend in gross income, reflecting an increase in enrollment during this period, with the property recently operating at full capacity. Looking ahead, based on typical annual increases rather than growth driven by higher enrollment, we project a 5% increase in gross income for 2025, alongside a 5% rise in expenses. This results in an operating expense ratio of 75.2%, which aligns with the industry average for similar camps. This stable



financial performance demonstrates the camp's continued success and its ability to effectively manage both growth and operational costs.

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $5,199,868 | $5,397,729 | 3.81% | $6,095,813 | 12.93% | $7,158,046 | 17.43% | 16.31% | 5.00% | $7,515,948 |
| Total Expense | $3,992,998 | $4,490,389 | 12.46% | $4,864,316 | 8.33% | $5,457,352 | 12.19% | 10.77% | 5.00% | $5,730,220 |
| % of PGI | 76.8% | 83.2% | | 79.8% | | | | | | 76.2% |
| Net Operating Income | $1,206,870 | $907,340 | | $1,231,497 | | $1,700,694 | | | | $1,785,729 |

The subject projected operating expense ratio of 76.2%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at directly in the range of the comparable expenses indicating the camp is operating efficiently.

## Capitalization

**<u>Discount Rate</u>**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 250 basis points for risk.  This results in an 11.50% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment resulting in an equity yield rate of 15.50%.

Based on the foregoing, it is our opinion that a 15.50% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.



## Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 15.50% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 15.50% | | | = | 5.43% |
| **Weighted Rate** | | | | | | | **10.69%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.81% | = | 0.70% |
| **Adjusted Rate** | | | | | | | **9.99%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.81% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 9.99% |
| **(rounded to)** | | | | | | | **10.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 10.00%.  Therefore, our projected camp value for the subject property, as of December 31, 2024  is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,785,729 | | 10.00% | | $17,857,287 | $17,900,000 |



## C16 – Lokanda

### Property Financials

### CAMP LOKANDA OPERATING HISTORICALS

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | %EGI | TOTAL | %EGI | TOTAL | %EGI |
| Tuition Revenue | $4,208,937 | 100.0% | $5,166,785 | 99.6% | $5,092,734 | 100.0% |
| Other Revenue | $47 | 0.0% | $20,927 | 0.4% | $2,226 | 0.0% |
| TOTAL GROSS INCOME | $4,208,984 | 100.0% | $5,187,712 | 100.0% | $5,094,960 | 100.0% |
| EXPENSE ITEMS | | | | | | |
| Payroll | ($1,058,004) | (25.1%) | ($1,077,605) | (20.8%) | ($1,146,864) | (22.5%) |
| Taxes and Benefits | ($107,914) | (2.6%) | ($121,820) | (2.3%) | ($93,189) | (1.8%) |
| Total Kitchen Expense | ($207,428) | (4.9%) | ($366,299) | (7.1%) | ($340,819) | (6.7%) |
| Total Program Activities Expense | ($253,109) | (6.0%) | ($463,065) | (8.9%) | ($457,276) | (9.0%) |
| Total Grounds Expense | ($224,066) | (5.3%) | ($280,105) | (5.4%) | ($340,411) | (6.7%) |
| Transportation Expense | ($36,386) | (0.9%) | ($379,455) | (7.3%) | ($158,666) | (3.1%) |
| Camper Recruitment Expense | ($85,437) | (2.0%) | ($65,490) | (1.3%) | ($37,605) | (0.7%) |
| Staffing Expense | ($86,712) | (2.1%) | ($223,902) | (4.3%) | ($182,430) | (3.6%) |
| Advertising | ($7,891) | (0.2%) | ($15,720) | (0.3%) | ($16,523) | (0.3%) |
| Bank and Credit Card Fees | ($54,187) | (1.3%) | ($44,890) | (0.9%) | ($38,865) | (0.8%) |
| Consulting | ($12,750) | (0.3%) | ($12,211) | (0.2%) | ($12,000) | (0.2%) |
| Insurance | ($106,234) | (2.5%) | ($104,400) | (2.0%) | ($107,819) | (2.1%) |
| Management Fee | ($15,000) | (0.4%) | ($15,000) | (0.3%) | ($20,000) | (0.4%) |
| Office Expense | ($44,441) | (1.1%) | ($61,930) | (1.2%) | ($26,727) | (0.5%) |
| Postage and Printing | ($4,638) | (0.1%) | ($5,052) | (0.1%) | ($3,504) | (0.1%) |
| Professional Fees | ($22,442) | (0.5%) | ($15,996) | (0.3%) | ($44,298) | (0.9%) |
| Real Estate Taxes | ($185,308) | (4.4%) | ($122,361) | (2.4%) | ($121,814) | (2.4%) |
| Rent - Office | ($12,180) | (0.3%) | ($1,495) | (0.0%) | $0 | - |
| Telephone & Internet | ($20,177) | (0.5%) | ($26,725) | (0.5%) | ($20,777) | (0.4%) |
| Travel and Auto Expense | ($77,818) | (1.8%) | ($104,844) | (2.0%) | ($154,468) | (3.0%) |
| Utilities | ($70,395) | (1.7%) | ($106,343) | (2.0%) | ($106,901) | (2.1%) |
| General Expense | ($56,444) | (1.3%) | ($15,524) | (0.3%) | ($61,488) | (1.2%) |
| TOTAL EXPENSES | ($2,748,962) | (65.3%) | ($3,630,232) | (70.0%) | ($3,492,444) | (68.5%) |
| NET OPERATING INCOME | $1,460,022 | 34.7% | $1,557,479 | 30.0% | $1,602,516 | 31.5% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



|  | Lokanda |
|---|---|
| **STATEMENT OF INCOME AND EXPENSES** |  |
| ACCRUAL BASIS |  |
| For the period January 1, 2024 to December 31, 2024 |  |
| **INCOME:** |  |
| Tuition - camp income (net) | $ 5,560,083 |
| Tuition - school income (net) |  |
| Other revenue | 362 |
| **Total income** | **$ 5,560,445** |
|  |  |
| Grant Income |  |
|  |  |
| Total income | $ 5,560,445 |
|  |  |
| **DIRECT COST OF OPERATIONS:** |  |
| Payroll | $ 1,186,381 |
| Taxes and benefits | 131,234 |
| Total kitchen expense | 337,226 |
| Total program activities expense | 582,043 |
| Total grounds expense | 405,938 |
| Transportation expense | 98,293 |
| Camper recruitment expense | 56,385 |
| Staffing expense | 258,164 |
| Other direct expense |  |
| Total direct cost of operations | $ 3,055,664 |
|  |  |
| **Gross profit** | **$ 2,504,781** |
|  |  |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** |  |
| Advertising | $ 36,692 |
| Banking and credit card fees | 78,977 |
| Consulting | 8,750 |
| General expense | 39,250 |
| Insurance | 123,900 |
| Management Fee | 20,000 |
| Office | 37,884 |
| Postage and Printing | 7,943 |
| Professional fees | 45,859 |
| Real estate taxes | 121,059 |
| Camp Rent |  |
| Rent - Office |  |
| Telephone & Internet | 19,159 |
| Travel & Auto Exp | 134,592 |
| Utilities | 100,500 |
| Total selling, general and administrative expens | $ 774,565 |
|  |  |
| **Net income before interest, depreciation & Corp. Tax** | **$ 1,730,217** |

## Analysis of Income and Expenses

Covid severely impacted 2020 with some residual impact in 2021.  Thus, less reliance is placed on the historical income and expense from 2021.

Excluding the year over year change from 2021 to 2022 due to the influence of COVID, we have trended our income and expenses for 2025 based on 2023 and 2024 (3.59% increase to the income for 2025 and 2.75% increase to the expenses for 2025) as follows:



| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $4,208,984 | $5,187,712 | 23.25% | $5,094,960 | -1.79% | $5,560,445 | 9.14% | 3.59% | $5,760,202 |
| Total Expense | $2,748,962 | $3,630,232 | 32.06% | $3,492,444 | -3.80% | $3,830,229 | 9.67% | 2.75% | $3,935,737 |
| % of PGI | 65.3% | 70.0% | | 68.5% | | 68.9% | | | 68.3% |
| Net Operating Income | $1,460,022 | $1,557,480 | | $1,602,516 | | $1,730,216 | | | $1,824,465 |

The subject projected operating expense ratio of 68.3%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at directly in the range of the comparable expenses indicating the camp is operating efficiently.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 250 basis points for risk.  This results in an 11.50% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment resulting in an equity yield rate of 15.50%.

