**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*,[1] | Case No. 26-16388 (CMG) |
| Debtors. | (Jointly Administered) |

**SIMAD DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE SIMAD DEBTOR LOAN PARTIES TO OBTAIN POSTPETITION FINANCING FROM THE BANK OF NEW HAMPSHIRE, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings, Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

53503373

TO THE HONORABLE CHIEF JUDGE CHRISTINE M. GRAVELLE,
UNITED STATES BANKRUPTCY COURT:

The above-captioned debtors and debtors in possession (collectively, the "SIMAD Debtors", the SIMAD Debtors that are "Borrowers," the "SIMAD Debtor Borrowers,"[2] together with the SIMAD Debtors that are "Guarantors," the "SIMAD Debtor Guarantors,"[3] collectively, the "SIMAD Debtor Loan Parties") state the following in support of this motion (the "Motion") for the relief set forth herein. In support of this Motion, the SIMAD Debtors submit the *Declaration of Assaf Ravid, Chief Restructuring Officer of the SIMAD Debtors in Support of the SIMAD Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[4] and the *Declaration of Christopher Pizzo, In Support of the SIMAD Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the SIMAD Debtor Loan Parties to Obtain Postpetition Financing from Bank of New Hampshire, (II) Authorizing the SIMAD Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Pizzo Declaration" and together with the First Day Declaration, the "Declarations") filed contemporaneously herewith. Accordingly, the SIMAD Debtors respectfully request that the Court approve the relief requested herein and enter an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order

---

[2]   The following SIMAD Debtors are SIMAD Debtor Borrowers: Belgrade Lakes Summer Camps LLC, Iafalandco, LLC, Poland Landco LLC, Washington Lake, LLC, Waukeela Landco LLC, Wekeeland LLC, and WM Land, LLC.

[3]   The following SIMAD Debtors are SIMAD Debtor Guarantors: Camp Med-O-Lark, Inc., Iafaoperatingco, LLC, Mainewekeelaco, LLC, Poland Campco LLC, Waukeela Operatingco LLC, and WM Camp, LLC.

[4]   The First Day Declaration provides detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases. Capitalized terms used but not defined in this Motion have the meaning ascribed to them in the First Day Declaration, the BNH DIP Term Sheet, or the Interim Cash Collateral Order (as defined below), as applicable.

53503373

(the "Final Order," and together with the Interim Order, the "DIP Orders").  In further support of this Motion, the SIMAD Debtors respectfully state the following:

**Introduction**

1.      The SIMAD Debtors commenced these chapter 11 cases in the face of an acute liquidity crisis that endangered—and in certain respects continues to endanger—their operations during their most critical operating period.  Although the SIMAD Debtors have taken meaningful steps to stabilize liquidity, including securing postpetition financing for a portion of the SIMAD Debtors, material shortfalls persist at certain of the SIMAD Debtors' camps which are not adequately funded.  The proposed additional debtor-in-possession financing, to be provided by another of the SIMAD Debtors' secured stakeholders, the Bank of New Hampshire ("BNH"), is designed to address these funding gaps and ensure continuity of operations across the SIMAD Debtors' businesses.  Under the circumstances, this incremental financing represents a fair and reasonable solution that provides critical liquidity on a timeline and with a level of certainty that no alternative source could match.

2.      The SIMAD Debtor Borrowers require additional liquidity to fund operations at camps that are BNH's collateral[5] and thus have an immediate and critical need for an infusion of additional capital in the form of additional postpetition financing.  Without immediate access to liquidity, the SIMAD Debtor Borrowers will be unable to fund their obligations at their camps, and any disruption would jeopardize not only enterprise value, but, critically, the health, safety, and welfare of young campers entrusted to their care.

---

[5]     The SIMAD Debtor Borrower camps consist of: Indian Acres Camp for Boys & Forest Acres Camp for Girls, Camp Med-O-Lark, New England Golf & Tennis Camp, Camp North Star, Camp Waukeela, Camp Wekeela, Windsor Mountain Summer Camp.

53503373

3.     The SIMAD Debtors' peak season brings substantial operating costs for the essential infrastructure necessary to support the core functions of their summer camp operations, including payment of employee wages, programs, food and dining services, medical staffing, camp leadership.  This core infrastructure must be timely implemented and operational before and as campers arrive and must continue through the duration of camp in order for the camps to operate safely and effectively.  Against this backdrop, the SIMAD Debtor Loan Parties seek financing on an immediate expedited basis, as it is critically necessary to fund ongoing operations. Given the extreme time pressure associated with funding the SIMAD Debtors' camp operations, their immediate operational demands, and the complexity of their capital structure, the SIMAD Debtor Loan Parties determined that entry into the BNH DIP Facility (defined below) provides the degree of certainty required at this stage of their chapter 11 cases.

4.     To that end, the SIMAD Debtors and their advisors engaged with certain of the SIMAD Debtors' known secured creditors, including BNH in the limited time available since the commencement of these chapter 11 cases to negotiate the terms of debtor-in-possession financing. Following good-faith, arm's-length negotiations, on June 27, 2026, the SIMAD Debtor Loan Parties and BNH agreed to a term sheet for debtor-in-possession financing (the "BNH DIP Term Sheet"), a copy of which is attached here to as **Exhibit B**, pursuant to which BNH agreed to provide the financing described herein (the "BNH DIP Facility"), wherein the BNH DIP Lenders agreed to the consensual use of Cash Collateral (defined in the BNH DIP Term Sheet) and to provide the SIMAD Debtor Borrowers with DIP financing necessary to fund these chapter 11 cases.

5.     As further described below, the BNH DIP Facility consists of a senior, secured, priming debtor-in-possession credit facility in an aggregate principal amount of up to $30,000,000 million (the "BNH DIP Loan"), which consists of: (i) new money term loans in an

4

53503373

aggregate principal amount of up to $10,000,000, with up to $2,000,000 available upon entry of the Interim Order (the "Interim Advance") and the remaining principal amount in draws of no less than $8,000,000 in the aggregate upon entry of the Final Order, and (ii) upon entry of the Final Order, a 2:1 "roll up" of $20,000,000 (the "Roll-Up Amount") of the BNH Pre-Petition Obligations (as defined in the *Agreed Interim Order with Bank of New Hampshire Pursuant to 11 U.S.C. §§ 361, 362, 363 and 507 and Fed. R. Bankr. P. 2002, 4001, and 9014 (1) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (II) Granting Relief from the Automatic Stay and (IV) Scheduling a Final Hearing*, dated June 18, 2026 [Docket No. 166] (the "Interim Cash Collateral Order").

6.      Importantly, the BNH DIP Facility provides the SIMAD Debtor Borrowers with the immediate liquidity required to ensure that operations of the SIMAD Debtor Borrowers' camps continue without disruption during these chapter 11 cases. The availability of new money will enable the SIMAD Debtor Borrowers to meet payroll, satisfy vendor obligations, and provide essential services necessary for campers arriving now.  It will also send a critical signal to campers and their families, vendors, and employees that the SIMAD Debtor Borrowers are adequately capitalized and positioned to continue delivering the safe, reliable, and deeply valued camp experience that families have come to expect and trust. Without prompt access to the BNH DIP Facility, the SIMAD Debtor Borrowers would lack sufficient capital to fund ongoing operations or administrative costs and would be unable to provide even basic camp necessities.

7.      The SIMAD Debtor Loan Parties submit that the BNH DIP Facility represents a fair and reasonable financing option. Approval of interim relief is therefore essential to preserve enterprise value and provide the stability required to protect the campers, employees, and stakeholders during a critical time in the SIMAD Debtors' chapter 11 cases. The reasons

5

53503373

necessitating the SIMAD Debtors' access to additional liquidity through the BNH DIP Facility are detailed in the Declarations.  In summation, the BNH DIP Facility represents the culmination of extensive negotiations between the SIMAD Debtor Loan Parties and BNH and is a fair and reasonable financing option under the circumstances.  Accordingly, the SIMAD Loan Parties seek authorization to enter into the BNH DIP Facility that will provide the SIMAD Debtor Borrowers with a BNH DIP Loan of $30 million, including $10 million in new money, $2 million of which will be available upon interim approval of this Motion.

8.      For the reasons set forth in this Motion and in the Declarations, the SIMAD Debtor Loan Parties believe that approval of the BNH DIP Facility will maximize the value of the SIMAD Debtor Loan Parties' estates for the benefit of all stakeholders.  It is also a sound exercise of the SIMAD Debtor Loan Parties' business judgment as it provides for critical liquidity that will support the SIMAD Debtor Borrowers ongoing camp operations, all while they seek value maximizing sale transaction(s).

**Jurisdiction and Venue**

9.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b).  The SIMAD Debtors confirm their consent to the Court entering a final order in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6

53503373

11.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 365, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-3 of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules").

**Background**

12.     On June 4, and June 5, 2026 (collectively, the "Petition Date"), each of the SIMAD Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered under Case No. 26-16388 (CMG) pursuant to Bankruptcy Rule 1015(b) [Docket No. 15].  The SIMAD Debtors are operating their business and managing their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

13.     Information regarding the SIMAD Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of the chapter 11 cases can be found in the First Day Declaration, which is incorporated herein by reference.

14.     On June 14, 2026, the SIMAD Debtors filed the *SIMAD Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the SIMAD Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 61] (the "Cash Collateral Motion").  On June 17 and 18, 2026, the Court entered various orders

7

53503373

granting the Cash Collateral Motion [Docket Nos. 142, 143, 144, 145, 146, 147, 148, 149, 150, 165, 166, 167].

**Relief Requested**

15.     By this Motion, the SIMAD Debtor Loan Parties seek entry of the DIP Orders:

a.      authorizing the SIMAD Debtor Loan Parties to enter into the BNH DIP Facility in an aggregate principal amount not to exceed $30,000,000 comprised of (i) new money term loans in an aggregate principal amount of up to $10,000,000, inclusive of the Interim Advance of up to $2,000,000, and (ii) upon entry of the Final Order, a 2:1 "roll up" of $20,000,000 of BNH Pre-Petition Obligations which shall be deemed to be constitute BNH DIP Loans (as defined herein);

b.      authorizing the SIMAD Debtor Loan Parties to enter into and execute one or more definitive documents governing the BNH DIP Facility (the "BNH DIP Loan Documents"); *provided, however* that the Interim Advance will be governed by the terms and conditions set forth in the Interim Order;

c.      authorizing the SIMAD Debtor Loan Parties to consummate the transactions contemplated by the BNH DIP Loan Documents and granting Adequate Protection Liens to BNH to the extent of any diminution in value;

d.      granting BNH a perfected first-priority, primed lien secured by all assets and property of the SIMAD Debtor Loan Parties, whether now owned or hereafter acquired, and proceeds thereof;

e.      granting superpriority administrative expense claims against each of the SIMAD Debtor Borrowers' and Guarantors estates to BNH with respect to the BNH DIP Obligations of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114;

f.      authorizing payment of certain of BNH's fees and expenses incurred in connection with the BNH DIP Facility (including the reasonable documented attorneys' fees, financial advisor fees, if any, and out-of-pocket expenses, if any);

g.      subject to and upon entry of the Final Order, BNH shall have the unqualified right to credit bid any or all of BNH's DIP Obligations in connection with the disposition of BNH's Collateral;

8

53503373

h.  subject only to the challenge rights set forth in the Interim Cash Collateral Order, BNH shall be fully, absolutely, plenarily, and unconditionally released of all liability for any and all claims, causes of action or other rights of the SIMAD Debtor Loan Parties;

i.  scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion on July 13, 2026, at 10:00 a.m., prevailing Eastern time and the entry of the Final Order no later than thirty-two (32) days after entry of the Interim Order, and approving the form of notice with respect to the Final Hearing; and

j.  granting related relief.

**Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-3**

**I.  Concise Statement regarding the BNH DIP Facility.**

16.  The chart below contains a summary of the material terms of the proposed BNH DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-3.[6]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **SIMAD Debtor Borrower(s)** Bankruptcy Rule 4001(c)(1)(B) | Belgrade Lakes Summer Camps LLC, Iafalandco, LLC, Poland Landco LLC, Washington Lake, LLC, Waukeela Landco LLC, Wekeeland LLC and WM Land, LLC. *See* BNH DIP Term Sheet, Page 1. |
| **SIMAD Debtor Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Camp Med-O-Lark, Inc., Iafaoperatingco, LLC, Mainewekeelaco, LLC, Poland Campco LLC, Waukeela Operatingco LLC, and WM Camp, LLC. The SIMAD Debtor Guarantors absolutely and unconditionally guarantee, as a guaranty of performance and payment and not as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, the payment and performance of any and all BNH DIP Obligations (as defined below), subject to, and in accordance with, the terms of the Orders (as defined below). This guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the BNH DIP Obligations or any instrument or agreement evidencing any BNH DIP Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the BNH DIP Obligations which might otherwise constitute a defense to the obligations of any SIMAD Debtor Guarantor under this guaranty other than the irrevocable payment in full in cash and performance of all obligations hereunder, and each SIMAD Debtor Guarantor hereby irrevocably waives any defenses it may now have |

---

[6]  The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the BNH DIP Term Sheet or the Interim Order, as applicable.

53503373

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | or hereafter acquire in any way relating to any or all of the foregoing (other than the defense of payment in full).<br><br>*See* BNH DIP Term Sheet, Page 1. |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Bank of New Hampshire ("BNH" or the "DIP Lender").<br><br>*See* BNH DIP Term Sheet, Page 1. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | Commencing after the third (3rd) full week after the entry of the Interim Order, on or before 5:00 p.m. (prevailing Eastern time) on Thursday of every calendar week ending on Friday, the SIMAD Debtor Loan Parties shall deliver to BNH, BNH's Advisors, and counsel to any Creditors' Committee appointed in the Cases, if any, a budget variance report/reconciliation (each, a "Variance Report") in form reasonably satisfactory to BNH (the "Approved DIP Budget Variance Report"), setting forth in detail (i) the Operating Disbursements for the immediate one-week period ending on the applicable Testing Date; and (ii) as to each material variance contained in the Approved DIP Budget Variance Report and required to be tested, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any such material variance. In addition, the SIMAD Debtor Loan Parties shall provide a detailed, line-by-line computation of actual versus budget deviations on a bi-weekly basis beginning in the third week following entry of the Interim Order, with brief but meaningful commentary for each material line-item deviation (both favorable and unfavorable) when comparing actuals to the Approved DIP Budget for all variances greater than $50,000.<br><br>*See* BNH DIP Term Sheet, Pages 5. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The DIP Obligations shall be due and payable upon the earliest of:<br><br>(i)     the date that is six (6) months after the initial funding of the BNH DIP Loans;<br><br>(ii)    the closing date of the sale of all or substantially all of the SIMAD Debtor Loan Parties' assets pursuant to an order entered by the Bankruptcy Court (or, if multiple closings relating to the SIMAD Debtor Loan Parties, upon the last of such closings);<br><br>(iii)   the acceleration of the BNH DIP Loans and the termination of the BNH DIP Facility by BNH following the occurrence or during the continuation of an Event of Default; and<br><br>(iv)   the confirmation of a plan of reorganization or liquidation of the SIMAD Debtor Borrowers (such earliest date, the "Maturity Date").<br><br>*See* BNH DIP Term Sheet, Pages 2. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Subject to the entry of Orders, BNH shall extend to the SIMAD Debtor Borrowers a senior, secured, priming debtor-in-possession credit facility in an aggregate principal amount of up to $30,000,000, comprised of (i) new money term loans in an aggregate principal amount of up to $10,000,000 (the "New Money Commitments"), with up to $2,000,000 available upon entry of the Interim Order and the remaining principal amount in draws of no less than $8,000,000 in the aggregate upon entry of the Final Order and (ii) upon entry of the Final Order, the Roll-Up Amount of up to $20,000,000 of the BNH Pre-Petition Obligations (as defined in the Interim Cash Collateral Order) (such loans collectively, the "BNH DIP Loans," and collectively with all other obligations owed by the SIMAD Debtor Loan Parties to BNH pursuant to the BNH |

53503373

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | DIP Loan Documents (as defined herein), including all principal and accrued interest, premiums (if any), costs, fees (including the Exit Fee, defined herein) and expenses or any other amounts due (the "BNH DIP Obligations").<br><br>The BNH DIP Obligations shall be secured by the Collateral (as defined in the BNH DIP Term Sheet) and be deemed effective and automatically perfected upon the date of the Interim Order without the necessity of the execution, recordation of filings by the SIMAD Debtor Borrowers of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by BNH of, or over, any Collateral; *provided however*, that BNH may require the execution by the SIMAD Debtor Loan Parties and the recording of certain of such documents, as determined by BNH in its sole discretion.<br><br>*See* BNH DIP Term Sheet, Page 2. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | BNH's commitment to provide the BNH DIP Facility and to enter into the BNH DIP Loan Documents, on the terms and conditions set forth in the BNH DIP Term Sheet, is expressly conditioned on the SIMAD Debtor Loan Parties and BNH reaching agreement on substantially final forms of (i) the BNH DIP Loan Documents, (ii) proposed forms of the Orders, and (iii) a DIP Budget, in each case in form and substance satisfactory to BNH in its sole discretion; *provided* that BNH shall fund the Interim Advance upon entry of the Interim Order and execution of the BNH Term Sheet.<br><br>BNH's obligation to make any BNH DIP Loans will be subject to customary closing conditions for this type of financing in form and substance satisfactory to BNH, in its sole discretion, including: (i) the entry of an Interim Order and, upon expiration of the Interim Order, the entry of a Final Order; (ii) the execution and delivery of the BNH DIP Loan Documents; *provided* that BNH shall fund the Interim Advance upon entry of the Interim Order and execution of the BNH DIP Term Sheet prior to execution and delivery of the BNH DIP Loan Documents; (iii) receipt by BNH of a DIP Budget in form and substance satisfactory to BNH; (iv) no default or Event of Default shall have occurred and be continuing; (v) the SIMAD Debtor Loan Parties shall be in compliance with the Milestones; and (vi) payment of all out-of-pocket costs, fees and expenses required to be paid to BNH.<br><br>*See* BNH DIP Term Sheet, Page 9. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Interest shall accrue on the outstanding principal amount of the BNH DIP Loans at a fixed rate of 10% per annum.  Upon the occurrence and during the continuance of an Event of Default, the BNH DIP Loans and all BNH DIP Obligations will automatically bear interest at an additional 3% per annum.<br><br>*See* BNH DIP Term Sheet, Page 3. |
| **Use of DIP Financing Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-3 | The proceeds of the BNH DIP Facility will be used, in accordance with the terms of the DIP Budget, to provide working capital and for other general corporate purposes of the SIMAD Debtor Loan Parties during the administration of the chapter 11 cases, including the payment of administrative claims allowed in the chapter 11 cases. Notwithstanding the foregoing, no proceeds of the BNH DIP Facility or any Cash Collateral shall be used to pay any fees, costs, or expenses of, or allocated to, any SIMAD Debtors that are not a SIMAD Debtor Loan Party, including any professional fees or administrative expenses of such SIMAD Debtor that is not a SIMAD Debtor Loan Party, unless such fees, costs, or expenses are allocated to such SIMAD Debtor that is not a SIMAD Debtor Loan Party in accordance with an agreed-upon allocation as set forth in the DIP Budget. In no event |

11

53503373

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | shall any proceeds of the BNH DIP Facility or any Cash Collateral be used to satisfy any claim or obligation of a SIMAD Debtor that is not a Loan Party. <br><br> No portion of the BNH DIP Facility, any cash collateral, or the Carve-Out shall be used in connection with asserting any claims or causes of action against BNH or any of its respective advisors, agents and sub-agents, including for formal discovery proceedings in anticipation thereof, or challenging any lien thereof. <br><br> On terms and conditions acceptable to BNH, in its sole discretion, the Orders shall expressly contemplate and authorize the use by the SIMAD Debtor Borrowers of any "cash collateral" (as defined in Bankruptcy Code § 363(a)), pursuant to the DIP Budget. <br><br> *See* BNH DIP Term Sheet, Page 4. |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | As additional adequate protection for the BNH Pre-Petition Obligations, upon entry of the Interim Order, BNH shall receive the Roll-Up Amount, which shall be deemed to constitute BNH DIP Loans and shall be entitled to all of the priorities, liens, and other protections afforded to the BNH DIP Obligations under the BNH DIP Term Sheet and the BNH DIP Loan Documents. The Roll-Up Amount shall be secured by the BNH Pre-Petition Liens, the BNH Adequate Protection Liens, and the BNH DIP Liens. All other amounts owing to BNH in respect of the BNH Pre-Petition Obligations (other than the Roll-Up Amount) shall be secured by the BNH Pre-Petition Liens and the BNH Adequate Protection Liens but shall not be secured by the DIP Liens. <br><br> The SIMAD Debtor Loan Parties shall pay BNH's reasonable and documented attorneys' fees, financial advisor fees, if any, and out-of-pocket expenses incurred in connection with the BNH DIP Facility, the BNH Collateral, or the chapter 11 cases, within ten (10) days of delivery of a statement to the SIMAD Debtor Loan Parties, the U.S. Trustee, and any Creditors Committee  For the avoidance of doubt, these statements shall not be required to be filed with the Bankruptcy Court or be subject to Bankruptcy Court approval. <br><br> *See* BNH DIP Term Sheet, Pages 3. |
| **Roll-Up** <br> Local Rule 4001-2(a)(i)(E) | A 2:1 roll up of $20,000,000 of the BNH Pre-Petition Obligations. <br><br> *See* BNH DIP Term Sheet, Page 2. |
| **Budget and Variance Reporting** <br> Bankruptcy Rule 4001 (c)(1)(B) <br><br> Local Rule 4001-3 | "DIP Budget" shall mean the 13-week cash flow and financial projections of the SIMAD Debtors Loan Parties, covering the period beginning on the date of filing the motion seeking approval of the Orders and ending on the Maturity Date, itemizing on a weekly basis all uses, and anticipated uses, of the BNH DIP Facility, revenues projected to be received and all expenditures proposed to be made during such period. A copy of the DIP Budget is attached hereto as **Exhibit A**. <br><br> Approved DIP Budget: <br><br> On or before the fifth (5th) business day before the end of every four-week period beginning with the date of entry of the Interim Order, the SIMAD Debtor Loan Parties and/or the DIP Lender may request an updated budget, and in such case, the Loan Parties shall deliver to BNH, BNH's Advisors, and counsel to any Creditors' Committee appointed in the Cases, if any, an updated budget for the subsequent 13-week period (a "Subsequent DIP Budget"), which shall be in form and substance acceptable to BNH. The DIP Budget or any Subsequent DIP Budget approved by BNH shall be deemed to constitute the "Approved DIP Budget" for purposes of the Orders, with the most recently |

12

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | delivered budget constituting the "Approved DIP Budget" solely upon approval by BNH (which must be in writing, email being sufficient). In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved DIP Budget" are not met, the prior Approved DIP Budget shall remain in full force and effect and the SIMAD Debtors Loan Parties shall be required to work in good faith with BNH to modify such Subsequent DIP Budget until BNH approves it. Each Approved DIP Budget delivered shall be accompanied by such supporting documentation as requested by BNH and shall be prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof.<br><br>"Budget Period" means the initial four-week period set forth in the Approved DIP Budget in effect at such time.<br><br>Permitted Variances:<br><br>Commencing with the third (3rd) full calendar week after the entry of the Interim Order, Permitted Variances shall be tested on each Friday on a weekly basis for the SIMAD Debtor Loan Parties' actual expenditures (the "Operating Disbursements") (each such date, a "Testing Date"). The SIMAD Debtor Loan Parties shall not permit Operating Disbursements for any one-week period to be more than 115% of the Budgeted Disbursements on an aggregate basis as set forth in the Approved DIP Budget with respect to such period (the "Permitted Variances").  The fees and expenses of Professional Persons (as defined in the BNH DIP Term Sheet) shall not be subject to the Permitted Variances and shall not exceed 100% of the Budgeted Disbursements for such fees and expenses; *provided however*, that nothing in the BNH DIP Term Sheet or Orders shall constitute a waiver of such fees and expenses and the Professional Persons reserve all of their rights to seek allowance and payment thereof. To the extent that actual aggregate disbursements as of any Testing Date are less than the aggregate budgeted disbursements as of such Testing Date (a "Favorable Variance"), such Favorable Variance may be carried forward and added to the permitted disbursements for a subsequent testing period.<br><br>*See* BNH DIP Term Sheet, Pages 5-6. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-3 | The Events of Default, include, without limitation, the following:<br><br>(a)  Failure to make payments to BNH and the adequate protection payments to BNH on the BNH Pre-Petition Obligations when due;<br><br>(b)  Breaches of representations and warranties;<br><br>(c)  The Chapter 11 Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee, receiver, interim receiver or receiver and manager shall be appointed in the Chapter 11 Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in the Chapter 11 Cases;<br><br>(d)   Any super-priority administrative expense claim or lien that is *pari passu* with or senior to the claims, charges or liens of BNH or BNH shall have arisen or be authorized or allowed;<br><br>(e)  Except for payments to BNH with regard to the BNH Pre-Petition Obligations, the SIMAD Debtor Loan Parties shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables, |

