**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*,[1] | Case No. 26-16388 (CMG) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF CHRISTOPHER PIZZO IN SUPPORT OF THE SIMAD
DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE SIMAD DEBTOR BORROWERS TO OBTAIN
POSTPETITION FINANCING FROM BANK OF NEW HAMPSHIRE,
(II) AUTHORIZING THE SIMAD DEBTORS TO USE CASH COLLATERAL, (III)
GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING
THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND
<u>(VII) GRANTING RELATED RELIEF</u>**

---

[1]    A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.  The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

53492273

I, Christopher Pizzo, make this declaration (the "Declaration") pursuant to 28 U.S.C. § 1746:

1. I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a financial advisory firm and the proposed financial advisor for SIMAD Holdings Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "SIMAD Debtors", the SIMAD Debtors that are "Borrowers," the "SIMAD Debtor Borrowers,"[2] together with the SIMAD Debtors that are "Guarantors," the "SIMAD Debtor Guarantors,"[3] collectively, the "SIMAD Debtor Loan Parties") in the above-captioned chapter 11 cases.

2. I submit this Declaration in support of the *SIMAD Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the SIMAD Debtor Loan Parties to Obtain Postpetition Financing from Bank of New Hampshire, (II) Authorizing the SIMAD Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Motion"),[4] which, as noted in the Motion, seeks approval of debtor-in-possession financing consisting of new money in the aggregate principal amount of up to $30 million (the "BNH DIP Facility") which consists of (i) new money term loans in an aggregate principal amount of up to $10,000,000, with up to $2,000,000 available upon entry of the Interim Order (the "Interim Advance") and (ii) a 2:1 "roll up" of $20,000,000 (the "Roll-Up Amount") of the BNH Pre-Petition Obligations (as defined in the *Agreed Interim*

---

[2] The following SIMAD Debtors are SIMAD Debtor Borrowers: Belgrade Lakes Summer Camps LLC, Iafalandco, LLC, Poland Landco LLC, Washington Lake, LLC, Waukeela Landco LLC, Wekeeland LLC, and WM Land, LLC.

[3] The following SIMAD Debtors are SIMAD Debtor Guarantors: Camp Med-O-Lark, Inc., Iafaoperatingco, LLC, Mainewekeelaco, LLC, Poland Campco LLC, Waukeela Operatingco LLC, and WM Camp, LLC.

[4] Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

53492273

*Order with Bank of New Hampshire Pursuant to 11 U.S.C. §§ 361, 362, 363 and 507 and Fed. R. Bankr. P. 2002, 4001, and 9014 (1) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (II) Granting Relief from the Automatic Stay and (IV) Scheduling a Final Hearing*, dated June 18, 2026 [Docket No. 166] (the "Interim Cash Collateral Order").

3.      Although FTI is being compensated for its work as the financial advisor proposed to be retained by the SIMAD Debtors pursuant to a retention application to be filed in due course, I am not being compensated separately for this Declaration or testimony.  Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by FTI professionals involved in advising the SIMAD Debtors in these chapter 11 cases, or information provided to me by the SIMAD Debtors or their other advisors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am over the age of 18 years and authorized to submit this Declaration.

**Background and Qualifications**

4.      FTI Consulting is a leading restructuring consulting firm with extensive experience providing and advising specialized management and advisory services to debtors and distressed companies. FTI's core services are broad and include turnaround advisory, interim and crisis management, revenue improvement, transaction services, forensic litigation services, among numerous other specializations. FTI's restructuring practice and its senior professionals specialize in stabilizing and improving a company's financial position, including developing and validating forecasts, business plan assessment, cash flow and vendors monitoring, and designing and negotiating financial restructuring packages. In addition, FTI and its professionals are well known

3

53492273

for the ability to work with company management and key constituents in a Chapter 11 process to develop and execute a plan of reorganization.

5.      In July 2019, I joined FTI Consulting.  Since 2022, I have served as a Senior Managing Director. I have over 35 years of experience in financial and operational restructuring, investment banking, interim management, and finance and accounting, including substantial experience advising companies in distressed situations and chapter 11 proceedings.

6.      Prior to joining FTI Consulting, I was a member of the Corporate Restructuring Group at Deloitte and previously served as an investment banker at LCG Advisors. Earlier in my career, I was a Certified Public Accountant with Ernst & Young, LLP. I have advised on numerous financing transactions, restructuring engagements, interim management roles, and mergers and acquisitions. I previously held Series 79 and Series 63 licenses.

7.      I have advised clients in both in-court and out-of-court restructurings, including, among others, Pinnacle Management, The Children's Place, American Commercial Barge Lines, Laser Spine Institute, Sears Methodist Retirement Centers, Companhia Siderúrgica Nacional, The Tampa Bay Times, Nassau Broadcasting, and CCNG Energy Partners. I received a Master of Business Administration from the Leonard N. Stern School of Business at New York University and a bachelor's degree in accounting from the State University of New York at Albany.

