**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*,[1] | Case No. 26-16388 (CMG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF STALKING HORSE BIDDER**
**AND STALKING HORSE ASSET PURCHASE AGREEMENT**

　　**PLEASE TAKE NOTICE** that on June 26, 2026, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered that certain *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 298] (as modified by that certain *Fourth Notice of Extension of Deadline to Select Stalking Horse Bidder(s)* [Docket No. 469], the "Bidding Procedures Order").[2]

---

[1]　A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.  The location of Debtor SIMAD Holdings, Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[2]　Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order or the *Motion For Entry of an Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 227].

53621393

**PLEASE TAKE FURTHER NOTICE** that the Bidding Procedures Order, among other things, approved procedures (the "Bidding Procedures") for the solicitation and consideration of offers for the sale of the SIMAD Debtors' assets, and procedures for designating a Stalking Horse Bidder for such assets and seeking Court approval of Bid Protections.

**PLEASE TAKE FURTHER NOTICE** that counsel for the SIMAD Debtors, the SIMAD Debtors' proposed investment banker, SSG Capital Advisors, LLC, and the SIMAD Debtors' Chief Restructuring Officer, Asaf Ravid (the "CRO"), engaged with numerous parties to attain the highest or otherwise best value for the assets comprised of Camp Echo.  Ultimately, the SIMAD Debtors and the CRO determined to move forward with Ohel Children's Home and Family Services, Inc. as a Stalking Horse Bidder and, subject to approval of this Court, executed the asset purchase agreement with Ohel Children's Home and Family Services, Inc. attached hereto as Exhibit A (the "Stalking Horse Agreement").

**PLEASE TAKE FURTHER NOTICE** that the CRO consulted with (a) counsel to Mishmeret Trust Company Ltd., in its capacity as Trustee for the Debentures (Series A) and as DIP Agent and the (b) Official Committee of Unsecured Creditors ("Committee") (collectively, the "Consultation Parties") in connection with its selection and negotiation of the Stalking Horse Agreement.

**PLEASE TAKE FURTHER NOTICE** that the Stalking Horse Agreement provides for the aggregate Purchase Price in an amount equal to $12 million in cash (the "Cash Payment"), plus Cure Amounts (as defined in the Stalking Horse Agreement), plus the assumption of Assumed Liabilities (as defined in the Stalking Horse Agreement), with a good faith cash deposit of $1.2 million.

**PLEASE TAKE FURTHER NOTICE** that the Stalking Horse Agreement contemplates certain bid protections, including, *inter alia*, (i) a break-up fee in the amount equal to 3.0% of the Cash Payment, (ii) an expense reimbursement up to an amount equal to 1.0% of the Cash Payment, and (iii) a $250,000 overbid requirement at the Auction (collectively, the "Bid Protections").  *See* Stalking Horse Agreement, §§ 9.04(a), (b).

**PLEASE TAKE FURTHER NOTICE** that pursuant to paragraph 7 of the Bidding Procedures Order:

(a) by filing this Stalking Horse Notice, the SIMAD Debtors are seeking approval of the designation of the Stalking Horse Bidder and the Bid Protections, and have disclosed the following information: (i) the identity of the Stalking Horse Bidder; (ii) the amount of the Stalking Horse Bid; (iii) a copy of the Stalking Horse Agreement, which includes the terms and applicable Sale Package to which the Stalking Horse Bid relates; and (iv) the proposed Bid Protections to be provided to the Stalking Horse Bidder.

(b) the SIMAD Debtors shall serve this Stalking Horse Notice on the Stalking Horse Bidder(s), the Office of the United States Trustee,

53621393

counsel to the DIP Agent, counsel to the Bond Trustee, counsel to Bank of New Hampshire, counsel to any other Secured Creditor to the extent such Stalking Horse Notice applies to such Secured Creditor's collateral, and the Committee, and those parties who have requested service of notices pursuant to Bankruptcy Rule 2002, with no further notice being required.

**PLEASE TAKE FURTHER NOTICE that any objection to (i) the Bid Protections set forth in this Stalking Horse Notice or (ii) the designation of the Stalking Horse Bidder shall be filed no later than Tuesday, July 21, at 4:00 p.m. (prevailing Eastern Time).**

**PLEASE TAKE FURTHER NOTICE** that the SIMAD Debtors will file a further notice of hearing once the Court has scheduled a hearing to consider approval of (i) the entry into the Stalking Horse Agreement, and (ii) the proposed Bid Protections, to the extent such hearing is required pursuant to paragraph 7 of the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that this Stalking Horse Notice and any sale are subject to the terms and conditions of the Bidding Procedures Order, the Bidding Procedures, and any further orders of the Court. The SIMAD Debtors encourage parties-in-interest to review such documents in their entirety. Copies of the Bidding Procedures Order, Bidding Procedures, Stalking Horse Agreement, and this Stalking Horse Notice may be obtained on the website maintained by the SIMAD Debtors' Claims and Noticing Agent, Kroll, at https://restructuring.ra.kroll.com/SIMAD. The SIMAD Debtors reserve their right to adopt other or further modifications to the Bidding Procedures in accordance with the terms thereof and of the Bidding Procedures Order.

Dated: July 17, 2026

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
               wusatine@coleschotz.com
               dbass@coleschotz.com
               fyudkin@coleschotz.com
               dharris@coleschotz.com

*Counsel to the Debtors and
Debtors in Possession*

53621393

## Exhibit A

## Stalking Horse Agreement

53621393

**ASSET PURCHASE AGREEMENT**

by and among

**OHEL CHILDREN'S HOME AND FAMILY SERVICES, INC.,**

as Buyer;

and

**THE SELLERS NAMED HEREIN,**

as Sellers

**Dated as of July 16, 2026**

71829/0001-53640003v8

## TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ...................................................................................................1
      "2026 Camp Season" means the Camp Season during calendar year 2026. ......................8

ARTICLE II. PURCHASE AND SALE ..................................................................................8
    Section 2.01      Acquired Assets ........................................................................8
    Section 2.02      Excluded Assets ......................................................................10
    Section 2.03      Assumed Liabilities ................................................................11
    Section 2.04      Excluded Liabilities ...............................................................11
    Section 2.05      Further Assurances..................................................................12
    Section 2.06      Purchase Price ........................................................................12
    Section 2.07      Deposit; Payment of Purchase Price. .....................................12
    Section 2.08      Transfer Taxes .......................................................................13
    Section 2.09      Allocation of Purchase Price...................................................13
    Section 2.10      Assumed Contracts .................................................................14

ARTICLE III. CLOSING ......................................................................................................14
    Section 3.01      Closing....................................................................................14
    Section 3.02      Sellers' Closing Deliverables.................................................15
    Section 3.03      Buyer Closing Deliverables ...................................................16

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLERS ...........................16
    Section 4.01      Organization and Qualification of Sellers...............................16
    Section 4.02      Authority of Sellers................................................................16
    Section 4.03      No Conflicts ...........................................................................17
    Section 4.04      Title to Acquired Assets.........................................................17
    Section 4.05      Litigation................................................................................17
    Section 4.06      Compliance with Laws; Permits .............................................17
    Section 4.07      Environmental Matters............................................................17
    Section 4.08      Real Property .........................................................................17
    Section 4.09      Brokers...................................................................................18
    Section 4.10      Insurance ................................................................................18
    Section 4.11      No Other Representations .......................................................18

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ................................18
    Section 5.01      Organization of Buyer.............................................................18
    Section 5.02      Authority of Buyer..................................................................18
    Section 5.03      No Conflicts ...........................................................................18
    Section 5.04      Sufficiency of Funds ..............................................................19
    Section 5.05      Litigation................................................................................19
    Section 5.06      Brokers...................................................................................19
    Section 5.07      No Outside Reliance ...............................................................19
    Section 5.08      Adequate Assurances Regarding Executory Contracts.....................19

ARTICLE VI. COVENANTS ................................................................................................19
    Section 6.01      Conduct of Business ...............................................................19

71829/0001-53640003v8

Section 6.02      Access to Information ........................................................................19
Section 6.03      Access; Inspections, Testing and Remediation.................................20
Section 6.04      Expired Approvals; Cooperation .......................................................20
Section 6.05      Efforts; Consents...............................................................................21
Section 6.06      Bankruptcy Court Matters.................................................................21
Section 6.07      Publicity .............................................................................................21
Section 6.08      Confidentiality ..................................................................................22
Section 6.09      Notification of Certain Matters..........................................................22
Section 6.10      Bulk Transfer Laws............................................................................22
Section 6.11      Employee Matters ..............................................................................22
Section 6.12      Camp Matters.....................................................................................22

ARTICLE VII. TAX MATTERS .......................................................................................23
Section 7.01      Transfer Taxes ...................................................................................23
Section 7.02      Periodic Taxes....................................................................................23
Section 7.03      Reimbursement for Taxes ..................................................................23
Section 7.04      Cooperation on Tax Matters ..............................................................23

ARTICLE VIII. CONDITIONS TO CLOSING....................................................................23
Section 8.01      Conditions to Obligations of All Parties............................................23
Section 8.02      Conditions to Obligations of Buyer ...................................................24
Section 8.03      Conditions to Obligations of Sellers ..................................................24

ARTICLE IX. TERMINATION ........................................................................................25
Section 9.01      Termination.........................................................................................25
Section 9.02      Effect of Termination.  ......................................................................26
Section 9.03      Remedies.............................................................................................27
Section 9.04      Bid Protections...................................................................................27

ARTICLE X. MISCELLANEOUS .....................................................................................28
Section 10.01     Survival...............................................................................................28
Section 10.02     Notices ................................................................................................29
Section 10.03     Interpretation......................................................................................29
Section 10.04     Severability ........................................................................................30
Section 10.05     Entire Agreement...............................................................................30
Section 10.06     Assignment ........................................................................................30
Section 10.07     Amendment and Waiver ....................................................................30
Section 10.08     Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial 30
Section 10.09     Specific Performance .........................................................................31
Section 10.10     Counterparts.......................................................................................31
Section 10.11     No Third-Party Beneficiaries.............................................................31
Section 10.12     "As Is, Where Is" Transaction ..........................................................31
Section 10.13     No Successor Liability........................................................................31

Exhibits

71829/0001-53640003v8

Exhibit A        Form of Bill of Sale
Exhibit B        Form of Assignment and Assumption Agreement


