**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*,[1] | Case No. 26-16388 (CMG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF STALKING HORSE BIDDER**
**AND STALKING HORSE ASSET PURCHASE AGREEMENT**

  **PLEASE TAKE NOTICE** that on June 26, 2026, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered that certain *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 298] (as modified by that certain *Fourth Notice of Extension of Deadline to Select Stalking Horse Bidder(s)* [Docket No. 469], the "Bidding Procedures Order").[2]

---

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings, Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order or the *Motion For Entry of an Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 227].

**PLEASE TAKE FURTHER NOTICE** that the Bidding Procedures Order, among other things, approved procedures (the "Bidding Procedures") for the solicitation and consideration of offers for the sale of the SIMAD Debtors' assets, and procedures for designating a Stalking Horse Bidder for such assets and seeking Court approval of Bid Protections.

**PLEASE TAKE FURTHER NOTICE** that counsel for the SIMAD Debtors, the SIMAD Debtors' proposed investment banker, SSG Capital Advisors, LLC, and the SIMAD Debtors' Chief Restructuring Officer, Asaf Ravid (the "CRO"), engaged with numerous parties to attain the highest or otherwise best value for the assets comprised of Island Lake Camp.  Ultimately, the SIMAD Debtors and the CRO determined to move forward with CMAO, LLC as a Stalking Horse Bidder and, subject to approval of this Court, executed the asset purchase agreement with CMAO, LLC attached hereto as Exhibit A (the "Stalking Horse Agreement").

**PLEASE TAKE FURTHER NOTICE** that the CRO consulted with (a) counsel to Mishmeret Trust Company Ltd., in its capacity as Trustee for the Debentures (Series A) and as DIP Agent and the (b) Official Committee of Unsecured Creditors ("Committee") (collectively, the "Consultation Parties") in connection with its selection and negotiation of the Stalking Horse Agreement.

**PLEASE TAKE FURTHER NOTICE** that the Stalking Horse Agreement provides for the aggregate Purchase Price in an amount equal to $10 million in cash (the "Cash Payment"), plus Cure Amounts (as defined in the Stalking Horse Agreement), plus the assumption of Assumed Liabilities (as defined in the Stalking Horse Agreement), with a good faith cash deposit of $1 million.

**PLEASE TAKE FURTHER NOTICE** that the Stalking Horse Agreement contemplates certain bid protections, including, *inter alia*, (i) a break-up fee in the amount equal to 3.0% of the Cash Payment, (ii) an expense reimbursement up to an amount equal to 1.0% of the Cash Payment, and (iii) a $350,000 overbid requirement at the Auction (collectively, the "Bid Protections").  *See* Stalking Horse Agreement, § 6.04(e); §§ 9.02(b), (c).

**PLEASE TAKE FURTHER NOTICE** that pursuant to paragraph 7 of the Bidding Procedures Order:

> (a) by filing this Stalking Horse Notice, the SIMAD Debtors are seeking approval of the designation of the Stalking Horse Bidder and the Bid Protections, and have disclosed the following information: (i) the identity of the Stalking Horse Bidder; (ii) the amount of the Stalking Horse Bid; (iii) a copy of the Stalking Horse Agreement, which includes the terms and applicable Sale Package to which the Stalking Horse Bid relates; and (iv) the proposed Bid Protections to be provided to the Stalking Horse Bidder.

> (b) the SIMAD Debtors shall serve this Stalking Horse Notice on the Stalking Horse Bidder(s), the Office of the United States Trustee, counsel to the DIP Agent, counsel to the Bond Trustee, counsel to Bank

of New Hampshire, counsel to any other Secured Creditor to the extent such Stalking Horse Notice applies to such Secured Creditor's collateral, and the Committee, and those parties who have requested service of notices pursuant to Bankruptcy Rule 2002, with no further notice being required.

**PLEASE TAKE FURTHER NOTICE that any objection to (i) the Bid Protections set forth in this Stalking Horse Notice or (ii) the designation of the Stalking Horse Bidder shall be filed no later than Wednesday, July 29, at 4:00 p.m. (prevailing Eastern Time).**

**PLEASE TAKE FURTHER NOTICE** that the SIMAD Debtors will file a further notice of hearing once the Court has scheduled a hearing to consider approval of (i) the entry into the Stalking Horse Agreement, and (ii) the proposed Bid Protections, to the extent such hearing is required pursuant to paragraph 7 of the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that this Stalking Horse Notice and any sale are subject to the terms and conditions of the Bidding Procedures Order, the Bidding Procedures, and any further orders of the Court.  The SIMAD Debtors encourage parties-in-interest to review such documents in their entirety.  Copies of the Bidding Procedures Order, Bidding Procedures, Stalking Horse Agreement, and this Stalking Horse Notice may be obtained on the website maintained by the SIMAD Debtors' Claims and Noticing Agent, Kroll, at https://restructuring.ra.kroll.com/SIMAD.  The SIMAD Debtors reserve their right to adopt other or further modifications to the Bidding Procedures in accordance with the terms thereof and of the Bidding Procedures Order.

Dated: July 26, 2026

|  |
|---|
| */s/ Michael D. Sirota* |
| **COLE SCHOTZ P.C.** |

Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            dbass@coleschotz.com
            fyudkin@coleschotz.com
            dharris@coleschotz.com

*Counsel to the Debtors and*
*Debtors in Possession*

**Exhibit A**

**Stalking Horse Agreement**

*EXECUTION VERSION*

**ASSET PURCHASE AGREEMENT**

by and among

**CMAO, LLC, as Buyer,**

and

**THE SELLERS NAMED HEREIN,**

as Sellers

**Dated as of July 26, 2026**

Premises:

Island Lake Camp
Starrucca, Pennsylvania

*EXECUTION VERSION*

## TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ..................................................................................................................2

ARTICLE II. PURCHASE AND SALE ................................................................................................9
    Section 2.01    Acquired Assets ....................................................................................9
    Section 2.02    Excluded Assets ..................................................................................12
    Section 2.03    Assumed Liabilities ...........................................................................13
    Section 2.04    Excluded Liabilities ...........................................................................13
    Section 2.05    Further Assurances.............................................................................14
    Section 2.06    Purchase Price ....................................................................................14
    Section 2.07    Deposit; Payment of Purchase Price. .................................................15
    Section 2.08    Transfer Taxes ...................................................................................16
    Section 2.09    Allocation of Purchase Price..............................................................16
    Section 2.10    Assumed Contracts .............................................................................16

ARTICLE III. CLOSING ...................................................................................................................17
    Section 3.01    Closing ...............................................................................................17
    Section 3.02    Sellers' Closing Deliverables.............................................................17
    Section 3.03    Buyer Closing Deliverables ...............................................................18

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLERS ............................19
    Section 4.01    Organization and Qualification of Sellers...........................................19
    Section 4.02    Authority of Sellers............................................................................19
    Section 4.03    No Conflicts .......................................................................................19
    Section 4.04    Title to Acquired Assets.....................................................................20
    Section 4.05    Litigation............................................................................................20
    Section 4.06    Compliance with Laws; Permits ........................................................20
    Section 4.07    Brokers...............................................................................................20
    Section 4.08    Assumed Contracts.............................................................................20
    Section 4.09    No Other Representations ...................................................................20

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ................................21
    Section 5.01    Organization of Buyer........................................................................21
    Section 5.02    Authority of Buyer .............................................................................21
    Section 5.03    No Conflicts .......................................................................................21
    Section 5.04    Sufficiency of Funds ..........................................................................21
    Section 5.05    Litigation............................................................................................21
    Section 5.06    Brokers...............................................................................................22
    Section 5.07    No Outside Reliance ..........................................................................22
    Section 5.08    Adequate Assurances Regarding Executory Contracts.......................22
    Section 5.09    No Other Representations. ..................................................................22

ARTICLE VI. COVENANTS ............................................................................................................22
    Section 6.01    Conduct of Business ..........................................................................22
    Section 6.02    Access to Information ........................................................................23
    Section 6.03    Efforts; Consents. ..............................................................................23

Section 6.04     Bankruptcy Court Matters.................................................................23
Section 6.05     Publicity ........................................................................................24
Section 6.06     Confidentiality ...............................................................................24
Section 6.07     Notification of Certain Matters.........................................................25
Section 6.08     Bulk Transfer Laws.........................................................................25
Section 6.09     Employee Matters ...........................................................................25
Section 6.10     Camp Matters..................................................................................26
Section 6.11     Casualty..........................................................................................26

ARTICLE VII. TAX MATTERS ...............................................................................27
Section 7.01     Transfer Taxes ...............................................................................27
Section 7.02     Cooperation on Tax Matters .............................................................27

ARTICLE VIII. CONDITIONS TO CLOSING...............................................................27
Section 8.01     Conditions to Obligations of All Parties...........................................27
Section 8.02     Conditions to Obligations of Buyer ..................................................27
Section 8.03     Conditions to Obligations of Sellers .................................................28

ARTICLE IX. TERMINATION ..................................................................................28
Section 9.01     Termination.....................................................................................28
Section 9.02     Effect of Termination.......................................................................30
Section 9.03     Remedies.........................................................................................31

ARTICLE X. MISCELLANEOUS ..............................................................................31
Section 10.01    Survival..........................................................................................31
Section 10.02    Notices ...........................................................................................32
Section 10.03    Interpretation...................................................................................32
Section 10.04    Severability .....................................................................................32
Section 10.05    Entire Agreement.............................................................................33
Section 10.06    Assignment .....................................................................................33
Section 10.07    Amendment and Waiver ...................................................................33
Section 10.08    Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial
                 33
Section 10.09    Specific Performance .......................................................................33
Section 10.10    Counterparts ...................................................................................34
Section 10.11    No Third-Party Beneficiaries............................................................34
Section 10.12    "As Is, Where Is" Transaction ..........................................................34
Section 10.13    No Successor Liability......................................................................34

EXHIBITS
Exhibit A       Form of Bill of Sale

Schedules

Schedule 1.01(a)     Sellers Knowledge Parties
Schedule 1.01(b)     Buyer's Knowledge Parties
Schedule 2.01(n)     Assumed Permits

2

Schedule 2.10(a)      Assumed Contract List
Schedule 4.04(b)      Owned Real Property
Schedule 4.04(c)      Leased Real Property
Schedule 4.09          Bank Accounts

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated as of July 26, 2026 (the "Effective Date"), and is entered into by and among CMAO, LLC, a Pennsylvania limited liability company ("Buyer"), and each of the "Sellers" identified on the signature pages hereto (each a "Seller" and collectively, the "Sellers"). Each of Buyer and Sellers are at times referred to herein individually as a "Party" and together as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I. The Parties acknowledge and agree that the Transaction is intended to be consummated pursuant to sections 363 and 365 of the Bankruptcy Code and that the Sale Order shall contain customary findings supporting the transfer of the Acquired Assets free and clear of all Encumbrances and claims, the assumption and assignment of the Assumed Contracts, the good faith of Buyer under Section 363(m) of the Bankruptcy Code, and the absence of successor liability of Buyer.

