**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*,[1] | Case No. 26-16388 (CMG) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF J. SCOTT VICTOR IN SUPPORT OF ENTRY OF**
**SALE ORDERS APPROVING THE SALE TRANSACTION(S)**
**FOR CERTAIN OF THE SIMAD DEBTORS' CAMP ASSETS**

I, J. Scott Victor, hereby declare as follows:

1.      I am a Founding Partner and Managing Director of SSG Advisors, LLC ("SSG"),

the investment banker to the above-captioned debtors and debtors in possession (collectively,

the "SIMAD Debtors").  SSG is an investment banking firm that maintains offices at 300 Barr

---

[1]    A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.  The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

Harbor Drive, Suite 420, West Conshohocken, PA 19428.  SSG has expertise assisting middle-market companies and their stakeholders in completing special situation transactions and provides its clients with comprehensive investment banking services in the areas of mergers and acquisitions, private placements, financial restructurings, valuations, litigation and strategic advisory. SSG has served as an investment banker to debtors and creditors in a variety of industries and has provided its advisory services in connection with more than 500 transactions. SSG and its professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

2.      I am authorized to submit this declaration (the "Declaration") on behalf of SSG in support of the approval of the Sale Transactions described in the *Notice of Successful Bidders for Certain of the SIMAD Debtors' Assets* [Docket No. 789] and in further support of the *Motion For Entry of an Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 227].[2]

3.      I have over 40 years of experience in the restructuring industry and extensive experience (i) marketing companies or their assets for sale, including companies in distress and debtors in bankruptcy cases, (ii) raising capital for special situation transactions, and (iii) restructuring companies' balance sheets both in and out of court.  I have closed over 300 transactions.  I have served as an investment banker in more than 200 chapter 11 cases since 2001.

---

[2]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s) (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 298] (the "Bidding Procedures Order") or the Bidding Procedures, as applicable.

4. Although SSG is expected to be compensated for its work as the SIMAD Debtors' proposed investment banker in these chapter 11 cases, I am not being compensated separately for this Declaration or testimony. Unless otherwise indicated, all facts set forth in this Declaration are based on (i) my personal knowledge, (ii) my discussions with the numerous constituencies in this case, including the SIMAD Debtors' Chief Restructuring Officer, the SIMAD Debtors' Associate Chief Restructuring Officer, SIMAD Debtors' other professionals, the Committee's professionals, Potential Purchasers, Qualified Bidders, counsel to the SIMAD Debtors' secured lenders, camp directors, employees, and other interested parties, (iii) my review of relevant documents, or (iv) my opinion based upon my experience, knowledge, and information concerning the SIMAD Debtors' operations and financial affairs. If I were called to testify, I would testify competently to the facts set forth herein. I am over the age of 18 years and authorized to submit this Declaration.

A. **The SIMAD Debtors' Camp Assets**

5. As more fully described in the *Declaration of Assaf Ravid, Chief Restructuring Officer of the SIMAD Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 62], the SIMAD Debtors own and operate thirty (30) summer camps around the country. The SIMAD Debtors' summer camps operate from June through August and are located predominantly throughout the eastern United States region, including in New Jersey, New York, Maine, Pennsylvania, among other states, in which approximately 20,500 children enroll each year.

6. The summer camps within the SIMAD Debtors umbrella are: (1) Camp Achim, (2) Banner Day Camp, (3) New England Golf & Tennis Camp, (4) Blue Star Camps, (5) Camp Chateaugay, (6) Camp Chen-a-Wanda, (7) Club Getaway, (8) Country Roads Day Camp, (9) Eagle's Landing Day Camp, (10) Camp Echo, (11) Camp Green Lane, (12) Indian Acres Camp for Boys & Forest Acres Camp for Girls, (13) Island Lake Camp, (14) Kiwi Country Day Camp,

3

(15) Camp Lavi, (16) Camp Lokanda, (17) Malka, (18) Meadowbrook Country Day Camp, (19) Camp Med-O-Lark, (20) Camp Mesorah, (21) Camp Mogen Avraham, (22) Mohawk Day Camp, (23) Camp North Star, (24) Pine Forest Camp, (25) Rolling Hills Day Camp, (26) Summit Camp and Travel, (27) Camp Waukeela, (28) Camp Wekeela, and (29) Windsor Mountain Summer Camp.  In addition, the SIMAD Debtors own a fifty (50%) percent equity interest in (30) Willow Lake Day Camp.

**B.      The SIMAD Debtors' Need for a Prompt and Comprehensive Sale**

7.      Prior to the Petition Date, it became apparent that the SIMAD Debtors would not be able to satisfy their funded debt obligations without a chapter 11 filing and required an emergent filing to avoid potentially catastrophic impacts on the SIMAD Debtors' summer camp season. Given these circumstances, the SIMAD Debtors, in consultation with their advisors, determined that the best path to preserving and maximizing value was to pursue the sale of all, substantially all, or any portion of the SIMAD Debtors' summer camps on an expedited basis.  Shortly following the chapter 11 filings, the SIMAD Debtors' immediate focus turned to consummating Sale Transaction(s) for the camp Assets.  As part of this process, the SIMAD Debtors engaged SSG as their investment banker on June 15, 2026 to initiate a marketing and sale process.  Since its engagement, SSG has worked closely with the SIMAD Debtors and their advisors to market the SIMAD Debtors' Assets, including compiling diligence materials and identifying and engaging with Potential Purchasers.  Additionally, SSG has worked with the SIMAD Debtors' management and other professionals and has become familiar with the SIMAD Debtors' capital structure, financial condition, liquidity needs, and business operations.

