Order Filed on September 29, 2026
by Clerk
U.S. Bankruptcy Court
District of New Jersey

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT BETWEEN FRIENDS OF CHATEAUGAY LLC AND CHATEAUGAY CAMPCO LLC AND CHATEAUGAY LANDCO LLC (II) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ASSETS OF CHATEAUGAY CAMPCO LLC AND CHATEAUGAY LANDCO LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 363(b), AND 363(f), (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365, AND (IV) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through sixteen (16), is hereby **ORDERED**.

**DATED: September 29, 2026**

Honorable Christine M. Gravelle, Chief Judge
United States Bankruptcy Judge

---

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings, Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

Upon the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") seeking entry of an order (this "Sale Order"), pursuant to the Bankruptcy Code, Bankruptcy Rules and Local Rules, authorizing and approving the Debtors' entry into and performance under the terms and conditions of that certain asset purchase agreement dated as of September 9, 2026 [Docket No. 1093] (the "APA") (together with the schedules and/ or exhibits thereto and all related documents, and as may be amended, supplemented or otherwise modified from time to time after the date hereof), attached hereto as Exhibit A, by and among the Seller(s) and Friends of Chateaugay LLC (together with any successors and permitted assigns, or designees, the "Buyer"); and the Court having entered the Bidding Procedures Order on June 26, 2026 [Docket No. 298] (the "Bidding Procedures Order") approving the bidding procedures (the "Bidding Procedures"), and the Debtors having filed *a Notice of Filing of Stalking Horse Bidder and Stalking Horse Agreement* on September 10, 2027 [Docket No. 1093] (the "Stalking Horse Notice") and a *Notice of Cancellation of Auction and Successful Bidder* on September 16, 2026 [Docket No. 1140] (the "Sale Notice"), pursuant to which the SIMAD Debtors provided notice, *inter alia*, that (x) the Auction was cancelled, (y) the Buyer, pursuant to the APA, was determined to be the Successful Bidder and (z) the deadline for filing of objections to the approval and consummation of the transactions set forth in the APA was September 23, 2026; and on September 24, 2026, the Debtors having filed a *Certification of No Objection with Respect to SIMAD Debtors' Sale of the Assets of Chateaugay Campco LLC and Chateaugay Landco LLC Pursuant to Stalking*

*Horse Agreement with Friends of Chateaugay LLC* [Docket No. •] reflecting that no such objections or other responses to the Sale Notice were filed; and the Debtors having identified the Buyer's bid as the Successful Bid for the Purchased Assets in accordance with the Bidding Procedures; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A. Jurisdiction and Venue. This Court has jurisdiction over the Debtors' chapter 11 cases, including this matter, pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the United States District Court for the District of New Jersey. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B. Statutory Predicates. The statutory predicates for the relief sought herein are Sections 105(a), 363(b), 363(f), 363(m), 365, and 1146(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of the United States Bankruptcy Court for the District of New Jersey.

C. Notice. Proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Notice, and the APA was provided to all parties entitled to notice in accordance with the

Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including (i) counsel to the Buyer (Jeffer Mangels & Mitchell, LLP), (ii) the Office of the United States Trustee, (iii) the Official Committee of Unsecured Creditors (the "Committee"), (iv) all creditors and parties in interest in these chapter 11 cases, (v) all parties asserting liens on the Acquired Assets, (vi) all non-debtor counterparties to the Assumed Contracts, and (vii) all applicable governmental authorities. No further or other notice of the Sale Notice or the APA is or shall be required.

D. Sound Business Purpose. The Debtors have demonstrated a sound business purpose and compelling justification for consummating the sale of the Acquired Assets (as defined in the APA) to the Buyer under 11 U.S.C. § 363(b). The Buyer is willing to acquire the property for the Purchase Price in an amount equal the outstanding principal balance of the DIP Facility (as defined in the APA) and the prepetition debt of Community Bank, National Association ("Community Bank"), plus all interest accrued thereon and all fees and expenses payable in connection therewith, *plus* (y) fees due and payable to SSG Capital Advisors, LLC, in an amount not to exceed $60,000.00, which sum for (x) and (y) is expected to be approximately $3,563,978.67, in cash (the "Cash Payment"), plus Cure Amounts (as defined in the APA), plus the assumption of Assumed Liabilities (as defined in the APA and which include any Liabilities (including all accrued interest as of the Closing Date (as defined in the APA)) on account of that certain Subordinated Promissory Note dated June 23, 2022 in the principal amount of $1,045,000, executed by Chateaugay Landco

LLC and Chateaugay Campco, LLC in favor of Harold Lyons, as amended, modified, and restated) (the "Lyons Subordinated Promissory Note"), and without this consideration, Chateaugay Landco LLC and Chateaugay Campco, LLC will not have sufficient liquidity to continue to operate and satisfy their obligations under the DIP Facility. The Debtors' decision to sell the Acquired Assets outside a plan of reorganization pursuant to the procedures approved in the Bidding Procedures Order was an exercise of the Debtors' sound business judgment, is in the best interests of the Debtors, their estates, their creditors, and all parties in interest, and should be approved.

E. Adequate Consideration; Cash, Cure Amounts, and Assumed Liabilities. The consideration provided by the Buyer for the Acquired Assets constitutes fair and adequate consideration. The Purchase Price consists of the Cash Payment; (b) the Cure Amounts; and (c) the assumption of Assumed Liabilities, including, without limitation, the assumption of Liabilities on account of the Lyons Subordinated Promissory Note, as amended, modified, and restated.

F. Arm's Length Transaction; Good Faith Purchaser. The APA was negotiated, proposed, and entered into by the Sellers and the Buyer without collusion, in good faith, and from arm's length bargaining positions. Neither the Buyer nor any of its Affiliates (as defined in the APA) is an insider of the Debtors as that term is defined in 11 U.S.C. § 101(31). The Buyer is a good faith purchaser of the Acquired Assets within the meaning of 11 U.S.C. § 363(m) and is entitled to all of the protections afforded thereby. The Buyer has not engaged in any conduct that

would prevent the application of 11 U.S.C. § 363(m). The APA was not entered into for the purpose of hindering, delaying, or defrauding any creditor of the Debtors.

G. Free and Clear. The Sellers are the rightful owners of the Acquired Assets. The Acquired Assets shall be transferred to the Buyer free and clear of all liens, claims, interests, and encumbrances of any kind or nature whatsoever (collectively, "Encumbrances"), including without limitation any Encumbrances or other interests in favor of Community Bank, Harold Lyons, individually or as assignee of Chateaugay Lake Camp Inc., and any merchant cash advance and short-term funders and lenders, other than Permitted Encumbrances and Assumed Liabilities as set forth in the APA (which for the avoidance of doubt shall include any Liabilities under the Lyons Subordinated Promissory Note, as amended, modified, and restated), pursuant to 11 U.S.C. § 363(f), because in each case one or more of the conditions set forth in 11 U.S.C. § 363(f)(1) through (5) have been satisfied with respect to each such Encumbrance. All holders of Encumbrances who did not object to the sale, or whose objections were overruled, are deemed to have consented to the sale pursuant to § 363(f)(2). All Encumbrances shall attach to the proceeds of the sale with the same validity, extent, and priority as existed immediately prior to the sale; *provided*, *however*, any Encumbrance held by Harold Lyons, individually, or as assignee of Chateaugay Lake Camp, Inc., shall not attach to the proceeds of sale, as the Liabilities on account of the Lyons Subordinated Promissory Note (including all accrued interest as of the Closing Date), as amended, modified, and restated with the consent of Harold Lyons, is an Assumed Liability.

H. No Successor Liability. The Buyer is not a successor to the Sellers or their estates by reason of any theory of law or equity and shall not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of the APA or the consummation of the transactions contemplated thereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability (as defined in the APA).

I. Assumption and Assignment of Contracts. The assumption and assignment of the Assumed Contracts (as defined in the APA) to the Buyer pursuant to Section 365 of the Bankruptcy Code is integral to the APA, is in the best interests of the Debtors, their estates, and their creditors, and represents a valid and proper exercise of the Debtors' business judgment. The Buyer has demonstrated adequate assurance of future performance under the Assumed Contracts within the meaning of 11 U.S.C. §§ 365(b)(1) and 365(f)(2). The Cure Amounts, as set forth on Schedule 2.01(a) to the APA and as determined by the Bankruptcy Court and to be paid by the Buyer in connection with the Closing, are sufficient to satisfy all monetary defaults required to be cured under 11 U.S.C. § 365(b)(1)(A).

J. Sale Procedures. The Transaction was conducted in accordance with the Sale Procedures approved under the Bidding Procedures Order [Docket No. 298]. The Sale Notice was duly filed on September 16, 2026, and the notice and objection period was completed in full compliance with the requirements of the Bidding Procedures Order.

K. Legal Authority. The legal requirements for approval of the sale have been satisfied. The sale is authorized pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f), and 365.

L. Waiver of Stay. Good cause has been shown for waiver of the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d). The Transaction may be consummated promptly to preserve the going-concern value of Camp Chateaugay. Immediate effectiveness of this Order is warranted.

**IT IS HEREBY ORDERED THAT:**

1. Approval of the APA and the Transaction. The APA, including all exhibits, schedules, and ancillary documents thereto, and the transaction contemplated thereby (the "Transaction"), are hereby approved in their entirety pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f), and 365. The Sellers are authorized and directed to perform under, consummate, and implement the terms of the APA together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and consummate the Transaction. This Order is in form and substance reasonably acceptable to the Buyer as required under the APA.

