**Exhibit "74"**

APPRAISAL REPORT

REAL ESTATE APPRAISAL




OF

**APR**

4800 US Highway 280, Opelika
Lee County
Alabama 36801

As of
June 11, 2025

**Prepared For**
Newtek Bank
1981 Marcus Ave 130
Lake Success, NY 11042

Client File:
Newtek Bank File No: [redacted]6246

**Prepared By**
ATLAS VALUATION, LLC
G. Scott Lakas, MAI
Valerie Spicuzza

File Name:
3879

atlas VALUATION

ATLAS VALUATION, LLC

145 East Magnolia Avenue, Suite 202
Auburn, AL 36830

334-737-6993
Fax: 334-737-6996
admin@atlasvaluation.com
www.atlasvaluation.com

June 18, 2025

Newtek Bank
1981 Marcus Ave 130
Lake Success, NY 11042

**RE: APR**
4800 US Highway 280, Opelika, Alabama 36801

Atlas Valuation LLC File No: 3879
Newtek Bank File No: [redacted]6246

Newtek Bank:

Atlas Valuation LLC is proud to present the appraisal that satisfies the agreed upon scope of work with Newtek Bank.

The subject property, located at 4800 US Highway 280, Opelika, AL, is an industrial, research and development property with improvements located in the Opelika submarket.

The property features 47,073 square feet of industrial space and 24,542 square feet of office space; as such, the office space represents 34.3% of the total square footage. The subject also features numerous grade-level roll-up doors and a few dock doors.

The intended use of this appraisal report is mortgage-related financing.

The purpose of this appraisal is to develop an opinion of the As-Is (Leased Fee Interest). An Insurable Replacement Cost Estimate has also been included within the report. The following table conveys the final opinion of value that is developed in this appraisal:

| MARKET VALUE CONCLUSION | | | | |
|---|---|---|---|---|
| VALUATION SCENARIO | INTEREST APPRAISED | EXPOSURE TIME | EFFECTIVE DATE | VALUE |
| As-Is | Leased Fee Interest | Three to Six Months | June 11, 2025 | $7,825,000 |
| ADDITIONAL CONCLUSIONS | | | | |
| Insurable Replacement Cost Estimate | | | | $9,070,000 |

This report conforms to the current Uniform Standards of Professional Appraisal Practice (USPAP), and the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) standards.

**Extraordinary Assumptions**

No Extraordinary Assumptions were made for this assignment.

**Hypothetical Conditions**

No Hypothetical Conditions were made for this assignment.

If there are any specific questions or concerns regarding the attached appraisal report, or if Atlas Valuation LLC can be of additional assistance, please contact the individuals listed below.

Respectfully Submitted,

**ATLAS VALUATION LLC**

G. Scott Lakas, MAI
President
Certified General Real Estate Appraiser
Alabama License No. G00914
Expiration Date 9/30/2025
+1 (334) 737-6993
scott@atlasvaluation.com

Valerie Spicuzza
Associate Appraiser
Trainee Real Estate Appraiser
Alabama License No.003130
Expiration Date 9/30/2025
334-387-6915
valerie@atlasvaluation.com

# TABLE OF CONTENTS

**LETTER OF TRANSMITTAL**

**INTRODUCTION**
Executive Summary 5
Subject Property Photographs 8
Identification of Appraisal Assignment 17
Scope of Work 20

**DESCRIPTIONS & EXHIBITS**
Regional Area Analysis 22
Local Area Analysis 25
Site Description 35
Exhibits 37
Taxes & Assessment 41
Zoning 42
Improvement Description 46
Market Analysis 48
Highest & Best Use Analysis 52
As Vacant Analysis 52
As-Improved Analysis 53

**VALUATION METHODS**
Sales Comparison Approach 56
Sales Approach Reconciliation 65
Income Capitalization Approach 66
Capitalization Rate Analysis 78
Income Approach Conclusion 82
Income Approach Reconciliation 82
Reconciliation of Value Conclusions 83
Certification 84

**ADDENDA** **88**
Qualifications of Appraiser & Appraiser License
Qualifications of Company
Glossary

# EXECUTIVE SUMMARY

| | PROPERTY IDENTIFICATION | |
|---|---|---|
| Name | APR | |
| Property | Industrial - Research and Developm | |
| Address | 4800 US Highway 280 | |
| City, State Zip | Opelika, Alabama 36801 | |
| County | Lee County | |
| MSA | Auburn-Opelika, AL MSA | |
| Market / Submarket | Auburn/Opelika MSA / Opelika | |
| Geocode | 32.656745,-85.453247 | |
| Census Tract | 01-081-040901 | |

| | SITE DESCRIPTION | |
|---|---|---|
| Number of Parcels | 1 | |
| Assessor Parcel Number | 43-09-02-09-0-000-003.005 | |
| Land Area | Square Feet | Acres |
| Usable | 500,940 | 11.50 |
| Total | 500,940 | 11.50 |
| Zoning | General Commercial, Gateway Corridor - Primary Overlay District (C3, GC-P) | |
| Shape | Generally Rectangular | |
| Topography | Steep above street grade | |
| Flood Zone | Zone X (Unshaded) | |
| Seismic Zone | Low Risk | |

| | IMPROVEMENT DESCRIPTION |
|---|---|
| Tenancy | Single-Tenant Occupied By A Third Party Tenant |
| Net Rentable Area (NRA) | 71,615 |
| Gross Building Area (GBA) | 71,615 |
| Ground Floor SF | 71,615 |
| Units | 1 |
| Total Buildings | 1 |
| Floors | 2 |
| Year Built | 2007 |
| Actual Age | 18 Years |
| Effective Age | 15 Years |
| Economic Life | 50 Years |
| Remaining Useful Life | 35 Years |
| Land To Building Ratio | 6.99 : 1 |
| Site Coverage Ratio | 14.3% |
| Parking | 1.2 / 1,000 SF NRA |

| | QUALITATIVE ANALYSIS |
|---|---|
| Site Quality | Good |
| Site Access | Good |
| Site Exposure | Good |
| Site Utility | Good |
| Building Quality | Good |
| Building Condition | Good |
| Building Appeal | Good |

## HIGHEST & BEST USE

| | |
|---|---|
| Proposed Construction | No |
| As Vacant | Commercial |
| As Improved | As-is |

## EXPOSURE & MARKETING TIME

| | |
|---|---|
| Exposure Time | Three to Six Months |
| Marketing Time | Three to Six Months |

## INVESTMENT INDICATORS

| | | |
|---|---|---|
| Current Occupancy | 100.00% | |
| Stabilized Occupancy / Stabilized Vacancy & Credit Loss | 95.00% | 5.0% |
| Expense Structure | Triple Net | |
| Number of Commercial Tenants in Occupancy | 1 | |
| Lease Term Remaining for Commercial Tenants | 3.1 Years | |
| Total Contract Rent for Commercial Tenants | $567,000 | $7.92/SF |
| Total Market Rent (Occupied Space) | $2 | |
| Annual Rent Increases | 0.00% | |
| Expense Ratio (Expenses/EGR) | 17.94% | |
| Direct Capitalization NOI | $508,619 | $7.10PSF |
| Capitalization Rate (OAR) Conclusion | 6.50% | |

## VALUE CONCLUSION

| VALUATION SCENARIOS | AS-IS |
|---|---|
| Interest | Leased Fee Interest |
| Exposure Time | Three to Six Months |
| Effective Date | June 11, 2025 |
| Site Value | Not Presented |
| Cost Approach | Not Presented |
| Sales Comparison Approach | $7,875,000 |
| Income Capitalization Approach | $7,825,000 |
| FINAL VALUE CONCLUSION | $7,825,000 |
| ADDITIONAL CONCLUSIONS | |
| Insurable Replacement Cost Estimate | $9,070,000 |

# AERIAL PHOTOGRAPH



# SUBJECT PROPERTY PHOTOGRAPHS



SE Corner of Improvements


SE Corner of Improvements


SE Corner of Improvements


SE Corner of Improvements


View West in between the two portions of the building


Rear of Front Portion of Building



SE Corner of Improvements




Front of Improvements



Parking Lot



Building Entrances in Open U-Shaped Area In Between the Building



Building Entrances in Open U-Shaped Area In Between the Building



Building Entrances in Open U-Shaped Area In Between the Building



SE Corner of Improvements



View West in between the two portions of the building



Eastern Side of Improvements



NE Corner of Improvements



Northern Side of Improvements



Northern Side of Improvements


NW Corner of Improvements


Northern Side of Improvements


SW Corner of Improvements


Western Side of Improvements


SW Corner of Improvements


Parking Lot

## SUBJECT PROPERTY PHOTOGRAPHS (CONTINUED)


Lobby


Lobby


Restrooms


Interior Workshop



Interior Workshop


Interior Workshop



Interior Workshop



Hallway



Offices



Offices



Offices



Interior Workshop


Interior Workshop


Interior Workshop


Interior Workshop


Interior Workshop


Interior Workshop


Interior Workshop



Interior Workshop



Restroom



Interior Workshop



Interior Workshop



Interior Workshop



Lobby



Lobby



Storage



Interior Workshop




Interior Workshop

## PROPERTY IDENTIFICATION

The subject property, located at 4800 US Highway 280, Opelika, AL, is an industrial, research and development property with improvements located in the Opelika submarket.

The property features 47,073 square feet of industrial space and 24,542 square feet of office space; as such, the office space represents 34.3% of the total square footage. The subject also features numerous grade-level roll-up doors and a few dock doors.

The assessor parcel Number is: 43-09-02-09-0-000-003.005.

## LEGAL DESCRIPTION

PART NW4 SEC 9 T19B R26E: COM INT W LINE & NE ROW US HWY 280; SE 490'S ON ROW TO BEG; SE 1025'S ON ROW; N 860'S; W 940'S; S 500'S TO POB. ABATEMENT EXP. 2018 COLL YR

## CLIENT IDENTIFICATION

The client of this specific assignment is Newtek Bank.

## INTENDED USE & INTENDED USERS

The intended use of this appraisal is to assist the client with a potential loan that would be collateralized by this asset. Newtek Bank, National Association and its affiliates and subsidiaries are the only intended users of this report.

## PURPOSE

The purpose of this appraisal is to develop an opinion of the As-Is (Leased Fee Interest).

## PERSONAL PROPERTY & BUSINESS INTANGIBLE

There is no personal property (FF&E) included in this valuation.

## PROPERTY AND SALES HISTORY

### Current Owner

The subject title is currently recorded in the name of 4800 U SH 280 Real Estate LLC who acquired title to the property on July 19, 2017 for the improvements for $7,000,000, as recorded in the Lee County Deed Records, Document Number 2518-622.

### Three-Year Sales History

According to county records there has been no transfer of ownership for the subject property in the past three years and there is no known pending sale or listing of the subject.

## EXPOSURE & MARKETING TIME

Marketing time and exposure time are both influenced by price. That is, a prudent buyer could be enticed to acquire the property in less time if the price were less. Hence, the time span cited below coincides with the value opinion(s) formed herein.

USPAP Standard rule 1-2(c)(iv) requires an opinion of exposure time, not marketing time, when the purpose of the appraisal is to estimate market value. In the recent past, the volume of competitive properties offered for sale, sale prices, and vacancy rates have fluctuated little. Sale concessions have not been prevalent. The following information is used to estimate exposure time and marketing time for the subject:

| EXPOSURE & MARKETING TIME | | | | | | |
|---|---|---|---|---|---|---|
| SOURCE | | YEAR/QUARTER | MONTHS RANGE | | | AVERAGE |
| National Warehouse Market | PwC | | | | | |
| Current Quarter | | 2025 Q2 | 0.0 | to | 12.0 | 4.3 |
| Previous Quarter | | 2025 Q1 | 0.0 | to | 12.0 | 4.0 |
| Four Quarters Prior | | 2024 Q2 | 1.0 | to | 12.0 | 4.0 |
| Improved Sales | | | 5.2 | to | 5.2 | 5.2 |
| General Trend | | | 2.6 | to | 7.9 | 5.1 |
| **OVERALL AVERAGE** | | | | | | **4.9** |
| Exposure Period Conclusion | | | | | | Three to Six Months |
| Marketing Time Conclusion | | | | | | Three to Six Months |

### Exposure Time Conclusion

The subject is a industrial (research and development) use totaling 71,615 SF (NRA) on 11.5000-acres (500,940 SF) located at 4800 US Highway 280 in Opelika, Lee County, Alabama. Considering these factors, a reasonable estimate of exposure time for the subject As-Is (Leased Fee Interest) is three to six months.

### Marketing Time Conclusion

A marketing time estimate is a forecast of a future occurrence. History should be considered as a guide, but anticipation of future events & market circumstances should be the prime determinant. Overall market conditions are expected to remain stable, so a marketing time of three to six months is predicted for the subject.

## DEFINITION OF MARKET VALUE

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming that the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

## PROPERTY RIGHTS APPRAISED

The property rights appraised constitute the leased fee interest.

### Leased Fee Interest

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.[2]

[1] Office of Comptroller of the Currency (OCC), Title 12 of the Code of Federal Regulation, Part 34, Subpart C -Appraisals, 34.42 (g); Office of Thrift Supervision (OTS), 12 CFR 564.2 (g); This is also compatible with the FDIC, FRS and NCUA definitions of market value.

[2] The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022

## VALUE SCENARIOS

**As-Is Market Value**

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.[3]

[3] The Dictionary of Real Estate Appraisal, Seventh Edition, Appraisal Institute, Chicago, Illinois, 2022

# SCOPE OF WORK

The scope of work for this appraisal assignment is outlined below:

- The appraisal analyzes the regional and local area profiles including employment, population, household income and real estate trends. The local area was inspected to consider external influences on the subject.
- The appraisal analyzes legal and physical features of the subject including site size, improvement size, flood zone, seismic zone, site zoning, easements, encumbrances, site access and site exposure.
- The appraisal includes an industrial market analysis for the Auburn/Opelika MSA market and Opelika submarket using vacancy, absorption, supply and rent data. Conclusions were drawn for the subject's competitive position given its physical and locational features, current market conditions and external influences.
- The appraisal includes a Highest and Best Use analysis and conclusions have been completed for the highest and best use of the subject property As Vacant and As Improved. The analysis considered legal, locational, physical and financial feasibility characteristics of the subject site and existing improvements.
- In selecting applicable approaches to value, the appraisers considered the agreed upon appraisal scope and assessed the applicability of each traditional approach given the subject's characteristics and the intended use of the appraisal. As a result, this appraisal developed Sales Comparison and Income (Direct Capitalization) Approaches. The values presented represent the As-Is (Leased Fee Interest). An Insurable Replacement Cost Estimate has also been included within the report.
- The assignment was prepared as an Appraisal Report in accordance with USPAP Standards Rules 2, with the analysis stated within the document and representing a summarized level of analysis.
- The authors of this report are aware of the Competency Rule of USPAP and meet the standards.

## ASSISTANCE PROVIDED

No one provided real property appraisal assistance to the individuals signing this report.

## SOURCES OF INFORMATION

The following sources were contacted to obtain relevant information:

| INFORMATION PROVIDED | |
|---|---|
| Property Assessment & Tax | Lee County Assessor |
| Zoning & Land Use Planning | City of Opelika Zoning |
| Site Size | Lee County Assessor |
| Building Size | Lee County Assessor |
| Supply & Demand | CoStar |
| Flood Map | FEMA |
| Demographics | STDB On-Line |
| Comparable Information | MLS \| Public Records \| Confirmed by Local Agents |
| Legal Description | Assessor |
| Lease Documents | Client |

The lack of the unavailable items could affect the results of this analysis. As part of the general assumptions and limiting conditions, the subject is assumed to have no adverse easements, significant items of deferred maintenance, or be impacted by adverse environmental conditions.

## SUBJECT PROPERTY INSPECTION

| PROPERTY INSPECTION | | | | |
|---|---|---|---|---|
| APPRAISER | INSPECTED | EXTENT | DATE | ROLE |
| G. Scott Lakas, MAI | Yes | Interior & Exterior | June 11, 2025 | Primary Appraiser |
| Valerie Spicuzza | No | N/A | June 11, 2025 | Appraiser |

# REGIONAL AREA MAP



## INTRODUCTION

In order to understand the subject's position in the area or region, we have undertaken a brief analysis in order to determine how trends—both historical and projected—in population, employment, personal income, consumer spending, and housing impact supply and demand and influence the subject's area directly and indirectly. This analysis first begins on a broader spectrum, and without respect to the subject itself, and is highlighted in the Regional Area Analysis. Secondly, we undertake a more narrowly focused study of the aforementioned attributes as they relate directly to the subject and the subject's neighborhood. This discussion is presented in the forthcoming Local Area Analysis.

### REGIONAL AREA ANALYSIS

The subject property is located in Opelika, Alabama. The map presented on the previous page illustrates the subject property location relative to the Auburn-Opelika, AL MSA metropolitan area.

The subject is located within the Auburn-Opelika MSA and located about five miles from Auburn University, which employs 5,500 people. East Alabama Medical Center employs 3,200 people. The third and fourth largest employers are the Lee County Schools System and Auburn City Schools.

The Auburn-Opelika MSA is located directly in-between two major automotive manufacturers, which are Kia (located in West Point, GA) and Hyundai (Montgomery, AL). Due to the central location of both plants, Auburn-Opelika has become a manufacturing hub to many supportive industries, which include: Mando America (brakes), Briggs and Stratton (gasoline engines), Daewon (automotive suspension), Borbet (wheels), CV Holdings (plastic molding), Seohan Auto USA (axels), SCA (plastics), etc. There are numerous American and Korean automotive manufacturers servicing automotive companies in the region.

## UNEMPLOYMENT

The following graphs charts the trailing 18 months and trailing 10 years unemployment rate for the United States, South Region, Alabama, Auburn-Opelika, AL MSA, and Lee County.




| | Nov | Dec | Jan | Feb | Mar | 2024 Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | 2025 Apr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nation | 3.7% | 3.8% | 3.7% | 3.9% | 3.9% | 3.9% | 4.0% | 4.1% | 4.2% | 4.2% | 4.1% | 4.1% | 4.2% | 4.1% | 4.0% | 4.1% | 4.2% | 4.2% |
| Region | 3.2% | 3.2% | 3.6% | 3.7% | 3.5% | 3.1% | 3.4% | 4.0% | 4.1% | 4.0% | 3.6% | 3.7% | 3.7% | 3.4% | 3.8% | 3.9% | 3.8% | 3.4% |
| State | 2.5% | 2.6% | 3.2% | 3.2% | 2.8% | 2.4% | 2.4% | 3.3% | 3.4% | 3.5% | 3.1% | 3.2% | 3.3% | 3.2% | 3.4% | 3.4% | 3.4% | 2.7% |
| Area | 2.2% | 2.3% | 2.9% | 2.9% | 2.7% | 2.3% | 2.3% | 3.2% | 3.7% | 3.5% | 3.0% | 3.0% | 3.1% | 2.8% | 3.0% | 3.1% | 3.2% | 2.6% |
| County | 2.1% | 2.2% | 2.8% | 2.8% | 2.6% | 2.2% | 2.3% | 3.1% | 3.5% | 3.4% | 2.9% | 2.9% | 3.0% | 2.7% | 2.9% | 3.0% | 3.1% | 2.4% |




| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| Nation | 5.3% | 4.9% | 4.4% | 3.9% | 3.7% | 8.1% | 5.3% | 3.6% | 3.6% | 4.0% |
| Region | 5.3% | 4.9% | 4.3% | 3.8% | 3.5% | 7.3% | 4.8% | 3.4% | 3.3% | 3.7% |
| State | 6.1% | 5.8% | 4.5% | 3.9% | 3.2% | 6.4% | 3.3% | 2.5% | 2.5% | 3.1% |
| Area | 5.5% | 5.2% | 4.1% | 3.6% | 2.9% | 5.8% | 2.9% | 2.3% | 2.3% | 3.0% |
| County | 5.3% | 4.9% | 3.9% | 3.4% | 2.8% | 5.4% | 2.6% | 2.2% | 2.2% | 2.8% |

## EMPLOYMENT

The following chart shows the trailing 10 years employment for the state of Alabama, Auburn-Opelika, AL MSA, and Lee County.

STATE & REGIONAL EMPLOYMENT

| YEAR | STATE | % CHG. | AREA | % CHG. | COUNTY | % CHG. |
|---|---|---|---|---|---|---|
| 2015 | 2,040,087 | 0.9% | 74,985 | (0.2%) | 67,608 | (0.0%) |
| 2016 | 2,069,474 | 1.4% | 81,461 | 7.9% | 73,790 | 8.4% |
| 2017 | 2,107,659 | 1.8% | 83,885 | 2.9% | 76,139 | 3.1% |
| 2018 | 2,148,823 | 1.9% | 85,777 | 2.2% | 78,120 | 2.5% |
| 2019 | 2,191,967 | 2.0% | 87,802 | 2.3% | 80,059 | 2.4% |
| 2020 | 2,113,768 | (3.7%) | 84,331 | (4.1%) | 77,003 | (4.0%) |
| 2021 | 2,169,700 | 2.6% | 87,362 | 3.5% | 80,088 | 3.9% |
| 2022 | 2,212,356 | 1.9% | 89,808 | 2.7% | 82,590 | 3.0% |
| 2023 | 2,246,436 | 1.5% | 92,228 | 2.6% | 85,004 | 2.8% |
| 2024 | 2,274,568 | 1.2% | 93,748 | 1.6% | 86,408 | 1.6% |
| **CAGR** | **1.2%** | - | **2.5%** | - | **2.8%** | - |

Source: U.S. Bureau of Labor Statistics www.bls.gov

# LOCAL AREA MAP



## LOCAL AREA ANALYSIS INTRODUCTION

The subject property is located along Highway 280 in the Opelika submarket. The subject is located northeast of Auburn and on the northwest side of Opelika. The immediate area of the subject is characterized by undeveloped land, residential uses, the Opelika Wastewater Treatment Facility, and a gas station with commercial uses located closer to town. About a mile southeast on Highway 280 is the proposed Opelika Innovation and Technology Park. About five miles southeast on Highway 280 is Tiger Town, Opelika's outdoor retail development that is comprised mostly of highway commercial retailers such as The Home Depot, Target, Best Buy, Kroger, Whataburger, LongHorn Steakhouse, and other regional stores.

### Demographics

The following information reflects the demographics for the subject's area.

LOCAL AREA DEMOGRAPHICS

| DESCRIPTION | 1 MILE | 3 MILE | 5 MILE | DESCRIPTION | 1 MILE | 3 MILE | 5 MILE |
|---|---|---|---|---|---|---|---|
| POPULATION TOTAL | | | | HOUSEHOLDS | | | |
| 2010 Census | 412 | 15,549 | 55,365 | 2010 Census | 146 | 6,401 | 22,751 |
| 2020 Census | 550 | 22,618 | 73,381 | 2020 Census | 182 | 9,242 | 29,109 |
| 2024 Estimate | 539 | 24,287 | 80,665 | 2024 Estimate | 194 | 9,922 | 32,008 |
| 2029 Projection | 563 | 25,942 | 87,186 | 2029 Projection | 202 | 10,546 | 34,604 |
| Δ 2010-2020 | 33.50% | 45.46% | 32.54% | Δ 2010-2020 | 24.66% | 44.38% | 27.95% |
| Δ 2020-2024 | (2.00%) | 7.38% | 9.93% | Δ 2020-2024 | 6.59% | 7.36% | 9.96% |
| Δ 2024-2029 | 4.45% | 6.81% | 8.08% | Δ 2024-2029 | 4.12% | 6.29% | 8.11% |
| Total Daytime Population | 366 | 24,199 | 90,287 | **HOUSEHOLDS BY INCOME (2024 ESTIMATE)** | | | |
| **HOUSING UNITS** | | | | <$15,000 | 15.5% | 12.6% | 16.8% |
| Total (2024 Estimate) | 205 | 10,614 | 35,058 | $15,000 - $24,999 | 1.0% | 6.1% | 10.1% |
| Owner Occupied | 68.8% | 42.5% | 43.1% | $25,000 - $34,999 | 2.1% | 7.1% | 6.8% |
| Renter Occupied | 25.9% | 51.0% | 48.2% | $35,000 - $49,999 | 6.7% | 12.8% | 9.7% |
| Vacant Housing Units | 5.4% | 6.5% | 8.7% | $50,000 - $74,999 | 5.2% | 17.2% | 15.8% |
| Total (2029 Projection) | 214 | 11,289 | 37,847 | $75,000 - $99,999 | 4.6% | 12.4% | 9.4% |
| Owner Occupied | 69.2% | 43.8% | 43.6% | $100,000 - $149,999 | 23.7% | 16.9% | 15.6% |
| Renter Occupied | 24.8% | 49.6% | 47.9% | $150,000 - $199,999 | 16.5% | 6.1% | 8.0% |
| Vacant Housing Units | 5.6% | 6.6% | 8.6% | $200,000+ | 24.7% | 8.8% | 7.9% |
| **AVERAGE HOUSEHOLD INCOME** | | | | **AVERAGE HOUSEHOLD SIZE** | | | |
| 2024 Estimate | $155,793 | $93,163 | $87,692 | 2024 Estimate | 2.78 | 2.41 | 2.37 |
| 2029 Projection | $175,851 | $105,977 | $100,516 | 2029 Projection | 2.79 | 2.43 | 2.38 |
| Δ 2024-2029 | 12.87% | 13.75% | 14.62% | Δ 2024-2029 | 0.36% | 0.83% | 0.42% |
| **MEDIAN HOUSEHOLD INCOME** | | | | **MEDIAN HOME VALUE** | | | |
| 2024 Estimate | $126,298 | $64,466 | $58,412 | 2024 Estimate | $454,000 | $284,514 | $310,034 |
| 2029 Projection | $139,043 | $74,290 | $66,475 | 2029 Projection | $527,778 | $332,567 | $366,298 |
| Δ 2024-2029 | 10.09% | 15.24% | 13.80% | Δ 2024-2029 | 16.25% | 16.89% | 18.15% |
| **PER CAPITA INCOME** | | | | **AVERAGE HOME VALUE** | | | |
| 2024 Estimate | $55,243 | $38,600 | $34,945 | 2024 Estimate | $484,220 | $325,150 | $354,665 |
| 2029 Projection | $62,128 | $43,756 | $40,015 | 2029 Projection | $527,196 | $389,727 | $426,192 |
| Δ 2024-2029 | 12.46% | 13.36% | 14.51% | Δ 2024-2029 | 8.88% | 19.86% | 20.17% |

Source: Sites To Do Business Online

### Population

The estimate provided by ESRI for the current 2024 population within the subject neighborhood's 3 mile radius is 24,287 representing a 7.38% change since 2020. ESRI's 2020 population estimate for the subject's 5 mile radius is 80,665, which represents a 9.93% change since 2020.

Looking forward, ESRI estimates that the population within the subject neighborhood's 3 mile radius is forecasted to change to 25,942 by the year 2029. As for the broader area, ESRI forecasts that the population within the subject's 5 mile radius will change to 87,186 over the next five years. The population estimates for

the next five years within the subject's 5 mile radius represents a 8.08% change as well as a 4.45% change within the subject's 1 mile radius for the same period.

**Households**

The estimates provided by ESRI indicate that the number of households within the subject neighborhood's 3 mile radius is 9,922, which is a 7.36% change since 2020. Within the subject's broader 5 mile radius, ESRI estimates that the number of households is 32,008, a 9.96% change over the same period of time.

By the year 2029, the estimates provided by ESRI indicate that the number of households within the subject neighborhood's 3 mile radius will change by 6.29% to 10,546 households. Additionally, ESRI's estimate for total households over the next five years within the subject's broader 5 mile radius indicates an expected change of 8.11% which will result in a total household estimate of 34,604.

