**Exhibit "75"**

APPRAISAL REPORT

# 7335 Gladiolus Drive
# Fort Myers, FL 33908

Medical Office Property
Bowery Report No. JOB-2500040702

REQUESTED BY

Newtek Bank, National Association and its affiliates and subsidiaries
1981 Marcus Avenue, Suite 130
Lake Success, NY 11042

DATE OF VALUE

June 12, 2025

PREPARED BY



Scott M.
Powell, MAI

bowery

140 Intracoastal Pointe Drive, Suite 212, Jupiter, FL 33477
333 SE 2nd Avenue, Suite 2000, Miami, FL 33131
121 S. Orange Ave, Suite 1500, Orlando, FL 32801
3001 N. Rocky Point Drive. E, Suite 200, Tampa, FL 33607

June 17, 2025

Newtek Bank, National Association and its affiliates and subsidiaries
1981 Marcus Avenue, Suite 130
Lake Success, NY 11042

Re: Appraisal File No. JOB-2500040702
Medical Office Property
7335 Gladiolus Drive
Fort Myers, FL 33908

To Whom It May Concern,

In accordance with your request, we have completed an appraisal of 7335 Gladiolus Drive in Fort Myers, FL 33908. The purpose of this appraisal is to provide the As Is Market Value of the Leased Fee Interest in the subject. An Insurable Replacement Cost Estimate has also been included within the report.

The subject consists of a one-story, single-tenant medical office building located on the east side of Gladiolus Drive, north of Old Gladiolus Drive in Fort Myers, Florida. The subject consists of 15,406 square feet of gross building area and 13,777 square feet of gross leasable area. The property contains 1,629 square feet of enclosed storage/parking space with four garage doors. The property has a lobby, exam rooms, administrative spaces, break rooms, and offices. The subject, which was built in 2004, was in good condition at the time of inspection. The subject property is currently leased to Lee Health System, Inc. The lease term was extended in 2021 for an additional ten years, extending through April 30, 2031. The base rent is $324,960 annually, or $23.59/ SF triple net. The rent shall remain constant, without adjustments, for the initial 10-year term. There are (2) five-year renewal options.

The subject is situated on a 1.43 acre / 62,290 square foot site in the C-1, Commercial District. It is identified on Lee County tax maps as Parcel ID: 26-45-24-00-00015.0060. Based on the subject property's zoning, physical characteristics, location, and forecasted economic conditions, continued use as a medical office building is concluded to be the highest and best use as improved.

Our analyses, opinion and conclusions were developed, and this report has been prepared, in conformance with the Standards of Professional Practice and Code of Professional Ethics of the Appraisal Institute, The Uniform Standard of Professional Appraisal Practice (USPAP), Newtek Bank's appraisal guidelines, and applicable state appraisal regulations. To report the assignment results, we use the Appraisal Report option of Standards Rule 2-2(a) of USPAP.

This appraisal is also prepared in compliance with Title XI (with amendments) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), as well as the Interagency Appraisal and Evaluation Guidelines dated December 2, 2010.

After carefully considering all available information and factors affecting value, our opinion is as follows:

Market Value Opinion

| Value | Date | Interest Appraised | Conclusion |
|---|---|---|---|
| Market Value As Is | June 12, 2025 | Leased Fee Interest | $4,175,000 |

As with any appraisal, the reader is reminded that the opinion of value is only valid as of the effective date(s). Our conclusions are predicated on the attitudes and expectations prevalent in the subject submarket and market on the date(s) of value. Bowery Valuation continuously monitors the markets where we are active and appropriate steps have been taken to ensure our analysis is based on the most recent, relevant data available. Changes in market conditions or associated with other unanticipated future events, could impact value.

bowery

140 Intracoastal Pointe Drive, Suite 212, Jupiter, FL 33477
333 SE 2nd Avenue, Suite 2000, Miami, FL 33131
121 S. Orange Ave, Suite 1500, Orlando, FL 32801
3001 N. Rocky Point Drive. E, Suite 200, Tampa, FL 33607



The value conclusions are subject to the following **Extraordinary Assumptions**[1] that may affect the assignment results. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

•None.

The value conclusions are based on the following **Hypothetical Conditions**[2] that may affect the assignment results.

•None.

The opinion of value expressed herein is subject to the certification, assumptions and limiting conditions, and all other information contained in the following written appraisal report.

Sincerely,

Scott M. Powell, MAI
Managing Director
FL State Cert Gen. RE Appraiser RZ2809
scott.powell@boweryvaluation.com
(561) 515-1269

---

[1] *The definition of Extraordinary Assumptions can be found in the Glossary of Terms, which is located in the Addenda.*

[2] *The definition of Hypothetical Conditions can be found in the Glossary of Terms, which is located in the Addenda.*

# Summary of Salient Facts & Conclusions

## Property Identification



The subject consists of a one-story, single-tenant medical office building located on the east side of Gladiolus Drive, north of Old Gladiolus Drive in Fort Myers, Florida. The subject consists of 15,406 square feet of gross building area and 13,777 square feet of gross leasable area. The property contains 1,629 square feet of enclosed storage/parking space with four garage doors. The property has a lobby, exam rooms, administrative spaces, break rooms, and offices. The subject, which was built in 2004, was in good condition at the time of inspection. The subject property is currently leased to Lee Health System, Inc. The lease term was extended in 2021 for an additional ten years, extending through April 30, 2031. The base rent is $324,960 annually, or $23.59/ SF triple net. The rent shall remain constant, without adjustments, for the initial 10-year term. There are (2) five-year renewal options.

## Salient Facts

| | | | |
|---|---|---|---|
| **GBA (sq. ft.)** | 15,406 | **Zoning** | C-1,Commercial District |
| **GLA (sq. ft.)** | 13,777 | | |
| **Occupancy Rate** | 100% Leased | **Flood Hazard Zone/Date** | Zone AE /November 17, 2022 |
| **Year Built** | 2004 | **Flood Hazard Map** | 12071C0419G |
| **Parcel IDs** | 26-45-24-00-00015.0060 | **Exposure Time** | 6-9 Months |
| **Site Area (SF/acres)** | 62,290 / 1.43 | **Date of Inspection** | June 12, 2025 |
| **Date of Report** | June 17, 2025 | | |

### Strengths/ Weaknesses

- The property was built in 2004 and is in good condition.

### Opportunities

- The S. Fort Myers/ San Carlos Office Submarket's rents have increased 2.8% over the past year.

### Threats

- The Federal Reserve met on May 7, 2025, and decided to maintain the benchmark interest rate at a range of 4.25% to 4.5%. This decision reflects the ongoing assessment of increased uncertainty around inflation and economic conditions influenced by recent federal policy shifts.

## Conclusions

Financial Indicators

| Financial Indicators | Total | Per SF-GBA |
|---|---|---|
| Effective Gross Income | $420,407 | $30.52 |
| Expense Ratio | 31% | |
| Net Operating Income | $291,398 | $21.15 |
| Capitalization Rate | 7.00% | |
| | | |
| Income Approach -Market Value As Is | $4,175,000 | $271 |
| Sales Approach - Market Value As Is | $4,150,000 | $270 |
| Insurable Value | $2,275,000 | |

Final Value Conclusion

| Value | Date | Interest Appraised | Conclusion |
|---|---|---|---|
| Market Value As Is | June 12, 2025 | Leased Fee Interest | $4,175,000 |

The value conclusions are subject to the following **Extraordinary Assumptions**[3] that may affect the assignment results. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

•None.

The value conclusions are based on the following **Hypothetical Conditions**[4] that may affect the assignment results.

•None.

The opinion of value expressed herein is subject to the certification, assumptions and limiting conditions, and all other information contained in the following written appraisal report.

[3] *The definition of Extraordinary Assumptions can be found in the Glossary of Terms, which is located in the Addenda.*

[4] *The definition of Hypothetical Conditions can be found in the Glossary of Terms, which is located in the Addenda.*

# Table of Contents

Introduction ....8
Purpose & Date of Value Opinion ....8
Identification of the Client ....8
Intended Use and User ....8
Property History ....8
Exposure Time ....8
Marketing Time ....8
Definition of Market Value ....8
Scope of the Appraisal ....9
General Assumptions ....9
Data Sources ....10
Appraisal Assistance ....10
Neighborhood & Demographic Overview ....11
Zoning Summary ....16
Appraiser's Conclusion on Conformity ....16
Assessed Values & Real Estate Taxes ....17
Site Description ....18
Description of Improvements ....20
Structural & Mechanical ....20
Layout & Finishes ....20
Building Condition ....21
Summary ....21
S Ft Myers/San Carlos: Office Submarket Analysis ....22
Highest & Best Use ....28
As Vacant ....28
As Improved ....28
Appraisal Valuation Process ....30
Income Approach ....31
Base Rental Income ....31
Vacancy and Collection Loss ....34
Income and Expense Pro Forma ....35
Effective Gross Income ....35
Operating Expense Analysis ....35
Stabilized Income and Expenses ....37
Income Capitalization ....38
Sales Comparison Approach ....40
Reconciliation & Final Value Opinion ....44
Certification ....45

Addenda ....47
Glossary of Terms ....47
Letter of Engagement....50
Subject Data....53
Insurable Replacement Cost....82
Insurable Value ....83
Fort Myers: Office Market Analysis ....84
Lee County Area Analysis ....90
Contingent & Limiting Conditions ....96
Subject Property Photos....99
Map Gallery.... 106
Comparable Sales Outlines .... 108

# Introduction

## Purpose & Date of Value Opinion

The purpose of the appraisal is to provide an opinion of the As Is Market Value of the leased fee interest in the subject property as of June 12, 2025.

## Identification of the Client

Newtek Bank, National Association and its affiliates and subsidiaries has engaged us and is our client for this assignment.

## Intended Use and User

The intended use of this appraisal is for the purpose of providing a loan. The intended user of this report is Newtek Bank, National Association and its affiliates and subsidiaries.

## Property Rights Appraised

The subject is appraised on the basis of Leased Fee Interest.

## Property History

The current owner of record is 7335 Gladiolus LLC, per Lee County records. The subject has not sold within the past three years.

We are not aware of any bids, transactions, offers or options to purchase this asset.

## Exposure Time[5]

It is our opinion that a normal exposure time for the subject property is between six and nine months. This conclusion is predicated on interviews with brokers and other real estate industry sources and on information obtained in the verification process. The value reported herein presumes such an exposure time.

## Marketing Time

It is our opinion that a current marketing time for the subject property is between six months and nine months. This conclusion considers the property's relative market position, as well as our market value conclusion and it is predicated on interviews with brokers, other real estate industry sources and on information obtained in the verification process.

## Definition of Market Value

According to Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472, the following definition is used by agencies that regulate federally insured financial institutions in the United States:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;

[5] *The definition of Exposure Time can be found in the Glossary of Terms, which is located in the Addenda.*

2. both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

## Scope of the Appraisal

Within the course of this assignment, we have:

- Inspected the full interior and exterior of the building.
- Researched and investigated the location in terms of its economic activity, development patterns, and future trends and related their impact on the market.
- Researched the subject's zoning.
- Determined the Highest and Best Use of the subject property based on an analysis of all relevant factors.
- Conducted a market survey of rent and vacancy levels of similar properties.
- We have researched and analyzed similar rental comparables.
- Projected the net operating income and applied a market-derived income capitalization rate to develop an opinion of value of the subject property by the income approach.
- Researched and analyzed sales of competitive assets and applied the techniques of the sales comparison approach in advancing opinions of value.
- Reconciled each approach to value in order to estimate the final value estimate(s) of the subject property based on the purpose of this appraisal.
- Advanced an opinion of the market value of the identified interest.

## General Assumptions

Various estimates of gross building area were furnished by the owner, client, and/or their agents. This opinion of value reported herein assumes that the data provided are the most recent and accurate.

We note that our appraisers are not experts in the following domains:

- **Technical Environmental Inspections:** No Environmental Site Assessment report was provided in conjunction with this appraisal. We recommend the services of a professional engineer for this purpose. If a report is commissioned and there are any environmental issues uncovered, they could affect our opinion of value reported.
- **Zoning Ordinances:** We recommend an appropriately qualified land use attorney be consulted if a definitive determination of compliance is required.
- **Building Inspections:** We recommend a building engineer or professional property inspector for the inspection. Any immediate expenditures that a trained professional may determine are needed, could affect our opinion of value reported.

## Data Sources

The data contained within this appraisal was compiled from market analysis utilizing the following sources (unless otherwise noted): the property appraiser, CoStar, Federal Reserve, and FEMA. When possible, we have confirmed the reported data with parties to the transactions or those who are intimately familiar with their critical details.

Sources of Data

| Data | Source/Verification: |
|---|---|
| Site Size | Public Record |
| Commercial SF | Owner; Inspection |
| Number of Buildings | Inspection |
| Deferred Maintenance | Inspection |

## Appraisal Assistance

Jason Telsey, State-Registered Trainee Appraiser RI25591, under the direct supervision of Harry C. Newstreet, MAI, State-Certified General Real Estate Appraiser RZ2278, provided significant real property appraisal assistance to the appraiser(s) signing this certification, including verifying rent and sale prices for the subject and similar property type. It is noted that the responsibilities of parties providing assistance is not considered to be significant in terms of any value determination. All parties conducted assistance und the direct supervision of the appraisers signing this report in compliance with State regulations.

# Neighborhood & Demographic Overview




*Source: Google Maps*

## Fort Myers at a Glance

Fort Myers is an urban city of Lee County, located in the southwestern part of Florida, about 120 miles south of Tampa, the largest city in the region. The city of Fort Myers has a mix of urban, suburban, and rural characteristics. The downtown area is more urban, with high-rise buildings and a bustling business district. However, as you move farther from the city center, the residential areas become more suburban and eventually transition into more rural areas. The housing stock in Fort Myers is diverse, with a mix of single-family homes, townhouses, and apartment complexes. The city has experienced significant growth in recent years, leading to various new construction projects and developments. However, there are also historic neighborhoods with pleasant, older homes. Residents in Fort Myers have access to various retailers and businesses. The downtown area has a mix of local and national tenants, including restaurants, specialty shops, and entertainment venues. As you move farther out from the city center, there are larger shopping centers and commercial areas with a mix of local and national businesses. Some of the largest retailers in Fort Myers include Walmart, Target, and Costco. There are also plenty of recreational activities and amenities for residents in Fort Myers. The city has several parks and green spaces, as well as a pleasing waterfront area with a marina and walking trails. There are also golf courses, sports complexes, and community centers for residents to enjoy. Some popular attractions in Fort Myers include the Edison and Ford Winter Estates and Fort Myers Beach. The major corridors of Fort Myers include Interstate 75 and U.S. Route 41, which provide access to Naples and Sarasota, the major cities in the region. State Routes 82 and 84 provide access to nearby towns like Lehigh Acres and Cape Coral. Fort Myers has access to regional bus services provided by LeeTran, connecting to cities like Cape Coral and Sanibel. The local airport is Southwest Florida International Airport, which is approximately 17 miles away and offers domestic and international flights.

## Population and Households

The following demographic profile, created with data from the U.S. Census Bureau, reflects the subject's municipality and market. As of the 2010 Census, Fort Myers had a population of 62,298 people and 24,968 households. 2020 Census data shows its population has grown by 3.9% per year to 86,395 residents.

Population and Household Growth

| | Area | 2010 Census | 2020 Census | Annual % Change | 2025 Forecast |
|---|---|---|---|---|---|
| Population | Fort Myers | 62,298 | 86,395 | 3.9% | 104,447 |
| | Lee County | 618,754 | 760,822 | 2.3% | 852,270 |
| Households | Fort Myers | 24,968 | 36,084 | 4.5% | 44,864 |
| | Lee County | 259,818 | 318,303 | 2.3% | 355,778 |

Households in Fort Myers are, on average, larger than those in Lee County. Households in Fort Myers have an average size of 2.37 people, compared to 2.35 people in Lee County. 2 person households account for the largest share in both Fort Myers and Lee County.




*Source: U.S. Census Bureau*

Households in Fort Myers have a lower median income than those in Lee County. Households in Fort Myers have a median income of $46,409, compared to $57,832 for households in Lee County. The chart below indicates the share of households by income brackets. In both Fort Myers and Lee County, the most common household income is between $75k-99,999.




*Source: U.S. Census Bureau*

## Housing

Single-family homes, followed by 20-49-unit properties then properties with 50+ units account for the most common forms of housing in Fort Myers. 43% of the housing units in Fort Myers are occupied by their owner. This percentage of owner-occupation is lower than the Lee County level of 71%.

Housing Units by Units in Structure




*Source: U.S. Census Bureau*

Occupied Housing Units by Tenure




*Source: U.S. Census Bureau*

Homes in Fort Myers have a median value of $238,700, compared to $224,800 for Lee County. In both Fort Myers and Lee County, the most common home value is between $300k - $399k.

Owner Occupied Housing Units by Value




*Source: U.S. Census Bureau*

Homes in Fort Myers have a median year built of 1995, compared to 1993 for Lee County. In both Fort Myers and Lee County, the largest share of homes were built between 2000-2009.




*Source: U.S. Census Bureau*

## Transportation

In Fort Myers, the majority of residents drive alone with 75% choosing to do so. The second most common method is carpooling with 12%.

Commuters in Fort Myers have a median commute time of about 22 minutes. In Fort Myers, the most common commute time is between 15-19 minutes, compared to 30-34 minutes for Lee County.




*Source: U.S. Census Bureau*



*Source: U.S. Census Bureau*

Transportation Methods

- The major corridors of Fort Myers include Interstate 75 and U.S. Route 41, which provide access to Naples and Sarasota, the major cities in the region. State Routes 82 and 84 provide access to nearby towns like Lehigh Acres and Cape Coral.
- Fort Myers is not served by any commuter or light-rail lines.
- Fort Myers has access to regional bus services provided by LeeTran, connecting to cities like Cape Coral and Sanibel.
- The local airport is Southwest Florida International Airport, which is approximately 17 miles away and offers domestic and international flights.

## Conclusion

Fort Myers is a city in Lee County, Florida with access to interstate highways, public transportation, a diverse housing stock, recreational amenities, and businesses and retailers for everyday use. Fort Myers has experienced strong population growth over the past decade, a trend that will likely continue in the near-term.

# Zoning Summary

The subject is within the C-1, Commercial District.

The purpose and intent of the C-1A, C-1 and C-2 districts is to regulate the continuance of commercial and select residential land uses and structures lawfully existing in the C-1A, C-1 and C-2 districts as of August 1, 1986, and as originally permitted by the County Zoning Regulations of 1962, as amended, and 1978, as amended, respectively. Subsequent to February 4, 1978, no land or water shall be rezoned into the C-1A, C-1 or C-2 districts. In no case shall new development be permitted in any existing C-1A, C-1 or C-2 district which is not consistent with the Lee Plan.




| Authority | Classification |
|---|---|
| Property Jurisdiction | Lee County |
| Existing Zoning Classification | C-1, Commercial District |
| Special permitting or Condition(s):<br>(i.e., site plan approval, PUD, or other variance) | None known |

| | Required | Status |
|---|---|---|
| Current Use | A variety of commercial uses including medical offices | Complying |
| Minimum Lot Size | 7,500 square feet | Complying |
| Minimum Lot Width | 75 feet | Complying |
| Maximum Lot Coverage | 40% | Complying |
| Maximum Height | 35 feet | Complying |
| Front Setback | 15 feet | Complying |
| Rear Setback | 25 feet | Complying |
| Side Setback | 15 feet | Complying |

## Appraiser's Conclusion on Conformity

The subject is complying with regard to bulk regulations, and is legally conforming with regard to the allowable uses.

# Assessed Values & Real Estate Taxes

Real property is subject to re-assessment on an annual basis in the State of Florida. Although the sale of a property does not automatically trigger its re-assessment, a price well above its assessed value has a high probability of resulting in a re-assessment during the next tax year. All properties are assessed as of January 1 of the tax year, with taxes paid in arrears. Preliminary assessed values are not made public until sometime between August and September, and taxes are due at the end of March of the next year.

By statute, real property is to be assessed at "just value", which is market value less transaction costs. From a practical standpoint, most commercial properties tend to be assessed at between 70 and 90 percent of market value.

Commercial properties (and all non-homesteaded properties) are subject to a 10% cap, which limits the increase of a real property assessment at 10% each year. This applies to all taxing authorities except the school board, which is based on just value (market value), not the capped assessed value. A prospective buyer should consider that taxes will reset to market value and the cap will reset when the property sells, or when renovations performed result in a greater than 25% increase in property value.

As mentioned, taxes are due at the end of March of the following calendar year. Discounts are available for early payment, with a maximum discount of 4% for payment in November. A prudent investor would likely take advantage of this discount, so we have factored it into our analysis.

## Current Assessment & Taxation

The subject's current assessment and taxes are presented in the following table (along with its recent history). The taxes are in paid status.

| Subject Assessment & Taxes | | | | |
|---|---|---|---|---|
| **Tax Parcel #** | **26-45-24-00-00015.0060** | | | |
| GBA (sf) | 15,406 | | | |
| Site Area (sf) | 62,290 | | | |
| **Tax Year** | **2024** | **2023** | **2022** | **2021** |
| Assessor's Value | $3,851,742 | $3,501,584 | $3,183,258 | $2,893,871 |
| Millages (Effec., per $1,000) | 13.4030 | 13.5940 | 13.7218 | 14.1978 |
| Ad Valorem Taxes | $57,394 | $51,924 | $46,742 | $42,370 |
| Non-Ad Valorem Taxes | $463 | $436 | $405 | $405 |
| **Total Taxes** | **$57,856** | **$52,360** | **$47,147** | **$42,775** |
| Assessment per SF | $250.02 | $227.29 | $206.62 | $187.84 |
| **Ad Valorem Taxes per SF** | **$3.73** | **$3.37** | **$3.03** | **$2.75** |
| **Non-Ad Val. Taxes per SF** | **$0.03** | **$0.03** | **$0.03** | **$0.03** |

## Conclusion

The subject's current assessment is 92.2% of our market value, which is a reasonable assessment ratio. Therefore, the current taxes of $57,856 (before any discounts for early payment) are also reasonable and applied herein. Note: the taxes are the responsibility of the tenant, so any change in the tax burden would not directly impact the subject's market value.

