**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

# REPLY IN SUPPORT OF SIMAD DEBTORS' EMERGENCY MOTION REQUESTING A DETERMINATION OF CERTAIN TAX WITHHOLDING OBLIGATIONS PURSUANT TO THE FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT OF 1980

TO: THE HONORABLE JUDGE CHRISTINE M. GRAVELLE
CHIEF UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "SIMAD Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") submit this reply to

[1] A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

the *United States' Response to Motion for Tax Determination* [Docket No. 1286] (the "Objection") and in further support of the *SIMAD Debtors' Emergency Motion Requesting a Determination of Certain Tax Withholding Obligations Pursuant to the Foreign Investment in Real Property Tax Act of 1980* [Docket No. 1141] and the supplement in support of the motion [Docket No. 1279] (together, the "Motion").[2]

**PRELIMINARY STATEMENT**

1. The United States, through its misguided Objection, seeks to destroy all of the SIMAD Debtors' extraordinary efforts and anticipated plan confirmation. Thus, the Objection must be overruled. As set forth in the Motion, the SIMAD Debtors seek a determination that the Exempt Entities, seven (7) of the SIMAD Debtors' camps, qualify for an exception under the Foreign Investment in Real Property Tax Act of 1980 (including IRC §§ 897 and 1445 and the Treasury Regulations thereunder, "FIRPTA") that eliminates any tax withholding obligations associated with the sale of such Exempt Entities' assets. The requested relief concerns only withholding requirements and will have no effect on the amount of tax ultimately due, if any. To be clear, the SIMAD Debtors do not seek to enjoin, impair, or otherwise restrict the collection of any tax that may be determined to be owed. Instead, the SIMAD Debtors are asking the Court to apply an exception to FIRPTA withholding that already exists in the FIRPTA regulations.

2. The United States objects to the Motion asserting, *inter alia*, that: (i) the Court lacks jurisdiction to grant the requested relief; (ii) the procedures established under FIRPTA cannot be employed to grant such relief; (iii) the requested relief improperly shifts the risk of administrative insolvency from the estates to the IRS; and (iv) purchasers of Exempt Entity assets are not entitled to the protections afforded by section 363(m) of the Bankruptcy Code.

[2] Capitalized terms used but not defined in this Motion have the meaning ascribed to them in the Motion.

3. The facts here are critical and undisputed. For FIRPTA purposes, SIMAD Holdings, Ltd. ("SIMAD Holdings") is the relevant transferor and the entity against which any resulting tax liability would arise. SIMAD Holdings owns directly or indirectly 100% of the Exempt Entities. As set forth in the Motion, the assets of each of the Exempt Entities are fully encumbered by valid and perfected liens and mortgages. Additionally, there are significant administrative and unsecured claims against the Exempt Entities. The secured claims against the Exempt Entities exceed the proceeds from the sale of the Exempt Entities' assets. Not a single dollar of sale proceeds of the subsidiary Exempt Entities will accrue or be distributed to their parent, SIMAD Holdings.

4. The United States nevertheless effectively asks the Court to disregard fundamental bankruptcy priority principles and elevate the IRS's *potential* administrative claim against the Exempt Entities' ultimate parent and tax obligor, SIMAD Holdings, simply because it is a foreign entity. The IRS cites no authority under relevant bankruptcy law for such extraordinary treatment because none exists.

5. Under the Bankruptcy Code's priority scheme, the Exempt Entities must satisfy their own creditors in full, including valid perfected mortgage liens on each of the Exempt Entities' real property, before any value can be distributed upstream to SIMAD Holdings. The United States' position would impermissibly circumvent the Bankruptcy Code's absolute priority rule. The Internal Revenue Code does not elevate FIRPTA withholding with a super priority over a mortgagee's senior secured interest in real property under the Bankruptcy Code. Similarly, the Bankruptcy Code does not permit an administrative expense claim of a parent company to prime valid mortgages, liens and claims on a subsidiary's asset. The United States nevertheless contends

that FIRPTA withholding must be taken from gross sale proceeds before mortgages of the Exempt Entities are satisfied in full.

6. The United States' position would produce an anomalous and legally unsupported result. Mortgagees of the Exempt Entities have perfected liens securing hundreds of millions of dollars, yet the United States could take a percentage of the proceeds of the collateral securing that debt simply by labeling that payment a FIRPTA withholding obligation. The practical effect of the United States' position is that purchasers of the Exempt Entities' assets would be required to withhold up to fifteen percent (15%) of the sale proceeds allocated to Real Property Assets on account of a potential tax obligation attributable to SIMAD Holdings. While the Exempt Entities and the purchasers are still in the process of determining the allocation of sale proceeds, assuming 50% of the proceeds for each of the sales are ultimately allocated to Real Property Assets (i.e. $92 million of the $184 million of the total sale proceeds), the withholding would be in excess of **$13.5 million** dollars. Such a result would have devastating consequences for the Exempt Entities' estates. The diversion of millions of dollars in sale proceeds would materially impair the Exempt Entities' ability to consummate a successful restructuring, satisfy secured and other creditor claims, and emerge from Chapter 11.

7. The Court undoubtedly has jurisdiction over this dispute. The relief sought falls squarely within the Court's authority to determine tax issues affecting the administration of the Debtors' estates and to adjudicate matters concerning the allowance, treatment, and priority of claims. Significantly, the FIRPTA regulations contemplate that a court with jurisdiction over the matter can grant the relief the SIMAD Debtors seek. The United States' jurisdictional objection ignores the practical reality of the relief sought by the SIMAD Debtors.

8. For the reasons set forth herein, the SIMAD Debtors respectfully request that the Court overrule the Objection and grant the Motion.

**SIMAD HOLDINGS' TAX CLASSIFICATION**

9. On or about May 28, 2025, SIMAD Holdings was formed. Prior to the Petition Date, SIMAD Holdings was controlled by its board of directors, which included its beneficial owners David and Michael Shabsels (the "Shabsels"). The Shabsels are the only shareholders of SIMAD Holdings. SIMAD Holdings, a British Virgin Islands corporation and the ultimate parent company of each of the SIMAD Debtors, raised bonds on the Tel Aviv Stock Exchange in December 2025. SIMAD Holdings is a holding company. It neither holds any tangible assets in the British Virgin Islands nor does it conduct any material business there, as all of its operational entities are located in the United States.

10. Under the Shabsels control, SIMAD Holdings entered into, among other things, (i) that certain Debentures (Series A) Deed of Trust, made and entered into on November 27, 2025, (the "Deed of Trust") by and between SIMAD Holdings and Mishmeret Trust Services Ltd. ("Mishmeret"), as trustee, pursuant to which SIMAD Holdings issued bonds (the "Debentures") to certain bondholders and (ii) a loan evidenced by certain promissory notes executed in favor of Mishmeret in the original principal amount of up to $195 million (subject to certain adjustments).[3] *See* Final DIP Order [Docket No. 518] (the "Final DIP Order"). In connection with the issuance of the Debentures, SIMAD Holdings issued a supplementary prospectus dated November 28, 2025 (the "Prospectus"), which made certain representations about the SIMAD Debtors' structure, including that SIMAD Holdings would be classified as a partnership for U.S.

[3] The Debentures have a par value of NIS 620,000,000, which when accounting for the exchange rate as of the Petition Date, amounted to approximately $211,600,000.

federal income tax purposes.[4] The Prospectus specifically explained that "[b]ecause [SIMAD Holdings], a British Virgin Islands corporation, ***<u>has elected</u>*** on IRS Form 8832 to be treated as a partnership for US federal income tax purposes, the US tax law treats the Debentures as issued by a pass-through entity. Accordingly, [SIMAD Holdings] generally will not pay US federal income taxes at the entity level, and US tax obligations generally flow through to the [SIMAD Holdings'] owners." *See* Prospectus, Section 2.9.2.1 (emphasis added).

11. In connection with the Debentures, SIMAD Holdings also issued a separate initial public offering document (the "<u>IPO</u>") which represents that the "[SIMAD Holdings] was incorporated in the British Virgin Islands and is not subject to local income tax in the British Virgin Islands. For U.S. federal income tax purposes, [SIMAD Holdings] ***<u>elected</u>*** to be classified as a partnership by filing IRS Form 8832" and that the income of SIMAD Holdings would pass through to the partners who are liable for any tax. IPO, Art. 7.14.2. (emphasis added). Importantly, the IPO specifically provides that "[t]he ability of the [IRS] to collect federal taxes is limited to the Partners' interests. The IRS cannot directly seize or take control of [SIMAD Holdings] or its assets. Enforcement may be pursued only through liens or levies against the Partners' interests, in accordance with U.S. federal tax law." *Id.* Similarly, the Deed of Trust provides "[SIMAD Holdings] and the entities held by it will not elect to be treated as corporations, but will continue to be treated as a pass-through entity for their owner(s), or as a partnership, as applicable, for U.S. federal income tax purposes." Deed of Trust, § 5.13.[5]

---

[4] Annexed hereto as **<u>Exhibit B</u>** is a copy of the Prospectus.

[5] The IPO and Deed of Trust are written in Hebrew and were translated by AI for the purposes of this Reply. The SIMAD Debtors will provide the copies of the Hebrew versions upon request.

12. In advance of the issuance of the Debentures, in the 2025 tax year, certain of the SIMAD Debtor operating companies were contributed to SIMAD Holdings. To prevent a recognition event due to the contribution to a foreign entity, which would be a taxable event, SIMAD Holdings needed to be recognized as a partnership for U.S. federal income tax purposes, as represented in the Prospectus, Deed of Trust and IPO documents (collectively, the "Offering Documents"). Critically, investors were advised that such tax treatment provided protection to the SIMAD Debtors from the IRS for any tax liability or related tax claims. IPO, Art. 7.14.2

13. Through the course of these Chapter 11 Cases and the various sale transactions consummated by the SIMAD Debtors, the Debtors' restructuring officers discovered that SIMAD Holdings never actually made the election necessary to be treated as a partnership for United States federal income tax purposes and, instead, is subject to the default classification as a corporation even though it was meant to be a pass-through entity based on all its public representations made in the Offering Documents. As a result, if SIMAD Holdings is unsuccessful in seeking retroactive relief to effectuate the intended election, it will be treated as a foreign corporation engaged in U.S. trade or business.

14. This classification has significant tax consequences. Rather than functioning as a pass-through entity, as originally intended and represented to investors, the current tax classification of SIMAD Holdings is, in the absence of corrective action, an association taxable as a corporation. Consequently, SIMAD Holdings, rather than its equity holders, is potentially liable for capital gains taxes arising from the sale of the SIMAD Debtors' camps and other assets. Had SIMAD Holdings been properly classified as a partnership, any taxable gains would have flowed through to its owners, the Shabsels, who would have borne the resulting tax liability. Thus, absent corrective action, SIMAD Holdings may incur tax liabilities on account of gains realized from the

SIMAD Debtors' asset sales which its creditors believed would be taxable to SIMAD Holdings' owners. The SIMAD Debtors are currently analyzing all available options to complete the tax election that was contemplated and represented in the Offering Documents. If the SIMAD Debtors are successful in doing as intended, SIMAD Holdings will have no tax liability and any FIRPTA withholdings could ultimately be applied by the United States to reduce the Shabsels' tax liability, a result that would unfairly prejudice the SIMAD Debtors' bankruptcy estates and their creditors.

15. Putting aside SIMAD Holdings' tax classification, the FIRPTA issues presently before the Court arise solely as a consequence of SIMAD Holdings' status as a potential foreign corporation. Had SIMAD Holdings been organized in the United States, where it conducts its business operations and where all of its assets are located, FIRPTA would have no application to the transactions at issue. The Motion concerns only the Exempt Entities, which are wholly owned, directly or indirectly, by SIMAD Holdings. The remaining SIMAD Debtors are not wholly owned by SIMAD Holdings and, thus, those camp sales are not subject to FIRPTA withholding from the gross sale proceeds. Accordingly, the Court must weigh whether the Bankruptcy Code's distribution and priority scheme should be altered to accommodate a withholding requirement designed to protect the IRS's ability to collect taxes from foreign taxpayers that may otherwise fall outside the reach of the United States tax system, even where the foreign taxpayer itself has here voluntarily submitted to the jurisdiction of this Court, where all of its assets are being administered.

## REPLY

### A. The Court has Jurisdiction over this Matter pursuant to Sections 105 and 505 of the Bankruptcy Code and Pursuant to its Jurisdiction over the Priority of Claims

16. The Court has jurisdiction over this matter pursuant to section 505(a) of the Bankruptcy Code which confers jurisdiction upon the Court to "determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously

assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." 11 U.S.C. § 505(a). In addition to the Court's jurisdiction under section 505 of the Bankruptcy Code, it also has jurisdiction over the IRS to determine other tax issues related to a debtor's bankruptcy estate pursuant to section 105(a). *See In re Majestic Star Casino, LLC*, 716 F.3d 736, 746–47 (3d Cir. 2013) (string citing cases and finding that the bankruptcy court has jurisdiction over the IRS to determine issues related to certain tax elections made pursuant to the IRC).

17. Moreover, pursuant to 28 U.S.C. 157(b)(2), this is a core matter over which this Court has jurisdiction, as the Court is authorized to hear and determine all core matters, including "matters concerning the administration of the estate" and "allowance or disallowance of claims against the estate or exemption from property of the estate." 28 U.S.C. § 157(b)(2)(A) and (B). "The determination of the priority of a claim is within the Bankruptcy Court's exclusive jurisdiction. Jurisdiction over the priority of claims is governed by 28 U.S.C. § 1334(a)." *In re Zachry Holdings, Inc.*, No. 24-90377, 2025 WL 3056951, at *3 (Bankr. S.D. Tex. Oct. 31, 2025). Further, as the Court in *In re Adelphia Commc'ns Corp.*, 307 B.R. 404, 422 (Bankr. S.D.N.Y. 2004) explained, " 28 U.S.C. § 157(b)(2)(B) does not distinguish between pre-petition and post-petition claims, and that it rather broadly provides core jurisdiction for the allowance and disallowance of *claims* against the estate. That is not surprising, as claims of both types seek to recover from the bankruptcy estate *res* (a *res* over which, even under the old Bankruptcy Act, the bankruptcy court had summary jurisdiction), and post-petition claims not only seek to recover from that *res,* but with a priority over creditors who have only pre-petition claims." (emphasis supplied). The court in *Adelphia Commc'ns* further explained that "nothing is more directly at the core of

bankruptcy administration ... than the quantification of all *liabilities* of the debtor." *Id.* (quoting *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 705 (2d Cir. 1995)) (emphasis supplied).[6]

18. Moreover, the Treasury Regulations themselves expressly recognize the authority of a court with jurisdiction over the matter to determine the amount that accrues to the foreign debtor for the purposes of FIRPTA withholding. Treas. Reg. § 1.1445-2(d)(3)(i)(A).

19. Here, there can be no question that the Court has jurisdiction under both the Bankruptcy Code and FIRPTA. The Bankruptcy Court has jurisdiction over the sales of assets, the SIMAD Debtors' property, the distribution of sale proceeds and the claims asserted against the SIMAD Debtors' estates. In that regard, this Court is being asked to determine a tax withholding obligation of the purchasers of assets in Court-approved section 363 sales that have direct implications on the payment of claims and administration of the Exempt Entities' estates.

**B. The Absolute Priority Rule Requires that the Court Overrule the Objection**

20. Under FIRPTA, a transferee acquiring a U.S. real property interest from a foreign transferor is required to withhold and remit to the IRS a percentage of such transferor's amount realized on the transfer, unless an exception applies. *See generally* IRC § 1445(a) and Treas. Reg.

---

6 *See also In re G-I Holdings, Inc.,* 323 B.R. 583, 611 (Bankr. D.N.J. 2005)

> The claims allowance process, which is governed by § 502 of the Bankruptcy Code, is unique to the bankruptcy forum. *In re Dow Corning Corp.,* 215 B.R. at 352. As such, it is generally accepted that this claims allowance process constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(B). *Id. See also Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (holding that the jurisdiction of the bankruptcy court is exclusive of all other courts with respect to the allowance and disallowance of claims); *Southeastern Sprinkler Co. v. Meyertech Corp. (In re Meyertech Corp.),* 831 F.2d 410, 417 (3d Cir. 1987) (noting that the process of allowance or disallowance of claims against the estate is a core proceeding); *Buena Vista Television v. Adelphia Communications Corp. (In re Adelphia Communications Corp.),* 307 B.R. 404, 418 (Bankr. S.D.N.Y. 2004) ( "'Because nothing is more directly at the core of bankruptcy administration ... than the qualification of all liabilities of the debtor, the bankruptcy court[']s determination whether to allow or disallow a claim is a core function") (citation omitted).

*And see, In re PRS Ins. Grp., Inc.,* 335 B.R. 77, 81 (Bankr. D. Del. 2005)*; In re D.M. Barber, Inc.,* 13 B.R. 962, 965 (Bankr. N.D. Tex. 1981) (holding that the bankruptcy court "retains the exclusive jurisdiction to determine the extent to which any such proof of claim should be allowed and priority treatment accorded it under the distribution hierarchy set forth in the Bankruptcy Code.").

§ 1.1445-2. Since each of the Exempt Entities are disregarded "pass-through" entities for tax purposes, SIMAD Holdings is deemed the transferor for tax purposes. This is a legal fiction created under the IRC for the purposes of allocating tax liability. The actual sellers, however, are the Exempt Entities. All creditor claims of the Exempt Entities, including validly perfected liens and mortgages, would need to be satisfied in full before any sale proceeds would be distributed to their parent, SIMAD Holdings. For ease of review, annexed hereto as **Exhibit A** is a revised organizational chart that shows each of the Exempt Entity's ownership structure. As shown in the organizational chart, SIMAD Holdings, the ultimate equity holder of the Exempt Entities, is the only regarded entity where all tax liability accrues.

21. Taking into account the corporate structure, what the United States argues in the Objection is that the Court should disregard the absolute priority rule pursuant to section 1129(b)(2) of the Bankruptcy Code and allow the IRS to elevate its potential administrative claim for taxes held against SIMAD Holdings over all claims (including claims secured by perfected mortgages) against the Exempt Entities. There is no basis for such treatment, particularly where the SIMAD Debtors' cases are not substantively consolidated and are only jointly administered for procedural purposes.

22. Indeed, FIRPTA does not establish that the FIRPTA withholding obligation has priority over valid, pre-existing liens encumbering the property. Rather, just the opposite. FIRPTA expressly addresses the treatment of liens in the foreclosure context and provides that amounts paid to satisfy such liens are not amounts accruing to the foreign transferor. Treas. Reg. § 1.1445-2(d)(3)(i)(A)(2) ("The amount of any mortgage, lien, or other security agreement secured by the property, that is terminated, assumed by another person or otherwise extinguished (as to the debtor/transferor) shall not be treated as an amount that accrues to the debtor/transferor"). FIRPTA

is dispositive where, as here, the proceeds from the disposition are required to satisfy liens against the property before any proceeds are distributed to the foreign transferor. The regulation does not merely permit a deduction from the FIRPTA withholding amount, it expressly excludes the amount satisfying the mortgage or lien from the amount deemed to accrue to the foreign transferor for purposes of determining an alternative amount of withholding.

23. Here, the total sale prices of the assets of the Exempt Entities do not exceed the liens and secured interests against those assets. Even assuming they did, the Bankruptcy Code's priority scheme prohibits the payment of a liability of SIMAD Holdings with those sale proceeds before ***all*** claims at the Exempt Entities are satisfied in full. Any contrary result would elevate the United States' claims at SIMAD Holdings and violate the priority scheme of the Bankruptcy Code.

24. As of the Petition Date, the Exempt Entities[7] were jointly and severally liable to Mishmeret for the obligations under the Debentures (which as noted above, with the exchange rate at the time, totaled approximately $211 million). The Exempt Entities thereafter obtained post-petition debtor-in-financing from Mishmeret and Klirmark Opportunity Fund IV LP (the "KM Lender") of $180 million comprised of up to $60 million in new money DIP loans and $120 million of roll-up DIP loans (as approved pursuant to the Final DIP Order). With interest and fees, the total obligations due on account of the DIP loan to Mishmeret and the KM Lender exceeds $181,755,000, for which the Exempt Entities are jointly and severally liable (with other SIMAD Debtors that are borrowers under that DIP facility). In addition to the amounts due under the DIP facility, the Exempt Entities also remain jointly and severally liable to Mishmeret in accordance

[7] References in the paragraph to the Exempt Entities do not include Chateaugay Landco LLC and Chateaugay Campco LLC, which are not subject to the obligations due to Mishmeret. As described below, Chateaugay Landco LLC and Chateaugay Campco LLC are obligated under other loans and the proceeds thereof will not exceed the amount due the putative secured creditors of Chateaugay Landco LLC and Chateaugay Campco LLC.

with the prepetition indebtedness pursuant to the Debentures of no less $113,104,000. That indebtedness is, however, subject to pre-existing mortgages and liens of record totaling nearly $44 million (some of which is, concededly, disputed, but as of record today and with priority over Mishmeret). Moreover, the Exempt Entities are also subject to other liens exceeding $18 million (though a substantial portion of that amount is disputed). All told, mortgages and liens of record against the SIMAD Debtors that are obligors under the Debentures (including the Exempt Entities) total nearly $357 million. Unless certain liens and mortgages are avoided, the claims of Mishmeret will ***not*** be paid in full (whether from the proceeds of sale of the Exempt Entities assets or the assets of other SIMAD Debtors that are jointly and severally obligated to Mishmeret). Even if Mishmeret is paid in full, other secured claims exist that currently encumber the assets of the Exempt Entities (and other SIMAD Debtors with whom the Exempt Entities are jointly liable) and the proceeds will be insufficient to pay those secured claims in full (to the extent the liens of such claimants are not avoided). Of course, that does not even take into account unsecured creditors of the Exempt Entities, which would need to be paid in full before any funds would flow up to SIMAD Holdings.

25. Camp Chateaugay is no different. The entirety of the cash proceeds anticipated from the sale of Chateaugay Landco LLC and Chateaugay Campco LLC (other than $60,000 earmarked for the SIMAD Debtors' investment banker, SSG) is to be used to repay the existing indebtedness of the first lien mortgage lender, Community Bank, N.A. See Docket Nos. 1093, 1274. Much like a foreclosure sale (or deed in lieu of foreclosure), the SIMAD Debtors will not receive any cash proceeds from that sale.

26. The Court cannot allow the IRS to elevate its potential claim in contravention of the basic principles of the Bankruptcy Code and, most respectfully, must grant the relief requested in the Motion.

**C. The Court is Well Within its Authority to Employ the Procedures Applicable to Foreclosures Set Forth in the Regulations**

27. Where a transaction is subject to FIRPTA, the withholding amount is generally 15% of the amount realized unless an exception or "alternative amount" applies. 26 U.S.C. § 1445. However, where the transaction constitutes a repossession or foreclosure and the "alternative amount" calculation applies, the transferor is not be required to withhold any amount. *See* Treas. Reg. § 1.1445-2(d)(3)(i)(A).

28. Although the Regulations reference foreclosure sales, district courts have applied the "alternative amount" in receivership cases. *See United States v. Arnold,* 93 A.F.T.R.2d 2004-1167 (M.D. Fla. Feb. 13, 2004) ("*Arnold*"); *and see United States v. Arnold*, 91 A.F.T.R.2d 2003-827 (M.D. Fla. Jan. 14, 2003). In total, the *Arnold* court applied the foreclosure provisions of the Regulations to no less than twelve (12) private sales entered into by the receivership estate to determine that no FIRPTA withholding was required because all proceeds were being applied to secured debt. The United States' attempt to distinguish the *Arnold* case is flawed. The Objection asserts that because the *Arnold* case was a foreclosure matter commenced by the United States, *Arnold* is not instructive here. The United States is wrong. The same principle applied in the *Arnold* case should control the Court's analysis here and the transactions at issue have the same economic result as in *Arnold*. The foreign debtor will receive ***none*** of the sale proceeds. The United States simply cannot have a greater right to the sale proceeds than SIMAD Holdings itself.

29. The Regulation itself is also not limited to foreclosure sales as suggested by the United States. Indeed, the Regulation applies to other similar scenarios such as a deed in lieu of

foreclosure. *See* Treas. Reg. § 1.1445-2(d)(3)(i)(A). Indeed, the United States' own citation to section 368 of the IRC titled "Definitions relating to corporate reorganizations" further supports the application of the Regulation to bankruptcy sales in that "'title 11 or similar case' means – a receivership, foreclosure, or similar proceeding in a Federal or State court." 26 U.S.C. § 368(a)(3)(A). Clearly, certain provisions of the IRC contemplate that Chapter 11 proceedings would be considered alongside foreclosures.

30. Accordingly, the SIMAD Debtors reiterate that the same analysis as applied in *Arnold* should be applied by the Court here since SIMAD Holdings, the ultimate owner and transferor for tax purposes, will not realize any proceeds from the Court-approved sales and, consequently, no withholding is required.

31. Additionally, the Congressional intent behind the withholding obligation under FIRPTA is satisfied by this result. FIRPTA was enacted in 1980 and later amended to include section 1445 of the IRC through section 129 of the Deficit Reduction Act of 1984. As the Senate Finance Committee explained:

> A major problem with the Foreign Investment in Real Property Tax Act is that it can often be easily evaded. Since the tax is not due until a tax return is filed after the end of the year, a foreign person can sell his U.S. real estate, take the proceeds out of the United States, and since he is beyond the jurisdiction of the United States, not pay any tax to the United States on the sale. Moreover, through nominees and foreign corporations established in tax havens, he can reinvest these untaxed proceeds back in the United States with impunity.
>
> The Senate version of the 1980 legislation sought to deal with this problem by requiring that the purchaser of the U.S. real estate or other persons with control over the amount paid withhold the tax that would be due on the sale. This is the method used to insure collection of tax on other payments of income to foreign persons, and is used by almost all countries.
>
> . . .

> Enforcement through withholding has several advantages over enforcement through information reporting. Most importantly, withholding should prove more effective than information reporting, and will eliminate the problem of identifying owners of bearer shares. It will also relieve U.S. persons of significant paperwork because the bill authorizes the Treasury to relax or eliminate the information reporting requirements. In addition, the relaxation or elimination of information reporting could reassure legitimate foreign investors who may fear disclosure of their holdings to their potential political adversaries in their home countries.

Pub. L. 98-369, 98 Stat. 494, 655–60.[8]

32. In enacting the withholding obligations of FIRPTA, Congress was clearly focused on the ability to collect or enforce tax obligations against foreign entities. That concern is eliminated here since SIMAD Holdings is a Chapter 11 debtor in a bankruptcy proceeding in the United States and has submitted to the jurisdiction of the Court. The United States can pursue any and all claims against SIMAD Holdings in this Court.

**D. The Tax Anti-Injunction Act Does Not Apply**

33. The United States incorrectly asserts that the Tax Anti-Injunction Act prohibits the Court from ruling on this request; however, the SIMAD Debtors do not seek to restrain the assessment or collection of a tax. 26 U.S.C. § 7421(a).

34. While the Tax Anti-Injunction Act provides broad protection to the IRS, it is not a prohibition on any or all actions by a bankruptcy court. *See, e.g., In re Martin*, 150 B.R. 43, 47 (Bankr. S.D. Cal. 1993) (finding "that §§ 105(a) and 505 provide sufficient power to enjoin the IRS to compliance with the confirmed plan and order thereon. Without the authority to enjoin the IRS, § 505 would be meaningless. The acknowledged power of the Court to determine tax liability is inconsistent with the inability to hold the IRS to the terms of the Court's order, which sets forth the method of determining the tax liability. Therefore, this Court concludes the IRS must be held

[8] https://www.finance.senate.gov/imo/media/doc/sprt98-16922.pdf (see pages 405-408).

to plan procedures for determining the amounts and collection of tax claims for 1984–86, and enjoins the IRS from procedures outside the scope of the plan."); *In re Cont'l Credit Corp.*, 1 B.R. 680, 686 (Bankr. N.D. Ill. 1979) ("The contention … that the Tax Injunction Act, 28 U.S.C. § 1341, prevents this Court from assuming jurisdiction is without merit. That Act did not abridge the bankruptcy court's power to enter any orders necessary to the enforcement of provisions of the Bankruptcy Act.").

35. Here, as set forth above, the SIMAD Debtors are not asking the Court to order the United States to refrain from collecting a tax that has been determined to be due. It is not being asked to enjoin an IRS assessment. It is not being asked to prohibit an IRS audit. And it is not being asked to prevent the United State from pursuing any tax liability that may independently exist under the Internal Revenue Code. Instead, the Court is being asked to make a legal determination concerning the amount of FIRPTA withholding required by sales pursuant to Section 363 of the Bankruptcy Code. The distinction is critical. This Court should reject any attempt to transform the Anti-Injunction Act into a jurisdictional bar against the determination of the SIMAD Debtors' FIRPTA withholding. Such an interpretation would nullify the Court's exercise of its core bankruptcy jurisdiction over the disposition of estate property and the determination of claims. The FIRPTA determination is directly connected to the Court's administration of the estates, approval of the Exempt Entities' sales and distribution of sale proceeds. The Court's granting of the Motion does not preclude the United States from pursuing tax liability, if any, against SIMAD Holdings.

## E. The Transferees are Entitled to Protection under Section 363(m) of the Bankruptcy Code

36. Finally, the United States takes the position that the transferees of the Exempt Entities' assets are not entitled to protection under section 363(m) of the Bankruptcy Code.

However, the Motion and the proposed Order attached thereto as Exhibit A solely reaffirms this Court's good faith finding already made in the various sale orders. *See, e.g.* Docket Nos. 539, 860, 936, 1078, 1046 and 1274.

37. The SIMAD Debtors submit that the section 363(m) finding is necessary to ensure that the purchasers will not face exposure for their compliance with the Order.

## CONCLUSION

38. Thus, for the reasons set forth in the Motion and herein, the SIMAD Debtors respectfully submit that the Court must overrule the Objection and should grant the relief requested in the Motion.

Dated: October 4, 2026

*/s/ Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email: msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the Debtors and*
*Debtors in Possession*

# EXHIBIT A

**Organizational Chart**

## SIMAD Holdings Ltd. —Exempt Entities Organizational Chart




*Chateaugay Landco LLC and Chateaugay Campco LLC are owned 100% by SIMAD Holdings Ltd.; all other Exempt Entities are owned 100% by SIMAD Equities LLC.*

For U.S. federal tax purposes, SIMAD Holdings Ltd. is currently classified as a foreign corporation and all depicted entities below SIMAD Holdings Ltd. are disregarded. SIMAD Holdings Ltd. is therefore treated as the direct owner of all assets held by the disregarded entities (including the Exempt Entities). SIMAD Holdings Ltd. is therefore treated as directly realizing all income, expenses, gains, and losses incurred by the disregarded entities (including the Exempt Entities). For this reason, when the Exempt Entities sell U.S. real property interests, SIMAD Holdings Ltd. is treated as the transferor for purposes of I.R.C. § 1445.

# EXHIBIT B

**Prospectus**

# SIMAD Holdings Ltd.

**A Company Incorporated Under the Laws of the British Virgin Islands**
**(the "Company")**

**Supplementary Prospectus**
**Of**

NIS 620,000,000 par value of the Company's non-convertible debentures (Series A), with 1 NIS par value, registered by name bearing a fixed annual interest rate of 7% and are not linked (principal and interest) to any index (the "**Debentures (Series A)**" or the "**Debentures"** or the **"Offered Securities"**).

The Debentures (Series A) are offered to the public by way of Non-Uniform Offer as is set forth in the Securities Regulations (Manner of Offer of Securities to the Public),2007 ("**Manner of Public Offering Regulations**"), through 620,000 units of NIS 1,000 par value Debentures (Series A) each, and the composition of each unit and the price thereof is as set forth below:

| | Price |
|---|---|
| NIS 1,000 par value Debentures (Series A) offered at 100% of their par value and in total | NIS 985 |
| **Total price per Unit** | **NIS 985** |

Prior to the Prospectus and following its publication, a Book Building process is taking place visa the institutional investors, through the Pricing Underwriter. The Company has yet to accept subscriptions from said institutional investors. The allocation of the Debentures (Series A) amongst the institutional investors shall be determined at the Company's discretion, after consulting with the Pricing Underwriter.

Notwithstanding the foregoing, the Company is entitled to sell, will be entitled to sell within the framework of a tender to be published thereby, up to 30% of the Debentures (Series A) offered hereunder, to whomever is not an Institutional Investor, provided that the sale to whomever is not an institutional investor, shall be according to the relative share of his subscription out of all the subscriptions by those who are not institutional investors, while each investor shall be permitted to submit one subscription. Should the Company wish to publish such tender ("**Tender"**) its details will be provided in the Supplementary Notice.

Following the publication of this Prospectus, the Company shall publish a Supplementary Notice, in which details missing in this Prospectus will be completed and/or details that can be updated will be updated in this Prospectus. In accordance with Article 16(1a)(2) of the Securities Law, 5728-1968 (the "**Securities Law**") and the Securities Regulations (Supplementary Notice and Draft Prospectus), 5767-2007 (the "**Supplementary Notice Regulations**"), including, but not only, changes, if any, in the amount and the terms and conditions of the Debentures (Series A), which will not exceed the rates permitted by the Supplementary Notice Regulations, offered pursuant to this Prospectus (the "**Supplementary Notice**"). Upon its publication, the supplementary notice will become an integral part of this Prospectus. For further details regarding the Supplementary Notice, see section 2.7 of the Prospectus. To the extent that there will also be a Uniform Offer to the public, as aforesaid, the Company shall publish within the framework of the Supplementary Notice the date in which the Tender Subscription list will open and the date in which the Tender subscription list will close (if any). In addition, to the extent that the Supplementary Notice changes details in rates that exceed the rates set forth in Regulations 1A(1) to 1A(3) of the Supplementary Notice Regulations, the period for submitting subscriptions for the purchase of securities offered under this prospectus will begin not before the lapse of two (2) trading days from the date of publication of the Supplementary Notice. The period for submitting subscriptions will end, in a Uniform Offer according to Regulation 11(a)(1) to the Manner of Public Offering Regulations, no later than 75 days from the publishing of the Supplementary Prospectus or 45 days from the commencement of the period for submitting subscriptions, according to the earlier, and in any case, not prior to the lapse of seven (7) hours, of which at least five (5) trading hours, from the date of publication of the Supplementary Notice.

**The offering of the Offered Securities is the initial public offering of securities of the Company (IPO).** For a description of the Offered Securities and of the particulars of the offer and manner of offering of the Debentures (Series A), see Chapter 2 of the Prospectus.

For details concerning the possibility of early redemption of the Debentures (Series A), see Section 7 of the Deed of Trust with respect to Debentures (Series A) included within **Annex B** of Chapter 2 of the Prospectus (the "**Deed of Trust**") For details regarding the possibility of forced early redemption of the Debentures see Section 8 of the Deed of Trust.

The Debentures (Series A) are rated A3.il(P) by Midroog Ltd., See **Annex A** of Chapter 2 of the Prospectus.

The Debentures (Series A) are secured by pledges as is set detailed in Section 6 to the Deed of Trust.

For details regarding restrictions the Company undertook upon itself in connection with dividend distribution, see Section 5.5 of the Deed of Trust and Section 7.4 of the Prospectus.

The listing of the offered Debentures for trading on the Tel Aviv Stock Exchange (**"TASE"**), is conditional upon fulfillment of the minimum distribution of public holdings in the Debentures (of the applicable Series) as is set forth in Section 2.3.1.1 to the

Prospectus and minimum value of public holdings requirements in the Debentures (of the applicable Series), as is set forth in Section 2.3.1.2 to the Prospectus and further conditional upon receiving of the Company's US legal consultants' approval that the Transferred Rights (as defined in Section .7.1.6 of the Prospectus) were all transferred to the Company ("**US Legal Consultants' Approval**") and the publication of an Immediate Report (which shall constitute an integral part of the Prospectus) regarding the receipt of the US Legal Consultants' Approval, which shall be signed by the Company, all the Directors serving in the Company (as of the immediate Report Date) and Infin Capital Ltd., used as an underwriter pricing in the offering. In the event that the TASE's conditions as said above were not all fulfilled and/or US Legal Consultants' Approval is not obtained within 14 business days of receipt of funds by the Dealer Manager, then the issuance of the Offered Securities will be cancelled, they will not be registered for trade, the funds received by the Dealer Manager will be returned to the subscribers and the Offered Securities will not be allocated to the applicants and the Company will notify this in an immediate report. In this regard, it is clarified that the Transferred Rights will be transferred to the Company close to the date of the issuance by virtue of this Prospectus and the Supplementary Notice, thus, prior to the listing of the Debentures.

For information regarding the issuance designation see Section 6 to the Prospectus. In this context, it should be noted that since the Controlling Shareholders of the Company provided guarantees in relation to the Company's obligations towards financing entities, repayment of loans taken by the Company from financing entities inherently includes the release of the Controlling Shareholders from said guarantees.

According to the evaluation of the management of the Company, the risk factors having a substantial impact on the business of the company are: Foreign Currency Risks. For details concerning these risk factors and other risk factors having an effect on the company's business, see Section .7.18 of the Prospectus.

As of June 30, 2025, the average interest rate of loans taken by the Company (as detailed in section 7.14 of the Prospectus) was approximately 6.3%.

The Controlling Shareholders of the Company have additional business activity which, in part, is in similar activity sectors as the Company. For information regarding the agreement to limit the activity of the Controlling Shareholders and the Company see Section 7.1.4.2 to the Prospectus.

**For details regarding the Undertaking of the Controlling Shareholders of the Company, to transfer to the Company all the Transferred Rights (as described in Section 7.1.6 of the Prospectus), against issuance of shares of the Company and a payment of $50 million (which will be paid from the proceeds of the issuance of the Company's Debentures (Series A)), subject to the fulfillment of the conditions for registration of the Debentures of the Company, offered for trade to the public under this Prospectus and the Supplementary Notice, and prior to the date of their registration for trade, see Section 7.1.6 of the Prospectus. The transfer of the Transferred Rights to the Company shall be made on an "as is" basis, and the Company shall not be entitled to any indemnification from the Transferring Entities, with respect to the Transferred Rights (as such terms are defined in Section 7.1.6 of the Prospectus).**

The Company was incorporated on May 28, 2025, in the British Virgin Islands as a private company limited by shares, according to the provisions of the BVI Business Companies Act, 2004. As long as securities of the Company, offered under this Prospectus, are held by the public, the Company will be subject to the provisions of the Securities Law and the regulations promulgated thereunder, applying to companies incorporated outside of Israel, which are traded on the stock exchange in Israel. Therefore, as long as the public holds securities of the Company offered under this Prospectus, the Company will report according to the appropriate reporting provisions, as per the Securities Law and its regulations. In addition, the provisions of Section 39A(a) of the Securities Law shall apply to the Company. In consequence thereof, various provisions of the Companies Law, 5759-1999 (the "**Companies Law**"), which apply to a company incorporated outside of Israel and which offers its debentures to the public in Israel, including provisions concerning the appointment of external directors, an internal auditor and an audit committee, as specified in the Fourth Supplement to the Securities Law, shall apply to the Company. These provisions shall apply in addition to the provisions of the incorporating documents of the Company and the laws of the British Virgin Islands.

The Company's Articles of Association include all of the provisions applicable to the Company by virtue of Section 39A(a) of the Securities Law, including Section 350 of the Companies Law, as well as an article determining that the Company may refer disputes arising from agreements, commitments and such arrangements (all according to Israeli Law as mentioned above) to the exclusive jurisdiction of the courts in Israel (the "**Israeli Jurisdiction Section**"). In this regard, the Company received an opinion of a British Virgin Islands law firm that applying Section 350 of the Companies Law, and the Israeli Jurisdiction Section to the Company's Articles of the Association does not contradict the laws of the British Virgin Islands. The aforesaid opinion is attached to Chapter 11 of the Prospectus.

**It shall be clarified that the Deed of Trust and its appendices (including the Debentures), are subject to the provisions of the Israeli Law (see Section 14 of the terms provided for in the Terms and Conditions Overleaf). The Deed of Trust provides that the competent court of Tel Aviv-Jaffa is the only court authorized to hear matters, with respect to the Company, pertaining to the Deed of Trust and its appendices (including the Debentures).**

**For information regarding the Company's, its Controlling Shareholders' (present and future ones) and Officers' (present and future ones) irrevocable undertakings, inter alia, not to object to the Trustee and/or the Bondholders) motion, which shall be filed to an Israeli Court in order to apply the Israeli Law to a settlement and insolvency agreement, if filed; not**

**to initiate proceedings in courts outside of Israel in order to obtain protection from proceedings taken by the Trustee to the Debentures and/or by the Bondholders; not to object should an Israeli Court seeks to apply the Israeli Law to a settlement and insolvency agreement; as well as not refrain from raising claims against the local jurisdiction of the Israeli Court with respect to proceedings filed by the Trustee to the Debentures and/or by the Bondholders, see Section 33 of the Deed of Trust. For the avoidance of doubt, it is hereby clarified and emphasized that the Controlling Shareholders' and Officers' undertakings in the Company shall include an explicit irrevocable undertaking not to initiate an insolvency proceeding under a foreign law and in a jurisdiction other than Israel. With respect to insolvency laws, it is possible that the laws of the three jurisdictions, i.e., Israel, the British Virgin Islands and the United States shall be applicable. However, in light of the aforesaid and subject to the Company, its Controlling Shareholders and Officers' compliance with their undertakings, an insolvency proceeding under any law other than the Israeli Law and/or in non-Israeli courts can only derive from a claim made by a foreign creditor. In this regard it should be noted that as long as an insolvency procedure develops, not in accordance with Israeli law and/or in a foreign court, arising from claims made by a foreign creditor, the Company will do its best and shall claim an "Inadequate Forum" wholly subject to the law.**

According to an opinion letter of the law offices of Maples & Calder from the British Virgin Islands[1] (the Company's jurisdiction of incorporation) which was filed with the TASE: the laws of the British Virgin Islands and the incorporating documents of the Company do not restrict or prevent the offering of the securities, offered according to this Prospectus, to the public in Israel, the registration for trade of the Offered Securities, according to this Prospectus, on the stock exchange and/or the trade therein on the stock exchange, as the securities offered by way of this Prospectus could be traded freely on the stock exchange and be cleared by means of the clearing house of the stock exchange without any restrictions under the laws of the British Virgin Islands and the incorporating documents of the Company. For further details, see also the Maples & Calder Opinion Letter in this matter and its translation to Hebrew, attached hereto in Chapter 11 of the Prospectus.

This Prospectus, offer and purchase of the securities and anything relating to and/or prospectus relating to this offering of securities and the subsequent purchase, are subject to the laws of the State of Israel. Jurisdiction over matters arising from this prospectus and from offering securities is granted to the competent courts in Israel. Purchasers of the securities are offered pursuant to this Prospectus, with the agreement to purchase these securities, accept the exclusive jurisdiction and choice of law is this.

For details concerning the tax implications pertaining to an investment in the securities offered according to this Prospectus, inter alia, due to application of the tax laws of the British Virgin Islands, the US tax laws and the tax laws in Israel, see Section 2.9 of the Prospectus.

The Company (upon signing the Prospectus) and its controlling shareholders have undertaken that as long as there is a balance of Debentures (Series A) in circulation, subject to the applicable tax laws, the Company will not elect to be classified as an association taxable as a corporation for US tax purposes. See Section 7.15 of the Prospectus.

As at the Publishing date of the Prospectus, the Company has appointed a Chairman of the Board of Directors who is an Israeli resident, alongside additional Directors who are Israeli residents, whereby the Company's Board of Directors has a majority of Directors who are Israeli residents. Accordingly, at the publishing date of the Prospectus date the Company does not fall under the definition of "a company with no connection to Israel", as defined in the Securities Authority's instructions to fund managers regarding disclosure on behalf of the fund regarding possible exposure to bonds that are not rated in investment rating, in bonds of companies with no connection to Israel and to banking corporation with which cash and deposits of the fund are kept (new version - 2021).

As of the Date of this Prospectus, the Company's controlling shareholders and officers are organized in, or are residents and/or citizens of the US, more than 50% of the Company's assets are located in the US and the Company's business is administered in the US. Therefore, the Company is a domestic issuer, as that term defined in Section 902 of Regulation S promulgated under of the United States Securities Act of 1933, as amended (the "**Regulation S**" and the "**Securities Act**", respectively).

The public offering made pursuant to this Prospectus, if any, will be made in Israel only, and will be made pursuant to the Regulation S exemption from the Securities Act U.S. securities registration requirements, as a Category 1 offering thereunder.

Any purchaser of Debentures (Series A) offered pursuant to this Prospectus will be deemed to have declared to the Company and its underwriters that he, she, or it is an Israeli resident who was not in the US while originating the order for the purchase of said Debentures, is not purchasing the Debentures on behalf of a person in the US, and is not purchasing the Debentures with the intent of effecting a "distribution" (as such term is used in the Securities Act).

Under Section 904 of Regulation S, Debentures offered pursuant to this Prospectus may be resold on the TASE by any individual (with the exception of the Company, a distributor or affiliates of any of them (except any officer or director who is an affiliate solely by virtue of holding such position) or any person acting on behalf of any of the foregoing persons)) provided that: (a) the offer is not made to a person in the United States, (b) neither the seller nor anyone acting on the seller's behalf knows that the purchase was pre-arranged with a buyer in the United States, and (c) no "directed selling efforts" (as defined in Regulation S) are made in the United States by the seller, an affiliate, or any person acting on their behalf. In the case of an offer or resale of Debentures (Series A) by an officer or director of the Company or a distributor, who is an affiliate of the Company or distributor solely by virtue of holding such position, such offer or resale must comply with the restrictions set forth in the immediately preceding sentence and no selling concession, fee or other remuneration may be paid in connection with such offer or sale, other than the usual and customary broker's commission that would be received by a person executing such transaction as an agent.

[1] It should be emphasized that this opinion letter may not be regarded as an attorney's opinion for the purpose of Section 17(b)(3) of the Securities Law.

No person is authorized to take any action in the United States in connection with the offering or sale of the Debentures offered pursuant to this Prospectus.

This Prospectus has not been filed with the US Securities and Exchange Commission and the Debentures (Series A) that are offered according to this Prospectus have not been, and will not be, registered under the Securities Act in the United States.

A decision as to the purchase of the Debentures offered pursuant to this Prospectus should be based solely upon the information included in this Prospectus. The Company does not allow, nor will it allow any other individual or body whatsoever convey different information than that set forth in this Prospectus.

This Prospectus will not constitute an offer of securities in any other country other than the State of Israel.

The Company furnished the TASE with an opinion letter of a US law firm, stating that, subject to the assumptions, qualifications and limitations set forth in such opinion letter, no registration of the Debentures under the Securities Act is required for the sale and delivery of the Debentures in the offering in the manner contemplated hereby, to list them for trade on the TASE and to enable them to trade thereon.

Total expenses related to the issuance of securities offered pursuant to this Prospectus shall be provided in the Supplementary Notice.

**The Trustee for the Debentures (Series A)**: Mishmeret -Trust Services Ltd. (the "**Trustee**").[2]

**Underwriting**: Pursuant to Regulation 11(a)(1) to the Manner of Public Offering Regulations, the issuance of the Offered Securities will be partially (25%) guaranteed by underwriting. The Company intends to engage with Infin Capital Ltd. (the "**Pricing Underwriter**"), in such underwriting agreement. The Pricing Underwriter will sign the Supplementary Notice, under which the offered securities will be offered, and said signatures shall be deemed the signing of the Prospectus. Details regarding the underwriting agreement shall be provided in the Supplementary Notice.

In the Company's financial statements as of December 31, 2024 and June 30, 2025, the Company's auditors drew attention, without qualifying their opinion, to the statement in Note 1A to the proforma financial statements regarding the change in the Company's structure, within the framework of which rights in corporations will be transferred against the issuance of Company shares and in consideration of a payment in the amount of $50 million, which will reduce the Company's capital by this amount.

**And a Shelf Prospectus**

Under this Prospectus, the Company may issue different types of securities, including Non-convertible Bonds, Option notes that can be realized as Non-convertible Bonds, commercial securities, as well as any other security, not convertible into shares, which can be legally issued under a Shelf Prospectus in the relevant date.

According to the requirement of the TASE, an offer of securities according to the Shelf Offering Reports to be published under this Prospectus will be contingent upon the opinion of the Company's lawyers from the British Virgin Islands that will be submitted to the TASE prior to the publication of the Shelf Offering Report by the Company, by and subject to which: the laws of British Virgin Islands and the Company's Articles of Association do not restrict or prohibit the offering of securities to be offered in accordance with the Shelf Offering Report to the Israeli public, their listing for trading on the TASE and/or their trading on the TASE, and they can be traded freely on the stock exchange and cleared at the Clearing House without any restrictions under British Virgin Islands law and the Company's Articles of Association.

The offering of the securities under this Shelf Prospectus shall be made under Section 23a(f) of the Securities Law, by shelf offering reports, in which the Company shall include all the required details for each offering, including the composition of the offered units and the rest of the terms of the offered securities and the manner of the offering under the applicable law (including the TASE by-laws), as applicable at the time of the offering.

An offer of securities according to Shelf Offering reports published by virtue of this Prospectus, if offered, will be made only in Israel, and will not be made in the US and/or to a person in the US and/or to a US Person as defined in Regulation S promulgated under the Securities Act. According to the TASE regulations and requirements, an offer of securities in accordance with Shelf Offering Reports published by virtue of this Prospectus will be dependent upon the Company meeting an exemption from the registration requirements in accordance with Regulation S in relation to securities offered by the Company as aforesaid, and this in accordance with an opinion made by a US attorney for the Company that will be filed with the TASE prior to the date of publication of the Shelf Offering Report by the Company, by which there is no hindrance on the Company under US law to offer the public in Israel the securities offered in the Shelf Offering Report, list them for trade on the TASE and exercise their trade.

Any purchaser of the securities to be offered on the basis of a Shelf Offering Report published pursuant to this Prospectus shall be deemed to have declared that s/he is a resident of Israel, that s/he is not a U.S. Person, that s/he is not acquiring the securities offered in said Shelf Offering Report for a U.S. Person and/or a person in the U.S., that s/he was not in the U.S. at the time of filing a request to purchase said securities and s/he is not purchasing said securities with the intention to conduct a "distribution" (as defined in the Securities Act) in the U.S. Distributors with whom the Company shall enter into an agreement, if so shall enter, for the dissemination of the securities offered on the basis of a Shelf Offering Report published by virtue of this Prospectus, their related companies and anyone acting on their behalf, shall declare that they will offer said securities to residents of Israel only, and not someone who is a US

[2] As informed to the Company by the Trustee: On November 17, 2025, a motion was filed against the Trustee for approval of a class action lawsuit in connection with his role as trustee for the holders of the debentures (Series C) of Automax Motors Ltd. by a holder of the said debentures. The Applicant claims, in essence, that the Trustee violated his statutory and contractual duties and acted negligently. According to the Applicant, the Trustee did not exercise his powers of supervision and inspection to discover the company's alleged fraud, and according to the Applicant, the alleged failure of the Trustee caused disciplinary damage. The Trustee rejects the claims and believes that he acted as required by the trust deed and fulfilled his fiduciary duties according to law, and that the claim is based on incorrect facts.

Person and that they did not carry out nor will they carry out an action or advertisement in the U.S. in connection with the promotion of the sale of said securities.

This Prospectus, the Shelf Offering Reports to be published by its virtue and the securities offering and acquisition made on their basis and all that arises and/or is related to this Prospectus and the Shelf Offering Reports to be published by its virtue, are subject to the laws of the State of Israel. Jurisdiction in any matter relating to this Prospectus, (1) Shelf Offering Reports to be published by its virtue and the offering and acquisition of securities made on their basis are granted to the competent courts in Israel. Purchasers of the securities offered on the basis of Shelf Offering Reports published by the virtue of this Prospectus, in their agreement to purchase said securities, accept this exclusive jurisdiction and choice of law.

Purchase of securities offered on the basis of a Shelf Offering Report published by virtue of this Prospectus will be subject to resale restrictions on the TASE in accordance with Article 904 of Regulation S, as described in Chapter 1 to the Prospectus.

**This Prospectus and Shelf Offering Reports published by its virtue are not intended for publication, distribution and/or circulation in the US and/or to a US Person as defined in Regulation S, and no person is authorized to carry out the sale of the securities offered based on said Shelf Offering Reports in the US. This Prospectus was not filed with the US Securities and Exchange Commission and Shelf Offering Reports published by its virtue will not be filed with the US Securities and Exchange Commission. Securities offered based on Shelf Offering Reports published by virtue of this Prospectus will not be registered under the Securities Act in the US.**

**Date of the Prospectus: November 28, 2025**

**Table of Contents**


| | | | Page |
|---|---|---|---|
| **1** | **Preamble** | | |
| | 1.1 | General | 1-1 |
| | 1.2 | Permits and Approvals for the Initial Offering of Securities under this Prospectus | 1-1 |
| | 1.3 | Permits and Approvals regarding the Shelf Prospectus | 1-2 |
| | 1.4 | Capital of the Company | 1-5 |
| | 1.5 | financial data in the prospectus are in US Dollars | 1-5 |
| **2** | **Details of the Offering** | | |
| | 2.1 | 2.1.1. Details of the Securities Offered to the Public | 2-1 |
| | 2.2 | Method of Offering the Securities to the Public | 2-2 |
| | 2.3 | Registration for Trading on the TASE | 2-2 |
| | 2.4 | Manner of Offering to the Public | 2-3 |
| | 2.5 | Qualified Investors | 2-8 |
| | 2.6 | Refraining from arrangements | 2-11 |
| | 2.7 | **Taxation** | 2-11 |
| | 2.8 | Terms and Conditions of the Debentures (Series A) | 2-24 |
| | 2.9 | Deed of Trust in respect of the Debentures (Series A) | 2-26 |
| | 2.10 | Pricing Underwriter, Coordination and Distribution | 2-27 |
| | Appendix A | Rating Report and letter of Consent | 2-31 |
| | Appendix B | The Deed of Trust and its Appendices | 2-32 |
| | Appendix C | Summary of Issue Terms and Conditions | 2-33 |
| **3** | **Share Capital of the Company** | | |
| | 3.1 | Details regarding the Share Capital of the Company as of the Date of the Prospectus | 3-1 |
| | 3.2 | Development of the Registered and Issued Capital of the Company from the Date of its Establishment | 3-1 |
| | 3.3 | Holdings of Interested Parties in the Securities of the Company | 3-1 |
| **4** | **Voting Rights Associated with the Company's Shares** | | |
| | 4.1 | Articles 20 and 22 of the Companies Law | 4-1 |
| | 4.2 | Section 59 of the Companies Law | 4-1 |
| | 4.3 | Section 61(a) of the Companies Law | 4-1 |
| | 4.4 | Section 81 of the Companies Law | 4-1 |
| | 4.5 | Section 222 of the Companies Law | 4-2 |
| | 4.6 | Section 301 of the Companies Law | 4-2 |
| | 4.7 | Voting Rights Accompanying the Company’s Shares | 4-2 |
| **5** | **Comparison of Laws** | | |
| | 5.1 | Subordination to the Israeli Companies Laws and the British Virgin Islands | 5-1 |
| | 5.2 | Enforcement of Foreign Judgments | 5-4 |
| | 5.3 | The Applicable Law to the Deed of Trust | 5-5 |
| | 5.4 | Comparison Between Several Corporate Law Issues – the Provisions of the Applicable Law in the British Virgin Islands versus the Provisions of the Israeli Law | 5-5 |
| | 5.5 | Opinion of the Company's legal counsel regarding the BVI laws Comparison | 5-15 |
| **6** | **Designation of the Proceeds** | | |
| | 6.1 | The Proceeds from the Offering | 6-1 |
| | 6.2 | Designation of the Proceeds from the Offering | 6-1 |
| | 6.3 | Minimum Amount | 6-2 |

| | | | Page |
|---|---|---|---|
| **7** | **DESCRIPTION OF THE GENERAL DEVELOPMENT OF THE COMPANY'S BUSINESS** | | |
| | See separate table of contents in the chapter | | 7-1 |
| 8 | **The Company's Board of Directors** | | |
| | 8.1 | Board of Directors of the Company | 8-1 |
| | 8.2 | Senior Officers | 8-2 |
| | 8.3 | Provisions of the Company's Articles of Association Regarding the Board of Directors' Members | 8-2 |
| | 8.4 | Independent Authorized Signatories. | 8-12 |
| | 8.5 | Additional Details | 8-12 |
| **9** | **Interested Parties of the Company** | | |
| | 9.1 | Remunerations of Interested Parties and Senior Office Holders of the Company | 9-1 |
| | 9.2 | Transactions with Controlling Shareholder | 9-1 |
| | 9.3 | Holdings of Interested Parties and Officer | 9-4 |
| **10** | **Financial Reports** | | |
| | 10.1 | The Company's consolidated proforma financial statements as of December 31, 2024; The Company's Solo financial statements as of March 5, 2025 (Date of incorporation) | 10-1 |
| | 10.2 | Consent Letter of the Auditors of the Company and the Transferred Companies | 10-1 |
| 11 | **Additional Details** | | |
| | 11.1 | Attorney's Opinion | 11-1 |
| | 11.2 | Obligation of Indemnification | 11-2 |
| | 11.3 | Expenses and Commissions | 11-2 |
| | 11.4 | Brokerage Fees in Connection with Other Securities | 11-3 |
| | 11.5 | Allotment of Securities Not According to Full Consideration in Cash | 11-3 |
| | 11.6 | Documents Review | 11-3 |
| | 11.7 | opinion of the legal consultants of the Company in the British Virgin Islands | 11-3 |
| **12** | **Signatures** | | |
| | 12.1 | The Company | 12-1 |
| | 12.2 | The Directors | 12-1 |

# SIMAD Holdings Ltd.
## A Company Incorporated Under the Laws of the British Virgin Islands
## (In this Prospectus – the "Company")

## Chapter 1 - Preamble

1.1. **General**

The Company was incorporated on May 28, 2025, in the British Virgin Islands ("**BVI**"), as a private company limited by shares, according to the provisions of the BVI Business Companies Act, 2004 (as amended).

As long as securities of the Company, offered under this Prospectus, are held by the public, the Company will be subject to the provisions of the Securities Law, 5728-1968 (the "**Securities Law**") and the regulations promulgated thereunder, applicable to companies incorporated outside of Israel, which securities are traded on the Tel Aviv Stock Exchange Ltd. (the **"TASE"**) in Israel. Accordingly, the Company will report according to the appropriate reporting provisions, as per the Securities Law and its regulations.

Also, the provisions of Section 39A(a) of the Securities Law shall apply to the Company. In consequence thereof, it shall be subject to various provisions of the Companies Law, 5759-1999 (the "**Companies Law**"), which apply to a company incorporated outside of Israel and which offers its debentures to the public in Israel, including provisions concerning the appointment of external directors, an internal auditor and an audit committee, as specified in the Fourth Supplement to the Securities Law. These provisions shall apply in addition to the provisions of the incorporating documents of the Company and the laws of the BVI.

**For details regarding the laws which shall apply to the Deeds of Trust and the securities to be issued under this Supplementary Prospectus, and regarding obligations of the Company, its controlling shareholders and officers of the Company, including with respect to aforementioned and to the laws which shall apply to the Company, see section 5.1 of the Prospectus.**

1.2. **Permits and Approvals for the Initial Offering of Securities under this Supplementary Prospectus**

The Company received all the permits, approvals and licenses required according to any law, to offer and issue the Securities under this Prospectus) and for publication of the Prospectus.

**The approval of the Securities Authority for the publication of the Prospectus may not be considered as authentication of the details included therein or as an approval to their reliability or completeness, and it may not be regarded as an expression of an opinion as to the nature of the offered Debentures under the Prospectus.**

The TASE granted the Company an approval in principle to this Supplementary Prospectus (the "**TASE Approval to the Supplementary Prospectus**"), according to which the terms of the Debentures (Series A), included in this Prospectus (the "**Debentures**"), are in compliance with the provisions of the TASE regulations.

The said TASE Approval to the Supplementary Prospectus does not constitute an approval to the listing for trade of the offered Debentures under this Prospectus, and their listing for trade on the TASE will be subject to the TASE approval of listing according to the Supplementary Notice, that will be published by the Company pursuant to the provisions of the Securities Law

and the Securities Regulations (Supplementary Notice and Draft Prospectus), 2007 (the "**Supplementary Notice"** and the **"Supplementary Notice Regulations"**, respectively).

The listing of the Securities included in this Prospectus and the Supplementary Notice is conditioned by the existence of a minimum distribution of public holdings in the Debenture Series as is set forth in Section 2.3.1.1 to the Prospectus, on the existence of a minimum value of public holdings in the Debenture Series as is set forth in Section 2.3.1.2 to the Prospectus, and to the Company receiving an approval from its legal advisors in the U.S. whereby the Transferred Rights were transferred to the Company ("**U.S. Legal Advisor's Approval"**) and the publication of an immediate report (which will be an integral part of this Prospectus) regarding the transference of the Transferred Rights to the Company and the receipt of the U.S. Legal Advisor's Approval, to be signed by the Company, all serving directors of the Company (as of the date of the immediate report), and by Infin Capital Ltd., used as a underwriter pricing in the offering within 14 days as of the date in which the funds were received by the Dealer Manager (See Section 2.3.2 to the Prospectus).

**This TASE Approval to this Supplementary Prospectus is not be considered as confirming the details included in the Prospectus or as to their reliability or completeness, and it by no means serves as any opinion with respect to the Company or to the nature of the Securities offered under the Supplementary Prospectus or the price at which they are offered or the price in which they shall be offered under the Supplementary Notice.**

**Furthermore, the said approval may not be considered as a commitment for providing an approval for registration for trade of the Debentures according to a Supplementary Notice. The approval of the application for the registration for trade according to a Supplementary Notice will be subject to the TASE Regulations as will be in effect at the time of application for the registration for trade as above mentioned, including in connection with the existence of minimum distribution of the Debentures and compliance with the requirements of minimal public holdings of Debentures, as aforesaid.**

The TASE approval for the registration for trade of the Debentures according to a Supplementary Notice will be provided to the Company (if at all) prior to the publication of the Supplementary Notice in relation to the issue under this Prospectus. All Distributors undertake that any offering or sale of Securities performed thereby or by whomever on their behalf shall be carried out solely in Israel and that no Securities shall be offered to any person in the U.S. nor to any person who is deemed a member of the group known as U.S. Citizens, outside of the United States.

1.3. **Permits and Approvals regarding the Shelf Prospectus**

the Company received all permits, approvals and licenses required under any law for the publishing of the Shelf Prospectus.

**The ISA Permit to publish the Prospectus neither constitutes an authentication of the information included therein, nor does it confirm its reliability or completeness, and by no means serves as any opinion with respect to the nature of the Securities offered under the Shelf Prospectus**.

The offering of securities under said Shelf Prospectus, pursuant to the provisions of Section 23A(f) to the Securities Law, shall be made by way of a Shelf Offering Report to be submitted under the Securities Law and Securities Regulations (Shelf Offering of Securities) 5765-2005 (the **"Shelf Prospectus Regulations"**) in which the Company shall add all the specific details for said offering (the "**Shelf Offering Report" or the "Offering report"**). Prior to executing

the offering of any security under Shelf Offering Reports to be published by virtue of **this** Prospectus, the Company shall provide the TASE an opinion in the following matters, from its BVI and U.S. attorneys.

Within the framework of the Offering Report all Distributors shall undertake that any offering or sales of Securities performed thereby or by whomever on their behalf shall be carried out solely in Israel and that no Securities shall be offered to any person in the U.S. nor to any person who is deemed a member of the group known as U.S. Citizens, outside of the United States.

The TASE has granted an in-principle approval with respect to the listing of Debentures, Options exercisable into Debentures and tradable **Securities** (the **"Securities"**) to be offered under this Prospectus by way of the Shelf Offering Report (the **"In Principle Approval")**

**The in TASE In Principle Approval shall neither be deemed as confirming the information included in the Shelf Prospectus nor their reliability or completeness and by no means serves as any opinion with respect to the Company or to the nature of the Securities to be offered under the Shelf Prospectus by way of the Shelf Offering Reports or the price at which they shall be under the Shelf Offering Report.**

The granting of the In Principal Approval does not constitute an approval for the listing of the Securities, and the listing of Securities to be offered under this Shelf Prospectus by way of the Shelf Offering Reports shall be contingent upon receiving an approval for the application to list the Securities under a Shelf Offering Report which shall be submitted pursuant to the Securities Law and to the Shelf Offering Regulations.

The granting of the In Principal Approval does not constitute an undertaking for granting an approval for the listing of the Securities under a Shelf Offering Report. The application to list the Securities under a Shelf Offering Report shall be subject to the provisions of the TASE Regulations and directives promulgated thereunder as these shall be upon the filing of the application to list the Securities under a Shelf Offering Report.

According to an opinion letter of the law offices of Maples & Calder of the British Virgin Islands (the Company's jurisdiction of incorporation)[1] which was filed with the TASE: the laws of the British Virgin Islands and the incorporating documents of the Company do not restrict or prevent the offering of the securities, offered according to this Prospectus, to the public in Israel, their listing and/or their trade in the TASE and that the Offered Securities under this Prospectus, could be traded freely on the TASE and be cleared by means of the TASE clearing house without any restrictions under the laws of the British Virgin Islands and the incorporating documents of the Company. For further details, see also the Maples & Calder Opinion Letter in this matter and its translation to Hebrew, attached to this Prospectus in Chapter 11. Prior to executing the offering of any security under Shelf Offering Reports to be published by virtue of this Prospectus, the Company shall provide the TASE with an opinion in the following matters, from its BVI attorneys.

The Company is a "foreign issuer" within the meaning assigned thereto under the Securities Regulations (Annual Financial Statements), 2010 ("**Financial Statements Regulations**"), and therefore it is subject to the provisions of Rule 5 of the financial statements, including with respect to ease the company's reporting format.

[1] It is emphasized that this letter does not constitute a legal opinion with respect to Section 17(B) (3) to the Securities Law.

The Company is a "domestic issuer", as defined in Section 902 of Regulation S promulgated under the United States Securities Act of 1933, as amended (the "**Regulation S**" and the "**Securities Act**", respectively).

**The public offering made pursuant to this Prospectus, if any, will be made in Israel only to Israeli residents and will not be made in the "United States" and/or to "US Person", as such terms are defined in Regulation S, pursuant to the Regulations S exemption from the Securities Act registration requirements, as a Category 1 offering, as set forth in Section 903 thereof.**

**Any purchaser of Securities offered under this Prospectus will be deemed to have represented to the Company and its underwriters that he, she, or it is an Israeli resident who was not in the U.S. while his offer for the purchase e of the Offered Securities was filed, and that he, she, or it is not a member of the group known as U.S. Citizens, is not purchasing the Offered Securities for a person who is a member of the group known as U.S. Citizens or for a person residing in the U.S., and is not purchasing the Offered Securities with the intent of effecting a "distribution" in USA. Additionally, all Distributors (as defined in this Prospectus and in the Supplementary Notice) undertook that any offer of securities carried out by them or by whomever on their behalf will only take place in Israel and shall be made only to Israeli residents, pursuant to the Israeli Law and to the procedures and regulations applicable therein, and not in the U.S. nor to any person who is a member of the group known as U.S. Citizens. The Distributors further undertook that they will not make Direct Selling Efforts (within the meaning thereof in Regulation S) in the U.S. with respect to the offering of the Securities, and that the offering is not part of a plan to evade the registration requirements under the Securities Act.**

**This Prospectus and the offering of the Securities thereunder, and anything arising from and/or pertaining to this Prospectus, to the offering of Securities thereunder and the purchase thereof, will be subject to the laws of the State of Israel. The jurisdiction in any matter pertaining to this Prospectus and the offering of the Securities is vested to the competent courts in Israel. Purchasers of the Securities offered under this Prospectus, by consenting to purchase the aforementioned Securities, undertake to accept this exclusive jurisdiction and this choice of law.**

**Under Section 903 of Regulation S, the Securities offered pursuant to this Prospectus may be resold on the TASE by any individual (with the exception of the Company, a distributor or affiliates of any of them or any person acting on behalf of any of the foregoing persons) provided that: (a) the offer is not made to a person in the United States, (b) neither the seller nor anyone acting on the seller's behalf has knowledge that the purchase was organized on behalf of a "US Person" (as defined in Regulation S) and (c) no "directed selling efforts" (as defined in Regulation S) are made in the United States by the seller, an affiliate, or any person acting on their behalf. In the case of an offer or resale of Debentures by an officer or director of the Company or a distributor, who is an affiliate of the Company or distributor solely by virtue of holding such position, no selling concession, fee or other remuneration may be paid in connection with such offer or sale, other than the usual and customary broker's commission that would be received by a person executing such transaction as an agent, in connection with the offering or sale of the above mentioned Securities.**

**No person is authorized to take any action in the United States in connection with the offering or sale of the Securities offered under this Prospectus.**

**This prospectus and the information presented herein is not aimed for distribution in the U.S. this prospectus does not constitute a sale offering or a solicitation for a sale offering of the Securities in the U.S. or in any other jurisdiction in which the aforesaid is unlawful. The Securities offered under this Prospectus have not been listed and shall not be listed under the Securities Act nor under the securities laws of any state in the U.S. and they should not be offered or sold within U.S. territory without the registration of a proper exemption from registration within the framework of a transaction that does not comply with the Securities Act registration requirements. This Prospectus as neither reviewed not approved by the U.S. Securities and Exchange Commission, nor shall there be any public offering of Securities in the U.S. Securities can be offered or sold by way of this Prospectus only in Israel, in a transaction outside of the country under Regulation S to the Securities Act. The Securities as aforesaid shall not be offered within U.S. territory not to anyone who is a member of the group known as U.S. Citizens outside of the U.S.**

**A resolution to purchase the Securities offered under this Prospectus should be made solely based on the information included in this Prospectus. The Company did not permit nor shall it permit to any other person or entity to divulge any information different to the one set forth in this Prospectus.**

**This Prospectus does not constitute an offer of securities in any country or in any other country other than the State of Israel.**

**The Company has submitted to the TASE an opinion of a US law firm, stating that, based on the assumptions, restrictions and qualifications set forth in such opinion, the offer under the Supplementary Notice by virtue of this Prospectus is exempt from the registration requirements pursuant to Category 1 of Regulation S and that, in accordance with Regulation S, securities offered under this Prospectus will be available for resale on the TASE by any person (except as aforesaid).**

**The, offering securities according to shelf offering report by virtue of this Prospectus, with regards to the securities will be subject to the Company's compliance with the exempt from registration requirements pursuant to Regulation S, and that according to a letter of opinion of a U.S. attorney of the Company that will be provided to the TASE prior to the date of publication of a shelf offering report by the Company, according to which there is no impediment to the Company, by US law, to offer securities to the public in Israel, to register them for trade in the TASE and to trade them.**

1.4. **Capital of the Company**

1.4.1. Company's share capital on the date of the Prospectus:

| Type of Shares[2] | Registered Share Capital | Issued and Paid-Up Share Capital |
|---|---|---|
| Ordinary Shares with no Par Value | 50,000 | 1,000 |

1.4.2. Combined Equity (in USD Thousands) as of June 30, 2025:

| | |
|---|---|
| Share capital and capital funds | 276,980 |
| Retained loss | (151,781) |
| **Total equity attributed to the Parent Company's Shareholders** | **125,199** |
| **Total equity attributed to non-controlling interest** | **25,203** |
| **Total equity** | **150,402** |

2 Not registered for trade on the TASE.

For further details, see the Consolidated Proforma financial statements of the Company as of December 31, 2024, and as of June 30, 2025, attached hereto in Chapter 10 of the Prospectus

1.5. All financial data in the prospectus are in US Dollars ("**USD**"), unless explicitly stated otherwise.

# 2. CHAPTER 2 – DETAILS OF THE OFFERING

**The offering of the Debentures by the Company as described in this Prospectus Shall be carried out under this Prospectus and to a Supplementary Notice.**
**Following the publication of this Prospectus, the Company shall publish a Supplementary Notice, in which details missing in this Prospectus will be completed and/or details that can be updated will be updated in this Prospectus. In accordance with Article 16(1a)(2) of the Securities Law, 1968 ("Securities Law") and the Securities Regulations (Supplementary Notice and Draft Prospectus), 2007 (the "Supplementary Notice Regulations"), including, changes, if any, in the amount and/or the terms of the Offered Securities. ("Supplementary Notice"). The Supplementary Notice shall be published, and to the extent a Uniform Offer to the public is made, the public tender, shall be held, no later than 75 days from the publishing of the Supplementary Prospectus or 45 days from the commencement of the period for submitting subscriptions, according to the earlier. To the extent the Supplementary Notice is published and/or the tender held at a later date to the foregoing dates, the Company shall be required to file a motion to amend the Prospectus prior to making an offering under this Prospectus. Upon its publication, the Supplementary Notice will form an integral part of this Prospectus.**

The Offered Securities shall be offered by way of a Non-Uniform Offer, as is set forth in Regulation 11 to the Securities Regulations (Manner of Offering Securities to the Public), 5767-2007 ("**Offering Regulations**"), to Institutional Investors, as such term is defined in the Offering Regulations ("**Institutional Investors**"). The offer under this Prospectus shall be partially guaranteed by underwriting, whereby Infin Capital Ltd., is intended to serve as the Pricing Underwriter ("**Underwriter**" or "**Pricing Underwriter**"). However, the Company will be permitted to sell up to 30% of the issuance to whomever is not an Institutional Investor, provided that such sale shall be performed by way of a Uniform Offer at the same price at which the Offered Securities will be allocated to the Institutional Investors and at the same day, subject to the terms set forth in the Offering Regulations. For further information see section 2.4 to the Prospectus

## 2.1. Securities Offered to the Public

### 2.1.1. <u>Debentures (Series A)</u>

2.1.1.1. NIS 620,000,000 par value Debentures (Series A) (hereinafter: the "**Debentures (Series A)**" or the "**Debentures**" or the "**Offered Securities**"), offered to the public in consideration of their par value, bearing a fixed annual interest rate of 7% (the "**Annual Interest Rate**"). [1] The Debentures (Series A) are not linked (principal and interest) to any index.

---

[1] Subject to adjustments as specified in Sections 5.2 and 5.3 to the Deed of Trust to the Debentures (Series A) and/or to the entitlement to interest in arrears (as defined in Section 3.4 of the Terms and Conditions Overleaf in the First Addendum to the Deed of Trust to the Debentures (Series A), attached hereto as **Appendix 1** to this Chapter).

2.1.1.2. The Principal of the Debentures (Series A) shall be repaid in five (5) payments On November 30 of each of the years 2026 to 2030 (inclusive), so that the first four payments shall be in the rate of 2.5% of principal amount of the Debentures and the last payment shall be at the rate of 90% of the principal of the Debentures.

2.1.1.3. The Interest in respect of the Debentures (Series A) shall be paid in semiannual payments to be made on May 31 and November 30 of each of the years 2026 to 2030 (inclusive). The interest rate to be paid for a certain interest period (except for the payment for the First Interest Period (as set forth below), shall be calculated as the Annual Interest Rate divided by two.

2.1.1.4. The first interest payment on the Debentures (Series A) will be made on May 31, 2026, for the period commencing on the first trading day following the date of the report on the issuance results (as is set forth in Section 2.4.6 to the Prospectus) date and will end on the last day prior to the date of the first payment of interest (i.e., on May 30, 2025) (the "**First Interest Period**"). The First Interest Period will be calculated according to the number of days in this period on the basis of 365 days a year. The Company shall publish within the report on the issuance results, the interest rate for the First Interest Period and the semi-annual interest rate.

2.1.1.5. The following Interest payments shall be at the annual interest payment divided by two (number of interest payments per year) and shall be payable for the period commencing at the most recent interest payment and ending at the last day prior to the following payment date.

2.1.1.6. The last interest payment shall be made on November 30, 2030, alongside the last payment of the Principal on the Debentures (Series A) this against the delivery of the Debentures (Series A) certificates to the Company.

2.1.1.7. For further information regarding the terms of the Debentures (Series A) see Section 2.10 to the Prospectus and the Deed of Trust to the Debentures (Series A) (the "**Deed of Trust**").

2.2. **Method Offering Securities**

The Debentures (Series A) are offered to the Institutional Investors by way of a Nom-Uniform Offer, as stated in the Offering Regulations.

The Debentures (Series A) shall bear an annual interest in a rate of 7%, and are offered in 620,000 units (the "**Debentures (Series A) Units**" or the "**Units**"), whereby the composition of each unit and the price thereof is as set forth hereinafter:

| | |
|---|---|
| NIS 1,000 par value Debentures (Series A) at a price of | NIS 985 |
| **Total price per Debentures (Series A) unit** | **NIS** 985 |

2.3. **Registration for Trading on the TASE**

2.3.1. The TASE has given an approval in principle to this Supplementary Prospectus (the "TASE Approval to the Supplementary Prospectus"), according to which the Debentures (Series A), offered to the public under this Prospectus comply with the provisions of the TASE regulations.

2.3.2. Before publishing the Supplementary Notice, the Company will apply to the TASE to list for trading the Debentures (Series A) offered under this Supplementary Prospectus and the Supplementary Notice. Subject to approval of the TASE for the listing, as aforesaid, the Company will apply to list the securities for trading within three (3) business days after the fulfilment of the condition set forth in Section 2.3.4 to the Prospectus.

2.3.3. The TASE approval is subject to compliance with the requirements of the TASE with respect to the Debentures (Series A) as specified in this Section below.

2.3.3.1. The minimum distribution of public holdings is at least 35 holders, each of which holds a minimum holding value of NIS 200,000 (in this respect, a "Holder" will be considered as one holder with holdings exceeding the minimum holdings value per holder as mentioned above, or holding jointly with others, whose joint holdings exceed the minimum holding value per such holder as mentioned above).

2.3.3.2. The value of holdings of the public in the Debentures, after registration for trading shall not be less than NIS 36 million.

Since the public's holdings in the Debentures (Series A) is at least NIS 200 million, the Company is not required to meet a minimum equity requirement

2.3.4. Additionally, the listing of the Debentures is also contingent upon the transference of rights in the Transferred Rights (as defined in Section 7.1.6 to the Prospectus) to the Company and upon the Company issuing an Immediate Report regarding the transference of the Transferred Rights to the Company and upon receiving an approval from the Company's U.S. legal counsel (as defined in Section 1.2 to the Prospectus), whereby the Transferred Rights have been transferred to the Company.

2.3.5. In the event that there was a failure to comply with whichever of the TASE requirements as specified in Sections 2.3.3 to the Prospectus and/or the Approval of the U.S. Legal Counsel is not received and/or the Immediate Report was not issued as is set forth in Section 2.3.4 to the Prospectus within 14 business days of receipt of funds by the Dealer Manager, then the issuance of the Debentures (Series A), shall be cancelled, they will not be registered for trading on the TASE, funds received by the Dealer Manager will be returned to the subscribers, securities may not be assigned to subscribers, and the Company will issue an Immediate Report. In this regard it shall be clarified that the Transferred Rights will be transferred to the Company closely after the issuance under this Prospectus.

2.4. **Manner of Offering to the Public**

2.4.1. General

The Offered Securities shall be offered by way of a Non-Uniform Offer in 620,000 units, as is set forth Chapter C to the Offering Regulations, whereby each unit contains an equal number of Debentures (Series A) offered.

The Offered Securities are offered by the Company by way of a Non-Uniform Offer, as is set forth in Regulation 11(a)(1) of the Offering Regulations. Therefore, according to the provisions of said regulations, the offer under this Prospectus will be guaranteed in part (at least 25% of the amount of the Offered Securities) by underwriting and the offerees in the Non-Uniform Offer will be Institutional Investors (as said term is defined in the Offering Regulations). However, the Company will be permitted to sell up to 30% of the issuance to whomever is not an Institutional Investor, provided that the sale to whomever is not an Institutional Investor, shall be by way of a Uniform Offer at the same price at which the Offered Securities will be allocated to the Institutional Investors and at the same day, and the amount allocated to each investor who is not an Institutional Investor, shall be according to the relative share of his subscription out of all the subscriptions by those who are not Institutional Investors, while each investor shall be permitted to submit one subscription.

2.4.2. The Period for Submitting Subscriptions

The Periods for the submission of subscriptions under this Prospectus, shall be listed within the framework of the Supplementary Notice ("**Period for Submission of Subscriptions**")

2.4.3. Early commitments

2.4.3.1. The Company intends to hold a Book Building process place vis a vis the institutional investors, through the Pricing Underwriter. The Company has yet to accept subscriptions from said institutional investors. The allocation of the Debentures Units (Series A) amongst the Institutional Investors shall be determined at the Company's discretion, after consulting with the Pricing Underwriter.

2.4.3.2. All subscriptions from Institutional Investors in the Non-uniform Offer will be submitted to the Pricing Underwriter and the Company on subscription forms in the version sent to them by the underwriter and will specify the price per unit that will be published in the Supplementary Notice and the number of units requested for purchase. Subscriptions may be submitted to purchase entire units only. A subscription submitted for any part of a unit will be considered as an application submitted for the number of entire units specified therein only, and the part of the unit included in the application will be considered as not having been included in it in the first place. Accordingly, a subscription in which the number of units specified therein is less than one unit will not be accepted.

2.4.3.3. The subscriptions of Institutional Investors for the purchase units as aforesaid will be irrevocable. Each subscription will be considered an irrevocable commitment on the part of the subscriber to receive the securities that will be allocated to him as a result of a full or partial acceptance of his subscription, and to pay, through the Dealer Manager, whose name will be specified in the Supplementary Notice ("**Dealer Manager**"), the full price according to the terms of the Prospectus and the Supplementary Notice of the Offered Securities that will be allocated to him as a result of an acceptance of his subscription, according to the terms of the Prospectus and the Supplementary Notice.

2.4.3.4. It shall be emphasized that the Pricing Underwriter undertook that any offering of the Securities made thereby or by whomever on its behalf, will be made only in Israel and not to a US Person as such term is defined in Section 1.3 to the Prospectus.

2.4.4. Allocation of Units to the Institutional Investors

2.4.4.1. Following the Period for Submission of Subscriptions, the Offered Units shall be allocated to the subscribers in a Non-Uniform Offer, at the Company's discretion, after consulting with the Pricing Underwriter. As part of the allocation, the quantity allocated to all Institutional Investors pertaining to the group of an underwriter in the offering (whether sold to him by the underwriter pertaining to his group or sold to him by another underwriter or distributor) or in a Distributor's Group, or whose investments are managed by his group, will not exceed 5% of the quantity of units sold in the offering. If the value of the assets managed for the public by all Institutional Investors in the Underwriter's Group, as aforesaid, is higher than NIS 10 billion, the quantity allocated to them will not exceed 10% of the quantity of units offered.

2.4.4.2. "**Underwriter Group**" or "**Distributor Group**", as applicable, shall mean as said term is defined in the Offering Regulations.

2.4.4.3. All units will be sold to Qualified Investors at a uniform price per unit, (hereinafter in this section the: "**Uniform Price**"), without any discount or benefit beyond distribution fees to distributors as will be published in the Supplementary Notice.

2.4.5. Subscription and Allocation of Units to be allocated within the framework of a Uniform Offer to the Public, to the extent applicable

2.4.5.1. As aforesaid, the offerees in this Non-Uniform Offer will be Institutional Investors (as defined in the Offering Regulations), but the Company will be permitted to sell up to 30% of the offering to whomever is not an Institutional Investor, provided that the sale to whomever is not an Institutional Investor will be made by way of a-Uniform Offer, with each subscriber being allowed to submit only one subscription, at the Uniform

Price and during the Period for Submission of Subscriptions to be published in the Supplementary Notice.

2.4.5.2. The quantity allocated to each investor will be according to the relative share of his subscription out of the total subscriptions in the part of the offering open to everyone, whereby the allocation to those who are not Institutional Investors will be made shortly after the closing of the list of subscriptions in the public tender (if any). To the extent that a public tender will be held, the Company shall publish in the Supplementary Notice the date for the opening and closing of the subscription list.

2.4.5.3. If, in the allocation of securities based on the acceptance of the public tender as stated above, fractions of units are produced, they will be rounded up as much as possible to the nearest whole unit. Surplus units remaining as a result of the aforementioned rounding up will be purchased by the Dealer Manager with whom the Company will engage until the date of publication of the Supplementary Notice, at the price per unit which was determined.

2.4.6. Notice of the Results of the Issuance

On the first trading day after the ending of the Period for Submission of Subscriptions, the Company shall file an immediate report to the Securities Authority and the TASE about the results of the issuance (“**Report on the Issuance Results**”).

2.5. **The Special Account**

2.5.1. Shortly before the commencement of the Period for Submission of Subscriptions, the Dealer Manager will open a special trust account, bearing proceeds, in the Company's name, in a banking corporation (hereinafter: the "**Special Account**"). This account will be managed exclusively by the Dealer Manager in the Company's name and for it and in accordance with the Securities Law. All monies received in respect of subscriptions to purchase the Units which are included in subscriptions that were accepted will be transferred to the Special Account.

It shall be stated that the issuance consideration to investors that are not Institutional Investors, which might be performed by the Company by way of a Uniform Offer (as is set forth in Section 2.4.5 to the Prospectus) will also be deposited in the Special Account.

2.5.2. On the first trading day after the ending of the Period for Submission of Subscriptions, the Dealer Manager will charge no later than 12:00 at noon, the accounts of the Institutional Investors whose subscription for the purchase of the Debenture Units (Series A) were accepted fully or partially, as is set forth in Section 2.4.4 to the Prospectus. The aforementioned funds will be invested in unlinked liquid shekel deposits bearing interest on a daily basis.

2.5.3. Subject to the Provisions of Section 2.3 to the Prospectus, the Dealer Manager will transfer to the Company no later than 12:00 on the second trading day following the

ending of the Period for Submission of Subscriptions, the balance of the funds remaining in the Special Account together with the fruits accrued with respect thereof to the Trust Account (as is defined in the Deed of Trust) this against the transference of the Debentures to the Nominee Company and crediting the TASE member according to the Dealer Manager's instructions.

2.5.4. The Company considers the deposit of the Issuance Consideration with the Dealer Manager at the Dealer Manager's account, as the receipt of proceeds by the Company.

2.6. **Allocation of Securities, Allocation Letters and Securities Certificates**

2.6.1. At the allocation date, and provided the conditions for the transfer of the funds deposited in the Special Account by the Dealer Manager to the Company, as specified in Section 2.5.3 of the Prospectus, have been met, and against the transfer of the said funds, the Company shall allocate to the subscribers, through Tel Aviv Stock Exchange Nominee Company Ltd. (the "**Nominee Company**"), the securities included in Units in respect of which, the subscriptions to purchase have been accepted (in the Non-Uniform Offer and in the Uniform Offer, to the extent applicable), in full or in part, and the consideration has been fully paid, by delivering certificates in respect of the Debentures (Series A) to the Nominee Company.

2.6.2. The Debenture certificates can be split, transferred or waived in favor of others, subject to filling a deed of transfer or split or waiver, as applicable, and to the delivery thereof to the Company together with the certificates, and subject to payment by the subscriber of any tax or levy or expense involved therein.

2.6.3. The Company is entitled to cancel the offer under this Prospectus and the Supplementary Notice at any time prior to obtaining the issuance consideration, without the offerees having any claim in this regard. In the event of an issuance cancellation as aforesaid, the Offered Securities shall not be issued, will not be listed on the TASE, and monies shall not be charged from the subscribers with respect to the Units ordered thereby.

2.7. **Supplementary Notice**

2.7.1. Following the publication of this Prospectus, the Company shall publish a Supplementary Notice, in which details missing in this Prospectus will be completed and/or details that can be updated will be updated in this Prospectus (all, to the extent relevant) in accordance with and subject to Article 16(1a)(2) of the Securities Law and the Supplementary Notice Regulations, including details about changes, if any, in the amount and the terms and conditions of the offered Debentures and further details, *inter alia*:

A. The Period for Submission of Subscriptions, and the date of the public tender (if held);

B. The TASE approval for the listing of the Debentures;

C. Details regarding the Dealer Manager;

D. Change in the amount of the Debentures and/or in the unit price and/or in the Annual Interest Rate of the Debentures offered under this Prospectus at a rate which shall not exceed 20% of the amount and/or the Annual Interest Rate Set forth in Section 2.1.1.1 to the Prospectus if the change is with respect to the Maximum Interest Rate, and subject to the multiple of the amount of Units offered by the price shall not differ by 30% of said multiple derived from the price and quantity set forth in the Prospectus, and subject to the provisions of the supplementary notice regulations. The amount, price and Updated Annual, Interest rate will be provided in the Supplementary Notice;

E. A Change in the amount and/or in the unit price and/or in the Annual Interest Rate of the Debentures offered under this Prospectus at a rate exceeding the rate set forth in the foregoing Subsection (D), and provided that neither the price nor quantity of the Offered Securities shall differ by more than 50% of the amount and price set forth this Prospectus, as applicable, and the multiple of the price and the quantity shall not differ by more than 50% from the multiple which is derived from the amount and price set forth in Section 2.1 to the Prospectus.

F. In the event of a Uniform Offer to the Public, the total number of prior commitments provided to the Company by Classified Investors in connection with the Debentures (Series A) offered pursuant to the Prospectus and the Supplementary Notice, including their names, as well as the interest rates and amount of Debenture Units (Series A) with respect to which each of the Classified Investors has provided a commitment;

G. Details of expenses incurred due to the offer of the Debentures and issue thereof, including commissions in respect of prior commitment, coordination, and distribution;

H. Any detail the amendment of which is required, if any, by the change in the terms and conditions of the Debentures offered as aforesaid, if any

I. The amount of offered Units to be sold to whomever is not an Institutional Investor.[2]

J. The main terms of the underwriting agreement with the Pricing Underwriter

2.7.2. Upon the publishing of a Supplementary Notice, the Period for Submission of Subscriptions shall commence not prior to the publishing of the Supplementary Notice as well as not prior to the end if five (5) business days as of the publication date of the Prospectus. Additionally, to the extent in the Supplementary Notice details will be changed in rates exceeding the rates set forth in Subsection (D) above, the Period for Submission of Subscriptions for the purchase of the Securities offered hereunder shall commence not prior to the lapse of two(2) trading days from the publishing of the Supplementary Notice. The Period for Submission of Subscriptions shall end in a Non-Uniform Offer, pursuant to Regulation 11(a)(1) to the Offering Regulations, and

---

2 Up to 30% of the Units offered in this issuance.

no later than 75 days as of the publishing of the Supplementary Prospectus or 45 days as of the commencement of the period for submission of subscriptions, according to the earlier, and in a Uniform Offer as aforesaid, within the framework of the public tender, to the extent held under this Prospectus , shall end no later than seven (7) hours, five (5) of which at least being trade hours as of the publishing of the Supplementary Notice.

2.7.3. Upon its publication, the Supplementary Notice shall form an integral part of the Prospectus and shall be attached to any copy of the Prospectus to be distributed by the Company following the publishing of the Supplementary Notice.

2.7.4. The TASE approval for the listing of the Offered Securities hereunder will be granted prior to the publishing of the Supplementary Notice.

2.8. **Refraining from arrangements**

2.8.1. The Company, the directors, and the Pricing Underwriter undertake, by their signature on this Prospectus and/or the Supplementary Notice (as applicable)[3], to refrain from making arrangements that are not written in the Prospectus in connection with the offering of the securities, their dissemination and distribution to the public, and undertake to refrain from granting the right to purchasers of securities under the Prospectus to sell the securities they purchased over and above that stated in the Prospectus.

2.8.2. The Company, the directors, and the Pricing Underwriter undertake, by their signature on this Prospectus and/or the Supplementary Notice (as applicable), to notify the Securities Authority of any arrangement known to them with a third party, which violates the undertaking specified in Section 2.8.1 to the Prospectus.

2.8.3. The Company, the directors, and the Pricing Underwriter undertake, by their signature on this Prospectus and/or the Supplementary Notice (as applicable), to refrain from entering into agreements in connection with the securities offered under the Prospectus with any third party, which to the best of their knowledge and examination, drew up arrangements contrary to that stated in Section 2.8.1 to the Prospectus.

2.8.4. The Company, the directors, and the Pricing Underwriter will not receive subscriptions for securities under this issuance from a distributor that had not undertaken in writing to act in accordance with the provisions of this Section.

2.9. **Taxation**

**THE FOLLOWING DISCUSSION OF CERTAIN TAX CONSIDERATIONS IS NOT, AND SHOULD NOT BE CONSTRUED, AS TAX AND/OR LEGAL ADVICE. POTENTIAL INVESTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS TO DETERMINE THE PARTICULAR INCOME OR OTHER TAX**

---

[3] It shall be clarified that contrary zo the Company and the Directors, who will sign both the Prospectus and the Supplementary Notice, the Pricing Underwriter shall sign only the Supplementary Notice, however upon said signing, it shall be deemed the signing of the Prospectus.

**CONSEQUENCES TO SUCH INVESTORS BASED ON THEIR PARTICULAR CIRCUMSTANCES.**

2.9.1. British Virgin Island Laws

The description provided below regarding the tax laws of the British Virgin Islands is based on the applicable law on the date of the Prospectus. As at the date of this Prospectus, the State of Israel does not have an agreement or treaty with the British Virgin Islands with respect to prevention of double taxation and prevention of tax evasion.

Tax Considerations Applicable to the Debenture Holders in the British Virgin Islands

With respect to capital gains arising from the sale of the Debentures, both individuals and companies that are Israeli residents, foreign companies, including such that are residents of the British Virgin Islands, are exempt from tax in the British Virgin Islands in respect of capital gains arising to them from the sale of the Debentures and the obligation to withhold tax at the source from such capital gains does not exist in the British Virgin Islands.

With respect to capital gains arising from the Debentures, as well as to taxation in respect of discount fees for the Debentures, both individuals and companies that are Israeli residents, foreign residents and foreign companies, including such that are residents of the British Virgin Islands, are exempt from tax in the British Virgin Islands in respect of interest on the Debenture, or in respect of discount fees on the Debentures, as applicable, and the interest payable by the Company is not subject to withholding tax in the British Virgin Islands, and the holders shall be exempt from withholding tax also in respect of the discount fees on the Debentures.

For special arrangements that will be required from the holders in connection with interest payment on the Debentures, see the provisions below.

It is clarified that insofar as the obligation to withhold tax is established in the future, the Company will notify the Debenture Holders by an immediate report, shortly before the date of making the payment, and the obligation to withhold tax will be the obligation of the Company, and the Debenture Holders shall be subject to the obligation to act in accordance with the following provisions.

As at the date of the Prospectus, the obligation to withhold tax does not apply to individuals and companies that are Israeli residents as well as to foreign residents and/or foreign companies, including residents of the British Virgin Islands, in respect of capital gains arising to them from the sale of the Debentures and/or with respect to the interest payable to them from the Debentures and/or in respect of the discount fees of these Debentures.

2.9.2. US Laws

2.9.2.1. Federal Taxation in the United States

This Section summarizes the material tax implications relating to US federal income tax and US federal estate tax with respect to the purchase, holding, or sale (or any other disposition) of the Debentures.

**Unless stated otherwise, this Section applies only to an "Israeli Holder" (as this term is defined below) who holds the Debentures as a capital asset for US federal income tax purposes (in general, an asset held for investment purposes).**

This description is based on the provisions of the US Internal Revenue Code of 1986, as amended (the "**Code**"), the Code's legislative history, existing and proposed regulations published by the US Department of the Treasury, legal interpretations and administrative guidelines published by the US Internal Revenue Service (the "**IRS**"), which may, in limited circumstances, apply retroactively as specifically provided in the regulations, and all of which are subject to various interpretations. This description does not address all aspects of US federal income tax that may apply to investors in view of their special circumstances or to investors who are subject to special treatment according to US federal income tax laws. In addition, this description is based on the treaty between the United States and the government of Israel in relation to taxation of income, which was signed on November 20, 1975 and was amended by protocols that were signed on May 30, 1980 and January 26, 1993 (the "**Treaty**").

For the purpose of this discussion, a holder of Debentures is an "Israeli Holder" if such holder is an Israeli resident for the purposes of the Treaty, is entitled to benefits of the Treaty, and is the beneficial owner of the Debentures , provided that such holder is not for US federal income tax purposes: (a) an individual that is a US citizen or resident; (b) an individual that is a former US citizen or resident subject to the special rules prescribed in Sections 877 or 877A of the Code; (c) a corporation, partnership, or other entity created or incorporated under the laws of the United States or any State within the United States or the District of Columbia; (d) a trust if (1) a US court has the authority to exercise primary supervision over its administration and one or more US persons have the authority to control all substantial decisions of the trust, or (2) the trust was in existence on August 20, 1996, and, pursuant to applicable Treasury Regulations, has in effect a valid election to be treated as a domestic trust; (e) an estate, the income of which is subject to US income tax, regardless of its source; or (f) otherwise an entity or arrangement classified as a partnership.

**This summary is general in nature and does not address all the US federal income tax implications that may be relevant to Israeli Holders**

**given their special circumstances or to certain types of investors who are subject to special tax treatment under the US federal income tax laws, such as Government authorities, banks or financial institutions, insurance companies, non-US entities that may be classified as partnerships or trusts for US federal income tax purposes, controlled foreign corporations, passive foreign investment companies, dealers in securities or currencies, tax-exempt investors, employees who receive the securities as part of their salaries or within the framework of their employment, and Israeli Holders who hold (directly or indirectly) at least 10% of the voting powers in the payor.**

**Israeli Holders are recommended to consult their tax advisors regarding the implications of the Israeli income tax law and taxes on personal property, franchise, local, state and federal, US and other tax consequences, including the application of the treaty provisions relating to the acquisition, ownership and sale of securities.**

Because the Company, a British Virgin Islands corporation, has elected on IRS Form 8832 to be treated as a partnership for US federal income tax purposes, the US tax law treats the Debentures as issued by a pass-through entity. Accordingly, the Company generally will not pay US federal income taxes at the entity level, and US tax obligations generally flow through to the Company's owners.

2.9.2.2. Taxation of Israeli Holders

The US federal income tax laws applicable to Israeli Holders of the Debentures are complex, and this section will only provide a brief summary of these laws. It is recommended to prospective investors to consult their own tax advisors to determine the impact of the federal tax laws of the United States and other jurisdictions (including Israel) as well as any relevant income tax treaties regarding an investment in the Debentures (Series A) and the related reporting obligations**.**

2.9.2.3. Interest Income

In general, interest income (including original issue discount, hereinafter referred to as "**OID**") received by an Israeli Holder with respect to the Debentures is foreign-source income for U.S. federal income tax purposes, unless such income is effectively connected with a U.S. trade or business of the Israeli Holder or the Company has U.S.-source income. As a result, U.S. withholding tax generally does not apply unless the interest is treated as U.S.-source income.

If the interest is U.S.-source, the 30% U.S. withholding tax may apply. Israeli Holders may be eligible for a reduced treaty rate under the U.S.–Israel tax treaty, subject to applicable certification requirements, including furnishing a valid IRS Form W-8BEN, W-8BEN-E, or W-8IMY.

Israeli Holders may also qualify for the Portfolio Interest Exemption under U.S. law, but such exemption applies only if all requirements are satisfied, including:

1. The Israeli Holder does not own, directly or indirectly, at least 10% of the voting power of the Company;
2. The Israeli Holder is not a controlled foreign corporation related to the Company's equity owners;
3. The Israeli Holder is not a bank receiving interest in the ordinary course of lending; and
4. Proper W-8 documentation is provided to the withholding agent.

Except as otherwise provided by the Treaty, interest effectively connected with a U.S. trade or business of the Israeli Holder is subject to U.S. federal income tax. In such cases, an Israeli Holder classified as a corporation for U.S. tax purposes may also be subject to U.S. branch profits tax at the statutory or treaty-reduced rate, and potentially applicable U.S. state and local taxes.

2.9.2.4. <u>Sale, Exchange, Repurchase, Redemption or Other Disposition of Debentures</u>

An Israeli Holder generally will not be subject to US federal income tax on any profit from sale, exchange, repurchase, redemption, or other disposition of the Debentures (other than any amounts representing accrued and unpaid interest, which generally will be treated as interest, as described above) unless: (1) the profit is effectively connected with a trade or business of the Israeli Holder within the United States and, if the Treaty applies, such profit is attributable to a permanent establishment of the Israeli Holder in the United States; or (2) if the Israeli Holder is an individual, such Israeli Holder was physically present in the United States for a total of 183 days or more in the taxable year in which the disposition took place and certain additional requirements are satisfied.

2.9.2.5. <u>Federal Estate Tax</u>

If the interest on the Debentures qualifies for the Portfolio Interest Exemption and the interest is not treated as U.S-source income, described above, then Debentures held by an individual Israeli Holder at death will not be included in such individual's gross estate for US federal estate tax purposes.

2.9.2.6. <u>Backup Withholding Tax and Reporting Duties</u>

The Company is required to perform "backup withholding" on a gross basis on all interest payments on the Debentures if certain requirements are not met. Under current law, the backup withholding tax rate is currently 24%. Backup withholding does not apply to payments on the Debentures to an Israeli Holder if the relevant confirmations described below (under the heading of -- *Completion of IRS Form W-8BEN, IRS Form W-8BEN-E or IRS Form W-8IMY by Debenture Holders*) are duly provided by the Israeli Holder,

provided the Company has no actual knowledge or reason to know that the Israeli Holder is a US person. The backup withholding tax (if any), for any Israeli Holder, will be reported to the IRS. Failure to provide valid W-8 forms may also result in reporting obligations to the IRS.

2.9.2.7. <u>Completion of IRS Form W-8BEN, W-8BEN-E or W-8IMY by Debenture Holders</u>

The Debenture Holders that purchase the Debentures pursuant to this Prospectus, and any holders that purchase said Debentures at a later stage, will be required, as a condition of such purchase, to complete an IRS Form W-8BEN, IRS Form W-8BEN-E, or IRS Form W-8IMY (together with appropriate attachments, or IRS Form W-8ECI.

**For the avoidance of any doubt, it shall be noted that any holder of Debentures that fails to provide an IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-8IMY (together with appropriate attachments) or IRS Form W-8ECI completed as required, will be subject to withholding tax on all interest payments at a rate of 30% as described above.**

**If in the future the Withholding Tax obligations shall apply to the Company, the Company shall provide notice thereof by way of an Immediate Report closely prior to the payment date, and the Withholding Tax obligation shall be borne by the Company.**

2.9.2.8. <u>Additional Operating Requirements</u>

On or before December 15 of each calendar year, the Company shall submit to the TASE Clearing House a draft IRS Form 1042, including a breakdown of the various payments the Debenture Holders who purchased the Debentures (pursuant to this Prospectus) are entitled to receive from the Company, through the Nominee Company and the TASE Clearing House, according to the terms of the Debentures and the terms of the Deed of Trust, including interest payments, prepared as required by law. Each year, the Company will provide the TASE Clearing House the IRS Form 1042, in their final version, duly prepared for the ending calendar year, pursuant to the schedule set forth in the TASE bylaws.

2.9.2.9. <u>The Foreign Account Tax Compliance Act</u>

Pursuant to Sections 1471 –1474 of the Code , enacted in 2010 by legislation commonly known as the Foreign Account Tax Compliance Act ("**FATCA**"), a gross withholding tax of 30% may be imposed on certain U.S.-source payments of interest (including interest on the Debentures), financial institutions, either as beneficial owners or as intermediaries, if certain certification or other requirements are not satisfied. Under current guidance, FATCA withholding generally does not apply to gross proceeds from the sale, exchange, repurchase, redemption or other disposition of obligations that

produce U.S.-source interest (such as the Debentures), although certain aspects of these rules remain subject to interpretation and regulatory guidance.

In the case of payments made to a "foreign financial institution" as defined under FATCA, subject to certain exceptions, the FATCA withholding tax generally will be imposed unless such institution (1) collects and provides to the IRS or other relevant tax authorities certain information regarding US account holders of such institution pursuant to an agreement with the IRS or applicable foreign law enacted in connection with an intergovernmental agreement, and (2) complies with obligations to withhold and report on certain payments to certain of its account holders and to certain other persons. In the case of payments made to a foreign entity that is not a foreign financial institution (as so defined), subject to certain exceptions, FATCA withholding tax generally will be imposed unless such foreign entity provides the withholding agent either (1) a certification that it does not have any "substantial United States owners" as defined under FATCA or (2) certain information regarding its substantial United States owners.

The failure of either an Israeli Holder or any non-US intermediary within the chain of ownership to comply with the certification or other requirements imposed under FATCA or an applicable intergovernmental agreement generally will result in 30% withholding. No additional amounts will be payable on account of any withholding obligation that is imposed with respect to payments on the Debentures as a result of the failure of any Israeli Holder of a Debenture, or any non-US intermediary through which such holder directly or indirectly owns such Debenture, to comply with the requirements of FATCA.

2.9.3. Income Taxation under the Laws of the State of Israel

As is customary in investment decisions, the investor must consider the tax implications related to the investment in Securities included in the Prospectus. The provisions contained in the Prospectus do not purport to be a complete and/or competent interpretation of the statutory provisions, or an exhaustive description of the tax provisions relating to the Securities included therein, nor is it a substitute for professional legal advice on the matter, which should be obtained according to the particular circumstances of each investor.

It will be clarified that the following refers to the manner of taxation of Israeli investors only. Therefore, it is suggested that a foreign resident interested in purchasing the offered securities seek professional advice before making the purchase.

The provisions contained in the Prospectus in relation to the taxation of the Securities do not purport to be a competent interpretation of the statutory provisions mentioned in the Prospectus, nor do they replace professional advice, in accordance with the particular circumstances of each investor.

Aspects of the Israeli Companies Tax.

Pursuant to Section 1 of the Income Tax Ordinance (New Version), 5721-1961, (hereinafter: "**the Ordinance**"), a company shall be considered an Israeli resident for tax purposes if incorporated in Israel or if the control and management thereof are activated from Israel. The terms "control" and "management" are not defined in the Ordinance. The Company was incorporated according to the laws of British Virgin Islands and to its best knowledge, registration of the Company's offered Securities for trading on the TASE, in and of itself, does not constitute control and management in Israel, therefore, to the best knowledge of the Company, it is not considered an Israel resident for income tax purposes.

A foreign resident body of persons is liable to tax in Israel only on income from Israeli sources. The Company does not expect to have income from Israeli sources.

Taxation Aspects Applicable to the Debenture Holders

It should be clarified that the following refers only to the way investors Israelis are taxed. Therefore, it is advisable to a foreign resident who wishes to purchase the offered securities should seek professional advice before making a purchase. Under the currently existing applicable law, the tax arrangements in Israeli described briefly below apply to the Securities offered under this Prospectus:

2.9.3.1. Taxation of Capital Gains from the Sale of Marketable Securities

A. Capital gain from the sale of securities by Israel residents

Pursuant to Section 91 of the Ordinance, a capital gain of an individual selling a debenture which in not linked to the Index[4] (or which is not denominated in a foreign currency or whose value is not linked to a foreign currency), similarly to the Securities offered under this Prospectus, shall be liable to tax at a rate not exceeding 15%, and the entire capital gain shall be regarded as a real capital gain. Regarding the sale of securities by an individual who is a "Substantive Shareholder" in a company – *i.e.* who holds, directly or indirectly, alone or with another[5], at least 10% of one or more categories whatsoever of the means of control in the company on the date of the sale of the securities or on any date in the 12 months preceding said sale – the tax rate on the capital gains will be at a rate which does not exceed 30% (hereinafter: "**Substantive Shareholder**").

Furthermore, regarding an individual who has claimed real interest expenses and linkage differentials due to the securities, the capital gains from the sale of the securities will be taxed at the rate of 30%, until the determination of provisions and terms for the deduction of real interest expenses pursuant to Sections 101A (A) (9) and 101A (B) of the

---

4 As this term is defined in Section 91 of the Ordinance.
5 As this term is defined in Section 88 of the Ordinance.

Ordinance. Such reduced tax rate will not apply to an individual whose income from the sale of the securities is income from "business", in accordance with the provisions of Section 2(1) of the Ordinance. In such case, the individual will be liable to tax at a marginal tax rate in accordance with the provisions of Section 121 of the Ordinance.

A body of persons which is an Israel resident shall be liable to tax on a real capital gain from the sale of securities at the rate prescribed in Section 126(A) of the Ordinance (23% at the issue).

Exempt mutual funds as well as provident funds and tax-exempt bodies under Section 9(2) of the Ordinance, are exempt from tax in respect of capital gains from the sale of securities as aforesaid, upon fulfillment of the terms set forth in that Section, and provided such bodies issue the appropriate approvals. The income of a liable mutual fund from the sale of securities will be subject to the tax rate applicable to the income of an individual whose income does not constitute an income from "business" or "occupation", unless expressly stated otherwise by law. If no special tax rate is determined for such income, it will be taxed at the maximum rate prescribed in Section 121 of the Ordinance.

Generally, a foreign resident is liable to capital gain taxes in Israel only for capital gains deriving from or created in Israel. In the event a foreign resident is liable to capital gain taxes in Israel, pursuant to the provisions set forth in the Ordinance, a foreign resident shall be exempt from paying taxes on capital gains deriving from the sale of securities traded in the Stock Exchange, if said capital gain is not in its permanent operations in Israel[6]. In the event said exemption is not applicable, the provisions of the Tax Treaty between Israel and the foreign resident's country of residency (if any) shall apply.

Losses in the tax year, whose source is from the sale of securities offered during the tax year and capital gains were taxable by their receivers, if the capital gains and land betterment including the gain on the sale of securities, traded or not traded, Israeli or foreign, as well as against interest paid in respect of that securities or interest and dividend paid on other securities (provided that the tax rate on interest or dividends did not exceed the corporate tax rate with respect to a company and has not exceeded the tax rate set forth in Sections 125(B) (1) to the Ordinance and 125(C) (b) to the Ordinance with respect to an individual (a 25% tax rate)), in the same tax year. Offsetting the losses will be offset by capital losses against capital gains or income from interest or dividend as stated.

---

[6] The aforesaid shall not apply to a foreign company held by an Israeli resident, as is set forth in Section 68A to the Ordinance.

Pursuant to the Income Tax Regulations (Deduction from Consideration, Payment or Capital Gain in the Sale of Securities, in the Sale of a Unit in a Mutual Fund or in a Future Transaction) 5762-2002 ( the **"Capital Gain Deduction Regulations"**) when calculating the capital gain for the purpose of Withholding Tax with respect to the sale of tradable securities, units in mutual funds and future transactions (**"Tradable Securities"**) the debtor shall offset in the Withholding Tax the capital loss created from the sale of the Tradable Securities managed thereby; this, subject to the gain being created at the same tax year as the loss, whether prior to the loss being created or following said date.

With regard to the withholding tax from the real capital gain in the sale of the offered securities, in accordance with the capital gain deduction regulations, the debtor (as this term is defined in the aforementioned regulations) who pays the seller consideration for the sale of the securities, will deduct a tax at a rate of fifteen percent (15%) from the real capital gain in respect of the security which is not linked to the index when the seller is an individual, and at the corporate tax rate (23% at the time of issue) the real capital gain when the seller is a group of people. This is subject to exemption approvals (or a reduced rate) from withholding tax and subject to offsetting losses that the withholding agent is allowed to make. Also, no withholding tax will be deducted for provident funds, trust funds and other entities that are exempt from withholding tax according to the law. If at the time of the sale the full amount of the withholding tax is not deducted from the real capital gain, the provisions of Section 91(d) of the Ordinance and the provisions pursuant thereto regarding reporting and advance payment by the seller for such sale shall apply.

To the extent that the securities offered according to this prospectus are deleted from trading on the stock exchange, the withholding rate that will be deducted at the time of their sale (after the deletion) will be thirty percent (30%) of the proceeds, as long as a certificate from the assessor ordering a different rate of withholding tax has not been produced (including exemption from withholding tax).

The provisions of the Capital Gain Deduction Regulations will not apply to a debtor who is a financial institution that pays the seller who is a foreign resident consideration or other payment due to an exempt capital gain, if the foreign resident submitted to the financial institution within 14 days from the day the account was opened and once every three years, if he was in Israel, he or his representative, a statement in form 2402 about being a foreign resident and his eligibility for exemption.

Generally, a foreign resident (both an individual and a company) is exempt from capital gain tax for the sale of securities traded in the Stock Exchange, if the capital gain is not in its permanent place of operations in

Israel. The foregoing shall not apply to a foreign company held by an Israeli resident as is set forth in Section 68A to the Ordinance. In the event said exemption is not applicable, the provisions of the Tax Treaty between Israel and the foreign resident's country of residency (if any) shall apply. Furthermore, Withholding Tax shall not be deducted by a banking corporation or by a Stock Exchange member for a foreign resident upon the fulfillment of certain terms.

2.9.3.2. Tax rate applicable to interest income from debentures

Pursuant to Section 125C (C) of the Ordinance, an individual shall be liable to tax on income from interest (including withholding fees) from a Debenture that is not indexed, at a rate of 15%.

Pursuant to Section 125C (D) of the Ordinance, the reduced rates stated above shall not apply if, *inter alia*, one of the following terms is met: (1) the interest is an income from "business" or "occupation" under Section 2(1) of the Ordinance or is registered in the accounting books of the individual or is subject to such registration; (2) the individual has claimed deduction of interest expenses and linkage differentials on the debentures (3) the individual is a Substantive Shareholder – as defined in Section 88 of the Ordinance – in the company paying the interest. In such cases a marginal tax shall apply, in accordance with the provisions of Section 121 of the Ordinance as set forth above.

The tax rate applicable to interest income or discount fees of an Israel resident body of persons which is not a body of persons to which the provisions of Section 9(2) of the Ordinance apply in determining its income, except in the matter of Section 3(H) of the Ordinance in respect of accrued interest, is the corporate tax rate (23% in 2024).

As a general rule, a foreign resident is not liable to tax in Israel when the domicile of the interest payer is not in Israel. To the extent that the payer of the interest is a resident of Israel, a foreign resident is exempt from tax on income from interest, discount fees or linkage differences due to a bond traded on the stock exchange in Israel, issued by a member of the public, a resident of Israel, provided that the income is not in a permanent establishment of the foreign resident in Israel. To the extent that the exemption as stated above does not apply, the tax rate that will be applied to interest income by non-residents (individuals and partners) derived from the securities, may be subject to the provisions of treaties to prevent double taxation concluded between the State of Israel and the non-resident's country of residence.

Exempt mutual funds as well as provident funds and tax-exempt bodies under Section 9(2) of the Ordinance, are exempt from tax in respect of income from interest or discount fees as aforesaid, upon fulfillment of the terms set forth

in Section 3(H) of the Ordinance regarding interest or discount fees accumulated during the time it was held by another, and only if the appropriate approvals are provided by them. The income of a liable mutual fund from the sale of interest or discount fees will be subject to the tax rate applicable to the income of an individual whose income does not constitute an income from "business" or "occupation", unless otherwise stated.

Pursuant to the Income Tax Regulations (Deduction from the Interest, Dividends and certain Profits), 5766-2005 ("**the Deduction Regulations**"), the tax to be withheld from interest (as defined in the Deduction Regulations) , with respect to an ASE payable on debentures that are traded on the [7] individual who is not a Substantive Shareholder in the company paying the interest in the case where the debentures are not linked to the Consumer Price Index or to a foreign currency, is 15%. With respect to an individual who is a Substantive Shareholder in the company paying the interest or provides it with services or sells products to such a company, the tax rate will be according to the maximum marginal tax rate under Section 121 of the Ordinance as specified above. With respect to a body of persons (Israel resident and foreign resident), tax at the corporate tax rate prescribed in Section 126(A) of the Ordinance will be deducted.

The rate of tax that will be withheld at source for a foreign resident, insofar as he is liable for tax as stated above, is subject to the provisions of the Convention for the Prevention of Double Taxation to which the State of Israel is a signatory.

The Company[8] will withhold at source, from the interest payments that it will pay to the Debenture holders the tax payments it must withhold at source, except for entities that are exempt from withholding tax as stated by law.

In regulation 4 of the Income Tax Regulations (calculation of capital gain on the sale of a security traded on the stock exchange, a state lender or unit in a mutual fund), 2002, it is established that upon the redemption of a bond traded on the stock exchange in which discount fees are also paid, the redemption proceeds shall be considered plus fees The discount, if all of these are met: (1) the capital gain from the sale of the bond is not tax-exempt; (2) at the time of redemption, there is a capital loss and (3) the redemption is not in the hands of the owner of the bond from the date it was assigned or issued, and all Up to the amount of the capital loss. The discount fees that are considered as consideration according to these instructions will not be considered as income according to section 2(4) of the ordinance.

---

7 Interest - interest, linkage differences that are not exempt under any law, including partial linkage differentials, as defined in Article 9 (13) of the Ordinance and withholding fees.

8 Directly or through TASE members, under the provisions of the Tax Authority dated 27 December 2010 and the provisions of the Tax Authority as will be from time to time.

2.9.3.3. Surtax on high incomes

In accordance with Section 121B of the Ordinance, an individual whose taxable income rising in the Tax Year (2024) exceeds NIS 721,560 (a sum that is adjusted annually), must pay taxes on the portion of his taxable income in excess of this amount, at an additional rate of 3%. Provisions of this section apply, among other, to capital gains from securities, excluding the inflationary component of capital gains, and on dividend and interest income.

In accordance with the Economic Efficiency Law (Legislative Amendments to Achieve Budget Goals for Budget Year 2025) (Freezing Tax Updates and Surtax),2024, in 2025-2027, the amount of the above-mentioned taxable income will be frozen, so that in the above-mentioned tax years this amount will not be adjusted according to the rate of increase in the index. In addition, the above-mentioned law stipulates that an additional tax of an additional 2% (beyond the existing 3%) will be imposed on "taxable income from capital sources" which includes, among other things, capital gains, interest and dividends.

2.9.3.4. Issue of Additional Debentures under the Expansion of a Series

Since the debentures (Series A) are issued at par value, there will not be a discount to the offering pursuant to this Prospectus.

In the event that the Company issues additional Debentures(Series A) in the future, as part of the expansion of the Series, at a discount rate different than the discount rate of the Series (including absence of discount, if relevant), the Company shall apply to the Tax Authority, before the expansion of the Series, in order to obtain its approval that as for withholding tax on discount fees in respect of the Debentures (Series A), a standard discount rate will be set for the Debentures according to a formula weighing the different discount rates of the same Series, if any (hereinafter in this Section: "**Weighted Discount Rate**"). In case of obtaining such an approval, the Company shall calculate, prior to the expansion of the Series, the Weighted Discount Rate in respect of all the Debentures in accordance with the said approval, and prior to the expansion of the Series, the Company will issue an Immediate Report ( to the extent possible within the framework of the Report on the Issuance Results) in which it will set forth the Weighted Discount Rate for all the Series and also the company will deduct tax on the redemption dates of the Debentures of that said Series according to the discount rate stated above and in accordance with the provisions of the law. In such a case, all other statutory provisions relating to taxation of discount fees shall apply. In case the aforementioned approval is not obtained from the Tax Authority, the Company shall file an immediate report prior to the expansion of the Series, in which it will notify of the failure to obtain the approval and about the fact that the standard discount rate will be the highest discount rate created in respect of the Series, and all other statutory provisions relating to taxation of

discount fees shall apply. The members of the TASE shall withhold tax upon redemption of the Series, according to the rate reported as aforesaid.

Therefore, there may be cases where the Company will withhold tax in respect of discount fees at a rate higher than the discount fees prescribed for Debentures Holders of that same Series prior to the expansion of the Series (hereinafter: "**Surplus Discount Fees**"), whether or not the approval of the Tax Authority for determining a Standard Discount Rate to that same Series has been obtained. An assessee holding the Debentures of that said Series prior to the expansion of the Series and until repayment of the Debenture he holds, shall be entitled to submit a report to the Tax Authority and receive tax return in the amount of the tax deducted from the Surplus Discount Fees, provided he is entitled to such a return by law.

The TASE members shall withhold tax payments that must be withheld from the interest payments paid by them to the Debenture Holders, except with respect to entities exempt from withholding tax pursuant to the law. On the repayment dates of the principal of the Debentures, the TASE members shall withhold tax in respect of the discount fees, if any.

As of the date of the Prospectus, the Company began the process of opening an income tax deductions account in Israel.

**The above general description does not replace individual advice by experts, while paying attention to the special circumstances of each investor. It is recommended to all those wishing to purchase Securities under this Prospectus, to seek professional advice in order to clarify the tax results that will apply to it, taking into account its special circumstances.**

**As is customary when making decisions on financial investments, it is necessary to consider the tax implications related to the investment in the Securities offered under this Prospectus. It shall be clarified that the foregoing reflects the statutory provisions described therein as at the date of the Prospectus, and the provisions of relevant tax treaties, which may all change and lead to different results. In addition, it should be emphasized that the foregoing does not purport to be a competent interpretation of the statutory provisions mentioned in the Prospectus; therefore, the above general description does not replace an individual advice by experts, while paying attention to the special circumstances of each investor. It is recommended to all those wishing to purchase Securities under this Prospectus, to seek professional advice in order to clarify the tax results that will apply to it, taking into account its special circumstances.**

2.10. **Terms and Conditions of the Debentures**

2.10.1. In any case where the due date for any payment occurs on a day that is not a business day, the due date will be postponed to the first next business day, without additional payment, and the record date for the purpose of determining the entitlement to redemption or interest will not change as a result thereof.

2.10.2. The payment to those entitled will be made in check or bank transfer payable to the bank account of the people whose names are recorded in the Debenture Holders Register, and which were listed in the details provided in writing to the Company beforehand, in accordance with Section 2.7.4 to the Prospectus. If the Company is unable to pay any sum to those entitled to it, for a reason beyond its control, the provisions of Section 14 of the Deed of Trust shall apply.

2.10.3. The Debenture Holder will inform the Company of the bank account details for crediting the payments in accordance with the Debentures as aforesaid, or of any change in the details of the said account or in the Holder's address, as applicable, by a notice sent to the Company by registered mail. The Company will be obligated to act in accordance with the Holder's notice with regard to a change as stated after fifteen (15) Business Days have passed from the date on which the Holder's notice arrived at the Company.

2.10.4. Should a Debenture Holder entitled to payments as aforesaid, fail to furnish the Company with the details of its bank account beforehand, each such payment on account of interest and principal will be made by check, which will be sent by registered mail to his most recent address that is listed in the Debenture Holders Register. Sending a check to an entitled Holder by registered mail as stated will be deemed, for all intents and purposes, as the payment of the amount quoted therein on the date on which it was sent by mail as stated, provided that the check was duly honored upon presenting it for payment.

2.10.5. The Debentures (Series A) shall have an equal security level *pari passu*, among themselves in connection with the Company's obligations under the Debentures, and without any prerogative or preference of one over the other.

2.10.6. All payments in respect of the Debentures (Series A) will be subject to the deduction of any mandatory payment required by law (see Section 2.9 to the Prospectus and Section 3.8 in the Terms and Conditions Overleaf to the Deed ofTrust).

2.10.7. **Expansion of Existing Series and Issuance and Allocation of additional Debentures and Securities**

2.10.7.1. The Company shall be entitled to issue additional Debentures (Series A) in accordance with the terms provided for in Section 4.1 of the Deed of Trust and subject to the receipt of the TASE's approval for listing such additional Debentures for trade.

2.10.7.2. The Company shall be entitled to issue, at any time, additional series of debentures and/or other securities of any kind whatsoever, without having to obtain approval from the trustee and/or holders existing at that time, as aforesaid in Section 4.2 of the Deed of Trust.

2.10.8. **Obligations**

The Company assumed obligations which it must meet until full repayment of the amounts to which the Debenture Holders (are entitled – for details, see Sections 5 and 18 of the Deed of Trust.

2.10.9. **Immediate Repayment**

The Debentures (Series A) may be called for immediate repayment upon the occurrence of the events described in Section 8 of the Deed of Trust.

2.10.10. **Early Redemption (Forced or at the Company's Initiative)**

The Debentures (Series A) might be subject to an early redemption either forced or according to the Company's decision, as described in sections 7.1 and 7.2 of the Deed of Trust.

2.10.11. **Arrears Interest**

For details about the arrears interest applicable to the Debentures, see section 3.4 of the Terms and Conditions Overleaf in the Deed of Trust.

2.10.12. **The rating of the Debentures**

The Debentures (Series A) are rated by Midroog Ltd. ("**Midroog**") (P)A3.il rating with a stable outlook in a scope of up to NIS 480 par value; For information regarding the Rating Report and Midroog's consent letter as aforesaid, see **Appendix A** to this Chapter of the Prospectus.

Prior to the publication of the Supplementary Notice, the Company intends to contact Midroog with a request to increase the quantity of Debentures (Series A) determined by it within the framework of the aforementioned rating report.

For a detailed disclosure of the Protecting mechanism in the Deed of Trust see **Appendix C** to this chapter of the Prospectus.

2.11. **Deed of Trust in respect of the Debentures (Series A)**

The Company entered into a Deed of Trust with Mishmeret -Trust Services Ltd. (the "**Trustee**") which regulates the terms and conditions of the Debentures (Series A)

The details of the Trustee provided to the Company, as at the date of the Prospectus, are as follows: Menachem Begin Street 46-48, Tel-Aviv, Phone Number: 03-6374352 Fax: 03-6374344. The contact person on behalf of the Trustee is CPA Rami Sabati, Email ramis@mtrust.co.il [9]. The Trustee is a company registered in Israel, engaged in trusts, and it complies with the qualification requirements to serve as a trustee for the debentures set forth

[9] As communicated to the Company by the Trustee: On November 17, 2025, a motion was filed against the Trustee for approval of a class action lawsuit in connection with his role as trustee for the holders of the debentures (Series C) of Automax Motors Ltd. by a holder of the said debentures. The Applicant claims, in essence, that the Trustee violated his statutory and contractual duties and acted negligently. According to the Applicant, the Trustee did not exercise his powers of supervision and inspection to discover the company's alleged fraud, and according to the Applicant, the alleged failure of the Trustee caused disciplinary damage. The Trustee rejects the claims and believes that he acted as required by the trust deed and fulfilled his fiduciary duties according to law, and that the claim is based on incorrect facts.

in the Securities Law, 5728-1968 (the "**Securities Law**") and the regulations promulgated thereunder.

The Trustee declared in the Deed of Trust that it complies with all the qualification requirements necessary for a trustee for debt certificates pursuant to the Securities Law and any other law, and that it agreed to sign the Deed of Trust and act as the trustee of the holders of the Debentures.

The Trustee's signature on the Deed of Trust does not constitute an expression of opinion on its part with respect to the nature of the securities offered or the profitability of the investment therein.

2.12. **Pricing Underwriter, Coordination and Distribution**

2.12.1. The offering of the Securities pursuant to this Prospectus, the Company shall be by way of a Non-Uniform Offer according to Regulation 11(a)(1) to the Offering Regulations, and therefore the Non- Uniform Offer shall be guaranteed by underwriting of at least 25% of the Offer.

2.12.2. Accordingly, the Company intends to enter into an underwriting agreement with the Pricing Underwriter (as defined above). The main terms of the underwriting agreement, including the name of the Pricing Underwriter and of other underwriters (if any), their participation rate in guaranteeing the offer, the prior commitments that were given, including distribution fees in respect of the undertakings aforesaid, and the existence of an undertaking to indemnify the underwriters, if any, will be provided in the Supplementary Notice.

2.12.3. The Pricing Underwriter shall execute the Supplementary Notice by virtue thereof the offered securities shall be offered and said signature shall be deemed a signature of the Prospectus, and said signature constitutes a condition for the publishing of the Supplementary Notice.

2.12.4. It shall be clarified, that as of the Prospectus date the underwriting undertaking has yet to enter into force, and the underwriting undertaking shall enter into force only upon the signing of the underwriting agreement and the publishing of the Supplementary Notice.

2.12.5. Furthermore, subject to the provisions of any law, the Company will be entitled to engage with distributors and pay distribution fees to those who will act as distributors.

Within the framework of the Supplementary Notice, disclosure shall be provided (if applicable) as to the identity of the distributors and the Dealer Manager, as well as of the fees they are expected to receive, and details regarding relationships between distributors and Qualified Investors and between the distributors and the Company and/or to the interested parties therein, if any.

2.13. **Offering of the Securities under A Shelf Prospectus**

By virtue of this Prospectus which constitutes a Shelf Prospectus, the Company shall be entitled to offer Securities ( non-convertible Debentures, Options realizable into Debentures and tradable

Securities, jointly in this section: the **"Securities"**) pursuant to the provisions of Section 23A to the Securities Law, by way of Shelf Offering Reports in which all necessary information shall be completed as required under Chapter C to the Securities Regulations (Prospectus Details and Draft Prospectus - Structure and Form) 5729-1969, pertaining to said offering, including the details and terms of the Securities as well as the composition of the offered Units; this pursuant to any law, and particularly pursuant to the TASE Regulations and Guidelines, as they shall be at such time, and pursuant to the type of Securities Offered under said Shelf Offering Report.

## Appendix A to chapter 2

## Rating Report and letter of Consent

## Appendix B to Chapter 2

## <u>The Deed of Trust (Series A)</u>

***Convenience translation***

# Debentures (Series A) Deed of Trust

**Made and entered into on November 27, 2025**

**By and Between**

**SIMAD Holdings Ltd. and Mishmeret -Trust Services Ltd.**

**Deed of Trust**

**Made and entered into on November 27, 2025**

**Between**

**SIMAD Holdings Ltd.**

A Company incorporated under the laws of the British Virgin Islands, whose registered office and address are as follows:

| | |
|---|---|
| The registered office of the Company in the British Virgin Islands: | c/o Maples Corporate Services (BVI) Limited<br>PO Box 173<br>Kingston Chambers<br>Road Town, Tortola<br>British Virgin Islands |
| The Company's address in Israel for purposes of service of process: | 98 Yigal Alon Street, Tel Aviv<br>c/o Goldfarb Gross Seligman & Co.<br>Telephone: 03-608-9999<br>Facsimile: 03-6089909 |

(the "**Company**" or the "**Corporation**")

**On the one part**;

**And**

**Mishmeret -Trust Services Ltd.**

Of 46-48 Menachem Begin Rd., Tel-Aviv

Tel: 03-637-4352

Facsimile: 03-637-4344

(the "**Trustee**")

**On the other part;**

**Table of Contents**


| Section | Topic | Page |
|---|---|---|
| **Deed of Trust** | | **2** |
| **1** | Preamble; Interpretation and Definitions | **5** |
| **2** | Issuance of the Debentures; Terms of Issue; Equal Rank | **9** |
| **3** | Purchase of Debentures by the Company and/or a Related Holder | **10** |
| **4** | Expansion of Series of Series A Debentures and Issuance and Allotment of Shares and Other Securities | **11** |
| **5** | Obligations of the Company | **14** |
| **5.2** | Adjustment of the Interest Rate due to a Change of the Rating of the Debentures (Series A) | **14** |
| **5.3** | Interest Rate Adjustment resulting from the manner of the Company's Compliance with Financial Covenants | **17** |
| **6** | Securing the Debentures | **26** |
| **7** | Early Redemption | **28** |
| **8** | The Right to call for Immediate Repayment | **31** |
| **9** | Claims and Proceedings by the Trustee | **38** |
| **10** | Trust over the Proceeds | **39** |
| **11** | The Authority to Demand Funding | **40** |
| **12** | Authority to Withhold distribution of Funds | **41** |
| **13** | Notice of Distribution | **42** |
| **14** | Refraining from Payment for a Reason beyond the Company’s Control | **42** |
| **15** | Receipt from the Bondholders | **43** |
| **16** | Presentation of Debenture to the Trustee; Registration in connection with the Partial Payment | **43** |
| **17** | Investment of Funds | **43** |
| **18** | The Company’s Undertakings towards the Trustee | **44** |
| **19** | Additional Liabilities | **48** |
| **20** | Attorneys-in-Fact | **49** |
| **21** | Other Agreements | **49** |
| **22** | Reports on the Trust's Affairs | **50** |
| **23** | Fees and Coverage of the Expenses of the Trustee | **50** |
| **24** | Special Powers | **52** |
| **25** | The Trustee's Authority to Employ Agents | **53** |
| **26** | Indemnification of the Trustee | **53** |
| **27** | Notices | **57** |
| **28** | Waiver, Settlement and Modification of the Deed of Trust | **58** |
| **29** | The Register of Bondholders | **59** |
| **30** | Release | **60** |
| **31** | Appointment and Expiration of the Term of Office of the Trustee, his Roles and Powers | **60** |
| **32** | Meetings of Bondholders | **62** |
| **33** | Applicability of the Law and Jurisdiction; Undertaking of the Company, the Controlling Shareholder and the Company’s officers | **62** |
| **34** | General | **65** |
| **35** | Liability of the Trustee | **65** |
| **36** | Addresses | **65** |
| **37** | Consent to Magna | **66** |
| Appendix A – Pledged Real Estate Assets | | |
| Appendix B – manner of calculating the Financial Covenants | | |
| **First Schedule of the Deed of Trust – the Debentures (Series A) Certificate** | | **67** |
| **Terms and Conditions Overleaf** | | **69** |
| **1** | General | **69** |
| **2** | The Debentures (Series A) | **69** |
| **3** | Principal and Interest Payments for the Debentures (Series A) | **70** |

| Section | Topic | Page |
|---|---|---|
| 4 | Refraining from Payment on Grounds not under Control of the Company | 71 |
| 5 | Register of Holders of Debentures | 71 |
| 6 | Split of the Debenture Certificates | 71 |
| 7 | Transfer of the Debentures | 71 |
| 8 | Replacement of Debenture Certificates | 72 |
| 9 | Early Redemption | 72 |
| 10 | Waiver, Compromise and Changes in the Deed of Trust | 72 |
| 11 | Meetings of the Holders of Debentures | 72 |
| 12 | Immediate Repayment | 72 |
| 13 | Notices | 72 |
| 14 | Applicable Law and Jurisdiction | 72 |
| **Second Schedule of the Deed of Trust – Meetings of the Holders of the Series A Debentures** | | 73 |
| **Third Schedule of the Deed of Trust – Urgent Representation of the Holders** | | 79 |


**WHEREAS**: the Company intends to publish a Supplementary Prospectus (which is also a Shelf Offering Report) under which it will offer Debentures (Series A), for the first time and which, subject to the terms and conditions set forth therein, will be listed on the Tel Aviv Stock Exchange Ltd.;

**WHEREAS:** in November 2025, the Rating Agency (as defined below) announced that it assigned an A3,il rating (the "**Base Rating**") to a new series of the Company's debentures subject to this Deed;

**WHEREAS:** as of the date of execution hereof, the Company complies with the Rating Agency's requirements for assigning the above rating to the Debentures (Series A).

**WHEREAS** the Company has asked the Trustee to act as Trustee for the Holders of the Series A Debentures, and the Trustee agreed to do so, subject to and in accordance with the terms and conditions of this Deed of Trust.

**WHEREAS** the Trustee is a private company limited by shares that was incorporated in Israel under the Companies Law, 5759-1999 (the "**Companies Law**"), and whose main purpose is to provide trust services; and

**WHEREAS** the Trustee has declared that there is no impediment under the Securities Law, 5728-1968 (the "**Securities Law**"), or any other applicable law, that prevents it from contracting with the Company under s this Deed of Trust, including with respect to conflicts of interest preventing it from contracting with the Company hereunder, and that it meets the qualification requirements and conditions provided by the Securities Law for acting as Trustee for the issue of the Debentures underlying this Deed, and that he has no interest in the Company and the Company has no personal interest in the Trustee;

**WHEREAS** the Company declares that there is no impediment under law that prevents it from contracting with the Trustee under this Deed of Trust.

**WHEREAS** there is no impediment by law and/or any agreement to for the Company to issue the Debentures (Series A) in accordance with this Deed of Trust, and all approvals for the issuance of the Debentures (Series A) in accordance with this Deed of Trust, under any law and/or agreement, have been obtained, except the receipt for the approval of the Stock

Exchange (as defined below), which has not yet been received as of the date of execution hereof and will be accepted until the publication of the shelf offer report.

**Now therefore, it has been stipulated and agreed between the parties as follows**:

1. **Preamble, Interpretation and Definitions**

1.1. The preamble to this Deed of Trust and the Appendices hereto constitute an integral part hereof.

1.2. The division of this Deed of Trust into sections and the section headings are for convenience and reference purposes only and shall not be used for interpretation purposes.

1.3. Whenever the term "subject to applicable law" (or any similar term) is used herein, it means "subject to applicable law that cannot be superseded".

1.4. All words used herein in the plural shall include the singular and vice versa, all words used herein in the masculine gender shall include the female gender, and vice versa, and the word "person" shall include a corporation, unless otherwise expressly stated herein.

1.5. This Deed of Trust shall become effective as of the date of actual allotment of the Debentures by the Company. It is agreed that upon cancellation of the issuance of the Debentures for any reason whatsoever, this Deed of Trust shall be void, and the parties hereto shall have no Claim against each other.

1.6. In this Deed of Trust and in the Debentures, the following terms shall have the meaning set next to them, unless expressed otherwise:

1.6.1. "**A Default Event" –** the date in which: (a) there rises cause to call for the immediate repayment of the Debentures and/or for the realization of collaterals under the provisions of the Deed of Trust; or (b) the Debentures were called for immediate repayment, the earlier of the two.

1.6.2. "**This Deed**" or the "**Deed of Trust**" or "**This Deed of Trust**": this Deed of Trust, including the appendices attached hereto, as amended from time to time, which constitute an integral part hereof.

1.6.3. "**The Prospectus**" – the Company's Supplementary Prospectus and Shelf Prospectus bearing the date of November 28, 2025.

1.6.4. "**Debentures**" or "**Debentures (Series A)**" or "**Series A Debentures**" **-** the Company's Series A debentures, registered in name, with terms and conditions in accordance with the Debenture Certificate and the Prospectus of the Company, which shall be issued from time to time by the Company, at its sole discretion, in accordance with and subject to applicable law and the provisions hereof;

1.6.5. "**Trustee**": Mishmeret **-** Trust Services Ltd. or any other person acting from time to time as trustee for the Bondholders hereunder;

1.6.6. "**Register of Debentures Holders**" or "**Register**" **-** the register of Debentures Holders as provided for under Section 29 hereof;

1.6.7. "**Holder/s**" and/or "**Holder/s of Debentures**" or "**Bondholder/s**" – shall have the same meaning as the terms "holder" and "holder of a certificate of indebtedness" in in Section 35A of the Securities Law.

1.6.8. "**Debenture Certificate**"- certificate of debenture (Series A) in the form set forth in **Appendix A** hereto.

1.6.9. "**Business Day**" - any day on which most of the banks in Israel are open for transactions;

1.6.10. "**Trading Day**": - any day on which transactions are executed on the Stock Exchange.

1.6.11. "**Nominee Company**": Tel Aviv Stock Exchange Nominee Company Ltd. or any nominee company with which the Company contracts, at its sole discretion and subject to applicable law, provided that all securities of the Company are registered in the name of said Nominee Company.

1.6.12. "**Principal**" - the total par value of the Debenture (Series A).

1.6.13. "**Stock Exchange**" - the Tel Aviv Stock Exchange Ltd.

1.6.14. "**Stock Exchange Guidelines**"- the provisions of the Stock Exchange Rules and Regulations, the guidelines thereunder and the bylaws of the Stock Exchange Clearing House (as applicable), in the form in effect from time to time.

1.6.15. "**Stock Exchange Clearing House** "- the Clearing House of the Tel Aviv Stock Exchange Ltd.

1.6.16. "**Adjourned Meeting**" or "**Adjourned Meeting of Holders**" - a meeting of holders postponed to another date than that set for the meeting pursuant to Section 3 of the Second Schedule hereto.

1.6.17. "**Special Resolution**" - a resolution adopted at a General Meeting of Holders of Debentures, attended by Bondholders, in person or by proxy, who hold at least fifty percent (50%) of the balance of the par value of the Debentures in circulation, or the Adjourned Meeting attended by the Debentures Holders, in person or by a proxy, who hold, in person or by a proxy at least 20% of such balance, by a majority of at least two-thirds (2/3) of the votes participating in the voting, excluding abstaining votes;

1.6.18. "**Ordinary Resolution**" – a resolution adopted at a Meeting of Bondholders, convened in accordance with Sections 35L13 and 35L14(a) of the Securities Law, and adopted (either by the original or adjourned meeting) by a majority of at least fifty percent (50%) of all votes participating in the voting, excluding abstaining votes. It is hereby clarified that in any place in this Deed where not expressly stated otherwise and subject to the provisions of the law that are not subject to conditions, a resolution of the Meeting of Bondholders shall be adopted as an Ordinary Resolution.

1.6.19. "**Urgent Representation**" – shall have the meaning assigned to it in Section in the Third Schedule hereto;

1.6.20. "**Rating**" – the rating assigned by the Rating Agency.

1.6.21. In this Deed of Trust and the Debentures, the following debenture ratings shall have the meaning set forth in the table below:

| | |
|---|---|
| **"ilAA-"** | ilAA- Standard & Poor's Maalot rating or Aa3.il Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |

| | |
|---|---|
| **"ilA+"** | ilA+ Standard & Poor's Maalot rating or A1 Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |
| **"ilA"** | ilA Standard & Poor's Maalot rating or A2 Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |
| **"ilA-"** | ilA- Standard & Poor's Maalot rating or A3 Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |
| **"ilBBB+"** | ilBBB+ Maalot rating or Baa1 Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |
| **"ilBBB"** | ilBBB Maalot rating or Baa2 Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |
| **"ilBBB-"** | ilBBB- Maalot rating or Baa3 Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |
| "**ilBB+**" | ilBB+ Maalot rating or Ba1 Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |
| "**ilBB**" | ilBB Maalot rating or Ba2 Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |
| "**ilBB-**" | ilBB- Maalot rating or Ba3 Midroog rating or equivalent rating determined by another rating agency that has rated or will rate the Debentures (Series A). |

1.6.22. "**Dollar"** – U.S. Dollar.

1.6.23. **"Rating Agency"** – Midrog Ltd, or any other rating agency, within the meaning of the term "Rating Agency" in the Law for Regulating the Activity of Credit Rating Agencies, 5774-2014 and the regulations thereunder

1.6.24. **"Trust Account"** – an account that the Trustee will open in his name in trust for Bondholders (Series A), in one of the five largest banks in Israel where, among other things, the expense cushion and funds that will be deposited in this account, on his sub-accounts, in accordance with the provisions of this Deed of Trust and that all the Company's rights in the account and in what has been deposited therein (whichever these may be) from time to time, will be pledged in favor of the Trustee in a single, first-in-class and fixed pledge, unlimited in amount, on all the funds that will be deposited in the account from time to time, and in its his sub-accounts, including the fruits thereof, as these will be in it from time to time, as well as all the funds that are expected to be deposited therein. The bank in which the Trust Account will be opened will confirm to the Trustee in writing that he waives any right of offset, delay or retention the bank may have with respect to any debt or obligation of the Company towards the bank with the exception of the Company's obligations regarding the activity in the Trust Account itself. The signing rights in the Trust Account will belong to the Trustee only. All costs of opening management and closing the Trust Account will be borne by the Company. The Trustee will invest the funds in the Trust Account in accordance with the provisions of section 17 of the Deed of Trust.

1.6.25. "**Reporting Corporation**" - as defined in the Securities Law.

1.6.26. "**Controlling Shareholders**" – David Shabsels and Michael Shabsels.

1.6.27. "**Reporting Regulations**" – the Securities Regulations (Periodic and Immediate Reports), 5730-1970.

1.6.28. "**Financial Statements**" – consolidated audited or reviewed, annual or quarterly, Financial Statements that the Company is required to publish under the Securities Law.

1.6.29. "**Liability Value of the Debentures (Series A)**" or the "**Adjusted Value of the Debentures**"– on a particular examination date, the principal balance of the Debentures (Series A) with accrued interest.

1.6.30. "**Equity**" – the Company's nominal consolidated equity (including minority interest) according to the Financial Statement.

1.6.31. **"Adjusted Net Financial Debt"** – short term and long term interest bearing debt from banks and financial institutions, as well as from any other party that imposes a debt, together with interest-bearing debt towards the Bondholders, with respect to debentures issued, less cash and cash equivalent, unrestricted (or restricted in favor of the bonds), and less short term investments, commercial securities classified in the financial statements as current assets and deposits (including limited assets as aforesaid except for a restriction in favor of securing a guarantee given in favor of a third party), and all on the basis of the Company's consolidated financial statements.

It is clarified that for the purpose of calculating the ratio of Adjusted Net Financial Debtto Adjusted EBITDA , in calculating the Adjusted Net Financial Debt, the Company's share on the net financial debt of companies treated according to the Equity Method shall be added.

Additionally, It is clarified that in relation to the calculation of the of Adjusted Net Financial Debt to Adjusted EBITDA Ratio, will be taken into account the impact of new assets that will be purchased and/or transferred during the Bonds period will be neutralized (the Senior Debt and Equity invested in the property) from the calculation of the Adjusted Net Financial Debt, until the end of the first four quarters after the purchase date and/or construction completion date, as applicable.

1.6.32. **"Net Cap"** – the Adjusted Net Financial Debt plus the consolidated Equity of the Company (including minority interests) according to the last published consolidated Financial Statements, reviewed or audited.

1.6.33. **"Adjusted EBITDA" –** for a certain calculation date, operating profit plus financing income (to the extent not included in the operating profit) and plus depreciation and amortization less revaluation gains / losses, less the Company's share in the gains/losses of companies treated using the equity method (to the extent not included in the operating profit), plus the Company's share in the Adjusted EBITDA of companies treated according to the equity method, calculated according to the four quarters ended on the calculation date, less the effect of exchange rate and plus profit from realized assets.

Notwithstanding the above, it will be clarified that the impact of new assets that will be purchased and/or contributed during the Bonds period will be neutralized from the

adjusted EBITDA calculation, until the end of the first four quarters after the purchase date and/or construction completion date, as applicable.

1.6.34. **"LTV Ratio in the Pledged Corporation"** – as is set forth in Section 6.4 to this Deed.

1.6.35. "**Debt Yield of the Pledged Assets**" – the total Adjusted EBITDA of the Pledged Real Estate Assets divided by the Liability Value of the Debentures, less funds deposited in the Pledged Account and/or the Trust Account and/or cash and cash equivalents in the Pledged Corporation.

1.6.36. **"Holding Company" –** SIMAD Equities Company LLC, a Subsidiary fully owned (directly) by the Company.

1.6.37. **"Pledged Corporation" –** Intermediate Simad 1 LLC, a Subsidiary fully owned (directly) by the Holding Company.

1.6.38. **"Property Companies"** and "**Operating Companies**" – the relevant Property Companies and Operating Companies whose membership rights will be transferred to the Pledged Corporation that will hold them directly. For further information, see Section 6.2.1 and in **Appendix A** to this Deed.

1.7. Should the Stock Exchange Guidelines now or in the future apply to any action taken hereunder, such guidelines shall prevail over the provisions of this Deed of Trust, and the time frame for these acts shall be determined in accordance with the Stock Exchange Guidelines.

1.8. In the event of a contradiction between this Deed of Trust and the documents attached hereto, the Deed of Trust shall prevail. In any event of a contradiction between the Deed of Trust and the provisions of the Prospectus, the provisions of the Deed of Trust shall prevail.

2. **<u>Issuance of the Debentures; Terms of Issue; Equal Rank</u>**

2.1. Subject to acceptance of the offer of the Debentures (Series A), the Company will issue the Series A Debentures, registered in name, to be repaid (Principal) in five (5) annual payments to be made November 30 of each of the years 2026-2030 (inclusive). The first four payments shall constitute 2.5% of the Principal, and the fifth and final payment shall constitute 90% of the Principal. The Debentures (Series A) shall not be linked (Principal and Interest) to any index. The Debentures (Series A) shall bear an annual interest at a fixed rate to be determined in the Supplementary Notice (but subject to interest rate adjustments, if any, resulting from the manner in which the Company does not comply with the financial covenants and/or resulting from a change in the rating of the Debentures (Series A); all, as it has been set forth in Sections 5.2 and 5.3 to this Deed). The Interest on the outstanding balance of the Debentures (Series A) shall be paid in semi-annual payments on May 31 and on November 30 of each of the years 2026 to 2030 (inclusive).

For further information regarding the terms of the Debentures (Series A), including the manner in which the payments on account of Principal and Interest on the Debentures shall be made, the manner in which the interest rate shall be determined for the first interest payment, arrears interest and the effective date for the payments due on account of the Principal and Interest on the Debentures, see Sections 2 and 3 to the Terms and Conditions Overleaf.

2.2. Subject to compliance with the threshold conditions set forth in the TASE's instructions, the Debentures (Series A) which will be issued for the first time according to the Prospectus, will

be listed for trading on the TASE and without prejudice to the provisions of this promissory note, the Company shall operate optimally in order to ensure that the Debentures are traded in the TASE until their final repayment (including).

2.3. The Company reserves the right to effect an early redemption of the Debentures on the conditions set out in Section 7.2 hereof.

2.4. The Debentures (Series A) will rank *pari passu*, among themselves, in respect of the Company's obligations under the Debentures, without priority or preference of one over the other.

2.5. Under the Stock Exchange Guidelines, the Principal of the Debentures is not and will not be linked to any index throughout the duration of the Debentures.

2.6. The provisions of this Deed of Trust shall apply to the Debentures issued hereunder and held from time to time by the buyers thereof, including the public, unless otherwise explicitly stated.

3. **Repurchase of Debentures by the Company and/or a Related Holder**

3.1. Subject to applicable law, the Company reserves the right to purchase (at its sole discretion) the Debentures (Series A) at any time and from time to time, without prejudice to the obligation to repay the Debentures (Series A) in circulation. In the event of such purchase, the Company will notify the Trustee in writing, without prejudice to the immediate reporting obligation that applies to it and file an Immediate Report about such purchase. Should the Debentures (Series A) be purchased by the Company, the Company will request the Stock Exchange Clearing House to withdraw the certificates so purchased.

Upon such purchase by the Company, the purchased Debentures (Series A) will automatically expire, canceled and delisted, and the Company will not be allowed to reissue them, unless otherwise explicitly provided for by applicable law. If, under the then applicable law, the Series A Debentures are neither canceled nor delisted by the Stock Exchange the Company may sell all or part of the purchased Debentures (Series A), at its sole discretion, in accordance with the then applicable law, without having to obtain the consent of the Trustee and/or the Holders of the Series A Debentures, provided such sale is subject to the fulfillment of all terms and conditions set out in Section 4.1 hereof with respect to additional issuance of Debentures (Series A), *mutatis mutandis*. Should the Debentures (Series A) be sold by the Company, the Company will give prior notice to the Trustee of its intention to effect the sale, and will attach to its notice a certificate signed by the senior financial officer of the Company (along with the relevant calculation) certifying the fulfillment of all such conditions To the satisfaction of the Trustee.

Nothing in the foregoing shall prejudice the right of the Company to make an early redemption of the Series A Debentures, as stated in Section 7.2 hereof.

3.2. Controlling shareholders of the Company (either directly or indirectly) and/or his relative (spouse, siblings, parents, grandparents, children or spouse's children, or the spouse of any of them) and/or a subsidiary and/or affiliated company and/or equity investment company of the Company and/or a corporation controlled by any of them (either directly or indirectly) (other than the Company itself to which Section 3.1 of the Deed shall apply) ("**Related Holder**") shall be entitled to purchase and/or sell Debentures (Series A) from time to time on or off the Stock Exchange (including in the event of an issuance by the Company), at their discretion (subject to applicable law). Upon such purchase and/or sale by a subsidiary of the Company and/or a corporation controlled by it, the Company will file an Immediate Report. Debentures (Series A)

held by a Related Holder shall be considered the property of the Related Holder, and if the Debentures are listed, they will not be delisted from the Stock Exchange, and be transferable like the other Debentures (Series A), subject to the provisions of the Deed of Trust and the Debentures. It should be clarified with respect to the balance of the par value of the Debentures series, which is required for calculating the quorum referred to in the Second Schedule hereto, Debentures held by a Related Holder will not be taken into account; additionally, said Debentures shall not confer voting rights to a Related Holder

3.3. The manner of convening a Meeting of the Bondholders, the quorum at the Meeting and the count of voters at the Meeting, will be subject to the provisions of the Second Schedule hereto shall apply to.

3.4. A Related Holder will, If so required by law, report the Company of the purchase of Debentures (Series A), and the Company will provide the Trustee, at its request, with the list of Related Holders and the amounts held by them as of the date requested by the Trustee, based on the reports received from Related Holders and filed through the Magna System by the Company. It is clarified that, for purposes of this Section, a report filed through the Magna System will constitute a report to the Trustee.

3.5. Nothing contained in this Section, in and of itself, shall obligate the Company or a Related Holder or the Holders of the Series A Debentures to purchase Debentures and/or sell the Debentures in their possession.

4. **Expansion of Series A Debentures and Issuance and Allotment of Shares and Other Securities**

4.1. Expansion of Series A Debentures

Subject to obtaining the approval of the Stock Exchange for the listing, the Company may issue, from time to time, at its sole discretion, and without having to obtain the approval of the Trustee and/or the then existing Holders, including Related Holders (as defined in this Section 3.2 above), in accordance with applicable law, additional Debentures (Series A) (the "**Additional Debentures**") (by means of a private placement or under a prospectus and/or an amendment to the Prospectus and/or a shelf offering report or otherwise), under the same terms and conditions as those of the Debentures (Series A) initially issued, for any price and in any manner it deems appropriate.

The Company will apply to the Stock Exchange for the listing of the additional Series A Debentures, if offered.

Notwithstanding the aforesaid, an Additional Issuance of the Debentures (Series A) shall be performed subject to compliance with all the terms set forth hereafter: (a) the Additional Debentures issuance as aforesaid, will not affect the rating of the Debentures (Series A) (*i.e.*, their rating at the eve of the Series A expansion). Should the Debentures (Series A) be rated by more than one Rating Agency, then, for the purpose of this Section, the rating will be determined at the eve of the Series A expansion according to the higher rating assigned to the Debentures; (b) pursuant to the Company's most recent Financial Statements published prior to the issuance of the Additional Debentures, at the Additional Debentures issuance date, the Company is compliance with all the financial covenants set forth in Section 5.7 to this Deed and shall continue to be in compliance therewith following the aforesaid expansion and this without taking into account the cure and waiting periods in connection with the financial covenants; (c)

at the Additional Debentures issuance date there exists no cause for calling for the immediate repayment of the Debentures and there is no concern for the existence of such a cause as a result of issuing the Additional Debenture, and this without taking into account the cure and waiting periods in connection with the grounds for immediate repayment, if applicable; (d) the Company is in compliance with all of its material obligations to the Bondholders pursuant to the provisions of the Deed of Trust; (e) the LTV Ratio in the Pledged Corporation will not exceed 65%.

In this case, the scope of Debentures (Series A) in circulation will not exceed NIS 750 million par value.

Prior to the tender for qualified investors (if any) or the public tender, whichever is earlier, the Company shall provide the Trustee with a written certificate, signed by the Senior Financial Officer of the Company in a wording to the Trustee's satisfaction, certifying: (1) the compliance with all the foregoing terms (except for the term set forth in Subsection (a) hereinabove with respect to which the Company shall provide an approval from the Rating Agency, as is set forth hereafter); (2) that the Additional Debentures issuance shall not impact the Company's ability to repay the Debentures (Series A).

In the event of an Additional Debentures issuance, the Series expansion will be subject to the prior approval of the rating agency that such expansion will not affect the rating of the Debentures (Series A) then in effect (*i.e.*, the rating at the eve of the Series expansion). The Rating Agency's approval will be published prior to the Series A expansion and will be attached to the certificate provided by the Company to the Trustee as set forth in this Section. Prior to the Additional Debentures issuance, the Company will notify the Trustee in writing and file an Immediate Report, or include the following disclosure in the Shelf Offering Report, specifying whether the Additional Debentures issuance complies (or fails to comply, as applicable) with the conditions set forth above and that the Company's Board of Directors has reviewed the impact of the Series A expansion on the Company's ability to meet all of its obligations to the Bondholders (Series A) prior to such issuance.

The Company's right referred to above does exempt the Trustee from reviewing the issuance, if such obligation is imposed on the Trustee by law. Not shall it prejudice the rights of the Trustee and the Holders of Debentures hereunder, including their right to call for immediate repayment of the Debentures, as set out in Section 8 hereof.

To the extent necessary, pursuant to the instructions of the US attorney, in the event of a series expansion, the Pledges under this Deed shall be amended in such manner that will guarantee also the expanded series and the issuance consideration shall not be transferred to the Company until the amendment of the applicable pledge documents. For further information see Section 6.3.5 hereunder.

Subject to the provisions of the Deed of Trust, the Trustee shall serve as trustee for the Debentures (Series A) in circulation from time to time, even in the event of a Series A expansion, and the Trustee's consent to also serve as trustee for the expanded series will not be required. The Debentures (Series A) in circulation immediately prior to the Series A expansion and issuance of additional debentures (Series A), (if any), shall constitute (as of the date of issuance) one series for all intents and purposes, and the Deed of Trust shall also apply to all additional Debentures (Series A) issued by the Company. The Additional Debentures shall not grant a right to payment of Principal and/or interest on the Debentures (Series A) if the effective date for

payment occurs prior to the date of issuance. In the event of an expansion of series, tax consequences shall apply, including in connection with the calculation of the discount rate, if required, as provided for in the Offering Report and in accordance with the law applicable as the date of issuance of the additional Debentures.

4.2. Issuance and Allotment of Additional Debentures and Securities

Without derogating from the generality of the foregoing, the Company reserves the right, subject to applicable law, to issue at any time and from time to time (by means of a private placement, prospectus, shelf offering report or otherwise) and without having to obtain the consent of the Holders of the Series A Debentures and/or the Trustee, as applicable, including a Related Holder (as defined in Section 3.2 hereof), such additional series of debentures and/or securities, as the Company shall deem fit, and without prejudice to the repayment obligation imposed on the Company by this Deed. Moreover, should the Company issue an additional series of Debentures or other securities that are debt and such series or other securities that are debt is not secured by collateral (and as so long it is not secured by collaterals), the rights of the additional series, or other securities that are debt, as applicable, upon liquidation will have no priority over those of the Debentures (Series A). It is clarified that to the extent that the Company issues an additional series of Debentures or other securities that are debt and such series or other securities that are debt, as the case may be, is secured by collateral, the rights of the additional series upon liquidation will have priority over those of the Debentures (Series A) only for those collateral.

Notwithstanding the foregoing, the Company undertakes that for as long as the Debentures (Series A) have not been fully repaid, it shall not issue Debentures outside of Israel and shall not undertake another debt outside of Israel. Despite the aforesaid, the Company shall be entitled to undertake credit lines and liabilities from banks in Israel and/or the US only, for currency hedging purposes; this against Non- recourse pledges only, as is set forth in Section 5.11 to this Deed of Trust as well as provide other customary guarantees and undertakings as a property owner in the U.S.

Without derogating from the foregoing, the Company's rights set forth above do not prejudice the Trustee's right to review the implications of such issuance, nor the rights of the Trustee and/or the Bondholders hereunder, including their right to call for immediate repayment of the Debentures (Series A), as provided for in Section 8 hereof.

Subject to applicable law, the Company will notify the Trustee of such issuance of Debentures and additional securities prior to the issuance and provide it with any report it may issue in this regard under applicable law.

Notwithstanding the foregoing, in this Section 4.2 above, the issuance of an additional series or other securities that are debt (the "**Other Issuance**") will be subject to receiving the approval of the TASE and to the fulfillment of all the following conditions: (a) The aforementioned Other Issuance will not affect the rating of the Debentures (Series A) as it will be rated at that time (*i.e.*, the rating on the eve of the Other Issuance). The approval of the rating agency that the Other Issuance will not affect the rating of the Debentures (Series A) will be published by the Company before the Other Issuance is carried out; (b) On the date of the Other Issuance, in accordance with its most recent financial statements published prior to the date of the Other Issuance, and after the execution of the Other Issuance, the Company will comply with all the financial covenants specified in Section 5.7 of this Deed without taking into account the cure

and waiting periods; (c) There is no ground for calling for an immediate repayment as detailed in Section 8.1 of this Deed and this without taking into account the cure and waiting periods (as applicable). The Company will deliver the Trustee a written confirmation signed by the senior officer in the field of finance in the Company, together with a calculation in relation to the condition set forth in this Section 4.2 above, regarding the fulfillment of all the aforementioned conditions prior to conducting a tender to receive early commitments from qualified investors (to the extent that such a tender is held in accordance with the sole discretion of the Company) and in any case prior to the execution of the Other Issuance, everything to the satisfaction of the Trustee.

**5. Obligations of the Company**

5.1. Obligation to Make Payments and Comply with Terms and Conditions:

The Company hereby undertakes to pay, on the dates stipulated, all Principal and interest amounts (any additional interest that is in accordance with the provisions of this Deed and interest for delay, if applicable) which shall be paid under the terms of the Debentures (Series A). The Company cannot condition, in any manner whatsoever, its undertakings as aforesaid in this Section. In case of a contradiction between the aforesaid in this Section and any other contradicting undertaking of the Company under this Deed, the provisions of this Section shall prevail.

Additionally, the Company undertakes to comply with all other conditions and obligations imposed on it under the terms of the Debentures (Series A) and in accordance with this Deed. In any event that the a date of payment on account of the Principal and/or interest amount occurs on a day other than a Business Day, the payment date will be postponed to the first Business Day thereafter, without any additional payment or interest and the determining date for determining eligibility for redemption or interest will not change as a result.

5.2. Adjustment of the interest rate due to a change in the rating of the Debentures (Series A):

For purposes of this Section:

It shall be clarified that in the event the Debentures (Series A) are rated by more than one rating agency, examination of the rating for adjustment of the interest rate to the modification in the rating (if applicable) shall be made at any time, according to the lower rating.

The interest rate borne by the Debentures (Series A) will be adjusted upon a change in the rating of the Debentures (Series A), as described in this Section:

**It shall be clarified that, if and to the extent an adjustment of interest is required according to the mechanism described in this Section above and below and according to the mechanism described in Section 5.3 hereof, then in any case (except where an entitlement to default interest is established in accordance with Section 3.4 of the Terms and Conditions Overleaf, which will be added in any case where the Company will be required to pay it, regardless of the interest rate that the Debentures bear at that time), the maximum cumulative rate of the Additional Interest Rate will not exceed 2% above the annual interest rate on the Debentures (Series A) ("Maximum Interest Increase Restriction").**

For this purpose:

**"Additional Interest Rate"** – a rate of 0.25% per annum for each decrease of one notch below the Base Rating, and all up to a maximum addition of 1.5% to the annual interest at most (in this Section 5.2, the "**Additional Interest Rate Restriction**").

A. If, during a particular interest period, the rating assigned to the Debentures (Series A) by the Rating Agency (and if the Rating Agency is replaced, the Company will submit to the Trustee a comparison between the rating scale used by the former rating agency and that used by the new rating agency) is downgraded by one or more notches to a rating lower than the Base Rating (in this Section 5.2, the "**Reduced Rating**"), the annual interest on the outstanding balance of the Principal of the Debentures (Series A) will be increased, in the Additional Interest Rate, subject to the Additional Interest Rate Restriction, for the period commencing on the date of publication of the new rating by the Rating Agency and ending upon full repayment of the outstanding balance of the Principal of the Debentures (Series A), subject to a change in the interest rate in accordance with Section 5.3 hereof. If the interest rate was increased earlier due to violation of the financial covenants set forth in Section 5.3 hereof, the increase in interest due to such rating downgrade will be limited in according to the Maximum Interest Increase Restriction.

B. No later than one Business Day after receipt of the Rating Agency's notice of the downgrade of the Debentures (Series A) to the Reduced Rating, the Company will publish an immediate report, specifying: (a) the downgrade, the Reduced Rating, the rating report and the effective date of the Reduced Rating of the Debentures (Series A) (in this Section 5.2, "**Date of Downgrading**"); (b) the Company's compliance or non-compliance with all the financial covenants specified in Section 5.3 of the Deed, according to the last consolidated Financial Statements (reviewed or audited, as applicable) published immediately prior to the date of said immediate report, and whether there was any change in the interest rate due to its compliance or non-compliance with such financial covenants; (c) the exact interest rate payable on the Principal balance of the Debentures (Series A) for the period commencing on the current interest period and ending on the Date of downgrade (the interest rate will be calculated according to 365 days a year) (in this Section 5.2, "**Original Interest Rate**" and the "**Original Interest Period**", respectively); (d) the interest rate payable on the Principal balance of the Debentures (Series A) from the Date of Downgrade until the next actual interest payment date, *i.e.*, the Original Interest Rate plus the Additional Interest Rate per year (the interest rate will be calculated according to 365 days a year) (the "**Updated Interest Rate**"), subject to the Maximum Interest Increase Restriction and the Additional Interest Rate Restriction; (e) the Weighted Interest Rate payable by the Company to the Holders of the Series A Debentures on the next interest payment date under subsections (c) and (d) above; (f) the annual interest rate reflected in the Weighted Interest Rate; and (g) the annual interest rate and the semiannual interest rate (semiannual interest will be calculated as the annual interest rate divided by two) for the following periods.

C. If the Date of Downgrade of the Debentures (Series A) occurs during the period commencing four (4) days before the record date for interest payment, and ending on the next interest payment date (in this Section 5.2, "**Period of Delay**"), then, on the next interest payment date, the Company will only pay the Holders of the Series A Debentures the Original Interest Rate, and the interest rate resulting from the addition of interest at a rate equal to the Additional

Interest Rate per year, for the Period of Delay (calculated based on 365 days per year), will be paid on the next interest payment date, subject to the Maximum Interest Increase Restriction and the Additional Interest Rate Restriction. The Company will announce, in an immediate report, the exact interest rate payable on the next interest payment date.

D. Should the rating assigned to the Debentures (Series A) by the Rating Agency be updated in a manner affecting the interest rate payable on the Debentures (Series A) as set out in subsection (A) above or (E) below, the Company will give written notice thereof to the Trustee within one Business Day from the date of publication of the said immediate report.

E. It should be clarified that if, following a downgrade affecting the interest rate payable on the Debentures (Series A) as provided for in subsection (A) above, the Rating Agency upgrades the rating of the Debentures (Series A), then, the interest rate payable on the outstanding principal of the Debentures (Series A) will be reduced, on the relevant interest payment date, by the Additional Interest Rate, or any part thereof, in such predetermined increments as is set forth in Subsection (A) above, this only for the period in which the Debentures (Series A) ware assigned the highest rating, so that the interest rate payable on the outstanding Principal of the Debentures (Series A), to the extent the rating of the Debentures will be the Base Ratting, the interest rate established in the Supplementary Notice will be without additional increase in the interest rate due to a previous downgrade referred to in this Section 5.2 (but subject to Section 5.3 hereof). It should be clarified that in any event, the annual interest rate on the Debentures shall be less than the interest rate established in the Supplementary Notice. In such case, the Company shall act in accordance with subjections (B) to (D) above, with the necessary changes arising from the highest rating that replaced the Reduced Rating. It is emphasized that to the extent that the rating of the Debentures exceeds the Base Rating, this will have no impact on the interest that the Debentures bear at that time.

F. Should the Debentures (Series A) cease to be rated for reasons dependent on the Company (for example, but not limited to, due to the Company's failure to comply with its obligations to the Rating Agency, including failure to make payments and/or provide reports which the Company has undertaken to provide to the Rating Agency) for a period exceeding twenty one (21) days, prior to their final maturity, the termination of rating shall be deemed a Downgrade below the Base Rate and the additional interest will stand at 1.5% (even if the interest rate was already increased under subsection (A) above prior to such date) and/or if the interest rate was increased earlier due to violation of the financial covenants set out in Section 5.3 hereof (but subject to the Maximum Interest Increase Restriction), and the provisions of subsections (B) to (E) above shall apply accordingly, without derogating from the provisions of Section 8.1.25 hereof. The additional interest will be paid from the date on which the rating was terminated by the company. For the avoidance of doubt, it is clarified that if, prior to final maturity, the Debentures (Series A) cease to be rated, for a reason beyond the control of the Company, the interest rate will be impacted in the manner described in subsection (A) above and the provisions of this Section 5.2 shall not apply.

G. Should the Rating Agency be replaced or the Debentures (Series A) cease to be rated by a Rating Agency, the Company will publish an immediate report, within one Trading Day from the date of the change, specifying the circumstances of the replacement of the Rating Agency or termination of the rating, as the case may be.

H. For the avoidance of doubt, it is clarified that: (1) a change in the rating outlook for the Debentures (Series A) and/or a downgrade of the rating of the Debentures (Series A) as part of an update to the ratings of all Israeli companies operating in the same segment as that of the Company, particularly as a result of a change in only the Rating Agency's methodology, will not result in a change in the interest rate payable on the Debentures (Series A) as stated in this Section above; (2) if and so long as, at any time, the Debentures (Series A) are rated by more than one rating agency, subsection (F) above shall not apply unless all rating agencies cease to rate the Debentures (Series A), and the rating will be reviewed for the purpose of adjusting the interest rate to the change in rating (if any), at all times, according to the lowest rating.

I. In the event of Downgrade, the Company shall act in accordance with subsection (B) above. If, prior to the Date of Downgrade, the interest rate is increased due to violation of one or more of the financial covenants according to the mechanism described in Section 5.3 of the Deed, the change in the interest rate based on the adjustment mechanism described in this Section 5.2 above will be limited by the Maximum Interest Increase Restriction.

5.3. <u>Interest Rate Adjustment due to the Company's Non-Compliance with financial covenants</u>:

5.3.1. The interest rate payable on the Debentures (Series A) will be adjusted if the Company violates the financial covenants, as follows:

A. The Equity be no less than $120 million (this amount will not be linked to any linkage base).

B. The Ratio of Adjusted Net Financial Debt to Net CAP shall not exceed 70%.

C. Ratio of Adjusted Net Financial Debt to Adjusted EBITDA shall not exceed 15.

D. The LTV Ratio in the Pledged Corporation shall not exceed 72.5%.

E. The Debt Yield of the Pledged Assets shall not fall below 8.5%.

"In Sections 5.3.1(a) to (e) above and below, each of the Financial Covenants set forth above will be referred to as a "**Financial Covenant**", and together the "**Financial Covenant**s".

For purposes of this Section 5.3:

| |
|---|
| It is clarified that if an interest rate adjustment of interest is to be made in accordance with the mechanism described in this Section above and below as well as the mechanism described in Section 5.2 hereof, then in any event (except where an entitlement to default interest is established in accordance with Section 4 (3) of the Terms and Conditions Overleaf), the maximum cumulative rate of the additional interest shall not exceed the Maximum Interest Increase Restriction (as defined in Section 5.2 hereof). |

For purpose of this Section 5.3:

"**Additional Interest Rate**" - 0.5% for a violation of any Financial Covenant ( with respect to the financial covenant set forth in Subsection D – 0.75%) up to a maximum addition of 1.5% to the annual interest at most. It should be clarified that an increase in the interest rate will be only made once for a Violation of a Financial Covenant, if any, and the interest rate will not be increased again if the Violation of the same Financial Covenant continues.

"**Violation Date**" - the date of publication of the Financial Statements indicating the violation. It is clarified that as part of the examination of the financial covenants under this section 5.3 above, the fair value effects of currency hedging transactions in which the Company will be associated at the relevant Examination Date will be neutralized in particular and exchange rate effects in general..

5.3.2. Should the Company violates a Financial Covenant pursuant to the reviewed or audited consolidated Financial Statements of the Company (in this Section 5.3 the "**Violation**"), the annual interest rate payable on the outstanding balance of the Debentures (Series A) will increase by the Additional Interest Rate due to the Violation, above the interest rate of the Debentures (Series A) then in effect, prior to the change, for the period commencing on the Violation Date and ending upon full repayment of the outstanding Principal balance of the Debentures (Series A) or the date of publication of the Financial Statements based on which the Company complies with the Financial Covenant, whichever is earlier, all subject to the Additional Interest Rate Restriction.

5.3.3. Should such Violation occur, the Company will publish an immediate report, no later than one Business Day of publication of the reviewed or audited Financial Statements (as applicable), announcing of: (a) the failure to comply with a Financial Covenants and details of the Financial Covenants in effect on the date of the Financial Statements; (b) the current rating of the Debentures (Series A), according to latest rating report released prior to the date of the immediate report; (C) the exact interest rate payable on the Principal of the Debentures (Series A) for the period beginning on the current interest period until the date of the Violation (the interest rate will be calculated according to 365 days a year) (in this Section 5.3 the "**Original Interest**" and the "**Original Interest Period**", respectively); (d) the interest rate payable on the Principal balance of the Debentures (Series A) from the date of the Violation until the next actual interest payment date, *i.e*. the Original Interest Rate plus the Additional Interest Rate per year (the interest rate will be calculated according to 365 days a year) (in this Section 5.3 "**Updated Interest Rate**"), subject to the Additional Interest Rate Restriction; (e) the Weighted Interest Rate payable by the Company to the Holders of the Series A Debentures on the next interest payment date in accordance with subsections (b) and (c) above; (f) the annual interest rate reflected in the Weighted Interest Rate; and (g) the annual interest rate and semiannual interest rate (the semiannual interest will be calculated as the annual interest rate divided by two) for the following periods.

5.3.4. If Violation Date occurs during the period commencing four (4) days before the record date for any interest payment, and ending on the interest payment date closest to such record date (in this Section 5.3 "**Period of Delay**"), then, on the next interest payment date, the Company will only pay the Holders of the Series A Debentures the Original Interest Rate, and the interest rate resulting from the addition of interest at a rate equal to the Additional Interest Rate per year during the Period of Delay (calculated based on 365 days a year), will be paid on the next interest payment date, all subject to the Additional Interest Rate Restriction. The Company will file an immediate report announcing the exact interest rate to be paid on the next interest payment date.

5.3.5. In the event of Violation of any Financial Covenant, which impacts the interest rate payable on the Debentures (Series A), the Company will notify the Trustee in writing within one Business Day of publication of the Financial Statements.

5.3.6. For the avoidance of doubt, it is clarified that in the event that, after the Violation, the Company publishes the reviewed or audited Financial Statements (as applicable), based on which the Company complies with the said Financial Covenant, then the annual interest increase due the Violation will be cancelled, and as a result, the Annual Interest Rate on the Debentures will decrease by 0.5% for the period in which the Company complied with the Financial Covenant, which commenced on the date of publication of the Financial Statements indicating the Company's compliance with the Financial Covenant, without derogating from the provisions of this Section 5.3 in the case of an additional Violation of the same Financial Covenant in the future. In such case the Company shall act in accordance with Sections 5.3.3. to 5.3.5 above, *mutatis mutandis*, as applicable, arising from its compliance with said Financial Covenant. It should be clarified that the annual interest rate on the debentures will in any event not be less than the interest rate to be determined in the Supplementary Notice.

5.3.7. The review of the Company's compliance with all the Financial Covenants will take place on the date of publication of the Financial Statements by the Company and as long as the Debentures (Series A) are in circulation, in relation to the quarterly/annual Financial Statements the Company had to publish up to that time.

In its quarterly or annual Directors' Report, as applicable, the Company will disclose its compliance or non-compliance with any of the Financial Covenants

For the avoidance of doubt, it is clarified that, subject to the foregoing and the Additional Interest Rate Restriction, additional interest payments resulting from the rating downgrade described in Section 5.2 hereof and/or the Company's non-compliance with the Financial Covenant in Section 5.3 above, are cumulative.

In the event of a rating downgrade and the Company's Violation of one or more of the Financial Covenant, the Bondholders (Series A) shall be entitled to an interest rate increase in accordance with the foregoing, provided the Additional Interest Rate does not exceed the Maximum Interest Increase Restriction.

5.4. Rating of the Debentures:

The Company undertakes that, as far as it is within its control, the Debentures (Series A) will be rated by the Rating Agency throughout the duration of the Debentures (Series A), and for this purposes, *inter alia*, the Company undertakes to pay to the Rating Agency the amounts it has undertaken to pay and provide the Rating Agency with the reports and information required as under the agreement between the Company and the Rating Agency. In this regard, inter alia, an failure to pay the amounts that the Company has undertaken to pay to the Rating Agency and the failure to deliver reports required by the Rating Agency under the agreement between the Company and the Rating Agency, shall be deemed reasons and circumstances within the control of the Company.

The Company does not undertake not to replace the Rating Agency or terminate the agreement with the Rating Agency throughout the duration of the Debentures (Series A). Should the

Company replace the Rating Agency which terminate the Rating Agency's work even if the Debentures are rated by more than one Rating Agency, the Company undertakes to publish an immediate report and give notice thereof to the Trustee and the Holders of Debentures specifying the reasons for replacing the Rating Agency, no later than one Trading Day from the date of replacement and/or the date of the decision to terminate the agreement with the Rating Agency, whichever is earlier. It is clarified that nothing in the foregoing shall prejudice the Company's right to replace the Rating Agency or terminate the agreement with the Rating Agency (if it is not the only rating agency rating the Debentures), at any time, at its sole discretion and for such reasons as it shall deem necessary.

In case of suspension of rating for reasons and/or circumstances within the Company's control, the provisions of Section 8.1.25 hereof will apply.

It is further clarified that suspension of rating for reasons and/or circumstances beyond the Company's control shall not be deemed a breach by the Company, and shall not, in and of itself, grant the Bondholders grounds for calling for the immediate repayment of the Debentures, without prejudice to other grounds, if any. Nothing in the foregoing shall prejudice the right of the Bondholders to receive additional interest in case of suspension of rating for a reason dependent on the Company, as provided for in Section 5.2(f) hereof.

5.5. Distribution Restrictions:

The Company undertakes that until full, final and accurate settlement of the debt in accordance with the terms and conditions of the Debentures it will not make any distribution (within the meaning of the Companies Law), nor declare, pay or distribute any dividends and will not perform similar actions according to the law applicable to the Company, the result of which is a reduction of capital in the Company ("**Distribution**"), unless all following conditions are met:

(1) The amount of the distribution will not exceed 75% of the net income in the financial statements for the period beginning from July 1, 2025 (in this Section: the "**Effective Date**") plus depreciation and amortization, and excluding the net revaluation losses/gains (as yet unrealized) resulting from changes in the fair value of the properties of the Company in relation to fair value as of June 30, 2025, or the date on which the properties were acquired, whichever is later ("**Gains/Loss Revaluation**") and neutralizing exchange rates gains/losses. From this amount $50 million will be reduced (an amount paid to the Controlling Shareholders against the assignment of the Transferred Rights to the Company, as is described in Section 7.1.6 to the Prospectus) ("**Distributable Profit**"). It is clarified that the distributable profits not carried out on the basis of certain distribution will accumulate to subsequent quarters;

(2) Equity, before the distribution and after, less the dividend to be distributed, shall not be less than 180 million (this amount will not be linked to any index).

(3) The ratio of Adjusted Net Financial Debt to Net CAP, before the distribution and after, shall not exceed 68%.

(4) The Ratio of Adjusted Net Financial Debt to Adjusted EBITDA, before the distribution and after, shall not exceed 12.

(5) The LTV Ration in the Pledged Corporation shall, before the distribution and after, not exceed 72.5%.

(6) The Debt Yield of the Pledged Assets shall, before the distribution and after, not fall below 9%.

(7) At the date in which the Board of Directors resolved to carry out a distribution and according to the Financial Statements, the Company does not have "Warning Signs", as is defined under Section 10(b)(14) to the Securities Regulations.

(8) At the date on which the Board of Directors resolved to carry out a distribution or as a result thereof, none of the grounds for calling form an immediate repayment as detailed in Section 8.1 hereof met (without taking into account cure and waiting periods).

(9) The Company is in compliance with all of its material obligations to the Bondholders pursuant to the provisions of this Deed.

It is clarified that within the framework of examining the restrictions set forth hereabove, impacts deriving from the fair value of currency hedging transactions in which the Company shall be engaged as of the Examination Date in particular and exchange rate effects in general, shall be neutralized.

The Company shall furnish the Trustee, within two (2) Business Days after approval of the distribution by the Board of Directors and prior to the distribution, with a written certificate from the senior financial officer of the Company, to the satisfaction of the trustee, regarding the Company's compliance with all of the distribution restrictions listed above, along with details of the relevant calculation. The Trustee will be entitled to rely on the Company's approval and will not be required to perform further inspections on his behalf. In its quarterly and annual Board of Directors' reports, the Company will report the total Distributable Profits (as defined above) as of that date. In addition to the aforesaid, the Company shall publish notice of its intention to make a distribution at least 14 days prior to the actual distribution, specifying, *inter alia*, its compliance with restrictions provided under the Deed of Trust for the purpose of effecting the distribution as detailed in the Section above.

It should be noted that as of the date of execution of this Deed, the Company is not subject to any restrictions on distribution or repurchase of its shares, other than those set forth in this Section 5.5 above.

5.6. Appointment of the Company Representative in Israel:

5.6.1. Until the full, final, and accurate repayment of the Debentures (Series A) under the terms of this Deed of Trust vis-à-vis the Bondholders, the Company undertakes to ensure that it, shall have a representative on its behalf in Israel, who will be served court documents relating to this Deed on behalf of the Company and /or its Officers and/or its Controlling Shareholders in lieu of service of such documents at their overseas address, as set forth in the Introduction to this Deed. It should be noted that said service shall be deemed service to the Property Companies, as well as to the Pledged Corporation, to the Operating Companies and the Holding Company.

5.6.2. As of the date of execution hereof, the representative in Israel is Goldfarb Gross Seligman & Co. Law Office (the address of which is as specified in the Introduction to this Deed) (the "**Company's Representative in Israel**").

5.6.3. Service of process on the Company's Representative in Israel shall be considered valid and binding service of process with respect to any claim and/or demand of the Trustee and/or the Holders of the Series A Debentures pursuant to this Deed of Trust (including the pledge documents).

5.6.4. The Company shall be entitled to replace the identity of its Representative in Isreal from time to time, provided that when making such replacement, the Company shall publish an Immediate Report containing the details of the new Representative, and provide a notice, immediately and in writing, in said regard to the Trustee. The Immediate Report and the notice to the Trustee shall include the date in which the appointment of the new Representative came into effect.

It should be clarified that until the appointment of a new Representative in Israel takes effect, including in the event of the resignation of Company's Representative in Israel, the address of the former Company's Representative in Israel shall be binding on the Company and /or its Officers and/or its Controlling Shareholders for all intents and purposes.

5.6.5. The Company undertakes, prior to the issuance of the bonds, to obtain the consent of the person said in section 5.6.1 of this Deed to the provisions of this section 5.6. It should also be emphasized that the Company undertakes that upon the appointment of an officer in the Company (the "**New Officer**") and at the time when control of the Company is changed (the "**New Controlling Shareholder**"), then the New Officer and the New Controlling Shareholder will be bound by the provisions of this section 5.6.

5.7. Financial Covenants:

After full, final and complete payment of the debt under the terms of the Debentures (Series A), and fulfillment of all other obligations of the Company to the Holders of the Series A Debentures hereunder and under the terms of the Debentures (Series A), the Company will at all times comply with all the financial covenants set forth herein (with the meaning ascribed to such terms below, and in the absence of an explicit definition, within the meaning under accepted accounting principles:

5.7.1. The Equity shall not fall below $100 (this amount will not be linked to any linkage base) ("**Conditional Equity**").

5.7.2. The ratio of Adjusted Net Financial Debt to Net CAP shall not exceed 75% ("**Conditional Debt Ratio to CAP**").

5.7.3. The ratio of Adjusted Net Financial Debt to Adjusted EBITDA shall not exceed 17.

Each one of the financial covenants set forth in this Section 5.7 above shall be referred to as a "**Financial Covenant**", and together as the "**Financial Covenants**".

The examination of the Company's compliance with any one of the financial covenants in this Section above, will be made upon publication of the Financial Statements by the Company and as long as the Debentures (Series A) are in circulation (the "**Examination Date**"). Exchange rate implications as well as the fair value effects of currency hedging transactions in which the Company will be associated at the relevant Examination Date will not be taken into account in the examination of the Company's compliance with each of the foregoing Financial Covenants.

The Company will report its compliance or non-compliance with Financial Covenants in the Board of Directors' Report for the relevant period together with the numerical figures.

Should the Company fail to comply with any Financial Covenants in a certain quarter, it will give written notice to the Trustee and file an immediate report through the Magna System about the non-compliance and its meaning in accordance with this Section, no later than one Business Day after publication of the Financial Statements (quarterly and annual, as applicable). For purposes of this Section, filing a report through the Magma System will not be considered reporting to the Trustee.

Non-compliance with any Financial Covenant for two (2) consecutive quarters shall constitute grounds for calling for immediate repayment of the entire outstanding balance of the Debentures (Series A), as provided for in Sections 1.8.14, 8.1.15 and 8.1.16 hereof.

5.8. Expense Cushion:

Without derogating from Section 26 hereof, an amount equal to $400 thousands, and in the event the scope of the Debentures exceeds NIS 650 million par value, an amount equal to $500 thousands (an additional $100,000.) (according to the representative exchange rate of the Dollar for the day before the date of the reporting on the results of the initial issuance of the bonds) from the net issuance proceeds will be deposited into the Trust Account, which will be used to pay current expenses and administrative expenses incurred by the Trustee should the Debentures (Series A) be called for immediate repayment and/or should the Company breach of the terms and conditions of the Deed of Trust (the "**Expense Cushion**"). It should be noted that the expenses will be paid by the Company whereas the Expense Cushion will be used to secure such payments, and the Trustee, at its sole discretion, shall be entitled to use such account for the purposes set out above. The Expense Cushion will be deposited in cash and/or by means of an autonomous bank guarantee, at the Company's discretion. Such autonomous bank guarantee will be issued by one of the five largest banks in Israel and be renewed at least 14 business days prior to expiration thereof. If the said guarantee is not renewed, the Trustee shall be entitled to forfeit the guarantee.

Should the Trustee use the Expense Cushion in accordance with the foregoing, the Company will supplement the Expense Cushion with finds to make the account equal to $400 or $500 thousands, within 14 days of the day on which the Trustee has delivered a written demand to the Company to supplement the Expense cushion with funds (the "**Demand to Supplement the Expense Cushion**").

The amount of the Expense Cushion shall be maintained after the date of full and final repayment of the Debentures (Series A), unless the Company uses the Expense Cushion for the final redemption of the Debentures. After full repayment of the Debentures (Series A), the balance of the Expense Cushion, of not used, will be transferred (together with all proceeds accrued thereon) to the Company according to prior written instructions provided by the Company to the Trustee.

If the amount of the Expense Cushion is not sufficient to cover the Trustee's expenses in connection with the immediate repayment of the Debentures (Series A) and/or the breach of the provisions of the Deed of Trust by the Company as stated above, the Trustee shall act in accordance with Section 26 hereof.

5.9. Company's Activities:

5.9.1. So long as the Debentures (Series A) of the Company have not yet been fully repaid, the Company undertakes that 90% of its assets will be investment real estate assets (including

fixed assets) in USA. Additionally, the scope of the Company's Consolidated Development Projects (including the Company's share in companies (affiliates and jointly controlled companies) shall not exceed 20% of the total Consolidated Balance Sheet of the Company (as defined below) ("**Main Business Restriction**").

"**Company's Consolidated Development Projects**" in this section means the cost of the investment (as distinct from fair value) of the Company in projects whose construction commenced as of the date of the relevant financial statements.

In this section means the total consolidated balance sheet of the Company plus the Company's share in affiliates and jointly-controlled companies.

“**Net Assets**” in this section shall mean – the Company’s assets according to their value in the Financial Statements, neutralizing cash and short-term investments.

5.9.2. So long as the Debentures (Series A) of the Company have not yet been fully repaid, the Company undertakes generally, it will operate only in the United States, and that the real estate properties held by the Company, through corporations held thereby, will be in the United States ("**Main Business Location Restriction**");

5.9.3. As long as the Company's Debentures (Series A) have not yet been repaid in full, the Company undertakes not to purchase a single asset whose cost exceeds 20% of the Company's total Balance Sheet according to the latest Consolidated Financial Statements of the Company (audited or reviewed, as the case may be) (“**Single Asset Restriction**”).

For this purpose, a “Single Asset” – includes several buildings located in the same city, purchased in the same calendar month, from the same seller (directly and/or indirectly) and the distance between each of the buildings does not exceed 1 km.

The examination of the Company's compliance with such obligations will be carried out on the date of publication of the Company’s Quarterly/Annual Financial Statements (reviewed or audited, as applicable) based on the Company's Consolidated Financial Statements for the relevant period. The Company shall report its compliance or non-compliance with such obligations within the framework of its Board of Directors’ Report. Failing to comply with one of the Main Business Restriction, Main Business Location Restriction and the Single Asset for more than one (1) quarter shall constitute cause for calling for an immediate repayment of the entire outstanding amount of the Debentures (Series A) as is set forth in Section 8.1.16 hereof.

5.10. Extraordinary Transactions with the Controlling Shareholders

The Company undertakes that the Company’s Extraordinary Transactions (as defined in the Companies Law) with the Company’s Controlling Shareholders, or the Company’s Extraordinary Transactions with another entity in which the Controlling Shareholders have a personal interest, or the Company’s engagement with the Controlling Shareholder or a Family member thereof (as such term is defined in the Companies Law), directly or indirectly, including through a company controlled thereby as well as if he serves as an Office therein with respect to his term in office and employment, and if he is an employee of said company but does not serve as an officer, with respect to his employment in the Company (the **“Special Transactions”**), will be contingent, in addition to the approvals under the provisions of Section 275 of the Companies Law, on the consent of the Bondholders (Series A), in advance, by way of an Ordinary Resolution.

For the purpose of this Section 5.10, the "**Company**" – including its Investee Companies

**For the purpose of this Section 5.10 it is clarified that the transactions set forth hereafter shall not be deemed Extraordinary Transactions, and therefore shall not require the Bondholders approval as is aforesaid in this Section 5.10 (the "Exempted Transactions"):**

A. Release of controlling shareholders and/or stakeholders from guarantees provided to the benefit of third parties in connection with assets owned by the Company, directly or indirectly.

B. Transferring properties to the Company with a positive value (fair value of the property less the financial liabilities related to it) by the Controlling Shareholders or relative thereof, directly or indirectly, including through a company controlled thereby, solely against an allocation of shares (without monetary consideration in cash);

C. Acquisition of the share of partners and/or investors (who are third parties) in investee companies of the Company (including affiliates and jointly controlled companies) that hold (directly or indirectly) real estate assets, based on an independent valuation that will not exceed three (3) months;

D. Approving or renewing the transactions set forth in Chapter 9 to the Prospectus, which were approved prior to the issuance of the Prospectus, provided that the renewal shall be performed in the same commercial terms as described in the Prospectus.

E. Non- Extraordinary Transactions and Extraordinary Transactions which approved pursuant to the Companies Regulations (Relief in transactions with Interested Parties) 5760-2000.

F. Engaging in insurance policies with respect to the Company's and Investee Companies' properties to provide coverage against customary risks, within the frameworks of the insurance policies covering the Company's property portfolio alongside the Controlling Shareholder's properties, if any, (while the premium amounts are allocated by the insurance company to the various properties, and it is clarified that the Company shall not bear the premium amounts being allocated to the Controlling Shareholder's properties) as well as for his share if he holds by way of joint ownership with the Company in any properties);

G. Granting a Letter of Indemnity to the Controlling Shareholders and/or a relative thereof as is set forth in in Chapter 9 to the Prospectus, as well as a new Letter of Indemnity, as shall be updated, if updated, pursuant to the provisions set forth in the Companies Law and the regulations promulgated thereunder, as these shall be from time to time, and engaging in D&O Insurance Policies as is customary in such companies. The terms of the Letter of Indemnity to the Controlling Shareholders and/or a relative thereof as the terms of the D&O Insurance Policies will be the same as the terms of the Letter of Indemnity and the D&O Insurance Policies of the other officers in the Company.

The Company shall confirm within the framework of the Board of Directors' Report attached to the Financial Statements, as applicable, that no Special Transactions were performed as is set forth in this Section 5.10 without obtaining the consent of the Bondholders (Series A).

5.11. The Company undertakes not to take credit from non-Israeli financial institutions on its own, nor grant pledges to non-Israeli financial institutions, other than for credit facilities provided only by U.S. financial institutions (and this against specific pledges to secure such credit facilities and those financial institutions will not have any ability to return to the Company in

connection with the same obligations of the Company except for the specific liens that the Company has imposed on those financial institutions as aforesaid), for the execution of transactions hedging the NIS/USD exchange rate applicable to debentures issued by the Company. It is clarified that nothing in the foregoing shall prejudice the Company's ability to issue debentures in Israel, including debentures backed by collateral, and/or provide guarantees.

5.12. Compliance with the Company's Obligations Upon Changes in Accounting Standards:

It should be noted that for purposes of this Deed, including in connection with the Company's compliance with the obligations set forth in Section 5 hereof, upon a change in the accounting standards applicable to the Company, including in the case where the Company has adopted a different accounting standard compared to those applicable to it as of the date of entering into this Deed of Trust and which affect the calculation results of any of the Financial Covenants of this Deed including any of the financial terms, then the Company's compliance therewith Shall be reviewed in accordance with the accounting standard applicable to the Company at the time of entering into this Deed and the Company shall prepare on a quarterly basis a condensed pro-forma balance sheet, reviewed or audited (as applicable), with only relevant material notes, in accordance with the accounting standards used by the Company to prepare financial statements At the date of issue of the debentures to the change ("**Pro-Forma Balance Sheet**") and will publish such balance sheet together with its Financial Statements, on a quarterly basis. In such case, the applicability of the provisions of this Deed will be reviewed based on the Pro-Forma Balance Sheet.

5.13. Undertakings of the Company, its Controlling Shareholders and its Officers:

Further to the undertakings of the Company, its Controlling Shareholders and its Officers as stated in Section 33 hereof, the Company's current and future Controlling Shareholders and Officers, irrevocably undertake and will irrevocably undertake (as applicable):

5.13.1. Not to raise claims against the Bondholders (Series A) right to file a derivative claim.

5.13.2. That the Company and the corporations it holds will not opt to be considered as corporations rather will continue to be considered a Pass-Through Entity for its owners or a partnership, as applicable, for Federal Income Tax purposes in the United States.

5.13.3. To act in accordance with their undertaking to delineate the Company's operations detailed in the Prospectus.

5.14. Minimum Liquidity

The Company undertakes that its Liquid Means at the end of each quarter shall not fall below an amount equal to the interest payment(s) it is obligated to pay to the holders of Debentures (Series A) during the period commencing at the end of the quarter and ending upon the lapse of 6 months from the end of the quarter (the: "**Minimum Liquidity Amount**").

"**Liquid Means**" – cash deposited in the accounts of the Company and/or in the Pledged Account and/or in the Trust Account, with no limit to the transfer to the Company, cash value, and short-term investments (including deposits and tradable securities) according to the Company's consolidated Financial Statements, audited or reviewed, as applicable, and there is no limit to the transfer of company. For the avoidance of any doubt, cash and cash equivalents pledged to secure currency hedging transactions will be accounted for as liquid.

The Company shall specify in the Board Report for the relevant period, its compliance or non-compliance with the undertaking provided in this Section 5.14 above.

6. **<u>Securing the Debentures</u>**

6.1. The Debentures (Series A) are secured by the collaterals as is set forth in Section 6.2 to this Deed. For information regarding the Company's undertaking not to create a general floating and/or specific charge, see Section 6.3 to this Deed. Without derogating from the foregoing, see details regarding the Expense Cushion in Section 5.8 to this Deed.

For the avoidance of doubt, it is clarified that the Trustee had no obligation to, and did not review, the need for providing collateral to secure the payments to the Bondholders (Series A). The Trustee has not been requested to, and did not perform an economic, legal or accounting due diligence process with regard to the condition of the Company's business and the business of its subsidiaries. By entering into this Deed of Trust, and with the Trustee's consent to act as Trustee for the Holders of the Series A Debentures, the Trustee does not explicitly or implicitly express an opinion regarding the Company's ability to meet its obligations to the Holders of the Series A Debentures. The foregoing shall not prejudice the Trustee's duty (if such duty applies to the Trustee by law) to review the impact of changes in the Company as of the date of the Prospectus and thereafter, if such changes adversely affect the Company's ability to meet its obligations to the Holders of the Series A Debentures.

6.2. <u>The Pledged Assets</u>:

In order to secure all of the Company's obligations towards the Bondholders (Series A) with respect to the Debentures (Series A) under his Deed of Trust, including Debentures (Series A) to be issued from time to time within a framework of a series expansion, and including full and timely repayment of the Debentures (including principal, interest and arrears interest, if applicable), and guaranteeing the full and exact fulfillment of all other terms of the Debentures, including covering all costs of the realization of pledges created in favor of the Bondholders in this Deed, including all legal expenses (the "**Secured Amounts**") the Company shall create and register and/or cause the creation and registration in favor of the Trustee and the Bondholders, Pledges as is set forth hereunder.

It is clarified that upon the initial issuance of the Debentures (Series A), the Company does not undertake that all the assets specified in Section 6.2.1 to this Deed hereof will be pledged, but that the assets that will be pledged from the said assets, shall be chosen in the order they are presented, in such a manner that the LTV Ratio in the Pledged Corporation upon the closing of the issuance of the Debentures (Series A) for the first time, shall not exceed 65%. It is clarified that the Company will not be entitled to pledge part of its rights in any asset for the purpose of meeting the LTV Ratio in the Pledged Corporation provisions, but only the entire rights in said asset. In this way, the Company will cause pledges to be registered in benefit of the Trustee and the Bondholders as detailed below:

6.2.1. First mortgage on the full rights (100%) of the Property Companies in the properties set forth in **<u>Appendix A</u>** to this Deed (the "**Mortgages**" and the "**Pledged Real Estate Assets**", as applicable), in accordance with the provisions of an attorney's opinion, as specified in Section 6.2.3 hereof. The Company and the Property Companies declare that as at the signing date of this Deed of Trust, a first mortgage in favor of financing entities is recorded

on the Pledged Real Estate Asset. In order to create the mortgages pursuant to this Section, the mortgage registered on the Pledged Real Estate Assets will be removed and replaced by mortgage under the provisions of this Deed of Trust in favor of the Trustee to secure the Company's undertakings towards the Bondholders (Series A).

Within the framework of the Mortgage documents as aforesaid ,an irrevocable pledge shall be made in favor of the Trustee to the Bondholders (Series A) on all the rights to receive funds deriving from or due by force of the Pledged Real Estate Assets, preemptive rights or other rights and/or any right to receive cash flows and/or right to receive insurance receipts, if received, and/or any other agreement, if any, which grant or will grant from time to time with respect to, and including the movables, rights in the Pledged Real Estate assets, the agreements, the contracts, the insurance policies, the rights of compensation and indemnity, licenses, accounts receivables, deposits, accounts, intellectual property, intangible assets and legal rights with respect to the Pledged Real Estate Assets.

It is clarified that as long as the Pledges with respect to the Pledged Real Estate Assets are in effect pursuant to the provisions of this Deed, the entire cash flow of the Property Companies and Operating Companies shall be transferred only directly to the Pledged Corporation.

On the first trading day after the end of the period for submitting applications (as stated in the Prospectus and the supplementary announcement), the Company will announce in an immediate report the results of the issuance, including which assets, out of the assets detailed in this Section 6.2.1 above, will be pledged in favor of the Trustee for the Bondholders (Series A).

Except the mortgages, by signing on the margins of this Deed, each of the Company, the Holdings Company, the Pledged Corporation, the Property Companies and the Operating Companies undertakes not to pledge the existing and future assets and rights of the Property Companies and to cause that companies owned thereby will not to pledge their assets and rights, in whole or in part, with a general floating pledge and specific pledges (including a floating pledge on specific assets(s), without obtaining the prior consent of the general meeting of the Bondholders (Series A) in a special resolution. The Company shall include such disclosure regarding the non-creation of liens by the Property Companies in the framework of the Board of Directors' Report, which will be attached to the Periodic and/or Quarterly Report of the Company.

It is clarified that as long no Default Event has occurred, subject to the Mortgages and the undertakings in this Deed, the Company's rights in the Pledged Assets and/or in the Property Companies by virtue of law, agreement or regulation shall not be affected and shall be in its full and exclusive possession.

In this regard, it is hereby clarified, that the loan amount in the Note, shall be updated on a semiannual basis according to the outstanding par balance of the Debentures upon the publishing of the Company’s financial statements as of December 31 and June 30, based on the exchange rate as at the examination date. In the event of such increase, the Mortgage shall be increased thus guaranteeing the addition to the Note; all in accordance with the legal advice the Trustee shall receive from its US attorneys.

To the extent that at the end of said examination period the value of the Note (loan amount) shall exceed the outstanding par balance of the Debentures, based on the exchange rate as of the examination date, the Company shall be permitted not to update the loan amount in the Note. To the extent that the Company updated the loan amount in the Note, the Company shall state the Note amount in every Board of Directors Report, Quarterly or Annual.

Additionally, the Company shall perform an examination of the exchange rate as of the publishing of the Financial Statements as of March 31 and September 30 of each year, and to the extent the exchange rate in whichever of said examination dates exceeds 10% of the exchange rate of the previous examination date, and the secured amount as of the publishing of the Financial Statements as of March 31 and September 30, as applicable, falls below the par value of the Debentures at said date, the foregoing update shall be carried out even in this date, and the foregoing provisions shall apply *mutatis mutandis*,

It is hereby clarified that the Mortgage exercise process, insofar as it is carried out, will be carried out in accordance with U.S. law and in accordance with the advice received by the Trustee shortly before the Exercise date.

6.2.2. The Holding Company shall pledge, in favor of the Trustee to the Bondholders (Series A) in a first position pledge, unlimited in amount, the holdings in its membership rights in the Pledged Corporation, future and existing, including the accompanying rights (as defined below) (the "**Pledged Membership Rights**" and the "**Pledging of Rights**" respectively) according to the opinion of the attorney, as is set forth in Section 6.3 to this Deed.

Aas long as the Debentures (Series A) have yet to be fully repaid, the Holding Company will continue to be a fully owned and controlled Subsidiary (directly and/or indirectly) of the company, and the Pledged Corporation will continue to be fully owned by the Holding Company.

The "**Accompanying Rights**" – in this section above shall mean: all the rights deriving and/or related and/or which will derive from the Pledged Membership Rights, including, but without derogating the generality of the foregoing: any right to receive assets, funds as well as rights of any type and kind to be received from time to time, including: preemptive rights, rights to receive other securities of any kind whatsoever, rights for indemnification and/or compensation, as well as any dividend in cash or in kind, and principal and/or interest payments to be granted and/or payable with respect thereto, as well as the right to receive any consideration with respect thereto, as well as all the rights to receive the funds and/or rights to receive assets deriving from preemptive rights or other rights, including receipts from lease agreements with respect to the properties.

It is hereby clarified that the Pledging of Rights process, insofar as it is carried out, will be carried out in accordance with U.S. law and in accordance with the advice received by the Trustee shortly before the Exercise date.

The Company, the Holding Company undertakes that the Holding Company transfer to the Pledged Corporation its full rights in the Property Companies and Operating Companies, which hold and/or operate the Pledged Real Estate Assets, which the Company shall pledge in favor of the Bondholders. After the transfer of rights as aforesaid, the Property

Companies and the Operating Companies will affix their signatures to this Deed. It is clarified, that the Trustee will not release the Issuance Consideration (as is set forth in Section 6.3.3 to this Deed) without obtaining the signatures of all relevant Property Companies and Operating Companies.

6.2.3. Each of the Property Companies and each of the operating companies will record a permanent current lien, by filing of UCC-1 Financing Statements with the applicable office of the Secretary of State for the U.S. State where the relevant Property Company or Operating Company was formed. Each such statement shall specifically state: (i) the applicable Property Company or Operating Company, as debtor, and the Trustee, as secured party; and (ii) the collateral as "all assets of Debtor," which shall, by definition, grant the Trustee to the Bondholders (Series A) a first priority security interest all of such debtor's assets (including, without limitation, all of such Property Company's and Operating Company's bank accounts). Accordingly, upon an Event of Default under the Mortgage documents, the Trustee to the Bondholders (Series A) shall have the right to, among other things, take control over any and all assets of the Property Companies, and/or the Operating Companies, including, without limitation, all of the bank accounts for all such Property Companies.

6.2.4. The Company and the Holding Company shall be responsible and the Property Company undertakes that it will execute and deliver a controlling agreement (DACA) to be signed the Property Company and by the U.S banking corporation where the account of the Property Company is opened (the "**Control Agreement**"), which will be the only account under the name of the Property Company, which will grant Trustee to the Bondholders (Series A) first priority pledges on its entire rights in a bank account of the Property Company (the "**Pledged Account**"), including to all the funds, deposits and securities deposited and/or those which shall be deposited from time to time in the pledged account, as well as any consideration received with respect thereto, and the fruits thereof, according to the provisions below while the banking corporation in which the Pledged Account is managed has confirmed its consent to the provisions of the said control agreement and including:

a. The Pledge shall be created pursuant to the foreign law applicable to the Property Company and to the Pledged Property as shall be instructed by a U.S. attorney on behalf of the Trustee.

b. The signatory rights in the Pledged Account shall be of the Property Company only, which will Be responsible for enabling the Trustee viewing rights to the Pledged Account. If the Loan to Collateral Value (LTV) in the Pledged Corporation exceeds 75% Or until the date when the Debt Yield of the Pledged Assets falls below 10% or at such date in which the Debentures (Series A) are called for an immediate repayment or on the date on which a Default Event occurs, whichever is earlier. the Trustee shall have the right to provide notice thereof to the banking corporation in which the Pledged Account is held and as of said date, the signatory rights in the Pledged Account shall be of the Trustee only. In view of the foregoing, it is clarified that until such date in which Loan to Collateral Value (LTV) in the Pledged Corporation does not exceed 75% Or until the date when the Debt Yield of the Pledged Assets falls below 10% or the Debentures were not called for an immediate repayment or on the

date on which a Default Event occurs, whichever is earlier, the account shall be managed exclusively by the Company and the Trustee will not have the effective ability to audit operations in real time but only in retrospect. The Company and the Pledged Corporation shall make their best efforts to ensure that the Trustee has account viewing rights (for the Pledged Account). As long as the Trustee does not have account viewing rights, the Company will provide the Trustee, at the beginning of each month, a printout of the Pledged Account movements. The Company shall specify in its Board of Directors Report for the applicable period the LTV Ratio in the Pledged Corporation.

c. The Company shall provide the Trustee with a certificate from the banking corporation in which the Pledged Account shall be opened, according to which the banking corporation will subordinate to Debentures any right to pledge, offset, lien, to the extent he is entitled to any of the foregoing. Without derogating from the generality of the aforesaid, the Pledged Corporation shall not open additional bank accounts (whether at the same banking corporation or at a different banking corporation or financial institution) and the Pledged Account shall be the only account the Pledged Corporation shall have. For the avoidance of doubt, as part of the documents required under Section 6.4.1 below, the Pledged Corporation will represent in the Control Agreement that the Pledged Account is and shall remain the sole account of the Pledged Corporation.

d. As long as Loan to Collateral Value (LTV) in the Pledged Corporation does not exceed 75% and/or until the date when the Debt Yield of the Pledged Assets falls below 10% and/or the Debentures were not called for immediate repayment and/or no Default Event occurred, whichever comes first, there shall be no restrictions on the use of funds deposited in the Pledged Account, including distributions made by the Pledged Corporation. Additionally, the management policy of the funds in the Pledged Account and its execution shall be determined according to the Pledged Corporation's sole discretion and/or according to the provisions of Section 17 to this Deed of Trust.

e. As of the date and as long as the LTV Ratio in the Pledged Corporation exceeds 75% and/or until the date when the Debt Yield of the Pledged Assets falls below 10% and/or the Debentures were not called for immediate repayment and/or no Default Event occurred, whichever comes first, all the funds deposited in the Pledged Account and/or the funds to which the Pledge Corporation is entitled, from any source whatsoever, shall remain in the Pledged Account and will be used only for: a) developing and operating the Pledged Real Estate Assets; and/or b) in order to carry out current payments to the Bondholders pursuant to the Debenture amortization schedule and/or in order to carry out a full or partial Early Redemption of the Debentures; and/or (c) for the acquisition of the Debentures (Series A) within the framework of Stock Exchange trade and/or a tender offer; this until the full and final repayment of the Debentures (Series A) based on the Company's confirmation, signed by its Senior Financial Officer to which appropriate references and calculations shall be attached in a version satisfactory to the Trustee.

It shall be clarified, that in a case the Debentures (Series A) will be purchased by the Pledged Corporation using funds from the Pledged Account and for as long as said

Debentures (Series a) are held by the Pledged Corporation these Debentures will be held in the Pledged Account, all proceeds for them will be deposited in the Pledged Account and as long as the LTV Ratio in the Pledged Corporation exceeds 75% and/or until the date when the Debt Yield of the Pledged Assets falls below 10% and/or the Debentures are called for immediate repayment and/or no Default Event occurred, whichever comes first, the proceeds will not be used until the Debentures (Series A) are fully repaid, unless the Trustee determines otherwise in his absolute discretion. If the Debentures that are purchased by the Pledged Corporation as set forth above are sold to a third party, the sale consideration shall be deposited directly in the Pledged Account.

f. All activities of the Pledged Corporation will be carried out only through the Pledged Account and except for the Pledged Account the Pledged Corporation will not open additional accounts with banks or any corporation or entity that enables the management of an account in which funds can be deposited. Notwithstanding the foregoing, the Pledged Corporation shall be entitled to open additional accounts at the same banking corporation in which it hold the Pledged Account if it has applied to that accounts the full provisions relating to the Pledged Account (including, but not limited to, the account pledge, signing a the Control Agreement and granting trustee rights in the event as set forth in Section 6.2.3.b. to this deed).

6.2.5. The Company and the Holdin Company shall be responsible, and the Pledged Corporation undertakes to sign and provide a Control Agreement (DACA) over the bank accounts (existing or those opened for this purpose) of the Operating companies which operate Pledge Real Estate Properties that according to the Company's Financial Statements as of December 31, 2025 shall have an NOI which exceeds $5,000 thousands (TTM), this until July 31, 2026. The Provisions of Section 6.2.4 (including the use of the definition Pledged Account) shall apply to this Section, *mutatis mutandis*. The Company shall publish an Immediate Report regarding the completion of the engagement in said control agreements

It is clarified that as long as a Default Event did not occur and/or the LTV Ratio in the Pledged Corporation exceeds 75% and/or until the date when the Debt Yield of the Pledged Assets falls below 10% or if the Debentures were not called for immediate repayment, whichever comes first, subject to the terms of the Mortgage ,the Pledge and other loan documents executed in respect thereof, and to the undertakings under this Deed, the remining rights of the Company in the Pledged Assets and/or in the Property Companies by virtue of law, agreement or regulation shall not be affected and shall be in its full and exclusive possession.

It is further clarified that, except in section 6.2.5 of this Deed, the ongoing activities of the Operating Companies (that do not fall under the provisions of section 6.2.5 of this Deed) shall be carried out in accounts owned by the Operating Companies which will not be pledged in favor of the Trustee, and the Trustee shall not have signatory rights therein. The accounts of the aforementioned Operating Companies are the only operating accounts of the relevant Pledged Real Estate Assets.

All liens that will be created in favor of the Trustee for the bondholders as stated in this Section 6.2 above will be referred to in this Deed as: the "**Pledges"**; the Pledged Real Estate Assets, the

Pledged Membership Interest and the Pledged Account shall be referred to in this Deed as: the "**Pledged Assets**"

6.3. Creation of the Pledges

6.3.1. Manner of Creation and Registering the Pledges

The Creation of the Pledges shall be done in accordance with the memorandum or opinion of an attorney or attorneys familiar with the relevant law in the United States that applies to the relevant Pledged Assets (the "**American Attorney**"), as specified in sub-Section A below, and according to the following documents, that upon the presentation of all of them to the Trustee, in a manner satisfactory to the Trustee, the Pledges will be considered "registered" and/or "created" as the case may be.

**It should be noted, as stated above, that at the date of signing this Deed, mortgages were recorded on the Pledged Real Estate Assets in favor of financing entities. In accordance with the guidance of the American** Attorney**, the Company will re-register or convert the pledges in favor of the Trustee in accordance with the provisions of the Deed of Trust.**

A. A memorandum addressed to the Trustee with a copy to the Company by an American Attorney regarding the manner in which the Pledges will be created, which will detail the required documents to be attached to the memorandum and the decisions required for the purpose of creating the Pledges and registering them in accordance with the law applicable to the Pledged, as the case may be. The memorandum shall also specify the ways and means of realizing the Pledges according to the relevant law. The memorandum shall include a list of approvals or documents to be received annually, if and to the extent required, to verify the validity of the Pledges by virtue of which the law they were created. It is clarified that this memorandum shall not create attorney-client relations between the Trustee and the American Attorney.

B. An opinion from the American Attorney, addressed to the Trustee, that all Holding Companies, the Pledged Corporation, and all Property Companies have adopted all the resolutions required to create the Pledges, and that those authorized to sign it signed all the documents required for the creation and registration of the Pledges.

C. An opinion from the American Attorney addressed to the Trustee, according to which: (1) the Pledges are valid, and enforceable; (2) Confirmation that the creation and registration of the Pledges by the aforementioned closing agent complies with the requirements stated in the memorandum of the American Attorney as stated in paragraph (a) above; (3) The terms of the Pledges comply with the provisions of this Deed and in particular the provisions of paragraph (a) above in relation to the description of the Pledged Assets, to the guaranteed amounts, and also includes appropriate instructions in order to allow the Company to meet its obligations to provide information regarding the Pledged Assets. For the purpose of this opinion, the American Attorney may rely on a confirmation from the closing agent as stated in paragraph (e) below.

D. A Declaration from an senior officer in the Company, the Holding Companies, and the Pledged Corporation, the Property Companies and the Operating Companies, as

applicable, (Officer Certificate) certifying that the resolutions required for the Creation and registration of the Pledges have been made and regarding the absence of conflicting /or opposites obligations of the Company, the Holding Company and the Property Companies and the Operating Companies in connection with the creation of the pledges and that the Pledged Real Estate Assets are owned by them and is the exclusive property of the Property Companies, as the case may be; and that U.S. laws are the laws that apply to the Pledges, and that the granting of the Pledges neither negates nor contradicts any other undertaking or duty of said corporation. The certificate shall include a calculation according to which as of the issuance date of the Debentures, the LTV ratio does not exceed 75%, and an active excel file calculation will be attached to the certificate.

E. The identity of the signatory and his being a Senior Officer of the Company and/or the Holding Companies and/or the Property Company and/or the Operating Companies, as the case may be, will be verified and approved by an American Attorney.

F. Within 90 days as of the Closing Date – A confirmation from the Closing Agent certifying that the Pledges have been registered in accordance with the Opinion of the American Attorney s is set forth in in sub-Section A above.

G. The Control Agreement signed by the parties thereto.

H. Copy of the documents required for the creation and registration of the Pledges which will be attached to the Memorandum of the American Attorney, as is set forth in Subsection A above, in a version satisfactory to the Trustee.

I. Confirmation from the insurer of each of the Pledged Real Estate Asset that the Trustee has been added as a beneficiary to the insurance policies (purchase policy and liability policy) of the Pledged Asset.

J. Lender Policy Title Insurance policy(s), in favor of the Trustee.

K. Confirmation from the insurer of the Pledge Real Estate Assets that the Trustee has been added as a beneficiary to the insurance policies (property policy and liability policy) of each of the Pledge Real Estate Assets.

L. The Company, the Holding Company, the Pledge Corporation, the Property Companies and the Operating Companies undertake to sign any document required for the creation, registration, enforcement and realization of the Pledges, as applicable.

The documents by virtue of which the Pledges will be registered in favor of the Trustee will be in the wording satisfactory to the Trustee and the Trustee will have the authority to agree to any change in the wording of the pledge documents under the same conditions as the Trustee is entitled to agree in changes to the Deed of Trust, as detailed in Section 28 of the Deed of Trust, *mutatis mutandis*. It is hereby clarified that the approvals of the American attorney (including the opinion and the memorandum) may include factual assumptions and accepted reservations, and the American attorney may rely on the statements of the Company and/or the Holding Companies and/or the Property Companies and/or other person in connection with the factual assumptions (without independent examination) inasmuch as it is accepted in the relevant law for carrying out such an examination in the country in which the lien is performed.

It is hereby clarified that on the final repayment of the Debentures (Series A) and subject to full repayment or settlement of the unpaid balance of the Debentures (Series A) in any manner (including by way of buyback and/early redemption) and for the payment of all the Trustee's fees and expenses, including all of its agents, the Pledges shall expire and shall be deemed to be void without the need to take further action and the Trustee shall sign any document required for the purpose of canceling the Pledges, as necessary, or in order to transfer them to another party in accordance with the Company's instructions, according to the terms determined in the Pledge and subject to legal counsel the Trustee shall receive from its US attorney at said date.

The Company undertakes to sign any document that will be required for the creation and realization (as necessary) of the Pledges.

6.3.2. Removing the Mortgages registered on assets of the Property Companies and Creation of new Mortgages.

6.3.2.1. The Company, the Holding Company, the Pledge Corporation, the Property Companies and Operating Companies declare that as at the signing date of this Deed of Trust, the Pledged Real Estate Assets have Mortgages registered in favor of financing entities as well as additional liens on any of Property Companies and Operating Companies, and in general (the “**Existing Pledges**”).

6.3.2.2. In order to release the Existing Pledges and the registration of new mortgages in favor of the Trustee to the Bondholders (Series A) as aforesaid on the Pledged Real Estate Assets, in whole or on part thereof, in their entirety and to secure the Company's liabilities to the Bondholders, the Company may repay the entire debt (in whole or part thereof) towards the financing entities.

For this purpose, the Trustee shall transfer, pursuant to such instruction, out of the proceeds of the issuance that will be held by him in trust as, amounts pursuant to Payoff Letters (the “**Payoff Letters**”) on behalf of the financing entities which will be provided to the Trustee (or according to the request of the Closing Agent who receives the Payoff Letters) detailing the redemption amounts required to be transferred to the financing entities in order to remove the Existing Pledges and the details of the bank account of the Closing Agent (as detailed below) to which the repayment amounts should be transferred, subject to the provisions of Sections 6.3.2.3 and 6.3.2.4 to this Deed. The Payoff Letters shall state that against the transfer of the said amounts, which shall constitute final repayment of all of the existing loans towards the financing entities, the financing entities will release the Pledges existing in their favor on the assets and remove any registration in respect of these pledges.

Without derogating from the aforesaid, the Company may redeem the Existing Pledges from its sources and not from the proceeds from the issuance of the Debentures (Series A).

6.3.2.3. To the extent that the repayment will be made out of all of the existing loans towards the financing entities, the consideration of the issuance of the Debentures (Series A), the Trustee will transfer to the Closing Agent, out of the issuance

proceeds, the required amounts, In accordance with the Payoff Letters, against the removal of all of the Existing Pledges that the Company has chosen to pledge in favor of the Trustee and the registration of the liens specified in Section 6.2 of this deed are in favor of the Trustee for the Bondholders.

**According to legal advice received by the Company, the process of removing the Existing Liens and registering new Mortgages is performed by a Closing Agent who does not represent either party. As part of the closing process, all of the parties are given all approved and signed transaction documents as well as, as much as required, all the funds required for transfer. Therefore, subject to the provisions of Section 6.3.2.4 hereof, the Trustee, as much as required, will transfer the funds required to the Closing Agent after the Closing Agent confirms that the funds will be held by him in trust for the Trustee in accordance with the provisions of Section 6.3.2.5 hereof.**

6.3.2.4. The Trustee shall transfer the amounts required to remove the Existing Pledges to the Closing Agent in accordance with the Payoff Letters, after an Escrow Agreement has been signed between the Trustee and the Closing Agent, which will include the following arrangements and actions:

A. Transfer of the issuance proceeds to the payment of the relevant amounts to the removal of the Existing Pledges.

B. Guaranteeing the creation and registration of the Mortgages and Pledges to guarantee the Debentures (Series A).

C. Undertaking of a Closing Agent for the issuance of a mortgage insurance policy as detailed in Section 6.3.2.5 hereof.

D. The Pledges will be recorded in favor of the Trustee for the purpose of guaranteeing the Debentures (Series A), as specified in Section 6.2 of this Deed.

E. The Closing Agent shall issue a mortgage insurance policy as specified in Section 6.3.2.5 hereof.

In the framework of the Trust Agreement, the Closing Agent shall declare and undertake as follows:

A. He shall approve the Trustee immediately after he has all the documents required to: (1) perform the repayment of the Existing Pledges; (2) the creation of the Mortgages and Pledges in relation to the amount equal to the full consideration of the issue.

B. Copies of the above documents shall be sent to the Trustee within 7 days from the Closing Date.

C. The Closing Agent shall not transfer any amount without receipt of the Trustee's written instruction.

D. As long as the trustee's order is not received until the date of the Closing Agent's decision, the monies deposited by the trustee for the account from which they were deposited will be returned.

E. Upon the transfer of funds for the benefit of the Bondholders (series A) of the Company, Title Insurance will be issued as detailed in Section 6.3.2.5 hereof. mortgage insurance certificate in respect of the mortgage insurance policy as stated above in the amount of the entire consideration of the issue will be delivered to the Trustee upon its issuance (which will be after the registration of Pledges and Mortgages in the relevant registers which is expected to apply several weeks after the closing date, but this does not affect the fact that the policy and the insurer's obligation are in effect).

F. Upon the transfer of funds, he shall submit all the documents for the execution of the aforesaid and shall verify their registration as required.

6.3.2.5. On the closing date, the Closing Agent shall provide the trustee with a document containing the main issues of pledge insurance policy (pro forma title commitments) in the name of the Trustee in the amount secured by the specific mortgage of the full consideration for the issuance of the bond (hereinafter: the **"mortgage insurance policy"**), concurrent with the release of the monies by the trustee as detailed above. After the closing date, the Closing Agent will take care of the registration of the Mortgages and Pledges and providing the Trustee a full phrasing of the mortgage insurance policy, where in this respect it is clarified that the mortgage insurance will be in effect from the date of release of the monies by the Trustee (regardless of the creation and registration of the liens). The mortgage insurance policy will insure the full amount of the mortgage loans, which is the full consideration for the issuance, in respect of any defect discovered by the ownership of the Holding Company, the Pledge Corporation, the Property Companies and Operating Companies in the pledged assets and/or the mortgages and/or the bonds and/or pledges in favor of the Trustee, including in cases where insolvency proceedings are taken against the Company and/or the Holding Companies and/or the Pledged Corporation and/or the Property Companies and/or the Operating Companies, subject to Subject to standard exclusions related to default in the mortgage insurance policy as set out in the policy documents, and also insures the validity, enforceability and priority against third parties of the Pledges and Mortgages in connection with the Pledged Assets in favor of the Trustee. It is clarified that the policy's coverage amount shall be in USD and will not be linked to exchange rate differentials or to any other linkage basis.

6.3.3. <u>Transfer of the issuance proceeds to the Company.</u>

6.3.3.1. Upon receipt of the approval of the Dealer Manager (as defined in the Prospectus) for receipt of the proceeds of the issuance at the offering coordinator, will be transferred by the Dealer Manager the gross proceeds from the issue (but less the early commitment fee to institutional investors) , to its Trust Account, until the transfer of the consideration of the issue to the Closing Agent as specified in this Deed. It is hereby clarified that in practice, an amount equal to the amount of

issuance expenses in accordance with the calculation to be transferred by the Company to the Trustee may remain in the trust account and/or the Dealer Manager in trust for the Trustee and the Bondholders, and it will be paid by the Company only at the expense of the issuance expenses only at the time of removal of the Existing Pledges and the registration of the and Pledges in favor of the Trustee.

**In addition to what is stated in Section 6.5 of this Deed, the** Company**, the Holding Company, the Pledge Corporation, the Property Companies and Operating Companies undertake that until the completion of the creation of the Pledges in favor of the Trustee to the Bondholders, in a manner satisfactory to the Trustee, and the provision of all the documents specified in Sections 6.2.3 and 6.2.4 hereof, as the case may be, in a manner satisfactory to the Trustee, the Company, the Holding Company, the Pledge Corporation, the Property Companies and Operating Companies shall not enter into agreements and/or undertake obligations of any kind and type that may create additional creditors to the Holding Company, the Pledge Corporation, the Property Companies and Operating Companies other than the Bondholders (Series A).**

In order to register the Debentures for trade only, the Company considers receipt of the proceeds from the issuance at the Dealer Manager as receipt of the proceeds at the Company, and accordingly will request the registration of the Debentures (Series A) for trade on the stock exchange.

6.3.3.2. Only after the Closing Agent is provided all the documents specified in Section 6.2.3and 6.3.1 hereof, regarding the Pledges, and after the Existing Pledges are removed and the Pledges are created in favor of the Trustee to the Bondholders (Series A), in a manner satisfactory to the Trustee pursuant to the provisions of this Deed the balance of the issue will be transferred (less the expenses cushion) to the Company according to the Company's written request, which will also specify the details of the account for transfer (including instructions to the Dealer Manager to make the payments in respect of issuance expenses out of amounts held by him in trust).

6.3.3.3. The Trustee shall rely on the opinion and approvals of its or Company's attorneys in the United States, as specified in Section 6.2.3 above ("**U.S. Attorney Approvals**") and shall not be required to check their validity and/or their reliability.

6.3.3.4. It is agreed that as long as the conditions for releasing the proceeds from the issuance to the Company have not been fulfilled, the Company will not be entitled to any amount from the proceeds of the issuance for which the condition for his release has not been fulfilled.

6.3.3.5. The Company undertakes that all the conditions detailed in Sections 6.3.1, 6.3.2, and 6.3.3 hereof will take place within a period of one hundred and twenty (120) days from the date of issuance of the Debentures (Series A). A meeting of the Bondholders may approve the extension of said period by a special resolution (the aforesaid 120-day period, with the addition of any extension approved as aforesaid, if approved, shall be termed: the “Interim Period”).

To the extent that all the conditions set forth in Sections 6.3.1, 6.3.2 and 6.3.3. hereof are not fulfilled, as aforesaid, by the end of the Interim Period, the Company will act to carry out full early redemption and delisting of the Debentures from trade not before the end of the Interim Period (the "**Compulsory Early Redemption**"). One business day after the end of the Interim Period, the Company shall publish an immediate report with a copy to the Trustee, in which it shall announce the execution of the Compulsory Early Redemption and its date. The Compulsory Early Redemption date shall be no less than seventeen (17) days and no more than forty-five (45) days after the Company's report of the Compulsory Early Redemption to the Bondholders. In said immediate report, the Company shall publish the amount of the principal to be redeemed in the Compulsory Early Redemption and the accrued interest in respect of the principal amount until the Compulsory Early Redemption date.

In this case, the principal of the Debentures (Series A) plus annual interest at the rate of the interest in respect of the Debentures (Series A) accrued from the first trading day after the date of reporting on the results of the offering until the actual Compulsory Early Redemption date will be paid to the Bondholders(Series A), with the tax deduction as legally required. For the purpose of carrying out Compulsory Early Redemption under Section 6.2.5.5, this will be done, inter alia, using funds remaining in the Trust Account that will be transferred by the Trustee directly from the Trust Account to the Nominee Company less the costs of opening, managing and closing of the Trust Account, less any additional fees to third parties, and the Company shall complete any amount required for the purpose of carrying out such Compulsory Early Redemption.

For the avoidance of doubt, as long as the Pledges as is set forth in this Deed have not yet been registered at the time of the carrying out the full Compulsory Early Redemption, the Company will no longer be obligated to register the Pledges in favor of the Bondholders(Series A), and this Deed of Trust shall expire and be void.

6.3.3.6. Without derogating from the aforesaid, it is hereby clarified that as long as the conditions for transfer of the consideration of the issuance to the Company are not fulfilled, the proceeds of the issuance that will be held in the Trust Account are designated to secure the Company's full liabilities in respect of the Debentures (Series A) pursuant to the Deed of Trust, and the Company will not be entitled to receive The proceeds of the issuance, except subject to the fulfillment of all the conditions detailed in Sections 6.2.3, 6.2.4 and 6.3.3 above.

6.3.3.7. Notwithstanding the provisions of this Section hereinabove, it is clarified that the signing of the Control Agreement as is set forth in Section 6.1.1.3 to this Deed and the Pledging of the Pledged Account, do not constitute a contingency for the release of the issuance consideration, and the Company shall act to sign said Control Agreement after the closing of the issuance of the Debentures (Series A) for the first time. Until the signing of said Control Agreement, and the completion of creating the pledge on the Pledged Account, the Trust Account shall hold an amount equal to $5 million, out of the issuance consideration (the "**DACA Deposit**"). Upon the engagement of the Pledged Corporation in said Control

Agreement and completion of creating the pledge on the Pledged Account, the pledge on the Pledged Account shall be deemed part of the Pledges described in this Deed for all effects and purposes, and the Trustee shall release the DACA deposit to the Company according to its instruction.

6.3.4. Sale of Pledged Assets and/ or refinance

The Company may sell to third parties and/or refinance the Pledged Real Estate Assets (as they may be from time to time), in whole or in part, and it is emphasized that a Pledged Asset will only be sold in whole, without receiving the approval of the Trustee and/or the Meeting of the Holders of Debentures provided that it acts as follows:

6.3.4.1. The net proceeds from the sale of the Pledged Real Estate Asset and/or its refinance*, i.e.*, with a deduction (which will be performed prior to the transfer to the Trustee), of taxes and the direct expenses that apply to the Company in respect of the sale of the Pledged Property or its refinance (“**Net Sale Proceeds**”) will be deposited directly in the Trust Account so that after the deposit of the said Sale Proceeds, the LTV Ratio in the Pledged Corporation shall not exceed 65% on the date of the Examination, which is the date in which the Net Sale Proceeds are fully transferred to the Trust Account. The Company undertakes to ensure that the sale agreement and/or refinance agreement shall include an irrevocable directive according to which the Net Sale Proceeds will be deposited directly in the Trust Account and that it will enforce the implementation of this directive. It is hereby clarified that the Company will give notice by way of an Immediate Report about the sale and/or refinance of the asset, which will be published at least thirty (30) days before the date of the sale of the property, whether the Net Sale Proceeds of will be deposited in the trust account until the final redemption date of the Debentures, or until the early redemption of the Debentures, as specified in Section 6.3.4.3 hereof.

Prior to the transfer of the Net Sale Proceeds to the Trust Account, the Company shall provide the Trustee with a calculation signed by a Senior Financial Officer of the Company's in connection with the Net Sale Proceeds, the LTV Ratio in the Pledged Corporation after the Sale and/or refinance, the balance of the Adjusted Value of the Debentures (including an authentic copy of the Sale Agreement and/or refinance agreement) and any approval or other document that the Trustee in a manner satisfactory to him.

It is agreed that as long as the sale is carried out through a Closing Agent, the deposit of the funds with the Closing Agent and acceptance of the Closing Agent's commitment to deposit the funds in the Trust Account will be considered as a direct deposit in the Trust Account.

6.3.4.2. Subject to the Company's compliance with the terms and obligations as stated in Section 6.3.4.1 hereof, after making such a Sale and/or refinance, and after receiving all of the above stated in Section 6.3.4.2 hereof to the satisfaction of the Trustee, the Trustee will deliver to the Company a letter confirming that upon receipt of the confirmation of deposit of the Net Sale Proceeds in the Trust Account, he will cooperate with the Company to remove the pledge from the Pledged

Property that is for sale and/or refinance in accordance with an opinion obtained from the American Attorney.

6.3.4.3. It is hereby clarified that the Company may at any time, at its sole discretion, make use of the funds deposited in the Trust Account, including their profits, which will be received from the sale and/or refinance of a Pledged Asset for the purpose of repayment of principal and/or interest of Debentures (Series A) including by way of Early Redemption (in whole or in part, at the Company's discretion).

In addition to what has been aforesaid in this Section, the Company will be entitled to withdraw only the funds deposited in the Trust Account which will be received from the sale and/or refinance of the Pledged Asset, Consideration provided that after payment of the principal and/or interest or the withdrawing the funds as stated, the LTV Ratio in the Pledged Corporation shall not exceed 65%.

In the event of an Early Redemption, the provisions of Section 7.2 to the Deed will apply, *mutatis mutandis*.

6.3.5. Instructions for A Series Expansion

6.3.5.1. The Company will be entitled to expand the series of Debentures pursuant to Section 4.1 hereof.

6.3.5.2. In order to meet the LTV Ratio in the Pledged Corporation provision after the expansion of the Series, the Company will be entitled, to the extent required, without obtaining the approval of the Trustee and/or the Bondholders(Series A) existing at that time, to create a first-rate mortgage as well as all additional liens in Section 6.2 of the Deed, in favor of the Trustee for the Bondholders only on any of the Pledged Assets specified in Section 6.2.1 hereof for which no pledges has yet been created;

6.3.5.3. The proceeds of the issuance received by the Dealer Manager will be transferred by the Dealer Manager, with its fruits, to the Trust Account, until the creation of the additional pledges in accordance with the opinion of the American Attorney, with the necessary changes, all in a manner satisfactory to the Trustee.

6.3.6. Release of the Pledged Assets from the Pledge.

The Company shall be entitled, at any date, at its sole consideration, to require the Trustee to remove a Pledge from any Pledged Asset in full, including the release of financial collateral and its fruits (to the extent that it is encumbered), whereby the asset from which the pledge was removed shall not be included in the Pledged Real Estate Assets as of said date, and/or to change the registration of the pledge so that it applies only to part of the Pledged Real Estate Assets, at its sole discretion, and without requiring the approval of the Trustee and/or the Bondholders (Series A) (including their approval with respect to the identity properties which will continue to be pledged and those which shall be released as aforesaid) and the Trustee hereby undertakes to act according to the Company's request as aforesaid and execute ant document and/or certificate that will be required or useful for the removal of the Pledges.

The removal of the Pledges as aforesaid shall be possible only after the Company has proven to the Trustee by way of a calculation authorized by the Company's Senior Financial Officer, that following the removal of the Pledged Properties the LTV Ratio in the Pledged Corporation shall not exceed 55%, and subject to the Company's approval that as of the pledge release request date the Company complies with all its obligations towards the Bondholders in accordance with the Deed and that there exists no cause for calling for the immediate repayment of the Debentures and/or for the realization of collaterals, all in the form acceptable to the Trustee.

It is hereby clarified that following the removal of the Pledge Real Estate Asset from the Pledge Real Estate Assets, , they will not be subject in any form whatsoever to the provisions of this Deed of Trust (including the Property Company that holds it and the Operating Company that operates it).

6.4. Loan to Collateral Ratio

The Loan to Collateral Ratio shall be calculated according to the following formula (the "**LTV Ratio in the Pledged Corporation**"):

$$\textbf{Loan to Collateral Ratio in the Pledged Corporation} = \frac{A - B - D}{C - D}$$

A = The Liability Value of the Debentures (Series B), *i.e.,* principal plus accrued interest as at the Examination Date

B = Cash balance in the Trust Account as at the Examination Date.

C = The fair value of all the Pledged Real Estate Assets according to the Company's' most recent financial statements.

D = Cash held in the Pledged Account.

6.5. Declarations and undertakings in connection with the Pledged Assets

Each of the Company, the Holding Company, the Pledged Corporation, the Operating Companies, and the Property Companies declare and undertake, as the case may be, as follows:

6.5.1. Any of the Pledged Real Estate Assets is fully, directly and solely owned by the relevant Property Company; all according to the provisions of **Appendix A** hereof.

6.5.2. Each of the Operating Companies is entitled, exclusively, to the full revenues deriving from the Pledge Real Estate Assets and is liable for all the expenses of the Pledged Real Estate Assets; all according to the provisions of **Appendix A** hereof.

6.5.3. To make use of the power by virtue of their holdings in order that the Holding Company, the Pledge Corporation, the Property Companies and Operating Companies will sign any document required in accordance with the Deed of Trust.

6.5.4. The operating agreements of the Holding Company, the Pledged Corporation, the Property Companies and Operating Companies or their incorporation documents or any other agreement to which they are a party do not contradict the provisions of this Deed, nor will they contradict any of provisions of this Deed.

6.5.5. To make use of the power by virtue of its holdings in order that the Holding Company, the Operating Companies and the Property Companies will not change their operating agreements or any other agreement with which they are engaged or will engage, in a way that there will be any limitations on the rights in the Pledged Assets, their transfer or their realization and/or pledge of rights by virtue of them and/or realizing the Pledges.

6.5.6. Each of the Holding Company, the Operating Company, the Pledged Corporation, and the Property Companies shall not change their operating agreements nor any other agreement in which it engages in such form that any restrictions whatsoever shall be applicable to whichever of the rights in the Pledged Assets, their transferability or realization and/or the assignment of rights by virtue thereof and/or the validity and/or enforceability and realization of the Pledges thereupon which are created under the Deed of Trust

6.5.7. Subject to the provisions of the Deed of Trust, to refrain from making any dispositions in the Holding Company and/or in the Pledged Corporation and/or the Property Companies and/or the Operating Companies and/or the Pledged Assets, including to refrain from allocating additional rights in the Property Companies and/or in the Pledged Corporation and/or in the Operating Companies to any person (including the Company), including not granting any person any right to the Pledged Real Estate Assets as long as all the secured amounts have not been repaid and all of the Company's undertakings in respect thereto have not been fulfilled, without obtaining the prior approval of the Trustee after the resolution was adopted at the meeting of Bondholders on the matter by way of a special resolution. It is hereby clarified that the Company will not pledge its holdings in the Property Companies and will not pledge the Pledges Properties in favor of any other creditor for as long as all the secured amounts have yet to be repaid and all the Company's undertakings with respect thereof have yet to be fulfilled. The Company shall include a certificate pertaining to its compliance with this Section in the Annual confirmation to the Trustee pursuant to Section 18.17 hereof.

It will be clarified that the transfer of its rights in the Property Companies and in the Operating Companies to the Pledged Corporation as is set forth in Section 6.2.2 to this Deed, will not constitute a disposition for the purposes of this Section.

6.5.8. Without derogating from the provisions of Section 6.5.1.7 herein, the Company and the Holding Company undertake that to the extent they are allocated additional rights in the Pledged Corporation, they will be responsible for these rights being pledged in favor of the Trustee to the Bondholders according to the provisions of this Deed (including with respect to the documents required for said pledge).

6.5.9. The sole activity of the Holding Company is the direct holding of the Pledged Membership Rights of the Pledged Corporation, and it does not have any assets except Pledged Membership Rights. The Holding Company undertakes not to change the aforementioned throughout the life of the bonds.

6.5.10. The sole activity of the Pledged Corporation is directly holding the membership interest in the Property Companies, and it does not have any assets except for the Pledged membership interest. The Pledged Corporation undertakes this shall not change throughout the duration of the Debentures.

6.5.11. The sole activity of each of the Property Companies is directly holding the Pledged Real Estate Asset fully held thereby, and neither of the Property Companies has any property other than the Pledged Real Estate Asset. The Property Companies undertake not to change this state of affairs for the duration of the Debentures.

6.5.12. The sole activity of each of the Operating Companies is to operate the Pledged Real Estate Assets in which they operate. The Operating Companies undertakes this shall not change throughout the duration of the Debentures

6.5.13. Subject to the provisions of the Deed of Trust, not to initiate any proceedings in respect of whichever of the Pledges and whichever of the Pledged Assets, which harm the ability of the Trustee to enforce and/or realize the Pledges and/or the validity of any of the Pledges.

6.5.14. Not to mortgage or pledge, directly or indirectly, whether by action or by failure to act, the Pledged Assets or any part thereof in favor of any third party in any manner whatsoever, as well as not to grant any right whatsoever in the Pledged Corporation or in any of the Property Companies or whichever of the Operating Companies, including their assets.

6.5.15. Subject to the provisions of the Deed of Trust, as long as the Pledged Assets are pledged, not to sell, transfer or assign and/or to grant to any party in any way the Pledged Assets, directly or indirectly, whether by action or by omission.

6.5.16. To cause and instruct the Holding Company, the Pledged Corporation, the Property Companies, and the Operating Companies, at the Company's expense or at their expense, as the case may be, under the circumstances of the case, in order that the Pledges that will be registered in favor of the Trustee will be valid with respect to third parties, including other creditors - existing or future - of the Company and of the Holding Company, the Pledged Corporation, the Property Companies, and the Operating Companies, and shall overrule their rights in matters related to the Pledges.

6.5.17. The Holding Company, the Pledged Corporation, the Property Companies, and the Operating Companies may pledge the Pledged Assets pursuant to the contents of this Deed in favor of the Bondholders (Series A), and no consent is required for the transfer and registration of the Mortgages, except as detailed in this Deed.

6.5.18. At the time of entering into this Deed and as of the date in which the Pledges are created and registered, there is no impediment under any law, agreement or undertaking, including the incorporation documents of the Company, the Holding Company, the Pledged Corporation the Property Companies, and the Operating Companies to sign the Deed of Trust, and there is no restriction or condition on the registration of the Pledges and on the obligations of the Company, the Holding Company, the Pledged Corporation, the Property Companies, and Operating Companies therein, and that the Company's, the Pledged Corporation's, the Holding Company's, the Operating Companies' and the Property Companies' signing of this Deed does not constitute a breach of any undertaking that the whichever of the foregoing has undertaken, and that the qualified entities in each of the relevant corporations have adopted a legal resolution regarding the creation and registration of the Pledges, for them signing this Deed, and that no consent is required for the

registration of the Pledges from any entity. The Company hereby undertakes to notify the Trustee in writing immediately in the event of a change in the provisions of this sub-Section.

6.5.19. With the exception of the Existing Pledges, which, as stated, will be removed and in lieu new Pledges will be registered in favor of the Trustee to the Bondholders, the Pledged Corporation's, the Holding Company's, Property Companies', and the Operating Companies' rights in the Pledged Assets are free and clear of any debt, foreclosure, lien or any third party right, and there is no restriction or condition applicable by law or agreement on the transfer of ownership therein or their lien and/or on their realization and/or the transfer of ownership thereof upon realization.

6.5.20. On the date of signing this Deed and upon the registration of the Pledges, the Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies and/or the Holding Companies are not in the process of liquidation and/or receivership (temporary or permanent) and/or stay of proceedings (or any similar proceeding in accordance with the law applicable to the Company and/or the Holding Company and/or the Pledged Corporation, and/or the Property Companies and/or the Operating Companies) and/or a threat of filing an application or initiating such proceedings, and the Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies, and/or the Operating Companies have not received a liquidation decision or a similar decision according to the Governing law applicable thereto.

6.5.21. The Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies have not received any notice of any claims regarding the rights of whichever of the foregoing companies in the Pledged Assets upon the signing of this Deed and upon the creation and registration of the Pledges. The Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies, and/or the Operating Companies hereby undertake to notify the Trustee in writing in the event of a change in the provisions of this sub-Section as soon as it becomes aware of whichever of the foregoing and to immediately address these claims.

6.5.22. Upon the signing of this Deed and upon the creation and registration of the Pledges, the Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies and/or the Operating Companies, are not aware of any criminal or administrative proceeding held by a governmental or administrative authority against any of them.

6.5.23. The Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies and/or the Operating Companies, are not aware of any defect in the rights in the Pledged Assets and that if such a defect is discovered, they will act to correct the defect as soon as possible immediately upon becoming aware of such defect, and upon discovering said defect to immediately inform the Trustee in writing of the defect and the expected time for remedying it.

6.5.24. Immediately after it becomes known to the Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies, and/or the Operating Companies, notify the Trustee in writing of any case of imposition of a foreclosure, pledge

(including lien), carrying out of an execution or submission of an application for the appointment of a receiver or any other functionary over any or all of the Pledged Assets (or any similar proceeding in accordance with the law applicable to the Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies, and/or the Operating Companies). In addition, after it becomes known to the Company and/or the Holding Company and/or the Pledged Corporation and/or the Property companies, and/or the Operating Companies, they will immediately notify of the existence of a lien in favor of the Trustee to the authority that made or took the action of the execution or was requested to appoint such receiver (or any similar proceeding in accordance with the law applicable to the Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies, and/or the Operating Companies) and/or a third party who initiated or requested these or some of these, and immediately initiate at the expense of the Company, by all the reasonable means required to cancel the repossession, the execution or the appointment of the receiver or the special manager, as the case may be.

6.5.25. As long as the Debentures (Series A) remain in circulation, the Company, the Holding Company, the Pledged Corporation, the Property Companies and the Operating Companies, undertake to insure the Pledged Assets as customary in senior loans in the states in which the Pledged Real estate Assets are located. The Company undertakes to notify the Trustee in writing immediately in any event in which it learns of a change in the scope of the insurance coverage in respect of any of the Pledged Real Estate Assets, or that the insurance policy expired or in the event that the insurer informed the Company, the Pledged Corporation, the Property Companies or the Operating Companies, of the expiry of the policy in respect thereof or of its cancellation. The Company shall include a disclosure regarding the validity of the insurance in the Board of Directors Report to be attached to the Company's Periodic or Quarterly Report (as applicable).

6.5.26. Upon signing this Deed and upon the creation and/or registration of the Pledges, the Company and/or the Holding Company and/or the Pledged Corporation and/or the Property Companies, and/ or the Operating Companies, did not receive any written demand and/or claim and/or any order from a competent authority in the field of environmental hazards deriving from any of the Pledged Real estate Assets.

6.5.27. As long as the Debentures (Series A) remain in circulation, once a year close to the date of publication of the Company's annual Financial Statements, the Company will provide the Trustee with an approval or an opinion from the American Attorney, in the form to the satisfaction of the Trustee, that the Pledges on the Pledged Assets, including the mortgages in respect of the Pledged Real estate Assets are valid and enforceable.

6.5.28. The Company and the Holding Company and the Pledged Corporation and the property Companies, and the Operating Companies, undertake to hold and maintain the Pledged Assets in a favorable and functioning manner, and without derogating from the generality of the foregoing, pay when due all the taxes and fees duly applicable and those which shall be duly applicable to the Pledged Assets, by the government and/or relevant local authorities; this without derogating from their rights to take any action vis a vis said authorities regarding said requirements. As of the signing of the Deed of Trust and as of the creation and registration of the Pledges, the company and the Property Companies declare that there are no payable taxes or fees with respect to whichever of the Pledged

Assets or to the Property Companies or the Holding Company, or the Operating Companies or the Pledged Corporation. which have yet to

6.5.29. Upon the signing of this Deed and the registration of the Pledges, there are no delinquent tax payments or fees due with respect to the Pledged Asserts or the Property Companies.

6.5.30. The Property Companies and the Operating Companies, shall not be entitled to file for bankruptcy, voluntary liquidation or similar proceedings, except under the bankruptcy remote proceeding according to which the consent of an external manager or director whose sole role shall be granting an approval to such proceeding. It is clarified that the appointment of such manager will be performed by the Trustee and shall be required only prior to said resolution being taken.

6.5.31. As long as the Debentures (Series D) remain in circulation the following provisions shall apply to the Holding Company, the Pledged Corporation, the Operating Companies and the Property Companies:

A. Shall not lien any of their assets with a lien of any kind whatsoever and will not place them as collateral in any way, without obtaining the prior consent of the meeting of the Bondholders (Series A) in a special resolution.

B. will not assume any debts as well as additional financial liabilities, including providing guarantees to third parties.

C. will not allocate additional rights without receiving a prior approval signed by the Trustee after receipt of the approval of the meeting of the Bondholders in a Special Resolution.

D. The Company will continue to hold the controlling rights and capital of the Entities holding (directly or indirectly) in the Property Companies, and in the Operating Companies, as they are at the date on which the property company mortgaged the relevant real estate asset.

E. will continue to pay management fees pursuant to the Management Agreement as described in Chapter 9 of the Prospectus and apart from said Management Agreement, the Property Companies will not be parties to transactions with the Controlling Shareholder of the Company.

F. shall not pass a resolution on voluntary liquidation or a similar resolution under the law applicable to them.

6.5.32. The Property Companies will not form Corporations between them and the Pledged Corporation; the Pledged Corporation will not form corporations between it and the Property Companies and/or the Operating Companies; the Property Companies or the Operating Companies will not form additional corporations under them. The Company shall perform valuations of the Pledged Real Estate Assets at least once a year. The publishing of a valuation or an update letter for a valuation by the Company, via the Magna System, shall be deemed service to the Trustee

6.5.33. Provisions with respect to the Note

6.5.33.1. The Company, the Holding Company, the Pledged Corporation and the Property Companies (As applicable), shall be joint borrowers, whereby the Company shall have the right to bind the Property Companies, the Holding Companies and the Pledged Corporation, in any resolution pertaining to the Deed of Trust, including an early redemption.

6.5.33.2. The Company, the Holding Company, the Pledged Corporation and the Property Companies shall not be entitled to take any action whatsoever to reduce and/or change the terms of the Promissory Note, in any form whatsoever and/or to exercise rights granted to the Company in the Promissory Note, except by way of full repayment of the debt according to its terms (and without detracting from the Company's responsibility for making repayments to the Bondholders).

6.5.33.3. The Company, the Holding Company, the Pledged Corporation and the Property Companies shall not be entitled to take any action under the Promissory Note and/or any action that they are entitled to take under law (in Israel and/or the United States) with respect to the Promissory Note and/or other actions with respect to the debt secured by the Promissory Note, unless such action is permitted in the Deed of Trust and in accordance with and subject to the terms of the Deed of Trust.

6.5.33.4. Any repayment on account of the Note shall be deemed paid if was made to the Trust Account or directly to the Nominee Company's account, for the repayment of the Principal and/or Interest of the Debentures (Series A) and/or for an early redemption of the Debentures (Series A).

6.6. Undertaking not to create Pledges

6.6.1. The Company undertakes not pledge, including in favor of a financing entity its entire property (directly held thereby) by way of a general floating charge (or a similar pledge in accordance with the law applicable to the Company) without obtaining the prior consent of the Bondholders Assembly (Series A) by way of an Special Resolution (for information regarding Bondholders Assembly proceedings, see Section 32 and the Second Schedule to this Deed).

Notwithstanding the above, the Company may create a general floating charge and/or specific charge on its existing and future assets and rights, in whole or in part, to the benefit of the financing entity in Israel only with which the Company engages in hedging transactions on the exchange rate of the shekel against the dollar in connection with bonds issued (or to be issued) by the Company (including the Bondholders of other series) without the need to obtain the consent of the Meeting of Bondholders(Series A), provided that, concurrently with the creation of the floating charge as aforementioned, the Company will create a pledge of the same type and of equal rank for the benefit of the Bondholders (Series A) and to the financing party as detailed above *pari passu* according to debt ratio as at that date,

which will be in effect as long as the Debentures (Series A) have not been paid in full. The Company clarifies that as at the date of signing this Deed, the Company has not created a general floating charge and has not committed to creating a floating charge as aforementioned.

In case of the creation of a floating charge as aforesaid, the charge shall be created according to guidelines from the Trustee's attorney in the applicable territory, and the Trustee's shall be provided by its attorney with a legal opinion regarding the manner of registration of the charge, its validity, its crediting rank, its legality and its enforceability under the applicable law, and will be provided by the Company's declaration whereby there is no restriction nor condition in the agreement to secure the debt and/or liability and/or the charge agreement with said third party preventing the realization of the charge by the Trustee, and that the consent of the third party and/or whomever on its behalf, is not required for the realization of the charge by the Trustee and/or the Bondholders (Series A), in a version satisfactory, at his reasonable discretion. The Company shall bear the full costs associated with the creation of said charge, including the Trustee's fees and the fees of the Trustee's attorney.

6.6.2. Additionally, the Company undertakes, it shall not pledge its entire property (directly held thereby) in whole, or part thereof, by way of specific charges (including a floating charge on specific asset/assets), without obtaining the prior consent of the Bondholders Assembly (Series A) by way of an Special Resolution; this, unless it is granted to a financing entity in Israel only, for currency hedging transactions concerning debentures issued (or those to be issued) by the Company (including the Debentures (Series A) issued by virtue of this Deed). In this respect it should be clarified that the Company shall be entitled to grant guarantees which are not backed by a charge without requiring the approval of the Bondholders Assembly (Series A). The Company shall specify within the framework of its Board of Directors' Report, for each quarter, its compliance with its undertakings under Sections 6.2.1 and 6.2.2 hereof, and will set forth, *inter alia*, each charge it has created in accordance with this undertaking (including the purpose of the charge created according to the aforementioned).

Whenever the Company creates charges in favor of the Bondholders (Series A) as provided in Section 6.2.1 hereof, the Company shall furnish the Trustee with all the documents required to create and register the charge with all relevant registers (including certificates and/or reports extracted from such register after registration of the charge), including a certificate signed by a the Company's Senior Financial Officer in which the charge that the Company intends to create will be described and in which it will be approved that the is a permitted charge, as is set forth in this Section, and including an opinion from an attorney versed in the relevant law applicable to Company, in a wording satisfactory to the Trustee, and any other document as may be reasonably required from time to time by the Trustee and as may be reasonably required under the circumstances in order to secure the validity of the charge and the enforceability and realization thereof.

For the avoidance of doubt it shall be clarified that subject to the provisions of Section 6.3 hereof, the Company's other Investee Companies are entitled to pledge their assets, fully or part thereof, in any pledge (including a floating charge) and in any manner whatsoever without obtaining the consent of the Bondholders Assembly (Series A) for this and without requiring the provision of any collateral whatsoever to the Bondholders (Series A), concurrently with the creation of such charges by them.

6.6.3. The Company undertakes not to pledge in any pledge whatsoever (not existing as at the Deed's execution date), its holdings in corporations directly held thereby. It is hereby clarified, that the aforesaid in this Section will not apply with respect to the pledge of direct holdings in the Property Companies (corporations directly holding the Company's real estate assets) by the parent companies of the Property Companies,; this for in favor of the Company's Bondholder with respect to a new Debenture Series and/or with financing to be granted to the parent companies of *the* Property Companies and/or in with respect to financing to be granted to the Property Companies. [there is need to add an undertaking not to take financial liabilities in the Pledged Corporation and not to pledge the holdings of the Pledged Corporation in the Property Companies, as well as not to carry out any disposition in the Pledged Corporation's holdings in the Property Companies, all subject to the provisions of this Deed of Trust.

6.7. The Company will provide the Trustee, no later than 30 days after the signing of this Deed of Trust, with an opinion from an attorney proficient in the BVI laws applicable to the Company, under which it is impossible in the British Virgin Islands to register an obligation not to create the pledges set forth in Section 6.6 hereof with any register kept under BVI laws.

The Company will provide the Trustee, on June 30 and December 31 of each year, with a certificate from the Company's Senior Finance Officer, stating that the Company has not recorded in its registers and/or other register maintained under applicable law, any floating or specific pledge in favor of any person in violation of Section 6.6 hereof.

The Company will provide the Trustee, on December 31 of each year, with a certificate from an attorney specializing in the relevant law applicable to the Company, certifying that the Company has not recorded in its Register and/or in other registers maintained under applicable law, nor has it undertaken to create any floating and/or specific pledge in favor of any person in violation of its undertakings under Section 6.6 hereof. Such certificate from an attorney specializing in the relevant law will only refer to the Company rather than its Investee Companies.

The Company shall include in the Board of Directors' Report for each quarter a reference concerning compliance or non-compliance with the obligation set forth in Section 6.6 hereof. Except with respect to the Pledged Assets, the Company may sell, lease, assign, deliver or transfer in any manner whatsoever, its assets, in whole or part thereof, to such person as it shall deem fit, without having to obtain the consent of the Trustee and/or the Bondholders (Series A), as applicable. Except with respect to the Pledged Assets, the Company is not required to notify the Trustee of the transfer or sale of its assets, unless such sale or transfer is of a "Material Asset of the Company" as defined in Section 8.1 hereof, and is also not

required to notify the Trustee of the creation of any pledge on its assets, except as provided for in Section 6.6 hereof.

7. **Early Redemption**

7.1. Early Redemption Initiated by the Stock Exchange:

In the event the Stock Exchange decides to delist the Debentures (Series A) from circulation, because the value of the Series has fallen below the amount prescribed in the Stock Exchange Guidelines, the Company shall affect an early redemption of the Debentures (Series A) as follows:

7.1.1. Within forty-five (45) days as of the date of the resolution made by the Stock Exchange's Board of Directors of the regarding the delisting as aforementioned, the Company shall notify the early redemption date in which a Bondholder may redeem his bonds.

7.1.2. The early redemption date shall be no earlier than seventeen (17) days after the date of publishing said the notice and no later than forty-five (45) days as of said date, but not in the period between the Effective Date for the payment of interest and the date of its *de facto* payment.

7.1.3. On the early redemption date, the Company shall redeem the Debentures which Holders thereof requested to redeem, the redemption amount shall not fall below the Adjusted Value of the Debentures (i.e. the balance of the Debentures (Series A) in circulation plus interest differences accrued until the actual payment date and have yet to be paid as of said date, as is set forth in the terms of the Debentures) and shall be in the higher amount out of the amounts stated in Section 7.2.7 hereof.

7.1.4. The determining of the early redemption date, as aforementioned, shall not affect the redemption rights stipulated in the Debentures of any of the Bondholders who will not redeem them on the aforesaid early redemption date;, however, the Debentures shall be delisted from the Stock Exchange and be subject, *inter alia*, to tax consequences resulting therefrom.

7.1.5. Early redemption of the Debentures as aforementioned shall not grant the holders of redeemed Debentures the right to payment on account of interest for the period after the redemption date.

The notice regarding the early redemption date will be published in an Immediate Report sent to the Israel Securities Authority and to the Stock Exchange. This notice shall specify the early redemption amount.

7.2. Early Redemption Initiated by the Company:

The Company shall be entitled, at any time, but not prior to the end of a sixty (60) days as of the listing of the Debentures (Series A), at its sole discretion, effect an early redemption of the Debentures (Series A), in whole or in part, and in such case the following provisions shall apply, subject to the instructions of the Israel Securities Authority and the provisions of the Stock Exchange Guidelines, as in effect at the relevant time.

7.2.1. The frequency of early redemption shall not exceed one redemption per quarter. In the event an early redemption date is determined in the quarter in which an interest payment date, or a partial redemption payment date or the final redemption payment date, are due,

then the early redemption shall be determined at the time of such payment. Notwithstanding the foregoing, final redemption may be made in the quarter even if interest or partial redemption has been made. For purpose hereof, "Quarter" shall mean any of the following periods: January-March, April-June, July-September, October-December.

7.2.2. The minimum scope of any early redemption shall not be less than NIS 1 million. Notwithstanding the foregoing, the Company shall be entitled to affect early redemption at a scope smaller than NIS 1 million, provided that the frequency of the redemptions does not exceed one redemption per year. Each amount to be redeemed in early redemption by the Company will be redeemed with respect to all Bondholders, pro-rata to the par value of the Debentures held by them.

7.2.3. The Company shall furnish the Trustee, within five (5) Business Days as of the date in which a Board of Directors' resolution on such early redemption was made, alongside an approval signed by the Company's senior finance officer, together with the calculation of the amount payable to the Holders of Debentures (Series A) at the early redemption. In addition, upon adoption of said Board resolution regarding the early redemption in the trustee's satisfaction, the Company shall issue an Immediate Report with a copy to the Trustee, about the execution of the early redemption to the Holders of Debentures (Series A), which will include, *inter alia*, the amount payable to the Holders of Debentures (Series A) upon the early redemption. The Immediate Report will be published no less than seventeen (17) days and not more than forty-five (45) days prior to the early redemption date.

7.2.4. The early redemption date will not take place during the period between the date set for payment of interest on the Debentures and the *de facto* date of payment of interest. The Company shall publish in the Immediate Report as aforementioned, the amount of the Principal to be redeemed early, the interest accrued in respect thereto, up to the early redemption date, in accordance with the provisions specified hereinafter.

7.2.5. In the event of a Partial Early Redemption, if any, the Company shall pay the Bondholders, on the partial early redemption date, only the interest accrued for the portion redeemed as part of the partial redemption rather than the total outstanding balance. No Early Redemption shall be affected with respect to a part of a Series of Debentures if the amount of the last redemption is less than NIS 3.2 million. On the date of partial early redemption, if applicable, the Company shall notify by an Immediate Report: (1) the rate of the partial redemption in terms of the outstanding balance; (2) the rate of partial redemption in terms of the original series; (3) the interest rate, in the case of partial redemption, on the part that has been redeemed; (4) an update of the remaining partial redemption rates, in terms of the original series; (5) the Effective Date for entitlement to obtain early redemption of the Principal of the Debentures, which shall be twelve (12) days prior to the date set for early redemption; all, as applicable.

7.2.6. A partial early redemption will be carried out *pari passu* to each one of the Bondholders.

7.2.7. The amount payable to the Holders of Debentures (Series A) in the event of early redemption shall be the higher of: (1) the market value of the outstanding balance of the Debentures (Series A) that are up for early redemption, which will be determined by the average closing price of the Debentures on the thirty (30) days preceding the date of a

resolution made by the Board of Directors regarding the execution of the early redemption; however, in the event that the early redemption date falls on the date on which interest is paid, an amount equal to the interest paid only on that date will be deducted from the said market value of the Debentures; (2) the liability value of the outstanding Debentures available for early redemption, i.e., Principal plus accrued interest until the actual early repayment date; (3) the balance of the cash flow of the Debentures to be redeemed early (Principal plus the interest borne by the Debentures at the early redemption), discounted based on Government Bond Returns (as defined below) plus 1.5% per annum. The capitalization of the Debentures for early redemption will be calculated from the early redemption date to the last repayment date set for the Debentures (Series A) that are due for early redemption.

In this regard, "**Government Bond Return**" shall mean the average weighted return on redemption (gross), in a period of seven (7) Business Days, ending two (2) Business Days prior to the date of the notice of early redemption, of two (3) series of Government bonds (unlinked to an index, bearing a fixed interest rate and the average lifespan of which is the closest to the average lifespan of the Debentures (Series A) at the relevant time, i.e., one series with a higher average lifespan than the lifespan of Debentures (Series A) on the relevant date, and one series with a lower average lifespan than the lifespan of the Debentures (Series A) on the relevant date, and whose weighting will reflect the lifespan of the debentures at the relevant time.

For example, if the lifespan of government bond A is 4 years, the lifespan of government bond B is 2 years and the lifespan of the loan balance is 3.5 years, the yield shall be calculated as follows:

$4x + 2(1-x) = 3.5$

X = The yield weight of government bond B.

1-x = The yield weight of government bond.

According to the calculation, the annual yield of Government Bond Return A will be diluted at seventy-five percent (75%) of the Government Bond Return", and the annual yield of Government Bond B will be weighted at 25 percent (25%) of the Government Bond Return.

In the event of payment of additional interest under sub-sections (1) or (3) above due to the early redemption, the additional interest will be paid on the par value redeemed at early redemption only.

8. **<u>The Right to Call for an Immediate repayment.</u>**

8.1. Upon the occurrence of one or more of the events listed in this Section hereunder, the provisions set forth in Section 8.2 of the Deed shall apply, as applicable:

8.1.1. If the Company fails to repay on time any amount owed it in connection with the Debentures or under the Deed of Trust or fails to meet any of its other material obligations to the Holders.).

8.1.2. If the Company files a motion for a stay of proceedings order, as defined in the Insolvency and Economic Rehabilitation Law, 5778-2018 (hereinafter, the "**Insolvency**

**Law**"), or if a similar order under the Insolvency Law is issued against the Company, or if the Company files a motion for settlement or arrangement with the Company's creditors under Section 350 to the Companies Law, or if such an order is given, or in accordance with the Insolvency Law or if the Company filed a motion for the initiation of proceedings as said term is defined in the Insolvency Law (other than for the purpose of a merger with another company as specified in Section 8.1.21 below and/or a change in the Company's structure, including split, which are not forbidden under the terms of this Deed, and except for arrangements entered into between the Company and its Shareholders, which do not affect the ability to repay the Debentures (Series A) and which are not forbidden under the terms herein), or if such an order is granted against the Company, or if the Company otherwise proposes a settlement or arrangement to its creditors, in view of the Company's inability to meet its obligations when these come due. It is clarified that for the purposes of this paragraph, proceedings and actions, such as an arrangement, in relation to the Company shall have proceedings as well as actions in accordance with Israeli law or similar proceedings, in accordance with foreign law.

8.1.3. If an application is filed under Section 350 of the Companies Law or the Insolvency Law (or a similar proceeding in accordance with applicable law) against the Company and without its consent, which has not been denied or canceled within forty-five (45) days of its filing.

It is clarified that for the purposes of this paragraph, proceedings and actions, such as an arrangement, in relation to the Company shall have proceedings as well as actions in accordance with Israeli law or similar proceedings, in accordance with foreign law.

8.1.4. If the Company adopts a resolution of liquidation (other than liquidation as results of merging with another company as specified in Section 8.1.21 to the Deed) or if a permanent and final liquidation order is granted by the court with respect to the Company or an order of similar significance in accordance with the provisions of the Insolvency Law or if a permanent receiver is appointed to the Company, or if a similar decision is adopted or if a similar official is appointed by the Company or with respect thereto under the Insolvency Law or any other law or a trustee shall be appointed as the definition of this term in the Insolvency Law. It should be clarified that for the purposes of this Subsection, liquidation proceedings in respect of the Company or similar proceedings shall be proceedings in accordance with Israeli Law or parallel proceedings, in accordance with foreign law that is relevant to the company, similar to the Israeli proceeding.

8.1.5. If a temporary liquidation order or an order of similar significance in accordance with the provisions of the Insolvency Law or a similar order under the relevant law or a temporary liquidator will be appointed or similar position in accordance with the provisions of the Insolvency Law or similar position in accordance with the relevant law or a temporary trustee is, within the meaning of these term under the Insolvency Law, or if any other similar official is appointed under the relevant law or any judicial decision of a similar nature is issued by the court, and such order or decision are neither rejected nor cancelled within forty-five (45) days from the date of said order or decision, as applicable. Notwithstanding the foregoing, the Company will not be granted any grace period with respect to motions or orders filed or granted, as applicable, by the

Company or with its consent. It should be clarified that for the purposes of this subsection, liquidation proceedings in respect of the Company or similar proceedings shall be proceedings in accordance with the Israeli Law or parallel proceedings, in accordance with foreign law that is relevant to the company, similar to the Israeli proceeding.

8.1.6. If a motion is filed for receivership or appointment of a receiver (temporary or permanent) or if any other similar official is appointed for the Company or to its Material Asset (as defined hereunder), or if an order is granted for the appointment of a temporary receiver or any other similar official under the law, or if a temporary trustee as said term is defined in the Insolvency Law, was appointed, and such order is neither rejected nor canceled within forty-five (45) days as of the date of filing such motions or granting such orders, as applicable; or, if an order for the appointment of a permanent receiver to the Company or an order was issued for the appointment of a trustee (as this term is defined in the Insolvency Law), or for any Material Asset of the Company (as defined below) is granted, or if a similar order is granted under the law that applies to the Company. Notwithstanding the foregoing, the Company will not be granted any grace period with respect to the appointment of a permanent receiver or a trustee or with respect to the motions or orders filed or granted, as applicable, by the Company or with its consent. It is hereby clarified that for the purposes of this Subsection, proceedings in connection with the Company or similar proceedings shall be proceedings under the Israeli Law or parallel proceedings, in accordance with foreign law that is relevant to the company, similar to the Israeli proceeding.

8.1.7. If a foreclosure is imposed or execution actions are taken in connection with a Material Asset of the Company (as defined hereunder) , and the foreclosure is not removed, or the actions are not cancelled, as applicable, within forty-five (45) days from the date of them being imposed f and/or implemented, as applicable. Notwithstanding the foregoing, the Company will not be granted any grace period in relation to motions or orders filed or granted, as applicable, by the Company or with its consent. It is hereby clarified that for the purposes of this Subsection, foreclosure proceedings or execution proceedings in relation to the Company or similar proceedings shall be proceedings under Israeli Law or parallel proceedings, in accordance with foreign law, similar to the Israeli proceeding.

8.1.8. If the holders exercise the pledges, they have on a Material Asset of the Company (as defined hereunder).

8.1.9. If there is a real concern that the company will not meet, or that the company has not met, its material obligations to the bondholders (Series A). It is clarified that the Company's material liabilities include, inter alia, the amounts of payment to the holders and their dates.

8.1.10. If the Company or ceased or announced its intention to cease its payments, or if it has ceased or announced its intention to cease managing its business, as may be from time to time.

8.1.11. If a material deterioration occurs in the Company's business compared to its condition on the date of the initial offering of the Debentures (Series A), and there is a real concern that the Company would fail to repay the Debentures (Series A) when these come due.

8.1.12. If the control of the Company has been transferred, directly or indirectly, without obtaining the consents of the Holders of Debentures (Series A) by a Special Resolution, prior to the Transference of Control.

For the purpose of this subsection, "**Control**" – as is defined in the Securities Law, does not include joint holdings with others who are not Family Members (as said term is defined in the Securities Law). For the avoidance of doubt, it shall be clarified in this regard that inheritance under the law does not constitute a transference of Control.

8.1.13. If there is a calling for the Immediate Repayment of: (1) another Debenture Series issued by the Company and listed on the Stock Exchange; or (2) debt or a number of debts in the aggregate of the Company or consolidated company with a liability value of at least $35 million, or which exceeds 10% of the Company's total assets according to the its most recently published Consolidated Financial Statements (audited or reviewed, as applicable), whichever is lower; or (3) debt or a number of debts in the aggregate of an Associate Company with respect to which the multiple of the Company's holding rate (in the final holdings chain) in the Associate Company by the liability value of the debt constitutes at least $35 million according to said Financials Statements (debts set forth in Subsections (2) and (3), shall be referred to hereinabove, hereafter, in this Section as the **"Other Debt"**); or (4) debt or a number of debts in the aggregate of the Company or consolidated company or Associate Company, including Non-Recourse loans, whose liability value exceeds 30% of the Company's total assets according to its most recently published Financial Statements (audited or reviewed as applicable). With respect to Subsections (2 and (3) hereinabove, Non-Recourse loans shall not be deemed as an Other Debt as aforesaid. In this regard it shall be noted that with respect to an Other Debt for which the Company's liability derives from granting a guarantee for the repayment of said debt, cause under this Section 8.1.13 shall exist only at said date in which the company was required to *de* facto repay an amount equal to or higher than said Other Debt. To the extent the foregoing terms are met, the foregoing cause shall apply, starting from the date in which the Company was required to repay said debt (and for the avoidance of doubt once the grace period with respect to the relevant debts have transpired and not as of the date of calling for the Immediate repayment of that debt, inasmuch as these dates do not overlap.

8.1.14. If the Company fails to comply with the Equity Covenant (as defined in Section 5.7.1 hereof) for the period set forth in section 5.7 to this Deed.

8.1.15. If the Company fails to comply with the Debt to CAP Ratio Covenant (as defined in Section 5.7.2 hereof) for the period set forth in section 5.7 to this Deed.

8.1.16. If the Company fails to comply with the Net Financial Debt to EBITDA ratio Covenant (as defined in Section 5.7.2 hereof) for the period set forth in section 5.7 to this Deed.

8.1.17. If the Company fails to comply with the Main Business Restriction and/or Main Business Location Restriction and/or Single Asset Restriction (as defined in Section 5.9 of the hereof) and this has not been rectified until the publishing of the Consolidated Financial Statements (Quarterly or Annual) consecutive to the Consolidated Financial Statements in which the Company did not comply with said restriction.

8.1.18. If the Company breaches any of its obligations, as set forth in Section 5.10 to this Deed.

8.1.19. If the Company makes a distribution in violation of the Restrictions of Section 5.5 to this Deed.

8.1.20. If the rating assigned to the Debentures (Series A) by the Rating Agency is downgraded to a rating lower than 'BBB-' rating. In the event of replacing the Rating Agency, the Company will transfer to the Trustee a comparison between the rating scale of the replaced Rating Agency and the rating scale of the new Rating Agency.

For purposes of this Section hereinafter it shall be emphasized that if, at any time, the Debentures (Series A) are rated by more than one Rating Agency, the examination of the rating for the purpose of determining the cause for calling for an immediate repayment as specified above, shall be made, at all times, according to the lowest rating of the two.

8.1.21. If the Company sells to others all or substantially all of its Assets without obtaining the prior consent of the Bondholders (Series A) by means of a Special Resolution. For the purposes of this Section "**Sale to Others**" shall mean – sale to any third party (including to the Controlling Shareholders in the Company and/or to companies under his control), excluding sales to corporations fully owned by the Company.

for the purposes of this Section and the term "**Most of the Company's Assets**" shall mean –asset or combination of assets whose value or aggregate value (as applicable) as in the most recent consolidated Financial Statements published prior to the occurrence of the relevant event, does not exceed fifty percent (50%) of the scope of its assets in the consolidated balance sheet in accordance with such Financial Statements.

8.1.22. In case a merger is carried out without obtaining the prior approval of the Holders of Debentures (Series A) by a Special Resolution, unless the receiving entity assumed all the Company's obligations towards the Bondholders and in addition, the Company or the surviving entity, as applicable, has stated to the Holders of Debentures (Series A), including through the Trustee, at least ten (10) Business Days prior to the date of the merger, that there is no reasonable concern that due to the merger, the surviving entity would not be able to meet its obligations towards the Holders of Debentures (Series A). Nothing in this Section shall derogate from the other causes for calling for immediate repayment that are available to the Bondholders (Series A) pursuant to this Section 8.1 above and below, and that starting from a thirty (30)-day period prior to the date of the contemplated merger all the causes listed in this Section 8.1 above and below also with respect to the surviving entity shall apply as if it were the Company. With respect to Sections whose content derives from the surviving entity's Financial Statements the examination shall be carried out with respect to the surviving entity's Financial Statements as these shall be following the merger.

8.1.23. If the Stock Exchange has suspended trading of the Debentures (Series A), except for a suspension on the Grounds of Uncertainty, within the meaning of this term in Part IV of the Stock Exchange Regulations, and the suspension has not been canceled within sixty (60) days.

8.1.24. If the Company is liquidated or delisted for any reason whatsoever.

8.1.25. If the Company has breached the terms of the Debentures (Series A) or the Deed of Trust, including if it turns out that any of the representations of the Company with respect to the Debentures or the Deed of Trust is incorrect or incomplete, and the Trustee has given notice to the Company in writing in order to rectify the breach, and the Company did not rectify the breach within fourteen (14) days as of the date said notice was given.

8.1.26. If the Debentures (Series A) cease to be rated for a period exceeding sixty (60) days for reasons or circumstances within the Company's control. For purposes hereof, *inter alia*, the failure to make payments which the Company has undertaken to pay to the Rating Agency and the failure to deliver reports and information required by the Rating Agency, in the framework of the agreement between the Company and the Rating Agency, shall be deemed reasons and circumstances within the Company's control.

8.1.27. If the Company expands the series of the Debentures (Series A) or issues additional series of Debentures or other Securities, in violation of the provisions of the Deed of Trust.

8.1.28. If the Company ceases to be a Reporting Corporation.

8.1.29. If the Company fails to publish Financial Statements which it is required to publish by law, within thirty (30) days as of the last date on which it is required to publish them in accordance with the provisions of the law applicable to it or the termination of the extension granted to the Company by a Competent Authority under applicable law, whichever is later.

8.1.30. If the Debentures (Series A) are delisted.

8.1.31. If the Debentures (Series A) have not been repaid when due or if any other material undertaking with respect to the Bondholders was not met.

8.1.32. If the Company breaches any one of its obligations, as set forth in Section 6.2 to the Deed, and particularly the Provisions of Section 6.2.5 to this Deed.

8.1.33. If a “Going Concern" Note is recorded in the Company’s Financial Statements of the for a period of two (2) consecutive quarters.

8.1.34. If the Company breaches its undertaking not to issue Debentures outside of Israel and not to incur other debt outside of Israel, as set forth in Section 4.2 to the Deed or if any of the undertakings set forth in Section 5.11 hereof were breached.

8.1.35. If the Company, its Officers and/or Controlling Shareholders breach their obligations as set forth in Section 33 to the Deed.

8.1.36. Upon the occurrence of any other event that constitutes and/or which may a material impact to the Bondholders’ rights.

8.1.37. If the Company and/or its Controlling Shareholders breach their undertakings as is set forth in Section 5.13 to the Deed.

8.1.38. If the Company breaches any of its obligations with respect to the Expense Cushion as set forth in Section 5.8 to the Deed.

8.1.39. If the Company breaches any of its obligation to appoint a representative for the Company in Israel as set forth in Section 5.6 to the Deed.

8.1.40. If the Holding Company, the Pledged Corporation, the Property Companies or the Operating Companies have fundamentally violated the provisions of Section 6 of this Deed and/or the Encumbrance Documents, including if it becomes apparent that a material representation of the Holding Company, the Pledged Corporation, the Property Companies or the Operating Companies, as the case may be, in Section 6 of this Deed or in the Encumbrance Documents is incorrect or incomplete and which of Holding Company, the Pledged Corporation, the Property Companies or the Operating Companies, as the case may be, has not corrected the said violation within 30 days from the date of the violation or from the date he/she became aware of the violation, as the case may be.

8.1.41. If one or more of the events described in Sections 8.1.2 – 8.1.8, 8.1.10 and 8.1.24 above occur with respect to the Holding Company, the Pledged Corporation, the Property Companies or the Operating Companies.

A "**Material Asset of the Company**", shall mean an Asset (single) which according to the most recent Consolidated Financial Statements of the Company published prior to said date, its rate exceeds exceed twety percent (20%) of the scope of assets in the Company's consolidated balance sheet pursuant to said Financial Statements; or several assets in aggregate the rate of which, which, according to the Company's most recent consolidated Financial Statements published prior to said date, the rate of which exceed thirty percent (30%) of the scope of total assets the Company's consolidated balance sheet pursuant to said Financial Statements

8.2. Upon the occurrence of any of the events specified in Section 8.1 of the Deed, the following provisions shall apply, as applicable:

8.2.1. The Trustee shall be required to convene a meeting of Holders of Debentures (Series A), the date of which shall be after twenty-one (21) days from the date of the notice announcing it convening (or an earlier date in accordance with the provisions of Section 8.2.6 to the Deed) and the agenda of which shall include a resolution regarding the call for an immediate repayment of the entire outstanding balance of the Debentures (Series A) and/or for the realization of collaterals if given, due to the occurrence of any of the events set forth in Section 8.1 to the Deed. The Trustee shall act in said cases immediately upon the most recent date to take said action.

8.2.2. The notice for convening the meeting shall specify that if the Company causes the cancellation and/or termination of the relevant event set forth in Section 8.1 to the Deed, in respect of which the meeting was convened, prior to the date scheduled for the meeting, then the notice convening the Bondholders meeting shall be canceled as aforesaid.

8.2.3. It is clarified that the foregoing does not prevent the Trustee from convening the Bondholders meeting on an earlier date should he deem it necessary in order to protect the Bondholders' rights.

8.2.4. A Bondholders (Series A) resolution to call for an immediate repayment of the Debentures shall be passed at a Bondholders meeting attended by Holders of at least fifty percent (50%) of the balance of par value Debentures (Series A), by a majority of the Holders of the balance of the par value of the Debentures represented in the voting or by said majority in the deferred Bondholders meeting attended by at least twenty percent (20%) of said balance.

8.2.5. In the event that up to the date in which the meeting is convened none of the events set forth in Section 8.1 to this Deed, as applicable, has been canceled or removed, and the resolution at a Holders of Debentures (Series A) meeting was adopted in the manner set forth in Section 8.2.4 to this Deed, the Trustee shall be compelled, as soon as possible, to call for an immediate repayment of the entire outstanding balance of the Debentures (Series A) and/or for the realization of collaterals, if granted, provided the Company was given an advance written notice of fifteen (15) days of his intention to do so And the event for which the resolution was made was neither cancelled nor removed within said period.

8.2.6. The Trustee shall be entitled, at his discretion, to shorten the period of twenty one (21) days as set forth in Section 8.2.1 to the Deed and/or the fifteen (15) day-period of said notice (in Section 8.2.5 to this Deed) and/or not provide any notice at all, in the event the Trustee is in the opinion that there is suspicion that waiting during said period or that the delivery of the notice, as applicable, shall impact either the possibility of calling for the immediate repayment of the Debentures or the rights of the Holders.

8.2.7. A copy of the notice for convening said meeting will be sent by the Trustee to the Company for it to be published and the summon for the meeting shall constitute an advance written warning to the Company of his intention to take action tin order to call for the immediate repayment of the debentures as aforesaid.

8.2.8. In the event that any of the subsections of Section 8.1 of this Deed stipulate a reasonable period in which the Company may take action or make a resolution as a result of which the cause for calling for an immediate repayment shall no longer be applicable, then the Trustee or the Holders are entitled to effect the call for the immediate repayment of the Debentures as provided in this Section 8, only if the foregoing prescribed period has transpired and the cause for has not been made inapplicable; Nonetheless, the Trustee may shorten said period if he believes that it may materially impact the Bondholders rights.

8.2.9. For the avoidance of doubt, it is clarified that nothing set forth in this Section 8.2 hereinabove shall derogate from the power of the Trustee to call for the immediate repayment of the Debentures (Series A), at his discretion, and subject to any law.

8.2.10. The Company shall notify the Bondholders and the Trustee of the occurrence of an event constituting cause for calling for an immediate repayment, immediately upon its *de facto* learning about it. Said notice to the Bondholders will be published on the

Magna System, provided the Company is a Reporting Corporation at that time, and all without derogating from the provisions of Section 27 below.

8.2.11. For the avoidance of doubt it is clarified that the immediate repayment will be made according to the par value balance of the Debentures (Series A), which have not yet been repaid, including accrued interest differentials (and penalty interest, if applicable) on the Principal, and the interest shall be calculated for the period beginning after the last day for which interest was paid until the *de facto* date of the immediate repayment (interest calculation for part of a year will be done on the basis of 365 days per year).

8.2.12. For the avoidance of doubt, it is clarified that the right to call for an immediate repayment and/or the calling for an immediate repayment shall neither derogate from nor impact any other or additional remedy available to the Holders of Debentures (Series A) or to the Trustee under the terms of the Debentures (Series A) and the provisions of this Deed, or those stipulated by law (including the right of the Trustee to make the Debentures immediately repayable in accordance with section 35T1 of the Law, even without a Bondholders meeting), and the failure to call for an immediate repayment upon the occurrence of any of the events set forth in Section 8.1 above, shall not constitute any waiver of the rights of Bondholders or of the Trustee as aforementioned.

8.2.13. Upon the occurrence of one or more of the events set forth in Section 8.1 to this Deed, the Company undertakes that as of said date (and as long as the breach event exists) it will not pay to Controlling Shareholders the proceed to which they are entitled with respect to the management agreement in which he is directly engaged with the Company (i.e., the management agreement the main terms of which have been set forth in Regulation 22 to Part D of the Periodic Report).

## 9. <u>Claims and Proceedings by the Trustee</u>

9.1. In addition to any other provision in this Deed and as an independent right and authority, the Trustee may, at any time, at its discretion, and will be obligated to do so by an ordinary Resolution (excluding the liquidation, for which a special resolution required) adopted at a Meeting of the Bondholders and without notice, take such proceedings, including legal proceedings and requests for instructions, as he sees fit and subject to the law, in order to realize and/or protect the rights of Holders of the Series A Debentures and to enforce the Company's execution of the other obligations of the Company under the Deed of Trust. Nothing in the foregoing shall violate and/or detract from the right of the Trustee to initiate legal proceedings and/or other proceedings, even if the Debentures (Series A) have not been called for immediate repayment, all for purposes of protection of the Holders of the Series A Debentures and/or for the grant of orders with respect to the Trust and subject to the law. Notwithstanding the provisions of this Section, it is clarified that the right to demand immediate repayment will be established only in accordance with Section 8 of the Deed and not by virtue of this Section.

9.2. The Trustee may convene, before initiating the proceedings set out above in a regular resolution, a Meeting of the Bondholders in order for them to decide which proceedings should be taken to exercise their rights under this Deed. Additionally, the Trustee may in a regular resolution reconvene Meetings of the Bondholders for the purpose of receiving

instructions in all matters pertaining to the conduct of such proceedings, provided that the Meeting convenes on the first possible date according to the provisions of the Second Schedule hereto, and nothing in the postponement of the proceedings shall prejudice the rights of the Holders.

9.3. Subject to the provisions of the Deed of Trust, the Trustee is entitled but not obliged, at any time, to convene a General Meeting of the Holders of the Series A Debentures, in order to discuss and/or obtain instructions on any matter relating to the Deed of Trust.

9.4. Whenever the Trustee shall be obliged under the terms of the Deed of Trust to take any action, including the initiation of proceedings or claims at the request of the Holders of the Series A Debentures as specified in this Section, the Trustee may, at his sole discretion, delay the performance of any such action until he receives instructions of the General Meeting of the Holders of the Series A Debentures in a regular resolution and/or instructions from the court on how to act, provided that the convening of the Meeting or the application to the court is made at the earliest date possible. For the avoidance of doubt, it shall be clarified that the Trustee shall not be entitled to delay taking action or initiating such proceedings as aforementioned in the event that the delay may infringe upon the rights of the Holders of the Series A Debentures.

9.5. The Trustee may, subject to a Special Resolution of the Holders of the Series A Debentures, as mentioned above, and on such conditions as he may deem fit, waive the fulfillment of the Company's obligations, all or part thereof.

**10. <u>Trust over the Proceeds</u>**

All receipts obtained by the Trustee, except his fees, expenses and repayment of any debt to the Trustee, in any manner whatsoever, including but not limited to, as a result of immediate repayment of the Debentures and/or as a result of proceedings to be taken, if any, against the Company, shall be held by him in trust and shall be used by him for the following purposes, in the following order of priority: **<u>first</u>** – for settlement of expenses, payments, levies and liabilities incurred by the Trustee, imposed on him, or caused incidental to or as a result of actions necessary for the execution of the trust or otherwise in connection with the terms of the Deed of Trust, including his remuneration (provided the Trustee does not receive his fees from the Company or from the Holders of the Debentures); **<u>second</u>** – for the payment of all other amounts in accordance with the Indemnification Obligation (as defined in Section 26.4 of this Deed), and; **<u>third</u>** – for the payment to the Holders of the Series A Debentures who incurred payments under Section 26.3.2 of this Deed.

The balance of said receipts shall be used, unless otherwise decided upfront by a Special Resolution at, for other purposes according to the following order of priority: (a) **<u>first</u>** - to pay the Bondholders the default interest, *pari passu*, and in proportion to the amount of interest in arrears owed to each of them without preference or priority right regarding any of them; (b**)** **<u>secondly</u>** - to pay to the Bondholders the default interest in respect of arrears of the principal due to them under the terms of the Debentures, *pari passu* and in proportion to the amount of the principal in arrears due to each of them, without preference or priority in respect of any of them; (c) **<u>thirdly</u>** - payment to the Debentures Holders of interest payments due to them under the terms of the Debentures held by them, *pari passu*, which payment date is not yet due, and in proportion to the amounts due to each of them, without preference in connection with priority in time of issue of the Debentures by the Company or otherwise; and (c) **<u>fourth</u>** – a payment to Bondholders of the principal amounts owed to them on the basis of the

debentures held by them, *pari passu*, that the payments date had not yet occurred at the time and in proportion to the amounts owed to them, without any preference in connection with priority at the time of issuance of the debentures by the Company or otherwise; (D) **fifth** - the balance, if applicable, shall be paid by the Trustee to the Company or its substitutes.

Withholding tax shall be deducted from payments made to the Bondholders (Series A), inasmuch as such tax must be withheld by law.

The Bondholders (Series A) shall be able to modify the order of priorities specified above, by means of a Special Resolution, with respect to alternatives (a) and (b) above only. The aforementioned is subject to receipt of proper approval from the tax authorities.

It shall be clarified that inasmuch as the Company had to bear any of the expenses but failed to do so, the Trustee shall act in order to receive said amounts from the Company and in the event it succeeds to receive them, such amounts shall be held by him in trust and used by him for the purposes, and according to the order of priority, specified in this Section above.

**11. The Authority to Demand Funding**

11.1. The trustee shall be entitled to order the Company to transfer to it, into the trustee account for the Bondholders (Series A), only part of the interest payment that the Company shall pay to the Bondholders (in this Section: the "**Relevant Payment**") and this to finance the proceedings and/or expenses and/or Trustee's salary according to this Deed (the "**Amount of Funding**") provided that the Company did not bear the Amount of Funding and/or deposited with the Trustee the Amount of Funding in advance. The Company may not refuse to act in accordance with the Trustee's notice and the Company will be deemed to have fulfilled its obligation to the said Holders if it transferred the full Amount of Funding to the account whose details were specified in the Trustee's notice.

The Amount of Funding that the Trustee may order the Company to transfer to him as stated in this Section above, unless a decision has previously been made by the Holders in the matter (including a decision regarding the taking of proceedings and/or the actions for which the Amount of Funding is required) will be limited to NIS 500,000 thousands (+VAT).

The aforesaid does not release the Company from its obligation to bear the payments of the Amount of Funding, insofar as they exist, where it must bear them according to this Deed or according to law. This does not detract from the Trustee's obligation to act reasonably to obtain the amounts that were used for such financing and are due to the Holders of the Company.

11.2. In the above case, the following provisions shall apply, unless the Company transfers to the Trustee, before the determining date as stated above, an amount equal to the Amount of Funding, and not from the specific payment as stated above:

11.3. The Company will transfer to the Trustee the Amount of Funding on the date specified in this Deed for the payment of interest as stated above.

11.4. The amount of the specific payment of the interest as stated above will be reducedand will be an amount less the Amount of Funding. The Amount of Funding will be deducted only from interest payments and not from principal payments.

11.5. No later than four Trading Days before the determining date for making the relevant payment from which the Amount of Funding will be deducted, an immediate report will be published detailing the Amount of Funding, the purpose of the interest amounts and the current interest rates to be paid to the Holders in connection with the relevant payment.

11.6. In addition, the Company will state in the immediate report as stated, that the Amount of Funding transferred to the Trustee will be considered for all intents and purposes as payment to the Bondholders.

11.7. Notwithstanding the foregoing, insofar as it determines in a final judicial decision after the transfer of the Amount of Funding as stated in this Section above that the Company was not liable for the financing required for matters set out in the said resolution, the Company shall be entitled to a remedy of non-application of the provisions of Section 11.5 above or any other remedy as determined in the judicial decision.

11.8. The aforesaid does not release the Company from its obligation to bear the payments of expenses and wages as aforesaid where it must bear them according to this Deed and/or according to law and the Trustee must act to collect the said amounts from the Company. Nothing in this Section above shall exempt the Trustee from taking any urgent action necessary to prevent material infringement of the rights of the Bondholders.

**12. Authority to Withhold Distribution of Funds**

Notwithstanding the provisions of Section 10 of this Deed, if the amount of money received by the Trustee as a result of taking the actions specified above, and available at any time for distribution as stated in the said Section, is less than the amount of 1 million NIS ("**Minimum Amount**"), the Trustee shall not be obligated to distribute it and shall be entitled to invest said amount, in whole or in part, in investments permitted by section 17 hereof, and shall be entitled to substitute these investments, from time to time, with other permitted investments, as he deems fit as is set forth in Section 17 hereof.

When these investments and the proceeds thereof, together with other funds the Trustee shall obtain in order to pay them to the Bondholders, reach the Minimum Amount, the Trustee shall pay them to the Holders for according to the purposes and order of priority as stated in Section 10 of the Deed. In the event where until the earlier of: the closest interest and/or Principal payment date or a reasonable time after receipt of said sum of money, the Trustee does not have the Minimum Amount, the Trustee shall be entitled to distribute to the Bondholders the funds in his possession.

Notwithstanding the provisions of Section 12 above, the Holders of the Series A Debentures are entitled, by an ordinary resolution to be adopted by them, to instruct the Trustee to pay them the funds received by the Trustee and available for distribution, as provided in Section 10 of the Deed, even if the amount is less than the Minimum Amount, subject to the Stock Exchange Regulations. Notwithstanding the foregoing, the fees of the Trustee and the expenses of the Trustee shall be paid from these funds immediately upon their due dates (and with respect to expenses already paid by the Trustee, the Trustee shall be reimbursed immediately upon receipt of the funds by the Trustee) even if the amounts received by the Trustee are less than the Minimum Amount.

It should be clarified that nothing in this Section shall derogate from the Company's duty to issue the payment to the Bondholders, and the Trustee will demand the amount payable, in full.

**13. Notice of Distribution**

The Trustee shall notify the Bondholders (Series A) of the day and the place where any of the payments referred to in Sections 10 and 12 of this Deed shall be made, by means of a prior notice of fourteen (14) days to be delivered in the manner determined in Section 27 of the Deed.

After the date prescribed in the notice, the Bondholders (Series A) shall be entitled to interest at the rate prescribed in respect of the Debentures, but only on the balance of the Principal amount (if any) after deducting the amount paid.

Funds distributed as provided in Section 13 above shall be deemed a payment on account of the repayment.

**14. Refraining from Payment for a Reason beyond the Company's Control**

14.1. Any amount owed to the Bondholders (Series A) which has not been paid de facto, on the date set for its payment, for any reason beyond the control of the Company, whereas the Company was willing and was to pay it, shall cease to bear interest from the said date, and said Holder of the Series A Debentures shall be entitled only to those amounts he was entitled to on the date set for repayment of said payment on account of the Principal or the interest.

14.2. The Company shall deposit with the Trustee, within fourteen (14) days from the date set for payment, the payment amount not paid on time, as provided in Section 14.1 of the Deed, and shall notify the Bondholders (Series A) in writing at the address in its possession (if applicable) of such deposit, and such deposit shall be considered discharge of said payment to the Holder, and in the event of a discharge of all amounts due in respect of the Debentures, such deposit shall also be considered a redemption of the Debentures (Series A) by the Company.

14.3. Any amount held by the Trustee in trust for the Holders shall be deposited by the Trustee at the Bank, and shall be invested by him, in his name or at his order, at his discretion, in investments permitted under the provisions of Section 17 of the Deed. In the event the Trustee has done so, he will owe nothing to those entitled in respect of said amounts, other than the proceeds received from the realization of investments, less the expenses related to such investment, as well as in respect of managing the trust account, the commissions, less mandatory payments that apply to the trust account and less the Trustee's fees. The Trustee will transfer amounts out of said funds to the Bondholders entitled thereto and will pay them against submission of the proofs required by him to his complete satisfaction.

14.4. The Trustee will hold the said funds and invest them in accordance with the provisions of Section 17 of the Deed, until the end of one year from the final maturity date of the Debentures (Series A). Then, the Trustee will return the accumulated funds in his possession (including their benefits) less expenses and less his fees and other expenses incurred in accordance with the provisions of this Deed (such as fees of service providers, etc.), to the Company, and the Company will hold these amounts in trust for the Holders of the Series A Debentures who are entitled to these funds, for a period of up to seven (7) years from the date of final repayment of the Debentures (Series A), and with regard to amounts to be transferred by the Trustee as stated, the provisions of Section 14.3 of the Deed shall apply, mutatis mutandis. Funds that were not claimed from the Company by the Holders of the Series A Debentures after seven (7) years from the date of final repayment of the Debentures

(Series A), will be transferred to the ownership of the Company, and the Company shall be allowed to use the remaining funds for any purpose whatsoever. After returning the funds to the Company, the Trustee shall not owe the Holders of the Series A Debentures any amount held by him as aforesaid.

14.5. The Company will confirm in writing to the Trustee the reimbursement of the funds as stated in Section 14.4 of this Deed and their receipt in trust for the Holders of the Series A Debentures as aforesaid, and shall indemnify the Trustee against any claim and/or expense and/or damage of any kind incurred by him as a result and due to the transfer of the funds as aforementioned, unless the Trustee acted negligently (except negligence exempt by law as in effect from time to time), in bad faith or with malice.

**15. Receipt from the Bondholders**

15.1. A signed receipt by the Holder of the Debenture (Series A) or a reference from the transferring member of the Stock Exchange for the execution of the transfer, or transfer through the stock exchange clearinghouse, in respect of the Principal and interest amounts paid to him by the Trustee in respect of the Debentures, will completely release the Trustee in relation to the actual payment of the amounts specified in the receipt.

15.2. Receipt of the Trustee regarding the deposit of the Principal and interest amounts with him to the benefit of the Holders of the Series A Debentures as stated, shall be deemed a receipt from a Holder of Series A Debentures for the purpose of Section 15.1 of the Deed, in relation to the release of the Company in relation to execution of the payment of the amounts specified in receipt.

15.3. Funds distributed under the provisions of Sections 10 and 12 above will be considered payment on account of the repayment of the Debentures (Series A).

**16. Presentation of Debenture to the Trustee; Registration in connection with the Partial Payment**

16.1. The Trustee shall be entitled to demand that the Holder of a Debenture (Series A) present to the Trustee, upon payment of any interest or partial payment of Principal and interest, the Certificate of the Debentures (Series A) for which payments are made and the Holder of the Debenture (Series A) will have to present the Certificate of the Debentures, provided that this does not charge the Holders of the Series A Debentures any payment and/or expense and/or impose on the Holders of the Series A Debentures any responsibility and/or liability.

16.2. The Trustee shall be entitled to make a note on the certificate of Debentures (Series A) regarding the amounts paid as above, and the date of such payment.

16.3. The Trustee shall be entitled, in any particular case, at his discretion, to waive the submission of a Certificate of Debentures (Series A) after the Holder of the Debenture (Series A) has provided to him a letter of indemnity and/or adequate collateral, at his discretion, for damages that may arise due to failure to record the said note, as he shall deem fit.

16.4. Notwithstanding the foregoing, the Trustee may, at his discretion, maintain records in another manner, with respect to such partial payments.

**17. Investment of Funds**

Any funds which the Trustee may invest according to this Deed of Trust, will be invested by him in one of the five largest banks in Israel the rating of which is not less than AA, and in the event that there is no Israeli bank with such a rating, in one of the three largest banks in Israel, in his name or at his order, and provided he invests in bank ILS deposits for a period of up to 30 days and/or in Israeli Government Bonds.

In the event the Trustee did so, he shall not be liable to those entitled for those amounts, but only for the proceeds received from the realization of the investments, after deduction of his fees and expenses, and net of mandatory payments, fees and expenses related to such investments and to the management of the trust accounts. The Trustee shall act with respect to the balance of such funds pursuant to the provisions of Section 12 and/or 14 of this Deed, as applicable.

**18. The Company's Undertakings towards the Trustee**

The Company hereby undertakes towards the Trustee, as long as the Debentures (Series A) have not yet been fully redeemed, as follows:

18.1. To maintain and manage the Company's and the companies are controlled by the company business in an orderly, proper and effective manner.

18.2. To maintain orderly financial records in accordance with the generally accepted accounting principles, and to keep records and documents serving as reference thereof (including pledge and mortgage deeds, invoices and receipts) in its offices, and to allow the Trustee and/or any of the Trustee’s representative authorized for said purpose, to review on a date to be coordinated in advance with the Company and which shall not exceed five (5) Business Days, any such record and/or documents requested by the Trustee for review. In this regard, a representative authorized by the Trustee shall mean whomever the Trustee appointed for the purpose of the foregoing review, by a written notice of the Trustee to be delivered to the Company prior to such review, subject to the undertaking of confidentiality and to the provisions of Section 31.11 to this Deed. To the extent possible, while paying attention to the essence and circumstances of the subject matter, the Company shall act to grant the right to review set forth in this Section above, in Israel including the transference of materials in all mediums.

18.3. To notify the Trustee in writing as soon as possible and no later than one (1) Business Day after it became aware thereof, about any event in which a charge has been imposed and/or an action was taken on a Material Asset of the Company (within the meaning of this term in Section 8.1 hereof), and in any event where a receiver and/or special administrator and/or temporary or permanent liquidator and/or trustee and/or other official under the relevant law applicable to the Company, is appointed in the framework of a motion for a stay of proceedings under Section 350 to the Companies Law against the Company, and / or a similar official under the relevant laws applicable to the Company, and take as soon as possible all reasonable measures, at its own expense, to remove such pledge or cancel such receivership, liquidation or administration, as applicable. The provisions in this Subsection shall apply also to the Property Companies should any of the events described above in this Section, have occurred with respect to whichever of the Pledged Properties.

18.4. To notify the Trustee in writing promptly upon becoming aware thereof and no later than one (1) Business Day thereafter, about: (1) the occurrence of one or more of the events set forth in Section 8.1 to this Deed and the subsections thereunder; (2) the Company's genuine concern that one or more of the events set forth in Section 8.1 to this Deed may occur. The provisions relating to said notice will be carried out by the Company without taking into account the grace period set forth in Section 8.1 to the Deed, if applicable.

18.5. To deliver to the Trustee, a notice in writing signed by the senior financial officer of the Company, regarding the execution of any payment to the Bondholders, including details pertaining to the calculation of the payment, and to the outstanding balance owed by the Company at that time to the Bondholders, within seven (7) Business Days after execution of the aforesaid payment. It is be clarified that the publication of such report on the Magana System shall be deemed as delivery to the Trustee for purposes of this Section.

18.6. To deliver to the Trustee immediately upon its publication, any report the Company is required to file with the Israel Securities Authority. Unless otherwise expressly stated in this Deed, an Immediate Report filed in the Israel Securities Authority Magna System and any report or information published (in full) by the Company through the Magna System, shall be deemed delivered to the Trustee. Notwithstanding the foregoing, the Company shall, at the request of the Trustee, submit to the Trustee a printed copy of the report or the information as aforementioned.

18.7. To allow the Trustee and/or whomever the Trustee appoints for this purpose, in writing, following prior coordination, to enter the Company's offices and any other place where the Company's assets may be located, at any reasonable time and no later than seven (7) Business Days as of the date of the Trustee's request, in order to examine its assets, at the sole discretion of the Trustee, for the purpose of protecting the Bondholders.

18.8. To deliver to the Trustee copies of notices and invitations issued by the Company, as set forth in Section 27 to this Deed.

18.9. To ensure the senior financial officer of the Company shall provide, within seven (7) Business Days as of the date of the Trustee's request, to the Trustee and/or to such persons as instructed by him, any explanation, document, calculation or information pertaining to the Company, its business and/or its assets that shall be reasonably necessary, in the discretion of the Trustee, for examinations made by the Trustee in order to protect the Bondholders.

18.10. For as long as the Company is a Bond Company which is a private company (within the meaning of these terms in the Companies Law) – to provide the Trustee, signed minutes of Shareholder Meetings no later than 5 Business Days as of the date of the signing, and in this context, the Company undertakes to provide the Trustee with a copy of any document and/or information delivered by the Company to the Bondholders, if any, as well as copies of notices and invitations issued to the Bondholders, if any. to the extent that throughout the life of the Debentures the Company becomes a public company (as defined in the Companies Law) - to invite the Trustee to attend the General Meetings by phone call (whether Annual General Meetings or Special General Meetings of the Company's Shareholders) of the Company's shareholders (without participation or voting rights). Publishing an invitation to a General Shareholders Meeting of the Company through the Magna System, shall be deemed a as summoning the Trustee for the purposes of this Section.

18.11. Subject to the provisions of Section 18.6 to this Deed, and for as long as the Debentures (Series A) have yet to be fully repaid - to submit to the Trustee the statements and reports as follows:

18.11.1. The Company's Audited Annual Financial Statements, and its Reviewed Quarterly Financial Statements, no later than the dates stipulated under the Securities Law also in an event the Company ceases to be a Reporting Corporation.

18.11.2. If and to the extent the Company becomes a public company (as defined in the Companies Law) – to provide the Trustee a copy of any document that the Company submits to all its Shareholders or to Bondholders as well as any information the Company otherwise provides to them with, including any report submitted by law to the Israel Securities Authority for purposes of it being released to the public (Immediate Reports), immediately upon its publication. As long as the Company is a Bond Company which is a private company – submit to the Trustee a copy of any document that the Company delivers to the Bondholders and details of all information the Company otherwise provides them, including any report submitted by law to the Israel Securities Authority, for purposes of it being released to the public (Immediate Reports), immediately upon its publication.

18.11.3. To deliver to the Trustee, No later than 5 business days from the date of the trustee's demand a written and signed approval of the Company's auditors pursuant to which all the payments to the Bondholders were paid on time, as well as the balance of the par value of the Debentures in circulation.

18.11.4. In the event the Company has ceases to be a reporting corporation, the Company shall deliver to the Trustee, in addition to the provisions set forth in Sections 18.3 to 18.10 to the Deed, Annual, Quarterly and Immediate Reports, as follows, each of which signed by the Chief Financial Officer and by the Company's CEO:

(A) An annual report containing the information specified in Appendix 5.2.4.8 to Chapter 4 of Part 2 (Management of Investment Assets and the Provision of Credit), Volume 5 (Principles for Business Management) in the Unified Circular[1] or as may be updated from time to time, no later than sixty (60) days as of the date the Company was required to publish its Annual Reports were it a Reporting Corporation;

(B) A Quarterly Report containing the information specified in Appendix 5.2.4.9 to Chapter 4 of Part 2 (Management of Investment Assets and the Provision of Credit) Volume 5 (Principles Doing Business Management) in the Unified Circular (1), or as may be updated from time to time, no later than thirty (30) days from the date the Company was required to publish its quarterly reports were it a Reporting Corporation;

(C) An Immediate Report upon the occurrence of any of the events specified in Appendix 5.2.4.10 to Chapter 4 of Part 2 (Management of Investment Assets and the Provision of Credit), Volume 5 (Principles of Business Management) in the Unified Circular or as may be updated from time to time. The report shall be delivered on the date on which the Company would have been required to report the occurrence

---

[1] 1 http://ozar.mof.gov.il/hon/2001/law/Codex.asp .

of the event under Regulation 30 (b) to the Reports Regulations or under any Regulation replacing said Regulation.

(D) In the event of a report being submitted in accordance with the aforesaid, the Company will notify the stock exchange for publication in the Maya System, according to which the Company has notified the Trustee of a notice pursuant to this section and that the Debentures Holder may receive a copy upon presentation of ownership. To the extent that it will not be possible to publish notices in the aforementioned manner, the Company will open a website (including through the Trustee) where notices will be published to the Bondholders, and the Company will announce the address of the website in an immediate report that will be published before the termination of the Company's reporting obligations.

18.12. To deliver to the Trustee no later than seven (7) Business Days as of the Trustee's request following his reasonable request, an affidavit and/or statements and/or documents and/or data and/or additional information concerning the Company and its subsidiaries (including explanations, documents and calculations concerning the Company its subsidiaries, their businesses or assets And information which at the reasonable discretion of the trustee is required for the purpose of protecting the rights of the bondholders) and instruct its accountant and legal advisors to do so; to the extent he reasonably believes the required information is necessary for the implementation and exercising the authorities, powers and privileges awarded to the Trustee and/or those empowered by him according to the Deed of Trust, including information which may be essential and necessary to protect the rights of Bondholders, provided that the Trustee acts in good faith, subject to a confidentiality undertaking as set forth in Section 31.11 to this Deed.

18.13. To deliver to the Trustee all reports or notices as set forth in Section 35 of Securities Law.

18.14. No later than ten (10) Business Days after the publication of the Company's Annual or Quarterly Financial Statements, as applicable, the Company will provide to the Trustee, the Company's written approval, together with a calculation in an active Excel file, signed by a Director, CEO or the Company's senior financial officer, regarding the Company's compliance with the financial covenants set forth in Section 5.7 to the Deed and all in a wording to the Trustee's satisfaction.

18.15. To have the Company's senior finance officer provide, within five (5) Business Days, the Trustee and/or to the persons designated by the Trustee, any explanation, document, calculation or information concerning the Company, its business and/or assets, as may be reasonably required at the sole discretion of the Trustee, for the purpose of fulfilling its functions and for protecting the Bondholders.

18.16. To hold and maintain its assets in good and proper condition and pay regularly and promptly all mandatory payments applicable to its assets, if applicable.

18.17. Every April 10 of each year, for the previous calendar year, and as long as this Deed is in effect, the Company shall provide to the Trustee, the Company's approval, duly signed by a Director, CEO or the Company's senior financial officer, regarding the execution of all payments of interest and/or repayment on account of the Principal, in connection with the Debentures (Series A), the payment date of which became due prior to the date of the

approval, and the date of the payment, as well as the balance of the par value of the Debentures (Series A), which are still in circulation as of the date of the approval; and also, on March 31 of each year and so long as this Deed is in effect, an approval from a director of the Company and from the CEO, pursuant to which, during the period commencing on the date of the Deed and/or the date of the previous approval provided to the Trustee, whichever is later, and until the date of the approval, the Company has not committed either any breach of this Deed, nor any breach of the terms of the Debentures, unless otherwise expressly stated in said approval.

18.18. To notify the Trustee in writing of any change in the name or the address of the Company No later than 2 business days from the change.

18.19. The Trustee may instruct the Company to immediately report, through the Magna System, on behalf of the Trustee, any report drafted in the form to be transferred by the Trustee to the Company, and the Company shall be compelled to report immediately and in any event no later than one Trading Day after receiving said report.

18.20. The Company shall notify the Trustee in writing of its failure to comply with any foreign covenant as soon as possible and no later than one (1) Business Day after the commencement of the non-compliance with the foreign covenant, or within one (1) Business Day as of the date it has received a notice by an Equity Investment Company of the Company regarding a failure to comply with any foreign covenant, as applicable, as well as the expected effects of said non-compliance in accordance with the agreements with said entity. It is clarified that inasmuch as the Company or any held corporation fail to comply with any foreign covenant and is given an extension to comply with the foreign covenant, it shall not derogate from the Company's obligation to notify the Trustee of the failure to meet said foreign covenant.

Notwithstanding the provisions Set forth in Section 27 to the Deed, the Company shall deliver the Trustee a written notice concerning the non-compliance with the foreign covenant in addition to any Immediate Report published by the Company in this regard, if published.

For purposes of this Section -

**"Foreign Covenant"** - a material financial covenant of the Company or and holding corporation and of any Equity Investment Company of the Company, in the framework of an agreement with a financial institution or with another entity that granted the Company or and holding corporation with credit Which constitutes at least 7.5% of the Company's total loans according to consolidated financial statements.

**"Material Financial Covenant"** – a financial covenant a failure to comply therewith constitutes cause for calling for the immediate repayment of the relevant debt.

**19. <u>Additional Liabilities</u>**

19.1. Should the Debentures be called for immediate repayment, as defined in Section 8 of the Deed, the Company will carry out, from time to time and at any time it is required to do so by the Trustee, all reasonable actions in order to exercise all the powers conferred upon the Trustee, and in particular, the Company will take the following actions, no later than 7 Business Days from the request of the Trustee;

19.1.1. To repay to the Bondholders and to the Trustee all the amounts due to them under the terms of the Deed of Trust, whether or not the date of the charge is due (Acceleration).

19.1.2. Make the declarations and/or sign any documents and/or perform and/or cause others to perform all actions necessary and/or required in accordance with the law in order to give effect to the exercise of the authorities, powers and privileges of the Trustee and/or his attorneys-in-fact, pursuant to this Deed of Trust.

19.1.3. Give all notices, orders and instructions, deemed by the Trustee to be useful and necessary for implementing the provisions of this Deed.

19.1.4. For the purposes of this Section - a written notice signed by the Trustee confirming that an action required by him, within his powers, is a reasonable action, shall constitute prima facie evidence thereof.

**20. <u>Attorneys-in-Fact</u>**

20.1. The Company hereby irrevocably appoints the Trustee as its attorney-in-fact, to execute and perform in its name and stead all the actions it shall be required to perform under the conditions contained in this Deed, and act on its behalf with respect to the actions that the Company must perform in accordance with this Deed and failed to perform them, or to perform part of the powers granted to it, and appoint any other person the Trustee shall deem fit to perform his duties in accordance with this Deed, provided the Company has not performed the actions it must perform under the terms of this Deed within fourteen (14) days, as determined by the Trustee, from the date of the Trustee's demand, and provided he acted reasonably.

20.2. The appointment pursuant to Section 20.1 of the Deed shall not require the Trustee to take any action nor shall it derogated from the Company's obligations in accordance with the Deed of Trust, and the Company hereby exempts the Trustee and its delegates in advance if they do not perform an action, and renounces in advance any claim against the Trustee and its delegates for any damage caused or likely to be caused to the Company in respect of this, directly or indirectly, on the basis of any action not performed by the Trustee and its delegates as mentioned above, except in case of an act or omission committed in bad faith or negligence (other than negligence exempted by law, as in effect from time to time).

**21. <u>Other Agreements</u>**

21.1. Subject to the provisions of Law and the restrictions imposed on the Trustee under the Law, the fulfillment of the functions of the Trustee, pursuant to this Deed, or his position as Trustee, shall to prevent him from entering into various agreements with the Company, or conduct transactions with it in the ordinary course of its business.

21.2. As at the signing date of this Deed, the Trustee declares that he is insured under professional liability insurance in the amount of $10 million for the period (the **"Coverage Amount"**). To the extent that prior to the full repayment of the Debentures (Series A) the Coverage Amount shall be reduced below $8 million for any reason whatsoever, the Trustee will update the Company no later than seven (7) Business Days as of the date on which the abovementioned reduction from the insurer was announced; this, in order to publish an immediate report on this matter.

The provisions of this section shall apply until the date of entry into force of regulations to the Securities Law which shall regulate the duty of insurance coverage of the Trustee. After the entry into force of such regulations, the Trustee will be obliged to update the Company only in the event that the Trustee does not meet the requirements of the regulations.

**22. <u>Reports on the Trust's Affairs</u>**

22.1. The Trustee shall be obliged to submit a report on the actions he took in accordance with Section 35H 1 of the Securities Law.

22.2. The Trustee will draft, up to June 30 of each year, for the previous calendar year, an annual report on the affairs of the Trust (in this Section 22: "Annual Report"). The Annual Report will include the following: A report on extraordinary events in connection with the Trust that occurred during the past year.

22.3. The Trustee shall publish (in person or through the Company at the request of the Trustee) the annual report through the Magna System.

22.4. In the event the Trustee becomes aware of a material breach of this Deed and/or the terms of the Debentures (Series A) on the part of the Company, from public releases of the Company or by virtue of the Company's notice to the Trustee pursuant to Section 18.4 of this Deed, he shall notify the Debenture (Series A) Holders within a reasonable time of the breach and the steps it has taken to prevent it or to fulfill the Company's obligations, as applicable. This obligation shall not apply if the event was published by the Company by virtue of the law. This obligation of the Trustee is subject to his actual knowledge of said breach.

22.5. The Trustee will update the Company on any report submitted under this Section 22 Unless it is to the detriment of the rights of the bondholders.

22.6. Nothing in this Section shall derogate from any other or additional reporting duty of the Trustee under any law. The Trustee must submit a report regarding the activity he performed in accordance with the provisions of Chapter E1 of the Law at the reasonable demand of Holders of at least ten percent (10%) of the balance of the par value of the Debentures within a reasonable time from the date of the request, all subject to the confidentiality obligation imposed by the Trustee in Section J35(D) of the Law.

22.7. At the request of the Holders of more than 5% (5%) of the balance of the par value of the Debentures, the Trustee will provide the Holders with data and details of his expenses in connection with the Trust.

**23. <u>Trustee Fees and Coverage of the Expenses</u>**

The Company shall pay to the Trustee remuneration for his services as trustee for the Debentures in accordance with the Deed of Trust, as set forth below:

23.1. With respect to the series of Debentures (Series A), the Trustee's fees will be calculated as follows:

23.2. A payment of NIS 28,000 in respect of each trust year, starting from the first trust year onwards (that is, starting from 12 month after the date of the issuance) or any part thereof, in which there are Debentures in circulation (Principal, interest and linkage).

23.3. The annual fee provided for in Section 23.2 above will be paid to the Trustee at the beginning of each trust year in respect of the next trust year or any part thereof, and the date of payment of the Trustee's fees in respect of the first trust year will take place within 30 days of the date of the actual issuance of the Debentures.

23.4. If the Company extends the debentures (Series A), the annual salary will be equal to the annual salary specified above, multiplied by the result of the distribution of the total Debentures (Series A) issued up to that date (excluding redemptions) divided by the total Debentures (Series A) issued as part of the first issue of the Debentures (Series A). In the event that the Company repays Debentures (Series A), the Trustee's fee will be reduced proportionately accordingly, but in any case, the fee will not be less than the amount determined in the first issue of the Debentures (Series A).

23.5. Without derogating from the provisions of this Section 23 below, the payments prescribed in the Deed of Trust will be paid to the Trustee in respect of the period until the end of the trust period in relation to each Debenture to be issued under the terms of the Deed of Trust, even if a receiver and/or administrator was appointed to the Company and/or if the trust under the Deed of Trust will be conducted under the supervision of the court.

23.6. In return for participation in shareholders' meetings held in Israel, the Trustee will be paid NIS 750 per meeting.

23.7. Without derogating from the generality of Sections 23.1-23.6 above, the Trustee shall be entitled to fees in the amount of NIS 600 for each working hour required to it in respect of (all subject to the provisions of the Deed of Trust):

23.7.1. Actions arising from a breach or concern of a breach of the Deed by the Company.

23.7.2. Actions in connection with calling for immediate repayment of a certain series of the Debentures issued under the Prospectus and/or actions in connection with a decision adopted at the Meeting of the Bondholders of such series to call for the immediate repayment of the Debentures as provided in this Deed.

23.7.3. Actions related to the Pledges, as is set forth in Section 6 to this Deed.

23.7.4. Special actions that the Trustee will be required or obligated to carry out for the purpose of fulfilling its duties under this Deed in connection with the rights of Bondholders of a certain series, including the convening of Meeting of Bondholders as provided in this Deed.

23.7.5. Special works (including, but not limited to, works required due to a change in the structure of the Company or works at the request of the Company), or in respect of the need to carry out further actions in order to fulfill its duty as a reasonable trustee, due to a future change in laws and/or regulations and/or other binding provisions that may apply in connection with the actions taken by the Trustee and its liability under this Deed.

23.7.6. Actions with respect to the registration or cancellation of collaterals in a legally maintained registry (including abroad), as well as inspection, supervision, control, enforcement and so forth, of obligations (such as: restrictions on the Company's freedom of action, pledging of assets, etc.), which the Company has assumed or

will assume, or which will be assumed by whomever on its behalf or for it, in connection with securing other liabilities of the company or of whomever on its behalf (such as: making payments according to the terms of the Debentures) towards the Bondholders, including with regard to the nature of the terms of the said collateral and obligations and their fulfillment.

23.7.7. In the event there is a need to register charges, additional fee will be determined in accordance with the scope of the work to be required.

23.7.8. It shall be clarified that, should, due to future changes in laws and/or regulations and/or other binding provisions that apply to actions taken by the Trustee, the Trustee incur additional expenses required from it to fulfill its duties as a reasonable trustee, the Company will pay the Trustee its fees and expenses (positively linked to the Consumer Price Index, from the date of the expense).

23.8. Subject to the provisions of the Deed of Trust, the Trustee shall be entitled to reimbursement of expenses (positively linked to the Consumer Price Index from the date of the issuance) incurred by the Trustee in order to fulfill its duties and/or by virtue of the powers conferred upon it under the Deed of Trust, including (but not only) Newspaper Ads and an expert opinion, provided that in respect of expenses due to an expert opinion, the Trustee will give prior notice to the Company of its intention to obtain an expert opinion.

23.9. The Company shall bear any payment and/or expense related to the Debentures, from the issuance thereof until their final maturity. Such expenses include, inter alia, fees for service providers such as, attorneys, underwriters, trustees, economic consultants, etc., if hired, as well as taxes and fees that are not imposed on the Bondholders by law.

23.10. In the event that the term of office of the Trustee expires as provided in Section 31 of the Deed of Trust, the Trustee shall not be entitled to its fees commencing on the date of the beginning of the term of office of the substitute trustee.

23.11. The provisions of other Sections contained in this Deed regarding coverage of expenses and costs related to actions taken by the Trustee, are in addition to the provisions of this Section 23.

23.12. All the amounts payable to the Trustee will be subject to VAT and positively linked to the Consumer Price Index, when the base index is the index published at the Execution Date of this Deed.

**24. <u>Special Powers</u>**

24.1. The Trustee shall be entitled to deposit all bills and documents that attest, represent and/or determine his right in connection with any asset in his possession at that time, in a safe deposit box and/or anywhere else as he shall choose.

24.2. The Trustee may, in the framework of the affairs of the Trust according to this Deed, request an expert opinion and/or the advice of any attorney, accountant, appraiser, assessor, surveyor, broker or other expert ("Experts"), and act upon its conclusions, and the Trustee shall not be liable for any loss or damage resulting from any act or omission made by him based on such opinion and/or advice, unless it has been determined in a conclusive judicial decision that the Trustee acted negligently (excluding negligence exempted by law) and/or in bad faith

and/or maliciously. The Trustee shall provide a copy of the opinion or the advice as aforementioned, for review by the Bondholders (subject to the petitioner's proof that he holds a debenture). The Company shall bear all reasonable costs in respect of the employment of consultants to be appointed as stated, provided that, as much as possible under the circumstances and that the rights of Bondholders are not injured, the Trustee shall give to the Company advance notice of its intention to obtain an expert opinion or advice as stated, and as much as possible under the circumstances, the Trustee shall act after obtaining several price offers.

24.3. Any such advice or opinion may be given, sent or received by letter, telegram, facsimile, e-mail and/or any other electronic means for the transmission of information, and the Trustee shall not be liable for actions he took based on the advice and/or opinion or information transmitted in one of the aforementioned means, even if errors and/or non-authenticities have occurred therein, unless such errors were possible to detect by means of a reasonable verification, and provided it does not act with negligence (other than negligence exempted by law, as in effect from time to time) and/or bad faith. It shall be clarified that the documents are transferable, on the one hand, and the Trustee may rely thereon, on the other hand, only if such documents are comprehensive and easy to read.

24.4. Subject to applicable law, the Trustee shall not be required to notify any party about the execution of the Deed of Trust, nor will he be allowed to intervene in any manner in the management of the Company's business or affairs, other than according to the powers granted to the Trustee herein or in accordance with applicable law. The provisions of this Section shall not restrict the Trustee with respect to actions he has to perform in accordance with the Deed of Trust.

24.5. Subject to applicable law, the Trustee shall exercise, in the execution of the Trust, the powers and authorizations conferred upon him by the Deed of Trust, at its sole discretion and subject to the other provisions of this Deed. if the Trustee so acted, he shall not bear any liability for any damage and/or loss and/or expense which will be incurred by the Company and/or the Holders of Debentures and/or and which they shall be obligated to bear due to any act and/or omission committed by the Trustee, including as a result of mistakes in judgment, unless it has been determined in a final judgment that the Trustee acted negligently (except negligence exempt by law as applicable from time to time) or in bad faith or with malice or in violation of this Deed, subject to and in accordance with any law.

**25. <u>The Trustee's Authority to Employ Agents</u>**

The Trustee shall be entitled, in the framework of the management of the business of the Trust, to appoint a delegate/s in his place, whether a lawyer or someone else, to perform or participate in performing special actions that should be performed in relation to the Trust, and without derogating from the generality of the foregoing, to initiate legal proceedings. The Trustee shall also be entitled to pay, at the expense of the Company, a reasonable fee to each such delegate, including by means of set-off from the amounts received by him, and the Company shall reimburse such expenses to the Trustee immediately upon his first request, provided the Trustee gave the Company an advance notice regarding the appointment of such delegates and to the extent the rights of the Holders are not injured as a result thereof.

It shall be clarified that the appointment of such delegates shall not derogate from the liability of the Trustee for his actions and the actions of its delegates.

**26. <u>Indemnification of the Trustee</u>**

26.1. The Company and the Debentures Holders (on the relevant effective date as provided in Section 26.6 hereof, each in respect of its obligations set forth in Section 26.4 of the Deed), hereby undertake to indemnify the Trustee and all his officers, employees, agents or experts to be appointed on his behalf (hereinafter: "those entitled to indemnification"):

26.1.1. For any damage and/or loss and/or financial liability in accordance with a judgment (regarding which no stay of execution has been issued) or under a resolved compromise (and if the compromise concerns the Company, the company's consent should be obtained), the grounds of which derive from actions performed by those entitled to indemnification, or actions they must perform by virtue of this Deed and/or by law and/or by an order of a competent authority and/or by any law and/or at the request of the Company and/or the Debentures Holders (Series A); and

26.1.2. In respect of the compensation of those eligible for indemnification and expenses incurred by them and/or which shall be incurred by them by virtue of this Deed and/or by law and/or the instruction of a competent authority and/or at the request of the Bondholders (Series A) and/or at the request of the Company and/or in connection with the exercise of powers and authorizations granted by virtue of this Deed, as well as in connection with all kinds of legal proceedings, opinions of lawyers and other experts, negotiations, arguments, expenses, claims and demands relating to any matter and/or act done and/or not done in any manner relating to the above.

All provided that:

26.1.2.1 Those entitled to indemnification shall not require advance indemnification in a matter that cannot be delayed, (without prejudice to their right to indemnification in retrospect, if and to the extent such right is available to them).

26.1.2.2 No conclusive judicial decision determines that those entitled to indemnification have acted in bad faith and that such action was performed other than within their duties, not in accordance with the law and/or not in accordance with this Deed of Trust.

26.1.2.3 No conclusive judicial decision determines that those entitled to indemnification have acted in negligence, which is not exempt by the law, as may be in effect from time to time.

26.1.2.4 No conclusive judicial decision determines that those entitled to indemnification have acted with malice, gross negligence or willful misconduct.

The indemnification obligations under this Section 26.1 shall be referred to as the "**Indemnification Obligation**."

26.2. Even in the event that it is argued against those entitled to indemnification that they are not entitled to indemnification for any reason, those entitled to indemnification will be entitled immediately upon their first demand, to the payment of the amount due to them in respect of the 'indemnification obligation'. In the event that it is determined in a final judicial decision that the persons entitled to indemnification have not arisen, the persons entitled to indemnification will reimburse the amounts of the indemnification obligation paid to them. Without prejudice to the rights of indemnification granted to the Trustee by law and subject to the provisions of this Deed and/or the obligations of the Company in accordance with this Deed, those entitled to indemnification shall be entitled to receive indemnification of the monies received by the Trustee from the proceedings he has initiated and/or obligations they have assumed, regarding reasonable expenses incurred while performing the trust or in connection with such actions, which, in their opinion, were necessary to carry out the above, and/or in connection with the exercise of the powers and authorizations conferred by virtue of this Deed, as well as in connection with all kinds of legal proceedings, opinions of lawyers and of other experts, negotiations, arguments, claims and demands relating to any matter and/or action done and/or not done in any manner whatsoever in relation to the foregoing, and the Trustee may withhold the funds in his possession and pay the amounts required in order to pay said indemnification out of such funds. All these amounts shall have priority over the rights of the Bondholders (Series A), subject to applicable law, provided the Trustee acted in good faith and in accordance with the obligations imposed on him by law and in accordance with this Deed. For the purposes of this Section, an action of the Trustee which has been approved by the Company and/or by the Bondholders, shall be considered an action reasonably required.

26.3. Without derogating from the validity of the indemnification Obligation, as specified in Section 26.1 of the Deed, whenever the Trustee is obligated under the terms of the Deed of Trust and/or by law and/or by an order issued by a competent authority and/or by any law and/or at the request of the Holders of the Series A Debentures and/or at the request of the Company, to take any action, including, but not limited to, the initiation of proceedings or the filing of claims at the request of the Holders of the Series A Debentures, as stated herein, the Trustee may refrain from taking any such action, until he receives at first priority from the Company, to his satisfaction, a monetary deposit to cover the Indemnification Obligation (hereinafter the **"Cushion Fund"**) in the required amount, and in the event the Company does not deposit the entire Cushion Fund when requested to do so by the Trustee, provided that the Trustee has taken the reasonable steps under the circumstances to collect the funds covered by the indemnity undertaking from the Company, the Trustee will contact the Bondholders (Series A) who held the Debentures (Series A) on the Effective Date (as provided in Section 26.6 of the Deed), and request them to entrust the amount of Cushion Fund with him, each Holder his proportionate share' (as defined in Section 26.5 of the Deed). In the event the Holders of the Series A Debentures fail to actually deposit the full amount of the 'Cushion Fund' as required, the Trustee duty to take action or to initiate the relevant proceedings will not apply to the Trustee; Nothing in the foregoing shall exempt the Trustee from taking any urgent action required to prevent material damage to the rights of Holders of the Series A Debentures. Nothing in the payment made by the Holders under this Section will release the Company from its obligation to bear such payment.

The Trustee is authorized to determine the amount of the Cushion Fund and shall be entitled to create another cushion fund, from time to time, in an amount to be determined by him.

The Cushion Fund will be deposited with a bank account to be opened by the Trustee and in its name only (the "**Cushion Fund Account**"), which will be used for the purpose of the indemnification obligation. The Trustee may, at its sole discretion, use the funds deposited in the Cushion Fund Account in order to execute actions or for relevant proceedings.

The amount of the Cushion Fund will be held in the Cushion Fund Account until the date of full and final repayment of the Debentures (Series A) and until the full payment is made to the Trustee and/or its delegates in respect of their remuneration, expenses, damages and losses incurred by them as a result of their actions under the Deed of Trustee.

After full repayment of these amounts are made to the Trustee and its delegates, the balance of the Cushion Fund will be transferred to the party that deposited it. In case several parties have deposited the funds of the Cushion Fund, the balance of the Cushion Fund will be distributed among them pari passu.

In the event the amount of the Cushion Fund is not sufficient to cover the Trustee's expenses in connection with calling for immediate repayment of the Debentures (Series A) and/or breach by the Company of the provisions of the Deed of Trust, the Trustee shall act in accordance with the provisions of Section 26 below.

26.4. The indemnification obligation:

26.4.1. Shall apply to the Company in any case where (1) actions performed at the discretion of the Trustee and/or by law and/or required to be performed under the terms of the Deed of Trust or in order to protect the rights of Bondholders; and (2) actions performed and/or actions required to be performed at the request of the Company.

26.4.2. Shall apply to the Holders who held, on the Effective Date (as specified in Section 26.6 of this Deed of Trust), in any event of (1) actions performed and/or required to be performed at the request of the Bondholders (excluding actions taken at the request of the Holders in order to protect the rights of Bondholders); and (2) failure to pay, by the Company, the amount of the Indemnification Obligation applicable to it under Section 26.4.1 of this Deed of Trust (subject to the provisions of Section 26.7 of this Deed). It shall be clarified that payment in accordance with subsection (2) above shall not derogate from the duty of the Company to assume the Indemnification Obligation in accordance with Section 26.4.1 of this Deed.

26.5. In any case in which the Company does not pay the full amounts required to cover the Indemnification Obligation and/or does not deposit the full amount of the Cushion Fund, as applicable; and/or in any case the Holders were called to deposit the amount of the Cushion Fund in accordance with the provisions of Section 26.3 of this Deed, the funds will be collected as follows:

26.5.1. <u>First</u> – the amount will be funded out of the interest and if the interest amounts is not enough, from the Principal amounts which the Company must pay to the Holders of the Series A Debentures after the date of the required action, and the provisions of Section 11 of this Deed shall apply; It should be clarified that, if such amounts were used by the Trustee because the Company failed to pay the full amounts required to

cover the Indemnification Obligation and/or failed to deposit the full amount of the Cushion Fund, such amounts will not be deemed to have been repaid by the Company on account of the Debentures to the benefit of the Bondholders;

26.5.2. Second – inasmuch as the Trustee is of the opinion that the amounts deposited in the Cushion Fund shall not cover the Indemnification Obligation, the Holders holding Debentures on the Effective Date (as provided in Section 26.6 of this Deed) shall deposit with the Trustee the missing amount according to their proportionate share (as defined below).

"**Proportionate Share**" means the relative share of the Debentures (Series A) held on the relevant Effective Date as provided in Section 26.6 of this Deed, out of the total par value of the Series in circulation on that date. It is clarified that the calculation of the proportionate share will remain constant even if after said date a change occurs in the par value of the Debentures held by the Holder.

It shall be clarified that the Holders of Debentures who will bear the liability for covering such expenses as specified in this Section, will be able to bear such expenses as stated in this Section beyond their proportionate share and in such case, the reimbursement of these funds will be subject to the order of priority in accordance with Section 10 of this Deed.

26.6. The effective date for determining the Indemnification Obligation of the Holder and/or the payment of the Cushion Fund shall be as follows:

26.6.1 In any case where the Indemnification Obligation and/or the payment of the Cushion Fund are required due to a decision or an urgent action needed in order to prevent material damage to the rights of the Bondholders (Series A), without the prior resolution of the meeting of the Bondholders Meeting (Series A) – then the effective date with respect to the liability shall be the end of the Trading Day on which the action has been taken or the resolution has been held, and if said day is not a Trading Day, the Trading Day preceding it.

26.6.2 In any case where the Indemnification Obligation and/or the payment of the Cushion Fund are required in accordance with the decision of the Meeting of the Bondholders (Series A) – the effective date for the liability shall be the effective date of for participation in the Meeting (as such date shall be set in the notice convening the Meeting), and such date will apply also to holders who were not present or did not participate in the Meeting.

26.7. Payment by the Holders in lieu of the Company of any amount imposed on the Company under this Section 26, shall not release the Company from liability to bear such payment and the Trustee shall act according to the provisions of this Deed and the power granted to him by it to return such payment to the Holders.

26.8. For the purposes of repayment priority, the Holders who bore the payments under this Section out of the proceeds in possession of the Trustee, see Section 10 of the Deed.

**27. Notices**

27.1. Any notice from the Company and/or the Trustee to the Bondholders will be given by means of a report through the Magna System of the Securities Authority.

27.2. The Trustee may instruct the Company, and the Company will be obligated to immediately report on the Magna System on behalf of the Trustee, any report to the Bondholders in the wording provided to the Company by the Trustee in writing.

27.3. In the event the Company cease to report in accordance with Chapter F of the Law, any notice on behalf of the Company and/or the Trustee to the Bondholders will be given by sending a notice via registered mail to each registered Bondholder according to the last address recorded in the Bondholders Register (in case of joint Holders – to the joint Holder whose name appears first in the Register). Any notice sent as aforesaid will be deemed to have been delivered to the Bondholders after 14 Business Days from the date of delivery thereof by registered mail at the same time, a message by email will be sent to the trustee. The Company shall also publish a notice in two daily newspapers with wide circulation, published in Hebrew. Alternatively, the Company will open a website (including through the Trustee) where notices will be published to the Bondholders, and the Company will announce the address of the website in an immediate report that will be reported before the termination of the Company's reporting obligations.

27.4. Copies of notices and invitations provided by the Company to the Bondholders will be sent by the Company to the Trustee as well. It should be clarified that such notices and invitations do not include the Company's ongoing public reports.

27.5. Any notice or demand on behalf of the Trustee to the Company or on behalf of the Company to the Trustee may be given by letter sent via registered mail at the address indicated in the Deed of Trust, or to another address notified in writing by one party to the other (including email address), or by fax transmission or by courier, and any such notice or demand shall be deemed received by the other party: (1) in the event of dispatch by registered mail – three (3) Business Days from the date of dispatch; (2) in the event of transmission by facsimile (along with telephone confirmation of receipt) - one Business Day from the date of dispatch; (3) in the case of sending it by means of a courier - upon its delivery by the courier to the recipient or upon the recipient's offer to accept it, as applicable; and (4) in the event of sending it by e-mail - upon receipt approval whereby the notice has been read (whichever is earlier).

**28. Waiver, Settlement, and Modification of the Deed of Trust**

Subject to the provisions of any law, except with respect to (1) dates and payments under the terms of the Debentures; (2) the interest rate adjustment mechanisms, including the Additional Interest Rate resulting from noncompliance with financial covenants and changes in the rating; (3) the terms of repayment of the Debentures and grounds for immediate repayment of the Debentures; (4) reducing the interest rate denominated in the Debentures; (5) waiver of payments and reports which the Company is required to provide the Trustee with; (6) The provisions relating to the expansion of a series; (7) financial covenants and financial conditions; (8) restrictions on distribution (9) a limit on the area of activity; (10) the appointment of a representative; (11) Expense Cushion (12) provisions of Section 6 of the Deed; (13) provisions regarding transactions with Controlling Shareholders; and (14) restrictions on the Company's activity, as detailed in Section 5.9 of the Deed; the Trustee may, from

time to time and at any time where, in his opinion, the rights of Holders of the Series A Debentures are not violated, waive any breach or non-fulfillment of any of the terms of the Debentures or the non-fulfillment of any of the provisions of the Deed of Trust by Company.

Subject to the provisions of any law and with the prior approval of the Bondholders by a special resolution, the Trustee may, either before or after the Principal of the Debentures (Series A) is payable, compromise with the Company in connection with any right or claim of the Holders of the Series A Debentures, waive any right or claim of the Holders of the Series A Debentures or any of them against the Company in accordance with the Deed of Trust and the Debentures (Series A), and agree with the Company with any arrangement of their rights, including waiver of any right or claim of the Bondholders(Series A) or any of them against the Company under this Deed.

In the event the Trustee has reached a compromise with the Company, waived any right or claim of the Holders of the Series A Debentures or consented to the Company regarding any arrangement of the rights of the Holders of the Series A Debentures after obtaining the prior approval of the Holders of the Series A Debentures as stated above, the Trustee shall be exempt from liability for doing so, which was approved by the General Meeting, provided the Trustee committed no breach of the fiduciary duty nor acted in bad faith or with malice in implementing the decision of the General Meeting.

Without derogating from the foregoing, subject to applicable law, the Company and the Trustee shall be entitled either before or after the Principal of the Debentures is called for repayment, to modify the Deed of Trust and its appendices (including the terms of the Debentures (Series A)), if one of the following occurs:

28.1. The Trustee is convinced that the modification does not prejudice the Holders of the Debentures, (except with respect to the list of subjects specified in subsections (1) to (14) at the beginning of Section 28 above, regarding which the Trustee is not entitled to agree to modifications and/or concessions therein or with respect thereto), provided he gave a written notice thereof to the Holders Debentures (Series A).

28.2. The change was approved by the Holders of the Series A Debentures by a Special Resolution.

The provisions hereof may also be amended as part of a settlement under Section 350 of the Companies Law and/or debt restructuring under the Insolvency and Economic Rehabilitation Law.

Without derogating from the above, the terms of the Debentures may also be changed within the framework of an arrangement or compromise, which has been approved by the court, under the Insolvency Law or within the framework of liquidation proceedings under the Eighth Chapter of the Companies Law or as part of insolvency proceedings according to other law to the extent that it is taken (and this without detracting from the obligations of the Controlling Shareholders, the officers and the Company, as specified in section 33 hereof).

The Company shall provide all Debentures Holders with a notice by means of reporting through the Magna System of any such change, to the extent possible after implementation thereof.

In any event of exercise of the right of the Trustee under this Section above, the Trustee may require the Holders of the Series A Debentures to provide him or the Company with the Debenture Certificates, in order to record a note regarding any waiver, compromise,

modification or amendment as aforesaid, and at the request of the Trustee, the Company shall record a such note on the certificates submitted to it. In any event of exercising the Trustee's right pursuant to this Section, the Trustee shall notify the Holders of the Series A Debentures about it in writing, within a reasonable time.

**29. <u>The Register of Bondholders</u>**

29.1. The Company shall keep and maintain at its registered office a Register of Bondholders (Series A) in accordance with the provisions of the Securities Law, which will be open for anyone's review.

29.2. The following details will be recorded in the Register:

29.2.1. The number of Debentures issued to the public, stating the series, par value and repayment date.

29.2.2. The number of Debentures held by all Bondholders.

29.2.3. Name, ID and address of each Holder of Debentures.

29.2.4. The date of issuance of the registered Debentures or the date of transfer to the Holder, as applicable.

29.3. Each transfer of ownership of the Debentures will be recorded in the Register. Any person, including the Trustee and all Bondholders, shall be entitled to review the Register at any reasonable time.

29.4. The Company shall not be required to record in the Register of Bondholders (Series A) any notice regarding an explicit, implied or estimated trust, or regarding any pledge or encumbrance of any kind or regarding any equitable right, claim or right of set-off or any right in relation with the Debentures (Series A). The Company shall solely acknowledge the ownership of the person on whose behalf the Debentures have been registered, provided that the legal heirs of the person in the name of whom the Debentures were registered, the administrators or executors and any person who shall be entitled to the Debentures due to bankruptcy of the registered Holder (and if it is a corporation - due to its dissolution) shall be entitled to be registered as Holders therein after providing evidence which, in the opinion of the Company, shall be satisfactory to prove their right to register as Holders of the relevant Debentures.

**30. <u>Release</u>**

When proven to the satisfaction of the Trustee that the Debentures (Series A) have been repaid, redeemed or when the Company deposits in trust sums of money which shall be sufficient to fully redeem the Debentures in Pari (and default interest, if applies) and under the Deed of Trust, and, when proven to the satisfaction of the Trustee that its full remuneration and expenses made by the Trustee and/or his delegates in connection with his actions pursuant to the Deed of Trust and according to its provisions, have been paid in full, then the Trustee shall be obligated, at the first demand of the Company to act with respect to the funds deposited with it, relating to the Debenture (Series A) which redemption has not been required according to the conditions set out in this Deed.

**31. <u>Appointment and Expiration of the Term of Office of the Trustee, his Roles and Powers</u>**

31.1. The Company hereby appoints the Trustee as trustee for the Holders of the Series A Debentures only, in accordance with Section 35 of the Securities Law.

31.2. The term of appointment of the Trustee will be up to the date of a Meeting of the Holders in accordance with Section 35 (a 1) of the Securities Law.

31.3. From the date this Deed of Trust becomes effective, the functions of the Trustee will be in accordance with the law and with this Deed.

31.4. The Trustee shall act in accordance with the provisions of any law, inter alia, the Securities Law and the guidelines of the Securities Authority.

31.5. The Trustee shall represent the Holders of the Series A Debentures in any matter arising from the Company's liabilities to the Holders, and may, for that purpose, exercise the rights of the Holders under the Securities Law or the Deed of Trust.

31.6. The Trustee may take any proceedings to protect the rights of the Holders in accordance with any law and as specified in this Deed of Trust.

31.7. The Trustee may appoint delegates as specified in Section 25 of the Deed.

31.8. The Trustee's actions shall be effective, notwithstanding if a flaw is detected in his appointment or qualification.

31.9. The signature of the Trustee on the Deed of Trust does not constitute an expression of opinion on the part of the Trustee regarding the nature of the offered securities or the advisability of investing in them.

31.10. Subject to the provisions of any law, the Trustee is not obligated to act in any manner not expressly specified in Deed of Trust, so that any information, including about the Company and/or in connection with the Company's ability to meet its obligations to the Holders of the Debentures, which will become known to the Trustee, nor is it his role to do so.

31.11. Subject to the provisions of any law and the provisions of the Deed of Trust, the Trustee undertakes, by signing this Deed, to keep confidential any information provided to him by the Company and which he receives under any law, as may be from time to time, and not to reveal it to another, nor make any use of it, unless the disclosure or the use is necessary for the discharge of his duties under the Securities Law, under the Deed of trust, or by court order or to protect the rights of the Bondholders, provided however that such disclosure of information is reduced to the minimum extent and scope necessary to meet the requirements of the law. And this will not infringe on the rights of the bondholders, and that the Trustee coordinates with the Company in advance, to the extent possible and permitted, the content and timing of the disclosure, in a manner providing the Company with reasonable time to apply to the court, if so required in order to prevent such disclosure of information. The duty of confidentiality, as stated, shall also apply to any delegate of the Trustee (including any consultant, counsel, etc.). It is clarified that the transfer of information to the Bondholders for purposes of making a decision regarding their rights under the Debentures or providing a report on the condition of the Company, does not constitute a violation of the confidentiality obligation of the Trustee as aforementioned.

31.12. The Trustee may rely, in the framework of his trust, on any written document, including a written instruction, notice, request, consent or approval, purporting to be signed or issued by any person or body, which the Trustee believes in good faith that it was signed or issued by it.

31.13. <u>Termination of Office</u>

31.13.1. The termination of office of the Trustee shall be subject to the provisions of the Securities Law.

31.13.2. The Trustee may resign from its office whenever it wishes to do so, after giving written notice to the Company, specifying the reasons for the resignation. The resignation of the Trustee will not become effective unless approved by the court, and from the day fixed for this purpose by the court.

31.13.3. Notwithstanding the foregoing, Holders holding five percent of the outstanding balance of the Debentures are entitled to convene a Holders Meeting, and the Meeting is entitled to decide to remove the Trustee from office, provided that Bondholders holding by themselves, or by their proxies, at least fifty percent (50%) of the outstanding balance of the Debentures in circulation are present, and with respect to adjourned Holders Meeting – provided that Bondholders holding by themselves or by their proxies at least ten percent (10%) of the said balance are present, and that the decision was adopted by a majority of seventy-five percent (75%) of the outstanding balance of the Debentures represented at the vote, or by the same majority at an Adjourned Meeting at which Bondholders holding by themselves or by their proxies at least ten percent (10%) of the said balance are present.

31.13.4. In the event the Trustee's term of office has expired, a new trustee will be appointed at a Holders Meeting, in his place.

31.13.5. Subject to the provisions of any law, the Trustee whose term of office has expired will continue to serve in office until the appointment of another trustee. The Trustee will transfer to the new trustee all the documents and the sums accumulated in connection with the trust, which is the subject of this Deed, and sign any document required for that purpose. Any new trustee will have the same powers, duties and authorities, and may act in all respects, as if he were appointed as trustee in the first place.

31.14. Each new Trustee shall have the same powers, authorities and authorizations as those of the Trustee whose term of office has expired, and it may act, for all intents and purposes, as if it was appointed as Trustee in the first place. It shall be clarified that the Trustee's obligation to take actions in accordance with the Deed of Trustee and the Debenture will not expire before the end of the transfer of the trust funds, assets and rights, if any, to the new Trustee. The Trustee undertakes to act in cooperation with the Company and the substitute trustee for the purpose of such transfer. It should be clarified that nothing in the termination of the office of the Trustee shall derogate from any rights, claims or allegations on the part of the Company and/or the Bondholders towards the Trustee, if any, the grounds thereof have

occurred prior to the date of termination of office of the Trustee, and nothing therein shall release the Trustee from any liability under any law.

31.15. The Company shall publish an immediate report in any case of resignation of the Trustee and/or the appointment of another trustee.

**32. Meetings of Bondholders**

Meetings of Holders of Debenture (Series A) shall be conducted as stated in the **Second Schedule** of this Deed.

The Trustee shall convene a Holders Meeting in accordance with Section 35L(A1) of the Law as may be from time to time. This provision shall remain in effect as long as the Law contains a non-dispositive requirement to convene such Meeting.

**33. Applicability of the Law and Jurisdiction; Undertaking of the Company, the Controlling Shareholders and the Company's officers**

The only law applicable to this Deed of Trust, including its appendices, is the Israeli law. In any matter not mentioned in this Deed and in the event of any inconsistency between the provisions of the law and this Deed, the parties shall act in accordance with the provisions of the Israeli law. In addition, in the event of any inconsistency between the provisions described in the shelf Offering Report in connection with this Deed and/or the Debentures, the provisions of the Deed shall prevail.

The sole and exclusive jurisdiction in all matters pertaining to this Deed and its appendices and to the Debenture attached as an appendix thereto shall be given to the competent courts of Tel Aviv - Yaffo. It is clarified that the realization of the liens granted within the framework of this deed will be done (to the extent that it is done) in accordance with the law applicable to them.

The Company, the Controlling Shareholders in the Company (present and future) and the officers in the Company (present and future), have undertaken and will undertake, respectively: that they will not object to the request of the Trustee/ the Holders of the Series A Debentures which shall be submitted to a court in Israel, in a procedure against the Company, for applying the Israeli law to compromise, arrangement and insolvency in connection with the Company (including liquidation), if submitted, will not apply on their own initiative to a court outside of Israel in order to receive protection against a proceeding taken by the Trustee and/or the Holders of the Company's Debentures; and shall not object if a court in Israel shall seek to apply Israeli law regarding compromise or settlement and insolvency in connection with the Company (including liquidation); and will not raise claims against the local authority of the Israeli court in connection with the proceedings filed against the Company by the Trustee and/or the Holders of the Series A Debentures of the Company against the Company, including a class action and a derivative claim. In addition, the Company will not sign agreements with any parties, including employees of the Company, unless it is determined that proceedings in connection with a compromise, settlement and insolvency (including liquidation) against the Company will be initiated only in Israeli courts and in accordance with Israeli law.

In light of the above and subject to the fulfillment of the obligations of the Company, the Controlling Shareholders and officers (present and future, as the case may be), then insolvency proceedings, other than under Israeli law and/or in non-Israeli courts, may arise only from the claim of a foreign creditor. In this matter, it should be noted that insofar as a proceeding of insolvency arises, other than in accordance with Israeli law and/or in a foreign court, arising from a claim by a foreign creditor, the Company shall do its best claim "inappropriate forum," all subject to the law.

For the avoidance of doubt, it should be clarified that the obligations of the Controlling Shareholders and officers (present and future) as stated will also include an unequivocal undertaking not to initiate a process of insolvency under foreign law and/or a foreign court.

In light of the above and subject to the fulfillment of the obligations of the Company, the Controlling Shareholders and officers (present and future), as aforesaid, in the Company's understanding, the Company's insolvency process, not according to Israeli law and/or in non-Israeli courts, can only arise from a claim by a creditor who is not one of the aforementioned entities (the Company, the Controlling Shareholders and the officers).

In addition, the Company, Controlling Shareholders and officers of the Company (who are not residents of Israel) (present and future) undertake and will undertake (as the case may be) irrevocably, in writing, not to raise claims against the authority of the Securities Authority and/or the Administrative Enforcement Committee in Israel in respect of financial sanctions and/or administrative enforcement measures imposed on them by the Securities Authority and/or the Administrative Enforcement Committee in Israel, pursuant to Chapter H3 and/or H4 of the Securities Law, and they also undertake and will undertake in an irrevocable manner in writing to comply with the decisions of the Securities Authority and/or the Administrative Enforcement Committee in Israel, including without derogating from the generality of the foregoing, to pay the financial sanctions and/or payments to victims of breach that will be imposed upon them (if imposed) and act to correct the breach and prevent its recurrence.

In addition to the above, the Company undertakes to submit to the Trustee near the time of signing the Deed of Trust and no later than 2 Business Days, an irrevocable, written undertakings of the Company, the Controlling Shareholder and near the time of signing the Deed of Trust (as well as immediately and no later than 2 Business Days after a change in the Company’s Controlling Shareholders, as applicable) and of all additional officers on the date of execution of this Deed of Trust (as well as immediately and no later than 2 Business Days after the appointment of additional officers to the Company, as applicable), in their capacity as officers of the Company: (1) not to object to any request of the Trustee and/or the Holders of the Series A Debentures which shall be submitted to a court in Israel in a proceeding initiated against the Company, for applying the Israeli law regarding compromise or arrangement and insolvency (including liquidation) in connection with the Company, if submitted; (2) not to object if a court in Israel seeks to apply Israeli law to a compromise or settlement and insolvency (including liquidation) in connection with the Company; (3) not to raise claims against the local jurisdiction of the court in Israel in connection with proceedings filed by the Trustee and/or the Holders of the Company's Debentures against the Company, including a class action and a derivative claim; (4) not to apply to a court outside of Israel in a proceeding against the Company, at their own initiative in order to obtain protection from a proceedings initiated by the Trustee and/or the Holders of Debentures of the Company and not to voluntarily initiate, a process of insolvency against the Company under foreign law and in a place of jurisdiction other than Israel (5) not to raise arguments against the authority of the Securities Authority and/or the Administrative Enforcement Committee in Israel in connection with monetary sanctions and/or administrative enforcement measures imposed on them by the Israel Securities Authority and/or the Administrative Enforcement Committee in Israel, according to Chapter H3 and/or Chapter H4 of the Securities Law, and they undertake and will undertake in an irrevocable manner in writing to comply with the decisions of the Securities Authority and/or the Administrative Enforcement Committee in Israel, including without derogating from the generality of the foregoing, to pay the financial sanctions and/or payments to victims of breach that

will be imposed upon them (if imposed) and to take action to remedy the breach and prevent its recurrence. The aforesaid undertakings of the Company, officers and Controlling Shareholders of the Company will be referred to below as the "**Liabilities of the Company, Officers and Controlling shareholders**".

The Liabilities of the Company, Officers and Controlling shareholders as aforesaid will be published in an immediate report shortly after the issuance of the Debentures (Series A) or as the case may be and will be added in an immediate report regarding the appointment of the officer or regarding the change in control of the Company, as the case may be, which the Company will make public in accordance with the provisions of the law in Israel, as part of the pre-issuance reports and upon the appointment of each new officer and/or the entry of a new Controlling Shareholder, and all during the life of the Debentures (Series A).

The laws of the British Virgin Islands and the Company's Articles of Association do not restrict or prevent the registration of securities offered under this Prospectus, which may be freely traded on the Stock Exchange without any restrictions under the laws of the British Virgin Islands and the Company's Articles of Association.

In addition to the above, it should be noted that the Company, the Controlling Shareholders and officers of the Company, present and future, undertake irrevocably and will undertake irrevocably (as the case may be) not to raise claims against the applicability, validity or manner of application of Section 39A of the Securities Law.

For the avoidance of doubt it should be clarified and emphasized that the Controlling Shareholder and Officers' Obligations will include explicit irrevocable undertaking not to initiate, at their own initiative, insolvency proceedings against the Company under foreign law and in a place of jurisdiction which is not Israel.

The Officers' Obligations will be added as part of the Immediate Report concerning the appointment of the officer to be published by the Company in accordance with the law.

The Company agrees that approvals and notices signed by it by the Company or anyone acting on its behalf to the Trustee in connection with the Debentures and which will be sent to the Trustee as scanned documents by e-mail, the Trustee may present them as a source.

Without derogating from the aforementioned in this Section, it shall be clarified that the Company’s assets are located in the US, and therefore the processes of asset realization and insolvency of the Companies holding the Company’s assets, which are incorporated in the United States, will be performed according to the Laws of the United States.

**34. <u>General</u>**

Without derogating from the other provisions of this Deed and the Debentures (Series A), any waiver, extension, discount, silence, inaction (each one of them: "**Waiver**") by the Trustee with respect to the non-fulfillment or partial or incorrect fulfillment of any obligations to the Trustee pursuant to this Deed and the Debentures (Series A), shall not be deemed a Waiver by the Trustee on any right, but a consent limited to the special circumstances in which it has been given. Without derogating from the other provisions of this Deed and of the Debentures (Series A), any change in the obligations to the Trustee requires the prior written consent of the Trustee. Any other consent, whether orally or by way of waiver and inaction or any other way other than in writing, shall not be considered a consent. The rights of the Trustee under this Agreement are independent and unrelated to each other, and they are granted in

addition to any rights that arise and/or will arise to the Trustee under the law and/or an agreement (including this Deed and the Debentures (Series A)).

**35. Liability of the Trustee**

35.1. Notwithstanding the provisions of any law and the Deed of Trust, inasmuch as the Trustee acted to fulfill his duties in good faith and within reasonable time and verified the facts which a reasonable Trustee would have verified under the circumstances, he shall not be liable to the Holder for any damage caused to him as a result of the fact that the Trustee exercised his discretion under Sections 35 H (d1) or 35 I1 of the Securities Law, unless the plaintiff proves that the Trustee acted with gross negligence, with malice and/or in bad faith. It is clarified that in case of inconsistencies between the provisions of this Section and other provisions of this Deed of Trust, the provisions of this Section shall prevail.

35.2. Subject to any law, the Trustee shall use the trust, powers, privileges and powers conferred on him under this Deed, in its absolute discretion and shall not be liable for any damages caused by an error of the aforesaid discretion, made in good faith, unless a final judgment provides that the Trustee acted negligently (except for negligence exempt by law as it will be from time to time) or in bad faith or maliciously or contrary to this Deed.

35.3. In the event the Trustee acted in good faith and without negligence under Sections 35H (d 2) or 35H (d3) of the Securities Law, he shall not be liable due to the execution of said action.

**36. Addresses**

The addresses of the parties shall be as specified in the introduction to this Deed, or any other address regarding which an appropriate written notice shall be delivered to the other party.

**37. Consent to Magna**

In accordance with the provisions of the Securities Regulations (Signature and Electronic Reporting), 5763-2003, the Trustee hereby authorizes the authorized entity of the Company, to report this Deed of Trust electronically.

**IN WITNESS WHEREOF THE PARTIES HAVE AFFIXED THEIR SIGNATURE**

| ______________________________ | ______________________________ |
|---|---|
| **SIMAD Holdings Ltd.** | **Mishmeret Trust Services Ltd.** |
| ______________________________ | |
| **SIMAD Equities LLC** | |
| ______________________________ | |
| **Intermediate Simad 1 LLC** | |

# SIMAD Holdings Ltd.

## Appendix A

## The Pledged Real Estate Assets

| Property Group | Serial No, | Camp name | Property company | Company's holding rate in the Property Company | Operating Company | Company's holding rate in the Operating Company |
|---|---|---|---|---|---|---|
| **Group A** | C1 | Achim | Achim Landco LLC | 100% | Achim Operatingco LLC | 100% |
| | C5 | Chen-A-Wanda | BAHS Holdings LLC | [2]99% | BAHS Operating Inc. | [2]100% |
| | C6 | Club Getaway | Club Getaway Landco, LLC | 80% | Club Getaway Operatingco, LLC | 80% |
| | C7 | Country Roads | Country Roads Landco LLC | 99% | Country Roads Operatingco LLC | 99% |
| | C8 | Eagles Landing | Mill Road Landco LLC | 100% | Eagle's Landing Day Camp LLC | 100% |
| | C9 | Echo | SHAB Holdings LLC | 100% | Shab Operating Inc | 100% |
| | C10 | Green Lane | Green Lane Landco, LLC | 51% | Green Lane Operatingco, LLC | 51% |
| | C11 | Malka | Greenvilleland LLC | 100% | Malka Operatingco LLC | 100% |
| | C15 | Lavi | Lavland LLC, | 99% | Lavco LLC | 99% |
| | C17 | Meadowbrook | Meadowbrook Landco LLC | 99% | Meadowbrook Operatingco LLC | 99% |
| | C20 | Mogenavco | Mogenavland LLC | 100% | Mogenavco LLC | 100% |
| | C21 | Mohawk | Mohawkland LLC | 100% | Mohawkcampco LLC | 100% |
| | | | | | Mohawk Country Day School, Inc. | 100% |
| | C25 | Rolling Hills | Rolling Hills Landco LLC | 99% | Rolling Hills Operatingco LLC | 99% |
| **Group B** | C2 | Banner | Banner Landco LLC | 90% | Banner Operatingco LLC | 90% |
| **Group C** | C13 | Island Lake | Island Lake Landco LLC | 99% | Island Lake Campco LLC | 99% |
| **Group D** | C16 | Lokanda | RDM Camps, LLC | 75% | - | - |
| **Group E** | C12 | IAFA | Iafalandco, LLC, | 99% | IAFAOPERATINGCO, LLC | 99% |
| | C18 | Med-O-Lark | Camp Med-O-Lark, Inc | 100% | Washington Lake, LLC | 99% |
| | C22 | New England Golf & Tennis (Belgrade) | Belgrade Lakes Summer Camps, LLC | 99% | - | - |
| | C23 | North Star (Poland) | , Poland Landco LLC | 99% | Poland Campco LLC | 99% |
| | C28 | Waukeela | Waukeela Landco LLC | 99% | Waukeela Operatingco LLC | 99% |
| | C29 | Wekeela | Wekeeland, LLC | 99% | Mainewekeelaco LLC | 99% |
| | C31 | Windsor Mountain | , WM Land LLC | 51% | WM Camp, LLC | 51% |
| **Group F** | C19 | Mesorah | Mesorahland LLC | 75% | Mesorahco LLC | 75% |
| | C24 | Pine Forest | Pine Forest Landco LLC | 99%[3] | Pine Forest Campco LLC | 99%[3] |

2 In accordance with contractual agreements, the actual holding rate is 51%.
3 In accordance with contractual agreements, the actual holding rate is 79%.

# SIMAD Holdings Ltd.

## Appendix B

## Manner of Calculating the Financial Covenants

See below an example, for illustration purposes only, based on the Company's Proforma Financial Statements as of September 30, 2025 (assuming the completion of the assigning of the Transferred Rights to the Company, including the payment of the cash component with respect thereto (as is set forth in Section 7.1.6 to the Prospectus)) detailing the Company's compliance with the main financial covenants set forth in the Deed of Trust:

| Section | Financial covenant | According to Section in the Deed of Trust | | | Manner of calculation and results as of September 30, 2025 (financial data in USD thousands) | | |
|---|---|---|---|---|---|---|---|
| | | **Section 5.7 to the Deed of Trust regarding the calling for an immediate repayment** | **Section 5.3 to the Deed of Trust with respect to the adjustments to the Interest Rate** | **Section 5.5 to the Deed of Trust with respect to restrictions on dividend distribution (*)** | | | |
| 1 | Equity | Shall not fall below $100 million | Shall not fall below $120 million | Shall not fall below $180 million | Equity (including minority interest) | 169,367 | **169,367** |
| 2 | Adjusted Net Financial Debt to Net CAP | Shall not exceed 75% | Shall not exceed 70% | Shall not exceed 68% | Adjusted Net Financial Debt | 219,103 | **56.4%** |
| | | | | | Net CAP | 388,471 | |
| 3 | Adjusted Net Financial Debt to Adjusted EBITDA | Shall not exceed 17 | Shall not exceed 15 | Shall not exceed 12 | Adjusted Net Financial Debt | 219,103 | **5.04** |
| | | | | | Adjusted EBITDA | 43,441 | |
| 4 | LTV in the Pledged Corporation (**) | - | Shall not exceed 72.5% | Shall not exceed 72.5% | Liability value of the Debentures | 170,599 | **62.4%** |
| | | | | | Value of the Pledged Assets | 273,500 | |
| 5 | Debt Yield of the Pledged Assets (**) | - | Shall not fall below 8.5% | Shall not fall below 9% | Liability value of the Debentures | 170,599 | **15.9%** |
| | | | | | Adjusted EBITSA of the Pledged Assets | 27,155 | |

(*) For further restrictions on distribution, see Section 5.5 to the Deed of Trust.

(**) Assuming the issuance of NIS 564 par value Debentures (Series A) and the pledging of the assets set forth in Groups A, B and C of Appendix A to the Deed of Trust.

See below information regarding the manner of calculating the EBITDA under the Deed of Trust:

| | For a period of nine months ending September 30, 2024 | For a period of year ending December 31, 2024 | For a period of year ending September 30, 2025 |
|---|---|---|---|
| | (in USD thousands) | | |
| Operating profit | 39,528 | 22,047 | 42,608 |
| Pluss depreciation and amortization | 11,420 | 15,187 | 12,688 |
| The Company's share in the profits of Companies treated according to the Equity Method | (2,092) | (1,522) | (1,987) |
| Financing income | 315 | 413 | 1,186 |

| | For a period of nine months ending September 30, 2024 | For a period of year ending December 31, 2024 | For a period of year ending September 30, 2025 |
|---|---|---|---|
| | (in USD thousands) | | |
| The Company's share in the EBITD of Companies treated according to the Equity Method | 2,438 | 2,008 | 2,359 |
| The Company's share in the financing income of Companies treated according to the Equity Method | 5 | 15 | 53 |
| **Adjusted EBITDA for the period** | **51,614** | **38,148** | **56,907** |
| **Adjusted EBITDA on an annual basis** | **43,441** | | |

**SIMAD Holdings Ltd.**

**First Schedule**

**Certificate of Debentures (Series A)**

**Debentures (Series A) registered in name**

Number of Certificate: ____________________

Par Value of this Debenture: NIS ___________

Registered Holder of this Debenture: ____________

1. This Certificate attests that SIMAD Holdings Ltd. (the "**Company**") shall pay the Bondholders (Series A) interest and Principal payments on due dates, according to the terms of payment, to a Holder, as defined in the Terms and Conditions Overleaf, registered in the Debenture on the effective date for such payment, and all subject to and in accordance with all the other terms provided for in the Terms and Conditions Overleaf contained within the Deed of Trust, in respect of the Debentures (Series A) of November 27, 2025 (and the appendices attached thereto), which was executed between the Company on the one hand, and the Trustee for the said Debentures and/or anyone serving from time to time as trustee for the Bondholders (Series A) under the deed of trust (the "**Deed of Trust**") on the other hand.
2. This Debenture bears interest at the fixed annual interest rate, payable on the dates set forth in the Terms and Conditions Overleaf, and all as provided in the Terms and Conditions Overleaf.
3. This Debenture shall be traded on the Tel Aviv Stock Exchange Ltd.
4. This Debenture is issued as part of Series A Debentures having the same terms as the terms of this Debenture, subject to the Terms set forth under the and Conditions Overleaf and in accordance with the Deed of Trust; and said Debentures are secured by collateral as is set forth in Section 6 to the Deed of Trust.
5. It should be clarified that the provisions of the Deed of Trust shall constitute an integral part of the provisions of this Debenture and be binding upon the Company and the Holders of Debentures included in the said series. In any event of contradiction between the provisions of this Certificate and those of the Deed of Trust, the provisions of the Deed of Trust shall prevail.
6. The Principal payment and the last interest payment will be made against delivery of the Debenture to the Company at its registered office on the day of the payment, as provided in the Terms and Conditions Overleaf, or in any other place notified by the Company, the Company's announcement will be delivered no later than five Business Days prior to the payment date.
7. The Debentures (Series A) in circulation shall be equally ranked, pari passu, in connection with the Company's obligations under the Debentures (Series A), without any preferred right or priority of the one over the other.
8. Any transfer of Debentures is subject to the transfer restrictions set out in Section 7 of the Terms and Conditions Overleaf.

Signed by the Company on _________

______________________________

**SIMAD Holdings Ltd.**

**Terms and Conditions Overleaf**

1. **General**

1.1. The terms and expressions contained in this Part shall have the meanings ascribed to them in Section 1 of the Deed of Trust, unless explicitly determined otherwise.

1.2. The terms and conditions of the Debentures (Terms and Conditions Overleaf) constitute an integral part of the Deed of Trust, and the provisions of the Deed of Trust shall be deemed to have been explicitly included in the terms and conditions of the Debentures. In the event of inconsistencies between the provisions of this Certificate and those of the Deed of Trust, the provisions of the Deed of Trust shall prevail.

2. **The Debentures (Series A)**

2.1 The Debentures (Series A), registered in name, shall be repaid (Principal) in four (4) annual payments to be made on November 30 of each of the years 2026-2030 (inclusive). The first four payments shall constitute 2.5% of the Principal, and the fifth and final payment shall constitute 90% of the Principal. The Debentures (Series A) shall not be linked (Principal and Interest) to any index. The Debentures (Series A) shall bear an annual interest at a fixed rate of as shall be determined in the Supplementary Notice (but subject to interest rate adjustments, if any, resulting from the manner in which the Company does not comply with the financial covenants and/or resulting from a change in the rating of the Debentures (Series A); all, as it has been set forth in Sections 5.2 and 5.3 to this Deed).

2.2 Pursuant to the Stock Exchange Guidelines, the fact that the Principal of the Debentures is not linked to any index will not be altered throughout the term of the Debentures.

2.3 The Interest on the outstanding balance of the Debentures (Series A) shall be pain in semi-annual payments on May 31 and November 30 of each of the years 2026 to 2030 (inclusive). The first Interest Period of the Debentures (Series A) shall commence on the first Trading Day following the date of reporting on the results of the initial offering of the Debentures and shall end on the day preceding the first payment date of the Debentures (*i.e.*, on May 30, 2026). The interest for the first Interest Period shall be calculated according to the number of days in said period based on 365 days a year.

Interest payments after the first interest payment will be in the amount of the annual interest divided by two (the number of interest payments per year) and will be paid for a period of six (6) months, beginning on the day of payment and ending the day before the next payment.

2.4 For information on the interest adjustment mechanism to be used upon a change in the rating of the Debentures (Series A), see Section 5.2 of the Deed of Trust. For information on the interest adjustment mechanism to be used upon changes in the Company's compliance with financial covenants assumed by the Company, see Section 5.3 of the Deed of Trust. For details regarding the Company's entitlement to early redemption of the Debentures (Series A), see Section 7 of the Deed of Trust.

2.5 The Annual interest rate, the semi-annual interest rate and the interest rate for the First Interest Period of the Debentures (Series A) shall be specified in an Immediate Report to be published by the Company with respect to the results of the initial offering of the Debentures (Series A).

2.6 The last payment of interest on the Principal of the Debentures (Series A) shall be made together with the last payment on account of the Principal of the Debentures (Series A), against delivery of Debenture Certificates to the Company.

2.7 If after the date of the initial offering of the Debentures (Series A), the Series is expanded by the Company, the Holders of Debenture (Series A) issued in the framework of the Series A expansion shall not be entitled to receive payment on account of Principal and/or interest on the Debentures (Series A), of effective date for payment thereof occurs prior to the date of the offering thereof.

**3. <u>Principal and Interest Payments for the Debentures (Series A)</u>**

3.1 Payments on account of Principal and/or interest on the Debentures (Series A) shall be made to persons whose names will be recorded in the Register (as defined in Section 1 of the Deed of Trust) on May 19 and November 19 for each relevant period preceding the maturity date of the such payment (any such date shall be referred to as the: "**Effective Date**"). Notwithstanding the foregoing, the last payment on account of Principal and interest on the Debentures (Series A) shall be made against delivery of Debenture Certificates to the Company on the payment date, at the registered offices of the Company or any other place to be notified by the Company. The Company's notice mentioned above will be published no later than five (5) Business Days prior to the last payment date.

3.2 It shall be clarified that anyone who is not registered in the Register on the Effective Date shall not be entitled to interest payment in respect of the Interest Period commencing prior to that date.

3.3 In any event where the date of the payment on account of the Principal and/or interest occurs on a non-Business Day, the payment date will be postponed to the first following Business Day, at no extra charge, and the Effective Date for the purpose of determining entitlement to redemption or interest will not change because of it.

3.4 Any payment on account of Principal and/or interest to be paid later than seven (7) Business Days from the date prescribed for payment thereof under the terms of the Debentures (Series A), for reasons within the Company's control, shall bear default interest starting from the date prescribed for payment of the late payment and until actual payment thereof. In this respect, default interest means an annual interest at the rate equal to the rate of interest on the Debentures (Series A), together with 3.5% per year. In such case, the Company shall file an immediate report, at least two (2) Business Days prior to the unpaid Principal and interest payments, specifying the accurate rate of default interest and the new payment date.

3.5 The payment to eligible Holders shall be made by check or bank transfer credited to the bank account of the persons whose names will be listed in the Register and noted in the details provided to the Company in writing beforehand, in accordance with Section 3.6. In case the Company fails to pay a certain amount to those entitled to it, for reasons beyond the Company's control, the provisions of Section 14 of the Deed of Trust shall apply.

3.6 A registered Holder of Series A Debentures shall notify the Company of the details of the bank account to be credited with payments due to them under the Debentures as specified above, or of changes in the said bank account or in its address, as applicable, by a written notice sent by registered mail to the Company. The Company shall be obliged to act upon the Holder's notice regarding such changes after fifteen (15) Business Days have passed from the date his notice was accepted by the Company.

3.7 In case a Bondholder eligible to such payment does not provide the Company with details of its bank account, each payment on account of the Principal and/or interest shall be made by check to be sent via registered mail to its last address recorded in the Register. Sending a check to an eligible Holder via registered mail as stated shall be deemed for all intents and purposes a payment of the amount stated in the check on the date of delivery thereof by mail, provided it is paid upon proper presentation thereof for collection.

3.8 All mandatory payments required by law shall be deducted from each payment in respect of the Debentures (Series A).

**4. <u>Refraining from Payment on Grounds not under Control of the Company</u>**

For details regarding refraining from payment on grounds beyond the Company's control and regarding deposits with the Trustee, see Section 14 of the Deed of Trust.

**5. <u>Register of Holders of Debentures</u>**

For details regarding the Register of Holders of the Series A Debentures, see Section 29 of the Deed of Trust.

**6. <u>Split of the Debenture Certificates</u>**

6.1 In respect of the Debentures (Series A) registered in the name of one Holder, one Certificate will be issued to him, or, at his request, a reasonable number of Certificates will be issued to him.

6.2 Any Debentures Certificate may be split into Certificates of Debentures with a total par value equal to the sum of the par value of the Certificate the split of which has been requested, provided that said Certificates are only issued in a reasonable amount. The split will be made against delivery of the Debenture Certificate, along with a written request signed by the registered Holder, to the Company at its registered office for purposes of execution of the split. All costs involved in the split, including taxes and fees, if any, will be borne by the Holder requesting the split.

**7. <u>Transfer of the Debenture</u>**

The total par value amount of the Debentures, and even part thereof, can be transferred, provided it is denominated in whole New Israeli Shekels. Any transfer of Debentures held by a Holder registered in the Bondholders Register shall be made in accordance with a transfer deed, drafted in acceptable form and duly signed by the registered Holder or his lawful representatives, as well as by the transferee or his lawful representatives, to be submitted to the Company at its registered office, together with certificates of the Debentures transferred thereunder, and any other reasonable proof that shall be required by the Company to prove the right of the transferor to transfer them. If a tax or any other mandatory payment applies to the transfer deed, evidence of payment thereof shall be submitted to the Company, to the Company's satisfaction. The Company's Articles of Association applicable to the transfer of fully redeemed shares and assignment thereof, shall apply, *mutatis mutandis*, as applicable, with respect to the manner of transfer and assignment of the Debentures as stated. In the event of a transfer of only part of the par value amount stated in the Debenture Certificate, then first, the Certificate will be split, according to the provisions of Section 6 of this Schedule, into the required number of Debenture Certificates, in such a manner that the total par value stated therein shall be equal to the par value amount stated in the said Debenture Certificate. After meeting the above conditions, the transfer shall be registered in the Register and the Company shall be entitled to request that a note regarding

said transfer will be recorded on the transferred Debenture Certificate to be delivered to the recipient of the transfer, or that a new Debenture Certificate shall be issued to him, and all the conditions set out in the Deed of Trust and in the Debentures shall apply to the transferee, thus whenever the term "Holder" is used, it shall mean "the transferee", and such transferee shall be deemed a "Holder" for the purposes of the Deed of Trust.

All expenses and fees related to the transfer shall apply to the party requesting the transfer.

**8. <u>Replacement of Debenture Certificates</u>**

In the event that the Debenture Certificate is defaced, lost or destroyed, the Company shall be entitled to issue a new certificate in its stead, under the same terms. Taxes and other levies as well as other expenses involved in the issue of the new certificate shall apply to the applicant of the said certificate (including expenses related to proving its ownership of the Debenture, and in connection with indemnity and/or insurance coverage to be requested by the Company, if requested, in connection therewith). In case of wear and tear, the defaced certificate will be returned to the Company simultaneously with and against the issue of a new certificate.

**9. <u>Early Redemption</u>**

For details about early redemption of the Debentures at the initiative of the Stock Exchange and/or the Company, see Section 7 of the Deed of Trust.

**10. <u>Waiver, Compromise and Changes in the Deed of Trust</u>**

For details regarding the power to waive, compromise and/or change the terms of the Deed of Trust, see Section 28 of the Deed of Trust.

**11. <u>Meetings of the Holders of Debentures</u>**

Meetings of Holders of the Series A Debentures will convene and be held in accordance with the Second Schedule of the Deed of Trust.

**12. <u>Immediate Repayment</u>**

For details on immediate repayment of the Debentures, see Section 8 of the Deed of Trust.

**13. <u>Notices</u>**

For details on notices, see Section 27 of the Deed of Trust.

**14. <u>Applicable Law and Jurisdiction</u>**

For details regarding applicable law and jurisdiction, see Section 33 of the Deed of Trust.

**SIMAD Holdings Ltd.**

**Second Schedule**

**Meetings of the Holders of the Series A Debentures**

1. **Entitlement to Convene a Meeting**

1.1. The Trustee or the Company may convene a meeting of the Bondholders at any time. In the event the Company calls a Meeting of the Holders of the Debentures, it must immediately send a written notice to the Trustee specifying the place, date and the time of the Meeting as well as the issues to be discussed at the Meeting, and the Trustee or any representative on his behalf will be allowed to participate at such Meeting without having the right to vote.

1.2. The Trustee shall be obliged to convene such Meeting at the request of one or more Holders holding at least five percent (5%) of the outstanding Principal balance of the Debentures. In the event those who requested to convene the Meeting are Bondholders, the Trustee may demand indemnification for reasonable expenses involved.

1.3. It shall be clarified that a claim for indemnification by the Trustee shall not interfere with the convening of a Meeting convened for the purpose of taking an action designed to prevent violation of the rights of the Bondholders and such demand for indemnification shall not derogate from the Company's obligation to bear the expenses involved in convening the Meeting.

1.4. The Trustee shall convene a Meeting within twenty one (21) days from the date of the request to convene such Meeting, for a date to be determined in the notice convening the Meeting, provided that the date of the Meeting is not earlier than seven (7) days and not later than twenty one (21) days from the date of the notice convening the Meeting; however, the Trustee may precede the convening of the Meeting, at least one day after the date of the date of the notice convening the Meeting, if the Trustee deems it necessary to protect the rights of the Holders; if the Trustee did so, he will specify in the notice Convening the Meeting the reasons for preceding the date of the Meeting.

1.5. In the event the Trustee does not convene a Meeting of Holders at the demand of a Holder within twenty one (21) days from the date of such request, the Holder may convene the Meeting, provided the date of the Meeting is within 14 days from the end of the period for convening a meeting by the Trustee, and the Trustee shall bear the expenses incurred by the Holder in connection with the convening of the Meeting.

1.6. All Meetings of the Holders of the Series A Debentures will be held in Israel, at a place to be notified by the Company and/or the Trustee, and the Company will bear the costs of the place, provided such costs are reasonable. The Trustee may determine that the meeting shall be held by way of electronic means.

2. **The Convening of a Meeting and the Agenda of a Meeting**

2.1. A notice convening a Meeting on behalf of the Trustee for sole purposes of consultation with the Bondholders will be published at least one day before the date of the Meeting ("**Consultation Meeting**"). No agenda will be published with respect to a Consultation Meeting, and no decisions shall be adopted in such a Meeting.

2.2. A notice convening a Meeting other than a Consultation Meeting will be published in accordance with the Securities Law, as may be in effect from time to time, at least seven (7) days, but not more than twenty one (21) days prior to the convening of the Meeting ("**Invitation**").

2.3. The Trustee will determine the agenda of the Meeting of the Holders. One or more Holders of the Series A Debentures holding at least five percent (5%) of the unpaid balance of the Debentures (Series A), may request the Trustee to include an issue on the agenda of the Meeting of Holders to be convened in the future, provided the issue it is appropriate, according to the Trustee, to be discussed at such Meeting and that such request was submitted to the Trustee at least 7 Business Days prior to the date of convening the Meeting;

2.4. The Trustee may shorten the period preceding the Meeting up to at least one day after the date of the Invitation if he is of the opinion that delaying the Meeting constitutes or may constitute an injury to the rights of the Bondholders. If he did so, the Trustee will explain, in the notice convening the Meeting, the reasons for advancing the date of the meeting.

2.5. The Invitation shall specify, *inter alia*:

2.5.1. The place for convening the meeting;

2.5.2. The date and time for convening the meeting;

2.5.3. Details regarding the issues on the agenda. Description and details of the main facts required to understand each matter requiring a vote at the Meeting will be provided next to each issue on the agenda, as well as the wording of each proposed resolution and a condensed description thereof;

2.5.4. The majority required to pass a resolution with respect to each one of the issues on the agenda;

2.5.5. The effective date for participation at the Meeting which will be not less than three trading days and not more than fourteen days before the convening thereof.

2.5.6. The quorum required to open the meeting as specified in Section 3 of this Schedule;

2.5.7. Arrangements with respect to written votes;

2.6. The Trustee may determine that a meeting of Bondholders shall be held by electronic means.

3. **<u>The Quorum for Opening a Meeting and an Adjourned Meeting</u>**

3.1. Consultation Meetings shall be held with the attendance of any number of participants.

3.2. The Meetings of Holders of Debentures will open after it is proven that the quorum required for the Meeting is present.

3.3. Subject to the quorum required for a Meeting convened for passing a Special Resolution, and subject to the provisions of the Securities Law, the quorum for a Meeting of Holders is the presence of at least two (2) Holders of Debentures who hold at least twenty five percent (25%) of the outstanding par value balance of the Debentures in circulation at the time, within half an hour from the time appointed for the Meeting, unless otherwise required by the Law.

3.4. In the event that, within half an hour after the time set for opening the Meeting, no quorum is present, the Meeting will be postponed to a later date, which will not be earlier than two (2) Business Days after the date set for the original Meeting, or not earlier than one Business Day, if

the Trustee believes it necessary in order to protect the rights of Holders of the Debentures; In the event the Meeting is adjourned, the Trustee will explain, in a report regarding the convening of the Adjourned Meeting, the reasons thereof.

3.5. Except in connection with a Meeting convened for passing a Special Resolution and subject to the provisions of the Securities Law, or another Meeting with respect to which the Deed of Trust expressly provides for different provisions in relations to the following provisions, in the event where no quorum is present at the Adjourned Meeting after half an hour from the time fixed for opening the Meeting, the quorum shall be as follows:

3.5.1. If the meeting was convened by the Trustee - any number of participants;

3.5.2. If the meeting was convened due to the demand of the Holders or by the Holders, as specified in Sections 1.2 and 1.5 of this Schedule – the quorum will be one or more Holders of Debentures, who hold at least five percent (5%) of the voting rights in the series of the Debentures.

3.6. Debentures held by a Related Holder (as defined in Section 3.2 of the Deed of Trust) will not be taken into account when determining the quorum.

4. **The Chairman**

At any Meeting of Holders, the Trustee, or a person appointed by him, shall act as Chairman of that Meeting.

5. **Continued Meeting**

5.1. A Meeting opened shall be closed by a notice of the Trustee or the Chairman of the Meeting, and may consist of one or more sessions.

5.2. In a Meeting of Holders in which a quorum is present, the Chairman of the Meeting and/or the Trustee, may decide to hold another session, which will be held at another time and place to be determined by the Trustee ("**Continued Meeting**");

5.3. The Trustee shall be responsible for the publication of a notice regarding the time and place for convening the Continued Meeting, provided such notice is given at least twelve (12) hours prior to the convening of the Continued Meeting.

5.4. At the Continued or Adjourned Meeting, it is possible to discuss an issue that was on the agenda of the Original Meeting, regarding which no decision has been made as well as other issues. Discussion of such other issues will be subject to prior notice to be issued through the Magna System.

5.5. A holder who has not attended the Original Meeting may attend the Continued Meeting and vote on the issues brought for a vote (and the vote on which is not yet closed) and which will be brought for a vote, provided such Holder proves to the party convening the Meeting, his ownership of the Debentures which are the object of the Meeting as of the Effective Date of the Meeting as determined in the Invitation.

6. **Extraordinary Meetings**

In Meetings whose agenda includes a decision on an issue which, pursuant to the Deed of Trust or the Debenture, is subject to a Special Resolution, the quorum shall consist of the presence of Debentures Holders, by themselves or by proxies, who hold at least fifty percent (50%) of the balance of the par

value of the Debentures in circulation, or, at the Adjourned Meeting, the presence of the Bondholders, by themselves or by proxies, who hold at least twenty percent (20%) of the balance of the par value of the Debentures in circulation. The majority required for passing a Special Resolution (whether at the Original Meeting or at the Adjourned Meeting) is a majority of two-thirds (2/3) of the outstanding par value balance of the Debentures represented in the vote.

The quorum and majority required to pass a resolution of the Holders, at an Extraordinary Meeting, to call for immediate repayment of the Debentures (Series A), shall be as specified in Section 8.2.4 of the Deed.

7. **<u>Position Statements</u>**

7.1. The Trustee or one or more Holder of the Debentures, who holds at least five percent (5%) of the par value balance of the Debentures (Series A) may apply in writing to the Bondholders by a letter attached to the voting instrument in order to convince them of how to vote on the issues raised for discussion at that meeting (in this Schedule – the "**Position Statement**").

7.2. A Holder wishing to exercise the said right shall notify the Trustee during the session in which it was decided to put that issue up for vote, and shall transfer to the Trustee a Position Statement Within two Business Days prior to the last date for delivery of voting papers. The party convening the Holders Meeting will issue to the Holders the wording of the Position Statement as early as possible and no later than one Business Day after a Holder has delivered it to the party convening the Meeting.

7.3. In a Meeting convened due to a request of Bondholders or by Bondholders as described in Sections 1.2 and 1.5 of this Schedule, any Holder will be entitled to issue, through the Trustee, a Position Statement with respect to the issues on the agenda of the Meeting.

7.4. The Trustee and the Company shall be entitled, individually, to publish a Position Statement in response to the Position Statement sent pursuant to Sections 7.1 or 7.3 of this Schedule or in response to another request, to the Holders of the Debentures.

7.5. No Position Statements shall be published in Consultation Meetings.

7.6. The Position Statement will be prepared in a clear and condensed, simple and comprehensive language, and will include no more than 500 words for each issue on the agenda.

7.7. If the Position Statement was provided by a Holder, it must include the Holder's identity and percentage of its holdings of the Debentures or any other security of the issuer, the Controlling shareholder or affiliate thereof. If the Holder is a corporation, the Position Statement will include the identity of the controlling shareholder thereof and other holdings such controlling shareholder may have in securities of the issuer, the controlling shareholder or affiliate thereof, to the best knowledge of the Holder.

7.8. A Holder submitting a Position Statement, who acts in cooperation with others as regards the vote at the Holders Meeting, generally or with respect to one of the issues on the agenda, will mention this in the Position Statement and specify the cooperation arrangements and the identity of the Holders acting in cooperation. If the Holder or the person acting in cooperation with him has other interest in the results of the voting at the Holders Meeting, the nature of the other interest will be specified.

7.9. A Position Statement of a Holder who, at his request, the Meeting was convened under Section 35L1 of the Law, will include also the fact that the Holders Meeting was convened at his request.

7.10. The content of the Position Statement will only be the responsibility of the party submitting the Position Statement.

8. **Voting at the Meeting**

8.1. Voting at a meeting of Bondholders will only be on issues specified in the Invitation or in a notice in accordance with Section 5.4 above.

8.2. A Holder may vote in person, by a proxy appointed in accordance with this Schedule or by means of a Proxy Statement.

8.3. The Chairman of the Meeting may determine that the votes will be by way of Proxy Statements or by voting during the Meeting. In the event the Chairman stated that the vote will be by way of a Proxy Statement, the Trustee shall ensure, that the wording of the voting instrument will be distributed to the Holders, and will determine the date by which the voting will be closed, which is the date by which the Holders should send to voting instrument to the Trustee, duly completed and signed. A Holder who fails to fill out his voting instrument in full and/or who will not prove his entitlement to attend and vote at the Meeting in accordance with the provisions of the Second Schedule, shall be considered as having failed to deliver the voting instrument, and therefore has chosen not to vote on the issue/s provided in the voting instrument. A duly completed and signed voting instruments in which the Holder indicated his vote, and which arrived to the Trustee before the last date set for that purpose, shall be deemed presence at the Meeting for purposes of compliance with the quorum at the Meeting.

8.4. Unless otherwise expressly stated herein, the majority required for any decision of the General Meeting is a simple majority of the votes represented at the meeting and voting for or against. In addition, the Trustee may decide at his discretion, depending on the circumstances, whether a decision requires the approval of a majority other than a simple majority.

8.5. The Trustee will attend the Meeting without having a voting right. The Company will not participate in the Meeting, but will merely present issues, through its representatives, prior to the discussion, or its agents shall participate therein, inasmuch as the Holders wish to address questions to the Company, provided the Trustee was asked to do so a reasonable time beforehand. The Bondholders are entitled to attend and vote at any General Meeting in person or by proxy. In any vote of the Holders of Debentures the voting will be determined by the number of votes, thus each Holder of Debentures or his proxy shall be entitled to one vote for each NIS 1 par value of the total outstanding Principal of the Debentures by virtue of which he is entitled to vote. In the event of joint holders, only the vote of the Holder who asked to vote and is recorded first in the Register shall be entitled to vote, in person or by proxy.

8.6. A Bondholder or his proxy may vote in respect of part of his votes in favor of a specific proposed resolution, and in respect of another part, he may vote against, and in respect of another part he may abstain, at his discretion.

9. **Declaration of Holding a Resolution**

The declaration by the Chairman that a resolution has been passed or rejected, whether unanimously or by a certain majority, shall constitute prima facie evidence of the contents thereof.

No resolution duly passed at a Meeting convened as aforesaid may be disqualified, if by error the notice thereof has not been given to the Holders of less than ten percent (10%) of the outstanding balance of the Principal of the Debentures, or if such notice has not been received by Holders as provided above.

10. **The Letter of Appointment**

10.1. The letter of appointment that appoints a proxy and/or delegate shall be in writing and signed by the appointer or by his authorized representative who has been authorized in writing to do so. If the appointer is a corporation, the appointment shall be made in writing, signed with the stamp of the corporation together with the signature of an authorized signatory of the corporation. The letter of appointment of a proxy shall be made in any acceptable manner. A proxy does not have to be a Holder.

10.2. The letter of appointment and the power of attorney, or any other certificate under which the letter of appointment was signed, or a certified copy of such power of attorney, shall be deposited in the office of the Trustee, prior to the date of the Meeting for which the power of attorney has been issued, unless otherwise stated in the notice convening the Meeting. The Company may receive, at its request, a copy of the appointment letters and the said power of attorney.

10.3. A vote made in accordance with the conditions set forth in the letter appointing the proxy shall be valid even if prior thereto, the appointer has died or has been declared legally incompetent, or if the letter of appointment was canceled or if the debenture for which the vote was given, has been transferred, unless a written notice of the death, the declaration of incompetence, the cancellation or the transfer, as applicable, is received at the registered office of the Trustee, prior to the Meeting.

10.4. Any corporation that is the owner of a Debenture, may by means of a written and duly signed authorization empower any person it may deem fit, to act as its representative at any Meeting of the Holders, and the person so authorized shall be entitled to act on behalf of the corporation he represents.

11. **Minutes of Meetings**

11.1. The Trustee will prepare minutes of the Meeting of the Holders and will keep such minutes at its registered office for a period of seven (7) years from the date of the Meeting.

11.2. Minutes signed by the Chairman of the Meeting will serve as prima facie evidence of the matters listed therein, and as long as nothing to the contrary is proven, any resolution passed at such Meeting shall be deemed to have been duly received. The statement of the Chairman of the Meeting whether the decision was accepted or rejected, and the recording of this matter in the Register of minutes, shall serve as prima facie evidence of this fact.

11.3. The Register of minutes of Meetings of the Holders will be kept at the registered office of the Trustee and shall be open for review by the Holders of the Debentures, and a copy thereof shall be sent to all the Holders of Debentures who requested it.

11.4. The Trustee shall be entitled to delay delivery of minutes to any entity whatsoever, if, at his sole discretion, the delivery of the minutes, in whole or in part, may harm or result in harm to the rights of the Holders of the Series A Debentures.

12. A person or persons appointed by the Trustee, the Company's Secretary and any other person or persons so authorized by the Trustee may attend Meetings of Bondholders. In the event that, at the reasonable

discretion of the Trustee, a discussion must be held in part of the meeting without the presence of the Company's, then the representatives of the Company or anyone on behalf of a related Holder shall not participate in that part of the discussion.

13. The provisions set forth in this Schedule are subject to the provisions of the Deed of Trust.

14. This Schedule shall be subject to the Securities Regulations (Written Votes, Position Statements and Proving Ownership of Promissory Notes for the purpose of Voting at a Meeting of Holders of Promissory Notes), 5771-2015.

***

**SIMAD Holdings Ltd.**

**Third Schedule**

**Urgent Representation of the Bondholders**

To the extent an Urgent Representation of the Bondholders (Series A) is appointed with respect to noncompliance with one or more of the Financial conditions, the Company undertakes at the Urgent Representation and its actions shall be subject to the relevant provisions as is set forth in Appendix 5.2.4.4 to Chapter 4, Part 2, Section 5 to the Regulation Codex[4], as this shall be from time to time, or in any other circular and/or document that is set forth *in lieu* thereof. Furthermore, the Company undertakes to fully cooperate with the Urgent Representation and the Trustee, to the extent necessary, in order for them to carry out the required examinations, and formulate the resolution of the Urgent Representation, as well as to provide the Urgent Representation all the information and required documents with respect to the Company.

The Urgent Representation shall have the authority to grant a one-time extension to the Company with respect to the dates for complying with any of the financial conditions set forth in the Deed of Trust; this, for the period until the publishing of the Company's next Financial Statements close to the Financial Statements which indicated that the Company failed to comply with any of the financial conditions for two(2) consecutive calendar quarters, or for a period of up to ninety (90)days, the earlier. It is clarified that the period of time until the appointment of the Urgent Representation will be taken into account within the framework of the aforesaid extension, and it will not constitute ground for granting any additional extension to the Company beyond the aforesaid. It is further clarified that the activity of the Urgent Representation and the cooperation between its members will be limited to a discussion of the possible granting such an extension, and that no other information will be passed between the Members of the Urgent Representation that does not relate to such an extension.

The company undertakes to act in full cooperation with the urgent representation and the trustee, as much as necessary for the purpose of carrying out the tests required by them and formulating the decision of the urgent representation, and to transfer to the urgent representation all the data and documents it will require regarding the Company, when the information does not include any misleading details and is not incomplete.

If no urgent representation has been appointed as aforesaid, or if the urgent representation has decided not to grant the Company an extension as aforesaid, the Trustee shall be obliged to convene the Bondholders Assembly in accordance with the provisions of Section 8 to the Deed of Trust.

The Company shall bear the costs of the Emergency Representative, including the costs of employing consultants and experts by the Representative or on its behalf, in accordance with the provisions of Section 26 of the Deed.

The Emergency Representative shall act and decide on matters entrusted to it, at its absolute discretion and shall not be liable, it or any of its members, officers thereof, their employees or advisors, and the Company and the Bondholders hereby release them, with respect to any claims, demands and demands against them for having used or refrained from using the powers, authorities or discretion granted to them under and in

[4] The Regulation Codex – Principals for Business Management, Section 5, Part 2 – Capital Measurement and Risk Management. Chapter 4 – Management of Investment Properties, published by the Commissioner of Capital Markets, Insurance and Savings in the Ministry of Finance, as shall be from time to time.

connection with this Trust Deed or for any other action they have taken pursuant to it, except if they have acted maliciously and/or in bad faith.

# Chapter 3 – Share Capital of the Company

## 3.1. Details regarding the Share Capital of the Company as of the Date of the Prospectus

| Type of Share | Registered | Issued and Paid-in |
|---|---|---|
| Ordinary Shares with no Par Value | 50,000 | 1,000 |

## 3.2. Development of the Registered and Issued Capital of the Company from the Date of its Establishment

On May 28, 2025, the date of incorporation of the Company, the Company allocated 1,000 ordinary shares with no Par Value ("**Ordinary Shares**"),

Since the date of the Company's incorporation and till the Prospectus Publishing Date, no changes occurred in the registered and issued share capital of the Company.

## 3.3. Holdings of Interested Parties in the Securities of the Company

3.3.1. As of the date of this Prospectus, the issued share capital of the Company is held by Mr. David Shabsels and Mr. Michael Shabsels (the "**Controlling Shareholders**").

3.3.2. As of the publishing date of the Prospectus, the holding of the Company's shares shall be as follows:

| Name of the Shareholder | Number of ordinary shares of the Company with no par value to be held by the Controlling shareholders | Percentage of holding in the issued and paid in capital of the Company |
|---|---|---|
| David Shabsels | 500 | 50% |
| Michael Shabsels | 500 | 50% |

3.3.3. Holdings of Interested Parties and Senior Office Holders in securities of the Company, controlled entities, and affiliates of the Company

As described above, as of the date of publication of this Prospectus, the Controlling Shareholders hold 100% of the Company's Issued and Paid-Up Capital.

# Chapter 4 – Voting Rights Associated with the Company's Shares

**The following description constitutes the essence of the memorandum and articles of association of the Company with respect to voting rights attached to the Company's Shares. The Company's memorandum and articles of association will be available on the MAGNA site of the Israeli Securities Authority at: http://www.magna.isa.gov.il. The following description is not a substitute for a comprehensive studying of the Company's memorandum and articles of association.**

For information regarding the applicability of the provisions of the Securities Law, 5728-1968, and its regulations thereunder, as well as the various provisions of the Companies Law, 5759-1999 (the "**Companies Law**"), over the Company, see Sections 1.1 and 4.1 of the Prospectus.

The following details are arrangements under the provisions of Regulation 26(d) of the Securities Regulations (Details of the Prospectus and the Draft Prospectus – Shape and Form), 1969, that are set forth in the Articles of the Company and that are different from the relevant default arrangements in the Companies Law:

4.1. Articles 20 and 22 of the Companies Law – In accordance with the provisions of the Articles of Association: (a) the Articles of Association may be amended by a Resolution of the Board of Directors or by the Shareholders of the Company from time to time; (b) notwithstanding the aforementioned, the Board of Directors shall not have the power to amend the provisions of the Articles of Association: (1) if the provisions restrict the rights or powers of shareholders to amend the Articles of Association; (2) so that there is a change in the majority of shareholders required to pass a resolution to amend the Articles of Association; or (3) in circumstances where shareholders cannot amend the Articles of association.

4.2. Section 59 of the Companies Law – In accordance with the provisions of the Articles of Association, the Company's directors shall be appointed by a Resolution of the General Meeting of Shareholders or by a Resolution of the Board.

4.3. Section 61(a) of the Companies Law – The Articles of Association do not stipulate any obligation regarding the holding of an annual meeting.

4.4. Section 81 of the Companies Law – In accordance with the provisions of the Articles of Association: (a) The quorum required for commencing the General Meeting is the presence of a shareholder or shareholders, either in person or by proxy, entitled to exercise at least fifty percent (50%) of the relevant voting rights; (b) if half an hour after the time appointed for commencing the General Meeting no quorum has been established, the General Meeting shall be dissolved, or, at the discretion of the Chairman, the General Meeting shall stand adjourned to the same day the following week at the same time and/or place or day, hour and/or another place, according to the decision of the chairman. If half an hour after the time appointed to commence the adjourned General Meeting a quorum has not been established, the shareholders present shall establish a quorum; (c) Directors shall be entitled at any time before the date of the General Meeting to appoint any person to act as Chairman of the General Meeting, or, if the Directors have not made such a decision, the Chairman of the Board of Directors shall preside over the General Meeting. In the absence of such Chairman, or if he is not present fifteen (15) minutes after the time appointed for the commencement of the General Meeting or if he is unwilling to act as Chairman, the Directors present shall elect one of their number as Chairman of the General Meeting. If no Director is willing to act as Chairman of the General Meeting, or in the event that after fifteen (15) minutes from the time appointed for the

commencement of the General Meeting no Director is present, the shareholders present shall choose one of their number to be Chairman of the Meeting.

4.5. Section 222 of the Companies Law – In accordance with the provisions of the Articles of Association, a Director shall be appointed for a term as may be specified on his appointment or, in the absence of such a term specified, he shall be deemed to be appointed indefinitely.

4.6. Section 301 of the Companies Law – In accordance with the provisions of the Articles of Association, the Board of Directors of the Company may, by a Resolution of Directors, authorize a distribution by the Company at a time, and of an amount, and to any shareholders as they think fit, and if they are satisfied, on reasonable grounds that, immediately after said distribution, the Company's assets will outweigh its obligations and the Company will be able to pay its debts as they fall due.

4.7. Voting Rights Accompanying the Company's Shares

4.7.1. The Shares shall be divided into several classes and series as shall be decided by the Board of Directors from time to time, and until their distribution as aforesaid, they shall constitute one class and one series.

4.7.2. Each of the Company's Shares grants the Shareholder:

4.7.2.1. The right of voting on any Shareholders' Resolution;

4.7.2.2. The right to an equal share in any Dividend paid by the Company;

4.7.3. The right to an equal share in any Distribution of the Company's Surplus Assets upon liquidation; It shall be possible to issue Shares and other Securities at dates, to individuals, in the consideration and under the terms the Directors shall resolve upon by way of a Board of Directors' resolution. The aforesaid consideration can be in any form, pursuant to the Board of Directors' resolution, including monies, promissory note, or any other written undertaking for the transference of monies, property, real estate property, private property (including Goodwill and Knowledge), the provision of services or a contract for future services.

4.7.4. Shares shall not be issued in return to non-monetary consideration, unless the Directors reach a resolution stating:

4.7.4.1. The amount imputed to the issuance of the Shares;

4.7.4.2. The current reasonable monetary value of the non-monetary consideration for the issuance;

4.7.4.3. That in their view the current monetary value of the non-monetary consideration for the issuance is no less than the amount imputed to the issuance of the Shares.

**The description of the instructions of the Articles of Association listed in Chapter 4 above is a brief summary of the Articles of Association's instructions in relation to those subject matters and is not a substitute for an inspection of the full text of the Company's Articles of Association.**

# Chapter 5 – Comparison of Laws

**The following is a general and summary description of issues relating to the Israeli law, and issues relating to the applicable laws of the British Virgin Islands, which does not purport to be a complete description or an authoritative interpretation of the law, nor does it replace a professional advice.**

**The laws of the British Virgin Islands that apply to the Company are the BVI Business Companies Act, 2004 (hereinafter: the "BVI Law").**

**The reference in this Chapter to the BVI Law is in accordance with the Opinion of Maples & Calder Law Firm, which is included in this Chapter below both in the original language and in Hebrew translation. Maples & Calder Law Firm agreed to include the translation of its Opinion in the Prospectus. It should be noted that the Opinion includes additional provisions relating to the Companies Law of the British Virgin Islands that are not included in this chapter, in light of the application of Part B of the Fourth Schedule, as defined below.**

**The Company's Articles of Association include all of the provisions applicable to the Company by virtue of Section 39A(a) of the Securities Law, 5278-1968 (the "Securities Law"), including Section 350 of the Companies Law, as well as an article determining that the Company may refer disputes arising from agreements, commitments and such arrangements (all according to Israeli Law as mentioned above) to the exclusive jurisdiction of the courts in Israel (the "Israeli Jurisdiction Section"). In this regard, the Company received an opinion of a British Virgin Islands lawyer that the applying Section 350 of the Companies Law (mutatis mutandis), and the Israeli Jurisdiction Section to the Company's Articles of Association does not contradict the laws of the British Virgin Islands, the aforesaid opinion is attached to Chapter 11 of the Prospectus.**

5.1 **Subordination to the Israeli Companies Laws and the British Virgin Islands**

The Company was incorporated and registered outside of Israel under the applicable law in the British Virgin Islands, and not under the Companies Ordinance [New Version], 5743-1983 (the "**Companies Ordinance**") or the provisions of the Companies Law.

Due to the fact that certificates of indebtedness (nonconvertible) of the Company are being offered to the public in Israel under this Prospectus and will be registered for trading on the Stock Exchange, then, for as long as securities of the Company namely the Debentures offered under this Prospectus, are held by the public, the Company will be subject to the provisions of the Securities Law and the regulations promulgated thereunder, applying to companies incorporated outside of Israel, and whose securities are traded on the Stock Exchange in Israel or listed for trading thereon. Accordingly, the Company will report pursuant to the appropriate reporting provisions of the Securities Law and its regulations.

In addition, the provisions of Section 39A(a) of the Securities Law will apply to the Company, and as a consequence thereof, the Company will be subject to the various provisions of the Companies Law that apply to a company incorporated outside of Israel, which is offering its debentures to the public in Israel, including provisions concerning the appointment of external directors, an internal auditor and the audit committee, as specified in the Fourth Schedule (Part B) to the Securities Law. These provisions will apply in addition to the provisions of the

documents of incorporation of the Company[1] and the laws of the British Virgin Islands. It shall be noted that the Securities Authority may exempt such a company from provisions and regulations contained in the said Schedule, all or part thereof, if realized that the foreign law applicable to the Company sufficiently secures the interests of the investor public in Israel.

The Company (by signing this Prospectus), its current and future controlling shareholders and officers irrevocably undertake, and will irrevocably undertake, not to raise claims against the applicability, validity, or manner of implementation of Section 39A as aforesaid.

**The Deed of Trust and its appendices, as well as the Debentures, are subject to the provisions of the Israeli law[2]. The Deed of Trust determines that the only court authorized to hear matters related to the Company, pertaining to the Deed of Trust and its appendices and to the Debentures, attached, shall be the competent court in Tel-Aviv – Jaffa. In case of matters not mentioned in the Deed of Trust and in any event of contradiction between the provisions of the law and the Deed of Trust, the parties shall act in accordance with the Israeli law.**

**The Company (by signing this Prospectus), the Company's Controlling Shareholders (present and future) and the office holders of the Company (those currently serving and those who will serve in the future) undertook, and will undertake, accordingly, not to object to an application of the Trustee and/or the Debenture Holders, which would be filed with a court in Israel, pursuant to the application of the Israeli Law with respect to a settlement, arrangement and insolvency (including Liquidation), if any; they will not initiate an application with a court outside of Israel, in order to receive protection against any proceedings assumed by the Trustee and/or the holders of the Debentures of the Company; they will not object if a court in Israel shall seek to apply the Israeli law in the matter of settlement, arrangement and insolvency in connection with the Company (including Liquidation); and they will not raise claims against the local jurisdiction of the court in Israel as regards proceedings to be filed against the Company by the Trustee and/or the Debenture Holders of the Company, including class action and derivative action. Also, the Company (in signing this Prospectus) will not sign agreements with any party, including the Company's employees, unless set in the agreements that proceedings in connection with settlement, arrangement, and insolvency (including liquidation) against the Company will take place in Israeli courts and according to the Israeli law.**

**In light of the above and subject to compliance with the Company's undertakings, the Controlling Shareholders and office holders (present and future, as applicable), insolvency proceedings, not under Israeli law and/or in non-Israeli courts, can solely arise from claims of foreign creditors. In this regard it shall be noted that inasmuch as insolvency proceedings will be initiated, not under Israeli law and/or in a foreign court, arising from a foreign creditor, the Company will do its best and will argue for "Inappropriate Forum" and all subject to the law.**

In order to remove any doubt, it is hereby clarified that the undertaking of the Controlling Shareholders and the office holders of the Company (present and future), as stated, will

---

1 The Company's Articles of association contains sections applied to the Company by virtue of Section 39a of the Securities Law. It should be clarified that as of the date of the Prospectus, the Articles of Association do not include provisions that contradict a mandatory law of the British Virgin Islands.

2 In this matter, see Section 34 of the Deed of Trust to the Debentures (Series A) between the Company and the Trustee for the Debenture Holders, attached as Appendix B to Chapter 2 of the Prospectus (the "**Deed of Trust**").

explicitly include an irrevocable undertaking not to initiate a proceeding of insolvency according to any foreign law and/or in a foreign court.

In light of the aforementioned and subject to the execution of said Undertakings of the Company's Controlling Shareholders and officers (present and future), then per the Company's understanding, the process of insolvency of the Company, not under the Israeli law and not in Israeli courts, can arise only from a claim of a creditor which is not one of those mentioned above (the Company, the controlling shareholders and officers as stated).

Additionally, the Company (by signing this Prospectus), its holders in control and the office holders[3] of the Company (present and future), irrevocably do and will undertake (as applicable) not to raise claims against the authority of the Securities Authority and/or the Israeli Administrative Enforcement Committee in connection with financial sanctions and/or administrative means of enforcement that will be imposed on them by the Securities Authority and/or the Israeli Administrative Enforcement Committee, pursuant to Chapter H3 and/or Chapter H4 of the Securities Law, and they also irrevocably undertake at present and in the future to comply with the decisions of the Securities Authority and/or the Israeli Administrative Enforcement Committee, *inter alia*, without derogating from the generality of the foregoing, to pay financial sanctions and/or payments that will be imposed on them (if any) to victims of violations, and to take actions to remedy such violations and prevent recurrence thereof.

Further to the foregoing, the Company (by signing this Prospectus) undertakes to provide the Trustee, on the date of execution of the Deed of Trust, with irrevocable undertakings of the Company in writing of the Controlling Shareholders on the date of executing the Deed of Trust (as well as shortly after a change in control in the Company, as applicable) and of all said office holders serving in the Company on the date of execution of the Deed of Trust (as well as shortly after the appointment of additional directors to the Company, as applicable), in their capacity as office holders of the Company (1) not to object to the application of the Trustee and/or the Debenture Holders, which will be filed to a court in Israel in proceedings against the Company, to apply the Israeli law relating to settlement or arrangement and insolvency (including Liquidation) in connection with the Company, to the extent filed; (2) not to object if a court in Israel seek to apply the Israeli law relating to settlement or arrangement and insolvency (including Liquidation) in connection with the Company; (3) not to raise any claims against the local jurisdiction of the Israeli court in connection with proceedings that will be filed against the Company, including class action and derivative action, by the Trustee and/or the Debenture Holders; (4) not to apply on their own initiative to any court outside of Israel in order to obtain protection against proceedings taken by the Trustee and/or the Debenture Holders of the Company and not initiate on their own accord insolvency proceedings against the Company under foreign law and in a jurisdiction that is not Israel; (5) that starting from the end of three (3) months after the date of the issuance and as long as the Debentures are in circulation, at least two directors will serve on the Company's Board (including external directors); (6) not to raise claims against the authority of the Securities Authority and/or the Israeli Administrative Enforcement Committee in connection with financial sanctions and/or administrative means of enforcement that will be imposed on them by the Securities Authority and/or the Israeli Administrative Enforcement Committee, pursuant to Chapter H3 and/or Chapter H4 of the Securities Law, and they also irrevocably undertake and will undertake to comply with the decisions of the Securities Authority and/or the Israeli Administrative Enforcement Committee, *inter alia*, without derogating from the generality of the foregoing, to

[3] Who are not residents of the State of Israel

pay the financial sanctions and/or payments that will be imposed on them (if any) to victims of violations, and take actions to remedy such violations and prevent recurrence thereof. The undertakings of the Company, the Company's office holders and Controlling Shareholders as specified above shall be referred to below as "**the Undertakings of the Company and the Company's Office holders and Controlling Shareholders**".

The Undertakings of the Company and the Company's Office holders and Controlling Shareholders, as stated above, shall be published shortly after the results of the tender regarding issuance of Debenture (Series A) or, as applicable, within the framework of the immediate report on the appointment of an office holder or on a change in the control of the Company, as applicable, which will be published by the Company in accordance with the provisions of the Israeli law, as part of the pre-offering reports and upon the appointment of any new office holder and/or the entry of a new controlling shareholder, and all throughout the life of the Debentures.

**The laws of the British Virgin Islands and the corporate instruments of the Company neither restrict nor prevent the listing for trading of the securities offered under this Prospectus, which will be traded freely on the Stock Exchange without any restrictions under the laws of the British Virgin Islands and the corporate instruments of the Company.**

5.2 **Enforcement of Foreign Judgments**

The Israeli Law

Pursuant to the laws of the State of Israel, the enforcement of a foreign judgment is made in accordance with the provisions of the Foreign Judgment Enforcement Law, 5718-1958 including the aforementioned law stipulates that a foreign judgment shall not be declared enforceable if issued in a country which laws do not enforce judgments issued in Israel. As at the date of this Prospectus, there is no treaty whereby it is possible to recognize foreign judgments of the British Virgin Islands in Israel, and to the best knowledge of the Company, there are no judgments in which the question of enforcement between the two sets of laws was discussed.

The BVI Law

No foreign judgment has any direct operation in the British Virgin Islands, but it may be enforced by action at common law or in the case of judgments from certain jurisdictions by registration under the Foreign Judgments Reciprocal Enforcement Ordinance or the Reciprocal Enforcement of Judgments Act in the BVI. It should be noted that not every foreign judgment is capable of enforcement. Some may lend themselves only to recognition by the British Virgin Islands Courts.[4]

The Reciprocal Enforcement of Judgments Act 1922 and the Foreign Judgments (Reciprocal Enforcement) Ordinance 1964 does not extend to Israel or the United States of America and thus enforcement by common law is applicable.

4 For example, a judgment dismissing a claim (although an adverse costs order may be enforced); a declaratory judgment; and orders relating to the bankruptcy of individuals or the liquidation of companies. The British Virgin Islands court may also recognize a foreign judgment as a defense to an action or recognize it as constituting an assignment of property.

Under common law, any final and conclusive monetary judgment for a definite sum against the debtor in the Courts of a foreign jurisdiction is treated by the British Virgin Islands Courts as a cause of action for debt itself, thereby no retrial of the issues is necessary provided that in respect of the foreign judgment: (a) the foreign Court issuing the judgment had jurisdiction in the matter and the company either submitted to such jurisdiction or was resident or carrying on business within such jurisdiction and was duly served with process; (b) the judgment given by the foreign Court was not in respect of penalties, taxes, fines or similar fiscal or revenue obligations of the Company[5]; (c) in obtaining the judgment, there was no fraud on the part of the person in whose favor judgment was given or on the part of the Court; (d) recognition or enforcement of the judgment in the British Virgin Islands would not be contrary to public policy; and (e) the proceedings pursuant to which judgment was obtained were not contrary to natural justice.

Under BVI law a judgement or order for payment of a sum of money other than an order for payment of money into a Court may be enforced by (a) a charging order; (b) a garnishee order; (c) a judgement summons for a hearing and a capability inquiry; (d) an order for seizure and sale of goods; and (e) the appointment of a receiver.

The BVI Court plays a supportive role to facilitate arbitration procedures and will recognise and enforce foreign arbitral awards made in any of the contracting states to the New York Convention under the terms of the Convention. In addition, pursuant to, the Arbitration Act, 2013 (a) the BVI became a signatory to the New York convention and (b) the grounds for refusal of enforcement that apply to a New York Convention award also apply to the enforcement of a non-Convention award, and in both cases those grounds are fully incorporated into the Arbitration Act itself.

5.3 **The Applicable Law to the Deed of Trust**

**As stated in Section 14 of the Deed of Trust, the applicable law to the Deed of Trust is the Israeli Law.**

**5.4 Comparison Between Several Corporate Law Issues – the Provisions of the Applicable Law in the British Virgin Islands versus the Provisions of the Israeli Law**

5.4.1. Since the company offers to the public liability certificates, the company shall be subject to the provisions of Part II of Schedule IV of the Securities Law, as follows:

5 The BVI Courts will not necessarily be able to enforce financial sanctions imposed by ISA or administrative enforcement measures imposed by the Administrative Enforcement Committee in Israel according to sections H'3 and H'4 to the Securities Law, as applicable.

| Subject | Relevant Sections[6] of the Israeli Law | Are said sections include in the Articles of Association?[7] | The sections in the Company's Articles of Association which address the provisions of Part B to the Fourth Schedule of the Securities Law | BVI Law[8] |
|---|---|---|---|---|
| **Chairman of the Board Serving and CEO** | Sections 94(A), 95, 119, 121(D) of the Companies Law. | Yes | 13.1, 23.8, 23.9, 23.10 | There is no requirement under the Act for a company to appoint external directors/non-executive directors to the board of a company. The BVI Law does not distinguish between a company's directors and independent directors. |
| **Audit Committee** | Sections 114-117 of the Companies Law. | Yes | 24 | There is no requirement under the BVI Law for a company to appoint an audit committee. |
| **Remuneratio n Committee** | Sections 118A and 118 of the Companies Law. | Yes | 26 | There is no requirement under the BVI Law for a company to appoint a remuneration committee. |
| **Committee to examine the financial statements** | Companies Regulations (Instructions and Conditions Regarding the Approval of the financial statements), 2010 | Yes | 27 | There is no legal obligation to appoint a committee to examine the financial statements. |
| **Registered address** | Sections 123(A) of the Companies Law. | Yes | 3<br>The Company will appoint a representative in Israel as specified in the Deeds of trust | According to the laws of the BVI each company that registered in the BVI it must has a registered agent who is located in the British Virgin Islands. A person will not agree to be a registered agent of a company incorporated in the BVI, unless such person holds a license under the Company Management Act or by the Banks and Trust Companies Act of the BVI, authorizing it to provide registered agent services. |

6 The Company's Articles of Association includes (as set forth in the Company's Articles of Association, in Chapters 4 and 8 to the Prospectus and in this table) Sections from the Company's Law which are applicable to the Company by force of Section 39A to the Securities Law. The Company's Articles of Association has been drafted and approved by the British Virgin Island Attorney (the **"BVI Attorney"**). It shall be emphasized that the Company was informed by the BVI Attorney that the Company's Articles of Association includes no provision which contradicts a cogent law in the British Virgin Islands. By force of the Israeli Jurisdiction Section, included in the Company's Articles of Association) (the **"Jurisdiction Section"**) the inclusion of the Prospectus undertaking with respect to the derivative claim as set forth in Section 5.1 hereinabove – does not contradict a cogent law in the British Virgin Islands. For further information, See the opinion of the Company's legal counsel in the British Virgin Islands, provided in chapter 11 of the Prospectus.

7 *Mutatis Mutandis*, including by way of incorporating the jurisdiction Section (as defined in footnote 7 above) in the Company's Articles of Association, alongside the Prospectus undertakings as is set forth in Section 5.1 to the Prospectus.

8 The provisions, specified in this column, are provisions on the strength of the BVI Law and the common law in certain aspects.

| Subject | Relevant Sections[6] of the Israeli Law | Are said sections include in the Articles of Association?[7] | The sections in the Company's Articles of Association which address the provisions of Part B to the Fourth Schedule of the Securities Law | BVI Law[8] |
|---|---|---|---|---|
| **Internal Auditor** | Sections 146-153 of the Companies Law. | Yes | 32 | There is no requirement under the BVI Law for a company to appoint an internal auditor. |
| **Class Actions and Derivative suits** | Class Actions Law, 2006 and Sections 194-209 of the Companies Law. | No | For the undertaking of the Company, the controlling shareholder and officers, in the present and the future, not to oppose the filing of a derivative claim by the bondholders, see section 5.1 of the prospectus. | According to the law in the BVI, shareholders may make derivative claims, lawsuits or class actions in certain circumstances. We emphasize that the law in the BVI does not grant such rights to creditors. |
| **Restrictions on Appointment and Termination of Office of a Director** | Sections 225-226A, 231-232A and 234 of the Companies Law. | Yes | 14 | There are restrictions on the appointment of a director (including one under the age of 18, incompetent, bankrupt, etc.) as well as the circumstances prescribed by law to end his term and /or expiration.<br>The officers of the Company irrevocably undertake that in the event that any of the serving directors has notified the Company that he has been convicted by a judgment of an offense as stated in Section 226(a)(1) of the Companies Law or 226(a1) of the Companies Law, or that the Administrative Enforcement Committee has decided to impose enforcement measures on that director prohibiting him from serving as a director in a private company that is a bond company, then they will act in accordance with the provisions of the Company's Articles of Association to convene an urgent shareholders' meeting or board of directors' meeting (as the case may be), the agenda of which will be to adopt a resolution to dismiss the said director immediately (the "**Resolution**") and that the controlling shareholders of the Company will vote in favor of such a resolution. |
| **Restrictions on the Appointment and Termination of Office of a Office Holder (who is not a Director)** | Section 251A of the Companies Law | Yes | 22.1 | There is no requirement under the BVI Law for a company to appoint office holders other than the directors. It is at the discretion of a BVI company whether they wish to appoint office holders of the company. The Act does not contain provisions for disqualification for appointment or removal as office holder of a BVI company. |
| **External Directors** | Sections 219 and 239-249A of the Companies Law | Yes | 16 | There is no requirement under the BVI Law for a company to appoint external directors/non-executive directors to the board of a company. The BVI Law does not distinguish between a company's directors and independent directors. |

| Subject | Relevant Sections[6] of the Israeli Law | Are said sections include in the Articles of Association?[7] | The sections in the Company's Articles of Association which address the provisions of Part B to the Fourth Schedule of the Securities Law | BVI Law[8] |
|---|---|---|---|---|
| **Independent Director** | Sections 249B and 249C of the Companies Law | Yes | 10<br>Definition of "Non-External Independent Director" | There is no legal obligation to appoint independent directors. |
| **Duty of Care and Fiduciary Duty** | Sections 252-256 of the Companies Law. | Yes | 18 | The laws of the BVI impose fiduciary duties on the directors of the company. The directors must act honestly and bona fide in what they consider is in the best interests of the company. In addition to their fiduciary duties a director has the duties of care, diligence and skill which are owed to the company itself. The laws of the BVI do not apply such duties on the officer that are not directors. |
| **Exemption, Indemnification and Insurance** | Sections 258-264 of the Companies Law. | Yes | 25 | British Virgin Islands law does not limit the extent to which a company's articles of association may provide for indemnification of office holders and directors, except to the extent any such provision may be held by the Court to be contrary to public policy. As for insurance, the company may purchase and maintain insurance in relation to any person who is or was a director of the company.[9] |
| **Remuneration Policy Concerning Office holders and Terms of Service and Employment of Office holders** | Sections 267A, 267B, 270(2), 270(3), 270(4), 272, 273 and 275of the Companies Law. Companies Regulations (Relief in Transactions with Interested Parties), 2000. | Yes | 20 | Shareholder or, subject to the memorandum and articles of association of a company, the directors of the company may fix the remuneration of directors in respect of the services to be rendered in any capacity to the company. There is no requirement under the BVI Law for a company to maintain a remuneration policy for directors and/or office holders. |
| **Transactions with Related Party and Conflicts of Interest** | Sections 117, 270(4a) and 275-282 of the Companies Law. Companies Regulations (Relief in Transactions with Interested Parties), 2000. | Yes | 20 | Directors must not place themselves in a position in which there is a conflict between their duty to the company and their personal interests.<br>Usually, a memorandum and articles of association of a company in the British Virgin Islands will allow a director with an interest in a certain transaction to vote in respect of it, to be present at the meetings in which the aforementioned transaction is considered and to sign documents on behalf of company which are associated with the transaction. |
| **Distribution** | Sections 301-307 | Yes | 29 | (1) Subject to the memorandum and articles of association of the company, the |

9 As aforementioned in Section 7.1.7 of the Prospectus, as a part of the transfer of the Transferred Rights Agreement, the rights holders have not committed to provide any indemnity to the Company regarding the Transferred Rights and these may be transferred "as is".

| Subject | Relevant Sections[6] of the Israeli Law | Are said sections include in the Articles of Association?[7] | The sections in the Company's Articles of Association which address the provisions of Part B to the Fourth Schedule of the Securities Law | BVI Law[8] |
|---|---|---|---|---|
| **of Dividends** | and 310-311 of the Companies Law. Companies Regulations (Distribution Approval), 2001 | | | directors of a company may, by resolution of the board, authorize a distribution by the Company to its shareholders at such time and of such an amount, as the directors think fit if they are satisfied, on reasonable grounds, that the company will, immediately after the distribution, satisfy the solvency test prescribed by British Virgin Islands law and not the Profit Test in accordance with the Israeli law. A company satisfies the solvency test if (a) the value of the company's assets exceeds its liabilities, and (b) the company is able to pay its debts as they fall due. The resolution of the directors must contain a statement that, in the opinion of the directors, the company will, immediately after the distribution, satisfy the solvency test.<br>(2) Authorities from English case law, which are considered as highly persuasive by the Court but are not binding on it,[10] provide guidance on the meaning of a company being "able to pay its debts as they fall due". One such case is BNY Corporate Trustee Services Ltd. v Eurosail- UK Plc[11] which held that a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) was the applicable test and that the burden of proof must be on the party which asserted balance-sheet insolvency. The test would involve an analysis of the overall context and facts applicable to the company in question. As per the case of Re Cheyne Finance plc (in receivership)[12], consideration should be given to debts falling due in the future. It that case it was held that cash flow insolvency should not be ascertained purely by looking at debts presently due, but that it is possible to take into account known future debts falling due in the immediate future. The court considered that the words "as they fall due" suggested an element of futurity such that both debts presently due and those falling due in the immediate future are likely to be relevant to determining whether a company is able to pay its debts. In addition, Re a Company (No 006794 of 1983)[13] held that the fact that the company can only pay its debts using borrowed money does not necessarily mean that it is unable to pay its debts, although if it has persistently failed or neglected to pay them until forced to do so then, in an appropriate case, the court can find that it is unable to pay its debts.<br>(3) Distribution, in relation to a distribution by a company limited by shares to its |

10 The legal system in the BVI is based, largely, on the English common law system, and therefore, it is customary to import laws from the Common Law, although these are not binding the courts in the British Virgin Islands.

11 *2007-3BL Plc* [2013] UKSC 28

12 [2007] EWHC 2402 (Ch)

13 [1986] BCLC 261

| Subject | Relevant Sections[6] of the Israeli Law | Are said sections include in the Articles of Association?[7] | The sections in the Company's Articles of Association which address the provisions of Part B to the Fourth Schedule of the Securities Law | BVI Law[8] |
|---|---|---|---|---|
| | | | | shareholders means (a) the direct or indirect transfer of an asset, other than the company's own shares, to or for the benefit of the shareholder, or (b) the incurring of a debt to or for the benefit of a shareholder, in relation to shares held by same a shareholder, or the entitlements to distributions of a member who is not a shareholder, and whether by means of the purchase of an asset, the purchase, redemption or other acquisition of shares, a transfer of indebtedness or otherwise, and includes a dividend.<br>(4) A distribution made to a shareholder at a time when the company did not, immediately after the distribution, satisfy the solvency test may be recovered by the company from the shareholder unless: (a) the shareholder received it in good faith and without knowledge of the company's failure to satisfy the solvency test; (b) the shareholder has altered its position in reliance on the validity of the distribution; and (c) it would be unfair to require repayment in full or at all.<br>If, after a distribution is authorized and before it is actually made, the directors cease to be satisfied on reasonable grounds that a company will, immediately after the distribution is made, satisfy the solvency test, any distribution made by the company is deemed not to have been authorized.<br>If a distribution is deemed not to have been authorized a director who (a) ceased, after authorization but before the making of the distribution, to be satisfied on reasonable grounds for believing that the company would satisfy the solvency test immediately after distribution is made; and (b) failed to take reasonable steps to prevent the distribution being made, is personally liable to the company to repay to the company so much of the distribution as is not recovered from shareholders.<br>(5) If, in an action brought against a director or shareholder under the aforementioned paragraph, the High Court of the British Virgin Islands is satisfied that the company could, by making a distribution of a lesser account, have satisfied the solvency test, the Court may (a) permit the shareholder to retain an amount equal to the value of any distribution that could properly have been made; or (b) relieve the director from liability in respect of an amount equal to the value of any distribution that could properly have been made. |
| **Settlement and Arrangement** | Sections 350 - 351 of the Companies Law. | Yes | 36 | Under the BVI Law, there are statutory provisions which facilitate arrangements which involve a plan of arrangement being approved by a resolution of directors of the company and application being made to the Court for approval of the proposed arrangement. |
| **Imposing financial sanctions** | Sections 257 and 319-347 of the Companies Ordinance and Section 362 of the Companies Law | No | For the undertaking of the Company, the controlling shareholder and the officers, in the present and the future, not to raise claims against the authority of the Securities | Courts at BVI may not enforce a foreign judgment which is given by a foreign court in connection with fines, sanctions, taxes or or other fiscal or profit based obligations, including not able to impose financial sanctions imposed by the Israel Securities Authority or enforcement measures administrative imposed by the administrative enforcement Committee in Israel, in accordance with chapters H3 and-H4 the securities Act, as applicable. |

| Subject | Relevant Sections[6] of the Israeli Law | Are said sections include in the Articles of Association?[7] | The sections in the Company's Articles of Association which address the provisions of Part B to the Fourth Schedule of the Securities Law | BVI Law[8] |
|---|---|---|---|---|
| | | | Authority and / or the Administrative Enforcement Committee in Israel, see section 5.1 of the prospectus. | However, as noted above, the Company and officers in the company, who are not Israeli citizens, present and future, undertake irrevocably and commit themselves irrevocably and in writing, to not raise claims against the authority of the Securities Authority and/or the Administrative Enforcement Committee in Israel in connection with civil penalties and/or administrative enforcement measures imposed on them by the Israel Securities Authority and/or the Administrative Enforcement Committee in Israel, And in accordance with Section H3 and/or Chapter H4 Securities Act and are irrevocably undertake and irrevocably undertake in writing to comply with the decisions of the ISA and / or administrative enforcement committee including Israel, And Without derogating from, to pay financial sanctions and / or payments to victims of crime that are imposed on them (if imposed) and take actions to correct the violation and prevent its recurrence. |

5.4.2. Winding up and Preference

It should be noted that despite the fact that Part B to the Fourth Schedule does not include instructions regarding liquidation and preference, and therefore does not apply these provisions from the Israeli law to a foreign company[14], the following is a brief description of the law that applies in the BVI in connection with the liquidation and preference and liabilities of the Company and its officers regarding insolvency:

| Subject | Relevant Sections of the Israeli Law | BVI Law[15] |
|---|---|---|
| **Grounds for Winding up of the Company** | Section 257and 319-347 of the Companies Ordinance. And Section 362 of the Companies Law. | The liquidation of a company may be a voluntary solvent liquidation or liquidation under the Insolvency Act. The Insolvency Act regulates insolvent liquidation. According to the Insolvency Act, a company is insolvent if it cannot comply with a statutory demand which was not set aside by the Insolvency Act, the execution or other process issued by judgment, decree or order of a court in favor of a creditor of the company is returned wholly or partly unsatisfied or either the value of the company's liabilities exceed its assets or the company is unable to pay its debts as they fall due. |
| **Preference** | Section 354 of the Companies Ordinance, and the provisions of Israeli law on matters of order of priority in the dissolution of a company. | Upon the insolvent liquidation of a company, the assets of a company shall be applied in accordance with the following order of priority: (a) in paying, in priority to all other claims, the costs and expenses lawfully incurred in the liquidation in accordance with the prescribed priority; (b) after payment of the costs and expenses of the liquidation, in paying the preferred claims approved by the liquidator (wages and salary, amounts to the BVI Social Security Board, pension contributions, government taxes) - preferred claims rank equally between themselves and, if the assets of the company are insufficient to meet the claims in full, they shall be paid in a proportionate manner; (c) after the payment of preferred claims, in paying all other claims approved by the liquidator, including those of unsecured creditors - the claims of unsecured creditors of the company shall rank equally among themselves and if the assets of the company are insufficient to meet the claims in full, such non-secured creditors shall be paid in a proportionate manner; (d) after paying all approved claims in full, paying any interest payable under the BVI Insolvency Act; and finally (e) any surplus assets remaining after payment of the costs, expenses and claims above shall be distributed to the shareholders in accordance with their rights and interests in the company. Part VIII of the Insolvency Act provides for various applications which may be made by a liquidator to set aside transactions which have unfairly diminished the assets which are available to creditors. |

14 Further to the aforementioned, it is noted that with regard to insolvency laws the British Virgin Islands laws shall apply to the company.

15 The provisions, specified in this column, are provisions on the strength of the BVI Law and the common law in certain aspects.

5.4.3 Grounds for Winding up of the Company

A. Israeli law

Pursuant to the Companies Ordinance, the causes for winding-up by the court are set forth below: (1) the company adopted a special resolution that it is to be wound up by the court; (2) the company did not commence its business within one year after its incorporation, or ceased its business for one year; (3) the company became insolvent; (4) the court is of the opinion that it is just and equitable for the company to be wound up. In addition, pursuant to the Companies Law, in certain circumstances of failure to pay monetary fines, the Companies Registrar may request the dissolution of a company by the court. In addition, a company may also wind up voluntarily in circumstances determined in the Companies Ordinance.

B. BVI Law

The liquidation of a BVI company may be a voluntary solvent liquidation or a liquidation under the Insolvency BVI Law. Where a company has been struck off[1] the Register of Companies under the Act continuously for a period of 7 years it is dissolved with effect from the last day of that period.

If the liquidation is a voluntary solvent liquidation, the provisions of the Insolvency Act govern the liquidation. A company may only be liquidated under the Act as a solvent liquidation if it has no liabilities or it is able to pay its debts as they fall due, and the value of its assets exceeds its liabilities. Subject to the memorandum and articles of association of a company, a liquidator may be appointed by a resolution of directors or resolution of shareholders but if the directors have commenced liquidation by a resolution of directors the shareholders must approve the liquidation plan by a resolution of shareholders save in limited circumstances.

A liquidator is appointed for the purpose of collecting in and realising the assets of a company and distributing proceeds to creditors.

The Insolvency Act, 2003 (hereinafter: the “**Insolvency Act**") governs an insolvent liquidation. Pursuant to the Insolvency Act, a company is insolvent if it fails to comply with the requirements of a statutory demand that has not be set aside pursuant to the Insolvency Act, execution or other process issued on a judgment, decree or order of Court in favor of a creditor of the company is returned wholly or partly unsatisfied or either the value of the company's liabilities exceeds its assets or the company is unable to pay its debts as they fall

[1] Where a company has been struck off the Register, the company and the directors, members and any liquidator or receiver thereof, may not (a) commence legal proceedings, carry on any business or in any way deal with the assets of the company; (b) defend any legal proceedings, make any claim or claim any right for, or in the name of, the company; or (c) act in any way with respect to the affairs of the company. Notwithstanding the foregoing, where a company has been struck off the register, the company, or a director, member, liquidator or receiver thereof, may (a) make application for restoration of the company to the Register; (b) continue to defend proceedings that were commenced against the company prior to the date of the striking-off; and (c) continue to carry on legal proceedings that were instituted on behalf of the company prior to the date of striking-off. The fact that a company is struck off the Register does not prevent (a) the company from incurring liabilities, or (b) any creditor from making a claim against the company and pursuing the claim through to judgement or execution, and does not affect the liability of any of its members, directors, officers or agents.

due. The liquidator must be either the Official Receiver in BVI or a BVI licensed insolvency practitioner. An individual resident outside the BVI may be appointed to act as liquidator jointly with a BVI licensed insolvency practitioner or the Official Receiver. The shareholders of the company may appoint an insolvency practitioner as liquidator of the company, or the Court may appoint an Official Receiver or an eligible insolvency practitioner. The application to the Court can be made by one or more of the following: (a) the company (b) a creditor (c) a shareholder (d), the supervisor of a creditors' arrangement in respect of the company, the Financial Services Commission and the Attorney General in the BVI.

The Court may appoint a liquidator if:

(a) the company is insolvent;

(b) the Court is of the opinion that it is just and equitable that a liquidator should be appointed; or

(c) the Court is of the opinion that it is in the public interest for a liquidator to be appointed.

An application under Subsection (a) above by a shareholder may only be made with leave of the Court, which shall not be granted unless the Court is satisfied that there is prima facie case that the company is insolvent. An application under Subsection (c) above may only be made by the Financial Services Commission or the Attorney General and they may only make an application under Subsection (c) above if the company concerned is, or at any time has been, a regulated person (i.e. a person that holds a prescribed financial services licence) or the company is carrying on, or at any time has carried on, unlicensed financial services business.

It should be noted that the Company and the Company's officers would not object to the request of the trustee and/or holders of bonds that will be filed in a court in Israel for applying Israeli law regarding the compromise and settlement and insolvency, if submitted, and will not resist if an Israeli court would seek to apply Israeli law regarding the compromise and settlement and insolvency.

For the avoidance of doubt, it shall be clarified and emphasized that the obligations of the Company and officers will include an explicit irrevocable undertaking not to initiate insolvency proceedings under foreign law and jurisdiction that is not Israel, including the British Virgin Islands.

In view of the above, and subject to the obligations of the Company and its officers, it shall be emphasized and clarified that the insolvency proceeding, not under Israeli law and Israeli courts, can only arise from a foreign creditor's claim. In this regard it should be noted that as long as insolvency proceedings develop, not under Israeli law and foreign court, arising from claims of foreign creditors, the Company will do its best and will claims "inadequate forum" and wholly subject to law.

5.4.4 Preference

A. Israeli law

The order of preference in debt repayment in a winding-up shall be as follows (subject to the dates and caps prescribed by law): (1) receiver's expenses; (2) tax debts that are subject to a statutory pledge; (3) debts secured by a fixed charge; (4) wages to employees of the company and a loan for the purpose of paying the wages; (5) amounts of income tax in respect of wages deducted at source and not yet paid; (6) mandatory taxes payments and taxes (including municipal taxes, taxes to the state treasury and fees payable to the Registrar) and rent, which the company owes in respect of its assets; (7) debts secured by a floating charge which crystallized upon the winding up of the company; (8) debts to general creditors; (9) the company's shareholders.

In accordance with the Companies Ordinance, any act relating to the assets of a company, which, if executed by an individual in bankruptcy would have been considered an unfair preference, will be considered an unfair preference of a creditor in the dissolution of a company and therefore shall have no effect. Any act or transaction shall be considered a prohibited unfair preference, and therefore invalid, if the four cumulative conditions shall apply as follows: (1) the company is in dissolution; (2) at the time the act or the transaction was made, the company was unable to pay its debts at the date of repayment thereof; (3) the act or transaction was made in order to prefer one creditor over others (or through unlawful coercion or solicitation); (4) the act or transaction were made during the three months preceding the filing of a dissolution application.

B. BVI Law

(1) Upon the insolvent liquidation of a company, the assets of a company shall be applied in accordance with the following order of priority: (a) in paying, in priority to all other claims, the costs and expenses lawfully incurred in the liquidation in accordance with the prescribed priority; (b) after payment of the costs and expenses of the liquidation, in paying the preferred claims approved by the liquidator (wages and salary, amounts to the BVI Social Security Board, pension contributions, government taxes) - preferred claims rank equally between themselves and, if the assets of the company are insufficient to meet the claims in full, they shall be paid in a proportionate manner; (c) after the payment of preferred claims, in paying all other claims approved by the liquidator, including those of unsecured creditors - the claims of unsecured creditors of the Company shall rank equally among themselves and if the assets of the company are insufficient to meet the claims in full, such unsecured creditors shall be paid in a proportionate manner; (d) after paying all approved claims in full, paying any interest payable under the BVI Insolvency Act; and finally (e) any surplus assets remaining after payment of the costs, expenses and claims above shall be distributed to the shareholders in accordance with their rights and interests in the Company. Part VIII of the Insolvency Act provides for various applications which may be made by a liquidator to set aside transactions which have unfairly diminished the assets which are available to creditors.

(2) The appointment of a liquidator over the assets of a company does not affect the right of a secured creditor to take possession of and realize or otherwise deal with assets of the

company over which that creditor has a security interest. Accordingly, a secured creditor may enforce its security directly without recourse to the liquidator, in priority to the order of payments described in paragraph (1) above. However, so far as the assets of a company in liquidation available for payment of the claims of unsecured creditors are insufficient to pay the costs and expenses of the liquidation and the preferential creditors, those costs, expenses and claims have priority over the claims of charges in respect of assets that are subject to a floating charge created by a company and shall be paid accordingly out of those assets.

In the event of the insolvency of a company, there are four types of voidable transaction provided for in the Insolvency Act:

(a) **Unfair Preferences**: Under section 245 of the Insolvency Act a transaction entered into by a company, if it is entered into within the hardening period at a time when the company is insolvent, or it causes the company to become insolvent (an "**Insolvency Transaction**"), and which has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position it would have been in if the transaction had not been entered into, will be deemed an unfair preference. A transaction is not an unfair preference if the transaction took place in the ordinary course of business. It should be noted that this provision applies regardless of whether the payment or transfer is made for value or at an undervalue.

(b) **Undervalue Transactions**: Under section 246 of the Insolvency Act the making of a gift or the entering into of a transaction on terms that the company is to receive no consideration, or where the value of the consideration for the transaction, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company will (if it is an insolvency transaction entered into within the hardening period) be deemed an undervalue transaction. A company does not enter into a transaction at an undervalue if it is entered into in good faith and for the purposes of its business and, at the time the transaction was entered into, there were reasonable grounds for believing the transaction would benefit the company.

(c) **Voidable Floating Charges**: Under section 247 of the Insolvency Act a floating charge created by a company is voidable if it is an insolvency transaction created within the hardening period. A floating charge is not voidable to the extent that it secures: (i) money advanced or paid to the company, or at its direction, at the same time as, or after, the creation of the charge; (ii) the amount of any liability of the company discharged or reduced at the same time as, or after, the creation of the charge; (iii) the value of assets sold or supplied, or services supplied, to the company at the same time as, or after, the creation of the charge; and (iv) the interest, if any, payable on the amount referred to in (i) to (iii) pursuant to any agreement under which the money was advanced or paid, the liability was discharged or reduced, the assets were sold or supplied or the services were supplied.

(d) **Extortionate Credit Transactions**: Under section 248 of the Insolvency Act an insolvency transaction entered into by a company for, or involving the provision of, credit to the company, may be regarded as an extortionate credit transaction if, having regard to the risk accepted by the person providing the credit, the terms of the transaction are or were such to require grossly exorbitant payments to be made in

respect of the provision of the credit, or the transaction otherwise grossly contravenes ordinary principles of fair trading and such transaction takes place within the within the hardening period.

The "hardening period" (known in the Insolvency Act as the "vulnerability period") in respect of each voidable transaction set out above is as follows:

(1) for the purposes of sections 245, 246 and 247 of the Insolvency Act the period differs depending on whether the person(s) that the transaction is entered into with, or the preference is given to, are "connected persons" of the company within the meaning of the Insolvency Act:

(A) in the case of "connected persons" the "hardening period" is the period beginning two years prior to the "onset of insolvency" and ending on the appointment of a liquidator of the company; and

(B) in the case of any other person, the "hardening period" is the period beginning six months prior to the "onset of insolvency" and ending on the appointment of a liquidator of the company.

(2) for the purposes of section 248 of the Insolvency Act the "hardening period" is the period beginning five years prior to the "onset of insolvency" and ending on the appointment of a liquidator of the company regardless of whether the person(s) that the transaction is entered into with is a connected person.

The onset of insolvency for these purposes is the date on which an application for the appointment of a liquidator was filed (if the liquidator was appointed by the Court) or the date of the appointment of the liquidator (where the liquidator was appointed by the members).

(3) A transferring of assets made by a person with intent to defraud creditors is voidable at the instance of the person thereby prejudiced. There is no requirement that the relevant transaction was entered into at a time when one party was insolvent or became insolvent as a result of the transaction, and there is no requirement that the transferring party subsequently went into liquidation. However, no conveyance entered into for valuable consideration and in good faith to a person who did not have notice of the intention to defraud may be impugned.

**5.5 Opinion of the Company's legal counsel regarding the BVI laws Comparison**

The following is a review of the company's legal counsel BVI regarding the comparison laws between Israeli law and the laws of the British Virgin Islands.:

MAPLES GROUP

Our ref: CMO/857353-000001/41869725v1

To the Addressees named in the Schedule

26 November 2025

Dear Sirs

**SIMAD Holdings Ltd.** (the "**Company**")

We have acted as counsel as to British Virgin Islands law to the Company in connection with the filing and publication of a supplementary prospectus and a supplementary notice under Israeli Securities laws and have been asked to render a legal opinion on certain matters and provisions of British Virgin Islands ("**BVI**") company law.

Having regard to such legal considerations as we deem relevant, we are of the opinion as follows:

## Summary of BVI company law

The Company is incorporated in the BVI under the BVI Business Companies Act (As Revised) (the "**Act**") and is subject to BVI law. Set out below is a summary of certain provisions of BVI company law. The summary does not purport to contain all applicable qualifications and exceptions or to be a complete review of all matters of BVI company law and taxation, which may differ from equivalent provisions in jurisdictions with which interested parties may be more familiar.

### 1 Incorporation, Registered Office and Registered Agent

1.1 According to the provisions of the Act, a certificate of incorporation issued by the Registrar of Corporate Affairs is conclusive evidence that all the requirements of the Act as to incorporation have been complied with and that the Company is incorporated as from the date specified in the certificate of incorporation.

1.2 To maintain the Company in good standing with the Registrar of Corporate Affairs under the laws of the BVI, annual filing fees must be paid and returns made to the Registrar of Corporate Affairs within the time frame prescribed by law.

1.3 The Company shall, at all times, have a registered office in the BVI.

1.4 Every company registered in the BVI must have a registered agent present in the BVI. A person shall not act or agree to act as the registered agent of a company incorporated in the BVI unless, among other things, such person holds a licence under the Company Management Act (As

Maples and Calder
6th Floor DUO 280 Bishopsgate London EC2M 4RB England
Tel +44 20 7466 1600 Fax +44 20 7466 1700 maples.com
Registered in England and Wales No. 03369233. Registered office: 6th Floor DUO 280 Bishopsgate London EC2M 4RB England

Revised) or the Banks and Trust Companies Act (As Revised), that authorises it to provide registered agent services.

## 2 Shares

2.1 Subject to the Act and to the company's memorandum or articles of association, shares in a company may be issued, and options to acquire shares in a company granted, at such times, to such persons, for such consideration and on such terms as the directors may determine.

2.2 A statement of the maximum number of shares that the company is authorised to issue or that the company is authorised to issue an unlimited number of shares, and the classes of shares that the company is authorised to issue, and – if the company is authorised to issue two or more classes of shares - the rights, privileges, restrictions and conditions attaching to each class of shares, must be included in the company's memorandum of association.

2.3 Shares may be issued for consideration which is in whole or in part in any form, including money, a promissory note, or other written obligation to contribute money or property, real property, personal property (including goodwill and know-how), services rendered or a contract for future services. The consideration for the issuance of a share with par value shall not be less than the par value of the share.

2.4 If shares are to be issued by a company for a consideration which is in whole or in part other than money, then the directors are required to pass a resolution stating: (a) the amount to be credited for the issue of the shares; and (b) that, in their opinion, the present cash value of the non-money consideration and money consideration, if any, for the issue is not less than the amount to be credited for the issue of the shares.

2.5 Subject to the company's memorandum or articles of association, a company may issue bonus shares, partly paid shares and nil paid shares. Subject to the company's memorandum or articles of association, a bonus share issued by the company is deemed to have been fully paid for on issue.

## 3 Transfer of Shares

3.1. Under the Act the transfer of a registered share which is not listed on a recognised exchange is by a written instrument of transfer signed by the transferor and containing the name of the transferee. However, the instrument must also be signed by the transferee if registration would impose a liability on the transferee to the company. The instrument of transfer must be sent to the company for registration. Subject to the company's memorandum or articles of association the company shall on receipt of an instrument of transfer enter the name of the transferee of the share in the register of members unless the directors resolve to refuse or delay registration of the transfer for reasons that should be specified in a resolution of directors. The transfer of a registered share is effective when the name of the transferee is entered in the register of members. The entry of the name of a person in the company’s register of members is prima facie evidence that legal title in the share vests in that person.

3.2 The procedure is different for the transfer of shares that are listed on a recognised exchange. Such shares may be transferred without the need for a written instrument of transfer if the transfer is carried out in accordance with the laws, rules, procedures and other requirements applicable to shares listed on the recognised exchange and subject to the company’s memorandum and articles of association.

## 4 Financial Assistance to Purchase Shares of a Company

The Act specifically provides that, subject to the memorandum and articles of association of the company, a company may give financial assistance to any person in connection with the acquisition of the company's own shares.

## 5 Purchase of Shares and Warrants by a Company and its Subsidiaries

5.1 The Act provides that a company may purchase, redeem or otherwise acquire its own shares, either in accordance with the procedures set out in the Act, or any other procedure as provided for in the company's memorandum and articles of association. The statutory provisions do not apply to a company to the extent that they are negated, modified or inconsistent with the provisions contained in a company's memorandum and articles of association. A company may acquire its own fully paid share or shares for no consideration by way of surrender of the share or shares to the company by the person holding the share or shares. Any such surrender of a share or shares shall be in writing and signed by the person holding the share or shares.

5.2 Under the statutory provisions, the directors may make an offer to purchase, redeem or otherwise acquire the shares in a company provided that the offer is either made: (a) to all members and would, if successful, leave the relative voting and distribution rights unaffected, and affords each member a reasonable opportunity to accept the offer; or (b) to one or more members and consented to in writing by all members, or otherwise permitted by the memorandum or articles of association. Where the offer is to one or more members, the directors must have passed a resolution to the effect that in their opinion the purchase, redemption or other acquisition would (y) benefit the remaining members, and (z) that the proposed offer is fair and reasonable to the company and the remaining members. A member may apply to the BVI High Court for an order restraining the proposed purchase, redemption or other acquisition on the grounds that (i) the purchase, redemption or other acquisition is not in the best interests of the remaining members; or (ii) the terms of the offer and the consideration offered for the shares are not fair and reasonable to the company or the remaining members.

5.3 Subject to the memorandum and articles of association of the company and the Act, a company may only acquire its own shares if the directors, by resolution of directors are satisfied, on reasonable grounds, that a company will, immediately after the distribution, satisfy the solvency test i.e. that the value of the company's assets exceeds its liabilities and the company is able to pay its debts as they fall due.

5.4 A share in the company can be redeemed otherwise than at the option of the company if such share is redeemable at the option of the member and the member gives proper notice to the company of his intention to redeem the share.

5.5 Under BVI law a company may hold shares that have been purchased, redeemed or otherwise acquired as treasury shares if the memorandum or articles of association of the company do not prohibit it from holding treasury shares; the directors resolve that shares to be purchased, redeemed or otherwise acquired shall be held as treasury shares; and the number of shares purchased, redeemed or otherwise acquired, when aggregated with shares of the same class already held by the company as treasury shares, does not exceed 50% of the shares of that class previously issued by the company, excluding shares that have been cancelled. All the rights and obligations attaching to a treasury share are suspended and cannot be exercised by or against the company while it holds a share as a treasury share.

5.6 A company is not prohibited from purchasing and may purchase its own warrants subject to and in accordance with the terms and conditions of the relevant warrant instrument or certificate. There is no requirement under BVI law that a company's memorandum or articles of association contain a specific provision enabling such purchases and the directors of a company may rely upon the general power contained in its memorandum of association.

## 6 Dividends and Distributions

6.1 Subject to the memorandum and articles of association of the company, the directors of a company may, by resolution of directors, authorise a distribution by the company to members at such time and of such an amount, as the directors think fit if they are satisfied, on reasonable grounds, that the company will, immediately after the distribution, satisfy the solvency test. A company satisfies the solvency test if (a) the value of the company's assets exceeds its liabilities, and (b) the company is able to pay its debts as they fall due. The resolution of the directors must contain a statement that, in the opinion of the directors, the company will, immediately after the distribution, satisfy the solvency test.

6.2 Authorities from English case law, which are treated as highly persuasive by the BVI High Court but are not binding on it, provide guidance on the meaning of a company being "able to pay its debts as they fall due". Once such case is *BNY Corporate Trustee Services Ltd. v Eurosail-UK Plc*[1] which held that a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) was the applicable test and that the burden of proof must be on the party which asserted balance-sheet insolvency. The test would involve an analysis of the overall context and facts applicable to the company in question. As per the case of *Re Cheyne Finance plc (in receivership)*[2], consideration should be given to debts falling due in the future. In that case it was held that cash flow insolvency should not be ascertained purely by looking at debts presently due, but that it is possible to take into account known future debts falling due in the immediate future. The court considered that the words "as they fall due" suggested an element of futurity such that both debts presently due and those falling due in the immediate future are likely to be relevant to determining whether a company is able to pay its debts. In addition, *Re a Company (No 006794 of 1983)*[3] held that the fact that the company can only pay its debts using borrowed money does not necessarily mean that it is unable to pay its debts, although if it has persistently failed or neglected to pay them until forced to do so then, in an appropriate case, the court can find that it is unable to pay its debts.

6.3 Distribution, in relation to a distribution by a company limited by shares to a member, means (a) the direct or indirect transfer of an asset, other than the company's own shares, to or for the benefit of the member, or (b) the incurring of a debt to or for the benefit of a member, in relation to shares held by a member, and whether by means of the purchase of an asset, the purchase, redemption or other acquisition of shares, a transfer of indebtedness or otherwise, and includes a dividend.

6.4 A distribution made to a member at a time when the company did not, immediately after the distribution, satisfy the solvency test may be recovered by the company from the member unless: (a) the member received it in good faith and without knowledge of the company's failure to satisfy the solvency test; (b) the member has altered its position in reliance on the validity of the distribution; and (c) it would be unfair to require repayment in full or at all. If, after a distribution is authorised and before it is made, the directors cease to be satisfied on reasonable grounds that a company will, immediately after the distribution is made, satisfy the solvency test, any distribution made by the company is deemed not to have been authorised. If a distribution is deemed not to have been authorised a director who (a) ceased, after authorisation but before the making of the distribution, to be satisfied on reasonable grounds for believing that the company would satisfy the solvency test immediately after distribution is made; and (b) failed to take reasonable steps to prevent the distribution being made, is personally liable to the company to repay to the company so much of the distribution as is not recovered from members.

[1] *2007-3BL Plc* [2013] UKSC 28

[2] [2007] EWHC 2402 (Ch)

[3] [1986] BCLC 261

6.5 If, in an action brought against a director or member under the aforementioned paragraph, the BVI High Court is satisfied that the company could, by making a distribution of a lesser account, have satisfied the solvency test, the Court may (a) permit the member to retain; or (b) relieve the director from liability in respect of, an amount equal to the value of any distribution that could properly have been made.

## 7 Rights of Members and Protection of Minorities

7.1 Under the provisions of the Act the memorandum and articles of association of a company are binding as between the company and its members and between the members. In general, members are bound by the decision of the majority or special majorities as set out in the articles of association or in the Act. As for voting, the usual rule is that with respect to normal commercial matters members may act from self-interest when exercising the right to vote attached to their shares[4].

7.2 If the majority members have infringed a minority member's rights, the minority may seek to enforce its rights either by derivative action or by personal action. A derivative action concerns the infringement of the company's rights where the wrongdoers are in control of the company and are preventing it from taking action, whereas a personal action concerns the infringement of a right that is personal to the particular member concerned.

7.3 The Act provides for a series of remedies available to members. Where a company incorporated under the Act conducts some activity which breaches the Act or the company's memorandum and articles of association, the BVI High Court can issue a restraining or compliance order. Members can now also bring derivative, personal and Representative Actions[5] under certain circumstances.

7.4 The traditional English basis for members' remedies have also been incorporated into the Act: where a member of a company considers that the affairs of the company have been, are being or are likely to be conducted in a manner likely to be oppressive, unfairly discriminating or unfairly prejudicial to him, he may apply to the BVI High Court for an order on such conduct.

7.5 Any member of a company may apply to the BVI High Court for the appointment of a liquidator for the company and the Court may appoint a liquidator for the company if it is of the opinion that it is just and equitable to do so.

7.6 The Act provides that any member of a company is entitled to payment of the fair value of his shares upon dissenting from any of the following:

(a) a merger;

(b) a consolidation;

(c) any sale, transfer, lease, exchange or other disposition of more than 50 per cent in value of the assets or business of the company if not made in the usual or regular course of the business carried on by the company but not including (i) a disposition pursuant

[4] There is a line of authorities that suggests that in certain circumstances, notably the exercise of a power to amend constitutional documents or alter voting rights, a majority member must act in good faith for the benefit of the Company as a whole (the burden of proof being upon the person who challenges the amendment) and failure to do so can lead to the amendment being invalidated: see *Citco Banking Corp. NV v Pusser's Ltd* [2007] UKPC 13; *Shuttleworth v. Cox Bros & Co (Maidenhead) Ltd and Ors* [1927] 2 KB 9 (CA); and most recently the English Court of Appeal case of *Arbuthnott v Bonnyman* [2015] ALL ER (D) 218 which illustrates the current approach of the Courts.

[5] Under the Act, a Representative Action is described as follows "Where a member of a company brings proceedings against the company and other members have the same or substantially the same interest in relation to the proceedings, the Court may appoint that member to represent all or some of the members having the same interest and may, for that purpose, make such order as it thinks fit including an order (a) as to the control and conduct of the proceedings; (b) as to the costs of the proceedings; and (c) directing the distribution of any amount ordered to be paid by the defendant in the proceedings among the members represented". As such this action is only available to members and not any other party such as creditors.

to an order of the court having jurisdiction in the matter; (ii) a disposition for money on terms requiring all or substantially all net proceeds to be distributed to the members in accordance with their respective interest within one year after the date of disposition; or (iii) a transfer pursuant to the power of the directors to transfer assets for the protection thereof;

(d) a redemption of 10 per cent, or fewer, of the issued shares of the company required by the holders of 90 percent, or more, of the shares of the company pursuant to the terms of the Act; and

(e) an arrangement, if permitted by the BVI High Court.

7.7 Generally any other claims against a company by its members must be based on the general laws of contract or tort applicable in the BVI or their individual rights as members as established by the company's memorandum and articles of association.

7.8 The Act provides that if a company or a director of a company engages in, proposes to engage in or has engaged in, conduct that contravenes the Act or the memorandum or articles of association of the company, the BVI High Court may, on the application of a member or a director of the company, make an order directing the company or director to comply with, or restraining the company or director from engaging in conduct that contravenes the Act or the memorandum or articles of association.

## 8 Management

8.1 The Act provides that the business and affairs of a company shall be managed by, or under the direction or supervision of, the directors of the company. The directors of a company have all the powers necessary for managing, and for directing and supervising, the business and affairs of the company.

8.2 The Act provides that, subject to the memorandum or articles of association of a company, any sale, transfer, lease, exchange or other disposition, other than a mortgage, charge or other encumbrance or the enforcement thereof, of more than 50 per cent in value of the assets of the company, if not made in the usual or regular course of the business carried on by the company, must be approved by a resolution of members. The Act contains no other specific restrictions on the power of directors to dispose of assets of a company.

8.3 Fiduciary duties of directors have been enshrined in the Act, giving statutory standing to the duties to act honestly and in good faith, in what the relevant director believes to be the best interests of a company. The Act also permits a director of a subsidiary company to exercise his duty by acting in the best interests of a holding company, even though it may not be in the best interests of the company of which he is a director (if so authorised by the memorandum or articles of association and – where the company is not a wholly-owned subsidiary – with the prior agreement of the members).

8.4 The Act reflects the English common law duties of due care, diligence and skill and imposes on directors the duty to act for a proper purpose and not in a manner which contravenes either the Act or the company's memorandum or articles of association.

8.5 See paragraph 11 below in relation to conflicts of interest.

## 9 External Directors

There is no requirement under the Act for a company to appoint external directors/non-executive directors to the board of a company. The Act does not distinguish between a company's directors and independent directors.

## 10 Chairman of the Board Serving as CEO

Subject to the company's memorandum and articles of association and the Act in respect of matters related to disclosure of interests, there is no prohibition in the Act which prevents an individual acting as Chairman and CEO of a BVI company.

## 11 Transactions with Related Parties and Conflicts of Interest

11.1 Directors must not place themselves in a position in which there is a conflict between their duty to the company and their personal interests. This means that, strictly speaking, a director should not participate in a decision in circumstances where he has a potential conflict. That is, he should declare his interest and abstain. The Act provides that a director "*shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the company, disclose the interest to the board of the company*". The failure of a director to so disclose an interest does not affect the validity of a transaction entered into by the director or the company, provided that the director's interest was disclosed to the board prior to the company's entry into the transaction or was not required to be disclosed (for example where the transaction is between the company and the director himself or is otherwise in the ordinary course of business and on usual terms and conditions). Typically a BVI company's memorandum and articles of association will allow a director interested in a particular transaction to vote on it, attend meetings at which it is considered, and sign documents on behalf of the company which relate to the transaction.

11.2 Under BVI law, a transaction entered into by the company in respect of which a director is interested will not be voidable by the company where the members have approved or ratified the transaction in knowledge of the material facts of the interest of the director in the transaction, or if the company received fair value for the transaction.

11.3 Broadly speaking, the duties that a director owes to a company may be divided into two categories. The first category encompasses fiduciary duties, that is, the duties of loyalty, honesty and good faith. The second category encompasses duties of skill and care. Each is considered in turn below.

11.4 A director's fiduciary duties can be summarised as follows:

(a) Bona Fides: The directors must act bona fide in what they consider is in the best interests of the company (or, if permitted as above, that company's parent company).

(b) Proper Purpose: The directors must exercise the powers that are vested in them for the purpose for which they were conferred and not for a collateral purpose.

(c) Unfettered Discretion: Since the powers of the directors are to be exercised by them in trust for the company, they should not improperly fetter the exercise of future discretion.

(d) Conflict of Duty and Interest: see paragraph 11.1 above.

11.5 In addition to their fiduciary duties a director has the duties of care, diligence and skill which are owed to the company itself and not, for example, to individual members (subject to the limited exceptions as to enforcement on behalf of the company).

## 12 Alternate Directors

12.1 Subject to the memorandum and articles of association of a company, a director of the company may appoint as an alternate any other director or any other person who is not disqualified for appointment as a director under the Act to (a) exercise the appointing director's powers, and (b) carry out the appointing director's responsibilities, in relation to the taking of decisions by the directors in the absence of the appointing director.

12.2 The appointing director may, at any time, terminate the alternate's appointment. The appointment of an alternate director and its termination shall be in writing and written notice of the appointment and termination shall be given by the appointing director to the company (a) within such period as may be specified in the memorandum or articles of association; or (b) if no period is specified in the memorandum or articles of association, as soon as reasonably practicable.

12.3 The termination of the appointment of an alternate director does not take effect until written notice of the termination has been given to the company.

12.4 An alternate director has no power to appoint an alternate, whether of the appointing director or of the alternate director; and does not act as an agent of or for the appointing director.

12.5 An alternate director has the same rights as the appointing director in relation to any directors' meeting and any written resolution circulated for written consent. Any exercise by the alternate director of the appointing director's powers in relation to the taking of decisions by the directors, is as effective as if the powers were exercised by the appointing director. An alternate director is liable for his own acts and omissions as an alternate director and Division 3 of Part VI of the Act applies to a person appointed as an alternate director, when acting as such.

## 13 Audit Committee

13.1 There is no requirement under the Act for a company to appoint an audit committee.

## 14 Remuneration Committee

There is no requirement under the Act for a company to appoint a remuneration committee.

## 15 Limitation on Appointment and Termination of Position as Company Directors and Officers

15.1 A person shall not be appointed as director or alternate director of a company, or nominated as a reserve director[6], unless, he has consented in writing to be a director or alternate director or to be nominated as a reserve director.

15.2 The Act states that the following are disqualified for appointment as the director of a company:

(a) an individual who is under eighteen years of age;

(b) a person who is a disqualified person within the meaning of section 260(4) of the Insolvency Act (As Revised) (the "**Insolvency Act**");

(c) a person who is a restricted person within the meaning of section 409 of the Insolvency Act;

(d) an undischarged bankrupt; and

(e) a person who, in respect of a particular company, is disqualified by the memorandum or articles from being a director of the company.

15.3 A director of a company shall resign forthwith if he is, or becomes, disqualified to act as director pursuant to the above.

[6] Where a company has only one member who is an individual and that member is also the sole director of the company, notwithstanding anything contained in the memorandum or articles, that sole member/director may, by instrument in writing, nominate a person who is not disqualified from being a director of the company under the Act as a reserve director of the company to act in the place of the sole director in the event of his death.

15.4 There is no requirement under the Act for a company to appoint officers. It is at the discretion of a BVI company whether they wish to appoint officers of the company. The Act does not contain provisions for disqualification for appointment or removal as officer of a BVI company.

## 16 Remuneration Policy

16.1 Members or, subject to the memorandum and articles of association of a company, the directors of the company may fix the emoluments of directors in respect of services to be rendered in any capacity to the company.

16.2 There is no requirement under the Act for a company to maintain a remuneration policy for directors and/or officers.

## 17 Indemnification

BVI law does not limit the extent to which a company's articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the BVI High Court to be contrary to public policy (e.g. for purporting to provide indemnification against the consequences of committing a crime). An indemnity will be void and of no effect and will not apply to a person unless the person acted honestly and in good faith and in what he believed to be in the best interests of the company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

## 18 Insurance

Under the Act, the company may purchase and maintain insurance in relation to any person who is or was a director of the company, or who at the request of the company is or was serving as a director of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the company has or would have had the power to indemnify the person against liability. For the avoidance of doubt the company may purchase and maintain insurance in relation to any employee or officer of the company against any liability asserted against the employee or officer and incurred by the employee or officer in that capacity, whether or not the company has or would have had the power to indemnify the person against liability.

## 19 Internal and External Auditor

There is no requirement under the Act for a company to appoint an internal auditor. There is also no requirement under the Act for a company to appoint an external auditor unless the company is a public mutual fund or is carrying out certain activities within the BVI which require the company to be licensed and have an auditor e.g. insurance company. It is at the discretion of the directors of a BVI company whether they should call for the company's accounts to be audited.

## 20 Accounting Requirements and Financial Records

20.1. The Act also requires every company:

(a) to keep at the office of its registered agent or at such other place or places as the directors may determine, the records and underlying documentation[7] of the company;

[7] "Records and underlying documentation" includes accounts and records (such as invoices, contracts and similar documentation) in relation to (i) all sums of money received and expended by the company and the matters in respect of which the receipt and expenditure takes place; (ii) all sales and purchases of goods by the company; and (iii) the assets and liabilities of the company.

(b) to retain the records and underlying documentation for a period of at least five years from the date:

(i) of completion of the transaction to which the records and underlying documentation relate; or

(ii) the company terminates the business relationship[8] to which the records and underlying documentation relate;

(c) to provide its registered agent without delay any records and underlying documentation in respect of the company that the registered agent requests where the registered agent has been required to do so by the BVI Financial Services Commission or any other competent authority in the BVI acting pursuant to the exercise of a power under an enactment;

(d) to ensure that the records and underlying documentation of the company shall be in such form as:

(i) are sufficient to show and explain the company's transactions; and

(ii) will, at any time, enable the financial position of the company to be determined with reasonable accuracy;

(e) where the records and underlying documentation are kept at a place or places other than at the office of the company's registered agent, to provide the registered agent with:

(i) a written record of the physical address of the place at which the records and underlying documentation are kept; and

(ii) a written record of the name of the person who maintains and controls the company's records and underlying documentation;

(f) where the place or places at which the records and underlying documentation of the company, or the name of the person who maintains and controls the company's records and underlying documentation, change, to provide to its registered agent within 14 days of the change:

(i) the physical address of the new location of the records and underlying documentation; and

(ii) the name of the new person who maintains and controls the company's records and underlying documentation.

20.2 A company[9] must, in respect of each year, file an annual return with its registered agent. The annual return shall be filed within 9 months after the end of the year[10] to which the annual return relates and contain such information and be in such form as the Financial Services Commission may prescribe. Where a company fails to file its annual return as required under the Act, the

[8] "Business relationship" means a continuing arrangement between a company and one or more persons with whom the company engages in business, whether on a one-off, regular or habitual basis.

[9] The requirement to prepare and file an annual return does not apply to (i) a listed company, (ii) a company that is regulated under a financial services legislation and provides financial statements to the Financial Services Commission in accordance with the requirements of that financial services legislation; and (c) a company that files its annual tax return to the Inland Revenue Department accompanied by the company's financial statements.

[10] "Year" refers to a calendar year or, if a company's fiscal or financial year is not a calendar year, the company's fiscal or financial year.

registered agent shall, not later than 30 days after the annual return was due, notify the British Virgin Islands Registrar of Corporate Affairs in writing.

## 21 Inspection of Corporate Records

21.1 Members of the general public, on payment of a nominal fee, can inspect the public records of a company available at the office of the BVI Registrar of Corporate Affairs ("**Registrar of Corporate Affairs**") which will include the company's Certificate of Incorporation, its memorandum and articles of association (with any amendments) , a list of the names of the current directors and records of licence fees paid to date, and those records will also disclose any articles of dissolution or, articles of merger filed by the company and a register of charges if the company or a chargee has elected to file such a register.

21.2 A member of a company is entitled, on giving written notice to the company, to inspect (a) the memorandum and articles of association; (b) the register of members; (c) the register of directors; and (d) the minutes of meetings and resolutions of members and of those classes of members of which he is a member; and to make copies of or take extracts from the documents and records. Subject to the memorandum and articles of association, the directors may, if they are satisfied that it would be contrary to the company’s interests to allow a member to inspect any document, or part of a document, specified in (b), (c) and (d) above, refuse to permit the member to inspect the document or limit the inspection of the document, including limiting the making of copies or the taking of extracts from the records.

21.3 Where a company fails or refuses to permit a member to inspect a document or permits a member to inspect a document subject to limitations, that member may apply to the BVI High Court for an order that he should be permitted to inspect the document or to inspect the document without limitation.

21.4 A company is required to keep at the office of its registered agent: the memorandum and articles of association of the company; the register of members or a copy of the register of members; the register of directors or a copy of the register of directors; and copies of all notices and other documents filed by the company in the previous ten years.

21.5 Where a company keeps a copy of the register of members or the register of directors at the office of its registered agent, it is required to notify any changes to such registers to the registered agent, in writing, within 15 days of any change; and to provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept. In the event that the place at which the original register of members or the original register of directors is changed, the company is required to provide the registered agent with the physical address of the new location of the records within fourteen days of the change of location.

21.6 A company is also required to keep at the office of its registered agent or at such other place or places, within or outside the BVI, as the directors determine the minutes of meetings and resolutions of members and of classes of members, the minutes of meetings and resolutions of directors and committees of directors and underlying documentation. Such records must be kept for a period of at least five years, commencing on the date of completion of the transaction to which the records and underlying documentation relate, or the termination of the business relationship to which they relate. If such records are kept at a place other than at the office of the company’s registered agent, the company is required to provide the registered agent with a written record of the physical address of the place or places at which the records are kept and to notify the registered agent, within 14 days, of the physical address of any new location where such records may be kept.

21.7 Where a company has created a charge over any of its property, the company must keep a register of charges and enter particulars of the charge in such register. The register of charges or a copy thereof must be kept at the registered office of the company or at the office of its

registered agent. Where a change occurs in the relevant charges or in the details of the charges required to be recorded in the company's register of charges the company must, within 14 days of the change occurring, transmit details of the change to its registered agent.

## 22 The Right to Compromise or Settle

There are statutory provisions which facilitate both plans of arrangement and schemes of arrangement.

*Plan of Arrangement*

22.1 In relation to a plan of arrangement, "arrangement" includes:

(a) an amendment to the memorandum or articles of association;

(b) a reorganisation or reconstruction of a company;

(c) a merger or consolidation of one or more companies that are companies registered under the Act with one or more other companies, if the surviving company or the consolidated company is a company incorporated under the Act;

(d) a separation of two or more businesses carried on by a company;

(e) any sale, transfer, exchange or other disposition of any part of the assets or business of a company to any person in exchange for shares, debt obligations or other securities of that other person, or money or other assets, or a combination thereof;

(f) any sale, transfer, exchange or other disposition of shares, debt obligations or other securities in a company held by the holders thereof for shares, debt obligations or other securities in the company or money or other property, or a combination thereof;

(g) a dissolution of a company; and

(h) any combination of any of the things specified in paragraphs (a) to (g).

22.2 A plan of arrangement must be approved by a resolution of directors of the company and application made to the BVI High Court for approval of the proposed arrangement.

22.3 In the event that the BVI High Court makes an order approving a plan of arrangement, the directors of the company, if they are still desirous of executing the plan, shall confirm the plan of arrangement as approved by the Court whether or not the Court has directed any amendments to be made thereto.

22.4 The directors of the company, upon confirming the plan of arrangement shall (a) give notice to the persons to whom the order of the BVI High Court requires notice to be given; and (b) submit the plan of arrangement to those person for such approval, if any, as the Court requires.

22.5 After the plan of arrangement has been approved by those persons by whom the order of the BVI High Court may require approval, articles of arrangement shall be executed by the company and shall contain (a) the plan of arrangement, (b) the order of the Court approving the plan of arrangement; and (c) the manner in which the plan of arrangement was approved, if approval was required by the order of the BVI High Court. The articles of arrangement shall be filed with the Registrar of Corporate Affairs who shall register them. Upon registration of the articles of arrangement, the Registrar of Corporate Affairs shall issue a certificate in the approved form certifying that the articles of arrangement have been registered.

22.6 An arrangement is effective on the date the articles of arrangement are registered by the Registrar of Corporate Affairs or such date subsequent thereto, not exceeding thirty days, as is stated in the articles of arrangement.

22.7 A voluntary liquidator of the company may approve a plan of arrangement if a company is in liquidation, in which case the voluntary liquidator will carry out the functions of the director listed above and will be subject to such other modifications as are appropriate.

*Scheme of Arrangement*

22.8 Where a compromise or arrangement (which includes a reorganisation of the company's share capital by the consolidation of shares of different classes or by the division of shares into shares of different classes, or by both of those methods) is proposed between a company and its creditors, or any class of them, or between the company and its members, or any class of them, the BVI High Court may, on the application of (a) the company, (b) a creditor of the company, (c) a member, (d) the administrator, (e) the liquidator, order a meeting of the creditors or class of creditors, or of the members or class of members, as the case may be, to be summoned in such manner as the Court directs.

22.9 If a majority in number representing 75% in value of the creditors or class of creditors or members or class of members, as the case may be, present and voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement, if sanctioned by the BVI High Court, is binding on all the creditors or class of creditors, or the members or class of members, as the case may be, and also on the company or, in the case of a company in voluntary liquidation or in liquidation under the Insolvency Act, on the liquidator and on every person liable to contribute to the assets of the company in the event of its liquidation.

22.10 An order of the BVI High Court made as above shall have no effect until a copy of the order has been filed with the Registrar of Corporate Affairs.

## 23 Compulsory Acquisition

Subject to the memorandum or articles of association of a company, members of the company holding 90 per cent of the votes of the outstanding shares entitled to vote may give a written instruction to a company directing the company to redeem the shares held by the remaining members. Upon receipt of the written instruction, the company is required to redeem the shares specified in the written instruction irrespective of whether or not the shares are by their terms redeemable and give written notice to each member whose shares are to be redeemed stating the redemption price and the manner in which the redemption is to be effected. In such circumstances minority members can dissent from the acquisition and are entitled to receive payment of the "fair value" of their shares which is assessed on the basis of a statutory appraisal process.

## 24 Enforcement of Foreign Judgments

24.1 No foreign judgment has any direct operation in the BVI, but it may be enforced by action at common law or in the case of judgments from certain jurisdictions by registration under the Foreign Judgments Reciprocal Enforcement Ordinance or the Reciprocal Enforcement of Judgments Act in the BVI. It should be noted that not every foreign judgment is capable of enforcement. Some may lend themselves only to recognition by the BVI courts[11]. The Reciprocal Enforcement of Judgments Act (As Revised) and the Foreign Judgments

[11] For example, a judgment dismissing a claim (although an adverse costs order may be enforced); a declaratory judgment; and orders relating to the bankruptcy of individuals or the liquidation of companies. The British Virgin Islands court may also recognise a foreign judgment as a defence to an action or recognise it as constituting an assignment of property.

(Reciprocal Enforcement) Ordinance (As Revised) does not extend to Israel or the United States of America and thus enforcement by common law is applicable. Under common law, any final and conclusive money judgment for a definite sum obtained against the debtor in the courts of a foreign jurisdiction is treated by the BVI courts as a cause of action for debt itself so that no retrial of the issues is necessary provided that in respect of the foreign judgment:

(a) the foreign court issuing the judgment had jurisdiction in the matter and the company either submitted to such jurisdiction or was resident or carrying on business within such jurisdiction and was duly served with process;

(b) the judgment given by the foreign court was not in respect of penalties, taxes, fines or similar fiscal or revenue obligations of the company;

(c) in obtaining judgment there was no fraud on the part of the person in whose favour judgment was given or on the part of the foreign court;

(d) recognition or enforcement of the judgment in the BVI would not be contrary to public policy; and

(e) the proceedings pursuant to which judgment was obtained were not contrary to natural justice.

24.2 Under BVI law a judgement or order for payment of a sum of money other than an order for payment of money into a court may be enforced by (a) a charging order; (b) a garnishee order; (c) a judgement summons; (d) an order for seizure of sale of goods; and (e) the appointment of a receiver.

24.3 A party to a judicial proceeding in a foreign court outside the BVI who has in its favour a non-money judgment, such as a declaratory judgment or an injunction, may, in certain circumstances, be able to enforce that judgment in the courts of the BVI. This would involve that party bringing fresh proceedings in the BVI in which the equitable doctrine of estoppel could be relied upon to obtain summary judgment from the BVI court on the basis that it would be an abuse of process for the claim to be re-litigated. In order to avail itself of the equitable doctrine of estoppel, certain requirements must be met including: (a) the non-money foreign judgment must be based on a cause of action recognised under the law of the BVI; (b) the foreign judicial proceeding must have identical parties and identical issues; (c) the foreign judgment must be rendered by a court with judicial authority; (d) the judgment must be final and conclusive; and (e) the judgment debtor must either have been present in the foreign country at the time the foreign proceedings were commenced, or have submitted to the jurisdiction of the foreign court by voluntarily appearing in the foreign proceedings, or prior to the commencement of those proceedings, agreed to submit to the jurisdiction of the foreign court in respect of the subject matter of the proceedings.

24.4 The BVI court plays a supportive role to facilitate arbitration procedures and will recognise and enforce foreign arbitral awards made in any of the contracting states to the New York Convention under the terms of the Convention. In addition, pursuant to the Arbitration Act (As Revised) (a) the BVI became a signatory to the New York Convention and (b) the grounds for refusal of enforcement that apply to a New York Convention award also apply to the enforcement of a non-Convention award, and in both cases those grounds are fully incorporated into the Arbitration Act (As Revised) itself.

24.5 The articles of association of a company may provide for any dispute involving the company or the company and its members or the members of the company among themselves, to be settled through arbitration and for such arbitration to be conducted in the BVI pursuant to or in accordance with the Arbitration Act (As Revised) or any subsidiary legislation made thereunder.

## 25 Liquidation

25.1 The liquidation of a BVI company may be a voluntary solvent liquidation or a liquidation under the Insolvency Act. Where a company has been struck off[12] the Register of Companies under the Act, the company is dissolved on the date the Registrar of Corporate Affairs publishes a notice of the striking off in the *British Virgin Islands Gazette*.

*Voluntary Liquidation*

25.2 If the liquidation is a solvent liquidation, the provisions of the Act governs the liquidation. A company may only be liquidated under the Act as a solvent liquidation if it has no liabilities or it is able to pay its debts as they fall due and the value of its assets exceeds its liabilities. Subject to the memorandum and articles of association of a company, a liquidator may be appointed by a resolution of directors or resolution of members but if the directors have commenced liquidation by a resolution of directors the members must approve the liquidation plan by a resolution of members save in limited circumstances.

25.3 A sole liquidator appointed after 1 January 2023 must be resident in the BVI. An individual resident outside the BVI may be appointed to act as liquidator jointly with a BVI resident liquidator.

25.4 A liquidator is appointed for the purpose of collecting in and realising the assets of a company and distributing proceeds to creditors.

*Liquidation under the Insolvency Act*

25.5 The Insolvency Act governs an insolvent liquidation. Pursuant to the Insolvency Act, a company is insolvent if (a) it fails to comply with the requirements of a statutory demand that has not be set aside pursuant to the Insolvency Act, execution or other process issued on a judgement, decree or order of court in favour of a creditor of the company is returned wholly or partly unsatisfied or either the value of the company's liabilities exceeds its assets or the company is unable to pay its debts as they fall due. The liquidator must be either the Official Receiver in BVI or a BVI licensed insolvency practitioner. An individual resident outside the BVI may be appointed to act as liquidator jointly with a BVI licensed insolvency practitioner or the Official Receiver. The members of the company may appoint an insolvency practitioner as liquidator of the company or the court may appoint an Official Receiver or an eligible insolvency practitioner. The application to the court can be made by one or more of the following: (a) the company (b) a creditor (c) a member (d), the supervisor of a creditors' arrangement in respect of the company, the Financial Services Commission and the Attorney General in the BVI.

25.6 The court may appoint a liquidator if:

(a) the company is insolvent;

(b) the court is of the opinion that it is just and equitable that a liquidator should be appointed; or

(c) the court is of the opinion that it is in the public interest for a liquidator to be appointed.

[12] Where a company has been struck off the Register and dissolved, the company and the directors, members and any liquidator or receiver thereof, may not (a) commence legal proceedings, carry on any business or in any way deal with the assets of the company; (b) defend any legal proceedings, make any claim or claim any right for, or in the name of, the company; or (c) act in any way with respect to the affairs of the company. Notwithstanding the foregoing, where a company has been struck off the register and dissolved, the company, or a director, member, liquidator or receiver thereof, may (a) make application for restoration of the company to the Register; (b) continue to defend proceedings that were commenced against the company prior to the date of the striking-off; and (c) continue to carry on legal proceedings that were instituted on behalf of the company prior to the date of striking-off. The fact that a company is struck off the Register and dissolved does not prevent (a) the company from incurring liabilities, or (b) any creditor from making a claim against the company and pursuing the claim through to judgement or execution, and does not affect the liability of any of its members, directors, officers or agents.

25.7 An application under (a) above by a member may only be made with leave of the court, which shall not be granted unless the court is satisfied that there is prima facie case that the company is insolvent. An application under (c) above may only be made by the Financial Services Commission or the Attorney General and they may only make an application under (c) above if the company concerned is, or at any time has been, a regulated person (i.e. a person that holds a prescribed financial services licence) or the company is carrying on, or at any time has carried on, unlicensed financial services business.

*Order of Preferential Payments upon Liquidation*

25.8 Upon the insolvent liquidation of a company, the assets of a company shall be applied in accordance with the following priorities: (a) in paying, in priority to all other claims, the costs and expenses properly incurred in the liquidation in accordance with the prescribed priority; (b) after payment of the costs and expenses of the liquidation, in paying the preferential claims admitted by the liquidator (wages and salary, amounts to the BVI Social Security Board, pension contributions, government taxes) - preferential claims rank equally between themselves and, if the assets of the company are insufficient to meet the claims in full, they shall be paid rateably; (c) after the payment of preferential claims, in paying all other claims admitted by the liquidator, including those of non-secured creditors - the claims of non-secured creditors of the Company shall rank equally among themselves and if the assets of the company are insufficient to meet the claims in full, such non-secured creditors shall be paid rateably; (d) after paying all admitted claims, paying any interest payable under the BVI Insolvency Act; and finally (e) any surplus assets remaining after payment of the costs, expenses and claims above shall be distributed to the members in accordance with their rights and interests in the Company. Part VIII of the Insolvency Act provides for various applications which may be made by a liquidator to set aside transactions which have unfairly diminished the assets which are available to creditors.

25.9 The appointment of a liquidator over the assets of a company does not affect the right of a secured creditor to take possession of and realise or otherwise deal with assets of the company over which that creditor has a security interest. Accordingly, a secured creditor may enforce its security directly without recourse to the liquidator, in priority to the order of payments described in paragraph 25.8. However, so far as the assets of a company in liquidation available for payment of the claims of unsecured creditors are insufficient to pay the costs and expenses of the liquidation and the preferential creditors, those costs, expenses and claims have priority over the claims of chargees in respect of assets that are subject to a floating charge created by a company and shall be paid accordingly out of those assets.

*Voidable Transactions*

25.10 In the event of the insolvency of a company, there are four types of voidable transaction provided for in the Insolvency Act:

(a) Unfair Preferences: Under section 245 of the Insolvency Act a transaction entered into by a company, if it is entered into within the hardening period at a time when the company is insolvent, or it causes the company to become insolvent (an "**insolvency transaction**"), and which has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position it would have been in if the transaction had not been entered into, will be deemed an unfair preference. A transaction is not an unfair preference if the transaction took place in the ordinary course of business. It should be noted that this provision applies regardless of whether the payment or transfer is made for value or at an undervalue.

(b) Undervalue Transactions: Under section 246 of the Insolvency Act the making of a gift or the entering into of a transaction on terms that the company is to receive no consideration, or where the value of the consideration for the transaction, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company will (if it is an insolvency transaction entered

into within the hardening period) be deemed an undervalue transaction. A company does not enter into a transaction at an undervalue if it is entered into in good faith and for the purposes of its business and, at the time the transaction was entered into, there were reasonable grounds for believing the transaction would benefit the company.

(c) Voidable Floating Charges: Under section 247 of the Insolvency Act a floating charge created by a company is voidable if it is an insolvency transaction created within the hardening period. A floating charge is not voidable to the extent that it secures: (i) money advanced or paid to the company, or at its direction, at the same time as, or after, the creation of the charge; (ii) the amount of any liability of the company discharged or reduced at the same time as, or after, the creation of the charge; (iii) the value of assets sold or supplied, or services supplied, to the company at the same time as, or after, the creation of the charge; and (iv) the interest, if any, payable on the amount referred to in (i) to (iii) pursuant to any agreement under which the money was advanced or paid, the liability was discharged or reduced, the assets were sold or supplied or the services were supplied.

(d) Extortionate Credit Transactions: Under section 248 of the Insolvency Act an insolvency transaction entered into by a company for, or involving the provision of, credit to the company, may be regarded as an extortionate credit transaction if, having regard to the risk accepted by the person providing the credit, the terms of the transaction are or were such to require grossly exorbitant payments to be made in respect of the provision of the credit, or the transaction otherwise grossly contravenes ordinary principles of fair trading and such transaction takes place within the hardening period.

25.11 The "hardening period" (known in the Insolvency Act as the "vulnerability period") in respect of each voidable transaction provision set out above is as follows:

(a) for the purposes of sections 245, 246 and 247 of the Insolvency Act the period differs depending on whether the person(s) that the transaction is entered into with, or the preference is given to, are "connected persons" of the company within the meaning of the Insolvency Act:

(i) in the case of "connected persons" the "hardening period" is the period beginning two years prior to the "onset of insolvency" and ending on the appointment of a liquidator of the company; and

(ii) in the case of any other person, the "hardening period" is the period beginning six months prior to the "onset of insolvency" and ending on the appointment of a liquidator of the company; and

(b) for the purposes of section 248 of the Insolvency Act the "hardening period" is the period beginning five years prior to the "onset of insolvency" and ending on the appointment of a liquidator of the company regardless of whether the person(s) that the transaction is entered into with is a connected person.

25.12 The onset of insolvency for these purposes is the date on which an application for the appointment of a liquidator was filed (if the liquidator was appointed by the court) or the date of the appointment of the liquidator (where the liquidator was appointed by the members).

25.13 A conveyance made by a person with intent to defraud creditors is voidable at the instance of the person thereby prejudiced. There is no requirement that the relevant transaction was entered into at a time when one party was insolvent or became insolvent as a result of the transaction, and there is no requirement that the transferring party subsequently went into liquidation. However, no conveyance entered into for valuable consideration and in good faith to a person who did not have notice of the intention to defraud may be impugned.

**26 Jurisdiction**

Subject to the memorandum or articles of association of a company, a company can enter into documents governed by Israeli law and can submit to the jurisdiction of the Courts of Israel contained in such documents and the submission is legal, valid and binding on the company assuming that it has been made in good faith and would be regarded as a valid and binding submission which will be upheld by the Courts of Israel.

We hereby consent to the inclusion of this opinion letter and its translation to Hebrew (which we have not reviewed) in the Company's supplementary prospectus (or draft supplementary prospectus) to be published no later than November 2025 and (if applicable) its filing with the Israeli Securities Authority.

This opinion letter is given only as to, and based on, circumstances and matters of fact existing and known to us on the date of this opinion letter. This opinion letter only relates to the laws of the British Virgin Islands which are in force on the date of this opinion letter.

This opinion letter is in English and we have not approved, and we shall have no liability in respect of, any translation of this opinion letter.

This opinion letter may be relied upon by the addressee only. It may not be relied upon by any other person except with our prior written consent.

We hereby authorise the authorised electronic signatory of the Company to file this opinion electronically (if applicable) with the Israeli Securities Authority.

Yours faithfully

Maples and Calder.

Maples and Calder

**First Schedule**

**List of Addressees**

SIMAD Holdings Ltd.
PO Box 173
Road Town
Tortola
British Virgin Islands

The Tel Aviv Stock Exchange Ltd
2 Ahuzat Bayit St., Tel Aviv
Israel

Goldfarb Gross Seligman & Co., Law Offices
Electra Tower
98 Yigal Alon Street
Tel Aviv 6789141
Israel

# Chapter 6 – Designation of the Proceeds

6.1. **The Proceeds from the Offering**

The proceeds expected from the issuance of the Offered Securities and the estimated expenses involved in the issue of the Offered Securities and the expected net proceeds from the offering shall be set forth in the Supplementary Notice to be published by the Company in accordance with Section 16(A1) (2) of the Securities Law-1968 and the Securities Regulations (Supplementary Notice and Draft Prospectus), 2007. As of the date of the Prospectus, details of the engagement with distributors and the consideration therefore have yet to be finalized.

However, the Company estimates that the expected (gross) proceeds, assuming the entire Amount Issued to the Public of the Debentures (Series A) offered under this Prospectus and the Supplementary Notice and the total expected expenses involved in the preparation and publication of this Prospectus and the Supplementary Notice are as detailed below:

| | |
|---|---|
| the Immediate Expected Proceeds (Gross) | NIS 610,700 thousand |
| Net of consultancy, Management, distribution and coordination fees | Approx. NIS 15,000 thousand |
| Net of Other expenses | Approx. NIS 200 thousand |
| **Expected proceeds (net)** | **Approx. NIS 595,500 thousand** |

Accordingly, assuming the full Amount Issued to the Public is purchase, the total issuance expenses shall constitute approximately 2.5% of the immediate expected proceeds (gross) for the Debentures.

It should be emphasized that the above regarding the issuance expenses is an initial estimate by the Company only based on the information available to it at this time and its estimates, and the above amounts may change and will be updated as part of the Supplementary Notice.

6.2. **Designation of the Proceeds from the Offering**

The Company intends to use the proceeds of the offering to finance its ongoing business operations, including, *inter alia*, the acquisition of new assets and renovation of its assets, and to strengthen the Company's capital structure and/or as otherwise determined by the Company's Board of Directors from time to time.

Without derogating from the foregoing, the Company intends to use the proceeds of the offering for (in the order of presentation and depending on the actual scope of the offering):

If the Company issues Debentures for a (gross) consideration of at least $148 million – **(a)** the early repayment of the loan provided to it by Bank of America (the balance of which as of the date of the prospectus is approximately $70 Million (principal)). For details regarding the aforementioned loan, see Section 7.14.4 of the prospectus; **(b)** Payment to the Company Controlling Shareholders in amount of $50 million in exchange to the Transfer Rights (For details see section 7.1.6 to the Prospectus);

If the Company issues Debentures for a (gross) consideration of at least $167 million –as is stated at paragraphs (a) and (b) above, and (c) the early repayment of the provided with respect to the Banner

Camp by a financing entity (the balance of which as of the Prospectus date is approximately $13 Million (principal));

If the Company issues Debentures for a (gross) consideration of at least $172 million – as is stated at paragraphs (a), (b) and (c) above, and **(d)** early repayment of the loans provided with respect to Island Lake Camp by financing entities (the balance of which as of the prospectus date is approximately $5 Million (principal));

If the Company issues Debentures for a (gross) consideration of at least $183 million – as is stated at paragraphs (a), (b), (c) and (d) above, and **(e)** early repayment of the loans provided with respect to Lokanda Camp by financing entities (the balance of which as of the prospectus date is approximately $10.6 Million (principal));

If the Company issues Debentures for a (gross) consideration of at least $225 million – as is stated at paragraphs (a), (b), (c), (d) and (e) above, and **(f)** the early repayment of the loan provided to it by Bank of New Hampshire (the balance of which as of the date of the prospectus is approximately $30 Million (principal)). For details regarding the aforementioned loan, see Section 7.14.4 of the prospectus;

If the Company issues Debentures for a (gross) consideration of at least $253 million – as is stated at paragraphs (a), (b), (c), (d), (e) and (f) above, and **(g)** the early repayment of the loans provided in connection with Mesorah and Pine Forest camps, by a financing entity (the balance of which as of the date of the prospectus is approximately $39 Million (principal)).

The Company may, from time to time, in its sole discretion and subject to the approval of its board of directors, change the designation of the proceeds from the offering. The Company shall issue an immediate report regarding the said change.

It should be noted with respect to the tiers detailed in this section that to the extent that the Company issues Debentures for a (gross) consideration for an amount exceeding that specified in a particular tier but for a (gross) consideration for an amount lower than the tier following it, the Company will use the difference for the purpose of its ongoing business activities, including the acquisition of new income-producing real estate assets (that are not in the Company's current field of activity) and renovation of the Company's existing assets and/or in accordance with the decisions of the Company's Board of Directors as may be made from time to time.

The Company may hedge, fully or partially, its exposure to exchange rate fluctuations of the US dollar against the Israeli shekel, resulting from the fact that the debentures are denominated in NIS, by purchasing SWAPs, and may use the proceeds from the offering for the acquisition of such protection.

Until the use of the proceeds from the offering, as aforementioned, the Company shall deposit and invest the proceeds from the offering in low risk investments, as it shall deem suitable, out of the following options: bank deposits which are rated (Israeli rating) A and above (or an equivalent international rating) and/or government bonds issued by the Bank of Israel or the US government, and/or short term bonds issued by the Bank of Israel and/or similar securities issued by the US government, as shall be determined by the Company's management from time to time.

It is clarified that as of the date of the Prospectus, the Company does not intend to use the proceeds from the offering for investment in currency derivatives other than for currency protection purposes.

With respect to the Shelf Prospectus, should Securities be offered in the future under this Shelf Prospectus and under the Shelf Offering Reports, the Issuance Consideration received shall be used to finance the Company's business activities and its investments in its field of operation, as is set forth in Chapter 7 to the Prospectus; this, pursuant to resolutions made by the Company's Board of Directors, as shall be made from time to time. If a specific designation is set forth for the consideration of the Securities under a Shelf Offering Report published by the Company, said designation shall be set forth in the Shelf Offering Report.

6.3. **Minimum Amount**

The issuance of Debentures within the framework of this Prospectus is not conditional on raising a minimum amount, except for the requirement described in Section 2.3.1.2 of the Prospectus.

**6.4. Underwriting**

The issuance of the Debentures offered hereunder shall be partially guaranteed by underwriting, according to Regulation 11(a) (1) to the Manner of Public Offering Regulations. The Company intends to engage with Infin Capital Ltd. ("**Pricing Underwriter**") in said underwriting agreement. Subject to the Company's engagement in the underwriting agreement, the Pricing Underwriter shall sign the Supplementary Notice, under which the Offered Securities will be offered, and his signature shall be deemed as the signing of the Prospectus Within the framework of the Supplementary Notice, the information missing in the Prospectus shall be completed and/or updated, including , but not only, underwriting, distribution, coordination and so forth.

# CHAPTER 7 - DESCRIPTION OF THE COMPANY'S BUSINESS

## Table of Contents


| | | |
|---|---|---|
| 7.1 | The Company's Activities and Business Development | 7-1 |
| 7.2 | Field of Activity of the Company | 7-8 |
| 7.3 | Investments in the Company's Capital and Transactions in its Shares | 7-8 |
| 7.4 | Distribution of Dividends | 7-8 |
| 7.5 | Financial Information regarding the Company’s Field of Activity | 7-9 |
| 7.6 | General Environment and Impact of External Factors | 7-9 |
| 7.7 | Field of Loan Origination | 7-13 |
| 7.8 | Information with respect to loans granted by the Company | 7-18 |
| 7.9 | Products and Services | 7-20 |
| 7.10 | Clients | 7-22 |
| 7.11 | Marketing and Distribution | 7-22 |
| 7.12 | Competition | 7-23 |
| 7.13 | Fixed Assets, Real Estate and Facilities | 7-25 |
| 7.14 | Working Capital | 7-25 |
| 7.15 | Financing | 7-25 |
| 7.16 | Taxation | 7-30 |
| 7.17 | Human Resources | 7-31 |
| 7.18 | Material Agreements | 7-31 |
| 7.19 | Restrictions and Supervision of the Company's Activity | 7-31 |
| 7.20 | Business Objectives and Strategy | 7-32 |
| 7.21 | Legal Proceedings | 7-33 |
| 7.22 | Discussion of Risk Factors | 7-34 |
| 7.23 | Explanations of the Board of Directors condition of the Company for the periods ended December 31,2024 and June 30, 2025 | 7-40 |


As of the Prospectus Date[1], the Company complies with the terms set forth in Section 1(a) to the First Schedule of the Securities Regulations (Prospectus Details and Draft Prospectus), 5729-1969 (“**Prospectus Regulation**”) and therefore, the Description of the Company and its business, as shall be set forth hereinafter, are for the period commencing on January 1, 2023 and ending closely to the Prospectus Date, unless it is otherwise explicitly stated.

[1] In this Chapter, the “**Prospectus Date**” shall mean: upon the publishing of the Prospectus or shortly thereafter, as applicable.

# PART A - DESCRIPTION OF THE GENERAL DEVELOPMENT OF THE COMPANY'S BUSINESS

7.1. **The Company's Activities and Business Development**

7.1.1. SIMAD Holdings, Ltd. (the "**Company**") was incorporated on May 28, 2025, in accordance with the BVI Business Companies Act, 2004, in the British Virgin Islands, as a private company limited by shares.

7.1.2. The Company was established, among other reasons, for the purposes of raising debt through the issuance of debentures (non-convertible into shares), and their registration for trade on the Tel Aviv Stock Exchange Ltd. ("**TASE**"). Since the incorporation of the Company and until the date of the Prospectus, the Company has had no operations.

7.1.3. The Company Operates in the field of summer camps in the United States, whereby within this framework the Company operates to purchase, manage and operate summer camps for children and teenagers in the United States, located on real estate properties owned by the Company. As of the Prospectus date the Company has 30 summer camps in the United States, *inter alia*, in the states of: New York, New Jersey, Maine, Pennsylvania and so forth, in which approximately 20, 500 children enroll each year.

7.1.4. SIMAD Group

7.1.4.1. The SIMAD Group

SIMAD group (the "**Group**" or "**SIMAD Group**") was founded by Michael Shabsels and David Shabsels (the "**Controlling Shareholders)**" who are senior and experienced investors in the field of hospitality and leisure.

The Group's activities focus on the acquisition and management of cash-generating assets. From the date of its establishment, the Group has purchased more than 80 real estate properties in the US, in a wide variety of areas, including: residential, commercial, office, hotel and summer camping.

As of the year 2006 the Group operates in the field of summer camps for children in the United States, and within this framework the Group purchased 30 camps.

The Group's management has vast experience of 10-20 years in the Company's field of activity and it employs over 7,500 employees in its various properties (of which approximately 300 employees are permanent employees, and the rest are seasonal employees).

Within the framework of its operations, the Group purchased different assets, including multifamily properties, offices, retail spaces as well as properties designated for operating summer camps.

7.1.4.2. Obligation to limit the operations of the Controlling Shareholders

All opportunities for equity investments in summer camps in the United States a "**New Property**") presented to the Controlling Shareholders, will be first offered

to the Company, excluding: (1) opportunities related to existing investments of the Controlling Shareholders and their affiliates that are not transferred to the Company; (2) investments of any kind outside the Company's field of activity.

The Controlling Shareholders have undertaken that if they seek or plan to invest in a New Property which is included in the Company's field of activity (and is not excluded in accordance with the above, then the Controlling Shareholders will deliver to the Company a written offer to purchase and/or invest in the New Property (the "**Offer**"), together with reasonable supporting materials and information in order to enable the Board of Directors to make an investment decision with regards to the Offer. The Offer will be evaluated by the Board of Directors of the Company, which will be required to deliver its decision with regard to the Offer within 5 business days after receiving the full information required by the Board of Directors to make a decision.

The decision whether to agree to the Offer will be made only by the Board of Directors, in good faith, based on any number of factors, including, without limitation, (1) whether the Company has sufficient capital to make the proposed investment; (2) whether the proposed investment is suitable for the Company (taking into account, without limitation, the Company's policies, objectives, guidelines, restrictions, diversification policy, and any other relevant business consideration, be it regulatory or legal); (3) the potential impact of the proposed investment on the Company's financial statements; (4) the potential impact of the proposed investment on the Company's ability to comply with the covenants set forth in the Deed of Trust; and (5) any other relevant business, regulatory or legal consideration. In any event where the Company's Board of Directors of the Company does not approve the Offer, the decision to reject the offer will be brought to the approval of the Audit Committee, whose decision to reject the Offer shall be final. In case the Audit Committee does not agree to reject the Offer, the Offer will be submitted in writing to the Board of Directors for a second discussion, which will be permitted to approve or reject the Offer. This proceeding shall be held only if the Controlling Shareholders wish to make the proposed investment.

If the Company shall not respond to the Offer within five (5) Business Days from the date in which the full information required by the Board of Directors to make a decision was received thereby, the Offer shall be deemed rejected by the Company, and the Controlling Shareholders (either directly or indirectly) will be permitted to accept the Offer. Additionally, even if despite the Company accepting the Offer, the agreement for the Company's investment in the New Property and/or the purchase thereof will not come into fruition (for reasons unrelated to the Controlling Shareholders) the Controlling Shareholders (either directly or indirectly) will be permitted to make the investment and/or purchase.

The Company will publish a report regarding the decisions of the Company's Audit committee and Board of Directors after each decision relating to delimitation of operations.

For the avoidance of doubt, it is clarified and emphasized that the above-mentioned undertaking shall apply as of the date in which the Company's securities will be listed in the Stock exchange and onwards and shall not apply to other properties held by the Controlling Shareholders as of the Issuance Date (which were not transferred to the Company's ownership).

It should be noted that to the best of the Company's knowledge, as of the Prospectus date, the Controlling Shareholders own summer camps which are not owned through the Company, as well as have a separate investment real estate activity.

7.1.5. Holdings Structure Chart as of the date of the Prospectus:




(*) In accordance with contractual agreements, the actual holding rate is 51%.

(**) In accordance with contractual agreements, the actual holding rate is 79%.

(***) An agreement was signed between the operating company (Wiki Operatingco LLC) and the land company (which is a company controlled by the controlling shareholders of the Company) under which the operating company will lease the property. For details, see section 9.2.2 of the prospectus.

7.1.6. **<u>Assignment of the Transferred Rights to the Company against issuance of shares</u>**

The Company entered into an agreement with the Controlling Shareholders, and companies controlled thereby pursuant to which the Controlling Shareholders undertook to assign to the Company the full membership interest in the subsidiary entities detailed below (Collectively, the "**Transferred Rights**" or the "**Transferred Companies**"), in exchange for the issuance of shares of the Company and a cash payment of $50 million (which will be paid from the proceeds of the issuance of the company's debentures (Series A)).

The assignment of the Transferred Rights was made on an "*as-is*" basis as of the date in which the transfer of the Transferred Rights is completed (the "**Closing Date**"), and the Company shall not be entitled to any indemnification from the Controlling Shareholders, with respect to the Transferred Rights. It shall be clarified that after completing the assignment of the Transferred Rights to the Company, the Company will not be subject to any restrictions on the further assignment and/or sale of the Transferred Rights, and/or other assets of the Company, except with respect for the consent, if any, of lenders with respect to any sale and/or transfer (if relevant)

**In This Chapter 7, unless stated otherwise, or unless implied otherwise as a result of its contents or context, the description of the Company's business is made assuming the completion of the transfer of the Transferred Rights to the Company (including with respect to relevant past periods). Accordingly, the term "as at the date of the Prospectus" shall have the meaning assuming completion of the transfer of the Transferred Rights to the Company notwithstanding the fact that their actual transfer shall be made on the Date of Closing. For details regarding the manner of preparation of the financial statements of the Company on a pro forma basis, see Note 1 to the Company's Pro Forma Financial Statements as of June 30, 2025 (the "Financial Statements").**

The following table specifies the Transferred Rights, as well as data regarding the necessary consents for completing the transference of the Transferred Rights. It is clarified that any transfer of said rights is conditioned upon the receipt of capital rights in the Company's and a cash payment, as described in this Section, and in Sections 3.3.1 and 9.2.1 of the Prospectus.

| Serial No. | Camp name | Transferred entity | Holder of rights in the transferred entity | | Total transference rate | Is there need for any consent? |
|---|---|---|---|---|---|---|
| | | | Name | Holding rate in the transferred entity | | |
| C1 | Achim | Achim Operatingco | Michael Shabsels | 1% | 100% | - |
| | | | Shabsels Gift LLC | 49% | | - |

| Serial No. | Camp name | Transferred entity | Holder of rights in the transferred entity | | Total transference rate | Is there need for any consent? |
|---|---|---|---|---|---|---|
| | | | Name | Holding rate in the transferred entity | | |
| | | LLC | David Shabsels | 50% | | - |
| | | Achim Landco LLC | Michael Shabsels | 1% | | Senior Lender (*) |
| | | | Shabsels Gift LLC | 49% | | Senior Lender (*) |
| | | | David Shabsels | 50% | | Senior Lender (*) |
| C2 | Banner | Banner Landco LLC | SIMAD Holdings LLC | 90% | 90% | Senior Lender (**) |
| | | Banner Operatingco LLC | SIMAD Holdings LLC | 90% | | - |
| C3 | Blue Star | Bluestar Operatingco, LLC | SIMAD Holdings LLC | 70% | 70% | - |
| | | Bluestar Landco, LLC | SIMAD Holdings LLC | 70% | | - |
| C4 | Chateaugay | Chateaugay Landco LLC | Shabsels Gift Trust | 50% | 100% | Senior Lender (**) |
| | | | Holdingcods LLC | 50% | | Senior Lender (**) |
| | | Chateaugay Campco LLC | Shabsels Gift Trust | 50% | | - |
| | | | Holdingcods LLC | 50% | | - |
| C5 | Chen-A-Wanda | BAHS Operating Inc. | Michael Shabsels | 50% | [2]99% | - |
| | | | David Shabsels | 50% | | - |
| | | BAHS Holdings LLC | SIMAD Holdings LLC | 99% | | Senior Lender (*) |
| C6 | Club Getaway | Club Getaway Operatingco, LLC | SIMAD Holdings LLC | 80% | 80% | - |
| | | Club Getaway Landco, LLC | SIMAD Holdings LLC | 80% | | Senior Lender (*) |
| C7 | Country Roads | Country Roads Landco LLC | SIMAD Holdings LLC | 99% | 99% | Senior Lender (*) |
| | | Country Roads Operatingco LLC | SIMAD Holdings LLC | 99% | | - |
| C8 | Eagles Landing | Mill Road Landco LLC | Shabsels Management LLC | 50% | 100% | Senior Lender (*) |
| | | | David Shabsels | 50% | | Senior Lender (*) |
| | | | Shabsels Management LLC | 50% | | - |

2 In accordance with contractual agreements, the actual holding rate is 51%.

| Serial No. | Camp name | Transferred entity | Holder of rights in the transferred entity | | Total transference rate | Is there need for any consent? |
|---|---|---|---|---|---|---|
| | | | Name | Holding rate in the transferred entity | | |
| | | Eagle's Landing Day Camp LLC | David Shabsels | 50% | | - |
| C9 | Echo | Shab Operating Inc | Michael Shabsels | 50% | 100% | - |
| | | | David Shabsels | 50% | | - |
| | | Shab Holdings LLC | Michael Shabsels | 1% | | Senior Lender (*) |
| | | | David Shabsels | 50% | | Senior Lender (*) |
| | | | Shabsels Gift LLC | 49% | | Senior Lender (*) |
| C10 | Green Lane | Green Lane Landco, LLC | Michael Shabsels | 25.5% | 51% | Senior Lender (*) |
| | | | David Shabsels | 25.5% | | Senior Lender (*) |
| | | Green Lane Operatingco, LLC | Michael Shabsels | 25.5% | | - |
| | | | David Shabsels | 25.5% | | - |
| C11 | Malka | Greenvillelan d LLC | Michael Shabsels | 1% | 100% | Senior Lender (*) |
| | | | David Shabsels | 50% | | Senior Lender (*) |
| | | | Shabsels Gift LLC | 49% | | Senior Lender (*) |
| | | Malka Operatingco LLC | Michael Shabsels | 1% | | - |
| | | | David Shabsels | 50% | | - |
| | | | Shabsels Gift LLC | 49% | | - |
| C12 | IAFA | IAFALANDC O, LLC | SIMAD Holdings LLC | 99% | 75% | Senior Lender (**) |
| | | IAFAOPERA TINGCO, LLC | SIMAD Holdings LLC | 99% | | - |
| C13 | Island Lake | Island Lake Landco LLC | SIMAD Holdings LLC | 99% | 99% | Senior Lender (**) |
| | | Island Lake Campco LLC | SIMAD Holdings LLC | 99% | | - |
| C14 | Kiwi | Kiwi Operatingco LLC | SIMAD Holdings LLC | 62.5% | 62.5% | - |
| C15 | Lavi | Lavco LLC | SIMAD Holdings LLC | 99% | 99% | Senior Lender (*) |
| | | Lavland LLC | SIMAD Holdings LLC | 99% | | - |
| C16 | Lokanda | RDM Camps, LLC | Michael Shabsels | 37.5% | 75% | Senior Lender (**) |
| | | | David Shabsels | 37.5% | | Senior Lender (**) |

| Serial No. | Camp name | Transferred entity | Holder of rights in the transferred entity | | Total transference rate | Is there need for any consent? |
|---|---|---|---|---|---|---|
| | | | Name | Holding rate in the transferred entity | | |
| C17 | Meadowbrook | Meadowbrook Operatingco LLC | SIMAD Holdings LLC | 99% | 99% | - |
| | | Meadowbrook Landco LLC | SIMAD Holdings LLC | 99% | | Senior Lender (*) |
| C18 | Med-O-Lark | Camp Med-O-Lark, Inc | Shabsels Management LLC | 50% | 99% | - |
| | | | David Shabsels | 50% | | - |
| | | Washington Lake, LLC | SIMAD Holdings LLC | 99% | | Senior Lender (**) |
| C19 | Mesorah | Mesorahco LLC | SIMAD Holdings LLC | 75% | 75% | - |
| | | Mesorahland LLC | SIMAD Holdings LLC | 75% | | Senior Lender (**) |
| C20 | Mogenavco | Mogenavco LLC | Michael Shabsels | 1% | 100% | - |
| | | | David Shabsels | 50% | | - |
| | | | Shabsels Gift LLC | 49% | | - |
| | | Mogenavland LLC | Michael Shabsels | 1% | | Senior Lender (*) |
| | | | David Shabsels | 50% | | Senior Lender (*) |
| | | | Shabsels Gift LLC | 49% | | Senior Lender (*) |
| C21 | Mohawk | Mohawkcampco LLC | Michael Shabsels | 1% | 100% | - |
| | | | David Shabsels | 50% | | - |
| | | | Shabsels Gift LLC | 49% | | - |
| | | Mohawkland LLC | Michael Shabsels | 1% | | Senior Lender (*) |
| | | | David Shabsels | 50% | | Senior Lender (*) |
| | | | Shabsels Gift LLC | 49% | | Senior Lender (*) |
| | | Mohawk Country Day School, Inc. | Michael Shabsels | 50% | | - |
| | | | David Shabsels | 50% | | - |
| C22 | New England Golf & Tennis | Belgrade Lakes Summer Camps LLC | SIMAD Holdings LLC | 99% | 99% | Senior Lender (**) |
| C23 | North Star | Poland Landco LLC | SIMAD Holdings LLC | 99% | 99% | Senior Lender (**) |
| | | Poland Campco LLC | SIMAD Holdings LLC | 99% | | - |
| C24 | Pine Forest | Pine Forest Campco LLC | SIMAD Holdings LLC | 99% | [3]99% | - |

3 In accordance with contractual agreements, the actual holding rate is 79%.

| Serial No. | Camp name | Transferred entity | Holder of rights in the transferred entity | | Total transference rate | Is there need for any consent? |
|---|---|---|---|---|---|---|
| | | | Name | Holding rate in the transferred entity | | |
| | | Pine Forest Landco LLC | SIMAD Holdings LLC | 99% | | Senior Lender (**) |
| C25 | Rolling Hills | Rolling Hills Landco LLC | SIMAD Holdings LLC | 99% | 99% | Senior Lender (*) |
| | | Rolling Hills Operatingco LLC | SIMAD Holdings LLC | 99% | | - |
| C27 | Summit | Summit Camp, LLC | Michael Shabsels | 25.5% | 51% | - |
| | | | David Shabsels | 25.5% | | - |
| C28 | Waukeela | Waukeela Operatingco LLC | SIMAD Holdings LLC | 99% | 99% | - |
| | | Waukeela Landco LLC | SIMAD Holdings LLC | 99% | | Senior Lender (**) |
| C29 | Wekeela | Wekeeland LLC | SIMAD Holdings LLC | 99% | 99% | Senior Lender (**) |
| | | Mainewekeelaco LLC | SIMAD Holdings LLC | 99% | | - |
| C30 | Willow Lake | Willow Lake Day Camps, LLC | Michael Shabsels | 25% | 50% | The other shareholders (**) |
| | | | | | | The other shareholders (**) |
| | | | David Shabsels | 25% | | The other shareholders (**) |
| | | Willow Lake Land Corporation | Shabsels Management LLC | 25% | | The other shareholders (**) |
| | | | | | | The other shareholders (**) |
| | | | David Shabsels | 25% | | The other shareholders (**) |
| C31 | Windsor Mountain | WM Camp, LLC | SIMAD Holdings LLC | 51% | 51% | - |
| | | WM Land, LLC | SIMAD Holdings LLC | 51% | | Senior Lender (**) |

(*) Since the Company intends to repay the existing loan from the proceeds of the issuance, the Company has not contacted the financing entity to obtain its consent to carry out the transfer of the rights.

(**) The Company has received the relevant consents to carry out the transfer of the rights.

7.2. **Field of Activity of the Company**

As of the date of the prospectus, the company operates in one main field of activity, which constitutes an operational sector in its financial statements: **Operating summer camps for children and teenagers in the united states** – for further information, see Section 7.7 to the Prospectus.

7.3. **Investments in the Company's Capital and Transactions in its Share**

7.3.1. Upon its incorporation, the Company issued 1,000 ordinary shares with no Par Value, held equally by the Controlling Shareholders, which at that time constituted the entire issued and paid-up share capital of the company. For further details regarding the company's capital, see Chapter 3 of the prospectus.

7.3.2. For details regarding the Controlling Shareholders' obligations to transfer the Transferred Rights to the company in exchange for the issuance of ordinary shares and a cash payment, see Section 7.1.6 of the prospectus.

7.4. **Distribution of Dividends**

7.4.1. Since its incorporation, the Company has not distributed dividends.

7.4.2. As of June 30, 2025, the Company does not have distributable profits, pursuant to the provisions of Section 302 to the Companies Law 5759-1999 (the "**Companies Law**").

7.4.3. For details regarding limitations assumed by the Company in connection with the distribution of dividends, see Section 5.5 of the Deed of Trust.

7.4.4. It should be noted that there is no prevention of dividend distributions from the Company's subsidiaries to the Company.

7.4.5. As of the Prospectus date, the Company's Board of Directors did not adopt a dividend distribution policy.

## PART B – OTHER INFORMATION

7.5. **Financial Information regarding the Company's Field of Activity**

For financial information see the Financial Reports and Financial Statements as well as the Company's Directors Report as of December 31, 2024, and June 30, 2025 (the "**Board of Directors Report**")

7.6. **General Environment and Impact of External Factors**[4]

The following are factors in the macroeconomic environment of the Company that impact and/or may materially impact the activities and/or results of the Company.

For details regarding other external factors that materially affect and/or may materially affect the Company's operations and/or results, see Section 7.22 (Risk Factors) of the Prospectus.

7.6.1. Summer Camp Industry

The summer camp industry dates to the mid-1800s, with the founding of several camp organizations that still operate today. During the 20th Century, this field evolved upon the founding of the American Camp association (the "**ACA**") in 1910, as well as various other camp associations. Between 1948 and 1965 the ACA established standards for the operation of summer camps and adopted various resolutions regulating the activity in the field, including resolutions pertaining to anti-discrimination, and even proposed changes to the bylaws to address issues of race and religion. In the 2000s the ACA developed the Camp Program Quality Assessment designed for training staff and allowing them to identify opportunities for improvement while the camp program is in session.[5]

The ACA operates a voluntary accreditation program aimed at educating camp owners and directors in the administration of key aspects of camp operation, particularly those related to program quality and the health and safety of campers and staff. The standards establish guidelines for needed policies, procedures, and practices. The camp, then, is responsible for the ongoing implementation of these policies. The program is also aimed at assisting the public in selecting camps that meet industry-accepted and government-recognized standards.[6]

As part of the prevailing culture in the United States, many parents are looking for camps for their children that not only provide fun activities during the summer but also help their children develop skills and learn in areas such as sports, art,

---

4 Chapter 7 of the Prospectus in general and this Section 7.6 in particular, sometimes includes data based on surveys, studies and various websites. It shall be noted that unless explicitly stated otherwise, the Company has not applied for, and in any event has not received, the consent of the pollsters, the drafters of studies and the sites as aforementioned, to include said information in this Prospectus and such information is information that is released to the public, and to the best knowledge of the Company, it is in the public domain. The Company is not responsible for the content of surveys, studies and websites, as stated.

5 https://www.acacamps.org/about/history/timeline

6 https://www.acacamps.org/accreditation/accreditation-overview

or academics. Educational camps cover a variety of educational subjects, such as STEM, arts, language, outdoor, and leadership. This diversity allows for different interests to be represented and promotes a holistic approach to education. Educational camps focus on hands-on learning, allowing students to engage with the material in the field. This approach increases retention and makes learning experiential and effective.[7]

A general economic review of the field

In 2024, the youth camp industry contributed approximately $70 billion to the United States' national economy, both from the camp industry's production and from business-to-business purchases, alongside employment of more than986 thousand employees across the United States.[8]

The number of summer camps in the United States in 2024 amounted to approximately 20,175 camps. It should be noted that this figure does not include camps operating in states which do not require a license, as well as camps operated by public entities.[9]

A statistical review performed by Summer Camp Hub (a member and business affiliate of the ACA) shows that the summer camps accredited by the ACA reported almost $2.8 billion dollars in revenue out of the $3.4 to $4 billion in revenue generated by the industry.[10]

Between 2020 and 2023 there was a consistent increase in the market size of the summer camp sector, from $2.46 billion in 2020 to $3.56 billion in 2023.[11]




During 2024 the industry revenues amounted to approximately $4.7 billion.[12]

---

7 https://www.mordorintelligence.com/industry-reports/us-recreational-and-vacation-camp-market

8 https://news.umich.edu/us-camp-industry-adds-billions-to-national-economy/

9 https://members.acacamps.org/Shop/Product-Details?productid=%7B6DBDCB45-7118-EF11-9F89-000D3A9C5F09%7D

10 https://summercamphub.com/summer-camp-statistics/

11 See footnote 12

12 https://www.ibisworld.com/united-states/industry/summer-camps/5349/

7.6.2. Impacts on the summer camp industry

The summer camp industry may be affected by a variety of external and economic factors. Key influencing factors include weather conditions, inflation levels, the popularity of summer camps among children and teenagers, the nature of the camp (day camps and overnight camps), recruiting and retaining staff and so forth. Each of these elements may directly impact the number of participants, revenue generation, and the overall economic viability of operating summer camps.

7.6.2.1. The Impact of Extreme Weather Conditions

Many summer camps rely on outdoor activities such as hiking, swimming, camping, and adventure sports. Extreme weather conditions, including heatwaves, severe storms, or heavy rainfall, can lead to the cancellation of core activities, damage to camp facilities, and even pose serious health and safety risks to campers and staff. It should be noted that although Such circumstances may impact the camp's schedule and the activities planned, generally it shall not lead to the cancelation of the camp, and the campers' parents are not entitled to a refund due to the cancellation of specific activities.

7.6.2.2. Inflation and Rising Cost of Living

Another factor that may adversely affect the summer camp industry is the rise in the cost of living and high inflation. A general increase in prices, particularly for food, transportation, and staff wages, might lead to an increase in camp operating costs, and consequently to an increase in participation costs. For many families, a summer camp represents a significant financial expenditure. If prices become unaffordable, registration numbers are likely to decline. Evidence of the foregoing can be found in Rustic Pathways statistical review, whereby 42% of parents cite cost as the single most important barrier in deciding whether to send their children to summer camp, and 66% ranked it among the top three barriers.[13] Nevertheless, despite the increase in prices as aforesaid, the demand for enrollment in the Company's summer camps increases from one year to the other. Furthermore, due to the nature of the camps' target audience, which is comprised mostly of affluent families; hence, to the Company estimation, an increase in the camps' operational expenses shall be reflected in the participation price, without damaging their profitability.

---

[13] https://rusticpathways.com/summer-camp-statistics

7.6.2.3. Recruiting and retaining staff

One of the main challenges facing the summer camp operators is recruiting and retaining qualified staff, which are mostly hired during the operating periods of the camps, which might lead some of the camps to operate in reduced capacity.

7.6.3. Covid-19 Pandemic

In 2020 the Covid-19 pandemic spread throughout the world, and lead to extensive actions which were taken to prevent the spreading of the virus, such as closing borders, restrictions on movement, restrictions on gatherings, closures and quarantine.

The Covid-19 pandemic impacted the Company's camps to varying degrees. While most camps were able to operate, they did so with a reduced number of campers and, in some cases, shortened sessions; this, in order to comply with state health guidelines and ensure the safety of campers and staff.

Despite the said challenges, the impact in the Company's cash flow was not material, inter *alia*, given that some of the campers who could not attend chose to roll over their tuition to the following summer.

Additionally, within this framework the Company secured two PPP loans (of an immaterial scope, totaling several million dollars). These loans were fully forgiven, and the funds were used by the Company to maintain payroll for employees (year-round and seasonal staff), who remained employed during the pandemic.

## PART C – DESCRIPTION OF THE COMPANY'S ACTIVITY

7.7. **Fields of activity- Summer Camps**

7.7.1. **General information about the field of activity**

7.7.1.1. General

A. Within its field of activity, the Company operates in purchasing, operating and managing summer camps for children and teenagers in the US.

The Company acquires camps with established reputations and an existing customer base, thereby enjoying a significant competitive advantage. As of the Prospectus publishing date, the Company directly operates 30 summer camps, which operate mostly in the summer months (June-August), whereby the summer camp activities take place on real estate owned by the Property Companies, which are generally owned (in full or partially) by the Company.

The Company operates to maximize the potential income from the camp areas, and accordingly, in some of the Company's camps, during periods when they are not active, the Company rents the properties for events, concerts, family vacations, etc. In addition, kindergartens/schools operate in several camps throughout the year.

The Camps operated by the Company are divided into two main segments: (a) sleepaway camps; and (b) day camps, to which the participants arrive each morning and return to their homes at the end of the day. As of the Prospectus date, 8 of the Company's camps are day camps and the rest are sleepaway camps. Furthermore, the Company operates various types of camps, catering to diverse populations and a wide range of interests (such as sports camps, arts, technology, religious camps, and more), thereby achieving broad diversification of target audiences. Each camp is separately branded and operates independently, including its own management team, staff, accounting, and dedicated operational infrastructure, etc.

The Company's main sources of income in the field of activity include client payments (parents) for their children's participation in the summer camps, accompanying income from catering services, transportation, special enrichment activities, additional payments for trips, vending machines in the camps, merchandise, as well as from the rental of spaces during the year for privet events or groups and the institutions (kindergartens and schools) that operate in them throughout the year.

The average price per participant in the Company's summer camps ranges between $8 thousand and $10 thousand, whereby in certain camps the cost might be significantly lower (approximately $3 thousand) or significantly higher (approximately $16 thousand) depending on the duration of the stay in the camp and the type of camp.

All of the Company's assets on which the summer camps are located are operated by the Company. Each of the Company's summer camps are operated as an independent unit and is managed by a designated staff for said camp, comprising, *inter alia*, from the camp manager, guides and additional staff members.

B. See below information regarding the summer camps managed by the Company for the 2023 and 2024 seasons, and for the 2025 season as of June 30, 2025

| | **2023 season** | **2024 season** | **2025 season (as of June 30, 2025)** |
|---|---|---|---|
| **Number of camps** | 30 | 30 | 30 |
| **Number of enrolled/ participants (*)** | 20,723 | 20,568 | 19,909 (**) |
| **Average price per participant (USD)** | 6,882 | 7,166 | 7,579 |

(*) It should be noted that participants in the Club Getaway camp, which is a camp that allows participation for shorter durations, were not taken into account.

(**) It should be noted that registration for some participants is accepted after June 30, 2025, and the registration continues until several days before the start of each camp.

C. <u>See below information regarding the camps the Company operates</u>

| No. | Information about the camp | | | | | | Value in the financial statement as of June 30, 2025 | Income for the period ended December 31, 2024 (USD thousand | EBITDA As of December 31, 2024 (in USD thousand) | Advances received as of June 30, 2025 (in USD thousands) | Loans in the Property (as of June 30, 2025) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Camp name | Location | Area (acres) | Purchase year | Company's share in the property company | Method of presentation in the financial statements | | | | | Total principal balance in the books | Specified interest rate and final repayment date |
| C1 | Achim | Route 59, 365 Suite 110, Airmont, NY | 98.03 | 2012 | 100% | Consolidated | 6,300 | 2,190 | 397 | 1,724 | 1,905 (*) | 6.42 Variable interest 11/2032 |
| C2 | Banner | Riverwoods 1177 Rd Lake Forest, IL | 54.01 | 2013 | 90% | Consolidated | 30,300 | 10,503 | 3,396 | 6,302 | 13,125 | 6.93% Variable interest 11/2027 |
| C3 | Blue Star | 179 Blue Star Way, Hendersonville, NC | 447.09 | 2012 | 70% | Consolidated | 17,500 | 8,027 | 1,699 | 5,820 | 3,401 | 3.95% Fixed interest 9/2026 |
| C4 | Chateauguay | Gadway Rs 233 Merril, NY | 243.20 | 2022 | 100% | Consolidated | 4,100 | 2,361 | 43 | 2,183 | 2,402 | 6.00% Fixed interest 6/2042 |
| | | | | | | | | | | | 1,045 | 4.50% Fixed interest 6/2032 |
| C5 | Chen-A-Wanda (BAHS) | Camp Rd 355 Thompson, PA | 180.68 | 2007 | 51% | Consolidated | 17,900 | 7,158 | 1,309 | 7,621 | 2,935 (*) | 6.42% Variable interest 11/2032 |
| C6 | Club Gateway | S Kent Rd 59 Kent CT | 271.12 | 2012 | 80% | Consolidated | 19,300 | 7,008 | 2,171 | 2,127 | 4,193 (*) | 6.42% Variable interest 11/2032 |
| C7 | Country Roads | Pine Brook 139 Rd, Manalapan Township, N | 25.68 | 2013 | 99% | Consolidated | 12,100 | 6,473 | 1,294 | 5,032 | 1,142 (*) | 6.42% Variable interest 11/2032 |
| C8 | Eagles Landing | Davidson Mill 74 Road N. Brunswick Township, NJ | 12.79 | 2011 | 100% | Consolidated | 5,000 | 3,354 | 482 | 2,978 | 5,176 (*) | 6.42% Variable interest 11/2032 |
| C9 | ECHO (SHAB) | Kenilworth 244 Rd, Ridgewood, NJ | 206.17 | 2007 | 100% | Consolidated | 12,500 | 5,004 | 1,037 | 4,813 | 2,888 (*) | 6.42% Variable interest 11/2032 |
| C10 | Green Lane | 249 Camp Green Lane Rd Green Lane, PA | 106.40 | 2011 | 51% | Consolidated | 9,400 | 3,676 | 911 | 3,610 | 812 (*) | 6.42% Variable interest 11/2032 |

| No. | Information about the camp | | | | | | Value in the financial statement as of June 30, 2025 | Income for the period ended December 31, 2024 (USD thousand | EBITDA As of December 31, 2024 (in USD thousand) | Advances received as of June 30, 2025 (in USD thousands) | Loans in the Property (as of June 30, 2025) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Camp name | Location | Area (acres) | Purchase year | Company's share in the property company | Method of presentation in the financial statements | | | | | Total principal balance in the books | Specified interest rate and final repayment date |
| | | | | | | | | | | | 2,500 | 8.00%<br>fixed interest<br>1/2028 |
| C11 | Greenville Land (Malka) | Ingalside Rd 150 Greenville, NY | 131.52 | 2010 | 100% | Consolidated | 10,800 | 711 | (103) | 1,000 | 17,206<br>(*) | 6.42%<br>Variable interest<br>11/2032 |
| C12 | IAFA | Main St., 1712 Freyburg, ME | 206.70 | 2011 | 99% | Consolidated | 7,000 | 3,156 | 503 | 2,674 | 2,203<br>(**) | 3.50%<br>Fixed interest<br>12/2041 |
| C13 | Island Lake | Island Lake 50 Rd, Starrucca, PA | 464.11 | 2022 | 99% | Consolidated | 15,600 | 5,751 | 1,247 | 6,038 | 743 | 4.25%<br>Fixed interest<br>1/2037 |
| | | | | | | | | | | | 991 | 9.50%<br>Fixed interest<br>10/2028 |
| | | | | | | | | | | | 3,254 | 4.00%<br>Fixed interest<br>1/2027 |
| C14 | Kiwi | Union Valley 825 Road, Carmel, NY | 14.07 | 2013 | 62.5% | Consolidated | 13,100 | 4,434 | 1,213 | 4,079 | 585 | 6.44%<br>9/2033Variable interest |
| | | | | | | | | | | | 172 | 6.13%<br>**Variable interest**<br>10/2037 |
| C15 | Lavi | Upper 2656 Woods Dr, Lakewood, PA | 119.00 | 2008 | 99% | Consolidated | 7,700 | 4,613 | 146 | 4,537 | 6,401<br>(*) | 6.42%<br>Variable **interest**<br>11/2032 |
| C16 | Lokanda | Haring Rd, 432 Glen Spey, NY | 219.46 | 2008 | 75% | Consolidated | 18,200 | 5,560 | 1,731 | 5,789 | 7,840 | 7.50%<br>Variable interest<br>12/2041 |
| | | | | | | | | | | | 2,780 | 9.50%<br>Fixed interest<br>10/2028 |
| C17 | Meadowbrook | E Valley 73 Brook Rd, Long Valley, NJ | 53.10 | 2016 | 99% | Consolidated | 9,100 | 6,202 | 709 | 7,280 | 3,204<br>(*) | 6.42%<br>Variable interest<br>11/2032 |
| C18 | Med-O-Lark | Medolark 82 Road Washington, ME | 44.88 | 2006 | 100% | Consolidated | 3,000 | 2,203 | 148 | 2,014 | 1,006<br>(**) | 3.50%<br>Fixed interest<br>12/2041 |
| | | | | | | | | | | | 220 | 0.00%<br>Fixed interest<br>12/2026 |
| | | | | | | | | | | 3,728 | 4,170 | 7.50% |

| No. | Information about the camp | | | | | | Value in the financial statement as of June 30, 2025 | Income for the period ended December 31, 2024 (USD thousand | EBITDA As of December 31, 2024 (in USD thousand) | Advances received as of June 30, 2025 (in USD thousands) | Loans in the Property (as of June 30, 2025) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Camp name | Location | Area (acres) | Purchase year | Company's share in the property company | Method of presentation in the financial statements | | | | | Total principal balance in the books | Specified interest rate and final repayment date |
| C19 | Mesorah | North Pond 325 Road, Guilford, NY | 315.73 | 2008 | 75% | Consolidated | 5,100 | 3,564 | (1,734) | | | Variable interest 8/2032 |
| | | | | | | | | | | | 991 | 9.50% fixed interest 10/2028 |
| | | | | | | | | | | | 5,898 (**) | 3.50% Fixed interest 12/2041 |
| C20 | Mogenavco | Laymon Rd, 169 Swan Lake, NY | 481.15 | 2010 | 100% | Consolidated | 24,100 | 7,095 | 1,981 | 6,824 | 3,700 (*) | 6.42% Variable interest 11/2032 |
| | | | | | | | | | | | 6,944 (**) | 3.50% Fixed interest 12/2041 |
| C21 | Mohawak | Old 200 Tarrytown Rd, White Plains, NY | 37.39 | 2009 | 100% | Consolidated | 75,100 | 19,755 | 7.434 | 19,811 | 11,019 (*) | 6.42% Variable interest 11/2032 |
| C22 | New England Golf & Tennis (Belgrade) | Maine St. 135 suite 292 Brunswick, ME (winter address) Golf Academy 35 Drive Belgrade, ME (summer address) | 34.46 | 2014 | 99% | Consolidated | 2,900 | 615 | (234) | 292 | 1,953 (**) | 3.50% Fixed interest 12/2041 |
| C23 | North Star (Poland) | Verrill Road, 200 Poland, ME | 219.00 | 2015 | 99% | Consolidated | 6,000 | 2,518 | 549 | 1,729 | 1,048 (**) | 3.50% Fixed interest 12/2041 |
| | | | | | | | | | | | 1,225 | 1.00% Fixed interest 7/2028 |
| C24 | Pine Forest | Pine Forest 185 Rd, Greeley PA | 988.35 | 2022 | 80% | Consolidated | 37,300 | 14,205 | 3,826 | 11,707 | 19,308 | 6.00% Fixed interest 12/2042 |
| | | | | | | | | | | | 3,860 | 1.50% Fixed interest 12/2027 |
| | | | | | | | | | | | 5,157 | 9.50% Fixed interest 10/2028 |

| No. | Information about the camp | | | | | | Value in the financial statement as of June 30, 2025 | Income for the period ended December 31, 2024 (USD thousand | EBITDA As of December 31, 2024 (in USD thousand) | Advances received as of June 30, 2025 (in USD thousands) | Loans in the Property (as of June 30, 2025) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Camp name | Location | Area (acres) | Purchase year | Company's share in the property company | Method of presentation in the financial statements | | | | | Total principal balance in the books | Specified interest rate and final repayment date |
| C25 | Rolling Hills | Dittmar Dr. 14 Freehold, NJ | 22.18 | 2022 | 99% | Consolidated | 18,300 | 9,307 | 1,817 | 10,032 | 8,753 (*) | 6.42% Variable interest 11/2032 |
| C27 | Summit | Duck Harbor 168 Rd, Honesdale, PA | 93.60 | 2009 | 51% | Consolidated | 11,100 | 5,140 | 979 | 4,393 | 3,497 | 5.28% Fixed interest 9/2032 |
| C28 | Waukeela | Brownfield 23 Rd, Eaton Center, NH | 43.87 | 2014 | 99% | Consolidated | 2,400 | 1,177 | (11) | 1,003 | 2,165 (**) | 3.50% Fixed interest 12/2041 |
| C29 | Wekeela | Bear Pond 1750 Rd, Hartford, ME | 120.90 | 2008 | 99% | Consolidated | 12,900 | 4,014 | 1,233 | 3,881 | 2,119 (**) | 3.50% Fixed interest 12/2041 |
| | | | | | | | | | | | 2,778 (***) | 7.50% Fixed interest 11/2031 |
| C30 | Willow Lake | Lake ,181-200 Hopatcong, NJ | 21.99 | 2012 | 50% | Included | 36,600 | 10,664 | 4,015 | 11,496 | 1,800 | 6.10% Fixed interest 8/2035 |
| C31 | WM Camp (Windsor Mt.) | World Way, 1 Windsor, NHs | 375.00 | 2010 | 51% | Consolidated | 14,600 | 3,581 | 1,482 | 3,402 | 1,163 (**) | 3.50% Fixed interest 12/2041 |
| | | | | | | | | | | | 2,778 (***) | 7.50% Fixed interest 11/2031 |
| **consolidated plus included companies Total** | | | **5,651.63** | **-** | **-** | **-** | **465,300** | **170,019** | **39,727** | **153,919** | **-** | **-** |

(*) For the aforementioned camps, a single loan was taken in the amount of approximately $80 million, which was split between the camps - for additional information regarding the loan, see Section 7.14 of the Prospectus.

(*) For the aforementioned camps, a single loan was taken in the amount of approximately $27 million, which was split between the camps - for additional information regarding the loan, see Section 7.14 of the Prospectus.

(*) For the aforementioned camps, a single loan was taken in the amount of approximately $6 million, which was split between the camps - for additional information regarding the loan, see Section 7.14 of the Prospectus.

7.7.1.2. Geographic Regions

As of the Prospectus date, the Company operates in the United States, mainly in Northeast US. See below information regarding the geographic distribution of the Company's camps as of December 31, 2023, December 31, 2024, and as of June 30, 2025:

| Region | Rate out of the Company's portfolio as of | | |
|---|---|---|---|
| | June 30, 2025 | December 31, 2024 | December 31,2023 |
| Northeast US | 88.2% | 88.3% | 88.4% |
| Mid-Atlantic US | 5.5% | 5.1% | 5% |
| Central US | 6.6% | 6.6% | 6.6% |

It should be noted that because most of the Company's summer camps are sleepaway camps, given the fact that each camp has its history, target audience and unique characteristics, the geographic location of the camp has a secondary impact on the nature of the camp and the scope of campers therein.

7.7.1.3. Information regarding the Company's properties according to the valuation as of December 31, 2024 (according to 100%) (*)

| Serial No. | Camp Name | Valuation Method | Value established (in USD thousand) | Representative NOI | Actual NOI | Cap Rate |
|---|---|---|---|---|---|---|
| C1 | Achim | DCF | 6,300 | 662 | 397 | 10.50% |
| C2 | Banner | DCF | 30,300 | 3,180 | 3,396 | 10.50% |
| C3 | Blue Star | DCF | 17,500 | 1,752 | 1,699 | 10.00% |
| C4 | Chateauguay | DCF | 4,100 | 388 | 43 | 9.50% |
| C5 | Chen-A-Wanda (BAHS) | DCF | 17,900 | 1,786 | 1,309 | 10.00% |
| C6 | Club Gateway | DCF | 19,300 | 2,025 | 2,171 | 10.50% |
| C7 | Country Roads | DCF | 12,100 | 1,146 | 1,294 | 9.50% |
| C8 | Eagles Landing | DCF | 5,000 | 478 | 482 | 9.50% |
| C9 | ECHO (SHAB) | DCF | 12,500 | 1,252 | 1,037 | 10.00% |
| C10 | Green Lane | DCF | 9,400 | 937 | 911 | 10.00% |
| C11 | Greenville Land (Malka) | DCF | 10,800 | 1,134 | (103) | 10.50% |
| C12 | IAFA | DCF | 7,000 | 664 | 503 | 9.50% |
| C13 | Island Lake | DCF | 15,600 | 1,565 | 1,247 | 10.00% |

| Serial No. | Camp Name | Valuation Method | Value established (in USD thousand) | Representative NOI | Actual NOI | Cap Rate |
|---|---|---|---|---|---|---|
| C14 | Kiwi | DCF | 13,100 | 1,249 | 1,213 | 9.50% |
| C15 | Lavi | DCF | 7,700 | 805 | 146 | 10.50% |
| C16 | Lokanda | DCF | 18,200 | 1,824 | 1,731 | 10.00% |
| C17 | Meadowbrook | DCF | 9,100 | 896 | 709 | 9.50% |
| C18 | Med-O-Lark | DCF | 3,000 | 288 | 148 | 9.50% |
| C19 | Mesorah | DCF | 5,100 | 512 | (1,734) | 10.00% |
| C20 | Mogenavco | DCF | 24,100 | 2,169 | 1,981 | 9.00% |
| C21 | Mohawak | DCF | 75,100 | 8,259 | 7,434 | 11.00% |
| C22 | New England Golf & Tennis (Belgrade) | DCF | 2,900 | 309 | (234) | 10.50% |
| C23 | North Star (Poland) | DCF | 6,000 | 569 | 549 | 9.50% |
| C24 | Pine Forest | DCF | 37,300 | 3,733 | 3,826 | 10.00% |
| C25 | Rolling Hills | DCF | 18,300 | 1,734 | 1,817 | 9.50% |
| C27 | Summit | DCF | 11,100 | 1,219 | 979 | 11.00% |
| C28 | Waukeela | DCF | 2,400 | 255 | (11) | 10.50% |
| C29 | Wekeela | DCF | 12,900 | 1,227 | 1,233 | 9.50% |
| C30 | Willow Lake | DCF | 36,600 | 4,031 | 4,015 | 11.00% |
| C31 | WM Camp (Windsor Mt.) | DCF | 14,600 | 1,530 | 1,482 | 10.50% |

**(*)** The Company's appraiser is Leitner, Berman. The appraiser is independent, and no indemnification agreement was signed between him and the Company.

### 7.7.1.4. Operational information regarding the Company's Camps (Consolidated) (In relation to consolidated assets)

| | Sleepaway Campa | | | | Day Camps | | | |
|---|---|---|---|---|---|---|---|---|
| **Period** | **Q2 2025** | **2024** | **2023** | **2022** | **Q2 2025** | **2024** | **2023** | **2022** |
| **Asset value** | 274,800 | 247,800 | 254,735 | 234,770 | 153,900 | 153,900 | 147,000 | 140,300 |
| **Capex investments made** | 5,652 | 8,269 | 9,250 | 8,336 | 1,040 | 1,687 | 2,058 | 1,192 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Revenues** | 5,700 | 105,528 | 102,343 | 83,676 | 5,808 | 53,828 | 54,094 | 48,979 |
| **Number of campers (*) (**)** | 11,526 | 13,511 | 13,366 | 11,420 | 8,383 | 7,057 | 7,357 | 7,391 |
| **EBITDA (in USD thousands)** | (14,181) | 20,019 | 19,263 | 15,411 | (3,410) | 15,636 | 15,733 | 12,885 |
| **Revenues from camps purchased during the period (in USD thousands)** | N/A | N/A | N/A | 7,050 | N/A | N/A | N/A | 7,523 |
| **EBITDA attributed to camps purchased during the period (in USD thousands** | N/A | N/A | N/A | 1,041 | N/A | N/A | N/A | 1,129 |
| **Value of properties purchased during the period ( in USD thousand)** | N/A | N/A | N/A | 26,670 | N/A | N/A | N/A | 12,500 |

(*) It should be noted that participants in the Club Getaway camp, which is a camp that allows participation for shorter durations, were not taken into account.
(**) In relation to the data for the first half of 2025, it should be noted that registration for some participants is accepted after June 30, 2025, and the registration continues until several days before the start of each camp.

<u>See below information regarding assets which displayed a negative EBITDA or an EBITDA lower than 5% in the years 2022 – 2024</u>

| Serial Number | Name of the Camp | Value of the camp as of June 30, 2025 | EBITDA in the year | | | Company's explanations of the EBITDA and the Company's plans for the camp |
|---|---|---|---|---|---|---|
| | | | 2024 | 2023 | 2022 | |
| C4 | Chateaugay | 4,100 | 43 | 35 | 525 | The Camp was purchased by the Company in 2022 and is currently under the management of a new managing director. The manger's strategy focused at first on increasing revenues, whereby recently it was resolved to put more emphasis on the expense management in the camp, and in preparation for the 2025 season, a detailed budget was prepared. |
| C11 | Greenville Land (Malka) | 10,800 | (103) | 15 | (296) | The camp has operated for many years as an Orthodox camp and struggled to achieve profitability. In 2024, the Company resolved to cease camp operations and instead lease the property. It is the Company's estimate that this change shall result in positive EBITDA for the 2025 fiscal year. The lease agreement is for 5 seasons (until October 2029), with the lease fees set at $1 million per season (plus the camp's operating costs that the tenant will bear). |
| C15 | Lavi | 7,700 | 146 | 521 | (120) | The camp operates as an Orthodox camp and faces challenges related to revenue generation. Despite efforts to improve enrollment and program offerings, the camp has yet to achieve financial stability. The Company is exploring the need of making further operational adjustments may be to drive growth and efficiency. |
| C18 | Med-O-Lark | 3,000 | 148 | 40 | 176 | In order to improve the camp's performance, in 2024, the Company replaced the camp's managing director. The impact of the changes in the camp's management might last a certain period, and the Company estimates that the improvement in the camp's results shall be reflected as of the 2026 season. |
| C19 | Mesorah | 5,100 | (1,734) | (1,195) | 616 | In order to improve the camp's performance, in 2023, the Company replaced the camp's managing director. The camp's director operating |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | strategy focused primarily on increasing revenue, whereby recently it was resolved to put more emphasis on the expense management in the camp, and in preparation for the 2025 season, a detailed budget was prepared. The impact of the changes in the camp's management might last a certain period, and the Company estimates that, although there was some progress in the 2025 season which saw a decrease in the camp's annual loss, the Company's opinion is that it shall take 1-2 more seasons for the camp to reach profitability. |
| C22 | New England Golf & Tennis (Belgrade) | 2,900 | (234) | (112) | (133) | In order to improve the camp's performance and particularly enhance the camp's physical infrastructure and its sales strategy, in 2025 the Company appointed a co-director in the camp. The impact of the changes in the camp's management might last a certain period, whereby the Company estimates that although a certain decline in results is anticipated in the 2025 season, the Company is in the opinion that these results will improve in the 2026 season, and it shall take 1-2 more seasons for the camp to reach profitability. |
| C28 | Waukeela | 2,400 | (11) | 22 | (86) | The camp is a girls-only camp. The technical condition of the camp requires upgrading, which has been delayed in recent years for various reasons. In addition, as of this date, a full-time manager has not been appointed to the camp. The Company believes that appointing such a manager and implementing various upgrades to the camp's facilities will improve the camp's results. |

**The Company's estimates regarding the impact of activities it has carried out and/or intends to carry out in connection with its summer camps are forward-looking information, as defined in the Securities Law, 1968 (the "Securities Law"). These estimates are based on information available to the Company as of the date of the prospectus and on the experience of the Company's management in the field of activity. All or part of the aforementioned estimates may not materialize or may materialize differently than described, including materially, as a result of various factors, some of which are beyond the Company's control, including deterioration in the US economy, reduced demand, regulatory changes in the field of activity and the materialization of all or part of the risk factors described in Section 7.18 of the Prospectus.**

7.7.1.5. The Structure of the Field of Activity and the Changes Therein

The summer camp sector in the United States is a long-standing and deeply rooted part of American culture, forming an integral element of the family experience in the country. It is a longstanding tradition, with many families sending their children to summer camps from generation to generation, sometimes even to the very same camps they attended in their own childhood. For many in the U.S., participation in a summer camp is a formative, educational, and social experience, serving as a central component in the process of growing up. Accordingly, the summer camp sector in the U.S. is a large-scale industry, with hundreds of thousands of participants each year and extensive alumni communities that maintain connections with the camp for many years.

Today, the U.S. summer camp sector is characterized by a wide variety of camps catering to unique audiences, as well as to different cultural, religious, and ethnic communities, and to individuals with diverse interests. Alongside general summer camps, there are now specialized camps tailored to Jewish, Catholic, and other communities, as well as camps designed for specific interests such as professional sports, science, technology, arts, music, theater, leadership, special needs, and more. This segmentation allows parents and children to choose an experience that matches their values, lifestyle, and interests, resulting in a broad distribution of target audiences and reducing dependence on any single sector or uniform target group. In addition, each camp has its own unique character, internal culture, and independent management team. This trend contributes to the stability of the sector and its ability to adapt to changes in demand or shifting trends, enabling companies operating in the field to offer a broad and personalized range of products.

An average summer camp operates on an area of dozens to hundreds of dunams (acres), including residential facilities (cabins or rooms), a central dining hall, sports facilities (basketball, soccer, and tennis courts, swimming pool), arts and crafts areas, theater, natural spaces, hiking trails, and a clinic. The camp's daily schedule is structured and includes wake-up, breakfast, morning activities (usually classes or workshops in various areas of interest), lunch break, afternoon activities (sports, swimming, trips, arts and crafts), dinner, and evening social activities (performances, bonfires, competitions, and more). The camp operates as a full residential program under the supervision of a professional staff, with each group of campers assigned a dedicated counselor. The camp staff includes a camp director, counselors, educational staff, medical staff, kitchen, and maintenance teams. Registration and payment are made in advance, and the camp provides a comprehensive package that includes accommodation, meals, classes, activities, basic medical services, and sometimes organized

transportation from central pick-up points. The emphasis at camp is on providing an educational, social, and safe experience, while fostering values of independence, teamwork, and personal development.

7.7.1.6. Developing, Purchasing and Selling assets in the field of activity

The development of a summer camp is a process adjusted to the needs of the camp. Therefore, for example, a sleepaway camp should spread across a greater area and include a larger number of facilities. It should be noted that to the best of the Company's knowledge, in recent years, no new camps were developed in the New York area and outside other large cities, due to the difficulty in locating appropriate assets to develop such camps.

Despite the large size of the summer camp market in the US, there are not many purchase and sale transactions; this is due, *inter alia*, to the summer camps being based on longstanding traditions. Nevertheless, the Company estimates that the small number of transactions in the market is a result of low supply rather than of a lack of demand, whereby in the market there are entities which operate in the field of activity and are potential buyers for summer camps, both operating camps and non-operating camps. It is the Company's estimate that the timeframe for marketing and selling an asset in its field of activity is 6 to 12 months, and up to a maximum of 24 months[14]. In this respect it should be noted that the Company's estimate that upon purchasing or selling a camp there is no particular difficulty in finding operators for the camps. For example, the Company replaces and/or appoints, from time to time, managing directors in the camps it operates, at times by way of promoting existing employees and at times by recruiting new personnel.

The Company's strategy focuses on purchasing existing camps with a relatively good physical state and with a solid participant population, making them profitable as of the date in which the Company commences their operation. When examining the purchase of a new property, the Company reviews, *inter alia*, the current occupancy, the type of population the camp targets, the physical state of the camp and its yield as of the purchase date. Generally, the Company does not rely on the potential of a future improvement of the camp, rater pursues the purchase of stable camps with a positive yield. Nonetheless, throughout the years, the results of many of the Camps the Company purchased according to the foregoing strategy have improved.

---

[14] In this regard see what has been set forth in Page 3 in the valuation of the Company's properties attached to the Prospectus.

See below information regarding properties purchased by the Company in 2022:

| Serial Number | Name of the Camp | Purchase date | Purchase consideration | Revenues | | | EBITDA | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 2024 | 2023 | 2022 | 2024 | 2023 | 2022 |
| | | | (In thousands of dollars) | | | | | | |
| C4 | Chateaugay | 24/6/2022 | 3,820 | 2,361 | 2,124 | 2,098 | 43 | 35 | 525 |
| C13 | Island Lake | 18/1/2022 | 4,250 | 5,751 | 5,019 | 3,922 | 1,247 | 1,005 | 189 |
| C24 | Pine Forest | 14/12/2022 | 27,000 | 14,205 | 13,681 | 1,030 | 3,826 | 4,004 | 326 |
| C25 | Rolling Hills | 31/8/2022 | 12,500 | 9,307 | 8,672 | 7,523 | 1,817 | 2,001 | 1,129 |

7.7.1.7. Critical Success factors in the field of activity

The Company estimates that the critical success factors in the field of activity are:

a) **Reputation** – the reputation of the camp and/or of the entity operating the camp is a critical success factor in the field of activity, particularly given that many families send their children to the same summer camps over several years and even parents who send their children to camps in which they themselves participated.

b) **Staff Quality –** the Company's ability to recruit a high-quality staff with ample experience in the field of operation (including in the fields of training. Pedagogy, safety, management and so forth) constitutes a critical success factor in the field of activity.

c) **Infrastructure availability** – summer camps which spread across ample grounds, which need to be adapted to the operation of camps, whereby given their seasonal nature, need to be vacant in the relevant months.

7.7.1.8. Key Entry and Exit Barriers of the Field of Activity

The Company estimates that the key entrance barriers in the field of activity are:

a) **Equity** – successfully entering the field of activity requires a significant initial equity for the purpose of purchasing/leasing real estate properties and for investing in physical infrastructures;

b) **Need to establish reputation and client loyalty** –_building a reputation and obtaining recognition amongst the target audience is a material entry barrier, and it may take several years to overcome it.

c) **Requirement for knowledge and unique managerial experience** – a company interested in operating in the summer camp field requires professionals uniquely experienced in this field.

d) **Seasonality** – in given that seasonality is inherently characteristic of the field of activity, a company operating in the field of activity is required to manage a significant operating array only throughout

parts of the year and therefore is required to recruit a large quantity of temporal employees and so forth.

The Company estimates that the there is no material exit barriers in the field of activity.

7.7.1.9. <u>Restrictions, legislation, regulations, and special constraints applicable to the field of activity</u>

Day camps and overnight camps are most commonly regulated together under a single set of “camp” or “childcare” rules. However, most states separate the two, grouping day camps with the states’ other childcare facilities or programs and creating a specific set of rules pertaining to overnight camps. Camps are mostly regulated under a state’s Department of Health or other entities such as the Health & Human services. The Departments of Education, Human Services or Child & Family Services are also sometimes responsible for camp licensing. It should be noted that the issue of licenses depends on the specific state in which the camp is located, and while some states license camps on the basis of their facilities or location, other states require licenses for the programs themselves.

Nevertheless, many states provide exemptions to their camp licensing requirements, most commonly with respect to religious organizations, non-profit organizations, educational institutions, camps accredited by the ACA and so forth. Additionally, many camps are entitled to an exemption from licensing requirements since they do not meet the minimum threshold activity,

The camps which the Company operates do not require licensing rather are required to pass inspections by various entities in the fields of health, sanitation and safety, and comply with the requirements set forth by said entities. Additionally, in many states in the United States, hiring staff in summer camps requires performing background checks (criminal records, sex offenders’ registry) as well as them complying with role-specific requirements such as first-aid certification, CPR certification, training in terms of drug administration and so forth).

To the best of the Company’s knowledge, as of the Prospectus date, the summer camps operated by the Company operates are not in breach of any provisions related to Zoning in states in which it operates.

7.7.2. **<u>Products and services</u>**

The main service provided by the Company is the operation of summer camps for several weeks in the months of June- August. As part of the activity the campers receive full board which includes sleeping in designated cabins, three meals per day, diverse educational programs (including workshops, sports, art, music, and theater), water activities, outdoor trips, custom tailored activities, as well as

medical services on site. The camps' staff include guides, educational personnel, sports and arts instructors, kitchen staff, maintenance staff etc. Additionally, the Company offers accompanying services such as transportation, indoor store, sale of equipment and souvenirs, documenting, and photography, as well as ongoing reports to the parents. Additionally, the sleepaway camps include full board under professional supervision as well as various activities, while the day camps provide transportation services from and to the campers homes every morning and evening.

7.7.3. **Segmentation of revenue and profitability of products and services**

As is set forth above, most of the Company's revenues in the field of activity derive from registration fees paid by participants in summer camps. Additionally, the Company has immaterial revenues from the sale of food and clothing in the campgrounds as well as from leasing the campgrounds for events, as well as to institutions such as kindergartens and schools that operate in some of the Company's properties throughout the year.

It should be noted that, given the wide distribution of the Company's camps, the impact on the Company's cash flow in the event that for some reason the Company is unable to operate a particular camp is not material. In this context, it should be noted that the likelihood that the Company will be unable to operate one of its summer camps is extremely minimal, as in the event that an exceptional event occurs in which there is no package to maintain the camp as usual, the Company often has contingency plans for operating the camp (such as erecting temporary structures and even moving the camp to other land).

7.7.4. **Clients**

7.7.4.1. The Company's clients are parents to children and teenagers aged 7 to 16 who wish to grant their children an educational summer experience. Most of the clients are middle to high class individuals, residents of major cities and of suburbs in the East Coast and the Midwest of the United States.

The Company's clients include mostly families from the United States (and approximately 1% to 5% of the clients are families from outside the U.S., depending **on** the camp and the season. Additionally, a significant rate of the participants in the Company's summer camps are members of the Jewish community in the US, whereby in the sleepaway camps operated by the Company, the vast majority (approximately 60% to 70%) are from the Jewish community, this without considering camps which are designated only for members of the Jewish community). In the day camps operated by the Company, which are of a more diverse nature, approximately half of the participants are members of the Jewish Community. The registration to the Company's camps is mostly carried out online, via the Company's website or each camp's designated website. Within the framework of the registration, the parents are required to fill out an online form including the information of the child, selecting dates and programs in which to

participate, and the payment of a deposit which secures the reservation. Following the initial registration, the parents are required to provide accompanying medical information, including doctors' certificates and health declaration, certificate of vaccination, and consent forms regarding the provision of medical services if needed.

Although the Company does not perform follow-up on the scope of its returning clients, it is the Company's estimation that a large number of the participants in the Company's summer camps are returning clients, whereby many families send their children to the same camp for several consecutive years. The model of returning clients alongside a geographic and cultural distribution, contributes to the stability of the revenues and to the Company's reputation in the field.

7.7.4.2. Cancellation policy

The registration process for the camps typically starts about a year in advance, at the end of the operating season and includes full financial commitment from the parents. In view of the demand and limited supply, many parents make sure to enroll their children to the camps several months in advance, and sometimes immediately upon the conclusion of the previous operating season.

The payment schedule varies from camp to camp and from year to year, with participants paying a deposit of $750 to $1,500 at the time of registration. Payment terms generally allow for payment of the registration fee in up to six (6) installments, with camps generally accepting payments as early as possible. In most cases, approximately 40%-50% of the registration fees of registered campers are received by the end of February of each year (approximately six months before the actual start date of the activity). In any case, the full registration fee is paid prior to the opening of the camp.

The Company's cancellation policy varies depending on the camp, as each camp has its own terms and conditions. However, a significant portion of the Company's camps generally operate in accordance with the following guidelines:

a) Cancellations made by December-January (approximately 6 months before the start of the camps season) will be eligible for a full refund; [
b) Cancellations made later (depending on the camp and year) will result in a 25% of the registration fee and forfeiture of the deposit paid.

In practice, camp managers and the Company management often exercise discretion in implementing the cancellation policy (for example, in the event of a camper's injury or family tragedy, managers may provide a full

refund or allow the camper to exercise their right to participate in the camp in the next year).

Historically, the overall cancellation rate at the Company's camps has been an insignificant – 1%-2%.

7.7.5. **Marketing and distribution**

The Company's marketing is firstly ear to mouth. Additionally, the Company's marketing strategy includes activity in digital channels, including on social media as well as advertising in the relevant communities. Furthermore, the Company's marketing array is based on referrals from consultants and agents who direct clients to the Company.

7.7.6. **Competition**

The summer camp field is characterized by multiple players, diverse models and ample competition in certain areas. The Company competes both with private family-owned camps with well-established reputations, as well as with large commercial networks or non-profit organizations.

As aforesaid, given the deep relationships formed between the campers and their families and the camp, as well as the friendships which are formed between the various campers, many times a significant portion of those enrolling are returning campers and/or members of the same family. Accordingly, the Company emphasizes the deepening of the relationships between the camps, the campers and their families.

7.7.7. **Seasonality**

The Company's activities are inherently impacted by seasonality, which is typical of this field. Most of the camps activity takes place in the third quarter of the year when students are on school vacation. Camps are scheduled in accordance with the annual holiday calendar and therefore the activity outside this period is significantly lower. Economically as well, camps follow an annual cycle: throughout the year, preparations take place including marketing, staff recruitment, and facility maintenance, but the majority of revenue is recognized only during the short summer season. However, the registration to the Company's summer camps is open throughout the entire year and usually starts a year in advance (mostly at the end of the operating season).

Accordingly, approximately 90% of the Company's revenue is recognized during the third quarter of the year, with the Company's expenses divided into seasonal expenses related to the operation of the camps, which are incurred mainly in the third quarter of the year, constituting approximately 85%-90% of the total annual cost , and fixed expenses, which are paid during the year, derive from salaries to fixed employees, current debt service expenses, real estate taxes, camp

maintenance, insurance and so forth, constituting approximately 10%-15% of the total annual cost.

See below information regarding the number of participants enrolled in the Company's summer camps and the expected revenues with respect thereto (in aggregate)

| | Season of the year 2025 | | | Season of the year 2024 | | |
|---|---|---|---|---|---|---|
| | Number of participants enrolled for the upcoming season (in thousand) | Rate out of all enrollments (%) | Expected revenue from registration fees (in USD thousand) | Number of participants enrolled for the upcoming season (in thousand) | Rate out of all enrollments (%) | Expected revenue from registration fees (in USD thousand) |
| November | 14.6 | 73% | 122,572 | 14.9 | 73% | 119 |
| December | 15.6 | 78% | 127,588 | 15.8 | 78% | 124 |
| January | 16.4 | 83% | 131,176 | 16.6 | 82% | 127,353 |
| February | 17.3 | 87% | 135,535 | 17.6 | 86% | 131,770 |
| March | 18.3 | 92% | 141,047 | 18.5 | 91% | 136,556 |
| April | 19 | 95% | 143,876 | 19.2 | 94% | 139,611 |
| May | 19.5 | 98% | 148,335 | 19.8 | 97% | 143,404 |
| June | 19.9 | 100% | 150,888 | 20.3 | 100% | 145,772 |

7.7.8. **Raw materials and suppliers**

Within the field of activity, the Company engages with diverse suppliers in order to operate the camps. In terms of catering the Company engages large regional suppliers who provide food in commercial quantities while meeting safety requirements. in terms of equipment, the Company purchases sports, camping, art and computer equipment from licensed suppliers. Transportation services to campers are provided through regional transportation companies, according to local regulation. Furthermore, the Company also works with medical entities – doctors, nurses and pharmacists to establish and operate clinics on the camp sites.

### 7.7.9. **The Company's Material and Very Material Properties**[15]

Below are details regarding the Company's very material and material assets, as well as assets that will be pledged and/or may be pledged for the benefit of the holders of the Company's debentures (Series A):

#### 7.7.9.1. Camp Mohawk (Very Material asset)

a) Presentation of the Property :

| **(Data is according to 100%. The Company's share in the Property – 100%)** | |
|---|---|
| Name of the Property: | **Mohawk (C21)** |
| General description of the property | Summer camp, during the year a school operates on the land |
| Location of the Property: | 200 Old Tarrytown Rd, White Plains, NY |
| Company's share in the Property (legal/effective) | 100% |
| Is it rented during the year | Throughout the year the property is leased to a pre-school |
| Expected CAPEX costs | $300 – 400 thousand per year, over the next five (5) years |
| Are the land and facilities owned by the Company | Yes |
| Area of the property | 37.39 acres |
| Is it operated by an external manager | yes |
| Year of purchase | 2009 |
| Cost of purchase | 20,000 |

b) Operational Information of the Property :

| **(Data is according to 100%. The Company's share in the Property – 100%)** | | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Fair value | 75,100 | 72,900 | 70,800 |
| Revenues (in USD thousands) | 19,755 | 19,747 | 17,910 |
| Revaluation Profits (losses) (in USD thousand) | 2,337 | 2,602 | 2,700 |
| EBITDA (in USD thousands) | 7,434 | 6,578 | 5,227 |
| Actual rate of return | 9.9% | 9.0% | 7.4% |
| Average participation cost per one week (in USD) | 1,628 | 1,425 | 1,312 |
| Number of participants | 1,834 | 1,850 | 1,765 |
| **Identity of the appraiser** | | | |
| Name of the appraiser | Leitner Berman | | |
| Is the appraiser dependent on the company | No | No | No |
| Is there an indemnification agreement | Yes | Yes | Yes |
| **Details of the Valuation** | | | |
| Date of the valuation | 31/12/2024 | 31/12/2023 | 31/12/2022 |

[15] It should be noted that the examination of Material and Very Material assets in this section is according to the definitions established in the proposed amendment to the Securities Regulations for establishing the ""Disclosure Guideline with respect to Investment Property", this although the Company does not operate in the field of Investment Property.

| | | | | |
|---|---|---|---|---|
| Valuation model | | DCF | DCF | DCF |
| EBITDA in a stabilized year (in USD thousands) | | 8,259 | 8,383 | 7,434 |
| Growth rate assumed with respect to the revenues | | 3% | 3% | 3% |
| Growth rete assumed with respect to the costs | | 3% | 3% | 3% |
| Average participation cost per one week (in USD) | | 1,628 | 1,425 | 1,312 |
| Discount Rate | | 11.00% | 11.50% | 10.50% |
| Cap Rate | | 11.00% | 11.50% | 10.50% |
| OCR | | 11.00% | 11.50% | 10.50% |
| Impact of the change in Capitalization rates on the property's value | An increase of 0.5% | (3,282) | (3,041) | (3,218) |
| | A decrease of 0.5% | 3,557 | 3,093 | 3,540 |

### 7.7.9.2. Camp Banner (Very Material asset)

#### a) Presentation of the Property

| (Data is according to 100%. The Company's share in the Property – 90%) | |
|---|---|
| Name of the Property: | Banner (C2) |
| General description of the property | Summer camp operating as a day camp. |
| Location of the Property: | 1177 Riverwoods Road, Lake Forest, IL |
| Company's share in the Property (legal/effective) | 90% |
| Is it rented during the year | No |
| Expected CAPEX costs | $100 – 150 thousand per year, over the next five (5) years |
| Are the land and facilities owned by the Company | Yes |
| Area of the property | 54.01 acres |
| Is it operated by an external manager | Yes |
| Year of purchase | 2013 |
| Cost of purchase | 10,750 |

#### b) Operational Information of the Property :

| (Data is according to 100%. The Company's share in the Property – 90%) | | | |
|---|---|---|---|
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 30,300 | 29,400 | 28,500 |
| Revaluation Profits(losses) (in USD thousands) | 1,113 | 850 | 912 |
| Revenues (in USD thousands) | 10,503 | 10,469 | 9,414 |
| Number of participants | 1,477 | 1,572 | 1,598 |
| EBITDA (in USD thousands) | 3,396 | 3,604 | 3,519 |
| Actual rate of return | 11.2% | 12.3% | 12.3% |
| Average participation cost per one week (in USD) | 1,174 | 1,097 | 954 |
| **Identity of the appraiser** | | | |
| Name of the appraiser | Leitner Berman | | |
| Is the appraiser dependent on the company | No | | |
| Is there an indemnification agreement | yes | | |
| **Details of the Valuation** | | | |
| Date of the valuation | 31/12/2024 | 31/12/2023 | 31/12/2022 |

| | | | | |
|---|---|---|---|---|
| Valuation model | | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD thousands) | | 3,180 | 3,234 | 2,850 |
| Growth rate assumed with respect to the revenues | | 0.00% | 0.15% | 11.62% |
| Growth rete assumed with respect to the costs | | 3.00% | 3.56% | 16.76% |
| Average participation cost per one week (in USD) | | 1,174 | 1,097 | 954 |
| Discount Rate | | 10.50% | 11.00% | 10.00% |
| Cap Rate | | 10.50% | 11.00% | 10.00% |
| OCR | | 10.50% | 11.00% | 10.00% |
| Impact of the change in Capitalization rates on the property's value | An increase of 0.5% | (1,377) | (1,278) | (1,357) |
| | A decrease of 0.5% | 1,515 | 1,400 | 1,500 |

### 7.7.9.3. Camp Chen-A-Wanda (Very Material Asset)

#### a) Presentation of the Property :

| **(Data is according to 100%. The Company's share in the Property – 51%)** | |
|---|---|
| Name of the Property: | Chen -A- Wanda (C5) |
| General description of the property | Summer camp operating as a sleepaway camp. The camp offers sporsta nd arts activities |
| Location of the Property: | 355 Camp Rd Thompson, PA |
| Company's share in the Property (legal/effective) | 51% |
| Is it rented during the year | No |
| Expected CAPEX costs | $150 – 200 thousand per year, over the next five (5) years |
| Are the land and facilities owned by the Company | Yes |
| Area of the property | 180.68 acres |
| Is it operated by an external manager | Yes |
| Year of purchase | 2007 |
| Cost of purchase | 4,750 |

#### b) Operational Information of the Property :

| **(Data is according to 100%. The Company's share in the Property – 51%)** | | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Fair value | 17,900 | 17,400 | 16,900 |
| Revaluation Profits (losses) (in USD thousand) | 676 | 957 | 1,056 |
| Revenues (in USD thousands) | 7,158 | 6,102 | 5,404 |
| Number of participants | 583 | 531 | 499 |
| EBITDA (in USD thousands) | 1,309 | 833 | 513 |
| Actual rate of return | 7.3% | 4.8% | 3.0% |
| Average participation cost per one week (in USD) | 1,628 | 1,517 | 1,423 |
| **Identity of the appraiser** | | | |
| Name of the appraiser | | Leitner Berman | |
| Is the appraiser dependent on the company | No | No | No |
| Is there an indemnification agreement | Yes | Yes | Yes |
| **Details of the Valuation** | | | |
| Date of the valuation | 31/12/2024 | 31/12/2023 | 31/12/2022 |

| Valuation model | | DCF | DCF | DCF |
|---|---|---|---|---|
| EBITDA in a stabilized year (in USD thousands) | | 1,786 | 1,786 | 1,786 |
| Growth rate assumed with respect to the revenues | | 5.00% | 17.43% | 12.93% |
| Growth rete assumed with respect to the costs | | 5.00% | 12.19% | 8.33% |
| Average participation cost per one week (in USD) | | 1,628 | 1,517 | 1,423 |
| Discount Rate | | 10.00% | 10.50% | 9.50% |
| Cap Rate | | 10.00% | 10.50% | 9.50% |
| OCR | | 10.00% | 10.50% | 9.50% |
| Impact of the change in Capitalization rates on the property's value | An increase of 0.5% | (852) | (791) | (845) |
| | A decrease of 0.5% | 942 | 870 | 939 |

### 7.7.9.4. Camp Gateway (Very Material Asset)

#### a) Presentation of the Property :

| (Data is according to 100%. The Company's share in the Property – 80%) | |
|---|---|
| Name of the Property: | Club Getaway (C6) |
| General description of the property | Summer camp, which serves as a camp- resort site offering adventures for families (and adults). The camp is open for participation during various periods |
| Location of the Property: | 59 S Kent Rd Kent CT |
| Company's share in the Property (legal/effective) | 80% |
| Is it rented during the year | Active during most of the year |
| Expected CAPEX costs | $150 – 200 thousand per year, over the next five (5) years |
| Are the land and facilities owned by the Company | Yes |
| Area of the property | 271.12 acres |
| Is it operated by an external manager | Yes |
| Year of purchase | 2012 |
| Cost of purchase | 4,750 |

#### b) Operational Information of the Property :

| (Data is according to 100%. The Company's share in the Property – 80%) | | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Fair value | 19,300 | 18,700 | 18,200 |
| Revaluation Profits (losses) (in USD thousand) | 642 | 566 | 474 |
| Revenues (in USD thousands) | 7,008 | 6,588 | 6,127 |
| Number of participants | N/A | N/A | N/A |
| EBITDA (in USD thousands) | 2,171 | 2,261 | 1,890 |
| Actual rate of return | 11.2% | 12.1% | 10.4% |
| Average participation cost per one week (in USD) | N/A | N/A | N/A |
| **Identity of the appraiser** | | | |
| Name of the appraiser | Leitner Berman | | |
| Is the appraiser dependent on the company | No | No | No |
| Is there an indemnification agreement | Yes | Yes | Yes |
| **Details of the Valuation** | | | |

| | | | | |
|---|---|---|---|---|
| Date of the valuation | | 31/12/2024 | 31/12/2023 | 31/12/2022 |
| Valuation model | | DCF | DCF | DCF |
| EBITDA in a stabilized year (in USD thousands) | | 2,025 | 2,025 | 2,025 |
| Growth rate assumed with respect to the revenues | | 3.00% | 7.81% | 6.24% |
| Growth rete assumed with respect to the costs | | 3.00% | 11.75% | 2.22% |
| Average participation cost per one week (in USD) | | N/A | N/A | N/A |
| Discount Rate | | 10.50% | 11.00% | 10.00% |
| Cap Rate | | 10.50% | 11.00% | 10.00% |
| OCR | | 10.50% | 11.00% | 10.00% |
| Impact of the change in Capitalization rates on the property's value | An increase of 0.5% | (877) | (813) | (867) |
| | A decrease of 0.5% | 965 | 890 | 958 |

### 7.7.9.5. Camp Mongenvaco (Very Material Asset)

#### a) Presentation of the Property :

| (Data is according to 100%. The Company's share in the Property – 100%) | |
|---|---|
| Name of the Property: | Mogenavco (C20) |
| General description of the property | Summer camp, which operates as a sleepaway camp. The camp is designated for Orthodox Jewish boys, and includes activities of spiritual learning alongside summer activities. |
| Location of the Property: | 160 Laymon Road, Swan Lake, NY |
| Company's share in the Property (legal/effective) | 100% |
| Is it rented during the year | No |
| Expected CAPEX costs | $200 – 250 thousand per year, over the next five (5) years |
| Are the land and facilities owned by the Company | Yes |
| Area of the property | 481.15 acres |
| Is it operated by an external manager | Yes |
| Year of purchase | 2010 |
| Cost of purchase | 7,000 |

#### b) Operational Information of the Property :

| (Data is according to 100%. The Company's share in the Property – 100%) | | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Fair value | 24,100 | 18,700 | 22,700 |
| Revaluation Profits (losses) (in USD thousand) | 1,338 | 566 | 1,003 |
| Revenues (in USD thousands) | 7,095 | 6,588 | 6,343 |
| Number of participants | 954 | 23,400 | 1,081 |
| EBITDA (in USD thousands) | 1,981 | 902 | 1,560 |
| Actual rate of return | 8.2% | 7.6% | 6.9% |
| Average participation cost per one week (in USD) | 1,094 | 1,015 | 915 |
| **Identity of the appraiser** | | | |
| Name of the appraiser | Leitner Berman | | |
| Is the appraiser dependent on the company | No | No | No |
| Is there an indemnification agreement | Yes | Yes | Yes |

| Details of the Valuation | | | | |
|---|---|---|---|---|
| Date of the valuation | | 31/12/2024 | 31/12/2023 | 31/12/2022 |
| Valuation model | | DCF | DCF | DCF |
| EBITDA in a stabilized year (in USD thousands) | | 2,169 | 2,223 | 1,930 |
| Growth rate assumed with respect to the revenues | | 5.00% | 4.99% | 6.43% |
| Growth rete assumed with respect to the costs | | 3.00% | 3.17% | 3.68% |
| Average participation cost per one week (in USD) | | 1,094 | 1,015 | 915 |
| Discount Rate | | 9.00% | 9.50% | 8.50% |
| Cap Rate | | 9.00% | 9.50% | 8.50% |
| OCR | | 9.00% | 9.50% | 8.50% |
| Impact of the change in Capitalization rates on the property's value | An increase of 0.5% | (1,268) | (1,170) | (1,261) |
| | A decrease of 0.5% | 1,418 | 1,300 | 1,419 |

### 7.7.9.6. Camp Pine Forest (Very Material Asset)

a) Presentation of the Property :

| (Data is according to 100%. The Company's share in the Property – 80%) | |
|---|---|
| Name of the Property: | Pine Forest (C24) |
| General description of the property | Summer camp, which operates as a sleepaway camp. The camp has been active for many years |
| Location of the Property: | 185 Pine Forest Rd, Greeley PA |
| Company's share in the Property (legal/effective) | 80% |
| Is it rented during the year | No |
| Expected CAPEX costs | $250 – 300 thousand per year, over the next five (5) years |
| Are the land and facilities owned by the Company | Yes |
| Area of the property | 241.44 acres |
| Is it operated by an external manager | Yes |
| Year of purchase | 2022 |
| Cost of purchase | 27,000 |

b) Operational Information of the Property :

| (Data is according to 100%. The Company's share in the Property – 100%) | | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Fair value | 37,300 | 29,450 | 21,600 |
| Revaluation Profits (losses) (in USD thousand) | 6,941 | 6,496 | (3,602) |
| Revenues (in USD thousands) | 14,205 | 13,681 | 1,030 |
| Number of participants | 1,093 | 1,091 | 1,120 |
| EBITDA (in USD thousands) | 3,826 | 4,004 | 326 |
| Actual rate of return | 10.3% | 13.6% | 1.5% |
| Average participation cost per one week (in USD) | 2,163 | 1,890 | 1,843 |
| Identity of the appraiser | | | |
| Name of the appraiser | Leitner Berman | | |
| Is the appraiser dependent on the company | No | No | No |
| Is there an indemnification agreement | Yes | Yes | Yes |

| Details of the Valuation | | | | |
|---|---|---|---|---|
| Date of the valuation | | 31/12/2024 | 31/12/2023 | 31/12/2022 |
| Valuation model | | DCF | DCF | DCF |
| EBITDA in a stabilized year (in USD thousands) | | 3,733 | 3,239 | 2,160 |
| Growth rate assumed with respect to the revenues | | 3.00% | 3.83% | 10.65% |
| Growth rete assumed with respect to the costs | | 5.00% | 7.24% | 1.58% |
| Average participation cost per one week (in USD) | | 2,163 | 1,890 | 1,843 |
| Discount Rate | | 10.50% | 11.00% | 10.00% |
| Cap Rate | | 10.50% | 11.00% | 10.00% |
| OCR | | 10.50% | 11.00% | 10.00% |
| Impact of the change in Capitalization rates on the property's value | An increase of 0.5% | (1,695) | (1,280) | (1,029) |
| | A decrease of 0.5% | 1,865 | 1,402 | 1,137 |

### 7.7.9.7. Camp Rolling Hills (Very Material Asset)

a) Presentation of the Property :

| (Data is according to 100%. The Company's share in the Property – 99%) | |
|---|---|
| Name of the Property: | Rolling Hills (C25) |
| General description of the property | Summer camp operating as a day camp. The camp includes heated swimming pools, climbing wall,basketball courts and other sports courts, and arts and crafts studio and cooking compounds. |
| Location of the Property: | 14 Dittmar Road, Freehold, NJ |
| Company's share in the Property (legal/effective) | 99% |
| Is it rented during the year | No |
| Expected CAPEX costs | $150 – 250 thousand per year, over the next five (5) years |
| Are the land and facilities owned by the Company | Yes |
| Area of the property | 22.18 acres |
| Is it operated by an external manager | Yes |
| Year of purchase | 2022 |
| Cost of purchase | 12,500 |

b) Operational Information of the Property :

| (Data is according to 100%. The Company's share in the Property – 99%) | | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Fair value | 18,300 | 15,400 | 12,500 |
| Revaluation Profits (losses) (in USD thousand) | 3,154 | 2,934 | (911) |
| Revenues (in USD thousands) | 9,307 | 8,672 | 7,523 |
| Number of participants | 1,456 | 1,355 | 1,318 |
| EBITDA (in USD thousands) | 1,817 | 2,001 | 1,129 |
| Actual rate of return | 9.9% | 13.0% | 9.0% |
| Average participation cost per one week (in USD) | 928 | 891 | 822 |
| **Identity of the appraiser** | | | |
| Name of the appraiser | Leitner Berman | | |
| Is the appraiser dependent on the company | No | No | No |

| | | | | |
|---|---|---|---|---|
| Is there an indemnification agreement | | Yes | Yes | Yes |
| **Details of the Valuation** | | | | |
| Date of the valuation | | 31/12/2024 | 31/12/2023 | 31/12/2022 |
| Valuation model | | DCF | DCF | DCF |
| EBITDA in a stabilized year (in USD thousands) | | 1,734 | 1,617 | 1,187 |
| Growth rate assumed with respect to the revenues | | 3.00% | 7.31% | 15.14% |
| Growth rete assumed with respect to the costs | | 5.00% | 8.52% | 4.31% |
| Average participation cost per one week (in USD) | | 928 | 891 | 822 |
| Discount Rate | | 9.50% | 10.50% | 10.00% |
| Cap Rate | | 9.50% | 10.50% | 10.00% |
| OCR | | 9.50% | 10.50% | 10.00% |
| Impact of the change in Capitalization rates on the property's value | An increase of 0.5% | (915) | (700) | (595) |
| | A decrease of 0.5% | 1,017 | 770 | 658 |

## 7.7.9.8. Camp Blue Star (Material Asset)

| **(Data is according to 100%. The Company's share in the Property – 70%)** | | | |
|---|---|---|---|
| Purchase date | 27/02/2012 | | |
| Purchase cost (in USD thousands) | 8,800 | | |
| Company's share in the Property (legal/effective) | 70% | | |
| Property location | Blue Star Wy 179, Hendersonville, NC | | |
| Area of the property | 447.09 acres | | |
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 17,500 | 17,000 | 16,500 |
| Revaluation Profits(losses) (in USD thousands) | (53) | 213 | 133 |
| Revenues (in USD thousands) | 8,027 | 7,257 | 6,468 |
| Number of participants | 1,105 | 1,062 | 1,010 |
| EBITDA (in USD thousands) | 1,698 | 996 | 801 |
| Average participation cost per one week (in USD) | 1,642 | 1,500 | 1,500 |
| **Details of the Valuation** | **2024** | **2023** | **2022** |
| Name of the appraiser | Leitner Berman | | |
| Valuation model | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD) | 1,752 | 1,785 | 1,568 |
| Average participation cost per one week (in USD thousands) | 1,642 | 1,500 | 1,500 |
| Discount Rate | 10.00% | 10.50% | 9.50% |
| Cap Rate | 10.00% | 10.50% | 9.50% |
| OCR | 10.00% | 10.50% | 9.50% |

## 7.7.9.9. Camp Achim

| **(Data is according to 100%. The Company's share in the Property – 100%)** | |
|---|---|
| Purchase date | 21/08/2012 |
| Purchase cost (in USD thousands) | 3,500 |
| Company's share in the Property (legal/effective) | 100% |
| Property location | 365 Route 59, Suite 110, Airmont, NY |

| Area of the property | 98.03 acres | | |
|---|---|---|---|
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 6,300 | 6,100 | 5,900 |
| Revaluation Profits (losses) (in USD thousands) | 404 | 451 | 126 |
| Revenues (in USD thousands) | 2,190 | 2,009 | 1,883 |
| Number of participants | 551 | 562 | 554 |
| EBITDA (in USD thousands) | 397 | 107 | 619 |
| Average participation cost per one week (in USD) | 435 | 435 | 403 |
| **Details of the Valuation** | **2024** | **2023** | **2022** |
| Name of the appraiser | Leitner Berman | | |
| Valuation model | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD thousands) | 662 | 671 | 590 |
| Average participation cost per one week (in USD) | 435 | 435 | 403 |
| Discount Rate | 10.50% | 11.00% | 10.00% |
| Cap Rate | 10.50% | 11.00% | 10.00% |
| OCR | 10.50% | 11.00% | 10.00% |

7.7.9.10. Camp Country Roads

| **(Data is according to 100%. The Company's share in the Property – 99%)** | | | |
|---|---|---|---|
| Purchase date | 06/11/2013 | | |
| Purchase cost (in USD thousands) | 4,500 | | |
| Company's share in the Property (legal/effective) | 99% | | |
| Property location | 139 Pine Brook Rd, Manalapan Township, NJ | | |
| Area of the property | 25.68 acres | | |
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 12,100 | 11,700 | 11,400 |
| Revaluation Profits (losses) (in USD thousands) | 599 | 461 | 502 |
| Revenues (in USD thousands) | 6,473 | 6,630 | 5,819 |
| Number of participants | 1,064 | 1,131 | 1,086 |
| EBITDA (in USD thousands) | 1,294 | 1,288 | 971 |
| Average participation cost per one week (in USD) | 659 | 635 | 578 |
| **Details of the Valuation** | **2024** | **2023** | **2022** |
| Name of the appraiser | Leitner Berman | | |
| Valuation model | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD thousands) | 1,146 | 1,170 | 1,026 |
| Average participation cost per one week (in USD) | 659 | 635 | 578 |
| Discount Rate | 9.50% | 10.00% | 9.00% |
| Cap Rate | 9.50% | 10.00% | 9.00% |
| OCR | 9.50% | 10.00% | 9.00% |

### 7.7.9.11. Camp Eagles Landing

| (Data is according to 100%. The Company's share in the Property – 100%) | | | |
|---|---|---|---|
| Purchase date | 30/12/2011 | | |
| Purchase cost (in USD thousands) | 5,700 | | |
| Company's share in the Property (legal/effective) | 100% | | |
| Property location | 74 Davidson Mill Road N. Brunswick Township, NJ | | |
| Area of the property | 12.79 acres | | |
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 5,000 | 4,900 | 4,800 |
| Revaluation Profits (losses) (in USD thousands) | 229 | 68 | 51 |
| Revenues (in USD thousands) | 3,354 | 3,683 | 3,365 |
| Number of participants | 581 | 654 | 704 |
| EBITDA (in USD thousands) | 482 | 908 | 714 |
| Average participation cost per one week (in USD) | 765 | 662 | 595 |
| **Details of the Valuation** | **2024** | **2023** | **2022** |
| Name of the appraiser | Leitner Berman | | |
| Valuation model | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD thousands) | 478 | 490 | 432 |
| Average participation cost per one week (in USD) | 765 | 662 | 595 |
| Discount Rate | 9.50% | 10.00% | 9.00% |
| Cap Rate | 9.50% | 10.00% | 9.00% |
| OCR | 9.50% | 10.00% | 9.00% |

### 7.7.9.12. Camp Green Lane

| (Data is according to 100%. The Company's share in the Property – 51%) | | | |
|---|---|---|---|
| Purchase date | 27/07/2011 | | |
| Purchase cost (in USD thousands) | 3,200 | | |
| Company's share in the Property (legal/effective) | 51% | | |
| Property location | 249 Camp Green Lane Rd Green Lane, PA | | |
| Area of the property | 106.40 acres | | |
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 9,400 | 9,100 | 8,800 |
| Revaluation Profits (losses) (in USD thousands) | 439 | 382 | 435 |
| Revenues (in USD thousands) | 3,676 | 3,514 | 2,754 |
| Number of participants | 354 | 380 | 324 |
| EBITDA (in USD thousands) | 911 | 897 | 336 |
| Average participation cost per one week (in USD) | 1,027 | 1,031 | 1,107 |
| **Details of the Valuation** | **2024** | **2023** | **2022** |
| Name of the appraiser | Leitner Berman | | |
| Valuation model | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD thousands) | 937 | 956 | 836 |

| | | | |
|---|---|---|---|
| Average participation cost per one week (in USD) | 1,027 | 1,031 | 1,107 |
| Discount Rate | 10.00% | 10.50% | 9.50% |
| Cap Rate | 10.00% | 10.50% | 9.50% |
| OCR | 10.00% | 10.50% | 9.50% |

7.7.9.13. Camp Lavi

| (Data is according to 100%. The Company's share in the Property – 99%) | | | |
|---|---|---|---|
| Purchase date | 28/02/2008 | | |
| Purchase cost (in USD thousands) | 7,500 | | |
| Company's share in the Property (legal/effective) | 99% | | |
| Property location | 2656 Upper Woods Dr, Lakewood, PA | | |
| Area of the property | 119.00 acres | | |
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 7,700 | 7,500 | 7,300 |
| Revaluation Profits (losses) (in USD thousands) | 273 | 53 | (536) |
| Revenues (in USD thousands) | 4,613 | 4,741 | 4,079 |
| Number of participants | 767 | 743 | 712 |
| EBITDA (in USD thousands) | 146 | 521 | (120) |
| Average participation cost per one week (in USD) | 859 | 852 | 750 |
| **Details of the Valuation** | **2024** | **2023** | **2022** |
| Name of the appraiser | Leitner Berman | | |
| Valuation model | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD thousands) | 805 | 825 | 730 |
| Average participation cost per one week (in USD) | 859 | 852 | 750 |
| Discount Rate | 10.50% | 11.00% | 10.00% |
| Cap Rate | 10.50% | 11.00% | 10.00% |
| OCR | 10.50% | 11.00% | 10.00% |

7.7.9.14. Camp Malka

| (Data is according to 100%. The Company's share in the Property – 100%) | | | |
|---|---|---|---|
| Purchase date | 11/03/2010 | | |
| Purchase cost (in USD thousands) | 3,500 | | |
| Company's share in the Property (legal/effective) | 100% | | |
| Property location | 150 Ingalside Rd Greenville, NY | | |
| Area of the property | 131.52 acres | | |
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 10,800 | 10,500 | 10,200 |
| Revaluation Profits (losses) (in USD thousands) | 312 | (171) | 304 |
| Revenues (in USD thousands) | 710 | 2,587 | 2,482 |
| Number of participants | N/A | 963 | 933 |
| EBITDA (in USD thousands) | (103) | 15 | (296) |
| Average participation cost per one week (in USD) | N/A | N/A | N/A |

| Details of the Valuation | 2024 | 2023 | 2022 |
|---|---|---|---|
| Name of the appraiser | Leitner Berman | | |
| Valuation model | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD thousands) | 1,134 | 1,155 | 1,020 |
| Average participation cost per one week (in USD) | N/A | N/A | N/A |
| Discount Rate | 10.50% | 11.00% | 10.00% |
| Cap Rate | 10.50% | 11.00% | 10.00% |
| OCR | 10.50% | 11.00% | 10.00% |

### 7.7.9.15. Camp Meadowbrook

| (Data is according to 100%. The Company's share in the Property – 99%) | | | |
|---|---|---|---|
| Purchase date | 16/06/2016 | | |
| Purchase cost (in USD thousands) | 8,350 | | |
| Company's share in the Property (legal/effective) | 99% | | |
| Property location | 73 E Valley Brook Rd, Long Valley, NJ | | |
| Area of the property | 53.10 acres | | |
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 9,100 | 8,800 | 8,500 |
| Revaluation Profits (losses) (in USD thousands) | 391 | 342 | 209 |
| Revenues (in USD thousands) | 6,202 | 6,412 | 6,323 |
| Number of participants | 1,103 | 1,132 | 1,060 |
| EBITDA (in USD thousands) | 709 | 435 | 1,223 |
| Average participation cost per one week (in USD) | 748 | 742 | 740 |
| **Details of the Valuation** | **2024** | **2023** | **2022** |
| Name of the appraiser | Leitner Berman | | |
| Valuation model | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD thousands) | 869 | 880 | 765 |
| Average participation cost per one week (in USD) | 748 | 742 | 740 |
| Discount Rate | 9.50% | 10.00% | 9.00% |
| Cap Rate | 9.50% | 10.00% | 9.00% |
| OCR | 9.50% | 10.00% | 9.00% |

### 7.7.9.16. Camp Echo

| (Data is according to 100%. The Company's share in the Property – 100%) | | | |
|---|---|---|---|
| Purchase date | 15/09/2007 | | |
| Purchase cost (in USD thousands) | 5,600 | | |
| Company's share in the Property (legal/effective) | 100% | | |
| Property location | 244 Kenilworth Rd, Ridgewood, NJ | | |
| Area of the property | 206.17 acres | | |
| **Details regarding the Property** | **2024** | **2023** | **2022** |
| Fair value at the end of the period (in USD thousand) | 12,500 | 12,100 | 11,700 |
| Revaluation Profits (losses) (in USD thousands) | 770 | 760 | 340 |

| | | | |
|---|---|---|---|
| Revenues (in USD thousands) | 5,004 | 5,180 | 5,239 |
| Number of participants | 470 | 493 | 571 |
| EBITDA (in USD thousands) | 1,037 | 1,141 | 1,534 |
| Average participation cost per one week (in USD) | 1,229 | 1,402 | 1,459 |
| **Details of the Valuation** | **2024** | **2023** | **2022** |
| Name of the appraiser | Leitner Berman | | |
| Valuation model | DCF | | |
| Stabilized EBITDA according to the property's valuation (in USD thousands) | 1,251 | 1,271 | 1,112 |
| Average participation cost per one week (in USD) | 1,229 | 1,402 | 1,459 |
| Discount Rate | 10.00% | 10.50% | 9.50% |
| Cap Rate | 10.00% | 10.50% | 9.50% |
| OCR | 10.00% | 10.50% | 9.50% |

# PART D – MATTERS RELATED TO THE COMPANY IN GENERAL

7.8. **Fixed Assets, Real Estate and Facilities**

For further information see note 5 to the Financial Statement

7.9. **Human capital**

7.9.1. As of the Prospectus date, the Company itself does not have a separate senior management mechanism to carry out its operations. Given the aforementioned, the Company has entered into a management agreement with a company controlled by the Controlling Shareholders, pursuant to which it shall provide the Company, inter alia, with management personnel services (including the provision of officers and directors to the Company). for further information regarding said management agreement see Section 9.2.2 to the Prospectus. The group headquarters has approximately 15 staff members in the summer camp field and works in collaboration with the property managers and directors at the camps.

7.9.2. The Company's summer camp activity is characterized by employing many seasonal employees. The Company engages, from time to time, as needed, with seasonal employees that mostly provide services in the Company's summer camps. In 2024, approximately 300 of the Company's employees were permanent employees and the rest were seasonal. Most of the permanent employees are maintenance personnel responsible for operating the properties, as well as sales and marketing personnel responsible for enrolling participants, purchasing materials, preparing activity plans, as well as recruiting seasonal employees.

7.9.3. Each of the Company's summer camps are operated as an independent unit and is managed by a designated staff for said camp, comprising, inter alia, from the camp manager, guides and additional staff members.

7.9.4. In order to incentivize the camp directors, in most cases, the Company grants, from time to time, incentives (bonuses) to the Camp directors. In most cases, the incentive mechanism is not fixed and varies from one camp to the other, depending on different factors such as scope of sales and profitability compared to previous periods. The decision making with respect to the granting of incentives is pursuant to the discretion of the Company's management.

7.10. **Material Agreements**

Below are material agreements outside the ordinary course of business to which the Company and/or its subsidiaries or affiliates are a party, as of the Prospectus publishing date:

7.10.1. The Deed of Trust in respect of the Debentures (Series A) between the Company and the Trustee for the Debentures. For further information, see Chapter 2 of the Prospectus.

7.10.2. Services and Management Agreements – see chapter 9 to the Prospectus.

7.11. **Restrictions and Oversight of the Company's Activities**

7.11.1. **The Insolvency Law**

In September 2019, the Insolvency and Economic Rehabilitation Law, 5778-2018 (hereinafter the **"Insolvency Law"**) which includes, inter alia, provisions which substitutes certain sections in the Companies Law regarding settlements or arrangements has come into effect. Therefore, to the best of the Company's knowledge, said provisions pertaining to a settlement or arrangement (including Chapter C to Part J dealing with the approval of a material arrangement in a debentures company) shall apply to the Company as of the date in which the Insolvency Law came into effect.

7.12. **Insurance**

The Company works to insure its operations and the operations of its subsidiaries with appropriate coverage. Accordingly, the Company contracts with insurers (including A-rated ones) for group umbrella policies with a coverage amount of approximately $30 million.

7.13. **Financing**

7.13.1. Financing – General

The activities of the Company and of the companies held thereby are financed through equity, working capital, the Company's investment (by way of investee companies) and investment from partners in the Property Companies or in the corporations holding them, as well as through credit lines and mortgages from banks and other financial institutions (including from government entities).

Generally, it is customary for the Property Companies (the "**Borrowing Companies**") to secure designated financing for each property or for a number of properties from a bank or from another financial institution in a loan structure which conforms to the developmental stage of the property being purchased, where the loan is for the most part without the right of recourse to the Borrowing Company, other than exceptions which allow recourse to the Borrowing Company under certain circumstances (in respect of the entire amount of the debt or up to a predetermined ceiling, as applicable, and according to the terms of the financing agreement). The loan which is provided to the Borrowing Company is secured, *inter alia*, by a pledge on the Property owned by the Borrowing Company and the proceeds derived therefrom, as applicable, as well as by means of guarantees of various types as detailed in Section 14.7.2 of the Report.

Within the framework of the financing agreements, common restrictions are imposed on the Borrowing Company, including (and according to the circumstances) limitations with respect to: the use of the property for purposes other than those stipulated in the financing agreement; executing additional assignments of the rights in the real property; undertaking additional financing secured by the property; engaging in activities which are not the designated

activities for which the Borrowing Company was formed and financing was provided; change in control in the property company; and execution of certain construction in the property, all without receiving approval from the lender, and so forth. Failure to abide by such limitations (as well as, with respect to properties which are also subject to regulatory agreements as default events under said agreements), may constitute, under the financing documents of the relevant property, a cause for calling for the immediate prepayment of the balance of the debt of the relevant Property Company to the financing entity.

7.13.2. Guarantees

Generally, as part of the financing agreements in which the Borrowing Companies engage with the lending corporations, the Parent Company or one of the Subsidiaries may be required to provide guarantees to secure certain undertakings of the Borrowing Companies as detailed in summary below:[16]

A) Monetary guarantee (Payment Guarantee) –This guarantee ensures repayment of the Borrowing Company's debt to the financing entity in the event of the Borrowing Company's failing to repay such debt.

B) Bad Acts guarantee – Generally, under the terms of this guarantee, the guarantor undertakes to personally be liable for the Borrowing Company's obligations in respect to any loss, expense, or damage incurred by the lender as a result of, *inter alia*, the following activities, and in certain cases for the Borrowing Company's entire debt to the lender as well: (1) misrepresentation or fraud by the Borrowing Company or the guarantor; (2) inappropriate use and/or embezzlement of the participants deposits; (3) inappropriate use and/or embezzlement of proceeds received from the insurance and/or nonpayment of the insurance premium; (4) intentional physical destruction of the property; (5) gross negligence or a criminal act in connection with the pledged property; (6) non-payment of real estate taxes and/or expenses connected with the pledged property; (7) unauthorized transfer of the ownership rights in the property; (8) engaging in activities which are not the Borrowing Company's designated activities; or (9) filing a motion or causing the filing of a motion for bankruptcy of the Borrowing Company.

C) Environmental Guarantees – Guarantees for the payment and repair of environmental damages discovered in the property (in order to restore the property's value to where it should be where it not for said damages). Some of the foregoing environmental guarantees cover the necessary repairs required for the property to meet the ADA requirements.

---

16 Such guarantees may be provided in favor of the primary financing entity of the Borrowing Company and/or in favor of a different entity which provided a guarantee in favor of the financing entity in connection with the financing which was provided by it to the Borrowing Company.

7.13.3. See below information regarding the balance of other loans granted to the Company as of June 30, 2025, and as of December 31 of the years 2023 and 2024, and closely to the publishing of the Prospectus (consolidated):

| | **Closely to the prospectus date** | **30.06.2025** | **31.12.2024** | **31.12.2023** |
|---|---|---|---|---|
| | **(in USD million)** | | | |
| **Total outstanding principal balance**[17] | 176,923 | 179,342 | 185,601 | 193,374 |

[17] It should be noted that the amounts detailed in the table include COVID grants/loans that the Company received from the US government, the balance of which, as of the Prospectus date, is approximately $3.3 million.

7.13.4. See below information regarding the Company's Material Loans

| Borrowing Corporation | Lender | Loan granting date | Original loan amount | Principal and interest payment dates | Loan balance as of June 30, 2025 | Final repayment date | Pledges/ collaterals | Annual interest (effective) as of June 30, 2025 (%) | Guarantees | Main financial covenants | Additional terms | Value of mortgaged assets as of June 30, 2025 (thousands of dollars) | Is the loan a recourse for the company? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BAHS Holdings LLC, Mohawkland LLC, Achim Landco LLC, Club Getaway Landco, LLC, Country Roads Landco LLC, Mill Road Landco LLC, Green Lane Landco, LLC, Lavland LLC, Greenvilleland LLC, Mogenavland LLC, SHAB Holdings LLC, Meadowbrook Landco LLC, Rolling Hills Landco LLC | Bank of America | 10/2022 | 80,000 | Monthly principal and interest payment | 69,667 | 11/2032 | Pledge over the borrower's summer camps | TERM SOFR + 2% | The Controlling Shareholders in the Company and companies controlled thereby; the operating companies of the borrowing camps, guaranteeing the full repayment of the loan, unlimited in amount | Debt service coverage ratio (DSCR) of 1:1.4 (The DSCR Ratio as of December 31,2024 (the testing date), is 1:1.635) | Cross-default of whomever of the borrowers or guarantors or of their subsidiaries, of another debt in excess of $500,000 | 227,600 | No |

7.13.4. <u>See below information regarding the Company's Material Loans</u>

| Borrowing Corporation | Lender | Loan granting date | Original loan amount | Principal and interest payment dates | Loan balance as of June 30, 2025 | Final repayment date | Pledges/ collaterals | Annual interest (effective) as of June 30, 2025 (%) | Guarantees | Main financial covenants | Additional terms | Value of mortgaged assets as of June 30, 2025 (thousands of dollars) | Is the loan a recourse for the company? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Belgrade Lakes Summer Camps LLC, Iafalandco, LLC, Poland Landco LLC, Washington, Lake, LLC, Waukeela Landco LLC, Wekeeland, LLC, WM Land LLC | Bank of New Hampshire | 12/2021 | 27,000 | Monthly principal and interest payment | 24,560 | 12/2031 | Pledge over the borrower's summer camps | 3.5% | The Controlling Shareholders in the Company and companies controlled thereby, the operating companies of the borrowing camps guaranteeing the full repayment of the loan, unlimited in amount | Debt service coverage ratio (DSCR) of 1 (The DSCR Ratio as of December 31,2024 (the testing date), is 2.2) | Cross-default of whomever of the borrowers or guarantors of another debt in excess of $50,000 | 48,800 | No |
| | | 7/2023 | 6,000 | Monthly principal and interest payment | 5,558 | 11/2031 | Pledge over the borrower's summer camps | 7.5% | | | - | | No |

7.13.5. The Company estimates that for the upcoming year it shall not require in addition to the issuance consideration, additional sources in order to meet the issuance goals or to cover its current operations.

7.14. **Taxation**

7.14.1. **Real Estate Taxation**

The Company is required to pay real estate taxes on its properties located in New York, New Jersey, and Pennsylvania. In New Jersey, each property is subject to a single real estate tax payable to the municipality in which it is located. In New York and Pennsylvania, property owners are typically required to pay separate taxes to the state, the county, and, in Pennsylvania, to school districts. These taxes are calculated and assessed based on varying appraisal methods used in each state and municipality where the real estate asset is located.

7.14.2. **Taxation of the Company**

7.14.2.1. The Company is incorporated in the British Virgin Islands and is not subject to local income tax in the British Virgin Islands. According to the tax laws in the United States, the Company has elected to be treated as a partnership pursuant to IRS Form 8832. Accordingly, (1) the Company generally does not pay U.S. federal income taxes at the entity level. Tax obligations flow through to the Company's partners (the "**Partners**"), who are responsible for U.S. federal tax on their distributive shares; (2) the IRS's ability to collect U.S. federal taxes is limited to the Partners' ownership interests in the Company. The IRS cannot directly seize or take over management of the Company or its assets. Enforcement occurs through liens or levies on Partners' interests only, consistent with U.S. federal tax law, and (3) the IRS cannot unilaterally change the Company's classification or force distributions from the Company contrary to its governing documents. Any change in classification would require proper elections and filings under U.S. tax law and check-the-box regulations.

7.14.2.2. According to US tax laws, in addition to the Company being taxed as a partnership for US federal tax purposes, the LLCs transferred to or created by the Company ("**Investee LLCs**") are generally treated as pass-through entities for U.S. federal income tax purposes. As a result, tax liabilities related to the Investee LLCs' operations generally flow through to the Partners, and the Investee LLCs do not incur U.S. federal income tax at the entity level.

If the Company or the Investee LLCs cease to be treated as pass-through entities for U.S. federal income tax purposes (for example, due to a change in classification or election), the Company may become liable for U.S. federal income tax on its income from that date forward. Any conversion of a pass-through entity to a corporation under the check-the-box rules is

generally treated as a deemed asset transfer, which may result in a new tax basis for the entity and the partners but does not itself trigger immediate U.S. federal income tax. Tax consequences for Partners and any new owners should be evaluated based on the specific facts at the time of the conversion. Transfers of equity in the Company to third parties or Bondholders may create a new tax basis for the transferees and for the Company's assets, but will not automatically affect the Company's pass-through status, and U.S. federal tax treatment depends on whether the Company remains classified as a partnership for U.S. federal tax purposes.

The Controlling Shareholder and the Company have represented that as long as there is a balance of Bonds in circulation, and subject to the existing tax laws, the Company and the Investee LLCs will not choose to be considered to be "corporations" but rather will continue to be treated as Partnerships for US tax purposes (in this subsection: the "**Undertaking to Maintain Partnerships Classification**"). It is clarified that the Undertaking to Maintain Partnerships Classification is a personal undertaking of the Controlling Shareholders, and the breach thereof by the Controlling Shareholders also constitutes grounds to call for immediate repayment of the Bonds.

With regard to the Investee LLCs: as state above, According to the US tax laws, the conversion of a partnerships (which **is** pass-through entity) to a "corporation" creates a usually conceptual tax event of asset transfer, which may result in a new tax basis for the entity and the partners as if the shareholders of the company transferred to the company the assets and liabilities in consideration for their existing shares in the company (in this subsection: the "**Conceptual Transfer**").In the event that the Controlling Shareholders violates its Undertaking to Maintain Partnerships Classification of the Investee LLCs and causes the Investee LLCs to cease to be transparent for tax purposes[18] the tax basis of the assets will be the historic tax basis of the Controlling Shareholder in the assets (which may be close or equal to zero). In such a case, as of the date of loss of Partnerships Classification, upon the sale of assets, the Company may be exposed to tax for the entire difference between the sale price and the tax basis, as it exists with the Controlling Shareholder, and for which deferred taxes were not allocated in the financial statements. In addition, as of the loss of Partnerships Classification, the Company will be subject to income taxes for its ongoing activity (income from the lease of assets, revenues from the sale of assets, and so on).[19]

**It is clarified that this event will generally occur only in the case in which the Controlling Shareholders violates the Undertaking to Maintain**

**Partnerships Classification and the Company itself will cooperate with the aforesaid breach.[20] Additionally, this event will constitute grounds to call for immediate repayment of the Bonds of the Company and a violation of the Undertaking to Maintain Partnerships Classification of the Controlling Shareholders.**

7.14.2.3. It is clarified that in In the case of calling the Bonds for immediate repayment that leads to the appointment of a functionary for the Company (hereinafter in this subsection: the **"Functionary"**), which acts to sell its assets (hereinafter in this subsection: the **"Insolvency Proceedings"**), the Company's status as a partnership for US federal tax purposes generally flows through to the owners, preserving US tax treatment of Debenture Holders and, thus, no change is expected to occur to the tax status of the Company in terms of the Bondholders.

**It is clarified that the Company has prepared a general outline, as set forth above, of the relevant tax principles of US tax laws with regard to matters discussed in this section; however, the Company is unable to assess the precise feasibility of the situations described in this Section above, or the meanings of these situations, including the scope of the exposure, if any, to the Company, as situations of this kind depend on the circumstances and many variables that cannot be reasonable anticipated where the Company is a living business, including compliance with the various requirements of the US tax laws, a risk of a change in legislation, and so on. The description set forth in this Section will not replace the tax counsel that the Bondholders and/or Trustee and/or special manager will seek in the case in which the Bonds of the Company are called for immediate repayment.**

7.14.3. **Real estate tax (a tax similar to property tax in Israel)**

To the best of the Company's knowledge, the real estate taxes are calculated by the local authority where the real estate assets are located after examination of various factors. These factors include relevant sales in the market at the time (if any), operating expenses, and an analysis of lease fees in order to examine whether they have increased, decreased, or remain unchanged, the economic situation in the market generally and several additional factors. Additionally, the local taxing authority takes into account the increases in real estate taxes ordered for an asset in the past, in order to avoid placing an excessive burden on the asset.

7.15. **Legal Procedures**

As of the date of the prospectus, the Company (and its subsidiaries) are not a party to any material legal proceedings.

## 7.16. **Business Objectives and Strategy; expected development over the coming year**

As of the date of the Prospectus, the Company's business strategy focuses on maintaining its position as a leader in its field in the summer camp market. The Company works to establish and maintain a positive reputation among campers and their families, primarily by maintaining a high level of service and adhering to operational, safety and educational standards, as well as strengthening the connection and identity between the camp and the campers. The Company views its reputation and the relationship established between the camps and the campers as its main asset.

As part of its efforts to ensure long-term growth, the Company works to increase occupancy rates at the camps it operates, whether by retaining repeat customers, recruiting new participants or expanding the geographic activity of its marketing efforts. To this end, the Company invests in targeted marketing activities, while adapting to the relevant target audiences and the unique characteristics of each camp.

In addition, the Company is constantly examining opportunities to expand its activities in the medium and long term, including the acquisition of new camps, the utilization of the land during periods outside the camp season, or strategic collaborations with educational and business entities. also, the Company may expand its activities by purchasing and/or investing in income-producing real estate assets (that are not in the Company's current field of activity).

## 7.17. **Discussion of Risk Factors**

Macro Risks

### 7.17.1. Inflation Risks

The United States has experienced rapid growth in inflation in recent periods. Persistent inflationary pressure and associated changes in monetary policy or other policy responses may adversely affect the macroeconomic environment and consequently impact the operations and performance of the Company’s summer camps. An overall increase in prices, particularly an increase in the prices of food, transportation, instructors’ salaries, may lead to an increase in the summer camps operating costs, and consequently to an increase in the cost of participation in the camps. For many families, summer camps are a significant expense, and if the prices become inaccessible – the number of those enrolled might decrease. If an investment cannot increase its profits during periods of higher inflation, its profitability may be adversely affected.

Inflation affects loan expenses, including through increased tax costs, property insurance and liability insurance, service expenses, and credit acquisition costs. Furthermore, an increase in interest rates may result in higher financing costs and reduce the after-tax cash flow generated by the investment.

### 7.17.2. Financial risks

The Company's operations expose it to various financial risks, such as liquidity risk and capital risks, as detailed in Note 12 to the Financial Statements.

7.17.3. Significant increase in prices

The Company is exposed to price increases in the key expense components involved in operating the camps, including payroll costs (particularly seasonal workers), food, insurance and infrastructure. Such increases may result from, among other things, inflation, changes in the labor market, new regulations or disruptions in supply chains. A significant increase in operating costs may require the Company to increase camp participation prices, which may adversely affect the ability of some participants to bear the cost of the camp and harm demand. In addition, to the extent that the Company is unable to pass on costs to customers due to competitive or other constraints, profitability may be impaired.

Sector Risks

7.17.4. The Cost of Employing personnel and engagement with Suppliers

The cost of employing personnel in the Company's summer camps as well as the costs associated with the engagement with suppliers of various services (food, sports, camping, art and computer equipment, transportation, cleaning services, security, medical staff, and so forth) affects the Company's profitability and therefore the Company is affected by changes in cost of products and services, by the cost of personnel and by a lack of manpower. Additionally, retaining high quality personnel qualified to work with the different age groups, is one of the main challenges in the field of summer camps. To the extent the Company shall not manage to hire and/or retain high quality personnel, might lead to the camps being operated at a reduced capacity.

7.17.5. Seasonality

The summer camp industry is inherently impacted by seasonality. Most of the Company's income is received in the third quarter of the year, since camps are scheduled in accordance with the students' holiday calendar. Nevertheless, the preparation towards the operation of the camps and the costs associated therewith (marketing, recruiting and training instructors, facilities maintenance) takes palace throughout the entire year.

7.17.6. Operating costs and expenses of income-producing assets

Holding real estate involves fixed costs, which obligation of payment applies to the owner of the property, throughout the entire period of ownership, whether or not the property generates any income. For example, the property owner bears the costs of infrastructure services, including water and taxes (municipal and state), which may increase at rates exceeding inflation, and consequently, may burden the Company's expenses and impair the profitability of its business. These expenses are not under the control of the property owner and may incur without a corresponding increase in summer camp revenues. It should be noted that in light of the fact that the (current) real estate tax which constitutes part of the operating expenses of the real estate property is determined based on the value of the property, and the update of the tax amount (when the value of the property

has increased) is carried out over a period of several years, the Company's exposure relies in the fact that operating costs will increase accordingly, even if the value of the properties shall not increase in the same ratio.

7.17.7. Changes in Regulations and Regulatory requirements

The Company's operations involve meeting inspections from various state entities such as the Health & Human services, the Departments of Government, Human Services, Child & Family Services and so forth. As of this date the Company's summer camps do not require holding a license in order to operate the summer camps. Stricter governmental inspections and /or the imposition of a licensing requirement for the Company's summer camps might increase the Company's operating harm and/or delay the operation of the summer camps and consequently impact on the Company's returns.

7.17.8. Legal exposure

Summer camps, like schools and other childcare frameworks, owe a duty of care to the children in their care. This means that camp operators and staff are legally obligated to take reasonable steps to ensure the safety of all campers. This liability can extend to a variety of scenarios, such as negligent supervision, for example if a child is hurt while swimming or during sports activities, the camp might be sued for negligence. Nonetheless, most camps require the children's parents to sign waivers within the framework of registration, in which the parents waive their right to file a lawsuit against the camp for certain injuries, but these waivers do not grant the camp immunity. Legal proceedings of said nature might affect the camp's operation, create a negative reputation for the Company and harm its revenues.

7.17.9. Managing Emergencies

Camp operators are required to prepare emergency plans detailing the steps which should be taken for each emergency, starting from basic first aid to treating graver injuries or emer5gencies such as a missing child, drowning, fire, extreme weather conditions, and the need for evacuation. To the extent that the camps' personnel (instructors and volunteers) are not aware of the plan and the emergency proceedings it might cause an exposure for the camp and the Company.

7.17.10. Impact of the digital age

In the social media age, teenagers are influenced by various changing trends, and to the extent that the summer camp industry is not attractive for them, they might decide they do not want to participate in summer camps, which might lead to a decrease in the number of camp participants and in the Company's revenues. Nevertheless, many companies, amongst them the Company's 'summer camps adjust themselves to the changing environment by offering diverse experiences that cater to multiple interests. Additionally, many parents express a desire for

their children to participate in summer camps in order to develop social skills, learn, and detach from their electronic devices.

7.17.11. Sales of Properties

Despite the large size of the summer camp market in the US, there are not many purchase and sale transactions; this is due, *inter alia*, to the summer camps being based on longstanding traditions. Nevertheless, the Company estimates that the small number of transactions in the market is a result of low supply rather than of a lack of demand, whereby in the market there are entities which operate in the field of activity and are potential buyers for summer camps, both operating camps and non-operating camps. It is the Company's estimate that the timeframe for marketing and selling an asset in its field of activity is 6 to 12 months, and up to a maximum of 24 months. Nevertheless, in extreme cases the Company might encounter difficulties in finding a buyer for a particular property and the sale of a property, should the Company be required to sell it, might take a longer time.

Unique Risks

7.17.12. Dependence on Camp Managers

Each of the Company's camps operates as an independent management unit. Each camp is assigned a management team experienced in operating said camp. These teams, particularly camp managers, have a material role in leading the operational activity of the camp, in training staff and maintaining professional standards. Additionally, the relationship formed between the campers, and the camp is, in many instances, based on the Camp's management team, who personally engage with the campers and their families, thus establishing the camp's reputation.

Given the aforesaid, the Company estimates that it is to some extent dependent on some of its camp managers, since the departure of a camp manager, particularly close to the operating season, may cause operational difficulties, impact on the quality of service and the participants' satisfaction, as well as harm the existing relationship between the camp and the campers. Locating and training suitable substitutes might be challenging, since once a substitute is recruited an acclimatization period shall be required.

7.17.13. Foreign Currency Risks

The Company conducts its operations in the United States and in U.S. dollars. As a portion of the Company's debt is expected to be serviced in Israel, the Company may be exposed to fluctuations in the exchange rate between the U.S. dollar and the Israeli shekel. Accordingly, appreciation of the shekel against the dollar may have an adverse effect on the Company's financial results. The company reviews from time to time the implementation of hedging strategies through derivatives in order to mitigate such exposure.

7.17.14. Insurance Risks

The Company insures its real estate assets through property insurance policies and obtains coverage for customary risks to which it is exposed. In the event of an insured incident, the Company may face financial exposure in an amount equal to the difference between the insurance coverage limit and the actual value of the claim or the damage to the property. It should be noted that the Company believes it is not underinsured.

7.17.15. US Tax Laws

The Company is incorporated in the British Virgin Islands. The Company is not liable for tax in the British Virgin Islands. According to US tax law, the company is a Pass-Through Entity, which means that the shareholders of the Company, rather than the Company itself, have US tax liability. The Controlling Shareholders and the Company have made an undertaking that, as long as there is a balance of Debentures in circulation and subject to the existing tax laws, the Company and its Subsidiaries will not elect to be taxed as a corporation and instead will be taxed as a partnership for US tax purposes. Notwithstanding the foregoing, a change in US tax laws relating to taxation may change the tax structure of the Company.

7.17.16. Insolvency Laws and for Insolvency Laws and a Claim Filed By A Foreign Creditor

The Company was incorporated and registered outside of Israel under the applicable laws of the British Virgins Islands, Therefore, pursuant to the provisions of Section 39A of the Securities Law, various provisions of the Companies Law (including provisions pertaining to the appointing of External Directors, Auditor and Audit Committee) shall apply to the Company, and the Company will subject itself to provisions with associated with a settlement or arrangement under the Insolvency and Economic Rehabilitation Law, 5778-2018 (including Chapter C of Part J that addresses the approval of a material debt arrangement in a Debenture Company); these provision will apply in addition to the provisions set forth in the Company's formation documents and to the applicable laws of the British Virgin Islands.

Furthermore, the Controlling Shareholder and Officers have made irrevocable Prospectus undertakings as is set forth in Chapter 5 to the Prospectus as well as various other undertakings with respect to the applicability of the Israeli Law, primarily undertakings not to object to the Trustee and/or the Bondholders motion which shall be filed in an Israeli Court in order to apply the Israeli Law to a settlement, arrangement or insolvency proceeding associated with the Company, as well as other undertakings specified in Chapter 5 as aforesaid.

Notwithstanding the foregoing, with respect to insolvency laws, it is possible that the laws of the three jurisdictions, i.e., Israel, the British Virgin Islands and the United States shall be applicable (both with respect to local jurisdiction and

subject matter jurisdiction). However, in light of the aforesaid and subject to the Company, its Controlling Shareholder and Officers'(present and future ones, as applicable) compliance with their undertakings, an insolvency proceeding under any law other than the Israeli Law and/or in non-Israeli courts can only derive from a claim made by a foreign creditor.

In this regard, it should be noted that, to the extent an insolvency proceeding is instituted against the Company under any law other than the Israeli law and/or in a foreign court, as a result of a foreign creditor's claim, the Company undertook to make all efforts in this regard and shall raise an "improper forum" claim, subject to the applicable law.

Furthermore, with respect to any foreign creditor, it should be noted that the Company shall undertake, within the framework of the Deeds of Trust, neither to take credit from non-Israeli financial institutions, nor grant pledges to non-Israeli financial institutions, except for credit facilities which might be provided by US financial institutions for the purpose of performing NIS/USD exchange rate hedging transactions with respect to the Debentures to be issued by the Company; this by way of granting specific charges to secure said credit facilities. It is clarified that the Company shall be entitled to provide guarantees with respect to its operations in the Investee Companies.

Upon holding international insolvency proceedings, the courts are required to determine which proceeding – the foreign or Israeli – is the main proceeding and which one is the secondary proceeding. Therefore, if an Israeli or foreign court determines that the proceeding instituted in Israel is a secondary proceeding, the legal implications in terms of the Bondholders may be that the competent court will be a foreign court, and the Bondholders will be required to hold insolvency proceedings in a foreign country. Consequently, the powers of the Israeli court will be limited and the remedies that Bondholders may receive from the Israeli court may also be limited.

view of the foregoing, the Company estimates that the extent of this risk's impact to the Company is small.

It should be stated that if insolvency proceedings are initiated in Israel, there is no certainty that the foreign courts in the British Virgin Islands and/or in the United States will enforce decisions and judgments issued under Israeli Insolvency Laws. Furthermore, to the extent that insolvency proceedings are initiated in foreign jurisdictions, in parallel to the proceedings initiated in Israel, there is no certainty that the foreign courts will recognize the proceedings held in Israel.

Without derogating from the aforesaid, it should be clarified that the Company's properties are located in the US and therefore, property realization and insolvency proceedings applicable to companies incorporated in the US shall be carried out in accordance with US Laws.

The risk factors specified above are be presented below in a table rating the estimated level of effect of the risk factors on the Company's business, classified by risk types:

| Risk Factors | Impact Level | | |
|---|---|---|---|
| | Large Impact | Medium Impact | Small Impact |
| **Macro Risks** | | | |
| Inflation risks | | X | |
| Financial risks | | X | |
| Significant increase in prices | | X | |
| **Sector Risks** | | | |
| The Cost of Employing personnel and engagement with Suppliers | | | X |
| Seasonality | | | X |
| Operating costs and expenses of income-producing assets | | X | |
| Changes in Regulations and Regulatory requirements | | | X |
| Legal exposure | | X | |
| Managing Emergencies | | X | |
| Impact of the digital age | | | X |
| Sales of Properties | | | X |
| **Unique Risks** | | | |
| Dependence on Camp Managers | | X | |
| Foreign Currency Risks | X | | |
| Insurance Risks | | | X |
| US Tax Laws | | | X |
| Insolvency Laws and for Insolvency Laws and a Claim Filed by a Foreign Creditor | | | X |

7.18. **The Company's Subsidiaries and Associates**

7.18.1. See below information, to the best of the Company's and its Directors' knowledge, regarding others who hold as of the prospectus date, approximately twenty-five percent (25%) or more of the issued share capital or of the voting powers or of the powers to appoint directors in Subsidiaries and in main (active) Associates of the Company: **[to the extent that there are shareholder agreements in the below companies please provide them to us**

| Serial No. | Camp name | Name of the other holder | Other holder's holding rate |
|---|---|---|---|
| | Indian Acres/ Forest Acres | Melissa Newman | 25% |
| C31 | WM Camp (Windsor Mt) | Jacob Labovitz | 24.5 |
| | | Kerry Labovitz | 24.5 |
| C10 | Green Lane | Jay Freedman | 24.5 |
| | | Adam Weiner | 24.5 |
| C27 | Summit | (*) Beton Holdings LLC | 49% |
| C16 | Lokanda | Ronen Gabbay | 25% |
| C19 | Mesorah | Joseph Stansky | 25% |
| C30 | Willow Lake | (**) Willow Lake Day Camps, Inc | 50% |

(*) To the best of the Company's knowledge, a private Company owned by Glynis Conyer and Alan Smith

(**) To the best of the Company's knowledge, a private Company owned by Michael Shabsels (25), David Shabsels (25%) (who are the Controlling Shareholders in the Company); Steven Weissman (19.24), Wendy Saiff (5.8%), Abraham Weissman (8.32%), Eva Weissman (8.32%) and Jacob Weissman (8.32%)

7.18.2. See below information regarding profits (loses) (before tax provision and after-tax provision of the Company's active Subsidiaries and Associates in the years 2023. 2024 and in the second quarter of 2025 (in USD thousand):

| Serial No. | Camp name | second quarter of 2025 | | The year 2024 | | The year 2023 | |
|---|---|---|---|---|---|---|---|
| | | Profit (loss for the period) | Total profit (loss) for the period | Profit (loss for the period) | Total profit (loss) for the period | Profit (loss for the period) | Total profit (loss) for the period |
| C1 | Achim | (914) | (728) | (107) | 297 | (382) | 69 |
| C2 | Banner | 1,267 | 1,435 | 1,990 | 3,227 | 2,018 | 2,962 |
| C3 | Blue Star | (348) | (1,054) | 882 | 807 | 22 | 326 |
| C4 | Chateaugay | (688) | (550) | (428) | (151) | (431) | (134) |
| C5 | Chen-A-Wanda (BAHS) | (1,582) | (1,526) | 254 | 930 | (190) | 767 |
| C6 | Club Getaway | (245) | (412) | 1,268 | 1,910 | 1,381 | 1,947 |
| C7 | Country Roads | (646) | (466) | 643 | 1,242 | 926 | 1,423 |
| C8 | Eagles Landing | (969) | (920) | (109) | 120 | 317 | 385 |
| C9 | ECHO (SHAB) | (1,244) | (1,023) | 301 | 1,071 | 423 | 1,183 |
| C10 | Green Lane | (815) | (841) | 466 | 906 | 460 | 842 |
| C11 | Greenville Land (Malka) | (1,306) | (1,090) | (2,092) | (1,780) | (1,825) | (1,996) |
| C12 | IAFA | (839) | (646) | 94 | 391 | (62) | 232 |
| C13 | Island Lake | (1,302) | (1,153) | 55 | 6,227 | 656 | 5,673 |
| C14 | Kiwi | (1,338) | (1,151) | 470 | 1,373 | 650 | 1,309 |
| C15 | Lavi | (1,074) | (1,159) | (783) | (510) | (377) | (324) |
| C16 | Lokanda | (1,290) | (1,121) | 222 | 1,244 | 137 | 1,085 |
| C17 | Meadowbrook | (1,129) | (1,040) | 216 | 607 | 53 | 3935 |
| C18 | Med-O-Lark | (623) | (632) | 50 | 225 | (56) | 110 |
| C19 | Mesorah | (1,180) | (1,120) | (2,873) | (3,260) | (2,334) | (2,378) |
| C20 | Mogenavco | (2,483) | (2,982) | (379) | 959 | (122) | 781 |
| C21 | Mohawk | (2,820) | (2,827) | 5,151 | 7,488 | 4,262 | 6,864 |
| C22 | New England Golf & Tennis (Belgrade) | (222) | (111) | (5100 | (210) | (373) | (115) |
| C23 | North Star (Poland) | (525) | (453) | 259 | 443 | 435 | 256 |
| C24 | Pine Forest | (3,104) | (2,944) | 1,139 | 9,816 | 1,661 | 9,780 |
| C25 | Rolling Hills | (1,874) | (1,706) | 797 | 3,982 | 1,023 | 3,987 |
| C27 | Summit | (1,111) | (814) | 118 | 1,059 | (10) | 888 |
| C28 | Waukeela | (352) | (306) | (196) | (19) | (160) | (9) |
| C29 | Wekeela | (1,290) | (1,087) | 616 | 1,201 | 830 | 1,302 |
| C30 | Willow Lake | (2,603) | (2,938) | 3,042 | 3,709 | 2,441 | 3,787 |
| C31 | WM Camp (Windsor Mt) | (822) | (674) | 964 | 1,578 | 1,271 | 1,682 |

7.18.3. See below income received by the Company or which it is entitled to receive from its active Subsidiaries and Associates in the years 2023 and 2024 and in the second quarter of 2025 (in USD thousand):

For December 31, 2023, and December 31, 2024

| Serial No. | Camp name | The year 2024 | | | The year 2023 | | |
|---|---|---|---|---|---|---|---|
| | | Interest income (expenses)_ | Distributions | Management fees | Interest income (expenses)_ | Distributions | Management fees |
| C1 | Achim | - | - | - | - | - | - |
| C2 | Banner | - | 36 | - | - | 343 | - |
| C3 | Blue Star | - | 98 | - | - | 70 | - |
| C4 | Chateaugay | - | 2 | - | - | - | - |
| C5 | Chen-A-Wanda (BAHS) | - | 229 | - | - | - | - |
| C6 | Club Getaway | - | 853 | - | - | 1,423 | - |
| C7 | Country Roads | - | 632 | - | - | 819 | - |
| C8 | Eagles Landing | - | 17 | - | - | - | - |
| C9 | ECHO (SHAB) | - | 433 | - | - | 403 | - |
| C10 | Green Lane | - | 230 | - | - | 204 | - |
| C11 | Greenville Land (Malka) | - | 2 | - | - | - | - |
| C12 | IAFA | - | 149 | - | - | 245 | - |
| C13 | Island Lake | - | - | - | - | - | - |
| C14 | Kiwi | - | - | - | - | - | - |
| C15 | Lavi | - | - | - | - | - | - |
| C16 | Lokanda | - | 1,428 | - | - | 702 | - |
| C17 | Meadowbrook | - | - | - | - | 523 | - |
| C18 | Med-O-Lark | - | - | - | - | 250 | - |
| C19 | Mesorah | - | - | - | - | - | - |
| C20 | Mogenavco | - | - | - | - | - | - |
| C21 | Mohawk | - | - | - | - | - | - |
| C22 | New England Golf & Tennis (Belgrade) | - | - | - | - | - | - |
| C23 | North Star (Poland) | - | 187 | - | - | 125 | - |
| C24 | Pine Forest | - | 582 | - | - | - | - |
| C25 | Rolling Hills | - | 78 | - | - | 14 | - |
| C27 | Summit | - | - | - | - | - | - |
| C28 | Waukeela | - | - | - | - | - | - |
| C29 | Wekeela | - | 629 | - | - | - | - |
| C30 | Willow Lake | - | 1,720 | - | - | 1,373 | - |
| C31 | WM Camp (Windsor Mt) | - | 632 | - | - | 645 | - |

For June 30, 2025, and up to closely to the publishing of the Prospectus

| Serial No. | Camp name | Interest income (expenses) | | Distributions | | Management fees | |
|---|---|---|---|---|---|---|---|
| | | Q2. 2025 | The period following June 30, 2025, and up to closely to the publishing of the Prospectus | Q2. 2025 | The period following June 30, 2025, and up to closely to the publishing of the Prospectus | Q2. 2025 | The period following June 30, 2025, and up to closely to the publishing of the Prospectus |
| C1 | Achim | - | - | - | - | - | - |
| C2 | Banner | - | - | 354 | - | - | - |
| C3 | Blue Star | - | - | - | 7 | - | - |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| C4 | Chateau gay | - | - | - | - | - | - |
| C5 | Chen-A-Wanda (BAHS) | - | - | 13 | - | - | - |
| C6 | Club Getaway | - | - | 46 | 129 | - | - |
| C7 | Country Roads | - | - | 4 | 44 | - | - |
| C8 | Eagles Landing | - | - | - | - | - | - |
| C9 | ECHO (SHAB) | - | - | 3 | 2 | - | - |
| C10 | Green Lane | - | - | - | - | - | - |
| C11 | Greenville Land (Malka) | - | - | 2 | - | - | - |
| C12 | IAFA | - | - | - | - | - | - |
| C13 | Island Lake | - | - | - | - | - | - |
| C14 | Kiwi | - | - | - | - | - | - |
| C15 | Lavi | - | - | - | - | - | - |
| C16 | Lokanda | - | - | 452 | - | - | - |
| C17 | Meadow brook | - | - | - | - | - | - |
| C18 | Med-O-Lark | - | - | - | - | - | - |
| C19 | Mesorah | - | - | - | - | - | - |
| C20 | Mogenavco | - | - | 4 | - | - | - |
| C21 | Mohawk | - | - | - | - | - | - |
| C22 | New England Golf & Tennis (Belgrade) | - | - | - | - | - | - |
| C23 | North Star (Poland) | - | - | - | - | - | - |
| C24 | Pine Forest | - | - | - | - | - | - |
| C25 | Rolling Hills | - | - | 83 | - | - | - |
| C27 | Summit | - | - | 153 | - | - | - |
| C28 | Waukeela | - | - | - | 2 | - | - |
| C29 | Wekeela | - | - | - | - | - | - |
| C30 | Willow Lake | - | - | 872 | 564 | - | - |
| C31 | WM Camp (Windsor Mt) | - | - | 34 | 69 | - | - |

7.19. **Explanations of the Board of Directors to the condition of the Company for the periods ending December 31,2024, June 30,2025 and September 30, 2025**

# SIMAD Holdings Ltd.

## Report of the Board of Directors of the Company on the State of Affairs of the Company for the nine (9) months and three (3) month period ended September 30, 2025.

1. **Explanations of the Board of Directors on the State of Affairs of the Company's Business, the Results of its Operations, its Shareholders' Equity and Cash Flows**

The Company was incorporated on May 28, 2025, in the British Virgin Islands as a private Company limited by shares, according to the provisions of the BVI Business Companies Act, 2004. Since its incorporation and until the date of the Prospectus, the Company had no operations except for organizational costs.

For details regarding the undertaking of the Company's Shareholder, CREIF(REIT) LLC to transfer to the Company the Transferred Rights (as defined in Section 7.1.6 to the Prospectus), subject to fulfillment of the conditions for the listing of the Debentures (Series A) of the Company offered under this Prospectus and the Supplementary Notice, see Note 1 of the consolidated financial statements presented in Chapter 10 to the Prospectus.

**In this Report of the Board of Directors, unless specified otherwise or unless it is implicit from the content or context: the description of the Company's business (including financial data) assumes the closing of the transfer of the Transferred Rights to the Company (including in relevant past periods). For details regarding the manner in which the Company's financial statements were prepared, see Note 1 of the Company's consolidated financial Statements presented in Chapter 10 to the Prospectus**

2. **The Financial Position according to the Consolidated Financial Statements (Proforma)**

2.1. Analysis of the Main Changes in the Financial Position

| Section | The period ended on September 30 | | The period ended on December 31 | The Company's explanations of the material changes |
|---|---|---|---|---|
| | 2025 | 2024 | 2024 | |
| | In USD Thousands | | | |
| Cash and cash equivalents | 7,867 | 5,068 | 3,663 | For information on changes in cash balances, see Cash Flow Statements in the Company's Consolidated Proforma Financial Statements as of September 30, 2025. |
| Receivables and outstanding balances | 1,258 | 853 | 644 | |
| Related parties | 1,399 | 11,623 | 7,639 | Current balances pertain to related parties of the Company. The decrease is attributed to a repayment during the third quarter of 2025. |
| **Current assets** | **10,524** | **17,544** | **11,966** | |
| Investments accounted for under the equity method | 17,590 | 17,691 | 17,173 | Attributed to the Willow Lake property, whose holding company it treated using the equity method. |
| Fixed assets | 428,700 | 401,735 | 428,700 | Most of the increase compared to the equivalent period last year is attributed to the revaluation of assets into their fair value according to valuations. |

| | | | | |
|---|---|---|---|---|
| **Non-current assets** | **446,290** | **419,426** | **445,873** | |
| **Total assets** | **456,814** | **436,970** | **457,839** | |
| Loans from bank institutions and others | 12,906 | 8,993 | 9,016 | Attributed to the liability for loan principal for the year as of the periods presented. |
| Accounts payable | 13,583 | 8,545 | 4,134 | Most of the increase in the reporting period is attributed to distributions to the minority in the amount of approximately $7 million. |
| advances from clients | 41,876 | 37,475 | 62,790 | Advances received from clients for the registration to summer camps in the US. |
| **total current liabilities** | 68,365 | 55,013 | **75,940** | |
| Loans from bank institutions and others | 164,017 | 178,678 | 176,585 | Most of the decrease in the reporting period is attributed to the repayment of loans. |
| Accounts payable | 5,065 | 4,665 | 4,765 | Attributed to compensation payable for employees. |
| **Total non-current liabilities** | **169,082** | **183,343** | **181,350** | |
| **Total liabilities** | **237,447** | **238,356** | **257,290** | |
| **Total equity** | **219,397** | **198,614** | **200,549** | Most of the change is attributed to a total profit in the reporting period in the amount of approximately $39.6 million. On the other hand, there is a decrease in the reporting period attributed to distribution to the Controlling Shareholders in the amount of approximately $20.7 million. For further information see the reports on changes in capital in the company's Consolidated Proforma Financial Statements as of September 30, 2025. |
| **Total equity and liabilities** | **456,814** | **436,970** | **457,839** | |

2.2. Analysis of the main results of operations in accordance with the consolidated financial statements:

| **Section** | **For the nine (9) months ended on September 30** | | **For the three (3) months ended on September 30** | | **The year ended on December 31** | **The Company's explanations of the material changes** |
|---|---|---|---|---|---|---|
| | **2025** | **2024** | **2025** | **2024** | **2024** | |
| | **In USD Thousands** | | | | | |
| Income from summer camp operations | 160,952 | 156,245 | 149,444 | 146,381 | 159,355 | Most of the increase is attributed to an improvement in the operational results of some of the Company's assets. The Company's income is recognized after services are granted to the clients participating in the summer camps which take place during the second half of the year. Given the Company's income recognition policy and due to the |

| Section | For the nine (9) months ended on September 30 | | For the three (3) months ended on September 30 | | The year ended on December 31 | The Company's explanations of the material changes |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2024 | |
| | In USD Thousands | | | | | |
| | | | | | | seasonal characteristic of its operations, the Company recognizes income from the operation of the summer camps only after the ending of each operating season. |
| Summer camp operating cost | (114,898) | (113,004) | (79,560) | (78,463) | (131,761) | Operating costs during the quarters derive from preparation for the summer camps, which include recruiting instructors, facility maintenance and other current expenses. Operating costs include depreciation expenses in the nine month period of 2025 in the amount of approximately $12.7 million, in the nine month period of 2024 in the amount of approximately $11.4 million and in the year 2024 in the amount of approximately $15.1 million. |
| **Gross Profit** | **46,054** | **43,241** | **69,884** | **67,918** | **27,594** | |
| General and administrative expenses | (2,103) | (2,343) | (861) | (1,053) | (2,820) | |
| Sales and marketing expenses | (3,383) | (3,338) | (2,408) | (2,508) | (4,307) | |
| Other income (expenses), net | 53 | (124) | 25 | 12 | 58 | |
| The Company's share in the profits of companies accounted for using the equity method | 1,987 | 2,092 | 3,288 | 3,102 | 1,522 | Attributed to the Willow Lake property, whose holding company it treated using the equity method. |
| **Operating Profit (loss)** | **42,608** | **39,528** | **69,928** | **67,471** | **22,047** | |
| Financing expenses | (8,279) | (8,622) | (2,647) | (2,907) | (11,960) | Financing expenses are mostly attributed to financing expenses for loans from banks and others. |
| Financing income | 1,186 | 315 | 400 | 64 | 413 | |
| Financing expenses, net | (7,093) | (8,622) | (2,647) | (2,907) | (11,547) | |
| **Profit (loss) for a period** | **35,515** | **31,221** | **67,681** | **64,628** | **10,500** | |
| Other total profit (loss) | 4,041 | 3,184 | 2,444 | 1,955 | 32,529 | For the revaluation of fixed assets (summer camps) |
| **Total comprehensive profit** | **39,556** | **34,405** | **70,125** | **66,583** | **43,029** | |

2.3. Working capital

The working capital for the twelve-month period ended September 30, 2025:

| | Amount included in the consolidated Financial Statements as of September 30, 2025 (in USD thousands) |
|---|---|
| **Current assets** | 10,524 |
| **Current liabilities** | (68,365) |
| **Excess current liabilities on current assets** | (57,481) |

As of September 30, 2025, the Company has a negative working capital in the amount of approximately $57.8 million according to its Consolidated Proforma Financial Statements.

Most of the deficit as of September 30, 2025, is attributed mostly to advances received from clients in the amount of approximately $41.9 million for the registration to summer camps in the US.

The Company estimates that it can meet the repayment of its liabilities in the foreseeable future, *inter* alia, through its positive cash flow from current operations and from other actions to the extent required, which will allow it to meet its current liabilities and finance its operations. The Company's Board of Directors performed an examination and determined that in view of the foregoing, the Company can meet the repayment of its liabilities and therefore, the working capital deficit is not indicative of a liquidity issue in the Company, and accordingly, the company does not have a 'warning sign', as the term is defined in Regulation 10(b)(14) of the Securities Regulations (Periodic and Immediate Reports),5730-1970.

2.4. Analysis of liquidity and financing sources of the Transferred Companies:

| Section | For the nine (9) months ended on September 30 | | For the three (3) months ended on September 30 | | The year ended on December 31 | The Company's explanations of the material changes |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2024 | |
| | In USD Thousands | | | | | |
| Cash flows from operating activities | 35,986 | 33,444 | (13,409) | (14,629) | 41,845 | Most of the Cash flows from operating activities are attributed to advances received from clients, which are recognized as income after the summer camps take place during the second half of the year. For further information regarding the cash flows from operating activities, see the Cash Flow Statements in the Company's Consolidated Proforma Financial Statements as of September 30, 2025. |
| Cash flows from investing activities | (8,513) | (8,167) | (1,821) | (1,635) | (9,957) | The cash flows used for investing activities in the periods presented derive from an investment in fixed assets. For further information regarding the cash flows from operating activities, see the Cash Flow Statements in the Company's Consolidated Proforma Financial Statements as of September 30, 2025. |
| Cash flows from financing activities | (23,269) | (29,740) | 9,122 | (3,199) | (37,756) | Most of the cash flows from financing activities in the presented periods derive from the undertaking and repayment of loans, changes in related party balances, investments and distributions, and interest payments on loans. For further information regarding the cash flows from operating activities, see the Cash Flow Statements in the Company's Consolidated Proforma Financial Statements as of September 30, 2025. |

2.5. EBITDA (Earnings Before Interest, Taxes, Depreciations, Amortizations)

EBITDA Earnings Before Interest, Taxes, Depreciations and Amortizations) is an indicator which represents the Company's operational profit less Depreciations and Amortizations and with the neutralization of non-operational income or expenses and does not constitute a financial indicator based on the Generally Accepted Accounting Rules. However, the Company is in the opinion that the EBITDA is one of the most important parameters and therefore serves as an important financial aspect of the understanding of its financial results (in addition and subject to its operational results as these are presented in its Financial Statements).

**It is emphasized that the EBITDA**

(A) Does not present cash flows from operating activities in accordance with generally accepted accounting principles;

(B) Does not reflect cash available to finance all of the Company's cash flows, including its ability to distribute funds;

(C) Is not supposed to be considered as a substitute for net income for the purpose of evaluating the results of the Company's operations;

(D) Is not a figure audited and/or reviewed by the Company's auditors.

See below information regarding the Company's EBITDA:

| Section | For the nine (9) months ended on September 30 | | For the three (3) months ended on September 30 | | The year ended on December 31 | The Company's explanations of the material changes |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2024 | |
| | In USD Thousands | | | | | |
| EBITDA (consolidated including the Company's share in included companies | 55,616 | 51,418 | 74,270 | 71,378 | 37,662 | Most of the increase is attributed to an improvement in the operational results of some of the Company's assets. The Company's income is recognized after services are granted to the clients participating in the summer camps which take place during the second half of the year. |
| EBITDA (Company's share including the Company's share in included companies | 48,577 | 44,636 | 65,005 | 61,924 | 32,793 | |

## 3. Exposure to Market Risks and Risk Management

The management of the Company estimates that its operations are exposed to the main market risks as detailed in Note 11 of the Company's consolidated financial statements for 2024.

Additionally, as a result of the issuance of the Debentures under this prospectus, to the extent issues, the Company will be exposed to changes in the Shekel/Dollar exchange rate. The Company's policy is to hedge the currency exposure by way of appropriate financial instruments to reduce said exposure.

3.1. The Company's policy for managing market risks

The Board of Directors of the Company supervises the policy for managing market risks and instructs the management. Additionally, the Company adjusts the structure of financing (or refinancing) of its assets (including the loan term, creating exit/ early repayment points without penalties, agreeing with the bank on the terms of the loan and so forth) to the business plan of each asset in a manner which allows maximum flexibility in the execution of the

business plan as aforesaid and maximizing the value of the asset and the Company’s profit therefrom.

3.2. Means of supervising and exercising the policy

The management of the Company regularly monitors the developments in the Company's relevant markets and reports to the Board of Directors of the Company regarding the current level of exposure. The Board of Directors of the Company supervises the policy for management of the market risks and instructs the management.

**4. Corporate Governance Aspects**

4.1. General

For details regarding the application of certain corporate governance provisions of the Companies Law, 5759-1999 and the regulations promulgated thereunder, on the Company as a foreign company which its debentures are offered to the public in Israel, see Chapter 5 of the Prospectus. Soon after the closing of the Company's Debentures (Series A)'s offer under this Prospectus and the Supplementary Notice, and as long as securities of the Company are held by the public in Israel, the Company will operate for its compliance with all of the corporate governance provisions that are binding upon it, including appointing external directors and an independent directors (See Section 5.1 of the Prospectus) and establishing an audit committee and a remuneration committee.

4.2. Disclosures regarding Independent Directors

As at the Prospectus date the Company has no Independent Directors, as this term is defined in Companies Law. The Company’s Articles of Association do not include a provision regarding the rate of Independent Directors in the Company.

As at the Prospectus date, the Company has yet to appoint external directors. Following and subject to the completion of the registration of the Debentures for trade in the TASE under this prospectus and the Supplementary Notice, the Company shall act as required by law to appoint External Directors.

4.3. Internal Auditor

As of the date of the Prospectus, the Company has no Internal Auditor.

4.4. Company’s Policy regarding donations

The Board of Directors did not establish a donations policy. There are no undertakings to make donations in future periods.

**5.** Details regarding the Auditor of the Company

Since its incorporation, the Company's auditor is BDO Ziv Haft. The Auditor’s fees were determined pursuant to a negotiation between the Company’s management and the Auditor, according to the scope and nature of the work, past experience and market terms.

The Company was incorporated on May 28, 2025, and therefore did not pay the Auditor during the years 2023 and 2024.

**6. Significant events that occurred during and after the reporting date**

see Note 4 to the Company's Consolidated Proforma Financial Statements as of September 30, 2025

**November 18, 2025**

| | |
|---|---|
| **David Shabsels** | **Michael Shabsels** |
| **Director &CEO** | **Chairman** |

# SIMAD Holdings Ltd.

## Report of the Board of Directors of the Company on the State of Affairs of the Company for the year ended December 31, 2024, and for the six (3) month period ended June 30, 2025.

1. **Explanations of the Board of Directors on the State of Affairs of the Company's Business, the Results of its Operations, its Shareholders' Equity and Cash Flows**

The Company was incorporated on May 28, 2025, in the British Virgin Islands as a private Company limited by shares, according to the provisions of the BVI Business Companies Act, 2004. Since its incorporation and until the date of the Prospectus, the Company had no operations except for organizational costs.

For details regarding the undertaking of the Company's Shareholder, CREIF(REIT) LLC to transfer to the Company the Transferred Rights (as defined in Section 7.1.6 to the Prospectus), subject to fulfillment of the conditions for the listing of the Debentures (Series A) of the Company offered under this Prospectus and the Supplementary Notice, see Note 1 of the consolidated financial statements presented in Chapter 10 to the Prospectus.

**In this Report of the Board of Directors, unless specified otherwise or unless it is implicit from the content or context: the description of the Company's business (including financial data) assumes the closing of the transfer of the Transferred Rights to the Company (including in relevant past periods). For details regarding the manner in which the Company's financial statements were prepared, see Note 1 of the Company's consolidated financial Statements presented in Chapter 10 to the Prospectus**

2. **The Financial Position according to the Consolidated Financial Statements (Proforma)**

2.1. Analysis of the Main Changes in the Financial Position

| Section | The period ended on December 31, | | The Company's explanations of the material changes |
|---|---|---|---|
| | 2024 | 2023 | |
| | In USD Thousands | | |
| Cash and cash equivalents | 3,663 | 9,531 | For information on changes in cash balances, see Cash Flow Statements in the Company's Consolidated Proforma Financial Statements as of December 31, 2024. |
| Receivables and outstanding balances | 664 | 888 | |
| Related parties | 7,639 | 4,506 | For further information see Note 12 to the Company's Consolidated Proforma Financial Statements as of December 31, 2024. |
| **Current assets** | **11,966** | **14,926** | |
| Investments accounted for under the book value method | 17,173 | 17,038 | |
| Fixed assets | 428,700 | 401,735 | Most of the increase in 2024 is attributed to the revaluation of assets into fair value according to valuations. For further information, see Note 5 to the Company's Consolidated Proforma Financial Statements as of December 31, 2024. |
| **Non-current assets** | **445,873** | **418,273** | |
| **Total assets** | **457,839** | **699,433** | |
| Loans from bank institutions and others | 9,016 | 8,984 | Attributed to the liability for loan principal for the year as of the periods presented. |
| Accounts payable | 4,134 | 3,472 | |
| advances from clients | 62,790 | 59,665 | Advances received from clients for the registration to summer camps in the US. |
| **total current liabilities** | **75,940** | **72,121** | |
| Loans from bank institutions and others | 176,585 | 184,390 | Most of the decrease is attributed to the repayment of loans. |

| | | | |
|---|---|---|---|
| Accounts payable | 4,765 | 4,365 | Attributed to compensation payable for employees. |
| **Total non-current liabilities** | **181,350** | **188,755** | |
| **Total liabilities** | **257,290** | **260,876** | |
| **Total equity** | **200,549** | **172,823** | Most of the change is attributed to an overall profit in 2024 in the amount of approximately $43 million. Conversely there is a decrease attributed to distributions. For further information see the reports on changes in capital in the company's Consolidated Proforma Financial Statements as of December 31, 2024. |
| **Total equity and liabilities** | **457,839** | **433,699** | |

| **Section** | **The period ended on June 30** | | **The period ended on December 31** | **The Company's explanations of the material changes** |
|---|---|---|---|---|
| | **2025** | **2024** | **2024** | |
| | **In USD Thousands** | | | |
| Cash and cash equivalents | 13,975 | 24,531 | 3,663 | For information on changes in cash balances, see Cash Flow Statements in the Company's Consolidated Proforma Financial Statements as of June 30, 2025. |
| Receivables and outstanding balances | 13,655 | 12,890 | 664 | |
| Related parties | 16,347 | 14,903 | 7,639 | Current balances pertain to related parties of the Company. The balance was repaid during the third quarter of 2025. |
| **Current assets** | **43,977** | **52,324** | **11.966** | |
| Investments accounted for under the book value method | 14,832 | 15,160 | 17,173 | |
| Fixed assets | 428,700 | 401,735 | 428,700 | Most of the increase compared to the equivalent period last year is attributed to the revaluation of assets into their fair value according to valuations. |
| **Non-current assets** | **443,532** | **416,895** | **445,873** | |
| **Total assets** | **487,509** | **469,219** | **457,839** | |
| Loans from bank institutions and others | 9,764 | 8,937 | 9,016 | Attributed to the liability for loan principal for the year as of the periods presented. |
| Accounts payable | 10,376 | 4,095 | 4,134 | Most of the increase in the reporting period is attributed to distributions to the minority in the amount of approximately $7 million. |
| advances from clients | 142,424 | 137,219 | 62,790 | Advances received from clients for the registration to summer camps in the US. |
| **total current liabilities** | **162,564** | **150,251** | **75,940** | |
| Loans from bank institutions and others | 169,578 | 181,214 | 176,585 | Most of the decrease compared to the equivalent period last year is attributed to the repayment of loans. |
| Accounts payable | 4,965 | 4,565 | 4,765 | Attributed to compensation payable for employees. |
| **Total non-current liabilities** | **174,543** | **185,779** | **181,350** | |
| **Total liabilities** | **337,107** | **336,030** | **257,290** | |
| **Total equity** | **150,402** | **133,189** | **200,549** | Most of the change is attributed to a total loss in the reporting period in the amount of approximately $30.6 million and distribution. For further information see the reports on changes in capital in the |

| | | | | |
|---|---|---|---|---|
| | | | | company's Consolidated Proforma Financial Statements as of June 30, 2025. |
| **Total equity and liabilities** | **487,509** | **469,219** | 457,839 | |

2.2. <u>Analysis of the main results of operations in accordance with the consolidated financial statements:</u>

| Section | For the year ended December 31, In USD Thousands | | | The Company's explanations of the material changes |
|---|---|---|---|---|
| | 2024 | 2023 | 2022 | |
| | | | | |
| Income from summer camp operations | 159,355 | 156,437 | 132,656 | Most of the increase compared to 2022 is attributed to the purchase of properties during 2022 and to an improvement in the operational results of some of the Company's assets. |
| Summer camp Operating cost | (131,761) | (128,498) | (110,311 | Most of the operating costs are attributed to salaries and accompanying expenses. For further information. See Note 9 to the Company's Consolidated Proforma Financial Statements as of December 31, 2024.<br>Operating costs include depreciation expenses in the year 2025 in the amount of approximately $15.2 million, in the year 2024 in the amount of approximately $13.7 million, and in the year 2023 in the amount of approximately $11.7 million. |
| **Gross profit** | **27,594** | **27,939** | **22,345** | |
| General and administrative expenses | (2,820) | (2,695) | (2,307) | |
| Sales and marketing expenses | (4,307) | (3,942) | (3,488) | |
| Other income (expenses), net | 58 | 506 | 80 | |
| The Company's share in the profits of companies accounted for using the equity method | 1,522 | 1,220 | 603 | Attributed to the Willow Lake property, whose holding company it treated using the equity method. |
| **Operating Profit** | **22,047** | **23,028** | **17,233** | |
| Financing expenses | (11,960) | (11,767) | (7,159) | Financing expenses are mostly attributed to financing expenses for loans from bank institutions and others. |
| Financing income | 413 | 198 | 3,020 | |
| Financing expenses, net | (11,547) | (11,569) | (4,139) | |
| **Profit for a period** | **10,500** | **11.459** | **13,094** | |
| Other total profit | 32,529 | 29,724 | 5,531 | For the revaluation of fixed assets (summer camps). |
| **Total comprehensive profit** | **43,029** | **41,183** | **18,625** | |

| **Section** | **For the six (6) months ended on June 30** | | **For the three (3) months ended on June 30** | | **The year ended on December 31** | **The Company's explanations of the material changes** |
|---|---|---|---|---|---|---|
| | **2025** | **2024** | **2025** | **2024** | **2024** | |
| | **In USD Thousands** | | | | | |
| Income from operations | 11,509 | 9,8649,864 | 10,399 | 8,715 | 159,355 | The Company's income is recognized after services are granted to the clients participating in the summer camps which take place during |

| Section | For the six (6) months ended on June 30 | | For the three (3) months ended on June 30 | | The year ended on December 31 | The Company's explanations of the material changes |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2024 | |
| | In USD Thousands | | | | | |
| | | | | | | the second half of the year. Given the Company's income recognition policy and due to the seasonal characteristic of its operations, the Company recognizes income from the operation of the summer camps only after the ending of each operating season. Accordingly, as of June 30, 2025. The Company has yet to recognize advances paid by the Company's clients, which are classified as liabilities under advances from clients. |
| Summer camp operating cost | (35,388) | (34,541) | (20,591) | (20,337) | (131,761) | Operating costs during the quarters derive from preparation for the summer camps, which include recruiting instructors, facility maintenance and other current expenses. Operating costs include depreciation expenses in the first half of 2025 in the amount of approximately $8.5 million, in the first half of 2024 in the amount of approximately $7.6 million and in the year 2024 in the amount of approximately $15.1 million. |
| **Gross Profit (loss)** | **(23,830)** | **(24,677)** | **(10,192)** | **(11,622)** | **25,594** | |
| General and administrative expenses | (1,242) | (1,290) | (706) | (731) | (2,820) | |
| Sales and marketing expenses | (975) | (830) | (549) | (464) | (4,307) | |
| Other income (expenses), net | 28 | (136) | 14 | 50 | 58 | |
| The Company's share in the profits of companies accounted for using the equity method | (1,301) | (1,010) | (728) | (453) | 1,522 | Attributed to the Willow Lake property, whose holding company it treated using the equity method. |
| **Operating Profit (loss)** | **(27,320)** | **(27,943)** | **(12,161)** | **(13,220)** | **22,047** | |
| Financing expenses | (5,632) | (5,715) | (2,840) | (2,884) | (11,960) | Financing expenses are mostly attributed to financing expenses for loans from bank institutions and others. |
| Financing income | 786 | 251 | 477 | 120 | 413 | |
| Financing expenses, net | (4,846) | (5,464) | (2,363) | (2,764) | (11,547) | |
| **Profit (loss) for a period** | **(32,166)** | **(33,407)** | **(14,524)** | **(15,984)** | **10,500** | |

| Section | For the six (6) months ended on June 30 | | For the three (3) months ended on June 30 | | The year ended on December 31 | The Company's explanations of the material changes |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2024 | |
| | In USD Thousands | | | | | |
| Other total profit (loss) | 1,597 | 1,229 | (241) | (184) | 32,529 | For the revaluation of fixed assets (summer camps) |
| **Total comprehensive profit** | **(30,569)** | **(32,178)** | **(14,765)** | **(16,168)** | **43,029** | |

2.3. Working capital

The working capital for the twelve-month period ended December 31, 2024:

| | **Amount included in the consolidated Financial Statements as of December 31, 2024 (in USD thousands)** |
|---|---|
| **Current assets** | 11,966 |
| **Current liabilities** | (75,940) |
| **Excess current liabilities on current assets** | (63,974) |

The working capital for the twelve-month period ended June 30, 2025:

| | **Amount included in the consolidated Financial Statements as of June 30, 2025 (in USD thousands)** |
|---|---|
| **Current assets** | 43,977 |
| **Current liabilities** | (162,564) |
| **Excess current liabilities on current assets** | **(118,587)** |

As of December 31, 2024, and June 30, 2025, the Company has a negative working capital in the amount of approximately $ 64 million and approximately $118.6 million respectively. According to its Consolidated Proforma Financial Statements.

Most of the deficit as of December 31, 2024, and as of June 30, 2025, is attributed to advances received from clients in the amount of approximately $62.8 and approximately $142.4 million, respectively, for the registration to summer camps in the US.

The Company estimates that it can meet the repayment of its liabilities in the foreseeable future, *inter* alia, through its positive cash flow from current operations and from other actions to the extent required, which will allow it to meet its current liabilities and finance its operations. The Company's Board of Directors performed an examination and determined that in view of the foregoing, the Company can meet the repayment of its liabilities and therefore, the working capital deficit is not indicative of a liquidity issue in the Company, and accordingly, the company does not have a 'warning sign', as the term is defined in Regulation 10(b)(14) of the Securities Regulations (Periodic and Immediate Reports),5730-1970.

2.4. Analysis of liquidity and financing sources of the Transferred Companies:

| Section | The year ended on | | | The Company's explanations of the material changes |
|---|---|---|---|---|
| | 31.12.2024 | 31.12.2023 | 31.12.2024 | |
| | In USD Thousands | | | |
| Cash flows from operating activities | 41,845 | 37,006 | 51,379 | For information regarding cash flow from operating activities see the cash flow reports in the Company's Consolidated Proforma Financial Statements as of December 31, 2024. |

| | | | | |
|---|---|---|---|---|
| Cash flows from investing activities | (9,957) | -(11,308) | -(58,936) | Most of the cash flows used in investment activities in the periods presented derive from investment in fixed assets. For further information, see the cash flow reports in the Company's Consolidated Proforma Financial Statements as of December 31, 2024. |
| Cash flows from financing activities | (37,756) | (33,270) | 9,308 | Most of the cash flows from financing activities in the periods presented derive from undertaking and repaying loans, changes in related party balances, investment and distributions, and interest payments for the loans. For further information, see the cash flow reports in the Company's Consolidated Proforma Financial Statements as of December 31, 2024. |

| Section | For the six (6) months ended on June 30 | | For the three (3) months ended on June 30 | | The year ended on December 31 | |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2024 | |
| | In USD Thousands | | | | | |
| Cash flows from operating activities | 49,395 | 48,073 | 17,517 | 16,685 | 41,845 | Most of the Cash flows from operating activities are attributed to advances received from clients, which are recognized as income after the summer camps take place during the second half of the year. For further information regarding the cash flows from operating activities, see the Cash Flow Statements in the Company's Consolidated Proforma Financial Statements as of June 30, 2025. |
| Cash flows from investing activities | (6,692) | (6,532) | (4,466) | (4,077) | (9,957) | The cash flows used for investing activities in the periods presented derive from an investment in fixed assets. For further information regarding the cash flows from operating activities, see the Cash Flow Statements in the Company's Consolidated Proforma Financial Statements as of June 30, 2025. |
| Cash flows from financing activities | (32,391) | (26,541) | (13,956) | (13,623) | (11,888) | Most of the cash flows from financing activities in the presented periods derive from the undertaking and repayment of loans, changes in related party balances, investments and distributions, and interest payments on loans. For further information regarding the cash flows from operating activities, see the Cash Flow Statements in the Company's Consolidated Proforma Financial Statements as of June 30, 2025. |

2.5. EBITDA (Earnings Before Interest, Taxes, Depreciations, Amortizations

EBITDA Earnings Before Interest, Taxes, Depreciations and Amortizations) is an indicator which represents the Company's operational profit less Depreciations and Amortizations and with the neutralization of non-operational income or expenses and does not constitute a financial indicator based on the Generally Accepted Accounting Rules. However, the Company is in the opinion that the EBITDA is one of the most important parameters and therefore serves as an important financial aspect of the understanding of its financial results (in addition and subject to its operational results as these are presented in its Financial Statements).

**It is emphasized that the EBITDA:**

(A) Does not present cash flows from operating activities in accordance with generally accepted accounting principles;

(B) Does not reflect cash available to finance all of the Company's cash flows, including its ability to distribute funds;

(C) Is not supposed to be considered as a substitute for net income for the purpose of evaluating the results of the Company's operations;

(D) Is not a figure audited and/or reviewed by the Company's auditors.

See below information regarding the Company's EBITDA:

| Section | For the year ended on | | | The Company's explanations of the material changes |
|---|---|---|---|---|
| | 31.12.2024 | 31.12.2023 | 31.12.2022 | |
| | In USD Thousands | | | |
| EBITDA (consolidated including the Company's share in included companies | 37,662 | 36,657 | 29,316 | Most of the increase is attributed to the purchase of assets during 2022 and to an improvement in the operational results of some of the Company's assets. |
| EBITDA (Company's share including the Company's share in included companies | 32,793 | 31,955 | 25,607 | |

| Section | For the six (6) months ended on June 30 | | For the three (3) months ended on June 30 | | The year ended on December 31 | |
|---|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2024 | |
| | In USD Thousands | | | | | |
| EBITDA (consolidated including the Company's share in included companies | (18,654) | (19,960) | (7,808) | (9,320) | 37,662 | The Company's income is recognized after services are granted to the clients participating in the summer camps which take place during the second half of the year. |
| EBITDA (Company's share including the Company's share in included companies | (16,428) | (17,288) | (7,045) | (8,206) | 32,793 | |

## 3. Exposure to Market Risks and Risk Management

The management of the Company estimates that its operations are exposed to the main market risks as detailed in Note 11 of the Company's consolidated financial statements for 2024.

Additionally, as a result of the issuance of the Debentures under this prospectus, to the extent issues, the Company will be exposed to changes in the Shekel/Dollar exchange rate. The Company's policy is to hedge the currency exposure by way of appropriate financial instruments to reduce said exposure.

### 3.1. The Company's policy for managing market risks

The Board of Directors of the Company supervises the policy for managing market risks and instructs the management. Additionally, the Company adjusts the structure of financing (or refinancing) of its assets (including the loan term, creating exit/ early repayment points without penalties, agreeing with the bank on the terms of the loan and so forth) to the business plan of each asset in a manner which allows maximum flexibility in the execution of the business plan as aforesaid and maximizing the value of the asset and the Company's profit therefrom.

3.2. Means of supervising and exercising the policy

The management of the Company regularly monitors the developments in the Company's relevant markets and reports to the Board of Directors of the Company regarding the current level of exposure. The Board of Directors of the Company supervises the policy for management of the market risks and instructs the management.

**4. Corporate Governance Aspects**

4.1. General

For details regarding the application of certain corporate governance provisions of the Companies Law, 5759-1999 and the regulations promulgated thereunder, on the Company as a foreign company which its debentures are offered to the public in Israel, see Chapter 5 of the Prospectus. Soon after the closing of the Company's Debentures (Series A)'s offer under this Prospectus and the Supplementary Notice, and as long as securities of the Company are held by the public in Israel, the Company will operate for its compliance with all of the corporate governance provisions that are binding upon it, including appointing external directors and an independent directors (See Section 5.1 of the Prospectus) and establishing an audit committee and a remuneration committee.

4.2. Disclosures regarding Independent Directors

As at the Prospectus date the Company has no Independent Directors, as this term is defined in Companies Law. The Company’s Articles of Association do not include a provision regarding the rate of Independent Directors in the Company.

As at the Prospectus date, the Company has yet to appoint external directors. Following and subject to the completion of the registration of the Debentures for trade in the TASE under this prospectus and the Supplementary Notice, the Company shall act as required by law to appoint External Directors.

4.3. Internal Auditor

As of the date of the Prospectus, the Company has no Internal Auditor.

4.4. Company’s Policy regarding donations

The Board of Directors did not establish a donations policy. There are no undertakings to make donations in future periods.

**5.** Details regarding the Auditor of the Company

Since its incorporation, the Company's auditor is BDO Ziv Haft. The Auditor’s fees were determined pursuant to a negotiation between the Company’s management and the Auditor, according to the scope and nature of the work, past experience and market terms.

The Company was incorporated on May 28, 2025, and therefore did not pay the Auditor during the years 2023 and 2024.

**6. Significant events that occurred during and after the reporting date**

For details, see Notes 2 to the Financial Statements.

**November 18, 2025**

| ____________________ | ____________________ |
|---|---|
| **David Shabsels** | **Michael Shabsels** |
| **Director &CEO** | **Chairman** |

# Chapter 8 – The Company's Board of Directors

## 8.1. Board of Directors of the Company

Following are details relating to the Directors in the Company's Board of Directors, as of the date of the Prospectus:

| Name | David Shabsels | Michael Shabsels | Shahar Nachmias | Doron Turgeman | Limor Beladev | Benjamin Gabbay |
|---|---|---|---|---|---|---|
| **Passport/ I.D. Number** | 472749398 | A19922239 | 034442202 | 023568389 | 028511285 | 022051577 |
| **Date of Birth** | September 15, 1977 | April 5, 1970 | August 31, 197 | April 23, 1968 | March 12, 1971 | September 30, 1965 |
| **Address for Service of Court Papers** | 60 Carthage Road, Scarsdale, New York, 10583, United States of America | 444 East 58th Street #3C, New York, New York, 10022, United States of America | Kibbutz Gadot | Inbar 9, MeVaseret Tzyon, Israel | 17th Ha-Shita Street, Kfar Neter | Zeelon 12, Yarkona, Israel |
| **Nationality** | American | American | Israeli | Israeli | Israeli | Israeli |
| **Role** | Director and CEO | President and Director | Chairman of the Board of Directors | External Director | External Director | Independent Director |
| **Appointed Date** | May 28, 2025 | May 28, 2025 | November 23, 2025 | November 23, 2025 | November 23, 2025 | November 23, 2025 |
| **Membership in the Company's Board of Directors committee** | No | No | No | The Audit Committee Financial Statements Review Committee Compensation Committee | The Audit Committee Financial Statements Review Committee Compensation Committee | The Audit Committee Financial Statements Review Committee Compensation Committee |
| **An External or Independent Director** | No | No | No | Accounting and financial expertise | professional qualification | Accounting and financial expertise |
| **Accounting and financial expertise or professional qualification or expert External Director** | No | No | No | Yes | Yes | Yes |
| **An Employee of the Company, of its Subsidiary, of its Affiliate or of an Interested Party of the Company – if so, the Position the Director holds** | CFO in the Company | Company's CEO | No | No | No | No |
| **Education** | - Bachelor's Degree from Adelphi University in | Bachelor's Degree from Brandies University, | BSc, Computer Sciences, UMass Lowell | Accounting BA – and Economics, Hebrew | Bachelor of Law (LLB) from the Netanya | Accounting BA – and Economics, Hebrew |

| Name | David Shabsels | Michael Shabsels | Shahar Nachmias | Doron Turgeman | Limor Beladev | Benjamin Gabbay |
|---|---|---|---|---|---|---|
| | New York | Massachusetts | | University; CPA | Academic Collage Master of Business Administration (MBA), specialized in Finance. | University; CPA |
| **Employment in the Past 5 Years** | CEO of Damis | President and Chairman of Damis | Business Manager in Gadot Holdings (2018- present) | CEO of Internet Gold – Kavei Zahav Ltd.(2011-2024); Financial advisor and independent accountant. | Independent attorney; Director in various companies | CFO of Epilaidy LLC (2024-present) |
| **Other Entities in which the Director Serves as a Director** | - | - | Hadarei Hagalil, Gal Avocado, Plasgad Smart Packing, Gadot Holdings, Gadot Tourism, Gadot Entrepreneurship, Dorel Gadot, Nofar Gadot, Bashan Entrepreneurship, Kelah Initiatives and Investments Management Ltd., Bashan Amara, Bashan Amara Investment Management, Limited Partnership | External Director of Alon Ribua Kachol Ltd., Effi Capital Nadlan Ltd., MV. Investments Ltd. Greystone senior debt, Encore Properties, GFI Real Estate Limited, MDG MDG Real Estate Global Limited | External Director in: Gabay Group; Menara Ventures xl-limited Partnership; One Technologies; Independent Director in: Amram Abraham Construction Ltd.; and MDG Real Estate Global Limited | - |
| **Relative of an Interested Party of the Company** | Yes | Yes | No | No | No | No |
| **A director whom the Company considers having accounting and financial expertise in order to meet the minimum number determined by the Board of directors under Section 92(a)(12) of the Companies Law.** | No | No | No | Yes | No | Yes |

## 8.2. Senior Officers (who are not directors)

| Name | Randolph (Randy) Mittasch |
|---|---|
| Date of Birth | May 25, 1962 |
| An Employee of the Company, of its Subsidiary, of its Affiliate or of an Interested Party of the Company – if so, the Position senior officer holds | CFO |
| Education | CPA; MBA from Adelphi University in New York |
| Employment in the Past 5 Years | Various positions in the Group |
| Relative of a senior officer of an Interested Party of the Company | No |

## 8.3. Provisions of the Company's Articles of Association Regarding the Board of Directors' Members

Hereinafter is a general and incomplete description of part of the provisions applying to the board of directors of the Company under the British Virgin Islands laws and the memorandum and articles of association of the Company. It is clarified that the memorandum and articles of association of the Company are subject to the Laws of the British Virgin Islands.

The reference in this chapter to the British Virgin Islands law is in accordance with the opinion of a certified British Virgin Islands law firm, attached herein to chapter 11 of the Prospectus, after they have consented to the attachment of the opinion and its translation to the Prospectus.

As aforementioned in Section 1.1 of the Prospectus, for as long as Debentures (Series A) and of the Company will be in circulation, provisions of Section 39a of The Securities Law, 1968 (hereinafter: "**Securities Law**") will apply to the Company, and consequently various provisions of the Companies Law, 1999 (hereinafter: "**Companies Law**"), including provisions regarding mandatory appointment of external directors[1], audit committee[2] and remuneration committee[3], shall apply to the Company, in addition to the provisions of the memorandum and articles of association of the Company and the British Virgin Islands laws[4].

The Company, its controlling shareholder and the officers of the Company undertake irrevocably (as applicable) not to raise contentions against the application, validity, or implementation of Section 39a of the Securities Law as aforesaid.

Further, whereas according to the British Virgin Islands law the office of a director terminates prior to the term fixed by the resolution appointing him, only due to his death (God forbid), resignation, resolution of the board or resolution of shareholders or the court, then the controlling shareholder and the rest of the directors on the board hereby undertake irrevocably that: (1) If an external director informs the Company that a condition to his office under the Companies Law has ceased to exist, then they will act in accordance with the articles of association of the Company for the convening of an urgent meeting of the shareholders or of the directors (as the case may be), which agenda shall be a resolution to terminate immediately the office of such director and that they will vote for such Resolution; and (2) If any of the directors notified the Company, of his/her conviction of an offense as aforesaid in Sections 226(a)(1) or 226(a1) of the Companies Law, or that the Administrative Enforcement Committee has resolved

1 Sections 239 to 249a of Companies Law.
2 Sections 114 to 117 of Companies Law.
3 Sections 118a to 118b of Companies Law.
4 It is clarified, that as of the date of the Prospectus, the Articles contain no provisions in contradiction with the cogent law in the British Virgin Islands.

to impose on him/her means of enforcement preventing him/her from holding office as a director in a private company which is a Debentures Company, then they will act in accordance with the articles of association of the Company in order to convene a meeting of the shareholders or the directors (as the case may be), which agenda shall include a resolution to terminate immediately the office of such director and that they will vote for such Resolution.

The Company and its controlling shareholder hereby irrevocably undertake, that from completion of three (3) months after the date of the offering and as long as the Company's Debentures (Series A) are in circulation, at least two (2) directors (including the external directors), who are residents of Israel, will serve in the Company.

**The following description constitutes the essence of the memorandum and articles of association of the Company and is not fully comprehensive or being a substitute for reviewing the memorandum and articles of association of the Company. The memorandum and articles of association of the Company, as well as any amendment to them, if any, will be available electronically on the MAGNA site of the Israeli Securities Authority at: www.magna.gov.il.**

8.3.1. Subject to that stated in the Company's Articles of Association, the business affairs of the company will be managed by the board of directors or under its supervision. At all times at least two (2) external directors will serve in the Company. The articles of association further states that a director does not need to own shares of the Company in order to be fit for office.

8.3.2. Appointment and Removal of Directors; Substitute Directors

8.3.2.1. The first Director or Directors shall be appointed by the registered agent of the Company.[5] Thereafter, the Directors shall be appointed and removed by Resolution of the board or Resolution of the shareholders. A Director shall be appointed for such term as may be specified on his appointment or, failing any term specified, shall be deemed to be appointed indefinitely.

8.3.2.2. Subject to Section 8.3.2.1 to the Prospectus, no person shall be appointed as a Director of the Company unless the following is disclosed to the Board of the Company in the form of a written declaration (the "**Declaration**"):

(a) If the Person has been convicted by a Judgment of an offence stated in Section 8.3.2.3(a) to the Prospectus where the period has not yet passed in which the Person is prevented from being appointed as a Director under Section 8.3.2.3(a) to the Prospectus;);

(b) If the Person has been convicted by a Judgment of an offence as stated in Section 8.3.2.3(b) of the Prospectus,), where the period determined by the court under the same Section 8.3.2.3(b) to the Prospectus has not yet passed; and

(c) If the Administrative Enforcement Committee imposed enforcement measures which prohibit the Person from serving as a Director of any Public Company or any Private Company which is a Debentures

5 In accordance with the BVI laws, any company registered in the British Virgin Islands must is required to have a registered agent, present in the BVI. No person shall serve or agree to serve as a registered agent of an incorporated company in the BVI unless such a person holds a license, according to the BVI's Company Management Law, 1990 and the Banks and Trust Companies Law, 1990, authorizing him to provide services of a registered agent.

Company and the period determined by the Administrative Enforcement Committee as stated has not yet passed.

8.3.2.3.

(a) A person convicted by a Judgment of one of the following offences shall not hold office as a Director in the Company unless five years have passed since the date on which the Judgment by which he was convicted was given:

(i) Offences of: (1) bribery, (2) theft of company property by a manager of the company, (3) obtaining anything by deceit, (4) forgery, (5) use of a forged document, (6) inducement by deceit, (7) false registration in documents of a company,(8) offences by managers or employees of a company, (9) failure to disclose information and misleading publication by an officer of a company, (10) deceit and breach of trust in a company, (11) deceitful concealment (12) blackmail by use of force, (13) blackmail by use of threats, (14) use of inside information by an insider, (15) use of inside information the source of which is an insider, (16) offer and sale of securities to the public in Israel not in accordance to a prospectus or a draft prospectus, (17) causing a misleading item to be included in a draft prospectus or in a prospectus, (18) causing a misleading item to be included in information presented at a meeting of the company's employees, (19) issuing an opinion, report or certification which is subsequently included or referred to in a prospectus, report, notice or purchase offer memorandum, knowing that the opinion, report or certification contained a misleading item, (20) causing a report, notice, registration document or purchase offer memorandum, submitted to the ISA or the TASE to contain a misleading item, (21) including a misleading item in one of its reports, publications or in other information provided by it, (22) fraud in connection with securities; or

(ii) Conviction by a court anywhere in the world of the offences of bribery, deceit, offences by managers of a corporate body or offences involving misuse of inside information.

(b) A person convicted by a Judgment which is not listed in Section 8.3.2.3(a) above shall not hold office as a Director in the Company, if a court has determined that by virtue of the substance, severity or circumstances, the Person is not permitted to serve or is not deserving of serving as a Director of a Public Company or a Private Company which is a Debentures Company for a period determined by the court which shall not exceed five years from the date on which the Judgment was given.

(c) Where the Administrative Enforcement Committee has imposed Enforcement Means on a Person preventing the said Person from serving as a Director of a Public Company or a Private Company

which is a Debentures Company, the same person shall not be appointed as Director of the Company in accordance with the same decision.

8.3.2.4. Each Director holds office until (a) his or her disqualification to act as a director under the BVI Business Companies Act, 2004 (the "**Act**"); (b) his or her death or, in the case of a Director that is not an individual, its ceasing to exist; (c) his or her resignation; (d) the expiry of the term of office (if any) specified on his or her appointment or as the directors or shareholders may have determined; (e) the effective date of his or her removal by Resolution of Directors or Resolution of Shareholders; or (f) with respect to External Directors, as is outlined in Section 8.3.3.9 of the Prospectus, and with respect to Non-External Independent Directors, such Directors will not serve as a director in the Company for a period longer than nine (9) years, and in regards to this, ceasing to serve as Director for a period which is no longer than two (2) years will not be considered as stopping the sequence of Directorship.

8.3.2.5. A person shall not be appointed as a Director unless he has consented in writing to be a Director.

8.3.2.6. If the Company becomes aware that a Director was appointed contrary to the provisions of Sections 8.3.2.2-8.3.2.3 to the Prospectus, or that a Director has breached the provisions of Section 8.3.2.3 or 8.3.2.8, the Board or Shareholders shall terminate the office of such Director at their first meeting to be convened after they had become so aware, if it finds that the said conditions are fulfilled, and such office shall expire on the date of such resolution. Additional requirements for the removal of an External Director are outlined in Sections 8.3.3.10-8.3.3.14 to the Prospectus.

8.3.2.7. If after his or her appointment as a Director of the Company, a Director has been convicted of an offence provided in Section 8.3.2.3(a) or 8.3.2.3(b), that Director shall inform the Company as soon as is reasonably practicable and that Director's office shall be terminated by the Board or Shareholders of the Company, and it shall not be possible to reappoint the said person as a Director unless the time period during which the Person is prohibited from serving as a Director, as provided in Section 8.3.2.3 of the Prospectus, has passed.

8.3.2.8. If after his or her appointment as a Director of the Company, the Administrative Enforcement Committee has resolved to impose Enforcement Means on a Director preventing that Director from being appointed as a Director in any Public Company, any Private Company which is a Debentures Company or in the Company, the said Director shall notify the Company as soon as is reasonably practicable thereof and that Director's office shall be terminated by the Board or Shareholders of the Company, and that Person will not be permitted to be reappointed as a Director in the Company, unless the prohibition period as stated by the Administrative Enforcement Committee has passed.

8.3.2.9. A Director may resign office by giving written notice of his or her resignation to the Company and the resignation has effect from the date the notice is received by the Company or from such later date as may be specified in the notice. In addition to the requirements outlined in Sections 8.3.2.3, 8.3.2.6, 8.3.2.7 and 8.3.2.8, a Director shall resign forthwith as a Director if he is, or becomes, disqualified from acting as a Director under BVI law.

8.3.2.10. The Board, by Resolution of Directors, may at all times appoint a Director to fill a vacancy on the Board of Directors of the Company. The term of the appointment of such Director shall not exceed the term that remained when the person who has ceased to be a Director ceased to hold office. A vacancy on the Board of Directors of the Company occurs if a Director dies, or in the case of a Director that is not an individual, ceases to exist, or otherwise ceases to hold office of a Director prior to the expiration of his term of office.

8.3.2.11. The following are disqualified for appointment as a Director: (a) an individual who is under 18 years of age; (b) a person who is a disqualified person or a restricted person within the meaning of the BVI Law; (c) an undischarged bankrupt.

8.3.2.12. The remuneration of Directors (whether by way of salary, commission, participation in profits or otherwise) in respect of services rendered or to be rendered in any capacity to the Company (including to any company in which the Company may be interested) shall be fixed by Resolution of the Board or Resolution of Shareholders.

8.3.2.13. A Director who breached the disclosure provisions of Sections 8.3.2.2, 8.3.2.7 or 8.3.2.8 of the Prospectus, shall be deemed to have breached his or her fiduciary duty towards the Company.

8.3.2.14. A Director, by written instrument deposited at the offices of the Registered office, may from time to time appoint another Director or another person who is not disqualified for appointment as a Director under the terms of appointment of directors, to be his or her Substitute to: (a) exercise the appointing Director's powers; and (b) carry out the appointing Director's responsibilities, in relation to the taking of decisions by the Directors in the absence of the appointing Director.

8.3.3. <u>External Directors</u>

8.3.3.1. If on the date of appointment of an External Director, all members of the Board of Directors who are not Controlling Shareholder or Relatives thereof are of one gender, the External Director appointed shall be of the other gender.

8.3.3.2. The first External Directors shall be appointed no later than three (3) months from the date in which the Company became a Debentures Company.

8.3.3.3. An External Director will be appointed by Resolution of Shareholders or by Resolution of the Board of the Company only after the date on which

the said nominee has provided a written declaration that he meets the conditions for appointment as an External Director and the Audit Committee (or, with respect to the first External Directors, the Board of Directors) has confirmed that all of the conditions stated in Section 8.3.3.4, 8.3.3.5 and 8.3.3.6 have been met.

8.3.3.4. Only an individual who is a resident of Israel and who is qualified for appointment as a Director shall be appointed as an External Director and that individual shall either possess Professional Qualifications or Accounting and Financial Expertise. At least one of the External Directors shall possess Accounting and Financial Expertise.

8.3.3.5. The following individuals shall not be appointed as an External Directors of the Company:

(a) An individual may not be appointed as an External Director if he is a Relative of a Company's Controlling Shareholder.

(b) An individual may not be appointed as an External Director where the individual himself, or whose Relative, partner, employer, person who he is directly or indirectly subject to or a corporation in which he has Control, has, on the date of appointment or during the two (2) years prior thereto, a Connection with the Company, with a Controlling Shareholder of the Company or with a Relative thereof, on the date of appointment or to Another Body Corporate.[6],[7]

(c) An individual may not be appointed as an External Director if the said individual's other positions or business does or may give rise to a conflict of interest with his or her role as Director of the Company, or if this might harm the individual's ability to act as a Director.

(d) A Director of a company shall not be appointed as an External Director of another company if at such time, a Director of the other company is acting as an External Director of the Company.

(e) An individual shall not be appointed as an External Director if the said individual is an employee of the ISA or the TASE.

8.3.3.6. Without derogating from the provisions of Section 8.3.3.5 above, an individual shall not be appointed as an External Director where the individual himself, or whose Relative, partner, employer, person who he is directly or indirectly subject to or a corporation in which he has Control, has business or professional relationship to a Person with whom he is prohibited from having a Connection thereto under the provisions of Section 8.3.3.5 above, even if such relationships are not general, with the exception of negligible Connections, and also an individual who has received consideration in violation with the provisions of Section 8.3.3.8. Where the said relationship exists or where consideration, as stated, was

---

[6] "Connection" – means the existence of labor relations, business or professional relations generally or Control, as well as acting as an office holder, other than as a director appointed to serve as an External Director in a company which intends to undergo an initial public offering.

[7] "Another Body Corporate" - means a body corporate in which the Controlling Shareholder is, on the date of appointment or during the two years prior thereto, the Company or a Controlling Shareholder therein.

received during the tenure of the External Director, the foregoing shall be considered, for the purpose of Section 8.3.3.11 through 8.3.3.14 to be a breach of one of the conditions required for the appointment or tenure as an External Director.

8.3.3.7. On each and every committee authorized to exercise any of the powers of the Board of Directors (in so far as the Act or these Articles permit) at least one External Director shall serve.

8.3.3.8. An External Director is entitled to remuneration and to a refund of expenses subject to any applicable law. An External Director shall not receive, in addition to the remuneration to which he is entitled and refund of expenses, any other consideration, directly or indirectly, for acting as a Director of the Company. For the purposes of this Section, consideration shall not include the grant of an exemption, an undertaking to indemnify, indemnification or insurance.

8.3.3.9. The term of office of an External Director shall be three years, and the Company may, notwithstanding the provisions of Section 8.3.3.5 above, appoint the External Director for two additional terms of three years each.

8.3.3.10. Other than as set forth in Section 8.3.3.9 of the Prospectus, External Director shall only be dismissed, and his or her tenure shall only expire in accordance with the provisions of Section 8.3.3.11 through 8.3.3.14 of the Prospectus.

8.3.3.11. An External Director to which the conditions required to serve as an External Director no longer apply shall immediately notify the Board, and his or her tenure shall be terminated by the Board or by the Shareholders of the Company.

8.3.3.12. Where the Board of Directors becomes aware that there is a suspicion that an External Director no longer complies with one of the conditions required for appointment as an External Director, or that there is a suspicion that the Director has breached a fiduciary duty to the Company, the Board of Directors or Shareholders shall discuss such matter at the first meeting to be convened after becoming so aware.

8.3.3.13. Where the Board of Directors or Shareholders finds, after giving the External Director a reasonable opportunity to present his or her position, that the External Director no longer complies with one of the conditions required for his or her appointment as an External Director or that he has breached a fiduciary duty to the Company, the Board of Directors or Shareholders shall convene a meeting to terminate the tenure of the External Director.

8.3.3.14. The Court may, on the request of either a Director or a Shareholder, instruct for termination of the tenure of an External Director if it has found that the External Director no longer fulfills one of the conditions required for his or her appointment as an External Director or that he has breached a fiduciary duty to the Company. Also, at the request of the Company, of a Director, a Shareholder or a creditor, the Court may instruct for termination

of the tenure of an External Director if it has found that one of the following prevails: (1) the External Director is permanently unable to fulfill his or her function; (2) during the term of his or her tenure he was found guilty in a court outside Israel of offences referred to in Section 8.3.2.3 of the Prospectus.

8.3.3.15. Where the position of External Director becomes vacant and there are no longer two External Directors serving in the Company, the Board of Directors shall fill such vacancy by resolution of the Board.

8.3.3.16. The Company, the Controlling Shareholder therein and a company controlled thereby shall not grant an individual who served as an External Director of the same company, the individual's spouse or child with any benefit, directly or indirectly, and shall not appoint the said person, the spouse or child thereof as an Officer of the Company or a company under the Control of the Controlling Shareholder therein, shall not hire such person as an employee and shall not receive professional services from such person in return for payment, whether directly or indirectly, including by way of a corporate body controlled by such person, unless two (2) years have elapsed from the termination of his tenure as External Director of such company, and regarding a Relative who is not a spouse or child, one year from the termination of his tenure as External Director.

8.3.4. Powers of the Board

Subject to the provisions of the articles of association, the business of the Company shall be managed by the Board of the Company who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company, and may exercise all such powers of the Company necessary for managing and for directing and supervising, the business and affairs of the Company as are not by BVI law or by the Memorandum or the Articles required to be exercised by the Shareholders.

8.3.5. Board Committees

The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit.

The Board is not entitled to delegate the following powers to a committee of the Board:

(a) to amend the Memorandum or these Articles;

(b) to designate committees of Directors;

(c) to appoint Directors;

(d) to appoint an agent;

(e) to approve a plan or merger, consolidation or arrangement;

(f) to make a declaration of solvency or approve a liquidation plan; or

(g) to take a resolution under the BVI Laws that the Company will, immediately after a proposed distribution, satisfy the solvency test.

8.3.6. Audit Committee

8.3.6.1. The Board of Directors shall appoint from its members an Audit Committee.

8.3.6.2. There shall be not less than three (3) Persons on the Audit Committee. The members of the Audit Committee shall be chosen from Board of Directors and shall at all times comprise of all appointed External Directors. The majority of Audit Committee members shall be either External Directors or independent directors.

8.3.6.3. The chairman of the Audit Committee shall be an External Director.

8.3.7. <u>Remuneration Committee</u>

8.3.7.1. The Board of Directors shall appoint out of its members a Remuneration Committee.

8.3.7.2. There shall be not less than three (3) Persons on the Remuneration Committee. The members of the Remuneration Committee shall be chosen from Board of Directors and shall at all times comprise of all appointed External Directors. The majority of members of the Remuneration Committee shall be External Directors and the rest of the members shall be Directors whose terms of tenure and employment are pursuant to the provisions set forth under Section 8.3.3.8 of this Prospectus.

8.3.7.3. The chairman of the Remuneration Committee shall be an External Director.

8.3.8. <u>Indemnification</u>

Subject to the provisions of the BVI Laws, every Director and officer of the Company (which for the avoidance of doubt, shall not include auditor of the Company), together with every former Director and former officer of the Company (In this Section an "**Indemnified Person**") shall be indemnified out of the assets of the Company against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud or willful misconduct. No Indemnified Person shall be liable to the Company for any loss or damage incurred by the Company as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud or willful misconduct of such an Indemnified Person. No person shall be found to have committed actual fraud or willful misconduct under this section unless or until a court of competent jurisdiction shall have made a finding to that effect.

The Company shall advance to each Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit, proceeding, or investigation involving such Indemnified Person for which indemnity will or could be sought. In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to the Company if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this section. If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment,

costs or expenses, then such party shall not be indemnified Person with respect to such judgment, costs or expenses and any advancement shall be returned to the Company (without interest) by the Indemnified Person.

The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

Subject to the aforementioned provisions, the Company shall indemnify and insure officers of the Company with respect to payments they are required to pay as an Enforcement Measure to parties who were injured by a violation in accordance to the resolution of the Administrative Enforcement Committee, or with respect to a payment of expenses incurred in connection with an Administrative Enforcement proceeding that was conducted regarding such a person's matter, including reasonable litigation expenses – including attorney's fees, and including by way of an advance indemnification.

**8.4. <u>Independent Authorized Signatories</u>**

As of the date of the prospectus, David Shabsels and Michael Shabsels are independent authorized signatories of the Company.

**8.5. <u>Additional Details</u>**

| | |
|---|---|
| The Prospectus lawyers: | **Goldfarb Gross Seligman & Co., Law Offices**<br>98 Yigal Alon Street, Tel Aviv |
| The Company's accountants: | Ziv Haft (BDO) accountants – 48 Menachem Begin Street, Tel Aviv |
| The Company's registered offices in the British Virgin Islands: | C/o Maples Corporate Services (BVI) Limited<br>PO Box 173<br>Kingston Chambers<br>Road Town, Tortola<br>British Virgin Islands |
| Address in Israel for Service of Court Papers: | 98 Yigal Alon Street, Tel Aviv<br>c/o Goldfarb Gross Seligman & Co., Law Offices |

# Chapter 9 – Interested Parties of the Company

9.1. **Remunerations of Interested Parties and Senior Office Holders of the Company**

From the date of its incorporation and until the date of the Prospectus, no remuneration was paid to Interested Parties in the Company and/or its office holders in connection with their holding office in the Company or in a company it controls.

9.2. **Transactions with Controlling Shareholders**

To the best of the Company's knowledge, hereinafter are details regarding any transaction which the Company and/or corporations under its control and/or related companies thereto, entered into with the Controlling Shareholder of the Company or in which the Controlling Shareholder of the Company have a personal interest, from January 1, 2022 and ending in proximity to the date of the Prospectus, or on an earlier date if it is still valid at the date of the Prospectus. With the establishment of the audit committee, the audit committee will uphold its obligations under the law, including the review of the implementation of transactions that were approved after the date of this Prospectus.

9.2.1. Transfer of Rights in the Property Companies Against the Issuing of Shares in the Company:

The Company entered into an agreement with the Controlling Shareholders, David and Michael Shabsels, and companies controlled thereby pursuant to which the Controlling Shareholders, and said Companies undertook, subject to the fulfillment of the conditions for registration of the Debentures of the Company, offered under this Prospectus, and prior to the date of their registration for trade on the TASE , to transfer to the Company all the Transferred Rights (as is set forth in Section 7.1.6 to the Prospectus), in exchange for issuance of shares of the Company and for a payment of $50 million (which will be paid from the proceeds of the issuance of the company's debentures (Series A)).

The assigning of the Transferred Rights to the Company shall be made on an "as is" basis on the transfer date.

For more information, see section 7.1.6 of the prospectus.

9.2.2. Lease Agreement in connection with Kiwi Summer Camp

Kiwi Landco LLC, a company controlled by the Company's controlling shareholders, which owns the land on which Kiwi Summer Camp is located, entered to agreement with Wiki Operatingco LLC, which is the camp's operating company, under which the operating company will lease the said land for the purpose of operating the camp, in exchange for a sum of $1 per year. The lease period is approximately 25 years and will be automatically extended for additional periods unless the Company chooses not to extend the lease period.

9.2.3. The Company Management Agreement

The Company was established, *inter alia*, for the purpose of issuing the Company's Debentures, offered under this Prospectus in Israel, and the Transferred Rights shall be transferred thereto prior to the listing of the Company's Debentures offered hereunder, as is set forth in Section 9.2.1 above. Therefore, as of the Prospectus Date, the Company

itself has no independent operation and management mechanism with respect to its operation in its field of activity[1], as is set forth in this Prospectus.

The Company intends to engage, closely to the Issuance Date of the Debentures, with a corporation controlled by the Controlling Shareholder (in the final holding chain) (the **"Management Company"**) in a comprehensive Services Agreement (the **"Services Agreement"**). Within the framework of the Services Agreement, the Management Company shall provide the Company various headquarters management services which shall include, *inter alia*, in-house personnel CEO services, CFO services, accounting services, investment advice, book-keeping, administrative, telecommunications, IT services, oversight of portfolio management, office and secretarial services etc. (the **"Management Services"**). The Management Company shall provide the Group or cause the Group to be provided with sufficient internal personnel and consultants, which shall be third parties, as required by the Company from time to time, including, *inter alia,* the Management Company's headquarters employees. These individuals shall provide, *inter alia*, CEO services, CFO services, accounting services, legal services, auditing and office services, communications services, computer services and secretarial services. The Management Services shall be granted by the Management Company's or its affiliate's employees[2]. As of the Prospectus Date, the companies controlled by the Controlling Shareholder are granting and/or have granted certain services to the Company, and by way of the Services Agreement, said services shall continue to be provided to the Group.

The Services Agreement shall enter into effect upon the closing of the Right Transference Agreement with respect to the rights being transferred to the Company as is set forth in Section 7.1.6to the Prospectus and shall remain in effect throughout the life of the Company's Debentures. The Services Agreement shall expire at said date in which no Debentures shall remain in circulation.

The annual consideration for the headquarters and professional services that will be provided by the Management Company is $750 Thousands.

9.2.4. From time to time in the course of their business, the Company has made loans to the Controlling Shareholders (directly and/or through companies under their control) and the Controlling Shareholders have made loans to the Company. As of December 31, 2024 and June 30, 2025, the balance owed by the Controlling Shareholders to the Company amounted to approximately $7,639 and $16,347 thousand, respectively. As of the date of publication of the Prospectus, the aforementioned balance has been repaid.

9.2.5. Controlling Shareholders Guarantees

The Controlling Shareholders have provided, directly or indirectly, and may provide from time to time, guarantees in favor of third parties, to secure the obligations of the Company and its Subsidiaries according to agreements in which they engage, as is set

---

[1] For information regarding employees and service providers in the Company's subsidiaries see Section 7.9 to the Prospectus

[2] Management Services shall be provided by employees of the Management Company (as defined in Chapter 7 hereinabove) or its affiliate from the Group's headquarters. The employees and Officers in the Management Company by whom the services shall be provided to the Company, shall not be employed by the Company, and the consideration paid thereto for their services shall not be paid by the Company. It shall be noted that the Management Company shall be entitled to resolve upon changing the identity of the Officers; this, subject to the approval of the Company's Board of Directors.

forth in Section 7.13.2 to the Prospectus. No consideration is paid by the Company for receiving the guarantees set forth hereunder.

9.2.6. Reimbursement of insurance costs

A Company controlled by the Controlling Shareholders in the Company bears the insurance costs of the Company and its Subsidiaries within the framework of a comprehensive insurance policy. The Company reimburses said corporation the insurance costs paid thereby without margin.

9.2.7. Taxation

For details with respect to the Company choosing to be classified as a pass-through entity instead of a corporation, for US tax purposes, see Section 7.16 of the Prospectus.

9.2.8. Undertaking of Controlling Shareholder to implement Israeli Law in different matters

For details regarding the undertakings of the Controlling Shareholder for the benefit of the Trustee and the holders of the Debentures – see chapter 5 to the Prospectus.

9.2.9. Letters of Indemnification to Directors and Office Holders

The Company agreed to provide to its directors and office holders with customary indemnification, whereby the Company undertakes, subject to the provisions of the law, to indemnify the office holders, due to any liability or expense, imposed upon them or incurred in consequence of one or more of the following: (a) actions and/or derivatives thereof on the strength of being office holder and/or employees in the Company and/or subsidiaries and/or related companies of the Company, as they would be from time to time; and (b) actions and/or their derivative on the strength of being office holders, employees or agents of the Company or in any other corporation, in which the Company holds securities directly and/or indirectly (hereinafter: the "**Other Corporation**").

The undertaking for indemnification applies for any liability or expense which is indemnified according to law and according to the Articles of Association of the Company including:

Financial liability imposed on officers for the benefit of another person pursuant to a judgment, including a judgment given settlement or an award approved by the court, which is connected directly or indirectly to one or more of the events detailed in the indemnification.

Reasonable litigation costs, including attorneys' fees, which was a result of an investigation or proceeding conducted against him by an authority competent to conduct an investigation or proceeding, which ended without an indictment against the officer and without obligation imposed on him financially as an alternative to criminal proceedings, or ended without an indictment against the officer but with a financial liability instead of a criminal offense does not require proof of criminal intent or in connection with a financial sanction;

Reasonable litigation costs, including attorney's fees, incurred by or imposed by the court proceedings filed against him by the company or other corporation, as applicable, or on behalf of any of them or by another person, or a criminal charge in which he was acquitted, or a criminal charge the convicted does not require proof of criminal intent.

Expenses incurred in connection with the proceedings conducted in his case, including reasonable litigation expenses, including attorney's fees. In this regard "process" - "a procedure under Chapter H(3) Securities Law (imposing financial sanctions by the Securities Authority), a procedure under Chapter H(4) Securities Law (imposition of administrative enforcement by the Administrative Enforcement Committee), a procedure under Chapter I(1) of the Securities Law (the order not to start proceedings or termination Conditioned Proceedings) and proceeding under Article D (imposing financial sanctions by the Securities Authority) of Chapter 4 (relief, a monetary sanction and registration company as breaks) part 9 of the Companies Law.

Payment to the victim from the breach as stated in Section 52ND(a)(1)(a) of the Securities Law pursuant to Chapter H'4 Securities Law (imposition of administrative enforcement by the Administrative Enforcement Committee).

Liability or expense otherwise permitted indemnification under applicable law.

9.2.10. Commitment to acquire an Insurance Policy of Directors and Officers in the Company

The Board of the Company has or will have approved the commitment of the Company to acquire directors' and officers' liability insurance policy coverage (hereinafter: the "**Insurance Policy**"). Upon that date, the Board of the Company has or will have approved the inclusion of all the directors and officers (including the Controlling Shareholder of the Company and/or their relatives) serving and/or who shall serve, from time to time, at the Company and/or a subsidiary and/or a related company and/or at the request of the Company and/or a subsidiary and/or a company related to the Company, in any other company as an officer therein, as shall be in effect from time to time.

It was also decided that the Company may purchase insurance policies for directors and company officers that serve and/or will serve from time to time, at the Company and/or a subsidiary and/or a related company and/or at the request of the Company and/or a subsidiary and/or a related company, in another company as an officer, as may be in effect from time to time, for additional insurance periods. Such policies, if purchased will be in effect after the expiry of the existing policy or the extended or renewed policy as aforementioned, as applicable. The insurance policies that may be purchased may be by means of extensions or renewals of the existing policy and/or by purchasing another policy.

9.3. Holdings of Interested Parties and Officer

For holdings of interested parties and officers in the shares of the Company as of the date of the Prospectus – see section 3.3 of the Prospectus.

# Chapter 10 – Financial Reports

**10. 1** In accordance with Section 56 of the Securities Regulations (Details of Prospectus and Draft Prospectus - Structure and Form), 1969 ("**Prospectus Regulations**"), the following financial statements attached to this Chapter 10:

10.1.1 The Company's consolidated proforma financial statements as of December 31, 2024;

10.1.2 The Company's consolidated proforma financial statements as of June 30, 2025.

10.1.3 The Company's Solo financial statements as of June 30, 2025;

10.1.4 The Company's consolidated proforma financial statements as of September 30, 2025.

10.1.5 The Company's Solo financial statements as of September 30, 2025.

**10. 2** **Consent Letter of the Auditors of the Company and the Transferred Companies**

The consent letter of the Auditors of the Company which contains their consent to include their opinion and review reports (as applicable) to each of the Financial Statements listed in Section 10.1 to the Prospectus, shall be included in this Prospectus, are hereby presented in this Chapter below.

**Events Report**

**As defined in Regulation 56A of the Securities Regulations (Details of the Prospectus and Draft Prospectus - Structure and Form), 1969, regarding material events (as defined in the said regulation) that occurred during the period after the date of signing the Company's consolidated financial statements as of September 30, 2025 (*i.e.*, November 18, 2025), until the date of publication of the Prospectus.**

*No events*

| | | |
|---|---|---|
| **Randolph (Randy) Mittasch**<br>CFO | **Michael Shabsels**<br>Director and President | **David Shabsels**<br>Director and CEO |

Date: November 26, 2025.

*The following translation is intended solely for the convenience of the reader although every effort has been made to ensure its accuracy. Only the original Hebrew text of the Written Representation is binding.*

# SIMAD Holdings, Ltd

# Pro Forma Consolidated Financial Statements

# as of December 31, 2024

# SIMAD Holdings, Ltd

## Pro Forma Consolidated Financial Statements as of December 31, 2024

### Table of Contents


| | Page |
|---|---|
| Independent Auditor's Report | 1-3 |
| Pro Forma Consolidated Statements of Financial Position | 4 |
| Pro Forma Consolidated Statements of Profit or Loss and Other Comprehensive Income | 5 |
| Pro Forma Consolidated Statements of Changes in Equity | 6-7 |
| Pro Forma Consolidated Statements of Cash Flows | 8 |
| Notes to the Pro Forma Consolidated Financial Statements | 9-27 |

BDO

**Independent Auditor's Report to the Shareholders of SIMAD Holdings, Ltd**

We have audited the accompanying pro forma consolidated statements of financial position of SIMAD Holdings, Ltd (the "Company") as of December 31, 2024 and 2023, and the pro forma consolidated statements of profit or loss and other comprehensive income, changes in equity, and cash flows for each of the three years in the period ended December 31, 2024. These financial statements are the responsibility of the Company's Board of Directors and management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in Israel, including those prescribed by the Auditors' Regulations (Manner of Auditor's Performance), 1973. Those standards require that we plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes evaluating the accounting principles used and significant estimates made by the Company's Board of Directors and management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, pro forma the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company and its consolidated subsidiaries as of December 31, 2024 and 2023, and their financial performance, changes in equity, and cash flows for each of the three years in the period ended December 31, 2024, in accordance with International Financial Reporting Standards (IFRS) and the Israeli Securities Regulations (Annual Financial Statements), 2010 and the pro forma assumptions detailed in the pro forma financial statements.

**Key Audit Matters**

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements for the current period. These matters were communicated, or were required to be communicated, to the Company's Board of Directors and, in our judgment, relate to material financial statement items or disclosures and involved especially challenging, subjective, or complex auditor judgment. These matters were addressed in the context of our audit of the consolidated financial statements as a whole and in forming our opinion thereon. We do not provide a separate opinion on these matters or on the individual items or disclosures to which they relate.



אילת 08-6339911 | מודיעין עילית 08-9744111 | קרית שמונה 077-8983322 | בני ברק 073-7145300 | רחובות 03-6386788 | באר שבע 077-7784100 | חיפה 04-8680600 | ירושלים 02-6546200 | תל אביב 03-6386868

משרד ראשי: בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 דואל: bdo@bdo.co.il בקרו באתר שלנו: www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

BDO

**Revaluation of Property, Plant and Equipment (PPE)**

The Company operates summer camps located on real estate properties owned by the Company and presented as property, plant and equipment. As of December 31, 2024, the carrying amount of PPE was 428,700 thousand USD. The revaluation of PPE for the year ended December 31, 2024 amounted to approximately 32,195 thousand USD.

As described in Notes 2.I and 4 to the pro forma consolidated financial statements, the Company's PPE includes summer camps and is initially recognized at cost. In subsequent periods, the Company applies the revaluation model. At the date of revaluation, the gross carrying amount was adjusted in a manner that is consistent with the revalued amount of the asset. The accumulated depreciation at the date of revaluation was adjusted so that the carrying amount of the asset equals the revalued amount. An increase in the carrying amount of an asset resulting from a revaluation is recognized in other comprehensive income and accumulated in equity under a revaluation reserve. .

The fair value of PPE is determined using the discounted cash flow (DCF) method, which involves estimating expected cash flows from the asset and discounting them using an appropriate discount rate. This process includes assumptions regarding expected revenues and operating costs. These assumptions are based on historical, current, and forecasted data for the asset being valued, as well as comparable data from similar assets in type and/or location. The process also involves determining appropriate discount rates for each individual asset.

Changes in the assumptions used in the valuation of PPE could significantly impact its fair value and, accordingly, the Company's financial position and performance. The valuations are performed by independent external appraisers based on their experience and knowledge of the relevant assets and market data, and with input from Company management.

The process of determining the fair value of PPE is subject to significant uncertainty, requires subjective estimates, and is sensitive to changes in the underlying assumptions. It also involves significant management judgment.

Given the above, the auditor's judgment regarding the fair value of PPE was particularly challenging, subjective, and complex. Due to the materiality of PPE in the Company's financial statements, we identified the estimates and assumptions used in the valuation of PPE as a key audit matter.



אילת 08-6339911 | מודיעין עילית 08-9744111 | קרית שמונה 077-8983322 | בני ברק 073-7145300 | רחובות 03-6386788 | באר שבע 077-7784100 | חיפה 04-8680600 | ירושלים 02-6546200 | תל אביב 03-6386868

משרד ראשי: בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 דואל: bdo@bdo.co.il בקרו באתר שלנו: www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

BDO

**Audit Procedures Performed in Response to the Key Audit Matter:**

1. We obtained an understanding of the Company's processes and controls related to the valuation of PPE, and we reviewed the design and implementation of certain controls related to these processes.
2. We selected a sample of assets based on both quantitative and qualitative criteria and performed the following procedures:
    - Obtained valuation reports and verified that the results were appropriately reflected in the Company's financial statements, including relevant disclosures.
    - Evaluated the independence and qualifications of the appraisers and challenged the data and assumptions used in the valuations.
    - Reviewed the source data provided by the Company to the appraisers and compared it to the financial reporting data and other supporting documentation.
    - Performed analytical procedures and substantive tests to evaluate the reasonableness of assumptions and data, including expected revenues, operating expenses, and planned investments relating to PPE.
    - Engaged our own valuation expert to assess the overall reasonableness of the valuation, including the appropriateness of the methodology and assumptions used by the Company, with specific focus on the discount rates applied to each asset based on its characteristics.

Tel Aviv, September 18, 2025

Ziv Haft
Certified Public Accountants



אילת 08-6339911 | מודיעין עילית 08-9744111 | קרית שמונה 077-8983322 | בני ברק 073-7145300 | רחובות 03-6386788 | באר שבע 077-7784100 | חיפה 04-8680600 | ירושלים 02-6546200 | תל אביב 03-6386868
משרד ראשי: בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 דואל: bdo@bdo.co.il בקרו באתר שלנו: www.bdo.co.il
BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

**SIMAD Holdings, Ltd**

**Pro Forma Consolidated Statements of Financial Position (in thousands of USD)**

| | Note | December 31 2024 | December 31 2023 |
|---|---|---|---|
| **Assets** | | | |
| **Current Assets:** | | | |
| Cash and Cash Equivalents | | 3,663 | 9,531 |
| Other Receivables and Debit Balances | | 664 | 889 |
| Related Parties | 12 | 7,639 | 4,506 |
| Total Current Assets | | 11,966 | 14,926 |
| **Non-Current Assets:** | | | |
| Investments Accounted for Using the Equity Method | 3 | 17,173 | 17,038 |
| Property, Plant and Equipment | 4 | 428,700 | 401,735 |
| Total Non-Current Assets | | 445,873 | 418,773 |
| **Total Assets:** | | 457,839 | 433,699 |
| **Liabilities and Equity** | | | |
| **Current Liabilities:** | | | |
| Loans from Banks and Others | 5 | 9,016 | 8,984 |
| Trade Payables and Credit Balances | 6 | 4,134 | 3,472 |
| Advances from Customers | 7 | 62,790 | 59,665 |
| Total Current Liabilities | | 75,940 | 72,121 |
| **Non-Current Liabilities:** | | | |
| Loans from Banks and Others | 5 | 176,585 | 184,390 |
| Trade Payables and Credit Balances | 6 | 4,765 | 4,365 |
| Total Non-Current Liabilities | | 181,350 | 188,755 |
| **Total Liabilities:** | | 257,290 | 260,876 |
| **Equity:** | 8 | | |
| **Equity Attributable to Equity Holders of the Parent Company:** | | | |
| Share Capital and Capital Reserves | | 275,558 | 246,835 |
| Accumulated Loss | | (111,501) | (107,371) |
| Total Equity Attributable to Equity Holders of the Parent Company | | 164,057 | 139,464 |
| **Equity Attributable to Non-Controlling Interests** | | 36,492 | 33,359 |
| Total Equity | | 200,549 | 172,823 |
| **Total Liabilities and Equity** | | 457,839 | 433,699 |

| September 18, 2025<br>Date of Approval of the Financial Statements | Michael Shabsels<br>Chairman | David Shabsels<br>CEO & Director | Randy Mittasch<br>CEO |
|---|---|---|---|

**SIMAD Holdings Ltd**

**Pro Forma Consolidated Statements of Profit or Loss and Other Comprehensive Income (in thousands of USD)**

| | Note | For the Year Ended December 31 2024 | 2023 | 2022 |
|---|---|---|---|---|
| Operating Revenues | | 159,355 | 156,437 | 132,656 |
| Operating Costs | 9 | (131,761) | (128,498) | (110,311) |
| **Gross Profit** | | 27,594 | 27,939 | 22,345 |
| General and Administrative Expenses | | (2,820) | (2,695) | (2,307) |
| Selling and Marketing Expenses | | (4,307) | (3,942) | (3,488) |
| Other Income (Expenses), Net | | 58 | 506 | 80 |
| Company's Share in Net Profits of Equity-Accounted Investees | 3 | 1,522 | 1,220 | 603 |
| **Operating Profit** | | 22,047 | 23,028 | 17,233 |
| Finance Expenses | 10 | (11,960) | (11,767) | (7,159) |
| Finance Income | | 413 | 198 | 3,020 |
| Total Finance Expenses, Net | | (11,547) | (11,569) | (4,139) |
| **Profit for the Year** | | 10,500 | 11,459 | 13,094 |
| **Other Comprehensive Income:** | | | | |
| Items That Will Not Be Reclassified Subsequently to Profit or Loss: | | | | |
| Revaluation Gain on Property, Plant and Equipment | 4 | 32,195 | 29,052 | 4,781 |
| Group's Share in Other Comprehensive Income, Net, of Equity-Accounted Investees | | 334 | 672 | 750 |
| Total Other Comprehensive Income | | 32,529 | 29,724 | 5,531 |
| Total Comprehensive Income for the Year | | 43,029 | 41,183 | 18,625 |
| Profit (Loss) for the Period Attributable to: | | | | |
| Equity Holders of the Parent Company | | 8,806 | 9,871 | 11,471 |
| Non-Controlling Interests | | 1,694 | 1,588 | 1,623 |
| | | 10,500 | 11,459 | 13,094 |
| Total Comprehensive Income (Loss) Attributable to: | | | | |
| Equity Holders of the Parent Company | | 37,448 | 35,803 | 15,844 |
| Non-Controlling Interests | | 5,581 | 5,380 | 2,781 |
| | | 43,029 | 41,183 | 18,625 |

**SIMAD Holdings, Ltd**

## Pro Forma Consolidated Statements of Changes in Equity (in thousands of USD)

**For the Year Ended December 31, 2024**

| | Equity Attributable to Equity Holders of the Parent Company | | | | | | |
|---|---|---|---|---|---|---|---|
| | Share Capital and Share Premium | Revaluation Reserve for Property, Plant and Equipment | Capital Reserves from Transactions with Controlling Shareholder | Accumulated Loss | Total | Non-Controlling Interests | Total |
| **Balance as of January 1, 2024** | 1,633 | 244,555 | 647 | (107,371) | 139,464 | 33,359 | 172,823 |
| Profit for the Year | - | - | - | 8,806 | 8,806 | 1,694 | 10,500 |
| Other Comprehensive Income | - | 28,642 | - | - | 28,642 | 3,887 | 32,529 |
| Total Comprehensive Income for the Year | - | 28,642 | - | 8,806 | 37,448 | 5,581 | 43,029 |
| Distributions to Owners and Non-Controlling Interests | - | - | - | (12,936) | (12,936) | (2,497) | (15,433) |
| Capital Contributions by Owners and Non-Controlling Interests | 81 | - | - | - | 81 | 49 | 130 |
| **Balance as of December 31, 2024** | 1,714 | 273,197 | 647 | (111,501) | 164,057 | 36,492 | 200,549 |

**For the Year Ended December 31, 2023**

| | Equity Attributable to Equity Holders of the Parent Company | | | | | | |
|---|---|---|---|---|---|---|---|
| | Share Capital and Share Premium | Revaluation Reserve for Property, Plant and Equipment | Capital Reserves from Transactions with Controlling Shareholder | Accumulated Loss | Total | Non-Controlling Interests | Total |
| **Balance as of January 1, 2023** | 604 | 218,623 | - | (110,103) | 109,124 | 31,719 | 140,843 |
| Profit for the Year | - | - | - | 9,871 | 9,871 | 1,588 | 11,459 |
| Other Comprehensive Income | - | 25,932 | - | - | 25,932 | 3,792 | 29,724 |
| Total Comprehensive Income for the Year | - | 25,932 | - | 9,871 | 35,803 | 5,380 | 41,183 |
| Acquisition of Non-Controlling Interests | - | | 647 | - | 647 | (1,647) | (1,000) |
| Distributions to Owners and Non-Controlling Interests | - | - | - | (7,139) | (7,139) | (2,093) | (9,232) |
| Capital Contributions by Owners and Non-Controlling Interests | 1,029 | - | - | - | 1,029 | - | 1,029 |
| **Balance as of December 31, 2023** | 1,633 | | 647 | (107,371) | 139,464 | 33,359 | 172,823 |

**SIMAD Holdings, Ltd**

## Pro Forma Consolidated Statements of Changes in Equity (in thousands of USD)

| **For the Year Ended December 31, 2022** | **Equity Attributable to Equity Holders of the Parent Company** | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Share Capital and Share Premium** | **Revaluation Reserve for Property, Plant and Equipment** | **Capital Reserves from Transactions with Controlling Shareholder** | **Accumulated Loss** | **Total** | **Non-Controlling Interests** | **Total** |
| **Balance as of January 1, 2022** | - | 214,250 | - | (112,526) | 101,724 | 31,585 | **133,309** |
| Profit for the Year | - | - | - | 11,471 | 11,471 | 1,623 | 13,094 |
| Other Comprehensive Income | - | 4,373 | - | - | 4,373 | 1,158 | 5,531 |
| Total Comprehensive Income for the Year | - | 4,373 | - | 11,471 | 15,844 | 2,781 | 18,625 |
| Distributions to Owners and Non-Controlling Interests | - | - | - | (9,048) | (9,048) | (2,653) | (11,701) |
| Capital Contributions by Owners and Non-Controlling Interests | 604 | - | - | - | 604 | 6 | 610 |
| **Balance as of December 31, 2022** | 604 | 218,623 | - | (110,103) | 109,124 | 31,719 | 140,843 |

**SIMAD Holdings Ltd**

**Pro Forma Consolidated Statements of Cash Flows (in thousands of USD)**

| | For the Year Ended December 31 | | |
|---|---|---|---|
| | **2024** | **2024** | **2024** |
| **Cash Flows from Operating Activities:** | | | |
| Profit for the Period | 10,500 | 11,459 | 13,094 |
| Adjustments for: | | | |
| Company's Share in Profits of Equity-Accounted Investees, Net | (1,522) | (1,220) | (603) |
| Depreciation | 15,187 | 13,695 | 11,746 |
| Finance Expenses, Net | 11,547 | 11,569 | 4,139 |
| Changes in Assets and Liabilities: | | | |
| Increase in Advances from Customers | 3,125 | 64 | 18,630 |
| Decrease (Increase) in Other Receivables and Debit Balances | 225 | 366 | (420) |
| Increase (Decrease) in Trade Payables and Credit Balances | 1,063 | (300) | 3,246 |
| Cash Generated from Operating Activities | 40,125 | 35,633 | 49,832 |
| Dividends Received from Equity-Accounted Investees (see Note 4) | 1,720 | 1,373 | 1,547 |
| **Net Cash Provided by Operating Activities** | 41,845 | 37,006 | 51,379 |
| **Cash Flows from Investing Activities:** | | | |
| Purchases and Investments in Property, Plant and Equipment | (9,957) | (11,308) | (58,936) |
| **Net Cash Used in Investing Activities** | (9,957) | (11,308) | (58,936) |
| **Cash Flows from Financing Activities:** | | | |
| Proceeds from Long-Term Loans from Banks and Others | 500 | 19,033 | 136,974 |
| Repayment of Long-Term Loans from Banks and Others | (8,454) | (10,666) | (72,384) |
| Capital Contributions by Owners | 81 | 1,029 | 604 |
| Distributions to Owners | (12,936) | (7,139) | (9,048) |
| Capital Contributions by Non-Controlling Interests | 49 | - | 6 |
| Distributions to Non-Controlling Interests | (2,497) | (2,093) | (2,653) |
| Related Parties, Net | (3,133) | (21,030) | (37,441) |
| Interest Paid | (11,366) | (11,404) | (6,750) |
| Acquisition of Non-Controlling Interests | - | (1,000) | - |
| **Net Cash Provided by (Used in) Financing Activities** | (37,756) | (33,270) | 9,308 |
| **Increase (Decrease) in Cash and Cash Equivalents** | (5,868) | (7,572) | 1,751 |
| **Cash and Cash Equivalents at Beginning of Year** | 9,531 | 17,103 | 15,352 |
| **Cash and Cash Equivalents at End of Year** | 3,663 | 9,531 | 17,103 |

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Consolidated Financial Statements (in thousands of USD)**

**Note 1 – General:**

A. **General**

SIMAD Holdings Ltd (the “Company”) was incorporated on May 28, 2025, as a private company under the laws of the British Virgin Islands pursuant to the BVI Business Companies Act, 2004, with no assets, liabilities, or operations (except for share capital). The Company was established for the purpose of raising capital through the issuance of non-convertible debentures on the Tel Aviv Stock Exchange.

The Company is controlled by SIMAD Holdings LLC, a limited liability company ultimately controlled by the brothers Mr. Michael Shabsels and Mr. David Shabsels (the “Ultimate Controlling Shareholders”). SIMAD Holdings LLC has undertaken that, prior to the listing of the debentures for trading on the stock exchange, it will transfer to the Company its rights in entities that indirectly hold interests in 30 real estate properties in the United States (the “Transferred Entities”), in exchange for the issuance of shares by the Company (the “Transfer” or the “Acquisition”). Prior to the transfer, the Transferred Entities were held by SIMAD Holdings LLC (the “Parent Entity”).

As of the date of the financial statements, the Company’s main activity is the operation of summer camps in the United States, located on real estate properties owned by the Company.

The completion of the acquisition is subject to the fulfillment of two key conditions:

1. Completion of the debenture issuance;
2. Approvals from various financial institutions that hold liens on the assets owned by the Transferred Entities;
3. Execution of several agreements that have not yet been signed, which essentially govern the transfer of the controlling shareholder’s rights in the real estate holding companies to the Company.
   The required agreements and approvals will be obtained prior to the acquisition date.

**Note 1 – General (cont.):**

As the entities that will be transferred, are controlled by the same controlling shareholders both before and after the acquisition, the transaction does not fall within the scope of IFRS 3 (Business Combinations).

The Company accounted for the acquisition using the pooling of interests method. The Company also prepared pro forma consolidated financial statements to reflect the acquisition as if it had occurred at the beginning of the earliest period presented in the financial statements (January 1, 2022). Accordingly, the pro forma consolidated financial statements:

- Reflect the financial position, results of operations, and cash flows of the Company and the Transferred Entities on a consolidated basis;
- Recognize the assets and liabilities of the Transferred Entities as of December 31, 2021, or their acquisition date (whichever is later), based on their book value in the Ultimate Controlling Shareholders' records at that time;
- Reflect assets acquired and liabilities assumed by the Transferred Entities after December 31, 2021, from the date they were initially recognized by the Transferred Entities.

The transfer of the rights in the Transferred Entities to the Company will be made on an "AS IS" basis as of the date of the transfer, and the Company will not be entitled to any indemnification from the transferring entities regarding the transferred rights. It is clarified that, following the completion of the transfer of rights to the Company, the Company will not be subject to any restrictions on the sale of these rights or of the underlying assets, except for the requirement to obtain lender approvals for any sale or transfer.

B. **Definitions**

In these financial statements:

| | | |
|---|---|---|
| The Group | - | The Company and its subsidiaries |
| Subsidiaries | - | Companies controlled by the Company (as defined in IFRS 10) |
| Related Parties | - | As defined in IAS 24 |
| Held Companies | - | Subsidiaries |
| Interested Parties | - | As defined in the Securities Regulations (Annual Financial Statements), 2010. |
| Dollar | - | U.S. Dollar (USD). |

**C. Working Capital Deficit**

As of December 31, 2024, the Company had a working capital deficit of approximately $64 million.

The primary reason for the deficit is customer advances totaling approximately $62.8 million, received for registration in summer camps in the United States.

The Company estimates that it is capable of meeting its obligations in the foreseeable future, primarily through positive cash flows from operating activities and other actions, if required, that would enable it to meet its current obligations and finance its operations.

**Note 2 – Summary of Significant Accounting Policies:**

**A. Compliance with IFRS**

The pro forma consolidated financial statements comply with the provisions of the International Financial Reporting Standards (IFRS accounting standards).

**B. Basis of preparation of the Financial Statements**

The pro forma annual consolidated financial statements include the additional disclosures required under the Israeli Securities Regulations (Annual Financial Statements), 2010.

The Company's operating cycle is up to 12 months.

The accounting policies were applied consistently throughout all reporting periods presented in the pro forma financial statements.

The financial statements were prepared based on the historical cost principle, except for property, plant and equipment used as summer camps, which are measured under the revaluation model.

Information regarding management's judgments (other than those involving estimates described in Note 2C below), which significantly affect the amounts recognized in the financial statements, is provided in Note 4.

**C. Key Assumptions in the Use of Critical Estimates and Significant Judgments**

The preparation of the financial statements in accordance with IFRS requires management to make estimates and assumptions that affect the amounts presented. These estimates may involve judgment in an environment of uncertainty and have a material impact on the presentation of the financial statements. The following describes the key assumptions used in making significant accounting estimates applied in preparing the financial statements, where management was required to make assumptions about circumstances and events involving significant uncertainty. In making these estimates, management relies on past experience, various facts, external factors, and reasonable assumptions according to the circumstances. Actual results may differ from these estimates.

**Property, Plant and Equipment (PPE) –**

At the end of each reporting period, the Company evaluates the fair value of the summer camp properties using independent appraisers. The commonly used valuation method is the "income capitalization approach". The applicable discount rate is determined based on asset-specific risk factors. Management reviews the estimates at each reporting period end. For further details on valuation techniques and assumptions used in the fair value measurement of PPE – see Note 4.

**Useful Life of PPE –**

Useful life is based on management's assessment of the period in which assets are expected to generate economic benefits. These assessments are reviewed at year-end to determine whether they remain appropriate. Changes in these estimates may materially impact depreciation expenses, including for assets measured at revalued amounts as a result of revaluation.

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Consolidated Financial Statements (in thousands of USD)**

**Note 2 – Summary of Significant Accounting Policies (cont.):**

**D. Fair Value**

1. Fair Value Measurement

The Company measures fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

When the price for an identical asset or liability is not observable (i.e., there is no quoted price in an active market), the Company measures fair value using another valuation technique that is appropriate under the circumstances and for which sufficient data is available to measure fair value. The Company maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs.

The Company measures fair value assuming that the transaction to sell the asset or transfer the liability takes place in the principal market for the asset or liability to which the Company has access; or, in the absence of a principal market, in the most advantageous market to which the Company has access.

When measuring the fair value of a non-financial asset, the Company considers a market participant's ability to generate economic benefits by using the asset in its highest and best use or by selling it to another market participant who would use the asset in its highest and best use.

2. Fair Value Hierarchy

For disclosure purposes, the Company classifies fair value measurements using the fair value hierarchy that reflects the significance of the inputs used in making the measurement:

Level 1 – Quoted (unadjusted) prices in active markets for identical assets or liabilities.

Level 2 – Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly.

Level 3 – Unobservable inputs for the asset or liability.

When fair value measurements are based on inputs from different levels of the hierarchy, the entire fair value measurement is classified in the lowest level input that is significant to the entire measurement. The Company exercises judgment in assessing the significance of particular inputs to the fair value measurement in its entirety, taking into account asset- or liability-specific factors.

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Consolidated Financial Statements (in thousands of USD)**

**Note 2 – Summary of Significant Accounting Policies (cont.):**

**E. Consolidated Financial Statements**

1. Subsidiaries

The Company controls an investee when it is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. The Company reassesses control when facts and circumstances indicate changes in one or more of the elements of control.

The consolidated financial statements include the financial statements of the Company and its subsidiaries as if they were a single economic entity, from the date control is obtained until the date it is lost. Intercompany balances, income and expenses, gains and losses, and cash flows from transactions between group entities are eliminated in full.

The financial statements of the subsidiaries are prepared using uniform accounting policies consistent with those of the Company for similar transactions and events under similar circumstances.

2. Non-Controlling Interests

Non-controlling interests represent the portion of equity in subsidiaries that is not attributable, directly or indirectly, to the Company.

**F. Business Combinations**

When the Group obtains control of one or more businesses (the "acquiree"), the business combination is accounted for using the acquisition method.

**G. Investments Accounted for Using the Equity Method**

The Group's investments in associates and joint ventures are accounted for using the equity method.
.

**H. Functional Currency, Presentation Currency, and Foreign Currency**

The functional currency of the Company and its subsidiaries, as well as the presentation currency of the financial statements, is the U.S. dollar (USD).

**I. Cash Equivalents**

Cash equivalents include short-term investments with high liquidity that are readily convertible to known amounts of cash and which are subject to an insignificant risk of changes in value. These are investments with original maturities of three months or less from the date of acquisition.

**Note 2 – Summary of Significant Accounting Policies (cont.):**

**J. Short-Term Restricted Cash**

Short-term restricted cash includes deposits in financial institutions with original maturities exceeding three months from the investment date, or for which there are restrictions on their use, and which do not meet the definition of cash equivalents. These deposits are presented based on their terms and expected dates of use.

**K. Financial Instruments**

1. Financial Assets

Financial assets within the scope of the standard are initially measured at fair value plus directly attributable transaction costs, except for financial assets measured at fair value through profit or loss, for which transaction costs are expensed immediately in profit or loss. At initial recognition, the classification of financial assets for subsequent measurement is determined.

Subsequent to initial recognition, financial assets that are debt instruments are classified and measured according to one of the following three categories: Amortized cost, Fair value through profit or loss (FVTPL) or Fair value through other comprehensive income (FVOVI).

Debt instruments are classified into one of the above categories based on the following criteria:

(a) The Company's business model for managing the financial assets, and

(b) The contractual cash flow characteristics of the financial asset.

Debt instruments are classified under amortized cost only if they are held within a business model whose objective is to hold the assets to collect contractual cash flows, and the contractual terms give rise on specified dates to cash flows that are solely payments of principal and interest.

For the purpose of this test "Principal" is the fair value of the financial asset at initial recognition . "Interest" is consideration for the time value of money and the credit risk associated with the outstanding principal amount, and may also include compensation for other basic lending risks (such as liquidity risk) and a reasonable profit margin.

These assets are initially measured at fair value plus directly attributable transaction costs, except for trade receivables which are initially measured at transaction price. After initial recognition, such assets are measured at amortized cost. Short-term credit instruments (e.g., trade receivables) are presented according to their terms, usually at nominal value. Gains and losses are recognized in profit or loss upon derecognition or upon recognition of impairment.

Financial assets are not reclassified after initial recognition unless—and only if—the Company changes its business model for managing financial assets. In such cases, affected financial assets are reclassified at the beginning of the subsequent reporting period.

**Note 2 – Summary of Significant Accounting Policies (cont.):**

**K. Financial Instruments (cont.)**

2. Financial Liabilities

A financial liability is recognized when the Company becomes a party to the contractual provisions of the instrument. All of the Company's financial liabilities are classified under the category of financial liabilities measured at amortized cost. These include liabilities such as bank loans and debentures.

Financial liabilities in this category are initially measured at fair value less directly attributable transaction costs. Subsequently, they are measured at amortized cost using the effective interest method, which takes into account directly attributable transaction costs.

3. Impairment of Financial Assets and Its Reversal

At each reporting date, the Company assesses the loss allowance for financial instruments measured at amortized cost.

For financial assets with short credit terms of up to one year, such as other receivables, the loss allowance is measured at an amount equal to the expected credit losses over the life of the instrument — that is, until its settlement.

Expected credit losses represent a probability-weighted estimate of credit losses. These losses are measured as the present value of the difference between the cash flows the Company is contractually entitled to receive and the cash flows the Company expects to receive. The expected credit losses are discounted using the financial asset's effective interest rate.

Any impairment loss, if applicable, is recognized in profit or loss against an allowance that offsets the carrying amount of the financial asset.

**Note 2 – Summary of Significant Accounting Policies (cont.):**

**L. Property, Plant and Equipment**

The Company's property, plant and equipment includes summer camps and is initially recognized at cost, including costs directly attributable to the acquisition of the asset and bringing it to the location and condition necessary for its intended use. In subsequent periods, the Company applies the revaluation model. The Company depreciates separately each significant part of property, plant and equipment that has a cost that is significant in relation to the total cost of the item. At the revaluation date, the gross carrying amount of the asset is adjusted in a manner that is consistent with the revalued amount. The accumulated depreciation at the date of revaluation is adjusted so that the carrying amount of the asset equals its revalued amount. Revaluations of property, plant and equipment used in summer camps are performed with sufficient regularity to ensure that the carrying amount does not differ materially from the fair value at the end of the reporting period.

An increase in the carrying amount of an asset resulting from a revaluation is recognized in other comprehensive income and accumulated in equity under a revaluation reserve. However, the increase is recognized in profit or loss to the extent that it reverses a revaluation decrease of the same asset previously recognized in profit or loss. A decrease in the carrying amount of an asset resulting from a revaluation is recognized in profit or loss. However, the decrease is recognized in other comprehensive income to the extent of any credit balance existing in the revaluation reserve in respect of that asset in equity. The Company transfers the revaluation surplus directly to retained earnings when the asset is derecognized.

Depreciation expenses are recognized in profit or loss for each period. To allocate the depreciable amount of property, plant and equipment systematically over its useful life, the Company uses the straight-line depreciation method, which reflects the pattern in which the Company expects to consume the future economic benefits of the asset (see Note 4).

The Company reviews the residual value, useful life, and depreciation method of its property, plant and equipment at least at each year-end. Any changes are accounted for as changes in accounting estimates. The Company does not recognize in the carrying amount of an item of property, plant and equipment the costs of day-to-day servicing. These costs are recognized in profit or loss as incurred. The Company recognizes the cost of replacing parts of certain items of property, plant and equipment in the carrying amount of the item when it is probable that future economic benefits will flow from the item and the carrying amount of the replaced part is derecognized.

**M. Revenue Recognition**

The Company recognizes revenue only from inflows of economic benefits that it receives or is entitled to receive for its own benefit.

Revenue is measured at the fair value of the consideration received or receivable.

Revenue from hospitality and leisure services is recognized based on the stage of completion of the service arrangement at the end of the reporting period. Under this method, revenue is recognized in the reporting period in which the services are rendered.

**Note 2 – Summary of Significant Accounting Policies (cont.):**

**N. Income Taxes**

Under the tax laws applicable to companies incorporated in the British Virgin Islands (BVI) and in the United States, the companies within the Group are treated as pass-through entities for income tax purposes. Accordingly, no federal or state income taxes in the U.S., or any tax benefits, are recognized in the financial statements, as taxable income or tax losses are reported in the shareholders' individual tax returns.

**O. Initial Application of New Standards**

The following information relates to amendments to standards that the Company has applied for the first-time beginning January 1, 2024.

Classification of Liabilities as Current or Non-Current and Non-Current Liabilities with Covenants – Amendments to IAS 1 "Presentation of Financial Statements" (collectively referred to as "the IAS 1 Amendments")

A summary of the key amendments to IAS 1 is presented below:

- The right to defer settlement of a liability for at least twelve months after the reporting period must be substantive and must exist at the end of the reporting period. The Company's right to defer settlement of a liability arising from a loan arrangement for at least twelve months may be subject to compliance with financial covenants. Such covenants:
  - Affect whether the right exists at the end of the reporting period, if the Company is required to comply with them on or before the reporting date, even if compliance is assessed after the reporting date.
  - Do not affect whether the right exists at the end of the reporting period, if the Company is required to comply with them only after the reporting period.
- The classification criterion based on the existence of a right to defer settlement for at least twelve months after the reporting period is not affected by management's intentions or expectations regarding the exercise of that right or the actual settlement of the liability within twelve months after the reporting date.
- For the purposes of classification as current or non-current, "settlement" refers to the transfer to the counterparty that results in extinguishment of the liability — such as the transfer of cash, other economic resources (e.g., goods or services), or equity instruments — unless the liability involves the transfer of equity instruments arising from a conversion option classified as an equity instrument and recognized separately as the equity component of a compound financial instrument.

-

**Note 2 – Summary of Significant Accounting Policies (cont.):**

**O. Initial Application of New Standards (cont.)**

- Additional disclosure requirements have been introduced regarding settlements after the reporting period for liabilities classified as non-current, as well as information that enables users of the financial statements to understand the risk that liabilities arising from loan arrangements classified as non-current — but subject to compliance with financial covenants within twelve months of the reporting period — may become repayable within that period.

The IAS 1 Amendments are applied retrospectively for annual periods beginning on or after January 1, 2024.

**P. New Standards Not Yet Adopted**

International Financial Reporting Standard 18, Presentation and Disclosure in Financial Statements (“IFRS 18” or “the new standard”)

IFRS 18, issued in April 2024, is intended to improve comparability and transparency in the reporting of entities’ financial performance. The new standard replaces IAS 1 Presentation of Financial Statements and does not address recognition or measurement of items in the financial statements.

The following is a summary of the main changes that will affect the financial statements upon adoption of IFRS 18, in comparison to the current presentation and disclosure requirements:

- The new standard will restructure the statement of profit or loss, introducing three newly defined categories: Operating, Investing, and Financing. It will also add two new subtotals: Operating profit and Profit before financing and income taxes.
- IFRS 18 introduces guidance on disclosures of management-defined performance measures (MPMs).
- The standard provides guidance on aggregation and disaggregation of information in the financial statements, including determining whether information should be presented in the primary statements or in the notes, and with respect to items labeled as “other”.
- IFRS 18 includes amendments to other standards, including limited amendments to IAS 7 Statement of Cash Flows.

IFRS 18 is to be applied retrospectively for annual periods beginning on or after January 1, 2027, with specific disclosure requirements as outlined in the transition provisions of the standard. Early adoption is permitted, provided that such adoption is disclosed.

The Company is currently evaluating the potential impact of IFRS 18 on its financial statements but is not yet able to estimate the effect. Any impact will relate solely to presentation and disclosure matters.

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Consolidated Financial Statements (in thousands of USD)**

**Note 3 – Investment in Investee Companies:**

**A. Investments in Associates:**

1. **General Information Regarding the Company's Associates:**

| Property | Name of the Direct Holding Company of the Property (*) | Equity Interest in the Project Company (Direct and/or Indirect), as of: | | Company's Equity Interest in the Project Company, Adjusted for Future Profit Distribution Preference Mechanism (Direct and/or Indirect) (**) | |
|---|---|---|---|---|---|
| | | % | | % | |
| | | December 31 | | December 31 | |
| | | 2024 | 2023 | 2024 | 2023 |
| Willow Lake | Willow Lake Day Camps, LLC<br>Willow Lake Land Corporation | 50.0% | 50.0% | 50.0% | 50.0% |

(*) All of the entities listed above were incorporated in the United States, which is also their place of business activity.

2. **Information on Material Associates Accounted for Using the Equity Method:**

The following is summarized financial information regarding the financial position and results of operations of the investee company, prepared in accordance with IFRS and the Company's accounting policy (equity method measurement), without adjustments for the Company's ownership interest:

Willow Lake Day Camps, LLC & Willow Lake Land Corporation (Willow Lake)

| | December 31 2024 | December 31 2023 |
|---|---|---|
| | Audited | |
| Current Assets | 4,607 | 1,293 |
| Property, Plant and Equipment | 36,600 | 35,500 |
| Current Liabilities | (5,101) | (2,715) |
| Non-Current Liabilities | (1,759) | - |
| Net Assets | 34,347 | 34,078 |
| **Carrying Amount of the Investment in the Associate** | 17,173 | 17,038 |

| | For the Year Ended December 31 2024 | 2023 | 2022 |
|---|---|---|---|
| | Audited | | |
| Revenue | 10,664 | 9,222 | 8,080 |
| Profit for the Period | 3,042 | 2,441 | 1,206 |
| Total Comprehensive Income for the Period | 3,709 | 3,787 | 2,706 |
| **Dividends Received by the Group from the Associate** | 1,720 | 1,373 | 1,547 |

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Consolidated Financial Statements (in thousands of USD)**

**Note 3 – Investment in Investee Companies (cont.):**

**B. Investments in Subsidiaries:**

**General Information Regarding the Company's Subsidiaries:**

| Property | Name of the Direct Holding Company of the Property (*) | Equity Interest in the Project Company (Direct and/or Indirect), as of: | | Company's Equity Interest in the Project Company, Adjusted for Future Profit Distribution Preference Mechanism (Direct and/or Indirect) | |
|---|---|---|---|---|---|
| | | % | | % | |
| | | December 31 | | December 31 | |
| | | 2024 | 2023 | 2024 | 2023 |
| Achim | Achim Operatingco LLC<br>Achim Landco LLC | 100.00% | 100.00% | 100.00% | 100.00% |
| Banner | Banner Landco LLC<br>Banner Operatingco LLC | 90.00% | 90.00% | 90.00% | 90.00% |
| Blue Star | Bluestar Operatingco, LLC<br>Bluestar Landco, LLC | 70.00% | 70.00% | 70.00% | 70.00% |
| Chateaugay | Chateaugay Landco LLC<br>Chateaugay Campco LLC | 100.00% | 100.00% | 100.00% | 100.00% |
| Chen-A-Wanda (BAHS) | BAHS Operating Inc. (dba Camp Chen-a-Wanda)<br>BAHS Holdings LLC | 51.00% | 51.00% | 51.00% | 51.00% |
| Club Getaway | Club Getaway Operatingco, LLC<br>Club Getaway Landco, LLC | 80.00% | 80.00% | 80.00% | 80.00% |
| Country Roads | Country Roads Landco LLC<br>Country Roads Operatingco LLC | 99.00% | 99.00% | 99.00% | 99.00% |
| Eagles Landing | Mill Road Landco LLC<br>Eagle's Landing Day Camp LLC | 100.00% | 100.00% | 100.00% | 100.00% |
| ECHO (SHAB) | Shab Operating Inc.<br>Shab Holdings LLC | 100.00% | 100.00% | 100.00% | 100.00% |
| Green Lane | Green Lane Landco, LLC<br>Green Lane Operatingco, LLC | 51.00% | 51.00% | 51.00% | 51.00% |
| Greenville Land (Malka) | Greenvilleland LLC<br>Malka Operatingco LLC | 100.0% | 100.0% | 100.0% | 100.0% |
| IAFA | IAFALANDCO, LLC | 99.0% | 99.0% | 99.0% | 99.0% |
| Island Lake | Island Lake Landco LLC<br>Island Lake Campco LLC | 99.0% | 99.0% | 99.0% | 99.0% |
| Kiwi | Kiwi Operatingco LLC<br>Kiwi Landco LLC | 62.5% | 62.5% | 62.5% | 62.5% |

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Consolidated Financial Statements (in thousands of USD)**

**Note 3 – Investment in Investee Companies (cont.):**

**B. Investments in Subsidiaries (cont.):**

**General Information Regarding the Company's Subsidiaries (cont.):**

| Property | Name of the Direct Holding Company of the Property (*) | Equity Interest in the Project Company (Direct and/or :Indirect), as of | | Company's Equity Interest in the Project Company, Adjusted for Future Profit Distribution Preference Mechanism (Direct and/or Indirect) | |
|---|---|---|---|---|---|
| | | % | | % | |
| | | December 31 | | December 31 | |
| | | 2024 | 2023 | 2024 | 2023 |
| Lavi | Lavco LLC<br>Lavland LLC | 99.0% | 99.0% | 99.0% | 99.0% |
| Lokanda | RDM Camps, LLC | 75.0% | 75.0% | 75.0% | 75.0% |
| Meadowbrook | Meadowbrook Operatingco LLC<br>Meadowbrook Landco LLC | 99.0% | 99.0% | 99.0% | 99.0% |
| Med-O-Lark | Camp Med-O-Lark, Inc.<br>Washington Lake, LLC | 100.0% | 100.0% | 100.0% | 100.0% |
| Mesorah | Mesorahco LLC<br>Mesorahland LLC | 75.0% | 75.0% | 75.0% | 75.0% |
| Mogenavco | Mogenavco LLC<br>Mogenavland LLC | 100.0% | 100.0% | 100.0% | 100.0% |
| Mohawk | Mohawkcampco LLC<br>Mohawkland LLC<br>Mohawk Country Day School, Inc. | 100.0% | 100.0% | 100.0% | 100.0% |
| New England Golf & Tennis (Belgrade) | Belgrade Lakes Summer Camps LLC | 99.0% | 99.0% | 99.0% | 99.0% |
| North Star (Poland) | Poland Landco LLC | 99.0% | 99.0% | 99.0% | 99.0% |
| Pine Forest | Pine Forest Campco LLC<br>Pine Forest Landco LLC | 80.0% | 80.0% | 80.0% | 80.0% |
| Rolling Hills | Rolling Hills Landco LLC<br>Rolling Hills Operatingco LLC | 99.0% | 99.0% | 99.0% | 99.0% |
| Summit | Summit Camp, LLC | 51.0% | 51.0% | 51.0% | 51.0% |
| Waukeela | Waukeela Operatingco LLC<br>Waukeela Landco LLC | 99.0% | 99.0% | 99.0% | 99.0% |
| Wekeela | Wekeeland LLC<br>Mainewekeelaco LLC | 99.0% | 99.0% | 99.0% | 99.0% |
| WM Camp (Windsor Mt) | WM Camp, LLC<br>WM Land, LLC | 51.0% | 51.0% | 51.0% | 51.0% |

(*) All of the entities listed above were incorporated in the United States, which is also their place of business activity.

(**) In entities where the ownership interest is 99%, the remaining interest is held by the controlling shareholder.

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Consolidated Financial Statements (in thousands of USD)**

**Note 4 – Property, Plant and Equipment:**

**A. Composition:**

| | Land and Buildings of Summer Camps | Furniture, Equipment and Others | Total |
|---|---|---|---|
| Cost | | | |
| Balance as of January 1, 2023 | 445,484 | 25,004 | 470,488 |
| Additions during the year | 10,304 | 1,004 | 11,308 |
| Revaluation surplus | 42,516 | - | 42,516 |
| Balance as of December 31, 2023 | 498,304 | 26,008 | 524,312 |
| Additions during the year | 9,384 | 573 | 9,957 |
| Revaluation surplus | 49,186 | - | 49,186 |
| Balance as of December 31, 2024 | 556,874 | 26,581 | 583,455 |
| Accumulated Depreciation | | | |
| Balance as of January 1, 2023 | (84,166) | (11,252) | (95,418) |
| Additions during the year | (11,195) | (2,500) | (13,695) |
| | (13,464) | - | (13,464) |
| Balance as of December 31, 2023 | | | |
| Additions during the year | (108,825) | (13,752) | (122,577) |
| | (12,586) | (2,601) | (15,187) |
| Balance as of December 31, 2024 | (16,991) | - | (16,991) |
| Depreciated Cost as of December 31, 2024 | (138,402) | (16,353) | (154,755) |
| Depreciated Cost as of December 31, 2023 | 418,472 | 10,228 | 428,700 |

The value of the pledged assets as of December 31,2024 is $428,700 thousands.

**B. Additional Information:**

The depreciation method used by the Company for depreciating property, plant and equipment is the straight-line method. The useful lives of the buildings and equipment of the summer camps were determined based on the Company's estimates.

**C. Revaluation Model:**

**1. Valuation Techniques and Inputs Used in Fair Value Measurements:**

The fair value of property, plant and equipment was measured by an external independent appraiser with relevant professional qualifications and experience in the location and type of assets being measured.

The fair value measurement of property, plant and equipment was classified as Level 3 and was performed based on the discounted cash flow (DCF) method, applying a discount rate appropriate to those projected cash flows:

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Consolidated Financial Statements (in thousands of USD)**

**Note 4 – Property, Plant and Equipment (cont.):**

**C. Revaluation Model (cont.):**

**1. Valuation Techniques and Inputs Used in Fair Value Measurements (cont.):**

| Valuation Technique | Unobservable Inputs | 31.12.2024 | 31.12.2023 |
|---|---|---|---|
| Discounted Cash Flows | Discount Rate | 9.00%-11.00% | 9.50%-11.50% |

**2. The carrying amount that would have been recognized under the cost model for each class of property, plant and equipment if the assets were carried under the cost model:**

| | 31.12.2024 | | | 31.12.2023 | | |
|---|---|---|---|---|---|---|
| | Cost | Accumulated Depreciation | Carrying Amount | Cost | Accumulated Depreciation | Carrying Amount |
| **Total** | 324,899 | (214,897) | 110,002 | 314,942 | (200,356) | 114,586 |

**Note 5 – Loans from Banks and Others:**

**A. Composition:**

| | Final Maturity Date (*) | Interest Index | Interest Rate (*) | 31.12.2024 | 31.12.2023 |
|---|---|---|---|---|---|
| Fixed Interest | 2041 | | 3.50% | 24,876 | 26,656 |
| Fixed Interest | 2028-2042 | | 5.28%-9.50% | 38,289 | 38,369 |
| Fixed Interest | 2026-2050 | | 1.00%-4.50% | 19,414 | 19,584 |
| Fixed Interest | 2031 | | 7.50% | 5,681 | 5,910 |
| Variable Interest | 2032 | SOFR+2.1% | 6.65% | 71,333 | 75,333 |
| Variable Interest | 2027 | SOFR+2.6% | 7.13% | 13,500 | 14,188 |
| Variable Interest | 2032-2041 | SOFR+2%<br>WSJ Prime Rate | 6.67%-7.50% | 13,119 | 13,798 |
| Other Loans | | | | 646 | 974 |
| **Total Loan Balance** | | | | **186,858** | **194,812** |
| עלויות גיוס נדחות | | | | (1,257) | (1,438) |
| **Total Loan Balance, Net** | | | | **185,601** | **193,374** |
| Current Liabilities | | | | 9,016 | 8,984 |
| Non-Current Liabilities | | | | 176,585 | 184,390 |

(*) As of December 31, 2024

**Note 5 – Loans from Banks and Others (Cont):**

**B. Additional Information:**

1. Financial Covenants - Certain loan agreements include requirements for financial covenants at the property company level, for example, relating to DSCR (Debt Service Coverage Ratio) and LTV (Loan to Value). As of the reporting date, the Company is in compliance with all specified financial covenants.
2. The controlling shareholder, directly or indirectly, usually provides guarantees to lenders to secure the obligations of the group companies under agreements entered into by the group companies
3. The company's assets are pledged to secure the loans obtained.

**Note 6 – Trade Payables and Credit Balances:**

**Composition:**

**Current Liabilities:**

| | As of December, 31 | |
|---|---|---|
| | **2024** | **2023** |
| Trade Payables | 2,274 | 2,506 |
| Accrued Expenses and Other Liabilities | 1,860 | 966 |
| | 4,134 | 3,472 |

**Non-Current Liabilities:**

| | As of December, 31 | |
|---|---|---|
| | **2024** | **2024** |
| Provision for Employee Severance Benefits | 4,765 | 4,365 |
| | 4,765 | 4,365 |

**Note 7 – Advances from Customers:**

Represents advances received from customers for registration to summer camps scheduled to take place during the summer months.

**Note 8 – Equity:**

As described in Note 1 above, the Company was incorporated on May 28, 2025. As of the date of incorporation, the Company had 1,000 shares with no par value.

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Consolidated Financial Statements (in thousands of USD)**

**Note 9 – Cost of Revenues:**

| | For the year ended December 31 | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Depreciation | 15,187 | 13,695 | 11,746 |
| Salaries and Wages | 58,316 | 56,286 | 46,224 |
| Infrastructure and Energy | 2,824 | 2,835 | 2,552 |
| Maintenance and Operations | 47,341 | 47,539 | 41,760 |
| Property Taxes | 2,418 | 2,562 | 2,583 |
| Insurance | 3,027 | 2,743 | 2,799 |
| Property Management Fees | 785 | 926 | 528 |
| Professional Services | 1,517 | 1,651 | 1,673 |
| Other | 346 | 261 | 446 |
| | 131,761 | 128,498 | 110,311 |

**Note 10 – Finance Expenses:**

| | For the year ended December 31 | | |
|---|---|---|---|
| | **2024** | **2024** | **2024** |
| Interest and fees to banking corporations and other credit providers | 11,779 | 11,602 | 7,002 |
| Amortization of discount on loans from banking corporations and others | 181 | 165 | 157 |
| | 11,960 | 11,767 | 7,159 |

**Note 11 – Financial instruments:**

**A. Risk Management Policy:**

The Company's activities expose it to various financial risks. The Company's risk management program focuses on minimizing potential adverse effects on the Company's financial performance. Risk management is carried out by management.

**B. Credit Risk:**

The Company does not anticipate any material credit risk with respect to the balances of various receivables, including restricted cash.

**C. Interest Rate Risk:**

The Company is exposed to changes in the U.S. federal interest rate. An increase in the aforementioned interest rate may limit the Company's ability to refinance its assets by replacing existing higher-interest loans with new loans at lower interest rates.

**D. Liquidity Risk:**

Liquidity risks arise from the Company's working capital management, as well as from financing expenses and principal repayments related to the Company's debt instruments.

.**Note 11 – Financial instruments (cont.):**

**D. Liquidity Risk:**

The Company's policy is to ensure that sufficient cash is held to meet its obligations as they fall due. To achieve this objective, the Company seeks to maintain adequate cash balances (or appropriate credit lines). In order to meet expected cash requirements, the Company reviews cash flow forecasts on a monthly basis, including information on cash balances.

As of the end of the reporting period, these forecasts indicate that the Company expects to have sufficient liquid resources to cover all of its obligations under reasonable assumptionsThe following is an analysis of the contractual maturity dates of financial liabilities, based, where relevant, on undiscounted cash flows using interest rates applicable as of the end of the reporting period:

| | December 31, 2024 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Up to 1 Year | 1 to 2 Years | 2 to 3 Years | 3 to 4 Years | 4 to 5 Years | Over 5 Years | Total |
| Trade receivables and debit balances | 4,134 | - | - | - | - | 4,765 | 8,899 |
| Loans from banks and financial institutions | 20,990 | 26,082 | 37,362 | 29,531 | 16,522 | 282,021 | 412,508 |
| | 25,124 | 26,082 | 37,362 | 29,531 | 16,522 | 286,786 | 421,407 |

| | December 31, 2023 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Up to 1 Year | 1 to 2 Years | 2 to 3 Years | 3 to 4 Years | 4 to 5 Years | Over 5 Years | Total |
| Trade receivables and debit balances | 3,472 | - | - | - | - | 4,365 | 7,837 |
| Loans from banks and financial institutions | 20,200 | 20,848 | 28,929 | 40,776 | 22,104 | 382,736 | 515,593 |
| | 23,672 | 20,848 | 28,929 | 40,776 | 22,104 | 387,101 | 523,430 |

**Note 12 – Related parties and interested parties:**

**A. Balances with related parties and interested parties:**

| | As of December, 31 | |
|---|---|---|
| | **2024** | **2023** |
| Related parties – debit balances (1) | 7,639 | 4,506 |

(1) From time to time, in the ordinary course of business, the company has provided loans to the controlling shareholders (directly and/or through entities under their control), and the controlling shareholders have provided loans to the company. The balance was repaid during the third quarter of 2025. Finance income has been recognized in respect of these balances, as detailed in Section B below..

**B. Transactions with related parties and interested parties:**

| | For the Year ended December 31 | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Management fees in consolidated companies | 580 | 580 | 390 |
| Insurance (1) | 3,027 | 2,743 | 2,799 |
| Finance income | 399 | 191 | - |

(1) Payment to the parent company for back-to-back insurance coverage.

*The following translation is intended solely for the convenience of the reader although every effort has been made to ensure its accuracy. Only the original Hebrew text of the Written Representation is binding.*

# SIMAD Holdings, Ltd

# Pro Forma Condensed Consolidated Financial Statements as of JUNE 30, 2025

**(Unaudited)**

# SIMAD Holdings, Ltd

## Pro Forma Condensed Consolidated Financial Statements as of June 30, 2025

### Table of Contents


| | Page |
|---|---|
| Review Report of the Independent Auditor | 1 |
| Pro Forma Condensed Consolidated Statements of Financial Position | 2 |
| Pro Forma Condensed Consolidated Statements of Profit or Loss and Other Comprehensive Income | 3 |
| Pro Forma Condensed Consolidated Statements of Changes in Equity | 4-6 |
| Pro Forma Condensed Consolidated Statements of Cash Flows | 7 |
| Notes to the Pro Forma Condensed Consolidated Financial Statements | 8-10 |

**Independent Auditor's Review Report to the Shareholders of SIMAD Holdings, Ltd**

*Introduction*

We have reviewed the accompanying pro forma condensed consolidated financial information of SIMAD Holdings, Ltd (the "Company"), which includes the pro forma condensed consolidated statement of financial position as of June 30, 2025, and the pro forma condensed consolidated statements of profit or loss and other comprehensive income, changes in equity, and cash flows for the six-month and three-month periods then ended. The Board of Directors and management are responsible for the preparation and presentation of this interim financial information in accordance with International Accounting Standard (IAS) 34, "Interim Financial Reporting," subject to the pro forma assumptions detailed in the pro forma condensed consolidated financial information, and are also responsible for preparing this interim financial information in accordance with Chapter D of the Israeli Securities Regulations (Periodic and Immediate Reports), 1970. Our responsibility is to express a conclusion on this interim financial information based on our review.

*Scope of Review*

We conducted our review in accordance with Review Standard (Israel) 2410 of the Institute of Certified Public Accountants in Israel, "Review of Interim Financial Information Performed by the Independent Auditor of the Entity." A review of interim financial information consists of making inquiries, primarily of persons responsible for financial and accounting matters, and applying analytical and other review procedures.

A review is substantially less in scope than an audit conducted in accordance with generally accepted auditing standards in Israel and, consequently, does not enable us to obtain assurance that we would become aware of all significant matters that might be identified in an audit. Accordingly, we do not express an audit opinion.

*Conclusion*

Based on our review, nothing has come to our attention that causes us to believe that the above-mentioned pro forma financial information is not prepared, in all material respects, in accordance with IAS 34 and the pro forma assumptions detailed in the pro forma condensed consolidated financial information.

Furthermore, based on our review, nothing has come to our attention that causes us to believe that the above-mentioned pro forma financial information does not comply, in all material respects, with the disclosure requirements under Chapter D of the Israeli Securities Regulations (Periodic and Immediate Reports), 1970.

Tel Aviv, September 18, 2025

Ziv Haft

Certified Public Accountants



אילת 08-6339911 | מודיעין עילית 08-9744111 | קרית שמונה 077-8983322 | בני ברק 073-7145300 | רחובות 03-6386788 | באר שבע 077-7784100 | חיפה 04-8680600 | ירושלים 02-6546200 | תל אביב 03-6386868

משרד ראשי: בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 דואל: bdo@bdo.co.il בקרו באתר שלנו: www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

**SIMAD Holdings, Ltd**

**Pro Forma Condensed Consolidated Statements of Financial Position (in thousands of USD)**

| | June 30 | | December 31 |
|---|---|---|---|
| | **2025** | **2024** | **2024** |
| | Unaudited | | |
| **Assets** | | | |
| **Current Assets:** | | | |
| Cash and Cash Equivalents | 13,975 | 24,531 | 3,663 |
| Other Receivables and Debit Balances | 13,655 | 12,890 | 664 |
| Related Parties | 16,347 | 14,903 | 7,639 |
| Total Current Assets | 43,977 | 52,324 | 11,966 |
| **Non-Current Assets:** | | | |
| Investments Accounted for Using the Equity Method | 14,832 | 15,160 | 17,173 |
| Property, Plant and Equipment | 428,700 | 401,735 | 428,700 |
| Total Non-Current Assets | 443,532 | 416,895 | 445,873 |
| **Total Assets:** | 487,509 | 469,219 | 457,839 |
| **Liabilities and Equity** | | | |
| **Current Liabilities:** | | | |
| Loans from Banks and Others | 9,764 | 8,937 | 9,016 |
| Trade Payables and Credit Balances | 3,376 | 4,095 | 4,134 |
| Advances from Customers | 142,424 | 137,219 | 62,790 |
| Total Current Liabilities | 155,564 | 150,251 | 75,940 |
| **Non-Current Liabilities:** | | | |
| Loans from Banks and Others | 169,578 | 181,214 | 176,585 |
| Trade Payables and Credit Balances | 4,965 | 4,565 | 4,765 |
| Total Non-Current Liabilities | 174,543 | 185,779 | 181,350 |
| **Total Liabilities:** | 330,107 | 336,030 | 257,290 |
| **Equity:** | | | |
| **Equity Attributable to Equity Holders of the Parent Company:** | | | |
| Share Capital and Capital Reserves | 276,980 | 247,868 | 275,558 |
| Accumulated Loss | (151,781) | (143,343) | (111,501) |
| Total Equity Attributable to Equity Holders of the Parent Company | 125,199 | 104,525 | 164,057 |
| **Equity Attributable to Non-Controlling Interests** | 32,203 | 28,664 | 36,492 |
| Total Equity | 157,402 | 133,189 | 200,549 |
| **Total Liabilities and Equity** | 487,509 | 469,219 | 457,839 |

| September 18, 2025 | | | |
|---|---|---|---|
| Date of Approval of the Financial Statements | Michael Shabsels<br>Chairman | David Shabsels<br>CEO & Director | Randy Mittasch<br>CFO |

**SIMAD Holdings Ltd**

**Pro Forma Condensed Consolidated Statements of Profit or Loss and Other Comprehensive Income**

**(in thousands of USD)**

| | For the six-month period ended on June 30 | | For the three-month period ended on June 30 | | For the year ended December 31 |
|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2024 |
| | Unaudited | | Unaudited | | |
| Operating Revenues | 11,508 | 9,864 | 10,399 | 8,715 | 159,355 |
| Operating Costs | (35,338) | (34,541) | (20,591) | (20,337) | (131,761) |
| **Gross Profit (Loss)** | (23,830) | (24,677) | (10,192) | (11,622) | 27,594 |
| General and Administrative Expenses | (1,242) | (1,290) | (706) | (731) | (2,820) |
| Selling and Marketing Expenses | (975) | (830) | (549) | (464) | (4,307) |
| Other Income (Expenses), Net | 28 | (136) | 14 | 50 | 58 |
| Company's Share in Net Profits of Equity-Accounted Investees | (1,301) | (1,010) | (728) | (453) | 1,522 |
| **Operating Profit (Loss)** | (27,320) | (27,943) | (12,161) | (13,220) | 22,047 |
| Finance Expenses | (5,632) | (5,715) | (2,840) | (2,884) | (11,960) |
| Finance Income | 786 | 251 | 477 | 120 | 413 |
| Total Finance Expenses, Net | (4,846) | (5,464) | (2,363) | (2,764) | (11,547) |
| **Profit (loss) for the Year** | (32,166) | (33,407) | (14,524) | (15,984) | 10,500 |
| **Other comprehensive income (loss):** | | | | | |
| Items That Will Not Be Reclassified Subsequently to Profit or Loss: | | | | | |
| Revaluation Gain on Property, Plant and Equipment | 1,765 | 1,083 | (216) | (243) | 32,195 |
| Group's Share in Other Comprehensive Income, Net, of Equity-Accounted Investees | (168) | 146 | (25) | 59 | 334 |
| Total Other Comprehensive Income | 1,597 | 1,229 | (241) | (184) | 32,529 |
| Total comprehensive income (loss) for the period | (30,569) | (32,178) | (14,765) | (16,168) | 43,029 |
| Profit (Loss) for the Period Attributable to: | | | | | |
| Equity Holders of the Parent Company | (28,280) | (29,088) | (12,938) | (14,044) | 8,806 |
| Non-Controlling Interests | (3,886) | (4,319) | (1,586) | (1,940) | 1,694 |
| | (32,166) | (33,407) | (14,524) | (15,984) | 10,500 |
| Total Comprehensive Income (Loss) Attributable to: | | | | | |
| Equity Holders of the Parent Company | (26,858) | (28,055) | (13,101) | (14,237) | 37,448 |
| Non-Controlling Interests | (3,711) | (4,123) | (1,664) | (1,931) | 5,581 |
| | (30,569) | (32,178) | (14,765) | (16,168) | 43,029 |

**SIMAD Holdings, Ltd**

**Pro Forma Condensed Consolidated Statements of Changes in Equity (in thousands of USD)**

**For the six-month period ended June 30, 2025 (Unaudited)**

| | Equity Attributable to Equity Holders of the Parent Company | | | | | | |
|---|---|---|---|---|---|---|---|
| | Share Capital and Share Premium | Revaluation Reserve for Property, Plant and Equipment | Capital Reserves from Transactions with Controlling Shareholder | Accumulated Loss | Total | Non-Controlling Interests | Total |
| **Balance as of January 1, 2025** | 1,714 | 273,197 | 647 | (111,501) | 164,057 | 36,492 | 200,549 |
| loss for the Period | - | - | - | (28,280) | (28,280) | (3,886) | (32,166) |
| Other Comprehensive Income | - | 1,422 | - | | 1,422 | 175 | 1,597 |
| Total Comprehensive Income for the Period | - | 1,422 | - | (28,280) | (26,858) | (3,711) | (30,569) |
| Distributions to Owners and Non-Controlling Interests | - | - | - | (12,000) | (12,000) | (578) | (12,578) |
| **Balance as of June 30, 2025** | 1,714 | 274,619 | 647 | (151,781) | 125,199 | 32,203 | 157,402 |

**For the six-month period ended June 30, 2024 (Unaudited)**

| | Equity Attributable to Equity Holders of the Parent Company | | | | | | |
|---|---|---|---|---|---|---|---|
| | Share Capital and Share Premium | Revaluation Reserve for Property, Plant and Equipment | Capital Reserves from Transactions with Controlling Shareholder | Accumulated Loss | Total | Non-Controlling Interests | Total |
| **Balance as of January 1, 2024** | 1,633 | 244,555 | 647 | (107,371) | 139,464 | 33,359 | 172,823 |
| loss for the Period | - | - | - | (29,088) | (29,088) | (4,319) | (33,407) |
| Other Comprehensive Income | - | 1,033 | - | - | 1,033 | 196 | 1,229 |
| Total Comprehensive Income for the Period | - | 1,033 | - | (29,088) | (28,055) | (4,123) | (32,178) |
| Distributions to Owners and Non-Controlling Interests | - | - | - | (6,884) | (6,884) | (572) | (7,456) |
| **Balance as June 30, 2024** | 1,633 | 245,588 | 647 | (143,343) | 104,525 | 28,664 | 133,189 |

**SIMAD Holdings, Ltd**

**Pro Forma Condensed Consolidated Statements of Changes in Equity (in thousands of USD)**

**For the three-month period ended June 30, 2025 (Unaudited)**

| | Equity Attributable to Equity Holders of the Parent Company | | | | | | |
|---|---|---|---|---|---|---|---|
| | Share Capital and Share Premium | Revaluation Reserve for Property, Plant and Equipment | Capital Reserves from Transactions with Controlling Shareholder | Accumulated Loss | Total | Non-Controlling Interests | Total |
| **Balance as of April 1, 2025** | 1,714 | 274,782 | 647 | (127,730) | 149,413 | 34,298 | 183,711 |
| loss for the Period | - | - | - | (12,938) | (12,938) | (1,586) | (14,524) |
| Other Comprehensive Income | - | (163) | - | - | (163) | (78) | (241) |
| Total Comprehensive Income for the Period | - | (163) | - | (12,938) | (13,101) | (1,664) | (14,765) |
| Distributions to Owners and Non-Controlling Interests | - | - | - | (11,113) | (11,113) | (431) | (11,544) |
| **Balance as of June 30, 2025** | 1,714 | 274,619 | 647 | (151,781) | 125,199 | 32,203 | 157,402 |

**For the three-month period ended June 30, 2024 (Unaudited)**

| | Equity Attributable to Equity Holders of the Parent Company | | | | | | |
|---|---|---|---|---|---|---|---|
| | Share Capital and Share Premium | Revaluation Reserve for Property, Plant and Equipment | Capital Reserves from Transactions with Controlling Shareholder | Accumulated Loss | Total | Non-Controlling Interests | Total |
| **Balance as of April 1, 2024** | 1,633 | 245,781 | 647 | (128,498) | 119,563 | 30,784 | 150,347 |
| loss for the Period | - | - | - | (14,044) | (14,044) | (1,940) | (15,984) |
| Other Comprehensive Income | - | (193) | - | - | (193) | 9 | (184) |
| Total Comprehensive Income for the Period | - | (193) | - | (14,044) | (14,237) | (1,931) | (16,168) |
| Distributions to Owners and Non-Controlling Interests | - | - | - | (801) | (801) | (189) | (990) |
| **Balance as of June 30, 2024** | 1,633 | 245,588 | 647 | (143,343) | 104,525 | 28,664 | 133,189 |

**SIMAD Holdings, Ltd**

**Pro Forma Condensed Consolidated Statements of Changes in Equity (in thousands of USD)**

**For the Year Ended December 31, 2024**

| | Equity Attributable to Equity Holders of the Parent Company | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Share Capital and Share Premium** | **Revaluation Reserve for Property, Plant and Equipment** | **Capital Reserves from Transactions with Controlling Shareholder** | **Accumulated Loss** | **Total** | **Non-Controlling Interests** | **Total** |
| **Balance as of January 1, 2024** | 1,633 | 244,555 | 647 | (107,371) | 139,464 | 33,359 | 172,823 |
| Profit for the Year | - | - | - | 8,806 | 8,806 | 1,694 | 10,500 |
| Other Comprehensive Income | - | 28,642 | - | - | 28,642 | 3,887 | 32,529 |
| Total Comprehensive Income for the Year | - | 28,642 | - | 8,806 | 37,448 | 5,581 | 43,029 |
| Distributions to Owners and Non-Controlling Interests | - | - | - | (12,936) | (12,936) | (2,497) | (15,433) |
| Capital Contributions by Owners and Non-Controlling Interests | 81 | - | - | - | 81 | 49 | 130 |
| **Balance as of December 31, 2024** | 1,714 | 273,197 | 647 | (111,501) | 164,057 | 36,492 | 200,549 |

**SIMAD Holdings Ltd**

**Pro Forma Condensed Consolidated Statements of Cash Flows (in thousands of USD)**

| | For the three-month period ended on June 30 | | For the three-month period ended on June 30 | | For the year ended December 31 |
|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2025 |
| | Unaudited | | Unaudited | | |
| **Cash Flows from Operating Activities:** | | | | | |
| Profit (loss) for the Period | (32,166) | (33,407) | (14,524) | (15,984) | 10,500 |
| Adjustments for: | | | | | |
| Company's Share in Profits of Equity-Accounted Investees, Net | 1,301 | 1,010 | 728 | 453 | (1,522) |
| Depreciation | 8,456 | 7,615 | 4,250 | 3,834 | 15,187 |
| Finance Expenses, Net | 4,846 | 5,464 | 2,363 | 2,764 | 11,547 |
| Changes in Assets and Liabilities: | | | | | |
| Increase in Advances from Customers | 79,635 | 77,554 | 33,258 | 32,743 | 3,125 |
| Decrease (Increase) in Other Receivables, and Debit Balances | (12,991) | (12,001) | (9,883) | (9,510) | 225 |
| Increase (Decrease) in Trade Payables and Credit Balances | (558) | 823 | 874 | 1,869 | 1,063 |
| Cash Generated from Operating Activities | 48,523 | 47,058 | 17,066 | 16,169 | 40,125 |
| Dividends Received from Equity-Accounted Investees | 872 | 1,015 | 451 | 516 | 1,720 |
| **Net Cash Provided by Operating Activities** | 49,395 | 48,073 | 17,517 | 16,685 | 41,845 |
| **Cash Flows from Investing Activities:** | | | | | |
| Purchases and Investments in Property, Plant and Equipment | (6,692) | (6,532) | (4,466) | (4,077) | (9,957) |
| **Net Cash Used in Investing Activities** | (6,692) | (6,532) | (4,466) | (4,077) | (9,957) |
| **Cash Flows from Financing Activities:** | | | | | |
| Proceeds from Long-Term Loans from Banks and Others | - | 500 | - | - | 500 |
| Repayment of Long-Term Loans from Banks and Others | (6,368) | (3,812) | (4,158) | (1,753) | (8,454) |
| Capital Contributions by Owners | - | - | - | - | 81 |
| Distributions to Owners | (12,000) | (6,884) | (11,113) | (801) | (12,936) |
| Capital Contributions by Non-Controlling Interests | - | - | - | - | 49 |
| Distributions to Non-Controlling Interests | (578) | (572) | (431) | (189) | (2,497) |
| Related Parties, Net | (8,708) | (10,397) | 4,388 | (6,422) | (3,133) |
| Interest Paid | (4,737) | (5,376) | (2,309) | (2,723) | (11,366) |
| **Net Cash Used in Financing Activities** | (32,391) | (26,541) | (13,623) | (11,888) | (37,756) |
| **Increase (Decrease) in Cash and Cash Equivalents** | 10,312 | 15,000 | (572) | 720 | (5,868) |
| **Cash and Cash Equivalents at Beginning of Year** | 3,663 | 9,531 | 14,547 | 23,811 | 9,531 |
| **Cash and Cash Equivalents at End of Year** | 13,975 | 24,531 | 13,975 | 24,531 | 3,663 |

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Condensed Consolidated Financial Statements as of June 30, 2025**

**(in thousands of USD)**

**Note 1 – General:**

A. **General**

SIMAD Holdings Ltd (the "Company") was incorporated on May 28, 2025, as a private company under the laws of the British Virgin Islands pursuant to the BVI Business Companies Act, 2004, with no assets, liabilities, or operations (except for share capital). The Company was established for the purpose of raising capital through the issuance of non-convertible debentures on the Tel Aviv Stock Exchange.

The Company is controlled by SIMAD Holdings LLC, a limited liability company ultimately controlled by Mr. Michael Shabsels and Mr. David Shabsels (the "Ultimate Controlling Shareholders").
SIMAD Holdings LLC has undertaken that, prior to the listing of the debentures for trading on the stock exchange, it will transfer to the Company its rights in entities that indirectly hold interests in 30 real estate properties in the United States (the "Transferred Entities"), in exchange for the issuance of shares by the Company (the "Transfer" or the "Acquisition"). Prior to the transfer, the Transferred Entities were held by SIMAD Holdings LLC (the "Parent Entity").

As of the date of the financial statements, the Company's main activity is the operation of summer camps in the United States, located on real estate properties owned by the Company.

The completion of the acquisition is subject to the fulfillment of two key conditions:

1. Completion of the debenture issuance.
2. Approvals from various financial institutions that hold liens on the assets owned by the Transferred Entities.
3. Execution of several agreements that have not yet been signed, which essentially govern the transfer of the controlling shareholder's rights in the real estate holding companies to the Company.
   The required agreements and approvals will be obtained prior to the acquisition date.

As the entities that will be transferred, are controlled by the same controlling shareholders both before and after the acquisition, the transaction does not fall within the scope of IFRS 3 (Business Combinations). The Company accounted for the acquisition using the pooling of interests method.

**Note 1 – General (cont.):**

The Company also prepared pro forma consolidated financial statements to reflect the acquisition as if it had occurred at the beginning of the earliest period presented in the financial statements (January 1, 2022). Accordingly, the pro forma consolidated financial statements:

- Reflect the financial position, results of operations, and cash flows of the Company and the Transferred Entities on a consolidated basis;
- Recognize the assets and liabilities of the Transferred Entities as of December 31, 2021, or their acquisition date (whichever is later), based on their book value in the Ultimate Controlling Shareholders' records at that time;
- Reflect assets acquired and liabilities assumed by the Transferred Entities after December 31, 2021, from the date they were initially recognized by the Transferred Entities.

The transfer of the rights in the Transferred Entities to the Company will be made on an "AS IS" basis as of the date of the transfer, and the Company will not be entitled to any indemnification from the transferring entities regarding the transferred rights. It is clarified that, following the completion of the transfer of rights to the Company, the Company will not be subject to any restrictions on the sale of these rights or of the underlying assets, except for the requirement to obtain lender approvals for any sale or transfer.

B. **Working Capital Deficit**

As of June 30, 2025, the Company had a working capital deficit of approximately $111.6 million.

The primary source of the deficit is advances received from customers in the amount of approximately $142.4 million for registration to summer camps in the United States.

The Company believes it will be able to meet its obligations in the foreseeable future, among other things, through positive cash flows from operating activities and, if necessary, additional actions that will enable it to meet its current liabilities and finance its operations.

**Note 2 – Summary of Significant Accounting Policies:**

**Basis of Preparation of the Pro Forma Financial Statements:**

The pro forma condensed interim financial statements comply with the provisions of International Accounting Standard (IAS) 34 – Interim Financial Reporting. In addition, the pro forma condensed interim financial statements comply with the disclosure requirements of Chapter D of the Israeli Securities Regulations (Periodic and Immediate Reports), 1970.

The pro forma condensed interim financial statements have been prepared using the same accounting policies and calculation methods applied in the Company's annual financial statements as of December 31, 2024.

These condensed interim financial statements should be read in conjunction with the Company's annual financial statements as of December 31, 2024, and the accompanying notes. Accordingly, these condensed interim financial statements do not include disclosures for matters that were not materially updated compared to those disclosed in the latest annual financial statements.

**SIMAD Holdings Ltd**

**Notes to the Pro Forma Condensed Consolidated Financial Statements as of June 30, 2025**

**(in thousands of USD)**

**Note 3 – Investment in Investee Companies:**

**Information on Material Associates Accounted for Using the Equity Method:**

The following is summarized financial information regarding the financial position and results of operations of the held company, prepared in accordance with IFRS and the Company's accounting policy (equity method of accounting), and without adjustments for the ownership percentage.

Willow Lake Day Camps, LLC & Willow Lake Land Corporation (Willow Lake)

| | June 30 | | December 31 |
|---|---|---|---|
| | 2025 | 2025 | 2024 |
| | Unaudited | | |
| Current Assets | 6,168 | 5,321 | 4,607 |
| Property, Plant and Equipment | 36,600 | 35,500 | 36,600 |
| Current Liabilities | (11,344) | (10,502) | (5,101) |
| Non-Current Liabilities | (1,759) | - | (1,759) |
| | 29,665 | 30,319 | 34,347 |
| **Carrying Amount of the Investment in the Associate** | 14,832 | 15,160 | 17,173 |

| | For the three-month period ended on June 30 | | For the three-month period ended on June 30 | | For the year ended December 31 |
|---|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 | 2025 |
| | Unaudited | | Unaudited | | |
| Revenue | - | - | - | - | 10,664 |
| Profit (loss) for the Period | (2,603) | (2,021) | (1,457) | (907) | 3,045 |
| Total Comprehensive Income for the Period | (2,938) | (1,729) | (1,506) | (788) | 3,709 |
| **Dividends Received by the Group from the Associate** | 872 | 1,015 | 451 | 516 | 1,720 |

*The following translation is intended solely for the convenience of the reader although every effort has been made to ensure its accuracy. Only the original Hebrew text of the Written Representation is binding.*

# SIMAD Holdings, Ltd

## Financial Statements as of June 30, 2025

# SIMAD Holdings, Ltd

## Financial Statements as of May 28, 2025

### Table of Contents


| | Page |
|---|---|
| Independent Auditor’s Report to the Shareholders | 1 |
| Statement of Financial Position | 2 |
| Notes to the Financial Statements | 3-4 |

**Independent Auditor's Report to the Shareholders of SIMAD Holdings, Ltd**

We have audited the accompanying statement of financial position of SIMAD Holdings, Ltd (hereinafter: "the Company") as of June 30, 2025. This financial statement is the responsibility of the Company's Board of Directors and management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in Israel, including those prescribed by the Auditors' Regulations (Auditor's Mode of Operation), 1973. Those standards require that we plan and perform the audit to obtain reasonable assurance that the financial statement is free from material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by the Company's Board of Directors and management, as well as evaluating the overall presentation of the financial statement. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, based on our audit, the above financial statement fairly presents, in all material respects, the financial position of the Company as of May 28, 2025, in accordance with International Financial Reporting Standards (IFRS) and the provisions of the Israeli Securities Regulations (Annual Financial Statements), 2010..

Tel Aviv, September 18, 2025

Ziv Haft
Certified Public Accountants



| תל אביב | ירושלים | חיפה | באר שבע | בני ברק | קרית שמונה | פתח תקווה | מודיעין עילית | נצרת עילית | אילת |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 03-6386868 | 02-6546200 | 04-8680600 | 077-7784100 | 073-7145300 | 077-5054906 | 077-7784180 | 08-9744111 | 04-6555888 | 08-6339911 |

משרד ראשי: בית אמות BDO, דרך מנחם בגין 48, תל אביב, 6618001 דוא"ל: bdo@bdo.co.il בקרו באתר שלנו: www.bdo.co.il

BDO Israel, an Israeli partnership, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. BDO is the brand name for the BDO network and for each of the BDO Member Firms

**SIMAD Holdings, Ltd**

**Statements of Financial Position (in thousands of USD)**

| | June 30 2025 |
|---|---|
| **Assets:** | |
| | (*) |
| **Total Assets:** | (*) |
| **Equity:** | |
| Total Equity: | (*) |
| **Total Equity and Liabilities** | (*) |

(*) Less than $1 thousand.

| September 18, 2025 | | | |
|---|---|---|---|
| Date of Approval of the Financial Statements | Michael Shabsels<br>Chairman | David Shabsels<br>CEO & Director | Randy Mittasch<br>CFO |

**Note 1 - General**

SIMAD Holdings Ltd (hereinafter: the “Company”) was incorporated on May 28, 2025, as a private company under the laws of the British Virgin Islands pursuant to the BVI Business Companies Act, 2004, with no assets, liabilities, or operations (other than share capital). The Company was established for the purpose of raising capital through the issuance of non-convertible debentures on the Tel Aviv Stock Exchange.

The Company’s controlling shareholder is SIMAD Holdings LLC, a limited liability company ultimately controlled by Mr. Michael Shabsels and Mr. David Shabsels (hereinafter: the “Ultimate Controlling Shareholders”).

SIMAD Holdings LLC has undertaken that, prior to the listing of the debentures offered to the public, it will transfer to the Company its rights in entities that, through a chain of ownership, hold rights in 30 real estate assets located in the United States (hereinafter: the “Transferred Entities”), in exchange for the issuance of shares in the Company (the “Transfer” or the “Acquisition”). Prior to the transfer, the Transferred Entities were held by SIMAD Holdings LLC (hereinafter: the “Parent Entity”).

Following the transfer, the Company’s principal activity will be the operation of summer camps in the United States, located on real estate properties owned by the Company.

The Statement of Comprehensive Income, the Statement of Changes in Equity, and the Statement of Cash Flows were not included in the financial report, as the Company had no operations as of the financial reporting date.

## Note 2 - Summary of Significant Accounting Policies

### 2.1 Basis of Preparation of the Condensed Interim Financial Statements

The financial statements have been prepared in accordance with International Accounting Standard (IAS) 34, Interim Financial Reporting. In addition, the financial statements comply with the disclosure requirements of Chapter D of the Israeli Securities Regulations (Periodic and Immediate Reports), 1970.

### 2.2 Pooling of Interests Method

The Company accounts for the acquisition using the pooling of interests method. The Company has also prepared pro forma consolidated financial statements as of December 31, 2024, and March 31, 2025, to reflect the acquisition as if it had occurred at the beginning of the earliest period presented in the financial statements (January 31, 2021). Accordingly, the pro forma consolidated financial statements:

- Reflect the financial position, results of operations, and cash flows of the Company and the Transferred Entities on a consolidated basis.
- Recognize the assets and liabilities of the Transferred Entities as of January 31, 2021, at their carrying amounts in the books of the Ultimate Controlling Shareholder as of that date.
- Assets acquired and liabilities assumed by the Transferred Entities after January 31, 2021, reflect their balances and activities from the date of initial recognition by the Transferred Entities.
- The equity balance of the Transferred Entities as of January 31, 2021, was classified under share premium in the pro forma statement of changes in equity. Distributions made to shareholders were reflected in the pro forma statement of changes in equity as if made from the premium.

The transfer of rights in the Transferred Entities to the Company at closing will be made on an “AS IS” basis as of the transfer date, and the Company will not be entitled to any indemnification from the transferring entities in respect of the transferred rights. It is clarified that, following the completion of the transfer of rights to the Company, there will be no restrictions on the Company’s ability to sell the transferred rights and/or the underlying assets, except for obtaining lender approvals for any such sale and/or transfer.
For additional information, see Note 1 to the Company’s pro forma consolidated financial statements as of June 30, 2025.

### 2.3 Statement of Comprehensive Income, Statement of Changes in Equity, and Statement of Cash Flows

These statements are not included in the financial report, as the Company had no operations as of the reporting date.

# Chapter 11 – Additional Details

## 11.1. Attorney's Opinion

The Company received the following legal opinion:

GOLDFARB
GROSS
SELIGMAN

Established 1930

To: November 27, 2025

SIMAD Holdings Ltd.

Dear Sirs and Madams,

**Re: Supplementary Prospectus and Shelf Prospectus dated November 28, 2025 (the "Prospectus") of SIMAD Holdings Ltd. (the "Company")**

As per your request, we hereby confirm we are of the opinion, as follows:

[1] The rights attached to the securities, offered according to the Prospectus, have been described correctly in the Prospectus.

[2] The Company has the authority to issue the securities offered within the framework of the Prospectus, as described in the Prospectus.

[3] The Company's directors were duly appointed, and their names are included in the Prospectus.

We hereby give our consent that this opinion shall be included in the Prospectus.

Sincerely,

Hod Mimun, Adv. Shuki Gottlieb, Adv. Daniela Repolo, Adv.

Goldfarb Gross Seligman & Co., Law Offices

**11.2. Obligation of Indemnification**

(a) The Company has undertaken toward Goldfarb Gross Seligman & Co. Law Offices ("**Goldfarb Gross Seligman**") that in the event that Goldfarb Gross Seligman, any of its partners, employees and/or anyone on its behalf (in this Section the "**Defendants**") will be required to pay any amount to a third party, including but without prejudice to the generality to that stated, to shareholders of the Company, holders of debentures of the Company and/or the trustee for the aforementioned holders or any of the pricing underwriters in the Prospectus, due to a ground, which may arise directly or indirectly from the opinion appearing in Section 11.1 of the Prospectus, given by Goldfarb Gross Seligman to the Company (in this Section, the "**Opinion**") in consequence of reliance of Goldfarb Gross Seligman on data and documents, conveyed to them by the Company or by its external consultants, including the opinion of the legal consultants of the Company in the USA and in the BVI, respectively (hereinafter jointly: the "**Company's Documents**") then the Company will indemnify the Defendants for any amount that the Defendants will be required to pay according to a court judgment or under settlement that the Company consented thereto in writing, and also for reasonable expenses (taking into account the scope of the proceeding, the attorneys, professional and consultants appointed to handle this matter) that Goldfarb Gross Seligman will pay or will be required to pay for legal representation or otherwise, defending against legal proceedings, negotiations and the like in connection with any claim, requirement or other proceedings, whose ground emerges from the reliance of Goldfarb Gross Seligman or any of the other Defendants on the Company's Documents. Goldfarb Gross Seligman undertook in its name and on behalf of the other Defendants to notify the Company of any claim, filed against them, and of any notice in writing with respect to an intention to file a claim against them, shortly after Goldfarb Gross Seligman becomes aware of it. The Company will be entitled to require from the Defendants in writing, that the Company will handle any defense and negotiations against the aforementioned claim on their behalf, so long as such defense or negotiations against the aforementioned claim are handled by legal consultants of the appropriate professional level, taking into account the scope of the proceeding, its nature and the professionals on behalf of the Plaintiffs, that legal consultants will be approved by Goldfarb Gross Seligman and also that Goldfarb Gross Seligman will be involved according to its discretion in the handling of the claim or the negotiations, and that any settlement will require the approval of Goldfarb Gross Seligman. In the event that the Company will not realize its right to handle the defense or negotiations, as stated, or if it realizes its rights but thereafter abandons the handling of the defense and/or negotiations or fails to assume reasonable means under the circumstances of this matter, to handle the defense and/or negotiations, Goldfarb Gross Seligman will be entitled to settle with the plaintiffs on any amount deemed fit by it, and the Company will be obligated to indemnify it in the full settlement amount and for all the reasonable expenses incurred, as stated above, and a settlement as stated will be regarded as a settlement that the Company consented thereto in writing. The aforementioned obligation of indemnification and release will not apply in the event of a deceit or a malicious or criminal act or a malicious or criminal omission, or gross negligence, on the part of Goldfarb Gross Seligman.

**11.3. Expenses and Commissions**

For details regarding the expenses involved in the offering under this prospectus, see Section 6.1 of the Prospectus.

Other than the aforementioned expenses, the Company did not pay nor was it obliged to pay any commission regarding the securities offered under this Prospectus.

**11.4. Brokerage Fees in Connection with Other Securities**

From its foundation, the Company did not pay commissions in connection with the subscription or underwriting of securities issued by it.

**11.5. Allotment of Securities Not According to Full Consideration in Cash**

For details regarding the shares of the Company to be allotted to the Controlling Shareholders, upon completion of the offering and in return of transferring the Transferred Rights (as such term defined in Section 7.1.6 of the Prospectus) to the Company, see Sections 7.1.6 and 7.1.7 of the Prospectus.

**11.6. Documents Review**

Copies of this Prospectus and any report, opinion or approval included or mentioned in this Prospectus are available for the review by the public at the offices of Goldfarb Gross Seligman & Co., Attorneys, 98 Yigal Alon St., Electra Tower, Tel Aviv, during regular work hours and following advanced coordination. Furthermore, this Prospectus can be viewed on the Israeli Securities Authority distribution website at: www.magna.isa.gov.il.

**11.7.** The following is an opinion of the legal consultants of the Company in the British Virgin Islands. This opinion may not be considered an attorney's opinion for the purpose of Section 17(b)(3) of the Securities Law.

MAPLES GROUP

Our ref: CMO/857353-000001/41816282v1

To the Addressees named in the First Schedule

26 November 2025

Dear Sirs

**SIMAD Holdings Ltd.**

**Public Offering in Israel**

We have acted as counsel as to British Virgin Islands law to SIMAD Holdings Ltd. (the "**Company**") and have been requested to render a legal opinion as to certain legal matters relating to the Company's registration, ownership, control and business.

We have been advised that our opinion has been requested in connection with (i) the filing by the Company of a supplementary prospectus and a supplementary notice (the "**Prospectus**" and the "**Supplementary Notice**", respectively) to be published in Israel according to the Israeli Law; (ii) the Company's public offering of the Company's Debentures (Series A) (the "**Securities**") to be offered to persons in Israel (the "**Public Offering**"); and (iii) the listing and trading of the Securities on the Tel Aviv Stock Exchange Ltd. ("**TASE**").

## 1 Documents Reviewed

We have reviewed originals, copies, drafts or conformed copies of the following documents:

1.1 The public records of the Company on file and available for public inspection at the Registry of Corporate Affairs in the British Virgin Islands (the "**Registry of Corporate Affairs**") on 25 November 2025, including the Company's Certificate of Incorporation and its Memorandum and Articles of Association (the "**Memorandum and Articles**").

1.2 The records of proceedings available from a search of the electronic records maintained on the Judicial Enforcement Management System from 1 January 2000 and available for inspection on 25 November 2025 at the British Virgin Islands High Court Registry (the "**High Court Registry**").

1.3 The written resolutions of the board of directors of the Company dated 26 November 2025 (the "**Resolutions**").



Maples and Calder
6th Floor DUO 280 Bishopsgate London EC2M 4RB England
Tel +44 20 7466 1600 Fax +44 20 7466 1700 maples.com
Registered in England and Wales No. 03369233. Registered office: 6th Floor DUO 280 Bishopsgate London EC2M 4RB England

1.4 A Certificate of Incumbency dated 25 November 2025, issued by Maples Corporate Services (BVI) Limited, the Company's registered agent, (a copy of which is attached as Annexure A) (the "**Registered Agent's Certificate**").

1.5 A certificate of good standing with respect to the Company issued by the Registrar of Corporate Affairs dated 25 November 2025 (the "**Certificate of Good Standing**").

## 2 Assumptions

In giving the following opinions, we have relied (without further verification) upon the completeness and accuracy of the Registered Agent's Certificate and the Certificate of Good Standing. We have also relied upon the following assumptions, which we have not independently verified:

2.1 Copies of documents, conformed copies or drafts of documents provided to us are true and complete copies of, or in the final forms of, the originals, and translations of documents provided to us are complete and accurate.

2.2 The accuracy and completeness of all factual representations expressed in or implied by the documents we have examined.

2.3 All signatures, initials and seals are genuine.

2.4 That all public records of the Company which we have examined are accurate and that the information disclosed by the searches which we conducted against the Company at the Registry of Corporate Affairs and the High Court Registry is true and complete and that such information has not since then been altered and that such searches did not fail to disclose any information which had been delivered for registration but did not appear on the public records at the date of our searches.

2.5 The choice of Israeli law as the governing law of the Securities has been made in good faith and would be regarded as a valid and binding selection which will be upheld by the courts of Israel and any other relevant jurisdiction (other than the British Virgin Islands) as a matter of the Israeli law and all other relevant laws (other than the laws of the British Virgin Islands).

2.6 An application to a court of Israel of the type referred to in paragraph 3.16 below would constitute submission by the Company to the jurisdiction of a court of Israel as a matter of Israeli law.

2.7 There is nothing under any law (other than the laws of the British Virgin Islands) which would or might affect the opinions set out below. Specifically, we have made no independent investigation of the laws of Israel.

## 3 Opinions

Based upon, and subject to, the foregoing assumptions and the qualifications set out below, and having regard to such legal considerations as we deem relevant, we are of the opinion that:

3.1 The Company is a company limited by shares incorporated with limited liability under the BVI Business Companies Act (As Revised) (the "**Act**"), is in good standing at the Registry of Corporate Affairs, is validly existing under the laws of the British Virgin Islands and possesses the capacity to sue and be sued in its own name. The Company was incorporated under the laws of the British Virgin Islands on 28 May 2025.

3.2 Based solely on the Registered Agent's Certificate, the current directors of the Company are David Shabsels, Michael Shabsels, Shahar Nachmias, Doron Turgeman, Limor Beladev and Benjamin Gabbay.

3.3 David Shabsels, Michael Shabsels, Shahar Nachmias, Doron Turgeman, Limor Beladev and Benjamin Gabbay have each been duly appointed as a director of the Company.

3.4 Under the Act and the Memorandum and Articles the directors have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company.

3.5 Pursuant to the Resolutions, the Company has duly authorised publishing to the public the Prospectus and the Supplementary Notice to be filed with the Israel Securities Authority and TASE under applicable Israeli securities laws and has all requisite power and authority under the Amended and Restated Memorandum and Articles to issue the Securities offered within the framework of the Prospectus and the Supplementary Notice, in the manner and subject to the terms described therein.

3.6 The Memorandum and Articles do not violate, conflict with or result in a breach of any law, public rule or regulation applicable to the Company in the British Virgin Islands currently in force.

3.7 The Company has full power and authority to carry out any object not prohibited by the Act or any other law of the British Virgin Islands including the power and authority to issue the Securities described above.

3.8 No authorisations, consents, approvals, licences, validations or exemptions are required by law from any governmental authorities or agencies or other official bodies in the British Virgin Islands in connection with the ownership disposal of property or interests located outside the British Virgin Islands.

3.9 The Securities are not subject to any restrictions on transfer under British Virgin Islands law or the Memorandum and Articles, and following the completion of the Public Offering of the Securities in Israel (under applicable Israeli securities laws) and the listing of the Securities on the TASE, the Securities may be resold freely on TASE and cleared by the TASE Clearing House without the imposition of any holding period or other restriction under British Virgin Islands law or the Memorandum and Articles.

3.10 No authorisations, consents, approvals, licences, validations or exemptions are required by law (or the Memorandum and Articles) from any governmental authorities or agencies or other official bodies in the British Virgin Islands in connection with:

(a) the publication of the Prospectus and the Supplementary Notice;

(b) the consummation of the Public Offering of the Securities in Israel via the TASE in accordance with the Prospectus and the Supplementary Notice; or

(c) the listing and trading of the Securities on TASE.

3.11 With the exception of filing fees charged by the Registry of Corporate Affairs in respect of any optional filings made at the Registry of Corporate Affairs no taxes, fees or charges (including stamp duty) are payable (either by direct assessment or withholding) to the government or other taxing authority in the British Virgin Islands under the laws of the British Virgin Islands in respect of the Public Offering of the Securities.

3.12 Companies incorporated or registered under the Act are currently exempt from income and corporate tax including with respect to all dividends, interest, royalties, compensation and other amounts payable by the Company to persons who are resident or not resident in the British Virgin Islands. In addition, the British Virgin Islands currently does not levy capital gains tax on companies incorporated or registered under the Act, or on persons who are resident or not resident in the British Virgin Islands in relation to any share, debt obligations or other securities of the Company. No estate, inheritance, succession or gift tax, rate, duty, levy or other charges

are payable by persons who are resident or not resident in the British Virgin Islands with respect to any share, debt obligations or other securities of the Company.

3.13 Pursuant to the Company's Memorandum and Articles, the Company is authorised to issue a maximum of 50,000 shares of one class with no par value, of which 100 shares have been issued and are outstanding.

3.14 Based solely on our inspection of the Registered Agent's Certificate the shareholders of the Company as at the date hereof are Michael Shabsels holding 500 voting shares of no par value and David Shabsels holding 500 voting shares of no par value.

3.15 There is no express provision of British Virgin Islands legislation preventing or prohibiting the Company, its controlling shareholders and its officers (acting in that capacity) from giving undertakings in the Prospectus and the Supplementary Notice not to challenge or object to, on grounds of jurisdiction, the jurisdiction of a court in Israel in connection with a derivative claim under Israeli law filed against the Company in Israel regarding the Company's compliance with the terms of the Deed of Trust (as described in the Prospectus and in the Supplementary Notice) and the terms of the Bond (as described in the Prospectus and in the Supplementary Notice).

3.16 There is no express provision of British Virgin Islands legislation preventing or prohibiting the Company from applying to a court in Israel with respect to the approving of a settlement or arrangement under applicable Israeli law in order to amend the terms of the Securities. The submission by the Company to the jurisdiction of a court in Israel with respect to the approving of a settlement or arrangement under applicable Israeli law in order to amend the terms of the Securities is legal, valid and binding on the Company assuming that the same is true under Israeli law and under the laws, rules and procedures applying in the courts of the Israel.

## 4 Qualifications

The opinions expressed above are subject to the following qualifications:

4.1 To maintain the Company in good standing under the laws of the British Virgin Islands, annual filing fees must be paid to the Registry of Corporate Affairs.

4.2 The question of whether proceedings of the type referred to in paragraph 3.15 and 3.16 could be opposed on jurisdictional grounds is principally a question of Israeli law which we express no view on.

4.3 Under the Act, a company, a member or director of a company or any interested person may apply to the High Court for an order that an amendment to the memorandum or articles should have effect from a date no earlier than the date of the resolution to amend the memorandum or articles and the High Court may make such an order where it is satisfied it would be just to do so.

4.4 We express no opinion as to the meaning, validity or effect of any references to foreign (i.e. non-British Virgin Islands) statutes, rules, regulations, codes, judicial authority or any other promulgations and any references to them in the Memorandum and Articles.

4.5 This opinion is given only as to, and based on, circumstances and matters of fact existing and known to us on the date of this opinion letter. These opinions only relate to the laws of the British Virgin Islands which are in force on the date of this opinion letter.

We consent to the filing of this opinion (and its Hebrew translation, which we have not reviewed) with the Israel Securities Authority and TASE, as an exhibit to the Prospectus (or draft Prospectus) to be published no later than November 2025 and the filing thereof with the Israel Securities Authority.

This opinion is in English, and we have not approved, and we shall have no liability in respect of, any translation of this opinion.

This opinion letter is addressed to and for the benefit solely of the addressees and may not be relied upon by any other person for any purpose, nor may it be transmitted or disclosed (in whole or part) to any other person without our prior written consent.

We hereby authorise the authorised electronic signatory of the Company to electronically file this opinion to the Israel Securities Authority.

Yours faithfully

Maples and Calder

**First Schedule**

**List of Addressees**

SIMAD Holdings Ltd.
PO Box 173
Road Town
Tortola
British Virgin Islands

The Tel Aviv Stock Exchange Ltd
2 Ahuzat Bayit St., Tel Aviv
Israel

Goldfarb Gross Seligman & Co., Law Offices
Electra Tower
98 Yigal Alon Street
Tel Aviv 6789141
Israel

**Annexure A**

**Registered Agent's Certificate**

MAPLES GROUP

**REGISTERED AGENT'S CERTIFICATE**

In this certificate:

| | |
|---|---|
| **"Act"** | means the BVI Business Companies Act (As Revised). |
| **"BVI"** | means the British Virgin Islands. |
| **"Company"** | means **SIMAD Holdings Ltd.** |
| **"FSC"** | means the BVI Financial Services Commission. |
| **"Register"** | means the Register of Companies maintained by the Registrar. |
| **"Register of Charges"** | means the Company's register of charges maintained at the Registered Office pursuant to section 162 of the Act. |
| **"Registered Agent"** | means the Company's registered agent, being Maples Corporate Services (BVI) Limited. |
| **"Registered Office"** | means the Company's registered office as detailed below. |
| **"Registrar"** | means the Registrar of Corporate Affairs in the BVI. |

We, Maples Corporate Services (BVI) Limited of Kingston Chambers, PO Box 173, Road Town, Tortola, British Virgin Islands, being the Company's duly appointed Registered Agent hereby certify that as far as can be determined from the documents relating to the Company and retained for the Company at the Registered Office:

1 the Company was incorporated in the BVI on 28 May 2025 with company number 2177857;

2 the Registered Office is at Kingston Chambers, PO Box 173, Road Town, Tortola, British Virgin Islands;

3 the Company's name appears on the Register and the Company has paid all fees due and payable to the FSC;

4 the Company is duly incorporated, validly existing and in good standing under the laws of the British Virgin Islands;

5 the Company has not commenced liquidation under the Act or the Insolvency Act (As Revised) and no receiver has been appointed over the Company or any of its assets;

6 no legal, arbitration or other administrative proceedings have been threatened or commenced against the Company;

7 based solely on the register of directors and officers of the Company as maintained at the Registered Office, the Directors of the Company are as follows:

| Name | Appointment Date |
|---|---|
| Doron Turgeman | 23 November 2025 |
| Shahar Abraham Nachmias | 23 November 2025 |
| Michael Shabsels | 28 May 2025 |
| Limor Beladev | 23 November 2025 |
| David Shabsels | 28 May 2025 |
| Bejamin Gabay | 23 November 2025 |

8 based solely on the register of members of the Company as maintained at the Registered Office, the Shareholders of the Company are as follows:

| Name | Number of Shares Held |
|---|---|
| Michael Shabsels | 500 |
| David Shabsels | 500 |

9 the Company is not authorised to issue bearer shares;

10 no entries have been made on the Register of Charges.

All certifications are correct as at the 25th day of November 2025.

For and on behalf of

Maples Corporate Services (BVI) Limited

Registered Agent

# Chapter 12 – Signatures

**12.1. The Company**

**SIMAD Holdings Ltd.** ______________________________

**12.2. The Directors**

**Shahar Nachmias** ______________________________

**Michael Shabsels** ______________________________

**David Shabsels** ______________________________

**Limor Beladev** ______________________________

**Doron Turgeman** ______________________________

**Benjamin Gabbay** ______________________________