**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email: msirota@coleschotz.com
Email: wusatine@coleschotz.com
Email: dbass@coleschotz.com
Email: fyudkin@coleschotz.com
Email: dharris@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

**-and-**

**RIKER DANZIG LLP**
Joseph L. Schwartz
Daniel A. Bloom
John D. Stern
7 Giralda Farms, Suite 250
Madison, New Jersey 07940
Telephone: (973) 538-0800
Email: jschwartz@riker.com
Email: dbloom@riker.com
Email: jstern@riker.com

**CHAPMAN AND CUTLER LLP**
Michael Friedman (admitted *pro hac vice*)
Jorge Eric Coronel Hamilton (admitted *pro hac vice*)
1270 Avenue of the Americas, 30th Floor
New York, New York 10020
Telephone: (212) 655-2508
Email: friedman@chapman.com
Email: jcoronel@chapman.com

*Counsel to the Lender Parties*

**ROBINSON & COLE LLP**
Evan M. Lazerowitz
Rachel Jaffe Mauceri
Brya M. Keilson
666 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 451-2900
Email: elazerowitz@rc.com
Email: rmauceri@rc.com
Email: bkeilson@rc.com

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman (admitted *pro hac vice*)
Kristin K. Going (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com
Email: kgoing@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Rachel Biblo Block (admitted *pro hac vice*)
2801 North Harwood Street, Suite 2600
Dallas, Texas 75201
Telephone: (214) 295-8000
Email: rbibloblock@mcdermottlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 26-16388 (CMG)<br><br>(Jointly Administered) |

**JOINT MOTION OF THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND THE LENDER PARTIES FOR ENTRY OF AN ORDER (I) APPROVING SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "Committee"), and Mishmeret Trust Company Ltd., in its capacities as DIP Agent and Prepetition Trustee (together, the "Lender Parties," and, together with the Committee, the "Settlement Parties"), jointly submit this motion (this "Motion")[2] for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and rules 9019 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the settlement (the "Settlement") between the Committee and the Lender Parties, as memorialized in the term sheet attached to the Proposed Order as Exhibit 1 (the "Term Sheet"). The Debtors are not parties to the Settlement or the Term Sheet. The Debtors join in this Motion solely to express their support for the Settlement and to confirm their agreement to the budget attached to the

[1] A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet or the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [Docket No. 552] (the "Final DIP Order"), as applicable.

Proposed Order as Exhibit 2 (the "Approved Budget"), which the Term Sheet requires be agreed among the Committee, the Lender Parties, and the Debtors. In support of the Motion, the Debtors, the Committee, and the Lender Parties respectfully state as follows:

**PRELIMINARY STATEMENT**

1. After months of investigation, discovery, and hard-fought negotiations, the Committee and the Lender Parties have reached a comprehensive, consensual resolution of the Committee's Challenges to the liens and claims asserted against the Debtors' estates on account of approximately $214 million of prepetition bond debt and the Roll-Up DIP Loans. Together with the Debtors, they also agreed to a budget that is expected to fund these chapter 11 cases through confirmation and consummation of a chapter 11 plan. The Settlement resolves those disputed claims and liens by providing a $13 million Settlement Fund reserved exclusively for the benefit of holders of allowed general unsecured claims, while securing structural protections that clear a path toward confirmation of a chapter 11 plan.

2. This progress arrives at a critical juncture in these chapter 11 cases, and it did not come easily. In the roughly four months since the Petition Date, these cases have moved at an extraordinary pace. Since the Committee's formation, the Debtors obtained approval of seven debtor-in-possession financing facilities layered atop eleven separate cash collateral orders. *See* Docket Nos. 142, 143, 144, 145, 146, 147, 148, 149, 150, 166, 167, 287, 299, 335, 372, 543, 784, 786. At the same time, substantially all of the Debtors' camps proceeded through an expedited sale process involving four stalking horse designations, a multiday auction, and twenty-five separate sale orders and asset purchase agreements. Lastly, during this timeframe, the Debtors filed their schedules of assets and liabilities and statements of financial affairs, and the general claims bar date passed, yielding proofs of claim asserting more than $220 million in general unsecured claims. The Committee served a key role in each of those workstreams, engaging with

the Debtors, the Lender Parties, the DIP Lenders, and proposed purchasers to advocate for unsecured creditors and maximize the value of the estates. In that same compressed window, the Committee completed the investigation of the Prepetition Trustee's asserted liens and the bond transaction that culminated in this Settlement. The Settlement converts the litigation-driven uncertainty into a consensual resolution among the estates' principal stakeholders and resolves a major dispute in these cases.

