**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

**NOTICE OF FILING OF PROPOSED ASSET PURCHASE AGREEMENT AND SALE ORDER FOR GREENVILLELAND LLC AND MALKA OPERATINGCO, LLC**

**PLEASE TAKE NOTICE** that, on June 26, 2026, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 298] (the "Bidding Procedures Order") in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "SIMAD Debtors").

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

**PLEASE TAKE FURTHER NOTICE** that, on August 4, 2026, the SIMAD Debtors filed the *Notice of Successful Bidders with Respect to Certain of the SIMAD Debtors' Assets* [Docket No. 789] (the "Sale Notice"), which identified Cho Pro Holdings LLC (the "Buyer") as the Successful Bidder for the Assets of Greenvilleland, LLC and Malka Operatingco, LLC (the "Sellers").

**PLEASE TAKE FURTHER NOTICE** that, the Court held a hearing on August 10, 2026 where it approved the Sale from Sellers to Buyer subject to final agreement on the terms of a Purchase Agreement and proposed Sale Order.

**PLEASE TAKE FURTHER NOTICE** that, on October 14, 2026, the Buyer and the Sellers executed the asset purchase agreement, attached hereto as **Exhibit A** (the "Malka APA").

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as **Exhibit B**, is a copy of the proposed sale order (the "Sale Order"), approving the Malka APA.

**PLEASE TAKE FURTHER NOTICE that, copies of the Bidding Procedures Order, the Malka APA, the Sale Order, and this Notice may be obtained free of charge on the website maintained by the SIMAD Debtors' Claims and Noticing Agent, Kroll, at https://restructuring.ra.kroll.com/SIMAD.**

Dated: October 16, 2026

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email: msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the Debtors and*
*Debtors in Possession*

# Exhibit A

**Malka APA**

*Execution Version*

# ASSET PURCHASE AGREEMENT

by and among

**CHO PRO HOLDINGS, LLC OR AN ENTITY TO BE FORMED,**

as Buyer;

and

**THE SELLERS NAMED HEREIN,**

as Sellers

**Dated as of October 14, 2026**

**TABLE OF CONTENTS**

ARTICLE I. DEFINITIONS ....................1

ARTICLE II. PURCHASE AND SALE ....................7
Section 2.01 Acquired Assets ....................7
Section 2.02 Excluded Assets ....................8
Section 2.03 Assumed Liabilities ....................9
Section 2.04 Excluded Liabilities ....................10
Section 2.05 Further Assurances....................10
Section 2.06 Purchase Price ....................10
Section 2.07 Deposit; Payment of Purchase Price. ....................11
Section 2.08 Transfer Taxes ....................11
Section 2.09 Allocation of Purchase Price....................11

ARTICLE III. CLOSING ....................12
Section 3.01 Closing ....................12
Section 3.02 Sellers' Closing Deliverables....................12
Section 3.03 Buyer Closing Deliverables ....................13

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLERS ....................13
Section 4.01 Organization and Qualification of Sellers....................13
Section 4.02 Authority of Sellers....................13
Section 4.03 No Conflicts ....................14
Section 4.04 Title to Acquired Assets....................14
Section 4.05 Litigation....................14
Section 4.06 Compliance with Laws; Permits ....................14
Section 4.07 Brokers....................14
Section 4.08 No Other Representations ....................14

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ....................15
Section 5.01 Organization of Buyer....................15
Section 5.02 Authority of Buyer ....................15
Section 5.03 No Conflicts ....................15
Section 5.04 Sufficiency of Funds ....................15
Section 5.05 Litigation....................15
Section 5.06 Brokers....................15
Section 5.07 No Outside Reliance ....................16

ARTICLE VI. COVENANTS ....................16
Section 6.01 Conduct of Business ....................16
Section 6.02 Access to Information ....................16
Section 6.03 Efforts; Consents....................16
Section 6.04 Bankruptcy Court Matters....................16
Section 6.05 Publicity ....................17
Section 6.06 Confidentiality ....................17
Section 6.07 Notification of Certain Matters ....................17

Section 6.08 Bulk Transfer Laws ....................17
Section 6.09 Employee Matters ....................17

ARTICLE VII. TAX MATTERS ....................18
Section 7.01 Transfer Taxes ....................18
Section 7.02 Cooperation on Tax Matters ....................18

ARTICLE VIII. CONDITIONS TO CLOSING ....................18
Section 8.01 Conditions to Obligations of All Parties ....................18
Section 8.02 Conditions to Obligations of Buyer ....................18
Section 8.03 Conditions to Obligations of Sellers ....................19

ARTICLE IX. TERMINATION ....................19
Section 9.01 Termination ....................19
Section 9.02 Effect of Termination. ....................20
Section 9.03 Remedies. ....................20

ARTICLE X. MISCELLANEOUS ....................21
Section 10.01 Survival ....................21
Section 10.02 Notices ....................21
Section 10.03 Interpretation ....................22
Section 10.04 Severability ....................22
Section 10.05 Entire Agreement ....................22
Section 10.06 Assignment ....................22
Section 10.07 Amendment and Waiver ....................22
Section 10.08 Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial 23
Section 10.09 Specific Performance ....................23
Section 10.10 Counterparts ....................23
Section 10.11 No Third-Party Beneficiaries ....................23
Section 10.12 "As Is, Where Is" Transaction ....................23
Section 10.13 No Successor Liability ....................24

Exhibits

Exhibit A Form of Bill of Sale

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated as of October 13, 2026 (the "Effective Date"), and is entered into by and among Cho Pro Holdings, LLC, a New York State Limited Liability Company, or an entity to be formed ("Buyer") and each of the "Sellers" identified on the signature pages hereto (each a "Seller" and collectively, the "Sellers"). Each of Buyer and Sellers are at times referred to herein individually as a "Party" and together as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

## RECITALS

WHEREAS, on June 4, 2026 and June 5, 2026, Sellers commenced bankruptcy cases which are being jointly administered under Case No. 26-16388 (CMG) (the "Bankruptcy Case") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

WHEREAS, in connection with the Bankruptcy Case, Sellers desire to sell, transfer, convey, assign and deliver to Buyer, all of the Acquired Assets, and Buyer desires to: (i) purchase, acquire and assume all of the Acquired Assets and all of the Assumed Liabilities (and no other liabilities) (each as defined herein); and (ii) consummate such other transactions as are contemplated by this Agreement, in each case upon the terms and conditions set forth in this Agreement (with all such transactions referred to as the "Transaction");

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Acquired Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey, all on the terms and subject to the conditions set forth in this Agreement and in the Sale Order (as defined herein); and

WHEREAS, Sellers' and Buyer's willingness to consummate the Transaction is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"Accounts Receivable" means (a) all accounts, accounts receivable, payment intangibles, rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Acquired Assets" has the meaning set forth in Section 2.01.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means any transaction or series of transactions (other than the Transaction) pursuant to which any Person or group of Persons (other than Buyer or any of its Affiliates) directly or indirectly acquires or would acquire any of the Acquired Assets, whether by sale, merger, recapitalization, reorganization, or otherwise.

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Causes of Action" means any and all claims, rights, causes of action, suits, and proceedings, whether known or unknown, arising under chapter 5 of the Bankruptcy Code (including Sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code) or any analogous state or federal law, including all preference, fraudulent transfer or conveyance, and other avoidance claims, rights, and causes of action, together with any and all proceeds, recoveries, and rights to recovery (whether judicial or otherwise) arising therefrom or related thereto, that are or may be asserted by, or on behalf of, the Sellers, their estates, or any trustee, examiner, or other estate representative.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" has the meaning set forth in the recitals.

