**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**


**FAEGRE DRINKER BIDDLE & REATH LLP**
Michael P. Pompeo
600 Campus Drive
Florham Park, New Jersey 07932-1047
(973) 549-7000 (Telephone)
(973) 360-9831 (Facsimile)
michael.pompeo@faegredrinker.com

-and-

Ian J. Bambrick (*pro hac vice*)
Patrick A. Jackson (*pro hac vice*)
Sarah E. Silveira (*pro hac vice*)
222 Delaware Ave. Suite 1410
Wilmington, DE 19801
(302) 467-4200 (Telephone)
(302) 467-4201 (Facsimile)
ian.bambrick@faegredrinker.com
patrick.jackson@faegredrinker.com
sarah.silveira@faegredrinker.com

*Counsel to the DAMIS Debtors and Debtors in Possession*

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff (*pro hac vice*)
Megan M. Wasson (*pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Facsimile)
adam.rogoff@hsfkramer.com
megan.wasson@hsfkramer.com

*Co-Counsel to the DAMIS Debtors and Debtors in Possession*


| | |
|---|---|
| In re:<br><br>DAMIS Holdings LLC, *et al.*,<br><br>Debtors | Chapter 11<br><br>Case No. 26-16439 (CMG)<br><br>(Jointly Administered) |
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

**JOINDER OF THE DAMIS DEBTORS TO THE SIMAD DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF A DETERMINATION THAT THE ORCAFUNDING SALE OF FUTURE**

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

**RECEIPTS AGREEMENTS ARE DISGUISED LOANS AND NOT TRUE SALES AND (II) OPPOSITION TO ORCAFUNDING LLC'S MEMORANDUM OF LAW, AND SUPPLEMENTAL ARGUMENTS IN SUPPORT THEREOF**

**TO THE HONORABLE CHRISTINE M. GRAVELLE, CHIEF JUDGE, UNITED STATES BANKRUPTCY COURT:**

DAMIS Holdings LLC and its affiliates (collectively, the "DAMIS Debtors")[2], the debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby submit this joinder and supplemental memorandum of law (this "Joinder") to *The SIMAD Debtors' (I) Memorandum of Law in Support of a Determination that the OrcaFunding Sale of Future Receipts Agreements Are Disguised Loans and Not True Sales and (II) Opposition to OrcaFunding LLC's Memorandum of Law in Support of a Determination that the OrcaFunding Sale of Future Receipts Agreements Are Sales, Not Loans* [SIMAD D.I. 1156] (the "SIMAD Memorandum"), filed by SIMAD Holdings Ltd. and its affiliated debtors and debtors in possession (collectively, the "SIMAD Debtors") in the jointly administered chapter 11 cases captioned *In re SIMAD Holdings Ltd., et al.*, Case No. 26-16388 (CMG) (the "SIMAD Chapter 11 Cases"), and in opposition to the *Memorandum of Law of OrcaFunding LLC in Support of a Determination that the OrcaFunding Sale of Future Receipts Agreements Are Sales, Not Loans* [SIMAD D.I. 1092] (the "OrcaFunding Memorandum") filed by OrcaFunding LLC ("OrcaFunding"), and respectfully state as follows:[3]

---

[2] A complete list of the DAMIS Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the DAMIS Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/DAMIS/. The location of DAMIS Holdings LLC's principal place of business and the DAMIS Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the SIMAD Memorandum (as defined herein) or the OrcaFunding Agreements (as defined herein), as applicable. References to "SIMAD D.I." are to the docket in the SIMAD Chapter 11 Cases (as defined herein), references to "D.I." are to the docket in these Chapter 11 Cases, and references to "Hr'g Tr." are to the transcript of the September 29, 2026 hearing in the SIMAD Chapter 11 Cases.

## PRELIMINARY STATEMENT

1. The DAMIS Debtors are not bystanders to the Characterization Dispute (as defined herein). The two OrcaFunding agreements at issue in the SIMAD Chapter 11 Cases purport to bind more than fifty DAMIS Debtors as "Sellers," jointly and severally with the SIMAD Debtors. As the Court observed at the September 29, 2026 hearing, "there's a ton of DAMIS debtors on here," and the Court indicated that it would "need to hear from DAMIS, too." Hr'g Tr. 36:2–37:9. The DAMIS Debtors thank the Court and submit this Joinder in response to that invitation and to the *SIMAD Debtors' Notice of Briefing and Hearing Regarding Whether the OrcaFunding LLC Sale of Future Receipts Agreements Are Disguised Loans and Not True Sales* [D.I. 1333] (the "Notice").

