# Exhibit A

KIWI OPERATINGCO LLC

("Borrower")

to

PUTNAM COUNTY SAVINGS BANK

("Lender")

---

**MORTGAGE NOTE**

---

Dated: August 28, 2013

<u>Mortgaged Premises</u>

| | |
|---|---|
| Location: | 825 Union Valley Road and 1-5 Blossom Lane |
| Section: | 77 / 77 |
| Block: | 1 / 1 |
| Lot: | 32 / 41 |
| County: | Putnam / Putnam |

PREPARED BY:
Daniels, Porco and Lusardi, LLP
102 Gleneida Avenue
Carmel, New York 10512

| | |
|---|---|
| Attention: | Emily J. Westbrook, Esq. |
| File No.: | 35,028RE |
| Title No.: | 13-17892-PU, issued by Kingston Abstract, Inc. as Agent for Commonwealth Land Title Insurance Company |

# MORTGAGE NOTE

(hereinafter, the "Note")

$1,300,000.00 Brewster, New York

August 28, 2013

FOR VALUE RECEIVED, **KIWI OPERATINGCO LLC**, a limited liability company organized and existing under the laws of the State of New York with an address of 825 Union Valley Road, Mahopac, New York 10541( the "Borrower") unconditionally promises to pay to the order of **PUTNAM COUNTY SAVINGS BANK**, a mutual savings bank organized and existing under the laws of the State of New York (the "Lender"), at its principal place of business located at 2477 Route 6, Brewster, New York, 10509-0417, or at such other address as Lender or a subsequent holder hereof may from time to time designate in writing, the principal sum of **One Million Three Hundred Thousand Dollars and No Cents ($1,300,000.00)**, plus interest, in lawful money of the United States of America, in the amounts and in the manner specified below.

1. From the date hereof through and including the Maturity Date (as hereinafter defined) Borrower shall pay interest on the outstanding principal balance of this Note (the "Principal"), for each Interest Accrual Period, at a fluctuating annual interest rate equal to two percent (2.00%) above the Index (the "Applicable Interest Rate"). The Index shall be set on the date hereof and adjusted on the first day of each month during the term of this Note (each such date being a "Reset Date") "Interest Accrual Period" means the period commencing on the first (1st) day of the preceding calendar month and terminating on the last day of the preceding calendar month; except that the initial Interest Accrual Period shall begin on the date of the this Note and shall end on the last day of the calendar month in which this Note is executed. "Index" means the London Inter-Bank Offered Rate (LIBOR) for deposits in U.S. Dollars for a period of one month reported on the Bloomberg Financial website (www.bloomberg.com) as of 11:00 AM, London time, on the day that is two (2) business days prior to the Reset Date. If the Index does not appear on the Bloomberg Financial website, Lender may utilize any other reputable source of financial data, including but not limited to the Wall Street Journal. Interest shall be computed on the basis of a 365-day year. There will be no cap on the interest rate Borrower pays Lender under this Note except as may be imposed by applicable State or Federal Law. The Applicable Interest Rate as of the date hereof is two and one hundred eighty-four thousandths percent (2.184%).

2. If this Note is dated other than the first day of a month, the first payment will be of interest only, for the period running from today through the last day of this month, inclusive. Then, commencing **October 1, 2013,** Borrower shall make monthly payments equal to (i) **Five Thousand Four Hundred Sixteen Dollars and Sixty-Seven Cents ($5,416.67)** in principal, plus (ii) accrued and unpaid interest at the Applicable Interest Rate. The payment amount may vary from month to month based on any reduction in the Principal, fluctuations of the Index, or as a result of an interest rate increase following an Event of Default (as hereinafter defined). The payment due on **October 1, 2013** is Seven Thousand Seven Hundred Fifty Dollars and Twenty-Six Cents ($7750.26). Borrower shall make payment on the first day of each and every month until **September 1, 2023** (the "Maturity Date"), when a final payment of all outstanding Principal, any unpaid interest thereon, and any other amounts due under this Note shall be due and payable in full. The foregoing monthly principal payment amount is that which would apply in the case of repayment of One Million Three Hundred Thousand Dollars and No Cents ($1,300,000) in equal monthly installments of principal over a term of twenty (20) years. **HOWEVER, THIS NOTE IS DUE AND**

**PAYABLE IN FULL ON DEMAND AT ANY TIME AFTER TEN (10) YEARS FROM THE FIRST MONTHLY PAYMENT DATE.**

3. Each payment shall first be applied to interest then due; then to reimburse Lender for monies, if any, expended by Lender to preserve any collateral securing this Note, including without limitation payments of taxes, charges, assessments, or insurance policy premiums, and for any expenses, including attorney's fees, which Lender incurs as a result of an uncured Event of Default, in upholding the lien of, or enforcing the terms of, this Note or the other Loan Documents (as hereinafter defined); and, lastly, toward reduction of Principal.

4. If the due date of any payment under this Note falls on a Saturday, Sunday or a day that is not a banking day in New York, such date shall be extended to the next such succeeding banking day, and interest shall be payable for any principal so extended at the rate of interest specified in this Note.

5. If any monthly payment owed under this Note is not paid within fifteen (15) days after the date on which it is due (which failure to pay shall include any failure to maintain funds in Borrower's account(s) with Lender sufficient to support the auto-debit of payments required under Section 8 hereof, within fifteen (15) days of the due date of such payments) Borrower shall pay to Lender upon demand an amount equal to the lower of five (5) cents for each dollar ($1.00) of the overdue monthly payment and the maximum amount permitted by applicable law (the "Late Fee") to defray the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment, and such Late Fee shall be secured by the Mortgage and the Other Security Documents.

6. Provided no default exists under this Note or any of the other Loan Documents (as hereinafter defined) at the maturity of this Note, the Borrower shall have the option to extend the term of this Note for an additional ten (10) year period, on the terms provided herein except that the Note shall mature on **September 1, 2033** (the "Extended Maturity Date").

7. Except as provided above, Lender is under no obligation to refinance this Note on the Maturity Date, or Extended Maturity Date, as the case may be. Borrower may therefore be required to liquidate Borrower's own assets, or to procure financing with another lender, to pay this Note in full. If Borrower refinances this Note, Borrower may have to pay some or all of the closing costs normally associated with a new loan, even if Borrower obtains refinancing through Lender.

8. For so long as Lender is the owner and holder of this Note, Borrower shall maintain its primary operating account(s) with Lender in the name of Borrower and deposit therein all income generated by the Borrower and the Mortgaged Premises. Lender shall be authorized to automatically deduct and make payments of interest, Principal, escrow, fees and any other expenses due the Lender under the Loan Documents from said account(s). In the event the balance of said account(s) falls below a sum equal to ten percent (10%) of the aggregate outstanding principal of all loan facilities held by Borrower with Lender (the "Minimum Account Balance"), the Applicable Interest Rate hereunder, and the interest rate on all other such loan facilities, shall be increased by one-half of one percent (0.5%).

