# Exhibit E

# COLLATERAL SECURITY AGREEMENT

dated August 28, 2013

between

KIWI LANDCO LLC

("Debtor")

and

PUTNAM COUNTY SAVINGS BANK

("Secured Party")

# COLLATERAL SECURITY AGREEMENT

**THIS COLLATERAL SECURITY AGREEMENT,** dated as of August 28, 2013, is made by and between **KIWI LANDCO LLC,** a limited liability company organized and existing under the laws of the State of New York with an address of 825 Union Valley Road, Mahopac, New York 10541 (the "Debtor") and **PUTNAM COUNTY SAVINGS BANK,** a mutual savings bank organized and existing under the laws of the State of New York with its principal place of business located at 2477 Route 6, Brewster, New York 10509 (hereinafter referred to as the "Secured Party").

**1. DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Security Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Security Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

a) **Security Agreement.** The word "Security Agreement" means this Collateral Security Agreement, as it may be amended or modified from time to time, together with all exhibits and schedules attached to this Collateral Security Agreement from time to time.

b) **Borrower.** The word "Borrower means **KIWI OPERATINGCO LLC,** a limited liability company organized and existing under the laws of the State of New York with an address of 825 Union Valley Road, Mahopac, New York 10541

c) **Collateral.** The word "Collateral" means all of Debtor's right, title and interest in and to all the Collateral as described in Exhibit "A" of this Security Agreement.

d) **Environmental Laws.** The words "Environmental Laws" mean any and all state, federal, and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, at seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, at seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, at seq., or other New York or federal laws, rules, or other New York or federal laws, rules, or regulations adopted pursuant thereto.

e) **Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness, including without limitation the Debtor.

f) **Guaranty.** The word "Guaranty" means a guaranty from a Guarantor to Secured Party, including without limitation a guaranty of all or part of the Note.

g) **Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a .present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

h) **Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Debtor is responsible under this

Security Agreement or under any of the Related Documents, and any other indebtedness or liability of Debtor or the Borrower to Secured Party, for payment of performance, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.

i) **Note.** The word "Note" means that certain Mortgage Note, of even date herewith, pursuant to which Borrower promised to pay the Secured Party the principal sum of **One Million Three Hundred Thousand Dollars and No Cents ($1,300,000.00)**, plus interest, together with any amendments, extensions, modifications, substitutions, replacements, or consolidations thereof.

j) **"Permitted Liens"** means all security interests permitted under any documents and agreements entered into between Debtor and Secured Party

k) **"Person"** means any natural person, corporation, proprietorship, partnership, professional corporation, joint venture, association, group, governmental agency or agent, whether foreign or domestic, and any other entity.

l) **Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

2. **CREATION OF THE SECURITY INTEREST**. For valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Debtor hereby grants to Secured Party a security interest in all of the right, title and interest of Debtor in and to the Collateral to secure the Indebtedness and agrees that Secured Party shall have the rights stated in this Security Agreement with respect to the Collateral, in addition to all other rights which Secured Party may have by law.

3. **CROSS-COLLATERALIZATION**. In addition to the Note, this Security Agreement secures all obligations, debts and liabilities, plus interest thereon, of Debtor or the Borrower to Secured Party, or any one or more of them, as well as all claims by Secured Party against Debtor or Borrower or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Debtor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

4. **FUTURE ADVANCES**. In addition to the Note, this Security Agreement secures all future advances made by Secured Party to Debtor or Borrower regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

5. **RIGHT OF SETOFF**. To the extent permitted by applicable law, Secured Party reserves a right of setoff in all Debtor's accounts with Secured Party (whether checking, savings, or some other account and whether evidenced by a certificate of deposit). This includes all accounts Debtor holds jointly with someone else and all accounts Debtor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Debtor authorizes Secured Party, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Secured Party's option, to administratively freeze all such accounts to allow Secured Party to protect Secured Party's charge and setoff rights provided in this paragraph.

6. **PERFECTION OF SECURITY INTEREST**. Debtor agrees to take whatever actions are requested by Secured Party to perfect and continue Secured Party's security interest in the Collateral. Upon request of Secured Party, Debtor will deliver to Secured Party any and all of the documents evidencing or constituting the Collateral, and Debtor will note Secured Party's interest upon any and all chattel paper and instruments if not delivered to Secured Party for possession by Secured Party. Debtor authorizes Secured Party to file a UCC financing statement, or alternatively, a copy of this Security Agreement to perfect Secured Party's security interest. At Secured Party's request, Debtor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Secured Party's security interest in the Collateral. Debtor will pay all filing

fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Secured Party is required by law to pay such fees and costs. Debtor irrevocably appoints Secured Party to execute documents necessary to transfer title if there is a default. Secured Party may file a copy of this Security Agreement as a financing statement. If Debtor changes Debtor's name or address, or the name or address of any person granting a security interest under this Security Agreement changes, Debtor will promptly notify the Secured Party of such change.

