**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**ROBINSON & COLE LLP**
Evan M. Lazerowitz (063232013)
Rachel Jaffe Mauceri (038102001)
Brya M. Keilson (022502004)
666 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 451-2900
Email: elazerowitz@rc.com
Email: rmauceri@rc.com
Email: bkeilson@rc.com

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman (admitted *pro hac vice*)
Kristin K. Going (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com
Email: kgoing@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Rachel Biblo Block (admitted *pro hac vice*)
2801 North Harwood Street, Suite 2600
Dallas, Texas 75201
Telephone: (214) 295-8000
Email: rbibloblock@mcdermottlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 26-16388 (CMG)<br><br>(Jointly Administered) |

[1] A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' REPLY (A) IN SUPPORT OF THE JOINT MOTION FOR ENTRY OF AN ORDER (I) APPROVING SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019 AND (II) GRANTING RELATED RELIEF, AND (B) IN RESPONSE TO THE UNITED STATES' OPPOSITION TO SETTLEMENT MOTION**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, submits this reply (this "Reply") in support of the *Joint Motion of the Debtors, the Official Committee of Unsecured Creditors, and the Lender Parties for Entry of an Order (I) Approving Settlement Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Docket No. 1336] (the "Settlement Motion" and the term sheet attached to the Proposed Order thereto, the "Term Sheet"), and in response to the *United States' Opposition to Settlement Motion* [Docket No. 1368] (the "Objection") of the United States of America (the "United States").[2] In support of the Settlement Motion and in response to the Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Settlement before the Court resolves the Committee's claims against the Prepetition Secured Parties, funds these cases through a plan process, and delivers $13 million for the benefit of unsecured creditors. Every estate fiduciary and every major economic stakeholder in these cases supports it: the Debtors, the Committee, and the Lender Parties. The only objector is the United States. Its principal concern is a potential 2026 administrative income tax claim against SIMAD Holdings Ltd. that it concedes is "currently unliquidated" and asks the Court simply to "presume." Obj. at 2–3.

2. The unliquidated contingent claim is not relevant to the Settlement, and the

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Settlement Motion or the Objection, as applicable.

Objection's central premise fails under controlling law. The United States contends that the Settlement Fund is estate property subject to the Bankruptcy Code's priority scheme. It is not. The Settlement Fund is paid by the Prepetition Secured Parties from amounts they would otherwise recover on account of their allowed Prepetition Secured Claim. It is the Prepetition Secured Parties' own recovery, paid at their election to, among other things, resolve claims that were waived by the Debtors, and not a distribution by the Debtors. The Third Circuit rejected the same argument, made by the United States on closely analogous facts, in *In re ICL Holding Co.*, 802 F.3d 547, 555–58 (3d Cir. 2015). The Objection never mentions that binding decision. Furthermore, the legal authority the Objection relies upon does not say what the Objection alleges. *Iridium*, an out-of-circuit decision, expressly rejected the rigid priority rule the United States advances. *In re Iridium Operating LLC*, 478 F.3d 452, 464–65 (2d Cir. 2007). And in *Biolitec*, the court refused to approve a structured dismissal that would have transferred estate assets and litigation rights to the largest unsecured creditor and subordinated other creditors' claims, all without their consent and outside the chapter 11 process. *In re Biolitec, Inc.*, 528 B.R. 261, 265–66, 269–72 (Bankr. D.N.J. 2014). The Settlement does none of those things: no case is dismissed, no estate asset is transferred to a creditor, no non-settling party's claim is subordinated or released, and administrative and priority claims remain to be addressed through the plan process the Settlement funds.

3. The Objection also ignores the choice actually before the Court. The Lender Parties will not consent to the continued use of cash collateral to fund these cases unless and until the Challenges are resolved. That position did not dictate the Committee's view of the merits. The $13 million Settlement Fund and the funding of these cases are significant concessions, and the Committee negotiated hard for them. But the Lender Parties' position does dictate whether, and

when, these cases will be funded with a path to a plan. With the Settlement, the Lender Parties consent to the use of cash collateral to fund these cases through a plan process under an Approved Budget. The estates also gain the Lender Parties' cooperation in pursuing claims against non-settling parties, and a path to a plan that will address administrative and priority claims on a complete record. Without the Settlement, there is no $13 million funded from the Prepetition Secured Parties' recovery, rather, there is costly litigation with no guaranteed outcome. There is also no approved budget to fund these cases or pay the claims the United States says it is concerned about, and no progress toward a plan. Every creditor, the United States included, is better off with the Settlement than without it.

