**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |
| In re:<br><br>DAMIS HOLDINGS LLC, *et al.*,[2]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16439 (CMG)<br><br>(Jointly Administered) |

**DECLARATION OF J. SCOTT VICTOR IN SUPPORT OF ENTRY OF SALE ORDER APPROVING THE SALE TRANSACTION FOR KIWI OPERATINGCO LLC, KIWI LANDCO LLC, AND DASMAS LANDCO LLC**

I, J. Scott Victor, hereby declare as follows:

1. I am a Founding Partner and Managing Director of SSG Advisors, LLC ("SSG"), the investment banker to the above-captioned debtors and debtors in possession in the bankruptcy cases of SIMAD Holdings LTD and its affiliates jointly administered under case number 26-16388 (collectively, the "SIMAD Debtors").[3] SSG is an investment banking firm that maintains offices

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[2] A complete list of the DAMIS Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the DAMIS Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/DAMIS. The location of Debtor DAMIS Holdings LLC's principal place of business and the DAMIS Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[3] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the: (a) *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s) (IV) Approving the Form and Manner of Notice Thereof, (V)*

at 300 Barr Harbor Drive, Suite 420, West Conshohocken, PA 19428. SSG has expertise assisting middle-market companies and their stakeholders in completing special situation transactions and provides its clients with comprehensive investment banking services in the areas of mergers and acquisitions, private placements, financial restructurings, valuations, litigation and strategic advisory. SSG has served as an investment banker to debtors and creditors in a variety of industries and has provided its advisory services in connection with more than 500 transactions. SSG and its professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

2. I am authorized to submit this declaration (the "Declaration") on behalf of SSG in support of the approval of the sale transaction for the assets of Kiwi Operatingco LLC, Kiwi Landco, LLC, and DASMAS Landco, LLC (collectively, the "Kiwi Assets") as described in the *Notice of Successful Bidder for Kiwi Operatingco LLC, Kiwi Landco LLC, and DASMAS Landco LLC* [SIMAD Docket No. 1369; DAMIS Docket No. 1474] and in further support of the *Debtors' Joint Motion for Entry of Order (A) Modifying and (B) Applying to Damis Holdings LLC the Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [SIMAD Docket No. 1332; DAMIS Docket No. 1380] (the "Joint Motion").

---

*Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [SIMAD Docket No. 298] (the "Bidding Procedures Order") or the Bidding Procedures set forth therein, as applicable; and (b) *Order (A) Modifying and (B) Applying to DAMIS Holdings, LLC the Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s) (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [SIMAD Docket No. 1352; DAMIS Docket No. 1400] ("Kiwi Bidding Procedures Order").

3. I have over 40 years of experience in the restructuring industry and extensive experience (i) marketing companies or their assets for sale, including companies in distress and debtors in bankruptcy cases, (ii) raising capital for special situation transactions, and (iii) restructuring companies' balance sheets both in and out of court. I have closed over 300 transactions. I have served as an investment banker in more than 200 chapter 11 cases since 2001.

4. Although SSG is expected to be compensated for its work as the SIMAD Debtors' investment banker in these chapter 11 cases, I am not being compensated separately for this Declaration or testimony. Unless otherwise indicated, all facts set forth in this Declaration are based on (i) my personal knowledge, (ii) my discussions with the numerous constituencies in this case, including the SIMAD Debtors' Chief Restructuring Officer, the SIMAD Debtors' Associate Chief Restructuring Officer, SIMAD Debtors' other professionals, the professionals of the official committees appointed in each Debtors' chapter 11 cases (the "Committees"), the DAMIS Debtors' Chief Restructuring Officers and the DAMIS Debtors' professionals, Potential Purchasers, Qualified Bidders, the camp director for Camp Kiwi, and other interested parties, (iii) my review of relevant documents, or (iv) my opinion based upon my experience, knowledge, and information concerning the SIMAD Debtors' operations and financial affairs. If I were called to testify, I would testify competently to the facts set forth herein. I am over the age of 18 years and authorized to submit this Declaration.

**A. The Marketing Process**

5. Beginning in June 2026, SSG conducted a broad marketing process for the SIMAD Debtors' camp assets, including the Kiwi Assets owned by the SIMAD Debtors, *e.g.*,, the personal property, leases and goodwill held by Kiwi Operatingco (but without title the real property owned by Kiwi Landco and DASMAS). In connection with that process, SSG contacted more than 280 prospective strategic and financial purchasers, facilitated diligence through a virtual data room,

and obtained more than 150 executed confidentiality agreements. By the commencement of the July 2026 auction process, the SIMAD Debtors had received more than 50 qualified bids across the camp portfolio.

