**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |
| In re:<br><br>DAMIS Holdings LLC, *et al.*,[2]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16439 (CMG)<br><br>(Jointly Administered) |

# NOTICE OF FILING OF PROPOSED ASSET PURCHASE AGREEMENT AND SALE ORDER FOR KIWI OPERATINGCO, LLC, KIWI LANDCO, LLC, AND DASMAS LANDCO LLC

**PLEASE TAKE NOTICE** that on October 13, 2026, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered the *Order (A) Modifying and (B) Applying to DAMIS Holdings LLC the Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [SIMAD Docket No. 1352; DAMIS Docket No. 1400] (the "Kiwi Bidding Procedures Order") in the above-captioned cases of the debtors and debtors in possession (as applicable, the "SIMAD Debtors", or the "DAMIS Debtors", and together, the "Debtors") applying the SIMAD Bidding Procedures Order[3] to the DAMIS Debtors' chapter 11 cases.

---

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[2] A complete list of the DAMIS Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the DAMIS Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/DAMIS. The location of Debtor DAMIS Holdings LLC's principal place of business and the DAMIS Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[3] On June 26, 2026, the Court entered the *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [SIMAD Docket No. 298] (the "SIMAD Bidding Procedures Order")

**PLEASE TAKE FURTHER NOTICE** that, on October 21, 2026, the SIMAD Debtors filed the *Notice of Successful Bidders with Respect to the Assets of Kiwi Operatingco LLC, Kiwi Landco, LLC, and DASMAS Landco LLC* [Docket No. 1369] (the "Sale Notice"), which identified LKQE Associates, LLC (the "Buyer") as the Successful Bidder for the Assets of Kiwi Operatingco, LLC, Kiwi Landco LLC, and DASMAS Landco LLC (the "Sellers").

**PLEASE TAKE FURTHER NOTICE** that, the Court held a hearing on October 26, 2026 where it approved the Sale from Sellers to Buyer subject to final agreement on the terms of a Purchase Agreement and proposed Sale Order.

**PLEASE TAKE FURTHER NOTICE** that, on October 30, 2026, the Buyer and the Sellers executed the asset purchase agreement, attached hereto as **Exhibit A** (the "Kiwi APA").

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as **Exhibit B**, is a copy of the proposed sale order (the "Sale Order"), approving the Kiwi APA.

**PLEASE TAKE FURTHER NOTICE that copies of the SIMAD Bidding Procedures Order and the Kiwi Bidding Procedures Order, the Kiwi APA and the Sale Order, are available: (a) upon request to Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent retained in these chapter 11 cases) by calling (888) 575-9318 (toll free) or, for international callers, +1 (646) 930-4577; (b) by visiting the Debtors' restructuring website at (1) https://restructuring.ra.kroll.com/SIMAD or (2) https://restructuring.ra.kroll.com/DAMIS; or (c) for a fee via PACER by visiting http://www.njd.uscourts.gov.**

---

in the SIMAD Debtors' chapter 11 cases. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the SIMAD Bidding Procedures Order.

*<u>/s/ Michael D. Sirota</u>*
**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the SIMAD Debtors and Debtors in Possession*

*<u>/s/ Michael P. Pompeo</u>*
**FAEGRE DRINKER BIDDLE & REATH LLP**
Michael P. Pompeo
600 Campus Drive
Florham Park, New Jersey 07932-1047
(973) 549-7000 (Telephone)
(973) 360-9831 (Facsimile)
michael.pompeo@faegredrinker.com

and

Ian J. Bambrick (*pro hac vice*)
Patrick A. Jackson (*pro hac vice*)
Sarah E. Silveira (*pro hac vice*)
222 Delaware Ave. Suite 1410
Wilmington, DE 19801
(302) 467-4200 (Telephone)
(302) 467-4201 (Facsimile)
ian.bambrick@faegredrinker.com
patrick.jackson@faegredrinker.com
sarah.silveira@faegredrinker.com

and

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**

Adam C. Rogoff (*pro hac vice*)
Megan M. Wasson (*pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Facsimile)
adam.rogoff@hsfkramer.com
megan.wasson@hsfkramer.com

*Counsel to the DAMIS Debtors and Debtors in Possession*

# **Exhibit A**

**Kiwi APA**

**ASSET PURCHASE AGREEMENT**

by and among

**LKQE ASSOCIATES LLC,**

as Buyer;

and

**THE SELLERS NAMED HEREIN,**

as Sellers

**Dated as of October 26, 2026**

**TABLE OF CONTENTS**

ARTICLE I. DEFINITIONS ....................2

ARTICLE II. PURCHASE AND SALE ....................9
Section 2.01 Acquired Assets ....................9
Section 2.02 Excluded Assets ....................12
Section 2.03 Assumed Liabilities ....................13
Section 2.04 Excluded Liabilities ....................13
Section 2.05 Bellotto Claims. ....................14
Section 2.06 Seller and Bankruptcy Excluded Liabilities. ....................15
Section 2.07 Further Assurances ....................15
Section 2.08 Purchase Price ....................15
Section 2.09 Deposit; Payment of Purchase Price. ....................16
Section 2.10 Transfer Taxes ....................17
Section 2.11 Allocation of Purchase Price ....................17
Section 2.12 Distribution of Sale Proceeds ....................17
Section 2.13 Assumed Contracts ....................18

ARTICLE III. CLOSING ....................18
Section 3.01 Closing ....................18
Section 3.02 Sellers' Closing Deliverables ....................19
Section 3.03 Buyer Closing Deliverables ....................19

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLERS ....................20
Section 4.01 Organization and Qualification of Sellers ....................20
Section 4.02 Authority of Sellers ....................20
Section 4.03 No Conflicts ....................20
Section 4.04 Title to Acquired Assets ....................21
Section 4.05 Litigation ....................21
Section 4.06 Compliance with Laws; Permits ....................21
Section 4.07 Brokers ....................21
Section 4.08 Insurance ....................21
Section 4.09 No Other Representations ....................21

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ....................21
Section 5.01 Organization of Buyer ....................21
Section 5.02 Authority of Buyer ....................21
Section 5.03 No Conflicts ....................22
Section 5.04 Sufficiency of Funds ....................22
Section 5.05 Litigation ....................22
Section 5.06 Brokers ....................22
Section 5.07 No Outside Reliance ....................22
Section 5.08 Adequate Assurances Regarding Executory Contracts ....................22

ARTICLE VI. COVENANTS ....................23
Section 6.01 Conduct of Business ....................23

Section 6.02 Access to Information ....................23
Section 6.03 Efforts; Consents ....................23
Section 6.04 Bankruptcy Court Matters ....................23
Section 6.05 Publicity ....................24
Section 6.06 Confidentiality ....................24
Section 6.07 Notification of Certain Matters ....................24
Section 6.08 Bulk Transfer Laws ....................25
Section 6.09 Employee Matters ....................25
Section 6.10 Camp Matters ....................26

ARTICLE VII. TAX MATTERS ....................26
Section 7.01 Transfer Taxes ....................26
Section 7.02 Cooperation on Tax Matters ....................26
Section 7.03 Periodic Taxes ....................26
Section 7.04 Reimbursement for Taxes ....................27

ARTICLE VIII. CONDITIONS TO CLOSING ....................27
Section 8.01 Conditions to Obligations of All Parties ....................27
Section 8.02 Conditions to Obligations of Buyer ....................27
Section 8.03 Conditions to Obligations of Sellers ....................28

ARTICLE IX. TERMINATION ....................28
Section 9.01 Termination ....................28
Section 9.02 Effect of Termination. ....................29
Section 9.03 Remedies. ....................30

ARTICLE X. MISCELLANEOUS ....................31
Section 10.01 Survival ....................31
Section 10.02 Notices ....................31
Section 10.03 Interpretation ....................32
Section 10.04 Severability ....................32
Section 10.05 Entire Agreement ....................32
Section 10.06 Assignment ....................32
Section 10.07 Amendment and Waiver ....................33
Section 10.08 Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial 33
Section 10.09 Specific Performance ....................33
Section 10.10 Counterparts ....................33
Section 10.11 No Third-Party Beneficiaries ....................34
Section 10.12 “As Is, Where Is” Transaction ....................34
Section 10.13 No Successor Liability ....................34

EXHIBITS

Exhibit A Form of Bill of Sale

<u>Schedules</u>

Schedule 2.03 Assumed Claims

Schedule 2.13(a) Assumed Contract List

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated as of October 26, 2026 (the "Effective Date") and is entered into by and among LKQE Associates LLC ("Buyer") and each of the "Sellers" identified on the signature pages hereto (each a "Seller" and collectively, the "Sellers"). Each of Buyer and Sellers are at times referred to herein individually as a "Party" and together as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

## RECITALS

WHEREAS, on June 4, 2026 and June 5, 2026, certain debtors (the "Simad Debtors") commenced bankruptcy cases which are being jointly administered under Case No. 26-16388 (CMG) captioned as Simad Holdings Ltd. ("Simad") (the "Simad Bankruptcy Cases") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), inclusive of Simad and Kiwi OperatingCo, LLC (the "Simad Seller"), Chapter 11 Case No. 26-16410;

WHEREAS, on June 4, 2026, Dasmas LandCo, LLC (the "Dasmas Seller") and certain of its related affiliates (the "Initial DAMIS Debtors") commenced a bankruptcy case bearing case number 26-16492 which is being jointly administered under the case of DAMIS Holdings LLC, Chapter 11 Case No. 26-16439 (the "Initial DAMIS Bankruptcy Cases");

WHEREAS, on August 11, 2026, Kiwi LandCo, LLC (the "Kiwi Seller" and together with the Dasmas Seller, the "DAMIS Sellers" or the "DAMIS Debtors", and the DAMIS Sellers together with the Simad Seller, the "Sellers") commenced a bankruptcy case bearing case number 26-19134 (the "Kiwi Bankruptcy Case" and together with the Initial DAMIS Bankruptcy Cases, the "DAMIS Bankruptcy Cases", and the DAMIS Bankruptcy Cases together with the Simad Bankruptcy Cases, the "Bankruptcy Cases" and each a "Bankruptcy Case") which is being jointly administered with the Initial DAMIS Bankruptcy Cases;

WHEREAS, in connection with the Bankruptcy Cases, Sellers desire to sell, transfer, convey, assign and deliver to Buyer, all of the Acquired Assets, and Buyer desires to: (i) purchase, acquire and assume all of the Acquired Assets and all of the Assumed Liabilities (and no other liabilities) (each as defined herein); and (ii) consummate such other transactions as are contemplated by this Agreement, in each case upon the terms and conditions set forth in this Agreement (with all such transactions referred to as the "Transaction");

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Acquired Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey, all on the terms and subject to the conditions set forth in this Agreement and in the Sale Order (as defined herein); and

WHEREAS, Sellers' and Buyer's willingness to consummate the Transaction is subject to, among other things, the entry of the Sale Order in each of the Bankruptcy Cases by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"Accounts Receivable" means (a) all accounts, accounts receivable, payment intangibles, rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Acquired Assets" has the meaning set forth in Section 2.01.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means any transaction or series of transactions (other than the Transaction) pursuant to which any Person or group of Persons (other than Buyer or any of its Affiliates) directly or indirectly acquires or would acquire any of the Acquired Assets, whether by sale, merger, recapitalization, reorganization, or otherwise.

"Assumed Contract List" has the meaning set forth in Section 2.13(a).

"Assumed Contracts" means those Contracts that have been assigned to and assumed by Buyer pursuant to Section 2.13 and Section 365 of the Bankruptcy Code.

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Assumed Permits" means all Permits, but excluding all Permits to the extent solely related to any Excluded Asset.

"Auction" has the meaning set forth in Section 6.04(a).

