**JACOBS P.C.**
Adam Sherman
Leo Jacobs (admitted pro hac vice)
Wayne Greenwald (admitted pro hac vice)
Aaron Slavutin (admitted pro hac vice)
717 Fifth Avenue, Floor 17
New York, New York 10022
Telephone: (212) 229-0476
adam@jacobspc.com
leo@jacobspc.com
wayne@jacobspc.com
aaron@jacobspc.com
*Counsel to OrcaFunding LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| | |
|---|---|
| In re:<br><br>DAMIS HOLDINGS LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16439 (CMG)<br><br>(Jointly Administered) |

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[2]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

# RESPONSE OF ORCAFUNDING LLC TO THE JOINDER AND SUPPLEMENTAL MEMORANDUM OF THE DAMIS DEBTORS, AND FURTHER MEMORANDUM IN SUPPORT OF A DETERMINATION THAT THE ORCAFUNDING SALE OF FUTURE RECEIPTS AGREEMENTS ARE SALES, NOT LOANS

[1] A complete list of the DAMIS Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the DAMIS Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/DAMIS. The location of DAMIS Holdings LLC's principal place of business and the DAMIS Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[2] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 3

A. The Briefing and the September 29 Hearing ........ 3

B. The Joinder and the Court's October 23 Direction ........ 4

ARGUMENT ........ 5

I. THE JOINDER'S THREE SUPPLEMENTAL ARGUMENTS DO NOT WITHSTAND SCRUTINY ........ 5

A. The Early Delivery Schedule Is a Discount for Early Delivery, Not a Charge for the Use of Money ........ 5

B. The Risk OrcaFunding Bore Is the Risk New York Law Looks To, and It Materialized ........ 7

C. The ACH Authorization and Section 14(a) Confirm a Sale ........ 12

D. The Joinder's Reservation of Rights Undercuts the Relief It Seeks ........ 15

II. MATTERS LEFT OPEN AT THE HEARING ........ 15

A. What OrcaFunding Bought, and Why the Sellers Kept the Rest ........ 16

B. Section 4 Is a Reconciliation ........ 16

C. Addendum Section 5.1(e), Agreement Section 15, and the "Facade" Argument ........ 18

D. The Arithmetic of Thirty-Two Weeks ........ 19

E. *Apollo Funding* Is a Merits Holding, Not a Preservation Rule ........ 20

F. The Proofs of Claim, the Schedules, and the Financing Statements ........ 22

G. *M Design Village* and Legal Impossibility ........ 24

H. Clarifications of the Record ........ 25

III. ANTICIPATED REPLIES ........ 26

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Cases**

*Apollo Funding Co. v. Dave Reilly Constr., LLC*, 241 A.D.3d 1508 (2d Dep't 2025).......... passim

*Crosby Marine Transp., LLC v. Meged Funding Grp. (In re Crosby Marine Transp., LLC)*, No. 26-10678, 2026 WL 1765197 (Bankr. E.D. La. June 17, 2026) ............................20, 21

*Diesel Funding, LLC v. Build Retail, Inc.*, 257 N.Y.S.3d 687 (2d Dep't 2026)............................21

*Fireman's Fund Ins. Cos. v. Grover (In re Woodson Co.)*, 813 F.2d 266 (9th Cir. 1987)......5, 8, 9

*Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-cv-5120 (LJL), 2022 WL 1997207 (S.D.N.Y. June 6, 2022), *aff'd sub nom. Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885-cv, 2023 WL 3882697 (2d Cir. June 8, 2023)......................8, 13, 16

*In re Greenwich Retail Grp. LLC*, 677 B.R. 473 (Bankr. S.D.N.Y. 2026).............................11, 21

*Guttman v. EBF Holdings, LLC (In re Global Energy Servs., LLC)*, No. 21-17305-NVA, 2025 WL 1012721 (Bankr. D. Md. Mar. 31, 2025)................................................8, 14, 17, 20, 23

*In re IVF Orlando, Inc.*, No. 24-05475 (TPG), 2025 WL 2831400 (Bankr. M.D. Fla. Oct. 3, 2025)..........................................................................................25

*Kim Eng'g, Inc. v. United First, LLC*, Adv. Pro. No. 25-00287 (Bankr. D. Md. Feb. 23, 2026) ..........................................................................................................8, 17, 20

*Lange v. Inova Cap. Funding, LLC (In re Qualia Clinical Serv., Inc.)*, 441 B.R. 325 (B.A.P. 8th Cir. 2011).........................................................................................5, 8, 9

*Lateral Recovery LLC v. Queen Funding, LLC*, No. 21 Civ. 9607 (LGS), 2022 WL 2829913 (S.D.N.Y. July 20, 2022) ..........................................................................20, 21

*LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664 (2d Dep't 2020) ..........................................................................................3, 7, 17, 20, 23

*M Design Vill. LLC v. Versant Funding LLC (In re M Design Vill.)*, No. 24-21406 (MEH), 2025 WL 2088887 (Bankr. D.N.J. July 24, 2025) ..............................................24, 25, 28

*Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538 (3d Cir. 1979)..........5, 8, 9, 10

*Nickey Gregory Co. v. AgriCap, LLC*, 597 F.3d 591 (4th Cir. 2010)....................................5, 8, 9

*O'Toole v. Radium2 Cap. LLC (In re J.P.R. Mech., Inc.)*, No. 19-23480 (DSJ), 2025 WL 1550541 (Bankr. S.D.N.Y. May 29, 2025)......................................................... passim

*Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752 (2d Dep't 2022) .......................7, 8, 16, 17, 20

*Rowan Advance Grp. LLC v. DraftPros, LLC*, No. EC2025-38978, 2025 WL 2858612 (N.Y. Sup. Ct. Wash. Cnty. Oct. 7, 2025) ......................................................................19

*In re Sackman Mortg. Corp.*, 158 B.R. 926 (Bankr. S.D.N.Y. 1993)....................................4, 8, 9

*Surfside Cap. v. Rodgers*, 87 Misc. 3d 1258(A) (Sup. Ct. Kings Cnty. 2025) ............................21

*Togut v. eProdigy Fin., LLC (In re Kossoff PLLC)*, No. 21-10699 (DSJ), 2026 WL 2168916 (Bankr. S.D.N.Y. July 27, 2026) ......................................................... passim

**Statutes and Rules**

N.Y. U.C.C. § 1-201(b)(35)........................................................................................25

N.Y. U.C.C. § 9-102(a)(2) ........................................................................................13

N.Y. U.C.C. § 9-102(a)(73)(D)..............................................................................13, 28

N.Y. U.C.C. § 9-109(a)(1) ........................................................................................13

N.Y. U.C.C. § 9-109(a)(3) ...............................................................................13, 24, 25, 28

N.Y. U.C.C. § 9-109 cmt. 4 ......................................................................................13, 28

N.Y. U.C.C. § 9-203 ..................................................................................................25

N.Y. U.C.C. § 9-204(a)...............................................................................................25

N.Y. U.C.C. § 9-310(a)...............................................................................................24

N.Y. U.C.C. § 9-318(a)...........................................................................................13, 25

N.Y. U.C.C. § 9-406 .......... 14

11 U.S.C. § 541 .......... 15, 29

11 U.S.C. § 547(b)(1) .......... 23

Fed. R. Bankr. P. 3003(c)(2) .......... 22

## PRELIMINARY STATEMENT

1. OrcaFunding LLC ("OrcaFunding") submits this response to the Joinder of the DAMIS Debtors [SIMAD Docket No. 1362; DAMIS Docket No. 1416] (the "Joinder").[3] The Court invited the DAMIS Debtors to state their position on the Characterization Dispute. They have done so, and OrcaFunding does not quarrel with their right to be heard. But the Joinder is not a statement of position. It is a seventeen-page supplemental brief filed three weeks after the evidentiary record closed, raising three arguments that no party made in the briefing or at the hearing and citing several authorities that no party cited. OrcaFunding responds to those arguments here, and takes this opportunity to address matters the Court raised at the hearing that warrant a fuller answer.

