**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG) |
| AYC NORTH STAR OPCO LLC; and AMERICAN YOUTH CAMPING HOLDCO LLC,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN BERNSTEIN; BROOKE BERNSTEIN; and BERKSHIRE TRAILS CAMP, LLC<br><br>Defendants. | Adv. Pro. No. 26-____ (CMG) |

**COMPLAINT**

Plaintiffs AYC North Star Opco LLC ("OpCo") and American Youth Camping Holdco LLC ("HoldCo," together with OpCo, "Plaintiffs"), by and through their undersigned counsel, for their complaint against defendants Steven Bernstein ("Mr. Bernstein"), Brooke Bernstein ("Mrs. Bernstein," together with Mr. Bernstein, the "Bernsteins"), and Berkshire Trails Camp, LLC ("Berkshire Trails," together with the Bernsteins, the "Defendants"), allege as follows:

---

1 A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD (collectively, the "Debtors"). The location of Debtor SIMAD Holding Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

## NATURE OF ACTION

1. This adversary proceeding arises from the theft, misappropriation, and destruction of the confidential business information, trade secrets, and digital assets of Camp North Star, a children's summer camp located at 200 Verrill Rd., Poland Spring, Maine 04274 (the "Camp" or "Camp North Star"), which HoldCo purchased free and clear through a Court-approved sale in these jointly administered chapter 11 cases (the "Sale"). See Order (I) Approving Asset Purchase Agreement Between American Youth Camping Holdco LLC, Poland Landco LLC, and Poland Campco LLC, (II) Authorizing the Sale of Substantially All Assets of Poland Landco LLC and Poland Campco LLC Free and Clear of All Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. §§ 363(b) and 363(f), (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365, and (IV) Granting Related Relief [Bankr. Dkt. 1081] (the "Sale Order") at ¶ 3. *See also* Asset Purchase Agreement, Sale Order Exhibit A, attached hereto as **Exhibit 1** ("APA"). On September 16, 2026, pursuant to APA §10.06, HoldCo assigned and transferred all rights and obligations as Buyer under the APA to OpCo and AYC North Star Landco LLC ("LandCo," together with OpCo, the "Assignees") (the "Side Letter").

2. Prior to the Sale, the Bernsteins were directors of the Camp. On August 23, 2026, the Bernsteins announced and effectuated their resignations as directors of Camp North Star. In the three weeks preceding the Sale and the two weeks following the Sale, while the Camp, its assets, and various other properties were subject to the jurisdiction of the Bankruptcy Court, the Bernsteins executed bulk exports of approximately 55,222 of the Camp's files from the Camp's Google Workspace shared drive (the "Shared Drive"), including client contact information, advertising materials, financial records, operational logs, staff files, years of lesson plans and

Camp programming materials, and photographs and videos of campers—all of whom were minors. After exporting copies of the Camp's property, the Bernsteins then deleted tens of thousands of files from the Shared Drive.

3. Despite being an acquired asset under the Sale, the Bernsteins have retained exclusive control over the Camp's Instagram account, @cnsmaine (the "Camp Instagram"), refusing to convey credentials to the Camp's new owners—Plaintiffs.

4. The Bernsteins did not take the Camp's digital assets solely for their personal enjoyment or merely to antagonize Plaintiffs. At or around the time of their resignations, the Bernsteins secured their future employment as directors at a competing youth camp operated by Berkshire Trails in Great Barrington, Massachusetts, and, on information and belief, shared the stolen and misappropriated materials with Berkshire Trails, which received, retained, and used and continues to use those materials to compete with the Camp and to solicit the Camp's customers.

5. Plaintiffs bring this action to enforce the Sale Order, to recover and protect the assets they purchased, to enjoin Defendants' continued use and disclosure of those assets, and to recover for injuries arising from the Defendants' conduct.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b), and Standing Order of Reference 12-1 of the United States District Court for the District of New Jersey dated September 18, 2012.

7. This adversary proceeding includes both core and non-core matters. Plaintiffs' claim to enforce the Sale Order and to confirm and protect Plaintiffs' title to the Acquired Assets[2] is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N), and (O), and is a matter arising in these

[2] Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the APA.

chapter 11 cases, requiring this Court to interpret and give effect to its own order. To the extent certain Counts seek damages for Defendants' conduct, Plaintiffs plead them as non-core proceedings related to these chapter 11 cases, as set forth below.

8. This Court expressly retained exclusive jurisdiction to, among other things, enforce and implement the terms and provisions of the Sale Order and the APA, to resolve any disputes arising in connection with the Sale Order, the APA, or the Sale, and to protect the Buyer, against all liens, claims, interests, and encumbrances of any kind or nature whatsoever, with respect to the Acquired Assets. *See* Sale Order at ¶ 24.

9. To the extent any claim asserted herein is determined to be non-core, such claim arises in or is related to the above-captioned cases because its resolution depends upon Plaintiffs' title to and ownership of the Acquired Assets conveyed under the Sale Order and the APA, and affects the interpretation, implementation, and consummation of the Sale and would have a conceivable effect upon the estate.

10. Pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7008, Plaintiffs consent to the entry of final orders or judgment by the Bankruptcy Court. To the extent any Count asserted herein is determined to be a non-core proceeding to which any Defendant does not consent to the entry of final orders or judgment by the Bankruptcy Court, Plaintiffs consent to the Bankruptcy Court hearing such claim and submitting proposed findings of fact and conclusions of law to the United States District Court for the District of New Jersey for entry of final judgment.

11. This adversary proceeding is properly commenced pursuant to Bankruptcy Rule 7001(a), (g), and (i).

12. Service of the summons and complaint may be made upon each Defendant anywhere in the United States pursuant to Bankruptcy Rule 7004, and such service is sufficient to

establish personal jurisdiction over a defendant in a proceeding arising under, arising in, or related to a case under title 11, as consistent with the Constitution and laws of the United States. Each Defendant resides in, or is organized under the laws of, a State of the United States. The conduct giving rise to Plaintiffs' claims, including the access to, and the exfiltration, deletion, and transfer of, the Camp's digital assets, and their subsequent use, occurred in the United States.

13. Each Defendant further purposefully directed the conduct at issue at these chapter 11 cases and the Sale administered by this Court. Defendants took, withheld, and used property of which this Court had approved the sale, free and clear. The exercise of personal jurisdiction over each Defendant is therefore reasonable and comports with traditional notions of fair play and substantial justice.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because the above-captioned chapter 11 cases are pending in this district.

**PARTIES**

15. Plaintiff American Youth Camping Holdco LLC, a Delaware limited liability company, is the Court-approved purchaser and the original Buyer under the APA and the Sale Order. Effective as of the closing of the Sale, HoldCo assigned and transferred all of its rights, titles, interests, benefits and privileges under the APA to OpCo and LandCo.

16. Plaintiff AYC North Star Opco LLC, a Delaware limited liability company, is an Assignee of HoldCo under the APA, pursuant to the Side Letter, and the present owner of, and holder of title to, substantially all of the assets of Camp North Star (other than the Camp's real property), including the Camp's intellectual property, digital records, and other digital assets, together with the causes of action relating to the Camp Business and the and the non-real property Acquired Assets that were conveyed under the APA. Together with LandCo, OpCo is deemed the

Buyer under the Side Letter and is entitled to the protections of the Sale Order and the APA with respect to the non-real property Acquired Assets.

17. Defendant Steven Bernstein is an individual who, on information and belief, resides at 850 Limekiln Pike, Ambler, Pennsylvania 19002. Mr. Bernstein is a former director of the Camp, having submitted his notice of resignation on August 23, 2026, effective that same day. Mr. Bernstein is presently a director of Berkshire Trails.

18. Defendant Brooke Bernstein is an individual who, on information and belief, resides at 850 Limekiln Pike, Ambler, Pennsylvania 19002. Mrs. Bernstein is a former director of the Camp, having submitted her notice of resignation on August 23, 2026, effective that same day. Mrs. Bernstein is presently a director of Berkshire Trails.

19. Defendant Berkshire Trails Camp, LLC is, on information and belief, a Massachusetts limited liability company, having a primary mailing address of 25 Deerwood Park Road, Great Barrington, Massachusetts 01230, that owns and operates Berkshire Trails Camp, a competing youth camp located in Great Barrington, Massachusetts.

## FACTUAL ALLEGATIONS

### I. PLAINTIFFS' ACQUISITION OF CAMP NORTH STAR

20. In 1927, Camp North Star opened its gates for its inaugural summer season to a class of all-female campers. For nearly a century, it has operated continuously as a premier recreational sleep-away camp, welcoming tens of thousands of campers, staff, and families across generations. Situated upon more than 200 acres of pristine Maine wilderness and abutting a 55-acre private lake, Camp North Star is a New England treasure—deeply valued by its alumni network, its camper families, and the local Oxford County community.

21. On the eve of its historic 2027 centennial summer, Camp North Star—through no fault of its own—stood on the brink of being stripped for parts. On or about June 4, 2026, the Debtors in these chapter 11 cases—jointly administered under In re SIMAD Holdings Ltd., Case No. 26-16388 (CMG)—including the entities that owned and operated Camp North Star, filed for relief under Chapter 11 of the Bankruptcy Code.

22. On September 4, 2026, HoldCo, as Buyer, and Poland Landco LLC and Poland Campco LLC (collectively, the "Sellers"), entered into the APA.

23. Rather than allowing this northeastern gem to be auctioned off piecemeal, or sold for scrap land re-development, Plaintiffs stepped in to protect this century-long legacy. Plaintiffs provided the institutional backing and operational stability necessary to keep Camp North Star's doors open. Through this acquisition, the Camp's history, campus infrastructure, and founding spirit remain intact, ensuring that Camp North Star enters its 100th summer not as a victim of financial distress, but as a preserved institution ready to serve generations to come.

24. Plaintiffs' acquisition of Camp North Star is part of a broader charitable and educational undertaking. Plaintiffs are affiliates of American Youth Camping, Inc. ("AYC"), which was formed to own and operate non-profit, educational, residential summer camps for youth and which is dedicated to charitable, religious, and educational purposes. Central to AYC's mission is the desire to build joyful, immersive, and welcoming camp communities in which young people of all backgrounds grow through enriching educational and recreational programming. Camp North Star was one of a family of historic summer camps that Plaintiffs and the broader AYC enterprise assembled through various approved asset purchase agreements in these chapter 11 cases, in order to preserve these institutions and transition them into a single, mission-driven, non-profit camping system.

25. Consistent with this charitable mission, Plaintiffs acquired Camp North Star to safeguard it for the benefit of its campers, their families, and the surrounding communities, rather than to extract short-term profit. Plaintiffs and the broader AYC enterprise will make their budgeting, tuition, and programming decisions based on mission alignment rather than profitability and the benefit of private interest. Under the leadership of AYC's volunteer board of directors, and through responsible and careful stewardship, Plaintiffs intend to honor and carry forward Camp North Star's century-long legacy for generations to come.

26. On September 8, 2026, the Bankruptcy Court entered the Sale Order approving the APA and authorizing the sale of substantially all of the Camp's assets to HoldCo, free and clear of all liens, claims, interests, and encumbrances for a purchase price of $6,250,000 in cash plus the assumption of certain liabilities. *See* APA § 2.06. The Sale closed on September 9, 2026.

27. Effective as of the closing, and pursuant to APA § 10.06 and the Side Letter, HoldCo assigned and transferred to OpCo and LandCo all of HoldCo's rights, titles, interests, benefits, and privileges under the APA, and the Assignees assumed HoldCo's obligations thereunder. The Side Letter allocated the Acquired Assets and the Assumed Liabilities between the Assignees: LandCo acquired the Camp's real property and related "Real Estate Assets," as that term is defined in the Side Letter, and OpCo acquired all other Acquired Assets, including, without limitation, the Camp's Intellectual Property (defined below), records, digital assets, permits, and the causes of action relating to (i) the Camp Business; and (ii) the Acquired Assets. The Side Letter further provides that the Assignees are deemed the Buyer under the APA.

28. Under the APA, Buyer acquired, *inter alia*, the following assets:

- [A]ll of the Sellers' assets, rights, properties of every nature, kind and description, tangible or intangible (including goodwill), whether now existing or hereafter acquired, wheresoever situated, relating to or used or held for use in connection with the Camp Business (*see* APA § 2.01);

- [A]ll Intellectual Property [(defined below)] owned or purported to be owned by Sellers and all of Sellers' rights to use other Intellectual Property, together with all goodwill associated therewith (*see* APA § 2.01(e));

- [A]ll Records related to . . . the Camp Business, including, without limitation, **camper and student records** (including applications, evaluations, academic records, medical forms and related documents), alumni records, infirmary records, program records, manuals, invoices, sales records, sales and **marketing materials**, correspondence, and **any and all other business records** or business information, in each case to the extent (x) transferable or capable of being made available in compliance with applicable Law, and (y) in the possession and control of Sellers (*see* APA § 2.01(g) (emphasis added));

- [A]ll goodwill associated with the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers, and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Camp Business (*see* APA § 2.01(h));

- [A]ll rights (but not any obligations) of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with Current Employees, Former Employees or **any other current or former directors**, consultants, independent contractors and agents of Sellers (*see* APA § 2.01(i));

- [E]xcept for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) solely related to the Camp Business, the Acquired Assets or the Assumed Liabilities, to the extent the transfer of the foregoing is effective under applicable non-bankruptcy law; provided that it is understood and agreed by the Parties that Buyer will not pursue or cause to be pursued any Bankruptcy Causes of Action against any of the Designated Parties other than as a defense (to the extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party (*see* APA § 2.01(l));

- [A]ll telephone numbers, fax numbers, e-mail accounts, **websites, URLs and Domain Names [**(defined below)] and reservation or registration platforms, together with **all passwords, administrator rights, access credentials and related account-control rights**, in each case to the extent (x) transferable or capable of being made available in compliance with applicable Law, and (y) in the possession and control of Sellers (*see* APA § 2.01 (q) (emphasis added));

- [A]ll advertising and **marketing materials**, samples, artwork, **photography**, **images**, videos, copy, catalogues, labels, **recordings** and similar material **relating to the Camp Business** (*see* APA § 2.01 (r) (emphasis added)); [and]

- [A]ll educational curriculum materials, lesson plans, training materials, programming materials, manuals, operational manuals and policies relating to the Camp Business (*see* APA § 2.01 (s));

29. The APA defines "Intellectual Property" to mean:

> collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) **all trade secrets** and confidential business information (including **confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques**, **technical and other data**, designs, drawings, specifications, **customer and supplier lists**, **pricing and cost information**, and **business and marketing plans and proposals**), (e) **Software**, (f) **Domain Names**, (g) **all other proprietary and intellectual property rights**, (h) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (i) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (j) **all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property**), **and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.**

*See* APA art. I, "Intellectual Property" (emphasis added). As used in this Complaint, the term "Intellectual Property" has the meaning ascribed to it in the APA, as set forth above.

30. The APA defines "Domain Names" to mean:

> Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet and all applications for any of the foregoing, **as well as social media handles and other names**, identifiers and locators associated with Internet sites and services.

*See* APA art. I, "Domain Names" (emphasis added).

31. The Sale included a discrete list of Excluded Assets not acquired by Plaintiffs under the APA. *See* APA § 2.02. Carved out from the Excluded Assets—and thus preserved as Acquired Assets—are all claims against Camp directors as follows:

> (2) Excluded Assets **shall not include any claim against any individual whose principal role is the day-to-day operation or management of the Camp Business** (**including any Camp director**, Camp operator, or other Camp operational personnel), regardless of title or whether such individual performs services on-site or remotely, **to the extent arising from such individual's** ordinary-course, day-to-day performance of Camp Business operations or **management of the Camp Business**; provided that such individual does not include any individual whose principal role is ownership, financing, or enterprise-level management of any Seller[.]

*See* APA § 2.02(k)(2) (emphasis added).

32. Under the APA, the Sellers represented and warranted that:

> Except as set forth in Section 4.09 of the Schedules, the Acquired Assets include all of the material assets, rights and properties, that are used in or held for the Camp Business or necessary to conduct the Camp Business in all material respects as conducted during the 2026 Camp Season.

*See* APA § 4.09. Section 4.09 of the Schedules in the APA is inapplicable here.

## II. THE CAMP'S INFORMATION INFRASTRUCTURE

33. At all relevant times, the Camp stored, maintained, and managed substantial portions of its Intellectual Property and other confidential information on the Shared Drive with substantial data processing on Camper data performed by the Camp's third-party customer relationship management ("CRM") vendor, Campminder—a comprehensive, web-based management platform and customer (camper, family, and future leads) management system. Access to the Shared Drive was limited to certain high-level directors who managed the day-to-day operations of the Camp. Both Mr. Bernstein and Mrs. Bernstein held administrative control over the Shared Drive prior to the Sale.

34. Despite resigning on August 23, 2026, the Bernsteins maintained access to the Shared Drive and the Campminder system until at least September 19, 2026.

## III. THE BERNSTEINS' MISAPPROPRIATION OF CAMP DATA AND THE BENEFIT TO BERKSHIRE TRAILS

35. Mr. Bernstein served as a director of the Camp between May 2015 and August 23, 2026. Despite resigning on August 23, 2026, Mr. Bernstein retained and utilized credentials to the Shared Drive, without authorization, until at least September 19, 2026.

36. Mrs. Bernstein served as a director of the Camp from at least as early as July 2019 until August 23, 2026. Despite resigning on August 23, 2026, Mrs. Bernstein retained and utilized credentials to the Shared Drive, without authorization, until at least September 19, 2026.

37. As directors of the Camp, the Bernsteins had administrative access to the Shared Drive, which housed substantial portions of the Camp's Intellectual Property and confidential business information.

38. On information and belief, the Bernsteins also used the Shared Drive to store personal files, intermingling their personal data with digital assets belonging to the Camp.

### a. The Unauthorized Bulk Exports of Camp Files

39. On the morning of August 23, 2026, over the course of several hours, Mr. Bernstein, using the personal account StevenDRC@gmail.com, accessed the Shared Drive and downloaded approximately 55,035 files from the Shared Drive. Between August 24 and August 30, 2026, the Bernsteins downloaded an additional 187 files from the Shared Drive, totaling 55,222 downloads over one week (the "Bernstein Download"). On information and belief, Mrs. Bernstein participated in, facilitated, and otherwise cooperated with Mr. Bernstein, in executing the Bernstein Download and the related exfiltration of the Camp's files, including through her own contemporaneous access to the Camp's information systems and the Camp's CRM, as set forth below.

40. The Bernstein Download included approximately 25,509 image files, 7,013 PDFs, 3,974 word-processing documents, 2,947 video files, and thousands of business records encompassing client contact information, financial records, advertising materials, lead logs, operational logs, staff files, years of lesson plans and Camp programming materials.

41. The Bernstein Download also contained substantial amounts of sensitive personally identifiable information about campers, their families, and Camp staff. The exfiltrated data included, at minimum, Full Names, Genders, Addresses, Phone Numbers, Email Addresses, Social Security Numbers; Medical Data: Immunization Records and Diagnosis Records; Passports; Countries of Origin; Dates of Birth; Criminal Background Checks; and the voice, image, and other biometric identifiers of minor children, including numerous videos of minor-campers in swimwear.

**b. Campminder Access Logs**

42. At all relevant times, the Camp used Campminder to process camper data, camper's parent or guardian data, financial data, and potential lead data, and assist with the Camp's record management.

43. The Campminder system produces comprehensive logs concerning (i) system access/sign-in by authorized users; and (ii) reports run on the Campminder system tagged using native labeling. When a report is run, a user has executed a query or otherwise triggered a function that aggregated, extracted, or rendered a specific set of records from Campminder's core database.

44. On August 19, 2026, only two accounts accessed or otherwise signed in to the Campminder system—one from an account belonging to Mr. Bernstein, the other from an account belonging to Mrs. Bernstein. On August 19, 2026, the Campminder system recorded a report on a lead source list containing names with lead sources.

45. On August 24, 2026, after the Bernsteins resigned as directors of the Camp, only two accounts accessed or otherwise signed in to the Campminder system—one from an account belonging to Mr. Bernstein, the other from an account belonging to Mrs. Bernstein. On August 24, 2026, the Campminder system recorded a report on a contact list containing names with email addresses of parents or families of campers.

46. On August 25, 2026, the Campminder system recorded four access instances—one from an account belonging to Mr. Bernstein, three from an account belonging to Mrs. Bernstein. On August 25, 2026, the Campminder system recorded eight reports: two reports concerning camper household lists containing the child's name, gender, age, grade, school, home city/state and phone, lead source/date for the 2016 camping season; one report concerning the same for the 2026 camping season; and five reports concerning the same for the 2027 camping season.

47. On August 26, 2026, the Campminder system recorded three access instances—one from an account belonging to Mr. Bernstein, two from an account belonging to Mrs. Bernstein. On August 26, 2026, the Campminder system recorded a report concerning camper household lists containing the child's name, gender, age, grade, school, home city/state and phone, lead source/date for the 2027 camping season.

48. On August 27, 2026, the Campminder system recorded three access instances—one from an account belonging to Mr. Bernstein, two from an account belonging to Mrs. Bernstein. On August 27, 2026, the Campminder system recorded a report concerning camper household lists containing the child's name, gender, age, grade, school, home city/state and phone, lead source/date for the 2027 camping season.

49. On August 28, 2026, the Campminder system recorded two access instances—both from an account belonging to Mrs. Bernstein. On August 28, 2026, the Campminder system

recorded a report on the Household lists containing the child's name, gender, age, grade, school, home city/state and phone, lead source/date for the 2027 camping season.

50. On information and belief, Mr. Bernstein and Mrs. Bernstein accessed the Campminder system between August 19 and August 28, 2026, in anticipation of their then-forthcoming departure to competitor Berkshire Trails. The reports run during this period include the contact information for parents and families of campers; a lead source list containing both names and lead sources; the personal data and lead source information for campers for the 2016 camping season, the personal data and lead source information for the campers for the 2026 camping season, and the personal data and lead source information for the campers for the forthcoming 2027 summer camping season ("2027 Camp Season").

**c. The Deletion of the Camp's Files**

51. Following the downloads, the Bernsteins caused a substantial number of the Camp's files to be deleted from the Shared Drive.

52. At minimum, the Bernsteins caused the following to be deleted from the Shared Drive:

- Between August 24 and August 30, 2026, approximately 570 files, including the only copies of two staffing folders for the Camp;
- On or about September 4, 2026, approximately 2,570 files and 65 folders, including staffing folders, coaching materials, and media folders;
- Between September 5 and September 9, 2026, approximately 587 files; and
- On or about September 7, 2026, approximately 85 folders containing years' worth of lesson plans, evening programs, and staff training documents.

53. Plaintiffs have incurred, and continue to incur, substantial costs attempting to respond to the Bernsteins' deletion of files from the Shared Drive, including the costs of auditing the Bernsteins' unauthorized access, conducting a forensic investigation of the Shared Drive, assessing the scope of the exfiltration and deletion, and attempting to recover and restore the deleted files.

**d. <u>The Deletion of the Camp Instagram And Refusal To Turn Over Credentials</u>**

54. Despite being an Acquired Asset under the APA and the property of Plaintiffs, the Bernsteins have refused to convey the credentials for accessing and managing the Camp Instagram.

55. Further, on or about August 30, 2026, the Bernsteins deactivated and deleted or caused to be deleted the Camp Instagram, attempting to destroy its economic value to Plaintiffs.

56. On information and belief, Instagram permits users with access to an account's credentials to reverse an account deletion request within 30 days of submission.

57. On September 23, 2026, Plaintiffs caused to be delivered to the Bernsteins a cease-and-desist letter which demanded, *inter alia*, the avoidance of spoliation of all Camp digital property and the reactivation of the Camp Instagram in order to prevent total and irreversible deletion of the content contained on the Camp Instagram.

58. On information and belief, the Bernsteins received the above-mentioned cease-and-desist letter while reversal of the Camp Instagram deletion was still viable, and elected not to reactivate the Camp Instagram, willfully permitting the account's total and irreversible deletion.

59. The deletion of the Camp Instagram has substantially eliminated the Camp's presence and accessibility on social media, diminishing the Camp's capacity to advertise to the Camp Instagram's established audience, and reduced the image and reputation of the Camp to prospective campers, parents, and employees.

e. **Transfers of Camp Digital Assets to Berkshire Trails**

60. Prior to the Sale, the Bernsteins secured director positions at Berkshire Trails, a Massachusetts competitor to the Camp.

61. On or around August 23, 2026, Mr. Bernstein and Mrs. Bernstein created or otherwise acquired access to email accounts with a Berkshire Trails email domain. For Mr. Bernstein, this was steven@berkshiretrailscamp.com. For Mrs. Bernstein, this was brooke@berkshiretrailscamp.com.

62. Immediately preceding and following the Sale the Bernsteins, using administrative credentials to the Camp's information systems, transferred, or otherwise provided access to certain materials from the Camp's Shared Drive to their respective Berkshire Trails email accounts. At minimum this included:

- On August 26, 2026, Mrs. Bernstein shared a document titled "Berkshire Trails Questions" from the Shared Drive with steven@berkshiretrailscamp.com.
- On September 3, 2026, Mrs. Bernstein shared a document titled "Berkshire Trails Questions" from the Shared Drive with brooke@berkshiretrailscamp.com.
- On September 7, 2026, Mr. Bernstein granted steven@berkshiretrailscamp.com access to a spreadsheet on the Shared Drive.
- On September 19, 2026, folder-inheritance settings previously configured by Mrs. Bernstein automatically shared two documents—titled "New Client" and "#131 Andi Zampelli old (#171 – RETIRED)"—from the Shared Drive with brooke@berkshiretrailscamp.com.
- On September 19, 2026, Mrs. Bernstein granted brooke@berkshiretrailscamp.com edit access to a folder containing several years' worth of Camp North Star's confidential operational files, including staffing schedules, client rosters, and similar competitively sensitive information.

63. On information and belief, Berkshire Trails, by and through the Bernsteins as directors, has received, retained, accessed, and used the Camp's confidential materials and trade secrets for its own commercial benefit, including to solicit and divert the Camp's customers and

prospective customers, to develop competing programming, and otherwise to gain a competitive advantage over the Camp.

64. Since the Bernsteins have joined as directors, Berkshire Trails has adjusted the 2027 Camp Season dates to mirror those of Camp North Star and has adjusted its rates to undercut Camp North Star's current prices.

65. Numerous families of past campers have indicated to Plaintiffs that they would not be returning to Camp North Star for the 2027 Camp Season having elected to enroll in Berkshire Trails.

66. On information and belief, the Bernsteins used the Intellectual Property and other confidential information belonging to the Camp captured in the Bernstein Download and from reports run on Campminder between August 19 and August 28, 2026, to (i) solicit former campers and their families to Berkshire Trails for the 2027 Camp Season; and (ii) use the Camp North Star lead lists to generate new business for Berkshire Trails.

**f. <u>Bernstein Obligations Concerning Data Management</u>**

67. The Camp maintained an Employee Handbook (a copy of the April 2025 version of which is attached hereto as **Exhibit 2** (the "<u>Handbook</u>")) which set out standards and obligations applicable to all employees of the Camp.

68. Mr. Bernstein and Mrs. Bernstein were employees of the Camp subject to the standards and obligations of the Handbook.

69. Under the Handbook, the Camp secured its Intellectual Property and other confidential information as follows:

- Employees agree to the *Confidential Nature of Work Policy*, which notes that all records, files, and electronic files maintained by the Camp, whether on Camp property or on

personal devices, are considered confidential.[3] Employees further accept responsibility for properly securing and maintaining confidential and proprietary materials (*see* Handbook at 33);

- Employees agree that confidential information may only be shared with certain other employees of the Camp who have a business need to receive such information (*see* Handbook at 37);
- Employees agree that confidential information must remain confidential and may not be released or removed from the Camp's premises, and may not be copied, transmitted or in any other way used for any purpose by any employee outside the scope of their employment (*see* Handbook at 33);
- Employees must maintain the confidentiality of the Camp's trade secrets[4] and proprietary and confidential information (*see* Handbook at 47);
- Employees are prohibited from using Camp computers to support or promote any activity for personal gain or any unauthorized private business (*see* Handbook at 42);
- Excluding authorized use of Camp equipment, employees are prohibited from removing customer or other business information, records, and files (*see* Handbook at 66);
- After employment separation, employees have no right to read, recover transmission, or communicate through email or other electronic communications belonging to the Camp (*see* Handbook at 43);

[3] The Handbook describes that confidential information "includes, but is not limited to, personnel and payroll records, trade secrets, patents, confidential information relating to clients, vendors, campers and camper families, medical information, donors, member agencies, products, processes, know-how, test data, marketing data, accounting records, pricing, business plans and strategies, negotiations, and contracts." *See* Handbook at 33.

[4] The Handbook notes that "Trade secrets may include information regarding the development of systems, processes, products, know-how, and technology." *See* Handbook at 47.

- Terminating employees were required to surrender all Camp information contained on personal devices and then removed or deleted from said personal devices (*see* Handbook at 60);
- Terminating employees were further required to provide a list of all passwords to assets, files, and work-related links before their last day of work (*See* Handbook at 60);

70. Under the Handbook, "All internet data that is composed, transmitted, or received via our [the Camp's] computers is considered a part of the official records of Camp North Star[.]" *See* Handbook at 44. Further,

> Abuse of the Wi-Fi and internet access provided by Camp North Star in violation of law or Camp North Star policies will result in disciplinary action, up to and including termination of employment. Employees may also be held personally liable for any violations of this policy. The following behaviors are examples of actions and activities that are prohibited and can result in disciplinary action:
>
> . . .
>
> - Copying, pirating, or downloading software and electronic files without permission
> - Sending or posting confidential material, trade secrets, or proprietary information outside of the organization
>
> . . .
>
> - Sending or posting messages or material that could damage the organization's image or reputation
>
> . . .
>
> For protection of the Camp network and proprietary information, security measures have been installed on the systems. No employee shall, under any circumstances, attempt to disable or circumvent these security measures.

Handbook at 44-45.

71. The Handbook is acknowledged and executed by all Camp employees. *See* Handbook at 90. On information and belief, Mr. Bernstein and Mrs. Bernstein each agreed to the terms of the Handbook.

**g. Express Knowledge of the Camp's Property and Court Supervision**

72. In addition to the standing obligations imposed by the Handbook, Mr. Bernstein received an express and contemporaneous directive concerning the Camp's data and property. On August 29, 2026—after the Bernsteins had resigned, and as the Sellers and HoldCo prepared to close the Sale—the Debtors' Associate Restructuring Officer—Daniel Sasson—informed and reminded Mr. Bernstein that (i) as part of the preparation for closing, and since the purchaser—Plaintiffs—is acquiring all of the assets of the Camp, Mr. Bernstein was to provide Debtors with login information for all of the platforms used by the Camp; (ii) all camper and sales-related information is the property of the Camp and may not be downloaded by any party; (iii) any camp related information that has been downloaded onto or otherwise exists on personal devices must be deleted immediately; (iv) all property must remain at the Camp except for Mr. Bernstein's personal items; and (v) Mr. Bernstein, together with Debtors, are under court supervision and subject to the court's scrutiny (the "August 29 Directive").

73. The August 29 Directive placed Mr. Bernstein on express, unambiguous notice that (i) the Camp's camper and sales-related information was the property of the Camp and the acquiring purchaser; (ii) such information could not be downloaded or retained by anyone and any copies already downloaded onto or existing on personal devices had to be deleted immediately; (iii) all login credentials for the Camp's platforms were to be surrendered in preparation for the closing; and (iv) the entire process was subject to the supervision and scrutiny of this Court. Notwithstanding the August 29 Directive, Mr. Bernstein did not surrender the Camp's credentials

to the Camp Instagram, did not return or delete the materials he had exfiltrated, and instead continued to retain, use, transfer, and delete the Camp's property, as set forth above.

## IV. THE MISAPPROPRIATION'S EFFECT ON PLAINTIFFS AND CAMP NORTH STAR

74. The Camp has operated since 1927, offering recreational camping to boys and girls ages 7-17, normally during 2–7-week stints. Average enrollment per summer at the Camp is approximately 225, with substantial reenrollments by satisfied campers and parents alike.

75. Campers from across the United States and from at least 19 countries around the world look forward to spending a summer at the Camp.

76. For its centennial summer, enrollment has plummeted. By November 3, 2025, Camp North Star had 248 enrollments for the summer 2026 camping season ("**2026 Camp Season**"). As of November 3, 2026, Camp North Star had 40 enrollments for the 2027 Camp Season. Accordingly, as of November 3, 2026, Camp North Star has experienced a more than 80% enrollment drop between the 2026 Camp Season and the 2027 Camp Season.

77. In these chapter 11 cases HoldCo also acquired, *inter alia*, through separate asset purchase agreements, approved by the bankruptcy court free and clear, substantially all of the assets of (i) Indian Acres Camp, located at 1712 Main Street Fryeburg, Maine 04037 ("**Indian Acres**") and Forest Acres Camp located at 54 Swans Falls Road, Fryeburg, Maine 04037 ("**Forest Acres**") [Bankr. Dkt. 1079]; (ii) Camp Echo, located at 210 Echo Road, Burlingham, New York 12722 ("**Camp Echo**") [Bankr. Dkt. 1078]; and (iii) Camp Lokanda, located at 432 Haring Road, Glen Spey, New York 12737 ("**Camp Lokanda**") [Bankr. Dkt. 1080].

78. Despite their acquisition in substantially the same fashion and around the same time as Camp North Star, Indian Acres and Forest Acres, Camp Echo, and Camp Lokanda have each seen increases in enrollment between the 2026 Camp Season and the 2027 Camp Season.

79. By November 3, 2025, Indian Acres and Forest Acres had 124 enrollments for the 2026 Camp Season. As of November 3, 2026, Indian Acres and Forest Acres have 139 enrollments for the 2027 Camp Season.

80. By November 3, 2025, Camp Echo had 353 enrollments for the 2026 Camp Season. As of November 3, 2026, Camp Echo has 365 enrollments for the 2027 Camp Season.

81. By November 3, 2025, Camp Lokanda had 351 enrollments for the 2026 Camp Season. As of November 3, 2026, Camp Lokanda has 376 enrollments for the 2027 Camp Season.

82. On information and belief, the Bernsteins used Camp North Star's client lists and lead lists to solicit former and prospective Camp North Star campers, and their families, to register for Berkshire Trails for the 2027 Camp Season.

83. In addition to misappropriating the Camp's Intellectual Property, the Bernsteins have triggered substantial administrative costs borne by Plaintiffs.

84. Further, because the Bernsteins exfiltrated and misappropriated digital assets belonging to the Camp, taking for their benefit and the benefit of Berkshire Trails the Camp North Star's Intellectual Property, and deleting valuable business information from the Shared Drive, Plaintiffs have been deprived of substantial economic value from their purchase of the Camp.

## COUNT I

Declaratory Judgment Confirming Title to Acquired Assets
28 U.S.C. § 2201; 11 U.S.C. § 363; Bankruptcy Rule 7001(i)
(Against All Defendants)

85. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

86. Through the Sale Order, this Court approved the APA and authorized the sale of substantially all of the Camp's assets to HoldCo free and clear of all liens, claims, interests, and

encumbrances pursuant to 11 U.S.C. §§ 363(b), (f), and conveyed to HoldCo good title to the Acquired Assets.

87. The Acquired Assets conveyed to Plaintiffs free and clear under the Sale Order, the APA, and the Side Letter include the Camp's Intellectual Property, records, and digital assets, and all e-mail accounts, websites, URLs, and Domain Names, access credentials, and related account-control rights. The Camp Instagram, the files and digital assets exfiltrated from the Shared Drive and Campminder system, and the access credentials to the Camp's digital assets are therefore Acquired Assets that were conveyed to the Plaintiffs free and clear.

88. An actual and justiciable controversy exists between Plaintiffs and Defendants concerning title to, and control of, the Acquired Assets. Defendants dispute and impair Plaintiffs' title by retaining and using exfiltrated copies of the Camp's files, refusing to convey the credentials to, and control of, the Camp Instagram and the Camp's other digital assets, and otherwise asserting dominion over, and use of, the Acquired Assets.

89. Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy Procedure 7001(i), that the Camp Instagram, the files exfiltrated from the Shared Drive and Campminder system, and the access credentials to the Camp's digital assets are Acquired Assets that were sold and conveyed to Plaintiffs free and clear of all liens, claims, interests, and encumbrances under the Sale Order, the APA, and the Side Letter, and that Plaintiffs hold exclusive title to and right of possession and control over those Acquired Assets.

## COUNT II

Enforcement of the Sale Order
11 U.S.C. § 105(a)
(Against All Defendants)

90. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

91. The Sale Order is a final order of this Court. This Court expressly retained exclusive jurisdiction to enforce and implement the Sale Order and the APA and to protect Plaintiffs, as Buyer, against all interference with the Acquired Assets, and is empowered under 11 U.S.C. § 105(a) to issue any order necessary or appropriate to carry out and enforce its own orders.

92. Each Defendant had knowledge of the Sale, the Sale Order, and of the acquisition of the Acquired Assets to Plaintiffs free and clear of all liens, claims, interests, and encumbrances. On August 29, 2026, prior to the entry of the Sale Order, the Debtors' Associate Restructuring Officer issued the August 29 Directive to Mr. Bernstein, which (i) informed him that Plaintiffs were acquiring all of the assets of the Camp as part of the Sale; (ii) requested all login information for all platforms used by the Camp; (iii) reminded him that all camper and sales-related information was the property of the Camp and may not be downloaded by anyone, and that any Camp information downloaded onto or existing on personal devices must be deleted immediately; and (iv) reminded him that the process was under the supervision and scrutiny of this Court. As directors of Berkshire Trails, the Bernsteins' knowledge is imputed to Berkshire Trails.

93. Each Defendant knowingly and willfully violated the Sale Order by exfiltrating, retaining, deleting, using, and transferring the Acquired Assets, by refusing to convey the credentials to, and control of, the Camp Instagram, and by otherwise exercising dominion over, interfering with, and using the Acquired Assets sold free and clear to Plaintiffs. Each Defendant did so with knowledge of, and in deliberate disregard of, the August 29 Directive and this Court's supervision and scrutiny of the Sale process.

94. Plaintiffs are entitled to an order, pursuant to 11 U.S.C. § 105(a), enforcing the Sale Order and directing each Defendant to deliver, convey, and restore the Acquired Assets to Plaintiffs, to return and permanently delete all copies of the exfiltrated materials, and to cease all

interference with Plaintiffs' title to and use of the Acquired Assets, together with Plaintiffs' resulting damages, costs, and reasonable attorneys' fees incurred as a result of the Defendants' violation of the Sale Order.

**COUNT III**
Violation of the Computer Fraud and Abuse Act
18 U.S.C. § 1030
(Against the Bernsteins)

95. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

96. The Computer Fraud and Abuse Act ("CFAA") affords a private right of action to any person who suffers damage or loss by reason of a violation of the statute, where the conduct involves at least $5,000 in loss during a one-year period.

97. The Shared Drive is a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2)(B) because it is used in and affects interstate commerce, foreign commerce, and communications.

98. Upon the Bernsteins' resignations as directors on August 23, 2026, their authorization to access the Shared Drive terminated. The Camp did not authorize the Bernsteins to access the Shared Drive following their resignations, and the Handbook independently terminated any right of access upon separation. Moreover, on or about August 29, 2026, the Debtors' Associate Restructuring Officer issued the August 29 Directive, which expressly directed Mr. Bernstein to surrender all login information for the Camp's platforms, demanded that any Camp information downloaded onto or existing on personal devices be deleted immediately, and confirmed that the Camp's information was the property of the Camp and could not be downloaded or retained by anyone—thereby affirmatively revoking and confirming the absence of any authorization for the Bernsteins to access, download, or retain the Camp's data. The Bernsteins' continued access to the

Shared Drive after August 23, 2026, and in all events after the August 29 Directive, was therefore without authorization within the meaning of 18 U.S.C. § 1030.

99. The Bernsteins intentionally accessed the protected computer after August 23, 2026—including after receiving the August 29 Directive—without authorization and thereby transferred and obtained the Camp's information and impaired the integrity and availability of the Camp's data, including by deleting thousands of the Camp's files from the Shared Drive, thereby causing "damage" within the meaning of 18 U.S.C. § 1030(e)(8).

100. As a direct and proximate result, Plaintiffs have suffered "loss" aggregating well in excess of $5,000 during a one-year period, consisting of the costs of responding to the unauthorized access and the resulting damage to the Camp's data, conducting a forensic investigation and damage assessment of the Shared Drive, and attempting to restore the deleted and impaired data, all of which constitute "loss" under 18 U.S.C. § 1030(e)(11).

**COUNT IV**
Misappropriation of Trade Secrets Under the Defend Trade Secrets Act
18 U.S.C. §§ 1836 et seq.
(Against All Defendants)

101. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

102. The Defend Trade Secrets Act affords a private right of action to any owner of a misappropriated trade secret used in or intended for use in interstate or foreign commerce.

103. The Camp lead lists, staffing lists, all camper and parent/guardian contact lists, business operational materials, advertising materials, programming materials, and lesson plans are trade secrets within the meaning of 18 U.S.C. § 1839(3). This information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors and other persons who could obtain economic

value from its disclosure or use. The Camp's trade secrets are related to services used in, and intended for use in, interstate and foreign commerce: the Camp recruits, enrolls, and serves campers from across the United States and from at least 19 countries, markets its programs nationally, and maintains the lead lists, camper and family contact lists, and marketing and programming materials at issue to solicit and serve that interstate and international clientele.

104. The Camp took reasonable measures to maintain the secrecy of this information, including by restricting access to the Shared Drive and the Campminder system to certain high-level directors who managed the Camp's day-to-day operations, and by imposing on its employees the confidentiality obligations set forth in the Handbook, which require employees to maintain the confidentiality of the Camp's trade secrets and confidential information, prohibit the removal, copying, or transmission of such information outside the Camp, and require the return of all Camp information and passwords upon separation.

105. The Bernsteins accessed and acquired the Camp's trade secrets after submitting their resignations and thus did so without authority. Accordingly, through improper means, including theft and breach of their duties to maintain the secrecy of the Camp's confidential information, the Bernsteins misappropriated the Camp's trade secrets. The Bernsteins further misappropriated the Camp's trade secrets by disclosing and using them without the Camp's express or implied consent—including, on information and belief, by disclosing and transferring the Camp's trade secrets to Berkshire Trails, a direct competitor to Camp North Star—at a time when they knew or had reason to know that the trade secrets had been acquired by improper means and were subject to a duty to maintain their secrecy. Furthermore, both Mr. Bernstein and Mrs. Bernstein transferred files from Camp North Star's information system to, or otherwise provided system access to, their respective Berkshire Trails email accounts:

steven@berkshiretrailscamp.com and brooke@berkshiretrailscamp.com. Additionally, Mr. Bernstein's misappropriation was knowing, willful, and malicious: he continued to acquire, retain, use, and transfer the Camp's trade secrets even after the August 29 Directive expressly reminded him that such information was the property of the Camp, could not be downloaded or retained by anyone, and had to be deleted immediately, and that the process was under this Court's supervision and scrutiny.

106. On information and belief, Berkshire Trails misappropriated the Camp's trade secrets by acquiring and using said trade secrets with knowledge or reason to know that said trade secrets had been acquired through improper means and were derived from persons—the Bernsteins—who owed the Camp a duty to maintain their secrecy.

107. Plaintiffs are entitled to injunctive relief, damages for actual loss and unjust enrichment or a reasonable royalty, together with exemplary damages of up to twice the compensatory award for willful and malicious misappropriation and attorneys' fees.

**COUNT V**

Misappropriation of Trade Secrets Under the Maine Uniform Trade Secrets Act
10 M.R.S.A. §§ 1541 et seq.
(Against All Defendants)

108. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein. This Count is pled in the alternative to Plaintiffs' claim under the Massachusetts Uniform Trade Secrets Act (Count VI), to the extent the law of Maine governs the misappropriation of the Camp's trade secrets.

109. The Camp lead lists, staffing lists, all camper and parent/guardian contact lists, business operational materials, advertising materials, programming materials, and lesson plans constitute a "trade secret" under 10 M.R.S.A. § 1542(4) because the Camp derives independent economic value from said information not being generally known or readily ascertainable and

because the information is the subject of efforts reasonable under the circumstances to maintain its secrecy, including by limiting access to the Shared Drive and Campminder system to certain high-level directors who managed the Camp's day-to-day operations and by imposing on employees the confidentiality, non-removal, and return-of-information obligations set forth in the Handbook.

110. The Bernsteins misappropriated the Camp's trade secrets by accessing and acquiring said trade secrets through improper means, including theft and breach of a duty to maintain secrecy. The Bernsteins further misappropriated the Camp's trade secrets by disclosing and using them without the Camp's consent—including, on information and belief, by disclosing and transferring the Camp's trade secrets to Berkshire Trails, as set forth above—knowing or having reason to know that the trade secrets had been acquired by improper means and were subject to a duty to maintain their secrecy. Furthermore, both Mr. Bernstein and Mrs. Bernstein transferred files from Camp North Star's information system to, or otherwise provided system access to, their respective Berkshire Trails email accounts: steven@berkshiretrailscamp.com and brooke@berkshiretrailscamp.com. Additionally, Mr. Bernstein's misappropriation was knowing, willful, and malicious: he continued to acquire, retain, use, and transfer the Camp's trade secrets even after the August 29 Directive expressly reminded him that such information was the property of the Camp, could not be downloaded or retained by anyone, and had to be deleted immediately, and that the process was under this Court's supervision and scrutiny.

111. On information and belief, Berkshire Trails misappropriated the Camp's trade secrets by acquiring and using said trade secrets with knowledge or reason to know that said trade secrets had been acquired through improper means and were derived from persons—the Bernsteins—who owed the Camp a duty to maintain their secrecy.

112. Plaintiffs are entitled to recover their actual losses and the Defendants' unjust enrichment, or a reasonable royalty, together with exemplary damages of up to twice that award for willful and malicious misappropriation.

**COUNT VI**

Misappropriation of Trade Secrets Under the Massachusetts Uniform Trade Secrets Act
Mass. Gen. Laws ch. 93, §§ 42 et seq.
(Against All Defendants)

113. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein. This Count is pled in the alternative to Plaintiffs' claim under the Maine Uniform Trade Secrets Act (Count V), to the extent the law of Massachusetts governs the misappropriation of the Camp's trade secrets.

114. The Camp lead lists, staffing lists, all camper and parent/guardian contact lists, business operational materials, advertising materials, programming materials, and lesson plans constitute "trade secrets" under Mass. Gen. Laws ch. 93, § 42, because the information provided an economic advantage from not being generally known and was the subject of efforts reasonable under the circumstances to protect its secrecy, including the limiting of access to the Shared Drive and Campminder system to certain high-level directors who managed the Camp's day-to-day operations and the imposing on employees of confidentiality, non-removal, and return-of-information obligations set forth in the Handbook.

115. The Bernsteins misappropriated the Camp's trade secrets by accessing and acquiring them through improper means, including theft and breach of a confidential relationship and duty to maintain secrecy. The Bernsteins further misappropriated the Camp's trade secrets by disclosing and using them without the Camp's consent—including, on information and belief, by disclosing and transferring the Camp's trade secrets to Berkshire Trails, as set forth above—knowing or having reason to know that the trade secrets had been acquired by improper means and

were subject to a duty to maintain their secrecy. Furthermore, both Mr. Bernstein and Mrs. Bernstein transferred files from Camp North Star's information system to, or otherwise provided system access to, their respective Berkshire Trails email accounts: steven@berkshiretrailscamp.com and brooke@berkshiretrailscamp.com. Additionally, Mr. Bernstein's misappropriation was knowing, willful, and malicious: he continued to acquire, retain, use, and transfer the Camp's trade secrets even after the August 29 Directive expressly reminded him that such information was the property of the Camp, could not be downloaded or retained by anyone, and had to be deleted immediately, and that the process was under this Court's supervision and scrutiny.

116. On information and belief, Berkshire Trails—a Massachusetts entity that received and used the trade secrets in Massachusetts—misappropriated said trade secrets by acquiring and using them with knowledge or reason to know that said trade secrets were acquired by improper means and were derived from persons—the Bernsteins—who owed a duty to limit their acquisition, disclosure, and use.

117. Plaintiffs are entitled to recover their actual losses and the Defendants' unjust enrichment, or a reasonable royalty, together with exemplary damages of up to twice that award for willful and malicious misappropriation, and reasonable attorneys' fees and costs.

**<u>COUNT VII</u>**

Unfair Methods of Competition and Unfair or Deceptive Acts
Mass. Gen. Laws ch. 93A, §§ 2, 11
(Against Berkshire Trails)

118. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein. This Count is governed by Massachusetts law.

119. Plaintiffs and Berkshire Trails are each engaged in trade or commerce within the meaning of Mass. Gen. Laws ch. 93A, § 11.

120. The misappropriation and use of a competitor's trade secrets is an unfair method of competition and an unfair or deceptive act or practice actionable under Chapter 93A, and such a claim is actionable independent of any employment or contractual relationship.

121. By knowingly receiving and using the Camp's trade secrets and confidential information to compete with the Camp and to solicit its customers, Berkshire Trails engaged in unfair methods of competition or deceptive acts or practices in violation of Chapter 93A. Berkshire Trails, acting through Mr. Bernstein as its director—who had been expressly reminded by the August 29 Directive that the Camp's information was the property of the Camp, could not be downloaded or retained by anyone, and was subject to this Court's supervision—received, retained, and used the Camp's trade secrets and confidential information with knowledge that they had been wrongfully taken.

122. The actions and transactions constituting Berkshire Trails' unfair methods of competition and unfair or deceptive acts or practices occurred primarily and substantially within the Commonwealth of Massachusetts, where Berkshire Trails is organized and operates, where it received and used the Camp's trade secrets and confidential information, and where it adjusted its programming and pricing to compete with the Camp.

123. Because Berkshire Trails' conduct was willful and knowing, Plaintiffs are entitled to recover multiple damages of up to three times their actual damages, including disgorgement of profits, together with mandatory attorneys' fees and costs, and injunctive relief.

**COUNT VIII**
Breach of Fiduciary Duties
(Against the Bernsteins)

124. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein. This Count is governed by Maine law.

125. As directors of the Camp, the Bernsteins owed the Camp fiduciary duties of loyalty and care to the Sellers, including duties to act in good faith and in the best interests of the Camp, to safeguard the Camp's confidential information, and to refrain from using their positions to secure a private advantage at the Camp's expense.

126. Under the APA, Buyer acquired the causes of action belonging to the Sellers relating to the Camp Business and the Acquired Assets, including this breach of fiduciary duties claim.

127. Prior to their resignations, the Bernsteins breached those duties by accessing the Campminder system on August 19, 2026, to run a report on a lead source list, in anticipation of their then-forthcoming resignation and for use with their future employment with Berkshire Trails.

128. The Bernsteins continued the breach of their fiduciary duties up to, and after, their resignation as a continuous transaction. After their resignations, the Bernsteins continued to breach those duties by (i) accessing the Campminder system using credentials acquired through their then-prior role as directors of Camp North Star to run reports on the Camp's 2016, 2026, and 2027 lead sources; and (ii) exporting and retaining the Camp's Intellectual Property and other confidential information, deleting the Camp's files and the Camp Instagram, and using their positions and access to divert the Camp's business and information to a competitor. For his part, Mr. Bernstein pursued this course in bad faith and in knowing disregard of the August 29 Directive, which expressly reminded him that the Camp's information was the property of the Camp, could not be downloaded or retained, and had to be deleted immediately.

129. The Bernsteins' post-resignation access to the Campminder system, and their exfiltration, deletion, and commercial exploitation of the Camp's Intellectual Property and other confidential information remains actionable as their misconduct exploited the specialized access,

administrative credentials, and confidential corporate materials entrusted to them solely in their capacity as directors of the Camp, and such conduct occurred as a continuous course of action initiated prior to their resignation. Further, the Bernsteins' ongoing duty to protect the Camp's confidential records and trade secrets survived their resignation.

130. As a direct and proximate result of these breaches, Plaintiffs have been damaged.

**COUNT IX**
Conversion
(Against the Bernsteins)

131. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein. This Count is governed by Massachusetts law and is pled in the alternative to Plaintiffs' trade-secret claims (Counts IV-VI) and only to the extent it is not based upon the misappropriation of a trade secret.

132. Plaintiffs own the Camp's digital assets, including the Camp Instagram and the files maintained on the Shared Drive.

133. The Bernsteins intentionally (i) exercised dominion and control over Plaintiffs' property in a manner that seriously interfered with Plaintiffs' right of control—including deleting the Camp Instagram and its associated content, and by deleting and retaining the Camp's Intellectual Property and other confidential materials—thereby completely dispossessing Plaintiffs of that property; and (ii) retained downloaded copies of said Intellectual Property and other confidential material, for use in Massachusetts at Berkshire Trails. For his part, Mr. Bernstein did so notwithstanding the August 29 Directive, which demanded that he surrender all login information for the Camp's platforms and immediately delete any Camp information downloaded onto or existing on his personal devices; Mr. Bernstein refused to comply and instead continued to exercise dominion over, and to retain and destroy, Plaintiffs' property.

134. As a direct and proximate result, Plaintiffs have been damaged, including through lost business opportunities and the costs of investigation and restoration.

**COUNT X**
Trespass to Chattels
(Against the Bernsteins)

135. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein. This Count is governed by Maine law and is pled in the alternative to Plaintiffs' trade-secret claims (Counts IV-VI) and only to the extent it is not based upon the misappropriation of a trade secret.

136. The Bernsteins intentionally interfered with and impaired Plaintiffs' personal property, including the deletion of materials on the Shared Drive and the deletion of the Camp Instagram, and thereby impaired its condition, quality, or value, and deprived Plaintiffs of its use. For his part, Mr. Bernstein did so intentionally and in knowing disregard for the August 29 Directive, which demanded the surrender of all credentials and the immediate deletion of any Camp information on his personal devices.

137. As a direct and proximate result, Plaintiffs have been damaged.

**COUNT XI**
Unjust Enrichment—Pleaded in the Alternative
(Against All Defendants)

138. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein. This Count is pleaded in the alternative and governed under Massachusetts law and applies only where no adequate remedy at law and no enforceable express contract governs the subject matter, and only to the extent the benefit at issue is not wholly coextensive with the trade-secret misappropriation alleged in Counts IV-VI.

139. The Defendants received and retained a benefit at Plaintiffs' expense—including the Camp's confidential information, digital assets, and non-trade secret proprietary materials, and the competitive advantage derived from them—under circumstances, including the Defendants' active wrongdoing (unauthorized access, data exfiltration, deletion, and transfer of the Camp's materials and the taking and withholding of the Camp Instagram) continued, in knowing disregard of the August 29 Directive, in which it would be inequitable for the Defendants to retain that benefit without payment of its value.

140. Plaintiffs are entitled to restitution and disgorgement of the value of the benefit the Defendants unjustly received as a result of that wrongful conduct.

## RESERVATION OF RIGHTS

141. Plaintiffs reserve all rights to amend this Complaint as new facts develop and are discovered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court grant the following relief:

A. Declaring that the Camp Instagram, the files exfiltrated from the Shared Drive and Campminder system, and the access credentials to the Camp's digital assets are Acquired Assets that were sold and conveyed to Plaintiffs free and clear under the Sale Order, the APA, and the Side Letter, and issuing an order enforcing the Sale Order and directing the Defendants to (i) deliver, convey, and restore those Acquired Assets to Plaintiffs; (ii) cease all interference with Plaintiffs' title to and use of those Acquired Assets; and (iii) permanently delete all copies of the exfiltrated materials however stored or retained;

B. Preliminarily and permanently enjoining the Defendants, and all persons acting in concert with them, from accessing, using, disclosing, or retaining the Camp's Intellectual Property, confidential information, trade secrets, and digital assets, and directing the Defendants to return and then permanently delete all copies thereof and to restore the Camp Instagram and convey all related credentials;

C. Awarding Plaintiffs compensatory damages in an amount to be determined at trial, including actual loss and the Defendants' unjust enrichment, or in the alternative a reasonable royalty;

D. Awarding Plaintiffs exemplary and multiple damages, including exemplary damages of up to twice the compensatory award under the Defend Trade Secrets Act and the Maine and Massachusetts Uniform Trade Secrets Acts, and up to treble damages under Mass. Gen. Laws ch. 93A;

E. Awarding Plaintiffs their reasonable attorneys' fees and costs as provided by the Defend Trade Secrets Act, the Massachusetts Uniform Trade Secrets Act, and Mass. Gen. Laws ch. 93A;

F. Awarding Plaintiffs pre-judgment and post-judgment interest; and

G. Granting such other and further relief as the Court deems just and proper.

Dated: November 5, 2026

Respectfully submitted,
**BROWN RUDNICK LLP**

/s/ *Gerard T. Cicero*

Gerard T. Cicero, Esq. (N.J. Bar No. 173562015)
Bennett S. Silverberg (*pro hac vice*)
Hayden Miller (*pro hac vice* forthcoming)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Facsimile: (212) 209-4801
Email: gcicero@brownrudnick.com
bsilverberg@brownrudnick.com
hmiller@brownrudnick.com

-and-

Sharon I. Dwoskin (*pro hac vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856 8200
Facsimile: (617) 856 8201
Email: sdwoskin@brownrudnick.com

-and-

Matthew Richardson (*pro hac vice* forthcoming)
Jase Panebianco (*pro hac vice* forthcoming)
1900 N. Street NW, Floor 4
Washington, D.C. 20036
Tel: (202) 536 1700
Facsimile: (202) 536 1701
Email: mrichardson@brownrudnick.com
jpanebianco@brownrudnick.com

*Counsel to Plaintiffs.*

# EXHIBIT 1

**Execution Version**

**ASSET PURCHASE AGREEMENT**

**by and among**

**American Youth Camping Holdco LLC,**

**as Buyer;**

**and**

**THE SELLERS NAMED HEREIN,**

**as Sellers**

**Dated as of September 4, 2026**

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ........................................................................................1

ARTICLE II PURCHASE AND SALE ....................................................................10

Section 2.01 Acquired Assets..................................................................................10
Section 2.02 Excluded Assets .................................................................................12
Section 2.03 Assumed Liabilities............................................................................14
Section 2.04 Excluded Liabilities............................................................................14
Section 2.05 Further Assurances.............................................................................15
Section 2.06 Purchase Price ....................................................................................16
Section 2.07 Deposit; Payment of Purchase Price. .................................................16
Section 2.08 Transfer Taxes....................................................................................17
Section 2.09 Allocation of Purchase Price ..............................................................17
Section 2.10 Assumed Contracts.............................................................................18
Section 2.11 Right to Modify Classification of Assets and Liabilities. ...................19

ARTICLE III CLOSING ..........................................................................................19

Section 3.01 Closing................................................................................................19
Section 3.02 Sellers' Closing Deliverables .............................................................19
Section 3.03 Buyer Closing Deliverables................................................................20

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS .............................21

Section 4.01 Organization and Qualification of Sellers ..........................................21
Section 4.02 Authority of Sellers ............................................................................21
Section 4.03 No Conflicts .......................................................................................21
Section 4.04 Title to Acquired Assets .....................................................................22
Section 4.05 Litigation ............................................................................................22
Section 4.06 Compliance with Laws; Permits.........................................................22
Section 4.07 Environmental Matters .......................................................................22
Section 4.08 Brokers ...............................................................................................22
Section 4.09 Sufficiency..........................................................................................22
Section 4.10 Real and Tangible Property.................................................................23
Section 4.11 Assumed Contracts..............................................................................23
Section 4.12 Insurance .............................................................................................23
Section 4.13 Employees. ..........................................................................................23
Section 4.14 ..............................................................................................................24
Section 4.15 No Other Representations ..................................................................24

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ..................................24

Section 5.01 Organization of Buyer .........................................................................24
Section 5.02 Authority of Buyer ..............................................................................24
Section 5.03 No Conflicts ........................................................................................25
Section 5.04 Sufficiency of Funds ...........................................................................25
Section 5.05 Litigation .............................................................................................25

Section 5.06 Brokers ....................................................................................25
Section 5.07 No Outside Reliance....................................................................25
Section 5.08 Adequate Assurances Regarding Executory Contracts ..............................25
Section 5.09 No Other Representations ................................................................25

ARTICLE VI COVENANTS .....................................................................................26

Section 6.01 Conduct of Business ........................................................................26
Section 6.02 Access to Information ......................................................................26
Section 6.03 Survey..............................................................................................27
Section 6.04 Expired Approvals; Cooperation .........................................................27
Section 6.05 Efforts; Consents ..............................................................................27
Section 6.06 Bankruptcy Court Matters. ................................................................27
Section 6.07 Publicity............................................................................................28
Section 6.08 Confidentiality ..................................................................................29
Section 6.09 Notification of Certain Matters ..........................................................29
Section 6.10 Bulk Transfer Laws ...........................................................................29
Section 6.11 Employee Matters..............................................................................29
Section 6.12 Camp Matters ....................................................................................30
Section 6.13 Post-Closing Receipt and Possession of Assets ..................................30

ARTICLE VII TAX MATTERS ..................................................................................31

Section 7.01 Transfer Taxes ..................................................................................31
Section 7.02 Cooperation on Tax Matters...............................................................31
Section 7.03 Periodic Taxes ...................................................................................31
Section 7.04 Reimbursement for Taxes ..................................................................31

ARTICLE VIII CONDITIONS TO CLOSING.................................................................32

Section 8.01 Conditions to Obligations of All Parties .............................................32
Section 8.02 Conditions to Obligations of Buyer.....................................................32
Section 8.03 Conditions to Obligations of Sellers ...................................................33

ARTICLE IX TERMINATION.....................................................................................33

Section 9.01 Termination ......................................................................................33
Section 9.02 Effect of Termination .........................................................................34
Section 9.03 Remedies. .........................................................................................34

ARTICLE X MISCELLANEOUS .................................................................................35

Section 10.01 Survival ...........................................................................................35
Section 10.02 Notices.............................................................................................35
Section 10.03 Interpretation ...................................................................................36
Section 10.04 Severability.......................................................................................36
Section 10.05 Entire Agreement .............................................................................36
Section 10.06 Assignment.......................................................................................36
Section 10.07 Amendment and Waiver....................................................................36
Section 10.08 Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial ....37
Section 10.09 Specific Performance .......................................................................37
Section 10.10 Counterparts ....................................................................................37

Section 10.11 No Third-Party Beneficiaries ....................................................................37
Section 10.12 "As Is, Where Is" Transaction....................................................................37
Section 10.13 No Successor Liability ....................................................................38

<u>Exhibits</u>

Exhibit A Form of Bill of Sale

<u>Schedules</u>

Schedule 1.1 – Knowledge
Schedule 2.01(t) – Other Acquired Assets
Schedule 2.10(a) – Assumed Contract List
Schedule 4.04 – Title to Acquired Assets
Schedule 4.06(b) – Acquired Permits
Schedule 4.09 – Sufficiency
Schedule 4.10 – Real and Tangible Property
Schedule 4.13(a) – Current Employees
Schedule 7.04 – Reimbursement for Taxes

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is dated as of September 4, 2026 (the "Effective Date"), and is entered into by and among the purchaser, American Youth Camping Holdco LLC (together with any successors and permitted assigns, or designees, "Buyer"), and each of the "Sellers" identified on the signature pages hereto (each a "Seller" and collectively, the "Sellers"). Each of Buyer and Sellers are at times referred to herein individually as a "Party" and together as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

## RECITALS

WHEREAS, on June 4, 2026 and June 5, 2026, Sellers commenced bankruptcy cases which are being jointly administered under Case No. 26-16388 (CMG) (the "Bankruptcy Cases") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

WHEREAS, in connection with the Bankruptcy Cases, Sellers desire to sell, transfer, convey, assign and deliver to Buyer, all of the Acquired Assets, and Buyer desires to: (i) purchase, acquire and assume all of the Acquired Assets and all of the Assumed Liabilities (and no other liabilities) (each as defined herein); and (ii) consummate such other transactions as are contemplated by this Agreement, in each case upon the terms and conditions set forth in this Agreement (with all such transactions referred to as the "Transaction");

WHEREAS, simultaneously with the execution of this Agreement, Buyer has delivered to the Escrow Agent, an amount in cash equal to the Deposit in immediately available funds pursuant to the terms of the Bid Procedures Order;

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Acquired Assets pursuant to Sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey, all on the terms and subject to the conditions set forth in this Agreement and in the Sale Order (as defined herein); and

WHEREAS, Sellers' and Buyer's willingness to consummate the Transaction is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"Accounts Receivable" means (a) all accounts, accounts receivable, payment intangibles, rights to payment, notes, notes receivable, negotiable instruments, chattel paper, vendor rebates and any other rights to receive payment or value for goods or services rendered, whether earned or unearned, billed or unbilled, accrued or unaccrued of Sellers, and (b) any security interest, claim, recoveries, remedy or other right related to any of the foregoing.

"Acquired Assets" has the meaning set forth in Section 2.01.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Assumed Contract List" has the meaning set forth in Section 2.10(a).

"Assumed Contracts" means those Contracts that have been assigned to and assumed by Buyer pursuant to Section 2.10 and section 365 of the Bankruptcy Code.

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Auction" has the meaning set forth in the Bid Procedures Order.

"Back-Up Bidder" has the meaning set forth in the Bid Procedures Order.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Causes of Action" means any and all claims, rights, causes of action, suits, and proceedings, whether known or unknown, arising under chapter 5 of the Bankruptcy Code (including Sections 502(d), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code) or any analogous international, state or federal law, including all preference, fraudulent transfer or conveyance, and other avoidance claims, rights, and causes of action, together with any and all proceeds, recoveries, and rights to recovery (whether judicial or otherwise) arising therefrom or related thereto, that are or may be asserted by, or on behalf of, the Sellers, their estates, or any trustee, examiner, or other estate representative, but excluding, in each case, any such claims, rights, causes of action, suits and proceedings against any Designated Party.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" has the meaning set forth in the recitals.

"Bid Procedures" means the procedures governing the solicitation of bids for the Acquired Assets and, to the extent applicable, the conduct of the Auction, as approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court dated June 26, 2026 approving the Bid Procedures.

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Camp" means the recreational and/or informal educational programs for Campers during the Camp Season in a communal traditional residential camp environment at Camp North Star, located at 200 Verrill Rd., Poland Spring, Maine 04274.

"Camp Business" means the establishment, administration, provision and management of the recreational and/or informal educational programs for Campers at the Camp, including all day camps, overnight camps, specialty camps, youth development programs, recreational activities, educational activities, transportation services, food services, merchandising activities and ancillary operations related to the Camp. The Camp Business also includes recruitment, enrollment, registration and servicing of Campers, staff, management of Camp facilities and equipment, procurement of necessary provisions, lease or ownership of real estate, creation and execution of programs and events and follow-up relations with Campers, prospective Campers, and their parents. The Camp Business may also include the rental of the facilities of the Camp during periods other than the Camp Season.

"Camp Season" shall mean the months of June, July and August in a given calendar year.

"Campers" means the individuals who are enrolled, registered or otherwise accepted to attend the Camp, including prospective Campers for whom Sellers have received an application, enrollment form or deposit.

"Cash Payment" has the meaning set forth in Section 2.06.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral agreement, contract, lease, sublease, license, sublicense, obligation, promise, undertaking, commitment, or other legally binding arrangement or understanding.

"Cure Amounts" means all amounts that must be paid and all obligations that must otherwise be satisfied pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, as determined by the Bankruptcy Court.

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date, in each case, inclusive of those on approved paid or unpaid leave of absence (such as those on short- or long-term disability, military, maternity or other medical leave of absence).

"Deposit" has the meaning set forth in Section 2.07(a).

"Designated Party" means any of the Sellers' vendors, suppliers, employees, customers or trade creditors with whom Buyer or any of its Affiliates continues to conduct business in regard to the Acquired Assets after the Closing.

"DIP Facility" means any debtor-in-possession credit facility entered into by Sellers in connection with the Bankruptcy Cases.

"Dollars" or "$" means the lawful currency of the United States.

"Domain Names" means Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the Internet and all applications for any of the foregoing, as well as social media handles and other names, identifiers and locators associated with Internet sites and services.

"Effective Date" has the meaning set forth in the preamble.

"Encumbrance" means any lien, pledge, security interest, charge, claim, mortgage, deed of trust, option, right of first refusal or offer, preemptive right, restriction on transfer, lease, assignment, option, easement, right of way, encroachment, covenant, restriction, judgment, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title, or other encumbrance of any kind or nature, including any condition or restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Escrow Agent" means Flagstar Bank, or such other escrow agent as mutually agreed in writing between the Parties.

"Escrow Fund" has the meaning set forth in Section 2.07(a).

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Claims" means all (a) rights (including rights of set-off and rights of recoupment), claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, rights of set-off, rights of subrogation and all other rights of any kind of the Sellers against (i) any current or former director, officer, or manager of any Seller, or any

spouse, family member, or other relative of, or any Person related to or affiliated with, any of the foregoing, (ii) any DIP lender, prepetition secured or unsecured lender, or other financing party in the Bankruptcy Cases, including, without limitation, any DIP Lender and Prepetition Lender (each as defined in the Final DIP Order Docket No. 547) and each of their respective Affiliates, and (iii) third parties solely to the extent arising in respect of any Excluded Asset or Excluded Liability, (b) Bankruptcy Causes of Action, and (c) claims or causes of action of any Seller to the extent such claims or causes of action neither (X) directly and exclusively arose out of or related to the ordinary course, day-to-day operation prior to Closing of the Acquired Assets (including the Assumed Contracts) and the Camp Business, nor (Y) directly and exclusively arise out of or relate to the post-Closing operation of the Camp Business; provided, however, that (1) for the avoidance of doubt, claims against any Designated Party arising under chapter 5 of the Bankruptcy Code or any analogous international, state or federal law, together with any and all proceeds, recoveries, and rights to recovery (whether judicial or otherwise) arising therefrom or related thereto, are not Excluded Claims, and (2) Excluded Claims shall not include any claim against any individual whose principal role is the day-to-day operation or management of the Camp Business (including any Camp director, Camp operator, or other Camp operational personnel), regardless of title or whether such individual performs services on-site or remotely, to the extent arising from such individual's ordinary-course, day-to-day performance of Camp Business operations or management of the Camp Business; provided that such individual does not include any individual whose principal role is ownership, financing, or enterprise-level management of any Seller.

"Excluded Contract" has the meaning set forth in Section 2.10(a).

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Excluded Taxes" means any Liability for any: (i) Taxes imposed on or payable by any Seller or its respective Affiliates for any Tax period (including any Taxes required to be withheld from any payment to any Seller hereunder); (ii) Taxes imposed with respect to any of the Acquired Assets, any of the Assumed Liabilities or the Camp Business for any Pre-Closing Tax Period; (iii) Taxes imposed on or with respect to any of the Excluded Assets or any of the Excluded Liabilities for any Tax period; (iv) any Transfer Taxes for which Sellers are responsible pursuant to Section 2.08; (v) Taxes imposed on Buyer or any of its Affiliates as a transferee or successor to any Seller or its respective Affiliates by operation of Law; and (vi) Periodic Taxes apportioned to Sellers pursuant to Section 7.03; provided that Excluded Taxes shall not include any Transfer Taxes for which Buyer is responsible pursuant to Section 2.08 or any Periodic Taxes apportioned to Buyer pursuant to Section 7.03.

"Final Order" means an Order of the Bankruptcy Court (or any court of competent jurisdiction) as to which the time to file an appeal, motion for rehearing, or writ of certiorari has expired and no appeal, motion for rehearing, or writ of certiorari is pending; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule, may be filed shall not cause an Order not to be a Final Order.

"Former Employees" means all individuals who have been employed by Sellers who are not Current Employees.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, provincial, local, municipal, foreign, or other government, or any department, commission, board, bureau, agency, regulatory authority, instrumentality, or political subdivision thereof, or any court, arbitral body, or similar body of competent jurisdiction.

"Inside Date" means the later of (i) the date on which Buyer has received valid transfer or replacement of the Permits set forth in Section 4.06(a) of the Schedules, where the absence of such Permits would constitute a Material Adverse Effect, and (ii) the date on which the Campers and seasonal staff of the Camp have vacated the Camp following the conclusion of the 2026 Camp Season.

"Intellectual Property" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) Domain Names, (g) all other proprietary and intellectual property rights, (h) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (i) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (j) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"Inventory" means all of Sellers' now owned and hereafter acquired raw materials and work-in-process therefor and all of Sellers' tangible property, wherever located, used in the operation of the Camp Business or that are otherwise included in the Acquired Assets, including supplies, signage, food and beverage items, retail products, camp store merchandise, uniforms, apparel, awards, activity supplies, medical and first-aid supplies, maintenance and janitorial supplies and office supplies.

"IT Equipment" means all security systems, surveillance equipment, computers, servers, laptops, tablets, telephones and other information technology equipment.

"Knowledge" means, with respect to any matter in question, (a) in the case of Sellers, the actual knowledge of the individuals set forth on Section 1.1(a) of the Schedules and (b) in the case of Buyer, the actual knowledge of the individual set forth on Section 1.1(b) of the Schedules.

"Law" means any federal, state, provincial, local, municipal, foreign, international, or multinational constitution, statute, treaty, rule, regulation, ordinance, order, code, or other similar requirement enacted, adopted, promulgated, or applied by any Governmental Authority.

"Leased Real Property" means each parcel of real property leased by a Seller, together with all rights, title and interest of each such Seller in and to leasehold improvements relating thereto.

"Liabilities" means any debt, liability, commitment, Tax or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Material Adverse Effect" means any change, effect, event, occurrence, development, or state of facts that, individually or in the aggregate with all other changes, effects, events, occurrences, developments, or states of facts, (a) has had or would reasonably be expected to have a material adverse effect on the Camp Business, the Acquired Assets or the Assumed Liabilities or the ability of Sellers to consummate the Transaction, or (b) prevents or materially impairs or delays, or would reasonably be expected to prevent or materially impair or delay, the ability of Sellers to consummate the Transaction; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (i) changes in general economic or political conditions or the securities, credit, or financial markets in general in the United States or any other jurisdiction in which Sellers operate; (ii) changes in conditions generally affecting the industries in which Sellers operate; (iii) the announcement or pendency of this Agreement or the Transaction, including the impact thereof on the relationships, contractual or otherwise, of Sellers with employees, customers, suppliers, distributors, partners, or other third parties (provided that this clause (iii) shall not apply to representations or warranties that, by their terms, specifically address the consequences arising out of the pendency or consummation of the transactions contemplated herein); (iv) any change in Law or GAAP (or any interpretation thereof) after the date hereof; (v) acts of war (whether or not declared), sabotage, terrorism, military actions, or the escalation or worsening of any of the foregoing; (vi) any natural or man-made disaster, pandemic, epidemic, disease outbreak, or acts of God; (vii) the filing or commencement of the Bankruptcy Cases or any events or circumstances resulting therefrom; (viii) any action taken or omitted to be taken by Sellers at the express written request, or with the prior written consent of Buyer; (ix) any failure by Sellers to meet any internal or external projections, forecasts, or estimates of revenue, earnings, or other financial metrics (provided that the underlying causes of such failure may be taken into account unless otherwise excluded by this definition), (x) any matter disclosed on the Schedules hereto.

"Order" means any order, judgment, injunction, ruling, writ, assessment, or decree of any Governmental Authority.

"Outside Date" means September 10, 2026; provided, however, that the Outside Date may be extended by mutual written agreement of the Parties.

"Owned Real Property" means all Real Property currently owned by a Seller.

"Parties" has the meaning set forth in the preamble.

"Party" has the meaning set forth in the preamble.

"Patents" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"Periodic Taxes" has the meaning set forth in Section 7.03.

"Permits" means all licenses, permits, certificates, approvals, including the Approvals as defined in Section 6.04, registrations, consents, authorizations, franchises, variances, exemptions, and orders pending with or issued or granted by a Governmental Authority.

"Permitted Encumbrances" means (a) Encumbrances created under this Agreement; (b) statutory liens for current Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings only if, and only to the extent, related to an Assumed Liability; (c) mechanics', carriers', workers', repairers', and similar statutory liens arising or incurred in the ordinary course of business for amounts not yet due and payable, or the amount or validity of which is being contested in good faith by appropriate proceedings only if, and only to the extent, related to an Assumed Liability; (d) zoning, entitlement, conservation restrictions, and other land use and environmental regulations against the Owned Real Property or Leased Real Property by Governmental Authorities that do not materially interfere with the present use of the applicable asset; and (e) prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" means the dates on which Sellers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period ending on the Closing Date.

"Purchase Price" has the meaning set forth in Section 2.06.

"Real Property" means any real estate, land, building, structure, improvement or other real property of any kind or nature whatsoever owned, leased or occupied by any Person, and all appurtenant and ancillary rights thereto, including easements, covenants, water rights, sewer rights and utility rights.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, alumni lists, parent contact lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Camp Business or the Acquired Assets or Assumed Liabilities, including without limitation a schedule of Sellers' current Campers, attendance records, academic records, marketing databases, Camper performance and participation records, accreditation files and safety audits.

"Reimbursing Party" has the meaning set forth in Section 7.04.

"Sale Order" means an order of the Bankruptcy Court approving the Transaction, entered pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, which order shall be in a form reasonably acceptable to Buyer.

"Schedules" means the disclosure schedules delivered by Sellers to Buyer in connection with the execution of this Agreement.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Allocation Notice" has the meaning set forth in Section 2.09.

"Seller Benefit Plan" means any benefit or compensation plan, program, policy, practice, agreement, contract, arrangement or other obligation, whether or not in writing and whether or not funded, in each case, that is sponsored or maintained by, or required to be contributed to by, or with respect to which any potential obligation or liability is or could be borne by, a Seller.

"Software" means all websites, computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation).

"Straddle Period" means any Tax period that includes, but does not end on, the Closing Date.

"Successful Bidder" has the meaning given to such term in the Bid Procedures Order.

"Tax Records" means all Tax Returns, elections, consents, and other documents relating to Taxes filed with or submitted to any Governmental Authority.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto.

"Taxes" means all federal, state, local, and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy, and other taxes, duties, or assessments of any nature whatsoever, together with all interest, penalties, and additions thereto imposed with respect to such amounts.

"Termination Date" means September 30, 2026; provided, however, that the Termination Date may be extended by mutual written agreement of the Parties.

"Trademarks" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"<u>Transaction</u>" has the meaning set forth in the recitals.

"<u>Transaction Documents</u>" has the meaning set forth in <u>Section 4.02</u>.

"<u>Transferred Employee</u>" has the meaning set forth in <u>Section 6.01(a)</u>.

"<u>Transfer Taxes</u>" has the meaning set forth in <u>Section 2.08</u>.

"<u>Tuition</u>" means consideration paid by or for a Camper to attend a Camp.

"<u>Tuition Deposits</u>" means all Tuition deposits paid by or for a Camper to attend the Camp that are held by or on behalf of Sellers.

"<u>2025 Camp Season</u>" means the Camp Season during calendar year 2025.

"<u>2026 Camp Season</u>" means the Camp Season during calendar year 2026.

"<u>2027 Camp Season</u>" means the Camp Season during calendar year 2027.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01 Acquired Assets**. On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Sellers shall sell, assign, transfer, convey, and deliver to Buyer, and Buyer shall purchase, acquire, and accept from Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), other than the Excluded Assets, all of the Sellers' assets, rights, properties of every nature, kind and description, tangible or intangible (including goodwill), whether now existing or hereafter acquired, wheresoever situated, relating to or used or held for use in connection with the Camp Business as of the Closing, including without limitation, the right, title and interest in and to the following assets (collectively, the "<u>Acquired Assets</u>"):

(a) all Accounts Receivable of Sellers as of the Closing and all other rights of Sellers to receive or recoup, whether by offset or netting against production from the Camp Business and the proceeds thereof or otherwise, amounts owed by Persons other than the Sellers and their Affiliates with respect to the Camp Business or the Acquired Assets;

(b) all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(c) all deposits (including, without limitation, Tuition Deposits, Camper canteen or camp store account balances, deposits in transit, customer deposits and security deposits for rent, deposits for the 2027 Camp Season received by or pledged to the Sellers on behalf of a Camper, electricity, telephone, utilities, Seller Benefit Plans or otherwise) and other prepaid charges and expenses of Sellers;

(d) all Assumed Contracts;

(e) all Intellectual Property owned or purported to be owned by Sellers and all of Sellers' rights to use other Intellectual Property, together with all goodwill associated therewith;

(f) all items of machinery (including vehicles, boats, buses, vans, maintenance vehicles and trailers) and equipment (including IT Equipment, recreational equipment, teaching materials, athletic equipment, sporting goods, educational equipment, dining hall and food service equipment, health and health center equipment), as well as tools, parts, furniture and fixtures owned by Sellers as of the Closing;

(g) all Records related to the Acquired Assets, Assumed Liabilities, including Tax Records, and the Camp Business, including, without limitation, camper and student records (including applications, evaluations, academic records, medical forms and related documents), alumni records, infirmary records, program records, manuals, invoices, sales records, sales and marketing materials, correspondence, and any and all other business records or business information, in each case to the extent (x) transferable or capable of being made available in compliance with applicable Law, and (y) in the possession and control of Sellers;

(h) all goodwill associated with the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Sellers, and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Camp Business, the Acquired Assets and/or the Assumed Liabilities (or any portion thereof);

(i) all rights (but not any obligations) of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with Current Employees, Former Employees or any other current or former directors, consultants, independent contractors and agents of Sellers;

(j) all of the Permits or all of the rights and benefits accruing under any Permits, including, to the extent transferable under applicable Law, the accreditation rights and status associated with the Camp Business, but excluding any Permit to the extent solely related to any Excluded Asset;

(k) other than with respect to any insurance proceeds related to, arising out of, or in connection with any directors' and officers' liability insurance policies, the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Acquired Assets occurring on or after the date hereof or (ii) any Assumed Liabilities;

(l) except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) solely related to the Camp Business, the Acquired Assets or the Assumed Liabilities, to the extent the transfer of the foregoing is effective under applicable non-bankruptcy law; provided that it is understood and agreed by the Parties that Buyer will not pursue or cause to be pursued any Bankruptcy Causes of Action against any of the Designated Parties other than as a defense (to the

extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party;

(m) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person related to the Acquired Assets;

(n) the right to receive and retain mail relating to Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(o) the Owned Real Property;

(p) the Leased Real Property;

(q) all telephone numbers, fax numbers, e-mail accounts, websites, URLs and Domain Names and reservation or registration platforms, together with all passwords, administrator rights, access credentials and related account-control rights, in each case to the extent (x) transferable or capable of being made available in compliance with applicable Law, and (y) in the possession and control of Sellers;

(r) all advertising and marketing materials, samples, artwork, photography, images, videos, copy, catalogues, labels, recordings and similar material relating to the Camp Business;

(s) all educational curriculum materials, lesson plans, training materials, programming materials, manuals, operational manuals and policies relating to the Camp Business; and

(t) any other assets, properties and rights listed on Section 2.01(t) of the Schedules.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, remove any Acquired Asset from this Section 2.01 in its sole and absolute discretion until the Closing and elect to treat such Contract, Permit or other asset as an Excluded Asset; provided that no such removal shall result in any adjustment to the Cash Payment.

**Section 2.02 Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, Sellers shall retain, and shall not sell, assign, transfer, convey, or deliver to Buyer, and Buyer shall not purchase, acquire, or accept from Sellers, any of the following assets of Sellers (collectively, the "Excluded Assets"):

(a) all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, stock transfer books, stock certificates and other documents solely relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity;

(b) all Contracts, in each case, other than the Assumed Contracts;

(c) the Excluded Claims;

(d) any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the transfer and disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Bankruptcy Cases that are protected by the attorney-client privilege that would be waived if provided to Buyer hereunder. To the extent any such Records are excluded from the Acquired Assets because Sellers are required by Law to retain them or because they are otherwise nontransferable, Sellers shall, to the extent legally permissible, provide Buyer with copies of such Records and reasonably cooperate with Buyer until the latest of (i) thirty (30) days following the Closing, (ii) the effective date of any plan of reorganization or liquidation in the Bankruptcy Cases, and (iii) conversion of the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, in connection with any matter involving such Records and relating to the Camp Business, the Acquired Assets or the Assumed Liabilities;

(e) all directors' and officers' liability insurance policies in existence as of the Closing and any proceeds arising out of such directors' and officers' liability insurance policies;

(f) the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement;

(g) all cash and cash equivalents of Sellers, which for the avoidance of doubt shall not include any assets of Sellers specifically set forth in Section 2.01(a);

(h) all Records to the extent solely related to the Excluded Assets;

(i) any unused retainers paid by the Sellers to any third party prior to the Closing for professional services or any amounts remaining in any escrow or similar account as of the Closing which are required by Law or applicable Contract to be used to fund the same;

(j) the Seller Benefit Plans and all assets thereof;

(k) any Claims of any Seller against (i) current or former directors, officers, insiders, or affiliates, (ii) any spouse, family member, or other relative of, or any Person related to or affiliated with, any of the foregoing, (iii) any DIP lender, prepetition secured or unsecured lender, or other financing party in the Bankruptcy Cases (including any DIP Lender and Prepetition Lender each as defined in the Final DIP Order Docket No. 547) and their respective Affiliates, and (iv) any other Person to the extent such Claims neither (X) directly and exclusively arose out of or related to the ordinary course, day-to-day operation prior to Closing of the Acquired Assets (including the Assumed Contracts) and the Camp Business, nor (Y) directly and exclusively arise out of or relate to the post-Closing operation of the Camp Business; provided, however, that (1) for the avoidance of doubt, claims against any Designated Party arising under chapter 5 of the Bankruptcy Code or any analogous international, state or federal law, together with any and all proceeds, recoveries, and rights to recovery (whether judicial or otherwise) arising therefrom or related thereto, are not Excluded Claims, and (2) Excluded Assets shall not include any claim against any individual whose principal role is the day-to-day operation or management of the Camp Business (including any Camp director, Camp operator, or other Camp operational personnel), regardless of title or whether such individual performs services on-site or remotely, to

the extent arising from such individual's ordinary-course, day-to-day performance of Camp Business operations or management of the Camp Business; provided that such individual does not include any individual whose principal role is ownership, financing, or enterprise-level management of any Seller; and

(l) equity securities of any other Person held by Seller.

**Section 2.03 Assumed Liabilities**. On the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to pay, perform, and discharge when due, the following Liabilities (collectively, the "Assumed Liabilities").

(a) all Liabilities arising under the Assumed Contracts to the extent such Liabilities arise from and after the Closing Date and relate to periods from and after the Closing Date; provided that, with respect to any Contract added to the Assumed Contract List after the Closing Date pursuant to Section 2.10, Buyer shall assume all Liabilities arising under such Contract from and after the Closing Date, whether such Liabilities arise before or after the date on which such Contract is designated as an Assumed Contract or assigned to Buyer;

(b) any Liabilities for Periodic Taxes apportioned to Buyer pursuant to Section 7.03 and any Liabilities for Transfer Taxes for which Buyer is responsible pursuant to Section 2.08, in each case that are either unpaid as of the Closing Date or arise from and after the Closing Date;

(c) all ordinary course accounts payable of Sellers for the 2026 Camp Season that are unpaid as of the Closing Date;

(d) base salary and base wages (but, for the avoidance of doubt, excluding any severance, incentive, bonus, transaction, change in control and/or equity-based pay) due to Current Employees of the applicable Seller employed primarily with respect to the Camp Business and at the Camp for the 2026 Camp Season, for the regular payroll period of such applicable Seller during which the Closing occurs (or, if applicable, the last payroll period that ends prior to the Closing Date) that are earned and unpaid as of the Closing Date, and which shall not exceed $12,865.00;

(e) any Liabilities arising under environmental Laws to the extent imposed on Buyer as owner or operator of the Owned Real Property acquired hereunder by operation of applicable Law, that cannot otherwise be excluded, assigned, or otherwise allocated to Sellers as a matter of Law;

(f) any Liabilities that arise out of the operation of the Camp Business from and after the Closing; and

(g) all Cure Amounts relating to the assumption and assignment of the Assumed Contracts to Buyer that are unpaid as of the Closing.

**Section 2.04 Excluded Liabilities**. Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume or be obligated to pay, perform, or discharge any Liabilities of Sellers other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including

the following. For the avoidance of doubt, Excluded Taxes shall constitute Excluded Liabilities and shall not constitute Assumed Liabilities.

(a) any Liability arising under, arising out of, or relating to any Excluded Asset and any Liability for Excluded Taxes;

(b) any Liability for any claim, action, suit, investigation, or proceeding that may be brought or threatened against Sellers or any of their Affiliates, including, for the avoidance of doubt, any directors' and officers' liability claim brought against Sellers or any of their Affiliates;

(c) any Liability arising under any employment agreement, or under any employment, consulting, retention, severance, bonus, profit-participation, equity-appreciation, change-of-control or similar arrangement with, or otherwise relating to, any current or former employee, officer, director or independent contractor of any of the Sellers (including under the Worker Adjustment and Retraining Notification Act);

(d) any Liability arising under any lease, sublease, license, occupancy agreement, ground lease, tenancy or other leasehold or possessory interest that is not an Assumed Contract, or under any Encumbrance (other than the Permitted Encumbrances and the Assumed Liabilities);

(e) the Seller Benefit Plans and any Liability under, arising out of, or relating to any Seller Benefit Plan, COBRA, ERISA, or Section 412 of the Code, or arising out of the employment or engagement of, or relating to, any Current Employees, Former Employees or any other current or former independent contractors, consultants, directors or agents of any of the Sellers;

(f) any Liability arising out of or relating to any violation of Law by Sellers or any of their Affiliates;

(g) any indebtedness for borrowed money or purportedly purchased receipts, including any obligations under the DIP Facility or any other debtor-in-possession financing, and any pre-petition secured or unsecured indebtedness, including any merchant cash advance or similar agreement;

(h) any Liability to the extent arising out of or relating to any breach, default, or violation by Sellers prior to the Closing Date under any Contract (other than Cure Amounts);

(i) any Liability relating to any rejected executory contract or unexpired lease; and

(j) any other Liabilities of Sellers not specifically included in the Assumed Liabilities.

**Section 2.05 Further Assurances**. From and after the Closing, each of the Parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances

and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transaction.

**Section 2.06 Purchase Price**. The aggregate purchase price for the Acquired Assets (the "Purchase Price") shall be an amount equal to:

(a) $6,250,000.00 in cash (the "Cash Payment"); plus

(b) the assumption of the Assumed Liabilities.

At the time of Closing, the Parties shall agree on an allocation of a portion of the Cash Payment among the real property being acquired hereunder for Transfer Tax purposes, which allocation shall be binding on the Parties for Transfer Tax purposes notwithstanding anything contained herein to the contrary; provided, however, that such allocation shall not be probative or binding in determining the allocation of Purchase Price pursuant to Section 2.09.

**Section 2.07 Deposit; Payment of Purchase Price.**

(a) **Deposit**.

(i) Simultaneously with the execution of this Agreement, Buyer shall deposit with the Escrow Agent, by wire transfer of immediately available funds, an amount equal to ten percent (10%) of the Cash Payment (the "Deposit"), to be held by the Escrow Agent in an interest-bearing account pursuant to an escrow agreement in form and substance reasonably acceptable to Buyer and Sellers (the "Escrow Fund"); however to the extent that the purchase price set forth in this Agreement is modified at or prior to the potential Auction, or to the extent Buyer is the Successful Bidder or the Back-Up Bidder, Buyer shall pay an additional amount into the Escrow Fund, within two (2) business days of the Auction, such that the Deposit equals ten percent (10%) of the proposed purchase price offered to purchase the Acquired Assets.

(ii) Buyer has previously delivered a deposit in connection with its bid to purchase certain camps subject to the Bankruptcy Cases (the "Bid Deposit"). The Bid Deposit shall be credited toward the Deposit required under this Agreement. The Bid Deposit may be allocated among this Agreement and the asset purchase agreements being executed in connection with the purchase of the assets of the other camp businesses listed in Section 8.02(f), as determined by the Buyer in its sole discretion. At Closing, the portion of the Bid Deposit allocated to this Agreement shall be credited against the Cash Payment.

(b) **Payment at Closing**. At the Closing, Buyer shall pay or cause to be paid to Sellers (or as Sellers may direct), by wire transfer of immediately available funds to an account or accounts designated by Sellers in writing at least two (2) Business Days prior to the Closing Date, the Cash Payment less the Deposit (together with any interest earned thereon), which shall be released to Sellers at Closing.

(c) **Return of Deposit**. If this Agreement is terminated by Sellers or Buyer for any reason, other than by Sellers pursuant to Section 9.01(e), then the Deposit (together with any interest earned thereon) shall be returned to Buyer within five (5) Business Days after such termination. If this Agreement is terminated by Sellers pursuant to Section 9.01(e), the Deposit

shall be released to Sellers as liquidated damages, which shall constitute the sole and exclusive remedy of Sellers against Buyer for any breach or failure to perform by Buyer, except in the case of Buyer's fraud or willful misconduct.

(d) **Deposits; Prepaid Tuition; Camp Fees; Prorations**. If Buyer assumes any post-Closing obligations in respect of any customer deposits, prepaid tuition, camp fees, registration payments, or other prepaid amounts relating to periods from and after the Closing, Buyer shall receive at Closing the associated cash, escrowed amounts, or a corresponding purchase price adjustment. The Parties shall also provide for customary prorations and adjustments as of the Closing Date, including with respect to real estate taxes, insurance premiums, and utilities, to the extent applicable and consistent with Section 7.03; provided that the Parties shall cooperate to identify and quantify prior to Closing all prorations and adjustments that are the responsibility of the Sellers and any such amounts so identified shall be satisfied at Closing.

(e) **Withholding Tax**. Notwithstanding anything to the contrary in this Agreement, (i) Buyer shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as Buyer is required to deduct and withhold under the Code or any other applicable Tax law and (ii) all such withheld amounts shall be treated for all purposes as delivered to Sellers hereunder.

**Section 2.08 Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration, recording, value-added, and other similar Taxes and fees (including any penalties and interest but, for the avoidance of doubt, not any income or gains Taxes) ("Transfer Taxes") incurred in connection with this Agreement and the Transaction shall be borne and paid fifty percent (50%) by Buyer and fifty percent (50%) by Sellers; provided, however, that the Parties shall cooperate in good faith to minimize the amount of any such Transfer Taxes and to avail themselves of any available exemptions from any such Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code.

**Section 2.09 Allocation of Purchase Price**. Within sixty (60) days after the Closing Date, Buyer shall prepare and deliver to Sellers a schedule allocating the Purchase Price (and any Assumed Liabilities to the extent properly taken into account as part of the consideration for U.S. federal income tax purposes) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. Sellers shall have thirty (30) days to review and comment on such schedule. Insofar as Sellers provide written notice to Buyer within such thirty (30) day period of one or more specific disagreements with Buyer's allocation (such written notice received by Buyer within such thirty (30) day period, a "Seller Allocation Notice"), Buyer and Sellers shall endeavor in good faith to resolve any such disagreements. Buyer's schedule shall be final and binding on the Parties with respect to any matters as to which no Seller Allocation Notice is provided by Sellers. If Buyer and Sellers are unable to resolve any disagreement contained in a Seller Allocation Notice within fifteen (15) days following Buyer's receipt of such Seller Allocation Notice, such disagreement shall be resolved by a nationally recognized independent accounting firm mutually acceptable to Buyer and Sellers, whose determination shall be final and binding on the Parties. The fees and expenses of such accounting firm shall be borne equally by Buyer and Sellers. Buyer and Sellers agree to file all Tax Returns in a manner consistent with Buyer's allocation (with respect to any matters as to which no Seller Allocation Notice is provided), any written agreement between Buyer and Sellers as to any disputed items and any

Case 26-16381-CMG Doc 81 Filed 01/02/26 Entered 01/02/26 11:50:26 Desc Main Document Page 43 of 200

determination with respect to disputed items by the mutually acceptable independent accounting firm and shall not take any position inconsistent therewith in any Tax proceeding, audit, or otherwise, except as required by applicable Law.

**Section 2.10 Assumed Contracts.**

(a) Section 2.10(a) of the Schedules (the "Assumed Contract List") sets forth a list of all Contracts to which a Seller is a party and which Buyer has designated to be included as an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract. Sellers shall use reasonable best efforts to provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts to which any Seller is a party that are Assumed Contracts and take all other actions reasonably necessary to cause such Contracts to be assigned to Buyer pursuant to section 365 of the Bankruptcy Code. At the Closing, Sellers shall assign to Buyer the Assumed Contracts that may be assigned by any such Seller to Buyer pursuant to sections 363 and 365 of the Bankruptcy Code. From and after the date hereof, until the earlier of (x) the date on which the Bankruptcy Court enters an Order confirming Sellers' plan of reorganization or liquidation, and (y) thirty (30) days following the Closing, Buyer shall be entitled to make additions and deletions to the Assumed Contract List by delivery of written notice to Sellers (which shall then serve notice on the non-debtor counterparties to each of the Contracts so added or deleted); provided that (1) Buyer shall pay any net increase in the sum of Cure Amounts resulting directly from such designation of additional Assumed Contracts (the intent being that there will be no net negative effect on the bankruptcy estate due to a net increase in Cure Amounts resulting from any additional assumptions), and (2) in the case of designating an additional Assumed Contract, at the sole cost and expense of Buyer, Sellers will use reasonable best efforts to cause such Contract to be assumed and assigned to Buyer in accordance with the Bankruptcy Code. Any such deleted Contract shall be deemed to no longer be an Assumed Contract and any such added Contract shall be deemed an Assumed Contract. Any Contract that is designated (or deemed to be designated) for exclusion and rejection pursuant to this Section 2.10 shall constitute an "Excluded Contract" as of the Closing Date.

(b) In connection with the assumption and assignment to Buyer of any Assumed Contract that is executory pursuant to this Section 2.10, the allowed Cure Amounts, if any, necessary to cure all monetary defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts, shall be paid by Buyer in connection with and upon the assignment.

(c) Sellers shall use their respective reasonable best efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.10. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court on or prior to the Closing, then the Parties shall use their reasonable best efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Authorities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that Sellers' obligations hereunder shall only continue until the Bankruptcy Cases are closed or dismissed. In addition, Sellers shall use their commercially reasonable best efforts to transfer to Buyer, or to assist Buyer in obtaining or having reissued, all Permits necessary to own and operate the Camp (including all applicable Department of Health or analogous body

children's-camp, food-service, and swimming-pool/bathing-beach permits and all water, septic and dam registrations), and shall reasonably cooperate with Buyer in connection therewith for a period of ninety (90) days following the Effective Date.

**Section 2.11 Right to Modify Classification of Assets and Liabilities**. At any time up to two Business Days prior to the Closing Date, the Buyer shall have the right, in its sole discretion and upon written notice to the Sellers, to: (a) remove any asset from the definition of Acquired Assets; or (b) add any Liability or obligation to the definition of Assumed Liabilities. Upon delivery of such written notice by the Buyer to the Sellers, Sections 2.01, 2.02, 2.03 and 2.04, as applicable, and any related schedules to this Agreement shall be deemed amended automatically to reflect such additions or removals, and the Parties shall cooperate reasonably and in good faith to execute any further documents necessary to effectuate such changes. For the avoidance of doubt, any such additions or removals shall not result in any adjustment to the Purchase Price.

## ARTICLE III
## CLOSING

**Section 3.01 Closing**. Subject to the satisfaction or waiver of the conditions set forth in Article VIII, the closing of the Transaction (the "Closing") shall take place remotely by exchange of documents and signatures electronically (or by such other means as the Parties may agree) on the date that is three (3) Business Days after the satisfaction or waiver of all conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), or at such other time and place as Buyer and Sellers may mutually agree in writing; provided that, notwithstanding the foregoing, the Closing shall not occur prior to the Inside Date without the prior written consent of Buyer (the date on which the Closing actually occurs, the "Closing Date"). Notwithstanding anything contained herein to the contrary, in the event that the Closing Date occurs after September 10, 2026, Buyer shall be responsible for reasonable, documented, out-of-pocket costs, expenses and Liabilities incurred by Seller in the ordinary course of business in operating, maintaining and/or otherwise carrying the Camp from and after September 10, 2026 through the Closing Date; provided that Seller shall provide Buyer with reasonable supporting documentation for such amounts and reasonable advance notice of any material expenditure. Such costs, expenses and/or Liabilities shall be timely reimbursed to Seller or satisfied directly by Buyer, at the direction of Seller, as incurred.

**Section 3.02 Sellers' Closing Deliverables**. At the Closing, Sellers shall deliver or cause to be delivered to Buyer the following:

(a) a bill of sale, substantially in the form attached hereto as Exhibit A, duly executed by Sellers, evidencing the sale, transfer, conveyance, and assignment of the Acquired Assets to Buyer;

(b) the tangible Acquired Assets within the control or possession of such Seller or its Affiliates;

(c) an assignment and assumption agreement, in a form reasonably acceptable to Buyer, duly executed by Sellers, evidencing the assignment of the Assumed Contracts and the assumption of the Assumed Liabilities by Buyer;

(d) a certificate executed by an authorized officer of Sellers, dated as of the Closing Date, certifying that the conditions set forth in Section 8.02(a), Section 8.02(b) and Section 8.02(c) have been satisfied;

(e) an IRS Form W-9 duly executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes;

(f) a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that Sellers are not a "foreign person" as defined in Section 1445 of the Code;

(g) certified copies of (i) the Sale Order and (ii) the Bid Procedures Order, in each case as entered by the Bankruptcy Court;

(h) with respect to each parcel of Owned Real Property, a special warranty deed, in recordable form and acknowledged by the applicable Seller and otherwise in form and substance reasonably acceptable to Buyer, together with an affidavit of title acceptable to Sellers in their sole discretion, transfer tax forms, FIRPTA-related certificates (to the extent not covered by Section 3.02(e)) and other customary real property transfer documents reasonably acceptable to Sellers and reasonably required to convey such Seller's fee simple interest in such Owned Real Property to Buyer, subject only to Permitted Encumbrances and the Sale Order;

(i) Assignment agreements in customary recordable form for the applicable recording jurisdiction duly executed by Sellers, evidencing the assignment of the Leased Real Property to Buyer; and

(j) such other documents, instruments, or certificates as Buyer may reasonably request to evidence and effectuate the consummation of the Transaction (including, without limitation, a joint release instruction, duly executed by Sellers, for the Escrow Agent to release the Deposit to Sellers).

**Section 3.03 Buyer Closing Deliverables**. At the Closing, Buyer shall deliver or cause to be delivered to Sellers the following:

(a) the Cash Payment less the Deposit (together with any interest earned thereon), by wire transfer of immediately available funds in accordance with Section 2.07(a);

(b) the assignment and assumption agreement, in a form reasonably acceptable to Buyer, duly executed by Buyer, evidencing the assumption of the Assumed Liabilities by Buyer;

(c) a certificate executed by an authorized manager, member, officer or other authorized representative of Buyer, dated as of the Closing Date, certifying that the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied;

(d) a certificate of an authorized manager, member, officer or other authorized representative of Buyer certifying (i) that the execution and delivery of this Agreement and the consummation of the Transaction have been duly authorized, and (ii) the incumbency and signature of the person executing this Agreement and any other documents delivered in connection herewith on behalf of Buyer; and

(e) such other documents, instruments, or certificates as Sellers may reasonably request to evidence and effectuate the consummation of the Transaction (including, without limitation, a joint release instruction for the Escrow Agent, duly executed by Buyer, to release the Deposit to Sellers).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the correspondingly numbered Sections of the Schedules, Sellers represent and warrant to Buyer that the statements contained in this Article IV are true and correct as of the Effective Date and as of the Closing Date.

**Section 4.01 Organization and Qualification of Sellers**. Each Seller is a corporation/limited liability company duly organized, validly existing, and in good standing under the Laws of the State of its incorporation/formation, and has all requisite power and authority to own, lease, and operate its properties and to carry on its business as presently conducted. No Seller is in violation, in any material respect, of any of the material provisions of its relevant organizational documents, except as would not reasonably be expected to have a Material Adverse Effect.

**Section 4.02 Authority of Sellers**. Subject to the entry of the Sale Order, Sellers have full power and authority to execute and deliver this Agreement and each other agreement, document, or instrument to be executed and delivered by Sellers in connection herewith (including the exhibits to this Agreement, collectively, the "Transaction Documents"), to perform their obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement, the Transaction Documents and the consummation of the Transaction have been duly authorized by all necessary action on the part of Sellers (including, to the extent required, approval of the Bankruptcy Court). This Agreement has been duly executed and delivered by Sellers and, assuming the due authorization, execution, and delivery by Buyer, and subject to entry of the Sale Order, constitutes a legal, valid, and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 4.03 No Conflicts**. Subject to entry of the Sale Order, the execution, delivery, and performance of this Agreement and the Transaction Documents by Sellers and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of formation, limited liability company agreement, certificate of incorporation, bylaws, or other organizational documents of Sellers, (b) violate or result in a breach of any Law applicable to Sellers, or (c) except as would not reasonably be expected to have a

Material Adverse Effect or materially adversely affect the validity or enforceability against such Seller of this Agreement or such Transaction Documents, (i) violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which any Seller is a party or by which any Seller or any of its assets is bound, or (ii) result in the creation of any Encumbrance (other than a Permitted Encumbrance).

**Section 4.04 Title to Acquired Assets**. Subject to entry of the Sale Order, Sellers have good, marketable and valid title to, or a valid leasehold interest in, the Acquired Assets, free and clear of all Encumbrances, other than Permitted Encumbrances. No Person other than Sellers has any ownership interest in any Acquired Asset other than any Permitted Encumbrance or other interest that shall be extinguished pursuant to the Sale Order. Except as set forth on Schedule 4.04, no portion of the Real Property or the other Acquired Assets is subject to any lease, sublease, license, occupancy agreement, ground lease, tenancy, or other leasehold or possessory interest in favor of any Person, or any lien on account of work performed on the Real Property, and at the Closing the Real Property shall be delivered free of all leases, tenancies and rights of possession, and, consistent with and subject to the Sale Order, free and clear of all Encumbrances other than Permitted Encumbrances.

**Section 4.05 Litigation**. Except for the Bankruptcy Cases, there is no action, suit, Order, claim, investigation, or proceeding pending or, to the Knowledge of Sellers, threatened against Sellers that (a) challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction, or (b) would reasonably be expected to have a Material Adverse Effect.

**Section 4.06 Compliance with Laws; Permits.**

(a) Except as would not reasonably be expected to have a Material Adverse Effect, Sellers are in compliance with all Laws applicable to the Acquired Assets or the ownership or operation thereof.

(b) To Sellers' Knowledge, a true and complete list of all material Acquired Permits is set forth in Section 4.06(b) of the Schedules. Those Acquired Permits set forth in Section 4.06(b) of the Schedules constitute all usual and necessary Permits to operate the Camp Business in the manner conducted as of immediately prior to the Effective Date. Except as would not reasonably be expected to have a Material Adverse Effect, Sellers are in compliance with the Permits.

**Section 4.07 Environmental Matters**. To the Knowledge of Sellers, Sellers have not received, within the last year, any written notice from any Governmental Authority of a violation of any environmental Laws with respect to the Real Property that remains outstanding.

**Section 4.08 Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transaction or any other Transaction Documents based upon arrangements made by or on behalf of Sellers.

**Section 4.09 Sufficiency**. Except as set forth in Section 4.09 of the Schedules, the Acquired Assets include all of the material assets, rights and properties, that are used in or held for

the Camp Business or necessary to conduct the Camp Business in all material respects as conducted during the 2026 Camp Season.

**Section 4.10 Real and Tangible Property.**

(a) Section 4.10(a) of the Schedules sets forth a true and complete list of all Owned Real Property. None of the Sellers have leased or otherwise granted to any third party, including any Campers (other than a Seller), the right to use or occupy any Owned Real Property or any portion thereof, except as may be set forth on the Schedules hereto.

(b) Section 4.10(b) of the Schedules sets forth a true and complete list of all Leased Real Property. None of the Sellers has subleased or otherwise granted to any third party the right to use or occupy any Leased Real Property or any portion thereof, except as may be set forth on the Schedules hereto. Except as set forth on Schedule 4.04, to Sellers' actual knowledge: (i) no Seller has received written notice that it is in material default under any leases, subleases, licenses or other occupancy agreements related to a Leased Real Property, and (ii) no landlord, licensor or other counterparty is in material default under any leases, subleases, licenses or other occupancy agreements related to a Leased Real Property.

(c) To Sellers' Knowledge, Section 4.10(c) of the Schedules sets forth a true and complete list of all vehicles, boats, buses, vans, maintenance vehicles and trailers included in the Acquired Assets. None of the Sellers have leased or otherwise granted to any third party (other than a Seller) a leasehold or ownership interest in any items of machinery.

(d) There are no rights of first refusal or first offer applicable to the Owned Real Property.

**Section 4.11 Assumed Contracts.**

(a) Except as would not reasonably be expected to have a Material Adverse Effect and assuming satisfaction of any applicable Cure Amounts, (i) each Assumed Contract is valid and binding on the parties thereto and is in full force and effect, (ii) Sellers have not received notice of any uncured breach or default under any Assumed Contract, (iii) to the Knowledge of Sellers, no party to such Assumed Contract has provided notice that such third party intends to terminate, or not renew, any Assumed Contract.

**Section 4.12 Insurance**. Sellers maintain material insurance covering the Camp Business and the Acquired Assets in amounts (and subject to deductibles and self-insurance amounts) that, to the Knowledge of Sellers, are consistent with industry practice and which Sellers have reasonably determined to be adequate for the Camp Business.

**Section 4.13 Employees.**

(a) To Sellers' Knowledge, a true and complete list of all Current Employees is set forth on Section 4.13(a) of the Schedules.

(b) To the Knowledge of Sellers, no individual serving in the capacity of director of a Camp has provided notice of resignation, retirement, or other termination of

employment, and Sellers have no Knowledge of any present intention of any such individual to cease employment with the Camp.

**Section 4.14 American Camp Association Accreditation**. The Camp is accredited by the American Camp Association, and, to Sellers' actual knowledge, there are no, and no Seller has received written notice of any, proceedings, pending or threatened, seeking the revocation, cancellation, or suspension of such accreditation.

**Section 4.16 No Other Representations**. Except for the representations and warranties expressly set forth in this Article IV, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers, the Acquired Assets, or the Transaction, and Sellers disclaim any other representations or warranties, whether made by Sellers or any of their Affiliates, officers, directors, employees, agents, or representatives. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS Article IV, SELLERS MAKE NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND SELLERS HEREBY DISCLAIM ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date of this Agreement and as of the Closing Date.

**Section 5.01 Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware, and has all requisite limited liability company power and authority to own, lease, and operate its properties and to carry on its business as presently conducted. Buyer is not in violation of any of the provisions of its relevant organizational documents, except as would not reasonably be expected to be material to Buyer.

**Section 5.02 Authority of Buyer**. Buyer has full power and authority to execute and deliver this Agreement and the Transaction Documents, to perform its obligations hereunder and thereunder, and to consummate the Transaction. The execution, delivery, and performance of this Agreement, the Transaction Documents and the consummation of the Transaction have been duly authorized by all necessary action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, assuming the due authorization, execution, and delivery by Sellers, constitutes a legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**Section 5.03 No Conflicts**. The execution, delivery, and performance of this Agreement and the Transaction Documents by Buyer and the consummation of the Transaction do not and will not (a) violate, conflict with, or result in a breach of any provision of the certificate of formation, limited liability company operating agreement, or other organizational documents of Buyer, (b) violate or result in a breach of any Law applicable to Buyer, or (c) except as would not reasonably be expected to prevent or materially impair or delay the consummation of the Transaction or materially adversely affect the validity or enforceability against Buyer of this Agreement or such Transaction Documents, (i) violate, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which Buyer or any of its assets is bound, or (ii) result in the creation of any Encumbrance (other than a Permitted Encumbrance).

**Section 5.04 Sufficiency of Funds**. Buyer has, and at the Closing will have, immediately available funds sufficient to pay the Cash Payment and all other amounts required to be paid by Buyer hereunder and to consummate the Transaction. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.

**Section 5.05 Litigation**. There is no action, suit, claim, investigation, or proceeding pending or, to the knowledge of Buyer, threatened against Buyer that reasonably challenges or seeks to enjoin, alter, or materially delay the consummation of the Transaction.

**Section 5.06 Brokers**. Except for fees and expenses that will be borne solely by Buyer, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission from Buyer in connection with the Transaction based upon arrangements made by or on behalf of Buyer.

**Section 5.07 No Outside Reliance**. Buyer acknowledges and agrees that (a) Buyer has conducted its own independent investigation, review, and analysis of the business, operations, assets, liabilities, results of operations, financial condition, and prospects of Sellers and the Acquired Assets, which investigation, review, and analysis was performed by Buyer and its Affiliates and representatives, (b) Buyer has been afforded access to certain books and records, facilities, equipment, Contracts, and other assets of Sellers that Buyer and its representatives have requested to review, and (c) in entering into this Agreement, Buyer has relied solely upon its own investigation and analysis and the representations and warranties expressly set forth in Article V(as qualified by the Schedules) and acknowledges that, except as expressly set forth in Article V, neither Sellers nor any of their Affiliates or representatives makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or representatives.

**Section 5.08 Adequate Assurances Regarding Executory Contracts**. Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

**Section 5.09 No Other Representations**. Except for the representations and warranties expressly set forth in this Article V, neither Buyer nor any other Person on behalf of Buyer makes any express or implied representation or warranty with respect to Buyer or the Transaction, and

Buyer disclaims any other representations or warranties, whether made by Buyer or any of its Affiliates, officers, directors, employees, agents, or representatives.

## ARTICLE VI
## COVENANTS

**Section 6.01 Conduct of Business**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall:

(a) use commercially reasonable efforts to maintain the Acquired Assets in good working order (ordinary wear and tear excepted);

(b) not take any action that would reasonably be expected to result in a Material Adverse Effect;

(c) not terminate or materially amend any Assumed Contract (other than with cause or due to expiration or termination by the counterparty), other than in the ordinary course of business consistent with past practice;

(d) not sell, transfer, lease, mortgage, pledge, grant any Encumbrance (other than Permitted Encumbrances) on or otherwise encumber or dispose of any Acquired Asset (or commit to take any such actions), other than with respect to the disposal of inventory in the ordinary course of business consistent with past practice; and

(e) except (i) as required by applicable Law, Bankruptcy Court order, or the terms of this Agreement, or (ii) with Buyer’s prior written consent, operate the Camp Business in the ordinary course consistent with past practice.

**Section 6.02 Access to Information**. From the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers shall (a) provide Buyer and its representatives with reasonable access during normal business hours, upon reasonable advance notice, to the personnel, properties, books, records, Real Property and Contracts relating to the Acquired Assets and Assumed Liabilities, and (b) furnish to Buyer such financial, operating, and other data and information relating to the Acquired Assets and Assumed Liabilities as Buyer may reasonably request. At any time following the conclusion of the 2026 Camp Season, Buyer and its agents, employees, consultants, inspectors, appraisers, engineers, and contractors shall have the right, at Buyer’s sole cost and expense, to enter the Real Property to examine and inspect the same, as well as conduct such non-invasive tests, studies, investigations, and surveys as Buyer deems necessary, in its reasonable discretion, to assess utility availability, soil conditions, environmental conditions, physical conditions, and the like of the Property; provided that in all instances, Buyer shall give notice to the Sellers at least forty-eight (48) hours in advance of entering the Real Property; and, provided, further that Buyer shall be solely responsible for any loss, damage or other condition arising out of or in connection with such testing, study, investigation or survey. For the avoidance of doubt, the closing of the transactions contemplated hereby shall in no manner be conditioned or contingent upon Buyer’s receipt of such tests, studies, investigations, and surveys or the results thereof. Notwithstanding the foregoing, Sellers shall not be required to provide access or information to the extent that (i) such access or the provision of such information would violate any Law or binding agreement, (ii) such information is subject to

attorney-client privilege or attorney work-product protection that would be waived if provided to Buyer hereunder, or (iii) such access or the provision of such information would be unreasonably disruptive to the operations of Sellers.

**Section 6.03 Survey**. Buyer shall be entitled to conduct, at Buyer's expense, a new ALTA/NSPS survey for the Real Property; provided, however, that, in order to avoid disruption to the operation of the Camp Business, any such survey shall be conducted only following conclusion of the 2026 Camp Season, and shall not be conducted while the Camp is in session without Sellers' prior written consent. For the avoidance of doubt, the closing of the transactions contemplated hereby shall in no manner be conditioned or contingent upon Buyer's receipt of such survey or the results thereof.

**Section 6.04 Expired Approvals; Cooperation**. From and after the Effective Date, Sellers consent to Buyer's taking such steps as Buyer deems reasonably necessary or advisable to identify, obtain, renew, reinstate, or perfect any site-plan, special-use, building, bunkhouse, zoning, occupancy, or other approvals, permits, variances, or certificates relating to the Real Property or the Camp Business (collectively, the "Approvals"), including the governmental approvals for the Camp that were issued or applied for and have since expired (the "Expired Approvals"), in all cases, at Buyer's sole cost and expense and with no liability to Sellers. Sellers shall have no affirmative obligation to search for, investigate, apply for, obtain, renew, or reinstate any Approval or Expired Approval; provided, however, that Sellers shall reasonably cooperate with (at Buyer's sole cost and expense), and not intentionally impede, Buyer's efforts. Following the Closing, Sellers hereby consent and authorize Buyer to work directly with Sellers' professionals, engineers, and consultants, as Buyer may reasonably require, in each case at no out-of-pocket cost or liability to Sellers.

**Section 6.05 Efforts; Consents**. Subject to the terms and conditions of this Agreement, each of the Parties hereto shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable under applicable Law to consummate the Transaction as promptly as practicable, including (i) obtaining all necessary consents, approvals, or authorizations of, and making all filings with and giving all notices to, Governmental Authorities and other third parties, and (ii) obtaining all consents, approvals, or authorizations of third parties necessary for the consummation of the Transaction.

**Section 6.06 Bankruptcy Court Matters.**

(a) [**Reserved**].

(b) Sale Order. The Sale Order shall, among other things, (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (x) the execution, delivery and performance by Sellers of this Agreement, (y) the sale of the Acquired Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances), and (z) the performance by Sellers of their obligations under this Agreement, (ii) authorize and empower Sellers to assume and assign to Buyer the Assumed Contracts, (iii) find that Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, find that Buyer is not a successor to any Seller, and grant Buyer the protections of section 363(m) of the Bankruptcy Code, (iv) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of

any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (v) find that Buyer has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assumed Contracts, (vi) find that Buyer shall have no Liability for any Excluded Liability, (vii) find that the consideration provided by Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets, (viii) find that Buyer and Sellers did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code, (ix) order that, notwithstanding the provisions of the Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry and (x) find that no "bulk sales" or "bulk transfers" laws shall apply to the transactions contemplated hereby. Buyer agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (1) demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (2) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

(c) No Modification or Appeal. Neither Buyer nor Sellers shall oppose or not take any action that is intended to, or that would reasonably be expected to, result in the reversal, modification, or vacatur of the Bid Procedures Order or the Sale Order.

(d) Defense of Orders. Each of Sellers and Buyer shall use their reasonable best efforts to take such actions as may be reasonably necessary to defend against any objection to the Sale Order or any appeal therefrom.

**Section 6.07 Publicity**. Except as required by applicable Law (including any disclosure required by the Securities and Exchange Commission or other Governmental Authority or any disclosure required in connection with the Bankruptcy Cases), no Party hereto shall issue any press release or make any public announcement or public communication announcing the court's approval and/or consummation of the Transaction absent first providing the other Party with a reasonable opportunity to review and comment on such communication prior to its issuance, and the other Party shall consider any such comments in good faith, but may accept or reject any such comments in its reasonable discretion; provided that each Party shall be permitted to respond to private inquiries in a manner consistent with the terms and provisions of this Agreement and public disclosures existing at the time of such inquiry; provided, further, that such responses do not involve any press release or other public statement or disclosure other than in accordance with this Section 6.07. Following the Closing, no Seller will send out any email or notice communication to customers of the Camp Business without the prior written consent of Buyer (such consent not to be unreasonably withheld) except to the extent required by applicable Law. Notwithstanding anything in this Agreement to the contrary, following the Closing, Buyer and its Affiliates may communicate directly with Campers, prospective Campers, parents, alumni, employees, vendors and other stakeholders of the Camp Business regarding the completion of the Transaction and the continued operation of the Camp Business, so long as such communication does not disclose any confidential information of Sellers or any information otherwise prohibited from disclosure under this Agreement.

**Section 6.08 Confidentiality**. The Parties acknowledge that certain confidential information has been and may be exchanged in connection with this Agreement. Each Party agrees to keep confidential all information provided by the other Party in connection with this Agreement that is not otherwise publicly available, and to use such information solely for the purposes of consummating the transactions contemplated hereby, except as required by applicable Law (including any disclosure required in connection with the Bankruptcy Cases).

**Section 6.09 Notification of Certain Matters**. Each Party hereto shall give prompt notice to the other Parties of (a) the occurrence or non-occurrence of any event that has caused or would reasonably be expected to cause any condition to the obligations of any Party to effect the transactions contemplated hereby not to be satisfied, and (b) any action, suit, claim, investigation, or proceeding commenced or, to the knowledge of such Party, threatened against such Party that relates to the consummation of the Transaction or could materially and adversely impact the ability of such Party to consummate the Transaction.

**Section 6.10 Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances on the Acquired Assets, including any Encumbrances arising out of the "bulk sales" or "bulk transfer" Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 6.11 Employee Matters.**

(a) Prior to Closing (and thereafter), Buyer may engage with key employees and operational personnel of Sellers regarding potential post-Closing employment arrangements and transition matters at the Camp. Any offers of employment and the terms thereof will be determined by Buyer in its sole discretion. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be referred to as an "Offeree." Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee."

(b) Following the date of this Agreement, Sellers shall provide reasonable cooperation and information to Buyer as reasonably requested by Buyer with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(c) Notwithstanding anything in this Agreement to the contrary and unless otherwise agreed to by Sellers and Buyer, Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees and former employees of Sellers. Sellers shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all employees and former employees of Sellers as of such date. Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect to all Transferred Employees (with respect to their employment with Buyer after the Closing Date). Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees (with respect to their employment with Buyer after the Closing Date).

(d) Nothing contained herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific Seller Benefit Plan or to continue the employment or engagement of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any Seller Benefit Plan, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other Person (other than the Parties to this Agreement in accordance with its terms), any rights to enforce any provisions of this Agreement under ERISA or otherwise.

(e) Sellers and/or their Affiliates shall be exclusively responsible for complying with the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, with respect to each employee and former employee of Sellers (and their qualified beneficiaries), and Buyer shall not have or assume any obligation or Liability with respect thereto.

(f) Each Seller, on behalf of itself and each of its Affiliates, hereby waives any and all restrictive covenants (including, without limitation, any non-competition, non-solicitation, non-disclosure, non-interference or similar restrictions) to which any Transferred Employee (or other current or former service provider of any Seller) is or may be subject by virtue of such Person's prior or current employment or engagement with any Seller or any of its Affiliates ("Existing Restrictive Covenants"), to the extent that the Existing Restrictive Covenants would restrict or impede such Person from becoming an employee or service provider of Buyer or its Affiliates. Sellers further covenant and agree that they shall not, and shall cause their respective Affiliates not to, enforce, or attempt to enforce, any Existing Restrictive Covenants against any current or former service provider of any Seller in connection with such Person's employment or engagement with Buyer or any of its Affiliates on or after the Closing Date.

**Section 6.12 Camp Matters**. From the date of this Agreement until the Closing Date, Sellers shall (i) operate the Camp Business in substantially the same manner as Sellers have operated the Camp Business during the 2026 Camp Season to date, and in accordance with all Laws and governmental requirements, and further in accordance with the policies, rules, regulations and standards of the American Camp Association; (ii) use commercially reasonable efforts to (A) maintain existing Campers and Current Employees during the 2026 Camp Season, and (B) re-enroll and, consistent with past practice, seek deposits for Campers who attended Camp during the 2026 Camp Season for the 2027 Camp Season, except to the extent any of the foregoing would no longer be age-appropriate; (iii) not refuse attendance to any prospective Camper who is willing to pay full Tuition; and (iv) utilize the same marketing practices, techniques and methods to enroll prospective Campers for the 2027 Camp Season as were employed during the 2025 Camp Season and 2026 Camp Season, such as holding visiting days for parents of Campers, offering guided tours for all prospective Campers and their families who request them, and offering discounts and promotions to prospective Campers consistent with those, if any, offered by Sellers in connection with the 2025 Camp Season and 2026 Camp Season.

**Section 6.13 Post-Closing Receipt and Possession of Assets**. In the event that, after the Closing Date, Buyer receives or otherwise is in possession of any Excluded Asset, Buyer shall promptly notify the Sellers of its receipt or possession of such Excluded Asset and transfer

promptly (but in any event within two Business Days), if so requested by the Sellers, at the Sellers' expense, such Excluded Asset to the Sellers. In the event that, after the Closing Date, the Sellers receive or otherwise are in possession of any Acquired Asset, the Sellers shall promptly notify Buyer of its receipt or possession of such Acquired Asset and transfer promptly (but in any event within two Business Days), if so requested by Buyer, at the Sellers' expense, such Acquired Asset to Buyer.

## ARTICLE VII
## TAX MATTERS

**Section 7.01 Transfer Taxes**. All Transfer Taxes incurred in connection with this Agreement and the Transaction shall be allocated as set forth in Section 2.08. The party required by applicable Law to file any Tax Return with respect to any such Transfer Taxes shall timely file such Tax Return, and the other party shall cooperate with such filing party as reasonably requested.

**Section 7.02 Cooperation on Tax Matters**. After the Closing, Sellers and Buyer agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit, or proceeding relating to any Tax.

**Section 7.03 Periodic Taxes**. For purposes of this Agreement, with respect to any Acquired Asset, Sellers and Buyer shall apportion the liability for real and personal property Taxes, including, but not limited to, any taxes as may be indicated on a municipal lien certificate or analogous documentation, ad valorem Taxes, and similar Taxes (other than Transfer Taxes) ("Periodic Taxes") for Straddle Periods applicable to such Acquired Asset in accordance with this Section 7.03. The Periodic Taxes described in this Section 7.03 shall be apportioned between Sellers and Buyer as of the Closing Date, with Buyer liable for that portion of the Periodic Taxes for a Straddle Period equal to the Periodic Taxes for such Straddle Period multiplied by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period. Sellers shall be liable for that portion of the Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Pre-Closing Tax Period) equal to the Periodic Taxes for such Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of such Straddle Period ending on (and including) the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period. The party hereto responsible under applicable Law for paying a Tax described in this Section 7.03 shall be responsible for administering the payment of such Tax.

**Section 7.04 Reimbursement for Taxes**. Sellers, on the one hand, or Buyer on the other hand, as the case may be (the "Reimbursing Party") shall provide reimbursement for any Tax paid by the other, all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Agreement; provided that, prior to Closing, Buyer and Sellers shall cooperate to identify and quantify any Periodic Taxes and Transfer Taxes that are the responsibility of Sellers pursuant to the terms of this Agreement, and such amounts shall be (i) set forth on Schedule 7.04 and (ii) satisfied by Sellers at Closing.

## ARTICLE VIII
## CONDITIONS TO CLOSING

**Section 8.01 Conditions to Obligations of All Parties**. The obligations of each party hereto to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by both Sellers and Buyer) of each of the following conditions as of the Closing:

(a) **No Injunction**. No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Law or Order that enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(b) **Sale Order**. The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall be a Final Order and shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent.

**Section 8.02 Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) of each of the following additional conditions as of the Closing:

(a) **Representations**. (i) The representations and warranties of Sellers set forth in Section 4.01 (Organization and Qualification of Sellers), Section 4.02 (Authority of Sellers) and Section 4.08 (Brokers) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date), and (ii) the other representations and warranties of Sellers set forth in Article IV shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications set forth therein) as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct as of such date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b) **Performance of Covenants**. Sellers shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Sellers under this Agreement at or prior to the Closing.

(c) **No Material Adverse Effect**. Since the date hereof, there shall not have occurred any Material Adverse Effect.

(d) **Closing Deliveries**. Sellers shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.02.

(e) **Bid Procedures Order**. The Bankruptcy Court shall have entered the Bid Procedures Order, and the Bid Procedures Order shall not have been reversed, stayed, modified, or amended in any manner that is materially adverse to Buyer without Buyer's prior written consent.

(f) **Other Camp Bids**. With respect to each of the following camps: (i) Camp Echo; (ii) Camp Lokanda; (iii) Camp North Star; (iv) Camp Wekeela; (v) Camp Indian Acres/Forest Acres; and (vi) Camp Med-o-Lark, (x) Buyer shall have been declared the Successful Bidder following the completion of all remaining stages of the Auction; (y) the Debtors shall have obtained a Sale Order with respect to all six camps listed in this Section 8.02(f) and such Sale Order has become a Final Order; and (z) the Debtors shall not have terminated this Agreement or any of the analogous agreements with respect to any of the camps listed in this Section 8.02(f).

**Section 8.03 Conditions to Obligations of Sellers**. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Sellers) of each of the following additional conditions as of the Closing:

(a) **Representations**. The representations and warranties of Buyer set forth in Article V shall be true and correct in all material respects as of the Effective Date and the Closing Date as though made on and as of the Closing Date (except for representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date).

(b) **Performance of Covenants**. Buyer shall have performed or complied with in all material respects all of the covenants and agreements required to be performed or complied with by Buyer under this Agreement at or prior to the Closing.

(c) **Closing Deliveries**. Buyer shall have delivered (or be ready, willing, and able to deliver at the Closing) each of the items set forth in Section 3.03.

## ARTICLE IX
## TERMINATION

**Section 9.01 Termination**. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a) by the mutual written consent of Buyer and Sellers;

(b) subject to Section 3.01 hereof, by either Buyer or Sellers, upon written notice to the other party, if the Closing shall not have occurred on or before the Termination Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.01(b) shall not be available to any party whose failure to fulfill any of its obligations hereunder has been the principal cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c) by Buyer, upon written notice to Sellers, if Sellers' representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.02(a) would not be satisfied, or if Sellers shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.02(b) would not be satisfied, and, in either case, such breach or failure is incapable of being cured or is not cured prior to the earlier of (i) the Termination Date or (ii) within thirty (30) days after written notice thereof is given by Buyer to Sellers;

(d) by Buyer, upon written notice to Sellers, if there shall have occurred a Material Adverse Effect;

(e) by Sellers, upon written notice to Buyer, if any of Buyer's representations or warranties set forth in this Agreement shall have been or become untrue or incorrect such that the conditions set forth in Section 8.03(a) would not be satisfied, or if Buyer shall have breached or failed to perform any covenant or agreement set forth in this Agreement such that the condition set forth in Section 8.03(a) would not be satisfied, and, in either case, such breach or failure is incapable of being cured or is not cured prior to the earlier of (i) the Termination Date or (ii) within thirty (30) days after written notice thereof is given by Sellers to Buyer;

(f) by either Buyer or Sellers, upon written notice to the other Parties, if, following completion of the Auction, Buyer is not the Successful Bidder or the Back-Up Bidder;

(g) by either Buyer or Sellers, upon written notice to the other Parties, if any court of competent jurisdiction or other Governmental Authority shall have issued an Order permanently enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable; provided that no Party may terminate this Agreement under this Section 9.01(g) if the issuance of such Order was caused by such Party's material breach of any of its obligations under this Agreement;

(h) by Buyer, upon written notice to the Sellers, if (A) one or more of the Bankruptcy Cases relating directly to the Camp Business or the Acquired Assets is dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if a trustee is appointed in all of the Bankruptcy Cases, or a portion thereof relating directly to the Camp Business (B) the Bankruptcy Court enters any Order that would reasonably be expected to prevent, impede or materially delay the consummation of the Transaction in accordance with the terms hereof, or (C) any creditor of any Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the stay to foreclose on any portion of the Acquired Assets; or

(i) by Buyer, upon written notice to Sellers, if the Sale Order shall not have been entered by the Bankruptcy Court on or prior to September 8, 2026.

**Section 9.02 Effect of Termination**. In the event of termination of this Agreement pursuant to Section 9.01, this Agreement shall become void and of no effect, without any liability or obligation on the part of any party hereto (or any of their respective Affiliates, officers, directors, employees, agents, or representatives), except that (i) the provisions of Section 2.07(c) (Return of Deposit), this Section 9.02 (Effect of Termination), Section 9.03 (Remedies), and Article X (Miscellaneous) shall survive any termination of this Agreement, and (ii) no such termination shall relieve any party from liability for any willful breach of this Agreement or fraud.

**Section 9.03 Remedies.**

(a) In the event that this Agreement is terminated by Sellers pursuant to Section 9.01(e) due to Buyer's breach or failure to perform, or in the event that Buyer fails to consummate the Closing when all conditions to Buyer's obligations to close have been satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing), Sellers' sole and exclusive

remedy (except in the case of fraud or willful misconduct) shall be to retain the Deposit as liquidated damages. The Parties acknowledge that the actual damages to Sellers resulting from such breach or failure would be difficult to ascertain, and the Deposit constitutes a reasonable estimate of such damages.

(b) Notwithstanding anything to the contrary herein, in no event shall any party be liable to any other party for any punitive, exemplary, special, incidental, consequential, or indirect damages, including lost profits or loss of business opportunity, in connection with this Agreement or the Transaction, other than claims based on fraud or willful misconduct.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01 Survival**. The representations, warranties, covenants, and agreements contained in this Agreement shall not survive the Closing and shall terminate at the Closing, except for (a) covenants and agreements that by their terms contemplate performance after the Closing, which shall survive until fully performed, and (b) claims based on fraud or willful misconduct.

**Section 10.02 Notices**. Notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be deemed duly given (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (c) when sent by email (with confirmation of transmission) if sent during normal business hours of the recipient (and if not sent during normal business hours, then on the next Business Day), or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, in each case addressed to the Parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

| | |
|---|---|
| if to Buyer, then to: | American Youth Camping Holdco LLC |
| with a copy (which shall not constitute notice) to: | Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Attention:<br>Bennett S. Silverberg, Esq.,<br>Shari I. Dwoskin, Esq.,<br>Tristan Axelrod, Esq.<br>Email:<br>bsilverberg@brownrudnick.com,<br>sdwoskin@brownrudnick.com,<br>taxelrod@brownrudnick.com |
| if to Sellers, then to: | Asaf Ravid<br>Email: aravid@circleinv.com |

with a copy (which shall not constitute notice) to:

Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601
Attention: Roger Iorio, Esq.
Email: riorio@coleschotz.com

**Section 10.03 Interpretation**. When a reference is made in this Agreement to an Article, Section, Exhibit, or Schedule, such reference shall be to an Article, Section, Exhibit, or Schedule of this Agreement unless otherwise indicated. The words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation." The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "or" is not exclusive. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

**Section 10.04 Severability**. If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement, and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal, or unenforceable, had never been contained herein.

**Section 10.05 Entire Agreement**. This Agreement, together with all Exhibits and Schedules hereto and any other Transaction Documents, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, among the Parties with respect to the subject matter hereof.

**Section 10.06 Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Neither Party may assign this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Party; provided, however, that Buyer may, at any time prior to the Closing, assign this Agreement and any or all of its rights or obligations hereunder to one or more Affiliates of Buyer without the written consent of Sellers; provided, further, that (a) Buyer shall provide Sellers with written notice of such assignment, (b) the applicable assignee shall execute and deliver an assignment and assumption agreement in form reasonably satisfactory to Sellers, and (c) no such assignment shall relieve Buyer of any obligation or liability under this Agreement. Following any such assignment, references to Buyer shall include the applicable Affiliate assignee to the extent of the rights and obligations assigned to such Affiliate.

**Section 10.07 Amendment and Waiver**. This Agreement may not be amended except by an instrument in writing signed by Buyer and Sellers. Any party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto, or (c) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party

to be bound thereby. No failure or delay by any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**Section 10.08 Governing Law; Jurisdiction; Service of Process; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Sellers and Buyer hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Cases have been closed, the courts of the State of New York. Sellers and Buyer each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT, OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTION.

**Section 10.09 Specific Performance**. The Parties agree that irreparable damage to Buyer would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, the Parties agree that, prior to the termination of this Agreement, Buyer shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court (or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, the state and federal courts located in the State of New York), without proof of actual damages (and Sellers hereby waive any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity. Sellers further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law, or inequitable for any reason.

**Section 10.10 Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.11 No Third-Party Beneficiaries**. Except as otherwise expressly provided herein, this Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.12 "As Is, Where Is" Transaction**. Buyer acknowledges that the Acquired Assets are being sold on an "AS IS, WHERE IS" basis, with all faults, and Buyer has relied solely on its own investigation, analysis, and evaluation of the Acquired Assets in making its decision to enter into this Agreement. Buyer further acknowledges that, except for the representations and warranties expressly set forth in Article IV, Sellers have not made, and Sellers hereby expressly

disclaim, any representations or warranties of any kind or nature, express or implied, at common law, by statute, or otherwise, relating to the Acquired Assets or the transactions contemplated hereby, and Buyer hereby shall have no claims related to the condition of the Acquired Assets except as expressly set forth herein. Notwithstanding anything in this Section 10.12 to the contrary, nothing herein shall limit or waive any claim (i) arising from a breach of any representation, warranty or covenant expressly set forth in this Agreement or (ii) in the case of fraud or willful misconduct.

**Section 10.13 No Successor Liability**. Except as expressly provided herein, Buyer does not assume or agree to pay, satisfy, discharge, or perform, and shall not be deemed by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby to have assumed or agreed to pay, satisfy, discharge, or perform, and shall have no liability for, any Excluded Liability. Buyer is not, and shall not be, a successor to Sellers by reason of any theory of law or equity.

***[Signature Pages Follow]***

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**BUYER:**

**AMERICAN YOUTH CAMPING HOLDCO LLC**

By:
Name: David Rosen
Title: Authorized Member

**SELLERS**:

**POLAND LANDCO LLC**

By:
Name: Asaf Ravid
Title: Chief Restructuring Officer

**POLAND CAMPCO LLC**

By:
Name: Asaf Ravid
Title: Chief Restructuring Officer

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**SELLERS:**

POLAND LANDCO LLC

By: ______________________________
Name: Assaf Ravid
Title: Chief Restructuring Officer

POLAND CAMPCO LLC

By: ______________________________
Name: Assaf Ravid
Title: Chief Restructuring Officer

# EXHIBIT A

## FORM OF BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, ________________ ("**Sellers**"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to _______________________ ("**Buyer**"), all of their rights, title, and interest in and to the Acquired Assets, as such term is defined in the Asset Purchase Agreement, dated as of ____________________ (the "**Purchase Agreement**"), by and among Sellers and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Sellers make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Each Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Sellers will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Sellers have duly executed this Bill of Sale as of _______, 2026.

[SELLERS]

By_____________________
Name:
Title:

**DISCLOSURE SCHEDULES**

**TO**

**ASSET PURCHASE AGREEMENT**

**by and among**

**American Youth Camping Holdco LLC,**

**as the Buyer,**

**and**

**Poland Landco LLC and Poland Campco LLC,**

**as the Sellers**

Dated as of September 4, 2026

Reference is hereby made to that certain Asset Purchase Agreement (the "Agreement"), dated as of September 4, 2026, by and among American Youth Camping Holdco LLC, as Buyer, and Poland Landco LLC and Poland Campco LLC, as Sellers. All capitalized terms which are not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

The section numbers in these Disclosure Schedules correspond to the section numbers in the Agreement; provided, however, that the disclosure of any fact(s) or item(s) in these Disclosure Schedules relevant to any section of the Agreement shall be deemed to be disclosed with respect to any other section(s) of the Agreement to which the applicability and relevance of such disclosure is reasonably apparent on its face, whether or not these Disclosure Schedules include an explicit cross-reference to such other section(s) and whether or not such other section(s) contemplate these Disclosure Schedules. The disclosure of any information in these Disclosure Schedules shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by the Sellers in the Agreement, nor shall it be deemed an admission of any liability of, or concession as to any defense available to, the Sellers. The inclusion of information in these Disclosure Schedules shall not be construed as an admission or agreement that such information is material to or outside the ordinary course of business of any Seller. No disclosure in these Disclosure Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. All attachments to these Disclosure Schedules are incorporated by reference into the section of these Disclosure Schedules in which they are referenced.

**<u>Schedule 1.1</u>**

**Knowledge**

(a)

1. Assaf Ravid
2. Steve Bernstein
3. Brooke Berstein

(b)

1. To come.

**<u>Schedule 2.01(t)</u>**

**Other Acquired Assets**

None.

**Schedule 2.10(a)**

**Assumed Contract List**

1. All Camper Applications for Camp North Star, by and between Camp North Star and families/parents of campers and/or students in effect as of the date hereof and/or the Closing Date. Cure Amount: $0

2. Artist Agreement for Camp North Star, dated March 31, 2026, by and between Camp North Star and DBI, Inc. Representative on behalf of Artist in effect as of the date hereof and/or the Closing Date. Cure Amount: $0

| Camp | Description | Contract | Cure Amount | Notice Party |
|---|---|---|---|---|
| North Star | Technology | Master Licensing Agreement, dated January 8, 2018, by and between CampMinder, LLC and Poland Campco LLC d/b/a Camp North Star | $0 | CampMinder |
| North Star | Financial & Corporate | Maintenance Agreement, dated May 14, 2026, by and between KYOCERA Document Solutions America and Camp North Star | $0 | Kyocera |
| North Star | Program Services | Lease Agreement (Cliffside), dated March 14, 2025, by and between Poland Campco LLC d/b/a Camp North Star and Kristy L. Pelletier and Michael N. Harnden | $0 | Kristy L Pelletier and Michael Harnden |
| North Star | Equipment & Assets | Equipment Lease, dated February 25, 2026, by and between PNC Bank, National Association and Poland Campco LLC d/b/a Camp North Star | $0 | PNC Equipment Finance |
| North Star | Program Services | Clarity Weather Agreement, dated February 25, 2026, by and between BAMWX LLC and Steven | $0 | BAMWX LLC |

| | | | | |
|---|---|---|---|---|
| | | Bernstein (Camp North Star) | | |
| North Star | Program Services | Lease Agreement (Cliffside), dated November 20, 2025, by and between Poland Campco LLC d/b/a Camp North Star and Rebecca McEntee and Mytchell Wilbert (Customer Contract for Facility Usage) | $0 | Rebecca McEntee and Mytchell Wilbert |
| North Star | Equipment & Assets | Equipment Lease Agreement (Cushman Shuttle 2 Golf Cart), dated February 25, 2026, by and between PNC Bank, National Association and Poland Campco LLC d/b/a Camp North Star | $0 | PNC Bank, National Association |

**<u>Schedule 4.04</u>**

**Title to Acquired Assets**

Schedule 4.10(b) is incorporated by reference.

## <u>Schedule 4.06(b)</u>

**Acquired Permits**

1. State of Maine Department of Health and Human Services Youth Camp Operating Permit (ID 19538).

2. State of Main Department of Agriculture Conservation & Foresty, Swim Area Permit (Permit # 51, DHHS Lic. # 19538)

## Schedule 4.09

**Sufficiency**

None.

**Schedule 4.10(a)**

**Owned Real Property**

1. Real property, in the City/Town of Poland, County of Androscoggin, and State of Maine, described as follows:

Tract I (Tax Map 2, Lot 16)
A certain lot or parcel of land, with the buildings thereon, situated at the Westerly end of the public right-of-way of Verrill Road, so-called in the Town of Poland, County of Androscoggin, State of Maine, and being more particularly bounded and described as follows, to wit:

Beginning at a 5/8-inch rebar, capped, "PLS 1271", at the Westerly end of the public right-of-way of Verrill Road at the Northwesterly corner of land now or formerly of Ronald M. and Marjorie A. Powell (Book 2524, Page 226) and near the Southeasterly side of the traveled way of an existing gravel drive or roadway;

Thence, from the Point of Beginning, South 37 degrees 20 minutes 44 seconds East, along said land now or formerly of Powell, along land now or formerly of Thomas E. and Cynthia M. Powell (Book 4925, Page 258), and along other land now or formerly of Ronald M. and Marjorie A. Powell (Book 2142, Page 42), a distance of one thousand seven hundred forty-six and thirty-one hundredths (1,746.31) feet, to a stone monument on the Poland and New Gloucester town line;

Thence, South 52 degrees 17 minutes 42 seconds West, along the said Poland and New Gloucester town line, a distance of two thousand nine hundred one and seventy-eight hundredths (2,901.78) feet, to a stone monument at the Southeasterly corner of land now or formerly of Pike Industries, Inc. (Book 2025, Page 317);

Thence, North 40 degrees 12 minutes 13 seconds West, along said land now or formerly of Pike Industries, Inc., a distance of one thousand five hundred sixty-three and twelve hundredths (1,563.12) feet, to a point on the Southeasterly line of land now or formerly of HT Northstar Properties (Book 7128, Page 100);

Thence, North 37 degrees 14 minutes 31 seconds East, a distance of five hundred ninety-four and eighteen hundredths (594.18) feet, to a 5/8-inch rebar, capped, "PLS 1271";
Thence, South 21 degrees 29 minutes 02 seconds East, a distance of one hundred fifty-three and eighty-five hundredths (153.85) feet, to a point;

Thence, South 39 degrees 04 minutes 01 seconds East, a distance of two hundred ninety-two and twenty-seven hundredths (292.27) feet, to a point;
Thence, South 06 degrees 03 minutes 50 seconds East, a distance of ninety-two and twenty-four hundredths (92.24) feet, to a point;

Thence, South 36 degrees 20 minutes 37 seconds East, a distance of one hundred sixty-three and forty-three hundredths (163.43) feet, to a point;

Thence, South 89 degrees 34 minutes 14 seconds East, a distance of eighty and eighty-nine hundredths (80.89) feet, to a point;

Thence, North 54 degrees 29 minutes 05 seconds East, a distance of two hundred one and six hundredths (201.06) feet, to a point;

Thence, North 25 degrees 25 minutes 28 seconds East, a distance of three hundred six and twenty-eight hundredths (306.28) feet, to a point;

Thence, North 40 degrees 36 minutes 50 seconds East, a distance of one hundred seventy-two and sixty-three hundredths (172.63) feet, to a point at or near the top of ledge;
Thence, North 06 degrees 49 minutes 35 seconds West, a distance of fifty-three and one hundredths (53.01) feet, to a point;

Thence, North 32 degrees 22 minutes 57 seconds East, a distance of three hundred forty-seven and eighty-four hundredths (347.84) feet, to a point;

Thence, North 51 degrees 43 minutes 18 seconds East, a distance of one hundred eighty-three and sixty-six hundredths (183.66) feet, to a point;
Thence, North 60 degrees 10 minutes 31 seconds East, a distance of one hundred seventy-seven and forty-eight hundredths (177.48) feet, to a point;

Thence, generally Northeasterly by a circular curve deflecting to the right, a distance of one hundred twenty-four and seventy-three hundredths (124.73) feet, to a point, the radius of said curve being ninety-eight and nineteen hundredths (98.19) feet;
Thence, South 47 degrees 02 minutes 35 seconds East, a distance of one hundred seventy-two and eighty-three hundredths (172.83) feet, to a point;

Thence, North 67 degrees 18 minutes 01 seconds East, a distance of one hundred thirteen and sixty-nine hundredths (113.69) feet, to a point;

Thence, North 22 degrees 58 minutes 21 seconds East, a distance of one hundred fifty-seven and fifty-three hundredths (157.53) feet, to a point;
Thence, North 05 degrees 20 minutes 06 seconds West, a distance of one hundred thirty-six and fifty-eight hundredths (136.58) feet, to a point;

Thence, North 49 degrees 59 minutes 27 seconds West, a distance of one hundred seventy-three and ninety-five hundredths (173.95) feet, to a point near the Easterly side of the traveled-way of an existing gravel drive or roadway, the previous nineteen (19) courses run along said land now or formerly of HT Northstar Properties;

Thence, generally Northeasterly by a circular curve deflecting to the right, a distance of seventy-one and seventy-three hundredths (71.73) feet, to a point, the radius of said curve being two hundred and fifty and zero hundredths (250.00) feet;
Thence, North 22 degrees 02 minutes 58 seconds East, a distance of eighty-one and fifty-six hundredths (81.56) feet, to a point;

Thence, generally Northwesterly by a circular curve deflecting to the left, a distance of one hundred fifty and thirty-four hundredths (150.34) feet, to a point, the radius of said curve being eighty-one and ninety-three hundredths (81.93) feet;

Thence, generally Northwesterly by a circular curve deflecting to the right, a distance of ninety-three and eighty-eight hundredths (93.88) feet, to a point, the radius of said curve being three hundred fifteen and seven hundredths (315.07) feet;
Thence, North 66 degrees 00 minutes 57 seconds West, a distance of one hundred one and ten hundredths (101.10) feet, to a point;

Thence, generally Northeasterly by a circular curve deflecting to the right, a distance of thirty-seven and fifty-two hundredths (37.52) feet, to a point, the radius of said curve being fifty-eight and eighty-seven hundredths (58.87) feet;

Thence, generally Northeasterly by a circular curve deflecting to the right, a distance of forty-seven and eighty hundredths (47.80) feet, to a point, the radius of said curve being one hundred nineteen and twenty-one hundredths (119.21) feet;
Thence, generally Northeasterly by a circular curve deflecting to the right, a distance of sixty-five and seventy-three hundredths (65.73) feet, to a point, the radius of said curve being fifty-three and twenty-six hundredths (53.26) feet;

Thence, North 79 degrees 20 minutes 34 seconds East, a distance of one hundred seventy-three and fifty hundredths (173.50) feet, to a point;
Thence, North 60 degrees 09 minutes 34 seconds East, a distance of ninety-seven and fifty-seven hundredths (97.57) feet, to a point;

Thence, North 26 degrees 23 minutes 34 seconds East, a distance of one hundred seventy-three and eight hundredths (173.08) feet, to a point;

Thence, North 76 degrees 09 minutes 34 seconds East, a distance of one hundred fifteen and sixty-seven hundredths (115.67) feet, to a point;

Thence, North 83 degrees 19 minutes 47 seconds East, a distance of sixty-nine and forty-seven hundredths (69.47) feet to a 5/8-inch rebar, capped, "PLS 1271" and the Point of Beginning, the previous thirteen (13) courses run along or near the said Southeasterly side of the traveled way of an existing gravel drive or roadway and along said land now or formerly of HT Northstar Properties.

Tract II (Tax Map 2, Lot 17)
A certain lot or parcel of land, with the buildings and other appurtenant features found thereon, situated Southeasterly of, but not adjacent to Route 122, so-called, in the Town of Poland, County of Androscoggin, State of Maine. Said parcel of land is located at or near the Westerly end of the public right-of-way of Verrill Road, so-called. Said parcel of land encompasses all the shoreline of Worthley Pond, so-called, with the exception of about 1300 feet along the Northwesterly shore of said Pond that is being retained by the grantor. Said parcel of is more particularly bounded and described as follows:

Commencing at a drill hole in a granite right-of-way monument found on the Southeasterly right-of-way limit of said Route 122 at a point fifty and zero hundredths (50.00) feet opposite center-line station 45+50 as delineated on a Maine Department of Transportation Right-of-Way map designated as S.H.C. File No. 1-41 sheet 2 of 7.
Thence from the Point of Commencement South 53 degrees 41 minutes 33 seconds West, along the Southeasterly right-of-way limit of said Route 122, a distance of four hundred ninety and sixty-four hundredths (490.64) feet to a point.

Thence South 34 degrees 16 minutes 55 seconds East, along land now or formerly of Pike Industries, Inc. and other land now or formerly of Worthley Pond Properties, LLC, a distance of two thousand sixty and seventeen hundredths (2060.17) feet to a two-inch diameter iron pipe found.

Thence South 34 degrees 31 minutes 22 seconds East, along other land now or formerly of Worthley Pond Properties, LLC, a distance of seventy-one and sixteen hundredths (71.16) feet to a two-inch diameter iron pipe found set at or near the apparent high-water line of said Worthley Pond and the Point of Beginning of the herein described parcel of land.

Thence from the Point of Beginning North 34 degrees 31 minutes 22 seconds West, along other land now or formerly of Worthley Pond Properties, LLC, distance of seventy-one and sixteen hundredths (71.16) feet to a two-inch diameter iron pipe found.

Thence North 34 degrees 16 minutes 55 seconds West, along other land now or formerly of Worthley Pond Properties, LLC, distance of one hundred twenty-three and thirty-nine hundredths (123.39) feet to a point marking the Southeasterly corner of land now or formerly of Pike Industries, Inc.

Thence by the following bearings and distances along land now or formerly of Pike Industries, Inc. and staying approximately two hundred (200) feet from the high-water line of said Worthley Pond;

South 44 degrees 40 minutes 17 seconds West, two hundred seventy-eight and twenty-five hundredths (278.25) feet.
South 30 degrees 41 minutes 17 seconds West, one hundred sixty-seven and twenty hundredths (167.20) feet.

South 25 degrees 18 minutes 17 seconds West, two hundred forty-seven and eighty hundredths (247.80) feet.

South 13 degrees 45 minutes 17 seconds West, two hundred fifty-five and seventy hundredths (255.70) feet.
South 23 degrees 02 minutes 17 seconds West, one hundred forty-one and thirty hundredths (141.30) feet.

South 14 degrees 49 minutes 17 seconds West, two hundred eight and seventy hundredths (208.70) feet.

South 04 degrees 33 minutes 17 seconds West, two hundred sixty-four and sixty hundredths (264.60) feet.

South 06 degrees 47 minutes 43 seconds East, two hundred seven and ninety-one hundredths (207.91) feet.
South 54 degrees 05 minutes 43 seconds East, four hundred eleven and forty-seven hundredths (411.47) feet.

North 68 degrees 54 minutes 17 seconds East, four hundred forty-nine and thirty hundredths (449.30) feet.

North 16 degrees 48 minutes 17 seconds East, one hundred sixty-one and sixty-three hundredths (161.63) feet to a point marking the Northwesterly corner of other land now or formerly of Worthley Pond Properties, LLC.

Thence by the following bearings and distances along other land now or formerly of Worthley Pond Properties, LLC.

North 37 degrees 14 minutes 31 seconds East, five hundred ninety-four and eighteen hundredths (594.18) feet to a point to be marked with a 5/8 inch rebar.

South 21 degrees 29 minutes 02 seconds East, one hundred fifty-three and eighty-five hundredths (153.85) feet.

South 39 degrees 04 minutes 01 seconds East, two hundred ninety-two and twenty-seven hundredths (292.27) feet.
South 06 degrees 03 minutes 50 seconds East, ninety-two and twenty-four hundredths (92.24) feet.

South 36 degrees 20 minutes 37 seconds East, one hundred sixty-three and forty-three hundredths (163.43) feet.

South 89 degrees 34 minutes 14 seconds East, eighty and eighty-nine hundredths (80.89) feet. North 54 degrees 29 minutes 05 seconds East, two hundred one and six hundredths (201.06) feet.

North 25 degrees 25 minutes 28 seconds East, three hundred six and twenty-eight hundredths (306.28) feet.

North 40 degrees 36 minutes 50 seconds East, one hundred seventy-two and sixty-three hundredths (172.63) feet to a point at or near the top of a ledge.

North 06 degrees 49 minutes 35 second West, fifty-three and one hundredths (53.01) feet.

North 32 degrees 22 minutes 57 seconds East, three hundred forty-seven and eighty-four hundredths (347.84) feet.

North 51 degrees, 43 minutes 18 seconds East, one hundred eighty-three and sixty-six hundredths (183.66) feet.

North 60 degrees 10 minutes 31 seconds East, one hundred seventy-seven and forty-eight hundredths (177.48) feet.

Thence by a radial curve to the right having a radius of ninety-eight and nineteen hundredths (98.19) feet, an arc distance of one hundred twenty-four and seventy-three hundredths (124.73) feet.

Thence South 47 degrees 02 minutes 35 seconds East, one hundred seventy-two and eighty-three hundredths (172.83) feet.

North 67 degrees 18 minutes 01 seconds East, one hundred thirteen and sixty-nine hundredths (113.69) feet.

North 22 degrees 58 minutes 21 seconds East, one hundred fifty-seven and fifty-three hundredths (157.53) feet.

North 05 degrees 20 minutes 06 seconds West, one hundred thirty-six and fifty-eight hundredths (136.58) feet.

North 49 degrees 59 minutes 27 seconds West, one hundred seventy-three and ninety-five hundredths (173.95) feet to a point near the Easterly side of the traveled-way of an existing graveled drive or roadway. The following thirteen courses running along or near Easterly or Southerly side of said drive or roadway.

Thence by a non-radial curve to the right having a radial bearing of South 84 degrees 23 minutes 25 seconds East and a radius of two hundred fifty and zero hundredths (250.00) feet, an arc distance of seventy-one and seventy-three hundredths (71.73) feet.
Thence North 22 degrees 02 minutes 58 seconds East, eighty-one and fifty-six hundredths (81.56) feet.

Thence by a radial curve to the left having a radius of eighty-one and ninety-three hundredths (81.93) feet, an arc distance of one hundred fifty and thirty-four hundredths (150.34) feet.

Thence by a radial curve to the right having a radius of three hundred fifteen and seven hundredths (315.07) feet, an arc distance of ninety-three and eighty-eight hundredths (93.88) feet.

Thence North 66 degrees 00 minutes 57 seconds West, one hundred one and ten hundredths (101.10) feet.

Thence by a radial curve to the right having a radius of fifty-eight and eighty-seven hundredths (58.87) feet, an arc distance of thirty-seven and fifty-two hundredths (37.52) feet.

Thence by a radial curve to the right having a radius of one hundred nineteen and twenty-one hundredths (119.21) feet, an arc distance of forty-seven and eighty hundredths (47.80) feet.

Thence by a radial curve to the right having a radius of fifty-three and twenty-six hundredths (53.26) feet, an arc distance of sixty-five and seventy-three hundredths (65.73) feet.

Thence North 79 degrees 20 minutes 34 seconds East, one hundred seventy-three and fifty hundredths (173.50) feet.

North 60 degrees 09 minutes 34 seconds East, ninety-seven and fifty-seven hundredths (97.57) feet.

North 26 degrees 23 minutes 34 seconds East, one hundred seventy-three and eight hundredths (173.08) feet.

North 76 degrees 09 minutes 34 seconds East, one hundred fifteen and sixty-seven hundredths (115.67) feet.

Thence North 83 degrees 19 minutes 47 seconds East, sixty-nine and forty-seven hundredths (69.47) feet to a point to be marked with a 5/8-inch rebar. Said point lying on the apparent Southerly right-of-way limit of said Verrill Road. Said point also being located North 46 degrees 36 minutes 49 seconds

East, one hundred forty-two and thirty-seven hundredths (142.37) feet from the Northeasterly corner of a house located on other land now or formerly of Worthley Pond Properties, LLC.

Thence North 36 degrees 34 minutes 00 seconds West crossing said Verrill Road, a distance of forty-nine and fifty hundredths (49.50) feet to 1-1/2 inch iron pipe found near the Southeasterly side of a stonewall. Said pipe marking the Southwest corner of Lot 22 as depicted on a plan entitled Verrill Ridge, recorded in Plan Volume 27, Page 68 at the Androscoggin County Registry of Deeds.

Thence North 36 degrees 34 minutes 00 seconds West along the Westerly sideline of said Lot 22, a distance of two hundred twenty-four and eighty-one hundredths (224.81) feet to an iron. Said iron marking the Northwest corner of said Lot 22 and the Southwest corner of Lot 3 depicted on a plan entitled Poland Spring Terrace, recorded in Plan Volume 28, Page 199 at the Androscoggin County Registry of Deeds.

Thence North 37 degrees 24 minutes 00 seconds West along the Westerly sideline of said Lot 3, a distance of one hundred ninety-nine and eighty-six hundredths (199.86) feet to a rebar found in a stonewall. Said rebar marking the Southwest corner of land now or formerly of Donald Roux (Book 1438, Page 331).

Thence North 37 degrees 25 minutes 13 seconds West along the Westerly sideline of land now or formerly of Donald Roux (Book 1438, Page 331), a distance of four hundred twenty-one and seventy-two hundredths (421.72) feet to a rebar.

Thence North 52 degrees 24 minutes 47 seconds East along land now or formerly of Donald Roux (Book 1438, Page 331), a distance of one hundred twenty-eight and sixty-four hundredths (128.64) feet to a point.

Thence North 02 degrees 02 minutes 43 seconds West along land now or formerly of Irene Deditch (Book 2657, Page 205), a distance of one hundred eighty-one and forty-seven hundredths (181.47) feet to a rebar.

Thence North 26 degrees 29 minutes 16 seconds West along the Westerly sideline of land now or formerly of Irene Deditch (Book 2657, Page 205), a distance of thirty-four and six hundredths (34.06) feet to a rebar found on the Southerly side of a sixty (60) foot wide right-of-way known as Bishop Road.

Thence North 26 degrees 29 minutes 16 seconds West crossing said Bishop Road, a distance of sixty-nine and eighty-eight hundredths (69.88) feet to a rebar found on the Northerly side of a sixty (60) foot wide right-of-way known as Bishop Road.

Thence North 26 degrees 29 minutes 16 seconds West along land now or formerly of Irene Deditch (Book 2657, Page 205), a distance of one hundred forty-nine and eighty-eight hundredths (149.89) feet to a rebar.

Thence by the following bearings and distances along land now or formerly of Irene Deditch (Book 2657, Page 205), and staying approximately two hundred (200) feet from the high-water line of said Worthley Pond;

North 45 degrees 03 minutes 13 seconds West, seventy-five and thirty hundredths (75.30) feet to a point.

North 50 degrees 18 minutes 47 seconds East, one hundred ninety-five and ten hundredths (195.10) feet to a point.

North 77 degrees 39 minutes 47 seconds East, one hundred twenty-five and fifty hundredths (125.50) feet to a point.

North 43 degrees 33 minutes 47 seconds East, forty-five and thirty hundredths (45.30) feet to a point.

North 26 degrees 12 minutes 47 seconds East, one hundred nineteen and twenty hundredths (119.20) feet to a point.

North 08 degrees 52 minutes 47 seconds East, two hundred sixty-four and twenty hundredths (264.20) feet to a point.

North 01 degrees 45 minutes 13 seconds West, ninety-nine and sixty hundredths (99.60) feet to a point.

North 33 degrees 40 minutes 13 seconds West, two hundred forty-one and zero hundredths (241.00) feet to a point.

Thence North 53 degrees 27 minutes 13 seconds West, crossing a twenty (20) foot wide right-of-way known as The Landing on Worthley Pond, for a distance three hundred sixty-five and twenty hundredths (365.20) feet to a point. The abutting land Westerly of said 20-foot right-of-way being land now or formerly of the Town of Poland.

Thence by the following bearings and distances along land now or formerly of the Town of Poland, and staying approximately two hundred (200) feet from the high-water line of said Worthley Pond;

North 68 degrees 14 minutes 13 seconds West, one hundred two and ten hundredths (102.10) feet to a point.

South 82 degrees 11 minutes 47 seconds West, one hundred two and ten hundredths (102.10) feet to a point.

South 67 degrees 24 minutes 47 seconds West, one hundred forty two and ninety hundredths (142.90) feet to a point.

South 46 degrees 50 minutes 47 seconds West, one hundred ninety-three and thirty hundredths (193.30) feet to a point.

South 26 degrees 03 minutes 47 seconds West, one hundred fifty-three and seventy hundredths (153.70) feet to a point.

South 36 degrees 49 minutes 47 seconds West, three hundred sixty-one and thirty hundredths (361.30) feet to a point.

South 23 degrees 54 minutes 47 seconds West, eighty-nine and forty hundredths (89.40) feet to a point.

South 10 degrees 58 minutes 47 seconds West, ninety-one and twenty hundredths (91.20) feet to a point.

South 03 degrees 54 minutes 13 seconds East, one hundred two and seventy hundredths (102.70) feet to a point.

South 18 degrees 48 minutes 13 seconds East, one hundred fifty-one and ten hundredths (151.10) feet to a point.

Thence South 48 degrees 13 minutes 47 seconds West, along land now or formerly of the Town of Poland and along land now or formerly of William & Beverly Coy (Book 2669, Page 145), a distance of two hundred seven and fifty hundredths (207.50) feet to a point.

South 33 degrees 25 minutes 30 seconds West along land now or formerly of William & Beverly Coy (Book 2669, Page 145), a distance of one hundred thirty one and thirty hundredths (131.30) feet to a point.

South 20 degrees 02 minutes 47 seconds West along land now or formerly of William & Beverly Coy (Book 2669, Page 145) and along land now or formerly of Robert L. Coy (Book 4575, Page 133, a distance of four hundred sixty-seven and fifty-one hundredths (467.51) feet to a point. Said point being located South 29 degrees 57 minutes 54 seconds East a distance of one thousand four hundred forty-one and fifty-five hundredths (1441.55) feet from a 1-1/2 inch iron pipe found on the apparent Southerly right of way limit of West Crestwood Avenue, so-called at the Northeasterly corner of other land now or formerly of Worthley Pond Properties, LLC.

Thence South 29 degrees 57 minutes 54 seconds East along other land now or formerly of Worthley Pond Properties, LLC. For a distance of two hundred thirty-four and eighty hundredths (234.80) feet to a 1-1/2 inch iron pipe found near the high-water line on the Northwesterly side of said Worthley Pond. Said iron pipe being located North 34 degrees 52 minutes 16 seconds East a distance of one thousand two hundred forty-four and sixty-eight hundredths (1244.68) feet from a two-inch iron pipe found on the high-water line of said Worthley Pond and the Point of Beginning of the above-description.

Thence from said 1-1/2 inch iron pipe South 29 degrees 57 minutes 54 seconds East along other land now or formerly of Worthley Pond Properties, LLC, to said Worthley Pond.

Thence in a general Northeasterly, Easterly, Southeasterly, Southerly, Southwesterly, Westerly and Northwesterly clock-wise direction along said Worthley Pond to the intersection of Worthley Pond and a line running South 34 degrees 31 minutes 22 seconds East from the two-inch pipe marking the Point of Beginning.

Thence North 34 degrees 31 minutes 22 seconds West to the two-inch pipe marking the Point of Beginning.

Also conveyed is all right, title and interest the grantor may have in a certain right-of-way over the "Bishops Road" so-called, and as described in a deed from Hiram Ricker & Sons to the Roman Catholic Bishop of Portland, recorded in Book 694, Page 593.

<u>**Schedule 4.10(b)**</u>

**Leased Real Property**

1. Lease Agreement between Poland Landco LLC (as Lessor) and Poland Campco LLC d/b/a Camp North Star (as Lessee), dated July 21, 2015, as amended; premises located at 200 Verrill Road, Poland, ME 04274. *See* <u>Schedule 4.10(a)</u>.

2. Facility Use Agreement between Fryeburg Academy and Camp North Star, dated June 9, 2026; premises at Fryeburg Academy campus, 745 Main Street, Fryeburg, ME 04037.

3. Lease Agreement between Poland Campco LLC d/b/a Camp North Star (as Lessor) and Rebecca McEntee and Mytchell Wilbert (as Lessee), dated November 20, 2025; Cliffside Lodge at Camp North Star, 200 Verrill Road, Poland Spring, ME 04274.

4. Lease Agreement between Poland Campco LLC d/b/a Camp North Star (as Lessor) and Kristy L. Pelletier and Michael N. Harnden (as Lessee), dated March 14, 2025; Cliffside Lodge at Camp North Star, 200 Verrill Road, Poland Spring, ME 04274.

5. Lease Agreement between Poland Campco LLC d/b/a Camp North Star (as Lessor) and Upside Arts (as Lessee), dated May 10, 2026; cabins, meeting spaces, and recreational facilities at Camp North Star, 200 Verrill Road, Poland Spring, ME 04274.

**Schedule 4.10(c)**

**Vehicles, Boats and Trailers**

**Equipment**

1. Tractor: Description: Tractor; Manufacturer / Make: John Deere; Model / Serial No.: 5205; Quantity: 1.

2. ATV Rhino 450: Description: ATV Rhino 450; Year: 2007; Manufacturer / Make: Yamaha; Model / Serial No.: 5Y4AJ19Y37A015667; Quantity: 1.

3. Ride on Mower: Description: Exmark 60" Lazer Z ride on mower; Manufacturer / Make: E Series; Model / Serial No.: LZE742GKC604A3 / 409200306; Quantity: 1.

4. 4W Off Road Vehicle: Description: 4W off road vehicle; Year: 2016; Manufacturer / Make: Yamaha; Model / Serial No.: YXE70WPSGS; Quantity: 1.

5. Golf Cart: Description: Cushman Shuttle 2 golf cart (new); Quantity: 1. Leased from PNC Bank, National Association pursuant to Equipment Lease Agreement (Lease No. 99011245-1), dated February 25, 2026.

**Vehicles**

1. 2005 Ford Econoline: Vehicle No.: 001; Year: 2005; Make: Ford; Model / Description: Econoline; VIN / Serial No.: 1FBSS31L35HB17193.

2. 2005 Ford Econoline: Vehicle No.: 002; Year: 2005; Make: Ford; Model / Description: Econoline; VIN / Serial No.: 1FBSS31LX5HB17238.

3. 2023 Kia Sorento: Vehicle No.: 003; Year: 2023; Make: Kia; Model / Description: Sorento; VIN / Serial No.: 5XYRLDLCXPG233478.

4. 2004 Chevy Silverado: Vehicle No.: 004; Year: 2004; Make: Chevy; Model / Description: Silverado; VIN / Serial No.: 1GCJK34G94E287208.

5. 2014 GMC Sierra: Vehicle No.: 005; Year: 2014; Make: GMC; Model / Description: Sierra; VIN / Serial No.: 3GTU2VEC7EG114169.

6. 2025 Kia Telluride: Vehicle No.: 006; Year: 2025; Make: Kia; Model / Description: Telluride; VIN / Serial No.: 5XYP6DGC8SG579756.

7. 2020 Kia Sorento: Vehicle No.: 007; Year: 2020; Make: Kia; Model / Description: Sorento; VIN / Serial No.: 5XYPG4A39LG709356.

**Boats, Canoes, Kayaks, and Other Watercraft**

1. 16' Motorboat: Description: 16' motorboat; Year: 1969; Model / Serial No.: HSP40 / 00000073183BTJ169; Quantity: 1.

2. Malibu T22 Trailer: Description: Malibu T22 trailer; Year: 2020; Model / Serial No.: 59XBB2424LL006071; Quantity: 1.

3. Jet Boat: Description: Jet boat; Year: 2003; Manufacturer / Make: Yamaha; Model / Serial No.: LX210 / YAMCK480C303; Quantity: 1.

4. Malibu Trailer: Description: Malibu trailer; Year: 2021; Model / Serial No.: 59XBB2423ML009769; Quantity: 1.

5. Axls A420: Description: Axls A420; Year: 2022; Model / Serial No.: AWRB5973B222; Quantity: 1.

6. Malibu TXI (Black/White): Description: TXI (Black/White); Year: 2023; Manufacturer / Make: Malibu; Model / Serial No.: MB2Z9864K223; Quantity: 1.

7. Malibu TXI (Blue): Description: TXI (Blue); Year: 2023; Manufacturer / Make: Malibu; Model / Serial No.: MB2Z9892K223; Quantity: 1.

8. 14' Aluminum Boat: Description: 14' aluminum boat (25 HSP); Year: 2014; Manufacturer / Make: Lund; Model / Serial No.: 23GYH; Quantity: 1.

9. Canoes: Description: Canoes; Quantity: 8.

10. Sailboats: Description: Sailboats; Quantity: 14.

11. Kayaks: Description: Kayaks; Quantity: 14.

12. Class II Boats: Description: Class II boats; Quantity: 2.

13. Class III Boats: Description: Class III boats; Quantity: 5.

# REDACTED

## Schedule 7.04

### Reimbursement for Taxes

To come.

# **EXHIBIT 2**

CAMP NORTH STAR
MAINE

# EMPLOYEE HANDBOOK

*April 2025 / Version 1*

## Table of Contents

**SECTION 1 –WELCOME .......... 6**

WELCOME! .......... 7
DISCLAIMER .......... 8
ABOUT CAMP NORTH STAR .......... 10
AT-WILL EMPLOYMENT .......... 12
EMPLOYEE CLASSIFICATIONS .......... 13
*Full-Time Employees .......... 13*
*Part-Time Employees .......... 13*
*Temporary, Contract, or "1099" Workers .......... 13*
*Seasonal Employees .......... 13*
*Non-Exempt/Exempt Status .......... 14*
*Salaried / Hourly .......... 14*

**SECTION 2- WORKPLACE COMMITMENTS .......... 15**

EQUAL EMPLOYMENT OPPORTUNITY POLICY .......... 16
SEXUAL AND OTHER UNLAWFUL HARASSMENT .......... 16
RELIGIOUS ACCOMODATION POLICY .......... 18
IMMIGRATION LAW COMPLIANCE .......... 19
WORKPLACE VIOLENCE PREVENTION .......... 19
"WHISTLEBLOWER" PROTECTION .......... 20
OPEN DOOR POLICY .......... 21
PROBLEM RESOLUTION .......... 22
CHILD ABUSE POLICY .......... 22
*Guidelines for the Discipline of Children .......... 23*
*Child Sexual Abuse .......... 23*
*Procedures for Child-Abuse Complaints: .......... 23*
*Specific Guidelines for Camper-Staff Contact and Interactions: .......... 24*
*Guidelines for Camper-Counselor Contact .......... 24*
*Specific Camp North Star Rules regarding the Interaction between Staff and Children .......... 24*
COMPLAINT PROCEDURE .......... 27
*Procedure .......... 27*
*Retaliation Prohibited .......... 28*
*Responsive Action .......... 28*

**SECTION 3 – STANDARDS OF CONDUCT .......... 30**

BUSINESS ETHICS AND STANDARD OF CONDUCT .......... 31
CONFLICT OF INTEREST .......... 32
CONFIDENTIAL NATURE OF WORK .......... 33
ACCESS TO COMPANY AND PERSONAL FILES & PROPERTY .......... 33
RELEASE OF INFORMATION TO EXTERNAL PARTIES .......... 34
EMPLOYEE RELATIONS .......... 34
CUSTOMER RELATIONS .......... 34
INTERPERSONAL RELATIONS .......... 35
*Supervisor to Subordinate Relations .......... 35*
*Staff to Camper Relations .......... 35*
PERSONAL APPEARANCE .......... 35
ATTENDANCE AND PUNCTUALITY .......... 36
ACCEPTING/GIVING GIFTS .......... 36
DRUG AND ALCOHOL TESTING .......... 38

*Reasonable suspicion* ... *38*
*Post-accident* ... *39*
*Random* ... *39*
DRUG AND ALCOHOL (INCLUDING: MARIJUANA, ILLEGAL DRUGS & ILLEGAL SUBSTANCE USE) ... 39
SMOKING ... 40
USE OF CAMP OFFICE AND OFFICE SUPPLIES ... 40
ELECTRONIC INFORMATION AND COMMUNICATIONS ... 41
*Use of Information Technologies* ... *41*
*Access to Computer Files* ... *42*
*Email / Voice Mail/ Electronic Communications Policy* ... *43*
*Receipt of Adverse Communication* ... *44*
*Security Breach* ... *44*
*Wi-Fi and Internet* ... *44*
*Identification of Sender* ... *45*
*Violation* ... *45*
TECHNOLOGY POLICY ... 46
SOCIAL MEDIA / BLOGGING ... 46
EMPLOYEE PERSONAL ITEMS ... 48
COMPANY ACCESS TO PERSONAL PROPERTY ... 48
INTERNAL INVESTIGATIONS AND SEARCHES ... 48

SECTION 4- EMPLOYMENT AT CNS ... 50

HIRING AT CAMP NORTH STAR ... 51
*Job Descriptions* ... *51*
*Work Assignments* ... *51*
*Employment Applications* ... *51*
*Background and Employment Reference Checks* ... *52*
*Reference Checks about CNS Employment* ... *52*
*Medical Examination* ... *52*
WORK SCHEDULES ... 53
PERSONNEL DATA CHANGES ... 53
COMPENSATION & PAYROLL ... 53
*Timekeeping* ... *54*
*Pay Days* ... *54*
*Pay Corrections* ... *55*
*Pay Deductions* ... *55*
*Record of Absence or Lateness* ... *56*
PERFORMANCE MANAGEMENT ... 56
*Progressive Discipline* ... *56*
*Performance Evaluations* ... *57*
TERMINATION ... 58
*Voluntary Termination* ... *58*
*Involuntary Termination* ... *59*
*Exit Interview* ... *59*
*Return of Camp North Star Property* ... *60*

SECTION 5 – FACILITIES ... 61

HEALTH & SAFETY ... 62
*Safety Committee* ... *62*
*Infection Control Practices* ... *63*
*Exposure Control Plan:* ... *63*

EMERGENCY PROCEDURES ........ 64
*Medical emergencies and injuries ........ 64*
*Other Emergency Situations ........ 64*
*Department Health and Safety Procedures ........ 65*
*Missing Camper Policy ........ 65*
*Dealing with the Media ........ 65*
INCLEMENT WEATHER AND OTHER EMERGENCY CLOSINGS ........ 65
*Severe Weather ........ 65*
*Fire ........ 65*
*Storms ........ 66*
*Severe Storms (i.e., Tornado) ........ 66*
FACILITIES SECURITY & USE OF CAMP PROPERTY ........ 66
*General ........ 66*
*Animals in the workplace ........ 67*
*Equipment and Vehicles ........ 67*
*Personal Vehicles and Parking ........ 67*
*Waterfront ........ 68*
*Morning Workouts ........ 68*
*Cabin Privacy ........ 68*
*Weapons ........ 68*
VISITORS IN THE WORKPLACE ........ 69
*Visitors ........ 69*
*Intruder/Trespasser Policy ........ 69*
*Steps for dealing with trespassers: ........ 69*
*Summer Policy ........ 69*
DELIVERIES ........ 70
SOLICITATION ........ 70

**SECTION 6 – BENEFITS FOR ALL STAFF ........ 71**

MAINE FAMILY LEAVE INSURANCE ........ 72
LACTATION ACCOMMODATION ........ 73
JURY DUTY ........ 73

**SECTION 7 – NEXT STEPS ........ 74**

**SECTION 8 –FOR YEAR-ROUND STAFF ONLY ........ 75**

FOR FULL TIME / YEAR-ROUND STAFF ........ 76
BUSINESS TRAVEL EXPENSES ........ 76
REMOTE / HYBRID WORKING ........ 80
OFF SEASON VISITOR POLICY ........ 80
NON-EXEMPT ONLY: OVERTIME AND BREAKS ........ 81
COMPANY SPONSORED BENEFITS ........ 82
*CNS Retirement Savings Plan ........ 82*
*Health Insurance ........ 82*
*Benefits Continuation (COBRA) ........ 83*
*Paid Time Off ........ 83*
*Common Vacation ........ 86*
*Holidays ........ 86*
*Time off to vote ........ 86*
*Military Leave ........ 87*
*Military Family Leave Entitlements ........ 88*

**SECTION 9 - FORMS .......... 89**

HANDBOOK ACKNOWLEDGEMENT .......... 90
EMPLOYEE COMPLAINT FORM .......... 91

# SECTION 1 –WELCOME

WELCOME!

We welcome you to Camp North Star and wish you every success with us.

We believe that each employee contributes directly to Camp North Star's growth and success, and we hope you will take pride in being a member of our team. We also believe that the workplace should be one of continuous growth, both professionally and personally.

Our goal is to provide the highest quality summer camp experience, and you are central to this process. As a staff member, each and every one of you has an amazing opportunity to significantly and positively impact our campers and each other.

We hope that your experience at Camp North Star will be challenging, enjoyable, and rewarding.

Best regards,

Steven and Brooke Bernstein

Owners/Directors

DISCLAIMER

THIS EMPLOYEE HANDBOOK IS NOT A CONTRACT OF EMPLOYMENT

In this Handbook, the operating company, Poland Campco LLC d/b/a as Camp North Star, will be known as "CNS," "The Camp", "The Company", or "Camp North Star." Employees with a job title including the word "Director" will be considered as one of the "Camp Directors." Steven and Brooke Bernstein will be known as the "Owners/Directors" and therefore have full authority over the Camp administration and operations.

The Camp North Star Employee Handbook (hereinafter referred to as the "Handbook") has been developed to provide general guidelines about Camp North Star policies and procedures for both seasonal employees and full-time staff members. Employees should read, understand, and comply with all provisions of the Handbook. In the event there is a conflict between any policy or procedure in this Handbook and any individual employment contract, or federal, state, or local law, regulation or ordinance, the terms and conditions of that contract, law, regulation, or ordinance shall prevail. In all other cases, the policies and procedures set forth in this Handbook shall prevail.

Employees should be comfortable referring to the Handbook whenever a question regarding employment with Camp North Star arises. However, the Handbook cannot anticipate every circumstance or answer all of the questions employees may have about Camp North Star policies or benefits. If the Handbook does not answer the question, employees should contact their supervisor or the Owners/Directors, for assistance.

This Handbook revokes and supersedes any prior summaries or statements of employment policies and procedures, as well as any unwritten policies that were orally communicated. This Handbook is a living document. Camp North Star expects to revise and update this Handbook from time to time. Camp North Star will advise employees of changes or additions or deletions in policies and procedures covered in this Handbook by circulating such changes, additions, or deletions either in writing or electronically. An employee should confirm the status of a policy or practice before acting on it.

None of the policies or guidelines in the Handbook are intended to give rise to contractual rights or obligations, or to be construed as a guarantee of employment for any specific period of time, or any specific type of work. As explained in this Handbook, all employment with Camp North Star is at-will, which means that Camp North Star or the employee may terminate the employment relationship at any time, with or without cause, and with or without notice.

Additionally, with the exception of the at-will employment policy, these guidelines are subject to modification, amendment, or revocation by Camp North Star at any time, without advance notice. In addition, employees may be demoted, job duties may be changed, or benefits altered at any time, with or without cause, and with or without notice.

No one at Camp North Star has the authority to enter into any agreement for employment for a specified period of time, or to make any representations or agreements that are inconsistent with the at-will status. No director or representative of Camp North Star other than the Owners/Directors has the authority to enter into any agreement for employment, which must be signed by Steven and Brooke Bernstein, Owners.

Information provided regarding fringe benefits (i.e.: medical, 401K) is merely a summary and the actual plan documents should be consulted for specific details and/or contact the Owners/Directors.

Camp North Star will provide each employee with a copy of this Handbook upon employment. All employees are expected to abide by it. The highest standards of personal and professional ethics and behavior are expected of all Camp North Star employees.

All policies in this handbook are to be taken at the written word. Camp North Star Owners/Directors have the final interpretation on all policies and procedures. Employees should not make assumptions about their interpretation of policies and should ask for clarifications as needed from the Owners/Directors.

Further, Camp North Star expects each employee to display good judgement, diplomacy, and courtesy in their professional relationships with Camp North Star Owners/Directors, Directors, all staff, clients, vendors, volunteers, and the general public.

## ABOUT CAMP NORTH STAR

Camp North Star sits on a 200-acre property in Poland Spring Maine, on the shores of Worthley Pond, a private 55-acre lake we enjoy all summer. There have been summer camps running on this property since 1927. Three different types of camps under different names have been running on the property since that time. Camp North Star got its current name in 2008. There are campers on property for 7 weeks each summer. Those 7 weeks are divided into 3 sessions, and campers from ages 7 to 17 return summer after summer to stay for any combination of those sessions.

## What are Camp North Star's Goals?

Camp North Star's goal is to encourage each of our campers to discover and develop into the best version of themselves. We are committed to instilling positive values that are modeled and learned in a nurturing camp environment. Enthusiastic, talented, and skilled staff members facilitate the development of friendships, essential life skills, and strengthen campers' self-confidence and self-esteem.

## What are the RICHS?

Camp North Star believes in following a strong value system in its daily operations. Five values known as RICHS are woven into the camp's program and philosophy, and are the foundation for all our interactions within the greater camp community.

- Respect - to value yourself, others, and the community at large. To be thoughtful in your actions and interactions with others.
- Independence - to discover yourself and to celebrate whoever that may be. To try new things, make new friends, and seek new experiences. To take the road less traveled.
- Caring - to be thoughtful, kind, considerate, and interested in the well-being of all those you come in contact with each day. To provide a welcoming and helpful environment to all that you interact with at camp. To openly share your heart and your friendship with others.
- Honor - doing the right thing because it is the right thing to do. Being a leader. Showing strong character and principles. Being someone who challenges each of us to be a better person by sharing their sense of self with us.
- Spirit - embracing the values and community of camp and life. Celebrating yourself, others, and the camp experience in your own unique way that is contagious to the camp community.

## What are the Core Values of our Staff?

- Teamwork. When people work together, they can create something greater than themselves as individuals.
- Fun. Enjoyment while developing or using the skills and expertise to create a memorable and rewarding experience for campers and staff.
  Learning. No one has all the answers. We develop professionally by expanding our capabilities with innovative ongoing training.

- Belonging. Ensuring everyone involved feels like they have a place and are accepted for who they are. Fostering a sense of community and family.
- Impact. Having a positive influence and effect on your peers and the campers you supervise. Have an unwavering approach toward a difference with positive results.
  Grit. We embrace the hard stuff. Sleeves rolled up, we attack every challenge head-on.

## AT-WILL EMPLOYMENT

All employment at Camp North Star is at-will. No policy or provision in this Handbook is intended to create a contract binding the employee or Camp North Star to an agreement of employment for a specific period of time. This means that seasonal, non-seasonal, part-time and full-time employees may be terminated from employment with Camp North Star at any time, for any reason, with or without notice, and employees are free to leave the employment of Camp North Star at any time, for any reason, with or without notice. Any representation by any Director or employee contrary to this policy is not binding upon Camp North Star unless it is in writing and signed by Steven and Brooke Bernstein, Owners.

## EMPLOYEE CLASSIFICATIONS

It is the intent of Camp North Star to clarify the definitions of employment classifications so that employees understand their employment category and benefit eligibility. All employment at Camp North Star is at-will. These classifications do not guarantee employment for any specified period of time. Accordingly, the right to terminate the employment relationship at any time is retained by both the employee and Camp North Star.

Should an employee's status change during the year, such as moving from part time to full time during the camp season or changing positions/job titles, the employment classification will be changed to match the timing and role. If you have questions, please direct them to the Owners.

At the time an employee is hired, they are classified as a full-time, part-time, or seasonal employee and are told whether they qualify for overtime pay (exempt or non-exempt). Employment classifications are reviewed again at orientation.

### Full-Time Employees

An employee who regularly works a 40-hour work week is considered a full-time direct hire employee and is eligible for the Company's discretionary benefits package (see plan documents) in accordance with their position and length of employment. Full-time employees are expected to abide by all behaviors, policies, and conditions outlined in this handbook. All full-time employees are under a W2 tax arrangement. All employees will be provided their hours of work in their offer letter.

### Part-Time Employees

An employee who regularly works a less than a 39-hour work week (or <1000 hours per year for 401(k) benefits) is considered a part-time direct hire employee and may  be eligible for the Company's discretionary benefits package (see plan documents) in accordance with their position and length of employment. All part-time employees are under a W2 tax arrangement.

Part-time employees are expected to abide by all behaviors, policies, and conditions outlined in this handbook. All employees will be provided their hours of work in their offer letter.

### Temporary, Contract, or "1099" Workers

A "Temporary Worker" or "Contract Worker" or "1099" worker is self-employed. The Company may enter into a contract with an independent contractor to do a specific role or complete a specific task. The Company expects an invoice for services and will not withhold taxes from their payments. The Company will provide the Contract Worker with a 1099 year-end tax document. A contract worker is not an employee of the Company and is not eligible for the Company's benefit package.

Neither temporary, nor contract, nor 1099 workers are considered full-time employees of the Company and are therefore not eligible for the company benefits described in the handbook, however, they are held to all the same standards of conduct and company behavioral policies.

### Seasonal Employees

Seasonal employees are hired for a specified time for a specific purpose. In the case of Camp North Star, Seasonal Employees are hired for the specific time and purpose of summer

camp. These employees are eligible for statutory benefits only. Statutory benefits are mandated by Federal, state, or local law and include Social Security, Workers' Compensation insurance and unemployment compensation insurance. Seasonal employees are hired via W2 tax arrangement.

Unless otherwise specified, the Company group benefits described in this Handbook apply only to full-time employees. All other policies described in this Handbook and communicated by the Company apply to all employees.

Non-Exempt/Exempt Status

All employees are classified as either "exempt" or "non-exempt." Employees are advised of their classification at time of hire, transfer, or promotion.

Per the Fair Labor Standards Act (FLSA) and applicable state law, employees in certain types of jobs are entitled to overtime pay for hours worked more than forty (40) hours per work week. These employees are considered non-exempt and are eligible for overtime pay.

Exempt employees are managers, executives, administrative staff, professional staff, technical staff, officers, directors, owners, and others whose duties and responsibilities allow them to be "exempt" from overtime pay provisions as provided by the federal Fair Labor Standards Act (FLSA) and any applicable state laws. Exempt employees will be advised that they are in this classification at the time of hire, transfer, or promotion.

Salaried / Hourly

Salaried employees are paid on the basis of a predetermined annual amount. The annual salary is divided by the Company's pay periods for the year and the employee receives the same gross amount every paycheck. This includes holidays and any time off.

Hourly employees are paid on the basis of a predetermined hourly rate. Hourly employees are paid for the exact time they work each pay period along with any holidays or approved time off.

Non-exempt employees are often thought of as hourly employees; however, there is no requirement that they be paid on an hourly basis.

Both salaried and hourly employees can be classified as non-exempt employees.

For the purposes of clarification, the Employee's offer letter will clearly state their classification.

In general, Camp North Star classifies their employees as such:

- Full Time / Exempt / Salaried – for year-round employees
- Part Time / Non-Exempt / Hourly – for specific roles designed with a part time function
- Seasonal / Exempt / Salaried – for all employees hired with the specific purpose of summer camp support.

# SECTION 2- WORKPLACE COMMITMENTS

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

Camp North Star provides equal employment opportunities to all employees and applicants for employment and prohibits discrimination and harassment of any type without regard to ethnicity, race, color, religion, age, sex, national origin, marital status, disability, genetics, protected veteran status, sexual orientation, gender identity or expression, pregnancy, breastfeeding, or any other characteristic protected by federal, state, or local laws. Each person is evaluated on the basis of personal skills, qualifications, and merit.

Camp North Star's policy regarding equal employment opportunity applies to all terms and conditions of employment, including recruiting, hiring, job assignments, promotions, termination, layoff, leaves of absence, compensation, and training.

Camp North Star will not tolerate any form of unlawful discrimination. All employees are expected to cooperate fully in implementing this policy. Any employees with questions or concerns about any type of discrimination in the workplace are encouraged to bring these issues to the attention of management per the Complaint Procedure in this Handbook.

Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination of employment.

## SEXUAL AND OTHER UNLAWFUL HARASSMENT

Camp North Star is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment. Actions, words, jokes, or comments based on an individual's race, color, religion, age, sex, national origin, marital status, disability, genetics, protected veteran status, sexual orientation, gender identity or expression, pregnancy, breastfeeding, or any other characteristic protected by federal, state, or local laws will not be tolerated.

Sexual harassment is defined as unwanted sexual advances, or visual, verbal, or physical conduct of a sexual nature. This definition includes many forms of offensive behavior and includes gender-based harassment of a person of the same sex as the harasser. The following is a partial list of sexual harassment examples:

- Unwanted sexual advances.
- Offering employment benefits in exchange for sexual favors.
- Making or threatening reprisals after a negative response to sexual advances.
- Visual conduct that includes leering, making sexual gestures, or displaying of sexually suggestive objects or pictures, cartoons, or posters.
- Verbal conduct that includes making or using derogatory comments, epithets, slurs, or jokes.
- Verbal sexual advances or propositions.
- Verbal abuse of a sexual nature, graphic verbal commentaries about an individual's body, sexually degrading words used to describe an individual, or suggestive or obscene letters, notes, or invitations.
- Physical conduct that includes touching, assaulting, or impeding or blocking movements.

Unwelcome sexual advances (either verbal or physical), requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of employment; (2) submission or

rejection of the conduct is used as a basis for making employment decisions; or, (3) the conduct has the purpose or effect of interfering with work performance or creating an intimidating, hostile, or offensive work environment.

Unlawful Harassment is generally defined as unwelcome verbal or non-verbal conduct, based upon a person's protected characteristic, that denigrates or shows hostility or aversion toward the person because of the characteristic, and which affects the person's employment opportunities or benefits, has the purpose or effect of unreasonably interfering with the person's work performance, or has the purpose or effect of creating an intimidating, hostile or offensive working environment.

Harassing conduct includes but is not limited to: epithets; slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes and display or circulation in the workplace of written or graphic material that denigrates or shows hostility or aversion toward an individual or group based on their protected characteristic.

If you experience or witness sexual or other unlawful harassment in the workplace, report it immediately per the Complaint Procedure in this Handbook. You can raise concerns and make reports without fear of reprisal or retaliation.

All allegations of sexual or unlawful harassment will be quickly and discreetly investigated. To the extent possible, your confidentiality and that of any witnesses and the alleged harasser will be protected against unnecessary disclosure. When the investigation is completed, you will be informed of the outcome of the investigation.

Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment must immediately advise the Owners/Directors so it can be investigated in a timely and confidential manner.

Violation of this policy will subject an employee to disciplinary action, up to and including immediate termination. Moreover, any employee, supervisor or manager who condones or ignores potential violations of this policy will be subject to appropriate disciplinary action, up to and including termination.

**False and malicious complaints of harassment, discrimination, or retaliation (as opposed to complaints that, even if erroneous, are made in good faith) may be the subject of appropriate disciplinary action.**

NON-DISABILITY DISCRIMINATION AND REASONABLE ACCOMODATIONS

Camp North Star will comply with all applicable provisions of the Americans with Disabilities Act ("ADA"). It is CNS's policy not to discriminate against any qualified employee or applicant regarding any terms or conditions of employment because of such individual's disability or perceived disability so long as the employee can perform the essential functions of the job. Consistent with this policy of nondiscrimination, Camp North Star will provide reasonable accommodations to a qualified individual with a disability, as defined by the ADA, who has made the Camp aware of their disability, provided that such accommodation does not constitute an undue hardship to CNS. Employees with a disability who believe they need a reasonable accommodation to perform the essential functions of their job should contact the Owners/Directors to discuss options. Camp North Star encourages individuals with disabilities to come forward and request reasonable accommodation.

In general, it is the employee's responsibility to notify the Owners/Directors of the need for accommodation. On receipt of an accommodation request, the Owners/Directors will meet with the employee to discuss and identify the precise limitations resulting from the disability and the potential accommodation that CNS might make to help overcome those limitations. Upon doing so, they may ask the employee for input or the type of accommodation the employee believes may be necessary or the functional limitations caused by the employee's disability. When appropriate, CNS may need permission to obtain additional information from a physician or other medical or rehabilitation professionals.

CNS will determine the feasibility of the requested accommodation considering various factors, including, but not limited to, the nature and cost of the accommodation, the availability of tax credits and deductions, outside funding, CNS's overall financial resources and organization, and the accommodation's impact on the operation of the Camp, including its impact on the ability of other employees to perform their duties and on CNS's ability to conduct business.

Camp North Star Owners/Directors will inform the employee of their decision on the accommodation request or on how they will make the accommodation. If the accommodation request is denied, employees will be advised of their right to appeal the decision by submitting a written statement explaining the reasons for the appeal to the Owners/Directors. If the request for appeal is denied, that decision is final.

The ADA does not require Camp North Star to make the best possible accommodation, to reallocate essential job functions, or to provide personal use items (i.e., eyeglasses, hearing aids, wheelchairs, etc.).

An employee or job applicant who has questions regarding this policy or believes that they have been discriminated against based on a disability should notify the Owners/Directors. All such inquiries or complaints will be treated as confidential to the extent permissible by law.

The Americans with Disabilities Act Amendments Act (ADAAA) became effective in 2009 and significantly amends the Americans with Disabilities Act (ADA) and will affect how employers analyze ADA coverage and requests for reasonable accommodation.

Some of the major amendments made by the ADAAA to the components of the term "disability" expand the definition of "major life activities." This definition refers to activities, such as reading, bending, or lifting that may be considered under ADAAA. Under the ADAAA, employees are obligated to communicate any disability to their employer.

Camp North Star must review any reasonable accommodation request and may not discriminate against the employee or applicant. For more information regarding this amendment and the required responsibilities, please visit www.ada.gov.

This policy is neither exhaustive nor exclusive. Camp North Star is committed to taking all other actions necessary to ensure equal employment opportunity for persons with disabilities in accordance with the ADA and all other applicable federal, state, and local laws.

## RELIGIOUS ACCOMODATION POLICY

The Camp respects the religious beliefs and practices of all employees and will make, on request, an accommodation for such observances when a reasonable accommodation is available that does not create an undue hardship on the Camp's business.

### Requesting a Religious Accommodation

An employee whose religious beliefs or practices conflict with his or her job, work schedule, or with the Camp's policy or practice on dress and appearance, or with other aspects of employment, and who seeks a religious accommodation must submit a formal written request for the accommodation to Owners. The written request will include the type of religious conflict that exists and the employee's suggested accommodation.

### Providing Religious Accommodation

The Owners will evaluate the request considering whether a work conflict exists due to a sincerely held religious belief or practice and whether an accommodation is available that is reasonable and that would not create an undue hardship on the Camp's business. An accommodation may be a change in job, using paid leave or leave without pay, allowing an exception to the dress and appearance code that does not affect safety requirements, or for other aspects of employment.

The Owners and employee will meet to discuss the request and decision on an accommodation. If the employee accepts the proposed religious accommodation, the Owners will implement the decision. If the employee rejects the proposed accommodation, he or she may appeal following the Camp's general appeal/open door policy and procedure.

## IMMIGRATION LAW COMPLIANCE

Camp North Star is committed to employing only United States citizens and aliens who are authorized to work in the United States and does not unlawfully discriminate on the basis of citizenship or national origin.

In compliance with the Immigration Reform and Control Act of 1986, each new employee, as a condition of employment, must complete the Employment Eligibility Verification Form I-9 and present documentation establishing identity and employment eligibility no later than the first day of employment. Former employees who are rehired must also complete the form if they have not completed an I-9 with Camp North Star within the past two years, or if their previous I-9 is no longer retained or valid.

## WORKPLACE VIOLENCE PREVENTION

Camp North Star is committed to preventing workplace violence and to maintaining a safe work environment. Given the increasing violence in society in general, Camp North Star has adopted the following guidelines to deal with intimidation, harassment, bullying or other threats of (or actual) violence that may occur during business hours or on its property.

All employees, including supervisors and seasonal/temporary employees, should be treated with courtesy and respect at all times. Employees are expected to refrain from fighting, "horseplay," or other conduct that may be dangerous to others. Firearms, weapons, and other dangerous or hazardous devices or substances are prohibited from the property of Camp North Star without proper authorization.

Conduct that threatens, intimidates, bullies, or coerces another employee, a customer, or a member of the public at any time, including off-duty periods, will not be tolerated. This prohibition includes all acts of harassment, including harassment that is based on an individual's sex, race, age, or any characteristic protected by federal, state, or local law.

All threats of (or actual) violence, both direct and indirect, should be reported as soon as possible to your immediate supervisor or any other member of management. This includes threats by employees, as well as threats by customers, vendors, solicitors, or other members of the public. When reporting a threat of violence, you should be as specific and detailed as possible.

All suspicious individuals or activities should also be reported as soon as possible to a supervisor. Camp North Star will promptly and thoroughly investigate all reported threats of (or actual) violence and of suspicious individuals or activities. The identity of the individual making a report will be protected as much as is practical. In order to maintain workplace safety and the integrity of its investigation, Camp North Star may suspend employees, either with or without pay, pending investigation.

Anyone determined to be responsible for threats of (or actual) violence or other conduct that is in violation of these guidelines will be subject to prompt disciplinary action up to and including termination of employment.

Camp North Star encourages employees to bring their disputes or differences with other employees to the attention of their supervisors or the Owners/Directors before the situation escalates into potential violence. Camp North Star is eager to assist in the resolution of employee disputes and will not discipline employees for raising such concerns.

## “WHISTLEBLOWER” PROTECTION

Each employee, contractor, subcontractor, and agent of Camp North Star has the right to raise a concern about any activity, policy, or practice that he or she reasonably believes is in violation of a federal or state law, rule, or regulation promulgated pursuant to law without fear of retaliation or reprisal. Additionally, employees have the right to raise concerns about Camp North Star policies and procedures. All concerns will be taken seriously and promptly investigated.

Camp North Star prohibits all employees from asking or requiring an employee to violate laws, rules, or regulations. Any employee(s) asked or required to violate a law, rule, or regulation shall file a written objection, within five (5) working days, with the Owners/Directors.

1. Camp North Star shall not take any retaliatory action against an employee because the employee does any of the following:
    a. the employee acting in good faith (or a person acting on the employee's behalf) reports to the employer or a public body what the employee has reasonable cause to believe is a violation of a federal, state or local law or rule,
    b. the employee acting in good faith (or a person acting on the employee's behalf) reports to the employer or a public body what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual,
    c. the employee is requested to participate in an investigation, hearing, or inquiry held by that public body, or in court action,

d. the employee acting in good faith, has refused to carry out a directive to engage in activity that would be a violation of a law or rule adopted under the laws of this state, a political subdivision of this state or the United States or that would expose the employee or any individual to a condition that would result in serious injury or death, after having sought and been unable to obtain a correction of the illegal activity or dangerous condition from the employer, or
e. the employee, acting in good faith and consistent with state and federal privacy laws, reports to the employer, to the patient involved or to the appropriate licensing, regulating or credentialing authority, orally or in writing, what the employee has reasonable cause to believe is an act or omission that constitutes a deviation from the applicable standard of care for a patient by an employer charged with the care of that patient.

An employee who makes a disclosure to a public body is asked to notify the Owners/Directors, in writing, of the activity, policy or practice, which is believed to be in violation of the law. This notice requirement is intended to give the Camp a reasonable opportunity to correct the activity, policy, or practice.

However, an employee does not have to notify the Owners/Directors first under the following circumstances:

a. Where it is reasonably certain that the activity, policy, or practice is known to one or more supervisor of the Camp, or
b. Where the employee reasonably evaluates the situation as emergent in nature.

Should an employee feel that he or she has been subject to retaliatory action for exercising his or her right under this policy, he or she may file a complaint, in writing, within thirty (30) calendar days of the incident in accordance with the Complaint Procedure in this Handbook.

## OPEN DOOR POLICY

As employees of Camp North Star, you have the opportunity to contribute to our future success and growth by submitting suggestions for practical work-improvement or cost-savings ideas.

A suggestion is an idea that will benefit Camp North Star by solving a problem, reducing costs, improving operations or procedures, enhancing customer service, eliminating waste, or making Camp North Star a better or safer place to work. Statements of problems without accompanying solutions, or recommendations concerning co-workers and management are not appropriate suggestions.

All suggestions should contain a description of the problem or condition to be improved, a detailed explanation of the solution or improvement, and the reasons why it should be implemented. If you have questions or need advice about your idea, contact your supervisor for help.

Submit suggestions to any Director, and after review, they will be forwarded to the Owners/Directors. As soon as possible, you will be notified of the adoption or rejection of your suggestion.

Special recognition will be given to employees who submit a suggestion that is implemented.

## PROBLEM RESOLUTION

Camp North Star is committed to providing the best possible working conditions for its employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response from Camp North Star supervisors and management.

Camp North Star strives to ensure fair and honest treatment of all employees. Supervisors, managers, and employees are expected to treat each other with mutual respect. Employees are encouraged to offer positive and constructive criticism.

If employees disagree with established rules of conduct, policies, or practices, they can express their concern through the problem resolution procedure. No employee will be penalized, formally or informally, for voicing a complaint with Camp North Star in a reasonable, business-like manner, or for using the problem resolution procedure.

If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to make use of the following problem resolutions steps. The employee may discontinue the procedure at any step.

1. Employee presents problem to immediate supervisor after incident occurs.
2. If supervisor is unavailable or employee believes it would be inappropriate to contact that immediate supervisor, employee may present problem to next level of management or Owner/Director, as needed.
3. Supervisor/Management responds to problem during discussion or after consulting with appropriate additional management or Owners/Directors, when necessary.
4. Supervisor/Management documents discussion. Documentation provided to Owners/Directors.
5. If Employee is not satisfied with the resolution, Employee may present problem to Owner/Director in writing.
6. Owner/Director reviews original resolution and considers appeal.
7. Owner/Director informs employee of decision and communicates response to employee’s other supervisors. The Owner/Director has full authority to make any adjustment deemed appropriate to resolve the problem.

**Not every problem can be resolved to everyone's total satisfaction, but only through understanding and discussion of mutual problems can employees and management develop confidence in each other. This confidence is important to the operation of an efficient and harmonious work environment and helps to ensure everyone's job security.**

## CHILD ABUSE POLICY

Child abuse is legally and morally wrong and the Camp will not tolerate any violation of our commitment to child protection.

We are required to report any alleged physical or sexual abuse that takes place at camp to the State Child Protective Services within 24 hours after the allegation is made known. Any allegation of abuse prior to a camper’s arrival at camp is to be reported within 8 hours and followed by a written report within 72 hours (Maine Law: 22MRSA 4011-4015).

In a camp setting, physical abuse is most likely to happen when a counselor is disciplining a rebellious or unruly camper. Anything done to inflict pain while disciplining a camper is considered child abuse.

Guidelines for the Discipline of Children

- Counselors may NOT, under any circumstances, hit a child.
- Counselors may not use abusive or derogatory language with campers.
- A staff member who encounters a particularly difficult child must seek the help of supervisory or administrative staff.
- In dealings with campers, counselors should strive to respond, as opposed to reacting, to children.

The physical size and strength of staff members necessitate that you use discretion and restraint in all physical contact activities with campers. Games that encourage intense competitive activities with physical contact that potentially could cause injury should be stopped or supervised very closely by nonparticipating staff members.

Child Sexual Abuse

We cannot be too careful in the area of sexual abuse. Even the appearance of a wrong, or a false allegation, can cause irreparable damage to the reputation of the accused staff member and the camp. Therefore, all staff members must be very cautious in order to avoid doing anything that could be interpreted as sexual abuse.

Child sexual abuse includes but is not limited to, any contact or interaction between a child and an adult when the child is being used for the sexual stimulation of the adult or of a third person. The behavior may or may not involve touching. Sexual behavior between a child and an adult is always considered forced, whether or not the child has consented.

Affectionate touch and the warm feelings it brings is an important factor in helping a child grow into a loving and peaceful adult. However, staff and volunteers need to be sensitive to each person's need for personal space (i.e., not everyone wants to be hugged). Our camp encourages appropriate touch; however, at the same time, prohibits inappropriate touch or other means of sexually exploiting children.

Procedures for Child-Abuse Complaints:

- Any actions you observe or that may be disclosed, that are not acceptable behavior according to the above guidelines, should be reported as soon as possible to the Camp Director.
- The Camp Owner/ Director will notify the appropriate authorities and parents.
- The Camp Owner/ Director will take appropriate internal action.

In the event the reported incident(s) involve a program volunteer or employed staff, the Director will, without exception, suspend the volunteer or staff person from the camp. The parents or legal guardians of the child(ren) involved in the alleged incident will be promptly notified in accordance with the directions of the relevant state or local agency.

Whether the incident or alleged offense takes place on or off camp property, it will be considered job-related (because of the youth-involved nature of the camp). Reinstatement of the employed staff person will occur only after all allegations have been cleared to the satisfaction of the Director. All

camp staff and volunteers must be sensitive to the need for confidentiality in the handling of this information and, therefore, should only discuss the incident with the Director.

Specific Guidelines for Camper-Staff Contact and Interactions:

These lists are here to provide guidelines but are not exhaustive and counselors must always use their best judgment.

Guidelines for Camper-Counselor Contact

- Touch should be on the hand, shoulder, or upper back.
- Never against a child's will (unless in the case of the clear and present danger of the child).
- Never against a child's discomfort, whether expressed verbally or nonverbally.
- In the Camp of other people.
- Never when it would have the effect of over-stimulating the child.
- Never in a place on a child's body that is normally covered by a bathing suit, unless for a clear medical necessity and, then, only with supervision from another adult.

Specific Camp North Star Rules regarding the Interaction between Staff and Children

- There is no 'hazing' of campers by campers or counselors. Campers will not be subjected to any type of 'initiation rights'.
- Younger children should be encouraged to change their own clothes as much as possible.
- Campers will never be alone with a counselor in their cabin, or any building.
- A staff member will never share a bed or sleeping bag with a camper.
- Counselors will set limits with children who 'cling' or hang on them
- Counselors will not give back rubs
- Tickling or teasing a camper to the point where that camper is out of control is unacceptable
- Pillow fights or wrestling matches and the like can become over-stimulating in short order and need to be limited and carefully supervised.
- Overnight trips need a minimum of two adult leaders and there needs to be at least one counselor from the same side of camp as the campers.
- Counselors having romantic/physical relations on property and overnight trips are grounds for dismissal. The romantic lives of counselors are not, under any circumstances, shared with campers.
- Counselors must stay out of cabins other than their own unless on specific camp business.
- Whatever is done with campers should be done in broad daylight, with company.

### 1. Prevention of Abuse and Neglect

At Camp North Star, we are committed to creating a safe and nurturing environment for all campers. Our proactive measures to prevent abuse and neglect include the following:

**Staff Training**: All camp staff members undergo mandatory training on recognizing signs of abuse; types of abuse, including peer-to-peer abuse; grooming behaviors; and understanding proper behavior management techniques, their responsibilities in communication and reporting, and the camp's code of conduct. Staff are trained that any indications of serious problems must be reported to the Camp Director or designee

immediately.

**Education**: We educate campers, staff, and parents about child protection, boundaries, and appropriate conduct. Professional speakers are brought in during our 9 days of staff training who explain these standards. Part of the training includes a member from Community Concepts who teaches a class in Mandated Reporter Training.

**Supervision**: We have established clear guidelines for ratios and supervision practices, ensuring no child is left alone with an adult. We identify high-risk areas (where youth cannot be seen or less supervision is in place) and provide specific training and expectations on managing these areas. We maintain vigilant supervision of campers during all activities to prevent any incidents of abuse or neglect. We teach our counselors the rule of 3 — if a camper needs to go anywhere at camp, they must have at least themselves and two staff or themselves, another camper, and a staff member.

**Communication expectations:** Camp North Star has established open lines of communication between staff, campers, and parents to encourage reporting any concerns or suspicions. Information is shared with camp families through our Parent Handbook, newsletters, and a yearly webinar hosted by our camp directors.

**Code of conduct:** Camp North Star has a comprehensive code of conduct that details appropriate behavior for staff and campers and includes clear consequences for violation.

**Camper arrival**: Upon arrival of our campers, the nurses shall screen all campers as to their physical condition. Nurses note any bruises, cuts, or markings on the child's body.

**Background Checks**: Criminal background and child abuse clearance checks are done for all staff every year. New staff have professional reference checks before employment is offered.

**2. Reporting Suspected Abuse or Neglect**

Camp North Star has clear procedures for reporting suspected abuse or neglect to the appropriate authorities.

**Designated authorities:** As mandated reporters, our staff is legally obligated to report any suspected child abuse or neglect. Each staff member will sign off that they have read and understand the guidelines and the process and expectations to report as set forth by Maine state law and taught by Community Concepts during Mandated Reporter Training. Camp staff is required to report any incidents of child abuse to North Star's Camp Director promptly. The camp director will then report suspected child abuse to

the DHHS Mandated Reporter Hotline at 1-800-452-1999.

**Reporting requirements:** North Star staff are trained on their legal obligations to report suspected abuse or neglect, including the timeline and methods for making reports. Staff must also understand the criminal ramifications of failure to report.

**Confidentiality:** Staff are made aware that all reports are handled confidentially and in accordance with Maine's privacy laws.

**Handling a report of abuse:** Staff training should include preparation for how staff will handle a report. Staff will practice the skills of listening and responding calmly, believing the report, not asking shaming questions, sharing with their supervisors immediately, and gathering facts but not investigating.

**Medical Treatment for Injured Campers**: If a camper appears to be injured, immediate medical treatment should be sought from the nearest medical facility.

**3. Course of Action for Allegations**

Camp North Star has protocols in place for responding to allegations of abuse or neglect against the camp, staff, a fellow camper, or someone outside the camp setting. This may include:

**Internal investigation:** Camp North Star Camp Directors conduct a thorough and impartial investigation into any allegations, involving appropriate authorities as necessary. The accused staff member is isolated from campers pending the investigation. This step ensures that the alleged victim(s) is protected and prevents any further potential harm. During this period, the accused staff member is closely supervised by a director to prevent any unauthorized contact with campers. The investigation involves interviewing relevant parties, including the alleged victim(s), witnesses, and the accused staff member. Any available evidence (such as written statements, photographs, or video footage) is also collected. Detailed records are maintained throughout the investigation documenting each step taken and the information gathered.

**Suspension, termination, or removal:** If any allegation is substantiated there will be disciplinary action against the staff member(s). There is also a plan in place for removing campers who may have caused harm.

**Cooperation with authorities:** Camp North Star is fully committed to cooperating with law enforcement and child protection agencies throughout the investigation process.

**Notification**: Parents/guardians of the affected camper(s) are informed of the

allegations.

**Support**: We offer support to the camper(s) and their family during this difficult time through our camp administration, social workers, and nurses.

### 4. Grievance Procedures

Camp North Star has grievance procedures in place for both staff and campers regarding alleged abuse or neglect. This may include:

**Multiple avenues for reporting:** Staff and campers have multiple ways to report concerns including an anonymous online form, specific directors who are designated as "safe staff" to report to, and small group verbal check-ins with head counselors.

**Supportive culture and environment:** The directors who are designated as "safe staff" to report to, go through training to help ensure individuals feel safe and supported when reporting concerns, with protections against retaliation. We use age-appropriate language and create a safe space for campers to express their concerns. From the beginning of staff training, all staff members are assured that their well-being and safety, in addition to the well-being and safety of campers, are paramount.

**Timely resolution:** Based on the allegation, the camp director will determine a reasonable timeline for addressing grievances and communicating outcomes to all parties involved. The timeline is shared with the person(s) that file the grievance so they are aware of our responsiveness. One of the camp directors will be responsible for handling camper and parent/guardian grievances.

COMPLAINT PROCEDURE

It is the policy of Camp North Star to investigate any claim of alleged discrimination, unlawful harassment, and/or retaliation and to take such measures as are necessary and appropriate including disciplinary action, suspension, dismissal, and/or referral to the local law enforcement authority.

Investigations of all alleged discrimination, unlawful harassment and/or retaliation complaints will be conducted by an individual so designated by Camp North Star.

Procedure

Any employee who believes he or she is being discriminated or retaliated against or harassed in the workplace is required to follow the following complaint procedures:

1. Immediately report, either orally or in writing, any incident of discrimination/retaliation/harassment to the Owners/Directors, Steven and Brooke Bernstein. If the reporting employee ("complainant") does not feel comfortable reporting the claim of discrimination/retaliation/harassment to his or her immediate supervisor, then the

complainant may make the complaint to the Owners/Directors or any member of management.
2. The written complaint of discrimination/retaliation/harassment should be submitted in writing by the complainant on the "Complaint Form" which has been made part of this Handbook and can be obtained from the Owners/Directors.
3. Camp North Star will hold all complaints of alleged discrimination/ retaliation/harassment in confidence to the extent the needs of investigation permit. The complainant must maintain the confidentiality of any communication with his or her immediate supervisor, the Owners/Directors, member of management and any other person involved in the investigation so as not to interfere with the investigation process.
4. All complaints of alleged discrimination/retaliation/harassment will be promptly and thoroughly investigated. The purpose of the investigation is to gather facts relating to the incident(s) outlined in the written complaint and to determine whether it is more likely than not that the alleged behavior occurred. Careful documentation of all aspects of the complaint shall be recorded. When appropriate, prior to or during the investigation, Camp North Star may take interim steps to ensure the safety of all employees.
5. Upon completion of the investigation, the person conducting the investigation shall prepare a written report addressing all allegations of the reported discrimination/retaliation/harassment, and objectively documenting all relevant factual findings of the investigation. That report will be provided to the Owner.
6. Once the Owner reviews the complaint, the information gathered during the investigation, and the written report of the investigation, the complainant shall be notified of the findings of the investigation, and the remedial action, if any, to be taken by Camp North Star.
7. The complainant has an affirmative obligation to take advantage of any and all preventative or remedial action offered and/or taken by Camp North Star.
8. All personnel must utilize this complaint procedure before resorting to any outside remedy. Failure to fulfill this obligation could affect an individual's rights in pursuing legal action. Also, please note, federal and state employment laws establish specific time frames for initiating a legal proceeding pursuant to those laws.

Retaliation Prohibited

No person filing a complaint under this policy, or who assists in the filing or investigation of any such complaint, shall be subject to retribution or retaliation for doing so.

However, if, after investigating any complaint of alleged discrimination/retaliation/harassment, Camp North Star determines that the complainant or any other employee has intentionally provided knowingly false information regarding the complaint, or the complaint was filed for a malicious or bad faith reason, disciplinary action may be taken against that person.

Responsive Action

Camp North Star will address misconduct constituting discrimination, retaliation, or harassment promptly and appropriately. Responsive action may include, for example, training, referral to counseling, monitoring of the offender, and/or disciplinary action such as a verbal or written warning, written reprimand, withholding of a promotion or pay increase, reduction of wages, demotion, reassignment, suspension without pay, or termination, as Camp North Star determines is appropriate under the circumstances. Camp North Star may also refer the complaint to the local law enforcement authority when appropriate or required by law.

If at any time during the summer, you feel that you have been discriminated against or received any form of sexual harassment, then contact any member of the Camp North Star Sexual Harassment Grievance Procedure Committee:

| | | | |
|---|---|---|---|
| Steven Bernstein | steven@cnsmaine.com | 215-892-5528 | Camp Director |
| Brooke Bernstein | brookeb@cnsmaine.com | 215-910-0102 | Camp Director |
| Em Bruce | emma@cnsmaine.com | 973-758-7237 | Assistant Director |
| Elizabeth Coffey | elizabeth@cnsmaine.com | 740-701-5310 | Girls Director |
| Paul Ravey | paul@cnsmaine.com | +44 7504-948484 | Boys Director |

# SECTION 3 – STANDARDS OF CONDUCT

BUSINESS ETHICS AND STANDARD OF CONDUCT

The successful business operation and reputation of Camp North Star is built upon the principles of fair dealing and ethical conduct of our employees. Our reputation for integrity and excellence requires careful observance of the spirit and letter of all applicable laws and regulations, as well as a scrupulous regard for the highest standards of conduct and personal integrity.

The continued success of Camp North Star is dependent upon our customers' trust, and we are dedicated to preserving that trust. Employees owe a duty to Camp North Star and its clients, vendors, campers and camper families, to act in a way that will merit the continued trust and confidence of the public.

Camp North Star will comply with all applicable laws and regulations and expects its directors and employees to conduct business in accordance with the letter, spirit, and intent of all relevant laws and to refrain from any illegal, dishonest, or unethical conduct.

In general, the use of good judgment, based on high ethical principles, will guide you with respect to lines of acceptable conduct. If a situation arises where it is difficult to determine the proper course of action, the matter should be discussed openly with your immediate supervisor and, if necessary, with the Owners/Directors for advice and consultation.

Compliance with this policy of business ethics and conduct is the responsibility of every Camp North Star employee. Disregarding or failing to comply with this standard of business ethics and conduct could lead to disciplinary action, up to and including possible termination of employment.

It is important that we all demonstrate a high level of responsibility and act appropriately and professionally in the workplace. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace. The following guidelines, work rules and policies will assist you in understanding our expectations.

Professional conduct and our expectations include:

1. Providing excellent service and support to clients, vendors, campers and camper families
2. Dependability – reporting to work when scheduled and on time.
3. Following all federal, state, and local laws and regulations
4. Meeting the standards for your position
5. Absolutely no profanity. Profanity is unnecessary and unacceptable by campers and staff. The use of profanity by campers must be dealt with in a manner appropriate to the circumstances.
6. Valuing Diversity and treating everyone with respect
7. Act in accordance with the Camp's policies regarding discrimination and harassment.
8. Presenting an image which is appropriate for the position.
9. Acting with Integrity

Other activities may be harmful to the organization and could lead to termination. These include, but are not limited to, such things as:

1. Negligence or improper conduct leading to damage of employer-owned or customer-owned property
2. Falsification of any employment, time-keeping, or other work-related documents
3. Insubordination: refusal to follow directions

4. Engaging in interpersonal physical relationships
5. Excessive absenteeism, tardiness, or failure to follow proper call-out procedure.
6. Violation of non-harassment policy, including sexual or other unlawful or unwelcome harassment
7. Possession, use, or sale of alcohol/drugs on company property or coming to work under their influence.
8. Violation of health, safety, or fire codes
9. Violation of Confidential nature of work policy
10. Theft or inappropriate removal or possession of company property
11. Conducting personal business while on company time and/or using company property/equipment for personal business, including but not limited to use of personal electronics and use of social media (Facebook, Instagram, Linked In, Twitter, etc.)

Corrective disciplinary action will be taken in the event an individual's violation of these standards is harmful to the Camp. Disciplinary action may include a verbal warning, written warning, suspension and/or termination. The Camp will determine the appropriate disciplinary action to be imposed, and the Camp does not guarantee that one form of action will precede another.

***All employment with Camp North Star is at-will. Either party may terminate that relationship at any time, with or without cause, and with or without advance notice.***

CONFLICT OF INTEREST

Employees have an obligation to conduct business within guidelines that prohibit actual or potential conflicts of interest. This policy establishes only the framework within which Camp North Star wishes the business to operate. The purpose of these guidelines is to provide general direction so that employees can seek further clarification on issues related to the subject of acceptable standards of operation. Contact the Owners/Directors for more information or questions about conflicts of interest.

Transactions with outside firms must be conducted within a framework established and controlled by the Owners/Directors of Camp North Star. Business dealings with outside firms should not result in unusual gains for those firms. Unusual gain refers to bribes, product bonuses, special fringe benefits, unusual price breaks, and other windfalls designed to ultimately benefit either the employer, the employee, or both. Promotional plans that could be interpreted to involve unusual gain require specific approval by the Owners/Directors. An actual or potential conflict of interest occurs when an employee is in a position to influence a decision that may result in a personal gain for that employee or for a relative as a result of Camp North Star's business dealings. For the purposes of this policy, a relative is any person who is related by blood or marriage, or whose relationship with the employee is similar to that of persons who are related by blood or marriage.

No "presumption of guilt" is created by the mere existence of a relationship with outside firms. However, if employees have any influence on transactions involving purchases, contracts, or leases, it is imperative that they disclose to the Owners/Directors of Camp North Star as soon as possible the existence of any actual or potential conflict of interest so that safeguards can be established to protect all parties.

Personal gain may result not only in cases where an employee or relative has a significant ownership in a firm with which Camp North Star does business, but also when an employee or relative receives

any kickback, bribe, substantial gift, or special consideration as a result of any transaction or business dealings involving Camp North Star.

## CONFIDENTIAL NATURE OF WORK

Employees may have access to confidential information about finances, services and/or products of the Camp that is not available to the public, including but not limited to, information about clients, vendors, campers and camper families, medical information, donors, suppliers, and pricing ("confidential information"). Such information must remain confidential and may not be released, removed from the Camp's premises, copied, transmitted, or in any other way used for any purpose by employees outside the scope of their employment.

All records, files, and electronic files maintained by the Camp, whether on Company property or on personal property, are confidential. This includes, but is not limited to, personnel and payroll records, trade secrets, patents, confidential information relating to clients, vendors, campers and camper families, medical information, donors, member agencies, products, processes, know-how, test data, marketing data, accounting records, pricing, business plans and strategies, negotiations, and contracts. All employees are responsible for properly securing and maintaining confidential and proprietary material in the employee's possession, both inside and outside the office. Confidential information may not be removed from the Camp's premises without prior authorization from management.

Confidential information should only be shared with other employees within the Camp who have a business need to receive such information once there is explicit permission from the Owners/Directors to do so or where information is related to the terms and conditions of employment.

Failure to observe this policy will result in corrective action, including termination and alerting law enforcement, when necessary.

## ACCESS TO COMPANY AND PERSONAL FILES & PROPERTY

Camp North Star maintains a personnel file on each employee. The personnel file includes such information as the employee's job application, resume, records of training, documentation of performance appraisals and salary increases, and other employment records. Personnel files are the property of Camp North Star, and access to the information they contain is restricted.

Employees who wish to review their own file should contact the Owners/Directors. With reasonable advance notice, employees may review their own personnel files in Camp North Star's offices and in the presence of an individual appointed by Camp North Star to maintain the files. No documents may be altered, copied, or removed by the employee. Every reasonable effort is made to keep the information confidential, and access is limited to staff members who require access to perform their job functions. Copies will not be distributed to any third party unless mandated to do so by a court of law.

## RELEASE OF INFORMATION TO EXTERNAL PARTIES

Occasionally, agents from federal, state, or local governments or financial institutions request information such as wages and hours, or the history of an employee. Inquiries should be directed to Owners/Directors or their delegate. Do not give any confidential information to anyone outside the Camp.

Individuals not employed by the Camp are not allowed to use phone recording, tape recorders, video cameras or take notes on Company property. If this occurs, courteously ask them to stop. If the practice continues, ask them to leave and contact the Owners/Directors.

Employees confronted with such requests for information should be courteous and friendly. External party questions about the Camp's confidential information should not be answered. These types of questions must be directed to the Owners/Directors or to a specified delegate. Employees should direct anyone requesting confidential information to the Owners/Directors. The Owners/Directors can answer questions concerning what types of information are confidential and who is authorized to receive information.

The Camp may remove any materials that are not in compliance with the standards stated in this policy or are posted or distributed without proper approval. Failure to observe these guidelines will result in corrective action.

In the event of an emergency and where Camp North Star has information about an employee or camper, and the information is needed by external Emergency Service providers, Camp North Star will release information in CampMinder, in accordance with the camp's Medical Emergency Plan.

## EMPLOYEE RELATIONS

Camp North Star believes that the work conditions, wages, and benefits it offers to its employees are competitive with those offered by other employers in this industry and in this area of the country. If employees have concerns about work conditions or compensation, they are strongly encouraged to voice these concerns directly to the directors or Owners/Directors.

Our experience has shown that when employees deal openly and directly with their supervisors, the work environment can be excellent, communications can be clear, and attitudes can be positive. We believe that Camp North Star amply demonstrates its commitment to employees by responding effectively to employee concerns.

## CUSTOMER RELATIONS

Customers (campers and camper families, vendors, the public) are among our organization's most valuable assets. Every employee represents Camp North Star to our customers and the public. Our customers include our campers, their parents, prospective camp families, as well as our vendors. The way we do our jobs presents an image of our entire organization. Customers judge all of us by how they are treated with each employee contact. Therefore, nothing is more important than being courteous, friendly, helpful, and prompt in the attention you give to others.

Camp North Star provides ongoing customer relations and services training to all employees with extensive customer contact. Customers who wish to lodge specific comments or complaints should be directed to the Directors or Owners/Directors for appropriate action. Our personal contact with the public, our manners on the telephone, and the communications we send to customers are a reflection not only of ourselves, but also of the professionalism of Camp North Star. Positive customer relations is an expectation of all Camp North Star employees.

## INTERPERSONAL RELATIONS

Intimate interpersonal relationship between staff during the camp session is in bad taste, unprofessional, and is not permitted in any way during the camp season. Physical and/or romantic contact between staff is not permitted in the cabins, or anywhere else on camp property during the entirety of the camp season.

### Supervisor to Subordinate Relations

Camp North Star endeavors to prevent relationships that may present an actual, potential, or perceived conflict of interest. Potential conflicts may arise through hiring and working with relatives or people in close personal relationships. Intimate or romantic relationships between a Director or Supervisor and a subordinate are prohibited. The Director/Owners will do everything possible to reduce any potential conflicts of interest should employees have a formal relationship prior to the camp season starting.

### Staff to Camper Relations

Staff members are prohibited from having romantic, social, and/or physical relationships with campers, including those in training roles—CITs. Staff and Camper relations are never permitted and will result in immediate termination.

## PERSONAL APPEARANCE

Dress, grooming, and personal cleanliness standards contribute to the morale of all employees and affect the business image Camp North Star presents to campers, families, and visitors. Camp staff members are first and foremost role models for the children in our summer camp program. To ensure that Camp North Star's values are reflected in our daily interactions, we ask that the following dress code be upheld.

During business hours or when representing Camp North Star, you are expected to present a clean, neat, and tasteful appearance. You should dress and groom yourself according to the requirements of your position and accepted social standards. The workplace is Camp North Star and anywhere that Camp North Star goes, therefore this policy applies to offsite trips, evening duties such as campfires or talent shows.

If your supervisor feels your personal appearance is inappropriate, you may be asked to leave the workplace/work area until you are dressed or groomed properly. Consult your supervisor if you have questions as to what constitutes appropriate appearance.

Prohibited attire:

- Skimpy, excessively short, or see-through clothing
- Clothing with offensive or suggestive writing/logos, etc.
- Clothing and hats may not have alcohol, drugs, tobacco, sexual, or otherwise inappropriate messages on them
- Additional attire requirements:
- Closed-toed shoes must be worn each day. Sandals with a secured backing are only permitted while at Waterfront Activities.
- Shirts should be worn at all times and should cover midriff areas.
- Shorts or long pants should be worn at camp. Clean and hemmed shorts are required on opening and closing days of every session.
- Staff Shirts (provided) are to be worn on the first and last day of every session and all out-of-camp trips, or as instructed by the camp's management.
- Appropriate bathing suits must be worn at the waterfronts. Bathing suits must be either a full coverage one-piece bathing suit and/or appropriate length swim trunks. Bathing suits may not be excessively small, skimpy, or see-through, nor may they have any inappropriate messages or logos on them.

Where necessary, reasonable accommodation may be made to a person with a disability.

Upon request and with the advance approval of the Owners/Directors, Camp North Star may reasonably accommodate an employee's bona fide, sincerely held religious belief, so long as the accommodation does not violate safety standards or create any safety hazard.

ATTENDANCE AND PUNCTUALITY

To maintain a safe and productive work environment, Camp North Star expects employees to be reliable and to be punctual in reporting for scheduled work. Absenteeism and tardiness place a burden on other employees and on Camp North Star. In the rare instances when employees cannot avoid being late to work or are unable to work as scheduled, they should notify their supervisor as soon as possible in advance of the anticipated tardiness or absence.

Supervisors are expected to arrive prior to the rest of the staff, to adequately prepare for the upcoming events, and to show the staff your commitment and professionalism. Poor attendance and excessive tardiness are disruptive and result in a loss of respect from your co-workers. Either may lead to disciplinary action, up to and including termination of employment. Any valid absences pursuant to the Maine Sick Leave policy (for Seasonal and Part time workers) shall not be subject to discipline or credited against this attendance policy that may result in discipline, discharge, demotion, suspension, a loss or reduction of pay, or any other adverse employment action.

ACCEPTING/GIVING GIFTS

Accepting or giving a gift in a personal gift business setting can create a sense of obligation or the appearance of obligation. Employees must refrain from accepting anything of value, which is intended, or may appear to be intended, to compromise their judgment, integrity, or impartiality. Other than common courtesies usually employed with accepted business such as meals for business purposes, employees should not accept any gifts, payments, fees, services, special favors, vacations, pleasure trips, use of recreational facilities or vacation

homes, loans, or other favors from any person or business organization that does or seeks to do business with or is a competitor of the Camp.

A gift can be anything of value, including such items as a ticket to a sporting event or play, a non-business meal, a bottle of wine, a free service, a special discount, or an all-expense paid trip to a conference or trade conference or trade show. All gifts from vendors, clients, or any other business connections must be reported to the Owners within 2 days of receipt.

The Camp forbids employees, as well as members of their immediate families, from accepting or giving gifts to/from contractors, customers, vendors, consultants, or similar business contacts doing business with or seeking to do business with the Camp

In addition to the restrictions on gifts, you and members of your family must never accept a loan or payment from a contractor, vendor, consultant, customer, or similar business contact under terms that are not available to the public.

This policy extends to tips. The Company has a "no tips" policy. If an employee is tipped, it is expected that they will report the tip to the Owners/Directors and the money will be donated to the Camp North Star's foundation that supports camper tuition.

## DRUG AND ALCOHOL TESTING

The Camp believes it is our right, responsibility, and obligation to provide a safe work environment for our employees, campers, and the public. It is also our responsibility to provide a high level of service to our families. We must also protect the Camp from unnecessary financial loss due to substance abuse by employees. To reinforce our commitment to a safe and healthy workplace, we have a Drug-Free and Alcohol-Free Policy.

To help ensure a safe and healthful working environment, job applicants and current employees may be asked to provide body substance samples (such as urine and/or blood) to determine the illicit or illegal use of drugs and/or alcohol. The Camp reserves the right to drug test under several different conditions including randomly, post-accident, and under reasonable suspicion (which must be based on specific reliable observations about the employee’s appearance, behavior, speech, or body odors. Some examples would be unsteady gait, odor of alcohol on the breath, slurring speech, aggressive or abusive language or behavior, disorientation, or lethargy). The Camp may request the employee have a drug test at an Urgent Care or other medical facility within a certain time frame from these observations. The Camp would need a copy of negative drug tests results, presented to the Owners/Directors, prior to returning to work. Test results and all other documentation pertaining to the testing process will be maintained as confidentially as possible.

We want to prevent any accidents or injuries, especially those that are the result of improper medication or substance use. Some prescribed substances may produce side effects that may present a safety hazard for other employees, the Camp, our customers, or the public. Employees must inform the Nurse and Owners/Directors of any prescription or other drugs they are taking which may affect their work performance. We may ask an employee to provide proof that a licensed physician prescribed or recommended the medication, including medical marijuana, and that they are following the instructions.

Any employee who has an alcohol or substance abuse problem is encouraged to seek help on their own, confidentially. Seeking treatment does not relieve the employee of appropriate performance of their job if they are working and attending treatment or waiting for treatment to begin. Seeking treatment does not relieve the employee of the responsibility for following all Company policies.

Any employee convicted of any violation of alcohol or drug-related criminal statutes must inform the Owners/Directors. This notice must be within five days of the conviction. Any violation of this policy can be cause for immediate employment separation.

### Reasonable suspicion

Employees are subject to testing based on (but not limited to) observations by at least two members of management of apparent workplace use, possession, or impairment. The Owners/Directors must be consulted before sending an employee for testing. Management must use the Reasonable Suspicion Observation Checklist to document specific observations and behaviors that create a reasonable suspicion that an employee is under the influence of illegal drugs or alcohol. Examples include, but are not limited to:

- Odors (smell of alcohol, marijuana, body odor or urine).
- Movements (unsteady, fidgety, dizzy).
- Eyes (dilated, constricted or watery eyes, or involuntary eye movements).
- Face (flushed, sweating, confused or blank look).
- Speech (slurred, slow, distracted mid-thought, inability to verbalize thoughts).

- Emotions (argumentative, agitated, irritable, drowsy).
- Actions (yawning, twitching).
- Inactions (sleeping, unconscious, no reaction to questions).

When reasonable suspicion testing is warranted the Owners/Directors will meet with the employee to explain the observations and the requirement to undergo a drug and/or alcohol test within 2 hours. Refusal by an employee will be treated as a positive drug test result and will result in immediate termination of employment

*Under no circumstances will the employee be allowed to drive themself to the testing facility. A designated Director of Camp North Star may transport the employee or arrange for a ride and arrange for the employee to be transported to a testing facility.*

Post-accident

Employees are subject to testing when they cause or contribute to accidents that seriously damage a Camp North Star vehicle, machinery, equipment or property or that result in an injury to themselves or another employee or customer requiring offsite medical attention, and that Camp North Star has a reasonable suspicion that the employee is under the influence of alcohol or a controlled substance and it appears that the employee caused the accident or might have reasonably avoided the accident, or minimized the consequences, but did not do so. A circumstance that constitutes probable suspicion will be presumed to arise in any instance involving a work-related accident or injury in which an employee who was operating a motorized vehicle (including a loader, truck, gator, golf cart, etc.) is found to be responsible for causing the accident. In any of these instances, the investigation and subsequent testing must take place within 2 hours following the accident, if not sooner. Refusal by an employee will be treated as a positive drug test result and will result in immediate termination of employment.

*Under no circumstances will the employee be allowed to drive himself or herself to the testing facility. A designated Director of Camp North Star may transport the employee or arrange for a ride and arrange for the employee to be transported to a testing facility and/or home.*

Random

Employees are subject to random testing if they serve in a safety-sensitive position.

DRUG AND ALCOHOL (INCLUDING: MARIJUANA, ILLEGAL DRUGS & ILLEGAL SUBSTANCE USE)

While on Camp North Star property and while conducting business-related activities off Camp North Star property, no employee may use, possess, distribute, sell, or be under the influence of alcohol, marijuana, illegal drugs or other illegal substances. This includes days off and free time spent away from camp that may impact an employee's ability to work when they return to camp responsibilities.

Employees are not permitted to report for duty while under the influence of alcohol, marijuana, illegal drugs, or other illegal substances. Employees failing to adhere strictly to this policy will be subject to disciplinary action, up to and including termination. Report any suspicious activity to your immediate supervisor or the Owners/Directors. Any alcohol, marijuana (in any form), illegal drugs or drug paraphernalia will be turned over to an appropriate law enforcement agency and may result in criminal prosecution.

Additionally, staff members that use, store, or conceal drug (legal or illegal) and alcohol at Camp North Star risk endangering campers. Child endangerment as defined in Maine, which includes recklessly endangering a dependent person's health, safety, or mental welfare and intentionally or knowingly endangering a dependent person's health, safety, or mental welfare may result not only in harm to a child, but for the employee(s) that caused the endangerment legal consequences of penalties, jail time, and either a misdemeanor or felony charge.

The legal use of prescribed drugs is permitted on the job only if it does not impair an employee's ability to perform the essential functions of the job effectively and in a safe manner that does not endanger other individuals in the workplace. Employees living in cabins with campers must have all medication (prescribed or over the counter) stored and locked in the health center.

Employees who, use, sell, store, or distribute a substance at work that affects the ability to work are subject to disciplinary action, up to and including employment termination.

If an employee will be off-site an choses to use alcohol, marijuana, illegal drugs or other illegal substances, they should make themselves aware of legal alcohol age and blood alcohol limits in the State of Maine. At any time an employee is caught violating the State laws, they will be subject to local law enforcement, they will additionally face disciplinary action deemed appropriate by Camp North Star.

## SMOKING

In keeping with Camp North Star's intent to provide a safe and healthy work environment as well as a healthy camp environment for the campers, any type of smoking (including e-cigarettes and vape pens) is prohibited.

Smoking of any kind, including but not limited to cigarettes, cigars, vaping, e-cigarettes, and JUULing, is not permitted at any time, anywhere on camp property, in camp equipment or vehicles, or in personal vehicles. This includes trips away from camp and overnights. Smoking includes inhaling, exhaling, burning, or carrying any lighted or heated cigar, cigarette, or pipe, or any other lighted or heated tobacco, plant, or synthetic product intended for inhalation, whether natural or synthetic, in any manner or in any form. This policy also includes ingestible nicotine, in the form of anything chewed or placed in the mouth with the intention of consuming nicotine, such as chewing tobacco and Zyn packets.

In the event an employee is found to be smoking at Camp North Star or during Company offsite events, the employee will be disciplined, up to and including termination.

## USE OF CAMP OFFICE AND OFFICE SUPPLIES

Camp North Star office supplies, postage, postage systems, shipping accounts, and accounts with various vendors and suppliers are to be used for company purposes only. Improper use of these items may result in appropriate disciplinary action, up to and including termination.

Employees may be required to reimburse Camp North Star for any charges resulting from their PERSONAL use of the telephone, postage, computers, printers, etc.

International calls on camp phones for personal use are prohibited.

The use of Camp North Star printers for personal use is not permitted. If necessary, arrangements can be made with the Owners/Directors to use this equipment for personal use, if the employee reimburses Camp North Star for the cost of the materials and usage/equipment fees. Please advise others who may not be aware of this policy if/when you see them using this equipment for their personal use.

To ensure effective telephone communications, employees should always use the approved greeting "Camp North Star, this is (your name) …" and speak in a courteous and professional manner. Please confirm information received from the caller and hang up after the caller does so.

## ELECTRONIC INFORMATION AND COMMUNICATIONS

Camp North Star provides electronic information and communications systems to facilitate its operational needs and interests. These systems may include individual computers, Camp North Star's computerized network (the "Network"), electronic mail ("e-mail") and access to the Internet (collectively, "Information Technologies"). This policy sets forth the principles that govern the use of the Information Technologies by Camp North Star's employees, consultants, vendors, anyone accessing the Network from a remote site, and anyone accessing the Internet from a remote location or using software supplied by Camp North Star.

### Use of Information Technologies

The Information Technologies of Camp North Star shall be used for Camp North Star business. The Information Technologies are intended: (i) to enable employees to research and acquire information needed to assist them in their work; and (ii) to facilitate communications by all employees and others for business-related purposes.

Under no circumstances should anyone use Camp North Star's Information Technologies for any of the following:

- to display or transmit any sexually explicit image, message, cartoon, ethnic slur, racial comment, off-color joke, or anything that may be construed as harassment or showing disrespect for others:
- to watch TV or Movies from any streaming sources, including but not limited to: YouTube, Hulu, Netflix, Starz, Disney, HBO Max, etc.;
- distribute or communicate confidential information other than as directed or permitted;
- to disseminate or print any copyrighted or protected materials in violation of copyright laws;
- to engage in any activity that knowingly violates international, federal, state, and local laws;
- to produce or distribute "chain mail," to operate a business or to make solicitations for personal gain or political causes;
- to download or distribute software without approval; or
- to cause Network congestion or significantly hamper the ability of others to access and use the Network.

Employees are required to maintain their computers and related equipment in good working order. If any of your equipment needs service, repair, or maintenance, notify the Owners/Directors immediately. All equipment should be turned off during the weekends if not in use.

Camp North Star equipment shall not be used to create or store personal information or projects.

Camp North Star equipment shall not be used to store or display images depicting violence, sexually explicit material, or racially offensive material.

Software installed on company computers must be properly licensed and installed at the direction of the Owner/Director or designated IT professional.

Employees are not permitted to download any software (free or otherwise) without the express permission of the Owners/Directors or designated IT professional, this includes Computer Games and personal software.

Employees may not use the Camp computer to support or promote any activity for personal gain or any unauthorized private business, religious, or political activity. Employees also may not use the Camp computer in a manner which prevents or disrupts the ability of other employees to use the services or equipment of the system.

All information processed and transferred through any Company computer is the property of the Camp. Information processed or transferred is not personal or confidential. Employees should be aware that periodic monitoring can occur.

Employees should have no expectation that any privacy exists in connection with the use of the Camp's systems or with the transmission, receipt, or storage of information on these systems. Employees are also responsible for following all copyright regulations and are personally liable for any consequences of failure to comply.

Access to Computer Files

All information contained in Camp North Star's Information Technologies (including computer files, e-mail messages, Internet access logs, etc.) is Camp North Star's property. It should be understood that this information is not confidential and that authorized Camp North Star personnel have unrestricted access to all electronic data stored on the Information Technologies. At any time, with or without notice, this information may be monitored, searched, reviewed, disclosed or intercepted by Camp North Star for any legitimate purpose permitted by law, including the following: to monitor performance; to assure compliance with policies, including this policy; to prevent misuse of the Information Technologies; to troubleshoot hardware and software problems; to investigate disclosure of confidential business or proprietary information or conduct that may be illegal or adversely affect Camp North Star or its employees or students; and to comply with legal and regulatory requests for information. Camp North Star reserves the right to block an employee's access to any web site.

Camp North Star may also gain access to communications that have been deleted from e-mail or the Internet. Deleting an e-mail or other document does not guarantee that it has been erased from the computer or Camp North Star's Network. Camp North Star may retain and access back-up documents, including e-mail correspondence produced on the Information Technologies.

By using the Information Technologies as a term and condition of employment, all employees acknowledge and consent to Camp North Star's right to access, search, audit, intercept and/or review individual computer or Network files, e-mail messages, and Internet activity at any time with or without specific notice. This includes Camp North Star's right to access, search, audit, intercept and/or review any e-mail message sent from or received through an employee's personal, password-protected, e-mail account (e.g., Gmail, Hotmail, Yahoo, or other web-based mail), which an

employee accesses through his or her workplace computer or a Camp North Star issued personal electronic communications device (e.g., Smart Phone, Smart Watch). Any such e-mail message may be forensically retrieved and monitored by Camp North Star. **Thus, there is no right of privacy applicable to an employee's usage of Camp North Star's Information Technologies, including his or her personal, password-protected, e-mail account accessed through Camp North Star's computers, personal electronic communications devices, or any other communications system**.

Email / Voice Mail/ Electronic Communications Policy

All email, voice mail and electronic communication is the property of the Camp and is intended for business use and is not considered personal to the employee. Email, voice mail and electronic communications are treated as business communications. Employees should not use these methods to convey personal messages, since all messages are viewed as business messages.

By using Company email, voice mail or other electronic communications, employees consent to employer interception, monitoring, access and/or disclosure of any information that is maintained on, stored in, or transmitted over the systems.

Employees waive any right to privacy in email and voice mail messages to the extent permitted by law. Employees' use of these systems constitutes consent to employer access and disclosure for any lawful purpose.

The Camp reserves the right to enter, review, monitor, copy, or delete any messages and to disclose such messages to others at any time, without notice to the employee. Employees who use e-mail, voice mail or electronic communication waive their rights to privacy in any e-mail, voice mail or electronic communication and consent to access and disclosure for any reason.

The Camp prohibits employees from reading or intercepting e-mail or other communication not intended for their use. Employees must be careful when transmitting e-mail or electronic information to send information only to those employees authorized to have the information. Employees should not leave email on their computer screens or where it is visible to others.

Email and other electronic communication cannot be used to discuss confidential business information.

Obscenities, vulgarities, jokes, and actual or potentially offensive or discriminatory material cannot be transmitted through email, voice mail, or electronic communication. Employees who use email, voice mail and other electronic communication of the Camp must always use appropriate and professional language.

Employees are prohibited from developing or using private or encryption programs.

Employees do not have the right to read, recover transmissions, or communicate through email or other electronic communication after employment separation.

Employees should remember that email can be forwarded without the knowledge or permission of the sender.

Important documents must be treated securely. Email can become corrupted in transmission and should not be relied upon as the only means of transmission.

Receipt of Adverse Communication

One of the Owners must be notified of the receipt of any negative information addressed to any Company employee immediately upon its receipt. The Owner(s) will determine necessary action.

Security Breach

"Breach of security" means unauthorized access to electronic files, media or data containing personal information that compromises the security, confidentiality, or integrity of personal information when access to the personal information has not been secured by encryption or by any other method or technology that renders the personal information unreadable or unusable. Good faith acquisition of personal information by an employee or agent of the business for a legitimate business purpose is not a breach of security, provided that the personal information is not used for a purpose unrelated to the business or subject to further unauthorized disclosure.

Wi-Fi and Internet

Wi-Fi and Internet access is provided by Camp North Star to assist employees in obtaining work-related data and technology. The following guidelines have been established to help ensure responsible and productive Internet usage. While Internet usage is intended for job-related activities, incidental and occasional brief personal use is permitted within reasonable limits.

All Internet data that is composed, transmitted, or received via our computers is considered a part of the official records of Camp North Star and, as such, is subject to disclosure to law enforcement or other third parties. Consequently, employees should always ensure that the business information contained in email messages and other transmissions is accurate, appropriate, ethical, and lawful.

Data that is composed, transmitted, accessed, or received via the Internet must not contain content that could be considered discriminatory, offensive, obscene, threatening, harassing, intimidating, or disruptive to any employee or other person. Examples of unacceptable content may include, but are not limited to, sexual comments or images, racial slurs, gender-specific comments, or any other comments or images that could reasonably offend someone on the basis of race, age, sex, religious or political beliefs, national origin, disability, sexual orientation, or any other characteristic protected by law.

Abuse of the Wi-Fi and internet access provided by Camp North Star in violation of law or Camp North Star policies will result in disciplinary action, up to and including termination of employment. Employees may also be held personally liable for any violations of this policy. The following behaviors are examples of actions and activities that are prohibited and can result in disciplinary action:

- Sending or posting discriminatory, harassing, or threatening messages or images
- Using the organization's time and resources for personal gain/entertainment – including watching TV or Movies from any streaming sources, including but not limited to: YouTube, Hulu, Netflix, Starz, Disney, HBO Max, etc
- Stealing, using, or disclosing someone else's code or password without authorization
- Copying, pirating, or downloading software and electronic files without permission
- Sending or posting confidential material, trade secrets, or proprietary information outside of the organization

- Violating copyright law
- Engaging in unauthorized transactions that may incur a cost to the organization or initiate unwanted Internet services and transmissions
- Sending or posting messages or material that could damage the organization's image or reputation
- Sending or posting messages that defame or slander other individuals
- Using the Internet for political causes or activities, religious activities, or gambling
- Jeopardizing the security of the organization's electronic communications systems
- Sending or posting messages that disparage another organization
- Passing off personal views as representing those of the organization

Employees are expressly prohibited from allowing any third party (including family and visitors) to use company provided computers or internet services without the explicit consent of the Owners/Directors.

Conducting company business on the internet must be done following all guidelines and policies for conducting business in conventional settings.

Do not expect privacy on company computers. Our software and systems may have the capability of tracking each visit, each email, each chat and each file transfer, by every computer on the system.

Camp North Star maintains the right to limit internet access.

Camp North Star will comply with any reasonable requests from law enforcement to review internet activities of any employee.

While accessing the internet, employees should be fully aware of the global reach of the media. Employees are required to maintain a high level of dignity and be mindful that they represent Camp North Star to the world at large while online.

For protection of the Camp network and proprietary information, security measures have been installed on the systems. No employee shall, under any circumstances, attempt to disable or circumvent these security measures.

### Identification of Sender

No communications should be made that attempt to hide the identity of the sender, or to represent the sender as someone else from Camp North Star or other entity. No anonymous emails can be sent from company systems. All employees are required to identify themselves by name and email address.

### Violation

Any employee found to have violated this policy may be subject to disciplinary action, up to and including termination of employment and/or contract, as allowed by law. In addition, Camp North Star may take steps to block any abusive activity and/or take any other action it deems appropriate in its sole discretion. In the event of suspected, alleged, or actual illegal activity, Camp North Star may refer violators to the appropriate law enforcement authorities and will fully cooperate in connection with any civil or criminal investigation.

## TECHNOLOGY POLICY

Camp North Star is a technology-free camp. The only electronic device permitted in the cabin is a basic mp3 player with no internet or video capabilities. Any type of "Smart Watch" with cellular or internet capacity is not permitted to be worn while working.

In the event that an employee has an urgent need for the phone or computer (examples: calling a family member or medical provider, class enrollment on a university website), we ask that the employee address the need with one of the Owner/Directors, who can help resolve the need.

Staff are permitted to use their phones and computers in the Staff Lounge during their time off. Personal calls, emails, and Internet are to be used on assigned time off only. Office phones or office computers are not for personal use. All cell phones must be kept in the counselor's lockboxes. Cell phones may never be in camper cabins. Camp North Star is not responsible for such personal items.

Phone calls that come into the Camp Office for staff members will have a message taken. The message will be delivered to that staff person by a director.

Camp North Star does not permit staff to bring electrical appliances (TVs, VCRs, heaters). If an employes bringing any personal electronics to camp, they will not be allowed to keep them in their cabin.

Staff are not permitted to take pictures of campers using their personal cell phone or digital camera, and post/share those pictures online.

## SOCIAL MEDIA / BLOGGING

The Camp North Star community extends well beyond the borders of the camp property, and the days of the summer. Close friendships amongst the staff are part of the joy of working at camp. With Facebook, Twitter, Instagram, Snapchat, text messages, Zoom, etc., it is easier than ever to keep in touch with your camp friends, either in the next town over or around the world.

The Camp has in place policies that govern use of its own electronic communication systems, equipment, and resources that employees must follow. The Camp encourages employees to use good judgment when communicating via social media.

“Social media” includes all means of communicating or posting information or content of any sort on the Internet, including to your own or someone else’s web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, whether or not associated or affiliated with the Camp, as well as any other form of electronic communication.

The same principles and guidelines found in the Camp's Employee Handbook policies apply to an employee’s activities online. Ultimately, as individuals, employees are solely responsible for what they post online. Before creating online content, consider some of the risks and rewards that are involved. Violation of this policy may result in disciplinary action up to and including immediate discharge.

The following is a general and non-exhaustive list of guidelines employees should keep in mind:

1. The Camp’s hope is that employees will try to be fair and courteous to fellow employees, customers, vendors, suppliers, or people who work on behalf of the Camp. Also, keep in

mind that employees maybe more likely to resolve work related complaints by speaking directly with our co-workers or by utilizing the Camp's Open-Door policy than by posting complaints to a social media outlet. Nevertheless, if an employee decides to post complaints or criticism, avoid using statements, photographs, video, or audio that reasonably could be viewed as malicious, obscene, threatening or intimidating, or that might constitute harassment or bullying. Examples of such conduct might include offensive posts meant to intentionally harm someone's reputation or posts that could contribute to a hostile work environment on the basis of race, age, gender, national origin, color, disability, religion, or any other status protected by federal, state, or local law or Company policy. Inappropriate postings that may include discriminatory remarks, harassment, retaliation, and threats of violence or similar inappropriate or unlawful conduct will not be tolerated and may subject the employee to disciplinary action up to and including immediate discharge.

2. The Camp's hope is that as employees of this Company, the employee will always try to be truthful and accurate when posting information or news. If a mistake is made, the Camp encourages the employee to correct it quickly. Be open about any previous posts the employee has altered. Use privacy settings when appropriate. Remember that the Internet archives almost everything; therefore, even deleted postings can be searched. The Internet is immediate. Nothing that is posted ever truly "expires." Never post any information or rumors that are known to be false about the Camp, fellow employees, customers, vendors, suppliers, people working on behalf of the Camp or competitors.
3. Maintain the confidentiality of Company trade secrets and proprietary or confidential information (as defined in the Confidential Nature of Work Policy). Trade secrets may include information regarding the development of systems, processes, products, know-how, and technology. Do not post the Camp's trade secret, proprietary or confidential information. Employees must be conscientious about sharing information about the camp or campers that may jeopardize the health and safety of the campers or employees.
4. Express only personal opinions. Never represent material as a spokesperson for the Camp. If the Camp is a subject of the content that is created, be clear and open about the fact that it is an employee opinion and that the statement views do not represent those of the Camp, customers, vendors, or suppliers. The Camp requests employees include a disclaimer such as "The opinions expressed herein are the personal opinions of [your name]. Content published here has not been read or approved by Camp North Star before it was posted and does not represent the views and opinions of Camp North Star."
5. Employees must refrain from using social media while on working time or while using equipment the Camp provides unless it is work-related as authorized by their supervisor or other member of management.
6. Do not use any Company email addresses to register on social networks, blogs or other online tools utilized for personal use.

This policy is neither intended to nor should it interfere with employees' rights to engage in protected concerted activity as defined in Section 7 of the National Labor Relations Act.

In order to for employees to protect their own personal social media spaces and reputation, as well as the Camp's, the Camp asks that employees take the following steps:

- Set Privacy Settings so that only friends can view your content.
- Only use clean profile pictures (assume camper families might be looking at it.
- Do not post pictures that include campers.

- Employee should consider "untagging" themselves in pictures that are inappropriate for camp families to see.
- Do not "friend", follow, or add campers. (Please "unfriend" and unfollow them immediately. This includes after the camp season.)
- Do not text, call, or message campers directly, ever and for any reason. If there is need for a call to a camper's parent, the Camp Office will make the call.

Employees are encouraged to report violations of this policy. The Camp prohibits retaliation against any employee for reporting a possible deviation from this policy or for cooperating in an investigation.

Any employee who retaliates against another employee for reporting a possible deviation from this policy or for cooperating in an investigation will be subject to disciplinary action, up to and including immediate discharge.

Employees should not speak to the media on the Camp's behalf without the Camp's authorization. All media inquiries should be directed to the Owners/Directors.

Where applicable, the Camp complies with state laws concerning access to an employee's personal social networking account, including restrictions concerning employer requests for an employee's username and/or password.

## EMPLOYEE PERSONAL ITEMS

The Camp is not responsible for the personal property of employees onsite, in any of the facilities, in cars or parking areas, or personal bags, trunks and/or luggage. Any personal property brought to Company location is at the risk of the employee.

Employees must keep all personal items locked and stored away. Staff members are provided with a personal locker for important items in the staff lounge area.

Any personal items brought on premises deemed inappropriate by the Camp may be removed without notice. Items may be returned to the employee after seasonal employment has ended, unless those items are a part of a legal proceeding, unlawful, or may cause harm to the employees of the Camp.

## COMPANY ACCESS TO PERSONAL PROPERTY

The Camp reserves the right to search Company and personal property in "reasonable cause" situations such as where a threat of harm to employees or campers or the Camp exists or illegal activity is suspected. Company and personal property include, but are not limited to, work areas, desks, cabins, cabin areas, cabinets, storage closets, vehicles, coats, bags, etc. Employees should not have any expectation of privacy with respect to any possessions maintained or left on Company property.

## INTERNAL INVESTIGATIONS AND SEARCHES

To the maximum extent permitted by applicable law, CNS reserves the right to require employees while on Camp property, to agree to the inspection of their persons, personal possessions and property, personal vehicles parked on Camp property, and work areas. This includes lockers,

vehicles, desks, cabinets, workstations, packages, handbags, briefcases and other personal possessions or places of concealment, as well as personal mail sent to the Camp. Employees are expected to cooperate in the conduct of any search or inspection.

# SECTION 4- EMPLOYMENT AT CNS

# HIRING AT CAMP NORTH STAR

## Job Descriptions

As Camp North Star is a small business, with a small staff during the non-summer months, job descriptions are not standard, and are uniquely based on a combination of the skill set of the employee and the needs of the organization. In the summer months, job descriptions are standard for seasonal staff and will match the duties pertaining to the job title and as described during the recruitment process .

The Owners/Directors and the hiring team prepare job descriptions when new positions are created. Existing job descriptions are also reviewed and revised in order to ensure that they are up to date. Job descriptions may also be rewritten periodically to reflect any changes in the position's duties and responsibilities.

Employees should remember that job descriptions do not necessarily cover every task or duty that might be assigned, and that additional responsibilities may be assigned as necessary. Contact the Owners/Directors if you have any questions or concerns about your job description.

## Work Assignments

The Camp recognizes that not all work assignments are equally attractive to employees; however, all work must be performed. Refusal of any work assignment is not allowed. Whenever possible, the Camp will consider extenuating circumstances, such as personal and family hardships or physical limitations, when scheduling work assignments. Refusal to accept and satisfactorily perform work an employee is suitable for may result in disciplinary actions, up to and including termination.

Occasionally, it becomes necessary to change staff assignments or responsibilities as defined on the staff member's employment agreement. While such changes will be held to a minimum, staff members are expected to recognize the importance of flexibility in staffing a camp. Every effort will be taken to match the needs of camp with the needs of the staff member. Consultation between a director and the affected staff member will precede any contemplated change in assignment.

Part of the Camp North Star employee work assignments are off-site day trips. Staff members are representatives of Camp North Star and should act in a manner consistent with the mission, the standards of conduct in this handbook, and objectives of camp at all times. They will be held strictly accountable for their actions on and off the property.

## Employment Applications

Camp North Star relies upon the accuracy of information contained in the employment application, as well as the accuracy of other data presented throughout the hiring process and employment.

Each staff member is required to complete a staff application and to sign a written staff agreement which outlines salary and working requirements and conditions.

The Camp is committed to ensuring that recruiting, hiring, and training for all jobs are made without regard to race, creed, color, religion, national origin, age, sex, gender identification, or disability.

Furthermore, the Camp will make reasonable accommodations to modify a job function to allow those with disabilities to perform essential job functions.

Any misrepresentations, falsifications, or material omissions in any of this information or data may result in the exclusion of the individual from further consideration for employment or, if the person has been hired, termination of employment.

### Background and Employment Reference Checks

It is our policy that all employees will submit to a third-party background check after the acceptance of their employment offer. Such requirement usually involves national and state criminal reviews, child abuse background check, employment information, business references. The Federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies and your information will be treated within these guidelines.

### Reference Checks about CNS Employment

It is our policy that all requests for information concerning current and former employees are handled in a consistent and appropriate manner. Such requests usually involve employment information, personal and business references, descriptions of job duties and responsibilities.

All written, oral, or informal requests for information about employees or former employees are to be referred immediately to the Owners/Directors.

No information about any employee, current or former is to be released to anyone without the specific authorization of the Owners/Directors.

The procedure outlined above is to be followed by all employees who are approached either formally or informally and asked to provide information about present or former employees.

Under no circumstances, should any employee of the Camp release any information about any current or former employee of the Camp over the telephone. All telephone inquiries regarding any current or former employee must be referred/transferred to the Owners/Directors. In response to a request for information regarding a current or former employee, the Owners/Directors may confirm the job title and dates of employment. No other data or information regarding any current or former employee, or his or her employment with the Camp, will be furnished unless: (1) the employee authorizes the Camp to furnish the requested information in writing, and releases the Camp from liability in connection with the furnishing of this information; or (2) the Camp is required by law to furnish the information.

By following this policy for all reference requests, we can ensure that the information released is accurate, authorized, and representative of the management's position.

### Medical Examination

To help ensure that employees are able to perform their duties safely, medical examinations may be required. After an offer has been made to an applicant entering a designated job category, a health professional of Camp North Star's choice may perform a medical examination at Camp North Star's

expense. The offer of employment and assignment to duties is contingent upon satisfactory completion of the exam.

Information on an employee's medical condition or history will be kept separate from other employee information and maintained confidentially. Access to this information will be limited to those who have a legitimate need to know.

## WORK SCHEDULES

Work schedules for employees vary throughout our organization. Supervisors will advise employees of their individual work schedules. Camp North Star will comply with all Federal and State laws as it pertains to hiring and scheduling work periods for those under the age of 18.

The employee's specific job duties/role, staffing needs, and operational demands may necessitate variations in starting and ending times, as well as variations in the total hours that will be worked each day/each week. To be clear, all full-time exempt employees will have at-work requirements that will vary throughout the year. It is the expectation of Camp North Star that as a full-time exempt employee, the required daily, weekly, and special events work is completed as planned. Work schedules will vary per day, and will include evenings and weekends, as operational demands require.

It is also the expectation of Camp North Star that full-time exempt employees make every effort to complete their work within Owners expected timelines. No work may be outsourced unless there is explicit Owner approval.

No minor under 18 may work more than 6 consecutive days in a week, or more than 40 hours in a week, or more than 8 hours in a day. The hours of work of minors under 16 employed outside school hours must not exceed 3 hours in a day when school is in session and must not exceed in a week when school is in session the maximum number of hours permitted for that period under the federal Fair Labor Standards Act.

## PERSONNEL DATA CHANGES

It is the responsibility of each employee to promptly notify Camp North Star of any changes in personnel data. Personal mailing addresses, telephone numbers, Email, number and names of dependents, individuals to be contacted in the event of an emergency, school attending, current employer, and other such status reports should be accurate and current at all times. If any personnel data has changed, notify an Owner/Director.

## COMPENSATION & PAYROLL

Employees should review their signed offer letter, agreement, and/or subsequent wage statements to understand the wages they will receive for their services at Camp North Star to understand their compensation.

If and when there are changes in compensation, the information will be formally documented for the employee.

Seasonal compensation is comprised of several types of compensation, both wages and in-kind benefits:

- **Salary:** Salaries will vary due to many factors (i.e. experience, professional training, level of schooling, annual increments). Remuneration is an individual and personal affair arrived at by a confidential agreement and should be respected in that way. Most staff are paid 3 times during the summer with the last paycheck being on the day you depart and after your cabin is checked out for its cleanliness by a director.
- **Tips\Gratuities:** Keeping with the American Camping Association standards, staff cannot accept tips. Parents should be encouraged to contribute to the SCOPE program through the American Camp Association or speak with the Camp Directors to make a contribution to the camp staff in another way.
- **Laundry:** Poland Campco, LLC provides laundry service to all residential staff members at no fee. Staff members are provided with a laundry bag that must be used with our laundry service. Laundry is picked up on designated days and returned on the following day. Poland Campco, LLC is not responsible for lost, stolen, or damaged items.
- **Bedding:** Poland Campco, LLC can provide linens (sheets, pillow, pillowcases, and blanket) to staff members traveling via plane.
- **Unauthorized use of camp credit:** Camp North Star does not allow any staff member to charge any items to camp for their personal use and have the amount deducted from their paycheck at a later date.

## Timekeeping

Federal and state laws require Camp North Star to keep an accurate record of time worked to calculate employee pay and mandatory benefits. Time worked is all the time actually spent on the job performing assigned duties.

Should an employee have a request for an adjustment to their schedule or duties, they must make a direct request to the Assistant Director or Owner/Directors for approval. If approved, the employee’s supervisor and payroll will be properly informed.

All hourly, non-exempt employees are required to track their work time. All time must be submitted to the Facilities Director in a timely manner/upon request. Altering, falsifying, or tampering with time records may result in disciplinary action, up to and including termination of employment.

## Pay Days

All employees are, at minimum, paid twice per month. Each wage statement (paystub) will include earnings for all work performed through the end of the previous payroll period.

Employees may have pay directly deposited into their bank accounts if they provide advance written authorization and appropriate supporting documents to Camp North Star.

All employees will have access to their account on ADP. At the beginning of their employment employees will be provided with their personalized log-on credentials. Employees may log into the employee portal at during active employment to see wage statements.

## Pay Corrections

Camp North Star takes all reasonable steps to ensure that employees receive the correct amount of pay in each paycheck and that employees are paid promptly on the scheduled payday. Employees are encouraged to review their pay slips/wage statements every payroll.

In the unlikely event that Camp North Star made an error in the amount of pay, the employee should promptly bring the discrepancy to the attention of the Owners/Directors so that corrections can be made as quickly as possible.

An unintentional payroll error as to an exempt employee will not change that employee's exempt status under the law.

## Pay Deductions

Camp North Star is required by law to make certain deductions from an employee's paycheck each time one is prepared. Among these are federal, state, and local income taxes and employee contributions to Social Security as required by law. These deductions will be itemized on individual wage statements (paystubs).

The amount of the deductions may depend on the employee's earnings and on the information the employee provides on their W-4 form, specifically regarding the number of dependents/exemptions that are claimed. Any change in name, address, telephone number, marital status, or number of exemptions must be reported in writing/email to brookeb@cnsmaine.com immediately, to ensure proper credit for tax purposes. The W-2 form an employee receives for each year indicates precisely how much of the earnings are deducted for these purposes. Federal withholding allowance is required by federal law and subject to the rules and regulations outlined on the standard federal W-4 form. Staff members who are not exempt will receive salary checks that are adjusted for withholding tax based on current IRS (Internal Revenue Service) guidelines. Such amounts are paid directly to the federal government for you in anticipation of your year-end federal tax liability.

Virtually all international staff with a J-1 visa are classified as nonresident aliens and are subject to US tax laws. As of 2007, international staff may no longer claim exemption from federal withholding, and income taxes will be withheld from their paychecks. However, most staff members will receive all of this money back at the end of the year by filing an income tax return. A Form W-2 reflecting the withheld tax will be sent to each paid staff member in February for this purpose.

The United States Government operates a system of contributory insurance known as Social Security. As a wage earner, Employes are required by law to contribute a set amount of their weekly wages to the trust fund from which benefits are paid. As the employer, Camp North Star is required to deduct this amount from each paycheck an employee receives. In addition, Camp North Star matches the contribution dollar for dollar, thereby paying one-half of the cost of Social Security benefits. Camp North Star is required by law to withhold FICA and Medicare taxes based on a percentage of your gross salary as a direct employee contribution toward the federal programs. The camp matches FICA and Medicare amounts. The net summer salary will reflect the FICA and Medicare deductions. Most international staff, due to their visa status, are exempt from withholding FICA or Medicare taxes.

Whenever court-ordered wage assignment or garnishment deductions are to be taken from an employee's paycheck, the employee will be notified. Any other mandatory deductions to be made from an employee's paycheck, such as court-ordered attachments, will be explained whenever Camp North Star is ordered to make such deductions. Some states may require other payroll deductions.

Payroll withholdings from employee's pay for the new Paid Family Medical Leave program will begin on January 1, 2025, and be transferred to the Maine Paid Family and Medical Leave Fund. ("PFML Fund"). Both the employer and the employee contribute to the PFML Fund. All funds are pooled to pay for future claims and other administrative costs. Although benefits will not go live until May 1, 2026, contributions will begin in 2025 to allow time to accumulate sufficient funds to pay for benefits and other administrative costs to operate the program.

If employees have questions about deductions from their pay, if employees believe they have been subject to any improper deductions, or if an employee's pay does not accurately reflect hours worked, please contact the Owner/Director. Camp North Star will make every effort to ensure that employees receive the pay to which they are entitled. Camp North Star will not allow any form of retaliation against individuals who make good faith reports of alleged violations of this policy, even if the reports do not reveal any errors or wrongdoing.

### Record of Absence or Lateness

If you are absent because of illness for three (3) or more consecutive days, Owners may request that you submit written documentation from a doctor, and it may be required to include information regarding the employee's ability to resume normal work duties before they will be allowed to return to work. Employees will be responsible for any charges made by their doctor for this documentation.

Employees and their supervisor are responsible for notifying the Owner/Director of all absences including eligible personal time off (PTO) and any other forms of leave.

Employees are expected to arrive for work on time and be ready to work. Employees are expected to start working at their arrival time and should not be managing personal business once they start working. Personal business may be managed during assigned breaks/ lunch, if required.

If an Employee is excessively or consistently late for their workday /shift or absent from work, the employee may be subject to progressive disciplinary actions. The Employee's supervisor will make a note of any absence or lateness in the personnel file. Employee attendance record will be considered when evaluating requests for promotions, transfers, leaves of absence, and approved time off (PTO).

## PERFORMANCE MANAGEMENT

### Progressive Discipline

Employees found to be in violation of company policy will be given official notice of the infraction. Disciplinary action may call for a verbal warning, a written warning, suspension with or without pay, or termination of employment depending on the severity of the problem and the number of occurrences.

It is the company's general practice to focus on Employee development, and it is understood that mistakes will happen or that employees make poor choices. Should an employee violate any of the policies outlined in this handbook, the misconduct will be reviewed by the Assistant Director and Owner/Directors and the employee's discipline will be at their discretion. In general, progressive discipline* will be utilized.

1. Verbal discussion – This will be an open discussion advising the employee of the concerns. The employee's direct supervisor and employee will devise an action plan to improve performance. The employee's supervisors will endeavor to coach the employee.
2. Written warning – This will advise the employee in writing of the violation or concern. An action plan with timeframes for improving performance will be included. The employee will know that their job is in jeopardy and that failure to correct the problem may result in separation of employment.
3. Separation – Termination from the Company.

*The Owner/Directors will determine if progressive discipline steps are appropriate. Camp North Star reserves the right to terminate employment, based on the at-will relationship. Should there be gross misconduct or an egregious policy violation, for example, knowingly subjecting a child to something harmful, the Owner/Directors may opt for immediate separation with no verbal coaching or warnings.

It is in the best interest of all employees to review and understand all of the policies and expectations set forth in this handbook.

Employees who believe they have been falsely charged with an infraction can appeal the charge to the Owners/Directors. All appeals must be in writing clearly defining the reason you believe the charge was false. Owners/Directors will review all available information and make a ruling. All decisions of the Owners/Directors are final. Notice of violations, appeals, and final disposition documentation will become a permanent record in the employee's personnel file.

This policy is to be used as guidance and Camp North Star reserves the right to modify the policy in any way should the circumstances deem it necessary.

## Performance Evaluations

Camp North Star provides performance evaluations to both full-time and seasonal employees to ensure staff performance aligns with the camp's mission, improve operations, and support staff development. These annual and seasonal evaluations are structured to do the following:

1. Performance Assessment
    a. Evaluates how well employees fulfill their job responsibilities.
    b. Identifies strengths and areas for improvement.
    c. Ensures staff are providing a safe, engaging, and positive experience for campers.
2. Feedback & Professional Growth
    a. Gives employees constructive feedback to help them improve.
    b. Helps seasonal staff develop skills that may lead to future leadership roles or full-time positions.
    c. Encourages reflection and self-improvement.
3. Operational Improvement
    a. Identifies gaps in training or policies that may need adjustment.

   b. Helps camp leadership understand staffing strengths and weaknesses.
   c. Ensures consistency in staff performance across different sessions.
4. Employee Retention & Recognition
   a. Recognizes and rewards high-performing employees.
   b. Provides a positive camp culture and retention of quality staff members.

*Seasonal Staff Employee Evaluations*

Seasonal evaluations occur one or more times during the summer camp season. In additional to recognition for a job well done, it provides opportunities to discuss challenges and ways to navigate them for the rest of the seasonal employment.

*Full Time Employee Performance Evaluations*

Supervisors and employees are strongly encouraged to discuss job performance and goals on an informal, day-to-day basis.

Additionally, formal performance evaluations are conducted to provide both supervisors and employees the opportunity to discuss job tasks, identify and correct development needs, encourage and recognize strengths, and discuss positive, purposeful approaches for meeting goals. Performance evaluations are scheduled approximately every 12 months.

Merit-based pay adjustments are awarded by Camp North Star in the discretion of the Owners/Directors in an effort to recognize superior employee performance, and organizational/financial growth.

TERMINATION

Termination of employment is an inevitable part of personnel activity within any organization, and many of the reasons for termination are routine. Below are examples of some of the most common circumstances under which employment is terminated:

Voluntary Termination

Camp North Star recognizes that personal situations may arise which require a voluntary termination of employment. Should this occur, the Camp requests that the employee provide two weeks' advance notice in writing. This request does not alter an employee's at-will relationship with the Camp. All rights and privileges of employment with the Camp terminate upon the date of separation. Employees of Camp North Star are not given tenure. Any employee of Camp North Star may choose to terminate employment at any time.

<u>Resignation</u> - Resignation is a voluntary act initiated by the employee to terminate employment with Camp North Star. Although advance notice is not required, Camp North Star requests at least 2 weeks written notice from all employees. Prior to an employee's departure, an exit interview will be scheduled to discuss the reasons for resignation and the effect of the resignation on benefits.

<u>Retirement</u> - Voluntary employment termination initiated by the employee meeting age, length of service, and any other criteria for retirement from the organization. Although advance notice is not required, Camp North Star requests at least 2 weeks written notice from all employees.

Involuntary Termination

An involuntary termination of employment, including layoffs of over 30 days, is an owner-initiated dismissal. The inability of an employee to perform the essential functions of his or her job with or without a reasonable accommodation may also result in an involuntary termination. An employee may also be discharged for any legal reason, e.g., misconduct, tardiness, absenteeism, unsatisfactory performance, or inability to perform. Camp North Star may terminate employment at any time for any reason. If an employee is terminated for a severe violation of policy, they will be escorted from the property immediately.

In some cases, progressive discipline may be used, prior to termination, to correct a performance problem. However, certain types of employee misconduct are so severe that one incident of misconduct will result in immediate dismissal without prior use of progressive discipline.

Annual post-season termination - At the end of each camp season, all the employees classified as seasonal employees will be terminated and therefore inactive in Camp North Star's payroll systems. Seasonal employees will not be eligible for any additional Company compensation or benefits.

Discharge - Discharge is initiated by the Owners and is considered an involuntary termination, requiring the employee and Camp North Star employment relationship to end. All employees with Camp North Star are at-will employees and therefore discharge from employment may be for any legal reason.

Layoff - involuntary employment termination initiated by the organization for non-disciplinary reasons, most often related to cost reduction requirements and/or redundancy in duties.

Exit Interview

Camp North Star will provide an exit interview opportunity to any individuals leaving Camp North Star for any non-disciplinary termination reason.

The exit interview will afford an opportunity to discuss such issues as employee benefits, outstanding pay, repayment of outstanding debts to Camp North Star, and return of Camp North Star-owned property. Suggestions, complaints, and questions can also be voiced. Since employment with Camp North Star is based on mutual consent, both the employee and Camp North Star have the right to terminate employment at-will, with or without cause, at any time.

Some benefits may be continued at the employee's expense if the employee so chooses. The employee will be notified in writing of the benefits that may be continued and of the terms, conditions, and limitations of such continuance. In the event of a layoff or in some cases a discharge, Camp North Star may choose to continue benefits at their expense for a short period of time.

Former employees should notify the Owners/Directors if their address changes during the calendar year in which termination occurs so that tax information may be sent to the proper address.

Return of Camp North Star Property

Terminating employees are required to return all assigned Company property to their immediate supervisor before leaving the property on their final day of employment. This includes, but is not limited to, computers, credit cards, phones, keys, gate opener, equipment, Camp North Star materials, and /or any other Camp North Star proprietary information.

Camp North Star information on a personal computer or phone must be provided to the Owners and then removed/deleted from the personal device.

Terminating employees will be required to provide a list of all passwords to assets, files, work related links, etc., before the last day of work.

Failure to do so may result in the withholding of their final paycheck. Should Camp North Star be unsuccessful in retrieving all assets from the exiting employee, the Owners may engage legal counsel and/or the proper authorities to assist with the recovery of assets.

# SECTION 5 – FACILITIES

## HEALTH & SAFETY

**Employee and child welfare are our highest priority**. To assist in providing a safe and healthful work environment for employees, customers, and visitors, Camp North Star has established a workplace safety program, which abides by all OSHA regulations and requirements as well as State of Maine requirements. This program is a top priority for Camp North Star. The Directors have responsibility for implementing, administering, monitoring, and evaluating the safety program. Its success depends on the alertness and personal commitment of all.

Camp North Star provides information to employees about workplace safety and health issues through regular internal communication channels such as supervisor-employee meetings, bulletin board postings, Emails, or written communications.

Some of the best safety improvement ideas come from employees. Those with ideas, concerns, or suggestions for improved safety in the workplace are encouraged to raise them with their supervisor, or with another supervisor or manager, or bring them to the attention of the Owners/Directors. Reports and concerns about workplace safety issues may be made anonymously if the employee wishes. The Camp relies on staff members to bring to the Owner/Directors attention any potential safety hazards (i.e., faulty equipment, structural damage to buildings, and natural hazards such as a falling tree, etc.). Please report any faulty or broken equipment to the Office, and do not use it until it can be inspected and/or repaired. **Safety always comes first.** Do not use anything if you suspect that it may be unsafe. All reports can be made without fear of reprisal.

Each employee is expected to obey safety rules and to exercise caution in all work activities. Employees must immediately report any unsafe condition to the appropriate supervisor. Employees who violate safety standards, who cause hazardous or dangerous situations, or who fail to report or, where appropriate, remedy such situations, may be subject to disciplinary action, up to and including termination of employment.

In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify the Owners/Directors or the appropriate supervisor. Such reports are necessary to comply with laws and initiate insurance and workers' compensation benefits procedures.

### Safety Committee

The purpose of the Camp North Star Safety Committee is to:

- Create and maintain an active interest in safety.
- Serve as a means of safety and health communication to and from employees.
- Make safety inspections on a periodic basis to help identify and correct hazards or unsafe procedures before an accident or injury occurs.
- Provide input and information to the Directors for the improvement of the Safety Program.
- Review accident reports and assist in the development of methods or corrective measures to help prevent accident recurrence.

The members of the committee are:

| | | | |
|---|---|---|---|
| Steven Bernstein | Director | steven@cnsmaine.com | 215-892-5528 |
| Brooke Bernstein | Director | brookeb@cnsmaine.com | 215-910-0102 |

| | | | |
|---|---|---|---|
| Brenden Dallaire | Facilities Director | brenden@cnsmaine.com | 207-212-8994 |
| Liana Lemke | Head Nurse | nurse@cnsmaine.com | 989-619-0379 |
| Em Bruce | Assistant Director | emma@cnsmaine.com | 973-758-7237 |

The Safety Committee meets once a week to review any accidents and all aspects of safety at camp. Please bring to their attention any areas of concern you may have regarding safety.

Infection Control Practices

The Occupational Safety and Health Administration (OSHA), has set standards that specify that universal precautions are to be part of infection control practices. Universal precautions are specific guidelines that must be followed to provide every person protection from diseases that are carried in the blood. These safety measures will help ensure the health of all camp employees and campers. Since blood can carry all types of infectious diseases, even when a person does not look or feel ill, knowledge of universal precautions is essential for anyone that might come into contact with blood or other body fluids.

The Center for Disease Control has recommended the following guidelines to prevent diseases that are carried in the blood from infecting a camper or camp employee:

1. Non-Latex gloves, such as Nitrile, or vinyl gloves are a suitable barrier to be used if contact with blood or body fluids is anticipated or if handling a surface or item soiled with another individual's blood or body fluid.
2. These gloves should be removed inside out to prevent the spread of blood or bloody secretions and then placed in a plastic bag and taken to the Health Care Center for correct disposal. Gloves are for single use only.
3. Once gloves have been removed and disposed of, hands should be washed thoroughly with antibacterial soap and warm water if available. If no visible particles, blood, dirt, etc., then a hand sanitizer can be used in the absence of soap and water. Then, wash hands as soon as possible. If blood or body fluids should get on the skin, the area should be washed with soap and water. No other disinfectant or bleach is necessary. If soap and water are not immediately available, the skin should be initially cleaned with an antiseptic wipe, and washing is done as soon as possible.
4. CPR masks should be used when administering CPR.

Exposure Control Plan:

The following plan incorporates the current Occupational Safety and Health Administration (OSHA) policies regarding the risk of infection from blood-borne pathogens and how incidents will be handled. Camp North Star adopts the "Universal Precautions" policy for infection control, whereby all employees assume that ALL human blood and human body fluids containing blood are infected with HIV, HBV (Hepatitis B), and other blood-borne pathogens.

Practices designed to reduce the risk of transmission of infectious diseases have been developed and should be utilized by ALL employees. We provide gloves, plastic disposal bags, and antiseptic wipes for skin cleaning in all first-aid kits. Also, each department has its own separate supply of

gloves. Current information from the American Academy of Pediatrics and the Center for Disease Control states that even within an area with a high prevalence of HIV or HBV infection, the risk of infection resulting from a single cutaneous exposure to blood from a school-aged child or adolescent is minute.

Because of this minimal risk, the only mandatory precautionary action should be washing the exposed skin with soap and water. Lacerations and other bleeding lesions should be managed in a manner that minimizes direct contact of the caregiver with blood (i.e., by the wearing of gloves or use of a plastic bag).

Any member of staff who has had contact with blood, or body fluids containing blood needs to inform the nursing staff and complete an accident form and exposure record. OSHA states that any staff member who has occupational exposure to blood or other potentially infectious materials be offered vaccination against the hepatitis B virus. This is at no charge to the employee. Anyone wishing to decline the vaccination may do so but should sign a waiver form and can change their mind at a later date.

## EMERGENCY PROCEDURES

### Medical emergencies and injuries

Allow medical staff to handle all accidents and emergencies. Send someone for help immediately and stay with the accident victim. Do not move the patient. Minor injuries may be initially dealt with by department members/bunk counselors and then referred to the Health Care Center.

All departments, bunks, and vehicles have first aid kits with gloves, Band-Aids, gauze, antiseptic wipes, tape, and plastic bags for the disposal of any contaminated medical waste.*

*Medical waste is the term used to describe refuse from a healthcare facility. Medical waste includes Band-Aid wrappers, used tissues, syringes, and medicine cups. While most medical waste is noninfectious, some are considered infectious or contaminated "waste which contains pathogens with sufficient virulence and quantity so that exposure to the waste by a susceptible host could result in an infectious disease." Infectious/contaminated waste includes blood, body fluids, and used needles. It does not include feces, nasal secretions, sputum, sweat, tears, urine, or vomit unless they contain visible blood.

### Other Emergency Situations

In all emergency situations (weather, natural disaster, situation regarding evacuation) and drills, the following procedures will be followed:

- If you discover the emergency, notify administrative staff.
- Emergency Buzzer will sound.
- Gather all cabins in the designated area on the basketball court, and conduct a head count to ensure that all of your campers are accounted for.
- Wait for further direction.

## Department Health and Safety Procedures

Every department will have a list of safety rules and regulations visibly posted within their department. During Staff Training, each department will train, practice, and run through an emergency situation that is likely to occur in that department with their department head. These procedures will be reviewed and practiced.

There will also be open discussions of all potential emergency situations, including remedies and post-emergency follow-up (i.e., completing necessary forms). The nursing staff also will discuss during Staff Training camp health policies, regarding dealing with emergencies, control of infection, and exposure control.

## Missing Camper Policy

If a camper does not show up to a counselor's period within 5 minutes of the bell (which marks the activity's start time), the staff in charge should ask the other campers where they last saw the missing camper. Because our community is so small, it is likely that someone knows where they were in the previous period and perhaps why they are late. After waiting 5 minutes for the camper, the staff member must immediately inform a director, typically via walkie-talkie. The administrative staff member will begin the process for a missing camper.

## Dealing with the Media

In the event of a crisis, at no time will staff speak with the media or anyone outside of Camp North Star other than to tell them that they need to talk to the Camp Owners. A key message will be communicated by the Camp Owners to the camp community only after all of the facts of the situation have been collected.

## INCLEMENT WEATHER AND OTHER EMERGENCY CLOSINGS

### Severe Weather

In case of sudden severe weather, take cover with your activity group in a bunk or nearby building and wait for further instructions.

### Fire

If you suspect there is a fire, immediately vacate the building and inform a director. In the case of a fire in a cabin, exit quickly and proceed to the outdoor basketball court. Counselors should be the last person out of the cabin and direct campers to their assigned position to check off names. No one should delay their exit by collecting personal items. Counselors stay with their campers. There are exit signs, smoke detectors, and fire extinguishers in all cabins, so make sure you know where all of these are located.

Storms

Listen for announcements on the P.A. system or walkie-talkie. If the power is out, the office staff will communicate with instructions. If you are at an activity, take refuge in the nearest indoor building. Do a headcount to make sure you have all your campers with you.

Severe Storms (i.e., Tornado)

Listen for announcements. If the power is out, office staff will visit bunks and departments with instructions. If you are at an activity, take refuge in the nearest indoor building. Do a headcount to make sure you have all your campers with you. Depending on the severity of the storm, instructions may include taking shelter in the Field House or Cliffside Lodge.

FACILITIES SECURITY & USE OF CAMP PROPERTY

General

It is the responsibility of all employees to ensure the facilities and work areas are secure. Any employee entrusted with a gate code and/or facility keys shall make certain the facility is secure when that employee is the last to leave. This includes, but is not limited to, turning off appropriate lights, closing and locking all doors and windows. Setting the alarm if appropriate. If you are responsible for giving out keys, then you are also responsible for guaranteeing their return upon the end of the camp season, or their completion of work. Any questions, contact the Owners/Directors.

Employees are not permitted to share their keys, gate codes, alarm codes, or any other Camp North Star facility security information with anyone. This includes, but is not limited to, friends and family members. Should it be discovered that the security information has been breached or shared without explicit Owner/Director authorization, the employee will be disciplined up to and including termination.

Employees must be alert and aware of any potential dangers to themselves or their coworkers. Take every precaution to ensure that your surroundings are safe and secure. Guard personal belongings and Company property. Report any suspicious activity to an Owner/Director immediately.

The Camp assumes no responsibility for the loss or theft of any personal property. It is suggested that all wallets, backpacks, computer bags, purses and other belongings be kept in an inconspicuous place, left in your locked car, or not brought to Camp as a precautionary measure.

Employees may not use Camp North Star property for personal use. CNS's policy is to prosecute any employee who is caught stealing, pilfering, or vandalizing any CNS property or equipment.

Except for authorized use of company equipment, employees cannot remove customer or other business information, records, or files from the office. Employees must remember this is confidential information. Lost or missing property must be immediately reported to the Owner/Director.

Animals in the workplace

Staff members are not allowed to have pets at camp. Any exceptions must be cleared with the Directors.

Equipment and Vehicles

Equipment and vehicles essential in accomplishing job duties are expensive and may be difficult to replace. When using property, employees are expected to exercise care, perform required maintenance, and follow all operating instructions, safety standards, and guidelines.

Please notify the Facilities Manager if any equipment, machines, tools, or vehicles appear to be damaged, defective, or in need of repair. Prompt reporting of damages, defects, and the need for repairs could prevent deterioration of equipment and possible injury to employees or others. The Facilities Manager can answer any questions about an employee's responsibility for maintenance and care of equipment or vehicles used on the job.

The improper, careless, negligent, destructive, or unsafe use or operation of equipment or vehicles, as well as excessive or avoidable traffic and parking violations, can result in disciplinary action, up to and including termination of employment.

*Use of Facilities, Vehicles & Equipment*

Staff use of equipment and supplies is a privilege rather than a right. Each department head will determine if staff can use equipment and supplies.

*Use of Power Tools*

Only trained maintenance personnel may operate power tools.

*Camp Vehicles*

Anyone driving a camp vehicle must first pass a driving test. Camp vehicles are not for use by counselors for time off. Employees MUST ask a Director before taking a golf cart or vehicle for use on or off property. When using any type of vehicle on camp property all driving rules and safety procedures must be followed.

Personal Vehicles and Parking

Staff Members are not permitted to use their personal vehicle on camp property for personal purposes, this includes driving the vehicle to an activity area. Personal vehicles remain in the designated staff parking lot until the staff member departs camp on his day/night off. Camp policy states:

- Staff members are not permitted to drive campers in personal vehicles without consent from the Camp Director.
- If driving the personal vehicle has been approved by the Camp Director, all drivers and passengers must wear seatbelts, the vehicle must not go faster than the camp property speed limit of 5 mph.

- Staff members are cautioned about loaning out their vehicle to other Employees. Should there be an agreement between two staff members and a vehicle is borrowed, the Camp does not hold any responsibility for risk, damage, or traffic violations that may occur.

Staff members with automobiles are required to park the vehicle in the assigned camp parking lot. Use of these automobiles within the camp property is prohibited unless permitted by the director. Keys to the vehicle must remain in the Employee locker.

Employees are required to park in designated employee parking areas. All other parking is reserved for customers and visitors. Designated employee parking areas are subject to change without notice based on the use of the facility.

## Waterfront

Nobody may use the waterfront unless there is a minimum of one lifeguard on duty.

Staff that are not lifeguards or waterfront instructors are not permitted at the waterfront or in the water unless it is part of a camp activity, they are instructed by a director, or they are looking for a camper.

Staff is NEVER permitted at the waterfront or in the water during time off unless it is approved by the Waterfront Directors.

Swimming for exercise is permitted in the lake prior to the morning bell. Employees must let a director know if they are planning to swim in the morning. The following precautions must be met at all times: it is not raining, thundering or lightning, the employee never swims alone, and a certified lifeguard is acting as a lifeguard, not as a swimmer. Employees must be back inside their cabin by the morning bell which is typically at 7:15 AM.

## Morning Workouts

Running or general exercise is permitted prior to the morning bell. Employees must be back inside their cabin by the morning bell, which is typically at 7:15 AM. Only 1 staff member per cabin may leave the cabin to swim or exercise on any given morning. CITs are not permitted to leave the cabin for swimming or exercise unless given permission by a director. All staff must stay on property during this time.

## Cabin Privacy

To ensure privacy and provide other protection to our community, staff and campers are not permitted to enter any cabin other than their own cabin. This includes tents and cabins or other lodging on trips. This also includes cabins for directors, administrators, nurses, and support staff.

## Weapons

Employee and child welfare are our highest priority. No weapons, of any type (guns, knives, etc.) or any items considered dangerous or employed as a defense aid may be brough to the camp site. Bringing any type of items onsite may put the campers or other employees at risk.

It may be required to conduct an investigation, which can include the inspection of property belonging to a camper or staff member. All staff and campers are required to cooperate with such investigations being residents of our camp community. Failure to do so may cause disciplinary action up to and include termination. Searches are only conducted with permission from the Camp Director.

## VISITORS IN THE WORKPLACE

### Visitors

Camp North Star does not allow visitors during the camp season. Steven or Brooke Bernstein must approve any persons wishing to visit camp before they arrive on camp property.

### Intruder/Trespasser Policy

If trespassers are on the property, staff must notify the director team immediately and they will come to assist. Depending on the situation, the trespassers should be notified that they are on private property and need to leave. If the trespassers are uncooperative, the police will be called. If the trespassers look as if they are there to cause trouble (sneaking around, there late at night, intoxicated, etc.) police will be called immediately.

Steps for dealing with trespassers:

- Inquire as to why they are at camp and if they don't have a scheduled meeting or are unrelated to camp, politely ask them to leave
- If you are unsure of what to do, or don't feel comfortable approaching an intruder/trespasser, then don't. Find another staff member or director immediately.
- Notify a senior staff member (who will call the police if warranted)
- Write an incident report with as many details as possible - What was said. What direction they arrived from. What they looked like (hair, size, clothing, etc.)

Workplace visitors may refer to employees' friends and family, contractors, external vendors, former employees, and the public.

To provide for the safety and security of employees and the facilities at Camp North Star, only authorized visitors are allowed in the workplace. Restricting unauthorized visitors helps maintain safety standards, protects against theft, ensures security of equipment, protects confidential information, safeguards employee welfare, and avoids potential distractions and disturbances.

### Summer Policy

All visitors should enter Camp North Star at the front gate. Visitors must be pre-approved by the Owners/Directors. The entry gate at the front of the property has video cameras for security purposes.

Authorized visitors will receive a visitor tag, directions to or be escorted to their destination. Employees are responsible for the conduct and safety of their visitors and must escort them while they are on the Camp North Star property.

If an unauthorized individual is observed on Camp North Star's property, employees should immediately approach the visitor and direct the individual to the Office. If the visitor does not follow instructions, immediately notify the office. If there is reason to believe the visitor could be harmful to the property, the staff or the campers, the Camp Director must be immediately notified and the police will be notified.

## DELIVERIES

All signed for mail or packages must be brought to the office and then disseminated to the appropriate employee.

## SOLICITATION

Solicitation on the Camp's property causes employees to neglect their own work and interferes with the work of fellow employees. The following rules shall apply to solicitation, and to the distribution of literature, by employees on the Camp's property:

1. There shall be no solicitation during working time.
2. There shall be no distribution of literature during working time or any other time in any working area.

"Working time" means time designated for performing actual job duties, either by the person soliciting, or the person distributing the literature, or the person being solicited or receiving the literature. Examples of "solicitation" include, but are not limited to, solicitations for magazines or periodical subscriptions, political contributions, or membership in organizations. Examples of "distribution" include, but are not limited to, distribution of political literature, subscription forms or informational bulletins.

Persons not employed by the Camp are forbidden from coming on the Camp's property to solicit or distribute for any reason or at any time. All employees should immediately report to their supervisor any solicitation or distribution of literature in violation of this rule by non- employees. Any such violation by an employee is grounds for disciplinary action, up to and including discharge.

# SECTION 6 – BENEFITS FOR ALL STAFF

MAINE FAMILY LEAVE INSURANCE

Beginning in 2026, eligible workers in the private and public sector will have up to 12 weeks of paid time off available to take care for a family member with a serious health condition, to bond with a child after birth, fostering or adoption, to care for their own medical needs, to deal with the transition of a family member's impending military deployment or to stay safe after abuse or violence.

Maine's PFML law will provide up to 12 weeks of paid leave for family, military, medical or safe leave. This law became effective in October 2023 in accordance with Maine law. The Maine Department of Labor is responsible for the implementation of this new program.

(See Pay Deductions section)

WORKERS' COMPENSATION INSURANCE

Camp North Star provides a comprehensive workers' compensation insurance program at no cost to employees. This program covers any injury or illness sustained in the course of employment that requires medical, surgical, or hospital treatment. Subject to applicable legal requirements, workers' compensation insurance provides benefits after a short waiting period or, if the employee is hospitalized, immediately.

**Employees who sustain work-related injuries or illnesses should inform their supervisor immediately.** This will enable an eligible employee to qualify for coverage as quickly as possible. Neither Camp North Star nor the insurance carrier will be liable for the payment of workers' compensation benefits for injuries that occur during an employee's voluntary participation in any off-duty recreational, social, or athletic activity sponsored by Camp North Star.

Workers' Compensation benefits provide medical treatment and income (reduced) replacement for the loss of earnings that result from work-related injuries. All time away from work must be properly certified by a medical professional.

All injuries, no matter how slight, must be reported immediately to your supervisor to assure consideration under Workers' Compensation Insurance, should complications develop later. The site Nurse (seasonal) will see that an Employee receives medical attention and complete an accident report. Prompt reporting is the key.

While out of work under Workers Compensation, when an Employee can return to work, the Camp should be given at least one week's notice by providing a doctor's certificate stating that the employee is physically able to resume normal duties. If there are any limitations on the employee's ability to resume their job duties, the doctor should note them in the medical certificate. The Camp reserves the right to require a physical examination by a physician of their choosing prior to continuation of salary payments or resumption of duties.

Camp North Star will make reasonable efforts to return employees to the same or similar job as held prior to the leave of absence, subject to the Camp's staffing and business requirements. Pay will resume at 100% once the employee has returned to work full-time. Failure to notify the Camp of the availability to work or continued absence beyond the time medically certified will be deemed to be a voluntary resignation of employment.

## LACTATION ACCOMMODATION

Camp North Star supports breastfeeding mothers by accommodating the mother who wishes to express breast milk during her workday when separated from her newborn child.

Any employee who is breastfeeding her child will be provided reasonable break times to express breast milk for her baby. Any employee wishing to express breast milk during the workday must request such break time from the Owners/Directors. If approved, the Camp shall provide reasonable unpaid break time for non-exempt employees (if the break is 20 minutes or more in duration, otherwise the break shall be paid) and also permit an exempt employee to use paid break time each day to allow the employee to express breast milk for her nursing child. The Camp will provide a designated room for this purpose.

A small refrigerator reserved for the specific storage of breast milk will be made available. Any breast milk stored in the refrigerator must be labeled with the name of the employee and the date of expressing the breast milk. Employees storing milk in the refrigerator assume all responsibility for the safety of the milk and the risk of harm for any reason, including improper storage, refrigeration, and tampering.

## JURY DUTY

When called to serve on jury duty or as a witness, employees are to notify his or her supervisor immediately. CNS reserves the right to provide the employee a letter of hardship to the court for release of jury duty. Employees are expected to provide this letter to the court for review and consideration. All employees are required to submit to their supervisor a certificate from the court listing the days of jury duty service.

Seasonal Employees - Seasonal employees will not be paid while on jury duty.

Full Time Employees - Employees who are called to serve on jury duty will be allowed to use available PTO time or be given an unpaid leave of absence should they select the court provided stipend.

# SECTION 7 – NEXT STEPS




If you are **a Seasonal Employee**, please sign the Handbook Acknowledgement Page in your Camp Minder Forms.

If you are a **Full Time or Part Time Employee**, please advance to the next section to:

1. Continue to onto Section 8 – Year-Round Staff for additional expectations and benefits.
2. Then please sign the Handbook Acknowledgement Page in your Camp Minder Forms.

# SECTION 8 –FOR YEAR-ROUND STAFF ONLY

## FOR FULL TIME / YEAR-ROUND STAFF

The first six sections of this handbook are for all staff, regardless of classification.

As full-time staff there are additional policies, benefits and expectations that Employees must be aware of as a part of their commitments to Camp North Star.

Nothing in this section changes the at-will employment arrangement.

## BUSINESS TRAVEL EXPENSES

Travel and entertainment expenses are part of certain job functions that require off-site work as a part of an employee's role. It is the policy of Camp North Star ("CNS" or "The Camp") to reimburse staff for reasonable and necessary expenses incurred during approved work-related travel.

Employees seeking reimbursement should incur the lowest reasonable travel expenses and exercise care to avoid impropriety or the appearance of impropriety. Reimbursement is allowed only when reimbursement has not been, and will not be, received from other sources. If a circumstance arises that is not specifically covered in this travel policy, then the most conservative course of action should be taken.

Business travel policies are aligned with company reimbursement rules and processes. All business-related travel paid for with Camp North Star funds must comply with company policies.

### Authorization and responsibility

- Staff travel must be authorized. Travelers should verify that planned travel is eligible for reimbursement before making travel arrangements.
- Within 30 days of completion of a trip, the traveler must submit for travel reimbursement supporting documentation to obtain reimbursement of expenses.
- An individual may not approve his or her own travel or reimbursement. Approval may only be provided by the Owners.
- Personal funds
  - Travelers who use personal funds to facilitate travel arrangements will not be reimbursed until after the trip occurs and proper documentation is submitted.
- Exceptions
  - Occasionally it may be necessary for travelers to request exceptions to this travel policy.
  - Requests for exceptions to the policy must be made in writing and approved by the Owners.

### Travel Expenses/Procedures

General information

- Authorized business travel for staff that includes prepayments must be pre-approved.
- All airline tickets, hotel rooms, car rentals, and other purchases over $100 should be made on the Camp North Star business credit card whenever possible.
- Reimbursement of parking, mileage, car service, taxi, ferry or bus passes all require receipts.
- Requests for reimbursements of travel-related expenses are submitted to the Owners within 30 days of the travel event.

- When more than one employee is scheduled to travel together, group travel options, such as carpooling, should be utilized as appropriate.
- All requests must be accompanied by supporting documentation and receipts.
- Airfare, Bus, and Rail Transportation
  - Travelers are expected to obtain the lowest available airfare/rail-fare that reasonably meets business travel needs.
  - Airfare/bus/rail-fare may be prepaid by the Camp North Star or Owners.
  - Travelers are encouraged to book flights at least 30 days in advance to avoid premium airfare pricing.
  - Coach class or economy tickets must be purchased for domestic flights.
- The following airline-related fees may be submitted for reimbursement:
  - Baggage fees for 1 checked bag
  - Meals (see Meals – Employee Only)
  - Wi-Fi access only if needed for business use
- The following airline-related charges do not qualify for reimbursement: Fees for early boarding, preferential seating (e.g., aisle, exit or other rows), Class of service upgrade, Entertainment, Lounge access – membership or one-time use, Alcoholic beverages, Fees to attain airline status.
- Airfare/bus/rail-fare - If the Airfare/bus/rail-fare was not prepaid by Camp North Star or the Owners, an original itemized airline receipt, an e-ticket receipt/statement or an Internet receipt/statement is required. The receipt must show the method of payment, dates of travel, and indicate that payment was made.

Vehicles

Automobile (personally owned—domestic travel).

- A valid driver's license issued within the United States and personal automobile insurance are required for expenses to be reimbursed. Employees must submit a copy of both with reimbursement requests.
- Drivers should be aware of the extent of coverage (if any) provided by their automobile insurance company for travel that is business or not personal in nature. CNS will not be responsible for any damage to the personal vehicle.
- Mileage reimbursement for use of a personal automobile is based on the IRS mileage rate.
  - Mileage payment is the reimbursement of all vehicle-related expenses, including gasoline, wear and tear, and personal auto insurance.
  - Mileage rate information can be found here: https://www.irs.gov/tax-professionals/standard-mileage-rates

Automobile (rental—domestic travel).

- Automobile rental must be preapproved.
- Travelers are expected to obtain the lowest available rental pricing that reasonably meets business travel needs.
- Original itemized receipt, an e-ticket receipt/statement or an Internet receipt/statement is required. The receipt must show the date of the rental and the method of payment and indicate that payment was made.

- CNS encourages travelers to purchase collision damage waiver (CDW) and loss damage waiver (LDW) coverage. CNS will reimburse the cost of CDW and LDW coverage; all other insurance reimbursements will be denied.
- Parking fees, tolls and other incidental costs associated with vehicle use are not covered by the rental agreement. These out-of-pocket costs should be recorded, and receipts provided for reimbursement.
- Travelers must fill the gas tank before returning the vehicle to the rental agency to avoid service fees and more expensive fuel rates.
- Employees who are involved in an accident while traveling on business must promptly report the incident to their immediate supervisor. Vehicles owned, leased, or rented by Camp North Star may not be used for personal use without prior approval.

Taxi/Uber/Lift/ Car Service/ Airport Shuttle.

- CNS will reimburse employees for normal, business-related expenses for taxis, car services or airport shuttle services. Receipts or dated screenshots are required for reimbursement.
- Personal use of car services and limousines is not reimbursable.
- Miscellaneous transportation cost.
- Original receipts or dated screenshots are required for Uber, car service, taxi, bus, subway, metro, ferry, and other modes of transportation.
- Original receipts or dated screenshots are required for parking fees (including airport parking).
- The lodging bill can be used as a receipt when charges are included as part of the overnight stay.
- Original receipts are required for tolls.

Conferences and Training.

- If the conference or training fee was not prepaid by CNS, CNS will reimburse these fees, including business-related banquets or meals that are part of the conference registration.
- Original receipts to support the payment are required. If the conference/training does not provide a receipt, then a canceled check, credit card slip/statement or documentation that the amount was paid is required for reimbursement.
- A prorated amount for the meals provided must be deducted from the traveler's per diem. See Per Diem section for more details.
- Entertainment activities such as golf outings and sightseeing tours will not be reimbursed.
- Registration fees paid directly by an individual will not be reimbursed until the conference/training is completed.

Lodging.

- Travelers are expected to obtain the lowest available lodging pricing that reasonably meets business travel needs. Camp North Star Owners/Directors must approve any lodging reservations over the amount of $150.00 per night.
- The cost of overnight lodging (room rate and tax only) will be reimbursed to the traveler if the authorized travel is 60 miles or more from the traveler's home or primary worksite.
- CNS will reimburse lodging expenses at reasonable, single occupancy or standard business room rates. When the hotel or motel is the conference or convention site, reimbursement will be limited to the conference rate.

- Only single room rates are authorized for payment or reimbursement unless the second party is representing the agency in an authorized capacity. If the lodging receipt shows more than a single occupancy, the single room rate must be noted. If reimbursement for more than the single room rate is requested, the name of the second person must be included.

Business meals.

- Travelers are required to follow CNS expenditure policies when requesting reimbursement for business meals.
- Alcohol at meals will be the responsibility of the employee and will not be reimbursed by CNS. Employees must request that alcohol charges be on a separate check.
- Original itemized receipts are required.

Other business expenses.

- Business expenses, including faxes, photocopies, internet charges, data ports and business telephone calls incurred while on travel status, can be reimbursed, with CNS approval.
- Original itemized receipts are required.

Non-Reimbursable Travel Expenses

- Alcohol expense, including tax and tip
- Airline club memberships.
- Airline upgrades.
- Business class for domestic flights or first class for all flights.
- Childcare, babysitting, house-sitting, or pet-sitting/kennel charges.
- Commuting between home and the primary work location.
- Costs incurred by traveler’s failure to cancel travel or hotel reservations in a timely fashion.
- Evening or formal wear expenses.
- Gifts.
- Haircuts and personal grooming.
- General laundry and dry cleaning.
- Passports, vaccinations, and visas when not required as a specific and necessary condition of the travel assignment.
- Personal entertainment expenses, including in-flight movies, headsets, health club facilities, hotel pay-per-view movies, in-theater movies, social activities, and related incidental costs.
- Travel accident insurance premiums or purchase of additional travel insurance.
- Other expenses not related to the business travel.

PTO in conjunction with business travel

- In cases in which PTO time is added to a business trip, any cost variance in airfare, car rental or lodging must be clearly identified.
- CNS will not prepay any personal expenses with the intention of being “repaid” at a later time, nor will any personal expenses be reimbursed.
- Travel for Non-Employees
    - Additional costs for travel, lodging, meal or other travel expenses for spouses, significant others, or other family members will not be reimbursed unless the individual has a bona fide company purpose for engaging in the travel or attending the event.

Compensation

- Exempt Employees – Exempt employees will not receive extra compensation for travel/conferences over their regular salaried amounts. If there are special or extenuating circumstances, the Owners may grant a "comp or flex" day.
- Non-Exempt Employee – Non-Exempt employees will be paid for time worked, which includes travel to the site, and only during times of actively working. Non-Exempt employees should keep track of their working hours.
- Volunteers and Guests - Those who are not on CNS payroll but are considered Volunteers or Guests of CNS for events (conferences and training) which require travel will not be reimbursed for their expenses or their time.

***Abuse of this business travel expenses policy, including falsifying expense reports to reflect costs not incurred by the employee, can be grounds for disciplinary action, up to and including termination of employment***

## REMOTE / HYBRID WORKING

Remote/Hybrid Working is the practice of working at home or at a remote site instead of physically traveling to a central workplace. Since the work location of Camp North Star is in Maine during the summer, and the team works "remotely" during the off season, the remote/hybrid work policy is to emphasize expectations while employees are at their alternate locations.

All summer positions/roles will require the employees' time at our central camp location in Maine.

There may be times that the Owners request employees to track their activities/ time (regardless of exemption status) while working remotely. The employee's compensation, benefits, work status, work responsibilities, and the amount of time the employee is expected to work per day or per pay period will not change due to the onsite or remote work location. The employees' remote work hours will conform to a schedule agreed upon by the employee and the Owners/Directors. Changes to this schedule must be reviewed and approved in advance by the Owners/Directors.

## OFF SEASON VISITOR POLICY

As a general rule, employees may not allow access to our facilities or buildings to unauthorized personal visitors. Employees must always tend to their visitors while they on Camp North Star property. Visits should be limited in length to protect confidential information and avoid potential distractions and disturbances.

Contractors, suppliers, and service vendors can enter our property only to complete their job duties.

Our internet usage, data protection and confidentiality policies temporarily cover our visitors while they are on company property. They must not misuse our internet connection, disclose confidential information, or take photographs of restricted areas. If they don't conform, they will be escorted out or face prosecution if appropriate.

Contractors and vendors are allowed during off-season working hours, as approved. Off-season visitors (non-Contractor or Vendor) must obtain prior authorization from the Owners/Directors. To avoid confusion or misunderstanding, authorization should be in writing.

Employees who violate this policy may face disciplinary action up to and including termination.

NON-EXEMPT ONLY: OVERTIME AND BREAKS

Full-time exempt staff members do not qualify for overtime. Owners may grant additional PTO time in certain circumstances, as per the guidelines outlined in this handbook.

This information is specifically for hourly / nonexempt who work full-time or part-time for the Camp. (See Employee Classifications Section for more information on eligibility)

Non-exempt employees may be paid overtime for work over 40 hours per week, with pre-approval by the Owners.

From time to time, it may be necessary for Employees to perform overtime work in order to complete a job on time. All overtime must be approved in advance by the Employee's supervisor. When it is necessary to work overtime, Employees are expected to cooperate as a condition of their employment. There are two types of overtime work:

Scheduled overtime - work is announced in advance and generally will involve an entire department or operation. This type of overtime becomes part of the required work week of the people who are members of the department or operation. If an Employee needs to be excused from performing scheduled overtime, Employees must bring this to the attention of the Owner/Directors. The Camp will consider the employee situation and the requirements of the department or operation in deciding whether the employee may be excused from performing the scheduled overtime.

Incidental overtime that is not scheduled – this type of overtime becomes necessary in response to extenuating circumstances. It is extra time needed to complete work normally completed during regular hours. Incidental overtime may become necessary when an illness or emergency keeps employees from being at work as anticipated. It may require an employee to return to the workplace for emergency work. All incidental overtime work must be approved by the Owner/Directors. Employees that work overtime hours and do not have the time pre-approved by the Owner/Directors may be subject to progressive discipline.

All supervisors seeking overtime for their department members must seek advanced approval from the Owners/Directors prior to approving overtime for employees.

Employees that are a "non-exempt" employee and perform overtime work, will be paid one and one-half (1½) times their regular hourly wage for any time over the normal forty (40) hours per week.

The Camp must provide employees who work more than 6 consecutive hours with a rest period of at least 30 consecutive minutes. The rest time may be used by the employee as unpaid mealtime, only if the employee is completely relieved of duty.

Non-exempt employees are required to track their work time. All time must be submitted to the Facilities Director in a timely manner/upon request. Altering, falsifying, or tampering with time records may result in disciplinary action, up to and including termination of employment.

## COMPANY SPONSORED BENEFITS

Eligible employees at Camp North Star are provided a wide range of benefits. A number of the programs (such as Paid Sick Leave, social security, workers' compensation, state disability and unemployment insurance) cover all employees in the manner prescribed by law. The information in this Employee Handbook is intended as a summary of benefits only. Additional information about these programs may be obtained from the Owners/Directors and/or the specific plan documents.

Benefits eligibility is dependent upon a variety of factors, including employee classification. Your supervisor can identify the programs for which you are eligible. Camp North Star reserves its right to modify, suspend and/or terminate any benefit at any time with or without advance notice.

The following benefit programs are available to **eligible full-time exempt** employees, only:

- Paid Time Off (vacation, illness, personal business)
- Paid Holidays
- Health Insurance
- Remote work (as approved by the Owners)
- Participation in the CNS retirement savings plan

Some benefit programs require contributions from the employee, but many are fully paid by Camp North Star.

### CNS Retirement Savings Plan

Camp North Star encourages employees to plan for retirement. A 401(k) is a feature of a qualified profit-sharing plan that allows employees to contribute a portion of their wages to individual accounts.

- Elective salary deferrals are excluded from the employee’s taxable income (except for designated Roth deferrals). Employees should review plan documents and IRS information to understand maximum yearly contribution limits
- CNS will contribute to an employees’ account as a part of a designated match or contribution process
- Distributions, including earnings, are includible in taxable income at retirement (except for qualified distributions of designated Roth accounts).

### Health Insurance

Camp North Star’s health insurance plan provides employees and their dependents access to medical insurance benefits. **Only full-time exempt employees are eligible to participate in the health insurance plan.** Eligible employees may participate in the health insurance plan subject to all terms and conditions of the agreement between Camp North Star and the insurance carrier.

A change in employment classification that would result in loss of eligibility to participate in the health insurance plan may qualify an employee for benefits continuation under the applicable health benefits continuation law per federal or state law. Refer to the Benefits Continuation policy for more information.

Details of the health insurance plans are described in the Summary Plan Description(s) (SPD). An SPD and information on cost of coverage will be provided in advance of enrollment to eligible employees. Contact the Owners/Directors for more information about health benefits.

## Benefits Continuation (COBRA)

Applicable federal or state law gives employees and their qualified beneficiaries the opportunity to continue health insurance coverage under Camp North Star's health plan when a "qualifying event" would normally result in the loss of eligibility. Some common qualifying events are resignation, termination of employment, or death of an employee; a reduction in an employee's hours or a leave of absence; an employee's divorce or legal separation; or a dependent child no longer meeting eligibility requirements.

When electing continuation coverage, the employee or beneficiary pays the full cost of coverage at Camp North Star's group rates plus an administration fee. Camp North Star provides each eligible employee with a written notice describing rights granted under the law when the employee becomes eligible for coverage under Camp North Star's health insurance plan. The notice contains important information about the employee's rights and obligations.

### HIPAA Notice and privacy practices

The Health Insurance Portability and Accountability Act (HIPAA) includes components to ensure that your personal health information is protected so that individuals are not afraid to seek health care or to disclose sensitive information to health professionals. It is designed to ensure that protected health information is protected during its collection, use, disclosure, and destruction of records. Breach of this policy should be reported to the Owners/Directors.

## Paid Time Off

All full-time exempt employees are eligible to utilize paid time off (PTO) days per calendar year, in accordance with this policy. The PTO eligibility scale is as follows:

| Years of Service | Annual PTO Accrual |
|---|---|
| During the first 2 calendar years | 10 days |
| Between Year 3 and Year 5 | 15 days |
| Between Year 6 and Year 8 | 20 days |
| 9 years or more | 25 days |

All employees are encouraged to take time off each year to refresh themselves and ensure they have sufficient time away from their work duties. Employees are encouraged to use all of their granted PTO time within the calendar year. No PTO time will be carried into the next calendar year.

PTO can be taken for a variety of reasons, including planned vacation, personal and family member illnesses or injuries (including time off for the diagnosis, preventative care, care, or treatment of health conditions), school activities, medical or dental appointments, personal business or emergencies, bereavement time, domestic violence leave, and similar reasons. This policy complies with all the requirements of the Maine Earned Paid Leave Act: https://legislature.maine.gov/legis/statutes/26/title26sec637-2.html/. There is no separate paid sick leave policy starting the effective date of Camp North Star's new PTO policy

PTO does not replace the Camp's holiday schedule or the common closure in December. The Camp will continue to have designated paid holidays each year and the Camp closure.

PTO requests must be approved by the Owners/Directors, and each team member is expected to balance his or her work time and time off appropriately. Due to business or staffing needs, attendance may be required at certain times and PTO requests are not guaranteed to be approved, partially or in whole, at any time. PTO must be used in half or whole day increments.

To request time off from work, written notice to your Owner/Director supervisor is required (email suffices as written notice, however text messages do not) for consideration and then approval or rejection.

For planned PTO, such as a vacation of one week or more, advance notice of two (2) weeks is required to ensure sufficient time to evaluate the PTO request and to coordinate coverage as necessary.

For unplanned instances, such as for illness or bereavement leave, you must provide written (email) notification to your Owner/Director supervisor as soon as possible under the circumstances, but no later than by 8:00 a.m. Eastern Time on the first day of the absence. If possible, a courtesy text is appreciated. The written notice should also include expectations if additional time will be needed.

Supervisors may reject PTO requests if:

- Other team members with similar or complementary duties have already asked for leave during the same time.
- The time in question is too busy or includes an important deadline for the employee asking for leave or for the employee's department.
- An employee's performance, conduct, or attendance needs improvement and the time away from work would hinder the needed improvement.
- An employee appears to abuse the policy.
- Other legitimate business factors justify rejection.

Employees and supervisors should use common sense and adhere to all other Company policies when requesting and evaluating requests for PTO. Effective communication between team members is vital to make this policy work for everyone.

No single absence will be automatically approved for more than 7 consecutive workdays. Should your request for time off from work exceed 7 consecutive workdays, you must contact the Owner(s) ensure proper procedures and documentation are followed.

If an absence is due to an injury or illness, or otherwise constitutes a qualifying reason for leave under an applicable state or federal law or program, then (like all other absences) the absence will be unpaid after the seventh (7th) consecutive workday of PTO, per occurrence, unless applicable law requires otherwise.

In the event applicable wage replacement benefits such as a workers' compensation benefits, disability insurance plans, or other wage benefits apply, employees (i) cannot receive double pay for any time off and (ii) are still entitled to such benefits in accordance with applicable law and plan documents. Examples of reasons for leave under state and federal laws may include:

- the birth and care of the newborn child of an employee;
- placement with the employee of a child for adoption or foster care;
- to care for the employee's eligible family member with a serious health condition;
- to take medical leave when the employee is unable to work because of a serious health condition;
- because of certain military-related reasons involving the employee's eligible family member;
- to care for an eligible, covered servicemember with a serious injury or illness; or
- military leave for training, active duty, or other qualifying military service.
  (Please see the Camp's leave policies on these topics for more information.)

PTO may not be used as a means to extend other types of leave, such as leave under federal or state family and medical leave laws, leaves for a qualified short- or long-term disability, leaves required by state law, and other extended leave situations.

Once the PTO allotment is exhausted, the employee will not have any more paid time for the remainder of the calendar year. Unpaid time will be applied to the employee's pay cycle in full or half day increments.

The Camp expects all employees to maintain a high caliber of performance at all times. Therefore, if performance declines for any reason, including because of use or abuse of the PTO policy, the Camp reserves the right to revoke an employee's use of PTO and take other counseling and/or

disciplinary action, if necessary, up to and including termination of employment.

While employees may take time off from work under this policy, subject to work demands and management's discretion, due to the nature of this policy, employees do not accrue any vacation time or other paid time off. In other words, this PTO policy does not provide any additional wages to employees but rather operates as a benefit by allowing employees flexibility in their work schedules. Therefore, employees do not receive any payout for any "unused" time upon termination from employment.

Employees should refer to the appropriate policies, available in this handbook, for clarification on Leave policies, Holidays, or Jury Duty/Court Appearance.

### Common Vacation

Camp North Star, provides paid "Common Vacation" between Christmas and New Year's, depending on the school schedule, as determined by the Owners/Directors. Information will be available at the beginning of calendar year which days will be included in this office closure.

Therefore, employees do not receive any payout for Common Vacation upon termination from employment.

### Holidays

Camp North Star provides the following holiday schedule for all employees. Full-time exempt employees qualify for paid days. Non-exempt employees are required to take the days off without pay, unless otherwise approved in writing by your immediate supervisor.

- New Year's Day (January 1) *
- Labor Day *
- Thanksgiving*
- The Day after Thanksgiving

*Follows Federal Reserve observance schedule

Time off for observance of religious holidays not otherwise recognized by Camp North Star, will be granted, and will be applied against the employees' earned and available PTO days. If additional time is needed due to travel connected to the holiday that time will be applied against the employees' earned and available PTO days.

### Time off to vote

Camp North Star encourages employees to fulfill their civic responsibilities by participating in elections. Generally, employees are able to find time to vote either before or after their regular work schedule. If employees are unable to vote in an election during their non-working hours, Camp North Star will allow employees to arrive late or leave early in order to do so; whichever provides the least

disruption to the normal work schedule. Employees are asked to provide the Owners/Directors a courtesy note the day before Election Day, if they must use CNS time for voting.

Military Leave

An employee who is a member of the United States Army, Navy, Air Force, Marines, Coast Guard, National Guard, Reserves, or public health service, or is a member of any state militia, will be granted an unpaid leave of absence for military service, training, or related obligations in accordance with applicable state and federal law. Employees on military leave may elect to substitute their available PTO Days for the unpaid leave by providing written notice to the Owners/Directors of Camp North Star.

In order to be eligible for military leave, upon receipt of orders for active or reserve duty, an employee must notify his or her supervisor, as well as the Owners/Directors, as soon as possible (unless he or she is unable to do so because of military necessity or it is otherwise impossible or unreasonable).

Employees will also be granted time off for military training (normally fourteen (14) days plus travel time) and other related obligations, such as for an examination to determine fitness to perform service. Employees should advise their supervisor and the Owners/Directors of their training schedule and/or other related obligations as far in advance as possible. Employees should retain their military pay vouchers. Upon return from training, the employee should submit his or her military pay voucher to the Owners/Directors.

Employees in non-temporary positions who leave employment in order to perform military service are eligible for reinstatement upon discharge, and employment protections are expanded to those on active military service in the United States Armed Forces in time of war or in an emergency. Covered employers must reinstate former employees who: (1) receive a certificate of completion of military service duly executed by an officer of the applicable force; (2) are still qualified to perform the duties of their position; and (3) apply for reemployment within 90 days after they are relieved from military service. They must be returned to their former position, or to a position of like seniority, status, and pay, unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so. Employers must restore eligible employees without loss of seniority, and they cannot be discharged without cause within 1 year after reinstatement

During a military leave of less than 31 days, an employee is entitled to continue group health plan coverage under the same conditions as if the employee had continued to work. For military leaves of more than 30 days, an employee may elect to continue his or her health coverage for up to 24 months of uniform service but may be required to pay all or part of the premium for the continuation coverage.

An employee who served for less than 31 days or who reported for a fitness to serve examination, must provide notice of intent to return to work at the beginning of the first full regular scheduled work period that starts at least eight hours after then employee has returned from the location of service.

An employee who served for more than 30 days, but less than 181 days, must submit an application for reemployment no later than 14 days after completing his or her period of service, or, if that deadline is impossible or unreasonable through no fault of the employee, then on the next calendar day when submission becomes possible.

An employee who served for more than 180 days must submit an application for reemployment no later than 90 days after the completion of the uniformed service.

An employee who has been hospitalized or is recovering from an injury or illness incurred or aggravated while serving must report to the Owners/Directors(if the service was less than 31 days or if the employee reported for a fitness to serve examination), or submit an application for reemployment (if the service was greater than 30 days), at the end of the necessary recovery period (but which may not exceed 2 years, unless for a fitness to serve examination).

An employee whose military service was for more than 30 days must provide documentation upon his or her return (upon the request of the employer) (unless such documentation does not yet exist or is not readily available) showing the following: (i) the application for re-employment is timely (e.g. submitted within the required time period); (ii) the period of service has not exceeded five years; and (iii) the employee received an honorable or general discharge.

Upon satisfaction of the above conditions, an employee generally has a right to return to the same position he or she held prior to the leave, or to a position with like seniority, status and pay that the employee is qualified to perform, subject to the Camp's operational/staffing needs.

Military Family Leave Entitlements

Eligible employees with a spouse, son, daughter, or parent on active duty or call to active-duty status in the National Guard or Reserves in support of a contingency operation may use their 12-week leave unpaid entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings.

Employee is required to provide the Camp with advance notice of impending needs as soon as it is known by the employee or as soon as possible.

# SECTION 9 - FORMS

CAMP NORTH STAR
MAINE

HANDBOOK ACKNOWLEDGEMENT

- The Camp follows a policy of "employment at will." Accordingly, this Handbook is not intended to be a contract of employment or a warranty of benefits. I understand that Camp North Star is an "at-will" employer, consistent with applicable federal and state law, and subject to any individual employment or contract signed by the Owners/Directors of Camp North Star. Employment with Camp North Star is not for a fixed term or definite period and may be terminated at the will of either party, with or without cause, and without prior notice.
- I understand that no one is authorized to provide any employee with an employment contract or special arrangement concerning terms and conditions of employment unless the contract or arrangement is in writing and signed by Steven and Brooke Bernstein, Owners/Directors.
- I hereby acknowledge I have received a copy of the Camp North Star Handbook outlining the benefits, rules, and regulations of Camp North Star. I further acknowledge I will read the contents of the Handbook.
- I will contact the Owners/Directors, Steven and Brooke Bernstein with any questions and will abide by all policies.
- I understand Camp North Star reserves the right to change or terminate any of the policies, programs or benefits outlined in this Handbook and may do so without prior notice.
- I understand the employee benefits, policies and rules in this Handbook will remain in effect until I am notified of changes.
- I understand Camp North Star reserves the right to make a final interpretation of the terms and conditions of the policies set forth in this Handbook.
- I understand if I fail to follow any policy I may be terminated from employment. I understand that I may be suspended without pay during any investigation with which I am involved.

| | |
|---|---|
| Employee Name (Printed): | |
| Employee Signature: | |
| Date: | |

EMPLOYEE COMPLAINT FORM

{Attach additional sheets if necessary to fully complete all questions}

| | | | |
|---|---|---|---|
| DATE: | | | |
| | | | |
| NAME: | | DEPARTMENT: | |
| TITLE: | | SUPERVISOR: | |
| Time period covered by this complaint: | | | |
| Individuals who allegedly committed the acts being complained about: | | | |
| | | | |
| | | | |
| Describe the nature and dates of the acts allegedly committed by each individual: | | | |
| | | | |
| | | | |
| Identify all persons with knowledge of the complained conduct: | | | |
| | | | |
| | | | |
| Are there any documents or other evidence that supports the occurrences described above? | | | |
| | | | |
| | | | |
| If you previously complained about this or related acts to a supervisor, please identify the individual to whom you complained, the date of the complaint, and any action taken. | | | |
| | | | |
| | | | |
| Have you missed any time from work or incurred any un-reimbursed medical expenses as a result of the alleged acts? | | | |
| | | | |
| | | | |

| Are you concerned that someone may retaliate against you because you filed this complaint? If so, please identify the person(s) and indicate the reasons why you feel the person(s) may retaliate against you. |
|---|
| |
| |
| What is your requested remedy for this complaint? |
| |
| |

ACKNOWLEDGEMENT

The information provided above is true and correct to the best of my knowledge.

BY: ______________________ DATE: ______________________

*To investigate your complaint, it will be necessary to interview you, the accused party, and any witnesses with knowledge of the allegations or defenses. All persons involved in the investigation will be notified that: (1) the complaint is confidential; and (2) any unauthorized disclosures of information concerning the investigation or retaliation could result in disciplinary action, up to and including discharge.*

I am willing to cooperate fully in the investigation of my complaint and to provide whatever information/documentation Camp North Star deems relevant.

BY: ______________________ DATE: ______________________