**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**


**FAEGRE DRINKER BIDDLE & REATH LLP**
Michael P. Pompeo
600 Campus Drive
Florham Park, New Jersey 07932-1047
(973) 549-7000 (Telephone)
(973) 360-9831 (Facsimile)
michael.pompeo@faegredrinker.com

-and-

Ian J. Bambrick (*pro hac vice*)
Patrick A. Jackson (*pro hac vice*)
Sarah E. Silveira (*pro hac vice*)
222 Delaware Ave. Suite 1410
Wilmington, DE 19801
(302) 467-4200 (Telephone)
(302) 467-4201 (Facsimile)
ian.bambrick@faegredrinker.com
patrick.jackson@faegredrinker.com
sarah.silveira@faegredrinker.com

*Counsel to the DAMIS Debtors and Debtors in Possession*

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff (*pro hac vice*)
Megan M. Wasson (*pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Facsimile)
adam.rogoff@hsfkramer.com
megan.wasson@hsfkramer.com

*Co-Counsel to the DAMIS Debtors and Debtors in Possession*


| | |
|---|---|
| In re:<br><br>DAMIS Holdings LLC, *et al.*,[1]<br><br>Debtors | Chapter 11<br><br>Case No. 26-16439 (CMG)<br><br>(Jointly Administered) |
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[2]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

[1] A complete list of the DAMIS Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the DAMIS Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/DAMIS/. The location of DAMIS Holdings LLC's principal place of business and the DAMIS Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

[2] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

**REPLY OF THE DAMIS DEBTORS TO THE RESPONSE OF ORCAFUNDING LLC TO THE JOINDER AND SUPPLEMENTAL MEMORANDUM OF THE DAMIS DEBTORS**

**TO THE HONORABLE CHRISTINE M. GRAVELLE, CHIEF JUDGE, UNITED STATES BANKRUPTCY COURT:**

DAMIS Holdings LLC and its affiliated debtors and debtors in possession (collectively, the "DAMIS Debtors") submit this reply (this "Reply") to the *Response of OrcaFunding LLC to the Joinder and Supplemental Memorandum of the DAMIS Debtors, and Further Memorandum in Support of a Determination That the OrcaFunding Sale of Future Receipts Agreements Are Sales, Not Loans* [DAMIS D.I. 1560; SIMAD D.I. 1480] (the "Response" or "Resp.")[3], and respectfully state as follows:

## I. THE RESPONSE MOSTLY ADDRESSES MATTERS THE DAMIS DEBTORS DID NOT RAISE IN THE JOINDER

1. Only Point I of the Response (¶¶ 11–31) attempts to address the issues raised in the Joinder. Point II (¶¶ 32–56) and much of Point III (¶¶ 57–66) of the Response relitigate the September 29, 2026 evidentiary hearing in the SIMAD Chapter 11 Cases. The Joinder's supplemental arguments put none of those subjects at issue. OrcaFunding concedes as much, describing Point II as a response to "principally the Court's own questions and the SIMAD Debtors' closing arguments." Resp. ¶ 58.

2. Herein, the DAMIS Debtors reply solely to the arguments germane to their Joinder: (a) OrcaFunding's attempt to characterize what it purchased, and (b) its responses to the Joinder's three supplemental arguments (early delivery schedule, enterprise risk, and collection authority).

[3] Capitalized terms used but not defined herein have the meanings given to them in the *Joinder of the DAMIS Debtors to the SIMAD Debtors' (I) Memorandum of Law in Support of a Determination That the OrcaFunding Sale of Future Receipts Agreements are Disguised Loans and not True Sales and (II) Opposition to OrcaFunding LLC's Memorandum of Law, and Supplemental Arguments in Support Thereof* [DAMIS D.I. 1416; SIMAD D.I. 1362] (the "Joinder"). References to the "Agreements" are to the April Agreement and the May Agreement, together with their Addenda.

The DAMIS Debtors do not address, and do not adopt any new position on, the SIMAD-specific matters in Point II and Point III of the Response. The DAMIS Debtors' silence on those matters does not constitute a concession, and the DAMIS Debtors' joinder in the SIMAD Memorandum, as well as their reservation of rights, Joinder ¶ 31, remain in full force.[4]

## II. THE RESPONSE IS SUBSTANTIVELY DEFICIENT AND INTERNALLY INCONSISTENT

3. A true sale requires an identifiable asset. Yet, OrcaFunding cannot settle on what it supposedly owns. In one breath OrcaFunding "took full ownership of the purchased receipts" and holds "$5,400,000 in purchased receipts." Orca Mem. ¶¶ 5, 12. In the next, "OrcaFunding did not buy the Sellers' receipts. It bought the Specified Percentage of them." Resp. ¶ 33. Elsewhere still, "[t]he asset sold here is a percentage of revenue." *Id.* ¶ 17. And when convenient, it is a fixed "Purchased Amount" that is "fixed on day one, as the price of any asset is fixed when the asset is bought." *Id.* ¶ 12. These are not interchangeable descriptions. A fixed-dollar sum, an undivided fractional interest in a revenue stream, and a pool of identified receipts carry different risks and different consequences for ownership. That OrcaFunding shifts among them as each argument requires is itself telling: it confirms that no specific, identifiable asset was ever conveyed, which is precisely the Joinder's first point. Joinder ¶¶ 3, 20.

