**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re<br><br>SIMAD HOLDINGS LTD., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

**SUMMARY SHEET FOR FIRST INTERIM APPLICATION OF SSG ADVISORS, LLC, INVESTMENT BANKER TO THE DEBTORS, FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES**

| | |
|---|---|
| **Name of Applicant** | SSG Advisors, LLC |
| **Authorized to Provide Professional Services as:** | Investment Banker to the Debtors |
| **Petition Date:** | June 4, 2026 |
| **Date of Retention:** | July 22, 2026, effective as of June 15, 2026 [Docket No. 559] |
| **Period for Which Compensation and Reimbursement is Sought:** | June 15 through November 16, 2026 (services); Initial Fee and Monthly Fees earned through November 16, 2026; Transaction Fee on the twenty-six (26) Closed Sale Transactions only |
| **Total Amount of Fees Sought as Actual, Reasonable and Necessary:** | $5,742,424.50 |
| **Total Amount of Expenses Sought as Actual, Reasonable and Necessary:** | $12,263.09 |
| **Total Fees and Expenses Requested:** | $5,754,687.59 |
| **Total Amounts Previously Paid:** | $190,763.09 |
| **Total Amounts Unpaid:** | $5,563,924.50 |

**This is a(n): ______ monthly __X___ interim ______ final application**

[1] A complete list of the SIMAD Debtors in these Chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.

**This is SSG's first interim fee application. It seeks allowance of the Transaction Fee solely with respect to the twenty-six (26) camp Sale Transactions that have closed. The four (4) remaining camp Sale Transactions, Greenville Land / Malka, Kiwi Country Day Camp, Windsor Mountain Summer Camp, and Willow Lake Day Camp, have not closed, and no Transaction Fee is requested herein on account of those transactions.**

| Period | Fees | Reimbursable Expenses | Total | Status |
|---|---|---|---|---|
| Initial Fee (July 2026) | $60,000.00 | $0.00 | $60,000.00 | Paid |
| Monthly Fee (August 2026) | $40,000.00 | $0.00 | $40,000.00 | Paid |
| Monthly Fee (September 2026) | $40,000.00 | $0.00 | $40,000.00 | Paid |
| Monthly Fee (October 2026) | $40,000.00 | $10,763.09 | $50,763.09 | Paid |
| Monthly Fee (November 2026) | $40,000.00 | $1,500.00 | $41,500.00 | Unpaid |
| Transaction Fee (0.75% of $300M) | $2,250,000.00 | $0.00 | $2,250,000.00 | Unpaid |
| Transaction Fee (2.50% of Closed Total Consideration > $300M) | $3,362,424.50 | $0.00 | $3,362,424.50 | Unpaid |
| Less: Fee Credit (50% Initial & Monthlies Paid) | ($90,000.00) | $0.00 | ($90,000.00) | Applied |
| **TOTAL** | **$5,742,424.50** | **$12,263.09** | **$5,754,687.59** | |

**The table below lists the twenty-six (26) camp Sale Transactions that have closed as of the date of this Application and the Total Consideration for each (the "Closed Camp Table").**

**CLOSED CAMP TABLE**

| CLOSING STATUS | CAMP NAME | TOTAL CONSIDERATION |
|---|---|---|
| **CLOSED** | Banner Day Camp | $26,880,000 |
| **CLOSED** | Blue Star Camps | $15,289,770 |
| **CLOSED** | Camp Achim | $7,000,000 |
| **CLOSED** | Camp Chateaugay | $4,624,935 |
| **CLOSED** | Camp Chen-A-Wanda | $17,000,000 |
| **CLOSED** | Camp Echo | $17,000,000 |
| **CLOSED** | Camp Green Lane | $8,000,018 |
| **CLOSED** | Camp Lavi | $8,750,000 |
| **CLOSED** | Camp Lokanda (RDM) | $19,327,800 |
| **CLOSED** | Camp Med-O-Lark | $2,300,000 |
| **CLOSED** | Camp Mesorah | $8,708,363 |
| **CLOSED** | Camp Mogen Avraham | $22,400,000 |
| **CLOSED** | Camp North Star | $6,250,000 |
| **CLOSED** | Camp Waukeela | $1,200,000 |
| **CLOSED** | Camp Wekeela | $9,900,000 |
| **CLOSED** | Club Getaway | $13,250,000 |
| **CLOSED** | Country Roads Day Camp | $14,500,000 |
| **CLOSED** | Eagle's Landing Day Camp | $5,200,000 |
| **CLOSED** | Indian Acres Forest Acres | $6,000,000 |
| **CLOSED** | Island Lake Camp | $13,285,270 |
| **CLOSED** | Meadowbrook Country Day Camp | $12,250,000 |
| **CLOSED** | Mohawk Day Camp | $120,750,000 |
| **CLOSED** | New England Golf & Tennis Camp | $2,000,000 |
| **CLOSED** | Pine Forest Camp | $39,330,824 |
| **CLOSED** | Rolling Hills Country Day Camp | $28,500,000 |
| **CLOSED** | Summit Camp and Travel | $4,800,000 |
| **TOTAL** | **26 Closed Camp Transactions** | **$434,496,980** |

**Note: Transaction Fees have been and will continue to be deposited into escrow or the segregated account at each applicable closing. The Transaction Fee requested in this Application is calculated solely on the Total Consideration of the twenty-six (26) Closed Sale Transactions shown above.**

**The table below lists the four (4) camp Sale Transactions that have not closed as of the date of this Application and the estimated Total Consideration for each (the "Pending Camp Table").**

**PENDING CAMP TABLE**

| CLOSING STATUS | CAMP NAME | TOTAL CONSIDERATION |
|---|---|---|
| **PENDING** | Greenville Land / Malka | $8,150,000 |
| **PENDING** | Kiwi Country Day Camp | $9,200,000 |
| **PENDING** | Willow Lake Day Camp | $12,000,000 |
| **PENDING** | Windsor Mountain Summer Camp | $8,500,000 |
| **TOTAL** | **4 Pending Camp Transactions** | **$37,850,000** |

**Note: The Pending Sale Transactions have not closed as of the date of this Application. Consideration shown is an estimate and remains subject to definitive documentation, Court approval where required, and closing. No Transaction Fee is requested in this Application on account of the Pending Sale Transactions; SSG will seek allowance of such amounts in a final application after those transactions close.**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re | Chapter 11 |
| SIMAD HOLDINGS LTD., *et al.*[1] | Case No. 26-16388 (CMG) |
| Debtors. | (Jointly Administered) |

**FIRST INTERIM APPLICATION OF SSG ADVISORS, LLC, INVESTMENT BANKER TO THE DEBTORS,**
**<u>FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES</u>**

SSG Advisors, LLC ("SSG"), investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors"), submits this first interim application (the "Application") for interim allowance of compensation for professional services rendered from June 15, 2026 through November 16, 2026, including the Monthly Fees earned through November 16, 2026 (collectively, the "Application Period"), and reimbursement of actual and necessary expenses incurred. The Application seeks allowance of the Transaction Fee solely with respect to the twenty-six (26) camp sale transactions that have closed as of the date hereof, calculated on the actual Total Consideration for those transactions. The four (4) remaining camp sale transactions have not closed; they are not included in this Application and will be addressed in a final application. The Application is submitted pursuant to sections 328, 330, and 331 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Local Rules 2014-1 and 2016-1 of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"), the United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses filed

[1] A complete list of the SIMAD Debtors in these Chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD.

under 11 U.S.C. § 330, the *Administrative Fee Order Establishing Procedures for the Allowance and Payment of Interim Compensation and Reimbursement of Expenses of Professionals Retained by Order of This Court* [Docket No. 550] (the "Administrative Fee Order"), and the Retention Order [Docket No. 559]. In support of this Application, SSG represents as follows:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction to consider the Application pursuant to the provisions of 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b), and SSG confirms its consent pursuant to D.N.J. LBR 9013-1(f) to the entry of a final order by the Court in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are sections 327(a), 328, 330 and 331 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1.

