**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SIMAD HOLDINGS LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-16388 (CMG)<br><br>(Jointly Administered) |

# DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE HOLDING COMPANY DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED ON AN INTERIM BASIS BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR INTERIM APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT ON AN INTERIM BASIS OR OTHERWISE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES NOR IS IT SOLICITING AN OFFER TO BUY ANY SECURITIES. INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AN AUDIT.**

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
David M. Bass
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com
dharris@coleschotz.com

[1] A complete list of the SIMAD Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the SIMAD Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/SIMAD. The location of Debtor SIMAD Holdings Ltd.'s principal place of business and the SIMAD Debtors' service address in these chapter 11 cases is 50 Quality Street, #110357, Trumbull, CT 06611.

## DISCLAIMER

**THE HOLDING COMPANY DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT[2] IN CONNECTION WITH THE PLAN OF LIQUIDATION OF THE HOLDING COMPANY DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. THE HOLDING COMPANY DEBTORS ARE REQUESTING THAT THE BANKRUPTCY COURT CONFIRM THE PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. YOU SHOULD NOT RELY ON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN MAKING AN INFORMED JUDGMENT ABOUT VOTING TO EITHER ACCEPT OR REJECT THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT TO COMPLY WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS DETERMINED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

**NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE HOLDING COMPANY DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH THEIR OWN ADVISORS WITH**

---

[2] Unless otherwise defined herein, capitalized terms contained in this Disclosure Statement shall have the same meanings ascribed to them in either the Plan, the Bankruptcy Code, or the Bankruptcy Rules (each as defined herein), as applicable.

**RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S INTERIM APPROVAL OF THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. RATHER, HOLDERS OF CLAIMS OR INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND/OR OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.**

**NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR POTENTIAL OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE HOLDING COMPANY DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS BEFORE AND AFTER THE CONFIRMATION OF THE PLAN OR EFFECTIVE DATE THEREOF IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE HOLDING COMPANY DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE HOLDING COMPANY DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE HOLDING COMPANY DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL OR NON-MATERIAL INACCURACY OR OMISSION.**

**THE HOLDING COMPANY DEBTORS' MANAGEMENT AND THEIR ADVISORS HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE HOLDING COMPANY DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE**

**THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.**

**THE HOLDING COMPANY DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE HOLDING COMPANY DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE HOLDING COMPANY DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE FILING OF THIS DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM OR INTEREST MUST RELY ON THEIR OWN EVALUATION OF THE HOLDING COMPANY DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN ORDER TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.**

**THE HOLDING COMPANY DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE APPROVED BY THE BANKRUPTCY COURT INCLUDING THE LETTER OF THE CREDITORS' COMMITTEE. THE HOLDING COMPANY DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE HOLDING COMPANY DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN, IN ORDER TO MAKE AN INFORMED JUDGMENT ABOUT VOTING TO EITHER ACCEPT OR REJECT THE PLAN.**

**TABLE OF CONTENTS**

I. INTRODUCTION ....9
1.1 PURPOSE OF THE DISCLOSURE STATEMENT ....9
1.2 CONFIRMATION OF THE PLAN ....10
1.3 VOTING ON THE PLAN ....13
1.4 ACCEPTANCE OF THE PLAN ....18
1.5 SOURCES OF INFORMATION ....18

II. THE DEBTORS ....19
2.1 THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OPERATIONS AS OF THE PETITION DATE ....19
2.2 THE DEBTORS' PREPETITION CAPITAL STRUCTURE ....20
2.3 EVENTS LEADING TO THE BANKRUPTCY FILINGS ....27
2.4 THE DEBTORS' BANKRUPTCY PROCEEDINGS ....27

III. FEASIBILITY ....40
3.1 FINANCIAL FEASIBILITY ANALYSIS. ....40

IV. ALTERNATIVES TO THE PLAN ....40
4.1 CHAPTER 7 LIQUIDATION ....40
4.2 ALTERNATIVE PLAN(S) ....42

V. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....42
5.1 GENERAL ....42
5.2 CONSEQUENCES TO THE HOLDING COMPANY DEBTORS ....44
5.3 CONSEQUENCES TO CERTAIN U.S. HOLDERS OF CLAIMS AND INTERESTS ....44
5.4 MATTERS RELATED TO THE DISPUTED CLAIMS RESERVE ....46
5.5 CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF CLAIMS ....46
5.6 INFORMATION REPORTING AND BACK-UP WITHHOLDING ....48

VI. RISK FACTORS ....48
6.1 CERTAIN BANKRUPTCY CONSIDERATIONS ....49
6.2 CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIBUTION ....49

VII. ADDITIONAL RISK FACTORS ....49

VIII. CONCLUSION ....51

**EXHIBITS**

**EXHIBIT A** **Chapter 11 Plan**

**EXHIBIT B** **Organizational Chart**

**EXHIBIT C** **Liquidation Analysis**

## EXECUTIVE SUMMARY

This disclosure statement (this "Disclosure Statement") provides information regarding the *Joint Chapter 11 Plan of Liquidation of the Holding Company Debtors Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), which the Holding Company Debtors are seeking to have confirmed by the Bankruptcy Court. A copy of the Plan is attached hereto as **Exhibit A**. The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Holding Company Debtors believe that the Plan is in the best interests of the Estates. As such, the Holding Company Debtors recommend that all holders of Claims eligible to vote for the Plan vote to accept the Plan by returning their ballots (each, a "Ballot") so as to be **actually received** by Kroll Restructuring Administration, LLC ("Kroll")) no later than **[●], 2026, at 4:00 p.m. (ET)** for Solicitation Packages served by the Solicitation Deadline (as applicable, and as may be extended, the "Voting Deadline"). The Voting Deadline is also the deadline for holders of Claims and Interests to opt out of the third-party release, as described below. The Solicitation Packages for holders of Class 6 and Class 7 Claims will also include a letter from the Official Committee of Unsecured Creditors (the "Creditors' Committee") recommending that such holders vote to accept the Plan (the "Committee Letter").

The Solicitation Deadline will be established by the order of the Bankruptcy Court conditionally approving this Disclosure Statement. Assuming the requisite acceptances to the Plan are obtained, the Holding Company Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

### A. Overview of the Plan

The Holding Company Debtors propose to liquidate under chapter 11 of the Bankruptcy Code. Under chapter 11, a debtor may reorganize or liquidate its businesses for the benefit of its stakeholders. After the sale of substantially all of the SIMAD Debtors' camp assets by the Camp Business Debtors[3] and the other SIMAD Debtors that owned them, as described below, the consummation of a chapter 11 plan of liquidation is the principal final objective of these Chapter 11 Cases. A chapter 11 plan sets forth how a debtor will treat claims and equity interests.

The primary objectives of the Plan are to maximize the value of recoveries to all holders of Allowed Claims and generally to distribute all property of the Estates that is or becomes

[3] The "Camp Business Debtors" are: (1) Achim Landco LLC; (2) Achim Operatingco, LLC; (3) BAHS Holdings LLC; (4) BAHS Operating Inc.; (5) Banner Operatingco, LLC; (6) Banner Landco, LLC; (7) Bluestar Operatingco LLC; (8) Bluestar Landco, LLC; (9) Club Getaway Operatingco, LLC; (10) Club Getaway Landco, LLC; (11) Country Roads Operatingco, LLC; (12) Country Roads Landco, LLC; (13) Eagle's Landing Day Camp LLC; (14) Green Lane Operatingco, LLC; (15) Green Lane Landco, LLC; (16) Greenvilleland LLC; (17) Island Lake Campco, LLC; (18) Island Lake Landco, LLC; (19) Kiwi Operatingco, LLC; (20) Lavco, LLC; (21) Lavland, LLC; (22) Malka Operatingco, LLC; (23) Meadowbrook Operatingco, LLC; (24) Meadowbrook Landco, LLC; (25) Mill Road Landco, LLC; (26) Mogenavco, LLC; (27) Mogenavland, LLC; (28) Mohawkcampco, LLC; (29) Mohawkland, LLC; (30) Mohawk Country Day School, Inc.; (31) RDM Camps, LLC; (32) Rolling Hills Operatingco, LLC; (33) Rolling Hills Landco, LLC; (34) SHAB Holdings, LLC; (35) SHAB Operating Inc.; (36) Summit Camp, LLC; and (37) Quadstar Realty LLC.

available for distribution in accordance with the priorities established by the Bankruptcy Code. The Settlement Fund established in connection with the Committee Settlement is not property of the Estates and, accordingly, is not subject to such distribution priorities. The Holding Company Debtors believe that the Plan accomplishes these objectives and is in the best interest of the Estates.

A bankruptcy court's confirmation of a chapter 11 plan binds the Holding Company Debtors, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan. Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will provide for the exclusive treatment of Claims against and Interests in the Holding Company Debtors, terminate all of the rights and interests of pre-bankruptcy equity security holders, and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

The Holding Company Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Generally speaking, the Plan:

- vests all Liquidation Trust Assets, including SIMAD Holdings Ltd.'s interest in Willow Lake Day Camps, LLC and Willow Lake Land Corporation and Retained Causes of Action, in the Liquidation Trust on the Effective Date, for the purpose of distribution to holders of Allowed Claims (the Settlement Fund, the Liquidation Trust Claims Reserve, and the Professional Fee Claim Reserve are not Liquidation Trust Assets);

- provides for the treatment of the Mishmeret Prepetition Secured Claims, with any unsecured portion of the Prepetition Obligations treated as Lender Deficiency Claims in Class 7;

- designates a Liquidation Trustee to wind down the Holding Company Debtors' affairs, prosecute, continue, or settle Retained Causes of Action, pay and reconcile Claims, and administer the Plan; and

- provides for 100 percent recoveries for holders of Administrative Claims, Priority Tax Claims, Secured Tax Claims, Other Priority Claims, and Other Secured Claims, and for Disputed Secured MCA Claims to the extent Allowed as Secured Claims against Assets of the Holding Company Debtors.

The Holding Company Debtors do not own or operate any camps and were not sellers under any of the Sale Transactions. The proceeds of the Sale Transactions are Assets of the Camp Business Debtors and the other SIMAD Debtors that owned the assets sold, and are being applied under the Sale Orders, the Final Mishmeret DIP Order and the Camp Business Plan. Distributions under this Plan will be funded from the Holding Company Debtors' own Assets, which consist

principally of Cash, SIMAD Holdings Ltd.'s interest in Willow Lake Day Camps, LLC and Willow Lake Land Corporation, Causes of Action against the DAMIS Debtors, Michael Shabsels, David Shabsels and other insiders, and intercompany claims (if any), as described in Section 2.2.4.

The Holding Company Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

**THERE CAN BE NO ASSURANCE THAT THE ACTUAL CLAIM AMOUNTS WILL NOT BE DIFFERENT, AND PERHAPS SIGNIFICANTLY DIFFERENT, FROM THE ESTIMATES SET FORTH HEREIN.**

The table beginning on the following page is only a summary of the classification and treatment of Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and Plan for a complete description and understanding of the classification and treatment of Claims and Interests.

**SUMMARY OF CLASSIFICATION AND TREATMENT**
**OF CLAIMS AND INTERESTS UNDER THE PLAN**

| Class | Claim / Interest | Estimated Amount of Asserted Claims | Treatment |
|---|---|---|---|
| 1 | Secured Tax Claims | | Unimpaired |
| 2 | Other Secured Claims | | Unimpaired |
| 3 | Other Priority Claims | | Unimpaired |
| 4 | Mishmeret Prepetition Secured Claims | | Impaired (Entitled to Vote) |
| 5 | Disputed Secured MCA Claims | | Impaired (Entitled to Vote) |
| 6 | Disputed Unsecured MCA Claims | | Impaired (Entitled to Vote) |
| 7 | General Unsecured Claims | | Impaired (Entitled to Vote) |
| 8 | Subordinated Securities Claims | | Impaired (Not Entitled to Vote) |
| 9 | Interests | | Impaired (Not Entitled to Vote) |

## B. The Plan Structure

Pursuant to the Plan, the Liquidation Trustee will pay or provide for payments of Claims as follows:

- **Secured Tax Claims**: (a) payment in full in Cash of such holder's Allowed Secured Tax Claim; or (b) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five (5) years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Liquidation Trustee to prepay the entire amount of such Allowed Secured Tax Claim during such time period;

- **Other Secured Claims**: (a) payment in full in Cash of such holder's Allowed Other Secured Claim; (b) the Collateral securing such holder's Allowed Other Secured Claim; (c) Reinstatement of such holder's Allowed Other Secured Claim; or (d) such other treatment rendering such holder's Allowed Other Secured Claim Unimpaired;

- **Other Priority Claims**: payment in full in Cash of such holder's Allowed Other Priority Claim from the Liquidation Trustee or such other treatment rendering such holder's Allowed Other Priority Claim Unimpaired;

- **Mishmeret Prepetition Secured Claims**: to the extent not already paid in full pursuant to and in accordance with the Camp Business Plan, any value attributable to the Interests in SIMAD Equities LLC after payment in full of all Allowed Claims against SIMAD Equities LLC;

- **Disputed Secured MCA Claims**: if Allowed by order of the Bankruptcy Court, after payment of the Mishmeret Prepetition Secured Claims or other senior claims on the applicable Collateral, payment in full in Cash or such other treatment as determined by an order of the Bankruptcy Court;

- **Disputed Unsecured MCA Claims**: if Allowed by order of the Bankruptcy Court, its pro rata share of the Beneficial Trust Interests, which Beneficial Trust Interests shall entitle the holders thereof to receive their pro rata share of the Liquidation Trust Assets. Disputed Unsecured MCA Claims are classified separately from General Unsecured Claims because the Holding Company Debtors dispute the characterization, amount and allowability of the MCA Loans, as described in Sections 2.2.2 and 2.4.8;

- **General Unsecured Claims**: its pro rata share of the Beneficial Trust Interests, which Beneficial Trust Interests shall entitle the holders thereof to receive their pro rata share of the Liquidation Trust Assets. In addition, holders of Allowed General Unsecured Claims (other than Lender Deficiency Claims) may receive distributions from the Settlement Fund, as determined by the Committee Successor in its sole discretion, which distributions are in addition to, and shall not reduce, any distribution on account of Beneficial Trust Interests;

- **Subordinated Securities Claims**: no distribution under the Plan; and

- **Interests**: no distribution under the Plan, and all Interests shall be cancelled, released, and extinguished.

The Holding Company Debtors believe that the Plan is in the best interest of the Estates and urge such holders to vote to accept the Plan.

## C. The Adequacy of this Disclosure Statement

Before soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a plan. The Holding Company Debtors submit this Disclosure Statement in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the Holding Company Debtors' corporate history, structure, business operations, and prepetition capital structure and indebtedness (Sections 2.1 & 2.2);
- the events leading to the Chapter 11 Cases (Section 2.3);
- the Holding Company Debtors' prepetition restructuring efforts (Section 2.3);
- the significant pleadings Filed in the Chapter 11 Cases and certain relief granted by the Bankruptcy Court in connection therewith (Section 2.4);
- the classification and treatment of Claims and Interests under the Plan, including identification of the holders of Claims entitled to vote on the Plan, the procedures for voting, and projected recoveries;
- the method of distribution of any recoveries that may be available to holders of Claims pursuant to the Plan and other significant aspects of the Plan;
- the statutory requirements for confirming the Plan (Section 1.2);
- certain United States federal income tax consequences of the Plan (Section 5); and
- certain risk factors that holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Sections 4 and 6).

In light of the foregoing, the Holding Company Debtors believe that this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with section 1125 of the Bankruptcy Code.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

## D. Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Holding Company Debtors' rights in respect of any Unimpaired Claims or Interests, including all rights of

the Holding Company Debtors in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims or Interests.

**E. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims, determined without including acceptance of the Plan by any insider. The Holding Company Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Holding Company Debtors reserve the right to modify the Plan in accordance with Article IX of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**F. Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**G. Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H. Releases, Exculpation, and Injunction**

**Debtor Release**. Under Article VII.C of the Plan, as of the Effective Date, the Holding Company Debtors and their Estates release each Released Party (Mishmeret, the Prepetition Secured Parties, the DIP Lenders, and each of their Related Parties) from all Claims and Causes of Action relating to the Holding Company Debtors, the Chapter 11 Cases, and the other matters described therein, other than post-Effective Date obligations under the Plan, any Retained Causes of Action against any Entity other than a Released Party, any Claim or Cause of Action against any Excluded Party, and any obligation of any Released Party under the Settlement Term Sheet or the 9019 Settlement Order. Separately, Article IV.R of the Plan provides that no release under the Plan impairs any intercompany Claim or Cause of Action of the Holding Company Debtors (if any).