Based on the foregoing, it is our opinion that a 15.50% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.



|

## Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 15.50% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 15.50% | | | = | 5.43% |
| **Weighted Rate** | | | | | | | **10.69%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.81% | = | 0.70% |
| **Adjusted Rate** | | | | | | | **9.99%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.81% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 9.99% |
| **(rounded to)** | | | | | | | **10.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 10.00%.  Therefore, our projected camp value for the subject property, as of December 31, 2024  is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,824,465 | | 10.00% | | $18,244,652 | $18,200,000 |



## C13 – Island Lake

### Property Financials

| YEAR | 2022 | | 2023 | |
|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $3,921,166 | 100.0% | $5,018,299 | 100.0% |
| Other Revenue | $371 | 0.0% | $924 | 0.0% |
| TOTAL GROSS INCOME | $3,921,538 | 100.0% | $5,019,223 | 100.0% |
| EXPENSE ITEMS | | | | |
| Payroll | ($1,223,214) | (31.2%) | ($1,467,067) | (29.2%) |
| Taxes and Benefits | ($146,568) | (3.7%) | ($129,269) | (2.6%) |
| Total Kitchen Expense | ($412,690) | (10.5%) | ($408,197) | (8.1%) |
| Total Program Activities Expense | ($357,732) | (9.1%) | ($336,141) | (6.7%) |
| Total Grounds Expense | ($219,198) | (5.6%) | ($238,656) | (4.8%) |
| Transportation Expense | ($117,299) | (3.0%) | ($204,397) | (4.1%) |
| Camper Recruitment Expense | ($273,030) | (7.0%) | ($376,390) | (7.5%) |
| Staffing Expense | ($118,695) | (3.0%) | ($185,134) | (3.7%) |
| Advertising | ($30,073) | (0.8%) | ($6,152) | (0.1%) |
| Bank and Credit Card Fees | ($62,501) | (1.6%) | ($88,153) | (1.8%) |
| Consulting | ($33,864) | (0.9%) | ($3,034) | (0.1%) |
| Insurance | ($112,998) | (2.9%) | ($58,338) | (1.2%) |
| Management Fee | ($15,000) | (0.4%) | ($20,000) | (0.4%) |
| Office Expense | ($24,701) | (0.6%) | ($20,472) | (0.4%) |
| Postage and Printing | ($14,704) | (0.4%) | ($7,913) | (0.2%) |
| Professional Fees | ($3,000) | (0.1%) | ($41,189) | (0.8%) |
| Real Estate Taxes | ($297,413) | (7.6%) | ($12,750) | (0.3%) |
| Rent - Office | ($17,920) | (0.5%) | ($64,337) | (1.3%) |
| Telephone & Internet | ($16,370) | (0.4%) | ($26,974) | (0.5%) |
| Travel and Auto Expense | ($101,660) | (2.6%) | ($124,767) | (2.5%) |
| Utilities | ($78,597) | (2.0%) | ($99,246) | (2.0%) |
| General Expense | ($58,552) | (1.5%) | ($97,990) | (2.0%) |
| TOTAL EXPENSES | ($3,735,781) | (95.3%) | ($4,016,567) | (80.0%) |
| NET OPERATING INCOME | $185,757 | 4.7% | $1,002,656 | 20.0% |

In addition, to the above 2022-2023, we have been supplied with year-end 2024 income and expenses as follows:



| STATEMENT OF INCOME AND EXPENSES | |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| | **Island Lake** |
| **INCOME:** | |
| Tuition - camp income (net) | $ 5,749,361 |
| Tuition - school income (net) | |
| Other revenue | 1,366 |
| **Total income** | **$ 5,750,727** |
| | |
| | |
| Grant Income | |
| | |
| Total income | $ 5,750,727 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 1,514,709 |
| Taxes and benefits | 139,995 |
| Total kitchen expense | 408,002 |
| Total program activities expense | 639,249 |
| Total grounds expense | 316,296 |
| Transportation expense | 147,754 |
| Camper recruitment expense | 314,343 |
| Staffing expense | 257,226 |
| Other direct expense | |
| Total direct cost of operations | $ 3,737,575 |
| | |
| **Gross profit** | **$ 2,013,152** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 45,859 |
| Banking and credit card fees | 118,727 |
| Consulting | 9,822 |
| General expense | 88,277 |
| Insurance | 76,756 |
| Management Fee | 20,000 |
| Office | 46,911 |
| Postage and Printing | 6,044 |
| Professional fees | 25,837 |
| Real estate taxes | |
| Camp Rent | |
| Rent - Office | 71,203 |
| Telephone & Internet | 28,020 |
| Travel & Auto Exp | 147,358 |
| Utilities | 111,904 |
| Total selling, general and administrative expens | $ 796,717 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 1,216,435** |

## Analysis of Income and Expenses

Covid severely impacted 2020 with some residual impact in 2021.  Thus, less reliance is placed on the historical income and expense from 2021.

Ownership began operations of Island Lake in 2022 and has significantly increased revenue over the past few years as the property progresses toward stabilization. Assuming a three-year stabilization plan, we project moderate income growth for 2025 at a rate of 10%, consistent with the previous year. Additionally,


Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                    Individual Property Information

we anticipate a 5% increase in expenses, reflecting a continued trend of improving operational efficiency. This aligns with the goal of achieving typical, stabilized expense ratios observed in well-managed camps.

| | 2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|
| Gross Income | $3,921,166 | $5,018,299 | 27.98% | $5,750,727 | 14.60% | 23.33% | 10% | $6,325,800 |
| Total Expense | $3,735,781 | $4,016,567 | 7.52% | $4,534,292 | 12.89% | 10.69% | 5% | $4,761,007 |
| % of PGI | 95.3% | 80.0% | | 78.8% | | | | 75.3% |
| Net Operating Income | $185,385 | $1,001,732 | | $1,216,435 | | | | $1,564,793 |

The subject projected operating expense ratio of 75.3%.  Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at directly in the range of the comparable expenses indicating the camp is operating efficiently.

## Capitalization

### Discount Rate

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 250 basis points for risk.  This results in an 11.50% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment resulting in an equity yield rate of 15.50%.

Based on the foregoing, it is our opinion that a 15.50% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.



## Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 15.50% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 15.50% | | | | = | 5.43% |
| **Weighted Rate** | | | | | | | | **10.69%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.81% | | = | 0.70% |
| **Adjusted Rate** | | | | | | | | **9.99%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.81% | | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | | 9.99% |
| **(rounded to)** | | | | | | | | **10.00%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.00% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 10.00%.  Therefore, our projected camp value for the subject property, as of December 31, 2024  is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,564,793 | | 10.00% | | $15,647,931 | $15,600,000 |



## C6 – Club Getaway

### Property Financials

| CLUB GETAWAY OPERATING HISTORICALS | | | | | | |
|---|---|---|---|---|---|---|
| **YEAR** | **2021** | | **2022** | | **2023** | |
| **INCOME ITEMS** | **TOTAL** | **% EGI** | **TOTAL** | **% EGI** | **TOTAL** | **% EGI** |
| Tuition Revenue | $3,119,431 | 99.8% | $5,930,302 | 99.8% | $6,309,952 | 100.0% |
| Other Revenue | $5,435 | 0.2% | $9,175 | 0.2% | $0 | 0.0% |
| **TOTAL GROSS INCOME** | $3,124,865 | 100.0% | $5,939,477 | 100.0% | $6,309,952 | 100.0% |
| **EXPENSE ITEMS** | | | | | | |
| Payroll | ($975,749) | (31.2%) | ($1,431,687) | (24.1%) | ($1,505,087) | (23.9%) |
| Taxes and Benefits | ($156,186) | (5.0%) | ($184,471) | (3.1%) | ($187,365) | (3.0%) |
| Total Kitchen Expense | ($464,303) | (14.9%) | ($899,829) | (15.1%) | ($923,240) | (14.6%) |
| Total Program Activities Expense | ($234,430) | (7.5%) | ($390,777) | (6.6%) | ($298,596) | (4.7%) |
| Total Grounds Expense | ($153,438) | (4.9%) | ($192,134) | (3.2%) | ($259,122) | (4.1%) |
| Transportation Expense | ($5,360) | (0.2%) | ($34,207) | (0.6%) | ($25,384) | (0.4%) |
| Camper Recruitment Expense | ($64,839) | (2.1%) | ($93,638) | (1.6%) | ($95,864) | (1.5%) |
| Staffing Expense | ($52,215) | (1.7%) | ($162,832) | (2.7%) | ($155,262) | (2.5%) |
| Advertising | ($87,579) | (2.8%) | ($108,800) | (1.8%) | ($69,318) | (1.1%) |
| Bank and Credit Card Fees | ($109,456) | (3.5%) | ($112,557) | (1.9%) | ($121,712) | (1.9%) |
| Consulting | ($2,500) | (0.1%) | ($5,000) | (0.1%) | ($5,000) | (0.1%) |
| Insurance | ($178,684) | (5.7%) | ($163,854) | (2.8%) | ($177,780) | (2.8%) |
| Management Fee | ($15,000) | (0.5%) | ($15,000) | (0.3%) | ($20,000) | (0.3%) |
| Office Expense | ($23,804) | (0.8%) | ($14,654) | (0.2%) | ($17,375) | (0.3%) |
| Postage and Printing | ($4,844) | (0.2%) | ($5,962) | (0.1%) | ($4,612) | (0.1%) |
| Professional Fees | ($11,735) | (0.4%) | ($20,350) | (0.3%) | ($27,787) | (0.4%) |
| Real Estate Taxes | ($26,994) | (0.9%) | ($74,920) | (1.3%) | ($58,563) | (0.9%) |
| Rent - Office | $0 | - | ($13,383) | (0.2%) | ($18,754) | (0.3%) |
| Telephone & Internet | ($32,844) | (1.1%) | ($37,840) | (0.6%) | ($44,412) | (0.7%) |
| Travel and Auto Expense | ($34,478) | (1.1%) | ($78,872) | (1.3%) | ($87,238) | (1.4%) |
| Utilities | ($121,849) | (3.9%) | ($173,264) | (2.9%) | ($184,124) | (2.9%) |
| General Expense | ($29,341) | (0.9%) | ($20,314) | (0.3%) | ($41,651) | (0.7%) |
| **TOTAL EXPENSES** | ($2,785,627) | (89.1%) | ($4,234,344) | (71.3%) | ($4,328,247) | (68.6%) |
| **NET OPERATING INCOME** | $339,239 | 10.9% | $1,705,133 | 28.7% | $1,981,705 | 31.4% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