13

53503373

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | other than payments authorized by the Bankruptcy Court in orders entered upon pleadings in form and substance satisfactory to BNH, in its sole discretion; *provided that* the "first day" orders entered by the Court on June 17, 2026 are satisfactory to BNH; <br><br> (f) The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to: (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the SIMAD Debtor Loan Parties; or (ii) permit other actions that would have a material adverse effect on the SIMAD Debtor Loan Parties or their estates; <br><br> (g) An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Orders, or the SIMAD Debtor Loan Parties shall apply for the entry of such an order, without the prior written consent of BNH; <br><br> (h) The SIMAD Debtor Loan Parties shall fail to meet or comply with any of the Milestones or the terms of the DIP Budget (including permitted variances); <br><br> (i) Any of the BNH DIP Loan Documents shall cease to be valid or effective or shall be contested by the SIMAD Debtor Loan Parties; <br><br> (j) The SIMAD Debtor Loan Parties shall fail to comply in any respect with the Orders; <br><br> (k) The SIMAD Debtor Loan Parties shall file a chapter 11 plan that does not propose to indefeasibly repay the BNH DIP Obligations in full in cash on the plan effective date, unless otherwise consented to in writing by BNH; <br><br> (l) The filing of any challenge to the pre-petition liens or claims of BNH by any party that is supported by the SIMAD Debtor Loan Parties; <br><br> (m) The SIMAD Debtor Loan Parties shall fail to comply with any of the affirmative covenants, or take any action in violation of any of the negative covenants, set forth in the BNH DIP Loan Documents; <br><br> (n) The SIMAD Debtor Loan Parties shall assert in any pleading that the guarantee contained in the BNH DIP Loan Documents is not valid and binding; <br><br> (o) Cessation of the BNH DIP Liens or the BNH DIP Claims to be valid, perfected and enforceable; and <br><br> (p) Entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the BNH DIP Obligations. <br><br> *See* BNH DIP Term Sheet, Pages 8-9. |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | The SIMAD Debtor Loan Parties shall indemnify, pay and hold harmless BNH (and its directors, officers, employees, professionals and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith, fraud, or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). |

14

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | The BNH DIP Loan Documents and the Orders shall provide for a full, absolute, plenary and unconditional release of BNH of all liability for any and all claims, causes of action or other rights of the SIMAD Debtor Loan Parties, subject only to the challenge rights set forth in the Interim Cash Collateral Order.<br><br>*See* BNH DIP Term Sheet, Page 10. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The "**Carve-Out**" shall be comprised of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (ii) to the extent applicable, all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000, and (iii) subject to and effective upon the entry of the Final Order granting such relief, after the occurrence and during the continuance of an Event of Default ) fees and expenses projected in the DIP Budget that have been incurred by the SIMAD Debtor Loan Parties' professionals or the professionals of a Creditors Committee and remaining unpaid prior to delivery of a Carve-Out Trigger Notice (as defined below), all as may be allowed by the Bankruptcy Court (the "Pre-Trigger Carve-Out"), and (b) after delivery of a Carve-Out Trigger Notice, an amount not exceeding $150,000 in the aggregate to pay any fees or expenses incurred by the SIMAD Debtor Loan Parties' professionals or the professionals of any Creditors Committee (the "Post-Carve-Out Trigger Notice Cap"), provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described above. For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by BNH following the occurrence of an Event of Default, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. No portion of the Carve-Out, any cash collateral or proceeds of the BNH DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, any of BNH's liens or claims, or the initiation or prosecution of any claim or action against BNH, in any capacity.<br><br>*See* BNH DIP Term Sheet, Page 6. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | Interest shall accrue on the outstanding principal amount of the BNH DIP Loans at a fixed rate of 10% per annum.  Upon the occurrence and during the continuance of an Event of Default, the BNH DIP Loans and all BNH DIP Obligations will automatically bear interest at an additional 3% per annum.<br><br>Accrued interest shall be due and payable monthly in arrears on the 15th day of each month, calculated on the basis of the actual number of days elapsed in a 365/366-day year. All remaining accrued and unpaid interest as of the Maturity Date shall be due and payable in cash on the Maturity Date.<br><br>BNH shall receive the Exit Fee equal to 3% of the New Money Commitments (the "Exit Fee") which shall be fully earned and non-refundable upon the entry by the Bankruptcy Court of the Interim Order and payable in cash on the Maturity Date.<br><br>*See* BNH DIP Term Sheet, Page 3. |

53503373

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Stipulations to Prepetition Liens and Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-3 | The BNH DIP Loan Documents and the Orders shall provide for a full, absolute, plenary and unconditional release of BNH of all liability for any and all claims, causes of action or other rights of the SIMAD Debtor Loan Parties, subject only to the challenge rights set forth in the Interim Cash Collateral Order.<br><br>*See* BNH Term Sheet, Page 10. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-3 | All BNH DIP Obligations shall:<br><br>(a) be claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (the "BNH DIP Superpriority Claims"); and<br><br>(b) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first-priority, priming lien (the "BNH DIP Liens") on all assets and property of the SIMAD Debtor Loan Parties, whether now owned or hereafter acquired, and proceeds thereof (collectively, the "Collateral"); *provided that* the granting of the BNH DIP Liens on any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any, shall be subject to entry of the Final Order granting such relief.<br><br>*See* BNH DIP Term Sheet, Page 6. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The obligations of BNH to advance the BNH DIP Loans shall be subject to the SIMAD Debtor Loan Parties satisfying, or causing the satisfaction of, the milestones related to the Chapter 11 Cases set forth below by the specified date or such later date as BNH may agree in writing (email being sufficient):<br><br>(a) The Interim Order shall be entered no later than five (5) days after the filing of this Motion;<br><br>(b) All BNH DIP Loan Documents shall be duly executed and delivered no later than twenty-one (21) days after entry of the Interim Order;<br><br>(c) The Final Order shall be entered no later than thirty-two (32) days after the entry of the Interim Order; and<br><br>(d) Such other Milestones to be included in the BNH DIP Documents that are consistent with the *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* entered by the Bankruptcy Court at Docket No. 298.<br><br>*See* BNH DIP Term Sheet, Page 7. |

16

53503373

**The BNH DIP Facility**

I.     **The SIMAD Debtor Borrowers' Need Access to Financing and the Use of Cash Collateral.**

17.     Subsequent to the Petition Date, the SIMAD Debtor Borrowers, in consultation with their proposed financial advisor, FTI Consulting, Inc. ("FTI"), analyzed their liquidity needs and prepared projections of postpetition cash requirements for the initial thirteen (13) weeks of these chapter 11 cases (the "Initial DIP Budget"). *See* Pizzo Decl. ¶ 10. FTI evaluated anticipated cash flows and key cost drivers, including employee-related expenses, critical vendor payments, restructuring costs (including professional fees), and interest and expenses associated with the BNH DIP Facility to develop the Initial DIP Budget. *See* Pizzo Decl. ¶ 10. Based on this analysis, the SIMAD Debtor Loan Parties determined that immediate access to the BNH DIP Facility is essential to support the orderly opening and operation of the camps and to preserve and maximize the value of their estates.

18.     Without access to the liquidity provided by the BNH DIP Facility, including up to $10 million in new money, the SIMAD Debtor Borrowers lack sufficient cash to fund near-term operations during the critical opening period, including payroll, payments to essential vendors, and other key operating expenses. *See* Pizzo Decl. ¶ 11. As the SIMAD Debtor Borrowers enter their peak season, with campers arriving on a rolling basis, they must meet these obligations in real time to ensure safe and continuous operations. *See* Pizzo Decl. ¶ 12. Absent this additional liquidity, the SIMAD Debtor Borrowers would be unable to fully fund operations at certain camps, creating a risk of disruption across the SIMAD Debtor Borrowers' camps. *See* Pizzo Decl. ¶ 12.

19.     The BNH DIP Facility is specifically designed to address these remaining liquidity shortfalls, particularly at camps not supported by existing financing, and to ensure uninterrupted operations across all locations. Access to this incremental financing will not only allow the

17

SIMAD Debtor Borrowers to meet immediate obligations, but will also provide confidence to campers, families, employees, and vendors that the SIMAD Debtor Borrowers are positioned to continue operating in the ordinary course during these chapter 11 cases. *See* Pizzo Decl. ¶ 13. Any disruption at one or more of the SIMAD Debtor Loan Parties' camps could have cascading effects across the enterprise, including eroding stakeholder confidence and harming the value of the estates when the SIMAD Debtor Loan Parties are seeking a going-concern transaction. *See* Pizzo Decl. ¶¶ 13-14.

20.     Together, the BNH DIP Facility and the continued use of Cash Collateral will allow the SIMAD Debtor Borrowers to continue operations and to facilitate and effectuate a comprehensive restructuring. The SIMAD Debtor Loan Parties therefore believe the immediate use of Cash Collateral and entry into the BNH DIP Facility are essential to preserve and maximize the value of their estates and adequately administer these chapter 11 cases.

**A.     The BNH DIP Facility is Fair and Reasonable.**

21.     In light of the SIMAD Debtor Borrowers' immediate liquidity needs and operational demands, postpetition financing is required to sustain operations and administer these chapter 11 cases. *See generally* Pizzo Decl. Prior to entering into the BNH DIP Loan Documents, the SIMAD Debtor Loan Parties, with the assistance of their advisors, explored potential financing alternatives, including outreach to BNH and other existing secured lenders.

22.     Given the SIMAD Debtors' compressed timeline, it became apparent that BNH, an existing secured stakeholder with familiarity with the SIMAD Debtor Loan Parties' business, assets, and capital structure, provided a fair, reasonable and reliable source of financing. BNH and the SIMAD Debtor Loan parties engaged in extensive, good-faith, arm's-length negotiations regarding the terms of the BNH DIP Facility. *See* Pizzo Decl. ¶¶ 17-18. BNH's existing relationship with and knowledge of the SIMAD Debtor Loan Parties reduced diligence

53503373

requirements and enabled expedited execution, an outcome that is critical under the circumstances. *See* Pizzo Decl. ¶ 17.

23.     The BNH DIP Facility ensures that the SIMAD Debtor Borrowers have the liquidity necessary to meet payroll, satisfy vendor obligations, and maintain safe and continuous operations across their camps, thereby preserving enterprise value and stabilizing the business. *See* Pizzo Decl. ¶ 13.   Access to the BNH DIP Facility will also provide critical assurance to stakeholders that the SIMAD Debtor Borrowers are adequately funded and capable of continuing operations while pursuing value-maximizing strategies in these chapter 11 cases. *See* Pizzo Decl. ¶ 13.

24.     Importantly, the BNH DIP Facility represents a targeted, incremental financing solution that fills discrete liquidity gaps not addressed by the SIMAD Debtor Loan Parties' existing financing arrangements.   In light of the SIMAD Debtor Loan Parties' exigent circumstances, limited alternatives, and need for immediate and reliable funding, the terms of the BNH DIP Facility are fair and reasonable and reflect a sound exercise of the SIMAD Debtor Loan Parties' business judgment.

**B.      The BNH DIP Facility is Necessary to Preserve the Value of the SIMAD Debtor Loan Parties' Estates.**

25.     Absent the additional the liquidity infusion provided by the BNH DIP Facility, the SIMAD Debtor Borrowers would experience significant business disruption, would need to substantially scale back or potentially cease their operations, impacting the lives and summer plans of thousands campers and their families, and staff members, and could potentially have a devastating impact on the future of each of the SIMAD Debtor Loan Parties' camp's respective operations and ability to retain their camper base, and would face numerous other value-destructive consequences, including not only the risk of harm to employees, but also to the critical vendor

19

53503373

relationships that sustain the SIMAD Debtors Loan Parties' business. *See* Pizzo Decl. ¶ 13. The SIMAD Debtor Loan Parties' business is seasonal and dependent on their ability to operate seamlessly during the summer months. *See* Pizzo Decl. ¶ 13. Any disruption would have an immediate and disproportionate impact on the SIMAD Debtor Loan Parties' business. Access to the proposed BNH DIP Facility ensures that the SIMAD Debtor Borrowers have sufficient liquidity to maintain operations, fund payroll and vendor obligations, and continue delivering the experience to campers to which they have grown accustomed, maintain normal levels of camper retention and thereby preserving their businesses as a going concern. *See* Pizzo Decl. ¶ 13.

26.     Further, the proposed BNH DIP Facility will provide the SIMAD Debtor Loan Parties' campers, employees, contract counterparties, suppliers, and other stakeholders with assurance that these chapter 11 cases are sufficiently funded and that the SIMAD Loan Parties' business is on the path to improved, sustainable results. *See* Pizzo Decl. ¶ 14. This is particularly important given that the SIMAD Debtor Loan Parties rely upon advanced enrollments and upon their longstanding reputation in the marketplace. *See* Pizzo Decl. ¶ 14. The BNH DIP Facility will provide the SIMAD Debtor Borrowers with sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the SIMAD Debtor Loan Parties seek to pursue other value-maximizing transactions. Without the proposed BNH DIP Facility, the SIMAD Debtor Borrowers would be forced into reactive and value-destructive maneuvers, including the potentially ceasing operations right before the camps are set to open. *See* Pizzo Decl. ¶ 14. The BNH DIP Facility positions the SIMAD Debtor Loan Parties to stabilize their operations and conduct a deliberate and value-maximizing process for the benefit of all stakeholders. *See* Pizzo Decl. ¶ 14.

20

53503373

27.     Accordingly, the BNH DIP Facility pending approval before the Court is a fair and reasonable option available to the SIMAD Debtor Loan Parties given the timing constraints and under the facts and circumstances of these chapter 11 cases. Entry into the BNH DIP Facility positions the SIMAD Debtor Loan Parties for success during these chapter 11 cases and therefore should be approved.

**Basis for Relief**

**I.      The SIMAD Debtor Loan Parties Should Be Authorized to Obtain Postpetition Financing Through the BNH DIP Loan.**

**A.      Entry into the BNH DIP Loan Is a Sound Exercise of the SIMAD Debtor Loan Parties' Business Judgment.**

28.     The Court should authorize the SIMAD Debtor Loan Parties, as an exercise of their sound business judgment, to enter into the BNH DIP Loan Documents and obtain access to the BNH DIP Facility.

29.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances, as discussed in more depth below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

21

53503373

30. Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

31. Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP Lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the SIMAD Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*** This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a

53503373

> confirmable reorganization plan. That which helps foster consensus
> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

32.     The SIMAD Debtor Loan Parties' determination to move forward with the BNH DIP Facility is a sound exercise of their business judgment. *See* Pizzo Decl. ¶ 20. The SIMAD Debtor Loan Parties and their advisors determined that the SIMAD Debtor Borrowers would require postpetition financing to stabilize their operations, which they propose to obtain through, among other sources, the BNH DIP Facility. Access to the proposed BNH DIP Facility will enable the SIMAD Debtor Borrowers to (a) operate their summer camps, (b) send a clear, compelling "business as usual" message to campers and their families, employees, and vendors, (c) fund the administration of these chapter 11 cases, (d) fund the Carve Out, finance payroll and other working-capital needs, and (f) preserve going-concern value throughout the chapter 11 process. *See* Pizzo Decl. ¶ 20. Without immediate access to the BNH DIP Facility, the SIMAD Debtor Borrowers would experience significant business disruption and would face a number of other value-destructive consequences, including not only the risk of harm to campers, but also to employees and the critical vendor relationships that sustain the SIMAD Borrowers' business, and would alarm the camp families at the other SIMAD Debtor Loan Parties' camps and threaten their future enrollment. *See* Pizzo Decl. ¶ 13.

33.     The BNH DIP Facility specifically addresses the SIMAD Debtor Borrowers' immediate go-forward funding needs. The SIMAD Debtor Borrowers and their advisors determined that the BNH DIP Facility provides certainty with respect to the capital required to fund camp operations and the administration of these Chapter 11 Cases. Finally, the SIMAD Debtor Loan Parties and their advisors intend to continue market-checking the BNH DIP Facility

23

53503373

and the BNH's proposal for alternative proposals during the interim period. *See* Pizzo Decl. ¶¶ 19-21.

34.     For these reasons, the SIMAD Debtor Loan Parties, in consultation with their advisors, determined that BNH's financing proposal represents a reasonable and fair postpetition financing option available to the SIMAD Debtor Loan Parties.  Accordingly, the Court should authorize the SIMAD Debtor Loan Parties' entry into the BNH DIP Loan Documents as a reasonable exercise of the SIMAD Debtor Loan Parties' business judgment.

**B.      The SIMAD Debtor Loan Parties Should Be Authorized to Grant Liens and Superpriority Claims to BNH.**

35.     The SIMAD Debtor Loan Parties propose to obtain financing under the BNH DIP Facility by providing security interests and liens as set forth in the BNH DIP Loan Documents pursuant to section 364 of the Bankruptcy Code.  Specifically, the SIMAD Debtor Loan Parties propose to provide BNH postpetition security interests in and liens on BNH's Collateral that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order (except for BNH DIP Liens on any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code which shall be subject to entry of the Final Order).

36.     The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities and were a necessary feature to provide security for the proposed financings.  Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets. *See, e.g.*, *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 4, 2024) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law on a final basis); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP)

24

53503373

(Bankr. D.N.J. Feb. 29, 2024) (same); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (same); *In re Rite Aid Corporation*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 17, 2023); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (same).

37.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."   11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).   Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.     the credit transaction is necessary to preserve the assets of the estate; and

c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

38.     The SIMAD Debtor Loan Parties satisfy each part of this test.  First, as described herein and in the Pizzo Declaration, the SIMAD Debtor Borrowers would experience significant business disruption during the most crucial time of the year for the SIMAD Debtor Borrowers' business, these disruptions would also likely threaten future enrollment at other SIMAD Debtor

25

53503373

Loan Parties' camps.  Absent the cash infusion to be provided by the BNH DIP Facility, the SIMAD Debtor Borrowers risk jeopardizing camp opening and continuing operations, negatively impacting relationships with essential vendors and suppliers, and ultimately deteriorating the high-quality camp experience provided to campers.  *See* Pizzo Decl. ¶¶ 13-14.  Second, the SIMAD Debtor Loan Parties believe that the terms of the BNH DIP Facility, as set forth in the BNH DIP Loan Documents, are reasonable in light of the circumstances and represent a reasonable path to funding within the time frame required.  *See* Pizzo Decl. ¶ 18.  Finally, the SIMAD Debtor Loan Parties were unable to procure an alternative debtor-in-possession financing on expedited circumstances, because of, among other reasons, such parties' lack of desire to provide a financing facility on a junior or unsecured basis.  *See* Pizzo Decl. ¶ 18.  For all of these reasons, the SIMAD Debtor Loan Parties have met the standard for obtaining postpetition financing under section 364 of the Bankruptcy Code.

39.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the SIMAD Debtor Loan Parties are unable to obtain unsecured credit.  *See* Pizzo Decl. ¶ 18.  Therefore, approving the BNH DIP Superpriority Claims and BNH DIP Liens is reasonable and appropriate.

40.    Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after

53503373

notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The SIMAD Debtor Borrowers may incur "priming" liens under the BNH DIP Facility if the SIMAD Debtor Borrowers (a) obtain consent or (b) their interests in the collateral are adequately protected.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  As described in the Pizzo Declaration, the SIMAD Debtor Loan Parties are not able to obtain postpetition financing on an unsecured or junior basis.  *See* Pizzo Decl. ¶ 18.  Accordingly, approving priming liens in the SIMAD Debtor Loan Parties' Collateral pursuant to section 364(d)(1) in favor of BNH is reasonable, necessary and appropriate.[7]

**C.      No Alternative to the BNH DIP Facility Is Reasonably Available Given the SIMAD Debtor Borrowers' Immediate Liquidity Needs.**

41.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364I of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d

---

[7]   The SIMAD Debtor Borrowers continue to engage with the secured lenders whose existing liens and security interests will be primed upon the approval of the BNH DIP Facility.  The SIMAD Debtor Loan Parties submit that those lenders remain adequately protected notwithstanding the priming of their liens and security interests and if the SIMAD Debtor Borrowers are unable to obtain their consent, the SIMAD Debtor Loan Parties will, as applicable, seek approval of the priming liens over their objection.

27

1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

42.     The SIMAD Debtor Loan Parties do not believe that alternative postpetition financing is reasonably available under the circumstances of these chapter 11 cases.  The SIMAD Debtor Loan Parties, in consultation with their advisors, undertook a reasonable and good-faith effort to identify alternative sources of financing under the circumstances.   *See* Pizzo Decl. ¶ 18. Such effort was necessarily constrained by the SIMAD Debtor Borrowers' immediate liquidity needs and the compressed timeline on which financing was required.  *See* Pizzo Decl. ¶ 18.  As a result, while the SIMAD Debtor Loan Parties engaged with multiple potential financing sources, the SIMAD Debtor Loan Parties were ultimately unable to obtain any alternative proposal that could both satisfy their liquidity requirements and be implemented within the timeframe dictated by their operational demands. *See* Pizzo Decl. ¶ 18.   As a result, the SIMAD Debtor Loan Parties submit that they have satisfied the requirement of section 364 of the Bankruptcy Code.

## II.     BNH Should Be Deemed A Good-Faith Lender Under Section 364(m).

43.     Section 364 of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect

53503373

the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

44. As explained herein and in the Pizzo Declaration, the BNH DIP Loan Documents are the result of: (a) the SIMAD Debtor Loan Parties' determination that under the current circumstances the BNH DIP Facility provides the only viable postpetition financing alternative available to the SIMAD Debtor Borrowers and (b) heavily negotiated, arm's-length, good-faith negotiations between the SIMAD Debtor Loan Parties and BNH. *See generally* Pizzo Decl. The SIMAD Debtor Loan Parties submit that the terms and conditions of the BNH DIP Loan Documents are reasonable under the circumstances, provide certainty on timing, and the proceeds of the BNH DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the BNH DIP Loan Documents other than as described herein. Accordingly, the Court should find that BNH are "good faith" lenders within the meaning of section 364(m) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## III. The Automatic Stay Should Be Modified on a Limited Basis.

45. The BNH DIP Term Sheet and proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code may be modified to allow BNH to file any financing statements, notice of liens or similar instruments in order to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the SIMAD Debtor Loan Parties to grant liens to BNH and to incur all liabilities and obligations as set forth in the Interim Order. Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default and an appropriate opportunity for the SIMAD Debtor Loan Parties to obtain appropriate relief

29

53503373

from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit

BNH to exercise all rights and remedies in accordance with the BNH DIP Loan Documents.

46.     Stay modifications of this kind are ordinary and standard features of

debtor-in-possession financing arrangements and, in the SIMAD Debtor Loan Parties' business

judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In

re Thrasio Holdings, LLC*, No. 24-11840 (CMG) (Bankr. D.N.J. April 4, 2024) (modifying the

automatic stay as necessary to effectuate the terms of the order); *In re Careismatic Brands, LLC*,

No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) (same); *In re Rite Aid Corp.*, No. 23-18992

(MBK) (Bankr. D.N.J. Dec. 22, 2023) (same); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr.

D.N.J. May 30, 2024) (same); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June

6, 2023) (same).

**IV.     Failure to Obtain Immediate Interim Access to the BNH DIP Facility Would Cause
Immediate and Irreparable Harm.**

47.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to

section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service

of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing

on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and

irreparable harm to a debtor's estate.

48.     For the reasons noted above and as set forth in the Pizzo Declaration, the SIMAD

Debtor Borrowers have an immediate postpetition need to access the liquidity provided by the

BNH DIP Facility.  *See* Pizzo Decl. ¶ 9-10.  The SIMAD Debtor Borrowers will use cash to fund

the operation of their camps, in the first instance, and to pursue a value-maximizing transaction(s).