### The Retention of FTI

8.      FTI has been engaged as proposed financial advisor to the SIMAD Debtors as of June 11, 2026.  Since being engaged by the SIMAD Debtors, FTI has rendered financial advisory services to the SIMAD Debtors in connection with the SIMAD Debtors' evaluation of strategic alternatives.  Additionally, FTI has worked with the SIMAD Debtors' management and other

53492273

professionals retained by the Debtors and has become familiar with the SIMAD Debtors' capital structure, financial condition, liquidity needs, and business operations.

**The SIMAD Debtor Borrowers' Need for Financing and the Use of Cash Collateral**

9.      I am familiar with the BNH DIP Facility and the terms thereof, in addition to the SIMAD Debtor Borrowers' immediate need for liquidity.  Based on my experience in the restructuring industry generally and my experience with the SIMAD Debtor Loan Parties, I believe that approval of the proposed BNH DIP Facility is appropriate and necessary in these chapter 11 cases.

10.      Since FTI's retention subsequent to the Petition Date, FTI has reviewed and analyzed the SIMAD Debtor Loan Parties' cash needs and prepared projections of postpetition liquidity needs for the SIMAD Debtor Loan Parties' business in the initial thirteen (13) weeks of these chapter 11 cases. FTI accounted for anticipated disbursements during the projected period and considered several cost factors, including employee and vendor obligations as well as restructuring costs (including professional fees), and interest and expenses associated with the BNH DIP Facility.  I believe the immediate entry into the BNH DIP Facility is essential to allow the camps to open without delay and uncertainty and preserve and maximize the value of their estates and adequately administer these chapter 11 cases.

11.      Without immediate access to the liquidity provided by the BNH DIP Facility (including the Interim Advance), the SIMAD Debtor Borrowers lack sufficient cash to fund near-term operations during the critical opening weeks of the SIMAD Debtor Borrowers' camps, including the funds to satisfy payroll obligations, critical vendor payments, payments required to ensure the health and safety of the campers and camp staff, insurance, and other key operational disbursements.

53492273

12.     The SIMAD Debtor Loan Parties are beginning their peak operating season, with campers arriving daily.  Currently, the SIMAD Debtor Borrowers lack the ability to meet their needs to open the camps without access to immediate liquidity.  Access to the DIP Facility will not only immediately provide the liquidity needed to meet those obligations, but will send a strong message to campers, vendors, and other stakeholders that the SIMAD Debtor Loan Parties are well equipped to operate the camps and continue to meet their ordinary course obligations throughout the duration of these chapter 11 cases.

13.     Absent the additional liquidity infusion provided by the DIP Facility and the continued use of Cash Collateral, the SIMAD Debtor Borrowers would experience significant business disruption, would need to substantially scale back or potentially cease their operations, impacting the lives and summer plans of over 20,000 campers and their families, and over 5,000 staff members, and could potentially have a devastating impact on the future of each camp's respective operations and ability to retain their camper base, and would face numerous other value-destructive consequences, including not only the risk of harm to employees, but also to the critical vendor relationships that sustain the SIMAD Debtors' business.  The SIMAD Debtor Loan Parties' business is seasonal and dependent on their ability to operate seamlessly during the summer months.  Any disruption would have an immediate and disproportionate impact on the SIMAD Debtor Loan Parties' business.  Access to the proposed BNH DIP Facility ensures that the SIMAD Debtor Borrowers have sufficient liquidity to maintain operations, fund payroll and vendor obligations, insurance costs, maintain all health and safety requirements, and continue delivering the experience to campers to which they have grown accustomed, maintain normal levels of camper retention and thereby preserving their businesses as a going concern.

53492273

14.     The DIP Facility will provide the SIMAD Debtor Loan Parties' campers, employees, contract counterparties, suppliers, and other stakeholders with assurance that these chapter 11 cases are sufficiently funded and that the SIMAD Debtor Loan Parties' business is on the path to improved, sustainable results.  The BNH DIP Facility will provide the SIMAD Debtor Borrowers with sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases.  Without the proposed DIP Facility, the SIMAD Debtor Borrowers would be forced into reactive and value-destructive maneuvers, including potentially ceasing operations right before the camps are set to open.  Sending a clear message of stability is of particular importance because the SIMAD Debtors rely upon advanced enrollments, which the SIMAD Debtor Loan Parties historically collect in July and August for the next summer.  The BNH DIP Facility and the continued use of Cash Collateral will allow the SIMAD Debtor Borrowers to continue operations and to facilitate and effectuate a comprehensive restructuring.

15.     Accordingly, the BNH DIP Facility pending approval before the Court is reasonable, is the best option available to the SIMAD Debtor Loan Parties given the timing constraints under the facts and circumstances of these chapter 11 cases and is the catalyst to position the SIMAD Debtor Loan Parties for success during these chapter 11 cases and, therefore, should be approved.

### The BNH DIP Facility is Fair and Reasonable

16.     As described in the Motion, the proposed BNH DIP Facility critically provides the SIMAD Debtor Borrowers with access to an additional $10 million of post-petition new money, with $2 million available upon entry of the Interim Order, and the remaining $8 million available upon entry of the Final Order.