Schedules

Schedule 2.01(f)       Acquired Assets

Schedule 2.01(g)       Real Property

Schedule 2.10(a)       Assumed Contract List

Schedule 4.04        Leased Assets

Schedule 4.10        Insurance

Schedule 6.11        Employee Matters

71829/0001-53640003v8

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated as of July 16, 2026 (the "Effective Date"), and is entered into by and among Ohel Children's Home and Family Services, Inc., a New York charitable corporation ("Buyer") and each of the "Sellers" identified on the signature pages hereto (each a "Seller" and collectively, the "Sellers"). Each of Buyer and Sellers are at times referred to herein individually as a "Party" and together as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

## RECITALS

WHEREAS, on June 4, 2026 and June 5, 2026, Sellers commenced bankruptcy cases which are being jointly administered under Case No. 26-16388 (CMG) (the "Bankruptcy Case") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

WHEREAS, in connection with the Bankruptcy Case, Sellers desire to sell, transfer, convey, assign and deliver to Buyer, all of the Acquired Assets, and Buyer desires to: (i) purchase, acquire and assume all of the Acquired Assets and all of the Assumed Liabilities (and no other liabilities) (each as defined herein); and (ii) consummate such other transactions as are contemplated by this Agreement, in each case upon the terms and conditions set forth in this Agreement (with all such transactions referred to as the "Transaction");

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Acquired Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey, all on the terms and subject to the conditions set forth in this Agreement and in the Sale Order (as defined herein); and

WHEREAS, Sellers' and Buyer's willingness to consummate the Transaction is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"Accounts Receivable" means (a) all accounts, accounts receivable, payment intangibles, rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

1

71829/0001-53640003v8

"Acquired Assets" has the meaning set forth in Section 2.01.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means any transaction or series of transactions (other than the Transaction) pursuant to which any Person or group of Persons (other than Buyer or any of its Affiliates) directly or indirectly acquires or would acquire any of the Acquired Assets, whether by sale, merger, recapitalization, reorganization, or otherwise.

"Assumed Contract List" has the meaning set forth in Section 2.10.

"Assumed Contracts" means those Contracts that have been assigned to and assumed by Buyer pursuant to Section 2.10 and section 365 of the Bankruptcy Code.

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Assumed Permits" means all Permits, but excluding all Permits to the extent solely related to any Excluded Asset.

"Auction" has the meaning set forth in Section 6.06(a).

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Causes of Action" means any and all claims, rights, causes of action, suits, and proceedings, whether known or unknown, arising under chapter 5 of the Bankruptcy Code (including Sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code) or any analogous state or federal law, including all preference, fraudulent transfer or conveyance, and other avoidance claims, rights, and causes of action, together with any and all proceeds, recoveries, and rights to recovery (whether judicial or otherwise) arising therefrom or related thereto, that are or may be asserted by, or on behalf of, the Sellers, their estates, or any trustee, examiner, or other estate representative.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" has the meaning set forth in the recitals.

2

71829/0001-53640003v8

"Bid Procedures" means the procedures governing the solicitation of bids for the Acquired Assets and, to the extent applicable, the conduct of the Auction, as approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court dated June 26, 2026 approving the Bid Procedures.

"Bid Protections" has the meaning set forth in Section 9.04(a).

"Break-Up Fee" has the meaning set forth in Section 9.04(a).

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Camp" means recreational and/or informal educational programs for Campers during the Camp Season in a communal traditional residential camp environment.

"Camp Business" means the establishment and management of the Camp conducted for Campers during the Camp Season. Such business includes recruitment of Campers, staff, procurement of necessary provisions, lease or ownership of real estate, creation of programs and events and follow-up relations with Campers, prospective Campers, and their parents. The Camp Business may also include the rental of the facilities of the Camp during periods other than the Camp Season.

"Camp Season" shall mean the months of June, July and August in a specific calendar year.

"Campers" means juveniles and adolescents who attend the Camp.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral agreement, contract, lease, sublease, license, sublicense, obligation, promise, undertaking, commitment, or other binding arrangement or understanding.

"Cure Amounts" means all amounts that must be paid and all obligations that must otherwise be satisfied pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, as determined by the Bankruptcy Court.

3

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Deposit" has the meaning set forth in Section 2.07(a).

"DIP Agent" means Mishmeret Trust Company Ltd., in its capacity as agent under the DIP Facility.

"DIP Facility" means any debtor-in-possession credit facility entered into by Sellers in connection with the Bankruptcy Cases.

"Dollars" or "$" means the lawful currency of the United States.

"Effective Date" has the meaning set forth in the preamble.

"Employment Contracts" has the meaning set forth in Section 6.11.

"Encumbrance" means any lien, pledge, security interest, charge, Claim, mortgage, deed of trust, option, right of first refusal, preemptive right, restriction on transfer, or other encumbrance of any kind or nature, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Escrow Agent" means Flagstar Bank, or such other escrow agent as mutually agreed in writing between the Parties.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Claims" means all (a) rights (including rights of set-off and rights of recoupment), claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, rights of set-off, rights of subrogation and all other rights of any kind of the Sellers against (i) directors and officers of Seller, and (ii) third parties solely to the extent arising in respect of any Excluded Asset or Excluded Liability, and (b) Bankruptcy Causes of Action.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Expense Reimbursement" has the meaning set forth in Section 9.04(a).

"Final Order" means an Order of the Bankruptcy Court (or any court of competent jurisdiction) as to which the time to file an appeal, motion for rehearing, or writ of certiorari has expired and no appeal, motion for rehearing, or writ of certiorari is pending; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule, may be filed shall not cause an Order not to be a Final Order.

"Former Employees" means all individuals who have been employed by Sellers who are not Current Employees.

71829/0001-53640003v8

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, provincial, local, municipal, foreign, or other government, or any department, commission, board, bureau, agency, regulatory authority, instrumentality, or political subdivision thereof, or any court, arbitral body, or similar body of competent jurisdiction.

"Intellectual Property" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"Inventory" means all of Sellers' now owned and hereafter acquired raw materials and work-in-process therefor and all of Sellers' tangible property used in the operation of the Sellers' business or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"Knowledge" means, with respect to the Sellers, the actual knowledge of Assaf Ravid, in his capacity as the Chief Restructuring Officer of the Sellers, and Jeff Grabow, the camp director of the Camp.

"Law" means any federal, state, provincial, local, municipal, foreign, international, or multinational constitution, statute, treaty, rule, regulation, ordinance, order, code, or other similar requirement enacted, adopted, promulgated, or applied by any Governmental Authority.

"Liabilities" means any debt, liability, commitment, or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Material Adverse Effect" means any change, effect, event, occurrence, development, or state of facts that, individually or in the aggregate with all other changes, effects, events, occurrences, developments, or states of facts, (a) has had or would reasonably be expected to have

71829/0001-53640003v8

a material adverse effect on the Acquired Assets or the ability of Sellers to consummate the Transaction, or (b) prevents or materially impairs or delays, or would reasonably be expected to prevent or materially impair or delay, the ability of Sellers to consummate the Transaction; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic or political conditions or the securities, credit, or financial markets in general in the United States or any other jurisdiction in which Sellers operates; (ii) changes in conditions generally affecting the industries in which Sellers operates; (iii) the announcement or pendency of this Agreement or the Transaction, including the impact thereof on the relationships, contractual or otherwise, of Sellers with employees, customers, suppliers, distributors, partners, or other third parties; (iv) any change in Law or GAAP (or any interpretation thereof) after the date hereof; (v) acts of war (whether or not declared), sabotage, terrorism, military actions, or the escalation or worsening of any of the foregoing; (vi) any natural or man-made disaster, pandemic, epidemic, disease outbreak, or acts of God; (vii) the filing or commencement of the Bankruptcy Cases or any events or circumstances resulting therefrom; (viii) any action taken or omitted to be taken by Sellers at the written request or with the prior written consent of Buyer; (ix) any failure by Sellers to meet any internal or external projections, forecasts, or estimates of revenue, earnings, or other financial metrics (provided that the underlying causes of such failure may be taken into account unless otherwise excluded by this definition); or (x) any matter disclosed on the Schedules hereto.

"Order" means any order, judgment, injunction, ruling, writ, assessment, or decree of any Governmental Authority.

"Outside Date" means the later of (i) August 30, 2026 and (ii) the date that is thirty (30) days after the entry of the Sale Order; provided, however, that the Outside Date may be extended by mutual written agreement of the Parties or by Buyer to accommodate the occurrence of the Closing following entry of a Final Sale Order.

"Patents" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"Permits" means all licenses, permits, certificates, approvals, registrations, consents, authorizations, franchises, variances, exemptions, and orders issued or granted by a Governmental Authority.

"Permitted Encumbrances" means (a) Encumbrances arising under this Agreement; (b) statutory liens for current Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; (c) mechanics', carriers', workers', repairers', and similar statutory liens arising or incurred in the ordinary course of business for amounts not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; and (d) zoning, entitlement, conservation restrictions, and other land use and environmental regulations by Governmental Authorities that do not materially interfere with the present use of the applicable asset.

"Periodic Taxes" has the meaning set forth in Section 7.02.

6

71829/0001-53640003v8

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period ending on the Closing Date.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" means the dates on which Sellers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Purchase Price" has the meaning set forth in Section 2.06.

"Qualified Bid" has the meaning set forth in the Bid Procedures Order.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Camp Business, including without limitation a current schedule of Seller's Campers.

"Sale Hearing" means the hearing, if any, before the Bankruptcy Court to approve the Sale Order.

"Sale Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to, and prior to submission reasonably approved in writing by, Buyer, entered pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, approving and authorizing (a) the sale of the Acquired Assets to Buyer, free and clear of all Liabilities and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), pursuant to Section 363(f) of the Bankruptcy Code, and finding that Buyer has acted in good faith and is a good faith purchaser of the Acquired Assets entitled to all of the protections of Section 363(m) of the Bankruptcy Code, (b) the assumption and assignment of the Assumed Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code, (c) this Agreement and the Transaction, and (d) such other and further relief as is customary for transactions of this type.

"Schedules" means the disclosure schedules delivered by Sellers to Buyer in connection with the execution of this Agreement.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Software" means all websites, computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation).

"Stalking Horse Bidder" has the meaning set forth in Section 9.04.

"Straddle Period" means any Tax period that includes, but does not end on, the Closing Date.

"Successful Bid" has the meaning given to such term in the Bid Procedures Order.

7

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto.

"Taxes" means all federal, state, local, and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy, and other taxes, duties, or assessments of any nature whatsoever, together with all interest, penalties, and additions thereto imposed with respect to such amounts.

"Trademarks" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"Transfer Taxes" has the meaning set forth in Section 2.08.