## RECITALS

WHEREAS, the Sellers own and operate the Camp and the Owned Real Property;

WHEREAS, on June 4, 2026 and June 5, 2026, Sellers commenced bankruptcy cases which are being jointly administered under Case No. 26-16388 (CMG) (the "Bankruptcy Cases") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

WHEREAS, in connection with the Bankruptcy Cases, Sellers desire to sell, transfer, convey, assign and deliver to Buyer, all of the Acquired Assets, and Buyer desires to purchase, acquire and assume the Acquired Assets and the Assumed Liabilities (and no other liabilities), and consummate such other transactions as are contemplated by this Agreement, in each case upon the terms and conditions set forth in this Agreement (with all such transactions referred to as the "Transaction");

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Acquired Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey, all on the terms and subject to the conditions set forth in this Agreement and in the Sale Order (as defined herein); and

WHEREAS, Sellers' and Buyer's willingness to consummate the Transaction is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1

**ARTICLE I.**
**DEFINITIONS**

The following terms have the meanings specified or referred to in this <u>Article I</u>:

"<u>Accounts Receivable</u>" means (a) all accounts, accounts receivable, payment intangibles, rights to payment, notes, notes receivable, negotiable instruments, chattel paper, vendor rebates and any other rights to receive payment or value for goods or services rendered, whether earned or unearned, billed or unbilled, accrued or unaccrued of Sellers, and (b) any security interest, claim, recoveries, remedy or other right related to any of the foregoing.

"<u>Acquired Assets</u>" has the meaning set forth in <u>Section 2.01</u>.

"<u>Administrative Claim</u>" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Alternative Transaction</u>" means any transaction or series of transactions (other than the Transaction) pursuant to which any Person or group of Persons (other than Buyer or any of its Affiliates) directly or indirectly acquires or would acquire any of the Acquired Assets, whether by sale, merger, recapitalization, reorganization, or otherwise.

"<u>Assumed Contract List</u>" has the meaning set forth in <u>Section 2.10(a)</u>.

"<u>Assumed Contracts</u>" means those Contracts that have been assigned to and assumed by Buyer pursuant to <u>Section 2.10</u> and section 365 of the Bankruptcy Code.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.03</u>.

"<u>Assumed Permits</u>" has the meaning set forth in <u>Section 2.01(n)</u>.

"<u>Assumption Approval</u>" has the meaning set forth in <u>Section 2.10(c)</u>.

"<u>Auction</u>" has the meaning set forth in <u>Section 6.04(a)</u>.

"<u>Bank Accounts</u>" has meaning set forth in <u>Section 2.01(a)</u>.

"<u>Bankruptcy Cases</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Causes of Action</u>" means any and all claims, rights, causes of action, suits, and proceedings, whether known or unknown, arising under chapter 5 of the Bankruptcy Code

2

(including Sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code) or any analogous international, state or federal law, including all preference, fraudulent transfer or conveyance, and other avoidance claims, rights, and causes of action, together with any and all proceeds, recoveries, and rights to recovery (whether judicial or otherwise) arising therefrom or related thereto, that are or may be asserted by, or on behalf of, the Sellers, their estates, or any trustee, examiner, or other estate representative, but excluding, in each case, any such claims, rights, causes of action, suits and proceedings against any Designated Party.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" has the meaning set forth in the recitals.

"Bid Procedures" means the procedures governing the solicitation of bids for the Acquired Assets and, to the extent applicable, the conduct of the Auction, as approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court dated June 26, 2026 approving the Bid Procedures.

"Breakup Fee" has the meaning set forth in Section 9.02(c).

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Camp" means the recreational and/or informal educational programs and operations for Campers during the Camp Season in a communal traditional residential camp environment at the Island Lake Camp located at the Owned Real Property, including the location with a street address of 50 Island Lake Rd, Starrucca, PA 18462.

"Camp Business" means the establishment, administration, provision and management of the recreational and/or informal educational programs for Campers at the Camp, including all overnight camps, specialty camps, youth development programs, recreational activities, educational activities, transportation services, food services, merchandising activities and ancillary operations related to the Camp. The Camp Business also includes recruitment, enrollment, registration and servicing of Campers, staff, management of Camp facilities and equipment, procurement of necessary provisions, lease or ownership of real estate, creation and execution of programs and events and follow-up relations with Campers, prospective Campers, and their parents. The Camp Business may also include the rental of the facilities of the Camp during periods other than the Camp Season.

"Camp Season" means the months of June, July and August in a specific calendar year, together with any other period during which the Camp Business is conducted.

"Campers" means the individuals who are enrolled, registered or otherwise accepted to attend the Camp, including prospective Campers for whom Sellers have received an application, enrollment form or deposit.

"Cash Payment" has the meaning set forth in Section 2.06(a).

"Chapter 11 Allocation Claims" has the meaning set forth in Section 2.03(e).

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral agreement, contract, lease, sublease, license, sublicense, obligation, promise, undertaking, commitment, or other binding arrangement or understanding.

"Cure Amounts" means all amounts that must be paid and all obligations that must otherwise be satisfied pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, as determined by the Bankruptcy Court.

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date, in each case, inclusive of those on approved paid or unpaid leave of absence (such as those on short- or long-term disability, military, maternity or other medical leave of absence).

"Deposit" has the meaning set forth in Section 2.07(a).

"Designated Party" means any of the Sellers' vendors, suppliers, customers or trade creditors with whom Buyer or any of its Affiliates continues to conduct business in regard to the Acquired Assets after the Closing.

"DIP Facility" means any debtor-in-possession credit facility entered into by Sellers in connection with the Bankruptcy Cases.

"Dollars" or "$" means the lawful currency of the United States.

"Domain Names" means Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet and all applications for any of the foregoing.

"Effective Date" has the meaning set forth in the preamble.

4

"Encumbrance" means any lien, pledge, security interest, charge, claim, mortgage, deed of trust, option, right of first refusal or offer, preemptive right, restriction on transfer, lease, assignment, option, easement, right of way, encroachment, covenant, restriction, judgment, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title, or other encumbrance of any kind or nature, including any condition or restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Agent" means Flagstar Bank, or such other escrow agent as mutually agreed in writing between the Parties.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Claims" means all (a) rights (including rights of set-off and rights of recoupment), claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind of the Sellers against (i) directors and officers of Seller, (ii) third parties solely to the extent arising in respect of any Excluded Asset or Excluded Liability, and (iii) third parties related to the Acquired Assets which are not in connection with the use of the Acquired Assets in connection with the Camp Business, and (b) Bankruptcy Causes of Action.

"Excluded Contract" has the meaning set forth in Section 2.10(a).

"Excluded Employee" has the meaning set forth in Section 6.09(b).

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Expense Reimbursement" has the meaning set forth in Section 9.02(b).

"Final Order" means an Order of the Bankruptcy Court (or any court of competent jurisdiction) as to which the time to file an appeal, motion for rehearing, or writ of certiorari has expired and no appeal, motion for rehearing, or writ of certiorari is pending; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule, may be filed shall not cause an Order not to be a Final Order.

"Former Employees" means all individuals who have been employed by Sellers who are not Current Employees.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, provincial, local, municipal, foreign, or other government, or any department, commission, board, bureau, agency, regulatory authority, instrumentality, or political subdivision thereof, or any court, arbitral body, or similar body of competent jurisdiction.

5

"Health Plans" means all health plans including, but not limited to, health, dental, life, disability and long-term care insurance.

"Intellectual Property" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"Inventory" means all of Sellers' now owned and hereafter acquired raw materials and work-in-process therefor and all of Sellers' tangible property used in the operation of the Sellers' business or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"IT Equipment" means all security systems, surveillance equipment, computers, servers, laptops, tablets, telephones and other information technology equipment.

"Knowledge'' means, with respect to any matter in question, (a) in the case of Sellers, the actual knowledge of the individuals set forth on Schedule 1.01(a), and (b) in the case of Buyer, the actual knowledge of the individual(s) set forth on Schedule 1.01(b).

"Law" means any federal, state, provincial, local, municipal, foreign, international, or multinational constitution, statute, treaty, rule, regulation, ordinance, order, code, or other similar requirement enacted, adopted, promulgated, or applied by any Governmental Authority.

"Leased Real Property" means, as set forth on Schedule 4.04(c), all real property leased, subleased, licensed, occupied, or otherwise used by Sellers in connection with the Camp Business, together with all rights, title and interest of each such Seller in and to leasehold improvements relating thereto, in each case to the extent included in the Acquired Assets.

"Liabilities" means any debt, liability, commitment, or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Material Adverse Effect" means any change, effect, event, occurrence, development, or state of facts that, individually or in the aggregate with all other changes, effects, events, occurrences, developments, or states of facts, (a) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets or the ability of Sellers to consummate the Transaction, or (b) prevents or materially impairs or delays, or would reasonably be expected to prevent or materially impair or delay, the ability of Sellers to consummate the Transaction; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic or political conditions or the securities, credit, or financial markets in general in the United States or any other jurisdiction in which Sellers operate; (ii) changes in conditions generally affecting the industries in which Sellers operate; (iii) the announcement or pendency of this Agreement or the Transaction, including the impact thereof on the relationships, contractual or otherwise, of Sellers with employees, customers, suppliers, distributors, partners, or other third parties; (iv) any change in Law or GAAP (or any interpretation thereof) after the date hereof; (v) acts of war (whether or not declared), sabotage, terrorism, military actions, or the escalation or worsening of any of the foregoing; (vi) any natural or man-made disaster, pandemic, epidemic, disease outbreak, or acts of God; (vii) the filing or commencement of the Bankruptcy Cases or any events or circumstances resulting therefrom; (viii) any action taken or omitted to be taken by Sellers at the written request or with the prior written consent of Buyer; (ix) any failure by Sellers to meet any internal or external projections, forecasts, or estimates of revenue, earnings, or other financial metrics (provided that the underlying causes of such failure may be taken into account unless otherwise excluded by this definition); or (x) any matter disclosed on the Schedules hereto.