8.      Time was also of the essence because, at the time of the filing of the chapter 11 cases, camp directors and employees were in the midst of preparing for the 2026 camp season and planning for the 2027 camp season.  Critical decisions regarding funding, staffing, programming,

maintenance, capital expenditures, and enrollment for the 2026 and 2027 camp seasons needed to be made in the first few weeks of the chapter 11 cases. Camp directors required clarity regarding ownership and future operational control of the camps as parents were being asked to make decisions regarding future enrollment and, ultimately, to place deposits for the 2027 camp season. Absent immediate DIP funding and a prompt and orderly sale process, uncertainty regarding the future of the camps could have adversely affected enrollment, stakeholder confidence, and the value of the Assets themselves.

9. The SIMAD Debtors' objective throughout the sale process was to preserve and realize the highest possible value from these Assets while balancing the complex interests of numerous constituencies, including the camp directors and operators. Consistent with that objective, the SIMAD Debtors structured a marketing and sale process designed to generate the broadest possible interest, encourage robust competition among prospective purchasers, and maintain flexibility to pursue either individual asset sales or a portfolio transaction depending on which approach yielded the greatest overall value.

## C.    The SIMAD Debtors' Capital Structure

10. The SIMAD Debtors' capital structure presented significant challenges in designing and executing a value-maximizing sale process. Unlike many sale transactions in which substantially all assets secure a single creditor group or share a common collateral pool, the SIMAD Debtors' Assets were subject to multiple credit arrangements involving different creditor constituencies with distinct collateral packages and economic interests.

11. Specifically, the SIMAD Debtors' capital structure included three principal creditor silos: (i) Mishmeret Trust Company, Ltd., (ii) Bank of New Hampshire, and (iii) additional lenders, including HomeTrust Bank, Community Bank, Bank of America, N.A., Wayne Bank, and others. Because different camps and related assets were associated with different creditor constituencies,

any potential transaction required careful analysis of how value would be generated, allocated, and realized across the various creditor silos.

12. As a result, the SIMAD Debtors could not simply evaluate bids based on headline purchase price alone. Instead, the SIMAD Debtors and their advisors were required to assess how each proposal affected the various creditor groups, whether value was being created within a particular collateral pool, and whether an alternative combination of transactions could generate greater overall recoveries. These considerations added a level of complexity not typically present in a sale process involving a single lender constituency or a uniform collateral package. Moreover, the SIMAD Debtors had to consider the camp directors and operators for each camp as well as the culture of each camp.

13. The existence of multiple creditor silos also required extensive communication and coordination among stakeholders. Different constituencies often had differing perspectives regarding particular assets, bidding structures, or transaction alternatives based on their respective collateral interests. Consequently, the SIMAD Debtors and their advisors devoted substantial time to ensuring that all bids could be evaluated on a consistent and transparent basis and that decision-making remained focused on maximizing value for all stakeholders.

D. **The Unique Challenges and Complexities of the Camp Sale Process**

14. The marketing and sale process for the SIMAD Debtors' camp businesses was unlike any other sale process in which I have participated. While sales conducted in chapter 11 are frequently complex, the circumstances surrounding these Assets presented a unique combination of operational, legal, historical, and stakeholder-related challenges. Many of the camps have operated for decades and, in some instances, have served families across multiple generations. They are properties with deep historical significance to local communities, donors, former campers, volunteers, and other interested parties, many of whom maintain strong emotional

6

and institutional connections to the camps.  In addition, the assets vary significantly in size, location, condition, permitted uses, development potential, and operational characteristics, requiring tailored diligence and marketing efforts for different prospective buyers.  Simply, the thirty (30) different camp properties effectively required thirty (30) different marketing strategies and processes.

15.     During the course of the sale process, SSG received communication from numerous parents, including letters filed on the docket by parents and other members of the camp community expressing concerns regarding the potential sale of Camp Echo, as well as numerous other camps, and the future of camp programming.  SSG reviewed those communications and letters and understood that many members of the camp community had strong and sincerely held views regarding the camps, their missions, and their importance to current and former campers and their families.  Consistent with the SIMAD Debtors' efforts throughout these cases, SSG considered the concerns expressed in those letters as part of the broader evaluation of the sale process and potential transaction alternatives.  The sentiments reflected in the letters underscored the unique nature of these Assets and the significant emotional, historical, and community connections associated with the camps, factors that distinguished this process from a typical real estate or going-concern asset sale.  While the SIMAD Debtors were duty-bound to conduct a process designed to maximize value and satisfy their fiduciary responsibilities, the concerns expressed by parents, camp directors and operators, and other stakeholders were not ignored.  Rather, those views formed part of the overall stakeholder landscape that the SIMAD Debtors and their advisors considered as they evaluated bids, transaction structures, and the future use of the camp properties to determine the highest and best offers.  The SIMAD Debtors sought to balance those interests with their obligation to conduct a fair, competitive, and value-maximizing sale process.

16.    These challenges were further compounded by the need to conduct the sale process within the context of these chapter 11 cases, the heightened public interest surrounding the Assets, and the necessity of engaging with a broad range of stakeholders while maintaining a process focused on value maximization.  Potential Purchasers often approached the Assets with differing objectives.  As a result, the SIMAD Debtors and their advisors were required to manage a dynamic and highly nuanced process that involved extensive outreach, significant bidder education, and ongoing evaluation of a wide range of transaction structures.