2. Transfer Free and Clear. Pursuant to 11 U.S.C. §§ 363(b), and 363(f), the Sellers are authorized and directed to sell, assign, transfer, convey, and deliver the Acquired Assets (as defined in the APA) to the Buyer (or its designee), and the Buyer is authorized to acquire the Acquired Assets, free and clear of all Encumbrances of any kind or nature whatsoever, including without limitation all liens, claims, and encumbrances of Community Bank, Harold Lyons,

individually or as assignee of Chateaugay Lake Camp Inc., and any merchant cash advance and short-term funders and lenders, other than Permitted Encumbrances and Assumed Liabilities (as defined in the APA). All such Encumbrances shall attach to the proceeds of the sale with the same validity, extent, and priority as existed immediately prior to the sale; *provided*, *however*, any Encumbrance held by Harold Lyons, individually, or as assignee of Chateaugay Lake Camp, Inc., shall not attach to the proceeds of sale, as the Liabilities on account of the Lyons Subordinated Promissory Note (including all accrued interest as of the Closing Date), as amended, modified, and restated with the consent of Harold Lyons, is an Assumed Liability. To the extent any person or entity, including any lienholder, asserts an interest in the Acquired Assets, such interest is extinguished upon entry of this Order.

3. Repayment of Community Bank Obligations. The Debtors shall segregate such amounts from the Cash Payment as are necessary to satisfy the CBNA DIP Obligations and the Prepetition Obligations (each as defined in that certain *Final Order (I) Authorizing the Chateaugay Debtor Borrowers to Obtain Postpetition Financing, (II) Authorizing the Chateaugay Debtor Borrowers to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [Docket No. 1040]) due as of the Closing Date (collectively, the "Community Bank Obligations"). The Debtors shall be authorized, at the time of Closing, to pay

to Community Bank such amounts as are necessary to satisfy the Community Bank Obligations in full and the payment of any such amounts shall be applied to the Community Bank Obligations.

4. Good Faith Finding; Section 363(m) Protections. The Buyer is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and is entitled to all of the protections afforded thereby. The reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the sale to the Buyer unless such authorization is duly stayed pending such appeal. The Buyer has acted in good faith in all respects in connection with this proceeding. Neither the Sellers nor the Buyer have engaged in any action or inaction that would cause or permit the sale to be avoided, or costs or damages to be imposed, under 11 U.S.C. § 363(n).

5. No Successor Liability. Except as expressly provided in the APA, Buyer does not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of the APA or the consummation of the transactions contemplated thereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability (as defined in the APA). Buyer is not, and shall not be, a successor to Sellers by reason of any theory of law or equity.

6. Assumption and Assignment of Assumed Contracts. Pursuant to 11 U.S.C. §§ 365(a), 365(b), and 365(f), the Sellers are authorized and directed to assume and assign to the Buyer, and the Buyer is authorized to accept the assignment of, the Assumed Contracts listed on Schedule 2.01(a) to the APA, effective as of the Closing. The Buyer has provided adequate

assurance of future performance under the Assumed Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B). Anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption and assignment of such contracts and do not constitute a breach or default thereunder. The Buyer's contract designation period under the APA may be extended by the Buyer in its discretion as provided therein.

7. Cure Amounts. The Cure Amounts set forth on Schedule 2.01(a) to the APA, or as otherwise determined by the Court, represent all amounts that must be paid to cure all defaults under the Assumed Contracts pursuant to 11 U.S.C. § 365(b)(1). Upon payment by the Buyer of the Cure Amounts at Closing, all defaults under the Assumed Contracts shall be deemed cured, and non-debtor counterparties shall be forever barred from asserting any claim or cause of action against the Buyer arising from any pre-Closing default under the Assumed Contracts.

8. Unresolved Cure and Assignment Objections. The Sellers' assumption of the Assumed Contracts is subject to consummation of the Transaction. To the extent that an objection (if any) by a counterparty to any Assumed Contract, including any objection relating to the applicable Cure Amount, is not resolved prior to the Closing Date, the Sellers, with the consent of the Buyer and in accordance with the APA, may elect to (a) not assume and assign such Assumed Contract to the Buyer; (b) postpone the assumption and assignment of such Assumed Contract until resolution of such objection, without delaying the closing of the Transaction; (c) if the objection relates solely to the amount of the Cure Amount, pay the undisputed portion of the applicable Cure

Amount to the counterparty on the Closing Date, reserve the disputed portion, and assume and assign such Assumed Contract on the Closing Date; or (d) proceed with the assumption and assignment on such terms as are otherwise mutually agreeable to the applicable counterparty, the Sellers, and the Buyer.

9. Buyer Designation Right. The Buyer is authorized to assign its rights under the APA and this Order to any affiliate or designee of the Buyer (the "Designee") without further order of this Court and without the consent of the Sellers; *provided* that the Buyer shall remain liable for all of its obligations thereunder following any such assignment. Any such Designee shall be deemed a good faith purchaser entitled to all of the protections of 11 U.S.C. § 363(m) and this Order.

10. Injunction. All Persons (as defined in 11 U.S.C. § 101(41)) are forever prohibited and enjoined from taking any action against the Buyer (or its Designee), its successors, assigns, properties, or the Acquired Assets to recover any claim, Encumbrance, or interest that such Person had or may have had with respect to the Sellers or the Acquired Assets that is extinguished or otherwise discharged by this Order, except as expressly permitted by this Order or the APA. This injunction shall specifically apply to, without limitation, Community Bank, any merchant cash advance and short-term funders and lenders with respect to any liens, claims, or interests they may assert against the Acquired Assets, and to Harold Lyons except that Harold Lyons shall not be enjoined with respect to the enforcement of the Lyons Subordinated Promissory Note against the

Buyer, subject and pursuant to such agreement between the Buyer and Harold Lyons for the amendment, modification and restatement of the Lyons Subordinated Promissory Note and related mortgage.

11. Purchase Price Allocation. For the avoidance of doubt, the allocation of the Purchase Price set forth in Section 2.06 of the APA shall be without prejudice to the rights of the Debtors under Section 2.09 of the APA and the rights of any party in interest, including, without limitation, the Committee, to seek a different allocation in connection with any proceeding in the Cases. Entry of this Order shall not constitute approval of any allocation of the Purchase Price or a finding or determination that the allocation of sale proceeds among the Sellers is fair, reasonable, or appropriate.

12. Direction to Third Parties. All entities that are presently, or on the Closing Date may be, in possession of any of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Buyer on the Closing Date. On the Closing Date, the Sellers' creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release their Encumbrances on the Acquired Assets, if any, as such Encumbrances may have been recorded or may otherwise exist. The Sellers shall cooperate with the Buyer following the Closing Date with respect to transition matters.

13. Self-Executing. The provisions of this Order authorizing the sale and transfer of the Acquired Assets free and clear of all Encumbrances shall be self-executing, and neither the Sellers

nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order. If any Person or entity that has filed financing statements, mortgages, mechanics' liens, lis pendens, or other documents evidencing any Encumbrance against the Acquired Assets shall not have delivered to the Buyer at or before Closing, in proper form for filing, termination statements, releases, or instruments of satisfaction, then (i) the Buyer is authorized to execute and file such termination statements, releases, or instruments of satisfaction on behalf of such Person, and (ii) a certified copy of this Order may be filed with any recording office as conclusive evidence of the release of all such Encumbrances.

14. Recording. This Order shall be binding upon and govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or otherwise, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets. A certified copy of this Order may be filed with the appropriate clerk or recording office and shall constitute conclusive evidence of the free and clear transfer of the Acquired Assets to the Buyer.

15. Waiver of Stay. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry, and the 14-day stays imposed by such rules are hereby waived. The Sellers and the Buyer are authorized to close the Transaction immediately upon satisfaction of the conditions to closing set forth in the APA, but in no event later than the Outside Date (as defined in the APA) of the APA.

16. Binding Effect. This Order shall be binding upon (a) the Sellers, (b) all creditors of the Sellers, (c) holders of Encumbrances on the Acquired Assets, (d) all non-debtor counterparties to the Assumed Contracts, and (e) all other parties in interest and their respective successors and assigns, whether or not such parties were served with notice of the Transaction, and (f) any trustees, examiners, or other fiduciaries subsequently appointed in the Sellers' chapter 11 cases or upon a conversion to chapter 7 of any Seller's case. This Order shall inure to the benefit of the Buyer and its successors, assigns, and Designees.

17. Survival. The terms and provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any chapter 11 plan in these cases, (b) converting these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing these chapter 11 cases, or (d) pursuant to which this Court abstains from hearing these cases. The terms of this Order shall continue in full force and effect notwithstanding any such subsequent order.

18. Conflicts. To the extent that any provision of this Order conflicts with any provision of the APA, the terms of this Order shall govern and control. To the extent that there is any inconsistency between this Order and any other order entered in these chapter 11 cases, the terms of this Order shall govern.

19. Retention of Jurisdiction. This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of this Order and the APA (including any injunction hereunder), including all amendments thereto and any waivers and consents thereunder, (b) resolve any disputes arising in connection with this Order, the APA, or the Transaction, (c) interpret, implement, and enforce the provisions of this Order, (d) adjudicate any claims or disputes regarding the Cure Amounts, (e) protect the Buyer and its successors, assigns, and Designees against any Encumbrances in accordance with this Order, and (f) enter such further orders as may be necessary or appropriate to implement or effectuate the provisions of this Order.