Looking back, the number of households in the subject neighborhood's 3 mile radius changed 44.38% during the ten-year period of 2010 to 2020. Since then it has changed by 7.36%.

**Income**

Income estimates provided by ESRI for the subject neighborhood's 3 mile radius indicates that the median household income is $64,466 and that the average household income is $93,163. Further, the estimates provided by ESRI indicate that, for the subject's broader 5 mile radius the median household income is $58,412, and the average household income is $87,692. Given that there are reportedly 32,008 households in the subject's 5 mile radius, it is estimated that the local effective buying income is around $2,806,845,536.

## CONCLUSION

Based on our observation and the data provided by ESRI, it is perceived that the income and population demographics for the subject neighborhood exhibit above average characteristics in terms of reported population growth and income levels. As previously mentioned, the population growth for the subject's 3 mile radius has increased 7.38% since 2020 and based on the projections provided by ESRI, it is expected to continue to increase another 6.81% during the next 5 years. Lastly, we perceive that, since average household incomes are above the national average ($93,163, for the subject's 3 mile radius) and given that the area is well-populated (9,922 households in a 3 mile radius), developments like the subject should be adequately supported.

## SURROUNDING LAND USES

The following tables and maps highlight the development in and around the subject.

## LOCAL AREA OFFICE - THREE-MILE RADIUS

| CLASS | RBA | YEAR BUILT | PERCENT LEASED | PROPERTIES |
|---|---|---|---|---|
| A | 0 SF | - | - | 0 |
| B | 259,049 SF | 2003 | 97.2 | 45 |
| C | 172,221 SF | 1982 | 99.7 | 35 |
| TOTAL | 431,270 SF | 1996 | 95.8 | 84 |

Source: CoStar

## LARGEST OFFICE DEVELOPMENTS - THREE-MILE RADIUS




| PIN | NAME | ADDRESS, CITY | DIST TO SUBJ | RBA | BUILT | CLASS | %LEASED |
|---|---|---|---|---|---|---|---|
| A | | 2401 Village Professional Dr, Opelika | 2.6 mi | 18,509 | 2005 | B | 100 |
| B | Towne Center | 472 N Dean Rd, Auburn | 2.9 mi | 16,944 | 2000 | B | 92.56 |
| C | | 665 Opelika Rd, Auburn | 2.9 mi | 16,678 | 1960 | C | 100 |
| D | Pivotal Business Center | 2372 E University Dr, Auburn | 1.9 mi | 16,000 | 2023 | B | 88.13 |
| E | | 2201-B Executive Park Dr, Opelika | 2.3 mi | 15,100 | 2018 | B | 100 |
| F | | 1922 Professional Cir, Auburn | 1.7 mi | 14,398 | 2001 | B | 100 |
| G | | 778 N Dean Rd, Auburn | 2.4 mi | 14,000 | 2008 | B | 71.43 |
| H | | 2609 Village Professional Dr N, Opelika | 2.4 mi | 13,874 | 2006 | C | 100 |
| I | 890 N Dean Rd | 890 N Dean Rd, Auburn | 2.1 mi | 12,500 | 2008 | B | 100 |
| J | | 2195 1st Ave, Opelika | 2.9 mi | 11,220 | 2018 | 0 | 0 |

Source: CoStar

There are office developments scattered throughout the area. The largest of which is a pediatric clinic located just northwest of the East Alabama Medical Center. The second largest office development in a three-mile radius is a multi-tenant facility with tenants such as Auburn Corrective Massage Therapy, Community Rehab and Performance, and Porter Properties. The third largest office development used to be a medical office however, the building has remained vacant for a few years. This office is currently listed on the market.

| LOCAL AREA INDUSTRIAL - THREE-MILE RADIUS | | | | |
|---|---|---|---|---|
| TYPE | RBA | YEAR BUILT | PERCENT LEASED | PROPERTIES |
| Flex | 188,774 SF | 1976 | 83 | 13 |
| Gen-Ind <25,000 FT | 178,112 SF | 2002 | 99 | 16 |
| Gen-Ind >25,000 FT | 1,100,925 SF | 1948 | 18 | 7 |
| TOTAL | 1,467,811 SF | 1956 | 36.0 | 36 |

Source: CoStar

## LARGEST INDUSTRIAL DEVELOPMENTS - THREE-MILE RADIUS




| PIN | NAME | ADDRESS, CITY | DIST TO SUBJ | RBA | BUILT | TYPE | %LEASED |
|---|---|---|---|---|---|---|---|
| A | Mill Building | 2401 1st Ave, Opelika | 2.8 mi | 414,000 | 1925 | Industrial | 0 |
| B | Finishing Building | 2401 1st Ave, Opelika | 2.7 mi | 293,000 | 1947 | Industrial | 0 |
| C | Screen Print Building | 2600 1st Ave, Opelika | 2.7 mi | 157,000 | 1957 | Industrial | 0 |
| D | APR Corporate Headquarters | 4800 US Highway 280 W, Opelika | 0.0 mi | 83,000 | 2007 | Industrial | 100 |
| E | | 3200 Hipack Dr, Opelika | 2.6 mi | 61,925 | 1980 | Industrial | 100 |
| F | | 480 N Dean Rd, Auburn | 2.9 mi | 55,534 | 1952 | Flex | 47.96 |
| G | | 3800 Pepperell Pky, Opelika | 2.0 mi | 51,000 | 1968 | Industrial | 100 |
| H | | 1900 Cunningham Dr, Opelika | 2.6 mi | 43,510 | 1968 | Flex | 100 |
| I | | 2101-2199 1st Ave, Opelika | 2.9 mi | 41,000 | N/A | Industrial | 0 |
| J | | 1915 Mall Blvd, Auburn | 1.9 mi | 22,327 | 2019 | Industrial | 100 |

Source: CoStar

There are only industrial flex buildings within two miles of the subject. The larger industrial and technology parks are scattered throughout the outer edges of the cities. Points A-C on the map above are the old Pepperell Mill. These structures have since been demolished. The next largest industrial building in the area is the subject. The second largest industrial building within three miles is a cluster of multi-tenant flex buildings within tenants such as Candler Construction, G-Win Tech, Sonic Tools, and Chandler Pool.

| LOCAL AREA RETAIL - THREE-MILE RADIUS | | | | |
|---|---|---|---|---|
| SIZE | RBA | YEAR BUILT | PERCENT LEASED | PROPERTIES |
| <5,000 FT | 199,676 SF | 1991 | 91.3 | 69 |
| >5,000 FT-<20,000 FT | 570,086 SF | 1994 | 90.2 | 54 |
| >20,000 FT | 2,170,522 SF | 1988 | 90.8 | 25 |
| TOTAL | 2,940,284 SF | 1990 | 90.9 | 153 |

Source: CoStar

LARGEST RETAIL DEVELOPMENTS - THREE-MILE RADIUS




| PIN | NAME | ADDRESS, CITY | DIST TO SUBJ | RBA | BUILT | CLASS | %LEASED |
|---|---|---|---|---|---|---|---|
| A | Auburn Mall | 1627-1653 Opelika Rd, Auburn | 2.1 mi | 470,113 | 1973 | B | 90 |
| B | | 2900 E Pepperell Pky, Opelika | 2.2 mi | 230,000 | 2003 | B | 100 |
| C | Main Building | 2300-2600 Pepperell Pky, Opelika | 2.6 mi | 221,116 | 1993 | B | 94.57 |
| D | Saugahatchee Square | 3700 Pepperell Pky, Opelika | 1.9 mi | 210,000 | 1966 | B | 89.52 |
| E | Dillard's | 1627 Opelika Rd, Auburn | 2.0 mi | 124,506 | 2004 | B | 100 |
| F | Flint's Crossing | 1568-1572 Opelika Rd, Auburn | 2.3 mi | 97,668 | 1988 | C | 100 |
| G | Kmart | 2047-2055 E University Dr, Auburn | 2.2 mi | 88,000 | 1975 | C | 0 |
| H | | 1710-1716 Opelika Rd, Auburn | 2.3 mi | 85,259 | 1981 | B | 100 |
| I | | 2111 E University Dr, Auburn | 2.0 mi | 84,000 | 1999 | C | 100 |
| J | Building 3 | 2540 Pepperell Pky, Opelika | 2.5 mi | 81,805 | 1993 | C | 71.33 |

Source: CoStar

The majority of large retail uses proximate the subject are located along Opelika Road/Pepperell Parkway. The Auburn Mall is the largest retail development within three miles of the subject. The Auburn Mall has typical tenants such as Belk, Dillard's, Great American Cookies, B. Turner Clothing, Hibbett Sports, and LOFT. The second largest retail development is Walmart Supercenter. The third largest retail development is a strip center with tenants such a Planet Fitness, Mr. Smoke, Ollie's Bargain Outlet, Dollar General, and Bidding Kings Opelika.

# LOCAL AREA ANALYSIS (CONTINUED)

## LOCAL AREA MULTI-FAMILY - THREE-MILE RADIUS

| CLASS | RBA | YEAR BUILT | UNITS | PROPERTIES |
|---|---|---|---|---|
| A | 241,500 SF | 2007 | 361 | 1 |
| B | 2,288,772 SF | 2002 | 2,074 | 20 |
| C | 590,967 SF | 1976 | 581 | 10 |
| TOTAL | 3,121,239 SF | 1997 | 4,007 | 32 |

Source: CoStar

## LARGEST MULTI-FAMILY DEVELOPMENTS - THREE-MILE RADIUS




| PIN | NAME | ADDRESS, CITY | DIST TO SUBJ | RBA | BUILT | CLASS | STORIES |
|---|---|---|---|---|---|---|---|
| A | Paces at the Estates | 4150 Academy Dr, Opelika | 1.3 mi | 292,600 | 2008 | B | 3 |
| B | Creekside Of Auburn Condominium | 650 DeKalb St, Auburn | 2.7 mi | 241,500 | 2007 | A | 2 |
| C | The Village at Lakeside | 1309 Gatewood Dr, Auburn | 1.7 mi | 222,075 | 1988 | B | 2 |
| D | 1322 North | 1322 N Dean Rd, Auburn | 1.7 mi | 220,402 | 2002 | B | 2 |
| E | The Austin | 3000 Ballfields Loop, Opelika | 2.3 mi | 200,000 | 2023 | B | 3 |
| F | The Austin | 3000 Ballfields Loop, Opelika | 2.3 mi | 200,000 | 2023 | B | 3 |
| G | Shelton Road Townhomes | 600 Shelton Ln, Auburn | 2.3 mi | 180,576 | 1977 | C | 2 |
| H | The Reserve at Opelika | 3501 Birmingham Hwy, Opelika | 1.5 mi | 161,756 | 1974 | B | 2 |
| I | Champions Square | 3200 King Ave, Opelika | 2.8 mi | 126,000 | 2023 | B | 1 |
| J | Auburn Flats | 2260 E University Dr, Auburn | 1.8 mi | 109,420 | 1987 | B | 2 |

Source: CoStar

The largest multi-family development proximate the subject is Paces at the Estates. This apartment complex consists of one- and two-bedroom units. A two-bedroom two-bathroom unit is listed at $1,490 per month. Amenities include two pools, Amazon package lockers, a dog park, and on-site storage pods. The second largest multi-family development proximate the subject is Creekside of Auburn Condominiums. Due to the close proximity to Auburn University, Creekside of Auburn is mostly student-oriented housing. However, some of the condominiums are listed for sale. The third largest multi-family development is The Village at Lakeside. Units range from two to three bedrooms and rent ranges from $1,355 per month to $1,883 per month. Property amenities include a pool, fitness center, and dog park.

TOTAL DEVELOPMENT OVERLAY - THREE-MILE RADIUS




Source: CoStar

The land use in the subject's immediate neighborhood consists of a significant amount of commercial property, comprising of a mix of many property types. Commercial uses in the area include the regional malls and many other larger-sized multitenant retail centers, medium-sized retail/industrial/distribution-type properties, small- to- medium sized freestanding office and retail properties, as well as service-related uses, restaurants, gas stations/convenience stores and banks. The following chart illustrates the high concentration of multi-family and retail compared to industrial and office properties.

COMMERCIAL LAND USE




## RECENT DEVELOPMENT

Based on CoStar's research, there appears to be about 8 projects that have been recently developed. All of these projects are perceived to be within 2.8 miles of the subject. The range in size of developments is 400 SF to the largest development of 200,000 SF. Overall, the average size of recent developments in the area is 43,975 SF. Further, it appears that most of the developments are retail in nature.

The following table details our findings:

RECENT DEVELOPMENTS IN A THREE-MILE RADIUS (2024-2025)




| PIN | NAME | ADDRESS, CITY | DIST TO SUBJ | RBA | TYPE | CLASS |
|---|---|---|---|---|---|---|
| A | The Austin | 3000 Ballfields Loop, Opelika | 2.3 mi | 200,000 | Multi-Family | B |
| B | Champions Square | 3200 King Ave, Opelika | 2.8 mi | 126,000 | Multi-Family | B |
| C | Pivotal Business Center | 2372 E University Dr, Auburn | 1.9 mi | 16,000 | Office | B |
| D | Del Taco | 3065 Pepperell Pky, Opelika | 2.3 mi | 2,800 | Retail | B |
| E | Chipotle | 1700 Opelika Rd, Auburn | 2.3 mi | 2,313 | Retail | B |
| F | | 2124 E University Dr, Auburn | 2.0 mi | 2,200 | Retail | B |
| G | Valvoline | 3045 Pepperell Pky, Opelika | 2.3 mi | 2,089 | Retail | C |
| H | | 1026 Country Club Dr, Auburn | 2.3 mi | 400 | Specialty | C |

Source: CoStar

## DEVELOPMENT PIPELINE

### Under Construction

There do not appear to be any developments under construction within the market area.

### Proposed

Based on CoStar's research, there appears to be about 4 projects that are proposed for construction. All of these projects are perceived to be within 2.0 miles of the subject. The range in size of proposed developments is 3,000 SF to the largest proposed development of 17,700 SF. Overall, the average size of proposed developments in the area is 9,375 SF. Further, it appears that most of the developments that are proposed will be retail in nature.

The following table details our findings:

CURRENTLY PROPOSED DEVELOPMENT IN A THREE-MILE RADIUS




| PIN | NAME | ADDRESS, CITY | DIST TO SUBJ | RBA | TYPE | CLASS |
|---|---|---|---|---|---|---|
| A | | 0 Mall Pkwy Mall Pkwy Pky, Auburn | 2.0 mi | 17,700 | Retail | B |
| B | | SW Corner of Veterans Pkwy, Opelika | 1.3 mi | 12,600 | Retail (Strip Cer | B |
| C | | SW Corner of Veterans Pkwy, Opelika | 1.2 mi | 4,200 | Retail (Strip Cer | B |
| D | | SW Corner of Veterans Pkwy, Opelika | 1.2 mi | 3,000 | Retail (Strip Cer | B |

Source: CoStar

## ECONOMIC INFLUENCES

The local area economic status is important to recognize as the measurement of income levels provides an indication of the ability of the area population to buy, rent and maintain property. The economic status of an area also provides an indication of the population's appetite for goods and services. Relevant economic information includes income levels, property ownership vs. rent, property rent levels, rent level trends, property vacancy and new construction.

The vast majority of the housing units within the area are renter occupied, which contrasts with relative similarity to other parts of Opelika. Within three miles of the subject, 42.5% of housing units are owner occupied, 51.0% are renter occupied, and 6.5% are vacant. Housing occupancy is expected to remain stable over the next five years. The median home value within three miles of the subject is $284,000 and the average home value is $325,000. Over the next five years, the median home value within three miles of the subject is expected to increase to $332,000, and the average home value is expected to increase to $389,000. Average household incomes around the subject are around $93,000 with a 13.75% projected increase over the next five years.

## GOVERNMENT INFLUENCE

Governmental considerations relate to zoning, building codes, regulations, flood plain restrictions, special assessment, property tax and empowerment zones.

Zoning in the area is mixed, including commercial, residential and industrial designations. Zoning code is enforced by the municipality and enforcement in all areas of City of Opelika is considered to be strong. Rezoning is typically discouraged and requires public input in all municipalities. Building codes are in force and require a certain standard of construction quality and design. This is a typical influence on properties similar to the subject and falls in line with the zoning classification.

Property taxes in the area are established by Lee County and are assessed based on valuation. Considering broad authority of the county administration, the assessments in the neighborhood are similar to other neighborhoods in the metropolitan area. There are no known special assessments that affect property in the neighborhood.

## ACCESS/PUBLIC TRANSPORTATION

The subject is located along Highway 280 on the north side of the Auburn-Opelika MSA. The subject is roughly four miles northeast of downtown Auburn, five miles northwest of downtown Opelika, and four miles northwest of Tiger Town. Further, Highway 280 provides direct access northwest to Sylacauga and Birmingham and direct access southeast to Phenix City and Columbus. The subject is roughly five miles north of Interstate 85 which provides access west to Montgomery and northeast to LaGrange, Newnan, and Atlanta.

## ENVIRONMENTAL INFLUENCES

The subject area is considered to be a typical neighborhood with average building size and density. There are no extraordinary topographical features, nuisances of hazards. Public utilities are available in most all areas in quantities from public and private sources. The area has both public and private schools in adequate supply and quality.

## LOCAL AREA SUMMARY

The subject is located about five miles from Auburn University, Auburn’s top employer. The subject is located Highway 280 on the northern side of the Auburn-Opelika MSA. Population and household growth proximate the subject have occurred at a strong pace over the past few years. The majority of housing units proximate the subject are renter occupied, and the majority of commercial land proximate the subject is used for retail and multi-family purposes.

# SITE DESCRIPTION

The subject property consists of one parcel with a total site area of 500,940 SF (11.50 AC) which is based on information obtained from Lee County Assessor. It is perceived that there is no surplus or excess land at the subject. For the purposes of this report we have relied on this site area and reserve the right to amend our analysis upon receipt of a formal legal plan.

| | |
|---|---|
| **Address** | 4800 US Highway 280, Opelika, Alabama. |
| **Census Tract** | 01-081-040901 |

| | | |
|---|---|---|
| **Number of Parcels** | 1 | |
| **Assessor Parcel** | 43-09-02-09-0-000-003.005 | |
| **Land Area** | Square Feet | Acres |
| Economic Unit (Primary) Site Size | 500,940 | 11.50 |
| **Usable Site Size** | **500,940** | **11.50** |
| **Total Land Area** | **500,940** | **11.50** |
| **Excess/Surplus Land** | No | |
| **Corner** | No | |
| **Permitted Building Height** | 75 Feet | |
| **Floor Area Ratio (FAR)** | Not Available | |
| **Site Topography** | Steep Above street grade | |
| **Site Shape** | Generally Rectangular | |
| **Site Grade** | Above street grade | |
| **Site Quality** | Good | |
| **Site Access** | Good | |
| **Site Exposure** | Good | |
| **Site Utility** | Good | |
| **Utilities** | All to Site | |
| **Comments** | There is a power line easement that bisects the western side of the site. | |

| | |
|---|---|
| **Adjacent Properties** | |
| North | Undeveloped Land |
| South | Residential |
| East | Undeveloped Land |
| West | Residential |
| **Accessibility** | Access to the subject site is considered good overall. |

## STREET & TRAFFIC DETAIL

| Street Improvements | Type | Direction | Lanes | Lights | Curbs | Sidewalks | Signals | Median | Parking | Center Lane | Bike Lane |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Highway 280 | Major arterial | Two-Way | 4 | | | | x | | | | |

**Frontage**

Highway 280 — 900 feet; One Ingress/Egress.

| Traffic Counts | Location | Date | Source | Count |
|---|---|---|---|---|
| Highway 280 | Just North of Property | Mar-23 | ALDOT | 19,408 |
| | **TOTAL** | | | **19,408** |

**Exposure & Visibility** Exposure of the subject is good with frontage on US Highway 280.

**Flood Plain** Zone X (Unshaded). This is referenced by Panel Number 0062H, dated January 17, 2025. Zone X (unshaded) is a moderate and minimal risk area. Areas of moderate or minimal hazard are studied based upon the principal source of flood in the area. However, buildings in these zones could be flooded by severe, concentrated rainfall coupled with inadequate local drainage systems. Local storm water drainage systems are not normally considered in a community's flood insurance study. The failure of a local drainage system can create areas of high flood risk within these zones. Flood insurance is available in participating communities, but is not required by regulation in these zones. Nearly 25% of all flood claims filed are for structures located within these zones. Minimal risk areas outside the 1% and 0.2% annual chance floodplains. No BFEs or base flood depths are shown within these zones. (Zone X (unshaded) is used on new and revised maps in place of Zone C.)

**Seismic** The subject is in a low risk area.

**Easements** A preliminary title report was not available for review. During the property inspection, no adverse easements or encumbrances were noted. This appraisal assumes that there are no adverse easements present. If questions arise, further research is advised.

**Soils** A detailed soils analysis was not available for review. Based on the development of the subject, it appears the soils are stable and suitable for the existing improvements.

**Hazardous Waste** We have not conducted an independent investigation to determine the presence or absence of toxins on the subject property. If questions arise, the reader is strongly cautioned to seek qualified professional assistance in this matter. Please see the Assumptions and Limiting Conditions for a full disclaimer.

**Site Rating** Overall, the subject site is considered good as a industrial site in terms of its location, exposure and access to employment, education and shopping centers, based on its location along a major arterial.

# PLAT MAP


3.005
3.001
3.004
73
72
74
71
75
86
87
88
28
27
126
125
124
U.S. Hwy 280 W
Birmingham Hwy
Birmingham Hwy
U.S. Hwy 280 W
280
614.7
390.9
290.8
418.5

# SKETCH



TOTAL Sketch by a la mode

**Area Calculations Summary**

| **Living Area** | |
|---|---|
| Shop | 5689 Sq ft |
| Warehouse | 10800 Sq ft |
| Shop | 14143.5 Sq ft |
| Shop | 3800 Sq ft |
| Shop | 800 Sq ft |
| Office (x 2) | 17490 Sq ft |
| Shop | 11842.5 Sq ft |
| Office | 4500 Sq ft |
| Lobby | 2550 Sq ft |
| **Total Living Area (Rounded):** | **71615 Sq ft** |

TOTAL Sketch software by a la mode technologies, llc. 1-800-alamode

TOTAL Sketch by a la mode

**Area Calculations Summary**

| Living Area | | Calculation Details | | |
|---|---|---|---|---|
| Shop | 5689 Sq ft | 67 × 45 | = | 3015 |
| | | 34 × 76 | = | 2584 |
| | | 18 × 5 | = | 90 |
| Warehouse | 10800 Sq ft | 75 × 144 | = | 10800 |
| Shop | 14143.5 Sq ft | 13 × 12 | = | 156 |
| | | 75 × 186.5 | = | 13987.5 |
| Shop | 3800 Sq ft | 50 × 76 | = | 3800 |
| Shop | 800 Sq ft | 16 × 50 | = | 800 |
| Office (x 2) | 17490 Sq ft | 18 × 27 | = | 486 |
| | | 28 × 16 | = | 448 |
| | | 34 × 15 | = | 510 |
| | | 20 × 8 | = | 160 |
| | | 54 × 17 | = | 918 |
| | | 45 × 27 | = | 1215 |
| | | 46 × 48 | = | 2208 |
| | | 50 × 52 | = | 2600 |
| | | 0.5 × 50 × 8 | = | 200 |
| Shop | 11842.5 Sq ft | 110 × 63 | = | 6930 |
| | | 75 × 65.5 | = | 4912.5 |
| Office | 4500 Sq ft | 75 × 60 | = | 4500 |
| Lobby | 2550 Sq ft | 14 × 24 | = | 336 |
| | | 36 × 51 | = | 1836 |
| | | 14 × 27 | = | 378 |
| **Total Living Area (Rounded):** | **71615 Sq ft** | | | |

TOTAL Sketch software by a la mode technologies, llc. 1-800-alamode

4800 US-280 OPELIKA, AL 36804-9434

**LOCATION ACCURACY:** *User-defined location*

## Flood Zone Determination Report

**Flood Zone Determination:** OUT

| | | | |
|---|---|---|---|
| COMMUNITY | 010145 | PANEL | 0062H |
| PANEL DATE | January 17, 2025 | MAP NUMBER | 01081C0062H |



## TAX HISTORY

The subject's assessment history is shown in the following table:

| SUBJECT PROPERTY ASSESSMENT AND TAX HISTORY | | | | | |
|---|---|---|---|---|---|
| YEAR | TOTAL ASSESSED VALUE | TAX RATE | TAXES | TAXES/SF | CHANGE |
| 2024 | $5,365,720 | 0.00992 | $53,245 | $0.74 | 12.6% |

## CURRENT TAXATION & ASSESSMENT DESCRIPTION

In Alabama, taxes are calculated using the property's assessed value, which is determined by multiplying the appraised value by the property classification (or assessment rate) of 20% class II properties. The total assessment for the subject property for the tax year 2024 is $5,365,720 or $74.92 PSF. There are no exemptions in place. The total tax bill for the property is $53,245 or $0.74 PSF. This is within the general range for comparable research and development uses in the area. The subject's assessed values and property taxes for the current year are summarized in more detail in the following table.

| ASSESSMENT & TAXES (2024) | | | | | | |
|---|---|---|---|---|---|---|
| **TAX RATE AREA** | **Lee County** | | | | **TAX RATE** | 4.9616% |
| **ASSESSOR PARCEL #** | **LAND** | **IMPROVEMENTS** | **TOTAL** | **EXEMPTIONS** | **TAXABLE** | **BASE TAX** |
| 43-09-02-09-0-000-003.005 | $871,200 | $4,494,520 | $5,365,720 | $0 | $1,073,144 | $53,245 |
| Subtotal | $871,200 | $4,494,520 | $5,365,720 | $0 | $1,073,144 | $53,245 |
| Subtotal $/NRA | $12.17 | $62.76 | $74.92 | $0.00 | $14.98 | $0.74 |
| **TOTAL BASE TAX $/NRA / $ TOTAL** | | | | | **$0.74** | **$53,245** |

Source: Lee County Assessment & Taxation

The last assessment for the subject was January 2024 with future assessments scheduled annually, but are not required (next assessment estimated to be in January 2025). In this instance, the assessment is equal to the appraised value multiplied by the assessment ratio. The Lee County Tax Authority usually reassesses upon sale. Based on the foregoing, and the current assessment's relationship to market value, we perceive that the risk of a reassessment is average. Should a reassessment occur, we believe it could be around 100.0% of market value. Actual taxes are utilized in the income capitalization approach.

According to Lee County, real estate taxes for the subject property are current as of the date of this report. Based on the scope of this assignment, any pending tax liens are not considered in the value conclusion.

## CONCLUSION

In this section, we analyzed the subject's historical and current assessment, as well as considered the subject's tax burden as it relates to its current stabilized market value on a fee simple basis. The conclusion shown above is supported by comparable data and utilized going forward in the analyses that is to follow.