# Site Description




| | |
|---|---|
| **Location** | 7335 Gladiolus Drive is located on the east side of Gladiolus Drive, north of Old Gladiolus Drive in Fort Myers, Florida. |
| **Surrounding Land Uses** | Surrounding land uses include Lakes Park to the west, medical office use to the north, vacant land to the south, and commercial to the east. |
| **Easements, Encroachments, and Restrictions** | We know of no deed restrictions, private or public, that further limit the subject property's use. Our valuation assumes no adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title. |
| **Site Area** | 1.43± acres / 62,290± square feet |
| **Shape** | Irregular |
| **Frontage** | Gladiolus Drive (195 feet) |
| **Topography** | Generally level |
| **Drainage** | Assumed adequate |
| **Access** | The site is accessed from Gladiolus Drive. |
| **Paving** | All roads are paved with asphalt and are in satisfactory condition. |
| **Street Drainage** | Street drainage is collected by gravity into the local sewer storm system mains. |
| **Street Lighting** | Adequate |

| | |
|---|---|
| **Utilities & Services** | Water/Sewer and Refuse – Municipal<br>Police & Fire Protection – Municipal<br>Gas & Electric – Florida Power and Light |
| **Hazardous Substances** | We were not informed of toxic or environmental substances that would require remediation, and detection of such substances is beyond our expertise and beyond the scope of this assignment. |
| **Flood Hazard Status**[6] | The property is located in "Zone AE" on the National Flood Insurance Program Rate Map dated November 17, 2022 Community Panel #12071C0419G. Zone AE is an area inundated by 1% annual chance flooding, for which BFEs have been determined. |
| **Conclusion** | The site is like others in the vicinity, and there are no negative external factors. Based on its current use, it is adequate. |

[6] *The flood map can be found in the Map Gallery, which is located in the Addenda.*

# Description of Improvements

The subject consists of a one-story, single-tenant medical office building located on the east side of Gladiolus Drive, north of Old Gladiolus Drive in Fort Myers, Florida. The subject consists of 15,406 square feet of gross building area and 13,777 square feet of gross leasable area. The property contains 1,629 square feet of enclosed storage/parking space with four garage doors. The property has a lobby, exam rooms, administrative spaces, break rooms, and offices. The subject, which was built in 2004, was in good condition at the time of inspection. The subject property is currently leased to Lee Health System, Inc. The lease term was extended in 2021 for an additional ten years, extending through April 30, 2031. The base rent is $324,960 annually, or $23.59/ SF triple net. The rent shall remain constant, without adjustments, for the initial 10-year term. There are (2) five-year renewal options.

## Building Inspection

Eric Hix FL Cert Gen #RZ3769 inspected the property on June 12, 2025, which included a full interior and exterior inspection, including common areas, neighborhood streets, and surrounding environs.

## Structural & Mechanical

### Structural

| | |
|---|---|
| **Foundation** | Concrete slab on grade |
| **Exterior Walls/Framing** | Stucco |
| **Roof** | Pitched |
| **Windows** | Single hung |

### Mechanicals

| | |
|---|---|
| **Heating/ Cooling Systems/ Hot water** | 100% Central HVAC (not in storage/parking area) |
| **Electric/Gas/Water** | Individual meter |
| **Plumbing** | Copper, PVC |
| **Fire Safety** | Assumed to code |

## Layout & Finishes

| | |
|---|---|
| **Flooring** | Ceramic tile floor/carpet/vinyl |
| **Lighting** | Fluorescent |
| **Ceilings** | Tiles |
| **Walls** | Drywall |
| **Bathrooms** | The property features (10) restrooms |

### Functional Utility

From a utility standpoint, the subject is well laid out for an owner-user or a single tenant and adequately accommodates its present utilization.

# Building Condition

## Condition

The subject is in good condition. The building was constructed in 2004 and appears to have received ongoing maintenance and upkeep throughout the years.

## Deferred Maintenance

No property condition report was given in conjunction with this appraisal. At the time of the inspection, we noticed no items of deferred maintenance.

## Remaining Economic Life

7335 Gladiolus Drive was constructed in 2004. Similar buildings have a typical economic life of 50 years and we forecast an effective age of 10 years with a remaining economic life of 40 years.

# Summary

Based on our interior and exterior inspection, the subject improvements are in good condition and are functional for the current use.

# S Ft Myers/San Carlos: Office Submarket Analysis

The information contained in this report was provided using 2025 Q1 CoStar data for the S Ft Myers/San Carlos Office Submarket ("Submarket") located in the Fort Myers Market ("Market").




## Overview

The subject property is in the S Ft Myers/San Carlos Submarket of the Fort Myers Market, defined in the map above. This Submarket accounts for 42.4% of the Markets total inventory with 9.4 million square feet. In the S Ft Myers/San Carlos Submarket, vacancy rates increased in the latest quarter but are down over the past year. While annual rent growth is positive at 2.8%, no growth occurred in the latest quarter. Despite softening fundamentals, values continue to grow, increasing 0.3% over the past quarter and 3.7% over the past year to $196/square feet.

Sector Fundamentals

| | S Ft Myers/San Carlos | YoY | QoQ | Fort Myers | YoY | QoQ |
|---|---|---|---|---|---|---|
| Market Rent/SF | $27.44 | 2.8% | 0.0% | $27.44 | 3.0% | 0.0% |
| Vacancy Rate | 7.76% | -90 bps | 50 bps | 5.08% | -28 bps | 18 bps |
| Availability Rate | 8.1% | -171 bps | 27 bps | 5.8% | -59 bps | 19 bps |
| Net Absorption SF | -47,612 | 5.3% | -224.2% | -38,074 | 61.6% | -1857.8% |
| Asset Value/SF | $196 | 3.7% | 0.3% | $190 | 3.6% | 0.4% |
| Market Cap Rate | 8.34% | 5 bps | 1 bps | 8.46% | 5 bps | 1 bps |
| Transaction Count | 10 | 100% | 25% | 25 | 127% | 47% |
| Sales Volume | $14,389,250 | 150% | -41% | $24,477,150 | 120% | -31% |

The table below presents historical performance of key indicators for office space in the Submarket including inventory & construction levels, net absorption, vacancy & availability, rental rates, pricing, and cap rates.

Historical Office Performance: S Ft Myers/San Carlos Submarket

| Period | Inventory SF | Under Construction SF | Net Delivered SF 12 Mo | Net Absorption SF 12 Mo | Vacancy Rate | Availability Rate | Market Rent/SF | Market Sale Price Per SF | Market Cap Rate |
|---|---|---|---|---|---|---|---|---|---|
| 2025 Q1 | 9,428,995 | 12,000 | NA | 85,208 | 7.8% | 8.1% | $27.44 | $197 | 8.34% |
| 2024 Q4 | 9,428,995 | 7,000 | NA | 82,526 | 7.3% | 7.8% | $27.44 | $197 | 8.33% |
| 2023 | 9,428,995 | 0 | 127,182 | -20,654 | 8.1% | 8.7% | $25.92 | $187 | 8.28% |
| 2022 | 9,301,813 | 128,406 | 60,696 | -133,309 | 6.7% | 7.5% | $22.99 | $181 | 7.94% |
| 2021 | 9,241,117 | 206,505 | 223,301 | 365,097 | 4.6% | 5.8% | $21.00 | $171 | 7.65% |
| 2020 | 9,017,816 | 223,301 | 189,986 | 123,182 | 6.3% | 8.2% | $19.06 | $150 | 8.19% |
| 2019 | 8,827,830 | 189,986 | -42,700 | -51,568 | 5.7% | 7.4% | $17.91 | $140 | 8.50% |
| 2018 | 8,870,530 | 151,800 | 264,267 | 297,122 | 5.5% | 8.9% | $17.65 | $138 | 8.27% |
| 2017 | 8,606,263 | 14,190 | 59,632 | 164,667 | 6.1% | 10.5% | $16.62 | $131 | 8.15% |
| 2016 | 8,546,631 | 53,588 | 113,735 | 274,987 | 7.4% | 11.0% | $15.96 | $130 | 7.83% |
| 2015 | 8,432,896 | 106,858 | 231,301 | 348,297 | 9.4% | 11.8% | $14.90 | $124 | 7.84% |

## Supply & Demand

The Submarket has 9.4 million square feet of office space, and developers have added, net of demolitions, 1 million square feet over the past ten years, increasing inventory by 12.1% during that time. Despite an increase in supply over the past ten years, absorption levels have outpaced it, and vacancy rates are lower than they were a decade ago, compressing from 9.4% to 7.8%.

With demand picking up in the absence of inventory growth, vacancy rates have compressed 90 bps over the past year from 8.7% to 7.8%. Vacancy rates remain above the 10-year average of 6.8%, and above the Market average by 268 bps. With 47.6k square feet vacated in 2025 Q1, vacancy rates have increased 50 bps over the past quarter. In the first quarter, office tenants in the Submarket vacated 47.6k square feet, a decrease from the 38.3k square feet vacated in 2024 Q4, but an improvement from the -50.3k square feet vacated in the same quarter last year.

Vacancy Rates

| - | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 24 Q4 | 2025 Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| National | 10.1% | 9.7% | 9.6% | 9.3% | 9.4% | 10.7% | 11.8% | 12.3% | 13.4% | 13.9% | 13.9% |
| Market | 9.9% | 7.8% | 6.3% | 7.0% | 6.0% | 6.1% | 4.3% | 4.3% | 4.9% | 4.9% | 5.1% |
| Submarket | 9.4% | 7.4% | 6.1% | 5.5% | 5.7% | 6.3% | 4.6% | 6.7% | 8.1% | 7.3% | 7.8% |
| Class A | 14.1% | 13.2% | 10.2% | 10.4% | 8.7% | 10.1% | 6.6% | 9.5% | 7.7% | 8.8% | 9.8% |
| Class B | 8.8% | 6.5% | 5.9% | 5.1% | 5.6% | 6.4% | 4.5% | 7.1% | 8.9% | 7.5% | 7.7% |
| Class C | 8.8% | 7.3% | 4.7% | 4.7% | 4.3% | 3.7% | 3.8% | 3.1% | 5.5% | 5.5% | 6.5% |



*Source: CoStar*

## Rents

At $27.44/SF, rents in the S Ft Myers/San Carlos Submarket are equal to the Market. Rents vary throughout the Submarket. Class A space is at a premium with a rate of $30.83/SF, followed by $27.19/SF for Class B and $25.92/SF for Class C space. Rents in the Submarket have increased 8.3% per annum over the past decade, falling short of the Market average, where rents increased 8.6% per annum during that time.

Market Rents

| - | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 24 Q4 | 2025 Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| National | $30.59 | $31.66 | $32.49 | $33.55 | $34.90 | $34.27 | $34.55 | $35.05 | $35.47 | $35.91 | $35.97 |
| Market | $14.70 | $15.76 | $16.40 | $17.49 | $17.76 | $18.87 | $20.84 | $22.86 | $25.84 | $27.44 | $27.44 |
| Submarket | $14.90 | $15.96 | $16.62 | $17.65 | $17.91 | $19.06 | $21.00 | $22.99 | $25.92 | $27.44 | $27.44 |
| Class A | $15.59 | $16.85 | $17.03 | $18.28 | $18.78 | $20.61 | $23.80 | $26.53 | $29.65 | $31.01 | $30.83 |
| Class B | $15.13 | $16.16 | $16.92 | $17.88 | $18.06 | $19.13 | $20.89 | $22.80 | $25.70 | $27.16 | $27.19 |
| Class C | $13.53 | $14.56 | $15.18 | $16.34 | $16.72 | $17.67 | $19.38 | $21.15 | $24.06 | $25.90 | $25.92 |

Prior to the pandemic, the S Ft Myers/San Carlos Office Submarket experienced softening rent growth. In 2019 Q4, annual rent growth in the Submarket softened below the previous quarter, and was below the historical average, with annual growth of 1.5%. In 2020 Q2, quarterly rent growth fell to 0.1%. By the end of 2020, rents had increased 6.4% from the 2019 Q4 rent level of $17.91/SF. From 2019 Q4 to 2021 Q4, rents increased 17.3%. Quarterly rent growth in 2025 Q1 stalled, softening annual growth to 2.8%.

Market Rent/SF - Annual & Quarterly Growth




Source: CoStar

## Construction & Future Supply

Developers have been active for much of the past ten years. In fact, they have added 1.4 million square feet to the Submarket over that time, expanding inventory by 12.1%. Developers remain active in the Submarket, but elevated construction and debt costs have slowed the pipeline to 12k square feet, or the equivalent of 0.1% of existing inventory, underway. Demand in the S Ft Myers/San Carlos Submarket has outpaced new deliveries over the past year but could slow along with softening economic growth.

Under Construction SF - Share of Inventory




Source: CoStar

## Capital Markets

Investors have been active in the Submarket over the past three years. During that time, investors have closed on average 45 transactions per year with an annual average sales volume of $84.4 million. Over the past year, there were 41 closed transactions across 459.2k square feet, for a total sales volume of $97.3 million. As of 2025 Q1, CoStar data indicates there were 10 transactions for a total sales volume of $14.4 million, compared to $24.5 million in the previous quarter.




Source: CoStar

Market pricing, based on the estimated price movement of all properties in the Submarket, is currently $196/SF. Values have increased 3.7% over the past year and 0.3% in 2025 Q1. Capitalization rates increased 5 bps over the past year to 8.3% and increased 1 bps in Q1.




Source: CoStar

## Outlook

Office demand remains well below pre-pandemic levels. Many office markets are contending with elevated vacancy and availability rates. This is occurring at a time of a looming recession, which has resulted in layoffs from many companies, slowing the recovery for the sector.

Office market conditions in the S Ft Myers/San Carlos Submarket indicate that demand picked up in the absence of inventory growth, compressing vacancy rates over the past year. With vacancy rates compressing, quarterly rent growth stalled, softening annual growth to 2.8%. Looking ahead to the near term, it is likely that tenant demand remains active, outpacing an active pipeline, putting downward pressure on vacancy rates, improving rent growth.

Within the subject's submarket, there are rising rents with fairly stable occupancy and cap rates, except for lower cap rates in 2021 $2022 (and higher occupancies from 2018 through 2021), which displays a good market from an investment standpoint.

# Highest & Best Use

In determining highest and best use, we have considered the current trends of supply and demand on the market, current zoning regulations and other possible restrictions, and neighboring land uses.

It is to be recognized that in cases where a site has existing improvements on it, the highest and best use may be determined to be different from the existing use. The existing use will continue, however, unless and until land value in its highest and best use exceeds the total value of the property in its existing use.

In estimating highest and best use, alternative uses[7], such as the legally permissible use, the physically possible use, the financially feasibility, and the highest and best use, are considered and tested for the subject site.

## As Vacant

**Legally Permissible**

The subject is within the C-1, Commercial District, which permits a variety of commercial uses including medial offices, as of right.

**Physically Possible**

The site area is approximately 1.43-acres in size. The physical characteristics of the site do not appear to impose any unusual restrictions on development, and we are not aware of any easement or encroachments that would impact development. All necessary utilities are available, and the site appears functional for a variety of permitted uses.

**Financially Feasible**

The subject is located within a predominantly commercial district in a well-established community. Based on our analysis of the market, there is sufficient demand for commercial-use buildings. Market conditions are such that commercial-use building development is feasible, if the value would sufficiently exceed the cost plus developer's profit.

**Maximally Productive/ Highest and Best Use**

All legally permissible, physically possible, and financially feasible uses of the site, as vacant, have been presented and examined.

In conclusion, it is our opinion the highest and best use of the subject, as vacant, is to develop a commercial-use building.

## As Improved

**Legally Permissible**

The site may be developed with a variety of commercial uses including medical offices, previously discussed in the highest and best use if vacant.

**Physically Possible**

The subject is improved with a medical office building. The current improvements contain a gross building area of 15,406 square feet. As previously indicated within the zoning section, the subject appears to comply with current zoning. The subject improvements are considered to be in good condition overall and relatively well maintained and functional for its use.

**Financially Feasible**

The subject is located within a desirable neighborhood exhibiting stable vacancy rates and increasing rental rates. The improvements contribute to the value of the site, and it is likely no alternative use would result in a higher value. Therefore, use as a medical office building is financially feasible.

---

[7] *The definitions of these alternative uses can be found in the Glossary of Terms, which is located in the Addenda.*

| | |
|---|---|
| **Maximally Productive/ Highest and Best Use** | All legally permissible, physically possible, and financially feasible uses of the site, as improved, have been presented and examined. |
| **Conclusion** | It is our opinion the highest and best use of the subject, as improved, given the current improvements, is its current use as a medical office building. The most likely buyer is a local or regional investor of similar medical office properties or an owner-user. |

# Appraisal Valuation Process

The **Cost Approach** is based on market participants relating value of improvements to associated costs to build. In the Cost Approach, the cost to build a new or substitute property is used as a comparison to the subject. The replacement cost or reproduction cost estimate is then adjusted for all applicable depreciation. This approach reflects a good indicator of value when the improvements are new, nearly new, close to fully depreciated, or when the property has unique or specialized improvements.

The **Income Capitalization Approach** reflects the analysis of a property's capacity to generate future income and capitalizes the income into an indication of present value. This approach reflects the relationship between a property's potential income and its market value and is a strong indicator of value when there is reliable market data to derive market rents, vacancy rates, stabilized expenses, and capitalization/discount rates. The two most common valuation techniques are direct capitalization and the discounted cash flow (DCF) analysis, with one or both methods applied as appropriate. This approach is widely used in appraising income producing properties.

The **Sales Comparison Approach** assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with similar utility. This approach is reliable in an active market with sufficient sales data where few differences exist between the comparable sales and the subject, and the sales data collected is credible and accurate. Similar property types in competitive locations tend to sell within a consistent range, and this factor makes valuation on a per square foot and per unit basis a strong predictor of value. The Sales Comparison Approach is often relied upon for owner-user properties and/or in markets where leasing activity is sparse. For leased properties, this approach is more often considered as secondary support for the Income Approach.

Each approach applied is then reconciled to a final value conclusion after weighing the quantity and quality of data analyzed and the applicability of each approach to the subject property type.

Approaches to Value Applied

| Approach | Applicability to Subject | Use in Assignment |
|---|---|---|
| Cost Approach | Not Applicable | No |
| Income Capitalization Approach | Applicable | Yes |
| Sales Comparison Approach | Applicable | Yes |

The difficulty in credibly isolating the influence of physical and economic depreciation on value affects the reliability of the Cost Approach. Investors typically give nominal weight to this analysis if the asset is operating on a stabilized basis and its cost bears little relationship to the value.

# Income Approach

In the Income Capitalization Approach, a property's capacity to generate future benefits is analyzed; the forecasted income is capitalized into an indication of present value. Definitions of commonly used measures of anticipated benefits are defined in the Glossary of Terms within the Addenda.

The income capitalization approach supports two methodologies: direct and yield capitalization. Investors in the local market typically utilize a direct capitalization when making investment decisions for this asset class, therefore we conclude that the direct capitalization method is appropriate to apply to the subject.

## Base Rental Income

The subject property is currently leased to Lee Health System, Inc. The lease term was extended in 2021 for an additional ten years, extending through April 30, 2031. The base rent is $324,960 annually, or $23.59/ SF triple net. The rent shall remain constant, without adjustments, for the initial 10-year term. There are (2) five-year renewal options.

In order to gauge an appropriate market rent for the subject, we have surveyed the following lease comparables.

### Comparable Rentals

Comparable Lease Map



Comparable Lease Summary

| # | Address | Leased Sq. Ft. | Built | Sign Date | Base Rent / SF of GBA | Lease Notes |
|---|---|---|---|---|---|---|
| 1 | 12650 World Plaza Lane, Fort Myers, FL 33907 | 6,000 | 1997 | Aug-24 | $31.48 | NNN |
| 2 | 2675 Winkler Avenue, Fort Myers, FL 33901 | 7,191 | 1994 | Jul-24 | $18.00 | NNN |
| 3 | 7970 Summerlin Lakes Drive, Fort Myers, FL 33907 | 3,453 | 2005 | May-24 | $23.60 | NNN |
| 4 | 14551 Hope Center Loop, Fort Myers, FL 33912 | 14,146 | 2022 | Apr-24 | $28.50 | NNN |
| 5 | 45 Barkley Circle, Fort Myers, FL 33907 | 3,146 | 1987 | Mar-24 | $18.00 | NNN |
| | **Min** | **3,146** | | | **$18.00** | |
| | **Max** | **14,146** | | | **$31.48** | |
| | **Average** | **6,787** | | | **$23.92** | |
| | **Median** | **6,000** | | | **$23.60** | |

Comparable 1



Comparable 2



Comparable 3



Comparable 4



Comparable 5



## Comparable Lease Summary

The comparables range in size from 3,146 to 14,146 with an average of 6,787 square feet. The comparable rents range from $18.00 to $31.48 per square foot, with an average of $23.92 and a median of $23.60 per square foot. All of the rents are triple net lease terms.

Comparable 1 is a 6,000 square foot space in a medical office building built in 1997. This comparable is located along World Plaza Lane in Fort Myers. The rent at this location is $31.48 per square foot with triple net lease terms. Overall, this comparable is rated similar.

Comparable 2 is a 7,191 square foot space in a medical office building built in 1994. This comparable is located along Winkler Avenue in Fort Myers. The rent at this location is $18.00 per square foot with triple net lease terms. Overall, this comparable is rated similar.

Comparable 3 is an 3,453 square foot space in a medical office building built in 2005. This comparable is located along Summerlin Lakes Drive in Fort Myers. The rent at this location is $23.60 per square foot with triple net lease terms. Overall, this comparable is rated similar.

Comparable 4 is a 14,146 square foot space in a medical office building built in 2022. This comparable is located along Hope Center Loop Fort Myers. The rent at this location is $28.50 per square foot with triple net lease terms. Overall, this comparable is rated superior in condition.

Comparable 5 is a 3,146 square foot space in a medical office building built in 1987. This comparable is located along Barkley Circle in Fort Myers. The rent at this location is $18.00 per square foot with triple net lease terms. . Overall, this comparable is rated similar.

## Rent Conclusion

We placed equal weight on all five comparables as they are all good indicators of value. Given the subject's current age and condition, but also considering its size, we project a market rent of $23.00/SF triple net (NNN) for the property. The subjects contract rent is $23.59/SF, which appears to be market oriented and is used in our analysis herein. This equates to a potential gross income of $324,960.

## Commercial Expense Reimbursement

The in-place lease at the subject is quoted with triple net expense structures. This is consistent with the market rent comparables we have utilized from within the subject's submarket. The tenant is responsible for reimbursing the operating expenses, insurance costs, and real estate taxes (excluding management fees and reserves). As such, we project expense reimbursements of $112,964, or $8.20 per square foot of leasable area.