3. The Committee's investigation raised significant concerns regarding the Prepetition Trustee's asserted liens and the bond transaction, which the Committee believes would support meaningful Challenges. The Lender Parties dispute those concerns. As described below, the Settlement resolves that dispute on terms that deliver substantial value to unsecured creditors.

4. Rather than consume the estates' limited resources litigating those disputes to an uncertain conclusion, the Settlement Parties negotiated a resolution that locks in substantial and immediate value for unsecured creditors. In addition to the $13 million Settlement Fund, the Settlement secures, among other things, continued funding that is expected to be sufficient to permit confirmation and consummation of a chapter 11 plan, a budget that includes funding for the Committee's professionals, the Lender Parties' support for a chapter 11 plan creating a liquidating trust for the benefit of general unsecured creditors, and the Lender Parties' good-faith cooperation with the investigation and prosecution of estate claims against non-settling third parties.

5. The alternative to the Settlement is high-stakes, complex, and expensive litigation. Although the Committee believes its Challenges are substantial, prosecution of these claims would require significant estate resources and could take years to resolve. The Settlement eliminates both risks and undue delay while securing immediate value for

unsecured creditors.

6. The Settlement is fair, reasonable, and in the best interests of the Debtors' estates and their creditors. It provides meaningful value to unsecured creditors, eliminates substantial litigation risk, and facilitates an efficient path to confirmation and consummation of a chapter 11 plan. Accordingly, the Settlement Parties respectfully request that the Court approve the Settlement pursuant to Bankruptcy Rule 9019.

## JURISDICTION AND VENUE

7. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). This is a core proceeding under 28 U.S.C. § 157(b).

8. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The bases for the relief sought herein are sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 9019 and 6004(h), rules 9013-1 and 9019-3 of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules"), and the General Order Governing Chapter 11 Complex Case Procedures.

## BACKGROUND

### I. The Chapter 11 Cases

10. On June 4, 2026 and June 5, 2026 (together, the "Petition Date"), each of the Debtors commenced a chapter 11 case by filing a voluntary petition for relief under the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

11. On July 9, 2026, the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code. *See* Docket No. 438. No trustee or examiner has been

appointed in these chapter 11 cases.

**II. The Bond Debt, the Bondholder DIP Facility, and the Debtors' Stipulations**

12. Debtor SIMAD Holdings Ltd., the ultimate parent of each Debtor, issued Series A debentures listed on the Tel Aviv Stock Exchange with an original principal amount of up to $195 million, pursuant to a deed of trust dated November 27, 2025 between SIMAD Holdings Ltd. and the Prepetition Trustee. As of the Petition Date, the Debtors listed the principal amount outstanding on account of the bond debt at approximately $214 million. *See* First Day Decl. at ¶ 12.

13. In connection with the bond debt, certain of the Debtors executed promissory notes, mortgages, a security agreement, and pledge agreements in favor of the Prepetition Trustee (collectively, the "Financing Documents"). Under the security agreement dated as of December 31, 2025, each Debtor party thereto purported to grant the Prepetition Trustee a continuing security interest in the "Collateral," defined as the "Pledged Interests," which are in turn defined as "all assets of Debtor." Sixteen Debtor entities also executed mortgages encumbering their respective properties. In 2026, the Prepetition Trustee filed UCC-1 financing statements against certain of the Debtor obligors.

14. The Prepetition Trustee asserts that the Financing Documents grant it prepetition liens on, and security interests in, substantially all assets of the Debtor obligors.