"Bid Procedures" means the procedures governing the solicitation of bids for the Acquired Assets and, to the extent applicable, the conduct of the Auction (as defined in the Bid Procedures Order), as approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court dated June 26, 2026 approving the Bid Procedures.

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Camp" means recreational and/or informal educational programs for Campers during the Camp Season in a communal traditional residential camp environment.

"Camp Business" means the establishment and management of the Camp conducted for Campers during the Camp Season. Such business includes recruitment of Campers, staff, procurement of necessary provisions, lease or ownership of real estate, creation of programs and events and follow-up relations with Campers, prospective Campers, and their parents. The Camp Business may also include the rental of the facilities of the Camp during periods other than the Camp Season.

"Camp Season" shall mean the months of June, July and August in a specific calendar year.

"Campers" means juveniles and adolescents who attend the Camp.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral agreement, contract, lease, sublease, license, sublicense, obligation, promise, undertaking, commitment, or other binding arrangement or understanding.

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Deposit" has the meaning set forth in Section 2.07(a).

"DIP Facility" means any debtor-in-possession credit facility entered into by Sellers in connection with the Bankruptcy Cases.

"Dollars" or "$" means the lawful currency of the United States.

"Effective Date" has the meaning set forth in the preamble.

"Encumbrance" means any lien, pledge, security interest, charge, claim, mortgage, deed of trust, option, right of first refusal, preemptive right, restriction on transfer, or other encumbrance of any kind or nature, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Agent" means Flagstar Bank, or such other escrow agent as mutually agreed in writing between the Parties.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Claims" means all (a) rights (including rights of set-off and rights of recoupment), claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, rights of set-off, rights of subrogation and all other rights of any kind of the Sellers against (i) any current or former director, officer, or manager of any Seller, or any spouse, family member, or other relative of, or any Person related to or affiliated with, any of the foregoing, (ii) any DIP lender, prepetition secured or unsecured lender, or other financing party in the Bankruptcy Cases, including, without limitation, any DIP Secured Parties and Prepetition Secured Parties (each as defined in the Final DIP Order [Docket No. 552]) and each of their respective Affiliates, and (iii) third parties solely to the extent arising in respect of any Excluded Asset or Excluded Liability, (b) Bankruptcy Causes of Action, and (c) claims or causes of action of any Seller to the extent such claims or causes of action neither (X) directly and exclusively arose out of or related to the ordinary course, day-to-day operation prior to Closing of the Acquired Assets and the Camp Business, nor (Y) directly and exclusively arise out of or relate to the post-Closing operation of the Camp Business.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Final Order" means an Order of the Bankruptcy Court (or any court of competent jurisdiction) as to which the time to file an appeal, motion for rehearing, or writ of certiorari has expired and no appeal, motion for rehearing, or writ of certiorari is pending; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule, may be filed shall not cause an Order not to be a Final Order.

"Former Employees" means all individuals who have been employed by Sellers who are not Current Employees.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, provincial, local, municipal, foreign, or other government, or any department, commission, board, bureau, agency, regulatory authority, instrumentality, or political subdivision thereof, or any court, arbitral body, or similar body of competent jurisdiction.

"Health Plans" means all health plans including, but not limited to, health, dental, life, disability and long-term care insurance.

"Intellectual Property" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d)

all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"Inventory" means all of Sellers' now owned and hereafter acquired raw materials and work-in-process therefor and all of Sellers' tangible property used in the operation of the Sellers' business or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"Law" means any federal, state, provincial, local, municipal, foreign, international, or multinational constitution, statute, treaty, rule, regulation, ordinance, order, code, or other similar requirement enacted, adopted, promulgated, or applied by any Governmental Authority.

"Liabilities" means any debt, liability, commitment, or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Material Adverse Effect" means any change, effect, event, occurrence, development, or state of facts that, individually or in the aggregate with all other changes, effects, events, occurrences, developments, or states of facts, (a) has had or would reasonably be expected to have a material adverse effect on the ability of Sellers to consummate the Transaction, or (b) prevents or materially impairs or delays, or would reasonably be expected to prevent or materially impair or delay, the ability of Sellers to consummate the Transaction; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic or political conditions or the securities, credit, or financial markets in general in the United States or any other jurisdiction in which Sellers operates; (ii) changes in conditions generally affecting the industries in which Sellers operates; (iii) the announcement or pendency of this Agreement or the Transaction, including the impact thereof on the relationships, contractual or otherwise, of Sellers with employees, customers, suppliers, distributors, partners, or other third parties; (iv) any change in Law or GAAP (or any interpretation thereof) after the date hereof; (v) acts of war (whether or not declared), sabotage, terrorism, military actions, or the escalation or worsening of any of the foregoing; (vi) any natural or man-made disaster, pandemic, epidemic, disease outbreak, or acts of God; (vii) the filing or commencement of the Bankruptcy Cases or any events or circumstances resulting therefrom; (viii) any action taken or omitted to be taken by Sellers at the written request or with the prior written consent of Buyer; (ix) any failure by Sellers to meet any internal or external projections, forecasts, or estimates of revenue, earnings, or other

financial metrics (provided that the underlying causes of such failure may be taken into account unless otherwise excluded by this definition); or (x) any matter disclosed on the Schedules hereto.

"Order" means any order, judgment, injunction, ruling, writ, assessment, or decree of any Governmental Authority.

"Outside Date" means October 20, 2026; provided, however, that the Outside Date may be extended by mutual written agreement of the Parties.

"Patents" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"Permits" means all licenses, permits, certificates, approvals, registrations, consents, authorizations, franchises, variances, exemptions, and orders issued or granted by a Governmental Authority.

"Permitted Encumbrances" means (a) Encumbrances arising under this Agreement; (b) statutory liens for current Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; (c) mechanics', carriers', workers', repairers', and similar statutory liens arising or incurred in the ordinary course of business for amounts not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; and (d) zoning, entitlement, conservation restrictions, and other land use and environmental regulations by Governmental Authorities that do not materially interfere with the present use of the applicable asset.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" means the dates on which Sellers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Property" has the meaning set forth in Section 2.01(b).

"Purchase Price" has the meaning set forth in Section 2.06.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Camp Business, including without limitation a current schedule of Seller's Campers.

"Sale Hearing" means the hearing, if any, before the Bankruptcy Court to approve the Sale Order.

"Sale Motion" means the motion(s) or notice(s) of private sale filed by Sellers with the Bankruptcy Court seeking entry of the Sale Order.

"Sale Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, entered pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, approving and authorizing (a) the sale of the Acquired Assets to Buyer, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), pursuant to Section 363(f) of the Bankruptcy Code, (b) [reserved], (c) this Agreement and the Transaction, and (d) such other and further relief as is customary for transactions of this type.

"Schedules" means the disclosure schedules delivered by Sellers to Buyer in connection with the execution of this Agreement.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Software" means all websites, computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation).

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto.

"Taxes" means all federal, state, local, and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy, and other taxes, duties, or assessments of any nature whatsoever, together with all interest, penalties, and additions thereto imposed with respect to such amounts.

"Trademarks" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"Transfer Tax Forms" has the meaning set forth in Section 3.02(d).

"Transfer Taxes" has the meaning set forth in Section 2.08.