2. To avoid burdening the Court with unnecessarily duplicative submissions, and to minimize the incurrence of administrative expense, the DAMIS Debtors join in and adopt the SIMAD Memorandum in its entirety, including each of its arguments, authorities, and requested relief, as if fully set forth herein. The DAMIS Debtors likewise join in the substantively identical positions taken by Mishmeret Trust Company Ltd. [SIMAD D.I. 518, 1162] and Bank of New Hampshire [SIMAD D.I. 1188].

3. The DAMIS Debtors also submit three supplemental arguments, together with additional authority not previously cited by the SIMAD Debtors, that confirm that the OrcaFunding Agreements (as defined herein) are loans and not true sales. *First*, the OrcaFunding Agreements do not convey any specific, identifiable receivable; they convey a dollar-denominated claim against the aggregate future cash flow of more than 200 enterprises. This is an economic benefit that cannot be the subject of a true sale of receivables. *Second*, the only risk OrcaFunding bears is enterprise or revenue risk, which is the risk that the Sellers will not generate enough future revenue to deliver the fixed "Purchased Amount". That is the risk every lender bears, not the credit



DMS_US.380305885.3

risk of account debtors that defines a purchaser of receivables. *Third*, the power of attorney that OrcaFunding obtained is limited to effectuating ACH debits against the Sellers' bank accounts; it confers no authority to enforce or collect any receivable from any account debtor. That is the posture of a lender with recourse to its borrowers' deposit accounts, not an owner of purchased receivables.

4. For these reasons and those set forth in the SIMAD Memorandum, the Court should determine that the OrcaFunding Agreements are disguised loans, that the amounts OrcaFunding claims to have "purchased" are property of the applicable debtors' estates, and that OrcaFunding may, at most, assert an unsecured claim against the DAMIS Debtors (subject to the DAMIS Debtors' reservation of rights as to the validity of any such claim).

## BACKGROUND

### A. The Chapter 11 Cases

5. On June 4, 2026, certain of the DAMIS Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On August 11, 2026, debtor Kiwi Landco LLC filed a voluntary petition, and on September 14, 2026, debtors 2302 Windsong Drive Real Estate LLC and 2974 Coppercreek Road Real Estate LLC each filed voluntary petitions. The Chapter 11 Cases are being jointly administered under Case No. 26-16439 (CMG). [D.I. 35, 1223 & 1224]. The DAMIS Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. The DAMIS Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases. On June 12, 2026, the Court entered an order authorizing the joint administration and procedural

consolidation of the Chapter 11 Cases of the Initial Debtors pursuant to Bankruptcy Rule 1015(b) [D.I. 35]. On September 25, 2026, the Court entered orders authorizing the joint administration and procedural consolidation of the Chapter 11 Cases of the Additional Debtors with those of the Initial Debtors pursuant to Bankruptcy Rule 1015(b) [D.I. 1223 & 1224]. The Chapter 11 Cases are being jointly administered under Case No. 26-16439 (CMG).

7. On August 21, 2026, the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [D.I. 846].

8. Information regarding the DAMIS Debtors' history and business operations, capital structure, and the events leading up to the commencement of the Chapter 11 Cases can be found in the *Declaration of Perry Mandarino, Chief Restructuring Officer of the DAMIS Debtors, in Support of Chapter 11 Petitions and First Day Motions* [D.I. 157] (the "First Day Declaration"), which is incorporated herein by reference.

**B. The OrcaFunding Agreements**

9. On April 17, 2026 and May 21, 2026, OrcaFunding and more than two hundred SIMAD Debtor and DAMIS Debtor entities entered into two agreements, each captioned "Sale of Future Receipts Agreement" (together with the applicable addendum, the "April Agreement" and the "May Agreement," respectively, and collectively, the "OrcaFunding Agreements"). *See* Joint Stipulation of Undisputed Facts [SIMAD D.I. 1062] (the "Joint Stipulation") ¶ 1.[4] Each OrcaFunding Agreement lists as "Seller" Pine Forest Campco LLC (a SIMAD Debtor), 11200 West Florissant Avenue Realty LLC (a DAMIS Debtor), and "the entities listed on Exhibit A."