9. Further, Borrower does hereby agree that upon the occurrence of an Event of Default (as hereinafter defined) or upon the failure of Borrower to pay the Debt (as hereinafter defined) in full on demand following acceleration of this Note pursuant to Section 15 hereof, the Lender shall be entitled to receive, and the Borrower shall pay, interest on the Debt at a rate equal to the Applicable Interest Rate plus five percent (5.0%), or at the maximum rate of interest allowable by law, whichever is lower, to be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt. This clause, however, shall not be construed as an agreement or privilege to extend the date of the

payment of the Debt, or as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

10. This Note is secured by the Mortgage and the Other Security Documents. Mortgage," as used in this Note shall mean that certain Collateral Mortgage, Security Agreement and Assignment of Leases and Rents dated the date hereof, in the principal sum of $1,300,000 given by KIWI LANDCO LLC to Lender, encumbering certain real property known and designated as 825 Union Valley Road, Mahopac, New York 10541, bearing Tax Map Identification Number 77-1-32, and 1-5 Blossom Lane, Mahopac, New York 10541, bearing Tax Map Identification Number 77-1-41, each in the Town of Carmel, County of Putnam and State of New York (collectively, the "Mortgaged Premises"), as such Mortgaged Premises are more particularly described therein and which Mortgage is intended to be duly recorded in the Putnam County Land Records. The term "Other Security Documents" as used in this Note shall collectively mean any and all documents other than the Mortgage now or hereafter executed by Borrower and/or others in favor of Lender, which wholly or partially secure or guarantee payment and/or performance of this Note. The terms, covenants, and conditions of the Mortgage and the Other Security Documents are hereby made a part of this Note to the same extent and with the same force as if set forth at length herein. This Note, the Mortgage, the Other Security Documents, and any and all other instruments executed by Borrower and/or others pertaining to the Debt are collectively referred to as the "Loan Documents."

11. Each of the following occurrences shall be considered an Event of Default hereunder: (a) the Borrower shall (i) fail to pay a monthly payment owed hereunder within fifteen (15) days of the date when due, (ii) fail to pay any other sum due hereunder within fifteen (15) days of the delivery to Borrower of demand therefor, or (iii) fail to perform any non-monetary obligation imposed hereunder, and such failure shall continue for more than fifteen (15) days after delivery to Borrower of demand for compliance with such obligation; (b) the occurrence of a default under any of the other Loan Documents, after the expiration of any grace period, and subject to any right to cure, expressly set forth therein, (c) any representation or warranty made or deemed made by any third party with liability under this Note or any other Loan Document ("Third Party") in any document evidencing the obligations of such Third Party or contained in any certificate, document, opinion, financial or other statement furnished by a Third Party to Lender at any time in connection with this Note, shall prove to have been incorrect in any material respect on or as of the date made or deemed made; (d) the Borrower shall fail to pay when due any indebtedness for borrowed money owed to a third party, the principal balance of which, at the time of such failure, is greater than or equal to $100,000.00, beyond the expiration of any applicable notice and/or grace period, and subject to any right to cure, or if any such indebtedness shall become due and payable, or capable of becoming due and payable, by acceleration of its maturity; (e) the Borrower or any Third Party, excepting Michael Shablsels and David Shabsels,: (i) shall generally not, or be unable to, or shall admit in writing its inability to pay its debts as such debts become due; (ii) shall make an assignment for the benefit of creditors, (iii) shall file a petition in bankruptcy or for any relief under any law of any jurisdiction relating to reorganization, arrangement, readjustment of debt, dissolution or liquidation; (iv) shall have any such petition filed against it and the same shall remain undismissed for a period of sixty (60) days; or (v) shall have had a receiver, custodian or trustee appointed for all or a substantial part of its property, unless such appointment shall be extinguished within sixty (60) days; (f) Michael Shabsels or David Shabsels shall file a petition in bankruptcy or for any relief under any law of any jurisdiction relating to reorganization, arrangement, readjustment of debt, dissolution or liquidation or shall have any such petition filed against him and the same shall remain undismissed for a period of sixty (60) days;
(g) if the Borrower shall cease to exist; (h) if the Mortgage or any Other Security Document (whether executed by Borrower or a Third Party) shall at any time and for any reason cease to be in full force and effect, or shall be declared null and void, or shall cease to create a valid security interest in and to the property purported to be subject to such Mortgage or Other Security Document, in the lien position indicated therein, or its validity or enforceability shall be contested by Borrower or the relevant Third Party, or Borrower or such Third Party shall deny it has any further liability or obligation under the

Mortgage or any such Other Security Document, or fail to perform its obligations under the same; (i) if the Borrower shall convey, transfer, or otherwise divest itself (which conveyance, transfer, or divestment shall include, without limitation, the conveyance, transfer, or divestment of all or a portion of the membership interests, partnership interests, or stock, as the case may be, in Borrower) of title to the Mortgaged Premises, or encumber title to the Mortgaged Premises, without the consent of Lender; except that the members of the Borrower existing on the date hereof (each a "Current Member") shall each have the right to transfer all or a portion of their interest in Borrower without Lender's consent *provided* (i) no Event of Default exists hereunder or under any of the other Loan Documents at the time of the contemplated transfer, (ii) Borrower gives Lender notice of the contemplated transfer together with copies of all instruments to be executed to effect the same not less than ten (10) business days prior to the date of the contemplated transfer, (iii) the transfer is made to one or more of the following Excepted Transferees: non-minor immediate family member(s) of a Current Member; a trust, the holders of the beneficial interests in which are a Current Member and/or non-minor immediate family members of a Current Member; a limited liability company, the member(s) of which is/are a Current Member and/or non-minor immediate family members of a Current Member; or a limited liability company in which Michael Shabsels holds a controlling interest, (iv) Michael Shabsels and/or David Shabsels maintains control and management of Borrower and the Mortgaged Premises subsequent to such transfer(s), and (v) further provided that any transfer(s) allowed under these exceptions shall not, in the aggregate, result in the alienation of more than a twenty-five percent (25%) ownership interest in Borrower; (j) if the Borrower or a Guarantor shall enter into any intercompany debt or any other debt obligations or loans with any members/partners/shareholders of Borrower or any Guarantor except as permitted under that certain Corporate Debt Subordination Agreement of even date herewith between Borrower, Lender, and certain other parties ; (j) if any lien against the Mortgaged Premises or any judgment against Borrower in excess of $50,000.00, is docketed or entered, respectively, and not bonded, released or satisfied within sixty (60) days; (k) if any judgment against any Guarantor is docketed or entered, respectively, and not bonded, released or satisfied within sixty (60) days, provided such judgment is issued pursuant to a claim brought in connection with this Loan and/or any other indebtedness owed to Lender; (l) if there shall be a change in the ownership of the Borrower (including, without limitation, the ownership of any membership, partnership, or shareholder interests in the Borrower) or in the management of the Borrower; or (m) if there shall occur any failure to maintain the Minimum Debt Service Coverage Ratio (as hereinafter defined). Notwithstanding the foregoing, Lender shall consent any request of Borrower to encumber the Mortgaged Premises with a third (3rd) position mortgage lien, provided that, at the time of such request, (i) Borrower is not in default under this Note or any of the other Loan Documents, (ii) the Borrower can demonstrate, to the Lender's satisfaction, a debt service coverage ratio, calculated in accordance with the formula in Section 12 hereof, of no less than 2X, (iii) the aggregate mortgage indebtedness affecting the Mortgaged Premises if the proposed third mortgage were filed against the Premises would not exceed sixty-five percent (65%) of the value of the Mortgaged Premises (such value to be determined by Lender based upon appraisals conducted at Borrower's expense by a licensed appraiser selected by Lender), and (iv) the Lender providing the financing in connection with such third mortgage shall agree, upon Lender's request, to enter into a Debt Subordination Agreement and/or Inter-creditor Agreement with Lender upon terms acceptable to Lender.