7. **TITLE TO COLLATERAL.** Debtor represents and warrants to Secured Party that Debtor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Security Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Security Agreement or to which Secured Party has specifically consented. Debtor shall defend Secured Party's rights in the Collateral against the claims and demands of all other persons.

8. **LOCATION OF THE COLLATERAL.** Except in the ordinary course of Debtor's business, Debtor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Debtor's address shown above or at such other locations as are acceptable to Secured Party. Upon Secured Party's request, Debtor will deliver to Secured Party in form satisfactory to Secured Party a schedule of real properties and Collateral locations relating to Debtor's-operations, including without limitation the following: (1) all real property Debtor owns or is purchasing; (2) all real property Debtor is renting or leasing; (3) all storage facilities. Debtor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

9. **REMOVAL OF THE COLLATERAL.** Except in the ordinary course of Debtor's business, including the sales of inventory, Debtor shall not remove the Collateral from its existing location without Secured Party's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Debtor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of New York, without Secured Party's prior written consent. Debtor shall, whenever requested, advise Secured Party of the exact location of the Collateral.

10. **TRANSFER AND OTHER SECURITY INTERESTS.** Debtor shall not sell, assign (by operation of law or otherwise), transfer or otherwise dispose of any of the Collateral except for (i) sales, assignments and transfers of Collateral in the ordinary course of business; and (ii) the sale or other disposition of Collateral no longer used or useful in the conduct of its business or pursuant to agreements relating to the creation and/or enforcement of Permitted Liens.

11. **LANDLORD/MORTGAGEE WAIVERS.** If requested by Secured Party, Debtor shall exercise due diligence and good faith to obtain instruments satisfactory in form and substance to Secured Party by which the mortgagee or landlord of the premises at which the Collateral is planned to be located subordinates its rights, if any, in the Collateral to the security interest of the Secured Party

12. **REPAIRS AND MAINTENANCE.** Debtor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Security Agreement remains in effect. Debtor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

13. **TAXES, ASSESSMENTS AND LIENS.** Debtor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Security Agreement, the Indebtedness, or upon any of the other Related Documents. Debtor may withhold any such payment or may elect to contest any lien if Debtor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Secured Party's interest in the Collateral is not jeopardized in Secured Party's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Debtor shall deposit with Secured Party cash, a sufficient corporate surety bond or other security satisfactory to Secured Party in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Debtor shall defend itself and Secured Party and shall satisfy any final adverse judgment before enforcement against the Collateral. Debtor shall name Secured Party as an additional obligee under any surety bond furnished in the contest proceedings.

Debtor further agrees to furnish Secured Party with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Debtor may withhold any such payment or may elect to contest any lien if Debtor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Secured Party's interest in the Collateral is not jeopardized.

14. **COMPLIANCE WITH GOVERNMENTAL REQUIREMENTS.** Debtor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Debtor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Secured Party's interest in the Collateral, in Secured Party's opinion, is not jeopardized.

15. **HAZARDOUS SUBSTANCES.** Debtor represents and warrants that the Collateral never has been, and never will be so long as this Security Agreement remains a lien on the Collateral, used in violation of any environmental laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Debtor's due diligence in investigating the Collateral for Hazardous Substances. Debtor hereby (1) releases and waives any future claims against Secured Party for indemnity or contribution in the event Debtor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Secured Party against any and all claims and losses resulting from a breach of this provision of this Security Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Security Agreement.

16. **MAINTENANCE OF CASUALTY INSURANCE.** Debtor shall procure and maintain all risks insurance, including without limitation, fire, theft, and liability coverage together with such other insurance as Secured Party may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Secured Party and issued by a company or companies reasonably acceptable to Secured Party. Debtor, upon request of Secured Party, will deliver to Secured Party from time to time the policies or certificates of insurance in form satisfactory to Secured Party, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Secured Party and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Secured Party will not be impaired in any way by any act, omission or default of Debtor or any other person. In connection with all policies covering assets in which Secured Party holds or is offered a security interest, Debtor will provide Secured Party with such loss payable or other endorsements as Secured Party may require. If Debtor at any time fails to obtain or maintain any insurance as required under this Security Agreement, Secured Party may (but shall not be obligated to) obtain such insurance as Secured Party deems appropriate, including if Secured Party so chooses single interest insurance, which will cover only Secured Party's interest in the Collateral.