4. Many of the issues in the Objection could have been narrowed, or eliminated, through a conversation with the settling parties before it was filed. That conversation would have produced a more accurate filing by the United States and a more useful one for the Court. But a hard-fought resolution that benefits all of the Debtors' stakeholders should not be held hostage, and the Objection should be overruled and the Settlement approved.

**<u>REPLY</u>**

## I. The Settlement Satisfies Bankruptcy Rule 9019 and the *Martin* Factors, and Is in the Best Interests of the Estates

5. A compromise should be approved under Bankruptcy Rule 9019 where it is fair, reasonable, and in the interest of the estate, assessed under the four *Martin* factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay attending it; and (4) the paramount interest of creditors. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (following *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968)). The United States does not argue that any factor weighs against

approval; it argues only that the record is insufficient. Obj. at 10–11. The Declaration of Nicholas Weber, a Managing Director of M3 Advisory Partners, LP, the Committee's financial advisor (the "Weber Declaration"), filed contemporaneously herewith in support of the Settlement Motion, bolsters that record. Each factor is satisfied: the outcome of the Challenges is genuinely uncertain for both sides; enforcement of any judgment could require cross-border litigation activities against Israeli entities and dispersed foreign bondholders; the litigation would demand standing proceedings, adversary complaints, expert and forensic discovery, and near-certain appeals, all at the estates' expense; and the Settlement converts that uncertainty into a guaranteed $13 million reserved for the benefit of general unsecured creditors, together with funding for the Debtors' cases, agreement on a path for a plan, and cooperation in litigation against third parties. *See* Weber Decl. ¶¶ 13–16; Settlement Mot. ¶¶ 25–30.

6. The United States' critique of the first three factors also ignores the record of these cases. *First*, at this point in time, the Committee is the only party that can bring the Challenges. The Debtors stipulated to the validity, perfection, and non-avoidability of the Prepetition Liens and waived any Challenge in the Final DIP Order, and the Committee is the only party whose Challenge Period was extended. Weber Decl. ¶¶ 6–7; Final DIP Order ¶¶ F(ii), 12(a) [Docket No. 552]. The question under *Martin* is therefore whether the Committee's decision to resolve the Challenges, rather than litigate them with limited funding, is reasonable. It is.

7. *Second*, the United States asks why any of this would be litigated abroad or governed by foreign law. Obj. at 4. The answer lies in facts the United States could readily have learned. SIMAD Holdings Ltd.'s Supplemental Prospectus and Shelf Prospectus dated November 28, 2025 (the "Prospectus"), which includes the Deed of Trust for Bonds (Series A) dated November 27, 2025, between SIMAD Holdings Ltd. and Mishmeret Trust Company Ltd.

(the "Deed of Trust"), is available on the public website of the Tel Aviv Stock Exchange. *SIMAD Holdings Ltd.—Supplemental Prospectus and Shelf Prospectus* (Nov. 28, 2025), Maya (Tel Aviv Stock Exchange), https://maya.tase.co.il/he/reports/companies/1706283?attachmentType=pdf1. The bonds were issued in Israel and listed on the Tel Aviv Stock Exchange under the Hebrew-language Deed of Trust, with Mishmeret, an Israeli company, as trustee. Weber Decl. ¶ 14; Deed of Trust, recitals. The Deed of Trust provides that Israeli law governs the Deed of Trust, any matter it does not address and any conflict between its provisions and the law, and vests "unique and exclusive jurisdiction in all matters relating to" the deed and the related promissory note in the competent courts in Tel Aviv-Yafo. Deed of Trust § 33. In it, SIMAD Holdings Ltd., its controlling shareholders, and its officers also irrevocably undertook not to oppose a request by the trustee or bondholders in an Israeli court to apply Israeli law regarding compromise, arrangement, and insolvency, and not to contest the Israeli court's jurisdiction over proceedings brought by the trustee or bondholders. *Id.*; *see also* Prospectus § 7.17.16. SIMAD Holdings Ltd. is a British Virgin Islands company, and the Prospectus disclosed that most members of its board of directors reside in Israel. Prospectus §§ 7.1.1, 8.1. Nor are the Challenges limited to a lien-perfection question under the Uniform Commercial Code. As the Settlement Motion explains, the Committee's investigation was comprehensive, extending to the Lender Parties' liens and claims, the bond transaction, and other potential claims against the Lender Parties. Weber Decl. ¶ 8; Settlement Mot. ¶¶ 2–3, 17–19.

8. *Third*, the United States faults the movants for not describing the "specific claims," Mishmeret's defenses, and the range of possible outcomes. Obj. at 4, 10. A motion to approve a settlement is not the place for the Committee to waive privileges or disclose the litigation strategy it would pursue if the Settlement is not approved; doing so would prejudice the estates in the very

litigation the United States would have them pursue. The Weber Declaration describes the scope of the investigation and the cost, complexity, and risks of litigation, which is what *Martin* requires. Weber Decl. ¶¶ 4, 8–9, 13–15.