6. The Kiwi Assets generated substantial interest throughout the marketing process. Prior to the July auction for the SIMAD Debtors' camp assets, the Kiwi Assets attracted one (1) standalone qualified bid and eight (8) portfolio bids. Nevertheless, the SIMAD Debtors determined that additional time was necessary to address issues unique to the Kiwi Assets, including the fact that the transaction involves assets owned by debtors in two separately administered bankruptcy estates (and at the time of the July auction Kiwi Landco had not yet filed for chapter 11). As a result, while the SIMAD Debtors proceeded with auctions for other camp assets, the sale process for the Kiwi Assets was deferred.

7. Following significant progress in addressing those issues, SSG re-engaged potential purchasers for the Kiwi Assets. Beginning on August 31, 2026, SSG contacted more than seventy (70) parties that had previously expressed interest in the Kiwi Assets or executed confidentiality agreements. This renewed process generated substantial competitive interest. By September 10, 2026, the SIMAD Debtors had received three (3) standalone bids for the Kiwi Assets, each exceeding prior indications of value. Those bidders included the existing Kiwi Operatingco DIP lender and two independent third-party purchasers, each of whom submitted deposits and expressed a willingness to proceed expeditiously.

**B. <u>The Joint Motion and Court Approval for the Sale Process</u>**

8. On October 9, 2026, the SIMAD Debtors filed the Joint Motion together with the debtors and debtors-in-possession in the bankruptcy cases of DAMIS Holdings, LLC and its affiliates jointly administered under case number 26-14639 (collectively, the "<u>DAMIS Debtors</u>" and together with the SIMAD Debtors, the "<u>Debtors</u>"), seeking approval of a sale process for the

Kiwi Assets under the framework previously approved by the Court in the SIMAD Debtors' chapter 11 cases and to apply such framework to the DAMIS Debtors. The Joint Motion described the extensive marketing efforts undertaken by the SIMAD Debtors and their advisors, the reasons the Kiwi Assets were not included in the earlier camp asset sales, the substantial interest generated through the renewed process, and the benefits of utilizing the previously approved bidding procedures to efficiently and effectively market and sell the Kiwi Assets.

9. On October 13, 2026, the Court conducted a hearing on the Joint Motion, at which parties in interest were provided an opportunity to be heard regarding the proposed sale process for the Kiwi Assets. Following the hearing and consideration of the evidentiary record, the Court entered the Kiwi Bidding Procedures Order in the Debtors' respective cases, approving the requested relief and authorizing the Debtors to proceed with the Kiwi sale process pursuant to the Bidding Procedures, as expressly modified by the Kiwi Bidding Procedures Order.

10. In entering the Kiwi Bidding Procedures Order, the Court found that the Debtors had articulated good and sufficient reasons for applying the modified bidding procedures to the Kiwi Assets and that the modified bidding procedures were fair, reasonable, and appropriate under the circumstances. The sale process was designed to maximize recoveries and realizable value for the Debtors' estates and represents a sound exercise of the Debtors' business judgment.

## C. Evaluation and Selection of Stalking Horse Bidders

11. The Debtors ultimately identified a stalking horse bidder for the Kiwi Assets. The Debtors designated LKQE Associates, LLC (the "Stalking Horse Bidder" or "LKQE") as the Stalking Horse Bidder for the Kiwi Assets. The stalking horse bid provided for consideration consisting of a cash purchase price of $6.8 million, plus payment of cure costs and the assumption of certain liabilities, subject to a credit against the purchase price for amounts advanced under the Kiwi Operatingco debtor-in-possession financing facility (the "Stalking Horse Bid"). The Debtors

selected the Stalking Horse Bidder following extensive marketing efforts and consultation with the Committees.

12. In my opinion, the Stalking Horse Bid established a meaningful value floor for the Kiwi Assets and served as the foundation for a competitive sale process designed to encourage higher and better offers. The bid protections, consistent with those allowed under the Bidding Procedures Order, consisted of a break-up fee equal to 3% of the purchase price and expense reimbursement capped at 1% of the purchase price, amounts that are customary in transactions of this nature and that, in my view, were reasonable and appropriate to secure the Stalking Horse Bidder's participation and commitment to the sale process. In my professional judgment, the designation of the Stalking Horse Bidder significantly enhanced the value-maximizing nature of the process by establishing a credible and executable baseline transaction, facilitating price discovery, and encouraging continued engagement from other interested purchasers.