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Causes of Action" means any and all claims, rights, causes of action, suits, and proceedings, whether known or unknown, arising under chapter 5 of the Bankruptcy Code (including Sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code) or any analogous international, state or federal law, including all preference, fraudulent transfer or conveyance, and other avoidance claims, rights, and causes of action, together with any and all proceeds, recoveries, and rights to recovery (whether judicial or otherwise) arising therefrom or related thereto, that are or may be asserted by, or on behalf of, the Sellers, their estates, or any trustee, examiner, or other estate representative.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" has the meaning set forth in the recitals.

"Bid Procedures" means the procedures governing the solicitation of bids for the Acquired Assets and, to the extent applicable, the conduct of an Auction, in the Simad Bankruptcy Cases as approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court in the Simad Bankruptcy Cases dated June 26, 2026 approving the Bid Procedures.

"Breakup Fee" shall have the meaning set forth in Section 9.02(c).

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Camp" means recreational and/or informal educational programs for Campers during the Camp Season in a communal traditional residential camp environment.

"Camp Business" means the establishment and management of the Camp conducted for Campers during the Camp Season. Such business includes recruitment of Campers, staff, procurement of necessary provisions, lease or ownership of real estate, creation of programs and events and follow-up relations with Campers, prospective Campers, and their parents. The Camp Business shall also include the rental of the facilities of the Camp during periods other than the Camp Season and any other revenue-generating activities held upon the camp property.

"Camp Season" shall mean the months of June, July and August in a specific calendar year.

"Campers" means the individuals who are enrolled, registered or otherwise accepted to attend the Camp (including, for the avoidance of doubt, Camp Kiwi), including prospective Campers for whom Sellers have received an application, enrollment form or deposit.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral agreement, contract, lease, sublease, license, sublicense, obligation, promise, undertaking, commitment, or other binding arrangement or understanding.

"Credit Bid Amount" means the aggregate outstanding principal amount of the DIP Facility, together with accrued and unpaid interest, fees, costs, expenses, and other amounts owing thereunder and permitted to be credited against the Purchase Price pursuant to the applicable Bankruptcy Court order.

"Cure Amounts" means all amounts that must be paid and all obligations that must otherwise be satisfied pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, as determined by the Bankruptcy Court.

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"DAMIS Bankruptcy Cases" has the meaning set forth in the recitals.

"DAMIS Debtors" has the meaning set forth in the recitals.

"DAMIS Distribution" has the meaning set forth in Section 2.12.

"Deposit" has the meaning set forth in Section 2.09(a).

"DIP Facility" means an advance of $630,000 from the Deposit made by Buyer and approved by the Bankruptcy Court in the Simad Bankruptcy Cases under Section 364(d)(1) of the Bankruptcy Code in an order providing for a senior lien, subject to certain Permitted Encumbrances, on all assets of the Simad Seller that can be utilized by the Simad Seller as debtor-in-possession financing; provided that amounts due under the DIP Facility shall be credited against the Purchase Price for the Acquired Assets on the Closing Date.

"Dollars" or "$" means the lawful currency of the United States.

"Domain Names" means Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic

address on the Internet and all applications for any of the foregoing as well as social media handles and other names, identifiers and locators associated with Internet sites and services.

"Effective Date" has the meaning set forth in the preamble.

"Encumbrance" means any lien, pledge, security interest, charge, claim, mortgage, deed of trust, option, right of first refusal, preemptive right, restriction on transfer, or other encumbrance of any kind or nature, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Agent" means Flagstar Bank, or such other escrow agent as mutually agreed in writing between the Parties.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Claims" means all (a) rights (including rights of set-off and rights of recoupment), claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind of the Sellers against (i) any current or former director, officer, or manager of any Seller, or any spouse, family member, or other relative of, or any Person related to or affiliated with, any of the foregoing, (ii) any DIP lender, prepetition secured or unsecured lender, or other financing party in the Bankruptcy Cases, including, without limitation, any DIP Secured Parties and Prepetition Secured Parties (each as defined in the Final DIP Order [Docket Nos. 931 & 1197]) and each of their respective Affiliates, and (iii) third parties solely to the extent arising in respect of any Excluded Asset or Excluded Liability, (b) Bankruptcy Causes of Action, and (c) claims or causes of action of any Seller to the extent such claims or causes of action neither (X) directly and exclusively arose out of or related to the ordinary course, day-to-day operation prior to Closing of the Acquired Assets (including the Assumed Contracts) and the Camp Business, nor (Y) directly and exclusively arise out of or relate to the post-Closing operation of the Camp Business.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Final DIP Order" means the Final Order entered in the Bankruptcy Case approving the DIP Facility on a final basis.

"Final Order" means an Order of the Bankruptcy Court (or any court of competent jurisdiction) as to which the time to file an appeal, motion for rehearing, or writ of certiorari has expired and no appeal, motion for rehearing, or writ of certiorari is pending; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule, may be filed shall not cause an Order not to be a Final Order.

"Former Employees" means all individuals who have been employed by Sellers who are not Current Employees.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, provincial, local, municipal, foreign, or other government, or any department, commission, board, bureau, agency, regulatory authority, instrumentality, or political subdivision thereof, or any court, arbitral body, or similar body of competent jurisdiction.

"Health Plans" means all health plans including, but not limited to, health, dental, life, disability and long-term care insurance.

"Initial DAMIS Bankruptcy Cases" has the meaning set forth in the recitals.

"Initial DAMIS Debtors" has the meaning set forth in the recitals.

"Intellectual Property" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, lists of prospective customers and prospective staff members, contact information for all vendors, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"Inventory" means all of Sellers' now owned and hereafter acquired raw materials and work-in-process therefor and all of Sellers' tangible property used in the operation of the Sellers' business or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"Law" means any federal, state, provincial, local, municipal, foreign, international, or multinational constitution, statute, treaty, rule, regulation, ordinance, order, code, or other similar requirement enacted, adopted, promulgated, or applied by any Governmental Authority.

"Liabilities" means any debt, liability, commitment, or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Material Adverse Effect" means any change, effect, event, occurrence, development, or state of facts that, individually or in the aggregate with all other changes, effects, events, occurrences, developments, or states of facts, (a) has had or would reasonably be expected to have

a material adverse effect on the Acquired Assets or the ability of Sellers to consummate the Transaction, or (b) prevents or materially impairs or delays, or would reasonably be expected to prevent or materially impair or delay, the ability of Sellers to consummate the Transaction; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic or political conditions or the securities, credit, or financial markets in general in the United States or any other jurisdiction in which Sellers operate; (ii) changes in conditions generally affecting the industries in which Sellers operate; (iii) the announcement or pendency of this Agreement or the Transaction, including the impact thereof on the relationships, contractual or otherwise, of Sellers with employees, customers, suppliers, distributors, partners, or other third parties; (iv) any change in Law or GAAP (or any interpretation thereof) after the date hereof; (v) acts of war (whether or not declared), sabotage, terrorism, military actions, or the escalation or worsening of any of the foregoing; (vi) any natural or man-made disaster, pandemic, epidemic, disease outbreak, or acts of God; (vii) the filing or commencement of the Bankruptcy Cases or any events or circumstances resulting therefrom; (viii) any action taken or omitted to be taken by Sellers at the written request or with the prior written consent of Buyer; (ix) any failure by Sellers to meet any internal or external projections, forecasts, or estimates of revenue, earnings, or other financial metrics (provided that the underlying causes of such failure may be taken into account unless otherwise excluded by this definition); or (x) any matter disclosed on the Schedules hereto.

"Order" means any order, judgment, injunction, ruling, writ, assessment, or decree of any Governmental Authority.

"Outside Date" means November 5, 2026; provided, however, that the Outside Date may be extended by mutual written agreement of the Parties.

"Party" or "Parties" has the meaning set forth in the preamble.

"Patents" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"Permits" means all licenses, permits, certificates, approvals, registrations, consents, authorizations, franchises, variances, exemptions, and orders issued or granted by a Governmental Authority.

"Permitted Encumbrances" means (a) Encumbrances arising under this Agreement; (b) statutory liens for current Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; (c) mechanics', carriers', workers', repairers', and similar statutory liens arising or incurred in the ordinary course of business for amounts not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; and (d) zoning, entitlement, conservation restrictions, and other land use and environmental regulations by Governmental Authorities that do not materially interfere with the present use of the applicable asset.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" means the dates on which Sellers filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Proceeds" has the meaning set forth in Section 2.12.

"Purchase Price" has the meaning set forth in Section 2.08.

"Qualified Bid" has the meaning set forth in the Bid Procedures Order.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Camp Business, including without limitation a current schedule of Seller's Campers.

"Sale Hearing" means the hearing, if any, before the Bankruptcy Court to approve the Sale Order in each of the Bankruptcy Cases.

"Sale Motion" means the motion(s) or notice(s) of public sale or private sale filed by Sellers in each of the Bankruptcy Cases with the Bankruptcy Court seeking entry of the Sale Order.

"Sale Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, entered in each of the Bankruptcy Cases pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, approving and authorizing (a) the sale of the Acquired Assets to Buyer, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), pursuant to Section 363(f) of the Bankruptcy Code, (b) the assumption and assignment of the Assumed Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code, (c) this Agreement and the Transaction, and (d) such other and further relief as is customary for transactions of this type.

"Schedules" means the disclosure schedules delivered by Sellers to Buyer in connection with the execution of this Agreement.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Simad Bankruptcy Cases" has the meaning set forth in the recitals.

"Simad Distribution" has the meaning set forth in Section 2.12.

"Simad Seller" has the meaning set forth in the recitals.

"Software" means all websites, computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation).

"Straddle Period" means any Tax period that includes, but does not end on, the Closing Date.

"Successful Bid" has the meaning given to such term in the Bid Procedures Order.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto.

"Taxes" means all federal, state, local, and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy, and other taxes, duties, or assessments of any nature whatsoever, together with all interest, penalties, and additions thereto imposed with respect to such amounts.

"Trademarks" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"Transfer Taxes" has the meaning set forth in Section 2.10.

"Tuition" means consideration paid by or for a Camper to attend the Camp.

"Yahr Employment Agreement" means that certain Employment Agreement dated as of November 29, 2017 by and between Kiwi OperatingCo, LLC and William Yahr.

"2026 Camp Season" means the Camp Season during calendar year 2026.

"2027 Camp Season" means the Camp Season during calendar year 2027.