2. The Joinder's three supplemental arguments fail on the text of the OrcaFunding Agreements, including their Addenda, and on the record. The Early Delivery Schedule is a discount for early delivery of a Purchased Amount that is fixed on day one and can only go down; a charge for the use of money only goes up. The "enterprise risk" argument asks the Court to hold that the risk New York law's own third factor asks about — whether the funder has recourse if the merchant goes bankrupt — is not a buyer's risk at all; the argument proves too much, and it proves nothing on a record in which that risk materialized and currently is costing OrcaFunding more than $2.5 million. And the power-of-attorney argument attacks a provision in a manner that is not clearly supported by any case law applying New York law, while ignoring Section 14(a), which gives OrcaFunding the one collection right that courts applying such law have found missing when finding MCAs constitute disguised loans.

3. On the matters left open at the hearing, the answers are in the record:

[3] Capitalized terms used but not defined herein have the definitions set forth in the Joinder.

- The Sellers kept the proceeds above the Periodic Amount because they still owned them; OrcaFunding bought the Specified Percentage, not the business.
- Section 4[4] is a reconciliation because it measures actual revenue for a Review Period against what was remitted and compels a reduction on any Excess going forward. Neither the SIMAD nor DAMIS Debtors have cited a case applying New York law that has required that a reconciliation provision refund past collections as a condition of a genuine reconciliation, the refund language the SIMAD Debtors quote comes from *J.P.R. Mechanical* and *Kossoff*, neither of which was reviewing a mandatory, any-time adjustment like Section 4(d).
- Addenda Section 5.1(e) does not make the Section 6 carve-out a facade, because every remedy 5.1(e) provides still reaches only receipts, and because the SIMAD Debtors' own brief concedes the Sellers were still paying amounts owed to OrcaFunding on the eve of the petition.
- The arithmetic of thirty-two weeks is the arithmetic of every merchant cash advance agreement, because every such agreement states a purchased amount and an initial periodic amount. The courts that found a "finite term" in that arithmetic principally did so where the funder could hold the periodic amount constant at will due to, inter alia, a non-mandatory reconciliation provision. The arithmetic is an expectation, and an expectation that Section 4(d) requires OrcaFunding to revise downward whenever receipts fall is not a term.

[4] "Section" references are to the Agreements. When a reference is to a section in the Addenda, it will so indicate, "Addenda Section."

- *Apollo Funding* is a summary judgment reversal, not a preservation rule.
- And the proofs of claim were filed on the bar date, as unsecured claims, with a reservation of rights, after this Court overruled OrcaFunding's DIP objections and set the characterization question for a later hearing.

4. The Joinder's novel theories do not move the analysis. The question under New York law is whether OrcaFunding was "absolutely entitled to repayment under all circumstances," *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665 (2d Dept. 2020), and the three factors the Second Department uses to answer it come out the same way, whether the Court reads the Agreements as the SIMAD Debtors did or as the DAMIS Debtors do now. Reconciliation is mandatory in the Sellers' favor and available at any time. No term is stated and none can be fixed, because the payment must fall when revenue falls pursuant to the reconciliation provision. Bankruptcy is not a default, the guaranty is one of performance not payment, and every remedy on breach reaches only receipts. The SIMAD Debtors concede that the Agreements "appear to be true sales" on all three factors. SIMAD Mem. at 16. Nothing in the Joinder — not a prepayment discount, not the relabeling of bankruptcy risk as "enterprise risk," not a power of attorney no court has required — changes that. What the record adds is the one fact no label can: OrcaFunding paid $2,940,000 for receipts and has received $387,500. For the rest it can look only to receipts. That is not a lender's position. It is a buyer's.

## BACKGROUND

### A. The Briefing and the September 29 Hearing

5. The procedural history through the Scheduling Order [SIMAD Docket No. 932] is set out in OrcaFunding's opening memorandum [SIMAD Docket No. 1092] (the "OrcaFunding Memorandum" or "Orca Mem.") at ¶¶ 7–19 and is not repeated here. Under the Scheduling Order,

OrcaFunding filed the Orca Mem. and the Declaration of Yaakov Weiser on September 10, 2026, and a Supplemental Declaration of Mr. Weiser on September 22, 2026 [SIMAD Docket No. 1177] (the "Weiser Supp. Decl."). The SIMAD Debtors filed their memorandum and opposition on September 17, 2026 [SIMAD Docket No. 1156] (the "SIMAD Memorandum" or "SIMAD Mem."). Mishmeret Trust Company Ltd. and Bank of New Hampshire filed joinders [SIMAD Docket Nos. 1162, 1188]. The Scheduling Order provided no reply brief for OrcaFunding. Orca Mem. ¶ 38 n.7.

6. The Court held the evidentiary hearing on September 29, 2026 (the "Hearing"; citations are to the transcript, "Tr."). All exhibits and the Joint Stipulation of Undisputed Facts [SIMAD Docket No. 1062] ("Stip.") were admitted. Tr. 27:8–23. Mr. Weiser was the only witness; the SIMAD Debtors called none, resting on the documents. Tr. 26:13–15. The record closed. Tr. 77:8–10.

7. During Mr. Weiser's direct examination, the Court observed that several of the entities listed on Exhibit A to the April Agreement are DAMIS Debtors and stated that it would "need to hear from DAMIS, too." Tr. 36:2–11. At the close of the Hearing, the Court accordingly directed that a notice be placed on the DAMIS docket and that it include "some dates [] as to when DAMIS will respond." Tr. 146:8–11.

**B. The Joinder and the Court's October 23 Direction**

8. The SIMAD Debtors and OrcaFunding conferred regarding the Notice of Briefing, which was filed on the DAMIS docket on October 2, 2026 [DAMIS Docket No. 1333]. On October 19, 2026, the DAMIS Debtors filed the Joinder. It adopts the SIMAD Memorandum and the Mishmeret and Bank of New Hampshire joinders in their entirety, Joinder ¶¶ 2, 16, and then advances three "supplemental arguments, together with additional authority not previously cited

by the SIMAD Debtors," *id.* ¶ 3. It cites several authorities that no party had cited: *In re Sackman Mortgage Corp.*, 158 B.R. 926 (Bankr. S.D.N.Y. 1993); *Nickey Gregory Co. v. AgriCap, LLC*, 597 F.3d 591 (4th Cir. 2010); *In re Woodson Co.*, 813 F.2d 266 (9th Cir. 1987); *In re Qualia Clinical Service, Inc.*, 441 B.R. 325 (B.A.P. 8th Cir. 2011); and *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538 (3d Cir. 1979). Joinder ¶¶ 21, 24 n.6. It also relies on the Early Delivery Schedule and the ACH Authorization, neither of which the SIMAD Memorandum discussed. *Id.* ¶¶ 18–19, 25.

9. The Joinder asks for relief that the SIMAD Debtors did not request: a determination "that any accounts OrcaFunding claims to have purchased . . . are property of the applicable debtors' estates under section 541," *id.* at 16, while reserving the DAMIS Debtors' right "to contest whether any DAMIS Debtor is validly bound by the OrcaFunding Agreements," *id.* ¶ 31.

10. By email dated October 23, 2026, chambers advised the parties that the SIMAD Debtors and the DAMIS Debtors may each reply to this response. OrcaFunding addresses the replies it anticipates in Point III below, and respectfully requests that any reply be confined to matters raised in this response.