4. The vacillation is no accident. The Agreements draw on the Sellers' entire revenue stream rather than on segregated, identified accounts receivable. That design is inherently in tension with true-sale treatment. Here, "Future Receipts" means "all payments received by Seller, or its right to receive such payments, in the ordinary course of Seller's business," in any form whatsoever, Agreements at 1, aggregated across every Seller, *id.* § 21. The Sellers must deposit

---

[4] Nor do the DAMIS Debtors withdraw the relief requested in the Joinder. OrcaFunding's objection that a section 541 determination exceeds the Scheduling Order. *See* Resp. ¶¶ 30, 66. ignores that estate property is the very consequence that gives the Characterization Dispute meaning; OrcaFunding itself first raised the issue by asserting that the purchased receipts are not estate property. See Orca Mem. ¶ 16.

"all Future Receipts" into Authorized Accounts. *Id.* § 13(a). The definition thus sweeps in every collection of both the SIMAD Debtors and the DAMIS Debtors, including customer deposits and advance payments. OrcaFunding itself emphasizes that camp tuition is "typically paid in advance." Resp. ¶ 22. OrcaFunding even concedes that the Sellers "presented" themselves as "one giant, multi-part account." *Id.* ¶ 56. A claim against all cash flowing into the bank accounts of more than 200 enterprises is not a purchase of receivables; it is a claim against the enterprise's general revenue, which is the posture of a lender. *See* SIMAD Mem. at 25–26 (definition "so broad as to be essentially vacuous") (quoting *J.P.R. Mech.*, 2025 WL 1550541, at *9).

## III. THE EARLY DELIVERY SCHEDULE CONFIRMS A LOAN

5. OrcaFunding's principal response to the Early Delivery Schedule is that it is a "discount" that can only reduce the Purchased Amount. Resp. ¶¶ 12–13. That is a distinction without a difference. Whether one describes the schedule as an escalating charge or a declining discount, the economics are the same. The financing charge rises with each passing window and is lowest when the obligation is repaid earliest. That is the defining characteristic of a charge for the use of money, not the price of an asset. If OrcaFunding's return was truly contingent on the performance of purchased receivables, the date on which it received payment would not reprice its entitlement. The schedule is keyed to "[c]alendar days immediately following disbursement of funds," not to collections, volume, or the identity of any account debtor. *See* Agreements, Early Delivery Schedule.

6. The case law cited by the SIMAD Debtors and OrcaFunding supports that this feature indicates a loan. The controlling question is whether OrcaFunding was "absolutely entitled to repayment," *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665 (2d Dep't 2020), and, ultimately, "whether the transaction involves a transfer of risk." *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 1997207, at *10 (S.D.N.Y. June 6, 2022). A

"fixed term is typical of a loan." *Lateral Recovery LLC v. Queen Funding, LLC*, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022). An instrument that prices the funder's return by the length of time its money is outstanding presupposes repayment and measures only when, not whether, it occurs. Nor does the anti-stacking condition help OrcaFunding. Resp. ¶ 14. A condition that the payoff not be funded by another merchant cash advance funder is the same protection any lender demands against refinancing by competing short-term creditors, and it mirrors the Addenda's "most-favored-nation" repricing mechanism that the SIMAD Debtors have demonstrated is a lending feature. SIMAD Mem. at 28–29. Finally, OrcaFunding's observation that the Sellers never exercised the option, Resp. ¶ 13, is beside the point. Characterization turns on the contractual rights created at execution. *Id.* ¶¶ 47, 61.