## BACKGROUND

4. On June 4, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (collectively, the "Chapter 11 Cases"). The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

5. The Chapter 11 Cases are jointly administered under Case No. 26-16388 (CMG). Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of Asaf Ravid, Chief Restructuring Officer of the SIMAD Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 62] (the "First Day Declaration").

**RETENTION OF SSG ADVISORS, LLC**

6. To aid in obtaining competitive offers from potential buyers of the Debtors' assets, the Debtors elected to retain SSG to provide investment banking services based on SSG's substantial expertise in advising troubled companies, including in connection with asset sales and related issues.

7. Accordingly, on June 27, 2026, the Debtors filed the *SIMAD Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of SSG Advisors, LLC as Investment Banker to the SIMAD Debtors and Debtors in Possession* [Docket No. 310] (the "Retention Application") seeking to retain SSG as investment banker to the Debtors pursuant to the terms of the Engagement Letter dated June 15, 2026 (the "Engagement Agreement").

8. On July 22, 2026, the Court entered the *Order Approving (I) the Retention and Employment of SSG Advisors, LLC as Investment Banker to the SIMAD Debtors and Debtors in Possession* [Docket No. 559] (the "Retention Order"), which sets forth the procedure for final compensation and reimbursement of expenses to SSG in these Chapter 11 Cases pursuant to the terms of the Engagement Agreement. A copy of the Retention Order, with the Engagement Agreement annexed thereto, is attached hereto as **Exhibit A**.

## THE SALE PROCESS

### A. Highly Complex Sale Process

9. The SIMAD engagement differed materially from a traditional single-asset or single-buyer sale process. SSG was required to market and sell thirty (30) camps, each with its own real estate, operations, directors, culture, permitted uses, and universe of potential buyers. In effect, thirty (30) separate marketing processes were running in parallel. *See Declaration of J. Scott Victor in Support of Entry of Sale Orders* [Docket No. 825] (the "Victor Sale Declaration"). Different buyer groups pursued different camps and different combinations of camps, producing overlapping diligence requests, competing indications of interest, concurrent asset purchase agreement negotiations, bidder-specific issues, and, ultimately, staggered closings. In substance, SSG managed dozens of interconnected sale transactions simultaneously, each subject to bankruptcy-driven deadlines and evolving stakeholder requirements.

10. The process was conducted on a highly compressed timeline. SSG was engaged on June 15, 2026, eleven days after the Petition Date. The *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 298] (the "Bidding Procedures Order") was entered on June 26, 2026; the Bid Deadline passed on July 17, 2026; the primary portion of the Auction ran from July 28 through August 2, 2026 (the "Auction"), and the Successful Bidders were identified on August 4, 2026. Marketing and diligence took place at the height of the camp season, while the camps were full of children and staff, which limited site access, and without a single centralized source of financial information across all camps. At the same time, camp directors and families needed

clarity on ownership before deposits for the 2027 season were collected, so delay itself threatened value.

11. The Debtors' capital structure added a further layer of complexity. Because the camps were pledged to different creditor groups with distinct collateral packages, bids could not be evaluated on headline price alone. For every individual and portfolio bid, SSG and the Debtors were required to measure the effect on each collateral pool and to determine whether an alternative combination of transactions would produce greater overall recoveries. Those economic judgments had to be balanced against certainty of closing, continuity of camp operations, and the views of camp directors, parents, and community members, many of whom wrote to the Court regarding the future of particular camps. Throughout, SSG coordinated continuously with the Debtors' Chief Restructuring Officer, Cole Schotz P.C., FTI Consulting, Inc., the Official Committee of Unsecured Creditors, counsel to the secured lenders, and each prospective purchaser, often responding to material developments within hours to preserve transaction momentum.

**B. Marketing, Bidding, and the Auction**

12. As set forth in the Retention Application, the Debtors engaged SSG on June 15, 2026, to serve as their investment banker in connection with a sale of all or a portion of their assets. SSG worked with the Debtors, their counsel, and financial advisors to quickly evaluate potential buyers. In this regard, SSG worked with management to populate a Data Room and address individual buyer diligence requests.

13. SSG commenced a comprehensive post-petition marketing process and contacted 279 parties to solicit interest in a sale transaction involving the Debtors' assets. Relevant information regarding the Debtors' business was made available in a Data Room, allowing

potential bidders to conduct further diligence on the Debtors' business, subject to the execution of an appropriate confidentiality agreement.

14. On June 24, 2026, the Debtors filed the *SIMAD Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 227] and on June 26, 2026, the Court entered the Bidding Procedures Order.

15. Prior to the Auction, the Debtors determined that selling four (4) camp properties by private sale would be efficient and value-maximizing. The four (4) camp properties that were subject to private sale notices were: (1) Camp Achim, (2) Camp Chen-A-Wanda, (3) Camp Mesorah, and (4) Pine Forest Camp, each of which has since closed. These transactions resulted from targeted marketing efforts, negotiations with interested purchasers, and the Debtors' ongoing evaluation of opportunities to maximize value. The private sales also eliminated the need to subject those assets to further Auction proceedings.

16. Before the Auction, the Debtors, in consultation with the Consultation Parties, adjourned the sale processes for Camp Chateaugay, Kiwi Country Day Camp, and the Debtors' interests in Willow Lake Day Camp to permit further marketing and diligence. Camp Chateaugay has since been sold, and that sale has closed. The sales of Kiwi Country Day Camp and the Debtors' interests in Willow Lake Day Camp have not closed as of the date hereof.

17. The Debtors, in consultation with the Consultation Parties, ultimately determined that the designation of stalking horse bidders for certain camps would benefit the estates by

creating transaction certainty, establishing clear minimum value thresholds for the applicable assets, and fostering a more competitive Auction process.

18. The Debtors designated Grandview Ventures Group, LLC as the Stalking Horse Bidder for Mohawk Day Camp. Pursuant to its Stalking Horse Agreement, Grandview Ventures Group, LLC agreed to purchase Mohawk Day Camp for $68,000,000 in cash, plus cure costs and the assumption of certain liabilities.

19. The Debtors designated 18 Lions LLC as the Stalking Horse Bidder for Camp Lokanda. Pursuant to its Stalking Horse Agreement, 18 Lions LLC agreed to purchase Camp Lokanda for $18,150,000, plus cure costs and the assumption of certain liabilities.

20. The Debtors designated Ohel Children's Home and Family Services, Inc. as the Stalking Horse Bidder for Camp Echo. Pursuant to its Stalking Horse Agreement, Ohel Children's Home and Family Services, Inc. agreed to purchase Camp Echo for $12,000,000, plus cure costs and the assumption of certain liabilities.

21. The Debtors designated CMAO LLC as the Stalking Horse Bidder for Island Lake Camp. Pursuant to its Stalking Horse Agreement, CMAO LLC agreed to purchase Island Lake Camp for $10,000,000, plus cure costs and the assumption of certain liabilities.

22. Of the 279 parties contacted, 147 parties executed confidentiality agreements and received Data Room access. SSG continued to follow up proactively with interested parties to provide updates on the sale process and to facilitate diligence.

23. Prior to the expiration of the Bid Deadline, in addition to the four (4) Stalking Horse Bids, the Debtors received over 50 bids from potential purchasers. The structures of the Bids varied, as they included individual bids, group bids, and full portfolio bids from financial participants, camp directors, strategic buyers, and other potential purchasers.

24. In accordance with the Bidding Procedures Order, the Auction began on July 28, 2026, virtually via Zoom. Considering the number of camp assets being marketed and the possibility that different Potential Purchasers might ascribe different values to individual camps versus a larger portfolio of camps, the Debtors designed the sale process to evaluate value through multiple structures.

25. The first stage of the Auction commenced on July 28, 2026, with camp-by-camp bidding. At the conclusion of each individual camp Auction, the Debtors designated the highest bidder as the "Provisional High Bidder" and the second highest bidder as the "Provisional Back-Up Bidder" for each Camp. The provisional designations established a baseline valuation for each camp and served as the foundation for the subsequent portfolio and final-stage bidding processes, which were designed to determine whether additional value could be achieved through alternative transaction structures. Importantly, the designation of a Provisional High Bidder did not conclude the sale process but rather identified the leading bid against which portfolio proposals and final-stage bids would be evaluated in order to maximize value for the estates.