**Third-Party Release**. Under Article VII.D of the Plan, each Releasing Party releases each Released Party from the Claims and Causes of Action described therein. Releasing Parties include, among others, (a) holders of Claims that vote to accept or reject the Plan, (b) holders of Claims or



54414475

Interests that are deemed to accept or reject the Plan, or that abstain from voting, and, in the case of both (a) and (b), who do not affirmatively opt out of the releases, and (c) each Related Party of the foregoing; *provided*, *however*, that (y) notwithstanding anything to the contrary in the Plan, this Disclosure Statement, any ballot or opt-out form, or the Confirmation Order, no Released Party shall be a Releasing Party, in any capacity, including as a holder of a Mishmeret Prepetition Secured Claim, DIP Claim, DIP Roll-Up Claim, Lender Deficiency Claim, or General Unsecured Claim, and regardless of whether such Released Party votes to accept or reject the Plan, is deemed to accept or reject the Plan, abstains from voting, or fails to opt out of the releases provided by the Plan, or is a Related Party of any Released Party, and (z) no release given by a Releasing Party (including any release given by or through any Related Party under clause (c)) shall release any Claim or Cause of Action against any Excluded Party. **IF YOU DO NOT WISH TO GRANT THE THIRD-PARTY RELEASE, YOU MUST AFFIRMATIVELY OPT OUT IN ACCORDANCE WITH THE INSTRUCTIONS ON YOUR BALLOT OR OPT-OUT FORM. YOU MAY OPT OUT OF THE THIRD-PARTY RELEASE REGARDLESS OF WHETHER YOU VOTE TO ACCEPT OR REJECT THE PLAN, ABSTAIN FROM VOTING, OR ARE DEEMED TO ACCEPT OR REJECT THE PLAN.** An opt-out election will not affect the counting of a holder's vote to accept or reject the Plan or such holder's treatment under the Plan. The third-party release does not release any holder of Mishmeret Prepetition Secured Claims that has asserted Claims against the Debtors' Estates as part of a putative class in the *Proxima Investment Management Ltd. v. SIMAD Holdings Ltd.*, *et al.* matter pending in the District Court of Tel Aviv-Jaffa (Economic Division), Class Action No.: 88654-05-26, any Claim or Cause of Action against any Excluded Party, or any obligation of any Released Party under the Settlement Term Sheet or the 9019 Settlement Order.

**Exculpation**. Under Article VII.F of the Plan, the Exculpated Parties (the Holding Company Debtors and their representatives and agents who served during the Chapter 11 Cases, the Creditors' Committee and its members, Assaf Ravid, solely as Chief Restructuring Officer, Daniel Sasson, solely as Associate Restructuring Officer, the other Professional Persons (as defined in the Final Mishmeret DIP Order), and B. Riley Securities, Inc., solely for its role as financial advisor to the Holding Company Debtors between the Petition Date and June 8, 2026, but excluding any Excluded Party, any DAMIS Debtor, Michael Shabsels, and David Shabsels) are exculpated from Exculpated Claims arising from the Petition Date through the closing of the Chapter 11 Cases, except for liability resulting from gross negligence, fraud, or willful misconduct. The exculpation also covers Assaf Ravid, solely as Chief Restructuring Officer, for acts taken in contemplation of the Chapter 11 Cases from his appointment on June 2, 2026 through the Petition Date. In addition, under Article VII.J.10 of the Plan, each individual who served as an independent director of SIMAD Holdings Ltd. during the Chapter 11 Cases (excluding Michael Shabsels, David Shabsels, or any person described in clauses (f) or (g) of the definition of "Excluded Parties" with respect to each of them) is an Exculpated Party solely with respect to acts or omissions from the Petition Date until the Effective Date, and the Plan otherwise does not create, enlarge, or reduce any rights of or against such directors.

**Injunction**. The Plan does not discharge the Holding Company Debtors. Under Article VII.G of the Plan, holders of released or exculpated Claims and Causes of Action are permanently enjoined from pursuing them, and no Person may pursue a Claim or Cause of Action related to a matter subject to the third-party release against the Holding Company Debtors, the Liquidation Trust, the Exculpated Parties, or the Released Parties without the Bankruptcy Court first

determining that it is colorable and authorizing it. Nothing in the injunction restricts the Liquidation Trust or the Committee Successor from prosecuting Retained Causes of Action.

**Excluded Parties**. The Plan defines "Excluded Parties" to include, among others, (a) each current and former insider of any Debtor, (b) each current and former direct or indirect holder of any equity security or other Interest in any Debtor, (c) Michael Shabsels, (d) David Shabsels, (e) each of the DAMIS Debtors, their respective estates, and any trustee, liquidating trust, plan administrator, or other successor to or representative of any DAMIS Debtor or its estate, (f) family members, Affiliates, trusts, nominees, and controlled Entities of any of the foregoing, and (g) transferees of any of the foregoing, but excluding Assaf Ravid, solely as Chief Restructuring Officer, and Daniel Sasson, solely as Associate Restructuring Officer. Under Article VII.J of the Plan, no Excluded Party is a Released Party (whether in its own right or as a Related Party of another Entity) or an Exculpated Party, and no Excluded Party is entitled to the benefit of any release, exculpation, injunction, gatekeeping provision, or bar order under the Plan or the Confirmation Order. All Claims and Causes of Action against Excluded Parties are Retained Causes of Action that vest in the Liquidation Trust, and the Liquidation Trust may pursue them, including against any D&O Liability Insurance Policy, without first obtaining Bankruptcy Court authorization. Nothing in the Settlement, the 9019 Settlement Order, the Final Mishmeret DIP Order, or the Sale Orders releases or impairs any such Claim or Cause of Action. In addition, no Claim or Interest held by an Excluded Party is Allowed under the Plan; all such Claims and Interests remain Disputed and subject to objection, setoff, disallowance, equitable subordination, and recharacterization, and indemnification, contribution, reimbursement, and advancement obligations owed to Excluded Parties (other than certain independent director indemnification obligations in Article VII.J.10 of the Plan) will be rejected and will not be treated as Administrative Claims. However, under Article IV.H of the Plan, certain indemnification obligations of SIMAD Holdings Ltd. to its independent directors are not rejected but are not assumed; any resulting Claim is a prepetition Claim, is not an Administrative or priority Claim, is not payable from the Professional Fee Escrow, the Approved Budget, the Settlement Fund, or any reserve, and, if Allowed, is a General Unsecured Claim or Subordinated Securities Claim. Article VII.J controls over any conflicting provision of the Plan or related documents.

## I. The Settlement and the Settlement Fund

On the Effective Date, the $13 million Settlement Fund contributed by the Prepetition Secured Parties will be transferred from the GUC Trust Account to the Settlement Fund Account maintained by the Liquidation Trust. The Prepetition Secured Parties funded the Settlement Fund into the GUC Trust Account contemporaneously with, and as a condition to, any distribution on account of the Roll-Up Obligations. The Settlement Fund is not property of the Estates, is not a Liquidation Trust Asset, is free and clear of all Liens and Claims, and is not available to satisfy any Lender Deficiency Claim. The Committee Successor (the Liquidation Trustee) has sole and absolute discretion over the use of the Settlement Fund, subject to the 9019 Settlement Order, including to make distributions to holders of Beneficial Trust Interests (other than on account of any Lender Deficiency Claim) in such amounts, at such times, and on such basis as it determines, and such distributions are not subject to the Bankruptcy Code's distribution priorities. Consistent with the 9019 Settlement Order, no portion of the Settlement Fund may be distributed on account of any unsecured deficiency claim of the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders. The Prepetition Secured Parties' obligation to cooperate in the investigation and

prosecution of Causes of Action against third parties runs to the Liquidation Trust and, if the Liquidation Trustee requests such cooperation, the Prepetition Secured Parties will be reimbursed for their documented fees, costs, and expenses of providing it.

### J. The Liquidation Trust

On the Effective Date, the Liquidation Trust will be created for the benefit of holders of Beneficial Trust Interests, and the Liquidation Trust Assets, including the Retained Causes of Action, will be transferred to it. The Liquidation Trustee will be selected as provided in the Plan, namely, jointly by the Holding Company Debtors and the Creditors' Committee and, if the Prepetition Secured Parties hold no Lender Deficiency Claims, in consultation with the Prepetition Secured Parties (or, if the Prepetition Secured Parties hold any Lender Deficiency Claims, jointly with the Prepetition Secured Parties), and its identity and compensation will be disclosed in the Plan Supplement. The Liquidation Trustee will, among other things, reconcile and object to Claims, prosecute or settle Retained Causes of Action (including Causes of Action against the Debtors' insiders and equity holders, Michael Shabsels, and David Shabsels), and make distributions. The Liquidation Trust will dissolve no later than five (5) years after the Effective Date, subject to extension by the Bankruptcy Court. The tax treatment of the Liquidation Trust and tax reporting responsibilities will be set forth in the Liquidation Trust Agreement, the form of which will be filed in the Plan Supplement.

## I. INTRODUCTION

### 1.1 PURPOSE OF THE DISCLOSURE STATEMENT

The Holding Company Debtors provide this Disclosure Statement to the Office of the United States Trustee and to all of the Holding Company Debtors' known holders of Claims and Interests pursuant to section 1125(b) of the Bankruptcy Code for the purpose of seeking confirmation of the Plan. A copy of the Plan is attached hereto as **Exhibit A**. A hearing on the final approval of the Disclosure Statement and Confirmation of the Plan will be held on **[[●], 2026 at [●]] (ET)**.

The Holding Company Debtors strongly urge you to read this Disclosure Statement in its entirety before making any judgment about voting to either accept or reject the Plan because the Disclosure Statement contains a summary of the Plan and important information concerning the Holding Company Debtors' history and operations. The Disclosure Statement also provides information regarding alternatives to the Plan. Summaries of the Plan are included herein for the purpose of seeking Confirmation of the Plan and soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to voting to either accept or reject the Plan.

**PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE HOLDING COMPANY DEBTORS' BOOKS AND RECORDS. STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. ALTHOUGH THE HOLDING COMPANY DEBTORS HAVE ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE**

**HOLDING COMPANY DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR. UNLESS OTHERWISE INDICATED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

**NO STATEMENT CONCERNING THE HOLDING COMPANY DEBTORS OR THE VALUE OF THE HOLDING COMPANY DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE HOLDING COMPANY DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION, OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.**

## 1.2 CONFIRMATION OF THE PLAN

**1.2.1 Requirements**. The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code. The following summarizes some of the pertinent requirements:

i. **Acceptance by Impaired Classes**. Except to the extent that the cram down provisions of section 1129(b) of the Bankruptcy Code may be invoked, each Class of Claims and each Class of Interests must either accept the Plan or be deemed to accept the Plan because the Claims or Interests of such Class are not Impaired.

ii. **Feasibility**. The Bankruptcy Court is required to find that the Plan is likely to be implemented and that parties required to perform or pay monies under the Plan will be able to do so.

iii. **The "Best Interest" Test**. The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court find that the Plan is in the "best interest" of all Creditors and Interest holders. To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against, or Interest in, the Holding Company Debtors: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such holder would receive if the Holding Company Debtors' property were liquidated under Chapter 7 of the Bankruptcy Code on such date.

iv. **"Cramdown" Provisions**. The Bankruptcy Code contains provisions for confirmation of the Plan even if the Plan is not accepted by all Impaired Classes, as long as at least one Impaired Class of Claims has accepted it. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of section 1129(a) of the Bankruptcy Code, it (i) "does not discriminate unfairly," and (ii) is "fair and

equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, such plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claim or interests before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class, (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan; or (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or a class of interests receives full compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property on account of such claims or interests. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders either (i) retain their liens and receive deferred cash payments with a value as of the plan's effective date equal to the value of their interest in property of the estate, or (ii) otherwise receive the indubitable equivalent of these secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.

Because certain Classes are deemed to have rejected the Plan, the Holding Company Debtors will request confirmation of the Plan, as it may be modified from time to time, under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. The Holding Company Debtors will also seek confirmation of the Plan over the objection of individual holders of Claims who are members of an accepting Class.

The Holding Company Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, any exhibit or schedules thereto, or any Plan document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Holding Company Debtors believe that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

**1.2.2 Procedure**. To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code. The Bankruptcy Court has set **[●], 2026 at [●] (ET)** for the combined hearing for final approval of this Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing").

**1.2.3 Objections to Final Approval of the Disclosure Statement and Confirmation of the Plan**. Any party-in-interest may object to the final approval of the Disclosure Statement and/or to confirmation of the Plan and appear at the Confirmation Hearing to pursue any such objection. The Bankruptcy Court has set [●]**, 2026 at 4:00 p.m. (ET)**, as the deadline for filing and serving any objections to the final approval of the Disclosure Statement and/or to confirmation of the Plan for Solicitation Packages served by the Solicitation Deadline. Any objections must be filed with the Bankruptcy Court at the following address:

U.S. Bankruptcy Court for the District of New Jersey
Clarkson S. Fisher U.S. Courthouse
402 East State Street
Trenton, NJ 08608

With a copy served upon the following parties:

(i) counsel to the Holding Company Debtors, Cole Schotz P.C., 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota, Warren A. Usatine, David M. Bass, Felice R. Yudkin, and Daniel J. Harris;

(ii) co-counsel to Mishmeret Trust Company Ltd., as DIP agent and Prepetition Trustee, Chapman & Cutler LLP, 1270 Avenue of the Americas, 30th Floor, New York, New York 10020, Attn: Michael Friedman, Yuliya Zahoroda, and Jorge Coronel; and Chapman & Cutler LLP, 320 South Canal Street, Chicago, Illinois 60606, Attn: Stephen R. Tetro II, and Riker Danzig LLP, 7 Giralda Farms, Suite 250, Madison, New Jersey 07940, Attn: Joseph L. Schwartz and Daniel A. Bloom;

(iii) the Office of the United States Trustee, One Newark Center, 1085 Raymond Boulevard, Suite 2100, Newark, New Jersey 07102, Attn. Jeffrey M. Sponder; and

(iv) co-counsel to the Creditors' Committee, McDermott Will & Schulte LLP, One Vanderbilt Avenue, New York, New York 10017, Attn: Darren Azman, Kristin K. Going, and Rachel Biblo Block; and Robinson & Cole LLP, 666 Third Avenue, 20th Floor, New York, New York 10017, Attn: Evan M. Lazerowitz.

Service shall be made through the CM/ECF system, with courtesy copies by email, other electronic form as provided under the Local Rules, or by hard copy via hand delivery, first class or other mail or delivery.

**1.2.4 Effect of Confirmation**. Except as otherwise provided in the Plan, any Asset Purchase Agreement(s), Sale Order(s), or the Confirmation Order, on the Effective Date the

Liquidation Trust Assets will vest in the Liquidation Trust, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and interest holders, subject to the provisions of the Plan (including the continuation of the Liens securing the DIP Claims and the Mishmeret Prepetition Secured Claims until payment in full of such Claims). The Settlement Fund, the Liquidation Trust Claims Reserve, and the Professional Fee Claim Reserve are not Liquidation Trust Assets. Confirmation serves to make the Plan binding upon the Holding Company Debtors, all Creditors, Interest holders, and other parties-in-interest, regardless of whether they cast a Ballot to accept or reject the Plan.

## 1.3 VOTING ON THE PLAN[4]

**1.3.1 Impaired Claims or Interests**. Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims or Interests in Classes "Impaired" by the Plan may vote on the Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims or Interests may be "Impaired" if the Plan alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class. The holders of Claims or Interests not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. The holders of Claims or Interests in any Class which will not receive any payment or distribution or retain any property pursuant to the Plan are deemed to reject the Plan, unless they have agreed otherwise, and, in either event, do not have the right to vote. This Disclosure Statement is being distributed to all known holders of Claims classified as Class 4 (Mishmeret Prepetition Secured Claims), Class 5 (Disputed Secured MCA Claims), Class 6 (Disputed Unsecured MCA Claims), and Class 7 (General Unsecured Claims), all of which are entitled to vote to accept or reject the Plan (the "Voting Classes" and each individually, a "Voting Class").

**1.3.2 Eligibility**. Except as otherwise provided below, in order to vote on the Plan, each holder of a Claim in the Voting Classes must have timely filed or been assigned a timely filed Proof of Claim (including a Proof of Claim deemed timely filed by an order of the Bankruptcy Court), unless it holds a Claim that is scheduled by the Holding Company Debtors and is not identified as disputed, unliquidated, or contingent on the Schedules and Statements (as defined below).