2025-3163 – Single Asset Portfolio – Simad Holdings LLC                Individual Property Information

| STATEMENT OF INCOME AND EXPENSES | Club Getaway |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| **INCOME:** | |
| Tuition - camp income (net) | $ 6,802,898 |
| Tuition - school income (net) | |
| Other revenue | |
| **Total income** | **$ 6,802,898** |
| Grant Income | |
| Total income | $ 6,802,898 |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 1,761,330 |
| Taxes and benefits | 176,582 |
| Total kitchen expense | 937,989 |
| Total program activities expense | 473,466 |
| Total grounds expense | 303,730 |
| Transportation expense | 33,176 |
| Camper recruitment expense | 97,144 |
| Staffing expense | 221,606 |
| Other direct expense | |
| Total direct cost of operations | $ 4,005,023 |
| **Gross profit** | **$ 2,797,875** |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 63,108 |
| Banking and credit card fees | 79,953 |
| Consulting | 11,000 |
| General expense | 27,448 |
| Insurance | 187,035 |
| Management Fee | 20,000 |
| Office | 45,944 |
| Postage and Printing | 6,363 |
| Professional fees | 9,980 |
| Real estate taxes | 63,304 |
| Camp Rent | |
| Rent - Office | 3,475 |
| Telephone & Internet | 34,915 |
| Travel & Auto Exp | 122,240 |
| Utilities | 156,842 |
| Total selling, general and administrative expens | $ 831,607 |
| **Net income before interest, depreciation & Corp. Tax** | **$ 1,966,268** |

## Analysis of Income and Expenses

Over the past three years, the camp has seen strong income growth, largely due to the ongoing recovery from COVID-19 and increasing tuition rates in the local market. As the camp approaches more stabilized operations in 2025, we are assuming a 3% increase in income and expenses, in line with recent trends in tuition growth. This results in an income-to-expense ratio of 71.1%, which is supported by the past three year of operations. Based on these assumptions, the projected income and expenses for 2025 are as follows:

 Leitner | Berman

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $3,124,865 | $5,939,477 | 90.07% | $6,309,952 | 6.24% | $6,802,898 | 7.81% | 39.23% | 3.00% | $7,006,985 |
| Total Expense | $2,785,627 | $4,234,344 | 52.01% | $4,328,247 | 2.22% | $4,836,630 | 11.75% | 4.74% | 3.00% | $4,981,729 |
| % of PGI | 89.1% | 71.3% | | 68.6% | | 71.1% | | | | 71.1% |
| Net Operating Income | $339,238 | $1,705,133 | | $1,981,705 | | $1,966,268 | | | | $2,025,256 |

The subject projected operating expense ratio of 71.1%.  Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at directly in the range of the comparable expenses indicating the camp is operating efficiently.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations.  A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 400 basis points for risk.  This results in a 13.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment resulting in an equity yield rate of 17.00%.

Based on the foregoing, it is our opinion that a 17.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 17.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 17.00% | | | = | 5.95% |
| **Weighted Rate** | | | | | | | **11.22%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.47% | = | 0.65% |
| **Adjusted Rate** | | | | | | | **10.56%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.47% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 10.56% |
| **(rounded to)** | | | | | | | **10.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Capitalization rates for most camp properties typically range from 9.00% to 11.00%. Given the somewhat unique operational characteristics of the subject property, such as its seasonal business model, specialized programming, and limited market comparables, we have applied a capitalization rate of 10.50%, at the upper end of the range to reflect the additional risk associated with its non-typical operation. Accordingly, the camp value of the subject property, as of December 31, 2024 is estimated as follows:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $2,025,256 | | 10.50% | | $19,288,153 | $19,300,000 |



## C1 – Camp Achim

### Historical Property Financials and Projected Income and Expenses

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $1,729,610 | $1,883,306 | 8.16% | $2,008,826 | 6.66% | $2,256,599 | 12.33% | 6.61% | 15.0% | $3,307,500 |
| Total Expense | $1,364,180 | $1,253,756 | -8.81% | $1,887,614 | 50.56% | $1,848,109 | -2.09% | 15.80% | 0% | $2,646,000 |
| % of PGI | 78.9% | 66.6% | | 94.0% | | 81.9% | | | | 85% |
| Net Operating Income | $365,430 | $629,550 | | $121,212 | | $408,490 | | | | $661,500 |

### Capitalization of Net Operating Income

| PGI | NOI | Expense Ratio | Cap Rate | Going Concern |
|---|---|---|---|---|
| $3,307,500 | $661,500 | 85% | 10.50% | $6,300,000 |



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## C17 – Meadowbrook

### Property Financials

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $4,903,072 | 100.0% | $6,323,426 | 100.0% | $6,411,697 | 100.0% |
| Other Revenue | $0 | 0.0% | $0 | 0.0% | $0 | 0.0% |
| TOTAL GROSS INCOME | $4,903,072 | 100.0% | $6,323,426 | 100.0% | $6,411,697 | 100.0% |
| EXPENSE ITEMS | | | | | | |
| Payroll | ($1,928,757) | (39.3%) | ($2,160,877) | (34.2%) | ($2,491,850) | (38.9%) |
| Taxes and Benefits | ($294,104) | (6.0%) | ($284,435) | (4.5%) | ($373,402) | (5.8%) |
| Total Kitchen Expense | ($261,402) | (5.3%) | ($291,167) | (4.6%) | ($306,583) | (4.8%) |
| Total Program Activities Expense | ($334,713) | (6.8%) | ($461,813) | (7.3%) | ($578,058) | (9.0%) |
| Total Grounds Expense | ($117,492) | (2.4%) | ($191,535) | (3.0%) | ($239,844) | (3.7%) |
| Transportation Expense | ($440,598) | (9.0%) | ($648,470) | (10.3%) | ($634,131) | (9.9%) |
| Camper Recruitment Expense | $0 | - | ($1,119) | (0.0%) | $0 | - |
| Staffing Expense | ($93,303) | (1.9%) | ($99,647) | (1.6%) | ($106,141) | (1.7%) |
| Advertising | ($28,810) | (0.6%) | ($59,471) | (0.9%) | ($81,634) | (1.3%) |
| Bank and Credit Card Fees | ($133,235) | (2.7%) | ($182,258) | (2.9%) | ($182,749) | (2.9%) |
| Insurance | ($116,232) | (2.4%) | ($97,647) | (1.5%) | ($98,161) | (1.5%) |
| Management Fee | ($19,221) | (0.4%) | ($20,980) | (0.3%) | ($20,000) | (0.3%) |
| Office Expense | ($40,386) | (0.8%) | ($54,264) | (0.9%) | ($42,012) | (0.7%) |
| Postage and Printing | ($7,061) | (0.1%) | ($7,771) | (0.1%) | ($9,021) | (0.1%) |
| Professional Fees | ($53,500) | (1.1%) | ($18,669) | (0.3%) | ($4,500) | (0.1%) |
| Real Estate Taxes | ($36,596) | (0.7%) | ($70,797) | (1.1%) | ($52,167) | (0.8%) |
| Rent | ($58,150) | (1.2%) | ($61,400) | (1.0%) | ($65,000) | (1.0%) |
| Telephone & Internet | ($23,829) | (0.5%) | ($17,382) | (0.3%) | ($17,911) | (0.3%) |
| Travel and Auto Expense | ($56,479) | (1.2%) | ($171,745) | (2.7%) | ($168,370) | (2.6%) |
| Utilities | ($76,324) | (1.6%) | ($160,875) | (2.5%) | ($162,780) | (2.5%) |
| General Expense | ($30,863) | (0.6%) | ($44,101) | (0.7%) | ($120,932) | (1.9%) |
| TOTAL EXPENSES | ($4,151,055) | (84.7%) | ($5,106,424) | (80.8%) | ($5,755,246) | (89.8%) |
| NET OPERATING INCOME | $752,017 | 15.3% | $1,217,003 | 19.2% | $656,451 | 10.2% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

| STATEMENT OF INCOME AND EXPENSES | Meadowbrook |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| **INCOME:** | |
| Tuition - camp income (net) | $ 5,864,820 |
| Tuition - school income (net) | 337,261 |
| Other revenue | |
| **Total income** | **$ 6,202,081** |
| | |
| Grant Income | |
| | |
| Total income | $ 6,202,081 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 2,498,235 |
| Taxes and benefits | 283,735 |
| Total kitchen expense | 298,363 |
| Total program activities expense | 605,273 |
| Total grounds expense | 305,706 |
| Transportation expense | 534,635 |
| Camper recruitment expense | |
| Staffing expense | 45,261 |
| Other direct expense | |
| Total direct cost of operations | $ 4,571,209 |
| | |
| **Gross profit** | **$ 1,630,872** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 45,564 |
| Banking and credit card fees | 164,506 |
| Consulting | |
| General expense | 48,616 |
| Insurance | 93,180 |
| Management Fee | 20,000 |
| Office | 64,542 |
| Postage and Printing | 15,276 |
| Professional fees | 84,952 |
| Real estate taxes | 44,666 |
| Camp Rent | |
| Rent - Office | 35,000 |
| Telephone & Internet | 29,600 |
| Travel & Auto Exp | 174,467 |
| Utilities | 106,189 |
| Total selling, general and administrative expens | $ 926,558 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 704,314** |