*See generally* Pizzo Decl.  The SIMAD Debtor Borrowers will therefore be unable to operate their

53503373

business or otherwise fund these chapter 11 cases without access to postpetition liquidity and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest, including the SIMAD Debtor Guarantors.  In short, the SIMAD Debtor Borrowers' ability to open and operate is contingent on their ability to obtain financing.  The SIMAD Debtor Loan Parties need liquidity in order to administer these chapter 11 cases and maximize the value of the SIMAD Debtor Loan Parties' estates.  Furthermore, any disruption to the SIMAD Debtor Borrowers' camps threatens to disrupt the SIMAD Debtor Loan Parties' business and cause irreparable harm.

49.     The SIMAD Loan Parties request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the SIMAD Debtor Borrowers, from and after entry of the Interim Order until the Final Hearing, to access and receive funds from the Interim Advance. The SIMAD Debtor Borrowers require the Interim Advance prior to the Final Hearing and entry of the Final Order to continue operating, and to implement the relief requested in the SIMAD Debtors' other "first day" motions.  This relief will enable the SIMAD Debtor Borrowers' camps to remain open which will avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

50.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the SIMAD Debtors request that the Court schedule the Final Hearing on July 13, 2026, at 10:00 a.m., prevailing Eastern time, and fix **4:00 p.m., prevailing Eastern time, on July 6, 2026** as the time and date for any objections or responses to entry of the Final Order to be filed and served.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

51.     To implement the foregoing successfully, the SIMAD Debtor Loan Parties seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an

31

53503373

order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

### Reservation of Rights

52.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the SIMAD Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the SIMAD Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is a secured claim, an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission by the SIMAD Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the SIMAD Debtors' estates; (g) a waiver or limitation of the SIMAD Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the SIMAD Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or

53503373

(k) otherwise affecting the SIMAD Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the SIMAD Debtors' rights to subsequently dispute such claim.

### <u>Notice</u>

53.    The SIMAD Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of New Jersey; (b) counsel to BNH; (c) counsel to the Mishmeret Trust Company; (d) the SIMAD Debtors' fifty (50) largest unsecured creditors (on a consolidated basis); (e) any known secured creditors; (f) the merchant cash advance lenders; (g) the United States Attorney's Office for the District of New Jersey; (h) the Internal Revenue Service; (i) the attorney general in the states where the SIMAD Debtors conduct business operations; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The SIMAD Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of Page Intentionally Left Blank*]

53503373

**WHEREFORE**, the SIMAD Debtors Loan Parties request that the Court enter the Orders, in substantially the forms submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: June 27, 2026

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            dbass@coleschotz.com
            fyudkin@coleschotz.com
            dharris@coleschotz.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

53503373

# Exhibit A

## Interim Order

53503373

<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

---

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Co-Counsel for Debtors and Debtors-in-Possession*

---

In re:

SIMAD HOLDINGS LTD., *et al.*,[1]

    Debtors.

</td><td>

Chapter 11

Case No. 26-16388 (CMG)

(Jointly Administered)

</td></tr>
</table>

---

[1] A complete list of the debtors being jointly administered under lead case In re SIMAD Holdings Ltd., *et al.*, Case No. 26-16388 (CMG) (collectively, the "Debtors") and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through sixty-nine (69), is

**ORDERED**.

(Page 3)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Cases"), pursuant to sections 105, 361, 362, 363, 364, 506(c), 507, and 552 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001, 6004, and 9013 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"), seeking entry of this interim order (this "Interim Order"):

(i) authorizing the Debtors listed as borrowers in the DIP Term Sheet (the "SIMAD Debtor Borrowers") to obtain postpetition, superpriority, senior secured, priming debtor-in-possession financing (including the New Money DIP Loans and the Roll-Up DIP Loans (each as defined herein), the "DIP Facility") in an aggregate principal amount not to exceed $30,000,000 (inclusive of the New Money DIP Loans and the Roll-Up DIP Loans) (such loans, the "DIP Loans") from Bank of New Hampshire (in its capacity as a debtor-in-possession financing lender, the "DIP Lender"), in each case in accordance with the terms and conditions set forth in the DIP Term Sheet attached hereto as **Exhibit A** (the "DIP Term Sheet"), by and among the SIMAD Debtor Borrowers, the guarantors in the DIP Term Sheet (the "SIMAD Debtor Guarantors," and together with the SIMAD Debtor Borrowers, the "SIMAD Debtor Loan Parties"), and the DIP Lender, and on such other terms and conditions as set forth in the DIP Loan Documents (as defined in the DIP Term Sheet), consisting of:

(a) New Money DIP Loans. An aggregate principal amount of up to $10,000,000 in superpriority secured new money term loans (the "New Money Commitments") comprising (a) up to $2,000,000 in the aggregate principal amount available upon entry of this Interim Order (the "Interim Advances"), and (b) no less than $8,000,000 in the aggregate principal amount available upon entry of the Final Order (the "Final New Money DIP Loans," and together with the Interim Advances, the "New Money DIP Loans"); and

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms later in this Interim Order, the Motion, or the DIP Loan Documents, as applicable.

(Page 4)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

(b)  Roll-Up DIP Loans.  A roll-up of $20,000,000 (the "Roll-Up DIP Loans") of the Prepetition Obligations (as defined herein), calculated in accordance with the DIP Loan Documents;

(ii)  authorizing the SIMAD Debtor Loan Parties to (a) execute and deliver the DIP Loan Documents, (b) borrow funds under the DIP Facility pursuant to the terms set forth in the DIP Term Sheet and this Interim Order, (c) incur the DIP Obligations (as defined herein), and (d) perform such other and further acts as may be necessary, desirable, or appropriate in connection therewith;

(iii)  authorizing the SIMAD Debtor Loan Parties to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), (a) solely in accordance with the Approved DIP Budget (as defined herein) subject to any Permitted Budget Variances (as defined herein) set forth herein and in the DIP Term Sheet, and (b) to provide working capital for, and for other general corporate purposes of, the SIMAD Debtor Loan Parties, including for the payment of the Carve-Out (as defined herein) and for payment of any Adequate Protection Professional Fees and Expenses (as defined herein), in each case solely in accordance with the Approved DIP Budget subject to any Permitted Budget Variances;

(iv)  granting adequate protection to the Prepetition Lender (as defined herein) to the extent of any Diminution in Value (as defined herein) of its interests in the Prepetition Collateral;

(v)  granting the DIP Lender valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in the Prepetition Collateral, whether any such foregoing property is presently-owned or after-acquired, and each SIMAD Debtor Loan Party's estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined herein), subject only to the Carve-Out;

(vi)  to the extent provided by the Bankruptcy Code, granting superpriority administrative expense claims against each of the SIMAD Debtor Loan Party's estate to the DIP Lender with respect to the DIP Obligations with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve-Out on the terms and conditions set forth herein and in the DIP Loan Documents;

(vii)  authorizing payment of certain fees and expenses, including, but not limited to, any indemnity obligations to the Indemnified Parties (as defined herein);

4

(Page 5)
Debtors:            SIMAD HOLDINGS, LTD., *et al.*
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
(II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
and Providing Superpriority Administrative Expense Claims, (IV) Granting
Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
Final Hearing, and (VII) Granting Related Relief

---

(viii)   subject to and effective upon entry of the Final Order granting such relief, waiving the SIMAD Debtor Loan Parties' and the estates' right to surcharge the Prepetition Collateral or the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(ix)   subject to and effective upon entry of the Final Order granting such relief, and to the extent set forth herein, for the "equities of the case" exception under section 552(b) of the Bankruptcy Code to not apply to the Prepetition Lender and the DIP Lender with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable;

(x)   subject to and effective upon entry of a Final Order granting such relief, waiving the equitable doctrine of marshaling with respect to the Prepetition Lender and the DIP Lender;

(xi)   scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a final order (the "Final Order") and approving the form of notice with respect to the Final Hearing; and

(xii)   granting related relief.

The Court having considered the Motion, the exhibits thereto, the *Declaration of Assaf Ravid, Chief Restructuring Officer of the SIMAD Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 62] (the "First Day Declaration"), the *Declaration of Assaf Ravid, Chief Restructuring Officer of the SIMAD Debtors, in Support of the SIMAD Debtors' Emergency Motion for Entry of an Interim Order (I) Authorizing the SIMAD Debtors Immediate Use of Cash Collateral and Existing Bank Accounts for Purposes of Satisfying Prepetition Gross Salaries, Payroll Taxes, and Other Critical Expenses, (II) Authorizing the SIMAD Debtors to Satisfy and Direct Payroll Banks to Honor Certain Prepetition Gross Salaries and Payroll Taxes of Their Employees, (III) Authorizing the SIMAD Debtors Continued Use of Their Cash Management System, Honor Certain Prepetition Obligations Related Thereto, and*

5

(Page 6)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

*Continue Additional Transactions, and (IV) Granting Related Relief* [Docket No. 7], the *Declaration of Christopher Pizzo, In Support of the SIMAD Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the SIMAD Debtor Loan Parties to Obtain Postpetition Financing from Bank of New Hampshire, (II) Authorizing the SIMAD Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Pizzo Declaration") filed contemporaneously herewith, and the other evidence submitted or adduced and the arguments of counsel made at the interim hearing (the "Interim Hearing") held on [June 29], 2026; and the Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the SIMAD Debtor Loan Parties' entry into the DIP Term Sheet and the other DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the interim relief

6

(Page 7)

Debtors:               SIMAD HOLDINGS, LTD., *et al.*
Case No.               26-16388 (CMG)
Caption of Order:      Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                       (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                       and Providing Superpriority Administrative Expense Claims, (IV) Granting
                       Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                       Final Hearing, and (VII) Granting Related Relief

granted herein need be given under the circumstances; and after due deliberation and

consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE
COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:**[3]

      A.     *Petition Date*.  On June 4, 2026 and June 5, 2026 (collectively, the "Petition Date"),
each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the
United States Bankruptcy Court for the District of New Jersey (the "Court") commencing the
Cases.  On June 8, 2026, the Court entered an order approving joint administration of the Cases.

      B.     *Debtors-in-Possession*.  The Debtors continue to manage and operate their
businesses and properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the
Bankruptcy Code.  No trustee or examiner has been appointed in the Cases.

      C.     *Jurisdiction and Venue*.  The Court has jurisdiction over the Motion, the Cases, and
the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing
Order of Reference* of the United States District Court for the District of New Jersey, entered on
July 23, 1984 and amended on June 6, 2025 (Bumb, C.J.).  The Court may enter a final order
consistent with Article III of the United States Constitution.  Venue for the Cases and proceedings
on the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings
of fact, pursuant to Bankruptcy Rule 7052.

(Page 8)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

D.     *Creditors' Committee*.  As of the date hereof, the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (any such committee, the "Creditors' Committee").

E.     *Notice*.  Notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing is or shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, for purposes of Bankruptcy Rule 6003.

F.     *Debtors' Stipulations*.  Subject only to the rights of parties in interest specifically set forth in paragraph 12 of this Interim Order (and subject to the limitations thereon contained in such paragraph or otherwise in this Interim Order), the Debtors stipulate and agree that (collectively, paragraphs F(i) through (iv) below are referred to herein as the "Debtors' Stipulations"):

(i)     *Prepetition Loans*.

(a)     Prepetition Loan Documents.  That prior to the Petition Date, Bank of New Hampshire (in its capacity as a prepetition lender, the "Prepetition Lender") made (i) a loan in the original principal amount of $27,000,000.00, evidenced by that certain Loan Agreement and Promissory Note each dated as of December 14, 2021, and (ii) a loan in the original principal

(Page 9)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

amount of $6,000,000.00, evidenced by that certain Loan Agreement and Promissory Note each dated as of July 21, 2023 (collectively, the "Prepetition Loans"), in each case to the following Debtors, as borrowers: Belgrade Lakes Summer Camps LLC, Iafalandco, LLC, Poland Landco LLC, Washington Lake, LLC, Waukeela Landco LLC, Wekeeland LLC, and WM Land, LLC (collectively, the "Prepetition Borrowers"). The Prepetition Loans are guaranteed by the following Debtors: Camp Med-O-Lark, Inc., Iafaoperatingco, LLC, Mainewekeelaco, LLC, Poland Campco LLC, Waukeela Operatingco LLC, and WM Camp, LLC (collectively, the "Prepetition Guarantors," and together with the Prepetition Borrowers, the "Prepetition Loan Parties").[4] The Debtors further stipulate that the Prepetition Loans and the obligations thereunder are secured by first priority liens and security interests against substantially all of the assets of the Prepetition Loan Parties, granted pursuant to certain related agreements, instruments, and other documents executed in connection therewith (collectively, together with the Prepetition Loans, the "Prepetition Loan Documents"), including, without limitation, and as further described on Schedule 1 attached hereto, (i) mortgages and assignments of leases and rents on the camp properties owned by the Prepetition Borrowers, (ii) security agreements executed by each of the Prepetition Loan Parties in favor of the Prepetition Lender, and (iii) pledge and security agreements pursuant to which the membership interests in the Prepetition Loan Parties were pledged to the

---

[4]   The Prepetition Loans are also guaranteed by the following non-debtor entities: Shabsels Gift LLC, Shabsels Gift Trust, Shabsels Management LLC, Shabsels Management Trust, and the affiliated debtors: SIMAD Holdings LLC and DAMIS Holdings LLC (chapter 11 casess pending in this District at Case No. 26-16515), Michael Aaron Shabsels (chapter 11 case pending in this District at Case No. 26-16529), and David Arthur Shabsels (chapter 11 case pending in this District at Case No. 26-16530).

(Page 10)
Debtors:            SIMAD HOLDINGS, LTD., *et al.*
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Providing Superpriority Administrative Expense Claims, (IV) Granting
                    Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                    Final Hearing, and (VII) Granting Related Relief

Prepetition Lender as collateral.  The liens and security interests securing the Prepetition Loans

are referred to herein as the "Prepetition Liens."  The collateral covered by the Prepetition Loan

Documents, together with all cash proceeds thereof, is referred to herein as the "Prepetition

Collateral."

(b)     Prepetition Obligations.  As of the Petition Date, the Prepetition Loan

Parties, without defense, counterclaim, or offset of any kind, were jointly and severally indebted

to the Prepetition Lender in the aggregate principal amount of not less than $29,110,292.91

pursuant to, and in accordance with, the Prepetition Loan Documents plus (i) accrued and unpaid

interest thereon at the default rate through the Petition Date, (ii) all costs, fees, expenses, and

charges payable under the Prepetition Loan Documents (including, without limitation, reasonable

and documented fees and expenses of the Prepetition Lender's attorneys and, as applicable,

financial advisors) and other obligations incurred in connection therewith, (iii) any other loans,

advances, and other financial accommodations made pursuant to or in connection with the

Prepetition Loan Documents by the Prepetition Lender, and (iv) all other payment obligations of

the Prepetition Loan Parties arising under or in relation to any Prepetition Loan Document

(collectively, in each case whether now existing or hereafter arising, due or to become due, direct

or indirect, absolute or contingent, and howsoever evidenced, held or acquired, the "Prepetition

Obligations").

(ii)     *Validity, Perfection, and Priority of Prepetition Liens and Prepetition
Obligations*.

10

(Page 11)
Debtors:            SIMAD HOLDINGS, LTD., *et al.*
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Providing Superpriority Administrative Expense Claims, (IV) Granting
                    Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                    Final Hearing, and (VII) Granting Related Relief

(a)      The Debtors acknowledge and agree that, as of the Petition Date, (i) the Prepetition Liens on the Prepetition Collateral were and continue to be valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Lender for fair consideration and reasonable equivalent value; (ii) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to any liens determined by a court of competent jurisdiction to have been senior to the Prepetition Liens as of the Petition Date; (iii) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the applicable Prepetition Loan Party enforceable in accordance with the terms of the applicable Prepetition Loan Documents; (iv) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (v) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Lender or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees arising out of, based upon or related to the Prepetition Loan Documents or any payment made to the Prepetition Lender or applied to or paid on account of the obligations owing under the Prepetition Loan Documents prior to the

11

(Page 12)
Debtors:           SIMAD HOLDINGS, LTD., *et al.*
Case No.           26-16388 (CMG)
Caption of Order:  Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

Petition Date; and (vi) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens securing the Prepetition Obligations.

(iii)   *Cash Collateral*.   Any and all of the Prepetition Loan Parties' cash, including, without limitation, any amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Prepetition Loan Parties, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date or deposited into the Prepetition Loan Parties' banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing is the Prepetition Lender's cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral").   For purposes of this Interim Order, the term "Cash Collateral" shall also mean and include all "cash collateral" as defined by section 363(a) of the Bankruptcy Code and shall include and consist of the cash collateral of each Prepetition Loan Party, including, without limitation, all of the cash proceeds of the Prepetition Collateral and the BNH Post-Petition Collateral (as defined in the hereinafter defined Interim Cash Collateral Order) of each Prepetition Loan Party.   Cash Collateral of each Prepetition Loan Party constitutes Prepetition Collateral securing the Prepetition Obligations in favor of the Prepetition Lender.

(iv)   *Bank Accounts*.   The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to the *Interim Order SIMAD Debtors' Motion for Entry*

12

(Page 13)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

*of Interim and Final Orders (I) Authorizing the SIMAD Debtors to (A) Continue Using Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing SIMAD Debtors' Bank Accounts, Business Forms, and Books and Records, (D) Authorize Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 137] (the "Cash Management Order").

G.    *Findings Regarding the DIP Facility and Use of Cash Collateral*.(i)    The SIMAD Debtor Loan Parties have an immediate need to obtain the DIP Facility and to use Cash Collateral (solely to the extent consistent with the Approved DIP Budget, subject to any Permitted Budget Variances set forth herein and in the DIP Term Sheet) to, among other things, (a) permit the orderly continuation of the SIMAD Debtor Loan Parties' businesses; (b) maintain business relationships with the SIMAD Debtor Loan Parties' vendors, suppliers, campers, and other parties; (c) pursue a sale transaction or transaction(s); (d) pay certain adequate protection payments, if any, required hereunder; and (e) pay the costs of administration of the SIMAD Debtor Loan Parties' estates and satisfy other working capital and general corporate purposes of the Debtors.  The DIP Facility will also reassure the Debtors' campers and employees that the SIMAD Debtor Loan Parties will have access to additional liquidity to meet their commitments during the Cases. The ability of the SIMAD Debtor Loan Parties to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going concern value, continued operations over the immediate term, and successful reorganization.  The SIMAD Debtor

13

(Page 14)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

Loan Parties will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Cases without access to the DIP Facility and authorized use of Cash Collateral, and subject to the Carve-Out as provided herein.

(ii)     The Debtors and their estates will suffer immediate and irreparable harm if immediate financing is not obtained and permission to use Cash Collateral is not granted.  The extensions of credit under the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(iii)     The SIMAD Debtor Loan Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents and are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The SIMAD Debtor Loan Parties also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Loan Documents without the SIMAD Debtor Loan Parties granting to the DIP Lender the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) under the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

(iv)     The DIP Facility (including the Roll-Up DIP Loans) has been negotiated in good faith and at arm's length among the SIMAD Debtor Loan Parties, the DIP Lender, and the Prepetition Lender, and all of the SIMAD Debtor Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the SIMAD Debtor Loan

(Page 15)

Debtors:            SIMAD HOLDINGS, LTD., *et al*.
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

Parties pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents (the obligations under the DIP Facility (including the Roll-Up DIP Loans), the DIP Term Sheet, and the DIP Loan Documents, inclusive of the Roll-Up Obligations (as defined herein) and the Exit Fee, collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Lender in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; *provided however*, that the DIP Obligations relating to the Roll-Up DIP Loans shall be subject to Challenges in paragraph 12 herein.  The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code to the extent in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted to, or payments made to, the DIP Lender hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(v)      *Adequate Protection*.   The Prepetition Lender is entitled, pursuant to sections 105, 361, 362, and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral, including Cash Collateral, for any Diminution in Value thereof, subject only to the rights of parties in interest specifically set forth in paragraph 12 of this Interim

15

(Page 16)
Debtors:              SIMAD HOLDINGS, LTD., *et al*.
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

---

Order (and subject to the limitations thereon contained in such paragraph or otherwise in this Interim Order).

(vi)     *Sections 506(c) and 552(b)*.  In light of the Prepetition Lender's agreement to subordinate its liens and superpriority claims to the DIP Obligations and the Carve-Out and to permit the use of its Cash Collateral as set forth herein, the Prepetition Lender is entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order granting such relief, (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(vii)    *Roll-Up*.  The Prepetition Lender would not otherwise consent to the use of its Cash Collateral securing its secured obligations or the subordination of its liens to the DIP Liens, and the DIP Lender would not be willing to provide the DIP Loans or extend credit to the SIMAD Debtor Loan Parties thereunder without the Roll-Up (as defined herein).  Subject to paragraph 12 herein, the Roll-Up shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the DIP Lender to fund amounts under the DIP Facility, and shall be converted from Prepetition Obligations on a 2:1 basis (*i.e.*, $2.00 of Prepetition Obligations converted for each $1.00 of New Money DIP Loans), and not as adequate protection for, or otherwise on account of, any Prepetition Obligations.  The Prepetition Obligations shall be converted into and exchanged for Roll-Up DIP Loans in accordance with this Interim Order, any Final Order, and the DIP Term Sheet.

16

(Page 17)
Debtors:          SIMAD HOLDINGS, LTD., *et al.*
Case No.          26-16388 (CMG)
Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                  (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                  and Providing Superpriority Administrative Expense Claims, (IV) Granting
                  Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                  Final Hearing, and (VII) Granting Related Relief

H.      *Good Cause Shown; Best Interest*.  Good cause has been shown for entry of this

Interim Order, and entry of this Interim Order is in the best interests of the Debtors' respective

estates and creditors as its implementation will, among other things, allow for the continued

operation of the SIMAD Debtor Loan Parties' existing business and enhance the Debtors'

prospects for a successful reorganization.  Absent granting the relief sought by this Interim Order,

the Debtors' estates will be immediately and irreparably harmed.

I.      *Notice*.  In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and

applicable Local Rules, notice of the Interim Hearing and the emergency relief requested in the

Motion has been provided by the Debtors.  Under the circumstances, the notice given by the

Debtors of the Motion, the relief requested herein, and of the Interim Hearing complies with

Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and applicable Local Rules.

J.      *Arm's Length, Good Faith Negotiations*.  The terms of this Interim Order were

negotiated in good faith and at arm's length between the Debtors, the DIP Lender, and the

Prepetition Lender.  The Prepetition Lender has acted without negligence or violation of public

policy or law in respect of all actions taken by it in connection with or related in any way to

negotiating, implementing, documenting, or obtaining requisite approvals of the SIMAD Debtor

Loan Parties' incurrence of the DIP Facility (including the Roll-Up DIP Loans) and the SIMAD

Debtor Loan Parties' use of Cash Collateral, including in respect of all of the terms of this Interim

Order, all documents related thereto, and all transactions contemplated by the foregoing.

17

(Page 18)

Debtors:              SIMAD HOLDINGS, LTD., *et al.*
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

Based upon the foregoing findings and conclusions, the Motion, and the record before the

Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    <u>DIP Financing Approved</u>.  The Motion is granted on an interim basis as set forth

herein, the DIP Facility is approved on an interim basis, and the use of Cash Collateral on an

interim basis is authorized, subject to the terms of this Interim Order.  In the event of any conflict

between the terms of the *Agreed Interim Order with Bank of New Hampshire Pursuant to 11 U.S.C.*

*§§ 361, 362, 363 and 507 and Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing the Debtors*

*to Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Relief from the*

*Automatic Stay and (IV) Scheduling a Final Hearing* [Docket No. 165] (the "<u>Interim Cash</u>

<u>Collateral Order</u>") and this Interim Order, this Interim Order shall control.

2.    <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements

with respect to the Motion and entry of this Interim Order and the relief requested in this Interim

Order, to the extent not withdrawn or resolved, are overruled on the merits.  Sufficient cause exists

for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(e)(2) and the Local

Rules.  This Interim Order shall become effective immediately upon its entry.  The rights of all

parties in interest to object to the entry of a Final DIP Order are reserved.