53492273

17. In my role as the SIMAD Debtor Loan Parties' financial advisor, I have been actively involved in the solicitation, review, and analysis of the numerous proposals received by the SIMAD Debtor Loan Parties regarding DIP financing, as well as in the negotiation process. In my view, the negotiations between the SIMAD Debtor Loan Parties and their advisors, on the one hand, and BNH, on the other, were conducted in good faith and at arm's length. Those arm's length negotiations led to improvement in terms for the SIMAD Debtor Loan Parties. As a result of these arm's length negotiations, the parties agreed upon the BNH DIP Facility for which the SIMAD Debtor Loan Parties seek Court approval.

18. Prior to executing the BNH DIP Documents, the SIMAD Debtor Loan Parties sought proposals from several potential financing sources, including BNH and other existing secured lenders. Recognizing the immediate need for liquidity and the ability to execute immediately given their familiarity with the SIMAD Debtor Loan Parties' assets and operations, it became readily apparent that BNH provided a fair, reasonable, and reliable source of financing for the SIMAD Debtor Loan Parties on a compressed timeframe. Importantly, the SIMAD Debtor Loan Parties were unable to obtain alternative financing on equal or more favorable terms within the timeframe required, and the BNH DIP Facility represents the best available financing option to meet the SIMAD Debtor Loan Parties' immediate liquidity needs and preserve going-concern value. In my view, the benefits of the BNH DIP Facility, including the provision of critical liquidity, the stabilization of operations, and the preservation of relationships with key stakeholders, substantially outweigh any associated costs or concessions.

19. The SIMAD Debtor Loan Parties engaged extensively in good-faith, arm's length negotiations regarding the terms of the BNH DIP Facility with BNH, which has familiarity with the SIMAD Debtor Loan Parties' assets, operations and capital structure, which reduces the need

8

53492273

for protracted diligence that could delay closing.  The SIMAD Debtor Loan Parties received significant interest from many potential financing sources, yet no party was willing to provide debtor-in-possession financing on a junior or unsecured basis within the required expedited timeframe.  While certain parties expressed interest in pursuing a priming financing structure, the anticipated costs, delays, and litigation risks associated rendered such alternatives impracticable and none proved viable or capable of being consummated on the timeline required by the circumstances of these cases, making entry into the proposed BNH DIP Facility a reasonable and appropriate course of action under the circumstances.

20.     I believe the SIMAD Debtor Loan Parties' decision to move forward with the BNH DIP Facility is a sound exercise of their business judgment.  The SIMAD Debtor Loan Parties and their advisors determined that the SIMAD Debtor Loan Parties would require postpetition financing to stabilize their operations.  Access to the proposed BNH DIP Facility will enable the SIMAD Debtor Loan Parties to: (a) operate their summer camps, (b) send a clear, compelling "business as usual" message to campers and their families, employees, and vendors, (c) fund the administration of these chapter 11 cases, (d) fund the Carve-Out, (e) finance payroll and other working capital needs, and (f) preserve going-concern value throughout the chapter 11 process. Nevertheless, the SIMAD Debtor Loan Parties and their advisors, including FTI, intend to continue market-checking the DIP Facility and the DIP Lenders' proposal for alternative proposals during the interim period.

21.     I believe that the terms and conditions of the BNH DIP Facility are fair and reasonable under the circumstances. The BNH DIP Facility was negotiated in good faith and at arm's length among sophisticated parties, and reflects the SIMAD Debtor Loan Parties' constrained liquidity position, the compressed timeline of these chapter 11 cases, and current

53492273

market conditions for debtor-in-possession financing. The pricing, structure, and protections afforded to BNH are consistent with transactions of this nature and are appropriate in light of the risks undertaken.

## Interim Relief is Warranted

22. I believe approval of the interim relief requested in the Motion, including the Interim Advance, is essential to prevent immediate and irreparable harm to the SIMAD Debtor Loan Parties' estates. Without this relief, the SIMAD Debtor Loan Parties would face significant and potentially permanent impairment to their operations, and camps would be unable to operate to keep campers safe. This result would be value destructive. Interim approval will allow the SIMAD Debtor Loan Parties to continue business uninterrupted, maintain relationships with key vendors, meet working capital needs, and keep the children entrusted to their care safe and healthy.

23. Based on the forecasts I have reviewed and the analysis I have done with my team, access to the proposed BNH DIP Facility and Cash Collateral will provide the SIMAD Debtor Borrowers with sufficient liquidity to maintain operations, pay expenses, and pursue their value maximizing transactions.

24. Accordingly, I believe that entry into the BNH DIP Facility constitutes a sound exercise of the SIMAD Debtor Loan Parties' business judgment, and that the terms of the BNH DIP Facility are fair, reasonable, and in the best interests of the SIMAD Debtor Loan Parties' estates and all stakeholders.

## CONCLUSION

25. Based on my experience and involvement in marketing and in negotiating the BNH DIP Facility, I believe the proposed BNH DIP Facility is in the best interests of the SIMAD Debtor

53492273

Loan Parties' estates, is necessary to avoid immediate and irreparable harm, and is a reasonable exercise of the SIMAD Debtor Loan Parties' business judgment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June 27, 2026          By:     */s/ Christopher Pizzo*
                                      Name: Christopher Pizzo

11

53492273