"2026 Camp Season" means the Camp Season during calendar year 2026.

## ARTICLE II.
## PURCHASE AND SALE

**Section 2.01   Acquired Assets**.   On the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, assign, transfer, convey, and deliver to Buyer, and Buyer shall purchase, acquire, and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), other than the Excluded Assets, all of the Sellers' assets, rights, properties of every nature, kind and description, tangible or intangible (including goodwill), whether now existing or hereafter acquired, wheresoever situated, relating to or used or held for use in connection with the Camp Business as currently conducted, including without limitation, the following assets (collectively, the "Acquired Assets"):

(a)     [Omitted.]

(b)     all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(c)     [Omitted.]

(d)     all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.10;

(e)     all Intellectual Property owned by Sellers and all of Sellers' rights to use other Intellectual Property, including for the avoidance of doubt the "Camp Echo" name, trademarks, service marks, domain names, social-media accounts, and camper and customer lists;

8

(f)      all items of machinery (including vehicles, boats, buses, vans, maintenance vehicles and trailers) and equipment (including IT Equipment, recreational equipment, teaching materials, athletic equipment, sporting goods, educational equipment, dining hall and food service equipment, and health and health center equipment), as well as tools, parts, supplies, furniture and fixtures owned by Sellers as of the Closing, including but not limited to the assets listed on attached Schedule 2.01(f);

(g)      all real property owned by Sellers and used or held for use in the Camp Business, including the parcels identified as Section 10, Block 1, Lots 50.1, 50.2 and 50.3, having a street address of 210 Echo Road, Town of Mamakating, Sullivan County, New York (approximately 206 acres), including the lot set forth in the Camp Echo land survey by Joseph Gottlieb, P.E., P.C. dated March 29, 2013, as more particularly described on Schedule 2.01(g), together with all improvements, fixtures and appurtenances thereto;

(h)      all Records related to the Acquired Assets and Assumed Liabilities;

(i)      all goodwill associated with the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(j)      all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers;

(k)      all of the Assumed Permits or all of the rights and benefits accruing under any Permits;

(l)      other than with respect to any insurance proceeds related to, arising out of, or in connection with any directors' and officers' liability insurance policies, the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets occurring on or after the date hereof or (ii) any Assumed Liabilities;

(m)      except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) related to the Acquired Assets, to the extent the transfer of the foregoing is effective under applicable non-bankruptcy law;

(n)      all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person related to the Acquired Assets;

9

71829/0001-53640003v8

(o)   all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, remove any Acquired Asset from this Section 2.01 in its sole and absolute discretion until the Closing and elect to treat such Contract, Permit or other asset as an Excluded Asset; provided that no such removal shall result in any adjustment to the Purchase Price.

**Section 2.02   Excluded Assets**.   Notwithstanding anything to the contrary in this Agreement, Sellers shall retain, and shall not sell, assign, transfer, convey, or deliver to Buyer, and Buyer shall not purchase, acquire, or accept from Sellers, any of the following assets of Sellers (collectively, the "Excluded Assets"):

(a)   all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents solely relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity;

(b)   all Contracts, in each case, other than the Assumed Contracts;

(c)   the Excluded Claims;

(d)   any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the transfer and disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Bankruptcy Cases that are protected by the attorney-client privilege;

(e)   all Permits, other than the Assumed Permits;

(f)   all directors' and officers' liability insurance policies and any proceeds arising out of, or related to, such directors' and officers' liability insurance policies;

(g)   the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement;

(h)   all cash and cash equivalents of Sellers;

(i)   all Tax Records of the Sellers;

(j)   all Records related to the Excluded Assets;

(k)   any unused retainers paid by the Sellers to any third party prior to the Closing (for professional services or otherwise) or any amounts remaining in any escrow or similar account used to fund the same; and

10

71829/0001-53640003v8

(l)      any Claims of any Seller against any of its directors, officers, insiders, or affiliates.

(m)      the employment agreement of Jeffrey Grabow and any right of first refusal, option, or other similar right held by Jeffrey Grabow, each of which (i) is not an Assumed Contract, (ii) shall be rejected pursuant to Section 365 of the Bankruptcy Code effective as of the Closing and shall not be assumed by Buyer, and (iii) to the extent it constitutes a right of first refusal, option, or other right in or against any of the Acquired Assets, shall be extinguished by the Sale Order pursuant to section 363(f) of the Bankruptcy Code.

(n)      all Accounts Receivable of Sellers;

Section 2.03   Assumed Liabilities.   On the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to pay, perform, and discharge when due, the following Liabilities of Sellers (collectively, the "Assumed Liabilities")

(a)      all Liabilities arising under the Assumed Contracts that arise from and after the Closing Date and relate to periods from and after the Closing Date;

(b)      any Liabilities for Periodic Taxes with respect to the Acquired Assets for periods from and after the Closing Date (prorated as provided in Section 7.02; for the avoidance of doubt, Buyer shall not assume any other Taxes of Sellers, which are Excluded Liabilities;

(c)      any Liabilities for Transfer Taxes, which shall be allocated pursuant to Section 2.08;

(d)      [Omitted]; and

(e)      all Cure Amounts relating to the assumption and assignment of the Assumed Contracts to Buyer.

Section 2.04   Excluded Liabilities.   Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume or be obligated to pay, perform, or discharge any Liabilities of Sellers other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including the following:

(a)      any Liability for any claim, action, suit, investigation, or proceeding pending or threatened against Sellers or any of their Affiliates;

(b)      any Liability under any employee benefit plan or relating to any current or former employees, independent contractors, or directors of Sellers;

(c)      any Liability arising under any Employment Contract, or under any employment, consulting, retention, severance, bonus, profit-participation, equity-appreciation, change-of-control or similar arrangement with, or otherwise relating to, any current or former employee, officer, director or independent contractor of the Sellers (including under the Worker Adjustment and Retraining Notification Act);

11

71829/0001-53640003v8

(d)      any Liability arising under any lease, sublease, license, occupancy agreement, ground lease, tenancy or other leasehold or possessory interest that is not an Assumed Contract, or under any Encumbrance (other than the Permitted Encumbrances and the Assumed Liabilities);

(e)      any Liability for or relating to camper deposits, advance tuition, prepaid fees or deferred revenue collected or received by Sellers at any time (including any collected or received on or after the date hereof), or any obligation to honor, apply or refund any camper enrollment, deposit or payment for any Camp Season, all of which shall remain the sole responsibility of Sellers;

(f)      any Liability arising out of or relating to any violation of Law by Sellers;

(g)      any indebtedness for borrowed money, including any obligations under the DIP Facility or any other debtor-in-possession financing, and any pre-petition secured or unsecured indebtedness;

(h)      any Liability arising out of or relating to any Excluded Asset;

(i)      any Liability to the extent arising out of or relating to any breach, default, or violation by Sellers prior to the Closing Date under any Contract (other than Cure Amounts);

(j)      any Liability relating to any rejected executory contract or unexpired lease;

(k)      any Tax obligation that Sellers may incur as a result of the consummation of the Transaction, except as explicitly provided in Section 2.08; and

(l)      any other Liabilities of Sellers not specifically included in the Assumed Liabilities.

**Section 2.05   Further Assurances**.  From and after the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transaction.

**Section 2.06   Purchase Price**.  The aggregate purchase price for the Acquired Assets (the "Purchase Price") shall be an amount equal to:

(a)      $12,000,000.00 in cash (the "Cash Payment");

(b)      the Cure Amounts; plus

(c)      the assumption of the Assumed Liabilities.

Prior to Closing, the Parties will agree to an allocation of a portion of the Cash Payment to the Real Property being sold.

**Section 2.07   Deposit; Payment of Purchase Price.**

12

(a)    **Deposit**. Simultaneously with the execution of this Agreement, Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an amount equal to ten percent (10%) of the Cash Payment (the "Deposit"), to be held by the Escrow Agent in an interest-bearing account pursuant to an escrow agreement in form and substance reasonably acceptable to Buyer and Sellers; however to the extent that the purchase price set forth in this Agreement is modified at or prior to the potential Auction (as defined in the Bid Procedures Order), or to the extent Buyer is the Successful Bidder (as defined in the Bid Procedures Order) or the Back-Up Bidder (as defined in the Bid Procedures Order), Buyer shall pay an additional amount into the Escrow Fund, within two (2) Business Days of the Auction, such that the Deposit equals ten percent (10%) of the proposed purchase price offered to purchase the Acquired Assets.

(b)    **Payment at Closing**. At the Closing, Buyer shall pay or cause to be paid to Sellers (or as Sellers may direct) the Cash Payment (less the Deposit, which shall be released to Sellers at Closing, plus or minus adjustments and less applicable credits, in each case only to the extent expressly provided in this Agreement), by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing at least two (2) Business Days prior to the Closing Date.

(c)    **Return of Deposit**.  If this Agreement is terminated for any reason other than a termination by Sellers pursuant to Section 9.01(e) (i.e., a termination arising from Buyer's uncured breach or failure to perform) of by Sellers pursuant to Section 9.01(b) (i.e., a termination arising from a failure to timely close principally caused by Buyer's uncured breach), then the Deposit (together with any interest earned thereon) shall be returned to Buyer within five (5) Business Days after such termination. In the case of a termination by Sellers pursuant to Section 9.01(e) or Section 9.01(b), the Deposit shall be released to Sellers as liquidated damages, which shall constitute the sole and exclusive remedy of Sellers against Buyer for any breach or failure to perform by Buyer, except in the case of Buyer's fraud or willful misconduct.

**Section 2.08   Transfer Taxes** .  All transfer, documentary, sales, use, stamp, registration, recording, value-added, and other similar Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Transaction ("Transfer Taxes") shall be borne by Buyer; provided, however, that the parties shall cooperate in good faith to minimize the amount of any Transfer Taxes and to avail themselves of any available exemptions from any such Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code.

**Section 2.09   Allocation of Purchase Price**.  Within thirty (30) days after the Closing Date, Buyer shall prepare and deliver to Sellers a schedule allocating the Purchase Price (and any Assumed Liabilities to the extent properly taken into account as part of the consideration for U.S. federal income tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Sellers shall have thirty (30) days to review and comment on such schedule. Buyer and Sellers shall endeavor in good faith to resolve any disagreements. If Buyer and Sellers are unable to resolve any such disagreement within fifteen (15) days, such disagreement shall be resolved by a nationally recognized independent accounting firm mutually acceptable to Buyer and Sellers, whose determination shall be final and binding. The fees and expenses of such accounting firm shall be borne equally by Buyer and Sellers. Buyer and Sellers agree to file all Tax Returns in a manner consistent with such allocation and shall not

13

take any position inconsistent therewith in any Tax proceeding, audit, or otherwise, except as required by applicable Law.