"Offeree" has the meaning set forth in Section 6.09(a).

"Order" means any order, judgment, injunction, ruling, writ, assessment, or decree of any Governmental Authority.

"Outside Date" means September 15, 2026; provided, however, that the Outside Date may be extended by mutual written agreement of the Parties.

"Owned Real Property" means the real property described on Schedule 4.04(b), together with all buildings, structures, fixtures and other improvements located thereon and all appurtenances thereto.

"Party" or "Parties" has the meaning set forth in the preamble.

"Patents" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"Permits" means all licenses, permits, certificates, approvals, registrations, consents, authorizations, franchises, variances, exemptions, and orders issued or granted by a Governmental Authority.

"Permitted Encumbrances" means (a) Encumbrances created under this Agreement; (b) statutory liens for current Taxes not yet due and payable or the amount or validity of which is

being contested in good faith by appropriate proceedings; (c) mechanics', carriers', workers', repairers', and similar statutory liens arising or incurred in the ordinary course of business for amounts not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; and (d) zoning, entitlement, conservation restrictions, and other land use and environmental regulations by Governmental Authorities that do not materially interfere with the present use of the applicable asset.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" means the dates on which Sellers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Purchase Price" has the meaning set forth in Section 2.06.

"Qualified Bid" has the meaning set forth in the Bid Procedures Order.

"Real Property" means any real estate, land, building, structure, improvement or other real property of any kind or nature whatsoever owned, leased or occupied by any Person, and all appurtenant and ancillary rights thereto, including easements, covenants, water rights, sewer rights and utility rights.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, alumni lists, parent contact lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Camp Business or the Acquired Assets or Assumed Liabilities, including without limitation a current schedule of Sellers' Campers.

"Sale Approval Date" means the date on which the Bankruptcy Court enters the Sale Order.

"Sale Hearing" means the hearing, if any, before the Bankruptcy Court to approve the Sale Order.

"Sale Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, entered pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, approving and authorizing (a) the sale of the Acquired Assets to Buyer, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), pursuant to Section 363(f) of the Bankruptcy Code, (b) the assumption and assignment of the Assumed Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code, (c) this Agreement and the Transaction, and (d) such other and further relief as is customary for transactions of this type.

"Schedules" means the disclosure schedules delivered by Sellers to Buyer in connection with the execution of this Agreement.

"Seller Allocation Notice" has the meaning set forth in Section 2.09.

8

"Software" means all websites, computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation).

"Successful Bidder" has the meaning given to such term in the Bid Procedures Order.

"Tax Proceeding" means any judicial, governmental or administrative action, investigation, audit, claim, suit, arbitration, proceeding or other litigation, to the extent such action, investigation, audit, claim, suit, arbitration, proceeding, or litigation relates to Taxes.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto.

"Taxes" means all federal, state, local, and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy, and other taxes, duties, or assessments of any nature whatsoever, together with all interest, penalties, and additions thereto imposed with respect to such amounts.

"Trademarks" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Domain Names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"Transaction" has the meaning set forth in the Recitals.

"Transaction Documents" has the meaning set forth in Section 4.02.

"Transfer Taxes" has the meaning set forth in Section 2.08.

"Transferred Employee" has the meaning set forth in Section 6.09(a).

"Tuition" means consideration paid by or for a Camper to attend the Camp.

"2026 Camp Season" means the Camp Season during calendar year 2026.

"2027 Camp Season" means the Camp Season during calendar year 2027.

## ARTICLE II.
## PURCHASE AND SALE

**Section 2.01   Acquired Assets**.  On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Sellers shall sell, assign, transfer, convey, and deliver to Buyer, and Buyer shall purchase, acquire, and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), other than the Excluded Assets, all of the Sellers' assets, rights, properties of every nature, kind and description, tangible or intangible

(including goodwill), whether now existing or hereafter acquired, wheresoever situated, relating to or used or held for use in connection with the Camp Business as currently conducted, including without limitation, the right, title and interest in and to the following assets (collectively, the "Acquired Assets"):

(a)   to the extent transferrable, all bank operating account(s) of the Camp set forth on Schedule 4.09 (the "Bank Accounts"), including all rights of access thereto, together with all cash and cash equivalents of Sellers, including all cash on hand and cash held in the Bank Accounts or any other account of Sellers, in each case as of the Closing;

(b)   all Accounts Receivable of Sellers as of the Closing;

(c)   all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(d)   all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities, Health Plans or otherwise) and other prepaid charges and expenses of Sellers received on or before the Closing Date, it being understood and agreed that Buyer shall be entitled to retain all such deposits and prepaid charges and expenses notwithstanding that the Closing occurs after the Sale Approval Date;

(e)   all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.10;

(f)   all Intellectual Property owned by Sellers and all of Sellers' rights to use other Intellectual Property, together with any goodwill associated therewith;

(g)   all items of machinery (including vehicles, boats, buses, vans, maintenance vehicles and trailers) and equipment (including IT Equipment, recreational equipment, teaching materials, athletic equipment, sporting goods, educational equipment, dining hall and food service equipment, health and health center equipment), as well as tools, supplies, parts, furniture and fixtures owned by Sellers as of the Closing;

(h)   all computer hardware and transferable licenses to use software and related systems used by Sellers to operate the Camp Business;

(i)   the Owned Real Property and the Leased Real Property;

(j)   all Records related to the Acquired Assets, the Assumed Liabilities, and the Camp Business, including, without limitation, camper and student records (including applications, evaluations, academic records, medical forms and related documents), alumni records, infirmary records, program records, manuals, invoices, sales records, sales and marketing materials, correspondence, and any and all other business records or business information, in each case to the extent transferable or capable of being made available in compliance with applicable Law;

(k)   all rights of Sellers to use camp, camper and employee photographs (whether in paper, slide, negative, or digital form), yearbooks, and records relating to the history

10

and memorabilia of the Camp Business, in each case to the extent transferable or capable of being made available in compliance with applicable Law;

(l)　　all goodwill associated with the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(m)　　all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers;

(n)　　all of the Permits or all of the rights and benefits accruing under any Permits set forth on Schedule 2.01(n) (the "Assumed Permits"), as well as, to the extent transferable under applicable Law, the accreditation rights and status associated with the Camp Business;

(o)　　other than with respect to any insurance proceeds related to, arising out of, or in connection with any directors' and officers' liability insurance policies, the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets occurring on or after the Closing, (ii) any Assumed Liabilities, or (iii) any casualty event affecting any Acquired Asset occurring prior to the Closing, to the extent such proceeds are earmarked for, and actually used by Buyer for, the repair or restoration of the affected Acquired Asset;

(p)　　except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) solely arising from or related to the use of the Acquired Assets in connection with the Camp Business or the Assumed Liabilities, to the extent the transfer of the foregoing is effective under applicable non-bankruptcy law; provided that it is understood and agreed by the Parties that Buyer will not pursue or cause to be pursued any Bankruptcy Causes of Action against any of the Designated Parties other than as a defense (to the extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party;

(q)　　all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person related to the Acquired Assets;

(r)　　the right to receive and retain mail relating to Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(s)　　all telephone numbers, fax numbers, e-mail addresses, websites, URLs and Domain Names, together with all passwords, administrator rights, access credentials, and related account-control rights;

11

(t)      all advertising and marketing materials, samples, artwork, photography, images, videos, copy, catalogues, labels, recordings and similar material relating to the Camp Business; and

(u)      all educational curriculum materials, lesson plans, training materials, programming materials, manuals, operational manuals and policies relating to the Camp Business.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, remove any Acquired Asset from this Section 2.01 in its sole and absolute discretion until the Closing and elect to treat such Contract, Permit or other asset as an Excluded Asset; provided that no such removal shall result in any adjustment to the Purchase Price.

**Section 2.02   Excluded Assets**.   Notwithstanding anything to the contrary in this Agreement, Sellers shall retain, and shall not sell, assign, transfer, convey, or deliver to Buyer, and Buyer shall not purchase, acquire, or accept from Sellers, any of the following assets of Sellers (collectively, the "Excluded Assets"):

(a)      All of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents solely relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity.

(b)      All Contracts, in each case, other than the Assumed Contracts.

(c)      The Excluded Claims.

(d)      Any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the transfer and disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Bankruptcy Cases that are protected by the attorney-client privilege. To the extent any such Records are excluded from the Acquired Assets because Sellers are required by Law to retain them or because they are otherwise non-transferable, Sellers shall, to the extent legally permissible, provide Buyer with copies of such Records.

(e)      All Permits, other than the Assumed Permits.

(f)      All directors' and officers' liability insurance policies and any proceeds arising out of, or related to, such directors' and officers' liability insurance policies.

(g)      The rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

(h)      reserved.

(i)      All Tax Records of the Sellers.

12

(j)      All Records related to the Excluded Assets.

(k)      Any unused retainers paid by the Sellers to any third party prior to the Closing (for professional services or otherwise) or any amounts remaining in any escrow or similar account used to fund the same.

(l)      any Claims of any Seller against any of its directors, officers, insiders, or affiliates.

**Section 2.03   Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to pay, perform, and discharge when due, the following Liabilities of Sellers solely to the extent such Liabilities arise out of the Acquired Assets or the Camp Business (collectively, the "Assumed Liabilities")

(a)      all Liabilities arising under the Assumed Contracts that arise from and after the Closing Date and relate to periods from and after the Closing Date;

(b)      any Liabilities for Taxes of Sellers, in each case solely to the extent such Liabilities relate to the Acquired Assets or the Camp Business for any period, but excluding, for the avoidance of doubt, Liabilities for Taxes that are personal to any equity owner of a Seller (including, without limitation, any Taxes imposed on or measured by the income or gain of any such equity owner arising from the pass-through tax treatment of a Seller);

(c)      all accounts payable of Sellers for the 2026 Camp Season;

(d)      all accrued and unpaid amounts due to employees of Seller for the 2026 Camp Season;

(e)      any administrative expense claims or priority claims in the Bankruptcy Cases related to Sellers' operation of the Camp Business in the ordinary course (other than, for the avoidance of doubt, claims arising under the DIP Facility or that otherwise relate to estate-retained professionals);

(f)      any Liabilities that arise out of the operation of the Camp Business on and after the Closing Date; and

(g)      all Cure Amounts relating to the assumption and assignment of the Assumed Contracts to Buyer.

For the avoidance of doubt, Buyer shall not assume any Liability of Sellers unless such Liability is expressly set forth in this Section 2.03.