17.    The timing of the sale process created an additional and significant challenge.  As discussed in more detail below, the marketing and sale process occurred during the height of the camp season, when many of the properties were actively being utilized for camp operations and related programming.  As a result, the SIMAD Debtors were required to balance the need to conduct an extensive and competitive sale process with the equally important objective of minimizing disruption to ongoing camp activities and the individuals participating in those programs.    The SIMAD Debtors took seriously their responsibility to preserve safe and uninterrupted camp operations for campers, families, and staff while the sale process was unfolding.

18.    In my experience, the combination of the Assets' unique characteristics, the breadth of interested constituencies, the emotional significance attached to the properties, and the variety of potential transaction structures made this the most distinctive and challenging sale process that I have encountered in my career.  Despite these challenges, the SIMAD Debtors and their advisors successfully conducted a robust Marketing Process, facilitated extensive diligence, and maintained ongoing camp operations throughout the whole process.  The SIMAD Debtors' efforts generated substantial market interest and meaningful engagement from prospective purchasers.

**E.**     **The Marketing Process**

19.     Consistent with the foregoing, in June 2026, the SIMAD Debtors launched a competitive Marketing Process to solicit Potential Purchasers that might be interested in pursuing a Sale Transaction(s).  In connection with its initial attempts to sell the SIMAD Debtors' assets, SSG contacted over279 parties in order to capture a wide group of Potential Purchasers.

20.     At the same time, the SIMAD Debtors implemented reasonable procedures designed to provide interested parties with diligence opportunities, which were challenging due to deficient centralized financial information among many other reasons, while minimizing disruption to campers and ongoing operations.  These procedures included the dissemination of financial, operational, and property-related information, responses to diligence requests, and management discussions.  Importantly, those procedures applied generally and were not intended to favor or disadvantage any particular bidder.

21.     In my view, the Marketing Process appropriately balanced the need to preserve the value of the camps as operating businesses with the SIMAD Debtors' obligation to market the Assets and solicit competitive bids.  The SIMAD Debtors and their advisors remained committed to maintaining the integrity, transparency, and fairness of the sale process.  All Potential Purchasers were afforded substantially the same access to information and opportunities to participate in the bidding process.  The SIMAD Debtors consistently applied the Court-approved Bidding Procedures and worked to ensure that all interested parties were treated fairly and equitably.  In my view, the Auction was conducted in a competitive, arm's-length manner that promoted value maximization and preserved confidence in the process, resulting in the highest and best offer for the benefit of the estates and their stakeholders.

22.     Throughout the Marketing Process, the SIMAD Debtors' Chief Restructuring Officer and SSG maintained close and continuous coordination regarding bidder outreach,

expressions of interest, and ongoing negotiations with Potential Purchasers.  While my team led the formal Marketing Process and served as the principal point of contact for many interested parties, the Chief Restructuring Officer also had independent discussions with certain bidders and stakeholders regarding transaction structures, operational considerations, and potential paths to a transaction.

23.     To ensure that all such efforts were aligned with the SIMAD Debtors' objective of maximizing value, we regularly exchanged information regarding bidder feedback, diligence requests, valuation perspectives, and evolving proposals.  This collaborative approach allowed the SIMAD Debtors to leverage the relationships and expertise of both the SSG team and the Chief Restructuring Officer, expand engagement with the market, and ensure that potentially interested parties remained actively involved in the process.

24.     In my experience, this coordinated effort was particularly important given the unique nature of these assets and the diverse range of purchasers evaluating opportunities. Different bidders often focused on different camps, had varying strategic objectives, or preferred different transaction structures.  Maintaining an integrated communication strategy enabled the SIMAD Debtors to evaluate those opportunities comprehensively, identify emerging value-maximizing alternatives, and respond efficiently as negotiations developed.

25.     As the sale process progressed, information obtained through the Chief Restructuring Officer's direct discussions with bidders was incorporated into our ongoing assessment of strategic alternatives, just as information generated through the formal marketing process was shared with the Chief Restructuring Officer and the SIMAD Debtors' other advisors. This continuous coordination ensured that the SIMAD Debtors had the most complete and current understanding of market interest and were able to evaluate transaction proposals on a fully

informed basis. The result was a sale process that was both highly competitive and flexible, allowing the SIMAD Debtors to pursue the transaction or combination of transactions that generated the greatest value for the benefit of all stakeholders.

**F.      Diligence Access During Active Camp Operations**

26.      At all relevant times during the Marketing Process, the camps remained active operating properties. All of the camps were conducting summer programming, hosting campers and staff, and providing services consistent with their ordinary-course operations. As a result, the SIMAD Debtors and their advisors were required to balance the objective of providing diligence opportunities to prospective purchasers with the need to preserve ongoing operations and avoid disruptions that could negatively affect the value of the assets.

27.      Because the camps remained operational throughout the Marketing Process, unrestricted access by all Potential Purchasers was not feasible. Allowing large numbers of bidders, consultants, inspectors, and other representatives to tour occupied camp facilities during active camp sessions would have created significant disruptions to programming, interfered with business operations, raised privacy and safety concerns, and potentially diminished the value of the camps as ongoing enterprises.

28.      Accordingly, the SIMAD Debtors, in consultation with their advisors, implemented a managed diligence process designed to provide interested parties with access to information while minimizing operational disruption. Potential Purchasers were provided access to diligence materials through the data room, and participated in management and advisor discussions. Again, the diligence materials available from the parent company level and the individual camps were limited.

29.     The SIMAD Debtors and their advisors made substantial efforts to facilitate diligence in a manner that was fair, reasonable, and consistent with preserving the value of the Assets and the integrity of ongoing camp operations.