# EXHIBIT A

***Execution Version***

**ASSET PURCHASE AGREEMENT**

by and among

**FRIENDS OF CHATEAUGAY LLC,**

as Buyer;

and

**THE SELLERS NAMED HEREIN,**

as Sellers

**Dated as of September 9, 2026**

TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ..... 1

ARTICLE II. PURCHASE AND SALE ..... 8
Section 2.01 Acquired Assets ..... 8
Section 2.02 Excluded Assets ..... 10
Section 2.03 Assumed Liabilities ..... 11
Section 2.04 Excluded Liabilities ..... 12
Section 2.05 Further Assurances ..... 12
Section 2.06 Purchase Price ..... 13
Section 2.07 Deposit; Payment of Purchase Price. ..... 13
Section 2.08 Transfer Taxes ..... 14
Section 2.09 Allocation of Purchase Price ..... 14
Section 2.10 Assumed Contracts ..... 14

ARTICLE III. CLOSING ..... 15
Section 3.01 Closing ..... 15
Section 3.02 Sellers' Closing Deliverables ..... 15
Section 3.03 Buyer Closing Deliverables ..... 16

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLERS ..... 17
Section 4.01 Organization and Qualification of Sellers ..... 17
Section 4.02 Authority of Sellers ..... 17
Section 4.03 No Conflicts ..... 17
Section 4.04 Title to Acquired Assets ..... 18
Section 4.05 Litigation ..... 18
Section 4.06 Compliance with Laws; Permits ..... 18
Section 4.07 Environmental Matters ..... 18
Section 4.08 Brokers ..... 18
Section 4.09 No Other Representations ..... 18

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ..... 19
Section 5.01 Organization of Buyer ..... 19
Section 5.02 Authority of Buyer ..... 19
Section 5.03 No Conflicts ..... 19
Section 5.04 Sufficiency of Funds ..... 19
Section 5.05 Litigation ..... 19
Section 5.06 Brokers ..... 19
Section 5.07 No Outside Reliance ..... 20
Section 5.08 Adequate Assurances Regarding Executory Contracts ..... 20

ARTICLE VI. COVENANTS ..... 20
Section 6.01 Conduct of Business ..... 20
Section 6.02 Access to Information ..... 20
Section 6.03 Efforts; Consents ..... 20
Section 6.04 Bankruptcy Court Matters ..... 21

Section 6.05 Publicity ..... 22
Section 6.06 Confidentiality ..... 22
Section 6.07 Notification of Certain Matters ..... 22
Section 6.08 Bulk Transfer Laws ..... 22
Section 6.09 Employee Matters ..... 22
Section 6.10 Camp Matters ..... 23
Section 6.11 Accounts Receivable ..... 23

ARTICLE VII. TAX MATTERS ..... 24
Section 7.01 Transfer Taxes ..... 24
Section 7.02 Cooperation on Tax Matters ..... 24

ARTICLE VIII. CONDITIONS TO CLOSING ..... 24
Section 8.01 Conditions to Obligations of All Parties ..... 24
Section 8.02 Conditions to Obligations of Buyer ..... 24
Section 8.03 Conditions to Obligations of Sellers ..... 25

ARTICLE IX. TERMINATION ..... 25
Section 9.01 Termination ..... 25
Section 9.02 Effect of Termination. ..... 26
Section 9.03 Remedies. ..... 28

ARTICLE X. MISCELLANEOUS ..... 28
Section 10.01 Survival ..... 28
Section 10.02 Notices ..... 28
Section 10.03 Interpretation ..... 29
Section 10.04 Severability ..... 29
Section 10.05 Entire Agreement ..... 29
Section 10.06 Assignment ..... 29
Section 10.07 Amendment and Waiver ..... 30
Section 10.08 Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial 30
Section 10.09 Specific Performance ..... 30
Section 10.10 Counterparts ..... 30
Section 10.11 No Third-Party Beneficiaries ..... 30
Section 10.12 "As Is, Where Is" Transaction ..... 31
Section 10.13 No Successor Liability ..... 31

Exhibits

Exhibit A Form of Bill of Sale
Exhibit B Form of Assignment and Assumption Agreement

Schedules

Schedule 2.10(a) Assumed Contract List

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated as of September 9, 2026 (the "Effective Date"), and is entered into by and among Friends of Chateaugay LLC, a Delaware limited liability company ("Buyer") and each of the "Sellers" identified on the signature pages hereto (each a "Seller" and collectively, the "Sellers"). Each of Buyer and Sellers is at times referred to herein individually as a "Party" and together as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

## RECITALS

WHEREAS, on June 4, 2026 and June 5, 2026, Sellers commenced bankruptcy cases which are being jointly administered under Case No. 26-16388 (CMG) (the "Bankruptcy Cases") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

WHEREAS, in connection with the Bankruptcy Cases, Sellers desire to sell, transfer, convey, assign and deliver to Buyer, all of the Acquired Assets, and Buyer, either through itself or one or more of its subsidiaries, desires to: (i) purchase, acquire and assume all of the Acquired Assets and all of the Assumed Liabilities (and no other liabilities) (each as defined herein); and (ii) consummate such other transactions as are contemplated by this Agreement, in each case upon the terms and conditions set forth in this Agreement (with all such transactions referred to as the "Transaction");

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Acquired Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey, all on the terms and subject to the conditions set forth in this Agreement and in the Sale Order (as defined herein); and

WHEREAS, Sellers' and Buyer's willingness to consummate the Transaction is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"2026 Camp Season" means the Camp Season during calendar year 2026.

"2027 Camp Season" means the Camp Season during calendar year 2027.

"Accounts Receivable" means (a) all accounts, accounts receivable, payment intangibles, rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Acquired Assets" has the meaning set forth in Section 2.01.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means any transaction or series of transactions (other than the Transaction) pursuant to which any Person or group of Persons (other than Buyer or any of its Affiliates) directly or indirectly acquires or would acquire any of the Acquired Assets, whether by sale, merger, recapitalization, reorganization, or otherwise.

"Assumed Contract List" has the meaning set forth in Section 2.10(a).

"Assumed Contracts" means those Contracts that have been assigned to and assumed by Buyer pursuant to Section 2.10 and section 365 of the Bankruptcy Code.

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Assumed Permits" means all Permits, but excluding all Permits to the extent solely related to any Excluded Asset.

"Auction" has the meaning set forth in Section 6.04(a).

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Causes of Action" means any and all claims, rights, causes of action, suits, and proceedings, whether known or unknown, arising under chapter 5 of the Bankruptcy Code (including Sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code) or any analogous state or federal law, including all preference, fraudulent transfer or conveyance, and other avoidance claims, rights, and causes of action, together with any and all proceeds, recoveries, and rights to recovery (whether judicial or otherwise) arising therefrom or related thereto, that are or may be asserted by, or on behalf of, the Sellers, their estates, or any trustee, examiner, or other estate representative; provided, however, Bankruptcy Causes of Action shall not include any claims, rights, causes of action, suits, or proceedings for the collection of, or otherwise in connection with, any Accounts Receivable.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" has the meaning set forth in the recitals.

"Bid Procedures" means the procedures governing the solicitation of bids for the Acquired Assets and, to the extent applicable, the conduct of the Auction, as approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court dated June 26, 2026 approving the Bid Procedures.

"Breakup Fee" shall have the meaning set forth in Section 9.02(c).

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble; provided, however, that Friends of Chateaugay LLC shall have the right, in its sole discretion but subject in all respects to Section 10.06 hereof, to acquire title to the Acquired Assets through one or more subsidiaries, in which case such subsidiary or subsidiaries shall be deemed the Buyer under this Agreement.

"Camp" means recreational and/or informal educational programs for Campers during the Camp Season in a communal traditional residential camp environment, currently known as Camp Chateaugay and located in or around Merrill, Ellenburg and Dannemora, New York.

"Camp Business" means the establishment and management of the Camp conducted for Campers during the Camp Season. Such business includes recruitment of Campers, staff, procurement of necessary provisions, lease or ownership of real estate, creation of programs and events and follow-up relations with Campers, prospective Campers, and their parents. The Camp Business may also include the rental of the facilities of the Camp during periods other than the Camp Season.

"Camp Season" shall mean the months of June, July and August in a specific calendar year.

"Campers" means juveniles and adolescents who attend the Camp.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral agreement, contract, lease, sublease, license, sublicense, obligation, promise, undertaking, commitment, or other binding arrangement or understanding.

"Cure Amounts" means all amounts that must be paid and all obligations that must otherwise be satisfied pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, as determined by the Bankruptcy Court.

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Deposit" has the meaning set forth in Section 2.07(a).

"DIP Facility" means any debtor-in-possession credit facility entered into by Sellers in connection with the Bankruptcy Cases.

"Dollars" or "$" means the lawful currency of the United States.

"Domain Names" means Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet and all applications for any of the foregoing.

"Effective Date" has the meaning set forth in the preamble.

"Encumbrance" means any lien, pledge, security interest, charge, claim, mortgage, deed of trust, option, right of first refusal, preemptive right, restriction on transfer, or other encumbrance of any kind or nature, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Agent" means Flagstar Bank, or such other escrow agent as mutually agreed in writing between the Parties.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Claims" means all (a) rights (including rights of set-off and rights of recoupment), claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, rights of set-off, rights of subrogation and all other rights of any kind of the Sellers against (i) any current or former director, officer, or manager of any Seller (but which shall not include, for the avoidance of doubt, Mitch Goldman), or any spouse, family member, or other relative of, or any Person related to or affiliated with, any of the foregoing, (ii) any DIP lender, prepetition secured or unsecured lender, or other financing party in the Bankruptcy Cases, and each of their respective Affiliates, and (iii) third parties solely to the extent arising in respect of any Excluded Asset or Excluded Liability, (b) Bankruptcy Causes of Action, and (c) claims or

causes of action of any Seller to the extent such claims or causes of action neither (X) directly and exclusively arose out of or related to the ordinary course, day-to-day operation prior to Closing of the Acquired Assets (including the Assumed Contracts) and the Camp Business, nor (Y) directly and exclusively arise out of or relate to the post-Closing operation of the Camp Business.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Expense Reimbursement" shall have the meaning set forth in Section 9.02(b).

"Final Order" means an Order of the Bankruptcy Court (or any court of competent jurisdiction) as to which the time to file an appeal, motion for rehearing, or writ of certiorari has expired and no appeal, motion for rehearing, or writ of certiorari is pending; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule, may be filed shall not cause an Order not to be a Final Order.

"Former Employees" means all individuals who have been employed by Sellers who are not Current Employees.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, provincial, local, municipal, foreign, or other government, or any department, commission, board, bureau, agency, regulatory authority, instrumentality, or political subdivision thereof, or any court, arbitral body, or similar body of competent jurisdiction.

"Health Plans" means all health plans including, but not limited to, health, dental, life, disability and long-term care insurance.