# ZONING

The subject is located in the General Commercial, Gateway Corridor - Primary Overlay District (C3, GC-P) zoning area. C3: This district is characterized by a broad range of retail, wholesale, and service uses and is equivalent to previous general and highway business districts. Uses allowed are motels, individual businesses, small strip centers, banks, fast-food establishments, grocery stores, and similar uses. These areas should be served by sanitary sewer. GC-P: The intent of this section is to specify those areas that serve as a primary means of entry into Opelika and name those areas the Gateway Corridor Overlay District. The district is designated to be an overlay appended to residential, commercial, industrial or any other districts. The Gateway Overlay District is similar to airport hazard areas (Section 7.4) and the Flood Plain Overlay District (see Section 7.5) in that additional regulation will apply and supersede the underlying district regulations. In other words, a Gateway Overlay District can be placed on top of any of the City's existing zoning districts creating an overlap in the zoning along a specified length of roadway desired to be regulated. Any proposed development, then, would have to meet the zoning requirements of both the existing zone and the Gateway Overlay district. The Gateway Corridor Overlay District shall include roadway corridors and their adjacent development located in several use districts. Uses typically include retail, wholesale, motel, recreation, office, fast-food establishments, and similar uses. This district is characterized by special design controls enforced to prevent incompatible uses and to maintain an attractive "gateway" or entrance into Opelika. .

| ZONING | |
|---|---|
| Designation | General Commercial, Gateway Corridor - |
| Zoning Authority | City of Opelika |
| Permitted Uses | Single-Family Residential, Rooming/Boarding House, Bed & Breakfast, Hotel, Motel, Fully Enclosed Commercial Building less than 100,000 sf GLA (no storage or display of goods outside), Consumer Shopping Goods, Grocery Store, Professional Office, Office of Physicians or Dentist, Banks, Office of Contractor Without Equipment and Material Yard, Self-Service Car Wash, Bus Station, Day Care Center, Dry Cleaner, Social and Fraternal Clubs and Union Halls, Bowling Alleys and Skating Rinks, Fitness Center, Billiard and Pool Halls, Movie Theater, Golf and Country Clubs, Swimming and Tennis Clubs, Golf Driving Range, Miniature Golf, Skateboard Park, Bicycle Race Tract, Restaurant, Brewpub, Veterinarian, Laundromat, Post Office, Farm and Craft Market, Produce Market, On-Premise Sales Commercial Greenhouse Operation, Funeral Home, Medical or Dental Clinic, Pharmacies, Medical Research Laboratories, Retail Medical Supply. All proposed developments in a GC-P Overlay District require approval from the planning board. |
| Prohibited Uses | Those not listed above are either conditional or prohibited. |
| Current Use | Research and Development |
| Current Use Legally Permitted | Yes |
| Conforming Use | The bulk of the improvements conform to the requirements ordinance, and are deemed legal. |
| Conforming Lot | The bulk of the improvements as well as the parking conform to the requirements ordinance. |
| Zoning Change | Not Likely |
| Max Permitted Height | 75 |
| Max Permitted Floor Area Ratio (FAR) | |
| Maximum Building Area | 50% |
| Parking Requirement Spaces/Unit | One (1) space per employee on the largest shift plus one (1) space per four thousand (4,000) square feet of gross floor area. |
| Parking Spaces Provided | 86 |
| Min Permitted Yard Setbacks | |
| Front (Feet) | 30, 300 from Highway 280 |
| Rear (Feet) | 20 |
| Side (Feet) | 10, 25 on street |
| Max Permitted Density (Units/Acre) | 16 |

Source: City of Opelika Planning & Zoning Department

## PARKING REQUIREMENTS

Parking varies by use but is stated as one (1) space per employee on the largest shift plus one (1) space per four thousand (4,000) square feet of gross floor area. The subject provides 86 parking spaces and is therefore conforming to zoning requirements. The parking ratio of 1.2 per 1,000 SF is at the low end of the typical range of 1-5 / 1,000 SF for industrial buildings but within zoning requirements.

## ZONING CONCLUSION

The current use for the subject property is research and development and is a permitted use based on the current zoning guidelines. A zoning change for the subject does not appear likely. Based on the foregoing, it appears that the subject's improvements are a legally conforming use of the subject site.

# ZONING MAP


Sougahatchee Creek
Grand National Pkwy
GRAND NATIONAL PKWY
Grand National Pkwy
TURTLE CREEK CT
BIRMINGHAM HWY
BIRMINGHAM HWY
280
280
ASHETON DR
Shelton Cove Ln
Turnbury Ln
NORTH
AUBURN
SHELTON MILL RD
SOPHIA
WAY

# IMPROVEMENT DESCRIPTION

The information presented below is a basic description of the existing improvements that is used in the valuation of the property. Reliance is placed on information provided by sources deemed dependable for this analysis. It is assumed that there are no hidden defects, and that all structural components are functional and operational, unless otherwise noted. If questions arise regarding the integrity of the improvements or their operational components, it may be necessary to consult additional professional resources.

## OVERVIEW

The subject property, located at 4800 US Highway 280, Opelika, AL, is an industrial, research and development property with improvements located in the Opelika submarket. The property features 47,073 square feet of industrial space and 24,542 square feet of office space; as such, the office space represents 34.3% of the total square footage. The subject also features numerous grade-level roll-up doors and a few dock doors.

| | |
|---|---|
| **Property Type** | Industrial - Research and Development |
| **Tenancy** | Single-Tenant Occupied By A Third Party Tenant |
| **Net Rentable Area (NRA)** | 71,615 |
| **Gross Building Area (GBA)** | 71,615 |
| **Total Buildings** | 1 |
| **Density Per Unit (AC)** | 0.1 |
| **Floors** | 2 |
| **Year Built** | 2007 |
| **Age/Life Analysis** | |
| Actual Age | 18 |
| Effective Age | 15 |
| Economic Life | 50 |
| Remaining Useful Life | 35 |
| **Overall Building Quality** | Good |
| **Overall Building Condition** | Good |
| **Overall Building Appeal** | Good |
| **Land to Building Ratio** | 6.99 : 1 |
| **Site Coverage Ratio** | 14.30% (Based On Total Overall Site Area) |
| **Floor Area Ratio (FAR)** | 0.14 |
| **Total Parking Spaces** | 86 - Off-Street, Surface - Asphalt spaces |
| **Parking Ratio** | 1.2 / 1,000 SF NRA |

## COMPONENT DESCRIPTION

| | |
|---|---|
| **Foundation** | Reinforced concrete slab |
| **Exterior Walls/Framing** | Steel |
| **Roof** | Metal |
| **Elevator** | None |
| **Heating & AC (HVAC)** | Central HVAC |
| **Insulation** | Assumed to be standard and to code for both walls and ceilings |
| **Lighting** | Various |

| | |
|---|---|
| **Electrical** | Assumed adequate and to code |
| **Interior Walls** | Drywall in the office areas with exposed steel walls in the warehouse and production areas |
| **Doors and Windows** | Standard storefront windows and doors, glass in aluminum frames |
| **Ceilings** | The ceilings vary by area. Ceilings include 2x2 acoustical tiles, drywall, and exposed steel frames |
| **Plumbing** | Standard plumbing for an industrial building with multiple multi-user restrooms throughout. |
| **Floor Covering** | Carpet, wood, ceramic tile and stained concrete in the office areas with sealed concrete in the production and warehouse areas |
| **Fire Protection** | Wet fire sprinkler system |
| **Interior Finish/Build-Out** | The interior of the subject is typical for an industrial building with various walls, ceilings, and floor coverings. There are adequate restrooms throughout and a wet sprinkler system. |
| **Site Improvements** | Asphalt Pavement |
| **Landscaping** | A variety of trees, shrubbery and grass. |
| **Signage** | There is no signage along US Highway 280. |
| **Parking** | Parking varies by use but is stated as one (1) space per employee on the largest shift plus one (1) space per four thousand (4,000) square feet of gross floor area. The subject provides 86 off-street, surface - asphalt parking spaces, or 1.2 spaces per 1,000 SF of NRA, which is within market standards (1-5/1,000 SF) for industrial (research and development) property type. |
| **Site Coverage Ratio** | 14.3% (71,615 SF footprint / 500,940 SF site), which is within market standards (20-35%) for similar research and development buildings in the area. |
| **Deferred Maintenance** | There were no signs of deferred maintenance at the time of inspection. |
| **Functional Design** | The building features a functional Research and Development design with typical site coverage and adequate off-street parking. |
| **ADA Comment** | This analysis assumes that the subject complies with all ADA requirements. Please refer to the Assumptions and Limiting Conditions section. |
| **Hazardous Materials** | A Phase I report was not provided. This appraisal assumes that the improvements are constructed free of all hazardous waste and toxic materials, including (but not limited to) unseen asbestos and mold. Please refer to the Assumptions and Limiting Conditions section regarding this issue. |

# MARKET ANALYSIS

In this section, market conditions which influence the subject property are analyzed. An overview of Industrial supply and demand conditions for the Auburn/Opelika MSA market and Opelika submarket are presented. Key supply and demand statistics for the most recent quarter, last year and historical averages over the past 10 years are summarized in the tables below.

**INDUSTRIAL MARKET AND SUBMARKET DATA SUMMARY (10 YEARS)**

| | | INVENTORY SUPPLY (SF) | | VACANCY (%) | |
|---|---|---|---|---|---|
| QTR | YEAR | MARKET | SUBMARKET | MARKET | SUBMARKET |
| Q1 | 2025 | 12,350,538 | 8,087,092 | 8.2% | 9.3% |
| Q4 | 2024 | 12,327,738 | 8,069,092 | 6.5% | 6.4% |
| Q3 | 2024 | 12,327,738 | 8,069,092 | 7.0% | 7.0% |
| Q2 | 2024 | 12,327,738 | 8,069,092 | 7.4% | 7.0% |
| | 2024 | 12,327,738 | 8,069,092 | 6.5% | 4.4% |
| | 2023 | 12,327,738 | 8,069,092 | 4.4% | 5.4% |
| | 2022 | 11,852,738 | 7,594,092 | 3.7% | 3.9% |
| | 2021 | 11,572,738 | 7,314,092 | 6.3% | 10.0% |
| | 2020 | 11,452,738 | 7,314,092 | 14.7% | 20.1% |
| | 2019 | 11,158,988 | 7,314,092 | 14.2% | 18.3% |
| | 2018 | 10,730,581 | 7,314,092 | 17.5% | 18.7% |
| | 2017 | 10,501,236 | 7,084,747 | 18.3% | 21.0% |
| | 2016 | 10,047,520 | 6,731,031 | 17.3% | 20.7% |
| | 2015 | 9,994,538 | 6,731,031 | 16.6% | 23.4% |
| | | RENT $/SF | | NET ABSORPTION (SF) | |
| QTR | YEAR | MARKET | SUBMARKET | MARKET | SUBMARKET |
| Q1 | 2025 | $6.74 | $6.53 | (184,950) | (211,650) |
| Q4 | 2024 | $6.37 | $6.41 | 59,730 | 48,330 |
| Q3 | 2024 | $6.32 | $6.35 | 53,229 | (7,491) |
| Q2 | 2024 | $6.21 | $6.26 | (461,851) | (207,139) |
| | 2024 | $6.37 | $6.26 | (262,905) | (88,100) |
| | 2023 | $6.46 | $6.28 | 376,908 | 336,509 |
| | 2022 | $5.34 | $5.35 | 573,201 | 714,245 |
| | 2021 | $4.04 | $3.92 | 1,003,580 | 742,630 |
| | 2020 | $4.05 | $4.03 | 204,701 | (133,249) |
| | 2019 | $3.86 | $3.65 | 716,442 | 27,257 |
| | 2018 | $3.80 | $3.65 | 278,683 | 350,445 |
| | 2017 | $3.91 | $3.65 | 165,608 | 261,808 |
| | 2016 | $3.70 | $3.37 | (29,979) | 177,955 |
| | 2015 | $3.63 | $3.49 | 516,398 | 225,804 |

Source: CoStar Property®

The Auburn/Opelika MSA Industrial market demonstrates positive conditions. There has been an increase of 22,800 square feet in supply over the last year. This increase in supply caused a spike of vacancy from 6.5% to 8.2% in the most recent quarter. This increase in vacancy is reflected in a negative net absorption of 184,950 square feet. It is noted that the net absorption for 2024 was also negative. Further, market rent increased over the past year from $6.21 per square foot in second quarter of 2024 to $6.74 per square foot in the first quarter of 2025.

The Opelika Industrial submarket demonstrates mostly stable conditions. There has been an increase of 18,000 square feet in supply over the last year. This increase in supply is reflected in an increase in vacancy from 6.4% to 9.3% in the most recent quarter. This increase in vacancy is reflected in a negative net absorption of 211,650 square feet. It is noted that the net absorption for 2024 was also negative. Further, submarket rent increased over the past year from $6.26 per square foot in second quarter of 2024 to $6.53 per square foot in the first quarter of 2025.

## VACANCY

The following tables provide visual illustration of the long term and short term Industrial vacancy for the Auburn/Opelika MSA market and Opelika submarket.







## RENTAL RATES

The following tables provide a visual illustration of rental Industrial trends for the Auburn/Opelika MSA market and Opelika submarket in the short and long term:







## DELIVERIES

The following tables provides the recently delivered and under construction Industrial supply for the Auburn/Opelika MSA market and Opelika submarket:

| DELIVERIES (SF) | | | | | |
|---|---|---|---|---|---|
| QTR | YEAR | MARKET | % OF TOTAL | SUBMARKET | % OF TOTAL |
| Q1 | 2025 | 22,800 | 0.2% | 18,000 | 0.2% |
| Q4 | 2024 | 0 | 0.0% | 0 | 0.0% |
| Q3 | 2024 | 0 | 0.0% | 0 | 0.0% |
| Q2 | 2024 | 0 | 0.0% | 0 | 0.0% |
| | 2024 | 0 | 0.0% | 0 | 0.0% |
| | 2023 | 475,000 | 3.9% | 475,000 | 5.9% |
| | 2022 | 280,000 | 2.4% | 280,000 | 3.7% |
| | 2021 | 120,000 | 1.0% | 0 | 0.0% |
| | 2020 | 293,750 | 2.6% | 0 | 0.0% |

| UNDER CONSTRUCTION (SF) | | | | | |
|---|---|---|---|---|---|
| QTR | YEAR | MARKET | BUILDINGS | SUBMARKET | BUILDINGS |
| Q1 | 2025 | 24,000 | 1 | 0 | 0 |
| Q1 | 2024 | 0 | 0 | 0 | 0 |
| Q1 | 2023 | 475,000 | 3 | 475,000 | 3 |
| Q1 | 2022 | 280,000 | 1 | 280,000 | 1 |
| Q1 | 2021 | 120,000 | 1 | 0 | 0 |

## DEMAND GENERATORS

Local auto industries along Interstate 85 in and around the Auburn-Opelika MSA.

## BARRIERS TO ENTRY

None.

## CONCLUSION

Overall, investors would recognize these general industrial conditions and the subject's positioning in the immediate market area as having a positive overall influence when contemplating purchase of the subject.

# SUBJECT PROPERTY ANALYSIS

The subject property, located at 4800 US Highway 280, Opelika, AL, is an industrial, research and development property with improvements located in the Opelika submarket.

The property features 47,073 square feet of industrial space and 24,542 square feet of office space; as such, the office space represents 34.3% of the total square footage. The subject also features numerous grade-level roll-up doors and a few dock doors.

The subject has single-tenant design that is currently occupied by a third party tenant, and has an analyzed occupancy of 100.0%, which is equivalent to the stabilized occupancy level estimate of 95.0% developed in this appraisal.

The market generally classifies the subject as a standard Industrial Research and Development investment property that if exposed to the open market would command good interest from local and regional buyers that are actively pursuing similar investment properties in the $5 Million to $10 Million price range. Currently there is typical buyer demand, while there is limited availability for this property type on the supply side.

Based on the above factors the subject is considered to have average investment appeal. Further, the subject is considered to have good overall tenant appeal with a typical competitive position for attracting and retaining tenants.

The following SWOT Analysis chart summarizes the major property strengths and weaknesses while outlining potential opportunities or threats to the subject's competitive position and overall marketability.

## STRENGTHS, WEAKNESSES, OPPORTUNITIES & THREATS

| STRENGTHS | WEAKNESSES |
|---|---|
| Location along Highway 280 | None. |
| **OPPORTUNITIES** | **THREATS** |
| None. | Negative net absorption in the market |

The highest and best use of the subject property provides the foundation for the valuation section. Highest and best use is defined in the 7th edition of *The Dictionary of Real Estate Appraisal* (Appraisal Institute, Chicago, 2022), as follows:

1. The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.
2. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid.
3. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.

Highest and best use analysis uses the following steps for the subject:

- Highest & Best Use As Vacant
- Determination of the ideal improvements
- Highest & Best Use As Improved
- Conclusion of the Highest & Best Use

The analysis of highest and best use can be thought of as the logical end of a spectrum of market analysis procedures, running from the macroeconomic overview of a general market study, through more detailed marketability studies and analyses of financial feasibility, to the formal analysis of highest and best use. In theory, the highest and best use is commonly described as that reasonable and most profitable use that will support its highest present value. The highest and best use, or most profitable use, must be legally permissible, physically possible, financially feasible, and maximally productive.

This section develops the highest and best use of the subject property As-Vacant and As Improved.

## AS VACANT ANALYSIS

In this section the highest and best use of the subject as vacant is concluded after taking into consideration financial feasibility, maximal productivity, marketability, legal, and physical factors.

**Legally Permissible**

Private restrictions, zoning, building codes, historic district controls, and environmental regulations are considered, if applicable to the subject site. The legal factors influencing the highest and best use of the subject site are primarily government regulations such as zoning ordinances. Permitted uses of the subject's General Commercial, Gateway Corridor - Primary Overlay District (C3, GC-P) include single-family residential, rooming/boarding house, bed & breakfast, hotel, motel, fully enclosed commercial building less than 100,000 sf gla (no storage or display of goods outside), consumer shopping goods, grocery store, professional office, office of physicians or dentist, banks, office of contractor without equipment and material yard, self-service car wash, bus station, day care center, dry cleaner, social and fraternal clubs and union halls, bowling alleys and skating rinks, fitness center, billiard and pool halls, movie theater, golf and country clubs, swimming and tennis clubs, golf driving range, miniature golf, skateboard park, bicycle race tract, restaurant, brewpub, veterinarian, laundromat, post office, farm and craft market, produce market, on-premise sales commercial greenhouse operation, funeral home, medical or dental clinic, pharmacies, medical research laboratories, retail medical supply. all proposed developments in a gc-p overlay district require approval from the planning board. projects. Zoning change is not likely; therefore, uses outside of those permitted by the C3, GC-P zoning are not considered moving forward in the as-vacant analysis.

### Physical Possible

The test of what is physically possible for the subject site considers physical and locational characteristics that influence its highest and best use. In terms of physical features, the subject site totals 11.5000-acres (500,940 SF), it is generally rectangular in shape and has a steep topography. The site has good exposure and good overall access. There are no physical limitations that would prohibit development of any of the by-right uses on the site.

### Financial Feasibility

The highest and best use is dictated by the use that results in the highest overall sales price for the underlying development site. Commercial parcels have the highest sales prices proximate the subject.

### Maximum Productivity

There is only one use that creates value and at the same time conforms to the requirements of the first three tests. Financial feasibility, maximal productivity, marketability, legal, and physical factors have been considered and the highest and best use of the subject site as-vacant concluded to be commercial.

## AS IMPROVED ANALYSIS

### Legally Permissible

The legal factors influencing the highest and best use of the subject property are primarily governmental regulations such as zoning and building codes. The subject's improvements were constructed in 2007 and are a legal, conforming use.

### Physically Possible

The physical and location characteristics of the subject improvements have been previously discussed in this report. The project is of good quality construction and in good condition, with adequate site coverage and parking ratios. Therefore, the property as improved, meets the physical and location criteria as the highest and best use of the property.

### Financially Feasible

The market value, as improved, greatly exceeds the value of the subject's site less demolition costs. Thus, redevelopment of the property is not likely at the current time.

### Maximally Productive

In addition to legal and physical considerations, analysis of the subject property as-improved requires consideration of alternative uses. The five possible alternative treatments of the property are demolition (not warranted as the improvements contribute substantial value to the site), expansion (not warranted, no excess or surplus land), renovation (not warranted), conversion (not applicable), and continued use "as-is".

Among the five alternative uses, as-is is the Highest and Best Use of the subject As Improved.

## MOST PROBABLE BUYER

Based on the type of property and the income generating potential of the improvements, it is our opinion that the most probable buyer for the subject would be a regional investor.

# VALUATION METHODS

In traditional valuation theory, the three approaches to estimating the value of an asset are the cost approach, sales comparison approach, and income capitalization approach. Each approach assumes valuation of the property at the property's highest and best use. From the indications of these analyses, an opinion of value is reached based upon expert judgment within the outline of the appraisal process.

## SITE VALUATION

The site value is not a specific scope requirement of this assignment. Characteristics specific to the subject property do not warrant that a site value is developed. Therefore, this appraisal does not provide a valuation of the subject site.

## COST APPROACH

The cost approach considers the cost to replace the proposed improvements, less accrued depreciation, plus the market value of the land. The cost approach is based on the understanding that market participants relate value to cost. The value of the property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation in the structure from all causes. Profit for coordination by the entrepreneur is included in the value indication.

The Cost Approach is not a specific scope requirement of this assignment. The Cost Approach has limited applicability due to the age of the improvements and lack of market based data to support an estimate of accrued depreciation. Based on the preceding information, the Cost Approach will not be presented.

## SALES COMPARISON APPROACH

The sales comparison approach estimates value based on what other purchasers and sellers in the market have agreed to as price for comparable properties. This approach is based upon the principle of substitution, which states that the limits of prices, rents, and rates tend to be set by the prevailing prices, rents, and rates of equally desirable substitutes. In conducting the sales comparison approach, we gather data on reasonably substitutable properties and make adjustments for transactional and property characteristics. The resulting adjusted prices lead to an estimate of the price one might expect to realize upon sale of the property.

The Sales Comparison Approach is a specific scope requirement of this assignment. Considering the applicability of this approach in relation to the subject property's characteristics, we consider the application of this approach to be warranted.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach ("income approach") simulates the reasoning of an investor who views the cash flows that would result from the anticipated revenue and expense on a property throughout its lifetime. The net income developed in our analysis is the balance of potential income remaining after vacancy and collection loss, and operating expenses. This net income is then capitalized at an appropriate rate to derive an estimate of value or discounted by an appropriate yield rate over a typical projection period in a discounted cash flow analysis. Thus, two key steps are involved: (1) estimating the net income applicable to the subject and (2) choosing appropriate capitalization rates and discount rates. The appropriate rates are ones that will provide both a return on the investment and a return of the investment over the life of the particular property.

The Income Approach is a scope requirement for this assignment. The subject is a leased investment property making this valuation technique particularly applicable. Therefore, the Income Approach is developed. The Direct Capitalization method is used in this analysis. The Discounted Cash Flow analysis does not contribute substantially to estimating value beyond the Direct Capitalization method and is not used in this analysis.

## CORRELATION AND CONCLUSION

Based on the agreed upon scope with the client, the subject's specific characteristics and the interest appraised, this appraisal developed Sales Comparison and Income (Direct Capitalization) Approaches. The values presented represent the As-Is (Leased Fee Interest) This appraisal does not develop the Cost Approach, the impact of which is addressed in the reconciliation section.

An Insurable Replacement Cost Estimate has also been included within the report.

# SALES COMPARISON APPROACH

In the Sales Comparison Approach, the value of a property is estimated by comparing it with similar, recently sold properties in the surrounding or competing areas. Inherent in this approach is the principle of substitution, which holds that when a property is replaceable in the market, its value tends to be set by the cost of buying an equally desirable property, assuming that no costly delay occurs in making the substitution.

Through the analysis of sales of verified arm's-length transactions, market value and price trends are identified. The sales utilized are comparable to the subject in physical, functional, and economic characteristics.

**Comparable Selection**

Comparable sales are presented, which were selected due to their similarity in physical, locational, and qualitative attributes. They represent the most recent and relevant comparable sale available for this analysis. Emphasis was given to the subject's location and similarly positioned properties.

**Unit of Comparison**

The most relevant unit of comparison is the price per SF NRA. This best reflects the unit of comparison used by buyers and sellers in this market for the subject property type.

**Adjustments**

Adjustments to the comparable sales were considered and made when warranted for property rights, financing terms, conditions of sale, expenditures after sale and market conditions.

1. **Property Rights -** All of the sales comparables were leased fee and fee simple sales reflecting the property rights appraised herein per the agreed upon scope of work.
2. **Financing -** The sales all reflected typical cash equivalent, lender-financed transactions and no adjustments were required for financing terms.
3. **Sale Conditions -** None of the comparables required a condition of sale adjustment, as all were confirmed to be arm's length transactions.
4. **Expenditures After Sale -** Expenses that the buyer incurs after purchase (deferred maintenance, HVAC repairs, etc.). No adjustments are warranted based on review of the sales.
5. **Market Conditions (Time) -** Based on the analysis performed, which includes research and interpretation of value trends of the comparables presented herein, a market conditions adjustment of 3% is applied on an Annual basis reflecting the relatively consistent appreciation that occurred between the oldest comparable sale date up through the effective valuation date.

**Quantitative Adjustment Process**

Quantitative percentage adjustments are also made for location and physical characteristics such as size, age, site and parking ratios, access, exposure, quality and condition, as well as other applicable elements of comparison. Where possible the adjustments applied are based on paired data or other statistical analysis. It should be stressed that the adjustments are subjective in nature and are meant to illustrate the logic in deriving a value opinion for the subject property by the Sales Comparison Approach.

**Presentation**

The subject and comparable property attributes are presented on the following Improved Sales Comparison Table, location map and photographs. This is followed by analysis of the subject and comparable sales and the value conclusion indicated using the Sales Comparison Approach.

IMPROVED SALES SUMMARY

| | DATE OF SALE | LOCATION | CITY | YR. BLT | NRA | UNADJUSTED SALE PRICE | $/SF |
|---|---|---|---|---|---|---|---|
| 1 | 12/1/2024 | 252 Lee Road 231 | Auburn | 2023 | 70,000 | $7,250,000 | $104 |
| 2 | 2/18/2022 | 3365 Skyway Drive | Auburn | !016 (2008 avg | 38,509 | $3,750,000 | $97 |
| 3 | 4/15/2025 | 2471 Innovation Drive | Auburn | 2016 | 40,982 | $4,550,000 | $111 |
| 4 | 3/31/2025 | 70 SI White Blvd | LaGrange | 2024 | 190,457 | $26,473,523 | $139 |

## SALES COMPARISON APPROACH (CONTINUED)




| COMPARABLE | LABEL | ADDRESS | MILES FROM SUBJECT |
|---|---|---|---|
| COMPARABLE 1 | 1 | 252 Lee Road 231, Auburn, AL, 36830 | 10.4 |
| COMPARABLE 2 | 2 | 3365 Skyway Drive, Auburn , AL, 36830 | 3.3 |
| COMPARABLE 3 | 3 | 2471 Innovation Drive, Auburn, AL, 36832 | 9.2 |
| COMPARABLE 4 | 4 | 70 SI White Blvd, LaGrange, GA, 30241 | 38.5 |

## IMPROVED SALES PHOTOGRAPHS


COMPARABLE 1


COMPARABLE 2


COMPARABLE 3



COMPARABLE 4

# Auburn Distribution Center 300

Comparable 1



## Sale Information

| | | |
|---|---|---|
| Buyer | Karem USA | |
| Seller | Spring House Farms | |
| Sale Date | 12/1/2024 | |
| Transaction Status | Other | |
| Sale Price | $7,250,000 | $104 /SF NRA |
| Analysis Price | $7,250,000 | $104 /SF NRA |
| Rights Transferred | Fee Simple | |
| Conditions of Sale | Purchase Option | |

## Income Analysis

| | | |
|---|---|---|
| Occupancy | 100.0% | |
| Rent Income | $498,400 | $7.12 /SF NRA |
| Gross Income | $498,400 | $7.12 /SF NRA |
| Effective Gross Income | $498,400 | $7.12 /SF NRA |
| Expenses | ($10,500) | ($0.15) /SF NRA |
| Net Operating Income | $487,900 | $6.97 /SF NRA |
| Cap Rate | 6.73% | |

## Property

| | |
|---|---|
| Type | Industrial, Distribution Warehouse |
| Gross Building Area (GBA) | 70,000 SF |
| Net Rentable Area (NRA) | 70,000 SF |
| Buildings | 1 Building, 1 Floor |
| Foundation | Mat/Raft Foundation (Slab) |
| Year Built | 2023 |
| Land Area | 7.23 Acres (314,939 SF) |
| Site Coverage Ratio | 22.23% |
| FAR | 0.22 |
| Zoning | N/A |
| Shape | Generally Rectangular |
| Topography | Level to Sloping |
| Corner | No |
| Grade Doors | 1 |
| Dock Doors | 8 |
| Clear Height | 30 Feet |
| Office Buildout | 5% |

252 Lee Road 231
Auburn, AL 36830

County
Lee

Submarket
Auburn

APN
19-08-27-0-000-008.005




## Confirmation

| | |
|---|---|
| Name | Howard Porter |
| Company | Porter Properties |
| Affiliation | Owner |

## Remarks

The property is new construction and has 3,453 square feet of office, 30-foot eaves, and 8 dock doors with a drive-in door. The site is located south of Interstate 85 with a full interchange and just south of the Auburn city limits.