# Vacancy and Collection Loss

Vacancy and collection loss is a function of the interrelationship between absorption, lease expiration, renewal probability, estimated downtime between leases, and a collection loss factor based on the relative stability and credit of the subject's tenant base.

Within the subject's submarket, there are rising rents with fairly stable occupancy and cap rates, except for lower cap rates in 2021 $2022 (and higher occupancies from 2018 through 2021), which displays a good market from an investment standpoint.

The S. Fort Myers / San Carlos Office Submarket notes a vacancy rate of 7.76% and the Fort Myers Office Market notes a 5.08% vacancy rate. Based on typical investor expectations, but also considering typical trends in the market, we project a 4% vacancy and collection, which is applied to the potential gross income. This accounts for any potential turnover during the holding period.

# Income and Expense Pro Forma

## Effective Gross Income

| | |
|---|---|
| Potential Income | $324,960 |
| Expense Reimbursements | $112,964 |
| **Potential Gross Income** | **$437,924** |
| Less V/C Loss @ 4% | -$17,517 |
| **Effective Gross Income** | **$420,407** |

## Operating Expense Analysis

We requested both historical operating expenses and pro forma operating expenses for the subject property. We were not provided with historical operating expenses or pro forma operating expenses. As such, we analyzed expense reports of comparable properties, in developing our forecast of expenses. The data, analyzed in terms of gross square footage, is presented below:

### Comparable Operating Expenses

| Operating Expenses PSF | 1 | 2 | 3 | 4 | AVG |
|---|---|---|---|---|---|
| Real Estate Taxes | $2.54 | $2.55 | $2.73 | $2.91 | $2.68 |
| Insurance | $0.80 | $2.16 | $1.36 | $1.41 | $1.43 |
| Utilities | $1.21 | $1.50 | $1.47 | $1.57 | $1.44 |
| Repairs & Maintenance | $1.34 | $0.76 | $1.14 | $0.69 | $0.98 |
| Management | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Operating Expenses** | **$5.89** | **$6.96** | **$6.70** | **$6.58** | **$6.54** |

## Estimated Operating Expenses

Our analysis is presented:

### Real Estate Taxes

We utilize the forecasted real estate taxes of $57,856 as discussed in the Real Estate Tax section of this report.

### Insurance

Insurance costs vary by the type of coverage. Costs are generally lower (on a per square foot basis) for larger buildings and for multi-building policies. Insurance on similar buildings typically ranges from $0.80 to $2.16 per square foot with an average of $1.43 per square foot. We have projected this expense at $20,666 annually, or $1.50 per square foot.

### Utilities

Utilities on similar buildings typically ranges from $1.21 to $1.57 per square foot with an average of $1.44 per square foot. We have projected this expense at $20,666 annually, or $1.50 per square foot.

### Repairs & Maintenance

This expense varies depending on building age, management philosophy, services provided, and accounting methodology. Some management companies expense items that are normally included as capital costs. In addition, repairs and maintenance costs may change from year to year; in some cases, repairs that require attention may be postponed due to cash flow considerations. The comparables report a repairs and maintenance expense ranging from $0.69 to $1.34 with an average of $0.98. Based on the information above, we have projected this expense at $1.00 per square foot, or $13,777 annually, based on the comparable data.

### Management Fee

Management fees for commercial properties typically range from 3% to 6% of effective gross income in the local market. We applied a 3.0% management fee, which equates to $12,612 annually.

### Replacement Reserves

This expense provides for the periodic replacement of building components that wear out more rapidly than the building itself and that must be replaced periodically during the building's economic life. We note the owner did not indicate this expense, nor did any of the expense comparables, but a prudent investor would ascribe a fund to be used to pay for necessary ongoing capital expenses. We projected this expense at $0.25 per square foot, or $3,444 annually.

### Total Operating Expenses

Including taxes, we forecast total operating expenses at $129,020, or $9.36 per square foot including real estate taxes and $5.17 excluding real estate taxes. Excluding real estate taxes, the comparables ranged from $3.35 to $4.42 per square foot with an average of $3.85. Our forecast is slightly outside of the comparable range on a per square foot basis. However, we included both replacement reserves and managements fees in our analysis. Thus, this forecast is reasonable and will be applied in our valuation analysis.

# Stabilized Income and Expenses

Pro Forma

| Pro Forma | $ | PSF |
|---|---|---|
| **Income** | | |
| Potential Income | $324,960 | $23.59 |
| Expense Reimbursements | $112,964 | $8.20 |
| **Potential Gross Income** | **$437,924** | **$31.79** |
| Less V/C Loss @ 4% | -$17,517 | -$1.27 |
| **Effective Gross Income** | **$420,407** | **$30.52** |
| | | |
| **Operating Expenses** | | |
| Real Estate Taxes | $57,856 | $4.20 |
| Insurance | $20,666 | $1.50 |
| Utilities | $20,666 | $1.50 |
| Repairs & Maintenance | $13,777 | $1.00 |
| Management Fees | $12,612 | $0.92 |
| Replacement Reserves | $3,444 | $0.25 |
| **Total Operating Expenses** | **$129,020** | **$9.36** |
| | | |
| Total Expenses Excluding RE Taxes | $71,164 | $5.17 |
| | | |
| **Net Operating Income** | **$291,387** | **$21.15** |
| Operating Expense Ratio | 31% | |

# Income Capitalization

In developing an opinion of the overall capitalization rate required by an investor, we elected to use both Direct comparable sales and investor surveys.

## Direct Comparable Sales

Below we present a summary table of capitalization rate comparables from the Fort Myers, Florida area. We searched CoStar for medical office sales with cap rates from the last two years. The search produced 6 results with actual cap rates. The comparables ranged from 3,268 square feet to 38,404 square feet, with an average of 11,788 square feet. The reported actual cap rates range from 6.00% to 7.61%, with an average of 7.09%.The results are summarized below:

**Comps Statistics**

| | Low | Average | Median | High | Count |
|---|---|---|---|---|---|
| Sale Price | $719,000 | $3,038,778 | $2,030,000 | $13,200,000 | 9 |
| RBA | 3,268 SF | 11,788 SF | 9,760 SF | 38,404 SF | 9 |
| Price per SF | $157.27 | $257.79 | $224.91 | $376.62 | 9 |
| Actual Cap Rate | 6.00% | 7.09% | 7.25% | 7.61% | 6 |
| Days on Market | 64 | 168 | 127 | 358 | 6 |
| Sale Price to Asking Price Ratio | 56.31% | 87.41% | 94.21% | 100.00% | 5 |

**Totals**

| | | | | |
|---|---|---|---|---|
| Sold Transactions | **Total Sales Volume:** | **$27,349,000** | **Total Sales Transactions:** | **9** |

## National Survey Responses

The PwC Real Estate and Real Estate Research Corporation's investment surveys summarize the expectations of institutional investors. As indicated, the going-in capitalization rates range from 5.00% to 9.00%, with an average between 6.43% and 7.76%.

## Summary

| Survey | Low | Avg | High |
|---|---|---|---|
| PwC 1Q 2025 – Suburban Office | 5.00% | 6.43% | 8.25% |
| Situs-RERC 1Q 2025 - Suburban Office | 6.00% | 7.76% | 9.00% |
| Comparable Cap Rates | 6.00% | 7.09% | 7.61% |

## Capitalization Rate Conclusion

Primary emphasis was placed on the direct comparable sales, with support from the balance of the data. Additionally, increased interest rate pressure has had an upward pressure on capitalization rates. Considering this, we expect the cap rate to fall near central tendencies.

Based upon all factors, we have concluded a capitalization rate of 7.00%.

Value Conclusion Via Income Capitalization Approach

| | Date of Value | Value | Final Value (Rd) |
|---|---|---|---|
| NOI | | $291,387 | |
| Cap Rate | | 7.00% | |
| **Market Value As Is Via the Income Capitalization Approach** | **June 12, 2025** | **$4,162,665** | **$4,175,000** |

# Sales Comparison Approach

In the Sales Comparison Approach, an opinion of market value is provided by comparing the subject property to transactions of competitive assets. A major premise is the principle of substitution which holds market value is directly related to the prices of comparable properties as a knowledgeable investor will pay no more for a substitute.

The procedure involved in this Approach is to research the market for sales of improved properties which are comparable, select appropriate units of comparison, adjust the sale prices to the subject, and then reconcile the range of adjusted sale prices into an opinion of value.

In order to analyze comparable sales, it is necessary to convert the sale prices to an appropriate unit of comparison, a process which facilitates price comparisons between properties of different sizes, and it also enables adjustment for qualitative differences. Since investors typically purchase office properties in the subject's area in terms of price per square foot, we have applied this unit of comparison. Outlines of each of the comparable sales can be found in the Addenda.

Comparable Sales Summary[8]




[8] *The outlines of each of the comparable sales can be found in the Addenda.*

Comparable Sales Summary

| | Address | Sale Date | SF GBA | Year Built | Sale Price | Price Per SF |
|---|---|---|---|---|---|---|
| 1 | 13775 Plantation Road, Fort Myers, FL 33912 | May-24 | 16,736 | 2009 | $3,800,000 | $227 |
| 2 | 3840 Colonial Boulevard, Fort Myers, FL 33966 | Feb-24 | 6,000 | 1995 | $1,750,000 | $292 |
| 3 | 5248 Red Cedar Drive, Fort Myers, FL 33907 | Dec-23 | 12,432 | 2000 | $2,800,000 | $225 |
| 4 | 657 Del Prado Boulevard S., Cape Coral, FL 33990 | Oct-23 | 7,013 | 1987 | $2,200,000 | $314 |
| | | Min: | 6,000 | | $1,750,000 | $225 |
| | | Max: | 16,736 | | $3,800,000 | $314 |
| | | **Average:** | **10,545** | | **$2,637,500** | **$264** |
| | | **Median:** | **9,723** | | **$2,500,000** | **$259** |

Adjustments for the comparable sales have been considered based on comparison to the subject for financing terms, conditions of sale, market conditions (time), income level (if applicable), location, size, age/condition, land to building ratio, and utility.

Comparable Sales Adjustment Grid

| Sale No. | Subject | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Address: | 7335 Gladiolus Drive, Fort Myers, FL 33908 | 13775 Plantation Road, Fort Myers, FL 33912 | 3840 Colonial Boulevard, Fort Myers, FL 33966 | 5248 Red Cedar Drive, Fort Myers, FL 33907 | 657 Del Prado Boulevard S., Cape Coral, FL 33990 |
| Sale Date: | | 5/28/2024 | 2/29/2024 | 12/14/2023 | 10/5/2023 |
| No. SF | 15,406 | 16,736 | 6,000 | 12,432 | 7,013 |
| Sale Price | | $3,800,000 | $1,750,000 | $2,800,000 | $2,200,000 |
| **Price Per SF** | | **$227** | **$292** | **$225** | **$314** |
| Property Rights: | Leased Fee Interest | 0% | 0% | 0% | 0% |
| Financing Terms: | None | 0% | 0% | 0% | 0% |
| Conditions of Sale: | None | 0% | 0% | 0% | 0% |
| Market Conditions (Time): | 6/12/2025 | 0.0% | 0.0% | 0.0% | 0.0% |
| **Trended Price Per SF** | | **$227** | **$292** | **$225** | **$314** |
| Location: | Fort Myers | 0% | 0% | 0% | 0% |
| Size: | 15,406 | 0% | -5% | 0% | -5% |
| Age/Condition: | Good | 0% | 5% | 5% | 5% |
| Utility | | 0% | 0% | 0% | 0% |
| Other: | | 0% | 0% | 0% | 0% |
| **Total Adjustments** | | **0%** | **0%** | **5%** | **0%** |
| **Adjusted Price Per SF** | | **$227** | **$292** | **$236** | **$314** |

| **Unadjusted** | | **Adjusted** | |
|---|---|---|---|
| Low | $225 | Low | $227 |
| High | $314 | High | $314 |
| **Average** | **$264** | **Average** | **$267** |
| **Median** | **$259** | **Median** | **$264** |

**Property Rights Appraised**

The purpose of this adjustment is to account for differences in the property rights transferred with the sale. All sales were delivered vacant or leased. No property rights adjustments are required.

**Financing**

The purpose of adjusting for financing terms is to determine cash equivalent sale prices for the comparable sales in accordance with the definition of market value for this report. No financing terms adjustments are required.

**Conditions of Sale**

Conditions of sale refers to the motivations of the buyer and seller involved in a particular transaction. All sales are arm's length, and no adjustments are required.

**Market Conditions (Time)**

The purpose of this adjustment is to account for changes in market conditions. Given the current rising interest rate environment, we did not make an adjustment for market conditions.

**Location**

An adjustment for location is required when the locational characteristic of a comparable property differs from those of the subject property. The subject is located within Fort Myers, FL. All four sales are in similar locations and no adjustments were deemed necessary.

**Size**

This adjustment accounts for the difference in size between each of the comparables and the subject property. The sales range in size from 6,000 to 16,736 square feet, while the subject is 15,406 square feet. Sales 2 and 4 are smaller than the subject and were adjusted downward 5%.

**Age/Condition**

The subject was built in 2004 and is in good condition. The sales were built from 1987-2009. Sales 2, 3, and 4 are in inferior condition and were adjusted upward 5%.

**Utility**

No utility adjustments were deemed necessary.

**Other**

No other adjustments were deemed necessary.

All adjustments are percentages. A positive adjustment to a sale indicates an inferior characteristic relative to the subject. A negative adjustment indicates a superior characteristic relative to the subject. After adjustments, the comparable sales exhibited a range between $227 and $314 per square foot, with an average of $267 and a median of $264 per square foot. We have equal weight on all four sales as they are all good indicators of value. We conclude to a market value of $270 per square foot.

Market Value Conclusions Via Sales Comparison Approach

| | Date of Value | Value | Final Value (RD) |
|---|---|---|---|
| Concluded Value Per Square Foot | | $270 | |
| Square Footage | | 15,406 | |
| **Market Value As Is via the Sales Comparison Approach** | **June 12, 2025** | **$4,159,620** | **$4,150,000** |

# Reconciliation & Final Value Opinion

The estimated values arrived at by the approaches to value used in this report are as follows:

Market Value Opinion

| Approach | Value | Interest Appraised | Date of Value | Conclusion |
|---|---|---|---|---|
| Income Approach | Market Value As Is | Leased Fee Interest | June 12, 2025 | $4,175,000 |
| Sales Approach | Market Value As Is | Leased Fee Interest | June 12, 2025 | $4,150,000 |

The **Cost Approach** is based on market participants relating value of improvements to associated costs to build. In the Cost Approach, the cost to build a new or substitute property is used as a comparison to the subject. The replacement cost or reproduction cost estimate is then adjusted for all applicable depreciation. This approach reflects a good indicator of value when the improvements are new, nearly new, close to fully depreciated, or when the property has unique or specialized improvements.

The **Income Capitalization Approach** reflects the analysis of a property's capacity to generate future income and capitalizes the income into an indication of present value. This approach reflects the relationship between a property's potential income and its market value and is a strong indicator of value when there is reliable market data to derive market rents, vacancy rates, stabilized expenses, and capitalization/discount rates. The two most common valuation techniques are direct capitalization and the discounted cash flow (DCF) analysis, with one or both methods applied as appropriate. This approach is widely used in appraising income producing properties.

The **Sales Comparison Approach** assumes that an informed purchaser would pay no more for a property than the cost of acquiring another existing property with similar utility. This approach is reliable in an active market with sufficient sales data where few differences exist between the comparable sales and the subject, and the sales data collected is credible and accurate. Similar property types in competitive locations tend to sell within a consistent range, and this factor makes valuation on a per square foot and per unit basis a strong predictor of value. The Sales Comparison Approach is often relied upon for owner-user properties and/or in markets where leasing activity is sparse. For leased properties, this approach is more often considered as secondary support for the Income Approach.

The subject is leased. As such, this property type is typically purchased with significant weight given to the income approach to value and less weight given to the sales comparison approach.

Final Value Opinion

| Value | Date | Interest Appraised | Conclusion |
|---|---|---|---|
| Market Value As Is | June 12, 2025 | Leased Fee Interest | $4,175,000 |

The value conclusions are subject to the following **Extraordinary Assumptions**[9] that may affect the assignment results. If the assumption is found to be false as of the effective date of the appraisal, we reserve the right to modify our value conclusions.

•None.

The value conclusions are based on the following **Hypothetical Conditions**[10] that may affect the assignment results.

•None.

The opinion of value expressed herein is subject to the certification, assumptions and limiting conditions, and all other information contained in the following written appraisal report.

[9] *The definition of Extraordinary Assumptions can be found in the Glossary of Terms, which is located in the Addenda.*

[10] *The definition of Hypothetical Conditions can be found in the Glossary of Terms, which is located in the Addenda.*

# Certification

We certify to the best of our knowledge:

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
- We have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.
- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standard of Professional Practice of the Appraisal Institute, the Uniform Standards of Professional Appraisal Practice, and applicable state appraisal regulations.
- Eric Hix FL Cert Gen #RZ3769 inspected the property on June 12, 2025. Scott M. Powell, MAI and Harry C. Newstreet, MAI have not made a personal inspection of the property that is the subject of this report.
- Jason Telsey, State-Registered Trainee Appraiser RI25591, under the direct supervision of Harry C. Newstreet, MAI, State-Certified General Real Estate Appraiser RZ2278, provided significant real property appraisal assistance to the appraiser(s) signing this certification, including verifying rent and sale prices for the subject and similar property type. It is noted that the responsibilities of parties providing assistance is not considered to be significant in terms of any value determination. All parties conducted assistance und the direct supervision of the appraisers signing this report in compliance with State regulations.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.
- As of the date of this report, Harry C. Newstreet, MAI and Scott M. Powell, MAI have completed the continuing education program for Designated Members of the Appraisal Institute.
- We have experience in appraising properties similar to the subject and are in compliance with the Competency Rule of USPAP.



Scott M. Powell, MAI
Managing Director
FL State Cert Gen. RE Appraiser RZ2809
scott.powell@boweryvaluation.com
(561) 515-1269

# Addenda

## Glossary of Terms

Unless otherwise noted, *The Dictionary of Real Estate Appraisal*, 6th edition (Chicago: Appraisal Institute, 2015) is the source of the following definitions.

**As Is Market Value:** The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.[11] **Note:** The use of the "as is" phrase is specific to appraisal regulations pursuant to FIRREA applying to appraisals prepared for regulated lenders in the United States.

**Condominium**: A multiunit structure, or a unit within such a structure, with a condominium form of ownership.

**Deferred Maintenance:** Items of wear and tear on a property that should be fixed now to protect the value or income-producing ability of the property, such as a broken window, a dead tree, a leak in the roof, or a faulty roof that must be completely replaced. These items are almost always curable.

**Depreciation:** A loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvements on the same date.

**Direct Capitalization:** A method used to convert an estimate of a single year's net operating income expectancy into an indication of value in one direct step, either by dividing the income estimate by an appropriate rate or by multiplying the income estimate by an appropriate factor. This technique employs capitalization rates and multipliers extracted from sales. Only the first year's income is considered. Yield and value change are implied, but not identified overall. This method is most useful when the property is already operating on a stabilized basis.[12]

**Discounted Cash Flow:** The procedure in which a discount rate is applied to a set of projected income streams and a reversion. The analysis specifics the quantity and timing of the reversion, and discounts each to its present value at a specified yield rate.

**Effective Date: (1)** The date on which the appraisal or review applies. **(2)** In a lease document, the date upon which the lease goes into effect.

**Effective Gross Income:** The anticipated income from all operations of real property adjusted for vacancy and collection losses.

**Entrepreneurial Profit: (1)** A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovative change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses. **(2)** In economics, the actual return on successful management practices, often identified with coordination, the fourth factor of production following land, labor, and capital; also called entrepreneurial return or entrepreneurial reward.

**Equity Dividend:** The portion of net income that remains after debt service is paid; this is returned to the equity position.

**Exposure Time: (1)** The time a property remains on the market. **(2)** The estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. **Note:** Exposure time is a retrospective.

**Extraordinary Assumption:** An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions.

**Fee Simple Interest:** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

---

[11] *Interagency Appraisal and Evaluation Guidelines (Federal Deposit Insurance Corporation: 2010)*

[12] *The Appraisal of Real Estate, 14th Edition (Appraisal Institute: 2013)*

**Financial Feasibility:** An analysis to determine which of those uses deemed possible and legal can provide a net return to the owner of the site.

**Gross Building Area:** Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved.

**Highest and Best Use: (1)** The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. **(2)** The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid.[13] **(3)** [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.[14]

**Hypothetical Condition:** A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis.

**Leased Fee Interest:** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

**Leasehold Interest:** The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease.

**Legally Permissible Use:** An investigation into existing zoning regulations, lease terms, and deed restrictions on the site to determine which uses are legally permitted.

**Marketing Time:** An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal.

**Market Rent:** The most probable rent that property should bring in a competitive and open market reflecting the conditions and restrictions of a specified lease agreement, including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

**Net Operating Income:** The anticipated net income remaining after all operating expenses are deducted from effective gross income.

**Net Rentable Area:** For office or retail buildings, the tenant's pro rata portion of the entire office floor, excluding elements of the building that penetrate through the floor to the areas below. The rentable area of a floor is computed by measuring to the inside finished surface of the dominant portion of the permanent building walls, excluding any major vertical penetrations of the floor. Alternatively, the amount of space on which the rent is based; calculated according to local practice.

**Physically Possible Use:** An analysis to determine those uses of the subject which can be deemed physically possible.

**Potential Gross Income:** The total potential income attributable to the real property at full occupancy before operating expenses are deducted. It may refer to the level of rental income prevailing in the market or that contractually determine by existing leases.

**Property Rights Appraised:** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

**Prospective Opinion of Value:** A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

---

[13] *Parker, David. International Valuation Standards (John Wiley & Sons, Ltd: 2016)*

[14] Uniform Appraisal Standards for Federal Land Acquisitions *(The Appraisal Foundation: 2016)*

**Replacement Costs:** The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout.

**Reproduction Costs:** The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, super-adequacies, and obsolescence of the subject building.

**Reversion:** A lump-sum benefit an investor expects to receive upon the termination of the investment.

**Stabilized Income: (1)** An estimate of income, either current or forecasted, that presumes the property is at stabilized occupancy. **(2)** The forecast of the subject property's yearly average income (or average- equivalent income) expected for the economic life of the subject property. **(3)** Projected income that is subject to change but has been adjusted to reflect an equivalent, stable annual income.