15. To fund these chapter 11 cases, the Debtors sought approval of multiple debtor-in-possession financing facilities, including a $174 million facility provided by the Prepetition Secured Parties, consisting of $58 million of "new money" and a roll-up of $116 million of Series A bond debt (the "Bondholder DIP"), two times the new money commitments. *See* Docket No. 225 (the "Bondholder DIP Motion"). The Committee objected to the Bondholder DIP

Motion due to concerns over, among other things, liens on assets that should remain available to unsecured creditors, overly broad release and indemnification provisions, excessive fees, and insufficient Committee resources and protections.

16. The parties reached an agreement on revised terms that were memorialized in the Final DIP Order, which the Court entered on July 21, 2026. In connection with obtaining the Bondholder DIP, the Debtors stipulated to the validity, priority, and extent of the Prepetition Trustee's prepetition liens and claims and agreed to release the DIP Secured Parties, the Prepetition Secured Parties, and certain related parties from claims and causes of action relating to, among other things, the Prepetition Obligations, the Prepetition Liens, and the DIP Obligations, subject to certain exceptions, including for bad faith, fraud, gross negligence, or willful misconduct. *See* Final DIP Order ¶¶ F, 24. Those stipulations and releases bind all other parties in interest, including the Committee, unless a party timely commences a Challenge. *See id.* ¶ 12.

## III. The Committee's Investigation

17. Following its appointment, the Committee wasted no time. Within three weeks of its appointment, the Committee served requests for production on the Debtors and subpoenas on numerous third parties. Over the weeks that followed, the Committee participated in a series of meet and confers, corresponded extensively regarding the scope and sequencing of production, and obtained and reviewed thousands of documents produced by the Prepetition Trustee, the Debtors, and third parties, together with the Financing Documents, UCC filings, public securities filings, and other public records. The parties worked cooperatively to manage the practical challenges inherent in cross-border document collection on a highly compressed timeline.

18. The Committee's investigation raised significant concerns regarding, among other things, the attachment and perfection of the Prepetition Trustee's asserted liens. The Committee

believes those concerns would support colorable Challenges and that successful prosecution could meaningfully increase recoveries for unsecured creditors. The Lender Parties vigorously dispute the Committee's positions, maintain that the asserted liens are valid and properly perfected, and believe that the Challenges would fail if litigated. The Settlement resolves these disputed matters on agreed terms, without the cost, delay, and uncertainty of litigation.

**IV. The Settlement Negotiations and the Term Sheet**

19. Under the Final DIP Order, the Committee had until sixty (60) days after its appointment, or September 7, 2026, to commence a Challenge (the "Challenge Period"), which period "may be extended in writing (which may be via email) from time to time in the discretion of the Prepetition Secured Parties, the Debtors, and the Creditors' Committee." Final DIP Order ¶ 12(a). The Prepetition Secured Parties, the Debtors, and the Committee agreed in writing to multiple extensions of the Challenge Period.

20. Beginning in mid-September 2026 and continuing through the extended Challenge Period, the Committee and the Lender Parties engaged in extensive, good-faith, arm's-length negotiations regarding a comprehensive resolution of the Committee's Challenges. Those negotiations were hard fought. Over the course of several weeks, the Committee and the Lender Parties exchanged numerous settlement proposals and counterproposals addressing, among other things, the amount and structure of a settlement fund, continued funding of these chapter 11 cases, and the preservation of estate claims and causes of action against non-settling parties.

21. Those negotiations culminated in the Term Sheet, executed on October 11, 2026, which, upon satisfaction of the Conditions Precedent, constitutes the definitive and binding settlement agreement among the Settlement Parties. The Settlement is conditioned upon (a) entry of a final order of the Court granting this Motion and (b) approval of the Settlement by the requisite

majority of the Prepetition Bondholders, as required under the applicable trust documents and certified by the Prepetition Trustee. Pending the Settlement Effective Date and the funding of the Settlement Fund, the Challenge Period Termination Date is tolled as to the Committee, and if the Term Sheet is terminated in accordance with its terms, the Challenge Period Termination Date will be automatically extended for the Committee for five (5) business days following such termination, without prejudice to the Committee's right to seek further extensions as set forth in the Term Sheet. In connection with the Settlement, the Debtors, the Committee, and the Lender Parties have also agreed to a new budget to fund the administration of these chapter 11 cases through confirmation and consummation of a chapter 11 plan.