## ARTICLE II.
## PURCHASE AND SALE

**Section 2.01 Acquired Assets**. On the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, assign, transfer, convey, and deliver to Buyer, and Buyer shall purchase, acquire, and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), all of the Sellers' assets, rights, properties of every nature, kind and description, tangible or intangible (including goodwill), in or to the following assets (collectively, the "Acquired Assets"):

(a) all items of machinery, equipment, supplies, furniture and fixtures owned by Sellers as of the Closing as set forth on Schedule 2.01(a) attached hereto; and

(c) all real property, together with all buildings, structures, fixtures, and improvements located thereon, and all easements, rights of way, and appurtenances thereto, commonly known as: Camp Malka, 150 Ingalside Road, Greenville, New York, 12083 (the "Property").

In the interest of clarity, the Acquired Assets do not include any of the Excluded Assets.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, remove any Acquired Asset from this Section 2.01 in its sole and absolute discretion until the Closing and elect to treat such asset as an Excluded Asset; provided that no such removal shall result in any adjustment to the Purchase Price.

**Section 2.02 Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, Sellers shall retain, and shall not sell, assign, transfer, convey, or deliver to Buyer, and Buyer shall not purchase, acquire, or accept from Sellers, any of the following assets of Sellers (collectively, the "Excluded Assets"):

(a) all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents solely relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity;

(b) all Contracts;

(c) the Excluded Claims;

(d) any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the transfer and disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Bankruptcy Cases that are protected by the attorney-client privilege;

(e) all Permits;

(f) all directors' and officers' liability insurance policies and any proceeds arising out of, or related to, such directors' and officers' liability insurance policies;

(g) the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement;

(h) all cash and cash equivalents of Sellers;

(i) all Tax Records of the Sellers;

(j) all Records;

(k) any unused retainers paid by the Sellers to any third party prior to the Closing (for professional services or otherwise) or any amounts remaining in any escrow or similar account used to fund the same;

(l) any Claims of any Seller against (i) current or former directors, officers, insiders, or affiliates, (ii) any spouse, family member, or other relative of, or any Person related to or affiliated with, any of the foregoing, (iii) any DIP lender, prepetition secured or unsecured lender, or other financing party in the Bankruptcy Cases (including any DIP Secured Parties and Prepetition Secured Parties as defined in the Final DIP Order) and their respective Affiliates, and (iv) any other Person to the extent such Claims neither (X) directly and exclusively arose out of or related to the ordinary course, day-to-day operation prior to Closing of the Acquired Assets and the Camp Business, nor (Y) directly and exclusively arise out of or relate to the post-Closing operation of the Camp Business;

(m) all Accounts Receivable of Sellers as of the Closing Date;

(n) all Inventory of Sellers as of the Closing;

(o) all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities, Health Plans or otherwise) and other prepaid charges and expenses of Sellers;

(p) all Intellectual Property owned by Sellers and all of Sellers' rights to use other Intellectual Property;

(q) all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) solely related to the use of the Acquired Assets in connection with the Camp Business;

(r) the right to receive and retain mail relating to Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(s) all telephone numbers, fax numbers, email addresses, websites, URLs and internet domain names; and

(t) all of Seller's assets, rights, properties of every nature, kind and description, wheresoever situated, relating to or used or held for use in connection with the Camp Business that is not an Acquired Asset specifically set forth in Section 2.01.

**Section 2.03 Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to pay, perform, and discharge when due, the following Liabilities of Sellers (collectively, the "Assumed Liabilities"):

(a) any Liabilities that arise out of the operation of the Camp Business on and after the Closing Date; and

(b) any environmental Liabilities to the extent imposed on a Buyer as owner or operator of the Property by operation of applicable Law and that cannot be excluded, assigned, or otherwise allocated to Seller as a matter of Law.

**Section 2.04 Excluded Liabilities**. Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume or be obligated to pay, perform, or discharge any Liabilities of Sellers other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including the following:

(a) any Liability arising under any Excluded Asset;

(b) any Liability for any claim, action, suit, investigation, or proceeding pending or threatened against Sellers or any of their Affiliates;

(c) any Liability under any employee benefit plan or relating to any current or former employees, independent contractors, or directors of Sellers;

(d) any Liability arising out of or relating to any violation of Law by Sellers;

(e) any indebtedness for borrowed money, including any obligations under the DIP Facility or any other debtor-in-possession financing, and any pre-petition secured or unsecured indebtedness;

(f) any Liability arising out of or relating to any Excluded Asset;

(g) any Liability to the extent arising out of or relating to any breach, default, or violation by Sellers prior to the Closing Date under any Contract;

(h) any Liability relating to any rejected executory contract or unexpired lease; and

(i) any other Liabilities of Sellers not specifically included in the Assumed Liabilities.

**Section 2.05 Further Assurances**. From and after the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transaction.

**Section 2.06 Purchase Price**. The aggregate purchase price for the Acquired Assets (the "Purchase Price") shall be an amount equal to:

(a) Eight Million One Hundred Fifty Thousand Dollars ($8,150,000.00) in cash (the "Cash Payment"); and

(b) The assumption of the Assumed Liabilities.

Prior to the Closing, Buyer and Sellers will agree to an allocation of a portion of the Cash Payment to the Property being sold.

**Section 2.07 Deposit; Payment of Purchase Price.**

(a) **Deposit**. On July 16, 2026, Buyer deposited Three Million Dollars ($3,000,000.00) (the "Initial Deposit") with the Escrow Agent, by wire transfer of immediately available funds, receipt of which is hereby acknowledged; Eight Hundred and Fifteen Thousand Dollars ($815,000.00) of which was allocated as a down payment for the transactions contemplated hereby in an amount equal to ten percent (10%) of the Cash Payment (the "Deposit").

(b) **Credits.** Seller hereby acknowledges and agrees to allocate the remainder of the Initial Deposit (in an amount of $2,185,000) which is being held by the Escrow Agent as an allocation for Buyer's unsuccessful bids on other transactions as a credit towards the Cash Payment (the "Credits").

(c) **Payment at Closing**. At the Closing, Buyer shall pay or cause to be paid to Sellers (or as Sellers may direct) the Cash Payment (less the Deposit and the Credits, which shall be released to Sellers at Closing), by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing at least two (2) Business Days prior to the Closing Date.

(d) **Return of Deposit**. If this Agreement is terminated (i) by Buyer pursuant to Section 9.01(c), Section 9.01(d), Section 9.01(g) or Section 9.01(h), in each case, through no fault of Buyer, or (ii) pursuant to Section 9.01(a) or Section 9.01(b), then the Deposit and the balance of the Initial Deposit (together with any interest earned thereon) shall be returned to Buyer within five (5) Business Days after such termination. In all other circumstances of termination (including termination by Sellers pursuant to Section 9.01(e)), the Deposit (but not, for the avoidance of doubt, the balance of the Initial Deposit) shall be released to Sellers as liquidated damages, which shall constitute the sole and exclusive remedy of Sellers against Buyer for any breach or failure to perform by Buyer, except in the case of Buyer's fraud or willful misconduct.

(e) **Prorations**. The Parties shall also provide for customary prorations and adjustments as of the Closing Date, including with respect to real estate taxes, utilities and insurance premiums, to the extent applicable.

**Section 2.08 Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration, recording, value-added, and other similar Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Transaction ("Transfer Taxes") shall be borne by Buyer; provided, however, that the parties shall cooperate in good faith to minimize the amount of any Transfer Taxes and to avail themselves of any available exemptions from any such Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code.