[4] The OrcaFunding Agreements are the same agreements that the SIMAD Debtors refer to as the "MCA Loan Agreements" in the SIMAD Memorandum and that are attached as Exhibit A to the Joint Stipulation.

*See* April Agreement at 1; May Agreement at 1. Exhibit A to each OrcaFunding Agreement lists, among others, DAMIS Holdings LLC, DAMIS Ventures LLC, Kiwi Landco LLC, 2302 Windsong Drive Real Estate LLC, 2974 Coppercreek Road Real Estate LLC, and dozens of other DAMIS Debtor real estate and leasing entities. *See id.*, Ex. A. Michael A. Shabsels executed each OrcaFunding Agreement on behalf of all listed Sellers. *See* April Agreement at 8; May Agreement at 8.[5]

10. The DAMIS Debtors are therefore parties to, and purportedly bound by, the very same OrcaFunding Agreements at issue in the SIMAD Chapter 11 Cases, and they face the identical true-sale characterization question. Section 21 of each OrcaFunding Agreement provides that "[e]ach Seller agrees that it is jointly and severally liable to Buyer for the obligation to deliver the Purchased Amount from its own Future Receipts," and that "the release of any other Seller from any obligations under this Agreement, whether in whole or in part, will not limit, reduce, release, or impair such Seller's obligations to Buyer, including the obligation to deliver the undelivered balance of the Purchased Amount." May Agreement § 21; April Agreement § 21. OrcaFunding has filed sixty-one identical proofs of claim, each for $5,400,000, against the SIMAD Debtors, and has expressly reserved its rights against the DAMIS Debtor Sellers. *See* Joint Stipulation ¶ 17; OrcaFunding Memorandum at 11 n.5. The determination of the Characterization Dispute will therefore directly affect the DAMIS Debtors, their estates, and their creditors.

11. The economic terms of the OrcaFunding Agreements are undisputed. Under the April Agreement, OrcaFunding "purchased" $1,400,000 of "Future Receipts" for a $1,000,000

---

[5] The DAMIS Debtors expressly reserve, and do not waive, any argument that Michael A. Shabsels or any other signatory lacked authority to bind any particular DAMIS Debtor to the OrcaFunding Agreements. OrcaFunding itself has questioned whether certain listed Sellers were validly bound. *See* OrcaFunding Memorandum at 20–21. Nothing herein is an admission that any DAMIS Debtor is validly bound by, or liable under, the OrcaFunding Agreements.

"Purchase Price," with a weekly Periodic Amount of $43,750 and a Specified Percentage of 1.46%; OrcaFunding wired $980,000 to Quadstar Realty LLC after deducting a $20,000 origination fee. Joint Stipulation ¶¶ 2, 9; April Agreement at 1. Under the May Agreement, OrcaFunding "purchased" $4,000,000 of "Future Receipts" for a $2,000,000 "Purchase Price," with a weekly Periodic Amount of $125,000 and a Specified Percentage of 4.17%; OrcaFunding wired $1,960,000 to Quadstar Realty LLC after deducting a $40,000 origination fee. Joint Stipulation ¶¶ 3, 11; May Agreement at 1. OrcaFunding was authorized to debit any of twenty-three bank accounts on a weekly basis. Joint Stipulation ¶ 7. Neither OrcaFunding Agreement specifies a repayment term or maturity date, and neither party ever requested a Reconciliation. *Id.* ¶¶ 14, 16. In total, OrcaFunding received $387,500 against $2,940,000 advanced. Supplemental Declaration of Yaakov Weiser [SIMAD D.I. 1177] (the "Weiser Supp. Decl.") ¶ 11.