12. The Borrower shall not permit the ratio of its EBITDAR, less any Real Estate Operating Expenses paid by KIWI LANDCO LLC (the "Adjusted EBITDAR") to the aggregate scheduled and other required payments of principal and interest on all indebtedness owed by Borrower to any party(ies) (the "Indebtedness") during any given fiscal year to fall below 1.25X (the "Minimum Debt Service Coverage Ratio"). Compliance with this covenant shall be determined utilizing the data from the annual federal tax returns of the Borrower and KIWI LANDCO LLC. "EBITDAR" shall mean earnings before interest expense, taxes, depreciation, amortization, and rent expense. "Real Estate Operating Expenses" shall mean, for any period, aggregate operating expenses incurred in connection with all real property owned by the Borrower ("Borrower's Real Property"), including without limitation real estate taxes, insurance,

utilities, maintenance expenses, management fees not to exceed five percent (5.00%) of Gross Rents, and unfinanced capital reserves of not less than the greater of (i) actual replacement costs and (ii) one percent (1.00%) of Gross Rents. "Gross Rents" shall mean, for any given fiscal year, all rental income payable and actually collected for the applicable year with respect to all tenancy and occupancy agreements in effect at the Borrower's Real Property. Failure to maintain the Minimum Debt Service Coverage Ratio shall constitute an Event of Default under this Note.

13. The whole of the Principal, together with all interest accrued and unpaid thereon, and any and all other sums due under any of the Loan Documents (all such sums hereinafter collectively referred to as the "Debt") shall without notice become immediately due and payable at the option of Lender upon the occurrence of an Event of Default.

14. In the event Lender employs counsel to declare, collect, enforce, or adjudicate any rights or obligations owed under, or accruing pursuant to, the Loan Documents as a result of the occurrence of an Event of Default, Borrower agrees to pay all reasonable arbitration, paralegals', attorneys', and experts' fees; court costs; and expenses incurred by Lender, whether or not a suit be brought.

15. The unpaid principal balance of this Note may be prepaid upon not less than thirty (30) days prior written notice to Lender specifying the date on which prepayment is to be made (the "Prepayment Date") and upon payment of all Principal, accrued interest thereon, any and all other sums due under this Note or any of the other Loan Documents, and, if this Note is prepaid on or before eighteen (18) months from the first payment date (the "Prepayment Period"), a Prepayment Penalty equaling one percent (1%) of the principal prepaid. Lender shall not be obligated to accept any prepayment unless it is accompanied by all sums due in connection therewith. No Prepayment Penalty shall apply to prepayments tendered by Borrower subsequent to the expiration of the Prepayment Period. Provided no Event of Default exists under this Note or any of the other Loan Documents, no Prepayment Penalty shall be due in connection with a complete or partial prepayment resulting from the application of insurance proceeds or condemnation awards to Principal pursuant to the terms of the Mortgage. If a prepayment is made during the Prepayment Period after the occurrence of an Event of Default or an acceleration of the Maturity Date under any circumstances, Borrower shall pay to Lender the entire Debt together with the applicable Prepayment Penalty. Upon payment in full of the Loan, Lender will issue to Borrower a Satisfaction of Mortgage in recordable form or, upon Borrower's request, execute an Assignment of Mortgage in recordable form and an endorsement of this Note, each without recourse to Lender, in favor of any purchaser of the Loan. The Satisfaction of Mortgage, or Assignment, as applicable, and any documents ancillary thereto, shall be prepared at the expense of Borrower, such expenses to be limited to reasonable and customary attorneys and recording fees.

16. At all times while the Debt remains unpaid, Borrower shall furnish to the Lender annually (a) the Balance Sheet, Profit & Loss Statement and corporate tax returns of Borrower, and any corporate Guarantor, to be delivered to Lender within one hundred twenty (120) days of each fiscal year end, provided, however, that if an extension for any such tax return has been filed, a copy of such extension shall be delivered to Lender within one hundred twenty (120) days of fiscal year end and the tax return submitted no later than the expiration date of the extension, (b) the personal financial statements and federal tax returns of any Guarantor who is a natural person, to be delivered to Lender within one hundred twenty (120) days of each calendar year end, provided, however, that if an extension for any such return has been filed, a copy of such extension shall be delivered to Lender within one hundred twenty (120) days of calendar year end and the tax return submitted no later than the expiration date of the extension, (c) signed copies of all leases to which Borrower is a party, and a certified rent roll signed and dated by Borrower detailing the names of all tenants of the Mortgaged Premises, the portion of the Mortgaged Premises occupied by each tenant, the rent and any other charges payable under each lease, and the term of each lease, to be delivered to Lender within one hundred twenty (120) days of each calendar year end,

and (d) an annual operating statement of the Mortgaged Premises detailing the total revenues received and total expenses incurred certified by Borrower, delivered to Lender within one hundred twenty (120) days of each calendar year end. All financial statements and returns required hereunder shall be prepared by a certified public accountant reasonably acceptable to the Lender, in such detail as the Lender may reasonably require. Borrower shall further furnish to the Lender within ten (10) days of Lender's reasonable demand therefor, any other information or records relating to (i) the operation of the Mortgaged Premises, (ii) the financial affairs of the Borrower and/or Guarantor, or (iii) any other matter or thing which Lender reasonably determines relevant to the repayment of, or security for, the Debt. Failure to comply with the terms of this paragraph will constitute a default under the terms and conditions of this Note.