17. **APPLICATION OF INSURANCE PROCEEDS.** Debtor shall promptly notify Secured Party of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $5,000.00, whether or not such casualty or loss is covered by insurance. Secured Party may make proof of loss if Debtor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Secured Party as part of the Collateral. If Secured Party consents to repair or replacement of the damaged or destroyed Collateral, Secured Party shall, upon satisfactory proof of expenditure, pay or reimburse Debtor from the proceeds for the reasonable cost of repair or restoration. If Secured Party does not consent to repair or replacement of the Collateral, Secured Party shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Debtor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Debtor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness. Debtor hereby appoints Secured Party as its attorney-in-fact with full power and authority to endorse in Debtor's name any check or draft representing the proceeds of any insurance on the Collateral and to settle or compromise in Debtor's name any claims with respect to such insurance.

**18. INSURANCE RESERVES**. Secured Party may require Debtor to maintain with Secured Party reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Debtor of a sum estimated by Secured Party to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Debtor shall upon demand pay any deficiency to Secured Party. The reserve funds shall be held by Secured Party as a general deposit and shall constitute a non-interest-bearing account which Secured Party may satisfy by payment of the insurance premiums required to be paid by Debtor as they become due. Secured Party does not hold the reserve funds in trust for Debtor, and Secured Party is not the agent of Debtor for payment of the insurance premiums required to be paid by Debtor. The responsibility for the payment of premiums shall remain Debtor's sole responsibility.

**19. INSURANCE REPORTS**. Debtor, upon request of Secured Party, shall furnish to Secured Party reports on each existing policy of insurance showing such information as Secured Party may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; 4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Debtor shall upon request by Secured Party (however not more often than annually) have an independent appraiser satisfactory to Secured Party determine, as applicable, the cash value or replacement cost of the Collateral.

**20. DEBTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Debtor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Security Agreement or the Related Documents, provided that Debtor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Secured Party is required by law to perfect Secured Party's security interest in such Collateral. So long as no Event of Default has occurred, Debtor may collect any of the Collateral consisting of accounts. Upon the occurrence of an Event of Default, Secured Party may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Secured Party for application to the Indebtedness. If Secured Party at any time has possession of any Collateral, whether before or after an Event of Default, Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Secured Party takes such action for that purpose as Debtor shall request or as Secured Party, in Secured Party's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Debtor shall not of itself be deemed to be a failure to exercise reasonable care.

**21. SECURED PARTY'S EXPENDITURES**. If any action or proceeding is commenced that would materially affect Secured Party's interest in the Collateral or if Debtor fails to comply with any provision of this Security Agreement or any Related Documents, including but not limited to Debtor's failure to discharge or pay when due any amounts Debtor is required to discharge or pay under this Security Agreement or any Related Documents, Secured Party on Debtor's behalf may (but shall not be obligated to) take any action that Secured Party deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Secured Party for such purposes, with the exception of insurance premiums paid by Secured Party with respect to motor vehicles, but including the payment of attorneys' fees and expenses, will then bear interest at the rate charged under the Note from the date incurred or paid by Secured Party to the date of repayment by Debtor. All such expenses will become a part of the Indebtedness and, at Secured Party's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Security Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Secured Party may be entitled upon Default.

**22. DEFAULT**. The occurrence of any one or more of the following events shall constitute an Event of Default hereunder, whether such occurrence is voluntary or involuntary or comes about or is effected by

operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental authority:

(a) If Borrower shall default in the payment of any principal or interest due under the Note, or an Event of Default shall otherwise occur in accordance with the terms and conditions of the Note, subject to any grace period and/or right to cure expressly set forth therein.

(b) If Debtor shall fail to pay, perform or observe any term, obligation, covenant or condition of this Security Agreement and such failure shall continue fifteen (15) days after delivery to Debtor of notice of default and demand to cure the same

(c) If Debtor or Borrower fails to comply with or to perform any term, obligation, covenant or condition contained any of the other Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Secured Party and Debtor and/or Borrwer, subject to any grace period or right to cure expressly set forth therein.