9. Nor is the United States right that "estate causes of action are being relinquished, and nothing is being received in return." Obj. at 10. The Settlement is not an exchange of a release for $13 million. It is a comprehensive resolution among the estates' principal stakeholders that ends the Committee's investigation and the prospect of costly litigation; fixes the Lender Parties' claims; funds the Approved Budget from sale proceeds ahead of the Lender Parties; establishes the Professional Fee Escrow; and secures the Lender Parties' support for a chapter 11 plan and their cooperation in pursuing claims against non-settling parties. Settlement Mot. ¶ 4; Term Sheet at 1–6. The Settlement Fund is one component of that resolution, and Mishmeret funds it with its own money: amounts it is otherwise entitled to receive on account of the Prepetition Secured Claim. Term Sheet at 1–2, "Settlement Fund."

10. The Settlement is also the product of good-faith, arm's-length negotiations among independent, sophisticated parties represented by experienced counsel, and it falls well within the range of reasonable litigation outcomes. *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 92–93 (Bankr. D. Del. 2005); *Whyte v. Kivisto (In re SemCrude, L.P.)*, No. 08-11525 (BLS), Adv. No. 09-50189, 2010 WL 4814377, at *3 (Bankr. D. Del. Nov. 19, 2010).

11. The Settlement provides concrete and immediate benefits, and every fiduciary and every major economic stakeholder in these cases—the Debtors, the Committee, and the Lender Parties—jointly seeks its approval. Those benefits depend on approval. Absent the settlement, there is no agreement on a budget for the use of cash collateral or any proceeds of the DIP Facility. Weber Decl. ¶ 16. That position did not dictate the Committee's view of the merits, but it does

dictate whether, and when, these cases will be funded with a path to a plan. The United States has not shown that the estates, or any creditor, would be better off without the Settlement; the only alternative before the Court is costly, uncertain litigation with no guaranteed outcome and no funding to pursue it. Weber Decl. ¶¶ 6, 15. By every measure, the Settlement is in the best interests of these estates.

12. The United States also suggests that the Debtors' support carries little weight because they "are not even parties to the settlement." Obj. at 4. That is by design. As explained above, the Debtors stipulated to the Prepetition Liens and waived any Challenge in the Final DIP Order, leaving the Committee as the only estate fiduciary that could bring the Challenges—and the only one that could settle them. *See supra* ¶ 6. The Debtors are joint movants and estate fiduciaries who have independently concluded that the Settlement is in the best interests of their estates. Yet the Objection holds hostage the funding that keeps these estates alive through a plan process. The ransom is steep. If the Settlement terminates on the Outside Date, unsecured creditors lose the Settlement Fund, the estates lose the Approved Budget that carries them to a plan process, and the only funded path forward before the Court disappears. The United States, meanwhile, gains nothing.

## II. The Settlement Fund Is Not Estate Property, and the Priority Scheme Is Therefore Not Implicated

13. Stripped to its essence, the Objection turns on whether value that a secured creditor voluntarily surrenders from its own recovery becomes subject to the Bankruptcy Code's priority scheme. *See* Obj. at 3–4, 8–9. It does not. The Settlement Fund is a voluntary contribution by the Prepetition Secured Parties "from amounts otherwise recoverable by the Prepetition Secured Parties on account of the Prepetition Secured Claim." Term Sheet at 1, "Settlement Fund." That language is not a concession; it is the point. The Prepetition Secured Claim is allowed in the

aggregate principal amount of $98,162,349 as of the Petition Date, and the DIP Lenders separately hold allowed claims on account of the Roll-Up DIP Loans of approximately $120.7 million. *Id.* The Settlement Fund is paid out of amounts the Prepetition Secured Parties would otherwise recover on account of the Prepetition Secured Claim, and it is funded "contemporaneously with, and as a condition to," distributions on account of the Roll-Up DIP Loans. *Id.* at 2. It is therefore a recovery by the Prepetition Secured Parties on account of their claim that they have elected to redirect for the benefit of general unsecured creditors—not a waiver of any portion of their claim that would free up value for the estates. The estates' position is identical whether a given dollar is paid to the Prepetition Secured Parties or, at their direction, into the GUC Trust Account. In either case, the dollar is a recovery on their claim, and nothing that would otherwise be available to the United States or any other creditor is diverted.