13. Following the designation of the Stalking Horse Bidder, the Debtors continued to solicit and evaluate competing offers for the Kiwi Assets in accordance with the Bidding Procedures. As a result of those efforts, the Debtors received two qualified competing bids (each, a "Qualified Bid") from two qualified bidders (the "Qualified Bidders") that exceeded the stalking horse purchase price. One competing bid was submitted by Mark Transport at a purchase price of $7.4 million. Mark Transport timely submitted the required bid deposit of $740,000. Mark Transport owns and operates Crestwood Camps, Elmwood Camp, and Woodmont Camp. A second competing bid was submitted by Coleman Investments at a purchase price of $7.172 million. Coleman Investments timely submitted the required bid deposit of $717,200. Coleman Investments was well known to the SIMAD Debtors, having previously acquired Camp Meadowbrook from the SIMAD Debtors during the SIMAD Debtors' chapter 11 cases.

14. The receipt of multiple competing Qualified Bids confirmed the significant market interest in the Kiwi Assets and demonstrated the effectiveness of the Debtors' marketing efforts. Importantly, both Qualified Bids exceeded the stalking horse purchase price, validating the Stalking Horse Bid's role in establishing a meaningful value floor while fostering additional competition among interested purchasers. Due to the Debtors' receipt of multiple Qualified Bids, the Debtors conducted an auction as described herein, in accordance with the Bidding Procedures.

**D. <u>The Auction</u>**

15. On October 21, 2026, in accordance with the Kiwi Bidding Procedures Order, the Auction began at 10:00 a.m., eastern time and was conducted virtually via Zoom by SSG. The auction was attended by representatives of each of the Debtors, their respective advisors, including SSG, the Consultation Parties, the Stalking Horse Bidder, and each Qualified Bidder. The auction was conducted fairly, transparently, and in accordance with the Bidding Procedures. During the auction, the Qualified Bidders were afforded the opportunity to improve their offers through multiple rounds of bidding. The competitive bidding process generated substantial additional value for each of the Debtors' estates beyond the Stalking Horse Bid and provided meaningful price discovery regarding the market value of the Kiwi Assets. Throughout the auction, the Debtors, in consultation with their respective advisors and Consultation Parties, evaluated the competing bids based upon the factors set forth in the Bidding Procedures, including purchase price, certainty of closing, financial wherewithal, assumed liabilities, and the overall benefit to each of the Debtors' estates.

16. At the conclusion of the Auction, the Debtors and the Consultation Parties were able to identify the highest and best bid for the Kiwi Assets (the "<u>Successful Bid</u>"). The successful bidder, LKQE, was identified on the *Notice of Successful Bidder for Kiwi Operatingco LLC, Kiwi Landco LLC, and DASMAS Landco LLC* [SIMAD Docket No. 1369;

DAMIS Docket No. 1474], with a purchase price of $9.2 million, an amount exceeding the Stalking Horse Bid by more than 35%. The Debtors determined that the Successful Bid represented the highest or otherwise best offer for the Kiwi Assets. Mark Transport provided a Back-Up Bid of $9.1 million.

17. In my professional judgment, the auction process was robust and competitive, provided all qualified bidders with a full and fair opportunity to participate, and maximized value for each of the Debtors' estates. The existence of multiple qualified bidders willing to submit substantial deposits and actively participate in the Auction demonstrates that the Kiwi Assets were thoroughly exposed to the market and that the Debtors obtained the highest or otherwise best transaction reasonably available under the circumstances.

**E. Selection of Highest and Best Bid**

18. Throughout the sale process, as it had been with the sale of the other SIMAD Debtor camps, the Debtors' objective was to maximize value for the respective estates while also considering the long-term viability of the camp and the interests of the director, operator, employees, families, and communities that rely upon it.

19. In my professional judgment, the combination of an established Stalking Horse Bid, a court-approved competitive bidding process, and the opportunity for an auction provided the best mechanism to test the market, maximize value, and ensure that the Debtors received the highest or otherwise best offer reasonably available for the Kiwi Assets. The sale process has been structured to encourage participation by interested purchasers while providing certainty and transparency to all stakeholders.

**F. <u>Conclusion</u>**

20. For the reasons stated above, it is my opinion that the transaction resulting from the sale process represents the highest and best outcome reasonably available to the Debtors and their respective stakeholders under the circumstances.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 24, 2026

By: *J. Scott Victor*
J. Scott Victor
Managing Director
SSG Advisors, LLC