## ARTICLE II.
## PURCHASE AND SALE

**Section 2.01 Acquired Assets**. On the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, assign, transfer, convey, and deliver to Buyer, and Buyer shall purchase, acquire, and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), other than the Excluded Assets, all of the Sellers' assets, rights, properties of every nature, kind and description, tangible or intangible (including goodwill), whether now existing or hereafter acquired, wheresoever situated, relating to or used or held for use in connection with the Camp Business as currently conducted, including without limitation, the following assets (collectively, the "Acquired Assets"):

(a) all Accounts Receivable of Sellers as of the Closing;

(b) all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(c) all deposits (including, without limitation, deposits in transit, customer deposits, deposits and tuitions for the 2027 Camp Season received by or pledged to the Sellers on behalf of Campers, and security deposits for rent, electricity, telephone, utilities, Health Plans or otherwise) and other prepaid charges and expenses of Sellers including all cash derived therefrom currently and prospectively, including, without limitation, all cash proceeds of the deposits and tuitions for the 2027 Camp Season received by or pledged to the Sellers;

(d) all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.13;

(e) all Intellectual Property owned by Sellers and all of Sellers' rights to use other Intellectual Property;

(f) all items of machinery (including vehicles, boats, buses, vans, maintenance vehicles and trailers) and equipment (including IT Equipment, recreational equipment, teaching materials, athletic equipment, sporting goods, educational equipment, dining hall and food service equipment, health and health center equipment), as well as tools, parts, furniture and fixtures owned by Sellers as of the Closing;

(g) all Records related to the Acquired Assets and Assumed Liabilities;

(h) all goodwill associated with the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(i) all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers;

(j) all of the Assumed Permits and all of the rights and benefits accruing under any Assumed Permits;

(k) other than with respect to any insurance proceeds related to, arising out of, or in connection with any directors' and officers' liability insurance policies, the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets occurring prior to the Closing or (ii) any Assumed Liabilities;

(l) except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) solely arising from or related to the use of the Acquired Assets in connection with the Camp

Business or the Assumed Liabilities, to the extent the transfer of the foregoing is effective under applicable non-bankruptcy law;

(m) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person related to the Acquired Assets;

(n) the right to receive and retain mail relating to Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(o) all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names; and

(p) all right, title and interest of Sellers in and to all owned real property or leased real property and real-property-related assets owned, leased, or used in connection with the Camp Business, including without limitation:

(i) the real property commonly known as 825 Union Valley Road, Carmel, NY 10512, including (1) all buildings, structures, improvements, fixtures, utilities, roads, parking areas, recreational facilities, waterfront rights, docks, athletic facilities, and camp infrastructure located thereon; (2) all easements, rights-of-way, development rights, water rights, mineral rights (if any), appurtenant rights, licenses, permits, approvals, and entitlements related thereto; (3) all leases, leasehold interests, and occupancy rights relating thereto; and (4) all tangible and intangible rights associated with the ownership, operation, maintenance, use, or development of such real property.

(ii) the real property commonly known as 31 Blossom Road, Carmel, New York, including (1) all buildings, structures, improvements, fixtures, utilities, roads, parking areas, recreational facilities, waterfront rights, docks, athletic facilities, and camp infrastructure located thereon; (2) all easements, rights-of-way, development rights, water rights, mineral rights (if any), appurtenant rights, licenses, permits, approvals, and entitlements related thereto; (3) all leases, leasehold interests, and occupancy rights relating thereto; and (4) all tangible and intangible rights associated with the ownership, operation, maintenance, use, or development of such real property.

Notwithstanding anything herein to the contrary, the Acquired Assets include all assets, properties, rights and interests used in, held for use in, or necessary for the operation of the Camp Business as conducted immediately prior to the Closing, whether owned by, leased by, licensed to, or used by any Seller in connection with the Camp Business. Notwithstanding anything herein to the contrary, other than the contract designation rights provided for in Section 2.13(a), Buyer may, from time to time, remove any Acquired Asset from this Section 2.01 in its sole and absolute discretion until the Closing and elect to treat such Contract, Permit or other asset as an Excluded Asset; provided that no such removal shall result in any adjustment to the Purchase Price and shall be subject to the provisions of Section 2.13(a) hereof.

**Section 2.02 Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, Sellers shall retain, and shall not sell, assign, transfer, convey, or deliver to Buyer, and Buyer shall not purchase, acquire, or accept from Sellers, any of the following assets of Sellers (collectively, the "Excluded Assets"):

(a) all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents solely relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity;

(b) all Contracts, in each case, other than the Assumed Contracts;

(c) the Excluded Claims;

(d) any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the transfer and disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Bankruptcy Cases that are protected by the attorney-client privilege;

(e) all Permits, other than the Assumed Permits;

(f) all directors' and officers' liability insurance policies and any proceeds arising out of, or related to, such directors' and officers' liability insurance policies;

(g) the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement;

(h) all cash and cash equivalents of Sellers provided that such amounts are not proceeds of deposits and tuitions for the 2027 Camp Season received by or pledged to the Sellers;

(i) all Tax Records of the Sellers;

(j) all Records related to the Excluded Assets;

(k) any unused retainers paid by the Sellers to any third party prior to the Closing (for professional services or otherwise) or any amounts remaining in any escrow or similar account used to fund the same;

(l) any assets of the Dasmas Seller or Kiwi Seller that are not exclusively used in connection with the Camp Business; and

(m) any Claims of any Seller against (i) current or former directors, officers, insiders, or affiliates, (ii) any spouse, family member, or other relative of, or any Person related to or affiliated with, any of the foregoing, (iii) any DIP lender, prepetition secured or unsecured lender, or other financing party in the Bankruptcy Cases (including any DIP Secured Parties and

Prepetition Secured Parties as defined in the Final DIP Order) and their respective Affiliates, and (iv) any other Person to the extent such Claims neither (X) directly and exclusively arose out of or related to the ordinary course, day-to-day operation prior to Closing of the Acquired Assets (including the Assumed Contracts) and the Camp Business, nor (Y) directly and exclusively arise out of or relate to the post-Closing operation of the Camp Business.

**Section 2.03 Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to pay, perform, and discharge when due, the following Liabilities of Sellers (collectively, the "Assumed Liabilities"):

(a) all Liabilities arising under the Assumed Contracts that arise from and after the Closing Date and relate to periods from and after the Closing Date;

(b) any Taxes attributable to the ownership or operation of the Acquired Assets arising after the Closing Date. Buyer shall not assume any Taxes attributable to any taxable period ending on or before the Closing Date;

(c) only those administrative expense claims or priority claims in the Bankruptcy Cases related to the business and operations of the Sellers as expressly listed on Schedule 2.03;

(d) any Liabilities that arise out of the operation of the Camp Business on and after the Closing Date;

(e) any Liabilities arising under environmental Laws, but only to the extent imposed on Buyer as owner or operator of any real property acquired hereunder by operation of applicable Law that cannot otherwise be excluded, assigned, or otherwise allocated to Sellers as a matter of Law; and

(f) all Cure Amounts relating to the assumption and assignment of the Assumed Contracts to Buyer.

**Section 2.04 Excluded Liabilities**. Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume or be obligated to pay, perform, or discharge any Liabilities of Sellers other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including the following:

(a) any Liability arising under any Excluded Asset;

(b) any Liability for any claim, action, suit, investigation, or proceeding pending or threatened against Sellers or any of their Affiliates;

(c) any Liability under any employee benefit plan or relating to any current or former employees, independent contractors, or directors of Sellers;

(d) any Liability arising out of or relating to any violation of Law by Sellers;

(e) any indebtedness for borrowed money, including any obligations under any of the DIP Facilities or any other debtor-in-possession financing, and any pre-petition secured or unsecured indebtedness;

(f) any Liability arising out of or relating to any Excluded Asset;

(g) any Liability to the extent arising out of or relating to any breach, default, or violation by Sellers prior to the Closing Date under any Contract (other than Cure Amounts);

(h) any Liability relating to any rejected executory contract or unexpired lease;

(i) any administrative expense claim, priority claim, DIP obligation, professional fee claim, tax claim, or other bankruptcy claim that is not listed on Schedule 2.03; and

(j) any other Liabilities of Sellers not specifically included in the Assumed Liabilities.

**Section 2.05 Bellotto Claims.** Notwithstanding anything to the contrary contained herein, the Buyer shall not assume, and shall have no liability for, any Liability, Claim, cause of action, obligation, indebtedness, commitment, demand, judgment, settlement obligation, or dispute of any kind, whether known or unknown, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, arising out of, relating to, or asserted by Karla Bellotto, Ivan Bellotto, any member of the Bellotto family, or any entity affiliated with any of the foregoing (collectively, the "Bellotto Parties"), including without limitation:

(i) any ownership, membership, shareholder, partnership, or equity interest claims;

(ii) any claims for distributions, profits, dividends, compensation, reimbursements, or other payments;

(iii) any derivative claims, fiduciary duty claims, oppression claims, or governance-related claims;

(iv) any litigation claims, arbitration claims, settlement obligations, judgments, or causes of action existing as of or arising from facts occurring prior to the Closing Date;

(v) any indemnification, contribution, advancement, or reimbursement obligations;

(vi) any claims arising from or relating to the management, ownership, financing, operation, restructuring, or bankruptcy of Sellers or any affiliate thereof prior to Closing; and

(vii) any claims asserted in any pending or threatened litigation, adversary proceeding, contested matter, or other proceeding involving Sellers, the

Simad Debtors, the DAMIS Debtors, the Bellotto Parties, Michael Shabsels, David Shabsels, or any affiliate thereof.

**Section 2.06 Seller and Bankruptcy Excluded Liabilities**. Buyer shall acquire the Acquired Assets free and clear of any Encumbrance, including any Claim asserted by any Bellotto Party, pursuant to Section 363(f) of the Bankruptcy Code and the Sale Order and shall not assume any Liability arising from, relating to, or attributable to:

(i) any indebtedness of any Seller, Simad Debtor or DAMIS Debtor, or any affiliate thereof;

(ii) any obligations owed to secured lenders, bondholders, noteholders, DIP lenders, trade creditors, taxing authorities, employees, former employees, or governmental authorities;

(iii) any obligations arising under any debtor-in-possession financing facility, cash collateral order, adequate protection order, or other Bankruptcy Court order entered prior to Closing;

(iv) any claims arising from alleged fraud, misrepresentation, breach of fiduciary duty, fraudulent transfer, preferential transfer, avoidance actions, veil-piercing claims, equitable subordination claims, or similar causes of action arising prior to Closing;

(v) any claims relating to the issuance, sale, marketing, servicing, or repayment of any bonds, notes, loans, credit facilities, or other financing arrangements;

(vi) other than as set forth in Section 2.03(c), any administrative expense claims, priority claims, unsecured claims, or other claims against Sellers, the Simad Debtors, or the DAMIS Debtors arising before Closing; and

(vii) any liabilities not expressly identified as Assumed Liabilities under Section 2.03.

**Section 2.07 Further Assurances**. From and after the Closing, each of the Parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transaction.

**Section 2.08 Purchase Price**. The aggregate purchase price for the Acquired Assets (the "Purchase Price") shall be an amount equal to:

(a) $9,200,000 in cash (the "Cash Payment"), subject to reduction as provided in subsections (b) and (c) below;

(b) to the extent Buyer has provided the DIP Facility pursuant to an order of the Bankruptcy Court, Buyer shall be entitled to a dollar-for-dollar credit against the Cash Payment equal to the aggregate outstanding principal balance of such DIP Facility, together with all accrued and unpaid interest, fees, costs, expenses, and other amounts owing thereunder and permitted to be credited pursuant to the applicable Bankruptcy Court Order (the "Credit Bid Amount");

(c) less the amount of Breakup Fee in the amount of $204,000 and the Expense Reimbursement in the amount of $68,000, in the aggregate sum of $272,000 (collectively, the “Bid Protections”);

(d) the Cure Amounts; plus

(e) the assumption of the Assumed Liabilities.

For the avoidance of doubt, the amount of cash payable by Buyer at Closing shall equal:

$9,200,000 minus the Credit Bid Amount and the Bid Protections, provided, however, that the Cash Payment shall not be reduced below zero, and any Credit Bid Amount and Bid Protections in excess of $9,200,000 shall not entitle Buyer to any payment or refund from Sellers unless otherwise ordered by the Bankruptcy Court.

**Section 2.09 Deposit; Payment of Purchase Price.**

(a) **Deposit**. Simultaneously with the execution of this Agreement, if the Deposit (as defined herein) has not been converted into all or a portion of the DIP Facility, Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an amount equal to ten percent (10%) of the Cash Payment (the “Deposit”) in the amount of the difference between the sums previously advanced under the DIP Facility and ten percent (10%) of the Cash Payment, to be held by the Escrow Agent in an interest-bearing account pursuant to an escrow agreement in form and substance reasonably acceptable to Buyer and Sellers; however to the extent that the purchase price set forth in this Agreement is modified at or prior to the potential Auction (as defined in the Bid Procedures Order), or to the extent Buyer is the Successful Bidder (as defined in the Bid Procedures Order) or the Back-Up Bidder (as defined in the Bid Procedures Order), Buyer shall pay an additional amount into escrow, within two (2) Business Days of the Auction, such that the Deposit equals ten percent (10%) of the proposed purchase price offered to purchase the Acquired Assets.