## ARGUMENT

### I. THE JOINDER'S THREE SUPPLEMENTAL ARGUMENTS DO NOT WITHSTAND SCRUTINY

#### A. The Early Delivery Schedule Is a Discount for Early Delivery, Not a Charge for the Use of Money

11. The Joinder's lead argument is that the Early Delivery Schedule "confirms that OrcaFunding extended credit," because "[t]he amount required to discharge the Sellers' obligations . . . rises with the passage of time." Joinder ¶¶ 18.

12. The premise is wrong. The amount required to discharge the Sellers' obligations is the Purchased Amount, and it never rises. It is $1,400,000 under the April Agreement and $4,000,000 under the May Agreement whether delivered in week ten or week fifty. Stip. ¶¶ 2–3. Addendum Section 6.2 confirms that the Purchased Amount is "the maximum amount [OrcaFunding] is entitled to receive from Sellers and/or Guarantors." Orca Mem. ¶ 54. The Purchased Amount is the ceiling, and it is fixed on day one, as the price of any asset is fixed when the asset is bought. The Early Delivery Schedule does not raise that ceiling. It lowers it: to $1,120,000 if the Sellers deliver within thirty days, $1,170,000 within sixty, $1,210,000 within ninety, and the full $1,400,000 only after that. Joinder ¶ 18. Nothing accrues. A charge for the use of money grows for as long as the money is outstanding. Here the most the Sellers could ever owe was known at signing, and the Schedule can only reduce it.

13. What the Schedule provides is the opposite of what the Joinder describes. The Schedule permits the Sellers to satisfy their delivery obligation with *less* than the Purchased Amount if they deliver early: $1,120,000 rather than $1,400,000 within thirty days, for example. A rational buyer would accept a reduced amount in hand within a month in lieu of the full stream. That is the same present-value judgment OrcaFunding made at signing, when it paid $1,000,000 for $1,400,000 of future receipts, applied at later dates. That is a discount for early delivery, and it points the opposite way from a loan. A lender that has priced the use of money wants it outstanding for the full term; when the borrower pays early, the lender charges a prepayment penalty. A buyer that has paid a fixed price for a fixed quantity has no such interest and gives a discount for getting what it bought sooner. The Early Delivery Schedule is the buyer's instrument, not the lender's. And it imposes no obligation on the Sellers. It is an option, which they were free to leave unexercised and did.

14. The conditions on the Schedule's early payment option confirm its character. The discount is unavailable if the early delivery is funded by a third-party merchant cash advance. That is an anti-stacking term, protecting the purchased revenue stream from dilution, and echoes Section 13(b) of the Agreements, the covenant not to stack. *See* Orca Mem. ¶ 45; Tr. 98:25–99:2. A lender offering a prepayment discount does not care where the prepayment comes from. A buyer of a revenue stream cares very much whether the seller is pledging that same stream to someone else to fund the payoff.

15. The Joinder cites no case — none — holding that an early-delivery discount converts a sale of receipts into a loan. The three-day cancellation right in Section 10 that is cited in Joinder ¶ 19 as evidence of the Agreements being loans is in fact a cooling-off period of the kind found in commercial contracts of every description, and it, too, is cited to no authority. The SIMAD Debtors, who stipulated to the economic terms of the Agreements and briefed the "economic realities" at length, SIMAD Mem. at 24–29, did not think the Early Delivery Schedule worth mentioning. They were right.

**B. The Risk OrcaFunding Bore Is the Risk New York Law Looks To, and It Materialized**

16. The Joinder's second argument is that Section 6 allocates to OrcaFunding only "enterprise risk," which "is the risk every lender bears," whereas a true purchaser of receivables bears the credit risk of account debtors. Joinder ¶¶ 21–23. The argument proves too much. The third *LG Funding* factor asks "whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (2d Dep't 2020). The merchant's bankruptcy is enterprise risk. If enterprise risk were categorically a lender's risk, the third factor would be meaningless and every merchant cash advance would be a loan without regard to reconciliation, term, or recourse. New York's courts have not so held. The

Second Department applied the three factors in *Apollo Funding* and *Principis* and found sales; in each, the recourse inquiry was whether the funder could collect if the merchant went bankrupt, not whether it had underwritten any account debtor. *Apollo Funding Co. v. Dave Reilly Constr., LLC*, 241 A.D.3d 1508, 1508–09 (2d Dep't 2025) (agreement not a loan as a matter of law notwithstanding acceleration clause and personal guaranty); *Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752, 754 (2d Dep't 2022) (agreement not a loan where it contained a reconciliation provision, had no finite term, and funder had no recourse "should the merchant declare bankruptcy"). The SIMAD Debtors' own authority frames the inquiry the same way. *Fleetwood*, which found a loan, called "the ultimate question" "whether the transaction involves a transfer of risk" and answered it by asking whether the funder was entitled to repayment "in virtually every imaginable circumstance" — a question about the merchant, not its customers. *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-cv-5120 (LJL), 2022 WL 1997207, at *10, *12–13 (S.D.N.Y. June 6, 2022), *aff'd sub nom. Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885-cv, 2023 WL 3882697 (2d Cir. June 8, 2023); *see* SIMAD Mem. at 16, 23. And *Global Energy* and *Kim Engineering* found true sales on Section 6 language substantially identical to the language here, which allocates to the funder the risk that the seller's business "goes bankrupt or . . . ceased operations." *Guttman v. EBF Holdings, LLC (In re Global Energy Servs., LLC)*, No. 21-17305-NVA, 2025 WL 1012721, at *6, *10 (Bankr. D. Md. Mar. 31, 2025) (agreement "acknowledges the possibility that [the seller] may go bankrupt or out of business and squarely places the risk of either scenario with [the funder]"); *Kim Eng'g, Inc. v. United First, LLC*, Adv. Pro. No. 25-00287, slip op. at 5–6 (Bankr. D. Md. Feb. 23, 2026) (same provision; motion for leave to appeal pending, No. 8:26-cv-01036-DLB (D. Md.)).[5]

[5] A copy of the *Kim Eng'g* opinion is annexed to the Orca Mem.

17. The Joinder's authorities do not squarely address the question regarding bankruptcy recourse because they are not New York merchant-cash-advance cases. *Nickey Gregory*, *Qualia*, and *Major's Furniture Mart* are receivables-purchase cases; *Woodson* and *Sackman* concern mortgage-loan participations. Joinder ¶¶ 21, 24 n.6; *see Nickey Gregory Co. v. AgriCap, LLC*, 597 F.3d 591, 602 (4th Cir. 2010) (factoring of produce invoices; seller retained "virtually all of the risk of noncollection"); *Lange v. Inova Cap. Funding, LLC (In re Qualia Clinical Serv., Inc.)*, 441 B.R. 325, 330 (B.A.P. 8th Cir. 2011) (factoring of identified accounts receivable; question was whether the risk of noncollection on those accounts passed to the buyer); *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 544–45 (3d Cir. 1979) (sale of certain accounts; characterization turned principally on the extent of the seller's "extremely relevant" recourse obligation on the identified accounts); *Fireman's Fund Ins. Cos. v. Grover (In re Woodson Co.)*, 813 F.2d 266, 271 (9th Cir. 1987) (sale of fractional interests in identified loans; seller's guarantee relieved buyers "of all risk of loss"); *In re Sackman Mortg. Corp.*, 158 B.R. 926, 934 (Bankr. S.D.N.Y. 1993) (mortgage-loan participations; "[r]isk of loss is one of the traditional hallmarks of ownership"). In each case, the asset sold was a specific obligation of an identified obligor, and the question was who bore that obligor's credit risk. The asset sold here is a percentage of revenue. The risk of that asset is the risk that the revenue does not arrive. That is the risk Section 6 places on OrcaFunding: the risk "that the full Purchased Amount may never be remitted because Seller's business goes bankrupt or Seller otherwise ceased operations." Agreements § 6. OrcaFunding's risk with regard to the performance of what it bought was directly tied to what it bought: no receipts, no delivery, no way to obtain the purchased amount.