## IV. ORCAFUNDING'S OWN AUTHORITY ON RISK AND RECOURSE SUPPORTS A LOAN

### A. OrcaFunding's Recourse Indicates that the Agreements are Loans.

7. The cases confirm that the decisive inquiry is recourse against the seller. *Fleetwood*, on which OrcaFunding relies, Resp. ¶ 16, asks whether the funder was entitled to repayment "in virtually every imaginable circumstance," and found the substance of the transaction was a loan because of default provisions, acceleration, personal guaranties, and security interests. 2022 WL 1997207, at *12–13. *Kossoff* found that broad contractual remedies "against the merchant, its principals, or its assets" reflect "continuing recourse more characteristic of a secured lending transaction." *Togut v. eProdigy Fin., LLC, et. al.*, 2026 WL 2168916, at *11 (Bankr. S.D.N.Y. Jul. 27, 2026); *see* Resp. ¶ 40. *Greenwich Retail* turned, as OrcaFunding stresses, on "full recourse" against the merchants and guarantors. Resp. ¶ 21; *Greenwich Retail Group LLC v. Moby Cap., LLC*, 677 B.R. 473 (Bankr. S.D.N.Y. 2026). Under each of these authorities, the absence of recourse to the seller is the hallmark of a sale, and its presence is the hallmark of a loan.

8. Measured by that standard, OrcaFunding retained recourse under the Agreements. Although Section 1 recites a sale "without recourse," on any breach, including an Addendum Default for failure "to timely make the weekly payments," Addendum § 5.1(e), OrcaFunding may increase the Specified Percentage to 100%, accelerate the entire undelivered Purchased Amount plus fees, enforce the guaranties, and "debit depository accounts wherever situated . . . for all sums due." Agreements § 15(a)–(c), (e); SIMAD Mem. at 9–10. Every Seller is jointly and severally liable, *id.* § 21, so the failure of any one enterprise merely shifts the obligation to the remaining 200-plus Sellers. OrcaFunding's argument that these remedies "reach only receipts," Resp. ¶ 20, collapses back into the point made at II above: because "receipts" means all of the Sellers' revenue in every account, recourse to "receipts" is recourse to the Sellers' entire cash. And OrcaFunding's $2.5 million shortfall, *id.* ¶ 18, reflects nothing more than the automatic stay. Every prepetition lender to the DAMIS Debtors is presently unpaid; that fact does not convert any of them into owners. By OrcaFunding's own concession, rights are fixed at execution, *id.* ¶ 61, and at execution OrcaFunding bargained for a lender's recourse.

**B. Risk of Loss Is Not Transferred to OrcaFunding, Indicating a Loan.**

9. OrcaFunding argues that the Joinder's receivables-purchase authorities are inapposite because, "[i]n each case, the asset sold was a specific obligation of an identified obligor, and the question was who bore that obligor's credit risk." Resp. ¶ 17. That is the Joinder's point, not a rebuttal of it. A true sale transfers the credit risk of identified obligors to the buyer. The Agreements identify no obligor, so there is no account-debtor risk to transfer. What remains, the risk that the Sellers' enterprise fails, is the risk every unsecured lender to an operating business bears.

10. OrcaFunding argues that the third *LG Funding* factor—"(3) whether there is any recourse should the merchant declare bankruptcy," *LG Funding, LLC v. United Senior Props. of Olathe, LLC,* 181 A.D.3d 664, 666, 122 N.Y.S.3d 309 (2020)—shows that enterprise risk is borne by a purchaser of receivables. It asserts that "[t]he merchant's bankruptcy is enterprise risk. If enterprise risk were categorically a lender's risk, the third factor would be meaningless and every merchant cash advance would be a loan without regard to reconciliation, term, or recourse." Resp. ¶ 16. However, enterprise risk *is* categorically a lender's risk, which is the exact reason for the third *LG Funding* factor. If a transaction is a true sale, then enterprise insolvency or bankruptcy is a non-risk because the proceeds of the purchased accounts are not property of the bankruptcy estate; the true risk is the possibility that the account debtor does not pay what it owes.

11. Indeed, the *Apollo Funding* court, with respect to the third *LG Funding* factor, found that because " no contractual provision existed establishing that a declaration of bankruptcy would constitute an event of default," the agreement was a true sale. *Apollo Funding Co. v. Dave Reilly Constr., LLC*, 241 A.D.3d 1508, 1509 (2025); *see also Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752, 754 (2022) ("Here, the plaintiff established that the transaction set forth in the agreement was not a loan . . . no contractual provision existed establishing that a declaration of bankruptcy would constitute an event of default."). Conversely, in *LG Funding*, the court found that provisions in the agreement under which a bankruptcy filing *would* trigger an event of default, entitling buyer to full repayment and enforcement of the personal guaranty, weighed in favor of the court's ultimate finding that the agreement was a loan. *LG Funding, LLC,* 181 A.D.3d at 666. In other words, under the third *LG Funding* factor, where, as here, the "risk" to the putative buyer is insolvency of the merchant and *not* payment by the account debtor, such risk is indicative of a disguised loan.