26. Following completion of the individual camp auctions on July 30, 2026, and the designation of the Provisional High Bidders, the Debtors conducted a portfolio bid phase to determine whether greater value could be achieved through the sale of multiple camps in a single transaction. This stage was designed to test the market for portfolio premiums and to ensure that the Debtors fully evaluated all potential transaction structures before selecting the combination of sales that would maximize overall recoveries.

27. Following completion of the portfolio bid phase of the auction, the Debtors distributed the bid allocations contained in the best and highest Portfolio Bid to the parties holding

the Provisional High Bid and Provisional Backup Bid positions for the affected camps, who were then afforded an opportunity to determine whether they wished to improve their offers.

28. After additional negotiations and discussions with parties, the Debtors and the Consultation Parties were able to identify the highest and best bids for each of the Debtors' assets. On August 4, 2026, the Successful Bidders were identified on the *Notice of Successful Bidders With Respect to Certain of the SIMAD Debtors' Assets* [Docket No. 789]. In aggregate, the competitive Auction process generated substantial value for the estate. See *Declaration of J. Scott Victor in Support of Entry of Sale Orders Approving the Sale Transaction(s) for Certain of the SIMAD Debtors' Camp Assets* [Docket No. 825], incorporated herein by reference.

**C. Post-Auction Execution and Staggered Closings**

29. The Auction did not end the sale process, as each Successful Bid required its own asset purchase agreement, sale order, and closing processes. Following the Auction, SSG worked with the Debtors, their professionals, the lenders, and each purchaser to negotiate and document the asset purchase agreements, support the Debtors at the sale hearings, and coordinate the twenty-six (26) closings completed to date. The four (4) remaining Sale Transactions, for Greenville Land / Malka, Kiwi Country Day Camp, Windsor Mountain Summer Camp, and the Debtors' interests in Willow Lake Day Camp, have not closed as of the date hereof.

30. Each Sale Transaction closes on its own timeline, and because the Transaction Fee is a single, tiered fee calculated on aggregate Total Consideration, SSG submits this Application on an interim basis, solely with respect to the twenty-six (26) Sale Transactions that have closed. SSG does not seek in this Application any Transaction Fee on account of the Sale Transactions that have not closed, and will seek allowance of such amounts in a final application after those transactions close.

## STATUS OF THE SALE TRANSACTIONS

31. The thirty (30) sale transactions represent an estimated aggregate Total Consideration of $472,346,980.00, of which $434,496,980.00 is attributable to the twenty-six (26) Sale Transactions that have closed. Total Consideration includes the gross purchase price and any indebtedness assumed or paid off as provided in the Engagement Agreement.

32. As of the date hereof, twenty-six (26) Sale Transactions, representing Total Consideration of $434,496,980.00, have closed (the "Closed Sale Transactions"). The remaining four (4) Sale Transactions, Greenville Land / Malka, Kiwi Country Day Camp, Windsor Mountain Summer Camp, and the Debtors' interests in Willow Lake Day Camp, representing estimated Total Consideration of $37,850,000.00, have not closed (the "Pending Sale Transactions"). The Closed Camp Table lists each Closed Sale Transaction and its Total Consideration, and the Pending Camp Table lists each Pending Sale Transaction and its estimated Total Consideration. Consideration shown for a Pending Sale Transaction is an estimate based on the Debtors' current sale tracker and remains subject to definitive documentation, Court approval where required, closing, and any changes to assumed or paid-off indebtedness.

33. Specifically, the investment banking services rendered by SSG during the Application Period included, but were not limited to, the following:

a. Advised on and assisted the Debtors in the preparation of an information memorandum describing the Company, its subsidiaries and their operations, management, and cash flows and other relevant financial information as requested by prospective purchasers for use in discussions with prospective purchasers and assisted in the due diligence process for a potential Sale Transaction;
b. Created and managed an electronic data room with diligence materials about the Debtors;
c. Assisted the Debtors in developing a list of suitable potential buyers who were contacted on a discreet and confidential basis after approval by the Debtors;
d. Coordinated the execution of confidentiality agreements approved by the Debtors for potential buyers wishing to review the information memorandum and get access to the electronic data room;

e. Assisted the Debtors in coordinating camp director calls and/or physical site visits for interested buyers;
f. Solicited competitive offers from potential buyers;
g. Advised and assisted the Debtors in evaluating any proposals from potential buyers, structured the Sale Transactions, and negotiated the Sale Transaction agreements with potential buyers;
h. Assisted the Debtors and their professionals with the structuring of sale procedures and conducted the multi-day auction that resulted in incredible value for the Chapter 11 proceeding;
i. Participated in meetings and court appearances in the Chapter 11 estates, including, without limitation, providing testimony in the Bankruptcy Court in furtherance and support of the sale process and Sale Transactions; and
j. Assisted the Debtors and their other professionals through the closing of each sale, which has taken a tremendous amount of time and effort.

34. Pursuant to the SSG Retention Order, SSG summarized the tasks that it performed during these Chapter 11 Cases. The summary is not intended to be a detailed description of the work performed but merely a guideline offered to the Court and other interested parties with respect to the services performed by SSG during these Chapter 11 Cases. Day-to-day services and the time expended in performing such services during the Application Period are set forth in the timesheets, attached hereto and made a part hereof as **Exhibit B**.

35. The SSG professionals principally responsible for this engagement were:

- J. Scott Victor – Managing Director
- Teresa C. Kohl – Managing Director
- Craig D. Warznak – Director
- Alexander D. Lamm – Vice President
- Dylan E. Rush – Associate

## RELIEF REQUESTED

36. By this Application, SSG seeks (a) interim allowance of $5,742,424.50 in compensation for the Application Period, consisting of $220,000.00 in Initial and Monthly Fees (including the November 2026 Monthly Fee) and a Transaction Fee on the Closed Sale Transactions of $5,522,424.50, calculated under the Engagement Agreement on aggregate Total

Consideration of $434,496,980.00 for the Closed Sale Transactions, net of the fee credit described below; and (b) interim allowance and reimbursement of $12,263.09 in actual and necessary expenses incurred during the Application Period. After deducting the $190,763.09 previously paid (consisting of $180,000.00 in Initial and Monthly Fees and $10,763.09 in expenses), the balance requested is $5,563,924.50. No portion of the Transaction Fee attributable to the Pending Sale Transactions is requested herein. The November 2026 Monthly Fee and the $1,500.00 in expenses incurred in November 2026 are included as earned or incurred but have not been paid as of the date hereof.

37. Pursuant to the SSG Retention Order, the Court approved the following fee and expense structure set forth in the Engagement Agreement (the "Fee and Expense Structure"):

a. Initial Fee. An initial fee (the "Initial Fee") equal to $60,000 payable upon Bankruptcy Court approval of the Engagement Agreement.

b. Monthly Fees. Monthly fees (the "Monthly Fees") of $40,000 per month payable upon Bankruptcy Court approval of the Engagement Agreement, commencing on August 1, 2026 and on the first (1st) of each month thereafter throughout the Engagement Term (as such term is defined in the Engagement Letter). Each Monthly Fee is earned on the first (1st) day of each month, without proration. Fifty (50%) percent of the Initial Fee and Monthly Fees paid shall be credited to the Transaction Fee (as defined below).

c. Transaction Fee. Upon the consummation of a Sale Transaction to any party as a going-concern or the sale of a part or substantially all assets to one or more buyers, SSG shall be entitled to a fee (the "Transaction Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Sale Transaction and as a direct carveout from proceeds and cash, prior in right to any secured debt, equal to the following:

   i. In the event of Total Consideration, as that term is hereafter defined, up to $300,000,000, SSG's Transaction Fee shall be calculated at seventy-five (75) basis points or 0.75% of Total Consideration with a minimum fee of $1,500,000.

   ii. In the event that Total Consideration exceeds $300,000,000, SSG's Transaction Fee shall be calculated at seventy-five (75) basis points or 0.75% of Total Consideration up to $300,000,000, plus

250 basis points or two and one-half (2.50%) percent of Total Consideration in excess of $300,000,000.

iii. Notwithstanding the foregoing, in the event of a successful credit bid by the existing senior secured bondholders, without a qualified third party overbid, SSG's Transaction Fee shall be $1,000,000.