Only the following holders of Claims in the Voting Classes are entitled to vote:

a. holders of Claims for which Proofs of Claim have been filed, as reflected on the Claims Register as of [●], 2026 (the "Record Date"), except as otherwise ordered by the Bankruptcy Court with respect to a Claim timely filed after that date;

b. holders of Claims that are listed in the Schedules and Statements, with the exception of those Claims that are scheduled as contingent, unliquidated, or disputed

[4] Capitalized terms used but not defined in this Section 1.3 shall have the meanings ascribed to such terms in the Plan or the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement of the Holding Company Debtors; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Plan Confirmation and Deadlines Related Thereto; (III) Approving the Solicitation, Notice, and Tabulation Procedures and the Forms Related Thereto; and (IV) Granting Related Relief*, as applicable.

(excluding such scheduled Claims that have been superseded by a filed Proof of Claim);

c. holders whose Claims arise pursuant to an agreement or settlement with the Holding Company Debtors, as reflected in a document filed with the Bankruptcy Court, in a Final Order of the Bankruptcy Court, or in a document executed by the Holding Company Debtors pursuant to authority granted by the Bankruptcy Court, in each case regardless of whether a Proof of Claim has been filed; and

d. the assignee of any transferred or assigned Claim, only if such transfer or assignment: (i) has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e) and (ii) is reflected on the Claims Register on or before the Record Date.

**1.3.3** **Binding Effect**. Whether a Creditor or Interest holder votes on the Plan or not, such Person or Entity will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court. Absent timely submission of a Ballot in accordance with the solicitation procedures, a Creditor will not be included in the vote: (i) for purposes of accepting or rejecting the Plan or (ii) for purposes of determining the number of Persons voting on the Plan.

**1.3.4** **Procedure**. Members of Class 1 (Secured Tax Claims), Class 2 (Other Secured Claims), and Class 3 (Other Priority Claims) are Unimpaired and deemed to accept the Plan. Members of Class 4 (Mishmeret Prepetition Secured Claims) are entitled to vote to accept or reject the Plan. Mishmeret, as trustee for the Series A Bondholders, will coordinate with the beneficial holders of the Series A Bonds and any nominees to collect their votes and any opt-out elections and will convey them to Kroll on a Master Ballot by the Voting Deadline; beneficial holders of Class 4 Claims should follow the Beneficial Holder Ballot instructions or the voting instructions provided by Mishmeret. To the extent any Allowed Mishmeret Prepetition Secured Claim is paid in full under the Camp Business Plan before the Effective Date, such Claim shall be deemed satisfied, the holder shall receive no distribution under this Plan on account of such Claim, and, if satisfied before the Confirmation Hearing, Class 4 shall be treated as a vacant Class under Article III.F of the Plan. Holders of Class 5 (Disputed Secured MCA Claims) are entitled to vote to accept or reject the Plan. Solely for purposes of voting in Class 7, and not for purposes of allowance or distribution, any Lender Deficiency Claim shall be temporarily allowed in the amount of $[$17,758,250], as agreed by the Holding Company Debtors, Mishmeret, and the Creditors' Committee or, absent agreement, as estimated by the Bankruptcy Court pursuant to Bankruptcy Rule 3018(a). Members of Class 6 (Disputed Unsecured MCA Claims) and Class 7 (General Unsecured Claims) may vote to accept or reject the Plan. Members of Class 8 (Subordinated Securities Claims) and Class 9 (Interests) are deemed to reject the Plan. Accordingly, holders of Claims or Interests in Classes 1, 2, 3, 8, and 9 are not entitled to vote on the Plan. In order for your vote to count, holders of Claims in the Voting Classes must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) by first-class mail, overnight mail, or hand delivery to:

**First-Class Mail, Overnight Mail, or Hand Delivery**
SIMAD Holdings Ltd., Ballot Processing
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

Alternatively, holders of Claims in the Voting Classes may submit the Ballot via electronic online transmission solely through the customized online balloting portal on the Holding Company Debtors' case website, https://restructuring.ra.kroll.com/SIMAD, and clicking "Submit E-Ballot" under the Case Navigation section of the website (the "E-Ballot Portal") on or before the Voting Deadline. Holders of Claims submitting the Ballot electronically via the E-Ballot Portal should not also submit a ballot by mail. If multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last properly completed, valid Ballot timely received will supersede and revoke any prior Ballot.

**BALLOTS MUST BE RECEIVED BY KROLL BY THE VOTING DEADLINE. BALLOTS SENT BY FACSIMILE, ELECTRONIC MAIL, OR OTHER FORM OF ELECTRONIC TRANSMISSION, EXCEPT FOR THE HOLDING COMPANY DEBTORS' E-BALLOT PORTAL, OR, SOLELY WITH RESPECT TO MASTER BALLOTS, BY EMAIL AS EXPRESSLY PERMITTED ON THE MASTER BALLOT, ARE NOT ALLOWED AND WILL NOT BE COUNTED. HAVING YOUR BALLOT POST-MARKED BY THE VOTING DEADLINE IS NOT SUFFICIENT. RATHER, IT MUST BE RECEIVED BY KROLL ON OR BEFORE THE VOTING DEADLINE.**

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that Ballots for the acceptance or rejection of the Plan must be **received** by Kroll using an approved submission method described above on or before **4:00 p.m. (ET) on [●], 2026**. After the Voting Deadline, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing. The Holding Company Debtors may extend the Voting Deadline, after consultation with the Creditors' Committee, by filing a notice of such extension with the Bankruptcy Court.

In tabulating votes, the following hierarchy will be used to determine the amount of the Claim associated with each vote:

a) if a Claim is deemed Allowed under the Plan, an order of the Bankruptcy Court or a stipulated agreement between the parties, such Claim will be temporarily allowed for voting purposes in the deemed allowed amount set forth therein; [*provided*, that any Lender Deficiency Claim shall be temporarily allowed for voting in Class 7 solely as set forth above];

b) if a Claim for which a Proof of Claim has been timely filed for unknown or undetermined amounts, or is wholly unliquidated, or contingent (as determined on the face of the Claim or after a reasonable review of the supporting documentation by Kroll) and such Claim has not been Allowed, such Claim shall be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00 unless a different amount is established by agreement or order of the Bankruptcy Court; *provided*, *however*, that any liquidated, non-contingent portion of such Claim shall be temporarily allowed for voting purposes in such amount;



54414475

c) if a Claim, for which a Proof of Claim was timely filed, is listed in the Holding Company Debtors' filed Schedules as contingent, unliquidated or disputed in part, such Claim is temporarily allowed for voting purposes only, and not for purposes of allowance or distribution in the liquidated, non-contingent, undisputed amount set forth in such Proof of Claim, unless such Claim is subject to an objection filed in accordance with subsection (h) below;

d) if a Claim for which a Proof of Claim was timely filed or was listed in the Holding Company Debtors' filed Schedules in an amount that is liquidated, non-contingent, and undisputed, such Claim is allowed for voting in the amount set forth on the Proof of Claim or the Holding Company Debtors' filed Schedules;

e) if a Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, such Claim is temporarily allowed in the amount so estimated or allowed by the Bankruptcy Court for voting purposes only, and not for purposes of allowance or distribution;

f) if a Claim is listed in the Holding Company Debtors' Schedules as contingent, unliquidated, disputed or for $0.00 and a Proof of Claim was not (i) filed by the applicable bar date for the filing of Proofs of Claim established by the Bankruptcy Court; or (ii) deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline; such Claim shall be disallowed for voting purposes; *provided, however*, if the applicable bar date has not yet passed, such Claim shall be entitled to vote at $1.00, subject to a different amount being allowed for voting purposes by order of the Bankruptcy Court.

g) Proofs of Claim filed for $0.00 are not entitled to vote;

h) if the Holding Company Debtors have Filed an objection or request for estimation as to a Claim at least fourteen (14) days before the Voting Deadline, such Claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection, or as ordered by the Bankruptcy Court pursuant to Bankruptcy Rule 3018(a)(4); *provided*, *however*, that if such objection seeks only to reduce or reclassify such Claim (a "reduce and allow" objection), such Claim shall be temporarily allowed for voting purposes in the reduced amount and/or in the Class set forth in such objection;

i) for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one Claim against the Holding Company Debtors in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan; *provided* that, for the dollar-amount requirement of section 1126(c), the amounts of separate, nonduplicative Claims held by such creditor shall be aggregated;

j) notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased Claims arising from the same underlying obligation within the same Voting Class shall only be entitled to vote on account of a single Claim in such Class, in the amount of the largest such duplicate Claim, regardless of whether the Holding Company Debtors have objected to such duplicate Claims.

k) if a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Record Date, the later filed amending Claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed Claim shall be disallowed for voting purposes, regardless of whether the Holding Company Debtors have objected to such amended Claim. Except as otherwise ordered by the Bankruptcy Court, any amendments to Proof of Claim after the Record Date shall not be considered for purposes of these tabulation rules. For the avoidance of doubt, and notwithstanding the foregoing, a holder whose Proof of Claim is timely filed after the Record Date but on or before the applicable Amended Schedules Bar Date or Rejection Damages Bar Date shall be served with a Solicitation Package and shall be entitled to vote such Claim in accordance with these tabulation rules.

l) Claims asserted against more than one Holding Company Debtor on account of the same underlying obligation (including guaranty and joint and several Claims) shall be counted as a single Claim in the applicable Class, in the amount of such underlying obligation.

To the extent Claims in a Voting Class are subject to an objection other than a "reduce and allow" objection that is filed with the Bankruptcy Court and served on the affected holder on or prior to fourteen (14) days before the Voting Deadline, the holder of such Claims shall not be entitled to vote to accept or reject the Plan unless one or more of the following has occurred no later than two (2) business days prior to the deadline for Kroll to file the Voting Declaration (as defined below) or such later time as the Bankruptcy Court may permit (each, a "Resolution Event"):

a) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

b) an order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

c) a stipulation or other agreement is executed between the holder of such Claim and the Holding Company Debtors, with notice to the Creditors' Committee, resolving the objection and allowing such Claim in an agreed upon amount;

d) a stipulation or other agreement is executed between the holder of such Claim and the Holding Company Debtors, with notice to the Creditors' Committee, temporarily allowing the holder of such Claim to vote its Claim in an agreed upon amount; or

e) the pending objection is voluntarily withdrawn by the objecting party.

Holders of Claims that are not entitled to vote because of a pending objection will receive a notice of non-voting status and an opt-out form. The holder of any such Claim may file a motion pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of its Claim for voting purposes no later than fourteen (14) days after service of the applicable objection, and Kroll shall

provide such holder with a Ballot, which shall be counted only upon the occurrence of a Resolution Event.

Kroll will file a declaration certifying the results of the tabulation of Ballots (the "Voting Declaration") [●], 2026. The Voting Declaration will (i) identify any Ballots that were not counted and the reasons therefor and (ii) separately identify any Ballots cast by insiders of the Holding Company Debtors. Unless otherwise ordered by the Bankruptcy Court, any Ballot that is unsigned, or that does not indicate acceptance or rejection of the Plan or indicates both acceptance and rejection, will not be counted as a vote; provided that a valid opt-out election made on any such Ballot that is timely submitted will be honored.

## 1.4 ACCEPTANCE OF THE PLAN

**1.4.1 Creditor Acceptance**. As a creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must accept the Plan, or the Plan must qualify for cramdown of any non-accepting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code. At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. To the extent you hold a claim in Class 4 (Mishmeret Prepetition Secured Claims), Class 5 (Disputed Secured MCA Claims), Class 6 (Disputed Unsecured MCA Claims), or Class 7 (General Unsecured Claims), you are urged to complete, date, and sign the enclosed Ballot and promptly return it by mail, hand delivery, or the E-Ballot Portal. Please be sure to complete the Ballot properly and legibly identify the name of the Creditor. The amount of your Claim for voting purposes, as determined in accordance with the tabulation rules herein, will be set forth on your Ballot. If you identify a different Claim amount on your Ballot, your Claim will be counted for voting purposes in the amount determined under such tabulation rules, subject to Bankruptcy Rule 3018(a).

**1.4.2 Cramdown Election**. As long as at least one Impaired Class votes to accept the Plan, excluding the votes of insiders, the Holding Company Debtors may attempt to invoke the "cramdown" provisions. Cramdown may be an available remedy, because the Holding Company Debtors believe that, with respect to each Impaired Class, the Plan is fair and equitable within the meaning of section 1129(b)(2) of the Bankruptcy Code and does not discriminate unfairly.

## 1.5 SOURCES OF INFORMATION

The information contained in this Disclosure Statement has been obtained from the Holding Company Debtors' books and records and from pleadings filed by the Holding Company Debtors and other parties-in-interest. Every reasonable effort has been made to present accurate information and such information is believed to be correct as of the date hereof. Any value given as to the Assets of the Holding Company Debtors is based upon an estimation of such value. You are strongly urged to consult with your financial, legal, and tax advisors to understand fully the Plan and the Disclosure Statement.

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified. The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date. This

Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits, if any. If any conflict exists between the Plan and the Disclosure Statement, the terms of the Plan shall control.

## II. THE DEBTORS

### 2.1 THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OPERATIONS AS OF THE PETITION DATE

**2.1.1 Corporate History**. The Debtors owned and operated one of the largest privately held networks of for-profit summer camps in the United States. The enterprise encompassed approximately thirty (30) camp properties, including overnight and day camps located primarily in New York, Pennsylvania, New Jersey, Maine, and North Carolina. The camps offered a diverse range of recreational, athletic, educational, arts, and specialty programming for children and teenagers. Over time, the SIMAD enterprise grew through the acquisition and ownership of numerous camp-related operating and real estate entities, ultimately serving approximately 20,500 children annually through its network of camps.

**2.1.2 Corporate Structure**. SIMAD Holdings Ltd. is a British Virgin Islands holding company headquartered in Trumbull, Connecticut. The Holding Company Debtors are (i) SIMAD Holdings Ltd., the ultimate parent of each of the SIMAD Debtors, the equity interests in which are held 50% by Michael Shabsels and 50% by David Shabsels; (ii) Intermediate SIMAD 1, LLC, a New York limited liability company wholly owned by SIMAD Holdings Ltd.; and (iii) SIMAD Equities LLC, a New York limited liability company wholly owned by Intermediate SIMAD 1, LLC. SIMAD Holdings Ltd. is the issuer of the Debentures (Series A) described in Section 2.2.1.A. The Holding Company Debtors also guaranteed certain obligations of the Camp Business Debtors and other SIMAD Debtors, including certain of the MCA Loans. The Holding Company Debtors did not own any camp properties and did not conduct camp operations. A chart illustrating the Debtors' organizational structure is attached hereto as **Exhibit B**.

**2.1.3 Business Operations**. The Holding Company Debtors do not own or operate any camps directly. The camps owned and operated by the Camp Business Debtors and the other SIMAD Debtors were previously known as Camp Achim, Banner Day Camp, Blue Star Camps, Camp Chen-a-Wanda, Club Getaway, Country Roads Day Camp, Eagle's Landing Day Camp, Camp Echo, Camp Green Lane, Island Lake Camp, Kiwi Country Day Camp, Camp Lavi, Camp Lokanda, Malka, Meadowbrook Country Day Camp, Camp Mogen Avraham, Mohawk Day Camp, Rolling Hills Day Camp, and Summit Camp and Travel. Camp Chateaugay, Camp Mesorah and Pine Forest Camp, and the camps whose assets secured obligations to Bank of New Hampshire, were owned and operated by SIMAD Debtors that are not Camp Business Debtors and are not subject to the Camp Business Plan. The Camp Business Debtors' camps captured a large and diversified audience through the various types of camp-options offered, such as camps focused on sports, academics, arts, technology, and religion. Each camp had its own unique character and internal culture. The camps were separately branded and operated independently, including through their own management team, individualized staff, distinct accounting departments, and dedicated operational infrastructure.

As detailed herein, each of the summer camps was sold to various buyers. The proceeds of the Sale Transactions are Assets of the Camp Business Debtors and the other SIMAD Debtors that owned the assets sold, not of the Holding Company Debtors, and are being applied in accordance with the Sale Orders, the Final Mishmeret DIP Order and the Camp Business Plan. The Holding Company Debtors' Estates do not hold any direct interest in such proceeds other than through intercompany claims (if any) and the Holding Company Debtors' equity interests in their subsidiaries.

## 2.2 THE DEBTORS' PREPETITION CAPITAL STRUCTURE

### 2.2.1 Pre-Petition Secured Debt

#### A. The Series A Debentures

Prior to the Petition Date, in December 2025, SIMAD Holdings Ltd., a BVI holding company and the ultimate parent company of each of the Debtors, raised bonds on the Tel Aviv Stock Exchange.