## Analysis of Income and Expenses

The camp experienced a strong recovery from COVID-19 in 2022, followed by a modest income increase in 2023 and a moderate decline in 2024. Given these fluctuations and the recent downturn, we project no income growth for 2025. In 2022, the camp operated with an expense ratio of approximately 80%, aligning with industry standards for well-managed camps. However, in 2023 and 2024, the expense ratio rose to about 90%, despite a nearly $700,000 decrease in expenses from 2023 to 2024. This higher ratio was primarily due to the reduced income in 2024. For 2025, we anticipate a 3% reduction in expenses, resulting in an expense ratio closer to 85%. While this remains on the higher side, it is more consistent with the market average.

 Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $4,903,072 | $6,323,426 | 28.97% | $6,411,697 | 1.40% | $6,202,081 | -3.27% | 8.83% | 0.00% | $6,202,081 |
| Total Expense | $4,151,055 | $5,106,423 | 23.02% | $5,755,246 | 12.71% | $5,497,767 | -4.47% | 2.55% | -3.00% | $5,332,834 |
| % of PGI | 84.7% | 80.8% | | 89.8% | | 88.6% | | | | 86.0% |
| Net Operating Income | $752,017 | $1,217,003 | | $656,451 | | $704,314 | | | | $869,247 |

The subject projected operating expense ratio of 86.0%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps. In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range). The subject's projected expense ratio is at the upper end of the range, noting that as a day camp, there may be potential streamline expenses creating additional value.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties. In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value. In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment. The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds. The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 200 basis points for risk. This results in a 11.00% yield rate. This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 300 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment resulting in an equity yield rate of 14.00%.

Based on the foregoing, it is our opinion that a 14.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

**Change in Value**

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

 Leitner | Berman

114

| Assumptions Underlying Capitalization Rate Development | |
| --- | --- |
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 14.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 14.00% | | | = | 4.90% |
| **Weighted Rate** | | | | | | | **10.17%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 5.17% | = | 0.76% |
| **Adjusted Rate** | | | | | | | **9.41%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 5.17% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 9.41% |
| **(rounded to)** | | | | | | | **9.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
| --- | --- | --- | --- | --- |
| Akerson Method | | | | 9.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Capitalization rates for most camp properties typically range from 9.00% to 11.00%. Given the somewhat unique operational characteristics of the subject property, such as its seasonal business model, specialized programming, and limited market comparables, we have applied a capitalization rate of 9.50%. Accordingly, the camp value of the subject property, as of December 31, 2024 is estimated as follows:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
| --- | --- | --- | --- | --- | --- |
| $869,247 | | 9.50% | | $9,149,969 | $9,100,000 |


Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## C8 – Eagles Landing

### Historical Property Financials and Projected Income and Expenses

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $2,914,151 | $3,365,077 | 15.47% | $3,464,049 | 2.94% | $3,354,217 | -3.17% | -0.11% | 0.0% | $3,354,217 |
| Total Expense | $2,018,125 | $2,661,752 | 31.89% | $2,785,227 | 4.64% | $2,876,098 | 3.26% | 2.68% | 0.0% | $2,876,098 |
| % of PGI | 69.3% | 79.1% | | 80.4% | | 85.7% | | | | 86% |
| Net Operating Income | | $703,325 | | $678,822 | | $478,119 | | | | $478,119 |

### Capitalization of Net Operating Income

| PGI | NOI | Expense Ratio | Cap Rate | Going Concern |
|---|---|---|---|---|
| $1,930,000 | $478,119 | 86% | 9.50% | $5,000,000 |



116

2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## C18 – Med-o-Lark

### Historical Property Financials and Projected Income and Expenses

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $1,917,139 | $1,893,024 | -1.26% | $2,050,106 | 8.30% | $2,202,733 | 7.44% | 4.97% | 7.5% | $2,367,938 |
| Total Expense | $1,543,214 | $1,592,775 | 3.21% | $1,785,241 | 12.08% | $1,904,772 | 6.70% | 6.53% | 0.0% | $1,904,772 |
| % of PGI | 80.5% | 84.1% | | 87.1% | | 86.5% | | | | 80% |
| Net Operating Income | $373,925 | $300,249 | | $264,865 | | $297,961 | | | | **$463,166** |
| | | | | | | | | | * Less Incentive | **$175,000** |
| | | | | | | | | | Adjusted NOI | **$288,166** |

*Ownership provides a bonus incentive to the current camp operator in addition to their base salary. In the event the operator were to depart, it is expected that a comparable bonus structure would be necessary to attract and retain a qualified replacement capable of maintaining the camp's high level of profitability. Accordingly, this bonus is considered an ongoing operational expense, consistent with historical financial performance where this cost has been regularly incurred and accounted for in reported income and expenses.

### Capitalization of Net Operating Income

| PGI | NOI | Expense Ratio | Cap Rate | Going Concern |
|---|---|---|---|---|
| $2,367,938 | $288,166 | 80% | **9.50%** | **$3,000,000** |

 Leitner | Berman

## C14 – Kiwi Country Day Camp

## Property Financials

<div align="center">

**KIWI OPERATINGCO, LLC**
**STATEMENT OF INCOME AND EXPENSES**
**TAX BASIS**
**FOR THE YEAR ENDED DECEMBER 31, 2021**

</div>

| | | |
|---|---|---:|
| **INCOME** | | |
| Tuition | $ | 4,364,836 |
| Total income | | 4,364,836 |
| **COST OF OPERATIONS** | | |
| Gross salaries and related costs | | 1,466,385 |
| Transportation costs | | 321,667 |
| Selling expenses | | 66,762 |
| Operating expenses | | 830,473 |
| General and administrative expenses | | 445,805 |
| Total cost of operations | | 3,131,092 |
| Net income from operations | | 1,233,744 |
| **OTHER INCOME (EXPENSES)** | | |
| PPP loan forgiveness | | 539,800 |
| Interest expense | | (105,165) |
| Total other income | | 434,635 |
| **NET INCOME** | $ | 1,668,379 |



**Kiwi Operating Co, LLC**
**Statement of Income and Expense**
**Income Tax Basis**
**Year Ended December 31, 2022**

| | |
|---|---:|
| Tuition income | $ 4,944,176 |
| **Cost of operations** | |
| Gross salaries and related costs | 2,146,931 |
| Transportation costs | 357,365 |
| Selling expenses | 21,141 |
| Operating expenses | 1,104,014 |
| General and administrative expenses | 598,297 |
| **Total cost of operations** | 4,227,748 |
| **Income from operations** | 716,428 |
| **Other income (expense)** | |
| PPP loan forgiveness | 768,410 |
| Other Income | 3,701 |
| Interest expense | (33,248) |
| **Total other income** | 738,863 |
| **Net income** | $ 1,455,291 |

**Kiwi Operatingco, LLC**
**Statement of Revenues and Expenses**
**Income Tax Basis**
**Year Ended December 31, 2023**

| | |
|---|---:|
| **Revenues** | |
| Tuition income | $ 4,889,007 |
| **Cost of operations** | |
| Salaries | 1,643,298 |
| Payroll taxes and employee benefits | 329,973 |
| Transportation costs | 344,163 |
| Selling expenses | 54,226 |
| Operating expenses | 1,045,755 |
| General and administrative expenses | 626,576 |
| **Total cost of operations** | 4,043,991 |
| **Income from operations** | 845,016 |
| **Other expense** | |
| Interest expense | 53,502 |
| **Net income** | $ 791,514 |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:


Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                    Individual Property Information

| STATEMENT OF INCOME AND EXPENSES | |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| | **Kiwi** |
| **INCOME:** | |
| Tuition - camp income (net) | $ 4,218,331 |
| Tuition - school income (net) | |
| Other revenue | 216,068 |
| **Total income** | **$ 4,434,398** |
| | |
| | |
| Grant Income | |
| | |
| Total income | $ 4,434,398 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 1,563,100 |
| Taxes and benefits | 269,057 |
| Total kitchen expense | 232,330 |
| Total program activities expense | 129,024 |
| Total grounds expense | 85,696 |
| Transportation expense | 221,769 |
| Camper recruitment expense | 2,008 |
| Staffing expense | 47,707 |
| Other direct expense | |
| Total direct cost of operations | $ 2,550,690 |
| | |
| **Gross profit** | **$ 1,883,708** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 46,530 |
| Banking and credit card fees | 83,392 |
| Consulting | |
| General expense | 44,123 |
| Insurance | 97,922 |
| Management Fee | 20,000 |
| Office | 18,162 |
| Postage and Printing | 1,785 |
| Professional fees | 89,986 |
| Real estate taxes | 51,641 |
| Camp Rent | 100,000 |
| Rent - Office | |
| Telephone & Internet | 20,438 |
| Travel & Auto Exp | 36,927 |
| Utilities | 60,337 |
| Total selling, general and administrative expens | $ 671,243 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 1,212,466** |


Leitner | Berman

**120**

## Analysis of Income and Expenses

Covid severely impacted 2020 with some residual impact in 2021.  Thus, less reliance is placed on the historical income and expense from 2021.