3.    <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

(a)    The SIMAD Debtor Loan Parties are hereby immediately authorized and

empowered to enter into, execute, deliver and perform under, the DIP Loan Documents, including

18

(Page 19)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

the DIP Term Sheet, and such additional documents, instruments, certificates, and agreements as may be reasonably required or requested by the DIP Lender to implement the terms or effectuate the purposes of this Interim Order and the DIP Loan Documents. To the extent not entered into as of the date hereof, the SIMAD Debtor Loan Parties and the DIP Lender shall negotiate the DIP Loan Documents in good faith, and in all respects such DIP Loan Documents shall be, subject to the terms of this Interim Order and the Final Order, consistent with the terms of the DIP Term Sheet and otherwise reasonably acceptable to the SIMAD Debtor Loan Parties and acceptable in all respects to the DIP Lender. Upon entry of this Interim Order and until execution and delivery of the DIP Term Sheet and other DIP Loan Documents required to be delivered thereunder, the Debtors and the DIP Lender shall be bound by (i) the terms and conditions and other provisions set forth in the DIP Loan Documents (including any fee letter executed in connection with the DIP Facility), with the same force and effect as if duly executed and delivered to the DIP Lender by the SIMAD Debtor Loan Parties, and (ii) this Interim Order and the DIP Loan Documents (including any fee letter executed in connection with the DIP Facility) shall govern and control the DIP Facility. Upon entry of this Interim Order, this Interim Order, the DIP Term Sheet, and other DIP Loan Documents shall govern and control the DIP Facility, as applicable. The DIP Lender is hereby authorized to execute and enter into its respective obligations under the DIP Loan Documents, as applicable, subject to the terms and conditions set forth therein and this Interim Order. Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms. To the extent there

(Page 20)
Debtors:              SIMAD HOLDINGS, LTD., *et al*.
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

exists any conflict among the terms and conditions of the DIP Loan Documents or the Motion with this Interim Order, the terms and conditions of this Interim Order shall govern and control. To the extent there exists any conflict among the terms and conditions of the Motion and the DIP Loan Documents, the terms and conditions of the DIP Loan Documents shall govern and control.

(b)     Upon entry of this Interim Order, the SIMAD Debtor Borrowers are hereby authorized to borrow up to an aggregate principal amount of $2,000,000 of New Money DIP Loans, subject to and in accordance with this Interim Order and the DIP Term Sheet without any further action by the Debtors or any other party.

(c)     Effective upon the entry of the Final Order and the funding of the New Money DIP Loans, without any further action by the Debtors or any other party, subject to the Carve-Out and paragraph 12 herein, up to $20,000,000 of Prepetition Obligations shall immediately and automatically be deemed to be converted into Roll-Up DIP Loans on a cashless basis, without constituting a novation, repayment, or release of such Prepetition Obligations on a 2:1 basis and deemed to constitute DIP Obligations (such roll-up, the "Roll-Up," and such rolled-up Prepetition Obligations after giving effect to the Roll-Up, the "Roll-Up Obligations"), pursuant to the terms of this Interim Order, the Prepetition Loan Documents (as expressly modified herein), the DIP Loan Documents, and any other documents evidencing the Roll-Up Obligations. The Prepetition Lender would not otherwise consent to the use of its Cash Collateral or the subordination of the Prepetition Liens to the DIP Liens, and the DIP Lender would not be willing to provide the DIP Facility or extend credit to the SIMAD Debtor Loan Parties thereunder, without

20

(Page 21)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

approval of the Roll-Up upon entry of this Interim Order.  The Roll-Up Obligations shall be authorized as and deemed for all purposes to be consideration in exchange for, and solely on account of, the agreement of the Prepetition Lender to fund amounts under the DIP Facility and not as adequate protection for, or otherwise on account of, any Prepetition Obligations.  Because the Roll-Up Obligations are subject to the reservation of rights in paragraph 12 hereof, they will not prejudice the rights of any other party in interest.

(d)     In accordance with the terms of this Interim Order and the DIP Loan Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Loan Documents and this Interim Order, and consistent with the Approved DIP Budget, subject to the Carve-Out and any Permitted Budget Variances, as set forth in this Interim Order and the DIP Loan Documents.  For the avoidance of doubt, in no event shall any proceeds of the DIP Loans be used to satisfy any claim or obligation of a non-SIMAD Debtor Loan Party.  Attached as **Exhibit B** hereto and incorporated herein by reference is an initial budget prepared by the Debtors and approved by the DIP Lender (the "Initial DIP Budget").

(e)     In furtherance of the foregoing and without further approval of the Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Term Sheet, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or other DIP Loan Documents), and to pay all fees (including all amounts owed to the DIP Lender under the DIP

(Page 22)
Debtors:            SIMAD HOLDINGS, LTD., *et al.*
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Providing Superpriority Administrative Expense Claims, (IV) Granting
                    Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                    Final Hearing, and (VII) Granting Related Relief

Loan Documents) that may be reasonably required or necessary for the Debtors' performance of

their obligations under the DIP Facility and this Interim Order, including, without limitation:

(1)     the execution, delivery, and performance of the DIP Loan Documents,

including, without limitation, the DIP Term Sheet, any security and pledge

agreement, and any mortgage to the extent required thereby;

(2)     the execution, delivery, and performance of one or more amendments,

waivers, consents, or other modifications to and under the DIP Loan Documents

(in each case in accordance with the terms of the applicable DIP Loan Documents

and in such form as the SIMAD Debtor Loan Parties and the DIP Lender may

reasonably agree), it being understood that no further approval of the Court shall

be required for amendments, waivers, consents, or other modifications to and under

the DIP Loan Documents or the DIP Obligations that are not material; provided,

that, any such non-material amendments shall be provided to the U.S. Trustee and

counsel for the Creditors' Committee to the extent one has been appointed

substantially concurrently with being implemented;

(3)     the non-refundable payment of all reasonable and documented fees and

expenses arising from or related to negotiating, documenting, approving,

administering, monitoring, or enforcing any rights under the DIP Loan Documents

or related to these Cases as provided for in the DIP Loan Documents and this

Interim Order, including, for the avoidance of doubt, Mintz, Levin, Cohn, Ferris,

22

(Page 23)
Debtors:              SIMAD HOLDINGS, LTD., *et al*.
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

Glovsky and Popeo, P.C. and any other professionals or advisors retained by the DIP Lender in connection with these Cases (collectively, the "DIP Lender's Advisors"); which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of paragraph 18 of this Interim Order; and

(4)     the performance of all other acts required under or in connection with the DIP Loan Documents.

(f)     Upon entry of this Interim Order and subject to the Carve-Out (with respect to the DIP Collateral), such DIP Loan Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the SIMAD Debtor Loan Parties enforceable against each SIMAD Debtor Loan Party in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. Except as permitted hereby and subject to the Challenge rights set forth in paragraph 12 as it relates to the DIP Obligations and DIP Liens in connection with the Roll-Up, no obligation, payment, transfer, or grant of security under the DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or

23

(Page 24)

| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
|---|---|
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  All payments or proceeds remitted to or on behalf of the DIP Lender or the Prepetition Lender pursuant to the DIP Loan Documents, the provisions of this Interim Order, or any subsequent order of the Court, shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of rights under sections 506(c) of the Bankruptcy Code and the "equities of the case" exception of section 552(b) of the Bankruptcy Code, subject to and effective upon the entry of the Final Order granting such relief).

4. **Budget and Variance Reporting**.

(a) The Initial DIP Budget shall be approved by, and be in form and substance reasonably acceptable to the DIP Lender (it being acknowledged and agreed that the form of Initial DIP Budget set forth as **Exhibit B** hereto is approved by and acceptable to the DIP Lender), and all Subsequent DIP Budgets (as defined herein) shall be in form and substance reasonably acceptable to the DIP Lender.

(b) On or before the fifth (5th) business day before the end of every four-week period beginning with the date of entry of this Interim Order, the DIP Lender may request an updated budget, and in such case, the Debtors will deliver to the applicable DIP Lender, the DIP

24

(Page 25)
Debtors:          SIMAD HOLDINGS, LTD., *et al.*
Case No.          26-16388 (CMG)
Caption of Order:  Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                   (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                   and Providing Superpriority Administrative Expense Claims, (IV) Granting
                   Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                   Final Hearing, and (VII) Granting Related Relief

Lender's Advisors, and counsel to any Creditors' Committee an updated budget for the subsequent

13-week period (a "Subsequent DIP Budget"), which shall be in form and substance acceptable to

the DIP Lender.  The Initial DIP Budget or any Subsequent DIP Budget shall be deemed to

constitute the "Approved DIP Budget" for purposes of this Interim Order with the most recently

delivered budget constituting the "Approved DIP Budget" solely upon approval, as set forth herein,

by the DIP Lender (which must be in writing, email (including from the DIP Lender's Advisors)

being sufficient).  In the event the conditions for the most recently delivered Subsequent DIP

Budget to constitute an "Approved DIP Budget" are not met as set forth herein, the prior Approved

DIP Budget shall remain in full force and effect and the Debtors shall be required to work in good

faith with the DIP Lender to modify such Subsequent DIP Budget until the DIP Lender approves

such Subsequent DIP Budget as an "Approved DIP Budget."  Each Approved DIP Budget

delivered shall be accompanied by such supporting documentation as requested by the DIP Lender.

Each Approved DIP Budget shall be prepared in good faith based upon assumptions believed to

be reasonable at the time of preparation thereof.  "Budget Period" means the initial four-week

period set forth in the Approved DIP Budget in effect at such time.

(c)     Commencing with the third (3rd) full calendar week after the entry of this

Interim Order, Permitted Budget Variances shall be tested on each Friday on a weekly basis for

the SIMAD Debtor Loan Parties' actual expenditures (the "Operating Disbursements") (each such

date, a "Testing Date").  Commencing after the third (3rd) full week after the entry of this Interim

Order, on or before 5:00 p.m. (prevailing Eastern time) on Thursday of every calendar week ending

25

(Page 26)
Debtors:            SIMAD HOLDINGS, LTD., *et al*.
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Providing Superpriority Administrative Expense Claims, (IV) Granting
                    Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                    Final Hearing, and (VII) Granting Related Relief

on Friday, the Debtors shall deliver to the DIP Lender, the DIP Lender's Advisors, and counsel to any Creditors' Committee appointed in the Cases, if any, a budget variance report/reconciliation (each, a "Variance Report") in form reasonably satisfactory to the DIP Lender (the "Approved DIP Budget Variance Report"), setting forth in detail (i) the Operating Disbursements for the immediate one-week period ending on the applicable Testing Date; (ii) as to each material variance contained in the Approved DIP Budget Variance Report and required to be tested pursuant to this clause (c), an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any such material variance; and (iii) brief but meaningful commentary for each material line-item deviation (both favorable and unfavorable) when comparing actuals to the Approved DIP Budget for all variances greater than $50,000.

(d)     The Debtors shall not permit the SIMAD Debtor Loan Parties' Operating Disbursements for any one-week period to be more than 115% of the Budgeted Disbursements on an aggregate basis as set forth in the Approved DIP Budget with respect to such period (the "Permitted Budget Variances;" all references in this Interim Order and the DIP Loan Documents to "Approved DIP Budget" shall mean the Approved DIP Budget as it is subject to the Permitted Budget Variances).  The fees and expenses of Professional Persons (as defined herein) shall not be subject to the Permitted Budget Variances and shall not exceed 100% of the Budgeted Disbursements for such fees and expenses; *provided however*, that nothing herein or in the Orders shall constitute a waiver of such fees and expenses and the Professional Persons reserve all of their rights to seek allowance and payment thereof.  To the extent that actual aggregate disbursements

26

(Page 27)

| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
|---|---|
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

as of any Testing Date are less than the aggregate budgeted disbursements as of such Testing Date (a "Favorable Variance"), such Favorable Variance may be carried forward and added to the permitted disbursements for a subsequent testing period.

5.    Access to Records. The Debtors shall provide the DIP Lender and the DIP Lender's Advisors with all reporting, diligence requests, and all other information requested or required to be provided to the DIP Lender under this Interim Order and the DIP Loan Documents. In addition to, and without limiting, whatever rights to access the DIP Lender has under this Interim Order and the DIP Loan Documents, upon notice to counsel to the Debtors (email being sufficient), at reasonable times during normal business hours, and in a manner that does not interfere with the ordinary course activities and operations of the Debtors, the Debtors shall permit representatives, agents, and employees of the DIP Lender to have reasonable access to requested information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Lender shall be provided with access to all information it shall reasonably request. In addition, the DIP Lender and the DIP Lender's Advisors shall have reasonable access to SSG Advisors, LLC, the investment banker to the Debtors, and to the SIMAD Debtor Loan Parties' premises and properties upon reasonable prior notice to counsel to the Debtors (email being sufficient).

6.    DIP Superpriority Claims. Subject to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority

27

(Page 28)

Debtors:          SIMAD HOLDINGS, LTD., *et al.*

Case No.          26-16388 (CMG)

Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

---

administrative expense claims against each of the SIMAD Debtor Loan Parties' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) to the extent set forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the SIMAD Debtor Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, including to the extent allowed under the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order granting such relief), 507(a) (other than section 507(a)(1)), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, the DIP Collateral and, subject to and effective upon entry of the Final Order granting such relief, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "Avoidance Actions"), subject only to the payment of the Carve-Out.  Except as set forth in this Interim Order, the Final Order, or the DIP Term Sheet, no other superpriority claims shall be granted or allowed in the Cases unless junior to the DIP Superpriority Claims and Adequate Protection Claims (as defined herein) and consented to by the DIP Lender.

28

(Page 29)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

7.    <u>DIP Liens</u>.

(a)    As security for the DIP Obligations, effective as of the entry of this Interim Order (and without the necessity of the execution, recordation or filing by the SIMAD Debtor Loan Parties or the DIP Lender of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, control agreements, or other similar documents, or the taking of any other action to take possession of or control over any DIP Collateral), the DIP Lender is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "<u>DIP Liens</u>") in all DIP Collateral, in each case, subject to the Carve-Out in all respects, and subject to the relative priorities set forth in this Interim Order.  Any provision of any lease (except for nonresidential real property leases) or other license, contract or other agreement that requires (i) the consent or approval of one or more parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any SIMAD Debtor Loan Party to pledge, grant, sell, assign, or otherwise transfer any interest in any such lease, license, contract, or other agreement, or the proceeds thereof, or other collateral related thereto, is deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law. Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens (as defined herein) on such interest or the proceeds of any assignment and/or sale thereof by any SIMAD Debtor Loan Party in accordance with the terms of the DIP Loan Documents or this Interim Order, subject to applicable law.  Notwithstanding anything to the contrary in the

29

(Page 30)
Debtors:             SIMAD HOLDINGS, LTD., *et al.*
Case No.             26-16388 (CMG)
Caption of Order:    Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                     (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                     and Providing Superpriority Administrative Expense Claims, (IV) Granting
                     Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                     Final Hearing, and (VII) Granting Related Relief

foregoing, the provisions of this paragraph 7(a) shall not (i) render any contract or lease unable to be assumed and/or assigned by any SIMAD Debtor Loan Party or (ii) impair or limit the ability or right of (A) any SIMAD Debtor Loan Party to assume and/or assign any contract or lease or (B) any counterparty to object to such relief on any other grounds, including, but not limited to, sections 365(b)(3) or 1123 of the Bankruptcy Code.

(b)     The DIP Liens shall be subject to the following priorities (in each case, subject and subordinate in all respects to the Carve-Out):

i.   First Lien on Unencumbered Property: Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, automatically fully-perfected first priority senior security interest in and lien upon all tangible and intangible prepetition and postpetition property of the SIMAD Debtor Loan Parties whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to: (i) a valid, perfected, and non-avoidable lien; or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the SIMAD Debtor Loan Parties and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, proceeds of Avoidance Actions upon and subject to entry of the Final Order granting such relief, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "Unencumbered Property").

ii.  Liens Junior to Certain Other Liens: Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, automatically fully

30

(Page 31)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the SIMAD Debtor Loan Parties, which shall be immediately junior and subordinate only to the following valid, perfected and non-avoidable liens (the "Permitted Liens") (if any) in existence immediately prior to the Petition Date and permitted by the terms of security and other financing agreements in place on the Petition Date: (a) statutory liens for ad valorem, real property, personal property, sales, use, or similar taxes, assessments, or governmental charges that are not yet due or actively contested in good faith; (b) mechanics', materialmen's, warehousemen's, carriers', repairmen's, landlord's, and other similar statutory or possessory liens arising by operation of law in the ordinary course of business and not securing debt for borrowed money;; provided, that no Permitted Lien shall include any lien securing debt for borrowed money, funded debt, letter of credit obligations, or other financing obligations, and each such lien shall remain subject to avoidance, recharacterization, subordination, surcharge, reduction, disallowance, and challenge under the Bankruptcy Code or applicable non-bankruptcy law; provided, further, that nothing in the foregoing clause shall limit the rights of the DIP Lender under the DIP Loan Documents to the extent such liens are not permitted thereunder.

    iii.    Priming Liens: Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, automatically fully-perfected first priority senior priming security interest in and lien upon all DIP Collateral (subject to the Carve-Out), including all tangible and intangible prepetition and postpetition property of the SIMAD Debtor Loan Parties, which priming liens shall be senior in priority to all existing liens on such property, including all prepetition secured indebtedness of the SIMAD Debtor Loan Parties, other than Permitted Liens (if any) (collectively, the "Primed Liens"). The holders of the Primed Liens shall be deemed to have consented to the priming of the Primed Liens.

Other than as set forth above, the DIP Liens: (i) shall be senior to all security interests in, liens on, or claims against any of the DIP Collateral (subject and subordinate to the Carve-Out in all respects), including any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code; (ii) shall be valid and enforceable (a) against any trustee appointed in the Cases or such successor case (collectively, "Successor Cases"), (b) upon the conversion of any of the Cases to any Successor

31

(Page 32)
Debtors:          SIMAD HOLDINGS, LTD., *et al.*
Case No.          26-16388 (CMG)
Caption of Order:  Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

Case, and/or (c) upon the dismissal or conversion of any of the Cases or Successor Cases; (iii) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases; and (iv) shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code.

8.      Adequate Protection. Subject to the Carve Out and paragraph 12 of this Interim Order, the Prepetition Lender is entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of its Prepetition Liens in Prepetition Collateral on a dollar-for-dollar basis (including Cash Collateral), as follows (collectively, the "Adequate Protection Obligations"):

(a) *Adequate Protection Claims*. The Prepetition Lender is hereby granted, as adequate protection against the postpetition diminution in value of its liens and security interests in the Prepetition Collateral, including Cash Collateral (any such net postpetition diminution, to the maximum extent permitted under the Bankruptcy Code, "Diminution in Value"), from and after the Petition Date, superpriority administrative expense claims to the extent contemplated by section 507(b) of the Bankruptcy Code (the "Adequate Protection Claims") against each of the SIMAD Debtor Loan Parties. The Adequate Protection Claims shall be (a) subject and subordinate only to the Carve-Out and the DIP Superpriority Claims, and (b) senior to any and all other administrative expense claims and all other claims against the SIMAD Debtor Loan Parties and their estates, now existing or hereafter arising, of any kind or nature whatsoever.

(Page 33)

Debtors:                    SIMAD HOLDINGS, LTD., *et al*.

Case No.                    26-16388 (CMG)

Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
(II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
and Providing Superpriority Administrative Expense Claims, (IV) Granting
Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
Final Hearing, and (VII) Granting Related Relief

(b) *Adequate Protection Liens*.  The Prepetition Lender is hereby granted, effective and perfected as of the entry of this Interim Order (and without the necessity of the execution, recordation, or filing by the SIMAD Debtor Loan Parties or the DIP Lender of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, control agreements or other similar documents, or the taking of any other action to take possession of or control over any DIP Collateral), in the amount of any Diminution in Value of the Prepetition Liens in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, valid, binding, enforceable, and automatically perfected liens and security interests in the DIP Collateral (the "Adequate Protection Liens").  The Adequate Protection Liens shall be senior to all other liens on, or claims against any of the DIP Collateral, but subject to paragraph 12 herein and subordinate only to (i) the Carve-Out in all respects and (ii) the DIP Liens, it being understood that notwithstanding anything to the contrary in this Interim Order or the Final Order, in no circumstances and at no time in these Cases or in any Successor Case shall the Adequate Protection Liens be senior to or *pari passu* with any DIP Liens, regardless of whether any such liens attach prior in time.

(c)      *Adequate Protection Professional Fees and Expenses*.  The Debtors are authorized and directed to pay all of the reasonable and documented out-of-pocket fees, costs, and expenses of the Prepetition Lender, including, without limitation, the reasonable and documented fees and expenses of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., legal counsel to the Prepetition Lender (the "Adequate Protection Professional Fees and Expenses"), incurred prior to

33

(Page 34)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

or after the Petition Date and relating in any way to the provision of legal services related to the Prepetition Obligations, the DIP Facility, the Debtors, or the Cases.  None of the Adequate Protection Professional Fees and Expenses shall be subject to separate approval by the Court, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments, subject to paragraph 18 of this Interim Order.

(d)    Right to Seek Additional Adequate Protection.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Lender to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Lender is insufficient to compensate for any Diminution in Value of its interests in the Prepetition Collateral, during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by the Prepetition Lender that the adequate protection granted herein does in fact adequately protect the Prepetition Lender against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).

9.    Additional Adequate Protection for the Prepetition Lender.  The Prepetition Lender shall also receive the following adequate protection:

34

(Page 35)
Debtors:         SIMAD HOLDINGS, LTD., *et al.*
Case No.         26-16388 (CMG)
Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

(a)     Other Covenants.  The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order.  The Debtors' failure to comply with the covenants contained in the DIP Loan Documents shall be an Event of Default (as defined herein).

(b)     Reporting Requirements.  As additional adequate protection to the DIP Lender, the Debtors shall comply with all reporting requirements set forth in the DIP Loan Documents.  Reporting may be requested by any Creditors' Committee.

(c)     Miscellaneous.  Except for (i) the Carve-Out, (ii) the Final Order, and (iii) the DIP Liens and as otherwise provided in paragraphs 6 and 7, the Adequate Protection Liens granted pursuant to paragraphs 8 through 10 of this Interim Order shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 of the Bankruptcy Code or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest, or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 of the Bankruptcy Code or otherwise.

10.   Carve-Out.

(a)     Carve-Out.  As used in this Interim Order, the "Carve-Out" means the sum of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the U.S. Trustee for Region 3 under 28 U.S.C. § 1930(a) plus interest at the statutory rate, without regard to the notice set forth in clause (iv) below, and which shall not be subject to any budget ("Clerk

35

(Page 36)
Debtors:           SIMAD HOLDINGS, LTD., *et al.*
Case No.           26-16388 (CMG)
Caption of Order:  Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                   (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                   and Providing Superpriority Administrative Expense Claims, (IV) Granting
                   Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                   Final Hearing, and (VII) Granting Related Relief

and U.S. Trustee Fees"); (ii) in the event of a conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, all reasonable and documented fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, in an aggregate amount not to exceed $50,000 (the "Chapter 7 Trustee Fees"); (iii) subject to and effective upon the entry of the Final Order granting such relief, to the extent allowed at any time, whether by interim or final compensation order or any other order of the Court, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the SIMAD Debtor Loan Parties pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtors' Professionals") or retained by any statutory committee appointed in the Cases pursuant to section 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtors' Professionals, the "Professional Persons") at any time before or on the day of delivery by the DIP Lender of a Carve-Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, but solely up to and to the extent such fees and expenses are unpaid and as are provided for in the Approved DIP Budget (without any Permitted Variance therefor) (the "Pre-Trigger Carve-Out"); and (iv) Allowed Professional Fees incurred after the day of delivery by the DIP Lender of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, in an aggregate amount not to exceed $150,000 (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap") (collectively, the "Carve-Out Amount"). For purposes of the foregoing, "Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) by the DIP Lender

36

(Page 37)
Debtors:          SIMAD HOLDINGS, LTD., *et al*.
Case No.          26-16388 (CMG)
Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

to the Debtors, Debtors' counsel, the U.S. Trustee, and lead counsel to any Creditors' Committee stating that the Post Carve-Out Notice Cap has been invoked, which notice may be delivered only following the occurrence and during the continuation of an Event of Default.