**Section 2.10   Assumed Contracts**.

(a)      Schedule 2.10(a) sets forth a list of all Contracts to which a Seller is a party and which Buyer has designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract (the "Assumed Contract List").  From and after the date hereof, until two (2) days prior to the Closing, Buyer shall be entitled to make additions and deletions to the Assumed Contract List by delivery of written notice to Sellers (which shall then serve notice on the non-debtor counterparties to each of the Contracts so added or deleted); provided that Buyer shall pay any net increase in the sum of Cure Amounts and non-debtor counterparties' Administrative Claims resulting directly from such designation of additional Assumed Contracts (the intent being that there will be no net negative effect on the bankruptcy estate due to a net increase in Cure Amounts and non-debtor counterparties' Administrative Claims resulting from any additional assumptions).  Any such deleted Contract shall be deemed to no longer be an Assumed Contract and any such added Contract shall be deemed an Assumed Contract.  Any Contract that is designated (or deemed to be designated) for exclusion and rejection pursuant to this Section 2.10(a) shall constitute an "Excluded Contract" as of the Closing Date.

(b)      In connection with the assumption and assignment to Buyer of any Assumed Contract that is executory pursuant to this Section 2.10, the allowed Cure Amounts, if any, necessary to cure all monetary defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts, shall be paid by Buyer at the Closing as part of the Purchase Price in Section 2.06.

(c)      Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer (the "Assumption Approval") on the terms set forth in this Section 2.10.  In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Authorities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that Sellers' obligations hereunder shall only continue until the Bankruptcy Cases are closed or dismissed.  In addition, Sellers shall use their commercially reasonable best efforts to transfer to Buyer, or to assist Buyer in obtaining or having reissued, all Permits necessary to own and operate the Camp (including all New York State Department of Health children's-camp, food-service, and swimming-pool/bathing-beach permits and all water, septic and dam registrations), and shall reasonably cooperate with Buyer in connection therewith for a period of one-hundred-twenty (120) days following the Effective Date.

**ARTICLE III.
CLOSING**

**Section 3.01   Closing**.  Subject to the satisfaction or waiver of the conditions set forth in Article VIII, the closing of the Transaction (the "Closing") shall take place remotely by exchange of documents and signatures electronically (or by such other means as the parties may agree) on

71829/0001-53640003v8

the date that is three (3) Business Days after the satisfaction or waiver of all conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other time and place as Buyer and Sellers may mutually agree in writing   Notwithstanding the foregoing, the Closing shall take place on the date that is five (5) Business Days after the last day of the 2026 Camp Season (subject to the satisfaction or waiver of the conditions set forth in Article VIII), it being the intention of the parties that the Closing occur only after the conclusion of the 2026 Camp Season (the date on which the Closing actually occurs, the "Closing Date").

Section 3.02   Sellers' Closing Deliverables. At the Closing, Sellers shall deliver or cause to be delivered to Buyer the following:

(a)   a bill of sale, substantially in the form attached hereto as Exhibit A, duly executed by Sellers, evidencing the sale, transfer, conveyance, and assignment of the Acquired Assets to Buyer;

(b)   a bargain and sale deed with covenant against grantor's acts (or other form of deed reasonably acceptable to Buyer), in recordable form, conveying the Real Property to Buyer, together with a duly completed New York State Combined Real Estate Transfer Tax Return (Form TP-584), Real Property Transfer Report (Form RP-5217), and all other instruments of conveyance customary for a New York real property transfer;

(c)   an assignment and assumption agreement, substantially in the form attached hereto as Exhibit B, duly executed by Sellers, evidencing the assignment of the Assumed Contracts and the assumption of the Assumed Liabilities by Buyer;

(d)   a certificate executed by an authorized officer of Sellers, dated as of the Closing Date, certifying that the conditions set forth in Section 8.02(a) and Section 8.02(b) have been satisfied;

(e)   a certificate of the Secretary (or equivalent officer) of Sellers certifying (i) the resolutions duly adopted by the governing body of Sellers authorizing the execution and delivery of this Agreement and the consummation of the Transaction (as approved by the Bankruptcy Court), and (ii) the incumbency and signatures of the officers of Sellers executing this Agreement and any other documents delivered in connection herewith;

(f)   a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that Sellers are not a "foreign person" as defined in Section 1445 of the Code;

(g)   certified copies of (i) the Sale Order and (ii) the Bid Procedures Order, in each case as entered by the Bankruptcy Court;

(h)   all Records included in the Acquired Assets (including all books and records, files, plans, drawings, specifications, and other documents relating to the Camp, the Acquired Assets, and the Assumed Liabilities), to the extent in Sellers' possession or control and not already located at the Camp; and

15

(i)      such other documents, instruments, or certificates as Buyer may reasonably request to evidence and effectuate the consummation of the Transaction.

**Section 3.03   Buyer Closing Deliverables**. At the Closing, Buyer shall deliver or cause to be delivered to Sellers the following:

(a)      the Cash Payment (less the Deposit, together with any interest earned thereon) plus or minus, as applicable, Tax adjustments and less, if applicable, credits, but only to the extent expressly provided in this Agreement), by wire transfer of immediately available funds in accordance with Section 2.07(b);

(b)      the assignment and assumption agreement, substantially in the form attached hereto as Exhibit B, duly executed by Buyer, evidencing the assumption of the Assumed Liabilities by Buyer;

(c)      a certificate executed by an authorized officer of Buyer, dated as of the Closing Date, certifying that the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied;

(d)      a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying (i) the resolutions duly adopted by the governing body of Buyer authorizing the execution and delivery of this Agreement and the consummation of the Transaction, and (ii) the incumbency and signatures of the officers of Buyer executing this Agreement and any other documents delivered in connection herewith;

(e)      a duly completed New York State Combined Real Estate Transfer Tax Return (Form TP-584), Real Property Transfer Report (Form RP-5217), and all other instruments of conveyance customary for a New York real property transfer as may be customarily executed and delivered by a buyer in a New York real property transfer; and

(f)      such other documents, instruments, or certificates as Sellers may reasonably request to evidence and effectuate the consummation of the Transaction.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the correspondingly numbered Sections of the Schedules, Sellers represent and warrant to Buyer that the statements contained in this Article IV are true and correct as of the Effective Date and as of the Closing Date.

**Section 4.01   Organization and Qualification of Sellers**.   Each Seller is a corporation/limited liability company duly organized, validly existing, and in good standing under the Laws of the State of its incorporation/formation, and has all requisite power and authority to own, lease, and operate its properties and to carry on its business as presently conducted.

**Section 4.02   Authority of Sellers**.   Subject to the entry of the Sale Order, Sellers have full power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Sellers in connection herewith, to

16

71829/0001-53640003v8

perform its obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement and the consummation of the Transaction have been duly authorized by all necessary action on the part of Sellers (including, to the extent required, approval of the Bankruptcy Court). This Agreement has been duly executed and delivered by Sellers and, assuming the due authorization, execution, and delivery by Buyer, and subject to entry of the Sale Order, constitutes a legal, valid, and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 4.03   No Conflicts**.  Subject to entry of the Sale Order, the execution, delivery, and performance of this Agreement by Sellers and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of formation, limited liability company agreement, certificate of incorporation, bylaws, or other organizational documents of Sellers, (b) violate or result in a breach of any Law applicable to Sellers, or (c) except as would not reasonably be expected to have a Material Adverse Effect, violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which any Seller is a party or by which any Seller or any of its assets is bound.

**Section 4.04   Title to Acquired Assets**.  Subject to entry of the Sale Order, Sellers have good and valid title to the Acquired Assets and own the Real Property in fee simple, in each case free and clear of all Encumbrances other than Permitted Encumbrances.  The only leasehold interests held by Sellers with respect to the Real Property are leasehold interests in certain above-ground storage tanks identified on Schedule 4.04 (the "Tank Leases").  Except solely for the Tank Leases, no portion of the Real Property or the other Acquired Assets is subject to any lease, sublease, license, occupancy agreement, ground lease, tenancy, or other leasehold or possessory interest in favor of any Person, and at the Closing the Real Property shall be delivered free of all leases, tenancies and rights of possession (other than Permitted Encumbrances).

**Section 4.05   Litigation**.  Except for the Bankruptcy Cases, there is no action, suit, claim, investigation, or proceeding pending or, to the Knowledge of Sellers, threatened against Sellers that (a) challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction, or (b) would reasonably be expected to have a Material Adverse Effect.

**Section 4.06   Compliance with Laws; Permits**.  Except as would not reasonably be expected to have a Material Adverse Effect, Sellers are in compliance in all material respects with all Laws applicable to the Acquired Assets or the ownership or operation thereof.

**Section 4.07   Environmental Matters**.  To the Knowledge of Sellers, Sellers have not received, within the last year, any written notice from any Governmental Authority of a violation of any environmental Laws with respect to the Real Property that remains outstanding.

**Section 4.08   Real Property**.  [Omitted].

71829/0001-53640003v8

**Section 4.09   Brokers**.   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transaction or any other transaction document based upon arrangements made by or on behalf of Sellers.

**Section 4.10   Insurance**.   Sellers shall maintain the insurance covering the Camp Business and the Acquired Assets currently in place on the Effective Date as set forth in Schedule 4.10 in amounts (and subject to deductibles and self-insurance amounts) substantially as set forth on Schedule 4.10.

**Section 4.11   No Other Representations**.  Except for the representations and warranties expressly set forth in this Article IV, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers, the Acquired Assets, or the Transaction, and Sellers disclaim any other representations or warranties, whether made by Sellers or any of their Affiliates, officers, directors, employees, agents, or representatives. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE IV, SELLERS MAKE NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND SELLERS HEREBY DISCLAIM ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date of this Agreement and as of the Closing Date.

**Section 5.01   Organization of Buyer**. Buyer is a charitable corporation duly organized, validly existing, and in good standing under the Laws of the State of New York, and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as presently conducted.

**Section 5.02   Authority of Buyer**. Buyer has full power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Buyer in connection herewith, to perform its obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement and the consummation of the Transaction have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, assuming the due authorization, execution, and delivery by Sellers, constitutes a legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 5.03   No Conflicts**.  The execution, delivery, and performance of this Agreement by Buyer and the consummation of the Transaction do not and will not (a) violate, conflict with,

18

71829/0001-53640003v8

or result in a breach of any provision of the certificate of incorporation, bylaws, or other organizational documents of Buyer, (b) violate or result in a breach of any Law applicable to Buyer, or (c) except as would not reasonably be expected to prevent or materially impair or delay the consummation of the Transaction, violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which Buyer or any of its assets is bound.