**Section 2.04   Excluded Liabilities**.  Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume or be obligated to pay, perform, or discharge any Liabilities of Sellers other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including the following:

(a)      any Liability arising under or related to any Excluded Asset;

13

(b)      any Liability for any claim, action, suit, investigation, or proceeding that may be brought or threatened against Sellers or any of their Affiliates, including, for the avoidance of doubt, any directors' and officers' liability claim brought against Sellers or any of their Affiliates;

(c)      any Liability under any employee benefit plan or relating to any current or former employees, independent contractors, or directors of Sellers, including, but not limited to, any Liability arising under WARN, severance, retention, bonus, accrued vacation or paid time off, sick leave, disability and/or family leave, COBRA, pension, deferred compensation, workers' compensation, unemployment compensation, discrimination, immigration, employment of minors, payroll obligations, payroll Taxes, wages, salaries, commissions or other employee-related matter, and any Administrative Claim arising therefrom, in each case arising on or prior to the Closing Date or as a result of any action or omission of Sellers prior to Closing, other than the pre-Closing administrative expense claims and payroll obligations expressly assumed by Buyer pursuant to Section 2.03(e);

(d)      any Liability arising out of or relating to any violation of Law by Sellers;

(e)      any indebtedness for borrowed money, including any obligations under the DIP Facility or any other debtor-in-possession financing, and any pre-petition secured or unsecured indebtedness;

(f)      any Liability arising out of or relating to any Excluded Asset;

(g)      any Liability to the extent arising out of or relating to any breach, default, or violation by Sellers prior to the Closing Date under any Contract (other than Cure Amounts);

(h)      any Liability relating to any rejected executory contract or unexpired lease; and

(i)      any other Liabilities of Sellers not specifically included in the Assumed Liabilities.

**Section 2.05   Further Assurances**.  From and after the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transaction.

**Section 2.06   Purchase Price**.  The aggregate purchase price for the Acquired Assets (the "Purchase Price") shall be an amount equal to:

(a)      a cash payment of $10,000,000.00 (the "Cash Payment");

(b)      the Cure Amounts; plus

(c)      the assumption of the Assumed Liabilities.

14

At the time of Closing,  the Parties shall agree on an allocation of a portion of the Cash Payment among the real property being acquired hereunder for Transfer Tax purposes, which allocation shall be binding on the Parties for Transfer Tax purposes notwithstanding anything contained herein to the contrary.

**Section 2.07   Deposit; Payment of Purchase Price.**

(a)      **Deposit**. Simultaneously with the execution of this Agreement, Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an amount equal to ten percent (10%) of the Cash Payment (the "Deposit"), to be held by the Escrow Agent in an interest-bearing account pursuant to an escrow agreement in form and substance reasonably acceptable to Buyer and Sellers; however to the extent that the purchase price set forth in this Agreement is modified at or prior to the potential Auction (as defined in the Bid Procedures Order), or to the extent Buyer is the Successful Bidder (as defined in the Bid Procedures Order) or the Back-Up Bidder (as defined in the Bid Procedures Order), Buyer shall pay an additional amount into the escrow fund, within two (2) business days of the Auction, such that the Deposit equals ten percent (10%) of the proposed purchase price offered to purchase the Acquired Assets.

(b)      **Payment at Closing**. At the Closing, Buyer shall pay or cause to be paid to Sellers (or as Sellers may direct) the Cash Payment (less the Deposit and any accrued interest thereon, which shall be released to Sellers at Closing), by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing at least two (2) Business Days prior to the Closing Date.

(c)      **Return of Deposit**. The Deposit shall be held in escrow in accordance with the terms of this Agreement, an escrow agreement with the Escrow Agent and the Bid Procedures Order and shall not constitute property of the Sellers' estates unless and until released in accordance with Section 9.03 of this Agreement or otherwise as agreed by the parties or required by the Bid Procedures Order.  For the avoidance of doubt, to the extent of any discrepancy between this Agreement and the Bid Procedures Order, the Deposit is that "Good Faith Deposit" described in the Bid Procedures Order and such Order shall control with respect to the conditions and timing of return of the Deposit.

(d)      **Deposits; Prepaid Tuition; Camp Fees; Prorations**. If Buyer assumes any post-Closing obligations in respect of any customer deposits, prepaid tuition, camp fees, registration payments, or other prepaid amounts received on or before the Sale Approval Date or any other period from and after the Sale Approval Date through the Closing Date,  relating to the 2027 Camp Season (collectively, "Prepaid Amounts"), Buyer shall receive at Closing the associated cash, escrowed amounts, or a corresponding purchase price adjustment, in each case as set forth on a schedule to be delivered at the Closing or otherwise agreed by the Parties in writing, it being agreed that Buyer shall be entitled to retain all such Prepaid Amounts regardless of when the Closing occurs. At least two (2) Business Days prior to the Sale Hearing, Sellers shall deliver to Buyer a schedule reflecting all Prepaid Amounts as of a date no earlier than three (3) Business Days prior to such delivery. At the Closing, Sellers shall transfer to Buyer, by wire transfer of immediately available funds, cash in an amount equal to the aggregate Prepaid Amounts set forth on such updated schedule, or Buyer shall receive a dollar-for-dollar credit against the Cash Payment in such amount; provided that, in no event shall Buyer be obligated to assume any

15

obligation to provide services or issue refunds in respect of any Prepaid Amount for which Buyer has not received the corresponding cash or credit at Closing. The Parties shall also provide for customary prorations and adjustments as of the Closing Date, including with respect to real estate taxes and utilities, to the extent applicable and consistent with Section 7.03.

(e)      **Withholding Tax**.   Notwithstanding anything to the contrary in this Agreement, (i) Buyer shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as Buyer is required to deduct and withhold under the Code or any other applicable Tax law and (ii) all such withheld amounts shall be treated for all purposes as delivered to Sellers hereunder.

**Section 2.08   Transfer Taxes**.  All transfer, documentary, sales, use, stamp, registration, recording, value-added, and other similar Taxes and fees (including any penalties and interest but, for the avoidance of doubt, not any income or gains Taxes) ("Transfer Taxes") incurred in connection with this Agreement and the Transaction shall be borne and paid by Buyer; provided, however, that the Parties shall cooperate in good faith to minimize the amount of any Transfer Taxes and to avail themselves of any available exemptions from any such Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code, if applicable.

**Section 2.09   Allocation of Purchase Price**.  Within forty-five (45) days after the Closing Date, Buyer shall prepare and deliver to Sellers a schedule allocating the Purchase Price (and any Assumed Liabilities to the extent properly taken into account as part of the consideration for U.S. federal income tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder.  Sellers shall have thirty (30) days to review and comment on such schedule.  Insofar as Sellers provide written notice to Buyer within such thirty (30)-day period of one or more specific disagreements with Buyer's allocation (such written notice received by Buyer within such thirty (30)-day period, a "Seller Allocation Notice"), Buyer and Sellers shall endeavor in good faith to resolve any such disagreements.  Buyer's schedule shall be final and binding on the Parties with respect to any matters as to which no Seller Allocation Notice is provided by Sellers.  If Buyer and Sellers are unable to resolve any disagreement contained in a Seller Allocation Notice within fifteen (15) days following Buyer's receipt of such Seller Allocation Notice, such disagreement shall be resolved by a nationally recognized independent accounting firm mutually acceptable to Buyer and Sellers, whose determination shall be final and binding on the Parties.  The fees and expenses of such accounting firm shall be borne equally by Buyer and Sellers. Buyer and Sellers agree to file all Tax Returns in a manner consistent with Buyer's allocation (with respect to any matters as to which no Seller Allocation Notice is provided), any written agreement between Buyer and Sellers as to any disputed items and any determination with respect to disputed items by the mutually acceptable independent accounting firm and shall not take any position inconsistent therewith in any Tax Proceeding, audit, or otherwise, except as required by applicable Law. Sellers shall not settle or compromise any Tax Proceeding that would affect the allocation without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed.

**Section 2.10   Assumed Contracts**.

(a)      Schedule 2.10(a) (the "Assumed Contract List") sets forth a list of all Contracts to which a Seller is a party and which Buyer has designated to be included as an Assumed

16

Contract, together with estimated Cure Amounts for each Assumed Contract.  From and after the date hereof, until two (2) days prior to the Closing, Buyer shall be entitled to make additions and deletions to the Assumed Contract List by delivery of written notice to Sellers (which shall then serve notice on the non-debtor counterparties to each of the Contracts so added or deleted); provided that Buyer shall pay any net increase in the sum of Cure Amounts and non-debtor counterparties' Administrative Claims resulting directly from such designation of additional Assumed Contracts (the intent being that there will be no net negative effect on the bankruptcy estate due to a net increase in Cure Amounts and non-debtor counterparties' Administrative Claims resulting from any additional assumptions).  Any such deleted Contract shall be deemed to no longer be an Assumed Contract and any such added Contract shall be deemed an Assumed Contract. Any Contract that is designated (or deemed to be designated) for exclusion and rejection pursuant to this Section 2.10 shall constitute an "Excluded Contract" as of the Closing Date.

(b)     In connection with the assumption and assignment to Buyer of any Assumed Contract that is executory pursuant to this Section 2.10, the allowed Cure Amounts, if any, necessary to cure all monetary defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts, shall be paid by Buyer at the Closing as part of the Purchase Price in Section 2.06.

(c)     Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer (the "Assumption Approval") on the terms set forth in this Section 2.10.  In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all consents from Governmental Authorities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that Sellers' obligations hereunder shall only continue until the Bankruptcy Cases are closed or dismissed.

## ARTICLE III.
## CLOSING

**Section 3.01   Closing**.  Subject to the satisfaction or waiver of the conditions set forth in Article VIII, the closing of the Transaction (the "Closing") shall take place remotely by exchange of documents and signatures electronically (or by such other means as the parties may agree) on the date that is three (3) Business Days after  the satisfaction or waiver of all conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) and (ii) the conclusion of the 2026 Camp Season; provided that in no event shall the Closing occur while the 2026 Camp Season is in session, or at such other time and place as Buyer and Sellers may mutually agree in writing (the date on which the Closing actually occurs, the "Closing Date").