30.     In my opinion, the restrictions and protocols governing access to the camps were necessary and appropriate under the circumstances.  They were implemented not to limit competition, but rather to ensure that the Marketing Process could proceed while the camps continued to operate safely and effectively.  Despite these constraints, the Marketing Process generated significant interest, extensive bidder engagement, and robust competition for the camp Assets.

**G.     Private Sales**

31.     Prior to the Auction, the SIMAD Debtors determined that selling four (4) camp properties by private sale would be efficient and value maximizing.  The four (4) camp properties that were or are subject to private sale notices include: (1) Camp Achim, (2) Camp Chen-A-Wanda, (3) Camp Mesorah, and (4) Pine Forest Camp.[3]  These transactions resulted from targeted marketing efforts, negotiations with interested purchasers, and the SIMAD Debtors' ongoing evaluation of opportunities to maximize value.  The private sales generated, or will generate upon closing, immediate value for the SIMAD Debtors' estates and eliminated the need to subject those assets to further Auction proceedings. Those private sales generated approximately $71,700,000 in value to the SIMAD Debtors.

32.     Consistent with the SIMAD Debtors' overall sale strategy, the decision to pursue these private sales was based on an assessment of the value offered, the certainty of closing, and the likelihood that additional marketing or Auction exposure would produce a superior result.  The

---

[3]     Notices of each private sale were filed at Docket Nos. 433, 509, 551, and 601 respectively.

SIMAD Debtors, with the assistance of SSG and their other advisors, evaluated each opportunity in light of market feedback, bidder interest, and the specific characteristics of the applicable camp assets.

33.      In my opinion, these transactions were an important component of the SIMAD Debtors' value-maximization strategy and demonstrated the SIMAD Debtors' willingness to pursue the transaction structure best suited to each asset, whether through a negotiated private sale or a competitive Auction process.

**H.      Excluded Camps**

34.      Prior to the Auction, the SIMAD Debtors, in consultation with the Consultation Parties, also determined that the Auction should be adjourned with regard to the following camps: (1) Camp Chateaugay, (2) Kiwi Country Day Camp, and (3) the SIMAD Debtors' interests in Willow Lake Day Camp.  Due to operational and logistical challenges with these assets, the SIMAD Debtors intend to conduct separate auctions, if necessary, with regard to these camps.

**I.      Evaluation and Selection of Stalking Horse Bidders**

35.      Pursuant to the Sale Order, the SIMAD Debtors were authorized, in an exercise of their business judgment, to designate one or more Stalking Horse Bidder(s) with respect to the applicable Sale Package(s) and enter into such Stalking Horse Agreement(s) to provide such Stalking Horse Bidder(s) with Stalking Horse Bid Protections.

36.      Following extensive marketing efforts and negotiations with prospective purchasers, the SIMAD Debtors, together with SSG, the SIMAD Debtors' other advisors, and the Consultation Parties, evaluated whether the designation of stalking horse bidders would enhance the sale process for particular camps.  In making that determination, we considered numerous factors, including the level of bidder interest in each camp, the likelihood of attracting additional bids absent a stalking horse, the certainty and credibility of the proposed transaction, the

13

reasonableness of the proposed bid protections, the anticipated benefits of establishing a floor price, and the overall impact on value maximization.

37.    The SIMAD Debtors, in consultation with the Consultation Parties, ultimately determined that the designation of stalking horse bidders for certain camps would benefit the estates by creating transaction certainty, establishing clear minimum value thresholds for the applicable assets, and fostering a more competitive Auction process.

38.    The SIMAD Debtors designated Grandview Ventures Group, LLC as the Stalking Horse Bidder for Camp Mohawk.  Pursuant to its Stalking Horse Agreement, Grandview Ventures Group, LLC agreed to purchase Camp Mohawk for $68,000,000 in cash, plus cure costs and the assumption of certain liabilities.[4]

39.    The SIMAD Debtors designated 18 Lions LLC as the Stalking Horse Bidder for Camp Lokanda.  Pursuant to its Stalking Horse Agreement, 18 Lions LLC agreed to purchase Camp Lokanda for $18,150,000, plus cure costs and the assumption of certain liabilities.[5]

40.    The SIMAD Debtors designated Ohel Children's Home and Family Services, Inc. as the Stalking Horse Bidder for Camp Echo.  Pursuant to its Stalking Horse Agreement, Ohel Children's Home and Family Services, Inc. agreed to purchase Camp Echo for $12,000,000, plus cure costs and the assumption of certain liabilities.[6]

---

[4]    More information could be found in the *Notice of Filing Stalking Horse Bidder and Stalking Horse Agreement* [Docket No. 465].

[5]    More information could be found in the *Notice of Filing Stalking Horse Bidder and Stalking Horse Agreement* [Docket No. 489].

[6]    More information could be found in the *Notice of Filing Stalking Horse Bidder and Stalking Horse Agreement* [Docket No. 492].

41.  The SIMAD Debtors designated CMAO LLC as the Stalking Horse Bidder for Island Lake Camp.  Pursuant to its Stalking Horse Agreement, CMAO LLC agreed to purchase Island Lake Camp for $10,000,000, plus cure costs and the assumption of certain liabilities.[7]

42.  In each instance, SSG worked closely with the SIMAD Debtors, the SIMAD Debtors' other advisors, and the Consultation Parties, to evaluate the proposed purchase prices, the likelihood of obtaining superior offers, the anticipated benefits of establishing a floor bid, and the costs associated with providing bid protections.  Based upon those analyses, we concluded that the value generated by securing committed Stalking Horse Bidders outweighed the limited cost of the proposed bid protections and would increase the likelihood of maximizing value through the Auction process.