"Intellectual Property" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"Inventory" means all of Sellers' now owned and hereafter acquired raw materials and work-in-process therefor and all of Sellers' tangible property used in the operation of the Sellers' business or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"Law" means any federal, state, provincial, local, municipal, foreign, international, or multinational constitution, statute, treaty, rule, regulation, ordinance, order, code, or other similar requirement enacted, adopted, promulgated, or applied by any Governmental Authority.

"Liabilities" means any debt, liability, commitment, or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Lyons Note" shall have the meaning set forth in Section 2.03(e).

"Material Adverse Effect" means any change, effect, event, occurrence, development, or state of facts that, individually or in the aggregate with all other changes, effects, events, occurrences, developments, or states of facts, (a) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets or the ability of Sellers to consummate the Transaction, or (b) prevents or materially impairs or delays, or would reasonably be expected to prevent or materially impair or delay, the ability of Sellers to consummate the Transaction; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic or political conditions or the securities, credit, or financial markets in general in the United States or any other jurisdiction in which Sellers operates; (ii) changes in conditions generally affecting the industries in which Sellers operates; (iii) the announcement or pendency of this Agreement or the Transaction, including the impact thereof on the relationships, contractual or otherwise, of Sellers with employees, customers, suppliers, distributors, partners, or other third parties; (iv) any change in Law or GAAP (or any interpretation thereof) after the date hereof; (v) acts of war (whether or not declared), sabotage, terrorism, military actions, or the escalation or worsening of any of the foregoing; (vi) any natural or man-made disaster, pandemic, epidemic, disease outbreak, or acts of God; (vii) the filing or commencement of the Bankruptcy Cases or any events or circumstances resulting therefrom; (viii) any action taken or omitted to be taken by Sellers at the written request or with the prior written consent of Buyer; (ix) any failure by Sellers to meet any internal or external projections, forecasts, or estimates of revenue, earnings, or other financial metrics (provided that the underlying causes of such failure may be taken into account unless otherwise excluded by this definition); or (x) any matter disclosed on the Schedules hereto.

"Order" means any order, judgment, injunction, ruling, writ, assessment, or decree of any Governmental Authority.

"Outside Date" is the first Business Day that is at least fifteen (15) days after the Sale Order becomes a Final Order; provided, however, that the Outside Date may be extended by mutual written agreement of the Parties.

"Overbid" shall have the meaning set forth in Section 6.04(b).

"Patents" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"Permits" means all licenses, permits, certificates, approvals, registrations, consents, authorizations, franchises, variances, exemptions, and orders issued or granted by a Governmental Authority.

"Permitted Encumbrances" means (a) Encumbrances arising under this Agreement; (b) statutory liens for current Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; (c) mechanics', carriers', workers', repairers', and similar statutory liens arising or incurred in the ordinary course of business for amounts not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; (d) zoning, entitlement, conservation restrictions, and other land use and environmental regulations by Governmental Authorities that do not materially interfere with the present use of the applicable asset; and (e) any liens securing the Lyons Note, as amended, modified, and restated with the agreement of the Buyer in connection with the Transaction.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" means the dates on which Sellers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Purchase Price" has the meaning set forth in Section 2.06.

"Qualified Bid" has the meaning set forth in the Bid Procedures Order.

"Qualified Bid Deadline" has the meaning set forth in Section 6.04(a).

"Real Property" has the meaning set forth in Section 2.01(g).

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Camp Business, including without limitation a current schedule of Seller's Campers.

"Sale Hearing" means the hearing, if any, before the Bankruptcy Court to approve the Sale Order.

"Sale Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, entered pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, approving and authorizing (a) the sale of the Acquired Assets to Buyer, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), pursuant to Section 363(f) of the Bankruptcy Code, (b) the assumption and assignment of the Assumed Contracts to Buyer pursuant to Section 365 of the

Bankruptcy Code, (c) this Agreement and the Transaction, and (d) such other and further relief as is customary for transactions of this type, and also finding that Buyer is a good faith buyer of the Acquired Assets entitled to all the protections of Section 363(m) of the Bankruptcy Code.

"Schedules" means the disclosure schedules delivered by Sellers to Buyer in connection with the execution of this Agreement.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Software" means all websites, computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation).

"Successful Bid" has the meaning given to such term in the Bid Procedures Order.

"Tax" or "Taxes" means all federal, state, local, and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy, and other taxes, duties, or assessments of any nature whatsoever, together with all interest, penalties, and additions thereto imposed with respect to such amounts.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto.

"Trademarks" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"Transaction" is defined in the Recitals.

"Transfer Taxes" has the meaning set forth in Section 2.08.

"Tuition" means consideration paid by or for a Camper to attend the Camp.

## ARTICLE II.
## PURCHASE AND SALE

**Section 2.01 Acquired Assets**. On the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, assign, transfer, convey, and deliver to Buyer, and Buyer shall purchase, acquire, and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), other than the Excluded Assets, all of the Sellers' assets, rights, properties of every nature, kind and description, tangible or intangible (including goodwill), whether now existing or hereafter acquired, wheresoever situated, relating to or used or held for use in connection with the Camp Business as currently conducted, including without limitation, the following assets (collectively, the "Acquired Assets"):

(a) all Accounts Receivable of Sellers as of the Closing;

(b) all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(c) all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities, Health Plans or otherwise and deposits for tuition for the 2027 Camp Season) and other prepaid charges and expenses of Sellers;

(d) all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.10;

(e) all Intellectual Property owned, whether registered or unregistered, or licensed by Sellers and all of Sellers' rights to use other Intellectual Property;

(f) all items of machinery, equipment, supplies, tenant improvements, furniture and fixtures owned by Sellers as of the Closing;

(g) all real property owned by Sellers and used or held for use in the Camp Business, including the parcels identified as respectively tax map numbers 169-2-18.2; 155-1-10.1; 155-1-7.1; 155-1-7.2; 155-1-9; 155.3-1-1; 155.3-1-2; and 155.4-1-4 and having street addresses 233 Gadway Road, Ellenburg, New York; 172 Gadway Road, Ellenburg, New York; Gadway Road, Ellenburg, New York; Split Rock Point, Ellenburg, New York; 25 Birch Way, Ellenburg, New York; Route 374, Ellenburg and Dannemora, New York (collectively, the "Real Property"), together with all improvements, fixtures and appurtenances thereto;

(h) all Records related to the Acquired Assets and Assumed Liabilities;

(i) all goodwill associated with the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(j) all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers;

(k) all of the Assumed Permits or all of the rights and benefits accruing under any Permits;

(l) other than with respect to any insurance proceeds related to, arising out of, or in connection with any directors' and officers' liability insurance policies, the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets occurring on or after the Closing or (ii) any Assumed Liabilities;

(m) except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) related to the Acquired Assets, to the extent the transfer of the foregoing is effective under applicable non-bankruptcy law;

(n) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person related to the Acquired Assets;

(o) the right to receive and retain mail relating to Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(p) all telephone numbers, fax numbers, e-mail addresses, websites, URLs, and Domain Names;

(q) all cash and cash equivalents of Sellers; and

(r) all other assets of the Sellers relating to the Camp and the Camp Business that are not Excluded Assets (as defined below).

Notwithstanding anything herein to the contrary, Buyer may, from time to time, remove any Acquired Asset from this Section 2.01 in its sole and absolute discretion until the Closing and elect to treat such Contract, Permit or other asset as an Excluded Asset; provided that no such removal shall result in any adjustment to the Purchase Price.

**Section 2.02 Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, Sellers shall retain, and shall not sell, assign, transfer, convey, or deliver to Buyer, and Buyer shall not purchase, acquire, or accept from Sellers, any of the following assets of Sellers (collectively, the "Excluded Assets"):

(a) all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents solely relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity;

(b) all Contracts other than the Assumed Contracts;

(c) the Excluded Claims;

(d) any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the transfer and disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to

retain and (3) any Records or other documents relating to the Bankruptcy Cases that are protected by the attorney-client privilege;

(e) all Permits, other than the Assumed Permits;

(f) all directors' and officers' liability insurance policies and any proceeds arising out of, or related to, such directors' and officers' liability insurance policies;

(g) the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement;

(h) all Tax Records of the Sellers;

(i) all Records related to the Excluded Assets;

(j) any unused retainers paid by the Sellers to any third party prior to the Closing (for professional services or otherwise) or any amounts remaining in any escrow or similar account used to fund the same; and

(k) any Claims of any Seller against (i) current or former directors, officers, insiders, or affiliates (which shall not include, for the avoidance of doubt, Mitch Goldman), (ii) any spouse, family member, or other relative of, or any Person related to or affiliated with, any of the foregoing, (iii) any DIP lender, prepetition secured or unsecured lender, or other financing party in the Bankruptcy Cases and their respective Affiliates, and (iv) any other Person to the extent such Claims neither (X) directly and exclusively arose out of or related to the ordinary course, day-to-day operation prior to Closing of the Acquired Assets (including the Assumed Contracts) and the Camp Business, nor (Y) directly and exclusively arise out of or relate to the post-Closing operation of the Camp Business.

**Section 2.03 Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to pay, perform, and discharge when due, the following Liabilities of Sellers (collectively, the "Assumed Liabilities")

(a) all Liabilities arising under the Assumed Contracts that arise from and after the Closing Date and relate to periods from and after the Closing Date;

(b) any Liabilities for Taxes of Sellers that arise from and after the Closing Date and relate to periods from and after the Closing Date (except for Transfer Taxes, which shall be allocated pursuant to Section 2.08);

(c) any administrative expense claims in the Sellers' Bankruptcy Cases (other than the fees and related expenses of counsel, financial advisors, bankers and other professionals, which shall remain the exclusive obligation and liability of Sellers unless specifically included in the Cash Payment) related to the operation of the Camp Business and that relate to periods prior to the Closing Date (it being understood and agreed that any administrative expenses of any kind relating to periods from and after the Closing Date shall be the exclusive obligation and liability of Sellers);

(d) any Liabilities that arise out of the operation of the Camp Business on and after the Closing Date;

(e) any Liabilities arising under environmental Laws, but only to the extent imposed on Buyer as owner or operator of any real property acquired hereunder by operation of applicable Law that cannot otherwise be excluded, assigned, or otherwise allocated to Sellers as a matter of Law;

(f) any Liabilities (including all accrued interest as of the Closing Date) on account of that certain Subordinated Promissory Note dated June 23, 2022 in the principal amount of $1,045,000, executed by Chateaugay Landco LLC and Chateaugay Campco, LLC in favor of Harold Lyons (the "Lyons Note") as amended, modified, and restated; and

(g) all Cure Amounts relating to the assumption and assignment of the Assumed Contracts to Buyer.