The tenant has a 10-year lease, but there is a purchase option in Years 2 and 3 of the lease.

# Skyway Drive Office Building

Comparable 2



## Sale Information

| | | |
|---|---|---|
| Buyer | East Mag Investments, LLC | |
| Seller | 1199 South Donahue, LLC | |
| Sale Date | 2/18/2022 | |
| Transaction Status | Recorded | |
| Sale Price | $3,750,000 | $97 /SF NRA |
| Analysis Price | $3,750,000 | $97 /SF NRA |
| Rights Transferred | Leased Fee | |
| Financing | Cash Equivalent | |
| Conditions of Sale | Arm's Length | |

## Income Analysis

| | | |
|---|---|---|
| Occupancy | 77.0% | |
| Rent Income | $366,795 | $9.52 /SF NRA |
| Other Income | $16,992 | $0.44 /SF NRA |
| Gross Income | $383,787 | $9.97 /SF NRA |
| Effective Gross Income | $383,787 | $9.97 /SF NRA |
| Expenses | ($100,518) | ($2.61) /SF NRA |
| Net Operating Income | $283,269 | $7.36 /SF NRA |
| Cap Rate | 7.55% | |

## Property

| | |
|---|---|
| Type | Industrial, Office, Flex |
| Gross Building Area (GBA) | 41,717 SF |
| Net Rentable Area (NRA) | 38,509 SF |
| Buildings | 4 Buildings, 1-2 Floors |
| Foundation | Concrete |
| Parking | 62 Spaces (1.6/1,000 SF NRA) |
| Year Built | 1993 |
| Land Area | 3.03 Acres (131,987 SF) |
| Site Coverage Ratio | 28.99% |
| FAR | 0.32 |
| Zoning | I |
| Shape | Generally Rectangular |
| Topography | Level |
| Corner | No |
| Flood Zones | Zone X (Unshaded) |
| Building Class | D |
| Elevators | None |
| Office Buildout | 52% |
| Power | Assumed standard and to code |

3365 Skyway Drive
Auburn, AL 36830
County
Lee
Submarket
Auburn
APN
43-09-08-27-1-000-003.006




## Confirmation

| | |
|---|---|
| Name | Contract |
| Date | 4/15/2022 |

## Remarks

The property is located on Skyway Drive proximate to the Auburn University Airport. The building is approximately half warehouse space. The front of the building has office space.

This is the sale of a multi-tenant flex property on Skyway Drive in Auburn. The property has a mixture of executive office suites, warehouses, and an office building that is leased. The cap rate is based upon the 2021 expenses. The property was approximately 77% leased at the time of sale.

# Schmidt Automotive

Comparable 3

## Sale Information

| | | |
|---|---|---|
| Buyer | DK USA Holdings LLC | |
| Seller | MAT Holdings LLC | |
| Sale Date | 4/15/2025 | |
| Transaction Status | Recorded | |
| Sale Price | $4,550,000 | $111 /SF NRA |
| Analysis Price | $4,550,000 | $111 /SF NRA |
| Recording Number | 2745-307 | |
| Rights Transferred | Fee Simple | |
| Financing | Cash Eq. | |
| Conditions of Sale | Arm's Length | |
| Marketing Time | 156 days | |

## Property

| | |
|---|---|
| Type | Industrial, Manufacturing |
| Gross Building Area (GBA) | 40,982 SF |
| Net Rentable Area (NRA) | 40,982 SF |
| Buildings | 1 Building |
| Foundation | Class S |
| Parking | 50 Spaces (1.2/1,000 SF NRA) |
| Year Built | 2016 |
| Land Area | 9.21 Acres (401,188 SF) |
| Site Coverage Ratio | 10.22% |
| FAR | 0.10 |
| Zoning | I |
| Shape | Irregular |
| Topography | Rolling |
| Corner | No |
| Flood Zones | No Flood Zones |
| Grade Doors | 1 |
| Dock Doors | 2 |
| Clear Height | 22-26 Feet |
| Office Buildout | 12% |



2471 Innovation Drive
Auburn, AL 36832

County
Lee

Submarket
Auburn

APN
43-19-05-16-0-000-009.001




## Confirmation

| | |
|---|---|
| Name | John Coleman |
| Company | Graham & Co |
| Phone Number | 205-380-1075 |
| Affiliation | Listing Broker |
| Date | 6/17/2025 |

## Remarks

The building is in pristine condition and has high-end insulated double wall panels, 6" floors, and an insulated metal roof. Companies located in Auburn Technology Park West include Seohan Auto USA, Shinhwa Auto USA, GE Aerospace, Donghee America, and Arkal Automotive USA. There is LED Lighting and HVAC in the office and main plant, excellent electrical distribution via overhead buss duct, 22' to 26' clear span, 2 dock high doors and 1 oversized grade level door, and covered storage and dumpster area in the rear. There is also an expansion pad of up to 70,000 square feet available on the southern portion of the site.

There was no cap rate for this sale as the property sold vacant.

# KAIS Logistics

Comparable 4




## Sale Information

| | | |
|---|---|---|
| Buyer | KAIS LLC | |
| Seller | Arrowrock IV Troup #100 LLC | |
| Sale Date | 3/31/2025 | |
| Transaction Status | Recorded | |
| Sale Price | $26,473,523 | $139 /SF NRA |
| Analysis Price | $26,473,523 | $139 /SF NRA |
| Recording Number | 2316-87 | |
| Rights Transferred | Leased Fee | |
| Financing | Conventional | |
| Conditions of Sale | Arm's Length | |

## Income Analysis

| | | |
|---|---|---|
| Occupancy | 100.0% | |
| Net Operating Income | $1,501,049 | $7.88 /SF NRA |
| Cap Rate | 5.67% | |

## Property

| | |
|---|---|
| Type | Industrial |
| Gross Building Area (GBA) | 190,457 SF |
| Net Rentable Area (NRA) | 190,457 SF |
| Buildings | 1 Building, 1 Floor |
| Year Built | 2024 |
| Land Area | 20.67 Acres (900,385 SF) |
| Site Coverage Ratio | 21.15% |
| FAR | 0.21 |
| Zoning | CP-GI |
| Shape | Irregular |
| Topography | Level |
| Corner | No |
| Grade Doors | 2 |
| Dock Doors | 30 |
| Clear Height | 32 Feet |
| Office Buildout | 0% |

70 SI White Blvd
LaGrange, GA 30241

County
Troup

APN
0394 000044E




## Confirmation

| | |
|---|---|
| Name | CoStar |
| Company | Tax Assessor |
| Date | 6/16/2025 |

## Remarks

KAIS logistics acquired this 190,457 SF building within the Troup Logistics Center it partially occupies from Summit Real Estate Group through its Arrowrock US Industrial Fund IV for $26,473,524 or $139 PSF. KAIS occupied 110,457 SF within the building, with Daehan Solution in the remaining 80,000 SF. The property traded at a 5.67% in-place CAP rate or $1,501,049 in net operating income. Shinhan Bank America provided $17,200,000 in financing toward the trade.

## IMPROVED SALES COMPARISON TABLE

| | SUBJECT | COMP 1 | | COMP 2 | | COMP 3 | | COMP 4 | |
|---|---|---|---|---|---|---|---|---|---|
| Name | APR | Auburn | | Skyway Drive | | Schmidt | | KAIS Logistics | |
| Address | 4800 US Highway | 252 Lee Road | | 3365 Skyway | | 2471 Innovation | | 70 SI White Blvd | |
| City | Opelika | Auburn | | Auburn | | Auburn | | LaGrange | |
| State | AL | AL | | AL | | AL | | GA | |
| Zip | 36801 | 36830 | | 36830 | | 36832 | | 30241 | |
| County | Lee | Lee | | Lee | | Lee | | Troup | |
| Submarket | Opelika | Auburn | | Auburn | | Auburn | | - | |
| | - | - | | - | | - | | - | |
| **SALE INFORMATION** | | | | | | | | | |
| Transaction Price | | $7,250,000 | | $3,750,000 | | $4,550,000 | | $26,473,523 | |
| Transaction Price $/SF NRA | | $104 | | $97 | | $111 | | $139 | |
| Property Rights [1] | | Fee Simple | | Leased Fee | | Fee Simple | | Leased Fee | |
| Financing [2] | | - | | Cash Equivalent | | Cash Eq. | | Conventional | |
| Sale Conditions [3] | | Purchase Option | | Arm's Length | | Arm's Length | | Arm's Length | |
| Expenditures After Sale [4] | | $0 | | $0 | | $0 | | $0 | |
| Market Conditions [5] | | 12/1/2024 | 1.6% | 2/18/2022 | 10.4% | 4/15/2025 | 0.5% | 3/31/2025 | 0.6% |
| Sale Status | | Other | | Recorded | | Recorded | | Recorded | |
| Recording Number | | - | | - | | 2745-307 | | 2316-87 | |
| Marketing Status | | Other | | Off Market | | Open Market | | Open Market | |
| Marketing Period (Days) | | - | | - | | 156 Days | | - | |
| Total Transactional Adjustments | | $2 | 2% | $10 | 10% | $1 | 1% | $1 | 1% |
| **Adjusted $/SF (NRA)** | | **$106** | | **$107** | | **$112** | | **$140** | |
| **INCOME INFORMATION** | | | | | | | | | |
| NOI/SF NRA | $7.10 | $6.97 | | $7.36 | | $0.00 | | $7.88 | |
| Occupancy | 100% | 100% | | 77% | | - | | 100% | |
| Capitalization Rate | | 6.73% | | 7.55% | | - | | 5.67% | |
| **PHYSICAL INFORMATION** | | | | | | | | | |
| GBA (SF) | 71,615 | 70,000 | | 41,717 | | 40,982 | | 190,457 | |
| NRA (SF) | 71,615 | 70,000 | | 38,509 | | 40,982 | | 190,457 | |
| Year Built/Ren | 2007 | 2023 | | 1993 – 2016 (2008 avg) / | | 2016 | | 2024 | |
| Location | Good | Good | | Good | | Good | | Good | |
| Access | Good | Good | | Good | | Good | | Good | |
| Exposure | Good | Good | | Good | | Good | | Good | |
| Quality | Good | Good | | Good | | Good | | Good | |
| Condition | Good | Good | | Good | | Good | | Excellent | (20%) |
| Appeal | Good | Good | | Good | | Good | | Good | |
| Parking Ratio | 1.2 | - | | 1.6 | | 1.2 | | - | |
| Site Coverage | 14.3% | 22.2% | | 29.0% | | 10.2% | | 21.2% | |
| Office Buildout | 34% | 5% | | 35% | | 12% | | 0% | |
| L:B Ratio | 6.99 | 4.50 | | 3.16 | | 9.79 | | 4.73 | |
| Total Physical Adjustments | | $0 | 0% | $0 | 0% | $0 | 0% | ($28) | (20%) |
| **Adjusted $/SF (NRA)** | | **$106** | | **$107** | | **$112** | | **$112** | |
| **CONFIRMATION INFORMATION** | | | | | | | | | |
| Company | | Porter Properties | | Confidential | | Graham & Co | | Tax Assessor | |
| Name | | Howard Porter | | Contract | | John Coleman | | CoStar | |
| Affiliation | | Owner | | Confidential | | Listing Broker | | Confidential | |
| Phone | | Confidential | | Confidential | | 205-380-1075 | | Confidential | |
| Date | | Confidential | | 4/15/2022 | | 6/17/2025 | | 6/16/2025 | |

**Analysis of Comparable Sales**

The comparable sales indicate an overall unadjusted unit value range from $97/SF to $139/SF, and an average of $113/SF. After adjustments, the comparables indicate a narrower range for the subject property from $106/SF to $112/SF, and $109/SF on average. The adjustment process is summarized below.

**Sale No. 1 ($106/SF Adjusted**) - The property is new construction and has 3,453 square feet of office, 30-foot eaves, and 8 dock doors with a drive-in door. The site is located south of Interstate 85 with a full interchange and just south of the Auburn city limits. The tenant has a 10-year lease, but there is a purchase option in Years 2 and 3 of the lease.

This comparable did not require adjustment.

**Sale No. 2 ($107/SF Adjusted)** - The property is located on Skyway Drive proximate to the Auburn University Airport. The building is approximately half warehouse space. The front of the building has office space. This is the sale of a multi-tenant flex property on Skyway Drive in Auburn. The property has a mixture of executive office suites, warehouses, and an office building that is leased. The cap rate is based upon the 2021 expenses. The property was approximately 77% leased at the time of sale.

This comparable did not require adjustment.

**Sale No. 3 ($112/SF Adjusted)** - The building is in pristine condition and has high-end insulated double wall panels, 6" floors, and an insulated metal roof. Companies located in Auburn Technology Park West include Seohan Auto USA, Shinhwa Auto USA, GE Aerospace, Donghee America, and Arkal Automotive USA. There is LED Lighting and HVAC in the office and main plant, excellent electrical distribution via overhead buss duct, 22' to 26' clear span, 2 dock high doors and 1 oversized grade level door, and covered storage and dumpster area in the rear. There is also an expansion pad of up to 70,000 square feet available on the southern portion of the site. There was no cap rate for this sale as the property sold vacant.

This comparable did not require adjustment.

**Sale No. 4 ($112/SF Adjusted)** - - KAIS logistics acquired this 190,457 SF building within the Troup Logistics Center it partially occupies from Summit Real Estate Group through its Arrowrock US Industrial Fund IV for $26,473,524 or $139 PSF.
KAIS occupied 110,457 SF within the building, with Daehan Solution in the remaining 80,000 SF. The property traded at a 5.67% in-place CAP rate or $1,501,049 in net operating income. Shinhan Bank America provided $17,200,000 in financing toward the trade.

This comparable required a 20% downward adjustment due to superior location in comparison to Sales Nos. 1, 2, and 3.

## SALES COMPARISON APPROACH CONCLUSION




Based on general bracketing, the comparable sales support an adjusted unit value range from $106/SF to $112/SF, with a unit value of $110/SF concluded for the subject property. The following table summarizes the

analysis of the comparables, reports the reconciled price per SF value conclusion, and presents the concluded value of the subject property by the Sales Comparison Approach.

| IMPROVED SALES COMPARISON APPROACH CONCLUSION (NRA) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | TRANSACTION | ADJUSTMENT | | | | NET | GROSS |
| | PRICE | TRANSACTIONAL[1] | ADJUSTED | PROPERTY[2] | FINAL | ADJ | ADJ |
| 1 | $104 | 2% | $106 | 0% | $106 | 2% | 2% |
| 2 | $97 | 10% | $107 | 0% | $107 | 10% | 10% |
| 3 | $111 | 1% | $112 | 0% | $112 | 1% | 0% |
| 4 | $139 | 1% | $140 | (20%) | $112 | (19%) | 21% |
| *HIGH* | *$139* | *10%* | *$140* | *0%* | *$112* | *10%* | *21%* |
| *AVG* | *$113* | *3%* | *$116* | *(5%)* | *$109* | *(2%)* | *8%* |
| *MED* | *$108* | *1%* | *$110* | *0%* | *$110* | *1%* | *6%* |
| *LOW* | *$97* | *1%* | *$106* | *(20%)* | *$106* | *(19%)* | *0%* |

| | SUBJECT SF (NRA) | | $/SF CONCLUSION | | VALUE |
|---|---|---|---|---|---|
| | 71,615 | x | $110 | = | $7,877,650 |
| INDICATED VALUE (ROUNDED TO NEAREST $10,000) | | | $110 | | $7,875,000 |

[1]Cumulative [2]Additive

## SALES APPROACH RECONCILIATION

| SALES COMPARISON APPROACH | |
|---|---|
| **SALES COMPARISON APPROACH** | |
| Indicated Value | **$7,875,000** |
| $/SF NRA | $110 |

# INCOME APPROACH

The Income Approach is based on the premise that properties are purchased for their income producing potential. It considers both the annual return on the invested principal and the return of the invested principal. The two fundamental methods of this valuation technique include Discounted Cash Flow and Direct Capitalization. The Direct Capitalization method of the Income Approach is used in this analysis. This valuation technique best represents the decision-making process of an investor.

## DIRECT CAPITALIZATION METHOD

The first step in direct capitalization is to estimate the durable rental income through analysis of the in-place leases and market rent terms. Next, reimbursements and other revenue are analyzed. Then, vacancy and operating expenses are estimated. Finally, the net operating income is capitalized at a supported rate. The implied value may be adjusted to account for non-stabilized conditions or required capital expenditures to reflect an as-is value.

**Subject Leases**

The following table summarizes the subject's in place contract rents.

| SINGLE-TENANT LEASE | | | |
|---|---|---|---|
| Tenant Name | APR, LLC | Landlord | 4800 U SH 280 Real Estate LL |
| Square Feet Leased | 71,615 | Lease Structure | Triple Net |
| Occupancy | 100% | Lease Status | Signed |
| Lease Term Begin | July 24, 2023 | Lease Term End | July 24, 2028 |
| Lease Term | 5.0 Years | Renewal Options | (2) 5 Years |
| Beginning Monthly Rent Total | $47,250 | Beginning Annual Rent Total | $567,000 |
| Beginning Monthly Rent $/SF | $0.66 | Beginning Annual Rent $/SF | $7.92 |
| Tenant Improvements ($/SF) | $0.00 | Current In-Place Annual Rent $/SF | $7.92 |
| Average Escalations | 0.00% | Current In-Place Annual Rent Total | $567,000 |
| Reimbursements $/SF/YR | $0.00 | Current In-Place Monthly Rent Total | $47,250 |
| Concessions (Free Rent Months) | 0.0 Mos. | Current In-Place Annual Rent $PSF | $7.92 |
| Purchase Options | None | Current In-Place Monthly Rent $PSF | $0.66 |

| RENT SCHEDULE | | | | | | |
|---|---|---|---|---|---|---|
| TERM / OPTION | DATE | ANNUAL | MONTHLY | $/SF/MO | $/SF/YR | AVG ESC/YR. |
| Year 1 | July 24, 2023 | $567,000 | $47,250 | $0.66 | $7.92 | - |
| Year 2 | July 24, 2024 | $567,000 | $47,250 | $0.66 | $7.92 | 0.00% |
| Year 3 | July 24, 2025 | $567,000 | $47,250 | $0.66 | $7.92 | 0.00% |
| Year 4 | July 24, 2026 | $567,000 | $47,250 | $0.66 | $7.92 | 0.00% |
| Year 5 | July 24, 2027 | $567,000 | $47,250 | $0.66 | $7.92 | 0.00% |
| OPTION SCHEDULE | | | | | | |
| 5 Years | July 24, 2033 | $595,350 | $49,613 | $0.69 | $8.31 | 0.00% |
| 5 Years | July 24, 2038 | $625,116 | $52,093 | $0.73 | $8.73 | 0.00% |

The subject is leased to APR, LLC. The lease began on March 31st, 2014 and ended on July 24th, 2023. The lease agreement contained 3, 5-year options. As shown above, the tenant thus far, has used one of the 5-year options. Base rent increases by 5% at the beginning of each extension period. The lease is triple net in structure in which the tenant is responsible for reimbursement of operating expenses including real estate taxes, insurance, and common area maintenance.

## SINGLE-TENANT MARKET RENT ANALYSIS

This section examines comparable properties within the marketplace to estimate market rent for the subject. This allows for a comparison of the subject property's contract to what is attainable in the current market.

**Unit of Comparison**

The analysis is conducted on a dollar per square foot annually, reflecting market behavior. The market rent analysis is based on a **triple net** expense structure where the landlord pays for structural maintenance and

vacant space expenses and the tenants reimburse a pro rata share of all other operating expenses including taxes, insurance, utilities, and common area maintenance (CAM).

**Selection of Comparables**

A complete search of the area was conducted in order to find the most comparable properties in terms of location, tenancy, age, exposure, quality, and condition. The comparables in this analysis are the most reliable indicators of market rent for the subject available at the time of this appraisal.

**Adjustments**

The comparables have been evaluated for concessions such as free rent, tenant improvements in excess of the typical market, atypical rent escalations, and atypical lease terms. Adjustment was made for these concessions based on their impact over the original term period. Quantitative percentage adjustments were made for location and physical features such as size, age, condition, exposure and parking ratio. It is stressed that the adjustments are subjective in nature and are meant to illustrate the logic in deriving market rent for the subject.

**Market Conditions (Time)**

Based on research and interpretation of rental value trends, the analysis applies an upward market conditions adjustment of 3% annually reflecting the relatively consistent rent growth that occurred between the oldest lease date up through the effective valuation date.

**Tenant Improvements & Concessions**

Market based concessions range from $0.00/SF to $10.00/SF for tenant improvements and 0 to 3 months of free rent. Comparables with concessions that are outside these defined market boundaries are adjusted to the closest boundary with this difference divided over the term of the lease.

**Presentation**

The following presentation summarizes the comparables most similar to the subject property. The Single-Tenant Lease Comparison Table, location map, photographs, and an analysis of the rent comparables are presented on the following pages.

RENT COMPARABLE SUMMARY

| | START DATE | TENANT | LOCATION | YR. BLT | LEASE SF | LEASE STRUCTURE | $/SF |
|---|---|---|---|---|---|---|---|
| 1 | 1/1/2026 | Hanguk Mold | Distribution Dr, Auburn, AL | 2025 | 61,600 | NNN | $9.42 |
| 2 | 10/1/2023 | ›lt Paper & Pack | 240 George Roy Parkway, Calera, AL | 2023 | 54,080 | NNN | $8.45 |
| 3 | 11/15/2024 | Perrigo | 725 Hwy 74 S, Peachtree City, GA | 2006 | 100,420 | NNN | $8.00 |
| 4 | 12/1/2023 | Kraem USA | 252 Lee Road 231, Auburn, AL | 2023 | 70,000 | NNN | $7.12 |




| COMPARABLE | LABEL | ADDRESS | MILES FROM SUBJECT |
|---|---|---|---|
| COMPARABLE 1 | 1 | Distribution Dr, Auburn, AL, 36830 | 10.7 |
| COMPARABLE 2 | 2 | 240 George Roy Parkway, Calera, AL, 35040 | 83.5 |
| COMPARABLE 3 | 3 | 725 Hwy 74 S, Peachtree City, GA, 30269 | 70.8 |
| COMPARABLE 4 | 4 | 252 Lee Road 231, Auburn, AL, 36830 | 10.4 |

## Single-Tenant LEASE COMPARABLE PHOTOGRAPHS




COMPARABLE 1



COMPARABLE 2




COMPARABLE 3



COMPARABLE 4

# ADC Building 500

Comparable 1




## Lease Information

| | |
|---|---|
| Tenant | Hanguk Mold Co. |
| Tenant Type | Manufacturing |
| Lease Type | New |
| Tenant Size | 61,600 SF |
| Start Date | 1/1/2026 |
| Lease Term | 10 Years (120 Months) |
| Rent | $9.42/SF (Yr.) / $0.79/SF (Mo.) |
| Expense Structure | NNN |
| TI Allowance | $6.65/SF |
| Average Escalations | 3.5% (Yr.) |
| Escalation Detail | 3.5% Annual |

## Property

| | |
|---|---|
| Type | Industrial, Distribution Drive |
| Gross Building Area (GBA) | 61,600 SF |
| Net Rentable Area (NRA) | 61,600 SF |
| Buildings | 1 Building, 1 Floor |
| Foundation | Concrete |
| Year Built | 2025 |
| Frontage | 280' Distribution Drive |
| Land Area | 9.39 Acres (409,028 SF) |
| Site Coverage Ratio | 15.06% |
| FAR | 0.15 |
| Zoning | None |
| Shape | Generally Rectangular |
| Topography | Generally Level |
| Corner | No |
| Flood Zones | Zone X (Unshaded) |
| Grade Doors | 0 |
| Dock Doors | 6 |
| Clear Height | 30 Feet |
| Office Buildout | 3% |
| Power | Master meter |
| Cranes | Crane-ready |

Distribution Dr
400
Auburn, AL 36830

County
Lee

Submarket
Auburn

APN
Lot 2-A-2-A




## Confirmation

| | |
|---|---|
| Name | LOI |

## Remarks

This property is located proximate a few newer industrial developments in a rural part of south Auburn about two and a half miles from Interstate 85.

# Calera Commerce Park Building

Comparable 2



## Lease Information

| | |
|---|---|
| Tenant | Sunbelt Paper & Packaging |
| Tenant Type | Industrial |
| Lease Type | New |
| Tenant Size | 54,080 SF |
| Start Date | 10/1/2023 |
| Lease Term | 10 Years (120 Months) |
| Rent | $8.45/SF (Yr.) / $0.70/SF (Mo.) |
| Expense Structure | NNN |
| Average Escalations | 3% (Yr.) |

## Property

| | |
|---|---|
| Type | Industrial |
| Gross Building Area (GBA) | 216,000 SF |
| Net Rentable Area (NRA) | 216,000 SF |
| Buildings | 1 Building, 1 Floor |
| Year Built | 2023 |
| Land Area | 16.9 Acres (736,164 SF) |
| Site Coverage Ratio | 29.34% |
| FAR | 0.29 |
| Zoning | M-1 |
| Shape | Generally Rectangular |
| Topography | Level |
| Corner | No |
| Grade Doors | 2 |
| Dock Doors | 42 |
| Clear Height | 32 Feet |
| Power | 2,000a/480v 3p Heavy |

240 George Roy Parkway
Calera, AL 35040

County
Shelby

APN
28 3 05 1 001 008.007




## Confirmation

| | |
|---|---|
| Name | Ogden Deaton |
| Company | Graham Company |
| Phone Number | 205-871-7100 |
| Affiliation | Leasing Rep |
| Date | 12/2/2024 |

## Remarks

This property is located in the Calera Commerce Park just off of Interstate 65.

The rent is arm's length but the tenant is a partner in the project. 9,000 sf office and 3 percent annual bumps

# 725 Hwy 74 S

Comparable 3



## Lease Information

| | |
|---|---|
| Tenant | Perrigo |
| Tenant Type | Industrial |
| Lease Type | Renewal |
| Tenant Size | 100,420 SF |
| Start Date | 11/15/2024 |
| Lease Term | 5.5 Years (66 Months) |
| Rent | $8/SF (Yr.) / $0.67/SF (Mo.) |
| Expense Structure | NNN |
| Average Escalations | 3% (Yr.) |

## Property

| | |
|---|---|
| Type | Industrial |
| Gross Building Area (GBA) | 100,420 SF |
| Net Rentable Area (NRA) | 100,420 SF |
| Buildings | 1 Building |
| Parking | 60 Spaces (0.6/1,000 SF NRA) |
| Year Built | 2006 |
| Land Area | 6.13 Acres (267,023 SF) |
| FAR | 0.38 |
| Zoning | I GI |
| Shape | Generally Rectangular |
| Topography | Level |
| Corner | No |
| Grade Doors | 7 |
| Dock Doors | 14 |
| Clear Height | 30 Feet |
| Office Buildout | 0% |

725 Hwy 74 S
Peachtree City, GA 30269

County
Fayette

APN
0613 016




## Confirmation

| | |
|---|---|
| Name | CoStar |
| Date | 6/16/2025 |

## Remarks

Perrigo signed a renewal lease on November 15th, 2024. They will be occupying 100,420 square feet of space at 725 Highway 74 S in Peachtree City. Perrigo will be in suite C for 5.5 years. The tenant began their original lease in January of 2016.