**Stabilized Occupancy: (1)** The occupancy of a property that would be expected at a particular point in time, considering its relative competitive strength and supply and demand conditions at the time, and presuming it is priced at market rent and has had reasonable market exposure. A property is at stabilized occupancy when it is capturing its appropriate share of market demand. **(2)** An expression of the average or typical occupancy that would be expected for a property over a specified projection period or over its economic life.

**Yield Capitalization:** The capitalization method used to convert future benefits into present value by discounting each future benefit at an appropriate yield rate. This method explicitly considers a series of cash flows (net income over a holding period) over time together with any reversion value or resale proceeds. Since this technique explicitly reflects the investment's income pattern, it is especially suited to multi-tenant properties with varying leasing schedules as well as properties that are not operating at stabilized occupancy.[15]

[15] *The Appraisal of Real Estate, 14th Edition (Appraisal Institute: 2013)*

# Letter of Engagement

**Newtek Orders**

Please note the Service 1st Commercial Appraisal Requirements and the additional requirements below for Newtek appraisal assignments.

In accepting the assignment, you hereby agree to the following:

1. The lender, Newtek Small Business Finance, LLC, is your client for this assignment. All appraisals shall be addressed and certified to either Newtek Small Business Finance, LLC its successors and/ or assigns as noted on the above letterhead.

2. All appraisals will conform to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), the Uniform Standards of Professional Appraisal Practice (USPAP) and to the Appraisal Standards of Newtek Small Business Finance, LLC which standards are attached and identified as "Attachment A."

3. The Effective Date(s) in your appraisal should be the date of your inspection.

4. Complete appraisals must address the Sales Comparison, Income Approach and Cost approaches to value. It must incorporate a reasonable methodology, which reconciles these approaches into a value conclusion. If one or more approaches are not used, the appraiser must explain the reason for eliminating those approaches.

5. The Cost Approach alone is unacceptable for real estate (acceptable for personal property)

Service 1st operates in 50 states and the District of Columbia. AL #AL0185, AK 150891, AR #AMR-199, AZ #RAMC-40298, CA #3004699, CO #200001092, CT #AMC.0000217, DE #X7-0000131, FL #MC328, GA #257, HI AMC-1210, IA #92, ID AMC-4553, IL #558.000262, IN #AMC1700006, KS #KSP172, KY #176, LA #0229, MA 42, MD #32980, ME #AMC3854, MI #1202000193, MN #40548039, MO #2017019913, MS #AMC-133, MT #REA-AMC-LIC9341, NC #NC-1211, ND AMC-ND-2018-027, NE NE2017007, NH #AMC-161, NJ 42AC00009300, NM #AMC1198, NV #AMC.0000912, NY AMC_19_0271, OH #AMC.2019001807, OK #60197AMC, OR #AM-209, PA #AMC000200, RI #REA.0021-AMC, SC #20, SD #AMC-SD-1148-2017, TN #232, TX

# Service 1st Commercial Appraisal Requirements

If you have any questions regarding this assignment, please correspond to Service 1st through the Mercury Network and we will respond as quickly as possible

In accepting the order for an appraisal and submitting the requested appraisal, you, as the appraiser, certify that you: (1) are independent of the transaction; (2) have the requisite education, expertise, and experience necessary to competently complete the appraisal assignment; and (3) were not coerced in any way concerning the appraisal that you have submitted.

If you have performed valuation services for the subject property within the last 3 years that was not for the client in this assignment, please contact service 1st before starting on the assignment.

**General Requirements**

Please add the client order number to the appraisal in a prominent location where it can be easily identified by the reader.

Please assign all reports to the Lender/Client as indicated in the engagement letter

Please do not place additional contingencies on the appraisal without prior consent from Service 1st.

The client will not accept any statement of financial limit on appraiser liability added to the appraisal.

Appraisers must have access to and use CoStar data in the preparation of the appraisal. The appraiser is not limited to CoStar data only. If the appraiser finds alternate data they feel is more appropriate for the assignment they may substitute, but they need to have checked the CoStar data base completely to help insure they are considering all available data for an assignment.

**Report Requirements**

Please provide at least two approaches to value. You do not need to give equal weight to both approaches, but explain the weighting and relevance of each approach that is utilized.

Please include the estimated value in the letter of transmittal.

Please comment on any listing information of the subject within the past year in addition to the sales history within the past 3 years.

The client requests that recent comparable sales be utilized in the appraisal to reflect current market conditions.

Please provide a copy of the data/listing sheet for all comparable sales utilized in the appraisal.

Please provide pictures of all comparable sales and rentals.

Please give the actual age of the subject, an estimate of effective age, total life and remaining economic life for the subject property.

Please include a definition of market value.

Reports must include a quantitative adjustment grid for the comparable sales used in the Sales Comparison Approach and for the rental comparables used in the Income Approach.

Please include a zoning description and an analysis of the zoning and the subject improvements and an indication if the improvements appear to conform to zoning.

Please provide new, original, clear photos of the front, all sides, street and address verification for the subject property. If an interior inspection is requested, please provide a minimum of 6 interior photos.

Please provide location maps showing the subject and all comparable properties for the cost, sales and income approaches to value.

Please provide information on the microeconomic influences and trends that affect the subject property. These influences can include nearby competitive properties and developments, REO activity, nearby employment centers, traffic flows and other influences that directly influence the subject property. Provide a summary on the current trends and anticipated near term trends for these microeconomic influences.

Please provide information on the macroeconomic influences and trends affecting the subject property. These can include area employment trends, population trends, major road improvements and highway extensions, regional transportation trends including airports and railway hubs. Provide a summary on the current trends and anticipated near term trends for these macroeconomic influences.

Using only the GRM Method is not acceptable; the appraisal must include the Direct Capitalization Method. The appraisal must include pictures of the comparable rental properties as well as a location map.

Please measure the subject building wherever possible and use that information in your appraisal report.

**Please measure the structural improvements and include a perimeter building sketch in the appraisal unless the client has requested a curbside inspection. If the subject property has multiple units, please measure, or provide support for the individual unit sizes.**

# Subject Data

## Property Data

**STRAP: 26-45-24-00-00015.0060 Folio ID: 10493128**

Hurricanes Helene/Milton Tax Roll Value Letter Hurricane Ian Tax Roll Value Letter

Generated on 6/12/2025 2:46 PM

**Owner Of Record - Sole Owner**
[Change Mailing Address]

7335 GLADIOLUS LLC
444 E 58TH ST APT 3C
NEW YORK NY 10022

[ Tax Map Viewer ] [ View Comparables ]




[ Pictometry Aerial Viewer ]

**Site Address**
**Site Address maintained by E911 Program Addressing**

7335 GLADIOLUS DR
FORT MYERS FL 33908

**Property Description**
**Do not use for legal documents!**

PAR IN S 1/2 OF SE 1/4 AS DESC IN OR 4365 PG 47

View Recorded Plat at LeeClerk.org - Use this link to do an Official Records search on the Lee County Clerk of Courts website, using 4365 and 47 for the book and page numbers.

**Attributes and Location Details**

| | |
|---|---|
| Total Bedrooms / Fixtures | 0 / 28 |
| Gross Building Area | 15,406 |
| 1st Year Building on Tax Roll | 2004 |
| Historic Designation | No |

| Township | Range | Section | Block | Lot |
|---|---|---|---|---|
| 45 | 24E | 26 | | |
| **Municipality** | **Latitude** | **Longitude** | | |
| Lee County Unincorporated - 0 | 26.52569 | -81.87563 | | |

View Parcel on Google Maps

**Image of Structure**



Photo Date November of 2023 View other photos

Last Inspection Date: 11/07/2023

## Property Values / Exemptions / TRIM Notices

Generated on 6/12/2025 2:46 PM

**No existing exemptions found for this property.**

| TRIM Notices | Tax Year | Just | Land | Market Assessed | Capped Assessed | Exemptions | Classified Use | Taxable |
|---|---|---|---|---|---|---|---|---|
| 2024 / Additional Info | 2024 (Final Value) | 4,943,061 | 1,214,460 | 4,943,061 | 3,851,742 | 0 | 0 | 3,851,742 |
| 2023 / Additional Info | 2023 (Final Value) | 4,297,835 | 1,409,624 | 4,297,835 | 3,501,584 | 0 | 0 | 3,501,584 |
| 2022 / Additional Info | 2022 (Final Value) | 3,734,221 | 790,553 | 3,734,221 | 3,183,258 | 0 | 0 | 3,183,258 |
| 2021 / Additional Info | 2021 (Final Value) | 3,111,799 | 721,693 | 3,111,799 | 2,893,871 | 0 | 0 | 2,893,871 |
| 2020 / Additional Info | 2020 (Final Value) | 2,803,512 | 498,105 | 2,803,512 | 2,630,792 | 0 | 0 | 2,630,792 |
| 2019 / Additional Info | 2019 (Final Value) | 2,391,629 | 419,895 | 2,391,629 | 2,391,629 | 0 | 0 | 2,391,629 |

1/6

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2018 / Additional Info | 2018 (Final Value) | 2,354,230 | 424,823 | 2,354,230 | 2,354,230 | 0 | 0 | 2,354,230 |
| 2017 / Additional Info | 2017 (Final Value) | 2,333,781 | 424,823 | 2,333,781 | 2,333,781 | 0 | 0 | 2,333,781 |
| 2016 | 2016 (Final Value) | 2,233,516 | 311,450 | 2,233,516 | 1,527,170 | 0 | 0 | 1,527,170 |
| 2015 | 2015 (Final Value) | 1,388,336 | 311,450 | 1,388,336 | 1,388,336 | 0 | 0 | 1,388,336 |
| 2014 | 2014 (Final Value) | 1,415,258 | 311,450 | 1,415,258 | 1,415,258 | 0 | 0 | 1,415,258 |
| 2013 | 2013 (Final Value) | 1,442,180 | 311,450 | 1,442,180 | 1,442,180 | 0 | 0 | 1,442,180 |
| 2012 | 2012 (Final Value) | 1,469,102 | 311,450 | 1,469,102 | 1,469,102 | 0 | 0 | 1,469,102 |
| 2011 | 2011 (Final Value) | 1,427,655 | 311,450 | 1,427,655 | 1,427,655 | 0 | 0 | 1,427,655 |
| 2010 | 2010 (Final Value) | 2,166,074 | 498,320 | 2,166,074 | 2,166,074 | 0 | 0 | 2,166,074 |
| | 2009 (Final Value) | 2,451,610 | 747,480 | 2,451,610 | 2,451,610 | 0 | 0 | 2,451,610 |
| | 2008 (Final Value) | 2,613,230 | 950,490 | 2,613,230 | 2,613,230 | 0 | 0 | 2,613,230 |
| | 2007 (Final Value) | 2,525,700 | 827,580 | 0 | 2,525,700 | 0 | 0 | 2,525,700 |
| | 2006 (Final Value) | 2,283,500 | 829,250 | 0 | 2,283,500 | 0 | 0 | 2,283,500 |
| | 2005 (Final Value) | 1,828,500 | 401,880 | 0 | 1,828,500 | 0 | 0 | 1,828,500 |
| | 2004 (Final Value) | 280,310 | 280,310 | 0 | 280,310 | 0 | 0 | 280,310 |

The **Just** value is the total parcel assessment (less any considerations for the cost of sale). This is the closest value to *Fair Market Value* we produce and is dated as of January 1st of the tax year in question (F.A.C. 12D-1.002).

The **Land** value is the portion of the total parcel assessment attributed to the land.

The **Market Assessed** value is the total parcel assessment (less any considerations for the cost of sale) based upon the assessment standard. Most parcels are assessed based either upon the *Highest and Best Use* standard or the *Present Use* standard (*F.S. 193.011*) . For *Agriculturally Classified* parcels (or parts thereof), only agricultural uses are considered in the assessment (*F.S. 193.461 (6) (a)*). The difference between the *Highest and Best Use/Present Use* and the *Agricultural Use* is often referred to as the *Agricultural Exemption*. (i.e. Market Assessed = Just - Agricultural Exemption)

The **Capped Assessed** value is the *Market Assessment* after any *Save Our Homes* or *10% Assessment Limitation* cap is applied. This assessment cap is applied to all properties and limits year-to-year assessment increases to either the *Consumer Price Index* or 3%, whichever is lower for Homestead properties OR 10% for non-Homestead properties.

The **Exemptions** value is the total amount of all exemptions on the parcel.

The **Taxable** value is the *Capped Assessment* after exemptions (*Homestead, etc.*) are applied to it. This is the value that most taxing authorities use to calculate a parcel's taxes. (i.e. Taxable = Capped Assessed - Exemptions)

## Property Details (Current as of 6/11/2025)

Generated on 6/12/2025 2:46 PM

**Land**

**Land Tracts**

| Use Code | Use Code Description | Number of Units | Unit of Measure |
|---|---|---|---|
| 1910 | Medical Office Building | 60723.00 | Square Feet |

**Land Features**

| Description | Year Added | Units |
|---|---|---|
| BLACK TOP - IMPROVED | 2004 | 25,715 |
| WALL - DECORATIVE - C.B.S. | 2004 | 258 |
| SLAB - CONCRETE | 2004 | 168 |

**Buildings**

**Building 1 of 1**

2/6

**Building Characteristics**

| Improvement Type | Model Type | Stories | Living Units |
|---|---|---|---|
| 52 - Medical Office | 5 - OFFICE/MEDICAL | 1.0 | 0 |
| **Bedrooms** | **Bathrooms** | **Year Built** | **Effective Year Built** |
| 0 | 0.0 | 2004 | 2006 |

**Building Subareas**

| Description | Heated / Under Air | Area (Sq Ft) |
|---|---|---|
| BAS - BASE | Y | 13,196 |
| CFL - CATHEDRAL FLOOR AREA | Y | 581 |
| FGR - FINISHED GARAGE | N | 1,629 |
| FOP - FINISHED OPEN PORCH | N | 536 |

**Building Features**

| Description | Year Added | Units |
|---|---|---|
| SPRINKLER SYSTEM (INTERIOR) | 2004 | 15,941 |
| OVERHEAD DOOR - LARGE 10X10 OR LARGER | 2004 | 4 |

**Building Front Photo**



Photo Date: November of 2023

**Building Footprint**




## Property Details (2024 Tax Roll)

Generated on 6/12/2025 2:46 PM

Land

**Land Tracts**

| Use Code | Use Code Description | Number of Units | Unit of Measure |
|---|---|---|---|
| 1910 | Medical Office Building | 60723.00 | Square Feet |

**Land Features**

| Description | Year Added | Units |
|---|---|---|
| BLACK TOP - IMPROVED | 2004 | 25,715 |
| WALL - DECORATIVE - C.B.S. | 2004 | 258 |
| SLAB - CONCRETE | 2004 | 168 |

Buildings

**Building 1 of 1**

**Building Characteristics**

| Improvement Type | Model Type | Stories | Living Units |
|---|---|---|---|
| 52 - Medical Office | 5 - OFFICE/MEDICAL | 1.0 | 0 |
| **Bedrooms** | **Bathrooms** | **Year Built** | **Effective Year Built** |
| 0 | 0.0 | 2004 | 2006 |

**Building Subareas**

3/6

| Description | | Heated / Under Air | Area (Sq Ft) |
|---|---|---|---|
| BAS - BASE | Y | | 13,196 |
| CFL - CATHEDRAL FLOOR AREA | Y | | 581 |
| FGR - FINISHED GARAGE | N | | 1,629 |
| FOP - FINISHED OPEN PORCH | N | | 536 |

**Building Features**

| Description | Year Added | Units |
|---|---|---|
| SPRINKLER SYSTEM (INTERIOR) | 2004 | 15,941 |
| OVERHEAD DOOR - LARGE 10X10 OR LARGER | 2004 | 4 |

**Building Front Photo**



Photo Date: November of 2023

**Building Footprint**




## Taxing Authorities

Generated on 6/12/2025 2:46 PM

**SOUTH TRAIL FIRE / 047**

| Name / Code | Category | Mailing Address |
|---|---|---|
| LEE CO GENERAL REVENUE / 044 | County | LEE COUNTY OFFICE OF MGMT & BUDGET<br>PO BOX 398<br>FORT MYERS FL 33902-0398 |
| LEE CO ALL HAZARDS PROTECTION DIST / 101 | Dependent District | LEE COUNTY OFFICE OF MGMT & BUDGET<br>PO BOX 398<br>FORT MYERS FL 33902-0398 |
| LEE CO UNINCORPORATED MSTU / 020 | Dependent District | LEE COUNTY OFFICE OF MGMT & BUDGET<br>PO BOX 398<br>FORT MYERS FL 33902-0398 |
| LEE COUNTY LIBRARY DIST / 052 | Dependent District | LEE COUNTY OFFICE OF MGMT & BUDGET<br>PO BOX 398<br>FORT MYERS FL 33902-0398 |
| LEE CO HYACINTH CONTROL DIST / 051 | Independent District | LEE CO HYACINTH CONTROL DIST<br>15191 HOMESTEAD RD<br>LEHIGH ACRES FL 33971 |
| LEE CO MOSQUITO CONTROL DIST / 053 | Independent District | LEE CO MOSQUITO CONTROL DIST<br>15191 HOMESTEAD RD<br>LEHIGH ACRES FL 33971 |
| SOUTH TRAIL FIRE DISTRICT / 085 | Independent District | SOUTH TRAIL FIRE DISTRICT<br>5531 HALIFAX AVE<br>FORT MYERS FL 33912 |

4/6

| | | |
|---|---|---|
| WEST COAST INLAND NAVIGATION DIST / 098 | Independent District | WEST COAST INLAND NAVIGATION DIST<br>200 MIAMI AVE E<br>VENICE FL 34285-2408 |
| PUBLIC SCHOOL - BY LOCAL BOARD / 012 | Public Schools | LEE COUNTY SCHOOL BOARD<br>BUDGET DEPARTMENT<br>2855 COLONIAL BLVD<br>FORT MYERS FL 33966 |
| PUBLIC SCHOOL - BY STATE LAW / 013 | Public Schools | LEE COUNTY SCHOOL BOARD<br>BUDGET DEPARTMENT<br>2855 COLONIAL BLVD<br>FORT MYERS FL 33966 |
| GREEN CORRIDOR PACE / 363 | Special District | |
| SFWMD-DISTRICT-WIDE / 110 | Water District | SFWMD<br>3301 GUN CLUB RD<br>WEST PALM BEACH FL 33406 |
| SFWMD-EVERGLADES CONSTRUCTION PROJECT / 084 | Water District | SFWMD<br>3301 GUN CLUB RD<br>WEST PALM BEACH FL 33406 |
| SFWMD-OKEECHOBEE BASIN / 308 | Water District | SFWMD<br>3301 GUN CLUB RD<br>WEST PALM BEACH FL 33406 |

## Sales / Transactions

Generated on 6/12/2025 2:46 PM

| Sale Price | Date | Clerk File Number | Type | Notes | Vacant/ Improved |
|---|---|---|---|---|---|
| 0.00 | 02/01/2016 | 2016000102447 | 98 | Unable to process transfer due to deed or transfer instrument errors (examples: incomplete or incorrect legal description, incorrect grantor) | I |
| 5,050,000.00 | 02/01/2016 | 2016000022883 | 40 | | I |
| 3,950,000.00 | 09/18/2013 | 2013000217325 | 40 | | I |
| 323,100.00 | 07/01/2004 | 4365/47 | 08 | | V |
| 915,000.00 | 04/07/2003 | 3895/3992 | 02 | | V |
| 6,356,000.00 | 05/14/1997 | 2824/2290 | 02 | | V |
| 5,814,900.00 | 10/11/1989 | 2103/2904 | 02 | | V |
| 5,110,000.00 | 10/01/1989 | 2103/2902 | 04 | | V |

View Recorded Plat at LeeClerk.org

Use the above link to do a search on the Lee County Clerk of Courts website, using **4365** and **47** for the book and page numbers and **Official Records** for the book type.

Help safeguard your home against property fraud. Sign up for the Lee Clerk's free Property Fraud Alert.

## Building / Construction Permit Data

Generated on 6/12/2025 2:46 PM

| Permit Number | Permit Type | Date |
|---|---|---|
| ROF2024-05351 | Roof | 07/11/2024 |
| FIR2017-00806 | Commercial | 11/02/2017 |
| COM2017-00478 | Building Remodel / Repair | 07/10/2017 |

| | | |
|---|---|---|
| COM2003-02118 | Building New Construction | 03/16/2004 |

**IMPORTANT: THIS MAY NOT BE A COMPREHENSIVE OR TIMELY LISTING OF PERMITS ISSUED FOR THIS PROPERTY.**

Note: The Lee County Property Appraiser's Office does not issue or maintain any permit information. The Building / Construction permit data displayed here represents only those records this Office may find necessary to conduct Property Appraiser business. Use of this information is with the understanding that in no way is this to be considered a comprehensive listing of permits for this or any other parcel.

The Date field represents the date the property appraiser received information regarding permit activity; it may or not represent the actual date of permit issuance or completion.

Full, accurate, active and valid permit information for parcels can only be obtained from the appropriate permit issuing agency.