22. The principal terms of the Settlement are as follows:[3]

- **Settlement Fund.** The Prepetition Secured Parties will contribute $13,000,000 (the "Settlement Fund"), from amounts otherwise recoverable on account of the Prepetition Secured Claim, solely for the benefit of holders of allowed general unsecured claims. The Settlement Fund will be funded in full, in cash, by wire transfer directly to a segregated account held in the Debtors' name solely as custodian (the "GUC Trust Account"). Funding will occur contemporaneously with, and as a condition to, any distribution to the Lender Parties on account of the Roll-Up DIP Loans. The Settlement Fund and the GUC Trust Account will be held in trust solely for holders of allowed general unsecured claims. They will not be property of the Debtors' estates or DIP Collateral, Prepetition Collateral, or Cash Collateral, and they will be free and clear of all liens, claims, and interests, including the DIP Liens, Prepetition Liens, Adequate Protection Liens, and any superpriority claims. The GUC Trust Account will sit outside the Debtors' cash management system and will not be subject to setoff. The Committee (or its successor or designee) will direct all withdrawals and will administer and distribute the Settlement Fund in its sole discretion.

- **Administrative Expense Shortfall Cooperation.** The parties agree that if there are insufficient funds to pay all Allowed administrative expenses as contemplated by the chapter 11 plan, the Settlement Parties will meet and confer in good faith with the Debtors regarding potential resolutions of the shortfall to facilitate confirmation of the chapter 11 plan.

- **Deficiency Claims.** The Lender Parties will not recover any portion of the Settlement Fund on account of any unsecured deficiency claims. Any and all distributions from the Settlement

[3] This summary is qualified in its entirety by the Term Sheet attached as Exhibit 1 to the Proposed Order. All capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the Term Sheet. To the extent that there are any conflicts between this summary and the Term Sheet, the terms of the Term Sheet shall govern.

Fund shall be made solely to holders of allowed general unsecured claims.

- **Continued DIP Funding.** The Lender Parties will consent to the Debtors' use of Cash Collateral to fund these chapter 11 cases through confirmation and consummation of a chapter 11 plan, in accordance with the Approved Budget, and subject to milestones agreed to by those same parties. The Approved Budget includes a line item for Committee professional fees of not less than $8.1 million, inclusive of the approximately $2.334 million in the Budget annexed to the Final DIP Order. Notwithstanding anything to the contrary in the Final DIP Order, the DIP Documents, any sale order, or any other order, the Approved Budget will be funded in full from the proceeds of any sale of the Debtors' assets before any such proceeds are paid to or for the benefit of MTC, the Lender Parties, the DIP Lenders, or the Prepetition Secured Parties. Budgeted fees and expenses of Professional Persons and the other professionals in line item 26. of the Approved Budget (collectively, the "Escrowed Professional Persons") through the effective date of a chapter 11 plan will be deposited into a segregated escrow account (the "Professional Fee Escrow"). The Professional Fee Escrow will not be estate property or collateral of any party, will be free and clear of all liens and superpriority claims, will not be subject to setoff, sweep, or mandatory prepayment, and will be used solely to pay allowed professional fees; provided, however, following payment in full of all allowed fees and expenses of Escrowed Professional Persons, any funds remaining in the Professional Fee Escrow shall be released to the Debtors' estates. The Approved Budget and the Professional Fee Escrow are separate from, and will not reduce, the Settlement Fund.

- **Challenge Investigation Fees.** The $250,000 limitation referenced in paragraph 27 of the Final DIP Order will not restrict the payment of the allowed fees and expenses of the Committee's advisors incurred in connection with the investigation or prosecution of Challenges.

- **Plan Support / Liquidating Trust.** The Lender Parties will support a chapter 11 plan that provides for the creation of a liquidating trust to pursue estate claims and causes of action for the benefit of general unsecured creditors. The Committee will support confirmation of a chapter 11 plan that is consistent in all material respects with the terms of the Term Sheet.