**Section 2.09 Allocation of Purchase Price**. Within thirty (30) days after the Closing Date, Buyer shall prepare and deliver to Sellers a schedule allocating the Purchase Price (and any Assumed Liabilities to the extent properly taken into account as part of the consideration for U.S. federal income tax purposes) among the Acquired Assets in accordance with Section 1060 of the

Code and the Treasury Regulations thereunder. Sellers shall have thirty (30) days to review and comment on such schedule. Buyer and Sellers shall endeavor in good faith to resolve any disagreements. If Buyer and Sellers are unable to resolve any such disagreement within fifteen (15) days, such disagreement shall be resolved by a nationally recognized independent accounting firm mutually acceptable to Buyer and Sellers, whose determination shall be final and binding. The fees and expenses of such accounting firm shall be borne equally by Buyer and Sellers. Buyer and Sellers agree to file all Tax Returns in a manner consistent with such allocation and shall not take any position inconsistent therewith in any Tax proceeding, audit, or otherwise, except as required by applicable Law.

## ARTICLE III.
## CLOSING

**Section 3.01 Closing**. Subject to the satisfaction or waiver of the conditions set forth in Article VIII, the closing of the Transaction (the "Closing") shall take place remotely by exchange of documents and signatures electronically (or by such other means as the parties may agree) on or prior to the Outside Date, subject to the satisfaction or waiver of all conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other time and place as Buyer and Sellers may mutually agree in writing (the date on which the Closing actually occurs, the "Closing Date").

**Section 3.02 Sellers' Closing Deliverables**. At the Closing, Sellers shall deliver or cause to be delivered to Buyer the following:

(a) a bill of sale, substantially in the form attached hereto as Exhibit A, duly executed by Sellers, evidencing the sale, transfer, conveyance, and assignment of the Acquired Assets to Buyer;

(b) an assignment and assumption agreement, in a form agreed to by Buyer and Seller, duly executed by Sellers, evidencing the assumption of the Assumed Liabilities by Buyer;

(c) a certificate executed by an authorized officer of Sellers, dated as of the Closing Date, certifying that the conditions set forth in Section 8.02(a) and Section 8.02(b) have been satisfied;

(d) a bargain and sale deed with covenants against grantor's acts, in recordable form, conveying the Property to Buyer, together with duly completed New York State Combined Real Estate Transfer Tax Return (Form TP – 584), Real Property Transfer Report Form (Form RP – 5217), and any other instruments customary for a New York real property transfer (the "Transfer Tax Forms");

(e) an IRS Form W-8 duly executed by each Seller or each Seller's regarded owner for U.S. federal income tax purposes;

(f) certified copies of the Sale Order, as entered by the Bankruptcy Court; and

(g) such other documents, instruments, or certificates as Buyer may reasonably request to evidence and effectuate the consummation of the Transaction.

**Section 3.03 Buyer Closing Deliverables**. At the Closing, Buyer shall deliver or cause to be delivered to Sellers the following:

(a) the Cash Payment (less the Deposit and the Credits), by wire transfer of immediately available funds in accordance with Section 2.07(c);

(b) an assignment and assumption agreement, in a form agreed to by Buyer and Seller, duly executed by Buyer, evidencing the assumption of the Assumed Liabilities by Buyer;

(c) the Transfer Tax Forms, duly executed by Buyer;

(d) a certificate executed by an authorized officer of Buyer, dated as of the Closing Date, certifying that the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied;

(e) a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying (i) the resolutions duly adopted by the governing body of Buyer authorizing the execution and delivery of this Agreement and the consummation of the Transaction, and (ii) the incumbency and signatures of the officers of Buyer executing this Agreement and any other documents delivered in connection herewith; and

(f) such other documents, instruments, or certificates as Sellers may reasonably request to evidence and effectuate the consummation of the Transaction.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the correspondingly numbered Sections of the Schedules, Sellers represent and warrant to Buyer that the statements contained in this Article IV are true and correct as of the Effective Date and as of the Closing Date.

**Section 4.01 Organization and Qualification of Sellers**. Each Seller is a corporation/limited liability company duly organized, validly existing, and in good standing under the Laws of the State of its incorporation/formation, and has all requisite power and authority to own, lease, and operate its properties and to carry on its business as presently conducted.

**Section 4.02 Authority of Sellers**. Subject to the entry of the Sale Order, Sellers have full power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Sellers in connection herewith, to perform its obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement and the consummation of the Transaction have been duly authorized by all necessary action on the part of Sellers (including, to the extent required, approval of the Bankruptcy Court). This Agreement has been duly executed and delivered by Sellers and, assuming the due authorization, execution, and delivery by Buyer, and subject to entry of the Sale Order, constitutes a legal, valid, and binding obligation of Sellers,

enforceable against Sellers in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 4.03 No Conflicts**. Subject to entry of the Sale Order, the execution, delivery, and performance of this Agreement by Sellers and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of formation, limited liability company agreement, certificate of incorporation, bylaws, or other organizational documents of Sellers, (b) violate or result in a breach of any Law applicable to Sellers, or (c) except as would not reasonably be expected to have a Material Adverse Effect, violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which any Seller is a party or by which any Seller or any of its assets is bound.

**Section 4.04 Title to Acquired Assets**. Subject to entry of the Sale Order, Sellers have good and valid title to, or a valid leasehold interest in, the Acquired Assets, free and clear of all Encumbrances, other than Permitted Encumbrances.

**Section 4.05 Litigation**. Except for the Bankruptcy Cases, there is no action, suit, claim, investigation, or proceeding pending or, to the actual knowledge of Sellers, threatened against Sellers that (a) challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction, or (b) would reasonably be expected to have a Material Adverse Effect.

**Section 4.06 Compliance with Laws; Permits**. Except as would not reasonably be expected to have a Material Adverse Effect, Sellers are in compliance in all material respects with all Laws applicable to the Acquired Assets or the ownership or operation thereof.

**Section 4.07 Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transaction or any other transaction document based upon arrangements made by or on behalf of Sellers.

**Section 4.08 No Other Representations**. Except for the representations and warranties expressly set forth in this Article IV, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers, the Acquired Assets, or the Transaction, and Sellers disclaim any other representations or warranties, whether made by Sellers or any of their Affiliates, officers, directors, employees, agents, or representatives. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE IV, SELLERS MAKE NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND SELLERS HEREBY DISCLAIM ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date of this Agreement and as of the Closing Date.

**Section 5.01 Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of New York, and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as presently conducted.

**Section 5.02 Authority of Buyer**. Buyer has full limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Buyer in connection herewith, to perform its obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement and the consummation of the Transaction have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, assuming the due authorization, execution, and delivery by Sellers, constitutes a legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 5.03 No Conflicts**. The execution, delivery, and performance of this Agreement by Buyer and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of incorporation, bylaws, or other organizational documents of Buyer, (b) violate or result in a breach of any Law applicable to Buyer, or (c) except as would not reasonably be expected to prevent or materially impair or delay the consummation of the Transaction, violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which Buyer or any of its assets is bound.

**Section 5.04 Sufficiency of Funds**. Buyer has, and at the Closing will have, immediately available funds sufficient to pay the Cash Payment and all other amounts payable by Buyer hereunder and to consummate the Transaction. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.

**Section 5.05 Litigation**. There is no action, suit, claim, investigation, or proceeding pending or, to the knowledge of Buyer, threatened against Buyer that challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction.

**Section 5.06 Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission from Buyer in connection with the Transaction based upon arrangements made by or on behalf of Buyer.

**Section 5.07 No Outside Reliance**. Buyer acknowledges and agrees that (a) Buyer has conducted its own independent investigation, review, and analysis of the business, operations, assets, liabilities, results of operations, financial condition, and prospects of Sellers and the Acquired Assets, which investigation, review, and analysis was performed by Buyer and its Affiliates and representatives, (b) Buyer has been afforded access to the books and records, facilities, equipment, Contracts, and other assets of Sellers that Buyer and its representatives have requested to review, and (c) in entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations and warranties expressly set forth in Article IV (as qualified by the Schedules) and acknowledges that, except as expressly set forth in Article IV, neither Sellers nor any of its Affiliates or representatives makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or representatives.