**C. The Characterization Dispute and the Record**

12. On July 8, 2026, OrcaFunding filed limited objections to the SIMAD Debtors' two debtor-in-possession financing motions [SIMAD D.I. 225, 312], asserting that it "purchased and owns" more than $5,000,000 of future receipts that "arguably" are not property of the SIMAD Debtors' estates. [SIMAD D.I. 413 ¶ 3, 414 ¶ 3]. The SIMAD Debtors replied that the OrcaFunding Agreements are disguised loans [SIMAD D.I. 503]. The Court overruled OrcaFunding's objections and, on July 20, 2026 and July 21, 2026, entered final DIP orders that afford OrcaFunding neither adequate protection nor a reservation of rights. *See* SIMAD D.I. 547, 552.

13. On August 25, 2026, the Court entered the *Stipulation and Agreed Scheduling Order Regarding Characterization of OrcaFunding LLC's Sale of Future Receipts Agreements* [SIMAD D.I. 932] (the "Scheduling Order"), which governs the determination of whether the OrcaFunding Agreements are true sales or disguised loans (the "Characterization Dispute").

14. The parties thereafter filed the Joint Stipulation, the OrcaFunding Memorandum and supporting declarations [SIMAD D.I. 1092, 1177], the SIMAD Memorandum, and the joinders of Mishmeret and Bank of New Hampshire [SIMAD D.I. 1162, 1188]. On September 29, 2026, the Court held an evidentiary hearing on the Characterization Dispute (the "Hearing"). During the Hearing, the Court noted that many of the Sellers listed on Exhibit A to the OrcaFunding Agreements are DAMIS Debtors, and the parties agreed to give the DAMIS Debtors an opportunity to be heard before any ruling. Hr'g Tr. 36:2–39:4. On October 2, 2026, the SIMAD Debtors filed the Notice on the docket of these Chapter 11 Cases, requesting that the DAMIS Debtors advise the Court of their position regarding the Characterization Dispute.

15. The DAMIS Debtors adopt and incorporate the facts set forth in the Joint Stipulation.

## JOINDER

16. The DAMIS Debtors hereby join in and adopt the SIMAD Memorandum, including all arguments, authorities, and requested relief set forth therein, as if fully set forth herein. Each of those arguments applies with equal force to the DAMIS Debtors. The DAMIS Debtors are parties to the same two OrcaFunding Agreements, on the same terms, and are subject to the same joint and several obligations. Indeed, the SIMAD Debtors' arguments regarding the impracticability of reconciliation and the joint and several liability of more than 200 entities, including certain DAMIS Debtors that do not generate receipts, rest in substantial part on the inclusion of the DAMIS Debtors among the Sellers. *See* SIMAD Memorandum at 19, 26–27.

## SUPPLEMENTAL ARGUMENTS

17. In addition to joining the SIMAD Memorandum, the DAMIS Debtors submit the following supplemental arguments. Measured against the legal standards set forth in the SIMAD

Memorandum, each of the three arguments addressed below independently demonstrates that the OrcaFunding Agreements are financings. Taken together, they are dispositive.

### A. The Pricing Terms Are Time-Based, Confirming That OrcaFunding Priced the Use of Money, and Not the Value of Distinct, Identifiable Receivables.

18. The Early Delivery Schedule appended to each OrcaFunding Agreement confirms that OrcaFunding extended credit. Under the April Agreement, OrcaFunding agreed to accept $1,120,000 "in full satisfaction of Seller's contractual obligations" if delivered within 30 days of funding, $1,170,000 if delivered within 31 to 60 days, and $1,210,000 if delivered within 61 to 90 days, against a $1,000,000 "Purchase Price". April Agreement, Early Delivery Schedule. Under the May Agreement, OrcaFunding agreed to accept $2,120,000 if delivered within seven days of funding and $2,220,000 if delivered within eight to fourteen days, against a $2,000,000 "Purchase Price". May Agreement, Early Delivery Schedule. The amount required to discharge the Sellers' obligations thus rises with the passage of time without regard to the volume, identity, or collectability of any receivable.

19. A purchaser of receivables has no reason to price its asset by reference to the calendar; its return depends on what the account debtors pay. A lender, by contrast, prices the time value of money. The Early Delivery Schedule is, in substance, a schedule of prepayment amounts that increases the charge for the use of OrcaFunding's funds the longer those funds remain outstanding. It is irreconcilable with OrcaFunding's contention that it bought an asset whose value depends on collections. Likewise, the Sellers' right to "cancel" the transaction within three days by returning the Net Funded Amount, May Agreement § 10, functions as a right to repay the advance and not as the rescission of a sale of any identifiable asset.