17. This Note is subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Principal at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the Principal at a rate in excess of such maximum rate, the Applicable Interest Rate shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

18. The Borrower will use the proceeds of this loan only for the purposes described in the commitment letter from Lender to Borrower dated July 15, 2013 ("Commitment Letter") the terms, covenants and conditions of which are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.

19. Borrower and all others who may become liable for the payment of all or any part of the Debt waive demand, notice of demand, protest and notice of protest, and any or all other notices or demands in connection with the delivery, acceptance, performance of, or default under, this Note. The liability of the Borrower hereunder shall be unconditional and shall not be in any manner affected by any indulgence whatsoever granted or consented to by Lender, including, but not limited to any extension of time. Any failure of Lender to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any time and from time to time thereafter. Lender may accept late payments, or partial payments, even though marked "payment in full" or containing words of similar import or other conditions, without waiving any of its rights hereunder. No amendment, modification or waiver of any provision of this Note nor consent to any departure by the Borrower therefrom shall be effective, irrespective of any course of dealing, unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. This Note cannot be changed or terminated orally or by estoppel or waiver or by any alleged oral modification regardless of any claimed partial performance referable thereto. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of any of the Loan Documents, or release of any party thereto, made by Lender or pursuant to any agreement between Lender any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other who may become liable for the payment of all or any part of the Debt, under this Note or pursuant to any of the other Loan Documents.

20. If this Note is executed by more than one person or entity, all representations, warranties, obligations and covenants herein shall be deemed to have been made by each of such persons and entities and the obligations and duties of such parties hereunder shall be deemed to be joint and several in all respects.

21. Borrower represents, warrants and covenants to the Lender that (i) Borrower is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its organization, with full power and authority to make, deliver and perform this Note; (ii) the execution, delivery and performance by Borrower of this Note and the other Loan Documents has been duly authorized by all necessary corporate action or with partnership consent, as the case may be, and does not and will not violate or conflict with its organizational documents or any law, rule, regulation or order binding on Borrower or any agreement or instrument to which Borrower is a party or which may be binding on Borrower; (iii) this Note and the other Loan Documents have been, or shall simultaneously herewith be, fully executed by an authorized officer, member, partner, or representative of Borrower and constitute legal, valid, binding and enforceable obligations of Borrower enforceable in accordance with their terms; (iv) no authorization, consent, approval, license, exemption of or filing or registration with, any court or government or governmental agency is or will be necessary to the valid execution, delivery or performance by Borrower of this Note or the other Loan Documents; (v) there are no pending or threatened actions, suits or proceedings against or affecting Borrower by or before any court, commission, bureau or other governmental agency or instrumentality, which, individually or in the aggregate, if determined adversely to Borrower, would have a material adverse effect on the business, properties, operations, or condition, financial or otherwise, of Borrower; and (vii) the most recent financial statements of Borrower heretofore delivered to Lender are complete and correct and since the date thereof there has not occurred any material adverse change in the financial condition or operations of Borrower from that shown on said financial statements.

22. The term "Guarantor" as used in this Note shall collectively mean any person guaranteeing payment of the Debt, or any portion thereof, or performance by Borrower of any of the terms of this Note or any of the other Loan Documents, including but not limited to KIWI LANDCO LLC, MICHAEL SHABSELS, DAVID SHABSELS, SIMAD HOLDINGS LLC and RDM CAMPS LLC. "Person" shall mean an individual, partnership, corporation, limited liability company, limited liability partnership, professional limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature. Whenever used, the singular number shall include the plural, and the plural the singular.

23. Should any term, provision, covenant or condition of this Note be held to be void or invalid, the same shall not affect any other term, provision, covenant or condition, but the remainder hereof shall be effective as though such void or invalid term, provision, covenant or condition had not been contained herein.

24. This Note shall be binding upon Borrower, its successors, heirs, executors, administrators, personal representatives and permitted assigns, and shall inure to the benefit of Lender, its successors, and assigns.

25. Borrower agrees that any action, suit or proceeding in respect of or arising out of this Note may be initiated and prosecuted in the state courts located in Putnam County, New York or federal courts, as the case may be, located in Westchester County, New York. The Borrower consents to and submits to the exercise of jurisdiction over its person by any such court having jurisdiction over the subject matter. In any action or proceeding in connection with this Note, the Lender and Borrower mutually waive, to the fullest extent permitted by law, trial by jury and Borrower hereby waives, to the fullest extent permitted by law, any claim for consequential, punitive or special damages.

26. This Note shall be governed and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America; provided that the foregoing is not intended to limit the maximum rate of interest which may be charged or collected by the Lender, if under the law

applicable to it, the Lender may charge or collect such interest at a higher rate than is permissible under the laws of said state.

IN WITNESS WHEREOF, Borrower has duly executed this Note the day and year first above written.

KIWI OPERATINGCO LLC

By: Michael Shabsels
Title: Manager

STATE OF NEW YORK
}ss:
COUNTY OF PUTNAM

On the **28th** day of **August,** in the year **2013** before me, the undersigned personally appeared **Michael Shabsels** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

STEPHEN M SMITH
NOTARY PUBLIC STATE OF NEW YORK
PUTNAM COUNTY
LIC. #02SM6182509
COMM. EXP. 3/12/15



841808.7

KIWI OPERATINGCO, LLC

("Borrower")

to

PCSB BANK

("Lender")

---

# FIRST AMENDED AND RESTATED MORTGAGE NOTE

---

Dated: July 15, 2024

Mortgaged Premises

Location: 825 Union Valley Road and 1-5 Blossom Lane
Section: 77/77
Block: 1/1
Lot: 32/41
Town: Carmel
County: Putnam

PREPARED BY:
Daniels, Porco and Lusardi, LLP
102 Gleneida Avenue
Carmel, New York 10512

Attention: David E. Daniels, Esq.
File No.: 35,028RE
Title No.: 13-17892-PU, issued by Kingston Abstract, Inc.
as Agent for Commonwealth Land Title Insurance Company