(d) If Debtor or Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Debtor's or Borrower's property or Debtor's or Borrower's ability to repay the Indebtedness or perform its obligations under the Note, this Security Agreement, or any of the Related Documents.

(e) If any warranty, representation or statement made or furnished to Secured Party by Debtor or Borrower or on Debtor's behalf under this Security Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

(f) If this Security Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

(g) If Debtor shall: admit in writing its inability to pay its debts generally as they become due; dissolve or terminate on-going business operations, file a petition for relief under the bankruptcy laws or a petition to take advantage of any insolvency act; make an assignment for the benefit of creditors; commence a proceeding for the appointment of a receiver, trustee, liquidator or conservator of itself or the whole or any substantial part of its property; file a petition or answer seeking reorganization or arrangement or similar relief under the Federal Bankruptcy Laws or any other applicable law or statute of the United States or any State; or if Debtor shall be adjudged a bankrupt or insolvent, or a court of competent jurisdiction shall enter any order, judgment or decree appointing a receiver, trustee, liquidator or conservator of Debtor or of the whole or any substantial part of the property of Debtor or approves a petition filed against Debtor seeking reorganization or similar relief under the Federal Bankruptcy Laws or any other applicable law or statute of the United States or any State; or if, under the provisions of any other law for the relief or aid of debtors, a court of competent jurisdiction shall assume custody or control of Debtor or the whole or any substantial part of its property; or if there is commenced against Debtor any proceeding for any of the foregoing relief; or if Debtor by any act indicates its consent to, approval of, or acquiescence in any such proceeding.

(h) If any creditor of Debtor for any reason whatsoever hereafter shall accelerate payment in whole or in part of any outstanding obligation owed to it by Debtor under any agreement or arrangement, or if any judgment against the Debtor or any execution against any of its property for any amount remains unpaid, unstayed or undismissed for a period in excess of fifteen (15) days.

(i) If any creditor of Debtor or any governmental agency shall commence any foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, against any collateral securing the Indebtedness. This includes a

garnishment of any of Debtor's accounts, including deposit accounts, with Secured Party. However, this Event of Default shall not apply if there is a good faith dispute by Debtor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Debtor gives Secured Party written notice of the creditor or forfeiture proceeding and deposits with Secured Party monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Secured Party, in its sole discretion, as being an adequate reserve or bond for the dispute.

(j) Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor disputes the validity of, or liability under, any Guaranty of the Indebtedness.

(k) If Debtor or any Guarantor or surety of any Obligation shall decease or become incompetent, dissolve, or cease to exist.

(l) If there is a reduction in the value of the Collateral, a material adverse change occurs in Debtor's financial condition, Secured Party reasonable believes the prospect of payment or performance of the Indebtedness is impaired, or Secured Party in good faith believes itself to be insecure.

(m) If all or any part of the Collateral shall be sold, transferred or assigned, except as permitted hereunder and under the Note and Mortgage, without the prior written consent of Secured Party

If Debtor consists of more than one Person, any reference to Debtor in this Paragraph shall be deemed to mean "Any one or more of the Persons collectively referred to as "Debtor" in this Security Agreement."

**23. RIGHTS AND REMEDIES.** Upon the occurrence of an Event of Default, all outstanding Indebtedness shall at the Secured Party's option become immediately due and payable in full, without notice or demand. Secured Party shall have all rights and remedies provided by the Uniform Commercial Code in effect in the State of New York, as may be amended from time to time together with all other rights and remedies available to it at law, in equity, or otherwise. In addition to, or in conjunction with, or in substitution for such rights and remedies, Secured Party may at any time and from and after the occurrence of an Event of Default hereunder:

a) require Debtor, at Debtor's sole costs and expense, to prepare, assemble or collect the Collateral, together with any and all certificates of title and other documents relating to the Collateral and make the same available to Secured Party at such place as Secured Party may designate, whether at Debtor's premises or elsewhere.