14. Further, the Term Sheet requires the contribution to be wired directly into the segregated GUC Trust Account and held in trust solely for holders of allowed general unsecured claims, outside the Debtors' cash management system and not subject to setoff, with the Debtors acting solely as custodian. As made clear in both the Term Sheet and the Proposed Order:

> The Settlement Fund and the GUC Trust Account shall not constitute property of the Debtors' estates, shall not constitute DIP Collateral, Prepetition Collateral, or Cash Collateral of any entity within the meaning of section 363(a) of the Bankruptcy Code or otherwise, and shall be free and clear of all DIP Liens, Prepetition Liens, Adequate Protection Liens, DIP Superpriority Claims, Adequate Protection Claims, the Carve-Out, and any other liens, claims, or encumbrances.

Proposed Order ¶ 5.

15. The Third Circuit's decision in *ICL Holding* confirms that substance, not form, determines whether value is estate property. There, the secured lender group, which was also the purchaser in a section 363 sale, funded escrow and trust accounts for the benefit of estate

professionals and general unsecured creditors, the latter to resolve the creditors' committee's objection to the sale. The United States, holding an administrative tax claim, objected that the arrangement paid junior creditors while skipping its priority claim, and argued that the payments were in substance part of the purchase price and therefore estate property. *ICL Holding*, 802 F.3d at 555–56. Declining to "elevate form over substance," the Third Circuit held the funds were not estate property because the money "never made it into the estate," was not "paid at [the debtor's] direction," and was paid by the lender group "using that group's own funds." *Id.* at 555–56. The court accordingly held that the Bankruptcy Code's creditor-payment hierarchy, which only becomes an issue when distributing estate property, was not implicated. *Id.* at 558.

16. That substance-over-form inquiry leads to the same result here. The Settlement Fund is not a distribution by the Debtors; it is a recovery by the Prepetition Secured Parties on account of the Prepetition Secured Claim, which they have directed be paid to the GUC Trust Account rather than to themselves. It is funded contemporaneously with, and as a condition to, distributions on account of the Roll-Up DIP Loans; it sits outside the Debtors' cash management system. The Debtors hold the GUC Trust Account solely as custodian. Nor did the Settlement validate any lien. The Debtors stipulated to the validity, perfection, and non-avoidability of the Prepetition Liens months ago; the Settlement simply resolves the Committee's unexercised right to challenge them. Final DIP Order ¶¶ F(ii), 12(a). Value that never becomes distributable estate property is not subject to the Bankruptcy Code's estate-distribution hierarchy. *ICL Holding*, 802 F.3d at 558.

17. Bankruptcy courts in this Circuit have reached the same result on facts even closer to these. For example, in *World Health Alternatives*, the Bankruptcy Court for the District of Delaware rejected the same argument the United States makes here: that a lender's carve-out for

unsecured creditors violates priority because priority tax claims remain unpaid. There, the committee, the debtors, and the prepetition lender settled the committee's objections and potential claims, and the lender agreed to pay a carve-out "for the exclusive benefit of the Debtors' general unsecured creditors," to be distributed to them or used to pursue estate claims against third parties. *In re World Health Alts., Inc.*, 344 B.R. 291, 294–95 (Bankr. D. Del. 2006). The United States Trustee objected under *In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005), that the settlement paid general unsecured creditors before priority creditors, and the record reflected an IRS priority claim exceeding $4 million. *World Health*, 344 B.R. at 295–96. The court overruled the objection: "Although the general unsecured creditors will receive money before the priority creditors, that money does not belong to the estate—it belongs to [the lender]." *Id.* at 297. The court explained that *Armstrong* "distinguished, but did not disapprove of," the *SPM*[3] and *Genesis*[4] line of authority, under which a secured creditor may share its own lien proceeds with junior creditors because that property "belongs to the secured creditor—not the estate." *Id.* at 298–99. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017), does not disturb that principle.

18. The United States' contrary argument—that the Settlement Fund is estate property because it is the "proceeds of estate causes of action," Obj. at 8–9—gets the Settlement backwards. There are no proceeds of any cause of action here, because no cause of action is being prosecuted. The Settlement does the opposite: it ends the Committee's investigation and forecloses a litigation

---

3 *See In re SPM Mfg. Corp.*, 984 F.2d 1305, 1312–13 (1st Cir. 1993) (secured lender's agreement to share its recovery with general unsecured creditors, ahead of an unpaid IRS priority claim, did not violate the Bankruptcy Code because the priority provisions "apply only to distributions of property of the estate" and priority creditors "lost [nothing] owed them").