(b) **Payment at Closing**. At the Closing, Buyer shall pay or cause to be paid to Sellers (or as Sellers may direct) the Cash Payment (less the combined total of the Deposit, if such Deposit has not been converted into the DIP Facility, and the Credit Bid Amount), by wire transfer of immediately available funds to an account designated by Sellers in writing at least two (2) Business Days prior to the Closing Date. For the avoidance of doubt, if (i) the purchase price is $6,800,000, (ii) the $680,000 Deposit made on July 20, 2026 and in increments thereafter, has been converted into the DIP Facility, (iii) an additional $1,320,000 of the DIP Facility has been used by the Seller, and (iv) $100,000 is owed to the Buyer under the DIP Facility, then the Cash Payment remaining to be paid by the Buyer at Closing would be $4,700,000 ($6,800,000 - $2,000,000 - $100,000).

(c) **Return of Deposit**. If this Agreement is terminated (i) by Buyer pursuant to Section 9.01(c) or Section 9.01(d), or (ii) pursuant to Section 9.01(a) or Section 9.01(b) then the Deposit, if any (together with any interest earned thereon) shall be returned to Buyer within five (5) Business Days after such termination. In all other circumstances of termination (including termination by Sellers pursuant to Section 9.01(e)), (A) the Deposit, if any, shall be released to Sellers as liquidated damages, or (B) in the event that no Deposit has been provided, the Deposit has been converted into the DIP Facility, or a Deposit less than ten percent of the Purchase Price has been provided, the Sellers shall have a credit in an amount up to ten percent (10%) of the Purchase Price against the Deposit and the unpaid balance of the DIP Facility in an aggregate amount no greater than ten percent (10%) of the Purchase Price, and the remedies set forth in (A) and (B) above shall constitute the sole and exclusive remedies of Sellers against Buyer for any breach or failure to perform by Buyer, except in the case of Buyer's fraud or willful misconduct. Additionally, upon written notice to Buyer, if, following completion of the Auction, Sellers enter into a definitive agreement with respect to a Qualified Bid that constitutes the Successful Bid under the Bid Procedures, the Deposit shall be returned to Buyer within five (5) Business Days after Sellers enter into a definitive agreement with a Successful Bidder that is not the Buyer; provided, however, that if Buyer is the Back-Up Bidder, the Deposit shall be held and returned, as applicable, in accordance with the Bid Procedures.

**Section 2.10 Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration, recording, value-added, and other similar Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Transaction ("Transfer Taxes") shall be borne by Buyer; provided, however, that the Parties shall cooperate in good faith to minimize the amount of any Transfer Taxes and to avail themselves of any available exemptions from any such Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code.

**Section 2.11 Allocation of Purchase Price**. Within thirty (30) days after the Closing Date, Buyer shall prepare and deliver to Sellers a schedule allocating the Purchase Price (and any Assumed Liabilities to the extent properly taken into account as part of the consideration for U.S. federal income tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Sellers shall have thirty (30) days to review and comment on such schedule. Buyer and Sellers shall endeavor in good faith to resolve any disagreements. If Buyer and Sellers are unable to resolve any such disagreement within fifteen (15) days, such disagreement shall be resolved by a nationally recognized independent accounting firm mutually acceptable to Buyer and Sellers, whose determination shall be final and binding. The fees and expenses of such accounting firm shall be borne equally by Buyer and Sellers. Buyer and Sellers agree to file all Tax Returns in a manner consistent with such allocation and shall not take any position inconsistent therewith in any Tax proceeding, audit, or otherwise, except as required by applicable Law.

**Section 2.12 Distribution of Sale Proceeds**. Notwithstanding anything set forth in Section 2.09, at Closing, the Cash Payment less any Breakup Fee and Expense Reimbursement, if applicable (the "Proceeds") from the Transaction shall be allocated such that 35% of the Proceeds (the "DAMIS Distribution") are distributed to the DAMIS Sellers, and the remaining 65% of the Proceeds (the "Simad Distribution") are distributed to the Simad Seller, *provided however*, that the Proceeds for purposes of distribution allocation shall be determined prior to the application of the Credit Bid Amount to the DIP Facility, and *provided further* that the DAMIS Distribution shall

be funded entirely from the Cash Payment of the Purchase Price and the Simad Distribution shall be funded first by the Credit Bid Amount and thereafter from any amounts remaining from the Cash Payment.

**Section 2.13 Assumed Contracts**.

(a) Section 2.13(a) of the Schedules (the "Assumed Contract List") sets forth a list of all Contracts to which a Seller is a party and which Buyer has designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract. From and after the date hereof, until thirty (30) days after the Closing (the "Executory Contract Designation Period"), Buyer shall be entitled to make additions and deletions to the Assumed Contract List by delivery of written notice to Sellers (which shall then serve notice on the non-debtor counterparties to each of the Contracts so added or deleted); provided that Buyer shall pay any net increase in the sum of Cure Amounts and non-debtor counterparties' Administrative Claims resulting directly from such designation of additional Assumed Contracts (the intent being that there will be no net negative effect on the bankruptcy estate due to a net increase in Cure Amounts and non-debtor counterparties' Administrative Claims resulting from any additional assumptions) or the amount of any Administrative Claim accruing from the Closing to the earlier of the assumption and assignment or rejection of a particular executory contract to the end of the Executory Contract Designation Period. Any such deleted Contract shall be deemed to no longer be an Assumed Contract and any such added Contract shall be deemed an Assumed Contract. Any Contract that is designated (or deemed to be designated) for exclusion and rejection pursuant to this sub-section shall constitute an "Excluded Contract" as of the date of such designation.

(b) In connection with the assumption and assignment to Buyer of any Assumed Contract that is executory pursuant to this Section 2.13, the allowed Cure Amounts, if any, necessary to cure all monetary defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts, shall be paid by Buyer at the Closing or on or prior to the conclusion of the Executory Contract Designation Period as part of the Purchase Price in Section 2.08.

(c) Sellers shall use their respective commercially reasonable efforts to obtain an order of the Bankruptcy Court in the applicable Bankruptcy Case to assign the Assumed Contracts to Buyer (the "Assumption Approval") on the terms set forth in this Section 2.13. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all consents from Governmental Authorities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that Sellers' obligations hereunder shall only continue until the Bankruptcy Cases are closed or dismissed.

## ARTICLE III.
## CLOSING

**Section 3.01 Closing**. Subject to the satisfaction or waiver of the conditions set forth in Article VIII, the closing of the Transaction (the "Closing") shall take place remotely by exchange of documents and signatures electronically (or by such other means as the Parties may agree) on

the date that is three (3) Business Days after the satisfaction or waiver of all conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other time and place as Buyer and Sellers may mutually agree in writing (the date on which the Closing actually occurs, the "Closing Date").

**Section 3.02 Sellers' Closing Deliverables**. At the Closing, Sellers shall deliver or cause to be delivered to Buyer the following:

(a) a bill of sale, substantially in the form attached hereto as Exhibit A, duly executed by Sellers, evidencing the sale, transfer, conveyance, and assignment of the Acquired Assets to Buyer;

(b) one or more assignment and assumption agreements, in a form agreed to by Buyer and Sellers, duly executed by Sellers, evidencing the assignment of the Assumed Contracts to, and the assumption of the Assumed Liabilities by, Buyer;

(c) a certificate executed by an authorized officer of Sellers, dated as of the Closing Date, certifying that the conditions set forth in Section 8.02(a) and Section 8.02(b) have been satisfied;

(d) [reserved]

(e) a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that Sellers are not a "foreign person" as defined in Section 1445 of the Code;

(f) certified copies of (i) the Sale Order and (ii) the Bid Procedures Order, in each case as entered by the Bankruptcy Court, provided that the Sale Order must be approved and entered by the Bankruptcy Court in all of the Bankruptcy Cases; and

(g) such other documents, instruments, or certificates as Buyer may reasonably request to evidence and effectuate the consummation of the Transaction.

**Section 3.03 Buyer Closing Deliverables**. At the Closing, Buyer shall deliver or cause to be delivered to Sellers the following:

(a) the Cash Payment (less the Deposit and/or the Credit Bid Amount, if applicable), by wire transfer of immediately available funds in accordance with Section 2.09(b);

(b) one or more assignment and assumption agreements, in a form agreed to by Buyer and Sellers, duly executed by Buyer, evidencing the assignment of the Assumed Contracts to, and the assumption of the Assumed Liabilities by, Buyer;

(c) a certificate executed by an authorized officer of Buyer, dated as of the Closing Date, certifying that the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied;

(d) a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying (i) the resolutions duly adopted by the governing body of Buyer authorizing the execution and delivery of this Agreement and the consummation of the Transaction, and (ii) the incumbency and signatures of the officers of Buyer executing this Agreement and any other documents delivered in connection herewith; and

(e) such other documents, instruments, or certificates as Sellers may reasonably request to evidence and effectuate the consummation of the Transaction.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the correspondingly numbered Sections of the Schedules, Sellers represent and warrant to Buyer that the statements contained in this Article IV are true and correct as of the Effective Date and as of the Closing Date.

**Section 4.01 Organization and Qualification of Sellers**. Each Seller is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of its formation, and has all requisite power and authority to own, lease, and operate its properties and to carry on its business as presently conducted.

**Section 4.02 Authority of Sellers**. Subject to the entry of the Sale Order, Sellers have full power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Sellers in connection herewith, to perform their obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement and the consummation of the Transaction have been duly authorized by all necessary action on the part of Sellers (including, to the extent required, approval of the Bankruptcy Court in each applicable Bankruptcy Case). This Agreement has been duly executed and delivered by Sellers and, assuming the due authorization, execution, and delivery by Buyer, and subject to entry of the Sale Order, constitutes a legal, valid, and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 4.03 No Conflicts**. Subject to entry of the Sale Order, the execution, delivery, and performance of this Agreement by Sellers and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of formation, limited liability company agreement, certificate of incorporation, bylaws, or other organizational documents of Sellers, (b) violate or result in a breach of any Law applicable to Sellers, or (c) except as would not reasonably be expected to have a Material Adverse Effect, violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which any Seller is a party or by which any Seller or any of its assets is bound.

**Section 4.04 Title to Acquired Assets**. Subject to entry of the Sale Order, Sellers have good and valid title to, or a valid leasehold interest in, the Acquired Assets, free and clear of all Encumbrances, other than Permitted Encumbrances.

**Section 4.05 Litigation**. Except for the Bankruptcy Cases, there is no action, suit, claim, investigation, or proceeding pending or, to the actual knowledge of Sellers, threatened against Sellers that (a) challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction, or (b) would reasonably be expected to have a Material Adverse Effect.

**Section 4.06 Compliance with Laws; Permits**. Except as would not reasonably be expected to have a Material Adverse Effect, Sellers are in compliance in all material respects with all Laws applicable to the Acquired Assets or the ownership or operation thereof.

**Section 4.07 Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transaction or any other transaction document based upon arrangements made by or on behalf of Sellers.

**Section 4.08 Insurance**. Each Seller has valid and existing liability and property insurance coverage for the Acquired Assets being transferred.

**Section 4.09 No Other Representations**. Except for the representations and warranties expressly set forth in this Article IV, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers, the Acquired Assets, or the Transaction, and Sellers disclaim any other representations or warranties, whether made by Sellers or any of their Affiliates, officers, directors, employees, agents, or representatives. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE IV, SELLERS MAKE NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND SELLERS HEREBY DISCLAIM ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date of this Agreement and as of the Closing Date.