18. That risk was not hypothetical. OrcaFunding advanced $2,940,000 (which is the total Purchase Price under both Agreements of $3,000,000 less origination fees of $60,000) and

has received $387,500. Stip. ¶¶ 2–3, 10, 12. This is precisely the "enterprise-wide failure" the Joinder says OrcaFunding was protected against. Joinder ¶ 24 n.6. It was not protected against it. It lost eighty-seven percent of its money to it. The Joinder's assertion that OrcaFunding's risk profile is "more favorable than that of an ordinary lender," *id.* ¶ 24, cannot be squared with that number.

19. Nor is that risk peculiar to these Sellers. It is the risk a buyer of receipts takes in every transaction. A merchant can lose its customer base, its license, or a critical supplier. A senior secured lender can declare a default and foreclose on the merchant's accounts. A surety can take over a bonded project and direct its proceeds to itself. In each case the receipts stop, OrcaFunding's delivery stops with them, and the Agreements give the receipts buyer no one else to pursue. OrcaFunding has had Sellers go into bankruptcy before. Tr. 55:3–5. That is the business it is in. The Joinder's theory would make OrcaFunding a lender in every one of those scenarios, and it would do so on the strength of the one feature that distinguishes a buyer of receipts from a lender: when the receipts stop, so does the buyer's recovery.

20. The Joinder's remaining points on risk were made by the SIMAD Debtors and answered. The joint-and-several obligation under Section 21 runs only to delivery "from [each Seller's] own Future Receipts"; the exposure of each Seller is to its receipts, not its other assets. Orca Mem. ¶ 43; Tr. 97:22–98:3. The guaranty is a guaranty of performance of five specific covenants, not of payment. The SIMAD Memorandum itself describes it that way. SIMAD Mem. at 10; Orca Mem. ¶ 33. The Section 15 remedies the Joinder catalogues — sweeping up to 100% of receipts, accelerating the undelivered balance — arise only upon breach, reach only receipts, are capped by Addendum Section 6.2, and were never exercised. Orca Mem. ¶¶ 42, 51. Footnote 6 of the Joinder concedes that under *Major's Furniture Mart* recourse to the seller does not by

itself convert a sale into a secured loan. The Joinder should be held to that concession. It says that DAMIS "real estate holding entities that do not generate receipts function as additional credit support." Joinder ¶ 24. OrcaFunding has no recourse to such Sellers; a Seller with no receipts has nothing to deliver under Section 21 and nothing OrcaFunding can debit. That is what a receipts-only obligation looks like.

21. *Greenwich Retail*, on which the SIMAD Debtors and the Joinder both lean for the "mutually-guaranteed loan" theory, SIMAD Mem. at 26; Joinder ¶ 24, is distinguishable on the same ground. It was decided on a motion to dismiss. And the feature that drove it was recourse, not the number of obligors: a "Material Breach" by either merchant gave the funder "full recourse to recover its full claim from both Debtors," and the agreements provided "full recourse against the [merchants] and the guarantors" on "terms more commonly found in lending agreements than in true sales of receivables." *In re Greenwich Retail Grp. LLC*, 677 B.R. 473, 500, 502–04 (Bankr. S.D.N.Y. 2026) (quoted at SIMAD Mem. at 23–24, 26). Recourse here is not full and does not reach a claim. On a breach, OrcaFunding may collect receipts — the Specified Percentage, or on default up to all of them — from the accounts into which receipts flow, up to the Purchased Amount and no further. Agreements §§ 15, 21; Addendum § 6.2. The guaranty secures five covenants, not payment. A joint obligation to deliver receipts is not a mutual guaranty of a sum certain, and the difference is the one *Greenwich Retail* itself identified.

22. Finally, the Joinder repeats the SIMAD Debtors' argument that OrcaFunding did no diligence on account debtors and therefore "knew" it was not taking their credit risk. Joinder ¶ 23; Tr. 116:17–117:23. The record shows the diligence OrcaFunding did: twelve months of bank statements for every account the Sellers presented, reviewed live with the Sellers' accounting staff, with loan proceeds and intercompany transfers stripped out so that only revenue deposits remained.

Tr. 31:15–32:4; 82:3–21; Weiser Supp. Decl. ¶¶ 4–6. That is diligence on the asset OrcaFunding bought. A buyer of a percentage of a summer camp's revenue does not underwrite the credit of individual camper families, because there generally is no credit to underwrite; tuition is typically paid in advance. *See* Tr. 84:18–85:4. The absence of diligence that would have been meaningless proves nothing about who bore the risk.

### C. The ACH Authorization and Section 14(a) Confirm a Sale

23. The Joinder's third argument is that the only power of attorney in the Agreements is a "limited" one for the ACH Authorization, confined to debiting bank accounts, and that a true purchaser would have obtained authority to sue, endorse, compromise, and establish lockboxes. Joinder ¶¶ 25–30. No court applying New York law regarding MCA characterization requires any such collection authority as a condition of true-sale treatment, and the Joinder cites none. The argument is a standard of the DAMIS Debtors' own invention.

24. The Joinder characterizes the ACH debit as "recourse to its borrowers' deposit accounts." Joinder ¶ 3. It is not. It is how the purchased receipts are delivered. The Agreements require the Sellers to deposit their Future Receipts into the Authorized Accounts and prohibit them from diverting receipts elsewhere, changing accounts without consent, or revoking the ACH authorization. Agreements § 13; Orca Mem. ¶ 45. The Authorized Accounts are the channel through which the purchased asset arrives, and the debit of the Periodic Amount is OrcaFunding taking delivery of its share. Indeed, the Joinder's observation that a deposit account holds "funds the Seller has already collected," Joinder ¶ 26 (emphasis removed), describes exactly what a receipt is once it is received. The Agreements' definition of "Future Receipts" — "all payments received by Seller" — makes the point. Agreements at 1; *see* SIMAD Mem. at 6 (quoting it); Joinder ¶¶ 2, 16 (adopting the SIMAD Memorandum). And the breach-triggered right to debit

other accounts of the same Seller, Joinder ¶ 25, is a right to follow that Seller's receipts wherever the Seller has moved them, and the covenant not to move them is one of the five the guaranty secures. Agreements §§ 13, 18.

25. The Joinder's treatment of Section 14(a) does not survive its own premises. Section 14(a) provides that "with or without a breach of this Agreement," OrcaFunding "may notify account debtors . . . of Seller's sale of the Future Receipts and may instruct them to make payment . . . to or for the benefit of Buyer." Orca Mem. ¶ 34. Courts finding disguised loans have relied on the absence of exactly that right. *In re J.P.R. Mech., Inc.*, 2025 WL 1550541, at *9 (funder possessed no right or obligation to "collect directly from the Debtor's customers" absent a default); *Fleetwood*, 2022 WL 1997207, at *12.