12. Furthermore, the cases cited by OrcaFunding indicate that the risk of non-payment by account debtors must shift to the putative buyer to qualify as a true sale. *See LG Funding, LLC,* 181 A.D.3d at 666 (The agreement also contains provisions suggesting that United's obligation to repay was absolute *and not contingent on its actual accounts receivable* . . . These provisions suggest that the plaintiff *did not assume the risk that United would have less-than-expected or no revenues*.") (emphasis added); *In re Glob. Energy Servs., LLC*, 681 B.R. 601, 608 (Bankr. D. Md. 2025) ("The root of the analysis involves the question of whether the transaction involves a transfer of risk.") (quoting *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC,* 632 F. Supp. 3d 402, 452 (S.D.N.Y. 2022)); *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120 (LJL), 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022) ("A reconciliation provision is relevant because it can shift the risk of nonpayment *away from the merchant* by allowing the merchant to seek an adjustment of the amounts being taken out of its account based on its cash flow (or lack thereof).") (emphasis added).

13. Accordingly, under New York law, the "transfer of risk," includes a transfer of the risk from the merchant to the putative buyer that account debtors do not pay what they owe on the accounts receivable, and not purely a risk that the enterprise becomes insolvent.

## V. THE COLLECTION STRUCTURE IS A LOAN REPAYMENT MECHANISM

14. In a true sale of receivables, the buyer owns the asset, and if the seller continues to collect, it does so as the buyer's agent, holding collections for the buyer's account. Authority runs from owner to collector. The Agreements invert that structure. It is the Seller that "authorizes Buyer to debit an Authorized Account on each Remittance Day" in the amount of the Periodic Amount, Agreements § 3, and the Seller that grants OrcaFunding a "limited Power of Attorney" solely "to facilitate this Authorization Agreement." ACH Authorization; Joinder ¶ 25. Nothing in the Agreements appoints any Seller as OrcaFunding's collection agent, requires collections to be

held in trust or segregated for OrcaFunding, or restricts the Sellers' use of the funds in their own accounts. As *Fleetwood* explained, where the merchant "can use the proceeds . . . however it likes" and the receipts need not be "held in trust" for the funder, the funder "has none of the rights of ownership." 2022 WL 1997207, at *11; SIMAD Mem. at 27–28.

15. OrcaFunding's response confirms the point. It says the weekly ACH debit is "how the purchased receipts are delivered" and that the Authorized Accounts are "the channel through which the purchased asset arrives." Resp. ¶ 24. But a fixed weekly withdrawal from the Seller's own deposit account, made under the Seller's authorization, is a repayment installment, not the remittance of collections by an agent to its principal. And OrcaFunding's reliance on the UCC's treatment of buyers of accounts as "secured parties," Resp. ¶ 26, does not answer the question; as OrcaFunding acknowledges, the UCC leaves characterization "to the courts." *Id.* (quoting N.Y. U.C.C. § 9-109 cmt. 4). Section 14(a)'s unexercised right to notify unidentified account debtors, *id.* ¶¶ 25–28, cannot supply the owner-to-agent structure that the operative collection terms lack. The collection mechanism the parties actually created and used—weekly, fixed-amount ACH debits authorized by the Sellers—is that of a lender collecting from its borrowers. This factor independently supports a finding of a loan.

## CONCLUSION

16. For the reasons stated herein, in the Joinder, and in the SIMAD Memorandum, the DAMIS Debtors respectfully request that the Court determine that the OrcaFunding Agreements are disguised loans and not true sales, including as to each DAMIS Debtor that is a purported Seller thereunder (subject to the DAMIS Debtors' reservation of rights), and grant such other and further relief as is just and proper.

Dated: Florham Park, New Jersey
November 9, 2026

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Michael P. Pompeo*
Michael P. Pompeo
600 Campus Drive
Florham Park, NJ 07932
(973) 549-7000 (Telephone)
(973) 360-9831 (Facsimile)
michael.pompeo@faegredrinker.com

-and-

Ian J. Bambrick (*pro hac vice*)
Patrick A. Jackson (*pro hac vice*)
Sarah E. Silveira (*pro hac vice*)
222 Delaware Ave. Suite 1410
Wilmington, Delaware 19801
(302) 467-4200 (Telephone)
(302) 467-4201 (Facsimile)
ian.bambrick@faegredrinker.com
patrick.jackson@faegredrinker.com
sarah.silveira@faegredrinker.com

-and-

**HERBERT SMITH FREEHILLS KRAMER (US) LLP**
Adam C. Rogoff (*pro hac vice*)
Megan M. Wasson (*pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Facsimile)
adam.rogoff@hsfkramer.com
megan.wasson@hsfkramer.com

*Counsel and Co-Counsel to the*
*DAMIS Debtors and Debtors in Possession*