d. Expenses. In addition to the foregoing Initial Fee, Monthly Fees, and Transaction Fee noted above, whether or not a Sale Transaction is consummated, SSG will be entitled to reimbursement for SSG's reasonable and documented out-of-pocket expenses incurred in connection with the subject matter of the Engagement Agreement provided, however, that any expense above $5,000 shall be approved with the Company and that the Company shall have no obligation to reimburse SSG for that portion of any expense that is in excess of $50,000.

e. Actual Cost. Pursuant to paragraph 20 of the Retention Order, SSG shall seek reimbursement of its engagement-related expenses at the firm's actual cost.

f. Total Consideration. The Engagement Agreement defines "Total Consideration" as "the gross purchase price paid at the closing of the Sale for the equity, assets, or any portion of either, plus the assumption or payoff of indebtedness (secured and unsecured) of the Company."

g. Escrow of Transaction Fee. Pursuant to paragraph 7 of the Retention Order, SSG may file an application in respect of any Transaction Fee immediately upon the consummation of the applicable transaction, and the full amount of any Transaction Fee is escrowed upon consummation of the applicable transaction until such amounts are permitted to be paid to SSG pursuant to the Retention Order, any interim compensation order, or a further order of the Court.

38. Based on aggregate Total Consideration of $434,496,980.00 for the Closed Sale Transactions, the Transaction Fee calculated under the Engagement Agreement and requested herein on the Closed Sale Transactions is $5,522,424.50 (net of the fee credit), calculated as follows:

| | | |
|---|---|---|
| (i) | $300,000,000 × 0.75% | $2,250,000.00 |
| (ii) | $134,496,980.00 (excess over $300,000,000) × 2.50% | $3,362,424.50 |
| **Subtotal** | | $5,612,424.50 |
| (iii) | Less: 50% credit of Initial and Monthly Fees paid | ($90,000.00) |
| **Total Transaction Fee** | | **$5,522,424.50** |

39. SSG requests that the Court approve, on an interim basis, the Transaction Fee calculation on the Closed Sale Transactions and authorize payment as detailed herein.

40. All compensation allowed pursuant to this Application is allowed on an interim basis and remains subject to final allowance by the Court upon SSG's final fee application, including a final reconciliation of the Transaction Fee to actual aggregate Total Consideration across all Sale Transactions. Nothing herein limits any party's rights under the Retention Order, the applicable sale orders, or the Bankruptcy Code.

41. As of the date hereof, SSG has been paid an Initial Fee of $60,000.00 and Monthly Fees of $40,000.00 for each of August, September, and October 2026, totaling $180,000.00. SSG has also been reimbursed $10,763.09 in expenses, which were paid together with the October 2026 Monthly Fee. The November 2026 Monthly Fee of $40,000.00 was earned and is included in the compensation requested, but has not been paid as of the date hereof. In addition, SSG incurred $1,500.00 in expenses in November 2026, which are included in the expenses requested herein but have not been paid as of the date hereof.

42. SSG also seeks interim allowance of the $12,263.09 in actual and necessary out-of-pocket expenses incurred from June 15 through November 30, 2026, as itemized on **Exhibit C**.

43. SSG was retained under sections 327(a) and 328(a) of the Bankruptcy Code, and the Retention Order approved the Initial Fee, the Monthly Fees, and the Transaction Fee pursuant to section 328(a). Accordingly, the compensation requested herein is subject to review only under the standards of section 328(a), except that the U.S. Trustee retains the right to object based on the reasonableness standard of section 330. SSG seeks interim allowance of such compensation pursuant to section 331 of the Bankruptcy Code and paragraph 7 of the Retention Order.

44. SSG's retention continues until terminated by order of the Court. This Application does not include any Monthly Fees earned after November 30, 2026, expenses incurred after November 16, 2026, or any Transaction Fee attributable to the Pending Sale Transactions. SSG reserves the right to seek allowance of such additional amounts and will file a final fee application seeking final allowance of all compensation and reimbursement of expenses in these Chapter 11 Cases, including the amounts allowed on an interim basis pursuant to this Application.

## COMPLIANCE WITH GUIDELINES

45. SSG believes that this Application substantially complies with the Local Rules and the U.S. Trustee guidelines for fee applications. To the extent there has not been material compliance with any particular guidelines or rules, SSG respectfully requests a waiver of such guidelines or rules.

46. This is SSG's first interim application in these Chapter 11 Cases and covers the Initial Fee, Monthly Fees earned through November 30, 2026, expenses incurred through November 16, 2026, and the Transaction Fee on the twenty-six (26) Closed Sale Transactions. SSG has made no prior application to this or any other Court for allowance of the compensation

and reimbursement requested herein. Any additional Monthly Fees earned after November 30, 2026, expenses incurred after November 16, 2026, and the Transaction Fee attributable to the Pending Sale Transactions are not included and are reserved as stated above.

**NOTICE**

47. Notice of this Application has been provided in accordance with the Administrative Fee Order [Docket No. 550] and to all parties that have requested notice pursuant to Bankruptcy Rule 2002. SSG submits that no other or further notice is required.

**CONCLUSION**

48. SSG submits that the services provided to the Debtors during the Application Period were necessary and appropriate given the complexity of these Chapter 11 Cases, the issues involved, the nature and extent of services provided, and the cost of comparable services outside of bankruptcy. Accordingly, SSG submits that approval of the compensation sought for the Application Period is appropriate and should be approved.

49. WHEREFORE, SSG respectfully requests that the Court enter an order, (i) allowing, on an interim basis, compensation of $5,742,424.50, consisting of Initial and Monthly Fees of $220,000.00 and a Transaction Fee on the Closed Sale Transactions of $5,522,424.50, as fully described in paragraph 40; (ii) allowing, on an interim basis, reimbursement of $12,263.09 in actual and necessary expenses; (iii) authorizing payment of the Transaction Fee on the Closed Sale Transactions as requested herein; and (iv) granting such other and further relief as the Court deems just and proper.

Dated: November 16, 2026

**SSG ADVISORS, LLC**

/s/ ______________________
J. Scott Victor
Managing Director
Five Tower Bridge, Suite 420
300 Barr Harbor Drive
West Conshohocken, PA 19428
Tel: (610) 940-5802
Fax: (610) 940-3875
Email: jsvictor@ssgca.com

*Investment Banker to the SIMAD Debtors and Debtors in Possession*

**EXHIBIT A**
**Retention Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

*Counsel to the SIMAD Debtors and Debtors in Possession*

**Order Filed on July 22, 2026**
**by Clerk**
**U.S. Bankruptcy Court**
**District of New Jersey**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

**ORDER APPROVING (I) THE RETENTION AND EMPLOYMENT OF SSG ADVISORS, LLC AS INVESTMENT BANKER TO THE SIMAD DEBTORS AND DEBTORS IN POSSESSION; (II) WAIVING CERTAIN TIMEKEEPING REQUIREMENTS; AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through eleven (11), is **ORDERED**

**DATED: July 22, 2026**

Honorable Christine M. Gravelle, Chief Judge
United States Bankruptcy Judge

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al.* |
| Case No. | 26-16388 (CMG) |
| Caption of Order | Order (I) Authorizing the Retention and Employment of SSG Advisors, LLC as Investment Banker to the SIMAD Debtors and Debtors in Possession; (II) Waiving Certain Timekeeping Requirements; and (III) Granting Related Relief |

Upon the SIMAD Debtors' application (the "Application")[1] for entry of an order (this "Order"): (a) authorizing, but not directing, the SIMAD Debtors to retain and employ SSG Advisors, LLC ("SSG Advisors"), as their investment banker, effective as of June 15, 2026, in accordance with the Engagement Letter, dated as of June 15, 2026, a copy of which is attached hereto as **Schedule 1**; (b) waiving certain timekeeping requirements pursuant to Local Rule 2016-1, the U.S. Trustee Guidelines, and any other applicable procedures and orders of this Court in connection with SSG's engagement; and (c) granting related relief, all as more fully set forth in the Application; and upon the Victor Declaration; and this Court having jurisdiction to consider this Application and the relief requested therein and pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that (a) the terms and conditions of SSG's employment set forth in the Engagement Letter (including the Fee Structure) to the extent modified by this Order are reasonable as required by section 328(a) of the Bankruptcy Code, (b) SSG (i) does not hold or represent an interest adverse to the interest of the estates, and (ii) is a "disinterested person" as that

[1] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Application.

term is defined under section 101(14) of the Bankruptcy Code, (c) the Application and the Victor Declaration are in full compliance with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; and this Court having found that the SIMAD Debtors' notice of the Application and opportunity for a hearing on the Application were appropriate and no other notice need be provided; and this Court having reviewed the Application and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"), if any; and this Court having determined that the legal and factual bases set forth in the Application and at the Hearing, if any, establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1. The Application is **GRANTED** as set forth herein.