These certain certificates of indebtedness (nonconvertible) that are publicly held (the "Debentures (Series A)") were offered to the public in Israel and are registered for trading on the Tel Aviv Stock Exchange. The Debentures (Series A) with a par value of NIS 620,000,000 (or approximately $211,600,000) bear a fixed annual interest rate of 7% and are not linked (principal and interest) to any index. In order to secure the Debtors' obligations towards certain Israeli Bondholders with respect to the Debentures (Series A), the Debtors pledged certain collateral in favor of the Bondholders and the Trustee for the Bondholders. The principal payments of the Debentures (Series A) were to be made annually on November 30 each year from 2026 through 2030. The interest of the Debentures (Series A) was to be paid semi-annually on May 31 and November 30 from 2026 through 2030. The Debtors defaulted in making the first interest payment of the Debentures (Series A) due on May 31, 2026. The principal amount of the outstanding Debentures (Series A) was approximately $214 million using the exchange rate as of the Petition Date. SIMAD Holdings Ltd. is the issuer of and primary obligor on the Debentures (Series A). Pursuant to the Committee Settlement, the Prepetition Obligations are Allowed (including any portion constituting a Lender Deficiency Claim) in the aggregate principal amount of $98,162,349 as of the Petition Date plus, without duplication, all accrued and unpaid postpetition interest, fees, costs, expenses, charges, premiums, and other amounts owing under the document governing the Prepetition Obligations. The Prepetition Secured Parties hold $17,907,000 in a segregated account. That amount, together with associated credits, will reduce the Prepetition Obligations by $19,916,170.

Under Article II.B of the Plan, the DIP Claims were paid in full in connection with the consummation of the Asset Purchase Agreements in accordance with the Final Mishmeret DIP Order and the 9019 Settlement Order; to the extent any DIP Claim remains outstanding as of the Effective Date, such DIP Claim and the related Liens and protections will remain in full force and effect until it is paid in full. The Mishmeret Prepetition Secured Claims are being satisfied principally from the proceeds of the Sale Transactions relating to the Mishmeret Collateral Pool Debtors under the Camp Business Plan. To the extent not paid in full thereunder, Mishmeret will receive under this Plan (Class 4) any value attributable to the Interests in SIMAD Equities LLC

after payment in full of all Allowed Claims against SIMAD Equities LLC, and any unsecured balance will constitute a Lender Deficiency Claim in Class 7. If the Mishmeret Prepetition Secured Claims are paid in full before the Confirmation Hearing, Class 4 will be treated as a vacant Class.

**B. The Debtors' Other Secured Lenders**

The secured loans described in this Section 2.2.1.B are obligations of certain Camp Business Debtors and other SIMAD Debtors, none of which is a Holding Company Debtor. SIMAD Holdings Ltd. may have guaranteed certain of these loans. The Holding Company Debtors reserve all rights with respect to any Claim that could be asserted against the Holding Company Debtors.

**1. Wayne Bank**

On or about August 8, 2017, Mesorahland LLC and Mesorahco LLC (the "Mesorah Debtors") entered into that certain Loan Agreement with Wayne Bank with a principal loan balance of approximately $3,733,140 as of the Petition Date. The Wayne Bank secured debt relating to the Mesorah Debtors was purchased by an entity affiliated with the purchaser of the Mesorah Debtors, DH1 Holdings LLC [Docket No. 551].

On or about December 7, 2022, Pine Forest Landco LLC and Pine Forest Campco LLC (the "Pine Forest Debtors") entered into that certain Loan Agreement with Wayne Bank for two (2) loans to be advanced to these entities. As of the Petition Date, the principal loan balance for the two (2) loans was approximately $13,834,962 and $4,558,550, respectively. This secured debt was assumed by the buyer of the Pine Forest Debtors, Pine Forest 1931 Holdings LLC, Pine Forest 1931, LLC, and Pine Forest 1931 Land, LLC (the "Pine Forest Buyers") pursuant to the order approving the sale of the Pine Forest Debtors to those entities [Docket Nos. 601, 788].

**2. Visions Federal Credit Union**

On June 14, 2024, RDM Camps, LLC and Visions Federal Credit Union ("Visions") allegedly entered into that certain loan facility consisting of, among other loan documents, that certain Promissory Note dated June 14, 2024 and that certain Security Agreement dated June 14, 2024 by and among Rocking Horse Ranch LandCo, Rocking Horse Ranch Operatingco LLC, and RDM Camps, LLC as borrowers (the "Visions Loan"). On August 13, 2026, Visions filed a Proof of Claim asserting a secured claim against RDM Camps, LLC of $18,650,000 for "money loaned" to RDM Camps, LLC.

On September 24, 2026, the Debtors filed an adversary proceeding with respect to the Visions Loan seeking, among other things, to invalidate any liens and security interests granted to Visions in connection with the Visions Loan. Adv. Pro. No. 26-01439 (CMG). On October 29, 2026, the Debtors filed a motion for summary judgment in the adversary proceeding seeking a determination that Visions does not hold a valid, perfected security interest in the assets of RDM Camps, LLC.

**3. Newtek (NBL SPV II, LLC)**

On or about June 30, 2025, certain of the SIMAD Debtors, IAFAOPERATINGCO, LLC; Belgrade Lakes Summer Camps LLC; Waukeela Operatingco LLC; Mainewekeelaco LLC; Poland Campco LLC; WM Camp, LLC; Camp Med-O-Lark, Inc.; and Banner Operatingco LLC, as "Borrower," allegedly entered into that certain Business Loan Agreement, pursuant to which Newtek Business Solutions Holdco 6, Inc. and/or NBL SPV II, LLC (together, "Newtek") funded the sum of $15,000,000 in accordance with the terms of the Business Loan Agreement (the "Newtek Loan"). On August 14, 2026, NBL SPV II, LLC, as servicer for U.S. Bank Trust Co. as Trustee, filed a Proof of Claim against Banner Operatingco LLC asserting a secured claim of $15,941,579.43 for a "Commercial Loan."

**4. Mizzen Capital, L.P.**

On or about October 6, 2023, Mizzen Capital, L.P. ("Mizzen") entered into that certain Senior Subordinated Note Purchase Agreement (the "Mesorah Note Purchase Agreement") with (a) Mesorahco LLC and (b) various guarantors, including Mesorahland LLC. As of the Petition Date, the balance of the Mesorah Note Purchase Agreement was approximately $982,500 (the "Mizzen-Mesorah Loan"). On August 13, 2026, Mizzen filed a Proof of Claim with respect to the Mizzen-Mesorah Loan alleging that, on July 30, 2026, Mizzen entered into a *Settlement Agreement, Consent to Private Sale and Grant of Contingent Profits Interest* with DHAN Masores LLC in connection with its purchase of Camp Mesorah free and clear of any of its liens. On August 4, 2026, the Bankruptcy Court entered an order approving the sale of Camp Mesorah [Docket No. 785] free and clear of all liens. As a result of the foregoing, the Debtors do not believe that Mizzen has any remaining secured claims against the Debtors arising from the Mizzen-Mesorah Loan.

On or about October 6, 2023, Mizzen also entered into that certain Note Purchase Agreement with (a) Pine Forest Campco LLC and (b) various guarantors, including Pine Forest Landco (the "Pine Forest Note Purchase Agreement"). As of the Petition Date, the balance of the Pine Forest Note Purchase Agreement was approximately $8,845,666 (the "Mizzen-Pine Forest Loan"). On August 4, 2026, the Court entered an order approving the sale of the Pine Forest Debtors to the Pine Forest Buyers [Docket No. 788] (the "Pine Forest Sale Order"). Pursuant to the Pine Forest Sale Order, the Pine Forest Buyers assumed the Mizzen-Pine Forest Loan and Mizzen's secured claims arising from the Mizzen-Pine Forest Loan were waived against the Debtors' estates. As a result of the foregoing, the Debtors do not believe that Mizzen has any remaining secured claims against the Debtors arising from the Mizzen-Pine Forest Loan.

**5. HomeTrust Bank**

Prior to the Petition Date, HomeTrust Bank ("HTB") (i) made a loan in the original principal amount of $2,000,000.00 to Bluestar Landco, LLC (the "HTB Prepetition Loan"), evidenced by certain documents between and among Bluestar Landco, LLC, David A. Shabsels, Michael Shabsels, SIMAD Holdings LLC, Bluestar Operatingco, LLC, and HTB, including an Agreement dated February 2023, a Promissory Note executed by Bluestar Landco, LLC on February 3, 2023, in favor of HTB in the Principal Amount of $2,000,000, Commercial Guaranties of David A. Shabsels, Michael Shabsels, SIMAD Holdings LLC and Bluestar Operatingco, LLC in favor of HTB, and a Deed of Trust Securing Future Advances (a "Deed of Trust") and an

Assignment of Rents (an "Assignment of Rents"), each dated February 3, 2023, executed by Bluestar Landco, LLC in favor of HTB (the "2023 Promissory Note"); (ii) Debtor Bluestar Landco, LLC executed a promissory note in the Principal Amount of $5 million, together with a Deed of Trust and Assignment of Rents securing advance guarantees executed by Debtor Bluestar Operatingco, LLC, SIMAD Holdings, LLC, Michael Shabsels and David Shabsels each dated September 21, 2021 (the "2021 Promissory Note") in favor of HTB; (iii) Debtor Bluestar Landco, LLC executed a promissory note in the Principal Amount of $850,000, together with a Deed of Trust and Assignment of Rents securing advance guarantees executed by Debtor Bluestar Operatingco, LLC, SIMAD Holdings, LLC, Michael Shabsels, David Shabsels, Seth Adam Herschthal and Lauren Popkin Herschthal each dated November 17, 2025 (the "2025 Promissory Note" and together with the 2021 Promissory Note and the 2023 Promissory Note, the "Promissory Notes") in favor of HTB; and (iv) a promissory note in the Principal Amount of $450,000, together with a Deed of Trust modifying the Promissory Notes, executed by Debtor Bluestar Operatingco, LLC, SIMAD Holdings, LLC, Michael Shabsels, David Shabsels, Seth Adam Herschthal and Lauren Popkin Herschthal, each dated April 20, 2026; and such other related agreements, instruments, and other documents executed in connection with the HTB Prepetition Loan.

As of the Petition Date, Bluestar Landco, LLC and Bluestar Operatingco, LLC were indebted to HTB in the aggregate principal amount of not less than $4,210,592. The Committee undertook a review of the liens and claims associated with the HTB loan to Bluestar Operatingco, LLC. On October 16, 2026, the Debtors satisfied HTB's claims with proceeds from the sale of Blue Star Camps. As a result of the foregoing, the Debtors do not believe that HTB has any remaining claims against the Debtors.

### 6. Community Bank, N.A.

Prior to the Petition Date, Community Bank, National Association ("CBNA") made (i) a loan in the original principal amount of $2,775,000, evidenced by that certain Loan Agreement among Chateaugay Campco, LLC and Chateaugay Landco, LLC (together the "Chateaugay Debtor Borrowers") and CBNA dated June 23, 2022, together with other related loan documents, including a Promissory Note dated June 23, 2022, in the amount of $2,775,000, executed by the Chateaugay Debtor Borrowers in favor of CBNA, a Collateral Mortgage on certain real property owned by Chateaugay Landco LLC dated June 23, 2022, executed by Chateaugay Landco LLC in favor of CBNA, and recorded in the Land Records of the Clinton County Clerk at Instrument Number 2022-00325375 on June 28, 2022, a Mortgage Assumption, Spreader and Consent Agreement, dated June 23, 2022, executed by Chateaugay Landco LLC in favor of CBNA, and recorded in the Land Records of the Clinton County Clerk at Instrument Number 2022-00325376 on June 28, 2022, an Assignment of Rents dated June 23, 2022, executed by the Chateaugay Debtor Borrowers in favor of CBNA, and recorded in the Land Records of the Clinton County Clerk at Instrument Number 2022-00325377 on June 28, 2022, a Security Agreement dated June 23, 2022, executed by the Chateaugay Debtor Borrowers in favor of CBNA granting CBNA a lien on the Collateral (as defined in the Security Agreement) of each applicable Chateaugay Debtor, which lien was perfected by the filing of a UCC-1 Financing Statement covering collateral identified thereon with the Secretary of State of New York at Filing Number 202207260315623 on July 26, 2022.

As of the Petition Date, the Chateaugay Debtor Borrowers were jointly and severally indebted to CBNA in the aggregate principal of approximately $2,269,928. CBNA has been paid out of the proceeds associated with the sale of Camp Chateaugay. As a result, the Debtors do not believe that CBNA has any remaining claims against the Debtors.

**7. Bank of America, N.A.**

On or about September 30, 2022, Summit Camp, LLC ("Summit Camp") entered into that certain Loan Agreement with Bank of America, together with other related loan documents, including an Open-End Mortgage, Assignment of Rents, Security Agreement and Fixture Filing on certain real property owned by Summit Camp and a Security Agreement. Bank of America asserts that, as of the Petition Date, its principal loan balance is approximately $3,380,079.

The Committee undertook a review of the liens and claims associated with the Bank of America loan to Summit Camp. On October 8, 2026, the Debtors satisfied Bank of America's claims with proceeds from the sale of Summit Camp. As a result of the foregoing, the Debtors do not believe that Bank of America has any remaining claims against the Debtors.

**8. Enhanced Capital Pennsylvania Rural Fund, LLC**

On January 31, 2022, Green Lane Operatingco, LLC ("Green Lane") and Enhanced Capital Pennsylvania Rural Fund, LLC ("Enhanced Capital") entered into that certain Loan and Security Agreement, pursuant to which Enhanced Capital provided a term loan to Green Lane in an original principal amount equal to $2,000,000.00 (the "Enhanced Term Loan"). Enhanced Capital also entered into several ancillary agreements to the Enhanced Term Loan, including, (i) that certain Guaranty Agreement between BAHS Holdings LLC and Enhanced Capital; (ii) that certain Entity Guaranty Agreement between BAHS Operating Inc. and Enhanced Capital; (iii) that certain Guaranty Agreement between Green Lane Landco, LLC and Enhanced Capital; and (iv) that certain Guaranty Agreement between Michael Shabsels and David Shabsels and Enhanced Capital.

Enhanced Capital asserts that, as of the Petition Date, it is owed $2,502,031, exclusive of any late fees or charges or attorneys' fees.

**9. U.S. Small Business Administration**

On varying dates prior to the Petition Date in 2020, the U.S. Small Business Administration (the "SBA") made various (COVID-19) Economic Injury Disaster Loans (each, an "EIDL") to certain of the Debtors. The SBA asserts that the EIDLs are comprised of the following:

| Debtor | Outstanding Amount (as of the Petition Date) |
|---|---|
| Greenvilleland LLC | $147,873.53 |
| Meadowbrook Landco LLC | $131,019.26 |
| Mohawkland LLC | $147,344.50 |
| Bluestar Landco LLC | $147,372.78 |
| Club Getaway Landco LLC | $147,951.79 |
| Eagle's Landing Day Camp LLC | $144,634.60 |

| Debtor | Outstanding Amount (as of the Petition Date) |
|---|---|
| Achim Operatingco LLC | $147,172.64 |
| Mogenavco LLC | $147,478.12 |
| Mesorahland LLC | $147,810.32 |
| Banner Landco | $147,905.09 |
| BAHS Operating Inc. | $146,989.95 |
| SHAB Operating Inc. | $147,677.15 |
| BAHS Holdings LLC | $147,915.40 |
| Malka Operatingco LLC | $148,141.28 |
| Kiwi Landco LLC | $144,762.05 |
| Country Roads Landco LLC | $126,188.17 |
| Mogenavland LLC | $147,857.73 |
| Lavland LLC | $121,164.05 |

### 10. Seller Notes

#### a. Sports & Arts Center at Island Lake, Inc.

Sports & Arts Center at Island Lake, Inc. ("Sport") entered into that certain Seller Note dated on or about January 18, 2022 with Island Lake Landco LLC and Island Lake Campco LLC as borrowers (the "Sport Note Purchase Agreement"). The obligations of Island Lake Landco LLC are secured by a mortgage lien pursuant to that certain Mortgage, Assignment of Leases and Rents and Security Agreement dated on or about January 18, 2022 whereby Island Lake Landco LLC granted to Sport a mortgage on real property located at 50 Island Lake Road, Starrucca, Pennsylvania, 18462, which was recorded on January 21, 2022.

The Committee undertook a review of the liens and claims associated with the Sport Note Purchase Agreement. On September 28, 2026, the Debtors satisfied Sport's claims arising from the Sport Note Purchase Agreement with proceeds from the sale of Island Lake Camp. As a result of the foregoing, the Debtors do not believe that Sport has any remaining claims against the Debtors arising from the Sport Note Purchase Agreement.