To estimate the camp value of the subject we will first complete an abbreviated Income Capitalization Approach.  Due to the specific income and expense characteristics of a summer camp property, we will project income and expenses based on historical expenses tended for 2025.

After strong increases in the income between 2021 and 2023, the income was level for 2024.  Thus, we will project market increase of 3% for 2025.  With the significant income increases between 2021 and 2023, expense also increases significantly over this period and while the income increase from 2023 to 2024 was negligible, the expense increased at close to 3%.  Therefore, we have projected expenses to increase at 3% for 2025.

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2022-2024 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $4,364,836 | $4,944,176 | 13.27% | $4,889,007 | -1.12% | $4,434,398 | -9.30% | 0.47% | 3.00% | $4,567,430 |
| Total Expense | $3,131,092 | $4,227,748 | 35.02% | $4,043,991 | -4.35% | $3,221,933 | -20.33% | 0.72% | 3.00% | $3,318,591 |
| % of PGI | 71.7% | 85.5% | | 82.7% | | 72.7% | | | | 72.7% |
| Net Operating Income | $1,233,744 | $716,428 | | $845,016 | | $1,212,465 | | | | $1,248,839 |

The subject projected operating expense ratio of 72.7%.  Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at reflects reasonably at the lower end of the comparable range, noting that the lower end of the range reflects day camps.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 200 basis points for risk.  This results in an 11.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 300 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment resulting in an equity yield rate of 14.00%.

 Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

Based on the foregoing, it is our opinion that a 14.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

**Change in Value**

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 14.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 14.00% | | | = | 4.90% |
| **Weighted Rate** | | | | | | | **10.17%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 5.17% | = | 0.76% |
| **Adjusted Rate** | | | | | | | **9.41%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 5.17% | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | 9.41% |
| **(rounded to)** | | | | | | | **9.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 9.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |

Based on the above, we have concluded to market capitalization rate of 9.50%.  Therefore, our projected camp value for the subject property, as of December 31, 2024 is:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,248,839 | | 9.50% | | $13,145,673 | $13,100,000 |



2025-3163 – Single Asset Portfolio – Simad Holdings LLC    Individual Property Information

## C31 – Windsor Mountain

### Property Financials

### WINDSOR MOUNTAIN OPERATING HISTORICAL

| YEAR | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|
| INCOME ITEMS | TOTAL | % EGI | TOTAL | % EGI | TOTAL | % EGI |
| Tuition Revenue | $2,765,129 | 99.6% | $3,419,237 | 99.7% | $3,789,800 | 99.7% |
| Other Revenue | $11,067 | 0.4% | $11,307 | 0.3% | $11,000 | 0.3% |
| **TOTAL GROSS INCOME** | $2,776,195 | 100.0% | $3,430,544 | 100.0% | $3,800,800 | 100.0% |
| **EXPENSE ITEMS** | | | | | | |
| Payroll | ($501,056) | (18.0%) | ($637,059) | (18.6%) | ($752,105) | (19.8%) |
| Taxes and Benefits | ($82,643) | (3.0%) | ($57,860) | (1.7%) | ($111,262) | (2.9%) |
| Total Kitchen Expense | ($209,032) | (7.5%) | ($292,411) | (8.5%) | ($272,409) | (7.2%) |
| Total Program Activities Expense | ($181,528) | (6.5%) | ($189,241) | (5.5%) | ($123,923) | (3.3%) |
| Total Grounds Expense | ($81,211) | (2.9%) | ($95,751) | (2.8%) | ($100,997) | (2.7%) |
| Transportation Expense | ($15,888) | (0.6%) | ($32,684) | (1.0%) | ($66,416) | (1.7%) |
| Camper Recruitment Expense | ($24,823) | (0.9%) | ($61,707) | (1.8%) | ($71,595) | (1.9%) |
| Staffing Expense | ($14,990) | (0.5%) | ($53,518) | (1.6%) | ($46,250) | (1.2%) |
| Advertising | ($1,063) | (0.0%) | ($588) | (0.0%) | ($588) | (0.0%) |
| Bank and Credit Card Fees | ($68,935) | (2.5%) | ($89,044) | (2.6%) | ($90,628) | (2.4%) |
| Insurance | ($56,966) | (2.1%) | ($50,130) | (1.5%) | ($52,482) | (1.4%) |
| Management Fee | ($41,667) | (1.5%) | ($15,000) | (0.4%) | ($20,000) | (0.5%) |
| Office Expense | ($17,719) | (0.6%) | ($13,313) | (0.4%) | ($10,797) | (0.3%) |
| Postage and Printing | ($2,216) | (0.1%) | ($1,647) | (0.0%) | ($1,537) | (0.0%) |
| Professional Fees | ($3,700) | (0.1%) | ($3,698) | (0.1%) | ($4,452) | (0.1%) |
| Real Estate Taxes | ($26,431) | (1.0%) | ($24,251) | (0.7%) | ($19,706) | (0.5%) |
| Telephone & Internet | ($18,601) | (0.7%) | ($20,290) | (0.6%) | ($19,559) | (0.5%) |
| Travel and Auto Expense | ($20,747) | (0.7%) | ($30,557) | (0.9%) | ($42,348) | (1.1%) |
| Utilities | ($45,724) | (1.6%) | ($57,167) | (1.7%) | ($59,641) | (1.6%) |
| General Expense | ($10,097) | (0.4%) | ($10,170) | (0.3%) | ($54,443) | (1.4%) |
| **TOTAL EXPENSES** | ($1,425,036) | (51.3%) | ($1,736,083) | (50.6%) | ($1,921,136) | (50.5%) |
| **NET OPERATING INCOME** | $1,351,159 | 48.7% | $1,694,461 | 49.4% | $1,879,664 | 49.5% |

In addition, to the above 2021-2023, we have been supplied with year-end 2024 income and expenses as follows:

 Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                        Individual Property Information

| STATEMENT OF INCOME AND EXPENSES | Windsor Mountain |
|---|---|
| ACCRUAL BASIS | |
| For the period January 1, 2024 to December 31, 2024 | |
| **INCOME:** | |
| Tuition - camp income (net) | $ 3,569,267 |
| Tuition - school income (net) | |
| Other revenue | 11,999 |
| **Total income** | **$ 3,581,266** |
| | |
| Grant Income | |
| Total income | $ 3,581,266 |
| | |
| **DIRECT COST OF OPERATIONS:** | |
| Payroll | $ 776,788 |
| Taxes and benefits | 115,824 |
| Total kitchen expense | 252,818 |
| Total program activities expense | 118,537 |
| Total grounds expense | 126,338 |
| Transportation expense | 71,215 |
| Camper recruitment expense | 75,441 |
| Staffing expense | 49,090 |
| Other direct expense | |
| Total direct cost of operations | $ 1,586,050 |
| | |
| **Gross profit** | **$ 1,995,215** |
| | |
| **SELLING, GENERAL AND ADMINISTRATIVE EXPESES** | |
| Advertising | $ 588 |
| Banking and credit card fees | 84,996 |
| Consulting | |
| General expense | 39,498 |
| Insurance | 63,031 |
| Management Fee | 20,000 |
| Office | 15,112 |
| Postage and Printing | 1,484 |
| Professional fees | 4,250 |
| Real estate taxes | 43,107 |
| Camp Rent | |
| Rent - Office | |
| Telephone & Internet | 18,432 |
| Travel & Auto Exp | 50,984 |
| Utilities | 51,971 |
| Total selling, general and administrative expens | $ 393,453 |
| | |
| **Net income before interest, depreciation & Corp. Tax** | **$ 1,601,762** |



2025-3163 – Single Asset Portfolio – Simad Holdings LLC | Individual Property Information

## Analysis of Income and Expenses

Over the past three years, the camp has experienced strong income growth, driven primarily by the post-COVID-19 recovery and rising tuition rates in the local market. As operations are expected to stabilize in 2025, we are projecting a 3% increase in both income and expenses, consistent with recent tuition trends.