(b)     Carve-Out Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date (as defined herein) in respect of any Allowed Professional Fees shall not reduce the Carve-Out.  For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, any adequate protection liens, and superpriority claims, any and all other liens or claims securing the DIP Obligations or the Prepetition Obligations, and all other liens or claims granted by this Interim Order.  Further, without limiting the foregoing, the Pre-Trigger Carve-Out amount shall be limited to amounts for each Professional Person as set forth in the Approved DIP Budget.

(c)     No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Lender or the Prepetition Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to (a) obligate the DIP Lender or the Prepetition Lender, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement, (b) impair the ability of any party to object to

37

(Page 38)
Debtors:              SIMAD HOLDINGS, LTD., *et al.*
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

---

any of the fees, expenses, reimbursement or compensation of any professionals, or (c) alter the

requirement of a Professional Person to file and serve fee applications or otherwise comply with

the Bankruptcy Code, Bankruptcy Rules or Local Bankruptcy Rules of this Court relating to

payment of fees and reimbursement of expenses of Professional Persons, or with any interim

compensation order or retention order entered by this Court.

(d)     Payment of Carve-Out On or After the Termination Declaration Date. Any

payment or reimbursement made on or after the occurrence of the Termination Declaration Date

in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-

for-dollar basis. Any payment of the Carve-Out shall be added to, and made a part of, the DIP

Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted

under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

11.     Reservation of Rights of the DIP Lender and the Prepetition Lender. Subject only

to the Carve-Out and paragraph 23, notwithstanding any other provision in this Interim Order or

the other DIP Loan Documents to the contrary, the entry of this Interim Order is without prejudice

to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the

rights of any of the Prepetition Lender to seek any other or supplemental relief in respect of the

Debtors; (b) any of the rights of the DIP Lender or the Prepetition Lender under the DIP Loan

Documents, the Prepetition Loan Documents, or the Bankruptcy Code or under nonbankruptcy

law (as applicable), including, without limitation, the right of any of the DIP Lender or the

Prepetition Lender to (i) request modification of the automatic stay of section 362 of the

38

(Page 39)
Debtors: SIMAD HOLDINGS, LTD., *et al.*
Case No. 26-16388 (CMG)
Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Lender or the Prepetition Lender. The delay in or failure of the DIP Lender and/or the Prepetition Lender to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Lender's or the Prepetition Lender's rights and remedies. For all adequate protection purposes throughout the Cases, the Prepetition Lender shall be deemed to have requested relief from the automatic stay and adequate protection for any Diminution in Value from and after the Petition Date. For the avoidance of doubt, such request will survive termination of this Interim Order.

12. <u>Reservation of Certain Creditors' Committee and Third-Party Rights and Bar of Challenges and Claims</u>. Subject to the Challenge Period (as defined herein), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the Petition Date. The stipulations, admissions, and waivers contained in this Interim Order, including the Debtors' Stipulations shall be binding upon all other parties in interest, including any Creditors' Committee (if appointed) and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in

39

(Page 40)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules within seventy-five (75) calendar days after entry of this Interim Order or, in the case of the Creditors' Committee, but only to the extent one is appointed, sixty (60) days after the appointment of such Creditors' Committee but in no event later than September 15, 2026 (the "Challenge Period," and the date of expiration of the Challenge Period, the "Challenge Period Termination Date") (provided, however, that if, prior to the end of the Challenge Period, (x) the Cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period or (B) forty-five (45) days after the appointment of such trustee, (i) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Lender; (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations; (c) the Debtors' stipulations, admissions, agreements and releases; (d) objecting to or challenging the Roll-Up DIP Loans; or (e) objecting to or challenging any of the Debtors' stipulations, admissions, agreements and releases contained in paragraph F (any such claim, a "Challenge"), and (ii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges by any party

40

(Page 41)
Debtors:          SIMAD HOLDINGS, LTD., *et al*.
Case No.          26-16388 (CMG)
Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                  (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                  and Providing Superpriority Administrative Expense Claims, (IV) Granting
                  Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                  Final Hearing, and (VII) Granting Related Relief

(including the Creditors' Committee (if appointed), any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in the Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Cases) shall be forever barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Lender's claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in the Cases and any Successor Cases.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates. Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Creditors' Committee and any other person or entity except to the extent that such stipulations and

41

(Page 42)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Creditors' Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Obligations, and a separate order of the Court conferring such standing on any Creditors' Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge by such Creditors' Committee or such other party in interest.  Subject to other provisions in this Interim Order, for the avoidance of doubt, any trustee appointed or elected shall, until expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by another party in interest on behalf of the Debtors' estates), be deemed a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in this Interim Order.  Upon a successful Challenge brought pursuant to this paragraph 12, the Court may fashion an appropriate remedy.

13.     Termination Date.  Following a termination consistent with the DIP Term Sheet (a "Termination"): (a) all DIP Obligations shall be immediately due and payable, and all New Money Commitments will terminate; (b) all authority to use Cash Collateral shall cease; provided,

(Page 43)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

however, that during the Remedies Notice Period (as defined herein), the SIMAD Debtor Loan Parties may use Cash Collateral solely to fund the Carve-Out and pay payroll and other expenses critical to the administration of the Debtors' estates in accordance with the Approved DIP Budget, subject to any Permitted Budget Variances provided for in the DIP Loan Documents; and (c) the DIP Lender shall be otherwise entitled to exercise rights and remedies under the DIP Loan Documents in accordance with this Interim Order.

14.    Events of Default.  The occurrence of any of the following events, unless waived by the DIP Lender, shall constitute an event of default (collectively, the "Events of Default"):

(a)    the failure to make any payment on the DIP Loans (including interest payments) as and when due;

(b)    the failure to make any adequate protection payment to the Prepetition Lender on the Prepetition Obligations as and when due;

(c)    the SIMAD Debtor Loan Parties breach any of their representations and warranties set forth in the DIP Loan Documents, including the DIP Term Sheet;

(d)    the dismissal of the Cases, conversion of the Cases to chapter 7 cases, or suspension of the Cases under section 305 of the Bankruptcy Code;

(e)    a trustee or receiver shall be appointed in the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in the Cases (beyond those set forth in section 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code);

(f)    any superpriority administrative expense claim or lien that is *pari passu* with or senior to the claims, charges or liens of the DIP Lender pursuant to this Interim Order shall have arisen or be authorized or allowed;

(g)    except for payments to the DIP Lender with regard to the DIP Obligations and to the Prepetition Lender with regard to the Prepetition Obligations, the SIMAD Debtor Loan Parties shall make any payment (whether by way of

43

Debtors:            SIMAD HOLDINGS, LTD., *et al.*
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Providing Superpriority Administrative Expense Claims, (IV) Granting
                    Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                    Final Hearing, and (VII) Granting Related Relief

---

adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than payments authorized by this Court in orders entered upon pleadings in form and substance satisfactory to the DIP Lender, in its sole discretion;

(h)     the granting of relief from the automatic stay to any creditor or party in interest other than the DIP Lender or the Prepetition Lender (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the SIMAD Debtor Loan Parties, or (ii) to permit other actions that would have a material adverse effect on the SIMAD Debtor Loan Parties or their estates;

(i)     this Interim Order becomes reversed, amended, supplemented, stayed, vacated, or otherwise modified in any respect without the prior written consent of the DIP Lender, except by the Final Order;

(j)     the Final Order becomes reversed, amended, supplemented, stayed, vacated, or otherwise modified in any respect without the prior written consent of the DIP Lender, or the SIMAD Debtor Loan Parties apply for the entry of such an order without the prior consent of the DIP Lender;

(k)     the SIMAD Debtor Loan Parties shall fail to meet or comply with any of the Milestones (as defined in the DIP Term Sheet) or the terms of the Approved DIP Budget (including Permitted Budget Variances);

(l)     any of the DIP Loan Documents shall cease to be valid or effective or shall be contested by any of the Debtors;

(m)     the Debtors shall fail to comply in any respect with the Interim Order or the Final Order;

(n)     the Debtors shall file a chapter 11 plan that does not propose to indefeasibly repay the DIP Obligations in full in cash on the plan effective date, unless otherwise consented to in writing by the DIP Lender;

(o)     the filing of any Challenge by any party;

(p)     the SIMAD Debtor Loan Parties shall fail to comply with any of the affirmative covenants, or take any action in violation of any of the negative covenants, set forth in the DIP Loan Documents;

44

(Page 45)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

(q)     the SIMAD Debtor Loan Parties shall assert in any pleading that the guaranties contained in the DIP Loan Documents are not valid and binding;

(r)     the DIP Liens shall cease to be valid, perfected, and enforceable;

(s)     the occurrence of any Event of Default under the DIP Loan Documents;

(t)     the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; and

(u)     the entry of an order in any Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations.

The DIP Lender shall provide written notice of any Event of Default to the Debtors, any Creditors' Committee, and the U.S. Trustee; provided that such notice should be for informational purposes only and shall not be a pre-requisite to the occurrence of an Event of Default.

15.     Rights and Remedies Upon Event of Default.  Immediately upon occurrence and during the continuation of an Event of Default (including, without limitation, the failure to pay any amounts due and payable on the Maturity Date), notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, (a) the DIP Lender may declare (any such declaration shall be referred to herein as a "Termination Declaration") (i) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable in full in cash, as applicable, in accordance with the DIP Loan Documents, (ii) the termination, reduction, or restriction of any further commitment to extend credit to the SIMAD Debtor Borrowers to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without

45

(Page 46)
Debtors:          SIMAD HOLDINGS, LTD., *et al*.
Case No.          26-16388 (CMG)
Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
(II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
and Providing Superpriority Administrative Expense Claims, (IV) Granting
Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
Final Hearing, and (VII) Granting Related Relief

affecting any of the DIP Liens or the DIP Obligations, and (iv) that the Carve-Out shall be triggered, through the delivery of the Carve-Out Trigger Notice to the SIMAD Debtor Loan Parties; and (b) subject to paragraph 15, the DIP Lender may declare a termination, reduction, or restriction on the ability of the SIMAD Debtor Loan Parties to use Cash Collateral (the date on which a Termination Declaration is delivered, the "Termination Declaration Date").   The automatic stay in the Cases otherwise applicable to the DIP Lender and the Prepetition Lender is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (such five (5)-business-day period, the "Remedies Notice Period"), with written notice having been provided to the Debtors, any Creditors' Committee and the U.S. Trustee:  (a) the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve-Out; and (b) subject to the foregoing clause (a), the Prepetition Lender shall be entitled to exercise its rights and remedies to the extent available in accordance with the applicable Prepetition Loan Documents and this Interim Order with respect to the SIMAD Debtor Loan Parties' use of Cash Collateral.  During the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court.  Except as set forth in this paragraph or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and

46

(Page 47)
Debtors:              SIMAD HOLDINGS, LTD., *et al*.
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

remedies of the DIP Lender or the Prepetition Lender under this Interim Order. Unless the Court has determined prior to the expiration of the Remedies Notice Period that an Event of Default has not occurred and/or is not occurring or orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Lender and the Prepetition Lender shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Lender and the Prepetition Lender shall be permitted to exercise all remedies set forth herein, and in the DIP Loan Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with this Interim Order and the DIP Loan Documents.

16. <u>Limitation on Charging Expenses Against Collateral</u>. Subject to and effective upon entry of the Final Order granting such relief, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve-Out) or the DIP Lender or (b) the Prepetition Collateral (except to the extent of the Carve-Out) or the Prepetition Lender, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Lender and the Prepetition Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Prepetition Lender.

(Page 48)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

17.     Use of Cash Collateral.  The SIMAD Debtor Loan Parties are hereby authorized to use all Cash Collateral of the Prepetition Lender, but solely for the purposes set forth in this Interim Order and consistent with the Approved DIP Budget (subject to Permitted Budget Variances as set forth in this Interim Order and the DIP Term Sheet), including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of termination of the DIP Loan Documents.

18.     Expenses and Indemnification.

(a)     Subject to the Challenge rights in paragraph 12 herein, the Debtors are hereby authorized and directed to pay, in accordance with this Interim Order and to the extent permissible under the Bankruptcy Code, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Loan Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, backstop, fronting, closing, arrangement, or commitment payments (including all payments and other amounts owed to the DIP Lender), administrative agent's fees, collateral agent's fees, and escrow agent's fees, the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in paragraphs 3(e)(3), 8(c), and 10(c) of this Interim Order, all to the extent provided in this Interim Order or the DIP Loan Documents.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the date of funding of the Interim Advances, subject to paragraphs 3(e)(3),8(c), 9(c) and 10(c), all reasonable and documented fees, costs, and expenses,

48

(Page 49)
Debtors:            SIMAD HOLDINGS, LTD., *et al*.
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Providing Superpriority Administrative Expense Claims, (IV) Granting
                    Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                    Final Hearing, and (VII) Granting Related Relief

including the fees and expenses of counsel to the DIP Lender, incurred on or prior to the Petition

Date without the need to be subject to the procedures set forth in paragraph 18(b).

(b)      The Debtors shall be jointly and severally obligated to pay all fees and

expenses described above, which obligations shall constitute DIP Obligations.  The Debtors shall

pay the reasonable and documented professional fees, expenses, and disbursements of

professionals to the extent provided for in paragraphs 3(e)(3),8(c), 9(c) and 10(c) of this Interim

Order (collectively, the "Lender Professionals" and, each, a "Lender Professional") no later than

ten (10) business days (the "Review Period") after the receipt by counsel for the Debtors, any

Creditors' Committee, or the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees").

It being understood that such statements or invoices shall not be required to be maintained in any

particular format but shall include sufficient detail for the SIMAD Debtor Loan Parties to

determine the reasonableness of such fees and expenses including a general description of the

nature of the matters worked on, a list of professionals who worked on the matter, their hourly rate

(if such professionals bill at an hourly rate), the number of hours each professional billed and, with

respect to the invoices of law firms, the year of law school graduation for each attorney (with

appropriate redactions for privilege), nor shall any such counsel or other professional be required

to file any interim or final fee applications with the Court or otherwise seek the Court's approval

of any such payments) to the SIMAD Debtor Loan Parties, the U.S. Trustee and the Creditors'

Committee (if one is appointed), unless, within such ten (10) business day period, the SIMAD

Debtor Loan Party, the U.S. Trustee, or the Creditors' Committee (if one is appointed) serve a

49

(Page 50)
Debtors:           SIMAD HOLDINGS, LTD., *et al.*
Case No.          26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

---

written objection upon the requesting party, in which case, the SIMAD Debtor Loan Parties shall pay only such amounts that are not the subject of any objection and the withheld amount subsequently agreed by the objecting parties or ordered by the Court to be paid. Such summary statements or invoices shall not constitute a waiver of the attorney client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law. To the extent any invoices are redacted, the U.S. Trustee reserves his right to seek to obtain unredacted copies of such invoices and all parties reserve their respective rights. Any expenses sought to be reimbursed shall be specified, and broken out by type of expense.

(c)    In addition, as provided in the DIP Loan Documents, subject to and effective upon entry of the Final Order granting such relief, the Debtors will indemnify each of the applicable DIP Lender, the Prepetition Lender, and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (collectively, the "Indemnified Parties," and, each, an "Indemnified Party") and hold them harmless from and against any loss, costs or expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the financing contemplated in the DIP Loan Documents and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided herein and in the DIP Loan Documents; provided that the Debtors shall not indemnify any Indemnified Party against a successful Challenge or for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have

50

(Page 51)
Debtors:              SIMAD HOLDINGS, LTD., *et al*.
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

been incurred by reason of gross negligence and/or willful misconduct of such Indemnified Party.

No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or

otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with

the transactions contemplated hereby, except to the extent such liability is found in a final non-

appealable judgment by a court of competent jurisdiction to have resulted solely from such

Indemnified Party's gross negligence, fraud, or willful misconduct or breach of their obligations

under the DIP Facility, which indemnity shall have equal priority and lien status to the DIP

Superpriority Claims.  In no event shall any Indemnified Party or any Debtor be liable on any

theory of liability for any special, indirect, consequential, or punitive damages; provided, that this

shall not affect the Debtors' indemnification obligations pursuant to the immediately preceding

sentence.

19.    Survival of DIP Obligations.  To the extent obligations remain due and owing under

the DIP Loans, such obligations of the SIMAD Debtor Loan Parties in respect of the DIP Loans

shall not be discharged by the entry of an order confirming a plan of reorganization or a plan of

liquidation in the Cases, but rather shall be required to be paid in full on the effective date of such

plan, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the SIMAD Debtor Loan Parties

have waived such discharge with respect to the payment of the DIP Loans.

20.    No Third-Party Rights.  Except as explicitly provided for herein, this Interim Order

does not create any rights for the benefit of any third party, creditor, equity holder, or any direct,

indirect, or incidental beneficiary.

(Page 52)
Debtors:              SIMAD HOLDINGS, LTD., *et al*.
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

21.    Section 507(b) Reservation.  Subject only to the Carve-Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Lender is insufficient to compensate for any Diminution in Value of its interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Lender that the adequate protection granted herein does in fact adequately protect any of the Prepetition Lender against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).

22.    Insurance.  Until the DIP Obligations have been paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral as required by the Prepetition Loan Documents and the DIP Loan Documents and shall name the DIP Lender as a loss payee or additional insured, as applicable, thereunder.

23.    No Waiver for Failure to Seek Relief.  The failure or delay of the DIP Lender to exercise rights and remedies under this Interim Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

24.    Perfection of the DIP Liens and Adequate Protection Liens.

(a)    Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 7 of this Interim Order and the Adequate Protection Liens granted pursuant to paragraph 8 of this Interim Order, the DIP Lender is hereby authorized, but

52

(Page 53)
Debtors:          SIMAD HOLDINGS, LTD., *et al.*
Case No.          26-16388 (CMG)
Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                  (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                  and Providing Superpriority Administrative Expense Claims, (IV) Granting
                  Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                  Final Hearing, and (VII) Granting Related Relief

not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder or under the DIP Loan Documents.  Whether or not the DIP Lender chooses to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests and the lien and security interest granted pursuant to paragraph 24 shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of this Interim Order. If the DIP Lender determines to file or execute any financing statements, agreements, notice of liens, or similar instruments (which, in each case, shall be at the sole cost and expense of the Debtors), the Debtors shall use commercially reasonable efforts to cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Lender and the automatic stay shall be modified solely to allow such filings as provided for in this Interim Order.

(b)     A certified copy of this Interim Order may, but shall not be required to, be filed with or recorded in filing or recording offices by the DIP Lender in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(Page 54)
Debtors:           SIMAD HOLDINGS, LTD., *et al.*
Case No.           26-16388 (CMG)
Caption of Order:  Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                   (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                   and Providing Superpriority Administrative Expense Claims, (IV) Granting
                   Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                   Final Hearing, and (VII) Granting Related Relief

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, lessors, or other parties or (ii) excluding any stamp-tax, the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law. Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Loan Documents or this Interim Order, subject to applicable law.

25.     Release. Subject to and effective upon entry of the Final Order granting such relief, and subject to paragraph 12 solely regarding Challenges by parties other than the Debtors, in respect of the Prepetition Lender, the Prepetition Liens, and the Prepetition Obligations, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, successors, and assigns, fully and forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Lender, the Prepetition Lender (in each case, in their capacities as such), and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds, or investment vehicles, managed, advised, or sub-advised accounts, funds, or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants,

54

(Page 55)
Debtors:            SIMAD HOLDINGS, LTD., *et al*.
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Providing Superpriority Administrative Expense Claims, (IV) Granting
                    Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                    Final Hearing, and (VII) Granting Related Relief

accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such

(collectively, the "Released Parties"), of and from any and all claims, demands, liabilities,

responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights,

assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries,

attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted,

unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened

including, without limitation, all legal and equitable theories of recovery, arising under common

law, statute, or regulation, or by contract, of every nature and description that exist on the date

hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Loan Documents,

the Prepetition Obligations, the Prepetition Liens, or the Prepetition Loan Documents, as

applicable, including, without limitation, (i) any so-called "lender liability" or equitable

subordination claims or defenses, (ii) any and all claims and causes of action arising under the

Bankruptcy Code, (iii) any and all claims and causes of action regarding the validity, priority,

extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender, and (iv)

any and all claims and causes of action regarding the validity, priority, extent, enforceability,

perfection, or avoidability of the liens or claims of the Prepetition Lender; provided that (x) the

release set forth in the foregoing clauses (i) through (iii) in respect of the DIP Lender, the Interim

Advances, the DIP Liens in respect of the Interim Advances and any other DIP Obligations

approved by this Interim Order shall be effective upon entry of this Interim Order and not subject

to the Challenge Period or to a Challenge and (y) the release set forth in this paragraph shall not

55

(Page 56)

Debtors:              SIMAD HOLDINGS, LTD., *et al*.
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

release any claims or liabilities against a Released Party that a court of competent jurisdiction pursuant to a final, non-appealable order determines primarily result from the bad faith, fraud, gross negligence, or willful misconduct of such Released Party. For the avoidance of doubt, nothing in this paragraph shall in any way limit or release the obligations of the DIP Lender under the DIP Loan Documents, this Interim Order, the Final Order, and the other DIP Loan Documents.

26.     Credit Bidding. Subject to the lien priorities set forth herein and subject to section 363(k) of the Bankruptcy Code, (i) the DIP Lender shall have the right to credit bid all or any portion of the DIP Obligations in any sale of the DIP Collateral (or any portion thereof), in accordance with the terms and conditions set forth therein and (ii) the Prepetition Lender shall have the right to credit bid up to the full amount of the Prepetition Obligations (including any Adequate Protection Obligations) in the sale of the Prepetition Collateral (or any portion thereof), in each case without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k), 1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

27.     Preservation of Rights Granted Under this Interim Order.

(a)     Subject to the Carve-Out and to the extent provided in this Interim Order, other than as set forth in this Interim Order, the DIP Liens shall not be made subject to, junior to, or *pari passu* with (A) any lien or security interest granted in any of the Cases arising after the Petition Date or (B) any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code and (ii) no claim shall be granted for

56

(Page 57)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

any administrative expense, secured claim, or unsecured claim against any of the Debtors with priority superior to or equal to the DIP Superpriority Claims.

(b)     Subject to the Carve-Out and the DIP Liens, each to the extent provided in this Interim Order, (i) none of the Adequate Protection Liens or the Prepetition Liens shall be made subject to and/or *pari passu* with any lien or security interest granted in any of the Cases arising after the Petition Date, (ii) the Adequate Protection Liens shall not be subject to, junior to, or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code and (iii) absent further order of the Court (with respect to which the Prepetition Lender reserves all rights), no claim shall be granted for any administrative expense, secured claim, or unsecured claim against any of the Debtors with priority superior or equal to the Adequate Protection Claims or the Prepetition Obligations.

(c)     To the extent provided in Bankruptcy Code section 364(e), if any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Lender, as applicable, of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity, priority, or enforceability of the DIP Liens or the Adequate Protection Liens.  To the extent provided in Bankruptcy Code section 364(e), notwithstanding any reversal, modification, vacatur, or stay of any use of Cash Collateral, DIP Obligations, DIP Liens, Adequate Protection Obligations, or Adequate Protection Liens incurred by the SIMAD Debtor

(Page 58)
Debtors:              SIMAD HOLDINGS, LTD., *et al*.
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

Loan Parties to the DIP Lender and the Prepetition Lender, as the case may be, prior to the actual receipt of written notice by the DIP Lender, as applicable, of the effective date of such reversal, modification, vacatur, or stay, such use of Cash Collateral, DIP Obligations, DIP Liens, Adequate Protection Obligations, or Adequate Protection Liens shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and the Prepetition Lender shall be entitled to all the rights, remedies, privileges and benefits granted in sections 364(e) and 363(m) of the Bankruptcy Code to the extent provided therein, this Interim Order and the DIP Loan Documents with respect to all uses of Cash Collateral, DIP Obligations, and Adequate Protection Obligations.