**Section 5.04   Sufficiency of Funds**.  Buyer has, and at the Closing will have, immediately available funds sufficient to pay the Cash Payment and all other amounts payable by Buyer hereunder and to consummate the Transaction.  Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.

**Section 5.05   Litigation**. There is no action, suit, claim, investigation, or proceeding pending or, to the knowledge of Buyer, threatened against Buyer that challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction.

**Section 5.06   Brokers**.   No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission from Buyer in connection with the Transaction based upon arrangements made by or on behalf of Buyer.

**Section 5.07   No Outside Reliance**. Buyer acknowledges and agrees that (a) Buyer has conducted its own independent investigation, review, and analysis of the business, operations, assets, liabilities, results of operations, financial condition, and prospects of Sellers and the Acquired Assets, which investigation, review, and analysis was performed by Buyer and its Affiliates and representatives, (b) Buyer has been afforded access to the books and records, facilities, equipment, Contracts, and other assets of Sellers that Buyer and its representatives have requested to review, and (c) in entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations and warranties expressly set forth in Article IV (as qualified by the Schedules) and acknowledges that, except as expressly set forth in Article IV, neither Sellers nor any of its Affiliates or representatives makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or representatives.

**Section 5.08   Adequate Assurances Regarding Executory Contracts**.  Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts. **COVENANTS**

**Section 6.01   Conduct of Business**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) use commercially reasonable efforts to maintain the Acquired Assets in good working order (ordinary wear and tear excepted), and (b) not take any action that would reasonably be expected to result in a Material Adverse Effect.

**Section 6.02   Access to Information**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) provide Buyer

71829/0001-53640003v8

and its representatives with reasonable access during normal business hours, upon reasonable advance notice, to the personnel, properties, books, records, and Contracts relating to the Acquired Assets, and (b) furnish to Buyer such financial, operating, and other data and information relating to the Acquired Assets as Buyer may reasonably request. Notwithstanding the foregoing, Sellers shall not be required to provide access or information to the extent that (i) such access or the provision of such information would violate any Law or binding agreement, (ii) such information is subject to attorney-client privilege or attorney work-product protection, or (iii) such access or the provision of such information would be unreasonably disruptive to the operations of Sellers.

**Section 6.03   Access; Inspections, Testing and Remediation**.

(a)   Access.  From and after the Effective Date and prior to Closing, Seller shall provide Buyer and its contractors reasonable access to the Property, during normal business hours and upon reasonable prior notice to Seller, solely for the purpose of viewing and walking the real property owned by Seller that constitutes the Camp.  Seller may require that Seller's representative accompany Buyer and its contractors while they are on the Property, including by walking the Property with them during any such visit.

(b)   Environmental Testing.  Buyer shall be entitled to conduct, at Buyer's expense, a Phase I environmental site assessment, together with the inspection and testing of the well, water, and septic systems serving the Real Property; provided, however, that, in order to avoid disruption to the operation of the Camp Business, any such Phase I environmental assessment and well, water and septic system testing shall be conducted only on or after seven days prior to the conclusion of the 2026 Camp Season, and shall not be conducted otherwise while the Camp is in session without Sellers' prior written consent.  Sellers shall reasonably cooperate with, and shall not unreasonably interfere with, Buyer's conduct of such assessments and testing, and Buyer shall restore the Real Property to substantially its condition prior to such testing.  In the event Buyer wishes to conduct any Phase II investigation or sampling based on the findings of Buyer's Phase I environmental site assessment report, Buyer agrees that any such Phase II investigation or sampling shall be conducted after Closing.

(c)   Remediation Costs.   Sellers shall have no obligation or liability for any investigation, removal or remediation costs associated with any condition identified in any Phase I environmental site assessment of the Real Property.  With respect to any lead contamination in a source water well on the Real Property in excess of the governmental recommended safe limit for drinking water, the first $500,000 in total costs of investigation, removal and remediation shall be paid equally by the Debtors' estate and Buyer (i.e., 50% each); and any amount of such costs in excess of $500,000 shall be borne exclusively by Buyer, all pursuant to the following mechanism: such costs shall be reasonably estimated by Buyer's independent environmental consultant, and subject to Seller's reasonable review and approval, one half of such estimate, up to a total of $250,000 (the "Cap") shall be a credit against the Purchase Price at Closing, and, if such estimate shall not have yet been determined at Closing, then the amount of the Cap shall be deposited in full by Buyer to, and held by Buyer's counsel in escrow until resolution of the estimate and allocation under this Section 6.03(c).

**Section 6.04   Expired Approvals; Cooperation**.  Sellers consent to Buyer's taking such steps as Buyer deems necessary or advisable to identify, obtain, renew, reinstate, or perfect any

20

site-plan, special-use, building, bunkhouse, zoning, occupancy, or other approvals, permits, variances, or certificates relating to the Real Property or the Camp Business (collectively, the "Approvals"), including the governmental approvals for the Camp that were issued or applied for in or about 2013 and have since expired (the "Expired Approvals").  Sellers shall have no affirmative obligation to search for, investigate, apply for, obtain, renew, or reinstate any Approval; provided, however, that Sellers shall reasonably cooperate with, and not impede, Buyer's efforts.  Sellers hereby consent and authorize Buyer to work directly with Sellers' professionals, engineers, and consultants, as Buyer may reasonably require, in each case at no out-of-pocket cost or liability to Sellers.

**Section 6.05   Efforts; Consents.** Subject to the terms and conditions of this Agreement, each of the parties hereto shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable under applicable Law to consummate the Transaction as promptly as practicable, including (i) obtaining all necessary consents, approvals, or authorizations of, and making all filings with and giving all notices to, Governmental Authorities and other third parties, and (ii) obtaining all consents, approvals, or authorizations of third parties necessary for the consummation of the Transaction.

**Section 6.06   Bankruptcy Court Matters.**

(a)      **Bid Procedures**. [If the Bid Procedures Order provide for an auction (the "Auction") and one or more Qualified Bids are received by Sellers, Sellers shall conduct the Auction in accordance with the Bid Procedures Order.]

(b)      **Sale Order**.  Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order, in form and substance reasonably acceptable to Buyer, by the Bankruptcy Court as promptly as practicable after the Sale Hearing.

(c)      **Stalking Horse Designation**.  No later than 4:00 p.m. (prevailing Eastern Time) on July 16, 2026, the Sellers shall have consulted with the Consultation Parties (as defined in the Bid Procedures Order) and filed with the Bankruptcy Court a Stalking Horse Notice designating Buyer as the Stalking Horse Bidder for the Camp Echo Sale Package and seeking approval of the Bid Protections, thereby commencing the three (3) Business Day objection period under paragraph 7 of the Bid Procedures Order.

(d)      **No Modification or Appeal**. Buyer shall not oppose, and Sellers shall not take any action that is intended to, or that would reasonably be expected to, result in the reversal, modification, or vacatur of the Bid Procedures Order or the Sale Order.

(e)      **Defense of Orders**. Each of Sellers and Buyer shall use their commercially reasonable efforts to take such actions as may be reasonably necessary to defend against any objection to the Sale Order or any appeal therefrom.

**Section 6.07   Publicity**.  Except as required by applicable Law (including any disclosure required by the Securities and Exchange Commission or other Governmental Authority or any disclosure required in connection with the Bankruptcy Cases), no party hereto shall issue any press release or make any public announcement relating to this Agreement or the Transaction without

21

71829/0001-53640003v8

the prior written consent of the other parties hereto (which consent shall not be unreasonably withheld, conditioned, or delayed).

Notwithstanding the foregoing, from and after the Closing, Buyer may announce and publicize its acquisition of the Acquired Assets and its operation of a camp at the site under a new name, in each case without Sellers' prior consent.

**Section 6.08   Confidentiality**.    The parties acknowledge that certain confidential information has been and may be exchanged in connection with this Agreement. Each party agrees to keep confidential all information provided by the other party in connection with this Agreement that is not otherwise publicly available, and to use such information solely for the purposes of consummating the transactions contemplated hereby, except as required by applicable Law (including any disclosure required in connection with the Bankruptcy Cases).

**Section 6.09   Notification of Certain Matters**.   Each party hereto shall give prompt notice to the other parties of (a) the occurrence or non-occurrence of any event that has caused or would reasonably be expected to cause any condition to the obligations of any party to effect the transactions contemplated hereby not to be satisfied, and (b) any action, suit, claim, investigation, or proceeding commenced or, to the knowledge of such party, threatened against such party that relates to the consummation of the Transaction.

**Section 6.10   Bulk Transfer Laws**.   Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement.   The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances on the Acquired Assets, including any Encumbrances arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 6.11   Employee Matters**.

(a)      Schedule 6.11 lists all employment, consulting, retention, severance, bonus, profit-participation, equity-appreciation and similar Contracts of the Sellers relating to the Camp Business (collectively, the "Employment Contracts"). None of the Employment Contracts is an Assumed Contract. Each Employment Contract is rejected pursuant to Section 365 of the Bankruptcy Code effective as of the Closing, and the Sale Order shall so provide. Buyer does not assume, and shall have no Liability for, any Employment Contract or any obligation to any current or former employee, officer, director or independent contractor of the Sellers, including any wages, severance, bonus, profit-participation or equity-appreciation right. Buyer has no obligation to offer employment to any Person; any offer Buyer elects to make shall be made by Buyer as a new employer on an at-will basis and on terms Buyer determines in its sole discretion.

**Section 6.12   Camp Matters**.   From the Effective Date until the Closing Date, Sellers shall operate the Camp Business in substantially the same manner as Sellers have traditionally operated it and in accordance with all governmental requirements and the policies, rules, regulations and standards of the American Camp Association.   The parties acknowledge that Buyer

22

71829/0001-53640003v8

does not intend to continue the 2026 Camp Season operation under the existing brand, and Sellers shall have no obligation to maintain, enroll or re-enroll campers for Buyer's benefit.

## ARTICLE VII.
## TAX MATTERS

**Section 7.01   Transfer Taxes**.   All Transfer Taxes shall be allocated as set forth in Section 2.08. The party required by applicable Law to file any Tax Return with respect to any Transfer Taxes shall timely file such Tax Return, and the other party shall cooperate with such filing party as reasonably requested.