**Section 3.02   Sellers' Closing Deliverables**. At the Closing, Sellers shall deliver or cause to be delivered to Buyer, the following:

(a)    a bill of sale, substantially in the form attached hereto as <u>Exhibit A</u>, duly executed by Sellers, evidencing the sale, transfer, conveyance, and assignment of that portion of the Acquired Assets that is tangible personal property to Buyer;

(b)    an assignment and assumption agreement, in a form agreed to by Buyer and Sellers, duly executed by Sellers, evidencing the assignment of the Assumed Contracts and the assumption of the Assumed Liabilities by Buyer;

(c)    a certificate executed by an authorized officer of Sellers, dated as of the Closing Date, certifying that the conditions set forth in <u>Section 8.02(a)</u> and <u>Section 8.02(b)</u> have been satisfied;

(d)    a certificate of the Secretary (or equivalent officer) of Sellers certifying (i) the resolutions duly adopted by the governing body of Sellers authorizing the execution and delivery of this Agreement and the consummation of the Transaction (as approved by the Bankruptcy Court), and (ii) the incumbency and signatures of the officers of Sellers executing this Agreement and any other documents delivered in connection herewith;

(e)    a non-foreign affidavit from each Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(f)    certified copies of (i) the Sale Order and (ii) the Bid Procedures Order, in each case as entered by the Bankruptcy Court;

(g)    an IRS Form W-9 duly executed by each Seller or each Seller's regarded owner for purposes of U.S. federal income Taxes; and

(h)    such other documents, instruments, or certificates as Buyer may reasonably request to evidence and effectuate the consummation of the Transaction;

(i)    with respect to each parcel of Owned Real Property, a special warranty deed in recordable form, duly executed and acknowledged by the applicable Seller, together with such other customary real property transfer documents as may be reasonably required to convey such Seller's fee simple interest in such Owned Real Property to Buyer, subject only to Permitted Encumbrances and the Sale Order;

(j)    all passwords, administrator credentials, and access information for the websites, e-mail accounts, domain registrars, and other digital assets included in the Acquired Assets within the control or possession of Sellers or their Affiliates.

**Section 3.03   Buyer Closing Deliverables**. At the Closing, Buyer shall deliver or cause to be delivered to Sellers the following:

(a)    the Cash Payment (less the Deposit (together with any interest earned thereon)), by wire transfer of immediately available funds in accordance with <u>Section 2.07(b)</u>;

(b)      an assignment and assumption agreement, in a form agreed to by Buyer and Sellers, duly executed by Buyer, evidencing the assumption of the Assumed Liabilities by Buyer;

(c)      a certificate executed by an authorized officer of Buyer, dated as of the Closing Date, certifying that the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied;

(d)      a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying (i) the resolutions duly adopted by the governing body of Buyer authorizing the execution and delivery of this Agreement and the consummation of the Transaction, and (ii) the incumbency and signatures of the officers of Buyer executing this Agreement and any other documents delivered in connection herewith; and

(e)      such other documents, instruments, or certificates as Sellers may reasonably request to evidence and effectuate the consummation of the Transaction.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the correspondingly numbered Sections of the Schedules, Sellers jointly and severally represent and warrant to Buyer that the statements contained in this Article IV are true and correct as of the Effective Date and as of the Closing Date.

**Section 4.01   Organization and Qualification of Sellers**.   Each Seller is a corporation/limited liability company duly organized, validly existing, and in good standing under the Laws of the State of its incorporation/formation, and has all requisite power and authority to own, lease, and operate its properties and to carry on its business as presently conducted.

**Section 4.02   Authority of Sellers**.  Subject to the entry of the Sale Order, Sellers have full power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Sellers in connection herewith (including the exhibits to this Agreement, collectively, the "Transaction Documents"), to perform its obligations hereunder and thereunder, and to consummate the Transaction.  The execution, delivery, and performance of this Agreement, the Transaction Documents and the consummation of the Transaction have been duly authorized by all necessary action on the part of Sellers (including, to the extent required, approval of the Bankruptcy Court).  This Agreement has been duly executed and delivered by Sellers and, assuming the due authorization, execution, and delivery by Buyer, and subject to entry of the Sale Order, constitutes a legal, valid, and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 4.03   No Conflicts**.  Subject to entry of the Sale Order, the execution, delivery, and performance of this Agreement and the Transaction Documents by Sellers and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of formation, limited liability company agreement, certificate of incorporation, bylaws, or other organizational documents of Sellers, (b) violate or result in a breach

19

of any Law applicable to Sellers, or (c) except as would not reasonably be expected to have a Material Adverse Effect or materially adversely affect the validity or enforceability against such Seller of this Agreement or such Transaction Documents, (i) violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which any Seller is a party or by which any Seller or any of its assets is bound, or (ii) result in the creation of any Encumbrance (other than a Permitted Encumbrance).

**Section 4.04   Title to Acquired Assets**. Subject to entry of the Sale Order, Sellers have good and valid title to, or a valid leasehold interest in, the Acquired Assets, free and clear of all Encumbrances, other than Permitted Encumbrances.

**Section 4.05   Litigation**. Except for the Bankruptcy Cases, there is no action, Order, suit, claim, investigation, or proceeding pending or, to the Knowledge of Sellers, threatened against Sellers that (a) challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction, or (b) would reasonably be expected to have a Material Adverse Effect.

**Section 4.06   Compliance with Laws; Permits**

. Except as would not reasonably be expected to have a Material Adverse Effect, Sellers are in compliance in all material respects with all Laws applicable to the Acquired Assets or the ownership or operation thereof.

**Section 4.07   Brokers**. Other than as disclosed in the Bankruptcy Cases, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transaction or any other transaction document based upon arrangements made by or on behalf of Sellers.

**Section 4.08   Assumed Contracts.**

(a)     True and complete copies of all Assumed Contracts have previously been made available to Buyer.

(b)     Except as would not reasonably be expected to have a Material Adverse Effect and assuming satisfaction of any applicable Cure Amounts, (i) each Assumed Contract is valid and binding on the parties thereto and is in full force and effect, (ii) Sellers are not in uncured breach or default under any Assumed Contract and (iii) to the Knowledge of Sellers, no party to such Assumed Contract has provided notice that such third party intends to terminate, or not renew, any Assumed Contract.

**Section 4.09   No Other Representations**. Except for the representations and warranties expressly set forth in this Article IV, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers, the Acquired Assets, or the Transaction, and Sellers disclaim any other representations or warranties, whether made by Sellers or any of their Affiliates, officers, directors, employees, agents, or representatives. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE IV, SELLERS MAKE NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND SELLERS HEREBY DISCLAIM ANY SUCH REPRESENTATION

OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this <u>Article V</u> are true and correct as of the date of this Agreement and as of the Closing Date.

**Section 5.01  Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing, and subsisting under the Laws of the Commonwealth of Pennsylvania, and has all requisite limited liability company power and authority to own, lease, and operate its properties and to carry on its business as presently conducted.

**Section 5.02  Authority of Buyer**. Buyer has full limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Buyer in connection herewith, to perform its respective obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement and the consummation of the Transaction have been duly authorized by all necessary limited liability company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, assuming the due authorization, execution, and delivery by Sellers, constitutes a legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 5.03  No Conflicts**.  The execution, delivery, and performance of this Agreement by Buyer and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of organization, operating agreement or other organizational documents of Buyer, (b) violate or result in a breach of any Law applicable to Buyer, or (c) except as would not reasonably be expected to prevent or materially impair or delay the consummation of the Transaction, violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which Buyer or any of its assets is bound.

**Section 5.04  Sufficiency of Funds**.  Buyer has, and at the Closing will have, immediately available funds sufficient to pay the Cash Payment and all other amounts payable by Buyer hereunder and to consummate the Transaction.  Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.

**Section 5.05  Litigation**. There is no action, suit, claim, investigation, or proceeding pending or, to the Knowledge of Buyer, threatened against Buyer that challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction.

**Section 5.06  Brokers**.  No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission from Buyer in connection with the Transaction based upon arrangements made by or on behalf of Buyer.

**Section 5.07  No Outside Reliance**. Buyer acknowledges and agrees that (a) Buyer has conducted its own independent investigation, review, and analysis of the business, operations, assets, liabilities, results of operations, financial condition, and prospects of Sellers and the Acquired Assets, which investigation, review, and analysis was performed by Buyer and its Affiliates and representatives, (b) Buyer has been afforded access to the books and records, facilities, equipment, Contracts, and other assets of Sellers that Buyer and its representatives have requested to review, and (c) in entering into this Agreement, Buyer has relied solely upon their own investigation and analysis and the representations and warranties expressly set forth in Article IV (as qualified by the Schedules) and acknowledges that, except as expressly set forth in Article IV, neither Sellers nor any of their respective Affiliates or representatives make or have made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or representatives.

**Section 5.08  Adequate Assurances Regarding Executory Contracts.**  Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

**Section 5.09  No Other Representations.**  Except for the representations and warranties expressly set forth in this Article V, neither Buyer nor any other Person on behalf of Buyer makes any express or implied representation or warranty with respect to Buyer or the Transaction, and Buyer disclaims any other representations or warranties, whether made by Buyer or any of its Affiliates, officers, directors, employees, agents, or representatives.

**ARTICLE VI.**
**COVENANTS**

**Section 6.01  Conduct of Business**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) use commercially reasonable efforts to maintain the Acquired Assets in good working order (ordinary wear and tear excepted), (b) not take any action that would reasonably be expected to result in a Material Adverse Effect, (c) except (i) as required by applicable Law, Bankruptcy Court order, or the terms of this Agreement, (ii) as set forth on the Schedules, (iii) as necessary for the administration of the Bankruptcy Cases, or (iv) with Buyer's prior written consent (not to be unreasonably withheld, conditioned, or delayed), not (1) other than in the ordinary course of business, sell, transfer, or otherwise dispose of any material Acquired Asset outside of the ordinary course of business, (2) create any Encumbrance (other than a Permitted Encumbrance) on any Owned Real Property or Leased Real Property, or (3) terminate any Assumed Contract other than for cause or due to expiration or termination by the counterparty, and (d) notwithstanding the provisions of any order entered in the Bankruptcy Cases (including any cash management order, DIP order, or similar order) to the contrary, not use, transfer, sweep, or permit the use or transfer of any cash held in the Bank Accounts or otherwise generated by or attributable to the Camp Business (including any customer deposits, Prepaid Amounts, or Tuition) for any purpose other than the payment of expenses and liabilities incurred in the ordinary course of operating the Camp

22

Business, and shall not use, transfer, sweep, or apply any such cash to fund or satisfy the expenses, payroll, administrative costs, professional fees, or other obligations of any Seller Affiliate, camp, or estate other than Island Lake Landco LLC, Island Lake Campco LLC, and the Camp Business, in each case without Buyer's prior written consent.