43.  In each case, the Stalking Horse Agreements provided for break-up fees in the amount equal to 3% of the cash payment and expense reimbursements in the amounts of 1% of the cash payment.  In my opinion, the Bid Protections were reasonable in amount, consistent with market practice, and appropriately tailored to compensate the Stalking Horse Bidders for the risk and expense associated with serving as the initial committed purchasers and establishing a floor for subsequent bidding.

44.  The proposed Stalking Horse Agreements and related bid protections were shared with the Consultation Parties and were the subject of discussions among the SIMAD Debtors and their major stakeholders.  After notice and an opportunity for parties in interest to be heard, no objections to the designation of the Stalking Horse Bidders or the associated bid protections were sustained by the Court.

---

[7]  More information could be found in the *Notice of Filing Stalking Horse Bidder and Stalking Horse Agreement* [Docket No. 607].

45.      In my opinion, the selection of these Stalking Horse Bidders was an important component of the SIMAD Debtors' overall sale strategy.  The Stalking Horse Bids established minimum value for key assets, increased transaction certainty, encouraged additional competition, and ultimately contributed to the robust bidding process that followed.

**J.      Review of Written Offers and Determination of Qualified Bid Status**

46.      Prior to the expiration of the Bid Deadline on July 17, 2026, in addition to the four (4) Stalking Horse Bids, the SIMAD Debtor received 58 bids from Potential Purchasers. Generally speaking, the structures of the Bids varied as they included individual bids, group bids, and full portfolio bids from financial participants, camp directors, strategic buyers, and other potential purchasers.

47.      Following the Bid Deadline, the SIMAD Debtors and their advisors undertook a comprehensive review of the bids received from Potential Purchasers in coordination with the Consultation Parties.  The purpose of this review was not only to determine whether bids satisfied the requirements for qualification, but also to identify opportunities to improve value, resolve deficiencies, and facilitate competitive participation in the Auction process.

48.      To this end, each bid was evaluated to determine whether it contained the required information and documentation, including proposed purchase price, marked transaction documents where applicable, evidence of committed financing, and other materials necessary for the SIMAD Debtors to assess the bid.  The SIMAD Debtors and their advisors also reviewed the economic terms of each proposal, the scope of Assets included, closing conditions, execution risk, timing considerations, and any contingencies that could affect value or certainty of closing.

49.      During this review process, SSG, together with the SIMAD Debtors and their other advisors, engaged extensively with Potential Purchasers regarding their proposals.   Where appropriate, Potential Purchasers were asked to clarify terms, supplement diligence materials,

16

address deficiencies, provide additional evidence of financing, and improve the economic terms of their offers. These discussions were conducted with the objective of maximizing value and fostering competition among bidders, consistent with the SIMAD Debtors' fiduciary obligations and the framework established by the Bidding Procedures.

50. In many instances, bidders revised and improved their proposals following these discussions. Certain bidders increased purchase prices, modified transaction structures, reduced contingencies, or otherwise improved the overall value of their offers. In my experience, these interactions are an important component of a successful sale process because they allow Potential Purchasers to refine their proposals and ensure that the SIMAD Debtors receive the highest and best bids available prior to the commencement of the Auction.

51. Consistent with the requirements of the Bidding Procedures, the SIMAD Debtors also collected and verified deposits. The deposit requirement was necessary to assess bidder seriousness, confirm financial commitment, and reduce the risk that parties lacking the intent or ability to consummate a transaction would participate in the Auction. The SIMAD Debtors and their advisors reviewed submitted deposits and qualification materials to confirm compliance with the Bidding Procedures and to ensure that only Qualified Bidders advanced to the Auction.

52. Following completion of this review, the SIMAD Debtors, in consultation with their advisors and the Consultation Parties, determined which bids qualified for participation in the Auction pursuant to the standards set forth in the Bidding Procedures. The SIMAD Debtors communicated with participating bidders regarding qualification determinations and continued to engage with Qualified Bidders in advance of the Auction to facilitate informed participation and maximize competitive bidding.

53.     In my opinion, the review and qualification process functioned as intended under the Bidding Procedures.  The SIMAD Debtors carefully evaluated the bids received, worked constructively with bidders to improve proposals where possible, confirmed the financial credibility of participating parties through deposit and qualification requirements, and established a competitive field of 51 Qualified Bidders capable of participating meaningfully in the Auction. These efforts materially contributed to the robust Auction that followed and ultimately enhanced value for the benefit of the SIMAD Debtors' stakeholders.

## K.     The Auction Procedures

54.     Prior to the commencement of the Auction, the SIMAD Debtors and their advisors devoted substantial effort to developing procedures that would facilitate an orderly, transparent, and value-maximizing bidding process.  Given the unique nature of the assets, the existence of multiple creditor constituencies, the possibility of individual camp bids, portfolio bids, and combination bids, and the large number of interested parties participating in the process, it was important that all participants understood how the Auction would be conducted and how competing proposals would be evaluated.

55.     To that end, SSG, in coordination with the SIMAD Debtors and their other advisors, prepared and distributed an auction procedures memorandum (the "Auction Procedures Memorandum") to participating bidders in advance of the Auction.  The purpose of the Auction Procedures Memorandum was to provide Qualified Bidders with additional guidance regarding the mechanics of the Auction, the categories of bids that could be considered, the manner in which bids would be compared and evaluated, the information Qualified Bidders would be expected to provide during the Auction, and the procedures governing continued bidding.