**Section 2.04 Excluded Liabilities**. Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume or be obligated to pay, perform, or discharge any Liabilities of Sellers other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including the following:

(a) any Liability arising under any Excluded Asset;

(b) any Liability for any claim, action, suit, investigation, or proceeding pending or threatened against Sellers or any of their Affiliates;

(c) any Liability under any employee benefit plan or relating to any current or former employees, independent contractors, or directors of Sellers;

(d) any Liability arising out of or relating to any violation of Law by Sellers;

(e) any indebtedness for borrowed money, including any obligations under the DIP Facility or any other debtor-in-possession financing, and any pre-petition secured or unsecured indebtedness;

(f) any Liability arising out of or relating to any Excluded Asset;

(g) any Liability to the extent arising out of or relating to any breach, default, or violation by Sellers prior to the Closing Date under any Contract (other than Cure Amounts);

(h) any Liability relating to any rejected executory contract or unexpired lease; and

(i) any other Liabilities of Sellers not specifically included in the Assumed Liabilities.

**Section 2.05 Further Assurances**. From and after the Closing, each of the Parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances

and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transaction.

**Section 2.06 Purchase Price**. The aggregate purchase price for the Acquired Assets (the "Purchase Price") shall be an amount equal to:

(a) (x) the outstanding principal balance of the DIP Facility and the prepetition debt of Community Bank, National Association, plus all interest accrued thereon and all fees and expenses payable in connection therewith, *plus* (y) fees due and payable to SSG Capital Advisors, LLC, in an amount not to exceed $60,000.00, which amount is expected to be approximately $3,563,978.67, in cash (the "Cash Payment"); *plus*

(b) the Cure Amounts; *plus*

(c) any Transfer Taxes payable by Buyer, *plus*

(d) the assumption of the Assumed Liabilities, including the assumption of the Lyons Note (both principal and any accrued but unpaid interest), as amended, modified, and restated.

Prior to Closing, the Parties will agree to an allocation of a portion of the Cash Payment to the Real Property being sold.

**Section 2.07 Deposit; Payment of Purchase Price.**

(a) **Deposit**. Simultaneously with the execution of this Agreement, Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an amount equal to ten percent (10%) of the Cash Payment (the "Deposit"), to be held by the Escrow Agent in an interest-bearing account (the "Escrow Account") pursuant to an escrow agreement in form and substance reasonably acceptable to Buyer and Sellers; however to the extent that the purchase price set forth in this Agreement is increased at or prior to the potential Auction (as defined in the Bid Procedures Order), and to the extent Buyer is the Successful Bidder (as defined in the Bid Procedures Order) or the Back-Up Bidder (as defined in the Bid Procedures Order), Buyer shall pay an additional amount into the Escrow Account, within two (2) Business Days of the Auction, such that the Deposit equals ten percent (10%) of the proposed purchase price offered by Buyer to purchase the Acquired Assets.

(b) **Payment at Closing**. At the Closing, Buyer shall pay or cause to be paid to Sellers (or as Sellers may direct) the Cash Payment (less the Deposit, which shall be released to Sellers at Closing), by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing at least two (2) Business Days prior to the Closing Date.

(c) **Return of Deposit**. If this Agreement is terminated (i) by Buyer pursuant to Section 9.01(c) or Section 9.01(d), or (ii) pursuant to Section 9.01(a), Section 9.01(b), Section 9.01(f), Section 9.01(g), Section 9.01(h), or Section 9.01(i), then the Deposit (together with any interest earned thereon) shall be returned to Buyer within five (5) Business Days after such termination. If this Agreement is terminated by Sellers pursuant to Section 9.01(e), the Deposit shall be released to Sellers as liquidated damages, which shall constitute the sole and exclusive

remedy of Sellers against Buyer for any breach or failure to perform by Buyer, except in the case of Buyer's fraud or willful misconduct.

(d) **Prorations**. The Parties shall provide for customary prorations and adjustments as of the Closing Date, including with respect to real estate taxes, insurance premiums, and utilities, to the extent applicable and consistent with Section 7.01.

**Section 2.08 Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration, recording, value-added, and other similar Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Transaction ("Transfer Taxes") shall be borne by Buyer; provided, however, that the parties shall cooperate in good faith to minimize the amount of any Transfer Taxes and to avail themselves of any available exemptions from any such Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code.

**Section 2.09 Allocation of Purchase Price**. Within thirty (30) days after the Closing Date, Buyer shall prepare and deliver to Sellers a schedule allocating the Purchase Price (and any Assumed Liabilities to the extent properly taken into account as part of the consideration for U.S. federal income Tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Sellers shall have thirty (30) days to review and comment on such schedule. Buyer and Sellers shall endeavor in good faith to resolve any disagreements. If Buyer and Sellers are unable to resolve any such disagreement within fifteen (15) days, such disagreement shall be resolved by a nationally recognized independent accounting firm mutually acceptable to Buyer and Sellers, whose determination shall be final and binding. The fees and expenses of such accounting firm shall be borne equally by Buyer and Sellers. Buyer and Sellers agree to file all Tax Returns in a manner consistent with such allocation and shall not take any position inconsistent therewith in any Tax proceeding, audit, or otherwise, except as required by applicable Law.

**Section 2.10 Assumed Contracts**.

(a) Schedule 2.10(a) hereto (the "Assumed Contract List") sets forth a list of all Contracts to which a Seller is a party and which Buyer has designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract. From and after the date hereof, until two (2) days prior to the Closing, Buyer shall be entitled to make additions and deletions to the Assumed Contract List by delivery of written notice to Sellers (which shall then serve notice on the non-debtor counterparties to each of the Contracts so added or deleted); provided that Buyer shall pay any net increase in the sum of Cure Amounts and non-debtor counterparties' Administrative Claims resulting directly from such designation of additional Assumed Contracts (the intent being that there will be no net negative effect on the bankruptcy estate due to a net increase in Cure Amounts and non-debtor counterparties' Administrative Claims resulting from any additional assumptions). Any such deleted Contract shall be deemed to no longer be an Assumed Contract and any such added Contract shall be deemed an Assumed Contract. Any Contract that is designated (or deemed to be designated) for exclusion and rejection pursuant to this Section 2.10(a) shall constitute an "Excluded Contract" as of the Closing Date.

(b) In connection with the assumption and assignment to Buyer of any Assumed Contract that is executory pursuant to this Section 2.10, the allowed Cure Amounts, if any, necessary to cure all monetary defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts, shall be paid by Buyer at the Closing as part of the Purchase Price in Section 2.06.

(c) Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.10. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all consents from Governmental Authorities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that Sellers' obligations hereunder shall only continue until the Bankruptcy Cases are closed or dismissed. In addition, Sellers shall use their commercially reasonable best efforts to transfer to Buyer, or to assist Buyer in obtaining or having reissued, all Permits necessary to own and operate the Camp (including all New York State Department of Health children's camp, food-service, and swimming-pool/bathing-beach permits and all water, septic and dam registrations), and shall reasonably cooperate with Buyer in connection therewith for a period of one-hundred-twenty (120) days following the Effective Date.

## ARTICLE III.
## CLOSING

**Section 3.01 Closing**. Subject to the satisfaction or waiver of the conditions set forth in Article VIII, the closing of the Transaction (the "Closing") shall take place remotely by exchange of documents and signatures electronically (or by such other means as the parties may agree) on the date that is three (3) Business Days after the satisfaction or waiver of all conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other time and place as Buyer and Sellers may mutually agree in writing (the date on which the Closing actually occurs, the "Closing Date"). Notwithstanding anything contained herein to the contrary, in the event that the Closing Date occurs (through no fault of Sellers) after September 25, 2026, Buyer shall be responsible for all costs and expenses incurred by Sellers (other than the fees and related expenses of counsel, financial advisors, bankers and other professionals) in the ordinary course of operating the Camp Business, or maintaining and/or otherwise carrying the Camp from and after such date, except that such costs and expenses shall be paid in the first instance from Sellers' cash on hand, and, to the extent the Sellers's cash is not sufficient to cover such costs and expenses, shall be reimbursed to Sellers or satisfied directly by Buyer, at the direction of Sellers.

**Section 3.02 Sellers' Closing Deliverables**. At the Closing, Sellers shall deliver or cause to be delivered to Buyer the following:

(a) a bill of sale, substantially in the form attached hereto as Exhibit A, duly executed by Sellers, evidencing the sale, transfer, conveyance, and assignment of the Acquired Assets to Buyer;

(b) a bargain and sale deed with covenant against grantor's acts (or other form of deed reasonably acceptable to Buyer), in recordable form, conveying the Real Property to Buyer, together with a duly completed New York State Combined Real Estate Transfer Tax Return (Form TP-584), Real Property Transfer Report (Form RP-5217), such affidavits or other documents as may be reasonably requested by Buyer for purposes of confirming the condition of title, and all other instruments of conveyance customary for a New York real property transfer;

(c) an assignment and assumption agreement, in a form mutually agreed upon by Buyer and Sellers, duly executed by Sellers, evidencing the assignment of the Assumed Contracts and the assumption of the Assumed Liabilities by Buyer;

(d) a certificate executed by an authorized officer of Sellers, dated as of the Closing Date, certifying that the conditions set forth in Section 8.02(a) and Section 8.02(b) have been satisfied;

(e) a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that Sellers are not a "foreign person" as defined in Section 1445 of the Code;

(f) certified copies of (i) the Sale Order and (ii) the Bid Procedures Order, in each case as entered by the Bankruptcy Court;

(g) all Records included in the Acquired Assets (including all books and records, files, plans, drawings, specifications, and other documents relating to the Camp, the Acquired Assets, and the Assumed Liabilities), to the extent in Sellers' possession or control and not already located at the Camp; and

(h) such other documents, instruments, or certificates as Buyer may reasonably request to evidence and effectuate the consummation of the Transaction.