# Auburn Distribution Center 300

Comparable 4



## Lease Information

| | |
|---|---|
| Tenant | Kraem USA |
| Tenant Type | Warehouse |
| Lease Type | New |
| Tenant Size | 70,000 SF |
| Start Date | 12/1/2023 |
| Lease Term | 10 Years (120 Months) |
| Rent | $7.12/SF (Yr.) / $0.59/SF (Mo.) |
| Expense Structure | NNN |
| Average Escalations | 3% (Yr.) |

## Property

| | |
|---|---|
| Type | Industrial, Distribution Warehouse |
| Gross Building Area (GBA) | 70,000 SF |
| Net Rentable Area (NRA) | 70,000 SF |
| Buildings | 1 Building, 1 Floor |
| Foundation | Mat/Raft Foundation (Slab) |
| Year Built | 2023 |
| Land Area | 7.23 Acres (314,939 SF) |
| Site Coverage Ratio | 22.23% |
| FAR | 0.22 |
| Zoning | N/A |
| Shape | Generally Rectangular |
| Topography | Level to Sloping |
| Corner | No |
| Grade Doors | 1 |
| Dock Doors | 8 |
| Clear Height | 30 Feet |
| Office Buildout | 5% |

252 Lee Road 231
Auburn, AL 36830

County
Lee

Submarket
Auburn

APN
19-08-27-0-000-008.005




## Confirmation

| | |
|---|---|
| Name | Howard Porter |
| Company | Porter Properties |
| Affiliation | Owner |
| Date | 11/29/2023 |

## Remarks

The property is new construction and has 3,453 square feet of office, 30-foot eaves, and 8 dock doors with a drive-in door. The site is located south of Interstate 85 with a full interchange and just south of the Auburn city limits.

The tenant isa Tier 1 auto supply chain supplier for Kia and Hyundai.

## SINGLE-TENANT LEASE COMPARISON TABLE

| | SUBJECT | COMP 1 | | COMP 2 | | COMP 3 | | COMP 4 | |
|---|---|---|---|---|---|---|---|---|---|
| Name | APR | ADC Building | | Calera | | - | | Auburn | |
| Address | 4800 US Highway | Distribution Dr | | 240 George Roy | | 725 Hwy 74 S | | 252 Lee Road | |
| City | Opelika | Auburn | | Calera | | Peachtree City | | Auburn | |
| State | AL | AL | | AL | | GA | | AL | |
| Zip | 36801 | 36830 | | 35040 | | 30269 | | 36830 | |
| County | Lee | Lee | | Shelby | | Fayette | | Lee | |
| Submarket | Opelika | Auburn | | - | | - | | Auburn | |
| Floor/Suite | - | - | | - | | C | | - | |
| **LEASE INFORMATION** | | | | | | | | | |
| Rent ($/SF/Yr.) | $7.92 | $9.42 | | $8.45 | | $8.00 | | $7.12 | |
| Tenant | APR, LLC | Hanguk Mold Co | | Sunbelt Paper & Packaging | | Perrigo | | Kraem USA | |
| Start Date | 7/24/2023 | 1/1/2026 | -2% | 10/1/2023 | 5% | 11/15/2024 | 2% | 12/1/2023 | 5% |
| Lease Type | Signed | New | | New | | Renewal | | New | |
| Lease Str. | Triple Net | NNN | | NNN | | NNN | | NNN | |
| Size (SF) | 71,615 | 61,600 | | 54,080 | | 100,420 | | 70,000 | |
| Office (SF) | | - | | - | | - | | - | |
| Total Space (SF) | | 61,600 | | 54,080 | | 100,420 | | 70,000 | |
| Term (Yrs.) | 5 | 10 | | 10 | | 5.5 | | 10 | |
| Avg. Escalation | 0.0% | 3.5% | | 3.0% | | 3.0% | | 3.0% | |
| Free Rent | 0 Mos. | None | $0 | None | $0 | None | $0 | None | $0 |
| TI's ($/SF) | $0 | $7 | | None | $0 | None | $0 | None | $0 |
| Options | (2) 5 Years | None | | None | | None | | None | |
| Reimb. ($/SF) | $0.00 | None | | None | | None | | None | |
| Space Condition | | New | | New | | 2nd Gen | | New | |
| Total Lease Adjustments | | ($0.19) | (2%) | $0.42 | 5% | $0.16 | 2% | $0.36 | 5% |
| **Adjusted Rent ($/SF/Yr.)** | | **$9.23** | | **$8.87** | | **$8.16** | | **$7.48** | |
| **BUILDING INFORMATION** | | | | | | | | | |
| NRA (SF) | 71,615 | 61,600 | | 216,000 | | 100,420 | | 70,000 | |
| Year Built/Ren | 2007 | 2025 | | 2023 | | 2006 | | 2023 | |
| Location | Good | Good | | Good | | Good | | Good | |
| Access | Good | Good | | Good | | Good | | Good | |
| Exposure | Good | Good | | Good | | Good | | Good | |
| Quality | Good | Good | | Good | | Good | | Good | |
| Condition | Good | Excellent | (10%) | Good | | Good | | Good | |
| Appeal | Good | Good | | Good | | Good | | Good | |
| Parking Ratio | 1.2 | - | | - | | 0.6 | | - | |
| Site Coverage | 14.3% | 15.1% | | 29.3% | | - | | 22.2% | |
| | - | - | | - | | - | | - | |
| Total Building Adjustments | | ($0.92) | (10%) | $0.00 | | $0.00 | | $0.00 | |
| **Adjusted Rent ($/SF/Yr.)** | | **$8.31** | | **$8.87** | | **$8.16** | | **$7.48** | |
| **CONFIRMATION INFORMATION** | | | | | | | | | |
| Company | | Confidential | | Graham Company | | Confidential | | Porter Properties | |
| Name | | LOI | | Ogden Deaton | | CoStar | | Howard Porter | |
| Affiliation | | Confidential | | Leasing Rep | | Confidential | | Owner | |
| Phone | | Confidential | | 205-871-7100 | | Confidential | | Confidential | |
| Date | | Confidential | | 12/2/2024 | | 6/16/2025 | | 11/29/2023 | |

**Discussion of Single-Tenant Lease Comparables**

The Single-Tenant lease comparables indicate an unadjusted range from $7.12/SF to $9.42/SF, and an average of $8.25/SF. Rents are analyzed on a triple net basis. After adjustments a narrower rental range is indicated for the subject from $7.48/SF to $8.87/SF and $8.20/SF on average.

**Lease 1 ($8.31/SF Adjusted)** – This property is located proximate a few newer industrial developments in a rural part of south Auburn about two and a half miles from Interstate 85. -

This comparable required a 10% downward adjustment for superior condition in comparison to Rent Nos. 2, 3, and 4.

**Lease 2 ($8.87/SF Adjusted)** – This property is located in the Calera Commerce Park just off of Interstate 65. The rent is arms length but the tenant is a partner in the project. 9,000 sf office and 3 percent annual bumps

This comparable does not require adjustment.

**Lease 3 ($8.16/SF Adjusted)** – - Perrigo signed a renewal lease on November 15th, 2024. They will be occupying 100,420 square feet of space at 725 Highway 74 S in Peachtree City. Perrigo will be in suite C for 5.5 years. The tenant began their original lease in January of 2016.

This comparable does not require adjustment.

**Lease 4 ($7.48/SF Adjusted)** – The property is new construction and has 3,453 square feet of office, 30-foot eaves, and 8 dock doors with a drive-in door. The site is located south of Interstate 85 with a full interchange and just south of the Auburn city limits. The tenant isa Tier 1 auto supply chain supplier for Kia and Hyundai.

This comparable does not require adjustment.

## CONCLUSION OF MARKET RENT

Based on general bracketing, the comparable leases support an adjusted market rent range from $7.48/SF to $8.87/SF, with a market rent of $8.25/SF concluded for the subject property. The following table summarizes the various indicators of market rent, provides the market rent analysis and the conclusion for the subject property.

**SINGLE-TENANT MARKET RENT CONCLUSION**

| | LEASE RATE | ADJUSTMENT LEASE[1] | ADJUSTED | BUILDING[1] | FINAL | NET ADJ | GROSS ADJ |
|---|---|---|---|---|---|---|---|
| 1 | $9.42 | (2%) | $9.23 | (10%) | $8.31 | (12%) | 12% |
| 2 | $8.45 | 5% | $8.87 | 0% | $8.87 | 5% | 5% |
| 3 | $8.00 | 2% | $8.16 | 0% | $8.16 | 2% | 2% |
| 4 | $7.12 | 5% | $7.48 | 0% | $7.48 | 5% | 5% |
| *HIGH* | *$9.42* | *5%* | *$9.23* | *0%* | *$8.87* | *5%* | *12%* |
| *AVG* | *$8.25* | *3%* | *$8.44* | *(3%)* | *$8.20* | *0%* | *6%* |
| *MED* | *$8.23* | *4%* | *$8.52* | *0%* | *$8.23* | *4%* | *5%* |
| *LOW* | *$7.12* | *(2%)* | *$7.48* | *(10%)* | *$7.48* | *(12%)* | *2%* |

| | AVG CONTRACT | ASKING | | CONCLUSION |
|---|---|---|---|---|
| Single-Tenant | $7.92 | | Triple Net | $8.25 |

[1]Total Additive Adjustment

**Market Rent vs. Contract Rent**

Based on the previous conclusions, the subject's average contract rent is 96% of market rents. Contract rents are applied in our analysis.

**Total Rental Revenue**

The total rental revenue is based on the rent conclusions presented above and is summarized in the following table.

| OCCUPIED SPACE | | | | | | | |
|---|---|---|---|---|---|---|---|
| TENANT | NRA (SF) | CATEGORY | CONTRACT | MARKET | CONT V MKT | $/SF (YR.) | $/YEAR |
| APR, LLC | 71,615 | Single-Tenant | $7.92 | $8.25 | 96% | $7.92 | $567,000 |
| **OCCUPIED SUBTOTALS** | **71,615** | **-** | **$7.92** | **$8.25** | **96%** | **$7.92** | **$567,000** |
| TOTAL | 71,615 | – | $7.92 | $8.25 | 96% | $7.92 | $567,000 |

### Reimbursement Income

Under the terms of the market's triple-net lease expense structure, tenants would reimburse the landlord for operating expenses including property taxes, insurance, common area maintenance, and utilities. These reimbursements are based on the operating expenses that are concluded later in the Income Approach.

| REIMBURSEMENT REVENUE CONCLUSIONS | | | | |
|---|---|---|---|---|
| OTHER TENANT REVENUE | %PRR | $/SF NRA | TOTAL | COMMENT |
| Taxes | 9.4% | $0.74 | $53,245 | Tenants remiburse owner or directly pay taxes |
| Insurance | 1.9% | $0.15 | $10,742 | Tenants remiburse owner or directly pay insurance |
| Common Area Maintenance | 3.8% | $0.30 | $21,485 | Tenants remiburse owner or directly pay common area maintenance |
| **TOTAL OTHER TENANT REVENUE** | **15.1%** | **$1.19** | **$85,472** | |

### Miscellaneous Income

Based on review of the subject's historical operations, there is no miscellaneous income generators present.

### Potential Gross Revenue (PGR)

The potential gross revenue equals the total rental revenue plus reimbursement and miscellaneous revenue. The potential gross revenue of the subject is calculated by multiplying the sum of contract rent of $9.11 per square foot rent and reimbursements if any at $85,472 which is $1.19/SF by the net rentable area of 71,615 square feet, which indicates a PGR of $652,472.

### Vacancy and Credit Loss

This category accounts for the time period between occupants, as well as possible prolonged vacancies under slow market conditions. Market participants typically expect a vacancy and credit loss of 4% to 6% of potential gross income for similar property types. This assignment reflects the probable vacancy during the economic life of the property and not necessarily the current or short-term vacancy. The findings of the Market Analysis section support a typical vacancy and credit loss allocation. As of the effective date, the subject is 100.0% occupied. Based on current and perceived long-term market conditions and the subject's current and anticipated tenancy over a typical holding period, a vacancy and credit loss of 5.0% is concluded.

| ALL VACANCY LOSS | %PGR | %EGR | $/SF (YR.) | $/YEAR |
|---|---|---|---|---|
| Rental Revenue | 5.0% | 4.6% | ($0.40) | ($28,350) |
| Reimbursement Revenue | 5.0% | 0.7% | ($0.06) | ($4,274) |
| Miscellaneous Revenue | | | - | $0 |
| **TOTAL VACANCY & CREDIT LOSS** | 5.0% | 5.3% | ($0.46) | ($32,624) |

### Effective Gross Revenue (EGR)

Effective gross revenue equals the potential gross revenue less vacancy and credit loss. The total effective gross revenue for the subject is $619,848 which is $8.66/SF.

### Operating History

The subject's operating history is shown in the following chart.

| OPERATING HISTORY | | |
|---|---|---|
| YEAR | PROJECTION | |
| **RENTAL REVENUE** | **TOTAL** | **$/SF** |
| Potential Base Rent | $567,000 | $7.92 |
| Vacant Space Market Rent | $0 | - |
| **TOTAL RENTAL REVENUE** | $567,000 | $7.92 |
| **REIMBURSEMENT REVENUE** | **TOTAL** | **$/SF** |
| Taxes | $53,245 | $0.74 |
| Insurance | $10,742 | $0.15 |
| Common Area Maintenance | $21,485 | $0.30 |
| **TOTAL REIMBURSEMENT REVENUE** | $85,472 | $1.19 |
| **POTENTIAL GROSS REVENUE** | $652,472 | $9.11 |
| **ALL VACANCY LOSS** | **TOTAL** | **$/SF** |
| Rental Revenue | ($28,350) | ($0.40) |
| Reimbursement Revenue | ($4,274) | ($0.06) |
| Miscellaneous Revenue | $0 | - |
| Other | $0 | - |
| **EFFECTIVE GROSS REVENUE** | $619,848 | $8.66 |
| **OPERATING EXPENSES** | **TOTAL** | **$/SF** |
| Taxes | ($53,245) | ($0.74) |
| Insurance | ($10,742) | ($0.15) |
| Common Area Maintenance | ($21,485) | ($0.30) |
| Repairs & Maintenance | $0 | - |
| Management Fees | ($18,595) | ($0.26) |
| Other Expenses | $0 | - |
| Reserves | ($7,162) | ($0.10) |
| **TOTAL OPERATING EXPENSES** | ($111,229) | ($1.55) |
| **NET OPERATING INCOME** | **$508,619** | **$7.10** |

## Expense Comparables

The following table summarizes the expense comparables deemed to be applicable to the subject property.

| EXPENSE COMPARABLES | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COMPARABLE | COMP 1 | | COMP 2 | | COMP 3 | | COMP 4 | | COMP 5 | | COMP 6 | | LOW | HIGH | AVG |
| City | | Auburn | | Opelika | | Auburn | | Newnan | | Phenix City | | Auburn | - | - | - |
| State | | AL | | AL | | AL | | GA | | AL | | AL | - | - | - |
| Building Class | | D; S | | - | | S | | B | | - | | S | - | - | - |
| Expense Year | | 2021 | | 2019 | | 2024 | | 2022 | | 2019 | | 2023 | - | - | - |
| Actual/Budget | | - | | - | | Owner | | Off. Memo. | | - | | Owner | - | - | - |
| Units | | - | | - | | 7 | | - | | 4 | | 7 | 4 | 7 | 6 |
| Net Rentable Area | | 38,509 | | 83,750 | | 169,600 | | 22,200 | | 215,015 | | 169,600 | 22,200 | 215,015 | 116,446 |
| Year Built | | 1993 – 2016 | | 1990 | | 2000 – 2008 | | 2008 | | 1965 | | 2000 – 2008 | 1965 | 2008 | 1988 |
| EFFECTIVE GROSS REVENUE | $9.97 | - | $3.88 | - | $5.41 | - | $6.79 | - | $2.23 | - | $5.43 | - | $2.23 | $9.97 | $5.62 |
| OPERATING EXPENSES | $/SF | %EGR | $/SF | %EGR | $/SF | %EGR | $/SF | %EGR | $/SF | %EGR | $/SF | %EGR | LOW | HIGH | AVG |
| Taxes | $0.83 | 8.3% | $0.22 | 5.8% | $0.35 | 6.5% | $0.35 | 5.2% | $0.17 | 7.6% | $0.35 | 6.5% | $0.17 | $0.83 | $0.38 |
| Insurance | $0.21 | 2.1% | $0.09 | 2.3% | $0.04 | 0.8% | $0.30 | 4.4% | $0.10 | 4.3% | $0.08 | 1.5% | $0.04 | $0.30 | $0.14 |
| Common Area Maintenance | - | - | $0.30 | 7.8% | $0.26 | 4.8% | $0.15 | 2.2% | - | - | $0.35 | 6.5% | $0.15 | $0.35 | $0.27 |
| Repairs & Maintenance | $0.32 | 3.2% | $0.02 | 0.6% | $0.05 | 1.0% | - | - | $0.06 | 2.9% | $0.05 | 1.0% | $0.02 | $0.32 | $0.10 |
| Management Fees | $0.38 | 3.8% | $0.06 | 1.5% | $0.16 | 3.0% | $0.29 | 4.3% | $0.06 | 2.7% | $0.16 | 3.0% | $0.06 | $0.38 | $0.19 |
| Other Expenses | $0.02 | 0.2% | - | - | $0.00 | 0.0% | - | - | $0.01 | 0.7% | $0.00 | 0.0% | $0.00 | $0.02 | $0.01 |
| Reserves | - | - | - | - | - | - | - | - | - | - | - | - | $0.00 | $0.00 | - |
| TOTAL OPERATING EXPENSES | $1.76 | 17.6% | $0.69 | 17.9% | $0.87 | 16.0% | $1.09 | 16.1% | $0.40 | 18.1% | $1.00 | 18.5% | $0 | $2 | $1 |

### Expense Conclusions

The individual expense conclusions for the subject are summarized below. The analysis relies upon the subject's historical data, expense comparables and general market parameters.

| EXPENSE CONCLUSIONS | | | | |
|---|---|---|---|---|
| OPERATING EXPENSES | %EGR | $/SF NRA | TOTAL | COMMENT |
| Taxes | 8.6% | $0.74 | $53,245 | The concluded amount is based on the historical expense range. |
| Insurance | 1.7% | $0.15 | $10,742 | The concluded amount is based on the expense comparable information. |
| Common Area Maintenance | 3.5% | $0.30 | $21,485 | The concluded amount is based on the expense comparable information. |
| Repairs & Maintenance | 0.0% | $0.00 | $0 | Repairs and Maintenance are included in CAM. |
| Management Fees | 3.0% | $0.26 | $18,595 | The concluded amount is based on 3.0% of the concluded Effective Gross Income. |
| Other Expenses | 0.0% | $0.00 | $0 | The concluded amount is based on the expense comparable information. |
| Reserves | 1.2% | $0.10 | $7,162 | The concluded amount is based on $0.10/SF of the subject's building area. |
| TOTAL OPERATING EXPENSES | 17.9% | $1.55 | $111,229 | |

### Net Operating Income (NOI)

The net operating income equals the effective gross income less the total expenses. The total net operating income for the subject is $508,619 which is $7.10/SF.

### Capitalization Rate

In this section, a capitalization rate for the subject is developed based upon market extraction, national survey data, and band of investments analysis.

### Market Extraction

The following capitalization table restates the information for the sales previously presented in the Sales Comparison Approach.

| MARKET EXTRACTION METHOD | | | | |
|---|---|---|---|---|
| | COMP 1 | COMP 2 | COMP 3 | COMP 4 |
| Name | Auburn Distribution Center 300 | Skyway Drive Office Building | Schmidt Automotive | KAIS Logistics |
| Address | 252 Lee Road 231 | 3365 Skyway Drive | 2471 Innovation Drive | 70 SI White Blvd |
| City | Auburn | Auburn | Auburn | LaGrange |
| State | AL | AL | AL | GA |
| NRA (SF) | 70,000 | 38,509 | 40,982 | 190,457 |
| Units | | | 1 | |
| Year Built/Ren | 2023 | 1993 – 2016 / 2020 | 2016 | 2024 |
| Sale Date | 12/1/2024 | 2/18/2022 | 4/15/2025 | 3/31/2025 |
| Sale Price | $7,250,000 | $3,750,000 | $4,550,000 | $26,473,523 |
| Price/SF | $104 | $97 | $111 | $139 |
| Price/Unit | $0 | $0 | $4,550,000 | $0 |
| NOI/SF NRA | $6.97 | $7.36 | $0.00 | $7.88 |
| Occupancy | 100% | 77% | | 100% |
| Remaining Lease Term | 0.0 | 0.0 | 0.0 | 0.0 |
| **Capitalization Rate** | **6.73%** | **7.55%** | | **5.67%** |
| HIGH | 7.55% | | | |
| **AVERAGE** | **6.65%** | | | |
| LOW | 5.67% | | | |




The cap rate comps indicate a range from 5.67% to 7.55% with an average of 6.65%.

**Market Extraction Conclusion**

In conclusion, the market extraction method brackets the subject's applicable capitalization rate from 5.67% to 7.55%, and is supportive of a capitalization rate conclusion for the subject presented in the Capitalization Rate Conclusion section. A cap rate near the middle of the range is supported.

**National Survey**

The investor pool for the subject property likely includes regional or local investors, with a national investor profile viewed as unlikely based on the relatively smaller size and local tenant profile. However, for additional support, the following table summarizes national cap rate trends for similar properties.

| NATIONAL INVESTOR SURVEY | | | | | |
|---|---|---|---|---|---|
| CAPITALIZATION RATE (OAR) | YEAR/QUARTER | RANGE | | | AVERAGE |
| National Warehouse Market | | | | | PwC |
| **Retrospective Quarter** | **25 Q1** | **3.85%** | **to** | **6.50%** | **5.08%** |
| Previous Quarter | 24 Q4 | 4.00% | to | 7.50% | 5.27% |
| Four Quarters Prior | 24 Q1 | 4.00% | to | 8.00% | 5.38% |

The preceding table shows that cap rates have more or less leveled off around 5.0%. However, this list of national investor responses may apply more to institutional-grade industrial properties with a stronger tenant credit profile. A rate well above 5.0% is supported for the subject.

**RealtyRates.com**

Consideration has also been given to the RealtyRates.com Investor Survey – 2nd Quarter 2025 for Industrial – Flex/R&D. The RealtyRates.com includes secondary markets, such as Auburn, while the PWC Survey above only surveys primary markets, such as Atlanta. The RealtyRates.com Investor Survey indicates that the capitalization rates range from 6.46% to 13.19% with an average of 9.64%. The survey is shown as follows:

**RealtyRates.com INVESTOR SURVEY - 2nd Quarter 2025***
**INDUSTRIAL - FLEX/R&D**

| Item | Input | | | | | | OAR |
|---|---|---|---|---|---|---|---|
| **Minimum** | | | | | | | |
| Spread Over 10-Year Treasury | 1.25% | **DCR Technique** | | 1.35 | 0.068512 | 0.72 | **6.66** |
| Debt Coverage Ratio | 1.35 | **Band of Investment Technique** | | | | | |
| Interest Rate | 5.55% | Mortgage | | 72% | 0.068512 | 0.049328 | |
| Amortization | 30 | Equity | | 28% | 0.069200 | 0.019376 | |
| Mortgage Constant | 0.068512 | OAR | | | | | **6.87** |
| Loan-to-Value Ratio | 72% | **Surveyed Rates** | | | | | **6.46** |
| Equity Dividend Rate | 6.92% | | | | | | |
| **Maximum** | | | | | | | |
| Spread Over 10-Year Treasury | 5.80% | **DCR Technique** | | 2.05 | 0.129688 | 0.50 | **13.29** |
| Debt Coverage Ratio | 2.05 | **Band of Investment Technique** | | | | | |
| Interest Rate | 10.10% | Mortgage | | 50% | 0.129688 | 0.064844 | |
| Amortization | 15 | Equity | | 50% | 0.150900 | 0.075450 | |
| Mortgage Constant | 0.129688 | OAR | | | | | **14.03** |
| Loan-to-Value Ratio | 50% | **Surveyed Rates** | | | | | **13.19** |
| Equity Dividend Rate | 15.09% | | | | | | |
| **Average** | | | | | | | |
| Spread Over 10-Year Treasury | 3.53% | **DCR Technique** | | 1.70 | 0.094610 | 0.61 | **9.81** |
| Debt Coverage Ratio | 1.70 | **Band of Investment Technique** | | | | | |
| Interest Rate | 7.83% | Mortgage | | 61% | 0.094610 | 0.057712 | |
| Amortization | 23 | Equity | | 39% | 0.105965 | 0.041326 | |
| Mortgage Constant | 0.094610 | OAR | | | | | **9.90** |
| Loan-to-Value Ratio | 61% | **Surveyed Rates** | | | | | **9.64** |
| Equity Dividend Rate | 10.60% | | | | | | |

*1st Quarter 2025 Data

Copyright 2025 RealtyRates.com ™

## BAND OF INVESTMENT TECHNIQUES

To analyze the capitalization rate from a financial position, the Band of Investment Technique is used. Available financing information from lenders and the sales comparables indicates the following terms. Equity dividend rates vary depending upon motivations of buyers and financing terms. The terms, appreciation, NOI growth and other rates used in the Band of Investment calculations along with the Band of Investment conclusions are presented in the following tables. Our estimate for the interest rate is based on the range expressed by the Ten Year Treasury plus 200 bp (4.42%). These reasonable assumptions including Appreciation and Equity Yield Rate (EYR) are well supported by the market. The previous estimate for the EYR is near the middle aspect of the range quoted by market participants (10.0% to 15.0%). Based on our research, and market participant input, we have estimated that a reasonable EDR should be 10.00%, which is supported by our analysis.

As an additional test, we have presented the Simple Band of Investment as an alternate method for calculating the cap rate:

**SIMPLE BAND OF INVESTMENT**

| ASSUMPTIONS | | | |
|---|---|---|---|
| Interest Rate | 6.42% | Ten Year Treasury | 200 bp |
| Loan Amortization Period | 20 Years | Current 10-Yr. Treasury | 4.42% (As of Report Date) |
| Loan-To-Value-Ratio | 60.00% | 6-Mos Trend |  |
| Mortgage Constant | 0.08890 | Current SOFR | 4.32% (As of Report Date) |
| Debt Service Coverage Ratio | 1.70000 | 6-Mos Trend |  |

| CALCULATION | | | | | |
|---|---|---|---|---|---|
| Mortgage Component | 60% | x | 8.89% | = | 0.0533 |
| Equity Component | 40% | x | 10.00% | = | 0.0400 |
| **INDICATED CAPITALIZATION RATE** | | | | | **9.33%** |

As well, the resulting debt coverage service ratio (1.4368) is within the range indicated by analysts and lenders (1.2 to 2.5) as acceptable.

**DEBT SERVICE COVERAGE RATIO**

| DSCR | LTV | MORTGAGE CONSTANT | INDICATED CAP RATE |
|---|---|---|---|
| 1.70 | 0.60 | 0.0889 | 9.07% |

The similarities between the two conclusions (9.07% and 9.33%) using market data provide further support for the subject's cap rate selection.