## Parcel Numbering History

Generated on 6/12/2025 2:46 PM

| Prior STRAP | Prior Folio ID | Renumber Reason | Renumber Date |
|---|---|---|---|
| 26-45-24-00-00015.0050 | 10438473 | Split (From another Parcel) | 08/24/2004 |

## Solid Waste (Garbage) Roll Data

Generated on 6/12/2025 2:46 PM

| Solid Waste District | Roll Type | Category | Unit / Area | Tax Amount |
|---|---|---|---|---|
| 002 - Service Area 2 | C - Commercial Category | C | 15088 | 462.58 |

## Flood and Storm Information

Generated on 6/12/2025 2:46 PM

| | Flood Insurance Find my flood zone | | | |
|---|---|---|---|---|
| Community | Panel | Version | Date | Evacuation Zone |
| 071C | 0419 | G | 11/17/2022 | A |

Generated on 6/12/2025 2:46 PM

6/6

**Lee County Tax Collector**
**Noelle Branning**

# 2024 Real Estate Tax Notice

Ad Valorem Taxes and Non-Ad Valorem Assessments for Lee County, Florida

**Account Number:** 26-45-24-00-00015.0060
**Alternate Key:** 2100483436
**Millage Code:** 047

★ **See message below.**

**Site Address/Legal Description:**
7335 GLADIOLUS DR
PAR IN S 1/2 OF SE 1/4 AS DESC IN OR 4365 PG 47

**SCAN THIS CODE to pay online** or visit LeeTC.com/pay-online

**Exemptions/Values**

| | |
|---|---|
| Market Value | 4,943,061 |
| Assessed Value | 4,943,061 |
| Taxable Value | 3,851,742 |

7335 GLADIOLUS LLC
444 E 58TH ST APT 3C
NEW YORK, NY 10022

Paid 03/25/2025 DP-00-03316986 $57,856.19

| Ad Valorem Taxes Levying Authority | Telephone | Mill Rate | Assessed | Exemption | Taxable | Amount |
|---|---|---|---|---|---|---|
| LEE COUNTY GENERAL REVENUE | 239-533-2221 | 3.7623 | 3,851,742 | 0 | 3,851,742 | 14,491.41 |
| PUBLIC SCHOOL - BY LOCAL BOARD | 239-337-8215 | 2.2480 | 4,943,061 | 0 | 4,943,061 | 11,112.00 |
| PUBLIC SCHOOL - BY STATE LAW | 239-337-8215 | 3.0380 | 4,943,061 | 0 | 4,943,061 | 15,017.02 |
| LEE COUNTY ALL HAZARDS - MSTU | 239-533-2221 | 0.0693 | 3,851,742 | 0 | 3,851,742 | 266.93 |
| LEE COUNTY UNINCORPORATED - MSTU | 239-533-2221 | 0.8398 | 3,851,742 | 0 | 3,851,742 | 3,234.69 |
| LEE COUNTY LIBRARY FUND | 239-533-2221 | 0.4361 | 3,851,742 | 0 | 3,851,742 | 1,679.74 |
| SFL WATER MGMT-DISTRICT LEVY | 561-686-8800 | 0.0948 | 3,851,742 | 0 | 3,851,742 | 365.15 |
| SFL WATER MGMT-EVERGLADE CONST | 561-686-8800 | 0.0327 | 3,851,742 | 0 | 3,851,742 | 125.95 |
| SFL WATER MGMT-OKEECHOBEE LEVY | 561-686-8800 | 0.1026 | 3,851,742 | 0 | 3,851,742 | 395.19 |
| LEE COUNTY HYACINTH CONTROL | 239-694-2174 | 0.0200 | 3,851,742 | 0 | 3,851,742 | 77.03 |
| LEE COUNTY MOSQUITO CONTROL | 239-694-2174 | 0.2200 | 3,851,742 | 0 | 3,851,742 | 847.38 |
| SOUTH TRAIL FIRE DISTRICT | 239-433-0080 | 2.5000 | 3,851,742 | 0 | 3,851,742 | 9,629.36 |
| WEST COAST INLAND NAVIGATION DISTRICT | 941-485-9402 | 0.0394 | 3,851,742 | 0 | 3,851,742 | 151.76 |

KEEP FOR YOUR RECORDS

| Non-Ad Valorem Assessments Levying Authority | Telephone | Rate | Basis | Amount |
|---|---|---|---|---|
| LEE COUNTY SOLID WASTE ASSESSMENT | 239-533-8000 | | ACTL LEVY | 462.58 |

**2024 Combined Total Ad Valorem and Non-Ad Valorem:** $57,856.19

## 2024 Real Estate Tax Notice

**PAY ONLY ONE AMOUNT**

| If Received By: | Amount Due: |
|---|---|
| ☐ Mar 31, 2025 | $0.00 |
| ☐ | |
| ☐ | |
| ☐ | |
| ☐ | |

Phone/Email Contact: ____________________

For payment options and instructions, refer to the back of this notice.

Paid 03/25/2025 DP-00-03316986 $57,856.19

**Return with payment**

**Account:** 26-45-24-00-00015.0060
**Site Address:** 7335 GLADIOLUS DR
**Alternate Key:** 2100483436

★ If the address below is not correct, **visit LeePA.org** to update your address.

7335 GLADIOLUS LLC
444 E 58TH ST APT 3C
NEW YORK, NY 10022

Make check payable to:
LEE COUNTY TAX COLLECTOR
PO BOX 1609
FORT MYERS, FL 33902-1609

*Execution Copy*

MASTER BUSINESS LEASE

THIS MASTER LEASE AGREEMENT is made this 18th day of September 2013, between 7335 GLAD, LLC, a Florida limited liability company, ("Landlord"), whose address is: 305 West End Avenue, New York, New York 10023; and 21st CENTURY ONCOLOGY, LLC, a Florida limited liability company ("Tenant"), whose address is: 2234 Colonial Boulevard, Fort Myers, Florida 33907.

1. PREMISES/TERM: Landlord hereby leases to Tenant and Tenant hereby hires from Landlord, the real property more particularly described on **Exhibit "A"** attached hereto (hereinafter the "Premises"), on which there exists a 13,822± square foot commercial building and appurtenant parking area, located at 7335 Gladiolus Drive, Fort Myers, Florida 33919, for the initial term (the "Initial Term") of seven (7) years, commencing on the 18th day of September 2013 (the "Commencement Date"), and ending at midnight Eastern Daylight Time on the 18th day of September 2020. This Lease shall be renewable by Tenant for five (5) additional five (5) year consecutive terms (each such additional term is referred to herein as a "Renewal Term") by Tenant's delivery of written notice of its intention to renew prior to six (6) months before the termination date of the Initial Term of this Lease (or the end of any Renewal Term under this Lease, as applicable); and further provided however, that in the event Tenant fails to notify Landlord in writing of its intention to exercise any Renewal Term hereunder, Tenant shall not forfeit its right to exercise same unless Landlord shall have delivered to Tenant a written notice which notifies Tenant that its right to elect a Renewal Term shall expire unless such right is exercised within fifteen (15) days from the date of such notice. The Initial Term and any exercised Renewal Term are hereinafter collectively referred to as the "Term."

2. BASE RENT: During the Initial Term of this Lease, Tenant agrees to pay to Landlord, in United States currency, together with all applicable Florida Sales Tax levied upon the occupancy of the Premises, an annual base rent of THREE HUNDRED FORTY FIVE THOUSAND FIVE HUNDRED FIFTY AND NO/100 ($345,550.00) DOLLARS, payable in monthly base rent installments of TWENTY EIGHT THOUSAND SEVEN HUNDRED NINETY FIVE AND 83/100 ($28,795.83) DOLLARS. Said rent shall remain constant, without adjustment, for a period of one (1) year. Commencing on the first day of the second (2nd) Lease year, the annual base rent payable hereunder shall be increased by two and one-half (2.5%) percent over the base rent for the previous Lease year, and there shall be a two and one-half (2.5%) percent increase in base rent on each anniversary date of the Lease thereafter. The same two and one-half (2.5%) percent annual rent increase shall be made in the event Tenant exercises any or all of its Renewal Term options. All rent payments shall be payable in advance on the first (1st) day of each month at Landlord's address set forth herein. If the monthly rent is not received by Landlord within five (5) business days from the date it is due, a "late charge" of three (3%) percent of such payment shall be due to Landlord as additional rent. All rent shall be paid to Landlord without demand, set-off or any deduction whatsoever, at the address of Landlord hereinabove set forth or at such other place as Landlord may hereafter designate to Tenant in

*Execution Copy*

writing. Rent for the first month hereunder shall be prorated if the Commencement Date is other than the first day of a month. It is the purpose and intent of Landlord and Tenant that the base rent, shall be absolutely net to Landlord during the Term. All utilities (water, sewer, heat, gas), real estate taxes, assessments, permit fees, insurance, maintenance, repairs, or any other sums, costs, and expenses relative to the Premises shall be paid by the Tenant, subject to Section 7(B) below, and Tenant, assumes and agrees to pay same as additional rent due hereunder and in the event of any non-payment thereof, Landlord shall have (in addition to all other rights and remedies) all the rights and remedies provided herein or by law in the case of non-payment of base rent.

3. PURPOSE: Tenant shall use and occupy the Premises only for general and professional office purposes including, but not limited to, medical offices and attendant laboratory functions, and for no other purpose, unless Landlord's prior written consent is obtained, which consent shall not be unreasonably withheld or delayed.

4. ASSIGNMENT/SUBLEASE.

A. Sublease. Tenant shall have the right to sublease all or any portion of the Premises from time to time and at any time. In the event of any sublease, Tenant shall remain directly and primarily responsible for the faithful performance and observance of all of the covenants and obligations on Tenant's part to be performed in this Lease for the Term.

B. Assignment. Tenant may assign this Lease, without Landlord's consent but with written notice to Landlord, to one of the following entities in connection with one of the following transactions: (i) assignment to an affiliate or subsidiary; or (ii) to any corporation or other entity resulting from a merger, acquisition, consolidation or reorganization of or with Tenant (or, in the case of acquisition, of all or substantially all of Tenant's assets). Any other assignment of this Lease by Tenant shall require Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, so long as the proposed tenant credit and use are deemed reasonable.

Notwithstanding anything contained herein to the contrary, (i) the obligations of the Guarantor shall continue and will not be affected by a sublease, amendments, changes, renewals, or extensions of the Lease which may be agreed to from time to time between Tenant and a subtenant or between Tenant and Landlord, and (ii) the obligations of the Guarantor shall continue and will not be affected by an assignment of this Lease, unless the assignee shall first deliver to Landlord a replacement guaranty from a credit-worthy party (the "Replacement Guarantor"). The Replacement Guarantor must have a net worth at all times of at least $10,000,000.00 and liquid assets of at least $5,000,000.00. Failure to maintain the aforementioned credit/financial requirements shall be deemed a default under this Lease. Landlord agrees that the obligations of Guarantor from and after the effective date of any such assignment shall be cancelled.

*Execution Copy*

5. DEFAULT:

A. Landlord may terminate this Lease if (i) the base rent or any additional rent is not paid within five (5) business days after written notice from Landlord; or (ii) Tenant shall have failed to cure a default in the performance of any covenant of the Lease (except the payment of base rent and additional rent), within thirty (30) days after written notice thereof from Landlord, or if default cannot be completely cured in such time, if Tenant shall not promptly proceed to cure such default within said thirty (30) days, or shall not otherwise complete the curing of such default with due diligence; or (iii) a petition in bankruptcy shall be filed by Tenant or if Tenant shall make a general assignment for the benefit of creditors; or (iv) a petition in bankruptcy shall be filed against Tenant and such proceeding is not vacated within thirty (30) days; or (v) the entire Premises becomes and remains vacant for a period of ninety (90) days or longer; or (vi) the Premises are used for some purpose other than the authorized use without Landlord's prior written consent; (vii) the Leasehold is mortgaged or encumbered without the prior written consent of Landlord; or (viii) the Replacement Guarantor's net worth is less than $10,000,000.00 and the liquid assets of the Replacement Guarantor is less than $5,000,000.00 (The foregoing events (i) to (viii), inclusive shall be deemed "Events of Default".)

B. Should any Event of Default occur, Landlord may:

(i) In addition to all other rights and remedies available at law or in equity, and in addition to the right to reenter the Premises and remove all persons and property therefrom, storing same in a warehouse or elsewhere at the cost of, and for the account of Tenant, without becoming liable (absent negligence by Landlord or its agents) for any loss or damage which may be occasioned thereby, Landlord may elect to:

(a) Accelerate and declare the rent due under the balance of the Lease;

(b) Terminate this Lease, resume possession of the Premises for its own account, and recover immediately from the Tenant, the difference between the rent specified in this Lease and the fair rental value of the Premises for the remainder of the Lease Term, discounted to present value utilizing a discounting factor of five (5%) percent; or

(c) Resume possession of the Premises and re-lease the Premises for the remainder of the Term for the account of Tenant, and recover from the Tenant, at the end of the Lease Term, or at the time each payment of rent becomes due under this Lease, as Landlord may elect, the difference between the rent

*Execution Copy*

specified in the Lease and the rent received on such re-leasing.

(ii) In any event, the Landlord shall also recover all expenses incurred by reason of Tenant's breach, including, without limitation, costs and reasonable attorneys' fees, with or without trial, and also as to any appeal. It is agreed that Landlord is accorded a lien upon all of the fixtures belonging to Tenant, Tenant hereby granting to Landlord a security interest in such property.

C. At the expiration of the applicable notice period, the Lease and any rights of renewal or extension thereof shall terminate as completely as if it were the date originally fixed for the expiration of the term of the Lease, but Tenant shall nevertheless remain liable as hereinafter provided in this Lease.

6. CURE OF DEFAULTS:

A. Tenant Default. If Tenant shall have committed an Event of Default, Landlord may perform the same for the account of Tenant, and Tenant shall reimburse Landlord for any expense incurred therefor within ten (10) days from Landlord's written notice, which amounts shall be considered as additional rent.

B. Landlord Default. If (i) Landlord fails to perform any of Landlord's obligations under this Lease, and (ii) Tenant gives Landlord written notice setting forth in reasonable detail the nature of the default, and (iii) the default continues for either (A) three (3) business days after the giving of the notice in the case of a default that materially negatively affects Tenant's use and enjoyment of the Premises, or (B) thirty (30) days after the giving of the notice in all other cases (provided, if the nature of such default is such that it cannot be cured within thirty (30) days, such period shall be extended for a reasonable period if Landlord commences such cure within such thirty (30) day period and thereafter diligently pursues the completion of same), Tenant, without thereby waiving the default, and in addition to any other right or remedy of Tenant, shall have the right (but shall not be obligated) to cure the default at the expense of Landlord, in which event Tenant's actual out of pocket third party costs incurred in curing the default shall, at Tenant's election, either (i) be paid for by Landlord within ten (10) days following Landlord's receipt of documentary evidence of such out of pocket third party costs, or (ii) offset against Tenant's obligation to pay Rent.

7. REPAIRS AND MAINTENANCE:

A. Tenant's Obligations. During the Term, Tenant, at its sole cost and expense, shall, except as otherwise provided in subsection (b) below or elsewhere in this Lease, keep the Premises in good order, repair, replacement and condition,

4

*Execution Copy*

reasonable wear and tear excepted, and keep the Premises clean and free of litter. Tenant shall be responsible solely for all repairs and upkeep the Premises, whether structural, external or internal, including but not limited to repair and maintenance of parking area, roof, boiler and HVAC), subject in each case to Section 7(B) below.

B. Landlord's Obligations. Landlord shall reimburse Tenant, on demand, solely for Tenant's costs to comply with the terms of Section 7(A) above to the extent such repairs and/or replacements (i) arise from or are caused by the gross negligence or intentional misconduct of Landlord or Landlord's servants, employees or business invitees, or (ii) are caused by Landlord's failure to comply with its obligations under this Lease.

C. Warranties. On or before the date of this Lease, Landlord will assign to Tenant, the benefit of any warranties or warranty terms obtained by Landlord with respect to any equipment, materials, or systems which are to be repaired, maintained, and/or replaced by Tenant under the terms of this Lease, or to the extent not assignable, Landlord shall cause same to be issued in Tenant's name, if Landlord can commercially reasonably do so. In the event that Landlord is unable to cause any applicable warranties or warranty terms to be assigned to Tenant or issues in Tenant's name, Landlord will use commercially reasonable best efforts to enforce the terms of such warranties and warranty terms for Tenant's benefit in connection with Tenant's maintenance, repair and replacement obligations set forth in this Lease.

8. ALTERATIONS: Tenant shall make no structural changes to the Premises (or to the mechanical or building systems) and shall make no changes of any kind respecting the Premises which are visible from the exterior of the Premises without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed. Tenant shall be permitted to otherwise make any nonstructural changes or other alterations, additions, or improvements to the Premises which do not impact the base building systems. Such alterations or improvements shall not impair or diminish the present or future value of the Premises, and the Premises will not be rendered unsafe by such alterations or improvements.

9. SIGNS AND ADVERTISING: Tenant agrees to abide by all current and future Lee County Codes relating to signage. Subject thereto, Tenant shall be able to post such signage on the Premises as it may deem best for its business purposes. Landlord hereby approves all existing signage on the Premises.

10. AFFIRMATIVE COVENANTS OF TENANT:

Tenant covenants that it shall:

A. Comply with the terms of any and all state or federal statutes or local ordinances or regulations applicable to Tenant or its use of the Premises, and save and hold

*Execution Copy*

Landlord harmless from penalties, fines, costs, expenses, or damages resulting from Tenant's failure to do so.

B. Comply with the terms and conditions set forth herein relating to the use, operating, and maintenance of the Premises.

C. Give Landlord prompt written notice of any accident, fire, or damage occurring on or to the Premises.

D. Conduct its business on the Premises in a businesslike manner and keep the Premises in first-class condition in accordance with high standards of operation.

E. Perform all of the covenants and conditions on its part to be performed under this Lease.

11. <u>NEGATIVE COVENANTS OF TENANT</u>:

Tenant covenants that it shall not do any of the following without the prior consent in writing of Landlord:

A. Use or operate any machinery or emit any noises or noxious odors from the Premises that are harmful to the Premises.

B. Do or suffer to be done, anything objectionable to the fire insurance companies now in force or hereafter to be placed on the Premises or any part thereof. In the case of a breach of this covenant, in addition to all other remedies of Landlord hereunder, Tenant shall pay to Landlord as additional rent any increase of premiums on any such insurance, which increase is caused in any way, in whole or in part, by the occupancy of Tenant.

C. Commit, or suffer to be committed by any person, any waste upon the Premises.

D. Use or occupy the Premises or any part hereof for any unlawful purpose. Tenant shall immediately on discovery or notice of any unlawful use take prompt action to halt such activity.

12. <u>UTILITIES/TAXES/ASSESSMENTS</u>: Tenant shall pay for all utilities, including electricity, water, sewer, fiberoptics and cable television charges consumed by Tenant during the Term of the Lease. Tenant shall also pay the cost of garbage and trash collection to the Premises and for janitorial service. Interruption or failure of any service to the Premises shall not entitle Tenant to any allowance in or reduction of rent, unless such interruption or failure is caused by Landlord's negligence or intentional conduct. During the term of this Lease, and any Renewal Term(s) Landlord shall furnish to Tenant, within ten (10) days of receipt of the real estate tax, utility, water or assessments bills and Tenant shall pay same to the appropriate authority authorized to collect the same when due, and Tenant shall, upon request from Landlord, provide Landlord with evidence of the payment thereof. All utilities, real estate taxes

*Execution Copy*

and assessments shall be paid by Tenant directly to the appropriate municipality, agency or utility company, as the case may be, and copies of all receipts therefor shall be forwarded to Landlord upon Landlord's request, provided however that in the event that Tenant is not permitted to pay such bill directly, Tenant shall instead pay the amount of the bill directly to Landlord and Landlord shall have the obligation to pay same to the appropriate authority authorized to collect the same. In the event Landlord fails to timely provide any such bill to Tenant under this Section 12, Tenant shall pay same within ten (10) days following receipt and Landlord shall indemnify Tenant for any late charges or fees incurred. Tenant shall pay 1/12 of the insurance on a monthly basis with a true-up at year end. In the event that assessments against the Premises which did not exist as of the Commencement Date of this Lease are unpaid at the time of termination of this Lease, or if Tenant defaults under this Lease with such remaining unpaid assessments, Tenant shall nevertheless be liable for payment of such assessments in full with respect to Tenant's period of tenancy.

13. SUBORDINATION/ESTOPPELS: This Lease and any permitted sublease hereunder is and shall remain subject to and subordinate to all current and future mortgages and other encumbrances affecting the Premises, voluntarily placed thereon by Landlord and to all renewals, modifications, consolidations, replacements and extensions thereof. Tenant agrees to execute and deliver to Landlord within 15 days of Landlord's written request, at no expense to Landlord, any instrument which reasonably may be deemed necessary by Landlord or Landlord's lender to further effect the subordination of this Lease or any sub-lease as herein set forth, provided that any such attornment and subordination given by Tenant shall also include a non-disturbance provision from Landlord's lender. Upon execution of this Lease Tenant hereby agrees to execute a Subordination, Non Disturbance and Attornment Agreement in favor of Landlord's lender which shall be in form reasonably acceptable to Tenant's counsel as compared to similar documents of industry standard.

14. DESTRUCTION OF PREMISES:

A. If the Premises are damaged or destroyed so that the same is not reasonably usable for the purposes set forth herein (i.e. more than 25% of the Premises is not so usable), either Tenant or Landlord shall have the right to terminate this Lease by giving written notice to the other within thirty (30) days after the occurrence of such damage or destruction. If such notice is given, the term of the Lease shall terminate on the date specified in the Notice (which shall be not more than fifteen (15) days after giving of such notice) as fully and completely as if such date were the termination date set forth in the Lease. If either party exercises the option to terminate the Lease, Tenant must immediately vacate the Premises. Provided, however, such termination by Tenant is limited by the terms of paragraph 14(C) below.

B. If the Premises shall be partially damaged or partially destroyed (i.e. there is damage to the Premises, but at least 75% of the Premises are usable for the purposes set forth herein), the damages shall be repaired by and at the expense of Tenant and the rent, until such repairs are made, shall be abated in proportion to the portion of the Premises which is not usable by Tenant. Provided, however, that in the event that such casualty loss is covered by insurance pursuant to paragraph 15 herein, Tenant shall not be required to make any such repairs unless and

7

*Execution Copy*

until Tenant shall have received the proceeds from its claim for insurance. Landlord shall not be liable for any inconvenience or annoyance to Tenant resulting from such damage or the repair thereof.

C. Pursuant to paragraph 14(A) above, the Landlord shall have a period of one hundred eighty (180) days from the date written notice of termination is received from Tenant to repair all casualty damages (using available insurance proceeds from Tenant's insurance policies) and to restore the Premises to a condition the same or essentially similar to the condition of the Premises prior to such casualty. In the event the building(s) is so repaired and restored within this time frame, Tenant's notice of termination shall be rendered void. In such event, Tenant's rent (and additional rent) shall be abated in proportion to the portion of the Premises which was not usable by Tenant until at least 75% of the Premises becomes useable, at which time the terms of paragraph 14(B) will apply. Landlord shall not be liable for any inconvenience or annoyance to Tenant resulting from such damage or the repair thereof.

15. INSURANCE: Tenant agrees to secure and keep in force at all times while in possession of the Premises, at Tenant's sole cost and expense as follows:

A. Commercial General Liability Insurance. Such insurance shall be no more restrictive than that provided by the standard Commercial General Liability Form (I.S.O. Form CG 001) without any restrictive endorsements. Landlord shall be included as an "Additional Insured" on a form no more restrictive than Form CG 2010, Additional Insured - Owners, Lessees, or Contractors (Form B). The minimum limits (inclusive of amounts provided by an umbrella or excess policy carried by Tenant, which may include other properties) shall be:

| | | |
|---|---|---|
| (1) | $2,000,000.00 - | General Aggregate |
| (2) | $1,000,000.00 - | Products/Completed Operations Aggregate |
| (3) | $1,000,000.00 - | Personal and Advertising Policy |
| (4) | $1,000,000.00 - | Each Occurrence |

B. Property Coverage: Tenant shall purchase insurance to cover basic causes of loss for a medical building, including but not limited to flood insurance and fire and windstorm insurance to the building, including improvements and betterments on a form no more restrictive than the latest edition of I.S.O. Form CP 1010 on a replacement cost basis. Tenant shall pay the amount of any deductible.