- **Cooperation on Litigation Targets.** The Lender Parties will cooperate in good faith with the investigation and prosecution of avoidance actions and other causes of action against third parties.

- **Amendments to Final DIP Order.** Upon the later of (i) the Settlement Effective Date and (ii) the funding of the Settlement Fund, the restrictions in paragraph 12(b) of the Final DIP Order with respect to distributions on account of the Roll-Up Obligations, including the segregation requirement, will terminate. The Final DIP Order and the DIP Documents will be deemed amended to the extent necessary to effectuate the Settlement. Those amendments include, without limitation, the amendments necessary to permit (a) the funding of the Settlement Fund into the GUC Trust Account free and clear of all liens and claims, (b) the release of the paragraph 12(b) restrictions, (c) the funding in full of the Approved Budget from sale proceeds before any distribution to the Lender Parties, and (d) the funding of the Professional Fee Escrow free and clear of all liens and superpriority claims. The amendments

will be deemed approved upon entry of the Proposed Order.

- **Resolution of Challenges.** Upon the later of (i) the Settlement Effective Date and (ii) the funding of the Settlement Fund, all Challenges preserved by the Committee will be deemed finally resolved for all purposes under paragraph 12 of the Final DIP Order, and the Challenge Period Termination Date will be deemed to have occurred, in each case without releasing, waiving, or impairing any claims or causes of action against any non-settling party.

- **Committee Releases.** Effective upon the later of (i) the Settlement Effective Date and (ii) the funding of the Settlement Fund, the Committee releases each of the Released Parties, including the DIP Agent and the Prepetition Trustee, from all claims and causes of action of the type described in paragraph 24 of the Final DIP Order. The Committee gives this release on its own behalf and on behalf of the Debtors' estates, but only to the extent it has authority to act for the estates with respect to the Challenges.

## RELIEF REQUESTED

23. By this Motion, the Debtors and the Settlement Parties seek entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, (a) approving the Settlement and the Term Sheet; (b) approving the Approved Budget as the Approved DIP Budget under the Final DIP Order and the related use of Cash Collateral under the Final DIP Order, and directing that the Approved Budget be funded in full from the proceeds of any sale or other disposition of the Debtors' assets before any such proceeds are paid to or for the benefit of MTC, the Lender Parties, the DIP Lenders, or the Prepetition Secured Parties; (c) finding that the Settlement Fund constitutes a voluntary contribution by the Prepetition Secured Parties from their own recoveries, is held by the Debtors in a segregated account solely as custodian for the benefit of holders of allowed general unsecured claims, is not property of the Debtors' estates, does not constitute DIP Collateral, Prepetition Collateral, or Cash Collateral within the meaning of section 363(a) of the Bankruptcy Code, and is free and clear of all liens, claims, and encumbrances, including the DIP Liens, Prepetition Liens, Adequate Protection Liens, DIP Superpriority Claims, Adequate Protection Claims, and the Carve-Out; (d) approving the establishment and funding of the Professional Fee Escrow and finding that the Professional Fee Escrow and all funds in it are held solely for the

payment of allowed fees and expenses of Escrowed Professional Persons, are not property of the Debtors' estates, do not constitute DIP Collateral, Prepetition Collateral, or Cash Collateral, and are free and clear of all liens, claims, and encumbrances, including the DIP Liens, Prepetition Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Claims, and not subject to setoff, recoupment, sweep, or mandatory prepayment; (e) modifying paragraph 12(b) of the Final DIP Order, effective upon the later of the Settlement Effective Date and the funding of the Settlement Fund, to remove the restrictions on distributions on account of the Roll-Up Obligations, and deeming the Final DIP Order and the DIP Documents amended to the extent necessary to effectuate the Settlement, including, without limitation, the funding of the Settlement Fund, the Approved Budget, and the Professional Fee Escrow as provided in the Term Sheet; (f) modifying paragraph 27 of the Final DIP Order to remove the $250,000 limitation on the use of DIP Facility proceeds, DIP Collateral, and Prepetition Collateral, including Cash Collateral, to pay the Committee professionals' allowed fees and expenses incurred in connection with the investigation and pursuit of Challenges; (g) authorizing the Debtors and the Settlement Parties to take all actions necessary or appropriate to implement and effectuate the Settlement; (h) waiving any stay of the effectiveness of the Proposed Order, including under Bankruptcy Rule 6004(h); and (i) granting related relief.