## ARTICLE VI.
## COVENANTS

**Section 6.01 Conduct of Business**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) use commercially reasonable efforts to maintain the Acquired Assets in good working order (ordinary wear and tear excepted), and (b) not take any action that would reasonably be expected to result in a Material Adverse Effect.

**Section 6.02 Access to Information**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) provide Buyer and its representatives with reasonable access during normal business hours, upon reasonable advance notice, to the personnel, properties, books, records, and Contracts relating to the Acquired Assets, and (b) furnish to Buyer such financial, operating, and other data and information relating to the Acquired Assets as Buyer may reasonably request. Notwithstanding the foregoing, Sellers shall not be required to provide access or information to the extent that (i) such access or the provision of such information would violate any Law or binding agreement, (ii) such information is subject to attorney-client privilege or attorney work-product protection, or (iii) such access or the provision of such information would be unreasonably disruptive to the operations of Sellers.

**Section 6.03 Efforts; Consents.** Subject to the terms and conditions of this Agreement, each of the parties hereto shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable under applicable Law to consummate the Transaction as promptly as practicable, including (i) obtaining all necessary consents, approvals, or authorizations of, and making all filings with and giving all notices to, Governmental Authorities and other third parties, and (ii) obtaining all consents, approvals, or authorizations of third parties necessary for the consummation of the Transaction.

**Section 6.04 Bankruptcy Court Matters.**

(a) **Omitted.**

(b) **Sale Order**. Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as promptly as practicable after the Sale Hearing.

(c) **No Modification or Appeal**. Buyer shall not oppose, and Sellers shall not take any action that is intended to, or that would reasonably be expected to, result in the reversal, modification, or vacatur of the Bid Procedures Order or the Sale Order.

(d) **Defense of Orders**. Each of Sellers and Buyer shall use their commercially reasonable efforts to take such actions as may be reasonably necessary to defend against any objection to the Sale Order or any appeal therefrom.

**Section 6.05 Publicity**. Except as required by applicable Law (including any disclosure required by the Securities and Exchange Commission or other Governmental Authority or any disclosure required in connection with the Bankruptcy Cases), no party hereto shall issue any press release or make any public announcement relating to this Agreement or the Transaction without the prior written consent of the other parties hereto (which consent shall not be unreasonably withheld, conditioned, or delayed).

**Section 6.06 Confidentiality**. The parties acknowledge that certain confidential information has been and may be exchanged in connection with this Agreement. Each party agrees to keep confidential all information provided by the other party in connection with this Agreement that is not otherwise publicly available, and to use such information solely for the purposes of consummating the transactions contemplated hereby, except as required by applicable Law (including any disclosure required in connection with the Bankruptcy Cases).

**Section 6.07 Notification of Certain Matters**. Each party hereto shall give prompt notice to the other parties of (a) the occurrence or non-occurrence of any event that has caused or would reasonably be expected to cause any condition to the obligations of any party to effect the transactions contemplated hereby not to be satisfied, and (b) any action, suit, claim, investigation, or proceeding commenced or, to the knowledge of such party, threatened against such party that relates to the consummation of the Transaction.

**Section 6.08 Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances on the Acquired Assets, including any Encumbrances arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 6.09 Employee Matters**. Nothing contained herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' employee benefit plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any transferred employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

# ARTICLE VII.
# TAX MATTERS

**Section 7.01 Transfer Taxes**. All Transfer Taxes shall be allocated as set forth in Section 2.08. The party required by applicable Law to file any Tax Return with respect to any Transfer Taxes shall timely file such Tax Return, and the other party shall cooperate with such filing party as reasonably requested.

**Section 7.02 Cooperation on Tax Matters**. After the Closing, Sellers and Buyer agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit, or proceeding relating to any Tax.

# ARTICLE VIII.
# CONDITIONS TO CLOSING

**Section 8.01 Conditions to Obligations of All Parties**. The obligations of each party hereto to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by both Sellers and Buyer) of each of the following conditions as of the Closing:

(a) **No Injunction**. No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Law or Order that enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(b) **Sale Order**. The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall be a Final Order and shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent.

**Section 8.02 Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of each of the following additional conditions as of the Closing:

(a) **Representations**. (i) The representations and warranties of Sellers set forth in Section 4.01 (*Organization and Qualification of Sellers*) and Section 4.02 (*Authority of Sellers*) shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date), and (ii) the other representations and warranties of Sellers set forth in Article IV shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications set forth therein) as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct as of such date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b) **Performance of Covenants**. Sellers shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Sellers under this Agreement at or prior to the Closing.

(c) [Reserved]

(d) **Closing Deliveries**. Sellers shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.02.

(e) **Bid Procedures Order**. The Bankruptcy Court shall have entered the Bid Procedures Order, and the Bid Procedures Order shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent.

**Section 8.03 Conditions to Obligations of Sellers**. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Sellers) of each of the following additional conditions as of the Closing:

(a) **Representations**. The representations and warranties of Buyer set forth in Article V shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date);

(b) **Performance of Covenants**. Buyer shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Buyer under this Agreement at or prior to the Closing.

(c) **Closing Deliveries**. Buyer shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.03.

## ARTICLE IX.
## TERMINATION

**Section 9.01 Termination**. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a) by the mutual written consent of Buyer and Sellers;

(b) by either Buyer or Sellers, upon written notice to the other party, if the Closing shall not have occurred on or before the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.01(b) shall not be available to any party whose failure to fulfill any of its obligations hereunder has been the principal cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c) by Buyer, upon written notice to Sellers, if Sellers' representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.02(a) would not be satisfied, or if Sellers shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition

set forth in Section 8.02(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Buyer to Sellers;

(d) by Buyer, upon written notice to Sellers, if there shall have occurred a Material Adverse Effect;

(e) by Sellers, upon written notice to Buyer, if any of Buyer's representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.03(a) would not be satisfied, or if Buyer shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.03(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Sellers to Buyer;

(f) [omitted];

(g) by either Buyer or Sellers, upon written notice to the other parties, if any court of competent jurisdiction or other Governmental Authority shall have issued an Order permanently enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable;

(h) by either Buyer or Sellers, upon written notice to the other parties, if the Bankruptcy Cases are (x) dismissed or (y) converted to cases under Chapter 7 of the Bankruptcy Code, or if a trustee is appointed in the Bankruptcy Cases and, in each case, such trustee determines not to proceed with the closing of the sale transaction contemplated hereby; or

(i) by either Buyer or Sellers, upon written notice to the other party, if the Bankruptcy Court shall have entered an Order authorizing Sellers to consummate an Alternative Transaction with a Person other than Buyer.

**Section 9.02 Effect of Termination.** In the event of termination of this Agreement pursuant to Section 9.01, this Agreement shall become void and of no effect, without any liability or obligation on the part of any party hereto (or any of their respective Affiliates, officers, directors, employees, agents, or representatives), except that (i) the provisions of this Section 9.02 (*Effect of Termination*), Section 9.03 (*Remedies*), and Article X (*Miscellaneous*) shall survive any termination of this Agreement, and (ii) no such termination shall relieve any party from liability for any willful breach of this Agreement or fraud.

**Section 9.03 Remedies.**

(a) In the event that this Agreement is terminated by Sellers pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, or in the event that Buyer fails to consummate the Closing when all conditions to Buyer's obligations to close have been satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing), Sellers' sole and exclusive remedy (except in the case of fraud or willful misconduct) shall be to retain the Deposit as liquidated damages. The parties acknowledge that the actual damages to Sellers resulting from

such breach or failure would be difficult to ascertain, and the Deposit constitutes a reasonable estimate of such damages.