20. In short, OrcaFunding did not buy distinct, identifiable receivables. It advanced money in exchange for a fixed-dollar claim against the Sellers' aggregate future cash flow, priced according to how long its money remained outstanding. That is a loan.

**B. The Only Risk OrcaFunding Bears Is Enterprise Risk, Which Is a Lender's Risk, Not the Credit Risk of a Receivables Purchaser.**

21. "Risk of loss is one of the traditional hallmarks of ownership." *In re Sackman Mortgage Corp.*, 158 B.R. 926, 934 (Bankr. S.D.N.Y. 1993). In the context of receivables, the relevant risk is the risk of non-payment by the account debtors on the transferred receivables. Where the purported transferor retains "virtually all of the risk of noncollection," the transaction cannot properly be considered a true sale. *Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 602 (4th Cir. 2010). Where the transferor relieves the transferee of all risk of loss, that arrangement "seems to result in a finding of a debtor/creditor relationship in most cases." *Fireman's Fund Insurance Cos. v. Grover (In re Woodson Co.)*, 813 F.2d 266, 271 (9th Cir. 1987); *see also Lange v. Inova Capital Funding, LLC (In re Qualia Clinical Service, Inc.)*, 441 B.R. 325, 330 (B.A.P. 8th Cir. 2011).

22. OrcaFunding's case for true-sale treatment rests heavily on Section 6 of the OrcaFunding Agreements. *See* OrcaFunding Memorandum at 10–11. OrcaFunding "assumes the risk that Future Receipts may be remitted more slowly than Buyer may have anticipated or projected *because Seller's business has slowed down*, and the risk that the full Purchased Amount may never be remitted *because Seller's business goes bankrupt or Seller otherwise ceased operations* in the ordinary course of business." May Agreement § 6 (emphasis added); April Agreement § 6. OrcaFunding is "buying the Purchased Amount knowing the risks that *Seller's business may slow down or fail*." *Id.* (emphasis added). Section 6 says nothing about the risk that any customer, tenant, camper family, card processor, or other account debtor will fail to pay a

receivable. Every risk described is a risk about the Sellers' revenue, their operations, and their solvency.

23. That is enterprise risk, and it is the risk every lender bears. A lender to an operating business always faces the possibility that the borrower's revenues will decline and that the borrower will become insolvent; that possibility is why lenders charge for the use of money, take collateral, and obtain guaranties. A purchaser of receivables, by contrast, takes on a different and narrower risk: the risk that the specific account obligors on the specific receivables purchased will not pay, regardless of the seller's enterprise fortunes. *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.* 67 F.3d 1063, 1069 (2d Cir. 1995) (noting that when accounts receivable are truly sold, the purchaser's "risk with regard to the performance of the accounts is direct"). The OrcaFunding Agreements allocate none of that account debtor risk to OrcaFunding, because they identify no account debtors and no specific receivables whose non-payment OrcaFunding could suffer. *See Crosby Marine Transp. LLC*, 2026 WL 1765197, at *6 (Bankr. E.D. La. June 17, 2026) ("Because the Freedom MCA Agreements identify no particular revenue source, Freedom bore no actual risk of non-payment from any specific customer."); *Haymount Urgent Care PC v. GoFund Advance LLC*, 609 F. Supp. 3d 237, 249 (S.D.N.Y. 2022) (holding that the funder "did not assume the credit risks of any particular customer, or the risks of nonpayment associated with any particular receivable").