**FIRST AMENDED AND RESTATED MORTGAGE NOTE**
(hereinafter, the "Note")

$646,035.01 Yorktown Heights, New York
July 15, 2024

THIS FIRST AMENDED AND RESTATED MORTGAGE NOTE (the "Note") is executed this **15th** day of **July, 2024** by **KIWI OPERATINGCO LLC,** a limited liability company organized and existing under the laws of the State of New York with an address of 825 Union Valley Road, Mahopac, New York 10541 (the "Borrower") in favor of **PCSB BANK** , a New York Commercial Bank duly organized and existing under the laws of the State of New York, with its principal place of business located at 2651 Strang Blvd., Yorktown Heights, New York 10589 and is a wholly owned subsidiary of Brookline Bancorp. Inc. duly organized and existing pursuant to the laws of the State of Delaware and maintaining its principal place of business at 131 Clarendon Street, Boston, MA 02116 (the "Lender")

WITNESSETH

WHEREAS, the Borrower executed that certain Mortgage Note dated August 28, 2013 in the original principal sum of ONE MILLION THREE HUNDRED THOUSAND and 00/100 DOLLARS ($1,300,000.00) in favor of Lender (the "Original Note") to evidence a loan in like amount extended by Lender to Borrower on even date therewith; and

WHEREAS, the remaining outstanding principal balance of the Original Note on the date hereof is **Six Hundred Forty-Six Thousand Thirty-Five and 01/100 Dollars ($646,035.01)**; and

WHEREAS, Borrower has requested that certain terms of the Original Note be modified as more particularly provided herein; and

WHEREAS, Lender has agreed to such modification, subject to the terms and conditions hereinafter set forth;

NOW THEREFORE, in consideration of Ten Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Lender and Borrower hereby amend and restate the Original Note and agree as follows:

FOR VALUE RECEIVED, **KIWI OPERATINGCO, LLC,** a limited liability company organized and existing under the laws of the State of New York with an address of 825 Union Valley Road, Mahopac, New York 10541 (the "Borrower") unconditionally promises to pay to the order of **PCSB BANK,** a New York Commercial Bank duly organized and existing under the laws of the State of New York, and is a wholly owned subsidiary of Brookline Bancorp. Inc. duly organized and existing pursuant to the laws of the State of Delaware and maintaining its principal place of business at 131 Clarendon Street, Boston, MA 02116 (the "Lender"), at its principal place of business located at 2651 Strang Blvd., Yorktown Heights, New York, 10589, or at such other address as Lender or a subsequent holder hereof may from time to time designate in writing, the

principal sum of **Six Hundred Forty-Six Thousand Thirty-Five and 01/100 Dollars ($646,035.01)** (the "Loan") plus interest, in lawful money of the United States of America, in the amounts and in the manner specified below.

1. **Certain Definitions Used in this Note**:

**"Alternate Base Rate"** means, for any day, a fluctuating rate per annum equal to the greater of: (A) Term SOFR of Available Tenor (B) the Prime Rate in effect on such day minus 3% (C) the Federal Funds Rate. If the Alternate Base Rate as so determined shall be less than zero, then the Alternate Base Rate shall be deemed to be zero for purposes of this Agreement. Any change in the Alternate Base Rate due to a change in the Term SOFR of Available Tenor, Prime Rate or the Federal Funds Rate shall be effective from and including the effective date of such change in the Term SOFR of Available Tenor, Prime Rate or the Federal Funds Rate, as the case may be. The Applicable Margin will be added to the Alternative Base Rate.

**"Applicable Margin"** means 2.00%.

**"Available Tenor"** means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Accrual Period pursuant to this Note as of such date.

**"Benchmark"** means, initially, the Term SOFR Rate, provided, however, that if a "Benchmark Transition Event" and its related "Benchmark Replacement Date" have occurred with respect to the Term SOFR Rate or the then-current Benchmark, then "Benchmark" means the applicable **"Benchmark Replacement"** pursuant to clause (a) of Section 3 herein titled **"Benchmark Replacement Setting."**, provided, however that notwithstanding anything else contained herein to the contrary, in no event shall the Benchmark ever be less than the Floor.

**"Benchmark Replacement"** means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Lender for the applicable Benchmark Replacement Date:

(1) Daily Simple SOFR for the Available Tenor; or

(2) the alternate benchmark rate that has been selected by the Lender as the replacement for the then-current Benchmark giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body; and (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for U.S. dollar-denominated bilateral credit facilities at such time as determined by the Lender in its discretion;

Notwithstanding anything else to the contrary, if the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Note and the other Loan Documents.

**"Benchmark Replacement Adjustment"** means the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Lender giving due consideration to any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar denominated bilateral facilities at such time.

**"Benchmark Replacement Conforming Changes"** means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day," the definition of "Interest Accrual Period," the timing, frequency and manner of determining rates including the utilization of Benchmark Replacement Adjustments and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions and other technical, administrative or operational matters) that the Lender decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Lender in a manner substantially consistent with market practice (or, if the Lender decides that adoption of any portion of such market practice is not administratively feasible or if the Lender determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Lender decides is reasonably necessary in connection with the administration of this Note and the other Loan Documents).

**"Benchmark Replacement Date"** means in the case of clauses (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark permanently or indefinitely ceases to provide all Available Tenors of such Benchmark.

**"Benchmark Transition Event"** means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator, the regulatory supervisor of such administrator or a resolution authority or court with jurisdiction over such administrator announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark; or

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark announcing that all Available Tenors of such Benchmark are not, or as of a specified future date will not be, representative.

**"Benchmark Unavailability Period"** means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has

replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with the Section titled **"Benchmark Replacement Setting"** and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with the Section titled "Benchmark Replacement Setting".

**"Benchmark Unavailability Period"** means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with the Section titled **"Benchmark Replacement Setting"** and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with the Section titled "Benchmark Replacement Setting".

**"Business Day"** means any day other than a Saturday or a Sunday or any day on which commercial banks in New York, New York are authorized or required to close.

**"Daily Simple SOFR"** means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Lender in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for bilateral business loans; provided, that if the Lender decides that any such convention is not administratively feasible for the Lender, then the Lender may establish another convention in its reasonable discretion.

**"Federal Funds Rate"** means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the effective federal funds rate.

**"Floor"** means 0.00%.

**"Interest Accrual Period"** means the period commencing on the first (1st) day of the preceding calendar month and terminating on the last day of the preceding calendar month; except that the initial Interest Accrual Period shall begin on the date of this Note and shall end on the last day of the calendar month in which this Note is executed.