b) sell, lease, transfer or otherwise deal with the Collateral or proceeds thereof in Secured Party's own name or that of Debtor. Secured Party may sell the Collateral at public auction or private sale (at which Secured Party shall have the right to purchase) ), in lots or in bulk, for cash or for credit, with or without representations or warranties, and upon such other terms as Secured Party, in its sole discretion, may deem advisable Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will give Debtor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral (including legal fees and costs), shall become a part of the Indebtedness secured by this Security Agreement and payable from the proceeds

of the disposition of the Collateral, and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid. If Secured Party chooses to sell any or all of the Collateral, Secured Party may obtain a judgment against Debtor for any deficiency remaining on the Indebtedness due to Secured Party after application of all amounts received from the exercise of the rights provided in this Security Agreement. Debtor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

c) have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect any rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. Secured Party's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. The right to a receiver shall be given to Secured Party regardless of the solvency of Debtor and without any requirement to give notice to Debtor.

d) either itself or through a receiver, collect the payments, rents, income, and revenues from the Collateral. Secured Party may at any time in Secured Party's discretion transfer any Collateral into Secured Party's own name or that of Secured Party's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Secured Party may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Secured Party may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Secured Party may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Secured Party may, on behalf of and in the name of Debtor, receive, open and dispose of mail documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Secured Party may notify account debtors and obligors on any Collateral to make payments directly to Secured Party.

e) with or without notice to Debtor, foreclose the security interest created herein by any available judicial procedure, or take possession of the Collateral, or any portion thereof, with or without judicial process, and enter any premises where the Collateral may be located for the purpose of taking possession of or removing the same, or rendering the same unusable, or disposing of the Collateral on such premises, and Debtor agrees not to resist or interfere therewith. If the Collateral contains other goods not covered by this Security Agreement at the time of repossession, Debtor agrees Secured Party may take such other goods, provided that Secured Party makes reasonable efforts to return them to Debtor after repossession.

f) remedy any default by Debtor hereunder, without waiving such default, and any monies expended in so doing shall be chargeable with interest to Debtor and added to the Indebtedness secured hereby;

g) apply for an injunction to restrain a breach or threatened breach of this Security Agreement by Debtor; and/or

h) avail itself of any other remedies available to Secured Party at law or in equity

**24. CUMULATIVE RIGHTS.** Except as may be prohibited by applicable law, all of Secured Party's rights and remedies, whether evidenced by this Security Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any remedy, and an election to make expenditures or to take action to perform an obligation of Debtor under this Security Agreement, after Debtor's failure to perform, shall not affect Secured Party's right to declare a default and exercise its remedies. The release of (i) any Guarantor or co-obligor of any of the Indebtedness, (ii) any portion of the Collateral, or (ii) any collateral

under any other agreement between Debtor and Secured Party will not release the obligations of the Debtor, or waive any of Secured Party's rights, hereunder.

25. **ATTORNEYS' FEES; EXPENSES.** Debtor agrees to pay upon demand all of Secured Party's costs and expenses, including Secured Party's reasonable attorneys' fees and Secured Party's legal expenses, incurred in connection with the enforcement of this Security Agreement. Secured Party may hire or pay someone else to help enforce this Security Agreement, and Debtor shall pay the costs and expenses of such enforcement. Costs and expenses include Secured Party's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Debtor also shall pay all court costs and such additional fees as may be directed by the court.

26. **DEBTOR'S REPRESENTATIONS AND WARRANTIES.** Debtor hereby represents and warrants to Secured Party that:

a) The exact legal name of Debtor is the name specified in the preamble to this Security Agreement.

b) If Debtor is a general partnership then the principal place of business of Debtor is in the State of New York. If Debtor is a corporation, limited partnership or limited liability company then Debtor is organized or formed under the laws of the State of New York. Each location used by Debtor to conduct its business is located in the State of New York and all assets used in the conduct of such business and all records related to such business are located in the State of New York. All of the assets used in the operation of its business are in the possession of, and under the control of, Debtor and no material assets used by Debtor in the conduct of its business are held by any third party (excluding leased equipment).

c) Neither the execution nor the delivery of this Security Agreement, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof, will violate any law or regulation, or any order or decree of any court of governmental authority, or conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed or trust, agreement or other instrument to which Debtor is a party or by which Debtor may be bound, or result in the creation or imposition of any lien, claim or encumbrance upon any property of Debtor, excepting that of the Secured Party.

d) None of the Collateral is subject to a restriction that prohibits, restricts or limits the grant of a security interest in such Collateral pursuant to this Security Agreement, the perfection of the security interest granted by this Security Agreement (including the priority of such security interest, subject to any limitations specifically set forth herein) or the exercise by Lender of its rights, remedies and powers under this Security Agreement or otherwise.

e) Debtor has the power and authority to execute, deliver and perform the provisions of this Security Agreement and all instruments and documents delivered or to be delivered pursuant hereto, and has taken or caused to be taken all necessary or appropriate actions to authorize the execution, delivery and performance of this Security Agreement and all such instruments and documents. No authorization, approval or other action by, and no notice to or filing with, any governmental authority is required for the due execution, delivery and performance by Grantor of this Security Agreement.

f) There are not, nor does Debtor claim, any offset, defense, cause of action or counterclaim of any kind or nature whatsoever against any of the Indebtedness.