4 *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 601–02 (Bankr. D. Del. 2001) (senior lenders could "give up a portion of the value that they would receive, if absolute priorities were enforced," to general unsecured creditors while leaving out punitive damages claimants, because a senior creditor may share its distribution with some juniors "as long as the juniors who do not receive a distribution from the senior receive at least as much as they would without the sharing") (citing *In re MCorp Fin., Inc.*, 160 B.R. 941 (S.D. Tex. 1993)).

war before it begins. The passage the United States quotes from *Jevic* observes that any recovery from *prosecuting* the committee's fraudulent-conveyance suit would belong to the estate. 580 U.S. at 459. Nobody disputes that. But no complaint has been filed, no judgment is being collected, and no defendant is returning anything to the estates. The Prepetition Secured Parties are redirecting part of their own recovery, and, as shown above, *ICL Holding* and *World Health* foreclose treating that recovery as estate property. Bankruptcy Code section 551, which preserves avoided transfers for the benefit of the estate, adds nothing because the Settlement avoids no transfer. Apart from *Jevic*, the United States' only authority for its "proceeds" theory is an unpublished bankruptcy court decision from the Eastern District of Virginia, and that decision is far afield. There, a chapter 7 trustee settled fraudulent-transfer claims against the alleged transferees, who agreed to pay one unsecured creditor directly while the IRS held claims secured by federal tax liens to which no objection had been made. *In re Tovan Constr., Inc.*, No. 19-12423-KHK, 2021 WL 1235359, at *1–3 (Bankr. E.D. Va. Mar. 31, 2021). The settlement payments were thus a return of allegedly transferred estate property and, as the court noted, "proceeds of the IRS' collateral." *Id.* at *3 & n.2. Here, the payor is not a transferee returning estate property but the secured lender redirecting its own recovery on account of its liens. The recovery it gives up is its own. *Tovan* does not address *ICL Holding*, which controls here.

19. Respectfully, the Objection's "gotcha" points were a mistake. Each purported inconsistency is wrong, and each reflects a failure to understand the circumstances of these cases. *First*, the United States says Debtors' counsel "brushed aside" the "debtors' stated intent to challenge Mishmeret's liens." Obj. at 5. The Debtors stated no such intent; they had stipulated to those liens months earlier. Final DIP Order ¶¶ F(ii), 12(a). The only party that could challenge them at that point in time was the Committee, whose investigation was then ongoing and whose

Challenge Period had been extended.[5] There is nothing inconsistent about the Debtors describing their properties as fully encumbered while the Committee's investigation continued.

20. *Second*, the United States notes that the Debtors described approximately $13.5 million in FIRPTA withholding as having "devastating consequences for the Exempt Entities' estates" and says they "now seek permission to pay almost that exact amount" to general unsecured creditors. Obj. at 5. The comparison makes no sense. The Debtors described FIRPTA withholding as a "diversion of millions of dollars in sale proceeds" away from the estates. *Id.* The Settlement Fund diverts nothing from the estates. The Debtors are not paying the $13 million; the Prepetition Secured Parties are giving up part of their own recovery on account of their claim to fund it. Term Sheet at 1–2, "Settlement Fund." For the Debtors' estates, the Settlement Fund is net neutral.

21. *Third*, the United States notes that, in the FIRPTA dispute, it argued that withheld funds were not estate property, "meaning their payment would not violate the Bankruptcy Code's priority rules." Obj. at 5 (citing Docket No. 1286 at 3). The Committee does not quarrel with the premise: the priority scheme governs distributions of estate property, so the threshold question is always whose property is being distributed. Here, the answer turns on the Settlement's terms. The Settlement Fund is a contribution by Mishmeret from amounts otherwise recoverable on account of its Prepetition Secured Claim, paid into the GUC Trust Account for the benefit of unsecured creditors. The United States' own example simply confirms that the label "proceeds" does not answer the question of ownership.[6]

---

[5] Pursuant to the Final DIP Order, the United States was free to challenge the Prepetition Secured Parties' liens and claims before the Challenge Period Termination Date. It chose not to do so. *See* Weber Decl. ¶ 6; Final DIP Order ¶ 12(a).

[6] The FIRPTA dispute concerns the parties' disagreement regarding withholding obligations asserted under the Foreign Investment in Real Property Tax Act, 26 U.S.C. § 1445, in connection with certain of the Debtors' camp

22. Accordingly, the Settlement Fund is not estate property and does not disturb the Bankruptcy Code's priority scheme. The Settlement creates a benefit for unsecured creditors from value that otherwise would flow to the Lender Parties, while avoiding the expense, delay, and uncertainty of litigation.

## III. The United States' Authorities Do Not Support Its Position

23. Most of the authorities on which the United States builds its priority argument are out-of-circuit. Obj. at 6–9. Meanwhile, the Objection does not mention *ICL Holding*, the Third Circuit decision that rejected the same argument by the United States on closely analogous facts. And, as shown below, the authorities it does cite do not say what the Objection alleges.