**Section 5.01 Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation.

**Section 5.02 Authority of Buyer**. The Buyer has full legal power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Buyer in connection herewith, to perform its obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement and the consummation of the Transaction have been duly authorized by all necessary action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and,

assuming the due authorization, execution, and delivery by Sellers, constitutes a legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 5.03 No Conflicts**. The execution, delivery, and performance of this Agreement by Buyer and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the articles of organization, operating agreement, or other organizational documents of Buyer, (b) violate or result in a breach of any Law applicable to Buyer, or (c) except as would not reasonably be expected to prevent or materially impair or delay the consummation of the Transaction, violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which Buyer or any of its assets is bound.

**Section 5.04 Sufficiency of Funds**. Buyer has, and at the Closing will have, immediately available funds sufficient to pay the Cash Payment and all other amounts payable by Buyer hereunder and to consummate the Transaction. Buyer is a “good faith” purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.

**Section 5.05 Litigation**. There is no action, suit, claim, investigation, or proceeding pending or, to the knowledge of Buyer, threatened against Buyer that challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction.

**Section 5.06 Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission from Buyer in connection with the Transaction based upon arrangements made by or on behalf of Buyer.

**Section 5.07 No Outside Reliance**. Buyer acknowledges and agrees that (a) Buyer has conducted its own independent investigation, review, and analysis of the business, operations, assets, liabilities, results of operations, financial condition, and prospects of Sellers and the Acquired Assets, which investigation, review, and analysis was performed by Buyer and its Affiliates and representatives, (b) Buyer has been afforded access to the books and records, facilities, equipment, Contracts, and other assets of Sellers that Buyer and its representatives have requested to review, and (c) in entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations and warranties expressly set forth in Article IV (as qualified by the Schedules) and acknowledges that, except as expressly set forth in Article IV, neither Sellers nor any of their Affiliates or representatives makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or representatives.

**Section 5.08 Adequate Assurances Regarding Executory Contracts**. Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

## ARTICLE VI.
## COVENANTS

**Section 6.01 Conduct of Business**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) use commercially reasonable efforts to maintain the Acquired Assets in good working order (ordinary wear and tear excepted), and (b) not take any action that would reasonably be expected to result in a Material Adverse Effect.

**Section 6.02 Access to Information**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) provide Buyer and its representatives with reasonable access during normal business hours, upon reasonable advance notice, to the personnel, properties, books, records, and Contracts relating to the Acquired Assets, and (b) furnish to Buyer such financial, operating, and other data and information relating to the Acquired Assets as Buyer may reasonably request. Notwithstanding the foregoing, Sellers shall not be required to provide access or information to the extent that (i) such access or the provision of such information would violate any Law or binding agreement, (ii) such information is subject to attorney-client privilege or attorney work-product protection, or (iii) such access or the provision of such information would be unreasonably disruptive to the operations of Sellers.

**Section 6.03 Efforts; Consents**. Subject to the terms and conditions of this Agreement, each of the Parties hereto shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable under applicable Law to consummate the Transaction as promptly as practicable, including (i) obtaining all necessary consents, approvals, or authorizations of, and making all filings with and giving all notices to, Governmental Authorities and other third parties, and (ii) obtaining all consents, approvals, or authorizations of third parties necessary for the consummation of the Transaction.

**Section 6.04 Bankruptcy Court Matters.**

(a) **Bid Procedures**. If the Bid Procedures Order provides for an Auction and one or more Qualified Bids are received by Sellers, Sellers shall conduct the Auction in accordance with the Bid Procedures Order.

(b) **Sale Order**. Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court in each of the Bankruptcy Cases as promptly as practicable after the Sale Hearing that shall be satisfactory in all respects to the Buyer and will include, without limitation, that the Acquired Assets shall be sold free and clear of all Encumbrances and any successor liability, including without limitation, the Encumbrances of the Bellotto Parties whose Encumbrances, including equity interests, shall attach to the Sale proceeds. The Sale Order shall, among other things, (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (x) the execution, delivery and performance by Sellers of this Agreement, (y) the sale of the Acquired Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), and (z) the performance by Sellers of their obligations under this Agreement, (ii) authorize and empower Sellers to assume and assign to Buyer the Assumed Contracts, (iii) find that Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, find that Buyer is not a

successor to any Seller, and grant Buyer the protections of section 363(m) of the Bankruptcy Code, (iv) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (v) find that Buyer has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assumed Contracts, (vi) find that Buyer shall have no Liability for any Excluded Liability, (vii) find that the consideration provided by Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets, (viii) find that Buyer and Sellers did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code, (ix) order that, notwithstanding the provisions of the Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry and (x) find that no “bulk sales” or “bulk transfers” laws shall apply to the transactions contemplated hereby. Buyer agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (1) demonstrating that Buyer is a “good faith” purchaser under section 363(m) of the Bankruptcy Code and (2) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

(c) **No Modification or Appeal**. Buyer shall not oppose, and Sellers shall not take any action that is intended to, or that would reasonably be expected to, result in the reversal, modification, or vacatur of the Bid Procedures Order or the Sale Order.

(d) **Defense of Orders**. Each of Sellers and Buyer shall use their commercially reasonable efforts to take such actions as may be reasonably necessary to defend against any objection to the Sale Order or any appeal therefrom.

**Section 6.05 Publicity**. Except as required by applicable Law (including any disclosure required by the Securities and Exchange Commission or other Governmental Authority or any disclosure required in connection with the Bankruptcy Cases), no Party hereto shall issue any press release or make any public announcement relating to this Agreement or the Transaction without the prior written consent of the other Parties hereto (which consent shall not be unreasonably withheld, conditioned, or delayed).

**Section 6.06 Confidentiality**. The Parties acknowledge that certain confidential information has been and may be exchanged in connection with this Agreement. Each Party agrees to keep confidential all information provided by the other Parties in connection with this Agreement that is not otherwise publicly available, and to use such information solely for the purposes of consummating the transactions contemplated hereby, except as required by applicable Law (including any disclosure required in connection with the Bankruptcy Cases).

**Section 6.07 Notification of Certain Matters**. Each Party hereto shall give prompt notice to the other Parties of (a) the occurrence or non-occurrence of any event that has caused or would reasonably be expected to cause any condition to the obligations of any Party to effect the transactions contemplated hereby not to be satisfied, and (b) any action, suit, claim, investigation,

or proceeding commenced or, to the knowledge of such Party, threatened against such Party that relates to the consummation of the Transaction.

**Section 6.08 Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances on the Acquired Assets, including any Encumbrances arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 6.09 Employee Matters**.

(a) Buyer currently intends, but shall not be obligated, to offer employment to substantially all employees necessary for the continued operation of the Camp Business following the Closing. Buyer shall have sole discretion to determine which employees, if any, receive offers of employment, the terms of any such employment, and whether any such offers are accepted. Nothing in this Agreement shall require Buyer to offer employment to any particular employee or class of employees. That notwithstanding, prior to the Closing, Buyer may offer (or cause a designee of Buyer to offer) to employ any or all Current Employees, with employment commencing on the Closing Date. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be referred to as an "Offeree." Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee." At 11:59 pm on the date prior to the Closing Date, the Sellers shall terminate the employment of all of Sellers' Current Employees.

(b) Any employee of a Seller who is not offered employment by Buyer or who declines such employment shall be deemed an "Excluded Employee."

(c) Following the date of this Agreement, Sellers shall provide reasonable cooperation and information to Buyer as reasonably requested by Buyer with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(d) Notwithstanding anything in this Agreement to the contrary and unless otherwise agreed to by Sellers and Buyer, Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers. Sellers shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date. Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect to all Transferred Employees. Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees.

(e) Nothing contained herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall

anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' employee benefit plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

(f) For the avoidance of doubt, Buyer will not seek to have the Yahr Employment Agreement assumed by the Simad Seller and assigned to it and shall not assume any liabilities under such Agreement, whether for the pre-petition or post-petition period, including without limitation, the Equity Appreciation Right and the VCPR (each as defined in the Yahr Employment Agreement), including any liability arising from, triggered by, or becoming due as a result of the transactions contemplated by this Agreement or the Closing.

**Section 6.10 Camp Matters**. From the Effective Date until the Closing Date, Sellers shall (i) operate the Camp Business in substantially the same manner as Sellers have traditionally operated same and in accordance with all governmental requirements and further in accordance with the policies, rules, regulations and standards of the American Camp Association; (ii) use commercially reasonable efforts to (A) maintain existing Campers attending Camp during the 2026 Camp Season, and (B) re-enroll Campers who attended Camp during the 2026 Camp Season for the 2027 Camp Season, except to the extent any of the foregoing would no longer be age-appropriate; (iii) not refuse attendance to any prospective Camper who is willing to pay full Tuition; and (iv) utilize the same techniques and methods to enroll prospective Campers for the 2027 Camp Season, such as guided tours for all prospective Campers and their families who request them, discounts for prospective Campers, if any, promotions and other means traditionally employed by Sellers.

## ARTICLE VII.
## TAX MATTERS

**Section 7.01 Transfer Taxes**. All Transfer Taxes shall be allocated as set forth in Section 2.10. The Party required by applicable Law to file any Tax Return with respect to any Transfer Taxes shall timely file such Tax Return, and the other Parties shall cooperate with such filing Party as reasonably requested.

**Section 7.02 Cooperation on Tax Matters**. After the Closing, Sellers and Buyer agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit, or proceeding relating to any Tax.

**Section 7.03 Periodic Taxes**. For purposes of this Agreement, with respect to any Acquired Asset, the applicable Seller and Buyer shall apportion the liability for real and personal property Taxes, ad valorem Taxes, and similar Taxes (other than Transfer Taxes) ("Periodic Taxes") for Straddle Periods applicable to such Acquired Asset in accordance with this Section 7.03. The Periodic Taxes described in this Section 7.03 shall be apportioned between the applicable

Seller and Buyer as of the Closing Date, with Buyer liable for that portion of the Periodic Taxes for a Straddle Period equal to the Periodic Taxes for such Straddle Period multiplied by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period. The applicable Seller shall be liable for that portion of the Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Pre-Closing Tax Period) equal to the Periodic Taxes for such Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of such Straddle Period ending on (and including) the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period. The Party responsible under applicable Law for paying a Tax described in this Section 7.03 shall be responsible for administering the payment of such Tax.

**Section 7.04 Reimbursement for Taxes**. Sellers, on the one hand, or Buyer on the other hand, as the case may be (the "Reimbursing Party") shall provide reimbursement for any Tax paid by the other, all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Agreement.

## ARTICLE VIII.
## CONDITIONS TO CLOSING

**Section 8.01 Conditions to Obligations of All Parties**. The obligations of each Party hereto to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by both Sellers and Buyer) of each of the following conditions as of the Closing:

(a) *No Injunction*. No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Law or Order that enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(b) *Sale Order*. The Bankruptcy Court shall have entered the Sale Order in each of the Bankruptcy Cases in a form satisfactory to the Buyer in its sole discretion, and the Sale Order shall be a Final Order and shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent.

(c) *Sellers Must be Debtors*. All Sellers must be debtors and debtors-in-possession and all Acquired Assets must be owned by the Sellers and subject to the jurisdiction of the Bankruptcy Court.

**Section 8.02 Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of each of the following additional conditions as of the Closing:

(a) **Representations**. (i) The representations and warranties of Sellers set forth in Section 4.01 (*Organization and Qualification of Sellers*) and Section 4.02 (*Authority of Sellers*) shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date), and (ii) the other representations and warranties of Sellers set forth in Article IV shall be true and correct (without

giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications set forth therein) as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct as of such date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b) **Performance of Covenants**. Sellers shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Sellers under this Agreement at or prior to the Closing.

(c) **No Material Adverse Effect**. Since the date hereof, there shall not have occurred any Material Adverse Effect.