26. The Joinder answers that the right is "framed as a secured party's right" because Section 14(a) also grants a security interest and the rights of a secured party under the UCC. Joinder ¶ 28. But under the UCC, each buyer of accounts is a "secured party." N.Y. U.C.C. § 9-102(a)(73)(D) ("secured party" includes "a person to which accounts, chattel paper, payment intangibles, or promissory notes have been sold"); § 9-109(a)(3) (Article 9 applies to "a sale of accounts, chattel paper, payment intangibles, or promissory notes"); § 9-102(a)(2) (defining "Account" as "a right to payment of a monetary obligation, whether or not earned by performance"). The Uniform Commercial Code uses the vocabulary of secured transactions for sales of accounts because Article 9 governs both sales of accounts and loans secured by them, N.Y. U.C.C. § 9-109(a)(1), (3); the vocabulary does not make a buyer a lender. *See* N.Y. U.C.C. § 9-109 cmt. 4 (Article 9 does not "delineate[] how a particular transaction is to be classified"; "[t]hat issue is left to the courts"). And once an account is sold, "the debtor . . . retains no legal or equitable interest in the collateral sold." N.Y. U.C.C. § 9-318(a). That is the provision Section 6 of the

Agreements tracks. Agreements § 6 (Sellers transfer "full and complete ownership of the Purchased Amount of Future Receipts" and retain "no legal or equitable interest therein"). And a security interest limited to the receipts sold, as Section 14(a)'s is, "does not support a finding that the Funding Agreement is a loan." *Global Energy*, 2025 WL 1012721, at *9; Orca Mem. ¶ 35.

27. The Joinder next says the notification right is "illusory in practice" because the Agreements "identify no account debtors to notify," and adds that the record "reflects no instance" in which OrcaFunding used it. Joinder ¶ 29. The first point is answered below. The second proves nothing. The April Agreement was seven weeks old and the May Agreement two weeks old when the Sellers filed. The automatic stay barred any such notice. The Joinder cannot adopt the SIMAD Debtors' position that rights are measured at execution, SIMAD Mem. at 29 (citing *Kossoff*, 2026 WL 2168916, at *13), and simultaneously fault OrcaFunding for not exercising a right within the few days before the stay.

28. The Joinder also says OrcaFunding "could not invoke Section 14(a) without first determining . . . which customers owed which Sellers what amounts." Joinder ¶ 29. That is wrong. Section 14(a) permits notice to account debtors "or other persons . . . holding the Future Receipts," which includes the depository banks. And Mr. Weiser testified without contradiction that OrcaFunding files financing statements for the same reason factors and other purchasers do: to be in a position to invoke UCC § 9-406 against account debtors. Tr. 57:9–13. The Joinder's quotation of counsel's "administrative nightmare" remark, Joinder ¶ 29, takes it out of context. Counsel was answering the SIMAD Debtors' demand that the Agreements identify particular customers at signing, Tr. 97:9–16, not describing the exercise of a notification right after a breach.

29. Last, the Joinder reads the ACH Authorization's statement that it is irrevocable "until Buyer has received all amounts due" as "describing a repayment obligation." Joinder ¶ 25.

Every ACH authorization in commerce, whether it secures a loan, a lease, a subscription, or a purchase, says that it lasts until the payee has been paid what it is owed. The phrase describes the duration of the authorization. It does not characterize the underlying transaction, and the Joinder offers no authority that it does.

**D. The Joinder's Reservation of Rights Undercuts the Relief It Seeks**

30. The Joinder asks for relief the Scheduling Order does not present: a determination that receipts OrcaFunding purchased are property of each DAMIS Debtor's estate under § 541. Joinder at 15–16. The Scheduling Order frames one question — whether the Agreements are sales or loans — and the Joinder itself shows why the Court should go no further. The DAMIS Debtors reserve the right to contest whether any DAMIS Debtor is bound by the Agreements at all, id. ¶ 9 n.5, ¶ 31(a), and OrcaFunding has reserved the same question, Orca Mem. ¶ 43. Which entities are bound, and what each received, has not been litigated. A § 541 determination as to "each DAMIS Debtor" cannot be made on this record, and the request should be declined.

31. At this time, OrcaFunding does not dispute the Joinder's statement at ¶ 12 that the Final DIP Orders afford it no adequate protection and no reservation of rights. The Court reserved the characterization question for separate determination. OrcaFunding has proceeded on that basis by, among other things, not asserting its rights under the Agreements in connection with the § 363 sales. The characterization question is what is before the Court now.

## II. MATTERS LEFT OPEN AT THE HEARING

32. The Court asked several questions at the Hearing, and the SIMAD Debtors made several arguments in closing, which OrcaFunding addressed only briefly at the Hearing. Because

the Court will now have the benefit of replies from both estates, OrcaFunding sets out its position on each here so that the record is complete.[6]

**A. What OrcaFunding Bought, and Why the Sellers Kept the Rest**

33. The SIMAD Debtors argued that the Sellers "retain the use of all of the proceeds above the [weekly Periodic] amount," that OrcaFunding "has no right to possess, use or convey those so-called purchase assets, absent a default," and that this "lack of dominion" is "inconsistent with ownership." Tr. 108:11–109:5. OrcaFunding's answer lacked depth. Tr. 128:11–14. The more complete answer is: OrcaFunding did not buy the Sellers' receipts. It bought the Specified Percentage of them — 1.46% under the April Agreement, 4.17% under the May Agreement — up to the Purchased Amount. Agreements at 1. The Sellers kept the other 98.54% and 95.83% because they still owned it. A seller who conveys an undivided fractional interest in a stream and keeps the balance does not have a lender's indifference to its collateral; the seller is using property it never sold. And OrcaFunding's dominion over the portion it did buy is complete: the Periodic Amount is debited from the Authorized Accounts by OrcaFunding, on OrcaFunding's initiative, without any act of the Sellers. Agreements § 3.

34. *Fleetwood* is not to the contrary. The feature Judge Liman found inconsistent with ownership was that the funder there was "entitled to only the Purchased Amount, and not more," while holding an all-asset security interest and full recourse neither of which are present here. 2022 WL 1997207, at *11–13. A cap at the Purchased Amount is inherent in every discounted purchase of a fixed quantity, as OrcaFunding argued. Tr. 98:1–16. Recently, the Second Department twice

[6] The DAMIS Debtors themselves rely on the Hearing record. *See, e.g.*, Joinder ¶ 29 (quoting Hr'g Tr. 96:23–97:16 against OrcaFunding).

held merchant cash advances with capped purchased amounts to be sales. *Apollo Funding*, 241 A.D.3d at 1508–09; *Principis*, 201 A.D.3d at 753-54.

**B. Section 4 Is a Reconciliation**

35. The SIMAD Debtors argued, quoting *J.P.R. Mechanical*, that a "true reconciliation provision requires a mechanism by which the remittance amount is adjusted to reflect the merchant's actual receivables, and obligates the MCA funder to account for amounts collected in excess of the agreed upon percentage," and that Section 4 "is not a reconciliation" because it adjusts only prospectively and never requires a refund. Tr. 113:10–114:11. OrcaFunding did not respond to this point at the Hearing. Its memorandum anticipated it, Orca Mem. ¶ 39, and the answer is in the text.

36. Section 4(c) is retrospective. Upon a request, OrcaFunding "shall calculate Seller's average revenue for the 30-day period preceding the Reconciliation request," and shall determine "whether the total of all Periodic Amounts remitted to Buyer during the Review Period was greater than the Specified Percentage of Seller's actual revenue during the Review Period (an 'Excess')." Agreements § 4(c). That is a mechanism by which remittances are measured against actual receipts. Section 4(d) then obligates OrcaFunding to account for the Excess: "If there was an Excess, then Buyer shall decrease the Periodic Amount for each subsequent Remittance Day." *Id.* § 4(d). The adjustment is mandatory and it may be demanded again at any time. Tr. 44:19–45:12. *J.P.R. Mechanical* and *Kossoff* found the provisions before them illusory because adjustment was available "only once per month" and only if the funder elected to grant it. *J.P.R. Mech.*, 2025 WL 1550541, at *7; *Kossoff*, 2026 WL 2168916, at *8. Neither *LG Funding*, *Principis*, *Apollo Funding*, *Global Energy*, nor *Kim Engineering* requires that a reconciliation provision refund past collections. The only authority the SIMAD Debtors cite for that requirement is the bankruptcy

court's formulation in *J.P.R. Mechanical*, repeated in *Kossoff*, SIMAD Mem. at 17 — neither of which has been adopted by a New York appellate court, and neither of which was reviewing a mandatory adjustment available at any time.