2. Any objections to the entry of this Order, to the extent not withdrawn or settled, are overruled.

3. Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1, the SIMAD Debtors are hereby authorized to retain SSG as investment banker to the SIMAD Debtors in these chapter 11 cases effective as June 15, 2026 on the terms and conditions set forth in the Application and in the Engagement Letter attached hereto as Exhibit 1, except as modified herein.

4. SSG shall be compensated for fees and reimbursed for its reasonable, documented out-of-pocket expenses by the SIMAD Debtors in accordance with the terms of the Engagement Letter (together with all attachments thereto), as modified herein, including the Monthly Fees and

| | |
|---|---|
| Debtors: | SIMAD HOLDINGS LTD., *et al*. |
| Case No. | 26-16388 (CMG) |
| Caption of Order | Order (I) Authorizing the Retention and Employment of SSG Advisors, LLC as Investment Banker to the SIMAD Debtors and Debtors in Possession; (II) Waiving Certain Timekeeping Requirements; and (III) Granting Related Relief |

the Transaction Fee, all of which are approved pursuant to section 328(a) of the Bankruptcy Code, except as expressly set forth herein. Furthermore, the SIMAD Debtors are authorized and directed to perform their payment, reimbursement, contribution, and indemnification obligations, as well as their non-monetary obligations, in accordance with the terms and conditions, and at the times specified, in the Engagement Letter, as modified herein. All compensation and reimbursement of expenses payable under the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code, except as expressly set forth herein.

5. Notwithstanding any provision to the contrary in this Order or in the Application, the Victor Declaration and the Engagement Letter, SSG shall file fee applications for allowance of compensation and reimbursement of its out-of-pocket expenses incurred pursuant to sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the U.S. Trustee Guidelines, and any other procedures or orders of this Court; *provided, however*, that the compensation, fees, and expenses payable to SSG pursuant to the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to any other standard of review set forth in section 330 of the Bankruptcy Code, except as set forth herein.

6. Notwithstanding any provision to the contrary in this Order or in the Application, the Victor Declaration and the Engagement Letter, the U.S. Trustee shall retain the right and be entitled to object to SSG's fees, expenses, and other compensation based on the reasonableness standard provided in section 330 of the Bankruptcy Code, not section 328(a) of the Bankruptcy Code, and the Court retains jurisdiction to consider any such objection or response by the U.S.

Trustee to SSG's interim and final fee applications under section 330 of the Bankruptcy Code. This Order and the record relating to the Court's consideration of the Application shall not prejudice or otherwise affect the rights of the U.S. Trustee to challenge the reasonableness of SSG's fees, out-of-pocket expenses, and compensation under the standard set forth in the preceding sentence. Accordingly, nothing in this Order or the record shall constitute a finding of fact or conclusion of law binding the U.S. Trustee, on appeal or otherwise, with respect to the reasonableness of SSG's fees, out-of-pocket expenses, and compensation.

7. SSG shall be entitled to seek interim allowance and payment of any Monthly Fee or Transaction Fee by filing an application or monthly fee statement in accordance with any order entered by the Court in these chapter 11 cases allowing for interim compensation; *provided* that SSG shall be entitled to file and serve such application or monthly fee statement in respect of any Transaction Fee immediately upon the consummation of such transaction; *provided further* that, any Monthly Fee shall be payable in full upon the filing of a monthly fee statement. Notwithstanding the foregoing, the full amount of any Transaction Fee will be escrowed upon the consummation of the applicable transaction until such amounts are permitted to be paid to SSG pursuant to this Order, any interim compensation order or a further order of this Court.

8. The Initial Fee shall be payable upon the entry of this Order.

9. Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, orders of this Court, or any guidelines regarding submission and approval of fee applications, in light of the services to be provided by SSG and the structure of SSG's compensation pursuant to the Engagement Letter, SSG and its professionals shall be granted a

limited waiver of the information-keeping requirements of Bankruptcy Rule 2016(a), Local Rule 2016-1, the U.S. Trustee Guidelines, and any otherwise applicable orders or procedures of the Court in connection with the services to be rendered pursuant to the Engagement Letter, and shall instead be required only to maintain records of the services that SSG renders to the SIMAD Debtors in summary format, including summary descriptions of those services by each individual, the time expended in providing those services (in one-half hour increments), and the identity of the individuals who provided those services, and will submit such records with any interim or final fee applications.

10. The indemnification, contribution, and reimbursement provisions set forth in the Application, Victor Declaration, and the Engagement Letter including the Indemnity Provisions are approved, subject, during the pendency of these Chapter 11 Cases, to the following modifications:

a. no indemnified Party shall be entitled to indemnification, contribution, or reimbursement set forth in the Engagement Letter (including the Indemnity Provisions) unless such services and the indemnification, contribution, or reimbursement therefore are approved by this Court;

b. notwithstanding any provision of the Engagement Letter (including the Indemnity Provisions) to the contrary, the SIMAD Debtors shall have no obligation to indemnify the Indemnified Parties or provide contribution or reimbursement to an Indemnified Party for any claim or expense that is: (i) judicially determined (the determination having become final and no longer subject to appeal) to have arisen from any Indemnified Party's willful misconduct, gross negligence, fraud, breach of fiduciary duty (if any), self-dealing, or bad faith; (ii) for a contractual dispute in which the SIMAD Debtors allege the breach of an Indemnified Party's obligations under the Engagement Letter unless this Court determines that indemnification, contribution, or reimbursement would be permissible pursuant to *In re United Artists Theatre Company, et al.*, 315 F.3d 217 (3d Cir. 2003); or (iii)

settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to subparagraph (c) hereof to be a claim or expense for which an Indemnified Party should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Letter, as modified by this Order; and

c. if, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these chapter 11 cases, an Indemnified Party believes that it is entitled to the payment of any amounts by the SIMAD Debtors on account of the SIMAD Debtors' indemnification, contribution, and/or reimbursement obligations under the Engagement Letter (as modified by this Order), including, without limitation, the advancement of defense costs, the Indemnified Party or SSG must file an application therefore in this Court, and the SIMAD Debtors may not pay any such amounts to such Indemnified Party before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time during which the Court shall have jurisdiction over any request for indemnification, contribution, or reimbursement by an Indemnified Party and not a provision limiting the duration of the SIMAD Debtors' obligation to indemnify, or make contributions or reimbursement to, the Indemnified Party. All parties in interest shall retain the right to object to any demand by any Indemnified Party for indemnification, contribution, and/or reimbursement; and

d. any limitations of liability provisions in the Engagement Letter (including the Indemnity Provisions) are deemed to be of no force and effect with respect to the services to be provided pursuant to this Order.

11. None of the fees payable to SSG under the Engagement Letter shall constitute a "bonus" or fee enhancement under applicable law.

12. SSG shall use its best efforts to avoid any duplication of services provided by any of the SIMAD Debtors' other retained professionals in these Chapter 11 Cases.