#### b. Camping Management Corporation

Camping Management Corporation ("CMC") holds a subordinated mortgage lien, a security interest in fixtures and chattels, and a pledge of one hundred percent of the membership interests in the Pine Forest Debtors, each securing a Subordinated Promissory Note dated December 13, 2022 in the original principal amount of $3,860,000.00 (the "Subordinated Note"). CMC's lien is subordinate to Wayne Bank's lien pursuant to that certain Subordination and Intercreditor Agreement dated December 7, 2022 (effective December 13, 2022) among Wayne Bank, the Pine Forest Debtors, and CMC.

On August 4, 2026, the Court entered the Pine Forest Sale Order. Pursuant to the Pine Forest Sale Order, the Pine Forest Buyers credit bid the Subordinated Note and, at closing, CMC's claims arising from the Subordinated Note were waived against the Debtors' estates. As a result

of the foregoing, the Debtors do not believe that CMC has any remaining claims against the Debtors arising from the Subordinated Note.

**c. Chateaugay Lake Camp Inc.**

Prior to the Petition Date, Chateaugay Lake Camp Inc. ("Chateaugay Lake") made a loan in the original principal amount of $1,045,000, evidenced by that certain Subordinated Promissory Note dated June 23, 2022, in the amount of $1,045,000, executed by the Chateaugay Debtor Borrowers in favor of Chateaugay Lake and Harold Lyons, a Mortgage and Security Agreement on certain real property owned by Chateaugay Landco LLC dated June 23, 2022, executed by Chateaugay Landco LLC in favor of Chateaugay Lake, and recorded in the Land Records of the Clinton County Clerk at Instrument Number 2022-00325378 on June 28, 2022, a Security Agreement dated June 23, 2022, executed by the Chateaugay Debtor Borrowers in favor of Chateaugay Lake granting Chateaugay Lake a lien in the Collateral Security (as defined in the Security Agreement) of each applicable Chateaugay Debtor, which lien was perfected against the Collateral Security owned by Chateaugay Landco LLC by the filing of a UCC-1 Financing Statement with the Secretary of State of New York at Filing Number 202207148333698 on July 14, 2022.

As of the Petition Date, the Chateaugay Debtor Borrowers were jointly and severally indebted to Chateaugay Lake in the aggregate principal amount of not less than $1,045,000.

**2.2.2 The MCA Loans**. In the weeks and months leading up to the Petition Date, the Debtors became obligated on short-term loans (the "MCA Loans") provided by approximately forty-two (42) merchant cash advance and short-term funders and lenders (the "MCA Lenders"). As of the Petition Date, the MCA Loans total in excess of $100 million in the aggregate. In general, the MCA Lenders were purportedly granted security interests in certain of the Debtors' collateral in the MCA Loans, subject to further review and investigation by the Debtors. Also, in many cases, the MCA Loans were guaranteed by multiple entities within the Debtors' organizational structure. Many MCA Lenders were also given access to the Debtors' bank accounts through ACH authorizations contained in the loan agreements. Claims asserted against the Holding Company Debtors on account of the MCA Loans are classified under the Plan as Disputed Secured MCA Claims (Class 5) or Disputed Unsecured MCA Claims (Class 6). The Holding Company Debtors do not believe that any MCA Lender holds a valid, perfected security interest in any Asset of the Holding Company Debtors, and dispute the characterization, amount and secured status of substantially all of the MCA Loans, including on the grounds described in the Camp Business Debtors' disclosure statement.

**2.2.3 General Unsecured Creditors**. Based on the claims register maintained by Kroll as of October 7, 2026 and the Holding Company Debtors' review thereof, the Holding Company Debtors estimate that General Unsecured Claims against the Holding Company Debtors, exclusive of Lender Deficiency Claims, Disputed Unsecured MCA Claims and Subordinated Securities Claims, aggregate approximately $[●] million. The Holding Company Debtors reserve all rights to object to any Claim, and the actual amount of Allowed Claims may differ materially from these estimates.

**2.2.4 <u>The Holding Company Debtors' Assets and Sources of Distributions</u>**. Distributions under the Plan will be funded from the Assets of the Holding Company Debtors, which the Holding Company Debtors currently estimate consist of: (a) Cash of approximately $[●] as of [●], 2026; (b) SIMAD Holdings Ltd.'s interest in Willow Lake Day Camps, LLC and Willow Lake Land Corporation; (c) Causes of Action against the DAMIS Debtors, claims under section 550 of the Bankruptcy Code against any subsequent transferees of funds, including Michael Shabsels and David Shabsels, and claims on account of other amounts owed by the DAMIS Debtors to the Holding Company Debtors; (d) other Retained Causes of Action, including against current and former insiders of the Debtors; (e) Claims and Causes of Action of the Holding Company Debtors against any other Debtor (including the Camp Business Debtors (if any)), which are preserved under Article IV.R of the Plan; (f) the equity interests in the Holding Company Debtors' direct and indirect subsidiaries; and (g) rights under the Debtors' insurance policies. Recoveries on the Causes of Action against the DAMIS Debtors will depend upon the administration of the DAMIS Debtors' estates. A schedule of Retained Causes of Action will be Filed with the Plan Supplement.

## 2.3 EVENTS LEADING TO THE BANKRUPTCY FILINGS

These Chapter 11 Cases were filed due to the potentially catastrophic impact on the SIMAD Debtors' ability to operate resulting from the substantial purported duplicate debt obligations to which the SIMAD Debtors were made a party. Among other things, prior to the Petition Date, the SIMAD Debtors were in default on payments owed to Israeli Bondholders in connection with obligations due under certain certificates of indebtedness (nonconvertible) (the "<u>Debentures (Series A)</u>"). Those obligations owed under the Debentures (Series A) were secured by pledges made by the Debtors against certain collateral in favor of the Bondholders and the Trustee for the Bondholders. The Debtors were unable to make the first interest payment on the Debentures (Series A) and were in default as of May 31, 2026.

Additionally, in the days leading up to the filing of these Chapter 11 Cases, the Debtors' and their affiliates' estates were at risk of defaulting on their obligations on the MCA Loans. The Debtors were concerned that if a single MCA Loan went into default and was accelerated, the MCA Lenders may have exercised remedies upon default that would have left the Debtors without access to cash and accounts receivable.

Ultimately, the Debtors determined that filing for Chapter 11 protection, utilizing cash collateral, and seeking approval of the DIP Financing and a sale while pursuing an orderly liquidation of their assets was their best available option.

## 2.4 THE DEBTORS' BANKRUPTCY PROCEEDINGS

**2.4.1 <u>The Petition Date</u>**. On June 4 and 5, 2026 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

**2.4.2 <u>The First Day Operational Orders</u>**. On June 8, 2026, the Debtors filed their *Emergency Motion for Entry of An Interim Order (I) Authorizing the Debtors' Immediate Use of Cash Collateral and Existing Bank Accounts For Purposes of Satisfying Prepetition Gross*

*Salaries, Payroll Taxes, and Other Critical Expenses, (II) Authorizing the Debtors to Satisfy and Direct Payroll Banks to Honor Certain Prepetition Gross Salaries and Payroll Taxes of their Employees, (III) Authorizing the Debtors' Continued Use of Their Cash Management System, Honor Certain Prepetition Obligations Related Thereto, and Continue Additional Transactions, and (IV) Granting Related Relief* [Docket No. 7] (the "Emergency Motion") seeking, among other things, operational relief on an emergent basis to afford the Debtors sufficient time to prepare a complete submission of operational motions. Shortly thereafter, the Debtors filed several motions seeking certain operational relief by virtue of so-called first day orders. The first day orders assisted the Debtors in transitioning into operating as debtors-in-possession by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. The first day orders in the Chapter 11 Cases authorized, among other things:

- payments to the Debtors' critical vendors on an interim basis [Docket No. 132];
- the continuation of the Debtors' insurance programs on an interim basis [Docket No. 134];
- safeguards to provide assurance to utility providers on an interim basis [Docket No. 135];
- the appointment of Kroll as the noticing agent in these Chapter 11 Cases [Docket No. 136];
- the continued maintenance of the Debtors' bank accounts, continued use of existing business forms, and continued use of the Debtors' existing cash management system on an interim basis [Docket No. 137]; and
- payments to employees for accrued prepetition wages, salaries, and benefits on an interim basis [Docket No. 156].

**2.4.3 The Cash Collateral Orders**. By the Emergency Motion, the Debtors asserted that continued access to cash collateral was necessary to maintain operations, pay employees and vendors, and avoid disruptions to the camps operated by the Debtors. The Bankruptcy Court held an emergency hearing and granted emergency relief on an interim basis. *See Interim Order (I) Authorizing the Debtors' Immediate Use of Cash Collateral and Existing Bank Accounts For Purposes of Satisfying Prepetition Gross Salaries, Payroll Taxes, and Other Critical Expenses, (II) Authorizing the Debtors to Satisfy and Direct Payroll Banks to Honor Certain Prepetition Gross Salaries and Payroll Taxes of their Employees, (III) Authorizing the Debtors' Continued Use of Their Cash Management System, Honor Certain Prepetition Obligations Related Thereto, and Continue Additional Transactions, and (IV) Granting Related Relief* [Docket No. 17].

On June 14, 2026, the Debtors filed their *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 61] (the "Cash Collateral Motion"), seeking



54414475

Bankruptcy Court approval to utilize cash collateral of various prepetition secured parties in order to fund operations during the 2026 summer camp season and preserve going-concern value. Several parties filed reservations of rights and objections to the Debtors' requested use of cash collateral, raising various issues, including: (a) whether the objecting parties possessed valid, perfected, and enforceable liens in certain assets and cash proceeds; (b) the relative priority of competing security interests; (c) whether the proposed adequate protection package sufficiently protected the objecting parties against diminution in the value of their collateral; and (d) the appropriateness of proposed findings, stipulations, and waivers contained in the cash collateral orders [Docket Nos. 88, 96, 103, 108, 393, 435].

On June 17, 2026, the Bankruptcy Court held a hearing on the Cash Collateral Motion and subsequently entered certain orders approving the Debtors' use of cash collateral on an interim basis [Docket Nos. 142, 143, 144, 145, 146, 147, 148, 149, 150, 166, 167].

**2.4.4 <u>The July 20, 2026 Hearing</u>**. On July 20, 2026, the Bankruptcy Court held a final hearing on certain of the first day motions. As a result of that hearing, the Bankruptcy Court entered a further order authorizing the continued maintenance of the Debtors' bank accounts, continued use of existing business forms, and continued use of the Debtors' existing cash management system, on a second interim basis, and payments to the Debtors' critical vendors on a second interim basis [Docket No. 549]. Additionally, the Bankruptcy Court also entered orders which authorized, among other things:

- payments to the Debtors' critical vendors on a final basis [Docket No. 542];
- the continuation of the Debtors' insurance programs on a final basis [Docket No. 544];
- safeguards to provide assurance to utility providers on a final basis [Docket No. 546]; and
- payments to employees for accrued prepetition wages, salaries, and benefits on a final basis [Docket No. 548].

**2.4.5 <u>The Debtors' Professionals Retention Applications</u>**. To further facilitate the Debtors' restructuring efforts and ease administrative burdens, the Debtors filed applications to retain professionals postpetition pursuant to sections 327, 328, 105, and 363 of the Bankruptcy Code, including:

- ***Cole Schotz P.C., as Counsel for the Debtors and Debtors in Possession*** [Docket No. 308] (as approved at Docket No. 451);
- ***FTI Consulting, Inc., as Financial Advisors for the Debtors and Debtors in Possession*** [Docket No. 309] (as approved at Docket No. 458);
- ***SSG Advisors, LLC, as Investment Bankers for the Debtors and Debtors in Possession*** [Docket No. 310] (as approved at Docket No. 559); and

- ***Kroll Restructuring Administration LLC, as Claims and Noticing Agent and Administrative Advisor for the Debtors and Debtors in Possession*** [Docket Nos. 53 and 555] (as approved at Docket Nos. 136 and 782).

**2.4.6 DIP Financing**. Since the Petition Date, the Debtors have sought to obtain postpetition financing (collectively, "DIP Financing") to address immediate liquidity needs and continue to fund their obligations while avoiding any disruption to being able to open and operate the camps during the pinnacle summer season. Absent the DIP Financing, the enterprise value of the camps would have been in jeopardy, and, more critically, so would the health, safety, and well-being of thousands of young campers.

On June 24, 2026, the Debtors filed *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the SIMAD Debtor Borrowers to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 225] (the "Bondholder DIP Motion"). On June 26, 2026, after a hearing, the Bankruptcy Court granted the relief requested in the Bondholder DIP Motion on an interim basis (the "Interim Bondholder DIP Order") [Docket No. 299]. The Interim Bondholder DIP Order, among other things, approved postpetition, superpriority, senior secured, priming Bondholder debtor-in-possession financing from the Series A Bondholders of SIMAD Holdings Ltd., including Klirmark Opportunity Fund IV L.P. in an aggregate principal amount not to exceed $174,000,000, which is inclusive of $58,000,000 of superpriority senior secured new money term loans comprising (i) $20,000,000 to be funded upon entry of the Interim Bondholder DIP Order, and (ii) $40,000,000 upon entry of a final order (the "Bondholder DIP Facility"). Additionally, this financing is subject to a roll-up in the collective aggregate principal amount of $116,000,000—the roll-up converted the Debtors' prepetition obligations on a 2:1 basis (*i.e.*, $2.00 of prepetition obligations converted for each $1.00 of new DIP loan funds actually drawn and funded). On July 21, 2026, the Bankruptcy Court entered its order approving the relief sought in the Bondholder DIP Motion on a final basis [Docket No. 552]. Payment in full of the DIP Roll-Up Claim, including fees and expenses incurred and invoiced as of the Effective Date, is a condition precedent to the Effective Date.

On July 17, 2026, the Debtors filed *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Bluestar Debtor Borrowers to Obtain Postpetition Financing from HomeTrust Bank, (II) Authorizing the Bluestar Debtor Borrowers, LLC to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 504] (the "HTB DIP Motion"). On July 20, 2026, the Bankruptcy Court entered an interim order granting the HTB DIP Motion (the "Interim HTB DIP Order") [Docket No. 543]. The Interim HTB DIP Order authorizes the Bluestar Debtor Borrowers (as defined in the HTB DIP Motion) to obtain postpetition, superpriority, senior secured, priming debtor-in-possession financing from HomeTrust Bank ("HTB") in an amount not to exceed $4,500,000. On August 4, 2026, the Bankruptcy Court entered its order approving the relief sought in the HTB DIP Motion on a final basis [Docket No. 787].

On July 17, 2026, the Debtors also filed *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Chateaugay Debtor Borrowers to Obtain Postpetition Financing from*

*Community Bank, National Association, (II) Authorizing the Chateaugay Debtor Borrowers to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 506] (the "Chateaugay DIP Motion"). On July 20, 2026, the Bankruptcy Court entered an interim order granting the Chateaugay DIP Motion (the "Interim Chateaugay DIP Order") [Docket No. 545]. The Interim Chateaugay DIP Order approved postpetition, superpriority, senior secured, priming debtor-in-possession financing from Community Bank, National Association ("CBNA") in an aggregate principal amount not to exceed $1,200,000. On August 4, 2026, the Bankruptcy Court entered the second interim order concerning the Chateaugay DIP Motion [Docket No. 788]. On August 31, 2026, the Bankruptcy Court entered its order approving the relief sought in the Chateaugay DIP Motion on a final basis [Docket No. 1040].

**2.4.7 The Sale Transactions**. As explained above, the Debtors filed these Chapter 11 Cases to engage in a process to sell substantially all of their assets so that they could maximize the value of their Estates for the benefit of all of their constituents and preserve their ongoing business. Accordingly, the Debtors have been involved in sale processes as part of a concerted effort to maximize the value of their assets.

On June 24, 2026, the Debtors filed the *Motion For Entry of an Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 227] seeking, among other things, entry into the Stalking Horse APA, approval of certain bidding procedures to effectuate a sale of certain or substantially all of their assets (the "Sale"), the scheduling of a sale hearing, and approval of a sale to a bidder or bidders submitting the highest and best offer(s) at an auction, if necessary (the "Auction"). On June 27, 2026, the Debtors filed an application to retain SSG Advisors, LLC as their investment banker pursuant to their prepetition engagement agreement with SSG Advisors, LLC. On July 22, 2026, the Bankruptcy Court entered an Order approving the Debtors' retention of SSG Advisors, LLC [Docket No. 559].