Based on these projections, the income-to-expense ratio is estimated at 55.3%, which is on the low end compared to competitive camps. This lower ratio may indicate a potential for increased expense levels in the future as the camp aligns more closely with industry norms. This consideration introduces some operational risk, which will be addressed in the selection of an appropriate capitalization rate.

| | 2021 | 2022 | Change 2021/2022 | 2023 | Change 2022/2023 | 2024 | Change 2023/2024 | Annual Change 2021-2023 | Projected for 2025 | Projected for 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Income | $2,776,195 | $3,419,237 | 23.16% | $3,789,800 | 10.84% | $3,581,266 | -5.50% | 9.67% | 3.00% | $3,688,704 |
| Total Expense | $1,425,036 | $1,724,776 | 21.03% | $1,910,136 | 10.75% | $1,979,503 | 3.63% | 4.92% | 3.00% | $2,038,888 |
| % of PGI | 51.3% | 50.4% | | 50.4% | | 55.3% | | | | 55.3% |
| Net Operating Income | $1,351,159 | $1,694,461 | | $1,879,664 | | $1,601,763 | | | | $1,649,816 |
| | | | | | | | | | * Less Incentive | $120,000 |
| | | | | | | | | | Adjusted NOI | $1,529,816 |

Ownership provides a bonus incentive to the current camp operator in addition to their base salary. In the event the operator were to depart, it is expected that a comparable bonus structure would be necessary to attract and retain a qualified replacement capable of maintaining the camp's high level of profitability. Accordingly, this bonus is considered an ongoing operational expense, consistent with historical financial performance where this cost has been regularly incurred and accounted for in reported income and expenses.

The subject projected operating expense ratio of 55.3%. Optimal efficiency for youth camps typically indicates expense ratios ranging between about 60% to 80% of total revenues, noting the lower end of the range is typically seen in day camps as these operations do have additional expenses related to overnight and food service associated with overnight camps.  In the above table, Expense Comparable 7 and 8, reflect day camps (and are also at the low end of the range).  The subject's projected expense ratio is at the below the range of the comparable expenses indicating the possibility of potential for increased expense levels in the future to align with industry standards.

## Capitalization

**Discount Rate**

In selecting an appropriate discount rate, we have considered the foregoing yields as well as the subject property's location, age, and condition relative to competing properties.  In addition, we have taken into consideration a higher discount rate to aid in neutralize any operating business value.  In the development of the discount rate for the subject property, consideration was given to the risk, liquidity, and the time and expense of asset management inherent with income-producing property investment.  The summation approach was utilized to account for yield expectations associated with these investment considerations. A 5.00% basic rate was used based on the return exhibited by corporate and municipal bonds.  The 5.00% basic rate is increased by 200 basis points for liquidity, 200 basis points for asset management, and 400



basis points for risk.  This results in a 13.00% yield rate.  This is with the survey range for limited service lodging properties. For the equity yield rate, an additional 400 basis points has been added to the overall yield to reflect the additional risk associated with the equity portion of the investment resulting in an equity yield rate of 17.00%.

Based on the foregoing, it is our opinion that a 17.00% before - tax discount or yield rate would be required by a typical investor for a niche summer camp such as the subject.

### Change in Value

As previously noted, to neutralize any operating business value, we have conservatively concluded to zero change in value/appreciation over the term.

| Assumptions Underlying Capitalization Rate Development | |
|---|---|
| Loan to value ratio | 65% |
| Interest Rate | 6.50% |
| Term (years payout) | 25 |
| Annual Constant | 0.0810 |
| Equity Yield Rate | 17.00% |
| Holding Period | 10 |
| Appreciation Over Term | 0% |

| Development of Capitalization Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage Funds Contribution (Loan Ratio x Annual Constant) | 65.00% | × | 8.10% | | | | = | 5.27% |
| Equity Funds Contribution (Equity Ratio x Equity Yield Rate) | 35.00% | × | 17.00% | | | | = | 5.95% |
| **Weighted Rate** | | | | | | | | **11.22%** |
| Less Adjustment for Mortgage Amortization (% Paid off in Projected Period x Loan Ratio x Sinking Fund Factor) | 22.49% | × | 65.00% | × | 4.47% | | = | 0.65% |
| **Adjusted Rate** | | | | | | | | **10.56%** |
| Less/Plus Adjustment for Appreciation (Appreciation Over Term x Sinking Fund Factor) | 0.00% | × | 4.47% | | | | = | **0.00%** |
| Overall Capitalization Rate | | | | | | | | 10.56% |
| **(rounded to)** | | | | | | | | **10.50%** |

The methods of estimating an overall capitalization rate are illustrated in the following table.

| | Minimum | Maximum | Average | Derived |
|---|---|---|---|---|
| Akerson Method | | | | 10.50% |
| Market Participants | 9.00% | 11.00% | | |
| National Investor Survey | 7.50% | 12.50% | 9.50% | |
| Local Sales | 8.00% | 14.00% | 10.17% | |


Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                          Individual Property Information

Based on our analysis, we have determined a market capitalization rate of 11.00% for the subject property. Capitalization rates for most camp properties typically range from 9.00% to 11.00%. As noted previously, this camp is currently operating with a very low expense-to-income ratio, which is below industry standards. This low ratio introduces potential risks related to the future increase in expenses to align more closely with comparable camps. To account for the risk of increased expenses, we have selected a capitalization rate at the upper end of the typical range to reflect the potential for future adjustments. Therefore, a capitalization rate of 10.50% is considered reasonable. Accordingly, the camp value of the subject property, as of December 31, 2024 is estimated as follows:

| Net Operating Income | / | Cap Rate | = | Value | Rounded |
|---|---|---|---|---|---|
| $1,529,816 | | 10.50% | | $14,569,675 | $14,600,000 |



2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                    Portfolio Value Summary

# PORTFOLIO VALUE SUMMARY

| # | File # | Camp Name | Camp Type | Address | City | State | Camp Value | Capitalization Rate | Net Operating Income |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | December 31, 2024 | | |
| 1 | C2 | Banner Day Camp | Day Camp | 1225 Riverwoods Road | Lake Forest | IL | $30,300,000 | 10.50% | $3,180,374 |
| 2 | C7 | Country Roads Day Camp | Day Camp | 139 Pinebrook Road | Manalapan | NJ | $12,100,000 | 9.50% | $1,145,951 |
| 3 | C25 | Rolling Hills Country Day Camp | Day Camp | 14 Dittmar Road | Freehold | NJ | $18,300,000 | 9.50% | $1,733,907 |
| 4 | C11 | Malka | Overnight Camp | 150 Ingalside Road | Greenville | NY | $10,800,000 | 10.50% | $1,134,000 |
| 5 | C27 | Summit | Overnight Camp | 168 Duck Harbor Road | Honesdale | PA | $11,100,000 | 11.00% | $1,219,195 |
| 6 | C20 | SHMA Camps | Overnight Camp | 169 Laymon Road | Swan Lake | NY | $24,100,000 | 9.00% | $2,168,919 |
| 7 | C12 | Indian Acres / Forest Acres | Overnight Camp | 1712 Main Street | Freyburg | ME | $7,000,000 | 9.50% | $663,655 |
| 8 | C29 | Wekeela | Overnight Camp | 1750 Bear Pond Road | Hartford | ME | $12,900,000 | 9.50% | $1,227,278 |
| 9 | C3 | Blue Star | Overnight Camp | 179 Blue Star Way | Hendersonville | NC | $17,500,000 | 10.00% | $1,751,718 |
| 10 | C24 | Pine Forest/ Lake Owego/ Timber Tops | Overnight Camp | 185 Pine Forest Road/1687 US-6/1620 Route 6 | Greeley | PA | $37,300,000 | 10.00% | $3,732,549 |
| 11 | C21 | Mohawk | Day Camp | 200 Old Tarrytown Road | White Plains | NY | $75,100,000 | 11.00% | $8,258,799 |
| 12 | C30 | Willow Lake | Day Camp | 200 State Route 181 | Lake Hopatcong | NJ | $36,600,000 | 11.00% | $4,031,471 |
| 13 | C23 | North Star | Overnight Camp | 200 Verrill Road | Poland | ME | $6,000,000 | 9.50% | $569,194 |
| 14 | C9 | Echo | Overnight Camp | 210 Echo Road | Burlingham | NY | $12,500,000 | 10.00% | $1,251,781 |
| 15 | C28 | Waukeela | Overnight Camp | 23 Brownfield Road | Eaton Center | NH | $2,400,000 | 10.50% | $254,800 |
| 16 | C4 | Chateaguay | Overnight Camp | 233 Gadway Road | Merrill | NY | $4,100,000 | 9.50% | $388,498 |
| 17 | C10 | Green Lane | Overnight Camp | 249 Camp Green Lane Road | Green Lane | PA | $9,400,000 | 10.00% | $936,822 |
| 18 | C15 | Lavi | Overnight Camp | 2656 Upper Woods Road | Lakewood | PA | $7,700,000 | 10.50% | $805,350 |
| 19 | C19 | Mesorah | Overnight Camp | 325 North Pond Road | Guilford | NY | $5,100,000 | 10.00% | $511,875 |
| 20 | C22 | New England Golf | Overnight Camp | 35 Golf Academy Drive | Belgrade | ME | $2,900,000 | 10.50% | $308,700 |
| 21 | C5 | Chen-a-Wanda | Overnight Camp | 355 Camp Road | Thompson | PA | $17,900,000 | 10.00% | $1,785,729 |
| 22 | C16 | Lokanda | Overnight Camp | 432 Haring Road | Glen Spey | NY | $18,200,000 | 10.00% | $1,824,465 |
| 23 | C13 | Island Lake | Overnight Camp | 50 Island Lake Road | Starrucca | PA | $15,600,000 | 10.00% | $1,564,793 |
| 24 | C6 | Club Getaway | Overnight Camp | 59 South Kent Road | South Kent | CT | $19,300,000 | 10.50% | $2,025,256 |
| 25 | C1 | Camp Achim | Overnight Camp | 60 Pleasant Acres Road | Catskill | NY | $6,300,000 | 10.50% | $661,500 |
| 26 | C17 | Meadowbrook | Day Camp | 73 E. Valley Brook Road | Long Valley | NJ | $9,100,000 | 9.50% | $869,247 |
| 27 | C8 | Eagles Landing | Day Camp | 74 Davidson Mill Road North | Brunswick Township | NJ | $5,000,000 | 9.50% | $478,119 |
| 28 | C18 | Med-o-Lark | Overnight Camp | 82 Medolark Road | Washington | ME | $3,000,000 | 9.50% | $288,166 |
| 29 | C14 | Kiwi Country Day Camp | Day Camp | 825 Union Valley Road | Carmel | NY | $13,100,000 | 9.50% | $1,248,839 |
| 30 | C31 | Windsor Mountain | Overnight Camp | One World Way | Windsor | NH | $14,600,000 | 10.50% | $1,529,816 |
| | | | | | | Total | $465,300,000 | | |