(d)     Notwithstanding any order that may be entered dismissing any of the Cases under section 1112 of the Bankruptcy Code: (i) the DIP Superpriority Claims, the Adequate Protection Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full or otherwise satisfied in accordance with this Interim Order and the DIP Loan Documents (and that such DIP Superpriority Claims, Adequate Protection Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(Page 59)
Debtors:              SIMAD HOLDINGS, LTD., *et al.*
Case No.              26-16388 (CMG)
Caption of Order:     Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                      (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                      and Providing Superpriority Administrative Expense Claims, (IV) Granting
                      Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                      Final Hearing, and (VII) Granting Related Relief

    (e)    Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the Adequate Protection Claims, and all other rights and remedies of the DIP Lender and the Prepetition Lender granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired, or discharged by: (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases or terminating the joint administration of the Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases. The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in the Cases, in any Successor Cases if the Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and (x) the DIP Liens and the DIP Superpriority Claims, and all other rights and remedies of the DIP Lender, granted by the provisions of this Interim Order and the DIP Loan Documents shall continue in full force and effect until consummation of an Acceptable Plan (which shall mean a chapter 11 plan of reorganization or liquidation that (a) is in form and substance acceptable to the DIP Lender and the Prepetition Lender, (b) provides for the indefeasible payment in full in cash of all DIP Obligations and all Prepetition Obligations on the effective date of such plan, and (c) does not impair the claims or liens of the DIP Lender or the

(Page 60)

Debtors:          SIMAD HOLDINGS, LTD., *et al.*

Case No.          26-16388 (CMG)

Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief

Prepetition Lender without their prior written consent) with respect to the Debtors or, the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Loan Documents, and the DIP Commitments have been terminated and (y) the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the Prepetition Lender granted by the provisions of this Interim Order and the DIP Loan Documents shall continue in full force and effect until the earlier of (A) consummation of an Acceptable Plan and (B) the Prepetition Obligations and all Adequate Protection Obligations have been indefeasibly repaid in full in cash.

(f)     Nothing in this Interim Order shall modify, prime, limit, alter, or expand any terms of any surety bonds, any related indemnity agreements, and/or any rights of the Debtors' sureties in any of their collateral.

28.     <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve-Out or proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Lender or the Prepetition Lender (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission,

60

(Page 61)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Lender or the Prepetition Lender (each in their capacities as such) under the DIP Loan Documents, the Prepetition Loan Documents, or this Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Creditors' Committee appointed in the Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Lender or the Prepetition Lender to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Lender or the Prepetition Lender related to the DIP Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations, or the DIP Lender's or the Prepetition Lender's liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Lender or the Prepetition Lender, or the DIP Lender's or the Prepetition Lender's respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Lender or the Prepetition Lender, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations, to the extent applicable; (b) for objecting to or challenging in any way the

61

(Page 62)
Debtors:          SIMAD HOLDINGS, LTD., *et al*.
Case No.          26-16388 (CMG)
Caption of Order:  Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                   (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                   and Providing Superpriority Administrative Expense Claims, (IV) Granting
                   Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                   Final Hearing, and (VII) Granting Related Relief

legality, validity, priority, perfection, or enforceability of the claims, liens, or interests held by or on behalf of the Prepetition Lender, or by or on behalf of the DIP Lender related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations or the DIP Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Lender related to the DIP Obligations or the DIP Liens, provided that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including Cash Collateral, in the aggregate, may be used by any Creditors' Committee appointed in the Cases, if any, or a chapter 7 trustee or a chapter 11 trustee, if any, solely to investigate, within the Challenge Period, the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Lender solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests held by or on behalf of the Prepetition Lender related to the Prepetition Obligations.

29.     Conditions Precedent.  Except as provided for in the Carve-Out, the DIP Lender shall not have any obligation to make any DIP Loan under the respective DIP Loan Documents unless all of the conditions precedent to the making of such extensions of credit under such DIP Loan Documents have been satisfied in full or waived in accordance with the DIP Loan Documents.

(Page 63)
Debtors:           SIMAD HOLDINGS, LTD., *et al.*
Case No.           26-16388 (CMG)
Caption of Order:  Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                   (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                   and Providing Superpriority Administrative Expense Claims, (IV) Granting
                   Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                   Final Hearing, and (VII) Granting Related Relief

30.     Binding Effect; Successors and Assigns.  Immediately upon entry of this Interim Order, subject to paragraph 12 of this Interim Order, the DIP Loan Documents and this Interim Order, including all findings of fact and conclusions of law herein, shall be binding upon all parties in interest in the Cases and any Successor Cases, including without limitation, the DIP Lender, the Prepetition Lender, the Creditors' Committee (if appointed) or any other statutory or non-statutory committee appointed or formed in the Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Cases or any Successor Cases, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors, the DIP Lender, the Prepetition Lender, and their respective successors and assigns; provided, however, that, for the avoidance of doubt, the DIP Lender and the Prepetition Lender shall have no obligation to make any loan, permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Cases or any Successor Cases.

31.     Limitation of Liability.  In determining to make any loan under the DIP Loan Documents, or permitting the use of Cash Collateral, pursuant to this Interim Order or the DIP Loan Documents, the DIP Lender and the Prepetition Lender shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or

63

(Page 64)
Debtors:            SIMAD HOLDINGS, LTD., *et al.*
Case No.            26-16388 (CMG)
Caption of Order:   Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                    (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                    and Providing Superpriority Administrative Expense Claims, (IV) Granting
                    Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                    Final Hearing, and (VII) Granting Related Relief

"owner or operator" with respect to the operation or management of the Debtors (as such terms,

or any similar terms, are used in the United States Comprehensive Environmental Response,

Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or

state statute). Furthermore, nothing in this Interim Order or in the DIP Loan Documents shall in

any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the

Prepetition Lender of any liability for any claims arising from the prepetition or postpetition

activities of any of the Debtors.

32.     No Requirement to File Claim for DIP Obligations.  Notwithstanding anything to

the contrary contained in any prior or subsequent order of the Court, including, without limitation,

any order establishing a deadline for the filing of proofs of claim or requests for payment of

administrative expenses under section 503(b) of the Bankruptcy Code, the DIP Lender shall not

be required to file any proof of claim or request for payment of administrative expenses with

respect to any of the DIP Obligations, all of which shall be due and payable in accordance with

the DIP Loan Documents without the necessity of filing any such proof of claim or request for

payment of administrative expenses, and the failure to file any such proof of claim or request for

payment of administrative expenses shall not affect the validity, priority, or enforceability of any

of the DIP Loan Documents or of any indebtedness, liabilities, or obligations arising at any time

thereunder or prejudice or otherwise adversely affect the DIP Lender's rights, remedies, powers,

or privileges under any of the DIP Loan Documents, this Interim Order, or applicable law.  The

provisions set forth in this paragraph are intended solely for the purpose of administrative

64

(Page 65)

Debtors:           SIMAD HOLDINGS, LTD., *et al*.
Case No.           26-16388 (CMG)
Caption of Order:  Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                   (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                   and Providing Superpriority Administrative Expense Claims, (IV) Granting
                   Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                   Final Hearing, and (VII) Granting Related Relief

convenience and shall not affect the substantive rights of any party in interest or their respective

successors in interest.

33.     No Requirement to File Claim for Prepetition Obligations.     Notwithstanding

anything to the contrary contained in any prior or subsequent order of the Court, including, without

limitation, any order establishing a deadline for the filing of proofs of claim or requests for

payment of administrative expenses under section 503(b) of the Bankruptcy Code, the Prepetition

Lender shall not be required to file any proof of claim or request for payment of administrative

expenses with respect to any of the Prepetition Obligations; and the failure to file any such proof

of claim or request for payment of administrative expenses shall not affect the validity, priority, or

enforceability of any of the Prepetition Obligations or of any indebtedness, liabilities, or

obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition

Lender's rights, remedies, powers, or privileges under any of the Prepetition Collateral, this

Interim Order, or applicable law.  The provisions set forth in this paragraph are intended solely for

the purpose of administrative convenience and shall not affect the substantive rights of any party

in interest or their respective successors in interest.

34.     No Marshaling.  Subject to and effective upon entry of the Final Order granting

such relief and the priorities set forth in this Interim Order, the Prepetition Lender and the DIP

Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine

with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and

applied pursuant to this Interim Order, the DIP Loan Documents, and the Prepetition Loan

65

(Page 66)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

Documents, notwithstanding any other agreement or provision to the contrary, and the Prepetition Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral.

35.     Equities of the Case.  The Prepetition Lender shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to and effective upon entry of the Final Order granting such relief, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Lender with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).

36.     U.S. Small Business Administration.  Notwithstanding anything in this Order to the contrary, the U.S. Small Business Administration (the "SBA"), which claims a security interest in certain assets of debtors Poland Landco LLC ("Poland Landco") and Camp Med-O-Lark, Inc. ("Camp Med-O-Lark") (collectively, the "SBA Collateral"), shall be entitled to adequate protection to protect against the Diminution in Value of the SBA Collateral arising from, resulting from or attributable to, (a) the imposition of the automatic stay, or the use, sale, or lease of the SBA Collateral, or (b) the DIP Facility, DIP Loans, or DIP Liens, as follows:

(a)     SBA is granted a replacement perfected security interest under 11 U.S.C. § 361(2) in all of the assets of Poland Landco and Camp Med-O-Lark (x) only to the extent of the Diminution in Value of the SBA Collateral; (y) only to the extent SBA's pre-petition claim and lien against Poland Landco and Camp Med-O-Lark are valid; and (z) with the same priority in the post-petition collateral and proceeds thereof of Poland Landco and Camp Med-O-Lark that SBA

66

(Page 67)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

held in the SBA Collateral as of the Petition Date, if any; *provided*, that such replacement liens shall be subject and subordinate to (i) the Carve-Out in all respects and (ii) the DIP Liens;

(b)    The replacement lien and security interest granted herein is automatically deemed perfected upon entry of this Interim Order without the necessity of SBA taking possession of its collateral in Poland Landco or Camp Med-O-Lark or filing financing statements, mortgages or other documents;

(c)    Subject to the limitations set forth in subsection (a)(x)-(z) of this paragraph, and solely to the extent that the adequate protection herein provided is insufficient to protect SBA's interest in the SBA Collateral from Diminution in Value, SBA shall have a super-priority administrative expense claim against Poland Landco and Camp Med-O-Lark to the extent of such Diminution in Value, pursuant to 11 U.S.C. § 507(b), senior to any and all claims against Poland Landco and Camp Med-O-Lark under 11 U.S.C. § 507(a)(2), other than (i) the Carve-Out, (ii) the DIP Superpriority Claims, and (iii) to the extent that the Prepetition Liens are senior in priority to SBA's pre-petition liens on the SBA Collateral, the Adequate Protection Claims granted to the Prepetition Secured Parties pursuant to this Interim Order;

(d)    SBA shall be provided copies of any reporting to the DIP Lender required hereunder, but solely related to Poland Landco and Camp Med-O-Lark;

(e)    The adequate protection provided to SBA herein shall be in addition to any adequate protection provided in the *Interim Order Authorizing the SIMAD Debtors to use Cash Collateral, if Any of the U.S. Small Business Administration Pursuant to 11 U.S.C. § 363(c)(2) and*

(Page 68)
Debtors:          SIMAD HOLDINGS, LTD., *et al.*
Case No.          26-16388 (CMG)
Caption of Order: Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing,
                  (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens
                  and Providing Superpriority Administrative Expense Claims, (IV) Granting
                  Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A
                  Final Hearing, and (VII) Granting Related Relief

*Fed. R. Bankr. P. 4001 and Scheduling Final Hearing Date* [Docket No. 142] and any subsequent

orders on cash collateral usage.

Nothing herein shall prejudice the right of the SBA to object to the relief sought in

the Motion on a further interim basis or at a Final Hearing.

37.     Final Hearing.  The Final Hearing on the Motion shall be held on July 13, 2026, at

10:00 a.m., prevailing Eastern time.  Any objections or responses to entry of a final order on the

Motion shall be filed on or before **4:00 p.m., prevailing Eastern time, on July 6, 2026**, and shall

be served on: (a) counsel to the Debtors, Cole Schotz P.C. (Attn:  Michael D. Sirota

(msirota@coleschotz.com),  Warren A. Usatine (wusatine@coleschotz.com), David M. Bass

(dbass@coleschotz.com), Felice R. Yudkin (fyudkin@coleschotz.com)), (b) the Office of the U.S.

Trustee for the District of New Jersey, One Newark Center, Suite 2100 Newark, New Jersey

07102, Attn. Jeffrey M. Sponder (jeffrey.m.sponder@usdoj.gov), (c) counsel to the DIP Lender

and the Prepetition Lender, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. (Attn: Daniel S.

Bleck (DSBleck@mintz.com) and Kaitlin R. Walsh (KRWalsh@mintz.com)), (d) any party that

has requested notice pursuant to Bankruptcy Rule 2002, and (e) counsel to any Creditors'

Committee appointed in the Cases.  In the event no objections to entry of the Final Order on the

Motion are timely received, the Court may enter such Final Order without need for the Final

Hearing.

(Page 69)

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS, LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order: | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief |

38.     <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

39.     <u>Effectiveness as of the Petition Date</u>.  Notwithstanding anything to the contrary contained herein, any provision of this Interim Order that is subject to entry of the Final Order shall be effective as of the Petition Date, upon entry of the Final Order.

40.     <u>Retention of Jurisdiction</u>.  The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

**EXHIBIT A**

**DIP Term Sheet**

**SUMMARY OF TERMS AND CONDITIONS OF
DEBTOR-IN-POSSESSION LOAN FACILITY**

**June 27, 2026**

The following term sheet (the "**Term Sheet**") represents a summary of certain terms and conditions of a proposed debtor-in-possession financing for the benefit of certain of the debtors (collectively, the "**Debtors**," of which only those Debtors identified below as Borrowers or Guarantors are "**Loan Parties**") in the bankruptcy cases jointly administered as *In re Simad Holdings, Ltd., et al.*, Case No. 26-16388 (CMG) (the "**Chapter 11 Cases**") filed on June 4-5, 2026 (the "**Petition Date**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**").

| | |
|---|---|
| **Borrowers:** | Belgrade Lakes Summer Camps LLC<br>Iafalandco, LLC<br>Poland Landco LLC<br>Washington Lake, LLC<br>Waukeela Landco LLC<br>Wekeeland LLC<br>WM Land, LLC |
| **Guarantors:** | Camp Med-O-Lark, Inc.<br>Iafaoperatingco, LLC<br>Mainewekeelaco, LLC<br>Poland Campco LLC<br>Waukeela Operatingco LLC<br>WM Camp, LLC<br><br>The Guarantors absolutely and unconditionally guarantee, as a guaranty of performance and payment and not as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, the payment and performance of any and all DIP Obligations (as defined below), subject to, and in accordance with, the terms of the Orders (as defined below). This guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the DIP Obligations or any instrument or agreement evidencing any DIP Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the DIP Obligations which might otherwise constitute a defense to the obligations of any Guarantor under this guaranty other than the irrevocable payment in full in cash and performance of all obligations hereunder, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing (other than the defense of payment in full). |
| **DIP Lender:** | Bank of New Hampshire ("**BNH**" or the "**DIP Lender**") |
| **DIP Facility:** | Subject to the entry of interim and final orders of the Bankruptcy Court in forms satisfactory to the DIP Lender, in its sole discretion (the "**Interim Order**" and the "**Final Order**," respectively, and together, the "**Orders**"), the DIP Lender shall extend to the Borrowers a senior, secured, priming debtor-in-possession credit facility (the "**DIP Facility**") in an aggregate principal amount of up to |

|  | $30,000,000 (the **"Loan Commitment"**), comprised of (i) new money term loans in an aggregate principal amount of up to $10,000,000 (the "**New Money Commitments**"), with up to $2,000,000 available upon entry of the Interim Order (the "**Interim Advance**") and the remaining principal amount in draws of no less than $8,000,000 in the aggregate upon entry of the Final Order and (ii) upon entry of the Final Order, a 2:1 roll up of $20,000,000 (the "**Roll- Up Amount**") of the BNH Pre-Petition Obligations (as defined in the *Agreed Interim Order with Bank of New Hampshire Pursuant to 11 U.S.C. §§ 361, 362, 363 and 507 and Fed. R. Bankr. P. 2002, 4001, and 9014 (1) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (II) Granting Relief from the Automatic Stay and (IV) Scheduling a Final Hearing,* dated June 18, 2026 [Docket No. 166] (the "**Interim Cash Collateral Order**") (such loans collectively, the "**DIP Loans**," and collectively with all other obligations owed by the Debtors to the DIP Lender pursuant to the DIP Loan Documents (as defined below), including all principal and accrued interest, premiums (if any), costs, fees (including the Exit Fee, defined below) and expenses or any other amounts due (the "**DIP Obligations**").

The DIP Obligations shall be secured by the Collateral (as defined below) and be deemed effective and automatically perfected upon the date of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any Collateral; *provided however*, that DIP Lender may require the execution by the Loan Parties and the recording of certain of such documents, as determined by the DIP Lender in its sole discretion. |
| **DIP Loan Documents:** | The terms and conditions governing the DIP Facility shall be set forth in one or more definitive documents, all of which shall be in form and substance satisfactory to the DIP Lender in its sole discretion (the "**DIP Loan Documents**"); *provided however* that for the purposes Interim Advance, such funds will be provided under the terms and conditions of the Interim Order. |
| **DIP Facility Maturity:** | The DIP Obligations shall be due and payable upon the earliest of:<br><br>(i)    the date that is six (6) months after the initial funding of the DIP Loans;<br><br>(ii)    the closing date of the sale of all or substantially all of the Loan Parties' assets pursuant to an order entered by the Bankruptcy Court (or, if multiple closings relating to the Loan Parties, upon the last of such closings);<br><br>(iii)    the acceleration of the DIP Loans and the termination of the DIP Facility by the DIP Lender following the occurrence or during the continuation of an Event of Default (as defined below); and<br><br>(iv)    the confirmation of a plan of reorganization or liquidation of the Debtors (such earliest date, the "**Maturity Date**"). |

2

| | |
|---|---|
| **DIP Facility Interest Rate:** | Interest shall accrue on the outstanding principal amount of the DIP Loans at a fixed rate of 10% per annum.  Upon the occurrence and during the continuance of an Event of Default, the DIP Loans and all DIP Obligations will automatically bear interest at an additional 3% per annum.<br><br>Accrued interest shall be due and payable monthly in arrears on the 15th day of each month, calculated on the basis of the actual number of days elapsed in a 365/366-day year.  All remaining accrued and unpaid interest as of the Maturity Date shall be due and payable in cash on the Maturity Date.<br><br>The DIP Lender shall receive an exit fee equal to 3% of the New Money Commitments (the "**Exit Fee**"), which shall be fully earned and non-refundable upon the entry by the Bankruptcy Court of the Interim Order and payable in cash on the Maturity Date. |
| **Mandatory Prepayments:** | As will be set forth more fully in the DIP Loan Documents, the DIP Obligations shall be subject to mandatory prepayment under customary circumstances, with 100% of net cash proceeds applied to the prepayment of the outstanding DIP Obligations, including, without limitation:<br><br>(i)      upon the sale or disposition of any Collateral, other than in the ordinary course of business;<br><br>(ii)     upon any payment made to the Loan Parties on account of insurance, casualty or condemnation claims;<br><br>(iii)    upon the net proceeds of any debt issuance or equity issuance; and<br><br>(iv)    upon the proceeds of any claims and causes of action recovered by the Loan Parties. |
| **DIP Facility Availability:** | Commencing on the date of the Bankruptcy Court's entry of the Interim Order, the DIP Facility shall be made available to the Borrowers in an aggregate amount up to the lesser of the Loan Commitment and the amount of borrowings authorized by the Interim Order or the Final Order, as applicable, and in any case in accordance with the DIP Budget (as defined below).<br><br>As more fully set forth in the DIP Loan Documents, the Borrowers may borrow, no more frequently than bi-monthly, sufficient funds to cover any projected shortfalls for such two-week period, as set forth in the DIP Budget and after taking into account any cash then on hand. |
| **Use of Cash Collateral; Adequate Protection:** | On terms and conditions acceptable to the DIP Lender, in its sole discretion, the Orders shall expressly contemplate and authorize the use by the Borrowers of any "cash collateral" (as defined in Bankruptcy Code § 363(a)) pursuant to the DIP Budget.<br><br>As additional adequate protection for the BNH Pre-Petition Obligations, upon entry of the Final Order, the DIP Lender shall receive the Roll-Up Amount, which shall be deemed to constitute DIP Loans and shall be entitled to all of the priorities, liens, and other protections afforded to the DIP Obligations under this Term Sheet and the DIP Loan Documents. The Roll-Up Amount shall be |

3

|  | secured by the BNH Pre-Petition Liens, the BNH Adequate Protection Liens (each as defined in the Interim Cash Collateral Order), and the DIP Liens. All other amounts owing to BNH in respect of the BNH Pre-Petition Obligations (other than the Roll-Up Amount) shall be secured by the BNH Pre-Petition Liens and the BNH Adequate Protection Liens but shall not be secured by the DIP Liens.<br><br>The Debtors shall pay the reasonable and documented attorneys' fees, financial advisor fees, if any, and out-of-pocket expenses of the DIP Lender incurred in connection with the DIP Facility, the BNH Collateral, or the Chapter 11 Cases, within ten (10) days of delivery of a statement to the Debtors, the U.S. Trustee, and any official committee for unsecured creditors appointed in these Chapter 11 Cases (the "**Creditors Committee**"). For the avoidance of doubt, these statements shall not be required to be filed with the Bankruptcy Court or be subject to Bankruptcy Court approval. |
| **Purpose / Use of Proceeds:** | The proceeds of the DIP Facility will be used, in accordance with the terms of the DIP Budget, to provide working capital and for other general corporate purposes of the Loan Parties during the administration of the Chapter 11 Cases, including the payment of administrative claims allowed in the Chapter 11 Cases. Notwithstanding the foregoing, no proceeds of the DIP Facility or any Cash Collateral shall be used to pay any fees, costs, or expenses of, or allocated to, any Debtor that is not a Loan Party, including any professional fees or administrative expenses of such non-Loan Party Debtors, unless such fees, costs, or expenses are allocated to such non-Loan Party Debtor in accordance with an agreed-upon allocation as set forth in the DIP Budget. In no event shall any proceeds of the DIP Facility or any Cash Collateral be used to satisfy any claim or obligation of a non-Loan Party Debtor.<br><br>No portion of the DIP Facility, any cash collateral, or the Carve-Out (defined below) shall be used in connection with asserting any claims or causes of action against the DIP Lender or any of its respective advisors, agents and sub-agents, including for formal discovery proceedings in anticipation thereof, or challenging any lien thereof. |
| **Budget and Variances:** | "**DIP Budget**" shall mean the 13-week cash flow and financial projections of the Loan Parties, covering the period beginning on the date of filing the motion seeking approval of the Orders and ending on the Maturity Date, itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility, revenues projected to be received and all expenditures proposed to be made during such period. A copy of the DIP Budget is attached hereto as **Exhibit A**.<br><br>**Approved DIP Budget:** On or before the fifth (5th) business day before the end of every four-week period beginning with the date of entry of the Interim Order, the Loan Parties and/or the DIP Lender may request an updated budget, and in such case, the Loan Parties shall deliver to the DIP Lender, the DIP Lenders' Advisors, and counsel to any Creditors' Committee appointed in the Cases, if any, an updated budget for the subsequent 13-week period (a "**Subsequent DIP Budget**"), which shall be in form and substance acceptable to the DIP Lender. The DIP Budget or any Subsequent DIP Budget approved by the DIP Lender shall be deemed to constitute the "Approved DIP Budget" for purposes of the Orders, with the most recently delivered budget constituting |

4

the "Approved DIP Budget" solely upon approval by the DIP Lender (which must be in writing, email being sufficient). In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved DIP Budget" are not met, the prior Approved DIP Budget shall remain in full force and effect and the Loan Parties shall be required to work in good faith with the DIP Lender to modify such Subsequent DIP Budget until the DIP Lender approves it. Each Approved DIP Budget delivered shall be accompanied by such supporting documentation as requested by the DIP Lender and shall be prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof. "**Budget Period**" means the initial four-week period set forth in the Approved DIP Budget in effect at such time.

**Permitted Variances:** Commencing with the third (3rd) full calendar week after the entry of the Interim Order, Permitted Variances shall be tested on each Friday on a weekly basis for the Loan Parties' actual expenditures (the "**Operating Disbursements**") (each such date, a "**Testing Date**"). The Loan Parties shall not permit Operating Disbursements for any one-week period to be more than 115% of the Budgeted Disbursements on an aggregate basis as set forth in the Approved DIP Budget with respect to such period (the "**Permitted Variances**").  The fees and expenses of Professional Persons (as defined herein) shall not be subject to the Permitted Variances and shall not exceed 100% of the Budgeted Disbursements for such fees and expenses; *provided however*, that nothing herein or in the Orders shall constitute a waiver of such fees and expenses and the Professional Persons reserve all of their rights to seek allowance and payment thereof.  To the extent that actual aggregate disbursements as of any Testing Date are less than the aggregate budgeted disbursements as of such Testing Date (a "**Favorable Variance**"), such Favorable Variance may be carried forward and added to the permitted disbursements for a subsequent testing period.