**Section 7.02   Periodic Taxes**.   For purposes of this Agreement, with respect to any Acquired Asset, Sellers and Buyer shall apportion the liability for real and personal property Taxes, ad valorem Taxes, and similar Taxes (other than Transfer Taxes) ("Periodic Taxes") for Straddle Periods applicable to such Acquired Asset in accordance with this Section.  The Periodic Taxes shall be apportioned between Sellers and Buyer as of the Closing Date, with Buyer liable for that portion of the Periodic Taxes for a Straddle Period equal to the Periodic Taxes for such Straddle Period multiplied by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period.  Sellers shall be liable for that portion of the Periodic Taxes for a Straddle Period (which portion shall for purposes of this Agreement be deemed attributable to the Pre-Closing Tax Period) equal to the Periodic Taxes for such Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of such Straddle Period ending on (and including) the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period.  The party responsible under applicable Law for paying a Tax described in this Section shall be responsible for administering the payment of such Tax.

**Section 7.03   Reimbursement for Taxes**.  Sellers, on the one hand, or Buyer on the other hand, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other, all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Agreement.

**Section 7.04   Cooperation on Tax Matters**.  After the Closing, Sellers and Buyer agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit, or proceeding relating to any Tax.

## ARTICLE VIII.
## CONDITIONS TO CLOSING

**Section 8.01   Conditions to Obligations of All Parties**.  The obligations of each party hereto to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by both Sellers and Buyer) of each of the following conditions as of the Closing:

23

(a)      *No Injunction*.  No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Law or Order that enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(b)      *Sale Order*.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall be a Final Order, in form and substance reasonably acceptable to Buyer, and shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent, and the Sale Order shall have been entered by the Bankruptcy Court no later than the deadline for entry of a Sale Order set forth in the Bid Procedures Order.

**Section 8.02   Conditions to Obligations of Buyer**.   The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of each of the following additional conditions as of the Closing:

(a)      **Representations**.  (i) The representations and warranties of Sellers set forth in Section 4.01 (*Organization and Qualification of Sellers*) and Section 4.02 (*Authority of Sellers*) shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date), (ii) the other representations and warranties of Sellers set forth in Article IV shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications set forth therein) as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct as of such date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect; provided, however, that the foregoing Material Adverse Effect exception shall not apply to the representations and warranties of Sellers set forth in Section 4.04.

(b)      **Performance of Covenants**.  Sellers shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Sellers under this Agreement at or prior to the Closing.

(c)      **No Material Adverse Effect**.  Since the date hereof, there shall not have occurred any Material Adverse Effect.

(d)      **Closing Deliveries**.  Sellers shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.02.

(e)      **Bid Procedures Order**.  The Bankruptcy Court shall have entered the Bid Procedures Order, and the Bid Procedures Order shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent.

**Section 8.03   Conditions to Obligations of Sellers**.   The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Sellers) of each of the following additional conditions as of the Closing:

24

(a)     **Representations**.  The representations and warranties of Buyer set forth in Article V shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date);

(b)     **Performance of Covenants**.  Buyer shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Buyer under this Agreement at or prior to the Closing.

(c)     **Closing Deliveries**. Buyer shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.03.

**ARTICLE IX.**
**TERMINATION**

**Section 9.01   Termination**.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)     by the mutual written consent of Buyer and Sellers;

(b)     by Buyer (or Sellers, but, in the case of Sellers, only if the failure of the Closing to occur on or before the Outside Date has been principally caused by Buyer's breach of this Agreement that remains uncured after any applicable notice and cure period), upon written notice to the other party, if the Closing shall not have occurred on or before the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.01(b) shall not be available to any party whose failure to fulfill any of its obligations hereunder has been the principal cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c)     by Buyer, upon written notice to Sellers, if Sellers' representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.02(a) would not be satisfied, or if Sellers shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.02(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Buyer to Sellers;

(d)     by Buyer, upon written notice to Sellers, if there shall have occurred a Material Adverse Effect;

(e)     by Sellers, upon written notice to Buyer, if any of Buyer's representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.03(a) would not be satisfied, or if Buyer shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.03(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Sellers to Buyer;

71829/0001-53640003v8

(f)      by either Party if, following completion of the Auction, Sellers (a) enter into a definitive agreement with respect to a Qualified Bid that constitutes the Successful Bid under the Bid Procedures (which shall constitute an Alternative Transaction for purposes of the Bid Protections provisions of this Agreement) and (b) Buyer is not designated as the Back Up Bid (as defined in the Bid Procedures Order) in accordance with the Bid Procedures Order; provided that, the Sellers shall remain obligated to pay the Bid Protections to the Seller under Section 9.04 hereof in the event of a termination under this paragraph (f).

(g)      by Buyer, upon written notice to Sellers, if the Sellers shall not have satisfied each of the requirements set forth in the covenant entitled "Stalking Horse Designation" (including having consulted with the Consultation Parties (as defined in the Bid Procedures Order) and the filing of the Stalking Horse Notice) by 4:00 p.m. (prevailing Eastern Time) on July 16, 2026;

(h)      by Buyer, upon written notice to Sellers, if the Buyer's designation as the Stalking Horse Bidder and the Bid Protections shall not have been approved under the Bid Procedures Order (whether automatically upon expiration of the three (3) Business Day objection period under paragraph 7 of the Bid Procedures Order without a timely Stalking Horse Objection, or by entry of an order of the Bankruptcy Court) on or before 4:00 p.m. (prevailing Eastern Time) on July 21, 2026, or if a Stalking Horse Objection is filed and sustained (in whole or in part), or if the Bankruptcy Court denies, or approves on terms less favorable to the Buyer than those set forth in this Agreement, the Buyer's designation as the Stalking Horse Bidder or the Bid Protections;

(i)      [Omitted];

(j)      by either Buyer or Sellers, upon written notice to the other parties, if any court of competent jurisdiction or other Governmental Authority shall have issued an Order permanently enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable;

(k)      by either Buyer or Sellers, upon written notice to the other parties, if the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if a trustee is appointed in the Bankruptcy Cases;

(l)      by either Buyer or Sellers, upon written notice to the other party, if the Bankruptcy Court shall have entered an Order authorizing Sellers to consummate an Alternative Transaction with a Person other than Buyer; or

(m)      by Buyer, upon written notice to Sellers, if the Bankruptcy Court shall not have entered a Sale Order approving the sale of the Acquired Assets to Buyer on or before August 11, 2026 (the date that is five (5) Business Days after the Sale Hearing scheduled for August 4, 2026 under the Bid Procedures Order (Dkt. No. 298), as such Sale Hearing may be adjourned), or if an objection to the sale of the Acquired Assets to Buyer is sustained in a manner that prevents entry of such Sale Order by such date.

**Section 9.02   Effect of Termination.**   In the event of termination of this Agreement pursuant to Section 9.01, this Agreement shall become void and of no effect, without any liability or obligation on the part of any party hereto (or any of their respective Affiliates, officers, directors,

26

71829/0001-53640003v8

employees, agents, or representatives), except that (i) the provisions of this Section 9.02 (*Effect of Termination*), Section 9.03 (*Remedies*), Section 9.04 (*Bid Protections*), and Article X (*General Provisions*) shall survive any termination of this Agreement, and (ii) no such termination shall relieve any party from liability for any willful breach of this Agreement or fraud.

**Section 9.03   Remedies.**

(a)     In the event that this Agreement is terminated by Sellers pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, or in the event that Buyer fails to consummate the Closing when all conditions to Buyer's obligations to close have been satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing), Sellers' sole and exclusive remedy (except in the case of fraud or willful misconduct) shall be to retain the Deposit as liquidated damages. The parties acknowledge that the actual damages to Sellers resulting from such breach or failure would be difficult to ascertain, and the Deposit constitutes a reasonable estimate of such damages.

(b)     In the event that this Agreement is terminated other than pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, and Buyer is entitled to the return of the Deposit pursuant to Section 2.07(c), the return of the Deposit shall constitute the sole and exclusive remedy of Buyer against Sellers (except in the case of fraud or willful misconduct); provided that Buyer shall in all events remain entitled to the Bid Protections to the extent payable under Section 9.04.

(c)     Notwithstanding anything to the contrary herein, in no event shall any party be liable to any other party for any punitive, exemplary, special, incidental, consequential, or indirect damages, including lost profits or loss of business opportunity, in connection with this Agreement or the Transaction.

**Section 9.04   Bid Protections**

The parties acknowledge that Buyer is the stalking horse bidder (the "Stalking Horse Bidder") and that this Agreement constitutes a Qualified Bid under the Bid Procedures Order (Dkt. No. 298). As an inducement to Buyer to enter into this Agreement and serve as the Stalking Horse Bidder, and subject to the conditions set by the Bankruptcy Court in the Bid Procedures Order:

(a) Break-Up Fee and Expense Reimbursement. If this Agreement is terminated under circumstances in which the Bid Protections are payable pursuant to clause (c) below, the Sellers shall pay to Buyer (i) a break-up fee equal to three percent (3%) of the Cash Payment (the "Break-Up Fee") and (ii) an expense reimbursement of Buyer's reasonable and documented out-of-pocket fees, costs and expenses incurred in connection with the Transaction, in an amount not to exceed one percent (1%) of the Cash Payment (the "Expense Reimbursement", and together with the Break-Up Fee, the "Bid Protections"); for clarity, regardless of whether Buyer is entitled to a return of the down payment deposit under Section 2.07(c).

(b) Minimum Overbid; Administrative Priority. No competing bid shall be deemed a Qualified Bid unless it provides total consideration exceeding the sum of (i) the Cash Payment, (ii) the Break-Up Fee, (iii) the Expense Reimbursement, and (iv) [$250,000], with any subsequent bidding increments as established by the Bid Procedures Order. The Bid Protections shall

27

71829/0001-53640003v8

constitute an allowed administrative expense of the Sellers' estates under sections 503(b) and 507(a)(2) of the Bankruptcy Code, payable from the proceeds of any Alternative Transaction without further order of the Bankruptcy Court.

(c) Payment. The Bid Protections shall be earned, and shall be paid to Buyer ten (10) Business Days following the consummation of any Alternative Transaction (and from the proceeds thereof), if this Agreement is terminated as a result of the Sellers' consummation of, or entry into a definitive agreement providing for, an Alternative Transaction.