**Section 6.02   Access to Information**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) provide Buyer and their representatives with reasonable access during normal business hours, upon reasonable advance notice, to the personnel, properties, books, records, and Contracts relating to the Acquired Assets, and (b) furnish to Buyer such financial, operating, and other data and information relating to the Acquired Assets as Buyer may reasonably request. Notwithstanding the foregoing, Sellers shall not be required to provide access or information to the extent that (i) such access or the provision of such information would violate any Law or binding agreement, (ii) such information is subject to attorney-client privilege or attorney work-product protection, or (iii) such access or the provision of such information would be unreasonably disruptive to the operations of Sellers. In any such case, Sellers shall use commercially reasonable efforts to provide such information in a manner that does not violate such Law, agreement, or privilege, including through redaction, anonymization, summaries, or other alternative means.

**Section 6.03   Efforts; Consents.** Subject to the terms and conditions of this Agreement, each of the parties hereto shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable under applicable Law to consummate the Transaction as promptly as practicable, including (i) obtaining all necessary consents, approvals, or authorizations of, and making all filings with and giving all notices to, Governmental Authorities and other third parties, and (ii) obtaining all consents, approvals, or authorizations of third parties necessary for the consummation of the Transaction.

**Section 6.04   Bankruptcy Court Matters.**

(a)   **Bid Procedures**.  If the Bid Procedures Order provides for an auction (the "Auction") and one or more Qualified Bids are received by Sellers, Sellers shall conduct the Auction in accordance with the Bid Procedures Order.

(b)   **Sale Order**.  Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as promptly as practicable after the Sale Hearing, and in any event no later than August 11, 2026. If the Sale Order has not been entered by such date, Buyer may terminate this Agreement upon written notice to Sellers, and the Deposit shall be returned to Buyer in accordance with Section 2.07(c). The Sale Order shall be in form and substance reasonably acceptable to Buyer and shall include, among other things, provisions providing that (i) Buyer is purchasing the Acquired Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code, (ii) the transfer of the Acquired Assets is free and clear of all Encumbrances, claims, and interests to the fullest extent permitted by Section 363(f) of the Bankruptcy Code, (iii) find that Buyer is not a successor to Sellers and shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (iv) the

Assumed Contracts are validly assumed and assigned to Buyer pursuant to section 365 of the Bankruptcy Code (v) find that Buyer has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assumed Contracts; (vi) find that Buyer shall have no Liability for any Excluded Liability; (vii) find that the consideration provided by Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets, (viii) find that Buyer and Sellers did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code, (ix) order that, notwithstanding the provisions of the Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry and (x) find that no "bulk sales" or "bulk transfers" laws shall apply to the transactions contemplated hereby. Buyer agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (1) demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (2) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

(c)     **No Modification or Appeal**. Buyer shall not oppose, and Sellers shall not take any action that is intended to, or that would reasonably be expected to, result in the reversal, modification, or vacatur of the Bid Procedures Order or the Sale Order.

(d)     **Defense of Orders**. Each of Sellers and Buyer shall use their commercially reasonable efforts to take such actions as may be reasonably necessary to defend against any objection to the Sale Order or any appeal therefrom.

(e)     If an Auction is held, any initial overbid at the Auction must equal or exceed the sum of (i) the Purchase Price, plus (ii) the Breakup Fee, plus (iii) the Expense Reimbursement, plus (iv) $350,000 (the "Minimum Overbid"); provided that the setting, increase, or reduction of any Minimum Overbid thereafter shall remain subject to the Sellers' reasonable business judgment and the terms of the Bid Procedures Order. This Section 6.04(e) shall survive termination of this Agreement.

**Section 6.05   Publicity**.  Except as required by applicable Law (including any disclosure required by the Securities and Exchange Commission or other Governmental Authority or any disclosure required in connection with the Bankruptcy Cases), no party hereto shall issue any press release or make any public announcement relating to this Agreement or the Transaction without the prior written consent of the other parties hereto (which consent shall not be unreasonably withheld, conditioned, or delayed); provided, however, that, following the Closing, either party may, without the other party's prior consent, issue a press release or other public announcement acknowledging the completion of the Transaction, so long as such press release or public announcement does not disclose any confidential information of the other party or any information otherwise prohibited from disclosure under this Agreement; provided, further, that each party shall be permitted to respond to private inquiries in a manner consistent with the terms and provisions of this Agreement and public disclosures existing at the time of such inquiry.

**Section 6.06   Confidentiality**.    The parties acknowledge that certain confidential information has been and may be exchanged in connection with this Agreement. Each party agrees

to keep confidential all information provided by the other party in connection with this Agreement that is not otherwise publicly available, and to use such information solely for the purposes of consummating the transactions contemplated hereby, except as required by applicable Law (including any disclosure required in connection with the Bankruptcy Cases).

**Section 6.07   Notification of Certain Matters**.  Each party hereto shall give prompt notice to the other parties of (a) the occurrence or non-occurrence of any event that has caused or would reasonably be expected to cause any condition to the obligations of any party to effect the transactions contemplated hereby not to be satisfied, and (b) any action, suit, claim, investigation, or proceeding commenced or, to the Knowledge of such party, threatened against such party that relates to the consummation of the Transaction. Sellers shall also promptly notify Buyer of any material casualty or material governmental inquiry.

**Section 6.08   Bulk Transfer Laws**.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances on the Acquired Assets, including any Encumbrances arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 6.09   Employee Matters**.

(a)      Prior to the Closing, Buyer shall be entitled, in its sole discretion, to offer (or cause a designee of Buyer to offer), effective as of the Closing Date, employment to such Current Employees as Buyer or its designee determines, subject to applicable Law. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be referred to as an "Offeree." Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee." Each offer to an Offeree shall be on such terms and conditions as Buyer or its designee determines in their sole discretion, subject to applicable Law, and nothing herein shall require Buyer or any of its Affiliates to offer employment to any Current Employee or to provide any particular level of compensation, benefits, service credit or other terms of employment.

(b)      Each Current Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)      Following the date of this Agreement, Sellers shall provide reasonable cooperation and information to Buyer as reasonably requested by Buyer with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(d)      Notwithstanding anything in this Agreement to the contrary and unless otherwise agreed to by Sellers and Buyer, Sellers shall process the payroll for and pay, or cause to be paid, base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers, other than the pre-Closing administrative expense claims and payroll obligations assumed by Buyer pursuant to Section 2.03(e). Sellers shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date

25

with respect to all employees of Sellers as of such date, other than with respect to the payroll obligations assumed by Buyer pursuant to Section 2.03(e). Buyer shall process the payroll for and shall pay, or cause to be paid, (i) the pre-Closing administrative expense claims and payroll obligations assumed by Buyer pursuant to Section 2.03(e), and (ii) base wages, base salary and benefits that accrue after the Closing Date with respect to Transferred Employees. Buyer shall withhold and remit all applicable payroll taxes as required by Law with respect to the obligations it assumes pursuant to Section 2.03(e) and after the Closing Date with respect to Transferred Employees.

(e)    Nothing contained herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' employee benefit plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

(g)    Sellers shall, as promptly as reasonably practicable following Buyer's request and to the extent in Sellers' possession or control, provide Buyer with information reasonably requested by Buyer regarding any Health Plans or other group health coverage maintained by Sellers for Current Employees.

**Section 6.10   Camp Matters.** From the effective date of this Agreement until the Closing Date, Sellers shall (i) operate the Camp Business in substantially the same manner as Sellers have traditionally operated same and in accordance with all governmental requirements and further in accordance with the policies, rules, regulations and standards of the American Camp Association; (ii) use commercially reasonable efforts to (A) maintain existing Campers attending Camp during the 2026 Camp Season, and (B) re-enroll Campers who attended Camp during the 2026 Camp Season for the 2027 Camp Season, except to the extent any of the foregoing would no longer be age-appropriate; (iii) not refuse attendance to any prospective Camper who is willing to pay full Tuition; (iv) utilize the same techniques and methods to enroll prospective campers for the 2026 Camp Season, such as guided tours for all prospective Campers and their families who request them, discounts for prospective Campers, if any, promotions and other means traditionally employed by Seller, and (v) not materially change tuition, discounts, promotional activity, or enrollment criteria without Buyer's prior written consent, not to be unreasonably withheld, conditioned, or delayed.  Sellers shall also operate the off-season operations included in the Camp Business in substantially the same manner as traditionally operated.

**Section 6.11   Casualty.** If, prior to the Closing, all or any portion of the Acquired Assets are damaged or destroyed by a casualty, then, from and after the casualty prior to the Closing Date, Seller shall use commercially reasonable efforts to cause the insurance carrier(s) providing coverage with respect to the Acquired Assets at the time of the casualty to honor and pay any claim made in connection with such casualty.

## ARTICLE VII.
## TAX MATTERS

**Section 7.01   Transfer Taxes**.  All Transfer Taxes shall be allocated as set forth in Section 2.08. The party required by applicable Law to file any Tax Return with respect to any Transfer Taxes shall timely file such Tax Return, and the other party shall cooperate with such filing party as reasonably requested.

**Section 7.02   Cooperation on Tax Matters**.  After the Closing, Sellers and Buyer agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit, or proceeding relating to any Tax.

## ARTICLE VIII.
## CONDITIONS TO CLOSING

**Section 8.01   Conditions to Obligations of All Parties**.  The obligations of each party hereto to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by both Sellers and Buyer) of each of the following conditions as of the Closing:

(a)    *No Injunction*.  No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Law or Order that enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(b)    *Sale Order*.  The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall be a Final Order and shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent.

**Section 8.02   Conditions to Obligations of Buyer**.   The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of each of the following additional conditions as of the Closing:

(a)    **Representations**.  (i) The representations and warranties of Sellers set forth in Section 4.01 (Organization and Qualification of Sellers), Section 4.02 (Authority of Sellers) and Section 4.07 (Brokers) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date), and (ii) the other representations and warranties of Sellers set forth in Article IV shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications set forth therein) as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct as of such date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

27

(b)      **Performance of Covenants**.  Sellers shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Sellers under this Agreement at or prior to the Closing.

(c)      **No Material Adverse Effect**.  Since the date hereof, there shall not have occurred any Material Adverse Effect.

(d)      **Closing Deliveries**.  Sellers shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.02.

(e)      **Bid Procedures Order**.  The Bankruptcy Court shall have entered the Bid Procedures Order, and the Bid Procedures Order shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent.

**Section 8.03   Conditions to Obligations of Sellers**.   The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Sellers) of each of the following additional conditions as of the Closing:

(a)      **Representations**.  The representations and warranties of Buyer set forth in Article V shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date);

(b)      **Performance of Covenants**.  Buyer shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Buyer under this Agreement at or prior to the Closing.