56.     The Auction Procedures Memorandum was designed to enhance transparency and efficiency.  By communicating the process in advance, Qualified Bidders were able to prepare

appropriately, understand how alternative transaction structures would be evaluated, and make informed decisions regarding potential bidding strategies.  In my opinion, advance communication of auction expectations reduced confusion, promoted active participation, minimized process disputes, and improved the SIMAD Debtors' ability to obtain the highest and best value available for the Assets.

57.    The Auction Procedures Memorandum was particularly important in this case because the SIMAD Debtors were simultaneously evaluating a variety of transaction structures. Certain bidders were pursuing individual camps and others were evaluating broader portfolio opportunities.  As a result, the SIMAD Debtors required a framework that would permit meaningful comparisons among competing bids and allow the Auction to proceed in an organized manner notwithstanding the complexity of the bidding landscape.

58.    Consistent with the collaborative nature of the sale process, the Auction Procedures Memorandum was provided to, and reviewed by, the Consultation Parties and their respective advisors prior to the Auction.  Comments and feedback were received and considered as part of the process.  This consultation helped ensure that the procedures were understood by key stakeholders and further supported the fairness, transparency, and integrity of the Auction.

59.    In my opinion, the advance preparation and circulation of the Auction Procedures Memorandum materially contributed to the success of the Auction. The memorandum provided Qualified Bidders with a clear roadmap for participation, established expectations regarding the conduct of the Auction, and created a structured framework within which the SIMAD Debtors could evaluate competing bids and transaction alternatives.  As a result, the Auction proceeded in a manner that promoted competition, facilitated informed bidding, and assisted the SIMAD Debtors in identifying the transactions that maximized value for the benefit of stakeholders.

**L.**     **The Auction Structure**

60.     In accordance with the Bidding Procedures Order, the Auction began at 12 noon eastern time on July 28, 2026, virtually via Zoom.

61.     In light of the number of camp assets being marketed and the possibility that different Potential Purchasers might ascribe different values to individual camps versus a larger portfolio of camps, the SIMAD Debtors designed the sale process to evaluate value through multiple structures.

62.     Specifically, Potential Purchasers were afforded the opportunity to submit bids for the individual camps or portfolios of multiple camps.  The SIMAD Debtors believed this approach was necessary to ensure that they could fully test the market and determine whether greater value could be achieved through standalone asset sales or through the sale of multiple camps as a portfolio.

63.     Conducting the Auction in this manner required significant effort and analysis.  The SIMAD Debtors reviewed and compared competing bids across multiple transaction structures, including standalone bids for individual Sales and Sale Packages covering multiple camp Assets. Because the bids involved different Assets, combinations of Assets, economic terms, and closing considerations, the SIMAD Debtors undertook a detailed comparison of the competing proposals to determine which combination of transactions would generate the greatest overall value.

64.     To preserve the integrity of the overall sale process, each individual camp Auction was conducted separately and access to any particular Auction was limited to parties that had submitted Qualified Bids for that specific camp as well as the camp directors (to the extent that they were not also a bidder) and interested Portfolio Bidders (defined below).  The SIMAD Debtors implemented this structure to prevent bidding activity for one camp from influencing bidding behavior with respect to other camps and to ensure that bidders independently assessed the value

20

of each Asset.  Restricting participation in this manner encouraged bidders to submit offers based on their own valuation of the applicable camp, reduced the potential for strategic bidding across multiple auctions, and helped the SIMAD Debtors obtain the highest and best offers for each camp and the portfolio as a whole.

**M.      Stage One: Camp-By-Camp Bidding**

65.      The first stage of the Auction commenced on July 28, 2026 with camp-by-camp bidding.  At the conclusion of each individual camp Auction, the SIMAD Debtors, designated the highest bidder as the "Provisional High Bidder" and the second highest bidder as the "Provisional Back-Up Bidder" for each Camp.  The provisional designations established a baseline valuation for each camp and served as the foundation for the subsequent portfolio and final-stage bidding processes, which were designed to determine whether additional value could be achieved through alternative transaction structures.  Importantly, the designation of a Provisional Leading Bidder did not conclude the sale process but rather identified the leading bid against which portfolio proposals and final-stage bids would be evaluated in order to maximize value for the estates.

**N.      Stage Two: Portfolio Bidding**

66.      Following completion of the individual camp auctions on July 30, 2026 and the designation of provisional leading bids, the SIMAD Debtors conducted a portfolio bid phase to determine whether greater value could be achieved through the sale of multiple camps in a single transaction.  This stage was designed to test the market for portfolio premiums and to ensure that the SIMAD Debtors fully evaluated all potential transaction structures before selecting the combination of sales that would maximize overall recoveries.

67.      SSG carefully crafted instructions for this phase of bidding as part of the SIMAD Debtors' broader efforts to create a fair, transparent, and value-maximizing process for all interested parties.  In preparing those instructions, SSG sought to address a number of unique

21

considerations associated with these Assets, including the ability of bidders to pursue individual camps, groups of camps, or a comprehensive portfolio transaction, while ensuring that all bids could be compared on a consistent basis.

68.     Following preparation of the portfolio bid instructions, they were shared with the Consultation Parties for review and comment. The Committee and its professionals provided comments and feedback, which were considered and incorporated as appropriate.  The resulting bid instructions reflected substantial deliberation among the SIMAD Debtors and Consultation Parties regarding the most effective means of soliciting competing proposals and evaluating potential transactions.