**Section 3.03 Buyer Closing Deliverables**. At the Closing, Buyer shall deliver or cause to be delivered to Sellers the following:

(a) the Cash Payment (less the Deposit), by wire transfer of immediately available funds in accordance with Section 2.07(b);

(b) an assignment and assumption agreement, in a form mutually agreed upon by Buyer and Sellers, duly executed by Buyer, evidencing the assumption of the Assumed Liabilities by Buyer;

(c) a certificate executed by an authorized officer of Buyer, dated as of the Closing Date, certifying that the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied;

(d) a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying (i) the resolutions duly adopted by the governing body of Buyer authorizing the execution and delivery of this Agreement and the consummation of the Transaction, and (ii)

the incumbency and signatures of the officers of Buyer executing this Agreement and any other documents delivered in connection herewith;

(e) a duly completed New York State Combined Real Estate Transfer Tax Return (Form TP-584), Real Property Transfer Report (Form RP-5217), and all other instruments of conveyance customary for a New York real property transfer as may be customarily executed and delivered by a buyer in a New York real property transfer; and

(f) such other documents, instruments, or certificates as Sellers may reasonably request to evidence and effectuate the consummation of the Transaction.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the correspondingly numbered Sections of the Schedules, Sellers represent and warrant to Buyer that the statements contained in this Article IV are true and correct as of the Effective Date and as of the Closing Date.

**Section 4.01 Organization and Qualification of Sellers**. Each Seller is a corporation/limited liability company duly organized, validly existing, and in good standing under the Laws of the State of its incorporation/formation, and has all requisite power and authority to own, lease, and operate its properties and to carry on its business as presently conducted.

**Section 4.02 Authority of Sellers**. Subject to the entry of the Sale Order, Sellers have full power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Sellers in connection herewith, to perform its obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement and the consummation of the Transaction have been duly authorized by all necessary action on the part of Sellers (including, to the extent required, approval of the Bankruptcy Court). This Agreement has been duly executed and delivered by Sellers and, assuming the due authorization, execution, and delivery by Buyer, and subject to entry of the Sale Order, constitutes a legal, valid, and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 4.03 No Conflicts**. Subject to entry of the Sale Order, the execution, delivery, and performance of this Agreement by Sellers and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of formation, limited liability company agreement, certificate of incorporation, bylaws, or other organizational documents of Sellers, (b) violate or result in a breach of any Law applicable to Sellers, or (c) except as would not reasonably be expected to have a Material Adverse Effect, violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which any Seller is a party or by which any Seller or any of its assets is bound.

**Section 4.04 Title to Acquired Assets**. Subject to entry of the Sale Order, Sellers have good and valid title to the Acquired Assets and own the Real Property in fee simple, in each case free and clear of all Encumbrances other than Permitted Encumbrances. At the time of Closing, the Real Property shall be delivered free and clear of all Encumbrances other than Permitted Encumbrances and, to Seller's actual knowledge, free from any and all leases and rights of third parties to the Real Property except for those expressly agreed to in writing by Buyer. To Sellers' actual knowledge, there are no leases, subleases, licenses, concessions, occupancy agreements or other agreements (including, without limitation, agreements or property interests relating to or restricting the use of any portion of the Property), other than any lease, sublease, license, concession, occupancy agreement or other agreement that is an Assumed Contract (to the extent such Assumed Contract specifically relates to the Property) granting to any Person the right to use or occupy the Real Property or any portion thereof and to Sellers' actual knowledge there is no Person in possession of any portion of the Real Property other than Sellers. Notwithstanding anything contained herein to the contrary, Sellers make no representation or warranty with respect to the tax map numbers identified in Section 2.01(g) hereof.

**Section 4.05 Litigation**. Except for the Bankruptcy Cases, there is no action, suit, claim, investigation, or proceeding pending or, to the actual knowledge of Sellers, threatened against Sellers that (a) challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction, or (b) would reasonably be expected to have a Material Adverse Effect.

**Section 4.06 Compliance with Laws; Permits**. Except as would not reasonably be expected to have a Material Adverse Effect, Sellers are in compliance in all material respects with all Laws applicable to the Acquired Assets or the ownership or operation thereof.

**Section 4.07 Environmental Matters**. Sellers have not received, within the last year, any written notice from any Governmental Authority of a violation of any environmental Laws with respect to the Real Property that remains outstanding.

**Section 4.08 Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transaction or any other transaction document based upon arrangements made by or on behalf of Sellers.

**Section 4.09 No Other Representations**. Except for the representations and warranties expressly set forth in this Article IV, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers, the Acquired Assets, or the Transaction, and Sellers disclaim any other representations or warranties, whether made by Sellers or any of their Affiliates, officers, directors, employees, agents, or representatives. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE IV, SELLERS MAKE NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND SELLERS HEREBY DISCLAIM ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date of this Agreement and as of the Closing Date.

**Section 5.01 Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware, and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as presently conducted.

**Section 5.02 Authority of Buyer**. Buyer has full limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Buyer in connection herewith, to perform its obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement and the consummation of the Transaction have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, assuming the due authorization, execution, and delivery by Sellers, constitutes a legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 5.03 No Conflicts**. The execution, delivery, and performance of this Agreement by Buyer and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of incorporation, bylaws, or other organizational documents of Buyer, (b) violate or result in a breach of any Law applicable to Buyer, or (c) except as would not reasonably be expected to prevent or materially impair or delay the consummation of the Transaction, violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which Buyer or any of its assets is bound.

**Section 5.04 Sufficiency of Funds**. Buyer has, and at the Closing will have, immediately available funds sufficient to pay the Cash Payment and all other amounts payable by Buyer hereunder and to consummate the Transaction. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.

**Section 5.05 Litigation**. There is no action, suit, claim, investigation, or proceeding pending or, to the knowledge of Buyer, threatened against Buyer that challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction.

**Section 5.06 Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission from Buyer in connection with the Transaction based upon arrangements made by or on behalf of Buyer.

**Section 5.07 No Outside Reliance**. Buyer acknowledges and agrees that (a) Buyer has conducted its own independent investigation, review, and analysis of the business, operations, assets, liabilities, results of operations, financial condition, and prospects of Sellers and the Acquired Assets, which investigation, review, and analysis was performed by Buyer and its Affiliates and representatives, (b) Buyer has been afforded access to the books and records, facilities, equipment, Contracts, and other assets of Sellers that Buyer and its representatives have requested to review, and (c) in entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations and warranties expressly set forth in Article IV (as qualified by the Schedules) and acknowledges that, except as expressly set forth in Article IV, neither Sellers nor any of its Affiliates or representatives makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or representatives.

**Section 5.08 Adequate Assurances Regarding Executory Contracts**. Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

## ARTICLE VI.
## COVENANTS

**Section 6.01 Conduct of Business**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) use commercially reasonable efforts to maintain the Acquired Assets in good working order (ordinary wear and tear excepted), (b) not take any action that would reasonably be expected to result in a Material Adverse Effect, and (c) operate the Camp Business, and use cash of the Sellers, subject to and in accordance with the budget approved by the Bankruptcy Court in the Bankruptcy Cases in connection with the DIP Facility.

**Section 6.02 Access to Information**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) provide Buyer and its representatives with reasonable access during normal business hours, upon reasonable advance notice, to the personnel, properties, books, records, and Contracts relating to the Acquired Assets, and (b) furnish to Buyer such financial, operating, and other data and information relating to the Acquired Assets as Buyer may reasonably request. Notwithstanding the foregoing, Sellers shall not be required to provide access or information to the extent that (i) such access or the provision of such information would violate any Law or binding agreement, (ii) such information is subject to attorney-client privilege or attorney work-product protection, or (iii) such access or the provision of such information would be unreasonably disruptive to the operations of Sellers.

**Section 6.03 Efforts; Consents.** Subject to the terms and conditions of this Agreement, each of the parties hereto shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable under applicable Law to consummate the Transaction as promptly as practicable, including (i) obtaining all necessary consents, approvals, or authorizations of, and making all filings with and giving all notices to, Governmental Authorities and other third parties, and (ii) obtaining all consents, approvals, or authorizations of third parties necessary for the consummation of the Transaction.

**Section 6.04 Bankruptcy Court Matters.**

(a) **Bid Procedures**. If the Bid Procedures Order provide for an auction (the "Auction") and one or more Qualified Bids are received by Sellers on or before September 10, 2026 (the "Qualified Bid Deadline"), Sellers shall conduct the Auction on September 17, 2026 in accordance with the Bid Procedures Order.

(b) **Minimum Overbid**. Any initial competing bid to the bid for the Acquired Assets by the Buyer must equal or exceed the sum of (i) the Purchase Price, plus (ii) the Breakup Fee, plus (iii) the Expense Reimbursement, plus (iv) $100,000 (an "Overbid"). Any initial Overbid that does not equal or exceed such sum shall not be deemed a Qualified Bid. In the event that no Qualified Bid other than Buyer's bid is submitted by the Qualified Bid Deadline, no Auction will be held and, instead, the Sellers shall promptly file a notice in the Bankruptcy Cases that no such Overbid has been submitted and shall seek entry by the Bankruptcy Court of the Sale Order without the need for a Sale Hearing.