**Capitalization Rate Conclusion**

Taking all factors into consideration, the following table summarizes the various capitalization rate indicators and provides the final capitalization rate conclusion. Primary emphasis was placed on the Market Extraction Method, with support from the balance of the data.

**CAPITALIZATION RATE CONCLUSION**

| COMPONENT | RANGE | | | AVERAGE |
|---|---|---|---|---|
| Market Extraction | 5.67% | to | 7.55% | 6.65% |
| National PwC Investor Surveys Average | 3.85% | to | 6.50% | 5.08% |
| National Realty Rates Average | 6.46% | to | 13.19% | 9.64% |
| Simple Band of Investment Calculation | | | | 9.33% |
| DSCR Method Cap Rate | | | | 9.07% |
| **CONCLUDED CAPITALIZATION RATE** | | | | **6.50%** |

## DIRECT CAPITALIZATION CONCLUSION

The table below summarizes the Direct Capitalization Method and its value conclusion.

| DIRECT CAPITALIZATION | | | | | | | |
|---|---|---|---|---|---|---|---|
| OCCUPIED SPACE | | | | | | | |
| TENANT | NRA (SF) | CATEGORY | CONTRACT | MARKET | CONT V MKT | $/SF (YR.) | $/YEAR |
| APR, LLC | 71,615 | Single-Tenant | $7.92 | $8.25 | 96% | $7.92 | $567,000 |
| **OCCUPIED SUBTOTALS** | **71,615** | **-** | **$7.92** | **$8.25** | **96%** | **$7.92** | **$567,000** |
| TOTAL | 71,615 | - | $7.92 | $8.25 | 96% | $7.92 | $567,000 |
| GROSS RENTAL REVENUE | | | | | | | |
| RENTAL REVENUE | | | %PRR | %PGR | %EGR | $/SF (YR.) | $/YEAR |
| Potential Base Rent | | | 100% | 87% | 91% | $7.92 | $567,000 |
| TOTAL RENTAL REVENUE | | | | | | $7.92 | $567,000 |
| OTHER TENANT REVENUE (REIMBURSEMENT/RECOVERIES) | | | | | | | |
| Taxes | | | 9% | 8% | 9% | $0.74 | $53,245 |
| Insurance | | | 2% | 2% | 2% | $0.15 | $10,742 |
| Common Area Maintenance | | | 4% | 3% | 3% | $0.30 | $21,485 |
| TOTAL OTHER TENANT REVENUE (REIMBURSEMENT/RECOVERIES) | | | 15% | 13% | 14% | $1.19 | $85,472 |
| POTENTIAL GROSS REVENUE | | | | | | $9.11 | $652,472 |
| ALL VACANCY LOSS | | | | %PGR | %EGR | $/SF (YR.) | $/YEAR |
| Rental Revenue | | | | 5.0% | 4.6% | ($0.40) | ($28,350) |
| Reimbursement Revenue | | | | 5.0% | 0.7% | ($0.06) | ($4,274) |
| Miscellaneous Revenue | | | | | | - | $0 |
| TOTAL VACANCY & CREDIT LOSS | | | | 5.0% | 5.3% | ($0.46) | ($32,624) |
| EFFECTIVE GROSS REVENUE | | | | | | $8.66 | $619,848 |
| OPERATING EXPENSES | Reimburse | | | %PGR | %EGR | $/SF (YR.) | $/YEAR |
| Taxes | *Taxes 10C* | | | 8.2% | 8.6% | ($0.74) | ($53,245) |
| Insurance | *Insurance* | | | 1.6% | 1.7% | ($0.15) | ($10,742) |
| Common Area Maintenance | *Common* | | | 3.3% | 3.5% | ($0.30) | ($21,485) |
| Repairs & Maintenance | | | | | | - | $0 |
| Management Fees | | | | 2.9% | 3.0% | ($0.26) | ($18,595) |
| Other Expenses | | | | | | - | $0 |
| Reserves | | | | 1.1% | 1.2% | ($0.10) | ($7,162) |
| TOTAL OPERATING EXPENSES | | | | 17.0% | 17.9% | ($1.55) | ($111,229) |
| NET OPERATING INCOME | | | | | | $7.10 | $508,619 |
| Capitalization Rate | | | | | | | 6.50% |
| Capitalized Value | | | | | | | $7,824,915 |
| **INDICATED VALUE (ROUNDED TO NEAREST $10,000)** | | | | | | **$109** | **$7,825,000** |

## INCOME APPROACH RECONCILIATION

| INCOME CAPITALIZATION APPROACH | |
|---|---|
| DIRECT CAPITALIZATION | |
| NOI | $508,619 |
| NOI $/SF NRA | $7.10 |
| Capitalization Rate (OAR) | 6.50% |
| Indicated Value | **$7,825,000** |
| $/SF NRA | $109 |

# RECONCILIATION OF VALUE CONCLUSIONS

Based on the agreed upon scope with the client, the subject's specific characteristics and the interest appraised, this appraisal developed Sales Comparison and Income (Direct Capitalization) Approaches. The values presented represent the As-Is (Leased Fee Interest).

The Reconciliation of Value Conclusions is the final step in the appraisal process and involves the weighing of the individual valuation techniques in relationship to their substantiation by market data, and the reliability and applicability of each valuation technique to the subject property. Below, the individual strengths and weaknesses of each approach are analyzed.

As previously discussed, the **Cost Approach** was not presented in this analysis. This approach has limited application due to the age of the improvements and lack of market based evidence to support accrued depreciation. Additionally, investors typically do not place emphasis on replacement cost in establishing value for properties with stabilized income in place such as the subject. The exclusion of the Cost Approach does not diminish the credibility of the value conclusion.

The price per square foot method has been presented in the **Sales Comparison Approach**. There have been several recent sales of properties similar to the subject in the market area in the current market conditions, which increases the validity of this approach. The most likely buyer for the subject would be an investor and this approach is given less weight.

The **Income Approach** to value is generally considered to be the best and most accurate measure of the value of income-producing properties. The value estimate by this approach best reflects the analysis that knowledgeable buyers and sellers carry out in their decision-making processes regarding this type of property. Sufficient market data was available to reliably estimate gross income, vacancy, expenses and capitalization rates for the subject property. The subject is leased to a tenant and the most likely buyer is an investor, suggesting this approach deserves primary emphasis.

After considering all factors relevant to the valuation of the subject property, primary emphasis is placed on the Income Approach in the following As-Is market value.

| RECONCILIATION OF VALUES | |
|---|---|
| VALUATION SCENARIOS | AS-IS |
| Interest | Leased Fee Interest |
| Date | June 11, 2025 |
| **SALES COMPARISON APPROACH** | |
| **SALES COMPARISON APPROACH** | |
| Indicated Value | **$7,875,000** |
| $/SF NRA | $110 |
| **INCOME CAPITALIZATION APPROACH** | |
| **DIRECT CAPITALIZATION** | |
| NOI | $508,619 |
| NOI $/SF NRA | $7.10 |
| Capitalization Rate (OAR) | 6.50% |
| Indicated Value | **$7,825,000** |
| $/SF NRA | $109 |
| **ADDITIONAL CONCLUSIONS** | |
| Insurable Replacement Cost Estimate | $9,070,000 |
| $/SF NRA | $127 |
| **FINAL VALUE CONCLUSION** | |
| FINAL VALUE CONCLUSION | **$7,825,000** |
| $/SF NRA | $109 |

# CERTIFICATION

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions of the signers are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- The signers of this report have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.
- The signers have performed no services, specifically as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
- The signers are not biased with respect to the property that is the subject of this report or to the parties involved with this assignment.
- The engagement in this assignment was not contingent upon developing or reporting predetermined results.
- The compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- The reported analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the *Code of Professional Ethics* and *Standards of Professional Appraisal Practice* of the Appraisal Institute, and the *Uniform Standards of Professional Appraisal Practice*, as set forth by the Appraisal Standards Board of the Appraisal Foundation.
- G. Scott Lakas, MAI inspected the property that is the subject of this report.
- No one provided significant real property appraisal assistance to the appraisers signing the certification.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- As of the date of this report, G. Scott Lakas, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.
- The assignment was made subject to the regulations of the State of Alabama Real Estate Appraisers Board. The undersigned state licensed real estate appraiser has met the requirements of the board that allows this report to be regarded as a 'certified appraisal'.

G. Scott Lakas

June 18, 2025
Date

G. Scott Lakas, MAI
Certified General Real Estate Appraiser
State of Alabama License No. G00914
Expiration Date 9/30/2025

Valerie Spicuzza

June 18, 2025

Valerie Spicuzza Date
Trainee Real Estate Appraiser
State of Alabama License No.003130
Expiration Date 9/30/2025

# ASSUMPTIONS & LIMITING CONDITIONS

- Information presented in this report has been obtained from reliable sources, and it is assumed that the information is accurate.
- This analysis assumes that the information provided for this appraisal accurately reflect the current condition of the subject property.
- This report shall be used for its intended purpose only, and by the party to whom it is addressed. Possession of this report does not include the right of publication.
- The appraisers may not be required to give testimony or to appear in court by reason of this appraisal, with reference to the property in question, unless prior arrangements have been made.
- The statements of value and all conclusions shall apply as of the dates shown herein.
- There is no present or contemplated future interest in the property by the appraisers which is not specifically disclosed in this report.
- Without the written consent or approval of the authors neither all, nor any part of, the contents of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media. This applies particularly to value conclusions and to the identity of the appraisers and the company with which the appraisers are connected.
- This report must be used in its entirety. Reliance on any portion of the report independent of others, may lead the reader to erroneous conclusions regarding the property values. Unless approval is provided by the authors no portion of the report stands alone.
- We assume no responsibility for matters legal in character, nor do we render any opinion as to title, which is assumed to be marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, under responsible ownership, and competent management.
- The appraisal has provided exhibits to assist the client(s)/intended user(s) to understand from a graphical standpoint some of the salient issues which impact the subject property. We have made no survey of the property and if further verification is required, a survey by a registered surveyor is advised.
- The appraisers assume no responsibility for determining if the property requires environmental approval by the appropriate governing agencies, nor if it is in violation thereof, unless otherwise noted herein. This analysis assumes that no asbestos or other hazardous materials are stored or found in or on the subject property. If evidence of hazardous materials of any kind occurs, the reader should seek qualified professional assistance. If hazardous materials are discovered and if future market conditions indicate an impact on value and increased perceived risk, a revision of the concluded values may be necessary.
- The valuation stated herein assumes professional management and operation of the buildings throughout the lifetime of the improvements, with an adequate maintenance and repair program.
- The liability of Atlas Valuation LLC, its principals, agents, and employees is limited to the client. Further, there is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than the client, the client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions. The appraisers are in no way responsible for any costs incurred to discover or correct any deficiency in the property. The limitation of liability for both the client and the appraiser/firm is capped at the fee paid for appraisal services herein.
- The appraisers are not qualified to detect the presence of toxic or hazardous substances or materials which may influence or be associated with the property or any adjacent properties, has made no investigation or analysis as to the presence of such materials, and expressly disclaims any duty to note the degree of fault. Atlas Valuation LLC and its principals, agents, employees, shall not be liable for any costs, expenses,

assessments, or penalties, or diminution in value, property damage, or personal injury (including death) resulting from or otherwise attributable to toxic or hazardous substances or materials, including without limitation hazardous waste, asbestos material, formaldehyde, or any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, solids or gasses, waste materials or other irritants, contaminants or pollutants.

- The appraisers assume no responsibility for determining if the subject property complies with the *Americans with Disabilities Act* (*ADA*). Atlas Valuation LLC, its principals, agents, and employees, shall not be liable for any costs, expenses, assessments, penalties or diminution in value resulting from non-compliance.
- This appraisal assumes that the subject meets an acceptable level of compliance with *ADA* standards; if the subject is not in compliance, the eventual renovation costs and/or penalties would negatively impact the present value of the subject. If the magnitude and time of the cost were known today, they would be reduced from the reported value conclusion.
- Unless otherwise noted herein, a detailed soils study was not provided for this analysis. The subject's soils and sub-soil conditions are assumed to be suitable based upon a visual inspection of the subject property and surrounding properties, which did not indicate evidence of excessive settling or unstable soils. No certification is made regarding the stability or suitability of the soil or sub-soil conditions.
- Under no circumstances, shall any of the following parties be entitled to use or rely on the appraisal or this appraisal report: (i) the borrower(s) on any loans or financing relating to or secured by the subject property, (ii) any guarantor(s) of such loans or financing, or (iii) principals, shareholders, investors, members or partners in such borrower(s) or guarantor(s).

## INSURABLE REPLACEMENT COST

At the client's request, an estimate of the insurable replacement cost of the subject improvements is developed. This estimate represents the replacement cost new of the improvements, exclusive of land value and profit, and the costs associated with excavation, site work, and architects fees. Demolition, hauling and disposal of the destroyed improvements has been included as deductions. Insurance coverage is usually specific to a given project. The specific policy requirements were not provided, which limits the reliability of the conclusion presented.

Insurable replacement cost is a matter of underwriting as opposed to valuation. ***Users of this report should not construe the conclusion of insurable value to be an indication of market value.*** The insurable estimate is made using base costs and multiplier adjustments for market conditions and location from *Marshall Valuation Service,* which is assumed to accurately reflect replacement cost of the subject. We assume no liability as to the subject's insurable replacement cost and recommend that an estimate from a reputable insurance company be obtained if further assurance is required. The following chart summarizes the insurable replacement cost estimate:

| INSURABLE REPLACEMENT COST | | | |
|---|---|---|---|
| BUILDING | | 1 | TOTAL |
| Description | | Industrial Engineering (R&D) | |
| MVS Building Type | | 392 | |
| Number of Stories | | 2 | |
| Height Per Story (Feet) | | 14 | |
| MVS Section/Page | | Sec 14 Pg 16 | |
| Building Class | | S | |
| MVS Publication Date | | 2/1/2024 | |
| Quality Rating | | Good | |
| **BASE COST / SQUARE FOOT** | | | |
| Component GBA SF | | 71,615 | 71,615 |
| MVS Base Cost $/SF | | $142.00 | |
| **SQUARE FOOT REFINEMENTS** | | | |
| Heating and Cooling | | $0.00 | |
| Sprinklers | | $3.85 | |
| Elevators | | $0.00 | |
| Other | | $0.00 | |
| Subtotal $/SF | | $145.85 | |
| **HEIGHT & SIZE REFINEMENTS** | | | |
| Number of Stories Multiplier | | 1.000 | |
| Height Per Story Multiplier | | 1.000 | |
| Floor Area Multiplier | | 0.949 | |
| Subtotal $/SF | | $138.41 | |
| **COST MULTIPLIERS** | | | |
| Current Cost Multiplier | | 0.99 | |
| Local Area Multiplier | | 0.84 | |
| Prospective Multiplier | | 1.00 | |
| Subtotal $/SF | | $115.10 | |
| **DIRECT BUILDING COSTS MARSHALL VALUATION SERVICES** | | | |
| Direct Building Cost Total | | $8,243,111 | $8,243,111 |
| Indirect Costs (% of Direct) | | 15% | $1,236,467 |
| FINAL REPLACEMENT COST NEW | | | $9,479,577 |
| Demolition | | 5% | $412,156 |
| Replacement Cost Exclusion | | 10% | ($824,311) |
| Insurable Replacement Cost Total | | | $9,067,422 |
| **INSURABLE REPLACEMENT COST (ROUNDED TO NEAREST $10,000)** | | | **$9,070,000** |
| **INSURABLE REPLACEMENT COST (ROUNDED TO NEAREST $10,000) $/SF** | | | **$127** |

## QUALIFICATIONS OF G. SCOTT LAKAS

G. Scott Lakas, MAI
Atlas Valuation, LLC
145 E. Magnolia Avenue – Suite 202
Auburn, AL 36830
334-737-6993
scott@atlasvaluation.com

President of Atlas Valuation, LLC, a company specializing in market analyses and appraisals of real property throughout the entire southeast with an office in Auburn/Opelika, Alabama. Mr. Lakas is the former of Vice President of McColgan & Company, LLC being employed since 2004 through 2014. Professional associations include a designated member of the Appraisal Institute (MAI Designation No. 467998) and member of the Alabama Chapter of the Appraisal Institute.

**Education**
Bachelor of Business Administration, Real Estate
University of Georgia – Class of 2003
Terry College of Business

**Continuing Education**
Attacking and Defending An Appraisal in Litigation (2019)
2018-2019 7-Hour USPAP Update for Non-Residential Property (2018)
Online Business Practices and Ethics – Appraisal Institute (2017)
The FHA Handbook 4000.1 – McKissock (2017)
Residential Report Writing: More Than Forms- McKissock (2016)
Advanced Spreadsheet Modeling for Valuation Applications-Appraisal Institute (2015)
Using Your HP12C Financial Calculator – Appraisal Institute (2014)
Forest Valuation for Non-Foresters – Atlanta Chapter Appraisal Institute (2014)
Supervising Appraisal Trainees – Appraisal Institute (2013)
Small Hotel/Motel Valuation- Appraisal Institute (2012)
Fundamentals of Separating Real & Personal Property & Intangible Business Assets Appraisal Institute (2012)
General Demonstration Report Writing – Appraisal Institute (2010)
Advanced Sales and Comparison Approaches – Appraisal Institute (2010)
The Appraiser as an Expert Witness – Appraisal Institute (2010)
Advanced Applications – Appraisal Institute (2009)
General Appraiser Report Writing & Case Studies – Appraisal Institute (2008)
Advanced Income Capitalization – Appraisal Institute (2018)
General Appraiser Income Approach; Part 2 – Appraisal Institute (2018)
General Appraiser Site Valuation & Cost Approach – Appraisal Institute (2008)
General Appraiser Sales Comparison Approach – Appraisal Institute (2008)
General Market Analysis and Highest and Best Use – Appraisal Institute (2008)
Real Estate Finance, Statistics, and Valuation Modeling – Appraisal Ins. (2008)
General Appraiser Income Approach; Part 1 – Appraisal Institute (2007)
Analyzing Distressed Real Estate – Appraisal Institute (2006)

**Seminars/Appraisal Institute Meetings**

Mini LDAC – Regional Representative – Region IX Meetings (2019)
Subject Matter Roundtable – Alabama Chapter Appraisal Institute (2018)
Valuation Symposium – Alabama Chapter Appraisal Institute (2018)
Mini LDAC – Advancing the Appraisal Profession – Region IX (2018)
Hot Topics and Myths in Appraisal Liability – Alabama Chapter AI (2017)
Subject Matter Roundtable – Alabama Chapter Appraisal Institute (2017)
Adjustment Support for Residential Appraisers – Live Webinar (2017)
Litigation Skills for the Appraiser – Alabama Chapter Appraisal Institute (2016)
State of Atlanta – Atlanta Chapter Appraisal Institute (2013)
That's Logistics: Valuation of Warehouses – Atlanta Chapter AI (2013)
Writing Compelling Appraisal Reports – Atlanta Chapter AI (2012)
State of Atlanta – Atlanta Chapter Appraisal Institute (2011)
Reappraising, Readdressing, Reassigning – Atlanta Chapter AI (2007)
Market Analysis & STDB Online – Atlanta Chapter Appraisal Institute (2006)
The Spotlight on USPAP – Atlanta Chapter Appraisal Institute (2006)

**Current State Licenses/Certifications**

Alabama Certified General Real Estate Appraiser No. G00914 – Expiration 9/30/2025
Georgia Certified General Real Estate Appraiser No. 291155 – Expiration 3/31/2026
Florida Certified General Real Estate Appraiser No. RZ3378 – Expiration 11/30/2026

**Specialized Appraisal Experience**

Assisted Living Facilities
Nursing Homes
Forest/Timber/Acreage Tracts
Shopping Centers
Net-Leased Retail Buildings
Office Buildings – Single-Tenant, Multi-Tenant, Government
Condemnation – Right-of-Way
Industrial Buildings – Distribution, Manufacturing, Cold Storage
LITHC – Section 42 Apartment Complexes
Student-Occupied Multi-Family Housing
Independent Living Senior Housing
Subdivisions – Residential & Commercial
Commercial Pad Sites
Golf Courses
Hotels/Motels
Convenience Stores
Going-Concern/Business Enterprise
Condominium Developments
HUD Apartment Complexes
Low-Income Housing
USDA Rural Development Apartments
Self- or Mini-Storage
Rural Properties
Contaminated/Damaged Real Estate



## LICENSE



State of Alabama

This is to certify that

**Gregory Scott Lakas**

*having given satisfactory evidence of the necessary qualifications required by the laws of the State of Alabama is licensed to transact business in Alabama as a*

**Certified General Real Property Appraiser**

*With all rights, privileges and obligations appurtenant thereto.*

LICENSE NUMBER: G00914
EXPIRATION DATE: 9/30/2025

Executive Director
ALABAMA REAL ESTATE APPRAISERS BOARD

## QUALIFICATIONS OF VALERIE SPICUZZA

Valerie Spicuzza is an associate appraiser with Atlas Valuation, LLC. Valerie Spicuzza has worked at Atlas Valuation, LLC since February 2023 and was recently licensed as an appraiser trainee in January of 2024.

**Education Background**

Bachelor of Natural Resources Management
Auburn University – Class of 2020
College of Forestry, Wildlife and Environment

**Continuing Education**

| | |
|---|---|
| Basic Appraisal Principles | McKissock Online (2023) |
| Basic Appraisal Procedures | McKissock Online (2023) |
| 15-Hour National USPAP Course | McKissock Online (2023) |
| General Appraiser Market Analysis Highest and Best Use | McKissock Online (2024) |
| Statistics, Modeling, and Finance | McKissock Online (2024) |
| Site Valuation and Cost Approach | McKissock Online (2024) |
| Sales Comparison Approach | McKissock Online (2024) |
| Income Approach | McKissock Online (2025) |

**State Classification**

State of Alabama Trainee Real Property Appraiser – 003130

## LICENSE

# State of Alabama

*This is to certify that*

**Valerie Spicuzza**

*having given satisfactory evidence of the necessary qualifications required by the laws of the State of Alabama is licensed to transact business in Alabama as a*

**Trainee Real Property Appraiser**

*With all rights, privileges and obligations appurtenant thereto.*

LICENSE NUMBER: **003130**
EXPIRATION DATE: **9/30/2025**

Executive Director
ALABAMA REAL ESTATE APPRAISERS BOARD

## GLOSSARY

This glossary contains the definitions of common words and phrases, used throughout the appraisal industry, as applied within this document. Please refer to the publications listed in the **Works Cited** section below for more information.

**Works Cited:**

- Appraisal Institute. *The Appraisal of Real Estate.* 15th ed. Chicago: Appraisal Institute, 2020. Print.
- Appraisal Institute. *The Dictionary of Real Estate Appraisal.* 7th ed. 2022. Print.

**Band of Investment**

A technique in which the capitalization rates attributable to components of an investment are weighted and combined to derive a weighted-average rate attributable to the total investment (i.e., debt and equity, land and improvements). (Dictionary, 7th Edition)

**Common Area**

1. The total area within a property that is not designed for sale or rental but is available for common use by all owners, tenants, or their invitees, e.g., parking and its appurtenances, malls, sidewalks, landscaped areas, recreation areas, public toilets, truck and service facilities.
2. In a shopping center, the walkways and areas onto which the stores face and which conduct the flow of customer traffic. (ICSC) (Dictionary, 7th Edition)

**Common Area Maintenance (CAM)**

1. The expense of operating and maintaining common areas; may or may not include management charges and usually does not include capital expenditures on tenant improvements or other improvements to the property.
2. [For shopping centers, t]he amount of money charged to tenants for their shares of maintaining a center's common area. The charge that a tenant pays for shared services and facilities such as electricity, security, and maintenance of parking lots. Items charged to common area maintenance may include cleaning services, parking lot sweeping and maintenance, snow removal, security, [amenities,] and upkeep. (ICSC) (Dictionary, 7th Edition)

**Debt Coverage Ratio (DCR)**

The ratio of net operating income to annual debt service (*DCR = NOI/IM*), which measures the relative ability of a property to meet its debt service out of net operating income; also called *debt service coverage ratio (DSCR)*. A larger *DCR* typically indicates a greater ability for a property to withstand a reduction of income, providing an improved safety margin for a lender. (Dictionary, 7th Edition)

**Discount Rate**

A rate of return on capital used to convert future payments or receipts into present value. (Dictionary, 7th Edition)

**Effective Age**

The age of property that is based on the amount of observed deterioration and obsolescence it has sustained, which may be different from its chronological age. (Dictionary, 7th Edition)

**Effective Date**

1. The date on which the appraisal opinion applies. (SVP)
2. The date to which an appraiser's analyses, opinions, and conclusions apply; also referred to as *date of value*. (USPAP, 2020-2021 ed.)
3. The date that a lease goes into effect. (Dictionary, 7th Edition)

**Exposure Time**

1. The time a property remains on the market.

2. An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. (USPAP, 2020-2021 ed.) (Dictionary, 7th Edition)

**External Obsolescence**
A type of depreciation; a diminution in value caused by negative external influences and generally incurable on the part of the owner, landlord, or tenant. The external influence may be either temporary or permanent. There are two forms of external obsolescence: economic and locational. (Dictionary, 7th Edition).

**Extraordinary Assumption**
An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property, or conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis. (USPAP, 2020-2021 ed.) (Dictionary, 7th Edition)

**Fee Simple Estate**
Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. (Dictionary, 7th Edition)

**Functional Obsolescence**
The impairment of functional capacity of improvements according to market tastes and standards. (Dictionary, 7th Edition)

**Functional Utility**
The ability of a property or building to be useful and to perform the function for which it is intended according to current market tastes and standards; the efficiency of a building's use in terms of architectural style, design and layout, traffic patterns, and the size and type of rooms. (Dictionary, 7th Edition)

**Gross Building Area (GBA)**
1. Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved.
2. Gross leasable area plus all common areas.
3. For residential space, the total area of all floor levels measured from the exterior of the walls and including the superstructure and substructure basement; typically does not include garage space. (Dictionary, 7th Edition)

**Gross Leasable Area (GLA)**
Total floor area designed for the occupancy and exclusive use of tenants, including basements and mezzanines; measured from the center of joint partitioning to the outside wall surfaces. (Dictionary, 7th Edition)

**Highest and Best Use**
1. The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.
2. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid. (IVS)
3. [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform Appraisal Standards for Federal Land Acquisitions)
4. [For fair value determination] The use of a nonfinancial asset by market participants that would maximize the value of the asset or the group of assets and liabilities (for example, a

business) within which the asset would be used. (FASB Glossary) The highest and best use of a nonfinancial asset takes into account the use that is physically possible, legally permissible, and financially feasible. (FASB 820-10-35-10B). The highest and best use of a nonfinancial asset establishes the valuation premise used to measure the fair value of the asset, as follows: (a) The highest and best use of a nonfinancial asset might provide maximum value to market participants through its use in combination with other assets as a group (as installed or otherwise configured for use) or in combination with other assets and liabilities (for example, a business). (b) The highest and best use of the asset might provide maximum value to market participants on a standalone basis. (FASB 820-10-35-10E) (Dictionary, 7th Edition)

**Hypothetical Condition**

1. A condition that is presumed to be true when it is known to be false. (SVP)
2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2020-2021 ed.) (Dictionary, 7th Edition)

**Leased Fee Interest**

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.
(Dictionary, 7th Edition)

**Market Area**

The geographic region from which a majority of demand comes and in which the majority of competition is located. Depending on the market, a market area may be further subdivided into components such as primary, secondary, and tertiary market areas, or the competitive market area may be distinguished from the general market area. (Dictionary, 7th Edition)

**Market Rent**

The most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessee and lessor each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby

- Lessee and lessor are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their best interests;
- Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and
- The rent reflects specified terms and conditions typically found in that market, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, frequency of payments (annual, monthly, etc.), and tenant improvements (TIs). (Dictionary, 7th Edition)

**Market Value**

A type of value that is the major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined, such as the following.