All insurance to be procured by Tenant as set forth above shall be issued in the name of Tenant by one or more responsible insurance companies licensed to do business in the State of Florida, subject to Landlord's reasonable right to disapprove in the event of the insolvency of said insurance carrier. In the event that Tenant carries a blanket policy for additional locations, Tenant's insurance may be included in such blanket policy, provided that all Tenant requirements herein are

*Execution Copy*

otherwise met. All policies of insurance shall contain the following endorsements: (I) Landlord shall be named as loss payee, subject to Tenant's rights to receive so much or all of the insurance proceeds in order to repair a casualty loss pursuant to paragraph 14(B) herein; (ii) such insurance may not be canceled or amended with respect to Landlord except upon Landlord's receipt of thirty (30) days' prior written notice from the insurance carrier to Landlord; and (iii) Tenant shall be solely responsible for the payment of all premiums under such policies, and that Landlord shall have no obligation for the payment thereof. Tenant agrees to deliver to Landlord copies of said policies, certificates or memorandum of such policies to be procured by Tenant within fifteen (15) days of the inception of such policies, which shall be prior to commencement of the initial term of this Lease; and at least ten (10) days prior to the expiration of any such policy, Tenant shall deliver to Landlord certificates of memoranda of such insurance evidencing the renewal thereof within fifteen (15) days of each Lease year. The minimum limits of any insurance coverage to be maintained by Tenant hereunder shall not limit Tenant's liability under any indemnity clause contained elsewhere in this Lease.

16. MUTUAL RELEASE: In case of damage or destruction to the Premises, or any contents thereof, each party shall look first to any available insurance coverage before making any claim against the other party; and the parties release one another from any liability for any destruction to the Premises, provided that: (i) the damage or destruction is otherwise fully covered by insurance in each instance; (ii) such release is permitted under the terms of the insurance policies obtained by Tenant as required under this Lease; and (iii) Tenant receives so much or all of the insurance proceeds to meet its repair obligation under paragraph 14(B) herein.

17. RIGHT OF ENTRY: Landlord or Landlord's agents may enter the Premises at any reasonable time, on reasonable notice to Tenant (except that no notice need be given in case of emergency) for the purposes of inspection or making such repairs as Landlord deems necessary or desirable. Landlord may show the Premises to prospective purchasers and mortgagees and, during the six (6) months prior to termination of the Lease, or any Renewal Term (whichever is applicable) to prospective tenants, during business hours upon reasonable notice to Tenant.

18. INDEMNITY: Each party hereby agrees to indemnify, defend and hold the other party harmless from and against any and all claims, damages, liabilities, penalties, claims, costs and expenses, including reasonable attorneys fees, for which the indemnified party shall not be reimbursed by insurance, arising out of (a) the other party's use of the Premises, and (b) any and all claims arising from any breach or default in the performance of any obligation of, or representation made in this Lease by, either party. If such action be brought against either Landlord or Tenant, then upon notice from such party, the other party shall defend the same through counsel selected by such party's insurer or other counsel, in each case reasonably acceptable to the indemnified party. The provisions of this Section 18 shall survive the termination or expiration of this Lease.

19. ATTORNEY'S FEES AND EXPENSES: If either party shall default in the performance of any provision of the Lease on their part to be performed, or if either party is required to take any action to enforce the Lease, or to defend the validity of or interpret this Lease,

*Execution Copy*

then the prevailing party shall be entitled to recover all costs and expenses incurred thereby, including court costs and reasonable attorney's fees.

20. END OF TERM/ABANDONED PROPERTY: At the end of the Lease term (or any Renewal Term hereunder), Tenant and all sub-tenants shall vacate and surrender the Premises to Landlord, "broom clean", and in as good condition as they were at the beginning of this Lease, ordinary wear and tear excepted, and Tenant shall remove all of Tenant's equipment and personal property without damage to the premises. Any personal property, installations or additions which are required to be removed by Tenant or any sub-tenant and which remain on the Premises thirty (30) days after the end of the Lease term shall be considered abandoned and, at the option of Landlord, may either be retained as Landlord's property or the same may be removed by Landlord at Tenant's expense.

21. JURY WAIVER: LANDLORD AND TENANT AND EACH GUARANTOR HEREBY EACH WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER PERTAINING TO ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE LEASE OR TENANT'S USE AND OCCUPANCY OF THE PREMISES, OTHER THAN AN ACTION FOR PERSONAL INJURY. THIS PROVISION IS A MATERIAL CONSIDERATION FOR THIS LEASE.

22. QUIET ENJOYMENT: Landlord agrees with Tenant that upon Tenant paying the rent and performing all of the terms, covenants and conditions of the Lease on Tenant's part to be performed, Tenant may peaceably and quietly enjoy the Premises.

23. LIENS:

A. Tenant, at Tenant's expense, shall cause any lien filed against the Premises, or any portion thereof, for work or materials claimed to have been furnished to Tenant, or any subtenant, to be discharged of record within fifteen (15) days after Tenant's receipt of notice thereof.

B. The interest of the Landlord shall not be subject to liens for improvements made by Tenant or any approved subtenant in and to the Premises. Tenant shall notify every contractor making such improvements of the provision set forth in the preceding sentence of this subparagraph. Concurrent with the execution of this Lease Agreement, or at any time during the term hereof, the Landlord may prepare, at its election, and the parties agree to execute, acknowledge and deliver without charge, a Memorandum of Lease in recordable form, pursuant to Florida Statute Section 713.10 containing a confirmation that the interest of the Landlord shall not be subject to liens for improvements made by Tenant to the Premises.

24. HOLDING OVER: If Tenant remains in possession of the Premises or any part thereof after the expiration or earlier termination of this Lease, whether with or without Landlord's acquiescence, Tenant shall be deemed only a tenant at will and there shall be no renewal of this Lease without a written agreement signed by both parties specifying such renewal. The "monthly" rent payable by Tenant during any such tenancy at will period shall be

*Execution Copy*

one hundred twenty five percent (125%) of the monthly installment of Rent payable during the last full calendar month immediately preceding the expiration or such termination of this Lease.

25. NO WAIVER OF LEASE TERMS: The failure of Landlord or Tenant to take an action against the other for violation of any of the terms of the Lease shall not prevent a subsequent act of a similar nature from being a violation of the Lease. No act or agreement to accept surrender of the Premises from Tenant shall be valid unless in writing signed by Landlord.

26. "AS IS": Tenant has inspected the Premises prior to occupancy and is familiar and satisfied with its current condition. Tenant hereby accepts the Premises in "as is" "condition with all faults". No representation or warranty, either express or implied, of Landlord has been made as to the physical condition of the Premises on which Tenant is relying or on which Tenant is entitled to rely.

27. BROKER: Landlord and Tenant each represent to the other that neither party has dealt with any real estate broker in connection with this Lease which broker would or could expect the payment of Lease commission. If any Lease commissions are due, the same shall be the sole responsibility of Landlord. This provision shall not be deemed to preclude either Landlord or Tenant from entering into any subsequent agreement or arrangement with any broker or property manager for management of the Premises, and in such case, each party shall be responsible for its own management fees.

28. NOTICES: Any notice by either party to the other shall be in writing and mailed by registered or certified mail, return receipt requested, to the address above set forth, or to such other address as either party may designate in writing. Each notice shall be deemed given three (3) business days following the date of mailing. Any notice by Landlord to Tenant shall be deemed given if personally delivered to Tenant at the Premises.

29. NO ORAL AGREEMENTS/SUCCESSORS INTERESTS/AMENDMENTS: The agreements contained in the Lease set forth the entire understanding of the parties, and shall be given upon and shall inure to the benefit of the respective heirs, successors, assigns and legal representatives of the parties hereto and shall not be changed or terminated orally. No amendment to this Lease shall be effective unless it shall be signed by both Landlord and Tenant.

30. ENVIRONMENTAL PROVISIONS:

A. Tenant covenants that during the term of this Lease it will not use, generate, manufacture, produce, store, release, discharge, dispose of on, under, or about the Premises or transport to or from the Premises any toxic or hazardous substance, as defined under Federal, Florida or local law, or allow any other person or entity to do so. Provided, however, it is understood by the parties that Tenant's and sub-tenant's medical practices typically routinely involve the lawful use of materials considered to be toxic or hazardous, specifically as relates to use and disposal of medical waste and drugs which are used in the ordinary scope of Tenant's or sub-tenant's medical practices. With respect to such materials, such uses are specifically permitted provided that Tenant shall comply with the provisions of subparagraph (C). Tenant will keep and maintain the premises in compliance with, and shall be defined as any Federal, Florida or local law, ordinance, or

11

*Execution Copy*

regulation pertaining to environmental health or contamination of lands. Tenant shall give prompt written notice to Landlord of: (a) any proceeding or inquiry by any governmental authority with respect to the presence of any hazardous substance on the Premises or the migration thereof from or to other property; (b) all claims made or threatened by any third party against Tenant or the Premises relating to any loss or injury resulting from any hazardous substance; and (c) Tenant's discovery of any occurrence or condition of any real property adjoining or in the vicinity of the Premises that could cause the Premises or any part hereof, to be subject to any restrictions on the ownership, occupancy, transferability, or use of the Premises under any environmental law.

B. Tenant shall protect, indemnify, and hold harmless Landlord and its successors and assigns from and against any and all loss, damage, cost, expense or liability (including attorney's fees and costs) directly or indirectly arising out of or attributable to the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance on, under or about the Premises by Tenant or Tenant's agent(s) during the term of this Lease, including, without limitation, (a) all foreseeable consequential damages; and (b) the costs of any required or necessary repair, clean up or detoxification of the Premises, and this covenant shall survive the termination or extinguishment of this Lease. This indemnification provision shall not apply to any such condition which is shown by competent independent evidence to have existed in whole prior to the commencement date of this Lease.

C. Tenant shall abide by all municipal, county, state and federal statutes, laws, ordinances, administrative rules and regulations and guidelines applicable to the disposal of "Hazardous Waste Materials". Tenant shall not deposit or dispose of any Hazardous Waste Materials which require special handling into the waste disposal facilities on the Premises. Tenant shall, at Tenant's expense, employ or engage private waste management services to dispose of any and all waste of Tenant which must be handled in any manner other than general waste collection provided by Landlord through public or private waste collection service. Without limiting the foregoing, Tenant shall employ or engage a licensed waste disposal service to provide any required containers or storage facilities and to remove any "Special Waste" or "Infectious Waste" which Tenant must handle in a manner as provided for by "Hazardous Materials Laws".

31. <u>EMINENT DOMAIN</u>: If the whole or a portion of the Premises shall be taken for any public or quasi-public use under any statute or by right of eminent domain or private purchase in lieu thereof, then at Landlord's option, the term hereby demised and all rights of Tenant hereunder shall immediately cease and terminate and Tenant's obligation to pay rent (or additional rent) shall terminate as of the date of such termination. Tenant shall be entitled to no part of the award made for such condemnation (or other taking) or the purchase price thereof; provided however that notwithstanding the foregoing, Tenant shall not be precluded from independently seeking compensation or damages from the condemning authority. Nevertheless, if the Premises is unaffected by such condemnation (or other taking), then this Lease and each and every one of its provisions shall continue in full force and effect.

32. <u>GOVERNING LAW/VENUE</u>: This Lease shall be interpreted and governed under the laws of the State of Florida. Venue for any action arising out of this Lease shall lie only in Lee County, Florida.

*Execution Copy*

33. COUNTERPART EXECUTION: This Lease may be executed in counterparts, each of which shall constitute and original, but all taken together shall constitute one and the same Lease.

34. RADON GAS DISCLOSURE: RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA. ADDITIONAL INFORMATION REGARDING RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY PUBLIC HEALTH UNIT.

35. GUARANTY. Radiation Therapy Services, Inc., a Florida corporation, and the parent corporation to Tenant, hereafter executes this Lease for the sole and exclusive purpose of agreeing to guaranty the full and prompt payment and performance by Tenant of all of Tenant's obligations under this Lease.

*Execution Copy*

IN WITNESS WHEREOF, the parties hereto have executed this Lease on the day and year set forth on the first page hereof.

Signed, Sealed and Delivered
in the Presence of:

Witness Signature
MARIA M. SUAREZ
Printed Name of Witness

Witness Signature
DEBRA J. GUILD
Printed Name of Witness

21ST CENTURY ONCOLOGY, LLC,
a Florida Limited Liability Company

By:
its:
Printed Name & Title Daniel E. Dosoretz, M.D.
President & CEO

Tenant

Marcy Salwen
Witness Signature
Marcy Salwen
Printed Name of Witness

Witness Signature
STEPHEN HARRISON
Printed Name of Witness

7335 GLAD, LLC,
A Florida Limited Liability Company

By:
its: ALEXANDER SCHARF MANAGER
Printed Name & Title

Landlord

RADIATION THERAPY SERVICES, INC.,
a Florida corporation,
solely for the purposes set forth in Section 35 of the Lease

Witness Signature
MARIA M. SUAREZ
Printed Name of Witness

Witness Signature
DEBRA J. GUILD
Printed Name of Witness

By:
its:
Printed Name & Title Daniel E. Dosoretz, M.D.
President & CEO

THIS LEASE IS NOT ACKNOWLEDGED BY A NOTARY PUBLIC AND MAY NOT BE RECORDED ON THE PUBLIC RECORDS.

14

DocuSign Envelope ID: 0CF8FCBD-BF67-41AA-A673-67467457B6D9

**FIRST AMENDMENT TO LEASE**
(7335 Gladiolus Drive, Fort Myers, Florida)

This First Amendment to Lease Agreement ("Amendment") is entered into as of the last date signed hereinbelow, by and between **7335 Gladiolus LLC**, a Florida limited liability company ("Landlord") whose address for notice is 444 East 58th Street #3B New York, NY 10022; and **21st Century Oncology, LLC**, a Florida limited liability company (the "Tenant") whose address for notices is: 2234 Colonial Boulevard, Fort Myers, Florida 339907, Attn: Legal Department.

RECITALS

A. Landlord and Tenant entered into a Master Business Lease with an effective date of September 18, 2013 (the "Lease"), whereby Landlord leases to Tenant and Tenant leases from Landlord approximately **13,822+ sq. ft.** of rentable space, located at 7335 Gladiolus Drive, Fort Myers, Lee County, Florida (the "Premises"). Said Premises have been continually occupied by Tenant.

B. Landlord and Tenant desire to amend the Lease in accordance with the terms herein.

C. All capitalized terms used in this Amendment not otherwise defined herein, shall have the meaning assigned to them in the Lease.

NOW, THEREFORE, for valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Term**. Section 1 of the Lease is amended to provide that the Initial Term is extended for a period of one (1) year ending on **September 18, 2021** unless earlier terminated as provided for in the Lease. Thereafter, the Lease Term shall be renewable in accordance with Section 1.

2. **Ratification; Conflict**. Except as specifically amended by this Amendment, the Lease is not otherwise amended, and remains in full force and effect. In the event of a conflict between the terms of this Amendment and the terms of the Lease, the terms of this Amendment shall control.

DocuSign Envelope ID: 0CF8FCBD-BF67-41AA-A673-67467457B6D9

IN WITNESS WHEREOF, this Amendment is executed as of the dates set forth below each signature.

Signed, Sealed and Delivered
in the Presence of:

**TENANT:**
**21ST CENTURY ONCOLOGY, LLC,**
a Florida Limited Liability Company

Deborah Olivier
Witness Signature
Deborah Olivier
Printed Name of Witness

By: Blake Howard
Its: Treasurer
Printed Name & Title
Date: 6/19/2020

ERIKA VASKE
Witness Signature
ERIKA VASKE
Printed Name of Witness

**LANDLORD:**

**7335 Gladiolus LLC**
a Florida Limited Liability Company

Witness Signature
Jacob Herzberg
Printed Name of Witness

By:
Its: Michael Shabsels, Manager
Printed Name & Title
Date: 06/15/2020

David Shabsels
Witness Signature
David Shabsels
Printed Name of Witness

DocuSign Envelope ID: A76A419A-4664-4629-B3AD-A930B90B6B2A

## SECOND AMENDMENT TO LEASE

This **SECOND AMENDMENT TO LEASE AGREEMENT** (this "**Second Amendment**"), made as of July 1, 2021, by and between **7335 GLADIOUS LLC**, a Florida limited liability company whose address for notice is 444 East 58th Street, 3-C, New York, New York 10022 ("Landlord") and **GENESISCARE USA OF FLORIDA LLC**, a [Florida] limited liability company whose address for notice is 2270 Colonial Boulevard, Fort Myers, FL 33907, Attn: Legal Department ("Tenant").

## RECITALS

**WHEREAS**, Landlord's predecessor in interest, 7335 Glad, LLC, a Florida limited liability company, entered into a certain Master Lease Agreement with Tenant's predecessor in interest, 21st Century Oncology, LLC, a Florida limited liability company, as of September 18, 2013 (as amended from time to time, including by First Amendment to Lease dated as of June 19, 2020, the "Lease") with respect to an approximately 13,822 square feet commercial building and appurtenant parking area located at 7335 Gladiolus Drive, Fort Myers, Florida 33908 (the "Premises"); and

**WHEREAS**, Tenant and Landlord desire to extend the term of the Lease for ten (10) years, commencing as of the date of this Second Amendment and extending through April 30, 2031, upon the terms and conditions set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are acknowledged hereby, the parties hereto hereby agree as follows:

1. **Amendment to Term Provisions**. Section 1 of the Lease is hereby amended by restating the last two lines of the first sentence thereof, which begins with the words "of seven (7) years" and continues through "2020", so as to read as follows:

   "commencing on the 18th day of September 2013 (the 'Commencement Date') and ending at midnight Eastern Daylight Time on April 30, 2031."

2. **Amendment to Option Provisions**. Section 1 of the Lease is hereby further amended (a) by deleting, in the second sentence thereof, the words "five (5) additional five (5) year consecutive terms" and by inserting, in lieu thereof, the words "two (2) additional five (5) year consecutive terms" and (b) by deleting, also in the second sentence thereof, the words "six (6) months" and by inserting, in lieu thereof, the words "one hundred and twenty (120) days".

3. **Amendment to Base Rent Provisions**. Section 2 of the Lease is hereby amended by restating, in their entireties, the first four sentences thereof so as to read as follows:

   "During the Initial Term of this Lease, commencing on July 1, 2021, Tenant agrees to pay to Landlord, in United States currency, together with all applicable Florida State Tax levied upon the occupancy of the Premises, an annual base rent of THREE HUNDRED TWENTY-FOUR THOUSAND NINE HUNDRED AND SIXTY DOLLARS ($324,960), payable in monthly base rent installments of TWENTY-SEVEN THOUSAND EIGHTY DOLLARS ($27,080). Said rent shall remain constant, without adjustments, for a period of ten (10) years. In the event that Tenant exercises either or both of its Renewal Term

DocuSign Envelope ID: A76A419A-4664-4629-B3AD-A930B90B6B2A

options, the base rent, for each such Renewal Term, shall be equal to the lesser of the then current market rate of rent in the vicinity of the Premises for similar space, or the base rent then in effect."

For purposes of clarification, the provisions of Section 2 of the Lease set forth after the four sentences originally appearing therein, commencing with the words "All rent payments shall be payable in advance" shall remain in full force and effect and unamended.

4. **Tenant Improvement Costs**. In consideration of Tenant's agreement to extend the Initial Term for a period of ten (10) years from the date hereof, Landlord has agreed to provide Tenant with a tenant improvement allowance in the amount of $10.00 per square foot, which equals the sum of $130,822 (the "Tenant Improvement Allowance"), in order for Tenant to refurbish/update the Premises. The Tenant Improvement Allowance may be used for such items as, but not limited to, all interior demising walls, flooring, ceiling, electrical materials and equipment, mechanical, plumbing and life-safety equipment in the Premises. All work shall be designed, performed and/or constructed by architects, engineers, contractors and/or other appropriate persons or entities chosen, hired, engaged or employed by Tenant. The Tenant Improvement Allowance shall be disbursed by the Landlord directly to Tenant upon Tenant's request for reimbursement in proportion to the percentage of work completed (or partially completed) or upon Tenant providing Landlord with receipts or other proof of payment for the work completed. Tenant shall have the Term to submit to Landlord for the Tenant Improvement Allowance. Landlord shall promptly pay Tenant upon request.

5. **Tenant Representations**. Tenant warrants, represents and agrees that (i) neither it nor any of its affiliates is currently the subject of any proceeding under federal or state bankruptcy, receivership, insolvency or similar laws, (ii) no consents of third parties (including any lender) are necessary for the execution and performance of this Second Amendment by Tenant, (iii) it is, in fact, the successor-in-interest to the original Tenant party to the Lease and no party other than Tenant holds the lessee's interest in the Lease. Tenant shall defend, indemnify and save harmless Landlord from and against all losses, claims, demands, damages, liabilities, costs, judgments and reasonable attorney's fees resulting from a breach of or any inaccuracy in any of the representations, warranties and agreements set forth in this Section 5.

6. **No Defaults; Waiver.** The parties agree that the terms and conditions set forth in this Second Amendment, shall not alter, or modify any rights, remedies or claims that Landlord or Tenant now has or may hereafter have under or arising out of the Lease whether known or unknown and whether relating to periods of time before or after the date of this Amendment, including, without limitation, any rights, remedies or claims of Landlord or Tenant based in whole or in part on a default by the other party of its obligations under the Lease, or the non-satisfaction or failure of any requirement or condition under the Lease.

7. **Brokerage**. Landlord and Tenant represent and warrant to each other than no broker was involved in the negotiation of the terms of this Second Amendment, and no broker is entitled to any commission in connection with this Second Amendment, other than Cushman & Wakefield Commercial Property SWFL, whose commission, in the sum of $129,984, based upon four percent (4%) of the aggregate base rent payable in full by Landlord within sixty (60) days of the execution of this Second Amendment by each of Landlord and Tenant, notwithstanding the July 1, 2021 effective date hereof.