## BASIS FOR RELIEF

### I. The Settlement

24. Bankruptcy Rule 9019 provides, in relevant part, that "after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In addition, Bankruptcy Code section 105(a) authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Compromises are favored in bankruptcy because they minimize the costs of litigation

and further the parties' interests in expediting the administration of a bankruptcy estate. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also* 10 Collier on Bankruptcy ¶ 9019.01 (16th ed. 2026). In deciding whether to approve a compromise under Bankruptcy Rule 9019, the court must determine whether the settlement is "fair, reasonable, and in the best interest of the estate." *In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) (citing *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006); *see also In re NovaPro Holdings, LLC*, No. 14-10895-LSS, 2019 WL 1324950, at *4 (D. Del. Mar. 25, 2019), *aff'd*, 815 F. App'x 655 (3d Cir. 2020) (ruling under the fair and equitable standard, the court weighs the fairness of the settlement to parties who did not settle); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 451 (Bankr. D.N.J. 1990); *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

25. Courts within the Third Circuit consider the following four factors, referred to as the "*Martin factors*," to determine whether a particular compromise or settlement is fair and equitable: (1) the probability of success in litigation concerning the subject matter of the settlement; (2) the projected difficulty in collecting after obtaining a judgment in such litigation; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay that would attend such litigation; and (4) the paramount interest of creditors. *See In re Martin*, 91 F.3d at 393 (following *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968)); *see also In re NovaPro Holdings, LLC*, 815 F. App'x at 658; *In re Nutraquest, Inc.*, 434 F.3d 639, 644–45 (3d Cir. 2006); *In re RNI Wind Down Corp.*, 348 B.R. 286, 297 (Bankr. D. Del. 2006); *In re Kaiser Aluminum Corp.*, 339 B.R. 91, 96–97 (D. Del. 2006).

26. A proposed compromise need not be the best result that could have been achieved; it need only fall within the reasonable range of litigation possibilities. *See, e.g.*, *NovaPro Holdings*,

815 F. App'x at 658; *Key3Media*, 336 B.R. at 92–93; *In re Sea Containers Ltd.*, No. 06-11156 (KJC), 2008 WL 4296562, at *5 (Bankr. D. Del. Sept. 19, 2008); *In re Pa. Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), *aff'd*, 8 F.3d 812 (3d Cir. 1993). The Court need only determine whether the settlement "falls above the lowest point in the range of reasonable litigation possibilities." *Whyte v. Kivisto (In re SemCrude, L.P.)*, No. 08-11525 (BLS), 2010 WL 4814377, at *3 (Bankr. D. Del. Nov. 19, 2010) (citations omitted). The "ultimate inquiry" is "whether the compromise is fair, reasonable, and in the interest of the estate." *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *Louise's*, 211 B.R. at 801). The Settlement readily satisfies each of the *Martin* factors.

27. *First*, the outcome of litigation over the Challenges is uncertain for both sides, and that uncertainty weighs in favor of approval. The Committee believes its Challenges have substantial merit, and, if successful, would expose the Lender Parties to significant risks, including avoidance of their Prepetition Liens, disallowance or subordination of the Prepetition Obligations, and the unwinding of the $116 million Roll-Up, a remedy the Final DIP Order expressly contemplates. Moreover, until the Challenges are finally resolved, the Final DIP Order bars any distribution of sale proceeds on account of the Roll-Up Obligations, which instead must be held in a segregated account. Continued litigation would therefore delay the Lender Parties' recoveries for an extended and uncertain period. The Lender Parties, for their part, dispute each of the Committee's positions, contend that the Challenges lack merit, and would raise numerous defenses. Even if the Committee prevailed on some of its theories, significant secured claims could remain in place. The Settlement resolves these mutual risks. It provides a certain $13 million recovery reserved exclusively for holders of allowed general unsecured claims, together with the structural protections set forth in the Term Sheet, without the cost, delay, and risk of

protracted litigation.