(b) In the event that this Agreement is terminated other than pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, and Buyer is entitled to the return of the Deposit and the balance of the Initial Deposit pursuant to Section 2.07(d), the return of the balance of the Initial Deposit and the Deposit shall constitute the sole and exclusive remedy of Buyer against Sellers (except in the case of fraud or willful misconduct).

(c) Notwithstanding anything to the contrary herein, in no event shall any party be liable to any other party for any punitive, exemplary, special, incidental, consequential, or indirect damages, including lost profits or loss of business opportunity, in connection with this Agreement or the Transaction.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.01 Survival**. The representations, warranties, covenants, and agreements contained in this Agreement shall not survive the Closing and shall terminate at the Closing, except for (a) covenants and agreements that by their terms contemplate performance after the Closing, which shall survive until fully performed, and (b) claims based on fraud or willful misconduct.

**Section 10.02 Notices**. All notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be deemed duly given (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (c) when sent by email (with confirmation of transmission) if sent during normal business hours of the recipient (and if not sent during normal business hours, then on the next Business Day), or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, in each case addressed to the parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

| | |
|---|---|
| if to Buyer, then to: | CHO PRO HOLDINGS, LLC<br>19 Seven Springs Mountain Rd.<br>Monroe NY 10950<br>Attention: CHAIM OBERLANDER<br>Email: chaim@kjpoultry.com |
| with a copy (which shall not constitute notice) to: | ANDERSON & BOWMAN, PLLC<br>80-02 KEW GARDENS RD.<br>STE. 600, KEW GARDENS, NY<br>11415<br>ATTN: BTZALEL HIRSCHHORN, ESQ.<br>EMAIL:<br>BHIRSCHHORN@ANDERSONBOWMAN.COM<br><br>Tuvia Kimmel, Esq. |

| | |
|---|---|
| | Kimmel & Kimmel Attorneys at Law PLLC<br>Email: Tuvia@KimmelandKimmel.com<br>212-661-8838 x2 |
| if to Sellers, then to: | Assaf Ravid<br>Email: aravid@circleinv.com |
| with a copy (which shall not constitute notice) to: | Cole Schotz P.C.<br>25 Main Street<br>Hackensack, New Jersey 07601<br>Attention: Roger Iorio, Esq.<br>Email: riorio@coleschotz.com |

**Section 10.03 Interpretation**. When a reference is made in this Agreement to an Article, Section, Exhibit, or Schedule, such reference shall be to an Article, Section, Exhibit, or Schedule of this Agreement unless otherwise indicated. The words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "or" is not exclusive. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

**Section 10.04 Severability**. If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement, and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal, or unenforceable, had never been contained herein.

**Section 10.05 Entire Agreement**. This Agreement, together with all Exhibits and Schedules hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

**Section 10.06 Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other party; provided, however, that Buyer may assign any or all of its rights and obligations hereunder to any Affiliate of Buyer without the prior consent of Sellers, provided that Buyer shall remain liable for all of its obligations hereunder following any such assignment.

**Section 10.07 Amendment and Waiver**. This Agreement may not be amended except by an instrument in writing signed by Buyer and Sellers. Any party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto, or (c) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein. Any such

extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. No failure or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**Section 10.08 Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Sellers and Buyer hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of New York. Sellers and Buyer each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT, OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION.

**Section 10.09 Specific Performance**. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, the parties agree that, prior to the termination of this Agreement, each party shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court (or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, the state and federal courts located in the State of New York), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law, or inequitable for any reason.

**Section 10.10 Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.11 No Third-Party Beneficiaries**. Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.12 "As Is, Where Is" Transaction**. Buyer acknowledges that the Acquired Assets are being sold on an "AS IS, WHERE IS" basis, with all faults, and Buyer has relied solely on its own investigation, analysis, and evaluation of the Acquired Assets in making its decision to enter into this Agreement. Buyer further acknowledges that, except for the representations and

warranties expressly set forth in Article IV, Sellers have not made, and Sellers hereby expressly disclaim, any representations or warranties of any kind or nature, express or implied, at common law, by statute, or otherwise, relating to the Acquired Assets or the transactions contemplated hereby, and Buyer hereby waives any claims related to the condition of the Acquired Assets or the accuracy or completeness of any information provided or made available to Buyer.

**Section 10.13 No Successor Liability**. Except as expressly provided herein, Buyer does not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability. Buyer is not, and shall not be, a successor to Sellers by reason of any theory of law or equity.

***[Signature Pages Follow]***

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**CHO PRO HOLDINGS, LLC**

By:__________________________________
Name: Chaim Oberlander
Title: Sole Member

**SELLERS:**

**Greenvilleland LLC**

By:__________________________________
Name: Assaf Ravid
Title: Chief Restructuring Officer

**Malka Operatingco LLC**

By: _________________________________
Name: Assaf Ravid
Title: Chief Restructuring Officer

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**SELLERS:**

GREENVILLELAND LLC

By: ______________________
Name: Assaf Ravid
Title: Chief Restructuring Officer

MALKA OPERATINGCO LLC

By: ______________________
Name: Assaf Ravid
Title: Chief Restructuring Officer

# EXHIBIT A

## FORM OF BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Greenvilleland LLC and Malka Operatingco LLC ("**Sellers**"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to CHO PRO HOLDINGS, LLC OR AN ENTITY TO BE FORMED ("**Buyer**"), all of their rights, title, and interest in and to the Acquired Assets, as such term is defined in the Asset Purchase Agreement, dated as of October 13, 2026, (the "**Purchase Agreement**"), by and among Sellers and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Sellers make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Each Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Sellers will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Sellers have duly executed this Bill of Sale as of October ___, 2026.

Greenvilleland LLC

By______________________

Name:

Title:

Malka Operatingco LLC

By_______________________

Name:

Title:

**DISCLOSURE SCHEDULES**

**TO**

**ASSET PURCHASE AGREEMENT**

**by and among**

**CHO PRO HOLDINGS, LLC OR AN ENTITY TO BE FORMED A NEW YORK STATE LIMITED LIABILITY COMPANY,**

**as the Buyer,**

**and**

**Greenvilleland LLC,**

**as the Seller**

Dated as of October 14, 2026

Reference is hereby made to the Asset Purchase Agreement dated as of October 14, 2026 (the “Agreement”), by and between Cho Pro Holdings, LLC or an entity to be formed a New York State Limited Liability Company (“Buyer”) and Greenvilleland LLC (“Seller”). All capitalized terms which are not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

The section numbers in these Disclosure Schedules correspond to the section numbers in the Agreement; provided, however, that the disclosure of any fact(s) or item(s) in these Disclosure Schedules relevant to any section of the Agreement shall be deemed to be disclosed with respect to any other section(s) of the Agreement to which the applicability and relevance of such disclosure is reasonably apparent on its face, whether or not these Disclosure Schedules include an explicit cross-reference to such other section(s) and whether or not such other section(s) contemplate these Disclosure Schedules. The disclosure of any information in these Disclosure Schedules shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by the Sellers in the Agreement, nor shall it be deemed an admission of any liability of, or concession as to any defense available to, the Sellers. The inclusion of information in these Disclosure Schedules shall not be construed as an admission or agreement that such information is material to or outside the ordinary course of business of any Seller. No disclosure in these Disclosure Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. All attachments to these Disclosure Schedules are incorporated by reference into the section of these Disclosure Schedules in which they are referenced..