24. Moreover, even OrcaFunding's enterprise risk is largely illusory. The OrcaFunding Agreements bind more than 200 Sellers jointly and severally, so that the failure of any one enterprise, or of dozens, simply shifts the obligation to the others. May Agreement § 21; *see In re Greenwich Retail Grp. LLC*, 677 B.R. 473, 500 (joint liability of only two co-obligors supported characterization as "a mutually-guaranteed loan rather than a true sale of receivables"). The

DAMIS Debtors' inclusion magnifies that effect: the DAMIS Debtors' real estate holding entities that do not generate receipts function as additional credit support for OrcaFunding's advance. OrcaFunding also obtained personal guaranties from the Sellers' principals, May Agreement § 18, and personal recourse to the transferor's principals is further evidence that an agreement creates a loan rather than a sale. And upon any breach, OrcaFunding may sweep up to 100% of receipts, accelerate the undelivered balance, and debit any account "wherever situated." May Agreement § 15. The aggregate effect is that OrcaFunding is exposed to loss only if more than 200 enterprises and two individual guarantors all fail to perform. This risk profile is, if anything, *more* favorable than that of an ordinary lender.[6]

**C. The Power of Attorney Is Limited to ACH and Bank Account Rights and Confers No Right to Enforce or Collect Receivables.**

**1. The Grant of Authority Under the OrcaFunding Agreements Is Confined to Debiting Bank Accounts.**

25. The only power of attorney in the OrcaFunding Agreements appears in the Authorization Agreement for Automated Clearing House Transactions appended to each agreement (the "ACH Authorization"). The ACH Authorization authorizes OrcaFunding "to present automated clearing house (ACH) debits to the account identified" in the amount of any Periodic Amount or other amount due and, if a Seller breaches, "to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount . . . due to Buyer." May Agreement, ACH Authorization; April Agreement, ACH Authorization. It then provides:

[6] The DAMIS Debtors acknowledge that courts have held that recourse to the transferor, without more, does not automatically convert a sale into a security interest. *See Major's Furniture Mart*, 602 F.2d at 544–45. That principle is inapposite here, where OrcaFunding's protection is not a limited guaranty of the quality or collectability of identified receivables, but a comprehensive set of payment, acceleration, account-sweep, guaranty, and multi-obligor protections that leaves OrcaFunding exposed only to the risk of an enterprise-wide failure.

> In the event that Seller closes an Authorized Account, or the Authorized Account has insufficient funds for any ACH transaction under this Authorization Agreement, Seller authorizes Buyer to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization Agreement to such additional account(s). To the extent necessary, Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this Authorization Agreement.

*Id.* By its plain terms, the power of attorney is "limited," may be exercised only "[t]o the extent necessary," and exists solely "to facilitate this Authorization Agreement". It does not authorize OrcaFunding to endorse checks, to demand payment from any account debtor in the Sellers' names, to sue any account debtor, to compromise or settle any receivable, to take possession of any invoice or contract, or to establish a lockbox. The ACH Authorization is, moreover, "intended to be irrevocable during the course of the Sale Agreement and shall remain in full force and effect until Buyer has received all amounts due or that may become due to Buyer." This language describing a repayment obligation, not the transfer of an asset. *Id.*

26. Deposit accounts are not receivables. A bank account balance consists of funds the Seller has *already* collected; it is the Seller's general property, commingled from all sources. A right to debit a counterparty's bank accounts "for all sums due," May Agreement § 15(e), is the classic remedy of a lender with recourse to its borrower's deposit accounts. *See Rowan Advance Group LLC v. DraftPros, LLC*, No. 2025-38978 (RJM), 2025 WL 2858612, at *4 (N.Y. Sup. Ct. Wash. Cnty. Oct. 7, 2025) (right to debit any of the sellers' accounts "wherever situated" and to collect revenue "even if it is not a Future Receipt" demonstrated the funder's "absolute right to repayment"). It is not the right of an owner to collect assets it has purchased.

**2. Section 14(a) Does Not Alter This Conclusion.**

27. OrcaFunding points to Section 14(a), under which, "with or without a breach," it "may notify account debtors . . . of Seller's sale of the Future Receipts and may instruct them to make payment" to OrcaFunding. *See* OrcaFunding Memorandum at 16–17; May Agreement § 14(a). That provision does not salvage OrcaFunding's position, for three reasons.

28. *First*, Section 14(a) is expressly framed as a secured party's right. The same subsection that contains the notification right provides that, to the extent the Future Receipts include accounts or payment intangibles, the transaction "creates a security interest," the agreement "constitutes a security agreement under the UCC," and OrcaFunding "has all the rights of a secured party under the UCC with respect to such accounts or payment intangibles." May Agreement § 14(a). A right to notify account debtors is one that any secured lender with a security interest in accounts possesses; it is not distinctive of ownership. And the presence of a security interest in a funder's favor is itself indicative of a loan. *See* SIMAD Memorandum at 23–24 (citing *Fleetwood*, 2022 WL 1997207, at *12–13).