**"Relevant Governmental Body"** means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

**"SOFR"** means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

**"SOFR Administrator"** means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

**"Term SOFR"** and **"Term SOFR Rate",** as applicable, each mean, for each day during an Interest Accrual Period, the forward-looking term rate for a tenor comparable to the applicable Interest Accrual Period on the day (such day, the **"Periodic Term SOFR Determination Day")** that is two (2) U.S. Government Securities Business Days prior to the first day of calendar month in which such Interest Accrual Period falls, as such rate is published by the Term SOFR Administrator; (or if not so reported, then as determined by Lender from another recognized source or interbank quotation); *provided, however,* that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Rate for the Available Tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to such Term SOFR Rate has not occurred, then Term SOFR will be the Term SOFR Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day. If on or prior to the first day of any Interest Accrual Period, the Term SOFR Rate becomes unavailable or unlawful, or is determined by Lender, in its sole and absolute discretion, to no longer be commercially viable in the marketplace, then the obligation of Lender to make Term SOFR rate loans shall be suspended, and the term "Term SOFR" shall mean, as of the first day of the next Interest Accrual Period, the SOFR-based rates enumerated under the definition of Benchmark Replacement, considered in the order set forth therein, or, if such rates are not available, at the discretion of the Lender (i) such other index as is generally recognized in the relevant marketplace as the replacement for SOFR based rates or (ii) in the absence of such an index, the Alternative Base Rate as defined below.

**"Term SOFR Administrator"** means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Rate).

**"Unadjusted Benchmark Replacement"** means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

**"U.S. Government Securities Business Day"** means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

**"Variable Interest Rate"** means a variable rate equal to the sum of (i) the Applicable Margin and (ii) the "Term SOFR Rate" rounded to the next highest basis point (0.01%).

1. On the date hereof, Borrower will make a principal payment of **$37,916.69** together with accrued interest from December 31, 2023 through the date hereof, with the remaining principal balance of **$608,118.32** to be paid as provided in Section 3 below.

2. From the date hereof through and including the Maturity Date (as hereinafter defined) Borrower shall pay interest on the outstanding principal balance of this Note (the "Principal"), for each Interest Accrual Period, at the Variable Interest Rate. There will be no cap on the interest rate Borrower pays Lender under this Note except as may be imposed by applicable State or Federal Law.

3. Commencing on August 1, 2024 and on the 1st day of each month thereafter through and including August 1, 2033, Borrower will make monthly payments of Principal equal to **Five Thousand Four Hundred Sixteen Dollars and Sixty-Seven Cents ($5,416.67)** and on September 1, 2033 Borrower will make a principal payment equal to (ii) **Seventeen Thousand Seven Hundred One Dollars and Twenty-Nine Cents ($17,701.29)**, with each such monthly payment to be increased to include accrued and unpaid interest at the Variable Interest Rate. The payment amount may vary from month to month based on any reduction in the Principal, fluctuations of the Term SOFR, or as a result of an interest rate increase following an Event of Default (as hereinafter defined). Borrower shall make such payments on the first day of each and every month until **September 1, 2033** (the "Maturity Date"), when a final payment of all outstanding Principal, any unpaid interest thereon, and any other amounts due under this Note shall be due and payable in full without notice or demand of any kind, each of which is hereby waived.

3. Each payment shall first be applied to interest then due; then to reimburse Lender for monies, if any, expended by Lender to preserve any collateral securing this Note, including without limitation payments of taxes, charges, assessments, or insurance policy premiums, and for any expenses, including attorney's fees, incurred by Lender in upholding the lien of, or enforcing the terms of, this Note or the other Loan Documents (as hereinafter defined); then toward late fees, if any; and, lastly, toward reduction of Principal.

4. If the due date of any payment under this Note falls on a Saturday, Sunday or a day that is not a banking day in New York, such date shall be extended to the next such succeeding banking day, and interest shall be payable for any principal so extended at the rate of interest specified in this Note.

5. For so long as Lender is the owner and holder of this Note, Borrower shall maintain its primary depository/operating account(s), held in its name, with Lender, and deposit therein all income generated by the Borrower and the Mortgaged Premises (as hereinafter defined). Lender shall be authorized to automatically deduct and make payments of interest, Principal, escrow, fees and any other expenses due the Lender under the Loan Documents from said account(s). Borrower shall maintain funds in said account(s) sufficient to support such auto-payment.

6. If any monthly payment owed under this Note is not paid within fifteen (15) days after the date on which it is due, which failure shall include without limitation any failure to maintain funds in Borrower's account(s) with Lender sufficient to support the auto-debit of payments required hereunder, Borrower shall pay to Lender upon demand an amount equal to the lower of five (5) cents for each dollar ($1.00) of the overdue monthly payment and the maximum amount permitted by applicable law (the "Late Fee") to defray the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment, and such Late Fee shall be secured by the Mortgage and the Other Security Documents.

7. Further, Borrower does hereby agree that upon the occurrence of an Event of Default (as hereinafter defined) or upon the failure of Borrower to pay the Debt (as hereinafter defined) in full on demand, the Lender shall be entitled to receive, and the Borrower shall pay, interest on the Debt at a rate equal to the Variable Interest Rate plus five percent (5.0%), or at the maximum rate of

interest allowable by law, whichever is lower, to be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, or as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

8. This Note may be prepaid in whole or in part without penalty.

9. This Note is secured by the Mortgage and the Other Security Documents. "Mortgage" means that certain Collateral Mortgage, Security Agreement and Assignment of Leases mortgage, or mortgages in the principal sum of $1,300,000.00 executed by KIWI LANDCO LLC ("Guarantor") in favor of Lender dated August 28, 2013 and recorded in the Putnam County Clerk's office on September 4, 2013 in Book 6284 of Mortgages at page 241 which encumbers and is now a valid first lien on the Mortgaged Premises and , on which there is due the principal sum of $646,035.01 with interest thereon, as modified and extended by that certain Modification and Extension Agreement of even date herewith. , "Mortgaged Premises" means that certain real property known and designated as 825 Union Valley Road, Mahopac, New York 10541, bearing Tax Map Identification Number 77-1-32, and 1-5 Blossom Lane, Mahopac, New York 10541, bearing Tax Map Identification Number 77-1-41 a, both in the Town of Carmel, County of Putnam and State of New York , as such Mortgaged Premises are more particularly described therein and which Mortgage is intended to be duly recorded in the Putnam County Land Records. The term "Other Security Documents" as used in this Note shall collectively mean any and all documents other than the Mortgage now or hereafter executed by Borrower, Guarantor and/or others in favor of Lender, which wholly or partially secure or guarantee payment and/or performance of this Note. The terms, covenants, and conditions of the Mortgage and the Other Security Documents are hereby made a part of this Note to the same extent and with the same force as if set forth at length herein. This Note, the Mortgage, the Other Security Documents, and any and all other instruments executed by Borrower and/or others pertaining to the Debt are collectively referred to as the "Loan Documents."