27. **NOTICES.** Any notice required to be given under this Security Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the

addresses shown near the beginning of this Security Agreement. Any party may change its address for notices under this Security Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Debtor agrees to keep Secured Party informed at all times of Debtor's current address. Unless otherwise provided or required by law, if there is more than one Debtor, any notice given by Secured Party to any Debtor is deemed to be notice given to all Debtors.

28. **NO WAIVER BY SECURED PARTY**. Secured Party shall not be deemed to have waived any rights under this Security Agreement unless such waiver is given in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right. A waiver by Secured Party of a provision of this Security Agreement shall not prejudice or constitute a waiver of Secured Party's right otherwise to demand strict compliance with that provision or any other provision of this Security Agreement. No prior waiver by Secured Party, nor any course of dealing between Secured Party and Debtor, shall constitute a waiver of any of Secured Party's rights or of any of Debtor's obligations as to any future transactions. Whenever the consent of Secured Party is required under this Security Agreement, the granting of such consent by Secured Party in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Secured Party.

29. **AMENDMENTS**. This Security Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Security Agreement. No alteration of or amendment to this Security Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

30. **SEVERABILITY**. If a court of competent jurisdiction finds any provision of this Security Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Security Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Security Agreement shall not affect the legality, validity or enforceability of any other provision of this Security Agreement.

31. **SUCCESSORS AND ASSIGNS**. Subject to any limitations stated in this Security Agreement on transfer of Debtor's interest, this Security Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Debtor, Secured Party, without notice to Debtor, may deal with Debtor's successors with reference to this Security Agreement and the Indebtedness by way of forbearance or extension without releasing Debtor from the obligations of this Security Agreement or liability under the Indebtedness.

32. **SURVIVAL OF REPRESENTATIONS AND WARRANTIES.** All representations, warranties, and agreements made by Debtor in this Security Agreement shall survive the execution and delivery of this Security Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as the Indebtedness shall be paid in full.

33. **TIME IS OF THE ESSENCE**. Time is of the essence in the performance of this Security Agreement.

34. **WAIVER OF JURY TRIAL. All parties to this Security Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

35. **GOVERNING LAW AND JURISDICTION.** This Security Agreement will be governed by federal law applicable to Secured Party and, to the extent not preempted by federal law, the laws of the State of New York without regard to its conflicts of law provisions. This Security Agreement has been accepted by Secured Party in the State of New York. Debtor agrees that any suit, action or proceeding instituted against Debtor with respect to any of the Indebtedness, the Collateral, this Security Agreement or any of the Related Documents may be brought in any court of competent jurisdiction located in the State of New York. By its execution hereof, Debtor hereby irrevocably waives any objection and any right of immunity on the ground of venue, the convenience of the forum or the jurisdiction of such courts or from the execution of judgments

resulting therefrom, Debtor hereby irrevocably accepts and submits to the jurisdiction of the aforesaid courts in any such suit, action or proceedings.

**36. CAPTION HEADINGS**. Caption headings in this Security Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Security Agreement.

**37. MISCELLANEOUS**. This Security Agreement shall be construed in accordance with and shall be governed by the laws of the State of New York. The invalidity or unenforceability of any provision of this Security Agreement shall not affect the validity or enforceability of any other provision of this Security Agreement. Debtor covenants and agrees to execute and deliver to Secured Party on demand such additional assurances, writings and instruments as may be required by Secured Party for purposes of effectuating the intent of this Security Agreement. The captions in this Security Agreement are for convenience only, and shall not be considered in construing this Security Agreement.

**38. COUNTERPARTS**. This Security Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall be deemed to constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Security Agreement as of the date first above written.