### A. The Settlement Is Not a Final, Nonconsensual Distribution of Estate Property

24. The United States calls the Settlement a "backdoor means" of defeating priority. Obj. at 6. *Jevic* rejected a structured dismissal that made *final* distributions of *estate* value in violation of the priority scheme without the affected creditors' consent, and that neither made the dissenting priority creditors better off nor promoted a confirmable plan. *Jevic*, 580 U.S. at 464–68. The Court distinguished interim distributions that serve significant Bankruptcy Code-related objectives and expressly contrasted the "final distribution of estate value" in a dismissal with an interim settlement like the one in *Iridium*. *Id.* at 467–68.

25. The United States responds that the Settlement is "no interim distribution" because it "presumably sets up the final treatment of general unsecured claims," and that "[i]t's hard to imagine what other distributions will be provided for in a plan not already included in the DIP orders and this proposed settlement." Obj. at 9. It is not hard to imagine. The Settlement does

---

sales. Nothing in the Settlement, the Term Sheet, or the Proposed Order determines, releases, or impairs any party's rights, claims, or defenses with respect to that dispute, all of which are expressly preserved.

not classify a single claim or provide for the treatment of administrative, priority tax, secured, or general unsecured claims. *See* Weber Decl. ¶ 17. It does not establish a liquidating trust, appoint a trustee, or set the trust's governance. It does not vest or allocate the estates' remaining assets or the causes of action the estates retain against non-settling parties. It does not establish claims-reconciliation procedures or reserves for disputed claims, provide for the assumption or rejection of executory contracts, or address the cancellation of equity interests or the wind-down of the Debtors. And it does not determine any distribution from the Settlement Fund itself. Each of those matters is for a plan or such other disposition of each Debtor's case as the Bankruptcy Code permits, subject to the Bankruptcy Code's requirements. The Settlement is not a dismissal and makes no final distribution of estate property; instead, it funds the continued administration of these cases so that a plan can be proposed.

26. The United States' premise is also factually wrong. Approval of the Settlement is not approval of a $13 million distribution to anyone. It approves the Prepetition Secured Parties' funding of $13 million into the GUC Trust Account, to be held in trust solely for the benefit of holders of allowed general unsecured claims and used at the direction of the Committee or its successor or designee. Term Sheet at 1–2, "Settlement Fund." How and when that fund is ultimately used—whether to make distributions, to pursue estate claims against third parties, or otherwise—has not been determined and is not before the Court. What matters for present purposes is that, however the fund is used, it is not estate property, and its use takes nothing from the United States or any other creditor of the estates. Absent the Settlement, those dollars would go to the Prepetition Secured Parties, not to the United States. *Id.*

**B. The United States Overstates *Iridium* and *Biolitec***

27. The United States quotes *Iridium* for the proposition that priority compliance "must be the most important factor" under Bankruptcy Rule 9019. Obj. at 7 (quoting *Iridium*, 478 F.3d

at 464). It omits what *Iridium* held immediately before and after that sentence. The Fifth Circuit in *AWECO* held that "a bankruptcy court abuses its discretion in approving a [pre-plan] settlement with a junior creditor unless the court concludes that priority of payment will be respected as to objecting senior creditors." *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984). The Second Circuit considered and rejected that per se rule—the very rule the United States quotes through *Biolitec* (Obj. at 7)—as "too rigid," explaining that "a rigid per se rule cannot accommodate the dynamic status of some pre-plan bankruptcy settlements," particularly where an objector's administrative claim "is yet to be established." *Iridium*, 478 F.3d at 464. It held instead that a bankruptcy court may approve a settlement that deviates from priority where the remaining factors weigh in its favor and the court articulates its reasons. *Id.* at 464–65. And the Second Circuit found no fault with the rest of the settlement before it. *Id.* at 465–66. It held that the settlement had a proper business justification and was "a step towards possible confirmation of a plan of reorganization and not an evasion of the plan confirmation process." *Id.* at 467. It remanded for one narrow purpose: to have the bankruptcy court assess the justification for distributing any funds left in the litigation vehicle to unsecured creditors at the conclusion of certain litigation. *Id.* at 466.