(d) **Closing Deliveries**. Sellers shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.02.

(e) **Bid Procedures Order**. The Bankruptcy Court shall have entered the Bid Procedures Order, and the Bid Procedures Order shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent.

**Section 8.03 Conditions to Obligations of Sellers**. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Sellers) of each of the following additional conditions as of the Closing:

(a) **Representations**. The representations and warranties of Buyer set forth in Article V shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date);

(b) **Performance of Covenants**. Buyer shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Buyer under this Agreement at or prior to the Closing.

(c) **Closing Deliveries**. Buyer shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.03.

## ARTICLE IX.
## TERMINATION

**Section 9.01 Termination**. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a) by the mutual written consent of Buyer and Sellers;

(b) by either Buyer or Sellers, upon written notice to the other Parties, if the Closing shall not have occurred on or before the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.01(b) shall not be available to any Party

whose failure to fulfill any of its obligations hereunder has been the principal cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c) by Buyer, upon written notice to Sellers, if Sellers' representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.02(a) would not be satisfied, or if Sellers shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.02(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Buyer to Sellers;

(d) by Buyer, upon written notice to Sellers, if there shall have occurred a Material Adverse Effect;

(e) by Sellers, upon written notice to Buyer, if any of Buyer's representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.03(a) would not be satisfied, or if Buyer shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.03(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured prior to the Outside Date or is not cured within thirty (30) days after written notice thereof is given by Sellers to Buyer;

(f) by Sellers, upon written notice to Buyer, if, following completion of the Auction, Sellers enter into a definitive agreement with respect to a Qualified Bid that constitutes the Successful Bid under the Bid Procedures;

(g) by either Buyer or Sellers, upon written notice to the other Parties, if any court of competent jurisdiction or other Governmental Authority shall have issued an Order permanently enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable;

(h) by either Buyer or Sellers, upon written notice to the other Parties, if any of the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if a trustee is appointed in any of the Bankruptcy Cases; or

(i) by either Buyer or Sellers, upon written notice to the other Parties, if the Bankruptcy Court shall have entered an Order authorizing Sellers to consummate an Alternative Transaction with a Person other than Buyer.

**Section 9.02 Effect of Termination.**

(a) In the event of termination of this Agreement pursuant to Section 9.01, this Agreement shall become void and of no effect, without any liability or obligation on the part of any Party hereto (or any of their respective Affiliates, officers, directors, employees, agents, or representatives), except that (i) the provisions of Section 2.09(c) (*Return of Deposit*), this Section 9.02 (*Effect of Termination*), Section 9.03 (*Remedies*), and Article X (*Miscellaneous*) shall survive any termination of this Agreement, and (ii) no such termination shall relieve any Party from liability for any willful breach of this Agreement or fraud.

(b) In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated other than (i) by Sellers pursuant to Section 9.01(b) (if termination pursuant to Section 9.01(b) would be unavailable to Buyer) or Section 9.01(e), or (ii) pursuant to Section 9.01(a), then Sellers (jointly and severally) shall pay Buyer by wire transfer of immediately available funds within ten (10) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of its counsel and financial advisor) incurred by Buyer in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement (the "Expense Reimbursement"), which amount shall not exceed $68,000.00. The Expense Reimbursement shall be treated as an administrative expense in the Bankruptcy Cases under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Expense Reimbursement, if payable pursuant to this Section 9.02(b), shall be in addition to the return of the Deposit and payment of the Breakup Fee (as defined below), in each case, to the extent payable to Buyer pursuant to the terms hereof.

(c) In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Sellers shall pay to Buyer a breakup fee in the amount of $204,000.00 (the "Breakup Fee") to an account designated by Buyer in writing to Sellers, in the event that this Agreement is terminated pursuant to Section 9.01(f) or Section 9.01(i) and Sellers consummate an Alternative Transaction. The Breakup Fee shall be due and payable on the first date on which any such Alternative Transaction is consummated and shall be paid from the proceeds of the Alternative Transaction. The Breakup Fee shall be treated as an administrative expense in the Bankruptcy Cases under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Breakup Fee, if payable pursuant to this Section 9.02(c), shall be in addition to the return of the Deposit and payment of the Expense Reimbursement, in each case, to the extent payable to Buyer pursuant to the terms hereof.

(d) Each of the Parties acknowledges and agrees that the agreements contained in this Section 9.02 are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Expense Reimbursement and/or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e) Pursuant to the Bid Procedures Order, the claim of Buyer in respect of the Expense Reimbursement and/or the Breakup Fee is and constitutes an allowed administrative expense claim against Sellers under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Cases.

**Section 9.03 Remedies.**

(a) In the event that this Agreement is terminated by Sellers pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, or in the event that Buyer fails to consummate the Closing when all conditions to Buyer's obligations to close have been satisfied or waived (other

than conditions that by their nature are to be satisfied at the Closing), Sellers' sole and exclusive remedy (except in the case of fraud or willful misconduct) shall be to retain the Deposit as liquidated damages and/or to credit against the outstanding amounts owed under the DIP Facility, with an aggregate limit of ten percent (10%) of the Purchase Price. The Parties acknowledge that the actual damages to Sellers resulting from such breach or failure would be difficult to ascertain, and the Deposit and a credit against the outstanding amounts owed under the DIP Facility up to an aggregate amount of ten percent (10%) of the Purchase Price constitutes a reasonable estimate of such damages.

(b) In the event that this Agreement is terminated other than pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, and Buyer is entitled to the return of the Deposit pursuant to Section 2.09(c), the return of the Deposit shall constitute the sole and exclusive remedy of Buyer against Sellers (except in the case of fraud or willful misconduct) and the Buyer shall retain all rights and remedies under the DIP Facility.

(c) Notwithstanding anything to the contrary herein, in no event shall any Party be liable to any other Party for any punitive, exemplary, special, incidental, consequential, or indirect damages, including lost profits or loss of business opportunity, in connection with this Agreement or the Transaction.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.01 Survival**. The representations, warranties, covenants, and agreements contained in this Agreement shall not survive the Closing and shall terminate at the Closing, except for (a) covenants and agreements that by their terms contemplate performance after the Closing, which shall survive until fully performed, and (b) claims based on fraud or willful misconduct.

**Section 10.02 Notices**. Notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be deemed duly given (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (c) when sent by email (with confirmation of transmission) if sent during normal business hours of the recipient (and if not sent during normal business hours, then on the next Business Day), or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, in each case addressed to the Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 10.02):

| | |
|---|---|
| if to Buyer, then to: | LKQE Associates LLC<br>c/o Kenneth Schainman<br>1098 Greentree Road<br>Blue Bell, PA 19422<br>Email: schainmanken@gmail.com |
| with a copy (which shall not constitute notice) to: | Akerman LLP<br>1251 Avenue of the Americas, 37th Floor<br>New York, New York 10020 |

| | |
|---|---|
| | Attention: Mark Lichtenstein, Esq.<br>Email: Mark.Lichtenstein@akerman.com |
| if to Simad Seller, then to: | Assaf Ravid<br>aravid@circleinv.com |
| with a copy (which shall not constitute notice) to: | Cole Schotz P.C.<br>25 Main Street<br>Hackensack, New Jersey 07601<br>Attention: Roger Iorio, Esq.<br>Email: riorio@coleschotz.com |
| if to Dasmas Seller or Kiwi Seller, then to: | B. Riley Securities, Inc.<br>Attention: Perry M. Mandarino<br>Email: pmandarino@brileysecurities.com |
| with a copy (which shall not constitute notice) to: | Faegre Drinker Biddle & Reath LLP<br>600 Campus Drive<br>Florham Park, NJ 07932<br>Attention: Michael Pompeo<br>Email: michael.pompeo@faegredrinker.com |

**Section 10.03 Interpretation**. When a reference is made in this Agreement to an Article, Section, Exhibit, or Schedule, such reference shall be to an Article, Section, Exhibit, or Schedule of this Agreement unless otherwise indicated. The words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "or" is not exclusive. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

**Section 10.04 Severability**. If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement, and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal, or unenforceable, had never been contained herein.

**Section 10.05 Entire Agreement**. This Agreement, together with all Exhibits and Schedules hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, among the Parties with respect to the subject matter hereof.

**Section 10.06 Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. No Party may assign this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties; provided, however, that Buyer may assign any or all of its rights and

obligations hereunder to any Affiliate of Buyer without the prior consent of Sellers, provided that Buyer shall remain liable for all of its obligations hereunder following any such assignment.

**Section 10.07 Amendment and Waiver**. This Agreement may not be amended except by an instrument in writing signed by Buyer and Sellers. Any Party hereto may (a) extend the time for the performance of any of the obligations or other acts of any other Party, (b) waive any inaccuracies in the representations and warranties of any other Party contained herein or in any document delivered by any other Party pursuant hereto, or (c) waive compliance with any of the agreements of any other Party or conditions to such Party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby. No failure or delay by any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**Section 10.08 Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Sellers and Buyer hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Cases have been closed, the courts of the State of New Jersey. Sellers and Buyer each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT, OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION.

**Section 10.09 Specific Performance**. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, the Parties agree that, prior to the termination of this Agreement, each Party shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court (or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, the state and federal courts located in the State of New Jersey), without proof of actual damages (and each Party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity. The Parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law, or inequitable for any reason.

**Section 10.10 Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.11 No Third-Party Beneficiaries**. Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.12 "As Is, Where Is" Transaction**. Buyer acknowledges that the Acquired Assets are being sold on an "AS IS, WHERE IS" basis, with all faults, and Buyer has relied solely on its own investigation, analysis, and evaluation of the Acquired Assets in making its decision to enter into this Agreement. Buyer further acknowledges that, except for the representations and warranties expressly set forth in Article IV, Sellers have not made, and Sellers hereby expressly disclaim, any representations or warranties of any kind or nature, express or implied, at common law, by statute, or otherwise, relating to the Acquired Assets or the transactions contemplated hereby, and Buyer hereby waives any claims related to the condition of the Acquired Assets or the accuracy or completeness of any information provided or made available to Buyer.

**Section 10.13 No Successor Liability**. Except as expressly provided herein, Buyer does not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability. Buyer is not, and shall not be, a successor to Sellers by reason of any theory of law or equity.

***[Signature Pages Follow]***

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**LKQE ASSOCIATES LLC**

By: ______________________
Name: Kenneth R. Schainman
Title: Authorized Signatory

**SELLERS:**

**Kiwi OperatingCo, LLC**

By: ______________________
Name:
Title:

**Kiwi LandCo, LLC**

By: ______________________
Name:
Title:

**Dasmas LandCo, LLC**

By: ______________________
Name:
Title:

EXHIBIT A

**FORM OF BILL OF SALE**

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, __________________ ("**Sellers**"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to LKQE Associates LLC ("**Buyer**"), all of their rights, title, and interest in and to the Acquired Assets, as such term is defined in the Asset Purchase Agreement, dated as of ____________________ (the "**Purchase Agreement**"), by and among Sellers and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Sellers make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Each Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Sellers will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Sellers have duly executed this Bill of Sale as of _______, 2026.

[SELLERS]

By______________________

Name:

Title:

# SCHEDULES

## SCHEDULE 2.13(a)

## ASSUMED CONTRACT LIST

| Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|
| Bedford Central School District | Program Services Agreement | $0.00 |
| Camp America | Staffing Agency Agreement | $0.00 |
| First Congregational Church of Chappaqua | Rental Agreement | $0.00 |
| Flik Independent School Dining Division | Food & Dining Services Agreement | $0.00 |
| Town of Lewisboro Parks & Recreation Department | Fox Valley Park | $0.00 |
| Dr. Raymond H. Blanch | Transportation & Travel Agreement, KCDC Pickup and Dropoff | $0.00 |

# Exhibit B

**Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |
| In re:<br><br>DAMIS Holdings LLC, *et al.*,[2]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16439 (CMG)<br><br>(Jointly Administered) |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT BETWEEN LKQE ASSOCIATES, LLC, KIWI OPERATINGCO, LLC, KIWI LANDCO, LLC, AND DASMAS LANDCO, LLC, (II) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ASSETS OF KIWI OPERATINGCO, LLC, KIWI LANDCO, LLC, AND DASMAS LANDCO, LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 363(b), AND 363(f), (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365, AND (IV) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through twenty-one (21), is hereby **ORDERED**.