37. The SIMAD Debtors also argued that the Specified Percentage is "arbitrary," having been "backed into" from the weekly payment. Tr. 114:19–115:13. The Purchase Information states the opposite and the only sworn evidence confirms: the Periodic Amount "is the Specified Percentage of the average sales revenue we estimate you will receive," based on "a review of your past revenue," and OrcaFunding set it that way. Agreements at 1; Weiser Decl. ¶¶ 5–7; Tr. 44:6–11. The SIMAD Debtors offered no witness to the contrary.

### C. Addendum Section 5.1(e), Agreement Section 15, and the "Facade" Argument

38. One of the SIMAD Debtors' principal arguments on recourse was that Addendum Section 5.1(e) makes any missed weekly payment an automatic default; that Section 15 then permits OrcaFunding to raise the Specified Percentage to 100%, accelerate, and debit all twenty-three accounts; and that because a distressed company will miss a payment before it files, the Section 6 bankruptcy carve-out is "a facade." Tr. 122:10–124:10; SIMAD Mem. at 22–24. OrcaFunding's reply at the Hearing rested on the plural wording of Section 5.1(e). Tr. 127:15–19. That reading is set out at Orca Mem. ¶ 56 and OrcaFunding adheres to it, but it is not the main point. Three others are.

39. First, what Addendum Section 5.1(e) requires is "the weekly payments required by the Agreement," and what the Agreement requires is the revenue-adjusted Periodic Amount under Section 4(d), not a fixed sum. A Seller whose revenue declines and who invokes Section 4 cannot be in default of a payment that must be reduced to match its receipts. Orca Mem. ¶ 56.

40. Second, every remedy that Section 15 provides is triggered only upon a Seller failing to comply with the terms and covenants of the Agreement, nevertheless every such remedy still reaches only receipts. Raising the Specified Percentage to 100% is a right to 100% of the Future Receipts, not of anything else. Acceleration accelerates delivery of the Purchased Amount, which Section 21 obliges each Seller to deliver only "from its own Future Receipts," and which Addendum Section 6.2 caps. The right to debit the Authorized Accounts is the right to collect the receipts the Sellers were obliged to deposit there. One hundred percent of the receipts of a business that has no receipts is nothing. The *Kossoff* court found a carve-out regarding recourse in the event of bankruptcy was "narrowly circumscribed" because the funder there held recourse "against the merchant, its principals, or its assets." 2026 WL 2168916, at *11-14. OrcaFunding's recourse on default is to receipts, through the accounts into which receipts flow. That is what a buyer of receipts does when its seller diverts them. *Rowan Advance*, on which both the SIMAD Debtors and the Joinder rely for the "wherever situated" point, SIMAD Mem. at 23; Joinder ¶ 26, confirms the distinction. On their own description of it, *Rowan Advance* turned on the funder's right to collect the merchant's revenue "even if it is not a Future Receipt." Joinder ¶ 26 (quoting 2025 WL 2858612, at *4).[7] That is recourse beyond the purchased asset, and it is exactly what Section 21 and Addenda Section 6.2 withhold here.

41. Third, the "facade" theory is a prediction about what a distressed merchant would do before filing, and the record shows what this one did. The SIMAD Debtors state in their brief that they paid $43,750 on May 28, 2026 and $125,000 on May 29, 2026, "within a week of the Petition Date," and that they did so precisely because they understood a missed payment to be a default. SIMAD Mem. at 21 n.6. No payment was missed. No default was declared against any

[7] Nor did the *Rowan Advance* agreement contain a mandatory reconciliation provision. *See Rowan Advance*, 2025 WL 2858612, at *3 n.2.

debtor. Nothing was accelerated. No account was swept. The bankruptcy carve-out was never displaced by a prior default, and OrcaFunding is bearing the bankruptcy risk Section 6 assigns to it in full. A carve-out that operated is not a facade.

**D. The Arithmetic of Thirty-Two Weeks**

42. The SIMAD Debtors emphasized that dividing the Purchased Amount by the Periodic Amount yields thirty-two weeks under both Agreements. Tr. 119:11–121:2. The division is correct. It is also the case in almost every merchant cash advance ever written, because every such agreement states a purchased amount and an initial periodic amount. If the quotient were a "term," the second *LG Funding* factor could never favor a funder, and the Second Department could not have decided *Apollo Funding* and *Principis* as it did. The courts that have found a *de facto* term — *Kossoff*, *Lateral Recovery*, *Crosby Marine* — did so principally because the funder could hold the periodic amount constant at will, or because a missed payment accelerated rather than extended the schedule. Orca Mem. ¶¶ 38, 50.

43. *Kim Engineering* held, on an agreement with "an estimated duration of 37 weeks," that "the term of the Agreement is not finite." *Id.* ¶ 28. *Global Energy* held the same. *Id.* ¶ 27. The parties stipulated that no term was specified. Stip. ¶ 16. The arithmetic is an expectation, and an expectation that Section 4(d) requires OrcaFunding to revise downward whenever receipts fall is not a term. That both Agreements yield thirty-two weeks does not change the analysis. What separates a term from an estimate is not the arithmetic but whether the funder can hold the Sellers to it, and Section 4(d) answers that question: on any Excess, OrcaFunding "shall decrease the Periodic Amount." The mandatory reconciliation provision is what decides the second factor, because it is what makes the duration contingent. The SIMAD Debtors understood as much; their

principal answer to Section 4(d) was that it is illusory, SIMAD Mem. at 21-22, and Point II.B above shows that it is not.

### E. *Apollo Funding* Is a Merits Holding, Not a Preservation Rule

44. The SIMAD Debtors argued that *Apollo Funding* is a case about appellate waiver: the merchant "never availed themselves . . . of the reconciliation right," so the argument was "waived on appeal." Tr. 118:22–24; *see id.* at 118:15–119:11. That is not what the court did. *Apollo Funding* reversed the denial of a funder's motion for summary judgment and held, as a matter of law, that the agreement was not a loan. 241 A.D.3d at 1508–09. The Second Department reviewed a summary judgment record, and its stated reason for not finding the reconciliation provision illusory was that the merchant "did not engage in the agreement's reconciliation procedure" — a finding about the record, not about preservation. *Id.* at 1509. The Second Department repeated the point as a substantive matter in *Diesel Funding, LLC v. Build Retail, Inc.*, 257 N.Y.S.3d 687, 690 (2d Dep't 2026) ("[W]e note that the defendants did not seek to engage in the agreement's reconciliation procedure, which precludes our review of the claim that the process was illusory"). The Kings County Supreme Court applied it at the trial level "as it must" in *Surfside Capital v. Rodgers*, 87 Misc. 3d 1258(A), at *3 (Sup. Ct. Kings Cnty. 2025). Orca Mem. ¶ 25. A rule that binds trial courts is not an appellate preservation rule. Since *Apollo Funding*, the Second Department has applied the same rule in *Diesel Funding*, and OrcaFunding is aware of no New York appellate decision that found a reconciliation provision illusory where the merchant never invoked it. The bankruptcy decisions the SIMAD Debtors cite for the contrary proposition, SIMAD Mem. at 19 n.5, do not hold otherwise: *Kossoff* involved actual reconciliation requests by the merchant, *Kossoff*, 2026 WL 2168916, at *3, and the SIMAD Debtors identify nothing in *Crosby Marine* or *Greenwich Retail* that addresses *Apollo Funding* at all.