13. Notwithstanding anything to the contrary in the Application, the Victor Declaration, and the Engagement Letter, all fees paid to SSG by the SIMAD Debtors pursuant to

---

the Engagement Letter during these chapter 11 cases are subject to disgorgement unless and until they are approved by the Court on a final basis, after submission of SSG's final fee application

14. In the event that, during the pendency of these cases, SSG seeks reimbursement for any attorneys' fees and/or expenses, the invoices and supporting time records from such attorneys (which may be redacted for privilege) shall be billed in one-tenth hour increments and shall be included in SSG's fee applications, both interim and final, and such invoices and time records shall be in compliance with the Local Rules, the U.S. Trustee Guidelines, and approval of the Court under the standards of section 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy section 330(a)(3)(C) of the Bankruptcy Code. The U.S. Trustee shall have the right to respond or object to SSG's request for reimbursement of expenses, including but not limited to any request for the reimbursement of legal fees of SSG's independent counsel, based on the reasonableness standard provided in section 330 of the Bankruptcy Code and not section 328(a) of the Bankruptcy Code.

15. Notwithstanding anything in the Application, the Victor Declaration, and the Engagement Letter to the contrary, SSG shall only be reimbursed for any legal fees incurred in connection with these Chapter 11 Cases to the extent permitted under applicable law; *provided*, however, that SSG shall not seek reimbursement from the SIMAD Debtors' estates for any fees or expenses incurred in defending any of SSG's fee applications filed in these chapter 11 cases.

16. To the extent the SIMAD Debtors wish to expand the scope of SSG's services beyond those services set forth in or contemplated in the Engagement Letter or this Order (and as

to which additional compensation would otherwise be payable), the SIMAD Debtors shall be required to seek further approval from this Court. The SIMAD Debtors shall file notice of any proposed additional services and any underlying engagement agreement with the Court and serve such notice on the U.S. Trustee, counsel for any committee appointed in these chapter 11 cases, and any party requesting notice under Bankruptcy Rule 2002. If no such party files an objection within fourteen (14) calendar days of the SIMAD Debtors' filing such notice, such additional services and any underlying engagement agreement may be approved by the Court by further order without further notice or hearing.

17. Notwithstanding anything in the Application, the Victor Declaration, or Engagement Letter (including the Indemnity Provisions) to the contrary, to the extent that SSG uses the professional financial advisory or investment banking services of third-party independent contractors or subcontractors (collectively, the "Contractors") in these chapter 11 cases, SSG shall (i) pass-through the cost of such Contractors to the SIMAD Debtors at the same rate that SSG pays the Contractors, (ii) seek reimbursement for actual costs only, (iii) ensure that the Contractors are subject to substantially similar conflict checks as required for SSG, (iv) file or cause to be filed with the Court any disclosures required by Bankruptcy Rule 2014, and (v) attach any such Contractor invoices to its monthly fee statements, interim fee applications and/or final fee applications filed in these cases.

18. In the event SSG seeks to use any of its affiliates to perform services for the SIMAD Debtors (separate for the services being provided under the Engagement Letter), the SIMAD Debtors shall seek the separate retention of any such affiliates.

19. Such services other than set forth in the Application, the Victor Declaration, and the Engagement Letter that the SIMAD Debtors may request that SSG provide during the course of these Chapter 11 Cases, and as agreed to by SSG, shall be subject to separate application and order of this Court.

20. Notwithstanding anything in the Application, the Victor Declaration, and the Engagement Letter to the contrary, SSG shall seek reimbursement from the SIMAD Debtors' estates for its engagement-related expenses at the firm's actual cost.

21. Notwithstanding anything to the contrary in the Application, the Victor Declaration, and the Engagement Letter, termination of SSG's retention shall only commence upon entry of an order by this Court terminating SSG's retention.

22. Notwithstanding anything in the Application, the Victor Declaration, and the Engagement Letter to the contrary, SSG shall provide any and all fee applications in sortable electronic format ("LEDES" or "Excel") to the U.S. Trustee

23. To the extent that there may be any inconsistency between the terms of the Engagement Letter (including the Indemnity Provisions), the Application, the Victor Declaration, and this Order, the terms of this Order shall govern.

24. Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

25. The SIMAD Debtors and SSG are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

26. The relief granted herein shall be binding upon any chapter 11 trustee appointed in these chapter 11 cases, or upon any chapter 7 trustee appointed in the event of a subsequent conversion of any or all of these chapter 11 cases to cases under chapter 7.

27. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**<u>Schedule 1</u>**

**Engagement Letter**

SSG®
ADVISORS, LLC

June 15, 2026 **EXECUTION VERSION**

Mr. Asaf Ravid
Chief Restructuring Officer
SIMAD Holdings Ltd.
50 Quality Street, #110357
Trumbull, CT 06611

Dear Mr. Ravid:

This agreement (“Engagement Agreement”) will serve as the contract between SIMAD Holdings Ltd., *et al*, as debtors and debtors-in-possession in the Chapter 11 proceeding pending in the U.S. Bankruptcy Court for the District of Delaware Case No. 26-16388 (CMG) (jointly administered) (“SIMAD” or the “Company”) and SSG Advisors, LLC ("SSG") regarding the retention of SSG as exclusive investment banker to SIMAD for the purposes outlined in this Engagement Agreement. SSG’s responsibilities hereunder involve providing investment banking services to the Company, on an exclusive basis, focusing on the sale of all or part of the Company’s assets and subsidiaries (the “Sale Transaction (as defined below).

A. **<u>SSG’s Role:</u>**

1. Sale Services

- Advise on and assist SIMAD in the preparation of an information memorandum describing the Company, it’s subsidiaries and their operations, management, and cash flows and other relevant financial information as requested by prospective purchasers for use in discussions with prospective purchasers and assist in the due diligence process for a potential Sale Transaction;

- Create and manage an electronic data room with diligence materials about SIMAD;

- Assist SIMAD in developing a list of suitable potential buyers who will be contacted on a discreet and confidential basis after approval by the Company;

- Coordinate the execution of confidentiality agreements approved by the Company for potential buyers wishing to review the information memorandum and gain access to the data room;

- Assist SIMAD in coordinating management calls and site visits for interested buyers and work with the management team to develop appropriate presentations for such calls and visits;

- Solicit competitive offers from potential buyers;

- Advise and assist SIMAD in evaluating any proposals from potential buyers and investors, structuring the Sale Transaction, and negotiating the Sale Transaction agreements with potential buyers and investors;

- Assist SIMAD and its professionals with the structuring of sale procedures and the conduct of any auction that may result in the Chapter 11 proceeding;

- Be available for meetings and court appearances in the Chapter 11 proceeding, including without limitation, providing testimony in the Bankruptcy Court in furtherance and support of the sale process and Sale Transaction, as necessary; and

- Otherwise assist SIMAD, and its professionals, as necessary, through closing on a best efforts basis

In performing the services described above, the Company will furnish or cause to be furnished to SSG such information as SSG reasonably believes appropriate to the execution of its engagement hereunder (all such information so furnished being the "Information"). All Information furnished by the Company shall be provided on an "as is" basis provided that the Company shall not knowingly provide information which is not complete and correct in all material respects, to the best of its knowledge, and that until the expiration of SSG's engagement hereunder, it will advise SSG promptly of the occurrence of any event or any other change known by it or its agents that results in the Information ceasing to be complete and correct in all material respects. The Company recognizes and confirms that SSG: (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated hereby without having independently verified any of the same; (b) does not assume responsibility for accurateness or completeness of the Information and such other information; and (c) will not make an appraisal of any of the assets or liabilities of the Company. For the purposes of this Engagement Agreement, "known to," "to the knowledge of" or similar phrases means the actual knowledge, after due inquiry, of the executive officers of SIMAD.

The Company agrees that SSG shall be its exclusive investment banker in connection with any Sale Transaction undertaken with respect to the Company during the Engagement Term, as defined below, of this Engagement Agreement. The Company agrees that, during the Engagement Term, SSG shall assist and advise the Company in its negotiations with all prospective purchasers and investors in connection with any Sale Transaction. In that regard, the Company agrees to identify to SSG: (a) all prospective purchasers and investors who have been in contact with the Company prior to the date hereof and (b) all prospective purchasers and investors who come in contact with the Company during the Engagement Term.

SSG will consult with and advise the Company with respect to the financial aspects of any proposed Sale Transaction, including price, terms, and conditions of a Sale Transaction. SSG will not, however, have any authority to bind the Company with respect to any proposed Sale Transaction. Likewise, nothing contained herein shall require the Company to accept the terms of any proposal and the Company shall at

all times have the right in its sole and absolute discretion to accept or reject any proposed Sale Transaction regardless of the terms proposed. For the avoidance of doubt, nothing in this Engagement Agreement shall restrict the Company's right to pursue, negotiate, or consummate any transaction, including a partial sale of assets or equity of any subsidiary or business unit, at its sole discretion.