On June 26, 2026, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 298] (the "Bidding Procedures Order"). The Bidding Procedures Order, among other things, approved the Stalking Horse APA, specified procedures regarding bidding and the assumption and assignment of the Debtors' executory contracts and unexpired leases (the "Bidding Procedures"), and scheduled an Auction for July 28, 2026, at 10:00 a.m. prevailing Eastern Time, for the sale of the Debtors' Assets. The Bidding Procedures Order established July 17, 2026 at 4:00 p.m. as the deadline by which all bids must be received (the "Bid Deadline"). The Bidding Procedures Order also authorized the Debtors to designate one or more Stalking Horse Bidders and required that the respective Stalking Horse Agreements must be entered into by no later than July 9, 2026 at 4:00 p.m. (ET). Pursuant to the Bidding Procedures Order, objections to any proposed Sale Transaction, Sale Order and Notice of Successful Bidders must be made on or before July 31, 2026 at 4:00 p.m. (ET).

The Sale Transactions described below were consummated by the Camp Business Debtors and other SIMAD Debtors. None of the Holding Company Debtors was a seller under any Sale Transaction, and the proceeds of the Sale Transactions are not Assets of the Holding Company Debtors and are not available for distribution under the Plan.

Prior to the Auction, the Debtors entered into four (4) Private Sale Transactions (as defined in the Bidding Procedures Order) [Docket Nos. 433, 509, 551, and 601] with respect to Camp Achim, Camp Mesorah, Camp Chen-A-Wanda, and Pine Forest Camps. The Court entered orders with respect to these Private Sale Transactions as follows:

| Camp(s) | Buyer(s) | Sale Order Docket No. | Purchase Price |
|---|---|---|---|
| Camp Achim | Camp Achim LLC | 539 | $7,000,000 |
| Camp Mesorah | DHAN Masores LLC | 785 | $5,608,362.95[5] |
| Camp Chen-A-Wanda | Eleven11 Holdings LLC | 849 | $17,000,000 |
| Pine Forest Camps | Pine Forest 1931, LLC<br>Pine Forest 1931 Land, LLC | 788 | $35,079,000[6] |

The Auction took place on July 28, 2026 and concluded on July 30, 2026. Interested parties submitted bids through July 31, 2026. Thereafter, the Debtors selected the highest and best bid as the purchaser for each of the respective camps that were subject to sale. On August 4, 2026, the Debtors filed *Notice of Successful Bidders With Respect to Certain of the Debtors' Assets* [Docket No. 789] with respect to the following twenty-three (23) camps which were subject to the Auction:

1. Banner Day Camp
2. Club Getaway
3. Country Roads Day Camp
4. Eagle's Landing Day Camp
5. Camp Echo
6. Camp Green Lane
7. Island Lake Camp
8. Camp Lavi
9. Camp Lokanda
10. Greenville Land / Malka
11. Meadowbrook Country Day Camp
12. Mohawk Day Camp
13. Rolling Hills Country Day Camp
14. Camp Mogen Avraham
15. Blue Star Camps
16. Indian Acres Camp for Boys & Forest Acres Camp for Girls
17. Camp Med-O-Lark
18. New England Golf and Tennis Camp
19. Camp North Star
20. Camp Waukeela
21. Camp Wekeela
22. Windsor Mountain Summer Camp
23. Summit Camp and Travel

---

5 Purchase Price consisted of a credit bid in the aggregate amount of at least $5,608,362.95, comprised of: (i) $3,808,362.95 in prepetition secured indebtedness under the related existing loan documents, and (ii) $1,800,000 of DIP Obligation under the DIP Consent Order [Docket No. 287].

6 The Purchase Price consisted of, among other things, a Credit Bid of the Wayne Bank debt, the Mizzen-Pine Forest Loan, and the CMC Seller Note.

On August 5, 2026, the SIMAD Debtors separately filed *Notice of Successful Bidders With Respect to Certain of the SIMAD Debtors' Assets* [Docket No. 800] which noticed the Successful Bidder with respect to Camp Lavi.

The Bankruptcy Court held a hearing to approve the Sale Transactions on August 10, 2026 at 11:00 a.m. (ET) (the "Sale Hearing"). At the Sale Hearing, the Court approved the Sale Transactions as proposed. Subsequently, the Court entered the Sale Orders approving the following Sale Transactions:

| Camp(s) | Buyer(s) | Sale Order Docket No. | Purchase Price |
|---|---|---|---|
| Banner Day Camp | Yes Camps, LLC | 1502 | $26,880,000 |
| Club Getaway | LGTFPS Holdings LLC | 1174 | $13,250,000 |
| Country Roads Day Camp | Jewish Community Center of Greater Monmouth County | 877 | $14,500,000 |
| Eagle's Landing Day Camp | Mario Del Cueto | 936 | $5,200,000 |
| Camp Echo | American Youth Camping Holdco LLC | 1078[7] | $16,700,000 |
| Camp Green Lane | Camp Green Lane, LLC | 897 | $8,000,018.18 |
| Island Lake Camp | CMAO Land Co., LLC CMAO, LLC | 865 | $13,000,000 |
| Camp Lavi | Ohel Children's Home and Family Services, Inc. | 967 | $8,750,000 |
| Camp Lokanda | American Youth Camping Holdco LLC | 1080 | $19,327,800 |
| Greenville Land / Malka | Cho Pro Holdings, LLC | 1364 | $8,150,000 |
| Meadowbrook Country Day Camp | Coleman Investments LLC | 1048 | $12,250,000 |
| Mohawk Day Camp | FW CampCo LLC | 860[8] | $120,750,000 |
| Rolling Hills Country Day Camp | YES Camps, LLC | 1049 | $28,500,000 |
| Camp Mogen Avraham | SHMA, LLC | 1046 | $22,400,000 |
| Blue Star Camps | New Blue Star Opco LLC | 853 | $13,650,000 |
| Indian Acres Camp for Boys & Forest Acres Camp for Girls | American Youth Camping Holdco LLC | 1079[9] | $6,000,000 |

7 A *Supplemental Order Clarifying the Terms of the Sale Order Approving that Certain Asset Purchase Agreement Dated September 4, 2026 By and Between American Youth Camping Holdco, LLC, SHAB Operating Inc., and SHAB Holdings LLC* [Docket No. 1139] was entered on September 16, 2026 which clarified that certain leases were not deemed an "Acquired Asset" under that respective Asset Purchase Agreement.

8 On October 6, 2026, the Court entered the *Supplemental Order (I) Authorizing the Sale of Substantially All Assets of Mohawk Country Day School and (II) Granting Related Relief* [Docket No. 1316].

9 A *Supplemental Order Clarifying the Terms of the Sale Order Approving that Certain Asset Purchase Agreement Dated September 4, 2026 By and Between American Youth Camping Holdco, LLC, IAFALANDCO LLC, and*

| Camp(s) | Buyer(s) | Sale Order Docket No. | Purchase Price |
|---|---|---|---|
| Camp Med-O-Lark | American Youth Camping Holdco LLC | 1077[10] | $2,300,000 |
| New England Golf & Tennis Camp | Bank of New Hampshire | 888 | $2,000,000 (via credit bid) |
| Camp North Star | American Youth Camping Holdco LLC | 1081[11] | $6,250,000 |
| Camp Waukeela | Andrew Shlensky | 968 | $1,200,000 |
| Camp Wekeela | American Youth Camping Holdco LLC | 1082[12] | $9,900,000 |
| Windsor Mountain Summer Camp | Red Pines, LLC | 1522 | $8,500,000 |
| Summit Camp and Travel | 168 Duck Harbor Land LLC | 1181 | $4,800,000 |

On September 26, 2026, the Court entered an order approving the sale of Camp Chateaugay to Friends of Chateaugay LLC for a cash purchase price of $3,563,978.67. [Docket No. 1274].[13]

On November 3, 2026, the Court entered an order approving the sale of Kiwi Country Day Camp to LKQE Associates, LLC for a cash purchase price of $9,200,000 [Docket No. 1482].

**2.4.8** **<u>OrcaFunding Characterization Dispute</u>**. On August 25, 2026, the Debtors and OrcaFunding LLC ("<u>OrcaFunding</u>") entered into that certain Stipulation and Agreed Scheduling Order Regarding Characterization of OrcaFunding LLC's Sale of Future Receipts Agreements [Docket No. 932] (the "<u>Scheduling Order</u>") by which the Debtors and OrcaFunding agreed to have the Court make a determination of whether the Sale of Future Receipts Agreements between the parties constitute true sales of future receipts or disguised loans (the "<u>Characterization</u>

*IAFAOPERATINGCO LLC* [Docket No. 1131] was entered on September 16, 2026 which clarified that certain leases were not deemed an "Acquired Asset" under that respective Asset Purchase Agreement.

10 A *Supplemental Order Clarifying the Terms of the Sale Order Approving that Certain Asset Purchase Agreement Dated September 4, 2026 By and Between American Youth Camping Holdco, LLC, Camp Med-O-Lark, Inc. and Washington Lake, LLC* [Docket No. 1132] was entered on September 16, 2026 which clarified that certain leases were not deemed an "Acquired Asset" under that respective Asset Purchase Agreement.

11 A *Supplemental Order Clarifying the Terms of the Sale Order Approving that Certain Asset Purchase Agreement Dated September 4, 2026 By and Between American Youth Camping Holdco, LLC, Poland Landco LLC and Poland Campco LLC* [Docket No. 1133] was entered on September 16, 2026 which clarified that certain leases were not deemed an "Acquired Asset" under that respective Asset Purchase Agreement.

12 A *Supplemental Order Clarifying the Terms of the Sale Order Approving that Certain Asset Purchase Agreement Dated September 4, 2026 By and Between American Youth Camping Holdco, LLC, Wekeeland LLC, and Mainewekeelaco LLC* [Docket No. 1134] was entered on September 16, 2026 which clarified that certain leases were not deemed an "Acquired Asset" under that respective Asset Purchase Agreement.

13 On October 13, 2026, the Court entered *Amended Order (I) Approving Asset Purchase Agreement Between Friends of Chateaugay LLC and Chateaugay Campco LLC and Chateaugay Landco LLC (II) Authorizing the Sale of Substantially all Assets of Chateaugay Campco LLC and Chateaugay Landco LLC Free and Clear of All Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. §§ 363(b), and 363(f), (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365, and (IV) Granting Related Relief* [Docket No. 1350].

Dispute"). In accordance with the Scheduling Order, the parties engaged in discovery regarding the Characterization Dispute and filed extensive pleadings and briefs regarding the Characterization Dispute at Docket Nos. 225, 312, 413, 414, 503, 518, 1092, 1156, 1162, 1177, 1182, 1188, and 1198. On September 29, 2026, the Court held a hearing to determine whether the agreements between the Debtors and OrcaFunding LLC constituted disguised loans or true sales. On October 19, 2026, the DAMIS Debtors filed a joinder to the SIMAD Debtors' position with respect to the Characterization Dispute [Docket No. 1362]. As of the date hereof, the Court has not rendered a decision on the issue presented.

**2.4.9 Committee Settlement**. On October 11, 2026, the Debtors filed the *Joint Motion of the Debtors, the Official Committee of Unsecured Creditors, and the Lender Parties for Entry of an Order (I) Approving Settlement Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief* [Docket No. 1336] (the "Committee Settlement Motion"). The Committee Settlement Motion sought approval of a comprehensive, consensual settlement (the "Committee Settlement") which resolves the Committee's potential Challenges (as defined in the Committee Settlement Motion) relating to the Lender Parties' (as defined in the Committee Settlement Motion) asserted liens, secured claims, and roll-up DIP financing. The Committee Settlement includes, among other things, a $13 million cash fund for the exclusive benefit of holders of allowed general unsecured claims, continued funding of the chapter 11 cases through confirmation and consummation of a chapter 11 plan pursuant to the Approved Budget, the Lender Parties' support for a liquidation trust to pursue estate causes of action, and preservation of claims against non-settling parties. As described in the Committee Settlement Motion, the Committee Settlement avoids the expense, delay, and uncertainty of complex litigation while providing a substantial and immediate benefit to unsecured creditors and facilitating confirmation of a chapter 11 plan. The United States, on behalf of the IRS, objected to the Committee Settlement Motion [Docket No. 1368], asserting, among other things, that the Settlement Fund would provide a recovery to holders of general unsecured claims without providing for payment of administrative and priority claims. The Committee, in its reply filed on October 23, 2026 [Docket No. 1376], disputed that objection on the grounds that the Settlement Fund is funded from amounts otherwise recoverable by the Prepetition Secured Parties on account of their secured claims, is not property of the Estates, and is not subject to the distribution priorities of the Bankruptcy Code. The Bankruptcy Court held a hearing on the Committee Settlement Motion on October 26, 2026 and, on that date, signed the 9019 Settlement Order approving the settlement, which was entered on the docket on October 27, 2026 [Docket No. 1388]. The 9019 Settlement Order is a final order of the Bankruptcy Court, and the Settlement Effective Date occurred on October 27, 2026. In the 9019 Settlement Order, the Bankruptcy Court found, among other things, that the Settlement is fair, reasonable, and in the best interests of the Debtors, their estates, and their creditors and satisfies the standards for approval under Bankruptcy Rule 9019, and that the Settlement Fund constitutes a voluntary contribution by the Prepetition Secured Parties from their own recoveries on account of the Prepetition Secured Claim, is held in trust solely for the benefit of holders of allowed general unsecured claims, and is not property of the Debtors' estates. The United States, on behalf of the IRS, has appealed the 9019 Settlement Order to the United States District Court for the District of New Jersey, which is pending at case number 26-CV-14496-GC.

**2.4.10 Tax Withholding Issues**. In connection with the sale of certain real property assets, the Debtors became aware that, as a result of their corporate structure, SIMAD Holdings Ltd. may be subject to tax liability and/or that certain withholding obligations may apply



54414475

to the sale of assets owned by certain Exempt Entities (as defined in the FIRPTA Motion and the FIRPTA Supplement referenced below) pursuant to the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"). Specifically, FIRPTA generally imposes a withholding obligation on purchasers acquiring United States real property interests from a transferor that the Internal Revenue Service (the "IRS") deems to be a foreign person or entity for federal income tax purposes.

As set forth in the *SIMAD Debtors' Emergency Motion Requesting a Determination of Certain Tax Withholding Obligations Pursuant to the Foreign Investment in Real Property Tax Act of 1980* [Docket No. 1141] (the "FIRPTA Motion")[14], the Debtors asserted that any purported withholding obligations apply only to certain Exempt Entities, that the transactions involving such Exempt Entities fall within an exception to FIRPTA withholding requirements, and that FIRPTA ultimately may not apply to the Debtors. In response, the IRS filed the *United States' Response to Motion for Tax Determination* [Docket No. 1286] (the "FIRPTA Objection"), asserting, among other things, that the Bankruptcy Court lacked jurisdiction to adjudicate the issues raised in the FIRPTA Motion and that no exception from FIRPTA withholding requirements applied.

On October 4, 2026, the Debtors filed the *Reply in Support of SIMAD Debtors' Emergency Motion Requesting a Determination of Certain Tax Withholding Obligations Pursuant to the Foreign Investment in Real Property Tax Act of 1980* [Docket No. 1305] (the "FIRPTA Reply").[15] The Bankruptcy Court conducted a hearing on the FIRPTA Motion on October 5, 2026, and granted the requested relief on the record. The IRS and the Debtors were unable to agree upon the form of the proposed order, and the Bankruptcy Court has deferred entry of an order pending the parties' agreement to participate in mediation. Pending the resolution of the FIRPTA Motion, the Debtors have entered into agreements with various purchasers of the assets of Exempt Entities to escrow funds on account of the purported FIRPTA withholding obligations. As of the date of this Disclosure Statement, no resolution has been reached. The Debtors reserve all rights with respect to the FIRPTA Motion and any related matters.

Approximately $19.9 million of proceeds of the Sale Transactions related to the Debtors had been withheld, escrowed or reserved on account of purported FIRPTA withholding obligations, including approximately $12.2 million withheld by the escrow agent in connection with the sale of Mohawk Day Camp. If the FIRPTA Motion is resolved in the Debtors' favor, such amounts (net of any tax determined to be due) will become available for application in accordance with the Sale Orders, the Final Mishmeret DIP Order and the Plan. If it is not, such amounts will be remitted to the IRS and will not be available to satisfy Claims. The Liquidation Analysis attached hereto as Exhibit C treats such amounts as not available for distribution pending resolution of the FIRPTA Motion.

---

[14] The SIMAD Debtors also filed a supplement to the FIRPTA Motion [Docket No. 1279] (the "FIRPTA Supplement") disclosing certain additional Exempt Entities.

[15] Since the filing of the FIRPTA Motion, the SIMAD Debtors have also filed certain supplemental notices advising the Bankruptcy Court of the closing of certain sales, as required under FIRPTA and contemplated in the FIRPTA Motion. *See* Docket Nos. 1161, 1351, 1396, 1489, and 1537. Similar notices will be filed with respect to additional closings involving Exempt Entities, as applicable.