# RECONCILIATION OF VALUES

For the Camp Value, we have utilized the Income Capitalization Approach. The Income Capitalization Approach is based on the theory of anticipation, which affirms that value may be defined as the present worth of all rights to future benefits.  In the Income Capitalization Approach, earning potential is forecast over a typical investor holding period, and appropriate deductions are made for expenses and vacancy and collection loss resulting in the net operating income.  Summer camps are typically owner-user properties. However, income is generated in the form of dues collected from campers.  The subject's revenues and expenses were analyzed, with the resulting net operating income utilized in determining a market camp value.

Based on the foregoing, the overall camp value of the Portfolio, as of December 31, 2024, is:

| Appraisal Premise | Date of Value | Value Conclusion |
|---|---|---|
| Overall Camp Value | December 31, 2024 | $465,300,000 |



Case 26-16388-CMG   Doc 271-1   Filed 06/25/26   Entered 06/25/26 21:35:47   Desc
Exhibit A   Page 485 of 515

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                                    Addenda

# ADDENDA

- Representative Camp Photographs
- Limiting Conditions
- Certification
- Qualifications
- Appraiser's License



**130**

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                                      Addenda

## Representative Camp Photographs



**C2 – Banner Day Camp**





**C7 – Country Roads Day Camp**

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                Addenda

![Photo of the interior of a large pole barn with gymnastics equipment, cardboard boxes, and colorful bins.]

**C25 – Rolling Hills Day Camp**



**133**



**C20 – SHMA Camps**

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                    Addenda



**C12 – Indian Acres / Forest Acres**



**C29 – Wekeela**

![Photograph of a green and brown log cabin building with a screened porch, next to a red and green cabin in a wooded setting](image)

**C24 – Pine Forest / Lake Owego / Timber Tops**





**C21 – Mohawk**



**C30 – Willow Lake**



**C23 – North Star**

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                    Addenda



**C5 – Chen-a-Wanda**



**C16 – Lokanda**



**C6 – Club Getaway**

**C31 – Windsor Mountain**



## Limiting Conditions

The appraisal is expressly subject to the following limiting conditions:

1. Leitner Berman assumes no responsibility for the legal description provided or for matters pertaining to legal or title considerations. Leitner Berman assumes that title to the property is good and marketable unless otherwise stated.

2. Leitner Berman appraised the property free and clear of any and all liens or encumbrances unless otherwise stated.

3. All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so specified within this appraisal report. Leitner Berman assumes responsible ownership and competent property management.

4. Leitner Berman believe that information furnished by others is reliable, but Leitner Berman gives no warranty for its accuracy.

5. Leitner Berman assumes that all engineering studies are correct. The plot plans and illustrative material in this report are included only to help the reader to visualize the property.

6. Leitner Berman assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. Leitner Berman assumes no responsibility for such conditions or for obtaining the engineering studies that may be required to discover them.

7. In this appraisal assignment, unless otherwise stated in the report, Leitner Berman did not observe any potentially hazardous material used in the construction or maintenance of the building and/or the presence of toxic waste. Leitner Berman does not have any knowledge of the existence of such materials on or in the property. However, Leitner Berman is not qualified to detect such substances. The existence of any potentially hazardous material may influence the value of the property. Leitner Berman urges the client to retain an expert in this field if the client believes it is necessary or appropriate. If such hazardous material is present, the value of the property may be adversely affected and re-appraisal at additional cost may be necessary.

8. Leitner Berman assumes that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and analyzed in the appraisal report.

9. Leitner Berman assumes that all licenses, certificates of occupancy, consents and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value opinion contained in this report is based.

10. Possession of an original or copy of this report does not carry with it the right of publication or reproduction, nor may an original or a copy of the report be used for any purposes whatsoever by anyone except the client without the previous written consent of the appraiser and the client. Out-



of-context quoting from, and partial reprinting of this appraisal report are expressly prohibited. The omission or change of any part of this appraisal report without Leitner Berman's written authorization invalidates the entire appraisal.

11. No part of this report (especially any opinion of value or any reference to the Appraisal Institute or to any of its designations) shall be disseminated to the news media, sales media, or any other public means of communication without my prior written consent and approval.

12. Leitner Berman is not required to give testimony or appear in court in connection with this appraisal unless arrangements have been previously made.

13. Neither all nor any part of the contents of this report (especially Leitner Berman's opinion of value, identity, or the firm) shall be disseminated to the public through advertising, public relations, news, sales or other media without Leitner Berman's prior written consent and approval.

14. Leitner Berman assumes that the use of the land and improvements is confined within the boundaries of the property described and that there is no encroachment or trespass unless noted in the report.

15. Any allocation of the total value opinion in this report between the land and the improvements applies only under the stated program of use. The separate values allocated to the land and improvements must not be used in conjunction with any other appraisal and are invalid if so used. Any value opinion provided in the report applies to the entire property, and any proration or division of the total into fractional interests will invalidate the value opinion unless such proration or division of interests has been stated in the report.

16. The American with Disabilities Act (ADA) became effective January 26, 1992. Leitner Berman has not made a specific compliance survey and analysis of this property to determine whether it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more of the requirements of the ADA. If so, this fact could have a negative effect on the value of the property. Since Leitner Berman has no direct evidence relating to this issue, Leitner Berman did not consider possible noncompliance with the requirements of the ADA in developing an opinion of the value of the property.

17. Acceptance and/or use of this appraisal report by the client or any third party constitutes acceptance of the stated Limiting Conditions. Liability extends only to the stated client, not to subsequent parties or users of the report.



## Certification

The statements of fact contained in this report are true and correct.

1.  Joel Leitner, MAI personally prepared the analysis concerning the real estate that is the subject of this appraisal report.

2.  Joel Leitner, MAI, and Anthony Legotti, MAI have personally reviewed the analyses, opinions, and conclusions concerning the real estate contained in this appraisal report and fully concurs with the final market value conclusion.

3.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

4.  We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.

5.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.  This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the States of New York, Pennsylvania, Connecticut, New Jersey, Illinois, North Carolina, Maine, and New Hampshire.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. As of the date of this report, Joel Leitner, MAI and Anthony Legotti, MAI have completed the continuing education program for Designated Members of the Appraisal Institute.



2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                Addenda

12. As of the date of this report, Joel Leitner, MAI and Anthony Legotti, MAI have completed the Standards and Ethics Education Requirements for Candidates/Practicing Affiliates of the Appraisal Institute.

13. No one has provided significant real property appraisal assistance to the people signing this report.

14. Joel Leitner, MAI, and Anthony Legotti, MAI have not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

Joel Leitner, MAI
jleitner@leitnerberman.com
347-466-3264
Certified General Appraiser
State of New York (License #46-3011)
State of Pennsylvania (License #GA003488)
State of Connecticut (License #RCG.00011672)
State of New Jersey (License #RG01545)

Anthony Legotti, MAI
Certified General Appraiser
State of Illinois (License #553.002920)
State of North Carolina (License #A8898)
State of Maine (License #CG5108)


Leitner | Berman

## Qualifications

### Joel Leitner, MAI
### Founding Partner, Leitner Berman

**PROFILE AND BACKGROUND**

Joel has over 38 years of experience in real estate valuation, investment, analysis, and consultation. Joel's experience includes a diversified background in the valuation of real estate on a national basis for a wide range of applications including market value appraisals, property portfolio consulting and management, investment advisory service, valuations and consulting studies for securitization-equity based and mortgage-backed transactions, purchase price allocations, liquidation sale valuations, condemnation, tax reduction, estates, and expert witness testimony for litigation. These assignments have been conducted on behalf of foreign and domestic investment firms including major industrial corporations, leading foreign and domestic financial institutions, individual investors, leading law firms, and government agencies.