**Budget Variance Reporting:** Commencing after the third (3rd) full week after the entry of the Interim Order, on or before 5:00 p.m. (prevailing Eastern time) on Thursday of every calendar week ending on Friday, the Loan Parties shall deliver to the DIP Lender, the DIP Lenders' Advisors, and counsel to any Creditors' Committee appointed in the Cases, if any, a budget variance report/reconciliation (each, a "**Variance Report**") in form reasonably satisfactory to the DIP Lender (the "**Approved DIP Budget Variance Report**"), setting forth in detail (i) the Operating Disbursements for the immediate one-week period ending on the applicable Testing Date; and (ii) as to each material variance contained in the Approved DIP Budget Variance Report and required to be tested, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any such material variance. In addition, the Loan Parties shall provide a detailed, line-by-line computation of actual versus budget deviations on a bi-weekly basis beginning in the third week following entry of the Interim Order, with brief but meaningful commentary for each material line-item deviation (both favorable and unfavorable) when comparing actuals to the Approved DIP Budget for all variances greater than $50,000.

5

| | |
|---|---|
| **Security:** | All DIP Obligations shall:<br><br>(a) pursuant to section 364(c)(1) of the Bankruptcy Code, be claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (the "**DIP Superpriority Claims**"); and<br><br>(b) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first-priority, priming lien (the "**DIP Liens**") on all assets and property of the Loan Parties, whether now owned or hereafter acquired, and proceeds thereof (collectively, the "**Collateral**"); *provided that* the granting of the DIP Liens on any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any, shall be subject to entry of the Final Order granting such relief.<br><br>subject in each case only to a carve-out (the "**Carve-Out**") comprising: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (ii) to the extent applicable, all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000, and (iii) subject to and effective upon the entry of the Final Order granting such relief, after the occurrence and during the continuance of an Event of Default (as defined below) (a) fees and expenses projected in the DIP Budget that have been incurred by the Debtors' professionals or the professionals of a Creditors Committee and remaining unpaid prior to delivery of a Carve-Out Trigger Notice (as defined below), all as may be allowed by the Bankruptcy Court (the "**Pre-Trigger Carve-Out**"), and (b) after delivery of a Carve-Out Trigger Notice, an amount not exceeding $150,000 in the aggregate to pay any fees or expenses incurred by the Debtors' professionals or the professionals of any Creditors Committee (the "**Post-Carve-Out Trigger Notice Cap**"), provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described above. For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Lender following the occurrence of an Event of Default, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. No portion of the Carve-Out, any cash collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, any of the DIP Lender's liens or claims, or the initiation or prosecution of any claim or action against the DIP Lender, in any capacity. |
| **Credit Bidding:** | Subject to and upon entry of the Final DIP Order granting such relief, the DIP Lender shall have the unqualified right to credit bid any or all of the DIP Obligations in connection with any disposition of the Collateral, including any sale of the Loan Parties' assets under section 363 of the Bankruptcy Code. |

6

| Representations and Warranties: | The DIP Loan Documents will include such representations and warranties as are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lender, including without limitation: due organization; requisite power and authority; qualification; execution, delivery and enforceability of the DIP Loan Documents; no conflicts with organizational documents or applicable law; no material adverse change; restricted junior payments; absence of material litigation; payment of material taxes; title to properties; ERISA and other employee matters; absence of brokers or finders fees; compliance with laws; continued effectiveness of orders of the Bankruptcy Court, including the Orders, as applicable; full disclosure and accuracy of the DIP Budget; and the Patriot Act and other related matters. |
|---|---|
| Affirmative Covenants: | The DIP Loan Documents shall include such affirmative covenants as are usual and customary for transactions of this type (and to include reporting covenants, including with respect to the DIP Budget and permitted variances), update meetings and/or calls with the DIP Lender and the CRO, advisors to CRO, SSG, and FTI as reasonably requested.  The Debtors and their professionals shall provide BNH with periodic updates on the sale process, not less than once weekly, and shall provide BNH with copies of indications of interest, letters of intent, and bids within one (1) day of receipt. |
| Negative Covenants: | The DIP Loan Documents shall include such negative covenants as are usual and customary for transactions of this type (and to include limitations on indebtedness, liens, investments, acquisitions, restricted payments and dispositions of assets). |
| Chapter 11 Case Milestones: | The obligations of the DIP Lender to advance the DIP Loans shall be subject to the Debtors satisfying, or causing the satisfaction of, the milestones related to the Chapter 11 Cases set forth below (the "**Milestones**") by the specified date or such later date as the DIP Lender may agree in writing (email being sufficient):<br><br>(a)  The Interim Order shall be entered no later than five (5) days after the filing of the motion to approve the Interim Order;<br><br>(b)  All DIP Loan Documents shall be duly executed and delivered no later than twenty-one (21) days after entry of the Interim Order;<br><br>(c)  The Final Order shall be entered no later than thirty-two (32) days after the entry of the Interim Order;<br><br>(d)  Such other Milestones to be included in the DIP Documents that are consistent with the Bidding Procedures Order entered by the Bankruptcy Court at Docket No. 298. |

| Events of Default: | The DIP Loan Documents will include events of default that are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lender (each an "**Event of Default**"), including, without limitation, the following:<br><br>(a)  Failure to make payments to DIP Lender and the adequate protection payments to BNH on the BNH Pre-Petition Obligations when due;<br><br>(b)  Breaches of representations and warranties;<br><br>(c)  The Chapter 11 Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee, receiver, interim receiver or receiver and manager shall be appointed in the Chapter 11 Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in the Chapter 11 Cases;<br><br>(d)  Any super-priority administrative expense claim or lien that is *pari passu* with or senior to the claims, charges or liens of the DIP Lender or the DIP Lender shall have arisen or be authorized or allowed;<br><br>(e)  Except for payments to the DIP Lender and BNH with regard to the BNH Pre-Petition Obligations, the Debtors shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than payments authorized by the Bankruptcy Court in orders entered upon pleadings in form and substance satisfactory to the DIP Lender, in its sole discretion; *provided that* the "first day" orders entered by the Court on June 17, 2026 are satisfactory to the DIP Lender;<br><br>(f)  The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest: (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Loan Parties; or (ii) to permit other actions that would have a material adverse effect on the Loan Parties or their estates;<br><br>(g)  An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Orders, or the Debtors shall apply for the entry of such an order, without the prior written consent of the DIP Lender;<br><br>(h)  The Debtors shall fail to meet or comply with any of the Milestones or the terms of the DIP Budget (including permitted variances);<br><br>(i)  Any of the DIP Loan Documents shall cease to be valid or effective or shall be contested by the Debtors;<br><br>(j)  The Debtors shall fail to comply in any respect with the Orders;<br><br>(k)  The Debtors shall file a chapter 11 plan that does not propose to indefeasibly repay the DIP Obligations in full in cash on the plan |
|---|---|

<table>
<tr><td></td><td>effective date, unless otherwise consented to in writing by the DIP Lender;</td></tr>
</table>

|  |  |
|---|---|
|  | (l) The filing of any challenge to the pre-petition liens or claims of BNH by any party that is supported by the Debtors; |
|  | (m) The Debtors shall fail to comply with any of the affirmative covenants, or take any action in violation of any of the negative covenants, set forth in the DIP Loan Documents; |
|  | (n) The Debtors shall assert in any pleading that the guarantee contained in the DIP Loan Documents is not valid and binding; |
|  | (o) Cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable; and |
|  | (p) Entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations. |
| **Remedies:** | The DIP Documents will contain customary remedies, including, without limitation, the right following the occurrence of an Event of Default or the Maturity Date to (i) stop funding the DIP Loans; (ii) terminate the Loan Parties' use of any Cash Collateral; (iii) declare all DIP Obligations to be immediately due and payable; and (iv) realize on all Collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. |
| **Conditions Precedent to Commitment, Initial Borrowing:** | The commitment of the DIP Lender to provide the DIP Facility and to enter into the DIP Loan Documents, on the terms and conditions set forth in this Term Sheet, is expressly conditioned on the Debtors and the DIP Lender reaching agreement on substantially final forms of (i) the DIP Loan Documents, (ii) proposed forms of the Orders, and (iii) a DIP Budget, in each case in form and substance satisfactory to the DIP Lender in its sole discretion; *provided* that the DIP Lender shall fund the Interim Advance upon entry of the Interim Order and execution of this Term Sheet. |
|  | The obligation of the DIP Lender to make any DIP Loans will be subject to customary closing conditions for this type of financing in form and substance satisfactory to the DIP Lender, in its sole discretion, including: (i) the entry of an Interim Order and, upon expiration of the Interim Order, the entry of a Final Order; (ii) the execution and delivery of the DIP Loan Documents; *provided* that the DIP Lender shall fund the Interim Advance upon entry of the Interim Order and execution of this Term Sheet prior to execution and delivery of the DIP Loan Documents; (iii) receipt by the DIP Lender of a Budget in form and substance satisfactory to the DIP Lender; (iv) no default or Event of Default shall have occurred and be continuing; (v) the Debtors shall be in compliance with the Milestones; and (vi) payment of all out-of-pocket costs, fees and expenses required to be paid to the DIP Lender. |

| | |
|---|---|
| **Ongoing Conditions to Borrowings:** | The conditions to all borrowings will include requirements relating to prior written notice of borrowing, the accuracy of representations and warranties, and the absence of any default or Event of Default and will otherwise be customary and appropriate for this type of financing. |
| **Indemnity / Release / Validity:** | The Debtors shall indemnify, pay and hold harmless the DIP Lender (and its directors, officers, employees, professionals and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith, fraud, or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). The DIP Loan Documents and the Orders shall provide for a full, absolute, plenary and unconditional release of the DIP Lender of all liability for any and all claims, causes of action or other rights of the Debtors, subject only to the challenge rights set forth in the Interim Cash Collateral Order. |
| **Governing Law; Jurisdiction:** | The Debtors will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state of New Jersey; and shall waive any right to trial by jury. The DIP Loan Documents shall be governed by Delaware law. |

[*Remainder of page intentionally left blank*]

10

## EXHIBIT B

**Initial DIP Budget**

**Draft - Confidential; Subject to Material Revision; Subject to FRE 408 and Equivalents**

**SIMAD Holdings**
*BNH DIP Budget*

| BNH |
|---|

| $ in 000s<br>Forecast/Actual<br>No.  Week Ending | 1<br>Forecast<br>6/19/2026 | 2<br>Forecast<br>6/26/2026 | 3<br>Forecast<br>7/3/2026 | 4<br>Forecast<br>7/10/2026 | 5<br>Forecast<br>7/17/2026 | 6<br>Forecast<br>7/24/2026 | 7<br>Forecast<br>7/31/2026 | 8<br>Forecast<br>8/7/2026 | 9<br>Forecast<br>8/14/2026 | 10<br>Forecast<br>8/21/2026 | 11<br>Forecast<br>8/28/2026 | 12<br>Forecast<br>9/4/2026 | 13<br>Forecast<br>9/11/2026 | Total<br>Start WE 06/19/26<br>End WE 09/11/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Net Cash Flow** | | | | | | | | | | | | | | |
| 1.  Camper Deposits | $ 50 | $ 40 | $ 48 | $ 55 | $ 56 | $ 29 | $ 41 | $ 60 | $ 13 | $ 139 | $ 90 | $ 132 | $ 303 | $ 1,055 |
| 2.  Tuition Refunds | (9) | (9) | 0 | (2) | (3) | (8) | (0) | (1) | (0) | (8) | (0) | - | (0) | (41) |
| 3.  Other Receipts | 0 | 0 | 0 | - | 0 | - | 5 | - | - | 6 | 15 | - | 0 | 28 |
| 4.  Intercompany Funding | 193 | - | 193 | - | - | - | - | - | - | - | - | - | - | 386 |
| 5.  Rental Income | - | - | - | - | - | - | - | - | 22 | 38 | - | 50 | 10 | 120 |
| 6.  **Total Receipts** | **$ 234** | **$ 31** | **$ 242** | **$ 53** | **$ 52** | **$ 21** | **$ 45** | **$ 59** | **$ 34** | **$ 175** | **$ 105** | **$ 182** | **$ 313** | **$ 1,548** |
| 7.  Payroll & Benefits | (103) | (472) | (259) | (425) | (499) | (304) | (717) | (315) | (353) | (563) | (115) | (160) | (109) | (4,395) |
| 8.  Camp Operations | (474) | (422) | (473) | (367) | (515) | (381) | (336) | (289) | (202) | (124) | (319) | (87) | (74) | (4,063) |
| 9.  Rent Utilities & Maintenance | (167) | (97) | (47) | (69) | (52) | (45) | (50) | (57) | (47) | (49) | (72) | (50) | (72) | (874) |
| 10.  Insurance | (3) | (5) | - | (3) | - | (11) | - | - | (24) | (24) | (67) | (13) | (23) | (173) |
| 11.  Marketing & Enrollment | (9) | (31) | (7) | (10) | (18) | (20) | (16) | (16) | (10) | (4) | (41) | (31) | (17) | (231) |
| 12.  Other Operating | (45) | (48) | (20) | (16) | (13) | (12) | (16) | (17) | (15) | (15) | (20) | (20) | (12) | (269) |
| 13.  Intercompany | (193) | - | (193) | - | - | - | - | - | - | - | - | - | - | (386) |
| 14.  Taxes | (24) | - | (20) | (26) | (0) | (4) | (13) | (4) | - | (2) | (39) | (4) | (4) | (140) |
| 15.  **Total Operating Disbursements** | **$ (1,018)** | **$ (1,076)** | **$ (1,020)** | **$ (916)** | **$ (1,098)** | **$ (777)** | **$ (1,147)** | **$ (698)** | **$ (652)** | **$ (780)** | **$ (673)** | **$ (365)** | **$ (310)** | **$ (10,531)** |
| 16.  **Operating Cash Flow** | **$ (785)** | **$ (1,045)** | **$ (778)** | **$ (863)** | **$ (1,045)** | **$ (757)** | **$ (1,102)** | **$ (639)** | **$ (617)** | **$ (605)** | **$ (568)** | **$ (183)** | **$ 3** | **$ (8,983)** |
| 17.  **Transfers to Restricted Cash** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (0)** | **$ (38)** | **$ (12)** | **$ (139)** | **$ (90)** | **$ (132)** | **$ (303)** | **$ (715)** |
| 18.  Professional Fees | - | - | (12) | - | - | (319) | - | (6) | - | - | (281) | (4) | (917) | (1,540) |
| 19.  U.S. Trustee Fees | - | - | - | - | - | - | (38) | - | - | - | (49) | - | - | (87) |
| 20.  DIP Interest & Fees | - | - | - | - | (207) | - | - | - | - | (245) | - | - | (164) | (616) |
| 21.  **Total Non-Operating Items** | **$ -** | **$ -** | **$ (12)** | **$ -** | **$ (207)** | **$ (319)** | **$ (38)** | **$ (6)** | **$ -** | **$ (245)** | **$ (331)** | **$ (4)** | **$ (1,081)** | **$ (2,243)** |
| 22.  **Net Cash Flow** | **$ (785)** | **$ (1,045)** | **$ (790)** | **$ (863)** | **$ (1,252)** | **$ (1,076)** | **$ (1,140)** | **$ (683)** | **$ (630)** | **$ (989)** | **$ (988)** | **$ (320)** | **$ (1,381)** | **$ (11,942)** |
| | | | | | | | | | | | | | | |
| **II. Cash Balances - Book** | | | | | | | | | | | | | | |
| 23.  Beginning Balance | $ 2,931 | $ 2,147 | $ 1,102 | $ 1,169 | $ 305 | $ 1,196 | $ 120 | $ 803 | $ 120 | $ 1,109 | $ 120 | $ 466 | $ 147 | $ 2,931 |
| 24.  Net Cash Flow | (785) | (1,045) | (790) | (863) | (1,252) | (1,076) | (1,140) | (683) | (630) | (989) | (988) | (320) | (1,381) | (11,942) |
| 25.  DIP Funding | - | - | 857 | - | 2,142 | - | 1,823 | - | 1,619 | - | 1,335 | - | 1,354 | 9,130 |
| 26.  **Ending Cash Balance** | **$ 2,147** | **$ 1,102** | **$ 1,169** | **$ 305** | **$ 1,196** | **$ 120** | **$ 803** | **$ 120** | **$ 1,109** | **$ 120** | **$ 466** | **$ 147** | **$ 120** | **$ 120** |

*Notes : (All values noted below refer to consolidated BNH group)*

1. Management Fees and D&O insurance are assumed to be $85k, funded from the remaining cash of $120k, paid to TopCo. TopCo will make the actual disbursement to the respective vendors.

2. Accrued operational expenses ($294k) and exit fees ($300k) at the end of the case are assumed to be paid out of potential sale proceeds. Intercompany amounts relate to other BNH camps.

3. Accrued and unpaid professional fees and DIP interest are shown paid in Week 13 for presentation purposes, but these fees may be paid at a later date.

## SCHEDULE 1

**Prepetition Loan Documents**

**SCHEDULE 1**

DESCRIPTION OF BANK OF NEW HAMPSHIRE
LOAN DOCUMENTS AND COLLATERAL

**I.      BNH Loans**.

(a)      Loan Agreement and Promissory Note, each dated December 14, 2021, in the original principal amount of $27,000,000.00; and

(b)      Loan Agreement and Promissory Note, each dated July 21, 2023, in the original principal amount of $6,000,000.00; in each case by and among BNH, as lender, and the BNH Debtors, as borrowers.

**II.     Mortgaged Real Property** (including mortgages, security agreements, and assignments of leases and rents):

(a)      Camp Belgrade, 35 and 54 Golf Academy Drive, Belgrade, Maine (Belgrade Lakes Summer Camps LLC) – Kennebec County Registry of Deeds;

(b)      Indian Acres/Forest Acres, 1712 Main Street, 54 Swans Falls Road, and 22 Acorn Circle, Fryeburg, Maine (Iafalandco, LLC) – Oxford County Registry of Deeds;

(c)      Camp North Star, 136 and 200 Verrill Road, Poland, Maine (Poland Landco LLC) – Androscoggin County Registry of Deeds;

(d)      Camp Med-O-Lark, 82 Medolark Road, Washington, Maine (Washington Lake, LLC) – Knox County Registry of Deeds;

(e)      Camp Wekeela, 1729, 1745, and 1750 Bear Pond Road, Hartford, Maine (Wekeeland LLC) – Oxford County Registry of Deeds;

(f)      Waukeela Camp for Girls, 25 and 47 Brownfield Road, 26 Cass Point Road, and Map/Lot R03-27-B on Eaton Road, Eaton, New Hampshire (Waukeela Landco LLC) – Carroll County Registry of Deeds; and

(g)      Windsor Mountain International Summer Camp, 1 World Way, Windsor, New Hampshire (WM Land, LLC) – Hillsborough County Registry of Deeds.

**III.    Security Agreements**.   Security agreements granting BNH a security interest in substantially all personal property, including, without limitation, accounts and all proceeds thereof.   These security agreements were executed by each of the BNH Borrowers (Belgrade Lakes Summer Camps LLC, Iafalandco, LLC, Poland Landco LLC, Washington Lake, LLC, Waukeela Landco LLC, Wekeeland LLC, and WM Land, LLC), each of the BNH Guarantor Debtors (Camp Med-O-Lark, Inc., Iafaoperatingco, LLC, Mainewekeelaco, LLC, Poland Campco LLC, Waukeela Operatingco LLC, and WM Camp, LLC), and certain other related non-debtor entities.

**IV.**    **Equity Pledges**. Pledge and security agreements pursuant to which SIMAD Holdings LLC (Case No. 26-16515-CMG) and Damis Holdings, LLC (Case No. 26-16439-CMG), (each a non-SIMAD Debtor with an affiliated chapter 11 case pending in this District) pledged to BNH the membership and other equity interests in the BNH Debtors and certain related non-debtor entities.

## Exhibit B

## BNH DIP Term Sheet

53503373

**SUMMARY OF TERMS AND CONDITIONS OF
DEBTOR-IN-POSSESSION LOAN FACILITY**

**June 27, 2026**

The following term sheet (the "**Term Sheet**") represents a summary of certain terms and conditions of a proposed debtor-in-possession financing for the benefit of certain of the debtors (collectively, the "**Debtors**," of which only those Debtors identified below as Borrowers or Guarantors are "**Loan Parties**") in the bankruptcy cases jointly administered as *In re Simad Holdings, Ltd., et al.*, Case No. 26-16388 (CMG) (the "**Chapter 11 Cases**") filed on June 4-5, 2026 (the "**Petition Date**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**").