(d) No Waiver by Participation. Buyer's participation in the Auction, including by submitting one or more Overbids or otherwise increasing its Bid, shall not reduce, impair, or waive Buyer's right to the Bid Protections if Buyer is not the Successful Bidder, and the Break-Up Fee shall be calculated on the Cash Payment set forth in this Agreement.

**(e)** Segregation of Bid Protections. Upon the Debtors' execution of a definitive agreement with respect to, or the Bankruptcy Court's approval of, any Alternative Transaction, Sellers shall cause an amount equal to the Break-Up Fee and the Expense Reimbursement to be segregated and held by the Escrow Agent (or another escrow agent reasonably acceptable to Buyer) from the proceeds of such Alternative Transaction, and shall not permit the disbursement of such proceeds free of such segregation, pending payment of the Bid Protections to Buyer in accordance with this Section 9.04.

(f) Back-Up Bidder Duration. Notwithstanding anything to the contrary in this Agreement or in the Bidding Procedures, in no event shall Buyer's obligations as the Back-Up Bidder (as defined in the Bid Procedures Order) extend beyond the date that is forty five (45) days after Court approval of an Alternative Transaction, and upon such date Buyer shall be automatically released from all obligations as Back-Up Bidder and the Deposit (together with any interest earned thereon) shall be returned to Buyer within five (5) Business Days.

**(g)** Waiver of Bid Protections; Release as Back-Up Bidder. Buyer may, at any time and in its sole discretion, by written notice to Sellers, if it submits a bid on a different camp package that is then the Successful Bid on such camp package, irrevocably waive its right to receive the Break-Up Fee and the other Bid Protections, whereupon (i) Buyer shall be released from any obligation to serve as, or continue to serve as, the Back-Up Bidder, and (ii) the Deposit (together with any interest earned thereon) shall be returned to Buyer within five (5) Business Days.

(h) Qualified Bid for Other Auctions. The Debtors acknowledge and agree that Buyer is a Qualified Bidder, and that this Agreement together with the Deposit and the qualification materials delivered by Buyer constitute a Qualified Bid under the Bid Procedures Order, in each case with respect to each other Sale Package and Auction for which Buyer submits (or has submitted) a bid, without the need for Buyer to satisfy any additional qualification requirement.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.01 Survival**. The representations, warranties, covenants, and agreements contained in this Agreement shall not survive the Closing and shall terminate at the Closing, except

28

71829/0001-53640003v8

for (a) covenants and agreements that by their terms contemplate performance after the Closing, which shall survive until fully performed, and (b) claims based on fraud or willful misconduct.

**Section 10.02 Notices**.   notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be deemed duly given (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (c) when sent by email (with confirmation of transmission) if sent during normal business hours of the recipient (and if not sent during normal business hours, then on the next Business Day), or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, in each case addressed to the parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

| | |
|---|---|
| if to Buyer, then to: | Ohel Children's Home and Family Services, Inc.<br>2nd Floor<br>156 Beach 9th Street<br>Far Rockaway, NY 11691<br>Attention: Howard Lorch, CPA<br>Email: david_mandel@ohelfamily.org;<br>HowardLorch@ohelfamily.org; and<br>Aryeh_Schneider@ohelfamily.org |
| with a copy (which shall not constitute notice) to: | Akabas & Sproule<br>11th Floor<br>488 Madison Ave.<br>New York, NY 10022<br>Attention: Seth Akabas, Esq.<br>Email: SAkabas@akabas-sproule.com |
| if to Sellers, then to: | Asad Ravid<br>Email: aravid@circleinv.com |
| with a copy (which shall not constitute notice) to: | Cole Schotz P.C.<br>25 Main Street<br>Hackensack, New Jersey 07601<br>Attention: Roger Iorio, Esq.<br>Email: riorio@coleschotz.com |

**Section 10.03 Interpretation**.  When a reference is made in this Agreement to an Article, Section, Exhibit, or Schedule, such reference shall be to an Article, Section, Exhibit, or Schedule of this Agreement unless otherwise indicated. The words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this

29

71829/0001-53640003v8

Agreement. The term "or" is not exclusive. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

**Section 10.04  Severability**.  If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement, and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal, or unenforceable, had never been contained herein.

**Section 10.05  Entire Agreement**.   This Agreement, together with all Exhibits and Schedules hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

**Section 10.06  Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other party; provided, however, that Buyer may assign any or all of its rights and obligations hereunder to any Affiliate of Buyer without the prior consent of Sellers, provided that Buyer shall remain liable for all of its obligations hereunder following any such assignment.

**Section 10.07  Amendment and Waiver**.  This Agreement may not be amended except by an instrument in writing signed by Buyer and Sellers. Any party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto, or (c) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. No failure or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**Section 10.08  Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (without application of principles of conflicts of law).  In connection with any controversy arising out of or related to this Agreement, Sellers and Buyer hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of New Jersey.  Sellers and Buyer each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT, OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION.

71829/0001-53640003v8

**Section 10.09 Specific Performance**. [Omitted].

**Section 10.10 Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.11 No Third-Party Beneficiaries**.  Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.12 "As Is, Where Is" Transaction**.  Buyer acknowledges that the Acquired Assets are being sold on an "AS IS, WHERE IS" basis, with all faults, and Buyer has relied solely on its own investigation, analysis, and evaluation of the Acquired Assets in making its decision to enter into this Agreement. Buyer further acknowledges that, except for the representations and warranties expressly set forth in Article IV, Sellers have not made, and Sellers hereby expressly disclaim, any representations or warranties of any kind or nature, express or implied, at common law, by statute, or otherwise, relating to the Acquired Assets or the transactions contemplated hereby, and Buyer hereby waives any claims related to the condition of the Acquired Assets or the accuracy or completeness of any information provided or made available to Buyer.

**Section 10.13 No Successor Liability**.  Except as expressly provided herein, Buyer does not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability. Buyer is not, and shall not be, a successor to Sellers by reason of any theory of law or equity.

*[Signature Pages Follow]*

31

71829/0001-53640003v8

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**Ohel Children's Home and Family Services, Inc.**

By: _____
Name: David Mandel
Title: CEO

**SELLERS:**

**SHAB Holdings LLC**

By: _____
Name:
Title:

**Shab Operating Inc.**

By: _____
Name:
Title:

32

71829/0001-53640003v6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**Ohel Children's Home and Family Services, Inc.**

By:_____
Name:
Title:

**SELLERS:**

**SHAB Holdings LLC**

By:_____
Name:  Asaf Ravid
Title:  CRO

**Shab Operating Inc.**

By:_____
Name:  Asaf Ravid
Title:  CRO

## EXHIBIT A

### FORM OF BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, _____ ("**Sellers**"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to _____ ("**Buyer**"), all of their rights, title, and interest in and to the Acquired Assets, as such term is defined in the Asset Purchase Agreement, dated as of_____ (the "**Purchase Agreement**"), by and among Sellers and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Sellers make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Each Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Sellers will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Sellers have duly executed this Bill of Sale as of _____, 2026.

[SELLERS]


By_____
Name:
Title:

71829/0001-53640003v8

## EXHIBIT B

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

[To be attached.]

71829/0001-53640003v8

## DISCLOSURE SCHEDULES

[To be attached.]

**DISCLOSURE SCHEDULES**

**TO**

**ASSET PURCHASE AGREEMENT**

**by and among**

**Ohel Children's Home and Family Services, Inc.,**

**as the Buyer,**

**and**

**SHAB Holdings LLC and Shab Operating Inc.,**

**as the Sellers**

Dated as of July16, 2026

Reference is hereby made to that certain Asset Purchase Agreement (the "Agreement"), dated as of July 16, 2026, by and among Ohel Children's Home and Family Services, Inc., as Buyer, and SHAB Holdings LLC and Shab Operating Inc. (each a "Seller", and collectively the "Sellers").  All capitalized terms which are not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

The section numbers in these Disclosure Schedules correspond to the section numbers in the Agreement; provided, however, that the disclosure of any fact(s) or item(s) in these Disclosure Schedules relevant to any section of the Agreement shall be deemed to be disclosed with respect to any other section(s) of the Agreement to which the applicability and relevance of such disclosure is reasonably apparent on its face, whether or not these Disclosure Schedules include an explicit cross-reference to such other section(s) and whether or not such other section(s) contemplate these Disclosure Schedules.  The disclosure of any information in these Disclosure Schedules shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by the Sellers in the Agreement, nor shall it be deemed an admission of any liability of, or concession as to any defense available to, the Sellers.  The inclusion of information in these Disclosure Schedules shall not be construed as an admission or agreement that such information is material to or outside the ordinary course of business of any Seller.  No disclosure in these Disclosure Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  All attachments to these Disclosure Schedules are incorporated by reference into the section of these Disclosure Schedules in which they are referenced.

## Schedule 2.01(f)

## Acquired Assets

### Registered/Titled Motor Vehicles

| # | Year | Make / Model (per card; VIN-decoded) | VIN |
|---|------|--------------------------------------|-----|
| 1 | 2005 | Dodge (Durango) | 1D4HB58D95F560141 |
| 2 | 2002 | Chevrolet (Silverado 1500) | 1GCEK19T22E178114 |
| 3 | 2025 | Ford (Explorer Ford Sport Utility Vehicle) | 1FMUK8DH6SGA05042 |

### Other Rolling Stock / Equipment

| Asset # | Description | Acquired |
|---------|-------------|----------|
| 58 | Fire Truck | 05/24/16 |
| 59 | Vehicle (unspecified) | 12/16/16 |
| 101 | Vehicle (unspecified) | 09/06/22 |
| 74 | Trailer | 12/29/18 |
| 38/49/57/69/76 | Golf Carts (multiple) | 2013–2018 |