(c)      **Closing Deliveries**. Buyer shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.03.

**ARTICLE IX.**
**TERMINATION**

**Section 9.01   Termination**.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)      by the mutual written consent of Buyer and Sellers;

(b)      by either Buyer or Sellers, upon written notice to the other party, if the Closing shall not have occurred on or before the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.01(b) shall not be available to any party whose failure to fulfill any of its obligations hereunder has been the principal cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c)      by Buyer, upon written notice to Sellers, if Sellers' representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.02(a) would not be satisfied, or if Sellers shall have breached or

28

failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.02(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Buyer to Sellers;

(d)     by Buyer, upon written notice to Sellers, if there shall have occurred a Material Adverse Effect;

(e)     by Sellers, upon written notice to Buyer, if any of Buyer's representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.03(a) would not be satisfied, or if Buyer shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.03(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Sellers to Buyer;

(f)     by either Buyer or Sellers, upon written notice to the other Parties, if, following completion of the Auction, Buyer is not the Successful Bidder or the Back-Up Bidder;

(g)     by either Buyer or Sellers, upon written notice to the other parties, if any court of competent jurisdiction or other Governmental Authority shall have issued an Order permanently enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable; provided that no Party may terminate this Agreement under this Section 9.01(g) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(h)     by Buyer, upon written notice to the Sellers, if (A) one or more of the Bankruptcy Cases relating directly to the Camp Business or the Acquired Assets is dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if a trustee is appointed in all of the Bankruptcy Cases, or a portion thereof relating directly to the Camp Business (B) the Bankruptcy Court enters any Order that would reasonably be expected to prevent the consummation of the Transaction in accordance with the terms hereof, (C) the Bankruptcy Court shall enter any order sustaining, upholding, or otherwise ruling in favor of, a Stalking Horse Objection (as defined in the Bid Procedures Order) with respect to the Transaction or (D) any creditor of any Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the stay to foreclose on any portion of the Acquired Assets;

(i)     by either Buyer or Sellers, upon written notice to the other parties, if the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if a trustee is appointed in the Bankruptcy Cases;

(j)     by either Buyer or Sellers, upon written notice to the other party, if (x) the Bankruptcy Court shall have entered an Order authorizing Sellers to consummate an Alternative Transaction with a Person other than Buyer or (y) any Seller consummates one or more Alternative Transactions with one or more Persons other than Buyer; or

(k)      by Buyer, upon written notice to Sellers, if the Sale Order entered by the Bankruptcy Court does not contain provisions reasonably acceptable to Buyer implementing the protections contemplated by this Agreement, including free and clear transfer, no successor liability, and Section 363(m) good-faith purchaser findings;

**Section 9.02   Effect of Termination.**

(a)      In the event of termination of this Agreement pursuant to Section 9.01, this Agreement shall become void and of no effect, without any liability or obligation on the part of any party hereto (or any of their respective Affiliates, officers, directors, employees, agents, or representatives), except that (i) the provisions of this Section 9.02 (Effect of Termination), Section 9.03 (Remedies), and Article X (Miscellaneous) shall survive any termination of this Agreement, and (ii) no such termination shall relieve any party from liability for any willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by the Sellers to consummate the Closing when they are obligated to do so hereunder), or fraud; provided that, as between Buyer and Sellers, the return or release of the Deposit in accordance with Section 2.07(c) and Section 9.03 shall govern the consequences of any termination of this Agreement with respect to the Deposit.

(b)      In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated other than (i) by Sellers pursuant to Section 9.01(b) (if termination pursuant to Section 9.01(b) would be unavailable to Buyer) or Section 9.01(e), or (ii) pursuant to Section 9.01(a), then Sellers (jointly and severally) shall pay Buyer by wire transfer of immediately available funds within ten (10) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of its counsel and financial advisor) incurred by Buyer in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement (the "Expense Reimbursement"), which amount shall not exceed 1.0% of the Cash Payment (i.e., $100,000). The Expense Reimbursement shall be treated as an administrative expense in the Bankruptcy Cases under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Expense Reimbursement, if payable pursuant to this Section 9.02(b), shall be in addition to the return of the Deposit and payment of the Breakup Fee, in each case, to the extent payable to Buyer pursuant to the terms hereof.

(c)      In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Sellers (jointly and severally) shall pay to Buyer a break-up fee in an amount equal to 3.0% of the Cash Payment (i.e., 300,000) (the "Breakup Fee") to an account designated by Buyer in writing to Sellers, in the event that this Agreement is terminated pursuant to Section 9.01(f) or Section 9.01(j) and Sellers consummate an Alternative Transaction. The Breakup Fee shall be due and payable on the first date on which any such Alternative Transaction is consummated. The Breakup Fee shall be treated as an administrative expense in the Bankruptcy Cases under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Breakup Fee, if payable pursuant to this Section 9.02(c), shall be in addition to the return of the Deposit to the extent payable to Buyer pursuant to the terms hereof.

(d)      Each of the Parties acknowledges and agrees that the agreements contained in this Section 9.02 are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Expense Reimbursement and/or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)      Pursuant to the Bid Procedures Order, the claim of Buyer in respect of the Expense Reimbursement and/or the Breakup Fee is and constitutes an allowed administrative expense claim against Sellers under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Cases.

Section 9.03   Remedies.

(a)      In the event (i) Buyer has been designated the Successful Bidder, or Buyer has been designated the Back-Up Bidder and, following the Successful Bidder's failure to consummate the Transaction, Buyer has become the deemed Successful Bidder pursuant to Section XV of the Bid Procedures, and (ii) this Agreement is terminated by Sellers pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, or in the event that Buyer fails to consummate the Closing when all conditions to Buyer's obligations to close have been satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing), Sellers' sole and exclusive remedy (except in the case of fraud or willful misconduct) shall be to retain the Deposit as liquidated damages. The parties acknowledge that the actual damages to Sellers resulting from such breach or failure would be difficult to ascertain, and the Deposit constitutes a reasonable estimate of such damages.

(b)      In the event that this Agreement is terminated other than pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, and Buyer is entitled to the return of the Deposit pursuant to Section 2.07(c), the return of the Deposit shall constitute the sole and exclusive remedy of Buyer against Sellers (except in the case of fraud or willful misconduct).

(c)      Notwithstanding anything to the contrary herein, in no event shall any party be liable to any other party for any punitive, exemplary, special, incidental, consequential, or indirect damages, including lost profits or loss of business opportunity, in connection with this Agreement or the Transaction.

## ARTICLE X.
## MISCELLANEOUS

Section 10.01 Survival. The representations, warranties, covenants, and agreements contained in this Agreement shall not survive the Closing and shall terminate at the Closing, except for (a) covenants and agreements that by their terms contemplate performance after the Closing, which shall survive until fully performed, and (b) claims based on fraud or willful misconduct.

31

**Section 10.02 Notices**.  All notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be deemed duly given (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (c) when sent by email (with confirmation of transmission) if sent during normal business hours of the recipient (and if not sent during normal business hours, then on the next Business Day), or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, in each case addressed to the parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

| | |
|---|---|
| if to Buyer, then to: | CMAO, LLC<br>50 Island Lake Road<br>Starrucca, PA 18462<br>Attention: Craig Odiorne<br>Email: odiorne799@gmail.com |
| with a copy (which shall not constitute notice) to: | Royer Cooper Cohen Braunfeld LLC<br>101 W. Elm Street, Suite 400<br>Conshohocken, PA 19428<br>Attention: Neil A. Cooper, Esq. and Marc Skapof, Esq.<br>Email: ncooper@rccblaw.com and mskapof@rccblaw.com |
| if to Sellers, then to: | Asaf Ravid<br>Email:  aravid@circleinv.com |
| with a copy (which shall not constitute notice) to: | Cole Schotz P.C.<br>25 Main Street<br>Hackensack, New Jersey 07601<br>Attention: Roger Iorio, Esq.<br>Email: riorio@coleschotz.com |

**Section 10.03 Interpretation**.  When a reference is made in this Agreement to an Article, Section, Exhibit, or Schedule, such reference shall be to an Article, Section, Exhibit, or Schedule of this Agreement unless otherwise indicated. The words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "or" is not exclusive. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

**Section 10.04 Severability**.  If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement, and this Agreement

shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal, or unenforceable, had never been contained herein.

**Section 10.05 Entire Agreement**.   This Agreement, together with all Exhibits and Schedules hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

**Section 10.06 Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other party; provided, however, that Buyer may assign any or all of its rights and obligations hereunder to any Affiliate of Buyer without the prior consent of Sellers, provided that Buyer shall remain liable for all of its obligations hereunder following any such assignment.

**Section 10.07 Amendment and Waiver**.  This Agreement may not be amended except by an instrument in writing signed by Buyer and Sellers. Any party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto, or (c) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. No failure or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**Section 10.08 Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (without application of principles of conflicts of law); provided, however, that all matters relating to the conveyance, transfer, title, or other real property interests in and to, the Owned Real Property shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania (without application of principles of conflicts of law).   In connection with any controversy arising out of or related to this Agreement, Sellers and Buyer hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Cases have been closed, the courts of the State of New Jersey.  Sellers and Buyer each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT, OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION.

**Section 10.09 Specific Performance**.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, the parties agree that, prior to

33

the termination of this Agreement, each party shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court (or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, the state and federal courts located in the State of New Jersey), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law, or inequitable for any reason.

**Section 10.10 Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.11 No Third-Party Beneficiaries**.  Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.12 "As Is, Where Is" Transaction**.  Buyer acknowledges that the Acquired Assets are being sold on an "AS IS, WHERE IS" basis, with all faults, and Buyer has relied solely on its own investigation, analysis, and evaluation of the Acquired Assets in making its decision to enter into this Agreement. Buyer further acknowledges that, except for the representations and warranties expressly set forth in Article IV, Sellers have not made, and Sellers hereby expressly disclaim, any representations or warranties of any kind or nature, express or implied, at common law, by statute, or otherwise, relating to the Acquired Assets or the transactions contemplated hereby, and Buyer hereby shall have no claims related to the condition of the Acquired Assets except as expressly set forth herein. Notwithstanding anything in this Section 10.12 to the contrary, nothing herein shall limit or waive any claim in the case of fraud or willful misconduct, or waive any protection afforded to Buyer under the Sale Order.