69.     Parties interested in submitting a bid for a portfolio of camps (the "Portfolio Bidders") were permitted to submit portfolio bids for Sale Packages consisting of a minimum of three camps (each a "Portfolio Bid") on a single, sealed basis.  Portfolio Bidders were permitted to include camps across different collateral pools, provided that any such bid was capable of being severed between the collateral pools if necessary.  Portfolio Bidders were also required to identify any conditions regarding the minimum number of camps required for their proposed Sale Package and to provide an allocation of purchase price among the individual camps included in the bid.

70.     Keeping the bids sealed facilitated a fair comparison between the aggregate value offered through portfolio transactions and the value generated through the individual camp auctions.  The allocation information provided by Portfolio Bidders enabled the SIMAD Debtors and the Consultation Parties to compare Portfolio Bid against the Provisional High Bids received for individual camps and determine whether any Portfolio Bid produced greater overall value for the estates.

71.     All of the camps included in the individual camp auction were included in the Portfolio Bid auction except Summit Camp and Travel ("Camp Summit"), which is a camp for special needs children.  The decision to exclude Summit Camp from the Portfolio Bid auction was made in consultation with the Consultation Parties.  Maintaining continuity of operations by selling the camp to the existing director is critically important to the Summit Camp campers and overall community.  As a result, I believe the decision to exclude Summit Camp from the Portfolio Bid auction was appropriate considering the specific circumstances of this particular camp and the needs of its campers.

72.     I also understand that MOH LLC filed an objection to the sale of Summit Camp at Docket No. 690.  MOH LLC submitted a bid for the assets prior to the Bid Deadline, participated in the Auction for Summit Camp, and ultimately offered a lower price for the assets than that of the Successful Bidder.  Accordingly, MOH LLC had a full and fair opportunity to bid for Summit Camp.  In addition, another bidder was DC Camps that conditioned its bid on acquiring a number of other camps and hiring an operator for Summit Camp.  Because of the unique nature of Summit Camp, a conditional bid could not be accepted.

73.     The SIMAD Debtors received 4 total portfolio bids for various groups of Assets. After receiving the Portfolio Bids, the SIMAD Debtors and the Consultation Parties evaluated the Portfolio Bids by comparing them against the Provisional High Bids from the individual camp auctions on a collateral pool-by-collateral pool basis.  For each collateral pool, the value of a Portfolio Bid was determined by adding (i) the aggregate value allocated to the camps included in the Portfolio Bid within that collateral pool and (ii) the aggregate amount of the Provisional High Bid for any camps within that collateral pool that were not included in the Portfolio Bid.  This methodology enabled the SIMAD Debtors to compare competing transaction structures on an

equivalent basis and determine whether any proposed portfolio transaction generated greater overall value than the combination of individual camp sale results.

74.     After evaluating the Portfolio Bid alongside the Provisional High Bids and Provisional Backup Bids from the individual camp auctions, the SIMAD Debtors, in consultation with the Consultation Parties, determined the combination of transactions that represented the highest and best overall outcome and maximized recoveries for the estates and their stakeholders.

**O.      Stage Three: Final Round**

75.     The SIMAD Debtors then distributed the bid allocations contained in the best and highest Portfolio Bid to the parties holding the Provisional High Bid and Provisional Backup Bid positions for the affected camps, who were then afforded an opportunity to determine whether they wished to improve their offers.

76.     To preserve the efficiency and integrity of the process, participation in the final stage was limited solely to those entities that had previously been designated as either the Provisional High Bidder or the Provisional Back-Up Bidder for the applicable camp.  No new bidders were permitted to enter the process at this stage.  By limiting participation to the most competitive bidders identified through the earlier auction rounds, the SIMAD Debtors were able to conduct a focused final value-maximization process which encouraged bidders to submit their best bids while ensuring a fair comparison between the Provisional High Bidder, the Provisional Back-Up Bidder, and the Portfolio Bidders.

77.     This final bidding round concluded on August 2, 2026, and provided a critical mechanism for maximizing recoveries and ensuring that the ultimate transaction structure reflected the highest and best value reasonably obtainable for the estates.

## P.    Results of the Auction

78.    After additional negotiations and discussions with those parties that submitted either Provisional High Bids, Provisional Back-Up Bids, and Portfolio Bidders, the SIMAD Debtors and the Consultation Parties were able to identify the highest and best bids for each of the SIMAD Debtors' assets. The Successful Bidders were identified on the *Notice of Successful Bidders With Respect to Certain of the SIMAD Debtors' Assets* [Docket No. 789] and reproduced below:

| Camp Name | Collateral Pool | Successful Bidder Full Entity Name | Successful Bid Value |
|---|---|---|---|
| Banner Day Camp | Mishmeret Trust Company Ltd. | YES Camps, LLC | $30,000,000 |
| Camp Echo | Mishmeret Trust Company Ltd. | American Youth Camping, Inc. | $17,000,000 |
| Camp Green Lane | Mishmeret Trust Company Ltd. | Camp Green Lane LLC | $8,000,018 |
| Camp Lokanda | Mishmeret Trust Company Ltd. | American Youth Camping, Inc. | $19,327,800 |
| Camp Mogen Avraham | Mishmeret Trust Company Ltd. | SHMA LLC | $22,400,000 |
| Club Getaway | Mishmeret Trust Company Ltd. | LGTFPS Holdings LLC | $13,250,000 |
| Country Roads Day Camp | Mishmeret Trust Company Ltd. | Jewish Community Center of Greater Monmouth County | $14,500,000 |
| Eagle's Landing Day Camp | Mishmeret Trust Company Ltd. | Mario Del Cueto (as an individual, or his permitted assigns) | $5,200,000 |
| Greenville Land / Malka | Mishmeret Trust Company Ltd. | Cho Pro Holdings, LLC | $8,150,000 |
| Island Lake Camp | Mishmeret Trust Company Ltd. | CMAO, LLC | $13,000,000 |
| Meadowbrook Country Day Camp | Mishmeret Trust Company Ltd. | Coleman Investments, LLC | $12,250,000 |
| Mohawk Day Camp | Mishmeret Trust Company Ltd. | FitzWalter Capital Partners (AIV) II LP | $120,750,000 |
| Rolling Hills Country Day Camp | Mishmeret Trust Company Ltd. | YES Camps, LLC | $28,500,000 |
| Camp Lavi | Mishmeret Trust Company Ltd. | Ohel Children's Home and Family Services, Inc. (or its assignee) | $8,750,000 |
| Indian Acres Camp for Boys & Forest Acres Camp for Girls | Bank of New Hampshire | American Youth Camping, Inc. | $6,000,000 |
| Camp Med-O-Lark | Bank of New Hampshire | American Youth Camping, Inc. | $2,300,000 |
| Camp North Star | Bank of New Hampshire | American Youth Camping, Inc. | $6,250,000 |
| Camp Waukeela | Bank of New Hampshire | Andrew Shlensky (as an individual, or his permitted assigns) | $1,200,000 |
| Camp Wekeela | Bank of New Hampshire | American Youth Camping, Inc. | $9,900,000 |
| New England Golf & Tennis Camp | Bank of New Hampshire | Bank of New Hampshire (or its designee) | $2,000,000 |
| Windsor Mountain Summer Camp | Bank of New Hampshire | Red Pines, LLC | $8,500,000 |
| Blue Star Camps | HomeTrust Bank | New Blue Star Opco, LLC | $15,030,000 |
| Summit Camp and Travel | Bank of America, N.A. | Summit Camp and Travel LLC and 168 Duck Harbor Land LLC | $4,800,000 |
| | | **TOTAL:** | **$377,057,818** |

## Q.    <u>Selection of Highest and Best Bids</u>

79.    Throughout the sale process, the SIMAD Debtors' objective was to maximize value for the estates while also considering the long-term viability of the camps and the interests of the directors, operators, employees, families, and communities that rely upon them.  Accordingly,

26

where consistent with value maximization, the SIMAD Debtors favored transaction structures that preserved existing camp operations and positioned the camps for continued success.

80.     In determining the highest and best bids, the SIMAD Debtors did not evaluate offers solely on purchase price.  Rather, the SIMAD Debtors compared competing proposals across multiple transaction structures, taking into account economic value, closing certainty, timing, allocated value, stakeholder impact, and the likelihood that a transaction would preserve ongoing camp operations and support existing camp leadership and staff.  Based on this analysis, the SIMAD Debtors concluded that the selected transactions generated the greatest overall benefit to the estates while providing the strongest path for the continued operation and success of the camps.

**R.      Response to Objection Raised by the Committee of Concerned Parents of Camp Lavi**

81.     I am aware that a Committee of Concerned Parents of Camp Lavi (the "Parents of Camp Lavi") filed an objection to the proposed sale of Camp Lavi (the "Camp Lavi Objection") at Docket No. 805.  In evaluating the bids received for Camp Lavi, the SIMAD Debtors and their advisors conducted a thorough marketing and sale process pursuant to the Court-approved Bidding Procedures.  Following that process, the SIMAD Debtors, in consultation with the Consultation Parties, determined that Ohel Children's Home and Family Services, Inc. or its assignee ("Ohel"), was the highest and best bidder for Camp Lavi because it offered the bid that provided the greatest value and certainty of closing for the SIMAD Debtors' estates.

82.     Despite the fair and open process contemplated by the Bidding Procedures and clear communications to the director of Camp Lavi regarding the sale process, the Parents of Camp Lavi failed to submit a Bid for Camp Lavi in accordance with the Bidding Procedures approved by the Court.  As a result, the Parents of Camp Lavi were not Qualified Bidders, nor were they entitled to participate in the Auction.  In my opinion, reopening the Auction now to consider a bid from the

27

Parents of Camp Lavi would be contrary to the Court-approved Bidding Procedures and undermine the integrity and finality of the Auction. Such action would also be prejudicial to Ohel (and other Successful Bidders) that complied with the approved procedures and could adversely affect the ability to timely close not only the transaction at issue but also the closings of the other camps that were sold through the Auction.

83.     I respectfully submit that the Camp Lavi Objection does not alter the outcome of the competitive sale process or the SIMAD Debtors' conclusion that the sale to Ohel or its assignee maximizes the value of the Assets and is in the best interests of the estate.

**S.     Conclusion**

84.     In my more than 40 years of experience advising companies in distressed and chapter 11 transactions, I have never encountered a sale process presenting the combination of challenges present here. The SIMAD Debtors were required to market and sell active camp properties with deep historical and community significance while operating during peak camp season, addressing competing stakeholder interests, and navigating a complex, multi-silo capital structure. Notwithstanding those challenges, the SIMAD Debtors and their advisors conducted a disciplined, transparent, and competitive process that generated significant market interest and meaningful bidding competition.

85.     For the reasons stated above, it is my opinion that the transactions resulting from the sale process represent the highest and best outcomes reasonably available to the SIMAD Debtors and their stakeholders under the circumstances.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge, information, and belief.

Dated:  August 7, 2026

By:   *J. Scott Victor*
           J. Scott Victor
           Managing Director
           SSG Advisors, LLC