(c) **Sale Order**. Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as promptly as practicable after the Sale Hearing or, if no other Qualified Bids are received by the Qualified Bid Deadline, as promptly as practicable after the Qualified Bid Deadline. The Sale Order shall, among other things, (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (x) the execution, delivery and performance by Sellers of this Agreement, (y) the sale of the Acquired Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances), including, without limitation, any Encumbrance resulting from that certain UCC-1 financing statement filed with the New York Department of State on June 3, 2026 by Corporation Service Company, as representative, bearing filing number 20260603059980, and (z) the performance by Sellers of their obligations under this Agreement, (ii) authorize and empower Sellers to assume and assign to Buyer the Assumed Contracts, (iii) find that Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, find that Buyer is not a successor to any Seller, and grant Buyer the protections of section 363(m) of the Bankruptcy Code, (iv) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (v) find that Buyer has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assumed Contracts, (vi) find that Buyer shall have no Liability for any Excluded Liability, (vii) find that the consideration provided by Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets, (viii) find that Buyer and Sellers did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code, (ix) order that, notwithstanding the provisions of the Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry and (x) find that no "bulk sales" or "bulk transfers" laws shall apply to the transactions contemplated hereby. Buyer agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (1) demonstrating that Buyer is a "good faith"

purchaser under section 363(m) of the Bankruptcy Code and (2) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

(d) **No Modification or Appeal**. Buyer shall not oppose, and Sellers shall not take any action that is intended to, or that would reasonably be expected to, result in the reversal, modification, or vacatur of the Bid Procedures Order or the Sale Order.

(e) **Defense of Orders**. Each of Sellers and Buyer shall use their commercially reasonable efforts to take such actions as may be reasonably necessary to defend against any objection to the Sale Order or any appeal therefrom.

**Section 6.05 Publicity**. Except as required by applicable Law (including any disclosure required by the Securities and Exchange Commission or other Governmental Authority or any disclosure required in connection with the Bankruptcy Cases), no party hereto shall issue any press release or make any public announcement relating to this Agreement or the Transaction without the prior written consent of the other parties hereto (which consent shall not be unreasonably withheld, conditioned, or delayed).

**Section 6.06 Confidentiality**. The parties acknowledge that certain confidential information has been and may be exchanged in connection with this Agreement. Each party agrees to keep confidential all information provided by the other party in connection with this Agreement that is not otherwise publicly available, and to use such information solely for the purposes of consummating the transactions contemplated hereby, except as required by applicable Law (including any disclosure required in connection with the Bankruptcy Cases).

**Section 6.07 Notification of Certain Matters**. Each party hereto shall give prompt notice to the other parties of (a) the occurrence or non-occurrence of any event that has caused or would reasonably be expected to cause any condition to the obligations of any party to effect the transactions contemplated hereby not to be satisfied, and (b) any action, suit, claim, investigation, or proceeding commenced or, to the knowledge of such party, threatened against such party that relates to the consummation of the Transaction.

**Section 6.08 Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances on the Acquired Assets, including any Encumbrances arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 6.09 Employee Matters**.

(a) Prior to the Closing, Buyer shall offer (or cause a designee of Buyer to offer) to employ all Current Employees, with employment commencing on the Closing Date. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be referred to as an "Offeree." Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee." Each offer to an Offeree shall be on terms

equal to, or more favorable to the Current Employee than, such employment terms the Sellers offered to the Current Employee on the Closing Date.

(b) Each Current Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c) Following the date of this Agreement, Sellers shall provide reasonable cooperation and information to Buyer as reasonably requested by Buyer with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(d) Notwithstanding anything in this Agreement to the contrary and unless otherwise agreed to by Sellers and Buyer, Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers. Sellers shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date. Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect to all Transferred Employees. Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees.

(e) Nothing contained herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' employee benefit plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

**Section 6.10 Camp Matters**. From the Effective Date of this Agreement until the Closing Date, Sellers shall (i) operate the Camp Business in substantially the same manner as Sellers have traditionally operated same and in accordance with all governmental requirements and further in accordance with the policies, rules, regulations and standards of the American Camp Association; (ii) use commercially reasonable efforts to (A) maintain existing Campers attending Camp during the 2026 Camp Season, and (B) re-enroll Campers who attended Camp during the 2026 Camp Season for the 2027 Camp Season, except to the extent any of the foregoing would no longer be age-appropriate; (iii) not refuse attendance to any prospective Camper who is willing to pay full Tuition; and (iv) utilize the same techniques and methods to enroll prospective campers for the 2026 Camp Season, such as guided tours for all prospective Campers and their families who request them, discounts for prospective Campers, if any, promotions and other means traditionally employed by Seller.

**Section 6.11 Accounts Receivable**. Sellers shall use all amounts collected on the Sellers' Accounts Receivable from the Petition Date through the Closing Date solely to fund the expenses

of the Camp Business incurred from and after the Petition Date in accordance with the budget approved by the Bankruptcy Court in the Bankruptcy Cases in connection with the DIP Facility.

## ARTICLE VII.
## TAX MATTERS

**Section 7.01 Transfer Taxes**. All Transfer Taxes shall be allocated as set forth in Section 2.08. The party required by applicable Law to file any Tax Return with respect to any Transfer Taxes shall timely file such Tax Return, and the other party shall cooperate with such filing party as reasonably requested. All real property and school taxes and all utilities shall be pro-rated as of the Closing Date, with the Sellers obligated to pay all amounts which accrue on or before the Closing Date and the Buyer obligated to pay all amounts which accrue after the Closing Date; provided, however, to the extent that the Sellers operate the Camp Business in the ordinary course and in accordance with the budget approved by the Bankruptcy Court in connection with the DIP Facility and nevertheless have insufficient cash on hand on the Closing Date to pay their share of such amounts, such amounts in excess of the cash on hand will become the obligation of the Buyer.

**Section 7.02 Cooperation on Tax Matters**. After the Closing, Sellers and Buyer agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit, or proceeding relating to any Tax.

## ARTICLE VIII.
## CONDITIONS TO CLOSING

**Section 8.01 Conditions to Obligations of All Parties**. The obligation of each Party hereto to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by both Sellers and Buyer) of each of the following conditions as of the Closing:

(a) **No Injunction**. No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Law or Order that enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(b) **Sale Order**. The Bankruptcy Court shall have entered the Sale Order, the Sale Order shall be in full force and effect, not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent, and the Sale Order shall have become a Final Order; provided, however, that with the written consent of both Sellers and Buyer, the Parties may agree to waive the condition that the Sale Order has become a Final Order, provided that the Sale Order is not the subject of a stay.

**Section 8.02 Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of each of the following additional conditions as of the Closing:

(a) **Representations**. (i) The representations and warranties of Sellers set forth in Section 4.01 (*Organization and Good Standing*) and Section 4.02 (*Authorization; Enforceability*) shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date), and (ii) the other representations and warranties of Sellers set forth in Article IV shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications set forth therein) as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct as of such date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b) **Performance of Covenants**. Sellers shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Sellers under this Agreement at or prior to the Closing.

(c) **No Material Adverse Effect**. Since the date hereof, there shall not have occurred any Material Adverse Effect.

(d) **Closing Deliveries**. Sellers shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.02.

(e) **Bid Procedures Order**. The Bankruptcy Court shall have entered the Bid Procedures Order, the Bid Procedures Order shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent, and the Bid Procedures Order shall have become a Final Order.

**Section 8.03 Conditions to Obligations of Sellers**. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Sellers) of each of the following additional conditions as of the Closing:

(a) **Representations**. The representations and warranties of Buyer set forth in Article V shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date);

(b) **Performance of Covenants**. Buyer shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Buyer under this Agreement at or prior to the Closing.

(c) **Closing Deliveries**. Buyer shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.03.

## ARTICLE IX.
## TERMINATION

**Section 9.01 Termination**. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a) by the mutual written consent of Buyer and Sellers;

(b) by either Buyer or Sellers, upon written notice to the other party, if the Closing shall not have occurred on or before the earlier of October 30, 2026 or the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.01(b) shall not be available to any party whose failure to fulfill any of its obligations hereunder has been the principal cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c) by Buyer, upon written notice to Sellers, if Sellers' representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.02(a) would not be satisfied, or if Sellers shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.02(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Buyer to Sellers;

(d) by Buyer, upon written notice to Sellers, if there shall have occurred a Material Adverse Effect;

(e) by Sellers, upon written notice to Buyer, if any of Buyer's representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.03(a) would not be satisfied, or if Buyer shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.03(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Sellers to Buyer;

(f) by Sellers, upon written notice to Buyer if, following completion of the Auction, Sellers enter into a definitive agreement with respect to a Qualified Bid that constitutes the Successful Bid under the Bid Procedures Order;

(g) by either Buyer or Sellers, upon written notice to the other parties, if any court of competent jurisdiction or other Governmental Authority shall have issued an Order permanently enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable;

(h) by either Buyer or Sellers, upon written notice to the other parties, if the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if a trustee is appointed in the Bankruptcy Cases; or

(i) by either Buyer or Sellers, upon written notice to the other party, if the Bankruptcy Court shall have entered an Order authorizing Sellers to consummate an Alternative Transaction with a Person other than Buyer.

**Section 9.02 Effect of Termination.**

(a) In the event of termination of this Agreement pursuant to Section 9.01, this Agreement shall become void and of no effect, without any liability or obligation on the part of

any party hereto (or any of their respective Affiliates, officers, directors, employees, agents, or representatives), except that (i) the provisions of this Section 9.02 (*Effect of Termination*), Section 9.03 (*Remedies*), and Article X (*General Provisions*) shall survive any termination of this Agreement, and (ii) no such termination shall relieve any party from liability for any willful breach of this Agreement or fraud.