1. The most widely accepted components of market value are incorporated in the following definition: The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest,

and assuming that neither is under undue duress.

2. Market value is described, not defined, in the Uniform Standards of Professional Appraisal Practice (USPAP) as follows: A type of value, stated as an opinion, that presumes the transfer of a property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the value definition that is identified by the appraiser as applicable in an appraisal. Comment: *Appraisers are cautioned to identify the exact definition of market value, and its authority, applicable in each appraisal completed for the purpose of market value*. (USPAP, 2020- 2021 ed.)
3. The following definition of *market value* is used by agencies that regulate federally insured financial institutions in the United States: The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
   - Buyer and seller are typically motivated;
   - Both parties are well informed or well advised, and acting in what they consider their best interests;
   - A reasonable time is allowed for exposure in the open market;
   - Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
   - The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (12 C.F.R. Part 34.42(g); 55 *Federal Register* 34696, August 24, 1990, as amended at 57 *Federal Register* 12202, April 9, 1992; 59 *Federal Register* 29499, June 7, 1994)
4. The International Valuation Standards Council defines *market value* for the purpose of international standards as follows: The estimated amount for which an asset or liability *should* exchange on the valuation date between a willing buyer and a willing seller in an arm's length transaction, after proper marketing and where the parties had each acted knowledgeably, prudently, and without compulsion. (IVS)
5. The Uniform Appraisal Standards for Federal Land Acquisitions defines *market value* as follows: Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of the appraisal, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the appraisal. (Uniform Appraisal Standards for Federal Land Acquisitions) (Dictionary, 7th Edition)

**Marketing Time**

An opinion of the amount of time to sell a property interest at the concluded market value or at a benchmark price during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which precedes the effective date of an appraisal. (Advisory Opinion 7 and Advisory Opinion 35 of the Appraisal Standards Board of The Appraisal Foundation address the determination of reasonable exposure and marketing time.) (Dictionary, 7th Edition)

**Net Operating Income (NOI or $I_0$)**

The actual or anticipated net income that remains after all operating expenses are deducted from effective gross income but before mortgage debt service and book depreciation are deducted. Note: This definition mirrors the convention used in corporate finance and business valuation for EBITDA (earnings before interest, taxes,

depreciation, and amortization). (Dictionary, 7th Edition)

**Obsolescence**
One cause of depreciation; an impairment of desirability and usefulness caused by new inventions, changes in design, improved processes for production, or external factors that make a property less desirable and valuable for a continued use; may be either functional or external. (Dictionary, 7th Edition)

**Parking Ratio**
A ratio of parking area or parking spaces to an economic or physical unit of comparison. Minimum required parking ratios for various land uses are often stated in zoning ordinances. (Dictionary, 7th Edition)

**Rentable Area**
For office or retail buildings, the tenant's pro rata portion of the entire office floor, excluding elements of the building that penetrate through the floor to the areas below. The rentable area of a floor is computed by measuring to the inside finished surface of the dominant portion of the permanent building walls, excluding any major vertical penetrations of the floor. Alternatively, the amount of space on which the rent is based; calculated according to local practice. (Dictionary, 7th Edition)

**Replacement Cost**
The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout. (Dictionary, 7th Edition)

**Scope of Work**
1. The type of data and the extent of research and analyses. (SVP)
2. The type and extent of research and analyses in an appraisal or appraisal review assignment. (USPAP, 2020-2021 ed.) (Dictionary, 7th Edition)

**Stabilized Occupancy**
1. The occupancy of a property that would be expected at a particular point in time, considering its relative competitive strength and supply and demand conditions at the time, and presuming it is priced at market rent and has had reasonable market exposure. A property is at stabilized occupancy when it is capturing its appropriate share of market demand.
2. An expression of the average or typical occupancy that would be expected for a property over a specified projection period or over its economic life. (Dictionary, 7th Edition)

**Tenant Improvements (TIs)**
1. Fixed improvements to the land or structures installed for use by a lessee.
2. The original installation of finished tenant space in a construction project; subject to periodic change for succeeding tenants. (Dictionary, 7th Edition)

**Vacancy and Collection Loss**
A deduction from potential gross income (*PGI*) made to reflect income reductions due to vacancies, tenant turnover, and nonpayment of rent; also called *vacancy and credit loss* or *vacancy and contingency loss*. (Dictionary, 7th Edition)

# LEASE AGREEMENT

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") dated as of March 31, 2014 (the "Effective Date"), is by and between **H2 DEVELOPMENT, L.L.C.**, an Alabama limited liability company ("Landlord") and **APR, LLC**, an Alabama limited liability company ("Tenant").

Landlord and Tenant agree as follows:

### ARTICLE I
### PREMISES

**1.1 Premises.** Subject to the terms and provisions of this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the real property described on Exhibit A (the "Land") and located at 4800 US Highway 280 W, Opelika, Alabama including, without limitation, the building currently located on the Land and consisting of approximately 78,000 rentable square feet (the "Building"), and all other buildings, structures, and other improvements located on the Land (collectively with the Building, the "Improvements"). The Land and the Improvements are, collectively, the "Premises".

### ARTICLE II
### TERM

**2.1 Initial Term.** The initial term of this Lease (the "Initial Term") shall commence on the Effective Date (also referred to as the "Commencement Date") and end on July 24, 2023, unless sooner terminated pursuant to the terms of this Lease. The Initial Term and any extension or renewal of this Lease (including, without limitation, any Extension Periods exercised pursuant to Section 2.2 below) are, collectively, the "Term."

**2.2 Extension Option**. Landlord hereby grants to Tenant an option to extend the term of this Lease (each, an "Extension Option") for three additional successive terms of five years each (each, an "Extension Period"), on the same terms, conditions, and covenants set forth in this Lease. Tenant may exercise each Extension Option by providing written notice to Landlord of such exercise at least 90 days prior to the commencement of such Extension Period.

### ARTICLE III
### RENT

**3.1 Rent.** During the Term, Tenant shall pay Landlord, as base rent (the "Base Rent"), the annual sum of $540,000, in equal monthly installments of $45,000 each. The Base Rent will automatically increase by 5.0% at the beginning of each Extension Period and will be held steady throughout the particular Extension Period. The Base Rent and any other amounts owed by Tenant to Landlord under this Lease are, collectively, the "Rent." Tenant shall pay make all Rent payments to Landlord at the address listed in Section 18.8, or to such other address as Landlord may from time to time designate by written notice to Tenant; provided that Tenant shall have the right (but not the obligation) to make Rent payments directly to Landlord's mortgagee, if any, in an amount equal to or less than Landlord's mortgage payment.

### ARTICLE IV
### ALTERATIONS AND TENANT EQUIPMENT

**4.1 Alterations.** Tenant shall have the right to make any structural and/or non-structural changes, additions, alterations or improvements in or to the Premises without the prior written consent of Landlord. All alterations made by Tenant shall be at Tenant's sole cost and expense. All such alterations and improvements shall be deemed owned by Tenant during the Term; provided, however, the ownership of such alterations shall revert to Landlord on the expiration or earlier termination of this Lease.

**4.2 Tenant Equipment.** Tenant, at its sole cost, shall have the right to place or install its trade fixtures, machinery, and equipment (collectively, the "Tenant Equipment") in, at, or upon the Premises without the prior written consent of Landlord. All Tenant Equipment shall be deemed owned by Tenant. Tenant may at any time (and shall upon the expiration or earlier termination of the Lease) remove any Tenant Equipment from the Premises.

**ARTICLE V**
**SIGNS**

**5.1 Signs.** Tenant, at its sole cost and expense, shall have the right to install signs related to Tenant's business in or on the Premises, provided that any signs installed by Tenant shall conform with all applicable codes, laws, regulations, and ordinances (collectively, "Legal Requirements"). Upon the expiration or earlier termination of the Lease, Tenant shall remove any signs installed by Tenant in or on the Premises.

**ARTICLE VI**
**USE; COMPLIANCE WITH LAWS**

**6.1 Use.** Tenant may use the Premises for office, warehouse, manufacturing, automotive repair, and servicing, and other ancillary and related uses in connection with its automotive engineering, parts, servicing, and enhancements business, and for any other lawful purpose; provided, Tenant may not use the Premises in any manner that constitutes a public nuisance or for any illegal purpose.

**6.2 Compliance with Laws.** Tenant shall, at its sole cost and expense, comply with (and shall be liable for violations and cure of) all Legal Requirements that are applicable to Tenant's use of the Premises; provided, however, nothing in this Lease shall require Tenant to make any structural alterations or changes to the Premises or to remedy any non-compliance with Legal Requirements not resulting from Tenant's use of the Premises.

**ARTICLE VII**
**ENVIRONMENTAL MATTERS**

**7.1 Definitions.**

(a) "Environmental Laws" as used herein shall mean all present and future applicable Federal, state or local laws, ordinances, rules, regulations, opinions, orders, directives and policies as, from time to time, may be amended, that relate to the environment, health or worker safety including, without limitation, the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq.; the Superfund Amendments and Reauthorization Act of 1986, Title III, 42 U.S.C. Section 11001, et seq.; the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300 (f), et seq.; the Solid Waste Disposal Act, 42 U.S.C. Section 6901, et seq.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. Section 1801, et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901, et seq; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251, et seq.; the Toxic Substances Control Act of

1976, 15 U.S.C. Section 2601, et seq.; and the Occupational Safety and Health Act, 29 U.S.C. Section 651, et seq.

(b) "Hazardous Substances" as used herein shall mean (i) all chemicals, materials and substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants" or "pollutants", or words of similar import, under any Environmental Laws, including, without limitation, petroleum products and materials; and (ii) all other chemicals, materials and substances, the exposure to which is prohibited, limited or regulated by any governmental authority, including asbestos and asbestos-containing materials in any form, lead-based paint, radioactive materials, polychlorinated biphenyls ("PCB's") and substances and compounds containing PCB's.

**7.2 Tenant's Environmental Covenants.** Tenant shall not manufacture, process, distribute, use, treat, store, dispose of, or handle on the Premises, or transport to or from the Premises, any Hazardous Substances, except in compliance with Environmental Laws. Tenant shall not cause, permit, or allow any Hazardous Substances to be brought upon, kept, used, or released in or about the Premises except in compliance with Environmental Laws. Tenant agrees to indemnify and hold harmless Landlord and Landlord's Affiliates (as hereinafter defined) against any and all claims for any costs, expenses, penalties, fines, losses, and liabilities arising out of or in connection with any failure of Tenant to comply with its obligations under this Section 7.2.

**7.3 Limitation on Tenant's Environmental Liability.** Notwithstanding anything in this Lease to the contrary, Tenant's liability in connection with any Hazardous Substances or other environmental matters is expressly limited to such matters that (a) arise or occur following the date Tenant took possession of the Premises on March 22, 2007 and (b) are caused by a failure of Tenant to comply with its obligations under Section 7.2. Without limiting the foregoing, in no event shall Tenant be liable for any environmental contamination to the Premises or any adjoining property, or any damages resulting therefrom, caused by Landlord or Landlord's Affiliates, or by any third parties.

## ARTICLE VIII
## UTILITIES

**8.1 Utilities.** During the Term, Tenant shall pay directly to the applicable public utility before delinquency, all water, sewer, electricity, gas, telephone, communication, and other utility charges related to the Premises. Landlord shall not interrupt or cause or permit the interruption of any utility service to the Premises, except in the event of an emergency.

## ARTICLE IX
## MAINTENANCE AND REPAIR

**9.1 Landlord's Obligations.** Landlord shall, at its sole cost and expense, maintain in good condition and repair (including any replacements thereof) the following portions of the Improvements: (a) foundation and slab; (b) roof and roof membrane (including, without limitation, keeping the roof watertight); and (c) structural components. Landlord's obligation in (b) above is limited to the original roof and roof membrane and is not intended to cover alterations made to the roof or roof membrane by Tenant. In the event Landlord fails to commence any required maintenance or repair within five days after written notice to Landlord (or immediately and upon oral notice in the event of an emergency), or fails to diligently pursue the completion of any such maintenance or repair), Tenant shall have the right, but not the obligation, to cause such repair or maintenance to be performed at Landlord's expense, and Landlord shall reimburse Tenant for all reasonable costs of such work within 30 days after receipt of paid invoices. If Landlord fails to reimburse Tenant within such 30 day period, Tenant may offset any unpaid

costs against Tenant's next accruing Rent obligations under this Lease. All work performed by Landlord in or at the Premises shall (i) be performed as expeditiously as possible, (ii) not unreasonably restrict access to or visibility of the Premises, (iii) be performed at such times and in such manner as to minimize inconvenience to or interference with Tenant's business operations, and (iv) be performed only after at least 48 hours prior written notice to Tenant, except in the event of an emergency. In the event that, as a result of any work being undertaken by Landlord, Tenant is forced to close its business for a period in excess of 24 hours, the Rent shall abate in its entirety until such work has been completed and Tenant can reopen for business.

**9.2 Tenant's Obligations.** Subject to Landlord's obligations set forth in Section 9.1 above, Tenant, at its expense, shall maintain all other portions of the Premises in good condition and repair (including necessary replacements, but excluding reasonable wear and tear and damage by Casualty).

**ARTICLE X**
**TAXES**

**10.1 Payment of Taxes.** During the Term, Tenant shall pay, as and when due, all real property taxes, general and special assessments, and other charges levied on or assessed against the Premises (collectively, the "Taxes"); provided, however, in no event shall Tenant be required to pay any franchise, income, inheritance, estate, succession, transfer, or gift taxes imposed upon Landlord or its successors or assigns. Tenant shall pay all Taxes directly to the applicable taxing authority and shall, upon written request, provide **Landlord** with evidence of the payment of such Taxes.

**10.2 Proration at Commencement and End of Term.** If the Commencement Date or end of the Term does not coincide with the commencement or end of a tax year, Taxes for the tax year in which this Lease commences and/or ends shall be prorated between Landlord and Tenant, based on the most recent assessment. Such proration shall be subsequently adjusted when the actual bills for Taxes become available. The provisions of this paragraph shall survive the expiration or earlier termination of this Lease.

**10.3 Right to Protest Taxes.** Tenant shall have the right to protest any Taxes assessed against the Premises, including, without limitation, the right to protest the valuation of the Premises as assessed for tax purposes. Landlord hereby appoints Tenant as Landlord's agent and attorney-in-fact for such purpose, and Landlord agrees that Tenant shall have the power to take any and all actions, execute and deliver in Landlord's name, any and all notices and/or other documents as may be necessary in Tenant's discretion to protest any Taxes (including, without limitation, any notices of protest and/or court pleadings), and appear in any court or at any appraisal hearings in connection with such protest. Such power of attorney is hereby expressly made irrevocable and coupled with an interest. This appointment shall not impose any duty on Tenant and is expressly made solely to allow Tenant, in its sole discretion and at its option, to protest the Taxes assessed against the Premises. Landlord further hereby agrees to fully cooperate in all reasonable respects with Tenant in connection with any such tax protest by Tenant.

**ARTICLE XI**
**INSURANCE**

**11.1 Maintenance of Policies.** From and after the Commencement Date of this Lease, and during the Term, Tenant shall procure and maintain the following insurance on or in connection with the Premises:

(a) Insurance against all physical loss or damage to the Improvements in amounts not less than the actual replacement cost of the Improvements. Such policies shall contain replacement

4

cost and agreed amount endorsements. To the extent Tenant has any restoration or repair obligations with respect to the Improvements, the proceeds from any property insurance shall be made available to Tenant for the purpose of such repair or restoration.

(b) Commercial general liability insurance against claims for bodily injury, death or property damage occurring on, in or as a result of the use of the Premises, in an amount not less than $1,000,000, combined single limit.

**11.2 Insurance Providers.** The insurance required by Section 11.1 above shall be written by insurance companies authorized to conduct insurance business in the state where the Premises are located. Any liability insurance policy shall name Landlord and Landlord's mortgagee, if any, as additional insureds, and any property insurance policy covering the Premises shall name Landlord and Landlord's mortgagee, if any, as loss payees, as their interests may appear. Any insurance required of Tenant may be effected by a policy or policies of blanket, excess, and/or umbrella insurance.

**11.3 Premiums.** Tenant shall (a) pay all premiums for the insurance required by Section 11.1 above as and when due, (b) timely renew or replace each policy, and (c) upon request, deliver to Landlord certificates evidencing such coverage.

**11.4 Waiver of Subrogation.** Each party hereby releases the other party, and waives its entire right of recovery against the other party, for all direct, consequential, or other loss or damage arising out of or related to any damage to the releasing and waiving party's property that is covered by property insurance carried by the releasing and waiving party, whether or not such loss or damage was caused by the negligence of the other party or its agents, employees, contractors and/or invitees.

## ARTICLE XII
## WAIVER AND INDEMNITY

**12.1 Tenant's Waiver and Indemnity.** Landlord shall not be liable to Tenant or to Tenant's employees, members, partners, venturers, officers, directors, stockholders, agents, or legal representatives (collectively, "Tenant's Affiliates"), for any personal injury or death, or for any damage to property, on or about the Premises (a) caused by the negligence or willful misconduct of Tenant or Tenant's Affiliates, or (b) arising out of any failure by Tenant to perform its obligations under this Lease; and Tenant hereby agrees to indemnify and hold harmless Landlord and Landlord's Affiliates (as defined in Section 12.2 below) from any loss, expense, or claims (collectively, "Claims") arising out of such injury, death, or damage. Notwithstanding the foregoing, Tenant's obligation to indemnify, defend, and hold harmless Landlord and Landlord's Affiliates in this paragraph shall not extend to any Claims against which Landlord is effectively protected by insurance; provided, however, if the amount of any such Claims shall exceed the amount of effective and collectible insurance of Landlord, Tenant's indemnification and hold harmless obligation shall apply to such excess. The provisions of this paragraph shall survive the expiration or earlier termination of this Lease.

**12.2 Landlord's Waiver and Indemnity.** Tenant shall not be liable to Landlord or to Landlord's employees, members, partners, venturers, officers, directors, stockholders, agents, or legal representatives (collectively, "Landlord's Affiliates"), for any personal injury or death, or for any damage to property, on or about the Premises (a) caused by the negligence or willful misconduct of Landlord or Landlord's Affiliates, or (b) arising out of any failure by Landlord to perform its obligations under this Lease; and Landlord hereby agrees to indemnify and hold harmless Tenant and Tenant's Affiliates from any Claims damage arising out of such injury, death, or damage. Notwithstanding the foregoing, Landlord's obligation to indemnify, defend, and hold harmless Tenant and Tenant's Affiliates in this paragraph shall not extend to any Claims against which Tenant is effectively protected by insurance;

provided, however, if the amount of any such Claims shall exceed the amount of effective and collectible insurance of Tenant, Landlord's indemnification and hold harmless obligation shall apply to such excess. The provisions of this paragraph shall survive the expiration or earlier termination of this Lease.

**ARTICLE XIII**
**DAMAGE OR DESTRUCTION**

**13.1 Notice of Casualty.** If the Improvements should be damaged or destroyed by fire, windstorm, or other casualty (hereinafter a "Casualty"), Tenant shall promptly give written notice thereof to Landlord.

**13.2 Damage.**

(a) Subject to Section 13.2(b) and 13.3 below, in the event of a Casualty, Tenant shall, to the extent insurance proceeds are available and sufficient to cover the full amount of Tenant's restoration costs, proceed with reasonable diligence to rebuild or repair the Improvements on the Premises to substantially the condition in which they existed prior to such Casualty. If the Improvements are to be rebuilt or repaired in whole or in part following such damage, the rent payable hereunder shall be adjusted equitably in proportion to the area damaged. Tenant's obligation to rebuild and repair under this Article XIII shall in any event be limited to restoring the Premises to substantially the same condition as existed immediately prior to the Casualty. Tenant's obligations hereunder shall further be limited to the extent of the insurance proceeds available for such restoration and repairs, and Tenant shall not be required to expend any of its own funds to rebuild and/or repair the Improvements.

(b) Tenant shall have the right, at its option, to cancel this Lease in the event of a Casualty that (i) damages or destroys all or substantially all of the Improvements at any time during the Term, (ii) is reasonably anticipated to prevent Tenant from conducting its business in the Premises for 180 days or more, or (iii) occurs during the last 12 months of the Term. Tenant shall give Landlord written notice of its intent to terminate this Lease within 60 days after the date of the Casualty. If the Lease is terminated by Tenant pursuant to this paragraph, the Rent shall be abated for the unexpired portion of this Lease effective from the date of the Casualty, and Tenant shall not be obligated to rebuild or restore the Improvements.

**13.3 Insurance Proceeds.** All insurance proceeds attributable to the Improvements and paid as a result of any Casualty shall be paid to Tenant and used by Tenant for the purpose of rebuilding or repairing the Improvements, unless Tenant terminates this Lease as herein provided, in which event all insurance proceeds paid as a result of any Casualty to the Improvements owned by Landlord shall be paid to and be the property of Landlord. All insurance proceeds paid as a result of any Casualty of Tenant's Equipment or any Improvements owned by Tenant shall be paid to and be the property of Tenant. Any insurance proceeds received by Landlord with respect to any Casualty to Tenant's Equipment or any Improvements owned by Tenant shall be promptly paid over to Tenant.

**13.4 Settlement.** Landlord and Tenant shall jointly adjust, collect and compromise all claims under any casualty insurance policy required by this Lease and execute and deliver all necessary proofs of loss, receipts, vouchers, and releases required by all insurers.

**ARTICLE XIV**
**CONDEMNATION**

**14.1 Notice.** If either Landlord or Tenant learns that any portion of the Premises has been or is proposed to be subjected to a Taking (as hereinafter defined), such party shall promptly notify the other

party of such Taking. A "Taking" means the taking of all or any portion of the Premises or any and all access thereto as a result of the exercise of the power of eminent domain or condemnation for public or quasi-public use, or the sale or conveyance of all or any part of the Premises or any and all access thereto in lieu of or under the threat of eminent domain or condemnation.

**14.2 Termination Option on Substantial Taking.** If a Taking occurs during the Term that, in the reasonable judgment of Tenant, interferes with the use of the Premises for Tenant's intended use (a "Substantial Taking"), Tenant may, at its option and upon written notice to Landlord, terminate this Lease as of the date title of any of the Premises subject to such Taking is transferred to the condemning authority (the "Taking Date").

**14.3 Continuation of Lease.** If a Taking occurs during the Term that is not a Substantial Taking, or if a Substantial Taking occurs but Tenant fails to exercise its termination option according to Section 14.2 above, this Lease shall remain in full force and effect according to its terms, except that, effective as of the Taking Date, this Lease shall terminate automatically as to any portion of the Premises taken, and the Rent payable during the remaining Term shall be adjusted equitably in proportion to the area taken.

**14.4 Reconstruction.** If a Taking occurs that is not a Substantial Taking, or if a Substantial Taking occurs but Tenant fails to exercise its termination option according to Section 14.2 above, Tenant shall proceed diligently to repair and restore the Improvements on the Land not so taken to the condition that existed immediately prior to the Taking or, if the Premises are not capable of being so repaired and restored, as closely to such condition as is reasonably practicable, and the Rent payable during the remaining Term shall be adjusted equitably in proportion to the area taken.

**14.5 Awards.** If any Taking occurs, Landlord shall be entitled to receive all compensation, damages, or consideration paid or payable as a result of or in connection with such Taking, except that Tenant shall be entitled to any portion of such award or payment that is attributable to the value of any personal property or inventory owned by Tenant, the value of the Tenant Equipment, moving expenses, business relocation expenses and other business damages, and the value of any Improvements owned by Tenant at the time of such Taking. In addition, and notwithstanding the foregoing, to the extent Tenant has any restoration or repair obligations pursuant to this Article XIV, any Taking compensation, damages, or consideration paid to Landlord shall be made available to Tenant and used by Tenant for the purpose of such repair or restoration.

## ARTICLE XV
## ASSIGNMENT AND SUBLETTING

**15.1 Assignment and Subletting.** Except as provided in Section 15.2 below, Tenant may not assign Tenant's interest in this Lease, or sublease the Premises or any portion thereof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed.

**15.2 Permitted Transfers.** Notwithstanding anything in this Lease to the contrary, Tenant may, without Landlord's consent, assign this Lease, sublet the Premises in whole or in part, or transfer any other interest of Tenant in this Lease or the Premises, to an entity (each, a "Permitted Transferee"): (a) controlled by, controlling, or under common control with Tenant; (b) resulting from an organizational change of Tenant or the division of Tenant into two or more entities; (c) with which or into which Tenant merges or consolidates in accordance with applicable statutory provisions governing merger and consolidation of business entities; (d) that acquires all or substantially all of the assets of Tenant; or (e) that acquires a controlling equity interest in Tenant; provided, however, in each case, the assignment, sublease, or transfer to such entity may not be undertaken primarily for the purposes of avoiding the restrictions on

assignment or sublease contained in Section 15.1 above. In addition, Tenant may, without Landlord's consent, execute or deliver any mortgage, deed of trust, collateral assignment of lease, security agreement, or other hypothecating instrument encumbering Tenant's interest under this Lease or the leasehold estate in the Premises created hereby, in connection with any financing arrangement of Tenant.

**ARTICLE XVI**
**END OF TERM**

**16.1 Surrender.** Upon the termination of this Lease, Tenant shall surrender the Premises to Landlord in good condition and in compliance with Tenant's maintenance and repair obligations in Section 9.2 above, normal wear and tear and Casualty damage excepted. Tenant shall have no obligation or responsibility to remove any alterations, improvements, or additions made by Tenant to the Premises, or to restore the Premises to their original delivered condition, upon the expiration or sooner termination of this Lease.

**16.2 Holding Over.** In the event Tenant remains in possession of the Premises after the expiration or earlier termination of this Lease, Tenant shall be deemed to be occupying the Premises as a tenant from month to month, at a monthly Base Rent rate, payable in advance, equal to 125% of the monthly Base Rent payable during the last month of the Term, and Tenant shall further be bound by all of the conditions, provisions, and obligations of this Lease to the extent applicable to a tenancy from month to month.

**ARTICLE XVII**
**DEFAULTS AND REMEDIES**

**17.1 Default by Tenant.** Each of the following events shall constitute an event of default (each, an "Event of Default") under this Lease:

(a) The failure of Tenant to timely pay any Rent when due, which failure is not cured within 10 days after written notice by Landlord to Tenant;

(b) The failure of Tenant to timely comply with any non-monetary term, condition, or covenant of this Lease, which failure is not cured within 30 days after written notice by Landlord to Tenant; provided, however, if such default cannot reasonably be cured within such 30 day period, Tenant shall be entitled to such additional time as is reasonably necessary to cure such default, so long as Tenant commences curing such default within the initial 30 day period and thereafter diligently pursues such cure to completion; and/or

(c) If any of Tenant's interest under this Lease or in the Premises is taken upon execution or by other process of law directed against Tenant, or is subject to any attachment by any creditor or claimant against Tenant and such attachment is not discharged or disposed of within 90 days after such levy.

**17.2 Landlord's Remedies.** If any Event of Default occurs, Landlord shall have the right, at its election and upon seven days' written notice to Tenant, to exercise any one or more of the following remedies:

(a) Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord. If Tenant fails to so surrender the Premises, Landlord may, without prejudice to any other remedy that it may have for possession of the Premises or arrearages in rent, enter upon and take possession of the Premises with due process of law and expel or remove Tenant and any other person

who may be occupying the Premises or any part thereof. Tenant shall pay to Landlord on demand the amount of all actual damage that Landlord may suffer by reason of such termination, whether through inability to relet the Premises or otherwise.