DocuSign Envelope ID: A76A419A-4664-4629-B3AD-A930B90B6B2A

8. **Amendment**. Except as otherwise expressly amended hereby, the Lease shall be and remain in full force and effect according to its terms. In the event that any of the terms or conditions of the Lease conflict with this Second Amendment, the terms and conditions of this Second Amendment shall control. Any references in the Lease to "this Agreement" shall be deemed to mean such Agreement as amended hereby.

9. **Effectiveness of Amendment**. The provisions of this Second Amendment shall be fully effective as of the date first set forth above following the execution and delivery of this Second Amendment by Landlord and Tenant.

10. **Successors and Assigns**. The provisions of this Second Amendment shall be binding upon, and shall inure to the benefit of, the successors and assigns of the parties hereto, respectively.

11. **Counterparts; Facsimile**. This Second Amendment may be executed in multiple counterparts and shall be valid and binding with the same force and effect as if all parties had executed the same Amendment. A fully executed facsimile or PDF copy of this Second Amendment shall be effective as an original.

**IN WITNESS WHEREOF**, the parties hereto have caused this Second Amendment to Lease to be executed as of the day and year first above written.

LANDLORD:

**Witnessed by:**

**7335 GLADIOUS LLC**

_________________________

By_________________

Name: Michael Shabsels

Title: Manager

TENANT:

**Witnessed by:**

**GENESISCARE USA OF FLORIDA LLC**

Deborah Olivier
_________________________

By:_________________

Name: Charles Powell

Title: COO

3

Docusign Envelope ID: A524EAED-C5C0-43F6-AF77-AA03AB9CE804

# ASSIGNMENT AND ASSUMPTION AGREEMENT

This **ASSIGNMENT AND ASSUMPTION AGREEMENT** (the "Assignment") is entered into and effective as of January 17, 2025 (the "Effective Date"), by and among **7335 GLADIOLUS LLC**, a Florida limited liability company ("Landlord") **GENESISCARE USA OF FLORIDA LLC**, a Florida limited liability company ("Assignor"), and **LEE HEALTH SYSTEM, INC.**, a Florida not-for-profit corporation ("Assignee").

## RECITALS:

**WHEREAS**, 7335 Glad, LLC, a Florida limited liability company, Landlord's predecessor-in-interest and 21st Century Oncology, LLC, a Florida limited liability company, Assignor's former name, entered into a Master Business Lease dated September 18, 2013, which was amended as of June 19, 2020 and as of July 1, 2021 (the "Lease"), and assigned to Landlord and Assignor, for premises located at 7335 Gladiolus Drive, Fort Myers, Florida 33908 (the "Premises"); and

**WHEREAS**, Assignor has agreed to assign all of its right, title and interest in and to the Lease and its right to occupy the Premises to Assignee, and Assignee has agreed to accept such assignment and to assume all of the obligations as tenant under the Lease on the terms and conditions contained in this Assignment; and

**WHEREAS**, Section 4(B) of the Lease requires Landlord's consent to this assignment of the Lease, and Landlord consents to the assignment and assumption of the Lease to Assignee,

**NOW THEREFORE**, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Landlord, Assignor and Assignee, intending to be legally bound, agree as follows, effective as of the Effective Date:

1. **Assignment by Assignor; Delivery of Possession**. Assignor hereby transfers, conveys and assigns to Assignee all of its right, title and interest in and to the Lease and to its right to occupy the Premises as of the Effective Date. Assignor hereby surrenders possession of the Premises to Assignee.

2. **Assumption by Assignee**. Assignee accepts the assignment of the Lease and the right to occupy the Premises and assumes those obligations of "Tenant" or "Lessee" under the Lease first accruing from and after the Effective Date.

3. **Consent by Landlord**. Landlord consents to the assignment of the Lease from Assignor to Assignee, as of the Effective Date.

4. **Binding Effect**. This Assignment is binding on and will inure to the benefit of Assignor, Assignee, and the respective successors and assigns of Assignor and Assignee.

Docusign Envelope ID: A524EAED-C5C0-43F6-AF77-AA03AB9CE804

5. **Counterparts; Electronic Signatures**. This Assignment may be executed in one or more counterparts, each of which will be deemed to be an original, but all of which together will constitute the same instrument. Any facsimile transmission or .pdf version of any signature or signatures and any signature delivered by electronic or digital format (e.g., DocuSign) will be deemed an original and will bind such party.

6. **Governing Law**. This Assignment shall be governed by and construed in accordance with the internal laws of the state of Florida.

**IN WITNESS WHEREOF**, Landlord, Assignor and Assignee have executed this Assignment, to be effective as of the date first written above.

**Landlord:**

**7335 GLADIOLUS LLC**

By: [signature]
Name: Michael Shabsels
Title: Manager

**Assignor:**

**GENESISCARE USA OF FLORIDA LLC**

By: Signed by: Shaden Marzouk A2D8AD6C26D4464...
Name: Shaden Marzouk, MD, MBA
Title: President

**Assignee:**

**LEE HEALTH SYSTEM, INC.**

By: ______________________
Name: Benjamin A. Spence
Title: Chief Operating Officer

5. **<u>Counterparts; Electronic Signatures</u>**. This Assignment may be executed in one or more counterparts, each of which will be deemed to be an original, but all of which together will constitute the same instrument. Any facsimile transmission or .pdf version of any signature or signatures and any signature delivered by electronic or digital format (e.g., DocuSign) will be deemed an original and will bind such party.

6. **<u>Governing Law</u>**. This Assignment shall be governed by and construed in accordance with the internal laws of the state of Florida.

**IN WITNESS WHEREOF**, Landlord, Assignor and Assignee have executed this Assignment, to be effective as of the date first written above.

**Landlord:**

**7335 GLADIOLUS LLC**

By: [signature]
Name: Michael Shabsels
Title: Manager

**Assignor:**

**GENESISCARE USA OF FLORIDA LLC**

By: ______________________
Name: Shaden Marzouk, MD, MBA
Title: President

**Assignee:**

**LEE HEALTH SYSTEM, INC.**

By: [signature]
Name: Benjamin A. Spence
Title: Chief Operating Officer

# Insurable Replacement Cost

In estimating the insurable replacement cost we have followed traditional appraisal standards and industry practices in using the calculator cost method of Marshall Valuation Service. This estimate is based on the replacement cost new of the building improvements less deductions for typical insurable exclusions. It is noted that actual construction costs and related estimates can vary greatly from this estimate.

It is noted that methodologies for developing insurable replacement costs vary dependent upon underwriter standards. We have not viewed the specific policy that is in effect or may be written for the subject, nor have we been given specific instructions by the client on what is to be included in or excluded from the insurable replacement cost estimate.

This is provided to aid the client/intended user in their overall decision-making process. We recommend the engagement of an appropriately qualified professional if a definitive estimate of insurable replacement cost for insurance coverage is required.

The indicated insurable replacement cost is shown on the following page.

Note: The insurable value is for the unit itself and does not include the common elements shared components of most commercial park improvements which contribute to the overall value of the property.

# Insurable Value

**Insurable Value Calculator**

**Office Buildings- Section 15, Page 17, Class C, Average Quality, Manual Dated Nov-23**

| | | | | |
|---|---|---|---|---|
| Base Unit Cost New PSF | | | | $157.00 |
| **Refinements:** | | | | |
| HVAC / Climate Adjustment | | | | $0.00 |
| Elevator Deduction | | | | $0.00 |
| Add Sprinklers | | | + | $0.00 |
| **Adjusted Base Unit Cost New PSF** | | | | **$157.00** |
| **Multipliers:** | | | | |
| Number of Stories Multiplier | | 1.000 | | |
| Height/Story Multiplier | | 1.000 | | |
| Floor Area/Perimeter Multiplier | | 1.000 | | |
| Current Cost Multiplier | | 1.100 | | |
| Local Multiplier | | 0.970 | | |
| Complex/Congested Sites Multiplier | x | 1.000 | | |
| Total Multiplier | | | x | 1.067 |
| **Adjusted Replacement Cost New PSF** | | | | **$167.52** |
| Area | | | x | 15,406 |
| **Replacement Cost New** | | | | **$2,580,798** |
| **Refinements:** | | | | |
| Elevator Addition | | | | $0 |
| Add Balconies / Canopies | | | + | $0 |
| **Replacement Cost New** | | | | **$2,580,798** |

| | | |
|---|---|---|
| **Total Replacement Cost New** | | **$2,580,798** |
| **Insurance Additions / Exclusions** | | |
| Foundation Below Grade | 4.80% | -$123,878 |
| Architects' Fees | 6.20% | -$160,009 |
| Piping Below Ground | 1.00% | -$25,808 |
| **Total Insurance Additions / Exclusions** | | **$309,696** |
| **Indicated Insurable Replacement Cost** | | **$2,271,102** |
| **Indicated Insurable Replacement Cost (RD)** | | **$2,275,000** |

# Fort Myers: Office Market Analysis

The information contained in this report was provided using 2025 Q1 CoStar data for the Fort Myers Office Market ("Market").




## Overview

The subject property is in the Fort Myers Market defined in the map above, which includes 22.3 million square feet of office space. The inventory is roughly 13% Class A, 63% Class B, and 23% Class C. The office sector continues to face headwinds as market fundamentals weaken amid economic uncertainty. Vacancy rates are trending upward while values decline, creating a challenging environment for owners and investors despite modest rental growth.

In the Fort Myers Market, vacancy rates increased in the latest quarter but are down by 28 bps over the past year. While annual rent growth is positive at 3.0%, no growth occurred in the latest quarter. Despite softening fundamentals, values continue to grow, increasing 0.4% over the past quarter and 3.6% over the past year to $190/square feet.

Sector Fundamentals

| | Fort Myers | YoY | QoQ | National | YoY | QoQ |
|---|---|---|---|---|---|---|
| Market Rent/SF | $27.44 | 3.0% | 0.0% | $35.97 | 1.1% | 0.2% |
| Vacancy Rate | 5.08% | -28 bps | 18 bps | 13.88% | 19 bps | -4 bps |
| Availability Rate | 5.8% | -59 bps | 19 bps | 16.1% | -38 bps | -8 bps |
| Net Absorption SF | -38,074 | 61.6% | -1857.8% | 7,710,258 | 133.1% | 3491.5% |
| Asset Value/SF | $190 | 3.6% | 0.4% | $263 | -7.1% | -0.7% |
| Market Cap Rate | 8.46% | 5 bps | 1 bps | 9.08% | 41 bps | 4 bps |
| Transaction Count | 25 | 127% | 47% | 2,618 | 20% | -15% |
| Sales Volume | $24,477,150 | 120% | -31% | $8,917,707,776 | 41% | -47% |

The table below presents historical performance of key indicators for office space in the Market including inventory & construction levels, net absorption, vacancy & availability, rental rates, pricing, and cap rates.

Historical Office Performance: Fort Myers Market

| Period | Inventory SF | Under Construction SF | Net Delivered SF 12 Mo | Net Absorption SF 12 Mo | Vacancy Rate | Availability Rate | Market Rent/SF | Market Sale Price Per SF | Market Cap Rate |
|---|---|---|---|---|---|---|---|---|---|
| 2025 Q1 | 22,253,677 | 25,900 | 13,540 | 75,790 | 5.1% | 5.8% | $27.44 | $190 | 8.46% |
| 2024 Q4 | 22,251,617 | 15,960 | 11,480 | 14,668 | 4.9% | 5.6% | $27.44 | $189 | 8.45% |
| 2023 | 22,240,137 | 15,880 | 161,147 | 26,261 | 4.9% | 5.9% | $25.84 | $180 | 8.39% |
| 2022 | 22,078,990 | 164,271 | 77,204 | 75,079 | 4.3% | 5.2% | $22.86 | $175 | 8.04% |
| 2021 | 22,001,786 | 295,516 | 270,086 | 636,553 | 4.3% | 5.4% | $20.84 | $166 | 7.71% |
| 2020 | 21,731,700 | 270,086 | 226,436 | 196,138 | 6.1% | 7.4% | $18.87 | $146 | 8.23% |
| 2019 | 21,505,264 | 226,436 | 74,870 | 288,109 | 6.0% | 7.3% | $17.76 | $137 | 8.53% |
| 2018 | 21,430,394 | 263,060 | 261,442 | 82,908 | 7.0% | 9.6% | $17.49 | $135 | 8.31% |
| 2017 | 21,168,952 | 28,990 | 121,936 | 443,458 | 6.3% | 9.3% | $16.40 | $128 | 8.18% |
| 2016 | 21,047,016 | 120,892 | 112,033 | 536,787 | 7.8% | 10.5% | $15.76 | $128 | 7.88% |
| 2015 | 20,934,983 | 121,017 | 802,125 | 1,105,825 | 9.9% | 11.8% | $14.70 | $122 | 7.90% |

## Supply & Demand

The Market has 22.3 million square feet of office space, and developers have added, net of demolitions, 1.7 million square feet over the past ten years, increasing inventory by 8.0% during that time. Despite an increase in supply over the past ten years, absorption levels have outpaced it, and vacancy rates are lower than they were a decade ago, compressing from 9.9% to 5.1%.

Despite an increase in inventory levels over the past year, demand has outpaced it, and vacancy rates have compressed 28 bps over the past year from 5.4% to 5.1%, remaining below the 10-year average of 6.3%, and below the National average by 880 bps. With 38.1k square feet vacated in 2025 Q1, vacancy rates have increased 18 bps over the past quarter. In the first quarter, office tenants in the Market vacated 38.1k square feet, a decrease from the 2.2k square feet vacated in 2024 Q4, but an improvement from the -99.2k square feet vacated in the same quarter last year. However, much of that can be attributed to a two-building medical office user sale in the third quarter of last year. Since then, the market has recorded less than 30,000 SF of absorption.

Vacancy Rates

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 24 Q4 | 25 Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| National | 10.1% | 9.7% | 9.6% | 9.3% | 9.4% | 10.7% | 11.8% | 12.3% | 13.4% | 13.9% | 13.9% |
| Market | 9.9% | 7.8% | 6.3% | 7.0% | 6.0% | 6.1% | 4.3% | 4.3% | 4.9% | 4.9% | 5.1% |
| Class A | 14.8% | 13.1% | 12.4% | 12.7% | 8.6% | 8.7% | 8.5% | 7.3% | 6.1% | 6.2% | 7.1% |
| Class B | 10.1% | 7.6% | 6.2% | 6.0% | 6.2% | 6.6% | 4.2% | 4.7% | 5.5% | 5.4% | 5.3% |
| Class C | 7.2% | 5.9% | 3.4% | 6.9% | 4.2% | 3.5% | 2.4% | 1.9% | 2.7% | 2.9% | 3.5% |



Source: CoStar

## Rents

At $27.44/SF, rents in the Fort Myers Market are roughly 24% lower than the National average of $35.97/SF. Rents vary throughout the Market. Class A space is at a premium with a rate of $30.90/SF, followed by $27.09/SF for Class B and $26.40/SF for Class C space. Rents in the Market have grown 8.6% per annum over the past decade, exceeding the National average, where rents increased 2.1% per annum during that time.

Market Rents

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 24 Q4 | 2025 Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| National | $30.59 | $31.66 | $32.49 | $33.55 | $34.90 | $34.27 | $34.55 | $35.05 | $35.47 | $35.91 | $35.97 |
| Market | $14.70 | $15.76 | $16.40 | $17.49 | $17.76 | $18.87 | $20.84 | $22.86 | $25.84 | $27.44 | $27.44 |
| Class A | $15.07 | $16.33 | $16.55 | $17.90 | $18.42 | $20.16 | $23.53 | $26.40 | $29.65 | $31.09 | $30.90 |
| Class B | $15.10 | $16.12 | $16.88 | $17.85 | $18.00 | $19.05 | $20.78 | $22.67 | $25.57 | $27.05 | $27.09 |
| Class C | $13.39 | $14.46 | $15.02 | $16.27 | $16.71 | $17.65 | $19.48 | $21.32 | $24.38 | $26.39 | $26.40 |

Prior to the pandemic, the Fort Myers Office Market experienced softening rent growth. In 2019 Q4, annual rent growth in the Market softened below the previous quarter, and was below the historical average, with annual growth of 1.5%. With demand softening during the initial stages of the pandemic, quarterly rent growth decreased 0.1% in 2020 Q2. By the end of 2020, rents increased 6.2% from the 2019 Q4 rent level of $17.76/SF. From 2019 Q4 to 2021 Q4, rents increased 17.3%. Quarterly rent growth in 2025 Q1 stalled, softening annual growth to 3.0%.




*Source: CoStar*

## Construction & Future Supply

Developers have been active for much of the past ten years. In fact, they have added 2.2 million square feet to the Market over that time, expanding inventory by 8.0%. Developers remain active in the Market, but elevated construction and debt costs have slowed the pipeline to 25.9k square feet, or the equivalent of 0.1% of existing inventory, underway. Demand in the Fort Myers Market has outpaced new deliveries over the past year but could slow along with softening economic growth.




*Source: CoStar*

## Capital Markets

Investors have been active in the Market over the past three years. During that time, investors have closed on average 108 transactions per year with an annual average sales volume of $179.1 million. Over the past year, there were 107 closed transactions across 1 million square feet, for a total sales volume of $185.2 million. As of 2025 Q1, CoStar data indicates there were 25 transactions for a total sales volume of $24.5 million, compared to $35.6 million in the previous quarter. Office transactions are typically on the smaller side here, with a $1.8 million average sale price over the past year. Larger transactions do occur and have typically been medical office trades. For instance, Family Health Centers of Southwest Florida purchased two medical office buildings for $15.5 million ($190/SF) in September 2024 in a user sale. Investors have also shown interest in medical office buildings in the Fort Myers area over the past year. A local investor purchased a 2019-built dentist's office for $2.9 million at a 6.1% cap rate.



Source: CoStar

Market pricing, based on the estimated price movement of all properties in the Market, is currently $190/SF. Values have increased 3.6% over the past year and 0.4% in 2025 Q1. Capitalization rates increased 5 bps over the past year to 8.5% and increased 1 bps in Q1.




*Source: CoStar*

## Outlook

Office demand remains well below pre-pandemic levels. Many office markets are contending with elevated vacancy and availability rates. This is occurring at a time of a looming recession, which has resulted in layoffs from many companies, slowing the recovery for the sector.

Office market conditions in the Fort Myers Market indicate growing demand that has outpaced an increase in inventory. With positive absorption, vacancy rates have compressed over the past year. With vacancy rates compressing, quarterly rent growth stalled, softening annual growth to 3.0%. Looking ahead to the near term, it is likely that tenant demand remains active, outpacing the small pipeline, putting downward pressure on vacancy rates, improving rent growth.

## Appendix

Fort Myers Office Market Overview

| Submarket | Inventory SF | Vacancy Rate | Availability Rate | Under Construction SF | Market Rent/SF | Market Sale Price Per SF | Market Cap Rate |
|---|---|---|---|---|---|---|---|
| S Ft Myers/San Carlos | 9,428,995 | 7.8% | 8.1% | 12,000 | $27.44 | $197 | 8.34% |
| City of Ft Myers | 5,387,719 | 3.1% | 4.1% | 0 | $26.59 | $162 | 8.55% |
| Cape Coral | 2,925,826 | 1.5% | 2.2% | 13,900 | $26.48 | $190 | 8.27% |
| Bonita Springs | 2,439,861 | 5.4% | 6.6% | 0 | $29.86 | $199 | 8.91% |
| Estero | 1,031,493 | 3.4% | 3.8% | 0 | $28.48 | $219 | 8.59% |
| Lehigh | 532,055 | 0.9% | 0.9% | 0 | $28.13 | $217 | 8.28% |
| North Ft Myers | 296,813 | 1.6% | 6.4% | 0 | $27.11 | $160 | 8.64% |
| The Islands | 211,539 | 4.5% | 5.3% | 0 | $28.48 | $291 | 8.14% |

# Lee County Area Analysis

The following analysis includes pertinent aspects of the surrounding region as it pertains to the subject property. This report was compiled using data as of 2024 Q4 unless otherwise noted. Data is from a number of sources including the U.S. Bureau of Labor Statistics ("BLS"), the U.S. Bureau of Economic Analysis ("BEA"), and the U.S. Census Bureau.




*Source: Google Maps*

## Lee County at a Glance

Lee County, FL is located in southwestern Florida and is known for its beaches, waterways, and outdoor recreational opportunities. The county encompasses the cities of Fort Myers, Cape Coral, and Bonita Springs, as well as several smaller communities. Lee County is primarily suburban, with a growing population and a robust economy. The economy of Lee County is driven by tourism, real estate, and healthcare. The county is a popular destination for visitors, with its abundant outdoor recreation opportunities, including its many beaches and parks. Real estate is also a major industry, with many homes and properties available for purchase or rental in the county. Healthcare is also an important sector, with several major hospitals and medical facilities located in the area. The housing options in Lee County are diverse, with everything from single-family homes to luxury condominiums and apartments available. The retail and business options are similarly diverse, with a wide range of shopping, dining, and entertainment options available. Community parks and recreation areas are abundant, providing residents and visitors with opportunities to enjoy the county's natural scenery and engage in outdoor activities. Local corridors and major roads in Lee County include US 41, I-75, and the Caloosahatchee River, which connect the county to other parts of Florida and the southeast United States. The county does not have any train service, but there is public transit bus service provided by the LeeTran system. The nearest major airport is Southwest Florida International Airport, located in Fort Myers, which serves Lee County and the surrounding areas.

Area Fundamentals

| Attribute | County Level Value | 5 Year Annualized Growth Rate | Relative to Baseline (MSA) |
|---|---|---|---|
| Employment | 365,211 | 1.4% | Equal to MSA |
| GDP | $40.4 billion | 4.8% | Equal to MSA |
| Population | 834,573 | 2.1% | Equal to MSA |
| Per Capita Personal Income | $65,878 | 4.9% | Equal to MSA |

## Labor Market Conditions

The latest data from the 2024 Q2 Quarterly Census of Employment and Wages, Lee County employed 291,451 employees. Establishments in the Trade, Transportation, & Utilities, Education & Health Services, and Construction industries accounted for the top three employers. These industries employ 59,293 (20.3%), 59,123 (20.2%), and 41,682 (14.3%) workers in the County, respectively. Lee County has an especially large share of workers in the Construction industry. In fact, its 14.3% fraction of workers is 2.7 times higher than the National average.