28. *Second*, the projected difficulty of collecting on any judgment independently supports the Settlement. The Lender Parties' prepetition claims arise under an Israeli deed of trust, governed exclusively by Israeli law, for NIS-denominated debentures that are listed on the Tel Aviv Stock Exchange and held through the exchange's clearing system, and Mishmeret Trust Company Ltd., an Israeli trust company, acts as trustee for the holders of those debentures. Much of the relief that the Challenges seek would have to be recovered from an Israeli trustee, and enforcing this Court's judgment internationally may require recognition proceedings in Israel. Such proceedings would impose their own procedural requirements, defenses, and appeals, and would add significant cost and delay before any recovery reached the estates. Although sale proceeds otherwise distributable on account of the Roll-Up Obligations are currently held in a segregated account in the United States, that account would not necessarily cover all monetary relief from the Challenges, and it would not prevent years of litigation and appeals over the Challenges before any of those funds could be applied. The Settlement avoids these collection risks. The Prepetition Secured Parties will fund the Settlement Fund by contributing $13,000,000, from amounts otherwise recoverable on account of the Prepetition Secured Claim, directly to the GUC Trust Account. That contribution is a condition to, and must occur contemporaneously with, any distribution to or for the benefit of the Lender Parties on account of the Roll-Up DIP Loans.

29. *Third*, Settlement avoids litigation that would be extraordinarily complex, costly, and time-consuming. Litigating the Challenges would require a contested standing motion, one or more adversary proceedings raising fact-intensive avoidance, authority, and subordination theories, expert discovery and forensic tracing of the bond proceeds, cross-border discovery, and near-certain appellate proceedings. That litigation would be funded at the expense of the estates,

would consume the attention of every major constituency, and would delay the formulation and confirmation of a chapter 11 plan indefinitely. The Settlement avoids those costs, burdens, and delays, and, through the Lender Parties' plan support and continued funding commitments under the Settlement terms, affirmatively clears a pathway to plan confirmation.

30. *Fourth*, the Settlement serves the paramount interest of creditors. Absent the Settlement, holders of general unsecured claims would face substantial uncertainty as to the timing and amount of any recovery. The Prepetition Secured Parties assert liens on substantially all of the Debtors' assets, and under the Final DIP Order, the DIP Liens prime those liens. The Settlement changes that outlook. It provides a $13 million Settlement Fund reserved exclusively for holders of allowed general unsecured claims. The Lender Parties have agreed not to share in that fund on account of any deficiency claims, thereby avoiding dilution of recoveries for other unsecured creditors. The Settlement also provides for the continued funding of these chapter 11 cases through confirmation and consummation of a chapter 11 plan, including funding for the Committee's professionals, without reducing the Settlement Fund. In addition, the Settlement preserves the estates' claims and causes of action against non-settling parties, including the Debtors' insiders, for the benefit of general unsecured creditors. It requires the Lender Parties to cooperate in the pursuit of those claims and to support a chapter 11 plan that establishes a liquidating trust to prosecute them. Together, these terms give unsecured creditors both an immediate, certain recovery and a continuing opportunity to pursue additional recoveries. This is achieved without the undue cost, delay, and risk endemic of protracted litigation, which would consume estate resources that could otherwise benefit creditors.

31. The Settlement's allocation of the Settlement Fund exclusively to holders of

allowed general unsecured claims is also consistent with the Bankruptcy Code's priority scheme. The Settlement Fund is a voluntary contribution by the Prepetition Secured Parties from their own recoveries on account of the Prepetition Secured Claim, not a distribution of unencumbered estate property.

32. Finally, the Settlement is the product of good-faith, arm's-length negotiations between independent, sophisticated parties represented by experienced counsel, and the Debtors support it. Over the course of several weeks, the Committee and the Lender Parties exchanged numerous written proposals and counterproposals, and the economic terms moved materially in both directions before an agreement was reached. No Debtor insiders are parties to, or beneficiaries of, the Settlement. For all of these reasons, the Settlement is fair, reasonable, and in the best interests of the Debtors' estates and their creditors, and it should be approved.