**Schedule 2.01(a)(iii)**

**Real Property**

150 Ingalside Road, Greenville, NY 12083.

# **Exhibit B**

## **Sale Order**

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**COLE SCHOTZ P.C.**<br>Michael D. Sirota<br>Warren A. Usatine<br>David M. Bass<br>Felice R. Yudkin<br>Daniel J. Harris<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>dbass@coleschotz.com<br>fyudkin@coleschotz.com<br>dharris@coleschotz.com<br><br>*Counsel to the Debtors*<br>*and Debtors in Possession* | |
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT BETWEEN CHO PRO HOLDINGS, LLC OR ITS DESIGNEE AND GREENVILLELAND LLC AND MALKA OPERATINGCO, LLC, (II) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ASSETS OF GREENVILLELAND LLC AND MALKA OPERATINGCO, LLC, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 363(b), AND 363(f), (III) AUTHORIZING THE ASSUMPTION ANDASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365, AND (IV) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through thirteen (13), is hereby

**ORDERED**.

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings, Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

Upon the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") seeking entry of an order (this "Sale Order"), pursuant to the Bankruptcy Code, Bankruptcy Rules and Local Rules, authorizing and approving the Debtors' entry into and performance under the terms and conditions of that certain asset purchase agreement dated October 14, 2026 (the "APA") (together with the schedules and/ or exhibits thereto and all related documents, and as may be amended, supplemented or otherwise modified from time to time after the date hereof), attached hereto as Exhibit A, by and among the Sellers and Cho Pro Holdings, LLC or its designee (together with any successors and permitted assigns, or designees, the "Buyer"); and the Court having entered the Bidding Procedures Order on June 26, 2026 [Docket No. 298] (the "Bidding Procedures Order") approving the bidding procedures (the "Bidding Procedures"), and the Court having considered any responses or objections thereto; and the Debtors having identified the Buyer's bid as the Successful Bid for the Purchased Assets following conclusion of the Auction in accordance with the Bidding Procedures and as set forth in the *Notice of Successful Bidders with Respect to Certain of the SIMAD Debtors' Assets* [Docket No. 798] (the "Notice of Successful Bidders") and the objection deadline of August 6, 2026 having expired; and the Court having held a hearing (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing, establish just cause

for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A. Jurisdiction and Venue. This Court has jurisdiction over the Debtors' chapter 11 cases, including this matter, pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the United States District Court for the District of New Jersey. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B. Statutory Predicates. The statutory predicates for the relief sought herein are Sections 105(a), 363(b), 363(f), 363(m), 365, and 1146(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of the United States Bankruptcy Court for the District of New Jersey.

C. Notice. Proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Notice, the APA, and the Sale Hearing was provided to all parties entitled to notice in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including: (i) counsel to the Buyer (Anderson Bowman, PLLC), (ii) the Office of the United States Trustee, (iii) the Official Committee of Unsecured Creditors (the "Committee"), (iv) all creditors and parties in interest in these chapter 11 cases, (v) all parties asserting liens on the

Acquired Assets, (vi) all non-debtor counterparties to the Assumed Contracts, and (vii) all applicable governmental authorities. No further or other notice of the Sale Notice, the APA, or the Sale Hearing is or shall be required.

D. Sound Business Purpose. The Debtors have demonstrated a sound business purpose and compelling justification for consummating the sale of the Acquired Assets (as defined in the APA) to the Buyer under 11 U.S.C. § 363(b). The Buyer is willing to acquire the property for the Purchase Price of: (a) Eight million, One Hundred Fifty Thousand Dollars in cash ($8,150,000); and (b) the assumption of Assumed Liabilities. The Debtors' decision to sell the Acquired Assets outside a plan of reorganization pursuant to the procedures approved in the Bidding Procedures Order was an exercise of the Debtors' sound business judgment, is in the best interests of the Debtors, their estates, their creditors, and all parties in interest, and should be approved.

E. Adequate Consideration; Cash, Cure Amounts, and Assumed Liabilities. The consideration provided by the Buyer for the Acquired Assets constitutes fair and adequate consideration. The Purchase Price consists of (a) Eight million, One Hundred Fifty Thousand Dollars in cash ($8,150,000) in cash; and (b) the assumption of Assumed Liabilities.

F. Arm's Length Transaction; Good Faith Purchaser. The APA was negotiated, proposed, and entered into by the Sellers and the Buyer without collusion, in good faith, and from arm's length bargaining positions. Neither the Buyer nor any of its Affiliates (as defined in the APA) is an insider of the Debtors as that term is defined in 11 U.S.C. § 101(31). The Buyer is a

good faith purchaser of the Acquired Assets within the meaning of 11 U.S.C. § 363(m) and is entitled to all of the protections afforded thereby. The Buyer has not engaged in any conduct that would prevent the application of 11 U.S.C. § 363(m). The APA was not entered into for the purpose of hindering, delaying, or defrauding any creditor of the Debtors.

G. Free and Clear. The Sellers are the rightful owners of the Acquired Assets. The Acquired Assets shall be transferred to the Buyer free and clear of all liens, claims, interests, and encumbrances of any kind or nature whatsoever (collectively, "Encumbrances"), other than Permitted Encumbrances and Assumed Liabilities as set forth in the APA, pursuant to 11 U.S.C. § 363(f), because in each case one or more of the conditions set forth in 11 U.S.C. § 363(f)(1) through (5) have been satisfied with respect to each such Encumbrance. All holders of Encumbrances who did not object to the sale, or whose objections were overruled, are deemed to have consented to the sale pursuant to § 363(f)(2). All Encumbrances shall attach to the proceeds of the sale with the same validity, extent, and priority as existed immediately prior to the sale.

H. Sale Process; Consultation. The Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures Order), including counsel to Mishmeret Trust Company Ltd., in its capacities as DIP Agent and as trustee for the Series A Bondholders, and the Committee, conducted a marketing and sale process for the Acquired Assets in accordance with the Bidding Procedures Order. Accordingly, the Buyer's bid, as reflected in the APA, constitutes the highest or otherwise best offer for the Acquired Assets.

I. No Successor Liability. The Buyer is not a successor to the Sellers or their estates by reason of any theory of law or equity and shall not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of the APA or the consummation of the transactions contemplated thereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability (as defined in the APA).

J. Transfer Taxes. To the extent applicable, the transfer of the Acquired Assets to the Buyer pursuant to this Order and the APA constitutes a transfer pursuant to Section 363 of the Bankruptcy Code, and is exempt from stamp taxes, transfer taxes, real estate transfer taxes, mortgage recording taxes, and similar taxes under applicable state or federal law.

K. Sale Procedures. The Transaction was conducted in accordance with the Sale Procedures approved under the Bidding Procedures Order [Docket No. 298]. The Sale Notice was duly filed on August 4, 2026, and the notice and objection period was completed in full compliance with the requirements of the Bidding Procedures Order.

L. Legal Authority. The legal requirements for approval of the sale have been satisfied. The sale is authorized pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f), and 365.

M. Waiver of Stay. Good cause has been shown for waiver of the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d). The Transaction should be consummated promptly to preserve the going-concern value of the Acquired Assets. Immediate effectiveness of this Order is warranted.

**IT IS HEREBY ORDERED THAT:**

1. Approval of the APA and the Transaction. The APA, including all exhibits, schedules, and ancillary documents thereto, and the transaction contemplated thereby (the "Transaction"), are hereby approved in their entirety pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f), and 365. The Sellers are authorized and directed to perform under, consummate, and implement the terms of the APA together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and consummate the Transaction. This Order is in form and substance reasonably acceptable to the Buyer as required under the APA.