29. *Second*, the notification right is illusory in practice because the OrcaFunding Agreements identify no account debtors to notify. OrcaFunding could not invoke Section 14(a) without first determining, across more than 200 Sellers, which customers owed which Sellers what amounts. That is the very exercise OrcaFunding characterized as an "administrative nightmare." Hr'g Tr. 96:23–97:16. The record reflects no instance in which OrcaFunding notified a single account debtor; OrcaFunding instead collected exclusively through weekly ACH debits. Joint Stipulation ¶¶ 9–12; Weiser Supp. Decl. ¶ 11. Because true-sale analysis turns on economic substance rather than paper rights, an unused and practically unusable notification right cannot transform a financing into a sale. *See Endico Potatoes*, 67 F.3d at 1069.

30. *Third*, a bare right to notify is not a power to enforce. Section 14(a) does not authorize OrcaFunding to sue an account debtor, to endorse instruments in a Seller's name, to compromise claims, or to take any other action as attorney-in-fact with respect to any receivable. The only such authority in the OrcaFunding Agreements is the "limited Power of Attorney" in the ACH Authorization, and that authority extends only to bank-account debits. The contrast between the narrow, ACH-focused power of attorney OrcaFunding actually obtained and the comprehensive collection authority that characterizes true sales confirms that OrcaFunding bargained for the rights of a lender with recourse to its borrowers' cash, not those of an owner of receivables.

## RESERVATION OF RIGHTS

31. The DAMIS Debtors hereby reserve all of their rights, claims, defenses, and remedies, including the right to supplement this Joinder, to seek discovery, to raise additional arguments, and to introduce evidence at or prior to any further hearing on the Characterization Dispute. Without limiting the foregoing, the DAMIS Debtors reserve all rights (a) to contest whether any DAMIS Debtor is validly bound by the OrcaFunding Agreements; (b) to object to any claim asserted by OrcaFunding against any DAMIS Debtor on any basis; (c) to assert any claim or cause of action against OrcaFunding, including avoidance actions under chapter 5 of the Bankruptcy Code and claims under applicable usury or other law; and (d) to be heard with respect to the form and scope of any order resolving the Characterization Dispute. Nothing herein constitutes an admission of liability by any DAMIS Debtor.

## CONCLUSION

32. For the reasons set forth in the SIMAD Memorandum and herein, the DAMIS Debtors respectfully submit that the OrcaFunding Agreements are, in substance, loans and not true sales.

WHEREFORE, the DAMIS Debtors respectfully request that the Court (i) determine that the OrcaFunding Agreements are disguised loans and not true sales of future receipts, including as to each DAMIS Debtor that is a purported Seller thereunder (subject to the Damis Debtors' reservation of rights); (ii) determine that any accounts OrcaFunding claims to have purchased under the OrcaFunding Agreements are property of the applicable debtors' estates under section 541 of the Bankruptcy Code; and (iii) grant such other and further relief as the Court deems just and proper.

Dated: October 19, 2026

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Michael P. Pompeo*
Michael P. Pompeo
600 Campus Drive
Florham Park, New Jersey 07932-1047
Telephone: (973) 549-7000
Facsimile: (973) 360-9831
michael.pompeo@faegredrinker.com

-and-

Ian J. Bambrick (admitted pro hac vice)
Patrick A. Jackson (admitted pro hac vice)
Sarah E. Silveira (admitted pro hac vice)
222 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
ian.bambrick@faegredrinker.com
patrick.jackson@faegredrinker.com
sarah.silveira@faegredrinker.com

*Counsel to the DAMIS Debtors and Debtors in Possession*

-and-

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff (admitted pro hac vice)
Megan M. Wasson (admitted pro hac vice)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
adam.rogoff@hsfkramer.com
megan.wasson@hsfkramer.com

*Co-Counsel to the DAMIS Debtors and Debtors in Possession*