10. Each of the following occurrences shall constitute an Event of Default hereunder: (a) the Borrower shall (i) fail to pay a monthly payment owed hereunder within fifteen (15) days of the date when due, (ii) fail to pay any other sum due hereunder within fifteen (15) days of the delivery to Borrower of demand therefor, or (iii) fail to perform any non-monetary obligation imposed hereunder, and such failure shall continue for more than fifteen (15) days after delivery to Borrower of demand for compliance with such obligation; (b) the occurrence of a default under any of the other Loan Documents, after the expiration of any grace period, and subject to any right to cure, expressly set forth therein, (c) any representation or warranty made or deemed made by any third party with liability under this Note or any other Loan Document ("Third Party") in any document evidencing the obligations of such Third Party or contained in any certificate, document, opinion, financial or other statement furnished by a Third Party to Lender at any time in connection with this Note, shall prove to have been incorrect in any material respect on or as of the date made or deemed made; (d) the Borrower shall fail to pay when due any indebtedness for borrowed money beyond the expiration of any applicable notice and/or grace period, and subject to any right to cure, or if any such indebtedness shall become due and payable, or capable of becoming due and payable, by acceleration of its maturity; (e) the Borrower or any Third Party , excepting Michael Shabsels and David Shabsels: (i) shall generally not, or be unable to, or shall admit in writing its inability to pay its debts as such debts become due; (ii) shall make an assignment for the benefit of creditors, (iii) shall file a petition in bankruptcy or for any relief under any law of any jurisdiction relating to reorganization, arrangement, readjustment of debt, dissolution or liquidation; (iv) shall have any such petition filed against it and the same shall remain undismissed for a period of sixty (60) days; or (v) shall have had a receiver, custodian or trustee appointed for all or a substantial part of its property, unless such

appointment shall be extinguished within sixty (60) days; (f) Michael Shabsels or David Shabsels shall file a petition in bankruptcy or for any relief under any law of any jurisdiction relating to reorganization, arrangement, readjustment of debt, dissolution or liquidation or shall have any such petition filed against him and the same shall remain undismissed for a period of sixty (60) days; (g) if the Borrower shall cease to exist; (h) if the Mortgage or any Other Security Document (whether executed by Borrower or a Third Party) shall at any time and for any reason cease to be in full force and effect, or shall be declared null and void, or shall cease to create a valid security interest in and to the property purported to be subject to such Mortgage or Other Security Document, in the lien position indicated therein, or its validity or enforceability shall be contested by Borrower or the relevant Third Party, or Borrower or such Third Party shall deny it has any further liability or obligation under the Mortgage or any such Other Security Document, or fail to perform its obligations under the same; (i) if the Borrower shall convey, transfer, or otherwise divest itself (which conveyance, transfer, or divestment shall include, without limitation, the conveyance, transfer, or divestment of all or a portion of the membership interests, partnership interests, or stock, as the case may be, in Borrower) of title to the Mortgaged Premises, or encumber title to the Mortgaged Premises, without the consent of Lender, (j) if the Borrower or a Guarantor shall enter into any intercompany debt or any other debt obligations or loans with one another, any Guarantor, or any members/partners/shareholders of Borrower, , or an Affiliated Entity (as hereinafter defined); (k) if any lien against the Mortgaged Premises or any judgment against Borrower or any Guarantor is docketed or entered, respectively, and not bonded, released or satisfied within sixty (60) days; or (l) if there shall be a change in the ownership of the Borrower (including, without limitation, the ownership of any membership, partnership, or shareholder interests in the Borrower) or in the management of the Borrower; (m) if there shall occur any failure to maintain the Minimum Debt Service Coverage Ratio (as hereinafter defined). Notwithstanding the foregoing, Lender shall consent any request of Borrower to encumber the Mortgaged Premises with a third (3rd) position mortgage lien, provided that, at the time of such request, (i) Borrower is not in default under this Note or any of the other Loan Documents, (ii) the Borrower can demonstrate, to the Lender's satisfaction, a debt service coverage ratio, calculated in accordance with the formula in Section 12 hereof, of no less than 2X, (iii) the aggregate mortgage indebtedness affecting the Mortgaged Premises if the proposed third mortgage were filed against the Premises would not exceed sixty-five percent (65%) of the value of the Mortgaged Premises (such value to be determined by Lender based upon appraisals conducted at Borrower's expense by a licensed appraiser selected by Lender), and (iv) the Lender providing the financing in connection with such third mortgage shall agree, upon Lender's request, to enter into a Debt Subordination Agreement and/or Inter-creditor Agreement with Lender upon terms acceptable to Lender.

12. The Borrower shall not permit the ratio of its EBITDAR, less any Real Estate Operating Expenses paid by KIWI LANDCO LLC (the "Adjusted EBITDAR") to the aggregate scheduled and other required payments of principal and interest on all indebtedness owed by Borrower to any party(ies) (the "Indebtedness") during any given fiscal year to fall below 1.25X (the "Minimum Debt Service Coverage Ratio"). Compliance with this covenant shall be determined utilizing the data from the annual federal tax returns of the Borrower and KIWI LANDCO LLC. "EBITDAR" shall mean earnings before interest expense, taxes, depreciation, amortization, and rent expense. "Real Estate Operating Expenses" shall mean, for any period, aggregate operating expenses incurred in connection with all real property owned by the Borrower ("Borrower's Real Property"), including without limitation real estate taxes, insurance, utilities, maintenance expenses, management fees not to exceed five percent (5.00%) of Gross Rents, and unfinanced capital reserves of not less than the greater of (i) actual replacement costs and (ii) one percent (1.00%) of Gross Rents. "Gross Rents" shall mean, for any given fiscal year, all rental income payable and actually collected for the applicable year with respect to all tenancy and occupancy agreements in effect at the Borrower's Real Property. Failure to

maintain the Minimum Debt Service Coverage Ratio shall constitute an Event of Default under this Note.

11. The whole of the Principal, together with all interest accrued and unpaid thereon, and any and all other sums due under any of the Loan Documents (all such sums hereinafter collectively referred to as the "Debt") shall without notice become immediately due and payable at the option of Lender upon the occurrence of an Event of Default.

12. In the event Lender employs counsel to declare, collect, enforce, or adjudicate any rights or obligations owed under, or accruing pursuant to, the Loan Documents, Borrower agrees to pay all reasonable arbitration, paralegals', attorneys', and experts' fees; court costs; and expenses incurred by Lender, whether or not a suit be brought.