KIWI LANDCO LLC

By: Michael Shabsels
Title: Manager

PUTNAM COUNTY SAVINGS BANK

By:
Name: JOSEPH D. ROBERTO
Title: President and Chief Executive Officer



841846.2

STATE OF NEW YORK

}ss:

COUNTY OF PUTNAM

On the **28th day of August,** in the year **2013** before me, the undersigned personally appeared **Michael Shabsels** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that (s)he executed the same in his/her capacity and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

STEPHEN M SMITH
NOTARY PUBLIC STATE OF NEW YORK
PUTNAM COUNTY
LIC. #02SM6162909
COMM. EXP. 3/12/15

STATE OF NEW YORK

}ss:

COUNTY OF PUTNAM

On the 28 **th day of August,** in the year **2013** before me, the undersigned personally appeared **JOSEPH D. ROBERTO** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

PAULA CIRELLI
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CI4820218
Qualified In Putnam County
My Commission Expires 7-6-14



841846.2

**EXHIBIT "A"**
**The Collateral**

The word "Collateral" as used in this Security Agreement means all personal property in which Debtor has any right, title or interest, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including but not limited to:

I. Goods of every nature, including without limitation:
   a. inventory
   b. stock-in-trade
   c. raw materials
   d. farm products
   e. work in process
   f. items held for sale or lease or furnished or to be furnished under contracts of sale or lease
   g. goods that are returned, reclaimed or repossessed
   h. materials used or consumed in the Debtor's business
   i. books, records, patent applications, trademark applications, blueprints, drawings, contracts, licenses, license agreements, designs and plans
   j. equipment, including, without limitation
      i. machinery
      ii. vehicles
      iii. furniture
      iv. appliances
   k. Extracted oil, gas, and minerals
   l. Manufactured Homes
   m. All Personal Property now or at any time hereafter affixed or attached to or placed upon, or used in any way in connection with the complete and comfortable use, enjoyment, operation, maintenance and occupancy of the improvements or buildings located at or to be constructed at the premises known and designated as **825 Union Valley Road, Mahopac, New York 10541, Tax Map Identification Number 77-1-32, Town of Carmel and 1-5 Blossom Lane, Mahopac, New York 10541, Tax Map Identification Number 77-1-41, Town of Carmel , as more particularly described in Exhibit "B" attached hereto and made a part hereof (collectively, the "Premises")** (and, to the extent they may be classified as Personal Property by law or pursuant to an agreement by which Debtor is bound, such improvements or buildings themselves), including but not limited to fixtures; trade fixtures; fittings; installations; machinery; vehicles; electrical, heating, air conditioning, plumbing, ventilating, refrigerating, vending, storage, incinerating, waste disposal, conveyor, communications, alarm, fire prevention and fire extinguishing systems, apparatus, and equipment; building materials; oil tanks; gas tanks; furniture; furnishings; floor coverings; appliances; office equipment; articles of interior decoration; lifts; cranes; hoists; platforms; passenger and freight elevators, escalators and machinery and equipment pertaining thereto; television, radio, musical instrument, audio and video equipment, and other similar equipment; pipes, conduits, pumps, boilers, tanks, motors, engines, furnaces, and compressors; computers, disc drives, tape drives, modems, data lines, memory blanks, processors, and all hardware and software relating thereto;

II. General Intangibles, of every kind and description, including, but not limited to, things in action, claims (including without limitation claims for indemnification or breach of warranty), patents, copyrights, royalty rights, trademarks, tradenames, tradestyles, goodwill, trade secrets, formulae, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims

under insurance policies, and computer information, software, source codes, object codes, records and data

III. All property of the Debtor now or hereafter in the Secured Party's possession, or in transit to or from, under the custody or control of, or on deposit with, the Secured Party or any affiliate thereof with respect to which Debtor agrees that Secured Party shall have the rights and remedies available under Article 9 of the Uniform Commercial Code of the State of New York or other applicable law relating to "cash collateral"

IV. Accounts (including without limitation accounts receivable, customer accounts, and customer lists)

V. Deposit Accounts

VI. Documents

VII. Chattel Paper

VIII. Money

IX. Commercial Tort Claims

X. Instruments

XI. Investment Property

XII. Letters-of-Credit

XIII. Letter-of-Credit Rights

XIV. Leases

XV. Non-extracted Oil, Gas, and Minerals

XVI. Supporting Obligations

XVII. All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the Collateral described herein, whether added now or later.