28. The United States also quotes *Iridium*'s statement that a committee seeking to deviate from priority "must come before the bankruptcy court with specific and credible grounds to justify that deviation." Obj. at 9 (quoting *Iridium*, 478 F.3d at 466). That statement concerned a single feature of a very different settlement: the estate there paid $37.5 million directly to a litigation vehicle controlled by committee members, and any balance left at the end of the litigation went to unsecured creditors, with no explanation in the record. *Iridium*, 478 F.3d at 459, 466. Nothing comparable exists here. The Settlement Fund comes from the Prepetition Secured Parties'

own recovery, and no estate cash is distributed to anyone. To the extent any showing were required, the record supplies it. The Settlement funds these cases and resolves costly litigation. It also leaves every creditor—the United States included—better off than the alternative: funded cases with a path to a plan, rather than litigation with no approved budget.

29. And *Biolitec* is no closer. The United States cites it for the proposition that a settlement is fair and equitable only if "senior interests are entitled to full priority over junior ones." Obj. at 7 (quoting *Biolitec*, 528 B.R. at 266). That is *Biolitec*'s recitation of *AWECO*—the very rule the Second Circuit rejected as "too rigid" in the same *Iridium* decision the United States quotes on the same page. *See* Obj. at 7; *Iridium*, 478 F.3d at 464. The United States cannot rely on both. Nor did *Biolitec* apply that rule. The court never reached priority. It denied approval because the settlement was coupled with a structured dismissal that "s[ought] to alter parties' rights without their consent and lack[ed] many of the Code's most important safeguards." *Biolitec*, 528 B.R. at 269.

30. The settlement in *Biolitec* bears no resemblance to this one. There, a chapter 11 trustee proposed to dismiss the case and transfer substantially all remaining estate assets to a liquidating trust. *Id.* at 265–66. The trust would distribute those assets under the direction of the debtor's largest unsecured creditor, which would "provide direction or consent to all significant actions" of the trust and control the resolution of disputed claims. *Id.* at 266, 271. The settlement would also have assigned the estate's interest in pending litigation to that creditor, subordinated the claims of the debtor's affiliates without any judicial determination, replaced the protections of a chapter 7 trustee, and done all of this without disclosure to, or a vote by, the affected creditors. *Id.* at 266, 270–72. The court concluded that the arrangement "resemble[d] an impermissible sub rosa plan." *Id.* at 272. None of that is present here. These cases are not being dismissed. No

estate asset is transferred; the Settlement Fund comes from the Prepetition Secured Parties' own recovery. No creditor's claim is subordinated, disallowed, or reclassified, and no creditor controls the claims process. The estates' claims against non-settling parties are preserved, and the Lender Parties must cooperate in pursuing them. Term Sheet at 6, "Reservation of Rights against Non-Settling Parties"; *id.* at 4, "Cooperation on Litigation Targets." Classification, treatment, and distributions are left to a plan, with the disclosure and voting protections that *Biolitec* found missing. *Biolitec* condemned a settlement that replaced the chapter 11 process. This Settlement funds it.

**C. The Objection Rests on a Presumed Claim, and the Settlement Takes Nothing from the United States**

31. The Objection's priority argument also rests on a claim that has not yet been asserted. Beyond the claims it has filed, which the Objection itself describes as including "small priority tax claims," the United States asks the Court to "presume" that the IRS will hold a "significant" 2026 income tax claim entitled to administrative priority. Obj. at 2–3, 11. It concedes that this claim is "currently unliquidated" and depends on whether the Debtors have sufficient basis and other deductions to offset any gain. *Id.* at 2–3. The burden of proof cases it cites govern who must prove the amount of a tax claim once asserted. *See Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 21 (2000). They do not create a presumption that a claim exists. Whatever the merits of the United States' filed claims, they will be addressed through the claims process and at confirmation, and the Court should not deny unsecured creditors the benefit of a $13 million settlement on the basis of a presumed one.

32. The United States invokes *Jevic*'s concern with "senior secured creditors and general unsecured creditors teaming up to squeeze out priority unsecured creditors." Obj. at 6. Nothing is squeezed out of the United States, because the Settlement Fund was never going to it.

Courts in this Circuit have approved senior lenders' allocation of their own recoveries on that basis. In *Genesis*, senior lenders agreed to allocate a portion of their plan distribution to general unsecured creditors, but not to punitive damages claimants, and the court held this was "a permissible allocation by the secured creditors of a portion of the distribution to which they would otherwise be entitled." 266 B.R. at 601–02, 612. The same is true here.

33. Like the punitive damages claimants in *Genesis*, the United States receives exactly what it would receive without the contribution, because absent the Settlement, every dollar of the Settlement Fund would go to the Prepetition Secured Parties. Indeed, administrative claimants do not have recourse to the Prepetition Collateral at all: the Final DIP Order waives any surcharge under Bankruptcy Code section 506(c) and bars charging expenses of administration against the collateral, except with respect to a carve-out. Final DIP Order ¶¶ G(vi), 16.