---

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[2] A complete list of the DAMIS Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the DAMIS Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/DAMIS. The location of Debtor DAMIS Holdings LLC's principal place of business and the DAMIS Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

<table>
<tr>
<td>UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY</td>
<td></td>
</tr>
<tr>
<td>Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>COLE SCHOTZ P.C.<br>Michael D. Sirota<br>Warren A. Usatine<br>David M. Bass<br>Felice R. Yudkin<br>Daniel J. Harris<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>dbass@coleschotz.com<br>fyudkin@coleschotz.com<br>dharris@coleschotz.com<br><br>Counsel to the Debtors<br>and Debtors in Possession</td>
<td>FAEGRE DRINKER BIDDLE & REATH LLP<br>Michael P. Pompeo<br>600 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>(973) 549-7000 (Telephone)<br>(973) 360-9831 (Facsimile)<br>michael.pompeo@faegredrinker.com<br><br>and<br><br>Ian J. Bambrick (pro hac vice)<br>Patrick A. Jackson (pro hac vice)<br>Sarah E. Silveira (pro hac vice)<br>222 Delaware Ave. Suite 1410<br>Wilmington, DE 19801<br>(302) 467-4200 (Telephone)<br>(302) 467-4201 (Facsimile)<br>ian.bambrick@faegredrinker.com<br>patrick.jackson@faegredrinker.com<br>sarah.silveira@faegredrinker.com<br><br>and<br><br>HERBERT SMITH FREEHILLS KRAMER (US) LLP<br><br>Adam C. Rogoff (pro hac vice)<br>Megan M. Wasson (pro hac vice)<br>1177 Avenue of the Americas<br>New York, New York 10036<br>(212) 715-9100 (Telephone)<br>(212) 715-8000 (Facsimile)<br>adam.rogoff@hsfkramer.com<br>megan.wasson@hsfkramer.com<br><br>Counsel to the DAMIS Debtors and Debtors in Possession</td>
</tr>
</table>

Upon the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") seeking entry of an order (this "Sale Order"), pursuant to the Bankruptcy Code, Bankruptcy Rules and Local Rules, authorizing and approving the Debtors' entry into and performance under the terms and conditions of that certain asset purchase agreement dated as of September 17, 2026 (the "APA")[3] (together with the schedules and/ or exhibits thereto and all related documents, and as may be amended, supplemented or otherwise modified from time to time after the date hereof), attached hereto as Exhibit A, by and among the Sellers,[4] and LKQE Associates, LLC (together with any of their respective successors and permitted assigns, or designees, collectively, the "Buyer"); and the Court having entered (i) the *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s) (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [SIMAD Docket No. 298] (the "Bidding Procedures Order") and (ii) the *Order (A) Modifying and (B) Applying to DAMIS Holdings, LLC the Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s) (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing*

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA.
[4] As defined in the APA, "Sellers" means Kiwi Operatingco LLC, Kiwi Landco LLC and Dasmas Landco LLC.

*Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [SIMAD Docket No. 1352; DAMIS Docket No. 1400] ("Kiwi Bidding Procedures Order") approving the bidding procedures (the "Bidding Procedures"), and the Court having considered any responses or objections thereto; and the Debtors having identified the Buyer's bid as the Successful Bid for the Purchased Assets following conclusion of the Auction in accordance with the Bidding Procedures, as modified on the record at the Auction, and as set forth in the *Notice of Successful Bidder for Kiwi Operatingco LLC, Kiwi Landco LLC, and DASMAS Landco LLC* [SIMAD Docket No. 1369; DAMIS Docket No. 1474] and the objection deadline of October 23, 2026 having expired; and the Court having held a hearing (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing, establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A. Jurisdiction and Venue. This Court has jurisdiction over the Debtors' chapter 11 cases, including this matter, pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference of the United States District Court for the District of New Jersey. This is a core

proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B. Statutory Predicates. The statutory predicates for the relief sought herein are Sections 105(a), 363(b), 363(f), 363(m), and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of the United States Bankruptcy Court for the District of New Jersey.

C. Notice. Proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Notice, the APA, and the Sale Hearing was provided to all parties entitled to notice in accordance with the Bidding Procedures Order, the Kiwi Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including (i) counsel to the Buyer, Akerman LLP, (ii) the Office of the United States Trustee for the District of New Jersey, (iii) the Official Committee of Unsecured Creditors in each of the Debtors' cases (the "Committees"), (iv) all creditors and parties in interest in these chapter 11 cases, (v) all parties asserting liens on the Acquired Assets, (vi) all non-debtor counterparties to the Assumed Contracts, and (vii) all applicable governmental authorities. No further or other notice of the Sale Notice, the APA, or the Sale Hearing is or shall be required.

D. Title to Assets. The Acquired Assets constitute property of the Sellers' estates, and the Sellers are the sole and lawful owners of the Acquired Assets and hold good, valid, and marketable title thereto (subject to Permitted Encumbrances). The sale, transfer, and conveyance of the Acquired Assets to Buyer will be a legal, valid, and effective sale, transfer, and conveyance of the Acquired Assets and will vest the Buyer with all right, title, and interest of the Sellers in and to the Acquired Assets free and clear of all Encumbrances (as defined below), except for Permitted Encumbrances. Except as expressly provided for in this Sale Order and the APA, Buyer shall have no liability for any claims against or liabilities of the Debtors or their estates.

E. Sound Business Purpose. The Debtors have demonstrated a sound business purpose and compelling justification for consummating the sale of the Acquired Assets (as defined in the APA) to the Buyer under 11 U.S.C. § 363(b). The Buyer is willing to acquire the property for the Purchase Price of: (a) $8,928,000 in cash after the Breakup Fee in the amount of $204,000 and the Expense Reimbursement in the amount of $68,0000 in the aggregate sum of $272,000 (collectively, the "Bid Protections") that was explicitly part of, and included in, its $9,200,000 winning bid is credited against the Purchase Price at the Closing; (b) the Cure Amounts; and (c) the assumption of Assumed Liabilities. The Debtors' decision to sell the Acquired Assets outside a plan of reorganization pursuant to the procedures approved in the Bidding Procedures Order, as modified by the Kiwi Bidding Procedures Order as modified on the record of the Auction, was an exercise

of the Debtors' sound business judgment, is in the best interests of the Debtors, their estates, their creditors, and all parties in interest, and should be approved.

F. Adequate Consideration; Cash, Cure Amounts, and Assumed Liabilities. The consideration provided by the Buyer for the Acquired Assets constitutes fair and adequate consideration. The Purchase Price consists of (a) $8,928,000 in cash after the Bid Protections that was explicitly part of, and included in, its $9,200,000 winning bid is credited against the Purchase Price at the Closing ; (b) the Cure Amounts; and (c) the assumption of Assumed Liabilities.

G. Arm's Length Transaction; Good Faith Purchaser. The APA was negotiated, proposed, and entered into by the Sellers and the Buyer without collusion, in good faith, and from arm's length bargaining positions. Neither the Buyer nor any of its Affiliates (as defined in the APA) are insiders of the Debtors as that term is defined in 11 U.S.C. § 101(31). The Buyer is a good faith purchaser of the Acquired Assets within the meaning of 11 U.S.C. § 363(m) and is entitled to all of the protections afforded thereby. The Buyer has not engaged in any conduct that would prevent the application of 11 U.S.C. § 363(m). The APA was not entered into for the purpose of hindering, delaying, or defrauding any creditor of the Debtors. The Buyer would not have entered into the APA or agreed to consummate the Transaction but for the free and clear, no successor liability, and injunctive provisions of this Order, which constitute a material inducement to and condition of the Buyer's performance.

H. Corporate Authority. Each of the Sellers has full requisite corporate or other organizational power and authority to execute and deliver the APA and all other documents related thereto, and to perform all of their respective obligations thereunder. No consents or approvals, other than as expressly provided for in the APA, and the entry of this Order, are required by the Sellers to consummate the Transaction.

I. Free and Clear. The Sellers are the rightful owner of the Acquired Assets. The Acquired Assets shall be transferred to the Buyer free and clear of all liens, claims, interests, and encumbrances of any kind or nature whatsoever (collectively, "Encumbrances"), other than Permitted Encumbrances and Assumed Liabilities as set forth in the APA, pursuant to 11 U.S.C. § 363(f), because in each case one or more of the conditions set forth in 11 U.S.C. § 363(f)(1) through (5) have been satisfied with respect to each such Encumbrance. All holders of Encumbrances who did not object to the sale are deemed to have consented to the sale pursuant to § 363(f)(2). All Encumbrances shall attach to the proceeds of the sale with the same validity, extent, and priority as existed immediately prior to the sale.

J. Sale Process; Consultation. The Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures Order as modified by the Kiwi Bidding Procedures Order), and the Committees in each of the Debtors' cases, conducted a marketing and sale process for the Acquired Assets in accordance with the Bidding Procedures Order. Accordingly, the

Buyer's bid, as reflected in the APA, constitutes the highest or otherwise best offer for the Acquired Assets.

K. No Successor Liability. The Buyer is not a successor to the Sellers or their estates by reason of any theory of law or equity, including de facto merger, mere continuation, continuity of enterprise, or theories of similar effect, and shall not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of the APA or the consummation of the transactions contemplated thereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability (as defined in the APA).

L. Assumption and Assignment of Contracts. The assumption and assignment of the Assumed Contracts (as defined in the APA) to the Buyer pursuant to Section 365 of the Bankruptcy Code is integral to the APA, is in the best interests of the Debtors, their estates, and their creditors, and represents a valid and proper exercise of the Debtors' business judgment. The Buyer has demonstrated adequate assurance of future performance under the Assumed Contracts within the meaning of 11 U.S.C. §§ 365(b)(1) and 365(f)(2). The Cure Amounts, as determined by the Bankruptcy Court and to be paid by the Buyer in connection with the Closing, are sufficient to satisfy all monetary defaults required to be cured under 11 U.S.C. § 365(b)(1)(A).

M. Bulk Transfer Laws. No bulk sales or bulk transfer laws of any jurisdiction apply to the Transaction. The Sellers' non-compliance with any such laws in connection with the

Transaction shall not subject the Buyer to any liability, and the transfer of the Acquired Assets shall be free and clear of any Encumbrances arising out of or related to any bulk sale or bulk transfer laws.

N. Sale Procedures. The Transaction was conducted in accordance with the Sale Procedures approved under the Bidding Procedures Order and the Kiwi Bidding Procedures Order [SIMAD Docket Nos. 298 & 1352; DAMIS Docket No. 1400]. The Sale Notice was duly filed on October 21, 2026, and the notice and objection period was completed in full compliance with the requirements of the Bidding Procedures Order and the Kiwi Bidding Procedures Order as modified on the record at the Auction.

O. Legal Authority. The legal requirements for approval of the sale have been satisfied. The sale is authorized pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f), and 365.

P. Final Order; Waiver of Stay. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Good cause has been shown for waiver of the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d). The Transaction should be consummated promptly to preserve the going-concern value of the Kiwi Assets. Immediate effectiveness of this Order is warranted.