45. The SIMAD Debtors' further point — that "there was simply no time" to invoke reconciliation before the petition, Tr. 118:9–15 — is a concession. A provision that could not be tested cannot be found illusory on the record of its testing. The burden of proving that a facially mandatory reconciliation provision is a sham lies with the party asserting it. *See Surfside Cap.*, 87 Misc. 3d 1258(A), at *5 (merchant "did not establish" that the agreement was a usurious loan where "nothing in the record" showed it attempted reconciliation). *Lateral Recovery* found a sham on allegations that the funder had no reconciliation department and had never performed one. 2022 WL 2829913, at *5. The uncontradicted evidence here is that OrcaFunding performs reconciliations, that they are mandatory in the merchant's favor, and that debits pause while they are calculated. Tr. 44:4–46:7. The concession is also only half true. The April Agreement was signed on April 17, 2026, seven weeks before the petition, and six weekly debits were taken under it. Stip. ¶¶ 2, 10. For every one of those weeks the Sellers had the reconciliation procedure available to them — a telephone number and an email address, Agreements § 4(a) — and the SIMAD Debtors describe those same weeks as the period in which the MCA burden was driving them toward filing. SIMAD Mem. at 4. If the weekly debit had outrun the Specified Percentage of actual revenue, one request would have reduced it. No one made one. A merchant that had the remedy, had the time, and had the motive, and did not use it, cannot be heard to say the remedy was a sham.

**F. The Proofs of Claim, the Schedules, and the Financing Statements**

46. The SIMAD Debtors, quoting *J.P.R. Mechanical*, called OrcaFunding's proofs of claim a "virtually dispositive, undisputed fact." Tr. 110:12–17. The Court asked whether OrcaFunding is scheduled as a creditor. Tr. 129:6–11. OrcaFunding addresses both.

47. The proofs of claim were filed on August 14, 2026, the bar date, after this Court overruled OrcaFunding's DIP objections on July 20, Tr. 25:14–21; SIMAD Docket Nos. 547, 552,

and directed that characterization be decided at a later evidentiary hearing. Orca Mem. ¶¶ 16–19. Each proof of claim was filed as unsecured, each identified a Sale of Future Receipts Agreement as its basis, and each reserved the right to amend. Weiser Decl. ¶ 10; Tr. 65:25–66:3; 70:9–23. A party whose ownership of an asset is disputed by the estate, and who has been told that the dispute will be decided after the bar date, files a protective claim or risks being barred from any recovery if it loses. That is the consequence Bankruptcy Rule 3003(c)(2) imposes on a party that does not file a proof of claim; filing to avoid it is not an admission. *Kossoff*, one of the SIMAD Debtors' principal authorities, holds that "the relevant inquiry under *LG Funding* is the nature of the contractual rights created at the time the MCA Agreements were executed, not whether a party later elected to exercise every remedy available to it," and that characterization may not "turn on unilateral litigation strategy." 2026 WL 2168916, at *13. The SIMAD Debtors accept that holding. SIMAD Mem. at 29. The same judge that wrote *Kossoff* wrote *J.P.R. Mechanical*. The two opinions are reconciled by their facts: in *J.P.R. Mechanical* the funder defaulted on requests for admission, filed untimely papers, and offered no evidence, and the court reached the proofs of claim only after concluding on the contract that the agreements "powerfully show" a loan and only on the question of creditor status under § 547(b)(1). 2025 WL 1550541, at *9; Orca Mem. ¶ 41. In *Global Energy*, the funder filed a *secured* proof of claim and the court found a true sale. 2025 WL 1012721, at *5, *9–10.

48. As to the schedules: OrcaFunding is scheduled as a contingent, unliquidated and disputed creditor because the SIMAD Debtors scheduled it that way, in an amount that does not match OrcaFunding's claims. Tr. 129:8–10. The schedules are the Debtors' characterization. They are the position the Debtors have argued since July. They are not evidence of OrcaFunding's understanding, and the Debtors appear to have scheduled many, if not all, MCA funders the same

way. The proof of claim rider's use of the defined term "Creditor" tracks the Official Form, which has no field for an owner of purchased receipts; the claims and the riders state that the claim arises under a Sale of Future Receipts Agreement. Tr. 65:25–66:3; 70:16–23.

49. As to the financing statements: Mr. Weiser testified that OrcaFunding filed UCC-1s against non-debtor Sellers when "the extent of the fraud and the misrepresentations became apparent," and that it terminated those filed against Debtors upon learning of the petitions. Tr. 50:21–51:9. That sequence is what the Addendum provides for. Addenda Section 11.1 bars a UCC-1 filing "absent the occurrence of an Addendum Default," and Addendum Section 5.1(b) makes any "misrepresentation [or] misleading statement" by a Seller or Guarantor an Addendum Default. Addendum §§ 5.1(b), 11.1. The filings against non-debtors were contractually authorized by the misrepresentation default; the filings against Debtors were terminated; none is of record against any Debtor. Stip. ¶ 15. And as Mr. Weiser testified, purchasers of accounts file financing statements as a matter of course, because Article 9 requires it of them. Tr. 57:5–12; N.Y. U.C.C. § 9-109(a)(3) (Article 9 applies to "a sale of accounts, chattel paper, payment intangibles, or promissory notes"); *id.* § 9-310(a) ("[A] financing statement must be filed to perfect all security interests").

### G. *M Design Village* and Legal Impossibility

50. The SIMAD Debtors argued that the Agreements are "nearly identical" to those in *M Design Village*, down to "the font and the spacing," and that OrcaFunding did not cite the case. Tr. 101:14–20; 103:4–9. OrcaFunding addressed *M Design Village* at the Hearing, Tr. 86:2–87:2, and adds three points.

51. First, *M Design Village* decided a motion to dismiss counterclaims on a different funder's agreements. Those agreements had no addenda, and it is the Addenda here — confining

remedies to enumerated defaults, capping recovery, governed UCC filings, and preserving reconciliation after every adjustment — that distinguish these Agreements from the form. Orca Mem. ¶¶ 54–57.

52. Second, the legal-impossibility theory was presented to Judge Jones in *Kossoff* and His Honor declined to rest on it, noting that "even the prior cases holding that a merchant cash advance was a loan rather than a sale have not relied on the trustee's legal impossibility theory." *Kossoff*, 2026 WL 2168916, at *15 (quoted at Tr. 86:8–87:2). OrcaFunding misspoke at the Hearing in saying that *Kossoff* "overturned" *M Design Village*, Tr. 127:1–3, and accepts the Court's correction: one bankruptcy judge cannot overrule another, and *Kossoff* disagreed with the theory rather than reversing the decision. Tr. 135:13–16.

53. Third, Article 9 answers the theory on its face. Article 9 applies to sales of accounts and payment intangibles. N.Y. U.C.C. § 9-109(a)(3). A security agreement "may create or provide for a security interest in after-acquired collateral." *Id.* § 9-204(a). And the Uniform Commercial Code treats a buyer of accounts as holding a "security interest" that attaches when the account comes into existence. *Id.* §§ 1-201(b)(35), 9-102(a), 9-203(a), (b)(2); *see id.* § 9-204(a). The *IVF Orlando* passage the SIMAD Debtors quote concedes that § 9-318(a) applies to "accounts, chattel paper, payment intangibles, and promissory notes *that have been sold*." SIMAD Mem. at 15 (emphasis supplied). If a present agreement cannot transfer an interest in receipts that do not yet exist, then no lender can take a lien on them either, and the Final DIP Orders' priming liens on "accounts receivable and rights to payment," Tr. 146:1–3, are liens on nothing.