B. **SSG's Compensation**

As compensation for providing the foregoing services, SSG shall receive the following:

1. Initial Fee. An initial fee (the "Initial Fee") equal to $60,000 payable upon Bankruptcy Court approval of this Engagement Agreement;

2. Monthly Fees. Monthly fees (the "Monthly Fees") of $40,000 per month payable upon Bankruptcy Court approval of the Engagement Agreement, commencing on August 1, 2026 and on the first (1st) of each month thereafter throughout the Engagement Term (as such term is hereafter defined). Each Monthly Fee is earned on the first (1st) day of each month, without proration. Fifty (50%) percent of the Initial Fee and Monthly Fees paid shall be credited to the Transaction Fee (as defined below).

3. Transaction Fee. Upon the consummation of a Sale Transaction to any party as a going-concern or the sale of a part or substantially all assets to one or more buyers, SSG shall be entitled to a fee (the "Transaction Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing such Sale Transaction and as a direct carveout from proceeds and cash, prior in right to any secured debt, equal to the following:

   In the event of Total Consideration, as that term is hereafter defined, up to $300,000,000, SSG's Transaction Fee shall be calculated at seventy-five (75) basis points or 0.75% of Total Consideration with a minimum fee of $1,500,000.

   In the event that Total Consideration exceeds $300,000,000, SSG's Transaction Fee shall be calculated at seventy-five (75) basis points or 0.75% of Total Consideration up to $300,000,000, plus 250 basis points or two and one-half (2.50%) percent of Total Consideration in excess of $300,000,000.

   Notwithstanding the foregoing, in the event of a successful credit bid by the existing senior secured bondholders, without a qualified third party overbid, SSG's Transaction Fee shall be $1,000,000.

4. In addition to the foregoing Initial Fee, Monthly Fee, and Transaction Fee noted above whether or not a Sale Transaction is consummated, SSG will be entitled to reimbursement for SSG's reasonable and documented out-of-pocket expenses incurred in connection with the subject matter of this Engagement Agreement provided, however, that any expense above $5,000 shall be approved with the Company and that the Company shall have no obligation to reimburse SSG for that portion of any expense that is in excess of $50,000.

C. **<u>Definitions</u>**

For the purpose of this Engagement Agreement:

**Total Consideration** shall mean the gross purchase price paid at the closing of the Sale for the equity, assets, or any portion of either, plus the assumption or payoff of indebtedness (secured and unsecured) of the Company.

For purposes of computing any fees payable to SSG hereunder, non-cash consideration shall be valued as follows: (a) publicly traded securities shall be valued in the manner specified in the definitive agreement for the Sale, or, if not so specified, at the average of their closing prices (as reported in <u>The Wall Street Journal</u>) for the five (5) trading days prior to the closing of the Sale; and (b) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by the Company and SSG. If such aggregate consideration may be increased by contingent payments such as an “earnout” or other monetary agreement in the transaction, the portion of SSG’s fee relating thereto shall be calculated and paid when and as such contingent payments or other monetary amounts are received.

**Sale Transaction** shall mean a Sale or transfer, directly or indirectly, of a part, all or a significant portion, of the assets or equity of SIMAD to any party.

D. **<u>Term of Engagement</u>**

This Engagement Agreement shall remain in force (the “Engagement Term”) for a period of six (6) months from the date of signing this Engagement Agreement and may be extended by mutual written agreement thereafter on a month-to-month basis until a Sale is completed and closed. Either party may terminate this Engagement Agreement upon thirty (30) days prior written notice to the other; provided, however, that this Engagement Agreement shall automatically terminate immediately upon the closing of a Sale Transaction. Upon the termination of this Engagement Agreement, neither party shall have any further obligations to the other except that: (a) termination of the Engagement Agreement shall not affect SSG’s right to indemnification under the Indemnification paragraph below; (b) the Company shall remain obligated to pay SSG any unpaid Monthly Fees and to reimburse SSG for any expenses incurred through the date of the termination of the Engagement Agreement; and (c) if a Sale Transaction is consummated within six (6) months (“Trailer Term”) of the termination of this Engagement Agreement with a party with whom SSG had substantive contact during the Engagement Term, the Company shall remain obligated to pay a Transaction Fee, as calculated above; *provided*, however, that if this Engagement Agreement has been terminated for gross negligence, bad faith, actual fraud, or willful misconduct by SSG in the performance of SSG’s duties under this Engagement, the Company shall have no further obligations to pay any additional fees. Sections B, D, E, F and G (entitled Compensation, Term of Engagement, Indemnification, Miscellaneous, and Scope of SSG’s Duties, respectively) of this Engagement Agreement shall survive the expiration or termination of this Engagement Agreement indefinitely.

Mr. Asaf Ravid
June 15, 2026
Page 5

E. **Indemnification**

The Company hereby acknowledges and agrees to the indemnification arrangements between the parties hereto as described on Attachment A hereto, which Attachment is incorporated herein and forms an integral part hereof.

F. **Miscellaneous**

No fee payable to any other financial advisor or finder by the Company in connection with the subject matter of this Engagement Agreement shall reduce or otherwise affect any fee payable to SSG hereunder. This Engagement Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto. This Engagement Agreement cannot be modified or changed, nor can any of its provisions be waived, except by written agreement signed by both parties. The benefits of this Engagement Agreement shall inure to the respective successors and assigns of the parties hereto and of the Indemnified Parties and their respective successors, assigns and representatives, and the obligations and liabilities assumed in this Engagement Agreement by the parties hereto shall be binding upon their respective successors and assigns.

SSG shall keep the Company current as to the progress of its marketing efforts by providing marketing reports to the Company not less than once a week. Such marketing reports shall provide lists of interested parties, background and the status of their interest.

The Company must approve all marketing materials in advance of their use.

This Engagement Agreement may be executed in any number of counterparts, which counterparts, taken together, shall constitute one and the same Engagement Agreement.

G. **Scope of Duties**

The Company hereby acknowledges and agrees that: (a) it has retained SSG for the purposes set forth in the Engagement Agreement and that the rights and obligations of the parties hereto are contractual in nature, and (b) SSG has not made any warranties or guarantees of any nature with respect to the success or satisfactory conclusion of any Sale Transaction or as to the economic, financial or other results which may be obtained or experienced by the Company as a result thereof.

H. **Other Matters**

SSG has the right, following a Sale Transaction closing, to place advertisements in financial and other newspapers and journals and to send email advertising at its own expense describing its services to the Company hereunder.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001), SSG is required to obtain, verify and record information that identifies its clients, which information may include the name and address of the Company, and its senior management team as well as other information that will allow SSG to properly identify its clients. Additionally, SSG

maintains important disclosures on its web site www.ssgca.com. These disclosures may be updated periodically on an as-needed basis. The Company agrees to accept and receive all of these disclosures by electronically accessing the website referenced above and acknowledges that printed hard copies of these disclosures are available upon request by contacting SSG directly at (610) 940-1094.

I. **Securities Platform**

All transactions involving the sale or purchase of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under) are offered through SSG Capital Advisors, LLC. ("SCA") which is an affiliated registered Broker-Dealer in good standing with the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC"). Principals of SSG are registered representatives of SCA. Therefore, SCA is included collectively as "SSG" with all the rights and obligations thereto under the terms of this Engagement Agreement.

To the extent a Transaction Fee is payable to SSG in connection with a Sale Transaction constituting the purchase or sale of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under), such Transaction Fee (excluding the Initial Fee and Monthly Fees) shall be specifically paid to SCA. In addition to the Initial Fee and Monthly Fees, under no circumstances will the Company be obligated to pay any fees in an aggregate amount in excess of the Transaction Fee. Payment of the fee to SCA shall constitute and be deemed payment of the Transaction Fee under the Engagement Agreement.

Any amendment, modification or other changes to this Engagement Agreement must be in writing and signed by both parties to be enforceable.