*$ in millions*

| Camps | Purchase Price | | Purchase Price Allocation | | FIRPTA Exposure | |
|---|---|---|---|---|---|---|
| Achim | $ | 7.0 | $ | 3.5 | $ | 0.5 |
| Echo | | 16.7 | | 8.4 | | 1.3 |
| Mill Road | | 5.2 | | 4.5 | | 0.7 |
| Mohawk | | 120.8 | | 28.9 | | 12.2 |
| Chateaugay | | 3.6 | | 2.9 | | 0.0 |
| Malka | | 8.2 | | 6.1 | | 1.2 |
| MogenAv | | 22.4 | | 11.2 | | 4.0 |
| **Total** | **$** | **183.8** | **$** | **65.4** | **$** | **19.9** |

**2.4.11 SIMAD Investigations**. SIMAD Holdings Ltd. ("SIMAD") is currently the subject of parallel criminal and civil investigations by governmental authorities in the United States and Israel. In the United States, the U.S. Department of Justice ("DOJ"), specifically the United States Attorney's Office for the Eastern District of New York ("EDNY-USAO"), has opened a criminal grand jury investigation (Grand Jury Number 2026R000436) and, in connection therewith, issued a grand jury subpoena dated June 15, 2026 ("Subpoena") requesting company records and other documents from SIMAD. Separately, the DOJ, specifically the United States Attorney's Office for the Southern District of New York ("SDNY-USAO"), is conducting a civil investigation involving allegations of fraud in obtaining funds from the U.S. Small Business Administration's Paycheck Protection Program as provided by the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). The SDNY-USAO seeks damages and penalties for approximately $43 million under the False Claims Act, 31 U.S.C. § 3729 et seq. In addition, the New York Division of Enforcement of the U.S. Securities and Exchange Commission ("SEC") has opened an investigation relating to SIMAD and has requested that SIMAD produce all documents previously produced to EDNY-USAO pursuant to the Subpoena.

In Israel, the Israel Securities Authority ("ISA") has opened a criminal investigation to examine, among other things, SIMAD's alleged failure to make a scheduled interest payment on the Debentures (Series A), and the related subsequent disclosure that approximately $34 million belonging to Israeli Bondholders had been transferred to companies controlled by former SIMAD insiders Michael Shabsels and David Shabsels.

SIMAD, through its counsel, is cooperating with each of the foregoing criminal and civil investigations. SIMAD has produced documents in response to the Subpoena issued by EDNY-USAO and is continuing to respond to requests for information from SDNY-USAO. SIMAD has also voluntarily produced to the SEC the productions it produced in response to the EDNY-USAO Subpoena. SIMAD also reproduced each of the productions made in response to the EDNY-USAO Subpoena to the Creditors' Committee.

Given the nature of the investigations across multiple jurisdictions, SIMAD has coordinated its response to the investigations with the administration of these Chapter 11 Cases. As of the date of this Disclosure Statement, each of the investigations remains pending, and SIMAD cannot predict the timing or outcome of any of them. SIMAD will continue to cooperate with the applicable governmental authorities, DOJ, SEC and ISA, going forward; any cooperation by the Liquidation Trust shall be determined by the Liquidation Trustee in accordance with the

Liquidation Trust Agreement and/or applicable law, and shall be subject to the preservation of all applicable privileges and protections and to the resources of the Liquidation Trust. Nothing in this Disclosure Statement constitutes an admission of fact or liability with respect to any of the investigations, and SIMAD reserves all rights in connection therewith.

**2.4.12 Relationship to the Camp Business Plan; Intercompany Claims**. Concurrently herewith, the Camp Business Debtors have Filed the Camp Business Plan and a separate disclosure statement with respect thereto. The Plan and the Camp Business Plan are separate chapter 11 plans, each with its own Liquidation Trust, Liquidation Trustee, reserves and Committee Successor. The Holding Company Debtors and the Camp Business Debtors hold claims against one another and the treatment of such intercompany claims, and the allocation between the Liquidation Trust and the liquidation trust established under the Camp Business Plan of Causes of Action against the DAMIS Debtors, Michael Shabsels and David Shabsels has not yet been determined. Under Article IV.R of the Plan, notwithstanding anything to the contrary in the Plan, the Confirmation Order, or any other chapter 11 plan or order entered in the Chapter 11 Cases, all Claims and Causes of Action of each Holding Company Debtor against any other Debtor (including the Camp Business Debtors), any Affiliate, or any parent, subsidiary, or other related Entity are preserved, constitute Retained Causes of Action, and will vest in the Liquidation Trust on the Effective Date.

**2.4.13 The Mulligan Adversary Proceeding**. On November 13, 2026, the SIMAD Debtors commenced an adversary proceeding against Mulligan Funding LLC ("Mulligan") and FinWise Bank ("FinWise") in the Bankruptcy Court, captioned *SIMAD Holdings Ltd., et al. v. Mulligan Funding LLC and FinWise Bank,* Adv. Pro. No. 26-01656 (CMG). The adversary proceeding concerns two loans of $7,500,000 each that FinWise made on January 20, 2026 to non-Debtor affiliates DAMIS Holdings, LLC and SIMAD Holdings LLC (together, the "Loans"). Mulligan has filed fifty-six (56) substantially identical proofs of claim against the SIMAD Debtors, each in the amount of $17,073,810.00 and some asserted as secured. Mulligan asserts that the SIMAD Debtors are liable on the Loans under a borrower addendum that purports to add more than one hundred (100) entities as borrowers. The SIMAD Debtors allege that they never expressly agreed to be bound by the Loan agreements. They further allege that no documentation shows the individuals who signed the addendum had authority to bind them, and that they did not receive the benefit of the Loan proceeds. The SIMAD Debtors also contend that the proofs of claim do not establish whether Mulligan owns the Loans or only services them as FinWise's agent. In addition, the SIMAD Debtors allege that the claims may include unmatured or usurious interest.

On these grounds, the SIMAD Debtors seek to disallow the proofs of claim under sections 502(b) and 502(d) of the Bankruptcy Code, or to reduce or reclassify them. They also seek a declaration under section 506 that any claims are unsecured. In the alternative, the SIMAD Debtors seek to avoid three categories of transfers and obligations under sections 547 and 548 of the Bankruptcy Code:

- liens perfected through UCC financing statements filed on or one day before the Petition Date;

- approximately $2.96 million in payments made within the ninety days before the Petition Date and approximately $9.48 million in payments made within the two years before it; and

- the SIMAD Debtors' obligations under the Loans themselves.

The SIMAD Debtors also seek to recover any avoided transfers under section 550 and to preserve them for the estates under section 551. The Defendants have not yet responded to the complaint. The SIMAD Debtors cannot predict the outcome of the adversary proceeding or its effect on recoveries for Holders of Claims, and all parties reserve their rights.

**2.4.14 The Bar Dates**. On July 7, 2026, the Debtors filed the Debtors' *Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 406] seeking entry of an order (the "Bar Date Order"), establishing the following claims bar dates:

| | |
|---|---|
| ***General Claims Bar Date*** | **August 14, 2026, at 5:00 p.m., prevailing Eastern Time,** as the last date and time for all Persons and Entities to submit proofs of claim based on prepetition claims, including requests for payment under section 503(b)(9) of the Bankruptcy Code (collectively, "Proofs of Claim") against the Debtors (the "General Claims Bar Date"). |
| ***Governmental Bar Date*** | Solely as to Governmental Units, **December 2, 2026, at 5:00 p.m., prevailing Eastern Time**, as the last date and time for each such Governmental Unit to file Proofs of Claim asserting Claims against the Debtors that arose on or before the Petition Date (the "Governmental Bar Date"). |
| ***Amended Schedules Bar Date*** | In the event that the Debtors amend their Schedules (as defined herein), the later of (a) the General Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days from the date on which the Debtors provide notice of the amendment to the Schedules, as the last date and time by which claimants holding Claims affected by the amendment must file Proofs of Claim against the Debtors (such later date, the "Amended Schedules Bar Date"). |
| ***Rejection Damages Bar Date*** | Solely as to Claims arising from the Debtors' rejection of executory contracts and unexpired leases, the later of (a) (i) the General Claims Bar Date or (ii) the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days following entry of the order approving the Debtors' rejection of the applicable executory |

| | |
|---|---|
| | contract or unexpired lease as the last date and time by which claimants holding Claims based upon such rejection must file Proofs of Claim against the Debtors, unless otherwise ordered by the Bankruptcy Court (such later date, the "Rejection Damages Bar Date" and together with the General Claims Bar Date, the Governmental Bar Date, and the Amended Schedules Bar Date, collectively, the "Bar Dates"). |

2.4.15 **Schedules and Statements**. On August 3, 2026, the Debtors filed their *Statements of Financial Affairs and Schedules of Assets and Liabilities* [Docket Nos. 712-771, 780] (as amended or modified and together as, the "Schedules and Statements").

2.4.16 **The Creditors' Committee**. On July 9, 2026, the Office of the U.S. Trustee appointed the Committee in these Chapter 11 Cases consisting of: (i) Smaller Earth Group *dba* Camp Leaders; (ii) American Institute for Foreign Study Inc. *dba* Camp America; (iii) Tavezio; (iv) Camp Specialists Ltd; and (v) Kelly Smith Brown, Individually. *See* Docket No. 438. On August 25, 2026, the Bankruptcy Court entered orders [Docket Nos. 934, 937, 938] authorizing the Committee to employ and retain McDermott Will & Schulte LLP and Robinson & Cole LLP as its counsel and M3 Advisory Partners, LP as its financial advisor, effective as of July 10, 2026.

## III. FEASIBILITY

### 3.1 FINANCIAL FEASIBILITY ANALYSIS.

3.1.1 **The Bankruptcy Code Standard**. The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Holding Company Debtors unless contemplated by the Plan.

3.1.2 **No Need for Further Reorganization of the Holding Company Debtors**. The Plan provides for the liquidation or distribution of all of the Holding Company Debtors' Assets. Accordingly, the Holding Company Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Holding Company Debtors.

## IV. ALTERNATIVES TO THE PLAN

### 4.1 CHAPTER 7 LIQUIDATION

4.1.1 **The Plan is in the Best Interests of Creditors**. Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the Holding Company Debtors liquidated under chapter 7.

The Holding Company Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims and Interests under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

The Holding Company Debtors did not sell any assets in the Sale Transactions, and the Plan effects a wind down of the Holding Company Debtors' remaining Assets. Although a chapter 7 liquidation would achieve the same goal, the Holding Company Debtors believe that the Plan provides a greater recovery to Holders of Claims than a chapter 7 liquidation would. Liquidating the Holding Company Debtors' Estates under the Plan likely provides Holders of Claims with a larger, more timely recovery, primarily due to the additional costs and delay a chapter 7 trustee would incur in administering the Holding Company Debtors' Assets.

A chapter 7 liquidation beginning on what would have been the Effective Date would provide less recovery for creditors than the Plan. The Holding Company Debtors have no operating business; their Assets consist principally of SIMAD Holdings Ltd.'s interest in the Willow Lake Entities, Causes of Action, and the intercompany relationships among the Debtors and affiliates. A chapter 7 trustee would be required to become familiar with the Holding Company Debtors' Assets, which consist principally of Causes of Action, the Claims asserted against the Estates and the intercompany relationships among the SIMAD Debtors, and would not have the knowledge of those matters that the Holding Company Debtors, the Committee and their respective professionals have developed. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses.

Recoveries would be further reduced (in comparison with the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Holding Company Debtors' assets, and these specific Chapter 11 Cases, in order to complete the administration of the Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

The Holding Company Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Holding Company Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than ninety (90) days following conversion of the case to chapter 7. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Holding Company Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Holding Company Debtors submit that a chapter 7 liquidation would result in materially reduced recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Holding Company Debtors believe that the Plan provides an opportunity to bring the highest return for creditors. As set forth in the Liquidation Analysis attached hereto as Exhibit C, the Holding Company Debtors estimate that holders of Allowed General Unsecured Claims against the Holding Company Debtors would receive [●]% in a chapter 7 liquidation, as compared with an estimated recovery of approximately [●]% under the Plan.

### 4.2 ALTERNATIVE PLAN(S)

If the Plan is not confirmed, the Holding Company Debtors or other Persons could attempt to formulate and propose a different plan. The Holding Company Debtors believe that the Plan, as described herein, enables holders of Claims or Interests to realize the greatest possible value under the circumstances, and that compared to any alternative plan, the Plan has the greatest chance of being confirmed and consummated.

## V. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 5.1 GENERAL

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Holding Company Debtors and to certain U.S. Holders and Non-U.S. Holders (each as defined below) of Claims entitled to vote on the Plan, and it does not address the U.S. federal income tax consequences to Holders of Claims and Interests whose Claims and Interests are unimpaired or otherwise not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, revenue rulings and revenue procedures of the U.S. Internal Revenue Service (the "IRS") and any other published administrative rules and pronouncements of the IRS, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations. Changes in applicable tax law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Holding Company Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No

assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, or non-income tax consequences of the Plan (including such consequences with respect to the Holding Company Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Holding Company Debtors within the meaning of the IRC, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, retirement plans, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the IRC). This summary also assumes that the Claims against any of the Holding Company Debtors will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Holding Company Debtors "solely as a creditor" for purposes of section 897 of the IRC (and thus are not subject to withholding under the Foreign Investment in Real Property Tax Act). This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the IRC) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes, or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes). In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership. If you are a partner (or other beneficial owner) of a partnership (or other entity treated as a partnership or

other pass-through entity) that is, or will be, a Holder of a Claim, then you should consult your own tax advisors.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## 5.2 CONSEQUENCES TO THE HOLDING COMPANY DEBTORS

**5.2.1 Cancellation of Debt Income**. In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("CODI") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, a taxpayer is not required to include CODI in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case, or (b), to the extent that the taxpayer is insolvent immediately before the discharge. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

## 5.3 CONSEQUENCES TO CERTAIN U.S. HOLDERS OF CLAIMS AND INTERESTS

**5.3.1 Consequences to Holders of Allowed General Unsecured Claims**. A U.S. Holder of Allowed General Unsecured Claims that receives Cash will be treated as receiving payment in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) sum of the Cash received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the IRC.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

**5.3.2 Accrued Interest and OID**. A portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest or original issue discount ("OID") on such Claims. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Holding Company Debtors.

If the payment does not fully satisfy all principal and interest or OID on Allowed Claims, the extent to which payment will be attributable to accrued interest or OID is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed General Unsecured Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest or OID that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest or OID and then as a payment of principal. The IRS could take the position that the payment received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

**5.3.3 Market Discount**. Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 5.4 MATTERS RELATED TO THE DISPUTED CLAIMS RESERVE

Although not free from doubt, U.S. Holders should not recognize any gain or loss when amounts are set aside in the reserve for Disputed Claims but should recognize gain or loss in an amount equal to: (i) the amount of Cash actually distributed to such U.S. Holder from the reserve, less (ii) the U.S. Holder's adjusted tax basis of its Claim when and to the extent Cash is actually distributed to such U.S. Holder. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. It is possible that the recognition of any loss realized by a U.S. Holder may be deferred until the reserve for Disputed Claims has made all payments to Holders of Disputed Claims. U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such Holders in respect of their Claims due to the receipt of cash in a taxable year subsequent to the taxable year in which the reserve is established. The discussion herein assumes that the installment method does not apply.

The timing of the inclusion of income may be subject to alteration for accrual method U.S. Holders that prepare "applicable financial statements" (as defined in Section 451 of the IRC), which may require the inclusion of income no later than the time such amounts are reflected on such financial statement.

### 5.5 CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF CLAIMS

The following discussion includes only certain U.S. federal income tax consequences of the payments to Non-U.S. Holders for Claims. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the payments to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the payment of a Claim and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

**5.5.1 Gain Recognition**. Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the exchange occurs or who otherwise meets the so-called "substantial presence test" under Section 7701(b)(3) of the IRC, or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or

exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's gains allocable to U.S. sources exceed losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

**5.5.2 <u>Accrued Interest</u>**. The United States generally imposes a 30% U.S. federal withholding tax on payments of interest to Non-U.S. Holders. Subject to the discussion below of interest effectively connected with the conduct of a trade or business within the United States, a Non-U.S. Holder will not be subject to the 30% U.S. federal withholding tax with respect to payments of interest, provided that:

i. it does not own, actually or constructively, 10% or more of the total combined voting power of all classes of stock entitled to vote;

ii. it is not a "controlled foreign corporation" with respect to which the Debtors are, directly or indirectly, a "related person"; and

iii. it provides its name and address, and certifies, under penalties of perjury, that it is not a U.S. person (on a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable form)), or it holds its notes through certain foreign intermediaries and the foreign intermediaries satisfy the certification requirements of applicable Treasury Regulations.