Joel's areas of specialization include preparation of market value appraisals for all types of real estate with a full range of valuation objectives; mortgage finance; investment analysis; discounted cash flow projections; before and after taxes; Ad valorem property appraisals; litigation support; consultation in the negotiations of equity investment acquisitions; market and economic feasibility studies for existing property or proposed development projects; estate valuations; and purchase price allocations. Appraisal assignments include industrial facilities, shopping centers and malls, office and medical centers, hotel and motel facilities, and apartment complexes.

Joel's real estate valuation and consulting experience has encompassed an extremely diverse range of real estate. This experience includes researching and analyzing various real estate markets within the Tristate area along with testifying as an expert witness in several local and federal courts. He has served on the panel of neutral arbitrators by the American Arbitration Association. Mr. Leitner is currently on the list of fiduciary appraisers maintained by Part 36 of the New York State Supreme Court for New York County.

**PROFESSIONAL AFFILIATIONS**
- MAI designation
- New York University, Adjunct Professor, Master of Real Estate
- Board of Directors of the New York Chapter Appraisal Institute (1997 – 2016)
- 2003 Person of the Year – Appraisal Institute
- 2008 President of the Metropolitan New York Chapter
- Member, Real Estate Board of New York – Real Estate Appraisal Committee (1997 – 2016)

**General Certified Appraiser:**
- State of New York (License # 46-3011)
- State of New Jersey (License # RG01545)
- State of Pennsylvania (License # GA003488)
- State of Connecticut (License # RCG.00011672)
- State of Maryland (License # 28730)
- State of Washington (License # 23002465)
- State of Colorado (License # CG2-00003500)

**EDUCATION**

Masters Degree in Real Estate Investment, Finance and Valuation, New York University

**COMMUNITY**
- Board of Directors – Brooklyn Navy Yard
- Board of Trustees – Brooklyn Hospital
- Board of Trustees – Brooklyn Historical Society
- Real Estate Co-Chair – Carnegie Hall
- Strong Support – Brooklyn Botanic Gardens
- Strong Support- Heights and Hills

 Leitner | Berman

2025-3163 – Single Asset Portfolio – Simad Holdings LLC                              Addenda



# ANTHONY J. LEGOTTI, MAI

Cell: (516) 818-0302 • anthony.legotti@mavenvaluation.com

## PROFESSIONAL LICENSURE & CERTIFICATION

| CERTIFIED GENERAL REAL ESTATE APPRAISER | | | |
|---|---|---|---|
| Alabama | #G01621 | Mississippi | #GA-1460 |
| Arizona | #CGA-1037864 | Nevada | #A.0208676-CG |
| Arkansas | #CG-5030 | New Jersey | #42RG00280300 |
| California | #3010205 | New Mexico | #03894-G |
| Colorado | #CG2000004354 | New York | #46000045471 |
| Connecticut | #RCG.0001680 | North Carolina | #A8898 |
| Delaware | #X1-0010797 | Ohio | #ACGO.2022005385 |
| Dist. of Columbia (DC) | #GA40000111 | Oklahoma | #13709CGA |
| Florida | #RZ4333 | Pennsylvania | #GA003643 |
| Georgia | #426246 | Rhode Island | #CGA.0020148 |
| Illinois | #553.002920 | South Carolina | #8505 |
| Indiana | #CG42200035 | Texas | #TX1381189G |
| Iowa | #CG04119 | Utah | #13050027-CG00 |
| Kansas | #5165 | Virginia | #4001018668 |
| Louisiana | #APR.05096-CGA | Washington | #22038376 |
| Maine | #CG5108 | West Virginia | # PENDING |
| Maryland | #35054 | Wisconsin | #2644-10 |
| Massachusetts | #1000264 | Wyoming | #AP-2335 |
| Michigan | #1205078189 | | |

- Approved New York State Real Estate Appraisal Instructor
- Approved New York State Real Estate Appraisal Supervisor
- New York State Licensed Salesperson - #40LE1172345

## EDUCATION
Community College of the Air Force, Montgomery, Alabama
Associate of Applied Science, Criminal Justice                    February 2010

## PROFESSIONAL/INDUSTRY AFFILIATIONS
- Designated Member of the Appraisal Institute (MAI)
- Designated Member of the Columbia Society of Real Estate Appraisers (CSA-G)
- Member of the National Association of Realtors (NAR)
- Member of the Long Island Board of Realtors (LIBOR)

Page 1 of 2


Leitner | Berman

150

<u>REAL ESTATE VALUATION EXPERIENCE</u>

- Provider of real estate appraisal reports and valuation consulting services for the purposes of mortgage lending decisions, asset valuation, legal matters, and governmental projects.
- Valuation of non-controlling interests in real estate.
- Valuation of diminution in value for title insurance companies.
- Appointed as a regional advisor by the State of New York Division of Licensing.
- Significant experience in multifamily, office, industrial, and retail properties.
- Expert testimony in both deposition and trial.

<u>EXPERT QUALIFICATIONS</u>

- State of New York - Division of Licensing
- Town of Islip - Town Board
- Town of Huntington - Zoning Board of Appeals

<u>WORK EXPERIENCE</u>

**Maven Appraisals/Valuation,** Nationwide
President                                                                 January 2019 to Present
- Specialty in multifamily valuation in both urban and suburban markets
- Agency lender experience including compliance with Fannie Mae & Freddy Mac
- Legal industry assignments for estates, divorces, and bankruptcies
- Other property type knowledge includes office, industrial, retail, and special use

**BBG, Inc.,** New York, New York
Staff Appraiser                                                        June 2015 to January 2019
- Completed property inspections and appraisal assignments as directed
- Assisted junior appraisers with valuation and industry guidance
- Focused mainly on urban multifamily properties for agency lender loans

**Rogers & Taylor, Inc.,** Hauppauge, New York
Staff Appraiser                                                        June 2007 to June 2013
- Completed property inspections and appraisal assignments as directed
- Focused mainly on suburban office, industrial, and retail properties

**Independent Fee Appraiser,** New York City Metro Area
Staff Appraiser                                                        January 2001 to June 2007
- Completed property inspections and appraisal assignments for various supervisors.
- Focused mainly on suburban office, industrial, and retail properties.

Page 2 of 2

 Leitner | Berman

## Appraiser's Licenses





2025-3163 – Single Asset Portfolio – Simad Holdings LLC                              Addenda



## Commonwealth of Pennsylvania- Department of State
## Bureau of Professional and Occupational Affairs

Mailing Address P.O. Box 2649, Harrisburg, PA 17105          Toll Free: 1-833-DOS-BPOA



### *JOEL  LEITNER*

| | | |
|---|---|---|
| License Number | : GA003488          Initial License Date : 07/07/2005 | Expiration Date          : 06/30/2027 |
| License Type | : Certified General Appraiser | License Status as of 6/5/2025 : Active |
| Issued By | : State Board of Certified Real Estate Appraisers | |
| Address | : ONE PIERREPONT STREET #8A, BROOKLYN, NY 11201 | |



Acting Commissioner Arion R. Claggett

Signature of Licensee



Please verify the license by visiting https://www.pals.pa.gov/verify or by scanning the QR Code

20250604989

 Leitner | Berman

**153**





**154**

THIS DOCUMENT IS PRINTED ON WATERMARKED PAPER, WITH A MULTI-COLORED
BACKGROUND AND MULTIPLE SECURITY FEATURES. PLEASE VERIFY AUTHENTICITY.

## State Of New Jersey
## New Jersey Office of the Attorney General
## Division of Consumer Affairs



THIS IS TO CERTIFY THAT THE

Real Estate Appraisers Board

HAS CERTIFIED

JOEL LEITNER
One Pierrepont Street #8A
Brooklyn NY  11201

FOR PRACTICE IN NEW JERSEY AS A(N):  Certified General Appraiser

11/01/2023  TO  12/31/2025
VALID

42RG00154500
LICENSE/REGISTRATION/CERTIFICATION #

Signature of Licensee/Registrant/Certificate Holder

ACTING DIRECTOR











2025-3163 – Single Asset Portfolio – Simad Holdings LLC                                      Addenda



## State of Maine
### DEPARTMENT OF PROFESSIONAL AND FINANCIAL REGULATION
### OFFICE OF PROFESSIONAL AND OCCUPATIONAL REGULATION
### BOARD OF REAL ESTATE APPRAISERS

### License Number CG5108

Be it known that

### ANTHONY JOSEPH LEGOTTI

has qualified as required by Title 32 MRS Chapter 123 and is licensed as:
### CERTIFIED GENERAL APPRAISER

*Anne L. Head*
Commissioner

**ISSUE DATE**
April 18, 2024

**EXPIRATION DATE**
December 31, 2024

Leitner | Berman



info@leitnerberman.com  |  www.leitnerberman.com  |  (347) 466-3264

# פרק 12 – חתימות

12.1      **החברה**


**SIMAD Holdings Ltd.**                    _____


12.1      **הדירקטורים**


**Shahar Nachmias**                        _____


**Michael Shabsels**                       _____


**David Shabsels**                         _____


**Doron Turgeman**                         _____


**Limor Beladev**                          _____


**Benjamin Gabbay**                        _____