| | |
|---|---|
| **Borrowers:** | Belgrade Lakes Summer Camps LLC<br>Iafalandco, LLC<br>Poland Landco LLC<br>Washington Lake, LLC<br>Waukeela Landco LLC<br>Wekeeland LLC<br>WM Land, LLC |
| **Guarantors:** | Camp Med-O-Lark, Inc.<br>Iafaoperatingco, LLC<br>Mainewekeelaco, LLC<br>Poland Campco LLC<br>Waukeela Operatingco LLC<br>WM Camp, LLC<br><br>The Guarantors absolutely and unconditionally guarantee, as a guaranty of performance and payment and not as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, the payment and performance of any and all DIP Obligations (as defined below), subject to, and in accordance with, the terms of the Orders (as defined below). This guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the DIP Obligations or any instrument or agreement evidencing any DIP Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the DIP Obligations which might otherwise constitute a defense to the obligations of any Guarantor under this guaranty other than the irrevocable payment in full in cash and performance of all obligations hereunder, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing (other than the defense of payment in full). |
| **DIP Lender:** | Bank of New Hampshire ("**BNH**" or the "**DIP Lender**") |
| **DIP Facility:** | Subject to the entry of interim and final orders of the Bankruptcy Court in forms satisfactory to the DIP Lender, in its sole discretion (the "**Interim Order**" and the "**Final Order**," respectively, and together, the "**Orders**"), the DIP Lender shall extend to the Borrowers a senior, secured, priming debtor-in-possession credit facility (the "**DIP Facility**") in an aggregate principal amount of up to |

| | |
|---|---|
| | $30,000,000 (the "**Loan Commitment**"), comprised of (i) new money term loans in an aggregate principal amount of up to $10,000,000 (the "**New Money Commitments**"), with up to $2,000,000 available upon entry of the Interim Order (the "**Interim Advance**") and the remaining principal amount in draws of no less than $8,000,000 in the aggregate upon entry of the Final Order and (ii) upon entry of the Final Order, a 2:1 roll up of $20,000,000 (the "**Roll- Up Amount**") of the BNH Pre-Petition Obligations (as defined in the *Agreed Interim Order with Bank of New Hampshire Pursuant to 11 U.S.C. §§ 361, 362, 363 and 507 and Fed. R. Bankr. P. 2002, 4001, and 9014 (1) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (II) Granting Relief from the Automatic Stay and (IV) Scheduling a Final Hearing*, dated June 18, 2026 [Docket No. 166] (the "**Interim Cash Collateral Order**") (such loans collectively, the "**DIP Loans**," and collectively with all other obligations owed by the Debtors to the DIP Lender pursuant to the DIP Loan Documents (as defined below), including all principal and accrued interest, premiums (if any), costs, fees (including the Exit Fee, defined below) and expenses or any other amounts due (the "**DIP Obligations**").<br><br>The DIP Obligations shall be secured by the Collateral (as defined below) and be deemed effective and automatically perfected upon the date of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any Collateral; *provided however*, that DIP Lender may require the execution by the Loan Parties and the recording of certain of such documents, as determined by the DIP Lender in its sole discretion. |
| **DIP Loan Documents:** | The terms and conditions governing the DIP Facility shall be set forth in one or more definitive documents, all of which shall be in form and substance satisfactory to the DIP Lender in its sole discretion (the "**DIP Loan Documents**"); *provided however* that for the purposes Interim Advance, such funds will be provided under the terms and conditions of the Interim Order. |
| **DIP Facility Maturity:** | The DIP Obligations shall be due and payable upon the earliest of:<br><br>(i)   the date that is six (6) months after the initial funding of the DIP Loans;<br><br>(ii)   the closing date of the sale of all or substantially all of the Loan Parties' assets pursuant to an order entered by the Bankruptcy Court (or, if multiple closings relating to the Loan Parties, upon the last of such closings);<br><br>(iii)   the acceleration of the DIP Loans and the termination of the DIP Facility by the DIP Lender following the occurrence or during the continuation of an Event of Default (as defined below); and<br><br>(iv)   the confirmation of a plan of reorganization or liquidation of the Debtors (such earliest date, the "**Maturity Date**"). |

| | |
|---|---|
| **DIP Facility Interest Rate:** | Interest shall accrue on the outstanding principal amount of the DIP Loans at a fixed rate of 10% per annum.  Upon the occurrence and during the continuance of an Event of Default, the DIP Loans and all DIP Obligations will automatically bear interest at an additional 3% per annum. |
| | Accrued interest shall be due and payable monthly in arrears on the 15th day of each month, calculated on the basis of the actual number of days elapsed in a 365/366-day year.  All remaining accrued and unpaid interest as of the Maturity Date shall be due and payable in cash on the Maturity Date. |
| | The DIP Lender shall receive an exit fee equal to 3% of the New Money Commitments (the "**Exit Fee**"), which shall be fully earned and non-refundable upon the entry by the Bankruptcy Court of the Interim Order and payable in cash on the Maturity Date. |
| **Mandatory Prepayments:** | As will be set forth more fully in the DIP Loan Documents, the DIP Obligations shall be subject to mandatory prepayment under customary circumstances, with 100% of net cash proceeds applied to the prepayment of the outstanding DIP Obligations, including, without limitation: |
| | (i)      upon the sale or disposition of any Collateral, other than in the ordinary course of business; |
| | (ii)     upon any payment made to the Loan Parties on account of insurance, casualty or condemnation claims; |
| | (iii)    upon the net proceeds of any debt issuance or equity issuance; and |
| | (iv)    upon the proceeds of any claims and causes of action recovered by the Loan Parties. |
| **DIP Facility Availability:** | Commencing on the date of the Bankruptcy Court's entry of the Interim Order, the DIP Facility shall be made available to the Borrowers in an aggregate amount up to the lesser of the Loan Commitment and the amount of borrowings authorized by the Interim Order or the Final Order, as applicable, and in any case in accordance with the DIP Budget (as defined below). |
| | As more fully set forth in the DIP Loan Documents, the Borrowers may borrow, no more frequently than bi-monthly, sufficient funds to cover any projected shortfalls for such two-week period, as set forth in the DIP Budget and after taking into account any cash then on hand. |
| **Use of Cash Collateral; Adequate Protection:** | On terms and conditions acceptable to the DIP Lender, in its sole discretion, the Orders shall expressly contemplate and authorize the use by the Borrowers of any "cash collateral" (as defined in Bankruptcy Code § 363(a)) pursuant to the DIP Budget. |
| | As additional adequate protection for the BNH Pre-Petition Obligations, upon entry of the Final Order, the DIP Lender shall receive the Roll-Up Amount, which shall be deemed to constitute DIP Loans and shall be entitled to all of the priorities, liens, and other protections afforded to the DIP Obligations under this Term Sheet and the DIP Loan Documents. The Roll-Up Amount shall be |

| | |
|---|---|
| | secured by the BNH Pre-Petition Liens, the BNH Adequate Protection Liens (each as defined in the Interim Cash Collateral Order), and the DIP Liens. All other amounts owing to BNH in respect of the BNH Pre-Petition Obligations (other than the Roll-Up Amount) shall be secured by the BNH Pre-Petition Liens and the BNH Adequate Protection Liens but shall not be secured by the DIP Liens.<br><br>The Debtors shall pay the reasonable and documented attorneys' fees, financial advisor fees, if any, and out-of-pocket expenses of the DIP Lender incurred in connection with the DIP Facility, the BNH Collateral, or the Chapter 11 Cases, within ten (10) days of delivery of a statement to the Debtors, the U.S. Trustee, and any official committee for unsecured creditors appointed in these Chapter 11 Cases (the "**Creditors Committee**"). For the avoidance of doubt, these statements shall not be required to be filed with the Bankruptcy Court or be subject to Bankruptcy Court approval. |
| **Purpose / Use of Proceeds:** | The proceeds of the DIP Facility will be used, in accordance with the terms of the DIP Budget, to provide working capital and for other general corporate purposes of the Loan Parties during the administration of the Chapter 11 Cases, including the payment of administrative claims allowed in the Chapter 11 Cases. Notwithstanding the foregoing, no proceeds of the DIP Facility or any Cash Collateral shall be used to pay any fees, costs, or expenses of, or allocated to, any Debtor that is not a Loan Party, including any professional fees or administrative expenses of such non-Loan Party Debtors, unless such fees, costs, or expenses are allocated to such non-Loan Party Debtor in accordance with an agreed-upon allocation as set forth in the DIP Budget. In no event shall any proceeds of the DIP Facility or any Cash Collateral be used to satisfy any claim or obligation of a non-Loan Party Debtor.<br><br>No portion of the DIP Facility, any cash collateral, or the Carve-Out (defined below) shall be used in connection with asserting any claims or causes of action against the DIP Lender or any of its respective advisors, agents and sub-agents, including for formal discovery proceedings in anticipation thereof, or challenging any lien thereof. |
| **Budget and Variances:** | "**DIP Budget**" shall mean the 13-week cash flow and financial projections of the Loan Parties, covering the period beginning on the date of filing the motion seeking approval of the Orders and ending on the Maturity Date, itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility, revenues projected to be received and all expenditures proposed to be made during such period. A copy of the DIP Budget is attached hereto as **Exhibit A**.<br><br>**Approved DIP Budget:** On or before the fifth (5th) business day before the end of every four-week period beginning with the date of entry of the Interim Order, the Loan Parties and/or the DIP Lender may request an updated budget, and in such case, the Loan Parties shall deliver to the DIP Lender, the DIP Lenders' Advisors, and counsel to any Creditors' Committee appointed in the Cases, if any, an updated budget for the subsequent 13-week period (a "**Subsequent DIP Budget**"), which shall be in form and substance acceptable to the DIP Lender. The DIP Budget or any Subsequent DIP Budget approved by the DIP Lender shall be deemed to constitute the "Approved DIP Budget" for purposes of the Orders, with the most recently delivered budget constituting |

4

the "Approved DIP Budget" solely upon approval by the DIP Lender (which must be in writing, email being sufficient). In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved DIP Budget" are not met, the prior Approved DIP Budget shall remain in full force and effect and the Loan Parties shall be required to work in good faith with the DIP Lender to modify such Subsequent DIP Budget until the DIP Lender approves it. Each Approved DIP Budget delivered shall be accompanied by such supporting documentation as requested by the DIP Lender and shall be prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof. "**Budget Period**" means the initial four-week period set forth in the Approved DIP Budget in effect at such time.

**Permitted Variances:** Commencing with the third (3rd) full calendar week after the entry of the Interim Order, Permitted Variances shall be tested on each Friday on a weekly basis for the Loan Parties' actual expenditures (the "**Operating Disbursements**") (each such date, a "**Testing Date**"). The Loan Parties shall not permit Operating Disbursements for any one-week period to be more than 115% of the Budgeted Disbursements on an aggregate basis as set forth in the Approved DIP Budget with respect to such period (the "**Permitted Variances**").  The fees and expenses of Professional Persons (as defined herein) shall not be subject to the Permitted Variances and shall not exceed 100% of the Budgeted Disbursements for such fees and expenses; *provided however*, that nothing herein or in the Orders shall constitute a waiver of such fees and expenses and the Professional Persons reserve all of their rights to seek allowance and payment thereof.  To the extent that actual aggregate disbursements as of any Testing Date are less than the aggregate budgeted disbursements as of such Testing Date (a "**Favorable Variance**"), such Favorable Variance may be carried forward and added to the permitted disbursements for a subsequent testing period.

**Budget Variance Reporting:** Commencing after the third (3rd) full week after the entry of the Interim Order, on or before 5:00 p.m. (prevailing Eastern time) on Thursday of every calendar week ending on Friday, the Loan Parties shall deliver to the DIP Lender, the DIP Lenders' Advisors, and counsel to any Creditors' Committee appointed in the Cases, if any, a budget variance report/reconciliation (each, a "**Variance Report**") in form reasonably satisfactory to the DIP Lender (the "**Approved DIP Budget Variance Report**"), setting forth in detail (i) the Operating Disbursements for the immediate one-week period ending on the applicable Testing Date; and (ii) as to each material variance contained in the Approved DIP Budget Variance Report and required to be tested, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any such material variance. In addition, the Loan Parties shall provide a detailed, line-by-line computation of actual versus budget deviations on a bi-weekly basis beginning in the third week following entry of the Interim Order, with brief but meaningful commentary for each material line-item deviation (both favorable and unfavorable) when comparing actuals to the Approved DIP Budget for all variances greater than $50,000.

5

| Security: | All DIP Obligations shall:<br><br>(a) pursuant to section 364(c)(1) of the Bankruptcy Code, be claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (the "**DIP Superpriority Claims**"); and<br><br>(b) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first-priority, priming lien (the "**DIP Liens**") on all assets and property of the Loan Parties, whether now owned or hereafter acquired, and proceeds thereof (collectively, the "**Collateral**"); *provided that* the granting of the DIP Liens on any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any, shall be subject to entry of the Final Order granting such relief.<br><br>subject in each case only to a carve-out (the "**Carve-Out**") comprising: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (ii) to the extent applicable, all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000, and (iii) subject to and effective upon the entry of the Final Order granting such relief, after the occurrence and during the continuance of an Event of Default (as defined below) (a) fees and expenses projected in the DIP Budget that have been incurred by the Debtors' professionals or the professionals of a Creditors Committee and remaining unpaid prior to delivery of a Carve-Out Trigger Notice (as defined below), all as may be allowed by the Bankruptcy Court (the "**Pre-Trigger Carve-Out**"), and (b) after delivery of a Carve-Out Trigger Notice, an amount not exceeding $150,000 in the aggregate to pay any fees or expenses incurred by the Debtors' professionals or the professionals of any Creditors Committee (the "**Post-Carve-Out Trigger Notice Cap**"), provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described above. For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Lender following the occurrence of an Event of Default, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. No portion of the Carve-Out, any cash collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, any of the DIP Lender's liens or claims, or the initiation or prosecution of any claim or action against the DIP Lender, in any capacity. |
|---|---|
| **Credit Bidding:** | Subject to and upon entry of the Final DIP Order granting such relief, the DIP Lender shall have the unqualified right to credit bid any or all of the DIP Obligations in connection with any disposition of the Collateral, including any sale of the Loan Parties' assets under section 363 of the Bankruptcy Code. |

| | |
|---|---|
| **Representations and Warranties:** | The DIP Loan Documents will include such representations and warranties as are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lender, including without limitation: due organization; requisite power and authority; qualification; execution, delivery and enforceability of the DIP Loan Documents; no conflicts with organizational documents or applicable law; no material adverse change; restricted junior payments; absence of material litigation; payment of material taxes; title to properties; ERISA and other employee matters; absence of brokers or finders fees; compliance with laws; continued effectiveness of orders of the Bankruptcy Court, including the Orders, as applicable; full disclosure and accuracy of the DIP Budget; and the Patriot Act and other related matters. |
| **Affirmative Covenants:** | The DIP Loan Documents shall include such affirmative covenants as are usual and customary for transactions of this type (and to include reporting covenants, including with respect to the DIP Budget and permitted variances), update meetings and/or calls with the DIP Lender and the CRO, advisors to CRO, SSG, and FTI as reasonably requested.  The Debtors and their professionals shall provide BNH with periodic updates on the sale process, not less than once weekly, and shall provide BNH with copies of indications of interest, letters of intent, and bids within one (1) day of receipt. |
| **Negative Covenants:** | The DIP Loan Documents shall include such negative covenants as are usual and customary for transactions of this type (and to include limitations on indebtedness, liens, investments, acquisitions, restricted payments and dispositions of assets). |
| **Chapter 11 Case Milestones:** | The obligations of the DIP Lender to advance the DIP Loans shall be subject to the Debtors satisfying, or causing the satisfaction of, the milestones related to the Chapter 11 Cases set forth below (the "**Milestones**") by the specified date or such later date as the DIP Lender may agree in writing (email being sufficient):<br><br>(a)  The Interim Order shall be entered no later than five (5) days after the filing of the motion to approve the Interim Order;<br><br>(b)  All DIP Loan Documents shall be duly executed and delivered no later than twenty-one (21) days after entry of the Interim Order;<br><br>(c)  The Final Order shall be entered no later than thirty-two (32) days after the entry of the Interim Order;<br><br>(d)  Such other Milestones to be included in the DIP Documents that are consistent with the Bidding Procedures Order entered by the Bankruptcy Court at Docket No. 298. |

7

| Events of Default: | The DIP Loan Documents will include events of default that are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lender (each an "**Event of Default**"), including, without limitation, the following: |
|---|---|
| | (a) Failure to make payments to DIP Lender and the adequate protection payments to BNH on the BNH Pre-Petition Obligations when due; |
| | (b) Breaches of representations and warranties; |
| | (c) The Chapter 11 Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee, receiver, interim receiver or receiver and manager shall be appointed in the Chapter 11 Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in the Chapter 11 Cases; |
| | (d)  Any super-priority administrative expense claim or lien that is *pari passu* with or senior to the claims, charges or liens of the DIP Lender or the DIP Lender shall have arisen or be authorized or allowed; |
| | (e) Except for payments to the DIP Lender and BNH with regard to the BNH Pre-Petition Obligations, the Debtors shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than payments authorized by the Bankruptcy Court  in orders entered upon pleadings in form and substance satisfactory to the DIP Lender, in its sole discretion; *provided that* the "first day" orders entered by the Court on June 17, 2026 are satisfactory to the DIP Lender; |
| | (f) The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest: (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Loan Parties; or (ii) to permit other actions that would have a material adverse effect on the Loan Parties or their estates; |
| | (g) An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Orders, or the Debtors shall apply for the entry of such an order, without the prior written consent of the DIP Lender; |
| | (h) The Debtors shall fail to meet or comply with any of the Milestones or the terms of the DIP Budget (including permitted variances); |
| | (i) Any of the DIP Loan Documents shall cease to be valid or effective or shall be contested by the Debtors; |
| | (j) The Debtors shall fail to comply in any respect with the Orders; |
| | (k) The Debtors shall file a chapter 11 plan that does not propose to indefeasibly repay the DIP Obligations in full in cash on the plan |

| | |
|---|---|
| | effective date, unless otherwise consented to in writing by the DIP Lender; |
| | (l) The filing of any challenge to the pre-petition liens or claims of BNH by any party that is supported by the Debtors; |
| | (m) The Debtors shall fail to comply with any of the affirmative covenants, or take any action in violation of any of the negative covenants, set forth in the DIP Loan Documents; |
| | (n) The Debtors shall assert in any pleading that the guarantee contained in the DIP Loan Documents is not valid and binding; |
| | (o) Cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable; and |
| | (p) Entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations. |
| **Remedies:** | The DIP Documents will contain customary remedies, including, without limitation, the right following the occurrence of an Event of Default or the Maturity Date to (i) stop funding the DIP Loans; (ii) terminate the Loan Parties' use of any Cash Collateral; (iii) declare all DIP Obligations to be immediately due and payable; and (iv) realize on all Collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. |
| **Conditions Precedent to Commitment, Initial Borrowing:** | The commitment of the DIP Lender to provide the DIP Facility and to enter into the DIP Loan Documents, on the terms and conditions set forth in this Term Sheet, is expressly conditioned on the Debtors and the DIP Lender reaching agreement on substantially final forms of (i) the DIP Loan Documents, (ii) proposed forms of the Orders, and (iii) a DIP Budget, in each case in form and substance satisfactory to the DIP Lender in its sole discretion; *provided* that the DIP Lender shall fund the Interim Advance upon entry of the Interim Order and execution of this Term Sheet.<br><br>The obligation of the DIP Lender to make any DIP Loans will be subject to customary closing conditions for this type of financing in form and substance satisfactory to the DIP Lender, in its sole discretion, including: (i) the entry of an Interim Order and, upon expiration of the Interim Order, the entry of a Final Order; (ii) the execution and delivery of the DIP Loan Documents; *provided* that the DIP Lender shall fund the Interim Advance upon entry of the Interim Order and execution of this Term Sheet prior to execution and delivery of the DIP Loan Documents; (iii) receipt by the DIP Lender of a Budget in form and substance satisfactory to the DIP Lender; (iv) no default or Event of Default shall have occurred and be continuing; (v) the Debtors shall be in compliance with the Milestones; and (vi) payment of all out-of-pocket costs, fees and expenses required to be paid to the DIP Lender. |

| | |
|---|---|
| **Ongoing Conditions to Borrowings:** | The conditions to all borrowings will include requirements relating to prior written notice of borrowing, the accuracy of representations and warranties, and the absence of any default or Event of Default and will otherwise be customary and appropriate for this type of financing. |
| **Indemnity / Release / Validity:** | The Debtors shall indemnify, pay and hold harmless the DIP Lender (and its directors, officers, employees, professionals and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith, fraud, or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). <br><br> The DIP Loan Documents and the Orders shall provide for a full, absolute, plenary and unconditional release of the DIP Lender of all liability for any and all claims, causes of action or other rights of the Debtors, subject only to the challenge rights set forth in the Interim Cash Collateral Order. |
| **Governing Law; Jurisdiction:** | The Debtors will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state of New Jersey; and shall waive any right to trial by jury. <br><br> The DIP Loan Documents shall be governed by Delaware law. |

[*Remainder of page intentionally left blank*]

10

## EXHIBIT A

**DIP Budget**

**Draft - Confidential; Subject to Material Revision; Subject to FRE 408 and Equivalents**

**SIMAD Holdings**
*BNH DIP Budget*

| | BNH |
|---|---|

| $ in 000s | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast/Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Start WE 06/19/26 |
| No. Week Ending | 6/19/2026 | 6/26/2026 | 7/3/2026 | 7/10/2026 | 7/17/2026 | 7/24/2026 | 7/31/2026 | 8/7/2026 | 8/14/2026 | 8/21/2026 | 8/28/2026 | 9/4/2026 | 9/11/2026 | End WE 09/11/26 |
| **I. Net Cash Flow** | | | | | | | | | | | | | | |
| 1. Camper Deposits | $ 50 | $ 40 | $ 48 | $ 55 | $ 56 | $ 29 | $ 41 | $ 60 | $ 13 | $ 139 | $ 90 | $ 132 | $ 303 | $ 1,055 |
| 2. Tuition Refunds | (9) | (9) | 0 | (2) | (3) | (8) | (0) | (1) | (0) | (8) | (0) | - | (0) | (41) |
| 3. Other Receipts | 0 | 0 | 0 | - | 0 | - | 5 | - | - | 6 | 15 | - | 0 | 28 |
| 4. Intercompany Funding | 193 | - | 193 | - | - | - | - | - | - | - | - | - | - | 386 |
| 5. Rental Income | - | - | - | - | - | - | - | - | 22 | 38 | - | 50 | 10 | 120 |
| **6. Total Receipts** | **$ 234** | **$ 31** | **$ 242** | **$ 53** | **$ 52** | **$ 21** | **$ 45** | **$ 59** | **$ 34** | **$ 175** | **$ 105** | **$ 182** | **$ 313** | **$ 1,548** |
| 7. Payroll & Benefits | (103) | (472) | (259) | (425) | (499) | (304) | (717) | (315) | (353) | (563) | (115) | (160) | (109) | (4,395) |
| 8. Camp Operations | (474) | (422) | (473) | (367) | (515) | (381) | (336) | (289) | (202) | (124) | (319) | (87) | (74) | (4,063) |
| 9. Rent Utilities & Maintenance | (167) | (97) | (47) | (69) | (52) | (45) | (50) | (57) | (47) | (49) | (72) | (50) | (72) | (874) |
| 10. Insurance | (3) | (5) | - | (3) | - | (11) | - | - | (24) | (24) | (67) | (13) | (23) | (173) |
| 11. Marketing & Enrollment | (9) | (31) | (7) | (10) | (18) | (20) | (16) | (16) | (10) | (4) | (41) | (31) | (17) | (231) |
| 12. Other Operating | (45) | (48) | (20) | (16) | (13) | (12) | (16) | (17) | (15) | (15) | (20) | (20) | (12) | (269) |
| 13. Intercompany | (193) | - | (193) | - | - | - | - | - | - | - | - | - | - | (386) |
| 14. Taxes | (24) | - | (20) | (26) | (0) | (4) | (13) | (4) | - | (2) | (39) | (4) | (4) | (140) |
| **15. Total Operating Disbursements** | **$ (1,018)** | **$ (1,076)** | **$ (1,020)** | **$ (916)** | **$ (1,098)** | **$ (777)** | **$ (1,147)** | **$ (698)** | **$ (652)** | **$ (780)** | **$ (673)** | **$ (365)** | **$ (310)** | **$ (10,531)** |
| **16. Operating Cash Flow** | **$ (785)** | **$ (1,045)** | **$ (778)** | **$ (863)** | **$ (1,045)** | **$ (757)** | **$ (1,102)** | **$ (639)** | **$ (617)** | **$ (605)** | **$ (568)** | **$ (183)** | **$ 3** | **$ (8,983)** |
| **17. Transfers to Restricted Cash** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (0)** | **$ (38)** | **$ (12)** | **$ (139)** | **$ (90)** | **$ (132)** | **$ (303)** | **$ (715)** |
| 18. Professional Fees | - | - | (12) | - | - | (319) | - | (6) | - | - | (281) | (4) | (917) | (1,540) |
| 19. U.S. Trustee Fees | - | - | - | - | - | - | (38) | - | - | - | (49) | - | - | (87) |
| 20. DIP Interest & Fees | - | - | - | - | (207) | - | - | - | - | (245) | - | - | (164) | (616) |
| **21. Total Non-Operating Items** | **$ -** | **$ -** | **$ (12)** | **$ -** | **$ (207)** | **$ (319)** | **$ (38)** | **$ (6)** | **$ -** | **$ (245)** | **$ (331)** | **$ (4)** | **$ (1,081)** | **$ (2,243)** |
| **22. Net Cash Flow** | **$ (785)** | **$ (1,045)** | **$ (790)** | **$ (863)** | **$ (1,252)** | **$ (1,076)** | **$ (1,140)** | **$ (683)** | **$ (630)** | **$ (989)** | **$ (988)** | **$ (320)** | **$ (1,381)** | **$ (11,942)** |
| | | | | | | | | | | | | | | |
| **II. Cash Balances - Book** | | | | | | | | | | | | | | |
| 23. Beginning Balance | $ 2,931 | $ 2,147 | $ 1,102 | $ 1,169 | $ 305 | $ 1,196 | $ 120 | $ 803 | $ 120 | $ 1,109 | $ 120 | $ 466 | $ 147 | $ 2,931 |
| 24. Net Cash Flow | (785) | (1,045) | (790) | (863) | (1,252) | (1,076) | (1,140) | (683) | (630) | (989) | (988) | (320) | (1,381) | (11,942) |
| 25. DIP Funding | - | - | 857 | - | 2,142 | - | 1,823 | - | 1,619 | - | 1,335 | - | 1,354 | 9,130 |
| **26. Ending Cash Balance** | **$ 2,147** | **$ 1,102** | **$ 1,169** | **$ 305** | **$ 1,196** | **$ 120** | **$ 803** | **$ 120** | **$ 1,109** | **$ 120** | **$ 466** | **$ 147** | **$ 120** | **$ 120** |

*Notes : (All values noted below refer to consolidated BNH group)*

*1. Management Fees and D&O insurance are assumed to be $85k, funded from the remaining cash of $120k, paid to TopCo. TopCo will make the actual disbursement to the respective vendors.*

*2. Accrued operational expenses ($294k) and exit fees ($300k) at the end of the case are assumed to be paid out of potential sale proceeds. Intercompany amounts relate to other BNH camps.*

*3. Accrued and unpaid professional fees and DIP interest are shown paid in Week 13 for presentation purposes, but these fees may be paid at a later date.*