### Real Property Improvements / Structures

| Bldg # | Structure / Occupancy | Yr Built | Constr. | Sq Ft |
|--------|-----------------------|----------|---------|-------|
| 001 | GATE HOUSE | 1960 | FRAME | 400 |
| 002 | WOLF DEN | 1995 | FRAME | 4500 |
| 003 | CARETAKER'S RESIDENCE | 1960 | FRAME | 1440 |
| 004 | STAFF LOUNGE | 1960 | FRAME | 952 |
| 005 | GUESTHOUSE (MODULAR) | 1960 | FRAME | 1456 |
| 007 | LAUNDRY | 1960 | FRAME | 790 |
| 008 | BOYS BUNK 1 & 2 (DOUBLE CABIN) | 1960 | FRAME | 1892 |
| 009 | BOYS BUNK 3 | 1960 | FRAME | 720 |
| 010 | BOYS BUNK 4 | 1960 | FRAME | 720 |
| 011 | BOYS BUNK 5 | 1960 | FRAME | 720 |
| 012 | BOYS BUNK 6 | 1960 | FRAME | 720 |
| 013 | BOYS BUNK 7 | 1960 | FRAME | 720 |
| 014 | BOYS BUNK 8 | 1960 | FRAME | 720 |
| 015 | BOYS BUNK 9 | 1960 | FRAME | 720 |
| 016 | BOYS BUNK 11 | 1960 | FRAME | 720 |
| 017 | BOYS BUNK 12 | 1960 | FRAME | 720 |
| 018 | BOYS BUUNK 13 | 1960 | FRAME | 720 |
| 019 | BOYS BUNK 14 | 1960 | FRAME | 720 |
| 020 | BOYS BUNK 15 | 1960 | FRAME | 720 |
| 021 | BOYS BUNK 17 | 1960 | FRAME | 720 |
| 022 | BOYS BUNK 18 | 1960 | FRAME | 720 |
| 023 | BOYS BUNK 19 | 1960 | FRAME | 720 |
| 024 | BOYS ARTS & CRAFTS (WOODSHOP) | 1960 | FRAME | 2800 |
| 025 | OWNER'S RESIDENCE | 2002 | FRAME | 2600 |
| 026 | NEW OFFICE MODULAR | 2002 | FRAME | 1100 |
| 027 | PUMP HOUSE LAUNDRY | 1960 | FRAME | 300 |
| 028 | HEATING HOUSE | 1960 | FRAME | 96 |
| 029 | BOYS HC CABIN | 1960 | FRAME | 225 |
| 030 | KITCHEN/DINING ROOM | 1960 | FRAME | 13040 |
| 031 | DANCE HALL (TEEN LOUNGE) | 1983 | FRAME | 1800 |
| 032 | INFIRMARY | 1960 | FRAME | 2515 |
| 033 | OLYMPIC HALL W/ DECK | 1960 | FRAME | 4368 |
| 034 | PRINCESS PALACE | 1960 | FRAME | 1440 |
| 035 | HALFWAY HOUSE | 1960 | FRAME | 800 |
| 036 | NATURE CABIN | 1960 | FRAME | 576 |
| 037 | GIRLS Y BUNK | 1960 | FRAME | 892 |
| 038 | PENTHOUSE | 1960 | FRAME | 3240 |
| 039 | JUNIOR PENTHOUSE | 1960 | FRAME | 3240 |
| 040 | GIRLS PLAYHOUSE | 1960 | FRAME | 2115 |
| 041 | GIRLS HC CABIN | 1960 | FRAME | 720 |
| 042 | GIRLS CABIN 16, 17, 18, 19 (QUAD) | 1960 | FRAME | 2624 |
| 043 | GIRLS CABIN (ARTS & CRAFTS) | 1960 | FRAME | 780 |
| 044 | MARRIAGE BUNK | 1960 | FRAME | 1430 |

2

71829/0001-53640558v4

| 045 | GIRLS STAFF CABIN | 1960 | FRAME | 480 |
| 046 | GIRLS STAFF CABIN | 1960 | FRAME | 480 |
| 047 | BOYS POOL SHED (2) | 1960 | FRAME | 280 |
| 048 | E-MAIL ROOM | 1960 | FRAME | 200 |
| 049 | POOL HOUSE - GIRLS | 2003 | FRAME | 672 |
| 050 | GIRLS STAFF CABIN | 1960 | FRAME | 480 |
| 051 | GIRLS STAFF CABIN | 1960 | FRAME | 480 |
| 052 | GIRLS STAFF CABIN | 1960 | FRAME | 480 |
| 053 | GIRLS HOCKEY PAVILLION | 2002 | FRAME | 7800 |
| 054 | STABLE | 2002 | FRAME | 700 |
| 055 | WEIGHT ROOM | 1998 | FRAME | 336 |
| 056 | VILLAGE CEDAR CABIN | 2001 | FRAME | 784 |
| 057 | GIRLS CABIN | 2006 | FRAME | 500 |
| 058 | CHEF'S CABIN | 2006 | FRAME | 300 |
| 059 | GROUP I - FENCES | | CONSTRUCTION NOT APPLICABLE | — |
| 060 | GROUP III - PAVED SURFACES | | CONSTRUCTION NOT APPLICABLE | — |
| 061 | GROUP IV - ANTENNAS | | CONSTRUCTION NOT APPLICABLE | — |
| 062 | OPEN PAVILLION | 2019 | NON-COMBUSTIBLE | 12000 |
| 063 | HOCKEY RINK | 2018 | CONSTRUCTION NOT APPLICABLE | — |
| 001 | STAFF HOUSING | 2008 | FRAME | 3500 |

3

71829/0001-53640558v4

**Schedule 2.01(g)**

**Real Property**

1. See attached Exhibit 2.01(g).

4

71829/0001-53640558v4

## Schedule 2.10(a)

### Assumed Contract List

None.

5

**Schedule 4.04**

**Title to Acquired Assets**

1.  Commercial Propane Gas Sales Agreement (Hibachi) by and between Suburban Propane and Camp Echo, dated March 28, 2018.

2.  Commercial Propane Gas Sales Agreement (Generator) by and between Suburban Propane and Camp Echo, dated March 28, 2018.

6

71829/0001-53640558v4

## **Schedule 6.11**

### **Employee Matters**

1.   Employment Agreement by and between Shab Operating Inc. and Jeffrey Grabow, dated October 4, 2013.

71829/0001-53640558v4

**Schedule 4.10**

**Insurance**

| Type of Coverage | Name of Insured | Insurer | Expiration Date | Coverage Amount |
|---|---|---|---|---|
| Commercial General Liability | Shab Operating, Inc. and Shab Holdings, LLC dba Camp Echo. | Church Mutual Insurance Company, S.I. | March 5th, 2027 | Each Occurrence: $1,000,000<br>Damage to Rented Premises: $1,000,000<br>Medical Expense (to any one person): $5,000<br>Personal and Adv Injury: $1,000,000<br>General Aggregate: $3,000,000<br>Products – Comp/Op Aggregate: $1,000,000 |
| Employment Practice Liability | Shab Operating, Inc. and Shab Holdings, LLC dba Camp Echo. | Philadelphia Indemnity Insurance Company | February 22, 2027 | $2,000,000 each claim/$5,000,000 aggregate (limits shared across the five DAMIS camps); $10,000 retention |
| Commercial Auto | Damis Holdings, LLC (primary named insured), with SHAB Operating, Inc. dba Camp Echo and SHAB Holdings, LLC listed as additional named insureds | Church Mutual Insurance Company, S.I. | March 5th, 2027 | $1,000,000 Covered Autos Liability limit |
| Commercial Property | Shab Operating, Inc.; Shab Holdings, LLC dba Camp Echo | Church Mutual Insurance Company, S.I. | March 5th, 2027 | Blanket Buildings $12,930,237; Blanket Business Personal Property $1,306,773; Property in the Open $921,690; Blanket Business Income/Extra Expense $500,000, each subject to a $100,000 deductible |
| Workers' Compensatio | Shab Operating, Inc.; Shab Holdings, LLC dba Camp Echo | Church Mutual Insurance Company, S.I. | March 5th, 2027 | Bodily Injury per Accident: $500,000 Per Accident<br>Bodily Injury by Disease: $500,000 Policy Limit<br>Bodily Injury by Disease: $500,000 Each Employee |
| Umbrella Liability | Shab Operating, Inc.; Shab Holdings, LLC dba Camp Echo | Church Mutual Insurance Company, S.I. | March 5th, 2027 | $10,000,000 each occurrence/$10,000,000 aggregate, $10,000 self-insured retention |
| Excess Liability ($20M x $10M) | Shab Operating, Inc.; Shab Holdings, LLC dba Camp Echo | HDI Global Specialty SE | | $20,000,000 each occurrence/$20,000,000 aggregate over the $10,000,000 lead umbrella; excludes sex abuse and molestation |

8

71829/0001-53640558v4

## Exhibit 2.01(g)

### Real Property Description

See attached.

9

71829/0001-53640558v4

American Land Title Association

Loan Policy of Title Insurance
[2021 v. 01.00 (07-01-2021)]

**File No.** FN-49372-NY-3          **Policy No.** M-NY1225-9324172038

### EXHIBIT A – LEGAL DESCRIPTION

All that certain plot, piece or parcel of land situate, lying and being in the Town of Mamakating, Sullivan County, New York;

BEGINNING at a point on a cul-de-sac at the southeasterly end of a 50 foot right-of-way (now referred to as Deer Path Court) leading to Doll Road, said point also being the division line between Lot 2 and 1as shown on a certain map entitled "Subdivision Lands of O'Gorman" filed in the Office of the Clerk of Sullivan County on March 5, 1980 as Map No. 750 (said Lot 1 now being known as Lot 3 on a certain map entitled "Subdivision of Property for Bruce Enterprises, Inc.," filed in the Office of the Clerk of Sullivan County on September 25, 1990 as Map No. 6-68);

Running thence South 39 degrees 45 minutes 55 seconds East 352.51 feet to an iron rod;

Thence North 50 degrees 14 minutes 5 seconds East 328.76 feet to an iron rod;

Thence North 38 degrees 06 minutes 55 seconds West 1147.50 feet to an iron rod;

Thence North 47 degrees 46 minutes 46 seconds East 2724.24 feet to an iron rod;

Thence South 40 degrees 04 minutes 46 seconds East 2117.31 feet to an iron rod;

Thence South 48 degrees 07 minutes 11 seconds West 1240.00 feet to a stone corner;

Thence South 41 degrees 22 minutes 30 seconds East 1164.14 feet to an iron rod;

Thence South 54 degrees 24 minutes 00 seconds West 1189.56 feet to an iron pipe and stones;

Thence North 85 degrees 21 minutes 02 seconds West 2120.85 feet to an iron pipe and stones;

Thence North 41 degrees 45 minutes 07 seconds West 873.41 feet to an iron pipe and stones;

Thence North 41 degrees 09 minutes 49 seconds East 542.24 feet;

Thence North 37 degrees 08 minutes 55 seconds West 39.92 feet;

Thence North 46 degrees 34 minutes 05 seconds East 280.91 feet to the southwesterly side of Deer Path Court;

Thence southeasterly along Deer Path Court and along the arc of a curve bearing to the left having a radius of 87.50 feet to a distance of 250.08 feet to an iron rod and the point or place of BEGINNING.

---

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

File No. FN-49372-NY-3
Policy No. M-NY1225-9324172038
Exhibit A Page 1 of 1