**Section 10.13 No Successor Liability**.  Except as expressly provided herein, Buyer does not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability. Buyer is not, and shall not be, a successor to Sellers by reason of any theory of law or equity. The Parties shall use commercially reasonable efforts to cause the Sale Order to expressly provide for the protections set forth in this Section 10.13.

*[Signature Pages Follow]*

34

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**CMAO, LLC**

By:_____
Name: Craig Odiorne
Title: Authorized Member

**SELLERS:**

**ISLAND LAKE LANDCO LLC**

By:_____
Name:
Title:

**ISLAND LAKE CAMPCO LLC**

By:_____
Name:
Title:

35

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**CMAO, LLC**


By:_____
Name: Craig Odiorne
Title: Authorized Member


**SELLERS:**

**ISLAND LAKE LANDCO LLC**


By:_____
Name:  Asaf Ravid
Title:   CRO


**ISLAND LAKE CAMPCO LLC**


By:_____
Name:  Asaf Ravid
Title:   CRO

35

## EXHIBIT A

### FORM OF BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, _____ ("**Sellers**"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to CMAO, LLC, a Pennsylvania limited liability company ("**Buyer**"), all of their rights, title, and interest in and to the tangible personal property that is included in the Acquired Assets, as such term is defined in the Asset Purchase Agreement, dated as of _____ (the "**Purchase Agreement**"), by and among Sellers and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Sellers make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Each Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Sellers will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Sellers have duly executed this Bill of Sale as of _____, 2026.

[SELLERS]

By_____

Name:

Title:

**DISCLOSURE SCHEDULES**

**TO**

**ASSET PURCHASE AGREEMENT**

**by and among**

**CMAO, LLC**

**as the Buyer,**

**and**

**ISLAND LAKE LANDCO LLC and ISLAND LAKE CAMPCO LLC,**

**as the Sellers**

Dated as of July 26, 2026

Reference is hereby made to the Asset Purchase Agreement dated as of July 26, 2026 (the "Agreement"), by and among CMAO, LLC, as Buyer, and Island Lake Landco LLC and Island Lake Campco LLC, as Sellers. All capitalized terms which are not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

The section numbers in these Disclosure Schedules correspond to the section numbers in the Agreement; however, the disclosure of any fact(s) or item(s) in these Disclosure Schedules relevant to any section of the Agreement shall, to the extent that it is reasonably apparent on its face that the existence of such fact or item or its contents be relevant to any other section(s) of the Agreement, be deemed to be disclosed with respect to such other section(s) whether or not these Disclosure Schedules include an explicit cross reference to such other section(s) and whether or not such other section(s) contemplate these Disclosure Schedules. The disclosure of any fact or item in these Disclosure Schedules shall not be deemed an admission as to whether such fact or item is "material" or may constitute, produce or result in a Material Adverse Effect as to Sellers.

2

<u>Schedule 1.01(a)</u>

**Sellers' Knowledge Parties**

1.	Asaf Ravid

<u>Schedule 1.01(b)</u>

**Buyer's Knowledge Parties**

1.      Craig Odiorne

Schedule 2.01(n)

**Assumed Permits**

| Permit / license (regulator) | Holder of record |
|---|---|
| Retail Food Facility License (PA Dept. of Agriculture, Bureau of Food Safety) | Island Lake Camp Co LLC |
| Storage Tank Registration/Permit (PA DEP, Division of Storage Tanks) | Island Lake Camp Co LLC |
| Clinical Laboratory Permit / CLIA (PA Dept. of Health) | Island Lake Camp Co LLC |
| ACA Accreditation | Island Lake Camp |

Schedule 2.10(a)

**Assumed  Contracts**

| NO. | TYPE OF CONTRACT | DESCRIPTION OF CONTRACT | CURE AMOUNTS |
|---|---|---|---|
| | Program Services | Entertainment Agreement, dated January 26, 2026, by and between Yahney Entertainment, Inc. and Island Lake Camp (Camp Dance Social - July 24, 2026) | |
| 1. | Program Services | Performance Confirmation and Contract, dated April 14, 2026, by and between Eric Wilzig LLC and Island Lake Camp | |
| 2. | Transportation & Travel | Transportation Service Agreement | |
| 3. | Program Services | Performance Agreement for Hypnosis Program, dated December 30, 2025, by and between Brad Henderson (Henderson Productions) and Island Lake Camp | |
| 4. | Technology | Computer Equipment Rental Contract, dated June 14, 2026, by and between Computer Rents Inc. and Island Lake Camp | |
| 5. | Technology | Sales Order Agreement, dated April 30, 2024, by and between Topp Business Solutions and Island Lake Camp | |
| 6. | Transportation & Travel | Charter Service Agreement, dated September 9, 2025, by and between Stout's Charter Service and Island Lake Camp | |
| 7. | Program Services | Group Sales Agreement, dated December 16, 2025, by and between HEI Hotels LLC d/b/a Embassy Suites Waltham and Island Lake Camp | |
| 8. | Transportation & Travel | Charter Service Agreement, dated June 3, 2026, by and between Nichols Bus and Island Lake Camp | $3,110 |
| 9. | Program Services | Professional Appearance Agreement, dated November 10, 2026, by and between SO Fun City, LLC and Island Lake Camp | |
| 10. | Transportation & Travel | Transportation Service Agreement | |
| 11. | Camper Agreements | Camper Agreement (Template) | |
| 12. | Employment Agreements | CCUSA 2026 Letter of Agreement, dated October 15, 2025, by and between Camp Counselors USA (CCUSA) and Island Lake Camp | $12,250 |

| 13. | Employment Agreements | Employment Agreement | |
|---|---|---|---|
| 14. | Equipment & Assets | Wild Packs Host Camp Agreement J-1 Exchange Visitors' Program, dated September 10, 2025, by and between Wild Packs and Island Lake Camp | |
| 15. | Program Services | 2026 Host Camp Agreement, dated December 8, 2025, by and between International Training & Exchange Inc. dba AmeriCamp, Intrax Work Travel, and Island Lake Camp | $7,475 |
| 16. | Employment Agreements | 2026 Camp Leaders Cultural Exchange Camp Program Agreement, by and between Smaller Earth Inc. dba Camp Leaders and Island Lake Camp | $13,095 |
| 17. | Employment Agreements | Camp Agreement and Program Terms for J-1 Visa Participants, by and between Cultural Homestay International (CHI) and Island Lake Camp | |
| 18. | Employment Agreements | International Camp Counselor Agency US Summer Camp Agreement - 2026, dated April 16, 2026, by and between Global Leaders USA LLC DBA ICCA and Island Lake Camp | |
| 19. | Employment Agreements | 2026 IENA Camp Program Agreement, by and between International Exchange of North America (IENA) and Island Lake Camp | $93,765 |
| 20. | Food & Dining | H&H Purchasing Service Agreement, dated March 10, 2021, by and between H&H Purchasing Services, LLC and Island Lake Camp | |
| 21. | Safety & Compliance | Insurance | |
| 22. | Transportation & Travel | Camper Referral Agreement, by and between Tips on Trips and Camps and Island Lake Camp | |
| 23. | Financial & Corporate | Non-Exclusive Agreement, dated November 12, 2024, by and between The Camp Authority and Island Lake Camp | |
| 24. | Financial & Corporate | Camper Referral Agreement, by and between The Camp Connection and Island Lake Camp | $850 |
| 25. | Financial & Corporate | Camper Referral Agreement, by and between Camp Experts and Island Lake Camp | |
| 26. | Financial & Corporate | Camp Specialists Service Agreement, dated November 20, 2025, by and between Camp Specialists LLC and | |

| | | Island Lake Camp | |
|---|---|---|---|
| 27. | Employment Agreements | Penn Placements Summer Program Referral Agreement, dated January 5, 2026, by and between Penn Placements and Island Lake Camp | |
| 28. | Financial & Corporate | Camper Referral Agreement, by and between Spectacular Summers LLC and Island Lake Camp | |
| 29. | Financial & Corporate | Camper Referral Agreement, by and between The Summer Lady, Inc. and Island Lake Camp | |
| 30. | Safety & Compliance | Constable Peacekeeping Agreement, dated March 24, 2026, by and between Island Lake Camp and East Donegal Constable LLC | |
| 31. | Safety & Compliance | Head Lice Treatment Services Agreement, dated March 2, 2026, by and between Naughty Nits LLC and Island Lake Camp | |
| 32. | Maintenance & Facilities | Lake Management Contract, dated January 20, 2026, by and between Aquatic Environment Consultants, Inc. and Island Lake Camp | |
| 33. | Safety & Compliance | Health Services Agreement | |
| 34. | Real Estate & Leases | Neighbors Agreement for Road Closure, by and between Island Lake Camp and neighboring property owners | |
| 35. | Real Estate & Leases | Lease Agreement, dated April 8, 2024, by and between Scott Township, Wayne County, Pennsylvania, as landlord, and Island Lake Camp LLC, as tenant, for the temporary exclusive use and control of a portion of Island Lake Road, Starrucca, Pennsylvania 18462, for seasonal summer camp operations, typically June through August annually. | |
| 36. | Program Services | Entertainment Agreement, dated January 26, 2026, by and between Yahney Entertainment, Inc. and Island Lake Camp (Silent Disco Dance Party - August 14, 2026) | |
| 37. | Program Services | Event Contract, dated April 22, 2026, by and between Air Fair Entertainment Inc. and Island Lake Camp | |
| 38. | Program Services | Event Contract, dated May 28, 2026, by and between | |

| | | Level99 Natick and Island Lake Camp | |
|---|---|---|---|

Schedule 4.04(b)

**Owned Real Property**

50 Island Lake Road, Starrucca, Pennsylvania 18462

Tax Parcel Nos: 23-0-0131-016.0003, 23-0-0131-0022, 23-0-0131-0021, 23-0-0131-0016, 23-0-0131-0020.0001, 23-0-0131-0023, 23-0-0131-0023.-L and 23-0-0131-0007; AND 23-0-0131-0037 and 23-0-0131-0037.A

Schedule 4.04(c)

**Leased Real Property**

Lease Agreement dated April 8, 2024, by and between Scott Township, Wayne County, Pennsylvania, as landlord, and Island Lake Camp LLC, as tenant, for the temporary exclusive use and control of a portion of Island Lake Road, Starrucca, Pennsylvania 18462, for seasonal summer camp operations, typically June through August annually.

Schedule 4.09

**Bank Accounts**

Island Lake Campco LLC
Business Interest Checking Account No. ██████████
Wayne Bank, 717 Main Street, PO Box 269, Honesdale, Pennsylvania 18431-0269
ABA Routing Number: ██████████