(b) In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated other than (i) by Sellers pursuant to Section 9.01(b) (if termination pursuant to Section 9.01(b) would be unavailable to Buyer) or Section 9.01(e) or (ii) pursuant to Section 9.01(a), then Sellers (jointly and severally) shall pay Buyer by wire transfer of immediately available funds within ten (10) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of its counsel and financial advisor) incurred by Buyer in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement ("Expense Reimbursement"), which amount shall not exceed 1.0% of the Purchase Price. The Expense Reimbursement shall be treated as an administrative expense in the Bankruptcy Cases under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Expense Reimbursement, if payable pursuant to this Section 9.02(b), shall be in addition to the return of the Deposit and payment of the Breakup Fee (as defined below), in each case, to the extent payable to Buyer pursuant to the terms hereof.

(c) In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Sellers (jointly and severally) shall pay to Buyer a break-up fee in an amount equal to 3.0% of the Purchase Price (the "Breakup Fee") to an account designated by Buyer in writing to Sellers, in the event that (i) this Agreement is terminated pursuant to Section 9.01(f) or Section 9.01(i) and Sellers consummate an Alternative Transaction, or (ii) this Agreement is terminated by Buyer or Sellers pursuant to Section 9.01(b), Section 9.01(c) or Section 9.01(d) and Sellers consummate an Alternative Transaction (solely in the case of this clause (ii), at any time within six (6) months following the termination of this Agreement). The Breakup Fee shall be due and payable on the first date on which any such Alternative Transaction described in the foregoing clause (i) or clause (ii) is consummated. The Breakup Fee shall be treated as an administrative expense in the Bankruptcy Cases under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Breakup Fee, if payable pursuant to this Section 9.02(c), shall be in addition to the return of the Deposit and payment of the Expense Reimbursement, in each case, to the extent payable to Buyer pursuant to the terms hereof.

(d) Each of the Parties acknowledges and agrees that the agreements contained in this Section 9.02 are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Expense Reimbursement and/or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e) Pursuant to the Bid Procedures Order, the claim of Buyer in respect of the Expense Reimbursement and/or the Breakup Fee is and constitutes an allowed administrative expense claim against Sellers under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Cases.

**Section 9.03 Remedies.**

(a) In the event that this Agreement is terminated by Sellers pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, or in the event that Buyer fails to consummate the Closing when all conditions to Buyer's obligations to close have been satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing), Sellers' sole and exclusive remedy (except in the case of fraud or willful misconduct) shall be to retain the Deposit as liquidated damages. The parties acknowledge that the actual damages to Sellers resulting from such breach or failure would be difficult to ascertain, and the Deposit constitutes a reasonable estimate of such damages.

(b) In the event that this Agreement is terminated other than pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, and Buyer is entitled to the return of the Deposit pursuant to Section 2.07(c), the return of the Deposit shall constitute the sole and exclusive remedy of Buyer against Sellers (except in the case of fraud or willful misconduct).

(c) Notwithstanding anything to the contrary herein, in no event shall any party be liable to any other party for any punitive, exemplary, special, incidental, consequential, or indirect damages, including lost profits or loss of business opportunity, in connection with this Agreement or the Transaction.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.01 Survival**. The representations, warranties, covenants, and agreements contained in this Agreement shall not survive the Closing and shall terminate at the Closing, except for (a) covenants and agreements that by their terms contemplate performance after the Closing, which shall survive until fully performed, and (b) claims based on fraud or willful misconduct.

**Section 10.02 Notices**. All notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be deemed duly given (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (c) when sent by email (with confirmation of transmission) if sent during normal business hours of the recipient (and if not sent during normal business hours, then on the next Business Day), or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, in each case addressed to the parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

if to Buyer, then to:

Friends of Chateaugay LLC, a Delaware
limited liability company,
236 7th Avenue, Apt. 4
Brooklyn, NY 11215

| | |
|---|---|
| | Attention: George Mitchell Goldman<br>Email: mitch@chateaugay.com |
| with a copy (which shall not constitute notice) to: | Jeffer Mangels & Mitchell, LLP<br>1900 Avenue of the Stars, 7th Floor<br>Los Angeles, CA 90067<br>Attention: David Ma<br>Email: dma@jeffer.com |
| if to Sellers, then to: | Asad Ravid<br>Email: aravid@circleinv.com |
| with a copy (which shall not constitute notice) to: | Cole Schotz P.C.<br>25 Main Street<br>Hackensack, New Jersey 07601<br>Attention: Roger Iorio, Esq.<br>Email: riorio@coleschotz.com |

**Section 10.03 Interpretation**. When a reference is made in this Agreement to an Article, Section, Exhibit, or Schedule, such reference shall be to an Article, Section, Exhibit, or Schedule of this Agreement unless otherwise indicated. The words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "or" is not exclusive. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

**Section 10.04 Severability**. If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement, and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal, or unenforceable, had never been contained herein.

**Section 10.05 Entire Agreement**. This Agreement, together with all Exhibits and Schedules hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

**Section 10.06 Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other party; provided, however, that Buyer may assign any or all of its rights and obligations hereunder to any Affiliate of Buyer without the prior consent of Sellers, provided that Buyer shall remain liable for all of its obligations hereunder following any such assignment.

**Section 10.07 Amendment and Waiver**. This Agreement may not be amended except by an instrument in writing signed by Buyer and Sellers. Any party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto, or (c) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. No failure or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**Section 10.08 Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Sellers and Buyer hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Cases have been closed, the courts of the State of New Jersey. Sellers and Buyer each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT, OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION.

**Section 10.09 Specific Performance**. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, the parties agree that, prior to the termination of this Agreement, each party shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court (or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, the state and federal courts located in the State of New Jersey), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law, or inequitable for any reason.

**Section 10.10 Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.11 No Third-Party Beneficiaries**. Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal

or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.12 "As Is, Where Is" Transaction**. Buyer acknowledges that the Acquired Assets are being sold on an "AS IS, WHERE IS" basis, with all faults, and Buyer has relied solely on its own investigation, analysis, and evaluation of the Acquired Assets in making its decision to enter into this Agreement. Buyer further acknowledges that, except for the representations and warranties expressly set forth in Article IV, Sellers have not made, and Sellers hereby expressly disclaim, any representations or warranties of any kind or nature, express or implied, at common law, by statute, or otherwise, relating to the Acquired Assets or the transactions contemplated hereby, and Buyer hereby waives any claims related to the condition of the Acquired Assets or the accuracy or completeness of any information provided or made available to Buyer.

**Section 10.13 No Successor Liability**. Except as expressly provided herein, Buyer does not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability. Buyer is not, and shall not be, a successor to Sellers by reason of any theory of law or equity.

***[Signature Pages Follow]***

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**Friends of Chateaugay LLC**

DocuSigned by:
By:____________________
F2C6D8175C3140B...
Name: George Mitchell Goldman
Title: Manager

**SELLERS:**

**Chateaugay Campco LLC**

Signed by:
By:____________________
FB125673327C466...
Name: Assaf Ravid
Title: Chief Restructuring Officer

**Chateaugay Landco LLC**

Signed by:
By:____________________
FB125673327C466...
Name: Assaf Ravid
Title: Chief Restructuring Officer

# SCHEDULE 2.01(A)

## ASSUMED CONTRACTS LIST

| Counterparty | Agreement | Cure Amount |
|---|---|---|
| Maurel Media | CMO Retainer Agreement | $0.00 |
| Vestals Gap Ventures | Challenge Course Inspection Contract | $0.00 |
| Vestals Gap Ventures | Adventure Course Instructor Agreement | $0.00 |
| Maurel Media | Agreement for Brand Bible Completion | $0.00 |
| Maurel Media | Charter Bus Agreement | $0.00 |
| Brown Coach | Charter Bus Agreement | $0.00 |
| Brown Coach | Charter Bus Agreement | $0.00 |
| Brown Coach | Charter Bus Agreement | $0.00 |
| Trublue LLC | Equipment Agreement | $0.00 |
| Computer Rents Inc. | Technology Rental | $0.00 |
| RAC Store | Equipment Rental Agreement | $0.00 |
| RAC Store | Equipment Rental Agreement | $0.00 |
| H&H | Service Agreement | $0.00 |
| Pond Hill Ranch | Equine & Equipment Lease Agreement | $0.00 |
| Pond Hill Ranch | Equine & Equipment Lease Agreement | $0.00 |
| Commission Scolaire English Montreal | Parking Agreement | $0.00 |
| Andean Hillstarec | Ecuadorian & Galapagos Adventure Agreement | $0.00 |
| Fleetpool USA | Vehicle Rental Agreement | $14,011.00 |

| | | |
|---|---|---|
| **Premier Coach Co., Inc.** | **Charter Bus Agreement** | **$0.00** |
| **Premier Coach Co., Inc.** | **Charter Bus Agreement** | **$0.00** |
| **Premier Coach Co., Inc.** | **Charter Bus Agreement** | **$0.00** |
| **New Testament Church** | **Rental Agreement** | **$0.00** |
| **Camp America** | **Letter of Agreement** | **$0.00** |
| **Wild Packs Summer Camps** | **Host Camp Agreement** | **$0.00** |
| **Camp Leaders** | **Camp Program Agreement** | **$0.00** |
| **Camp Counselors USA** | **Letter of Agreement** | **$0.00** |
| **Council on International Educational Exchange** | **Camp Agreement** | **$0.00** |
| **InterExchange** | **Staffing Agency Agreement** | **$1,945.00** |
| **1199SEIU/Employer Child Care Corporation** | **Employment Staffing Agreement** | **$0.00** |

# EXHIBIT A

## FORM OF BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, _________________ (“**Sellers**”), do hereby grant, bargain, transfer, sell, assign, convey and deliver to ______________________ (“**Buyer**”), all of their rights, title, and interest in and to the Acquired Assets, as such term is defined in the Asset Purchase Agreement, dated as of ___________________ (the “**Purchase Agreement**”), by and among Sellers and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Sellers make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Each Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Sellers will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Sellers have duly executed this Bill of Sale as of _______, 2026.

[SELLERS]

By_____________________

Name:

Title:

**DISCLOSURE SCHEDULES**

[To be attached.]