(b) Enter upon and take possession of the Premises with due process of law, but without terminating this Lease, and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof. Landlord may relet the Premises and receive the rent therefor, and Tenant agrees to pay to Landlord monthly or on demand from time to time any deficiency that may rise by reason of such reletting.

(c) Enter upon the Premises with due process of law without terminating this Lease and do whatever Tenant is obligated to do under the terms of this Lease. Tenant agrees to pay Landlord on demand for expenses that Landlord may reasonably incur in effecting compliance with Tenant's obligations under this Lease.

A receipt by Landlord of any sum in satisfaction of any obligation with knowledge of the breach of any provision hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision hereof shall be deemed to have been made unless expressed in a writing signed by Landlord. Upon the occurrence of an Event of Default hereunder, Landlord shall use its best efforts to relet the Premises for a reasonable rental value and to otherwise mitigate its damages.

**17.3 Default by Landlord.** Tenant shall give written notice to Landlord of any failure by Landlord to perform any of its obligations under this Lease. Landlord shall not be in default under this Lease unless Landlord fails to cure such non-performance within 30 days after written notice by Tenant; provided, however, if such default cannot reasonably be cured within said 30 day period, Landlord shall be entitled to such additional time as is reasonably necessary to cure such default, so long as Landlord commences curing such default within the initial 30 day period and thereafter diligently pursues such cure to completion. Should Landlord be in default of its obligations under this Lease, in addition to all other remedies available to Tenant under this Lease or at law or equity, Tenant may (but shall not be obligated to) perform the obligations of Landlord and the reasonable costs thereof shall be payable from Landlord to Tenant upon demand. If Landlord fails to reimburse Tenant on demand for the reasonable costs of performing Landlord's obligation, or if Landlord fails to timely pay Tenant any other amount due to Tenant under this Lease within 30 days after Tenant gives Landlord written notice of such past due amount, then Tenant may in either of such events deduct any such amounts owing from Landlord from the Rent due or to become due to Landlord under this Lease.

## ARTICLE XVIII
## MISCELLANEOUS

**18.1 Liens.** Neither Landlord nor Tenant shall cause or permit to be recorded, filed, claimed, or asserted against the Premises any mechanic's lien for supplies, machinery, tools, equipment, labor, or material contracted for by, through, or under such party and furnished or used in connection with any construction, development, alteration, improvement, addition to, repair to, or maintenance of any Improvements, and if Landlord or Tenant causes or permits any such lien to be so recorded, filed, claimed, or asserted, the responsible party shall cause the same to be released or discharged within 30 days thereafter. If either party breaches the foregoing covenant, the other party may cause any such claimed lien to be released of record by bonding or payment or any other means available. The defaulting party shall pay to the non-defaulting party on demand all sums paid and costs, including reasonable attorneys' fees, incurred by the non-defaulting party in connection therewith.

**18.2 Estoppel Certificates.** Within 20 business days following written request by Landlord or Tenant, the other party shall execute, acknowledge, and deliver to the requesting party a certificate indicating any or all of the following: (a) the date on which the Term of this Lease commenced and the date on which it is then scheduled to expire; (b) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect, as modified, and stating the date and nature of each modification); (c) the then current monthly rent; (d) the date through which Rent has been paid; and (e) that, to the certifying party's actual knowledge, no default by either party exists, other than those defaults stated in such certificate. Any such certificate may be relied upon by the requesting party and (i) if Landlord is the requesting party, by any prospective purchaser or mortgagee, and (ii) if Tenant is the requesting party, by any present or prospective lender of Tenant or any prospective subtenant or assignee.

**18.3 Non-Disturbance Agreement**. Landlord shall provide Tenant with a non-disturbance agreement reasonably acceptable to Tenant, which may be included as part of a subordination, non-disturbance, and attornment agreement (a "Non-Disturbance Agreement") executed by all current and, as and when applicable, future holders of any mortgages or deeds of trust on the Premises or any ground lessors of the Premises (each, a "Holder"). The entry into a satisfactory Non-Disturbance Agreement with (a) any current Holder shall be a condition precedent to Tenant's obligations under this Lease, and (b) with any future Holder shall be a condition precedent to the subordination of this Lease to any future mortgage, deed of trust, or ground lease and Tenant's obligation to attorn to any future Holder. No subordination of this Lease shall operate to modify the terms of this Lease with respect to the rights of the parties to any condemnation award or insurance proceeds.

**18.4 Entry By Landlord.** During the last 90 days of the Term, Landlord and its authorized representatives shall have the right to enter the Premises for the purpose of inspecting the Premises or making repairs thereto. Each entry shall be at reasonable times during normal business hours and upon reasonable prior notice. Landlord shall use its best efforts to avoid interfering with Tenant's use of the Premises during any such entry.

**18.5 Construction and Capitalized Terms.** As used in this Lease, the singular shall include the plural and any gender shall include all genders as the context requires. All capitalized terms used in this Lease shall have the meanings set forth in this Lease.

**18.6 Integration.** This Lease and all documents executed by Landlord and Tenant contemporaneously or in connection herewith constitute the entire agreement between the parties hereto with respect to the matters set forth herein and supersede all prior understandings and agreements, whether written or oral, between the parties hereto relating to the Premises and the transactions provided for herein. Landlord and Tenant are business entities having substantial experience with the subject matter of this Lease and each have fully participated in the negotiation and drafting of this Lease. Accordingly, this Lease shall be construed without regard to the rule providing that ambiguities in a document are to be construed against the drafter.

**18.7 Brokers.** Landlord and Tenant each hereby represent and warrant to the other that their sole contact with the other or with the Premises has been made without the assistance of any broker or other third party. Each party shall indemnify, defend, and hold harmless the other party from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including reasonable attorneys' fees) resulting from the breach by the indemnifying party of the representation and warranty set forth in the preceding sentence. The provisions of this paragraph shall survive the expiration or earlier termination of this Lease.

**18.8 Notices.** All notices, requests and demands to be given hereunder shall be confirmed in writing or in electronic form.

If to Landlord: H2 Development, L.L.C.
4800 U.S. Highway 280 West
Opelika, Alabama 36801
Fax No.: (334) 502-5180
Attention: Stephen C. Hooks

If to Tenant: APR, LLC
4800 U.S. Highway 280 West
Opelika, Alabama 36801
Fax No.: (334) 502-5180
Attention: Stephen C. Hooks

Any party hereto may change its notice address upon written notice to the other party hereto in accordance with this paragraph. Notices by the parties may be given on their behalf by their respective counsel.

**18.9 Landlord Lien Subordination.** Notwithstanding anything in this Lease to the contrary, Landlord hereby subordinates any and all of its Landlord's Liens (as defined below) to the liens of Tenant's lender(s). Without limiting the self-executing nature of the immediately preceding sentence, Landlord shall, within 10 business days after written request from Tenant, execute and deliver to Tenant a commercially reasonable form of subordination and access agreement in favor of Tenant's lender. The term "Landlord's Liens" means any contractual or statutory lien rights, and any other rights, that Landlord now possesses or may by virtue of law hereafter acquire, to seize, hold, distrain, levy on, take possession of, sell, or otherwise interfere with any or all chattels, new or used, that are owned, or may hereafter be acquired by Tenant, by landlord lien or otherwise

**18.10 Quiet Enjoyment**. Landlord covenants that, during the Term and so long as no Event of Default (as defined in Section 17.1) by Tenant exists, Tenant shall have quiet and peaceful possession of the Premises.

**18.11 Survival**. All obligations of any party hereto not fulfilled at the expiration or earlier termination of this Lease shall survive such expiration or earlier termination as continuing obligations of such party.

**18.12 Binding Effect.** This Lease shall inure to the benefit of and be binding upon each of the parties hereto and their heirs, legal representatives, successors and assigns.

**18.13 Modifications.** No modification, waiver or amendment of this Lease or any provisions of this Lease shall be binding upon any party to this Lease unless in writing and signed by such party.

**18.14 No Waiver.** No waiver of any provision of this Lease shall be implied by any failure of either party to enforce any remedy upon the violation of such provision, even if such violation is continued or repeated subsequently. No express waiver shall affect any provision other than the one specified in such waiver, and then only for the time and in the manner specifically stated.

**18.15 Captions.** The captions of Articles and Sections are for convenience only and shall not be deemed to limit, construe, affect, or alter the meaning of such Articles and Sections.

**18.16 Severability.** If any provision of this Lease is deemed or held to be illegal, invalid or unenforceable, this Lease shall be considered divisible and inoperative as to such provision to the extent it is deemed to be illegal, invalid or unenforceable, and in all other respects this Lease shall remain in full force and effect.

**18.17 Jury Trial.** Landlord and Tenant waive trial by jury in any action, proceeding or counterclaim brought by Landlord or Tenant against the other with respect to any matter arising out of or in connection with this Lease and/or Tenant's use and occupancy of the Premises.

**18.18 Only Landlord/Tenant Relationship.** Landlord and Tenant agree that neither any provision of this Lease nor any act of the parties shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

**18.19 Attorneys' Fees.** If on account of any breach or default by any party hereto in its obligations to any other party hereto, it shall become necessary for the non-defaulting party to employ an attorney to enforce or defend any of its rights or remedies hereunder, the defaulting party agrees to pay the non-defaulting party its reasonable attorneys' fees, whether or not suit is instituted in connection therewith. The provisions of this paragraph shall survive the expiration or earlier termination of this Lease.

**18.20 Time of Essence.** Time is of the essence of each of the provisions of this Lease.

**18.21 Counterparts; Electronic Signatures**. This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all such counterparts together shall constitute one and the same instrument. Signature and acknowledgment pages, if any, may be detached from the counterparts and attached to a single copy of this document to physically form one document. Signatures given by facsimile or portable document format (PDF) shall be binding and effective to the same extent as original signatures.

**18.22 Governing Law.** This Lease shall be construed, governed and enforced in accordance with the laws of the state in which the Premises are located.

**18.23 Recording**. Upon request of either party, Landlord and Tenant shall execute a memorandum or short form of this Lease, have it properly acknowledged for the purpose of recording, and record such instrument in the proper office in the City or County in which the Premises are located. Such memorandum or short form shall include such provisions of this Lease as may be reasonably requested by either of the parties, but shall not include the amount of Base Rent payable hereunder. The cost of recording shall be borne by the requesting party.

**18.24 Landlord's Consent**. Wherever this Lease calls for Landlord's consent, approval or discretionary action, Landlord shall not unreasonably withhold, condition, delay, or exercise such consent, approval or discretionary action.

**18.25 Exhibits**. Any exhibits attached to this Lease constitute a part of this Lease and are incorporated into this Lease by this reference.

## ARTICLE XIX
## TERMINATION OF EXISTING LEASE

**19.1 Termination of Existing Lease**. Landlord and Tenant hereby acknowledge, agree, and confirm that the Commercial Lease dated March 22, 2007 (as previously amended and modified, the "Existing Lease") by and between Landlord and Tenant for the lease of the Premises is hereby terminated as of the day immediately preceding the Commencement Date of this Lease (the "Termination Date"). As of the Termination Date, the Existing Lease is and shall be deemed to be of no further force and effect, and Landlord and Tenant shall have no further obligations whatsoever under the Existing Lease. As of the Termination Date, each of Landlord and Tenant, for itself and its successors and assigns, and any other

person claiming by or through it (collectively, the "Releasing Party") does hereby forever release and discharge the other party and its successors and assigns, and their respective members, managers, officers, directors, shareholders, partners, and employees (collectively, the "Released Parties") from any and all claims, causes of action, actions, suits, debts, demands, and damages of any kind whatsoever, whether in law or in equity, and whether known or unknown, that the Releasing Party ever had, now has, or hereafter shall or may have against the Released Parties, for, upon, or by reason of any manner, cause, or thing whatsoever, from the beginning of time to the Termination Date, arising out of or in any way relating in any way to the Existing Lease.

[SIGNATURE PAGE(S) TO FOLLOW]

**SIGNATURE PAGE TO LEASE AGREEMENT**

Landlord and Tenant have executed this Lease Agreement as of the Effective Date.

WITNESSES:

Name: Mark E. Lolley

Name: Ioan Petrina

**LANDLORD:**

**H2 DEVELOPMENT, L.L.C.,**
an Alabama limited liability company

By:
Name: Stephen C. Hooks
Title: Member and Manager

Date: March 31, 2014

WITNESSES:

Name: Elizabeth Reichert

Name: Charlie Reichert

**TENANT:**

**APR, LLC**, an Alabama limited liability company

By:
Name: J. Hunter Reichert
Title: Vice President

Date: March 31, 2014

**EXHIBIT A**
**(Legal Description of the Premises)**

PART NW4 SEC 9 T19B R26E: COM INT W LINE & NE ROW US HWY 280; SE 490'S ON ROW TO BEG; SE 1025'S ON ROW; N 860'S; W940'S; S 500'S TO POB.

## LEASE EXTENSION

APR

APR, LLC

4800 US Highway 280 W, Opelika, AL 36801

April 19, 2023

***VIA Email and UPS (#1Z6R80A50190947841)***

4800 USH 280 Real Estate LLC
c/o 4800 USH 280 Leasing LLC
Attn: Michael Shabsels
444 East 58th Street #3C
New York, NY 10022
mshabsels@gmail.com

RE: Notice of exercise of extension option pursuant to Lease Agreement between 4800 USH 280 Real Estate LLC, as successor in interest to H2 Development, L.L.C. ("Landlord") and APR, LLC ("Tenant") dated March 31, 2014, for premises located at 4800 US Highway 280 W, Opelika, Alabama (the "Lease").

Mike:

This letter will serve as written notice of Tenant's exercise of its right to extend the Term of the Lease for its first Extension Option of five years, pursuant to Section 2.2 of the Lease. Based on the terms contained within the Lease, the Term will now expire on July 24, 2028, with two remaining Extension Options of five years each. Each capitalized term used in this letter shall have the same meaning ascribed to it in the Lease, unless specifically defined in this letter.

Please contact me if you have any questions.

Sincerely,

Signature

Brian Appelgate
Chief Operating Officer
Printed Name and Title

cc: Carly Kennedy, via email: carlykennedy@holley.com

## ENGAGEMENT LETTER

Commercial Appraisal Order Details — Tracking #754748-54335248

**History (In Progress)**

| | |
|---|---|
| 06/06/25 12:56 PM | Order accepted by Appraiser (Scott Lakas) and In Progress |
| 06/06/25 11:49 AM | Appraiser Scott Lakas has been awarded this order by Client Natasha Valvo. |
| 06/06/25 11:49 AM | Bid Message by Client (Natasha Valvo)<br>*Notes: Point of Contact:<br>Michael Shabsels<br>Email: m.shabsels@gmail.com<br>Mike Covino: (203) 594-7444* |
| 06/06/25 09:12 AM | Appraiser Scott Lakas submitted a bid on this order. Certified<br>*Amount: $2,395; Turn Time: 14 business days<br>Notes: If you would like to do an 8-day, please increase the fee to 2950. Thanks so much We are very familiar with this asset.* |
| 06/06/25 08:54 AM | Bid Message by Client (Natasha Valvo)<br>*Notes: Good morning<br>Please give me an 8 business day turn time if you haven't already.<br>Thanks* |
| 06/06/25 07:36 AM | Bid Pending by Scott Lakas |

**Client Information**

| | | | |
|---|---|---|---|
| **Name** | Natasha Valvo | **Phone** | 412-200-2550 x543 |
| **Company** | Service 1st LLC | **Fax** | |
| **Address** | 1000 Cliff Mine Rd<br>Pittsburgh, PA 15275 | **E-mail** | nvalvo@service1inc.com |

**Vendor Information**

| | | | |
|---|---|---|---|
| **Name** | Scott Lakas | **Phone** | 334-737-6993 |
| **Company** | Atlas Valuation, LLC | **Fax** | |
| **Address** | 145 E Magnolia Ave<br>Suite 202<br>Auburn, AL 36830-4758 | **E-mail** | scott@atlasvaluation.com |

**Assignment Information**

| | | | |
|---|---|---|---|
| **Product** | Commercial Appraisal Report | | |
| **Order Fee** | $2,950 | **Payment Method** | Invoice |
| **Trans Fee** | | **Loan #** | 2767461 |
| **Due Date** | 6/18/2025 | **File #** | |
| **Other Ref #** | | **FHA#** | |
| **Internal Order #** | | **Sales Price** | |
| **Loan Type** | | **Lender Name** | |
| **Loan Purpose** | | **Lender Address** | |
| **Invoice #** | | **Invoice Amt** | |
| **Ordered By** | | **DU Case File** | |
| **LPA Key** | | **PDAPI Key** | Edit |
| **BACE Submission ID** | Edit | **Value conditions** | As is |

**Property Information**

| | | | |
|---|---|---|---|
| **Address** | 4800 US Highway 280 W | **Prop Type** | |
| **Unit Type** | | **Prop Rights** | |
| **City** | Opelika | **Legal Desc** | |
| **State** | AL | **Directions** | **PLEASE GIVE ME AN 8 BUSINESS DAY TURN TIME IF POSSIBLE. INTERIOR INSPECTION REQUIRED. SIGNING APPRAISER MUST COMPLETE THE INTERIOR INSPECTION. * Please include the remaining economic life |
| **Zip Code** | 36801 | **Characteristics** | |
| **Sq Ft** | | | |
| **Site Size** | | | |

**Contact and Access Information**

| | | |
|---|---|---|
| **Borrower:** | Shabsels Brothers Summer Camps | Home: 111-111-1111 |
| **Co-Borrower:** | | |
| **Owner:** | | |
| **Occupant:** | | |

**Agent:**

**Other:**

**Appt. Contact:**

**Additional Comments or Instructions to the Vendor**

****PLEASE SEE SEPARATE ATTACHMENT UPLOADED TO THE ORDER WITH THE COMPLETE ORDER INSTRUCTIONS**** **PLEASE NOTIFY US IF YOU WILL NOT HAVE ACCESS TO ALL OF THE UNITS** IF YOU ENCOUNTER ANY SITUATION THAT WOULD VIOLATE VALUATION INDEPENDENCE PLEASE REPORT IT IMMEDIATELY TO SERVICE 1ST AT THE FOLLOWING EMAIL ADDRESS. reportviolations@service1inc.com o Service 1st fully supports valuation independence. Our internal policies and procedures ensure strict adherence to all regulatory requirements and professional standards, including Appraiser Independence, USPAP, Dodd-Frank, and individual state requirements. Your assistance in reporting violations will help protect the valuation process from undue influences. The identity of the reporting person will be safe guarded so as to support and protect a process that encourages the open reporting of violations. Any individual reporting a violation will not be negatively impacted in work volume, assignment type, employment, or any other means for reporting the violation. In accepting this order for an appraisal and submitting the requested appraisal, you, as the appraiser, certify that you: (1) are independent of the transaction; (2) have the requisite licensing, education, expertise, and experience necessary to competently complete the appraisal assignment in accordance with USPAP and all applicable industry standards; and (3) were not coerced in any way concerning the appraisal that you have submitted. The client requires that you personally inspect the subject property and comparables included in the report; sub-contracting is not permitted. If anyone other than yourself will be providing assistance in the appraisal process, you must employ him or her, and we must receive their qualifications for the client's approval, prior to accepting this assignment. The client requires that you personally inspect the subject property and comparables included in the report; sub-contracting is not permitted. If anyone other than yourself will be providing assistance in the appraisal process, you must employ him or her, and we must receive their qualifications for the client's approval, prior to accepting this assignment. Service 1st operates in 50 states and the District of Columbia. AL #AL0185, AK 150891, AR #AMR-199, AZ #RAMC-40298, CA #3004699, CO #200001092, CT #AMC.0000217, DE #X7-0000131, FL #MC328, GA #257, HI AMC-1210, IA #92, ID AMC-4553, IL #558.000262, IN #AMC1700006, KS #KSP172, KY #176, LA #0229, MA 42, MD #32980, ME #AMC3854, MI #1202000193, MN #40548039, MO #2017019913, MS #AMC-133, MT #REA-AMC-LIC9341, NC #NC-1211, ND AMC-ND-2018-027, NE NE2017007, NH #AMC-161, NJ 42AC00009300, NM #AMC1198, NV #AMC.0000912, NY AMC_19_0271, OH #AMC.2019001807, OK #60197AMC, OR #AM-209, PA #AMC000200, RI #REA.0021-AMC, SC #20, SD #AMC-SD-1148-2017, TN #232, TX #2000244, UT #10504022-AMCO, VA #4009000174, VT #077.0131803.MAIN, WA #3000227, Washington D.C. AMC0028, WI #8-900, WV #WV010121, WY AMC-116 If you have any questions regarding this assignment please email our Manager of Commercial Valuations Natasha Phillips nvalvo@service1inc.com **INSURABLE VALUE REQUIRED** **DO NOT DISCUSS DELIVERY DATE OR FEE WITH ANYONE OTHER THAN SERVICE 1ST. WE ARE YOUR CLIENT. IF SOMEONE ELSE ASKS YOU FOR ANY INFORMATION ABOUT WHEN THEY WILL RECEIVE THE REPORT OR HOW MUCH THE FEE IS ASK THEM TO CALL THEIR SERVICER**

If you have any questions regarding this assignment please email our Manager of Commercial Valuations Natasha Phillips nvalvo@service1inc.com The client will not accept any statement of financial limit on appraiser liability added to the appraisal. NOTE: IF YOU HAVE PERFORMED VALUATION SERVICES FOR THE SUBJECT PROPERTY WITHIN THE LAST 3 YEARS THAT WAS NOT FOR THE CLIENT IN THIS ASSIGNMENT PLEASE CONTACT SERVICE 1st BEFORE STARTING ON THE ASSIGNMENT. Appraisers must have access to and use CoStar data in the preparation of the appraisal. The appraiser is not limited to CoStar data only. If the appraiser finds alternate data they feel is more appropriate for the assignment they may substitute, but they need to have checked the CoStar data base completely to insure they are considering all available data for an assignment. PLEASE ADD THE CLIENT ORDER NUMBER TO THE APPRAISAL IN A PROMINENT LOCATION WHERE IT CAN BE EASILY IDENTIFIED BY THE READER. Per client request please provide a copy of the data/listing sheet for all comparable sales utilized in the appraisal **Please do not place additional contingencies on the appraisal without prior consent from Service 1st.**The client requests that recent comparable sales be utilized in the appraisal to reflect current market conditions. EXTERIOR INSPECTIONS ¿ If the client has requested an exterior inspection, please do not contact the subject property owner or occupant as this is a client confidentiality request. Do not trespass on the subject property and do not disclose the client provided information or the client¿s identity. **Please include the estimated value in the letter of transmittal. The client has provided descriptive information about the subject property that was obtained from past valuations. If your research indicates a significant deviation from the client provided data, please provide your data source for that information, or support for your differing interpretation of the physical description or use of the subject property. It is requested that the appraiser provide the current as-is market value of the property and comment on any listing information of the subject within the past year in addition to the sale¿s history within the past 3 years. If the appraiser has ever appraised the subject property it must be noted in the appraisal report. The appraisal must include an adjustment grid, pictures of the comparable sale properties as well as a location map. The comparable sales should ¿bracket¿ the estimated value of the subject on both an unadjusted and adjusted basis. Using only the GRM Method is not acceptable; the appraisal must include the Direct Capitalization Method. The appraisal must include pictures of the comparable rental properties as well as a location map. reports include an adjustment grid for the comparables used in the Sales Comparison Approach. PLEASE PROVIDE NEW, ORIGINAL, CLEAR PHOTOS OF THE FRONT, ALL SIDES, STREET AND ADDRESS VERIFICATION FOR THE SUBJECT PROPERTY. IF AN INTERIOR INSPECTION IS REQUESTED, PLEASE PROVIDE A MINIMUM OF 6 INTERIOR PHOTOS. **A LOCATION MAP SHOWING THE SUBJECT AND ALL COMPS SHOULD ALSO BE INCLUDED. ***COMP PHOTOS MUST BE ORIGINALS (YOU CANNOT USE MLS)*** Please provide information on the microeconomic influences and trends that affect the subject property. These influences can include nearby competitive properties and developments, REO activity, nearby employment centers, traffic flows and other influences that directly influence the subject property. Provide a summary on the current trends and anticipated near term trends for these microeconomic influences. Please provide information on the macroeconomic influences and trends affecting the subject property. These can include area employment trends, population trends, major road improvements and highway extensions, regional transportation trends including airports and railway hubs. Provide a summary on the current trends and anticipated near term trends for these macroeconomic influences. Do not apply lease up charges if the subject building appears fully occupied. Please make the extraordinary assumption that the tenant will remain in place for an existing lease term or the owner/occupant will remain in the subject building. EXTERIOR INSPECTIONS - The client has provided descriptive information about the subject property that was obtained from past valuations. PLEASE MAKE THE EXTRAORDINARY ASSUMPTION THE CLIENT PROVIDED GLA AND INTERIOR INFORMATION IS CORRECT FOR EXTERIOR INSPECTIONS. If your research indicates a significant deviation from the client provided data, please provide your data source for that information, or support for your differing interpretation of the physical description or use of the subject property. INTERIOR INSPECTIONS ¿ PLEASE MEASURE THE SUBJECT BUILDING AND USE THAT INFORMATION IN YOUR APPRAISAL REPORT. In accepting this order for an appraisal and submitting the requested appraisal, you, as the appraiser, certify that you: (1) are independent of the transaction; (2) have the requisite education, expertise, and experience necessary to competently complete the appraisal assignment; and (3) were not coerced in any way concerning the appraisal that you have submitted. Service 1st operates in 50 states and the District of Columbia. AL #AL0185, AK, AR #AMR-199, AZ #RAMC-40298, CA #3004699, CO #200001092, CT #AMC.0000217, DE #X7-0000131, FL #MC328, GA #257, HI AMC-1210, IA #92, ID AMC-4553, IL #558.000262, IN #AMC1700006, KS #KSP172, KY #176, LA #0229, MA, MD #32980, ME #AMC3854, MI #1202000193, MN #40548039, MO #2017019913, MS #AMC-133, MT #REA-AMC-LIC9341, NC #NC-1211, ND, NE NE2017007, NH #AMC-161, NJ, NM #AMC1198, NV #AMC.0000912, NY, OH, OK #60197AMC, OR #AM-209, PA #AMC000200, RI, SC #20, SD #AMC-SD-1148-2017, TN #232, TX #2000244, UT #10504022-AMCO, VA #4009000174, VT #077.0131803.MAIN, WA #3000227, Washington D.C., WI #8-900, WV #WV010121, WY AMC-116 In accepting this assignment you hereby agree to the following: 1. The lender, Newtek Small Business Finance, LLC, is your client for this assignment. All appraisals shall be addressed and certified to either Newtek Small Business Finance, LLC its successors and/ or assigns as noted on the above letterhead. 2. All appraisals will conform to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), the Uniform Standards of Professional Appraisal Practice (USPAP) and to the Appraisal Standards of Newtek Small Business Finance, LLC which standards are attached and identified as "Attachment A." 3. The Effective Date(s) in your appraisal should be the date of your inspection. 4. Complete appraisals must address the Sales Comparison and Cost approaches to value. It must incorporate a reasonable methodology, which reconciles these approaches into a value conclusion. If one or more approaches are not used, the appraiser must explain the reason for eliminating those approaches. 5. The Cost Approach alone is unacceptable for real estate (acceptable for personal property

**PLEASE GIVE ME AN 8 BUSINESS DAY TURN TIME IF POSSIBLE. INTERIOR INSPECTION REQUIRED. SIGNING APPRAISER MUST COMPLETE THE INTERIOR INSPECTION. * Please include the remaining economic life