County Employment Composition & Wages by Industry (2024 Q2)




*Source: U.S. Bureau of Labor Statistics*

At the onset of the pandemic last spring, Lee County area employers shed 20.7% of their workforce, expanding the unemployment rate from 2.7% in February 2020 to 13.9% just two months later. The unemployment rate in Lee County has remained stable over the past year at 3.1%, equal to the Cape Coral-Fort Myers rate. As of 12/24, total employment is down 0% on a year-over-year basis. The unemployment rate remains above its pre-pandemic level (Feb 2020) of 2.7%.




*Source: U.S. Bureau of Labor Statistics*

According to the latest data from the Q2 2024 Quarterly Census of Employment and Wages, Lee County has experienced private employment expand 12.5% (27,890) in total over the last five years. During that time, the Construction, Manufacturing, and Information industries saw the strongest growth, expanding 30.3%, 28.7%, and 20.1%, respectively. Meanwhile, the Leisure & Hospitality Industry has experienced employment collapse of 0.3% over the previous five years.




*Source: U.S. Bureau of Labor Statistics*

## Economic Production




*Source: U.S. Bureau of Economic Analysis*

## Demographics

Going back ten years, Lee County's population has expanded 2.6% per annum to the 2023 count of 834,573. Over the past five years, growth has declined, growing 2.1% per annum since 2018. This growth rate exceeds the Nation, which has expanded 0.6% per year over the last five years.

Going back five years, Lee County residents' per capita personal income has expanded 4.9% per annum to the 2023 level of $65,878. Over the past three years, growth has declined, growing 4.1% per annum since 2020. This growth rate lags the Nation, which has expanded 5.8% per year over the last three years.

United States Florida Lee County







*Source: U.S. Census Bureau*

## Infrastructure

**Transportation Methods**

- The major corridors of Lee County include Interstate 75 and State Road 82, U.S. Route 41, and Colonial Boulevard, which provide access to Fort Myers and Cape Coral, the major cities in Lee County.
- Lee County is not served by any commuter or light rail lines.
- The Lee County Transit Department provides fixed-route bus service, which is operated as "LeeTran." Several routes extend outward from the Downtown Intermodal Transfer Center; in addition, suburb-to-suburb routes are operated, as is park-and-ride service to and from Fort Myers Beach and Southwest Florida International Airport.
- The nearest major airport is Southwest Florida International Airport, located in Fort Myers, which serves Lee County and the surrounding areas.

## Housing

In 2021, historically low mortgage rates, the desire for more space, and the ability for many to work from home, led to an increase in demand for housing. This, combined with historically low inventory levels, accelerated the growth in values, pushing the medium listing price in the US to a peak of $413,000 in June 2022. However, with persistent inflation, the Fed hiked interest rates at a record pace over the 2nd half of 2022 and for much of 2023, eroding housing affordability and dropping demand considerably. With demand decreasing across many metros, values have either declined or experienced limited growth in 2023. Demand has improved since though, with growth in values aided by limited inventory in some metros.

In Lee County, Realtor.com data points to negative growth in values over the past year. As of 01/2025, the median home list price sits at $439,900, a decrease of 8.5% compared to a decrease of 8.5% for the Cape Coral-Fort Myers Metro, and a decrease of 2.2% across the Nation over the past year. The county median list price has experienced an increase of 2.3% over the past 3 months, compared to an increase of 2.3% for the Cape Coral-Fort Myers Metro in the same period.




*Source: Realtor.com*

## Outlook

The United States economy has recovered from the pandemic, but, with persistent levels of inflation, the Fed repeatedly reaffirmed its commitment to fighting inflation by raising rates, softening economic growth. While the economy remains strong, their actions have led to a slowdown in growth, setting the stage for a mild recession in 2024.

The current unemployment rate in Lee County of 3.1% is below its five-year average. By contrast, that rate is also below the state rate of 3.4%, and below the national rate of 4.1%. Lee County continues to experience population gains with one- and five-year annual growth rates of 1.5% and 2.1%. Considering its strong positive growth relative to the nation as a whole over the five years prior to the pandemic, its diversified economy, and its continuously growing population, the county boasts all the attributes necessary for near- and long-term growth.

## Contingent & Limiting Conditions

1. Any legal description or plats reported herein are assumed to be accurate. Any sketches, surveys, plats, photographs, drawings or other exhibits are included only to assist the intended user to better understand and visualize the subject property, the environs, and the competitive data. We have made no survey of the property and assume no responsibility in connection with such matters.
2. The appraiser has not conducted any engineering or architectural surveys in connection with this appraisal assignment. Information reported pertaining to dimensions, sizes, and areas is either based on measurements taken by the appraiser or the appraiser's staff or was obtained or taken from referenced sources and is considered reliable. No responsibility is assumed for the costs of preparation or for arranging geotechnical engineering, architectural, or other types of studies, surveys, or inspections that require the expertise of a qualified professional.
3. No responsibility is assumed for matters legal in nature. Title is assumed to be good and marketable and in fee simple unless otherwise stated in the report. The property is considered to be free and clear of existing liens, easements, restrictions, and encumbrances, except as stated.
4. Unless otherwise stated herein, it is assumed there are no encroachments or violations of any zoning or other regulations affecting the subject property and the utilization of the land and improvements is within the boundaries or property lines of the property described and that there are no trespasses or encroachments.
5. Bowery Real Estate Systems, Inc. assumes there are no private deed restrictions affecting the property which would limit the use of the subject property in any way.
6. It is assumed the subject property is not adversely affected by the potential of floods; unless otherwise stated herein.
7. It is assumed all water and sewer facilities (existing and proposed) are or will be in good working order and are or will be of sufficient size to adequately serve any proposed buildings.
8. Unless otherwise stated within the report, the depiction of the physical condition of the improvements described herein is based on visual inspection. No liability is assumed for the soundness of structural members since no engineering tests were conducted. No liability is assumed for the condition of mechanical equipment, plumbing, or electrical components, as complete tests were not made. No responsibility is assumed for hidden, unapparent or masked property conditions or characteristics that were not clearly apparent during our inspection.
9. If building improvements are present on the site, no significant evidence of termite damage or infestation was observed during our physical inspection, unless so stated in the report. No termite inspection report was available, unless so stated in the report. No responsibility is assumed for hidden damages or infestation.
10. Any proposed or incomplete improvements included in this report are assumed to be satisfactorily completed in a workmanlike manner or will be thus completed within a reasonable length of time according to plans and specifications submitted.
11. No responsibility is assumed for hidden defects or for conformity to specific governmental requirements, such as fire, building, safety, earthquake, or occupancy codes, except where specific professional or governmental inspections have been completed and reported in the appraisal report.
12. Responsible ownership and competent property management are assumed.
13. The appraisers assume no responsibility for any changes in economic or physical conditions which occur following the effective date of value within this report that would influence or potentially affect the analyses, opinions, or conclusions in the report. Any subsequent changes are beyond the scope of the report.
14. The value estimates reported herein apply to the entire property. Any proration or division of the total into fractional interests will invalidate the value estimates, unless such proration or division of interests is set forth in the report.
15. Any division of the land and improvement values estimated herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application.

16. Unless otherwise stated in the report, only the real property is considered, so no consideration is given to the value of personal property or equipment located on the premises or the costs of moving or relocating such personal property or equipment.

17. Unless otherwise stated, it is assumed that there are no subsurface oil, gas or other mineral deposits or subsurface rights of value involved in this appraisal, whether they are gas, liquid, or solid. Nor are the rights associated with extraction or exploration of such elements considered; unless otherwise stated. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

18. Any projections of income and expenses, including the reversion at time of resale, are not predictions of the future. Rather, they are our best estimate of current market thinking of what future trends will be. No warranty or representation is made that these projections will materialize. The real estate market is constantly fluctuating and changing. It is not the task of an appraiser to estimate the conditions of a future real estate market, but rather to reflect what the investment community envisions for the future in terms of expectations of growth in rental rates, expenses, and supply and demand. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

19. Unless subsoil opinions based upon engineering core borings were furnished, it is assumed there are no subsoil defects present, which would impair development of the land to its maximum permitted use or would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

20. Bowery Real Estate Systems, Inc. representatives are not experts in determining the presence or absence of hazardous substances, defined as all hazardous or toxic materials, wastes, pollutants or contaminants (including, but not limited to, asbestos, PCB, UFFI, or other raw materials or chemicals) used in construction or otherwise present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such substances or for loss as a result of the presence of such substances. Appraisers are not qualified to detect such substances. The client is urged to retain an expert in this field.

21. We are not experts in determining the habitat for protected or endangered species, including, but not limited to, animal or plant life (such as bald eagles, gophers, tortoises, etc.) that may be present on the property. We assume no responsibility for the studies or analyses which would be required to determine the presence or absence of such species or for loss as a result of the presence of such species. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent endangered species impact studies, research, and investigation that may be provided.

22. No environmental impact studies were either requested or made in conjunction with this analysis. The appraiser hereby reserves the right to alter, amend, revise, or rescind any of the value opinions based upon any subsequent environmental impact studies, research, and investigation that may be provided.

23. The appraisal is based on the premise that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in the report; further, that all applicable zoning, building, and use regulations and restrictions of all types have been complied with unless otherwise stated in the report; further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

24. Neither all nor any part of the contents of this report or copy thereof, shall be conveyed to the public through advertising, public relations, news, sales, or any other media, without the prior written consent and approval of the appraisers. This limitation pertains to any valuation conclusions, the identity of the analyst or the firm and any reference to the professional organization of which the appraiser is affiliated or to the designations thereof.

25. Although the appraiser has made, insofar as is practical, every effort to verify as factual and true all information and data set forth in this report, no responsibility is assumed for the accuracy of any information furnished the appraiser either by the client or others. If for any reason, future investigations should prove any data to be in substantial variance with that presented in this report, the appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or estimates of value.

26. If this report has been prepared in a so-called "public non-disclosure" state, real estate sales prices and other data, such as rents, prices, and financing, are not a matter of public record. If this is such a "non-disclosure" state, although extensive effort has been expended to verify pertinent data with buyers, sellers, brokers, lenders, lessors, lessees, and other sources considered reliable, it has not always been possible to independently verify all significant facts. In these instances, the appraiser may have relied on verification obtained and reported by appraisers outside of our office. Also, as necessary, assumptions and adjustments have been made based on comparisons and analyses using data in the report and on interviews with market participants. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

## Subject Property Photos

All subject photos were taken on the date of value of this appraisal.

Exterior



Exterior



Exterior



Exterior



Exterior




Exterior



Exterior



Exterior



Exterior



Exterior



Exterior



Exterior



Exterior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior



Interior




Subject Street



Subject Street



Subject Street



Subject Street



# Map Gallery

## Flood Map



## Zoning Map



# Comparable Sales Outlines

Comparable Sale 1




**1**

**13775 Plantation Road, Fort Myers, FL 33912**

| | | | |
|---|---|---|---|
| **Grantee** | | | BOS Plantation LLC |
| **Grantor** | | | CAM Plantation LLC |
| **Sale No.** | | | 2024000152833 |
| **GBA (SF)** | | | 16,736 |
| **Parcel ID** | 19-45-25-27-00003.0000 | **NOI** | $285,000 |
| **Year Built** | 2009 | **Cap Rate** | 7.50% |
| | | **Sale Date** | 5/28/2024 |
| | | **Sale Price** | $3,800,000 |
| | | **Price Per SF** | $227 |

This is the sale of a two-story medical office building located on Plantation Road in Fort Myers, FL. The property, built in 2009, contains 16,736 square feet of GBA. This property most recently sold on May 28, 2024 for $3,800,000 or $227/SF of gross building area. The building is masonry construction. The property has several office rooms and a restroom. The sale was researched on CoStar and verified by the listing broker, Adam Palmer.

Comparable Sale 2



**2**

**3840 Colonial Boulevard, Fort Myers, FL 33966**

| | | | |
|---|---|---|---|
| **Grantee** | | | Cwh Holdings LLC |
| **Grantor** | | | Pynk Properties LLC |
| **Sale No.** | | | 2024000063637 |
| **GBA (SF)** | | | 6,000 |
| **Parcel ID** | 32-44-25-P4-00100.003A | **NOI** | Not Reported |
| **Year Built** | 1995 | **Cap Rate** | NA |
| | | **Sale Date** | 2/29/2024 |
| | | **Sale Price** | $1,750,000 |
| | | **Price Per SF** | $292 |

This is the sale of a one-story medical office building located on Colonial Boulevard in Fort Myers, FL. The property, built in 1995, contains 6,000 square feet of GBA. This property most recently sold on February 29, 2024 for $1,750,000 or $292/SF of gross building area. The building is reinforced concrete construction. The property has several office rooms and a restroom. The sale was researched on CoStar and verified by the listing broker, Randy L. Krise.

Comparable Sale 3



**3**

**5248 Red Cedar Drive, Fort Myers, FL 33907**

| | | | |
|---|---|---|---|
| **Grantee** | Lee County Florida | | |
| **Grantor** | Blushwood Land Development | | |
| **Sale No.** | 2023000392089 | | |
| **GBA (SF)** | 12,432 | | |
| **Parcel ID** | 02-45-24-P4-02700.0070 | **NOI** | Not Reported |
| **Year Built** | 2000 | **Cap Rate** | NA |
| | | **Sale Date** | 12/14/2023 |
| | | **Sale Price** | $2,800,000 |
| | | **Price Per SF** | $225 |

This is the sale of a one-story medical office building located on Red Cedar Drive in Fort Myers, FL. The property, built in 2000, contains 12,432 square feet of GBA. This property most recently sold on December 14, 2023 for $2,800,000 or $225/SF of gross building area. The building is reinforced concrete construction. The property has several office rooms and a restroom. The sale was researched on CoStar and verified by the listing broker, Thomas Pepitone.

Comparable Sale 4



**4**

**657 Del Prado Boulevard S., Cape Coral, FL 33990**

| | | | |
|---|---|---|---|
| **Grantee** | Del Prado South Investments LLC | | |
| **Grantor** | D B F Partnership | | |
| **Sale No.** | 000000326928 | | |
| **GBA (SF)** | 7,013 | | |
| **Parcel ID** | 17-44-24-C4-01296.0250 | **NOI** | Not Reported |
| **Year Built** | 1987 | **Cap Rate** | NA |
| | | **Sale Date** | 10/5/2023 |
| | | **Sale Price** | $2,200,000 |
| | | **Price Per SF** | $314 |

This is the sale of a one-story medical office building located on Del Prado Boulevard S. in Cape Coral, FL. The property, built in 1987, contains 7,013 square feet of GBA. This property most recently sold on October 5, 2023 for $2,100,000 or $314/SF of gross building area. The building is reinforced concrete construction. The property has several office rooms and a restroom. The sale was researched on CoStar and verified by Lee County public records.

# Qualifications

## Scott M. Powell, MAI

Managing Director

### Experience

Scott M. Powell, MAI, is the Managing Director of the Florida office for Bowery Valuation. Scott has been a Managing Director with Cushman & Wakefield and Integra Realty Resources, operated his own firm The SMP Group, and worked with other independent firms.

Scott entered the appraisal profession in 1992 at an independent firm in Erie, PA and joined the Appraisal Institute in 1995. He completed his MAI designation requirements in 2001, and in 2002 was invited by the Appraisal Institute to serve on the prestigious General Comprehensive Examination Subcommittee. Scott relocated to Florida (the Treasure Coast) in 2004 and has worked all over Florida.

Scott gained his clients' trust through attention to detail and thorough research, and by routinely applying advanced methods of analysis over a broad scope of work. He has extensive practical knowledge in market analyses/feasibility studies, consulting and market value appraisal reports for lending, litigation (including expert witness testimony), tax appeals and condemnation.

Scott is actively engaged in all aspects of appraisal practice, including appraisal and analysis of various types of properties, such as multifamily, office, industrial, retail and mixed-use, gas stations & convenience stores, various net leased properties, self-storage, marinas, golf courses, health clubs, other private clubs (e.g., tennis centers), and short-term rentals. He has extensive experience appraising all types of development sites, especially residential subdivisions (large and small), and regularly appraises going concerns. His clients include numerous banks/financial institutions, government institutions, attorneys, developers and private investors.

### Education

| | |
|---|---|
| **Pennsylvania State University** | Bachelor of Science, 1987 |

### Certifications & Professional Designations

| | | |
|---|---|---|
| **Appraisal Institute** | MAI, Designated Member<br>Scott is currently certified by the Appraisal Institute's voluntary program of continuing education for its designated members. | |
| **Certified General Real Estate Appraiser** | State of Florida (# RZ2809)<br>State of Arizona (# CGA-1042701)<br>State of Colorado (# CG200003172)<br>State of Louisiana (# APR.05078-CGA)<br>State of Nevada (# A.0208653-CG)<br>State of Tennessee (# 6498) | State of Alabama (# 3142)<br>State of Arkansas (# CG-5082)<br>State of Georgia (# 420747)<br>State of Mississippi (# GA-1467)<br>State of Oklahoma (#13773CGA)<br>State of Texas (# TX 1381272 G) |

### Professional Affiliations/Service

| | |
|---|---|
| **Appraisal Institute** | General Comprehensive Examination Subcommittee, Appraisal Institute<br>National Experience Review Panels, Appraisal Institute<br>University Relations Committee, Appraisal Institute South Florida Chapter<br>Candidate Guidance Committee, Appraisal Institute South Florida Chapter<br>President, Northwestern Pennsylvania Chapter, Appraisal Institute |
| **Litigation / Expert Witness** | State of Florida: 1st, 10th, 11th, 12th, 15th, 16th and 19th Circuit Courts<br>United States Bankruptcy Court, Southern District of Florida<br>Broward and Indian River Counties - Valuation Adjustment Boards |

## Harry C Newstreet, MAI

Senior Vice-President

### Experience

Harry C Newstreet is a Senior Vice-President at Bowery Valuation who joined the firm in June 2021. Mr. Newstreet can perform a wide variety of real estate services that cover the entire spectrum of the real estate appraisal field including property appraisal, acquisition, feasibility, development and counseling, as well as in specialized areas such as expert witness testimony in condemnation for right-of-way, valuation, tax problems and other real estate matters. Mr. Newstreet has completed both form and narrative appraisals of nearly every variety of residential and commercial property, including a specialty in outdoor advertising.

Before joining Bowery, Mr. Newstreet owned and operated his own appraisal firm. He is qualified as an expert witness in Federal and State Courts in Florida, North Carolina and Pennsylvania and has performed appraisal services in the following states; Florida, Georgia, New York, New Hampshire, North Carolina, South Carolina, Tennessee, Kentucky, Washington, Alabama, Pennsylvania, Texas, Virginia, Wisconsin and Michigan.

### Education

| | |
|---|---|
| Florida State University | Bachelor of Science – December 1989 |
| Appraisal Institute | Numerous appraisal related seminars and classes |
| | Certified by the Appraisal Institute for Continuing Education |

### Instructor

| | |
|---|---|
| Florida Atlantic University | Former Adjunct Professor, College of Business, Real Estate Section |

### Publications and Lectures

| | |
|---|---|
| Appraisal Journal | Smoothing Wrinkles in the Spread: Special Assessment Issues, April 2000 |
| SFWMD Seminar | The Development Timeline, May 2004 |
| FAR Convention | Appraisal Issues in CRA's, September 2004 |

### Certifications & Professional Designations

| | |
|---|---|
| Appraisal Institute | MAI, Designated Member |
| Certified General Real Estate Appraiser | Florida RZ2278 |

### Experience

| | |
|---|---|
| 1993 - 1994 | Pederson & Trask |
| 1995 | Rex Consulting |
| 1996 - 1998 | Real Property Analysts, Inc. |
| 1998 - 2004 | Newstreet-Miller & Associates |
| 2005 – 2011 | Harry C. Newstreet & Associates, LLC |
| 2011 - 2015 | Integra Realty Resources |
| 2015 - 2016 | Cushman & Wakefield |
| 2016 - 2021 | Harry C. Newstreet & Associates, LLC |
| 2021 - Present | Bowery Valuation |

## Jason Telsey

Valuation Associate

### Experience

Jason Telsey is a Valuation Associate at Bowery Valuation who joined the firm in January 2022. Jason is actively engaged in appraising mixed-use and multifamily properties in Florida.

Before joining Bowery, Jason served as a Compliance Intern at Provident Bank based in New Jersey. He is a member of the Young Real Estate Professionals in New York.

### Education

| | |
|---|---|
| **Indiana University, Kelley School of Business** | Bachelor of Science with a concentration in Finance and International Business |
| **Appraisal Classes** | Basic Appraisal Principles<br>Basic Appraisal Procedures<br>15-hr National USPAP Course<br>Supervisor-Trainee Course for Florida<br>Florida Trainee Appraiser Subject Matter Electives |

### Certifications & Professional Designations

## License

Scott M. Powell, MAI – State Certified General Real Estate Appraiser– Florida

Ron DeSantis, Governor

Melanie S. Griffin, Secretary

Florida dbpr

STATE OF FLORIDA
DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED GENERAL APPRAISER HEREIN IS CERTIFIED UNDER THE PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

**POWELL, SCOTT**
1200 UNIVERSITY BLVD
SUITE 104
JUPITER FL 33458

LICENSE NUMBER: RZ2809
EXPIRATION DATE: NOVEMBER 30, 2026
Always verify licenses online at MyFloridaLicense.com

ISSUED: 10/08/2024
Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

Harry C. Newstreet, MAI, State Certified General Appraiser– Florida

Ron DeSantis, Governor

Melanie S. Griffin, Secretary

Florida dbpr

STATE OF FLORIDA
DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

FLORIDA REAL ESTATE APPRAISAL BD

THE CERTIFIED GENERAL APPRAISER HEREIN IS CERTIFIED UNDER THE PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

**NEWSTREET, HARRY C**
1200 UNIVERSITY BLVD
SUITE 104
JUPITER FL 33458

LICENSE NUMBER: RZ2278
EXPIRATION DATE: NOVEMBER 30, 2026
Always verify licenses online at MyFloridaLicense.com

ISSUED: 10/24/2024
Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

Jason Telsey – Trainee Appraiser- Florida

Ron DeSantis, Governor

Melanie S. Griffin, Secretary

Florida dbpr

**STATE OF FLORIDA**
**DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION**

**FLORIDA REAL ESTATE APPRAISAL BD**

THE REGISTERED TRAINEE APPRAISER HEREIN HAS REGISTERED UNDER THE PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

**TELSEY, JASON**

520 COLEMAN PL
WESTFIELD NJ 07090

**LICENSE NUMBER: RI25591**

**EXPIRATION DATE: NOVEMBER 30, 2026**

Always verify licenses online at MyFloridaLicense.com

ISSUED: 11/13/2024

Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.