## II. Consensual Use of Cash Collateral

33. Section 363(c)(2) of the Bankruptcy Code permits a debtor in possession to use cash collateral where "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use." 11 U.S.C. § 363(c)(2). As required by the Term Sheet, the Debtors, the Committee, and the Lender Parties have agreed upon the Approved Budget attached as Exhibit 2 to the Proposed Order. In connection therewith, the DIP Secured Parties and the Prepetition Secured Parties have consented to the Debtors' continued use of Cash Collateral in accordance with the Approved Budget, subject to the terms of the Final DIP Order as amended by the Proposed Order. Upon entry of the Proposed Order, the Approved Budget shall constitute the Approved DIP Budget for all purposes under the Final DIP Order. The Lender Parties' consent further provides that the Approved Budget will be funded in full from the

proceeds of any sale of the Debtors' assets before any such proceeds are distributed to the Lender Parties, and that budgeted professional fees will be deposited into the Professional Fee Escrow, free and clear of all liens and superpriority claims. Accordingly, the Debtors' use of Cash Collateral on the terms set forth in the Approved Budget satisfies section 363(c)(2)(A) of the Bankruptcy Code, and, to the extent necessary, the Court should authorize such use under section 363(c)(2)(B).

**WAIVER OF BANKRUPTCY RULE 6004(h)**

34. To the extent applicable, the Debtors and the Settlement Parties request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h) and provide that the Proposed Order shall be effective and enforceable immediately upon entry. The Approved Budget governs the continued funding of these chapter 11 cases, and the Settlement Effective Date triggers the deposit of the Settlement Fund and the modification of paragraph 12(b) of the Final DIP Order. Any delay in the effectiveness of the Proposed Order would postpone the benefits of the Settlement to the estates and their creditors and could disrupt the administration of these chapter 11 cases.

**NOTICE**

35. Notice of the Motion will be given to the following parties or their counsel: (a) the Debtors; (b) the U.S. Trustee for the District of New Jersey; (c) counsel to the Lender Parties; (d) any known secured creditors, and (e) any party that requests service pursuant to Bankruptcy Rule 2002. The Settlement Parties and the Debtors submit that, in light of the nature of the relief requested, no other or further notice is required or necessary.

**NO PRIOR REQUEST**

36. No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Settlement Parties and the Debtors respectfully request that the Court enter the Proposed Order attached hereto as **Exhibit A** granting the relief requested herein and such other relief that the Court deems just and proper.

Dated: October 11, 2026

*/s/ Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email: msirota@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

*/s/ Joseph L. Schwartz*
**RIKER DANZIG LLP**
Joseph L. Schwartz
Daniel A. Bloom
John D. Stern
7 Giralda Farms, Suite 250
Madison, New Jersey 07940
Telephone: (973) 538-0800
Email: jschwartz@riker.com

**CHAPMAN AND CUTLER LLP**
Michael Friedman (admitted *pro hac vice*)
Jorge Eric Coronel Hamilton
*(admitted pro hac vice*)
1270 Avenue of the Americas, 30th Floor
New York, New York 10020
Telephone: (212) 655-2508
Email: friedman@chapman.com
Email: jcoronel@chapman.com

*Counsel to the Lender Parties*

Respectfully submitted,

*/s/ Evan M. Lazerowitz*
**ROBINSON & COLE LLP**
Evan M. Lazerowitz (063232013)
Rachel Jaffe Mauceri (038102001)
Brya M. Keilson (022502004)
666 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 451-2900
Email: elazerowitz@rc.com
Email: rmauceri@rc.com
Email: bkeilson@rc.com

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman (admitted *pro hac vice*)
Kristin K. Going (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com
Email: kgoing@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Rachel Biblo Block (admitted *pro hac vice*)
2801 North Harwood Street, Suite 2600
Dallas, Texas 75201
Telephone: (214) 295-8000
Email: rbibloblock@mcdermottlaw.com

*Counsel to the Official Committee of Unsecured Creditors*