2. Objections. Any and all objections to the entry of this Order and approval of the Transaction that have not been withdrawn, waived, or resolved prior to the Sale Hearing are hereby denied and overruled on the merits with prejudice.

3. Transfer Free and Clear. Pursuant to 11 U.S.C. §§ 363(b), and 363(f), the Sellers are authorized and directed to sell, assign, transfer, convey, and deliver the Acquired Assets (as defined in the APA) to the Buyer (or its designee), and the Buyer is authorized to acquire the Acquired Assets, free and clear of all Encumbrances of any kind or nature whatsoever, including without limitation all liens, claims, and encumbrances, other than Permitted Encumbrances and Assumed Liabilities (as defined in the APA). All such Encumbrances shall attach to the proceeds of the sale with the same validity, extent, and priority as existed immediately prior to the sale. To

the extent any junior lienholder asserts an interest in the Acquired Assets, such interest is extinguished upon entry of this Order.

4. Good Faith Finding; Section 363(m) Protections. The Buyer is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and is entitled to all of the protections afforded thereby. The reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the sale to the Buyer unless such authorization is duly stayed pending such appeal. The Buyer has acted in good faith in all respects in connection with this proceeding. Neither the Sellers nor the Buyer have engaged in any action or inaction that would cause or permit the sale to be avoided, or costs or damages to be imposed, under 11 U.S.C. § 363(n).

5. No Successor Liability. Except as expressly provided in the APA, Buyer does not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of the APA or the consummation of the transactions contemplated thereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability (as defined in the APA). Buyer is not, and shall not be, a successor to Sellers by reason of any theory of law or equity.

6. Transfer Taxes. Pursuant to 11 U.S.C. § 1146(a), the sale, transfer, and delivery of the Acquired Assets to the Buyer shall not be subject to any stamp tax, bulk sales tax, transfer tax, real estate transfer tax, mortgage recording tax, or similar tax. All federal, state, and local governmental agencies and recording offices, including any County Clerk's Office, are directed to

accept for recording any and all documents, instruments, or deeds necessary to effectuate and consummate the Transaction, free and clear of any transfer taxes, document stamps, or similar charges.

7. Buyer Designation Right. The Buyer is authorized to assign its rights under the APA and this Order to any affiliate or designee of the Buyer (the "Designee") without further order of this Court and without the consent of the Sellers; *provided* that the Buyer shall remain liable for all of its obligations thereunder following any such assignment. Any such Designee shall be deemed a good faith purchaser entitled to all of the protections of 11 U.S.C. § 363(m) and this Order.

8. Injunction. All Persons (as defined in 11 U.S.C. § 101(41)) are forever prohibited and enjoined from taking any action against the Buyer (or its Designee), its successors, assigns, properties, or the Acquired Assets to recover any claim, Encumbrance, or interest that such Person had or may have had with respect to the Sellers or the Acquired Assets that is extinguished or otherwise discharged by this Order, except as expressly permitted by this Order or the APA..

9. Purchase Price Allocation. For the avoidance of doubt, the allocation of the Purchase Price set forth in Section 2.06 of the APA shall be without prejudice to the rights of the Debtors under Section 2.09 of the APA and the rights of any party in interest, including, without limitation, the Committee, to seek a different allocation in connection with any proceeding in the Cases. Entry of this Order shall not constitute approval of any allocation of the Purchase Price or a finding or

determination that the allocation of sale proceeds among the Sellers is fair, reasonable, or appropriate.

10. DIP Financing. For the avoidance of doubt, all proceeds of the Transaction shall be applied and distributed in accordance with the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 552] (the "Final DIP Order"), including, without limitation, the requirements of paragraph 12(b) thereof.

11. For the avoidance of doubt, the attachment of Encumbrances to the proceeds of the Transaction shall not constitute a determination of the validity, extent, priority, or enforceability of any such Encumbrance, and all rights to Challenge the same under paragraph 12 of the Final DIP Order or otherwise are expressly preserved.

12. For the avoidance of doubt, nothing in this Order or the APA shall release, impair, waive, or otherwise affect any Challenges (as defined in the Final DIP Order) or Lender Avoidance Actions (as defined in the Final DIP Order) preserved pursuant to the Final DIP Order, all of which are expressly preserved and retained by the Sellers' estates regardless of the consummation of the Transaction.

13. Direction to Third Parties. All entities that are presently, or on the Closing Date may be, in possession of any of the Acquired Assets are hereby directed to surrender possession of

such Acquired Assets to the Buyer on the Closing Date. On the Closing Date, the Sellers' creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release their Encumbrances on the Acquired Assets, if any, as such Encumbrances may have been recorded or may otherwise exist. The Sellers shall cooperate with the Buyer following the Closing Date with respect to transition matters.

14. Self-Executing. The provisions of this Order authorizing the sale and transfer of the Acquired Assets free and clear of all Encumbrances shall be self-executing, and neither the Sellers nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order. If any Person or entity that has filed financing statements, mortgages, mechanics' liens, lis pendens, or other documents evidencing any Encumbrance against the Acquired Assets shall not have delivered to the Buyer at or before Closing, in proper form for filing, termination statements, releases, or instruments of satisfaction, then (i) the Buyer is authorized to execute and file such termination statements, releases, or instruments of satisfaction on behalf of such Person, and (ii) a certified copy of this Order may be filed with any recording office as conclusive evidence of the release of all such Encumbrances.

15. Recording. This Order shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, secretaries of state, federal,

state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or otherwise, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets. A certified copy of this Order may be filed with the appropriate clerk or recording office and shall constitute conclusive evidence of the free and clear transfer of the Acquired Assets to the Buyer.

16. Waiver of Stay. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry, and the 14-day stays imposed by such rules are hereby waived. The Sellers and the Buyer are authorized to close the Transaction immediately upon satisfaction of the conditions to closing set forth in the APA, but in no event later than the Outside Date (as defined in the APA) of the APA on or before the Outside Date, unless otherwise extended in accordance with the APA, without further order of the Court.

17. Binding Effect. This Order shall be binding upon (a) the Sellers, (b) all creditors of the Sellers, (c) holders of Encumbrances on the Acquired Assets, (d) all non-debtor counterparties to the Assumed Contracts, and (e) all other parties in interest and their respective successors and assigns, whether or not such parties were served with notice of the Sale Hearing, and (f) any trustees, examiners, or other fiduciaries subsequently appointed in the Sellers' chapter 11 cases or upon a conversion to chapter 7 of any Seller’s case. This Order shall inure to the benefit of the Buyer and its successors, assigns, and Designees.

18. Survival. The terms and provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any chapter 11 plan in these cases, (b) converting these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing these chapter 11 cases, or (d) pursuant to which this Court abstains from hearing these cases. The terms of this Order shall continue in full force and effect notwithstanding any such subsequent order.

19. Conflicts. To the extent that any provision of this Order conflicts with any provision of the APA, the terms of this Order shall govern and control. To the extent that there is any inconsistency between this Order and any other order entered in these chapter 11 cases, the terms of this Order shall govern.

20. Retention of Jurisdiction. This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of this Order and the APA (including any injunction hereunder), including all amendments thereto and any waivers and consents thereunder, (b) resolve any disputes arising in connection with this Order, the APA, or the Transaction, (c) interpret, implement, and enforce the provisions of this Order, (d) adjudicate any claims or disputes regarding the Cure Amounts, (e) protect the Buyer and its successors, assigns, and Designees against any Encumbrances in accordance with this Order, and (f) enter such further orders as may be necessary or appropriate to implement or effectuate the provisions of this Order.