13. At all times while the Debt remains unpaid, Borrower shall furnish to the Lender annually (a) the Balance Sheet, Profit & Loss Statement and corporate tax returns of Borrower, and any corporate Guarantor, to be delivered to Lender within one hundred twenty (120) days of each fiscal year end, provided, however, that if an extension for any such tax return has been filed, a copy of such extension shall be delivered to Lender within one hundred twenty (120) days of fiscal year end and the tax return submitted no later than the expiration date of the extension, (b) the personal financial statements and federal tax returns of any Guarantor who is a natural person, to be delivered to Lender within one hundred twenty (120) days of each calendar year end, provided, however, that if an extension for any such return has been filed, a copy of such extension shall be delivered to Lender within one hundred twenty (120) days of calendar year end and the tax return submitted no later than the expiration date of the extension, (c) signed copies of all leases to which Borrower is a party, and a certified rent roll signed and dated by Borrower detailing the names of all tenants of the Mortgaged Premises, the portion of the Mortgaged Premises occupied by each tenant, the rent and any other charges payable under each lease, and the term of each lease, to be delivered to Lender within one hundred twenty (120) days of each calendar year end, and (d) an annual operating statement of the Mortgaged Premises detailing the total revenues received and total expenses incurred certified by Borrower, delivered to Lender within one hundred twenty (120) days of each calendar year end. All financial statements and returns required hereunder shall be prepared by a certified public accountant reasonably acceptable to the Lender, in such detail as the Lender may reasonably require. Borrower shall further furnish to the Lender within ten (10) days of Lender's reasonable demand therefor, any other information or records relating to (i) the operation of the Mortgaged Premises, (ii) the financial affairs of the Borrower and/or Guarantor, or (iii) any other matter or thing which Lender reasonably determines relevant to the repayment of, or security for, the Debt. Failure to comply with the terms of this paragraph will constitute a default under the terms and conditions of this Note.

14. This Note is subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Principal at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the Principal at a rate in excess of such maximum rate, the Variable Interest Rate shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

15. The Borrower will use the proceeds of this loan only for the purposes described in the commitment letter issued from Lender to Borrower dated July 15, 2013 (the "Commitment Letter") the terms, covenants and conditions of which are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.

16. Borrower and all others who may become liable for the payment of all or any part of the Debt waive demand, notice of demand, protest and notice of protest, and any or all other notices or demands in connection with the delivery, acceptance, performance of, or default under, this Note. The liability of the Borrower hereunder shall be unconditional and shall not be in any manner affected by any indulgence whatsoever granted or consented to by Lender, including, but not limited to any extension of time. Any failure of Lender to exercise any right hereunder shall not be construed as a waiver of the right to exercise the same or any other right at any time and from time to time thereafter. Lender may accept late payments, or partial payments, even though marked "payment in full" or containing words of similar import or other conditions, without waiving any of its rights hereunder. No amendment, modification or waiver of any provision of this Note nor consent to any departure by the Borrower therefrom shall be effective, irrespective of any course of dealing, unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. This Note cannot be changed or terminated orally or by estoppel or waiver or by any alleged oral modification regardless of any claimed partial performance referable thereto. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of any of the Loan Documents, or release of any party thereto, made by Lender or pursuant to any agreement between Lender any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other who may become liable for the payment of all or any part of the Debt, under this Note or pursuant to any of the other Loan Documents.

17. If this Note is executed by more than one person or entity, all representations, warranties, obligations and covenants herein shall be deemed to have been made by each of such persons and entities and the obligations and duties of such parties hereunder shall be deemed to be joint and several in all respects.

18. Borrower represents, warrants and covenants to the Lender that (i) Borrower is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its organization, with full power and authority to make, deliver and perform this Note; (ii) the execution, delivery and performance by Borrower of this Note and the other Loan Documents has been duly authorized by all necessary corporate action or with partnership consent, as the case may be, and does not and will not violate or conflict with its organizational documents or any law, rule, regulation or order binding on Borrower or any agreement or instrument to which Borrower is a party or which may be binding on Borrower; (iii) this Note and the other Loan Documents have been, or shall simultaneously herewith be, fully executed by an authorized officer, member, partner, or representative of Borrower and constitute legal, valid, binding and enforceable obligations of Borrower enforceable in accordance with their terms; (iv) no authorization, consent, approval, license, exemption of or filing or registration with, any court or government or governmental agency is or will be necessary to the valid execution, delivery or performance by Borrower of this Note or the other Loan Documents; (v) there are no pending or threatened actions, suits or proceedings against or affecting Borrower by or before any court, commission, bureau or other governmental agency or instrumentality, which, individually or in the aggregate, if determined adversely to Borrower, would have a material adverse effect on the business, properties, operations, or condition, financial or otherwise, of Borrower; and (vii) the most recent financial statements of Borrower heretofore delivered to Lender are complete and correct and since the date thereof there has not occurred any material adverse change in the financial condition or operations of Borrower from that shown on said financial statements.

19. The term "Guarantor" as used in this Note shall collectively mean any person guaranteeing payment of the Debt, or any portion thereof, or performance by Borrower of any of the terms of this

Note or any of the other Loan Documents, including but not limited to KIWI LANDCO, LLC, MICHAEL SHABSELS, DAVID SHABSELS, and SIMAD HOLDINGS, LLC. "Person" shall mean an individual, partnership, corporation, limited liability company, limited liability partnership, professional limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature. Whenever used, the singular number shall include the plural, and the plural the singular.

20. Should any term, provision, covenant or condition of this Note be held to be void or invalid, the same shall not affect any other term, provision, covenant or condition, but the remainder hereof shall be effective as though such void or invalid term, provision, covenant or condition had not been contained herein.

21. This Note shall be binding upon Borrower, its successors, heirs, executors, administrators, personal representatives and permitted assigns, and shall inure to the benefit of Lender, its successors, and assigns.

22. Borrower agrees that any action, suit or proceeding in respect of or arising out of this Note may be initiated and prosecuted in the state courts located in Putnam County, New York or federal courts, as the case may be, located in Westchester County, New York. The Borrower consents to and submits to the exercise of jurisdiction over its person by any such court having jurisdiction over the subject matter. In any action or proceeding in connection with this Note, the Lender and Borrower mutually waive, to the fullest extent permitted by law, trial by jury and Borrower hereby waives, to the fullest extent permitted by law, any claim for consequential, punitive or special damages.

23. This Note shall be governed and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America; provided that the foregoing is not intended to limit the maximum rate of interest which may be charged or collected by the Lender, if under the law applicable to it, the Lender may charge or collect such interest at a higher rate than is permissible under the laws of said state.

Signature page to First Amended and Restated Mortgage Note to Follow

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the 15th day of **July, 2024**

KIWI OPERATINGCO, LLC

By: MICHAEL SHABSELS
Title: Manager

STATE OF NEW YORK
COUNTY OF New York ss:

On the 15 day of **July,** in the year **2024** before me, the undersigned personally appeared **MICHAEL SHABSELS** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

GEORGE E ANTTILA
Notary Public - State of New York
No. 01AN6340144
Qualified in Kings County
My Commission Expires April 11, 2028