XVIII. All products and produce of any of the property described in this Exhibit "A"

XIX. All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Exhibit "A".

XX. All cash and non-cash proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Exhibit "A", and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

XXI. All records and data relating to any of the property described in this Exhibit "A", whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**EXHIBIT "B"**
**The Premises**
**SCHEDULE A**
Legal Description

**PARCEL I (SBL #77.17-1-32, 825 Union Valley Road):**

All that certain plot, piece or parcel of land, together with the buildings and improvements situated thereon, situate, lying and being in the Town of Carmel, County of Putnam and State of New York, known and designated as Lot 1 on a certain map entitled "Final Plat, Subdivision Prepared for Brad & Karla Brown and Camp Kiwi, Inc." which said map was dated September 6, 1992 and filed in the Putnam County Clerk's Office on June 11, 1993 as Map #2587.

**PARCEL II (SBL #77.13-1-41, 1-5 Blossom Lane):**

Also all that certain plot, piece or parcel of land, together with the buildings and improvements situated thereon, situate, lying and being in the Town of Carmel, County of Putnam and State of New York, bounded and described as follows:

Beginning at a point on the southerly line of Union Valley Road, said point marking the northwesterly corner of the herein described parcel and the northeasterly corner of the lands of Camp Kiwi, Inc. as described in Liber 453 page 106;

Thence southerly along the division line between the lands of Camp Kiwi, Inc. and the herein described parcel the following courses and distances:

South 1 degree 42' 30" West 186.23 feet to a fence post,

North 85 degrees 59' 00" West 37.05 feet to a point

South 1 degree 47' 20" West 417.11 feet to a point marking the southwesterly corner of the herein described parcel and the northwesterly corner of the lands of Camp Kiwi, Inc. as described in Liber 910 page 013;

Thence easterly along the division line between the lands of Camp Kiwi, Inc. and the herein described parcel North 81 degrees 50' 20" East 112.79 feet to a point on the westerly line of Blossom Road marking the southeasterly corner of the herein described parcel and the northeasterly corner of the lands of Camp Kiwi, Inc.;

Thence Northerly along the westerly line of said Blossom Road and passing through a concrete monument found set at 22.02 feet from said corner North 8 degrees 35' East 582.17 feet to a point at the intersection of the westerly line of said Blossom Road with the southerly line of Union Valley Road, said point is marking the northeasterly corner of the herein described parcel;

Thence westerly along the southerly line of said Union Valley Road North 87 degrees 03' West 71.93 feet and North 85 degrees 56' West 71.38 feet to the point or place of beginning.

Also an easement over and across all that certain plot, piece or parcel of land, situate in the Town of Carmel, Putnam County, New York together with the buildings and improvements situate thereon, being shown as the

cross-hatched "Playing Field Use Easement (0.561± acres)" on survey map entitled "Final Plat Subdivision Prepared for Brad & Karla Brown and Camp Kiwi, Inc." filed in the Office of the Putnam County Clerk on June 11,1993 as Filed Map No. 2857, said easement area being more particularly bounded and described as follows:

Beginning at a point which is distant 249.39 feet on a course of N 03° 44' 11" W 90.09 feet from an old cross cut with drill hole found on the north face of a wall being the south westerly corner; thence from said point of beginning the following five (5) courses and distances:

1. N 03° 44' 11" W along lands of Camp Kiwi 260 feet;

2. Continuing along said lands N 17° 00' 00" E 150 feet;

3. N 36° 23' 04" E 105 feet;

4. Thence through lands now of Brown S 05° 54' 46" 317.98 feet and S 18° 15' 13" W 180.20 feet to the point and place of beginning. Containing 0.56± acres.

Being a portion of the premises conveyed by Bradford Brown and Karla Brown to Karla Brown by deed dated June 8, 2006, recorded in the Putnam County Clerk's Office as Document Number 1502159 in Liber 1750 of Deeds page 38.

Said easement area shall be maintained by the Party of the Second Part in a neat and clean condition and may be used for any and all school sports, camp or recreational activities relating to the operation of the Camp, School or other facility related to the adjoining 12.887± acre parcel shown as Lot 1 on said Filed Map #2857 provided that said use shall be at the sole risk of the Party of the Second Part, its successors and/or assigns, and the Party of the First Part shall be held harmless by the Party of the Second Part from any claim or liability arising out of or in connection with such use or the condition of the easement premises unless arising out of the gross negligence or intentional and willful acts of the Party of the First Part. This shall be deemed a covenant running with the land and binding upon the heirs, legal representatives, successors and assigns of both parties to this Deed.

This grant confirms the playing field use easement set forth on the Filed Map and used by the Camp openly, notoriously, continuously and under claim of right since 1992 and shall act as the Declaration referred to on the Map.