34. Finally, the United States objects that the Approved Budget pays estate professionals while "all parties seem intent on not paying the IRS's future administrative claim." Obj. at 1. That is backwards. The United States reminds the movants, "lest [they] forget," that administrative expense holders have priority over general unsecured creditors. Obj. at 7. No one has forgotten. That priority is precisely why the Approved Budget matters. Under the Settlement, the Lender Parties consent to the use of cash collateral to fund these cases under the Approved Budget, which is funded from sale proceeds before any amount is paid to the Lender Parties, and carries these cases toward a plan process. Term Sheet at 3, "Continued DIP Funding." Without it, there is no consensual source of funding for administrative claims at all. Nor is anyone "intent on not paying" the IRS. The Settlement Parties have agreed to meet and confer in good faith with the Debtors regarding any shortfall in allowed administrative expenses. Term Sheet at 2, "Reservation of Rights in connection with Chapter 11 Plan." And professional fees are paid from

the Professional Fee Escrow only as and when allowed by the Court, with any remaining funds released to the estates. *Id.* at 3, "Continued DIP Funding"; *id.* at 4–5, "Amendments to Final DIP Order." Whatever claim the IRS ultimately holds, and against whichever Debtor, its treatment will be determined through the claims process and in accordance with the Bankruptcy Code and is not affected by the Settlement. The choice before the Court is therefore simple. With the Settlement, these cases have a funded budget and a path to a plan. Without it, there is all-out litigation, no approved budget to fund these cases or pay the claims the United States says it is concerned about, and no progress toward a plan. That alternative benefits no one, including the United States.

## IV. Deferral to Confirmation Is Not an Alternative; Under the Term Sheet, It Is a Termination Event

35. The United States' proposed alternative, that the Court deny the Settlement and direct the parties to negotiate a plan with the United States or to mediate (Obj. at 6, 12), is not a schedule; it is a standstill. The administrative claim that drives the Objection has not been asserted or quantified, and mediation cannot be completed before the Outside Date. And, importantly, the United States is silent on who it expects to fund these cases during the standstill. The Settlement is conditioned on entry of a final order and approval by the requisite majority of Prepetition Bondholders, and the Term Sheet may be terminated if the Conditions Precedent are not satisfied by the November 7, 2026 Outside Date. Term Sheet at 7, "Termination." Upon any termination, the Challenge Period is automatically extended for five business days, and the Committee must then either commence its Challenges or seek a further extension that no party is obligated to grant, returning these cases to the costly, complex litigation the Settlement resolves, without an approved budget and while administrative expenses continue to accrue.

36. The Term Sheet does permit the Outside Date to be extended, but only "by mutual written agreement of the Settlement Parties." Term Sheet at 7, "Termination." No Settlement

Party is required to agree to an extension, and the United States cannot assume that one will. The Outside Date is a negotiated term of the Settlement, not a formality the parties can be expected to waive to accommodate a single objector with a presumed claim, and the Court should not be asked to defer approval on the premise that the parties will rewrite their bargain. Approval of the Settlement does not foreclose discussions with the United States on any issue that remains, including through mediation, but those discussions need not—and should not—come at the expense of the funding and resolution the Settlement provides now.

37. The Settlement is the only mechanism before the Court that funds these cases while preserving the plan process. Prompt approval permits the Debtors to continue administering the estates under the Approved Budget, protects professional fees, preserves all claims against non-settling parties, and allows the parties to proceed to a plan that will address administrative and priority claims on a complete record. Delay puts all of these benefits at risk, with no corresponding benefit to the United States. The Court should overrule the Objection and approve the Settlement.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (i) overrule the Objection, (ii) grant the Settlement Motion and enter the Proposed Order approving the Settlement pursuant to Bankruptcy Rule 9019, and (iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: October 23, 2026

Respectfully submitted,

*/s/ Evan M. Lazerowitz*

**ROBINSON & COLE LLP**
Evan M. Lazerowitz (063232013)
Rachel Jaffe Mauceri (038102001)
Brya M. Keilson (022502004)
666 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 451-2900
Email: elazerowitz@rc.com
Email: rmauceri@rc.com
Email: bkeilson@rc.com

**MCDERMOTT WILL & SCHULTE LLP**
Darren Azman (admitted *pro hac vice*)
Kristin K. Going (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Email: dazman@mcdermottlaw.com
Email: kgoing@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Rachel Biblo Block (admitted *pro hac vice*)
2801 North Harwood Street, Suite 2600
Dallas, Texas 75201
Telephone: (214) 295-8000
Email: rbibloblock@mcdermottlaw.com

*Counsel to the Official Committee of Unsecured Creditors*