**IT IS HEREBY ORDERED THAT:**

1. Approval of the APA and the Transaction. The APA, including all exhibits, schedules, and ancillary documents thereto, and the transaction contemplated thereby (the "Transaction"), are hereby approved in their entirety pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f), and 365. The consideration to be provided for the Acquired Assets is fair and reasonable and shall be deemed for all purposes to constitute value under the Bankruptcy Code or any other applicable law. The Debtors and Sellers are authorized and directed to perform under, consummate, and implement the terms of the APA together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and consummate the Transaction. This Order is in form and substance reasonably acceptable to the Buyer as required under the APA.

2. Objections. Any and all objections to the entry of this Order and approval of the Transaction that have not been withdrawn, waived, or resolved prior to the Sale Hearing are hereby denied and overruled on the merits with prejudice.

3. Transfer Free and Clear. Pursuant to 11 U.S.C. §§ 363(b), and 363(f), the Sellers' sale, assignment, transfer, conveyance, and delivery of the Acquired Assets to the Buyer (or its designee), and the Buyer's acquisition of the Acquired Assets from Sellers pursuant to the APA and this Sale Order shall be free and clear of all Encumbrances of any kind or nature whatsoever, other than Permitted Encumbrances and Assumed Liabilities. All such Encumbrances

(other than Permitted Encumbrances) shall attach to the proceeds of the sale with the same validity, extent, and priority as existed immediately prior to the sale. To the extent any junior lienholder asserts an interest in the Acquired Assets, such interest is extinguished upon entry of this Sale Order.

4. Good Faith Finding; Section 363(m) Protections. The Buyer is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and is entitled to all of the protections afforded thereby. The reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the sale to the Buyer unless such authorization is duly stayed pending such appeal. The Buyer has acted in good faith in all respects in connection with this proceeding. Neither the Sellers nor the Buyer has engaged in any action or inaction that would cause or permit the sale to be avoided, or costs or damages to be imposed, under 11 U.S.C. § 363(n). The Purchase Price was determined through an open, competitive Auction conducted in accordance with the Bidding Procedures, including as modified on the record at the Auction, and represents the highest or otherwise best offer received for the Acquired Assets.

5. No Buyer Liability for Sale Process. Except as expressly provided in the APA or this Order, neither the Buyer nor its respective affiliates, successors, assigns, equity holders, officers, directors, employees, or professionals shall have or incur any liability to, or be subject to any action by, the Sellers or their estates, predecessors, successors, or assigns, arising out of the

negotiation, investigation, preparation, execution, or delivery of the APA or the entry into and consummation of the sale of the Acquired Assets.

6. No Successor Liability. Except as expressly provided in the APA, the Buyer does not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of the APA or the consummation of the transactions contemplated thereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability (as defined in the APA). The Buyer is not, and shall not be, a successor to the Sellers by reason of any theory of law or equity, including de facto merger, mere continuation, continuity of enterprise, or theories of similar effect.

7. Assumption and Assignment of Assumed Contracts/Designation Rights of Buyer to have Contracts Rejected. Pursuant to 11 U.S.C. §§ 365(a), 365(b), and 365(f), the Sellers are authorized and directed to assume and assign to the Buyer, and the Buyer is authorized to accept the assignment of, the Assumed Contracts, effective as of the Closing. The Buyer has provided adequate assurance of future performance under the Assumed Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B). Anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption and assignment of such contracts and do not constitute a breach or default thereunder. The assignment of the Assumed Contracts to Buyer is subject in all respects to the Buyer's payment of Cure Costs as set forth in paragraph 9, below,

regardless of whether any Assumed Contract is so designated prior to or after Closing, *provided however*, that such assignment shall only be permitted so long as the designation occurs within the contract designation period as set forth in the APA. The assignment of the Assumed Contracts to Buyer shall not constitute a default or breach under any Assumed Contract, and no consent or approval of any Person is required for the assumption and assignment of any Assumed Contract. The Buyer's contract designation period under the APA may be extended by the Buyer in its discretion as provided therein. The Buyer also is authorized to have certain Contracts rejected by any Seller as more fully set forth in Section 2.13(a) of the APA.

8. Permits. To the maximum extent permitted by law, the Assumed Permits (as defined in the APA) shall be transferred to and vested in the Buyer as of the Closing. All governmental units are directed to transfer, reissue, or recognize the Assumed Permits in the name of the applicable Buyer without further order, and are prohibited from denying, revoking, suspending, conditioning, or refusing to renew any Assumed Permit on account of the commencement of these chapter 11 cases, any Seller's insolvency, any unpaid pre-Closing obligation, or the consummation of the Transaction, consistent with 11 U.S.C. § 525. Pending such transfer or reissuance, the Buyer is authorized to operate under the Assumed Permits.

9. Cure Amounts. The Cure Amounts set forth on Schedule 2.13(a) to the APA, or as otherwise determined by the Court, represent all amounts that must be paid to cure all defaults under

the Assumed Contracts pursuant to 11 U.S.C. § 365(b)(1). Upon payment by the Buyer of the Cure Amounts at Closing, all defaults under the Assumed Contracts, whether monetary or non-monetary (including any default under a provision restricting a change of control or ownership or any anti-assignment provision), shall be deemed cured, and non-debtor counterparties shall be forever barred from asserting any claim or cause of action against the Buyer arising from any pre-Closing default under the Assumed Contracts.

10. Unresolved Cure and Assignment Objections. The Sellers' assumption of the Assumed Contracts is subject to consummation of the Transaction and the payment of Cure Costs by the Buyer. To the extent that an objection by a counterparty to any Assumed Contract, including any objection relating to the applicable Cure Amount, is not resolved prior to the Closing Date, the Sellers, with the consent of the Buyer and in accordance with the APA, may elect to (a) not assume and assign such Assumed Contract to the Buyer; (b) postpone the assumption and assignment of such Assumed Contract until resolution of such objection, without delaying the closing of the Transaction; (c) if the objection relates solely to the amount of the Cure Amount, pay the undisputed portion of the applicable Cure Amount to the counterparty on the Closing Date, reserve and place in escrow the disputed portion, and assume and assign such Assumed Contract on the Closing Date; or (d) proceed with the assumption and assignment on such terms as are otherwise mutually agreeable to the applicable counterparty, the Sellers, and the Buyer.

11. Payment of Secured Obligations. The Debtors are authorized to pay in full the secured obligations (the "Obligations") of The Bank of Greene County ("Bank of Greene") and Beacon Bank & Trust, successor by merger to PCSB Bank f/k/a Putnam County Savings Bank ("Beacon") with respect to the Acquired Assets from the proceeds of the Transaction upon Closing pursuant to a pay-off letter agreed by the Debtors and, respectively, Beacon and Bank of Greene, whereupon all liens, claims and interests of Bank of Greene and Beacon against the respective Debtors shall be deemed discharged, released and satisfied in full. The Obligations of the Bank of Greene shall be paid solely from the DAMIS Distribution (as defined in the APA). The Obligations of Beacon (the "Beacon Obligations") shall be paid in accordance with the allocation of Proceeds set forth in the APA such that 35% of the Beacon Obligations shall be paid from the DAMIS Distribution and 65% of the Beacon Obligations shall be paid from the Simad Distribution (as defined in the APA).

12. No Bulk Sales Law. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Transaction.

13. No Brokers' or Finders' Fees. Except as otherwise provided in the APA, no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the APA or the transactions contemplated thereby for which the Buyer is or will become liable.

14. Buyer Designation Right. The Buyer is authorized to assign its rights under the APA and this Order to any affiliate of the Buyer (each, a "Designee") without further order of this Court and without the consent of the Sellers; *provided* that the Buyer shall remain liable for all of its obligations thereunder following any such assignment. Any such Designee shall be deemed a good faith purchaser entitled to all of the protections of 11 U.S.C. § 363(m) and this Order.

15. Injunction. All Persons (as defined in 11 U.S.C. § 101(41)) are forever prohibited and enjoined from taking any action against the Buyer (or its Designee), its successors, assigns, affiliates, members, managers, officers, employees, properties, or the Acquired Assets to recover any claim, Encumbrance, or other interest that such Person had or may have had with respect to the Debtors, including, without limitation, the Sellers, or the Acquired Assets that is extinguished or otherwise discharged by this Sale Order or otherwise excluded pursuant to the APA and this Sale Order, except as expressly permitted by this Sale Order or the APA.

16. Direction to Third Parties. All entities that are presently, or on the Closing Date may be, in possession of any of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the applicable Buyer on the Closing Date. On the Closing Date, the Sellers' creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release their Encumbrances on the Acquired Assets, if any, as such Encumbrances

may have been recorded or may otherwise exist. The Sellers shall cooperate with the Buyer following the Closing Date with respect to transition matters.

17. Self-Executing. The provisions of this Sale Order authorizing the sale and transfer of the Acquired Assets free and clear of all Encumbrances shall be self-executing, and neither the Sellers nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order. Without limiting the effect of the foregoing, if any Person or entity that has filed financing statements, mortgages, mechanics' liens, lis pendens, or other documents evidencing any Encumbrance against the Acquired Assets shall not have delivered to the Buyer at or before Closing, in proper form for filing, termination statements, releases, or instruments of satisfaction, then (i) the Buyer is authorized to execute and file such termination statements, releases, or instruments of satisfaction on behalf of such Person, and (ii) a certified copy of this Sale Order may be filed with any recording office as conclusive evidence of the release of all such Encumbrances.

18. Recording. This Sale Order shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of

law, the duties of their office, or otherwise, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets. A certified copy of this Sale Order may be filed with the appropriate clerk or recording office and shall constitute conclusive evidence of the free and clear transfer of the Acquired Assets to the Buyer.

19. Waiver of Stay. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall be effective and enforceable immediately upon entry, and the 14-day stays imposed by such rules are hereby waived. The Sellers and the Buyer are authorized to close the Transactions immediately upon satisfaction or waiver of the conditions to closing set forth in the APA, but in no event later than the Outside Date of the APA.

20. Binding Effect. This Sale Order shall be binding upon (a) the Debtors and Sellers, (b) all creditors of the Debtors and Sellers, (c) holders of Encumbrances on the Acquired Assets, (d) all non-debtor counterparties to the Assumed Contracts, and (e) all other parties in interest and their respective successors and assigns, whether or not such parties were served with notice of the Sale Hearing, and (f) any trustees, examiners, or other fiduciaries subsequently appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 of any Debtor’s case. This Sale Order shall inure to the benefit of the Buyer and its successors, assigns, and Designees.

21. Survival. The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any chapter 11 plan in these cases, (b) converting these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing these chapter 11 cases, or (d) pursuant to which this Court abstains from hearing these cases. The terms of this Sale Order shall continue in full force and effect notwithstanding any such subsequent order.

22. No Releases. Notwithstanding anything contained in this Sale Order or the APA to the contrary, nothing contained in this Sale Order or the APA shall constitute a waiver or release, or otherwise impair, any claims or causes of action that the any of the Debtors may have against any other Debtor or any affiliate of any Debtor, or any insider, officer, director, employee, shareholder, or member of any Debtor.

23. Conflicts. To the extent that any provision of this Sale Order conflicts with any provision of the APA, the terms of this Sale Order shall govern and control. To the extent that there is any inconsistency between this Sale Order and any other order entered in these chapter 11 cases, the terms of this Sale Order shall govern.

24. Retention of Jurisdiction. This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of this Sale Order and the APA (including any injunction hereunder), including all amendments thereto and any waivers and consents thereunder, (b) resolve

any disputes arising in connection with this Sale Order, the APA, or the Transaction, (c) interpret, implement, and enforce the provisions of this Sale Order, (d) adjudicate any claims or disputes regarding the Cure Amounts, (e) protect the Buyer and its successors, assigns, and Designees against any Encumbrances in accordance with this Sale Order, and (f) enter such further orders as may be necessary or appropriate to implement or effectuate the provisions of this Sale Order.