**H. Clarifications of the Record**

54. Three statements at the Hearing warrant clarification. First, OrcaFunding's counsel described the Addenda as "really unique" and withdrew the characterization when the Court asked

whether counsel knew the terms of the other MCA funders' agreements. Tr. 143:5–15. The accurate statement is Mr. Weiser's: the Addenda were requested and negotiated by Mr. Shabsels and are unique in OrcaFunding's experience. Tr. 33:18–34:2.

55. Second, the Court asked how long before the bankruptcy filing the *Kossoff* agreements were executed. Tr. 89:18–20. The *Kossoff* agreements were executed between November 2016 and June 2020 and the case was commenced in 2021. Tr. 135:24–136:2. The Agreements here were seven weeks and two weeks old on the Petition Date. The contrast matters. The funders in *Kossoff* had years of performance in which to reconcile, and did. OrcaFunding had weeks, and no one asked.

56. Third, Mr. Weiser described the Sellers' accounts as having been "presented to us as almost like a holistic or one giant, multi-part account." Tr. 79:16–20. That is a description of how the Sellers presented themselves. The SIMAD Memorandum confirms it: budgeting for the camps was "controlled by the parent company." SIMAD Mem. at 5. The consolidated presentation was the Debtors' structure, not OrcaFunding's. The SIMAD and DAMIS Debtors held themselves out as one enterprise to OrcaFunding, to their bondholders, and to this Court: a single management, a single budget, a single set of principals, and bond collateral spanning numerous camps. SIMAD Mem. at 5; Joinder ¶ 9 & nn.1–2 (Mr. Shabsels executed each Agreement on behalf of every listed Seller; the SIMAD and DAMIS Debtors share one principal place of business and service address). They filed within a day of one another, sought joint administration in each silo, and are pursuing their cases before the same Court. SIMAD Mem. at 3; Joinder ¶¶ 5–6. OrcaFunding does not suggest that joint administration is substantive consolidation. The point is narrower: the Debtors cannot present themselves as one business for every purpose but this one. An enterprise that ran itself as one cannot call a purchase of a percentage of its receipts a "mutually-guaranteed loan"

because the purchase was papered across the entities that make it up. A purchase of a percentage of the receipts of an enterprise that ran itself as one is still a purchase. *See* Stip. ¶¶ 1–3 (one Agreement, one wire, more than two hundred Sellers); Agreements § 21; Tr. 79:16–20.

## III. ANTICIPATED REPLIES

57. Chambers has advised that both estates may reply. OrcaFunding anticipates the following and responds now as there will not be a surreply at this time.

58. **That this response exceeds the scope of what the Court invited.** The Court invited the DAMIS Debtors' position and directed that something be filed on the DAMIS docket. Tr. 137:3–4. The DAMIS Debtors chose to file a supplemental brief with new arguments and new authority. OrcaFunding, which had no reply brief under the Scheduling Order, Orca Mem. ¶ 38 n.7, is entitled to answer them, and the matters addressed in Point II are principally the Court's own questions and the SIMAD Debtors' closing arguments.

59. **That Mr. Weiser's "one giant, multi-part account" testimony confirms a pooled-enterprise loan.** It confirms that the Sellers presented a consolidated revenue base, which the SIMAD Debtors' own brief admits. SIMAD Mem. at 5. Section 21 still limits each Seller's delivery obligation to its own receipts, and OrcaFunding has never collected from any account other than the one Mr. Shabsels designated. Tr. 79:21–80:8; 80:13–81:24. And the number of Sellers is a function of how the Debtors organized themselves, not of how OrcaFunding priced the risk; the Debtors chose to run one enterprise through more than two hundred entities and cannot now treat the count as OrcaFunding's credit enhancement.

60. **That Mr. Weiser's testimony that the UCC-1s were filed when "the fraud . . . became apparent" shows a creditor protecting itself.** It shows a buyer exercising a right that arose upon an Addendum Default under Sections 5.1(b) and 11.1 of the Addendum, which

OrcaFunding negotiated away in all other circumstances. A lender does not bargain for a covenant not to perfect.

61. **That OrcaFunding's realized loss is irrelevant because characterization is fixed at execution.** OrcaFunding agrees that the rights are fixed at execution. Section 6 fixed the business-failure risk on OrcaFunding at execution. The loss is not offered to change the contract; it is offered to answer the SIMAD and DAMIS Debtors' contention that the Section 6 allocation is a "facade" that could never operate. It operated.

62. **That *Apollo Funding* is distinguishable because the Agreements here ran only weeks.** The party asserting that a mandatory reconciliation provision is a sham bears the burden of showing it, and a provision no one invoked in a seven-week period cannot be shown to be a sham on that record.

63. **That the UCC provisions OrcaFunding cites show it is a "secured party."** They show that Article 9 governs sales of accounts and calls buyers secured parties. N.Y. U.C.C. §§ 9-102(a)(73)(D), 9-109(a)(3). Whether a given transaction is a sale or a loan is decided by the courts under state law, not by the label the Code assigns to both sales of accounts and loans secured by them. *See* N.Y. U.C.C. § 9-109 cmt. 4 ("[t]hat issue is left to the courts").

64. **That OrcaFunding "misspoke" about *Kossoff* overturning *M Design Village* and the theory remains good law in this District.** OrcaFunding corrected the statement. *M Design Village* was a motion-to-dismiss ruling on other agreements without analogous addenda, and the theory it adopted would void every lien on future receivables in these cases, including the DIP lenders' liens. The Court is not bound by it and should not adopt it.

65. **That the DAMIS Debtors received no proceeds, so nothing was purchased from them.** Both wires went to Quadstar Realty LLC, a SIMAD Debtor, at Mr. Shabsels'

direction, "ostensibly for the benefit of all the sellers." Stip. ¶¶ 2–3; Tr. 80:13–81:22; 82:22–83:2. Whether a particular Seller received consideration and was validly bound is the agency question both OrcaFunding and the DAMIS Debtors have reserved. Orca Mem. ¶ 43; Joinder ¶ 9 n.5. It is not a characterization question, and the DAMIS Debtors cannot invoke it to seek a ruling while reserving it to avoid one.

66. **That the Court should declare the receipts property of each estate under § 541.** The Scheduling Order presents one question: whether the Agreements are sales or loans. The consequences of the answer — for the Final DIP Orders, for the allocation of the Purchased Amount among more than two hundred Sellers, for the proofs of claim, and for any avoidance theory — are for another day and another record. The Court should decline the Joinder's request for relief under § 541.

**[Remainder of page intentionally left blank.]**

## CONCLUSION

67. For the reasons stated here and in the OrcaFunding Memorandum, OrcaFunding respectfully requests that the Court determine that the Agreements are true sales of future receipts and not loans, decline the additional relief requested in the Joinder, and grant such other and further relief as is just.

Dated: November 2, 2026
New York, New York

JACOBS P.C.

By: */s/ Adam Sherman*
Adam Sherman
Leo Jacobs (admitted pro hac vice)
Wayne Greenwald (admitted pro hac vice)
Aaron Slavutin (admitted pro hac vice)
717 Fifth Avenue, Floor 17
New York, New York 10022
Telephone: (212) 229-0476
adam@jacobspc.com
leo@jacobspc.com
wayne@jacobspc.com
aaron@jacobspc.com

*Counsel to OrcaFunding LLC*