Please indicate your acceptance of the foregoing by executing and returning the enclosed copy of this letter.

**SSG ADVISORS, LLC**

| | |
|---|---|
| By: [signature] | [signature] |
| J. Scott Victor<br>Managing Director | Teresa C. Kohl<br>Managing Director |

ACCEPTED:

**SIMAD HOLDINGS LTD., *et al*, DEBTORS-IN-POSSESSION**

| | |
|---|---|
| By: [signature] | 6.15.2026 |
| Mr. Asaf Ravid<br>Chief Restructuring Officer | Date |

**ATTACHMENT A**
**INDEMNIFICATION PROVISIONS**

The Company agrees to indemnify, defend and hold harmless SSG or SCA, and their affiliates, the respective partners, members, directors, officers, agents and employees of SSG, SCA, and their affiliates and each other person, if any, controlling SSG, SCA, and their affiliates (the foregoing being referred to herein individually as an "Indemnified Party" and collectively as the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities or costs, as and when incurred, to which such Indemnified Party may become subject to or which are asserted against any Indemnified Party, directly or indirectly, in any way related to SSG acting for the Company under the Engagement Agreement of which this Attachment A forms a part, including, without limitation, in connection with: (a) any act or omission by SSG related to its engagement as investment banker under the Engagement Agreement; or (b) SSG's acceptance, or its performance or of its obligations under said Engagement Agreement. The Company will reimburse the Indemnified Parties for any reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages or liabilities or any action in respect thereof, whether or not in connection with pending or threatened litigation, and whether or not any Indemnified Party is a party thereto; provided, however, that the Company shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability have resulted from SSG's gross negligence, bad faith, actual fraud, or willful misconduct in the performance of its duties under said Engagement Agreement (and in such event, expenses of SSG paid by the Company in advance that are reasonably attributable thereto shall be promptly reimbursed in full to the Company). The Company agrees that reliance by SSG on any publicly-available information, the information supplied by the Company to SSG in connection with said Engagement Agreement or any directions furnished by the Company shall not constitute gross negligence, bad faith or willful misconduct by SSG.

The provisions of this Attachment A shall survive any termination of said Engagement Agreement.

# EXHIBIT B
## Time Records

SSG's professionals working on this assignment are:

- J. Scott Victor ("JSV") – Managing Director
- Teresa C. Kohl ("TCK") – Managing Director
- Craig D. Warznak ("CDW") – Director
- Alexander D. Lamm ("ADL") – Vice President
- Dylan E. Rush ("DER") – Associate

A description of the services provided and time expended by the professionals is included below:

***SIMAD HOLDINGS LTD - Case No. 26-16388 (CMG)***
***SSG Advisors, LLC***

| **Description of Services** | **Time Expended (# Hours)** | | | | | |
|---|---|---|---|---|---|---|
| | **JSV** | **TCK** | **CDW** | **ADL** | **DER** | **Total** |
| Reviewed and analyzed the Debtor's financial, operational, and camp-level information in connection with the sale process and evaluation of transaction alternatives. | 30.0 | 75.0 | 80.0 | 115.0 | 50.0 | **350.0** |
| Prepared and finalized sale process materials; established the virtual data room; and identified and developed a list of potential strategic and financial buyers. | 20.0 | 30.0 | 35.0 | 43.5 | 45.0 | **173.5** |
| Contacted potential buyers, distributed sale process materials, conducted follow-up discussions, and evaluated buyer interest, capabilities, and potential transactions. | 90.0 | 150.0 | 120.0 | 68.0 | 100.0 | **528.0** |
| Coordinated the negotiation and execution of confidentiality agreements and related virtual data room access for interested parties. | 20.0 | 20.0 | 40.0 | 33.0 | 30.0 | **143.0** |
| Maintained and updated potential buyer and bidder tracking materials and regularly reviewed buyer outreach, interest, diligence status, and next steps with the Debtor's management and advisors. | 25.0 | 75.0 | 45.0 | 39.5 | 38.0 | **222.5** |
| Coordinated and managed buyer due diligence, including diligence requests, management discussions, site visits, follow-up inquiries, and communications among buyers, management, Camp Operators and advisors. | 45.0 | 125.0 | 68.0 | 65.0 | 63.0 | **366.0** |
| Maintained, organized, and updated the virtual data room with supplemental diligence materials for all 30 camps; coordinated data clean-up; and notified interested buyers regarding material additions and updates. | 20.0 | 20.0 | 65.0 | 103.5 | 120.5 | **329.0** |
| Reviewed, revised, and coordinated bidding procedures, sale process documents, bankruptcy filings, declarations, and related materials concerning transaction structures, bidder qualification, auction procedures, and the sale process. | 90.0 | 100.0 | 50.0 | 45.0 | 42.0 | **327.0** |
| Prepared for and attended court hearings regarding the sale process and related matters, including preparation to provide testimony and respond to questions concerning SSG's sale process. | 30.0 | 27.0 | 18.0 | 17.5 | 17.5 | **110.0** |
| Participated in regular strategy and status calls with the Debtor's management, counsel, and other advisors regarding buyer outreach, diligence, bids, auction preparation, transaction execution, and closing matters. | 100.0 | 110.0 | 70.0 | 54.5 | 54.5 | **389.0** |
| Assisted with the preparation, structuring, and conduct of the auction process, including bidder qualification, bid evaluation, transaction structure and bid-combination analyses, auction protocols, and sale recommendations. | 120.0 | 150.0 | 85.0 | 65.5 | 65.5 | **486.0** |
| Analyzed camp-level and portfolio-level transaction alternatives, bid combinations, buyer proposals, recovery scenarios, and proceeds impacts, and developed recommendations to support the Debtor's sale process and strategic decision-making. | 90.0 | 100.0 | 85.0 | 75.0 | 58.0 | **408.0** |
| Evaluated and tracked successful and backup bidders; coordinated post-auction matters; maintained alternative transaction paths; and communicated with bidders and purchasers to resolve transaction, financing, and closing issues. | 80.0 | 110.0 | 60.0 | 51.5 | 49.0 | **350.5** |
| Reviewed, compared, negotiated, and coordinated asset purchase agreements, amendments, schedules, sale orders, and related transaction documents with purchasers, counsel, and other advisors. | 100.0 | 150.0 | 70.0 | 58.5 | 52.5 | **431.0** |
| Prepared and reviewed camp-level funds flows, bid and transaction analyses, purchase price and proceeds allocations, recovery scenarios, and other ad hoc financial analyses supporting sale decisions and camp closings. | 60.0 | 75.0 | 65.0 | 75.0 | 60.0 | **335.0** |
| Coordinated and provided closing support, including: closing deliverables, deposit transfers, purchaser coordination, and camp transition matters. | 90.0 | 150.0 | 50.0 | 60.0 | 25.5 | **375.5** |
| Conducted additional sale processes for Camp Chateaugay and Kiwi Country Day Camp, including buyer identification and outreach, diligence coordination, bid solicitation and evaluation, and auction administration. | 60.0 | 60.0 | 55.0 | 75.0 | 64.0 | **314.0** |
| Responded to additional transaction-related requests and provided other sale process support to the Debtor, management, counsel, and other professionals. | 200.0 | 275.0 | 110.0 | 75.0 | 40.0 | **700.0** |
| **Total Hours:** | **1,270.0** | **1,802.0** | **1,171.0** | **1,120.0** | **975.0** | **6,338.0** |

# EXHIBIT C

## Expense Detail

***SIMAD HOLDINGS LTD - Case No. 26-16388 (CMG)***
***SSG Advisors, LLC***

| Month | Professional | Expense Type | | Amount |
|---|---|---|---|---|
| June 2026 | Multiple | Virtual Data Room | $ | 2,250.00 |
| July 2026 | Multiple | Virtual Data Room | | 1,500.00 |
| July 2026 | Multiple | Hotel / Travel - Auction | | 3,263.09 |
| August 2026 | Multiple | Virtual Data Room | | 1,500.00 |
| September 2026 | Multiple | Virtual Data Room | | 2,250.00 |
| November 2026 | Multiple | Virtual Data Room | | 1,500.00 |
| **Total Expenses** | | | **$** | **12,263.09** |