If you cannot satisfy the requirements described above, you will be subject to the 30% U.S. federal withholding tax with respect to payments of interest on the notes, unless you provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E or other applicable form claiming an exemption from or reduction in withholding under the benefit of an applicable U.S. income tax treaty.

If such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

**5.5.3 FATCA.** Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of interest on certain types of obligations. FATCA withholding may apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. U.S. Holders that hold Claims through foreign financial institutions and Non-U.S. Holders are encouraged to consult their tax advisors regarding the possible implications of these rules on their Claims.

### 5.6 INFORMATION REPORTING AND BACK-UP WITHHOLDING

Information reporting requirements may apply to payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

The Liquidation Trust, or the applicable agent, will withhold all amounts required by law to be withheld from payments under the Plan and comply with all applicable information reporting requirements.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE HOLDING COMPANY DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## VI. RISK FACTORS

**Holders of Claims or Interests should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before making a judgment with respect to voting to either accept or reject the Plan.**

### 6.1 CERTAIN BANKRUPTCY CONSIDERATIONS

Even if all Impaired voting classes vote to accept the Plan and the requirements for "cramdown" are met, the Bankruptcy Court may exercise substantial discretion and may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting holders of Claims or Interests may not be less than the value such holders would receive if the Holding Company Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Although the Holding Company Debtors believe that the Plan will meet such requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Any objection to the Plan by a member of a class of Claims or Interests could also prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

If the Plan is not confirmed or is confirmed but does not go effective, it is unclear what distribution, if any, holders of Allowed Claims ultimately would receive with respect to their Claims.

### 6.2 CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIBUTION

There can be no assurance that the estimated amounts of Claims and Interests set forth herein are correct, and the actual allowed amounts of Claims and Interests may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions, including, without limitation, that unanticipated proofs of claim are filed against the Estates prior to the Bar Dates and such Claims are either not subject to a valid objection by the Holding Company Debtors or such objections are overruled by the Bankruptcy Court. In particular, the Governmental Bar Date is December 2, 2026 and Governmental Units (including the IRS and the United States Department of Justice) may assert Claims in an amount that materially exceed the estimates set forth herein against the Holding Company Debtors, including Claims arising from the matters described in Section 2.4.11.

## VII. ADDITIONAL RISK FACTORS

**Recoveries Dependent on Litigation and on the DAMIS Debtors**. The Holding Company Debtors' Assets consist of Causes of Action, including against the DAMIS Debtors, Michael Shabsels, David Shabsels and other insiders. Such litigation is inherently uncertain, may take several years to resolve, may be subject to defenses (including the defenses available to subsequent transferees under section 550(b) of the Bankruptcy Code), and will be funded from the Liquidation Trust Expense Reserve and the Liquidation Trust Assets. The DAMIS Debtors are debtors in separately administered chapter 11 cases and any recovery from the DAMIS Debtors will depend upon the administration of their estates and the claims of their other creditors. No assurance can be given that holders of Beneficial Trust Interests will receive any distribution.

**Lender Deficiency Claim**. The Holding Company Debtors expect that Mishmeret will hold a Lender Deficiency Claim in Class 7 that substantially exceeds all other General Unsecured Claims against the Holding Company Debtors. The Lender Deficiency Claim will share pro rata in the Liquidation Trust Assets with other Allowed General Unsecured Claims (but not in the



54414475

Settlement Fund), and the amount of the Lender Deficiency Claim will depend upon the resolution of matters affecting the Camp Business Debtors, including the FIRPTA Motion, the Disputed Prepetition Secured Loan Claims (as defined in the Camp Business Plan) and the remaining Sale Transactions. Because the Lender Deficiency Claim is expected to account for a substantial portion of the aggregate dollar amount of Claims in Class 7, the vote cast on account of the Lender Deficiency Claim could determine whether Class 7 satisfies the dollar-amount requirement for acceptance of the Plan under section 1126(c) of the Bankruptcy Code (see Section 1.3).

**Intercompany Claims and Separate Plans**. The treatment of intercompany claims between the Holding Company Debtors and the Camp Business Debtors, and the allocation of Causes of Action against the DAMIS Debtors and the Shabsels between the Liquidation Trust and the liquidation trust established under the Camp Business Plan have not been finally determined as of the date hereof. The resolution of those matters could materially increase or decrease the Liquidation Trust Assets. Under Article IV.R of the Plan, all Claims and Causes of Action of the Holding Company Debtors against any other Debtor (including the Camp Business Debtors), any Affiliate, or any other related Entity are preserved and vest in the Liquidation Trust as Retained Causes of Action; however, the allowance, amount, priority, and collectability of such Claims in the Chapter 11 Cases of such other Debtors may affect the amount of Liquidation Trust Assets.

**The Characterization Dispute**. The Bankruptcy Court has not yet ruled on the Characterization Dispute described in Section 2.4.8. A determination that the OrcaFunding agreements constitute true sales of future receipts rather than disguised loans could affect the characterization and treatment of other MCA Loans and the amount of Allowed Claims in Classes 5 and 6.

**Subordinated Securities Claims and Israeli Proceedings**. The Plan subordinates and extinguishes Subordinated Securities Claims, including the claims asserted in the Israeli Securities Action, without any distribution. Recognition of such treatment outside the United States is not a condition to the Effective Date, and no assurance can be given that an Israeli court will recognize or enforce the Plan or the Confirmation Order. Continued prosecution of the Israeli Securities Action or related proceedings in Israel could require the Liquidation Trust to incur costs.

**Governmental Investigations and Tax Matters**. SIMAD Holdings Ltd. is the subject of the criminal and civil investigations described in Section 2.4.11, including a civil investigation by the SDNY-USAO seeking damages and penalties of approximately $43 million under the False Claims Act, and is the entity whose status as a foreign person gave rise to the FIRPTA withholding issues described in Section 2.4.10. The Holding Company Debtors cannot predict the outcome of those matters, which could result in Claims against one or more of the Holding Company Debtors, including Claims entitled to priority, require the Liquidation Trust to incur costs of cooperation, or otherwise affect the timing and amount of distributions.

**Settlement Fund**. Holders of Allowed General Unsecured Claims against the Holding Company Debtors are eligible to receive distributions from the Settlement Fund. The Settlement Fund is administered by the Committee Successor in its sole and absolute discretion and is not property of the Estates, and no assurance can be given as to the amount or timing of any distribution from it. The United States has appealed the 9019 Settlement Order; if the appeal is successful, the Settlement Fund and the other terms of the Settlement could be modified, vacated, or terminated.

**Dissolution of SIMAD Holdings Ltd.** SIMAD Holdings Ltd. is a British Virgin Islands company. Its dissolution and the winding up of its affairs following the Effective Date will be subject to the laws of the British Virgin Islands, which may impose requirements, costs or delays not contemplated by the Plan.

**Directors' and Officers' Insurance**. The Plan requires the Liquidation Trust to purchase a run-off or tail policy under the Holding Company Debtors' D&O Liability Insurance Policies with a term of not less than six years, on terms and limits no less favorable than under the current D&O Liability Insurance Policy, with the premium paid on or before the Effective Date. No assurance can be given as to the cost or availability of such coverage, and the cost of such coverage will reduce the amounts available for distribution.

## VIII. CONCLUSION

It is important that you exercise your right to vote on the Plan. It is the Holding Company Debtors' belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against and Interests in the Holding Company Debtors. In the opinion of the Holding Company Debtors, the Plan is preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than proposed under the Plan. Accordingly, the Holding Company Debtors recommend that holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan. The Creditors' Committee supports Confirmation of the Plan and recommends that holders of Disputed Unsecured MCA Claims (Class 6) and General Unsecured Claims (Class 7) vote to accept the Plan. A letter from the Creditors' Committee setting forth its recommendations is included in the Solicitation Package.

Dated: November 20, 2026

Respectfully Submitted,

The Holding Company Debtors and Debtors-in-Possession

By:

/s/ *Assaf Ravid*
Assaf Ravid
Chief Restructuring Officer

**Exhibit A**

**Chapter 11 Plan**

(Intentionally Omitted)

**Exhibit B**

**Organizational Chart**

# SIMAD Holdings Ltd. — Corporate Organizational Chart

Prepared for Bankruptcy Court Filing | District of New Jersey | All Debtor Entities

**Michael Shabsels**
Individual
*50% Owner*

**David Shabsels**
Individual
*50% Owner*

**SIMAD Holdings Ltd.**
British Virgin Islands
*Parent Entity*

**Intermediate SIMAD 1 LLC**
New York
*100% Owned*

**SIMAD Equities LLC**
New York
*100% Owned*

## 100% SIMAD Holdings (3)

| Entity | State | Camp | Ownership |
|---|---|---|---|
| Chateaugay Landco LLC | NY | *Chateaugay* | SIMAD: 100% |
| Chateaugay Campco LLC | NY | *Chateaugay* | SIMAD: 100% |
| Camp Med-O-Lark, Inc. | ME | *Med-o-Lark* | SIMAD: 100% |

## SIMAD Holdings 99% / DAMIS Holdings 1% (12)

| Entity | State | Camp | Ownership |
|---|---|---|---|
| IAFALANDCO, LLC | ME | *Indian Acres/Forest Acres* | SIMAD 99% \| DAMIS 1% |
| IAFAOPERATINGCO, LLC | ME | *Indian Acres/Forest Acres* | SIMAD 99% \| DAMIS 1% |
| Washington Lake, LLC | ME | *Med-o-Lark* | SIMAD 99% \| DAMIS 1% |
| Belgrade Lakes Summer Camps LLC | ME | *New England Golf* | SIMAD 99% \| DAMIS 1% |
| Poland Landco LLC | ME | *North Star* | SIMAD 99% \| DAMIS 1% |
| Poland Campco LLC | ME | *North Star* | SIMAD 99% \| DAMIS 1% |
| Pine Forest Campco LLC | PA | *Pine Forest* | SIMAD 99% \| DAMIS 1% |
| Pine Forest Landco LLC | PA | *Pine Forest* | SIMAD 99% \| DAMIS 1% |
| Waukeela Operatingco LLC | NH | *Waukeela* | SIMAD 99% \| DAMIS 1% |
| Waukeela Landco LLC | NH | *Waukeela* | SIMAD 99% \| DAMIS 1% |
| Wekeeland LLC | ME | *Wekeela* | SIMAD 99% \| DAMIS 1% |
| MaineWekeelaco, LLC | ME | *Wekeela* | SIMAD 99% \| DAMIS 1% |

## Other Ownership Composition (14)

| Entity | State | Camp | Ownership |
|---|---|---|---|
| Bluestar Operatingco, LLC | NC | *Blue Star* | SIMAD 70% \| S. Herschthal 15%, L. Popkin-Herschthal 15% |
| Bluestar Landco, LLC | NC | *Blue Star* | SIMAD 70% \| S. Herschthal 15%, L. Popkin-Herschthal 15% |
| Mesorahco LLC | NY | *Mesorah* | SIMAD 75% \| J. Stansky 25% |
| Mesorahland LLC | NY | *Mesorah* | SIMAD 75% \| J. Stansky 25% |
| Kiwi Operatingco LLC | NY | *Kiwi Country Day Camp* | SIMAD 62.5% \| I. Bellotto 18.75%, K. Bellotto 18.75% |
| Kiwi Landco LLC | NY | *Kiwi Country Day Camp* | SIMAD 50% \| I. Bellotto 25%, K. Bellotto 25% |
| Summit Camp, LLC | PA | *Summit* | SIMAD 51% \| Beton Holdings 49% |
| WM Camp, LLC | NH | *Windsor Mountain* | SIMAD 51% \| J. Labovitz 24.5%, K. Labovitz 24.5% |
| WM Land, LLC | NH | *Windsor Mountain* | SIMAD 51% \| J. Labovitz 24.5%, K. Labovitz 24.5% |
| Quadstar Realty LLC | NY | *Quadstar* | SIMAD 90% \| M. Sher 10% |
| One Canal Place Leasing LLC | LA | *One Canal Place* | SIMAD 90% \| E. Frankel 10% |
| One Canal Place Real Estate LLC | LA | *One Canal Place* | SIMAD 90% \| M. Sher 10% |
| Willow Lake Day Camps, LLC | NJ | *Willow Lake* | SIMAD 50% \| Willow Lake Day Camps, Inc. 50% |
| Willow Lake Land Corporation | NJ | *Willow Lake* | SIMAD 50% \| Willow Lake Day Camps, Inc. 50% |

## 100% SIMAD Equities (15)

| Entity | State | Camp | Ownership |
|---|---|---|---|
| Achim Operatingco LLC | NY | *Camp Achim* | SIMAD: 100% |
| Achim Landco LLC | NY | *Camp Achim* | SIMAD: 100% |
| BAHS Operating Inc. | PA | *Chen-a-Wanda* | SIMAD: 100% |
| BAHS Holdings LLC | PA | *Chen-a-Wanda* | SIMAD: 100% |
| Mill Road Landco LLC | NJ | *Eagles Landing* | SIMAD: 100% |
| Eagle's Landing Day Camp LLC | NJ | *Eagles Landing* | SIMAD: 100% |
| Shab Operating Inc. | NY | *Echo* | SIMAD: 100% |
| Shab Holdings LLC | NY | *Echo* | SIMAD: 100% |
| Greenvilleland LLC | NY | *Greenvilleland* | SIMAD: 100% |
| Malka Operatingco LLC | NY | *Greenvilleland* | SIMAD: 100% |
| Mogenavco LLC | NY | *Mogen Av* | SIMAD: 100% |
| Mogenavland LLC | NY | *Mogen Av* | SIMAD: 100% |
| Mohawkcampco LLC | NY | *Mohawk* | SIMAD: 100% |
| Mohawkland LLC | NY | *Mohawk* | SIMAD: 100% |
| Mohawk Country Day School, Inc. | NY | *Mohawk Country Day School* | SIMAD: 100% |

## SIMAD Equities 99% / DAMIS Holdings 1% (10)

| Entity | State | Camp | Ownership |
|---|---|---|---|
| Country Roads Landco LLC | NJ | *Country Roads* | SIMAD 99% \| DAMIS 1% |
| Country Roads Operatingco LLC | NJ | *Country Roads* | SIMAD 99% \| DAMIS 1% |
| Island Lake Landco LLC | PA | *Island Lake* | SIMAD 99% \| DAMIS 1% |
| Island Lake Campco LLC | PA | *Island Lake* | SIMAD 99% \| DAMIS 1% |
| Lavco LLC | PA | *Lavi* | SIMAD 99% \| DAMIS 1% |
| Lavland LLC | PA | *Lavi* | SIMAD 99% \| DAMIS 1% |
| Meadowbrook Operatingco LLC | NJ | *Meadowbrook* | SIMAD 99% \| DAMIS 1% |
| Meadowbrook Landco LLC | NJ | *Meadowbrook* | SIMAD 99% \| DAMIS 1% |
| Rolling Hills Landco LLC | NJ | *Rolling Hills* | SIMAD 99% \| DAMIS 1% |
| Rolling Hills Operatingco LLC | NJ | *Rolling Hills* | SIMAD 99% \| DAMIS 1% |

## Other Ownership Composition (7)

| Entity | State | Camp | Ownership |
|---|---|---|---|
| Banner Landco LLC | IL | *Banner Day Camp* | SIMAD 90% \| S. Kotelov 10% |
| Banner Operatingco LLC | IL | *Banner Day Camp* | SIMAD 90% \| S. Kotelov 10% |
| Club Getaway Operatingco, LLC | CT | *Club Getaway* | SIMAD 80% \| D. Schreiber 20% |
| Club Getaway Landco, LLC | CT | *Club Getaway* | SIMAD 80% \| D. Schreiber 20% |
| Green Lane Landco, LLC | PA | *Green Lane* | SIMAD 51% \| J. Freedman 24.5%, A. Weiner 24.5% |
| Green Lane Operatingco, LLC | PA | *Green Lane* | SIMAD 51% \| J. Freedman 24.5%, A. Weiner 24.5% |
| RDM Camps, LLC | NY | *Lokanda* | SIMAD 75% \| R. Gabbay 25% |

[Yellow box] = Non-filing entity (Kiwi Landco LLC; Willow Lake Day Camps, LLC; Willow Lake Land Corporation)

* References to "SIMAD" in the left branch refer to SIMAD Holdings Ltd.

** References to "SIMAD" in the right branch refer to SIMAD Equities LLC.

Note: "DAMIS" means and refers to DAMIS Holdings LLC, a separately administered debtor affiliate, pending under the case caption *In re DAMIS Holdings LLC,* Case No. 26-16439 (CMG) (Bankr. D.N.J.).

**Exhibit C**

**Liquidation Analysis**

**[TO COME]**